**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS <br><br> and <br><br> DUVALL'S SCHOOL OF COSMETOLOGY, L.L.C., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION <br><br> and <br><br> MIGUEL CARDONA, in his official capacity as Secretary of the U.S. Department of Education, <br><br> Defendants. | Case Number:  4:23-cv-1267 |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**INTRODUCTION**

1.      This is an action to forestall the third iteration of a twice-failed regulation that is a product of the government's contempt for the proprietary education industry, promulgated without regard for what the agency's openly flawed data say or how many socially beneficial small businesses will close, under the guise of addressing a problem that those most harmed by the regulation do not cause.

2.      Plaintiffs, the American Association of Cosmetology Schools ("AACS") and DuVall's School of Cosmetology, L.L.C. ("DuVall," and collectively, "Plaintiffs"), bring this action to challenge the latest attempt by the United States Department of Education

("Department") and its Secretary, Miguel Cardona ("Secretary," and collectively, "Defendants") to impose arbitrary, capricious, and unconstitutional new requirements on institutions of higher learning which, at minimum, threaten institutions' ability to recruit new students and—with respect to schools like DuVall and other AACS members—jeopardize their very existence.

3.      The new requirements in question are the Defendants' Financial Value Transparency and Gainful Employment final rules published on October 10, 2023, 88 Fed. Reg. 70004 ("Final Rule").  The Final Rule marks the Department's third attempt to manufacture grounds for dismissing institutions like DuVall from participation in federal student aid ("FSA") programs created under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070-1099d ("Title IV"), based on data concerning the purported income earned by graduates of a given program at a given institution, as compared against median graduate debt and median salaries of high school graduates in the institution's state (or, in some instances, in the entire country).  Although the Department's two prior attempts at similar "gainful employment" rules were repudiated by other federal courts, the Defendants have doubled down in the Final Rule by promulgating the strictest, most difficult-to-satisfy "gainful employment" standards to date while, at the same time, removing classic procedural safeguards, granting irreconcilable exemptions to certain schools/locales, and acknowledging that their data are flawed (but doing nothing about it).

4.      The Final Rule purports to "address ongoing concerns about educational programs" that allegedly leave students "with unaffordable amounts of student loan debt in relation to their earnings, or with no gain in earnings compared to others with no more than a high school education."  DuVall and the AACS's other member schools are not the sources of these "ongoing concerns," if they exist at all.  For decades, these schools have satisfied every debt metric and performance test that the Defendants have thrown at them, often performing better than not-for-

profit colleges.  Cosmetology and esthetics graduates from DuVall and other AACS schools enter the workforce with minimal loan burdens.  According to the Department's College Scorecard website, the median monthly student loan payment for a DuVall graduate is $84 per month—less than the average monthly cell phone bill in the U.S.[1]—while each person who completes one of its two academic programs gains a marketable skill and career pathways that he, or more often <u>she</u>, did not previously have.  But even if the Defendants' "ongoing concerns" were valid, the Final Rule does not address them in a rational way.

5.      The Final Rule purports to measure a program graduate's ability to repay debt through a debt-to-earnings ratio ("D/E Rate").  This metric is flawed from inception.  The Final Rule calculates the median income of program graduates (or "completers") based on information that Defendants admit is inaccurate, and then compares those inaccurate data to the completers' median debt to produce the D/E Rate.  Because the D/E Rate rests on income numbers that Defendants know are incorrect, the D/E Rate has no validity as a measure of a completer's ability to repay a loan.  Worse still, Defendants have eliminated any ability to appeal the admittedly flawed earnings data or to allow DuVall and other institutions to present more accurate evidence of the earnings of their completers.

6.      The Final Rule also purports to measure "the economic boost a [Title IV-funded] program provides to its students" through an "Earnings Premium" or "EP."  The EP compares the completers' median reported income against the median income of swaths of the population who hold only a high school diploma and who have no formal post-secondary education degree.  Yet this metric is flawed from inception as well.  As with the D/E Rate, the completer income inputs

---

[1]  *See* CNBC, Cut your cell phone bill up to 50% with these 4 tips, available at https://www.cnbc.com/select/how-to-cut-your-cell-phone-bill-costs/ (Nov. 14, 2023, accessed Dec. 22, 2023).

for the EP are inaccurate in ways that are known to, and openly acknowledged by, Defendants. Moreover, the comparison that the EP purports to achieve between those who took a given Title IV, FSA program and those who did not is false because the individuals whose income the EP uses for comparison are not similarly situated to the program completers whose income is being evaluated. The EP therefore produces an "apples to oranges" comparison, not an accurate assessment of whether a given program has "boosted" a completer's earnings above the high school graduate level. Furthermore, the methodology used to calculate the EP includes the earnings for all completers of a program (even those confirming they are not seeking employment, whose earnings would be zero), whereas the calculation for the high school graduate earnings threshold (against which completers' earnings are compared) excludes those opting out of the workforce or pursuing non-traditional occupational paths. In short, both the D/E Rate and the EP are arbitrary and capricious.

7.      The consequences of this misconceived Final Rule are dramatic. Depending on each institution's business model, a school whose completers do not attain a D/E Rate or Earnings Premium that complies with the Final Rule will be unconstitutionally forced to provide factually inaccurate warnings or, worse, their "failing" programs will be terminated from all Title IV, FSA participation altogether. Ultimately, if a critical mass of programs at an institution is terminated, the institution itself will lose Title IV, FSA eligibility and, likely, cease operations entirely.

8.      To be sure, the Defendants will measure D/E Rates and Earnings Premiums for all for-profit and not-for-profit institutions. However, the Final Rule specially targets private, for-profit institutions and not-for-profit institutions that offer one-year (or longer) certificate programs or programs leading to other non-degree recognized credentials. Those targeted groups must send controversial and potentially untrue warnings to students and face termination from Title IV, FSA

programs if they fail to meet the Defendants' unlawful standards.  Meanwhile, the Final Rule exempts Ivy League and other "traditional" non-profit and public institutions from the worst of such consequences even if their D/E Rate or EP metrics under the Final Rule are no better.  The upshot of this regulatory overreach is to penalize the underprivileged.  Cosmetology schools, and in particular, small, family-owned institutions like DuVall, will bear the brunt of the harm caused by the Final Rule, even though these schools do not cause the problems that the Final Rule purports to address.  That harm, in turn, will disproportionately affect persons in historically disadvantaged groups who simply want to learn the skills necessary to practice their desired profession.

9.      Briefly summarized, in promulgating the Final Rule, Defendants failed to articulate satisfactory explanations and rational grounds for disregarding myriad failures in the data underlying their new regulations; cherry-picked obviously biased research to support their campaign; failed to justify their change in position from existing regulations; ignored without justification non-economic benefits associated with post-secondary education; treated certain academic programs differently on irrational and unconstitutional grounds; based the Final Rule on unexplained, flawed assumptions; and failed to account for pandemic-related effects on income. The Final Rule also restrains administrative law judges from exercising discretion granted to them by statute and existing regulations; imposes unconstitutional restraints on speech; unconstitutionally compels speech; and deprives institutions of constitutionally protected due process rights.  The Final Rule must be set aside as arbitrary, capricious, in excess of statutory authority, and unconstitutional.

## PARTIES

10.     The American Association of Cosmetology Schools is a national, non-profit association open to accredited, proprietary schools of cosmetology arts and sciences.   Its membership is comprised of more than 290 school owners who, combined, operate more than 500

schools offering primarily cosmetology programs, but also smaller programs in skincare, esthetics, nail technician, barbering, make-up and massage training.  AACS's mission is to promote the interests of its members, their executives, faculty, administrators, students, and the employers for whom students are being trained and educated.

11.     AACS has one or more members that are, and will be, adversely affected by the regulatory action challenged in this lawsuit.  AACS members will face additional regulatory burdens and compliance costs and, by Defendants' own admission, many of their programs are almost certain to fail the D/E Rate and/or Earnings Premium calculations set forth in the Final Rule, thus subjecting such members to requirements to provide warnings to prospective students and to termination from Title IV, FSA programs.  All of this will lead to the closure of a significant percentage of AACS's member schools (at least 50.4 percent according to Defendants' own projections).  The interests for which AACS advocates are germane to its purpose of protecting private career schools, such as DuVall.  In addition to representing its member schools, AACS offers information and resources to its members about new teaching methods, industry events, and federal regulatory updates.

12.     DuVall's School of Cosmetology, L.L.C. is a limited liability company organized and formed under the laws of the State of Texas, and whose principal place of business is located at 201 Harwood Road, Suite 218, Bedford, Tarrant County, Texas 76021.

