# Exhibit B



*Via eRulemaking Portal at www.regulations.gov*

June 20, 2023

Hon. Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**Re:     Comment – American Association of Cosmetology Schools**
**        Docket ID ED-2023-OPE-0089**

Dear Secretary Cardona:

On behalf of the American Association of Cosmetology Schools ("AACS"), our member institutions and, most importantly, the tens of thousands of students that our specialized schools prepare annually for rewarding, professional careers in the multibillion-dollar beauty and wellness industry, we submit these comments in response to the above-referenced Notice of Proposed Rulemaking ("NPRM" or "Proposed Rule") regarding Financial Value Transparency, Gainful Employment ("GE"), Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit ("ATB").[1]

AACS is proud to represent a passionate, creative, unique, and diverse community, with characteristics that are valuable to both higher education and our economy. We have carried that message to the Department for over a decade now as it has sought to define two words - "gainful employment" - in the context of Title IV, Higher Education Act ("Title IV") program eligibility.

In 2014, we raised serious concerns with the Department regarding the then-Gainful Employment rule ("2014 GE Rule"),[2] specifically regarding the unreliability of graduate earnings data used to formulate and calculate Debt-to-Earnings ("D/E") rates. Unfortunately, our concerns have not been addressed. In fact, nearly all of the issues we raised in 2014 remain unresolved. Moreover, the Department has doubled down on the problematic aspects of the GE rule – including its dependence on unreliable earnings data – by removing the previous D/E alternate earnings appeal and adding a new, untested, stand-alone GE metric: the Earnings Premium ("EP") measure.

---

[1] Financial Value Transparency, Gainful Employment ("GE"), Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit ("ATB"), 88 Fed. Reg. 32300 (proposed May 19, 2023) (to be codified at 34 CFR 600, 668).

[2] This comment incorporates by reference AACS's public comments filed May 27, 2014, regarding Docket ID ED-2014-OPE-0039, *available at* regulations.gov.



It is our hope that before the Department promulgates a Final Rule, it will give close attention to the fact that AACS members:

- Are accredited institutions required to comply with rigorous placement, graduation and licensure passage rates (unlike community colleges, most private non-profit institutions, and unaccredited institutions), with an average graduation rate of 76 percent and an average job placement rate above 71 percent;
- Are predominately small institutions (with a median annual enrollment of 150 students per institution) operating as small businesses and run by families or individual owners (75 percent of our school owners have only one campus);
- Educate primarily women (who make up 90 percent of cosmetology program enrollment);[3]
- Provide education and training that allows graduates to have flexible work hours, start their own businesses, and support their families' climb up the economic ladder;
- Have an average annual tuition (for the longest program) of $15,953;
- Have program graduates with an average median debt of $8,900;
- Have program graduates with an average loan payment of $59/month;
- Are required to measure program length by state mandated clock hour minimums which vary from state to state;
- Have curriculum largely dictated by state educational and/or state cosmetology boards;
- Provide the training required by states for graduates to be state licensed to work as cosmetologists, barbers, hairstylists, skin care specialists, nail technicians, massage therapists, and related beauty and wellness occupations;
- Graduate 78 percent of the licensed workers needed to fill jobs at spas, salons and other personal services establishments;
- Support a beauty and wellness industry in the United States with an economic impact of at least $91 billion annually and that employs more than 2.3 million workers annually; and
- Educate students for in-demand occupations directly tied to the skills taught at our schools, including, but not limited to —
  - barbering, hair, and cosmetology specialists for whom employment demand is projected to grow by 11 percent (much faster than average) from 2021 to 2031;[4]
  - skin care specialists (estheticians) for whom employment demand is projected to grow 17 percent (much faster than average) from 2021 to 2031;[5]

---

[3] 88 Fed. Reg. at 32432 (stating that women comprise 90% of all cosmetology program enrollments).

[4] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook: Barbers, Hairstylists, and Cosmetologists (last modified Sept. 13, 2022), https://www.bls.gov/ooh/personal-care-and-service/barbers-hairstylists-and-cosmetologists.htm.

[5] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook: Skincare Specialists (last modified Sept. 13, 2022), https://www.bls.gov/ooh/personal-care-and-service/skincare-specialists.htm.



o   manicure and pedicure specialists for whom employment demand is projected to grow 22 percent (much faster than average) from 2021 to 2031;[6] and

o   massage therapists for whom employment demand is projected to grow 20 percent (much faster than average) from 2021 to 2031.[7]

Given the clear workforce need for our graduates and our strong student outcomes, AACS and its member schools are astonished that the Department would expend significant federal taxpayer resources to negotiate and publish a Proposed Rule that threatens to eliminate nearly 80 percent of cosmetology programs and 76 percent of enrollment in undergraduate certificate programs offered by our schools.[8] In doing so, the Department will effectively eliminate private, for-profit cosmetology programs as a choice for hundreds of thousands of students interested in working in the beauty and wellness industry.[9] Sadly, this would be the most significant impact of the Proposed Rule while not accomplishing *any* of the Department's stated goals.

*First*, as outlined in its Press Release, the Department states that its Proposed Rule is "part of the Administration's ongoing commitment to fixing a broken student loan system."[10]  In reality, the student loan system will not be "fixed" by eliminating up to 2/3 or more of enrollments in short-term, low-debt cosmetology certificate programs.[11] Graduate programs, not certificate programs,

---

[6] U.S. Bureau of Labor Statistics, Occupational Handbook: Manicurists and Pedicurists (last modified Oct. 4, 2022), https://www.bls.gov/ooh/personal-care-and-service/manicurists-and-pedicurists.htm

[7] U.S. Bureau of Labor Statistics, Occupational Handbook: Massage Therapists (last modified Oct. 6, 2022), https://www.bls.gov/ooh/healthcare/massage-therapists.htm?ref=nf.

[8] 88 Fed. Reg. at 32422 (Table 3.10 – 76% of undergraduate certificate programs by CIP covering cosmetology related programs would fail D/E or EP metric); *id.* at 32432 (Table 3.24).

[9] Michael Brickman, *Biden Doubles Down on 'Accountability' that Could Wipe Out Career Pathways* , Wash. Exam'r (Jun. 7, 2023), https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/biden-doubles-down-on-accountability-that-could-wipe-out-career-pathways; U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

[10] Press Release, U.S. Dep't of Educ., Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt (May 17, 2023), https://www.ed.gov/news/press-releases/department-education-releases-proposed-rules-accountability-certificate-and-profit-programs-and-transparency-unaffordable-student-debt.

[11] Katharine Meyer, *The Causes and Consequences of Graduate School Debt*, Brookings Inst. (Oct. 4, 2022), https://www.brookings.edu/blog/brown-center-chalkboard/2022/10/04/the-causes-and-consequences-of-graduate-school-debt/; 88 Fed. Reg. at 32427 (stating that 36.2% of cosmetology certificate programs fail GE, representing up to 2/3 of all cosmetology program enrollments); 88 Fed. Reg. at 32435 ("The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from 34 percent under the lowest threshold up to 66 percent under the highest threshold").



are the predominant source of ever-increasing student loan debt.[12] This rule eliminates primarily undergraduate certificate programs, the lowest source of student loan debt.[13]

*Second*, the Department states that the Proposed Rule delivers "on the Administration's promise to ensure quality and accountability in postsecondary education." In fact, the Proposed Rule will not ensure quality and accountability because it will allow most certificate GE programs offered at public and private non-profit institutions and non-GE programs to be exempt from any loss of Title IV participation, even though such exempt programs often lead to higher levels of debt and low earnings. The rule will exempt most community college and private non-profit certificate programs in the cosmetology field due to those institutions' low number of program graduates.[14] The proposed GE Rule lacks any rational basis because it measures neither quality nor accountability, since it leads to the closure of mostly of private, for-profit cosmetology programs that perform better than public and private non-profit options.

Based on data provided by the Department, certificate programs offered by private, for-profit schools have, on average, lower default rates[15] than comparable programs offered by public and private non-profit institutions, and low median debt.[16] It is misleading, therefore, for the Department to state that "[f]ailure rates are significantly lower for public certificate programs (4.3 percent of enrollment is in failing programs) than for proprietary (50 percent of enrollment is in failing programs) or non-profit (43.6 percent of enrollment is in failing programs) certificate programs" when a vast majority of private non-profit and public undergraduate certificate

---

[12] U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, One Year After a Bachelor's Degree: A Profile of 2015–16 Graduates , Table 5.1 (2020), https://nces.ed.gov/fastfacts/display.asp?id=900.

[13] U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, Digest of Education Statistics (2021), https://nces.ed.gov/fastfacts/display.asp?id=900; U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

[14] 88 Fed. Reg. at 32416 ("[GE rate calculation] [c]overage is typically higher in the proprietary sector—we are able to compute D/E or EP metrics for programs accounting for about 87.0 percent of enrollment in proprietary undergraduate certificate programs. Comparable rates are 61.5 percent and 21.4 percent of enrollment in the non-profit and public undergraduate certificate sectors, respectively"). Further, 50.8% of private, for-profit undergraduate certificate programs have measurable data, while only 12.4% of private non-profit and 4.7% of public undergraduate certificate programs have sufficient data to calculate D/E and EP rates. Lack of data is primarily based on 2 year and 4 year graduate cohorts not exceeding 30 graduates.

[15] *Id.* at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"); *id.* at 32425 ("The overall 3- year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools"). This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.

[16] 88 Fed. Reg. at 32402 (Table 1.8 states that average debt for private, for-profit undergraduate certificates is $8,857, which compares favorably with average debt for private, non-profit undergraduate certificate programs of $9,367).



programs are simply not large enough to be measured.[17] The Department further states that, "[a]cross all proprietary certificate and degree programs, 33.6 percent of enrollment is in programs that fail one of the two metrics, representing 22.1 percent of programs" but fails to adequately explain to the public the context: many private non-profit and public undergraduate programs are simply too small to measure.[18]

*Third*, the Department states that the Proposed Rule will "drive improvements in value at career training programs" by permitting institutions to "reform … programs to deliver better value to students." For AACS schools, the Proposed Rule will not allow program reform. Our programs are based on state-mandated minimum hours and curriculum, which cannot be changed significantly, have overlapping CIP codes, and are specialized in one industry.  The Proposed Rule is structured such that our schools cannot offer programs substantially similar to a failing program. Therefore, many of our schools will have to close if one or more significant programs loses Title IV eligibility, unlike most other institutions that can and do offer a wide variety of programs and can more easily shift program offerings.

*Fourth*, the Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt."  For cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[19] Further, cosmetology programs offered by these alternative institutions suffer from the same problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community colleges.[20]

---

[17] *Id.* at 32420-21.

[18] *Id.*

[19] *Id.* at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").

[20] *Id.* 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not large enough to be measured, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions to cosmetology programs offered at public and private non-



*Fifth*, the Department states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings … [or] online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[21] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training.[22] The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[23] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to take our place in supplying 78% of the graduates hired by employers.[24]

*Additionally*, the Department has proposed a number of further changes to regulations concerning financial responsibility, administrative capability, certifications procedures, and ATB programs that further harm our members. The proposed changes to financial responsibility and administrative capability convert the GE Rule from a programmatic eligibility metric to an institutional eligibility criteria by creating new standards that impose multiple letters of credit and other adverse consequences for failing the GE Rule for even one year.  Further, the Department proposes to eliminate the "150% rule" by which students could be eligible to participate in Title IV programs for up to 150% of the minimum clock hours required for licensure in the state in which they attend school or a neighboring state.  The proposed rule would restrict the hours to 100% of the hours in the state in which students are enrolled in a Title IV program, with limited exceptions for certain metropolitan areas.  These changes will harm students who rely on the additional program hours to guarantee license portability and access to short term programs that would otherwise not qualify them for student aid.

As a whole, the Proposed Rule is arbitrary, capricious, and illegal as applied to AACS schools. As a matter of policy, the Proposed Rule is also contrary to the interests of the very populations the White House and the Department seek to serve and promote: small businesses, diverse populations (our student bodies are composed of higher than average percentages of low-income

---

profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[21] *Id.* at 32434.

[22] Nor is distance learning permitted by state laws and accreditors who require hands on learning of this skill set.

[23] 88 Fed. Reg. at 32434.

[24] Qnity Inst., A Career in Pro Beauty: Compensation Study, Data & Insights (2023), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=216592.



[Pell Grant eligible], female, Black, Hispanic, Asian Pacific American, and LGBTQ+ individuals) and educational models that fill a clear workforce skills gap.

AACS remains committed to working with the Department to develop fair and equitable regulations that protect the integrity of the student loan program, increase accountability, provide clearer consumer disclosures and maintain access for underserved students. There are some aspects of the Proposed Rule that AACS can support, and we note them in our section-by-section comments attached to this cover letter, we strongly oppose proposals that would disproportionately and negatively impact AACS schools and the students they serve, unless and until the Department incorporates changes that address our specific concerns.

Lastly, it should be noted that on May 26, 2023, AACS formally requested an extension of the 30-day public comment period. The Proposed Rule covers six new areas of rulemaking. The GE proposal alone is estimated to result in 80% or more of undergraduate cosmetology certificate programs failing the GE Rule, likely leading to a large number of our member schools closing.[25] The stakes could not be higher -- the proposals represent an existential threat to our association, our school members, our current and future student career choices, employers reliant on our graduates, and the health of the beauty and wellness industry as a whole. The short comment period presents an undue burden on this small association and its predominantly small institution membership.  It has prejudiced our ability to fully respond to a rule that will disproportionately impact our programs. We reserve the right to object to additional aspects of the NPRM that may not be covered in this comment due to time and resource constraints.

Sincerely,

Cecil Kidd
Executive Director

---

[25] 88 Fed. Reg. at 32432 (Table 3.24).



**TABLE OF CONTENTS**

I.     **Executive Summary and Directed Requests**

II.    **General Response**

    A.     History of the GE Rule and Related Litigation

    B.     About AACS and AACS Schools

    C.     Department Bias

    D.     Data Flaws and Limitations

III.   **Section by Section Comments to Proposed Rule**

    A.     Financial Value Transparency

    B.     Gainful Employment

    C.     Financial Responsibility

    D.     Administrative Capability

    E.     Certification

    F.     Ability to Benefit

IV.    **Conclusion**



## I.      Executive Summary and Directed Requests

**Financial Value Transparency ("FVT")**: AACS supports the goal of increased transparency for *all* higher education programs through the Financial Value Transparency disclosure proposal. We cannot support the FVT disclosures for cosmetology-related programs, however, unless and until the unreliability of federal agency earnings data for our program graduates is addressed. Until then, the Department should not publish either D/E or EP rates for cosmetology programs or, in the alternative, should restore a fair and workable alternate earnings appeal to permit our schools to challenge earnings data prior to any D/E or EP disclosure for our programs.

**Gainful Employment ("GE")**: AACS strongly opposes the GE accountability framework that would lead to loss of Title IV program eligibility based on failure of either the EP or D/E metric. Unreliable federal agency earnings data renders these metrics unfair, arbitrary and illegal as applied to AACS member programs.

Directed Requests – FVT and GE:

1.      For both the FVT and GE regulations, for the D/E rate, we request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[26] or, in the alternative, cease publication of a Final Rule on Gainful Employment (Subpart S) until it conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates; and

2.      We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

**Financial Responsibility, Administrative Capability and Certification**:  Based on our opposition to the GE Rule, AACS opposes provisions of these proposed regulations that would have a disproportionate, punitive impact on our members by means of new provisions tied to GE program performance under the GE Rule. As a result of the projected number of failing GE programs for AACS member schools, any changes to the Financial Responsibility, Administrative Capability, or Certification regulations that penalize institutions for failing GE programs or require a proportion of non-failing GE programs will disproportionately and negatively impact our schools' ability to continue as Title IV certified institutions of higher education, and lead to institutional closures. We also oppose the Department's Certification proposal that would reduce Title IV eligible program length to 100% of a state's minimum training hours required for a state licensed occupation.

---

[26] *Am. Ass'n of Cosmetology Sch.'s v. DeVos*, 258 F. Supp. 3d 50, 63 (D.D.C. 2017).

9



**Ability to Benefit**: AACS supports the consensus rule but has recommendations on implementation of the Department's plan to verify compliance of career pathway programs to avoid disruption to current career pathway offerings by our member schools.

## II.   General Response

### A.   *History of the GE Rule and Related Litigation*

The Department has, for more than a decade, been attempting to regulate program eligibility by defining the terms "gainful employment" as used in the Higher Education Act of 1965, as amended ("HEA"). Over the course of three presidential administrations and in response to legal actions, the Department has frequently changed its definition of the term. At some times, it has used the GE Rule as a program eligibility threshold. At other times, it has rejected that and chosen instead to rely on it only as a disclosure to provide additional information to students. In the current version, the Department has pivoted again. The rule has become a political football. The Department now proposes to use the GE Rule to gauge *institutional* eligibility by tying the metric to certification, administrative capability and financial responsibility standards, the violation of any of which could lead to immediate loss of Title IV participation. The result has been a checkered history of interpretation, with frequent and dramatic changes to the agency's interpretation of statutory language that is untied to congressional intent or authority and devoid of reasoned based rulemaking.

After the Department published its first GE Rule in 2010-11 (the "2011 GE Rule"), the Association of Private Sector Colleges and Universities ("APSCU") brought a successful action to vacate the 2011 GE Rule's debt-measuring, reporting and disclosure, and program approval provisions.[27] Much of the case focused on the Department's two metrics for measuring whether programs led to "gainful employment": debt-to-income tests (comparing student loan debt to both "disposable income" and annual salary), and a debt repayment rate (based on the percentage of students who had completed the program and who were current on their student loans). Under the debt-to-income test, a program would not meet its standard if graduates' loan payments exceeded 30 percent of their disposable income and 12 percent of annual earnings. With respect to the debt repayment rate, a GE program would fail that standard unless 35 percent or more of program graduates were current on their student loans. The debt repayment rate standard was based on a finding that approximately one quarter of proprietary programs could not meet the 35 percent benchmark.

Reviewing the Department's justification for these metrics, the court found that while the Department had shown a "rational connection" between the facts before it (namely, expert testimony, studies, and industry standards) and the debt-to-income tests, the debt repayment rate standard was "not based upon any facts at all."[28] The Department cited no expert studies or industry standards to support its decision to set the required debt repayment rate at 35 percent.

---

[27] *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 144 (D.D.C. 2012) ("APSCU 2012").

[28] *Id.* at 154.



