**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> Defendants. | Civil Action No. 4:23-cv-01267-O |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**DUANE MORRIS LLP**

John M. Simpson (admitted *pro hac vice*)
Drew T. Dorner (DC Bar No. 1035125)
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone: +1 202 776 7800
Fax: +1 202 776 7801
JMSimpson@duanemorris.com
DTDorner@duanemorris.com

Joakim G. Soederbaum (Texas Bar No. 24091338)
777 Main Street, Suite 2790
Fort Worth, TX 76102
Telephone:  +1 817 704 1000
Fax:  +1 817 704 1001
JSoederbaum@duanemorris.com

Edward M. Cramp (admitted *pro hac vice*)
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
EMCramp@duanemorris.com

*Attorneys for Plaintiffs*
*American Association of Cosmetology Schools and DuVall's School of Cosmetology, L.L.C.*

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  STATUTORY, REGULATORY, AND FACTUAL BACKGROUND ............................4

    A.  The HEA Governs Eligibility and Protects Schools' Rights. ................................ 4

    B.  Defendants Fast-Tracked the Final Rule to Harm Proprietary Schools................. 5

        1.  D/E Rates and the Earnings Premium.......................................................... 6

        2.  Data Sources for Calculating D/E Rates and the Earnings Threshold........ 7

        3.  Penalties for "Failing" GE ......................................................................... 7

        4.  No Appeal or Opportunity to Provide Accurate Data................................. 8

    C.  Plaintiffs Face Termination Notwithstanding Their Exceptional Results. ............ 9

III.  ARGUMENT .........................................................................................................11

    A.  Plaintiffs Have Standing and Their Case is Ripe for Resolution......................... 11

    B.  The Final Rule Exceeds the Defendants' Statutory Authority............................. 12

        1.  The Final Rule Deprives Institutions of Their Right to a Hearing. .......... 13

        2.  The HEA Prohibits Convoluted "Gainful Employment" Tests. ............... 16

            a.  The Final Rule Is Irreconcilable with Provisions of the HEA. ......................................................................................17

            b.  Defendants' Authority is Not Plenary...........................................19

    C.  The Final Rule is Arbitrary and Capricious....................................................... 21

        1.  Reliance upon Data Admitted to be Faulty is Arbitrary and Capricious. . 22

        2.  Defendants' Rejection of Any Alternate Earnings Data is Unjustified. ... 31

        3.  D/E Rates and EP Thresholds Arbitrarily Ignore Data on Demographics.33

        4.  The Final Rule Turns on Arbitrary Comparisons of Incomparable People...................................................................................................... 37

        5.  Defendants' Refusal to Adjust for Coronavirus Effects is Arbitrary........ 39

6.     Defendants Unjustifiably Assume "High-Quality" Alternatives Exist..... 42

7.     Defendants Arbitrarily Target Proprietary Cosmetology Schools............ 44

D.     The Final Rule Unconstitutionally Governs Speech............................................... 45

1.     Shuttering Cosmetology Programs Regulates Speech Based on Content and Speaker............................................................................................. 45

2.     The Government Cannot Compel "Warnings."........................................ 49

IV.    CONCLUSION....................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*10 Ring Precision, Inc. v. Jones*, 722 F.3d 711 (5th Cir. 2013)................................................29, 36

*Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017)... ...........9, 14, 22-25, 28, 30, 43-44

*Am. Petroleum Inst. v. EPA*, 862 F.3d 50 (D.C. Cir. 2017)......................................................44

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018 (D.C. Cir. 2022) ............................22

*Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012).............. 9, 14-17

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) ................................................................................................................... 14, 16-17

*Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015)............................16

*Bakewell v. Stephen F. Austin St. Univ.*, 975 F. Supp. 858 (E.D. Tex. 1996) ..............................35

*Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60 (1983)..................................................... 48-49

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)........................................................ 49-50

*Career Colleges & Schs. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) ................................................................................................................................12, 17

*Chamber of Com. of U.S. v. SEC*, 85 F.4th 760 (5th Cir. 2023)....................................................41

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258 (5th Cir. 2015) ...................11, 19

*Continental Training Servs., Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) ..............................16

*Continental Training Servs., Inc. v. Cavazos*, 709 F. Supp. 1443 (S.D. Ind. 1989).....................15

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022) ..............................50

*Dep't of Tex., VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014) ...................48

*Dist. Hosp. Partners v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) .............................................22, 29

*Earl v. Boeing Co.*, 515 F. Supp. 3d 590 (E.D. Tex. 2021)...........................................................20

*El Paso Elec. Co. v. FERC*, 76 F.4th 352 (5th Cir. 2023) ......................................................39, 44

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)..............................................................29

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                    Page iii

*Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ............................12

*Gulf Fishermens Association v. National Marine Fisheries* Service, 968 F.3d 454
(5th Cir. 2020) ........................................................................................................................20

*Hines v. Pardue*, 688 F. Supp. 3d 522 (S.D. Tex. 2023) ................................................46

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ..................................................................47

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ............................... 16, 19-20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................11

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994).............................19

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29 (1983).......................................................................................... 28, 32, 44-45

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*, --- F. Supp. 3d ---, 2024 WL 3517504
(N.D. Tex. July 23, 2024) .................................................................................12, 33

*Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024).............................22, 31, 39

*Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023) .......................50

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1066 (9th
Cir. 2020) ...................................................................................................... 46-47

*Permian Basin Petroleum Ass'n v. Dep't of Interior*, 127 F. Supp. 3d 700 (W.D.
Tex. 2015) ..............................................................................................................44

*R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir. 2024) .................................50

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)................................20

*Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983) .......................45, 47

*Restaurant Law Ctr. v. U.S. Dep't of Labor*, --- F.4th ---, 2024 WL 3911308 (5th
Cir. Aug. 23, 2024) ..........................................................................................21, 31

*Rumsfeld v. Forum for Academic & Inst. Rights Inc.*, 547 U.S. 47 (2006) ...................................12

*Ryan LLC v. FTC*, --- F. Supp. 3d ---, 2024 WL 3297524 (N.D. Tex. July 3, 2024) ............. 19-20

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016) ....................................................48

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) .................................................. 47-48

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127 (5th Cir. 2018)....................17

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                    Page iv

*Texas v. U.S.*, 497 F.3d 491 (5th Cir. 2007) ................................................................12

*Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. Of Pers. Mgmt.*, 220
    F.3d 427 (5th Cir. 2000) .........................................................................................21

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273
    (D.C. Cir. 2023) .....................................................................................................35

**Federal Statutes and Rules of Court**

5 U.S.C. § 706 ......................................................................................................11

20 U.S.C. § 1001 ...............................................................................................4, 19

20 U.S.C. § 1002 ...........................................................................................4, 19, 43

20 U.S.C. § 1085 ..................................................................................... 4, 18-19, 43

20 U.S.C. § 1088 .............................................................................................4, 43

20 U.S.C. § 1094 ................................................................................ 5, 13-15, 19, 21

20 U.S.C. § 1098a ...................................................................................................5

20 U.S.C. § 1099c ..........................................................................15, 17-18, 20-21, 43

20 U.S.C. § 1221e-3 ..............................................................................................19

20 U.S.C. § 3474 ..................................................................................................19

**Code of Federal Regulations and Federal Register**

34 C.F.R. § 600.1 ..................................................................................................18

34 C.F.R. § 600.41 ..............................................................................................5, 14

34 C.F.R. § 668.2 ...........................................................................................6-7, 37, 42

34 C.F.R. § 668.13 ................................................................................................16

34 C.F.R. § 668.14 ................................................................................................15

34 C.F.R. § 668.89 .................................................................................................5

34 C.F.R. § 668.90 .................................................................................................5

34 C.F.R. § 668.141 ..............................................................................................46

34 C.F.R. § 668.171 ................................................................................................8

34 C.F.R. § 668.401 ..................................................................................................43

34 C.F.R. § 668.402 ....................................................................................................7

34 C.F.R. § 668.403 ....................................................................................................6

34 C.F.R. § 668.404 ...............................................................................................7, 37

34 C.F.R. § 668.405 .............................................................................................23, 38

34 C.F.R. § 668.407 ....................................................................................................8

34 C.F.R. § 668.408 ...............................................................................7, 12, 24, 40

34 C.F.R. § 668.603 ...............................................................................8, 9, 13, 14

34 C.F.R. § 668.605 ...........................................................................................8, 49-50

34 C.F.R. § 668.606 ....................................................................................................8

59 Fed. Reg. 22,324 (Apr. 29, 1994) .......................................................................14

75 Fed. Reg. 43,616 (July 26, 2010) .......................................................................48

76 Fed. Reg. 34,386 (June 13, 2011) ........................................................................9

79 Fed. Reg. 64,890 (Oct. 31, 2014) .....................................................................9, 32

86 Fed. Reg. 28,299 (May 26, 2021) .........................................................................5

88 Fed. Reg. 32,300 (May 19, 2023) ...........................................................5-6, 13, 35

88 Fed. Reg. 70,004 (Oct. 10, 2023) ................................................................. *passim*

## I.    INTRODUCTION

An agency, if acting rationally, learns from its mistakes and applies those lessons to future rulemaking.  When courts tell an agency (twice) that it went too far in issuing a rule, that agency, if acting reasonably, might issue a less radical version of the rule, and it would at minimum cure the flaws identified by the courts.  When the available data fail to support the agency's planned course of action, the agency, if thinking sensibly, would either adjust its plan to fit the data or accept that its plan is simply inconsistent with reality.  And when Congress has manifested its intent in the statutes governing the agency, the agency, if proceeding lawfully, would construct a rule consistent with what Congress *said* rather than what the agency *wants*.

The Department of Education ("Department") is the opposite of an agency acting rationally.  The regulation at issue—a third attempt at a "Financial Value Transparency and Gainful Employment" rule ("Final Rule")—is a Frankenstein's monster of regulatory provisions that are counter to judicial decisions, real-world data, and the plain language of the Higher Education Act of 1965, as amended ("HEA").  While some alleged aims of the Final Rule are ostensibly noble—reducing student debt and saving taxpayer dollars—the Department and its secretary, Miguel Cardona ("Secretary," and combined, "Defendants") have placed their ideology before reality and the law.  Believing, wrongly, that cosmetology schools subject students to high debt and low returns on investment, Defendants issued a Final Rule poised to wipe out a majority of proprietary cosmetology schools in two years or less, including many members of the American Association of Cosmetology Schools ("AACS"), such as co-plaintiff DuVall's School of Cosmetology, L.L.C. ("DuVall," and combined, "Plaintiffs").  Despite a voluminous preamble in which Defendants claim to have addressed the Final Rule's shortfalls, their explanations fall apart upon a deeper analysis of the HEA and administrative record.  Issues not raised in the preliminary injunction phase further expose a rule riddled with indefensible assumptions and dispositive flaws.

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                      Page 1

At its core, the Final Rule is founded on two measurements.  Both depend upon a factor that educational institutions cannot control: the earnings of individuals who have completed one of their programs of instruction.  One measurement is the debt-to-earnings ratio ("D/E Rate"), which purports to compare the median earnings and median student loan debt of a program's "completers."[1]  The other measurement is the earnings premium ("EP"), which Defendants claim measures whether a completer has increased his or her earnings beyond those of the "median" high school graduate as a result of completing a program of instruction.

If completers of a program do not earn enough money after attending school to reach certain D/E Rates and/or do not achieve an earnings premium by out-earning the so-called "median" high school graduate, then the program is assumed to be "low-quality" and is deemed to "fail" Defendants' gainful employment ("GE") standard.  From there, the effect of "failing" depends on the kind of program that is "failing."  Undergraduate programs at public or private non-profit colleges are entirely exempt from any penalties.  But if any program at a proprietary or vocational school "fails" (or a non-degree program at a not-for-profit school "fails"), the institution must send ominous warnings to current and prospective students, may have to post financial securities in Defendants' favor, and, if it fails two out of any three years, will have its program banned from participating in federal student aid ("FSA") programs authorized by the HEA.  For nearly all AACS members (including DuVall), such failure is an institutional death sentence. These schools offer only one or a handful of programs.  Losing one means losing the whole school.

Of all the institutions of higher learning in America, proprietary cosmetology schools are hit hardest by the Final Rule.  By Defendants' own estimations, more than half will close as a

---

[1] Because many programs affected by the Final Rule confer certificates, not degrees, on students who complete them, the term "completer" is most commonly used (instead of "graduate").

direct result of the Final Rule.  The vast majority of proprietary cosmetology schools are small, family businesses—many of which are owned by women and persons of color.  If these schools were saddling their students with insurmountable debt, then the Final Rule's punishing effects on them might be justified—but they are not.  In reality, cosmetology programs are relatively low in cost and lead to little debt.  Defendants have always known this but, now for the third time, have targeted them anyway with the most extreme GE-related regulations to date.