13.     DuVall is a member of AACS.

14.     The United States Department of Education is an executive department of the United States responsible for, *inter alia*, overseeing the provision of grants and loans to students enrolled at institutions of higher learning and improving the management and efficiency of federal education activities, especially with respect to the process, procedures, and administrative

structures for the dispersal of federal funds in connection with educational issues.  *See, e.g.*, 20 U.S.C. §§ 1070, 1087a, 3402(6).  As such, it is subject to the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1).

15.     Miguel Cardona is the Secretary of Education and the cabinet-level official responsible for the administration of the Department.  Plaintiffs sue the Secretary solely in his official capacity.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331, as this matter arises under the laws of the United States, specifically the United States Constitution, First and Fifth Amendments; Administrative Procedure Act, 5 U.S.C. § 706; Title 20 of the United States Code, §§ 1070a-1099c, inclusive; Declaratory Judgment Act, 28 U.S.C. § 2201; and Title 34 of the Code of Federal Regulations, Parts 600 and 668.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A) because no real property is involved and a plaintiff, DuVall, resides in the Fort Worth Division of the Northern District of Texas.

## FACTUAL BACKGROUND

### DuVall's Programs, Students, and Participation in Title IV, FSA Programs

18.     DuVall was founded in 2006 by three women who shared a motivation to invest their energies into providing an institution for others to learn, be inspired, and prepare for a profession in the beauty industry.

19.     DuVall has been family-owned since its founding.

20.     DuVall offers only two programs:  cosmetology and esthetics (i.e., skincare).  If either of its cosmetology or esthetics programs were terminated from Title IV, FSA programs, the school would be forced to close.  Students who complete either of DuVall's programs often go on

to work as professional stylists, hair and make-up artists, salon owners or managers, estheticians, skincare specialists, or spa trainers, among other careers.

21.     DuVall operates a single campus location in Bedford, Texas.  At this campus, students learn, train, and practice cosmetology and/or esthetic services on actual customers under the supervision of instructors who are licensed professionals in their fields.

22.     DuVall is licensed to operate in the State of Texas by the Texas Department of Licensing and Regulation ("TDLR").  TDLR sets the minimum requirements for cosmetologists to qualify for licensure in Texas, including the minimum number of academic clock hours that students must attend at DuVall and other cosmetology and barbering schools in the State.  As a condition of its license, DuVall must offer certain curriculum and meet or exceed TDLR's standards, as set forth in Texas state regulations.

23.     DuVall meets the requirements prescribed by the Department to participate in Title IV, FSA programs, including, *inter alia*, accreditation and state licensure.

24.     DuVall is accredited by the National Accrediting Commission of Career Arts and Sciences ("NACCAS").  NACCAS is an institutional accreditor recognized by the Department to accredit institutions of higher education, such as DuVall.  NACCAS sets academic and administrative standards that must be met by all institutions that it accredits.

25.     DuVall supports its campus and students with a full-time staffed support office that handles matters relating to financial aid and admissions, and that assists students with obtaining licensure and with their job searches.

26.     In 2022, DuVall enrolled 21 students in its cosmetology program and 91 students in its esthetics program.

27.     In 2023, DuVall enrolled 32 students in its cosmetology program and 69 students

in its esthetics program.

28.     As of December 1, 2023, 22 students were enrolled in DuVall's cosmetology program, and 41 students were enrolled in its esthetics program.  Generally, DuVall's enrollment is roughly consistent with these numbers.

29.     DuVall's student body is demographically and economically diverse.  It consists of women, persons of color, persons belonging to historically disadvantaged groups, and other diverse individuals.  Currently, 99 percent of DuVall students are women.  69 percent identify as black, indigenous, or as a person of color.  DuVall students likewise tend to be those who lack financial resources or face other life-long economic challenges and who do not come from economically privileged backgrounds.  In both 2022 and 2023, more than 50 percent of DuVall's students received Pell Grants, which are grants set aside by the Department for economically disadvantaged individuals.  Thus, for, 17 years, DuVall has offered a vital path forward for thousands of marginalized individuals—students who have no realistic opportunity of attending a traditional four-year institution of higher education—to improve their lives and the lives of their families by attaining a marketable skill that renders them productive members of society.

30.     Most students at DuVall (i.e., non-transfer students) who complete the cosmetology program select a full-time schedule, which allows the students to complete 1,000 hours of instruction within approximately 29 weeks.  The total program cost for the full cosmetology program is $17,525.  This includes a $50 application fee, books and kit ($2,975), and tuition ($14,500).

31.     Most students at DuVall (i.e., non-transfer students) who complete the esthetics program select a full-time schedule, which allows the students to complete 750 hours of instruction within approximately 22 weeks.  The total program cost for the full esthetics program is $13,220.

This includes a $50 application fee, books and kit ($1,770), and tuition ($11,400).

32.    The median loan debt for a person who completes one of DuVall's two academic programs is $7,917.

33.    While the cost of a student's books and kit has increased since 2020, DuVall has not raised tuition since 2020.  The increase in cost for books and kit is primarily due to higher charges from vendors and growing shipping costs.

34.    According to the Department's College Navigator website, for students who began their studies in Fall of 2021 and returned in Fall of 2022, DuVall's retention rate for full-time students is 80 percent, and its retention rate for part-time students is 67 percent.  Both numbers exceed the national average.  According to the Department's National Center for Education Statistics, for Fall of 2021, the average retention rate in the United States (based on 4,937 institutions, including public and not-for-profit schools) was 75.6 percent for full-time students, and the average retention rate for part-time students (based on 2,954 institutions, including public and not-for-profit schools) was 45 percent.  That DuVall beats the national average in student retention shows that its students view their educational experiences as worthwhile and valuable.

35.    According to NACCAS, 68.18 percent of students who complete their program of study at DuVall go on to work in a career field related to their academic program.  Historically, DuVall has seen a 100% licensure rate for its graduates who sit for the full licensure exam applicable to their field.

36.    In order to assist students with paying the costs of attendance, DuVall participates in Title IV, FSA programs.  As with other non-profit and for-profit institutions of higher learning, DuVall students may use Pell Grants and direct federal loans as well as other sources of funding (e.g., cash on hand, private loans, scholarships) to finance their educations.

37.     DuVall has participated in Title IV, FSA loan programs since 2009. Its initial application to participate in the Title IV, FSA programs was approved on August 14, 2009, and it has been eligible to participate in those programs without interruption since that date.

38.     As with every other institution that receives Title IV, FSA funds from its students, DuVall participates in the Title IV, FSA programs through a program participation agreement ("PPA"). DuVall's PPA authorizes DuVall to receive Title IV, FSA funds through June 30, 2029.

39.     In a typical year, the majority of students at DuVall rely in whole or in part on Title IV, FSA funds to pay for their educations. For example, in 2023, 51 percent of DuVall students received Pell Grants. That same year, 62 percent of DuVall students were awarded Title IV, FSA loans.

40.     In 2022, Title IV, FSA funds paid to DuVall on behalf of its students represented 67.56 percent of DuVall's revenue.

41.     Based on the past five award years (2018-22), for 2023, DuVall estimates that Title IV, FSA funds paid to DuVall on behalf of its students will have represented 67.5 percent of DuVall's revenue.

42.     Without student access to Title IV, FSA funds, DuVall would not have sufficient revenue to fund its operations and would cease to operate.

43.     DuVall employs 16 people, including 11 faculty.

44.     The Department's College Navigator system shows that, of the students who borrowed Title IV, FSA funds, completed a program of study at DuVall, and began repayment of their loans in 2019, **96 percent** of students were **not** in default on their loans.

45.     Other AACS members share characteristics with DuVall. The vast majority of students attending other AACS member institutions receive some form of Title IV, FSA funding

to cover the costs of their educations.  Women and persons of color comprise a large segment of the students at each AACS member institution.

46.     Recent data indicate that the median debt for a graduate of an AACS member institution is approximately $8,900.

47.     Ownership of AACS member institutions is not spread among large, corporate organizations.  To the contrary, individuals and families make up a significant percentage of the owners of AACS member institutions, including many women and persons of color.  Furthermore, based on U.S. Small Business Administration and Census definitions, 99 percent of the entities comprising AACS's membership are small businesses.  Approximately 75 percent of cosmetology schools accredited by NACCAS operate out of a single campus, including DuVall.