Rather, the Department "merely … pick[ed]" a number that, in its opinion, would not jeopardize too many schools' participation in the Title IV programs, but would not be so weak as to appear overly lenient.[29]   The court held that this "was not reasoned decision making," particularly because the Department's "explanation could be used to justify any [debt repayment] rate …."[30] Because the debt repayment rate was crucial to most other provisions of the 2011 GE Rule, the court struck down nearly every part of it.[31]

In 2014, the Department tried again (the "2014 GE Rule").  This time it was met with challenges in federal district courts in New York and the District of Columbia.[32]  Under the 2014 GE Rule, the Department abandoned a debt repayment standard; instead, it relied exclusively on debt-to-income tests similar to the 2011 GE Rule.  While both courts upheld the 2014 GE Rule, the decisions cited the importance of using the best available data; the need fully respond to commenters' concerns about data underlying its regulatory actions; and the importance of avoiding "unproven metrics" to determine program eligibility.[33]

The 2014 GE rule was not without faults, however, and was partially vacated following a 2017 Administrative Procedure Act ("APA") challenge by AACS.[34]  Pursuant to the 2014 GE rule, the Department's presumptive source of income data was from the Social Security Administration ("SSA"), which relies on individuals to accurately report their income.  In *AACS vs. DeVos*, the plaintiff established that workers in certain industries, such as cosmetology, are often self-employed, paid partially or entirely in cash, receive high levels of unreported or underreported tip income, and frequently under-report their total income.[35]  As a result, for cosmetology schools, the SSA's data are not accurate for the debt-to-income tests, a fact that the court noted the Department had admitted.[36]

During the comment period for the 2014 GE Rule, several commenters raised this issue, but the Department refused to adopt other proposed data sources (e.g., Bureau of Labor Statistics surveys).  It instead defended its use on two grounds:  first, that there are civil and criminal penalties for under-reporting income and, second, that the 2014 GE rule's "alternate earnings appeal" process gave the cosmetology schools an opportunity to provide other data to use in lieu of the SSA data—specifically, "state-sponsored" earnings data or school-administered surveys of

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 158.

[32] *See* Ass'n of Proprietary Colls. v. Duncan, 107 F. Supp. 3d 332 (S.D.N.Y. 2015); Ass'n of Private Sector Colls. & Univs. v. Duncan, 110 F. Supp. 3d 176 (D.D.C. 2015) ("APSCU II").

[33] *Ass'n of Proprietary Colls. v. Duncan* at 368; *APSCU II* at 176, 195.

[34] Am. Ass'n of Cosmetology Sch.'s. v. DeVos, 258 F. Supp. 3d 50 (D.D.C. 2017) ("AACS").

[35] *AACS* at 59-60.

[36] *Id.* at 71.



all, or very nearly all, of a program's graduates.[37]  Commenters, however, had explained to the Department that many states do not have "state-sponsored" earnings data and that "it is difficult to gather accurate earnings data for self-employed, heavily cash-earning individuals" that would satisfy the Department's 100-percent survey response rate requirement.[38]

The court sided with AACS, noting that the Department had "never explained how it came up with survey-response or state-based data requirements."[39]  The court held that the Department had assumed that cosmetology programs "would be able to effectively use the alternate-earnings appeal process," but it failed to affirmatively justify that assumption.[40]  The court also pointed out the Department's flawed reliance on civil and criminal penalties for under-reporting income, given that those penalties "existed before and after the [2014 GE rule] took effect, and the DOE regulations did not add any additional deterrent for under-reporting."[41]  While the court allowed the 2014 GE rule to stand, it relieved AACS of the "onerous regulatory prerequisites" of the alternate earnings appeal process.[42]

In 2019, the Department published a notice suspending the 2014 GE Rule and proving notice of its intent to revisit and revise the regulations.  More litigation ensued.[43]  Plaintiffs also in this case sought to vacate the rescission of the 2014 GE rule, but the court dismissed most of their claims for lack of standing.[44]  In 2022, the court ordered the case held in abeyance due to the Department's stated intention to "initiat[e] … new rulemaking processes on the same topics addressed" by the 2019 rescission.[45]

The Department then engaged in further rule making which resulted in the current iteration of the GE Rule (the "2019 GE Rule").  The Preamble to the 2019 GE Rule noted the many infirmities of the 2014 GE Rule.  The final rule repealed those portions of the rule that made GE a condition of program participation and, instead, implemented the rule as a programmatic disclosure.

Now, the Department has pivoted again with the current NPRM and, as discussed in these comments, continues to seriously miss the mark.

---

[37] *Id.* at 58, 60.

[38] *Id.* at 61-62.

[39] *Id.* at 58.

[40] *Id.* at 74-75.

[41] *Id.* at 73.

[42] *Id.* at 76-77.

[43] Am. Fed'n of Teachers v. DeVos, 484 F. Supp. 3d 731 (N.D. Cal. 2020).

[44] *Id.* at 731, 746, 748, 750.

[45] Am. Fed'n of Teachers v. Cardona, 2022 WL 1471388, 1, 2 (N.D. Cal. May 10, 2022).



B.    *About AACS and AACS Schools*

AACS is a private non-profit trade association founded in 1924 that represents the interests of over 600 accredited institutions of higher education that educate students for occupations in the beauty and wellness industry. Since AACS's establishment, we estimate that AACS members have graduated tens – if not hundreds - of thousands of students who have been prepared to take the state licensing examinations. Passing state licensing exams is required for graduates to work in the state-licensed occupations that feed into the robust spa, salon and wellness industry in the United States that, just for employment-based salons alone (not including graduates working as independent business owners), contributed $34.5 billion in taxable revenues in 2019. This figure was down to $25.6 billion or 26% in 2020 due to reduced services by spa and salon employers during the pandemic, which is an important fact based on the Department's proposal to use 2021 and 2022 earnings in the first GE metrics against which our school member programs would be measured.[46]

A majority of our member schools participate in Title IV programs allowing students in financial need who choose to attend one of our schools to receive Title IV loans and grants for eligible programs. The student population is comprised of a majority of non-traditional, diverse students seeking alternative unique career pathways. Across the industry, a majority of the worker population is 25 years of age or older, independent of any parental financial support and have families to support. We additionally have predominantly female student population, and a higher than average percentage of LGBTQ-identified students.

Our graduates work at spas, salons and other businesses as cosmetologists, estheticians, barbers, massage therapists, and entrepreneurs. Employer demand for our graduates is high, with very positive projections for occupational growth.[47] AACS schools generate 78% of the graduates who work in spas, salons, and as solo businesses in this field. Our graduates also start their own small businesses as the owners of salons and spas (including booth renters), and can, over time, work as management or executive employees in beauty and wellness based businesses.

In the NPRM, the Department fails to account for the unique nature of AACS member schools, which are predominantly small businesses (with a median enrollment of 150 students annually per institution) and specialized in cosmetology-related programs (cosmetology, barbering, nail tech, massage therapy, hair, make up and skin care, among others). For example, the NPRM contains no discussion of the impact of the GE Rule specifically on cosmetology schools as a subset of certificate granting institutions. Cosmetology programs offered by proprietary institutions are unique because the institutions are specialized. They are unlike community colleges and private non-profit institutions that may offer one or more cosmetology related programs among many other types of programs.  The result of the Department's failure to

---

[46] Professional Beauty Association, 2022 Economic Snapshot of Salon Industry (Oct. 2022), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=212246.

[47] *See* supra notes 3-6.



address our member school interests results in a disparate and catastrophic impact on this subset of certificate granting institutions, foreclosing options for students who choose this career path.

C.   *Evidence of Department Bias Against Cosmetology Schools and Programs*

In AACS's public comments to the 2014 GE Rule, we addressed concerns about bias of the Department against for-profit institutions generally.[48] It appears that bias has now evolved to target primarily cosmetology schools, including AACS schools, specialized in offering programs in the beauty and wellness sector.

1.   Exclusion from Negotiating Table

On December 8, 2021, the Department announced its intention to establish a negotiated rulemaking committee to propose a package of rules for Title IV programs.[49] As stated in the notice in the Federal Register, "the committee will include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations."[50] The Department identified the relevant constituencies with substantial interests impacted in the rulemaking.[51] Our membership – small institutions of a specialized nature - were unrepresented at the negotiating table to voice our concerns and help shape the rule.

The failure of the Department to take our concerns into consideration started early and tainted the entire rulemaking process as it applies to our membership.  At the request of AACS, at the start of the Institutional and Programmatic Eligibility negotiated rulemaking, the primary negotiator for the one seat for proprietary institutions of higher education made a motion to add a seat at the negotiating table for AACS member and then President, Michael Halmon of American Institute for Beauty for the purpose of representing small (less than 450 student enrollment) proprietary institutions of higher education (our average institution size is l50 or less in enrollment).

The Department led the voting to reject this motion, despite Department precedent for allowing such a "small school" seat to take into account the unique impacts on small business proprietary school operators and despite the fact that public institutions had seats for both 2-year and 4-year institutions. Once excluded from the negotiating table, AACS tried to engage in the process by meeting with Department officials for listening sessions, providing information and data, and meeting with the White House Office of Information and Regulatory Affairs ("OIRA"), but none

---

[48] American Association of Cosmetology Schools, Comment Letter on Proposed Rule on Program Integrity: Gainful Employment (May 29, 2014), https://www.regulations.gov/comment/ED-2014-OPE-0039-1899.

[49] 86 Fed. Reg. 69607 (Dec. 8, 2021) (to be codified at 34 CFR 600, 668).

[50] *Id.*

[51] *Id.*



of the concerns or data provided to the Department were addressed in the Proposed Rule.[52]
AACS was further hindered from participating by the Department's decision to conduct the
negotiation by remote video conference, instead of in-person.  AACS objected to this decision at
the time.  Although the President had not yet rescinded the public health emergency, the
COVID-19 pandemic was clearly ebbing and did not represent the threat to public health and
safety that it once did.  Less restrictive health measures were available to allow the traditional,
in-person negotiations to proceed, including masks, social distancing, vaccines, and rapid testing.
Under these circumstances, depriving AACS and the public the opportunity to attend an in-
person negotiation was unjustified.  AACS was substantially prejudiced as a result.  In-person
negotiations have, in the past, allowed AACS to "work the room" by speaking to negotiators
during breaks or when asking to be heard during discussion.  The absence of these formal and
informal modes of communication prevented AACS from participating.

The absence of a representative from the cosmetology school sector was significant for several
reasons.  First, the 2014 GE Rule had been rolled back by the Trump Administration after the
Department was enjoined by Judge Rudolph Contreras in the case of *AACS v. DeVos*. Second,
the Department has had a long history of acknowledging that there are flaws with earnings for
cosmetology school graduates.[53] As the Department admits in the NPRM, few other schools or
sub-sectors of private, for-profit schools have these same challenges.[54]  The negotiators
representing proprietary institutions were Bradley Adams, South College, and alternate Michael
Lanouette, Aviation Institute of Maintenance, Centura College and Tidewater Tech. Although
highly qualified negotiators, neither of these individuals had the cosmetology sector experience
needed to represent our schools.

In contrast to the schools of the proprietary school negotiators, programs offered by AACS
members are different in that they: (1) predominantly lead to licensed occupations; (2) have
curriculum length and content that is regulated by the states, which impacts the cost of tuition
and ability to modify programs; (3) have graduates requiring "ramp up" time to build a clientele
before maximizing their income; (4) have graduates who work disproportionately flexible (less
than full time) schedules, operate as independent business owners and operate cash-based
businesses, all of which can impact earnings (a critical issue of this rulemaking); and (5) have
students and graduates who are overwhelmingly women and disproportionately minority (so
their interests were not represented and this impacts the income measure).  Given these concerns,
the Department's decision to leave the AACS representative out of the negotiations was not just

---

[52] *See* Office of Mgmt. & Budget, Completed Meeting, EO 12866 (Mar. 10, 2023),
https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=false&rin=1840-
AD57&meetingId=189773&acronym=1840-ED/OPE.

[53] *Am. Ass'n of Cosmetology Sch.'s v. DeVos* (stating that the Department itself explicitly acknowledged the
problem of underreporting of income, finding that tips make up "about half of earnings in service occupations such
as cosmetology."); *see* Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 64955 (Oct. 31, 2014) (to be
codified at 34 C.F.R. pt. 600, 668).

[54] 88 Fed. Reg. at 32366.



questionable, it violates the Administrative Procedure Act (APA), the Equal Protection and Due Process Clauses of the Constitution and invalidates the Proposed Rule.

    2.    <u>Prejudicially Short Comment Period</u>

On May 26, 2023, AACS formally requested an extension of the 30-day public comment period. The Proposed Rule covers six new areas of rulemaking. The GE proposal alone is estimated to result in 80% or more of undergraduate cosmetology certificate programs failing the GE Rule, likely leading to a large number of our member schools closing.[55] The stakes could not be higher -- the proposals represent an existential threat to our association, our school members, our current and future student career choices, employers reliant on our graduates, and the health of the beauty and wellness industry as a whole. The short comment period presents an undue burden on this small association and its predominantly small institution membership.  It has prejudiced our ability to fully respond to a rule that will disproportionately impact our programs.

The APA requires that the process for negotiated rulemaking adequately represent parties that will be impacted by a proposed rule.[56]  The Department failed to meet this standard when selecting negotiators for the Institutional and Programmatic Eligibility portion of the Negotiated Rulemaking process. In particular, the Department failed to seat the nominee from AACS who could represent both small for-profit institutions and the interests of our unique sub-sector of higher education so impacted by this rule.

The APA states that an agency is required to provide a period of at least 30 calendar days for the submission of public comments.[57] Agencies have discretion to extend the public comment period to sixty days or longer for complex rulemakings.[58]

The Department published the official NPRM on May 19, 2023, which consisted of a 212 page NPRM containing high-level, data-driven arguments and proposed regulations not included in the original rule package. On May 25, 2023, AACS submitted a letter to the Department requesting an extension of the public comment period.[59] In its letter, AACS explained that additional time was necessary to properly respond to the proposed changes. AACS cited that the Department had previously provided forty-five (45) days to submit public comments to the 2010 Gainful Employment NPRM[60] and sixty (60) days to submit public comments to the 2014

---

[55] 88 Fed. Reg. at 32432 (Table 3.24).

[56] 5 U.S.C. § 565; 20 U.S.C. § 1098a.

[57] 5 U.S. Code § 564.

[58] Federal Register, A Guide to the Rulemaking Process (last visited Jun. 17, 2023), https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.

[59] Letter from Am. Ass'n of Cosmetology to Dep't of Educ. (May 25, 2023).

[60] Program Integrity: Gainful Employment, 75 Fed. Reg. 43615 (proposed on July 26, 2010) (to be codified at 34 C.F.R. 668), https://www.federalregister.gov/documents/2010/07/26/2010-17845/program-integrity-gainful-employment.



Gainful Employment NPRM.[61] The Department denied this request for an extension of the public comment period. This deprived AACS of a sufficient amount of time to properly analyze and respond to the NPRM.

3.    <u>Value of Appeal Data Improperly Dismissed</u>

As part of its rationale for not permitting an alternate appeals process in the proposed version of the GE Rule, the Department states that the alternate earnings data for cosmetology programs that schools filed under previous alternate earnings appeals as permitted in the 2014 GE Rule was "implausibly high."[62] The implication is that cosmetology schools "gamed" or otherwise manipulated graduate earnings to ensure a program passed the GE rates on appeal. This ugly and biased implication is unsubstantiated and, itself, implausible. The 2014 GE rule, under then § 668.406, required an institution's chief executive officer to attest that the survey was conducted in accordance with the survey standards in an Earnings Survey Form provided by the Department, and that the mean or median earnings used to recalculate the D/E rates was accurately determined from the survey results.

In addition, the 2014 GE Rule required an examination-level attestation engagement report prepared by an independent public accountant or independent governmental auditor, as appropriate, that the survey was conducted in accordance with the requirements set forth in the NCES Earnings Survey Form. The attestation had to be conducted in accordance with the attestation standards contained in the Government Accountability Office's Government Auditing Standards promulgated by the Comptroller General of the United States and with procedures for attestations contained in guides developed by and available from the Department of Education's Office of Inspector General. The appeal process also required institutions to file supporting documentation with the Secretary. What the Department is implying, then, is that school owners, accountants, and graduates conspired to manipulate the appeals process to ensure passing rates on appeal. The Department has provided no evidence that any such improper conduct occurred.

Yet, the Department relies on this unsupported belief in its rationale for not restoring the alternate earnings appeal. The Department notes that "past data submitted as part of the alternate earnings appeals" was one of the factors that led it not to include an alternate earnings appeal.[63] The implication is that the Department does not believe in the veracity of the alternate appeals data provided by institutions and believes institutions gamed the process, but without presenting any evidence that any wrongdoing occurred.[64] The Department has not considered the possibility that the alternate earnings appeals survey data filed and approved by the Department contained

---

[61] Program Integrity: Gainful Employment, 79 Fed. Reg. 16426 (proposed on Mar. 25, 2014) (to be codified at 34 C.F.R. 600, 668), https://www.federalregister.gov/documents/2014/03/25/2014-06000/program-integrity-gainful-employment.

[62] 88 Fed. Reg. at 32346.

[63] *Id.* at 32335.

[64] *Id.* at 32346 ("In addition, institutions had incentives to collect and show data that cast their programs in the best light within the administrative proceedings, whatever the applicable standard for reviewing appeals.").



*accurate information* that actual earnings for graduates far exceeded, in some cases, earnings data in the Social Security Administration database then relied upon as the sole source of graduate earnings data in the 2014 GE Rule. Instead, the Department dismisses that higher data as "implausible."

Specifically, the Department states: "One analysis of alternative earnings data, provided by cosmetology schools as part of the appeals process for GE debt-to-earnings thresholds under the 2014 Prior Rule, found that the average approved appeal resulted in an 82 percent increase in calculated earnings income relative to the numbers in administrative data. Results like that appear to be implausibly high …"[65] The Department then concludes that "at this stage that it seems likely that the use of alternative earnings estimates, typically generated from student surveys, could yield a substantial overestimate of income above that of unreported tips."[66] Again, the premise that use of an alternate earnings appeal leads to an *overestimate* of income illustrates the Department's bias that appeals data cannot be true data but without presentation of any actual evidence of wrongdoing.

Further, the Department improperly concludes that schools that filed a notice of their intent to file an alternate earnings appeal, but then did not later file one, could not establish higher earnings than in the SSA database. That is an unfounded conclusion on which to deny an appeals process. The Department states: "The difference between the 882 programs for which institutions submitted notices of intent to appeal when compared to the 341 appeals that were actually submitted suggests that institutions may often have concluded that the alternative earnings appeal process did not warrant the necessary investment of time and effort—or perhaps the initially supposed difference in graduates' earnings was not as significant as anticipated."[67] This specious conclusion disregards that the first version of the 2014 GE Rule appeal process required *100% of the graduate cohort* to respond to the earnings survey, which was struck down by the court in *AACS vs. DeVos* because it violated the APA. In addition, the 2014 GE Rule required advance notice of intent to appeal in order to *preserve* the right to file an alternate earnings appeal, so many schools likely rationally filed a notice of intent to preserve their right to appeal in case they later decided to do so.

Finally, the Department cannot conclude that alternate appeals data was "implausibly high" and statistically unreasonable unless the original earnings data was reliable and of high quality.  The high rate of successful appeals was either because the supporting data was *wrong*, or the appeal information was wrong.  In the 2014 GE Rule, the Department did not say the SSA information was the most reliable source of data, but rather pointed to the IRS as the best source but not available at that time. It is safe to conclude, then, that it is possible that the SSA information was wrong and that the appeal information was right.  If the Department is confident about the

---

[65] *Id.*

[66] *Id.*

[67] *Id.* ("Those other considerations include the Department's observations of the information provided in the earlier alternate earnings appeals process, which likewise suggest that the appeals had little value in improving the assessment of whether programs' ''true'' debt-to-earnings (or earnings) levels met the GE criteria").



quality of the federal earnings data in the GE Rule, there should be no reason to disallow a fair and workable challenge to that data. Administrative burden alone is simply not enough to violate due process and ensure a correct GE Rule outcome. The Department's unwillingness to restore an alternate earnings appeal is illegal, as it is based largely on its biased and unsupported views of the integrity of data in the prior appeals process.