Defendants' aggression has led to a Final Rule rife with arbitrary and unlawful provisions that they had no authority to issue in the first place.  Defendants willfully rely on earnings data known to be inaccurate; refuse to make commonsense adjustments to those data (recommended by their own policy allies) to account for those inaccuracies; and fail to offer a procedure that schools could use to provide earnings data that are actually accurate (something that has been in every prior GE rule).  They fail to explain critical assumptions.  They purport to empower themselves to strip institutions of their eligibility to participate in FSA programs without giving the institutions a statutorily mandated hearing, and they unconstitutionally restrict speech based on content and speaker while, at the same time, they compel other speech in the form of controversial, inaccurate "warnings" to students.  On top of that, Defendants—who claim the Final Rule is necessary to protect *all* students—arbitrarily exempt over 80 percent of programs that would otherwise be subject to the Final Rule, and further exempt *all* programs located in some parts of the country.  For the few programs that the Final Rule actually does target, Defendants determine whether they "pass" the EP test using data that pits, for example, the earnings of 22-year-old, first-year, part-time, female, minority hair stylists against the earnings of 34-year-old, full-time, white, male electricians who have been on the job for 16 years.  Any one of these infirmities warrants setting aside the Final Rule.  The Court should do exactly that.

## II.      STATUTORY, REGULATORY, AND FACTUAL BACKGROUND

Congress directed Defendants to provide federal loans to students for the pursuit of higher education in Title IV of the HEA ("Title IV").  In order for DuVall and all other AACS members to receive FSA dollars from Title IV loan programs on behalf of their students, they must meet certain statutory and regulatory criteria in Title IV and in Defendants' regulations implementing Title IV.  Even though DuVall and many of its AACS co-members have satisfied those criteria for years, the Final Rule jeopardizes their participation in Title IV FSA programs.

### A.      The HEA Governs Eligibility and Protects Schools' Rights.

To be eligible for participation in Title IV, FSA programs, DuVall and other proprietary colleges and vocational schools must meet the definition of an "institution of higher education." Such schools qualify as "institutions of higher education" if they, *inter alia*, "provide[ ] an eligible program of training to prepare students for gainful employment in a recognized occupation."  20 U.S.C. §§ 1002(b), (c); 1085.  A proprietary or vocational school's program is an "eligible program" if it "provides a program of training to prepare students for gainful employment in a recognized profession."  20 U.S.C. § 1088(b).  Public and private non-profit colleges ("Not-for-Profit Schools") must also qualify as "institutions of higher education," but the HEA generally does not condition their institutional eligibility on preparing students for "gainful employment." *See* 20 U.S.C. §§ 1001; 1002(a)(1).  However, programs at Not-for-Profit Schools that do not lead to a degree (i.e., certificate programs) are required to prepare students for gainful employment in a recognized occupation.  *Id*.  Programs that must prepare students for "gainful employment" are referred to herein (and in the Final Rule) as GE Programs.

In addition to the most obvious benefit—federal student aid—once an institution is deemed "eligible" and it is certified for Title IV participation, the institution's right to Title IV FSA participation cannot be terminated unless "the Secretary has determined, *after reasonable notice*

*and opportunity for hearing*, that such institution has violated . . . any regulation prescribed under [Title IV] . . . ."  20 U.S.C. § 1094(c)(1)(F) (emphasis added).  Regulations governing termination procedures are in part 668, subpart G of title 34 to the Code of Federal Regulations ("Subpart G").  Subpart G contains a series of protections for eligible institutions, including the right to notice, a hearing before a neutral official, placement of the burden of persuasion on Defendants, and appellate rights, to name a few.  *See, e.g.*, 34 C.F.R. §§ 668.89; 668.90.  Subpart G's procedures also apply to actions involving terminations of individual programs.  *See* 34 C.F.R. § 600.41(b).

### B.    Defendants Fast-Tracked the Final Rule to Harm Proprietary Schools.

On May 26, 2021, Defendants published a notice of their intention to form a negotiated rulemaking committee to discuss potential GE regulations.  86 Fed. Reg. 28,299, 28,300.[2, 3]  After several rounds of discussions, negotiators objected to Defendants' proposed GE regulation for a host of reasons, found myriad flaws, and ultimately failed to reach consensus on what GE-related regulations should say, if anything.  *See* Plaintiffs' Appendix ("Appx.") at 450-55.

Defendants published the Notice of Proposed Rulemaking that preceded the Final Rule on May 19, 2023 ("NPRM"), demanding responsive comments to more than 200 pages of regulatory proposals (on top of thousands of pages of data and cited studies) in 30 days.  88 Fed. Reg. 32,300.  Doing the best they could with the time allotted, both Plaintiffs filed comments.  *See* Appx. at 1002-06, 1012-13, 1018-20, 1044, 1046 (DuVall comments); 1088-1168 (AACS comment).  Scores of commenters noted, among other items, the prevalence of underreported earnings in highly self-employed and heavily tipped industries like cosmetology and esthetics; the need for a

---

[2] Any potential regulations governing Title IV FSA programs must first undergo negotiated rulemaking before they may be proposed for notice-and-comment.  *See* 20 U.S.C. § 1098a.

[3] Plaintiffs cite to the Federal Register but include the Federal Register entries in their appendix.

process by which schools can provide alternative evidence of their completers' earnings; critical differences in demographics in certain fields; the prevalence of part-time work in industries like cosmetology; and proof that cosmetology schools are not responsible for significant student debt burdens. *See id.*; *see also, e.g.,* Appx. at 1024-42 & 1069-77.

Defendants rebuffed <u>every</u> relevant suggestion and concern raised by cosmetology commenters and published the Final Rule on October 10, 2023 with no material changes from the NPRM.  The Final Rule consists of an information and reporting component (what Defendants call "financial value transparency") and an eligibility-stripping component (what Defendants call "GE program accountability").  Only GE Programs are subject to both components.

### 1.    D/E Rates and the Earnings Premium

The Final Rule revolves around three calculations: first, a school's "annual debt-to-earnings rate," which is the ratio of a program's median annual loan payment amount to the median annual earnings of completers; second, a school's "discretionary debt-to-earnings rate," which is the ratio of a program's median annual loan payment to the median "discretionary" earnings of completers[4]; and third, an "earnings threshold," which is the "median earnings for adults aged 25-34" with only a high school diploma who "either worked during the year" or indicated they were "not employed but looking for and available to work."  34 C.F.R. § 668.2(b).  A program "passes" Defendants' GE tests if its annual D/E Rate is less than or equal to eight percent (i.e., the annual loan payment of completers is less than or equal to eight percent of the annual earnings of completers) or if its discretionary D/E Rate is less than or equal to 20 percent (similarly described, but a 20 percent threshold); *and* if the median annual earnings of completers reflects an "Earnings

---

[4] Defendants calculate "discretionary" income by subtracting 150 percent of the federal poverty guideline from the annual median income of a cohort of completers.  *See* 34 C.F.R. § 668.403(a).

Premium" by exceeding the earnings threshold (i.e., completers earn more than the "median" high school graduate). If program completers have an annual D/E Rate of more than eight percent and a discretionary D/E Rate of more than 20 percent, or if program completers do not earn enough money to surpass the earnings threshold, then the program "fails" the GE test. 34 C.F.R. § 668.402.

Each year, for every program eligible to participate in Title IV FSA programs, Defendants plan to calculate whether a historical "cohort" of completers earned enough income (relative to their median student loan debt and to "median" high school graduate earnings) to "pass" GE. Defendants intend to measure the earnings of completers once they have been out of school for three years. *See* 88 Fed. Reg. at 70,038. Over objection by the cosmetology industry, Defendants chose to begin calculating D/E Rates and EP passage for students who completed school during the 2017-18 award year—that is, students whose earnings will be measured from the pandemic-stricken years of 2020 and 2021. *See* 34 C.F.R. § 668.408; 88 Fed. Reg. at 70,037, 70,091-92.

### 2. Data Sources for Calculating D/E Rates and the Earnings Threshold

Other than student data they already have, Defendants will obtain data for calculating D/E Rates and determining EP passage from three sources: (i) schools, which will provide the names of completers and their loans/costs; (ii) "federal agencies with earnings data" ("Data Providing Agencies")—and as a first preference, the IRS—who will provide earnings data for the D/E Rates and EP measurement; and (iii) the American Community Survey ("ACS") from the U.S. Census Bureau, which will provide "the median annual earnings of students with a high school diploma or GED . . . to calculate the earnings threshold." 34 C.F.R. §§ 668.2(b); 668.404(b)(2); 668.408(a); 88 Fed. Reg. at 70,042, 70,058. Defendants admit that Data Providing Agencies only have access to *reported* earnings. *See* 88 Fed. Reg. at 70,041-42.

### 3. Penalties for "Failing" GE

The Final Rule imposes disparate penalties for failing either the D/E Rate or the EP test,

depending on whether the "failing" program is a GE Program, the type of institution offering the program, and the level of credential that the program provides.  Potential penalties, from least to most severe, range from (i) compelling schools to obtain "acknowledgements" from prospective students that the prospective students viewed a government website with debt and earnings data on the "failing" program, to (ii) forcing institutions to provide current and prospective students with "warnings" that the "failing" program may lose eligibility to participate in Title IV FSA programs, to (iii) declaring the "failing" program ineligible to participate in Title IV FSA programs and cutting off the program's access to all federal student loans.  *See* 34 C.F.R. §§ 668.407; 668.603; 668.606.  To no one's surprise, only GE Programs face the latter two penalties.  In fact, Defendants have exempted all undergraduate degree programs at Not-for-Profit Schools from every potential sanction, even if they have the worst GE results in the country.  *See id*.

If a GE Program fails either the D/E Rate metric or EP test in any given year, the institution offering the program is compelled to send the abovementioned warning, in which it must state that the program "has not passed standards established by the [Department] based on the amounts students borrow . . . and their reported earnings" and that it could lose access to FSA grants and loans.  34 C.F.R. § 668.606(a), (c).  If a GE Programs fails the D/E Rates twice or the EP test twice in "two out of any three consecutive award years," the GE Program is deemed "ineligible" and "its participation in the title IV, HEA programs ends . . . ."  34 C.F.R. § 668.603(a).[5]

4. No Appeal or Opportunity to Provide Accurate Data

The Department has attempted to impose debt and earnings metrics on GE Programs twice

---

[5] Defendants devised a way to penalize institutions financially after just one year of "failing" either GE test.  In regulations issued after the Final Rule, Defendants require any institution that receives "at least 50 percent of its title IV, HEA program funds" from "failing" GE Programs to post a financial security in the government's favor.  If the institution cannot afford to do that, it can be terminated on the basis that it is not "financially responsible."  *See* 34 C.F.R. § 668.171(c)(2)(iii).

before—once in 2011 ("2011 Rule"), and again in 2014 ("2014 Rule").  *See* 76 Fed. Reg. 34,386, 34,448-49 (June 13, 2011); 79 Fed. Reg. 64,890 (Oct. 31, 2014).  Courts struck down almost every provision of the 2011 Rule (*see Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012) ("*APCU I*")) and significantly pared down the 2014 Rule as it related to cosmetology schools (*see Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) ("*AACS I*")).  However, one thing that the 2011 and 2014 Rules had in common was that they both gave schools an opportunity to provide alternative evidence to establish that their completers had higher earnings than what Data Providing Agencies' records revealed.  *See* 76 Fed. Reg. at 34,451; 79 Fed. Reg. at 65,011.

The Final Rule eliminates any alternate earnings appeal.  *See* 88 Fed. Reg. at 70,097 (referring to "the Department's decision not to include an alternate earnings appeal in this final rule").  Schools must accept, and are bound by, whatever earnings data that a Data Providing Agency gives to Defendants, even if the data are patently inaccurate.  Schools may challenge only Defendants' arithmetic, but only if Defendants first initiate a formal proceeding to terminate the GE Program's Title IV eligibility.  *See* 34 C.F.R. § 668.603(a)(2), (b).  As discussed *infra* at III(B)(1), Defendants gave themselves two other options for terminating the eligibility of GE Programs without notice, hearing, or any right of appeal.  *See* 34 C.F.R. § 668.603(a)(1), (a)(3).

### C.   Plaintiffs Face Termination Notwithstanding Their Exceptional Results.

Even though DuVall and other AACS member schools produce completers who find employment in their field, have little-to-no debt, and pay off their student loans at an extremely high rate, they face harm if the Final Rule is not set aside, including but not limited to outright termination from all Title IV FSA programs.