48.     AACS's member institutions, like DuVall, rely heavily on Title IV, FSA funds to operate and stay in business.

49.     In an article dated May 18, 2023, the Associated Press estimated that nearly two-thirds of cosmetology certificate programs at for-profit colleges would lose federal funding under the Department's Final Rule.  Plaintiffs' analysis—which concludes that 65.9 percent of cosmetology and personal grooming programs at proprietary institutions will fail to meet either the D/E Rate tests or Earnings Premium test—is consistent with the Associated Press's finding. Even the Department's own analysis indicates that at least 50.4 percent of cosmetology and personal grooming-related programs at proprietary institutions (and similar non-degree programs at not-for-profit institutions) will not pass the Final Rule's standards.  By all accounts, at least a majority of AACS's other members would cease business operations if the Department deems their academic programs ineligible to receive Title IV, FSA funds under the Final Rule.

### Underreporting of Income in the Cosmetology and Esthetics Industries

50.     In order to calculate completers' D/E Rates and to ascertain the median income for

measuring completers' Earnings Premium, the Final Rule requires the Department to obtain earnings data from a "Federal agency with earnings data."  This may include the Internal Revenue Service, Social Security Administration, the Department of Health and Human Services ("HHS"), and the Census Bureau (collectively, "Data-Providing Agencies").  88 Fed. Reg. 70186.

51.     Data-Providing Agencies are known to undercount the income of self-employed individuals, and in particular, self-employed individuals for whom cash is a significant portion of their earnings.

52.     Data-Providing Agencies are also known to undercount the income of individuals who receive significant portions of their income in the form of gratuities, particularly when those gratuities are paid with cash.

53.     Data-Providing Agencies undercount earnings because they generally rely on the individuals receiving such earnings to self-report their earnings accurately.  Such individuals, however, have a tendency to underreport such income in order to reduce their federal and state tax liabilities.  In addition, self-reporting places a material record-keeping burden on the individuals receiving such income.  Notwithstanding laws requiring accurate reporting of self-employment and gratuity income, as a group, individuals receiving such income tend to underreport it, either because of a lack of accurate records or in order to reduce their tax liability.  The extent of this underreporting is well-known to Data-Providing Agencies and is subject to reasonable quantification and, thus, capable of being adjusted and accounted for with respect to any metric that purports to compare the earnings of persons receiving cash wages and/or tips with the earnings of persons who do not receive cash wages and/or tips.

54.     Despite the successful outcomes for many completers of cosmetology or esthetics programs offered by DuVall and other AACS members, underreporting of income by completers

is a known problem that complicates, if not makes impossible, the accurate computation of income actually realized by completers.

55.    Because they are gratuity-driven industries, a substantial portion of every cosmetologist/esthetician's income is derived from tips.  Even with advances in payment methodologies, tips for cosmetology- or esthetics-driven work are often not reasonably traceable because they may be paid in, *inter alia*, cash or through third-party services (e.g., Venmo, PayPal) which do not necessarily associate the tip with any work that a cosmetologist/esthetician performed and which are not reported to the cosmetologist/esthetician's employer.

56.    Industry-wide, income derived through work in the fields of cosmetology or esthetics is underreported by 20 percent or more.  Even the Defendants admit that completers of cosmetology and esthetics programs understate their income by at least eight percent as a result of "tip underreporting."

57.    As a result of underreporting, unless they make adjustments for known data shortfalls, Data-Providing Agencies do not have, and will be unable to provide, accurate reports to the Department of the earnings completers actually realized from their cosmetology/esthetician services.

58.    By their own admission, Defendants were aware of underreporting in the cosmetology and esthetics industries during the entirety of the rulemaking proceedings leading up to the Final Rule.

### History of Gainful Employment Regulation

59.    For purposes of Title IV, a "proprietary institution of higher education" is neither a public nor a nonprofit institution and includes, *inter alia*, "a school that … provides an eligible program of training to prepare students for gainful employment in a recognized occupation," among other requirements not at issue here.  20 U.S.C. §§ 1001(a)(4), 1002(b)(1)(A)(i) & (C).

60.     In contrast, the Higher Education Act of 1965, as amended ("HEA"), generally does not explicitly require public or not-for-profit institutions to "prepare students for gainful employment in a recognized occupation" in order to qualify as institutions of higher education for purposes of Title IV.  *See* 20 U.S.C. § 1001(a).  However, to the extent a public or not-for-profit institution offers "at least a one-academic-year training program that leads to a certificate, or other nondegree recognized credential," such a program must also "prepare[ ] students for gainful employment in a recognized occupation."  34 C.F.R. § 668.8(c)(3).

61.     As a result of the difference in statutory and regulatory language, academic programs at for-profit institutions of higher learning, as well as programs at public or not-for-profit schools that lead to a certificate or to a non-degree recognized credential, are known in the industry and regulatory space as "Gainful Employment Programs" or "GE Programs."

62.     The phrase "gainful employment in a recognized occupation" first appeared in the original Higher Education Act of 1965.  *See* Pub. L. No. 89-329, § 461 (1965).  Congress has never defined "gainful employment."  For more than 40 years, the Department had no definition of the term nor did it use "gainful employment" as a metric for determining which institutions may participate in Title IV, FSA programs.

63.     However, in 2009, the Department began a rulemaking that ultimately resulted in the publication of a final rule in 2011, 76 Fed. Reg. 34386 (June 13, 2011) ("GE 1").  In GE 1, the Department attempted to determine if a GE Program led to "gainful employment" by using a debt-to-earnings measurement (similar to the D/E Rates at issue in this action) and a loan-repayment test.  *Id*. at 34,448.

64.     The U.S. District Court for the District of Columbia struck down GE 1 in *Association of Private Sector Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133 (D.D.C.

2012), noting that the Department's loan-repayment test was "not based upon any facts at all." The Department did not appeal the decision.

65.     Instead, the Department prepared an entirely new set of regulations, again purporting to interpret the "gainful employment" language in the HEA.  *See* 79 Fed. Reg. 64890 (Oct. 31, 2014) ("GE 2").

66.     In GE 2, the Department indicated that it would compare the median annual loan payment of a GE Program's recent graduates who received Title IV, FSA funding assistance to the higher of the mean or median annual earnings of those graduates as reported by the Social Security Administration ("SSA") to calculate an annual earnings rate and discretionary income rate.

67.     GE 2 included provisions that purported to allow institutions to supplant earnings data supplied by the SSA with alternative data on completers' earnings.  This was known as an alternate earnings appeal.  Such appeals had to be based on either (1) an institutional survey of nearly 100 percent of a GE Program's graduates, or (2) a state-sponsored data system.  *AACS v. DeVos*, 258 F. Supp. 3d 50, 55 (D.D.C. 2017).

68.     The U.S. District Court for the District of Columbia invalidated GE 2 as it applied to AACS member schools, finding that the Department's "rigid use of SSA data to calculate D/E rates" was arbitrary and capricious and that the Department could not "enforce the numerical survey requirements currently in effect for alternate earnings appeals."  *Id*. at 76.

69.     Rather than address the flaws in GE 2 that the district court identified, in 2019, the Department withdrew GE 2 entirely, noting:

> [T]he GE [2] regulations rel[ied] on a debt-to-earnings (D/E) rates formula that is fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs, fails to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes, fails to provide transparency regarding

> program-level debt and earnings outcomes for all academic
> programs, and wrongfully targets some academic programs and
> institutions while ignoring other programs that may result in lesser
> outcomes and higher student debt.

84 Fed. Reg. 31392, 31392 (July 1, 2019) ("2019 Rule").

### **Defendants' Third Attempt to Regulate "Gainful Employment"**

70.     Defendants published the Final Rule—their third attempt at defining and regulating

"gainful employment"—on October 10, 2023.

71.     The Final Rule applies, *inter alia*, to all GE Programs, including all Title IV, FSA-

supported programs that DuVall and AACS member schools offer.

72.     The provisions of the Final Rule relevant to this Complaint rely on two separate

metrics:  D/E Rates and Earnings Premiums.  D/E Rates are further subdivided into annual debt-

to-earnings rates ("Annual D/E Rate") and discretionary debt-to-earnings rates ("Discretionary

D/E Rate").  Under the Final Rule, the Department will calculate each program's D/E Rates and

Earnings Premium on an annual basis.

73.     A program's Discretionary D/E Rate equals "annual loan payment [divided by] (the

median annual earnings [minus] (1.5 [times] the single-person Poverty Guideline, as published by

HHS))."  88 Fed. Reg. at 70185-89.  Broken down:

   a.   Annual loan payment equals the median loan debt of all completers who completed

        the program during a two-to-four-year "cohort period," amortized over a 10-, 15-,

        or 20-year repayment period, utilizing an average annual interest rate based on the

        interest rate applicable to Federal Direct Unsubsidized Loans.

   b.   Median annual earnings are taken from Data-Providing Agencies and include "the

        most currently available median annual earnings of the students who completed the

        program during the cohort period."

     c. Debts and earnings for certain outlier completers (e.g., completers who have died, completers who subsequently finished a higher-credentialed degree program, completers enrolled in an approved prison education program) are excluded from the calculation.