> 4.    Cosmetology Programs Are Not Just Collateral Damage

The Department has prioritized the finalization of its 14-year odyssey to establish a GE Rule over ensuring accurate outcomes for GE rates for cosmetology programs. The Department states that the matter of unreliable earnings data "should be kept in perspective" because tip income "is not typical in every occupation and profession in which people work after graduating."[68] Apparently, because this issue only impacts "cosmetology, massage therapy, bartending, acupuncture, animal grooming, and tourism/travel services," it does not need to be addressed, even though the Department acknowledges that unreported income could constitute at least 8 percent of earnings.[69] The Department is "not convinced" that the problem is such that the Department should make any attempt to account for it, despite that incredibly damaging impact this decision will have on AACS members and the students they serve.[70]

The Department also states that they would not want to "incentivize institutions to discourage accurate reporting of earnings among program graduates."[71] The implication that our members coordinate with graduates to break tax laws is unacceptable.  The Department goes on to state that, "making special accommodations only for programs where under-reporting of earnings is suspected would differentially reward such programs and potentially create adverse incentives for programs to encourage such behavior."[72]  By stating that accounting for under-reporting would "reward" programs ignores that AACS schools merely seek a level playing field that results in more accurate GE rates, not special treatment. Also, to state that acknowledging underreporting through a proxy increase or other mechanism would encourage continued under-reporting is nonsensical. AACS schools do not have control over their graduates' tax returns. AACS schools want their graduates to comply with all tax reporting laws and many provide financial management training relevant to entrepreneurs. To imply without any evidence that AACS schools are coordinating with graduates to encourage illegal behavior is, again, an unacceptable way to make policy.

The Department acknowledges that under-reporting exists as a real problem.[73] It states: "[t]his is not to deny that some fraction of income will be unreported despite legal duties to report, but

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 32335.

[73] *AACS* at 63.



instead to recognize as well that legal demands and other relevant circumstances have changed" because "arguments on unreported income have become less persuasive to the Department."[74]  In determining not to offer an alternate earnings appeal, the Department again cites concerns about the honesty of schools subject to the GE Rule. Specifically, it states "[a]lternate sources such as graduate earnings surveys … could more easily be manipulated to mask poor program outcomes."[75]

By choosing to ignore well-known flaws in federal earnings databases as they relate to the earnings of many of our graduates,[76] doubling down on that omission by removing any means to appeal earnings data, establishing a new EP metric tied solely to earnings that decimates our programs, and incorporating institutional consequences for GE program GE rate failure - including warnings after one failing year and new administrative capability, certification and financial responsibility enforcement authority now tied to failing GE programs– AACS schools will be severely harmed after the GE Rule goes into effect.  Failing to provide a meaningful earnings data appeal process violates fundamental due process. The fact that the Department has concluded that the GE metric should not address a real problem of earnings data unreliability indicates significant bias by the Department against these programs and the students served by them.

### 5.     Gender and Race Bias in Earnings Data Used in GE Rates

As discussed in detail in Section II.D, both the D/E and EP metrics in the GE Rule are improperly weighted toward white and male earnings and do not account for systemic wage discrimination experienced by women and minorities.

### 6.     Retroactivity, Transition and Pandemic Earnings Bias

The GE rule is based on prior years' debt and earnings data.  For the first set of D/E rates, earnings data for pandemic calendar years 2021 and 2022 would be used for individuals who graduated in the 2017-2018 and 2018-2019 award years respectively, which would be part of the standard 2-year cohort for all programs evaluated in 2024-2025. Earnings data for pandemic calendar year 2020 would also be used for individuals who graduated in the 2016-2017 award year as part of the expanded 4-year cohort for programs with less than 30 Title IV completers in the 2-year cohort.

Our graduates go to work in a hands-on industry at spas, salons and other personal services establishments where they provide hair, massage, skin, nail and other services requiring direct human contact. The coronavirus pandemic significantly impacted employers of our graduates. According to the Professional Beauty Association, just the employment-based (W-2 issuing)

---

[74] 88 Fed. Reg. at 32355.

[75] *Id.* at 32366.

[76] *AACS* at 63 (stating that the Department itself explicitly acknowledged the problem of underreporting of income, finding that tips make up "about half of earnings in service occupations such as cosmetology."); *see also* 79 Fed. Reg. at 64955; 88 Fed. Reg. at 32366.



segment of the salon industry posted total revenue of $25.6 billion in 2020, down nearly 26% from a level of $34.5 billion in 2019.[77] This effect continued into 2021 and 2022. It is unfair and illegal for the Department to use pandemic impacted earnings years for the GE regulations for cosmetology school graduates. In addition, many graduates were delayed in working during the pandemic because of delays in cosmetology boards scheduling exams.

The use of pandemic-era earnings data is all the more concerning because the Proposed Rule removes zone and transition provisions contained in previous versions of the GE Rule. Like the Proposed Rule, under the 2014 GE Rule, a program would fail if its annual earnings rate exceeded 8 percent and its discretionary income rate exceeded 20 percent. However, in the 2014 GE Rule, the Department included a "zone" status that allowed a program additional time to come into compliance if its annual earnings rate was between 8 percent and 12 percent or its discretionary income rate was between 20 percent and 30 percent. In the Proposed Rule, the Department keeps the D/E thresholds at 8 percent and 20 percent, but removes the zone status and any transition period.  This is a material change for AACS members because their programs are more likely to fail the GE Rule (now with the required passage of both D/E and EP metrics) and there is no zone or transitional status but instead immediate Title IV consequences (warnings after 1 year of failure and loss of program eligibility after failing two of three consecutive years).

The Department's removal of the 2014 GE Rule zone and transition framework falls disproportionally on AACS member programs. If nearly 80% of our cosmetology certificate programs are expected to fail GE metrics, that will happen as soon as late 2024/early 2025. At that time, due to changes in the Administrative Capability, Financial Responsibility, and Certification rules, AACS schools will immediately have institutional Title IV eligibility issues, leading to potential school closures.

       D.    *Data Flaws and Limitations*

The data provided by the Department is flawed, incomplete and/or materially limited in scope such that it cannot reliably sustain the GE and other proposals. AACS recommends, therefore, that:

    (1) For both the FVT and GE regulations, for the D/E rate, the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[78] or, in the alternative, cease publication of a Final Rule on Gainful Employment (Subpart S) until it conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income,

---

[77] Professional Beauty Association, 2022 Economic Snapshot of Salon Industry (Oct. 2022), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=212246 .

[78] *AACS* at 63.



racial and gender wage discrimination, and other factors impacting our program graduates; and

(2)      The Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

We note below the deficiencies in the data provided that support the need for further study and analysis prior to implementing a GE Rule.

1.      <u>The Department Has Not Provided Information to Support its Conclusions</u>

The Regulatory Impact Analysis ("RIA") in the NPRM is predicated on the 2022 Program Performance Data ("2022 PPD" or "PPD") published by the Department on May 17, 2023. This data varies significantly from the previously published data in April 2022,[79] and from the data posted to the College Scorecard website. In reviewing the data, it has been difficult, if not impossible, for researchers to replicate and understand the PPD data and analysis provided in the NPRM.  The Department has, in fact, admitted that the PPD data has limitations. In the 2022 PPD Description, the Department states:

> "Due to data limitations, the Department calculated the median earnings data for a different cohort of program completers than the one used to calculate median debt. Earnings were measured for Title IV students completing their credential in either award years 2014-2015 or 2015-2016. Students in most programs would thus have their earnings captured in the third calendar year following the end of the award year in which they completed—calendar years 2018 and 2019, respectively. Median cumulative debt was measured for completers, including non-borrowers, in the 2015-2016 or 2016-17 award year. The Department measured their debt levels in 2016 dollars (adjusting by the CPI) and used this as an estimate for the debt levels of the AY2015 and AY2016 completers assuming debt levels remained unchanged in real terms between these cohorts."[80]

The Department asserts that this methodology provides the most recent and complete program-level debt and earnings data available. The methodology of using mismatched cohorts and data adjustments, however, does not produce results that properly reflect or project the outcomes of the rule. As a result, institutions cannot meaningfully plan for and project programmatic results. The use of the 4-digit CIP code in the data set is just one key example. It is deeply concerning

---

[79] *See* U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Info Rate April 2022 (Apr. 2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/geinforateapril2022.xlsx.

[80] U.S. Dep't of Educ., 2022 Program Performance Data Description (2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/nprm-2022ppd-description.pdf.



that the Department would utilize data that is insufficient, incomplete, or inaccurate to analyze the impact of the rule and reach its conclusions.  It also renders the RIA legally insufficient.

In addition, there are several unexplained variables.  For example, the PPD 2022 data contains a subset of the programs listed in the College Scorecard with no clear explanation of why this subset was chosen. The College Scorecard has more than 222 thousand programs, of which more than 37,000 appear to have sufficient data for GE calculations. The PPD 2022 has just over 150 thousand programs, of which just over 26 thousand have sufficient data for GE calculations.

We also note that in review of the data sources provided by the Department, there are significant variances.[81] The EP measure is based on data with inconsistent scope, in particular by comparing a program's cohort earnings to a State-aggregated Earnings Threshold (ET) metric. Each program has unique demographics that have a large bearing on earnings, such as the percentage of female vs. male learners; yet the EP measures aggregates all demographics beyond state and age and educational attainment for high school earnings.

The table below shows the three-year non-enrolled median earnings for female (EARN_NOMALE_NE_MDN_3YR) and male (EARN_MALE_NE_MDN_3YR) sub-cohorts, based on College Scorecard Most Recent field of study data for all undergraduate certificate disciplines (2-digit CIP). Across all disciplines, male completers earned 29% more than female completers, $29,803 vs. $23,021. These earnings disparities not accounted for in the EP are likely to have significant impacts on passage of the EP measure for predominantly female cosmetology programs.

---

[81] *See* U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22 (last visited Jun. 17, 2023), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn; *see also* U.S. Dep't of Educ., Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB) (last visited Jun. 17, 2023), https://www.regulations.gov/docket/ED-2023-OPE-0089/document.



## Gender

| Discipline1 | Median Female 3Yr Median NE Earnings | Median Male 3Yr Median NE Earnings |
|---|---|---|
| **Grand Total** | **$23,021** | **$29,803** |
| Null | | |
| AGRICULTURE, AGRICULTURE OPERATIONS, AND RELAT.. | $9,298 | $40,299 |
| ARCHITECTURE AND RELATED SERVICES | | |
| AREA, ETHNIC, CULTURAL, AND GENDER STUDIES | | |
| BASIC SKILLS | $18,402 | $28,746 |
| BIOLOGICAL AND BIOMEDICAL SCIENCES | | |
| BUSINESS, MANAGEMENT, MARKETING, AND RELATED .. | $21,779 | $26,959 |
| CITIZENSHIP ACTIVITIES | | |
| COMMUNICATION, JOURNALISM, AND RELATED PROGR.. | $19,958 | $25,353 |
| COMMUNICATIONS TECHNOLOGIES/TECHNICIANS AND .. | $21,040 | $16,195 |
| COMPUTER AND INFORMATION SCIENCES AND SUPPOR.. | $22,519 | $35,730 |
| CONSTRUCTION TRADES | $32,168 | $35,537 |
| EDUCATION | $21,043 | $30,562 |
| ENGINEERING | | $40,455 |
| ENGINEERING TECHNOLOGIES/TECHNICIANS | $16,647 | $32,462 |
| ENGLISH LANGUAGE AND LITERATURE/LETTERS | $15,389 | $24,495 |
| FAMILY AND CONSUMER SCIENCES/HUMAN SCIENCES | $16,300 | |
| FOREIGN LANGUAGES, LITERATURES, AND LINGUISTICS | | |
| HEALTH PROFESSIONS AND RELATED CLINICAL SCIENCES | $25,155 | $27,413 |
| HEALTH-RELATED KNOWLEDGE AND SKILLS | $23,550 | $24,399 |
| HIGH SCHOOL/SECONDARY DIPLOMAS AND CERTIFICAT.. | | |
| HISTORY | | |
| INTERPERSONAL AND SOCIAL SKILLS | | |
| LEGAL PROFESSIONS AND STUDIES | $34,036 | |
| LEISURE AND RECREATIONAL ACTIVITIES | | |
| LIBERAL ARTS AND SCIENCES, GENERAL STUDIES AND .. | $28,359 | $32,762 |
| LIBRARY SCIENCE | | |
| MATHEMATICS AND STATISTICS | | |
| MECHANIC AND REPAIR TECHNOLOGIES/TECHNICIANS | $26,385 | $35,140 |
| MILITARY TECHNOLOGIES | | |
| MULTI/INTERDISCIPLINARY STUDIES | | |
| NATURAL RESOURCES AND CONSERVATION | | $47,284 |
| PARKS, RECREATION, LEISURE, AND FITNESS STUDIES | $21,689 | $25,664 |
| PERSONAL AND CULINARY SERVICES | $17,349 | $15,343 |
| PERSONAL AWARENESS AND SELF-IMPROVEMENT | | |
| PHILOSOPHY AND RELIGIOUS STUDIES | | |
| PHYSICAL SCIENCES | | |
| PRECISION PRODUCTION | $31,482 | $35,063 |
| PSYCHOLOGY | | |
| PUBLIC ADMINISTRATION AND SOCIAL SERVICE PROFES.. | $36,377 | |
| RESERVE OFFICER TRAINING CORPS (JROTC, ROTC) | | |
| RESIDENCY PROGRAMS | $28,178 | $40,759 |
| SCIENCE TECHNOLOGIES/TECHNICIANS | $37,892 | |
| SECURITY AND PROTECTIVE SERVICES | $22,809 | $46,098 |
| SOCIAL SCIENCES | $44,646 | $69,251 |
| THEOLOGY AND RELIGIOUS VOCATIONS | $18,405 | $28,994 |
| TRANSPORTATION AND MATERIALS MOVING | $28,749 | $38,675 |
| VISUAL AND PERFORMING ARTS | $28,228 | $25,573 |

24



     2.    <u>Gender and Race</u>

Given that our graduates are comprised of 90% women, including white, Black, Hispanic and Asian Pacific American women,[82] we are concerned that the Department has not given enough attention to whether discrimination based on gender, gender identity, or race and ethnicity could influence program outcomes for programs that disproportionately enroll members of these groups. The Department states that its "analyses, and an ever-increasing body of academic research, strongly rebut the claim that differences across programs are solely or primarily a reflection of the demographic or other characteristics of the students enrolled."[83]

Even after claiming that programs with higher percentages of female and minority graduates are not disproportionately negatively impacted by the GE Rule, the Department implies that even if there was that impact, it is the result the Department wants. They state: "consistent with recurring allegations in student complaints and qui tam lawsuits (a type of lawsuit through which private individuals who initiate litigation on behalf of the government can receive for themselves all or part of the damages or penalties recovered by the government), through our compliance oversight activities including program reviews, the Department has concluded that many institutions aggressively recruit individuals with low income, women, and students of color into programs with substandard quality and poor outcomes and then claim their outcomes are poor because of the ''access'' they provide to such individuals."[84] The Department, however, has not provided any evidence in the NPRM of the complaints, lawsuits, compliance issues, or aggressive recruitment or how they relate to "poor outcomes," or even what they mean by "poor outcomes."

The Department then notes that even if the programs women and minority students are enrolled in fail GE, "more than 90 percent of students enrolled in failing programs have at least one non-failing option within the same geographic area, credential level, and broad field. These alternative programs usually entail lower borrowing, higher earnings, or both."

However, for cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[85] Further, cosmetology programs offered by these alternative institutions suffer from

---

[82] 88 Fed. Reg. at 32432 (for undergraduate certificate programs for cosmetology, 80% are failing programs. Of completers of these programs, 90% are women. Of these women, 15% are Black, 19% Hispanic, 5% are Asian, and 50% are white. For undergraduate certificate programs for somatic body work, 61% of programs fail. Of completers for these programs, 75% are women. Of these women, 10% are Black, 12% are Hispanic, 3% are Asian, and 42% are white).

[83] *Id.* at 32309.

[84] *Id.*

[85] *Id.* at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students



the same problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community college cosmetology programs.[86]

The chart below shows the percentage of cosmetology programs for each state, both at the associate's and undergraduate certificate level, that pass the proposed Gainful Employment tests. The color of each state represents the ratio of programs passing the Earnings Premium measure and the circle in each state represents the ratio of programs passing the Debt-to-Earnings metric. Data comes from the College Scorecard Most Recent program file.

---

transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").

[86] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") This is also not true. The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions) to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.





As illustrated, nearly all measured cosmetology programs fail EP not matter what type of institution offers the program.

The Department also states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings [or in] online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[87] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training.

The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[88] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to replace our members in supplying 78% of the graduates hired by employers.

---

[87] *Id.* at 32434.

[88] *Id.*



Further, it is well established that women, minorities, and groups bearing other socioeconomic characteristics are subjected to wage discrimination in the United States that would impact measured earnings for programs with a high proportion of female and minority graduates. At many career schools, enrollments in certain types of programs skew significantly toward one gender or another. For example, cosmetology programs tend to favor women, while automotive and trades programs tend to favor men. Minority populations at career schools in certain markets can be very high by virtue of their location and the communities they serve. Any D/E rate or earnings premium measure that does not recognize and adjust for these differences will yield unequal effects because of gender, racial/ethnic, and similar earnings disparities.[89]  It will also limit access to those students based on those very characteristics.

The Federal agency data fails to account for gender and other work-related disparities. A large number of cosmetologists work flexible hours, which significantly dilutes annual earnings. Cosmetology is a female dominated industry. [90] According to a recent study, 89% of graduates are female and 85% of salon owners have at least one female owner.[91] The Federal agency data further fails to account for gender-pay gaps, which is substantial. According to a recent Bureau of Labor and Statistics ("BLS") Report, "[i]n 2021, women who were full-time wage and salary workers had median usual weekly earnings that were 83 percent of those of male full-time wage and salary workers."[92]

---

[89] Anthony Carnevale, et al., *How Racial and Gender Bias Impede Progress toward Good Jobs*, GEO. UNIV. CTR. ON EDUC. & THE WORKFORCE, (2022) https://cewgeorgetown.wpenginepowered.com/wp-content/uploads/chase-uncertain_pathway_2-fr.pdf.

[90] Qnity Institute, A Career in Pro Beauty: Compensation Study.

[91] *Id.*

[92] U.S. Bureau of Labor Statistics, BLS Reports: Highlights of Women's Earnings in 2021 (Mar. 2023), https://www.bls.gov/opub/reports/womens-earnings/2021/home.htm#:~:text=Women%20ages%2025%20to%2034,See%20tables%201%20and%2012.