DuVall, for example, has been a family-owned (and women-owned) business in Bedford, Texas for nearly 20 years.  *See* Appx. at 1604 ("Maldonado Decl.").  It has participated in Title IV

FSA programs since 2009, and its current authorization to participate lasts through June 30, 2029. *Id*. at 1608.  DuVall produces roughly 75 to 85 completers per year in cosmetology and esthetics (its only two programs) who pay between $13,220 (for esthetics) and $17,525 (for cosmetology) in *total* for application fees, books, kit, and tuition.  *Id*. at 1606.  Historically, DuVall completers pass their licensure exams at a 100 percent success rate, while only around four percent of completers default on repaying their student loans.  *Id*. at 1607-08.  The average student debt of a DuVall completer is $7,917.  *Id*. at 1606-07.  Student loans are critical to DuVall's student body and DuVall itself.  In 2023, 62 percent of students obtained Title IV FSA loans; and for 2024, Title IV FSA funds will likely represent 66 percent of DuVall's revenue.  *Id*. at 1608.  If DuVall's two programs lose their eligibility to participate in FSA programs, most DuVall students could not afford school there, and DuVall would close.  *Id*.; *see also* Appx. at 1004-06.

Many AACS members have similar stories.  AACS is a trade association representing more than 290 proprietary cosmetology school owners who, combined, operate more than 500 schools nationwide.  *See* Appx. at 1611 ("Kidd Decl.").  Ninety-nine percent of AACS's members are small businesses according to the Small Business Administration, and many of those are owned directly by individuals and families.  *Id*. at 1612.  AACS member schools have an average graduation rate of 76 percent and job placement rate of 71 percent.  *Id*.  On average, completers leave AACS schools with $8,900 in debt and have a monthly payment of $59.[6]  *Id*.

Yet, despite their high performance and favorable statistics, the Final Rule—by all accounts—will devastate DuVall and most AACS member schools.  Defendants' data published

---

[6] Defendants' own data show that, industry-wide (i.e., AACS member schools and non-members), cosmetology-related GE Programs that "pass" their arbitrary GE metrics tend to have a <u>higher</u> rate of loan repayment defaults than programs that "fail."  *See* 88 Fed. Reg. at 70,140 (17.2% default rate at "passing" programs versus 13.0% default rate at "failing" programs).

with the NPRM indicate that, under the Final Rule, 50.4 percent of cosmetology-related GE Programs (at proprietary and Not-for-Profit Schools combined) will fail the D/E Rates or EP metric (or both).  *See* Appx. at 1618-19 ("Hill Decl.").  When Defendants' data are filtered to reflect only proprietary cosmetology programs, they show that a whopping 65.9 percent[7] of proprietary cosmetology programs will fail the EP test (or both tests).  *Id*.  Those "failing" institutions will have to send warnings to students (at minimum) and, in many cases, their cosmetology programs will lose eligibility for Title IV FSA funding, leading to school closure.

## III.   ARGUMENT

Pursuant to 5 U.S.C. § 706(2), the Court must set aside the Final Rule, but not solely as a result of arbitrary decision-making by Defendants.  Several of the Final Rule's provisions exceed Defendants' authority under the HEA, while others are unconstitutional.

### A.   Plaintiffs Have Standing and Their Case is Ripe for Resolution.

To have standing, a plaintiff must "present[ ] (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in [its] favor."  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015).  DuVall, as the "object of the challenged regulation," easily satisfies these criteria.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).  As a proprietary school with GE Programs, it is clearly the object of a regulation that sets new standards and imposes sanctions upon GE Programs and proprietary schools.  Defendants' own numbers confirm that DuVall will be forced to send warnings to students in a year and likely will lose its eligibility to receive Title

---

[7] This estimate is consistent with an estimate by the Associated Press that two-thirds of proprietary cosmetology programs will "fail" a GE metric.  *See* Sharon Lurye & Collin Binkley, AP Analysis: Most Beauty School Programs Would Be in Jeopardy Under US Proposal, ASSOCIATED PRESS, May 18, 2023. Appx. at 1596-602.

IV FSA funds within two years.  Even without those penalties, there is a 100 percent chance DuVall will pay significant costs to comply with the Final Rule's reporting obligations year after year (to the extent the Final Rule does not put it out of business).  *See* 34 C.F.R. § 668.408; *Career Colleges & Schs. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024) (compliance costs, if not *de minimis*, constitute injury); Appx. at 1609 (Maldonado Decl.) (DuVall's compliance costs are approximately $11,000 annually).  As long as one party has standing, the case can proceed.  *See Rumsfeld v. Forum for Academic & Inst. Rights Inc.*, 547 U.S. 47, 53 n.2 (2006).[8]

Plaintiffs' claims are ripe.  "[A] challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 681 (N.D. Tex. 2016) (quoting *Texas v. U.S.*, 497 F.3d 491, 498-99 (5th Cir. 2007)) (modifications in original).  Here, all questions are legal—did Defendants act arbitrarily, in violation of the HEA, or unconstitutionally?—and the Defendants' "*Final* regulations" obviously constitute *final* agency action.  *Texas v. U.S.*, 497 F.3d at 499.  Given that the case involves only legal questions, more facts will not aid in the Court's analysis.  *Id*.

### B.    The Final Rule Exceeds the Defendants' Statutory Authority.

While agency actions that are in excess of statutory authority are admittedly "cumulative under the arbitrary-and-capriciousness standard," *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, --- F. Supp. 3d ---, 2024 WL 3517504, at *12 (N.D. Tex. July 23, 2024), two of the reasons for setting aside the Final Rule are distinct insofar as they arise from Defendants' disregard for provisions in the HEA rather than from poor (or non-existent) reasoning or reliance on bad data.

---

[8] If challenged, Plaintiffs will further prove their standing in an opposition or reply brief.

1.    <u>The Final Rule Deprives Institutions of Their Right to a Hearing.</u>

If a GE Program twice fails the D/E Rates or EP test in the Final Rule, Defendants will pursue one of three procedures to end the GE Program's eligibility: "(1) the issuance of a new Eligibility and Certification Approval Report that does not include th[e "failing"] program; (2) the completion of a termination action of program eligibility, *if* an action is initiated under subpart G of [part 668 of title 34]; or (3) revocation of program eligibility if the institution is provisionally certified." 34 C.F.R. § 668.603 (emphasis added).  All three procedures ignore an institution's right to "reasonable notice and opportunity for [a] hearing[ ] that such institution has violated . . . any regulation prescribed under [Title IV]" before Defendants may terminate a GE Program's participation.  20 U.S.C. § 1094(c)(1)(F).

The first procedure—issuance of an Eligibility and Certification Approval Report ("ECAR")—appears to give Defendants the ability to terminate any GE Program's participation at any time, without notice or hearing.  Neither the NPRM nor the Final Rule mentions ECARs except to state in the preamble that the issuance of an ECAR will end a GE Program's participation and in the text of the new rules.  *See* 88 Fed. Reg. at 32,345, 32,509-10; 88 Fed. Reg. at 70,093, 70,192-193.  There is no discussion of when ECARs are issued, why they are issued, or what rights institutions have to contest ECARs.  All that is said is that they "serve[ ] as the main repository that tracks which eligible programs an institution offers, so removing a program from that document clearly establishes that it is no longer eligible for aid."  88 Fed. Reg. at 32,345.

Existing regulations do not help clarify the process surrounding the issuance of ECARs.  In fact, there *are literally no regulations in all of Title 34* discussing ECARs *except in the new Final Rule itself*.  Nor is Defendants' FSA Handbook (to the extent it is even binding on Defendants) informative: all it says is that a "school's eligible nondegree programs and locations are specifically named on the . . . ECAR[ ]" and that the Department is responsible for preparing

and sending ECARs to schools.  Appx. at 1547, 1585.  In short, there appears to be no documented process for the issuance of an ECAR, and certainly no right to "reasonable notice and opportunity for [a] hearing" under § 1094(c)(1)(F) before one is issued.

The second procedure—initiation of a Subpart G proceeding—also deprives schools of their right to notice and a hearing.  For starters, Defendants are not obligated to pursue a Subpart G proceeding; it is merely one of three options for them to use to end a GE Program's participation.  *See* 668.603(b) ("*If* the Secretary initiates an action under paragraph (a)(2), the institution may initiate an appeal under subpart G . . . .") (emphasis added).  Making Subpart G proceedings optional is irreconcilable with 34 C.F.R. § 600.41(b), a rule dating back to 1994[9], which says that if the Secretary wants to "terminate" an "educational program offered by an institution" because it "does not satisfy relevant statutory or regulatory requirements that define that educational program as part of an eligible institution," the Secretary must initiate a Subpart G proceeding.

Even if Defendants do begin a Subpart G proceeding to terminate a GE Program, the Final Rule impermissibly limits the scope of that hearing (and any appeal therefrom) to whether "the Secretary erred in the calculation of the program's D/E rates . . . or the earnings premium measure . . . ."  34 C.F.R. § 668.603(b).  A court has already held that "wooden use" of earnings data from a Data Providing Agency "is problematic," arbitrary, and capricious.  *AACS I*, 258 F. Supp. 3d at 73.  But under the Final Rule, Subpart G hearing officials cannot do anything other than check the Department's math.  "Wooden use" is all that the Final Rule allows.[10]  In this way, the Final Rule is a departure from *Association of Private Sector Colleges & Universities. v. Duncan*, in which the court upheld a less stringent GE rule.  110 F. Supp. 3d 176, (D.D.C. 2015)

---

[9] *See* 59 Fed. Reg. 22,324, 22,345-46 (Apr. 29, 1994) (first appearance of § 600.41(b)).

[10] Defendants' refusal to allow alternate earnings appeals is discussed *infra* at III(C)(2).

("*APSC*"); *see also Continental Training Servs., Inc. v. Cavazos*, 709 F. Supp. 1443, 1448 (S.D. Ind. 1989) (*aff'd in relevant part*, 893 F.2d 877 (7th Cir. 1990)) ("When Congress enacted section 1094(c), it was obviously attempting to provide certain procedural protections for the settled expectations of those institutions that had been deemed eligible to participate in [T]itle IV . . . ."). In *APSC*, the district court allowed the 2014 Rule to stand because, by "allow[ing] schools to . . . offer contrary earnings data based on the school's own survey of graduates or other state-gathered data," the Department satisfied the HEA's requirement to give "reasonable notice and opportunity for hearing." *Id.* at 197-98. No similar process exists in the Final Rule.

The third procedure—revoking the eligibility of provisionally certified GE Programs—again contemplates termination with no hearing whatsoever. The HEA grants Defendants the authority to "provisionally certify an institution's eligibility to participate in programs" for one to three years under certain circumstances (e.g., it is seeking its initial certification, it has undergone a change in ownership, or its "ability to perform its financial responsibilities under a program participation agreement" are in question).[11] 20 U.S.C. § 1099c(h). The HEA further empowers Defendants to "terminate the [provisional] institution's participation in [Title IV] programs" prior to the end of its certification period if "the Secretary determines that the institution is unable to meet its responsibilities under its program participation agreement." 20 U.S.C. § 1099c(h)(3).

However, satisfying a D/E Rates or EP test is not one of the statutorily mandated (or Department-added) terms in a PPA. *See* 20 U.S.C. § 1094(a)(1)-(29); *see also* 34 C.F.R. § 668.14(a)(1)-(35). Therefore, failing to pass the D/E Rates or EP test does not implicate a provisionally certified institution's ability to "meet its responsibilities under its [PPA]," and does

---

[11] All institutions must sign a program participation agreement ("PPA") with the Department to participate in Title IV FSA programs. *See* 20 U.S.C. § 1094. PPAs' terms are specified by statute and they set forth the agreement between the school and the government regarding Title IV. *Id.*

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                    Page 15

not trigger Defendants' statutory right to terminate its Title IV participation.  Even if it did, existing regulations mandate an appeal process for the provisionally certified school, including an opportunity to provide "written evidence that the revocation is unwarranted" and a review by an independent Department official.  34 C.F.R. § 668.13(d)(3).  Defendants never addressed this.

Defendants' refusal to allow a reasonable opportunity for a hearing also violates the due process rights of cosmetology schools.  Defendants assert that schools have no protected interest in continued eligibility to participate in Title IV programs, 88 Fed. Reg. at 70,089-90, but fail to note there is a circuit split on this issue.  In *Continental Training Services, Inc. v. Cavazos*, the Seventh Circuit held that a Title IV-eligible institution had "both a liberty and a property interest at stake" when the Department sought to terminate the institution's participation in FSA programs.  893 F.2d 877, 893 (7th Cir. 1990).  The court rejected the government's argument that the school, as an "indirect beneficiary" of student aid payments, had no due process protection, and instead held that where primary beneficiaries (students) depend on providers (institutions) for their benefits, and where the statutory program contains extensive certification or eligibility requirements and procedures for granting or revoking eligibility, institutions have constitutional due process rights and are entitled, at minimum, to a hearing by written submissions.  *Id*. at 893.

### 2.      The HEA Prohibits Convoluted "Gainful Employment" Tests.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  When an ambiguous term like "gainful employment in a recognized occupation" appears in a statute, a "court, after applying all relevant interpretive tools, concludes [what meaning] is best."  *Id*. at 2266; *see also APSC*, 110 F. Supp. 3d at 185; *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 359-60 (S.D.N.Y. 2015) (*"APC"*); *APCU I*, 870 F. Supp. 2d at 146 (all holding "gainful employment" provision is ambiguous).  In this case, those "interpretive tools" lead to a

conclusion that Defendants have exceeded their authority by imposing a complex, convoluted system of debt-to-earnings ratios, earnings premiums, data-gathering from schools and Data Providing Agencies, and program-by-program mathematical computations in the name of establishing "eligibility" to participate in Title IV FSA programs.

a.   The Final Rule Is Irreconcilable with Provisions of the HEA.