74. A program's Annual D/E Rate equals "annual loan payment [divided by] the median annual earnings." 88 Fed. Reg. at 70189. The calculation is the same as the Discretionary D/E Rate, except that the federal Poverty Guideline is not subtracted from the denominator of the fraction. *Id*.

75. Under the Final Rule, a program satisfies the D/E Rates tests if its Discretionary D/E Rate is less than or equal to 20 percent, its Annual D/E Rate is less than or equal to eight percent, or the value of the "D" and "E" are both zero. *Id*. at 70188.

76. A program fails the D/E Rates test if its Discretionary D/E Rate is greater than 20 percent (or if the "E" is negative or zero and the "D" is positive) and its Annual D/E Rate is greater than eight percent (or if the "E" is zero and the "D" is positive). *Id*.

77. The Department calculates a program's Earnings Premium "by determining whether the median annual earnings of the students who completed the program exceed the earnings threshold." 88 Fed. Reg. at 70189-90. Broken down:

     a. Median annual earnings are taken from Data-Providing Agencies and include "the most currently available median annual earnings of the students who completed the program during the cohort period."

     b. The "earnings threshold" equals "the median earnings for working adults aged 25-34, who either worked during the year or indicated they were unemployed (i.e., not employed but looking for and available to work) when interviewed, with only a

high school diploma (or recognized equivalent) … in the State in which the

institution is located[,] or … [n]ationally, if fewer than 50 percent of the students

in the program are from the State where the institution is located, or if the institution

is a foreign institution."

    c.    Earnings for certain outlier completers (*see supra* at ¶ 73(c)) are excluded from the

calculation.

78.    A program passes the Earnings Premium test if "the median annual earnings of the

students who completed the program exceed the earnings threshold."  A program fails the Earnings

Premium test if "the median annual earnings of the students who completed the program are equal

to or less than the earnings threshold."  *Id*. at 70188.

79.    The consequences for failing either of the D/E Rate tests or the Earnings Premium

test are dire.  If, in any single year, an institution's GE Program fails either the D/E Rate tests or

the Earnings Premium test, the institution must provide "a warning with respect to [the] GE

program to students and prospective students …."  88 Fed. Reg. at 70193.  The warning must, *inter

alia*, state that the GE Program "has not passed standards established by the [Department] based

on the amounts students borrow for enrollment in the program and their reported earnings," state

that the program "could lose access to Federal grants and loans," and present students and

prospective students with various contingencies and options as detailed in the Final Rule.

80.    Worse, any GE Program that fails either of the D/E Rates tests in two out of any

three consecutive years *or* fails the Earnings Premium test in two out of any three consecutive

years becomes ineligible "and its participation in the [T]itle IV, HEA programs ends upon the

earliest of" three events:  (1) the Department's issuance of a new Eligibility and Certification

Approval Report ("ECAR") that does not include that program; (2) the completion of a termination

action initiated by the Department under 34 C.F.R. Part 668, Subpart G ("Subpart G"); or (3) if applicable, a revocation of program eligibility if the institution is provisionally certified under a provisional program participation agreement ("PPPA").  88 Fed. Reg. at 70192.  In other words, with respect to the failing program, the institution loses all access to Title IV, FSA grants and loans.  Current students are forced to either quit the program or pay for it using alternative sources of funding, while prospective students must look elsewhere for the educational program they want.

81.     In the case of an institution which offers no more than one or two GE Programs—such as DuVall and many of AACS's other member schools—the loss of Title IV, FSA funding for any program is devastating to the institution's finances.  In such cases, the institution will be unable to operate and will go out of business almost immediately.

82.     Under the Final Rule, an institution whose GE Program the Department deems to have failed either the D/E Rate tests or the Earnings Premium test has no right to appeal or be heard before it is forced to send warnings to students and prospective students.

83.     Under the Final Rule, an institution whose GE Program the Department deems to have failed either the D/E Rate tests or the Earnings Premium test for two out of any three consecutive years, and whose participation in Title IV, FSA programs is ended by the issuance of a new ECAR has no right to appeal or be heard before it loses access to Title IV, FSA funding for the failing program.

84.     Under the Final Rule, a provisionally certified institution whose GE Program the Department deems to have failed either the D/E Rate tests or the Earnings Premium test for two out of any three consecutive years, and whose participation in Title IV, FSA programs is ended by a revocation of program eligibility, has no right to appeal or be heard before it loses access to Title IV, FSA funding for the failing GE Program.

85.     Under the Final Rule, an institution whose GE Program the Department deems to have failed either the D/E Rate tests or the Earnings Premium test for two out of any three consecutive years, and whose participation in Title IV, FSA programs is ended by the completion of a Subpart G termination proceeding is limited to challenging the Department's "calculation of the program's D/E rates … or the earnings premium measure …."  88 Fed. Reg. at 70192.  Based on the plain language of the Final Rule, if (and only if) the Department initiates a Subpart G termination proceeding, the institution may challenge only the Department's computation of the D/E Rates and/or Earnings Premium; it has no right to challenge the accuracy of the data that the Department relied upon.

86.     With respect to terminations based on failing the D/E Rate tests or the Earnings Premium test, the Final Rule eliminates all discretion that the hearing official presiding over a Subpart G termination proceeding would otherwise have had.  A "hearing official must terminate the program's eligibility unless the hearing official concludes that the Secretary erred in the applicable calculation."  88 Fed. Reg. at 70188.

87.     Under the Final Rule, each year, the Department will calculate D/E Rates and Earnings Premiums for all Title IV, FSA-eligible programs—including all programs at for-profit, public, and private not-for-profit institutions—unless fewer than 30 students complete the program during the applicable two- to four-year cohort period or the Data-Providing Agencies fail to provide the necessary data.  88 Fed. Reg. at 70187-89.  The D/E Rates and Earnings Premium calculations will be posted on a website maintained by the Department, and institutions are required to provide current and prospective students with the relevant information to access the website.  *Id.*

88.     Despite  the  fact  that  the  Department  will  calculate  D/E  Rates  and  Earnings

Premiums for *all* post-secondary Title IV, FSA-eligible programs with more than 30 completers, and notwithstanding Defendants' claim that such tests "denot[e] a threshold level of performance below which the program may have adverse financial consequences to students," the Final Rule imposes no significant consequences on undergraduate programs at public or private not-for-profit institutions whose programs fail the D/E Rate tests or the Earnings Premium test.  In other words, if a GE Program at a for-profit institution fails either the D/E Rate tests or Earnings Premium test, in addition to the warnings the institution must give and the potential termination of that GE Program, any prospective student who wants to enroll in that GE Program will first have to provide an "acknowledgement" that he or she viewed information on the Department's website about the "failing" GE Program.   On the other hand, undergraduate programs at not-for-profit, private colleges and public universities with failing D/E Rates or Earnings Premium results are explicitly exempted from this "acknowledgement" requirement and other penalties in the Final Rule.   88 Fed. Reg. at 70190.  The applicability of the Final Rule on not-for-profit institutions and for-profit institutions is may be summarized as:

| **Application of Gainful Employment Rule to Programs by Institution Type** | | | |
|---|---|---|---|
| **Type of Institution** | **Certificate Programs** Warnings required and are at risk of termination for failing D/E or EP? | **Undergraduate Degree Programs** Warnings required and are at risk of termination for failing D/E or EP? | **Graduate Degree Programs** Students must acknowledge viewing Department's GE website before enrolling in "failing" program? |
| Private, For Profit | Yes | Yes | Yes |
| Private, Non Profit | Yes | No | Yes |
| Public | Yes | No | Yes |

89.    The Final Rule imposes no consequences on for-profit institutions whose GE

Programs have fewer than 30 completers, even if those GE Programs would obviously fail the D/E Rate tests or the Earnings Premium test.

90.     The Final Rule exempts all programs located in Territories of the United States from the D/E Rate tests and the Earnings Premium test and all consequences (i.e., warnings, termination) flowing therefrom, irrespective of whether such programs are offered by not-for-profit or for-profit institutions, and irrespective of the data available to calculate D/E Rates for programs taught in U.S. Territories.

**Effective Date of the Final Rule and Other Regulations Accelerating its Effects**

91.     The listed effective date of the Final Rule is July 1, 2024.  According to a Fact Sheet published by Defendants, the first official D/E Rate and Earnings Premium metrics will be published in 2025, and the first year that GE Programs may become ineligible to participate in Title IV, FSA programs is 2026.