Chart 2. Median usual weekly earnings of women and men who are full-time wage and salary workers, by age, 2021 annual averages

When adding race to the equation, the income variances are even more stark. "Among women, Whites ($925) earned 81 percent as much as Asians ($1,141), Blacks ($776) earned 68 percent, and Hispanics ($718) earned 63 percent." Another variable that the Department must consider is the fact that women trend to lower paid occupations. For example, "[i]n 2021, 32 percent of women worked in low wage occupations, compared with 21 percent of men."[93] The income variances are a factor the Department must consider and address.   Failure to properly address these underlying and historic wage variances creates a rule that has a disparate impact based on gender and race. For cosmetology schools, that enroll a significant majority of women, sometimes up to 99% of the student body, the structural pay inequities are significant.

___

[93] *Id.*



Chart 3. Median usual weekly earnings of women and men who are full-time wage and salary workers, by race and Hispanic or Latino ethnicity, 2021 annual averages

It is critically important that the Department better understand the flaws in the earnings used in the FVT and GE frameworks before applying it to cosmetology programs for disclosure purposes or implementing a GE accountability framework. Failure to do so will disproportionately impact female, Black, Hispanic and low income students who attend cosmetology programs. As the Department itself notes, "programs that fail at least one GE metric have a higher share of students that are female, higher share of students that are Black or Hispanic, lower student and family income, and higher share of students that have ever received the Pell Grant."[94]

In addition, AACS schools admit a high proportion of Pell Grant eligible students, and traditional "value" criteria may not be indicative of the benefits students receive by attending an inclusive, diverse institution and the continuing challenges many face with earnings in the workplace driven by racism, sexism or other factors.[95] Equal earning power from a credential is not a reality, and earnings alone cannot capture value to all students. Foreclosing access to programs through a D/E or EP metric that does not account for challenges with debt, repayment rates, and earnings for low income students would have harmful, unintended consequences. Any measure of value must take into account the composition of the student body of an institution and adjust for programs with a high percentage of Pell eligible students.  In addition, earnings should be measured over 10 years, or at 5-10-15 year increments to truly gauge lifetime value. We note that

---

[94] 88 Fed. Reg. at 32429, 32432 (stating that "programs failing the EP threshold have a higher share of female students").

[95] *See, e.g.,* Am. Ass'n of Univ. Women, The Simple Truth About the Gender Pay Gap: 2022 Update (2022), https://www.aauw.org/app/uploads/2022/12/SimpleTruth_12.22_2.1-002.pdf.



the Georgetown Center for Education and the Workforce recommends a 10 year horizon to measure ROI.[96]

Earnings could also be benchmarked against earnings from similar programs across all sectors, rather than benchmarked against an arbitrary measure such as high school graduate earnings. Comparison between like programs, not comparison among entirely different programs, would provide more transparency to students looking for information about specific fields of study.

We also share Rep. Scott's questions about how earnings growth is measured.[97] The NPRM would measure graduate earnings three years after program completion as reported in federal databases. The EP measure would compare the median of those reported earnings against the median of high school graduates for a given program graduate cohort. The GE Rule does not measure earnings at the time a student enrolls in the program against earnings three years after. As Mr. Scott states, "that would address some of the problems." What Mr. Scott was alluding to is measuring social mobility – are low-income students obtaining positive earnings gains by attending the program, based on their own earnings history. This is not measured by the GE Rule. Rather, as Under Secretary Kvaal replied, "the proposal looks at earnings compared to high school graduates in the same state." Others also have concerns that "focusing on earnings can obscure realistic outcomes for groups vulnerable to pay disparities, like Black graduates and women."[98] As stated by Martin van der Werf at Georgetown University's Center for Education and the Workforce, "you wouldn't want lawmakers or institutional leaders to only use earnings data to make decisions about program cuts .. It's just one factor."[99]

Measuring earnings based on pre-enrollment vs. post-graduate earnings is more closely tied to social mobility and takes into account personalized factors that can impact market earnings. Before implementing the EP metric or the GE accountability framework, the Department should study the issue of earnings bias built into the data utilized by the Department in the Proposed Rule.

---

[96] Anthony Carnevale, Ban Cheah and Martin Van Der Werf, Ranking ROI Of 4,500 US Colleges And Universities, Georgetown Univ. (2019), https://cew.georgetown.edu/cew-reports/collegeroi/.

[97] See Breaking the System Part II: Examining the Implications of Biden's Student Loan Policies for Students and Taxpayers: Hearing Before the H. Comm. on Educ. and the Workforce, 118th Cong. (May 23, 2023),

https://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=409169.

[98] Liam Knox, Measuring Outcomes in Income, Inside Higher Ed (May 4, 2023), https://www.insidehighered.com/news/students/careers/2023/05/04/measuring-outcomes-income (also quoting a non-profit university President who states: "Earnings data is inherently skewed against graduates who are Black, Hispanic or women … [t]o understand the data as it relates to a student body, an observer would have to go probing and actually now about wage discrimination, race and gender discrimination and so forth, to factor into the calculations.").

[99] Id.



3.      Age

The average age of an AACS school student is 25 years old. We object to the Department using Census Bureau data in the EP portion of the FVT and GE Rule to arrive at median annual earnings of students with a high school diploma or GED. In the NPRM, the EP is measured based on the "median earnings for working adults aged 25–34, who either worked during the year or indicated they were unemployed when interviewed, with only a high school diploma (or recognized equivalent) (1) in the State in which the institution is located; or (2) nationally, if fewer than 50 percent of the students in the program are located in the State where the institution is located while enrolled."

In the Preamble, the Department states that the EP measure "is computed as the median annual earnings among respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education, and who are in the labor force when they are interviewed, indicated by working or looking for and being available to work."[100] The American Community Survey is an annual survey conducted by the United States Census Bureau.[101] According to the American Community Survey, the labor force includes individuals who are classified as either "employed" or "unemployed." The term "unemployed," as used in the Survey, includes:  All civilians 16 years old and over who (1) were neither "at work" nor "with a job but not at work" during the reference week, and (2) were actively looking for work during the last 4 weeks, and (3) were available to accept a job. Also included as unemployed are civilians who did not work at all during the reference week, were waiting to be called back to a job from which they had been laid off, and were available for work except for temporary illness.[102] Thus, the EP measure would indeed exclude all individuals who either were unavailable to accept a job or who were not actively looking for employment. The Department indicates that, for each program, the Earnings Threshold used would be for the State in which the institution is physically located. However, "if fewer than 50 percent of the students in a program are located in the State where the institution is located, the earnings premium calculation would compare the median earnings of the program's completers to the median earnings nationally…"[103]

The D/E Annual Earnings rate is based on the actual earnings of all of the program's graduates, without regard to whether they are seeking employment. Thus, the Annual Earnings calculation includes program graduates who may not need to work because their household income is sufficient to support their lifestyle, or who have determined to (or have no choice but to) remain home to care for children or other loved ones, or who for any other reason are not actively seeking employment. In contrast, the EP measure would exclude all of these individuals, as it

---

[100] 88 Fed. Reg. at 32413.

[101] For purposes of calculating the EP, the Department will use the "median annual earnings of students with a high school diploma or GED using data from the Census Bureau." Proposed § 668.404(b).

[102] *Definition – "Unemployed,"* U.S. CENSUS BUREAU, https://www.census.gov/glossary/#term_Laborforce?term=Unemployed.

[103] 88 Fed. Reg. at 32333.



only includes individuals who "were actively looking for work during the last 4 weeks" and "were available to accept a job." It also is the case that, under the Proposed Rule, the Annual Earnings is based on the actual earnings of all of the program's graduates, as measured approximately three years following completion of their program. Because most career school graduates are not employed in their career prior to completing their program, it is likely the case that most graduates will have been employed in their career, at best, for three years when their earnings are measured. In contrast, the EP measure includes earnings data for individuals between the ages of 25 and 34. Understanding that most persons graduate from high school at around 18 years of age, individuals included in the EP measure may have been employed in their current career for as many as 16 years.

### 4.    Small Cohort Exclusions

We are concerned that the exclusion of D/E rates for a program with fewer than 30 students completing during a two-year or four-year cohort period actually rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low graduation rates to escape the FVT disclosures because D/E and EP rates cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

In addition, the small cohort exclusions obscure the fact that there are few alternative cosmetology programs to replace failing programs. As part of its rationale for accepting high rates of certificate program failures, the Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt." For cosmetology programs, alternative programs are unavailable nearby either because community colleges or private nonprofit institutions do not offer them or, for such institutions that offer them, their graduation rates are so low that they are exempted from the GE Rule or will not have the capacity (or funds) to expand cosmetology program offerings.[104] Further, cosmetology programs offered by these alternative institutions suffer from the same problems with unreliable federal earnings data and if such programs had graduate cohorts large enough to be measured, by the GE Rule, they fail the EP just like AACS member programs, often with higher default rates than our schools as demonstrated by the Department's own data.[105]

---

[104] *Id.* at 32442-43 ("Costs to State and Local Governments" State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs").

[105] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the



Based on data provided by the Department, certificate programs offered by private, for-profit schools have, on average, lower default rates[106] than comparable programs offered by public and private non-profit institutions, and low median debt.[107] It is misleading, therefore, for the Department to state that "[f]ailure rates are significantly lower for public certificate programs (4.3 percent of enrollment is in failing programs) than for proprietary (50 percent of enrollment is in failing programs) or non-profit (43.6 percent of enrollment is in failing programs) certificate programs" when a vast majority of private non-profit and public undergraduate certificate programs are simply not large enough to be measured.[108] The Department further states that, "[a]cross all proprietary certificate and degree programs, 33.6 percent of enrollment is in programs that fail one of the two metrics, representing 22.1 percent of programs" but fails to adequately explain to the public the context: many private non-profit and public undergraduate programs are simply too small to measure.[109]

Using College Scorecard data, the views below show program payment-in-default rate at 3 years on the vertical axis and a GE Failure Score on the horizontal axis (annual median cohort debt payments minus allowable debt payments based on DTE minus Earnings Premium - essential DTE failure amount plus EP failure amount on an annual basis). Payment default rates are reported in discrete bands, which are represented as the midpoint of each band, leading to a quantum effect of only specific levels of payment default rates.

---

same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not above 30 completers, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions) to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[106] *Id.* at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"). The Department states: "The overall 3- year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools," *Id.* at 32425. This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.

[107] *Id.* at 32402 (Table 1.8 states that average debt for private, for-profit undergraduate certificates is $8,857, which compares favorably with average debt for private, nonprofit undergraduate certificate programs of $9,367).

[108] *Id.* at 32420-21.

[109] *Id.*



If Gainful Employment metrics were a significant predictor of student defaulting on loan payments, you would see a reasonably tight linear grouping from bottom left to top right, assuming that Gainful Employment metrics are a predictor of student defaulting on loan payments.

The view below shows all Undergraduate Certificate programs that have valid data and have a valid UnitID.  There is some correlation but no tight grouping, meaning that GE metrics are not a *significant* predictor of default rates.



This view limits the data to Cosmetology programs. Again, there is no tight grouping.





### 5.    Low Income (Pell Grant eligible) Student Access

AACS schools enroll a high percentage of Pell Grant eligible (low income) students. The Proposed Rule does not protect these students. In its Press Release, the Department states that its Proposed Rule is "part of the Administration's ongoing commitment to fixing a broken student loan system."  In reality, the student loan system will not be "fixed" by eliminating up to 2/3 or more of enrollments in short-term, low debt cosmetology certificate programs.[110] This rule eliminates primarily undergraduate certificate programs, the lowest source of student loan debt.[111]

---

[110] Katharine Meyer, *The Causes and Consequences of Graduate School Debt*; 88 Fed. Reg. at 32427 (36.2% of cosmetology certificate programs fail GE, representing up to 2/3 of all cosmetology program enrollments); 88 Fed. Reg. at 32435 ("The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from 34 percent under the lowest threshold up to 66 percent under the highest threshold").

[111] *Id.* at GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.



In addition, as stated, low income students will not have other available options to obtain federal aid for a cosmetology program. The Department cites a report stating that the need for cosmetology programs can be met by unaccredited, non-Title IV cosmetology schools.[112]

The below graphic illustrates all undergraduate certificates of cosmetology with valid zip codes The color code:

- Red = fails Gainful Employment due to Earnings Premium < 0 (adjusted by state) based on College Scorecard analysis
- Yellow = passes by exclusion
- Green = passes Gainful Employment due to Earnings Premium > 0 (adjusted by state) based on College Scorecard analysis

The distance Red -> closest Yellow is the distance from a failing program to one that passes by exclusion. The distance Red -> closest Green is the distance from a failing program to one that passes GE by Earnings Premium.

The size of each circle is based on the second-year cohort IPEDS2.

The first view is of the continental United States.

---

[112] Stephanie Cellini and Bianca Onwukwe, *Cosmetology Schools Everywhere Most Cosmetology Schools Exist Outside of the Federal Student Aid System*, George Wash. Univ. (Aug. 2022), https://www.peerresearchproject.org/peer/research/body/PEER_Cosmetology_B.pdf.



## Cosmetology Map



Earnings Premium



-$1         $1

For large swaths of the mountain states as well as parts of the Southeast, the closest EP passing program may be many hundreds of miles away.

If we zoom in on western Missouri, for instance, we can get a better sense of both distances:

38



## Cosmetology Map



Earnings Premium

-$1     $1

The distance from Springfield, MO (two larger circles lower Missouri) to Neosho, MO (yellow dot southwest corner of Missouri) is nearly 80 miles. That would be the distance to the closest 'pass by exclusion' program.

A worse case is in South Dakota. The closest pass by exclusion program to Rapid City's failing program is Torrington, Wyoming, 200+ miles away.



Cosmetology Map



Earnings Premium
-$1      $1

The Department states that the Proposed Rule will "drive improvements in value at career training programs" by permitting institutions to "reform … programs to deliver better value to students." For AACS schools, the Proposed Rule will not allow program reform. Our programs are based on state-mandated minimum hours and curriculum which cannot be changed significantly, have overlapping CIP codes, and are specialized in one industry. The Proposed Rule is structured such that our schools cannot offer programs substantially similar to a failing program. Therefore, many of our schools will simply close if one or more significant programs loses Title IV eligibility, unlike most other institutions that can and do offer a wide variety of programs and can more easily shift program offerings.

The Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt." As illustrated, for cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[113] Further, cosmetology programs offered by these alternative institutions suffer from the same

---

[113] 88 Fed. Reg. at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").



problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community colleges.[114]

The Department states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings … [or in] … online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[115] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training. Indeed, remote training is not authorized – in many cases by state law governing license requirements.  The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[116] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to take our place in supplying 78% of the graduates hired by employers.

As a result, the GE Rule will leave low income women and minority students without options to obtain federal aid to attend cosmetology programs.  To protect low income student access, the Department could bifurcate Direct Loan eligibility from Pell Grant eligibility to allow low income students to continue to access a failing program if they choose to do so.

---

[114] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") This is also not true. The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[115] *Id.* at 32434.

[116] *Id.*



6.     Earnings

The Proposed Rule provides that "[t]he Department would obtain from a Federal agency with earnings data, the most currently available median annual earnings of the students during the cohort period."[117]  This overly broad statement gives the Department too much discretion to obtain data from a variety of agencies meeting the definition and then choosing the one that best fits its goals or intent.  The data obtained from various agencies could vary significantly and where one agency could support a passing score, another might not.  This is emphasized in the rationale for Section 668.405 in which the Department admits it does not specify the source but wants to maintain flexibility.  It is ambiguous to say the Department will determine the specific source considering factors as data availability, quality and privacy.  There is no discussion about which of those factors would be considered relevant and more important.  For example, the SSA data was used in the past and the Department now points to the IRS because of quality.

In addition, under the rationale for Section 668.405, the Department states: "It is unlikely that any earnings appeal process would generate a better estimate of graduates' median earnings.  To date, the Department has identified no other data source that could be expected to yield data of higher quality and reliability than the data available to the Department from the IRS".[118]  If this is the case, why does the Department first ask for flexibility on its source?  Why would any other source be considered?  What happens to the ability of appeals if the Department opts for another source that might be less reliable but more available?  If the justification for not having an appeal is that the IRS data is high enough quality to render an appeals moot, does that justification apply to all agencies as there is no provision to allow for an appeals if the Department moves to another agency that the Department is admitting here would have information that is of less quality.

This issue underscores the highly negative impact of the Department's proposal to prevent institutions from having access to the earnings data and denying them any right of appeal.  Institutions must have access to the earnings data so that they can correctly evaluate the data used to evaluate their performance.  It would permit them to ensure the most appropriate data set is used.  It also allows them to adjust programs to increase outcome performance.  It underscores the need for appeal because if the Department applies the wrong data to an institution and that causes the institution to fail the GE metric, the Department's decision must be subject to review.  Fundamental due process demands both transparency as to the earnings data and the ability of institutions to effectively appeal.

a.     Tip Income

As discussed in Section II.A, a result of the 2011 GE Rule, 2014 GE Rule and *AACS vs. DeVos*, the Department is well aware of the issue of under-reporting of tip income for graduates from

---

[117] *Id.* at 32332.

[118] *Id.* at 32336.



cosmetology programs. Yet, the Department has refused to restore an alternate earnings appeal or to take any other steps to recognize flaws in this data.

The Department's reference to the implementation of 1099-K reporting for cash transactions as solving earnings data problems for tip reporting is not persuasive. These forms will be dependent on companies actually issuing them, and the IRS itself has struggled with the rule so much that they delayed implementation of the lower reporting threshold until 2023 so that they could issue additional guidance and allow for a transition period this year. It will also be up to taxpayers to report whether 1099-K funds are business-related or non-business amounts. In fact, the Department is getting ahead of itself by asserting that this untested transitional change in cash transaction reporting will ultimately resolve most problems with unreported income.

b.    Independent employment income

With regard to the Treasury data used to approximate cohort graduate earnings, at this point analysts have concluded that that data appears to be using Adjusted Gross Income not W-2 earnings. The NPRM 2022 PPD seems to show best case for the Department's methods, but the 2021 earnings will make the failures much worse. The Future Act, Public Law 116-91, is the main vehicle for Department and IRS data sharing for certain uses, including FAFSA. It is not clear that the Department has authority under the Future Act to use IRS data for the GE rule, as the law does not mention use of IRS data for Title IV accountability purposes.

Regarding debt payments, the only data for 10-year amortization debt payments are "NSLDS pooled AY2018-19, AY2019-20 cohort." This does not include the cohort pool used for the earnings calculation – AY2015-16. This is not a reasonable comparison, yet is the basis for the GE Rule and its regulatory impact analysis.

The Department does not specifically state what data points from the IRS it would obtain as earnings data.  We can only assume it will use the same data point as the FAFSA as it points out that income adjustment to IRS earnings are not used in other parts of the Title IV programs.