As the Court noted in its June 20, 2024 Order, interpreting a statute "begins with the statutory text, and ends there as well if the text is unambiguous." *See* Order, ECF No. 31 (June 20, 2024), at 6 (citing *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018)). Plaintiffs do not understand the Court to have concluded, in its June 20 Order, that the dictionary definitions of "gainful," "employment," "recognized," or "occupation" are so settled as to be unambiguous, and prior courts, on a full record, have actually concluded the opposite. *See, e.g.*, *APCU I*, 870 F. Supp. 2d at 145-46 (dictionary definitions revealed "no unambiguous meaning of what makes employment 'gainful'"); *see also APSC*, 110 F. Supp. 3d at 185 ("[T]he usual sources do not establish a single, ordinary meaning for this word.").

With ambiguity present, the Court must resort to its other interpretive tools. The "presumption against superfluity requires the court to 'give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section.'" *Texas Educ.*, 908 F.3d at 133. But "emasculate an entire section" is exactly what the six words underlying the Final Rule do.

Defendants claim they issued the Final Rule to enforce eligibility requirements. Taking that as true, 20 U.S.C. § 1099c contains the procedures that Defendants must follow "[f]or purposes of qualifying institutions of higher education for participation" in Title IV programs. The same section directs Defendants to "prepare and prescribe *a single application form* which . . . requires sufficient information and documentation to determine that the requirements of *eligibility* . . . are met." 20 U.S.C. § 1099c(b)(1) (emphasis added). Defendants, on the same *single application*

*form*, may "require[ ] such other information as the Secretary determines will ensure compliance with the requirements of [Title IV] with respect to eligibility . . . ." 20 U.S.C. § 1099c(b)(4).

The Final Rule is irreconcilable with the notion of a "single application form" for establishing eligibility. The HEA's plain language indicates that all "information" needed "to determine that the requirements of eligibility . . . are met" must come from one form completed by each school, plus any attachments.[12] Yet, the Final Rule requires Defendants to pull information from schools, the IRS, the Census Bureau, and other Data Providing Agencies just to determine *one aspect* of eligibility—whether GE Programs lead to "gainful employment."

Section 1099c also highlights a "chicken and egg problem." Eligibility is a prerequisite to participating in any Title IV FSA program. *See, e.g.,* 34 C.F.R. § 600.1. But D/E Rates and EP metrics are determined based on the earnings of students who are three years removed from completing their GE Program. If, as Defendants contend, meeting D/E Rates and EP metrics are a "statutory condition of eligibility," 88 Fed. Reg. at 70,005, then it is not possible for a new school seeking certification for the first time (or a school that has been certified for fewer than three years and is seeking re-certification) to provide "sufficient information" to allow Defendants to determine its eligibility because it does not have alumni who have been working for three years. Put paradoxically, a school cannot start educating future completers using Title IV funds until it is eligible, but a school cannot establish its eligibility without first having completers. The Final Rule is akin to saying, "You must first qualify to run the Boston Marathon, but to qualify, you

---

[12] To be sure, Congress created certain eligibility criteria that are measured by data obtained after institutions are certified as eligible. For example, an institution may become ineligible under the cohort default rule (20 U.S.C. § 1085(a)(2)) if, during its period of eligibility, a certain percentage of students in repayment default on their loans. Congress's inclusion of specific conditions that institutions must meet after being certified as eligible shows Defendants lack authority to impose their own post-certification conditions unless explicitly authorized. *See infra* at III(B)(2)(a), (b).

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                   Page 18

must run the Boston Marathon to see if you run fast enough to qualify."

Another controlling rule is that agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994); *see also Contender Farms*, 779 F.3d at 269 (adopting same). Defendants claim the Final Rule is intended to solve the difficulties students face in repaying their loans, to lessen the risk to the government and taxpayer, and to ensure program quality. 88 Fed. Reg. at 70,004. However, Congress has already prescribed means to address those concerns. Congress solved for program quality by requiring every institution to be accredited by an accrediting agency or association. 20 U.S.C. §§ 1001(a)(5); 1002(b)(1)(D). It solved for the affordability of debt payments with the cohort default rule and income-based repayment benefits. 20 U.S.C. §§ 1085(a)(2); 1098e. And it solved for protecting taxpayers with the "90-10" rule, which bars proprietary institutions from getting more than 90 percent of their revenue from federal funds. 20 U.S.C. § 1094(a)(24). Congress devoted *entire sections and sub-sections* to these concerns. To think it authorized an entirely new scheme for solving all those problems using six undefined words is misguided.

> **b.** Defendants' Authority is Not Plenary.

Defendants have long argued that two sections of the HEA—20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474—give it broad authority to issue any regulations they believe are "necessary or appropriate" to administer any aspect of Title IV, including the Final Rule. *See, e.g.,* 88 Fed. Reg. at 70,011. This claim warrants a fresh look in the *Loper Bright* era. *See Ryan LLC v. FTC*, --- F. Supp. 3d ---, 2024 WL 3297524, at *8 (N.D. Tex. July 3, 2024) (citing *Loper* in deciding that FTC did not have authority to issue regulations despite broad rulemaking authorizations in FTC Act). Seemingly broad grants of rulemaking power "do[ ] not—and indeed cannot—provide *carte blanche* rulemaking authority" to an agency "as to enable the agency to sidestep the parameters

within which Congress circumscribed [its] power." *Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 620 (E.D. Tex. 2021) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976)).

The Fifth Circuit has been skeptical of broadly worded grants of authority. For example, in *Gulf Fishermens Association v. National Marine Fisheries Service*, the court held that a statute giving the NMFS "general responsibility to carry out any fishery management plan" and the power to "promulgate such regulations . . . as may be necessary to discharge such responsibility or to carry out any other provision of this chapter" did not convey authority to regulate in an area not contemplated by the Magnuson-Stevens Act. 968 F.3d 454, 465 (5th Cir. 2020). More recently, in *Ryan*, Judge Brown held that a section of the FTC Act vesting the FTC with authority to "make rules and regulations for the purpose of carrying out the provisions of [the FTC Act]" did not grant any substantive rulemaking authority and was no more than a "housekeeping statute" allowing the agency to make up rules of procedure and practice. 2024 WL 3297524, at *8.

Defendants' reliance on sections 1221e-3 and 3474 (which are not even in Title IV) is no different from the government's positions in *Ryan*, *Gulf Fishermens*, and *Earl*. Those general sections should not be read to authorize Defendants' complex regulatory scheme for determining Title IV eligibility when a different provision that relates directly to eligibility procedures, 20 U.S.C. § 1099c, forbids it. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.").

If Congress wanted to give Defendants the authority to set up metrics for deciding, mathematically, whether employment is "gainful," it would have said so. Congress "often" enacts statutes that "'expressly delegate' . . . the authority to give meaning to a particular statutory term" or to "'fill up the details' of a statutory scheme." *Loper Bright*, 144 S. Ct. at 2263, n.5, n.6. The HEA expressly authorizes Defendants to come up with standards for other eligibility-related

matters.  For example, any institution seeking eligibility to participate in Title IV programs must demonstrate that it is "administratively capable" and "financially responsible," *see* 20 U.S.C. § 1099c.  The HEA explicitly directs Defendants to "establish procedures and requirements relating to the administrative capabilities of institutions" and to develop "criteria . . . regarding ratios that demonstrate financial responsibility."  *Id*.  In 20 U.S.C. § 1094 alone, Congress identified at least nine areas in which Defendants "shall prescribe" regulations.  Congress has even specified when Defendants may look back at past performance of an institution to determine its ongoing eligibility. *See* 20 U.S.C. § 1099c(d)(1)(A) (authorizing Secretary to "consider[ ] [the] past performance of institutions" in determining whether they satisfy the "administrative capability" eligibility factor). But nowhere in the HEA did Congress authorize Defendants to create, from whole cloth, a system for determining whether employment is "gainful" using earnings of students three years removed. The Court should not find such authority where Congress has been selective in granting it.

### C.     The Final Rule is Arbitrary and Capricious.

An agency must "engage[ ] in reasoned decisionmaking" within the bounds of its statutory authority.  *Restaurant Law Ctr. v. U.S. Dep't of Labor*, --- F.4th ---, 2024 WL 3911308, at \*9 (5th Cir. Aug. 23, 2024) (quoting *Loper Bright*, 144 S. Ct. at 2263).  An agency fails at that obligation if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*. (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The Administrative Procedure Act ("APA") requires agencies to "give a reasonable explanation for how [it] reached its decision." *Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. Of Pers. Mgmt.*, 220 F.3d 427, 430 n.2 (5th Cir. 2000).  The APA likewise places an "affirmative burden" on agencies to "explain all of

the key assumptions embedded in its new regulations." *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) (citing *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018)) (modifications omitted); *see also Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1027 (D.C. Cir. 2022) (agency failed to provide evidence to "justify the assumptions that underly its analysis"); *AACS I*, 258 F. Supp. 3d at 72 ("When an agency's reasoning involves a non-obvious, essential factual assumption, the agency must justify that assumption 'notwithstanding a party's failure to challenge [it], as part of its affirmative duty to engage in rational decisionmaking.'").

### 1.    Reliance upon Data Admitted to be Faulty is Arbitrary and Capricious.

When the court in *AACS I* vacated parts of the 2014 Rule as to cosmetology schools, it did so because the Department did not reasonably engage with the known phenomenon that, in the cosmetology industry, self-employment and gratuities are common and, as a result, a significant share of cosmetologists' earnings goes unreported. *See AACS I*, 258 F. Supp. 3d at 73-75. Given the 2014 Rule's heavy reliance on government-provided data (it too had a D/E Rates test), it was plain that cosmetology schools (and "certain occupations" in which tipping and self-employment is also commonplace) would be prejudiced by the government's reliance on reported earnings. *Id.* That concern has not abated, but in the Final Rule, Defendants arbitrarily act as if it has.

"To be clear, agencies do *not* have free rein to use inaccurate data." *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015) (emphasis in original). They cannot "fail to consider" problems with data or "ignore new and better data." *Id.* (emphasis and citation omitted). Defendants even admit (twice) in the Final Rule, "Inaccurate and unreliable earnings information . . . is problematic whatever the explanations for its low quality." 88 Fed. Reg. at 70,095, 70,097. Yet, despite losing in *AACS I* for the "problematic" and "wooden use" of flawed earnings data, Defendants have doubled-down this time. The D/E Rates and EP tests in the Final Rule rely exclusively, and without exception, on "reported income to the Federal Government." *See, e.g.,*

34 C.F.R. §§ 668.405; 668.605(c)(1)(i); 88 Fed. Reg. at 70,041.  Defendants offer many excuses for resorting to the same tactic, but none reflects "reasoned decisionmaking."

First, Defendants contend "individuals are legally required to report their income subject to Federal taxation."  88 Fed. Reg. at 70,041.  This excuse is arbitrary *as a matter of law*.  In *AACS I*, the Department made the exact same argument and the court rejected it, holding that the Department's "justification does not grapple with the issue [of underreporting] in any meaningful way."  258 F. Supp. 3d at 73.  The court noted, "Civil and criminal penalties existed before and after the [2014 Rule] took effect, and the [2014 Rule] did not add any additional deterrent for underreporting."  *Id*.  Back then, the Department lacked a "rational basis for concluding that rates of reporting would change" as a result of the 2014 Rule, *id*. at 74.  It still lacks one now.