92.     Despite Defendants' estimations, and without regard to the injuries already caused by the Final Rule to date, the Final Rule will cause financial strain on institutions with GE Programs beginning in 2025.

93.     Pursuant to 34 C.F.R. § 668.15(a), for any institution to continue participating in Title IV, FSA programs, it must demonstrate that it is "financially responsible."

94.     On October 31, 2023, Defendants published their Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB) final regulations. 88 Fed. Reg. 74568 ("Financial Responsibility Rules").  The Financial Responsibility Rules will take effect on July 1, 2024.

95.     The new Financial Responsibility Rules incorporate the Final Rule and its "gainful employment" provisions (including the D/E Rate tests and Earnings Premium test).  Specifically, any institution that "receive[s] at least 50 percent of its title IV, HEA program funds in its most

recently completed fiscal year from [GE Programs] that are 'failing'" is automatically deemed to be not "financially responsible." *Id.* at 74703.

96.     If an institution is deemed to be not "financially responsible" for "failing" Defendants' "gainful employment" regulations, it must submit a letter of credit to the Department "for an amount … that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year." *Id.* at 74708.  Only by posting a letter of credit (or similar security) will a "failing" institution remain "financially responsible."

97.     Letters of credit impose significant financial pressures on institutions and tie up funds that could otherwise be used in furtherance of the institution's educational mission.  An institution required to post a letter of credit worth half of the Title IV, FSA funds that it received in the preceding year is at substantial risk of closure.

98.     As a result of the Financial Responsibility Rules, institutions face severe financial consequences and closure sooner than the Defendants claim.

**Established and Ongoing Injuries to DuVall and AACS Member Schools**

99.     DuVall, the AACS, and AACS's member schools have been, and will continue to be, damaged by the Final Rule.

100.     DuVall, the AACS, and AACS's member schools have already been compelled to expend funds to analyze the Final Rule and to prepare to comply with its provisions.

101.     If the Final Rule is not set aside, DuVall, the AACS, and AACS's member schools will suffer harm.  Defendants have already forecasted that at least 50.4 percent of cosmetology and personal grooming GE Programs will fail the D/E Rate tests and/or Earnings Premium test.  *See* 88 Fed. Reg. at 70139-40.  When considering only cosmetology and personal grooming programs at for-profit institutions, the percentage of schools that will fail to meet the D/E Rate and/or Earnings Premium metric jumps to 65.9 percent.  In its rulemaking comments, DuVall predicted

that it would fail the D/E Rate tests and/or Earnings Premium test. *See* Exhibit A (comment filed on behalf of DuVall preceding the Final Rule). At least 9 other institutions offering cosmetology-related GE Programs informed the Defendants that they would fail the D/E Rate tests and/or Earnings Premium test and face the penalties in the Final Rule.

102.    As a result of these projected failures, DuVall, the AACS, and AACS's member schools will be: (1) compelled to state controversial warnings to current and prospective students; (2) forced to eliminate their GE Programs, reduce student enrollment, and/or cease all business operations, all of which deprive the schools of revenue (and the AACS of dues); and/or (3) required to provide a letter of credit.

103.    The impending closures of the GE Programs offered by DuVall and other AACS member institutions will have a significant negative impact on the entire beauty and wellness education sector, including students, graduates, employees, local employers, and allied businesses. *See* Exhibit B (AACS's comment preceding the Final Rule).

### **Arbitrary and Capricious Flaws in the Rulemaking Process and Final Rule**

104.    The Final Rule and the rulemaking process that led to it are replete with arbitrary and capricious decisions by Defendants that are indicative of Defendants' failures to meaningfully grapple with problems raised by interested parties, conform the Final Rule to data, justify changes in the existing regulatory scheme, and support assumptions underlying the Final Rule.

105.    **Part-time workers:** Many students who wish to enroll in cosmetology or esthetics programs intend to work part-time after graduation. Comments filed during the rulemaking process indicated that a significant percentage of persons who complete a cosmetology or esthetics program work part-time after graduation. For some cosmetology schools, a majority of the completers work part-time. The nature of part-time employment means that part-time workers will earn less than full-time workers. Thus, comparing the earnings of part-time workers to full-

time workers, which the Earnings Premium does, results in an inaccurate comparison.  Similarly, for purposes of the D/E Rates calculation, holding workers who have voluntarily chosen part-time work to the same earnings standard as full-time workers is unjustifiable, arbitrary, and capricious.

106.   The Defendants were informed of the prevalence of part-time work among cosmetologists and estheticians during the rulemaking process leading up to the Final Rule.

107.   In the Final Rule, the Defendants "acknowledge that many workers may choose to pursue occupations with work schedules that suit their lives," and specifically referenced comments that "workers often choose fields such as cosmetology for their flexible work schedules."

108.   Under the HEA, a student's decision or intention to work part-time does not impact his or her eligibility to obtain Title IV, FSA grants or loans.

109.   Notwithstanding its acknowledgement of the comments concerning part-time work, the Defendants failed to substantively address the issue of part-time work and its prevalence in the cosmetology and esthetics industries vis-à-vis other career fields in which part-time work occurs less frequently.

110.   **Non-financial benefits:**  In the Final Rule's preamble, the Defendants wrote that post-secondary education "leads to myriad non-financial benefits including better health, job satisfaction, and overall happiness.  In addition, increasing the number of individuals with postsecondary education creates social benefits, including productivity spillovers from a better educated and more flexible workforce, increased civic participation, improvements in health and well-being for the next generation, and innumerable intangible benefits that elude quantification."

111.   Comments filed during the rulemaking process noted, consistent with the Defendants' statement, that the D/E Rates and Earnings Premium fail to capture the non-financial

benefits associated with completing a post-secondary program of study.

112.    In the Final Rule, the Defendants acknowledge the concerns that "[m]any commenters" raised concerning non-financial benefits associated with completing a post-secondary program of study.  However, the Defendants failed to substantively address this issue or provide a rational connection between the facts found (i.e., the non-economic value of post-secondary education) and choice made (limiting its "gainful employment" determination to purely economic factors).

113.    **Programs with fewer than 30 completers:**  Programs with fewer than 30 completers in a cohort are effectively exempted from the Final Rule because the Department will not calculate D/E Rates or Earnings Premiums for such programs.  The Defendants admit that only 26 percent of GE Programs would have a sufficient cohort size to measure D/E Rates and Earnings Premiums.  This means that the vast majority of GE Programs—74 percent or more—will not even have D/E Rates or EPs calculated and therefore will totally evade the regulatory restrictions applicable to GE Programs with 30 or more completers.  Thus, the vast majority of GE Programs will not even be subject to measures that Defendants claim are necessary to ensure that GE programs "lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans."  88 Fed. Reg. at 70008.  If the alleged problems posed by GE Programs—"very low earnings and unmanageable debt," *id*. at 70006—were true and as significant as the Defendants assert, then it is arbitrary and capricious to exempt three-quarters of such "problem" programs from the solution.

114.    The Defendants have access to data sufficient to allow them to calculate D/E Rates and Earnings Premiums for GE Programs with fewer than 30 completers.

115.    The Defendants claim that they exclude all GE Programs with fewer than 30

completers from D/E Rate and Earnings Premium calculations on the basis of ensuring student privacy.

116.     However, as Defendants admit, all earnings data obtained from any Data-Providing Agency are produced "in aggregate and not in individual form," 88 Fed. Reg. at 70190, thereby obviating any legitimate privacy concern.

117.     Defendants' reasons for effectively excluding GE Programs with fewer than 30 completers from the Final Rule, including but not limited to their privacy-based excuse, are not satisfactorily cogent to support their decision.

118.     The Defendants' decision effectively to exclude all GE Programs with fewer than 30 completers from the Final Rule lacks a rational connection between the facts found and the choice made.

119.     The Defendants failed to consider other options presented to them which would have resolved the Defendants' alleged privacy concerns while producing more comprehensive results that would have included GE Programs with fewer than 30 completers within the scope of the Final Rule.

120.     **Disregard of well-suited data and the cohort default rule:** Pursuant to 34 C.F.R. Part 668, Subpart N, every year the Department calculates a cohort default rate ("CDR") which measures the percentage of an institution's students who are in default on their student loans.

121.     By Defendants' own admission, "measuring the realized repayment rates of borrower cohorts from particular programs may provide valuable information on borrower outcomes." 88 Fed. Reg. at 70034.

122.     Metrics that measure debt repayment rates, such as the CDR, are objectively better suited to "assess[ing] whether program completers are able to afford their debt," 88 Fed. Reg. at

70050, than D/E Rates or Earnings Premiums.  This is especially true for schools, such as DuVall and other AACS member institutions, who offer only one or two GE Programs.