For the "income" number it appears the Department would use Adjusted Gross Income (AGI) from 1040 Line 11 as a whole and then the amount on the W-2, Schedule 1 line 3 (net Schedule C income or loss), schedule 1 line 6 (Farm income or loss) and Schedule K-1 Box 14 (Code A). There are significant issues, alone, with net income of a schedule C, F, or K-1.  In each of those cases, the data point is the *net income of the business*.  This does not align with the stated goals of the Department in obtaining quality data that truly assesses the *earnings* of graduates.  The biggest problem is that tax earnings do not represent real earnings as emphasized by the fact that tax basis financial statements do not comply with U.S. GAAP.  The accounting profession is very aware of the significant differences in financial results between the two.  The goal of U.S. GAAP is to provide true, accurate, and reliable data.  The goal of tax basis accounting is to present financial results by applying specific tax laws, rules and regulations.  A simple example is depreciation.  U.S. GAAP requires straight line depreciation in determining the expense each



year.  U.S. tax laws allow for various accelerated methods, including a provision (Section 179) that allows for the full expensing of an asset that GAAP would require to be expensed over a period of time.  The difference in the timing of depreciation would greatly affect the earnings reported.  Financial institutions recognize the issues with tax basis accounting and often make a number of adjustments to those numbers to obtain a better reflection of the financial results of a business in order to determine if it should issue a loan, for example.

The difference in tax versus GAAP earnings as it relates to the calculation is exacerbated by short timeframe the Department wants to look at.  In choosing year 3 of employment, the Department has elected a period of time where most individuals who work independently are still considered to be in the "start-up" phase.  In this phase, the owner is still making investments to the business with expenses eligible for the tax benefits such as accelerated depreciation.  These individuals may be building a client base, investing in equipment, furnishings, or other activities that would take advantage of the tax codes.  In fact, most are going to have minimal income because of those investments (and the tax laws that provide them with the ability to expense them quickly). No one in the accounting industry would assume that tax basis financials are representative of earnings and would be shocked to see them treated in an earnings calculation. As a result, the GE rule is biased against self-employed graduates and under-reports graduate earnings overall by not taking into account entrepreneurs.  In addition, it is unclear in the earnings data how many high school graduates are working in W-2 generating positions versus owning a business.

In short, the Department does not have all the necessary data to truly determine earnings in order to sustain the GE accountability framework, in particular the EP measure. Rather than looking to determine how to best get accurate earnings numbers, the Department is taking a shortcut and pulling basic numbers from the IRS and claiming that as a thorough depiction of earnings for graduates.  Therefore, it is essential that there be an earnings appeals process to help determine the most accurate and reliable earnings information that may be missing in the databases on which the Department relies.

7.    Geographic Location

Because Annual  Earnings is based on the actual earnings of a program's graduates, it often will be the case that it reflects earnings in concentrated geographic regions. In contrast, the EP measure will represent median earnings at the State level. Thus, the earnings of graduates who reside in a rural area of a state would be compared to a state-wide earnings number that incorporates individuals living in wealthier regions of the State.

The Department's current proposal fails to accommodate or otherwise account for wage differences across geographies. Institutions in rural markets may not be able to reduce the costs associated with delivering their programming enough to offset local earnings depression. In many cases, program length and content are dictated by State agencies (cosmetology boards, nursing boards) or programmatic accreditors, and the costs associated with facilities and equipment are largely fixed, without regard to the location of the school. Here again, without any accommodation for the impact of geographic location on reported earnings, institutions housed



in rural and socioeconomically depressed markets will suffer. These, of course, are the very markets where students are most in need of programming that leads to upward socioeconomic mobility.

8.    Other Data Issues

We further note, that there are structural inequities in the calculation that impair the adequacy of the data, such as disabled graduate workers who choose not to or cannot work full time and other factors that impact earnings and integration with changes to the IDR and IBR programs. Any fair rule must properly account for these factors on income and debt management calculations.

**III.    Section-by-Section Comments to Proposed Rule**

A.    *Financial Value Transparency – Subpart Q - §§ 668.401-409*

AACS supports the transparency goals of the FVT framework in Subpart Q, but we have concerns with the D/E and EP measures used to calculate both the FVT disclosures and the GE framework because the earnings data used in both the FVT and GE components of the Proposed Rule are fatally flawed for cosmetology programs.[119] In the NPRM, the Department proposes a two-pronged approach to measuring the value of Title IV-eligible programs.  First, all types of institutions (proprietary, public and nonprofit) offering any Title IV program would be subject to a new Financial Value Transparency ("FVT") disclosure regime under a new 34 C.F.R. Subpart Q (§§ 668.401-409) that would result in posting of Debt-to-Earnings ("D/E") rate and Earnings Premium ("EP") measure for every Title IV eligible program, whether such program is a GE or non-GE program.  For both GE and non-GE programs, the Department will collect data, calculate results, and post results on both D/E and EP, and require student acknowledgments for non-GE programs where programs fail the D/E rate.  Second, the Department establishes a Title IV accountability framework under a new Subpart S, applicable to only GE programs, as discussed in Section IV.

This section provides our comments on the D/E rate and EP as contained in the FTV framework in Subpart Q and also utilized for GE program under Subpart S.

**§§ 668.401(b), 668.401(c) – D/E Rates**

*Under the Department's FTV framework under Subpart Q, the Secretary assesses a Title IV program's debt-to-earnings rates ("D/E rates") and Earnings Premium ("EP") measure. 668.401(a). For each award year, the Secretary calculates two D/E rates for each eligible program: the discretionary debt-to-earnings rate and the annual debt-to-earnings rate. 668.401(b). A program passes the D/E rates if— (i) Its discretionary debt-to-earnings rate is less than or equal to 20 percent; (ii) Its annual debt-to-earnings rate is less than or equal to 8 percent; or (iii) The denominator (median annual or discretionary earnings) of either rate is zero and the numerator (median debt payments) is zero. 668.401(c)(1). A program fails the D/E*

---

[119] *Id.* at 32460.



*rates if— (i) Its discretionary debt-to-earnings rate is greater than 20 percent or the income for the denominator of the rate (median discretionary earnings) is negative or zero and the numerator (median debt payments) is positive; and (ii) Its annual debt-to-earnings rate is greater than 8 percent or the denominator of the rate (median annual earnings) is zero and the numerator (median debt payments) is positive. See § 668.401(c)(2).*

AACS Comment: For the D/E rate in both the FVT and GE frameworks, we request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*. As even the Department admits in the NPRM, there is at least an 8% underreporting issue with cosmetology program earnings, but we believe the figure to be closer to 20%.[120] The Department has failed to make any adjustments to earnings based on underreporting. The Department has also failed to provide any mechanism for AACS schools to present an alternate earnings appeal. As stated by the Department in 2019, to remedy the underreporting issue impacting a program's D/E rates, the 2014 GE Rule offered an alternate earnings appeal process.[121] At that time, the Department noted that adjusting the appeals process due to the ruling in *AACS vs. DeVos* was administratively burdensome but that rescission of the entire GE Rule would remedy the problem of accounting for under-reporting. As a result, the Department has not fully addressed how to account for the issue of underreporting and other weaknesses in federal agency earnings data if it moves forward once more with a GE Rule.

For the reasons cited in Section II.C. and II.D., the earnings data used for the D/E metric are not reliable for the programs offered by AACS schools. The Department also needs to ensure that the D/E metric does not *mislead* the public. Information must be provided to the public about these programs in a manner that does not result in exacerbating supply shortages for trained graduates in these fields or creating political incentives to limit these programs. The Department needs to evaluate the economic impact of institutions deciding to make these programs non-Title IV eligible based on low financial value metrics (or GE metrics): will only the wealthiest students be able to pursue these credentials, while students needing Title IV aid will not have access? That result flies in the face of the purpose of the Title IV program to level the playing field for low and moderate income individuals by providing aid and thus access to a program of their choice.

The Department stated in its 2019 GE Rescission that it should not sanction institutions for aspects of student debt and earning outcomes that are outside of the institution's control and agreed that the exclusion of tip-based income— especially in heavily tip-influenced professions, such as cosmetology—some self-employment income, and household income from the D/E rates measure renders the earnings portion of the D/E calculation subject to significant errors.[122]

---

[120] *Id.* at 32366.

[121] Rescission of Gainful Employment, 84 Fed. Reg. 31392, 31410 (July 1, 2019) (to be codified at 34 C.F.R. 600, 668).

[122] *Id.* at 31409-10.



## 668.401(d) – Earnings Premium

*For each award year, the Secretary calculates the earnings premium measure for an eligible program. 668.401(d). A program passes the earnings premium measure if the median annual earnings of the students who completed the program exceed the earnings threshold. 668.401(e)(1). A program fails the earnings premium measure if the median annual earnings of the students who completed the program are equal to or less than the earnings threshold. 668.401(e)(2).*

AACS Comment: We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

The Earnings Premium is based on flawed earnings data for the reasons discussed in Section II.

## § 668.403(b) – Deduction of Institutional Grants and Scholarships

*The  Secretary calculates the annual loan payment for a program by— (1)(i) Determining the median loan debt of the students who completed the program during the cohort period, based on the lesser of the loan debt incurred by each student as determined under paragraph (d) of this section or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student; (ii) Removing, if applicable, the appropriate number of largest loan debts as described in § 668.405(d)(2); and (iii) Calculating the median of the remaining amounts. See § 668.403(b).*

AACS Comment: We support the proposal allowing a deduction from "tuition, fees, books equipment and supplies" the amount of any institutional grant or scholarship funds provided to a student. This will incentivize institutions to continue offering, or offer for the first time, significant aid to assist students with the cost of attendance.

## § 668.403(c) – Federal Agency Earnings Data

*For annual earnings, the Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (e) of this section; and (2) The Secretary uses the median annual earnings to calculate the D/E rates. 668.403(c).*

AACS Comment: For the reasons cited in Section II.C. and II.D. regarding earnings data flaws, we object to the use of Federal agency earnings data in D/E and EP measures as utilized in the FVT and GE regulations. We request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos* or, in the alternative, conduct a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting,



independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates.

## § 668.403(f) – Small Cohort Size Exclusion

*The Secretary does not issue D/E rates for a program under § 668.406 if—*

*(1) After applying the exclusions in paragraph (e) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or (2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (c) of this section. See § 668.403(f).*

AACS Comment: For the reasons provided in Section II.C.3., we are concerned that the exclusion of D/E rates for a program with fewer than 30 students completing during a two-year or four-year cohort period rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low graduation rates to escape the FVT disclosures because D/E and EP rates cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

Graduation rates are a critical program level value metric. As the Department states, "[i]mproved completion rates also have broader societal benefits, such as increased tax revenue because college graduates, on average, have lower unemployment rates, are less likely to rely on public benefit programs, and contribute more in tax revenue through higher earnings."[123] Ensuring students graduate is an important part of any program. The Department should consider a separate FVT metric based solely on program level graduation rates, so that students are aware when a program does poorly at graduating students and thus is excluded from calculating D/E and EP rates. For too long, too many institutions from all sectors have failed in graduating students at high enough rates, leaving students with debt and limited value from incomplete postsecondary education.

Nowhere in the FVT framework does the Department recognize programs with higher graduation rates, particularly for Pell eligible and minority students. The Department also does not take into account the longer term benefits of obtaining a credential, including improving the likelihood of having a good job by age 30.[124] Measuring the progress of low income or students of color in improving their economic mobility through enrollment in a program (i.e., "social mobility") is currently measured by varying approaches.  U.S. News and World Report measures social mobility based simply on Pell Grant eligibility and graduation rates. Measuring graduation rates

---

[123] 88 Fed. Reg. at 32446.

[124] Anthony P. Carnevale et al., What Works: Ten Education, Training, and Work-Based Pathway Changes that Lead to Good Jobs, Geo. Univ. (2023), https://cew.georgetown.edu/wp-content/uploads/cew-ten_pathway_changes-fr.pdf.



by Pell Grant eligibility demonstrates value, as noted by the Department, in increasing lifetime earnings and reducing the risk of unemployment.

## § 668.404(a), (b) – Earnings Premium Measure

*Except as provided under 668.404(d), for each award year, the Secretary calculates the earnings premium measure for a program by determining whether the median annual earnings of the title IV, HEA recipients who completed the program exceed the earnings threshold. 668.404(a). The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under 668.404(c); and (2) The Secretary uses the median annual earnings of students with a high school diploma or GED using data from the Census Bureau to calculate the earnings threshold described in § 668.2. 668.404(b)(1). The Secretary determines the earnings thresholds and publishes the thresholds annually through a notice in the Federal Register. See § 668.404(b)(2).*

AACS Comment: We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

For the reasons cited in Section II, we object to the lack of transparency in the EP measures regarding the source of the data that will be used by the Department. The lack of transparency both with the source of data and the inability to appeal such earnings data makes it impossible for institutions to accurately or reliably predict whether their programs will pass the EP measure. Particularly for GE programs subject to loss of Title IV, removal of the zone and transitional rates in the prior GE Rule means that the EP metric could lead immediately to warnings followed by loss of Title IV eligibility without sufficient prior notice. Further, we object to the Department using Census Bureau data to arrive at median annual earnings of students with a high school diploma or GED using individuals age 25-34.  Such a measure fails to account for demographic differences between cosmetology program students and the general public.

## § 668.404(d)- Small Cohort Size Exclusion

*The Secretary does not issue the earnings premium measure for a program under § 668.406 if— (1) After applying the exclusions in paragraph (c) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or (2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (b) of this section. See § 668.404(d).*

AACS Comment: Similar to our comment for § 668.403(f), we are concerned that the exclusion of an EP measure for a program rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low



graduation rates to escape the FVT disclosures because EP measure cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

The Department should consider a separate FVT metric based solely on program level graduation rates, so that students are aware when a program does poorly at graduating students and thus is excluded from calculating D/E and EP rates. [125]

## § 668.405(b)-(d) – Federal agency earnings challenge

*The Secretary uses the administrative data to— (1) Compile a list of students who completed each program during the cohort period. The Secretary—(i) Removes from those lists students who are excluded under §§ 668.403(e) or 668.404(c); (ii) Provides the list to institutions; and (iii) Allows the institution to correct the information about the students on the list, as provided in paragraph (a) of this section; (2) Obtain from a Federal agency with earnings data the median annual earnings of the students on each list, as provided in paragraph (c) of this section; and (3) Calculate the D/E rates and the earnings premium measure and provide them to the institution. See § 668.405(b).*

*For each list submitted to the Federal agency with earnings data, the agency returns to the Secretary— (1) The median annual earnings of the students on the list whom the Federal agency with earnings data has matched to earnings data, in aggregate and not in individual form; and (2) The number, but not the identities, of students on the list that the Federal agency with earnings data could not match. See § 668.405(c).*

*If the Federal agency with earnings data includes reports from records of earnings on at least 30 students, the Secretary uses the median annual earnings provided by the Federal agency with earnings data to calculate the D/E rates and earnings premium measure for each program. 668.405(d)(1). If the Federal agency with earnings data reports that it was unable to match one or more of the students on the final list, the Secretary does not include in the calculation of the median loan debt for D/E rates the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did not match. For example, if the Federal agency with earnings data is unable to match three students out of 100 students, the Secretary orders by amount the debts of the 100 listed students and excludes from the D/E rates calculation the three largest loan debts. See § 668.405(d)(2).*

---

[125] 88 Fed. Reg. at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"). The Department states: "The overall 3- year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools," *id.* at 32425. This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.



<u>AACS Comment</u>: We request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[126] or, in the alternative, conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates. The EP measure should be rescinded in both the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing an earnings-only value metric for higher education programs.

The Department does not provide a means for institutions to review or challenge Federal agency earnings data used in the D/E or EP rates, or allow appeal of same. The Department should restore the Alternate Earnings Appeal contained in the 2014 GE Rule to permit institutions to provide other, credible sources of alternate graduate earnings data. The appeal should be modified to account for the flaws identified by the Court, specifically by allowing institutions to file an appeal with a statistically significant response rate that is less than 100% of the program cohort.

## § 668.408(a) – Information reporting

*In accordance with procedures established by the Secretary, an institution must report to the Department—*
*(1) For each GE program and eligible non-GE program—*
*(i) The name, CIP code, credential level, and length of the program;*
*(ii) Whether the program is programmatically accredited and, if so, the name of the accrediting agency;*
*(iii) Whether the program meets licensure requirements or prepares students to sit for a licensure*
*examination in a particular occupation for each State in the institution's metropolitan statistical area;*
*(iv) The total number of students enrolled in the program during the most recently completed award year, including both recipients and nonrecipients of title IV, HEA funds; and*
*(v) Whether the program is a medical or dental program whose students are required to complete an internship or residency, as described in the definition of ''cohort period'' under § 668.2.*
*(2) For each student—*
*(i) Information needed to identify the student and the institution;*
*(ii) The date the student initially enrolled in the program;*
*(iii) The student's attendance dates and attendance status (e.g., enrolled, withdrawn, or completed) in the program during the award year; and*
*(iv) The student's enrollment status (e.g., full time, three quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;*

---

[126] *AACS* at 63.



*(v) The student's total annual cost of attendance;*
*(vi) The total tuition and fees assessed to the student for the award year;*
*(vii) The student's residency tuition status by State or district;*
*(viii) The student's total annual allowance for books, supplies, and equipment from their cost of attendance under HEA section 472;*
*(ix) The student's total annual allowance for housing and food from their cost of attendance under HEA section 472;*
*(x) The amount of institutional grants and scholarships disbursed to the student;*
*(xi) The amount of other State, Tribal, or private grants disbursed to the student; and*
*(xii) The amount of any private education loans disbursed, including private education loans made by the institution;*
*(3) If the student completed or withdrew from the program during the award year—*
*(i) The date the student completed or withdrew from the program;*
*(ii) The total amount the student received from private education loans, as described in § 668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;*
*(iii) The total amount of institutional debt, as described in § 668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;*
*(iv) The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;*
*(v) The total amount of the allowances for books, supplies, and equipment included in the student's title IV Cost of Attendance (COA) for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and*
*(vi) The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program; and*
*(4) As described in a notice published by the Secretary in the **Federal Register**, any other information the Secretary requires the institution to report.*

See § 668.408(a).

AACS Comment: We support the Department's approach to require institutions offering both GE and non-GE programs to provide a wide variety of information to the Department. It is our hope that with more robust data collection, the Department will make more information available to the public at the program level regardless of institution type.

We also recommend that the Department disclose on the FVT website:

- Program level on-time graduation rates
- Program level on-time graduation rates for Pell eligible students
- Program level on-time graduation rates for Black, Hispanic or other students of color
- Amount of state subsidies for public institution programs. State tax subsidies that support public programs should be evaluated, along with Title IV investments, to



better understand "public investment" in a program relative to cost, debt and earnings. Comparing public and non-profit schools to proprietary schools gives the public and non-profit institutions an unfair advantage over proprietary schools. Public institutions are supported by state appropriations and grants leading to lower tuition. Non-profit institutions benefit from non-profit tax status and tax deductible donations that can support operating revenues and lower tuition for high need students. These are taxpayer funded benefits that must be taken into consideration. The American Institute for Research study showed the proprietary sector's strong R.O.I. for the American taxpayer.  See, e.g., https://www.air.org/news/press-release/taxpayer-subsidies-most-colleges-and-universities-average-between-8000-more.