Next, Defendants argue that an "increasingly digitized economy" and "new Federal law" lowering the threshold for issuance of a Form 1099-K "should lessen the concern of tax evasion as a source of error."  88 Fed. Reg. at 70,041.  These arguments fail for several reasons.  First, the Final Rule contains no evidence, explanation, or support for the proposition that cosmetologists are "increasingly digitiz[ing]" their tips or income from self-employment.  In fact, Defendants admit that cosmetologists are still heavily reliant on cash.  *See id*. n.137 (noting that "commenters frequently cited that graduates . . . often operate cash businesses.").  Defendants simply assume, with no backup or economics expertise, that the advent of Venmo, PayPal, and other electronic payment services will reduce the use of cash or will stem the tide of underreporting.[13]  This is the very same kind of "non-obvious, essential factual assumption" that Defendants must justify to meet their affirmative burden.  *AACS I*, 258 F. Supp. 3d at 72.  Second, Defendants assume that

---

[13] PayPal had 1,000,000 users by 2000 and over 100,000,000 active users before the 2014 Rule was finalized.  *See* HISTORY & FACTS, https://about.pypl.com/who-we-are/history-and-facts/default.aspx (last visited September 6, 2024).  Electronic payments are nothing new.

payments made through electronic services will be identifiable as earnings, as opposed to reimbursements from friends or gifts from family. But there is nothing in the Final Rule to support that. Third, the IRS has delayed the "new Federal law" lowering the threshold for issuance of a Form 1099-K. The lower threshold will not be in place until 2025 at the earliest.[14]  But even if the threshold were lower *now*, the earnings used to test compliance with D/E Rates and the EP go back *to 2021*. *See* 34 C.F.R. § 668.408; 88 Fed. Reg. at 70,037, 70,091-92. By the time the Department is collecting earnings data governed by the "new Federal law," DuVall and the majority of AACS's other member schools will already be out of business.[15]

Defendants go on to argue that the Department "relies on reported income in its administration" of other Title IV programs. 88 Fed. Reg. at 70,041. This explanation also "does not grapple with the issue [of underreporting] in any meaningful way." *AACS I*, 258 F. Supp. 3d at 73. Bad data are bad data, and the Department's choice to award Pell Grants, subsidized loans, and debt relief using inaccurate earnings data does not cure the prejudice that cosmetology schools will suffer if their D/E Rates and EP metrics are based on underreported earnings. There is nothing reasonable about using inaccurate data for two purposes instead of one. Their reasoning is, at best,

---

[14] Subsequent to issuance of the Final Rule, the IRS published an announcement delaying changes to the reporting threshold in 2023 and 2024. *See IRS announces delay in Form 1099-K reporting threshold for third party platform payments in 2023; plans for a threshold of $5,000 for 2024 to phase in implementation*, https://www.irs.gov/newsroom/irs-announces-delay-in-form-1099-k-reporting-threshold-for-third-party-platform-payments-in-2023-plans-for-a-threshold-of-5000-for-2024-to-phase-in-implementation (last visited Sept. 12, 2024).

[15] Defendants stated that the law lowering the threshold for issuing a 1099-K is "not the decisive factor" for their determination that there is no better source of earnings data than IRS tax records. 88 Fed. Reg. at 70,043. This statement is problematic. If certain factors weigh more heavily on an agency's analysis than others, then the agency must explain what those factors are and why it has assigned different weight to each. *See AACS I*, 258 F. Supp. 3d at 72 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970)) (agency is "require[d] . . . to 'articulate with reasonable clarity its reasons for decision, *and identify the significance of the crucial facts*.'"). Defendants never stated what the "decisive factor" is.

circular.  The gist of Defendants' argument is, "Our data are reliable because we rely on them."

Finally, Defendants argue that it is reasonable to disregard unreported earnings because of "past experiences with the earnings appeals process"[16] and "new research on the prevalence and scope of unreported income."  88 Fed. Reg. at 70,041.  For this claim, Defendants hang their hats on two studies: one sponsored by an anti-proprietary school organization[17] and another that does not cover the segment of the cosmetology industry most likely to underreport income.

Defendants' "new research" must be viewed against the prior research.  Before finalizing the 2014 Rule, the Department obtained a study by Eric Bettinger that a court interpreted as saying "that tip income and self-employment income are underreported by as much as 60% in, among others, the cosmetology industry."  *AACS I*, 258 F. Supp. 3d at 71; *see also* Appx. at 618-43 ("Bettinger Study").  Defendants also received then, as they received now, testimony from Russell George, Treasury Inspector General for Tax Administration, that "self-employed individuals who formally operate . . . businesses . . . are estimated to report only about 68 percent of their income for tax purposes," and that "self-employed individuals operating businesses on a cash basis report just 19 percent of their income to the IRS." Appx. at 1156. However, Defendants have chosen to credit their tailor-made "new research," which contends that "earnings underreporting is likely to be small—around 8 percent," over the Bettinger Study.  88 Fed. Reg. at 70,042; Appx. at 827-36 ("Cellini Study"). While Defendants voraciously adopt Cellini's critique of the Bettinger Study, they arbitrarily disregard several weaknesses in the Cellini Study. These include:

---

[16] Plaintiffs address some aspects of this argument *infra* in III(C)(2).

[17] *See* Appx. at 827 (referring to grant from Arnold Ventures, which "invests in research, policy, advocacy, and litigation [to] build[ ] a higher education system that ensures students are better off for having attended higher education and that taxpayers aren't left holding the bag for unscrupulous institutions"); Higher Education Quality and Accountability, https://www.arnoldventures.org/work/accountability (last visited Sept. 12, 2024).

1.      Cellini (and Defendants, who took cues from Cellini) misread the Bettinger Study. Bettinger concluded that cosmetologists' "failure to impute tip income and other reported income resulted in an underestimation of the median . . . income reported of 19 . . . percent . . . ." Appx. at 626.  Bettinger *never* concluded that workers in the cosmetology industry underreport their income by 60 percent, nor did he conclude that one must "inflate[ ] total income by 50 percent" in order to accurately estimate cosmetologists' earnings.  Interestingly, however—and unmentioned by Defendants—is that it was the *IRS* is who had concluded "60 percent of tips are unreported." *Id.* at 634 ("The IRS reports that 60 percent of tips are unreported.").  Bettinger merely used the IRS's report to adjust earnings data in a Bureau of Labor Statistics survey, then he used those adjusted earnings to come up with his own estimate for median unreported income (19 percent). *See* Appx. at 1631-32 (Hill Decl.).  Defendants' rejection of the Bettinger Study is founded on a mistaken interpretation, but worse, they give no reason for disregarding the *IRS's* finding—the very agency from whom Defendants intend to acquire earnings data.

2.      The very first example cited in the Cellini Study is a school that pursued an alternate earnings appeal pursuant to the 2014 Rule.  Appx. at 829.  Although the Cellini Study rejected the IRS's estimate that 60 percent of earnings go unreported, this school's evidence showed a 54 percent increase in earnings over records provided by a Data Providing Agency.  *Id*.  Defendants fail to acknowledge, let alone explain away, the remarkable consistency between the IRS's determination and the school's alternate earnings evidence.

3.      The Cellini Study claims that earnings appeals by cosmetology schools resulted in an 82-percent increase over earnings reported by Data Providing Agencies, and further argues that this increase is "far beyond any reasonable estimate of what underreporting for *tips* could possibly be."  *Id.* (emphasis added).  The Cellini Study cites no authority for this claim.  Furthermore,

Cellini's claim focuses only on tips; it neglects the other significant source of unreported income: **self-employment**.  Elsewhere, the Cellini Study admits that "underreporting is not limited to tips" and that "those who are self-employed or accept unofficial 'under-the-table' cash payments for services may illegally underreport this income."  Appx. at 832.  In fact, evidence before Defendants *from a Treasury Inspector General for Tax Administration official* indicated that only 68 percent of all self-employment income is reported, and only 19 percent of self-employment income from cash businesses is reported.  Appx. at 1156.  Defendants fail to explain their reasons for disregarding the effects of self-employment on underreporting and for relying on Cellini's *ipse dixit* about what is "reasonable" over a Treasury official's sworn testimony.

4.     The Cellini Study found fault with the earnings appeal process because it purportedly gave way to "astonishing" increases in earnings.  *Id.* at 829 (calling, without citation, a 336% boost in earnings "astonishing" and "far beyond any reasonable estimate").  However, when considering the dollars at issue and the varying reports of income underreporting, such figures are not "astonishing" at all.  One appellant presented evidence that its completers' discretionary income in one year was $5,719—not $593, as the Department had calculated.  *See* Appx. at 935.  That reflects a change of nearly 1,000 percent, even though, in reality, it is a difference of only a few thousand dollars.  An appeal that boosts earnings from $1 to $10 would result in a 900-percent increase, but it would be far-fetched to call a $9 change "astonishing."

5.     The Cellini Study does not conclusively assert that only 8 percent of income is underreported.  The authors "double-check[ed]" their methodology using "another data point" to account for cash tips and found that cosmetologists' income may be underreported by 11.55 percent.  *Id.* at 830.  The authors also calculated the effects of underreporting of up to 15 percent "as a robustness check" for their study.  *Id.* at 832.  The Department did not explain why it adopted

the 8-percent figure, rather than the 11.55-percent figure or 15-percent figure, even though a 15-percent adjustment would nearly double the effect of unreported income.

Though they claimed to have "examined the relevant data," Defendants must "articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. Instead of that, Defendants adopted the most favorable portions of the Cellini Study without addressing any of the countervailing evidence.

Defendants also relied on a report by the Qnity Institute as support that many salons with W-2 employees include tip income on their employees' W-2s, and that "just 4 percent of salons did not report tips for employees on W2s." 88 Fed. Reg. at 70,042; *see also* Appx. at 897 ("Qnity Report"). Defendants' discussion highlights the arbitrariness of their analysis. They are well aware that W-2 employees only account for around half of all beauty industry professionals and that self-employed individuals, stylists who receive 1099s, and other cosmetologists who do not receive a W-2 represent the other half. Comments from cosmetology education professionals showed that 52 percent of the cosmetology workforce is "self-employed and not monitored [or] motivated to report their income properly," *Id.* at 1063, and 91 percent of salon businesses "are solo operators with no payroll employees," and are "very cash-intensive businesses . . . ." *Id.* at 1067. As prior courts and experts have noted, these individuals account for most of the underreporting. *See AACS I*, 258 F. Supp. 3d at 59-60; Appx. at 1156. Even the Qnity Report itself states that it "does not represent all segments of the pro beauty industry, nor was it intended to." Appx. at 922. It should come as no surprise that salons with *W-2 employees* report tip income; employers do not want to aid in tax evasion. However, Defendants never explain why a study about *W-2 employees* should be considered indicative of how *self-employed stylists* and *independent contractors* report (or do not report) their earnings in full.

Even if one forgives all of the abovementioned errors, there is still a consensus that, in the cosmetology industry, *at least* eight percent of earnings are unreported.  The APA does not set a threshold at which data go from "sort of bad, but useable" to "completely unusable."  The law is just that "agencies do *not* have free rein to use inaccurate data." *Dist. Hosp.*, 786 F.3d at 56.  This is especially important in the GE context.  To borrow a football analogy, GE can be a "game of inches," and when the debts and incomes at issue are usually less than $50,000, a few thousand dollars one way or the other can mean the difference between "passing" and "failing."[18]  That much is clear from the administrative record.  Under the 2014 Rule, an institution in Florida that was failing the Department's debt-to-earnings measure submitted alternate earnings data showing that its median annual earnings should have been $17,640 (instead of $11,623) and that its mean annual earnings should have been $18,797 (instead of $15,878). Appx. at 935. These relatively modest adjustments allowed the institution to pass the 2014 Rule's standard. Appx. at 935-36.

Defendants will argue that they do not need to have perfect data to support their Final Rule, and that they are making the most out of the data they can reasonably obtain.  In some cases, that may be enough to show reasoned decisionmaking under the APA.  *See, e.g., FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021).  However, this is not one of those cases, because Defendants could have pursued several obvious alternatives that would mitigate, if not solve, the issues caused by unreported earnings.  *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (agencies must consider "significant and viable" and "obvious" alternatives).

One alternative comes from Defendants' own study cited in support of the Final Rule.  The Cellini Study argues that "a reasonable earnings adjustment would be to allow earnings to be

---

[18] The average debt of a completer from an AACS school is $8,900.  *See* Appx. at 1612 (Kidd Decl.).  Defendants' data show the median income for a certificate program completer, whether at a proprietary or Not-for-Profit School, ranges from $25,400 to 33,400.  88 Fed. Reg. at 70,114.

inflated by 8%, or at most, 10%." Appx. at 832. It also advocates that "an 8-10% adjustment may reasonably be applied beyond cosmetology to other fields where underreporting is prevalent." Unlike in *AACS I*, where no one "suggest[ed] a specific adjustment factor that the [Department] could use for various programs that would inevitably claim underreporting as a problem with their earnings data," 258 F. Supp. 3d at 74, this time around, Defendants' own expert did just that.