123.    Comments filed during the rulemaking process advocated the use of other metrics, such as the CDR and repayment rates, to "assess whether program completers are able to afford their debt."

124.    The Defendants rejected the proposed use of CDRs and repayment rates, despite their greater accuracy and better fit for fulfilling the purpose behind the Final Rule, without providing a reasoned basis for doing so.

125.    **Reliance upon data known to be inaccurate:**  With respect to GE Programs that lead to careers in which gratuities represent a significant portion of a completer's income, the Defendants rely on a study cited in the Final Rule admitting that tips are underreported by at least eight percent.   The Defendants also acknowledge a second study that found that tips are underreported by 60 percent.

126.    Despite admitting that, at some level, income is underreported by workers employed in gratuity-driven industries like cosmetology, the Defendants refused to make any adjustments to D/E Rate or Earnings Premium calculations for those industries and refused to consider other sources for earnings data.

127.    Defendants' bases for disregarding a known error with their data are arbitrary and capricious.

128.    First, Defendants rely upon a third study that, Defendants claim, establishes "just 4 percent of salons did not report tips for employees on W2s."  88 Fed. Reg. at 70042.  Defendants' interpretation does not accurately characterize the results of this study and is based on flawed, unsupported assumptions, including an assumption that salons that report tips on W2s capture *all*

tips (including cash), an assumption that salons that "report[ ] tips on the W2 for some employees" capture all reportable tips, and an assumption that the salons cited in the survey are representative of the workplaces of completers of GE Programs.

129.    Second, Defendants disregarded gratuity-related data errors on the basis that "individuals are legally required to report their income subject to Federal taxation."  88 Fed. Reg. at 70041.  That exact excuse was rejected in *AACS v. DeVos*.

130.    Third, Defendants assume without basis that more tips will be reported in an "increasingly digitized economy," and that records of digital transactions "expose[ ] would-be evaders to elevated risk of apprehension in the case of an audit."  Defendants cite no authorities, statistics, or research to support their claim.  Furthermore, Defendants assume (without support) that transactions using digital technology will adequately label funds derived from a completer's work (as opposed to, for example, reimbursement for a personal expense) and further assume (without support) that completers will actually report earnings that they accepted digitally.

131.    Fourth, Defendants claim that, pursuant to the American Rescue Plan Act ("ARPA"), third-party payment processing services will send any completer a 1099-K form when that completer took in more than $600 via the service's system.  Defendants' claim is factually untrue:  the IRS has delayed implementation of this provision of the ARPA until 2024, when the threshold for providing a 1099-K to a completer will be $5,000.  The $600 threshold will not go into effect, if ever, until 2025 at the earliest.  The Department will issue its first set of D/E Rate and Earnings Premium calculations before the cited ARPA provision takes effect.

132.    Fifth, Defendants fail to account for cash tips.  Though Defendants speculate that digitized tipping has increased, Defendants provide no research or factual support for their prediction.

133.    Sixth, Defendants argue that the Department relies on reported income to determine Pell Grant eligibility and to prepare income-driven repayment plans.  88 Fed. Reg. at 70041. Defendants' use of flawed data for one purpose is not a reasoned basis for using the same data for another purpose.  Flawed data are flawed data.

134.    All earnings-related data that the Department may use to calculate D/E Rates and Earnings Premiums under the Final Rule must be provided by Data-Providing Agencies.  Such data include *only* reported income.  The Final Rule provides no alternative method or source for obtaining earnings-related data or measuring the actual (i.e., reported and unreported) income of completers.

135.    Defendants claim that the "Department's experience with the earnings appeal process also cautions against making accommodations for the possibility of income underreporting."  With respect to cosmetology and esthetic programs, Defendants' claim is factually impossible.  As noted in *AACS v. DeVos*, the alternate earnings appeal process in GE 2 was utterly infeasible for cosmetology schools to complete—a point that led to the invalidation of GE 2 as to AACS's member institutions.  Defendants have no significant "experience with the earnings appeal process" for institutions like DuVall and other AACS members.

136.    The Department failed to consider alternatives to ignoring income underreporting, including but not limited to the use of an adjustment factor to earnings data supplied by Data-Providing Agencies to account for the known and accepted phenomenon that between eight and 60 percent of gratuities are unreported.

137.    **Exemption of U.S. Territories:**  Citing the unavailability of reliable data, the Department exempted all U.S. Territories and freely associated states from all consequences flowing from D/E Rate and Earnings Premium calculations.  Institutions in U.S. Territories with

GE Programs face no penalties (such as the provision of warnings or termination from Title IV, FSA programs) no matter what their D/E Rates and Earnings Premiums are.

138.     The Defendants' decision to exempt all GE Programs in U.S. Territories from most "gainful employment" regulations on the basis of data quality is utterly irreconcilable with the Defendants' decision to enforce all "gainful employment" regulations against GE Programs located on the U.S. mainland despite the absence of reliable earnings data for completers of cosmetology and esthetics programs.

139.     The Final Rule contains no comparison of the severity of data gaps related to the earnings of Puerto Ricans (or citizens in other U.S. Territories) versus the data gaps related to the actual earnings of cosmetologists and estheticians.  Thus, the Defendants have failed to set forth a reasoned basis for accepting earnings data for mainland cosmetologists/estheticians while rejecting earnings data for residents of Puerto Rico, the U.S. Virgin Islands, and other Territories.

140.     **Failure to justify changes to existing regulations:**  As noted above, the Department withdrew GE 2 based on findings that its debt-to-earnings formula was fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs; it failed to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes; it failed to provide transparency regarding program-level debt and earnings outcomes for all academic programs; and it wrongfully targeted some academic programs and institutions while ignoring other programs that may result in lesser outcomes and higher student debt.

141.     As a result of, *inter alia*, successful court challenges, administrative delay, and the Department's withdrawal of GE 2, no provisions of any prior gainful employment rule have ever been enforced.  The Defendants have neither experience nor a historical record to serve as a basis

for altering the "gainful employment" regulations in the 2019 Rule.

142.    As noted above, upon information and belief, the Defendants have never completed an alternate earnings appeal for any GE Program, and in particular, have never completed an alternate earnings appeal process for a cosmetology or esthetics program.  As a result, the Defendants have neither experience nor a historical record to justify elimination of the alternate earnings appeal process first promulgated in GE 1 and also included in GE 2.

143.    The Final Rule fails to set forth reasoned bases for modifying the 2019 Rule or for altering provisions of GE 2 that offered protections to GE Programs, including but not limited to the alternate earnings appeal.

144.    **Arbitrary comparisons between completers and high school graduates:**  When calculating the Earnings Premium, the Final Rule directs the Department to compare the median earnings of completers of GE Programs with the median earnings for working adults aged 25-34, who either worked during the year or indicated they were unemployed but looking for work.

145.    During the rulemaking process, commenters identified material issues that will adversely affect the reasonableness and accuracy of this comparison, including but not limited to differences in earnings among persons in varying demographics, differences in urban versus rural earnings, differences in earnings among varying career fields (e.g., first-year cosmetologists versus 15-year electricians), and differences among high school graduates relating to non-degree post-secondary courses they may have taken (e.g., "boot camp" courses, vocational training, audited courses).

146.    In the Final Rule, the Defendants admit that the foregoing factors affect an individual's earnings.  As an example, more than 50 percent of states have a 20 percent or higher variability between earnings in metropolitan areas and earnings in rural areas.

147.    The Department possesses and/or has access to sufficient data to calculate D/E Rates and Earnings Premiums by race, sex, and population density.

148.    While acknowledging these comments, the Defendants failed to examine relevant data accurately and failed to articulate satisfactory explanations for refusing to account for the complicating factors that commenters identified.

149.    **Assumptions concerning alternative GE Programs:**  As part of the basis for the Final Rule, Defendants estimated the "short-term alternative options that are available to students that might, in the absence of these regulations, enroll in failing programs."  88 Fed. Reg. at 70145. Defendants' analysis is flawed as a result of its exclusion of GE Programs with fewer than 30 completers.

150.    Defendants claim, *inter alia*, "More than 90 percent of students have at least one transfer option within the same geographic area and credential level when the field is broadened to include programs [in a related field]."

151.    However, as noted above, D/E Rates and Earnings Premiums are not evaluated for 74 percent of GE Programs as a result of the Defendants' arbitrary and capricious decision to exempt GE Programs with fewer than 30 completers from most "gainful employment" regulations.

152.    Because 74 percent of GE Programs are not evaluated for their D/E Rates and Earnings Premiums, the Department has no way of knowing whether most alternative institutions would satisfy its "gainful employment" criteria or produce a financial outcome that the Defendants deem acceptable.  Furthermore, the Department does not know whether such locations even have the capacity to take on students who are leaving (or avoiding) GE Programs that fail under the Final Rule.  Thus, the Defendants' estimates of alternatives of "non-failing" programs available to students are mere conjecture.