- The Department should also identify access institutions that serve high proportion of low income students and disclose that information on the FVT website. For example, a prestigious non-profit institution with 5% of its program enrollment comprised of Pell eligible students with a 95% graduation rate is not more valuable than a for-profit institution with 80% of its program comprised of Pell eligible students with a 60% graduation rate. The former is doing little to improve social mobility except for an elite few, while the latter is making a material difference to low income students. An institution that can offer a program that graduates Pell eligible student population at a higher than average rate, and that demonstrates average or better debt levels across the programs should be applauded, not shamed on such lists. Recognizing different student profiles by either weighing more heavily at-risk student outcomes, producing separate metrics for certain students (such as those eligible to receive Pell Grants), or a combination of both, is a reasonable approach. *See* https://www.newamerica.org/education-policy/reports/searching-accountability-higher-education-balanced-framework-goals-metrics/priming-the-pump-guiding-principles

We believe this information could help the Department make any needed future adjustments to the D/E and EP rates to ensure that clear and accurate information is provided to students.

## § 668.409 - Severability

*The regulations provide for Subpart Q that if any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the part and this subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby. See § 668.409.*

AACS Comment: The Department indicates that the FVT provisions in Subpart Q are entirely severable from Subpart S (GE) and any other subpart of the NPRM. For that reason, the Department has the flexibility to remove Subpart S (GE) while still meetings its goals.

B.      *Gainful Employment – Subpart S - §§ 668.401-409*



From the date of its enactment in 1965, the HEA has required all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, to "prepare students for gainful employment in a recognized occupation." However, at no time has the Department been directed or authorized by Congress to develop a system for measuring whether programs were satisfying this "gainful employment" standard.  In defining the term now, the Department has exceeded its authority under the HEA.

As stated in Section III.A., the Department has taken a two-pronged approach to measuring the value of Title IV-eligible programs but the result is arbitrary and capricious.  For GE programs only, the D/E and EP metrics would result – after one year of program failure of either metric – mandatory student warnings for all enrolled students and the public, and loss of Title IV eligibility for a program if the program fails the D/E or EP metric in two out of three consecutive years.

Overall, the proposed GE accountability framework is substantially similar to the most recent discussion draft and would require that covered GE programs pass both the D/E and the EP metric. Subpart S applies to all GE programs offered by for-profit, proprietary institutions, as well as to most non-degree (certificate) programs offered by public and private nonprofit institutions.

In our view, two separate tracks, and potentially two different value measurements, will be unfair, inequitable and very confusing for students, the ultimate stakeholder. As discussed in Section III.A., we support the Department's effort to move forward with a Financial Value Transparency framework, but only if issues related to AACS school member program earnings are resolved in the D/E metric and the EP measure is rescinded pending further study on the risks of an earnings-only Title IV metric.

As discussed in detail in Section II.C. and II.D., AACS has significant concerns about the underlying metrics used to measure both D/E and EP. The EP and earnings threshold are based on earnings data that is inaccurate, biased and inconsistent. We are further concerned that the Department has not definitely identified the "Federal agency with earnings data" or provided evidence of a Memorandum of Understanding ("MOU") with any agency. With regards to the definition of student, we recommend that the Department expand the definition to include all students who *are eligible* for title IV funds, versus student *who received* title IV funds.

### § 602(a) – New GE Program Definition

*The Proposed Rule would establish new criteria for GE programs to be considered Title IV eligible programs. Specifically, a GE program would be Title IV eligible if it provides training that prepares students for gainful employment in a recognized occupation only if the program— (1) Satisfies the applicable [GE program] certification requirements in § 668.604; (2) is not a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated; and (3) is not a failing program under the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated. See § 602(a).*



<u>AACS Comment</u>: The HEA requires that a program offered by a proprietary institution or vocational institution to provide training that prepares students for gainful employment in a recognized occupation. The Department points to Sections 102(b) and (c), as well as Section 101(b)(1) for authority to apply the GE Rule and associated sanctions to certain programs. As described in the NPRM:

> "Sections 102(b) and (c) of the HEA define, in part, a proprietary institution and a postsecondary vocational institution as one that provides an eligible program of training that prepares students for gainful employment in a recognized occupation. Section 101(b)(1) of the HEA defines an institution of higher education, in part, as any institution that provides not less than a one-year program of training that prepares students for gainful employment in a recognized occupation. The statute does not further specify this requirement, and through multiple reauthorizations of the HEA, Congress has neither further clarified the concept of gainful employment, nor curtailed the Secretary's authority to further define this requirement through regulation."[127]

We disagree that the Department has the authority under Sections 101 and 102 of the HEA to promulgate the GE Rule and apply it selectively to certain institutions.

The Subpart S accountability regime also illegally and without any statutory support differs from the 2014 GE Rule in that it would require a GE program to pass BOTH a D/E metric and the new EP threshold metric which is based solely on earnings.

## § 602(b)-(e) – Rates Not Calculated

*If the Secretary does not calculate or issue D/E rates for a program for an award year, the program receives no result under the D/E rates for that award year and remains in the same status under the D/E rates as the previous award year. See § 602(b). If the Secretary does not calculate D/E rates for the program for four or more consecutive award years, the Secretary disregards the program's D/E rates for any award year prior to the four-year period in determining the program's eligibility.[128] If the Secretary does not calculate or issue earnings premium measures for a program for an award year, the program receives no result under the earnings premium measure for that award year and remains in the same status under the earnings premium measure as the previous award year.[129] If the Secretary does not calculate the earnings premium measure for the program for four or more consecutive award years, the*

---

[127] 88 Fed. Reg. at 32307.

[128] *See* Proposed § 668.602(c).

[129] *See* Proposed §668.602(d).



*Secretary disregards the program's earnings premium for any award year prior to the four-year period in determining the program's eligibility.*[130]

<u>AACS Comment</u>: In reviewing the 2022 Program Performance Data ("PPD"), it is clear that a significant number of programs do not meet the n>30 cohort requirements and are therefore excluded from the calculation. In reviewing the cosmetology specific data, nearly 1/3 of the programs pass as a result of insufficient cohort size.  Further, as described in detail in the RIA, the Department estimates that only 75 percent of GE enrollment and 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort. An additional 8 percent of GE enrollment and 11 percent of GE programs would be likely to have metrics computed using a four-year completer cohort.[131]

Based on the Department's own calculations, only 26 percent of programs would be measured. The proposed calculation regulation, therefore, results in arbitrary results where a significant margin of  GE programs (certificate level) offered by private nonprofit and public institutions have less than 30 graduates in a two or four year cohorts and therefore are exempt from having any GE rates calculated for accountability purposes.

### § 603(a) – Consequence of Failing GE Rates

*If a GE program is a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated, or the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated, the program becomes ineligible and its participation in the title IV, HEA programs ends upon the earliest of—*

> *(1) The issuance of a new Eligibility and Certification Approval Report that does not include that program;*
> *(2) The completion of a termination action of program eligibility, if an action is initiated under subpart G of this part; or*
> *(3) A revocation of program eligibility, if the institution is provisionally certified.*[132]

<u>AACS Comment</u>: We object to the consequences associated with a voluntary wind down of a program. Institutions that seek to close or wind down a program should be allowed to continue participation on a limited basis for currently enrolled students. We also believe that failing programs should only lose access to the Direct Loan program, not Pell Grants, and that all students in a failing GE program should have access to Title IV aid throughout the completion of their program.

---

[130] *See* Proposed § 668.602(e).

[131] 88 Fed. Reg. at 32355.

[132] *See* Proposed § 668.603(a).



## § 603(b) – Appeal

*If the Secretary initiates a program eligibility termination action, the institution may initiate an appeal under subpart G of this part if it believes the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. Institutions may not dispute a program's ineligibility based upon its D/E rates or the earnings premium measure except as described in this paragraph (b). See 603(b).*

AACS Comment: We note that this appeal process differs drastically from the 2014 GE Rule which provided for an Alternate Earnings Appeal, and that Department would curtail the discretion of the hearing official to do anything other than determine that the Department failed in the actual D/E or EP rate calculation as a matter of math – earnings information may not be challenged at all through this appeals process.

AACS opposes the elimination of the Alternate Earnings Appeal. We are of the strong opinion that the earnings appeal is essential to the due process concerns related to the earnings data.  In response to the 2014 GE Rule, AACS filed a lawsuit against the Department as related to the alternate earnings appeal.  In that case, the Court held that the "Department of Education's overall methodology for determining a program's average income is arbitrary and capricious."[133] The Court ruling was narrowly tailored to the concerns around the methodology. We recommend, and would support, an earnings appeal process that "removes  barriers  to  appeal, making  it  more  widely available for programs subject to the regulations"[134] as described by the Court.

In a related proposed amendment, the Department would *require* that a hearing official terminate the eligibility of a GE program that fails to meet the required GE metrics, unless the hearing official concludes that the Secretary erred in the calculation.

## § 603(c)(2)-(3) Ineligible GE programs.

*An institution may not seek to reestablish the eligibility of a failing GE program that it discontinued voluntarily either before or after D/E rates or the earnings premium measure are issued for that program, or reestablish the eligibility of a program that is ineligible under the D/E rates or the earnings premium measure, until three years following the earlier of the date the program loses eligibility under Section 603(a) or the date the institution voluntarily discontinued the failing program.[135] An ineligible program, or a failing program that an institution voluntarily discontinues, remains ineligible until the institution establishes the eligibility of that program under § 668.604(c).[136]*

---

[133] *AACS* at 73.

[134] *Id.* at 56.

[135] *See* Proposed § 668.603(c)(2).

[136] *See* Proposed § 668.603(c)(3).



**AACS Comment**: AACS has significant concerns about the reinstatement provisions. As we discussed throughout this comment, cosmetology schools are unique in the fact that they offer limited programs that are almost always within the same four digit CIP code. We note that as with the 2014 GE Rule, the Department indicates that this prohibition would cover any "substantially similar program," as well, which is defined as any program with "the same 4-digit CIP prefix and credential level."[137] This creates an undue burden on institutions, like cosmetology programs, that provide specialized education in a narrow field.

### § 604(a) to (d) Certification

*Except as provided in paragraph (a)(2) of this section, an institution must provide to the Secretary no later than December 31 of the year in which this regulation takes effect, in accordance with procedures established by the Secretary, a certification signed by its most senior executive officer that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. The Secretary accepts the certification as an addendum to the institution's program participation agreement with the Secretary under § 668.14[138]. If an institution makes the certification in its program participation agreement pursuant to paragraph 604(b) of this section between July 1 and December 31 of the year in which this regulation takes effect, it is not required to provide the transitional certification under this paragraph.[139] As a condition of its continued participation in the title IV, HEA programs, an institution must certify in its program participation agreement with the Secretary under § 668.14 that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. An institution must update the certification within 10 days if there are any changes in the approvals for a program, or other changes for a program that render an existing certification no longer accurate.[140] An institution establishes a GE program's eligibility for title IV, HEA program funds by updating the list of the institution's eligible programs maintained by the Department to include that program, as provided under 34 CFR 600.21(a)(11)(i). By updating the list of the institution's eligible programs, the institution affirms that the program satisfies the certification requirements in paragraph (d) of this section. Except as provided in paragraph (c)(2) of this section, after the institution updates its list of eligible programs, the institution may disburse title IV, HEA program funds to students enrolled in that program.[141]*

**AACS Comment**: Newly added 34 C.F.R. § 668.604 would require transitional certifications for existing GE programs, as well as certifications when seeking recertification or the approval of a new or modified GE program. Given the undefined variables in the GE Rule and the projected

---

[137] 88 Fed. Reg. at 32345.

[138] *See* Proposed § 668.604(a)(1).

[139] *See* Proposed § 668.604(a)(2).

[140] *See* Proposed § 668.604(b).

[141] *See* Proposed § 668.604(c)(1).



timing for institutional reporting and Department notification to institutions, we are concerned that institutions may be required to certify a GE program prematurely. We recommend that his section be amended to allow a more fulsome transition period. As currently drafted, an institution would need to provide a transitional certification no later than December 31 of the year in which the regulation takes effect (likely, by December 31, 2024), as an addendum to the institution's PPA with ED. Failure to complete the transitional certification would result in discontinued participation in the Title IV, HEA programs.[142]

### **Student Warnings§ 605(a) to (h)**

*The institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the GE program could become ineligible under this subpart based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the GE program.[143]*

*If a student or prospective student receives a warning under paragraph (a) of this section with respect to a GE program, but does not seek to enroll until more than 12 months after receiving the warning, the institution must again provide the warning to the student or prospective student, unless, since providing the initial warning, the program has passed both the D/E rates and earnings premium measures for the two most recent consecutive award years in which the metrics were calculated for the program.[144]*

*The institution must provide in the warning—*

*(1) A warning, as specified by the Secretary in a notice published in the Federal Register, that—
(i) The program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings, as applicable; and  (ii) The program could lose access to Federal grants and loans based on the next calculated program metrics;*

*(2) The relevant information to access the disclosure website maintained by the Secretary described in § 668.43(d);*

*(3) A statement that the student must acknowledge having seen the warning through the disclosure website maintained by the Secretary described in § 668.43(d) before the institution may disburse any title IV, HEA funds;*

*(4) A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students could transfer*

---

[142] *See* 88 Fed. Reg. at 32346-47.

[143] *See* Proposed § 668.605(a).

[144] *See* Proposed § 668.605(b)



*credits earned in the program to another program at the institution and which course credits would transfer, in the event that the program loses eligibility for title IV, HEA program funds;*

*(5) An indication of whether, in the event that the program loses eligibility for title IV, HEA program funds, the institution will—(i) Continue to provide instruction in the program to allow students to complete the program; and (ii) Refund the tuition, fees, and other required charges paid to the institution by, or on behalf of, students for enrollment in the program; and*

*(6) An explanation of whether, in the event that the program loses eligibility for title IV, HEA program funds, the students could transfer credits earned in the program to another institution in accordance with an established articulation agreement or teach-out plan or agreement.*[145]

*In addition to providing the English-language warning, the institution must also provide translations of the English language student warning for those students and prospective students who have limited proficiency in English.*[146]

*An institution must provide the warning required under this section in writing, by hand delivery, mail, or electronic means, to each student enrolled in the program no later than 30 days after the date of the Secretary's notice of determination under § 668.406 and maintain documentation of its efforts to provide that warning. The warning must be the only substantive content contained in these written communications.*[147]

*An institution must provide the warning as required under this section to each prospective student or to each third party acting on behalf of the prospective student at the first contact about the program between the institution and the student or the third party acting on behalf of the student by— (i) Hand-delivering the warning as a separate document to the prospective student or third party individually, or as part of a group presentation; (ii) Sending the warning to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the warning is the only substantive content in the email and that the warning is sent by a different method of delivery if the institution receives a response that the email could not be delivered; or (iii) Providing the warning orally to the student or third party if the contact is by telephone.*[148] *An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the institution delivers the warning as described in paragraph (f) of this section.*[149]

---

[145] *See* Proposed § 668.605(c).

[146] *See* Proposed § 668.605(d).

[147] *See* Proposed § 668.605(e).

[148] *See* Proposed § 668.605(f)(1).

[149] *See* Proposed. § 668.605(f)(2).



*An institution may not disburse title IV, HEA funds to the student until the student completes the acknowledgment described in paragraph (c)(3) of this section, as administered and collected through the disclosure website maintained by the Secretary described in § 668.43(d).*[150]

*The provision of a student warning or the acknowledgment described in paragraph (c)(3) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as evidence against a student's claim if applying for a loan discharge.*[151]

<u>AACS Comment</u>: We oppose the proposed warnings in § 605(a) to (h) on the grounds that they are an unconstitutional violation of the First Amendment and will cause irreparable harm to programs.  The First Amendment equally protects the right to speak freely and the "right to refrain from speaking at all." [152] The proposed GE Rule violates the First Amendment because it compels an institution to give voice to the government's non-factual perspective regarding a student's ability to find employment and to repay his debt. Such non-factual compelled speech cannot withstand either strict or intermediate scrutiny.

      B.     <u>Subpart S is Contrary to Law</u>

Below, we provide our comments as to why Subpart S is contrary to law and should be rescinded.

      1.     *Administrative Procedures Act*

The Federal Administrative Procedure Act[153] requires that agency actions satisfy an arbitrary-and-capricious standard. For the notice and comment rulemaking process, this standard requires that an agency give "reasoned consideration to all the material facts and issues."[154] Reasoned consideration is satisfied by demonstrating a "rational connection between the facts found and the choice made."[155] An agency fails to satisfy the standard if it does not consider all of the facts

---

[150] *See* Proposed § 668.605(g).

[151] *See* Proposed. § 668.605(h).

[152] Wooley v. Maynard, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'"); *see* Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n, 475 U.S. 1, 16 (1986) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say."); R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1211 (D.C. Cir. 2012) ("Both the right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind protected by the First Amendment") (quotations omitted); Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996) ("The right not to speak inheres in political and commercial speech alike and extends to statements of fact as well as statements of opinion.") (citations omitted).

[153] 5 U.S.C. § 706(2)(A).

[154] Greater Bos. Television Corp. v. FCC, 444 F.2d 841, 851 (1970).

[155] Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983).



and issues.[156] An agency additionally fails to satisfy the standard if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[157] The APA instills an affirmative duty to act in a rational manner in the agency, which requires the agency to address all essential factual assumptions.[158] Discretion is afforded to an agency to sacrifice "some measure of 'fit' for administrability" if it provides sufficient justification for treating certain actors differently than others.[159]

In this instance, the Department failed to provide any justification for the significant departure from the 2019 rescission.  In fact, the only justification the Department asserts in the NPRM is that there is a difference in the "Department's reasoning at the time."[160] This is insufficient. Further, the Department fails to meet the standards for significant rule changes that require the Department provide rationale for the change from the prior rule.

### 2.    Section 498 of the Higher Education Act

The Department states that the GE rule is supported by the Department's statutory responsibilities to observe eligibility limits in the HEA. Specifically, the Department asserts that Section 498 of the HEA requires institutions to establish eligibility to provide Title IV, HEA funds to their students. Eligible institutions must also meet program eligibility requirements for students in those programs to receive title IV, HEA assistance.[161] The Department states that since the inception of the Higher Education Act (HEA) in 1965, all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, have been required to "prepare students for gainful employment in a recognized occupation."[162]

As we have previously asserted in response to each of the GE NPRM's, and we assert again now, the Department does not have the statutory authority to attach an accountability framework to the phrase "gainful employment." Since 1965, the HEA has required all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, to "prepare students for gainful employment in a recognized occupation."[163] However, at no time has the Department been directed or authorized by Congress to develop a

---

[156] *See* N.Y. Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177 (D.C. Cir. 2004).

[157] *Motor Vehicle Mfrs. Ass'n* at 43.

[158] Am. Mar. Ass'n v. U.S., 766 F.2d 545, 567-568 (D.C. Cir. 1985).

[159] Leather Indus. of Am., Inc. v. Env't Prot. Agency, 40 F.3d 392, 403 (D.C. Cir. 1994).

[160] 88 Fed. Reg. at 32307.

[161] *Id.* at 32321-22.

[162] *See* Pub. L. No. 89-329 (Nov. 8, 1965).