To the extent Defendants considered this alternative—they never actually mention the Cellini Study's recommendation in the Final Rule—their rejection of it is capricious. Defendants argue that they "seek to avoid the perverse incentives that would be created by making the rule's application more lenient for programs in proportion to how commonly their undergraduates unlawfully underreport their incomes." 88 Fed. Reg. at 70,042. However, they make no "rational connection" between these so-called "perverse incentives" and their choice to rely on data they *know* to be wrong. First, Defendants "do not believe that taxpayer-supported educational programs where benefits are provided based on reported income should . . . in effect, receive credit when their graduates fail to report income . . . ." *Id*. This is entirely inconsistent with Defendants' position that "[i]naccurate and unreliable earnings information . . . is problematic whatever the explanations for its low quality." 88 Fed. Reg. at 70,095, 70,097. Moreover, schools are not "receiving credit" for anything; an 8- to 10-percent adjustment is merely remedying an *acknowledged* data flaw. If anything, by *not* granting tip- and self-employment-heavy industries an adjustment, Defendants are penalizing them. Second, Defendants offer the illogical non-sequitur that "earnings underreporting will tend to have borrowers repay less of their loans under income driven repayment plans." 88 Fed. Reg. at 70,042. But Defendants fail to explain how an adjustment to cosmetology schools' D/E Rates and EP calculations will influence the tax-reporting behaviors of individual taxpayers who, having completed school three years prior, will not be

impacted at all by the adjustment, .  *See Nat'l Ass'n of Mfrs.*, 105 F.4th at 815 (agencies must "explain all of the key assumptions embedded in its new regulations").  Third, Defendants claim an adjustment "would incentivize institutions to discourage accurate reporting of earnings among program graduates."  88 Fed. Reg. at 70,042; *see also id*. at 70,095.  Defendants' lack any evidence to support their conjecture.  This scandalous claim assumes that cosmetology schools intend to aid and abet tax fraud and is yet another unjustified assumption indicative of arbitrary rulemaking. Fourth, Defendants worry that an adjustment "could also potentially invite private investment" into low-performing cosmetology programs.  While this claim represents another unjustified assumption based on no evidence at all, it also neglects the converse: by refusing an adjustment, Defendants <u>dis</u>courage investment into cosmetology programs that would pass the GE metrics if only their completers' earnings were accurately counted.  Defendants did not reasonably consider this "important aspect of the problem."  *Restaurant Law Ctr.*, 2024 WL 3911308, at *9.

2.     Defendants' Rejection of Any Alternate Earnings Data is Unjustified.

Another alternative to curing bad earnings data is to allow schools to provide alternate data proving their completers' earnings.  While Defendants considered this, they arbitrarily rejected it. Despite receiving "a large number of comments objecting to [their] decision not to include an alternate earnings appeal," and despite allowing appeals in every prior GE rule, Defendants now refuse to allow institutions any opportunity to correct the government's mistakes in the earnings data used to determine whether schools "pass" or "fail" the D/E Rates and EP tests.  88 Fed. Reg. at 70,094-98.  Again, Defendants spill much ink to justify their departure from prior practice, but their reasoning does not support their decision.  Many of the reasons Defendants cite for abandoning alternate earnings appeals are identical to those given for ignoring underreporting of income.  *See* 88 Fed. Reg. at 70,095, 70,097-98.  To the extent there is overlap on the two topics, Plaintiffs incorporate their arguments here.  Plaintiffs are left with two other matters to address.

First, Defendants attempt to justify the removal of appeals based on their belief that the D/E Rates and EP metrics are "modest," are easier to satisfy than the tests in the 2014 Rule, and that GE Programs will have to fail "multiple times" before becoming ineligible.  88 Fed. Reg. at 70,095.  This is a red herring, not a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.  Defendants forget that they will force schools to send harmful warnings to current and prospective students if their GE Program "fails" either the D/E Rates test or the EP test *just once*.  Worse, Defendants miss the thrust of commenters' concern, which is: without an alternate earnings appeal, there will be some set of well-performing schools that will "fail" the Final Rule's tests when they should not have, and only because Defendants did not give them an opportunity to present evidence of their completers' actual, real-world earnings.

Second, Defendants take issue with the accuracy of completer surveys, which were one of the two ways institutions could pursue an alternate earnings appeal under the 2014 Rule.  *See* 79 Fed. Reg. at 65,011.  They claim that institutional surveys "would be more prone to issues such as low or selective . . . response rates and inaccurate reporting" and to undue influence or manipulation.  88 Fed. Reg. at 70,095, 70,121.  Defendants' defamatory and unsupported claims of manipulation are addressed *supra*, and their concerns about response rates are similarly arbitrary.  On one hand, Defendants refuse to allow surveys of completers because they are concerned that more completers with higher incomes will respond and skew the results.  *Id*.; *see also* Appx. at 828 (Cellini: "A predictable consequence of the lack of [alternate earnings appeal] standards, was that reported earnings under an appeal could be based on a small number of a school's most successful graduates.").  But on the other hand, Defendants are perfectly willing to use the survey responses of high school graduates to the American Community Survey ("ACS"), administered by the Census Bureau, to calculate the earnings threshold that schools must surpass

to "pass" the EP test. *See* 88 Fed. Reg. at 70,058. These positions are irreconcilable. According to the Census Bureau, "low-income households have been less likely to respond" to the ACS, and in every ACS survey from 2020 forward, ACS "nonresponse has continued to bias income statistics upward by 2% to 3% and official poverty rates downward by a fraction of a percentage point."[19] Another of Defendants' studies cited in support of the Final Rule concluded that the ACS "has earnings nonresponse rates of about 20 percent, suggesting that nonresponse is *pervasive across the most important federal household surveys*." Appx. at 747 (emphasis added). The Final Rule contains no explanation why the <u>documented</u> shortfalls of the ACS are less concerning than the <u>speculative</u> shortfalls of completer surveys, much less a reasonable justification for Defendants' conflicting positions regarding the use of surveys to establish earnings data.

### 3.    D/E Rates and EP Thresholds Arbitrarily Ignore Data on Demographics.

Women make up the vast majority of cosmetology students (90 percent), and half of those women are not white. *See, e.g.,* Appx. at 1112 (citing NPRM). Commenters advised Defendants that—due to the unfortunate but well-known phenomenon that women and minorities are often paid less than white people and men—the D/E Rates and EP tests will disadvantage GE Programs that have high percentages of women or minority students. *See* 88 Fed. Reg. at 70,031. Despite admitting that "systemic discrimination may affect the need for some groups of students to borrow and may affect their earnings after graduation," 88 Fed. Reg. at 70,031, Defendants arbitrarily

---

[19] Adam Bee & Jonathan Rothbaum, *Using Administrative Data to Evaluate Nonresponse Bias in the 2023 Current Population Survey Annual Social and Economic Supplement*, UNITED STATES CENSUS BUREAU (Sept. 12, 2023), https://www.census.gov/newsroom/blogs/research-matters/2023/09/using-administrative-data-nonresponse-cps-asec.html (Appx. at 1539-45). Given Defendants' heavy reliance on the ACS to set the earnings threshold for the EP, the Court should consider this document. It reflects factors that Defendants failed to consider and was published after the Department published the Final Rule. This report may also assist the Court in understanding the issues in what is a relatively complex case. *See Nat'l Ass'n for Gun Rights, Inc. v. Garland*, --- F. Supp. 3d ---, 2024 WL 3517504, at *15 (N.D. Tex. July 23, 2024).

refused to make any adjustments to the Final Rule to account for these known wage gaps.[20, 21]

The centerpiece of Defendants' reasoning is a regression analysis that they claim "show[s] that institutional and program factors . . . explain a great deal of the variation in program outcomes," and that "[a]dding student demographics on top of these variables does not explain much additional variation in outcome . . . ." *Id.* However, Defendants' regression analysis contains a critical flaw and should be given no weight. That flaw relates to the order in which variables (credential level, type of institution, race, gender, etc.) are introduced into the analysis.

According to the Final Rule, Defendants began by introducing "institutional control" (i.e., public, private non-profit, private for-profit), "credential level" (certificate, undergraduate degree, etc.), and institution "fixed effects" into their regression model. 88 Fed. Reg. at 70,142-43; *see also* Appx. at 1623 (Hill Decl.). Defendants claim that, when they looked at those three data elements (columns 1-3 in Tables 4.22 and 4.23), they (not race or gender) accounted for most of the variation in completers' earnings. Then, Defendants added race and gender on top of the first three data elements and saw little change in the numbers. Thus, Defendants concluded, things like institution type and degree level affect debt and earnings far more than race or gender. *Id.*

The error in Defendants' analysis is that race and gender effects are already baked into institution type and degree type. The student bodies at proprietary cosmetology schools are 90

---

[20] As Mr. Hill notes in his Declaration, Defendants also arbitrarily write off the differences in earnings in urban versus rural environments, but they ignored suggestions of commenters that would have addressed the problem. This problem is not insignificant: urban versus rural earnings differ by 20 percent or more in 27 states. Appx. at 1629-31.

[21] Even Defendants' own expert understands that the EP measure requires comparisons of individuals of the same demographic. In a study Defendants cited, Cellini "employ[ed] a matching strategy . . . based on prior earnings and demographics, matched within gender-age-zip [code] cells" when comparing earnings of proprietary school completers against Not-for-Profit School completers. If she considered that to be important, Defendants should have too. Appx. at 850.

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                    Page 34

percent female and heavily minority.  They differ from the student bodies at Not-for-Profit Schools.  *See* Appx. at 1112.  So, when Defendants began their analysis by looking at the earnings of completers from Not-for-Profit Schools versus for-profit schools, they were, in effect, already measuring many of the demographic differences between their student bodies.  This is a known problem in statistics called "multicollinearity," and it can invalidate a regression analysis.  Appx. at 1622-24 (Hill Decl.); *see also Bakewell v. Stephen F. Austin St. Univ.*, 975 F. Supp. 858, 905 (E.D. Tex. 1996) (rejecting regression analysis due to multicollinearity).  Thus, it is neither surprising nor informative that Defendants saw little change when they added in demographics near the end of their regression analysis.  Defendants' method was akin to coloring an already-red piece of paper with a red crayon and wondering why the color didn't change.[22]

Defendants also disregard demographics because they say many programs (e.g., nursing, dental support) have similar gender and racial make-ups as cosmetology and massage, but they still pass the EP test.  88 Fed. Reg. at 70,144-45.  However, Defendants fail to account for the fact cosmetology and massage are "highly tipped" fields, as their own expert admits, *see* Appx. at 829, and that there are high levels of self-employment in both.  In contrast, Defendants identify no evidence that nurses and dental hygienists earn tips or that they are self-employed.

Defendants also rejected the importance of demographics based on a belief that some institutions "aggressively recruit women or students of color . . . and claim that the resulting poor

---

[22] Defendants admitted that their regression analysis suffered from this flaw.  *See* 88 Fed. Reg. at 70,144; *see also* 88 Fed. Reg. at 32,431 (referring to same flaw in NPRM).  And while they claim they ran a separate "variance decomposition analysis" to dispel its effects prior to issuing the NPRM, they failed to provide that analysis for comment.  This violates the notice-and-comment requirements of the APA and warrants setting aside the Final Rule.  Agencies have a "duty to identify *and make available* technical studies and data that it has employed in reaching the decisions to propose particular rules."  *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1283 (D.C. Cir. 2023).  Mr. Hill's declaration discusses how Defendants prejudiced Plaintiffs by failing to provide its analysis for public scrutiny.  Appx. at 1624-25.

**BRIEF IN SUPPORT OF SUMMARY JUDGMENT**                                      Page 35

outcomes are because of the alleged 'access' the program provides to their students."  88 Fed. Reg. at 70,031.  While it is unclear what Defendants mean by "access," Defendants provide literally no evidence that cosmetology programs do this more than other institutions—or do it at all.  The Final Rule identifies just one incident of misconduct by a cosmetology school, and that case involved document forgery, not "aggressive recruitment."  88 Fed. Reg. at 70,006, n.22.  Defendants also fail to connect alleged "aggressive recruitment" to the wage discrimination that women and minorities undisputedly suffer.  One does not cause the other, so one should not excuse the other.

Next, Defendants argue that they can disregard demographics because D/E Rates do not include loans taken out for living costs, which may be higher for women and minorities.  88 Fed. Reg. at 70,031.  But this ignores that the EP—which is just as impacted by wage discrimination as D/E Rates—is purely a function of *earnings* and has nothing to do with the amount borrowed.[23]

Defendants complain of the administrability of adjusting for demographic differences, arguing that demographics can change over time and that, if accounting for both gender and racial differences, they would "need to estimate median earnings for ten subgroups within each State."  *Id*. at 70,032-33.  To the extent administrability can be an excuse for using bad data in this circuit, Defendants overstate the burden and ignore an easy alternative.  *10 Ring*, 722 F.3d at 724.  Instead of creating 10 subgroups per state, Defendants could at least address the gender gap, which would only require two D/E Rate and EP calculations per state (one for men, one for women).  Or, Defendants could have accepted the recommendation to apply a simple upward adjustment for women's earnings based on the Bipartisan Policy Center's Return on Investment model.  88 Fed. Reg. at 70,033.  Defendants turned this down because it "would misrepresent the true median

---

[23] Defendants' data show that cosmetology GE Programs will fail the EP, not D/E Rates.  *See* Appx. at 1618 (Hill Decl.) ("[T]here will be no cosmetology programs that fail [D/E Rates] only.").

earnings of graduates . . . by inflating the median salary for programs enrolling large shares of women . . . ." *Id.* Here, Defendants' caprice shines through: they are unwilling to adjust women's earnings upward to account for <u>admitted</u> wage discrimination, yet they are happy to accept artificially low earnings (by *at least* 8 percent) caused by <u>admitted</u> underreporting.