153.   **Refusal to account for pandemic-related drop-offs in earnings:**   During rulemaking, commenters informed Defendants that the coronavirus pandemic caused unique and detrimental effects to persons working in the beauty industry, "including the closure of salons and spas, the reluctance of clients to return, and the difficulty service providers experienced in reestablishing clientele." *See, e.g.*, 88 Fed. Reg. at 70091-92.

154.   Despite "acknowledge[ing] that the COVID-19 pandemic likely affected the earnings of workers in salons, spas, [and] the beauty industry," the Department made no adjustment to its method for calculating the earnings of completers in the cosmetology or esthetics industries.

155.   The Department's first set of D/E Rate calculations and Earnings Premium calculations will include cohorts of completers whose earnings were adversely affected by the coronavirus pandemic.

156.   Defendants failed to provide a reasoned justification for refusing to adjust the D/E Rate and Earnings Premium formulae as a result of the coronavirus pandemic.

157.   **Cosmetology programs are not the source of any problem:**  The Final Rule purports to target GE Programs with "very low earnings and unmanageable debt."  However, because of their low costs, cosmetology programs do not result in "unmanageable debt," as Defendants allege in the Final Rule.

158.   As an example, according to the Department's own data from 2019, 96 percent of DuVall graduates repay their student loans.  DuVall consistently complies with Defendants' cohort default regulations and meets or exceeds Defendants' CDR standards.

159.   Even though cosmetology programs at proprietary institutions produce some of the lowest debt loads among GE Programs, the impact of the Final Rule on cosmetology programs

dwarfs all other industries.  Based on Defendants' own data and status indicators, 65.9 percent of cosmetology and personal grooming GE Programs at proprietary institutions will fail to meet either the D/E Rate tests or Earnings Premium test.  The next closest GE program—Allied Health (medical assisting) at proprietary institutions—will suffer only a 42.0 percent failure rate which, while obviously significant, is less severe than the effect on cosmetology GE Programs.

160.     During rulemaking, Defendants were informed that cosmetology and esthetic programs do not cause the "very low earnings and unmanageable debt" that the Final Rule purportedly addresses, in part because the earnings data the Department intends to use to calculate D/E Rates and Earnings Premiums are grievously flawed.  *See, e.g.*, Exhibit B (AACS's comment preceding the Final Rule).  AACS informed Defendants that the earnings data in the Final Rule "fails to account for tip income under-reporting, independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates."   Additionally, AACS informed Defendants that graduates of AACS member institutions have low levels of student debt, with an average median loan debt of $8,900 and average loan payments of $59.  However, Defendants refused to adjust the Final Rule to account for these realities.  *See* 88 Fed. Reg. at 70042.

161.     As a result, Defendants failed to draw a rational connection between the choice made and the evidence before them.

## CAUSES OF ACTION

### Count I:  Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))

162.     Plaintiffs incorporate all of the foregoing paragraphs as if restated here.

163.     This Court must enjoin agency action that is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law.  5 U.S.C. § 706(2).  The Final Rule is final agency action subject to judicial review in accordance with 5 U.S.C. § 704.

164.    An agency acts arbitrarily and/or capriciously if it fails to examine relevant data, does not articulate a satisfactory explanation for an action, and/or lacks a rational connection between the facts found and the choice made.  An agency acts arbitrarily and capriciously if it entirely fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  If an agency changes its position with respect to a matter it previously considered, the agency must adequately explain the reason for the change in policy.

165.    As detailed above, in promulgating the Final Rule, Defendants acted arbitrarily and capriciously by ignoring part-time workers, failing to consider non-financial benefits, exempting GE Programs with fewer than 30 completers and GE Programs in U.S. Territories, disregarding cohort default rates and other germane data, relying upon earnings data known to be false, failing to justify changes to existing regulations, drawing comparisons between completers and high school graduates despite overwhelming demographic and other differences, making unsupported assumptions about alternative programs in which students could enroll and other matters, and refusing to adjust for pandemic-related downturns in earnings for cosmetologists/estheticians.

**Count II:  Agency Action Not in Accordance with Law, in Excess of Statutory Authority, and Without Observance of Procedure Required by Law (5 U.S.C. § 706(2)(A), (C), (D))**

166.    Plaintiffs incorporate all of the foregoing paragraphs as if restated here.

167.    This Court must enjoin agency action that is not in accordance with law, in excess of statutory authority, or without observance of procedure required by law.  5 U.S.C., § 706(2). The Final Rule is final agency action subject to judicial review in accordance with 5 U.S.C. § 704.

168.    Under the HEA, an institution's participation in a Title IV, FSA program cannot lawfully be ended without advance notice and an opportunity for a hearing.  Pursuant to 20 U.S.C.

§ 1094(c)(1)(F), the Secretary must prescribe regulations for the "termination of the participation in any [Title IV, HEA Program] of an eligible institution … whenever the Secretary has determined, after reasonable notice and opportunity for hearing, that such institution has violated or failed to carry out any provision of [subchapter IV of chapter 28 of Title 20, U.S.C.], any regulation prescribed under this subchapter, or any applicable special arrangement, agreement, or limitation …."

169.   The Secretary has prescribed regulations governing limitation and termination proceedings, which include regulations that set forth the procedures for pre-termination hearings and the authority of the official who presides over such hearings. *See* 34 C.F.R. §§ 668.81-668.100 ("Subpart G").

170.   Pursuant to the Department's regulations, a hearing official must "take[ ] all necessary steps to conduct a fair and impartial hearing."  34 C.F.R. § 668.90(a).

171.   Pursuant to the HEA and the Due Process Clause, any pre-termination hearing must grant an institution a reasonable opportunity to be heard.

172.   The Final Rule deprives institutions of a reasonable opportunity to be heard and of the hearing procedures in Subpart G.

173.   If the Department determines that a GE Program failed either the D/E Rates test or the Earnings Premium test and the Department issues a new ECAR that does not include that GE Program, under the plain language of the Final Rule, the institution's GE Program is immediately terminated with no reasonable notice and opportunity for a hearing.  *See* 88 Fed. Reg. at 70192. The Final Rule therefore strips institutions of their statutory right to a reasonable Subpart G pre-termination hearing.

174.   If the Department determines that a GE Program failed either the D/E Rates test or

the Earnings Premium test and the Department initiates a termination action under Subpart G, the hearing official is prevented from granting the institution a reasonable opportunity to be heard and is restricted from taking all necessary steps to conduct a fair and impartial hearing.  Instead, the Final Rule commands the hearing official to determine *only* whether the Department "erred in the applicable calculation."  88 Fed. Reg. at 70188.  In other words, the hearing is limited to correcting errors in arithmetic.  The institution is barred from presenting, and the hearing official is barred from considering, evidence that the earnings data fed into the Department's calculation was flawed or alternative evidence of, *inter alia*, its completers' earnings.  The Final Rule therefore strips institutions of their statutory right to a reasonable Subpart G pre-termination hearing conducted in accordance with the Department's longstanding hearing procedures and divests hearing officials of their discretion to ensure a fair and impartial hearing.

175.    No matter which of the three methods the Defendants use to terminate a GE Program from participation in Title IV, FSA programs, each violates the institution's statutory and constitutional right to a reasonable opportunity to be heard.  Thus, the termination provisions of the Final Rule are not in accordance with law, were issued in excess of statutory authority, and fail to observe procedure required by law.

### Count III:  Agency Action Not in Accordance with Law and Contrary to Constitutional Right (5 U.S.C. § 706(2)(B))

176.    Plaintiffs incorporate all of the foregoing paragraphs as if restated here.

177.    The Final Rule is final agency action subject to judicial review in accordance with 5 U.S.C. § 704.

#### Unconstitutional Restrictions on Speech

178.    The Final Rule imposes unconstitutional restrictions on speech, unconstitutionally compels speech, violates constitutional equal protection guarantees, and eliminates institutions'

constitutional due process rights.

179.    "Gainful employment" regulations apply only to for-profit private institutions and not-for-profit institutions that offer one-year (or longer) non-degree certificate programs or other non-degree recognized credentials.  In contrast, and only as an example, under the Final Rule, four-year academic programs at not-for-profit institutions that grant degrees are not subject to certain "gainful employment" regulations such as the D/E Rates test or the Earnings Premium test.