[163] *Id.*



system for measuring whether programs were satisfying this "gainful employment" as a standard for program participation. In the 2019 rescission, the Department observed that "[d]espite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-earnings ratios."[164]

Moreover, with regard to cosmetology programs in particular, these programs have been eligible to participate in Title IV since the enactment of the HEA, provided that they met all the other eligibility criteria. Yet, with the publication of the current NPRM, the Department has proposed a rule that will close almost all of them based on the Department's newest interpretation of the GE Rule. The Department has provided no evidence to support this dramatic change in regulation and departure from prior law.

In prior iterations of the GE Rule, the Courts have deferred to the Department based on the *Chevron Doctrine.* In light of the recent *West Virginia* case, however, the Court must re-evaluate the agency deference afforded the Department. Under *Chevron,* the Court looked to determine that the Department had general authority to regulate and that the terms in question were ambiguous. After *West Virginia,* for cases involving a major question, as is the case here, the Department must point to clear language that signals specific Congressional intent.[165]

In the NPRM, the Department cites a range of broad statutory authorities as the basis for its proposal, but nowhere does it point to specific authorization from Congress to define the phrase "gainful employment" or to embed an accountability framework into the definition of these "two words."

3.   *The Gainful Employment Rule Violates First Amendment Right to Speech.*

The First Amendment states that "Congress shall make no law…abridging the freedom of speech."[166] Courts apply a heightened standard of scrutiny when statutes or regulations burden free speech rights.[167] When the content of the speech is regulated, a "strict scrutiny" standard applies.[168] Regulations that burden speech based on the identity or type of speaker is a content-based restriction subject to this strict scrutiny standard.[169] Governmental action impacting speech based on content "must serve a compelling state interest that is narrowly tailored to meet

---

[164] 84 Fed. Reg. at 31411.

[165] W. Va. v. Env't Prot. Agency, 142 S.Ct. 2587, 2609 (2022).

[166] U.S. Const. Amend. I.

[167] *Id.*

[168] Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer, 961 F.3d 1062, 1068 (9th Cir. 2020).

[169] *Id.* at 1068, 1070.



that interest."[170]   The means chosen by the government to carry out its purported interest must be "the least restrictive means" to satisfy such interest.[171]

Vocational training is a category of speech that is entitled to First Amendment protection.[172] Laws—either statutes or regulation- that treat vocational programs differently based on content will be reviewed under a "strict scrutiny" standard.[173]  The GE Rule violates the First Amendment by interfering with the free speech rights of cosmetology students and schools. The rule interferes with the free speech rights of students by preventing them from receiving education in this space.  Likewise, the rule interferes with the free speech rights of cosmetology schools by preventing them from communicating the education to students.

As drafted, the GE Rule would potentially cause the closure of some cosmetology schools if significant GE programs become Title IV ineligible. Students attending these schools would be denied the opportunity to seek an education in the cosmetology field.   The GE Rule also violates the free speech rights of schools by regulating the type of speech or speakers in two different ways. First, the GE Rule only requires for-profit institutions and certificate programs at public and non-profit institutions to be sanctioned for failure to comply with the GE Rule, not other types of institutions that offer the same type of curriculum. Cosmetology programs, as vocational programs, are subjected to sanctions, potentially resulting in a loss of Title IV eligibility for failure to comply with the threshold metrics of the GE Rule. For this reason, the Department is specifically burdening a type of institution and the "speech" or programs that are typically taught at these institutions.

Second, the rule singles out a particular type of institution, i.e. cosmetology schools. The Department may claim that the rule is facially neutral with respect to the type of programs that will lose Title IV eligibility.  However, facially neutral laws violate the First Amendment when they have the effect of burdening a particular type of speech in effect.[174] Compliance with the GE Rule is conditioned on satisfying two metrics: the D/E Rate and the Premium Earnings. These metrics are fatally flawed, as they relate to cosmetology and barbering programs.  The earnings data used for both fails to account for the underreporting of income, which the Department admits is prevalent in the beauty and wellness industry. While acknowledging these flaws, the Department has failed to address this topic in the formulation of the metrics. This has resulted in the GE Rule imposing eligibility metrics that disproportionately burden a particular type of school— cosmetology schools—and simultaneously a particular type of speech—the delivery of beauty and wellness education. Therefore, the rule would be subject to the strict scrutiny standard of review, if challenged in court.

---

[170] *Id.* at 1068.

[171] Sable Commc'ns of Cal. v. FCC, 492 U.S. 115, 126 (1989).

[172] *Pac. Coast Horseshoeing Sch., Inc.* at 1069.

[173] *Id.*

[174] *See* Turner Broad. Sys. v. FCC, 512 U.S. 622, 647 (1994).



Further, the Department has not provided a "compelling state interest that is narrowly tailored to meet that interest."[175] The Department justifies the GE Rule on the ground that providing that "given the high cost of education and correspondingly high need for student debt, students, families, institutions, and the public have an acute interest in ensuring that higher education investments are justified through positive repayment and earnings outcomes for graduates."[176] The Department acknowledges that it previously (in the 2019 Rule) "eliminated any accountability framework in favor of non-regulatory updates to the College Scorecard on the premise that transparency could encourage market forces to bring accountability to bear"[177] but seeks now to discredit the value of market forces. We disagree. Required disclosures regarding student debt provide students critical information they need, and use, to make decisions about postsecondary enrollment. We note that in the context of the FVT, these same market forces are deemed sufficient. The Department should rescind the Subpart S provisions in favor of the Subpart Q framework.

The GE Rule fails the strict scrutiny standard as the Department's methods are not the least restrictive means to fulfill its purpose. The Department's purpose in enacting the accountability measures is to ensure that all Title IV programs lead to gainful employment. The Department has a number of less restrictive options that would satisfy this purpose, including simply retaining the Subpart Q framework. The Department's suggestion that "market forces" are insufficient fails to satisfy the standard of "strict scrutiny" and, therefore, the GE Rule violates the First Amendment.

4.   *The Gainful Employment Rule Violates the Due Process Clause*

a.   Protectable Property Interest

The proposed GE Rule violates the Due Process Clause because it strips access to Title IV funding from institutions that have a legitimate claim of entitlement to it. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[178] The Fifth Amendment applies the Due Process Clause to the Federal Government.[179] A property interest is not defined in the Constitution. Independent sources of law assist in identifying property interests. A public benefit falls within the category of "property interest" when an individual has a "legitimate claim of entitlement to it."[180] To determine whether a party has satisfied this definition of a property interest, a court will consider "'whether the statutes and regulations governing the distribution of benefits,' state or federal, 'meaningfully channel official discretion

---

[175] *See Pac. Coast Horseshoeing Sch., Inc.* at 1068 (defining strict scrutiny).

[176] 88 Fed. Reg. at 32307.

[177] *Id.*

[178] U.S. Const. Amend. V.

[179] *Id.*

[180] Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577 (1972).



by mandating a defined administrative outcome."[181] A property interest is present when the regulatory scheme provides "fixed eligibility criteria" to receive benefits.[182] No property interest is present when the regulatory scheme provides the government with significant discretion over the eligibility.[183]

In *Association of Proprietary Colleges v. Duncan*, the District Court found that a for-profit school did not have a property interest in the Title IV federal aid program. The District Court cited the following factors in its decision: (1) the institutions were not direct recipients of the federal funding, but instead third-party recipients; (2) the Department maintains significant discretion to determine the eligibility of the Title IV federal aid program; and (3) the Department possesses a reserved right to withhold funding from for-profit institutions. The Department should recognize, however, that the court's analysis in that case was flawed.

An institution of higher education is not a third-party recipient in the Title IV federal aid program.  The financial assistance provided to a student is distributed for purposes, and under the condition, that the student apply the funding towards enrollment at an eligible institution. The institution itself is a focal aspect of Title IV of the Higher Education Act, discussed at length throughout the regulation with various chapters dedicated to the eligibility and other aspects of an institution's participation in the federal aid program. Describing an institution as a "third-party recipient" of the Title IV program funds demonstrates  a misunderstanding of the federal aid process, and the institution's role in higher education.

Additionally, 20 U.S.C. § 1094(c)(1)(F) creates a constitutionally protected property interest. It provides for "the limitation, suspension, or termination of the participation in any program under this subchapter of an eligible institution, or the imposition of a civil penalty under paragraph (3)(B) whenever the Secretary has determined, after reasonable notice and opportunity for hearing."[184] The District Court's emphasis that the Department has discretion to remove Title IV eligibility in emergency circumstances, fails to include the subsection that in these circumstances, "the Secretary shall provide the institution an opportunity to show cause, if it so requests, that the emergency action is unwarranted."[185] For this reason, 20 U.S.C. § 1094(c)(1)(F) exemplifies that an institution has protected property interest in federal aid distributed in the Title IV federal aid program. For these reasons, an institution of higher education has a property interest in the benefits provided in the Title IV federal aid program and is entitled to a hearing and notice prior to the deprivation of this property interest.

---

[181] *Ass'n of Proprietary Colls. v. Duncan* at 347.

[182] *Id.*

[183] *Id.*

[184] 20 U.S.C. § 1094(c)(1)(F).

[185] 20 U.S.C. § 1094(c)(1)(G)(iii).



b.        Protectable Liberty Interest

The Proposed GE Rule deprives AACS member schools of their liberty interest without Due Process of the law. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[186] The Fifth Amendment applies the Due Process Clause to the Federal Government.[187] The Supreme Court has not provided a concrete definition of a liberty interest within the confines of the Due Process Clause. However, it has been accepted that a private party has a liberty interest in its reputation and name.[188] To constitute a liberty interest, a private party must have suffered reputational harm coupled "with the deprivation of a more tangible interest."[189]

AACS member schools will suffer severe reputational harm with additional financial injury resulting from its inability to comply with the proposed GE Rule, therefore satisfying the stigma-plus analysis of a liberty interest. Section 668.605 of the Proposed Rule provides that an institution is required to issue warnings to current and prospective students following the failure to satisfy the Gainful Employment metrics.[190] Noncompliant institutions will additionally have to provide students with an acknowledgement form stating that the student is aware of the institution's status. The reputational harm that the institutions will suffer is based on non-compliance with metrics that unfairly target cosmetology institutions. The metrics fail to accurately depict the actual earnings and incurred debt of cosmetology graduates and, in addition, employ irrational comparisons that do not assess whether an institution has fulfilled its obligations. The reputational damage that the schools will suffer for failure to comply with the GE Rule will lead to serious financial injury. Prospective students will drop out of the school in order to pursue "more secure" options. Current students will seek to transfer to "safer" institutions or "safer" career opportunities. This satisfies the requirement that the schools suffer reputational harm with financial injury. Therefore, AACS member schools have a constitutionally protected liberty interest in the continued participation in federal funding programs under the Higher Education Act.

c.        Procedural Violations

The proposed GE Rule violates the Due Process Clause because it would deprive AACS members of their federal student aid interests without sufficient notice and opportunity to be heard. The amount of process required depends on the interests of the parties involved.[191] In determining the amount of process to be provided, the courts will analyze three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous

---

[186] U.S. Const. Amend. V.

[187] *Id.*

[188] Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 177 (2d Cir.1991).

[189] Patterson v. City of Utica, 370 F.3d. 332, 330. (2d Cir. 2004).

[190] Proposed § 668.605.

[191] Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982).



deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[192]

AACS member schools have a significant interest in continued participation in the federal student aid program. If the current language of the proposed GE Rule remains intact, nearly 80% AACS member cosmetology programs will fail the metrics. A failure to satisfy the metrics for two out of three years will result in a loss of Title IV eligibility. Nearly all cosmetology and barbering schools offer no programs outside of its cosmetology-related or barbering offerings. Therefore, the inability to comply with the Proposed GE Rule will result in the entire school losing its Title IV eligibility. As we have stated, AACS member schools have a student population that is largely comprised of low-income students that rely on federal aid in order to enroll in the institution. If AACS members are ineligible to participate in Title IV federal aid programs, the schools will suffer significant revenue declines without transition time to adjust program offerings and locations to operate as non-Title IV institutions.

The demographic and economic backgrounds of the majority of the student population indicate that the schools will not survive without federal student aid. Additionally, the risk of an erroneous deprivation of this property interest through the procedures used is extremely high. As stated in this Public Comment, the proposed GE Rule relies on flawed federal agency data that fails to accurately indicate whether cosmetology programs comply with the accountability metrics. The reliance on this flawed data will result in the forced closure of the institutions and, therefore, the risk of the deprivation of the property interest is significant.

d.   <u>Substantive Violations</u>

The Proposed Gainful Employment Rule violates the Due Process Clause because it relies on flawed federal agency data. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[193] An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between facts found and the choice made.'" [194]

The proposed GE Rule establishes two metrics that an institution is required to comply with to maintain Title IV eligibility: (1) the D/E Rate and (2) the Premium Earnings Threshold. The D/E Rate was originally introduced in the 2011 Gainful Employment Rule. The D/E Rate is used to ensure that a graduate of a GE Program will earn a sufficient income to repay their federal loans. The D/E Rate is broken into two distinct measures: (1) the annual earnings rate, which is the "proportion of annual earnings that students who complete the program are devoting to annual

---

[192] Matthews v. Eldridge, 424 U.S. 319, 334 (1976).

[193] U.S. Const. Amend. V.

[194] Wildwest Institute v. Kurth, 855 F.3d 955 (9th Cir. 2017) (quoting *Burlington Truck Lines, Inc v. United States*, 371 U.S. 156 (1962)).



debt payments"[195] and (2) the discretionary rate income, which is "the proportion of annual discretionary income that students who complete the program are devoting to annual debt payments."[196] The D/E Rate is calculated using earnings data derived from a Federal agency, such as the Treasury Department, including the Internal Revenue Service (IRS), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau.[197] The earnings would be calculated for either the two-year or four-year cohort.

The Federal agency earnings data fails to accurately reflect the annual or discretionary earnings of a graduate from a cosmetology-related program. In *AACS v. DeVos*, the District Court for the District of Columbia found that "graduates of certain programs – including cosmetology programs – underreport their income with far greater frequency than graduates of other programs."[198] The District Court cited that the Department itself has acknowledged the issue of underreporting, stating that "about half of earnings in service occupations such as cosmetology."[199] Additional evidence was submitted to the District Court confirming the large impact of underreported tip income and self-employment income reported to the Internal Revenue Agency. Dr. Eric Bettinger, a professor at Stanford University, published a report finding that "tip income and self-employment income are, on average, underreported by around 60%."[200] Russell George, Treasury Inspector General of the Tax Administration, previously testified to the House Budget Committee that "self-employed individuals who formally operate . . . businesses . . . are estimated to report only about 68 percent of their income for tax purposes" and "self-employed individuals operating businesses on a cash basis report just 19 percent of their income to the IRS."[201]

The District Court concluded by agreeing with the Department and AACS that the earnings data relied upon by the Department was inaccurate to a material degree, which made the availability of an effective appeal mechanism all the more necessary.  In the Proposed Rule, the Department proposes to eliminate the Earnings Appeal altogether, but continues to rely upon the same flawed government data. This violates AACS members' substantive due process rights.

### C.    Financial Responsibility

The NPRM begins its discussion of the proposed changes to the regulations regarding the financial responsibility provisions set forth at §§ 668.15, 668.23, and 668, subpart L §§ 171, 174, 175, 176 and 177. For the reasons set forth below, we express our dissatisfaction with the Department's addition of § 668.171(c)(2)(iii). The proposed amendments to the Financial

---

[195] 88 Fed. Reg. at 32344.

[196] *Id.*

[197] 88 Fed. Reg. at 32328.

[198] *AACS* at 73.

[199] *See* 79 Fed. Reg. at 64955.

[200] *AACS* at 59-60 (quoting Decl. of Katherine Brodie at 493, ECF No. 8–4).

[201] *AACS* at 60 (quoting Decl. of Katherine Brodie at 1258, ECF No. 8–4).



Responsibility Regulations that impose new mandatory and discretionary "triggers" are written in over-broad terms, lack definitional clarity and, by going well beyond seeking to safeguard Title IV funds by ensuring institutional financial responsibility, in many instances would create financial instability in and of themselves, as well as cause many other unintended consequences.

We recommend that the Department omit the triggering events analyzed below as each fails to have any bearing on financial responsibly and the Department's proposal does not sufficiently explain the reasoned analysis conducted for the regulatory changes.

### § 668.171(c)(2)(iii)

*The Department adds a mandatory trigger for institutions that have received at "least 50% of its Title IV, HEA program funds in its most recent completed fiscal year from GE programs that are 'failing'" the Gainful Employment framework.[202]*

AACS Comment:

As stated before, the APA requires an agency to provide "reasoned consideration to all the material facts and issues" in accordance with its rulemaking authority.[203] The agency must provide sufficient evidence to demonstrate a rational connection between the evidence asserted and the action.[204]

A similar mandatory trigger was included in the 2016 Final Borrower Defense Regulations and later removed in the 2019 Final Borrower Defense Regulations.[205] The Department has asserted that the mandatory trigger provides it with financial protection from institutions that fail the Gainful Employment framework: "this trigger is necessary because the potential loss of revenue from failing GE programs would have a negative impact on the institution's overall financial stability when it represents such a significant share of the institution's revenue."[206] The Department further states that it established a threshold of 50% as that percentage "reasonably related to the required financial protection of 10 percent of the institution's Title IV, HEA funding."[207]

The Department fails to provide reasoned analysis and evidence for the addition of this mandatory trigger. The imposition of a potentially debilitating mandatory LOC in these events, without a determination by the Secretary either (1) that the institution is not able to rectify the triggering event, or (2) that the triggering event in fact will have an immediate impact on the

---

[202] 88 Fed. Reg. at 32358.

[203] *Greater Bos. Television Corp.* at 851.

[204] *Motor Vehicle Mfrs. Ass'n* at 43.

[205] 88 Fed. Reg. at 32358.

[206] *Id.*

[207] *Id.* at 32359.



institution's financial responsibility, could serve to *cause* a precipitous financial crisis at the institution whether one would otherwise not be present. The Department must thoroughly analyze the financial implications and other unintended consequences of the imposition of this trigger and its impact on schools and its enrolled students.

## § 668.171(c)(2)(ix)

*The Department adds a mandatory trigger for when an institution loses eligibility to participate in another Federal education assistance program due to administrative action.*

AACS Comment:

The Department claims that this trigger is necessary because institutions that have lost eligibility from another Federal education assistance program must have a weakness that contributed to this action. The Department additionally claims that the loss of eligibility will have financial repercussions from the impact on the loss of revenue.

The Department has not provided any evidence absent a general claim that the loss of eligibility "generally" indicates that the institution has a weakness resulting in this action. Its failure to specifically reference how this trigger indicates financial irresponsibility is indicative of the lack of reason that the Department put forth. The loss of eligibility may be unrelated to administrative or financial capabilities issues and/or may be financially immaterial to the institution. This mandatory trigger requires a detailed factual analysis to determine the financial impact, if any, and the financial magnitude, of the actions or activities that constitute this trigger.

## 68.171(d)(7)

*The following situation constitutes a discretionary triggering event:*

- *An institution discontinues academic programs enrolling more than 25 percent of students at the institution;*

AACS Comment:

The Department has added this trigger in response to the concern that the closure of significant programs at an institution will result in the forced closure of the institution. The Department stated that the 25 percent threshold is representative of an institution's financial stability to withstand the closure of a program.[208] The Department further provides that its concern with the occurrence of this event warrants a closer analysis of the institution because this discretionary trigger "would allow us to capture the situation where an institution closed all of its programs in a given degree level, only to later shutter the entire institution."[209]

---

[208] 88 Fed. Reg. at 32364.