Ignoring differences in demographics is harmful. Using Defendants' data, Mr. Hill determined that the median earnings of GE Programs whose completers are predominately women will be understated by approximately 16 percent if calculated in accordance with the Final Rule. If given credit for wage discrimination, 72 more proprietary cosmetology programs (out of 634 in Defendants' dataset) would pass the EP metric. If given credit for wage discrimination *and* eight percent of income that Defendants admit is unreported, 131 more would pass. Appx. at 1632-39.

4. <u>The Final Rule Turns on Arbitrary Comparisons of Incomparable People.</u>

The EP is based on comparing the median earnings of a GE Program's completers three years out of school with the median earnings of persons in the institution's state aged 25-34 who have only a high school degree. *See* 34 C.F.R. §§ 668.2; 668.404. In effect, Defendants' EP metric expects that a 22-year-old woman, just three years out from beauty school, will achieve higher earnings than what a 34-year-old long-time master electrician will earn. *See* Appx. at 1016. While that is unreasonable on its own, more telling is Defendants' total disregard for the prevalence of part-time work and its effect on cosmetology schools' ability to pass the D/E Rates and EP tests.

In setting the earnings threshold for the EP, the Final Rule uses earnings data for "adults aged 25-34 who either worked during the year or indicated they were unemployed (*i.e.*, not employed but looking for and available to work) . . . with only a high school diploma . . . ." 34 C.F.R. § 668.2. This means that Defendants will *exclude* high school graduates who have opted out of the workforce when calculating the median earnings of high school graduates. In effect, there will be fewer "$0s" factored into the earnings threshold.

However, when calculating the median earnings for a GE Program, Defendants declined to exclude completers who have opted out of the workforce.  The earnings, if any, of *every* completer count toward the program's median earnings whether they are in the workforce or not.[24] *See* 34 C.F.R. § 668.405(b).  This inconsistency skews the comparison between high school graduates and GE Program completers and works to the disadvantage of institutions—especially cosmetology schools, given their high rates of part-time work and voluntary workforce departures.

Defendants understood that the professionals in the cosmetology industry work part-time at a higher-than-average rate.  The Qnity Report, which Defendants relied on as support for the Final Rule, boasts the "extreme flexibility in work hours" and the "high percentage of part-time solo practitioners" in the cosmetology industry.  Appx. at 933.  Recognizing the appeal of part-time work for many women, it notes, "There aren't many industries where an employee has as much choice about the number of hours they work."  Appx. at 942.

Defendants also had several studies finding that women leave the workforce far more often than men.  One found that "women, more often than men, are forced to leave the workforce to care for children."  Appx. at 417.  Another stated that the wage gap between men and women worsens for women "who had periods with no earnings (for example, women who leave the labor force for childbearing/child rearing . . .)" and noted that "women are much more likely than men to be out of the labor force for spells of time (and thus, not regularly work full-time, full-year)."  Appx. at 801.  Defendants were forced to "recognize[ ] that individuals choose to leave the labor force for reasons that do not reflect their ability to find a job . . . ."  88 Fed. Reg. at 70,045.  Yet, Defendants arbitrarily concluded that there is no need to account for this in the Final Rule.

---

[24] The Final Rule does exclude some completers, *e.g.*, those whose parents took out loans for them, those in prison, those who have died, and those who have pursued additional education.  Plaintiffs take no issue with these exceptions.

The reasons Defendants gave for their decision are not reasonable.  With respect to non-working completers, Defendants merely said they "believe that . . . students typically have a strong interest in being employed in the three-year window directly after graduation."  88 Fed. Reg. at 70,045.  This comes nowhere close to meeting their "affirmative burden" to "explain all of the key assumptions embedded in its new regulations."  *Nat'l Ass'n of Mfrs.*, 105 F.4th at 815.  Defendants have no evidence and rely solely on their own say-so.  To the extent they rely on experience—which they do not even claim—that is insufficient in this circuit.  "[F]alling back on unexplained claims of agency expertise does not carry the [Department's] burden" under the APA.  *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023).

Defendants' response to the part-time problem is just as feeble.  All they said was, "Regardless of the hours that individuals choose to work, we believe it is important that students who borrow earn enough in total to be able to afford their debt payments."  88 Fed. Reg. at 70,044.  While Defendants' response attempts (but fails) to scratch the surface of D/E Rates, it says *nothing* about the EP.  With respect to the EP, comparing earnings in a field with a high proportion of voluntary part-time workers against the earnings of the general population cannot indicate whether the former are more "gainfully employed" or "better off" than the latter.[25]

5.      Defendants' Refusal to Adjust for Coronavirus Effects is Arbitrary.

Although the Final Rule took effect on July 1, 2024, the D/E Rates and EP tests are backward-looking.  As discussed above, the first "earnings" that will be used to calculate D/E

---

[25] A commenter brought to the Department's attention a survey of acupuncturists showing over 50 percent work part-time.  Appx. at 583.  The Qnity Report obtained data from stylists on "wages AND hours worked."  Appx. at 933.  Knowing these data exist, Defendants could have authorized institutions to present survey data (whether conducted by institutions or by groups like Qnity) on the prevalence of part-time work in an industry, similar to an alternate earnings appeal but with no risk of alleged over-reporting earnings.  Rather than ignore part-time work, Defendants could use those survey results to adjust the earnings threshold downward from a baseline 40-hour week.

Rates and the earnings threshold are from 2021 and 2022.  *See* 34 C.F.R. § 668.408; 88 Fed. Reg. at 70,037, 70,091-92.  Therefore, economic conditions in 2021 and 2022—peak years of the pandemic—will impact the very first results of Defendants' D/E Rates and EP calculations.

The evidence before the agency showed that the pandemic had outsized economic effects on the cosmetology industry.  As examples, a school president from Arizona advised that in 2021 and 2022, "[w]e were still in a COVID crisis.  Many salons and spas were closed or not hiring. State licensing tests were behind 6-8 months, even a year.  In this business, No license = No income." Appx. at 990.  A beauty institute president in California advised that salons the institute had operated for over 20 years "were forced to close due to COVID" and that "under-reporting of income was exacerbated by COVID, when salons in [his] state were forced closed."  Appx. at 996-97.  An owner of a family-operated cosmetology school in Nevada echoed these concerns and advised that state guidelines forced operational shifts that minimized stylists' incomes.  *Id.*

The anecdotal evidence is supported by the evidence in the record.  A May 2021 study that Defendants relied upon for support observed:

> As of this writing, tens of millions of Americans are out of work, thanks to the COVID-19 pandemic and ensuing recession.  *The economic impacts have not been evenly experienced.*  Bachelor's-degree holders were unemployed at about *half the rate of those with some college but less than an associate degree* . . ., and *Black and Hispanic workers with some college have experienced higher unemployment rates than white workers in the same category* . . . .

Appx. at 890.  Cosmetology programs award certificates that are "less than an associate degree," and as discussed *supra*, Defendants knew that cosmetology programs educate a higher percentage of minority students than other GE Programs.  *Compare* 88 Fed. Reg. at 70,141-42 *and* Appx. at 993-94, 1049-50, & 1117.  A Federal Reserve report that Defendants cited in support of the Final Rule concluded:

> Another difference between prime-age men and women is that women were more likely to say they were not working, at least in part, because of concerns about

getting COVID-19. * * * Previous studies have found that occupations with more women working in them before the pandemic had higher rates of COVID-19 exposure.

Appx. at 674-75.  As noted *supra*, Defendants understood that women make up roughly 90 percent of cosmetology completers.  *Id.* at 1112.

Defendants acknowledged that "the COVID-19 pandemic likely affected the earnings of workers in salons, spas, the beauty industry, and many other industries besides."  88 Fed. Reg. at 70,092.  Despite this and all the evidence in the administrative record, Defendants made no adjustments whatsoever to the Final Rule to account for the pandemic—not even for industries like cosmetology that, according to Defendants' own studies, were hit harder than others.  Defendants even rejected a simple proposal from a commenter to delay D/E Rates and EP calculations for a year or two until earnings had normalized.  *See* 88 Fed. Reg. at 70,065.

Despite recognizing that "data from some years included in the initial reporting period were impacted by the COVID-19 pandemic," Defendants stated they refused to postpone D/E Rates and EP calculations because they "believe the need for the transparency and accountability measures is too urgent . . . ."  88 Fed. Reg. at 70,065.  Defendants, however, are obligated to "consider *all relevant factors* raised by the public comments and provide a response *to significant points within*." *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023).  Defendants' response comes nowhere close.  Commenters' purpose in bringing the pandemic to Defendants' attention was to ensure that Defendants would properly account for the dip in earnings for many cosmetologists. *See* 88 Fed. Reg. at 70,065; Appx. at 1084.  Defendants provided no reasoned basis why their rush to impose GE metrics on schools—which they agree should be based on "quality data," 88 Fed. Reg. at 70,090—is superior to having actual "quality data" concerning completers' earnings.

Defendants next claim they are "unconvinced" that "data from prior to 2020 represent a pre-pandemic reality that no longer exists," citing other data showing that (as of April 2023) labor

force participation had returned to normal levels.  *Id*.  This response also does not address the "significant points" in the comments.  What labor force participation was before the pandemic or in 2023 is irrelevant to whether cosmetologists' earnings were depressed in 2021 and 2022.  Cosmetology schools are concerned because the first time Defendants measure D/E Rates and EP passage, they will use earnings that are unrealistically low because of a pandemic that disproportionately affected the cosmetology industry.  This will force schools undeserving of any penalties to issue warnings, subject them to a demand for financial security, and begin their downward spiral toward termination and closure.  Defendants failed to deal with that.

### 6.   Defendants Unjustifiably Assume "High-Quality" Alternatives Exist.

One of the critical assumptions underlying the Final Rule is that students whose GE Programs are terminated for failing the D/E Rates or EP test will "have alternatives with better student outcomes available to them."  88 Fed. Reg. at 70,086.  In reality, Defendants have no idea whether alternative programs will have better outcomes.  That is because Defendants excluded *over three-fourths* of all academic programs (GE and non-GE) from the Final Rule.

In the name of "privacy," Defendants decided they will not calculate a program's D/E Rates or EP unless "there is a minimum of 30 completers" in a two-year or four-year cohort.  34 C.F.R. § 668.2 (minimum of 30 completers needed for "cohort period").  When applying that limitation to all programs across the country, it means that over 80 percent of programs will not have their D/E Rates calculated or their EP measured.  88 Fed. Reg. at 70,128-29.  Such programs will simply be deemed to "pass" both measures.  Defendants misleadingly assert that the vast majority of programs will "pass" the "modest" GE metrics, and they label all "passing" programs as "high value."  *Id*. at 70,145.

Defendants claimed a "privacy" exemption is consistent with their practices.  *Id*. at 70,046.  However, they identified no legal requirement to protect anonymized, aggregated earnings data

devoid of any personally identifiable information or reason why "privacy" trumps their claimed interest in protecting students from allegedly poor-performing programs throughout the country. This is arbitrary. *See AACS I*, 258 F. Supp. 3d at 72.

Defendants also excluded every program in any U.S. territory on the basis that territories lack reliable data to calculate the earnings threshold for the EP measurement. *See* 34 C.F.R. § 668.401(b)(1); 88 Fed. Reg. at 70,027. Putting aside Defendants' willingness to use unreliable data when it supports their policy goals (i.e., underreported wages), this too is arbitrary because Defendants were left with an obvious and extremely simple alternative: they could have exempted territories from the EP but not from the D/E Rates test. They did not even consider that.[26]

However, these arbitrary exemptions give rise to an even more obvious error in judgment. Defendants "expect[ ] one outcome of these regulations will be an enrollment shift from low-financial-value to high-financial-value programs," and contend that "most students who enroll in a GE program projected to fail the D/E rates or EP measure have better options available to them in a similar field nearby or, possibly, at the same institution." 88 Fed. Reg. at 70,029-30. Defendants' lapse in judgment is clear: they *assume* that any non-failing programs are "high-financial-value" when, in fact, they have no data on over 80 percent of them. A program in the same area as a "failing" GE Program may perform better, the same, or worse than the GE Program, but with no data to calculate its D/E Rates or EP, Defendants can only hazard a guess.