180.    As the Department has already acknowledged, at least 50.4 percent of cosmetology and personal grooming GE Programs will fail the D/E Rate tests and/or Earnings Premium test. DuVall is among the institutions whose cosmetology and esthetics programs will fail, and—as DuVall represented to Defendants—DuVall will close as a result.  The Defendants acknowledge that other institutions offering GE Programs may close as a result of enforcement of the Final Rule. *See, e.g.*, 88 Fed. Reg. at 70086-87.

181.    The instruction imparted by DuVall and AACS members to their respective students is speech, the conveying and receipt of which is protected by the First Amendment. Because it will force the termination of educational programs and the closure of institutions of higher learning, the Final Rule is a restriction on the speech of institutions and their faculties.

182.    The Final Rule's restrictions on speech are not neutral with respect to the identity of the speaker.  Only for-profit institutions and not-for-profit institutions that offer one-year (or longer) non-degree certificate programs or programs leading to a recognized non-degree credential are subject to the Final Rule's termination provisions.  Furthermore, only speakers at institutions located in the U.S. mainland with GE Programs that have 30 or more completers may be affected by the Final Rule.

183.    The Final Rule's restrictions on speech are not neutral with respect to restrictions

on the content of speech.  The Final Rule restricts only vocational training offered by for-profit institutions and not-for-profit institutions with one-year (or longer) non-degree certificate programs or programs leading to a non-degree recognized credential.  As an example, the Final Rule does not impact communications made in a biology class at a four-year university, but it does restrict communications made in a vocational school's hair styling class.

184.    The Defendants' content-based, speaker-based impositions on speech do not serve a compelling governmental interest, nor are they the least restrictive means of serving any such interest.  As but one example, Defendants could measure completers' abilities to pay back FSA loans using cohort default rates or other data showing repayment rates.

185.    Even if the burdens upon on speech imposed by the Final Rule were content-neutral (and they are not), those restrictions do not serve a substantial governmental interest, are not narrowly tailored to serve any such interest and do not leave open ample channels for communication.

Unconstitutionally Compelled Speech

186.    Under the Final Rule, in the event that a GE Program offered by an institution like DuVall or another AACS member school fails Defendants' D/E Rates tests or Earnings Premium test in any singular year, Defendants will force that institution to issue "[a] warning … that … [t]he program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings" and that "[t]he program could lose access to Federal grants and loans based on the next calculated program metrics."  88 Fed. Reg. at 70193.

187.    Compelled speech must serve a compelling governmental interest and must be narrowly tailored to serve that interest.  The government lacks a compelling interest sufficient to support the Final Rule's mandatory warnings and the mandatory warnings are not narrowly

tailored to serve that interest.

188.   In the alternative, the government may not compel commercial speech unless it is purely factual and uncontroversial information about the (unwilling) speaker's services, so long as the disclosures are reasonably related to a legitimate governmental interest and are not unjustified or unduly burdensome.

189.   The information in Defendants' mandatory warnings is neither purely factual nor uncontroversial.

190.   With respect to whether the content of the warnings is purely factual, the Department's prescribed message is, at best, misleading to the reader.  As the administrative record makes clear, and as Defendants have admitted, persons engaged in certain professions fail to report their income accurately and fully.  Defendants' reference to "reported earnings" in the warning does not convert the representation into pure fact where Defendants have openly admitted that "reported earnings" are not factually accurate as to workers whose income is gratuity-driven.

191.   With respect to whether the content of the warnings is noncontroversial, the administrative record alone belies any claim that Defendants' prescribed warning is noncontroversial.   The Department received thousands of comments concerning the appropriateness of the D/E Rates, Earnings Premium, and data underlying those calculations, as well as the appropriateness of using such metrics to judge the merits of GE Programs.

192.   The speech compelled by Defendants' warnings is unjustified because the "standards established" by the Defendants are arbitrary and capricious.

<u>Equal Protection</u>

193.   Pursuant to the equal protection guarantee of the Fifth Amendment, similarly situated persons may not be treated differently by the federal government.

194.   DuVall, AACS member schools, and other entities are "persons" within the

- 42 -

meaning of the Fifth Amendment equal protection guarantee.

195.    DuVall and other AACS member schools are similarly situated to institutions offering GE Programs with fewer than 30 completers.

196.    DuVall and other AACS member schools are similarly situated to institutions located in U.S. Territories.

197.    DuVall and other AACS member schools are similarly situated to not-for-profit institutions, irrespective of whether such not-for-profit institutions offer one-year (or longer) non-degree certificate programs or other programs leading to a recognized non-degree credential.

198.    Pursuant to the Final Rule, the Department will measure the D/E Rates and Earnings Premiums for *all* institutions and *all* programs, irrespective of whether such programs are GE Programs, and irrespective of whether such programs are offered by a for-profit or not-for-profit institution.

199.    Despite the fact that GE Programs with fewer than 30 completers, or GE Programs located in U.S. Territories, would be just as likely to fail the D/E Rates tests or Earnings Premiums test, the Final Rule exempts such programs altogether but subjects mainland institutions whose GE Programs have 30 or more completers to all of the penalizing consequences in the Final Rule.

200.    Despite the fact that the Department will calculate D/E Rates and Earnings Premiums for all programs, and despite the Defendants' determination that it is "critical for students, families, and taxpayers alike to have accurate and transparent information about the possible financial consequences of their postsecondary program options," 88 Fed. Reg. at 70005, the Final Rule treats institutions with GE Programs differently.  Defendants will require warnings for—and eventually shut down—GE Programs that fail the D/E Rates tests or Earnings Premiums test, but Defendants will take no such action against non-GE Programs, even if the Defendants'

D/E Rates and Earnings Premiums calculations indicate that a non-GE Program would fail under the Final Rule.

201.    As indicated by the one-sided studies cited in the Final Rule, Defendants' refusal to invite cosmetology-affiliated stakeholders to negotiated rulemakings sessions, and the adverse effects that cosmetology and esthetics GE Programs will disproportionately suffer in comparison to other programs of study in other industries, the Final Rule treats DuVall and other AACS member schools differently out of a political animus and disfavor toward cosmetology and esthetics GE Programs.

202.    A bare desire to harm a politically unpopular group does not constitute a legitimate governmental interest.  The Final Rule unconstitutionally denies Plaintiffs the equal protection of the laws.

<u>Due Process</u>

203.    Under the Due Process Clause of the Fifth Amendment, Defendants may not deprive DuVall, the AACS, or AACS member schools of any property interest without first providing procedural due process in the form of adequate notice and a reasonable opportunity to be heard.

204.    DuVall and other AACS member schools have a legitimate and recognized property interest in their continued participation in Title IV, FSA programs.

205.    Defendants refused to include any procedures for challenging, supplementing, appealing, or correcting earnings data in the Final Rule, despite the fact that GE 1 and GE 2 both permitted alternate earnings appeals (even if flawed), and despite the fact that Defendants have already recognized flaws in earnings data that Data-Providing Agencies will provide.

206.    Defendants refused to include any procedures that would allow institutions facing termination from Title IV, FSA programs to be heard by the Department, Secretary, or an

administrative hearing official prior to termination.

207.   The Final Rule is unconstitutional due to these deprivations of due process.

## PRAYER FOR RELIEF

As a remedy to the arbitrary, capricious, unlawful, and unconstitutional Final Rule, Plaintiffs request the following relief:

    a.   A declaration, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the Final Rule is arbitrary, capricious, not in accordance with law, contrary to constitutional right, in excess of statutory authority, and/or without observance of procedure required by law;

    b.   A judgment holding unlawful, setting aside, and enjoining the enforcement of the Final Rule in its entirety, or, in the alternative, holding unlawful, setting aside, and enjoining the enforcement of the Final Rule as applied to DuVall, the AACS, and all AACS member schools; and

    c.   Any other relief that this Court deems just and proper.

Dated: December 22, 2023               Respectfully submitted,

                                     /s/ Joakim G. Soederbaum
                            Joakim G. Soederbaum (Texas Bar No. 24091338)
                            DUANE MORRIS LLP
                            777 Main Street, Suite 2790
                            Fort Worth, TX 76102
                            Telephone:  +1 817 704 1000
                            Fax:  +1 817 704 1001
                            JSoederbaum@duanemorris.com

                            John M. Simpson (admission application forthcoming, D.C. Bar No. 256412)
                            Drew T. Dorner (admission application forthcoming, D.C. Bar No. 1035125)
                            DUANE MORRIS LLP

901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone: +1 202 776 7800
Fax: +1 202 776 7801
JMSimpson@duanemorris.com
DTDorner@duanemorris.com

Edward M. Cramp (admission application
forthcoming, California Bar No. 212490)
DUANE MORRIS LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
EMCramp@duanemorris.com

*Attorneys for Plaintiffs*