[209] *Id.*

71



As stated above, the Department has not sufficiently explained the connection between this discretionary trigger and the financial responsibility of the institution. The Department has not provided any evidence or rational basis for its conclusion that the 25% threshold is indicative of an institution's financial stability to withstand the closure of a program. This Department proposes this arbitrary threshold as a discretionary trigger. The financial responsibility of the institution is not at risk and the magnitude of the penalty – 10% LOC – far exceeds the materiality of the underlying event. This trigger will have a significant impact on cosmetology schools, as such schools do not offer a significant amount of programs outside of cosmetology programs. The closure of one of its programs may constitute this discretionary trigger, however, the event is not indicative of the financial stability of the institution.

**68.171(d)(8)**

*The following situations constitute a discretionary triggering event:*

- *An institution closes more than 50 percent of its locations; or*
- *An institutions closes its locations which enroll more than 25 percent of its students.*

<u>AACS Comment:</u>

The Department has added this trigger in response to the concern that the closure of significant programs at an institution will result in the forced closure of the institution. The Department stated that it has anecdotes of an institution closing a portion of its locations, and then subsequently closing the entire institution. In the negotiated rulemaking process, a negotiator asserted that the closing of branch locations often times results in the strengthening of an institution's finances. The Department responded to this assertion stating that in those cases, the consequences of the discretionary trigger would not result in further escalation because the institution is financially stable. In its justification for the threshold for institutions that close locations which enroll more than 25 percent of its students, the Department simply provides that its determination was "for the same reasons that it selected that level for the discontinuation of academic programs."[210]

The Department has not provided a sufficient rationale for the establishment of this discretionary trigger. The Department has additionally not provided any evidence that the closure of the 50 percent of branch locations, or locations which enroll more than 25 percent of its students, will result in financial instability. In addition, the Department acknowledged that these events often have the opposite effect and positively impact an institution. For the 25 percent threshold, the Department did not provide any analysis or rationale. It has not been established that the financial responsibility of the institution is at risk and the significance of the penalty – 10% LOC – far exceeds the materiality of the underlying event. This trigger will have a significant impact on cosmetology schools, as such schools do not offer a significant number of programs outside

---

[210] *Id.*



of cosmetology programs. The closure of one of its programs may constitute a discretionary triggering event, however, the event is not indicative of the financial stability of the institution.

## 68.171(d)(10)

*The Department adds a discretionary trigger for when an institution loses eligibility to participate in another Federal education assistance program due to administrative action.*

AACS Comment:

The Department provides that its justification for this trigger is the same as was used for § 668.171(c)(2)(ix).

The Department has not provided any evidence absent a general claim that the loss of eligibility "generally" indicates that the institution has a weakness resulting in this action. Its failure to specifically reference how this trigger indicates financial irresponsibility is indicative of the lack of reasoned analysis. The loss of eligibility may be unrelated to administrative or financial capabilities issues and/or may be financially immaterial to the institution. This discretionary trigger requires a detailed factual analysis to determine the financial impact, if any, and the financial magnitude, of the actions or activities that constitute this trigger.

### D.   Administrative Capability

The NPRM proposes to amend and augment the administrative capability requirements contained in current § 668.16. As described below, the Department has failed to satisfy the statutory requirements for a permissible rule change.

## § 668.16(t)

*The Department includes this provision providing that an administratively capable institution is required to derive at least half of its total Title IV funds in the most recent award year from programs that are in compliance with Subpart S of Part 668. In addition, an administratively capable institution is required to have at least half of the fulltime equivalent Title IV students enrolled in programs that are in compliance with Subpart S of Part 668.*

AACS Comment: The standard for a permissible rule change under the APA is that the agency provide "reasoned consideration to all the material facts and issues."[211] An agency satisfies this standard by providing "rational connection between the facts found and the choice made."[212] The Department seeks to revise 668.16 to condition the administrative capability of an institution on the institution deriving at least half of its Title IV revenues from programs that meet the GE Rule or having a majority of full-time students enrolled in programs that meet the GE Rule. The Department justifies the enactment of this provision on the basis that "an institution that obtains

---

[211] *Greater Bos. Television Corp.* at 851.

[212] *Motor Vehicle Mfrs. Ass'n* at 43.



most of its revenue from, or enrolls most of its Title IV-eligible students in, failing GE programs would lack administrative capability."[213]

The Department has failed to provide substantial evidence necessary to support the need for the changes proposed and there is a lack of rational connection between the compliance requirement identified and an institution's ability to provide the education offered and effectively administer the financial aid program. The Department previously acknowledged that the Gainful Employment framework is designed to assess the financial value of a program, not the administrative capability of the institution offering it.[214] There is simply no basis to conclude that high D/E rates or low earnings would indicate an inability to successfully administer the Title IV programs. For these reasons, the Department has failed to satisfy the statutory requirements for a permissible rule change.

In addition, as the GE Rule is proposed, these administrative capability requirements would have an immediate, adverse and disproportionate impact on AACS members. Because, as the Department's data demonstrates, cosmetology certificate programs fail the GE Rule at much higher rates than other programs, many AACS schools offering such programs are likely to trigger these new administrative capability requirements leading to limitation or other enforcement actions that would threaten the ability of AACS schools to continue participation in Title IV programs. Until the GE Rule is amended to address our concerns, we oppose this proposed language.

## E. Certification Procedures

### § 668.13(e)

*The Department has amended § 668.13(e) to allow the Secretary to consider supplementary performance measures in its certification determination. The Secretary is allowed to assess the following:*

> *(1) Withdrawal rate of the institution;*
> *(2) D/E rates of programs;*
> *(3) Earnings Premium Measures of programs;*
> *(4) Amount an institution spends on instruction, academic support, and support services and, in addition, the amount spent on recruiting activities, advertising, and other funds spent on pre-enrollment activities; and*
> *(5) Licensure pass rate of program.*

AACS Comment:

The current language of § 668.13 provides certain procedures that the Department may undertake in its decision to certify an institution. The Department has stated that § 668.13(e) provides

---

[213] 88 Fed. Reg. at 32375.

[214] *Id.* at 32305.



additional context of the quality of an institution. As stated in other sections of this Public Comment, the D/E Rate and the Earnings Premium Measure fail to accurately indicate the quality of a cosmetology institution. The addition of those two metrics within the supplementary performance measures may result in a significant number of otherwise eligible cosmetology institutions not receiving certification status. AACS strongly recommends removing the D/E Rate and the Earnings Premium Measure from its certification analysis.

### § 668.14(b)(26)(ii)

*The NPRM amends § 668.14(b)(26)(ii) to limit Title IV eligibility for clock hour programs to either: (a) 100% of the state's minimum hours for where the institution is located, or under limited circumstances, (b) 100% of a state's minimum hours for a state within the metropolitan statistical area of the institution.*

AACS Comment:

AACS opposes this proposal. The Department should eliminate its proposed edits to § 668.14(b)(26), which would lower the clock hours cap for Title IV eligibility for certain programs that lead to gainful employment in a recognized occupation.

The current language of § 668.14(b)(26) permits institutions to offer Title IV aid at a maximum of "150% of the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the state in which the program is offered, if the State has established such a requirement, or as established by any federal agency."[215] The Proposed Rule amends § 668.14(b)(26)(ii) to limit Title IV eligibility for clock hour programs to either: (a) 100% of the state's minimum hours for where the institution is located, or under limited circumstances, (b) 100% of a state's minimum hours for a state within the metropolitan statistical area of the institution.[216] If an institution proceeds to comply with the alternative of up to 100% of another State's minimum hours, the institution must submit documentation, substantiated by a certified public accountant, of one of three qualifying requirements. The three qualifying requirements are as follows:

- A majority of students resided in that other State while enrolled in the program during the most recently completed Award Year;
- A majority of students who completed the program in the most recently completed Award Year were employed in that other State; or
- The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the

---

[215] Proposed § 668.14(b)(26).

[216] 88 Fed. Reg. at 32320.



most recently completed award year state in writing that they intend to work in that State.[217]

The proposed amendment to § 668.14(b)(26) will significantly impact institutions currently exceeding the 100% state minimum and short-term programs under 600 clock hours that obtained Title IV eligibility under the 150% threshold. In the 2014 Gainful Employment Final Rule, the Department stated that "the relationship is considered to be reasonable if the number of clock hours of the program does not exceed by more than 50 percent the minimum number of clock hours required for training that has been established by the State in which the program is located."[218] The current rule has allowed institutions to offer Title IV eligible short term programs that would become Title IV ineligible if the Department adopts this change. For example, where state minimum hours are 400 clock hours for a program, a school may offer a 600 hour program (150% of the state minimum clock hours) and the student receives Title IV aid for the full length of the program. This allows students to receive additional occupation-related training while receiving federal aid. With a cap at 100% of a state's minimum hours, students will not receive any federal aid for this program.

Institutions in compliance with the current requirement will face substantial challenges in continuing to participate in Title IV federal aid programs under the newly reformed certification procedures. Short-term clock hour programs will not be able to satisfy the new clock hour requirements. The amendment will result in institutions losing Title IV eligibility for these programs, which will likely lead to significant revenue impacts if not closure of the schools. This, in turn, affects the availability of educational opportunities for non-traditional students relying on federal aid to access these programs.

Short-term programs provide critical pathways to students, predominantly low-income and minority students that value the flexibility and workforce ready preparation provided by these programs. The amended certification procedures will result in longstanding Title IV eligible programs losing its eligibility. This will have a significant impact on the higher education industry, its students, graduates and interested parties. AACS strongly opposes any revisions that directly or indirectly harms students.

The length of educational programs, regardless of industry, is the prerogative of institutions and the purview of accreditors. Institutions are in the best positions to determine appropriate program lengths and curricula. Oversight, if required, is provided by accreditors, which are charged with ensuring the quality of an educational program. Department regulations, found at 34 C.F.R. Part 602, Subpart B, ensure that accrediting agencies have been judged by the Department as being reliable authorities of the quality of the education or training provided by the institutions or programs it accredits. The Department's proposed cap attempts to assert federal control into an area where such control is not appropriate. We observe that Congress, concerned with the

---

[217] *Id.*

[218] 79 Fed. Reg. at 64990.



potential for such overreach, in the General Education Provisions Act[219] expressly prohibits the Department from attempting to exercise any direction, supervision, or control over educational program curriculum.

### § 668.14(f)

*The Department amends the conditions that applies to institutions undergoing a change of ownership that attempt to convert from a for-profit institution to a non-profit institution. The second condition is the continued compliance with the Gainful Employment requirements outlined in Subpart S of Part 668 until the Department has completed its financial analysis of the institution.*

AACS Comment:

AACS opposes the continued reliance of the Gainful Employment requirements provided in Subpart S of Part 668. As stated throughout this Public Comment, the accountability framework provided in Subpart S inaccurately assesses the quality of cosmetology institutions. Institutions seeking to convert from for-profit to non-profit status should not continue to comply with Subpart S of Part 668, unless the Department revises its framework in accordance with our recommendations.

### F.     Ability to Benefit – 34 C.F.R. §§ 668.2 and 668.157

The proposed ATB rule changes reflect the consensus language agreed upon in the rulemaking negotiations. The HEA, in Section 484(d), establishes several ATB options that a student without a high school diploma may pursue in order to gain eligibility to access federal financial aid, including participating in a state process approved by the Department. ATB students, with limited exception, are required to enroll in an eligible career pathway program to access federal student aid. Several AACS member schools currently offer one or more eligible career pathway programs.

For institutions like AACS schools that offer one or more eligible career pathway programs outside of a state process, the regulations do three things that impact these programs: (1) include a definition for "eligible career pathway programs;" (2) establish new documentation requirements to demonstrate compliance and (3) establish a new verification process at the Department to ensure regulatory compliance of all eligible career pathway programs. We support each of these regulatory changes, but make recommendations to ensure that proprietary institutions like AACS schools are not punished in violation of the HEA for offering these programs and may continue to offer students without a high school diploma or GED this valuable pathway to concurrently earning a secondary and postsecondary credential.

---

[219] 20 U.S.C. § 1221 *et seq.*



A.   <u>Proposals</u>

**668.2 (Amended)**

The Department proposes to incorporate into § 668.2 the HEA definition of an "eligible career pathway program" which now aligns with the definition contained in the Workforce Innovation and Opportunity Act ("WIOA"):

*A program that combines rigorous and high-quality education, training, and other services that—*

> *(1) Align with the skill needs of industries in the economy of the State or regional economy involved;*
> *(2) Prepare an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the ''National Apprenticeship Act''; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.);*
> *(3) Include counseling to support an individual in achieving the individual's education and career goals;*
> *(4) Include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;*
> *(5) Organize education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the*
> *extent practicable;*
> *(6) Enable an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential;*
> *and*
> *(7) Help an individual enter or advance within a specific occupation or occupational cluster.*

**668.157 (New)**

The Department proposes that an institution offering an eligible career pathway program to be able to document certain requirements as detailed in new § 668.157 as follows:

> *§ 668.157 Eligible career pathway program.*
> *(a) An institution demonstrates to the Secretary that a student is enrolled in an eligible career pathway program by documenting that—*
> *(1) The student has enrolled in or is receiving all three of the following elements simultaneously—*
> *(i) An eligible postsecondary program as defined in § 668.8;*
> *(ii) Adult education and literacy activities under the Workforce Innovation and Opportunity Act as described in 34 CFR 463.30 that assist adults in attaining a*

78



*secondary school diploma or its recognized equivalent and in the transition to postsecondary education and training; and*
*(iii) Workforce preparation activities as described in 34 CFR 463.34;*
*(2) The program aligns with the skill needs of industries in the State or regional labor market in which the institution is located, based on research the institution has conducted, including—*
*(i) Government reports identifying in demand occupations in the State or regional labor market;*
*(ii) Surveys, interviews, meetings, or other information obtained by the institution regarding the hiring needs of employers in the State or regional labor market; and*
*(iii) Documentation that demonstrates direct engagement with industry;*
*(3) The skill needs described in paragraph (a)(2) of this section align with the specific coursework and postsecondary credential provided by the postsecondary program or other required training;*
*(4) The program provides academic and career counseling services that assist students in pursuing their credential and obtaining jobs aligned with skill needs described in paragraph (a)(2) of this section, and identifies the individuals providing the career counseling services;*
*(5) The appropriate education is offered, concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster through an agreement, memorandum of understanding, or some other evidence of alignment of postsecondary and adult education providers that ensures the secondary education is aligned with the students' career objectives; and*
*(6) The program is designed to lead to a valid high school diploma as defined in § 668.16(p) or its recognized equivalent.*
*(b) For career pathway programs that do not enroll students through a State process as defined in § 668.156, the Secretary will verify the eligibility of eligible career pathway programs for*
*title IV, HEA program purposes pursuant to paragraph (a) of this section. The Secretary provides an institution with the opportunity to appeal any adverse eligibility decision.*

B.    <u>AACS Comment and Recommendations</u>

AACS agrees with the new definition in 668.2, the new documentation requirements in 668.157 and the new proposed verification process. The definition is consistent with recent congressional amendments to HEA and prior Department eligible career pathway guidance.

As stated in the NPRM, at 32391-92, the Department previously did not approve individual career pathway programs and provided minimal guidance on documentation requirements. Institutions were required to make a good faith attempt at compliance with the HEA language with minimal guidance from the Department. We object, however, to the Department's reference in its policy justification to the unsubstantiated need to "curtail bad actors' efforts to provide subpar programming" as a veiled reference to the implementation of eligible career pathway programs to date mostly by proprietary institutions. *All* institutions require greater clarity on



implementation of the eligible career pathway program to ensure such programs comply with HEA and the HEA permits *all* institutions to offer such programs. We are concerned, given the Department's hostility toward for-profit colleges, that the Department's establishment of an as-yet defined "verification" program for eligible career pathway programs may result in an effort by the Department to "weed out" eligible career pathway programs offered at proprietary institutions. This is particularly true because the Department is pursuing a punitive GE Rule which would allow the Department to point to a failing GE program as a sub-par component of an eligible career pathway program.

Specifically, under proposed § 668.157(b), the Department "would review and approve every eligible career pathway program that enrolls students through means other than exclusively the State process. This is to ensure that the programs comply with the regulatory definition and documentation requirements. By requiring this verification, the Department would be able to address existing issues by which some programs may have failed to meet statutory requirements and have still received aid for ATB."

Recommendations:

First, the Department should make clear that institutions that are currently offering one or more eligible career pathway programs outside of a state process should be allowed to continue offering those programs uninterrupted until such time as the Department has reviewed that institution's eligible career pathway programs and approved such programs or noted any required changes.

Second, given the lack of guidance on implementation of compliant eligible career pathway programs, institutions should not be held liable for a future conclusion by the Department that an eligible career pathway program does not meet HEA requirements. Rather, the Department should work constructively with institutions to improve career pathway programs to strengthen HEA compliance without backward looking liabilities.

Finally, the Department should take an even-handed approach in its review of eligible career pathway programs so as not to use the approval process in a punitive manner to eliminate proprietary institutions' ability to offer an eligible career pathway programs while allowing public and private non-profit institutions to offer similar programs.

This is a concern given that the GE Rule primarily impacts proprietary institutions and thus proprietary institutions with a failing GE program could be unable to offer an eligible career pathway program while another institution with a similar program would be unaffected. This is another example of how the GE Rule leads to absurd results that do not protect students and is instead a targeted, punitive regulation aimed at curtailing educational programs at proprietary institutions, including congressionally sanctioned eligible career pathway programs. The Department should publish on its website the basis for its conclusions that an eligible career pathway program submitted by an institution is, or is not, in compliance with the HEA for all programs it reviews to ensure the Department is not using its review process to target and eliminate proprietary institution programs.



It bears pointing out that the state ATB process addressed in 668.156 would amend current § 668.156(b) (now redesignated as proposed § 668.156(e)) to clarify that the State is not subject to the success rate requirement at the time of the initial application, but is subject to the requirement for the subsequent period and reduces the required success rate (completion of the program) from the current 95 percent to 85 percent, with the option to reduce to 75 percent. The Department has chosen, therefore, when it comes to the state ATB process in which community colleges are likely to participate, to water down student success requirements. The Department has evidenced an arbitrary approach to eligible career pathway programs: one the one hand, imposing a GE Rule that may entirely eliminate some proprietary school pathway programs and targeting the elimination of so-called "sub-par" pathway programs through an opaque verification process and, on the second hand, weakening student success rates for pathway programs offered by public and private non-profit institutions.

## IV.    Conclusion

Thank you for the opportunity to submit our views. We ask that the Department closely evaluate our comments and carefully balance its intended goals against the disproportionate negative impact the Proposed Rule will have on the entire beauty and wellness education sector, including students, graduates, employees, local employers, and allied businesses. Our students are overwhelmingly female, diverse and low-income and benefit from the career options for which our members prepare our graduates. The impact that the Proposed Rule will have on the beauty and wellness industry, our membership, and the economy as a whole is unprecedented, catastrophic and requires significant reform.