The upshot is that, for all Defendants know, the Final Rule may end up doing more harm than good. Defendants assume these "better options"—most of which have fewer than 30

---

[26] Defendants also fail to reconcile these exemptions with their argument that the D/E Rates and EP metric relate to a program's eligibility to participate in Title IV FSA programs. *Every* institution and program regardless of size must be "eligible." 20 U.S.C. §§ 1002(b), (c); 1085; 1088(b). Defendants are waiving their statutory duty to determine eligibility. 20 U.S.C. § 1099c.

completers over *four years*—have capacity to take on hundreds of thousands of students whose GE Programs have been shut down.  Defendants also assume that the quality of these programs will be better, but have prevented themselves from getting the D/E Rates and EP data to prove it. Proprietary cosmetology schools train a majority of the nation's professional stylists, so there is at least an inference that the free market has determined that proprietary cosmetology schools are the best educators in the field.  *See* 88 Fed. Reg. at 70,105-09; Appx. at 1023.  Data from Defendants' oft-cited researcher, Cellini, supports that inference.  *See infra* at III(C)(7).   Either way, unexplained assumptions and "predictive judgments" are arbitrary and capricious.  *See El Paso Elec.*, 76 F.4th at 364 (While agencies "need not conduct their 'own empirical or statistical studies before exercising' their discretion," the "overarching standard [is that] all agency action, even 'predictive judgments based on the evidence' available, must be 'reasonable and reasonably explained.'");  *see also AACS I*, 258 F. Supp. 3d at 72; *Permian Basin Petroleum Ass'n v. Dep't of Interior*, 127 F. Supp. 3d 700, 712 (W.D. Tex. 2015) (holding agency's assumption was "arbitrary and capricious" where "no substantive basis was provided, legitimate or otherwise.").

7.   Defendants Arbitrarily Target Proprietary Cosmetology Schools.

With all the statistics, studies, and complex computations, it is important to keep an eye on the bigger picture: the Final Rule jeopardizes the majority of proprietary cosmetology schools and will leave thousands of educators and students in its wake.  *See* Appx. at 1089-90; Appx. at 1618-19 (Hill Decl.).  Cosmetology is affected more than any other field of study.  *See* 88 Fed. Reg. at 70,140.  For this result, like any other, an agency must "provide sufficient linkage between theory, reality, and the result reached."  *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 68 (D.C. Cir. 2017). There must be a "satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43.

Putting aside the low debt and high licensure of cosmetology graduates, *see supra* at II(C),

Defendants' own research shows there is no such connection between the Final Rule and its result. A different study by Cellini (and cited in support of the Final Rule) analyzed the purported outcomes for students who attended for-profit schools versus those who attended Not-for-Profit Schools or did not pursue postsecondary education. Appx. at 840 & 854-64. It analyzed the "ten most popular fields of study" and found the following: "Separate analyses of the ten most popular fields of study reveal that for-profit students experience similar or lower returns than public students in all fields **except cosmetology**." Appx. at 842 (emphasis added).

Defendants' data show 65.9 percent of proprietary cosmetology programs will fail the GE metrics. Appx. at 1618-19. Those same data show that only 17.2 percent of cosmetology programs at Not-for-Profit Schools will fail one or both metrics. *Id*. In other words, even though proprietary cosmetology programs perform better than cosmetology programs at Not-for-Profit Schools (as Cellini admits), the Final Rule penalizes a far higher percentage of proprietary schools than Not-for-Profit Schools. This should send up a red flag, but for these Defendants, it sent up a green one. The APA does not permit such a disconnect between fact and result.

### D.    The Final Rule Unconstitutionally Governs Speech.

The Final Rule both compels speech (in the form of warnings) and burdens speech (by terminating GE Programs from Title IV participation and preventing would-be listeners from taking classes). It is therefore subject to heightened scrutiny that it cannot withstand.

#### 1.    Shuttering Cosmetology Programs Regulates Speech Based on Content and Speaker.

The Final Rule threatens the ability of certain institutions to disseminate information about a select set of subjects to would-be listeners. *Compare* 34 C.F.R. §§ 668.401-409 *with* 34 C.F.R. §§ 668.601-668.606 (subjecting only "program[s] . . . that prepare students for gainful employment" but not other Title IV-eligible programs to sanctions for failing D/E Rates or EP

tests).  Once a GE Program fails the D/E Rates or EP metric twice, it loses eligibility to participate in Title IV programs, and prospective students who intend to pay for their educations using federal aid lose the ability to attend that program.  This is an unconstitutional burden on free speech.

In *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, the Ninth Circuit reviewed a law passed by the state of California that prohibited individuals who had not earned a high school diploma (or equivalent) from enrolling at a private postsecondary school unless that individual first took (and passed) an "Ability to Benefit" ("ATB") test akin to similar tests that the Department requires non-high school graduates to take before enrolling at a proprietary institution.  961 F.3d 1062, 1066 (9th Cir. 2020); *see also* 34 C.F.R. § 668.141(a).  An individual who had no high school degree wanted to enroll and pursue horseshoeing as a career, but was barred by the state statute from enrolling because he had not taken an ATB test.  961 F.3d at 1067.  The school and student sued, claiming that California's law abridged their freedom of speech, and won.  *Id*. at 1073.  Given the similarities between that law and the Final Rule, this Court should hold similarly.

In *Kirchmeyer*, the court first decided whether the law regulated speech or conduct.  *Id*. at 1068-69.  Courts in this circuit follow the same process.  "In cases brought under the Free Speech Clause, a court at times must initially determine whether the challenged law abridges the freedom of speech or merely impacts an individual's non-expressive conduct."  *Hines v. Pardue*, 688 F. Supp. 3d 522, 546 (S.D. Tex. 2023).  As in *Kirchmeyer*, the Final Rule is clearly an abridgement of speech, not conduct, because, "as applied to [cosmetology schools] the conduct triggering coverage under the [Final Rule] consists of communicating a message"—namely, vocational instruction.  *Kirchmeyer*, 961 F.3d at 1069 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).  Stated in the inverse, if cosmetology schools were not in the business of communicating educational messages to students, the Final Rule would obviously not cover them.

But they are in that business and so are horseshoeing schools, which prompted the Ninth Circuit to hold "[t]here can be little question that vocational training is speech protected by the First Amendment." *Id*. (citing *Holder*, 561 U.S. at 27); *see also Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (students have constitutional interest in hearing lecturers).

To be sure, the Supreme Court has held that if a law that deprives a speaker of money such that it "cannot exercise its freedom of speech as much as it would like, the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 550 (1983). While Title IV provides money to students and schools, *Regan* is not applicable to Plaintiffs' claim. Subsequent opinions from the Supreme Court confirm that, when the deprivation of funds "differentiates between speech or speakers," it is a burden on speech and subject to heightened scrutiny. *Kirchmeyer*, 961 F.3d at 1070 (citing *Holder*, 561 U.S. at 27-28); *see also, e.g., Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563-65 (2011) (law forbidding sales of prescription data to certain entities was restriction on speech subject to heightened scrutiny).

After finding that California's law "implicate[d] speech," the Ninth Circuit went on to find that the state had also "engage[d] in content discrimination." 961 F.3d at 1073. The court found it dispositive that the ATB testing law was "riddled with exceptions," and those exceptions "turn[ed] on one of two things: (1) the content of what is being taught, or (2) the identity of the speaker." *Id*. at 1070. Certain academic programs were exempt from the ATB testing requirement, as were certain providers (or sponsors) of academic programs. *See id*. at 1071. The Final Rule is a mirror image of the unconstitutional statute in *Kirchmeyer* in every material respect. It, too, is "riddled with exceptions." All non-GE Programs (i.e., "the content of what is being taught") and the Not-for-Profit Schools that offer them (i.e., "the identity of the speaker") are exempt from

termination from Title IV participation, whereas GE Programs are subject to termination (and other penalties).  A public school can teach sociology with impunity, but a vocational school cannot teach HVAC repair without the attendant risk that it will be terminated from Title IV because students who graduated three years prior did not make enough money. To borrow the *Kirchmeyer* court's words, the Final Rule "picks between winners and losers when it comes to which institutions must ensure that its listeners have satisfied the [GE] requirement." *Id*.

While the parties in *Kirchmeyer* did not brief the level of scrutiny that applies, the educational instruction that institutions offer through their GE Programs is clearly non-commercial speech protected by strict scrutiny.  Commercial speech "does no more than propose a commercial transaction." *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 66 (1983).  It is different from "speech for profit." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (citing *Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989)).  By definition, *for-profit* schools deliver "speech *for profit*."

"In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571.  The Final Rule does not overcome that presumption.  Defendants claim that their interest in "preventing deceptive advertising," improving institutional performance, and protecting Title IV funds is "compelling," 88 Fed. Reg. at 70,070, but they identify no authority recognizing those interests as "compelling."  More telling is the Final Rule's underinclusivity.  The Final Rule excludes *all* non-GE Programs at Not-for-Profit Schools, 80+ percent of GE Programs, and every school in a U.S. territory from coverage. "Such obvious underinclusiveness undermines any argument that [Defendants are] truly interested in regulating" against under-performing programs. *Dep't of Tex., VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014).  That the government waited more than 40 years to do anything with the "gainful employment" language in the HEA, *see* 75 Fed. Reg. 43,616, 43,619

(July 26, 2010), further shows that the government is not pursuing a compelling interest in the Final Rule.   Nor is the Final Rule narrowly tailored.   The comments are replete with recommendations to make the Final Rule less onerous.   Furthermore, Defendants recognize that the "transparency" aspect of the Final Rule will "dramatically enhance the quality of information available to all students."  88 Fed. Reg. at 70,005.  Better distribution and more effective messaging in Defendants' disclosures would fulfill the same purpose without violating the Constitution.

2.     The Government Cannot Compel "Warnings."

"The right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."  *Book People, Inc. v. Wong*, 91 F.4th 318, 338 (5th Cir. 2024) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  Yet, the Final Rule compels institutions to speak through "warnings" to students when their GE Programs do not pass Defendants' arbitrary GE metrics.  This, too, is unconstitutional.

The Final Rule's warnings are not commercial speech, which, again, "does no more than propose a commercial transaction."  *Bolger*, 463 U.S. at 66.  While the warnings have elements of economic messaging (e.g., that a GE Program could lose access to Title IV funds), they also contain statements that go well beyond proposing a transaction.  The warnings must also contain an analysis of the transferability of students' credits and the institution's plans for the "failing" GE Program after losing funding.  34 C.F.R. § 668.605(c)(4), (5)(i), (6).  Institutions would not discuss these matters—particularly the transferability of a current student's credits to *competing institutions*—if they were proposing a transaction to keep that student enrolled.  Therefore, the government must still show a compelling interest and that its regulation is narrowly tailored.  For the reasons discussed *supra*, the Final Rule fails both tests.

However, should the Court deem the warnings commercial speech, they are still unconstitutional.  Compelled commercial speech must be "purely factual and uncontroversial

information." *Book People*, 91 F.4th at 340-41 (citations omitted).  The warnings are neither.  "[A] statement may literally be true but nonetheless misleading and, in that sense, untrue." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) (quoting *CTIA v. City of Berkeley*, 928 F.3d 832, 847 (9th Cir. 2019)).  Defendants have structured the contents of the warnings to scrape by as *literally* true.  The warnings require schools to say that they have not passed "standards . . . based on the amounts students borrow . . . and their *reported* earnings." 34 C.F.R. § 668.605(c)(1)(i) (emphasis added).  But an 18-year-old prospective student with little to no experience reporting income is likely to be misled without the context of the complex legal dispute underlying the warnings and the issue of unreported income.  *Cf. Wheat Growers*, 85 F.4th at 1278.

The warnings are also not uncontroversial.  Controversial statements include those in which the "inherent nature of the subject raises a live, contentious political dispute." *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024).  That is the case here, made clear not only by the contentious administrative record in this case, but also from the fact that, in the last 14 years, Gainful Employment rules have been proposed, litigated, vacated, proposed again, litigated again, vacated in part, rescinded in full, and proposed again (where we are now).  This Court's addition to the legacy should be a third vacatur.

## IV.    CONCLUSION

When, as here, an agency action violates the APA, the "default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).  Given the multiple substantive defects inherent in the Final Rule, there is no reason for this Court to depart from the default rule.  For the reasons discussed above, the Court should enter judgment in Plaintiffs' favor and set the Final Rule aside.

Dated: September 13, 2024                    Respectfully submitted,

                                             _____/s/ Drew T. Dorner_____
                                             John M. Simpson (admitted *pro hac vice*)
                                             Drew T. Dorner
                                             Duane Morris LLP
                                             901 New York Avenue NW, Suite 700 East
                                             Washington, D.C.  20001-4795
                                             Telephone: +1 202 776 7800
                                             Fax: +1 202 776 7801
                                             JMSimpson@duanemorris.com
                                             DTDorner@duanemorris.com

                                             Joakim G. Soederbaum (Texas Bar No. 24091338)
                                             Duane Morris LLP
                                             777 Main Street, Suite 2790
                                             Fort Worth, TX 76102
                                             Telephone:  +1 817 704 1000
                                             Fax:  +1 817 704 1001
                                             JSoederbaum@duanemorris.com

                                             Edward M. Cramp (admitted *pro hac vice*)
                                             Duane Morris LLP
                                             750 B Street, Suite 2900
                                             San Diego, CA 92101-4681
                                             Telephone: +1 619 744 2200
                                             Fax: +1 619 744 2201
                                             EMCramp@duanemorris.com

                                             *Attorneys for Plaintiffs*
                                             *American Association of Cosmetology Schools and*
                                             *DuVall's School of Cosmetology, L.L.C.*