**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> Defendants. | Civil Action No. 4:23-cv-01267-O |

<u>**APPENDIX IN SUPPORT OF**</u>
<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

# VOLUME 1

_____

## Exhibits 1-10

## Pages 1-825

| Exhibit | Title/Description | Page Nos. |
|---|---|---|
| 1. | **Financial Value Transparency and Gainful Employment, 88 Fed. Reg. 70004 (Oct. 10, 2023) (AR-A-000001-AR-A-000190)** | **1-191** |
| 2. | **Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB), 88 Fed. Reg. 32300 (May 19, 2023) (AR-B-000001-AR-B-000212)** | **192-404** |
| 3. | **Negotiated Rulemaking Committee; Public Hearings, 86 Fed. Reg. 28299 (May 26, 2021) (AR-B-000213-AR-B-000214)** | **405-407** |
| 4. | **AR-E-000032-AR-E-000054** | **408-431** |
| 5. | **AR-E-000395-AR-E-000464** | **432-502** |
| 6. | **AR-E-000616-AR-E-000727** | **503-615** |
| 7. | **ERIC BETTINGER, IMPUTATION OF INCOME UNDER GAINFUL EMPLOYMENT (2014) (AR-F-000529-AR-F-000555)** | **616-643** |
| 8. | ***Economic Well-Being of U.S. Households in 2021*, BRD. GOVS. FED. RES. SYS. UPDATE (May 2022) (AR-F-000926-AR-F-001025)** | **644-744** |
| 9. | **Christopher R. Bollinger et. al, *Trouble in the Tails? What We Know about Earnings Nonresponse 30 Years after Lillard, Smith, and Welch*, 127 J. POL. ECON. 2143 (2019) (AR-F-001042-AR-F-001084)** | **745-788** |
| 10. | **ANTHONY P. CARNEVALE ET. AL, THE COLLEGE PAYOFF: EDUCATION, OCCUPATIONS, LIFETIME EARNINGS (2013) (AR-F-001408-AR-F-001443)** | **789-825** |
| 11. | STEPHANIE RIEGG CELLINI ET. AL, HAIR AND TAXES: COSMETOLOGY PROGRAMS, ACCOUNTABILITY POLICY, AND THE PROBLEM OF UNDERREPORTED INCOME (2022) (AR-F-001502-AR-F-001512) | 826-837 |
| 12. | Stephanie Riegg Cellini et. al, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, 54 J. Hum. Res. 342 (2019) (AR-F-001665-AR-F-001695) | 838-869 |

| 13. | MONIQUE O. OSITELU ET. AL, THE SHORT-TERM CREDENTIALS LANDSCAPE: WHAT WE SEE AND WHAT REMAINS UNSEEN (2021) (AR-F-004702-AR-F-004727 ) | 870-896 |
|---|---|---|
| 14. | *A Career in Beauty*, QNITY INST. (2023) (AR-F-004751-AR-F-004840) | 897-987 |
| 15. | Comment of The Studio Academy of Beauty, 2023 (AR-I-000561-AR-l-000563) | 988-991 |
| 16. | Comment of The Elaine Sterling Institute, 2023 (AR-I-000682-AR-l-000683) | 992-994 |
| 17. | Comment of Federico Beauty Institute, June 8, 2023 (AR-I-000727-AR-l-000728) | 995-997 |
| 18. | Comment of Lori Grieco, June 7, 2023 (AR-l-000760-AR-I-000761) | 998-1000 |
| 19. | Comment of Christy Yassen, June 10, 2023 (AR-I-000844-AR-l-000845) | 1001-1003 |
| 20. | Comment of Connie Maldonado, June 10, 2023 (AR-l-000846-AR-I-000847) | 1004-1006 |
| 21. | Comment Submission of Lillie Thornton, June 10, 2023 (AR-l-000848-AR-I-000848) | 1007-1008 |
| 22. | Comment of Lillie Thornton, June 10, 2023 (AR-l-000849) | 1009-1010 |
| 23. | Comment of Connie Maldonado, June 10, 2023 (AR-I-000850-51) | 1011-1013 |
| 24. | Comment of J. Churchill, June 14, 2023 (AR-l-001684-85) | 1014-1016 |
| 25. | Comment of Michele, June 14, 2023 (AR-I-001986) | 1017-1018 |
| 26. | Comment of Michele Duvall, June 14, 2023 (AR-I-001988) | 1019-1020 |
| 27. | Comment of Julie Mitchell, June 15, 2023 (AR-l-002368-69) | 1021-1023 |
| 28. | Comment of Aveda Arts & Sciences Institutes, June 20, 2023 (AR-l-002952-69) | 1024-1042 |
| 29. | Comment of Dawn, June 16, 2023 (AR-l-003116) | 1043-1044 |

| 30. | Comment of Veronica Ozuna, June 2023 (AR-I-003552) | 1045-1046 |
|---|---|---|
| 31. | Comment of Shore Beauty School, June 17, 2023 (AR-l-003946-58) | 1047-1060 |
| 32. | Comment of Keune Academy, June 20, 2023 (AR-I-004657-58) | 1061-1063 |
| 33. | Comment of The Esani Institute, June 19, 2023 (AR-l-004675-78) | 1064-1068 |
| 34. | Comment of Be Aveda Institutes, June 19, 2023 (AR-l-004785-92) | 1069-1077 |
| 35. | Comment of Aveda Institute Portland, June 19, 2023 (AR-l-007088-95) | 1078-1086 |
| 36. | Comment of American Association of Cosmetology Schools, June 20, 2023 (AR-I-007127-207) | 1087-1168 |
| 37. | 76 Fed. Reg. 34386 (2011 Rule) | 1169-1323 |
| 38. | 79 Fed. Reg. 64890 (2014 Rule) | 1324-1538 |
| 39. | 2023-09-12 Census Article Cite Pages 3 and 4 | 1539-1545 |
| 40. | 2024-25 FSA Handbook Chapter 2 ECAR | 1546-1573 |
| 41. | 2024-25 FSA Handbook Chapter 5 ECAR | 1574-1595 |
| 42. | Sharon Lurye et. al, *AP Analysis: Most Beauty School Programs Would Be in Jeopardy Under US Proposal* (May 18, 2023) | 1596-1602 |
| 43. | Declaration of C. Maldonado | 1603-1609 |
| 44. | Declaration of C. Kidd | 1610-1612 |
| 45. | Declaration of P. Hill | 1613-1644 |
| 46. | Declaration of D. Dorner | 1645-1647 |

Dated: September 13, 2024                    Respectfully submitted,

                                             /s/ Drew T. Dorner
                                             John M. Simpson (admitted *pro hac vice*)
                                             D.C. Bar No. 256412
                                             Drew T. Dorner (admitted *pro hac vice*)
                                             D.C. Bar No. 1035125
                                             DUANE MORRIS LLP
                                             901 New York Avenue NW, Suite 700 East
                                             Washington, D.C.  20001-4795
                                             Telephone: +1 202 776 7800
                                             Fax: +1 202 776 7801
                                             JMSimpson@duanemorris.com
                                             DTDorner@duanemorris.com

                                             Joakim G. Soederbaum
                                             Texas Bar No. 24091338
                                             DUANE MORRIS LLP
                                             777 Main Street, Suite 2790
                                             Fort Worth, TX 76102
                                             Telephone:  +1 817 704 1000
                                             Fax:  +1 817 704 1001
                                             JSoederbaum@duanemorris.com

                                             Edward M. Cramp (admitted *pro hac vice*)
                                             California Bar No. 212490
                                             DUANE MORRIS LLP
                                             750 B Street, Suite 2900
                                             San Diego, CA 92101-4681
                                             Telephone: +1 619 744 2200
                                             Fax: +1 619 744 2201
                                             EMCramp@duanemorris.com

                                             *Attorneys for Plaintiffs American Association of*
                                             *Cosmetology Schools and DuVall's School of*
                                             *Cosmetology, L.L.C.*

# EXHIBIT 1

# DEPARTMENT OF EDUCATION

## 34 CFR Parts 600 and 668

[Docket ID ED 2023 OPE 0089]

RIN 1840 AD57

## Financial Value Transparency and Gainful Employment

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary establishes and amends regulations related to gainful employment (GE) to address ongoing concerns about educational programs designed to prepare students for gainful employment in a recognized occupation, but that instead leave them with unaffordable amounts of student loan debt in relation to their earnings, or with no gain in earnings compared to others with no more than a high school education. The Secretary separately seeks to enhance transparency by providing information about financial costs and benefits to students at nearly all academic programs at postsecondary institutions that are eligible to participate in title IV of the Higher Education Act of 1965, as amended (HEA).

**DATES:** These regulations are effective July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Joe Massman. Telephone: (202) 453–7771. Email: *GE24@ed.gov*.

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

### Purpose of This Regulatory Action

The Federal Government makes significant annual investments under title IV of the HEA through programs that provide financial assistance to help students pay for postsecondary education and training. This includes both Federal grants and Federal loans, with the largest amount of such aid flowing through Pell Grants and Direct Loans. These investments in education amount to well over $100 billion in new Pell Grants and Direct Loans in total made each year.[1]

The Federal Government's commitment to postsecondary education and training is well-justified. Postsecondary education and training generate important benefits both to the students pursuing new knowledge and skills and to the Nation overall. Higher education increases wages and lowers unemployment risk,[2] and leads to myriad non-financial benefits including better health, job satisfaction, and overall happiness.[3] In addition, increasing the number of individuals with postsecondary education creates social benefits, including productivity spillovers from a better educated and more flexible workforce,[4] increased civic participation,[5] improvements in health and well-being for the next generation,[6] and innumerable intangible benefits that elude quantification. In addition, the improvements in productivity and earnings lead to increases in tax revenues from higher earnings and lower rates of reliance on social safety net programs. These downstream increases in net revenue to the Government can be so large that public investments in higher education, including those that Congress established in title IV, HEA, more than pay for themselves.[7]

These benefits are not guaranteed, however. Research has demonstrated that the returns, especially the gains in earnings students enjoy as a result of their education, vary dramatically across institutions and among programs within those institutions.[8] As we illustrate in the Regulatory Impact

[2] Barrow, L. & Malamud, O. (2015). Is College a Worthwhile Investment? *Annual Review of Economics, 7*(1), 519–555. Card, D. (1999). The Causal Effect of Education on Earnings. *Handbook of Labor Economics, 3*, 1801–1863.

[3] Oreopoulos, P. & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives, 25*(1), 159–184.

[4] Moretti, E. (2004). Workers' Education, Spillovers, and Productivity: Evidence from Plant-Level Production Functions. *American Economic Review, 94*(3), 656–690.

[5] Dee, T.S. (2004). Are There Civic Returns to Education? *Journal of Public Economics, 88*(9–10), 1697–1720.

[6] Currie, J. & Moretti, E. (2003). Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings. *The Quarterly Journal of Economics, 118*(4), 1495–1532.

[7] Hendren, N. & Sprung-Keyser, B. (2020). A Unified Welfare Analysis of Government Policies. *The Quarterly Journal of Economics, 135*(3), 1209–1318.

[8] Hoxby, C.M. (2019). The Productivity of U.S. Postsecondary Institutions. In *Productivity in Higher Education*, Hoxby, C.M. & Stange, K.M. (eds). University of Chicago Press. Lovenheim, M. & Smith, J. (2023). Returns to Different Postsecondary Investments: Institution Type, Academic Programs, and Credentials. In *Handbook of the Economics of Education Volume 6*, Hanushek, E., Woessmann, E. & Machin, S. (eds). New Holland.

Analysis (RIA) of this final rule, even among the same types of programs—that is, among programs with similar academic levels and fields of study—both the costs and the outcomes for students differ widely. Most postsecondary programs provide benefits to students in the form of higher wages that help them repay any loans they may have obtained to attend the program. But too many programs fail to increase graduates' wages, having little or even negative effects on graduates' earnings.[9] At the same time, too many programs charge much higher tuition than similar programs with comparable outcomes, leading students to borrow much more than they would have needed had they chosen a more affordable program.

While increased borrowing is indicative of higher education costs-of-attendance, financing the costs of postsecondary education and training with Federal student loans creates significant risk for borrowers and the Federal Government (as well as taxpayers). In particular, if students' earnings after college are low, then they are likely to face difficulty in repaying their loans and will be more likely to default. The associated penalties and delays in repayment make the student loan more costly to repay, and, by damaging the borrower's credit, may also increase costs of other borrowing considerably.[10] From the Federal Government's perspective, if borrowers earn less, then they are also entitled to repay less of their loans under Income-Driven Repayment (IDR) plans and can have their loans forgiven after preset amounts of time in repayment. And if borrowers default on a loan, they may end up repaying less than they borrowed depending on the success of various collections tools available to the Government. As a result, low labor market earnings and low earnings relative to debt both drive up the costs, to both the borrower and taxpayers, of

[9] Cellini, S. & Turner, N. (2018). Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data. *Journal of Human Resources, 54*(2).

[10] For example, a 2023 Consumer Financial Protection Bureau analysis suggests that a default on a borrower's credit record could lower their credit score by about 50 points, which might result in an additional cost of $1,700 on a typical auto loan due to less favorable interest rates. Gibbs, Christa (2023). Initial Fresh Start Program Changes Followed by Increased Credit Scores for Affected Student Loan Borrowers. Consumer Financial Protection Bureau (*https://www.consumerfinance.gov/about-us/blog/initial-fresh-start-program-changes-followed-by-increased-credit-scores-for-affected-borrowers/*).

[1] Note that the dollar figure in the text above refers to the sum of all Pell Grants and Direct Loans made each year. The cost of Direct Loans, which is the lion's share of this amount, to the Federal Government is less than the amount disbursed since borrowers repay, as expanded on below. This final rule affects a small fraction of the total amount, as detailed below.

App.2

postsecondary investments financed with student loans.

With college tuition consistently rising faster than inflation, and given the growing necessity of a postsecondary credential to compete in today's economy, it is critical for students, families, and taxpayers alike to have accurate and transparent information about the possible financial consequences of their postsecondary program options. Providing information on the typical earnings outcomes, borrowing amounts, costs of attendance, and sources of financial aid—and providing it directly to prospective students in a salient way at a key moment in their decision-making process—would help students make more informed choices. The same information will also allow taxpayers and college stakeholders to better assess whether public and private resources are being effectively used. For many students, and for many stakeholders, these financial considerations would, appropriately, be just one of many factors used in deciding whether and where to enroll. But as noted throughout this final rule including the RIA, it is clear that both prospective students and the population in general consider these financial factors as among the most important in assessing postsecondary education performance.

For programs that consistently produce graduates with very low earnings, or with earnings that are too low to repay the amount the typical graduate borrows to complete a credential, additional measures are needed to protect students from financial harm. Making information available has been shown to improve consequential financial choices across a variety of settings. But it has also been shown to be a limited remedy, especially for more vulnerable populations who may struggle to access the information, or who have less support in interpreting and acting upon the relevant information.[11]

To address these issues, the Department establishes subparts Q and S of part 668, and makes supporting amendments to §§ 600.10, 600.21, 668.2, 668.13, 668.43, and 668.91.

(1) In subpart Q, we establish a financial value transparency framework. That framework will increase the quality and availability of information provided directly to students about the costs, sources of financial aid, and outcomes of students enrolled in all eligible programs. In part, the transparency framework establishes measures of enhanced earnings and affordable debt—more specifically, the earnings premium (EP measure) that typical program graduates experience relative to the earnings of typical high school graduates, as well as the debt service burden (debt-to-earnings ratio or D/E rates measure) for typical graduates. It further establishes performance benchmarks for each measure, denoting a threshold level of performance below which the program may have adverse financial consequences to students. This information will be made available to all students via a program information website maintained by the Department and described in amended § 668.43. For programs that do not meet the performance benchmarks for the D/E rates measure, prospective students will be required to acknowledge having viewed these disclosures before entering into enrollment agreements with an institution. Further, the Department's program information website will provide the public, taxpayers, and the Government with relevant information with which they may act to better safeguard the Federal investment in these programs. The transparency framework will also provide institutions with meaningful information that they can use to compare their performance to other institutions and improve student outcomes in these programs.

(2) In subpart S, we establish an accountability and eligibility framework for gainful employment programs. This GE program accountability framework is specific to educational programs that, as a statutory condition of eligibility to participate in title IV, HEA, are required to provide training that prepares students for gainful employment in a recognized occupation or profession (GE programs). GE programs include nearly all educational programs at for-profit institutions of higher education, as well as non-degree programs at public and private nonprofit institutions such as community colleges. The GE program eligibility framework will use the same earnings premium and debt-burden measures from the transparency framework to determine whether a GE program remains eligible for title IV, HEA participation. The GE eligibility criteria define what it means to prepare students for gainful employment in a

recognized occupation, and they tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans. GE programs that fail the same measure in any two out of three consecutive years for which the measure is calculated will not be eligible to participate in title IV, HEA programs.

The Department has previously issued regulations on these issues three times. We refer to those regulatory actions as the 2011 Prior Rule (76 FR 34385), the 2014 Prior Rule (79 FR 64889), and the 2019 Prior Rule (84 FR 31392), which rescinded the 2014 Prior Rule. For a detailed discussion of the history of these regulations, please see the *Background* section of the notice of proposed rulemaking that was published in the **Federal Register** on May 19, 2023 (88 FR 32300) (NPRM). This final rule departs from the 2019 Prior Rule and partly reinstates provisions of the 2014 Prior Rule, but this final rule also departs in certain respects from the 2014 Prior Rule to improve the regulations in light of new data and current circumstances, as discussed in the NPRM.[12]

The financial value transparency framework covers all programs that participate in the title IV, HEA programs, and it will dramatically enhance the quality of information available to all students so that they may better assess the financial consequences of their education choices. As explained in the NPRM and elaborated below, the framework will improve on the information currently available to students by generating program-level information on cost of attendance and available aid for all types of students and by ensuring the information is delivered to students. The acknowledgment requirements ensure this information is viewed before students enroll when performance measures indicate a heightened risk of adverse borrowing outcomes for students.

With respect to GE programs, the Department remains concerned about the same problems that motivated our 2011 and 2014 Prior Rules. These included the growth in student loan debt generally, and especially increased borrowing at private for-profit colleges, increasingly high rates of default, higher costs, and lawsuits and investigations into the deceptive practices of many institutions.

---

[11] Baker, Dominique J., Cellini, Stephanie Riegg, Scott-Clayton, Judith & Turner, Lesley J. (2021). Why Information Alone Is Not Enough to Improve Higher Education Outcomes. The Brookings Institution (*www.brookings.edu/blog/brown-center-chalkboard/2021/12/14/why-information-alone-is-not-enough-to-improve-higher-education-outcomes/*). Steffel, Mary, Kramer II, Dennis A., McHugh, Walter & Ducoff, Nick (2019). Information Disclosure and College Choice. The Brookings Institution (*www.brookings.edu/wp-content/uploads/2020/11/ES-11.23.20-Steffel-et-al-1.pdf*).

[12] 88 FR 32300, 32306 (May 19, 2023).

Overall, the amount of outstanding student loan debt is even higher than it was at the time of the 2014 Prior Rule. Then we cited a total portfolio of $1,096.5 billion. It is now 49 percent larger—at $1,634 billion outstanding. The number of individuals with outstanding student loans is also 3.5 million higher.[13]

The 2011 and 2014 rules were issued during a time of growth at private for-profit colleges when the Department was concerned about the effects of such growth. While the sector is not currently growing at the rates it did at that time, its 12-month full-time-equivalent enrollment in 2020–21 was above its levels in 2017–18.[14] During those years, enrollment in private for-profit colleges grew 5 percent even as public and private nonprofit institutions saw a 7 percent decline. Similarly, the share of title IV, HEA funds going to private for-profit colleges in 2020–21 was at the same level as in 2016–17.[15]

Loan usage at private for-profit colleges also remains high. In the 2014 Prior Rule we noted concerns that the borrowing rate in 2011–12 among less-than-two-year institutions was 60 percent at private for-profit institutions versus 10 percent at public institutions.[16] Data from 2019–20 show that 63 percent of students in less-than-two-year private for-profit institutions took out loans compared to 18 percent of those at public colleges, though the estimate for public colleges has a high standard error.[17] In fact, the borrowing rate at two-year and less-than-two-year private for-profit colleges in 2019–20 was higher than in 2015–2016. And among two-year for-profit colleges it even exceeds the rates in 2011–12.[18]

Issues with default rates also did not abate between 2014 and the national pause on student loan payments and interest in 2020 due to the COVID–19 national emergency. From 2015 to 2019 there were still more than 1 million new Direct Loan defaults a year. And the number of new Direct Loan defaults in the 2019 fiscal year was higher than in 2015.[19] The official cohort default rates did see slight declines from fiscal year 2012 to fiscal year 2017 (the last cohort before the pause would affect results). But the decline in the overall rate was nearly double what it was at private for-profit colleges (a reduction of 2.1 percentage points versus 1.1 percentage points).[20] And this is despite the closure of large for-profit colleges with poor track records, such as ITT Technical Institute and Corinthian Colleges.

Regarding lawsuits and investigations, the Department notes that these actions still continue today. Just last year the California Department of Justice won its case against Ashford University, and the Secretary has concluded substantial misrepresentations brought to light in that case continued until 2020.[21] The U.S. Department of Justice has also continued to settle cases involving for-profit colleges.[22] Other State attorneys general or city officials have also reached settlements with for-profit institutions over allegations about the same type of behavior identified by the Department in the 2014 rule, though these settlements did not come with an admission of wrongdoing.[23]

According to the Department's data and analyses, which are presented in the RIA of this final rule,[24] GE programs account for a disproportionate share of students who complete programs with very low earnings and unmanageable debt. The expansion of IDR plans for Federal student loans, which has risen since the 2014 Prior Rule was released, partially shields borrowers from these risks. But such after-the-fact protections do not address underlying program failures to prepare students for gainful employment in the first place, and they shift the risks of nonpayment of loans from students with poor labor market outcomes and high debt to taxpayers.

---

[13] U.S. Department of Education, Federal Student Aid (2023). Federal Student Aid Portfolio Summary (data set). National Student Loan Data System (NSLDS) (*https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls*).

[14] See U.S. Department of Education, National Center for Education Statistics (2021). Table 8. Twelve-month full-time-equivalent enrollment at Title IV institutions, by student level, level and control of institution: United States, 2020–21. IPEDS Data Explorer (*https://nces.ed.gov/ipeds/Search?query=&query2=&resultType=all&page=1&sortBy=date_desc&overlayTableId=32468*). U.S. Department of Education, National Center for Education Statistics (2018). Table 8. Twelve-month full-time-equivalent enrollment at Title IV institutions, by student level, level and control of institution: United States, 2017–18. IPEDS Data Explorer (*https://nces.ed.gov/ipeds/Search?query=&query2=&resultType=all&page=1&sortBy=date_desc&overlayTableId=25212*).

[15] U.S. Department of Education, Federal Student Aid (2023). 2022–2023 Grant and Loan Volume by School Type (data set). FSA Data Center (*https://studentaid.gov/sites/default/files/fsawg/datacenter/library/SummarybySchoolType.xls*).

[16] U.S. Department of Education (2014). Program Integrity: Gainful Employment. 79 FR 65033, October 31, 2014. **Federal Register**, 34 CFR parts 600 and 668 (Docket ID ED–2014–OPE–0039) (*https://www.federalregister.gov/d/2014-25594/p-2324*).

[17] Cameron, M., Johnson, R., Lacy, T.A., Wu, J., Siegel, P., Holley, J., Wine, J. & RTI International (2023). Table A–1. Selected financial aid receipt: Percentage of undergraduates receiving selected types of financial aid. In *2019–20 National Postsecondary Student Aid Study (NPSAS:20) First Look at Student Financial Aid Estimates for 2019–20* (NCES 2023–466). U.S. Department of Education (*https://nces.ed.gov/pubs2023/2023466.pdf*).

[18] Compare the previous citation with Radwin, D., Wine, J., Siegel, P., Bryan, M. & RTI International (2013). Table 1. Percentage of undergraduates receiving selected types of financial aid, by type of institution, attendance pattern, dependency status, and income level: 2011–12. In *2011–12 National Postsecondary Student Aid Study (NPSAS:12) Student Financial Aid Estimates for 2011–12* (NCES 2013–165). U.S. Department of Education (*https://nces.ed.gov/pubs2013/2013165.pdf*). Radwin, D., Conzelmann, J. G., Nunnery, A., Lacy, T. A., Wu, J., Lew, S., Wine, J., Siegel, P. & RTI International (2018). Table 1. Percentage of undergraduates receiving selected types of financial aid, by control and level of institution, attendance pattern, dependency status, and income level: 2015–16. In *2015–16 National Postsecondary Student Aid Study (NPSAS:16) Student Financial Aid Estimates for 2015–16 First Look* (NCES 2018466). National Center for Education Statistics (*https://nces.ed.gov/pubs2018/2018466.pdf*).

[19] U.S. Department of Education (Sept. 14, 2023). Direct Loans Entering Default. National Student Loan Data System (NSLDS) (*https://studentaid.gov/sites/default/files/DLEnteringDefaults.xls*).

[20] Federal Student Aid Office, U.S. Department of Education (2016). National Student Loan Default Rates from its 2016 Official FY2013 Cohort Default Rate Briefing (*https://fsapartners.ed.gov/sites/default/files/attachments/eannouncements/2016OfficialFY2013CDRBriefing.pdf*). Federal Student Aid Office, U.S. Department of Education (2020). FY 2017 Official National Cohort Default Rates with Prior Year Comparison and Total Dollars as of the Date of Default and Repayment. In *2020 Cohort Default Rate National Briefing for FY2017* (*https://fsapartners.ed.gov/sites/default/files/attachments/2020-09/093020CDRNationalBriefingFY17Attach_0.pdf*).

[21] California Department of Justice, Office of the Attorney General (Mar. 7, 2022). Attorney General Bonta: Ashford University Must Pay $22 Million in Penalties for Defrauding California Students (*https://oag.ca.gov/news/press-releases/attorney-general-bonta-ashford-university-must-pay-22-million-penalties*). U.S. Department of Education (Aug. 30, 2023). Biden-Harris Administration Approves $72 Million in Borrower Defense Discharges for over 2,300 Borrowers Who Attended Ashford University (*https://www.ed.gov/news/press-releases/biden-harris-administration-approves-72-million-borrower-defense-discharges-over-2300-borrowers-who-attended-ashford-university*).

[22] U.S. Attorney's Office, Middle District of Louisiana (June 23, 2017). School Owner and CEO Convicted of Federal Financial Aid Fraud Offenses and Money Laundering. U.S. Department of Justice (*https://www.justice.gov/usao-mdla/pr/school-owner-and-ceo-convicted-federal-financial-aid-fraud-offenses-and-money*). U.S. Attorney's Office, District of Connecticut (May 27, 2022). School and Owner Pay Over $1 Million to Resolve Allegations of Attempts to Improperly Influence the School's Student Loan Default Rate. U.S. Department of Justice (*https://www.justice.gov/usao-ct/pr/school-and-owner-pay-over-1-million-resolve-allegations-attempts-improperly-influence*).

[23] Office of Attorney General Maura Healey (Aug. 8, 2018). American Military University Pays $270,000 for Alleged Failure to Disclose Job Prospects, High-Pressure Enrollment Tactics. Mass.gov (*https://www.mass.gov/news/american-military-university-pays-270000-for-alleged-failure-to-disclose-job-prospects-high-pressure-enrollment-tactics*). Department of Consumer and Worker Protection (Oct. 3, 2022). Department of Consumer and Worker Protection Settles With ASA College for Deceptive Advertising Targeting Immigrants and Other Vulnerable New Yorkers. NYC.gov (*https://www.nyc.gov/site/dca/media/pr100322-DCWP-Settles-With-ASA-College-for-Deceptive-Advertising.page*).

[24] See Tables 4.4, 4.5, 4.8, and 4.9 below.

The reasons for the departure from the 2019 rescission are discussed in detail in the NPRM of the rule, with detail on particular points discussed further below.

In light of the HEA differentiation between career training (GE) programs and other eligible programs, through statutory language that defines title IV-eligible career training programs as those that prepare students for gainful employment, the Department has different responsibilities with respect to GE programs and different tools available in administering the title IV, HEA programs. For these programs, where labor market outcomes are central to their mission, the Department establishes a clear and administrable GE program accountability framework based on the EP and D/E measures, which the Department will use to evaluate what it means to prepare students for gainful employment in a recognized occupation and whether a GE program is eligible to participate in title IV, HEA.

While the financial value transparency framework and the GE program accountability framework are both designed to improve student financial outcomes, they differ in scope and approach, derive from the Department's exercise of different regulatory authorities. The two frameworks are intended to function independently, and their respective components are intended to be severable. Elsewhere we discuss the complementary nature of the two frameworks as well as their severability,[25] and we address the Department's authority to take action in the next section. In subsequent sections we explain our reasoning and the evidence relevant to the positions that we adopt, and we identify a number of constructive public comments that, upon reflection, have convinced the Department to modify certain proposals made in the NPRM. But our core conclusions remain the same. Considering the promise of postsecondary education and training in its many forms alongside the Federal Government's investment therein and all applicable law, the Department adopts this final rule.

*Authority for This Regulatory Action*

To address the need for regulatory action, the Department amends §§ 600.10, 600.21, 668.2, 668.13, 668.43, and 668.91, and establishes subparts Q and S of part 668.

The Department's authority to establish the financial value transparency framework and the GE program accountability framework is derived primarily from: first, the Secretary's generally applicable rulemaking authority, which includes but is not limited to provisions regarding data collection and dissemination; second, authorizations and directives within title IV of the HEA regarding the collection and dissemination of potentially useful information about higher education programs, as well as provisions regarding institutional eligibility to benefit from title IV; and third, the further provisions within title IV, HEA that address the eligibility of GE programs.

As for general and crosscutting rulemaking authority, section 410 of the General Education Provisions Act (GEPA) grants the Secretary authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.[26] This authority includes the power to promulgate regulations relating to programs that we administer, such as the title IV, HEA programs that provide Federal loans, grants, and other aid to students. Moreover, section 414 of the Department of Education Organization Act (DEOA) authorizes the Secretary to prescribe those rules and regulations that the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.[27]

Section 431 of GEPA grants the Secretary additional authority to require institutions to make data available to the public about the performance of their programs and about students enrolled in those programs. That section directs the Secretary to collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving their intended purposes, and also to inform the public about federally supported education programs.[28] This provision lends additional support to the reporting requirements and the Department's program information website, which will enable the Department to collect data and information for the purpose of

developing objective measures of program performance, not only for the Department's use in evaluating programs but also to inform students, their families, institutions, and others about those federally supported programs.

As for provisions within title IV, HEA, several of them address the effective delivery of information about postsecondary education programs. For example, section 131 of the Higher Education Act of 1965, as amended (HEA), provides that the Department's websites should include information regarding higher education programs, including college planning and student financial aid,[29] the cost of higher education in general, and the cost of attendance with respect to all institutions of higher education participating in title IV, HEA programs.[30] Those authorizations and directives expand on more traditional methods of delivering important information to students, prospective students, and others, including within or alongside application forms or promissory notes for which acknowledgments by signatories are typical and longstanding.[31] Educational institutions have been distributing information to students at the direction of the Department and in accord with the applicable statutes for decades.[32]

The GE program accountability framework also is supported by the Department's statutory responsibilities to observe eligibility limits in the HEA. Section 498 of the HEA requires institutions to establish eligibility to provide title IV, HEA funds to their students. Eligible institutions must also meet program eligibility requirements for students in those programs to receive title IV, HEA assistance.

One type of program for which certain categories of institutions must establish program-level eligibility is, in the words of section 101 and section 102 of the HEA, a "program of training to prepare students for gainful employment in a

---

[25] See the NPRM, 88 FR 32300, 32341 (May 19, 2023), for a detailed discussion of how these regulations are intended to be severable.

[26] 20 U.S.C. 1221e–3.

[27] 20 U.S.C. 3474.

[28] 20 U.S.C. 1231a(2)–(3). "Applicable program" means any program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law. 20 U.S.C. 1221(c)(1).

[29] See, for example, 20 U.S.C. 1015(e).

[30] 20 U.S.C. 1015(a)(3), (b), (c)(5), (e), (h). See also section 111 of the Higher Education Opportunity Act, 20 U.S.C. 1015a, which authorizes the College Navigator website and successor websites.

[31] See, for example, 20 U.S.C. 1082(m), regarding common application forms and promissory notes or master promissory notes. See also 34 CFR 685.304(a)(3), regarding Direct Loan counseling and acknowledgments.

[32] A compilation of the current and previous editions of the *Federal Student Aid Handbook,* which includes detailed discussion of consumer information and school reporting and notification requirements, is posted at *https://fsapartners.ed.gov/knowledge-center/fsa-handbook.*

recognized occupation.''[33] Section 481 of the HEA articulates this same requirement by defining, in part, an ''eligible program'' as a ''program of training to prepare students for gainful employment in a recognized profession.''[34] The HEA does not more specifically define ''program of training to prepare,'' ''gainful employment,'' ''recognized occupation,'' or ''recognized profession'' for purposes of determining the eligibility of GE programs for participation in title IV, HEA. The Secretary and the Department have a legal duty to interpret, implement, and apply those terms in order to observe the statutory eligibility limits in the HEA. In the section-by-section discussion in the NPRM, we explained further the Department's interpretation of the GE statutory provisions and how those provisions should be implemented and applied.

The statutory eligibility criteria for GE programs are one part of the foundation of authority for warnings from institutions to prospective and enrolled GE students. In the GE context, the Department has not only a statutory basis for pursuing the effective dissemination of information to students about a range of GE program attributes and performance metrics,[35] but also the authority to use certain metrics to determine that an institution's program is not eligible to benefit, as a GE program, from title IV, HEA assistance. When an institution's program is at risk of losing eligibility based on a given metric, the Department may then require the institution that operates the at-risk program to alert prospective and enrolled students that they may not be able to receive title IV, HEA assistance for enrollment in the program in future years. Without a direct communication from the institution to prospective and enrolled students, the students may lack information critical to their program enrollment decisions contrary to the text, purpose, and traditional understandings of the relevant statutes as described above.

The above authorities collectively empower the Secretary to promulgate regulations to (1) require institutions to report information about their programs to the Secretary; (2) require prospective students, with respect to certificate programs and graduate degree programs that do not meet certain financial value measures established by the Department, to acknowledge having viewed the information on the Department's program information website before entering into an enrollment agreement; (3) establish measures to determine the eligibility of GE programs for participation in title IV, HEA; and (4) require institutions to provide warnings to students and prospective students with respect to GE programs that may lose their title IV, HEA eligibility in the next year, and require the students to acknowledge having viewed the warning through the Department's program information website. We provide additional detail on these provisions in the discussions below.

*Summary of the Major Provisions of This Regulatory Action*

As discussed under ''Purpose of This Regulatory Action,'' these regulations establish a financial value transparency framework and a GE program accountability framework.

Through this regulatory action, the Department establishes the following:

(1) In subpart Q, a financial value transparency framework that will increase the quality and availability of information provided directly to students about the costs, sources of financial aid, and outcomes of students enrolled in all title IV, HEA eligible programs. As part of this framework, we establish a measure of the earnings premium that typical program graduates experience relative to the earnings of typical high school graduates. As part of this framework, we also establish a mechanism for measuring the debt service burden for typical graduates. Further, we establish performance benchmarks for each measure, denoting a threshold level of performance below which students' enrollment in the program may have adverse financial consequences. This information will be made available via a program information website maintained by the Department, and, for certificate programs and graduate degree programs with poor outcomes under the debt-burden measures, prospective students will be required to acknowledge viewing this information before entering into enrollment agreements with an institution. Further, through the Department's program information website, we will provide the public, taxpayers, and the Government with relevant information which they can use to better safeguard the Federal investment in these programs. Finally, the financial value transparency framework will provide institutions with meaningful information that they can use to compare the performance of the programs to that of other institutions and improve student outcomes in these programs. For a detailed discussion of the financial transparency framework, see the ''Financial Value Transparency Framework'' section of the NPRM.[36]

(2) In subpart S, we create an accountability framework for career training programs (also referred to as gainful employment programs or GE programs) that uses the same earnings premium and debt-burden measures as subpart Q to determine whether a GE program remains eligible for participation in title IV, HEA. The GE eligibility criteria are used to identify those programs that prepare students for gainful employment in a recognized occupation, as that language is used in the HEA, and they tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans. GE programs that fail the same measure in any two out of three consecutive years for which the measure is calculated will lose eligibility for participation in title IV, HEA programs. Relatedly, for GE programs that may lose their title IV, HEA eligibility in the next year, institutions must provide warnings to those programs' enrolled and prospective students, and those students must acknowledge having viewed the warning through the Department's program information website before certain specified events occur, including the signing of an enrollment agreement or the disbursement of title IV funds. For a detailed discussion of the GE program accountability framework, see the ''Gainful Employment Criteria'' section of the NPRM.[37]

Specifically, the final regulations adopt the following changes.

• Amend § 600.10 to require an institution seeking to establish the eligibility of a GE program to add the program to its application.

• Amend § 600.21 to require an institution to notify the Secretary within 10 days of any update to information included in the GE program's certification.

• Amend § 668.2 to define certain terminology used in subparts Q and S, including ''annual debt-to-earnings rate,'' ''classification of instructional

---

[33] 20 U.S.C. 1001(b)(1); 20 U.S.C. 1002(b)(1)(A)(i), (c)(1)(A).

[34] 20 U.S.C. 1088(b)(1)(A)(i).

[35] See *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan*, 110 F. Supp. 3d 176, 198–200 (D.D.C. 2015) (recognizing statutory authority to require institutions to disclose certain information about GE programs to prospective and enrolled GE students), *aff'd*, 640 F. App'x 5, 6 (D.C. Cir. 2016) (per curiam) (unpublished) (indicating that the plaintiff's challenge to the GE disclosure provisions was abandoned on appeal).

[36] 88 FR 32300, 32325 (May 19, 2023).

[37] 88 FR 32300, 32343 (May 19, 2023).

programs (CIP) code," "cohort period," "credential level," "debt-to-earnings rates (D/E rates)," "discretionary debt-to-earnings rates," "earnings premium," "earnings threshold," "eligible non-GE program," "Federal agency with earnings data," "gainful employment program (GE program)," "institutional grants and scholarships," "length of the program," "poverty guideline," "prospective student," "student," and "substantially similar program."

• Amend § 668.43 to establish a Department website with program-level financial information, and to require institutions to inform a prospective student how to access that website before the student enrolls, registers, or makes a financial commitment to the institution.

• Amend § 668.91 to provide that a hearing official must terminate the eligibility of a GE program that fails to meet the GE program accountability metrics established in this rule, unless the hearing official concludes that the Secretary erred in the calculation.

• Add § 668.401 to identify the scope and purpose of the newly established financial value transparency regulations in subpart Q.

• Add § 668.402 to provide a framework for the Secretary to determine whether a program leads to high debt burden or low earnings, including establishing annual and discretionary D/E rate metrics and associated outcomes, and establishing an earnings premium metric and associated outcomes.

• Add § 668.403 to establish a methodology to calculate annual and discretionary D/E rates, including parameters to determine annual loan payment, annual earnings, loan debt, and assessed charges, as well as to provide exclusions, and specify when D/E rates will not be calculated.

• Add a new § 668.404 to establish a methodology to calculate a program's earnings premium measure, including parameters to determine median annual earnings, as well as to provide exclusions, and specify when the earnings threshold measure will not be calculated.

• Add § 668.405 to establish a process by which the Secretary will obtain administrative and earnings data to issue D/E rates and the earnings premium measure.

• Add § 668.406 to require the Secretary to notify institutions of their financial value transparency metrics and outcomes.

• Add § 668.407 to require current and prospective students to acknowledge having seen the information on the website maintained

by the Secretary if a program has failed the D/E rates measure, to specify the content and delivery parameters of such acknowledgments, and to require that students must provide the acknowledgment before entering an enrollment agreement with an institution.

• Add § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a program and to define the timeframe for institutions to report this information.

• Add § 668.409 to establish severability protections ensuring that if any provision in subpart Q is held invalid, the remaining provisions of that subpart and other subparts would continue to apply.

• Add § 668.601 to identify the scope and purpose of newly established GE regulations under subpart S.

• Add § 668.602 to establish criteria for the Secretary to determine whether a GE program prepares students for gainful employment in a recognized occupation.

• Add § 668.603 to define the conditions under which a failing GE program would lose title IV, HEA eligibility, to provide the opportunity for an institution to appeal a loss of eligibility solely on the basis of a miscalculated D/E rate or earnings premium, and to establish a period of ineligibility for failing GE programs that lose eligibility or voluntarily discontinue eligibility.

• Add § 668.604 to require institutions to provide the Department with transitional certifications, as well as to certify, when seeking recertification or the approval of a new or modified GE program, that each eligible GE program offered by the institution is included in the institution's recognized accreditation or, if the institution is a public postsecondary vocational institution, that the program is approved by a recognized State agency.

• Add § 668.605 to require warnings to current and prospective students if a GE program is at risk of a loss of title IV, HEA eligibility, to specify the content and delivery requirements for such warnings, and to provide that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

• Add § 668.606 to establish severability protections ensuring that if any GE provision under subpart S is held invalid, the remaining provisions of that subpart and of other subparts would continue to apply.

*Summary of the Costs and Benefits*

The Department estimates that the final regulations will generate benefits to students, postsecondary institutions, and the Federal Government that exceed the costs. The Department also estimates substantial transfers, primarily in the form of title IV, HEA aid shifting between students, postsecondary institutions, and the Federal Government, generating a net budget savings for the Federal Government. Net benefits are created primarily by shifting students from low-financial-value to high-financial-value programs or, in some cases, away from low-financial-value postsecondary programs to non-enrollment. These shifts would be due to improved and standardized market information about all postsecondary programs that would facilitate better decision making by current and prospective students and their families; the public, taxpayers, and the Government; and institutions. Furthermore, the GE program accountability framework will improve the quality of student options by directly eliminating the ability of low-financial-value GE programs to receive title IV, HEA funds. This enrollment shift and improvement in program quality will result in higher earnings for students, which will generate additional tax revenue for Federal, State, and local governments. Students will also benefit from lower accumulated debt and lower risk of default.

The primary costs of the final regulations related to the financial value transparency and GE accountability requirements are the additional reporting required by institutions and the time for students to acknowledge having seen the program information website. The final regulations may also result in some students at failing programs deciding to end their educational pursuits, even if they would benefit from re-enrollment. See "Discussion of Costs, Benefits, and Transfers" in the RIA in this document for a more complete discussion of the costs and benefits of the regulations.

*The NPRM and Public Comment*

The NPRM included proposed regulations on five topics—Financial Value Transparency and Gainful Employment, Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit. These final regulations contain only provisions on Financial Value Transparency and GE. We will publish another final rule with the remaining four topics at a later date. The later rule will include summaries and responses

to comments that made some references to the GE program accountability framework but are primarily concerned with the financial responsibility, administrative capability, or certification procedures sections.

In response to our invitation in the NPRM, 7,583 parties submitted comments on the proposed regulations. While the majority of respondents commented on the provisions we address in this final rule, the number includes all who commented on any of the five topics addressed in the NPRM.

In the NPRM, we discussed the background of the regulations,[38] the relevant data available,[39] and the key regulatory changes that the Department was proposing,[40] including the changes from the 2019 Prior Rule currently in effect, and the differences between the NPRM's proposal and the now-rescinded 2014 Prior Rule. Terms used but not defined in this document have the meanings set forth in the NPRM. The final regulations contain a number of changes from the NPRM. We fully explain the changes in the *Analysis of Comments and Changes* section of the preamble that follows.

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes.

*Analysis of Public Comments and Changes:* Analysis of the comments and of any changes in the regulations since publication of the NPRM follows.

**General**

*Rulemaking Process*

*Comments:* Several commenters asked the Department to extend the public comment period an additional 30 days. These commenters contended that, given the length of the NPRM, they needed more time to review it if they were to provide informed comment. The commenters also observed that Executive Orders 12866 and 13563 cite 60 days as the recommended length for public comment.

*Discussion:* The Department believes the public comment period was sufficient for commenters to review and provide meaningful feedback on the NPRM. We note that the public comment period for the 2019 Prior Rule also was 30 days.[41] In response to the NPRM we received comments from more than 7,500 individuals and

entities, including many detailed and lengthy comments. Those comments have helped the Department identify many areas for improvements and clarification that result in an improved final rule. Moreover, the negotiated rulemaking process, including multiple negotiating sessions, provided a significant additional opportunity for public engagement and feedback that exceeds what is typically available in notice-and-comment rulemaking outside the HEA's statutory framework. The Department began the rulemaking process by inviting public input through a series of public hearings in June 2021. We received more than 5,300 public comments as part of the public hearing process. After the hearings, the Department sought non-Federal negotiators for the negotiated rulemaking committee who represented constituencies that would be affected by our rules. As part of these non-Federal negotiators' work on the rulemaking committee, the Department asked that they reach out to the broader constituencies for feedback during the negotiation process. During each of the three negotiated rulemaking sessions, we provided opportunities for the public to comment, including in response to draft regulatory text, which was available prior to the second and third sessions. The Department and the non-Federal negotiators considered those comments to inform further discussion at the negotiating sessions, and we used the information when preparing our proposed rule. The Executive orders recommend an appropriate period for public comment, but they do not require more than 30 days, nor do their recommendations account for the HEA's negotiated rulemaking requirements, which the Department followed here as described.

*Changes:* None.

*Comments:* Several commenters asserted that only two days of the negotiated rulemaking process were specifically devoted to a discussion of the proposed GE regulations, which they contended was not adequate time.

*Discussion:* The Department disagrees. There were multiple opportunities throughout the rulemaking process for people to submit comments on the proposed GE regulations. We held public hearings to obtain initial public input. We also included daily public comment periods during three weeks of negotiation sessions and devoted two days to discuss the topic exclusively. Non-Federal negotiators solicited feedback from their constituents on our proposals during and between negotiation sessions. Finally, we provided the

public with a 30-day period to comment on the NPRM.

*Changes:* None.

*Comments:* A few commenters believed that the Department is rushing the implementation of the GE regulations. These commenters argued that programs need more time to comply with these new rules.

*Discussion:* The Department disagrees with the commenters who believe that there is not adequate time to comply with the new GE regulations. The Department gave notice of its intent to regulate in the Spring 2021 Unified Agenda. We conducted hearings to obtain public input and held negotiated rulemaking sessions in the Spring of 2022 where the Department's distributed plans for the rule and provided detailed data on the projected outcomes of GE programs. Accordingly, we believe there has been, and will continue to be prior to the effective date, ample time for institutions to take the necessary steps to be able to meet their reporting obligations under the final rule. In addition, we note that the lengthy period beginning with the Spring 2021 Unified Agenda, taken together with the transition period built into the GE program accountability framework, will further allow institutions to take steps to improve their programs' outcomes after the regulation takes effect. Adding more time would further delay the effective date of the GE regulations and would unnecessarily increase the likelihood that students would continue to invest their time and money in postsecondary programs that do not meet the minimum standards of these regulations. The Department believes that we must implement these rules as quickly as possible to protect students and taxpayers, and that there is enough time for programs to comply.

*Changes:* None.

**Statutory Authority; Other General Legal Support**

*Comments:* Some commenters acknowledged that the Department has authority to implement the financial value transparency framework.

*Discussion:* We agree with these commenters that the Department has well established authority to implement the financial value transparency framework. As discussed in more detail under ''Authority for this Regulatory Action'' in this document, this framework is supported in principal part by the Secretary's generally applicable rulemaking authority, which includes provisions regarding data collection and dissemination, and which applies in part to title IV of the

---

[38] 88 FR 32300, 32306 (May 19, 2023).
[39] 88 FR 32300, 32392 (May 19, 2023).
[40] 88 FR 32300, 32317 (May 19, 2023).
[41] See 83 FR 40167, 40168 (Aug. 14, 2018).

HEA, as well as authorizations and directives within title IV of the HEA regarding the collection and dissemination of potentially useful information about higher education programs.

*Comments:* Several commenters asserted that the proposed GE program accountability framework exceeds the Department's statutory authority. Some commenters argued that the description of GE programs in the HEA—that those programs must prepare students for gainful employment in recognized occupations—does not provide clear congressional intent to support the eligibility requirements in the proposed regulations. Some of these commenters contended that the HEA does not require the Department to establish a mathematical framework to determine when a program adequately prepares students for gainful employment in a recognized occupation, nor provide any explicit congressional authorization to do so. Similarly, some commenters asserted that the GE provisions in the HEA are too vague and ambiguous to support an eligibility framework based on student outcomes. Some commenters said the litigation addressing prior GE rules never identified clear congressional authorization for the Department to establish an eligibility framework for GE programs. Commenters also asserted that the variations in the prior and proposed GE regulations constitute further proof that there is no clear congressional authorization tied to the proposed GE regulations. In addition, some commenters viewed the proposed GE program eligibility framework in its use of two outcome measures as a significant expansion of the prior GE regulations and argued that such a framework could only be supported with clear authorization from Congress.

*Discussion:* As discussed in detail in the NPRM [42] and summarized in this document under "Authority for this Regulatory Action," the GE program accountability framework is supported by the Department's statutory responsibilities to enforce eligibility limits in title IV of the HEA as well as the Department's generally applicable rulemaking authority.

As for the latter, Federal statutes grant the Secretary general crosscutting rulemaking authority that includes and extends beyond title IV of the HEA. Section 410 of the General Education Provisions Act (GEPA) provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the

manner of operations of, and governing the applicable programs administered by, the Department.[43] This authority includes the power to promulgate regulations relating to programs that we administer, such as the title IV, HEA programs that provide Federal loans, grants, and other aid to students. Furthermore, section 414 of the DEOA authorizes the Secretary to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.[44] These provisions, together with the provisions in the HEA regarding GE programs, authorize the Department to promulgate regulations that establish measures to determine the eligibility of GE programs for title IV, HEA program funds; require institutions to report information about GE programs to the Secretary; require institutions to provide information about GE programs to students, prospective students, and others; and establish certification requirements regarding an institution's GE programs.

As for title IV of the HEA and its eligibility requirements, institutions must meet institution-level as well as program-level eligibility requirements for students in those programs to receive title IV assistance in the form of loans or grants. HEA sections 101 and 102 state that one type of program for which certain categories of institutions must establish program-level eligibility is a "program of training to prepare students for gainful employment in a recognized occupation."[45] HEA section 481 articulates this same requirement by defining, in part, an "eligible program" as a "program of training to prepare students for gainful employment in a recognized profession."[46]

The Department has increased its focus on these eligibility requirements over time as key circumstances have changed. College tuition levels have continued to rise relative to inflation, and student borrowing levels have reached very high levels. The earnings of college graduates have not risen apace, however, and earnings outcomes are not tightly correlated with borrowing levels. Moreover, cases of institutions using deceptive recruiting and advertising practices to lure students into postsecondary programs with little return on investment remain too common. All of these factors combine to strand many graduates with

unaffordable education debt and little enhancement to their earnings—too often leaving them worse off financially than if they had not pursued postsecondary education at all. While the financial returns to college remain high overall for the average student, in recent years these trends have contributed to increased skepticism about the value of going to college [47]— threatening one of the key pathways to upward mobility in the United States.

We recognize that these forces are an issue across sectors. However, by defining GE programs as programs that prepare students for gainful employment, Congress indicated that the value of adding such programs to the Federal student loan program and to title IV of the HEA more broadly lies in their financial outcomes. Yet, despite that statutory focus, GE programs account for a disproportionate share of students who complete programs with very low earnings and unmanageable debt. An essentially transparency-only approach to GE programs, which is reflected in the 2019 Prior Rule, has not substantially improved the most troubling trends. To address both the Department's obligation to oversee that the statutory eligibility requirements are met and to address the specific need for regulatory action within the sector, the GE program accountability framework specifies what it means to prepare students for gainful employment in a recognized occupation. The framework does so by establishing clear and administrable measures that are tied to student financial outcomes and that the Department will use to evaluate whether a GE program is eligible for title IV, HEA program funds. One measure focuses on manageable debt (the D/E rates measure), the other on enhanced earnings (the EP measure).[48] We believe the D/E and EP measures, singly and taken together, will help promote the

---

[42] 88 FR 32300, 32321–22 (May 19, 2023).

[43] 20 U.S.C. 1221e–3.

[44] 20 U.S.C. 3474.

[45] 20 U.S.C. 1001(b)(1); 20 U.S.C. 1002(b)(1)(A)(i), (c)(1)(A).

[46] 20 U.S.C. 1088(b).

[47] Several surveys have documented declines in the share of individuals who believe college is worth the cost. For example, see Education Expectations: Views on the Value of College and Likelihood to Enroll (June 15, 2022). Strada (*https://stradaeducation.org/report/pv-release-june-15-2022/*). Klebs, Shelbe, Fishman, Rachel, Nguyen, Sophie & Hiler, Tamara (2021). One Year Later: COVID–19s Impact on Current and Future College Students. Third Way (*https://www.thirdway.org/memo/one-year-later-covid-19s-impact-on-current-and-future-college-students*). See also Board of Governors of the Fed. Reserve Sys. (May 2022). Economic Well-Being of U.S. Households in 2021 (*https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf*).

[48] For a detailed discussion of how the D/E rates measure and the EP measure assess whether a program is preparing students for gainful employment in a recognized occupation, see the *Gainful Employment Criteria* section in the NPRM, 88 FR 32300, 32343 (May 19, 2023).

goal of career programs actually providing financial value to their graduates—consistent with the statutory definition of GE programs and in service of the specific need for regulatory action.

The GE accountability rules effectuate core statutory provisions in practical and administrable ways. The definitions of "gainful employment" programs are central to the statutory scheme regarding GE programs, and those provisions establish limits on the programs that may receive taxpayer support through title IV, HEA loans and grants to students in those programs. The measures adopted in the GE program eligibility framework are designed to ensure eligible programs leave students with affordable debt and enhanced earnings, consistent with the ordinary meaning of the operative words in the statute. It is not only reasonable but also in accord with all indications of Congress's intent to conclude that a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt, or if they earn no more than comparable high school graduates.[49] Students in such programs receive no financial gain, and may even experience financial loss, as a result of attending their career training programs. Those results indicate failure, not success, as a title IV, HEA eligible GE program. To be sure, as shown Tables 4.8 and 4.9 in the RIA, the Department estimates that most of the existing GE programs serving the majority of GE students will not fail these metrics, let alone be ineligible for title IV, HEA participation by failing in two of three consecutive years for which results are issued. In any event, the programs that may lose title IV, HEA eligibility under these rules are the programs that perform especially poorly for students and, consequentially, taxpayers.

Moreover, in past litigation involving affordable debt metrics, courts have accepted that reasonable performance measures may be used to evaluate the eligibility of GE programs for title IV,

HEA participation. Those courts based those decisions on the text, structure, and purposes of the relevant statutory provisions. Thus, in reviewing previous GE rules, courts have examined the GE provisions of the HEA and explained, for example, that "train" and "prepare" are terms that "suggest elevation to something more than just any paying job. They suggest jobs that students would less likely be able to obtain without that training and preparation."[50] Courts have further concluded that "it is reasonable to consider students' success in the job market as an indication of whether those students were, in fact, adequately prepared,"[51] and that "examining [GE] programs' outputs in terms of earnings and debts" is consistent with the HEA.[52] Accordingly, the basic question of whether the HEA authorizes nonarbitrary GE performance measures has been resolved repeatedly in the Department's favor. There are, of course, issues of detail to settle in formulating particular outcome measures that are clear, workable, and suited to their purposes. Indeed, questions of how exactly to specify the GE performance measures involve complex assessments of how best to evaluate whether programs prepare students for gainful employment, which the Department is statutorily authorized and well-positioned to resolve given the Department's experience, knowledge, and expertise. The Department administers the relevant statutes, and it has used the negotiated rulemaking process to inform its views and gather and consider a broad range of perspectives before adopting these final rules. Importantly, the Department now has better data and data analysis than ever previously available.[53]

The foregoing points and discussion elsewhere in this document and the NPRM are sufficient to establish the Department's authority to adopt the GE program eligibility framework. If additional support were needed, statutory history and legislative history confirm that program performance, including performance related to enhanced earnings and affordable debt, has been a focus of the relevant statutory provisions from the beginning. Such program performance was addressed in legislative history of the National Vocational Student Loan Insurance Act (NVSLIA), Public Law 89–287 (1965)—which is the statute that first permitted students to obtain federally financed loans to enroll in vocational programs. Both the ability of students to repay loans and the benefits to students from training were identified as principal issues during the development of that legislation.[54] Indeed, the Senate Report that accompanied the NVSLIA quoted extensively from testimony on behalf of the American Personnel and Guidance Association, which supported the legislation for the purpose of enabling students to ensure their financial security by "acquiring job skills which will allow them to enter and compete successfully in our increasingly complex occupational society," while also emphasizing, based on an early study, that "sufficient numbers" of graduates of such programs "were working for sufficient wages to make the concept of student loans to be [repaid] following graduation a reasonable approach to take."[55]

The statutory framework has not changed in relevant part, and the taxpayer interest in safeguarding the use of Federal funds persists today. Under the loan insurance program enacted in the NVSLIA, the specific potential loss to taxpayers of concern was the need to pay default claims to banks and other lenders if the borrowers defaulted on

---

[49] Some commenters criticized the Department's position in favor of performance measures for GE programs as focusing overly much on the two words, "gainful employment." In our view, that criticism understates the depth of analysis and breadth of considerations that support the Department's position—including our attention to the GE provisions as a whole as well as the structure of the Higher Education Act more broadly. This criticism also undervalues the enacted text, however many or few words are relevant to the issue of GE performance measures. We are unpersuaded by arguments that appear to place little value, and consequently no serious limits, on the terms of the gainful employment provisions in the statute.

[50] *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan*, 640 F. App'x 5, 8 (D.C. Cir. 2016) (per curiam).

[51] *Ass'n of Proprietary Colleges* v. *Duncan*, 107 F. Supp. 3d 332, 362 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Ass'n of Priv. Colleges & Universities* v. *Duncan*, 870 F. Supp. 2d 133, 147–48 (D.D.C. 2012)).

[52] *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan*, 110 F. Supp. 3d 176, 187–88 (D.D.C. 2015) (emphasis omitted), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016) (per curiam); *id.* at 187 n.4 (explaining by way of analogy that there is "no irreconcilable conflict" between a concentration on "inputs" such as pre-match training and "outputs" in terms of match performance).

[53] See the RIA in this document for analyses of how the D/E rates metric and the earnings premium metric provide objective, data-driven assessments of whether GE programs are preparing their students for gainful employment in a recognized occupation or whether they are instead leaving their students with unmanageable debt or no better off than if they had not pursued a postsecondary credential. See also the discussion below of the earnings premium metric and reasons for its adoption, in light of

recent developments and new evidence, in this final rule.

[54] See generally *Ass'n of Priv. Colleges & Universities* v. *Duncan*, 870 F. Supp. 2d 133, 138–41 (D.D.C. 2012) (*APCU*) (reviewing statutory history and legislative history).

[55] S. Rep. No. 89–758 (1965), reprinted in 1965 U.S.C.C.A.N. 3742, 3748–49 (quoting testimony of Professor Dr. Kenneth B. Hoyt); *id.* at 3749 (further quoting Hoyt's testimony as finding no reason to believe that making government funds available would be unjustified "in terms of benefits accruing to both these students and to society in general, nor that they would represent a poor financial risk"); *id.* at 3744 (explaining that the testimony "confirmed the committee's estimate of the need for such legislation"); *APCU*, 870 F. Supp. 2d at 139 (stating that both House and Senate subcommittees "placed considerable weight on Dr. Hoyt's testimony").

the loans. After its passage, the NVSLIA was merged into the HEA which, in title IV, part B, has both a direct Federal loan insurance component and a Federal reinsurance component that require the Federal Government to reimburse State and private nonprofit loan guaranty agencies upon their payment of default claims.[56] Under either HEA component, taxpayers and the Government assume the direct financial risk of default.[57] Since the Health Care and Reconciliation Act of 2010,[58] all Federal loans have been originated as Direct Loans from the Federal Government. As the originator and owner of Federal loans, the Federal Government (funded by taxpayers) bears the cost of any unpaid loans. Costs are generated by borrowers defaulting on their loans, but increasingly costs are also generated by borrowers electing to repay their loans on income driven repayment (IDR) plans. Under these plans, borrowers can pay a fixed share of the portion of their income exceeding a threshold level (*i.e.*, their discretionary income) for a preset period of time, and then have the remaining balance forgiven. When borrowers' debts are high relative to their income, they are more likely to not fully repay their loans. To avoid adverse repayment risks both from default or loan forgiveness via IDR plans, taxpayers have an interest in financing career training programs that leave students better off in terms of earnings, and with debt in reasonable proportion to their earnings. Participation in IDR plans has increased by approximately 50 percent since 2016 to about 9 million borrowers and is likely to increase more with the introduction of the new and more generous Saving on a Valuable Education (SAVE) IDR plan. Accordingly, the Department has a significant interest, on behalf of taxpayers, in ensuring the funds disbursed through title IV, HEA loans are invested responsibly, further supporting the use of performance measures to assess a program's eligibility to participate in the title IV, HEA programs as a GE program.

With regard to the earnings premium measure, we offer further discussion below. We note here that, to receive title IV funds, section 484 of the HEA generally requires that students already have a high school diploma or recognized equivalent. That requirement makes high-school-level achievement the presumptive starting point for title

IV, HEA funds. The EP measure adopts that statutory starting point by comparing the earnings of typical program completers with those of comparable high school graduates. As with the debt-to-earnings measure, the earnings premium measure is consistent with the text, structure, and purposes of the statute.

We disagree with the commenters who contended that the differences between the 2014 Prior Rule and the GE program accountability framework in these regulations suggest a lack of statutory authority. In the NPRM, we discussed the background of the regulations,[59] the relevant data available,[60] and the major changes proposed in that document,[61] including the changes from the 2014 Prior Rule and the 2019 Prior Rule. Although the GE program accountability framework in this final rule differs from the 2014 Prior Rule, including in the addition of a standalone earnings premium measure, we have demonstrated how the D/E rates measure and the EP measure, singly and taken together, are reasonable, evidence-based metrics that both serve to meet the statutory eligibility requirements and address the specific need for regulatory action in the sector. The fact that this final rule varies from prior GE regulations is not indicative of lack of authority for the Department to implement the statutory provisions related to GE programs and to develop rules to properly administer the title IV, HEA programs. Rather, the development of this rule reflects the reality that the Department's judgments and policies on a variety of issues may change over time in light of experience, information, and analysis—which the law permits, as long as the Department's rules remain within the boundaries of the applicable statutes and the Department provides a reasoned basis for the change in position.[62]

The Department, therefore, disagrees with commenters who believe that the GE program accountability framework is not within the Department's statutory authority, and further disagrees with claims that GE program results are not relevant to GE program eligibility for title IV, HEA funding. The Department also disagrees with suggestions that we should implement the statute without clear and administrable rules for evaluating whether GE programs are meeting statutory eligibility requirements. Without relatively

specific rules, the Department could not adequately ensure that title IV, HEA funds are properly channeled to students attending programs that prepare students for gainful employment; institutions would not have clarity as to the standards for GE programs that the Department applies; and we would not be able to address the need for regulatory action in the sector.[63]

We note, finally, that all or nearly all of the commenters' arguments against any GE performance measure have been raised and rejected during previous rulemaking efforts and in litigation over previous versions of the Department's GE program accountability rules. The statutory arguments against considering GE program outcomes of any kind are not more persuasive now than they were in past years. In fact, new data, data analysis, and the Department's experience in attempting to enforce the statutory limits on GE programs have convinced us that these performance measures are more, not less, urgently needed.

*Changes:* None.
*Comments:* Some commenters questioned the Department's authority, at least at this time, to adopt performance measures for GE program eligibility including the earnings premium (EP) measure. Some commenters noted that the EP measure is a new standard and argued that the measure was beyond the Department's authority to adopt for evaluating the eligibility of GE programs to participate in title IV, HEA. Some commenters asserted that the Department had not adequately supported the EP measure in the NPRM, or that the Department's

---

[56] 20 U.S.C. 1071(a)(1).
[57] 20 U.S.C. 1078(c) (Federal reinsurance for default claim payments); 20 U.S.C. 1080 (Federal insurance for default claims).
[58] Public Law 111–152.

[59] 88 FR 32300, 32306 (May 19, 2023).
[60] 88 FR 32300, 32392 (May 19, 2023).
[61] 88 FR 32300, 32317 (May 19, 2023).
[62] See, for example, *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515–16 (2009).

[63] In suggesting that congressional intent regarding GE programs indicates relatively narrow authority for the Department, a commenter pointed to post-enactment statements by Members of Congress as well as unsuccessful legislation. The Department is attentive to input from Members of Congress, but we disagree that the statutory authority for these rules is limited by unenacted bills or policy positions. To the extent that the 2019 Prior Rule can somehow be read to adopt a contrary position, that position cannot be sustained. See, for example, *Bostock* v. *Clayton County,* 140 S. Ct. 1731, 1747 (2020) ("All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt.") (quoting *Pension Ben. Guar. Corp.* v. *LTV Corp.,* 496 U.S. 633, 650 (1990)). In this rulemaking, we have emphasized, among other sources, statutory text, structure, purpose, and past judicial decisions, as well as the Department's well-reasoned choices on matters of detail in the exercise of its authority to administer the relevant statutes and in light of the Department's experience and expertise. Nothing in the 2019 Prior Rule, and its more limited review of the foregoing considerations, prevents the Department from engaging in this analysis and reaching the conclusions set forth herein.

support for the EP measure is arbitrary. While many commentators did not focus on the EP measure in terms of the Department's statutory authority, some commenters did make general challenges to the GE program accountability framework that applied to the EP measure as well as the debt-to-earnings (D/E) rates. Some of those challenges were based on the commenters' interpretation of "gainful employment" in the GE statutory provisions to mean any job that pays any amount, and on the contention that the Department is arbitrarily changing its position from the 2019 Prior Rule.

*Discussion:* In several respects, this final rule differs from the 2019 Prior Rule as well as the 2014 Prior Rule. We have acknowledged those differences and offered reasons for them in this document and in the NPRM.[64] One difference is the addition of an earnings premium measure, which will operate alongside the debt-to-earnings rates measure in evaluating GE program eligibility. Further details and reasons for adopting the EP measure are presented below and in the NPRM.[65] In this discussion, we summarize several connected reasons for adopting the EP measure for GE program eligibility in these final rules.

First of all, the Department's careful review of applicable law and public comments leave us convinced that the EP measure is within the Department's statutory authority. Statutory text, structure, and purpose support that conclusion. If program completers' earnings fall below those of students who never pursue postsecondary education in the first place, programs cannot fairly be said to "train" postsecondary students to "prepare" them for "gainful employment" in recognized professions or occupations.[66] Those statutory terms indicate that eligible GE programs must make students ready or able to achieve gainful employment in such professions or occupations—consistent with a statutory purpose of improving students' ultimate job prospects and income over what they would be in the absence of such training and preparation. As the D.C. Circuit stated when it reviewed the D/E measure in the 2014 Prior Rule, those statutory

terms "suggest elevation to something more than just any paying job. They suggest jobs that students would less likely be able to obtain without that training and preparation." [67] At minimum, the statutory language permits the conclusion that the Department adopts here.

Importantly, the overall structure of the applicable statutes reinforces our adoption of the EP measure. The basic starting point for students at eligible GE programs is a high school education or its equivalent, as we pointed out in the NPRM.[68] The HEA generally requires students who receive title IV assistance to have already completed a high school education,[69] and then, from that starting point, the statute requires GE programs to prepare those high school graduates for gainful employment in a recognized occupation. Whatever ambiguity or vagueness there might be in the HEA, clearly GE programs are supposed to enhance earnings power beyond that of what high school graduates, not leave them where they started. The EP measure reflects that premise of the applicable statutes. It will measure post-high school gain, in part, with an administrable test that reflects earnings beyond a typical high school graduate.

The discussions in this document and in the NPRM are more than sufficient to

establish the Department's authority to adopt the GE eligibility rules, including the EP measure.

The Department recognizes again, as we did in the NPRM,[70] that the EP measure will be new to the Department's regulations. More broadly, we recognize that until 2010 the Department did not specify through regulations an administrable test to identify which programs qualify as eligible GE programs under the statutes. Nevertheless, we do not believe that the meaning of the applicable statutes becomes narrower because the agency initially refrained from issuing regulations that incorporated specific performance tests. The need for such rules became clearer over time. In addition to the points made above, new data and analyses have underscored the need for performance-based limits on GE program eligibility, including a test for enhanced student earnings. Acting now will enable the Department to respond to that emerging need with administrable tests of program performance that accord with statutory text, structure, and purpose.

An EP measure for GE eligibility finds support in recent evidence and studies. Within the last several years, a number of researchers have recommended that the Department reinstate the 2014 GE rule with an added layer of accountability through a high school earnings metric.[71] That goal of ensuring that students benefit financially from their career training fits with broader research on the economics of postsecondary education. Similar earnings premium metrics are used ubiquitously by economists and other analysts to measure the earnings gains associated with college credentials relative to a high school education.[72]

---

[64] See 88 FR 32300, 32307–08 (May 19, 2023); *id.* at 32309–11, 32342–43 (providing reasons for the adoption of GE accountability rules at this time, in view of the 2019 Prior Rule and subsequent developments).

[65] See, for example, 88 FR 32300, 32308, 32325–28, 32343–44 (May 19, 2023). Those discussions also address the D/E rates measure.

[66] 20 U.S.C. 1002(b)(1)(A), (c)(1)(A). See also 20 U.S.C. 1088(b)(1)(A)(i), which refers to a recognized profession.

[67] *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan,* 640 F. App'x 5, 8 (D.C. Cir. 2016) (per curiam). Although the courts were likewise reviewing D/E measures for GE program eligibility rather than EP measures, generally supportive language also appears in *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 187–88 (D.D.C. 2015) (stating that "examining [GE] programs' outputs in terms of earnings and debts" is consistent with the HEA) (emphasis omitted), *aff'd,* 640 F. App'x at 6; *Ass'n of Proprietary Colleges* v. *Duncan,* 107 F. Supp. 3d 332, 362 (S.D.N.Y. 2015) (concluding that "it is reasonable to consider students' success in the job market as an indication of whether those students were, in fact, adequately prepared") (internal quotation marks omitted) (quoting *Ass'n of Priv. Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 147–48 (D.D.C. 2012)).

[68] See, for example, 88 FR 32300, 32308, 32333, 32327 (May 19, 2023).

[69] Regarding a high school education as the starting point, 20 U.S.C. 1001 states that an institution of higher education must only admit as regular students those individuals who have completed their secondary education or met specific requirements under 20 U.S.C. 1091(d), which includes an assessment that they demonstrate the ability to benefit from the postsecondary program being offered. The definitions for a proprietary institution of higher education or a postsecondary vocational institution in 20 U.S.C. 1002 maintain the same requirement for admitting individuals who have completed secondary education. Similarly, there are only narrow exceptions for students beyond the age of compulsory attendance who are dually or concurrently enrolled in postsecondary and secondary education. The apparent purpose of such limitations is to help promote that postsecondary programs build skills and knowledge that extend beyond what is taught in high school.

[70] See 88 FR 32300, 32307–11 (May 19, 2023).

[71] See, for example, Matsudaira, Jordan D. & Turner, Lesley J. (2020). Towards a Framework for Accountability for Federal Financial Assistance Programs in Postsecondary Education. The Brookings Institution (*www.brookings.edu/wp-content/uploads/2020/11/2021603-Mats-Turner.pdf*). Cellini, Stephanie R. & Blanchard, Kathryn J. (2022). Using a High School Earnings Benchmark to Measure College Student Success Implications for Accountability and Equity. The Postsecondary Equity and Economics Research Project. (*www.peerresearchproject.org/peer/research/body/2022.3.3PEER_HSEarnings-Updated.pdf*). Itzkowitz, Michael (2020). Price to Earnings Premium: A New Way of Measuring Return on Investment in Higher Education. Third Way (*https://www.thirdway.org/report/price-to-earnings-premium-a-new-way-of-measuring-return-on-investment-in-higher-ed*). For further discussion of such research, see the Regulatory Impact Analysis below.

[72] See, for example, Autor, D.H. (2014). Skills, Education, and the Rise of Earnings Inequality Among the "Other 99 Percent." *Science,344*(6186), 843–851. Baum, S. (2014). Higher Education Earnings Premium: Value, Variation, and Trends.

Furthermore, there is increasing public recognition that some higher education programs are not ''worth it'' and do not promote economic mobility.[73] While the D/E rates measure identifies programs where debt is high relative to earnings, the EP measure assesses the economic boost a program provides to its students independent of the debt incurred. After all, students and families invest their own time and money in postsecondary education in addition to the amount they borrow. The EP measure therefore provides a different measure than the D/E metric of whether a program prepares its students for gainful employment in a recognized occupation. Adopting an EP measure for GE programs that seek to participate in title IV, HEA fits within such recent recommendations, data analysis, and mainstream thinking about which career training programs should be considered gainful.

Furthermore, the EP measure that we adopt will set only minimal and reasonable expectations for programs that are supposed to help students move beyond a high school baseline. The rule marks an incremental and commonsense change that we are confident is within the Department's authority. In particular, we observe that the median earnings of high school graduates is about $25,000 nationally, which corresponds to the earnings of a full-time worker who makes about $12.50 per hour.[74] We also reiterate that the EP measure does not demand that every individual who attends a GE program must earn more than a high school graduate; instead, the measure requires only that at least half of those who actually complete the program are earning at least slightly more than individuals who had never completed

postsecondary education.[75] The vast majority of students cite the opportunity for a good job or higher earnings as a key, if not the most important, reason they chose to pursue a college degree.[76] While the 2014 Prior Rule justifiably emphasized that borrowers should be able to earn enough to afford to repay their debts, the Department recognizes here that borrowers must be able to afford more than ''just'' their loan payments and that postsecondary GE programs should help students reach a minimal level of labor market earnings.

Although modest in several respects, the EP measure for GE program eligibility is nonetheless likely to deliver important benefits and substantially further statutory purposes. We are convinced of these prospective gains by recent evidence. For example, recent research indicates that the EP measure will help protect students from the adverse borrowing outcomes prevalent among programs with very low earnings. Research conducted since the 2014 Prior Rule as well as new data analyses shown in this RIA illustrate that, for borrowers with low earnings, even small amounts of debt—including levels of debt that would not trigger failure of the D/E rates—can be unmanageable. We now can be reasonably confident that default rates tend to be especially high among borrowers with lower debt levels and very low earnings, because at low earnings levels any amount of debt in unaffordable.[77] Analyses in this RIA show that the default rate among students in programs that pass the D/E rates thresholds but fail the earnings premium are very high. In fact, those default rates are even higher than programs that fail the D/E rates measure but pass the EP measure. In that sense, the EP measure is an important separate measure of gainfulness, providing some added protection to borrowers who have

relatively low balances, but who have earnings so low that even low levels of debt payments are unaffordable.

In addition, we reaffirm that the EP measure will help protect taxpayers.[78] Borrowers with low earnings are eligible for reduced loan payments and loan forgiveness, which increase the costs of the title IV, HEA loan program to taxpayers. While income-driven repayment (IDR) plans for Federal student loans partially shield borrowers from default due to inability to make payments, such after-the-fact protections do not address underlying program failures to prepare students for gainful employment in the first place, and they exacerbate the impact of such failures on taxpayers as a whole when borrowers are unable to pay. Not all borrowers participate in these repayment plans, and, where they do, the risks of nonpayment are shifted to taxpayers when borrowers' payments are not sufficient to fully pay back their loans. This is true because borrowers with persistently low incomes who enroll in IDR—and thereby make payments based on a share of their income that can be as low as $0—will have their remaining balances forgiven at taxpayer expense after a specified number of years in repayment. Both the EP and D/E measures for GE program eligibility will help protect taxpayers, because both measures are well-designed to screen out GE programs that generate a disproportionate share of the costs to taxpayers and negative borrower outcomes. In support of this conclusion, the final RIA as well as the NPRM's RIA presented estimates of loan repayment under the hypothetical assumption that all borrowers pay on the SAVE plan announced by the Department in July 2023.[79] These analyses show that both D/E and EP measures are strongly correlated with an estimated subsidy rate on Federal loans, which measures the share of a disbursed loan that will not be repaid, and thus provides a proxy for the cost of loans to taxpayers.[80] Although many commenters disagreed with at least part of the Department's approach to GE programs, commenters did not appear to take issue with the proposition that taxpayer protection is a purpose to be served by the GE provisions in the HEA.

Thus, the EP and D/E measures serve some of the same purposes, but we observe again that they measure importantly distinct dimensions of

---

*Urban Institute.* Carnevale, A.P., Cheah, B. & Rose, S.J. (2011). The College Pay Off. Daly, M.C. & Bengali, L. (2014). Is It Still Worth Going to College. *FRBSF Economic Letter.13*(2014), 1–5. Li, A., Wallace, M. & Hyde, A. (2019). Degrees of Inequality: The Great Recession and the College Earnings Premium in US Metropolitan Areas. *Social Science Research,84,* 102342; Oreopoulos, P. & Petronijevic, U. (2013). Making College Worth It: A Review of Research on the Returns to Higher Education. *NBER Working Papers,* (19053); and Broady, Kristen E. & Herschbein, Brad (2020). Major Decisions: What Graduates Earn Over Their Lifetimes. The Hamilton Project.

[73] See, for example, polling evidence in *https://www.wsj.com/articles/americans-are-losing-faith-in-college-education-wsj-norc-poll-finds-3a836ce1.* A 2022 survey by the Federal Reserve shows that more than one-third of workers under the age of 45 say the benefits of their education did not exceed the costs (*https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf*).

[74] That figure is lower than the minimum wage in 15 States. See *https://www.dol.gov/agencies/whd/mw-consolidated.*

[75] See 88 FR 32300, 32333, 32327 (May 19, 2023). The EP measure simply compares program completers' earnings with high school graduates' earnings and therefore does not reflect tuition costs or debt. *See id.* at 32327. Note that these EP features are not unique to the GE program eligibility provisions. These EP features apply within the financial value transparency provisions as well.

[76] For example, a recent survey of 2,000 persons aged 16 to 19 and 2,000 recent college graduates aged 22 to 30 rated affordable tuition, higher income potential, and lower student debt as the top 3 to 4 most important factors in choosing a college (*https://www.nytimes.com/2023/03/27/opinion/problem-college-rankings.html*). The RIA includes citations of other survey results with similar findings.

[77] See Brown, Meta *et al.* (2015). Looking at Student Loan Defaults Through a Larger Window. Liberty Street Economics, Fed. Reserve Bank of N.Y. (*https://libertystreeteconomics.newyorkfed.org/2015/02/looking_at_student_loan_defaults_through_a_larger_window/*).

[78] See, for example, 88 FR 32300, 32307–09 (May 19, 2023).

[79] See 88 FR 1894 (Jan. 11, 2023). The Department's final rule for IDR can be found at 88 FR 43820 (July 10, 2023).

[80] See Table 2.10 in the RIA for this document.

gainful employment.[81] The distinctions support the Department's decision to require that GE programs not (repeatedly) fail either measure if those programs are to receive title IV, HEA support. D/E rates measure debt-affordability, indicating whether the typical graduate will have earnings enough to manage their debt service payments without incurring undue hardship. For any median earnings level of a program, the D/E rates and thresholds imply a maximum level of total borrowing beyond which students should be concerned that they may not be able to successfully manage their debt. The EP measure tests whether programs leave their completers with greater earnings capacity than those who do not enroll in postsecondary education, which represents a minimal benchmark that students pursuing postsecondary credentials likely expect to achieve. And while the EP measure provides additional protection to borrowers and taxpayers, it attends to a distinct aspect of determining whether a program prepares its students for gainful employment in a recognized occupation—namely, the extent to which the program helps students attain a minimally acceptable earnings enhancement.

Accordingly, we disagree with commenters who argue that the Department either generally lacks authority to adopt the EP measure for GE program eligibility, or that the Department chose the wrong time to adopt that measure. We understand the opinions of those who prefer that the Department not adopt administrable and clear rules to test GE program performance. Unlike the rules as they stood after the 2019 rescission, these final rules will demand that GE programs not have a track record of failure on certain basic measures of performance if they seek to benefit from title IV, HEA taxpayer funds. Some GE programs will repeatedly fail those measures, although we point out that some of those programs will survive without support from the Federal Government through title IV, HEA. Regardless, we are convinced that these rules are within the Department's statutory authority, and that recent events and new information confirm the importance of acting now. If the Department does not act effectively at

the front end to screen out the subset of GE programs that do not meet minimal performance standards of enhanced earnings and affordable debt, students and taxpayers will continue to suffer the consequences at the back end. Those consequences have grown larger and clearer, and the Department has decided to respond decisively yet reasonably. A clear earnings premium rule for GE program eligibility is one part of that measured response.

*Comments:* Several commenters contended that there is an increased burden on the Department to demonstrate congressional authorization for its proposed GE metrics under *West Virginia* v. *Environmental Protection Agency* [82] and the major questions doctrine. These commenters described the proposed eligibility framework as a major shift in the way GE programs maintain title IV, HEA eligibility that would impact the funding for many students and institutions, and asserted that the framework creates burdensome new reporting requirements. These commenters concluded that the statutory language relied upon—that GE programs "prepare students for gainful employment in a recognized occupation"—is not a sufficiently explicit statement of congressional intent to support such a change.

*Discussion:* We disagree that the major questions doctrine applies such that the Department needs an especially clear grant of statutory authority to adopt performance standards in the GE program accountability framework. Having considered the factors that courts have used to identify exceptional circumstances in which such clarity is required, we do not believe that the doctrine applies here.[83] If the doctrine did apply, we believe that the Department's authority to adopt performance standards for GE program eligibility is adequately clear based on ordinary tools of statutory interpretation.

As discussed above and in the NPRM,[84] we believe performance measures for GE accountability rules are firmly grounded in the text, structure, and purposes of title IV, HEA, including its gainful employment provisions. Furthermore, and for reasons also discussed above, GE performance measures are neither novel nor surprising. We have noted past litigation

and court opinions.[85] And given the grounding of performance measures in the text of core statutory provisions in the HEA regarding GE programs, there is nothing "ancillary" about those statutory provisions such that the major questions doctrine might apply on that basis.[86]

And far from taking any step toward mandating specific curricula when institutions prefer other educational strategies,[87] these performance measures simply evaluate whether programs should receive taxpayer support based on commonsense financial outcomes: affordable debt and enhanced earnings. Those outcomes plainly are related to whether a program actually prepares students for gainful employment in a recognized occupation or profession, instead of leaving the typical program completer with unaffordable debt burdens or no greater earnings than they could secure without career training. These performance measures are based on the text, structure, and purposes of the governing statutes. Such rules are, moreover, within the heartland of the Department's experience and expertise. Among the Department's longstanding missions are enforcing the limits on title IV, HEA eligibility for GE programs, and gathering, analyzing, and using data to evaluate education programs including GE programs. Accordingly, GE performance measures are not beyond the agency's core competence such that the major questions doctrine might apply on that basis.[88]

---

[81] See, for example, 88 FR 32300, 32308, 32327, 32344 (May 19, 2023). We reiterate that the D/E and EP measures are severable. The severability provisions in these final rules are §§ 668.409 and 668.606. For the Department's discussions of severability generally and as applied to the D/E and EP measures, please see the NPRM, 88 FR 32300, 32341–42, 32349 (May 19, 2023).

[82] 142 S. Ct. 2587 (2022).

[83] See, for example, *id.* at 2608 (discussing extraordinary cases in which the breadth, history, and economic and political significance of asserted agency authority provide reason to hesitate before concluding that Congress conferred such authority).

[84] 88 FR 32300, 32306 (May 19, 2023).

[85] See cases cited in notes 50–52 above, within that earlier discussion of authority for the GE program accountability framework.

[86] Compare *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *Ass'n of Priv. Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 148 (D.D.C. 2012) (*APCU*) (reviewing the 2011 Prior GE Rule, distinguishing *Whitman,* and explaining that "[n]either the elephant nor the mousehole is present here. . . . Concerned about inadequate programs and unscrupulous institutions, the Department has gone looking for rats in ratholes— as the statute empowers it to do."); *Ass'n of Proprietary Colleges* v. *Duncan,* 107 F. Supp. 3d 332, 361 (S.D.N.Y. 2015) (reviewing the 2014 Prior GE Rule and quoting *APCU*).

[87] Under section 103 of the Department of Education Organization Act, 20 U.S.C. 3403(b), the Department is generally prohibited from exercising any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of an educational institution, school, or school system.

[88] Compare *W. Virginia* v. *EPA,* 142 S. Ct. at 2612–13 (indicating that presumably Congress does not task an agency with making policy judgments in which the agency has "no comparative expertise"); *Biden* v. *Missouri,* 142 S. Ct. 647, 653 (2022) ("[T]here can be no doubt that addressing infection problems in Medicare and Medicaid

In addition, available data indicate that the GE program accountability framework will have important yet limited effects. The available data, presented in RIA Tables 4.8 and 4.9, indicate that most existing GE programs will not fail the D/E rates or EP measure when they are applied, let alone fail two out of three years for which program results are issued. Our estimates suggest about 1,700 GE programs will fail the D/E rates or EP measure—representing about 5.3 percent of all GE programs, and only 1.1 percent of all higher education programs attended by federally aided students. While the share of students currently enrolled in such programs is higher—23.7 percent of federally aided students in career training programs, and 3.6 percent of all federally aided students—it is important to note these students have other options. Analyses presented in Tables 4.25 and 4.26 of the RIA show that the majority of students have similar program options that do not fail the D/E rates or EP measure and are nearby, or even at the same institution. These analyses are supported by external research, suggesting that most students in institutions closed by accountability provisions successfully reenroll in higher performing colleges.[89] More generally, many more students will pursue a postsecondary education in the future, relative to the number enrolled now. As programs with poor performance close, these future college goers will benefit from better options to choose from and are unlikely to otherwise be affected by programs closed today. In any event, nearly three-quarters of institutions of higher education that participate in title IV, HEA programs have no enrollment in failing GE programs that might be subject to eligibility loss.

Those predicted effects do not establish the kind of transformation or upheaval in higher education that might trigger the major questions doctrine.[90] Indeed none of the above considerations indicates the special circumstances under which courts have invoked the major questions doctrine to demand especially clear statutory authorization for agency action.

Of course, the GE program accountability framework is not irrelevant as a matter of economics or politics. Every student who ends up with enhanced earnings or more affordable debt is important, in the Department's view, as is every Federal dollar saved from expenditure on poorly performing GE programs. And we acknowledge that there is disagreement among those who are engaged in the relevant policy debates about the appropriate content for the GE rules. We likewise acknowledge that the precise content of the GE rules and their effects are important to institutions, students, and taxpayers. In fact, the HEA requires that limits on GE programs be recognized and enforced; the Department is not free to ignore those limits as if the applicable sections were surplusage, and that point is not insignificant to the statutory scheme. But in this instance, the Department is adopting relatively modest, commonsense, minimum performance standards that most GE programs seeking government support can and should pass without trouble, and that do not preempt, through agency action, any widespread political controversy that Congress intended to reserve for itself. Although the Department must make judgments about the details of performance measures to make the rules clear and easily administrable, those choices of detail are, by definition, not subject to the major questions doctrine.

We also observe that the Department has followed and benefitted from an extensive process before issuing these final rules on GE accountability. The Department used the negotiated rulemaking provisions in the HEA, with notice and comment rulemaking, which is the process that was created for the Department to consider the interests of title IV, HEA participants, among others. In this context, reestablishing an eligibility framework for GE programs fits well with the financial value transparency framework for all programs while setting an outcome-based limit for GE programs.

*Changes:* None.

*Comments:* Some commenters contended that a lack of congressional authorization to use outcomes-based measures for GE programs is shown by other eligibility requirements in the HEA, including cohort default rates, the 90/10 revenue requirement, and limitations on correspondence courses. A commenter also asserted that Congress created cohort default rates (CDRs) as a performance measure for

institutions rather than directing the Department to set program-based outcomes as eligibility requirements. Some commenters argued that the framework of detailed program requirements under title IV of the HEA, including institutional CDR, institutional disclosure requirements, restrictions on student loan borrowing, and other financial aid requirements, prevents the Department from adopting debt measures to determine whether a GE program is eligible to receive title IV, HEA program funds.

*Discussion:* The Department disagrees that GE performance measures are somehow precluded by distinct and complementary safeguards elsewhere in law. There is no express support in the statutes for that position, which would diminish protections for students and taxpayers. Instead, the commenters are suggesting an inference of exclusivity with inadequate support in the statutes. Taking other safeguards as exclusive would effectively ignore the statutorily prescribed limits on GE programs as the HEA defines them. The Department can find no sound reason, in law or policy, for treating the GE provisions as surplusage. The Department's specification of details in clear and administrable rules helps us to implement and enforce these provisions appropriately, and the specific rules for these GE provisions are entirely consistent with the specific requirements in other statutory provisions.

The Department accordingly disagrees with the commenters' assertions that the HEA's provisions on CDR, student borrowing, and other financial aid matters prevent the Department from implementing the specific HEA provision limiting title IV eligibility to programs that provide training that prepares students for gainful employment in a recognized occupation. The different Department rules implement different statutory provisions. For example, the CDR and GE regulations serve related but different purposes. Congress enacted the CDR provision, which measures loan defaults from all programs at the institutional level, as one mechanism—not the sole, exclusive mechanism—for dealing with abuses in Federal student aid programs.[91] Congress did not, in

---

facilities is what [the Secretary of Health and Human Services] does.'').

[89] Cellini, S.R., Darlie, R. & Turner, L.J. (2020). Where Do Students Go When For-Profit Colleges Lose Federal Aid? *American Economic Journal: Economic Policy*, 12(2): 46–83.

[90] Compare *W. Virginia* v. *EPA*, 142 S. Ct. at 2610 (addressing what the Court characterized as agency authority to ''substantially restructure the American energy market,'' and an ''unheralded power'' that would represent a ''transformative expansion'' of agency authority) (internal quotation marks omitted); *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023) (discussing what the Court described as a ''fundamental revision of the statute'' and a decision with ''staggering'' economic and political significance).

[91] That conclusion regarding the non-exclusivity of CDR is consistent with relevant legislative history. See H.R. Rep. No. 110–500, at 261 (2007) (''Over the years, a number of provisions have been enacted under the HEA to protect the integrity of the federal student aid programs. *One* effective mechanism was to restrict federal loan eligibility for students at schools with very high cohort loan default rates.'') (emphasis added).

enacting the CDR provision or at any other time, limit the Department's authority to promulgate regulations to effectuate and specify limits on GE programs.[92] Nor did Congress alter the existing statutory language regarding GE program eligibility when it passed the CDR provision. Moreover, the CDR provision operates at the institutional level while the GE provisions and these GE accountability rules operate at the program level. In addition to statutory eligibility requirements at the institution level, each program must be evaluated for title IV, HEA eligibility as well.[93]

The GE program accountability rules are also consistent with other provisions of the HEA aimed at curbing abuses in the title IV, HEA programs. For example, Congress capped the amount of title IV revenues that proprietary institutions could receive at 85 percent in the 1992 HEA reauthorization as a condition of institutional eligibility, with subsequent changes that increased the percentage to 90 percent and that tied a loss of eligibility to two years of failing the 90 percent measure instead of one year. More recently, Congress also expanded the definition of Federal education funds to include military benefits to service members and families as a part of the funds included in the 90 percent limit. The 90/10 provisions were put in place to require proprietary institutions to generate some revenue from non-Federal sources. Those changes fit within a larger framework where Congress also specified that a participating "institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."[94] Additionally, to prevent

schools from improperly inducing people to enroll, Congress prohibited participating institutions from engaging in a "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."[95] Congress also required a minimum level of State oversight of eligible schools. The GE program accountability rules adopted here are consistent and compatible with such additional and separate regulations, including those that apply to institutions that seek eligibility for title IV, HEA support.

*Changes:* None.

*Comments:* Some commenters asserted that the Department is misinterpreting the GE program statutory language and suggested that the language is better read as referring to the type and content of the program an institution is offering rather than measuring any outcomes of the program graduates. Other commenters similarly stated that "gainful employment" was intended to refer to the nature of the employment associated with the training and not any type of outcome-based framework, noting that outcome-based standards provide no basis for new programs to establish eligibility under the HEA before there would be any program outcomes to measure. Another commenter referred to administrative decisions from the Department that also described GE programs as types of programs leading to recognized occupations. One commenter claimed that the Department has previously defined the phrase "gainful employment in a recognized occupation" in the context of conducting administrative hearings and argued that the Department did not adequately explain in the NPRM why it was departing from its prior use of the term.

*Discussion:* The GE program accountability framework builds on the Department's regulation of institutions participating in the title IV, HEA programs to protect students and taxpayers, as Congress authorized. For reasons given in this document and the NPRM,[96] the Department is adopting GE rules that consider program performance in eligibility determinations for GE programs. The Department disagrees with the commenters' claims that the GE

provisions address program content and curriculum alone. Whatever the extent of the Department's authority to consider GE program content—and the Department is not asserting such authority in these GE rules—the Department may assess GE program performance through student outcomes.

Furthermore, the rules adopted here allow for new as well as existing GE programs. Although parts of the GE rules are performance-based, these rules will not exclude programs from title IV, HEA eligibility until they build a track record to evaluate them. The Department must have student outcomes data to measure program performance, which can only come after a period of time. Moreover, the rules are designed as reasonable, minimum standards whereby title IV, HEA eligibility as a GE program is not precluded until a program fails one of the two GE metrics in two out of three consecutive years for which the Department can issue results. Under these rules, new programs that otherwise qualify as GE programs do not have to show performance results that are not yet available.

We further disagree that a previous administrative decision on GE program eligibility forecloses the adoption of these final rules. The Department would not be prevented from changing its position in this rulemaking, of course, even if an older agency decision during an administrative adjudication conflicted with our decision here. We provide numerous and extensive reasons for the rules that we are adopting. But in this instance, no such conflict exists. The argument was vetted and rejected more than 10 years ago. Challenging the 2011 Prior Rule and referring to a decision by an administrative law judge (ALJ), the Association of Private Colleges and Universities contended that the Department previously defined gainful employment in a recognized occupation in a manner that conflicted with those outcome-based rules. The adjudication involved the question whether a program in Jewish culture prepared students enrolled in the program for gainful employment in a recognized occupation. As the court understood, the ALJ did not purport to comprehensively decide what it means to prepare a student for gainful employment in a recognized occupation; instead the ALJ merely stated that any preparation must be for a specific area of employment.[97]

---

[92] Contrast the prohibition on Department regulations in 20 U.S.C. 1015b(i), regarding student access to affordable course materials. See *id.* ("The Secretary shall not promulgate regulations with respect to this section.").

[93] See *Ass'n of Priv. Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 147 (D.D.C. 2012). In that case, the court recognized that the "statutory cohort default rule . . . does not prevent the Department from adopting the debt measures" for GE programs. *Id.* (citing *Career Coll. Ass'n* v. *Riley,* 74 F.3d 1265, 1272–75 (D.C. Cir. 1996), for the proposition that the Department's authority to establish "'reasonable standards of financial responsibility and appropriate institutional capability' empowers it to promulgate a rule that measures an institution's administrative capability by reference to its cohort default rate—even though the administrative test differs significantly from the statutory cohort default rate test.").

[94] 20 U.S.C. 1094(a)(20). As one court explained, "The concern is that recruiters paid by the head are

tempted to sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." *United States ex rel. Main* v. *Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005).

[95] 20 U.S.C. 1094(c)(3)(A).

[96] 88 FR 32300, 32344 (May 19, 2023).

[97] *Association of Private Sector Colleges and Universities (APSCU)* v. *Duncan,* 870 F. Supp. 2d 133, 150 (D.D.C. 2012). The adjudication involved

Therefore, the Department did not depart from the ALJ's interpretation when the Department adopted outcome-based measures for GE programs in the 2011 Prior Rule.[98] Nor is the Department departing from that interpretation with these regulations.

*Changes:* None.

*Comments:* A few commenters argued that the Department does not provide adequate reasons for changing approaches from the 2019 Prior Rule, which rescinded the 2014 Prior Rule.

*Discussion:* We discussed departures from the 2019 rescission in the "Background" section of the NPRM.[99] Specifically, the Department remains concerned about the same problems documented in the 2011 and 2014 Prior Rules. Too many borrowers struggle to repay their loans, and the RIA shows these problems are more prevalent among programs where graduates have high debts relative to their income, and where graduates have low earnings. The Department recognizes that, given the high cost of education and correspondingly high need for student debt, students, families, institutions, and the public have an acute interest in knowing whether higher education investments payoff through positive repayment and earnings outcomes for graduates.

*Changes:* None.

*Comments:* One commenter asserted that the Department's 2019 action to rescind the 2014 GE regulation created a serious reliance interest, which will cause institutions to incur costs to comply with the requirements in this final rule. Another commenter noted that there is little correlation between the earnings data the Department relied upon in the NPRM RIA and the earnings data that has been posted on College Scorecard. This commenter believed that institutions have a reliance interest in how the Department has previously measured debt and earnings.

*Discussion:* The NPRM contained a *Reliance Interests* section,[100] where the Department acknowledged and considered reliance interests generally. We reiterate and reaffirm here that the Department's prior regulatory actions would not have encouraged reasonable reliance on any particular regulatory

position.[101] The 2019 Prior Rule was issued to rescind the 2014 Prior Rule at a point when no program had yet been denied title IV, HEA eligibility as a GE program due to failing GE outcome measures over multiple years. Thus, institutions that were operating programs with title IV, HEA support at the time of the 2019 rescission could not have reasonably relied on continuing eligibility based on their title IV support between the 2014 and 2019 Prior Rules, and in any case the absence of eligibility denials limited the practical differences across rule changes for institutions and other interested parties. As we discuss elsewhere in this document, including the RIA, we do anticipate positive effects from this final rule, but we also observe that effects such as ineligibility of GE programs for participation in title IV, HEA will not occur immediately. Institutions and others will have some time to adjust. Furthermore, as various circumstances have changed, in law and otherwise, and as more information and further analyses have emerged, the Department's position and rules have changed since the 2011 Prior Rule. Such alterations in rules do not establish a firmly stable foundation on which interested parties may develop reasonable and legitimate reliance interests in a particular set of rules that they prefer. In any event, we find no reasonable reliance interest in the 2019 rescission persisting such that the Department could not revise its approach and, for example, observe meaningful performance-based limits on the eligibility of gainful employment programs for title IV, HEA participation. The commenters did not offer useful evidence or other bases on which the Department could reasonably conclude that asserted reliance interests, as to the prior rules or the College Scorecard, are real and significant rather than theoretical and speculative. On balance, the reliance interests asserted by the commenters have not changed our position that there are no plausible reliance interests that are strong enough to lead us to fundamentally alter these final regulations.

*Changes:* None.

**General Comments on the Financial Value Transparency Framework (§§ 668.43, 668.401, 668.402, 668.403, 668.404, 668.405, 668.406, 668.407, 668.408, and 668.409)**

*General Support and Opposition*

*Comments:* We received many comments expressing support for the financial value transparency framework as a means of protecting students and improving higher education outcomes. Commenters urged prioritizing the establishment of the program information website so that students have clear information about the institutions and programs they are attending or considering attending. These commenters supported efforts that would help students identify "high-debt-burden" and "low-earning" programs and urged the Department to keep these strong transparency provisions in the final rule to protect students and taxpayers. Several commenters argued that this information would allow students to make informed decisions about their education.

*Discussion:* We thank the commenters for their support. Under § 668.43(d)(1), the Department will provide, through a website hosted by the Department, program-level information on the typical earnings outcomes for graduates and their borrowing amounts, cost of attendance, and sources of financial aid for all programs where it can be calculated to help students make more informed choices. We agree that this information will help students make more informed choices and allow taxpayers and other stakeholders to better monitor whether public and private resources are being well used.

*Changes:* None.

*Comments:* Many commenters supported the proposed transparency framework as a way to provide prospective students with relevant information about the programs and professions they may wish to pursue. Commenters noted that it was often difficult for students to understand total college costs in comparison to employment rates and post-graduate earnings and said that the information provided in the transparency framework could fill in some information gaps for students. Some commenters believed that this platform would, over time, encourage students to select the institutions and programs that are more likely to meet their needs and standards. Other commenters noted that interests in certain job fields drive career paths, so some students would not be interested in information about different programs that offered higher pay.

---

the question whether a program in Jewish culture prepared students enrolled in the program for gainful employment in a recognized occupation.

[98] See *id.* In any event, the Department has provided ample reasons for disagreeing with narrower positions on the GE provisions and in favor of its positions on outcome-based measures, as reflected in these rules.

[99] 88 FR 32300, 32306–11 (May 19, 2023).

[100] 88 FR 32300, 32316 (May 19, 2023).

[101] Our conclusions regarding reliance interests are guided by judicial opinions including *FCC* v. *Fox Television Stations,* Inc., 556 U.S. 502, 515–16 (2009).

*Discussion:* We appreciate the comments recognizing the benefits to students and families that the increased transparency framework will provide in conjunction with information institutions provide about programs and services they offer.

*Changes:* None.

*Comments:* One commenter asserted that we need more empirical evidence that publishing data will change student outcomes. Other commenters suggested that interests in certain job fields drive career paths, so some students would not be interested in information about different programs that offered higher pay.

*Discussion:* The Department discussed the substantial evidence base around the role of transparency and student choice in postsecondary education in the NPRM and in the "Outcome Differences Across Programs" section of RIA.[102] Information does not always sway student choice, but research suggests that providing students with comparable, timely information from a trusted source can influence their decisions.[103] The Department believes that the financial value transparency framework serves as an evidence-based approach to provide relevant, trusted, and timely information for student decision-making.

We understand that some students may be committed to pursuing a particular field and may not be swayed by information about other fields. But as the data in this RIA demonstrate, there are vast differences in earnings and debt outcomes for programs with the same credential level and field, and we anticipate that students already committed to a particular degree will benefit from being able to find programs with the best outcomes.

*Changes:* None.

*Comments:* A few commenters argued that the certain terms used in the NPRM to label programs that do not pass the D/E rates or EP measures could mislead students or misrepresent other positive aspects of the program. Commenters identified terms like "high debt burden" or "low earning" as overly pejorative.

*Discussion:* The D/E rates thresholds are based on research into how much debt service payments are affordable based on an individual's earnings. Programs do not meet the D/E criteria when a program's discretionary D/E rate is above 20 percent, and the annual D/

E rate is above 8 percent. As discussed in the NPRM, the discretionary D/E rate threshold is based on research conducted by economists Sandy Baum and Saul Schwartz,[104] and the annual D/E rate threshold is grounded in mortgage-underwriting standards. While the rules do not require the Department to use particular labels to describe the outcomes of programs under the D/E rates measure, we intend to use clear descriptive language to communicate these outcomes to students. For example, informing students that such programs are "high debt burden" provides context for the amount of debt that the student will take on relative to their early career earnings.

Similarly, the EP threshold is based on the median earnings of high school graduates in the labor force in the institution's State. When the median earnings for graduates from a postsecondary program are lower than this threshold, terming the program, for example, "low earning" is appropriate. The Department views these terms as examples of clear and transparent descriptors for potential students; we believe that less direct phrasing would make it harder for students to interpret the information. However, while the Department believes that students should be informed about the consequences of their choices in programs, we will consider adding language to the Department's program information website noting that the debt and earnings outcomes of programs are a subset of the myriad of factors students may consider important in deciding where to attend.

*Changes:* None.

*Comments:* One commenter suggested that the Department and the stakeholder community further discuss the application of the D/E rates and earnings premium metrics to all programs at all institutions before addressing the issue of student acknowledgements. This commenter noted that the required reporting of data will add costs and burden to institutions, particularly under-resourced institutions.

*Discussion:* The Department disagrees that the decision to apply financial value transparency metrics to programs across sectors and credential levels requires any further discussion. Because students consider both GE and non-GE programs when making postsecondary enrollment choices, providing comparable information for students would help them find the program that

best meets their needs across any sector. As discussed under "Reporting" above, while we are sensitive to the fiscal and logistical needs of institutions, we maintain that any burden on institutions to meet the reporting requirements is outweighed by the benefits of the transparency and accountability frameworks of the regulations to students, prospective students, their families, and the public.

*Changes:* None.

*Financial Outcomes and Other Outcomes*

*Comments:* Many commenters posited that although economic mobility is an important factor to many students, the value of higher education extends beyond purely financial benefits and the Department should recognize on the program information website, and on related warnings and acknowledgments, that there are many ways to measure the value of postsecondary education, such as increased civic participation and engagement; better health and well-being; increased sense of work engagement; lower reliance upon social safety-net programs; decreased rates of incarceration; decreased risk of homelessness; increased personal security; improved social status; and sense of personal achievement. Commenters said that focusing on program earnings for all programs promoted a false equivalency that all educational programs should be measured on this basis. Some other commenters noted earnings may not fully capture the value of benefits, such as health insurance, and job amenities, such as a flexible schedule.

One commenter further cited a study[105] highlighting additional individual and societal benefits of higher education, such as increased likelihood of employment; improved health choices; increased volunteerism; increased neighborhood interactions and trust; and intergenerational benefits.

Noting the numerous non-pecuniary benefits of postsecondary education, several commenters expressed concern that the nature of the D/E rates and EP measures is too simple to adequately reflect the full value of an education and one commenter opined that measuring a program's value based solely on the D/E rates and EP measures would be arbitrary and capricious. Many commenters noted that the D/E rates measure is not the only metric that can be used to assess the value of

[102] 88 FR 32300, 32322 (May 19, 2023).

[103] Steffel, Mary, Kramer, Dennis A. II, McHugh, Walter & Ducoff, Nick (2019). Information Disclosure and College Choice. The Brookings Institution (*www.brookings.edu/wp-content/uploads/2020/11/ES-11.23.20-Steffel-et-al-1.pdf*).

[104] Baum, Sandy & Schwartz, Saul (2006). How Much Debt Is Too Much? Defining Benchmarks for Managing Student Debt (*eric.ed.gov/?id=ED562688*).

[105] Trostel, Philip (2015). It's Not Just the Money: The Benefits of College Education to Individuals and to Society. LUMINA Foundation (*www.luminafoundation.org/files/resources/its-not-just-the-money.pdf*).

postsecondary programs and suggested that things like holistic value, social impact, import of work, or long-term economic value could also be used to measure the value of programs.

*Discussion:* The Department is not attempting to assess the full value of the education that programs provide based only on their debt and earnings outcomes through the D/E rates and EP measures. The Department recognizes that not all of the benefits of a postsecondary education are measurable or captured by debt and earnings, but low earnings or high debt burdens can significantly impact even those students who benefited in other ways from their programs.

Further, while the Department agrees there are aspects of job quality that are distinct from earnings, we believe that earnings, which unlike non-monetary compensation can be calculated consistently for most graduates through administrative data sources, is the best way to capture the employment outcomes of program graduates for purposes of implementing the gainful employment statutory requirement. For instance, in most cases non-monetary compensation does not aid in assessing the ability of graduates to afford repayment of student debt.

The financial value transparency framework aims to provide transparency to students about dimensions of the financial consequences of attending postsecondary programs. In particular, these measures will be used to convey information to students about the typical costs, borrowing, and earnings outcomes for students who graduate from a program, and whether typical students who complete the program end up with high-debt-burdens, and therefore may be at elevated risk for associated adverse borrower outcomes. On the Department's program information website, a program's outcomes under the D/E rates and EP metrics will be provided to students alongside other financial value information to help students understand how the program may help in achieving their goals. As a steward of taxpayer funds charged with ensuring the proper administration of the title IV, HEA programs, the Department seeks to require that students are aware of such information before they enroll in programs with high-debt burdens. For non-GE programs, we do not limit aid or eligibility for such programs but allow students to decide whether, upon considering this information, the program has value to them.

*Change:* None.

*Comments:* Commenters also suggested that focusing on relative

education debt could harm some students by encouraging them to limit education loan borrowing by sacrificing basic needs like food and housing or promoting some type of employment even when attending school full time.

*Discussion:* We believe it is reasonable for students to know what the average education debt and earnings are for an educational program and believe that this information can be considered along with many of the other factors suggested by the commenters. The information the Department will present is not describing debt as bad or to be avoided. Rather, it is giving students information about how affordable their debt payments will be based on the typical earnings of students in their programs. Students deserve to be aware of this information, and institutions have the capacity to control their pricing to avoid subjecting their students to unaffordable debts.

*Changes:* None.

### Potential Impacts on Lower Earning Fields

*Comments:* Commenters suggested that focusing on program earnings takes a narrow view that higher education is primarily about securing a job and misses the value of a liberal arts education and the value to society from those graduates. Some commenters emphasized that many students pursue careers in fields that help people such as social work, counseling, leadership, teaching, and a variety of cosmetology programs including hairstylists and estheticians. Nursing was another field where commenters noted that some institutions prepare instructors and practitioners to work in health care services where some jobs would not produce high earnings. Commenters also suggested that teaching programs should be excluded from application of the GE program accountability framework.

*Discussion:* The Department does not agree that providing information about education debt and average earnings for program graduates to students and families ignores the value of programs that may have lower earnings outcomes. Again, the Department is attempting to make debt and earnings information available to students and families on a comparable basis for programs so that they can use it to support the different career choices that may be under consideration, or to find a program within a particular field that is most beneficial to them.

As we demonstrate in Table 4.11 in the RIA, most programs in most fields pass the D/E rates measure, including programs that provide training for

occupations in healthcare. In healthcare (Health Professions and Related)—the program cited by the commenters—8.2 percent of GE programs did not pass the D/E rates or the EP measure and 2.0 percent of non-GE programs did not pass the D/E rates or the EP measure. Similarly, education training programs (*i.e.*, programs with a two-digit CIP code of 13) are less likely to fail the D/E rates or EP measure than other programs. We note that teaching programs that successfully place their students in teaching jobs are unlikely to fail to meet the earnings premium criteria. For example, data from the National Education Association's Teacher Salary Benchmark Report indicates that among reporting school districts, approximately 76 percent of teachers worked at schools that offered a starting teaching salary of at least $40,000.[106] Even States with lower salaries have average starting salaries at least $5,000 higher than the State's EP threshold.[107]

The Department fundamentally disagrees that ignoring the financial implications of students' college choices is an acceptable or necessary strategy to ensure that students pursue jobs in critical fields to society.

*Changes:* None.

*Comments:* Some commenters contended that publication of the financial value metrics could limit access to, or discourage students from enrolling in, arts and performing arts programs. These commenters stressed that these careers should be available to all and not just to affluent students who can attend without Federal financial aid.

*Discussion:* The Department believes that students of arts programs will benefit from consistent information about the typical debt and earnings experienced by a program graduate, particularly if the D/E outcomes for program graduates are in a range associated with high likelihood of student loan default. For non-GE programs, receiving this information does not preclude their ability to attend the program—it simply alerts them to the potential risk based on the program's students' outcomes. Approximately 12 percent of arts programs are GE programs.

Arts programs that fall under GE regulation have a failure rate that is similar to GE programs overall. According to the Program Performance Data (PPD) described in Table 4.11 of

---

[106] See Nat'l Ed. Ass'n (2022). Teacher Salary Benchmarks (*www.nea.org/resource-library/teacher-salary-benchmarks*).

[107] See Nat'l Ed. Ass'n (2022). Teacher Salary Benchmarks (*www.nea.org/resource-library/teacher-salary-benchmarks*).

the RIA, 5.3 percent of all GE programs fail due to D/E, EP, or both. Among the 1,042 GE arts programs (programs with a two-digit CIP code of 50), a similar share, 5.5 percent, have a failing status. Among the 7,518 arts programs that are non-GE programs, failure rates are slightly higher than for programs overall, but still relatively low. Using the PPD, 1.2 percent of all non-GE programs fail debt-to-earnings (DTE), EP, or both, and 3.7 percent of arts programs fail.

Although commenters acknowledged that arts careers are financially undercompensated relative to other career paths, federally aided students enrolled in arts programs tend to come from backgrounds similar to students enrolled in other programs, indicating that, among federally aided students, students from economically disadvantaged backgrounds are not currently dissuaded from pursuing a career in the arts. For example, the share of students who are Pell recipients within arts programs is broadly similar to the share of recipients overall across programs (Table 1.1). Institutions that are concerned that financial transparency will dissuade students from lower-income backgrounds from pursuing arts degrees could take steps such as packaging additional aid for students pursuing arts programs. This would decrease the risk of a high DTE and potentially mitigate the effect of lower typical salaries in the first few years of an arts career.

TABLE 1.1    MEAN AND MEDIAN PELL SHARE, ACROSS PROGRAMS

|  | All programs | | | Arts programs (CIP2 = 50) | | |
|---|---|---|---|---|---|---|
|  | Mean (%) | Median (%) | Number of programs | Mean (%) | Median (%) | Number of programs |
| Credential Level: Undergraduate ............ | .................... | .................... | 18,033 | .................... | .................... | 453 |
| (UG) Certificates ..................................... | 53 | 60 | .................... | 45 | 40 | .................... |
| Associate ........................................ | 61 | 67 | 25,807 | 64 | 69 | 1,248 |
| Bachelor s ....................................... | 38 | 36 | 47,643 | 41 | 40 | 3,792 |
| Total ........................................ | 47 | 50 | 91,483 | 47 | 48 | 5,493 |

Source: 2022 Program Performance Data.

*Changes:* None.

*Comments:* Some commenters expressed concern that the focus on debt-to-earnings and earnings could lead students and prospective students to prioritize salary over public service. By publishing these data and possibly categorizing certain programs as ''low value,'' we may discourage students from pursuing careers that are less lucrative but that have substantial value, such as careers in government or the nonprofit sector.

*Discussion:* The Department acknowledges the concern that students may be dissuaded from pursing programs, and ultimately, careers, that are primarily in the public sector or with nonprofit organizations. National data from the American Community Survey (ACS) on earnings by sector show, however, that the typical associate or bachelor's degree graduate working for government or a nonprofit substantially out-earns similarly aged workers with only a high school credential (Table 1.1). We estimate that a government worker with an associate degree has median earnings more than $13,700 higher than the overall median earnings for those with a high school diploma. A government worker with a bachelor's degree has earnings that are more than $19,100 higher. Those working in the nonprofit sector earn around $7,100 (associate) and $15,200 (bachelor's degree) more relative to similar workers with a high school diploma.

TABLE 1.2    MEDIAN EARNINGS, WORKERS IN LABOR FORCE AGE 25  34

| Credential | Overall | Private sector | Federal, state, or local govt. | Nonprofit sector |
|---|---|---|---|---|
| High School or Equivalent ............................................................... | $25,453 | $25,569 | $31,961 | $21,582 |
| Associate Degree ........................................................................... | 32,049 | 31,961 | 39,200 | 32,580 |
| Bachelor s Degree .......................................................................... | 45,811 | 48,870 | 44,638 | 40,725 |
| Graduate Degree ............................................................................ | 49,639 | 52,147 | 47,941 | 45,000 |

Source: American Community Survey, 2019, 5-year estimates.

These data indicate that workers within a given degree level tend to have relatively similar earnings across private sector, government, and nonprofit employers. And for those with an associate degree, employment within a Federal, State, or local government yields higher median earnings than employment in the private sector. While working in the private sector is more lucrative, at the median, for bachelor's degree and graduate degree holders, these differences are much smaller than the difference relative to the earnings premium threshold at the national level.

*Changes:* None.

*Comments:* A few commenters expressed concern that publication of financial value metrics could deter students from graduate education. Given differences in student loan eligibility and available Federal aid, commenters suggest that the proposed financial value metrics do not align well with the goals and earnings trajectories of those who enroll in graduate education.

*Discussion:* The Department aims to provide students with accurate information to help inform their choices. We acknowledge that some students might decide that not attending school might be the best option after obtaining the information.

Graduate students are eligible to borrow up to the cost of attendance for their program, while undergraduates are subject to substantially lower limits on borrowing, depending on their enrollment level and status as a

dependent or independent student. Because of the increased eligibility for student loans and their generally higher earnings outcomes, graduate programs that do not pass the GE thresholds typically fail the D/E standard of the GE rule, rather than the EP.

The Department believes that the D/E metric is valid across both undergraduate and graduate programs. As noted above, few graduate programs have median earnings below the typical high school student, but many programs have very high debt levels due to the lack of loan limits. This can make debt unaffordable even on a middle-class salary. Moreover, from a taxpayer perspective, as shown in Table 2.10 of the RIA, D/E is highly correlated with the taxpayer subsidy on student loans—if debt is high relative to earnings, it is unlikely a borrower will fully payoff their loans while on an income driven repayment plan.

The Department also notes aspects of the rule that are favorable to graduate programs. First, the debt used in the actual D/E calculations will be capped at the total net cost for tuition, fees, and books. This cap particularly affects graduate programs, as many graduate students borrow substantially for living costs in addition to direct costs of the program. As we note in the RIA, we do not have data reported by institutions to estimate directly how this cap will affect the share of programs that pass the D/E rates. An analysis by New America, however, suggests that the debt cap might reduce the number of graduate programs projected to fail in the RIA substantially by about 50 percent.[108] Because institutions have more control over direct program costs, some institution concerns about graduate financial value metrics will likely be mitigated. Furthermore, in the D/E rates calculation, graduate debt is amortized over a 15-year repayment period for master's degree programs and over a 20-year period for doctoral and first professional degrees. The use of a longer repayment period acknowledges the possibility that long term earnings are higher in proportion to earnings measured 3 years after graduation, the potentially larger amounts of debt that some graduate students may take on and allows for smaller annual payments based on a longer repayment period. We address additional concerns relevant to graduate programs, such as licensing and residencies for graduate programs that may result in lower initial earnings due to externally imposed constraints, in other sections of this preamble.

*Changes:* None.

*Comments:* Some commenters noted that many jobs in the entertainment industry may be impacted by the financial value and transparency regulations, given that a number of students in those fields are dependent upon Federal education assistance. The commenters suggested that those students may become more restricted in their opportunities to pursue careers in performing arts, music and education compared to students from more affluent families. Commenters noted that in general, the United States provides less support for students of the performing arts compared to other countries, and further opined that the lower wage for these jobs is beyond the control of the institutions providing those programs, notwithstanding the contributions those jobs make toward creativity and societal wellbeing.

*Discussion:* We recognize that educational programs can provide long term value and enrichment to students in multiple ways, and that some student may be interested in arts and entertainment careers for non-pecuniary reasons. We nonetheless note that the education debt and program earnings experienced by program graduates at specific institutions are a significant up-front consideration for any student to consider. Students looking at particular programs offered at multiple institutions may also consider the relative education debt and program earnings when selecting an institution. Institutions may also use the information about average education debt and earnings to consider program changes that would better serve students entering into careers with relatively large education debt compared to the near-term earnings. We appreciate the commenters' concerns about the level of support for performing arts relative to other countries, but respectfully note that such broader issues of the economic and social value of performing arts are beyond the scope of this rule.

*Changes:* None.

### Data Concerns and Other Information or Metrics

*Comments:* Several commenters suggested including measures of student satisfaction among the other measures listed in § 668.43(d)(1)(ii) to include on the program information website to provide context for the financial value measures.

*Discussion:* We recognize that there are many factors students consider when choosing to enroll, or continue, in a program, and also that education can confer many benefits beyond financial value, including satisfaction with the program. However, we are here focused on factors that affect students' financial well-being, and the return on the title IV, HEA financial investment. Low earnings and high debt burdens can negatively affect students who might benefit in other ways from their programs. More generally, measures of student satisfaction do not exist for all programs and the Department has no way of collecting such data in a systematic fashion at present.

*Changes:* None.

*Comments:* A few commenters noted that program-level graduation rates could have a substantial impact on financial value measures. They noted that a program that graduates a small share of enrolled students may have strong financial value measures, but overall financial value results may be poor for those who never completed the program. The commenters suggested that we provide information on the likelihood of completing the program as important context for the financial value metrics.

*Discussion:* The financial value metrics measure the earnings and debt only for those who complete a given program. The Department believes that these measures best represent the outcomes for a student who naturally anticipates to complete a given program. Enrolled students who do not complete could have outcomes that are worse overall than those for completers, but this is not necessarily the case. For example, non-completers could leave a program because they were offered a job that pays more than they anticipate they would earn if they completed their program. Further, those who do not complete a program are likely to leave with less debt than those who do, potentially lowering D/E measures.

At present, program-level graduation rates are not consistently measured or collected by the Department. Measurement of program graduation rates raises several measurement challenges.[109] For example, some bachelor's degree programs do not formally consider a student part of a program or major until their sophomore or junior year, which could substantially skew the graduation rate relative to a program which counts students starting from their freshman

[108] See Caldwell, Tia & Garza, Roxanne (2023). Previous Projections Overestimated Gainful Employment Failures: Almost All HBCUs & MSI Graduate Programs Pass. New America (*https://www.newamerica.org/education-policy/edcentral/ge-failures-overestimated/*).

[109] Blagg, Kristin & Rainer, Macy (2020). Measuring Program-Level Completion Rates: A Demonstration of Metrics Using Virginia Higher Education Data. Urban Institute: Washington, DC (*www.urban.org/sites/default/files/publication/101636/measuring_program-level_completion_rates_1_3.pdf*).

year. Still, the Department strongly agrees with the importance of holding institutions accountable for program completion and will explore development of accurate measures. The rule includes completion rates at the institution or program level among a set of important contextual information that may be included on the program information website.

*Changes:* None.

*Comments:* A few commenters requested that the Department include on the program information website information on cohort default rates, or a program's loan repayment rates, as additional context regarding a student's ability to manage or repay their debt.

*Discussion:* We agree that a program's loan repayment rate may be important information for students or taxpayers, and we note that this information was included in the list of proposed information under § 668.43(d)(1).

Although the cohort default rate (CDR) is an important measure of institutional accountability in ensuring that students do not experience exceptionally high default rates after leaving a program, an overall CDR does not measure outcomes of a given program. Moreover, graduate PLUS loans are not included as part of the CDR calculation, so these rates do not capture borrowers' outcomes even for broad sets of graduate programs. The Department will carefully consider what borrower outcome information will provide students with the clearest sense of the financial risks of their program choices, including whether institution level measures may be appropriate to provide where program level measures may be unavailable.

*Changes:* None.

*Comments:* Several commenters noted that high percentages of their career program graduates work in the fields associated with their training, unlike many students with associate degrees from public and nonprofit institutions that get jobs in unrelated fields. Commenters also noted that other jobs such as sales often start with lower salaries that increase over time as they learn their trades over the job.

*Discussion:* The regulations do not track earnings by source but provide some measure of the average education debt and average earnings that program graduates have. Graduates of career training programs who work in those fields may experience higher earnings than program graduates from nonprofit and public institutions who work in unrelated fields. The regulations will provide students considering either type of program with information about the education debt and earnings associated

with those programs to support them making better informed choices when they enroll.

*Changes:* None.

*Comments:* One commenter asserted that 4-year degree programs can charge students higher prices despite having no industry connections. A few other commenters noted that many students in 4-year programs are unable to get jobs, while students in shorter career and technical education (CTE) programs (which cost less) are able to get jobs.

*Discussion:* We agree that CTE programs are important. By ensuring that programs subject to the GE program eligibility requirements, including CTE programs, prepare students for gainful employment in a recognized occupation, we expect that the GE program accountability framework will drive improvements in CTE programs that are not providing students with earnings that allow them to afford their debt or leaving them better off than if they had not pursued a postsecondary credential. For 4-year programs that are not subject to the GE program accountability framework, students will be able to obtain critical information about their financial value, including their costs and student debt and earnings outcomes, to inform their education decision making.

*Changes:* None.

*Comments:* Some commenters suggested that the Department should play a role identifying unique missions of institutions, such as historically black colleges and universities and Tribal colleges and universities because of the social and cultural impacts these institutions provide as non-financial value.

*Discussion:* Under § 668.43(d)(1), the Department will provide, through a website hosted by the Department, program-level information on the typical earnings outcomes for graduates and their borrowing amounts, cost of attendance, and sources of financial aid to help students make more informed choices and allow taxpayers and other stakeholders to better monitor whether public and private resources are being well used. Nothing in the regulations precludes institutions from supplementing the financial value information provided on the Department website with additional information about the institution and its programs, including information for students and families about their missions and values. However, the Department website will be focused on financial value, consistent with the Department's obligation to administer the title IV, HEA financial assistance programs.

*Changes:* None.

*Comments:* A few commenters noted that the debt and earnings data used in the financial value transparency metrics do not precisely align with those measures presented in the College Scorecard.

*Discussion:* The financial value transparency metrics are designed for accountability purposes (with respect to GE programs) as well as for transparency (with respect to GE and eligible non-GE programs). Because these data serve different, though complementary, purposes the metrics are not quite the same as those in the College Scorecard although there are strong correlations between the information in the two datasets. For example, median earnings in this rule, similar to the 2014 Prior Rule, is calculated as the median earnings among all program completers including the ''zeros''—*i.e.,* individuals successfully matched in the list of program completers who have no earnings from employment. Especially for career training programs this measurement choice captures whether students find employment as a measure of program success. Similarly, median debt under this regulation is calculated by capping individual borrowing amounts at the net direct costs charged by the institution. This attempts to isolate student borrowing linked to factors more directly controlled by institutions. Still, broader measures of debt can be calculated and used for transparency purposes. The Department will carefully consider how to present information to students to avoid potential confusion.

*Changes:* None.

**General Comments on the GE Program Accountability Framework (§§ 600.10, 600.21, 668.91, 668.601, 668.602, 668.603, 668.604, 668.605, and 668.606)**

*General Support and Opposition*

*Comments:* Many commenters expressed support for building on the 2014 GE Prior Rule, including the addition of the earnings premium metric. These commenters believed that this metric would ensure that students only enroll in programs that would result in them being gainfully employed upon completing the program. Commenters also supported the inclusion of the D/E rates metric, arguing that this measure would protect taxpayers and students. Some commenters suggested that because of the rule, students will shift from enrolling at low-performing programs to programs with better outcomes, including shifting across sectors, similar

to what happened when institutions with high cohort default rates lost eligibility to participate in the Federal student aid programs.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* One commenter asserted that these regulations would help to protect students from taking on high levels of debt to obtain credentials with little to no value. The commenter also contended that there should be greater consequences for schools that commit fraud.

*Discussion:* We agree there should be greater consequences for schools that commit fraud. The Department's Office of the Inspector General (OIG) identifies and investigates fraud, waste, abuse, and criminal activity involving Department funds. Where we believe it is warranted, we can refer a situation to the OIG, which conducts criminal and civil investigations. Additionally, members of the public may report suspected fraud, waste, abuse, or criminal activity—including fraud or misuse of Federal student aid funds. The OIG maintains a telephone hotline and an online form to facilitate submission of such reports.

While these regulations do not replace other robust Department efforts aimed at ensuring program compliance and program integrity, the rule should make predatory behavior less attractive and less lucrative if poorly performing GE programs are not eligible to participate in title IV, HEA.

*Changes:* None.

*Comments:* Many commenters supported the GE rule because they believe it will help stop predatory recruitment practices that specifically target marginalized and underserved communities, including people of color, people with low socioeconomic status, single parents, and veterans. These commenters claimed that programs at these predatory schools have low graduation rates, high student debt loads, high student loan default rates, and higher tuition than comparable programs at State and community colleges.

Several other commenters expressed support for the GE accountability provisions, noting that most borrower defense loan discharges have been for students who attended for-profit institutions, and said that most accountability measures should focus on the institutions where large costs to the taxpayers have been incurred. Commenters noted that many completers from some for-profit institutions have incomes that would qualify them to make zero payments

under the Department's recently proposed income-driven repayment plan and create additional costs for taxpayers.

*Discussion:* We thank the commenters for their support and agree the GE rules apply to programs where students need protection.

*Changes:* None.

*Purpose*

*Comments:* Many commenters noted that the EP and D/E metrics do not capture all the ways that programs might be valuable for students and society, and thought the measures too narrowly focused on financial outcomes.

*Discussion:* In the GE program accountability framework, we use the EP and D/E metrics to assess whether programs are preparing students for gainful employment, consistent with statutory eligibility requirements. But, the use of particular performance metrics pursuant to the GE provisions of the HEA and the Department's rulemaking authority is not a commentary on the values that students and others may place on postsecondary education. As we demonstrate in Table 4.11 of the RIA, the majority of programs in most fields do not lead to high debt burdens or low earnings. As a result, we do not expect the rule to deprive students of postsecondary options that offer the nonfinancial benefits of greatest importance to them.

We underscore that the rule sets minimum standards of performance for career training programs, and for informing students in non-GE programs about potential financial risk. It does not attempt to distinguish among or rate programs based on their earnings above these standards beyond providing students with information. As such, we expect that programs meeting these minimum thresholds of financial outcomes for their students will still need to demonstrate how they help students in pursuing other goals that may be important to them.

*Changes:* None.

*Comments:* A few commenters suggested that the proposed GE program accountability framework will not fix the current systemic problems. Some commenters proposed that, rather than targeting so-called ''low value programs,'' we should address systemic issues contributing to the student debt crisis. For example, these commenters suggested that we provide adequate funding and resources to public institutions, implement more affordable tuition models, and expand financial literacy programs.

*Discussion:* The Department agrees that some systemic changes are needed to address the student debt crisis. And, in a variety of initiatives, the Department is responding to that crisis. For example, the Department recently published a new rule on IDR plans for student loans. Notwithstanding the importance of addressing systemic issues, the Department is charged with implementing and enforcing the HEA limits on title IV eligibility for GE programs and has concluded that programs that leave students unable to pay off their loans, or with earnings no greater than a comparable high school graduate, are not meeting the statutory requirements for title IV, HEA funding. The final rule will make meaningful strides in deterring students from attending programs that leave them with unaffordable debt and no improvement to their earnings. As noted in Tables 4.25 and 4.26 of the RIA, most students have available many alternative programs that do not fail the metrics, and these programs are very likely to lead to higher earnings and lower debt. Therefore, we expect the rule will result in students attending programs that require less borrowing or provide a better financial value in that they will lead to higher earnings relative to the amounts borrowed.

*Changes:* None.

*Comments:* Some commenters suggested that it would be more effective to limit borrowing in low-performing programs rather than to remove all Federal funding, noting that this would still protect students from high educational debt without limiting the types of programs that are available for them to pursue their passions and career goals in fields that may not be high-earning. One commenter noted that students have differing career objectives and was of the opinion that the Department and institutions offering those programs should strike a balance to keep these options open for students, suggesting that career counseling and accurate information could support those outcomes and a diverse workforce. Other commenters said that without striking a more holistic approach in the proposed regulations, there could be reductions in program diversity and more limited student choices available. Providing more quality assurance measures and a broader evaluation of other factors, such as curriculum, student satisfaction and achievements, were suggested as additional components to use with the financial-value measures in the proposed regulations. Commenters also suggested the Department should work with the higher education community to develop

alternative metrics that speak to a more holistic spectrum of success determinants.

*Discussion:* We agree there are many potential ways that students might be shielded from unaffordable debt or programs that fail to boost their earnings. Institutions are in the best position to limit their costs and limit student borrowing for direct costs (the subset of borrowing measured under the metrics in these regulations), and to provide counseling and guidance to students in choosing programs that prepare them for success. The Department's authority and ability to monitor curriculum quality across programs is limited. As noted elsewhere, these rules do not attempt to serve as a holistic measure of program quality. Instead, they focus on setting minimum standards aimed at ensuring that career training programs prepare students for gainful employment, and, more generally, to protect students from programs that may not improve their financial well-being.

*Changes:* None.

*Comments:* One commenter argued that controlling college costs should not be part of the Department's role, but it should instead concern itself with reining in lending. The commenter argued that the Department should set aggregate loan limits for all students to current limits for undergraduate students.

*Discussion:* The Department disagrees with the commenter that its role does not include encouraging institutions to offer programs that are financially valuable to students when the students' debt and likely future earnings are taken into account. The Department also does not have the ability to reduce aggregate loan limits for graduate students, since those limits are established by statute.

*Changes:* None.

*Comments:* A few commenters argued that it is not a school's responsibility to ensure that a student pays back their loans. According to these commenters, that responsibility lies with the borrower.

*Discussion:* The Department believes that pursuant to the GE statutory requirement, career training programs should be held responsible for ensuring the amount their students need to borrow is reasonable relative to the earnings they might expect from the career for which they are being trained. If programs set unreasonable tuition levels that lead students to borrow more than they can afford to repay, this puts borrowers at risk of default and adverse impacts on their credit and puts the taxpayer at risk of having to bear the cost of the loans. Under the D/E rates

measure, institutions are not held responsible for loan repayment outcomes. Rather, the D/E rates portion of the transparency framework provides a means to assess whether debt burdens are excessive given the typical earnings of program completers, and whether students' labor market earnings improve relative to students who do not pursue postsecondary credentials. The GE accountability framework applies this metric as a condition of eligibility for career programs. As addressed below, we believe the compliance burden created by these regulations is modest and well justified by the benefits expected from the rule.

*Changes:* None.

*Scope*

*Comments:* Several commenters stated that it is unfair to group together all private and for-profit schools when there are only a few "bad actors" causing problems. They asserted that these GE regulations will punish schools that are acting in good faith, and that there should not be a "one-size-fits-all" solution to these bad actors. They argued that different regulations should apply to for-profit and nonprofit schools since their missions differ.

Other commenters viewed the distinction between GE and non-GE programs as unclear, and argued that instituting sanctions for some programs, but not for others, based on sector or credential type is not appropriate. Commenters highlighted that an institution's tax status was not a good reason to treat programs differently under the proposed eligibility measures and voiced some concern that institutions with failing programs could change their tax status to avoid being held accountable under the eligibility provisions. Some commenters said the proposed regulations were politically motivated to target the career training programs and suggested that more emphasis should be placed on removing Federal funds from programs that pushed false information or promoted activism and political agendas. The regulations were described by these commenters as an effort to quickly eradicate the proprietary school sector instead of proposing a set of guardrails that would have encouraged institutions to operate within that system.

*Discussion:* The GE accountability framework applies to gainful employment programs through §668.601. Section 668.2 defines "gainful employment program" as an educational program offered by an institution under §668.8(c)(3) or (d) and identified by a combination of the institution's six-digit Office of

Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level. This definition is consistent with sections 101(b) and 102(b) and (c) of the HEA. Under the HEA, institutions must establish program-level eligibility for each "program of training to prepare students for gainful employment in a recognized occupation." [110] GE programs include nearly all educational programs at for-profit institutions of higher education, as well as non-degree programs at public and private nonprofit institutions, such as community colleges. With respect to comments that some institutions may change their tax status to remove their programs from being subject to the eligibility measures, applications to do so are reviewed independently by the Internal Revenue Service (IRS) and the Department to make sure the institution qualifies as a nonprofit entity.

In addition to being statutorily obligated to confirm whether GE programs are eligible for HEA assistance, we believe that it is appropriate to protect students in GE programs in all sectors, to help protect students pursuing career training through such programs from being left with unaffordable debt and no improvement in their labor market prospects beyond what they might have achieved without earning a postsecondary credential. The GE accountability framework is based on objective and evidence-based measures of student outcomes and, rather than being a one-size-fits-all approach, its impact on institutions is directly in proportion to the number of students they have enrolled in programs that are not serving students well based on the D/E rates and EP measures. The GE framework, applied as a measure of a program's continuing title IV, HEA eligibility, will be similarly applied to all GE programs, regardless of location or student demographics. GE programs will be held to the standards for GE programs uniformly, regardless of whether they are taught at public, proprietary, or nonprofit private institutions.

The Department does not have authority to expand the definition of a GE program to include non-GE programs. The financial value transparency framework is the Department's attempt to account for

---

[110] 20 U.S.C. 1002(b)(1)(A)(i), (c)(1)(A). See also 20 U.S.C. 1088(b)(1)(A)(i), which refers to a recognized profession. For further discussion in the NPRM, see 88 FR 32300, 32306–32311 (May 19, 2023).

App.24

eligible non-GE programs, by providing students in such programs with important statutory provisions. Other statutory provisions apply more broadly to GE and non-GE programs, and the Department will use the tools at its disposal to protect students and improve outcomes. For example, we are also addressing eligible non-GE programs through other Department initiatives, such as the final rule we published last year on Change in Ownership and Change in Control.[111]

*Changes:* None.

*Comments:* Several commenters asserted that the Department could require the eligibility framework to apply to all programs, based upon the Department's authority under 20 U.S.C. 1087d(a)(4) or 20 U.S.C. 1087d(a)(6), to include additional conditions necessary to protect the interests of the United States when approving an institution's participation in the Direct Loan programs. Other commenters said it is arbitrary for the Department to treat comparable programs differently and suggested that this different treatment violated a requirement in the HEA that the Department's regulations must be uniformly applied and enforced.

*Discussion:* We disagree with the commenters' suggestions and criticism. The Department must use its statutory authority in ways that accord with the various distinctions drawn in the HEA. The HEA conditions eligibility of some, but not all, programs on preparing students for gainful employment in a recognized occupation or profession. The commenters did not explain how those HEA provisions regarding GE programs fit with the commenters' suggested use of the HEA provisions regarding program participation agreements. Likewise, we disagree with commenters' arguments regarding uniformity in Department regulations. The commenters did not identify a basis for their recommended conclusion in 20 U.S.C. 1232(c), which refers to uniform application and enforcement throughout the 50 States rather than across program types. Nor did commenters identify any other statutory provision that requires GE program regulations to bind non-GE programs. In addition, linking the program accountability framework to the Department's Direct Loan authority as the commenters suggest would exclude programs that do not participate in the Direct Loan program. The commenters may prefer that gainful employment results be expected of non-GE programs, and we understand the policy considerations associated with that issue, but we lack persuasive

reasons to conclude that the Department's regulations must adopt that position as a matter of law.

*Changes:* None.

*Comments:* Several commenters stated that the proposed GE Accountability framework fails to account for the significant and multiple economic, social, and governmental differences between Puerto Rico and the United States. For example, these commenters stressed that Puerto Rico has no community college system and relies on proprietary institutions to provide a significant and varied portion of career-oriented educational opportunities. Therefore, these commenters advised that proprietary institutions in Puerto Rico award a far higher proportion of the island's postsecondary credentials than is the case on the mainland. The commenters contended that the proposed rule would place access to such programs in serious jeopardy. These same commenters stated if implemented as-is, without accounting for Puerto Rico's unique circumstances and challenges, the population, economy, and multiple industries on the Island will be adversely and irreparably harmed.

One commenter emphasized the ways in which earnings measurement issues are more a particular concern given the unique challenges facing Puerto Rico, stating that the justifications offered by the Department for not including an alternate earnings appeal fail to acknowledge the unique nature of Puerto Rico's economy. Citing the Department's claim that making accommodation for under-reporting of income would "differentially reward programs," the commenter submitted that the desire to be evaluated based on accurate data is not a desire to be rewarded but to address the fact that nonreporting and underreporting of income are widely recognized challenges facing Puerto Rico.

*Discussion:* As we noted in the NPRM, the Department is aware that, in some cases, using earnings data for high school graduates to estimate an earnings threshold may not be as reliable as the earnings data from the ACS, and welcomed comment on what data might be available to estimate the threshold in U.S. Territories.[112] In response to the commenters' concerns, the Department further investigated issues of data quality in Puerto Rico as well as other U.S. Territories and the freely associated states.

Through this investigation, we identified several concerns with data elements used in the rule with regard to

their application to programs at institutions in U.S. Territories and freely associated states. First, there is no robust source of earnings information in most U.S. Territories that would allow us to measure high school earnings. While we considered using a different threshold, such as 150 percent of the Federal Poverty Level, available data (data on high school earnings from the Puerto Rico Community Survey) suggested this approach would yield a threshold that is dramatically higher than high school earnings. While data do exist for Puerto Rico, the coverage rate of the Puerto Rico Community Survey (PRCS) is significantly lower than that of the ACS.[113] Moreover, the Federal Poverty Line (officially known as the poverty guidelines), used in the calculation of discretionary debt-to-earnings measures is not defined for the U.S. Territories and freely associated states. The Federal Poverty Line is a component of the D/E metric, used to define "discretionary earnings" by subtracting an estimate of the income required for necessary expenses. As a result, the Department is not confident that the thresholds used to determine an affordable amount of debt in the D/E rates calculations are appropriate for programs in these locations.

Because of these concerns, the Department will exempt all programs located in the Territories or freely associated states from most of the requirements in the transparency framework under subpart Q, and from the GE accountability provisions under subpart S. We will still require such programs to comply with the reporting requirements in § 668.408, will still follow the procedures in §§ 668.403(b) and (d) and 668.405(b) and (c) to calculate median debt and obtain earnings information, and will include debt, earnings, and price information on the Department's program information website established in § 668.43.

*Changes:* We have revised § 668.401(b) to exempt the Territories and freely associated states from the application of subpart Q, except that such institutions remain subject to the reporting requirements in § 668.408 and the Department will follow the procedures in §§ 668.403(b) and (d) and 668.405(b) and (c) to calculate median debt and obtain earnings information for their GE programs and eligible non-GE

---

[111] 87 FR 65426 (Oct. 28, 2022).

[112] See 88 FR 32300, 32333 (May 19, 2023).

[113] According to the Census, in the 2021 ACS and PRCS the coverage rate in Puerto Rico is 80.9 percent, relative to 94.5 percent in the United States and Washington, DC. The lowest state (Alaska) had a coverage rate of 88.0 percent. *See www.census.gov/acs/www/methodology/sample-size-and-data-quality/coverage-rates/index.php.* These figures indicate that Puerto Rico is an outlier.

programs, and we have revised § 668.601(b) to exempt the Territories and freely associated states from application of subpart S.

*Comments:* Some commenters urged the Department to exempt medical schools from the GE program accountability framework given the higher levels of borrowing students experience in those programs and the higher earnings later associated with those careers after physicians complete their residencies. Similar suggestions came from commenters to exclude law schools from the eligibility measures because the accreditation process provides oversight of admission standards, monitors faculty providing the coursework, reviews the academic engagement of the students, and sets benchmarks for graduates to pass the bar exams. These commenters believe that the law school accrediting process ensures students obtain long-term value from their legal education.

*Discussion:* As discussed in more detail in the Post-graduate Training Requirements section of this preamble which modifies the definition of the cohort period and adds a definition of a qualifying graduate program in § 668.2, these regulations already accommodate the commenters' concern about medical schools, by using a longer time horizon over which to measure graduates' earnings—six-years post-graduation rather than three. We do not agree that the accreditation process by itself provides adequate guardrails to ensure that students are not left with unaffordable debt or very low earnings. This is readily apparent in the Department's data, showing many accredited programs leave students with unaffordable debt.

*Changes:* None.

*Comments:* A few commenters requested that embedded certificates, stackable credentials, and transfer associate degrees be exempted from GE determinations because these programs are intended to combine into larger degree programs which, for public and nonprofit institutions, would not be subject to the GE accountability framework. One commenter requested further clarification about the treatment of certificates that are fully embedded into a degree program, in which students are not able to enroll in just the certificate program. The commenter was unsure of the extent to which a public/ not-for-profit institution would need to report on students in a certificate program that is both embedded in a degree program and also available as a stand-alone certificate program.

*Discussion:* The metrics used for evaluating whether a program leads to

gainful employment are based on students who complete various credentials at an institution, and if a student completes multiple credentials, they would typically only count in the metrics of the highest credential they earn. A student completing several stackable credentials would generally be included in the earnings and debt cohorts of their last or highest credential completed. Students completing a program with intermediate credentials may have higher program costs that would impact the debt outcome calculations for the program since the debt students accumulate at the same institution is generally all included.

We disagree that such programs should be exempted from the GE framework. If a student does take several intermediate credentials before obtaining a higher degree, then the student's cumulative debt and earnings outcomes are all, appropriately, associated with the higher credential. If they complete an intermediate credential but do not obtain the ultimate intended degree, then their debt and earnings outcomes are attributed to the last or highest credential they obtained.

*Changes:* None.

*Comments:* Some commenters suggested that credit-bearing non-degree programs at public and nonprofit institutions should be excluded from the eligibility framework if the institutions offering those programs also offered certified degree programs that used the identical CIP codes as the non-degree programs, particularly when there was overlap in the courses offered for the non-degree and degree programs that shared the same CIP code.

*Discussion:* We do not believe a such an exclusion is warranted. If students separately enroll in a certificate program at the institution, that program is a GE program for purposes of the eligibility framework. If students in a public or nonprofit program take courses in these programs but ultimately earn a credential, then those students will not be counted as they are not graduates of the program.

*Changes:* None.

*Comments:* Some commenters suggested that graduate programs not be included in the accountability framework because of the volatility of graduate career paths. Other commenters noted that doctorate programs leading to licensure should be excluded because the students are more mature and should have more experience in evaluating and selecting educational programs. Other commenters claimed that graduate Federal education funds were not included when proprietary schools were

approved to participate in the grant and loan programs so there was no congressional design to apply the gainful employment requirement on those programs when they were subsequently made available to proprietary institutions. Other commenters drew the opposite conclusion, that graduate programs became eligible for student aid without any exception to the gainful employment requirement for degree programs offered by for-profit institutions. Those commenters suggested that the higher debt levels associated with many graduate programs favor using the eligibility framework to assess program earnings, describing those graduate programs as the highest priced, highest debt programs in the postsecondary educational system.

*Discussion:* Graduate programs offered by for-profit institutions and graduate non-degree programs offered by public and nonprofit institutions are subject to the GE program requirements in the HEA. Given high and growing graduate borrowing levels, which often do not correlate highly with earnings outcomes, the protections of the GE rule are necessary for graduate students. That said, we also agree that there are some considerations, such as postgraduation training requirements, required before a program's impact on earnings can be realized that are unique to graduate programs. We discuss those considerations in the ''Measurement of Earnings'' section, below.

*Changes:* None.

*Comments:* One commenter thanked the Department for confirming that comprehensive transition and postsecondary programs are excluded from the D/E rates and EP measures.

*Discussion:* We thank the commenter for noting agreement with the exclusion of students in these programs from the calculation of D/E rates and EP measures under §§ 668.403(c)(6) and 668.404(c)(6).

*Changes:* None.

*Comments:* Commenters objected to measures where the program outcomes in the proposed regulations would be based on periods before those regulations were in effect, saying it would be unfair to sanction institutions under the eligibility measures based upon program and pricing decisions that could not be undone or modified now. These commenters claimed that the resulting metrics would not account for program changes made in the intervening years and would, therefore, not be useful to prospective students. Commenters suggested that it would be fairer to only use outcome measures for

informational purposes when the rates were based on periods before the regulations are in effect. Some commenters suggested that sanctions could not be based on retroactive periods without more explicit congressional authorization.

*Discussion:* The program information website and eligibility determinations based on past program performance, even performance that predates the effective date of the regulations, do not present a legal impediment to these regulations. A law is "not retroactive merely because the facts upon which its subsequent action depends are drawn from a time antecedent to the enactment." [114] This principle applies even when, as is the case with these regulations, the statutes or regulations at issue were not in effect during the period being measured. [115] This principle has been confirmed in the context of the Department's use of institutional cohort default rates. [116] [117] The courts in these matters found that measuring the past default rates of institutions was appropriate because the results would not be used to undo past eligibility, but rather, to determine future eligibility. [118] As with the institutional cohort default rate requirements, as long as it is a program's future eligibility that is being determined using the D/E rates and EP measure, the assessment can be based on prior periods of time. Indeed, the court in *APSCU* v. *Duncan* rejected this retroactivity argument with respect to the 2011 Prior Rule. [119]

Moreover, we believe that the program information website is of interest to current and prospective students, even when based on historical data, and provides helpful insight to students when comparing and selecting among program offerings. We further maintain that the transparency framework will be immediately useful to students, prospective students, institutions, and the public, by filtering out low-financial-value programs and enhancing competition among other programs.

*Changes:* None.

*Comments:* Some commenters believed it would be better to establish the financial value transparency framework for all institutions and not use that information for eligibility purposes until better data becomes available over time to monitor the results and assess the program outcomes.

*Discussion:* The Department disagrees that available data are not suitable to the task of measuring gainful employment. The Department has now over a decade of experience assessing the quality of program level measures of earnings and debt outcomes and is confident that both the earnings premium measure and debt to earnings measure capture the relevant dimensions of program performance. As we discuss elsewhere in this rule and in the NPRM, we believe that the transparency framework is critical, but that the GE eligibility provisions created by this rule provide critical additional protections for students and taxpayers in career training programs.

*Changes:* None.

*Potential Impacts*

*Comments:* Some commenters suggested some contradiction in policy measures like the transparency and GE accountability provisions in the rule that could discourage students from public service careers while also rewarding public service through loan forgiveness at a later career point. Commenters also recommended excluding public service educational programs whose graduates would qualify for Public Service Loan Forgiveness to avoid decreasing the number of graduates in fields that are already experiencing supply constraints.

*Discussion:* As noted elsewhere, the goal of these regulations is to ensure programs are not leaving students with unaffordable debt or with no enhancement to their earnings. Programs should ensure their students' do not need to borrow excessively, regardless of what repayment options may be available to them based on their career choices after graduating. In most cases, we expect that programs will serve both students likely to pursue public sector employment and students who will not enter the public sector, and all students should be protected from unaffordable levels of debt.

*Changes:* None.

*Comments:* Several commenters expressed concern that the GE program accountability framework would lead to the closure of smaller colleges and vocational schools serving students who may not thrive in traditional university settings. One of these commenters viewed the measures as discrimination against students who do not want a traditional college education and who want to work in the service industries.

*Discussion:* The Department disagrees with the commenters. The calculation and application of the D/E measure and the EP measure do not vary based upon the size of the institution or the type of learning environment it provides in its programs. They only vary to ensure there are sufficient students in the data to calculate results. The effects of the rule are driven by whether a program provides sufficient financial value, and there are many small institutions whose programs pass these metrics as well as larger institutions that see their programs fail. We also disagree that the rules discriminate based upon the type of postsecondary experience sought by students. There are significant numbers of all types of programs that pass the GE measures as shown in the RIA. The commenters did not provide any evidence as to how the non-traditional nature of the program could be expected to affect either the amount of debt students take on or their earnings.

*Changes:* None.

*Comments:* One commenter claimed that the regulations would lead to students shifting from larger institutions to smaller institutions that do not participate in title IV, HEA programs. The commenter further claimed that non-participating programs do not need to maintain any basic standards and therefore students will not be protected if they attend those schools.

Several other commenters also suggested that students dependent upon Federal student aid could be harmed if some institutions continued to offer programs that lost eligibility to students that could afford them without Federal student aid. Some commenters noted that programs at risk of losing Federal student aid might also lose access to State grants and further erode student access to some lower earnings programs.

*Discussion:* The Department expects one outcome of these regulations will be an enrollment shift from low-financial-value to high-financial-value programs or, in some cases, away from low-financial-value postsecondary programs to non-enrollment. It is also possible that some students will shift from low-financial-value postsecondary programs to programs where they cannot obtain title IV, HEA aid, though such transfers will likely be limited by the lack of Federal aid available to students at such programs. There is limited information about the outcomes of students at non-participating programs, making it difficult to estimate the consequences of such transfers (although research cited in the RIA finds that among cosmetology programs, non-

---

[114] *Reynolds* v. *United States,* 292 U.S. 443, 449 (1934).

[115] *Career College Ass'n* v. *Riley,* No. 94–1214, 1994 WL 396294 (D.D.C. July 19, 1994).

[116] *Ass'n of Accredited Cosmetology Schools* v. *Alexander,* 979 F.2d 859, 860–62 (D.C. Cir. 1992).

[117] *Pro Schools Inc.* v. *Riley,* 824 F. Supp. 1314 (E.D. Wis. 1993).

[118] See, for example, *Ass'n of Accredited Cosmetology Schools,* 979 F.2d at 865.

[119] 870 F. Supp. 2d at 151–52.

App.27

participating programs have lower prices but similar licensure passage rates). However, the Department believes that the rule will lead to net benefits, as we expect that the availability of higher quality information about program-level student outcomes, and the loss of title IV, HEA eligibility by low value GE programs, will result in fewer defaults, higher earnings for students, and additional tax revenue for Federal, State, and local governments.

*Changes:* None.

*Comments:* One commenter argued that, in the NPRM, the Department promoted a false narrative that higher education is not a pathway to success for students and their families. This commenter worried that if we enact these rules, there will not be students qualified to fulfill workforce needs.

*Discussion:* The Department disagrees. As we noted in the NPRM, most postsecondary programs provide benefits to students in the form of higher wages that help them repay any loans they may have borrowed to attend the program.[120] We believe that all students benefit from the availability of information about a program's debt and earnings outcomes provided under the financial value transparency framework. Moreover, by only providing title IV, HEA funding to GE programs that meet the GE eligibility requirements, the Department is encouraging students to pursue career pathways in higher education that will result in them being gainfully employed. It will provide students a pathway to success within higher education that does not leave them unable to pay their debt or with earnings no greater than a comparable high school graduate.

*Changes:* None.

*Comments:* Many commenters expressed that, by denying title IV, HEA eligibility to failing GE programs, the GE regulations will limit school choice for students. These commenters argued that students should choose where to attend school without being deterred by a lack of funding. Commenters asserted that it is unfair to limit student choices for educational programs by using the GE program accountability framework, and that doing so will perpetuate an uneven playing field for the for-profit institutions. One commenter opined that the GE program accountability framework will drive up the cost of higher education because it will reduce the number of schools available and decrease competition.

Commenters suggested that a better approach would be to provide more

guidance and accept alternate measures of success for a GE program, such as graduation and placement rates, or establish more stringent requirements for those institutions with higher cohort default rates. Commenters asserted that graduation rates reported by the National Center for Educational Statistics (NCES) show that proprietary schools have higher graduation rates for first-time, full-time students for two-year programs of over 60 percent, compared to 52 percent for private nonprofits and 29 percent for public institutions.

*Discussion:* The Department disagrees. By implementing the GE program accountability framework, the Department is protecting students from attending programs that leave students with unaffordable debt or earnings not more than comparable high school graduates. As explained further above, we do not believe such programs meet the HEA requirements for participating in title IV, HEA as GE programs. Those programs must prepare students for gainful employment in a recognized occupation or profession, and the accountability framework adopted here is designed to implement the applicable statutory provisions with clear and administrable rules that test for earnings enhancements and affordable debt. In addition, the GE program accountability framework, rather than limiting school choice, will improve the choices available to students and, at the same time, protect the interests of taxpayers and the Federal Government.

For several reasons, the Department does not agree that the rule will cause increases in tuition by reducing the number of educational options available to students. The GE accountability provisions of the rule, in part, target programs with high debt relative to earnings. We expect the primary impacts of the rule to be (1) encouraging institutions with high D/E programs to reduce their tuition or arrange for their students to receive greater grant support to reduce borrowing, and (2) making ineligible for participation in title IV, HEA student aid those GE programs that have particularly high costs to students, leaving more affordable options in other programs with better outcome measures. More generally, the fact that so much variation in debt exists across programs that are in similar fields with similar earnings levels suggests strongly that competition across such programs for students may play a limited role in keeping tuition low.

We expect that programs that are low performing under the framework will take steps to improve, to avoid a loss of title IV, HEA eligibility. As shown in the

RIA (see Tables 4.25 and 4.26), most students who enroll in a GE program projected to fail the D/E rates or EP measure have better options available to them in a similar field nearby or, possibly, at the same institution. On average, these alternative options leave graduates with 43 percent higher earnings and 21 percent less debt.[121] Accordingly, rather than restricting the educational and professional choices of those considering career-focused programs and causing cost increases due to reduced competition, we believe the GE program accountability framework will lead to overall improvement in the career program options available to students and in the financial outcomes for those students.

Nor has the Department ignored the value of student choice. The financial value transparency framework will provide average education debt and earnings information about degree programs offered at nonprofit and public institutions to help students and families make informed choices, while the GE program accountability framework will ensure that GE programs are meeting eligibility thresholds in accord with applicable statutes. Again, the GE program accountability framework is based on the GE provisions of the HEA that differentiate between career training programs and other eligible programs by conditioning the title IV eligibility of career training programs on their meeting the gainful employment requirement. We believe it is appropriate to set eligibility thresholds for these programs to ensure they meet the HEA requirements, and that these thresholds will promote better outcomes for students and encourage institutions to improve the outcome measures for marginal programs. By providing equivalent information about programs not subject to the GE eligibility requirements, the financial value transparency framework will promote better comparisons of comparable programs offered at different institutions for students looking at multiple institutions.

We also disagree with suggestions by commenters to adopt measures such as graduation or placement rates instead of the D/E rates and EP measures or to create stronger conditions around cohort default rates. While we agree that graduation rates are an important piece of information, they are insufficient for ensuring that programs prepare students for gainful employment in a recognized occupation. The measures in the GE

---

[120] 88 FR 32300, 32306 (May 19, 2023).

[121] See the section in the RIA titled "Alternative Options Exist for Students to Enroll in High-Value Programs."

program accountability framework are based upon students who graduate and received title IV, HEA aid, and the data included in the NPRM and this final rule show that even when looking only at graduates, there are too many programs that leave students in a situation where they are no better off than if they had never attended postsecondary education or they have debt that they cannot afford to repay. Restricting our analysis to graduation rates would overlook these concerning results. Broadly, we do not view a high completion rate as evidence that a program prepares its students for gainful employment if most graduates struggle in the labor market or cannot afford their debt.

Placement rates exhibit similar shortfalls. While they can be useful indicators of results, not every program is directly tied to a specific set of occupations and, thus, such measures may not always be appropriate. Moreover, calculating placement rates is burdensome and time consuming for institutions compared to the GE program accountability metrics. Further, we do not believe that job placement is proof that a program is preparing students for gainful employment in a recognized occupation, if graduate earnings are no better than if they had never attended postsecondary education or if they nonetheless have debts they cannot afford.

Regarding default rates, the Department is concerned about the negative effects of default on borrowers, so we are taking steps to lessen the likelihood of default, even if the institution does nothing to improve its offerings. For instance, in the final rule improving income-driven repayment,[122] we instituted regulatory provisions that would allow for the automatic enrollment into income-driven repayment of borrowers who go at least 75 days without making their scheduled payment and who have granted us the approval for the disclosure of their Federal tax information from the IRS. We have also created the new Saving on a Valuable Education (SAVE) plan, which increases the amount of income protected from payments, which will give more at-risk borrowers a $0 payment and prevent many from defaulting. While these provisions provide critical benefits for borrowers, they underscore the importance of additional measures of program outcomes beyond default rates to assess whether programs are preparing students for gainful employment.

*Changes:* None.

---

[122] 88 FR 43820 (July 10, 2023).

*Demographics and Outcomes*

*Comments:* Many commenters raised concerns about how the demographics of students at programs could lead to unfairness in the calculation of earnings or debt at programs with diverse student bodies. For example, several commenters raised the issue of wage discrimination that affects the earnings of racial and ethnic minority students and women. Because of this labor market discrimination, some commenters argued that programs that serve widely discriminated-against students and communities will be disadvantaged in the calculation of earnings relative to programs that serve fewer students from communities facing discrimination. Several commenters also claimed that the high school earnings threshold reflects in large part the gender composition of the high school completer workforce in each State, which, if largely male, may not be an appropriate comparator for postsecondary programs that predominantly graduate women. Many commenters argued that schools that educate a large population of low-income or low-wealth students will have higher debt-to-earnings ratios, since such students are more likely to borrow. Another commenter suggested that the Department should apply a "Pell Premium" to institutions with high populations of low-wealth students. However, several commenters also suggested that institutions play a strong role in the job opportunities their graduates can obtain, even if student demographics can have some role in the outcomes across programs.

*Discussion:* We agree that systemic discrimination may affect the need for some groups of students to borrow and may affect their earnings after graduation. Still, we do not believe that the demographic makeup of a program's students sufficiently influences whether the program meets this final rule's minimal thresholds for financial value such that the Department should alter or abandon the regulations that we adopt here.

The Department addresses this concern in the RIA, the basic points of which we reiterate and discuss here. In the RIA, the Department provides evidence indicating that programs and institutions play an important causal role in determining student outcomes, more so than student demographics. We first present regression analysis (Tables 4.22 and 4.23) showing that institutional and program factors (credential level, control, institution fixed effects) explain a great deal of the variation in program outcomes. Adding student

demographics on top of these variables does not explain much additional variation in outcome (as measured by increase in R-squared) (Tables 4.22–4.23). Second, we show that program-level differences in students' family income background is only modestly correlated with the EP measure, and that there are many programs that pass at every level of family income (Figure 4.3). The same is true among programs with similar gender and racial composition (Table 4.24). Third, evidence from our compliance oversight activities indicates that some institutions aggressively recruit women or students of color into programs of substandard quality and claim that the resulting poor outcomes are because of the alleged "access" the program provides to their students. Finally, the closure of a poor-performing program is not likely to affect students' access to a similar program with better outcomes. More than 90 percent of students have at least one transfer option within the same two-digit CIP code, credential level, and geographic area (Table 4.25). We also note that the research literature on this topic likewise concludes that factors related to institutions and programs are stronger predictors of student outcomes than the demographic characteristics of students. On that score, please consult the numerous citations to this literature in the "Need for Regulatory Action" section of the RIA.

Furthermore, in designing the D/E rates and EP measures, the Department included several features to limit the influence of student demographics on these financial value metrics. In the measurement of program debt under § 668.401(b)(1)(i), for example, we cap individual student borrowing at the direct costs charged by the program excluding borrowing for living costs. Low-income students tend to borrow more for non-tuition and fee expenses than do high-income students; therefore, this cap at the total cost for tuition, fees, and books should mitigate concerns that programs will be penalized for enrolling large numbers of low-income students.[123] Further, an analysis by New America suggests that capping debt at the total cost for tuition, fees, and books will have a particularly large impact for programs at Historically Black Colleges and Universities (HBCUs), Hispanic Serving Institutions, Tribal Colleges and Universities, and other Minority Serving

---

[123] See, for example, Dancy, Kim & Barrett, Ben (2018). Living on Credit? An Overview of Student Borrowing for Non-Tuition Expenses. New America (*https://www.newamerica.org/education-policy/reports/living-credit/*).

Institutions (MSIs), in terms of increasing the number of programs at these institutions that pass the metrics.[124]

Even using the data in the 2022 PPD, which does not have that cap applied (since the cap will rely on institution-level reporting not yet available to the Department), programs with small proportions of students who receive Pell Grants (which proxies for socioeconomic status) have median student debt levels that are similar to programs serving large shares of Pell students. In Figure 1.1, we show the relationship between median program debt and the share of Pell students using the PPD. As the share of Pell students increases (moving from left to right on the graph), the average median program debt does not increase (the average of the individual programs' median debt levels is shown in the dark line); rather, it remains similar. To illustrate that institutions do influence borrowing levels, in the same figure we show the average median debt levels for institutions with higher tuition levels (the highest quartile of tuition, with the average depicted by the dotted line) versus those with lower levels of tuition (those in the lowest quartile of tuition, depicted by the dashed line). The figure shows that tuition levels affect borrowing levels substantially, whereas the family income background (proxied by the percent of student receiving Pell grants) of students does not.

BILLING CODE 4000 01 P



Figure 1.1: Median debt and Pell receipt among Bachelor of Arts (BA) programs

BILLING CODE 4000 01 C

Related to potential issues raised about differences in the gender compositions of programs and high school graduates in the State, adjusting thresholds poses several challenges, including practical feasibility. As described in more detail below, attempting to create program-specific metrics would be very complex and lead to inconsistent standards across programs. As well, standards might need to continually change as the gender composition of programs change, potentially adding undesirable volatility to program outcomes.

*Changes:* None.

*Comments:* Working from concerns about the role of demographics in the comparison of metrics across programs, commenters suggested a number of potential solutions. One commenter suggested that the earnings information provided on the Department's program information website should note salary discrepancies by gender and race. One commenter recommended the Department disaggregate high school earnings data by demographic characteristics when an institution can demonstrate a predominate demographic or population being served by its programs or field of study. A few other commenters, relying on an estimate of return on investment from a think tank analysis,[125] suggested adjusting the threshold down by 15 percent to account for variances in earnings levels due to demographic differences. A few commenters suggested using demographic adjustments for labor market

[124] See Caldwell, Tia & Garza, Roxanne (2023). Previous Projections Overestimated Gainful Employment Failures: Almost All HBCUs & MSI Graduate Programs Pass. New America (*https://www.newamerica.org/education-policy/edcentral/ge-failures-overestimated/*).

[125] The referenced report is available here: *https://freopp.org/accountable-or-not-evaluating-the-biden-administrations-proposed-gainful-employment-framework-a49231683263.*

**Federal Register** / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations    **70033**

discrimination, similar to those used in the Bipartisan Policy Center's (BPC) methodology for estimating the return on investment (ROI) for college enrollment.

*Discussion:* We appreciate the suggestions provided by commenters. For website disclosures, the Department is interested in providing data to students that will help them make informed decisions and to institutions that will help them identify and remove the potential barriers to opportunities for all students to achieve success. The Department will carefully consider the best way of providing this information to students and institutions, including contextual information about the influence of factors such as race and gender discrimination on earnings levels, taking into account the results of consumer testing.

Related to high school earnings, the EP threshold is based on an estimate of State-level median earnings of individuals aged 25 to 34 who have only a high school diploma or GED. Further adjustment to this threshold, such as using a program-specific statistical adjustment to better match the demographics of students completing a given program to the composition of high school graduates in a given State, poses several challenges. An important constraint on this approach is its practical feasibility. To implement the approach, one would need to measure high school median earnings separately for each demographic subgroup of interest. If we only started with the five race and ethnicity groups on which the Office of Management and Budget (OMB) requires reporting and added two sex-at-birth categories, we would need to estimate median earnings for ten subgroups within each State. In many States there would be too few individuals in ACS data to produce a reliable measure, so different groups would need to be combined or other methods of adjustment would need to be employed, thereby requiring potentially arbitrary methodological choices. To compute a program-specific threshold, presumably one would create a weighted average of these subgroups, where the weights would correspond to the share of completers in the program. Again, this could be quite complex and create different standards that programs must meet for eligibility. Especially in small programs, changes in the demographic composition of programs could result in different earnings thresholds from year to year. This could add undesirable volatility to program outcomes under the rule.

With respect to establishing a 15 percent variance to account for

disadvantaged groups, we appreciate the suggestion, but there are numerous issues with the commenter's methodology that preclude a sound basis for adjusting the rule by an amount generated by that analysis. This includes several self-acknowledged reasons why the commenter's methodology systematically overestimates or underestimates ROI for different types of programs, and makes assumptions that students' earnings trajectories relative to their peers do not change over time. In addition, the commenter's attempt to create counterfactual wages relies on adjustments made on very broad educational credential by field of study groups that do not reflect specific programs well.

The Department has considered different methodologies for calculating a median high school earnings threshold in each State, including an option (using only those individuals with a high school degree working year-round) that would have used an earnings threshold approximately 20 percent higher.[126]

The BPC's ROI model includes a "discrimination adjustment" based on earnings gaps in the overall population of college graduates. Earnings of female graduates, and graduates from underrepresented minority racial or ethnic groups, are adjusted upward to match the earnings of white male college graduates. If applied to a program's earnings outcome measure, this statistical adjustment would misrepresent the true median earnings of graduates from a given program by inflating the median salary for programs enrolling large shares of women and underrepresented minorities. Such an adjustment could potentially misrepresent a student's potential earnings, and ability to repay their debt, for a given program, which are important datapoints within the financial value transparency framework. If applied to State-level EP thresholds of median high school earnings, this statistical adjustment is again likely to cause more year-over-year uncertainty for programs serving a demographic population that is dissimilar from the State-level population of high school graduates in the labor force, due to small n-sizes of these groups.

Finally, we note again that as shown in Tables 4.22 and 4.23 of the RIA and elsewhere in this rule, program demographics do not play an outsized role in influencing the debt and earnings-based outcomes measured in the final rule. In light of these factors,

we believe the methodology for setting thresholds based on State-level high school earnings described in this rule is better than alternative approaches and sets a reasonable benchmark for the earnings outcomes of all programs.

*Changes:* None.

*Comments:* Several commenters suggested that the Department should include separate provisions for underserved and under-resourced institutions such as HBCUs and other MSIs. These commenters contended that the unique circumstances of HBCUs and MSIs should be considered important factors in assisting both students and institutions. The commenters stated that the Department can do this by providing technical assistance to these schools instead of loss of eligibility if programs fail the D/E rates or EP measure, helping to achieve compliance.

*Discussion:* While we are sensitive to the additional burden associated with implementing these regulations, we do not believe an exception should be made for HBCUs and other MSIs. As for the financial value transparency framework and the acknowledgement provisions therein, we believe the students at HBCUs and other MSIs are just as deserving of access to useful and comparable information about programs, including information that may be necessary to prevent them from accumulating unaffordable debt. As for the GE program accountability framework, we similarly believe that consumer protection and providing information to highlight the value of programs is important for all students who attend GE programs. As stated above, we maintain that any burden on institutions to meet the reporting requirements is outweighed by the benefits of the transparency and accountability frameworks of the regulations to students, prospective students, their families, taxpayers, and the public at large.

*Changes:* None.

*Comments:* Many commenters expressed additional concerns about the impact of the rules on institutions that educate large numbers of low-income and minority students. For example, several commenters equated the student acknowledgement requirements to public shaming of institutions that educate such students. Several other commenters contended that, as a result of the rules, institutions will discriminate against students with lower incomes who do not have the capacity to pay for their program with their own money. These commenters believed that schools are likely to admit students who can be persuaded to borrow private student loans, who do

---

[126] See "Alternative Earnings Threshold" in the "Alternatives Considered" section of the RIA.

not require accommodations for disabilities, and who enroll in training for fields that are likely to result in higher incomes. This means, according to these commenters, that women, people of color, people with disabilities, and LGBTQ+ individuals will be less likely to gain access to these higher education programs.

*Discussion:* We do not agree that the student acknowledgment requirements constitute a public shaming of institutions that serve low-income and minority students. The acknowledgments are delivered to the Department through its website, and they are obtained from individual students with respect to particular programs—more specifically, title IV eligible programs that do not lead to an undergraduate degree and that are associated with high debt burden, as well as GE programs that are at risk of losing title IV, HEA eligibility based on measures of high debt burden or no enhanced earnings. The acknowledgments are not obtained from the public at large nor are they associated with the institution as a whole. Moreover, as further discussed in response to a comment above, our analysis of the PPD shows that programs with small proportions of students who receive Pell Grants (which proxies for socioeconomic status) have similar median student debt as programs serving large shares of Pell students.

Moreover, the Department believes that the GE program accountability framework will help protect all individuals including women, people of color, people with disabilities, and LGBTQ+ individuals from entering programs that do not prepare students for gainful employment. The lack of title IV, HEA aid at such programs will help students to avoid failing GE programs, which will ultimately help maximize their educational investment. To help prevent institutions from encouraging students to substitute private loans for Federal loans, the D/E rates measure counts all student borrowing including institutional and private loans in the median debt measure. In effect, then, institutions do not receive an advantage on that metric for concentrating on students with access to private lending, which was a matter of concern to some commenters.

*Changes:* None.

*Alternative Accountability Metrics*

*Comments:* One commenter proposed that the Department use repayment rates as an alternative affordability metric to monitor debt affordability. This commenter noted that in their analysis of College Scorecard data, they

identified many online schools where less than 20 percent of borrowers make any progress in lowering their loan principal; however, these programs pass the D/E rates and EP metrics. This commenter recommended penalties for programs where many students do not make progress paying down their principal. Specifically, the commenter suggested the Department consider mandatory disbursement delays, mandatory reduced loan maximums (*e.g.,* 20 percent less annual loan maximums), or limiting borrowing for one category of costs.

*Discussion:* The Department agrees that measuring the realized repayment rates of borrower cohorts from particular programs may provide valuable information on borrower outcomes. As provided in § 668.43(d)(1)(vii), through the program information website, we will provide the loan repayment rate for students or graduates who entered repayment on Direct Loans. The Department currently lacks sufficient evidence, however, to design accountability thresholds that would tie eligibility to whether a program's repayment rate exceeded a particular threshold.

*Changes:* None.

*Comments:* A few commenters suggested that we assess programs based on a tuition-to-earnings ratio rather than a debt-to-earnings ratio. These commenters believed this approach would treat programs with similar prices and earnings outcomes comparably, regardless of the share of students with debt.

*Discussion:* We believe it is reasonable to consider whether students' labor market outcomes justify the amount they borrow, as well as any educational expenses they pay using other funds. This rule will generate new program-level data that captures the total debt students borrow to attend programs, which will provide students with relevant information about program outcomes. Since no data on program-level tuition exists, we are not able to calculate a tuition-to-earnings ratio. We focus instead on the direct costs to attend a program that students finance with student loans. This approach reflects the Department's natural interest in Federal loans being repaid, and its concerns that excessive borrowing to attend postsecondary education may lead to financial consequences including default that undermine the goals of title IV, HEA programs in promoting economic mobility.

*Changes:* None.

*Comments:* One commenter noted that nursing education is composed of

various programs and specializations ranging from practical nursing degrees to doctoral degrees. The current GE metrics may not differentiate between the levels of nursing education and varying incomes. For example, the employment outcomes and debt-to-earnings ratio for a nursing assistant program may differ significantly from those of a four-year Bachelor of Science in nursing program. According to the commenter, incomes vary widely in individual fields in the nursing profession and a rigid formulaic measure may result in unfair and inconsistent outcomes. The commenter further stated that GE metrics prioritize financial indicators, such as earnings and debt, while overlooking other valuable outcomes specific to nursing. The commenter contended that the Department should consider factors like patient outcomes, job satisfaction, and advancement opportunities. The commenter believed that these aspects are also important in assessing the overall quality and value of nursing programs.

*Discussion:* The EP and D/E metrics are measured for programs that are defined based on credential level and CIP codes. We expect these measures will indeed differentiate between programs that train nurse assistants and BS programs in nursing, unless the BS program graduates end up finding employment as nurse assistants. Regardless, the GE measures are meant to determine whether graduates of career training programs leave their students with enhanced earnings or affordable debt. These are minimum standards to ensure students are not financially harmed by completing an education program. The additional factors specified by the commenter are important but not measured by or reported to the Department Therefore, we are unable to report on these measures.

*Changes:* None.

Other Comments

*Comments:* A commenter expressed concern that if we promulgate these GE regulations, there is nothing to stop the Department from enacting more restrictive metrics for all programs.

*Discussion:* Although D/E rates and the EP measure will be calculated for informational purposes for all programs, we note that the use of the D/E rates and EP measures in this final rule to determine continuing title IV, HEA eligibility for GE programs is pursuant to the statutory authority specific to those programs.

*Changes:* None.

*Comments:* Several commenters noted that proprietary schools provide value and economic strength to the country even though they do not receive the State and Federal support provided to public and nonprofit institutions that subsidize the education costs for students. The commenters said that students taking programs at trade schools should have the same opportunities to obtain Federal loans as students attending other institutions of higher education. Commenters also questioned whether programs offered at public and nonprofit institutions in fields such as performing arts, education, leisure, and hospitality provided gainful employment compared to the lower program costs and many jobs available to graduates from cosmetology programs.

*Discussion:* We agree that many factors go into program costs and post-graduate earnings for the choices students make when selecting institutions, programs, and careers. The regulations measure education debt and earnings for the student graduates, and the education debt itself is tied to the program costs that might or might not be subsidized from other sources. Other factors such as program length also impact those measures. Regardless of those factors, the average education debt for a program is relevant because it reflects the direct obligation that the student is expected to pay, while the average earnings provides some measure of the graduate's ability to do so.

*Changes:* None.

*Comments:* Some commenters noted that many graduates of the shorter programs offered at proprietary schools can get licensed in professions with work that provides those graduates and society with immediate benefits. One commenter acknowledged that some for-profit beauty schools may underperform, but surmised that students take cosmetology programs with different goals, plans and ambitions, such as working part-time instead of full time. A number of commenters criticized the eligibility outcome measures as being targeted to cosmetology programs and asserted that the proposed regulations are intended to drive student enrollments away from cosmetology programs and into other fields such as medical and dental. Commenters strongly objected to measures where Department estimates show the regulations could eliminate two-thirds of the cosmetology programs offered at proprietary institutions. Some commenters noted that institutions have little voice in factors that may be reflected in the lower earnings for cosmetology programs such as part time

work or unreported income. Some commenters cautioned that programs failing the earnings tests may close and students may face limited choices to enroll in more expensive degree programs or find comparable cosmetology programs in less convenient locations. Other commenters said that many cosmetology graduates seeking full time careers easily get well-paying jobs even before they develop dedicated clientele, while others may do little beyond maintaining their licenses.

*Discussion:* These measures for debt and earnings are comparable for all programs under the transparency framework and eligibility measures. In general, this means that to keep the education debt affordable for the graduates, programs with lower earnings will have lower costs. Graduates choosing not to work full-time or providing volunteer services in addition to working part-time still are faced with the obligation to repay the education debt associated with their program. The regulations provide the average education debt and average earnings for program graduates without adjustments for any part-time work, and students should consider that information when evaluating career options. Institutions offering GE programs that do not meet the eligibility thresholds may search for better options for their students that effectively reduce the education loan debt or lead to better earnings outcomes. A more detailed discussion about unreported income from cosmetology program graduates is addressed separately in the "Tipped Income" sections here and in the NPRM.

*Changes:* None.

*Comments:* Some commenters suggested earnings outcomes could be impacted due to student athletes who might underperform in academic engagement, impact retention and graduation rates, and not be gainfully employed.

*Discussion:* The Department has no information that suggests the commenters' assertions that student athletes are likely to have lower academic engagement and thus lower earnings might be correct. The metrics of the rule are based on students that complete a program, however, so the commenters' concerns about retention and completion are not likely to be relevant. Regardless, the Department expects institutions to serve all of its students well and to meet the minimal standards set by the rule.

*Changes:* None.

### Definitions—§ 668.2

*General Comments*

*Comments:* Several commenters stated that the definitions are unclear and do not adequately define terms in ways that can be operationalized by institutions. Commenters contended that previous iterations of the GE rule have shown that many definitions are so confusing that implementation for schools became overwhelming. These were general assertions, and no examples were given to the extent comments addressed specific definitions, they are addressed in the corresponding section.

*Discussion:* We believe the definitions are clear. We have taken care to define terms precisely in this final rule and do not anticipate widespread confusion. In addition, as we did when issuing the 2014 Prior Rule, we will again provide clear guidance and training to assist postsecondary institutions in complying with the new regulations.

*Changes:* None.

*Classification of Instructional Program (CIP) Code*

*Comments:* Many commenters asserted that the proposed regulation's definition of the CIP Code to consist of six-digits is not appropriate for the purposes of the transparency and accountability regulations. Commenters offered several at times conflicting reasons for using alternative approaches. One commenter noted that the six-digit CIP code does not adequately distinguish among different levels of program success at different locations of the institution. Another commenter cautioned that the four-digit CIP code captured several different six-digit programs offered at a school, and that if the program defined at a four-digit CIP level failed then all the programs at the school would fail and the school might need to close.

On the other hand, other commenters suggested the definition of a CIP code should consist of four-digits to increase the number of students covered by metrics under the rule, or alternatively to use the six-digit CIP but to "roll-up" programs to the four-digit level when doing so would avoid too few students at the six-digit level programs. Some commenters noted that few four-digit programs had multiple six-digit programs within them, and in those cases, the different six-digit programs rarely had different financial value outcomes. This, they said, suggested there would be little granularity lost in using the four-digit CIP level to define programs, and would increase coverage of the rates. Finally, one commenter

<span style="color:red">App.33</span>

expressed appreciation for the Department's decision to use 6-digit CIP codes and requested the Department to re-release the dataset included with the NPRM with a 6-digit CIP code versus the currently published 4-digit CIP code data to aid in understanding institutions' performance with these new measures.

*Discussion:* We appreciate commenters' views on both sides of this issue. There is a tradeoff between granularity of how specifically programs' performances are measured, and the coverage of metrics due to minimum n-size restrictions discussed elsewhere. As we note in the RIA, we estimate that metrics using a 6-digit CIP with the 4-year completion cohort roll-up for programs with few completers over 2 years will be available for programs enrolling over 80 percent of title IV, HEA recipients. While also rolling up programs to the four-digit level could allow even greater coverage, the potential gains are small, and it is possible that some programs (measured at the six-digit level) that should be deemed passing are combined with larger failing programs and end up failing. We put more weight on avoiding an inappropriate sanction on a passing program, and so prefer to define programs at the six-digit level.

Although the Department considered treating each additional location offering the same combination of six-digit CIP code and credential level as a separate program, we determined that doing so would further reduce the number of programs with a sufficient number of completers to be evaluated, and the gains in granular coverage may not be justified. This is, in part, due to an added dimension of complexity that not all locations are well aligned with the organizational units of institutions with which students engage in pursuing an education, and the mapping between locations and such units differs widely across States. The Department might revisit the issue of program classification in the future, for example to assess student outcomes more granularly across different campuses in some State systems or in online programs.

The Department does not anticipate being able to rerelease the information published with the NPRM at the six-digit CIP level due to constraints in our ability to obtain earnings data.

*Changes:* None.

*Office of Postsecondary Education Identification (OPEID) Code Level*

*Comments:* A few commenters argued that, in defining a ''program'', the Department should use the eight-digit Office of Postsecondary Education identification number (OPEID) since it because it more granularly identifies the institution where a student receives an education. The commenter asserted that disaggregated data would afford students a clearer understanding of the quality of their specific institution. Also, the commenter stated that accreditors and State regulators view institutions with distinct 8-digit OPEID numbers separately and so using the 8-digit OPEID would align data across the triad.

*Discussion:* The Department agrees with these commenters that it would be desirable to be able to track program performance at separate locations of colleges with multiple locations rather than reporting them together under a single six-digit OPEID campus. Currently, however, eight-digit OPEID locations do not correspond neatly to the separate components of an institution that students interact with to participate in their education programs. Moreover, the Department must balance the competing interests of specificity of data and having enough completers in a cohort group to calculate rates. Additional sub-division of completer groups would lead to some programs falling short of 30 students in the 4-year cohort, resulting in rates and data being unavailable for those programs. We believe that variation in the same program offered by the same institution at different locations would be too small to justify the loss of rates for programs that fall short of the 30 completer n-size requirement.

*Changes:* None.

*Cohort Period*

*Comments:* One commenter stated that, for programs that prepare pilots, student outcomes should be measured under the GE regulations after students have completed the credential and worked for the airlines at least 2 to 3 years. The commenter noted that the proposed GE outcomes measures could negatively impact flight schools.

The commenter proposed adding a new paragraph to the definition of ''cohort period'' that reads: ''For a program whose students are required to complete post-graduation flight hours pursuant to the Federal Aviation Administration (FAA) standards to qualify as an Airline Transport Pilot (ATP) and where a majority of the graduates are pursuing an FAA ATP certification, the sixth and seventh award years prior to the award year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings threshold measure are calculated. For this purpose, the institution must provide a certification that a majority of its graduates pursue completion of the required FAA certified flight hours to work as an FAA Certified ATP.''

The commenter also recommended adding another paragraph to the same definition of ''cohort period'' that reads: ''For a program whose students are required to complete post-graduation flight hours pursuant to the Federal Aviation Administration standards to qualify as an Airline Transport Pilot (`ATP') and where a majority of the graduates are pursuing an FAA ATP certification, the sixth, seventh, eighth, and ninth award years prior to the award year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings threshold measure are calculated. For this purpose, the institution must provide a certification that a majority of its graduates pursue completion of the required FAA certified flight hours to work as an FAA Certified ATP.''

*Discussion:* The Department declines to add the proposed language. We are committed to reviewing our own internal data and processes to collect, analyze, and make program eligibility determinations based on the soundest data available to us. We are concerned that providing program specific carve-outs that have not been evaluated using the Department's internal data and processes would cause the GE metrics to be inconsistent and ineffective.

*Changes:* None.

*Earnings Threshold*

*Comments:* None.

*Discussion:* The proposed definition of ''earnings threshold'' referred to a ''Federal agency with earnings data'' as the basis for determining median earnings for purposes of calculating the earnings threshold, however our proposed description of the provision in explained that ''[u]sing data from the U.S. Census Bureau, the Department would also calculate an earnings threshold. . . .'' [127]

*Change:* We have clarified the definition of ''earnings threshold'' to provide that median earnings are determined based on data from the Census Bureau.

*Institutional Grants and Scholarships*

*Comments:* One commenter stated that the definition is not grammatically correct and should be improved through technical, non-substantive edits.

---

[127] 88 FR 32300, 32332 (May 19, 2023).

*Discussion:* The Department agrees with the commenter.

*Changes:* The Department has updated the definition to read: ''Assistance that the institution or its affiliate controls or directs to reduce or offset the original amount of a student's institutional costs and that does not have to be repaid. Typically, an institutional grant or scholarship includes a grant, scholarship, fellowship, discount, or fee waiver.''

*Student*

*Comments:* Several commenters believed that defining ''student,'' for purposes of these regulations, to include only title IV, HEA recipients, would undermine the quality of data that the Department would use to calculate the D/E rates and EP measures for programs with significant numbers of students who did not receive Federal student aid. One commenter proposed to expand the definition of ''student'' to include graduates who have not received any title IV, HEA assistance for enrolling in a program, noting that in some years, 10 to 20 percent of the commenter's institution's graduates do not receive title IV, HEA funds. The commenter contended that it is unfair that a measure based on graduates' median debt excludes graduates who did not receive title IV, HEA assistance. One commenter suggested that, given the reporting proposed, logistical hurdles in adding these graduates to the cohorts are easily overcome.

*Discussion:* These rules provide a framework to provide financial value transparency information to students and to determine the eligibility for students to receive Federal student aid at career training programs. It is reasonable to base this eligibility on measures of the outcomes of students who receive that aid. Similarly, for non-GE programs the Department seeks to provide relevant information to students regarding the outcomes of programs for students receiving title IV, HEA assistance. This will help students who need to borrow to attend non-GE programs to make an informed decision and, where applicable, hold GE programs accountable to increased oversight and guardrails.

*Changes:* None.

*Title IV Loan*

*Comments:* One commenter recommended that the Department omit the ''title IV loan'' definition or, if the Department believes that it is crucial to define the term for these regulations, use the existing defined term of ''Direct

Loan Program loan'' at § 668.2(b).[128] The commenter contended that the proposed definition is incomplete and not aligned with actual statutory provisions, which could be misleading and confusing. The commenter noted that, although new Federal Family Education Loan Program (FFELP) and Federal Perkins (Perkins) Loan Program loans are no longer being originated, these loans still exist and should not be excluded from the definition of ''title IV loan.'' The commenter cited, as examples, §§ 668.403(e)(1) and 668.404(c)(1), in which the Department refers to ''title IV loans'' as including Perkins and FFELP.

*Discussion:* The Department agrees with the commenter. We can rely on the definition of Direct Loan Program loan in preexisting regulations, and we agree that, to avoid confusion, it is helpful to use consistent terminology in our regulations.

*Changes:* The Department has revised references to ''title IV loan'' to ''Direct Loan Program'' loan throughout the final rule's regulatory text.

*Comments:* One commenter suggested that, in calculating administrative burden, the Department should consider the administrative burden of all the proposed rules together, not individually.

*Discussion:* The Department took great care to analyze the impact of the proposed regulations. The Department has separated the GE and Financial Value Transparency Framework topics from the other rules covered in the NPRM. We, therefore, updated the RIA to reflect that, as well as to reflect changes we made from the proposed rules to these final rules.

*Changes:* None.

**Measurement of Earnings**

*Timing of Earnings Measurement*

*Comments:* One commenter supported the Department's proposal to measure students' earnings for the calendar year three years after graduation, observing that the proposed interval will give students time to establish normal earning levels and will allow for meaningful comparisons of debt and earnings outcomes between programs.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* Many commenters expressed concerns over the timing of earnings measurement. First, many expressed concerns that three years is too little time from graduation to allow

for earnings to grow enough to be a fair representation of the earnings return to pursuing a degree in their field of study. Commenters noted that, in some cases, fields with lower initial earnings can end up having higher lifetime earnings. Others believed that we should account for the full lifetime earnings that flow from the benefit of a degree. Some commenters suggested that students without family members to advise them to consider other factors might be more swayed by the short-term earnings information provided as part of the financial value transparency framework.

By contrast, others argued that this three-year lag between when students graduate and when their earnings are measured is too long to fairly characterize the current quality of the program at the moment any sanctions might be levied.

*Discussion:* Because the benefit of some educational investments may take time to manifest, real-time assessments of educational program performance face a tradeoff between allowing enough time to pass to produce an accurate measure of the benefits and assessing those outcomes quickly enough that they are likely to reflect the current performance of a program. We agree that trusted resources such as family members can provide important assistance in college decisions, and we believe that the information produced from this rule will aid the decision making of students and their families. We are not aware of evidence that supports the argument that students without family members on which to rely will systematically make differential decisions in the way suggested by the commenter.

We believe a three-year lag in measuring earnings, with longer periods for programs documented to have exceptionally high earnings growth due to government-imposed limits on early career earnings capacity, strikes this balance. Data from the Census' Postsecondary Employment Outcomes (PSEO) project shows that earnings levels measured shortly after graduation are very highly correlated with longer term measures.[129] The correlations of programs' 1-year and 5-year post-graduation earnings measures with 10-year program median earnings are 72 and 89 percent, respectively (a 3-year earnings measure is not available in the PSEO, but it is reasonable to expect its correlation with longer term earnings to be between the 1- and 5-year measures). Moreover, according to administrative Department data on median debt levels

---

[128] Under 34 CFR 668.2(b), a ''Direct Loan Program loan'' is a loan made under the William D. Ford Federal Direct Loan Program.

[129] These data are available at *https://lehd.ces.census.gov/data/pseo_experimental.html.*

for each program, programs' median debt levels evolve relatively slowly—the correlation of program median debt levels for the 2016–2017 and 2021–2022 cohorts is about 0.96. In general, then, information on past cohorts' debt and earnings outcomes are likely to be highly relevant for predicting outcomes of future cohorts.

*Changes:* None.

*Post-Graduate Training Requirements*

*Comments:* Several commenters noted that recent graduates who engage in apprenticeships and other types of probationary or training periods, often required by the State before students can practice independently, earn lower wages in those initial years as compared to later years. The specific programs that commenters pointed to include clinical psychologists; marriage and family therapists; clinical counselors; social workers; and veterinarians. Other programs, especially in medicine, have residency requirements. In other cases, commenters noted that careers in their field often involve graduates running their own business, which requires time to build out a steady clientele and suppresses initial earnings.

One commenter suggested that, in determining which programs should be eligible for a longer earnings horizon, the Department should consider whether (1) the relevant field requires multiyear post-degree supervision for licensure (noting the possibility of creating competing State and Federal regulatory frameworks); and (2) a large increase in the earnings of program graduates follows licensure.

*Discussion:* Both the D/E rates and EP measures are based on the earnings of graduates after three years. For example, for students graduating between July 1, 2018, and June 30, 2019 (the 2019 award year), their earnings would be measured in calendar year 2022. In most cases this should give students enough time to settle into stable employment, and after that transition the Department believes it is reasonable to expect students to be able to meet the minimum standards of this rule to be able to afford their debt payments and for a gain in earnings beyond what they might have earned in high school to be realized.

Moreover, we note that a student's earnings three years after graduation might govern their loan payments for up to five years after the student graduates if they enroll in income driven repayment plans. That is between 20 and 25 percent of the full time that

students will be required to make payments on such plans, so the Department has a responsibility to taxpayers to hold institutions accountable in providing quality programs that produce graduates that earn enough to repay their loans at that point.

The Department is sympathetic to the argument that some programs may have lower earnings three years after graduation due to government-imposed post-graduate training requirements necessary to earn a license before an individual can practice independently. To assess the commenters' claims that these programs see substantial earnings gains just outside the measurement window used in the rule, we used program-level PSEO data. These administrative data are based on individual records that match program graduates to their annual earnings from the U.S. Census Bureau's Longitudinal Employer-Household Dynamics program at one, five, and 10 years after completion. The PSEO reports program-level median earnings at these three intervals, linked to 2-digit or 4-digit Classification of Instructional Program (CIP) codes for a large number of institutions and State public higher education systems throughout the United States. This is the only dataset we know of that currently includes program-level earnings for programs from a broad selection of institutions, credential levels, and fields of study with such long follow-up.

We limited the dataset to programs and cohorts that had non-missing median earnings at all three intervals. We then grouped programs by credential level and focused here on graduate programs, where commenters noted post-graduate training requirements.

The PSEO data do have some important limitations. First, they cover a subset of States and not all sectors within each State (*e.g.,* in many States, only public institutions report data). For privacy reasons, data are not reported at the finest CIP level. For example, the PSEO data reports earnings for professional doctoral programs, such as MDs, at the 4-digit CIP level. These programs comprise about 10 percent of the programs that are in the data we analyze. However, the PSEO reports master's and doctoral research/scholarship degrees, which account for about 90 percent of the graduate programs in the data we use, at the 2-digit CIP level. For many programs, 2-

digit CIP groups can include a wide range of programs. Still, this is the only dataset that allows us to measure program-level earnings for a wide range of programs across the country at multiple time intervals that include earnings outcomes at least five years after students graduate. Ultimately, we observe median earnings for 7,856 graduate programs for the graduating cohorts of 2001, 2004, 2006, and 2007.

The commenters raise the concern that some programs will have particularly fast earnings growth after the third year after completion, suggesting that prior to earning their independent license their earnings three years after graduation were suppressed by the government-imposed requirement. In the PSEO data, we estimate 3-year median earnings as the average of the 1-year and 5-year median earnings available in PSEO.[130] Figure 1.2 below compares these estimated 3-year median earnings (on the x-axis) to the 10-year median earnings (on the y-axis), focusing on all graduate programs with available data. The figure shows that, in general, early career earnings are highly correlated with later career earnings: the correlation in the 3 vs. 10-year post-graduation median earnings is 0.74. The "best-fit line" in the figure (fit with a simple ordinary least-squares regression) illustrates the estimated linear relationship between the average 10-year measure and the estimated 3-year measure. Most programs have higher earnings when measured 10 years from graduation than 3 years after graduation, reflecting the fact that earnings tend to grow with experience for most workers. While most programs are centered around the best-fit line, there is an obvious cluster of graduate programs that have much higher 10-year median earnings than would be expected based on their 3-year earnings. The professional programs in Medicine, are all in the outlier group in the figure. Within the 2-digit CIP code of "Health Professions and Related," there are some programs within the group of outliers, as well as programs that are not outliers in terms of their earnings growth. Though we do not show the relationship here, there is no similar group of outliers for BA programs evident in the PSEO data.

BILLING CODE 4000 01 P

---

[130] We replicated these analyses focusing on earnings growth from 1 year after graduation to 5 years after graduation and found qualitatively similar results.

**Figure 1.2: 3- and 10-Year Median Earnings for All Graduate Programs, Highlighting Programs in Medicine and Health Professions**



BILLING CODE 4000 01 C

Some commenters pointed to programs that prepare students to become mental health clinicians, including Clinical Psychology and Marriage and Family Counseling, which require post-graduate work to obtain a license. We have limited ability to analyze these programs in the PSEO data since the master's and doctoral research and scholarship programs for these fields are lumped with other health and psychology programs in those broader 2-digit CIP categories. The PSEO data does have data for Clinical, Counseling, and Applied Psychology professional doctorate programs in the PSEO data, but there are only a very small number of these programs in the data, preventing a robust view of the earnings growth of these programs.

Social Work is somewhat different from the other programs in that graduates with a master's in Social Work (MSW) pursue a variety of fields, and not all of them require a clinical license.[131] The first column of Table 1.3 below shows the number of graduates with an MSW each year, based on an annual census of social work programs by the Council on Social Work Education.[132] The second column shows the number of first-time licensing exam takers, based on data from the Association of Social Work Boards.[133] Under the assumption that MSW graduates take their exam three years later, this leads to an estimate of approximately 60 to 70 percent of graduates taking the exam. Using a 6-year cohort period for all MSW graduates may not therefore be appropriate.

[131] See, for example, Salsberg et al. (2020). *The Social Work Profession: Findings from Three Years of Surveys of New Social Workers.*

[132] See, for example, Council on Social Work Education (2022). Annual Statistics on Social Work Education in the United States.

[133] See, for example, Association of Social Work Boards (2022). 2022 ASWB Exam Pass Rate Analysis Final Report.

TABLE 1.3  MSW GRADUATES AND FIRST TIME LCSW EXAM TAKERS, BY YEAR

| | MSW graduates | First-time LCSW exam takers |
|---|---|---|
| 2011 .................... | 20,573 | 9,100 |
| 2012 .................... | 22,441 | 9,604 |
| 2013 .................... | 22,677 | 10,879 |
| 2014 .................... | 25,018 | 12,217 |
| 2015 .................... | 25,883 | 13,044 |
| 2016 .................... | 27,659 | 14,007 |
| 2017 .................... | 27,270 | 16,095 |
| 2018 .................... | 27,296 | 16,022 |
| 2019 .................... | 29,546 | 17,207 |
| 2020 .................... | 31,750 | 16,801 |
| 2021 .................... | | 20,657 |

In summary, there appears to be some possibility that, similar to programs in medicine, some other programs that provide training to licensed mental health professions may also generate significant earnings growth following a post-graduate training period. At present, detailed data do not exist to evaluate which groups of programs by credential and CIP code are likely to

have outlier earnings growth, but over time such data will become available in the College Scorecard. For example, program median earnings measured five years after completion should be available by early 2024. One area of complication is that the career paths of graduates of some mental health training programs are more diverse, and not all graduates might seek to become licensed.

In light of the evidence presented by commenters and the Department's analyses, we adopt a data driven process to identify qualifying graduate programs where we will use a longer cohort period to measure the earnings of graduates six years, rather than three, after they graduate. The Department selected an initial set of these fields based on evidence currently available to the Department suggesting that graduates of such programs may have constrained earnings three years after graduation as a result of government imposed postgraduation training requirements. Data in the College Scorecard will eventually allow more accurate assessments of which programs experience atypically high growth in graduates' earnings that are potentially due to postgraduation training requirements. Going forward, the Department will use these data, combined with an information request to the field to identify groups of programs (at the credential level and CIP code level) where A) state or other government postgraduation requirements exist that are likely to lead to delays in program graduates being able to practice independently; and B) programs are outliers with regard to their earnings growth relative to programs at the same credential level.

The Department will use a standard statistical procedure to determine whether groups of programs (graduate fields of study, defined by their credential level and CIP codes) are outliers with regard to their earnings growth. The Department will use College Scorecard measures to calculate the percent growth in the median earnings of program graduates between one- (or three-) and five-years (or ten-years) postgraduation. Lastly, a qualifying graduate program must have at least half of its graduates obtain licensure in a State where the postgraduation requirements apply. Since the rule is based on measuring the earnings of the median graduate, this requirement means that the student with median level of earnings is likely to have their earnings outcomes influenced by the training requirement.

*Changes:* We modify the definition of "cohort period" in § 668.2 so that

earnings for the 2-year cohort period are measured six years after graduation for completers in "qualifying graduate programs," rather than "a program where students are required to complete a medical or dental internship or residency." Similarly, we modify the definition of "cohort period" so that earnings of completers of a qualifying graduate program for the 4-year cohort period are measured the sixth, seventh, eighth, and ninth award years prior to the year for which the most recent earnings data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated.

We then add to § 668.2 and define a "qualifying graduate program," which (a) establishes an initial list of graduate degree fields (defined by their credential level and CIP code) that potentially qualify for this longer cohort period used for earnings measurement for the first three years after the effective date of this rule; (b) establishes a regular data driven process the Department will use to update that list after the initial period; and (c) specifies further criteria that institutions must attest apply to a program to deem it a qualifying graduate program.

We define an initial list of potentially qualifying graduate programs whose students are generally required to complete a postgraduation training program to obtain a license to practice independently in the following fields: medicine, osteopathy, dentistry, clinical psychology, marriage and family therapy, clinical social work, and clinical counseling. These fields were selected based on credible evidence presented to the Department that program graduates are subject to lengthy, government-imposed, postgraduation training requirements; and graduates' earnings may be constrained by these requirements for at least three years after they graduate from a program.

A program is considered to be an outlier in terms of its earnings growth if its growth is more than two standard deviations higher than the average earnings growth among programs with the same credential level. A graduate degree field (defined by credential level and CIP code) will be considered to have outlier earnings growth if at least half of the individual programs in the field have outlier earnings growth.

In using the College Scorecard data to determine which graduate fields are outliers in terms of earnings growth, we seek to identify programs that have atypically high earnings growth between the first three years after they graduate, and subsequent years. In practice, the

College Scorecard measures earnings 1-, 3-, 5-, and 10-years (the 5- and 10-year measures are planned, but not yet available, though will be after the initial period) after graduation. Accordingly, to measure whether programs have outlier earnings growth we will base our assessment on the comparisons available in these data. Defining a program as an outlier based on whether its earnings growth is two standard deviations above the mean is rooted in a common statistical approach for defining outliers.[134]

We will conduct this process every three years to balance a desire to stay up to date with current practices around licensure and training requirements, while ensuring institutions have stability in how the metrics of the rule will be calculated for their programs. In identifying postgraduate training requirements, we limit the rule to those that typically take at least three years to complete. This accommodation is meant to apply to programs where graduates' earnings capacity three years after graduation is constrained due to not yet having a required license. If training requirements took only one or two years to complete, graduates' earnings would not be constrained at the point when earnings are typically measured three years after graduation and the accommodation would not be necessary.

Programs with a credential level and CIP code included in the list of potentially qualifying graduate degree fields are eligible to have their earnings calculated under the extended cohort period (with a six-year lag before earnings are measured) if the institution attests that A) if necessary for the license for which the postgraduate training is necessary, that it is accredited by an agency that meets State requirements; and B) at least half of the program's graduates obtain licensure in a State where the postgraduation requirements apply.

We have also made conforming changes to refer to a "qualifying graduate program" in § 668.408.

*Comments:* One commenter mentioned that medical residency length varies by specialty, so the D/E

---

[134] There are several common ways of defining statistical outliers in a distribution, including by measuring how many standard deviations an observation's value is from the mean or by measuring the distance of a value from the 25th or 75th percentile of a distribution in terms of multiples of the interquartile range. In defining a single observation as an outlier it is more common to use a threshold of three standard deviations away from the mean. We use a more lenient two standard deviation standard for any single program, in part because we require that a majority of programs in a graduate field are outliers in order for that field to meet the outlier earnings test to be on the list of potentially qualifying programs.

rates calculation should allow for individualized time to license for programs with medical residency, not just an overall extension that is the same for all programs.

*Discussion:* We acknowledge that different medical specialties have different residency lengths. It is not feasible, however, to adapt different cohort periods for every student depending on the type of residency they pursue. We believe that establishing a 6-year lag before earnings are measured gives the vast majority of students in such programs time to complete residency requirements and measure their early career earnings.

*Changes:* None.

*Tipped Income*

*Comments:* Many commenters expressed concerns about our ability to fully capture earnings in sectors where gratuities play an important role in the compensation structure of employees, such as many jobs associated with cosmetology. These commenters lamented the widespread underreporting of income of this form to tax authorities, but claimed it posed a major obstacle to the Department's ability to capture the complete earnings picture for workers in such situations. These commenters also argued that this phenomenon of tax evasion was not the fault of institutions, and they should not face sanctions as a consequence. Several other commenters pointed to past Department statements about the prevalence of the underreporting of tipped income. These commenters believed that the estimates expressed in those statements support modifying our earnings measurement methodology.

*Discussion:* In the NPRM, the Department addressed its views on the challenges posed by unreported income of any sort. In the NPRM section titled ''Process for Obtaining Data and Calculating D/E Rates and Earnings Premium Measure (§ 668.405),'' we explained the rationale for relying on administrative income data collected by a partner Federal agency. There are several reinforcing reasons why we choose to rely on reported income to the Federal Government. These reasons include: individuals are legally required to report their income subject to Federal taxation; the Department relies on reported income in its administration of the title IV, HEA programs, including with respect to Pell grant eligibility, subsidized loan eligibility, and income-driven repayment payment determinations; past experiences with the earnings appeals process suggests it does not improve the quality of information available to assess program

performance; and new research on the prevalence and scope of unreported income and its effects on the accuracy of earnings measures.

As the Department explained in the NPRM, individuals who fail to report taxable income in a manner consistent with Federal law are subject to considerable legal penalties.[135] In an increasingly digitized economy, new Federal law in the American Rescue Plan Act lowered to $600 the reporting threshold for when a 1099–K is issued, which will result in more third-party settlement organizations issuing these forms.[136] Relatedly, the increasing prevalence of electronic payment methods and the decline in cash transactions should lessen the concern of tax evasion as a source of error in our measurement of graduates' earnings. The anonymity of cash transactions makes it possible for the exchange of goods and services to take place without a record, facilitating evasion.[137] With digital transactions, however, records of the transactions are kept, not only by business owners but also by the payment processers. This record of payments exposes would-be evaders to elevated risk of apprehension in the case of an audit. Consequently, there are now greater practical hurdles to evading Federal tax reporting since the Department last regulated GE programs with respect to D/E rates. As we noted in the NPRM, this is not to deny that some fraction of income will be unreported despite legal duties to report, but instead to recognize as well that legal demands, technology, payment practices, and other relevant circumstances have changed.[138]

In the NPRM, the Department also explained that administrative earnings data from the IRS play a crucial role in the HEA framework for determining Pell grant and other aid eligibility, as well as monthly loan payments on income-

---

[135] 88 FR 32300, 32335 (May 29, 2023).

[136] The 1099–K form reports payments from payment card companies, payment apps, and online marketplaces and is required to be filed with the IRS by these third-party settlement organizations. In 2021, a statute was enacted that reduced the threshold for reporting to $600, as opposed to $20,000 in years prior. This lower reporting threshold means that settlement organizations will likely have to file 1099–K forms for a greater number of sellers and transactions. See Public Law 117–2 (2021) (*govinfo.gov/content/pkg/PLAW-117publ2/html/PLAW-117publ2.htm*).

[137] Indeed, commenters frequently cited the fact that graduates from fields such as cosmetology often operate cash businesses as a reason to suspect such proprietors of tax evasion. The economics literature also has cited a concern over tax evasion as a drawback of paper currency. See, for example, Rogoff, Kenneth (2015). Costs and Benefits to Phasing Out Paper Currency. *NBER Macroeconomics Annual,* 29.1: 445–456.

[138] 88 FR 32300, 32335 (May 19, 2023).

driven repayment plans. Income information provided from official filings to the IRS are one of the primary ways that borrowers document their income to the Department to qualify for critical student or borrower benefits. It would be inconsistent and imprudent for the Department to use different earnings data for similar purposes related to the administration of title IV, HEA student aid. In these regulations, earnings data are employed so that students might avoid programs that leave them with very low earnings or unaffordable debt, in part to protect taxpayer investments in the title IV, HEA programs. More specifically, these regulations represent front-end safeguards on the use of title IV, HEA support, which will reduce Federal investments in ineffectual programs through loans and other student aid and, likewise, will reduce back-end liabilities for the Department and taxpayers when program completers default or make reduced Federal loan payments. It would undermine the goals of taxpayer protection if we allow borrowers to qualify for lower or zero loan payments due to low reported earnings to the IRS, but ignore these low reported earnings when providing students with information or determining whether a program prepares students for gainful employment.

The Department's experience with the earnings appeal process also cautions against making accommodations for the possibility of income underreporting. Because institutions were permitted to offer alternative measures of earnings through an appeals process under the 2014 Prior Rule, the Department has direct experience with the challenge of trying to measure earnings more accurately than the information available through administrative wage records. As the Department noted in the NPRM, the goal of more accurate earnings data through the earnings appeal process in the 2014 Prior Rule was ultimately frustrated by implausibly high earnings reported through the survey measures. Problems of accurate recall and selection bias (*i.e.,* only higher earners were sampled, or they were differentially likely to respond) among survey respondents likely impacted the earnings appeal process and make it unlikely that a similar process would yield improved information on a program's earnings outcomes.

The Department notes that commenters' concerns with earnings reporting (*e.g.,* misreporting or mismeasurement, classification of small business income, ability to observe all

App.39

earners) would be more likely to occur in survey measurements of income than in administrative records. First, the definitions of different types of income are complicated and would require survey respondents to recall not only those definitions but also the amount of earnings that fit into each category. By contrast, administrative records contain this information for all earners, often prepared by tax professionals who are well aware of the proper definitions. To the extent that commenters are concerned about tax evasion in reporting to the IRS, it is hard to see why program graduates would be more forthcoming about the true nature of all their earnings on a survey, where they have no legal obligation to report accurately, especially if such reporting would implicate them in tax crimes. Survey data are also hard to collect accurately, with a great deal of scholarly work in survey methodology devoted to handling biases produced by common biases of respondents and the difficulty in collecting representative, truthful data on all types of individuals of interest. Given these challenges, lessons from prior experience, and the incentives for institutions to find a sample of students whose aggregated earnings would allow their program to continue operating, the Department does not believe that surveys would prove a reliable measure of earnings.

Finally, as we explained in the NPRM, new research is now available. A 2022 study shows that earnings underreporting is likely to be small—about 8 percent—in contrast to previous estimates that formed part of the record for the 2014 GE rule and was a basis for arguments in litigation over that rule.[139]

The Department's goal is a reasonable assessment of available evidence overall, and the Department has taken care not to rely unduly on any one study. At the same time, the Department has accounted for evidence that puts into perspective the low magnitude of possible underreporting that is relevant to these rules.

In addition, as we emphasized in the NPRM, the timing for measuring earnings in this final rule differs from the timing in the 2014 Prior Rule.[140] This change in timing, where graduates' earnings will be measured longer after when they graduate, will tend to increase the measured earnings of all programs. Based on our analyses of program median earnings estimates under the 2014 Prior Rule and those released in the PPD, we estimate that such increases are likely to be much higher than the 8 percent estimate of underreporting from the Cellini and Blanchard research. Therefore, the rule already includes safeguards against potential underestimates of earnings.

We also seek to avoid the perverse incentives that would be created by making the rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes. We do not believe that taxpayer-supported educational programs where benefits are provided based on reported income to the IRS should, in effect, receive credit when their graduates fail

to report income for tax purposes. All things equal, earnings underreporting will tend to have borrowers repay less of their loans under income driven repayment plans. If the Department ignores lower reported earnings among some programs, it would effectively be supporting greater taxpayer investments in those programs. Even if that position were fiscally sustainable, it would incentivize institutions to discourage accurate reporting of earnings among program graduates—at the ultimate expense of taxpayers. It could also potentially invite private investment in training programs aimed at exploiting this weakness in accountability for student loans that are unlikely to have to be repaid, thereby increasing the amount of Federal funds going to programs like these.

Given these considerations, the Department reaffirms its decision to rely on administrative earnings reported to a Federal agency, comparable in quality to earnings data from the IRS, without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting. To the extent that institutions believe that underreporting is negatively affecting their program's performance on the D/E rates and EP metrics, the Department continues to believe that institutions are well positioned to counsel their students on the importance of tax compliance. Indeed, many commenters noted the role that cosmetology programs play in training their students to run their own small businesses, including managing their finances. Though individuals are certainly the most responsible party for decisions about tax compliance, programs are as well positioned as any party to inform students about the requirements and benefits of tax compliance. Therefore, it is also important in the Department's view to maintain incentives for programs to deliver this message as effectively as possible.

*Changes:* None.

*Comments:* Many commenters expressed suspicion about the quality of our earnings data based on their own knowledge of earnings level in their industry. In some cases, this knowledge came from employing people in the field and marshalling evidence from the W–2 wage records of their employees, while others provided anecdotal reports of their own earnings or those of people they know working in the field.

*Discussion:* While we value the input of commenters who wish to alert us to a mismatch between their industry experience and the earnings reflected in the 2022 PPD released with the NPRM, we remain confident in the

---

[139] See *Am. Ass'n of Cosmetology Sch.* v. *Devos,* 258 F. Supp. 3d 50, 59–60 (D.D.C. 2017) (stating that ''[a] report by Stanford professor Dr. Eric Bettinger, which was submitted to the agency during the notice-and-comment period, found that both tip income and self-employment income are, on average, underreported by around 60 [percent]''). The report referenced by the court is Bettinger, Eric (May 26, 2014). Imputation of Income Under Gainful Employment. We have reviewed that report again during this rulemaking.

The recent study that we reference in the text of this final rule and that we discussed in the 2023 NPRM is Cellini, Stephanie Riegg & Blanchard, Kathryn J. (2022). Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of Underreported Income. Geo. Wash. Univ. (*www.peerresearchproject.org/peer/research/body/PEER_HairTaxes-Final.pdf*).

The 2022 Cellini and Blanchard study critiques the earlier May 26, 2014, study by Bettinger, which had estimated a much higher level of underreported earnings for cosmetologists. See *id.* at 11 n. 14 (discussing Bettinger (May 26, 2014). Imputation of Income Under Gainful Employment). See also our discussion in the NPRM, 88 FR 32300, 32336, 32346 (May 19, 2023). We independently reviewed the Bettinger report during this rulemaking, as well as Cellini and Blanchard's critique of it. We concur

with Cellini and Blanchard that the May 26, 2014, Bettinger report appears to include an unrealistic overestimate of underreported total income. The Bettinger report inflates total income by 50 percent, and the adjustment appears to be based on an assumption about the share of underreported tips; however, tipped income is only a portion of total income.

We further observe that, according to a report sponsored by Wella Company and others—with listed supporters including John Paul Mitchell Systems, the Professional Beauty Systems, and others, and submitted or referenced by numerous commenters during the public comment period for this final rule, including AACS-salon owners reported a ''high rate of tip compliance.'' Qnity Institute (2023). A Career in Pro Beauty, at 8 (*https://www.nsginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=216592*). Specifically, that source indicates that 4 percent of salons reported not allowing their employees to receive tips, 87 percent of salons surveyed reported that tips were included on the W2 for all employees, and another 5 percent of salons reported tips on the W2 for some employees; meaning that just 4 percent of salons did not report tips for employees on W2s. See *id.* This report also relied on the Cellini & Blanchard (2022) estimate of 8 percent tip underreporting for the report's estimate of annualized earnings. See *id.*

Finally, we note again that tips included on credit card payments to a business are more likely to be reported, as we have discussed above in the text, and it is reasonable to expect that many workers are complying with the law to include tips in their reported income.

[140] 88 FR 32300, 32329–35 (May 19, 2023).

<span style="color:red">App.40</span>

comprehensiveness of the data we use to assess the earnings of program graduates. IRS earnings data are the most comprehensive source of income available for individuals in the United States and are legally required to be reported by all individuals who have income above a minimum earnings level. The measures provided in the PPD come from the College Scorecard and contain both total wages and deferred compensation from W–2 forms, as well as positive self-employment earnings from 1040–SE IRS forms for each completer. Only Federal administrative sources contain such a comprehensive view of earned income. The quality and reliability of this data is reinforced by the many commenters who cited their own business's W–2 earnings as evidence of typical earnings in their industry. Indeed, one commenter conducted (and some others cited) a study of earnings in a segment of the beauty industry by compiling W2 records for a sample of independently owned salon businesses with 1–10 locations. These attempts to estimate earnings underscore the advantages of Federal administrative data, as it provides a comprehensive repository of the records commenters put a great deal of effort into collecting. However, whereas commenters report information from only W–2 records they have immediate access to through their own businesses, or through surveys of a convenience sample of employees with response rates of 11 percent, IRS administrative records have no such gaps in data collection or limitations in coverage to individuals in a particular set of employers. What is more, the data available to the Department through its data match with the IRS allows it to observe self-employment income through the 1040–SE records it has access to, a source of earnings not available to commenters.

*Changes:* None.

*Comments:* Some commenters argued that in lieu of constructing an accountability framework based on reported earnings, the Department should focus its efforts on encouraging or requiring tax compliance among employers in industries where cash tips are prevalent.

*Discussion:* Though the Department fully endorses tax compliance for all legally obligated parties, it recognizes that enforcement of those rules is under the purview of the IRS. In addition, as outlined in the NPRM and the Department's above responses about unreported income, the Department does not believe there are strong reasons to make accommodations for the possibility of income underreporting.

*Changes:* None.
*Comments:* Some commenters noted recent changes in tax law requiring electronic third-party payment processors to issue a 1099–K for dollar amounts as low as $600, a fact relevant to the ability of workers who use such electronic transfer payments to have those payments go undetected. One commenter noted that because this change will likely increase tax compliance and mitigate any underreporting issue, the Department should delay implementation of the regulations until the earnings years used in the rule were covered by this change, which was first applied to the 2022 tax year.

*Discussion:* As the Department explained in the NPRM and its response to commenters with regard to the underreporting of income, the changes to 1099–K reporting requirements for third party settlement organizations is an important change in the landscape of tax compliance since the last time the Department expressed a view on the extent of underreported income in administrative earnings data. However, while this change certainly buttresses the Department's confidence that currently there is not a more reliable source of earnings information for all occupations, it is not the decisive factor, and therefore the Department does not view the delay of the law's implementation as grounds to delay implementation of either the Transparency Framework or the GE standards.

*Changes:* None.

*Unearned and Self-Employment Income*

*Comments:* Some commenters noted that self-employment is common for some fields and that accurate income measurement could be difficult for individuals in such circumstances because individuals often choose to keep income in their business or may be able to count business expenses against their total income to reduce their taxable income. In particular, one commenter expressed concern that earnings captured on form 1040 schedule SE would not be included in graduates' incomes. One commenter asserted that the Department has acknowledged limitations in its ability to capture self-employment earnings in the Master Earnings File and claims no adequate remedy has been proposed.

*Discussion:* The earnings data in the PPD used to conduct the Regulatory Impact Analysis come from the College Scorecard data, which matches title IV, HEA recipient data for completer cohorts to three-year earnings information from the IRS. As the
technical documentation for the College Scorecard explains, these data contain "the sum of wages and deferred compensation from all non-duplicate W–2 forms and positive self-employment earnings from IRS Form 1040 Schedules SE (Self-Employment Tax) for each student measured." As noted elsewhere, the Department believes these are data are well-suited for the purposes of these regulations.

*Changes:* None.

*Inclusion of Non-Completers*

*Comments:* Several commenters provided feedback about our choice to exclude non-completers from our calculation of official measures of program performance, including the D/E rates and EP measures. Some mentioned the possibility of including non-completers in the information provided to students through the financial value transparency framework. One commenter supported including non-completers because they represent such a large share (the majority) of students in higher education. Another recognized the value of including non-completers but argued against it for the purposes of constructing a consumer information tool. The remaining commenters opposed the use of non-completers for these measures, arguing that most students were concerned with results for students who complete their programs.

*Discussion:* Though the Department recognizes the importance of considering the experiences of students who do not complete a program for understanding student success in any field, we believe that tracking results for completers is the most practical approach to assessing outcomes. That approach bases the median earnings measure on students who have had the full benefit of the educational experience at the institution, and that measured debt levels reflect the cost of obtaining the credential. While we agree that institutions should be accountable for helping their students attain a degree, these regulations focus primarily on promoting a balance between financial costs and benefits to students of different credentials. Still, the rule includes completion rates at the institution or program level among a set of supplemental performance metrics that may be included in the program information website to provide this added context to students.

*Changes:* None.

*Median and Mean—§§ 668.403 and 668.404*

*Comments:* A number of commenters disagreed with the Department's

proposal in the NPRM to use the median earnings amount for the D/E rates measure and the EP measure. Many commenters noted that in the 2011 and 2014 Prior Rules, the Department used the higher of the mean and median earnings amount as the denominator for the debt-to-earnings rate and these commenters suggested that approach should be applied to calculate earnings for the D/E and EP metrics in this rule as well. One commenter noted that the Department's rationale in the text of the 2014 final rule for using the higher of mean and median earnings was grounded in a concern about the impact of a large number of zero earnings individuals in a completer cohort. In general, quantile statistics such as the median have the drawback of instability if there is a large dispersion of the data near a given quantile point.

One commenter presented a simple example, if a program had five earners (putting to one side the fact that such a program's earnings would be privacy suppressed) whose earnings were $0, $0, $0, $50,000, and $50,000, their median earnings would be $0. However, if just one of those $0 estimates switched to $50,000, the median would switch to $50,000 as well. The question presented by such a case is whether the mean earnings ($20,000 in the first case, $30,000 in the second) better conveys what graduates typically earn at such a program than the $0 median.

The 2014 Prior Rule argued that in such cases the mean is the better reflection of what students can expect than the median. It concluded that in cases where the median is the higher of the two statistics, the mean should be preferred because it reflects high levels of employment in higher earning jobs. Such an example is evident in our second case above, where the median earnings would be $50,000, but the mean is $30,000.

*Discussion:* As the Department explained in the 2023 NPRM's Background Section,[141] the Department has changed its view on the tradeoffs presented by the advantages and disadvantages of these two measures of central tendency and has concluded that the median is the correct measure. This view is grounded in the fact that the median reflects the minimum earnings level achieved by at least half of a program's graduates, a meaningful measure of student earnings that reflects the experience of the majority of students. Based on data released in the 2014 rule, the median and mean earnings of programs are often very similar. Mean earnings are most

commonly higher than median earnings of program completers at programs with very low earnings levels. In such programs, most graduates may have earnings close to minimum wage earnings, but there may be some outlier observations with higher earnings—leading the mean to be higher. Again, we believe it is more appropriate to base the rule on the median earnings, since it indicates the amount of earnings that half of graduates exceed, and it is not as sensitive to outlier observations.

The Department notes that the commenter's example with just five earnings estimates provides some useful insight into potential limitations of the use of median earnings, but gives an overly dramatic sense of the stakes between the mean and median in the context of the rule. Under these rules, the Department only calculates earnings when there is a minimum of 30 completers in a cohort. With more observations, the difference in earnings among observations near the median is likely to be much smaller than in the commenter's example and so additions of one higher or lower earner will tend to change the median only slightly. On the other hand, an addition of a single extremely high earner could influence the mean substantially, even though outcomes for nearly all students are left unchanged. We view the potential of this latter type of distortion as much more likely and therefore prefer the median.

The Department also believes it is important to be consistent across measures by using same statistic to measure both program graduates' earnings and to construct the earnings thresholds to calculate the earnings premium. The Department cited evidence in the NPRM that mean earnings levels among high school graduates in a State are always higher than median earnings levels because of the large rightward skew of the earnings distribution created by very high earners in income distributions. Using the higher of mean and median earnings in the construction of each State's high school earnings threshold would thus result in a much higher EP threshold for programs to meet. Given our concerns with the representativeness of the mean in the earnings context, we believe such a standard would be an inappropriate comparator for programs. Taken as a whole, we believe the correct choice for both setting an earnings threshold and measuring program graduates' typical earnings against that threshold is to use median earnings.

*Changes:* None.

*Part-Time Employment*

*Comments:* Many commenters mentioned that workers often choose fields such as cosmetology for their flexible work schedules, allowing them to combine part-time work with other valuable activities such as childcare. Working fewer hours means lower annual earnings, they say, but that hourly rates remain very strong and show that many jobs are still lucrative given the number of hours employees in these sectors are working.

*Discussion:* We acknowledge that many workers may choose to pursue occupations with work schedules that suit their lives. Regardless of the hours that individuals choose to work, we believe it is important that students who borrow earn enough in total to be able to afford their debt payments. For the earnings premium metric, we do not condition on full-time employment in measuring the median high school earnings of individuals in the same State. We therefore compare the earnings of program graduates to high school degree earners in the same State, some of whom are also making similar choices to work part-time.

*Changes:* None.

*Graduates Who Earn Higher Degrees*

*Comments:* One commenter expressed concern about the exclusion of graduates who earn higher degrees from a program's data, since these students may ultimately have higher earnings.

*Discussion:* In measuring median earnings under the rule, we exclude program completers who are enrolled full-time in a postsecondary program in the year their earnings are measured. Otherwise, however, we will not exclude individuals who may subsequently have gone on to earn a higher credential. As a result, if one program helps students attain higher credentials and thereby higher earnings, that will be reflected in the programs outcomes.

*Changes:* None.

*Earnings Data*

*Comments:* Some commenters expressed suspicion whether the IRS data sources were accurate, with concerns often centering around differences between the incomes reported in the Program Performance and other government sources such as the Bureau of Labor Statistics. As a result, some commenters argued, schools should have the ability to examine earnings data.

*Discussion:* The disparities between the earnings data in the PPD and the Bureau of Labor Statistics (BLS) in

---

[141] 88 FR 32300, 32311 (May 19, 2023).

particular stem from a difference in what these two sources attempt to measure. Whereas the PPD measures earnings for all individuals who graduate from specific programs, regardless of the industry they enter (or whether they find any formal employment at all) 3 years after completion, the BLS data cited by the commenters measures the distribution of earnings for individuals who successfully work in a given industry, irrespective of their path into the industry or the stage of their career. It is, therefore, not surprising that these two data sources would differ in the earnings they observe; they estimate a different value for a different population. As we explained in the NPRM and elsewhere in this preamble, we believe that administrative earnings records from the Federal Government matched to the specific students who graduated from a given program is the correct way to measure program earnings outcomes. We believe it is much more appropriate for its purpose than aggregated statistics for whole sectors of the economy, which do not have any necessary relationship to the outcomes of graduates of particular programs.

*Changes:* None.

*Comments:* One commenter noted that there is no provision for adjusting the 2021 and 2022 earnings for inflation, in contrast to earnings data provided on the College Scorecard. The commenter noted that we did not explain was given in the NPRM about the rationale for this difference, even though it could affect earnings measurements.

*Discussion:* The D/E rates metric is a ratio of debt payments divided by earnings or discretionary earnings. For presentation purposes, debt and income numbers from previous years may be translated into more current year dollars on the program information website to facilitate interpretation. But outcomes under the D/E rates metric would not be affected if we do so since both the numerator and denominator would be subject to the same inflation adjustment. For the EP metric, again since both program earnings and the earnings threshold would be adjusted by inflation, the pass/fail outcome of each program is not influenced by the adjustment. Still, the Department may present the EP with such an adjustment on the Department's website and in other communications to facilitate interpretation.

*Changes:* None.

*Completers With No Income*

*Comments:* One commenter recommended that the Department

change its calculation of median earnings for programs by excluding individuals with no reported income and then also removing the same number of individuals from the debt cohort, where those individuals are selected for having the highest debt burdens out of the cohort for that program. The rationale, they explained, was that it is unfair to assume zero earnings reflects inability to find work.

*Discussion:* While the Department recognizes that often individuals choose to leave the labor force for reasons that do not reflect their ability to find a job, we believe that, especially with respect to the career training programs covered by the accountability provisions of the regulations, students typically have a strong interest in being employed in the three-year window directly after graduation. As a result, we believe measuring median earnings, and including those with zero earnings, among completers is the best way to capture the labor market outcomes of program graduates, including both the likelihood that they find employment and the earnings among those who are employed.

*Changes:* None.

*Individuals in Comprehensive Transition and Postsecondary (CTP) Programs*

*Comments:* One commenter indicated that the Department should not exclude students enrolled in CTP programs from GE requirements, arguing that such students were particularly vulnerable and, despite being ineligible for Direct Loans, could exhaust their Pell Grant eligibility while enrolled in poor-performing CTP programs. The commenter asked the Department to consider other options to ensure the quality of CTP programs.

*Discussion:* Although we agree with the commenter that it is important that CTP programs are of adequate quality, we do not believe that applying the Financial Transparency metrics to CTP programs is the appropriate method of ensuring program quality. As stated in the NPRM, the Department does not believe it is appropriate to apply either the earnings premium or D/E metric to CTP programs. Since students in CTP programs are not required to have a high school credential, it would be inappropriate to judge a CTP program's earnings outcomes against the outcomes of individuals with a high school diploma or the equivalent. And, since these students also are not eligible to obtain Federal student loans, debt-to-earnings rates would be meaningless for these programs.

*Changes:* None.

*Data Sources*

*Comments:* Some commenters expressed concern that the Department has not definitively determined the Federal data source that will provide the earnings data used to calculate the D/E rates and EP measures. These commenters further argued that this indeterminacy does not allow the public adequate opportunity to comment on their choice of data source.

*Discussion:* The Department provided an adequate notice and opportunity to comment on the proposed rules regarding earnings data, as well as the subjects and issues involved in choosing among data sources. Although the Department has not finalized its data source for the administration of these rules, we have confidence in the reliability of all Federal agency sources under consideration. We believe it is prudent for the long-term efficacy of the rules to retain the flexibility to change data sources if future changes in law or data collection practices and availability make impracticable the use of whichever source might be best to use today. At the same time, the Department's NPRM informed the public about the kind of data needed for the rules, as well as the sources from which those data might be drawn. Indeed, in the NPRM, the Department expressed its current preference for the use of the IRS data that already forms the basis of the earnings measures in the Department's College Scorecard data, and that is used for the Regulatory Impact Analysis in this rule. Comments were welcome on the data types and data sources that we could use in the final rule, including any specific concerns about the Department's preferred options. The Department did, in fact, receive a number of comments regarding those issues—for example, on whether administrative data capture self-employment earnings or whether other survey-based sources of earnings might be appropriate substitutes—and we have responded to those comments elsewhere in this document.

*Changes:* None.

*Comments:* Several commenters pointed to salary aggregation websites such as salary.com and ZipRecruiter as alternative data sources, either to support claims about the pay increases their students would see after an initial supervisory or apprenticeship period post-graduation or to dispute the facial validity of the Department's earnings estimates for some types of programs.

*Discussion:* As with other data sources provided by commenters to challenge the accuracy of the data provided through the PPD, the

Department would like to emphasize the comprehensiveness of its Federal administrative data and the reasons that it should be used instead of external sources that do not have a census of earnings records directly matched to the individuals who complete a given program of study.

Websites such as those mentioned by commenters use a variety of methods to estimate earnings for a field, but none of these methods come close to the coverage of the IRS data used to obtain program-level earnings. Instead, they rely on sources such as job listings or self-reported income from website users or other survey sources. By their nature, these methods try to estimate the data we directly obtain from Federal administrative sources. In addition, these external sources provide industry-wide estimates of earnings, regardless of worker experience or background, and often miss the earnings of program graduates who work in a different occupation than that the program intends to train students for, as well as students who may not find work altogether. We do not believe that these sources provide any reason to doubt the accuracy of Federal administrative data, and more broadly believe they are not an appropriate data source to assess the performance of particular programs for our present purposes.

*Changes:* None.

*Comments:* One commenter expressed concern that institutions would not be able to collect income information from their students, because it would be a large burden and because students would be unwilling to (and should not have to share) personal income information. This commenter also suggested that the State should collect such information.

*Discussion:* The regulations in this rulemaking do not require institutions to collect earnings information for their students. The Department will obtain the relevant earnings information through a Federal agency with administrative earnings records.

*Changes:* None.

*Minimum N-Size for Earnings and Debt Metrics*

*Comments:* One commenter noted that they interpreted the remarks of the Department as implying that we would consider a look-back period of 2 to 6 years to develop a cohort of a minimum of 30 students. The commenter objected to the longer look-back period, arguing that such a long period cannot account for any improvements in policy that a program may have made in more recent years.

*Discussion:* The Department will use a 4-year cohort (*i.e.,* combining completers who graduate over 4 consecutive award years) when a 2-year cohort is insufficient for a n-size of 30. The Department has not considered a period that is broader than 4 years. The use of a 4-year cohort, when needed, will enable the Department to include data from more programs in the D/E and EP measures.

We note that some lag in the metrics between when students complete a program and when the data is produced is inevitable if we wait several years to measure the earnings of program completers. As discussed elsewhere we believe the 3-year lag to measure earnings is appropriate to allow graduates a period to find employment and settle into their early careers, and the broader lag stems from this choice.

For a period after the effective date of the rule, however, institutions can choose to report data for transitional rates on more recent cohorts' information for calculating median debt levels. During this transition period, changes to programs' borrowing outcomes will be reflected more rapidly in the D/E rates published by the Department.

*Changes:* None.

*Comments:* One commenter suggested analysis of additional n-sizes beyond the assessment of 10 and 30 completers, as we discussed in the NPRM. They suggest allowing the minimum n-size to vary by program depending on the need for privacy considerations, or for the rule to include flexibility in the determination of n-size.

*Discussion:* An n-size of 30 is consistent with past Department practices, including the policy governing the development of cohort default rates, as well as IRS data policy. We recognize that a lower n-size would include more programs, but we believe the n-size of 30 completers over a four-year period is appropriate to protect the privacy of individuals who complete smaller programs, and we project will result in coverage of over 80 percent of students receiving Federal student aid (as documented in the RIA).

*Changes:* None.

*Comments:* A few commenters posited that excluding D/E rates for programs with fewer than 30 students completing during a 2- or 4-cohort period rewards public and private nonprofit programs with poor graduation rates.

*Discussion:* As detailed in the RIA, many programs have very few completers in any given year, and such programs are indeed more prevalent among public and private nonprofit

institutions. Still, the more relevant measure of coverage of the rule is the share of students covered. As we explain in the RIA, with these privacy safeguards in place we expect to be able to publish metrics for programs that enroll over 80 percent of federally aided students in both the GE and non-GE programs.

*Changes:* None.

*Comments:* One commenter supported the approach to calculate median debt based on at least 30 completers in an applicable cohort.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

**Measurement of Debt**

*General Opposition*

*Comments:* Several commenters argued that the rule is too lenient because of reasons such as: it does not include all types of debt in the calculation of D/E, does not take into account other debt metrics such as repayment rates, and because graduate student have longer amortization periods. One commenter argued that the leniency leads only a small subset of programs to be subject to the metrics and that many programs are immune from the accountability metrics.

*Discussion:* The regulations will provide stronger protections for students of programs where typical students have high debt burdens or low earnings. The share of student enrollment that is covered under the rule is much higher than the share of programs that is covered because there are many very small programs with only a few students enrolled each year. As discussed in the RIA, we estimate that more than half of all programs have fewer than five students completing per year and about 20 percent have fewer than five students enrolled each year. The Department believes that the coverage of students based on enrollment is more than sufficiently high to generate substantial net benefits from the policy. We believe that the number of students, rather than programs, covered by the rule is the more important consideration because the benefits, costs, and transfers associated with the policy almost all scale with the number of students (enrollment or completions) rather than the number of programs.

We do not agree that the Department arbitrarily chose which types of debt to include in the D/E rates calculation. For most borrowers, we measure substantially all of their debt, including private and institutional loans. We exclude parent PLUS loans because

parents—and not the students—are responsible for repaying those loans. Finally, we cap this debt at the net direct costs charged to a student in deference to consistent concerns from institutions that cannot directly control students' borrowing for living expenses.

*Changes:* None.

*Comments:* Several commenters criticized the Department for only applying GE rules to the for-profit sector. The commenters argued that 4-year degree programs (administered at private nonprofit and public institutions) saddle students with more debt than shorter programs; however, these programs are not subject to accountability under GE. These commenters argued that the notion that for-profit institutions saddle students with debt at the taxpayers' expense is misguided and not the source of the affordability problems in higher education.

*Discussion:* The GE regulatory provisions do not measure total debt in isolation. Rather, the regulations hold programs accountable for the ratio of debt to earnings. Although debt may be higher for graduates of some 4-year programs (at private and public institutions), it is reasonable to expect typical earnings to also be higher at programs that lead to students borrowing large amounts. The rule will require 4-year programs at for-profit institutions to pass the D/E and EP metrics, and the rule includes transparency provisions for non-GE programs, including 4-year degree programs, that fail D/E metrics to provide information about the program. Further, GE provisions in the HEA apply only to GE programs.

*Changes:* None.

*Comments:* One commenter does not believe institutions should be held accountable for student borrowing because institutions' financial aid departments do not have control over how much students borrow. Specifically, the commenter noted that institutions are required to offer students loans up to what they are offered, even if that exceeds the cost of tuition and fees.

*Discussion:* Under § 668.403, we cap the debt counted for institutions at the costs of tuition and fees and books and supplies. Institutions have a role in how much they charge to attend programs and in the earnings of their students. These regulations encourage students to attend programs where their debt levels are not likely to be burdensome relative to their earnings.

*Changes:* None.

*Comments:* One commenter questioned whether large loan balances are the primary reason for default, as opposed to students' choice or preference to not repay loans or changes in financial and repayment circumstances. The same commenter questioned the use of default rates while the Department is pursuing Fresh Start.

*Discussion:* This rule focuses on the ratio of debt to earnings and an earnings premium, not on default rates. The Department will use the D/E rates measure to assess the affordability of the debt students incur to pay for their educational program. Regardless of students' decision to make loan payments, a program's D/E rates will be the same.

*Changes:* None.

*Debt Capped at Net Direct Costs*

*Comments:* Several commenters supported the modification to cap the median loan debt at tuition and fees net of institutional grants rather than the amount assessed.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* Many commenters argued that the Department should reduce the total debt number by the amount of any Federal or State grant funds that the student received and used to pay tuition and fee costs. These commenters argued that some students borrow to cover living expenses even when they have received State and Federal aid to cover tuition and fees. These commenters suggested that to ensure that institutions are not held accountable for funds borrowed in excess of what is required to pay for tuition and fees, the Department should reduce the total debt number by the amount of any Federal or State grant funds that the student received and used to pay tuition and fee costs.

Two other commenters suggested that the Department deduct "outside scholarships and grants intended for direct costs from the capped tuition and fees" in the D/E metrics, recommending that the Department net-out both institutional and external grant aid.

*Discussion:* The Department will deduct only grant controlled by the institution from the estimate of charges for direct costs used to cap individual borrowers' debts. The institution controls institutional grants but would typically not control State grants or external scholarships.

Additionally, under § 668.403, median debt is calculated by capping the total amount of each student's borrowing at the charges for direct costs (tuition, fees, books, and supplies),

minus any institutional grant aid the student receives. Therefore, the Department does not hold institutions accountable for loans taken out in excess of direct costs as the commenters suggest. One way that programs can lower their D/E metric is by controlling their net direct program costs—that is, by lowering tuition or providing greater institutional aid.

*Changes:* None.

*Comments:* Several commenters suggested that the Department include all student debt (not just debt for tuition, fees, equipment, and supplies) in the measurement of debt. A few commenters argued that until the Department restricts borrowing to course delivery, the Department should count all debt regardless of what it is used for.

*Discussion:* The measurement of debt will cap each student's amount borrowed at the total net direct costs charged to a student. This is in part in deference to institutions' concerns that borrowing for the cost of living is not directly under the control of the institution, whereas institutions can exercise more control over the direct costs charged to students.

Another reason to cap the measurement of debt at direct charges is that it mitigates the influence of differences in students' family income background on measured median debt levels across programs, since some of the additional borrowing of low-income students relative to higher income students is due to borrowing for living costs.

*Changes:* None.

*Comments:* One commenter stated that the Department should not remove institutional grant aid from cost of attendance in the measurement of program debt.

*Discussion:* This rule departs from the 2014 Prior Rule in subtracting institutional grants and scholarships from the measure of direct costs. This change, as described in the NPRM, was in the interest of fairness to institutions that provide substantial assistance to students. Since this type of aid is more common among non-GE programs than GE programs, this change in approach is related to the fact that under subpart Q, the D/E rates will be computed for all types of programs rather than only GE programs as was the case in the 2014 Prior Rule.

*Changes:* None.

*Comments:* One commenter suggested that the Department exclude loans borrowed for programs at the institution—other than the one from which the student graduated. The commenter contended that, to establish

a true estimate of debt associated with the program a student completes, the attribution provisions should only apply to debt associated with credits from a non-completed program that transfer into the student's ultimate program or that share the same CIP code, or career programs completed at the institution, or both.

Another commenter noted that when students transfer between programs, or when a student enters an institution and does not declare a major, attributing debt to a particular program becomes complex.

A few commenters suggested that the Department include all student debt incurred as of graduation, not just debt incurred for a particular program. These commenters recommended that we hold institutions accountable for the overall financial well-being of their students. The commenters also noted that many programs admit students knowing that they incurred debt from other programs at the same institution or at other institutions. The commenters also highlighted the relevance of the inclusion of all debt for stackable credentials.

*Discussion:* The Department excludes loan debt incurred by the student for enrollment in programs at other institutions (with the potential exception of when institutions are under common ownership or control). We do not believe it would be fair to hold institutions accountable for debt incurred at other institutions not under their control. We agree that attributing debt to programs within institutions is complex and believe the most reasonable way to do so is to assign it to the highest credentialed program subsequently completed by the student at the institution (within undergraduate and graduate levels). The measurement of debt is based on program completers.

*Changes:* None.

*Parent PLUS Loans*

*Comments:* Many commenters supported exclusion of parent PLUS loans from the median debt calculation. Commenters noted that parent PLUS loans are serviced by parents' earnings, so these loans should not be included in a measure of the student's debt service obligations. Commenters also noted that the inclusion of parent PLUS loans in debt service might logically suggest also including parental earnings in D/E rates calculations.

*Discussion:* We agree with commenters in support of exclusion of parent PLUS loans. We exclude parent PLUS loans because parents are responsible for repaying those loans, and treating the debt service associated

with those loans as a burden to be paid out of the students' earnings may not be appropriate for many students.

*Changes:* None.

*Comments:* Several commenters suggested that the Department include parent PLUS loans in calculation of debt for D/E ratios. One commenter argued that excluding parent PLUS loans benefits programs serving mostly dependent students. The commenter also contended that since independent students are ineligible for parent PLUS loans, excluding these loans increases debt for programs serving primarily independent students. The commenter claimed that while the Department states that students are not responsible for repaying parent PLUS loans taken out by a family member, many students nevertheless assist their parents with repayment of these loans. Another commenter argued that the exclusion of parent PLUS loans fails to account for the true amount of debt and unreasonably benefits degree-granting programs at public institutions. Several other commenters claimed that by excluding parent PLUS loans, the Department is undercounting debt obligations and creating a loophole for institutions. Institutions could shift the financial burden of financing higher education from the institution or the student to the parents. One commenter suggested that the Department exclude Direct PLUS loans from measure of debt.

*Discussion:* The primary purpose of the D/E rates is to indicate whether graduates of the program can afford to repay their educational debt. Repayment of parent PLUS is ultimately the responsibility of the parent borrower, not the student. Moreover, the ability to repay parent PLUS loans depends largely upon the income of the parent borrower, who did not attend the program. We believe that including in a program's D/E rates the parent PLUS debt obtained on behalf of dependent students would cloud the meaning of the D/E rates and would ultimately render them less useful to students and families.

The commenter contended that not including parent PLUS loans increases debt for programs serving primarily independent students. This statement is not accurate, because including parent Plus loans would not impact (positively or negatively) the median debt for a program that serves predominantly independent students who are ineligible for parent PLUS loans. By not including parent PLUS loans, the median debt is not increased as the commenter suggests. Rather, exclusion of parent PLUS loans creates an accurate

assessment of the student's ability to repay loans as discussed above.

We remain concerned, however, about the potential for an institution to steer families away from less costly Direct Subsidized and Unsubsidized Loans towards parent PLUS in an attempt to manipulate its D/E rates. We have addressed this concern, in part, by proposing changes to the administrative capability regulations at § 668.16(h), which would require institutions to adequately counsel students and families about the most favorable aid options available to them.

While distinct from the rationale for excluding parent PLUS loans, we note that, for the vast majority of programs, a minority of students are recipients of parent PLUS loans and so their inclusion would affect the median debt of a program only infrequently.

*Changes:* None.

*Comments:* A commenter stated that loan debt from parent PLUS loans disproportionately impacts low-income and Black and Hispanic families and contributes to the Black-White racial wealth gap. This commenter suggested that the Department either include parent PLUS loans in the debt measure or impose restrictions on the use of parent PLUS loans that would make it harder for institutions to "game the system." Specifically, the commenter offered as an example, that the Department could set limits on the percentage of a school's funding that comes from parent PLUS loans or require that students exhaust their title IV, HEA borrowing options before taking out parent PLUS loans.

*Discussion:* The Department shares the commenter's broad concerns about parent PLUS loans. As explained above, however, the Department does not believe that this rule is the appropriate vehicle to address these concerns.

*Changes:* None.

*Cancelled Debt*

*Comments:* One commenter proposed that the Department remove any student debt discharged or cancelled, including as the result of a national emergency, from the D/E rates calculations.

*Discussion:* The Department may discharge or cancel debt for a variety of reasons, including if a student becomes totally and permanently disabled, if a student completed 10 years of payments while working for an eligible public service employer, and in circumstances where an institution may have made misrepresentations to students, among other reasons. These actions to discharge or cancel loans do not absolve or change an institution's obligation under the GE regulation to offer

programs that provide graduates with earnings sufficient to repay their education debt. For instance, discharges through borrower defense to repayment are due to acts or omissions by the institution. Excluding such discharges from the GE program accountability framework would create a situation where an institution that is found to have engaged in substantial misrepresentations ends up with reduced debt amounts for GE purposes. A similar rationale applies for false certification discharges. In addition, were we to exclude closed school discharges, an institution at risk of failure would have incentives to close some locations to improve their performance on metrics under the GE program accountability framework. Other discharges, such as those tied to Public Service Loan Forgiveness or income-driven repayment are unlikely to be relevant for consideration here because they take at least 10 years for forgiveness, which is longer than the timeframes under consideration for the GE program accountability framework.

However, consistent with the 2014 GE rule, the Department will exclude students with one or more loans discharged or under consideration for discharge based on the borrower's total and permanent disability or if the borrower dies. We exclude these students (from both the numerator and denominator of the D/E and EP measures) because under the HEA a student with a total and permanent disability is unable to engage in substantial gainful activity for a period of at least 60 consecutive months and thus their ability to work and have earnings or repay a loan could be diminished under these circumstances, which could adversely affect a program's results, even though the circumstances are the result of student events that have nothing to do with program performance. Similarly, an institution would not be able to anticipate if a borrower passes away.

*Changes:* None.

### Reduced Program Hours

*Comments:* One commenter proposed that the Department create a process for schools to report on programs where they reduced the hours and, therefore, student debt in recent years. The commenter contended that this will allow institutions to correct the debt of previous years that did not reflect the current program using the same CIP code.

*Discussion:* The Department acknowledges that institutions may attempt to improve their program outcomes following the introduction of

rates. The transitional D/E rates discussed in the NPRM allow non-GE programs to report information to calculate debts for the most recent 2 award-years, rather than for the same completer cohorts (who generally graduated about 5 years earlier) as used to measure earnings outcomes. Based on comments received, we have modified the final rule to extend this option to all programs. This will allow improvements in borrowing outcomes to be reflected in the D/E rates.

*Changes:* We have extended the option to report transitional rates information necessary to compute median debt for more recent cohorts to GE programs.

### High Debt Holders Eliminated Based on Data Limits

*Comments:* Many commenters questioned eliminating the highest debt holders based on the number of students without earnings data and believes the Department's basis for doing so is arbitrary and unspecified.

*Discussion:* The Department is subject to limitations in data access that necessitate our approach. When the Federal agency with earnings data provides the Department with the median earnings of students who complete a program, it will also provide an estimated count of the number of students whose earnings information could not be matched or who died. We remove that number of the highest loan debts before calculating the median debt for each program. Since we do not have individual-level information on which students did not match to the earnings data, we remove those with the highest loan debts to provide a conservative estimate of median loan debt so that we do not overestimate the typical loan debts of students who were successfully matched to earnings data.

*Changes:* None.

### Debt Service Payments Calculations

*Comments:* A few commenters expressed concerns with the calculation of the annual debt service amounts for a typical borrower at a program that serve as the basis for the debt-to-earnings ratios. The commenters disapproved of amortizing the median program debt balance according to the method described in the regulation rather than calculating the actual annual debt service levels observed for program graduates under the terms of their loans and chosen repayment plan.

A couple of commenters noted that the interest rates used to calculate D/E rates do not correlate with the actual interest rates of the student loan portfolio. The commenters

recommended that the Department revise the annual loan payment calculation to reflect the actual repayment terms of the individual student, including the amortization period and interest rate.

*Discussion:* Actual loan payments depend on a variety of factors, including which repayment plans borrowers elect. Programs with the same levels of borrowing and the same earnings outcomes could have median graduates with different realized loan payments, then, depending on the share enrolled in various plans. Similarly, changes in the set of plans available might lead actual loan payments to change even with no changes in borrowing or labor market outcomes. Using estimated yearly debt payments that are a function of how much students borrow should focus institutions on the goal of ensuring that their programs are *ex ante* not requiring students to take on unaffordable debt, given the expected earnings of their graduates. The Department disagrees that the interest rates used to calculate D/E rates do not relate to the actual rates of the student loan portfolio. We do not attempt to average the interest rates of the actual loans of student in the completion cohort, but rather take a simpler approach of taking an average of the interest rates on Direct loans over a span of years when completers were likely to borrow. This simpler approach yields much greater transparency and predictability to institutions in how their D/E rates will be determined, while still being likely to accurately reflect borrowing costs in most cases.

*Changes:* None.

*Comments:* Commenters suggested that the Department use the same amortization period for all programs. These commenters argued that when borrowers repay over a longer period, this is a sign that the debt is less affordable. Specifically, commenters argued that the 10-year standard should be used across programs regardless of level.

*Discussion:* Section 668.403(b), provides for three different amortization periods, based on the credential level of the program for determining a program's annual loan payment amount. This schedule will account for the fact that borrowers who enrolled in higher-credentialed programs (*e.g.,* bachelor's and graduate degree programs) are likely to have incurred more loan debt than borrowers who enrolled in lower-credentialed programs and, as a result, are more likely to select a repayment plan that would allow for a longer repayment period. The longer periods for higher level programs also

correspond empirically with the fact that borrowers in longer programs tend to take more time to repay. A further benefit of the longer amortization period for longer programs is that it provides some adjustment for the fact that longer programs often have higher earnings growth beyond the 3-year period used to measure earnings for most programs. As noted above, waiting longer to measure earnings results in the data being more backward looking and less recent. The longer amortization period provides some adjustment without sacrificing the recency of the metric's availability.

*Changes:* None.

*Comments:* One commenter proposed that the Department use a fixed interest rate to calculate median debt for the D/E rates. The commenter noted that interest rates are out of the control of the institution and not an indicator of education quality. The commenter proposed that a fixed interest rate be used with the most generous loan payment option available to students in the cohort.

*Discussion:* The D/E rates are designed to indicate whether graduates can afford to repay their educational debt. Therefore, the calculation uses interest rates over the years that students were likely to have borrowed to calculate median debt, since those interest rates affect the debt service costs that students will need to pay.

*Changes:* None.

*IDR and Debt Payment Calculations*

*Comments:* Several commenters argued that the Department should consider income-based repayment options available to students in the D/E rates calculation. A few commenters noted the loan payment calculation used for the D/E rates is substantially higher than the real monthly payments that borrowers are subject to because of these repayment programs. To improve accuracy of this estimate, and fairness of the regulation, these commenters suggested the Department use expected payments under an income-driven repayment (IDR) plan for D/E rates calculations. By not including repayment plans, these commenters asserted that there is a misconception about the ability of an institutions' graduates to satisfactorily make their loan payments.

A few other commenters argued that the availability of income-based and income-driven repayment programs makes all student debt affordable. The same commenters argued that as long as these programs exist (and students enroll in these programs) the D/E metric is not necessary because all student debt is affordable to students through these

repayment plans. One of these commenters argued that use of the D/E rates to indicate affordability is therefore arbitrary and capricious because loan payments for students in repayment plans do not the measures of debt used in the D/E metric. Several commenters noted that the availability of the Revised Pay as You Earn (REPAYE) program renders the D/E rates misleading since no borrower is actually required to pay off loans under a standard repayment plan.

Similarly, another commenter suggested that the D/E measure should incorporate loan repayment programs such as the National Health Service Corps Loan Repayment Program (LRP), Indian Health Service LRP, Health Professions LRP, and the Veterans Affairs Specialty Education LRP. According to this commenter, failure to consider these repayment programs may adversely affect medical schools whose students commit to public service.

*Discussion:* As we noted in the NPRM, income-based and income-driven repayment programs partially shield borrowers from the risks of not being able to repay their loans. However, such after-the-fact protections do not address underlying program failures to prepare students for gainful employment in the first place, and they exacerbate the impact of such failures on taxpayers as a whole when borrowers are unable to pay. Not all borrowers participate in these repayment plans; where they do, the risks of nonpayment shift to taxpayers when borrowers' payments are not sufficient to fully pay back the loans they borrowed. This is because borrowers with persistently low incomes who enroll in IDR—and thereby make payments based on a share of their income that can be as low as $0—will see their remaining balances forgiven at taxpayer expense after a specified number of years (*e.g.,* 20 or 25) in repayment. For these reasons, the Department disagrees with the commenters who believe that no debt limit should matter for the D/E metric to make the program affordable to students.

As explained in the NPRM, the purpose of the D/E rates is to assess whether program completers are able to afford their debt, including program completers who do not enroll in IDR or other repayment plans intended to help protect students from excessive payments. The Department recognizes that some repayment plans we offer allow borrowers to repay their loans as a fraction of their income, and that this fraction is lower for some plans than the rate used to calculate the D/E rates. However, we decline to set acceptable

program standards at a rate that would allow institutions to encumber students with even more debt while expecting taxpayers to pay more for poor outcomes related to the educational programs offered by institutions. Instead, we view the D/E rates as an appropriate measure of what students can borrow and feasibly repay. Put another way, under the D/E rates calculation, the maximum amount of borrowing is a function of students' earnings that would leave the typical program graduate in a position to pay off their debt without having to rely on payment programs like income-driven repayment plans.

The Department understands that other debt repayment plans for particular fields exist as well, but views these analogously to the Department's own IDR plans. Moreover, these loan repayment programs, while generous, affect only a small fraction of borrowers. For example, in fiscal year 2021, the National Health Service Corps made fewer than 7,000 new Loan Repayment Program awards and the Nurse Corps made about 1,600 LRP awards.[142] The Association of American Medical Colleges estimates that there were about 21,000 graduates of US medical schools in per year in the most recent few academic years, and during the same time period, the number of first time candidates taking the national Nurse Licensing Exam (NCLEX–RN) has totaled over 160,000 annually.[143] This means that these loan repayment programs are used by only a fraction of students.

*Changes:* None.

**D/E Metric**

*Support*

*Comments:* Two commenters noted that the D/E metric is a critical means to identify programs that do not serve

---

[142] The NHSC Loan Repayment Program (LRP) currently includes LRP programs for clinicians working at Indian Health Services facilities. See Indian Health Service (n.d.). NHSC Loan Repayment Program. U.S. Department of Health and Human Services Indian Health Service (retrieved from *https://www.ihs.gov/loanrepayment/nhsc-loan-repayment-program/*). U.S. Department of Health and Human Services, Health Resources and Services Administration (2021). Report to Congress: National Health Service Corps for the Year 2021 (available at *https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/about-us/reports-to-congress/report-congress-nhsc-2021.pdf*).

[143] See Association of American Medical Colleges (2022). 2022 FACTS: Enrollment, Graduates, and MD-Ph.D. Data (*https://www.aamc.org/data-reports/students-residents/data/2022-facts-enrollment-graduates-and-md-Ph.D.-data*). National Council of State Boards of Nursing (2023). 2022 NCLEX® Examination Statistics (Vol. 86). National Council of State Boards of Nursing, Inc. ISBN 979-8-9854828-2-9 (retrieved from *www.ncsbn.org/public-files/2022_NCLEXExamStats-final.pdf*).

App.48

students. According to these commenters, it will help protect students, particularly students from marginalized communities, from entering low-value programs.

*Discussion:* We thank commenters for their support.

*Changes:* None.

*Comments:* One commenter noted that D/E rates can be accurately and rapidly calculated using data available to the Department, are easy for students and institutions to understand, and are hard for institutions to manipulate or circumvent.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*General Opposition*

*Comments:* One commenter noted that graduate students are sophisticated and should be able to make decisions on their own based on evaluating costs and benefits. Allowing the Federal Government to signal its opinion or remove funding unfairly limits a student's right to choose the program according to this commenter.

Another commenter suggested that the D/E measure should not apply to graduate programs, since their undergraduate experiences affect future earnings.

*Discussion:* Graduate debt is growing as a share of Federal borrowing. While we might hope that graduate students' relative sophistication would result in fewer students taking on unaffordable debt, the data described in the RIA show that many graduate programs still lead to unaffordable debt. This problem may partially be addressed by the transparency provisions in subpart Q of these final regulations, which would for the first time produce accurate information on the net prices of graduate degree programs to better inform students about costs. Given the very high debt levels associated with some graduate programs, however, we seek to protect borrowers and taxpayers from all programs that consistently leave most of their graduates with unaffordable debts. Among non-GE programs, we will provide D/E and EP information to students and require acknowledgments at high-debt-burden programs to make sure students have this information when they make their choices. GE programs that consistently leave students with high debt-burdens will lose eligibility to participate in the title IV, HEA programs.

With respect to the influence of undergraduate experiences, students pursue graduate education expecting that they will benefit from additional education. The rule requires

measurement only of the debt students acquire at the graduate level when measuring the D/E rates of graduate programs yet credits the program with the entirety of a students' earnings (as opposed to the increment to those earnings added by attending the graduate program). Regardless of the extent to which students' undergraduate experience influences their earnings, their graduate debt should be affordable given what they can earn following program completion.

*Changes:* None.

*Comments:* One commenter contended that the rule rewards low graduation rate programs with higher typical salaries than would be the case with an acceptable graduation rate. According to this commenter, the Department should downward adjust earnings levels for low graduation rate programs and upward for higher graduation rate programs.

*Discussion:* The median debt and earnings information underlying the metrics in the rule are based on completers. For debt, the goal is to capture the full amount students need to borrow to obtain a credential. For earnings, we use completers' median earnings to better reflect the value of fully completing the program. While we agree in principle that accounting for completion rates may be additionally useful, in practice it is infeasible to measure program level completion outcomes given that students often do not enroll in a specific program at entry (*i.e.,* students enrolling in longer programs with overlapping general education requirements often begin undeclared), making it impossible to define completion cohorts. More generally, we believe the measures as defined are a reasonable compromise in measuring the debt and labor market costs of students who complete a program—a group of students where there can be less debate about whether the program should be responsible for their outcomes.

*Changes:* None.

*Comments:* One commenter proposed that D/E should include other types of debt, such as automobile loans and credit cards.

*Discussion:* The Department cannot definitively tie non-student loan debt that students acquire, such as automobile loans and credit card debt, to the student's pursuit of a degree. The D/E metric aims to measure how well a GE program prepares students for gainful employment in a recognized occupation. Data on the other debt students might incur is not readily available to us and, more importantly, is

outside of the scope of our regulatory authority.

*Changes:* None.

*Comments:* A few commenters warned that it is unclear how D/E is calculated for undeclared students.

*Discussion:* The D/E rates are calculated based only on students who graduate from a program. Students initially undeclared are counted in the program where they graduate at a given credential level, and the debt they accumulate at that credential level is included in their total debt.

*Changes:* None.

*Comments:* Several commenters contended that the D/E metric prevents institutions from developing new programs, because an institution that offers a new program will not have students completing within 6 years.

*Discussion:* In instances where a program does not have data to calculate the D/E rates, such as for a new program, there would simply be no D/E metric available. There are no eligibility consequences for a program with no D/E or EP rates available. Additionally, we do not believe the rule would discourage an institution from creating new programs unless the institution expected the program to eventually lose eligibility due to high-debt burdens or low-earnings.

*Changes:* None.

*Comments:* Two commenters argued that it is unfair to not allow programs to improve or reintroduce a program once it has failed.

Another commenter contended that the Department should not penalize an institution if it responsibly ends a program that produces failing D/E rates in its final years.

*Discussion:* The rule allows institution to report transitional D/E rates based on median debt outcomes for completers in the two most recent award years for a temporary period. This affords institutions the opportunity to improve their programs in response to the metrics produced for their programs. After this transitional period where institutions can improve their measures, the metrics become more backward-looking, so this opportunity is diminished.

If a program loses eligibility under the rule or if an institution voluntarily discontinues a failing program, the institution may not launch a similar program for 3 years. As we discussed in the NPRM, we intend for this waiting period to protect the interests of students and taxpayers by requiring that institutions with failing GE programs take meaningful corrective actions to improve program outcomes before reintroducing a similar program with

App.49

Federal support. The 3-year period of ineligibility closely aligns with the ineligibility period associated with failing the CDR, which is the Department's longstanding primary outcomes-based accountability metric on an institution-wide level.

*Changes:* None.

*Comments:* One commenter expressed concern about how D/E will be calculated for colleges and programs that do not participate in the Direct Loan program due to the low cost of tuition and fees.

*Discussion:* The median debt for programs whose students receive no Direct Loans will be zero. This means that these programs will pass D/E.

*Changes:* None.

*Comments:* One commenter suggested that students already enrolled in a failing program should be allowed to receive title IV, HEA aid until they complete the program.

*Discussion:* The Department is sympathetic to the potential disruption for students who may continue to be enrolled in a program that loses title IV, HEA eligibility. Institutions must issue warnings to any student in or interested in a program if the program fails one of the GE metrics and, therefore, faces a potential loss of Title IV, HEA eligibility if it fails again. Hopefully this will both allow students a chance to finish their studies, at least in shorter programs, or to make plans to transfer if the program loses funding.

The Department believes, however, that most students will be better served by transferring to a better performing program rather than further accumulating debt or spending time in a program where they will be unlikely to earn enough to manage it, or not accumulate skills to earn more than a high school graduate. Analyses presented in the RIA suggest that most students will have other better options to which to transfer.

*Changes:* None.

*Comments:* Several commenters contended that the GE rule should allow for transitional D/E rates for GE programs for a multiyear period after the regulation takes effect.

*Discussion:* All programs will have transitional rates that will be based on the debt of completers in more recent years for 6 years.

*Changes:* We have modified § 668.408(c) to give all programs the option to report transitional rates for the first six years after the rule is in effect. While we believe that most institutions with GE programs have experience reporting similar information under the 2014 Prior Rule, this change offers flexibility and alleviates burden for

some institutions to avoid reporting on cohorts that completed six years or more previously.

*Comments:* One commenter recommended that since the 2014 GE rule only included the D/E metric, passage of either D/E or EP should be sufficient for establishing that a program prepares students for gainful employment. Other commenters suggested that we require all programs to pass both measures, instead of some being required to just pass one.

*Discussion:* As we explain in the NPRM [144] and elaborate upon above, the EP measure captures distinct aspects of how programs prepare students for gainful employment. The EP is based in part on statutory provisions ensuring that postsecondary programs build on the skills learned in high school and enhance a students' earnings capacity regardless of how much they borrow. Whatever students' post-college earnings are, it is important that their debt levels are affordable and in reasonable proportion to their earnings. GE programs must pass both metrics to avoid consequences. Career training programs that fail either or both metrics in a single year will be required to provide warnings to students that the programs could be at risk of losing eligibility for title IV, HEA funds in subsequent years. Programs that fail the same metric in two of three consecutive years would have lose their eligibility. The two metrics together create the strongest framework for protecting students and taxpayers.

*Comments:* One commenter raised concerns that institutions cannot compel graduates to seek occupations in the field for which they train.

*Discussion:* The purpose of these regulations is to increase the likelihood that students entering career training programs are given the skills and credentials to repay their student loans and earn more than they would have had they not attended a postsecondary program. Many students may find employment in an occupation that differs from what the program prepared them for, and we do not penalize programs for that.

*Changes:* None.

*Exclusion or Inclusion of Certain Student Populations*

*Comments:* One commenter contended that the earnings component of the D/E rates calculation should exclude students who have a title IV, HEA loan in military-related deferment status. The commenter believed that including outcomes for such students in

the D/E rates would be arbitrary and exceed the Department's statutory authority, because such students' military earnings provide no information about the quality of the program. The commenter recommended that the Department adopt the approach in the 2014 Rule and exclude such students.

*Discussion:* The Department disagrees. As we acknowledged in the NPRM, the D/E rates calculation in these regulations differs from the 2014 Rule in certain respects. In the 2014 Prior Rule, the Department reasoned that students with military deferments should be excluded from the D/E rates calculations because they could have less earnings than if they had chosen to work in the occupation for which they received training. The final rule went on to state a student's decision to enlist in the military is likely unrelated to whether a program prepares students for gainful employment, that it would be unfair to assess a program's performance based on the outcomes of such students, and that the Department believed that this interest in fairness outweighed potential impact on the earnings calculations and the number of students in the cohort period.[145]

However, we cannot now conclude with confidence that the earnings of military personnel are unrelated to the postsecondary programs that they completed. First, the latest Quadrennial Review of Military Compensation (QRMC) shows how strongly correlated educational attainment is with pay grade for both enlisted personnel and officers. For example, in 2017 while none of the enlisted personnel at the lowest reported pay grade (E–2) had a bachelor's degree or more, 55 percent of those in the highest pay grade for enlisted personnel had at least a B.A. Similarly, virtually all officers (91 percent) at the lowest pay grade had a bachelor's degree, while 80–100 percent of the officers in the top pay grades had an advanced degree, with that share increasing with the pay grade. Educational attainment is clearly a key component of pay grade in the military, and program quality is a key factor in attainment.[146]

More broadly, program quality determines the skills a student will receive and have available to them on the job. Whether that job is in the military or in some other field with a

---

[144] 88 FR 32300, 32325 (May 19, 2023).

[145] 79 FR 64889, 64944–45 (Oct. 31, 2014).
[146] See tables 2.1 and 2.1 in Department of Defense (2020). Report of the Thirteenth Quadrennial Review of Military Compensation, Volume I, Main Report (*https://militarypay.defense.gov/Portals/3/QRMC-Vol_1_final_web.pdf*).

step-and-lane-style pay schedule, skill is still an important determinant of job success and pay, if for no other reason than more skilled employees (or military personnel) have more opportunities for advancement. That can be as simple as promotion to Officer, but it also includes opportunities such as the military's opportunities for service members to be trained in designated military skills or career fields, which require special advanced training or educational credentials in key fields that military seeks to promote. Training in these fields can earn personnel a bonus upon completion of their role, plus whatever career advancement comes from a military career in those valued fields.[147]

Furthermore, including these earners would likely raise the median income measured for their particular program because this group of program completers are demonstrably employed, and because, as the latest QRMC demonstrates, the military has long sought to (and surpassed) a goal of paying service members at a level equivalent to the 70th percentile of comparably educated and experienced civilians. Nevertheless, there is still a possibility that this group of program completers may have earnings that do not otherwise support the debt they incurred. Servicemembers should receive the same consumer protections afforded to other student borrowers from their GE program completer cohort. Accordingly, the Department has concluded that their earnings should be reflected in the data that we use to provide information about and evaluate GE programs supported by title IV, HEA student assistance. This conclusion is reasonable and, as we explained in the "Reliance Interests" section of the NPRM, this approach does not implicate any significant reliance interests.

*Changes:* None.

*Comments:* One commenter suggested that the Department should consider programs with fewer than 30 students as "passing due to insufficient data." The commenter contended that this label may help to mitigate the incentive for schools to cap program enrollment at 29 students.

*Discussion:* In principle, the Department agrees that "passing due to insufficient data" is one appropriate label for programs that have too few completers in the applicable cohort for metrics to be issued. That label conveys potentially helpful information, and we

may use that or similar language to describe programs in the future. We note that these rules specify the conditions under which programs pass or fail the D/E and EP metrics (§ 668.402), along with the conditions under which the Department does not issue the D/E rates or the EP measure because of an insufficient number of completers (§§ 668.403(f) and 668.404(d)). Those rules do not require the Department to use particular labels to describe programs that are subject to these metrics. At the appropriate times and consistent with these rules, the Department will make the necessary choices regarding the details of the Department's program information website, through which student acknowledgments will be administered (§§ 668.407(b) and 668.605(c)(3), (g)), as well as the warnings with respect to GE programs (§ 668.605).

*Changes:* None.

*Comments:* One comment expressed concern about how to calculate the data for students that do not complete their program of study because they choose to enter the workforce once they gain a certification in a program.

*Discussion:* Students who do not earn a credential are not counted in the earnings or debt metrics for a program. If a student does not complete an associate degree after obtaining a certificate, that student would be counted in the completer cohort for the certificate program. We may expect that student's earnings would be less than their earnings would have been if they completed the associate program, but so, too, would their debt. Regardless, we expect the majority of students completing a certificate to out-earn individuals with only a high-school diploma and to not have a high debt-burden.

*Changes:* None.

*Discretionary D/E Measures*

*Comments:* One commenter posited that D/E has a low correlation with a measure of return on investment (ROI) that the commenter themself created. The commenter then compares pass/fail under GE to pass/fail under their personal formula to assign whether they think a program "correctly" or "incorrectly" passes or fails. The commenter uses such comparisons to recommend changing amortization periods for graduate students and that the D/E rate should be assessed on the basis of the annual earnings rate alone.

*Discussion:* We appreciate the commenter's suggestions, and analysis of how this rule's parameters could be modified to better align its pass/fail outcomes with the commenter's own

estimates of program-level ROI. However, there are numerous issues with the commenter's methodology that do not make it an appropriate standard for judging whether the metrics used and pass/fail outcomes in GE are "correct" or "incorrect." This includes several self-acknowledged reasons why the methodology systematically overestimates or underestimates ROI for different types of programs, and assumptions that students' earnings trajectories relative to their peers do not change over time. In addition, the commenter's attempt to create counterfactual wages relies on adjustments made on very broad educational credential by field of study groups that do not reflect specific programs well.

*Changes:* None.

*Comments:* Several commenters argued that the evidence cited for the use of the 20 percent discretionary income threshold is not strong. Several commenters note that the 20 percent discretionary D/E threshold can be traced back to a 2006 report from Economists Sandy Baum and Saul Schwartz. The commenters asserted that discretionary income is always defined arbitrarily (*i.e.,* attempts to draw distinctions between discretionary and nondiscretionary expenditures are fraught with difficulty). Other commenters contended that the (annual) D/E threshold is based on affordability of mortgage rates and should not be used for student debt.

*Discussion:* As the commenters noted, the 20 percent discretionary D/E threshold is based on research conducted by Sandy Baum and Saul Schwartz. Their research proposed benchmarks for manageable debt levels, and the authors' research suggested that no student should have loan payments exceeding 20 percent of their discretionary income. In subsequent commentary one of the authors argued that, if anything, a 20 percent discretionary threshold for the median borrower is too permissive and a stricter standard would be justified.[148] Although the starting point for their research was in the context of the affordability of mortgage rates, their overall point stands—that it would not be affordable for borrowers to have student debt-service ratios beyond what is in the GE rule.

*Changes:* None.

*Comments:* One commenter asked how a school could pass the discretionary debt-to-earnings rate and

---

[147] Department of Defense, Under Secretary of Defense (Comptroller) (n.d.). DoD 7000.14—R: Military Pay Policy—Active Duty and Reserve Pay, Volume 7A (*https://comptroller.defense.gov/Portals/45/documents/fmr/Volume_07a.pdf*).

[148] See *https://www.urban.org/urban-wire/devos-misrepresents-evidence-seeking-gainful-employment-deregulation.*

**70054**    **Federal Register** / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations

not the annual debt to earnings measure. According to this commenter, if reasonable scenarios do not exist, this ratio is irrelevant and does not provide a reasonable additional option to schools.

*Discussion:* We carefully explain the relationship between the two rates in the NPRM (see Figure 1 from the NPRM and the surrounding text). Many programs with higher levels of earnings pass the discretionary D/E measure but not the annual D/E measure.

*Changes:* None.

*D/E Rates Thresholds*

*Comments:* A few commenters argued that the thresholds align with other measures of hardship: Borrowers with student loan payments above 8 percent of income or 20 percent of discretionary income experienced greater hardship than those with payments below these thresholds.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* Many commenters requested that the Department return to the D/E rate thresholds of 12 percent annual D/E and 30 percent annual discretionary D/E that were used in the 2011 and 2014 Prior Rules. Some of these commenters posited that the changes from those thresholds to the D/E rate threshold in the NPRM is arbitrary and capricious.

Several other commenters objected to the lack of inclusion of the "zone" as in the 2014 Prior Rule, asserting that without the zone, programs could fail because of fractions of a dollar in the GE calculation or that programs do not have the space to make necessary program changes.

*Discussion:* The Department considered these concerns and decided to base the thresholds upon expert recommendations and mortgage industry practice—that is, the 8 and 20 percent thresholds for annual and discretionary D/E, respectively. The 12 and 30 percent thresholds used in the "zone" were selected by adding a 50 percent buffer to these evidence-based thresholds, so as to give institutions that were "close" to the D/E thresholds an additional year to potentially improve their performance.

In the final rule, the Department has adopted a transition period where institutions can report debt information for more recent completion cohorts. This provision is similar to a transition provision that was included in the 2014 Prior Rule under 34 CFR 668.404(g) that permitted institutions to use updated program costs in the outcome calculations for 5 to 7 award years,

depending upon the length of the program. The transition period for these regulations will allow any improvements in the cost structure of programs to more rapidly be reflected in institutions' D/E rates.

*Changes:* None.

*Comments:* A few commenters stated that the 8 percent annual D/E threshold would preclude for-profits from offering BAs and eliminate many Associate of Arts (AA) programs. The commenters believe these institutions will be forced to lower tuition; therefore, this imposes a price cap on for-profit and vocational institutions.

*Discussion:* Programs must pass either the annual D/E threshold of 8 percent or the discretionary D/E threshold of 20 percent. For programs with higher income levels, the discretionary rate is more likely to apply, which allows median debt levels to be higher relative to median earnings levels. The RIA shows that the majority of proprietary associate and bachelor's programs do not fail the D/E metrics. We disagree with the commenters' assertion that institutions will be forced to lower tuition to pass the D/E rates, as the final rule allows institutions to set tuition or find additional student resources so that students' borrowing levels are reasonable in light of their typical earnings outcomes and so that students do not take on more debt than they can reasonably manage.

*Changes:* None.

*Programs With Low Borrowing Rates*

*Comments:* Some commenters suggested that the Department should not subject programs with only a few borrowers to the D/E metric or should use a different metric for them. According to this commenter, a program with a small percentage of borrowers overall that does not meet the debt to earnings ratio would jeopardize the Pell Grant eligibility for the entire program.

*Discussion:* Programs with few borrowers are very unlikely to fail the D/E rates measure. We calculate median debt among all title IV, HEA recipients, including those who receive only Pell grants. As a result, if the majority of program completers do not borrow, the median debt of program completers will be zero. The program will, therefore, pass the D/E metric. This acknowledges the affordability of programs where many or most students do not need to borrow to attend the program. As a result, we see no risk that programs with few borrowers will lose title IV, HEA eligibility as a result of the D/E provisions of rule.

*Changes:* None.

*Comments:* One commenter believed that non-borrowers will not look at the D/E ratios because they are not relevant to them.

*Discussion:* The D/E metric is primarily a measure of debt affordability, capturing the share of a typical graduate's annual earnings that will need to be devoted to loan payments. Under the transparency provisions in § 668.407, only prospective students will provide acknowledgments prior to enrolling in an institution. While ultimately those with no intention of borrowing may not be concerned with potential loan payments, prospective students may find information about the D/E rates of different programs helpful as an indicator of the labor market success of those programs' graduates, the costs of the programs, or both. More importantly, the information may inform their choice of whether to enroll in the program, and if so whether to borrow to attend. The rule will create more transparency on earnings outcomes and the net price of programs, however, and we expect that non-borrowers will find that information most salient. Moreover, we also expect the D/E ratios to be relevant to borrowers.

*Changes:* None.

**Earnings Premium Metric**

*General*

*Comments:* Many commenters expressed support for the EP measure as a "common sense" threshold to measure completer earnings against.

*Discussion:* We thank commenters for their support.

*Changes:* None.

*Comments:* Many commenters suggested that the EP measure is arbitrary, not sufficiently studied, and not backed by research evidence.

*Discussion:* The Department believes that the EP threshold, which uses the median State-level earnings of high school graduates in the labor force, is an intuitive benchmark for both policymakers and prospective students. Comparison to the earnings of those with only a high school diploma has long been a measure of the effectiveness or value of completing a given post-secondary credential in research literature.[149]

---

[149] See for example, see Goldin, Claudia & Katz, Lawrence F. (2010). *The Race Between Education and Technology.* Cambridge: Harvard Univ. Press. Baum, Sandy (2014). The Higher Education Earnings Premium. Urban Institute (*www.urban.org/sites/default/files/publication/22316/413033-Higher-Education-Earnings-Premium-Value-Variation-and-Trends.PDF*)—among other numerous examples.

*Changes:* None.

*Comments:* One commenter suggested that the EP threshold should be higher to account for a student's need to repay the loan debt incurred in connection with the credential.

*Discussion:* The Department recognizes that calculating a "net earnings premium" that subtracts from the EP some measure of the (amortized yearly) costs of college or debt service payments may provide a reasonable measure of the financial gain to completing a program in some contexts. However, under the rule, we will use the EP measure to assess whether students who complete a program are better off, strictly in terms of their earnings, than individuals who never attended a postsecondary program. The calculation of this measure is unaffected by the costs students might incur to attend the program. The measure applies even for a student whose education expenses might be entirely covered by grant aid. We note that the D/E rates are intended to assess a cohort's ability to afford the debt they borrow to pay the direct costs of attending the program, so we do not additionally account for program costs in the EP measure.

*Changes:* None.

*Earnings and Location*

*Comments:* Many commenters suggested that earnings vary substantially within a given State by urbanicity. These commenters suggested that we adjust the D/E rates or EP calculations for programs serving students in rural areas. Some other commenters suggested using metropolitan or micropolitan statistical areas (MSAs) to better distinguish between earnings potential for completers within a given State.

*Discussion:* Though many commenters expressed concerns about urban/rural divides in economic opportunity, their proposed solutions often involved calculating earnings premiums at the metropolitan area level. There are a few reasons the Department sees this as a flawed approach. First, as Office of Management and Budget (OMB) Bulletin No. 23–01 outlines, Core Based Statistical Areas, such as Metropolitan Statistical Areas (MSAs) "do not equate to an urban-rural classification; many counties and county-equivalents included in Metropolitan and Micropolitan Statistical Areas, and many other counties, contain both urban and rural territory and populations."[150] There is plenty of variety in the urban character of local areas even within area designations as small as the MSA, and so calculating earnings estimates at that level may not capture differences in labor market opportunities by population density or other characteristics of an area often associated with the urban/rural divide.

The same OMB bulletin further warns that, in keeping with the Metropolitan Areas Protection and Standardization (MAPS) Act of 2021, agencies should be hesitant to use CBSA designations for the administration or regulation of non-statistical programs and policies. Our view is that while MSAs provide a useful approximation to major and minor urban centers in a State, they do not measure a relevant unit for the purposes of this regulation. This is especially true in the context of postsecondary education, where students often travel outside of their home MSA to attend school and, as a result, are likely to have considerable cross-MSA mobility after graduation.

Our view is informed by an analysis the Department conducted to assess the viability of measuring earnings at the metropolitan area level. To understand the implications of such a change, we first examined how the earnings threshold would vary across each State if it varied for metropolitan and non-metropolitan areas. The IPUMS USA version of the ACS 5-year sample for 2019 adds the necessary information to the PUMS data to divide households into different geographic classifications based on the metropolitan status of the area they live in, which the IPUMS USA describes in this way: "[the relevant field] indicates whether the household resided within a metropolitan area and, for households in metropolitan areas, whether the household resided within or outside of a central/principal city." Table 1.4 below shows how earnings thresholds would vary if they were set at the median earnings for the same population (high school graduates aged 25–34 who were in the labor force in the previous year), divided by which type of metropolitan area those individuals live in.

TABLE 1.4  MEDIAN INCOME FOR HS GRADS 25–34 IN LABOR FORCE, BY STATE AND METRO STATUS

| | Metropolitan status | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Mixed met. status | Not in met. area | In met. area: central city | In met. area: not central city | Met. area: mixed central city status | Overall |
| Alabama | 21,582 | 23,000 | 21,177 | 29,202 | 22,445 | 22,602 |
| Alaska | 30,000 | 21,307 | 29,675 | .................... | .................... | 27,489 |
| Arizona | 21,582 | 18,111 | 26,000 | 26,471 | 25,453 | 25,453 |
| Arkansas | 22,527 | 21,902 | .................... | 30,000 | 25,569 | 24,000 |
| California | .................... | 25,000 | 26,073 | 26,178 | 26,073 | 26,073 |
| Colorado | 27,500 | 30,000 | 27,000 | 30,107 | 29,322 | 29,000 |
| Connecticut | .................... | 31,961 | 22,000 | 29,202 | 25,899 | 26,634 |
| Delaware | .................... | .................... | .................... | 26,634 | 25,453 | 26,471 |
| District Of Columbia | .................... | .................... | 21,582 | .................... | .................... | 21,582 |
| Florida | 22,373 | 21,582 | 22,445 | 24,819 | 24,000 | 24,000 |
| Georgia | 24,000 | 22,700 | 24,000 | 25,030 | 23,000 | 24,435 |
| Hawaii | 30,000 | 26,330 | 26,978 | 30,245 | 31,288 | 30,000 |
| Idaho | 23,883 | 28,000 | .................... | 28,600 | 25,453 | 26,073 |
| Illinois | 25,036 | 26,073 | 22,297 | 26,634 | 25,000 | 25,030 |
| Indiana | 27,000 | 27,699 | 24,503 | 28,000 | 24,842 | 26,073 |
| Iowa | 30,000 | 26,073 | 29,202 | .................... | 28,000 | 28,507 |
| Kansas | 25,569 | 24,819 | 23,438 | 30,544 | 26,073 | 25,899 |
| Kentucky | 26,073 | 22,945 | 20,221 | 25,359 | 23,012 | 24,397 |

[150] Executive Office of the President, Office of Management and Budget (2023). Revised Delineations of Metropolitan Statistical Areas, Micropolitan Statistical Areas, and Combined Statistical Areas, and Guidance on Uses of the Delineations of These Areas (OMB Bulletin No. 23–01). Washington, DC.

TABLE 1.4    MEDIAN INCOME FOR HS GRADS 25–34 IN LABOR FORCE, BY STATE AND METRO STATUS—Continued

| | Metropolitan status | | | | | |
|---|---|---|---|---|---|---|
| | Mixed met. status | Not in met. area | In met. area: central city | In met. area: not central city | Met. area: mixed central city status | Overall |
| Louisiana ........................................ | 26,073 | 26,500 | 20,024 | 26,386 | 21,000 | 24,290 |
| Maine ............................................. | .................. | 25,453 | .................. | 29,830 | 21,798 | 26,073 |
| Maryland ........................................ | 26,634 | .................. | 22,900 | 29,136 | 26,500 | 26,978 |
| Massachusetts ............................... | 26,073 | .................. | 28,000 | 30,000 | 30,349 | 29,830 |
| Michigan ........................................ | 23,988 | 23,740 | 17,000 | 25,030 | 24,000 | 23,438 |
| Minnesota ...................................... | 30,000 | 27,116 | 25,569 | 31,154 | 27,116 | 29,136 |
| Mississippi ..................................... | 21,000 | 20,562 | 17,613 | 25,569 | 19,963 | 20,859 |
| Missouri ......................................... | 25,000 | 23,988 | 21,307 | 25,575 | 26,471 | 25,000 |
| Montana ......................................... | 25,030 | 25,453 | .................. | .................. | 28,159 | 25,453 |
| Nebraska ........................................ | 29,783 | 29,800 | 21,307 | 34,092 | 25,782 | 27,000 |
| Nevada ........................................... | 23,417 | 31,961 | 25,030 | 27,489 | 27,387 | 27,387 |
| New Hampshire ............................. | 31,961 | 28,057 | 28,057 | 36,652 | 32,373 | 30,215 |
| New Jersey ..................................... | .................. | .................. | 23,438 | 27,325 | 23,620 | 26,222 |
| New Mexico .................................... | 19,548 | 26,741 | 20,400 | 20,859 | 25,453 | 24,503 |
| New York ........................................ | 26,000 | 24,405 | 24,700 | 26,978 | 25,000 | 25,453 |
| North Carolina ............................... | 23,000 | 22,661 | 22,399 | 23,417 | 23,417 | 23,300 |
| North Dakota .................................. | 33,598 | 27,116 | .................. | .................. | 27,116 | 31,294 |
| Ohio ............................................... | 24,435 | 25,569 | 18,326 | 26,073 | 23,000 | 24,000 |
| Oklahoma ....................................... | 25,030 | 25,453 | 25,453 | 27,800 | 26,000 | 25,569 |
| Oregon ........................................... | 23,988 | 23,000 | 25,569 | 29,800 | 24,435 | 25,030 |
| Pennsylvania .................................. | 25,453 | 26,073 | 21,307 | 27,806 | 25,030 | 25,569 |
| Rhode Island .................................. | .................. | .................. | 23,417 | 26,978 | 30,000 | 26,634 |
| South Carolina ............................... | 24,718 | 20,362 | .................. | 25,860 | 22,900 | 23,438 |
| South Dakota ................................. | 30,000 | 25,030 | .................. | .................. | 29,202 | 28,000 |
| Tennessee ...................................... | 23,438 | 22,900 | 19,500 | 26,438 | 23,824 | 23,438 |
| Texas ............................................. | 25,899 | 25,000 | 24,405 | 28,000 | 25,899 | 25,899 |
| Utah ............................................... | 26,471 | 30,215 | 19,709 | 29,202 | 28,765 | 28,507 |
| Vermont .......................................... | .................. | 25,000 | .................. | .................. | 30,215 | 26,200 |
| Virginia ........................................... | 25,453 | 20,566 | 25,000 | 27,699 | 24,435 | 25,569 |
| Washington ..................................... | 27,534 | 25,300 | 30,000 | 31,961 | 29,202 | 29,525 |
| West Virginia .................................. | 21,582 | 22,661 | .................. | 30,544 | 24,196 | 23,438 |
| Wisconsin ....................................... | 30,000 | 29,617 | 22,160 | 27,116 | 28,507 | 27,699 |
| Wyoming ......................................... | 27,082 | 31,961 | .................. | .................. | .................. | 30,544 |
| Total ......................................... | 25,453 | 25,000 | 24,280 | 26,654 | 25,453 | 25,453 |

Table 1.4 illustrates the challenge of this approach. To the extent that the commenters' main concern about State-level earnings thresholds is that institutions located outside of metropolitan areas would be disadvantaged, the data does not bear this out. In many instances, such as Alabama, Colorado, and Illinois, the earnings threshold outside of metropolitan areas would be higher than the current statewide standard (displayed in the ''Overall'' column). Because many low-income people live in cities, it is not consistently the case that metropolitan areas or central cities have higher median incomes than non-metropolitan

areas. What is more, this pattern is not consistent across States, suggesting there is not a systematic disadvantage for non-metropolitan areas that would justify switching to another standard that would have its own disadvantages.

*Changes:* None.

*Comments:* Several commenters suggested using a school's location in a Persistent Poverty County as an additional EP consideration. These commenters proposed that we could exclude schools located in these counties prior to the effective date of the GE rule from application of the EP measure, or we could adjust the EP threshold for programs in such counties downward by 20 percent.

*Discussion:* To understand the implications of this proposal, we assessed whether each program would be exempt based on being located in a Persistent Poverty County. To do this, we assigned each program to a county based on the location of its main campus and then determined whether that county was one of the 341 the Census Bureau determined to be persistently poor. We then examined which institutions, and which major cities housed institutions, that would be exempt from the EP measure if we modified the rule in this way. Below is a list of the 15 largest institutions located in a county that is Persistently Poor under the Census's definition:

LARGEST INSTITUTIONS WITH MAIN CAMPUSES IN PERSISTENT POVERTY COUNTIES IN TERMS OF ENROLLMENT

| Institution name | 6-Digit OPEID | Total enrollment | Number of programs | Location |
|---|---|---|---|---|
| University of Florida ......................................... | 1535 | 45,996 | 324 | Gainesville, FL. |
| Temple University ............................................. | 3371 | 40,537 | 255 | Philadelphia, PA. |
| Fresno City College .......................................... | 1307 | 40,431 | 114 | Fresno, CA. |
| University of Georgia ........................................ | 1598 | 35,589 | 296 | Athens, GA. |

App.54

LARGEST INSTITUTIONS WITH MAIN CAMPUSES IN PERSISTENT POVERTY COUNTIES IN TERMS OF ENROLLMENT—Continued

| Institution name | 6-Digit OPEID | Total enrollment | Number of programs | Location |
|---|---|---|---|---|
| Texas A&M University | 3632 | 34,089 | 252 | College Station, TX. |
| Ohio University | 3100 | 33,722 | 190 | Athens, OH. |
| El Paso Community College | 10387 | 31,413 | 81 | El Paso, TX. |
| University of Texas Rio Grande Valley | 3599 | 30,710 | 121 | Edinburg, TX. |
| West Virginia University | 3827 | 30,592 | 192 | Morgantown, WV. |
| Georgia Southern University | 1572 | 30,141 | 111 | Statesboro, GA. |
| East Carolina University | 2923 | 30,021 | 172 | Greenville, NC. |
| Brigham Young University    Idaho | 1625 | 29,243 | 84 | Rexburg, ID. |
| Central Michigan University | 2243 | 28,126 | 150 | Mt Pleasant, MI. |
| University of Texas at El Paso | 3661 | 27,759 | 141 | El Paso, TX. |

This list is a clear signal that the Persistent Poverty County exemption would be poorly targeted from the perspective of identifying institutions facing insurmountable economic conditions that would merit exemption from the general standard laid out in the NPRM. A number of the institutions on this list are major State flagship institutions with a strong track record of graduating large numbers of students into stable and well-remunerated employment, suggesting that being located in these counties is not in fact outcome determinative for students in such institutions. The exercise reveals a limitation of the approach more generally, which is that these institutions draw on students from a variety of different locations, and their graduates go on to work in many different places outside the county where the institution is located.

An additional datapoint that reveals that this measure of county poverty may not well capture economic conditions that dramatically impede labor market success for college graduates is the list of the 15 cities in Persistent Poverty Counties with the largest enrollment across all institutions and programs located there:

TOP CITIES IN PERSISTENT POVERTY COUNTIES IN TERMS OF ENROLLMENT

| City | Total enrollment | Total number of programs |
|---|---|---|
| Philadelphia, PA | 147,782 | 1,300 |
| Fresno, CA | 74,385 | 352 |
| Brooklyn, NY | 72,679 | 340 |
| El Paso, TX | 64,957 | 254 |
| New Orleans, LA | 58,608 | 532 |
| Gainesville, FL | 57,652 | 379 |
| Bronx, NY | 57,528 | 301 |
| Baltimore, MD | 51,202 | 542 |
| Athens, GA | 40,123 | 363 |
| College Station, TX | 34,089 | 252 |
| Athens, OH | 33,722 | 190 |
| Richmond, VA | 33,323 | 257 |
| Statesboro, GA | 32,570 | 163 |
| Morgantown, WV | 30,824 | 201 |
| Edinburg, TX | 30,710 | 121 |

This list includes a number of the country's largest cities, as well as a number of college towns. This gives us pause for two reasons: first, the inclusion of major cities with both a high incidence of poverty and vibrant economies suggests that the Persistent Poverty County construct is not designed to capture the kind of within-county inequality that allows deep poverty to coexist with strong labor markets for college graduates. Second, the existence of so many college towns suggests that the measurement of Persistent Poverty Counties may partly be picking up places where a large fraction of the area's residents are students who are in school and therefore not in the labor force or working only part time, perhaps exaggerating the true extent of poverty in the area, or at least not reflecting its likely transience for the individuals being measured, who can expect a significant increase in their standard of living once they graduate from college.[151] Additionally, in such cases we would not expect this more transient poverty measured in college towns to be an impediment to the earnings trajectory of students after college.

*Changes:* None.

*Economic Swings*

*Comments:* Several commenters expressed concern about how earnings data would be affected by rapid downturns in the economy. Their concerns largely regarded the lag between the economic conditions at the time students incur their debts and when the earnings are assessed. Other commenters argued that the EP threshold could not accurately account for the labor market impact of national events, such as a pandemic, or for more localized labor market events, such as a natural disaster.

*Discussion:* The Department recognizes that economic conditions can change rapidly, that the earnings

---

[151] See the Census's own analysis of poverty measurement in college towns here: *www.census.gov/library/stories/2018/10/off-campus-college-students-poverty.html.*

premium for a program during a booming economy may differ from that premium during a downturn, and that students often make decisions about their educational investments without a full picture of the economy they will graduate into. Nonetheless, we believe the uncertainty around the broader economic conditions provides more reason to monitor and enforce rules around the economic outcomes for students who graduate from a given program through the EP measure. One benefit of a college education is some degree of insulation from economic downturns, and an important measure of program quality is the robustness of its graduates' employment outcomes to economic shocks.

The EP threshold is well suited to adjust to State or national disruptions to the labor market. The earnings of high school graduates tend to be much more pro-cyclical than those of college graduates. That suggests that the EP threshold will tend to fall more in economic downturns than will the median earnings of college graduates, therefore buffering the impact on program outcomes. It is possible that the EP threshold may not adjust for more localized labor market shocks at the sub-State level. The Secretary may, however, have authority under statute to waive or modify regulatory provisions that apply to institutions in disaster areas or that are significantly affected by disasters.[152] The Department is not convinced that the rules here should be further adapted to address such exceptional circumstances.

*Changes:* None.

*Earnings Threshold for Graduate Programs*

*Comments:* A few commenters suggested using a different EP threshold for programs that issue graduate degrees. One suggestion was that we use the median earnings of bachelor's degree recipients who majored in the same field as the graduate degree.

*Discussion:* The 2019 5-year American Community Survey (ACS) contains information on bachelor's degree fields for survey respondents. These data are available in broad categories that generally align with similar CIP categories. The median earnings for those age 25–34 in the labor force with a bachelor's degree and a recorded major category is around $46,000, reported in 2019 dollars. The range of median earnings by degree field is substantial, ranging from around $28,000 to $71,000.

The Department recognizes the logic of this approach, but also has identified some substantial disadvantages. For example, the data do not have enough individuals in the sample to provide robust State-level estimates of median earnings for all fields of study. Further, the use of comparable undergraduate earnings relies on the assumption that those who seek a post-baccalaureate credential have a bachelor's degree in a similar field. This may not be the case, however, particularly for degrees that are less reliant on the attainment of a specific set of undergraduate prerequisites. We currently lack comprehensive information on the bachelor's degrees typically obtained by graduate students in each field. The Department believes that using the same standard for the EP for graduate programs provides some degree of protection from programs not meeting even this low bar.

*Changes:* None.

*ACS Earnings Measures*

*Comments:* At least one commenter suggested that because the ACS relies on self-reported earnings, rather than on administrative data, these earnings metrics are not comparable.

*Discussion:* The ACS is a commonly used source of data on the experiences of a representative sample of Americans and a provider of many key economic indicators used by governments and researchers throughout the country. The Census Bureau regularly reviews the accuracy of the data. The survey relies on decades of experience from nationally recognized experts to develop and constantly improve the quality of the information provided through these surveys. The U.S. Census Bureau has researched the accuracy of ACS income data and found that income data from the ACS corresponds well with administratively reported earnings measures (*e.g.,* via employer provided W2 forms) in IRS records.[153] The ACS is the best available data to measure the State-level earnings by education level used in the construction of the earnings threshold and the commenter did not provide an alternative source for comparable data.

*Changes:* None.

*Comments:* One commenter noted that recent earnings gains have been largely among those in the labor force without a post-secondary credential. When more recent years are used as the basis for the EP threshold, this could

raise the bar such that more programs fail.

*Discussion:* The Department believes that this comment highlights the value of using a dynamic measure from concurrent survey data, rather than a static benchmark. In cases where the economy improves for those without a post-secondary credential, the EP threshold could increase. If so, it appropriately sets a higher bar for college programs' performance.

*Changes:* None.

*State and National Benchmarks*

*Comments:* One commenter argued that standards for aid programs are set nationally—for example, a single maximum Pell grant amount, and standard national limits for undergraduate debt by level and dependency status. The commenter maintained that instituting different State-level thresholds for the EP by program location runs counter to this national framework.

*Discussion:* The earnings threshold is meant to proxy for the earnings levels that a typical student might obtain if they did not earn a postsecondary credential. As shown in the NPRM, these earnings vary across States for a variety of reasons related to local economic conditions, of the policies of States, Tribes, and Territories, and other factors. For example, States establish requirements for programs, licensing, or both. States, Tribes, and Territories also establish requirements for earning a high school diploma and its equivalency. Additionally, because State policy can have a substantial impact on both aid and on local labor market conditions, the Department believes that a State-level EP threshold is appropriate since the EP threshold is meant to measure the earnings that a student might have obtained had they not attended college.

*Changes:* None.

*Comments:* Some commenters thought that the proposed regulations needed to make more distinctions in outcomes based on the sizes of the institutions as well as the type of educational program and said the Department should consider the differences in the variety of jobs that students pursue from programs that are not specialized to lead into careers. Some concern was also expressed that there would be national earnings for programs compared to regional earnings information for high school graduates, as well as noting that many small programs would not be captured under the proposed regulations.

*Discussion:* The financial value transparency framework is intended to

---

[152] See, for example, 20 U.S.C. 1098bb(a)(2)(E).

[153] See *www.census.gov/content/dam/Census/library/working-papers/2016/acs/2016_Ohara_01.pdf.*

provide information to students and families about average educational debt and average program earnings using the CIP codes for those programs. This provides students and families with useful information not only about different programs offered at one institution, but also to compare comparable programs offered at different institutions. Institutions are in the best position to determine what additional information will provide context about the impact the size of an institution may have on the educational experience and the job opportunities that may be available to program graduates. We note that the average earnings provided for a program are based upon that program's graduates and therefore have some direct connection to the institution whose programs are at issue. This provides a reasonable comparison with the earnings for high school graduates in that region.

*Changes:* None.

*Comments:* One commenter suggested that, in place of the State-level median earnings on ACS, the Department should use BLS data on the lower end of earnings for a given career path. For example, the EP threshold could be the 10th percentile of earnings for those who are employed in a given occupation.

*Discussion:* BLS's Occupational Employment and Wage Statistics contain national-level data on annual wages at the 10th, 25th, 50th, 75th, and 90th percentile, by industry code (North American Industry Classification System) and by occupational code (Standard Occupational Classification System). Across roughly 450 broad occupational codes, about 11 percent of occupational codes had 10th percentile earnings of less than $25,000 (roughly the EP threshold). Using the BLS threshold would mean that most programs would likely be held to a higher threshold than they would under the ACS measure, and that the threshold would have no adjustment for geography. The Department intends the earnings threshold to represent a benchmark level of earnings that students would obtain had they not pursued a post-secondary credential. As

the comparison to BLS benchmarks suggest, this is a more conservative minimum bar on which to hold programs accountable. In our view it is the more appropriate threshold to determine whether career training programs are preparing their students for gainful employment.

*Changes:* None.

*Comments:* Two commenters suggested that students who earned higher-level credentials (such as a bachelor's degree or a graduate degree) were more likely to seek employment out of State.

*Discussion:* The earnings threshold is meant as a proxy for what students would earn had they not attended college, not to put graduates' earnings in context based on where they work after college. Accordingly, the high school earnings levels in the states where students come from is more relevant. We have clarified in the final rule that if fewer than 50 percent of the students in the program come from the State where the institution is located, the program would be subject to a national EP benchmark, rather than a State-level benchmark.

*Changes:* We revised the definition of "earnings threshold" at § 668.2 to clarify that national earnings are used if fewer than 50 percent of the students in the program come from the State where the institution is located, rather than where the students are located while enrolled.

*Growth Measure for Earnings Premium*

*Comments:* Many commenters suggested using earnings growth or an economic mobility measure, rather than an EP threshold. Commenters suggested that pre-enrollment earnings could be compared to post-enrollment earnings. If the post-enrollment earnings were higher (some comments suggested by 20 percent), then the program would pass the earnings test.

A couple of commenters also suggested that the programs could choose between being measured on the EP threshold or on the growth measure. Other commenters noted that students in cosmetology programs are often coming from very low wage jobs before entering school, so such a pre-post comparison would reflect favorably on these programs.

*Discussion:* The Department agrees that pre- and post-earnings comparisons are a theoretically attractive way to assess how well programs boost students' earnings potential. In practice, however, such a metric is infeasible to operationalize for the majority of programs.

For many programs, a large number of students have low pre-period earnings because, for example, they either do not work or work a limited number of hours, often because many are still enrolled in high school, prior to enrollment. All else equal, programs that enroll larger numbers of students without substantial prior attachment to the labor force (*e.g.,* younger students) will have calculated earnings gains that are larger than programs with a smaller share of students without significant prior work histories. Using administrative Department data on undergraduate certificate programs eligible for title IV, HEA programs, we show in Figure 1.3 that (a) the estimated earnings gains using simple pre- post-earnings comparisons are unrealistically large; and (b) the proportion of younger students enrolled in the program predicts earnings gains. The estimated earnings gains using data where many students do not have pre-enrollment data tend to be illogically large, with the typical program having earnings gains estimates over 10 times what is commonly found in the research literature.[154] While some of this relationship could be because of differences across programs, the figure demonstrates that because younger students having no or less robust earnings records, they will mechanically have lower pre-period earnings and higher calculated earnings gains. The earnings gain metrics, therefore, yield heavily biased estimates that are meaningless in assessing program quality, and the bias greatly disadvantages programs serving older students.

---

[154] For a summary of results from selected studies related to returns to certificates, see Table 1 from Darolia, Guo, & Kim (2023). The Labor Market Returns to Very Short Postsecondary Certificates. IZA Discussion Paper 16081 (*https://docs.iza.org/dp16081.pdf*).



Figure 1.3: Pre-post Earnings Gains Measure and Student Age

One way to address this would be to measure earnings gains only for workers who appear to have high labor force attachment in the pre-period, as evident by exceeding some minimum earnings threshold. In practice, however, this would result in dramatically smaller numbers of completers that could be used to measure earnings gains, and dramatic reductions in the share of programs and enrollment covered by an earnings gain metric. Based on analysis of administrative data, we approximate that at least half of programs that had sufficient student volume to calculate median student earnings would no longer have sufficient data if students without labor force attachment were excluded. These limitations make an earnings-gain measure infeasible, at least give current enrollment patterns.

*Changes:* None.

*Age Range for Measuring Earnings*

*Comments:* Several commenters raised reservations about the timing of earnings measurement for the high school graduates to which each program's completers would be compared. These commenters worried that the 25 to 34-year-old demographic used to calculate median earnings for high school graduates was inappropriately old for comparison to recent program completers and would put their programs at a disadvantage because their program completers were younger and earning less.

*Discussion:* The preamble in the NPRM discussed the motivation for choosing the 25 to 34-year-old age range. Across all credential levels, the average age three years after graduation is 30 years old, and the range from 25th

to 75th percentile of program age (the interquartile range) is 27 to 34 years old. In other words, the typical graduate from most credential programs is within the comparison EP age range three years after graduation. Because of this, the Department declines to consider additional adjustments to the age cohort selected for the EP.

*Changes:* None.

*Comments:* A few commenters suggested using years of work experience, rather than age, as the measure for selecting a comparable sample of high school graduates for the EP.

*Discussion:* This approach is generally infeasible since detailed information on workers' years of experience is not available in the ACS, which is the source for the EP threshold. Moreover, it is unclear whether and how a comparable years of experience variable could be generated for graduates from a given program, especially for those who started a program of study mid-career.

*Changes:* None.

*Comments:* One commenter noted that some of their students enroll through an early college option. As a result, these students tend to be even younger than a typical cohort with a given credential.

*Discussion:* Students enrolled through a dual enrollment or early college program are typically not eligible for title IV, HEA assistance, and would not be included in an earnings or debt measure unless they obtained Federal financial aid after their high school graduation, or as part of a pilot program (*i.e.,* the Department's Experimental Sites program). The Department reiterates that most programs have a

typical graduate whose age is within the age range used in the EP threshold.

*Changes:* None.

*Demographics and the Earnings Threshold*

*Comments:* Many commenters noted that program completers who are disabled, are incarcerated, or choose not to seek employment are included in the program's earnings data but would not be considered part of the labor force in the ACS, and therefore are not part of the EP threshold calculation.

*Discussion:* Individuals who are not seeking employment, or who are unable to find employment over a full year due to disability or incarceration or for other reasons, are not included in the calculation of the earnings threshold using ACS data. To the extent possible with administrative data, the Department also excludes those who are unable to work due to disability, as borrowers who have been identified as having a total and permanent disability are not included in the D/E or EP measure earnings. Further, individuals who are incarcerated and are enrolled in an approved prison education program are also excluded. The Department believes that those who enroll in a GE program are doing so with the intent of seeking employment after completing the program. This assumption is borne out by the fact that a much higher share of program graduates have positive earnings reported to the IRS than is true among individuals in a similar age range and with a college education in the ACS data.

*Changes:* None.

*Comments:* A few commenters contended that the median wage for

App.58

high school graduates should sample everyone who meets the age and credential criteria, including those who no longer participate in the workforce.

*Discussion:* The median high school earnings threshold includes those in the labor force (who have a job or report being available and looking for a job). As noted in the NPRM, the Department believes that most graduates of postsecondary programs, particularly those graduating from career training programs, are likely to seek work or be employed three years after graduation. A comparison to those who cannot work, or who have chosen not to work, is not appropriate in this case.

*Changes:* None.

### Reporting—§ 668.408

*General Support*

*Comments:* A few commenters praised the Department for requiring reporting for both GE and non-GE programs, noting that doing so will make more information about educational programs available to the public regardless of institution type. Another commenter expressed support for extending financial value transparency reporting requirements to graduate-level programs, which account for a substantial portion of student borrowing.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Benefits and Burdens*

*Comments:* One commenter stated that they expect the long-lasting and regularly accruing benefits of the new rule, including better earnings and employment opportunities, lower student loan burden, and reduced taxpayer costs, will dwarf the reporting costs to institutions. The commenter also maintained that most of the compliance costs will be one-time investments to adapt to new reporting requirements, while the benefits will be persistent.

*Discussion:* We agree that the costs associated with the institutional reporting requirements in § 668.408 will be outweighed by the benefits of the financial value transparency framework, as well as the benefits of the GE program accountability framework.

*Changes:* None.

*Comments:* Many commenters opined that the proposed reporting requirements would be costly, time consuming, and burdensome for institutions, especially HBCUs, community colleges, rural institutions, and small institutions which operate with budgetary and staffing limitations.

One commenter urged the Department to limit new reporting requirements to the greatest extent possible. Another commenter highlighted the need to balance the interests of accountability and practicality to achieve desired outcomes while minimizing reporting burden. Some commenters note that, because the proposed transparency framework applies to all programs, and not just GE programs, it represents a large increase in reporting burden for institutions.

*Discussion:* We understand the commenters' concerns about limiting reporting requirements and recognize the need to appropriately balance the interests of accountability and practicality. The Department requires the reporting under the regulations to calculate the D/E rates and EP measure, as provided in §§ 668.403 and 668.404, and to calculate or determine many of the disclosure items, as provided in § 668.43(d).

We have carefully reviewed all of the required reporting elements and have determined that the benefits of the transparency and accountability frameworks made possible through the reported data sufficiently justify the associated reporting costs and burden for institutions. We further note that institutions will benefit from the reporting because the information will allow them to make targeted changes to improve their program offerings, benchmark their tuition pricing against similar programs at other institutions, and better promote their positive outcomes to potential students.

In terms of staffing limitations, we have not estimated whether or how many new personnel may be needed to comply with the reporting requirements. Allocating resources to meet the reporting requirements is an individual institution's administrative decision. Some institutions may need to hire new staff, others will redirect existing staff, and still others will not need to make staffing changes because they have highly automated reporting systems. We expect these costs to be modest since, as noted in the RIA, most institutions have experience with the data reporting for the rule for at least some of their programs under the 2014 Prior Rule or in responding to recent NCES surveys.

*Changes:* None.

*Comments:* One commenter opined that it is unclear what mechanism and process institutions would use to provide the large amount of data necessary to calculate D/E and EP metrics for nearly all eligible programs to the Department. Some commenters said that this additional burden and cost of complying would be complex and

require meticulous coordination, particularly to create the reporting process for the first year the regulations would go into effect. Several commenters cautioned that the regulations the Department proposed to improve institution accountability will have the unintended consequences of imposing significant reporting burdens on many institutions that provide strong outcomes for students who readily find good jobs in high demand fields.

*Discussion:* While we acknowledge that the overall number of programs will increase from those reported under the 2014 Prior Rule, we anticipate the process will largely remain similar. We also expect to add additional fields as appropriate to existing Departmental systems including the Common Origination and Disbursement (COD) system and the National Student Loan Data System (NSLDS).

The Department will provide institutions with guidance and training on the new reporting requirements, provide a format for reporting, and enable our systems to accept reporting from institutions beginning several months prior to the July 31, 2024, deadline so that institutions have sufficient time to submit their data for the first reporting period. The Department will also continue to look at ways this information can be routinely updated in the systems to reduce separate reporting burdens on institutions and will consider additional ways to simplify our reporting systems, as appropriate.

We are also exempting from these regulations, including the reporting requirements, institutions offering any group of substantially similar programs, defined as all programs in the same four-digit CIP code at an institution with less than 30 completers in total during the four most recently completed award years. While these metrics are calculated at the six-digit CIP code level, for the purposes of qualifying for this exemption, we measure completers among all such programs at the four-digit CIP code level to avoid incentives for institutions to create new, smaller programs that are substantially similar in order to avoid being covered by these rules. Although this change will result in the loss of some beneficial information from these institutions independent of the D/E rates and earnings premium metrics, such as net pricing at specific credential levels, we believe this loss is acceptable when balanced against the alleviated reporting burden for many institutions. Approximately 700 institutions will benefit from this exemption, including about 85 percent of participating foreign

**70062**    **Federal Register** / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations

institutions and a diverse group of other institutions. This reduction of burden is achieved without diminishing the impact of the D/E rates or EP measure, as institutions exempted from the reporting requirement would not have sufficient numbers of completers to calculate those measures for any program. Moreover, the overall impact to students is minimal because institutions affected by this exemption constitute less than one percent of total title IV, HEA student enrollment and less than one percent of total title IV, HEA disbursement volume.

*Changes:* We have modified the exemptions under §§ 668.401(b) and 668.601(b) to exempt institutions that do not have any group of programs that share the same four-digit CIP code with 30 or more completers in total over the most recent four award years from these regulations, as described above.

*Comments:* A few commenters claimed that new reporting requirements would overly tax institutional financial aid and information technology staff who are already tasked with implementing and adapting to significant changes to Federal Student Aid processes and systems for the upcoming 2024–25 award year. One commenter noted that the 2014 Prior Rule presented technical difficulties in report coding for students enrolled concurrently in multiple GE programs and anticipated these challenges to be more significant with the potential for students to now simultaneously enroll in GE and non-GE programs. One commenter indicated that the proposed rule did not clearly explain how to handle reporting requirements for a student enrolled simultaneously in a GE program and an eligible non-GE degree program, recommending that the eligible non-GE degree program should take precedence for reporting because funds received by the student would be primarily used for that program.

A few commenters recommended that the data reported under § 668.408 be open, interoperable, and available for integration into State longitudinal data systems. One commenter noted that additional investments in State data systems will be necessary to ensure accurate reporting on the proposed metrics and requested that the Department encourage States to invest more resources into linked and integrated longitudinal data systems to reduce reporting burdens on institutions.

*Discussion:* We acknowledge that the reporting requirements in § 668.408 may, in some cases, increase the demands on an institution's information

technology staff and resources. We also recognize that institutions must adjust for technical and system changes under the Free Application for Federal Student Aid (FAFSA) Simplification Act and Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, effective for the 2024–2025 award year. The Department has provided, and will continue to provide, training and technical resources in advance of the implementation of the FAFSA Simplification Act and Future Act provisions.

We will also provide training and technical resources prior to the implementation of the Financial Value Transparency and Gainful Employment frameworks set forth in this final rule, which will address the handling of situations involving students simultaneously enrolled in multiple GE programs. We appreciate the request for a clearer explanation of how institutions should handle reporting requirements for a student enrolled simultaneously in a GE program and an eligible non-GE degree program. We will provide further clarification in sub-regulatory guidance and training in advance of the effective date of the reporting requirements under this final rule, and we will consider the request that eligible non-GE degree programs take precedence.

The Department agrees that data published under these provisions should be as transparent and interoperable as possible, while recognizing the necessary constraints to protect student privacy. We will continue to evaluate ways to make the published data as valuable as possible to researchers and State policymakers. We also agree that wise investments in State data systems may increase the value of data reporting requirements, and we encourage States to support linked and integrated longitudinal data systems as appropriate.

*Changes:* None.

*Comments:* One commenter noted that the proposed reporting requirements appear unnecessarily burdensome for institutions that do not participate in the Direct Loan program and whose graduates are therefore unburdened with student debt.

*Discussion:* The Department disagrees with the assertion that the reporting requirements are unnecessarily burdensome for institutions that do not participate in the Direct Loan program. A program should not be exempt from the reporting requirements because it has a low borrowing rate or a low institutional cohort default rate. The information that institutions must report is necessary to calculate not only the D/E rates, but also to calculate the EP

measure and to determine many of the disclosure items as provided in § 668.43(d). Exempting some institutions from the reporting requirements, whether partially or fully, would undermine the effectiveness of both the accountability and transparency frameworks of the regulations because the Department would be unable to assess the outcomes of those programs. In addition, students would not be able to access relevant information about these programs and compare outcomes across institutions. We also note that D/E rates calculations would likely be favorable for institutions with low rates of borrowing.

*Changes:* None.

*Comments:* One commenter noted that reporting requirements constitute administrative work that does not serve students in a direct manner. Several commenters noted that the costs of the new reporting requirements will inevitably transfer to the student.

*Discussion:* We do not agree that the efforts institutions will need to invest in to comply with reporting requirements do not directly serve students. The financial value transparency metrics calculated using the reported data will provide valuable information directly to current and prospective students, who can use that information to better inform critical enrollment and borrowing decisions. Moreover, the GE accountability framework will directly protect students, prospective students, families, and the public by ending title IV, HEA participation for the poorest performing programs.

While we acknowledge that institutions may pass administrative costs on to students through increased tuition and fees, we note that the transparency framework will increase the availability of cost information available to students and prospective students in comparing programs and institutions, and we expect that market forces will mitigate this practice to some extent through increased pricing competitiveness among institutions.

*Changes:* None.

*Specificity*

*Comments:* One commenter argued that proposed § 668.408(a)(4), which would allow the Department to specify additional reporting requirements in a future **Federal Register** notice, is vague and overly broad to such an extent as to provide us with unlimited discretion in imposing additional reporting requirements. This commenter contended that proposed § 668.408(a)(4) did not provide sufficient notice concerning the types of information that institutions may be required to report or

disclose. The commenter requested that the Department either provide further information about the types of reporting that may be required under § 668.408(a)(4) or remove this provision. Another commenter expressed concern that the public would lack a mechanism to engage the Department prior to the addition of any further reporting requirements through a future **Federal Register** notice.

*Discussion:* We believe that the Department needs the discretion to reasonably modify future reporting requirements to adapt to unforeseen changes in the postsecondary ecosystem, including to eliminate unnecessary or duplicative reporting requirements. Examples of such potential developments that might be relevant to students could include more reliable and consistent job placement rates, new types of financial assistance available to students in addition to the title IV, HEA programs, or other such information. Retaining the flexibility to efficiently modify future reporting requirements is necessary to support our goal to provide the students, families, and the public with relevant information to make better informed postsecondary choices.

We note that any future modifications to reporting requirements in the **Federal Register** would be published well in advance of the effective date of such modified requirements and would provide a contact for questions about the new requirements.

*Changes:* None.

*Timeframe*

*Comments:* One commenter expressed support for the proposed reporting timeline and urged the Department to aggressively prioritize the development of data systems and other related tools. This commenter further noted that such reporting requirements are not new because institutions with GE programs have previously implemented many aspects of the proposed reporting requirements, and we already require all institutions to report many of the proposed data points.

*Discussion:* We appreciate the commenter's support, and we affirm our intent to prioritize the development of the systems and tools necessary to facilitate the reporting requirements. We agree that the reporting requirements set forth in this final rule are not without precedent, and many of them should already be familiar to institutions.

*Changes:* None.

*Comments:* Many commenters noted that the proposed reporting provisions would require institutions to report multiple years of initial data with only a 30-day window from the effective date of this final rule and urged the Department to allow institutions adequate time to prepare and report any required information, particularly in light of other high-priority work competing for institutions' limited resources. One example provided was implementing sweeping FAFSA simplification changes for the 2024–2025 award year.

A few commenters remarked that efforts necessary to comply with the initial reporting deadline for the 2014 Prior Rule were harmful to other institutional operations that had to be postponed. These commenters suggested revising the initial reporting deadline from July 31, 2024, to October 1, 2024, which would be consistent with the reporting deadline for all subsequent years. Several commenters more broadly suggested that the initial reporting deadline should be a minimum of 90 to 120 days after the later of the effective date of the final rule or the date that the Department makes available the full reporting format and process. These commenters recommended further extensions if we modify or supplement reporting guidance after releasing it.

*Discussion:* We believe that the July 31, 2024, deadline for initial reporting is reasonable and appropriate. While this reporting period ends one month from the effective date of the final rule, institutions will have over nine months from the publication of the final rule to plan and prepare for the required reporting. With regard to alleged harm to other institutional operations caused by efforts to meet the initial reporting deadline, we note that under the existing administrative capability provisions at § 668.16(b)(2), institutions are required to maintain an adequate number of qualified staff to administer the title IV, HEA programs, and part of an institution's responsibility is to comply with reporting requirements. The Department will provide training in advance to institutions on the new reporting requirements, provide a format for reporting, and enable the Department's relevant systems to accept optional early reporting from institutions beginning several months prior to the July 31, 2024, deadline. We are not persuaded by commenters' arguments that the implementation of changes for the 2024–25 award year under the FAFSA Simplification Act and FUTURE Act would necessitate extending the initial reporting timeline because most institutions will have already made the necessary operational and procedural adjustments much sooner than July 2024. We note that the new FAFSA system and associated processes will become operational and available to institutions in December 2023.

We respectfully decline the commenters' suggestions to extend the initial reporting period through October 1, 2024, or for an initial reporting deadline 90 to 120 days after the effective date of this final rule. As discussed above, we maintain that institutions have sufficient advance notice between the publication of this final rule and the initial reporting deadline of July 31, 2024, to comply, especially given the anticipated option for advanced reporting. If the Department significantly modifies or supplements the reporting requirements after the effective date of this rule, we will consider further extending the deadline.

*Changes:* None.

*Reporting Period*

*Comments:* Many commenters noted that the requirement to report certain information for students who enrolled in the previous seven award years (and, in some cases, up to nine) would consume significant institutional time and resources. These commenters explained that this would especially burden under-resourced institutions. One such commenter postulated that requiring institutions to report data from prior award years could lead to a widespread exodus of institutional financial aid staff. Some commenters noted that reporting for more than three to five past award years would exceed existing record retention requirements and, as a result, this historical data requested by the Department would be incomplete. Several commenters urged the Department not to impose sanctions for metrics calculated using data from past years that exceed applicable record retention requirements.

*Discussion:* We believe that the initial reporting requirements are reasonable for most institutions and programs, including under-resourced institutions. Nearly all proprietary institutions are already familiar with the previous reporting requirements under the 2014 Prior Rule, and significant portions of public and private nonprofit institutions were also required to report for one or more GE certificate programs under those previous requirements. We remain skeptical that the initial reporting requirements would lead to significant departures of institutional financial aid professionals, in part because at most institutions, reporting responsibilities falls primarily on specific financial aid staff, and in many cases reporting is handled through automated processing systems or dedicated reporting staff

outside the financial aid office. Furthermore, most of the records institutions must report fall within the record retention timeframe required under § 668.24(e), even if the data are maintained in multiple systems or formats. In addition, institutions may have a policy of retaining student records for longer periods; or a State or accrediting agencies or both may require them to do so.

Nonetheless, we are sensitive to institutions' concerns about the initial reporting burden. To address these concerns, we have extended the transitional reporting period option initially proposed for non-GE programs to GE programs as well, as further discussed under "Transitional Period" below.

*Changes:* We have revised the transitional reporting option at § 668.408(c)(1) to now apply both to GE and non-GE programs.

*Comments:* A few commenters noted that the Department would better promote a cooperative and supportive relationship with institutions by including an opportunity for institutions to explain any failure to comply with reporting requirements. Another commenter suggested the Department further explain the provision at proposed § 668.408(b)(2) that would allow an institution to provide an explanation acceptable to the Secretary of why the institution failed to comply with any of the reporting requirements. A few commenters argued that the Department should hold an institution harmless for failing to report data it is no longer required to retain. These commenters suggested that, if a material number of institutions fall into this category, the Department should not calculate D/E or EP metrics for the impacted years.

*Discussion:* We concur with commenters that a process is necessary for institutions to explain to the Department any failure to comply with reporting requirements. This process would be appropriate, for example, in instances in which a disaster, emergency, or attack results in the loss or destruction of data the institution must otherwise report. We expect to provide additional information regarding the manner and circumstances in which institutions could employ this provision in future sub-regulatory guidance and training. In such instances where institutions are unable to comply with these reporting requirements because the institution was not required to retain the records, § 668.408(b)(2) will allow an institution to explain its inability to comply with part of the reporting requirements. The Department

will review an institution's explanation and may provide relief from the consequences of the rule if sufficiently supported by the circumstances and evidence provided. We believe this approach provides the needed flexibility to accommodate limited circumstances in which institutions may be unable to report, including exceptional circumstances that are difficult or impossible to foresee at this time, without unduly delaying or compromising the transparency and accountability benefits of the rule.

*Changes:* None.

*Comments:* One commenter noted that the Department and other regulators encourage institutions to limit the volume of data they store, further noting that our data destruction guidance encourages institutions to minimize the amount of data they retain by destroying them when no longer needed, identifying this as a best practice for protecting individuals' privacy and for limiting the potential impact of a data breach.

*Discussion:* We do not believe the proposed reporting requirements inherently conflict with the record retention requirements at § 668.24(e), nor with the Department's guidance pertaining to the destruction of records. The record retention provisions at § 668.24(e) were never intended to shield institutions from complying with the Department's legitimate program oversight activities. For example, § 668.24(e)(3) requires institutions to retain applicable program records relating to costs questioned in an audit or program review, indefinitely and beyond the prescribed three-year retention period, until resolution of such audit or program review. In addition, many institutions retain student records for longer periods than required by § 668.24(e), either as a matter of institutional policy or as a result of State or accrediting agency requirements. As noted in the Department's data destruction guidance cited by the commenter, some data may need to be preserved indefinitely, while other student information will need to be preserved for a prescribed period of time to comply with legal or policy requirements.[155] The reporting requirements established under this rule constitute such a requirement that necessitates the retention of relevant records, potentially beyond the three-year periods referenced in § 668.24(e).

*Changes:* None.

[155] *studentprivacy.ed.gov/sites/default/files/ resource_document/file/Best%20Practices% 20for%20Data%20Destruction%20%282019-3- 26%29.pdf.*

*Comments:* One commenter expressed concern that the proposed reporting period may inadvertently identify medical programs as low financial value, lessening their ability to recruit students and exacerbating the Nation's physician workforce shortage, because a program's current metrics would be calculated based on the outcomes of students from nearly a decade ago, long before the institution would know what metrics the Department would eventually consider to constitute good financial value in 2024.

*Discussion:* Our Regulatory Impact Analysis in the NPRM showed that certain undergraduate health professions programs, particularly certificate programs in medical assisting and medical administration, would fail the GE accountability measures at higher-than-average rates.[156] We do not, however, expect that programs leading to a terminal medical degree will fail the D/E rates or EP measure in significant numbers. We further note that the cohort period defined at § 668.2 for doctoral medical and dental programs that require students to complete a residency provides additional time, relative to other programs, before graduate earnings will be measured. This provides additional reassurance that reported earnings will accurately and positively reflect physicians' and dentists' ability to exceed the high school earnings threshold and capacity to repay their educational debts. In summary, we do not expect that the regulations will deter aspiring physicians and dentists from pursuing their chosen field, and we do not believe that they will substantially negatively impact the Nation's physician workforce.

*Changes:* None.

*Comments:* One commenter posited that a more practical and less burdensome reporting process might focus on forward-looking reporting rather than data from past award years, arguing that such an approach would better accommodate institutions' need for time to adapt to new reporting requirements, and that current and future data would be more relevant for evaluating program effectiveness.

*Discussion:* Although we appreciate the commenter's suggestion, as discussed in the "Background" section of the NPRM,[157] we perceive that the need for these financial value transparency measures and the GE accountability framework is too urgent to justify further delay in calculating and publishing the D/E rates and EP

[156] *See,* for example, 88 FR 32427.
[157] 88 FR 32300, 32306 (May 19, 2023).

measures. The Department believes that the regulations provide institutions sufficient time and flexibility to adapt to any new reporting requirements, and that historical data can provide helpful insight into an established program's performance over time. Students, families, and the public deserve to benefit from improved transparency and accountability as swiftly as possible.

*Changes:* None.

*Comments:* Several commenters noted that some of the required data would be associated with years in which institutions and students were impacted by the COVID–19 national emergency and that this pre-pandemic environment may no longer exist for many students.

One commenter suggested that the Department postpone any sanctions where data prior to 2022 is used in determination of eligibility, due to the broad impact of the COVID–19 pandemic on workers, graduates, and the postsecondary education industry. A commenter suggested extending the initial reporting requirements by one to two years to better account for the economic effects of the pandemic.

*Discussion:* The Department recognizes that data from some years included in the initial reporting period were impacted by the COVID–19 pandemic and national emergency. However, postponing calculating the outcome measures until such time as no earnings data through 2022 is included in D/E rate or EP calculations would delay the benefits of the rule until at least the 2026–2027 award year. Extending the initial reporting timeframe by one to two years would produce a similar result. As discussed above, we believe the need for the transparency and accountability measures is too urgent to postpone any of their primary components to such an extent, and to do so would abdicate our responsibility to provide effective program oversight.

Additionally, we are unconvinced by arguments that data from prior to 2020 represent a pre-pandemic reality that no longer exists. Recent data show that overall labor force participation is back to its pre-pandemic forecasted level, and the prime-age (25–54) labor force participation rate is now slightly above pre-pandemic levels.[158] We consider and further discuss comments pertaining to the COVID–19 pandemic below under "Other Accommodations and Special Circumstances."

*Changes:* None.

---

[158] *www.whitehouse.gov/cea/written-materials/ 2023/04/17/the-labor-supply-rebound-from-the- pandemic.*

*Transitional Period*

*Comments:* A few commenters expressed appreciation for the transitional reporting offered at proposed § 668.408(c)(1) for eligible non-GE programs.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comments:* Several commenters requested that we offer GE programs the same reporting options as non-GE programs in the interests of fairness, reduced burden, and consistent comparison among all types of programs. One commenter opined that the proposed transitional reporting period option would unfairly hold GE program to a more difficult standard. This commenter argued that the reporting burden offered by the Department as reasoning for the transitional reporting period for non-GE programs holds equally true for GE programs.

A few commenters requested further explanation of the Department's reasoning for the difference in initial reporting requirements.

A few commenters recommended extending the transitional reporting period option to GE programs that do not offer loans. These commenters noted that many GE programs—particularly at community colleges—do not offer loans, yet we would require them to report seven years of institutional data to facilitate D/E rates that we would ultimately not calculate for those programs.

*Discussion:* Our reasoning for offering the transitional reporting and rates option only to non-GE programs was to lighten the initial reporting burden for institutions offering only non-GE programs which they were not required to report under the 2014 Prior Rule. Given that the financial value transparency metrics do not impact program eligibility for non-GE programs, we believed that alleviating some of the initial reporting burden would justify a temporary sacrifice in the quality and comparability of the D/E data reported during the transition period.

With regard to concerns about reporting requirements for institutions and programs that do not offer loans, we note that the Department would nonetheless calculate the EP measure for such institutions and programs.

While we maintain that the initial reporting requirements are reasonable, in the interests of more equitable treatment of programs and institutions, and to facilitate smoother and less burdensome implementation for institutions, we extend the transitional

reporting option to all programs in this final rule. We believe that this change will alleviate many commenters' concerns about fairness, cost, and burden, and that these considerations justify the brief period for which the D/E rate data will be impacted.

*Changes:* We have revised the transitional reporting option at § 668.408(c)(1) to now apply both to GE and non-GE programs.

*Comments:* One commenter suggested that the Department use only the transitional reporting and calculation methodology, abandoning any requirements to report for periods older than the preceding two award years.

*Discussion:* The Department considered permanently adopting the transition period's structure of calculating D/E rates for all programs. While this approach would result in a mismatch between borrowing and earnings cohorts, it would use the most recently available debt and earnings data to determine program D/E outcomes. Such an approach would also increase institutions' ability to affect their students' borrowing levels in response to adverse D/E outcomes before losing eligibility. While this approach could make the D/E rates more forward-looking, we decided against it as a permanent measure because the earnings and debt measures would reflect the outcomes of different students. We believe the D/E rates will be more meaningful and informative to most students if completers' earnings outcomes are matched with the debt incurred by the same group of borrowers.

*Changes:* None.

*Comments:* One commenter posited that because the 2014 Prior Rule used a different methodology to calculate D/E rates, such as not considering scholarships and grants in capping loan debt, it would be inappropriate to use those earlier data to calculate D/E rates under this final rule.

*Discussion:* In writing the NPRM, we did not envision using previously reported data to calculate D/E rates. Instead, we will require reporting of new information for past completer cohorts to construct the rates as set forth in the final rule. Since we have extended the transitional reporting option to both GE and non-GE programs, institutions will have the choice to report these additional data elements, such as private loans, institutional scholarships, and grants, starting with the most recent completer cohorts, or for the historical cohorts matching those for whom we measure median earnings.

*Changes:* None.

*Redundancy*

*Comments:* Several commenters urged the Department to avoid imposing duplicative reporting requirements, asserting that institutions already report some data elements at proposed § 668.408 (such as CIP code, credential level, program name, program length, enrollment status, attendance and graduation dates, disbursement amounts, and income once IRS Direct Data Exchange is in place) to other Department-maintained websites such as NSLDS, COD, and Integrated Postsecondary Education Data System (IPEDS). These commenters further suggested that the Department should share data it controls between systems and processes to relieve administrative burden for institutions. A few commenters further noted that duplicative reporting requirements increase institutional burden yet provide little added value to students because much of the information is already available.

Several commenters noted that institutions are already required to publish graduation and placement rates through accrediting agency requirements. A few commenters opined that it is difficult for career training programs to comply with overlapping transparency requirements. These commenters suggested that the Department thoroughly review the annual requirements for reporting, accountability, and transparency.

*Discussion:* Although there is some overlap with the Department's current enrollment reporting and disbursement reporting requirements, those data do not include several key elements required for the calculation of D/E rates, such as debt students owe directly to the institution, other private education loan debt, tuition and fees, and allowance for books and supplies. As discussed under "Burden" above, we believe that the transparency and accountability benefits outweigh any burden of reporting. We further note that various factors, such as the sophistication of an institution's systems, the size of the institution and the number of programs that it has, whether or not the institution's operations are centralized, and whether the institution can update existing systems to meet the reporting requirements will affect the level of burden for any particular institution.

With regard to accrediting agency requirements concerning the publishing of graduation and placement rates, we remind commenters that we do not include placement rates among the reporting requirements in this rule.

Accrediting agency requirements and methodologies vary, and inconsistencies in how institutions currently calculate job placement rates limit their usefulness in comparing institutions and programs.

As previously noted, the Department has carefully considered the reporting requirements that support the transparency and accountability frameworks of this rule. We believe them to provide the most appropriate and helpful information for students, families, and the public at this time balanced with the needs of institutions. The Department will nonetheless review the data institutions currently report and will work to mitigate duplicative reporting to the greatest extent possible.

*Changes:* None.

*Data Elements*

*Comments:* One commenter suggested that, in addition to the data elements identified in the NPRM, the Department require institutions to report the distance education status of their students (*i.e.,* entirely online, entirely on-campus, or hybrid). This commenter reasoned that doing so would enable useful insights about the outcomes of online and hybrid programs and would allow a more targeted comparison of earnings between completers and high school graduates for the EP measure.

*Discussion:* We appreciate this suggestion, and we concur that more granular data on students' distance education status could yield useful and better targeted program information. We do not currently gather this information on the individual student level. We considered strategies for obtaining such information, such as creating and assigning virtual OPEID numbers to represent an institution's online-only programs. Upon further consideration, we believe that such changes could have wider ranging impacts and would be best addressed by including them in a broader discussion of distance education issues in our upcoming negotiated rulemaking.[159]

*Changes:* None.

*Comments:* One commenter suggested removing reporting requirements for non-Federal sources of aid, particularly private loans and institutional grants, noting that institutions are only aware of private loans if lenders or students disclose them. The commenter further noted that gathering and reporting private loan information is burdensome for institutions.

One commenter proposed removing the requirement to report institutional debt. This commenter argued that the

---

[159] See 88 FR 17777 (Mar. 24, 2023).

institutions collect these debts directly from the student, they are not tied to Federal investment, and they typically result from student withdrawals. As an alternative, this commenter suggested using return of title IV, HEA funds (R2T4) record submission to estimate the average institutional debt.

Another commenter noted that reporting debt due at time of exit from the program presents unique programming challenges that would require manually fixing a significant portion of records, suggesting that institutions be exempted from reporting this data element if the median value is less than $200.

*Discussion:* The reporting of non-Federal sources of aid—including institutional grants and scholarships; State, Tribal, or private funding; and the private education loans of which the institution is aware (including those made by an institution) is necessary to accurately determine educational debt for purposes of calculating and providing D/E rates. Omitting private education loan debt, including institutional loan debt, would harmfully diminish the usefulness of the information by providing an inaccurate estimate of the true costs typically incurred by students to enroll in a program. Regardless of any associated burden, reporting non-Federal grants and scholarships ultimately benefits institutions because, as provided under § 668.403, in determining a program's median loan amount each student's loan debt would be capped at the lesser of the loan debt or the program costs, less any institutional grants and scholarships. Some institutions with higher overall tuition costs offer significant institutional financial assistance or discounts that reduce the net cost for students to enroll in their programs. Requiring institutions to report institutional grants and scholarships allows the Department to take such financial assistance into consideration when measuring debt outcomes, will encourage institutions to provide financial assistance to students, and will ultimately result in a fairer metric and more consistent comparisons of the actual debt burdens associated with different programs.

While we appreciate the suggestion to use R2T4 reporting as a proxy to estimate institutional debt, doing so would overlook other sources of institutional debt such as gap loans, emergency loans, and payment plans. We believe it is necessary to capture all such sources of educational debt to calculate and provide D/E rates that are sufficiently accurate.

We also appreciate the commenter's suggestion that institutions be exempted from reporting institutional debt if the median value is less than $200. While we recognize the technical concerns, we believe that this burden is outweighed by the benefit of accurate debt information. While $200 may appear to be a reasonable *de minimus* amount of debt for institutions not to report, it is unclear what data would support this threshold or some other particular amount. Additionally, we do not believe a threshold to be appropriate, because to many current and prospective students even a modest amount could make the difference in covering critical indirect costs such as housing, food, or transportation, or going forward with those needs unfulfilled.

*Changes:* None.

*Comments:* Regarding the requirement to report licensure information (including whether the program meets licensure requirements for all States in the institution's area and the number of graduates attempting and completing licensure exams), one commenter noted that licensure requirements and oversight bodies vary by State and suggested that the Department investigate other, more accurate sources of licensing, certification, and workforce data, such as BLS Occupation and Wage Statistics or Employment Projections data.

One commenter opined that reporting State-specific licensure preparation requirements exceeds the limits of what institutions can reasonably accomplish.

One commenter noted that the Florida Education & Training Place Information Program does not disaggregate wage and employment data for private nonprofit institutions, further noting that student and employer surveys are unreliable and suffer from poor response rates.

One commenter posited that reporting program costs including books, supplies, and equipment would be burdensome for community colleges because those elements can frequently change. This commenter instead suggested that we require institutions to report a good-faith estimate.

*Discussion:* We are aware that licensure oversight bodies, processes, and requirements vary from State to State, and we acknowledge that institutions must commit sufficient time and resources to adequately navigate those requirements. Notwithstanding the complexities of the State licensing landscape, we remind commenters that accurate information about whether a program meets State licensure requirements is of paramount importance to students. Reporting whether a program meets relevant licensure requirements for the States in the institution's metropolitan statistical area or whether it prepares students to sit for a licensure examination in a particular occupation allows the Department to provide current and prospective students with invaluable information about the career outcomes for graduates of the program and supports informed enrollment decisions. In recent years, some institutions have misrepresented the career and employment outcomes of programs, including the eligibility of program graduates to sit for licensure examinations, resulting in borrower defense claims. Reporting information about a program's licensure outcomes—such as share of recent program graduates that sit for and pass licensure exams will help to reduce the number of future borrower defense claims that are approved.

With regard to the request to consider BLS data, we do not believe that BLS data reflect program-level student outcomes. The average or percentile earnings gathered and reported by BLS for an occupation include all earnings gathered by BLS in its survey, but do not show the specific earnings of the individuals who completed a particular program at an institution and, therefore, would not provide useful information about whether the program prepared students for gainful employment in that occupation.

With regard to concern about the disaggregated Florida earnings data, we note that institutions do not report wage and employment data under this rule. A Federal agency with earnings data provides aggregate earnings data directly to the Department.

We believe that institutions are capable of collecting and reporting State licensure information, and the importance of State licensure information to students justifies any burden to institutions in collecting and reporting such data. We do not believe that allowing institutions to report a good-faith estimate would result in accurate and comparable information, in part because whether an estimate was provided in good faith would be subjective and difficult if not impossible to define.

*Changes:* None.

*Comments:* One commenter suggested that the Department require institutions to report additional data elements, including (1) whether a program graduates commonly are subject to a postgraduate training period, similar to a medical or dental program internship or residency, that could impact their early career postgraduate earnings; (2) the amount of title IV, HEA funds obtained by the student for housing; and (3) whether graduates obtain employment that is unpaid or subsidized through a government program with housing, meal, or other non-income benefits.

*Discussion:* We appreciate the commenter's suggestions. With regard to postgraduate training requirements that could impact immediate postgraduate earnings, we include this information among requirements that institutions must report to the Department, and include it on the list of elements the Secretary may include on the program information website described in § 668.43. Our analysis, however, revealed that these particular disciplines demonstrate significantly more meaningful gains with an extended earnings measurement period than any other program categories. As further explained in our earlier discussion under "Measurement of Earnings," we determined that reporting postgraduate internship or residency requirements is properly targeted to medical and dental programs, as initially proposed.

We believe it is more appropriate for institutions to report the annual allowance for housing, rather than the amount of title IV, HEA funds a student obtained specifically for housing. Not all institutions offer institutional housing, nor do all students partake of institutional housings at institutions that offer it. It would be both burdensome and unreliable to require institutions to divine which specific educationally related indirect costs each student covers using title IV, HEA credit balances.

While we recognize that some students obtain employment that is unpaid or subsidized through a government program with housing, meal, or other non-income benefits, we believe this would apply to only a small portion of postsecondary graduates. While unpaid or subsidized programs may provide meaningful personal fulfilment and valuable societal benefits, financial concerns weigh more heavily in most students' decision to go to college, with the top three reasons identified being "to improve my employment opportunities," "to make more money," and "to get a good job." [160] We believe it would be unnecessarily burdensome to require institutions to report this supplementary information, and that such burden

[160] Rachel Fishman (2015). 2015 College Decisions Survey: Part I Deciding To Go To College. New America (*static.newamerica.org/attachments/3248-deciding-to-go-to-college/CollegeDecisions_PartI.148dcab30a0e414ea2a52f0d8fb04e7b.pdf*).

would outweigh the benefits to students.

*Changes:* None.

*Alternative Approaches*

*Comments:* One commenter urged the Department to consider alternative approaches to increase transparency without increasing costs to institutions.

*Discussion:* The Department is always interested in exploring new approaches to deliver improved outcomes while minimizing costs and burden. Nonetheless, among the options available at this time, we believe the approach set forth in this rule will provide the optimal achievable balance between costs and benefits. Further discussion is provided under ''Discussion of Costs and Benefits'' below.

*Changes:* None.

*Other*

*Comments:* One commenter opined that the Department did not discuss the collection of such a large amount of data and information during negotiated rulemaking sessions.

*Discussion:* The Department disagrees with the commenter's assertion that the reporting requirements were not discussed during negotiated rulemaking. Preliminary language in the GE issue papers for weeks two [161] and three [162] of negotiations provided potential reporting requirements for consideration and discussion by the committee. Because the committee did not reach consensus, the Department is neither limited nor bound to the specific regulatory language discussed in negotiated rulemaking. Moreover, the reporting requirements were published in the NPRM, and the Department provided the public—including the negotiators—a reasonable opportunity to provide feedback to the Department through the public comment period.

*Changes:* None.

## Program Information Website—§ 668.43

*General Support*

*Comments:* Several commenters voiced general support for the proposed program information website and requirements, noting that programmatic information should be more publicly available to support students in making informed decisions.

The commenters further noted that this information may help to prevent harm to vulnerable populations. Additionally, these commenters

suggested that this information can encourage schools to operate more efficiently and devote more resources to providing career services and job development resources to students. The commenters further highlighted that the program information website provides other State, local, and Federal stakeholders with information to monitor and guide the improvement of student outcomes.

One commenter noted that borrowers with defaulted loans interviewed in focus groups expressed a desire for more information about loans and college outcomes.

One commenter observed that financial value transparency information relating to cost of attendance, majors of interest, residence, and post-graduation earnings can impact a student's enrollment decisions.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*General Opposition*

*Comments:* One commenter opined that institutions, not the government, are best positioned to advise and inform students and families.

*Discussion:* We remind the commenter that nothing in this rule prohibits an institution from providing information to students and families. We of course welcome and encourage institutions to provide any reliable supplemental and contextual information to students that they may wish to provide in addition to the information we make available through the program information website. We believe, however, that both institutions and the government have important roles to play in this regard. We believe that relying solely on institutional efforts and resources would result in inconsistent information that would make comparing different institutions and programs more challenging and confusing for students, would increase the risk of misrepresentation and abuse leading to costly borrower defense claims, and would unfairly disadvantage smaller and under-resourced institutions without large marketing departments and budgets. The financial value transparency information we have chosen provides more consistent information to students and the public, more equitable treatment of institutions and programs, and better serves the needs of the public and the mission of the Department.

*Changes:* None.

*Comments:* Several commenters questioned how many students would carefully view the proposed program

information website, opining that excessive consumer information risks obscuring the information and overwhelming students.

Another commenter cited the Department's Direct Loan entrance counseling as an example of consumer information transparency where the organization, length, and language impede students' interest and understanding of the information, leading students to only skim the material to meet the requirement to enable disbursement of pending loan funds.

*Discussion:* The purpose of Direct Loan entrance counseling and the financial value transparency information materially differ. Entrance counseling is intended to make borrowers aware of their rights, responsibilities, and resources available to them. The financial value transparency information provides information about the debt and earnings outcomes of a program intended to aid students in making informed enrollment decisions. We believe that all of the required information would be useful and relevant to prospective and enrolled students. We, however, concur with the commenters that it is critical to provide prospective and enrolled students with the information that they would find most helpful in evaluating a program when determining whether to enroll or to continue in the program. We note that § 668.43(d)(1) allows us to use consumer testing to identify additional information that will be most meaningful for students, and § 668.408(a)(4) permits us to modify future reporting requirements as necessary to support improved transparency.

*Changes:* None.

*Comments:* One commenter opined that the requirements in proposed § 668.43(d)(1)(ii), (v), (vi), (vii), (x), and (xi) to report a program's completion and withdrawal rates, D/E rates, EP measure, loan repayment rates, median loan debt, and median earnings would violate institutions' constitutional rights under the First Amendment. The commenter argued it is not clear that the information required to be reported would be purely factual and uncontroversial because institutions would not have an opportunity to review, challenge, or appeal the Department's data or calculations before the information is made public. This commenter further posited that the proposed requirements do not advance a significant government interest in preventing deceptive advertising and providing consumer information about program benefits and outcomes because

---

[161] *www2.ed.gov/policy/highered/reg/hearulemaking/2021/3ge.pdf.*

[162] *www2.ed.gov/policy/highered/reg/hearulemaking/2021/isspap3gainempl.pdf.*

the information is made public before institutions have an opportunity to review, challenge, or appeal the information. As a result, according to the commenter, the Department could inadvertently provide deceptive or confusing information. This commenter additionally noted that, in response to similar objections under the 2014 Prior Rule, the Department cited that the disclosures in that rule were purely factual and uncontroversial in part because institutions were given an opportunity to challenge the data and calculations, which is absent in the proposed regulations.

*Discussion:* The Department disagrees that the requirements related to the program information website violate institutions' First Amendment rights to the freedom of speech. As an initial matter, the rules do not require institutions to disclose the information in § 668.43(d)(1) to students because that information will be posted on the Department's website, not the website of an institution or program. In order to clarify the nature of the reporting requirements in § 668.43(d), we are replacing references to the Department's ''disclosure'' website with ''program information'' website and making related conforming changes to better clarify the distinction between this website hosted by the Department and the institutional disclosure requirements in § 668.43(a) through (c). Section 668.43(d)(1) does not require institutions to make disclosures to students, as the 2014 Prior Rule did, and we are changing the terminology to avoid any confusion about the nature of these requirements.[163]

Additionally, the rules aim to protect the use of taxpayer funds and facilitate program innovation, not only to enhance informed student choice and public information more generally. To the extent some commenters suggest the rules will require institutions or programs to include such information on their own websites, they are incorrect. To clarify, the Department will collect information and data from institutions and other sources, conduct certain calculations in accordance with the rules, and post results on the Department's website. The material posted on the Department's website will be the government's speech, and clearly so, not any institution or program's

speech,[164] and will impose no burden on the content choices of institutions. To the extent that commenters suggest that private parties have free speech rights to control the content of an agency website under these circumstances, or that institutions have a free speech right to regulate communications between the Department and students receiving Federal aid, the Department disagrees with the conclusion. That view of the First Amendment would implicate a broad range of government communications that rely in part on information collections from private parties.

Moreover, the information available on the Department's program information website will consist of accurate factual, uncontroversial information regarding an institution's programs. Courts have upheld the provision of factual information against First Amendment challenge even when, unlike the situation here, the government has required disclosures to be made by private parties.[165] Indeed, a district court rejected First Amendment and other challenges to a disclosure provision in the 2014 Prior Rule, which required institutions to make disclosures directly to prospective and enrolled students.[166] We point out that,

in this final rule, § 668.43(d)(2) through (4) merely require schools to inform students of and direct them to the Department's program information website, which will contain purely factual, uncontroversial information. Such website links and access information are not the kind of ''compelled speech'' that has raised serious concerns in the past.[167]

As for the rules adopted here regarding the Department's program information website and the institutional reporting of information on which it will be based, we believe the rules will directly advance important government interests in informed student choice and protection of tax-financed resources, as well as innovation in educational programs, by making comparable information on program features and results readily available.[168] Moreover, the rules are crafted to serve the Department's goals and do not impose burdens on the speech rights of institutions. The final rules will make available objective, factual, uncontroversial, and commonsense information about programs and their track records. Those outcomes include clearly defined measures of affordable debt and adequate earnings.[169] As we discuss elsewhere in this document, institutions may correct errors in certain calculations.

Furthermore, the rules will not interfere with institutions' ability to convey their own messages about program performance and much else. Students and others will be free to evaluate the content of the Department's website as they make educational decisions. And we emphasize that the rules apply only to institutions that

---

[163] Section 668.43(d)(2) through (4) (regarding links to the Department's program information website) is addressed below in this section, as well as in a separate discussion that covers public comments on that section that are not directly related to the freedom of speech under the First Amendment.

[164] *See Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 207 (2015) (''When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.'').

[165] *See, e.g., Recht* v. *Morrisey,* 32 F.4th 398, 419 (4th Cir.) (involving required insertions into attorney advertisements regarding certain drugs and their approval by the Food and Drug Administration), *cert. denied,* 143 S. Ct. 527 (2022); *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 540 (D.C. Cir. 2020) (involving required disclosures of hospital pricing information to reduce confusion); *CTIA—The Wireless Ass'n* v. *City of Berkeley,* 928 F.3d 832, 849 (9th Cir. 2019) (involving required retail information regarding cellular phone carriage and Federal Communications Commission standards); *Spirit Airlines, Inc.* v. *U.S. Dep't of Transp.,* 687 F.3d 403, 414–15 (D.C. Cir. 2012) (involving the required prominent display of total prices on airline websites); *Am. Meat Inst.* v. *U.S. Dep't of Agric.,* 76 F.3d 18, 26–27 (D.C. Cir. 2014) (involving required country-of-origin labeling); *New York State Restaurant Ass'n* v. *New York City Bd. of Health,* 556 F.3d 114, 131 (2d Cir. 2009) (regarding required disclosure of calorie information in connection with the sale of restaurant meals). This list is not intended to be an exhaustive collection of relevant sources, but instead an instructive list of court decisions that upheld regulations even when government subsidies were not at issue. For a readily distinguishable case that found a constitutional violation, see *Nat'l Inst. of Family & Life Associates* v. *Becerra,* 138 S. Ct. 2361, 2371 (2018) (regarding crisis pregnancy centers). Note further that, below, we address the freedom of speech and warnings about GE programs.

[166] *See Ass'n of Priv. Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 198–200 (D.D.C. 2015) (alternative holdings) (involving required disclosures including total costs or

estimated costs of completing a program), *aff'd,* 640 F. App'x 5, 6 (D.C. Cir. 2016) (noting that, on appeal, the Association no longer challenged the disclosure rules).

[167] See *Rumsfeld* v. *Forum for Acad. & Institutional Rts., Inc.,* 547 U.S. 47, 61–62 (2006) (distinguishing government-mandated pledges and mottos from a requirement that law schools include notices regarding recruitment on behalf of the U.S. Military when the schools offer such assistance to other recruiters).

[168] See *Zauderer* v. *Office of Disciplinary Couns. of Supreme Ct. of Ohio,* 471 U.S. 626, 651 (1985) (testing advertiser disclosure requirements for a reasonable relationship to a governmental interest in preventing deception, and for whether the requirements are unduly burdensome to speech); *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 259–53 (2010) (following *Zauderer*); *Am. Hosp. Ass'n,* 983 F.3d at 540–42 (same).

[169] Contrast the dictum in *Ass'n of Priv. Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 154 n.7 (D.D.C. 2012), which expressed concern about a ''statement that every student in a program 'should expect to have difficulty repaying his or her student loans.' '' The requirements related to the program information website adopted here do not require any such message.

participate in title IV, HEA programs. Only institutions seeking to gain or maintain title IV, HEA eligibility will have to report the information at issue.

Therefore, the program information website directly advances compelling government interests—preventing deceptive advertising about postsecondary programs, providing consumers information about an institution's educational benefits and the outcomes of its programs, protecting taxpayer interests in the careful use of title IV, HEA funds, and improving program performance, which often comes from better and more accessible information about results. Furthermore, as we noted in the preamble to the 2014 Prior Rule, the program information website builds on significant Federal interests in consumer information that are evidenced in decades of statutory disclosure requirements for institutions that receive title IV, HEA program funds.[170] Contrary to the commenter's opinion, the information provided under § 668.43(d) is purely factual and will not be controversial, in part because the underlying information is either directly reported to the Department by the institution or, in the case of earnings data, is the highest quality data available and provided directly to the Department by a Federal agency with earnings data. As for concerns related to institutional data challenges, we address them below under "Challenges, Hearings, and Appeals."

The Department is confident in the quality of information to be presented on the Department's program information website, and confident that it will significantly improve what is easily available today. The individual items of information listed in § 668.43—including completion and withdrawal rates, D/E rates, EP measure, loan repayment rates, median loan debt, and median earnings—have been narrowly tailored to provide students and prospective students with the information the Department considers most critical in their educational decision making and in protecting taxpayer interests in the use of title IV, HEA aid, and in promoting improvement in education programs. Moreover, the Department intends to use consumer testing to further inform its determination of any additional items it will include on the program information website. We expect that this consumer testing will highlight the information that students find particularly critical in helping them make informed choices, which will in

turn help the Department protect tax-financed resources.

*Changes:* We have revised § 668.43 to refer to the Department's website as the "program information website" rather than the "disclosure website." We have also made conforming revisions to § 668.605(c)(2) and (3) by changing the reference from "disclosure website" to "program information website."

*Mechanism for Providing Transparency*

*Comments:* Several commenters generally supported the proposed requirements but suggested that the Department provide the information via a single centralized website such as the College Scorecard rather than develop a separate website for the proposed metrics. These commenters noted that the College Scorecard is an established and well-known comparison tool and that adding the financial value transparency information to it would give students and families a better-rounded assessment of program value.

One commenter argued that developing a separate program information website would be duplicative, confusing to students, and increase costs to taxpayers when the College Scorecard is already available.

*Discussion:* We agree that the College Scorecard is a well-established and beneficial tool for providing information about postsecondary outcomes. The Department, however, also recognizes that merely posting the information on the College Scorecard website has had a limited impact on student choice. For example, a randomized controlled trial[171] inviting high school students to examine program-level data on costs and earnings outcomes had little effect on students' college choices, possibly due to the fact that few students accessed the information outside of school-led sessions. Similarly, one study[172] found the College Scorecard influenced the college search behavior of some higher income students but had little effect on lower income students.

Consumer information is most likely to impact choice when tailored to the applicant's personal context. We seek to improve the information available to students with several refinements relative to information available on the

College Scorecard, including debt measures that are inclusive of private education loans and other institutional loans (including income sharing agreements or tuition payment plans), as well as measures of institutional, State, and private grant aid. This information will enable the calculation of both the net price to students as well as total amounts paid from all sources. We believe these improvements will better capture the program's costs to students, families, and taxpayers, and we maintain that these benefits sufficiently outweigh the costs of developing the new program information website.

*Changes:* None.

*Comments:* One commenter encouraged the Department to consider whether requiring institutions to provide disclosures directly to students could be more efficient than creating a new website.

Another commenter requested that the Department consider a disclosure template similar to the GE disclosure template featured in the 2014 Prior Rule, noting that it would provide clear, concise, and uniform information from institutions to students.

*Discussion:* We believe that providing financial value transparency information through a centralized website maintained by the Department will make this information more convenient because it allows students, families, institutions, and the public to more easily compare programs than direct institutional disclosure would allow. In addition, requiring institutions to complete and post disclosure templates, or to directly distribute the information to students, would be more burdensome and costly to institutions than the Department's hosting the program information website. We of course welcome and encourage institutions to provide any reliable supplemental and contextual information to students that they may wish to provide in addition to the information we make available through the program information website.

*Changes:* None.

*Comments:* One commenter expressed support for a comprehensive postsecondary education data system which would provide academic, debt, and earnings information beyond the institutional or programmatic level down to the individual student level, and which would follow individual students across institutions, ultimately providing more complete and accurate post-graduation debt and earnings information. This commenter expressed support for the system proposed in this rule as a workaround, given that the Department is currently prohibited from

---

[170] 79 FR 64890, 64967 (Oct. 31, 2014).

[171] Blagg, Kristin, Matthew M. Chingos, Claire Graves, and Anna Nicotera. "Rethinking consumer information in higher education." (2017) Urban Institute, Washington DC. *www.urban.org/research/publication/rethinking-consumer-information-higher-education.*

[172] Hurwitz, Michael, and Jonathan Smith. "Student responsiveness to earnings data in the College Scorecard." Economic Inquiry 56, no. 2 (2018): 1220–1243. Also, Huntington-Klein 2017. *nickchk.com/Huntington-Klein_2017_The_Search.pdf.*

establishing a unit record system of this nature, and noted that in the absence of such a system the approach proposed in this rule represents a generally positive workaround.

*Discussion:* We appreciate the commenter's support. While HEA section 134 [173] prohibits the creation of new student unit record databases, any earnings data provided to the Department by the Federal agency with earnings data will be at the aggregate level. In the absence of such a granular system of records, we believe the transparency and accountability frameworks will provide program-level information that will exceed the quality and utility of currently existing information and oversight mechanisms.

*Changes:* None.

*Comments:* One commenter urged the Department to conduct user testing on its program information website before it launches.

*Discussion:* We appreciate the commenter's suggestion. The Department recognizes the value of consumer testing, and to this end we deliberately affirm in § 668.43(d)(1) the Secretary's authority to conduct consumer testing to inform the design of the program information website, if we determine that such input would likely enhance the implementation of the transparency framework.

*Changes:* None.

*Scope*

*Comments:* A few commenters expressed support for applying financial value transparency to both GE and non-GE programs to increase access to meaningful information about program performance. The commenters believed this approach addresses concerns about the growing presence at public and nonprofit institution of certain predatory and wasteful practices more prevalent in the proprietary sector, such as incentive-based compensation for online program managers and aggressive marketing of costly online graduate programs. Another commenter expressed support for requiring the calculation of meaningful metrics and providing this information to all students in all eligible programs. One commenter noted that this information is especially important for graduate programs.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* A few commenters opined that any substantive language on the Department's program information website describing whether a program

has met the standards and its presentation should be consistent for both GE and non-GE programs. However, these commenters acknowledged that language regarding potential loss of title IV, HEA program eligibility would not be relevant to non-GE programs.

*Discussion:* The commenter correctly noted that any language relating directly or indirectly to the loss of title IV, HEA program eligibility must be limited to GE programs, as non-GE programs are not included in the GE program eligibility framework. In crafting any other language, we will attempt to deliver relevant content using language that best serves the needs of students, and we will consider the commenter's suggestion as we develop that content.

*Changes:* None.

*Comments:* One commenter argued that the requirements proposed at § 668.43(d)(1)(vii) to provide loan repayment rates for students or graduates who entered repayment, at § 668.43(d)(1)(x) to provide median loan debt of students who completed or withdrew from the program, and at § 668.43(d)(1)(xi) to provide median earnings of students who completed or withdrew from the program are inappropriate. This commenter noted that information would capture students who did not complete the program, further claiming that loan repayment rates, median loan debt, and median earnings for students who did not complete a program are unrelated to the quality of the program.

Several additional commenters opined that the information should not include median loan debt and median earnings for non-completers because it would have no bearing on the expected earnings of a student who completes the program.

*Discussion:* While the D/E rates and EP measure are specific to graduates of a program, the Department disagrees with the commenters' assertion that other information such as loan repayment rates, median loan debt, and median earnings for non-completers is unrelated to the quality of a program. Graduation is, unfortunately, not the only possible outcome of even the most effective and well-administered postsecondary programs. We believe that students and prospective students have a legitimate interest in knowing the median amount students borrow when enrolling in a given program and their likelihood of being able to repay that debt—whether or not those students ultimately graduate from the program. We contend that such information will assist students in

making better informed enrollment and borrowing decisions.

We further note that the outcomes of students who do not complete a program nonetheless reflect, at least to some extent, upon the quality of the program. It can be reasonably inferred that the capability of an institution to recruit students likely to succeed, to support and retain those students once enrolled, and to provide outreach and support (such as career services and information about loan repayment) to students who withdraw is indeed related to the overall quality of the program.

*Changes:* None.

*Content*

*Comments:* One commenter noted that proposed § 668.43(d)(1) provides that the program information website may include certain items, but does not actually require any of the listed items to appear on the new program information website. The commenter further noted that courts have held that such language would not require the Department to include any of the listed items. This commenter speculated that a future Secretary could effectively rescind the financial value transparency requirements without rulemaking. The commenter added that by providing students a regulatory right to specific information (beyond a right to a website, without any particular content) the Department would clarify that, should it later opt to remove the information, students would suffer an Article III injury-in-fact sufficient to confer legal standing.

*Discussion:* We share this commenter's concerns and appreciate the suggestion. We concur that proposed § 668.43(d)(1) would have established access to a Department website without guaranteeing access to any specific information. Upon further consideration, we have concluded that some of the listed items of information constitute a minimum of financial value transparency information that should be available to students, and that to remove any of those elements would harm students in the sense of receiving less than that minimum of important and useful information. We have reviewed the list of items in proposed § 668.43(d)(1) as well as data that we can foresee being available to the Department when these rules are implemented, in order to identify information that is feasible and especially important to post. Based on that review we have concluded that, to adequately safeguard students' access to the financial value transparency information otherwise provided under

---

[173] 20 U.S.C. 1015c.

this rule, proposed § 668.43(d)(1) should be revised to require the Secretary to include certain listed items of information on the Department's program information website when applicable, while retaining the flexibility to add additional items. In our judgment and based on available evidence, the required list of items represents core program features and matters of special importance to students, institutions, and others who are interested in evaluating and comparing postsecondary education programs. These elements are all key pieces of information that are likely relevant to all students to understand basic facts about how much the program costs, how long it takes to complete, the amounts students borrow, their typical earnings after graduating, and the D/E and EP measures for the program. The elements we mention as optional may have more or less relevance to some students and to some programs than others.

*Changes:* We have revised § 668.43(d)(1)(i) to require the Secretary to include certain items of information on the Department's program information website when applicable, including the published length of the program; the program total enrollment during the most recently completed award year; the total cost of tuition, fees, books, supplies, and equipment that a student would incur for completing within the published length of the program; the percentage of students who received a Direct Loan, a private loan, or both for enrollment in the program; the programs median loan debt and median earnings; whether the program is programmatically accredited and the name of the accrediting agency; the program's debt-to-earnings rates; and the program's earnings premium measure. The Department reserves the flexibility to add additional items, and retains the proposed data items at § 668.43(d)(1)(ii) as examples of such supplemental data items.

*Comments:* One commenter suggested revising the list of information items in § 668.43(d)(1) to remove redundant information. This commenter opined that a regulatory requirement for linking to the College Navigator is unnecessary because the College Navigator is not user-friendly for a typical student. The commenter also noted that we could choose to include a link if warranted, since the new program information website would be under the Department's control.

*Discussion:* We appreciate the commenter's suggestion, and we agree that the Department could include a link to the College Navigator website

without specifying it in the list of elements at § 668.43(d)(1).

*Changes:* We have removed the link to the College Navigator website from the list of required information items at § 668.43(d)(1).

*Comments:* Several commenters recommended that the Department provide generalized program level on-time graduation rates, as well as program level on-time graduation rates for Pell-eligible students and for women and for Black, Hispanic, and other students of color.

*Discussion:* The Department thanks the commenters for these suggestions. We recognize that this information could be useful to students and others, and we may consider adding it to the program information website in the future, particularly if such a change is supported by consumer testing.

*Changes:* None.

*Comments:* A few commenters suggested that the program information website should identify institutions that serve a high proportion of low-income students. These commenters argued that a nonprofit institution enrolling 5 percent Pell-eligible students and graduating 95 percent of students does less to improve social mobility than a proprietary institution enrolling 80 percent Pell-eligible students and graduating 60 percent of students.

*Discussion:* We appreciate the commenters' suggestion, and we might consider adding to the program information website in the future some designation of institutional mission or of programs that serve a high proportion of students with low income. We note, however, that the supporting argument made by these commenters is speculative and appears to understate the emphasis different institutions across all sectors and credential levels in higher education give to diversity in their students and the demographics they serve.

*Changes:* None.

*Comments:* One commenter identified loan repayment rates as important information for students, particularly those in GE programs.

*Discussion:* We agree that a program's loan repayment rate may be important information for students and other stakeholders, and this information is included in the list of information items under § 668.43(d)(1).

*Changes:* None.

*Comments:* A few commenters expressed concern that D/E rate information and the high debt burden and low earnings labels could confuse or mislead students, particularly first-generation and disadvantaged students, and could negatively impact

underfunded and under-resourced institutions in regions experiencing persistent poverty. A few commenters opined that labeling programs as high debt burden or low earnings would discourage students from pursuing majors, such as teaching, which suffer from low wages and staffing shortages.

*Discussion:* We do not agree that the high-debt-burden or low-earnings label on the program information website will be confusing or misleading to students. These designations stem from a program's D/E rate or EP measure outcomes, which in turn rely upon factual data provided by institutions themselves and by Federal agencies with the best available data. Additionally, the meaning of the designations comports with a plain reading of each respective phrase.

The Department disagrees with the commenters' assertion that labeling programs as high debt burden or low earnings would discourage students from pursuing fields such as teaching. While we expect that the high-debt-burden and low-earnings labels will discourage enrollment in particular programs at particular institutions that lead to poor outcomes, we do not expect the financial value transparency framework to discourage enrollment more broadly in those fields of study. With regard to the field of education cited by commenters as an area of concern, as further discussed under "Impact on Enrollment in Lower Earning Fields" above, our analysis reveals that education training programs are less likely to fail the D/E rates or EP measure than other programs. Although a career in education may be less lucrative than other professions within the same credential level, evidence suggests that programs that prepare graduates for a career in teaching easily pass the EP threshold for earnings, and even States with lower salaries have average starting salaries well above the State's EP threshold.

As discussed under "Geographic Variation in Earnings" above, our analysis suggests that being located in persistent poverty counties is not outcome determinative for students at such institutions.

*Changes:* None.

*Comments:* Several commenters recommended that information about low-earning programs should also include information about Public Service Loan Forgiveness, as well as other loan forgiveness programs available through the Department of Health and Human Services and the Department of Veteran Affairs, so students can make better informed enrollment and career decisions. One

commenter added that information about Public Service Loan Forgiveness and other relevant assistance programs would particularly benefit those entering the education profession.

One commenter posited that the Department should provide disclaimers and supplemental information where appropriate, such as a disclaimer if a program is disproportionally affected by unreported income. One additional commenter recommended including a disclaimer addressing programs with small cohort sizes.

*Discussion:* We appreciate the commenters' suggestions and concur that much of this information would be useful to students. We, however, also note that other commenters expressed concerns that the anticipated list of information items could confuse or overwhelm students. These conflicting perspectives demonstrate that we must seek an optimal balance of providing information of the most benefit to students without unduly distracting from the most salient information. We will carefully consider what supplemental information to convey on the program information website, taking into account consumer testing. We note that the list of required disclosure information items at § 668.43(d)(1) does not preclude the Department from adding additional information in the future. We further note that nothing would prohibit institutions from providing supplemental information directly to their students. Lastly, the final rule excludes programs with fewer than 30 completers in substantially similar programs over the previous four award years from reporting requirements of the rule, and therefore their D/E rates and the EP measure will not be available to publish.

*Changes:* We have revised § 668.408(a) to limit the reporting requirements to institutions offering any program with at least 30 total completers during the four most recently completed award years.

*Comments:* One commenter suggested that students and taxpayers would benefit from information about completion and placement rates; the existence of academic and related supports; and transfer and persistence rates.

Another commenter asserted that information such as licensure passage rates and residency placement rates are necessary to guard against deceptive recruitment tactics.

One commenter expressed support for providing the typical employment outcomes for a program.

Another commenter opined that the Department should not only require job

placement rates to be provided, but also regulate how such placement rates are calculated, citing the collapse of Corinthian as one example of why providing consistently calculated placement rates is essential to protect students and the public. This commenter contended that in the 2014 Prior Rule preamble, the Department cited a 2011 technical review panel, which concluded a uniform job placement methodology could not be developed without further study because of data limitations. The commenter noted that the NPRM preceding this final rule did not mention this study or discuss whether it should be updated in light of any advances in the available data systems since 2011. The commenter further questioned why the Department's policies requiring placement rates for certain short-term programs under § 668.8(g) could not be applied for purposes of financial value transparency.

*Discussion:* We agree that students will benefit from knowing completion rates and note that the program's or institution's completion rates are included among the list of information items at § 668.43(d)(1).

Though we agree that licensure passage and residency placement rates would be useful to students, a substantial portion of postsecondary programs do not prepare students to enter a field requiring licensure, and many programs do not entail any residency requirements. In the interest of focusing on the most relevant, comparable, and broadly applicable information, we do not anticipate including licensure passage and residency placement rates on the program information website at this time. We note that the list of information items at § 668.43(d)(1) is not all-inclusive and the Department could add these additional items in the future, particularly if consumer testing supports doing so.

We note that providing the "typical employment outcomes" for a program could mean a variety of things depending upon the audience—for example, the number of graduates who find employment in a specific field, the number of graduates who find employment in any field, the number of graduates who remain employed for a specific length of time, the job satisfaction of graduates, or any number of other measurements related in some way to employment. We therefore believe the suggestion to provide typical employment outcomes is too broad and imprecise to implement.

While we concur that job placement rates would be beneficial to most students, we note that accrediting agency methodologies and requirements for placement rates vary, and inconsistencies in how institutions currently calculate job placement rates limit their usefulness in comparing institutions and programs. The placement rate requirement for short-term programs under § 668.8(g) relies upon auditor attestations of institutional calculations, which again can vary amongst institutions and auditors. Developing a uniform Federal standard for the calculation of placement rates would be a complex and extensive undertaking surpassing the scope of this rulemaking. Nonetheless, should the Department introduce such a standard through future rulemaking, we could add placement rates to the program information website in the future.

*Changes:* None.

*Comments:* A few commenters suggested that any median earnings data provided under proposed § 668.43(d)(1)(xi) should be based on the same time periods as those used for the D/E rates and EP measure.

*Discussion:* We appreciate the commenter's suggestion. While in general we anticipate providing earnings data for the same time periods as those used for calculating the D/E rates and EP measure, we retain the flexibility to provide median earnings during a period determined by the Secretary. For example, if an institution uses the transitional reporting option and transitional metrics are calculated then the cohorts used for determining median debt may differ from the cohorts used for determining median earnings.

*Changes:* None.

*Comments:* Several commenters urged the Department to explain that the D/E rates exclude funding from State and local governments and only measure debt burden relative to students, not to taxpayers. One commenter noted that in the 2019–20 award year, public degree-granting institutions received 76.6 billion in State appropriations and 14.5 billion in local appropriations.

Several commenters suggested that the Department explore including an estimate of State and local taxpayer support for programs at public institutions, arguing that doing so would provide the public and policymakers a more accurate understanding of program cost, with one commenter noting that the Department has access to such information through The Digest of Higher Education Statistics.

*Discussion:* The Department disagrees with the commenters' suggestion that

the regulations unfairly assess for-profit institutions because programs operated by for-profit institutions are in fact less expensive than programs operated by public institutions, once State and local subsidies are taken into account. While some for-profit institutions may need to charge more than some public institutions because they do not have State and local appropriation dollars and must pass the educational cost onto the student, there is some indication that even when controlling for government subsidies, for-profit institutions charge more than their public counterparts. Research has found that the primary costs to students at for-profit institutions, including foregone earnings, tuition, and loan interest, amounted to $51,600 per year on average, as compared with $32,200 for the same primary costs at community colleges.[174] This analysis estimated taxpayer contributions, such as government grants, of $7,600 per year for for-profit institutions and $11,400 for community colleges.

The goals of this rule are to provide increased transparency of program outcomes and improved oversight of Federal taxpayer funds. While public institutions often benefit from State and local appropriations, we maintain that monitoring, providing, and otherwise overseeing such sources of institutional revenue falls outside the scope of this rule. We further note that non-Federal funding is not exclusive to public institutions and could include any number of sources such as endowments, research grants, charitable donations, private equity, fees from publicly offered services, and so forth. Requiring institutions to report all such sources of funding would be unduly burdensome, and the inclusion of all such sources of funding on the Department's website would likely overwhelm many students and distract from the core information provided under these regulations.

*Changes:* None.

*Comments:* One commenter urged the Department to clarify that the financial value transparency information does not measure academic quality (*e.g.,* skill of faculty, learning outcomes, quality of facilities) or the lifetime earnings of graduates.

*Discussion:* The Financial Value Transparency and Gainful Employment regulations are intended to establish an accountability and transparency framework to encourage eligible postsecondary programs to produce acceptable debt and earnings outcomes,

apprise current and prospective students of those outcomes, and provide better information about program price. Other factors such as those mentioned by the commenter may contribute to these financial outcomes, but we do not believe that students would mistake the financial value transparency information that the Department proposes to present in a straightforward manner on its website as for a direct measurement of academic quality. While the Department believes that students should be informed about the debt and earnings consequences of their postsecondary choices, we may consider adding language to the student program information website noting that the debt and earnings outcomes of programs are a subset of the myriad factors students may consider important in deciding where to attend, particularly if such language is supported by consumer testing.

*Changes:* None.

*Comments:* For public and nonprofit institutions, one commenter recommended that the Department additionally identify whether all revenues of the institution are committed to its educational and charitable mission and whether the majority of net tuition revenues in the program are used for post-enrollment instruction and student support. The commenter further suggested that such information should be affirmed in a footnote on the institution's audited financial statement. The commenter opined that this additional information would promote the legitimate nonprofit operation of institutions and shield students from incorrect assumptions that tuition dollars will be used to support their success in cases where the institution diverts funds to recruitment or other purposes. This commenter also suggested initially making this additional information a voluntary option, to accommodate institutions which may need time to add those measure to their internal accounting.

*Discussion:* While we share the commenter's concern about some nonprofit institutions' use of title IV, HEA revenue for marketing, recruitment, and other pre-enrollment functions unrelated to academic instruction and student support, we do not believe that the financial value transparency website is the best vehicle to address that concern. The Department also received comments related to this issue on both the Financial Responsibility and the Certification Procedures regulations proposed in the NPRM. Those issues will be discussed in a separate forthcoming final rule.

*Changes:* None.

*Comments:* A few commenters encouraged the Department to provide disaggregated data whenever possible.

*Discussion:* We thank the commenters for that suggestion. The metrics in the rule currently focus on whether a program is leading to high-debt-burdens or enhanced earnings for the majority of its completers. We will carefully consider what additional information might feasibly and usefully be added to give students more tailored information on program performance for students in their own demographic group, particularly in light of consumer testing and privacy safeguards.

*Changes:* None.

*Distribution and Linking Requirements*

*Comments:* Several commenters voiced general support for requiring institutions to provide current and prospective students with a link to the Department's program information website and urged the Department to preserve this component of the proposed rule. One commenter argued that students enrolling in postsecondary programs are sufficiently mature to be expected to review the information available to them without requiring institutions to actively distribute a link to the material.

A few commenters expressed concern about requiring institutions to post a link to the Department's program information website on every institutional web page containing information about a program or institution's academics, cost, financial aid, or admissions. One commenter likened this requirement to the requirement in the FAFSA Simplification Act for institutions to provide all elements of the cost of attendance on any portion of the institution's website that describes tuition and fees. This commenter noted that while it appears to be a simple requirement, it has already generated numerous inquiries from institutions about how to comply.

Several commenters noted that although adding links to the Department's program information website to institutions' websites would be a one-time cost and burden, large institutions may have hundreds of web pages requiring these links. These commenters advised that such a requirement could lead to compliance issues if such an institution inadvertently neglected to post the required link on one or a few web pages.

One commenter further noted that monitoring and enforcing such a broad requirement could divert the Department's resources away from more impactful issues and urged the

[174] Cellini, S.R. (2012). For Profit Higher Education: An Assessment of Costs and Benefits. *National Tax Journal,* 65 (1):153–180.

Department to require institutions to link to the program information website only on their main website and on each individual program's landing pages.

*Discussion:* We thank those commenters for their support. The Department disagrees with the commenter who suggested relying on students to find the Department's website on their own because students enrolling in postsecondary programs vary widely in life experience and financial literacy. For many students, selecting an institution and program of study is likely to be one of the most financially significant decisions of their life. While some students may possess the financial savvy and inclination to independently research and compare institutions and programs, others may not. We believe that requiring institutions to inform students about the Department's program information website under § 668.43(d)(3) and (4) would benefit students by informing them about the existence of information that could aid in their decision making, without unduly burdening institutions.

Furthermore, we do not believe the requirement for institutions to post a link to the Department's program information website on every institutional web page containing information about a program or institution's academic, cost, financial aid, or admissions is confusing or unclear. The requirements pertaining to the posting of Cost of Attendance information under the FAFSA Simplification Act are unrelated to the financial value transparency information established under this rule, and many of the inquiries concerning those Cost of Attendance posting requirements were about the specific content of the information that must be posted to meet FAFSA Simplification Act requirements. We note that for the required financial value transparency information, institutions must post the link to the Department's program information website on all relevant web pages. We believe that institutions can reasonably meet this requirement and, as noted in the RIA, we believe that this activity will require an estimated 50 hours per institution. We expect to provide sub-regulatory guidance and training to institutions in advance of the effective date of these provisions to minimize this burden. With regard to the argument about the potential for inadvertent noncompliance with the posting requirements, we note that an institution could inadvertently fail to comply with any of our regulatory provisions, and it remains the institution's responsibility to have the necessary staff, systems and processes to

be able to comply with all of our regulatory requirements. We do not expect that monitoring and enforcing this requirement will require significant resources and hinder the Department's other compliance monitoring and enforcement efforts.

*Changes:* None.

*Comments:* One commenter suggested that publicizing information and directing students to it during their senior year in high school or earlier could better impact enrollment decisions.

Another commenter expressed support for ensuring students receive the information before enrolling or making a financial commitment, agreeing with the Department that information on program value should be provided at relevant points of entry. This commenter further suggested that the Department consider providing access to this information through the FAFSA portal to provide the information to students earlier in the decision-making process in a manner that would not rely on institutional compliance.

*Discussion:* The timing of when applicants receive information about institutions and programs is critical. Data should be available at key points during the college search process, and applicants should have sufficient time and resources to process new information. Informational interventions work best when they arrive at the right moment and are offered with additional guidance and support.[175]

We do not agree that providing information to prospective students during high school or earlier would be more beneficial than providing it closer to when the student makes the decision to enroll. We, however, appreciate the commenter's suggestion to provide information about the program information website to students through the FAFSA portal. While it would not be possible to incorporate this change to the 2024–25 FAFSA portal at this stage of development, we will consider adding it in a future award year.

*Changes:* None.

*Comments:* A few commenters opined that the requirements would present obstacles to serving the basic needs of enrolled students by delaying title IV, HEA disbursements. These commenters also opined that the information would arrive too late in the admissions process to affect college enrollment decisions.

*Discussion:* We do not agree that the requirement to distribute information

about the program information website would disrupt the basic needs of students. We note that the distribution requirements at § 668.43(d)(3) and (4) are not directly tied to the disbursement of title IV, HEA funds. We also disagree that the distribution requirement would arrive too late to affect enrollment decisions. The institution must distribute information about the program information website to any prospective student before the student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution. If the student is considering enrolling in a risky program, the acknowledgment or warning requirements at §§ 668.407 and 668.605 provide additional information and protection.

*Changes:* None.

*Comments:* One commenter requested we clarify whether or how the definition of ''student'' in § 668.2 applies to the new program information website.

*Discussion:* The definition of ''student'' in § 668.2 applies specifically to subparts Q and S. The requirements related to the program information website in § 668.43 exist outside of subparts Q and S. Rather than relying upon the definition of ''student'' in § 668.2, § 668.43(d)(4) requires an institution to provide information to access the program information website to any enrolled title IV, HEA recipient prior to the start date of the first payment period associated with each subsequent award year in which the student continues enrollment at the institution.

*Changes:* None.

*Cooling-Off Period*

*Comments:* One commenter noted that the NPRM preamble text suggests that a three-day ''cooling off'' period after distributing information about the program information website is required for all enrollments, not just those where warnings are required, while the regulatory text of proposed § 668.43(d)(4) does not include such a requirement. This commenter asked that the Department clarify in the final rule that no pre-enrollment cooling-off period is required except when a warning requirement is in place for the intended program of study.

*Discussion:* We thank the commenter for alerting us to the discrepancy between the proposed regulatory text and the preamble discussion in the NPRM. We confirm that the three-day cooling off period in § 668.605(f)(2) only applies when a warning requirement is in place for a GE program and does not apply to the distribution of information

---

[175] Carrel, S. & Sacerdote, B. (2017). Why Do College-Going Interventions Work? American Economic Journal; Applied Economics. 1(3) 124–151.

about the Department's program information website under § 668.43(d).

*Changes:* None.

## Student Acknowledgments and GE Warnings—§§ 668.407 and 668.605

*General Support*

*Comments:* Several commenters expressed support for the proposed requirement in § 668.407 of the financial value transparency framework for students enrolling in a high-debt program to acknowledge viewing financial value information before the institution may enter an enrollment agreement with the student. One commenter further noted that information and market forces alone are insufficient without an acknowledgment requirement. One commenter expressed support for requiring acknowledgments prior to aid disbursement for poor-performing programs as an effective approach to improving the outcomes of students and encouraging the use of Federal aid at better-performing institutions.

*Discussion:* We thank the commenters for their support. We have retained the student acknowledgment provision in § 668.407 of the financial value transparency framework, with certain modifications that we explain below. Core features mentioned by these commenters remain the same compared to the proposed rule. Among those features are, for example, that the acknowledgments will not be limited to information about gainful employment programs but instead will extend to certain other postsecondary education programs; that the acknowledgments will be submitted by certain students to the Department through its program information website; and that the students will acknowledge having viewed information on the Department's website regarding particular programs that have substandard results on the D/E rates measure. As the commenters understood, the acknowledgments will help make salient to students, at important junctures in their decision-making processes, certain debt-related and other information about title IV, HEA eligible programs, and thereby assist students in making informed choices about their postsecondary education. Such informed decisions may benefit not only these students but also the Federal Government and others to the extent that title IV, HEA support is channeled, through informed student choices, toward programs that are not leaving graduates with unaffordable debt. Whatever is the full array of values that people pursue through higher education and training, including

nonpecuniary goals involving service to others, unaffordable debt can obstruct the achievement of all those goals.

*Changes:* None.

*General Opposition*

*Comments:* One commenter suggested that requiring acknowledgment of the program information website before disbursement creates a barrier to receiving title IV, HEA funds, and that institutions are prevented from adding additional barriers to title IV, HEA aid by statute. Many commenters argued that requiring students to acknowledge having viewed program information on the Department's website prior to enrollment would delay course registration and impede the disbursement of aid to students in need of such funds to cover costs for housing, food, and other basic needs.

*Discussion:* The student acknowledgment requirement in § 668.407 of the financial value transparency framework does not conflict with HEA provisions intended to protect student access to title IV aid. Instead, this requirement will provide additional protection to students, as well as taxpayers, by providing certain information to students about programs before institutions enter into enrollment agreements with students.

Under the transparency framework's student acknowledgment rule, in certain circumstances the Department will require prospective students to acknowledge to the Department that they have viewed relevant information on the Department's program information website before signing an enrollment agreement with an institution regarding a certificate program or graduate degree program. The acknowledgment will be made electronically on the Department's website. In itself, this step toward enrollment and title IV, HEA aid is not onerous for students. Moreover, we will except undergraduate degree programs in this final rule (see § 668.407(a)), for reasons explained elsewhere in this document, thus avoiding undue burden for programs where prospective students may not generally apply to a particular major (but rather "declare" a major after being enrolled for some time in the institution). Furthermore, and also as explained below, this final rule states that only prospective students,[176]

not enrolled students, must give acknowledgments when the relevant program has substandard results regarding debt burdens under the debt-to-earnings (D/E) rates measure (see § 668.407(b) and (c)). That adjustment to the regulation relieves much of the commenters' concerns about disruptions of title IV, HEA student aid, and targets the requirement to a group of students most likely to act on the information in considering where to enroll.

We explained in the NPRM our decision to limit the transparency framework's student acknowledgment requirement to programs with high debt burdens under the D/E rates measure,[177] and we adopt that position again here. While many non-GE students surely care about earnings, non-GE programs are more likely to have nonpecuniary goals. Requiring students to acknowledge low-earning information as a condition of receiving aid might risk conveying that economic gain is more important than nonpecuniary considerations. In contrast, students' ability to pursue nonpecuniary goals is jeopardized and taxpayers bear additional costs if students enroll in high-debt burden programs. Requiring acknowledgment of the D/E rates ensures students are alerted to risk on that dimension.[178]

Moreover, acknowledgments are a traditional, typical, and simple method of enhancing awareness of information before decisions are made. In this instance, the online mechanism for the acknowledgment will be relatively simple, and the decision in question involves both a student's education and Government support for that education. When programs fail certain performance metrics, the Department will protect prospective students and taxpayers by asking those students to pause and acknowledge information on the Department's program information website before they enter into an enrollment agreement for that program.

We agree that institutions may not add eligibility requirements that would prevent students or groups of students from receiving title IV, HEA aid for

---

[176] In § 668.2 of these rules, "prospective student" is defined as an individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a program. Potential transfer students are among those who may meet this definition of "prospective student."

[177] 88 FR 32300, 32336 (May 19, 2023).

[178] We note as well that § 668.605 in subpart S of these regulations, which cover GE programs, includes warnings from institutions to prospective and enrolled students as well as acknowledgments from students to the Department through its website. Those GE warnings and acknowledgments will help inform students when GE programs are at risk of losing title IV eligibility in the following year. And those GE provisions in subpart S will complement the student acknowledgment provision in the transparency framework of subpart Q, the latter of which helps serve the interests of non-GE students where program eligibility based on performance metrics is not at issue.

which they are otherwise eligible. But these student acknowledgment rules do not implicate those protections for students. *Changes:* None.

*Comments:* A few commenters urged the Department to ensure that institutions receive immediate confirmation when students complete any required acknowledgments through the Department's program information website, to ensure timely disbursement of title IV, HEA funds. One commenter noted that the system for providing D/ E and EP metrics has not yet been developed and that, as a result, institutions will not be timely made aware of metric outcomes, causing a delay in disbursements of title IV, HEA funds. One commenter suggested that the Department instead administer financial value transparency acknowledgment requirements through the Free Application for Federal Student Aid (FAFSA), which would provide the relevant information to each student at an important stage in the student's decision process while also eliminating disbursement delays and relieving administrative burden on institutions.

*Discussion:* We understand the commenters' concerns and we have made certain modifications to § 668.407 as proposed. To begin, in this final rule the Department has decided to require student acknowledgments under that regulation before students enter into an enrollment agreement with the relevant institution (§ 668.407(c)(1)), rather than before an institution may disburse title IV, HEA aid. Pegging student acknowledgments to an enrollment agreement should reduce concerns about unjustified disruptions in title IV aid, while nonetheless enabling students to make informed choices at an adequately early stage in the decision-making process. In the final rule, we also clarify that the Department will monitor an institution's compliance with the pre-enrollment-agreement acknowledgment requirement through audits, program reviews, and other investigations (§ 668.407(c)(2)). Although the students will make acknowledgments to the Department and the Department will operate the acknowledgment process through its website, institutions will check whether the students whom they seek to enroll have completed the acknowledgment. As we have explained, an acknowledgment is a simple yet important step that students must take when § 668.407 applies due to substandard debt-to-earnings results for the relevant program. In addition, we reiterate here that § 668.407 will apply to prospective students (§ 668.407(b)), rather than enrolled students.

We recognize that requiring prospective students to acknowledge the program information prior to an enrollment agreement means that some students will have to take that step before course registration and disbursement of aid. We understand students' need for timely access to title IV, HEA funds not only to cover direct institutional costs but also to cover indirect educationally related expenses. We note again, however, that the acknowledgment process will not be lengthy or particularly burdensome to students. And the adjustments to the rule that we have made in light of commenter concerns should minimize disruption while enhancing informed choice. We believe that such information is necessary to make an informed decision about whether to enroll in a program, and that the urgency of a student's need for this information warrants the potential delay, which again should not be excessive or disruptive.

Moreover, in part to reduce burden for institutions and students, we will limit the acknowledgment requirement in § 668.407 to programs that do not lead to an undergraduate degree. We believe this change will better target the acknowledgment requirements to programs to which students tend to directly apply. In addition, our empirical analysis shows that high-debt-burden programs are relatively rare among undergraduate degree programs outside the proprietary sector.

Commenters are correct in observing that the website for delivering financial value transparency information and administering acknowledgments is not yet developed. As we develop the website and its underlying processes, we will consider ways to efficiently and timely transmit confirmation of completed acknowledgments to institutions. Nevertheless, we recognize the potential for delays and uncertainty as the Department designs and deploys new systems to implement these requirements. To minimize disruption and facilitate a smoother implementation of the Department's program information website and acknowledgment requirements, the Department has specified that the requirements under § 668.43(d) and the acknowledgment requirements under §§ 668.407 and 668.605 are not applicable until July 1, 2026.

We appreciate the commenter's suggestion to administer the acknowledgment requirements through the FAFSA. However, administering the acknowledgment process through the FAFSA would not reach prospective students who have not yet applied for title IV, HEA funds. The acknowledgment requirement in § 668.407 is limited to prospective students and does not apply to enrolled students. We believe that administering the acknowledgment process through the Department's program information website is the most efficient and effective approach, but we will continue to analyze ways of most seamlessly delivering information to students.

*Changes:* The Department has specified that the requirements under § 668.43(d) and the acknowledgment requirements under §§ 668.407 and 668.605 are not applicable until July 1, 2026. Furthermore, the Department requires student acknowledgments under § 668.407(c)(1) before students enter into an enrollment agreement with the relevant institution, and the Department will monitor an institution's compliance with the pre-enrollment-agreement acknowledgment requirement through audits, program reviews, and other investigations per § 668.407(c)(2). In addition, we exclude undergraduate degree programs from the acknowledgment requirements at § 668.407(a)(1).

*Comments:* One commenter suggested that the Department consider a two-year pilot study, during which the student acknowledgment and GE warning requirements would not be applied, to review the earnings and salaries of completers to enable a real-world comparison of costs and earnings.

*Discussion:* We appreciate the commenter's suggestion. Although we will certainly monitor the median earnings data obtained under these regulations, we believe that the need for the financial value transparency framework and GE accountability framework is too great to delay implementation for a two-year study. As noted above, however, we recognize the potential for delays and uncertainty as the Department designs and deploys new systems to implement these requirements. To minimize disruption and facilitate a smoother implementation of the program information website and acknowledgment requirements, the Department has specified that those requirements are not applicable until July 1, 2026.

*Changes:* The Department has specified that § 668.43(d) and the acknowledgment requirements under § 668.407 are not applicable until July 1, 2026. In addition, we exclude undergraduate degree programs from the acknowledgment requirements at § 668.407(a)(1).

*Comments:* Many commenters opined that the proposed warning requirements

in § 668.605 of the GE accountability framework would irreparably harm programs, rendering ongoing recruitment impossible and leading to program teach-outs and closures after warnings were provided to students. Several commenters opined that requiring warnings after a single year of failing the D/E rates or EP measure would fail to account for market shifts, emergencies, disasters, or other unforeseen conditions, and would result in program closures precisely when they are most needed, such as during an economic downturn when many dislocated workers tend to seek retraining. Several commenters argued that such a swift warning requirement does not establish a pattern of poor performance and would offer institutions little or no opportunity to improve troubled programs. One commenter further noted that sudden changes to National or State licensure requirements could have far-reaching effects, causing more students than usual to fail licensure exams and delaying employment, causing programs to fail one or both metrics, and requiring warnings due to circumstances beyond an institution's control. One commenter predicted that these consequences would especially impact institutions that focus on a single program, such as cosmetology institutions, claiming that for such institutions a required warning would be tantamount to an accelerated school closure.

*Discussion:* We believe that enrolled students and prospective students should receive a warning when a GE program may lose eligibility in the following award year based on its D/E rates or EP measure. We recognize that a program's D/E rates and EP measure may be atypical in a particular year as a result of any number of factors and for that reason a GE program will not lose eligibility for failing the D/E rates or EP measure in a single year. However, a student enrolled in a GE program that loses its title IV, HEA program eligibility because of its D/E rates or earnings premium faces potentially serious consequences. If the program loses eligibility before the student completes the program, the student may need to transfer to an eligible program at the same or another institution to continue to receive title IV, HEA program funds. Even if the program does not lose eligibility before the student completes the program, the student could be, nonetheless, enrolled in a program consistently associated with poor earnings outcomes or unmanageable levels of debt. Accordingly, we believe it is essential that students be warned

about a program's potential loss of eligibility based on its D/E rates or earnings premium.

The student warning will provide currently enrolled students with important information about program outcomes and the potential effect of those outcomes on the program's future eligibility for title IV, HEA program funds. This information will also help prospective students make informed decisions about where to pursue their postsecondary education. Some students who receive a warning may decide to transfer to another program or choose not to enroll in such a program. Other students may decide to continue or enroll even after being made aware of the program's poor performance. In either case, students will have received the information needed to make an informed decision.

We believe that ensuring that students have this information is necessary, even if it may be more difficult for programs that must issue student warnings to attract and retain students, and even in cases where an institution only offers a single program of study. Institutions may mitigate the impact of the warnings on student enrollment by offering meaningful assurances and alternatives to the students who enroll in, or remain enrolled in, a program subject to the student warning requirements.

We disagree with the arguments from commenters about the effects of licensing changes. The Department does not dictate how many hours States require for students to sit for licensing tests. And since States dictate the required program lengths for licensure or certification, we think it is reasonable to assume States have considered the hours needed for someone to then be able to pass any necessary tests. As noted already in this discussion, to the extent there are changes in passage rates, the fact that programs have to fail more than once will mitigate this issue by giving institutions time to improve. Commenters raised the issue of potential changes to the length of GE programs in a part of the NPRM that will be addressed in a separate final rule.

*Changes:* None.

*Comments:* One commenter expressed concern that the rule as proposed would require programs without aid to send letters to prospective students stating that their target occupation is a low-income profession.

*Discussion:* This is incorrect. The warning provision requires schools to distribute warnings to prospective students of GE programs that still are eligible for title IV, HEA aid but are at risk of losing it so that the prospective

student can make an informed decision cognizant of the possibility that the program may lose title IV, HEA eligibility before the student has completed the program. The warning language does not identify any occupations as low-income professions, but rather alerts prospective students to the fact that the program in question has not passed standards established by the Department based on the amounts students borrow for enrollment in the program and their reported earnings, as applicable, and directs prospective students to the relevant program information web page so that they can explore more contextual information.

*Changes:* None.

*Comments:* One commenter objected to any warning requirements for GE programs under subpart S, opining that student acknowledgments under subpart Q are sufficient. Another commenter posited that neither the warning nor acknowledgment requirements are necessary because the requirement to post links to the Department's program information website would be sufficient.

One commenter maintained that establishing acceptable levels of performance regarding debt and earnings exceeds the role of government because the Department would substitute its own judgment of acceptability thresholds for those of prospective students whose risk tolerances could potentially differ. This commenter further postulated that some students could rely on the Department's assessment and still realize poor results, misinterpret "no results" as an absence of risk, or unnecessarily forego opportunities because the Department's information increased their risk aversion.

*Discussion:* The Department disagrees with the argument that the student acknowledgment requirements in § 668.407 under subpart Q obviate the need for GE program warning requirements in § 668.605 under subpart S. Those rules regard different programs, and they involve different information and circumstances. The student acknowledgment requirements under subpart Q are limited to prospective students,[179] and they are limited to programs that do not lead to

---

[179] In § 668.2 of these rules, "prospective student" is defined as an individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a program. And "student" is defined, for the purposes of subparts Q and S of this part and of § 668.43(d), as an individual who received title IV, HEA program funds for enrolling in the program.

an undergraduate degree and that have high debt-burden results under the D/E rates measure. In contrast, the acknowledgment and warning requirements under subpart S apply to GE programs (including degree programs) that are at risk of losing title IV, HEA eligibility because of failing either the D/E rates or the EP measure, and include additional content designed to assist prospective students and enrolled students facing a potential loss of funds, such as information about the transferability of credit, availability of refunds, and continued availability of the program of study in the event of a loss of title IV, HEA eligibility. The rules for GE program warnings and acknowledgments are crafted for the special circumstances of GE programs. Hence the student acknowledgment requirements in § 668.407 do not duplicate the GE program warning and acknowledgment requirements in § 668.605. Although the two provisions serve some of the same general purposes, such as informing students who seek title IV, HEA aid about higher education programs, § 668.407 does not eliminate the need for § 668.605.

We further disagree with the contention that the requirement in § 668.43(d)(2) for institutions to post links to the Department's program information website renders both the acknowledgment and warning requirements unnecessary. As discussed above, the timing of the delivery of relevant information significantly affects the impact of that information on students. Absent acknowledgment and warning requirements, even students who may have carefully reviewed information about their program of study on the Department's program information website before enrolling may be unaware of changes in that information that may have occurred since they first accessed the website. The Department seeks to require that, for programs where acknowledgments or warnings are required and before certain specified events such as the signing of an enrollment agreement, students have reviewed up-to-date information including information that may implicate the student's access to title IV, HEA funds in future years to complete the program.

With regard to the commenter's claim that establishing acceptable levels of performance regarding debt and earnings exceeds the role of government, the Department disagrees with the commenter's conclusions. As discussed in more detail under "Authority for this Regulatory Action" in this document, this framework is supported in principal part by the

Secretary's generally applicable rulemaking authority, which includes provisions regarding data collection and dissemination, and which applies in part to title IV of the HEA, as well as authorizations and directives within title IV of the HEA regarding the collection and dissemination of potentially useful information about higher education programs. We also disagree with the notion that the Department may not seek to inform students about program outcomes as they evaluate programs within a lawful range of options for Federal Government support. Existing law and sensible policy indicate that the Department's role in supporting the interests of students, taxpayers, and others is more meaningful than some commenters suppose.

As further discussed above under "Statutory Authority for GE Framework," the basic question of whether the HEA authorizes GE performance measures has been resolved repeatedly in the Department's favor. Questions of how exactly to specify the GE performance metrics involve matters of detail, which the Department is statutorily authorized and well-positioned to resolve. It is not only reasonable but also in accord with all indications of Congress's intent to conclude that a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt, or if they earn no more than comparable high school graduates. In addition, the Department is fully authorized to share information about the debt and earnings outcomes of a program with students, institutions, and the public to the extent that such information is available. In whatever manner the information is labeled, providing this information to students will allow them to make better informed enrollment and borrowing decisions.

*Changes:* As discussed in *General Opposition* under *Program Information website* above, we have revised the reference to the Department's website as the "program information website" rather than the "disclosure website."

*Scope of Acknowledgments*

*Comments:* Many commenters expressed support for requiring acknowledgments from students entering high-debt-burden GE and non-GE programs, but opined that acknowledgments should also be required when students enter low-earning non-GE programs. Some such commenters further argued that: (1) The Department's analysis in the NPRM concluded that more students enrolled

in failing non-GE programs than in failing GE programs; (2) earnings outcomes are important even to students in non-GE programs; (3) students do not differentiate programs by institution type; and (4) not applying acknowledgment requirements to non-GE programs that fail the EP measure would unfairly shield poor-performing programs at public and nonprofit institutions from any meaningful impact of poor performance.

In contrast, a few commenters urged the Department to exempt all non-GE programs from student acknowledgment requirements because of the time and burden associated with identifying relevant students and ensuring that they complete the acknowledgments, or because many non-GE programs are intended as only the first steps of a student's education and necessarily lead to graduate or doctoral studies or clinical work requirements. One commenter theorized that borrowers would likely ignore warnings associated with non-GE program as a result of the REPAYE income-driven repayment plan. One commenter suggested that the Department consider a tiered approach applying acknowledgment requirements to GE programs as well as a subset of low-earning non-GE programs, opining that such an approach would recognize the interests of students who prioritize earnings potential while reducing burden on institutions.

*Discussion:* We do not agree that students should be required to complete acknowledgments when enrolling in low-earning non-GE programs, nor do we agree that not applying acknowledgment requirements to non-GE programs that fail the EP measure would unfairly shield poor-performing programs at public and nonprofit institutions from meaningful impacts of poor performance. Public institutions are subject to additional layers of oversight and scrutiny at the State or local level, and nonprofit institutions typically are subject to oversight by a board of directors. We do anticipate that a considerable portion of non-GE programs lead to high debt burden or low earnings under the financial value transparency metrics, and we understand that many students seeking to enroll in non-GE programs may place high importance on improving their earnings. But we believe that students who enroll in non-GE programs are more likely to have nonpecuniary goals, and requiring students to acknowledge low-earning information as a condition of receiving aid might risk improperly conveying that economic gain is more important than those nonpecuniary considerations. We concur that most

students likely compare programs rather than institution types, but we note that in many cases the types of programs offered across institutions significantly vary, and public and nonprofit institutions are less likely to predominately market their programs solely based on employment and earnings outcomes.

We also disagree with the requests to entirely exempt non-GE programs from student acknowledgment requirements. As further discussed under "Burden" below, we believe that the burden associated with identifying relevant students and ensuring that they complete the acknowledgments is reasonable considering the benefit of providing relevant and timely information to students who enroll or continue in non-GE programs that do not lead to an undergraduate degree and are associated with high debt burden. We concur that many non-GE programs are intended as the initial stage of a student's education leading to further graduate or doctoral studies or clinical work requirements, but that does not obviate the relevance of information about debt outcomes in better informing students' enrollment choices, nor does the possibility that borrowers might ignore warnings associated with non-GE program as a result of the REPAYE income-driven repayment plan take away the relevance of this information.

*Changes:* None.

*Duration of Acknowledgments*

*Comments:* One commenter indicated that the duration of the obligation to obtain acknowledgments under proposed § 668.407(a)(1) of the financial value transparency framework appeared to be unspecified. The commenter recommended that the duration mirror that of GE programs requiring warnings and acknowledgments—that is, until the program receives two consecutive passing outcomes.

*Discussion:* The Department appreciates the commenter's suggestion. We have made changes to § 668.407(b)(3) to specify the duration and frequency of the requirement. Under revised § 668.407(b)(3), prospective students must provide acknowledgments until the program has passing D/E rates or three years after the institution was last notified it had failing D/E rates, whichever is earlier. The three-year "look-back" period is relevant only in situations where a program might fail the D/E rates measure in one year, but then not have rates issued by the Secretary in the following year(s) due to the number of completers at that program falling below the minimum threshold necessary for

the Secretary to issue the program's median debt and median earnings. In choosing to disregard rates over three years old, the Department is balancing the goals of making students aware of the financial risk involved in enrolling in the program and fairness.

A reduction in the number of completers at a program is very unlikely to be indicative of improvement in its performance. As a result, a program that fails the D/E rates measure in one year, and then experiences a decline in the number of completers leading its D/E rates not to be issued, is still likely to be failing the D/E rates measure. At the same time, we do not believe it fair to keep the acknowledgment requirement indefinitely if new rates are not calculated. After several years, continuing to base student acknowledgments on earlier calculated rates yet without confirmation of substandard program performance becomes less helpful to students and ultimately unreasonable. After considering the relevant factors and the importance of an administrable rule, we have chosen a period of three years as a reasonable and balanced intermediate option. That option falls between maintaining the student acknowledgment requirement for a single year (which is the minimum-length option and which would provide the least protection for students under the acknowledgment rule) and the lengthier five-year look-back period (which we will apply under § 668.602(c) for determining whether a GE program has failed a GE measure in two of the three most recent years when the GE measures were calculated). Since GE program eligibility is based on outcomes over three consecutive years in which metrics were calculated, the longer five-year period is apt for that purpose. We are not using the same duration set out in § 668.605 for GE student warnings and acknowledgments because the duration in § 668.605 is based on when an institution mitigates the risk of losing title IV, HEA eligibility for a GE program, which is not a factor for non-GE programs.

*Changes:* We have revised § 668.407(b)(3) to require acknowledgments annually until the program has passing D/E rates or three years after the institution was last notified that the program had failing D/E rates, whichever is earlier.

*Comments:* One commenter expressed appreciation for requiring subsequent acknowledgments for re-enrolling students after 12 months, as opposed to a 30-day window.

*Discussion:* We thank the commenter for their support. We believe that a 12-

month window appropriately balances the need for subsequent acknowledgments for students who re-enroll well after providing an initial acknowledgment with the time and effort needed to secure the acknowledgment.

*Changes:* None.

*Content of Acknowledgments and Warnings*

*Comments:* A few commenters expressed concern about the Department's decision not to publish specific text for institutions to convey acknowledgment requirements to students. These commenters predicted that offering this discretion to institutions would risk a patchwork approach that could provide some students with more clarity about their debt prospects than others.

*Discussion:* We disagree with the commenters. While institutions may communicate acknowledgment requirements differently, the acknowledgment would be facilitated through the Department's program information website. The Department's website will present information to students in a clear and consistent way with the goal of ensuring students understand the risk of incurring high debt.

*Changes:* None.

*Comments:* One commenter noted that the Department makes GE program eligibility determinations, not institutions, and opined that the wording of student warnings regarding GE programs should convey that the Department has chosen to revoke eligibility based on its own criteria.

*Discussion:* We agree that the Department, rather than an institution, makes GE program eligibility determinations. We disagree, however, with the assertion that warnings to students enrolled in failing GE programs should convey that the Department has chosen to revoke eligibility based on its own criteria. Students must receive a warning when a GE program faces a potential loss of title IV, HEA eligibility after failing the D/E rates or EP measure, but that does not mean that a subsequent loss of eligibility is certain. The institution could take swift and appropriate action that would enable the program to pass the GE metrics in subsequent years, and the Department would encourage that outcome. Even if a program loses eligibility due to a subsequent failure of the relevant GE metric, it would be inaccurate to characterize that loss of eligibility as a choice on the part of the Department. As with other metrics that can result in the loss of title IV, HEA eligibility, such as

failure to achieve acceptable cohort default rates under subpart N of part 668 or failure to comply with 90–10 requirements at § 668.28, the loss of eligibility is a predictable and consistent consequence reflecting the institution's failure to meet an established standard, not a matter of the Department's discretion.

*Changes:* None.

*Comments:* One commenter expressed support for retaining the warnings provision to require information about the academic and financial options to continue education at the same institution; whether the institution would refund tuition and fees; and whether students can transfer credits earned to another institution through articulation agreements or a teach-out.

*Discussion:* We thank the commenter for their support and will retain these components of the student warnings for GE programs.

*Changes:* None.

*Burden of Acknowledgments and Warnings*

*Comments:* A few commenters opined that the proposed requirement in the financial value transparency framework for students to acknowledge having seen information about a high-debt-burden program prior to disbursement of title IV, HEA funds resembles the Department's earlier efforts with the Annual Student Loan Acknowledgment (ASLA). These commenters suggested that, similar to the ASLA, the proposed acknowledgment requirements should be optional rather than required because of the burden to students and potential delays to title IV, HEA disbursements.

*Discussion:* The Department disagrees with this suggestion because the ASLA requirements serve a different purpose than the acknowledgment requirements of this rule. The Annual Student Loan Acknowledgment provides students an annual reminder of their individually accrued student debt amounts and expected repayment obligations, to enhance debt awareness and encourage students to limit borrowing. The acknowledgment requirements in the rule are targeted towards prospective students considering enrollment in a program that does not lead to an undergraduate degree that leaves students with a high debt-burden (§ 668.407), and current and prospective students of a GE program at risk of a loss of title IV, HEA eligibility (§ 668.605) because of failing either the EP or D/E measures. These acknowledgment requirements are intended to provide timely information to assist students in making informed decisions about whether to enroll or continue in the

program and is targeted only to students enrolled or considering enrollment in programs where the Department has identified concerns with financial value. We believe that making this acknowledgment optional would result in students not viewing and benefiting from the information.

*Changes:* None.

*Comments:* A few commenters opined that requirements that institutions directly deliver GE warnings to students, and that students acknowledge having seen the information, would be inefficient and burdensome to students and institutions.

*Discussion:* While we are sensitive to the fiscal and logistical needs of institutions, we maintain that any burden on institutions to meet the warning and acknowledgment requirements is outweighed by the benefits of the debt and earnings outcomes information to students in making better informed enrollment and borrowing decisions. The Department will clearly notify institutions about any programs for which warnings or acknowledgments will be required. Although, as noted above, we offer institutions flexibility to tailor communications about acknowledgment requirements in a manner that best fits the needs of their students, the required text for warning notices for GE programs will be provided to institutions. We therefore expect that the burden to institutions in administering the warning and acknowledgment requirements to be manageable.

*Changes:* None.

*Comments:* Another commenter noted that for non-GE programs, it would be difficult to identify which students require acknowledgments, as students may initially be in an undeclared major, may enroll in multiple majors, or may change majors mid-term or mid-year.

*Discussion:* We acknowledge that it may seem unclear whether acknowledgment requirements would apply in the situations noted by the commenter. For this reason, as discussed above, we will limit the acknowledgment requirements of § 668.407 to eligible programs that do not lead to an undergraduate degree. We believe this change will better target the acknowledgment requirements to programs to which students tend to directly apply, and should eliminate most of the situations identified by the commenter including for undeclared majors, as an undeclared major would be within the undergraduate degree program for which an acknowledgment would not be required. Our analysis shows that high-debt-burden programs are relatively rare among certificate

programs and graduate degree programs outside the proprietary sector, so we believe the impacts of this change on students will be minimal. To be clear the warnings and acknowledgment requirements in § 668.605 apply to all GE programs. Based on the Department's data and experience, it is extremely rare for students to enter such programs without a declared program major.

Students enrolled in multiple majors that do not lead to an undergraduate degree will complete acknowledgments for each program for which acknowledgment requirements would otherwise apply. For changes of program, acknowledgment requirements will begin when the student changes to a program for which acknowledgments are required. The Department intends to provide further sub-regulatory guidance and training prior to the effective date of the acknowledgment requirements.

*Changes:* None.

*Comments:* One commenter indicated that it would be burdensome and resource-intensive to require institutions to affirmatively provide students with transfer information in GE warnings and suggested that the Department instead only require institutions to provide a person for students to contact for questions about transfer eligibility.

*Discussion:* We do not agree that the requirement to provide transfer-related information to students in GE warnings is overly burdensome. The GE warning provisions generally require institutions to notify students about the transferability of credit to other programs offered by that institution. These warning provisions do not broadly require institutions to confirm the transferability of credit to other institutions, except in the case of an established articulation agreement or teach-out plan. We believe it is reasonable to expect an institution to be well aware of its own policies regarding transfers of credit amongst its own programs, and to communicate that information to students when required in a GE warning. It is equally reasonable to expect an institution to understand and communicate details about the transferability of credit in an established articulation or teach-out plan to which the institution is a party. With regard to the commenter's suggestion that the Department instead only require an institution to provide access to a person who students may contact with questions about transfer eligibility, we expect that institutions would already provide access to such a resource under the administrative capability requirements at § 668.16(h), as such

information would comprise conditions that may alter the student's aid package.

*Changes:* None.

*Timing of Warnings*

*Comments:* One commenter claimed that the requirement to provide warnings to prospective GE students who have contacted or been contacted by an institution on a single occasion is premature, as there is no indication that a prospective student is seriously considering enrolling in the program at such an early point. Instead, this commenter suggested that the Department change the proposed requirement so that, instead of requiring warnings at the first contact about the program, warnings would be provided before the student signs an enrollment agreement or makes a financial commitment to the institution, consistent with the timing of the requirement at proposed § 668.43(d)(3) to provide information about the Department's program information website. This commenter also argued that a requirement to provide warnings any time before the GE program loses eligibility is premature, because changes made by the institution to the program or changes in external forces such as the labor market could cause the program to pass the D/E rates and EP measure and remain eligible.

*Discussion:* We do not agree that a requirement for an institution to provide a GE warning to prospective students who have initially contacted or been contacted by an institution is premature, nor do we agree that it would be more appropriate to provide the GE warning before the student signs an enrollment agreement or makes a financial commitment to the institution. We believe it is important that prospective students have this critical program information early in the decision-making process, when students may be comparing many institutions and programs, so that students have the benefit of understanding the debt and earnings risks of the GE program before investing significant time into investigating it.

Additionally, we disagree that a requirement to provide GE warnings any time before the GE program loses eligibility is premature. A GE program that has failed the D/E rates or EP measure is at risk for loss of title IV, HEA eligibility. Such a loss of eligibility would significantly impact students, who may be unable to complete their program of study and may need to transfer to another program or institution. Given the seriousness of these consequences to students, we believe it is imperative that students are

alerted without delay and provided information to better inform their decision making.

*Changes:* None.

*Comments:* One commenter recommended that we should extend the deadline to provide warnings to enrolled students from 30 to 60 days after the date of the notice of determination, to provide institutions the time necessary to identify the appropriate students and accurately issue the warnings, while still allowing institutions to perform other necessary functions.

*Discussion:* We believe that 30 days from the date the Department issues a notice of determination that a GE program has failed the D/E rates or EP measure is a reasonable period of time for institutions to identify and distribute warnings to students enrolled in that GE program. We note that institutions should generally be well aware of which students are enrolled in each of the institution's programs. The Department further notes that the administrative capability regulations at § 668.16(b)(2) require an institution to use an adequate number of qualified staff to administer the title IV, HEA programs. The Department considers those requirements to include the distribution of required GE warnings to students. Moreover, § 668.16(b)(3) requires institutions to have a system in place to communicate to the financial aid administrator all information maintained by any institutional office that impacts students' title IV, HEA eligibility, including information about which students are enrolled in a particular program of study.

*Changes:* None.

*Cooling-Off Period After Warnings*

*Comments:* One commenter expressed support for the three-day cooling-off period after institutions deliver GE warnings to students, as prescribed in § 668.407(f)(2). The commenter encouraged the Department to consider additional guidance concerning the type of communication allowed between the institution and the student during the cooling-off period, such as stipulating that only students can initiate contact with the institution or communication from the institution may only occur via email.

*Discussion:* We thank the commenter for their support, and we appreciate the suggestion to provide additional guidance on allowable types of communication during the cooling-off period. Although we do not believe that this level of specificity is required in the regulation, we expect to provide additional sub-regulatory guidance and

training prior to the effective date of the rule.

*Changes:* None.

*Comments:* One commenter supported the Department's decision not to consider a student acknowledgment or GE warning as evidence against a borrower's loan discharge application, but expressed concern that institutions could exploit the warnings and acknowledgment requirements to try to insulate themselves from legal liability for misconduct and recommended that the Department include language providing that neither the warnings nor the acknowledgments can be used by an institution as a defense to deceptive practices claims brought by students and government agencies in administrative or judicial proceedings.

*Discussion:* The Department thanks the commenter for their support. While we share the commenter's concern, we are not changing the regulatory language because we believe that categorically limiting the defenses institutions can raise in the types of litigation noted by the commenter would extend beyond the scope of the Department's authority.

*Changes:* None.

*Alternative Languages for Warnings*

*Comments:* Several commenters opined that the requirement in § 668.605(d) to deliver warnings in alternative languages is overly vague, would be burdensome for institutions to administer, and could result in discrimination claims. Commenters suggested that the Department produce a template format and content that can be used unilaterally for consistency across institutions; specify the minimum required languages for translation; only require that warnings be available in English and in any other language in which the program offers instruction; or allow the warning to be posted as a disclaimer on admissions and enrollment materials.

*Discussion:* The Department disagrees that that the requirement to deliver GE warnings in alternative languages is overly vague, burdensome, or would result in discrimination claims. The Department expects an institution to be reasonably aware if it admits and enrolls students with limited proficiency in English and expects institutions to provide required GE warnings in a language relevant to the student. Translation tools and services are available to institutions to aid them in meeting this requirement. We believe that a warning template would be of limited use given the variety of potential information related to transferability of credit, written arrangements, and teach-

outs, and we further note that the regulation provides a helpful framework from which to craft the relevant GE warning language. Specifying the particular languages required for translation or only requiring that GE warnings be available in English and in the languages in which the program offers instruction would exclude some students from benefiting from content of the GE warnings.

The Department disagrees with the suggestion to allow the GE warning to merely be posted as a general disclaimer on admissions and enrollment materials. We want students to view any required GE warnings and have the opportunity to act upon the information. The timing and manner of information delivery can greatly affect whether the information is received and understood, such that audiences may use the information in their decisions. We believe the GE warning must be distributed directly to students, not provided as a general disclaimer. As discussed further below, the information at issue is critical for students when a GE program is at risk of losing eligibility to participate in title IV, HEA.

*Changes:* None.

*The First Amendment and Warnings*

*Comments:* A few commenters argued that a required warning under § 668.605 of the GE accountability framework, particularly a warning rule using prescribed language, may constitute compelled speech that may violate an institution's constitutional rights under the First Amendment. A few such commenters noted that the First Amendment extends to people and corporations alike, covers all types of lawful speech including factual disclosures, and protects the right to refrain from speaking at all. One commenter further opined that to survive legal scrutiny, a regulation must be narrowly tailored to promote a compelling government interest and suggested that the Department already has a narrowly tailored solution in the College Scorecard, which includes average student debt and average earnings. Another commenter posited that the warning provisions would require institutions to parrot the Department's determination of the program's value without regard for the reliability of the underlying data or the non-pecuniary value of the program to students.

*Discussion:* The Department disagrees. The relevant provisions of the GE program accountability framework will provide students with a straightforward, purely factual, and uncontroversial warning when there is a serious risk that title IV, HEA aid will not be available at a given GE program. These provisions will require institutions that operate these at-risk GE programs to deliver a one-time warning to students with whom they already have a relationship, through enrollment or outreach and contact as prospective students.[180]

As discussed above, the unavailability of title IV, HEA assistance is an undeniably serious consequence for students who are enrolled in or considering whether to enroll in a GE program. In addition, the Department has an overwhelming interest in enabling informed student decisions before government resources are directed toward at-risk programs. And the communicative burden on institutions will be minor at worst, given that they will remain free to deliver their own messages to students. A responsible institution would strive to warn students of the potential loss of eligibility in these circumstances, and the rule aims to require participating institutions to act responsibly. The GE warning rule is an entirely reasonable and constitutional requirement for institutions that benefit from title IV, HEA aid to students. Such rules are consistent with the First Amendment's guarantee of the freedom of speech.

The justifications for a warning are especially strong in these circumstances—situations involving the need to inform students about the risk to student aid before Federal funds are used in programs that are supposed to train and prepare students for gainful employment in a recognized occupation or profession—not education of all kinds. In commercial speech cases, courts have asked whether a regulation directly advances a significant government interest and is a reasonable fit between means and ends.[181] Courts also have recognized broader government authority to require disclosure of accurate information about services and products,[182] allowing for the preservation of various consumer protection laws. Furthermore, the GE warning rule involves participants in Federal funding programs, rather than the regulation of private parties who are not seeking government support.[183] Whatever the applicable test, the GE warning rule will satisfy it.

The Department's interests in informed student decisions and protection of tax-supported government resources are obviously important, and warnings will directly advance those interests. The rule applies to institutions that operate at-risk GE programs and that have established relationships with their enrolled students, and that have contact with prospective students. The Department understands the obvious threat to students and taxpayers when the former enroll in programs that turn out losing eligibility under title IV, HEA. But the Department does not have the advantages of institutions in their ability to deliver necessary warnings to both enrolled and prospective students, who are in the process of making decisions about higher education. And institutions should understand why students need to obtain the information at issue. Given the stakes for students and taxpayers, the College Scorecard does not provide a direct warning to students and, therefore, is not an adequate substitute for warnings from participating institutions that their GE programs are at risk.

In addition, the GE warning rule is carefully tailored to the Department's interests, while the burden on participating institutions' speech will be minimal. As described in § 668.605(a) and (b), the warning is a one-time obligation, with a narrow exception for students who seek to enroll 12 months after a warning. Furthermore, § 668.605(e) and (f) allows institution to choose among more than one method of delivering the warning, including an email or other electronic means. It is true that, when a warning is delivered in a written form, § 668.605(e) and (f)

---

[180] In § 668.2 of these rules, "prospective student" is defined as an individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a program. And "student" is defined, for the purposes of subparts Q and S and of § 668.43(d), as an individual who received title IV, HEA program funds for enrolling in the program.

[181] See, for example, *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980); *Bd. of Trustees of State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 480 (1989) (stating that the test involves reasonable fit).

[182] See, for example, *Zauderer* v. *Office of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985) (testing advertiser disclosure requirements for a reasonable relationship to a governmental interest in preventing deception, and for whether the requirements are unduly burdensome to speech); *Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 559 U.S. 229, 259–53 (2010) (following *Zauderer*); *Am. Hosp. Ass'n* v. *Azar*, 983 F.3d 528, 540–42 (D.C. Cir. 2020) (same). Other First Amendment cases regarding disclosures are collected in note 165, and we further discuss the freedom of speech in that discussion of the Department's program information website.

[183] See generally *United States* v. *American Library Ass'n*, 539 U.S. 194 (2003) (addressing Federal assistance for internet access and a condition on assistance involving internet filters); *United States* v. *Aguilar*, 515 U.S. 593, 606 (1995) (recognizing that private parties may voluntarily agree to assume an enforceable duty *not* to disclose information).

indicates that the warning must be separate from other communications from the institution. That provision advances the Department's interests in an effectively communicated warning and does not prohibit other messages from the institution such as a separate email or electronic communication.[184] In this rule, moreover, the Department chose not to ask institutions to deliver continuous warnings such as by posting messages on their own websites or incorporating warnings into their promotional materials. In our judgment, the warning rule in § 668.605 is necessary and adequate based on the Department's experience and available information. As a consequence, the burden on institutions will be minimized.

Other features of this GE warning rule likewise moderate any burden on participating institutions' preferred messages. In § 668.605(c), the Department selected carefully a list of factual, objective, and commonsense items to include in warnings to students when their GE programs are at risk: notification that the GE program has not passed the Department's standards, and that the program could lose access to Federal grants and loans when the next round of results are available; a link to the Department's program information website along with notification that the student must acknowledge having viewed the warning through the Department's website before disbursement of title IV, HEA funds; and, in the event that the program does lose eligibility to participate in the title IV, HEA programs, a description of options within the institution, an indication of what the institution plans to do regarding teaching and refunds, and an explanation of whether students may transfer credits to other institutions. Each of these items is independently valuable. Notably, however, the rules do not require participating institutions to adopt the Department's view on program value, as one commenter feared.

Certain details for warnings will be specified in a future notice in the **Federal Register**, consistent with the terms of § 668.605. But the rule clearly does not require any script that would compel any participating institution to misrepresent its views about what is a high-value program, low-value program, or any other topic. The Department does want students to be warned effectively and accurately but respects the

legitimate interests of participating institutions to maintain their own views and to communicate those views. We will avoid language in the GE warnings that may be unduly controversial, misleading, or distracting.[185] As we discuss elsewhere in this document, institutions can correct errors in certain calculations to increase the accuracy of the outcome measures. That process is part of the Department's effort to make available factual information about programs that is readily comparable and easily understood by students and the general public. At the same time, institutions will remain free to hold and express their own views on which if any program metrics are best through their own channels of communication.

This is not the first instance in which regulations have required individual, direct communication by institutions with consumers about Federal aid. Apart from the 2014 Prior Rule, section 454(a)(2) of the HEA [186] authorizes the Department to require institutions to make disclosures of information about Direct Loans, and Direct Loan regulations require detailed explanations of terms and conditions that apply to borrowing and repaying Direct Loans. The institution must provide this information in loan counseling given to every new Direct Loan borrower in an in-person entrance counseling session, on a separate form that must be signed and returned to the institution by the borrower, or by online or interactive electronic delivery with the borrower acknowledging receipt of the message.[187] Like the GE warning rule adopted here, under the loan counseling rules, institutions must provide warnings directly to the affected consumers.

Although we thoroughly considered the commenters' concerns regarding the First Amendment, we are convinced that the final regulations are constitutional. Additionally, we took into account a range of concerns expressed by commenters regarding disclosures and warnings, along with the Government interests in providing students an effective warning regarding a program's performance and eligibility status. Our judgment, in sum, is that the GE warning rule is both sound policy and constitutional.

Finally, the Department disagrees with a commenter's suggestion that the final rules are impermissible because any regulation of GE programs is content-based and subject to strict judicial scrutiny. The commenter's source of concern appears to be the GE statutes that create the distinctions between types of institutions and programs that prepare students for gainful employment. Regardless, we reiterate that the D/E rates and EP metrics focus on completer outcomes rather than program curriculum. We also observe that institutions have the option of not participating in title IV, HEA student aid programs. Title IV offers eligible institutions the option to participate in student aid programs. It does not compel institutions to prefer one curriculum over another.

*Changes:* None.

### Students Switching Programs

*Comments:* A few commenters recommended that the Department exempt from the acknowledgment requirements in § 668.407 all students who transfer from one program to another within an institution or who have not declared a major. For undeclared majors, a few commenters suggested that the acknowledgment requirement apply once the student selects a major.

A few other commenters suggested instead that the Department address program transfers and undeclared majors by listing all of a school's programs on the program information website, with failing programs in the credential level of the student at the top of the list, and clearly marking all programs as passing or failing, or noting where no information is available. One commenter added that we could use the College Scorecard for this purpose, provided it included the relevant information.

*Discussion:* As noted above, the student acknowledgment requirements in § 668.407 are aimed at providing information to prospective students before they enter into enrollment agreements with an institution. While we agree with commenters' arguments that this information would be valuable to already enrolled students who are considering changing their major, we do not believe the benefit of requiring acknowledgments to such students would outweigh the administrative burden of requiring students to provide such information prior to switching or declaring majors. Students' educational pathways are complex, and they may form their preferences about an ultimate field of study course-by-course or class-by-class as they progress. There may

---

[184] See *CTIA—The Wireless Ass'n* v. *City of Berkeley*, 928 F.3d 832, 849 (9th Cir. 2019) (observing that the regulation at issue permitted retailers to add information if the information was distinct).

[185] Contrast the warning that was criticized in a dictum in *Ass'n of Priv. Colleges & Universities* v. *Duncan*, 870 F. Supp. 2d 133, 154 n.7 (D.D.C. 2012), which expressed concern about a ''statement that every student in a program 'should expect to have difficulty repaying his or her student loans.' '' This rule does not require such a message.

[186] 20 U.S.C. 1087d(a)(2).

[187] 34 CFR 685.304(a)(3).

therefore be no obvious time to trigger a requirement that they view the program information website, and students may effectively have already made their decisions prior to being prompted to view the information. Accordingly, the Department believes it is best to rely on publicizing the availability of the information to all students to increase the odds students will have the relevant information available to them to inform choices in this situation. In this connection, we may consider listing links to information about all of a school's programs on the Department's program information website, with clear designations of each program's status under the financial value transparency metrics.

*Changes:* None.

*Comments:* One commenter urged the Department to ensure that transfer students from one institution to another acknowledge the information before receiving Federal aid for the receiving program.

*Discussion:* As noted above, transfer students to an institution are considered prospective students and so the acknowledgment requirements in § 668.407 apply.

*Changes:* None.

## Impact on Loan Discharges

*Comments:* A few commenters recommended that we omit proposed §§ 668.407(d) and 668.605(h), which provide that the Department will not consider a student acknowledgment or GE warning as evidence against a borrower's loan discharge application. These commenters also opined that the proposed acknowledgment and warning provisions are underly nuanced and that the Department could not rule out in all cases the possibility that a warning or acknowledgment would be irrelevant. Additionally, the commenters noted that a final rule adopted by the Department in 2022 [188] contained a provision requiring the Department to use all information in its possession when evaluating borrower defense claims. The commenters contended we should consider a warning or acknowledgment to constitute other relevant information about which the Department is aware.

*Discussion:* The Department disagrees with the suggestion to omit §§ 668.407(d) and 668.605(h). Under the borrower defense provisions at § 685.401(b), actionable circumstances for a borrower defense claim include a substantial misrepresentation; a substantial omission of fact; an

[188] 87 FR 65904 (Nov. 1, 2022).

institution's failure to perform its contractual obligations to the student; aggressive and deceptive recruitment; or a State or Federal judgment against the institution, including an institution's termination or denial of recertification by the Department. The student acknowledgments provided under the financial value transparency framework regarding D/E rates, as well as the warnings and acknowledgments under the GE program accountability framework regarding D/E rates and the EP measure, pertain specifically to a program's outcomes that are provided for students and their family. The course of dealings and information shared between an institution and its students remain the focus of whether a student qualifies for a borrower defense discharge. The borrower defense regulations address the consideration of the relevant facts related to the borrower defense claim. A student's acknowledgment of a program's failing D/E rates would be one consideration but would not be dispositive. We anticipate that in acknowledging having viewed the financial value information on the Department's website, borrowers will consider this information in the context of other information they may receive, including from institutions.

*Changes:* We have revised §§ 668.407(d) and 668.605(h) to specify that the provision of an acknowledgment or warning will not be considered ''dispositive'' evidence in any borrower defense claim.

*Comments:* One commenter supported the Department's decision not to consider a student acknowledgment or GE warning as evidence against a borrower's loan discharge application, but expressed concern that institutions could exploit the warnings and acknowledgment requirements to try to insulate themselves from legal liability for misconduct and recommended that the Department include language providing that neither the warnings nor the acknowledgments can be used by an institution as a defense to deceptive practices claims brought by students or government agencies in administrative or judicial proceedings.

*Discussion:* The Department thanks the commenter for their support. While we share the commenter's concern, we are not changing the regulatory language because we believe that categorically limiting the defenses institutions can raise in the types of litigation noted by the commenter would extend beyond the scope of the Department's authority.

*Changes:* None.

## Certification Requirements for GE Programs—§ 668.604

*Comments:* One commenter expressed concern that the timing of the requirement to certify GE programs may be overly burdensome for institutions, given the projected timing for institutional reporting and notification of D/E rates and EP measures. This commenter requested that the Department extend the certification deadline beyond December 31, 2024, to provide a more generous transition period.

*Discussion:* We do not anticipate the initial transitional certification requirements for GE programs to be particularly burdensome. Even institutions with many GE programs would generally submit a single transitional certification, likely through *eligcert.ed.gov* or its successor system. While some analysis is required on the part of institutions to know whether each GE program meets any applicable State licensure or accreditation requirements, the Department notes that, even in the absence of the GE certification requirements, institutions should be knowledgeable about the programs they offer. We reasonably expect institutions to keep their programs current and compliant with State and accrediting agency policies and requirements.

The December 31, 2024, deadline for GE program certification is entirely reasonable, especially given our decision to extend the transitional data reporting option to GE programs, as discussed under ''Reporting'' above, which already provides a more generous transition period.

*Changes:* None.

## Ineligible GE Programs

### Impact of Ineligibility

*Comments:* Two commenters voiced concern that a program's loss of eligibility to participate in the title IV, HEA programs will force many students to withdraw. According to these commenters, some students may abandon their education, others may struggle to find another institution willing to accept them, and others may have to retake some of their classes or restart their clinicals, thereby devaluing the taxpayer's investment in the student's education.

Another commenter discussed the lesser options for education in their field if their institution were to close, commenting that community colleges offer less in-depth programs in their field of study, located in areas with more limited housing options.

*Discussion:* As we illustrate in the RIA, most students in programs projected to fail the accountability metrics have alternatives with better student outcomes available to them. In most cases, then, where programs lose eligibility, we expect most students to reenroll in programs that result in higher earnings, less debt, or both. We acknowledge that a program's ineligibility may present some obstacles to some students' ability to complete their programs, but believe that these obstacles do not justify continuing to direct further taxpayer funds to programs that fail to meet standards. By providing prompt notice and an overview of options in student warnings, the GE framework will give students options to take action before sinking too much of their time, efforts, funds, and limited title IV, HEA aid into programs that do not lead to adequate student outcomes.

*Changes:* None.

*Comments:* Many commenters raised concerns about how the proposed rules would have disproportionate effects on cosmetology and massage therapy schools. Commenters said the rules would lead to the widespread closure of these schools. Commenters noted that many of these schools are small businesses. Commenters further opined that these negative effects would be felt not just by supposedly bad cosmetology schools.

Commenters then proceeded to raise concerns about multiple follow-on negative effects from these closures. They raised the possibility of negative effects on students, including reduced opportunities for women, people of color, immigrants, persons with disabilities, and other groups that are traditionally underrepresented in postsecondary education. Commenters also raised concerns about students losing access to Federal aid in the middle of programs, which would discourage continued enrollment.

Commenters also argued that community colleges and high schools would not be able to accommodate the influx of students interested in attending cosmetology programs after many private cosmetology schools closed. They also claimed schools would not be able to meet the demand for massage therapists.

Commenters further cited the effects of closure on unemployment and local communities. Commenters particularly emphasized the effects of businesses hiring graduates of programs, and the inability to fill in-demand jobs if programs and institutions close. They also said unemployment would increase from students who would otherwise

have found jobs after attending cosmetology schools. Others claimed thousands of employees from these schools would lose their jobs.

Commenters also expressed concern that closures would have negative effects on health, safety, and sanitary conditions as more services would be provided in homes and in unlicensed or uninspected facilities.

*Discussion:* We disagree with the commenters about the likelihood that closures would be widespread, as well as the negative effects that would come from any closures that might occur.

Regarding the extent of closures, commenters did not consider the large numbers of students attending cosmetology schools but not receiving Federal aid under title IV, HEA, as well as the significant number of cosmetology schools that do not participate in title IV at all. For example, across all institutions that participate in the title IV, HEA programs that award cosmetology certificate programs, we estimate the average institution awarded about 38 percent of its credentials to students who did not receive any Federal aid.[189] Moreover, a review of licensure examination results from California[190] suggests that only about one-third of schools with students taking the cosmetology licensure exam participate in the title IV, HEA programs. In a similar study cited in the RIA, Cellini and Onwukwe find the analogous share in Texas is about 14 percent.[191] The same data used in these studies, along with more rigorous academic studies,[192] suggest that loss of title IV, HEA eligibility among cosmetology schools results in schools adjusting their tuition downward (suggesting that students may not face higher costs of attendance despite losing access to title IV aid), and that their graduates still pass licensure exams at similar rates. These findings suggest that commenters' assertions that the loss of

Federal aid eligibility would automatically lead to closure and a reduction of opportunities for students may not be correct. There is a difference between an institution losing access to title IV, HEA funds and closing—a distinction that is particularly evident in the cosmetology space.

We also emphasize that the Federal financial aid programs are entitlements for students, not institutions of higher education. The GE accountability framework is designed to protect both Federal investment and student investment in programs of higher education. Students pursuing higher education are not just investing taxpayer and personal funds to attend a GE program, but are also incurring opportunity costs. The GE eligibility rules that we adopt here do not assess whether a program or a school is in some general sense "good" or "bad," which are labels the commenters did not define. More concretely, a student directing their limited title IV, HEA aid to a GE program that does not prepare them for gainful employment in a recognized occupation has lost the opportunity to use those funds to attend a different educational program that would better serve their goals. The D/E rates and earnings premium measures provide objective and evidence-based metrics to direct Federal funds to programs that do not saddle students with more debt than they can afford or leave them with earnings prospects no better than they would have had with only a high school diploma.

We also disagree with the arguments from commenters about the effects of closures. First, as we note above, there is a possibility of enrollment moving into programs that are still eligible for title IV, HEA funds or those that operate solely on the private market. Second, commenters did not consider the potential responses from programs that do pass the GE program accountability framework. For instance, a passing program may choose to expand its enrollment and meet any excess demand. Students may also choose to enroll in different types of programs, which are likely to provide them better economic benefits since passing programs generally have a combination of higher earnings and lower debt. The Department thus believes commenters overstate the potential loss of postsecondary opportunities.

We also disagree with comments about the negative effects of closures on particular groups of students, such as women and students of color. The Department has already provided an extensive discussion of the effects of these rules on women and students of

---

[189] This analysis compares data on the total number of awards granted during 2016 and 2017 reported by institutions in the Integrated Postsecondary Education Data System (IPEDS), which covers both federally aided students and not-federally aided students to the number of graduates in such programs reported to the National Student Loan Data System—covering only federally aided students.

[190] California makes these data available at this website: *https://www.barbercosmo.ca.gov/schools/schls_rslts.shtml.*

[191] Cellini, S.R. & Onwukwe, B. (2022). Cosmetology Schools Everywhere. Most Cosmetology Schools Exist Outside of the Federal Student Aid System. Postsecondary Equity & Economics Research Project working paper, August 2022.

[192] See, for example, Cellini, S.R., & Goldin, C. (2014). Does Federal student aid raise tuition? New evidence for-profit colleges. *American Economic Journal: Economic Policy,* 6(4), 174–206.

color, which can be found in the "Demographics and Outcomes" section of this final rule. Many of the other categories identified by commenters are not ones where there is any centralized data collection to identify them, such that there is no analysis of these populations that could be conducted. But we do not see a persuasive reason why the analysis conducted on women and students of color would not capture the largest demographic groups enrolling in cosmetology, massage therapy, and other beauty school programs. Given that cosmetology schools represent one of the largest areas of student enrollment in GE programs, we believe that analysis properly captures the consideration of the effects on these groups of students at beauty schools.

We also disagree with commenters' arguments about the effects of closure on local communities and businesses. The Department does not believe that a shortage of programs of study within a field is adequate justification for directing title IV, HEA funds to programs that do not lead to adequate student outcomes. If there is a shortage of eligible programs in a high-demand field, this provides an opening for institutions to expand the capacity of existing high-quality programs or to create new high-quality programs to meet that need. Moreover, employers also have tools available to them if they have jobs they cannot fill, such as increasing wages and benefits. Given that the beauty industry is predicated on charging clients for their services, they could also choose to either reduce their profit margins or pass some of these increased costs on to their clientele. We also reiterate that commenters have not considered the presence of a significant number of schools in these areas that do not participate in the title IV, HEA programs.

Finally, regarding concerns about the effects of the rules on health and safety, we note that cosmetologist licensure and facility inspection are areas regulated and enforced at the State and local levels, not at the Federal level. The Department trusts the appropriate State and local entities to maintain appropriate standards for health and safety within their jurisdiction.

*Changes:* None.
*Comments:* A few commenters mentioned the potential impact of school closures contributing to a shortage of practicing veterinarians and the competitive nature of veterinary school seats, contending that the loss of program eligibility would reduce the number of future veterinarians. Other commenters suggested that the D/E

metric would result in the closure of numerous Doctor of Veterinary Medicine programs.

*Discussion:* While a determination of ineligibility for title IV, HEA aid may lead to closure of programs in fields of high demand that do not produce adequate student outcomes, we believe that this does not justify continuing to steer students and funds to programs with inadequate student outcomes. It is also possible that the need for additional training opportunities in a particular field may lead to the establishment of new programs or the expansion of existing programs that lead to better student outcomes.

*Changes:* None.
*Comments:* Some commenters raised concerns about how the GE accountability framework and program ineligibility stemming from it could create challenges for businesses trying to hire in the allied health, business, and nursing spaces.

*Discussion:* We disagree with the commenters. Regarding nursing and business, we do not see evidence of high rates of ineligibility. As shown in Table 4.18, these two programs have the smallest number of students in failing programs out of all the programs with the largest number of failures. But for these two areas as well as allied health, we do not think a shortage of programs of study within a field is adequate justification for directing title IV, HEA funds to programs that do not lead to adequate student outcomes. If there is a shortage of programs and excess demand by employers, then institutions would have an incentive to expand the capacity of passing programs or employers would need to raise wages. Either solution could help expand the number of offerings to what is needed.

*Changes:* None.
*Comments:* One commenter stated that cosmetology licensure requirements provide vital consumer protection and make any loss of funding to cosmetology programs unnecessary.

*Discussion:* The commenter conflates the protection clients of cosmetology program graduates receive from licensure requirements with the protection the Department seeks to establish for students themselves under the GE accountability framework. These are not equivalent and are not even protections for the same populations. The Department believes that both provide important protections.

*Changes:* None.

### Alternatives to Ineligibility

*Comments:* One commenter suggested that title IV, HEA eligibility should be grandfathered for students who were

already enrolled in a program at the time of its first fail rating. Two other commenters similarly suggested allowing students already enrolled in a program losing eligibility for title IV, HEA aid to continue receiving aid through completion of the program if they decided to continue with full knowledge that the program is failing. Many commenters voiced a belief that students already enrolled in a program that loses eligibility should be able to choose to continue in the program knowing the program's failing rates and continue to access Pell loans to complete the program since loans come with negative consequences if default occurs, while Pell Grants come without repayment obligations. One commenter suggested allowing students to continue to borrow title IV, HEA loans for programs that would lose eligibility, adjusting loan limits for those programs downward to amounts that would bring D/E rates to within amounts that would pass.

*Discussion:* More harm can come to students from continuing in a failing program than merely accruing additional loan debt. Students are limited in the amount of time for which they can receive Pell Grants. Continuing in a failing program and receiving a Pell Grant would exhaust some of their eligibility. Continuing in a program that produces inadequate student outcomes will also consume student time and effort. This invested time comes with more readily apparent costs, such as increased costs for childcare or lost opportunities for paid employment, but also with the loss of substitutes—with the time invested in a failing program, the student could have been pursuing a course of study that would have better advanced their career.

It is also possible that if the institution became ineligible to participate in the Direct Loan program, but Pell funding continued, students would merely replace their Federal student loans with private loans. Continuing in a failing program without Direct Loans would leave students in a worse position than if we took no action.

It would be mathematically unworkable to lower limits on Direct Loans to amounts that would cause a failing program to pass D/E rates. D/E rates are calculated across a student's entire enrollment in a program and different students may take a different number of years to complete a program, so annual borrowing could not be precisely adjusted. Additionally, since students could potentially replace lowered Direct Loan amounts with private loan debt, keeping their debt

amount constant, it would be impossible to precisely lower D/E rates by lowering limits on title IV, HEA borrowing alone.

*Changes:* None.

*Comments:* One commenter suggested that the GE accountability metrics be paired with further reporting requirements but not tied to title IV, HEA eligibility. Another commenter recommended removing all references to the GE rule in the context of financial responsibility, administrative capability, and certification procedures, broadening the GE rule for uniform application across all program types.

*Discussion:* As further discussed in this document and in the NPRM,[193] we believe that for GE programs, further steps beyond information provisions are necessary and appropriate. The Department intends to integrate the GE accountability metrics into all relevant aspects of Federal student aid administration covered by the final rule.

*Changes:* None.

*Timeframe for Warnings and Ineligibility*

*Comments:* Several commenters suggested extending the timeframe for loss of title IV, HEA eligibility to failing in three out of any four consecutive award years for which metrics are calculated, with one of the commenters positing that allowing an additional year would limit loss of eligibility to programs truly demonstrating a pattern of poor performance versus merely experiencing a market shift or other unforeseen event. This commenter additionally suggested granting waiver authority to the Secretary for any program training students to be essential workers, for programs training students to enter professions experiencing critical national job shortages, or as a result of a national, State, or local emergency declared by the appropriate authority. Another commenter similarly suggested changing the provision for loss of eligibility to three consecutive fails.

*Discussion:* In the balance between gathering meaningful data and acting quickly enough to protect students and taxpayers from failing programs, an unavoidable amount of delay is already added to the rate and threshold calculation process for the time it takes for the data used in calculations to become available. The Department believes that allowing an additional year of failing GE metrics before a program becomes ineligible for title IV, HEA program participation would add too much risk for students in failing GE

programs. We further note that the accountability framework already accounts for sudden market shifts in that a GE program will not lose eligibility based on failing the D/E rates or EP measure for a single year. Waiving ineligibility for GE programs designed to train students to be essential workers or to work in fields experiencing labor shortages could especially fall short of protecting students—if program graduates do not have sufficient earnings when the field is at peak demand, those students will be at an even greater disadvantage if demand goes down.

*Changes:* None.

*Comments:* One commenter mentioned that closures with little notice to students are already problematic. This commenter voiced concern that the rule as proposed will cause still more schools to close within two years.

*Discussion:* Under the GE accountability framework, institutions are required to issue warnings when a GE program is at risk of becoming title IV, HEA ineligible based on the next calculation of D/E rates or earnings premium measure. This would occur if the GE program had a failing D/E rate within its last two rate calculations or if the program failed the earnings threshold within the last two measurements. We believe these warnings will provide students adequate notice and information to decide how they wish to proceed.

*Changes:* None.

*Comments:* One commenter opined that if a GE program did not have metrics calculated for two years, the programmatic eligibility clock would restart, citing that programs and their students are continually evolving and that most community college GE programs will be one year or shorter in length, making a cumulative evaluation period that could last up to four years not a reasonable period.

*Discussion:* The Department acknowledges that programs and student populations may evolve over time at any institution, but this does not negate the importance of using the best available data to hold programs accountable for student outcomes.

*Changes:* None.

*Period of Ineligibility and Substantially Similar New Programs*

*Comments:* Several commenters expressed the opinion that an institution voluntarily discontinuing a program should not be penalized if it produces failing rates in its final years. Two of the commenters did not think it made sense to employ the three-year

block on title IV, HEA eligibility for new programs substantially similar to programs voluntarily discontinued either before or after D/E rates or earnings premium measures are issued but allow eligibility for re-established programs that are discontinued before the metrics go into effect. One of these commenters expressed that they understood the need to prevent schools from using voluntary discontinuation to evade consequences, but that they believed the same goals could be achieved by limiting the block to programs that already had at least one failing accountability metric. A few commenters expressed the belief that CIP codes sharing the first four digits varied too greatly to be substantially similar, citing examples from the allied health fields and the cosmetology and related personal grooming fields, and that use of the six-digit CIP level would be sufficient to prevent manipulation. One commenter stated that this approach is problematic for institutions that provide specialized instruction in a narrow field such as cosmetology. Another of these commenters believed that the 3-year period was arbitrary and that its use in the rule on cohort default rates was not sufficient justification. Another commenter believed that the rule as proposed will block an institution from winding down a program based on market changes and reintroducing an improved version for three years, even if the newer program is designed to be shorter, less expensive, and more attractive to employers.

*Discussion:* As one of the commenters noted, this provision is designed to prevent institutions from evading consequences for programs producing inadequate student outcomes by voluntarily discontinuing a program before it could lose eligibility based on D/E rates or the earnings premium. Along those same lines, the period of ineligibility for new programs with substantial similarity would prevent institutions from bringing back a program that is failing or at risk of failing under a similar CIP code with few changes. While 6-digit CIP codes within some 4-digit CIP categories may have some more variation than others, there are still sufficient common elements to programs within a 4-digit CIP category to raise concerns that an institution with one failing program within the category should wait and reassess elements such as program design and market demand before establishing a new eligible program within the same category. The Department considers three years to be an appropriate waiting period. The

App.86

Department selected a three-year period of ineligibility because it most closely aligns with the ineligibility period associated with failing the Cohort Default Rate, which is the Department's longstanding primary outcomes-based accountability metric at the institutional level. Under those requirements, an institution that becomes ineligible for title IV, HEA support due to high default rates cannot reapply for approximately three award years.

*Changes:* None.

*Comments:* One commenter suggested not imposing the three-year period of ineligibility for programs that have lost eligibility and allowing schools to reintroduce their programs redesigned to meet GE standards.

*Discussion:* The Department believes that omitting the period of ineligibility would provide inadequate protection for students against a program being quickly re-established with the same elements that led to its loss of eligibility in the first place. Since it would require several years of more data before debt and earnings outcomes could be determined for the "new" program, this would subject student futures to an unacceptable level of risk.

*Changes:* None.

*Comments:* One commenter suggested disregarding any fail rating more than four years old, providing an illustrative example of how under the rule as proposed in § 668.602(c) and (e), a program only large enough to receive rates in certain years could have failing rates in years one and seven and maintain eligibility (since the older rate would be disregarded under § 668.602(c) because the program had four or more consecutive award years without rates), while if the program had a passing rate in the interval, with failing rates in years one and seven and a passing rate in year four, it would lose eligibility for failing in two of the three consecutive years for which rates were calculated.

*Discussion:* The Department thanks the commenter for pointing out the potential for this unintended consequence. The Department agrees that the situation described by the commenter is undesirable. This provision of the rule is meant to avoid using measures of program performance too far in the past to determine program eligibility.

*Changes:* In response, we have modified this provision in § 668.602(c) and (e) to state that in determining a program's eligibility, the Secretary will disregard any D/E or EP measure that was calculated more than five years prior.

*Comments:* One commenter voiced a concern that loss of title IV, HEA eligibility for massage therapy programs would have a ripple effect on the industry, requiring current massage therapists to take the time to train new entry-level students.

*Discussion:* The Department best serves students and taxpayers by regulating the use of title IV, HEA funds so they support students in attending programs that lead to adequate outcomes. If the occupational licensure structure in a State or locality permits a training path outside of institutions of higher education, that is beyond the Department's jurisdiction.

*Changes:* None.

*Other Concerns Related to Program Ineligibility Under the GE Framework*

*Comments:* One commenter expressed the opinion that it was unfair to make program eligibility determinations based on data from years preceding the effective date of the final rule.

*Discussion:* The HEA requirement that gainful employment programs prepare students for gainful employment in a recognized occupation predates any years for which data will be gathered for the GE accountability framework.

*Changes:* None.

*Comments:* One commenter expressed the opinion that these will be the strictest debt-to-earnings metrics to date, making it increasingly difficult for programs to remain eligible.

*Discussion:* The Department is committed to protecting student and taxpayer resources with strong accountability metrics and, as noted in the RIA, we expect that most programs will pass the D/E rates metric.

*Changes:* None.

**Challenges, Hearings, and Appeals**

*Comments:* One commenter supported the Department's proposal in § 668.603 to provide an opportunity for institutions to appeal a determination that a program fails the D/E test on the grounds that the Department made an error in calculating the institution's D/E ratio. The commenter offered that this provision provides important due process protections to institutions.

In contrast, many commenters objected to the Department's decision not to include review, challenge, and appeal opportunities in the proposed rule that were present in the 2014 Prior Rule, primarily on the grounds of due process and fairness. These commenters maintained that the Department cannot reasonably remove the eligibility of a program, potentially resulting in the closure of an institution, based on calculations derived from certain data without providing institutions a mechanism to review or challenge the data and offer other evidence, as well as appeal D/E and EP outcomes.

Referencing language from the preamble to the notice of proposed rulemaking for the 2014 Prior Rule, in which the Department stated that "[t]he proposed regulations are intended to provide institutions, in the interest of fairness and due process, with an adequate opportunity to challenge the completion, withdrawal, and repayment rates and median loan debt determined by the Department," [194] one commenter asserted that the Department is not adhering to its previously acknowledged standard of due process. That commenter, as well as others, noted that the 2014 Prior Rule afforded institutions the opportunity to review and correct the list of students (with the Secretary determining in consideration of evidence submitted, whether to accept those corrections), challenge the accuracy of the loan debt information that the Secretary used to calculate the median loan debt for the program, and file an alternate earnings appeal to request recalculation of a failing or "zone" program's most recent final D/E rates using earnings data obtained from an institutional survey or State-sponsored data system. These commenters objected that the proposed rule does not offer those provisions, allowing only for provision of the student list to institutions (assertedly without the opportunity for review or correction) and an appeal where the Secretary has initiated a termination action of program eligibility under subpart G of part 668 (Student Assistance General Provisions).

*Discussion:* The Department thanks the commenter who wrote in support of the appeal provisions in § 668.603. At the same time, we disagree with the commenters who asserted that the Department must include the same opportunities for appeals and challenges as those contained in the 2014 Prior Rule to afford institutions due process or fairness. We do not believe the appeal procedures urged by the commenters are required by the Due Process Clause of the Fifth Amendment or any applicable principle of fairness.

The threshold question for procedural due process purposes is whether a person has been or will be deprived of a property interest protected by the U.S. Constitution.[195] But institutions lack

---

[194] 79 FR 16426, 16485 (Mar. 25, 2014).

[195] *See Bd. of Regents of State Colls.* v. *Roth*, 408 U.S. 564, 569 (1972); *see also Assoc. of Private Colleges and Universities* v. *Duncan*, 870 F. Supp. Continued

such a protected interest in continued eligibility to participate in Federal student aid programs.[196] A unilateral expectation of benefits is insufficient, and institutions are neither promised nor led to believe that they will receive a continuing stream of Federal support without change in student aid rules.[197] In the context of title IV, HEA and GE programs, institutions and programs must satisfy a number of requirements for eligibility beyond the GE metrics in this rule, including standards related to administrative capability and financial responsibility. Moreover, neither institutions nor programs are direct beneficiaries of title IV, HEA aid to students. With respect to the GE accountability metrics, what will be at issue is specific program-level eligibility for Government support, not whether the institution and the other educational programs it offers may continue to participate in the Federal student aid programs. That indirect relationship to the benefit further weakens claims that institutions have a legitimate entitlement to continuing support from the Federal Government under title IV, HEA.[198]

Additionally, the final rule's appeal process is fair. The risk of error is low in the first place because the Department will use quality data on earnings from a Federal agency combined with other reliable information, including information supplied by institutions themselves. We have explained those choices at length in the NPRM and in this document. The calculations in question, moreover, are not fairly subject to open-ended debate or significant discretion. Regarding GE program accountability, the rules for calculating D/E and EP results specify clear formulas, thereby diminishing the value of additional procedures. On the flipside, and in view of the Department's experience with appeals

under prior GE rules, we are convinced that adding such procedures will not improve decisions but will increase delays, expenditures, and other burdens. The rules will give adequate assurance of accurate decisions, while serving the Department's important interests in supporting career training that results in enhanced earnings and affordable debt.

Although the Department concluded that the alternate earnings appeals available under the 2014 Prior Rule were not effective, these rules will provide appeals that are meaningful and manageable. Section 668.603(b) states that if the Secretary terminates a program's eligibility, the institution may initiate an appeal under subpart G of this part if it believes the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. Subpart G of part 668, specifically § 668.86(b), outlines the procedure for institutions to challenge decisions to limit or terminate a program. These procedures are designed to provide an opportunity to correct any errors in the calculation of a program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. These procedures include issuance by a designated Department official of notice informing the institution of the intent to limit or terminate that institution's participation, through a possible appeal of the initial decision of the hearing official to the Secretary. In addition, under § 668.405, institutions will be provided a "completer list" of all students who completed each program during the cohort period and given an opportunity to correct the information about students on the list.

It is true that, unlike the 2014 Prior Rule, the rules adopted here will not allow for institution-by-institution challenges to draft D/E rates based on evidence provided by the institution that loan debt information used to calculate the median loan debt for a program is incorrect. However, median loan debt for a program is not a statistic that the Department creates on its own, but rather is derived from student enrollment, disbursement, and program data, or other data the institution is required to report to the Secretary to support its administration of, or participation in, title IV, HEA. We expect that institutions will review these data and confirm they are correct at the time of reporting. Should any reported data contain inaccuracies, the institution must timely correct that data. The Department provides ample opportunity for an institution to evaluate the accuracy of its data through

reconciliation and closeout procedures at the end of each award year. Section 668.405 will require that, in accordance with procedures established by the Secretary, the institution update or otherwise correct any reported data no later than 60 days after the end of an award year. Inasmuch as participating institutions have access in real time to Department systems through which relevant data are reported—that is, COD and NSLDS—plus an appropriate period of time to correct any erroneous data, the presumption of accuracy with respect to such institution-provided information is fair and reasonable. Accordingly, these regulations do not establish a protocol for the publication of draft rates and an institutional challenge to those rates based on incorrect data being used to calculate median loan debt.

We acknowledge the references to fairness and due process in the preamble of the Department's 2014 Prior Rule. We remain committed to making decisions based on sufficiently reliable information that is relevant to the GE program accountability framework. We disagree, however, that due process or fairness requires the Department to adopt precisely the same appeals processes as in 2014, regardless of current circumstances and other rules that affect the reliability of the information needed to apply these rules. To the extent that constitutionally protected interests are implicated when institutions seek to benefit from government support, we observe that due process remains a flexible concept that accounts for considerations that include a relatively low probability of significant error and the Government's interest in reducing fiscal and administrative burdens.[199]

As explained above, institutions with programs that are not eligible to participate in title IV, HEA as the result of failing GE rates can appeal under subpart G of part 668 if they believe the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. We also note that some commenters mischaracterized these rules in asserting that the Department will limit institutions to a review of completer lists without an opportunity to make appropriate corrections. As previously discussed, § 668.405 will allow institutions to correct information about students on the list. Median loan debt challenges also are discussed

---

2d 133, 154 n.7 (D.D.C. 2012) ("Without a property right in their participation in Title IV programs, schools cannot press a Fifth Amendment challenge to the regulation of those programs.").

[196] See *Ass'n of Accredited Cosmetology Sch.* v. *Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992); *Dumas* v. *Kipp*, 90 F.3d 386, 392 (9th Cir. 1996); *Ass'n of Proprietary Colleges.* v. *Duncan*, 107 F. Supp. 3d 332, 348–52 (S.D.N.Y. 2015) (rejecting procedural due process challenges to the 2014 Prior Rule based on asserted interests in property and liberty); *Ass'n of Priv. Colleges & Universities* v. *Duncan*, 870 F. Supp. 2d 133, 154 n.7 (D.D.C. 2012) ("Without a property right in their participation in Title IV programs, schools cannot press a Fifth Amendment challenge to the regulation of those programs.").

[197] See *Ass'n of Accredited Cosmetology Sch.* v. *Alexander*, 979 F.2d at 864 (concluding that "schools have no 'vested right' to future eligibility to participate" in the Guaranteed Student Loan program).

[198] See *Dumas*, 90 F.3d at 392.

[199] See, for example, *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 347 (1976); see also *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 852 (2018) (reaffirming that due process is flexible).

above. Alternate earnings appeals are addressed in a separate discussion below.

*Changes:* None.

*Comments:* Several commenters, within the context of supporting the reintroduction of alternate earnings appeals, suggested the Department "cap" the number of programs at a given institution that can lose eligibility as a result of failing D/E rates or EP measures. One commenter broadly suggested a cap for the first year. However, commenters were not otherwise specific as to how such a cap might be applied.

*Discussion:* We are not convinced that a cap on the number of programs offered by a single institution that can lose eligibility is an appropriate or logical measure. Failing programs allowed to remain eligible as the result of such a cap would be no more successful than those that lost eligibility; however, institutions would still be able to enroll

students in those programs, subjecting them to the potential harm these regulations are designed to prevent. Restricting a cap to the first year that an institution is subject to program sanctions in no way mitigates these concerns.

*Changes:* None.

*Comments:* Some commenters claimed that cosmetology programs have limited ability to improve or reform because of State requirements for minimum hours and curriculum, restrictions on offering programs substantially similar to failing programs, costs of opening or expanding new programs, and limits to their ability to offer distance education.

*Discussion:* The commenters' claim that State regulation prevents program improvement is not borne out by the data on the median debt of cosmetology programs within States. As Figure 1.4 shows, median debts for undergraduate certificate programs in cosmetology vary

widely within all States. In Figure 1.4, each dot represents the median debt of a program, grouped by the State where the program is located using data from the 2022 PPD described in the RIA. This variation suggests that institutions can and do influence the amount of borrowing their students acquire and can therefore improve their outcomes. At a minimum, such varying program results within States are inconsistent with the theory that State regulation tightly restricts opportunities for program improvement. Furthermore, we note that, on its face, the restriction on offering programs that are substantially similar to failing programs does not prevent institutions from improving their existing programs. Rather, it plainly is a safeguard against institutions relabeling failing programs under different CIP codes without actually improving them.

**BILLING CODE 4000 01 P**



Figure 1.4: Median Debt Levels Among Undergraduate Cosmetology
Certificate Programs Across States

*Changes:* None.

*Comments:* One commenter expressed the opinion that closures resulting from the absence of an appeal process will

result in beauty professionals having no options for schooling and the displacement of thousands of employees. Another commenter listed

negative effects that the COVID–19 pandemic had on the beauty industry, including the closure of salons and spas, the reluctance of clients to return, and

the difficulty service providers experienced in reestablishing clientele, all of which reduced earnings. The commenter inquired how programs can accurately be measured without an appeal process for this time period. Another commenter posited that return on investment (ROI) should not be the only standard by which the value of an educational program is measured, and that there is inherent value in professions that help people, such as social worker, counselor, hairstylist, or esthetician. The commenter asked that due process in the form of an appeal on that basis be offered in final regulations.

*Discussion:* Regarding concerns about loss of educational opportunity for those seeking to enter the beauty profession and possible displacement of persons employed in the industry, the Department does not intend either of those results. We accept the need for quality programs in the fields of cosmetology and esthetics, as well as people to train those entering these occupations. However, those views do not obviate the importance of program outcomes that indicate completers have a reasonable expectation of reported, verifiable earnings exceeding those of a high school graduate and sufficient to service their education debt. Nor do predicted results for a given field of training establish any shortfall in the rules' procedures. Although some programs will not be eligible for title IV, HEA participation as the result of repeatedly failing D/E rates or EP measures, we are not convinced that opportunities for students who want to train for a career in the beauty industry will be materially circumscribed by the implementation of these rules, including the provisions for appeals. Moreover, we believe that the increased confidence students will have in the economic advantages of enrolling in programs that do establish passing D/E rates and EP measures outweigh the drawbacks associated with no longer being able to choose from among those programs that are not eligible under these rules.

We acknowledge that the COVID–19 pandemic likely affected the earnings of workers in salons, spas, the beauty industry, and many other industries besides. However, we do not find a basis for offering special appeals to any one field of programs or more broadly. As explained elsewhere in this document, the Department is not postponing action until such time as no earnings data through 2022 is included in D/E rate or EP calculations. Accordingly, and in consideration of the fact that most industries employing the graduates of GE programs were, to some extent,

affected by the pandemic, permitting appeals based on this circumstance would effectively obviate the full effect of the rule until at least the 2026–2027 award year. We do not view the effects of the pandemic as being germane to the discussion of alternate earnings appeals.

We agree with the commenter who asserted that ROI is not the only standard by which the benefits of an education should be measured, and that professions that help people have value beyond any remuneration that can be expected. Elsewhere in this document and in the NPRM, we have affirmed that students rely on a variety of appropriate considerations in choosing among postsecondary education options and that postsecondary education programs may reflect and serve a range of values.[200] However, having income sufficient to repay the debt incurred for a program is a commonsense and fundamental part of any assessment of whether the program prepares students for gainful employment in a recognized occupation. It is also reasonable in that assessment to expect that program graduates will, on average, earn more than a high school graduate. Last, we note that the GE program measures are not, strictly speaking, a determination of ROI, which is a formula for determining how well a particular investment has performed relative to others. As to the commenter's suggestion that the Department establish an appeal based on the extent to which a program's graduates help people or provide other societal benefits, we do not see how such an appeal could be anything other than entirely subjective and, therefore, lacking in fairness. Moreover, the suggestion seems to involve the commenter's preferred measures for program success, rather than statutory requirements or the adequacy of procedures used to determine program eligibility.

*Changes:* None.

*Comments:* Some commenters asserted that proposed § 668.603(b), which provides a basis for appeal if a program loses eligibility upon completion of a termination action of program eligibility, is a misapplication of the regulations applicable to limitation, suspension, and termination actions under subpart G, while still failing to give institutions adequate appeal rights. One commenter, while stressing the absence of challenges and appeals present in the 2014 Prior Rule and arguing for their reintroduction, noted that subpart G does provide institutions with notice and an

opportunity to request a hearing prior to suspension, limitation, or termination of that institution's participation in the title IV, HEA programs and that no limitation, suspension, or termination occurs until after the requested hearing is held. Alternatively, an institution may submit written materials to the designated Department official, who is required to consider the materials before determining whether to limit, suspend, or terminate participation. The commenter further offered that, even after an initial decision, regulations allow that an institution may appeal the initial decision to the Secretary. Citing proposed § 668.91(a)(3)(vi), which stated, ''In a termination action against a GE program based upon the program's failure to meet the requirements in § 668.403 or § 668.404, the hearing official must terminate the program's eligibility unless the hearing official concludes that the Secretary erred in the applicable calculation,'' another commentor expressed concern that the provision improperly removes the official's discretion to make an eligibility determination based on the facts and circumstances before them. The commenter also contended that, because the rule requires the official to terminate a program's eligibility without the opportunity for presentation of the case before a hearing official, it violates the institution's due process rights. Other commenters expressed the opinion that limiting the basis for any appeal to a calculation error on the part of the Department unfairly denies institutions any opportunity to present data that are potentially more accurate than the data on which the Department based its calculations.

A number of commenters objected to the appeal process in subpart G being limited to fully certified institutions. Commenters acknowledged that procedural rights for provisionally certified institutions differ from those of fully certified institutions with respect to institutional eligibility but argued that (unlike for institutional eligibility) certification status has no bearing on program-level GE outcomes or the resulting eligibility status of those programs. The commenters further argued that inasmuch as fewer procedural protections would be accorded provisionally certified institutions and opportunities to challenge underlying data are absent, the proposed rules effectively create two separate sets of analysis for GE programs that share the same outcome.

Some commenters suggested the introduction of an appeal based on recalculating GE metrics using an eight-digit OPEID number. The commenters

---

[200] See, for example, 88 FR 32300, 32306, 32322 (May 19, 2023).

offered that alternate results calculated at the eight-digit level would indicate where, despite failing across all locations (presumably at the six-digit CIP level), a program is passing in specific markets and locations, preventing those successful programs from becoming "collateral damage." Commenters added that the more specific rates and related information would have greater relevance to students attending individual locations.

*Discussion:* We disagree with the commenters who asserted that the basis for appeal in § 668.603(b) is a misapplication of the regulations in subpart G of part 668 and applicable to fine, limitation, suspension, and termination proceedings. Under the rules adopted here, a GE program that has failed the D/E rates measure or the earnings premium measure in § 668.402 in two out of any three consecutive award years is ineligible and its participation in the title IV, HEA programs ends upon the earliest of the issuance of a new Eligibility and Certification Approval Report (ECAR) that does not include that program, completion of a termination action of program eligibility, or revocation of program eligibility, if the institution is provisionally certified. Nothing in the regulations applicable to termination proceedings limits the Department in taking such action in circumstances where a GE program has failed the D/E rates measure or EP measure. Accordingly, we do not believe that any part of proposed § 668.603(b) is inconsistent with the provisions of subpart G or constitutes a misapplication of its provisions.

We agree with the commenter who noted that in taking an action to terminate the eligibility of a failing program, the Department is bound by all of the provisions of subpart G related to due process—that is, delivery of notice to the institution with an opportunity to request a hearing, as well as the opportunity to submit written materials to the designated Department official, and, finally, the institution's right to appeal the initial decision of the hearing officer to the Secretary. Section 668.91(a)(3)(vi) does, as noted by another commenter, require the hearing official to terminate the program's eligibility unless they conclude that the Secretary erred in the applicable calculation. However, we do not agree with that commenter that this provision either removes the official's discretion to make an eligibility determination based on the facts and circumstances before them or violates the institution's due process rights by requiring the Department official to terminate a

program's eligibility without the opportunity for presentation of the case before a hearing official.

Unlike with a similar action taken as the result of serious program violations, termination proceedings to end the participation of a failing GE program would be based solely on the regulatory loss of eligibility prescribed in § 668.603. Such loss of eligibility can only result from failing D/E rates or EP measures as objectively calculated using the formulas prescribed in §§ 668.403 and 668.404, respectively. Therefore, a conclusion by the hearing official that the Department erred in the applicable calculation is, appropriately, the only basis on which that individual may decline to terminate the program's participation. However, within the context of determining whether errors were made in calculating the D/E rates or EP measures, the hearing official is not constrained when considering the facts and circumstances before them. It is also not the case that these rules will mandate that the Department official terminate a program's eligibility without the opportunity for the institution to present its case before a hearing official. Under § 668.86(b)(1)(iii), the Department official must inform the institution that termination will not be effective on the date specified in the notice if the designated Department official receives from the institution by that date a request for a hearing.

Regarding the objections of some commenters that limiting the basis for any appeal to a calculation error on the part of the Department unfairly denies institutions any opportunity to present data that are potentially more accurate than the data on which the Department based its calculations, we have addressed the substance of that comment in the NPRM and we elaborate on due process concerns elsewhere in this document. Here we reiterate that, earnings data notwithstanding, the information used by the Department to calculate D/E rates is reported by institutions and presumed to be accurate. As discussed above, moreover, institutions are provided an opportunity to correct completer lists and to update or otherwise correct any reported data. Finally, we believe that the question of whether to identify programs based on the six-digit CIP, six-digit OPEID, or eight-digit OPEID is most appropriately addressed in the discussion of the definition of a GE program and not germane to a discussion of appeals. We address the substance of that suggestion elsewhere in this document.

*Changes:* None.

*Comments:* Addressing the provision in proposed § 668.405, allowing an

institution to update or otherwise correct any reported data no later than 60 days after the end of an award year, several commenters expressed confusion over and requested clarification from the Department on the required timeframe being tied to the end of an award year and suggested that the 60-day period be counted from the date the institution is provided with a completer list. An alternative offered by one commenter would bifurcate the process, giving institutions 60 days from the end of the award year to correct any self-reported data and an additional 60 days to respond to any subsequent completer list, the assumption being that the Department's intent is that any 60-day correction period would begin at a point where the institution has access to all data subject to correction. Additionally, commenters asserted that any correction opportunity should also extend to data the Department collects itself, such as Direct Loan Program loan debt, and that institutions should also have the opportunity to identify students whom the Department failed to exclude from the completer list, provided the institution has reliable evidence that the students should be excluded.

*Discussion:* We agree with the commenter who expressed confusion over the proposed timeframe for updating or otherwise correcting any reported data and suggested separating that process and corrections to the completer list. As noted by the commenter, an institution cannot review the completer list until it is received, a date which may not coincide with the end date of the academic year. Because the composition of completer lists is based on student enrollment information reported to NSLDS, we are not persuaded of the need for a process whereby an institution would identify to the Department students it (the institution) believes should be excluded from the list. Upon receipt of a completer list, the institution should correct any inaccurate enrollment data reported to NSLDS. Accordingly, we have revised § 668.405(b)(1)(iii) to allow the institution 60 days from the date the Secretary provides the list to make necessary corrections to underlying enrollment data in NSLDS. Subsequently, the Department will presume that all such data is correct and proceed with calculating D/E rates measures and EP measures. In response to the commenter who asserted that any correction opportunity should extend to data the Department collects itself (*e.g.,* Direct Loan Program loan debt), we note that median loan debt used in the D/E

calculation is derived from information the institution is required to report to the Department and provision for the correction of that data already exists in § 668.405(a).

*Changes:* Section 668.405(b)(1)(iii) is revised to allow the institution to correct underlying enrollment information reported to NSLDS about the students on the completer list no later than 60 days after the date the Secretary provides the list to the institution.

*Comments:* We received a large number of comments objecting to the Department's decision not to include an alternate earnings appeal in these rules. Several of these commenters characterized the absence of an earnings appeal as a retraction of assurances made by the Department in the 2014 Prior Rule to provide an opportunity for institutions to demonstrate that actual earnings for a failing program are higher than those on which D/E rates calculations were based. These commenters cited the 2014 Prior Rule NPRM where the Department, in addressing what was then proposed § 668.406, stated, "[w]e recognize that this process must provide an institution an adequate opportunity to present and have considered rebuttal evidence of the earnings data, and the alternate earnings appeal process provides that opportunity," and these commentators characterized the statement as evidence of a previous commitment to provide due process with respect to earnings that has been abrogated. Other commenters asserted that, inasmuch as a high potential for the underreporting of income to the IRS exists in "tipped" occupations and institutions have little or no control over whether graduates do report the portion of income derived from gratuities, it is unfair to predicate the loss of program eligibility on an incomplete earnings picture without providing an appeal based on earnings surveys such as existed in the 2014 Prior Rule. Still other commenters suggested the Department's stipulation in the preamble to the NPRM that earnings data obtained from the IRS contains "statistical noise" constitutes an admission that data are potentially flawed, further arguing the need for an earnings appeal process.

Many of the commenters writing in opposition to the lack of an earnings appeal objected to the Department's assertion (in the NPRM) that alternate earnings data for cosmetology schools filed under the previous earnings appeal (as permitted in the 2014 Prior Rule) were "implausibly high." This statement was characterized by one commenter as implying that cosmetology schools altered or manipulated earnings data obtained from surveys to ensure D/E rates passed upon appeal. A few commenters questioned the Department's position expressed in the NPRM that it is unlikely any earnings appeal process would generate a better estimate of graduates' median earnings. One of those commenters offered that whether the alternate earnings appeal process would frequently change the estimate of median earnings at issue is irrelevant to whether the Department is providing institutions with due process as required by the Constitution. Another commenter added that the Department's conclusions regarding the likely merit of such appeals are based on a single round of alternate earnings appeals in which only institutions offering GE programs participated. Yet another commenter rejected the Department's assertion that, to date, it has identified no other data source that could be expected to yield data of higher quality and reliability than the data available from the IRS, inquiring why the Department asks for flexibility in seeking a source for earnings data, why any other source would be considered, and how the availability of appeals might be affected should the Department opt for an alternate source that is more available but less reliable.

Some commenters questioned the Department's lack of confidence in the results of earnings surveys, in view of the 2014 regulations then in effect requiring an attestation from the institution's chief operating officer, as well as an examination-level attestation engagement report prepared by an independent public accountant or independent government auditor that the survey was conducted in accordance with NCES. One commenter asked whether the Department has considered that perhaps the reported Social Security Administration (SSA) earnings data might be the data set that is suspect. Two more commenters related the success their respective institutions had in mounting successful alternate earnings appeals, with one example offered where average reported income was 65.5 percent higher than reported SSA earnings. Both commenters expressed confidence that the surveys were conducted in full compliance with applicable standards and produced accurate results. Finally, two commenters disputed the notion that an appeal process creates adverse incentives for programs to encourage underreporting, inasmuch as institutions do not instruct students on how to complete their taxes. These commenters also expressed the opinion that there would be no benefit in encouraging students to underreport their income since graduates' underreporting of tip and other income will always harm an institution that is subject to the GE rule.

These commenters contended that, despite expressing serious misgivings as to the veracity of earnings surveys, the Department presented no evidence of wrongdoing or overstating of income and displayed an unwarranted bias against the appeal process. One commenter summarized the Department's arguments as largely tracking those that were rejected by the district court in *American Association of Cosmetology Schools* v. *DeVos* (*AACS*).[201] Commenters further criticized the Department's reference to the administrative burden resulting from the appeals structure under the 2014 Prior Rule, opining that easing burden on the Department is not a legitimate reason for denying institutions recourse to an earnings appeal as an essential part of ensuring due process.

Various commenters claimed that the decision of the district court in *AACS* constitutes an implied or even express mandate for the Department to offer an earnings appeal. Citing the court's conclusion regarding arbitrariness in making rebuttals of reported income data overly difficult, the commenters asserted that rather than modifying the alternate earnings appeal process to comply with the court's decision, the Department has proposed rules that ignore the court. One commenter added that the court ordered that the Department remove barriers to the appeal process in order to uphold the legality of the rule and, in doing so, signaled that it found value in the appeal process as an alternative means of measuring earnings data that was responsive to the problem but was constructed in a manner that was infeasible for certain programs to utilize the appeal.

Several of the commenters argued that the Department must, out of consideration for the district court's decision, principles of fairness, or both, restore the alternate earnings appeal contained in the 2014 Prior Rule (as modified by the court's order in *AACS*), or conduct a study of reasonable solutions for addressing the unreliability of reported earnings resulting from underreporting of tipped wages, independent employment tax treatment affecting net income, racial and gender wage discrimination, and

---

[201] 258 F. Supp. 3d 50 (D.D.C. 2017).

other factors that may have a bearing on program graduates. One commenter offered that, while the district judge in the *AACS* case found that the specific earnings appeal mechanism in the prior rule was unworkable, it might be modified to comply with the law. The commenter suggested that the Department could use an earnings appeal that required schools to submit a statistically significant number of responders to the appeal cohort as opposed to requiring a 100-percent response rate, adding that changes such as this would allow for schools to have appropriate due process rights under the GE Rule.

*Discussion:* The Department shares the commitment to using reliable earnings data for the D/E and EP metrics, as expressed by many commenters. But the Department disagrees that relatively open-ended earnings appeals are the appropriate and sensible, let alone legally required, means of achieving that goal. We reach that conclusion for several reasons, many of them recounted in the NPRM. Among them are the Department's experience with earnings appeals after the 2014 Prior Rule went into effect, and the particular features of the rules that we adopt here. With the benefit of experience, other developments since 2014, and the inclusion in these rules of various safeguards against significantly inaccurate or underestimated completer earnings, we have concluded that alternate earnings appeals of the kind the commenters suggested would be unreasonable if not arbitrary. We have likewise concluded that those appeals are not mandated by the Due Process Clause of the Fifth Amendment.

We disagree, first of all, with suggestions that the Department's 2014 Prior Rule locked in a position on appeals today. We repeat that agencies may lawfully alter positions based on nonarbitrary grounds, which we supplied in the NPRM and further address in this document. Furthermore, we observe that the commenters who referenced the preamble to the 2014 Prior Rule NPRM do not appear to support the rules on earnings appeals that were proposed and adopted in 2014. Those provisions limited alternate earnings appeals to complaints that were supported by a State-sponsored earnings database or an earnings survey conducted in accordance with certain requirements established by NCES.[202] Based on information that was available to the Department in 2014, and to adequately assure the reliability of

results and fairness to all concerned, the Department favored a controlled form of alternate earnings appeals. Some commenters refer us back to 2014 but without endorsing the rules that were adopted then, and apparently without accepting that the Department may consider developments since then. We are not persuaded by those positions.

In any event, the reasons for alternate earnings appeals do not hold as they did in 2014. We have explained the Department's position in this document and in the NPRM. Now-familiar arguments about unreported income have become less persuasive based on further review and a number of considerations including: current Federal requirements for the accurate reporting of income and increased use of electronic transactions, which makes underreporting income more difficult; the fact that IRS income data are used without adjustment for determining student and family incomes for purposes of establishing student title IV, HEA eligibility, and determining loan payments under income-driven repayment plans; the relatively low quality of past data submitted by institutions in alternate earnings appeals, including submissions after litigation over the 2014 Prior Rule, along with the problems associated with processing those appeals; and new research on unreported income. We reiterate as well that we designed the metrics to be commonsense and modest standards of enhanced earnings and affordable debt, and that a GE program will have to fail the D/E or EP metric multiple times before the program is ineligible to participate in the title IV, HEA programs. Therefore, GE programs that are ineligible based on their repeated failure to meet the metrics will not be on the margin in a substantive sense, but instead will be demonstrably unable to satisfy modest expectations with a built-in margin for error. Moreover, compared to the 2014 Prior Rule, these rules allow additional time for program completers to establish earnings—effectively increasing program-level calculated earnings far beyond any estimated effects of statistical noise in privacy-protected data, and providing further assurance that programs will not inadvertently fail the D/E rates measure or the EP measure. As a result of the Department's thorough review and in light of the particular features of these rules, we conclude that it is neither necessary nor appropriate to include a similar alternate earnings appeal process. We respect the objections offered by

commenters, but we are not persuaded to alter this position.

Regarding the argument made by some commenters that it would be unfair to determine program eligibility unless institutions may submit earnings surveys, again we refer to preamble language from the 2023 NPRM. There we explained that, to date, the Department has identified no other earnings data source that could be expected to yield higher quality and reliability than the data available to the Department from the IRS. We believe that alternative sources of earnings data such as graduate earnings surveys would be more prone to issues such as low or selective (*i.e.,* only higher earners are sampled, or are differentially likely to respond) response rates and inaccurate reporting, could more easily be manipulated to mask poor program outcomes, and would impose significant administrative burden on institutions, not only the Department. We add here that, in adopting these rules, the Department need not quantify the prevalence of self-interested or bad-faith earnings estimates. Inaccurate and unreliable earnings information in appeals is problematic whatever the explanations for its low quality. Furthermore, we lack a reasonable basis to conclude that subsets of institutions are likely to produce especially reliable or unreliable surveys on earnings. We, therefore, disagree with the commenter who suggested the Department's past experience with earnings appeals is irrelevant to evaluating rules that cover a different set of institutions compared to the 2014 Prior Rule. As to the influence of institutions on the degree of compliance exercised by their graduates with IRS reporting rules, that too is difficult to quantify with precision. But we offer our continued and logical belief that the potential influence of institutions on the ethical and lawful behavior of the students they educate is not insignificant. Regardless, we repeat that we do not believe that taxpayer-supported educational programs should effectively receive credit for earnings that their graduates fail to report.

Moreover, we have thoroughly considered the issue of statistical noise in IRS earnings data. As explained in the NPRM, we understand that the IRS would use a privacy-protective algorithm to add a small amount of statistical noise to its estimates before providing median earnings information to the Department. The Department recognizes this creates a small risk of inaccurate determinations, in both directions, including a very small likelihood that a failing program could have passed if its unadjusted median

---

[202] Formerly 34 CFR 668.406(b) through (d) (rescinded).

earnings data were used in calculating either D/E rates or the earnings premium. Using data on the distribution of noise in the IRS earnings figures used in the College Scorecard, however, we have estimated that the probability that a program could be erroneously declared ineligible (that is, fail in 2 of 3 years using adjusted data when unadjusted data would result in failure for 0 years or 1 year) is itself very small—less than 1 percent.

Assuming that such statistical noise would be introduced, the Department plans to counteract this already small risk of improper classification in several ways. First, we include a minimum n-size threshold as discussed under § 668.403 to avoid providing median earnings information for smaller cohorts, where statistical noise would have a greater impact on the earnings measure. The n-size threshold will effectively cap the influence of the noise on D/E and EP results. In addition, a program is not ineligible under the GE program accountability rules until that GE program fails the accountability measures multiple times. Furthermore, the rules will establish an earnings calculation methodology that is more generous to title IV, HEA supported programs than what the Department adopted in the 2014 Prior Rule for GE programs. The rules will measure the earnings of program completers approximately one year later (relative to when they complete their credential) than under the 2014 Prior Rule. This will yield substantially higher measured program earnings than under the Department's previous methodology—on the order of $4,000 (about 20 percent) higher for GE programs with earnings between $20,000 and $30,000, which are the programs most at risk for failing the earnings premium threshold. This will be more generous to programs under both the EP and D/E metrics because the higher measured program earnings will be used in both calculations. The increase in earnings from this later measurement of income will provide a buffer more than sufficient to counter possible error introduced by statistical noise added by the IRS. Together, these features of the rules safeguard against artificially low earnings results, and they do not suggest the need for further measures such as an earnings appeal process that would rely on survey earnings far less reliable than those provided by the IRS.

Although the Department currently prefers to rely on IRS earnings data, the rules also will allow the Department to obtain earnings data from another Federal agency if unforeseen circumstances arise. That provision of the rules will give the Department flexibility to work with another Federal agency to secure data of adequate quality and in a form that adequately protects the privacy of individual graduates. Despite suggestions by one commenter, the flexibility to use other data is no indication that the Department will use inferior data that are insufficiently accurate and reliable for purposes of these rules. We have confidence in the accuracy and reliability of all Federal agency sources under consideration. In any case, the Department's NPRM informed the public about the kind of data needed for the rules, as well as the sources from which those data might be drawn.

In response to those commenters who viewed as pejorative the Department's assertion that alternate earnings data for cosmetology schools filed under the 2014 Prior Rule were implausibly high, we intended no offense. This statement does not seek to imply that cosmetology schools altered or manipulated earnings data obtained from surveys to inflate D/E rates as to pass upon appeal. Rather, we sought to convey our misgivings over what appeared to have been an excessive amount of earnings reported by survey respondents. This may have resulted from a number of factors that are difficult to control when using such surveys. Those challenges in producing accurate and reliable survey results on completer earnings are not special to cosmetology schools.

Moreover, we disagree with some commenters' suggestions that infrequency of errors under the rules and administrative burdens from the alternatives that the commenters prefer are irrelevant to the Due Process Clause. Those assertions are incorrect. To the extent that constitutionally protected interests are even implicated when institutions seek to benefit from government support, we reiterate that due process remains a flexible concept that accounts for considerations that include a relatively low probability of significant error and the Government's interest in reducing fiscal and administrative burdens.[203] We likewise disagree that the Department's experience with alternate earnings appeals is somehow irrelevant or inadequate to provide support for these rules. Those appeals were received and analyzed over an extended period of time during which the Department compiled more than sufficient data to show that the process contained serious flaws and failed to yield adequately reliable earnings data. The Department

has no evidence to suggest that subsequent rounds of earnings appeals would have resolved the Department's misgivings about the accuracy and reliability of earnings data obtained through the use of earnings surveys, or about the various costs to all concerned in operating that process.

We also disagree with the other arguments that commenters raised for creating an earnings appeal in these rules. The 2014 Prior Rule did allow for institution-sponsored surveys that met National Center for Education Statistics (NCES) standards. However, adherence to NCES standards in this context, even when confirmed by an examination-level attestation engagement report prepared by an independent auditor, does not mitigate the potential for misreporting of earnings by program graduates participating in the earnings survey. There are inherent biases for survey respondents to inflate their earnings and little incentive for institutions to encourage accurate survey responses. Additionally, the amounts reported on such instruments cannot be substantiated in any other way than to accept at face value the information supplied by a survey respondent. The Department's reservations about the use of earnings data surveys are already addressed above and discussed at greater length in the 2023 NPRM. As for whether the SSA earnings data used under the 2014 Prior Rule were ''suspect,'' we are aware of no evidence to suggest that was the case. We do not imply that the commenters who related their own success in alternate earnings appeals under the 2014 Prior Rule were noncompliant with NCES standards. Again, however, the degree to which any earnings survey was conducted in accordance with those standards is not responsive to the Department's reservations, given experience and new evidence, about the use of earnings data obtained in that way for calculating D/E rates and the EP metric.

In response to the commenters who maintained that institutions do not instruct students on how to complete their taxes, we have not suggested that institutions regularly offer students tax advice. In addition, we have concluded that the available evidence, taken as a whole, indicates that underreporting is modest in size for graduates of GE programs and other programs that are eligible to participate in the title IV, HEA programs. We do, however, believe that adding an earnings appeal process that is aimed at capturing unreported income could encourage a culture of underreporting. The practical concern is that a significant fraction of tax-

---

[203] We further address due process in an above discussion of ''Challenges, Hearings, and Appeals.''

supported programs may produce completers who do not report substantially all of their income to the Government at the front end, but that, at the back end, those programs will remain eligible for title IV, HEA support through institution-sponsored earnings surveys in which responses are costless to program completers. And in response to the commenters who asserted that there is no direct and immediate benefit that accrues to institutions when students underreport their income, the extent to which such practices will affect institutions through GE program accountability metrics would certainly be affected by earnings appeals that allow institutions to pitch estimates of income that has not been reported to the IRS as required by law. Finally, regarding evidence of wrongdoing or overstating of income intentionally by institutions, we repeat that, in adopting these rules, the Department need not quantify the prevalence of self-interested or bad-faith earnings estimates. Inaccurate and unreliable earnings information in appeals is problematic whatever the explanations for its low quality. With respect to institution-sponsored surveys, earnings estimates are entirely reflective of whatever figures respondents choose to report, unverifiable, and subject to several biases for which there are not adequate controls. Self-reported earnings on surveys are not an appropriate substitute for substantiated earnings reported to the IRS or another Federal agency with earnings data of comparable quality. Indeed, most research into the extent of misreporting of incomes in surveys take administrative data, including that provided to the IRS or SSA using the same information reports (W2 forms and schedule SE) we rely on to measure program graduates' earnings, as the "ground truth" with which to compare survey reported earnings.[204]

The Department disagrees with the commenters who argued that the decision of the district court in *American Association of Cosmetology Schools* v. *DeVos*,[205] which addressed the 2014 Prior Rule, mandates that the Department offer an alternate earnings appeal in this final rule. There the district court rejected in part and accepted in part certain arbitrariness challenges to the 2014 Prior Rule. The court held that the Department had adequately explained why SSA earnings

data were used and without an adjustment factor for unreported income,[206] but the court also held that the Department had not justified certain limits on alternate earnings appeals. The court referred to evidence of unreported income in the 2014 rulemaking proceedings,[207] and the court examined the Department's reasoning, focusing on then-current law regarding income reporting and on the earnings appeals in the 2014 Rule. In reviewing the prior rule's limits on those appeals, the court stated that the Department had not explained its assumptions.[208] The court ultimately ordered that AACS member schools be allowed to pursue earnings appeals without meeting the numerical survey requirements in the rule.[209] The court did observe that the notice-and-comment process failed to identify better data or a better methodology for calculating earnings for program completers, but, in fashioning a remedy, the court believed that each school should be allowed to offer something better, if it existed, during an appeal.[210]

The Department followed the district court's opinion when the 2014 Prior Rule was in effect. The opportunity to submit a Notice of Intent to Appeal was re-opened and institutions were permitted to submit alternate earnings

appeals for programs with overall "zone" or fail ratings regardless of whether the 50 percent minimum response rate or 30-response minimum were met, with the Department agreeing to review the earnings appeals on a case-by-case basis. Indeed, the Department allowed these case-by-case earnings appeals for all institutions, not only AACS members. And we have taken care to examine the court's opinion again during this rulemaking. We understand the concerns expressed in the opinion, as well as the hope for a workable even if open-ended earnings appeals process, given the record evidence that was available and the reasoning in the 2014 rulemaking proceedings. We appreciate as well that the court expressed concern for administrability.[211] Of course, the district court's evaluation of the reasoning in the 2014 Prior Rule does not bind the Department in a subsequent rulemaking that considers new and different information, relies on a different set of reasons, and produces different final rules. Nonetheless, the Department has been mindful of the district court's review of the 2014 Prior Rule.

In this document and the accompanying NPRM, we have explained at length our rationale for relying on a Federal agency with earnings data as a source of reliable, verifiable, and accurate earnings information to use in the calculation of debt-to-earnings rates and the earnings premium. We have similarly explained the Department's decision not to include an alternate earnings appeal in this final rule. The Department's position here is not based on unexplained assumptions about tax law compliance or the value of certain survey response rates. Instead our conclusions are based on considerations such as new data on unreported income that indicate its modest size for the program graduates who are relevant to this rule; new laws on reported income and the increased use of electronic payments expected to further reduce underreporting; a longer earnings period in these rules that safeguards against programs failing the D/E or EP metrics in ways that concern various commenters; the use of reported income in other Department operations as well as the problematic incentives arising from crediting programs with unreported income; and the

---

[204] See for example, Bollinger, Hirsch, Hokayem & Ziliak (2019). Trouble in the Tails? What We Know about Earnings Nonresponse Thirty Years after Lillard, Smith, and Welch. *Journal of Political Economy*, 127(5).

[205] 258 F. Supp. 3d 50 (D.D.C. 2017).

[206] See *id.* at 75–76. We note here our disagreement with commentators' recommendations that the Department study the issue of unreported earnings even further, given our examination of the issue during this negotiated rulemaking process and the available research. See generally *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021) ("In the absence of additional data from commenters, the FCC made a reasonable predictive judgment based on the evidence it had."); *Am. Hosp. Ass'n* v. *Azar*, 983 F.3d 528, 539 (D.C. Cir. 2020) ("The Secretary . . . is not limited to relying only on definitive evidence. . . ."). We observe in this regard that the *AACS* district court concluded that the Department was not responsible for collecting earnings data on individual programs, *see* 258 F. Supp. 3d at 75 n.8, and the court indicated that the Department had no obligation to conduct independent studies under the applicable standard for use of data, see *id.* (quoting *Sw. Ctr. for Biological Diversity* v. *Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)). See also *Prometheus Radio*, 141 S. Ct. at 1160 ("The [Administrative Procedure Act] imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."); *District Hosp. Partners, L.P.* v. *Burwell*, 786 F.3d 46, 56, 61 (D.C. Cir. 2015) (addressing standards for agency data use, and indicating that a dataset on which an agency relies need not be perfect).

[207] Above in "Tipped Income," we address such evidence of unreported earnings along with more recent findings.

[208] See 258 F. Supp. 3d at 74 (discussing the prior rule's numerical response-rate requirements for earnings data from State-sponsored data systems and from institution-sponsored surveys).

[209] See *id.* at 76–77 (severing part of the 2014 appeals rule from the remainder of the 2014 Prior Rule, and stating that the Department "will be able to decide, on a case-by-case basis, what modicum of evidence is enough").

[210] See *id.* at 63.

[211] See *id.* at 73 ("'[T]he [Department] has discretion to sacrifice some measure of fit for the sake of administrability.'"); *id.* at 74 ("Nor did the commenters propose an alternative calculus to balance fit and administrability.").

Department's hard-earned experience in conducting open-ended appeals and processing the surveys and other information that was submitted. The Department has concluded that AACS's previous estimates of up to 60 percent unreported income in that case were far too high to be plausible, are even less indicative of actual earnings under current circumstances, and are not a reasonable basis for adding earnings appeals now.[212] That is not the quality of evidence on which the Department could rationally and fairly supersede earnings data from IRS or another Federal agency, nor should programs receive credit for such evidence of unreported earnings. Moreover, earnings appeals under the 2014 Rule were not only difficult to administer and burdensome for all involved but also, and crucially, they yielded low-value information overall. The district court in *AACS* could not have been aware of these developments when it evaluated the 2014 Prior Rule, and the Department's decision today obviously is no indication of disregard for the court. To the contrary, the Department's decisions in this final rule are importantly based on subsequent developments and insight gained from following the district court's judgment.

*Changes:* None.

**Program Application Requirements**

*Comments:* One commenter voiced concern about certain portions of the requirements under § 600.21(a)(11) to update application information for GE programs. They described the difficulty of knowing when a change is considered to occur for the 10-day requirement to begin, citing lengthy approval processes sometimes involving a State and accrediting agency in addition to institutional academic governance structures. They also voiced concern at whether even potentially minor changes, such as a one-credit change in program length, or a minor change in words in a program name, would trigger reporting requirements. They recommended extending the reporting period to 30 or 60 days, and that we clarify that we require updates only for substantive items relative to program eligibility and misrepresentation, not to minor clerical changes not fundamental to eligibility.

*Discussion:* The 10-day period for reporting changes is consistent with the 10-day period for changes to GE programs institutions are currently required to report, as well as other eligibility changes (*e.g.,* change in

institutional officials, change of address, etc.), and the Department believes that it is an appropriate reporting period. Changes to a GE program name were already reportable changes under § 600.21(a)(11)(v).

*Changes:* None.

*Comments:* One commenter sought to draw our attention to an inconsistency between the communicated intent in the preambulatory section to add a conforming change to acknowledge § 668.603 limitations on adding new programs and re-establishing programs after a loss in eligibility versus the language in proposed § 600.10(c)(1)(v), which would have required institutions to obtain Department approval before establishing or re-establishing any of these programs. They suggested repositioning that provision outside of § 600.10(c)(1) to correctly reflect the intention of a reporting requirement and not an approval requirement.

*Discussion:* The Department thanks the commenter for their observation. We agree that we are seeking to maintain the requirement to report new GE programs or changes to existing GE programs, and to add a requirement to report to the Department if a GE program is being established or re-established that would once have been ineligible to do so under § 668.403.

*Changes:* The provision was repositioned outside of § 600.10(c)(1), from § 600.10(c)(1)(v) to § 600.10(c)(3), with a slight rewording for additional clarity.

*Comments:* One commenter observed that while proposed § 668.604(c)(2) would prevent institutions from adding any new GE programs to their list of eligible programs if they are substantially similar to a failing program that became ineligible or was voluntarily discontinued, and while language in the preamble to the 2023 NPRM indicated an intent to use the same four-digit CIP prefix as under the 2014 rule, the rule as proposed did not contain a definition for "substantially similar."

*Discussion:* The Department agrees with the commenter and thanks them for bringing this to our attention. We will adopt a similar definition of "substantially similar program" using the four-digit CIP prefix as was used in the 2014 Prior Rule.

We are establishing at § 668.2 that two programs are substantially similar to one another if they share the same four-digit CIP code. Institutions may not establish a new GE program that shares the same four-digit CIP code as a program that became ineligible or was voluntarily discontinued when it was failing within the last three years. An

institution may establish a new GE program with a different four-digit CIP code that is not substantially similar to an ineligible or discontinued GE program and provide an explanation of how the new program is different when it submits the certification for the new program. We presume based on that submission that the new program is not substantially similar to the ineligible or discontinued program, but the information may be reviewed on a case-by-case basis so a new program is not substantially similar to the other program.

We believe that this revision strikes an appropriate balance between preventing institutions from closing and restarting a poorly performing program to avoid accountability and ensuring that institutions are not prevented from establishing different programs to provide training in fields where there is demand. We believe that it is appropriate to require an institution that is establishing a new program to provide a certification under § 668.604 that includes an explanation of how the new GE program is not substantially similar to each program offered by the institution that, in the prior three years, became ineligible under the regulations' accountability provisions or was voluntarily discontinued by the institution when the program was failing the D/E rates or EP measure. In the first instance, the institution will possess information on the programs in question, and the rule still will provide a safeguard in the form of an opportunity for the Department to evaluate such submissions when appropriate.

*Changes:* We have added a definition of "substantially similar program" under § 668.2.

**Miscellaneous**

*Comments:* One commenter recommended that the Department monitor the quality of education, or oversee curriculum, as the student progresses through their academic program, not just by using metrics established at the end of a program.

*Discussion:* The Department's authority in postsecondary education matters is limited to issues relating to Federal student aid, the use of Federal funds, and the specific programs administered by the Department. Further, under section 103 of the Department of Education Organization Act of 1979, the Department is generally prohibited from exercising any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of an educational institution, school, school

---

[212] For additional detail, see the discussion above in "Tipped Income."

system, or accrediting agency or association.[213] Consequently, we do not have the authority—and are expressly prohibited from regulating—postsecondary institutions' curriculum.

*Changes:* None.

*Comments:* A few commenters suggested ways to properly identify GE programs and determine the most appropriate method and period to measure earnings. Suggested approaches included institutions self-certifying the existence of adequate mechanisms already in place, provided they point to a specific State legal requirement or process that justifies the extended time period, or the Department could periodically accept submissions from reliable authorities (*e.g.,* State regulatory bodies, accreditors or occupational industry groups) regarding covered occupations, and the Department could periodically publish resulting determinations in the **Federal Register**.

*Discussion:* We appreciate these suggestions. The methods for identifying GE programs and reporting earnings data included in § 668.405 allow for consistent calculations and data across states, programs, and institutions. We believe it is critical to provide students and families access to information that is comparable and consistently calculated.

*Changes:* None.

**Other Accommodations and Special Circumstances**

*Comments:* Many commenters argued that the Department must consider economic factors such as recessions and the COVID–19 pandemic. These commenters stressed that these events led, and could again lead in the future, to widespread unemployment and depressed earnings. These commenters further stated that it would unreasonably penalize institutions to use earnings data from periods of time that many graduates, particularly in the health and beauty industry, were prohibited from or otherwise unable to work.

*Discussion:* We believe the need for the financial value transparency and GE program accountability frameworks is too urgent to postpone any of their primary components to such an extent. The first official rates published under these regulations will, for most programs, be based on students who completed a program in award years 2018 and 2019, measuring their earnings outcomes in 2021 and 2022. The impact of the COVID–19 pandemic was most pronounced in 2020, and the labor market had largely recovered by 2022,

with strong earnings growth particularly among lower income workers. While the unemployment rate for workers with some college or an associate degree overall was 6.6 percent in July of 2021, up from its rate in January of 2019 of 3.9 percent, this 2.7 percentage point difference in employment will have very little impact on median earnings—this is an additional benefit of using the median. And overall earnings growth among employed workers was very strong. By July of 2022, the unemployment rate had improved to 3.5 percent—tied for as low as it had ever been in the past 50 years.[214] On balance, then, we do not expect the median earnings of most program graduates to have been distorted by the pandemic in the relevant years such that discarding the metrics based on these years is necessary.

This assessment is bolstered by analysis of College Scorecard data. The Department does not have earnings measures for programs yet for 2021. But comparing College Scorecard earnings measures based on the year 2020—as noted above, by a large margin the year with the greatest elevation in unemployment due to the pandemic—suggests the pandemic may not have had a dramatic impact on measured earnings. Comparing 3-years earnings estimates based on earnings measured in 2018–2019 to those based on 2019–2020 (in real dollars), shows that the pandemic did not lead to systematically lower measured median earnings for all or even most programs. The middle 50 percent of programs ranged from a decline in earnings of 4.2 percent to an increase in earnings of 4.0 percent, with the median program experiencing no change in earnings across the two periods. Since the labor market had recovered considerably by 2021, we do not anticipate program earnings data based on earnings in 2021 and 2022 to be overly influenced by the pandemic for most programs.

*Changes:* None.

*Comments:* Several commenters stated that various State licensing boards were closed, behind, or backlogged by one to two years during the COVID–19 pandemic. These delays in State licensure substantially hindered job placements and earnings for graduates according to these commenters, who stated that many new graduates were not able to move forward and earn money until 2023.

*Discussion:* The Department recognizes that the COVID–19 pandemic and national emergency may have impacted data from some years included in the initial reporting period. But as noted above, available data suggest these impacts may be limited in scope even in 2020, the year when employment effects of the pandemic were most pronounced. Postponing sanctions until such time as no earnings data through 2022 is included in the D/ E rate or EP calculations would delay the benefits of the rule until at least the 2026–2027 award year. To repeat, we believe the need for the transparency and accountability measures is too urgent to postpone any of the primary components to such an extent.

*Changes:* None.

*Comments:* One commenter asked for an exception in the final rule for barbering and cosmetology schools based on the unique circumstances of those schools. Specifically, the commenter suggested that the final rule should provide for (1) a proxy amount to account for unreported earnings that would be added to Federal agency earnings data for barbering/cosmetology programs; (2) an alternate earnings appeal as in the 2014 GE Rule; and (3) an exemption for institutions with revenues of $10 million or below.

*Discussion:* As stated above, we do not believe it is appropriate to make an exception for these institutions because we believe the students at these institutions are just as deserving of protection from accumulating unaffordable debt or experiencing no earnings gains from GE programs. We discuss the issues of tipped income and earnings appeals elsewhere in this final rule. Moreover, we do not believe there is a reasoned basis for an exception based upon revenue amounts, nor why such an exception should be only applied to cosmetology schools. Commenters did not supply any persuasive bases for those suggested carveouts. We believe the GE program accountability framework should be applied to the programs that are covered by the GE provisions of the HEA, which include cosmetology programs.

*Changes:* None.

*Comments:* Another commenter requested that we not make exceptions to the GE rules for some institutions, and we do not allow for ''carve outs.'' The commenter stated that allowing institutions to offer low earnings and low ROI programs without a program information website or student acknowledgments is harmful to prospective students seeking to attend these programs and cannot be justified.

---

[213] 20 U.S.C. 3403(b).

[214] The official monthly civilian unemployment rate data can be accessed here: *https://www.bls.gov/ charts/employment-situation/civilian-unemployment-rate.htm.*

*Discussion:* We appreciate the commenter's support.

*Changes:* None.

## Financial Value Transparency and Gainful Employment (GE)

### Executive Orders 12866 and 13563 and 14094

### Regulatory Impact Analysis

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is ''significant'' and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866, as amended by Executive Order 14094, defines a ''significant regulatory action'' as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of the Office of Information and Regulatory Affairs (OIRA) for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

The Department estimates the quantified annualized economic and net budget impacts to be in excess of $200 million. Annualized transfers between institutions and the Federal Government through borrowers are estimated to be $1.2 billion at a 7 percent discount rate and $1.3 billion at a 3 percent discount rate in reduced Pell grants and loan volume. This analysis also estimates additional annualized transfers of $747 million (at a 3 percent discount rate; $732 million at 7 percent discount rate) among institutions as students shift programs and estimated annualized paperwork and compliance burden of $105.6 million (at a 3 percent discount rate; $109.5 million at a 7 percent discount rate) are also detailed in this analysis. Therefore, this final action is subject to review by OMB under section

3(f) of Executive Order 12866 (as amended by Executive Order 14094). Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as covered by 5 U.S.C. 804(2). Notwithstanding this determination, based on our assessment of the potential costs and benefits (quantitative and qualitative), we have determined that the benefits of this regulatory action will justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency ''to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.'' The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include ''identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes.''

We are issuing these final regulations to address inadequate protections for students and taxpayers in the current regulations and to implement recent changes to the HEA. In choosing among alternative regulatory approaches, we selected those approaches that

maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We have also determined that this regulatory action would not unduly interfere with State, local, territorial, and Tribal governments in the exercise of their governmental functions.

As required by OMB Circular A–4, we compare these final regulations to the current regulations. In this regulatory impact analysis, we discuss the need for regulatory action, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

### 1. Covered Rule Designation

Pursuant to Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated that this rule is covered under 5 U.S.C. 804(2) and (3).

### 2. Need for Regulatory Action

*Summary*

The title IV, HEA student financial assistance programs are a significant annual expenditure by the Federal Government. When used well, Federal student aid for postsecondary education can help boost student outcomes and economic mobility. But the Department is concerned that there are too many instances in which the financial returns of programs leave students with debt they cannot afford or with earnings that leave students no better off than similarly aged students who never pursued a postsecondary education.

The final regulations will provide stronger protections for current and prospective students of programs that typically leave graduates with high debt burdens or low earnings. Under a program-level transparency and accountability framework, the Department will assess a program's debt and earnings outcomes based on debt-to-earnings (D/E) metrics and earnings premium (EP) metrics. These regulations will require institutions to provide current and prospective students with a link to a Department website providing the debt and earnings outcomes of all programs. Students considering enrolling in all eligible programs, other than undergraduate degree programs, that have failed D/E metrics must acknowledge they have viewed the information prior to entering into an enrollment agreement with an institution. Students enrolled or considering enrollment in GE programs

failing either the EP or D/E measures will receive warnings that must be acknowledged prior to receiving title IV, HEA funds. Finally, GE programs that consistently fail to meet the performance metrics will become ineligible for title IV, HEA funds.

The regulations will, therefore, increase transparency and strengthen accountability for postsecondary institutions and programs in several critical ways. All institutions will be required to provide students a link to access information about debt and earnings outcomes. Non-GE certificate and graduate programs not meeting the D/E standards will be required to have students acknowledge viewing this information before entering enrollment agreements, and career training programs failing either the D/E or EP metrics will need to warn students about the possibility that they would lose eligibility for Federal aid. Some institutions will have to improve their offerings or lose access to Federal aid. As a result, students and taxpayers will have greater assurances that their money is spent at institutions that deliver value and merit Federal support.

The Financial Value Transparency and GE eligibility provisions in subparts Q and S of the final regulations are intended to address the problem that many programs are not delivering sufficient financial value to students and taxpayers, and students and families often lack the information on the financial consequences of attending different programs needed to make informed decisions about where to attend. These issues are especially prevalent among programs that, as a condition of eligibility for title IV, HEA program funds, are required by statute to provide training that prepares students for gainful employment in a recognized occupation. Currently, many of these programs leave the typical graduate with unaffordable levels of loan debt in relation to their income, earnings that are no greater than what they would reasonably expect to receive if they had not attended the program, or both.

Through this regulatory action, the Department establishes: (1) A Financial Value Transparency framework that will increase the quality, availability, and salience of information about the outcomes of students enrolled in all title IV, HEA programs and (2) an accountability framework for GE programs that will define what it means to prepare students for gainful employment in a recognized occupation by establishing standards by which the Department would evaluate whether a GE program remains eligible for title IV, HEA program funds. As noted in the preamble to this regulation, there are different statutory grounds for the transparency and accountability frameworks.

The transparency framework (subpart Q and § 668.43) will establish reporting and program information website requirements that will increase the transparency of student outcomes for all programs. This will provide the most accurate and comparable information possible to students, prospective students, and their families to help them make better informed decisions about where to invest their time and money in pursuit of a postsecondary degree or credential. Institutions will be required to provide information about program characteristics, outcomes, and costs and the Department will assess a program's debt and earnings outcomes based on debt-to-earnings and earnings premium metrics, using information reported by institutions and information otherwise obtained by the Department. The final rule seeks to provide salient information to students by requiring that institutions provide current and prospective students with a link to view cost, debt, and earnings outcomes of their chosen program on the Department's website. For non-GE programs (excepting undergraduate degree programs where students commonly do not apply to a particular program) failing the debt-to-earnings metrics, the Department will require an acknowledgment that the enrolled or prospective student has viewed the information. Further, the website will provide the public, taxpayers, and the Government with relevant information to help understand the outcomes of these programs receiving Federal investment.

Finally, the transparency framework will provide institutions with meaningful information that they can use to improve the outcomes for students and guide their decisions about program offerings.

The accountability framework (subpart S) defines what it means to prepare students for gainful employment by establishing standards that assess whether typical students leave programs with reasonable debt burdens and earn more than the typical worker who completed no more education than a high school diploma or equivalent. GE programs that repeatedly fail to meet these criteria will lose eligibility to participate in title IV, HEA student aid programs.

*Overview of Postsecondary Programs Supported by Title IV of the HEA*

Under subpart Q, we will, among other things, assess debt and earnings outcomes for students in all programs participating in title IV, HEA programs, including both GE programs and eligible non-GE programs. Under subpart S, we will, among other things, establish title IV, HEA eligibility requirements for GE programs. In assessing the need for these regulatory actions, the Department analyzed program performance. The Department's analysis of program performance is based on data assembled for all title IV, HEA postsecondary programs operating as of March 2022 that also had completions reported in the 2015–16 and 2016–17 award years (AY). This data, referred to as the "2022 Program Performance Data (2022 PPD)," is described in detail in the "Data Used in this RIA" section below, though we draw on it in this section to describe outcome differences across programs.

Table 2.1 reports the number of programs and average title IV, HEA enrollment for all institutions in our data for AY 2016 and 2017. Throughout this RIA, we provide analysis separately for programs that will be affected only by subpart Q and those that will additionally be affected by subpart S (GE programs).

TABLE 2.1   COMBINED NUMBER OF TITLE IV ELIGIBLE PROGRAMS AND TITLE IV ENROLLMENT BY CONTROL AND CREDENTIAL LEVEL COMBINING GE AND NON-GE

| | Number of | |
|---|---|---|
| | Programs | Enrollees |
| Public: | | |
| UG Certificates | 18,971 | 869,600 |
| Associate | 27,312 | 5,496,800 |
| Bachelor s | 24,338 | 5,800,700 |
| Post-BA Certs | 872 | 12,600 |

TABLE 2.1   COMBINED NUMBER OF TITLE IV ELIGIBLE PROGRAMS AND TITLE IV ENROLLMENT BY CONTROL AND CREDENTIAL LEVEL COMBINING GE AND NON-GE   Continued

|  | Number of | |
|---|---|---|
|  | Programs | Enrollees |
| Master s | 14,582 | 760,500 |
| Doctoral | 5,724 | 145,200 |
| Professional | 568 | 127,500 |
| Grad Certs | 1,939 | 41,900 |
| Total | 94,306 | 13,254,700 |
| Private, Nonprofit: | | |
| UG Certificates | 1,387 | 77,900 |
| Associate | 2,321 | 266,900 |
| Bachelor s | 29,752 | 2,651,300 |
| Post-BA Certs | 629 | 7,900 |
| Master s | 10,362 | 796,100 |
| Doctoral | 2,854 | 142,900 |
| Professional | 493 | 130,400 |
| Grad Certs | 1,397 | 35,700 |
| Total | 49,195 | 4,109,300 |
| Proprietary: | | |
| UG Certificates | 3,218 | 549,900 |
| Associate | 1,720 | 326,800 |
| Bachelor s | 963 | 675,800 |
| Post-BA Certs | 52 | 800 |
| Master s | 478 | 240,000 |
| Doctoral | 122 | 54,000 |
| Professional | 32 | 12,100 |
| Grad Certs | 128 | 10,800 |
| Total | 6,713 | 1,870,100 |
| Foreign Private: | | |
| UG Certificates | 28 | 100 |
| Associate | 18 | 100 |
| Bachelor s | 1,228 | 5,500 |
| Post-BA Certs | 27 | <50 |
| Master s | 3,075 | 9,000 |
| Doctoral | 793 | 2,800 |
| Professional | 104 | 1,500 |
| Grad Certs | 77 | 1,500 |
| Total | 5,350 | 20,400 |
| Foreign For-Profit: | | |
| UG Certificates | 1 | <50 |
| Master s | 6 | 200 |
| Doctoral | 4 | 1,900 |
| Professional | 7 | 11,600 |
| Total | 18 | 13,700 |
| Total: | | |
| UG Certificates | 23,605 | 1,497,500 |
| Associate | 31,371 | 6,090,700 |
| Bachelor s | 56,281 | 9,133,200 |
| Post-BA Certs | 1,580 | 21,400 |
| Master s | 28,503 | 1,805,800 |
| Doctoral | 9,497 | 346,800 |
| Professional | 1,204 | 283,100 |
| Grad Certs | 3,541 | 89,900 |
| Total | 155,582 | 19,268,200 |

**Note:** Counts are rounded to the nearest 100.

There are 123,524 degree programs at public or private nonprofit institutions (hereafter, "eligible non-GE programs" or "non-GE programs") in the 2022 PPD that will be subject to the transparency regulations in subpart Q but not the GE

regulations in subpart S.[215] These programs served approximately 16.3 million students annually who received title IV, HEA aid, totaling $25 billion in grants and $61 billion in loans. Table

2.2 displays the number of non-GE programs by two-digit CIP code, credential level, and institutional control in the 2022 PPD. Two-digit CIP codes aggregate programs by broad subject area. Table 2.3 displays enrollment of students receiving title IV, HEA program funds in non-GE programs in the same categories.

---

[215] Throughout the RIA, "not-for-profit" and "nonprofit" are used interchangeably to refer to private nonprofit institutions.

70104   Federal Register / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations

TABLE 2.2   NUMBER OF NON-GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL

| | Public | | | | | Private, Nonprofit | | | | | Foreign | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | |
| 1: Agriculture & Related Sciences | 693 | 507 | 267 | 143 | 1 | 20 | 95 | 14 | 5 | | | 10 | 27 | 6 | | 1,788 |
| 3: Natural Resources & Conservation | 260 | 433 | 219 | 114 | 2 | 10 | 445 | 67 | 8 | | | 12 | 80 | 9 | | 1,659 |
| 4: Architecture & Related Services | 91 | 216 | 224 | 43 | 6 | 4 | 102 | 117 | 13 | | | 14 | 54 | 12 | 2 | 902 |
| 5: Area, Ethnic, Cultural, Gender, & Group Studies | 84 | 366 | 128 | 58 | 2 | 3 | 413 | 58 | 25 | | | 11 | 70 | 20 | | 1,238 |
| 9: Communication | 460 | 807 | 301 | 75 | 2 | 28 | 1,221 | 216 | 20 | 1 | | 61 | 102 | 6 | | 3,300 |
| 10: Communications Tech | 312 | 63 | 9 | | | 10 | 97 | 16 | | | 1 | 6 | 7 | | | 520 |
| 11: Computer & Information Sciences & Support Services | 1,986 | 857 | 460 | 126 | 1 | 127 | 1,051 | 297 | 59 | 2 | | 36 | 59 | 11 | | 5,073 |
| 12: Personal & Culinary Services | 539 | 20 | | | | 27 | 21 | 2 | | | | | 2 | | | 611 |
| 13: Education | 975 | 1,158 | 2,204 | 641 | | 94 | 1,725 | 2,103 | 299 | 25 | 2 | 32 | 111 | 29 | | 9,438 |
| 14: Engineering | 516 | 1,556 | 1,243 | 719 | 36 | | 833 | 524 | 271 | | | 70 | 86 | 33 | 5 | 5,879 |
| 15: Engineering Tech | 2,375 | 563 | 164 | 13 | 15 | 98 | 136 | 89 | 7 | 2 | | 6 | 25 | 17 | 1 | 3,479 |
| 16: Foreign Languages | 286 | 960 | 332 | 167 | 5 | 4 | 1,148 | 102 | 93 | 1 | | 39 | 91 | 26 | 1 | 3,254 |
| 19: Family & Consumer Sciences/Human Sciences | 586 | 368 | 182 | 59 | 1 | 13 | 178 | 48 | 12 | 1 | | 6 | 24 | 1 | 1 | 1,481 |
| 22: Legal Professions & Studies | 437 | 98 | 81 | 18 | 97 | 44 | 158 | 107 | 42 | 114 | | 36 | 94 | 17 | 29 | 1,373 |
| 23: English Language | 262 | 645 | 451 | 121 | 5 | 10 | 1,063 | 208 | 57 | 2 | 1 | 57 | 130 | 57 | 3 | 3,068 |
| 24: Liberal Arts | 1,035 | 438 | 120 | 11 | 2 | 265 | 661 | 114 | 9 | 1 | | 52 | 43 | 17 | | 2,773 |
| 25: Library Science | 33 | 7 | 57 | 12 | 1 | | 2 | 16 | 2 | 1 | 1 | | 14 | 2 | | 149 |
| 26: Biological & Biomedical Sciences | 370 | 1,222 | 894 | 793 | 15 | 28 | 1,678 | 389 | 349 | 7 | | 75 | 171 | 58 | | 6,049 |
| 27: Mathematics & Statistics | 243 | 660 | 432 | 192 | 2 | 5 | 856 | 135 | 81 | 1 | | 15 | 30 | 11 | | 2,663 |
| 28: Military Science | 8 | 5 | | | | | 1 | | | | | 1 | 3 | | | 13 |
| 29: Military Tech | | 2 | 3 | | | | | 9 | | | | | 3 | | | 33 |
| 30: Multi/Interdisciplinary Studies | 440 | 716 | 372 | 115 | 6 | 33 | 1,023 | 259 | 52 | 4 | 2 | 45 | 139 | 27 | 1 | 3,234 |
| 31: Parks & Rec | 341 | 474 | 253 | 53 | 3 | 18 | 571 | 103 | 6 | | | 9 | 21 | 6 | | 1,859 |
| 32: Basic Skills & Developmental/Remedial Education | 18 | 1 | 2 | | | | 1 | | | | | | | | | 22 |
| 33: Citizenship Activities | | | 2 | | | 1 | | | | | | | | | | 3 |
| 34: Health-Related Knowledge & Skills | 4 | 2 | | | | 1 | 4 | 1 | | | | 1 | 14 | 2 | 1 | 30 |
| 35: Interpersonal & Social Skills | | | | | | | 1 | | | | | | 1 | | | 2 |
| 36: Leisure & Recreational Activities | 12 | 10 | | | | 1 | 21 | 1 | | | | 7 | 22 | 6 | | 83 |
| 37: Personal Awareness & Self-Improvement | | | | | | | 1 | | | | | | | | | 1 |
| 38: Philosophy & Religious Studies | 76 | 435 | 117 | 72 | 1 | 20 | 980 | 161 | 80 | 8 | | 17 | 43 | 26 | 1 | 2,037 |
| 39: Theology & Religious Vocations | 2 | 1 | | | 3 | 144 | 861 | 567 | 167 | 60 | 7 | 61 | 15 | 2 | | 1,890 |
| 40: Physical Sciences | 440 | 1,262 | 604 | 418 | 8 | 10 | 1,232 | 176 | 167 | | | 33 | 67 | 41 | 1 | 4,455 |
| 41: Science Technologies/Technicians | 171 | 11 | | 25 | | | 11 | | | | | | 15 | 5 | | 230 |
| 42: Psychology | 259 | 584 | 477 | 257 | | 36 | 1,053 | 424 | 189 | 13 | 7 | 61 | 127 | 34 | 3 | 3,525 |
| 43: Homeland Security | 1,253 | 392 | 195 | 10 | | 106 | 476 | 161 | 4 | 13 | 2 | 2 | 20 | 3 | 1 | 2,638 |
| 44: Public Admin & Social Services | 375 | 474 | 495 | 111 | | 40 | 509 | 254 | 45 | 4 | 6 | 6 | 73 | 7 | 2 | 2,403 |

TABLE 2.3   TITLE IV ENROLLMENT OF NON-GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL

| CIP2 Category | Public | | | | | Private, nonprofit | | | | | Foreign | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | |
| 1. Agriculture & Related Sciences | 24,100 | 65,500 | 5,300 | 1,300 | <50 | 700 | 5,200 | 200 | <50 | | | <50 | 100 | <50 | | 102,500 |
| 3. Natural Resources & Conservation | 10,200 | 50,800 | 5,300 | 1,400 | <50 | 300 | 15,700 | 2,200 | 200 | | | 100 | 100 | <50 | | 86,300 |
| 4. Architecture & Related Services | 5,300 | 24,000 | 8,400 | 500 | 300 | 100 | 7,700 | 4,300 | 100 | 100 | | <50 | 100 | <50 | <50 | 51,000 |
| 5. Area, Ethnic, Cultural, Gender, & Group Studies | 2,700 | 21,100 | 2,100 | 900 | <50 | <50 | 7,700 | 1,100 | 600 | | | <50 | 200 | <50 | | 36,500 |
| 9. Communication | 40,900 | 228,200 | 8,400 | 1,500 | <50 | 500 | 91,800 | 9,700 | 300 | <50 | | 200 | 300 | <50 | | 381,800 |
| 10. Communications Tech | 22,200 | 7,600 | 100 | | | 300 | 7,600 | 500 | | | | <50 | <50 | | | 38,400 |
| 11. Computer & Information Sciences & Support Services | 200,300 | 210,200 | 18,000 | 1,500 | 200 | 10,000 | 89,200 | 14,400 | 700 | <50 | <50 | 100 | 100 | <50 | | 544,700 |
| 12. Personal & Culinary Services | 47,900 | 1,000 | | | | 9,700 | 6,900 | 100 | | | | | <50 | | | 65,600 |
| 13. Education | 140,600 | 318,400 | 195,800 | 29,700 | 1,800 | 4,500 | 147,400 | 175,600 | 27,500 | 1,900 | 0 | 100 | 200 | 100 | <50 | 1,043,600 |
| 14. Engineering | 73,900 | 352,200 | 26,400 | 8,100 | 100 | 300 | 85,200 | 10,500 | 3,100 | | 100 | 200 | 100 | 100 | | 560,300 |
| 15. Engineering Tech | 120,400 | 61,800 | 4,700 | 200 | | 5,200 | 8,700 | 2,400 | 200 | | 200 | <50 | <50 | 0 | | 203,500 |
| 16. Foreign Languages | 14,600 | 51,800 | 3,900 | 1,800 | <50 | 100 | 20,900 | 1,000 | 700 | <50 | | 100 | 200 | <50 | | 95,100 |
| 19. Family & Consumer Sciences/Human Sciences | 83,500 | 78,700 | 5,500 | 700 | <50 | 1,900 | 18,900 | 2,500 | 100 | <50 | | <50 | 100 | <50 | | 191,800 |
| 22. Legal Professions & Studies | 33,700 | 13,200 | 2,700 | | 30,900 | 2,900 | 7,200 | 5,400 | 9,200 | 48,200 | 0 | 100 | 200 | <50 | 0 | 157,900 |
| 23. English Language | 26,500 | 110,700 | 11,200 | 3,800 | <50 | 100 | 45,800 | 8,400 | 1,000 | <50 | 100 | 200 | 300 | <50 | 100 | 208,200 |
| 24. Liberal Arts | 2,048,400 | 549,800 | 9,300 | 300 | 100 | 44,600 | 263,200 | 4,900 | 200 | <50 | 900 | 900 | 400 | 100 | <50 | 2,922,000 |
| 25. Library Science | 900 | 300 | 11,000 | 100 | 100 | | <50 | 2,000 | <50 | 100 | | <50 | 100 | 100 | <50 | 14,600 |
| 26. Biological & Biomedical Sciences | 94,700 | 419,700 | 17,400 | 11,000 | 100 | 800 | 163,100 | 11,000 | 5,100 | | 200 | 200 | 400 | 100 | | 724,000 |
| 27. Mathematics & Statistics | 21,500 | 62,500 | 6,300 | 2,200 | 200 | <50 | 24,800 | 1,400 | 500 | 200 | | <50 | <50 | | | 119,200 |
| 28. Military Science | 2,700 | <50 | <50 | <50 | <50 | | <50 | 500 | | | | <50 | <50 | <50 | 100 | 100 |
| 29. Military Tech | 500 | 500 | <50 | | | <50 | 900 | 700 | | | | <50 | <50 | | <50 | 4,800 |
| 30. Multi/Interdisciplinary Studies | 147,300 | 185,400 | 10,400 | 1,600 | <50 | 1,500 | 48,300 | 7,300 | 1,100 | <50 | <50 | 200 | 500 | 100 | <50 | 403,800 |
| 31. Parks & Rec | 43,100 | 170,200 | 12,300 | 1,000 | <50 | 1,100 | 64,300 | 7,500 | 300 | | <50 | <50 | 100 | <50 | <50 | 300,000 |
| 45. Social Sciences | 734 | 2,092 | 826 | 400 | 13 | 27 | 2,391 | 276 | 158 | 4 | 1 | 142 | 385 | 122 | 2 | 7,573 |
| 46. Construction Trades | 464 | 11 | 1 | | | 21 | 4 | | | | | | 3 | 1 | | 505 |
| 47. Mechanic & Repair Technologies/Technicians | 1,059 | 19 | | | | 41 | 8 | 2 | | | | | | | | 1,127 |
| 48. Precision Production | 433 | 2 | | | | 13 | 5 | | | | | | | | | 456 |
| 49. Transportation & Materials Moving | 114 | 57 | 7 | 1 | 8 | 10 | 35 | 5 | 2 | 1 | | | | 2 | | 234 |
| 50. Visual & Performing Arts | 1,442 | 1,746 | 637 | 144 | | 83 | 2,585 | 393 | 69 | | 2 | 128 | 225 | 54 | 1 | 7,518 |
| 51. Health Professions & Related Programs | 4,288 | 1,929 | 1,407 | 575 | 299 | 486 | 1,794 | 1,306 | 406 | 216 | 3 | 45 | 168 | 41 | 44 | 13,007 |
| 52. Business | 3,669 | 2,688 | 1,131 | 143 | 18 | 415 | 3,556 | 1,554 | 109 | 24 | 1 | 129 | 387 | 25 | 3 | 13,852 |
| 53. High School/Secondary Diplomas | 1 | 1 | | | 3 | | | 1 | | | | | | | | 5 |
| 54. History | 165 | 480 | 271 | 103 | 1 | 9 | 737 | 83 | 48 | | | 40 | 90 | 46 | 1 | 2,076 |
| 60. Residency Programs | 1 | | 4 | | | 1 | | | | | | | 6 | 2 | | 16 |

70106   Federal Register / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations

TABLE 2.3   TITLE IV ENROLLMENT OF NON-GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL—Continued

| | Public | | | | | Private, nonprofit | | | | | Foreign | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | Assoc. | Bach. | Masters | Doct. | Prof. | |
| 32: Basic Skills & Developmental/Remedial Education | 400 | <50 | 200 | | | 100 | | | | | | | | | | 600 |
| 33: Citizenship Activities | | | | | | | | | | | | | | | | <50 |
| 34: Health-Related Knowledge & Skills | 700 | 500 | | | | | 100 | | | | | | <50 | <50 | <50 | 1,400 |
| 35: Interpersonal & Social Skills | | | | | | | <50 | | | | | | | | | <50 |
| 36: Leisure & Recreational Activities | 600 | 700 | <50 | | | <50 | 700 | | | | <50 | | <50 | <50 | <50 | 2,100 |
| 37: Personal Awareness & Self-Improvement | | | | | | | | <50 | | | | | | | | <50 |
| 38: Philosophy & Religious Studies | 2,100 | 18,400 | 1,100 | 1,000 | <50 | 2,100 | 23,600 | 3,100 | 1,600 | 100 | | <50 | 100 | 100 | <50 | 53,200 |
| 39: Theology & Religious Vocations | 44,300 | <50 | 7,000 | 7,500 | <50 | 5,700 | 51,800 | 38,100 | 4,500 | 2,300 | <50 | 100 | 100 | 100 | <50 | 102,800 |
| 40: Physical Sciences | <50 | 114,300 | | <50 | | 100 | 33,700 | 1,100 | 2,500 | | | 100 | <50 | <50 | <50 | 210,700 |
| 41: Science Technologies/Technicians | 16,300 | 1,500 | 100 | <50 | 100 | 3,100 | 400 | <50 | | | | <50 | | | <50 | 18,500 |
| 42: Psychology | 81,000 | 330,000 | 24,900 | 9,700 | <50 | 12,500 | 157,300 | 49,200 | 16,100 | <50 | <50 | 300 | 300 | 100 | | 672,500 |
| 43: Homeland Security | 218,200 | 167,500 | 13,100 | 500 | | | 84,800 | 12,000 | 100 | 500 | | <50 | <50 | <50 | <50 | 508,700 |
| 44: Public Admin & Social Services | 53,800 | 100,500 | 66,200 | 2,200 | 900 | 5,500 | 49,700 | 45,500 | 1,000 | 500 | 800 | 800 | 100 | <50 | <50 | 326,100 |
| 45: Social Sciences | 82,800 | 320,200 | 15,500 | 7,400 | 200 | 300 | 125,700 | 11,900 | 2,300 | <50 | 0 | 800 | 1,700 | 300 | <50 | 569,200 |
| 46: Construction Trades | 18,300 | 1,100 | | | | 1,000 | 1,200 | | | | | | | | | 20,500 |
| 47: Mechanic & Repair Technologies/Technicians | 71,000 | 700 | <50 | <50 | | 7,700 | | <50 | | | | | <50 | | | 80,700 |
| 48: Precision Production | 23,700 | <50 | | | | 600 | 100 | | | | | | | | | 24,400 |
| 49: Transportation & Materials Moving | 6,900 | 11,900 | 300 | | | 1,300 | 9,800 | 1,400 | <50 | | | <50 | | | <50 | 31,700 |
| 50: Visual & Performing Arts | 118,600 | 215,900 | 14,300 | 3,400 | <50 | 3,000 | 137,400 | 12,800 | 1,100 | <50 | 600 | 600 | 900 | 100 | <50 | 508,200 |
| 51: Health Professions & Related Programs | 902,300 | 591,600 | 123,300 | 37,800 | 91,500 | 98,700 | 328,300 | 154,900 | 54,800 | 75,400 | 200 | 200 | 600 | 1,000 | 1,400 | 2,461,800 |
| 52: Business | 641,600 | 876,800 | 124,200 | 2,000 | 1,000 | 40,500 | 490,100 | 190,400 | 6,700 | 1,100 | 600 | 600 | 1,200 | <50 | <50 | 2,376,100 |
| 53: High School/Secondary Diplomas | <50 | 1,600 | | | <50 | | <50 | <50 | | | | | | | | 1,600 |
| 54: History | 9,000 | 63,800 | 5,900 | 2,200 | <50 | 100 | 25,700 | 2,400 | 1,000 | <50 | 100 | 100 | 300 | 100 | <50 | 110,500 |
| 60: Residency Programs | 0 | | <50 | <50 | <50 | | | <50 | | | <50 | | <50 | <50 | 0 | 100 |

**Note:** Counts rounded to the nearest 100.

GE programs are non-degree programs, including diploma and certificate programs, at public and private nonprofit institutions and educational programs at for-profit institutions of higher education regardless of program length or credential level.[216] Common GE programs provide training for occupations in fields such as cosmetology, business administration, medical assisting, dental assisting, nursing, and massage therapy. There were 32,058 GE programs in the 2022 PPD.[217] About two-thirds of these programs are at public institutions, 11 percent at private nonprofit institutions, and 21 percent at for-profit institutions. In AY 2016 or 2017, these programs annually served approximately 2.9 million students who received title IV, HEA aid. The Federal investment in students attending GE programs is significant and growing. In AY 2022, students enrolled in GE programs received approximately $5 billion in Federal Pell grant funding and approximately $11 billion in Federal student loans. Table 2.4 displays the number of GE programs grouped by two-digit CIP code, credential level, and institutional control in the 2022 PPD. Table 2.5 displays enrollment of students receiving title IV, HEA program funds in GE programs in the same categories.

---

[216] "For-profit" and "proprietary" are used interchangeably throughout this RIA. Foreign schools are schools located outside of the United States at which eligible US students can use Federal student aid.

[217] Note that the 2022 PPD will differ from the universe of programs that are subject to the final GE regulations for the reasons described in more detail in the "Data Used in this RIA" section, including that the 2022 PPD includes programs defined by four-digit CIP code while the rule defines programs by six-digit CIP code.

TABLE 2.4  NUMBER OF GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL.

| Program (CIP2) | Public | | | Private, nonprofit | | | Proprietary | | | | | | | | Foreign | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UG certs | Post-BA cert | Grad cert | UG certs | Post-BA cert | Grad cert | UG certs | Assoc. | Bach. | Post-BA cert | Masters | Doct. | Prof. | Grad cert | UG certs | Post-BA cert | Masters | Doct. | Prof. | Grad cert | |
| 1: Agriculture & Related Sciences | 375 | 4 | 3 | 7 | | 2 | 11 | 4 | 1 | 1 | | | | | | | | | | 1 | 409 |
| 3: Natural Resources & Conservation | 91 | 10 | 21 | 8 | | 2 | 2 | | 5 | 1 | 1 | | | | | | 1 | | | | 143 |
| 4: Architecture & Related Services | 29 | 10 | 10 | 4 | 1 | 8 | 1 | | 4 | | 3 | | 2 | 1 | | 1 | | | | | 74 |
| 5: Area, Ethnic, Cultural, Gender, & Group Studies | 61 | 14 | 42 | 14 | 4 | 12 | 1 | | | | | | | | 1 | | | | | 1 | 153 |
| 9: Communication | 171 | 12 | 38 | 25 | 7 | 16 | 1 | 14 | 25 | 1 | 9 | 1 | | 1 | 1 | 3 | | | | 2 | 335 |
| 10: Communications Tech | 272 | 2 | 2 | 3 | 3 | 3 | 1 | 23 | 24 | 1 | 3 | | | | 1 | | | | | | 361 |
| 11: Computer & Information Sciences & Support Services | 1,479 | 28 | 64 | 51 | 31 | 36 | 140 | 168 | 110 | 4 | 41 | 4 | | 8 | 1 | | | | | 8 | 2,162 |
| 12: Personal & Culinary Services | 788 | 2 | 2 | 34 | 134 | 406 | 900 | 79 | 11 | 4 | 6 | 3 | 4 | 7 | 2 | | | | | | 1,843 |
| 13: Education | 461 | 222 | 494 | 62 | 6 | 33 | 35 | 20 | 33 | 8 | 63 | 23 | 1 | 29 | 1 | | | | | | 1,999 |
| 14: Engineering | 98 | 31 | 62 | 10 | 4 | 4 | 4 | 5 | 10 | | 5 | | | 1 | | | | | | | 267 |
| 15: Engineering Tech | 1,453 | 5 | 21 | 34 | 4 | 3 | 84 | 71 | 21 | 1 | 4 | | | | 2 | | | | | | 1,706 |
| 16: Foreign Languages | 205 | 15 | 9 | 37 | 5 | | | | 2 | | | | | 1 | 1 | 1 | | | | | 278 |
| 19: Family & Consumer Sciences/Human Sciences | 530 | 7 | 23 | 18 | 5 | 7 | 10 | 8 | 11 | 1 | 2 | 1 | | 2 | | | | | | | 625 |
| 22: Legal Professions & Studies | 285 | 18 | 15 | 35 | 15 | 26 | 36 | 66 | 24 | 4 | 5 | 1 | 8 | | | 2 | | | | | 552 |
| 23: English Language | 79 | 18 | 35 | 18 | 5 | 6 | 11 | 5 | 11 | | 1 | 1 | | | | | | | | | 190 |
| 24: Liberal Arts | 329 | 15 | 22 | 22 | 18 | 19 | 1 | 10 | 12 | | 2 | | | | 2 | | | | | | 453 |
| 25: Library Science | 22 | | 16 | | 1 | 5 | 5 | | 1 | 1 | | | | 1 | | 1 | | | | | 52 |
| 26: Biological & Biomedical Sciences | 69 | 22 | 61 | 22 | 14 | 25 | 2 | 1 | 8 | 1 | 1 | 2 | | | 1 | 1 | 3 | | | | 234 |
| 27: Mathematics & Statistics | 18 | 12 | 26 | 10 | 2 | 3 | 1 | 1 | 2 | | | | | | | | | | | | 73 |
| 28: Military Science | | | | | | | 1 | | 1 | | | | | | | | | | | | 5 |
| 29: Military Tech | 6 | | 1 | 1 | | 3 | 1 | | 1 | | | | | 1 | | | | | | | 16 |
| 30: Multi/Interdisciplinary Studies | 156 | 51 | 105 | 26 | 23 | 36 | 5 | 4 | 14 | 2 | 6 | 6 | | 5 | 2 | | | | | | 435 |
| 31: Parks, Rec. & Leisure | 145 | 7 | 15 | 14 | 3 | 9 | 25 | 25 | 8 | | 2 | 1 | | 1 | 1 | 1 | | | | | 257 |
| 32: Basic Skills & Developmental/Remedial Education | 26 | | | 4 | | 1 | 7 | | | | | | | | | 1 | | | | | 39 |
| 33: Citizenship Activities | 1 | | | | | | | | | | | | | | | | | | | | 1 |
| 34: Health-Related Knowledge & Skills | 4 | | 3 | 1 | | 2 | 5 | 1 | | | | | | | | | | | | | 15 |
| 35: Interpersonal & Social Skills | | | | | | 1 | | 1 | | | | | | | | | | | | | 9 |
| 36: Leisure & Recreational Activities | 5 | | | | | | | | | | | | | | | | | | | | 3 |
| 37: Personal Awareness & Self-Improvement | | | 1 | 2 | | | | | | | 1 | | | | | | | | | | 64 |
| 38: Philosophy & Religious Studies | 15 | 1 | 7 | 23 | 6 | 7 | | | 3 | | | | | | | | 1 | | | | 176 |
| 39: Theology & Religious Vocations | 1 | | | 60 | 49 | 50 | | | 5 | | 7 | 1 | 1 | | | | | | | 1 | 90 |
| 40: Physical Sciences | 41 | 2 | 16 | 15 | | 5 | | 1 | 3 | | | 1 | | | 1 | | | | | | 84 |
| 41: Science Tech/Technicians | 75 | 7 | 3 | 1 | 1 | | 1 | 1 | | | | | | | | 1 | | | | | 64 |
| 42: Psychology | 38 | 23 | 74 | 19 | 20 | 59 | 1 | 2 | 14 | 2 | 19 | 15 | 1 | 7 | 1 | | | | | 3 | 296 |

App.106

*(continuation of preceding table — programs 43–60)*

| Program | Public UG certs | Total |
|---|---|---|
| 43: Homeland Security | 747 | 1,071 |
| 44: Public Admin & Social Services | 161 | 355 |
| 45: Social Sciences | 164 | 390 |
| 46: Construction Trades | 840 | 946 |
| 47: Mechanic & Repair Technologies/Technicians | 1,469 | 1,767 |
| 48: Precision Production | 751 | 833 |
| 49: Transportation & Materials Moving | 187 | 240 |
| 50: Visual & Performing Arts | 540 | 1,042 |
| 51: Health Professions & Related Programs | 4,025 | 7,543 |
| 52: Business | 2,733 | 4,396 |
| 53: High School/Secondary Diplomas | 4 | 6 |
| 54: History | 18 | 55 |
| 60: Residency Programs | 3 | 14 |

## TABLE 2.5  TITLE IV ENROLLMENT OF GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL

| Program | Public UG certs | Public Post-BA cert | Public Grad cert | Private, nonprofit UG certs | Private, nonprofit Post-BA cert | Private, nonprofit Grad cert | Proprietary UG certs | Proprietary Assoc. | Proprietary Bach. | Proprietary Post-BA cert | Proprietary Masters | Proprietary Doct. | Proprietary Prof. | Proprietary Grad cert | Foreign UG certs | Foreign Post-BA cert | Foreign Masters | Foreign Doct. | Foreign Prof. | Foreign Grad cert | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: Agriculture & Related Sciences | 5,600 | <50 | <50 | 200 | | <50 | 300 | <50 | | <50 | | | | <50 | <50 | | | | | | 6,200 |
| 3: Natural Resources & Conservation | 1,200 | <50 | <50 | 100 | | <50 | 100 | <50 | | | 400 | | | | <50 | | | | | | 6,400 |
| 4: Architecture & Related Services | 600 | <50 | <50 | <50 | <50 | <50 | <50 | | | | 200 | | | | <50 | | | | | | 1,700 |
| 5: Area, Ethnic, Cultural, Gender, & Group Studies | 800 | 100 | 300 | 100 | | 300 | <50 | | | | | | | | | | | | | | 1,500 |
| 9: Communication | 3,700 | 100 | 400 | 300 | <50 | 200 | 3,300 | 400 | 6,700 | <50 | 800 | | | <50 | <50 | | | | | | 15,800 |
| 10: Communications Tech | 4,700 | | | <50 | | | 3,200 | 2,700 | 7,300 | | | | 300 | <50 | <50 | | | | | | 18,200 |
| 11: Computer & Information Sciences & Support Services | 34,500 | 1,100 | | 1,200 | 300 | 500 | 8,900 | 20,500 | 52,500 | <50 | 6,400 | 800 | | 300 | <50 | | | | | | 127,100 |
| 12: Personal & Culinary Services | 31,000 | | | 3,200 | <50 | | 176,800 | 7,600 | 1,100 | | 200 | <50 | | 100 | <50 | | | | | | 220,100 |
| 13: Education | 16,100 | 4,500 | 16,000 | 1,700 | 2,400 | 14,100 | 800 | 6,700 | 33,500 | 100 | 37,000 | 15,800 | | 2,100 | <50 | <50 | | | | | 152,000 |
| 14: Engineering | 8,600 | 500 | 500 | 300 | <50 | 200 | <50 | 500 | 1,500 | <50 | 1,500 | 1,100 | | | <50 | | | | | | 11,900 |
| 15: Engineering Tech | 22,500 | <50 | 300 | 1,100 | <50 | <50 | 14,500 | 6,300 | 8,000 | | 1,400 | 100 | | | <50 | | | | | | 54,100 |
| 16: Foreign Languages | 4,600 | <50 | 500 | <50 | 100 | 100 | | | 300 | | | | | <50 | | | | | | | 5,400 |
| 19: Family & Consumer Sciences/Human Sciences | 22,100 | <50 | 200 | 500 | 100 | 100 | 600 | 2,100 | 4,500 | <50 | 1,000 | 300 | 1,700 | 100 | | | | | | | 31,600 |
| 22: Legal Professions & Studies | 7,100 | 500 | 400 | 900 | 800 | 800 | 1,200 | 6,700 | 2,200 | 200 | 2,200 | 200 | | | <50 | <50 | <50 | | | | 22,600 |
| 23: English Language | 3,900 | 500 | 3,000 | 1,000 | <50 | 600 | 4,300 | 700 | 200 | | 300 | <50 | | | <50 | | | | | | 15,700 |
| 24: Liberal Arts | 139,500 | 100 | 3,000 | 1,400 | 500 | 500 | 2,300 | 3,800 | | <50 | <50 | 100 | | | <50 | | | | | | 151,000 |
| 25: Library Science | 300 | | 300 | | 200 | 200 | | | <50 | | <50 | | | | | | | | | | 6,900 |
| 26: Biological & Biomedical Sciences | 2,700 | 100 | 400 | 300 | <50 | | <50 | | 2,700 | | 300 | | | | | | <50 | | | | 1,300 |
| 27: Mathematics & Statistics | 400 | 200 | 600 | 100 | | 200 | | | 400 | | | | | | | | | | | | 400 |
| 28: Military Science | | | | | | <50 | | | 100 | | | | | | | | | | | | 400 |
| 29: Military Tech | 100 | | <50 | | | 100 | <50 | 200 | 100 | | | | | | | 0 | | | | | 400 |
| 30: Multi/Interdisciplinary Studies | 14,100 | 700 | 1,600 | 500 | 500 | 500 | <50 | 3,500 | 25,000 | <50 | 1,200 | | | | <50 | | <50 | | | | 48,100 |
| 31: Parks & Rec | 4,000 | <50 | 200 | 500 | <50 | 100 | 800 | 1,600 | 5,700 | <50 | 500 | <50 | | <50 | <50 | | <50 | | | | 13,500 |
| 31: Basic Skills & Developmental/Remedial Education | 600 | | | <50 | | <50 | 100 | | | | | | | | | | | | | | 1,100 |
| 33: Citizenship Activities | <50 | | <50 | | | <50 | | | | | | <50 | | | | | | | | | <50 |
| 34: Health-Related Knowledge & Skills | 100 | | | 0 | | 0 | 100 | | | | | | | | | | | | | | 200 |
| 35: Interpersonal & Social Skills | | | | <50 | | | <50 | | | | | | | | | | | | | | 0 |
| 36: Leisure & Recreational Activities | 200 | | | | | 200 | | | | | | | | | | | | | | | 300 |
| 37: Personal Awareness & Self-Improvement | 200 | | 500 | 300 | 100 | 400 | | 200 | 300 | | | | | <50 | | | | | | | 600 |
| 38: Philosophy & Religious Studies | 200 | <50 | <50 | 2,300 | 200 | <50 | <50 | | 3,200 | <50 | 100 | 500 | | | | | | 0 | | | 1,200 |
| 39: Theology & Religious Vocations | 900 | <50 | <50 | 100 | 500 | 1,700 | | 200 | | | 900 | 300 | 300 | | | | | | | | 8,900 |
| 40: Physical Sciences | 2,200 | 200 | 1,400 | 100 | 100 | <50 | 100 | <50 | <50 | | | <50 | | <50 | | | | | | | 2,400 |
| 41: Science Technologies/Technicians | 2,700 | 300 | 600 | 400 | 100 | 300 | | 21,400 | 20,300 | <50 | 17,800 | 10,100 | | 2,200 | <50 | | | | | | 57,500 |
| 42: Psychology | 33,400 | 700 | 6,500 | 200 | 100 | 400 | 2,300 | 4,300 | 60,100 | | 7,000 | 700 | | 200 | <50 | | | | | | 50,100 |
| 43: Homeland Security | 18,000 | 400 | 3,200 | 1,800 | 100 | 200 | 8,300 | 900 | 6,100 | | 22,500 | 4,400 | | 100 | <50 | <50 | | | | | 127,500 |
| 45: Social Sciences | | | | | | | | | | | | 700 | | | | | | | | | 10,100 |
| 46: Construction Trades | | | | | | | | | | | 1,400 | | | | <50 | | | | | | 28,900 |

**70110** Federal Register / Vol. 88, No. 194 / Tuesday, October 10, 2023 / Rules and Regulations

TABLE 2.5 TITLE IV ENROLLMENT OF GE PROGRAMS BY CIP2, CREDENTIAL LEVEL, AND CONTROL—Continued

| | Public | | | Private, nonprofit | | | Proprietary | | | | | | | | Foreign | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UG certs | Post-BA cert | Grad cert | UG certs | Post-BA cert | Grad cert | UG certs | Assoc. | Bach. | Post-BA cert | Mas-ters | Doct. | Prof. | Grad cert | UG certs | Post-BA cert | Mas-ters | Doct. | Prof. | Grad cert | |
| 47: Mechanic & Repair Technologies/Technicians | 48,800 | 0 | <50 | 4,100 | | | 59,200 | 10,400 | <50 | | | | | | | | | | | | 122,600 |
| 48: Precision Production | 34,100 | | | 2,500 | | | 13,000 | 1,000 | | | | | | | | | | | | | 50,700 |
| 49: Transportation & Materials Moving | 4,900 | <50 | <50 | 700 | | <50 | 9,500 | 200 | | | <50 | | | | | | | | | | 15,300 |
| 50: Visual & Performing Arts | 15,000 | 100 | 300 | 2,100 | 200 | 400 | 2,600 | 7,700 | 29,700 | 0 | 3,100 | | <50 | <50 | <50 | <50 | | | | <50 | 61,200 |
| 51: Health Professions & Related Programs | 275,000 | 1,800 | 7,400 | 43,100 | 1,900 | 7,800 | 229,100 | 148,200 | 139,600 | <50 | 74,200 | 11,700 | 8,800 | 2,200 | <50 | <50 | 200 | 1,900 | 11,600 | 1,300 | 965,700 |
| 52: Business | 96,500 | 1,700 | 4,300 | 4,100 | 700 | 4,500 | 9,800 | 70,500 | 226,500 | 400 | 74,200 | 9,200 | 100 | 2,900 | <50 | <50 | | | | 100 | 504,300 |
| 53: High School/Secondary Diplomas | <50 | <50 | <50 | 100 | | <50 | 0 | <50 | <50 | | | | | | <50 | | | | | | 100 |
| 54: History | 400 | <50 | <50 | 100 | | 100 | 0 | 200 | 2,200 | | 900 | | | 100 | | | | | | | 3,900 |
| 60: Residency Programs | <50 | <50 | 100 | <50 | <50 | 100 | 100 | | | | | | | | | <50 | | | | <50 | 300 |

Tables 2.6 and 2.7 show the student characteristics of title IV, HEA students in non-GE and GE programs, respectively, by institutional control, predominant degree of the institution, and credential level. In all three types of institutional control, the majority of students served by the programs are female students. At public non-GE programs, out of all enrolled title IV,

HEA students: 58 percent received a Pell grant, 31 percent are 24 years or older, 36 percent are independent, and 43 percent non-white. At non-GE programs at nonprofit private institutions, 43 percent of students received a Pell Grant, 37 percent are 24 years or older, 44 percent are independent, and 43 percent are non-white. Sixty-eight percent of students in

the average public GE program ever received a Pell grant, 44 percent are 24 years or older, 50 percent are independent, and 46 percent are non-white. At for-profit GE programs, 67 percent of students received a Pell grant, 66 percent are 24 years or older, 72 percent are independent, and 59 percent are non-white.

TABLE 2.6    CHARACTERISTICS OF NON-GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL

[Enrollment-weighted]

| | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
| | | Age 24+ | Male | Pell | Non-white | Independent |
| **Public** | | | | | | |
| Less-Than 2-Year: | | | | | | |
| Associate | 5,700 | 36.4 | 37.2 | 73.8 | 41.8 | 41.7 |
| Bachelor s | 10,600 | 59.4 | 40.6 | 54.0 | 37.4 | 62.6 |
| Master s | 8,700 | 71.8 | 34.7 | 36.1 | 27.7 | 81.5 |
| 2-Year: | | | | | | |
| Associate | 5,800 | 29.6 | 37.5 | 74.1 | 49.3 | 34.8 |
| Bachelor s | 9,300 | 48.3 | 41.3 | 69.4 | 40.3 | 55.6 |
| Master s | 7,600 | 79.6 | 37.4 | 52.2 | 63.7 | 90.9 |
| Professional | 5,800 | 100.0 | 33.3 | 33.3 | ............... | 100.0 |
| 4-Year or Above: | | | | | | |
| Associate | 7,600 | 36.5 | 37.8 | 67.0 | 39.7 | 42.2 |
| Bachelor s | 16,600 | 24.0 | 43.3 | 47.3 | 39.8 | 27.0 |
| Master s | 11,900 | 60.6 | 35.9 | 32.9 | 40.2 | 72.7 |
| Doctoral | 10,400 | 69.9 | 41.4 | 28.0 | 44.1 | 84.1 |
| Professional | 7,800 | 55.7 | 48.4 | 10.8 | 37.1 | 91.7 |
| Total: | | | | | | |
| Total | 11,300 | 30.5 | 40.2 | 57.8 | 43.2 | 35.6 |
| **Private, Nonprofit** | | | | | | |
| Less-Than 2-Year: | | | | | | |
| Associate | 2,600 | 64.6 | 33.8 | 89.7 | 65.9 | 74.8 |
| Bachelor s | 9,100 | 65.8 | 37.1 | 67.0 | 62.6 | 70.0 |
| Master s | 9,200 | 52.2 | 30.7 | 37.7 | 56.3 | 61.4 |
| Doctoral | 5,500 | 24.7 | 14.6 | 32.1 | 41.2 | 58.5 |
| Professional | 4,600 | 52.0 | 54.6 | 1.9 | 39.6 | 97.1 |
| 2-Year: | | | | | | |
| Associate | 6,300 | 47.4 | 34.8 | 72.4 | 52.2 | 53.6 |
| Bachelor s | 8,300 | 60.7 | 40.7 | 68.3 | 51.4 | 64.8 |
| Master s | 9,600 | 86.5 | 34.0 | 28.9 | 69.9 | 89.2 |
| Doctoral | 9,600 | 81.3 | 26.4 | 14.6 | 62.5 | 100.0 |
| 4-Year or Above: | | | | | | |
| Associate | 6,800 | 54.9 | 34.6 | 70.2 | 49.3 | 60.5 |
| Bachelor s | 17,600 | 23.2 | 39.9 | 48.9 | 40.2 | 26.1 |
| Master s | 13,100 | 67.3 | 35.3 | 25.0 | 45.9 | 78.0 |
| Doctoral | 12,200 | 69.4 | 41.1 | 17.7 | 49.7 | 87.1 |
| Professional | 9,200 | 57.2 | 48.8 | 10.1 | 43.0 | 89.1 |
| Total: | | | | | | |
| Total | 15,400 | 37.3 | 39.0 | 43.3 | 42.6 | 43.5 |

**Note:** Average EFC values rounded to the nearest 100. Credential levels with very few programs and most table elements missing are suppressed.

TABLE 2.7    CHARACTERISTICS OF GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL

| | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
| | | Age 24+ | Male | Pell | Non-white | Independent |
| **Public** | | | | | | |
| Less-Than 2-Year: | | | | | | |
| UG Certificates | 4,500 | 45.5 | 37.5 | 76.5 | 42.4 | 53.1 |
| Post-BA Certs | 6,300 | 75.9 | 30.4 | 57.9 | ............... | 78.2 |
| Grad Certs | 8,100 | 57.1 | 16.7 | 57.5 | 32.1 | 65.2 |
| 2-Year: | | | | | | |

TABLE 2.7   CHARACTERISTICS OF GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL Continued

|  | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
|  |  | Age 24+ | Male | Pell | Non-white | Independent |
| UG Certificates ....................................... | 6,100 | 41.9 | 37.8 | 70.3 | 50.9 | 46.8 |
| Post-BA Certs ....................................... | 10,800 | 47.2 | 23.7 | 58.4 | ................ | 59.5 |
| Grad Certs ....................................... | 7,600 | 89.7 | 68.1 | 68.9 | 50.6 | 89.7 |
| 4-Year or Above: |  |  |  |  |  |  |
| UG Certificates ....................................... | 23,300 | 28.5 | 41.6 | 36.8 | 32.3 | 31.8 |
| Post-BA Certs ....................................... | 11,500 | 60.5 | 31.6 | 35.9 | ................ | 71.3 |
| Grad Certs ....................................... | 10,700 | 69.8 | 30.1 | 39.2 | 36.2 | 79.0 |
| Total: |  |  |  |  |  |  |
| Total ....................................... | 7,100 | 43.7 | 37.6 | 68.3 | 45.7 | 49.8 |
| **Private, Nonprofit** | | | | | | |
| Less-Than 2-Year: |  |  |  |  |  |  |
| UG Certificates ....................................... | 4,900 | 48.3 | 36.6 | 80.2 | 63.7 | 58.3 |
| Post-BA Certs ....................................... | 15,600 | 51.0 | 59.2 | 3.3 | ................ | 65.3 |
| Grad Certs ....................................... | 7,600 | 28.2 | 38.7 | 3.1 | 47.2 | 62.1 |
| 2-Year: |  |  |  |  |  |  |
| UG Certificates ....................................... | 3,300 | 61.0 | 21.1 | 83.2 | 56.3 | 73.8 |
| Post-BA Certs ....................................... | 10,100 | 94.8 | 28.4 | 53.7 | ................ | 94.8 |
| Grad Certs ....................................... | 26,700 | 89.5 | 10.5 | 19.3 | 100.0 | 100.0 |
| 4-Year or Above: |  |  |  |  |  |  |
| UG Certificates ....................................... | 10,500 | 37.4 | 35.8 | 66.4 | 65.8 | 42.1 |
| Post-BA Certs ....................................... | 14,200 | 60.1 | 31.8 | 36.0 | ................ | 68.5 |
| Grad Certs ....................................... | 11,500 | 70.8 | 32.8 | 29.8 | 44.5 | 80.3 |
| Total: |  |  |  |  |  |  |
| Total ....................................... | 8,300 | 55.1 | 32.3 | 60.6 | 57.3 | 64.2 |
| **Proprietary** | | | | | | |
| Less-Than 2-Year: |  |  |  |  |  |  |
| UG Certificates ....................................... | 3,900 | 45.7 | 31.5 | 82.4 | 63.0 | 56.5 |
| Associate ....................................... | 5,900 | 56.6 | 32.2 | 80.6 | 63.2 | 63.7 |
| Bachelor s ....................................... | 4,200 | 54.2 | 36.9 | 86.5 | 83.3 | 57.3 |
| Post-BA Certs ....................................... | 9,100 | 70.7 | 44.7 | 36.8 | ................ | 77.2 |
| Master s ....................................... | 9,200 | 85.4 | 26.7 | 32.2 | 62.1 | 90.4 |
| Doctoral ....................................... | 9,800 | 98.6 | 19.2 | 32.0 | 47.6 | 99.7 |
| Professional ....................................... | 14,100 | 84.7 | 19.5 | 30.5 | 54.2 | 100.0 |
| Grad Certs ....................................... | 6,200 | 64.6 | 7.7 | 63.9 | 6.6 | 67.4 |
| 2-Year: |  |  |  |  |  |  |
| UG Certificates ....................................... | 4,800 | 48.4 | 39.8 | 77.8 | 64.2 | 57.1 |
| Associate ....................................... | 5,700 | 51.8 | 33.3 | 77.8 | 60.6 | 58.1 |
| Bachelor s ....................................... | 7,900 | 61.6 | 42.7 | 70.5 | 65.0 | 67.9 |
| Post-BA Certs ....................................... | 13,400 | 86.4 | 25.0 | 39.4 | ................ | 86.4 |
| Master s ....................................... | 7,100 | 82.3 | 42.1 | 31.0 | 65.1 | 89.5 |
| Doctoral ....................................... | 0 | 0.0 | 0.0 | 100.0 | ................ | 0.0 |
| Professional ....................................... | 5,700 | 71.6 | 46.0 | 14.6 | 36.7 | 99.0 |
| Grad Certs ....................................... | 3,700 | 64.8 | 32.4 | 0.0 | 24.3 | 67.6 |
| 4-Year or Above: |  |  |  |  |  |  |
| UG Certificates ....................................... | 5,400 | 77.7 | 22.1 | 76.2 | 55.4 | 84.3 |
| Associate ....................................... | 5,400 | 75.4 | 31.9 | 76.1 | 57.2 | 82.7 |
| Bachelor s ....................................... | 9,700 | 75.2 | 40.7 | 64.2 | 54.6 | 78.8 |
| Post-BA Certs ....................................... | 7,500 | 84.6 | 28.5 | 54.7 | ................ | 92.3 |
| Master s ....................................... | 11,300 | 82.3 | 30.2 | 38.8 | 58.0 | 85.8 |
| Doctoral ....................................... | 19,800 | 92.9 | 30.0 | 25.2 | 57.9 | 95.2 |
| Professional ....................................... | 7,100 | 89.0 | 25.7 | 47.1 | 34.1 | 93.2 |
| Grad Certs ....................................... | 11,900 | 88.6 | 27.1 | 38.2 | 63.2 | 90.7 |
| Total: |  |  |  |  |  |  |
| Total ....................................... | 7,700 | 66.1 | 34.7 | 67.3 | 58.8 | 72.4 |

**Note:** EFC values rounded to the nearest 100.

*Outcome Differences Across Programs*

A large body of research provides strong evidence of the many significant benefits that postsecondary education and training confers, both private and social. Private pecuniary benefits include higher wages and lower risk of unemployment.[218] Increased educational attainment also confers private nonpecuniary benefits, such as better health, job satisfaction, and

[218] Barrow, L., & Malamud, O. (2015). Is College a Worthwhile Investment? *Annual Review of Economics,* 7(1), 519–555. Card, D. (1999). The causal effect of education on earnings. *Handbook of labor economics,* 3, 1801–1863.

overall happiness.[219] Social benefits of higher or increased number of individuals with a postsecondary education include productivity spillovers from a better educated and more flexible workforce,[220] increased civic participation,[221] and improvements in health and well-being for the next generation.[222] Improved productivity and earnings increase tax revenues from higher earnings and lower rates of reliance on social safety net programs. Even though the costs of postsecondary education have risen, there continues to be evidence that the average financial returns to graduates have also generally increased since at least the 1980s.[223]

However, there is also substantial heterogeneity in earnings and other outcomes for students who graduate from different types of institutions and programs. Table 2.8 shows the enrollment-weighted average borrowing and default by control and credential level. Mean borrowing amounts are for title IV, HEA recipients who completed their program in AY 2016 or 2017, with students who did not borrow counting as having borrowed $0. For borrowing, our measure is the average for each institutional control type and credential level combination of program average debt. For default, our measure is, among borrowers (regardless of completion status) who entered repayment in 2017,

the fraction of borrowers who have ever defaulted three years later. The cohort default rate measure follows the methodology for the official institutional cohort default rate measures calculated by the Department, except done at the program level. Though average debt tends to be higher for higher-level credential programs, default rates tend to be lower. At the undergraduate level, average debt is much lower for public programs than private nonprofit and for-profit programs and default rates are lower for public and nonprofit programs than those at for-profit institutions.

TABLE 2.8   AVERAGE DEBT AND COHORT DEFAULT RATE, BY CONTROL AND CREDENTIAL LEVEL

[Enrollment-weighted]

| | Average debt | Cohort default rate |
|---|---:|---:|
| Public: | | |
| UG Certificates | 5,759 | 16.9 |
| Associate | 5,932 | 17.4 |
| Bachelor s | 17,935 | 7.6 |
| Post-BA Certs | 7,352 | 2.3 |
| Master s | 29,222 | 2.9 |
| Doctoral | 71,102 | 2.9 |
| Professional | 124,481 | 0.8 |
| Grad Certs | 24,883 | 2.5 |
| Private, Nonprofit: | | |
| UG Certificates | 9,367 | 12.0 |
| Associate | 16,445 | 14.9 |
| Bachelor s | 20,267 | 7.3 |
| Post-BA Certs | 9,497 | 2.8 |
| Master s | 40,272 | 2.9 |
| Doctoral | 128,998 | 2.3 |
| Professional | 151,473 | 1.3 |
| Grad Certs | 40,732 | 2.4 |
| Proprietary: | | |
| UG Certificates | 8,857 | 14.2 |
| Associate | 18,766 | 15.3 |
| Bachelor s | 29,038 | 12.4 |
| Post-BA Certs | 15,790 | 16.9 |
| Master s | 39,507 | 4.1 |
| Doctoral | 99,422 | 4.4 |
| Professional | 96,836 | 0.7 |
| Grad Certs | 47,803 | 3.9 |
| Foreign Private: | | |
| UG Certificates | (*) | 0.0 |
| Associate | (*) | (*) |
| Bachelor s | 17,074 | 7.0 |
| Post-BA Certs | (*) | (*) |
| Master s | 40,432 | 2.0 |
| Doctoral | 22,600 | 3.5 |
| Professional | 247,269 | 3.1 |
| Grad Certs | 284,200 | 0.2 |
| Foreign For-Profit: | | |
| Master s | (*) | 0.0 |
| Doctoral | 84,200 | 1.4 |

[219] Oreopoulos, P., & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives*, 25(1), 159–184.

[220] Moretti, E. (2004). Workers' Education, Spillovers, and Productivity: Evidence from Plant-Level Production Functions. *American Economic Review*, 94(3), 656–690.

[221] Dee, T.S. (2004). Are There Civic Returns to Education? *Journal of Public Economics*, 88(9–10), 1697–1720.

[222] Currie, J., & Moretti, E. (2003). Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings. *The Quarterly Journal of Economics*, 118(4), 1495–1532.

[223] Avery, C. & Turner, S. (2013). Student Loans: Do College Students Borrow Too Much-Or Not Enough? *Journal of Economic Perspectives*, 26(1), 165–192. Goldin, C. & Katz, L. (2008). The Race Between Education and Technology. Harvard University Press.

TABLE 2.8   AVERAGE DEBT AND COHORT DEFAULT RATE, BY CONTROL AND CREDENTIAL LEVEL   Continued

[Enrollment-weighted]

|  | Average debt | Cohort default rate |
|---|---|---|
| Professional ........................................................................................................................................ | 280,667 | 1.3 |

* Cell suppressed because it based on a population of fewer than 30.

Table 2.9 shows median earnings (in 2019 dollars) for graduates (whether or not they borrow) along these same dimensions. Similar patterns hold for earnings, with lower earnings in proprietary programs than in public and nonprofit programs for almost all types of credential level.

TABLE 2.9   ENROLLMENT-WEIGHTED AVERAGE OF PROGRAM MEDIAN EARNINGS 3 YEARS AFTER PROGRAM COMPLETION, BY CONTROL AND CREDENTIAL LEVEL

|  | Median earnings 3 years after completion |
|---|---|
| Public: |  |
| UG Certificates ......................................................................................................................................... | 33,400 |
| Associate ................................................................................................................................................. | 34,400 |
| Bachelor s ............................................................................................................................................... | 46,100 |
| Post-BA Certs ......................................................................................................................................... | 45,600 |
| Master s .................................................................................................................................................. | 66,600 |
| Doctoral .................................................................................................................................................. | 83,500 |
| Professional ............................................................................................................................................ | 91,300 |
| Grad Certs .............................................................................................................................................. | 71,500 |
| Private, Nonprofit: |  |
| UG Certificates ......................................................................................................................................... | 26,200 |
| Associate ................................................................................................................................................. | 35,700 |
| Bachelor s ............................................................................................................................................... | 48,800 |
| Post-BA Certs ......................................................................................................................................... | 61,600 |
| Master s .................................................................................................................................................. | 68,600 |
| Doctoral .................................................................................................................................................. | 86,200 |
| Professional ............................................................................................................................................ | 88,200 |
| Grad Certs .............................................................................................................................................. | 74,800 |
| Proprietary: |  |
| UG Certificates ......................................................................................................................................... | 25,400 |
| Associate ................................................................................................................................................. | 34,600 |
| Bachelor s ............................................................................................................................................... | 45,600 |
| Post-BA Certs ......................................................................................................................................... | 43,500 |
| Master s .................................................................................................................................................. | 59,300 |
| Doctoral .................................................................................................................................................. | 78,000 |
| Professional ............................................................................................................................................ | 49,200 |
| Grad Certs .............................................................................................................................................. | 52,200 |
| Foreign Private: |  |
| UG Certificates ......................................................................................................................................... | .................. |
| Associate ................................................................................................................................................. | .................. |
| Bachelor s ............................................................................................................................................... | 8,200 |
| Post-BA Certs ......................................................................................................................................... | .................. |
| Master s .................................................................................................................................................. | 38,600 |
| Doctoral .................................................................................................................................................. | .................. |
| Professional ............................................................................................................................................ | 88,400 |
| Grad Certs .............................................................................................................................................. | 15,100 |
| Foreign For-Profit: |  |
| Master s .................................................................................................................................................. | .................. |
| Doctoral .................................................................................................................................................. | 65,900 |
| Professional ............................................................................................................................................ | 100,400 |

**Note:** Values rounded to the nearest 100.

A growing body of research, described below, shows that differences in institution and program quality are important contributors to the variation in borrowing and earnings outcomes described above. That is, differences in graduates' outcomes across programs are not fully (or primarily) explained by the characteristics of the students that attend. Differences in program quality—measured by the causal effect of attending the program on its students' outcomes—are important.[224] It is,

[224] Black, Dan A. & Smith, Jeffrey A. (2006). Estimating the Returns to College Quality with Multiple Proxies for Quality. *Journal of labor Economics* 24.3: 701–728. Cohodes, Sarah R. & Goodman, Joshua S. (2014). Merit Aid, College Quality, and College Completion: Massachusetts'

Adams Scholarship as an In-Kind Subsidy. *American Economic Journal: Applied Economics* 6.4: 251–285. Andrews, Rodney J., Li, Jing & Lovenheim, Michael F. (2016). Quantile treatment effects of college quality on earnings. *Journal of Human Resources* 51.1: 200–238. Dillon, Eleanor Wiske & Smith, Jeffrey Andrew (2020). The

therefore, important to provide students with this information and to hold programs accountable for high levels of student debt and poor earnings outcomes. Research reviewed below also shows that GE programs are the programs least likely to reliably provide an adequate return on investment, from the perspective of both the student and society. These findings imply that aggregate student outcomes—including their earnings and likelihood of positive borrowing outcomes—would be improved by limiting student enrollment in low-quality programs.

A recent study computed productivity—value-added per dollar of social investment—for 6,700 undergraduate programs across the United States.[225] In that study, productivity was measured using both private (individual earnings) and social (working in a public service job) notions of value. A main finding was that productivity varied widely even among institutions serving students of similar aptitude, especially at less selective institutions. That is, a dollar spent educating students does much more to increase lifetime earnings potential and public service at some programs than others. The author concludes that "market forces alone may be too weak to discipline productivity among these schools."

The finding of substantial variation in student outcomes across programs serving similar students or at similar types of institutions or in similar fields has been documented in many other more specific contexts. These include community colleges in California,[226] public two- and four-year programs in Texas,[227] master's degree programs in Ohio,[228] law and medical schools, and programs outside the United States.[229] Variation in institutional and program performance is a dominant feature of postsecondary education in the United States.[230]

The wide range of performance across programs and institutions means that prospective students face a daunting information problem. The questions of where to go and what to study are key life choices with major consequences. But without a way to discern the differences between programs through comparable, reliably reported measures of quality, students may ultimately have to rely on crude signals about the caliber of education a school offers.

Recent evidence demonstrates that information about colleges, delivered in a timely and relevant way, can shape students' choices. Students at one large school district were 20 percent more likely to apply to colleges that have information listed on a popular college search tool, compared with colleges whose information is not displayed on the tool. A particularly important finding of the study is that for Black, Hispanic, and low-income students, access to information about local public four-year institutions increases overall attendance at such institutions. This, the author argues, suggests "that students may have been unaware of these nearby and inexpensive options with high admissions rates." [231]

This evidence reveals both the power of information to shape student choices at critical moments in the decision process and how a patchwork of information about colleges may result in students missing out on opportunities. Given the variation in quality across programs apparent in the research evidence outlined above, these missed opportunities can be quite costly.

Unfortunately, the general availability of information does not always mean students are able to find and use it. Indeed, evidence on the initial impact of the Department's College Scorecard college comparison tool found minimal effects on students' college choices, with any possible effects concentrated among the highest achieving

students.[232] But the contrast between these two pieces of evidence, one where information affects college choices and one where it doesn't, is instructive: while students generally must seek out the College Scorecard during their college search process, the college search tool from the first study delivers information to students as they are taking other steps through the tool, from requesting transcripts and recommendation letters to submitting applications. It tailors that information to the student, providing information about where previous students from the same high school had enrolled and what their outcomes were. Accordingly, there is some basis to believe that personalized information delivered directly to students at key decision points from a credible source can have an impact.

To that end, the transparency component of these regulations attempts to improve not only the quality of information available to students (by newly collecting key facts about colleges), but also its salience, relevance, and timing. Because this information will be delivered directly to students who are reviewing financial aid packages from colleges and programs which they are considering, students would be likely to see the information and understand its credibility at a time when they are likely to find it most useful for deciding if and where to attend. Better still, the information would not be ambiguous when the message is most critical: if a school is consistently failing to put graduates on better financial footing, students are informed of that fact before they make a financial commitment.

The Department has concluded that relying on just market-disciplining role of information is not sufficient, and that regulation beyond information provision alone is warranted. This conclusion is based on evidence, reviewed below, that such regulations could reduce the risk that students and taxpayers spend money toward programs that will leave them worse off. Program performance is particularly varied and concerning among the non-degree certificate programs offered by all types of institutions, as well as at proprietary degree programs. These are the programs where the Department's concerns about quality are at their height, especially given the narrower career-focused nature of the credentials offered in this part of the system.

Consequences of Academic Match Between Students and Colleges. *Journal of Human Resources* 55.3: 767–808.

[225] Hoxby, C.M. (2019). The Productivity of US Postsecondary Institutions. In *Productivity in Higher Education*, Hoxby, C.M. & Stange, K.M. (eds). University of Chicago Press: Chicago.

[226] Carrell, S.E. & Kurlaender, M. (2019). Estimating the Productivity of Community Colleges in Paving the Road to Four-Year College Success. In *Productivity in Higher Education*, Hoxby, C.M. & Stange, K.M. (eds). University of Chicago Press: Chicago.

[227] Andrews, R.J. & Stange, K.M. (2019). Price Regulation, Price Discrimination, and Equality of Opportunity in Higher Education: Evidence from Texas. *American Economic Journal: Economic Policy*, 11.4, 31–65. Andrews, R.J., Imberman, S.A., Lovenheim, M.F. & Stange, K.M. (2022). The Returns to College Major Choice: Average and Distributional Effects, Career Trajectories, and Earnings Variability. NBER Working Paper w30331.

[228] Minaya, V., Scott-Clayton, J. & Zhou, R.Y. (2022). Heterogeneity in Labor Market Returns to Master's Degrees: Evidence from Ohio (EdWorkingPaper: 22–629). Retrieved from Annenberg Institute at Brown University: *doi.org/10.26300/akgd<5011*.

[229] Hastings, J.S., Neilson, C.A. & Zimmerman, S.D. (2013). Are Some Degrees Worth More than Others? Evidence from College Admission Cutoffs in Chile. NBER Working Paper w19241.

[230] A recent overview can be found in Lovenheim, M. & J. Smith (2023). Returns to Different Postsecondary Investments: Institution Type, Academic Programs, and Credentials. In *Handbook of the Economics of Education Volume 6*, E. Hanushek, L. Woessmann & S. Machin (eds). New Holland.

[231] Mulhern, Christine (2021). Changing College Choices with Personalized Admissions Information at Scale: Evidence on Naviance. *Journal of Labor Economics* 39.1: 219–262.

[232] Hurwitz, Michael & Smith, Jonathan (2018). Student Responsiveness to Earnings Data in the College Scorecard. *Economic Inquiry* 56.2: 1220–1243.

Certificate programs are intended to prepare students for specific vocations and have, on average, positive returns relative to not attending college at all. Yet this aggregate performance masks considerable variability: certificate program outcomes vary greatly across programs, States, fields of study, and institutions,[233] and even within the same narrow field and within the same institution.[234] Qualitative research suggests some of this outcome difference stems from factors that providers directly control, such as how they engage with industry and employers in program design and whether they incorporate opportunities for students to gain relevant workforce experience during the program.[235] Unfortunately, many of the most popular certificate programs do not result in returns on investment for students who complete the program. An analysis of programs included in the 2014 GE rule found that at 10 of the 15 certificate programs with the most graduates, graduates had typical earnings of $18,000 or less, well below what a typical high school graduate would earn.[236]

In addition to non-degree programs at all types of institutions, the final rule will subject for-profit degree programs to the transparency framework in § 668.43 and subpart Q, and the GE program-specific eligibility requirements in subpart S. This additional scrutiny, based in the requirements of the HEA, is warranted because for-profit programs have demonstrated particularly poor outcomes, as was shown in Tables 2.8 and 2.9 above. A large body of research provides causal evidence on the many ways students at for-profit colleges are at an economic disadvantage upon exiting their institutions. This research base includes studies showing that students who attend for-profit programs are significantly more likely to suffer from poor employment prospects,[237] low earnings,[238] and loan repayment difficulties.[239] Students who transfer into for-profit institutions instead of public or nonprofit institutions face significant wage penalties.[240] In some cases, researchers find similar earnings or employment outcomes between for-profit and not-for-profit associate and bachelor's degree programs.[241] However, students pay and borrow more to attend for-profit degree programs, on average.[242] The result of higher debt levels paired with lower or equivalent earnings means students attending for-profit degree programs have a worse overall return on investment. This evidence of lackluster labor market outcomes accords with the growing evidence that many for-profit programs may not be preparing students for careers as effectively as comparable programs at public institutions. A 2011 GAO report found that, for nine out of 10 licensing exams in the largest fields of study, graduates of for-profit institutions had lower passage rates than graduates of public institutions.[243] These comparatively poor outcomes may not be surprising, as many for-profit institutions devote more resources to recruiting and marketing than to instruction or student support services. A 2012 investigation by the U.S. Senate Committee on Health, Education, Labor, and Pensions (Senate HELP Committee) found that almost 23 percent of revenues at proprietary institutions were spent on marketing and recruiting but only 17 percent on instruction.[244] The report further found that at many institutions, the number of recruiters greatly outnumbered the career services and support services staff.

Particularly strong evidence comes from a recent study that found that the average undergraduate certificate-seeking student that attended a for-profit institution did not experience any earnings gains relative to the typical worker in a matched sample of high school graduates. They also had significantly lower earnings gains than students who attended certificate programs in the same field of study at public institutions.[245] Furthermore, the earnings gain for the average for-profit certificate-seeking student was not sufficient to compensate them for the amount of student debt taken on to attend the program.[246] At the same time, research also shows substantial variation in earnings gains from title IV, HEA-eligible undergraduate certificate programs by field of study,[247] with students graduating from cosmetology and personal services programs in all sectors experiencing especially poor outcomes.[248]

### Consequences of Attending Low Financial Value Programs

Attending a postsecondary education or training program where the typical student takes on debt that exceeds their capacity to repay can cause substantial harm to borrowers. For instance, high debt may cause students to delay certain milestones; research shows that high levels of debt decreases students' long-term probability of marriage.[249] Being overburdened by student loan payments can also reduce the likelihood that borrowers will invest in their future. Research shows that when students borrow more due to high tuition, they are less likely to obtain a graduate

[233] Aspen Institute (2015). *From College to Jobs: Making Sense of Labor Market Returns to Higher Education.* Washington, DC (*www.aspeninstitute.org/publications/labormarketreturns/*).

[234] Much of the research is summarized in Ositelu, M.O., McCann, C. & Laitinen, A. (2021). The Short-Term Credential Landscape. New America: Washington, DC (*www.newamerica.org/education-policy/reports/the-short-term-credentials-landscape*).

[235] Soliz, A. (2016). *Preparing America's Labor Force: Workforce Development Programs in Public Community Colleges.* Brookings: Washington, DC (*www.brookings.edu/research/preparing-americas-labor-force-workforce-development-programs-in-public-community-colleges/*).

[236] Aspen Institute (2015). *From College to Jobs: Making Sense of Labor Market Returns to Higher Education.* Washington, DC (*www.aspeninstitute.org/publications/labormarketreturns*).

[237] Deming, D.J., Yuchtman, N., Abulafi, A., Goldin, C. & Katz, L.F. (2016). The Value of Postsecondary Credentials in the Labor Market: An Experimental Study. *American Economic Review,* 106(3), 778–806.

[238] Cellini, S.R. & Chaudhary, L. (2014). The Labor Market Returns to a For-Profit College Education. *Economics of Education Review,* 43, 125–140.

[239] Armona, L., Chakrabarti, R. & Lovenheim, M.F. (2022). Student Debt and Default: The Role of For-Profit Colleges. *Journal of Financial Economics,* 144(1), 67–92.

[240] Liu, V.Y.T. & Belfield, C. (2020). The Labor Market Returns to For-Profit Higher Education: Evidence for Transfer Students. *Community College Review,* 48(2), 133–155.

[241] Lang, K. & Weinstein, R. (2013). The Wage Effects of Not-For-Profit and For-Profit Certifications: Better Data, Somewhat Different Results. *Labour Economics,* 24, 230–243.

[242] Cellini, S.R. & Darolia, R. (2015). College Costs and Financial Constraints. In Hershbein, B. & Hollenbeck, K. (ed). *Student Loans and the Dynamics of Debt* (137–174). W.E. Upjohn Institute for Employment Research: Kalamazoo, MI. Cellini, S.R. & Darolia, R. (2017). High Costs, Low Resources, and Missing Information: Explaining Student Borrowing in the For-Profit Sector. *The ANNALS of the American Academy of Political and Social Science,* 671(1), 92–112.

[243] Government Accountability Office (2011). Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools (GAO–12–143).

[244] U.S. Senate, Health, Education, Labor and Pensions Committee (July 30, 2012). For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success. Senate HELP Committee, July 30, 2012.

[245] Cellini, S.R. & Turner, N. (2019). Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students using Administrative Data. *Journal of Human Resources,* 54(2), 342–370.

[246] Id.

[247] Lang, K. & Weinstein, R. (2013). The Wage Effects of Not-For-Profit and For-Profit Certifications: Better Data, Somewhat Different Results. *Labour Economics,* 24, 230–243.

[248] Dadgar, M. & Trimble, M.J. (2015). Labor Market Returns to Sub-Baccalaureate Credentials: How Much Does a Community College Degree or Certificate Pay? *Educational Evaluation and Policy Analysis,* 37(4), 399–418.

[249] Gicheva, D. (2016). Student Loans or Marriage? A Look at the Highly Educated. *Economics of Education Review,* 53, 207–2016.

degree[250] and less likely to take out a mortgage to purchase a home after leaving college.[251]

Unmanageable debt can also have adverse financial consequences for borrowers, including default on their student loans. For those who do not complete a degree, more student debt may raise the probability of bankruptcy.[252] Borrowers who default on their loans face potentially serious repercussions. Many aspects of borrowers' lives may be affected, including their ability to sign up for utilities, obtain insurance, or rent an apartment.[253] The Department reports loans more than 90 days delinquent or in default to the major national credit bureaus, and being in default has been shown to be correlated with a 50-to-90-point drop in borrowers' credit scores.[254] A defaulted loan can remain on borrowers' credit reports for up to seven years and lead to higher costs that make insurance, housing, and other services and financial products less affordable and, in some cases, harm borrowers' ability to get a job.[255] Borrowers who default also lose access to some repayment options and flexibilities. At the same time, their full balances are accelerated and become due immediately, and borrowers become subject to involuntary collections such as administrative wage garnishment and Treasury offset which can result in the redirection of income tax refunds toward the defaulted loan.[256]

Research shows that borrowers who attend for-profit institutions have higher student loan default rates than students with similar characteristics who attend public institutions.[257] Furthermore, most of the rise in student loan default rates from 2000 to 2011 can be traced to increases in enrollment in for-profit institutions and, to a lesser extent, two-year public institutions.[258]

Low loan repayment also has consequences for taxpayers. Calculating the precise magnitude of these costs would require decades of realized repayment periods for millions of borrowers. However, Table 2.10 shows estimates of the share of disbursed loans that will not be repaid based on simulated debt and earnings trajectories at each program in the 2022 PPD under the income-driven repayment Saving on a Valuable Education (SAVE) plan announced in June 2023.[259] These estimates incorporate the subsidy coming from the features of the repayment plan itself (capped payments, forgiveness), not accounting for default or delinquency. Starting with the median earnings and debt at each program, the Department simulated typical repayment trajectories for each program with data available for both measures.

Using U.S. Census Bureau (Census) microdata on earnings and family formation for a nationally representative sample of individuals, the Department projected the likely repayment experience of borrowers at each program assuming all were enrolled in the SAVE plan (which can be found at 88 FR 43820).[260] Starting from the median earnings level of each program, the projections incorporate the estimated earnings growth over the life course through age sixty for individuals starting from the same earnings level in a given State. The projections also include likely spousal earnings, student debt, and family size of each borrower (also derived from the Census data), which makes it possible to calculate the total amount repaid by borrowers under each plan when paying in full each month (even if that means making a payment of $0). The simulation incorporates different demographic and income groups probabilistically due to important non-linearities in plan structure.

Table 2.10 shows that, among all programs, students who attend programs that fall below the debt-to-earnings standard are consistently projected to repay less on their loans, in present value terms, than they borrowed.[261] This is true regardless of whether a program is in the public, private nonprofit, or proprietary sector. The projected repayment ratio is even lower for programs that only fail the EP measure because at very low earnings levels, students are expected to make zero-dollar payments over extended periods of time.

TABLE 2.10    PREDICTED RATIO OF DOLLARS REPAID TO DOLLARS BORROWED BY CONTROL AND PASSAGE STATUS

|  | Predicted repayment ratio under SAVE |
|---|---|
| Public: |  |
|   No D/E or EP data ......................................................................................... | 0.54 |
|   Pass ............................................................................................................... | 0.72 |
|   Fail D/E (regardless of EP) ........................................................................... | 0.29 |
|   Fail EP only ................................................................................................... | 0.13 |
| Private, Nonprofit: |  |
|   No D/E or EP data ......................................................................................... | 0.69 |

[250] Chakrabarti, R., Fos, V., Liberman, A. & Yannelis, C. (2023). Tuition, Debt, and Human Capital. *The Review of Financial Studies*, 36(4), 1667–1702.

[251] Mezza, A., Ringo, D., Sherlund, S. & Sommer, K. (2020). Student Loans and Homeownership. *Journal of Labor Economics*, 38(1), 215–260.

[252] Gicheva, D. & Thompson, J. (2015). The Effects of Student Loans on Long-Term Household Financial Stability. In Hershbein, B. & Hollenbeck, K. (ed.). *Student Loans and the Dynamics of Debt* (137–174). W.E. Upjohn Institute for Employment Research: Kalamazoo, MI.

[253] Federal Student Aid. Student Loan Delinquency and Default (*studentaid.gov/manage-loans/default*).

[254] Blagg, K. (2018). Underwater on Student Debt: Understanding Consumer Credit and Student Loan Default. Urban Institute Research Report.

[255] Elliott, D. & Granetz Lowitz, R. (2018). What Is the Cost of Poor Credit? Urban Institute Report. Corbae, D., Glover, A. & Chen, D. (2013). Can Employer Credit Checks Create Poverty Traps? *2013 Meeting Papers*, No. 875, Society for Economic Dynamics.

[256] Federal Student Aid. Student Loan Delinquency and Default (*studentaid.gov/manage-loans/default*).

[257] Deming, D., Goldin, C., & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164. Hillman, N.W. (2014). College on Credit: A Multilevel Analysis of Student Loan Default. *Review of Higher Education* 37(2), 169–195.

[258] Looney, A. & Yannelis, C. (2015). A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Loan Defaults. *Brookings Papers on Economic Activity*, 2, 1–89.

[259] The White House (June 30, 2023). Fact Sheet: President Biden Announces New Actions to Provide Debt Relief and Support for Student Loan Borrowers (*www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/fact-sheet-president-biden-announces-new-actions-to-provide-debt-relief-and-support-for-student-loan-borrowers/*).

[260] These estimates of the subsidy rate are not those used in the budget and do not factor in take-up. Rather, they show the predicted subsidy rates under the assumption that all students are enrolled in SAVE.

[261] As explained in more detail later, the Department computed D/E and EP metrics only for those programs with 30 or more students who completed the program during the applicable two-year cohort period—that is, those programs that met the minimum cohort size requirements.

TABLE 2.10    PREDICTED RATIO OF DOLLARS REPAID TO DOLLARS BORROWED BY CONTROL AND PASSAGE STATUS Continued

| | Predicted repayment ratio under SAVE |
|---|---|
| Pass | 0.96 |
| Fail D/E (regardless of EP) | 0.36 |
| Fail EP only | 0.19 |
| Proprietary: | |
| No D/E or EP data | 0.43 |
| Pass | 0.80 |
| Fail D/E (regardless of EP) | 0.25 |
| Fail EP only | 0.08 |
| Total: | |
| No D/E or EP data | 0.58 |
| Pass | 0.77 |
| Fail D/E (regardless of EP) | 0.29 |
| Fail EP only | 0.12 |

Our analysis, provided in more detail in "Analysis of the Regulations," shows that for many GE programs, the typical graduate earns less than the typical worker with only a high school diploma or has debt payments that are higher than is considered manageable given typical earnings. As we show below, high rates of student loan default are especially common among GE programs that are projected to fail either the D/E rates or the earnings premium metric. Furthermore, low earnings can cause problems in aspects of a graduate's financial life beyond those related to loan repayment. In 2019, US individuals between ages 25 and 34 who had any type of postsecondary credential reported much higher rates of material hardship if their annual income was below the high school earnings threshold, with those below the threshold reporting being food insecure and behind on bills at more than double the rate of those with earnings above the threshold.[262]

In light of the low earnings, high debt, and student loan repayment difficulties for students in some GE programs, the Department has identified a risk that students may be spending their time and money and taking on Federal debt to attend programs that do not provide sufficient value to justify these costs. While even very good programs will have some students who struggle to obtain employment or repay their student loans, the metrics identify programs where the majority of students experience adverse financial outcomes upon completion.

Although enrollment in for-profit and sub-baccalaureate programs has declined following the Great Recession, past patterns suggest that future economic downturns could reverse this trend. For-profit institutions have shown to be more responsive than public and nonprofit institutions to changes in economic conditions[263] and during the COVID–19 pandemic, it was the only sector to see increases in student enrollment.[264] Additionally, research shows that reductions in State and local funding for public higher education institutions tend to shift college students into the for-profit sector.[265] During economic downturns, this response is especially relevant since State and local funding is procyclical, falling during recessions even as student demand is increasing.[266]

For-profit institutions that participate in title IV, HEA programs are also more reliant on Federal student aid than public and nonprofit institutions. In recent years, around 70 percent of revenue received by for-profit institutions came from Pell grants and

Federal student loans.[267] For-profit institutions also have substantially higher tuition than public institutions offering similar degrees. In recent years, average for-profit tuition and fees charged by two-year for-profit institutions were over 4 times the average tuition and fees charged by community colleges.[268] Research suggests that Federal student aid supports for-profit expansions and higher prices.[269] One study finds that for-profit programs in institutions that participate in title IV, HEA programs charge tuition that is approximately 80 percent higher than tuition charged by programs in the same field and with similar outcomes in nonparticipating for-profit institutions.[270]

A commonly expressed concern with past GE regulations is that if programs lose title IV, HEA aid eligibility due to the rule's sanctions this might result in a loss of education options for disadvantaged students. Past research has shown that for-profit institutions do indeed disproportionately enroll students with barriers to postsecondary access—low-income, non-white, and older students, as well as students who are veterans, single parents, or have a

[262] These findings come from ED's analysis of the 2019 Survey of Income and Program Participation. This analysis compares individuals with annual income below the 2019 U.S. National median income for individuals with a high school diploma aged 25–34 who had positive earnings or reported looking for work in the previous year, according to the Census Bureau's ACS.

[263] Deming, D., Goldin, C. & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164. Gilpin, G.A., Saunders, J. & Stoddard, C. (2015). Why Has For-Profit Colleges' Share of Higher Education Expanded So Rapidly? Estimating the Responsiveness to Labor Market Changes. *Economics of Education Review*, 45, 53–63.

[264] Cellini, S.R. (2020). The Alarming Rise in For-Profit College Enrollment. Brookings Institution: Washington, DC.

[265] Cellini, S.R. (2009). Crowded Colleges and College Crowd-Out: The Impact of Public Subsidies on the Two-Year College Market. *American Economic Journal: Economic Policy*, 1(2), 1–30. Goodman, S. & Volz, A.H. (2020). Attendance Spillovers between Public and For-Profit Colleges: Evidence from Statewide Variation in Appropriations for Higher Education. *Education Finance and Policy*, 15(3), 428–456.

[266] Ma, J. & Pender, M. (2022). *Trends in College Pricing and Student Aid 2022*. College Board: New York.

[267] Cellini, S. & Koedel, K. (2017). The Case for Limiting Federal Student Aid to For-Profit Colleges. *Journal of Policy Analysis and Management*, 36(4), 934–942.

[268] NCES (2022). Digest of Education Statistics (Table 330.10) (available at *nces.ed.gov/programs/digest/d21/tables/dt21_330.10.asp*).

[269] Cellini, S.R. (2010). Financial Aid and For-Profit Colleges: Does Aid Encourage Entry? *Journal of Policy Analysis and Management*, 29(3), 526–552. Lau, C.V. (2014). The Incidence of Federal Subsidies in For-Profit Higher Education. Unpublished manuscript. Northwestern University: Evanston, IL.

[270] Cellini, S.R. & Goldin, C. (2014). Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges. *American Economic Journal: Economic Policy*, 6(4), 174–206.

General Equivalency Degree.[271] Evidence from prior research and our analyses presented in this RIA, however, suggests that sanctioning low-performing programs would not reduce access to good quality programs.

For example, in the 1990s, sanctions related to high cohort default rates led a large number of for-profit institutions to close, significantly reducing enrollment in this sector.[272] Yet, these actions did not reduce access to higher education. Instead, a large share of students who would have attended a sanctioned for-profit institution instead enrolled in local open access public institutions and, as a result, took on less student debt and were less likely to default.[273] Similar conclusions were reached in recent studies of students who experienced program closures.[274] Better evidence is now available on the enrollment outcomes of students who would otherwise attend sanctioned or closed schools than when the 2014 GE Rule was considered. Further, as shown in the RIA section "Alternative Options Exist for Students to Enroll in High-Value Programs," most students who enroll in a GE program projected to fail the D/E rates or EP measure have better options available to them at the same or nearby institutions, and the graduates of these programs tend to have higher earnings and less debt.

**3. Summary of Comments and Changes From the NPRM**

TABLE 1  SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Provision | Regulatory section | Description of change from NPRM |
|---|---|---|
| Date, Extent, and Consequence of Eligibility. | § 600.10(c) | Repositioning § 600.10(c)(1)(v) to § 600.10(c)(3), with a slight rewording for additional clarity. |
| Definitions | § 668.2 | Updating definition of cohort period to extend the earnings measurement period for qualifying graduate programs beyond medical and dental programs. |
| | | Updating definition of earnings threshold to specifically reference Census Bureau data. |
| | | Updating definition of earnings threshold to clarify that national earnings are used if fewer than 50 percent of the students in the program come from the State where the institution is located, rather than where the students are located while enrolled. |
| | | Updating definition of Institutional Grants and Scholarships for clarity. |
| | | Adding a new definition of qualifying graduate program to establish an extended earnings measurement period for certain graduate programs beyond medical and dental programs. |
| | | Adding a new definition of substantially similar program. |
| | | Removing references to title IV loan and uses Direct Loan Program loan that is already defined. |
| Institutional and Programmatic Information and Student Acknowledgments. | §§ 668.43(d), 668.407, and 668.605. | Specifying that the program information website requirements and the acknowledgment requirements are not applicable until July 1, 2026. |
| Institutional and Programmatic Information. | § 668.43(a)(5)(v) and (d)(1). | Removing the requirement for an institution to post a list of States where a program meets or does not meet applicable State licensure requirements, in expectation that this provision will be published under a separate final rule. |
| | | Revising § 668.43(d) to refer to the Department s website as the program information website rather than the disclosure website. We have also made conforming revisions to § 668.605(c)(2) and (3) by changing the reference from disclosure website to program information website. |
| | | Revising the list of information items to include a list of the minimum elements that the Secretary must include on the program information website and an example list of supplemental information the Secretary may additionally include. |
| | | Removing the link to the College Navigator website from the list of required information items. |
| Financial Value Transparency Scope and Purpose. | § 668.401 | Adding § 668.401(b)(1) to exempt institutions located in U.S. Territories or the freely associated states from the provisions of subpart Q other than reporting requirements under § 668.408, noting that the informational requirements at § 668.43 also continue to apply. |
| | | Adding § 668.401(b)(2) to exempt from subpart Q institutions that offered no groups of substantially similar programs with 30 or more completers over the four most recently completed award years. |
| Process for Obtaining Data and Calculating D/E Rates and Earnings Premium Measure. | § 668.405(b)(1)(iii) | Revising to clarify that an institution can correct the information about the students on the completer list or provide evidence showing that a student should be included or removed from the list no later than 60 days after the date the Secretary provides the list to the institution. |
| Student Acknowledgments | § 668.407(a)(1), (b)(3), (c), and (d). | Revising to exempt undergraduate degree programs from the acknowledgment requirements. |
| | | Revising to require a student in high-debt-burden non-GE program to provide an acknowledgment before the institution enters into an agreement to enroll the student, rather than before the institution may disburse title IV, HEA funds. |
| | | Revising to clarify that the Department monitors an institution s compliance with the student acknowledgment requirements through audits, program reviews, or other investigations. |
| | | Revising to clarify that the acknowledgment requirements apply annually if the program has failing rates for the most recent year calculated, and continue to apply for three years if no new rates are calculated. |
| | | Revising to specify that the provision of an acknowledgment will not be considered dispositive evidence in any borrower defense claim. |
| Reporting Requirements | § 668.408(a) and (c) | Revising to limit the reporting requirements to institutions offering any program with at least 30 total completers during the four most recently completed award years. |
| | | Expanding the transitional reporting and rates option from non-GE programs to all programs. |

[271] Deming, D., Goldin, C. & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164. Cellini, S.R. & Darolia, R. (2015). College Costs and Financial Constraints. In Hershbein, B. & Hollenbeck, K. (ed). *Student Loans and the Dynamics of Debt* (137–174). W.E. Upjohn Institute for Employment Research: Kalamazoo, MI.

[272] Darolia, R. (2013). Integrity Versus Access? The Effect of Federal Financial Aid Availability on Postsecondary Enrollment. *Journal of Public Economics*, 106, 101–114.

[273] Cellini, S.R., Darolia, R. & Turner, L.J. (2020). Where Do Students Go When For-Profit Colleges Lose Federal Aid? *American Economic Journal: Economic Policy*, 12(2), 46–83.

[274] See Government Accountability Office (2022). College Closures: Education Should Improve Outreach to Borrowers about Loan Discharges (GAO–22–104403) (*www.gao.gov/products/gao-22-104403*). State Higher Ed. Executive Officers Ass'n (2022). More than 100,000 Students Experienced an Abrupt Campus Closure Between July 2004 and June 2020 (*sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020*).

TABLE 1    SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS    Continued

| Provision | Regulatory section | Description of change from NPRM |
|---|---|---|
| Gainful Employment Scope and Purpose. | § 668.601(b) .................... | Clarifying that the transitional reporting and rates option applies for the first six years the regulation is in effect.<br>Adding § 668.601(b)(1) to exempt institutions located U.S. Territories or the freely associated states from the provisions of subpart S.<br>Adding § 668.601(b)(2) to exempt from subpart S institutions that offered no groups of substantially similar programs with 30 or more completers over the four most recently completed award years. |
| Gainful Employment Criteria ................ | § 668.602(d) and (g) ....... | Revising to clarify that in determining a program s eligibility, the Secretary disregards any failing D/E rates and earnings premiums that were calculated more than four calculation years prior. |
| Student Warnings ................................. | § 668.605(h) .................... | Revising to specify that the provision of a warning will not be considered dispositive evidence in any borrower defense claim. |

## General

*Comments:* One commenter questioned why the Department's RIA data were less complete for nonprofit institutions than similarly provided data under the 2014 GE rules. The commenter also wondered what data motivated the extra regulation of for-profit institutions relative to nonprofit schools.

*Discussion:* The commenter did not specify how they determined that the data for nonprofit institutions were less complete in the NPRM RIA relative to the 2014 rule. Nonetheless, the Department provided the available data, subject to privacy standards as part of the NPRM. Moreover, the additional scrutiny of for-profit institutions is warranted because for-profit programs have demonstrated particularly poor outcomes. A large body of research provides causal evidence on the many ways students at for-profit institutions are economically disadvantaged upon exiting their institutions, as we described in the "Need for Regulatory Action" section above.

*Changes:* None.

*Comments:* A few commenters stated that the NPRM RIA's comparison of failure rates of public and nonprofit certificate programs to those of proprietary programs was misleading because many public and nonprofit programs are too small to have sufficient data to calculate metrics.

*Discussion:* Under the rule, only programs with sufficient data will be subject to failure. Therefore, the NPRM RIA contained an accurate description of the share of programs that fail.

*Changes:* None.

## Benefits and Costs—RIA

*Comments:* One commenter questioned whether the benefits of the regulations would exceed the costs, claiming that in the NPRM, the Department did not provide specific data and evidence about net benefits, did not consider negative impacts on students and institutions, provided an incomplete assessment of costs

associated with implementing the regulations, and did not consider the perspectives of students, institutions, and other stakeholders who would be directly affected by the regulation.

*Discussion:* The Department disagrees that the NPRM failed to consider these elements. We included extensive discussion of potential impacts on students and institutions (for example, see the "Discussion of Costs, Benefits, and Transfers" in the NPRM). The NPRM also included a robust discussion of the costs associated with implementing the regulations, including discussion of costs associated with the reporting, disclosure, and acknowledgement requirements (see the "Costs to Institutions" section of the NPRM). In addition, the NPRM was issued after a negotiated rulemaking process in which a diverse set of stakeholders participated, including representatives from accrediting agencies, civil rights organizations, consumer advocacy groups, financial aid administrators, institutions of higher education (public four-year and two-year, minority-serving, proprietary, private nonprofit), State attorneys general, and U.S. military service groups.

*Changes:* None.

## Data Used in This RIA

*Comments:* Several commenters noted that the NPRM RIA considered information that differed in certain ways from the data measurement that the Department proposed to use in the rule, including: that the RIA analyzed programs at the 4-digit CIP code level; used 2010 CIP codes; used data from earlier cohorts; used State-level earnings thresholds even in cases when more than half of a program's students are out-of-State, did not evaluate medical professional programs that have post-graduation residency requirements, and did not provide 4-year completer cohort data. Some commenters further noted that the data used to calculate D/E in the NPRM RIA did not include private education loan data or cap the loan debt

by an amount equivalent to cost of attendance less institutional grants. Some of these commenters claimed that this omission particularly harms cosmetology schools or that the NPRM RIA does not offer instructions a way to fully understand the potential impact of the regulations on their programs.

*Discussion:* We used the best available data in the NPRM RIA and in the RIA for the final rule to analyze the implications of the rule, and in these, and other comments, commenters did not suggest alternative sources of data that could be used to evaluate the rule proposed in the NPRM or in the final rule. Additionally, we described in detail the differences between data used for modeling and data used in the final rule, and when possible, included a discussion of expected differences in coverage between the NPRM RIA and the final rule. For example, the NPRM RIA estimated that for GE programs, an additional 8 percent of enrollment and 11 percent of programs would likely have metrics computed using a 4-year completer cohort but did not have metrics computed using a 2-year completer cohort. For eligible non-GE programs, the use of four-year cohort rates likely increases coverage rates of enrollment and programs by 13 and 15 percent, respectively.[275] To the extent that commenters seek perfect data that perfectly predict the effects of the rule, that is neither feasible nor the applicable legal standard. Further, institutions have ready access to data that would allow them to identify debt levels for students in their programs, and it is not unreasonable to expect institutions to have a sense of students' earnings.

*Changes:* None.

*Comments:* One commenter stated their appreciation for providing analysis of programs in 2-year cohorts, but a few commenters were concerned about the lack of information related to 4-year cohorts. A specific concern of the latter/

---

[275] See "Data Used in this RIA" and "Analysis of Data Coverage" from the NPRM.

these commenter(s) was that the RIA in the NPRM might have understated the number of programs that might be affected by the regulations.

*Discussion:* The data we used in the NPRM RIA was the best data available to analyze the implications of the rule. We included an estimate in the NPRM RIA of the share of enrollment in programs that would be covered under the four-year cohort approach (see, for example, Table 3.2 of the NPRM).

*Changes:* None.

*Comments:* One commenter claimed that they were unable to recreate or identify the source data for data used in the NPRM RIA. A few other commenters claimed that the PPD 2022 differed from other data, such as the College Scorecard or previously released data.

*Discussion:* We fulsomely documented the data used in the NPRM RIA analysis and in supplementary documentation posted on the Department's website and regulations.gov. Under the "Data Used in this RIA" section of the NPRM, the RIA explains that the data used non-public records contained in Department administrative systems, earnings data produced by the U.S. Treasury, and data from the Integrated Postsecondary Education Data System (IPEDS), Postsecondary Education Participants System (PEPS), and the College Scorecard, and further explained, in the following pages, how we constructed each data field. Further, the Data Codebook and Description provide detailed descriptions of the exact source of each variable and differences from previously released data.[276]

*Changes:* None.

*Comments:* One commenter indicated that the 2022 PPD data released along with the NPRM does not match with their college's internal data. The commenter further conducted a survey of some graduates in one their programs and among respondents, found higher median earnings than was included in the PPD. Further, the commenter claimed that the 2022 PPD included more completers than the college's internal data and had a different number of bachelor's programs.

*Discussion:* The Department used administrative IRS data from tax filings, which we believe to be the most accurate source of data on student earnings available. While graduate surveys can provide useful information about student outcomes, such data can be subject to response bias (and that is

possible in this case where only a portion of borrowers volunteered self-reported earnings information). Related to accuracy of completers and programs, the rule allows institutions to review and correct completer lists to review for and promote accuracy (see § 668.405).

*Changes:* None.

*Comments:* Two commenters asserted, for different reasons, that the PPD was in some way flawed. One commenter noted that only a fraction of the programs in the PPD file include data, and that this is too small a fraction of programs nationwide to analyze and use for the basis of a rule.

The other commenter noted that the PPD file contains fewer programs than the equivalent College Scorecard program file, even though they measure the same cohort. The same commenter opined that the PPD was not a valid source of data, because for programs that exist in both data sources, the earnings data are substantially different.

*Discussion:* The Department understands that not all programs include data that can be analyzed for the purposes of the final rule. However, we believe that the degree to which student enrollment concentrates in larger programs mitigates the concerns noted by the commenter. The number of students who enroll in programs large enough to produce data is the more relevant measure of the rule's effectiveness, in our opinion. As shown in the RIA, we estimate that the majority of enrolled students, approximately 83 percent, are enrolled in programs that would be covered by existing data.

The Department is aware of the differences in how the PPD and the College Scorecard universes of programs and data are constructed. As noted in the rule and in the RIA, the coverage of programs is different, and the two datasets should not be expected to be the same. A primary reason why the PPD has fewer programs is that the sample frame is different: the PPD is limited to programs with completers in the 2015–2017 academic years and who are currently in operation based on the Postsecondary Education Participation System (PEPS) data as of March 25, 2022.

The methodology for calculating median debt in the two data sources because in the College Scorecard, median debt is measured only among borrowers, whereas in the PPD programs that have completers who graduate with debt have those students' lack of debt factored into their median debt amounts.

The Department disputes the fact that the earnings measures differ substantially between the College

Scorecard and the PPD. The same data file forms the basis of both the Scorecard and the PPD earnings measures for 3-year earnings among students who are not enrolled. It is worth noting that the not-enrolled population that forms the basis of the 3-year program-level measure in the Scorecard is a different sample of students than the 1- and 4-year measures at the program level, which are calculated only for the working and not-enrolled population of students from each program. This may explain any confusion commenters have about comparability of measures, as commenters noted inconsistency across earnings horizons (arguing that the data showed an implausible jump from the three- to four-year measurement period. This disparity results from different measurement populations and is not a sign of mismeasurement. When examining program earnings for the same cohorts and measurement periods for the programs present in both samples, they differ only by a small inflation adjustment that serves to construct the GE measures properly to best approximate the true structure of the rule when implemented. For reasons explained in the NPRM, median debt in the rule (and hence the PPD) is based on all graduates regardless of whether they borrow. Similarly, median earnings are measured using all graduates regardless of whether they are employed.

*Changes:* None.

## 4. Analysis of the Financial Value Transparency and GE Regulations

This section presents a detailed analysis of the likely consequences of the Financial Value Transparency and GE provisions of the final regulations.

*Methodology*

Data Used in This RIA

This section describes the data referenced in this regulatory impact analysis. To generate information on the performance of different postsecondary programs offered in different higher education sectors, the Department relied on data on the program enrollment, demographic characteristics, borrowing levels, post-completion earnings, and borrower outcomes of students who received title IV, HEA aid for their studies. The Department produced program performance information, using measures based on the typical debt levels and post-enrollment earnings of program completers, from non-public records contained in the administrative systems the Department uses to administer the title IV, HEA programs along with earnings data produced by

---

[276] See *www2.ed.gov/policy/highered/reg/hearulemaking/2021/nprm-2022ppd-description.pdf* and *www2.ed.gov/policy/highered/reg/hearulemaking/2021/nprm-2022ppd-codebook.xlsx.*

the U.S. Treasury. This performance information was supplemented with information from publicly available sources including the Integrated Postsecondary Education Data System (IPEDS), Postsecondary Education Participants System (PEPS), and the College Scorecard. The data used for the State earnings thresholds come from the Census Bureau's 2019 ACS, while statistics about the price level used to adjust for inflation come from the Bureau of Labor Statistics' Consumer Price Index. This section describes the data used to produce this program performance information and notes several differences from the measures used for this purpose and the D/E rates and earning premium measures set forth in the rule, as well as differences from the data disseminated during negotiated rulemaking. The data described below are referred to as the ''2022 Program Performance Data (2022 PPD),'' where 2022 refers to the year the programs were indicated as active. The data are unchanged from that used in the NPRM RIA, and those data were released with the NPRM.[277]

The final rule relies on non-public measures of the cumulative borrowing and post-completion earnings of federally aided title IV, HEA students, including both grant and loan recipients. The Department has information on all title IV, HEA grant and loan recipients at all institutions participating in the title IV, HEA programs, including the identity of the specific programs in which students are enrolled and whether students complete the program. This information is stored in the National Student Loan Data System (NSLDS), maintained by the Department's Office of Federal Student Aid (FSA).

Using this enrollment and completion information, in conjunction with non-public student loan information also stored in NSLDS, and earnings information obtained from Treasury, the Department calculated annual and discretionary debt-to-earnings (D/E) ratios, or rates, for all title IV, HEA programs. The Department also calculated the median earnings of high school graduates aged 25 to 34 in the labor force in the State where the program is located using public data, which is referred to as the Earnings Threshold (ET). This ET is compared to a program's graduates' annual earnings to determine the Earnings Premium (EP), the extent to which a programs' graduates earn more than the typical high school graduate in the same State. The methodology that was used to calculate D/E rates, the ET, and the EP is described in further detail below. In addition to the D/E rates and earnings data, we also calculated informational outcome measures, including program-level cohort default rates, to evaluate the likely consequences of the final rule.

In our analysis, we identify a program by a unique combination consisting of the first six digits of its institution's Office of Postsecondary Education Identification (OPEID) number, also referred to as the six-digit OPEID, the program's 2010 Classification of Instructional Programs (CIP) code, and the program's credential level. The terms OPEID number, CIP code, and credential level are defined below. Throughout, we distinguish ''GE Programs'' from those that are not subject to the GE provisions of the final rule, referred to as ''non-GE Programs.'' The 2022 PPD includes information for 155,582 programs that account for more than 19 million title IV, HEA enrollments annually in award years 2016 and 2017. This includes 2,931,000 enrollments in 32,058 GE Programs (certificate programs at all institution types, and degree programs at proprietary institutions) and 16,337,000 enrollments in 123,524 non-GE Programs (degree programs at public and private not-for-profit institutions).

We calculated the performance measures in the 2022 PPD for all programs based on the debt and earnings of the cohort of students who both received title IV, HEA program funds, including Federal student loans and Pell grants, and completed programs during an applicable two-year cohort period. Consistent with the final rule, students who do not complete their program are not included in the calculation of the metrics. The annual loan payment component of the debt-to-earnings formulas for the 2022 PPD D/

E rates was calculated for each program using student loan information from NSLDS for students who completed their program in award years 2016 or 2017 (*i.e.,* between July 1, 2015, and June 30, 2017—we refer to this group as the 16/17 completer cohort). The earnings components of the rates were calculated for each program using information obtained from Treasury for students who completed between July 1, 2014, and June 30, 2016 (the 15/16 completer cohort), whose earnings were measured in calendar years 2018 and 2019.

Programs were excluded from the 2022 PPD if they were operated by an institution that was not currently active in the Department's PEPS system as of March 25, 2022, if the program did not have a valid credential type, or if the program did not have title IV, HEA completers in both the 15/16 and 16/17 completer cohorts.

Consistent with the regulations, the Department computed D/E and EP metrics in the 2022 PPD only for non-exempted programs with 30 or more students who completed the program during the applicable two-year cohort period—that is, those programs that met the minimum cohort size requirements. A detailed analysis of the likely coverage rate under the rule and of the number and characteristics of programs that met the minimum size in the 2022 PPD is included in ''Analysis of Data Coverage'' below.

We determined, under the provisions in the final regulations for the D/E rates and EP measures, whether each program would ''Pass D/E,'' ''Fail D/E,'' ''Pass EP,'' and ''Fail EP'' based on its 2022 PPD results, or ''No data'' if it did not meet the cohort size requirement, was located in Puerto Rico, U.S. Territories and freely associated states, or was a program for which we do not have data because the program has post-graduation residency requirements such that it is evaluated based on a longer earnings periods.[278] These program-specific outcomes are then aggregated to determine the fraction of programs that pass or fail either metric or have insufficient data, as well as the enrollment in such programs.

• *Pass D/E:* Programs with an annual D/E earnings rate less than or equal to 8 percent *OR* a discretionary D/E earnings rate less than or equal to 20 percent.

[277] To protect student privacy, we applied certain protocols to the publicly released 2022 PPD and therefore that dataset differs somewhat from the 2022 PPD analyzed in this RIA. Such protocols include omitting the values of variables derived from fewer than 30 students. For instance, the title IV enrollment in programs with fewer than 30 students is used to determine the number and share of enrollment in GE programs in this RIA, while the exact program-level enrollment of such programs is omitted in the public 2022 PPD. The privacy protocols are described in the data documentation accompanying the NPRM. The Department would not have reached different conclusions on the impact of the regulation or on the proposed rules if we had instead relied on the privacy-protective dataset, though the Department views analysis based on the 2022 PPD and described in this regulation to provide a more precise representation of such impact. We view the differences in the analyses as substantively minor for purposes of this rulemaking. As described in the final rule, institutions that do not have enough students completing over the most recent four award years to permit the Department to calculate metrics will be exempt—these programs are listed as ''no data'' in the public PPD.

[278] This is a simplification. Under the regulation, a ''no data'' year is not considered passing when determining eligibility for GE programs based on two out of three years. For non-GE programs, passing with data and without data are treated the same for the purposes of the warnings.

- *Fail D/E:* Programs with an annual D/E earnings rate over 8 percent *AND* a discretionary D/E earnings rate over 20 percent.
- *Pass EP:* Programs with median annual earnings greater than the median earnings among high school graduates aged 25 to 34 in the labor force in the State in which the program is located.
- *Fail EP:* Programs with median annual earnings less than or equal to the median earnings among high school graduates aged 25 to 34 in the labor force in the State in which the program is located.
- *No data:* Programs that had fewer than 30 students in the two-year completer cohorts such that earnings and debt levels could not be determined; exempted programs from Puerto Rico, U.S. Territories and freely associated states; or programs with longer earnings periods due to post-graduation residency requirements.

Under the final regulations, a GE program will become ineligible for title IV, HEA program funds if it fails the D/E measure for two out of three consecutive years or fails the EP measure for two out of three consecutive years. GE programs will be required to provide warnings in any year in which the program could lose eligibility based on the next D/E rates or earnings premium measure calculated by the Department. Students at such programs would be required to acknowledge having seen the warning and information about debt and earnings before receiving title IV, HEA funds. Eligible programs (excepting undergraduate degree programs) not meeting the D/E standards would need to have students acknowledge viewing this information before students sign enrollment agreements. These acknowledgment requirements will apply until the program passes the D/E measure, or for three years from the last published rate, whichever is earlier.

The Department analyzed the estimated impact of the final regulations on GE and non-GE programs using the following data elements defined below:

- *Enrollment:* Number of students receiving title IV, HEA program funds for enrollment in a program. To estimate enrollment, we used the count of students receiving title IV, HEA program funds, averaged over award years 2016 and 2017. Since students may be enrolled in multiple programs during an award year, aggregate enrollment across programs will be greater than the unduplicated number of students.
- *OPEID:* Identification number issued by the Department that identifies each postsecondary educational institution (institution) that participates

in the Federal student financial assistance programs authorized under title IV of the HEA.

- *CIP code:* Identification code from the Department's National Center for Education Statistics' (NCES) Classification of Instructional Programs, which is a taxonomy of instructional program classifications and descriptions that identifies instructional program specialties within educational institutions. The rule will define programs using six-digit CIP codes, but due to data limitations, the statistics used in this RIA are measured using four-digit codes to identify programs.[279] We used the 2010 CIP code instead of the 2020 codes to align with the completer cohorts used in this analysis.
- *Control:* The control designation for a program's institution—public, private nonprofit, private for-profit (proprietary), foreign nonprofit, and foreign for-profit—using PEPS control data as of March 25, 2022.
- *Credential level:* A program's credential level—undergraduate certificate, associate degree, bachelor's degree, post-baccalaureate certificate, master's degree, doctoral degree, first professional degree, or post-graduate certificate.
- *Institution predominant degree:* The type designation for a program's institution which is based on the predominant degree the institution awarded in IPEDS and reported in the College Scorecard: less than 2 years, 2 years, or 4 years or more.
- *State:* Programs are assigned to a U.S. State, DC, or territory based on the State associated with the main institution.

The information contained in the 2022 PDD and used in the analysis necessarily differs from what will be used to evaluate programs under the final rule in a few ways due to certain information not being currently collected in the same form as it would under the final rule. These include:

- 4-digit CIP code is used to define programs in the 2022 PPD, rather than 6-digit CIP code. Program earnings are not currently collected at the 6-digit CIP code level, but will be under the final rule. Furthermore, the 2022 PPD use 2010 CIP codes to align with the completer cohorts used in the analysis,

but programs will be defined using the 2020 CIP codes under the final rule;

- Unlike the final rule, the total loan debt associated with each student is not capped at an amount equivalent to the program's tuition, fees, books, and supplies in the 2022 PPD, nor does debt include institutional and other private debt. Doing so requires additional institutional reporting of relevant data items not currently available to the Department. In the 2014 Prior Rule, using information reported by institutions, the tuition and fees cap was applied to approximately 15 percent of student records for the 2008–2009 2012 D/E rates cohort, though this does not indicate the share of programs whose median debt would be altered by the cap.
- D/E rates using earnings levels measured in calendar years 2018 and 2019 would ideally use debt levels measured for completers in 2015 and 2016. Since program level enrollment data are more accurate for completers starting in 2016, we use completers in 2016 and 2017 to measure debt. We measure median debt levels and assume completers in the 2015 and 2016 cohorts would have had total borrowing that was the same in real terms (*i.e.,* we use the CPI to adjust their borrowing levels to estimate what the earlier cohort would have borrowed in nominal terms). This use of one cohort to measure earnings outcomes and another to measure debt necessarily reduces the estimated coverage in the 2022 PPD to a lower level than will be experienced in practice, as we describe in more detail below. Finally, the methodology used to assign borrowing to particular programs in instances where a borrower may be enrolled in multiple programs is different in the 2022 PPD than the methodology that would be used in the final rule (which is the same as that used in the 2014 Prior Rule);
- Medical and dental professional programs, and graduate mental health programs that lead to licensure, are not evaluated because earnings six years after completion are not available. The earnings and debt levels of these programs are set to missing and not included in the tabulations presented here;
- 150 percent of the Federal Poverty Guideline is used to define the ET for institutions in foreign institutions in the 2022 PPD, rather than a national ET;
- The final rule will use a national ET if more than half of a program's students are out-of-state, but the 2022 PPD uses an ET determined by the State an institution is located;
- Programs at institutions that have merged with other institutions since

---

[279] In many cases the loss of information from conducting analysis at a four- rather than six-digit CIP code is minimal. According to the Technical Documentation: College Scorecard Data by Field of Study, 70 percent of credentials conferred were in four-digit CIP categories that had only one six-digit category with completers at an institution. The 2015 official GE rates can be used to examine the extent of variation in program debt and earnings outcomes across 6-digit CIP programs within the same credential level and institution.

2017 are excluded, but these programs' enrollment will naturally be incorporated into the merged institution when the final rule goes into effect.

• Under the final rule, if the two-year completer cohort has too few students to publish debt and earnings outcomes, but the four-year completer cohort has a sufficient number of students, then debt and earnings outcomes would be calculated for the four-year completer cohort. This was not possible for the 2022 PPD, so some programs with no data in our analysis would have data to evaluate performance under the rule.

The 2022 PPD also differ from those published in the Negotiated Rulemaking data file in several ways. The universe of programs in the previously published Negotiated Rulemaking data file were based, in part, on the College Scorecard universe which included programs as they are reported to IPEDS, but not necessarily to NSLDS. IPEDS is a survey, so institutions may report programs (degrees granted by credential level and CIP code) differently in IPEDS than is reflected in NSLDS. To reflect the impact of the rule more accurately, the universe of the 2022 PPD is based instead on NSLDS records because NSLDS captures programs as reflected in the data systems used to administer title IV, HEA aid. Nonetheless, the 2022 PPD accounts for the same loan volume reflected in the Negotiated Rulemaking data file. In addition, the Negotiated Rulemaking data file included programs that were based on a previous version of College Scorecard prior to corrections made to resolve incorrect institution-reported information in underlying data sources.

*Methodology for D/E Rates Calculations*

The D/E rates measure is comprised of two debt-to-earnings ratios, or rates. The first, the annual earnings rate, is based on annual earnings, and the second, the discretionary earnings rate, is based on discretionary earnings. These two components together define a relationship between the maximum typical amount of debt program graduates should borrow based on the programs' graduates' typical earnings. Both conceptually and functionally the two metrics operate together, and so should be thought of as one ''debt to earnings (D/E)'' metric. The formulas for the two D/E rates are:

Annual Earnings Rate = (Annual Loan Payment) / (Annual Earnings) Discretionary Earnings Rate = (Annual Loan Payment / (Discretionary Earnings)

A program's annual loan payment, the numerator in both rates, is the median

annual loan payment of the 2016–2017 completer cohort. This loan payment is calculated based on the program's cohort median total loan debt at program completion, including non-borrowers, subject to assumptions on the amortization period and interest rate. Cohorts' median total loan debt at program completion were computed as follows.

• Each student's total loan debt includes both FFEL and Direct Loans. Loan debt does not include PLUS Loans made to parents, Direct Unsubsidized Loans that were converted from TEACH Grants, private loans, or institutional loans that the student received for enrollment in the program.

• In cases where a student completed multiple programs at the same institution, all loan debt is attributed to the highest credentialed program that the student completed, and the student is not included in the calculation of D/E rates for the lower credentialed programs that the student completed.

• The calculations exclude students whose loans were in military deferment, or who were enrolled at an institution of higher education for any amount of time in the earnings calendar year, or whose loans were discharged because of disability or death.

The median annual loan payment for each program was derived from the median total loan debt by assuming an amortization period and annual interest rate based on the credential level of the program. The amortization periods used were:

• 10 years for undergraduate certificate, associate degree, post-baccalaureate certificate programs, and graduate certificate programs;

• 15 years for bachelor's and master's degree programs;

• 20 years for doctoral and first professional degree programs.

The amortization periods account for the typical outcome that borrowers who enroll in higher-credentialed programs (*e.g.,* bachelor's and graduate degree programs) are likely to have more loan debt than borrowers who enroll in lower-credentialed programs and, as a result, are more likely to take longer to repay their loans. These amortization rates mirror those used in the 2014 Prior Rule, which were based on Department analysis of loan balances and the differential use of repayment plan periods by credential level at that time.[280] The interest rates used were:

• 4.27 percent for undergraduate programs;

• 5.82 percent for graduate programs.

For both undergraduate and graduate programs, the rate used is the average interest rate on Federal Direct Unsubsidized loans over the three years prior to the end of the applicable cohort period, in this case, the average rate for loans disbursed between the beginning of July 2013 and the end of June 2016.

The denominators for the D/E rates are two different measures of student earnings. Annual earnings are the median total earnings in the calendar year three years after completion, obtained from the U.S. Treasury. Earnings were measured in calendar years 2018 and 2019 for completers in award years 2014–2015 and 2015–2016, respectively, and were converted to 2019 dollars using the Consumer Price Index for all Urban Consumers (CPI–U). Earnings are defined as the sum of wages and deferred compensation for all W–2 forms plus self-employment earnings from Schedule SE.[281] Graduates who were enrolled in any postsecondary program during calendar year 2018 (2014–2015 completers) or 2019 (2015–2016 completers) are excluded from the calculation of earnings and the count of students. Discretionary earnings are equal to annual earnings, calculated as above, minus 150 percent of the Federal Poverty Guidelines for a single person, which for 2019 is earnings in excess of $18,735.

Professional programs in Medicine (MD) and Dentistry (DDS), and mental health graduate programs that lead to clinical licensure will have earnings measured over a longer time horizon to accommodate lengthy post-graduate internship training, where earnings are likely much lower three years after graduation than they would be even a few years further removed from completion.[282] Since longer horizon earnings data are not currently available, earnings for these programs were set to missing and treated as if they lacked sufficient number of completers to be measured.

*Methodology for EP Rate Calculation*

The EP measures the extent to which a program's graduates earn more than the typical high school graduate in the same State. The Department first calculated the ET, which is the median

[280] See 79 FR 64939–40.

[281] See Technical Documentation: College Scorecard Data by Field of Study.

[282] For example, the average medical resident earns between roughly $62,000 and $67,000 in the first three years of residency, according to the Association of American Medical Colleges (AAMC) Survey of Resident/Fellow Stipends and Benefits, and the mean composition for physicians is $260,000 for primary care and $368,000 for specialists, according to the Medscape Physician Compensation Report.

earnings of high school graduates in the labor force in each State where the program is located. The ET is adjusted for differences in high school earnings across States and over time so it naturally accounts for variations across these dimensions to reflect what workers would be expected to earn in the absence of postsecondary participation. The ET is computed as the median annual earnings among respondents aged 25–34 in the ACS who have a high school diploma or GED, but no postsecondary education, and who are in the labor force when they are interviewed, indicated by working or looking for and being available to work. This computation method yields a lower ET that is lower than the method proposed during negotiated rulemaking, which would compute median annual earnings among respondents aged 25–34 in the ACS who have a high school diploma or GED, but no postsecondary education, and who reported working (*i.e.,* having positive earnings) in the year prior to being surveyed. Table 4.1 below shows the ET for each State (along with the District of Columbia) in 2019. The ET ranges from $31,294 (North Dakota) to $20,859 (Mississippi). The threshold for institutions outside the United States is $18,735. We provide evidence in support of the chosen threshold below. Estimates of the impact of the regulations using these alternative thresholds are presented in the ''Regulatory Alternatives Considered'' section.

TABLE 4.1    EARNINGS THRESHOLDS
BY STATE, 2019

| | Earnings threshold, 2019 |
|---|---|
| State of Institution: | |
| Alabama ................................ | 22,602 |
| Alaska ................................... | 27,489 |
| Arizona ................................. | 25,453 |
| Arkansas ............................... | 24,000 |
| California ............................... | 26,073 |

TABLE 4.1    EARNINGS THRESHOLDS
BY STATE, 2019    Continued

| | Earnings threshold, 2019 |
|---|---|
| Colorado ................................ | 29,000 |
| Connecticut ........................... | 26,634 |
| Delaware ............................... | 26,471 |
| District of Columbia .............. | 21,582 |
| Florida .................................. | 24,000 |
| Georgia ................................. | 24,435 |
| Hawaii ................................... | 30,000 |
| Idaho .................................... | 26,073 |
| Illinois ................................... | 25,030 |
| Indiana .................................. | 26,073 |
| Iowa ...................................... | 28,507 |
| Kansas .................................. | 25,899 |
| Kentucky ............................... | 24,397 |
| Louisiana ............................... | 24,290 |
| Maine .................................... | 26,073 |
| Maryland ............................... | 26,978 |
| Massachusetts ....................... | 29,830 |
| Michigan ............................... | 23,438 |
| Minnesota .............................. | 29,136 |
| Mississippi ............................. | 20,859 |
| Missouri ................................ | 25,000 |
| Montana ................................ | 25,453 |
| Nebraska ............................... | 27,000 |
| Nevada .................................. | 27,387 |
| New Hampshire ..................... | 30,215 |
| New Jersey ............................ | 26,222 |
| New Mexico ........................... | 24,503 |
| New York ............................... | 25,453 |
| North Carolina ....................... | 23,300 |
| North Dakota ......................... | 31,294 |
| Ohio ...................................... | 24,000 |
| Oklahoma .............................. | 25,569 |
| Oregon .................................. | 25,030 |
| Pennsylvania .......................... | 25,569 |
| Rhode Island ......................... | 26,634 |
| South Carolina ....................... | 23,438 |
| South Dakota ......................... | 28,000 |
| Tennessee ............................. | 23,438 |
| Texas .................................... | 25,899 |
| Utah ...................................... | 28,507 |
| Vermont ................................ | 26,200 |
| Virginia ................................. | 25,569 |
| Washington ............................ | 29,525 |
| West Virginia ......................... | 23,438 |
| Wisconsin .............................. | 27,699 |
| Wyoming ............................... | 30,544 |
| Foreign Institutions ................. | 18,735 |

The EP is computed as the difference between Annual Earnings and the ET:

Earnings Premium = (Annual
    Earnings) − (Earnings Threshold)

Where the Annual Earnings is computed as above, and the ET is assigned for the State in which the program is located. For foreign institutions, 150 percent of the Federal Poverty Guideline for the given year is used as the ET because comparable information about high school graduate earnings is not available.

The Department conducted several analyses to support the decision of the particular ET chosen. The discussion here focuses on undergraduate certificate programs, which our analysis below suggests is the sector where program performance results are most sensitive to the choice of ET.

First, based on student age information available from students' Free Application for Federal Student Aid (FAFSA) data, we estimate that the typical undergraduate program graduate three years after completion, when their earnings are measured, would be 30 years old. The average age of students three years after completion for undergraduate certificate programs is 31 years, while for associate programs it is 30, bachelor's 29, master's 33, doctoral 38, and professional programs 32. There are very few Post-BA and Graduate Certificate programs (162 in total) and the average ages when their earnings are measured are 35 and 34, respectively.[283]

**BILLING CODE 4000 01 P**

---

[283] Age at earnings measurement is not contained in the data, so we estimate it with age at FAFSA filing immediately before program enrollment plus typical program length (1 for certificate, 2 for Associate programs, 4 for bachelor's programs) plus 3 years. To the extent that students take longer to complete their programs, the average age will be even older than what is reported here. Using this approach, the mean age when earnings are likely to be measured in programs with at least 30 students is 30.34 across all undergraduate programs; the mean for undergraduate certificate students is 30.42.



Figure 4.1. Mean Age When Earnings are Measured, UG For-Profit Certificate Programs

Figure 4.1 shows the average estimated age for for-profit certificate holders 3 years after completion, when earnings would be measured, for the 10 most common undergraduate certificate programs (and an aggregate "other" category). All credentials have an average age that falls within or above the range of ages used to construct the earnings threshold. In cases where the average age falls above this range, our earnings threshold is lower than it would be if we adjusted the age band use to match the programs' completers ages.

Second, the ET is typically less than the average pre-program income of program entrants, as measured in their FAFSA. Figure 4.2 shows average pre-program individual income for students at these same types of certificate programs, including any dependent and independent students that had

previously been working.[284] Figure 4.2 also plots the ET and the average post-program median earnings for programs under consideration. The program-average share of students used to compute pre-program income is also reported in parentheses.[285] Pre-program

[284] To exclude workers who are minimally attached to the labor force or in non-covered employment, the Census Postsecondary Employment Outcomes data requires workers to have annual earnings greater than or equal to the annual equivalent of full-time work at the prevailing Federal minimum wage and at least three quarters of non-zero earnings. (*lehd.ces.census.gov/ data/pseo_documentation.html*). We impose a similar restriction, including only those students whose pre-program earnings are equivalent to full-time work for three quarters at the Federal minimum wage. We only compute average pre-program income if at least 30 students meet this criteria.

[285] Across undergraduate certificate programs for which the pre-program income measure was calculated, the average share of students meeting the criteria is 41 percent (weighting each program equally) or 38 percent (weighting programs by title IV, HEA enrollment). Given incomplete coverage and the potential for non-random selection into the

income falls above or quite close to the ET for most types of certificate programs. Furthermore, the types of certificate programs that we show as having very high failure rates—Cosmetology and Somatic Bodywork (massage), for example—are unusual in having very low post-program earnings compared to other programs that have similar pre-program income.

We view this as suggestive evidence that the ET chosen provides a reasonable, but conservative, guide to the minimum earnings that program graduates should be expected to obtain.[286]

sample measuring pre-program income, we view this analysis as only suggestive.

[286] The earnings of 25 to 34 high school graduates used to construct the ET (similar in age to program completers 3 years after graduation) should be expected to exceed pre-program income because the former likely has more labor force experience than the latter. Therefore, the comparison favors finding that the ET exceeds pre-program income. The fact that pre-program income generally exceeds the ET suggests that the ET is conservative.



**Figure 4.2 Average Income Before Program and Earnings After Program, For-Profit UG Certificate Programs**

BILLING CODE 4000 01 C

Analysis of Data Coverage

This section begins with a presentation of the Department's estimate of the share of enrollment and programs that would meet the n-size requirement and be evaluated under the rule. We assembled data on the number of completers in the two-year cohort period (AYs 2016–2017) and total title IV, HEA enrollment for programs defined at the six-digit OPEID, credential level, and six-digit CIP code from NSLDS. This is the level of aggregation that will be used in the final rule. Total title IV, HEA enrollment at this same level of disaggregation was also collected. Deceased students and students enrolled during the earnings measurement rule will be excluded from the earnings sample under the final rule. We therefore impute the number of completers in the earning sample by multiplying the total completer count in our data by 82 percent, which is the median ratio of non-enrolled earning count to total completer count derived

from programs defined at a four-digit CIP code level.

Table 4.2 below reports the share of title IV, HEA enrollment and programs that would have metrics computed under an n-size of 30 and using six-digit CIP codes to define programs. We estimate that 75 percent of GE enrollment and 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort. An additional 8 percent of enrollment and 11 percent of programs have an n-size of between 15 and 29 and would be likely have metrics computed using a four-year completer cohort. The comparable rates for eligible non-GE programs are 69 percent of enrollment and 19 percent of programs with a n-size of 30 and using two-year cohort rates likely increasing these coverage rates of enrollment and programs by 13 and 15 percent, respectively.

Table 4.2 also reports similar estimates aggregating programs to a four-digit CIP code level. Coverage does not diminish dramatically (3–5 percentage points) when moving from

four-digit CIP codes, as presented in the 2022 PPD, to six-digit CIP codes to define programs.

We note that the high coverage of title IV, HEA enrollment relative to title IV, HEA programs reflects the fact that there are many very small programs with only a few students enrolled each year. For example, based on our estimates, more than half of all programs (defined at six-digit CIP code) have fewer than five students completing per year and about twenty percent have fewer than five students enrolled each year. The Department believes that the coverage of students based on enrollment is sufficiently high to generate substantial net benefits and government budget savings from the policy, as described in "Net Budget Impacts" and "Accounting Statement" below. We believe that the extent to which enrollment is covered by the final rule is the appropriate measure on which to focus coverage analysis on because the benefits, costs, and transfers associated with the policy almost all scale with the number of students (enrollment or completions) rather than the number of programs.

TABLE 4.2   SHARE OF ENROLLMENT AND PROGRAMS MEETING SAMPLE SIZE RESTRICTIONS, BY CIP CODE LEVEL

|  | Enrollment | | Programs | |
|---|---|---|---|---|
|  | CIP4 | CIP6 | CIP4 | CIP6 |
| GE Programs: | | | | |
| n-size = 15 | 0.86 | 0.83 | 0.29 | 0.26 |
| n-size = 30 | 0.79 | 0.75 | 0.18 | 0.15 |
| Non-GE Programs: | | | | |
| n-size = 15 | 0.85 | 0.82 | 0.39 | 0.34 |
| n-size = 30 | 0.74 | 0.69 | 0.23 | 0.19 |

**Notes:** Average school-certified enrollment in AY1617 is used as the measure of enrollment, but the 2022 PPD analyzed in the RIA uses total (certified and non-certified) enrollment, so coverage rates will differ. Non-enrolled earnings count for AY1617 completers is not available at a six-digit CIP level (for any n-size) or at a four-digit CIP level (for n-size = 15). Therefore, non-enrolled earnings counts are imputed based on the median ratio of non-enrolled earnings count to total completer count at the four-digit CIP level where available. This median ratio is multiplied by the actual completer count for AY1617 at the four- and six-digit CIP level for all programs to determine the estimated n-size.

The rest of this section describes coverage rates for programs as they appear in the 2022 PPD to give context for the numbers presented in the RIA. Again, the analyses above are the better guide to the coverage of metrics we are publishing under the rule. The coverage in the 2022 PPD is lower than that reported in Table 4.2, due to differences in data used and because the 2022 PPD does not apply the four-year cohort period "look back" provisions and instead only uses two-year cohorts.[287]

Tables 4.3a and 4.3b report the share of non-GE and GE enrollment and programs with valid D/E rates and EP rates in the 2022 PPD, by control and credential level.[288] For Non-GE programs, metrics could be calculated for about 62 percent of enrollment who attended about 18 percent of programs. Coverage is typically highest for public bachelor's degree programs and professional programs at private nonprofit institutions. Doctoral programs in either sector are the least likely to have sufficient size to compute performance metrics. Programs at foreign institutions are very unlikely to have a sufficient number of completers.

Overall, about 66 percent of title IV, HEA enrollment is in GE programs that have a sufficient number of completers to allow the Department to construct both valid D/E and EP rates in the 2022 PPD. This represents about 13 percent of GE programs. Note that a small number of programs have an EP metric computed but a D/E metric is not available because there are fewer than 30 completers in the two-year debt cohort. Coverage is typically higher in the proprietary sector—we are able to compute D/E or EP metrics for programs accounting for about 87 percent of enrollment in proprietary undergraduate certificate programs. Comparable rates are about 62 percent and 22 percent of enrollment in the nonprofit and public undergraduate certificate sectors, respectively.

TABLE 4.3a   PERCENT OF PROGRAMS AND ENROLLMENT IN PROGRAMS WITH VALID D/E AND EP INFORMATION BY CONTROL AND CREDENTIAL LEVEL

[Non-GE programs]

|  | Data availability category | | | | | |
|---|---|---|---|---|---|---|
|  | Has both D/E and EP | | Has EP only | | Does not have EP or D/E | |
|  | Programs | Enrollees | Programs | Enrollees | Programs | Enrollees |
| Public: | | | | | | |
| Associate | 11.6 | 55.8 | 0.3 | 0.3 | 88.1 | 43.9 |
| Bachelor s | 39.3 | 74.3 | 0.5 | 0.2 | 60.2 | 25.5 |
| Master s | 14.1 | 50.7 | 0.7 | 0.9 | 85.2 | 48.5 |
| Doctoral | 2.8 | 21.0 | 0.3 | 0.7 | 96.9 | 78.4 |
| Professional | 37.3 | 55.0 | 0.7 | 0.6 | 62.0 | 44.4 |
| Private, Nonprofit: | | | | | | |
| Associate | 12.6 | 61.9 | 0.4 | 0.1 | 87.0 | 38.0 |
| Bachelor s | 13.4 | 50.6 | 0.3 | 0.4 | 86.3 | 49.1 |
| Master s | 18.3 | 60.5 | 0.9 | 0.9 | 80.8 | 38.6 |
| Doctoral | 6.9 | 45.8 | 0.3 | 1.9 | 92.8 | 52.3 |
| Professional | 42.9 | 74.4 | 1.9 | 0.8 | 55.2 | 24.8 |
| Foreign Private: | | | | | | |
| Associate | .......... | .......... | .......... | .......... | 100.0 | 100.0 |
| Bachelor s | 0.1 | 1.2 | .......... | .......... | 99.9 | 98.8 |
| Master s | 0.3 | 4.6 | 0.1 | 0.4 | 99.6 | 95.0 |
| Doctoral | .......... | .......... | .......... | .......... | 100.0 | 100.0 |
| Professional | 3.4 | 20.7 | 1.1 | 3.9 | 95.5 | 75.4 |
| Total: | | | | | | |

[287] Unlike the final rule, the 2022 PPD also combines earnings and debt data from two different (but overlapping) two-year cohorts. Alternatively, the calculations in Table 4.2 use information for a single two-year completer cohort for both earnings and debt, as the rule would do, and therefore provides a more accurate representation of the expected overall coverage. A second difference between the coverage estimates in Table 4.2 and that in the 2022 PPD has to do with different data sources that result in slightly different estimates of enrollment coverage between the two sources.

[288] Programs located in U.S. Territories and freely associated states are included in this table but are considered as having no available data, which slightly underestimates the enrollment and program coverage estimates provided.

TABLE 4.3a  PERCENT OF PROGRAMS AND ENROLLMENT IN PROGRAMS WITH VALID D/E AND EP INFORMATION BY CONTROL AND CREDENTIAL LEVEL    Continued

[Non-GE programs]

|  | Data availability category | | | | | |
|---|---|---|---|---|---|---|
|  | Has both D/E and EP | | Has EP only | | Does not have EP or D/E | |
|  | Programs | Enrollees | Programs | Enrollees | Programs | Enrollees |
| Total ................................................................ | 17.7 | 61.3 | 0.4 | 0.3 | 81.9 | 38.4 |

TABLE 4.3b  PERCENT OF PROGRAMS AND ENROLLMENT IN PROGRAMS WITH VALID D/E AND EP INFORMATION BY CONTROL AND CREDENTIAL LEVEL

[GE programs]

|  | Data availability category | | | | | |
|---|---|---|---|---|---|---|
|  | Has both D/E and EP | | Has EP only | | Does not have EP or D/E | |
|  | Programs | Enrollees | Programs | Enrollees | Programs | Enrollees |
| Public: | | | | | | |
| UG Certificates ............................................. | 4.8 | 21.4 | 0.3 | 0.4 | 94.9 | 78.2 |
| Post-BA Certs ............................................... | 0.9 | 7.0 | 0.1 | 0.2 | 99.0 | 92.7 |
| Grad Certs .................................................... | 2.7 | 21.7 | 0.2 | 1.3 | 97.1 | 77.0 |
| Private, Nonprofit: | | | | | | |
| UG Certificates ............................................. | 12.4 | 61.5 | 0.5 | 0.1 | 87.1 | 38.4 |
| Post-BA Certs ............................................... | 0.7 | 3.8 | 1.0 | 2.5 | 98.3 | 93.8 |
| Grad Certs .................................................... | 3.9 | 25.6 | 0.4 | 1.1 | 95.8 | 73.4 |
| Proprietary: | | | | | | |
| UG Certificates ............................................. | 50.8 | 87.0 | 1.4 | 0.4 | 47.8 | 12.7 |
| Associate ...................................................... | 34.9 | 84.4 | 2.3 | 0.7 | 62.9 | 15.0 |
| Bachelor s ..................................................... | 38.5 | 91.6 | 1.3 | 0.6 | 60.3 | 7.8 |
| Post-BA Certs ............................................... | 8.7 | 62.2 | ................. | ................. | 91.3 | 37.8 |
| Master s ........................................................ | 40.6 | 89.6 | 1.9 | 0.3 | 57.5 | 10.1 |
| Doctoral ........................................................ | 32.5 | 68.7 | 0.8 | 3.3 | 66.7 | 28.0 |
| Professional .................................................. | 31.0 | 65.1 | 3.4 | 21.2 | 65.5 | 13.7 |
| Grad Certs .................................................... | 16.1 | 66.8 | 4.8 | 1.1 | 79.0 | 32.2 |
| Total: | | | | | | |
| Total ......................................................... | 12.7 | 65.0 | 0.6 | 0.6 | 86.6 | 34.4 |

### Explanation of Terms

While most analysis will be simple cross-tabulations by two or more variables, we use linear regression analysis (also referred to as "ordinary least squares") to answer some questions about the relationship between variables holding other factors constant. Regression analysis is a statistical method that can be used to measure relationships between variables. For instance, in the demographic analysis, the demographic variables we analyze are referred to as "independent" variables because they represent the potential inputs or determinants of outcomes or may be proxies for other factors that influence those outcomes. The annual debt to earnings (D/E) rate and earnings premium (EP) are referred to as "dependent" variables because they are the variables for which the relationship with the independent variables is examined. The output of a regression analysis contains several relevant points

of information. The "coefficient," also known as the point estimate, for each independent variable is the average amount that a dependent variable is estimated to change with a one-unit change in the associated independent variable, holding all other independent variables included in the model constant. The standard error of a coefficient is a measure of the precision of the estimate. The ratio of the coefficient and standard error, called a "t-statistic" is commonly used to determine whether the relationship between the independent and dependent variables is "statistically significant" at conventional levels.[289] If an estimated coefficient is imprecise (*i.e.*, it has a large standard error relative to the coefficient), it may not be a reliable measure of the underlying relationship. Higher values of the t-

statistic indicate a coefficient is more precisely estimated. The "R-squared" is the fraction of the variance of the dependent variable that is statistically explained by the independent variables.

*Results of the Financial Value Transparency Measures for Programs Not Covered by Gainful Employment*

In this subsection we examine the results of the analysis of the transparency provisions of the final regulations for the 123,524 non-GE programs. The analysis is focused on results for a single set of financial-value measures—approximating rates that would have been released in 2022 (with some differences, described above). Though programs with fewer than 30 completers in the cohort are not subject to the D/E and EP tests and would not have these metrics published, we retain these programs in our analysis and list them in the tables as "No Data" to provide a more complete view of the

---

[289] We use significance level, or alpha, of 0.05 when assessing the statistical significance in our regression analysis.

distribution of enrollment and programs across the D/E and EP metrics.

Tables 4.4 and 4.5 report the results for non-GE programs by control and credential level. Graduate programs with failing D/E metrics are required to have students acknowledge having seen the program outcome information before prospective students can sign enrollment agreements with an institution. Students at non-GE programs that do not pass the earnings premium metric are not subject to the student acknowledgement requirement, however, for informational purposes, we report rates of passing this metric for

non-GE programs as well. We expect performance on the EP metric contained on the ED-administered program information website to be of interest to students even if it is not part of the acknowledgment requirement. This analysis shows that:

• 842 public and 640 nonprofit degree programs (representing 1.2 and 1.5 percent of programs and 4.6 and 6.6 percent of enrollment, respectively) would fail at least one of the D/E or EP metrics.

• At the undergraduate level, failure of the EP metric is most common at associate degree programs, whereas

failure of the D/E metric is relatively more common among public bachelor's degree programs and at nonprofit associate degree programs.

• Failure for graduate programs is almost exclusively due to the failure of the D/E metric and is most prominent for professional programs at private, nonprofit institutions.

• In total, 125,600 students (1.1 percent) at public institutions and 231,100 students (5.8 percent) at nonprofit institutions are in programs with failing D/E metrics.

TABLE 4.4   NUMBER AND PERCENT OF TITLE IV, HEA ENROLLMENT IN NON-GE BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Percent of enrollment | | | | | Number of enrollments | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Public: | | | | | | | | | | |
| Associate | 44.1 | 48.1 | 0.4 | 0.2 | 7.3 | 2,425,300 | 2,641,900 | 19,900 | 9,800 | 400,000 |
| Bachelor s | 25.9 | 72.3 | 1.1 | 0.2 | 0.5 | 1,502,200 | 4,195,900 | 63,000 | 10,300 | 29,400 |
| Master s | 49.4 | 49.4 | 1.2 | 0.0 | 0.0 | 375,800 | 375,400 | 9,000 | 300 | 0 |
| Doctoral | 79.0 | 18.4 | 2.6 | 0.0 | 0.0 | 114,800 | 26,700 | 3,800 | 0 | 0 |
| Professional | 45.1 | 47.4 | 7.5 | 0.0 | 0.0 | 57,400 | 60,400 | 9,600 | 0 | 0 |
| Total | 36.3 | 59.2 | 0.9 | 0.2 | 3.5 | 4,475,500 | 7,300,200 | 105,300 | 20,300 | 429,400 |
| Private, Nonprofit: | | | | | | | | | | |
| Associate | 40.6 | 36.2 | 8.0 | 14.5 | 0.6 | 108,500 | 96,600 | 21,500 | 38,600 | 1,700 |
| Bachelor s | 51.4 | 44.8 | 1.7 | 1.0 | 1.2 | 1,362,100 | 1,186,900 | 44,800 | 26,800 | 30,600 |
| Master s | 40.2 | 55.6 | 3.8 | 0.3 | 0.1 | 320,300 | 442,300 | 30,400 | 2,400 | 800 |
| Doctoral | 54.2 | 30.3 | 15.4 | 0.1 | 0.0 | 77,400 | 43,300 | 22,000 | 200 | 0 |
| Professional | 26.7 | 39.0 | 34.1 | 0.0 | 0.2 | 34,900 | 50,900 | 44,400 | 0 | 300 |
| Total | 47.7 | 45.6 | 4.1 | 1.7 | 0.8 | 1,903,200 | 1,820,000 | 163,000 | 68,100 | 33,300 |
| Foreign Private: | | | | | | | | | | |
| Associate | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100 | 0 | 0 | 0 | 0 |
| Bachelor s | 98.8 | 0.0 | 0.0 | 1.2 | 0.0 | 5,400 | 0 | 0 | 100 | 0 |
| Master s | 95.4 | 2.8 | 1.8 | 0.0 | 0.0 | 8,600 | 300 | 200 | 0 | 0 |
| Doctoral | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,800 | 0 | 0 | 0 | 0 |
| Professional | 79.3 | 0.0 | 20.7 | 0.0 | 0.0 | 1,200 | 0 | 300 | 0 | 0 |
| Total | 95.7 | 1.3 | 2.6 | 0.4 | 0.0 | 18,100 | 300 | 500 | 100 | 0 |
| Total: | | | | | | | | | | |
| Associate | 44.0 | 47.5 | 0.7 | 0.8 | 7.0 | 2,533,800 | 2,738,500 | 41,400 | 48,400 | 401,700 |
| Bachelor s | 33.9 | 63.6 | 1.3 | 0.4 | 0.7 | 2,869,700 | 5,382,800 | 107,800 | 37,200 | 60,000 |
| Master s | 45.0 | 52.2 | 2.5 | 0.2 | 0.1 | 704,700 | 817,900 | 39,500 | 2,700 | 800 |
| Doctoral | 67.0 | 24.1 | 8.9 | 0.1 | 0.0 | 194,900 | 70,000 | 25,800 | 200 | 0 |
| Professional | 36.1 | 42.9 | 20.9 | 0.0 | 0.1 | 93,500 | 111,300 | 54,300 | 0 | 200 |
| Total | 39.2 | 55.8 | 1.6 | 0.5 | 2.8 | 6,396,700 | 9,120,500 | 268,800 | 88,500 | 462,700 |

**Note:** Enrollment counts rounded to the nearest 100.

TABLE 4.5   NUMBER AND PERCENT OF NON-GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Result in 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP Only | |
| | Percent | N | Percent | N | Percent | N | Percent | N | Percent | N |
| Public: | | | | | | | | | | |
| Associate | 88.5 | 24,165 | 9.9 | 2,693 | 0.1 | 24 | 0.1 | 19 | 1.5 | 411 |
| Bachelor s | 61.0 | 14,855 | 37.7 | 9,167 | 0.7 | 164 | 0.2 | 48 | 0.4 | 104 |
| Master s | 86.0 | 12,547 | 13.6 | 1,990 | 0.3 | 41 | 0.0 | 3 | 0.0 | 1 |
| Doctoral | 97.2 | 5,562 | 2.7 | 153 | 0.2 | 9 | 0.0 | 0 | 0.0 | 0 |
| Professional | 63.9 | 363 | 32.9 | 187 | 3.2 | 18 | 0.0 | 0 | 0.0 | 0 |
| Total | 79.3 | 57,492 | 19.6 | 14,190 | 0.4 | 256 | 0.1 | 70 | 0.7 | 516 |
| Private, Nonprofit: | | | | | | | | | | |
| Associate | 88.3 | 2,049 | 8.9 | 206 | 1.2 | 29 | 1.3 | 30 | 0.3 | 7 |
| Bachelor s | 87.0 | 25,891 | 12.1 | 3,608 | 0.4 | 119 | 0.2 | 69 | 0.2 | 65 |
| Master s | 82.2 | 8,513 | 16.1 | 1,665 | 1.6 | 162 | 0.2 | 17 | 0.0 | 5 |
| Doctoral | 93.1 | 2,658 | 5.0 | 142 | 1.8 | 52 | 0.1 | 2 | 0.0 | 0 |
| Professional | 58.6 | 289 | 24.5 | 121 | 16.2 | 80 | 0.0 | 0 | 0.6 | 3 |
| Total | 86.1 | 39,400 | 12.5 | 5,742 | 1.0 | 442 | 0.3 | 118 | 0.2 | 80 |
| Foreign Private: | | | | | | | | | | |
| Associate | 100.0 | 18 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |

TABLE 4.5    NUMBER AND PERCENT OF NON-GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL    Continued

| | Result in 2019 | | | | | | | | |
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP Only | |
| | Percent | N | Percent | N | Percent | N | Percent | N | Percent | N |
|---|---|---|---|---|---|---|---|---|---|---|
| Bachelor s ............................ | 99.9 | 1,227 | 0.0 | 0 | 0.0 | 0 | 0.1 | 1 | 0.0 | 0 |
| Master s ............................... | 99.7 | 3,067 | 0.1 | 4 | 0.1 | 3 | 0.0 | 0 | 0.0 | 1 |
| Doctoral ............................... | 100.0 | 793 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Professional ......................... | 97.1 | 101 | 0.0 | 0 | 2.9 | 3 | 0.0 | 0 | 0.0 | 0 |
| Total ................................... | 99.8 | 5,206 | 0.1 | 4 | 0.1 | 6 | 0.0 | 1 | 0.0 | 1 |
| **Total:** | | | | | | | | | | |
| Associate ............................. | 88.5 | 26,232 | 9.8 | 2,899 | 0.2 | 53 | 0.2 | 49 | 1.4 | 418 |
| Bachelor s ............................ | 75.9 | 41,973 | 23.1 | 12,775 | 0.5 | 283 | 0.2 | 118 | 0.3 | 169 |
| Master s ............................... | 86.1 | 24,127 | 13.1 | 3,659 | 0.7 | 206 | 0.1 | 20 | 0.0 | 7 |
| Doctoral ............................... | 96.2 | 9,013 | 3.1 | 295 | 0.7 | 61 | 0.0 | 2 | 0.0 | 0 |
| Professional ......................... | 64.6 | 753 | 26.4 | 308 | 8.7 | 101 | 0.0 | 0 | 0.3 | 3 |
| Total ................................... | 82.7 | 102,098 | 16.1 | 19,936 | 0.6 | 704 | 0.2 | 189 | 0.5 | 597 |

Tables 4.6 and 4.7 report results by credential level and 2-digit CIP code for non-GE programs. This analysis shows that—

• Rates of not passing at least one of the metrics are particularly high for professional programs in law (CIP 22, about 19 percent of law programs representing 29 percent of enrollment in law programs), theology (CIP 39, about 7 percent, 25 percent) and health (CIP 51, about 10 percent, 19 percent). Recall that for graduate degrees, failure is almost exclusively due to the D/E metric, which would trigger the acknowledgment requirement.

TABLE 4.6    PERCENT OF NON-GE TITLE IV, HEA ENROLLMENT IN PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | |
| | Associate | Bachelor s | Master s | Doctoral | Professional | Total |
|---|---|---|---|---|---|---|
| 1: Agriculture & Related Sciences .................... | 0.8 | 1.2 | 0.0 | 0.0 | 0.0 | 1.0 |
| 3: Natural Resources And Conservation ............ | 0.0 | 1.3 | 1.8 | 0.0 | 0.0 | 1.2 |
| 4: Architecture And Related Services ................ | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.7 |
| 5: Area & Group Studies ................................... | 0.0 | 0.6 | 0.0 | 0.0 | 0.0 | 0.5 |
| 9: Communication ............................................ | 3.5 | 1.8 | 2.0 | 0.0 | 0.0 | 2.0 |
| 10: Communications Tech ................................. | 8.1 | 2.9 | 0.0 | | | 5.9 |
| 11: Computer Sciences .................................... | 1.5 | 0.1 | 0.0 | 0.0 | 0.0 | 0.6 |
| 12: Personal And Culinary Services .................. | 9.5 | 0.0 | 0.0 | | | 8.3 |
| 13: Education .................................................. | 16.6 | 2.6 | 1.6 | 4.3 | 0.0 | 4.2 |
| 14: Engineering ............................................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 15: Engineering Tech ....................................... | 0.3 | 0.0 | 0.0 | 0.0 | | 0.2 |
| 16: Foreign Languages .................................... | 1.0 | 2.1 | 0.0 | 0.0 | 0.0 | 1.8 |
| 19: Family & Consumer Sciences .................... | 11.2 | 8.0 | 3.8 | 0.0 | 0.0 | 9.2 |
| 22: Legal Professions ...................................... | 7.8 | 9.8 | 3.6 | 29.6 | 28.5 | 20.0 |
| 23: English Language ...................................... | 1.1 | 5.7 | 3.9 | 0.0 | 0.0 | 4.8 |
| 24: Liberal Arts ............................................... | 14.0 | 2.8 | 0.6 | 0.0 | 0.0 | 10.8 |
| 25: Library Science ......................................... | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 26: Biological & Biomedical Sciences ............... | 4.9 | 2.2 | 6.0 | 1.4 | 0.0 | 2.7 |
| 27: Mathematics And Statistics ........................ | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 28: Military Science ......................................... | | | 0.0 | | | 0.0 |
| 29: Military Tech ............................................. | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 30: Multi/Interdisciplinary Studies .................... | 1.3 | 1.1 | 1.6 | 0.0 | 0.0 | 1.2 |
| 31: Parks & Rec .............................................. | 4.8 | 1.8 | 0.6 | 0.0 | 0.0 | 2.2 |
| 32: Basic Skills ............................................... | 0.0 | | 0.0 | | | 0.0 |
| 33: Citizenship Activities ................................. | | 0.0 | | | | 0.0 |
| 34: Health-Related Knowledge And Skills .......... | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 35: Interpersonal And Social Skills ................... | | 0.0 | 0.0 | | | 0.0 |
| 36: Leisure And Recreational Activities ............ | 0.0 | 0.0 | | | | 0.0 |
| 37: Personal Awareness And Self-Improvement . | | 0.0 | | | | 0.0 |
| 38: Philosophy And Religious Studies ............... | 40.5 | 1.3 | 0.0 | 0.0 | 0.0 | 4.2 |
| 39: Theology And Religious Vocations .............. | 9.4 | 21.5 | 7.7 | 0.0 | 25.4 | 14.8 |
| 40: Physical Sciences ..................................... | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.2 |
| 41: Science Technologies/Technicians .............. | 4.2 | 0.0 | 0.0 | | | 3.7 |
| 42: Psychology ............................................... | 10.8 | 6.4 | 4.7 | 2.0 | 0.0 | 6.6 |
| 43: Homeland Security ..................................... | 3.7 | 2.5 | 5.5 | 0.0 | 0.0 | 3.2 |
| 44: Public Admin & Social Services ................. | 23.4 | 3.9 | 0.5 | 0.0 | 0.0 | 6.2 |
| 45: Social Sciences ........................................ | 4.9 | 0.9 | 3.2 | 0.0 | 0.0 | 1.6 |
| 46: Construction Trades ................................... | 0.0 | 0.0 | | | | 0.0 |
| 47: Mechanic & Repair Tech ............................ | 0.4 | 0.0 | | 0.0 | | 0.4 |
| 48: Precision Production .................................. | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 49: Transportation And Materials Moving .......... | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 50: Visual And Performing Arts ........................ | 6.4 | 12.7 | 21.6 | 1.9 | 0.0 | 11.6 |
| 51: Health Professions And Related Programs ... | 5.8 | 1.0 | 5.5 | 20.1 | 18.6 | 5.4 |
| 52: Business .................................................. | 5.3 | 0.5 | 0.3 | 0.0 | 0.0 | 1.9 |
| 53: High School/Secondary Diplomas ............... | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 54: History ..................................................... | 0.0 | 0.8 | 12.2 | 0.0 | 0.0 | 1.6 |
| 60: Residency Programs .................................. | | | 0.0 | 0.0 | 0.0 | 0.0 |

TABLE 4.6   PERCENT OF NON-GE TITLE IV, HEA ENROLLMENT IN PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2   Continued

| | Credential level | | | | | |
|---|---|---|---|---|---|---|
| | Associate | Bachelor s | Master s | Doctoral | Professional | Total |
| Total ........................................................................ | 8.5 | 2.4 | 2.7 | 8.9 | 21.0 | 5.0 |

TABLE 4.7   PERCENT OF NON-GE PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | |
|---|---|---|---|---|---|---|
| | Associate | Bachelor s | Master s | Doctoral | Professional | Total |
| 1: Agriculture & Related Sciences ............................... | 0.1 | 0.7 | 0.0 | 0.0 | 0.0 | 0.3 |
| 3: Natural Resources And Conservation ...................... | 0.0 | 0.4 | 0.3 | 0.0 | 0.0 | 0.3 |
| 4: Architecture And Related Services .......................... | 0.0 | 0.0 | 0.8 | 0.0 | 0.0 | 0.3 |
| 5: Area & Group Studies ............................................. | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.2 |
| 9: Communication ........................................................ | 0.8 | 1.1 | 0.6 | 0.0 | 0.0 | 0.9 |
| 10: Communications Tech ............................................ | 2.2 | 2.4 | 0.0 | ................ | ................ | 2.1 |
| 11: Computer Sciences ............................................... | 0.4 | 0.1 | 0.0 | 0.0 | 0.0 | 0.2 |
| 12: Personal And Culinary Services ............................ | 3.9 | 0.0 | 0.0 | ................ | ................ | 3.6 |
| 13: Education .............................................................. | 3.5 | 0.8 | 0.7 | 0.1 | 0.0 | 0.9 |
| 14: Engineering ........................................................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 15: Engineering Tech ................................................... | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 16: Foreign Languages ................................................ | 0.3 | 0.6 | 0.0 | 0.0 | 0.0 | 0.4 |
| 19: Family & Consumer Sciences ............................... | 3.5 | 2.9 | 1.2 | 0.0 | 0.0 | 2.7 |
| 22: Legal Professions ................................................. | 1.0 | 1.4 | 0.4 | 14.3 | 19.2 | 4.9 |
| 23: English Language ................................................. | 0.4 | 1.9 | 1.0 | 0.0 | 0.0 | 1.4 |
| 24: Liberal Arts .......................................................... | 15.2 | 2.1 | 0.4 | 0.0 | 0.0 | 8.0 |
| 25: Library Science ..................................................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 26: Biological & Biomedical Sciences ......................... | 0.8 | 1.1 | 0.5 | 0.1 | 0.0 | 0.7 |
| 27: Mathematics And Statistics ................................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 28: Military Science ..................................................... | ................ | 0.0 | 0.0 | | | 0.0 |
| 29: Military Tech ......................................................... | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 30: Multi/Interdisciplinary Studies .............................. | 1.1 | 0.7 | 0.4 | 0.0 | 0.0 | 0.6 |
| 31: Parks & Rec ......................................................... | 0.8 | 1.3 | 0.3 | 0.0 | 0.0 | 1.0 |
| 32: Basic Skills ........................................................... | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 33: Citizenship Activities ............................................ | ................ | 0.0 | 0.0 | | | 0.0 |
| 34: Health-Related Knowledge And Skills .................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 35: Interpersonal And Social Skills ............................. | ................ | 0.0 | 0.0 | | | 0.0 |
| 36: Leisure And Recreational Activities ...................... | 0.0 | 0.0 | 0.0 | ................ | ................ | 0.0 |
| 37: Personal Awareness And Self-Improvement .......... | ................ | ................ | 0.0 | | | 0.0 |
| 38: Philosophy And Religious Studies ......................... | 2.1 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 |
| 39: Theology And Religious Vocations ........................ | 2.0 | 2.5 | 2.6 | 0.0 | 6.6 | 2.4 |
| 40: Physical Sciences ................................................. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 41: Science Technologies/Technicians ........................ | 0.6 | 0.0 | 0.0 | | | 0.4 |
| 42: Psychology ........................................................... | 3.1 | 2.9 | 0.9 | 0.6 | 0.0 | 2.0 |
| 43: Homeland Security ................................................ | 0.8 | 2.0 | 0.8 | 0.0 | 0.0 | 1.2 |
| 44: Public Admin & Social Services ............................ | 6.3 | 1.1 | 0.4 | 0.0 | 0.0 | 1.7 |
| 45: Social Sciences .................................................... | 0.5 | 0.5 | 0.2 | 0.0 | 0.0 | 0.4 |
| 46: Construction Trades .............................................. | 0.0 | 0.0 | 0.0 | 0.0 | ................ | 0.0 |
| 47: Mechanic & Repair Tech ....................................... | 0.2 | 0.0 | ................ | ................ | ................ | 0.2 |
| 48: Precision Production ............................................. | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 49: Transportation And Materials Moving .................... | 0.0 | 0.0 | 0.0 | 0.0 | ................ | 0.0 |
| 50: Visual And Performing Arts ................................... | 1.4 | 4.4 | 4.9 | 0.4 | 0.0 | 3.7 |
| 51: Health Professions And Related Programs ............ | 1.3 | 0.6 | 2.5 | 4.5 | 9.7 | 2.0 |
| 52: Business ............................................................... | 1.4 | 0.2 | 0.1 | 0.0 | 0.0 | 0.5 |
| 53: High School/Secondary Diplomas ......................... | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 54: History .................................................................. | 0.0 | 0.3 | 0.5 | 0.0 | 0.0 | 0.3 |
| 60: Residency Programs .............................................. | 0.0 | ................ | 0.0 | 0.0 | 0.0 | 0.0 |
| Total .......................................................................... | 1.8 | 1.0 | 0.8 | 0.7 | 8.9 | 1.2 |

*Results of GE Accountability for Programs Subject to the Gainful Employment Rule*

This analysis is based on the 2022 PPD described in the ''Data Used in this RIA'' above. In this subsection, we examine the combined results of the analysis of the final regulations for the 32,058 GE Programs. The analysis is primarily focused on GE metric results for a single year, though continued eligibility depends on performance in multiple years. The likelihood of repeated failure is discussed briefly below and is incorporated into the budget impact and cost-benefit analyses. Though programs with fewer than 30 completers in the cohort are not subject to the D/E and EP tests, we retain these programs in our analysis to provide a more complete view of program passage than if they were excluded.

*Program-Level Results*

Tables 4.8 and 4.9 report D/E and EP results by control and credential level for GE programs. This analysis shows that:

• About 64 percent of enrollment is in the 3,937 GE programs for which rates can be calculated.

• 40 percent of enrollment is in 2,228 programs (about 7 percent of all GE programs) that meet the size threshold and would pass both the D/E measure and EP metrics.

• About 24 percent of enrollment is in 1,709 programs (about 5 percent of all GE programs) that would fail at least one of the two metrics.

• Failure rates are significantly lower for public certificate programs (about 4

App.130

percent of enrollment is in failing programs) than for proprietary (about 51 percent of enrollment is in failing programs) or nonprofit (about 41 percent of enrollment is in failing programs) certificate programs, though

the latter represents a relatively small share of overall enrollment. Certificate programs that fail typically fail the EP metric, rather than the D/E metric.

• Across all proprietary certificate and degree programs, about 33 percent of enrollment is in programs that fail

one of the two metrics, representing about 22 percent of programs. Degree programs that fail typically fail the D/E metric, with only associate degree programs having a noticeable number of programs that fail the EP metric.

TABLE 4.8   NUMBER AND PERCENT OF TITLE IV, HEA ENROLLMENT IN GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Percent | | | | | Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| **Public:** | | | | | | | | | | |
| UG Certificates | 78.5 | 17.2 | 0.0 | 0.3 | 4.0 | 682,300 | 149,300 | 200 | 3,000 | 34,700 |
| Post-BA Certs | 93.0 | 7.0 | 0.0 | 0.0 | 0.0 | 11,800 | 900 | 0 | 0 | 0 |
| Grad Certs | 78.3 | 21.3 | 0.4 | 0.0 | 0.0 | 32,800 | 8,900 | 200 | 0 | 0 |
| Total | 78.7 | 17.2 | 0.0 | 0.3 | 3.8 | 726,900 | 159,200 | 300 | 3,000 | 34,700 |
| **Private, Nonprofit:** | | | | | | | | | | |
| UG Certificates | 41.6 | 17.9 | 0.0 | 3.9 | 36.6 | 32,400 | 14,000 | 0 | 3,100 | 28,500 |
| Post-BA Certs | 96.2 | 3.8 | 0.0 | 0.0 | 0.0 | 7,600 | 300 | 0 | 0 | 0 |
| Grad Certs | 75.4 | 21.9 | 2.7 | 0.0 | 0.0 | 26,900 | 7,800 | 1,000 | 0 | 0 |
| Total | 55.1 | 18.2 | 0.8 | 2.5 | 23.4 | 67,000 | 22,100 | 1,000 | 3,100 | 28,500 |
| **Proprietary:** | | | | | | | | | | |
| UG Certificates | 15.2 | 34.0 | 0.2 | 8.5 | 42.1 | 83,700 | 187,000 | 1,100 | 46,500 | 231,700 |
| Associate | 18.3 | 44.6 | 19.4 | 14.2 | 3.4 | 59,900 | 145,700 | 63,500 | 46,500 | 11,200 |
| Bachelor s | 9.6 | 66.0 | 22.5 | 1.8 | 0.0 | 65,200 | 446,100 | 152,200 | 12,100 | 200 |
| Post-BA Certs | 37.8 | 62.2 | 0.0 | 0.0 | 0.0 | 300 | 500 | 0 | 0 | 0 |
| Master s | 10.7 | 72.6 | 15.7 | 0.9 | 0.0 | 25,800 | 174,300 | 37,700 | 2,200 | 0 |
| Doctoral | 31.3 | 58.1 | 10.6 | 0.0 | 0.0 | 16,900 | 31,400 | 5,700 | 0 | 0 |
| Professional | 34.9 | 14.5 | 50.7 | 0.0 | 0.0 | 4,200 | 1,800 | 6,100 | 0 | 0 |
| Grad Certs | 32.6 | 28.9 | 37.9 | 0.0 | 0.7 | 3,500 | 3,100 | 4,100 | 0 | 100 |
| Total | 13.9 | 52.9 | 14.5 | 5.7 | 13.0 | 259,400 | 989,800 | 270,400 | 107,300 | 243,100 |
| **Foreign Private:** | | | | | | | | | | |
| Master s | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100 | 0 | 0 | 0 | 0 |
| Post-BA Certs | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 | 0 | 0 |
| Grad Certs | 15.8 | 0.0 | 0.0 | 84.2 | 0.0 | 200 | 0 | 0 | 1,300 | 0 |
| Total | 20.4 | 0.0 | 0.0 | 79.6 | 0.0 | 300 | 0 | 0 | 1,300 | 0 |
| **Foreign For-Profit:** | | | | | | | | | | |
| Master s | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 200 | 0 | 0 | 0 | 0 |
| Doctoral | 80.5 | 19.5 | 0.0 | 0.0 | 0.0 | 1,600 | 400 | 0 | 0 | 0 |
| Professional | 79.7 | 0.0 | 20.3 | 0.0 | 0.0 | 9,200 | 0 | 2,400 | 0 | 0 |
| Total | 80.0 | 2.8 | 17.2 | 0.0 | 0.0 | 11,000 | 400 | 2,400 | 0 | 0 |
| **Total:** | | | | | | | | | | |
| UG Certificates | 53.3 | 23.4 | 0.1 | 3.5 | 19.7 | 798,500 | 350,300 | 1,300 | 52,500 | 294,900 |
| Associate | 18.3 | 44.6 | 19.4 | 14.2 | 3.4 | 59,900 | 145,700 | 63,500 | 46,500 | 11,200 |
| Bachelor s | 9.6 | 66.0 | 22.5 | 1.8 | 0.0 | 65,200 | 446,100 | 152,200 | 12,100 | 200 |
| Post-BA Certs | 92.1 | 7.9 | 0.0 | 0.0 | 0.0 | 19,700 | 1,700 | 0 | 0 | 0 |
| Master s | 10.8 | 72.6 | 15.7 | 0.9 | 0.0 | 25,900 | 174,300 | 37,700 | 2,200 | 0 |
| Doctoral | 33.0 | 56.8 | 10.2 | 0.0 | 0.0 | 18,500 | 31,800 | 5,700 | 0 | 0 |
| Professional | 56.8 | 7.4 | 35.8 | 0.0 | 0.0 | 13,400 | 1,800 | 8,500 | 0 | 0 |
| Grad Certs | 70.6 | 22.1 | 5.8 | 1.4 | 0.1 | 63,500 | 19,900 | 5,200 | 1,300 | 100 |
| Total | 36.3 | 40.0 | 9.4 | 3.9 | 10.5 | 1,064,600 | 1,171,400 | 274,100 | 114,700 | 306,400 |

**Note:** Enrollment counts rounded to the nearest 100.

TABLE 4.9   NUMBER OF GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Number | | | | | Percent | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| **Public:** | | | | | | | | | | |
| UG Certificates | 18,051 | 729 | 1 | 6 | 184 | 95.2 | 3.8 | 0.0 | 0.0 | 1.0 |
| Post-BA Certs | 865 | 7 | 0 | 0 | 0 | 99.2 | 0.8 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 1,887 | 50 | 2 | 0 | 0 | 97.3 | 2.6 | 0.1 | 0.0 | 0.0 |
| Total | 20,803 | 786 | 3 | 6 | 184 | 95.5 | 3.6 | 0.0 | 0.0 | 0.8 |
| **Private, Nonprofit:** | | | | | | | | | | |
| UG Certificates | 1,229 | 93 | 0 | 5 | 60 | 88.6 | 6.7 | 0.0 | 0.4 | 4.3 |
| Post-BA Certs | 625 | 4 | 0 | 0 | 0 | 99.4 | 0.6 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 1,346 | 43 | 8 | 0 | 0 | 96.3 | 3.1 | 0.6 | 0.0 | 0.0 |
| Total | 3,200 | 140 | 8 | 5 | 60 | 93.8 | 4.1 | 0.2 | 0.1 | 1.8 |
| **Proprietary:** | | | | | | | | | | |
| UG Certificates | 1,659 | 528 | 5 | 153 | 873 | 51.6 | 16.4 | 0.2 | 4.8 | 27.1 |
| Associate | 1,155 | 327 | 98 | 78 | 62 | 67.2 | 19.0 | 5.7 | 4.5 | 3.6 |
| Bachelor s | 610 | 251 | 80 | 21 | 1 | 63.3 | 26.1 | 8.3 | 2.2 | 0.1 |
| Post-BA Certs | 48 | 4 | 0 | 0 | 0 | 92.3 | 7.7 | 0.0 | 0.0 | 0.0 |

TABLE 4.9   NUMBER OF GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL   Continued

| | Number | | | | | Percent | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Masters | 289 | 143 | 37 | 9 | 0 | 60.5 | 29.9 | 7.7 | 1.9 | 0.0 |
| Doctoral | 83 | 29 | 10 | 0 | 0 | 68.0 | 23.8 | 8.2 | 0.0 | 0.0 |
| Professional | 23 | 5 | 4 | 0 | 0 | 71.9 | 15.6 | 12.5 | 0.0 | 0.0 |
| Grad Certs | 105 | 14 | 6 | 0 | 3 | 82.0 | 10.9 | 4.7 | 0.0 | 2.3 |
| Total | 3,972 | 1,301 | 240 | 261 | 939 | 59.2 | 19.4 | 3.6 | 3.9 | 14.0 |
| Foreign Private: | | | | | | | | | | |
| UG Certificates | 28 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Post-BA Certs | 27 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 76 | 0 | 0 | 1 | 0 | 98.7 | 0.0 | 0.0 | 1.3 | 0.0 |
| Total | 131 | 0 | 0 | 1 | 0 | 99.2 | 0.0 | 0.0 | 0.8 | 0.0 |
| Foreign For-Profit: | | | | | | | | | | |
| UG Certificates | 1 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Masters | 6 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Doctoral | 3 | 1 | 0 | 0 | 0 | 75.0 | 25.0 | 0.0 | 0.0 | 0.0 |
| Professional | 5 | 0 | 2 | 0 | 0 | 71.4 | 0.0 | 28.6 | 0.0 | 0.0 |
| Total | 15 | 1 | 2 | 0 | 0 | 83.3 | 5.6 | 11.1 | 0.0 | 0.0 |
| Total: | | | | | | | | | | |
| UG Certificates | 20,968 | 1,350 | 6 | 164 | 1,117 | 88.8 | 5.7 | 0.0 | 0.7 | 4.7 |
| Associate | 1,155 | 327 | 98 | 78 | 62 | 67.2 | 19.0 | 5.7 | 4.5 | 3.6 |
| Bachelors | 610 | 251 | 80 | 21 | 1 | 63.3 | 26.1 | 8.3 | 2.2 | 0.1 |
| Post-BA Certs | 1,565 | 15 | 0 | 0 | 0 | 99.1 | 0.9 | 0.0 | 0.0 | 0.0 |
| Masters | 295 | 143 | 37 | 9 | 0 | 61.0 | 29.5 | 7.6 | 1.9 | 0.0 |
| Doctoral | 86 | 30 | 10 | 0 | 0 | 68.3 | 23.8 | 7.9 | 0.0 | 0.0 |
| Professional | 28 | 5 | 6 | 0 | 0 | 71.8 | 12.8 | 15.4 | 0.0 | 0.0 |
| Grad Certs | 3,414 | 107 | 16 | 1 | 3 | 96.4 | 3.0 | 0.5 | 0.0 | 0.1 |
| Total | 28,121 | 2,228 | 253 | 273 | 1,183 | 87.7 | 6.9 | 0.8 | 0.9 | 3.7 |

Tables 4.10 and 4.11 report the results by credential level and 2-digit CIP code. This analysis shows—

• The highest rate of failure is undergraduate certificate in Personal and Culinary Services (CIP2 12), where about 73 percent of enrollment, representing 37 percent of undergraduate certificate programs in that field, have failing metrics. This is primarily due to failing the EP metric.

• In Health Professions and Related Programs (CIP2 51), where allied health, medical assisting, and medical administration are the primary specific fields, 28 percent of enrollment is in an undergraduate certificate program that fails at least one of the two metrics, representing 8 percent of programs.

TABLE 4.10   PERCENT OF GE TITLE IV, HEA ENROLLMENT IN PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | UG certificates | Associate | Bachelors | Post-BA certs | Masters | Doctoral | Professional | Grad certs | Total |
| 1: Agriculture & Related Sciences | 0.0 | 0.0 | 0.0 | | | | | 0.0 | 0.0 |
| 3: Natural Resources And Conservation | 0.0 | | 13.1 | 0.0 | 0.0 | | | 0.0 | 9.1 |
| 4: Architecture And Related Services | 0.0 | | 0.0 | | 0.0 | | 0.0 | 0.0 | 0.0 |
| 5: Area & Group Studies | 0.0 | | | | | | | 0.0 | 0.0 |
| 9: Communication | 42.4 | 0.0 | 22.9 | 0.0 | 21.8 | | | | 30.1 |
| 10: Communications Tech | 10.4 | 54.7 | 61.9 | 0.0 | 88.9 | | | 0.0 | 38.6 |
| 11: Computer Sciences | 4.9 | 9.7 | 3.6 | 0.0 | 4.5 | 0.0 | | 0.0 | 5.0 |
| 12: Personal And Culinary Services | 73.2 | 59.4 | 31.8 | 0.0 | 0.0 | | 0.0 | 31.5 | 72.4 |
| 13: Education | 5.9 | 74.5 | 75.5 | 0.0 | 14.1 | 0.8 | | 3.4 | 24.9 |
| 14: Engineering | 0.0 | 37.0 | 14.5 | 0.0 | 0.0 | | | | 3.4 |
| 15: Engineering Tech | 2.0 | 1.8 | 0.0 | 0.0 | 0.0 | | | 0.0 | 1.6 |
| 16: Foreign Languages | 0.0 | | 94.8 | 0.0 | | | | | 4.5 |
| 19: Family & Consumer Sciences | 1.8 | 90.2 | 72.0 | 0.0 | 100.0 | 100.0 | | 0.0 | 21.7 |
| 22: Legal Professions | 3.3 | 55.9 | 32.3 | 0.0 | 0.0 | 0.0 | 61.0 | 24.2 | 26.9 |
| 23: English Language | 57.4 | 96.6 | 87.4 | 0.0 | 98.2 | | | | 66.0 |
| 24: Liberal Arts | 3.8 | 0.0 | | 0.0 | 0.0 | | | 0.0 | 3.5 |
| 25: Library Science | 0.0 | | 100.0 | 0.0 | 0.0 | | | 0.0 | 23.5 |
| 26: Biological & Biomedical Sciences | 0.0 | 0.0 | 0.0 | | 0.0 | 0.0 | | 9.1 | 1.1 |
| 27: Mathematics And Statistics | 0.0 | | 0.0 | | 0.0 | | | | 0.0 |
| 28: Military Science | 0.0 | 0.0 | 0.0 | | | | | | 0.0 |
| 29: Military Tech | 0.0 | 0.0 | 0.0 | | | | | | 0.0 |
| 30: Multi/Interdisciplinary Studies | 0.0 | 96.2 | 92.0 | 0.0 | 0.0 | | | 8.8 | 55.3 |
| 31: Parks & Rec | 4.3 | 66.0 | 0.0 | | 0.0 | | | 0.0 | 9.3 |
| 32: Basic Skills | 41.8 | | | | 0.0 | | | | 41.4 |
| 33: Citizenship Activities | 0.0 | | | | | | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | | | | | | | | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | | | | | | | | 0.0 |
| 37: Personal Awareness And Self-Improvement | 0.0 | | | | | | | | 0.0 |
| 38: Philosophy And Religious Studies | 0.0 | | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.0 |
| 39: Theology And Religious Vocations | 50.6 | 0.0 | 94.2 | 0.0 | 90.0 | 0.0 | 0.0 | 0.0 | 56.1 |
| 40: Physical Sciences | 0.0 | | 0.0 | 0.0 | | | | 0.0 | 0.0 |

TABLE 4.10   PERCENT OF GE TITLE IV, HEA ENROLLMENT IN PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2   Continued

| | Credential level | | | | | | | | |
| | UG certificates | Associate | Bachelors | Post-BA certs | Masters | Doctoral | Professional | Grad certs | Total |
|---|---|---|---|---|---|---|---|---|---|
| 41: Science Technologies/Technicians | 0.0 | 0.0 | | 0.0 | | | | 0.0 | 0.0 |
| 42: Psychology | 0.0 | 0.0 | 50.3 | 0.0 | 27.7 | 38.0 | | 33.3 | 36.3 |
| 43: Homeland Security | 3.1 | 54.3 | 21.9 | 0.0 | 19.2 | 66.5 | | 0.0 | 21.7 |
| 44: Public Admin And Social Services | 0.0 | 81.9 | 57.5 | 0.0 | 15.0 | 9.2 | | 2.8 | 36.7 |
| 45: Social Sciences | 0.0 | 0.0 | 25.4 | 0.0 | 64.5 | 0.0 | | 0.0 | 18.0 |
| 46: Construction Trades | 5.2 | 0.0 | | | | | | 0.0 | 5.1 |
| 47: Mechanic And Repair Tech | 2.6 | 9.6 | 0.0 | | | | | 0.0 | 3.2 |
| 48: Precision Production | 4.1 | 0.0 | | | | | | | 4.0 |
| 49: Transportation And Materials Moving | 2.3 | 0.0 | | 0.0 | | | | 0.0 | 2.2 |
| 50: Visual And Performing Arts | 9.8 | 46.8 | 52.4 | 0.0 | 83.5 | | 0.0 | 0.0 | 38.7 |
| 51: Health Professions And Related Programs | 28.4 | 33.0 | 25.2 | 0.0 | 24.0 | 3.3 | 36.7 | 15.1 | 27.8 |
| 52: Business | 6.7 | 40.6 | 2.8 | 0.0 | 3.8 | 2.0 | | 0.6 | 9.0 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | | | | | | | 0.0 |
| 54: History | 0.0 | 0.0 | 36.4 | 0.0 | 0.0 | | | 0.0 | 20.3 |
| 60: Residency Programs | 0.0 | | | | | | | 0.0 | 0.0 |
| Total | 23.3 | 37.1 | 24.3 | 0.0 | 16.6 | 10.2 | 35.8 | 7.3 | 23.7 |

TABLE 4.11   PERCENT OF GE PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | | | | |
| | UG certificates | Associate | Bachelors | Post-BA certs | Masters | Doctoral | Professional | Grad certs | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1: Agriculture & Related Sciences | 0.0 | 0.0 | 0.0 | 0.0 | | | | 0.0 | 0.0 |
| 3: Natural Resources And Conservation | 0.0 | | 20.0 | 0.0 | 0.0 | | | 0.0 | 0.7 |
| 4: Architecture And Related Services | 0.0 | | 0.0 | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 |
| 5: Area & Group Studies | 0.0 | | | | | | | 0.0 | 0.0 |
| 9: Communication | 1.9 | 0.0 | 12.0 | 0.0 | 11.1 | | | 0.0 | 2.4 |
| 10: Communications Tech | 1.3 | 17.4 | 29.2 | 0.0 | 33.3 | | | 0.0 | 4.4 |
| 11: Computer Sciences | 0.8 | 6.0 | 1.8 | 0.0 | 2.4 | 0.0 | | 0.0 | 1.2 |
| 12: Personal And Culinary Services | 37.2 | 12.7 | 18.2 | 0.0 | 0.0 | 0.0 | 0.0 | 11.1 | 35.5 |
| 13: Education | 1.3 | 10.0 | 18.2 | 0.0 | 6.3 | 4.3 | 0.0 | 0.4 | 1.2 |
| 14: Engineering | 0.0 | 20.0 | 10.0 | 0.0 | 0.0 | | | 0.0 | 0.7 |
| 15: Engineering Tech | 0.2 | 2.8 | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.3 |
| 16: Foreign Languages | 0.0 | | 50.0 | 0.0 | | | | 0.0 | 0.4 |
| 19: Family & Consumer Sciences | 0.7 | 25.0 | 27.3 | 0.0 | 100.0 | 100.0 | | 0.0 | 1.9 |
| 22: Legal Professions | 0.6 | 19.7 | 12.5 | 0.0 | 0.0 | 0.0 | 25.0 | 3.8 | 4.0 |
| 23: English Language | 8.6 | 20.0 | 36.4 | 0.0 | 50.0 | | | 0.0 | 7.9 |
| 24: Liberal Arts | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 0.9 |
| 25: Library Science | 0.0 | | 100.0 | 0.0 | 0.0 | | | 0.0 | 1.9 |
| 26: Biological & Biomedical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 1.1 | 0.4 |
| 27: Mathematics And Statistics | 0.0 | | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.0 |
| 28: Military Science | 0.0 | | | | | | | 0.0 | 0.0 |
| 29: Military Tech | 0.0 | | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.0 |
| 30: Multi/Interdisciplinary Studies | 0.0 | 25.0 | 28.6 | 0.0 | 0.0 | | | 0.7 | 1.4 |
| 31: Parks & Rec | 1.6 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 2.3 |
| 32: Basic Skills | 5.4 | | | | 0.0 | | | 0.0 | 5.1 |
| 33: Citizenship Activities | 0.0 | | | | | | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | | | | | | | 0.0 | 0.0 |
| 35: Interpersonal And Social Skills | | | | | | | | 0.0 | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | | | | 0.0 | | | | 0.0 |
| 37: Personal Awareness And Self-Improvement | 0.0 | | | | | | | 0.0 | 0.0 |
| 38: Philosophy And Religious Studies | 0.0 | | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.9 |
| 39: Theology And Religious Vocations | 4.9 | 0.0 | 20.0 | 0.0 | 14.3 | 0.0 | 0.0 | 0.0 | 2.8 |
| 40: Physical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 0.0 |
| 41: Science Technologies/Technicians | 0.0 | 0.0 | | 0.0 | | | | 0.0 | 0.0 |
| 42: Psychology | 0.0 | 0.0 | 28.6 | 0.0 | 15.8 | 13.3 | | 1.4 | 3.7 |
| 43: Homeland Security | 0.6 | 21.6 | 12.1 | 0.0 | 13.0 | 25.0 | | 0.0 | 3.0 |
| 44: Public Admin & Social Services | 0.0 | 40.0 | 21.4 | 0.0 | 10.5 | 28.6 | | 1.1 | 2.8 |
| 45: Social Sciences | 0.0 | 0.0 | 13.3 | 0.0 | 20.0 | 0.0 | | 0.0 | 0.8 |
| 46: Construction Trades | 1.2 | 0.0 | | | | | | 0.0 | 1.2 |
| 47: Mechanic & Repair Tech | 1.5 | 6.2 | 0.0 | | | | | 0.0 | 1.7 |
| 48: Precision Production | 1.6 | 0.0 | | | | | | | 1.6 |
| 49: Transportation And Materials Moving | 0.9 | 0.0 | | 0.0 | | | | 0.0 | 0.8 |
| 50: Visual And Performing Arts | 1.2 | 18.8 | 23.5 | 0.0 | 38.5 | | 0.0 | 0.0 | 5.5 |
| 51: Health Professions And Related Programs | 8.4 | 16.5 | 6.3 | 0.0 | 10.6 | 5.1 | 22.2 | 1.1 | 8.2 |
| 52: Business | 1.4 | 14.9 | 5.2 | 0.0 | 4.3 | 4.3 | | 0.2 | 2.4 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | | | | | | | 0.0 |
| 54: History | 0.0 | 0.0 | 16.7 | 0.0 | 0.0 | | | 0.0 | 1.8 |
| 60: Residency Programs | 0.0 | | | | | | | 0.0 | 0.0 |
| Total | 5.5 | 13.8 | 10.6 | 0.0 | 9.5 | 7.9 | 15.4 | 0.6 | 5.3 |

## Program Ineligibility

For GE programs, title IV, HEA ineligibility is triggered by two years of failing the same metric within a three-year period. Years when a program does not meet the n-size requirement are not counted towards those three years. The top panel of Table 4.12 shows the share of GE enrollment and programs in each result category in a second year as a function of the result in the first year,

along with the rate of becoming ineligible. Failure in one year being highly predictive of failure in the next year, and therefore ineligibility for title IV, HEA funds. Among programs that fail only the D/E metric in the first year, 69.6 percent of enrollment is in programs that also fail D/E in year 2 and would be ineligible for title IV, HEA participation the following year. The comparable rates for programs that fail

EP only or both D/E and EP in the first year are 86.6 and 96.3 percent, respectively. The share of programs (rather than enrollment in such programs) that become ineligible conditional on first year results is similar, as shown in the bottom panel of Table 4.12. These rates understate the share of programs that would ultimately become ineligible when a third year is considered.

Table 4.12. GE Program Performance Transition Between Years One and Two

|  |  | Percent of Enrollment by Result in Year Two | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Ineligible |
| Result in Year 1 | No D/E or EP data | 78.2 | 14.2 | 0.5 | 1.3 | 5.8 |  |
|  | Pass | 3.0 | 91.9 | 1.7 | 0.1 | 3.3 |  |
|  | Fail D/E only | 3.5 | 24.0 | 57.7 | 14.6 | 0.1 | 72.3 |
|  | Fail both D/E and EP | 0.3 | 0.3 | 5.5 | 83.2 | 10.6 | 99.3 |
|  | Fail EP only | 1.9 | 5.9 | 0.0 | 8.4 | 83.8 | 92.1 |

|  |  | Percent of Programs by Result in Year Two | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Ineligible |
| Result in Year 1 | No D/E or EP data | 95.6 | 3.0 | 0.1 | 0.2 | 1.1 |  |
|  | Pass | 9.5 | 82.9 | 1.5 | 0.4 | 5.7 |  |
|  | Fail D/E only | 13.4 | 16.2 | 51.8 | 17.8 | 0.8 | 69.6 |
|  | Fail both D/E and EP | 2.2 | 1.5 | 5.5 | 72.9 | 17.9 | 96.3 |
|  | Fail EP only | 9.1 | 4.1 | 0.1 | 8.1 | 78.5 | 86.6 |

## Institution-Level Analysis of GE Program Accountability Provisions

Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures. Characterizing the share of GE programs that have reported debt and earnings metrics that fail in particular postsecondary sectors can therefore give a distorted sense for the effect the rule might have on institutions in that sector. For example, a college (or group of colleges) might offer a single GE program that fails the rule and so appear to have 100 percent of its GE programs fail the rule. But if that program is a very small share of the institution's overall enrollment (or its title IV, HEA enrollment) then even if every student

in that program were to stop enrolling in the institution—an unlikely scenario as discussed below—the effect on the institution(s) would be much less than would be implied by the 100 percent failure rate among its GE programs. To provide better context for evaluating the potential effect of the GE rule on institutions or sets of institutions, we describe the share of all title IV, HEA supported enrollment—including enrollment in both GE and non-GE programs—that is in a GE program and that fails a GE metric and, therefore, is at risk of losing title IV, HEA eligibility.[290] Again, this should not be

viewed as an estimate of potential enrollment (or revenue) loss to the institution—in many cases the most likely impact of a program failing the GE metrics or losing eligibility is that students enroll in higher performing programs in the same institution.

Table 4.13 reports the distribution of institutions by share of enrollment that is in a failing GE program, by control and institution type. It shows that about 91 percent of public institutions and 95 percent of nonprofit institutions have no enrollment in GE programs that fail the GE metric. This rate is much lower–about 44 percent -for proprietary institutions, where all types of credential programs are covered by GE accountability and failure rates tend to be higher.

[290] Note that these statistics still do not fully capture the financial impact of GE on institutions. A complete analysis would account for the share of institutional revenue accounted for by title IV, HEA students, and the extent to which students in programs that fail GE will unenroll from the institutions entirely (versus transferring to a passing program at the same institution). The measures here are best viewed as a proxy for the share of Federal

title IV, HEA revenue at an institution that is potentially at risk due to the GE accountability provisions.

TABLE 4.13 DISTRIBUTION OF INSTITUTIONS BY SHARE OF ENROLLMENT THAT FAILS GE ACCOUNTABILITY, BY CONTROL AND INSTITUTION TYPE

[All Institutions]

| | | Share of institutional enrollment in failing GE programs | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | 0% | 0 5% | 5 10% | 10 20% | 20 40% | 40 99% | 100% |
| Public: | | | | | | | | |
| Less-Than 2-Year | 560 | 470 | 20 | 10 | 30 | 20 | 10 | 0 |
| 2-Year | 650 | 610 | 40 | 0 | 0 | 0 | 0 | 0 |
| 4-Year or Above | 380 | 380 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1,590 | 1,450 | 60 | 20 | 30 | 30 | 10 | 0 |
| Private, Nonprofit: | | | | | | | | |
| Less-Than 2-Year | 110 | 90 | 0 | 0 | 0 | 0 | 10 | 10 |
| 2-Year | 60 | 50 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4-Year or Above | 560 | 550 | 10 | 0 | 0 | 0 | 0 | 0 |
| Total | 730 | 690 | 10 | 0 | 0 | 10 | 10 | 10 |
| Proprietary: | | | | | | | | |
| Less-Than 2-Year | 1,270 | 530 | 10 | 10 | 20 | 30 | 200 | 480 |
| 2-Year | 120 | 70 | 0 | 10 | 0 | 10 | 30 | 0 |
| 4-Year or Above | 100 | 60 | 0 | 0 | 10 | 10 | 20 | 0 |
| Total | 1,490 | 660 | 10 | 10 | 30 | 60 | 240 | 490 |
| Total: | | | | | | | | |
| Less-Than 2-Year | 1,940 | 1,080 | 30 | 20 | 50 | 60 | 210 | 490 |
| 2-Year | 820 | 720 | 40 | 10 | 10 | 20 | 30 | 0 |
| 4-Year or Above | 1,050 | 990 | 10 | 10 | 10 | 10 | 20 | 0 |
| Total | 3,810 | 2,800 | 80 | 30 | 60 | 90 | 260 | 500 |

**Note:** All counts rounded to the nearest 100. Columns may not sum to totals because of rounding.

Very few public community or technical colleges (CCs) have considerable enrollment in programs that would fail GE. About 6 percent of the predominant 2-year public colleges have any of their enrollment in certificate programs that would fail, and about 5 percent of the predominantly less than two-year technical colleges have more than 20 percent of enrollment that does.

The share of enrollment in failing GE programs for Historically Black Colleges and Universities (HBCUs), Tribal Colleges and Universities (TCUs), and other minority-serving institutions is even smaller, as shown in Table 4.14.[291] At HBCUs, only five colleges out of 100 has more than five percent of enrollment in failing programs; across all HBCUs, only five programs at four schools fail. TCUs have no failing programs. Less than one percent of Hispanic-serving institutions (HSIs) have more than 10 percent of enrollment in failing programs.[292] We conducted a similar analysis excluding institutions that do not have any GE programs. The patterns are similar.

TABLE 4.14 DISTRIBUTION OF INSTITUTIONS BY SHARE OF ENROLLMENT THAT FAILS GE ACCOUNTABILITY, BY SPECIAL MISSION TYPE

| | Total | Share of institutional enrollment in failing GE programs | | | | |
|---|---|---|---|---|---|---|
| | | 0% | 0 5% | 5 10% | 10 20% | 20 40% | 40 99% |
| | | N of Institutions | | | | | |
| HBCU | 100 | 96 | 3 | 1 | 0 | 0 | 0 |
| TCU | 35 | 35 | 0 | 0 | 0 | 0 | 0 |
| HSI | 446 | 425 | 17 | 1 | 0 | 2 | 1 |
| All Other Non-FP MSI | 158 | 144 | 3 | 3 | 4 | 4 | 0 |
| Total | 739 | 700 | 23 | 5 | 4 | 6 | 1 |

As noted above, these estimates cannot assess the impact of the GE provisions on total enrollment at these institutions. Especially at institutions with diverse program offerings, many students in failing programs can be expected to transfer to other non-failing programs within the institution (as opposed to exiting the institution). Moreover, many institutions are likely to admit additional enrollment into their programs from failing programs at other (especially for-profit) institutions. We quantify the magnitude of this enrollment shift and revisit the

[291] Under § 668.403(b)(1)(i), debt considered in the calculation of the D/E rates is capped at the total net cost for tuition, fees, and books. However, due to data constraints noted in the RIA, this cap was not applied in the analysis of the impact of the rule. An analysis by New America suggests that this cap will lead to a large reduction in the number of

graduate programs at HBCUs, HSIs, TCUs, and other MSIs projected to fail the D/E rates measure. See Caldwell, Tia & Garza, Roxanne (2023). Previous Projections Overestimated Gainful Employment Failures: Almost All HBCUs & MSI Graduate Programs Pass. New America (*https://*

*www.newamerica.org/education-policy/edcentral/ ge-failures-overestimated/*).

[292] The number of Hispanic Serving Institutions reported here differs slightly from the current eligibility list, as the 2022 PPD uses designations from 2021. The number of HBCUs and TCUs is the same in both sources, however.

implications for overall institution-level enrollment effects in a later section.

*Regulation Targets Low-Performing GE Programs*

The Department conducted an analysis on which specific GE programs fail the metrics. The analysis concludes that the metrics target programs where students earn little, borrow more, and default at higher rates on their student loans than similar programs providing the same credential.

Table 4.15 reports the average program-level cohort default rate for GE programs, separately by result, control, and credential level. Programs are weighted by their average title IV, HEA enrollment in AY 2016 and 2017 to better characterize the outcomes experienced by students. The overall 3-year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools. The average default rate is higher for programs that fail the EP threshold than for programs that fail the D/E metric, despite debt being lower for the former. This is because even low levels of debt are difficult to repay when earnings are very low. Programs that pass the metrics, either with data or without, have lower default rates than those that fail.

TABLE 4.15   AVERAGE PROGRAM COHORT DEFAULT RATE BY RESULT, OVERALL AND BY CONTROL, AND CREDENTIAL LEVEL

[Enrollment-weighted]

| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Total |
|---|---|---|---|---|---|---|
| Public: | | | | | | |
| UG Certificates | 16.6 | 17.5 | 11.1 | 20.4 | 19.9 | 16.9 |
| Post-BA Certs | 2.3 | 2.4 | .................. | .................. | .................. | 2.3 |
| Grad Certs | 2.6 | 2.2 | 0.0 | .................. | .................. | 2.5 |
| Total | 15.8 | 16.5 | 6.2 | 20.4 | 19.9 | 16.1 |
| Private, Nonprofit: | | | | | | |
| UG Certificates | 10.0 | 9.9 | .................. | 15.9 | 14.5 | 12.0 |
| Post-BA Certs | 2.9 | 1.2 | .................. | .................. | .................. | 2.8 |
| Grad Certs | 2.6 | 1.9 | 0.4 | .................. | .................. | 2.4 |
| Total | 6.2 | 6.9 | 0.4 | 15.9 | 14.5 | 8.7 |
| Proprietary: | | | | | | |
| UG Certificates | 14.0 | 14.4 | 16.9 | 14.9 | 13.9 | 14.2 |
| Associate | 15.0 | 12.8 | 17.9 | 19.6 | 17.6 | 15.3 |
| Bachelor s | 13.7 | 11.5 | 14.4 | 14.8 | 11.9 | 12.4 |
| Post-BA Certs | 26.4 | 13.2 | .................. | .................. | .................. | 16.9 |
| Master s | 4.9 | 3.8 | 5.1 | 4.5 | .................. | 4.1 |
| Doctoral | 3.8 | 4.6 | 5.4 | .................. | .................. | 4.4 |
| Professional | 1.0 | 0.0 | 0.7 | .................. | .................. | 0.7 |
| Grad Certs | 1.4 | 4.2 | 5.5 | .................. | . | 3.9 |
| Total | 12.0 | 10.6 | 13.3 | 16.7 | 14.1 | 12.0 |
| Foreign Private: | | | | | | |
| UG Certificates | 0.0 | .................. | .................. | .................. | .................. | 0.0 |
| Post-BA Certs | 12.5 | .................. | .................. | .................. | .................. | 12.5 |
| Grad Certs | 5.2 | .................. | .................. | 0.0 | .................. | 0.2 |
| Total | 3.6 | .................. | .................. | 0.0 | .................. | 0.2 |
| Foreign For-Profit: | | | | | | |
| Master s | 0.0 | .................. | .................. | .................. | .................. | 0.0 |
| Doctoral | 0.5 | 5.3 | .................. | .................. | .................. | 1.4 |
| Professional | 1.3 | .................. | 1.3 | .................. | .................. | 1.3 |
| Total | 1.1 | 5.3 | 1.3 | .................. | .................. | 1.3 |
| Total: | | | | | | |
| UG Certificates | 16.1 | 15.4 | 16.1 | 15.3 | 14.6 | 15.5 |
| Associate | 15.0 | 12.8 | 17.9 | 19.6 | 17.6 | 15.3 |
| Bachelor s | 13.7 | 11.5 | 14.4 | 14.8 | 11.9 | 12.4 |
| Post-BA Certs | 2.9 | 5.4 | .................. | .................. | .................. | 3.2 |
| Master s | 4.8 | 3.8 | 5.1 | 4.5 | .................. | 4.1 |
| Doctoral | 3.5 | 4.6 | 5.4 | .................. | .................. | 4.3 |
| Professional | 1.2 | 0.0 | 0.8 | .................. | .................. | 1.0 |
| Grad Certs | 2.5 | 2.4 | 4.4 | 0.0 | . | 2.6 |
| Total | 13.9 | 11.3 | 13.1 | 16.6 | 14.7 | 12.9 |

To better understand the specific types of programs that underpin the aggregate patterns described above, Table 4.16 lists the 20 most common types of programs (the combination of field and credential level) by enrollment count in the 2022 PPD. The programs with the highest enrollments are undergraduate certificate programs in cosmetology, allied health, liberal arts, and practical nursing, along with bachelor's programs in business and nursing. These 20 most common types of programs represent more than half of all enrollments in GE programs. Table 4.17 provides the average program annual loan payment (weighted by the number of students completing a program), the average program earnings (weighted by the number of students completing a program), the average annual D/E rate, and the average cohort default rate (weighted by the number of students completing a program). This shows quite a bit of variability in debt, loan service, earnings, and default across different types of programs.

#### 4.16  GE Programs With the Most Students, by CIP and Credential Level

| | Number of programs | Percent of all programs | Number of students | Percent of students at all programs |
|---|---|---|---|---|
| **Field of Study (Ordered by All-Sector Enrollment):** | | | | |
| 1204  Cosmetology & Personal Grooming   UG Certificates ............................... | 1,267 | 4.0 | 191,600 | 6.5 |
| 5202  Business Administration   Bachelor s ................................................... | 72 | 0.2 | 149,000 | 5.1 |
| 5108  Allied Health (Medical Assisting)   UG Certificates ................................ | 895 | 2.9 | 147,100 | 5.0 |
| 2401  Liberal Arts   UG Certificates ............................................................. | 345 | 1.1 | 140,900 | 4.8 |
| 5139  Practical Nursing   UG Certificates ...................................................... | 1,032 | 3.3 | 130,900 | 4.5 |
| 5107  Health & Medical Administrative Services   UG Certificates ................... | 910 | 2.9 | 83,500 | 2.8 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Bachelor s ............................................................................... | 56 | 0.2 | 75,600 | 2.6 |
| 4706  Vehicle Maintenance & Repair   UG Certificates ................................... | 722 | 2.3 | 75,100 | 2.6 |
| 4301  Criminal Justice & Corrections   Bachelor s ......................................... | 47 | 0.2 | 55,500 | 1.9 |
| 5202  Business Administration   Master s ...................................................... | 46 | 0.1 | 55,400 | 1.9 |
| 4805  Precision Metal Working   UG Certificates ............................................ | 761 | 2.4 | 49,000 | 1.7 |
| 5109  Allied Health (Diagnostic & Treatment)   UG Certificates ...................... | 725 | 2.3 | 47,000 | 1.6 |
| 5108  Allied Health (Medical Assisting)   Associate ........................................ | 142 | 0.5 | 43,800 | 1.5 |
| 5107  Health & Medical Administrative Services   Bachelor s ......................... | 46 | 0.1 | 42,100 | 1.4 |
| 5202  Business Administration   Associate ..................................................... | 89 | 0.3 | 39,600 | 1.4 |
| 5107  Health & Medical Administrative Services   Associate ........................... | 128 | 0.4 | 38,700 | 1.3 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Master s .................................................................................. | 20 | 0.1 | 37,800 | 1.3 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Associate ................................................................................ | 92 | 0.3 | 36,300 | 1.2 |
| 5202  Business Administration   UG Certificates ............................................ | 573 | 1.8 | 34,300 | 1.2 |
| 5106  Dental Support   UG Certificates .......................................................... | 432 | 1.4 | 33,100 | 1.1 |
| All Other Programs ........................................................................................ | 22,920 | 73.2 | 1,424,900 | 48.6 |

**Note:** the number of students has been rounded to the nearest 100.

#### 4.17  Annual Loan Payment, Earnings, D/E Rate, Cohort Default Rate by Program Type
[Enrollment-weighted]

| | Annual loan payment | Median 2018 19 earnings (in 2019 $) of 3yrs after graduation | Average annual DTE rate | Cohort default rate |
|---|---|---|---|---|
| **Field of Study (Ordered by All-Sector Enrollment):** | | | | |
| 1204  Cosmetology & Personal Grooming   UG Certificates | 1,004 | 17,104 | 6.51 | 13.68 |
| 5202  Business Administration   Bachelor s | 2,711 | 48,059 | 5.78 | 14.07 |
| 5108  Allied Health (Medical Assisting)   UG Certificates | 947 | 24,137 | 4.28 | 16.58 |
| 2401  Liberal Arts   UG Certificates | 99 | 29,893 | 0.26 | 16.38 |
| 5139  Practical Nursing   UG Certificates | 1,075 | 39,763 | 3.07 | 10.23 |
| 5107  Health & Medical Administrative Services   UG Certificates | 1,107 | 23,556 | 5.34 | 14.96 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Bachelor s | 1,948 | 76,718 | 2.68 | 3.81 |
| 4706  Vehicle Maintenance & Repair   UG Certificates | 1,410 | 37,746 | 4.03 | 19.48 |
| 4301  Criminal Justice & Corrections   Bachelor s | 2,720 | 38,155 | 7.69 | 17.06 |
| 5202  Business Administration   Master s | 3,725 | 58,366 | 6.60 | 4.09 |
| 4805  Precision Metal Working   UG Certificates | 642 | 34,659 | 2.11 | 26.57 |
| 5109  Allied Health (Diagnostic & Treatment)   UG Certificates | 564 | 42,953 | 2.15 | 11.7 |
| 5108  Allied Health (Medical Assisting)   Associate | 2,275 | 31,598 | 7.98 | 12.16 |
| 5107  Health & Medical Administrative Services   Bachelor s | 3,292 | 37,044 | 9.22 | 10.89 |
| 5202  Business Administration   Associate | 2,532 | 32,427 | 8.30 | 21.66 |
| 5107  Health & Medical Administrative Services   Associate | 2,721 | 26,779 | 10.51 | 14.02 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Master s | 3,852 | 96,946 | 4.02 | 2.59 |
| 5138  Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Associate | 2,535 | 61,494 | 4.69 | 6.93 |
| 5202  Business Administration   UG Certificates | 705 | 35,816 | 1.60 | 20.07 |
| 5106  Dental Support   UG Certificates | 1,024 | 24,557 | 4.42 | 14.00 |
| All Other Programs | 3,105 | 42,530 | 7.98 | 12.07 |

Table 4.18 lists the most frequent types of failing GE programs (by enrollment in failing programs). Failing programs are disproportionately in a small number of types of programs. About 22 percent of enrollment in failing programs is in UG Certificate Cosmetology programs alone, reflecting both high enrollment and high failure rates. Another 20 percent are in UG Certificate programs in Health/Medical administration and assisting, dental support, and massage, reflecting large enrollment and moderate failure rates. These 20 categories account for about 72 percent of all enrollments in programs that fail at least one GE metric. Table 4.19 provides the average program annual loan payment, the average program earnings, and the average default rate (all weighted by title IV, HEA enrollment) for the most frequent types (by field and credential) of GE programs that fail at least one GE metric (by enrollment count), separately for failing and passing programs. Within each type of program, failing programs have much higher loan payments, lower earnings, and higher default rates than programs that pass the GE metrics. This demonstrates that higher-performing GE programs exist even within the same

field and credential level as programs
that fail GE.

### 4.18 FAILING GE PROGRAMS WITH THE MOST STUDENTS, BY GE RESULT, CIP, AND CREDENTIAL LEVEL

| | Number of failing programs | Percent of failing programs | Number of students | Percent of students at failing programs |
|---|---|---|---|---|
| 1204  Cosmetology & Personal Grooming   UG Certificates | 638 | 35.9 | 153,700 | 21.5 |
| 5108  Allied Health (Medical Assisting)   UG Certificates | 159 | 9.0 | 79,100 | 11.1 |
| 5107  Health & Medical Administrative Services   UG Certificates | 106 | 6.0 | 37,600 | 5.3 |
| 5107  Health & Medical Administrative Services   Associate | 37 | 2.1 | 28,800 | 4.0 |
| 5107  Health & Medical Administrative Services   Bachelor s | 5 | 0.3 | 26,400 | 3.7 |
| 3017  Behavioral Sciences   Bachelor s | 2 | 0.1 | 20,100 | 2.8 |
| 5202  Business Administration   Associate | 23 | 1.3 | 19,000 | 2.7 |
| 5108  Allied Health (Medical Assisting)   Associate | 38 | 2.1 | 17,600 | 2.5 |
| 1312  Teacher Education & Professional Development, Specific Levels & Methods   Bachelor s | 2 | 0.1 | 17,500 | 2.4 |
| 5115  Mental & Social Health Services & Allied Professions   Master s | 5 | 0.3 | 15,400 | 2.2 |
| 5106  Dental Support   UG Certificates | 63 | 3.5 | 14,300 | 2.0 |
| 5135  Somatic Bodywork   UG Certificates | 95 | 5.3 | 13,400 | 1.9 |
| 4301  Criminal Justice & Corrections   Bachelor s | 7 | 0.4 | 13,100 | 1.8 |
| 4400  Human Services, General   Bachelor s | 2 | 0.1 | 12,100 | 1.7 |
| 4301  Criminal Justice & Corrections   Associate | 16 | 0.9 | 11,700 | 1.6 |
| 4201  Psychology   Bachelor s | 4 | 0.2 | 10,200 | 1.4 |
| 1205  Culinary Arts   UG Certificates | 21 | 1.2 | 5,800 | 0.8 |
| 2301  English Language & Literature, General   UG Certificates | 8 | 0.5 | 5,600 | 0.8 |
| 5139  Practical Nursing   UG Certificates | 27 | 1.5 | 5,500 | 0.8 |
| 5204  Business Operations   UG Certificates | 33 | 1.9 | 5,400 | 0.8 |
| All Other Programs | 485 | 27.3 | 201,200 | 28.2 |
| Total | 1,776 | 100.0 | 713,200 | 100.0 |

**Note:** Student counts rounded to the nearest 100.

### 4.19 ANNUAL LOAN PAYMENT, EARNINGS, DEFAULT RATE AMONG TOP TYPES OF FAILING GE PROGRAMS

| | Annual loan payment indicator for failing GE metric in 2019 for any reason | | Earnings indicator for failing GE metric in 2019 for any reason | | Default rate (ever) indicator for failing GE metric in 2019 for any reason | |
|---|---|---|---|---|---|---|
| | Passing | Failing | Passing | Failing | Passing | Failing |
| Field of Study & Level (Ordered by Failing Program Enrollment): | | | | | | |
| 1204  Cosmetology & Personal Grooming   UG Certificates | 566.7 | 1,063.9 | 27,199.4 | 16,913.1 | 17.2 | 13.0 |
| 5108  Allied Health (Medical Assisting)   UG Certificates | 813.1 | 1,034.3 | 27,612.1 | 22,527.1 | 16.5 | 16.6 |
| 5107  Health & Medical Administrative Services   UG Certificates | 860.2 | 1,279.7 | 28,803.9 | 21,243.7 | 14.6 | 15.4 |
| 5107  Health & Medical Administrative Services   Associate | 2,250.0 | 2,857.4 | 32,807.9 | 25,598.2 | 9.5 | 15.5 |
| 5107  Health & Medical Administrative Services   Bachelor s | 2,960.3 | 3,482.3 | 43,590.7 | 34,118.7 | 10.4 | 11.2 |
| 3017  Behavioral Sciences   Bachelor s | | 3,499.3 | | 29,512.7 | 0.0 | 16.5 |
| 5202  Business Administration   Associate | 2,304.5 | 2,762.1 | 37,887.8 | 27,280.5 | 19.6 | 23.9 |
| 5108  Allied Health (Medical Assisting)   Associate | 3,458.0 | 3,121.2 | 36,729.0 | 31,081.2 | 9.2 | 11.0 |
| 1312  Teacher Education & Professional Development, Specific Levels & Methods   Bachelor s | 2,027.4 | 2,707.3 | 35,298.8 | 26,152.5 | 10.1 | 16.0 |
| 5115  Mental & Social Health Services & Allied Professions   Master s | 5,305.3 | 7,096.9 | 49,712.0 | 42,604.7 | 4.5 | 6.1 |
| 5106  Dental Support   UG Certificates | 986.9 | 1,055.5 | 27,084.4 | 23,011.8 | 13.1 | 15.1 |
| 5135  Somatic Bodywork   UG Certificates | 672.6 | 948.6 | 27,373.5 | 19,258.2 | 13.6 | 13.3 |
| 4301  Criminal Justice & Corrections   Bachelor s | 2,465.7 | 3,527.6 | 40,112.4 | 32,371.9 | 15.4 | 22.3 |
| 4400  Human Services, General   Bachelor s | 2,493.8 | 3,903.3 | 33,323.4 | 32,788.8 | 14.3 | 14.9 |
| 4301  Criminal Justice & Corrections   Associate | 1,517.7 | 2,625.0 | 35,501.2 | 28,408.3 | 18.8 | 22.1 |
| 4201  Psychology   Bachelor s | 2,068.4 | 3,333.3 | 36,641.7 | 28,865.8 | 11.1 | 17.4 |
| 1205  Culinary Arts   UG Certificates | 2,399.3 | 0.0 | | 19,361.7 | 35.0 | 6.0 |
| 2301  English Language & Literature, General   UG Certificates | | 3,661.0 | | 36,873.0 | 25.0 | 9.9 |
| 5139  Practical Nursing   UG Certificates | 104.7 | 0.0 | 30,557.3 | 26,423.7 | 16.6 | 11.9 |
| 5204  Business Operations   UG Certificates | 494.1 | 635.9 | 28,985.0 | 18,202.5 | 13.5 | 16.0 |
| All Other Programs | 2,462.3 | 4,062.4 | 52,687.3 | 29,767.5 | 11.6 | 13.3 |

*Student Demographic Analysis*

Methodology for Student Demographic Analysis

The Department conducted analyses of the 2022 PPD to assess the role of student demographics as a factor in program performance. Our analysis demonstrates that GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone. We examined the demographic composition of program enrollment, comparing the composition of programs that pass, fail, or did not have data. We also conducted regression analysis, which permits us to hold constant several factors at once. This analysis focuses on GE programs since non-GE programs are not at risk of becoming ineligible for title IV, HEA aid.[293]

For the race and ethnicity variables, we used the proportion of individuals in each race and ethnicity category among all completers of each certificate or

---

[293] We conducted the regression analysis discussed below for non-GE programs as well. Our conclusions about the relative contribution of demographic factors in explaining program performance on the D/E and EP metrics is similar for non-GE programs as for GE programs.

degree reported in the IPEDS 2016 and 2017 Completions Surveys.[294] Race and ethnicity is not available for only title IV, HEA recipients, so we rely on information for all (including non-title IV, HEA student) completers instead from IPEDS. We construct four race/ethnicity variables:

• Percent Black
• Percent Hispanic
• Percent Asian
• Percent non-White.

We aggregated the number of completions in each race/ethnicity category reported for each program in IPEDS to the corresponding GE program definition of six-digit OPEID, CIP code, and credential level. While D/E and EP rates measure only the outcomes of students who completed a program and received title IV, HEA program funds, IPEDS completions data include both title IV, HEA graduates and non-title IV, HEA graduates. Race and ethnicity data is not available separately for title IV, HEA completers. We believe the IPEDS data provides a reasonable approximation of the proportion, by race and ethnicity, of title IV, HEA graduates completing GE programs. We determined percent of each race and ethnicity category for 25,278 of the 32,058 programs. Many smaller programs could not be matched primarily because, as stated above, IPEDS and NSLDS use different program categorization systems, and the two sources at times are not sufficiently consistent to match data at the GE program-level. Nonetheless, we do not believe this will substantially affect our results since programs that do not match are less likely to meet the n-size criteria and would be likely excluded from our analysis of program performance.

Percent Pell for this analysis is the percentage of title IV, HEA completers during award years 2015, 2016, and 2017 who received a Pell grant at any time in their academic career. Because Pell status is being used as a proxy for socioeconomic background, we counted students if they had received a Pell grant at any time in their academic career, even if they did not receive it for enrollment in the program. For instance, students that received Pell at their initial undergraduate institution but not at another institution they attended later would be considered a Pell grant recipient at both institutions.

Several other background variables were collected from students' Free Application for Federal Student Aid (FAFSA) form. For all students receiving title IV, HEA aid in award years 2015, 2016, and 2017, the Department matched their enrollment records to their latest FAFSA filed associated with their first award year in the program in which they were enrolled. First-generation status, described below, is taken from students earliest received FAFSA. From these, the Department constructed the following:

• Percent of students that are male.
• Percent of students that are first-generation, defined as those who indicated on the FAFSA not having a parent that had attended college. Children whose parents completed college are more likely to attend and complete college.
• Average family income in 2019 dollars. For dependent students, this includes parental income and the students' own income. For independent students, it includes the student's own income and spousal income.
• Average expected family contribution. We consider EFC as an indicator of socioeconomic status because EFC is calculated based on household income, other resources, and family size.
• Average age at time of FAFSA filing.

• Percent of students aged 24 or older at time of FAFSA filing.
• Share of students that are independent. Independent status is determined by a number of factors, including age, marital status, having dependents, and veteran status.
• Median student income prior to program enrollment among students whose income is greater than or equal to three-quarters of a year of earnings at Federal minimum wage. We only compute this variable for programs where at least 30 students meet this requirement, this variable should be viewed as a rough indicator of students' financial position prior to program entry. The average percentage of enrollees covered by this variable is 57.6 across all programs.

Based on these variables, we determined the composition of over 23,907 of the 32,058 programs in our data, though some demographic variables have more non-missing observations. Unless otherwise stated, our demographic analysis treats programs (rather than students) as the unit of analysis. The analysis, therefore, does not weight programs (and their student characteristics) by enrollment.

Table 4.20 provides program-level descriptive statistics for these demographic variables in the GE program dataset. The typical (median) program has 6 percent completers that are Black, 6 percent Hispanic, 0 percent Asian (program mean is 3 percent), and 38 percent non-White. At the median program, sixty-one percent are independent, half are over the age 24, and 31 percent are male. Half are first-generation college students and 77 percent have ever received a Pell Grant. Average family income at time of first FAFSA filing is $38,000 and the typical student who is attached to the labor force earns $29,900 before enrolling in the program.

4.20   DESCRIPTIVE STATISTICS OF THE DEMOGRAPHIC VARIABLES

|  | Programs | Median | Average | Std. deviation |
|---|---|---|---|---|
| Share T4 Completers First Gen ................................................ | 24,199 | 50 | 49 | 34 |
| Share T4 Completers Ever Pell ................................................ | 24,199 | 77 | 67 | 36 |
| Share T4 Completers Out-of-State ........................................... | 24,199 | 0 | 16 | 30 |
| Share of T4 Completers Male ................................................... | 24,199 | 31 | 42 | 41 |
| Share of T4 Completers Age 24+ ............................................. | 24,199 | 50 | 51 | 37 |
| Share T4 Completers Independent ........................................... | 24,199 | 61 | 58 | 36 |
| Share All Completions Non-White ............................................ | 25,278 | 38 | 43 | 30 |
| Share All Completions Black ................................................... | 25,278 | 6 | 14 | 20 |
| Share All Completions Hispanic .............................................. | 25,278 | 6 | 15 | 23 |
| Share All Completions Asian ................................................... | 25,278 | 0 | 3 | 9 |
| Age at Time of FAFSA .............................................................. | 23,907 | 26 | 28 | 8 |
| FAFSA Family Income .............................................................. | 23,907 | 38,137 | 47,726 | 45,433 |

[294] Specifically, the C2016A and C2017A datasets available from the IPEDS data center. These cover the 2015–16 and 2016–17 academic years (July 1 to June 30).

## 4.20   DESCRIPTIVE STATISTICS OF THE DEMOGRAPHIC VARIABLES   Continued

| | Programs | Median | Average | Std. deviation |
|---|---|---|---|---|
| Median Student Pre-Inc ................................................... | 17,599 | 29,908 | 38,585 | 32,806 |

**Student Demographics Descriptive Analysis**

Table 4.21 reports average demographic characteristics of GE programs separately by GE result. Programs that fail at least one GE metric have a higher share of students that are female, higher share of students that are Black or Hispanic, lower student and family income, and higher share of students that have ever received the Pell grant. Average student age and dependency status is similar for passing and failing programs.

## 4.21   DEMOGRAPHIC SHARES BY RESULT

| | All | Passing | Fail (any) | Fails D/E | Fails EP |
|---|---|---|---|---|---|
| Share TIV Completers First Gen ........................................... | 49 | 48 | 61 | 55 | 62 |
| Share TIV Completers Ever Pell ........................................... | 67 | 66 | 80 | 74 | 82 |
| Share TIV Completers Out-of-State ...................................... | 16 | 15 | 21 | 40 | 16 |
| Share of TIV Completers Male .............................................. | 42 | 44 | 21 | 28 | 19 |
| Share of TIV Completers Age 24+ ........................................ | 51 | 51 | 49 | 57 | 46 |
| Share TIV Completers Independent ....................................... | 58 | 58 | 59 | 66 | 57 |
| Share All Completions Non-White ......................................... | 43 | 42 | 56 | 58 | 56 |
| Share All Completions Black ................................................. | 14 | 13 | 22 | 26 | 21 |
| Share All Completions Hispanic ........................................... | 15 | 15 | 22 | 18 | 23 |
| Share All Completions Asian ................................................ | 3 | 3 | 4 | 2 | 4 |
| Age at Time of FAFSA .......................................................... | 28 | 28 | 27 | 29 | 27 |
| FAFSA Family Income .......................................................... | 47,700 | 48,600 | 35,900 | 41,100 | 34,200 |
| Median Student Pre-Inc ....................................................... | 38,600 | 39,600 | 29,200 | 34,200 | 27,400 |

**Note:** Income values rounded to the nearest 100.

**Student Demographics Regression Analysis**

One limitation of the descriptive tabulations presented above is that it is difficult to determine which factors, whether they be demographics or program characteristics, explain the higher failure rate of programs serving certain groups of students. To further examine the relationship between student demographics and program results under the regulations, we analyzed the degree to which specific demographic characteristics might be associated with a program's annual D/E rate and EP, while holding other characteristics constant.

For this analysis, the Department estimated the parameters of ordinary least squares (OLS) linear regression models with annual debt-to-earnings or the earnings premium as the dependent (outcome) variables and indicators of student, program, and institutional characteristics as independent variables.[295] The independent demographic variables included in the regression analysis are: share of students in different race and ethnicity categories; share of students ever receiving Pell Grants; share of students that are male; share of students that are first-generation college students; share of students that are independent; and average family income from student's FAFSA. Program and institutional characteristics include credential level and control (public, private nonprofit, and proprietary). In some specifications we include institution fixed effects and omit control. When used with program-level data, institutional fixed effects control for any factors that differ between institutions but are common among programs in the same institution, such as institutional leadership, pricing strategy, and State or local factors.

Table 4.22 reports estimates from the D/E rate regressions described above, with each column representing a different regression model that includes different sets of independent variables. Comparing the R-squared across different columns demonstrates the degree to which different factors explain variation in the outcome. The first three columns quantify the extent to which variation in D/E rates are accounted for by program and institutional characteristics. The institutional control alone (column 1) explains 22 percent of the variation in D/E and adding credential level increases the R-squared to 33 percent (column 2). D/E rates are 2.5 to 3.9 percentage points higher for private nonprofit and for-profit institutions than public institutions (the omitted baseline category) after controlling for credential level. This may reflect the much higher tuition prices charged by private institutions, which can result in higher debt service. Graduate credential levels also have much higher debt-to-earnings ratios than undergraduate credentials, reflecting the typically higher tuition costs associated with graduate programs.

Almost all programs are in institutions with multiple GE programs, so column 3 includes institution fixed effects in place of indicators for control.[296] Credential level and institution together account for 77 percent of the variation in D/E rates across programs. To illustrate how much more of the variation in outcomes is accounted for by student characteristics, column 4 adds the demographic characteristics on top of the model with credential level and institution effects. Doing so only slightly increases the model's ability to account for variation in D/E, lifting the R-

---

[295] Though not shown below, we have conducted parallel regression analysis with binary indicators for whether the program fails the D/E metric and whether it fails the EP metric as the outcomes. Results are qualitatively similar to those reported here using continuous outcomes, though the amount of variation in these binary outcomes that demographics explain is even more muted than that reported here.

[296] Only 4 percent of GE programs are the only GE program within the institution. The median number of programs within an institution is 18.

App.140

squared to 79 percent. For example, this specification effectively compares programs with more Pell students to those with fewer Pell students within the same institution and same credential level, while also controlling for the other independent variables listed. Demographic characteristics, therefore,

appear to explain little of the variation in D/E rates across programs beyond what can be predicted by institutional characteristics and program credential level. Evidently, institution- and program-level factors, which could include such things as institutional performance and decisions about

institutional pricing along with other factors, are much more important.[297] The final two columns report similar models, but weighting by average title IV, HEA enrollment, and the results are qualitatively similar.

4.22  REGRESSION ANALYSIS OF THE DEMOGRAPHIC VARIABLES, GE PROGRAMS, OUTCOME: D/E

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Private, Nonprofit | 3.062 (0.305) | 2.512 (0.263) | | | | |
| Proprietary | 4.928 (0.110) | 3.868 (0.101) | | | | |
| Credential Level: | | | | | | |
| UG Certificates | | −2.118 (0.207) | −2.495 (0.603) | −4.083 (0.618) | −1.079 (0.654) | −5.037 (0.594) |
| Associate | | 0.084 (0.251) | 0.295 (0.449) | −0.651 (0.426) | 1.401 (0.651) | −0.927 (0.427) |
| Master s | | 2.780 (0.769) | 1.552 (0.591) | 1.303 (0.479) | 0.983 (0.719) | 1.683 (0.563) |
| Doctoral | | 4.451 (0.809) | 3.758 (1.096) | 5.701 (1.051) | 3.824 (1.469) | 7.892 (1.235) |
| Professional | | 12.480 (3.696) | 5.841 (1.002) | 5.672 (1.387) | 6.753 (0.850) | 8.839 (1.547) |
| Grad Certs | | 1.200 (0.596) | 1.431 (1.748) | 0.928 (1.679) | 4.650 (2.577) | 4.738 (2.415) |
| % Black | | | | 0.016 (0.009) | | 0.032 (0.016) |
| % Hispanic | | | | −0.015 (0.011) | | −0.035 (0.017) |
| % Asian | | | | −0.054 (0.028) | | −0.154 (0.043) |
| % Male | | | | −0.014 (0.002) | | −0.028 (0.004) |
| % Ever Pell | | | | 0.003 (0.012) | | 0.050 (0.017) |
| % First Generation | | | | 0.001 (0.008) | | −0.021 (0.015) |
| % Independent | | | | −0.008 (0.005) | | −0.008 (0.008) |
| FAFSA Family Income ($1,000) | | | | −0.056 (0.013) | | −0.087 (0.014) |
| Intercept | 1.265 (0.064) | 3.221 (0.217) | 6.371 (0.468) | 10.974 (1.618) | 6.220 (0.423) | 12.057 (2.079) |
| R-squared | 0.22 | 0.33 | 0.77 | 0.79 | 0.64 | 0.78 |

**Notes:** Specifications 3 to 6 include fixed effects for each six-digit OPEID number. Bachelor s degree and public are the omitted categories for credential type and control, respectively. Columns 5 and 6 weight programs by average title IV, HEA enrollment in AY16 and AY17.

Table 4.23 reports estimates from identical regression models, but instead using EP as the outcome. Again, each column represents a different regression model that includes different sets of independent variables. Program and institutional characteristics still matter greatly to earnings outcomes.

Institutional effects and credential level together explain 77 percent of the variation in program-level earnings outcomes (column 3). Adding demographic variables explains an additional 7 percentage points of the variation in program-level earnings (column 4). Note that the estimated

regression coefficients will likely overstate the effect of the baseline characteristics on outcomes if these characteristics are correlated with differences in program quality not captured by the crude institution and program characteristics included in the regression.

4.23  REGRESSION ANALYSIS OF THE DEMOGRAPHIC VARIABLES, GE PROGRAMS, OUTCOME: EP

[$1,000s]

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Private, Nonprofit | 8.923 (2.420) | 1.461 (1.711) | | | | |
| Proprietary | −4.475 (0.611) | −10.632 (0.489) | | | | |
| Credential Level: | | | | | | |
| UG Certificates | | −18.507 (0.835) | −17.315 (1.658) | −7.634 (1.415) | −20.963 (2.350) | −0.592 (1.922) |
| Associate | | −6.708 (1.000) | −8.647 (1.333) | −3.698 (1.128) | −11.169 (2.014) | −0.219 (1.271) |
| Master s | | 11.357 (1.661) | 11.083 (2.072) | 7.159 (1.778) | 11.594 (3.496) | 8.787 (2.811) |
| Doctoral | | 32.585 (3.078) | 33.356 (4.576) | 20.948 (4.079) | 27.749 (6.390) | 9.854 (4.553) |
| Professional | | 41.422 (12.277) | 58.755 (13.661) | 44.702 (11.280) | 66.316 (9.890) | 43.113 (11.599) |
| Grad Certs | | 23.756 (3.225) | 13.475 (4.224) | 11.475 (3.614) | 7.105 (6.533) | 7.995 (6.577) |
| % Black | | | | −0.116 (0.047) | | −0.201 (0.058) |
| % Hispanic | | | | −0.081 (0.038) | | 0.015 (0.061) |
| % Asian | | | | 0.487 (0.110) | | 1.376 (0.267) |
| % Male | | | | 0.099 (0.007) | | 0.096 (0.016) |
| % Ever Pell | | | | −0.158 (0.046) | | −0.094 (0.064) |
| % First Generation | | | | −0.052 (0.029) | | −0.006 (0.049) |
| % Independent | | | | 0.146 (0.018) | | 0.200 (0.032) |
| FAFSA Family Income ($1,000) | | | | 0.168 (0.056) | | 0.439 (0.071) |
| Intercept | 11.267 (0.514) | 27.745 (0.931) | 20.126 (1.349) | 9.874 (7.507) | 22.128 (1.676) | −20.312 (9.392) |
| R-squared | 0.03 | 0.42 | 0.77 | 0.84 | 0.71 | 0.87 |

**Notes:** Specifications 3 to 6 include fixed effects for each six-digit OPEID number. Bachelor s degree and public are the omitted categories for credential type and control, respectively. Columns 5 and 6 weight programs by average title IV, HEA enrollment in AY16 and AY17.

---

[297] The patterns by race are broadly similar to what was found in analysis of the 2014 final rule. The coefficient on % Black in the final column suggests that a 10-percentage point increase in the percent of students that are black is associated with a 0.15 higher debt-to-earnings ratio, holding institution, credential level, and the other demographic factors listed constant. Analysis of the prior rule found an increase of 0.19, though the set of controls is not the same.

Conclusions about the extent to which different factors explain variation in program outcomes can be sensitive to the order in which factors are entered into regressions. However, a variance decomposition analysis (that is insensitive to ordering) demonstrates that program and institutional factors explain the majority of the variance in both the D/E and EP metrics across programs when student characteristics are also included.

Figure 4.3 provides another view, demonstrating that many successful programs exist and enroll similar shares of low-income students. It shows the distribution of raw Eps for undergraduate certificate programs (the y-axis is in $1,000s) grouped by the average FAFSA family income of the program. Programs are placed in 20 equally sized groups from lowest to highest FAFSA family income.[298] Each dot represents an individual program. The EP of the median program in each income group, indicated by the large black square, is clearly increasing,

reflecting the greater earnings opportunities for students that come from higher income families. However, there is tremendous variation around this median. Even among programs with students that come from the lowest income families, there are clearly programs whose students go on to have earnings success after program completion. This graph demonstrates that demographics are not destiny when it comes to program performance.

BILLING CODE 4000 01 P



Figure 4.3 Distribution of Earnings Premium by Family Income, Certificate Programs

BILLING CODE 4000 01 C

### Gender Differences

The analysis above showed that programs failing the EP threshold have a higher share of female students. In Table 4.24, we show descriptively that there are many programs that have similar gender composition but have much higher rates of passage than programs in cosmetology and massage, where failure rates are comparatively higher. Other programs, such as practical nursing and dental support, are similar in terms of their gender and racial balance but have much higher passage rates.

TABLE 4.24   GENDER AND RACIAL COMPOSITION OF UNDERGRADUATE CERTIFICATE PROGRAMS

| | Share of programs failing | Share of all completers who are . . . | | | | | |
|---|---|---|---|---|---|---|---|
| | | Black women | Hispanic women | Asian women | Other women | White women | Women (any race) |
| Teacher Education ..................................................... | 0.066 | 0.226 | 0.165 | 0.025 | 0.094 | 0.439 | 0.950 |

---

[298] Since each of the 20 groups includes the same number of programs, the income range varies across groups.

TABLE 4.24    GENDER AND RACIAL COMPOSITION OF UNDERGRADUATE CERTIFICATE PROGRAMS    Continued

| | Share of programs failing | Share of all completers who are . . . | | | | | |
|---|---|---|---|---|---|---|---|
| | | Black women | Hispanic women | Asian women | Other women | White women | Women (any race) |
| Human Development | 0.019 | 0.216 | 0.284 | 0.039 | 0.063 | 0.366 | 0.968 |
| Health & Medical Admin | 0.441 | 0.209 | 0.171 | 0.029 | 0.086 | 0.442 | 0.938 |
| Medical Assisting | 0.535 | 0.171 | 0.292 | 0.030 | 0.067 | 0.317 | 0.876 |
| Laboratory Science | 0.211 | 0.163 | 0.138 | 0.030 | 0.079 | 0.434 | 0.843 |
| Practical Nursing | 0.034 | 0.154 | 0.134 | 0.033 | 0.067 | 0.498 | 0.886 |
| Cosmetology | 0.789 | 0.150 | 0.191 | 0.051 | 0.059 | 0.451 | 0.902 |
| Dental Support | 0.428 | 0.146 | 0.300 | 0.025 | 0.064 | 0.384 | 0.920 |
| Business Operations | 0.257 | 0.142 | 0.166 | 0.020 | 0.057 | 0.395 | 0.781 |
| Business Administration | 0.001 | 0.128 | 0.090 | 0.018 | 0.058 | 0.308 | 0.601 |
| Culinary Arts | 0.148 | 0.123 | 0.148 | 0.019 | 0.060 | 0.249 | 0.598 |
| Somatic Bodywork | 0.619 | 0.102 | 0.127 | 0.029 | 0.079 | 0.418 | 0.754 |
| Accounting | 0.071 | 0.096 | 0.141 | 0.060 | 0.067 | 0.361 | 0.725 |
| Criminal Justice | 0.039 | 0.072 | 0.079 | 0.004 | 0.027 | 0.151 | 0.333 |
| Liberal Arts | 0.038 | 0.049 | 0.205 | 0.043 | 0.055 | 0.262 | 0.613 |
| Allied Health, Diagnostic | 0.015 | 0.046 | 0.089 | 0.016 | 0.034 | 0.309 | 0.494 |
| Information Technology (IT) Admin & Mgmt. | 0.046 | 0.044 | 0.021 | 0.009 | 0.029 | 0.081 | 0.183 |
| Ground Transportation | 0.005 | 0.041 | 0.007 | 0.003 | 0.007 | 0.034 | 0.092 |
| Computer & Info Svcs | 0.074 | 0.030 | 0.078 | 0.012 | 0.017 | 0.113 | 0.250 |
| Precision Metal Working | 0.041 | 0.009 | 0.007 | 0.001 | 0.005 | 0.036 | 0.058 |
| Heating, Ventilation, and Air Conditioning (HVAC) | 0.025 | 0.008 | 0.003 | 0.000 | 0.001 | 0.012 | 0.025 |
| Fire Protection | 0.000 | 0.007 | 0.019 | 0.001 | 0.005 | 0.058 | 0.091 |
| Power Transmission | 0.021 | 0.007 | 0.006 | 0.000 | 0.003 | 0.019 | 0.035 |
| Vehicle Maintenance | 0.018 | 0.006 | 0.011 | 0.001 | 0.006 | 0.027 | 0.052 |
| Environment Ctrl Tech | 0.007 | 0.006 | 0.007 | 0.001 | 0.005 | 0.018 | 0.036 |

## Conclusions of Student Demographic Analysis

On several dimensions, programs that have higher enrollment of underserved students have worse outcomes—lower completion, higher default, and lower post-college earnings levels—due to a myriad of challenges these students face, including fewer financial resources and structural discrimination in the labor market.[299] And yet, there is evidence that some institutions aggressively recruit vulnerable students—at times with deceptive marketing and fraudulent data—into programs without sufficient institutional support and instructional investment, placing students at risk for having high debt burdens and low earnings.[300] Nonetheless, our analysis demonstrates that GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone.

Furthermore, alternative programs with similar student characteristics but where students have better outcomes exist and serve as good options for students that would otherwise attend low-performing programs. We quantify the extent of these alternative options more directly in the next section. The GE rule aims to protect students from low-value programs and steer them to programs that would be greater engines of upward economic mobility.

*Alternative Options Exist for Students To Enroll in High-Value Programs*

Measuring Students' Alternative Options

One concern with limiting title IV, HEA eligibility for low-performing GE programs is that such measures could reduce postsecondary opportunities for some students. The Department conducted an analysis to estimate the short-term alternative options that are available to students that might, in the absence of these regulations, enroll in failing programs. The scope of alternative options in the longer term is likely to be broader than the results of this analysis, as other institutions can expand their program offerings and failing programs can improve their performance.

Students deterred from attending a specific program because of a loss of title IV, HEA eligibility at that program have several potential alternatives. For programs that are part of a multi-program institution, many may choose to remain at the same institution, but attend a different

program in a related subject that did not lose access to title IV, HEA aid and, therefore, likely offers better outcomes for students in terms of student debt, earnings, or both. Some would stay in their local area and attend a nearby institution that offers a program in the same or related subject. Still others would attend an institution further away, but perhaps in the same State or online.[301] In order to identify geographical regions where the easiest potential transfer options exist, we used the 3-digit ZIP code (ZIP3) in which each institution is located. Three-digit zip codes designate the processing and distribution center of the United States Postal Service that serves a given geographic area. For each combination of ZIP3, CIP code, and credential level, we determined the number of programs available and the number of programs that would pass both the D/E and EP rates measures. Since programs that do not fail due to insufficient n-size to compute D/E and EP rates represent real options for students at failing programs, we include these programs in our calculations. Importantly, we also include all non-GE programs at public and private nonprofit institutions.[302]

[299] Blau, Francine D. & Kahn, Lawrence M. (2017). The Gender Wage Gap: Extent, Trends, and Explanations. *Journal of Economic Literature*, 55 (3): 789–865. Hillman, N.W. (2014). College on Credit: A Multilevel Analysis of Student Loan Default. *Review of Higher Education*, 37(2), 169–195. Pager, D., Western, B. & Bonikowski, B. (2009). Discrimination in a Low-Wage Labor Market: A Field Experiment. *American Sociological Review*, 74, 777–799.

[300] Cottom, T.M. (2017). *Lower Ed: The Troubling Rise of For-Profit Colleges in the New Economy*. Government Accountability Office (2010). *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices*. U.S. Senate Committee on Health, Education, Labor, and Pensions (2012). *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*.

[301] Two other possibilities, which we include in our simulation of budget impacts, is that students continue to enroll in programs without receiving title IV, HEA aid or decline to enroll altogether.

[302] Since the 2022 PPD are aggregated to each combination of the six-digit OPEID, four-digit CIP code, and credential level, we do not have precise data on geographic location. For example, a program can have multiple branch locations in different cities and States. At some of these

Continued

Our characterization of programs by the number of alternative options available is also used in the simulations of enrollment shifts that underlie the budget impact and cost, benefit, and transfer estimates, which we describe later.

Table 4.25 reports the distribution of the number of transfer options available to the students who would otherwise attend GE programs that fail at least one of the two metrics. We present estimates for four different ways of conceptualizing and measuring these transfer options. We assume students have more flexibility over the specific field and institution attended than credential level, so all four measures assume students remain in the same

credential level. While not captured in this analysis, it is possible that some students would pursue a credential at a higher level in the same field, thereby further increasing their available options. Half of students in failing GE programs (in 41 percent of failing programs) have at least one alternative non-failing program of the same credential level at the same institution, but in a related field (as indicated by being in the same 2-digit CIP code). More than a quarter have more than one additional option. Two-thirds of students (at 60 percent of the failing programs) have a transfer option passing the GE measures within the same geographic area (ZIP3), credential level,

and narrow field (4-digit CIP code). More than 90 percent of students have at least one transfer option within the same geographic area and credential level when the field is broadened to include programs in the same 2-digit CIP code. Finally, all students have at least one transfer option in the same State, credential level, and 2-digit CIP code. While this last measure includes options that may not be viable for currently enrolled students—requiring moving across the State or attending virtually—it does suggest that at least some options are available for all students, both current and prospective, who would otherwise attend failing GE programs.

TABLE 4.25   SHARE OF PROGRAMS AND ENROLLMENT IN FAILING GE PROGRAMS, BY NUMBER OF ALTERNATIVE OPTIONS

|  | Same institution, cred level, CIP2 | Same Zip3, cred level CIP4 | Same Zip3, cred level, CIP2 | Same state, cred level, CIP2 |
|---|---|---|---|---|
| A. Programs Transfer options: |  |  |  |  |
| 1 or more ............................................ | 0.41 | 0.60 | 0.88 | 1.00 |
| 5 or more ............................................ | 0.03 | 0.03 | 0.50 | 0.96 |
| B. Enrollment Transfer options: |  |  |  |  |
| 1 or more ............................................ | 0.50 | 0.65 | 0.91 | 1.00 |
| 5 or more ............................................ | 0.03 | 0.04 | 0.53 | 0.95 |

Table 4.26 repeats this analysis for non-GE programs with at least one failing GE metric. Students considering non-GE programs with D/E or EP metrics that do not meet Department standards may choose to enroll

elsewhere. More than half of students at failing non-GE programs have a non-failing program in the same 4-digit CIP code, credential level, and geographic area that they could choose to enroll in. This share approaches three-quarters if

the field is broadened to include programs in the same two-digit CIP code. Therefore, while the alternative options for non-GE programs are not as numerous as for GE programs, the number of alternatives is still quite high.

TABLE 4.26   SHARE OF PROGRAMS AND ENROLLMENT IN FAILING NON-GE PROGRAMS, BY NUMBER OF TRANSFER OPTIONS

| Level | Same institution, cred level, CIP2 | Same Zip3, cred level, CIP4 | Same Zip3, cred level, CIP2 | Same state, cred level, CIP2 |
|---|---|---|---|---|
| A. Programs Transfer options: |  |  |  |  |
| 1 or more ............................................ | 0.54 | 0.47 | 0.80 | 0.99 |
| 5 or more ............................................ | 0.12 | 0.05 | 0.40 | 0.95 |
| B. Enrollment Transfer options: |  |  |  |  |
| 1 or more ............................................ | 0.37 | 0.49 | 0.71 | 0.99 |
| 5 or more ............................................ | 0.08 | 0.05 | 0.29 | 0.93 |

This analysis likely understates the transfer options available to students for three reasons. First, as stated above, it does not consider programs of a different credential level. For example, students who would have pursued a certificate program might opt for an associate degree program that shows

higher earnings. Second, it does not consider the growth of online/distance education programs now available in most fields of study, from both traditional schools and primarily on-line institutions.

Third, we do not consider non-title IV, HEA institutions. Undergraduate

certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics. Nonetheless, recent data from California and Texas suggest that many students successfully pass

locations, the program could be offered as an online program while other locations offer only in-person programs. Each of these locations would present as a single program in our data set without detail

regarding precise location or format. We do not possess more detailed geographic information that would allow us to address this issue, so we recognize that our analysis of geographic scope and

alternatives may be incomplete and cause us to understate the number of options students have. Nonetheless, the vast majority of alternative options will be captured in our analysis.

licensure exams after completing non-title IV, HEA programs in cosmetology.[303] Non-title IV, HEA cosmetology schools operate in almost all counties in Texas.[304] In Florida, non-title IV, HEA cosmetology schools have similar licensure pass rates but much lower tuition.[305]

**Potential Alternative Programs Have Better Outcomes Than Failing Programs**

A key motivation for more accountability via this rule is to steer students to higher value programs. As mentioned previously, research has shown that when an institution closed after failing accountability measures based on Cohort Default Rates, students were diverted to schools with better outcomes.[306] The Department conducted an analysis of the possible earnings impact of students shifting from programs that fail one of the GE metrics to similar programs that do not fail. For each failing program, we computed the average program-level median earnings of non-failing programs included in the failing program's transfer options, which we refer to as "Alternative Program Earnings." Earnings were weighted by average title IV, HEA enrollment in award years 2016 and 2017. Alternative options were determined in the same way as described above. In computing Alternative Program Earnings, priority was first given to passing programs in the same institution, credential level, and two-digit CIP code if such programs exist and have valid earnings. This assigned Alternative Program Earnings for 20 percent of failing programs. Next

priority was given to programs in the same ZIP3, credential level, and four-digit CIP code, which assigned Alternative Program Earnings for 8 percent of programs. Next was programs in the same ZIP3, credential level, and two-digit CIP code, which assigned Alternative Program Earnings for 14 percent of programs. We did not use the earnings of programs outside the ZIP3 to assign Alternative Program Earnings given the wage differences across regions. It was not possible to compute the earnings of alternative options for the remaining 59 percent of programs primarily because the available options in those instances have insufficient number of completers to report median earnings (47 percent) or because they did not have alternative options in the same ZIP3 (12 percent). For these programs, we set the Alternative Program Earnings equal to the median earnings of high school graduates in the State (the same value used to determine the ET). The percent increase in earnings associated with moving from a failing program to a passing program was computed as the difference between a program's Alternative Program Earnings and its own median earnings, divided by its own median earnings. We set this earnings gain measure to 100 percent in the small number of cases where the median program earnings are zero or the ratio is greater than 100 percent.

Table 4.27 reports the estimated percent difference in earnings between alternative program options and failing programs, separately by two-digit CIP and credential level. Across all subjects, the difference in earnings at passing undergraduate certificate programs and failing programs is about 50 percent. This is unsurprising, given that the EP metric explicitly identifies programs with low earnings, which in practice are primarily certificate programs. Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail. Failing associate degree programs also have similar non-failing programs with much higher earnings. Earnings differences are still sizable and positive, though not quite as large for higher credentials. Passing GE bachelor's degree programs

have 31 percent higher earnings than bachelor's degree programs that fail the GE metrics.

Table 4.28 reports similar estimates for non-GE programs. The earnings difference between failing and passing non-GE programs is more modest than for GE programs, but still significant: 21 percent across all credential levels, ranging from close to zero for Doctoral programs to 30 percent for bachelor's degree programs.

We use a similar process to compute the percent change in average program-level median debt between failing GE or non-GE programs and alternative programs.[307] Tables 4.29 and 4.30 report the percent change in debt between alternative program options and failing programs, separately by two-digit CIP and credential level. Across all subjects and credential levels, debt is 22 percent lower at alternative programs than at failing GE programs. Large differences in debt are seen at all degree levels (other than professional), with modest differences for undergraduate certificate programs. At non-GE programs, there is no aggregate debt difference between failing programs and their alternatives, though this masks heterogeneity across credential levels. For graduate degree programs, relative to failing programs, alternative programs have lower debt levels, with the differences (the percent difference in debt between alternative and failing programs) ranging from 24 percent (Professional programs) to 35 percent (Doctoral programs). Failing associate degree programs have debt that is 12 percent higher than in passing programs.

While these differences do not necessarily provide a completely accurate estimate of the actual earnings gain or debt reduction that students would experience by shifting programs, they suggest alternative options exist that provide better financial outcomes than programs that fail the D/E and EP metrics.

---

[303] In California, 55 percent of individuals passing either the practical or written components of the licensure test are from title IV, HEA schools according to Department analysis using licensing exam data retrieved from *www.barbercosmo.ca.gov/ schools/schls_rslts.shtml* on December 7, 2022.

[304] Cellini, S.R. & Onwukwe, B. (Aug. 2022). Cosmetology Schools Everywhere: Most Cosmetology Schools Exist Outside of the Federal Student Aid System. Postsecondary Equity & Economics Research Project working paper.

[305] Cellini, S.R. & Goldin, C. (2014). Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges. *American Economic Journal: Economic Policy*, 6(4), 174–206.

[306] Cellini, S.R., Darolia, R. & Turner, L.J. (2020). Where Do Students Go When For-Profit Colleges Lose Federal Aid? *American Economic Journal: Economic Policy*, 12(2): 46–83.

[307] The only exception being that we use the debt for alternative programs in the same credential level, same two-digit CIP code, and State to impute alternative program debt if such a program is not available or calculable in students' ZIP3. This is because there is no other natural benchmark debt level analogous to the ET used to compute alternative program earnings.

TABLE 4.27   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| cip2 | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | UG certificates | Associate | Bachelors | Masters | Doctoral | Professional | Grad certs | |
| 1 | | | | | | | | |
| 3 | | | −0.18 | | | | | −0.18 |
| 9 | 0.12 | | 0.24 | 0.24 | | | | 0.17 |
| 10 | 0.42 | 0.19 | −0.01 | −0.38 | | | | 0.07 |
| 11 | 0.48 | 0.26 | 0.79 | −0.62 | | | | 0.45 |
| 12 | 0.53 | 0.12 | −0.18 | | | 1.00 | | 0.52 |
| 13 | 0.38 | 0.34 | 0.13 | 0.46 | 0.18 | | −0.04 | 0.21 |
| 14 | | −0.01 | −0.36 | | | | | −0.19 |
| 15 | 0.14 | −0.10 | | | | | | 0.11 |
| 16 | | | −0.03 | | | | | −0.03 |
| 19 | 0.65 | 0.29 | 0.13 | −0.28 | −0.55 | | | 0.11 |
| 22 | 0.33 | −0.03 | −0.04 | | | 0.22 | −0.60 | 0.00 |
| 23 | 0.57 | −0.07 | 0.38 | −0.09 | | | | 0.44 |
| 24 | 0.06 | | | | | | | 0.06 |
| 25 | | | −0.03 | | | | | −0.03 |
| 26 | | | | | | | −0.32 | −0.32 |
| 30 | | 0.15 | −0.07 | | | | −0.34 | −0.04 |
| 31 | 0.51 | −0.00 | | | | | | 0.09 |
| 32 | 0.32 | | | | | | | 0.32 |
| 39 | 0.40 | | −0.03 | −0.20 | | | | 0.04 |
| 42 | | | 0.06 | 0.25 | −0.52 | | −0.34 | −0.04 |
| 43 | 0.22 | 0.19 | 0.24 | 0.41 | −0.56 | | | 0.21 |
| 44 | | 0.04 | 0.43 | 0.62 | 0.46 | | −0.50 | 0.37 |
| 45 | | | 0.23 | −0.24 | | | | 0.06 |
| 46 | 0.40 | | | | | | | 0.40 |
| 47 | 0.39 | 0.14 | | | | | | 0.33 |
| 48 | 0.25 | | | | | | | 0.25 |
| 49 | 0.77 | | | | | | | 0.77 |
| 50 | 0.38 | 0.22 | 0.27 | 0.46 | | | | 0.29 |
| 51 | 0.51 | 0.83 | 0.75 | 0.87 | −0.30 | −0.06 | 0.08 | 0.60 |
| 52 | 0.50 | 0.31 | 0.61 | 0.22 | 0.34 | | 0.20 | 0.38 |
| 54 | | | −0.13 | | | | | −0.13 |
| Total | 0.50 | 0.47 | 0.30 | 0.54 | −0.40 | −0.03 | −0.11 | 0.43 |

TABLE 4.28   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| cip2 | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
| | Associate | Bachelors | Masters | Doctoral | Professional | |
| 1 | 0.31 | 0.12 | | | | 0.16 |
| 3 | | 0.38 | −0.14 | | | 0.31 |
| 4 | | | −0.31 | | | −0.31 |
| 5 | | 0.02 | | | | 0.02 |
| 9 | 0.12 | 0.24 | −0.02 | | | 0.20 |
| 10 | 0.14 | −0.01 | | | | 0.11 |
| 11 | 0.36 | 1.00 | | | | 0.40 |
| 12 | 0.25 | | | | | 0.25 |
| 13 | 0.22 | 0.32 | 0.21 | −0.12 | | 0.23 |
| 15 | 0.83 | | | | | 0.83 |
| 16 | 0.03 | 0.43 | | | | 0.40 |
| 19 | 0.18 | 0.40 | −0.42 | | | 0.27 |
| 22 | 0.00 | −0.08 | −0.26 | −0.59 | −0.07 | −0.13 |
| 23 | 0.38 | 0.23 | −0.18 | | | 0.20 |
| 24 | 0.15 | 0.10 | −0.54 | | | 0.14 |
| 26 | 0.13 | 0.28 | 0.16 | −0.70 | | 0.22 |
| 30 | 0.12 | 0.06 | −0.17 | | | 0.07 |
| 31 | 0.10 | 0.22 | −0.22 | | | 0.18 |
| 38 | −0.05 | −0.10 | | | | −0.07 |
| 39 | 0.55 | 0.49 | −0.02 | | 0.20 | 0.38 |
| 40 | | 0.58 | | | | 0.58 |
| 41 | 0.08 | | | | | 0.08 |
| 42 | 0.31 | 0.04 | −0.24 | −0.35 | | 0.07 |
| 43 | 0.19 | −0.04 | 0.06 | | | 0.09 |
| 44 | 0.21 | −0.16 | −0.08 | | | 0.10 |

TABLE 4.28   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL   Continued

| cip2 | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
| | Associate | Bachelor's | Master's | Doctoral | Professional | |
| 45 | 0.09 | 0.47 | −0.12 | | | 0.23 |
| 47 | 0.38 | | | | | 0.38 |
| 50 | 0.23 | 0.40 | 0.31 | −0.29 | | 0.37 |
| 51 | 0.62 | 0.78 | 0.57 | 0.26 | 0.11 | 0.46 |
| 52 | 0.15 | 0.48 | 0.72 | | | 0.22 |
| 54 | | 0.06 | −0.19 | | | −0.09 |
| Total | 0.22 | 0.27 | 0.26 | 0.07 | 0.04 | 0.21 |

TABLE 4.29   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| cip2 | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | UG certificates | Associate | Bachelor's | Master's | Doctoral | Professional | Grad certs | |
| 1 | 0.00 | | | | | | | 0.00 |
| 3 | | | −0.65 | | | | | −0.65 |
| 9 | 0.06 | | −0.26 | −0.01 | | | | −0.04 |
| 10 | 0.15 | 0.63 | −0.32 | | | | | −0.15 |
| 11 | 0.21 | −0.36 | −0.23 | −0.79 | | | | −0.14 |
| 12 | −0.23 | −0.49 | 0.13 | | | | 0.00 | −0.23 |
| 13 | −0.28 | −0.89 | −0.31 | −0.36 | −0.18 | | −0.20 | −0.39 |
| 14 | | 0.01 | −0.58 | | | | | −0.30 |
| 15 | −0.10 | −0.69 | | | | | | −0.17 |
| 16 | | | −0.52 | | | | | −0.52 |
| 19 | −0.05 | −0.26 | −0.24 | −0.30 | | | | −0.23 |
| 22 | 1.00 | −0.60 | −0.26 | | | −0.40 | | −0.47 |
| 23 | 0.00 | −0.82 | −0.33 | 0.00 | | | | −0.18 |
| 24 | 0.00 | | | | | | | 0.00 |
| 25 | | | | | | | | |
| 26 | | | | | | | −0.25 | −0.25 |
| 30 | | −0.91 | −0.54 | | | | | −0.58 |
| 31 | −0.83 | −0.75 | | | | | | −0.80 |
| 32 | 0.00 | | | | | | | 0.00 |
| 39 | 0.59 | | | | | | | 0.59 |
| 42 | | | −0.49 | −0.20 | −0.16 | | −0.77 | −0.35 |
| 43 | −0.57 | −0.70 | −0.42 | −0.10 | | | | −0.53 |
| 44 | | −0.74 | −0.09 | −0.32 | −0.38 | | | −0.23 |
| 45 | | | −0.11 | | | | | −0.11 |
| 46 | 0.07 | | | | | | | 0.07 |
| 47 | 0.05 | −0.24 | | | | | | 0.00 |
| 48 | −0.21 | | | | | | | −0.21 |
| 49 | 0.33 | | | | | | | 0.33 |
| 50 | 0.21 | −0.59 | −0.33 | −0.23 | | | | −0.31 |
| 51 | 0.01 | −0.16 | −0.39 | −0.48 | −0.64 | 0.60 | −0.43 | −0.10 |
| 52 | −0.14 | −0.42 | −0.33 | −0.17 | −0.17 | | −0.27 | −0.35 |
| 54 | | | −0.22 | | | | | −0.22 |
| Total | −0.10 | −0.38 | −0.36 | −0.36 | −0.22 | 0.48 | −0.34 | −0.22 |

TABLE 4.30   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| 2-digit CIP code | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
| | Associate | Bachelor's | Master's | Doctoral | Professional | |
| 1 | −0.37 | −0.14 | | | | −0.19 |
| 3 | | 0.02 | −0.53 | | | −0.06 |
| 4 | | | −0.35 | | | −0.35 |
| 5 | | −0.12 | | | | −0.12 |
| 9 | 0.64 | −0.22 | −0.37 | | | −0.13 |
| 10 | −0.19 | −0.11 | | | | −0.18 |
| 11 | −0.29 | −0.42 | | | | −0.30 |
| 12 | 0.08 | | | | | 0.08 |

TABLE 4.30   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL   Continued

| 2-digit CIP code | Credential level | | | | | Total |
| | Associate | Bachelor s | Masters | Doctoral | Professional | |
| --- | --- | --- | --- | --- | --- | --- |
| 13 | 0.24 | −0.13 | −0.30 | −0.03 | | 0.05 |
| 15 | 0.22 | | | | | 0.22 |
| 16 | −0.27 | 0.19 | | | | 0.15 |
| 19 | 0.07 | 0.21 | −0.39 | | | 0.14 |
| 22 | −0.55 | −0.28 | | −0.16 | −0.26 | −0.28 |
| 23 | 0.19 | −0.04 | −0.33 | | | −0.04 |
| 24 | 0.19 | −0.10 | | | | 0.16 |
| 26 | 0.78 | 0.11 | −0.28 | | | 0.16 |
| 30 | −0.15 | −0.16 | 0.00 | | | −0.15 |
| 31 | 0.80 | −0.22 | | | | 0.12 |
| 38 | | −0.26 | | | | −0.26 |
| 39 | −0.67 | −0.03 | −0.29 | | 0.00 | −0.10 |
| 40 | | 1.00 | | | | 1.00 |
| 41 | | | | | | |
| 42 | 0.33 | −0.11 | −0.04 | −0.17 | | −0.03 |
| 43 | −0.22 | −0.30 | −0.19 | | | −0.25 |
| 44 | −0.26 | −0.23 | −0.16 | | | −0.24 |
| 45 | −0.08 | −0.19 | −0.53 | | | −0.18 |
| 47 | 0.21 | | | | | 0.21 |
| 50 | 0.25 | −0.02 | −0.28 | | | −0.01 |
| 51 | 0.01 | −0.03 | −0.09 | −0.38 | −0.22 | −0.11 |
| 52 | −0.15 | −0.26 | −0.09 | | | −0.17 |
| 54 | | 0.39 | −0.79 | | | 0.10 |
| Total | 0.12 | −0.07 | −0.19 | −0.32 | −0.23 | 0.02 |

Transfer Causes Net Enrollment Increase in Some Sectors

The aggregate change in enrollment overall, by sector, and by institution would likely be less than that implied by the program- and institution-level results presented in the "Results of GE Accountability" section above because those do not consider that many students would likely transfer to passing programs or even remain enrolled at failing programs in response to a program losing title IV, HEA eligibility. The Department simulated the likely destinations of students enrolled in failing GE programs. Based on the research literature and described more fully in "Student Response Assumptions" subsection in Section 5 below, we use assumptions about the share of students that transfer to another program, remain enrolled in the original program, or drop out entirely if a program loses title IV, HEA eligibility. These student mobility assumptions differ according to the number of alternative options that exist and are the same assumptions used in the Net Budget Impact section.

Using these assumptions, for every failing GE program, we estimate the title IV, HEA enrollment from that program that would remain, dropout, or transfer to another program. Our notion of "transfers" includes both current students and future students who attend an alternative program instead of one

that fails the GE metrics. The number of transfers is then reallocated to specific other non-failing GE and non-GE programs in the same institution (OPEID6), credential level, and 2-digit CIP code. If multiple such programs exist, transfer enrollment is allocated based on the share of initial title IV, HEA enrollment in these programs. If no alternative options exist using this approach, the transfer enrollment is allocated to non-failing GE and non-GE programs in the same geographic area (ZIP3), credential level, and 4-digit CIP code. Again, initial title IV, HEA enrollment shares are used to allocate transfer enrollment if multiple such alternative programs exist. These two approaches reallocate approximately 80 percent of the transfer enrollments we would expect from failing GE programs. Finally, new title IV, HEA enrollment is computed for each program that sums existing enrollment (or retained enrollment, in the case of failing GE programs) and the allocated transfer enrollment.

Table 4.31 summarizes these simulation results, separately by type of institution.[308] Without accounting for transfers or students remaining in failing GE programs, aggregate title IV, HEA enrollment drops by 715,200 (3.7

percent), with at least some enrollment declines in all sectors. This will greatly overstate the actual enrollment decline associated with the regulation because it assumes that students leave postsecondary education in response to their program failing a GE metric. The final column simulates enrollment after accounting for transfers within institution (to similar programs) and to similar programs at other geographically proximate institutions, along with permitting some modest enrollment retention at failing programs. In this scenario, aggregate enrollment declines by only 231,000 (1.2 percent) due to the rule.[309] Importantly, some sectors experience an enrollment increase as students transfer from failing to passing programs. For instance, public 2-year community colleges are simulated to experience a 30,000-student enrollment increase once transfers are accounted for rather than a 30,000-student decrease when they are not. HBCUs are simulated to gain 1,200 students rather than lose 700.

[308] Programs at foreign institutions are excluded from Table 4.31 as they do not have an institutional type.

[309] Note that since many failing programs result in earnings lower than those of the typical high school graduate, students leaving postsecondary education still may be better off financially compared to staying in a failing program.

TABLE 4.31   ENROLLMENT WITH AND WITHOUT TRANSFERS, BY SECTOR

| | Number of inst. | Initial enrollment | No transfers or retention | + within institution CIP2 transfers | + within ZIP3 CIP4 transfers |
|---|---|---|---|---|---|
| Sector of institution: | | | | | |
| Public, 4-year + ........................................................ | 700 | 8,186,900 | 8,179,700 | 8,184,900 | 8,208,800 |
| Private not-for-profit, 4-year + .............................. | 1,400 | 4,002,400 | 3,994,500 | 3,999,200 | 4,004,500 |
| Private for-profit, 4-year + ..................................... | 200 | 1,298,900 | 951,100 | 1,147,900 | 1,155,900 |
| Public, 2-year .......................................................... | 900 | 5,025,200 | 4,995,600 | 5,013,300 | 5,054,900 |
| Private not-for-profit, 2-year .................................. | 100 | 97,200 | 74,900 | 91,200 | 92,100 |
| Private for-profit, 2-year ......................................... | 300 | 290,900 | 195,600 | 250,600 | 255,900 |
| Public, <2-year ....................................................... | 200 | 42,600 | 41,300 | 42,100 | 46,200 |
| Private not-for-profit, <2-year ............................... | <50 | 11,600 | 6,200 | 8,300 | 8,500 |
| Private for-profit, <2-year ...................................... | 1,000 | 278,400 | 85,700 | 151,100 | 178,200 |
| Total | 4,900 | 19,234,100 | 18,524,500 | 18,888,500 | 19,004,900 |

**Note:** Enrollment counts have been rounded to the nearest 100.

## 5. Discussion of Costs, Benefits, and Transfers

### Description of Baseline

In absence of the final regulations, many students enroll in low-financial-value programs where they either end up not being able to secure a job that leads to higher earnings, take on unmanageable debt, or both. Many of these students default on their student loans, with negative consequences for their credit and financial security and at substantial costs to the taxpayers. Many students with insufficient earnings to repay their debts would be eligible to have their payments reduced and eventually have their loans forgiven through income-driven repayment (IDR). This shields low-income borrowers from the consequences of unaffordable debts but shifts the financial burden onto taxpayers.

We have considered the primary costs, benefits, and transfers for the following groups or entities that will be affected by the final regulations:

• Students
• Institutions
• State and local governments
• The Federal Government

We first discuss the anticipated benefits of the final regulations, including improved market information. We then assess the expected costs and transfers for students, institutions, the Federal Government, and State and local governments. Table 5.1 below summarizes the major benefits, costs, and transfers and whether they are quantified in our analysis or not.

TABLE 5.1   SUMMARY OF COSTS, BENEFITS, AND TRANSFERS FOR FINANCIAL VALUE TRANSPARENCY AND GAINFUL EMPLOYMENT FINAL REGULATIONS

| | Students | Institutions | State and local governments | Federal government |
|---|---|---|---|---|
| **Benefits** | | | | |
| Quantified ............... | Earnings gain from shift to higher value programs. | ........................................................ | State tax revenue from higher earnings. | Federal tax revenue from higher earnings. |
| Not quantified ........ | Lower rates of default, higher rates of family & business formation, higher retirement savings, saving of opportunity cost for non-enrollees. | Increased enrollment and revenue associated with new enrollments from improved information about value; improvements in program quality. | | |
| **Costs** | | | | |
| Quantified ............... | Time for acknowledgment ........... | Time for acknowledgment ........... | Additional spending at institutions that absorb students from failing programs. | Implementation of data collection and information website. |
| Not quantified ........ | Time, logistics, credit loss associated with program transfer. | Investments to improve program quality; decreased enrollment and revenue associated with fewer new enrollments from improved information about value. | | |
| **Transfers** | | | | |
| Quantified ............... | ........................................................ | Aid money from failing programs to govt for non-enrollments; aid money from failing to better-value programs for transfers. | ........................................................ | Aid money from failing programs to govt for non-enrollments. |
| Not quantified ........ | Increased loan payments associated with less IDR forgiveness. | Aid money from failing programs to State govt for non-enrollments. | Aid money from failing programs to State govt for non-enrollments. | Increased loan payments associated with less IDR forgiveness and fewer defaults. |

### Benefits

We expect the primary benefits of both the accountability and transparency components of the final regulation to derive from a shift of students from low-value to high-value programs or, in some cases, a shift away from low-value postsecondary programs to non-enrollment. This shift will be

due to improved and standardized market information about GE and non-GE programs. This will increase the transparency of student outcomes for better decision-making by current students, prospective students, and their families; the public, taxpayers, and the Government; and institutions. Furthermore, the accountability component should improve program quality by directly eliminating the ability of low-value GE programs to participate in the title IV, HEA programs. Finally, both the transparency and accountability provisions of the rule should lead to a more competitive postsecondary market that encourages improvement, thereby, improving the outcomes and/or reducing the cost of existing programs that continue to enroll students.

Benefits to Students

Under the final regulation, students, prospective students, and their families will have extensive, comparable, and reliable information about the outcomes of students who enroll in GE and non-GE programs such as cost, debt, earnings, completion, and repayment outcomes. This information should assist them in choosing institutions and programs where they believe they are most likely to complete their education and achieve the earnings they desire, while having debt that is manageable. This information should result in more informed decisions based on reliable information about a program's outcomes.

Students will potentially benefit from this information via higher earnings, lower costs and less debt, and better program quality. This can happen through three channels. First, students benefit by transferring to passing programs. Second, efforts to improve programs should lead to better labor market outcomes, such as improved job prospects and higher earnings, by offering better student services, working with employers so graduates have needed skills, improving program quality, and helping students with career planning. This may happen as institutions improve programs to avoid failing the D/E or EP measures or simply from programs competing more for students based on quality, with the rule providing greater transparency about program quality. As a result of these enrollment shifts, students who graduate with manageable debts and adequate earnings should be more likely to pay back their loans, marry, buy a home, and invest in their futures.[310]

Finally, some students that chose not to enroll in low-value programs will save opportunity costs by not investing their time in programs that do not lead to good outcomes. While these other factors are certainly important to student wellbeing, our analysis focuses on the improvement in earnings associated with a shift from low-value programs to higher value programs.

Benefits to Institutions

Institutions offering high-performing programs to students are likely to see growing enrollment and revenue and to benefit from additional market information that permits institutions to demonstrate the value of their programs without excessive spending on marketing and recruitment. Additionally, institutions that work to improve the quality of their programs could see increased revenues from improved retention and completion and therefore, additional tuition revenue.

We believe the information transparency will increase enrollment and revenues in well-performing programs. Improved information should increase market demand for programs that produce good outcomes. While the increases or decreases in revenues for institutions are benefits or costs from the institutional perspective, they are transfers from a social perspective. However, any additional demand for education due to overall program quality improvement would be considered a social benefit.

The improved information that will be available as a result of the regulations will also benefit institutions' planning and improvement efforts. Information about student outcomes will help institutions determine whether it would be prudent to expand, improve quality, reduce costs, or eliminate various programs. Institutions may also use this information to offer new programs in fields where students are experiencing positive outcomes, including higher earnings and steady employment. Additionally, institutions will be able to identify and learn from programs that produce exceptional results for students.

Benefits to State and Local Governments

State and local governments will benefit from additional tax revenue associated with higher student earnings and students' increased ability to spend money in the economy. They are also likely to benefit from reduced costs because, as institutions improve the quality of their programs, their graduates are likely to have improved job prospects and higher earnings, meaning that governments are likely to be able to spend less on unemployment benefits and other social safety net programs. State and local governments will also experience improved oversight of their investments in postsecondary education. Additionally, State, and local postsecondary education funding could be allocated more efficiently to higher-performing programs. State and local governments would also experience a better return on investment on their dollars spent on financial aid programs as postsecondary program quality improves or if students reallocate to higher-performing programs.

Benefits to Federal Government

The Federal Government should benefit from additional tax revenue associated with higher student earnings and students' increased ability to spend money in the economy. Another primary benefit of the regulations will be improved oversight and administration of the title IV, HEA programs, particularly the new data reported by institutions. Additionally, Federal taxpayer funds should be allocated more efficiently to higher-performing programs, where students are more likely to graduate with manageable amounts of debt and gain stable employment in a well-paying field, increasing the positive benefits of Federal investment in title IV, HEA programs.

The taxpayers and the Government will also benefit from improved information about GE programs. As the funders and stewards of the title IV, HEA programs, these parties have an interest in knowing whether title IV, HEA program funds are benefiting students. The information provided will allow for more effective monitoring of the Federal investment in GE programs.

*Costs*

Costs to Students

Students may incur some costs as a result of the final regulations. One cost is that all title IV, HEA students attending eligible non-GE programs that fail the D/E metric will be required to acknowledge having seen information about program outcomes before students

---

[310] Chakrabarti, R., Fos, V., Liberman, A. & Yannelis, C. (2020). Tuition, Debt, and Human

Capital. Federal Reserve Bank of N.Y. Staff Report No. 912. Gicheva, D. (2016). Marriage or Marriage? A Look at the Highly Educated. *Economics of Education Review,* 53, 207–2016. Gicheva, D. & Thompson, J. (2015). The Effects of Student Loans on Long-Term Household Financial Stability. In Hershbein, B. & Hollenbeck, K. (Ed.). Student Loans and the Dynamics of Debt (137–174). W.E. Upjohn Institute for Employment Research: Kalamazoo, MI. Hillman, NW (2014). College on Credit: A Multilevel Analysis of Student Loan Default. *Review of Higher Education* 37(2), 169–195.

Mezza, A., Ringo, D., Sherlund, S. & Sommer, K. (2020). Student Loans and Homeownership. *Journal of Labor Economics,* 38(1): 215–260.

sign enrollment agreements. Students attending GE programs with at least one failing metric will additionally be required to acknowledge a warning that the program could lose title IV, HEA eligibility. The acknowledgment is the main student cost we quantify in our analysis. We expect that over the long-term, all students will have increased access to programs that lead to successful outcomes. In the short term, students in failing programs could incur search and logistical costs associated with finding and enrolling in an alternative program, whether that be a GE or non-GE program. Further, at least some students may be temporarily left without transfer options. We expect that many of these students will re-enter postsecondary education later, but we understand that some students may not continue. We do not quantify these costs associated with searching for and transferring to new postsecondary programs.

Costs to Institutions

Under the regulations, institutions will incur costs as they make changes needed to comply, including costs associated with the reporting, disclosure, and acknowledgment requirements. These costs could include (1) Training of staff for additional duties, (2) potential hiring of new employees, (3) purchase of new, or modifications to existing, software or equipment, and (4) procurement of external services.

As described in the Preamble, much of the necessary information required from GE programs would already have been reported to the Department under the 2014 Prior Rule, and as such we believe the added burden of this reporting relative to existing requirements will be reasonable. Furthermore, 88 percent of public and 47 percent of private nonprofit institutions operated at least one GE program and have experience with similar data reporting for the subset of their students enrolled in certificate programs under the 2014 Prior Rule. Moreover, many institutions report more detailed information on the components of cost of attendance and other sources of financial aid in the Federal National Postsecondary Student Aid Survey (NPSAS) administered by the National Center for Education Statistics. Finally, for the first six years after the effective date of the rule, the Department provides flexibility for institutions to avoid reporting data on students who completed programs in the past, and instead to use data on more recent completer cohorts to estimate median debt levels. In part, this is intended to ease the administrative burden of providing this data for programs that were not covered by the 2014 Prior Rule reporting requirements, especially for the small number of institutions that may not previously have had any programs subject to these requirements.

Our initial estimate of the time cost of these reporting requirements for

institutions is 5.0 million hours initially and then 1.4 million hours annually after the first year. The Department recognizes that institutions may have different approaches and processes for record-keeping and administering financial aid, so the burden of the GE and financial transparency reporting could vary by institution. Many institutions may have systems that can be queried or existing reports that can be adapted to meet these reporting requirements. On the other hand, some institutions may still have data entry processes that are very manual in nature and generating the information for their programs could involve many more hours and resources. Institutions may fall in between these poles and be able to automate the reporting of some variables but need more effort for others. The total reporting burden will be distributed across institutions depending on the setup of their systems and processes. We believe that, while the reporting relates to program or student-level information, the reporting process is likely to be handled at the institutional level.

Table 5.2 presents the Department's estimates of the hours associated with the reporting requirements. The reporting process will involve staff members or contractors with different skills and levels of responsibility. We have estimated this using Bureau of Labor statistics median hourly wage for Education Administrators, Post-Secondary of $48.05.[311]

TABLE 5.2   ESTIMATED HOURS AND WAGE RATE FOR REPORTING REQUIREMENTS

| Process | Hours | Hours basis |
|---|---|---|
| Review systems and existing reports for adaptability for this reporting | 10 | Per institution. |
| Develop reporting query/result template: | | |
| Program-level reporting | 15 | Per institution. |
| Student-level reporting | 30 | Per institution. |
| Run test reports: | | |
| Program-level reporting | 0.25 | Per institution. |
| Student-level reporting | 0.5 | Per institution. |
| Review/validate test report results: | | |
| Program-level reporting | 10 | Per institution. |
| Student-level reporting | 20 | Per institution. |
| Run reports: | | |
| Program-level reporting | 0.25 | Per program |
| Student-level reporting | 0.5 | Per program |
| Review/validate report results: | | |
| Program-level reporting | 2 | Per program |
| Student-level reporting | 5 | Per program |
| Certify and submit reporting | 10 | Per institution. |

The ability to set up reports or processes that can be rerun in future years, along with the fact that the first

reporting cycle includes information from several prior years, means that the expected burden should decrease

significantly after the first reporting cycle. We estimate that the hours associated with reviewing systems,

[311] Available at *https://www.bls.gov/oes/current/oes119033.htm*.

developing or updating queries, and reviewing and validating the test queries or reports will be reduced by 35 percent after the first year. After initial reporting is completed, the institution will need

to confirm there are no program changes in CIP code, credential level, preparation for licensure, accreditation, or other items on an ongoing basis. We expect that process would be less

burdensome than initially establishing the reporting. Table 5.3 presents estimates of reporting burden for the initial year and subsequent years under § 668.408.

TABLE 5.3.1   ESTIMATED REPORTING BURDEN FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 121 | 700 | 33,286 | 1,599,380 |
| Proprietary 2-year | 1,194 | 3,490 | 222,516 | 10,691,870 |
| Public 2-year | 1,036 | 37,612 | 1,265,169 | 60,791,370 |
| Private 4-year | 1,290 | 49,000 | 1,642,518 | 78,922,966 |
| Proprietary 4-year | 177 | 2,970 | 109,018 | 5,238,303 |
| Public 4-year | 700 | 56,088 | 1,805,753 | 86,766,432 |
| Total | 4,518 | 149,860 | 5,078,259 | 244,010,321 |

TABLE 5.3.2   ESTIMATED REPORTING BURDEN FOR SUBSEQUENT REPORTING CYCLES

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 121 | 700 | 13,411 | 644,399 |
| Proprietary 2-year | 1194 | 3490 | 105,852 | 5,086,165 |
| Public 2-year | 1036 | 37612 | 359,869 | 17,291,705 |
| Private 4-year | 1290 | 49000 | 464,890 | 22,337,965 |
| Proprietary 4-year | 177 | 2970 | 34,700 | 1,667,311 |
| Public 4-year | 700 | 56088 | 480,882 | 23,106,380 |
| Total | 4,518 | 149,860 | 1,459,603 | 70,133,924 |

These burden estimates are not reduced for the exemption that allows institutions to not report on programs with less than thirty completers across the most recent four award years. We expect this provision would reduce the burden on foreign institutions and others across a variety of fields and institutional characteristics.

As described in the section titled ''Paperwork Reduction Act of 1995,'' the final estimates of reporting costs will be cleared at a later date through a separate information collection. Institutions' share of the annual costs associated with disclosures, acknowledgment for all programs, and warnings and acknowledgment for GE programs are estimated to be $12 million, $0.05 million, and $0.76 million, respectively. Note that most of the burden associated acknowledgments will fall on students, not institutions. These costs are discussed in more detail in the section titled ''Paperwork Reduction Act of 1995.''

Institutions that make efforts to improve the outcomes of failing programs could face additional costs. For example, institutions that reduce the tuition and fees of programs would see decreased revenue. For students who are currently enrolled in a program, the reduced price would be a transfer to them in the form of a lower cost of

attendance. In turn, some of this price reduction would be a transfer to the government if the tuition was being paid for with title IV, HEA funds. An institution could also choose to spend more on curriculum development to, for example, link a program's content to the needs of in-demand and well-paying jobs in the workforce, or allocate more funds toward other functions. These other functions could include hiring better faculty; providing training to existing faculty; offering tutoring or other support services to assist struggling students; providing career counseling to help students find jobs; acquiring more up-to-date equipment; or investing in other areas where increased spending could yield improved performance. However, as mentioned in the benefits section, institutions that improve program quality could see increased tuition revenue with improved retention and completion.

The costs of program changes in response to the regulations are difficult to quantify generally, as they would vary significantly by institution and ultimately depend on institutional behavior. For example, institutions with all passing programs could elect to commit only minimal resources toward improving outcomes. On the other hand, they could instead make substantial investments to expand passing programs

and meet increased demand from prospective students, which could result in an attendant increase in enrollment costs. Institutions with failing programs could decide to devote significant resources toward improving performance, depending on their capacity, or could instead elect to discontinue one or more of the programs. However, as mentioned previously, some of these costs might be offset by increased revenue from improved program quality. Given these ambiguities, we do not quantify costs (or benefits) associated with program quality improvements.

Finally, some poorly performing programs will experience a reduction in enrollment that is not fully offset by gains to other institutions (which will experience increased enrollment) or the Federal Government (which will experience lower spending on Title IV, HEA aid). These losses should be considered as costs for institutions.

Costs to States and Local Governments

State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from failing programs, including those offered by for-profit institutions.

<span style="color:red">App.152</span>

The Department recognizes that a shift in students to public institutions could result in higher State and local government costs, but the extent of this is dependent on student transfer patterns, State and local government choices, and the existing capacity of public programs. If States choose to expand the enrollment capacity of passing programs at public institutions, it is not necessarily the case that they would face marginal costs that are similar to their average cost or that they would only choose to expand through traditional brick-and-mortar institutions. The Department continues to find that many States across the country are experimenting with innovative models that use different methods of instruction and content delivery, including online offerings, that allow students to complete courses faster and at lower cost. Furthermore, enrollment shifts would likely be towards community colleges, where declining enrollment has created excess capacity. An under-subscribed college may see greater efficiency gains from increasing enrollment and avoid other costly situations such as unused classroom space or unsustainably low enrollment. Forecasting the extent to which future growth would occur in traditional settings versus online education or some other model is outside the scope of this analysis. Nonetheless, we do include the additional instructional cost associated with a shift from failing to passing programs in our analysis, some of which will fall on State and local governments.

Costs to Federal Government

The main costs to the Federal Government involve setting up the infrastructure to handle and process additional information reported by institutions, compute rates and other information annually, and maintain a program information website and acknowledgment process. Most of these activities will be integrated into the Department's existing processes. We estimate that the total implementation cost will be $30 million.

*Transfers*

Enrollment shifts between programs, and potentially to non-enrollment, will transfer resources between students, institutions, State and local governments, and the Federal Government. We model three main transfers. First, if some students drop out of postsecondary education or remain in programs that lose eligibility for title IV, HEA Federal student aid, there would be a transfer of Federal student aid from those students to the Federal Government. Second, if students change institutions based on program performance, or title IV, HEA eligibility, revenues and expenses associated with students would transfer between postsecondary institutions. Finally, additional earnings associated with movement from low- to high-value programs would result in greater loan repayment by borrowers. This is through both lower default rates and a lower likelihood of loan forgiveness through existing IDR plans. This represents a transfer from students to the Federal Government. We do not quantify the transfers between students and State governments associated with changes in State-financed student aid, as such programs differ greatly across States. Transfers between students and States could be net positive for States if fewer students apply for, or need, State aid programs or they could be negative if enrollment shifts to State programs results in greater use of State aid.

**6. Methodology for Budget Impact and Estimates of Costs, Benefits, and Transfers**

In this section we describe the methodology used to estimate the budget impact as well as the main costs, benefits, and transfers. Our modeling and impact only include the Financial Value Transparency and GE parts of the final rule.

The main behaviors that drive the direction and magnitudes of the budget impacts of the rule and the quantified costs, benefits, and transfers are the performance of programs and the enrollment and borrowing decisions of students. The Department developed a model based on assumptions regarding enrollment, program performance, student response to program performance, and average amount of title IV, HEA funds per student to estimate the budget impact of these regulations. Additional assumptions about the earnings outcomes and instructional spending associated with program enrollment and tax revenue from additional earnings were used to quantify costs, benefits, and transfers. The model (1) takes into account a program's past results under the D/E and EP rates measure to predict future results, and (2) tracks a GE program's cumulative results across multiple cycles of results to determine title IV, HEA eligibility.

*Assumptions*

We made assumptions in four areas in order to estimate the budget impact of the rule: (1) Program performance under the rule; (2) Student behavior in response to program performance; (3) Borrowing of students under the rule; and (4) Enrollment growth of students in GE and non-GE programs. Table 6.1 below provides an overview of the main categories of assumptions and the sources. Assumptions that are included in our sensitivity analysis are also highlighted. Wherever possible, our assumptions are based on past performance and student enrollment patterns in data maintained by the Department or documented by scholars in prior research. Additional assumptions needed to quantify costs, benefits, and transfers are described later when we describe the methodology for those calculations.

TABLE 6.1   MAIN ASSUMPTIONS AND SOURCES

| Category | Detail | Source | Included in sensitivity? |
|---|---|---|---|
| **Assumptions for Budget Impact and Calculation of Costs, Benefits, and Transfers** | | | |
| Program Performance at Baseline .. | Share in each performance category at baseline (GE and non-GE programs). | ED data ............................. | No. |
| Enrollment Growth ........................... | Annual enrollment growth rate by sector/level and year ....................... | Sector-level projections based on Department data. | No. |
| Program transition between performance categories. | AY2025 26, AY2026 27 onward, separately by loan risk group and for GE and non-GE programs. | Based on Department data ............. + program improvement assumptions. | Yes. |
| Student response ............................. | Share of students who remain in programs, transfer to passing programs, or withdraw or decline to enroll by program performance category and transfer group; separately for GE and non-GE programs. | Assumptions from 2014 RIA and prior work. | Yes. |

TABLE 6.1     MAIN ASSUMPTIONS AND SOURCES     Continued

| Category | Detail | Source | Included in sensitivity? |
|---|---|---|---|
| Student borrowing ........................... | Debt changes if students transfer to passing program by program performance, risk group, and cohort; separately for GE and non-GE programs. | Based on Department data ............. | No. |
| **Additional Assumptions for Calculation of Costs, Benefits, and Transfers** | | | |
| Earnings gain .................................. | Average program earnings by risk group and program performance, separately for GE and non-GE programs. | Based on Department data ............. | Yes. |
| Tax rates ......................................... | Federal and State average marginal tax and transfer rates ................... | Hendren and Sprung-Keyser 2020 estimates based on CBO. | No. |
| Instructional cost .............................. | Average institution-level instructional expenditure by risk group and program performance; separately for GE and non-GE programs. | IPEDS ............................................. | No. |

*Enrollment Growth Assumptions*

For AYs 2023 to 2034, the budget model assumes a constant yearly rate of growth or decline in enrollment of students receiving title IV, HEA program funds in GE and non-GE programs in absence of the rule.[312] We compute the average annual rate of change in title IV, HEA enrollment from AY 2016 to AY 2022, separately by the combination of control and credential level. We assume this rate of growth for each type of program for AYs 2023 to 2034 when constructing our baseline enrollment projections.[313] Table 6.2 below reports the assumed average annual percent change in title IV, HEA enrollment.

TABLE 6.2     ANNUAL ENROLLMENT GROWTH RATE (PERCENT) ASSUMPTIONS

| | Public | Private, nonprofit | Proprietary |
|---|---|---|---|
| UG Certificates ................................................................................. | −2.6 | −6.9 | 4.1 |
| Associate .......................................................................................... | −3.7 | −3.9 | −3.7 |
| Bachelor s ......................................................................................... | −0.5 | −0.8 | −2.7 |
| Post-BA Certs .................................................................................... | 4.2 | −2.3 | −0.4 |
| Master s ............................................................................................ | 3.0 | 0.5 | −1.1 |
| Doctoral ............................................................................................. | 4.9 | 3.1 | −1.7 |
| Professional ....................................................................................... | 0.9 | −0.1 | −0.4 |
| Grad Certs ......................................................................................... | 1.2 | 2.0 | −0.8 |

*Program Performance Transition Assumptions*

The methodology, described in more detail below, models title IV, HEA enrollment over time not for specific programs, but rather by groupings of programs by broad credential level and control, the number of alternative programs available, whether the program is GE or non-GE, and whether the program passes or fails the D/E and EP metrics. The model estimates the flow of students between these groups due to changes in program performance over time and reflects assumptions for the share of enrollment that would transition between the following four performance categories in each year:

- Passing (includes with and without data)
- Failing D/E rate only
- Failing EP rate only
- Failing both D/E and EP rates

A GE program becomes ineligible if it fails either the D/E or EP rate measures in two out of three consecutive years.

We assume that ineligible programs remain that way for all future years and, therefore, do not model performance transitions after ineligibility is reached. The model applies different assumptions for the first year of transition (from year 2025 to 2026) and subsequent years (after 2026). It assumes that the rates of program transition reach a steady state in 2027. We assume modest improvement in performance, indicated by a reduction in the rate of failing and an increase in the rate of passing, among programs that fail one of the metrics, and an increase in the rate of passing again, among GE programs that pass the metrics. All transition probabilities are estimated separately for GE and non-GE programs and for four aggregate groups: proprietary 2-year or less; public or nonprofit 2-year or less; 4-year programs; graduate programs.[314]

The assumptions for the 2025 to 2026 transition are taken directly from an observed comparison of actual rates results for two consecutive cohorts of students. The initial assignment of performance categories in 2025 is based on the 2022 PPD for students who completed programs in award years 2015 and 2016, whose earnings are measured in calendar years 2018 and 2019. The program transition assumptions for 2025 to 2026 are based on the outcomes for this cohort of students along with the earnings outcomes of students who completed programs in award years 2016 and 2017 (earnings measured in calendar years 2019 and 2020) and debt of students who completed programs in award years 2017 and 2018. A new set of D/E and EP metrics was computed for each program using this additional two-year cohort. Programs with fewer than 30 completers or with fewer than 30 completers with earnings records are determined to be passing, though can transition out of this category between years. The share of enrollment that transitions from each performance

---

[312] AYs 2023 to 2034 are transformed to FYs 2023 to 2033 later in the estimation process.
[313] The number of programs in proprietary post-BA certificates and proprietary professional degrees

was too low to reliably compute a growth rate. Therefore, we assumed a rate equal to the overall proprietary rate of −0.4 percent.

[314] The budget simulations separate lower and upper division enrollment in 4-year programs. We assume the same program transition rates for both.

category to another is computed separately for each group.[315]

The left panels of Tables 6.3 and 6.4 report the program transition assumptions from 2025 to 2026 for non-GE and GE programs, respectively. Program performance for non-GE is quite stable, with 95.8 percent of passing enrollment in two-year or less public and nonprofit expected to remain in passing programs. Persistence rates are even higher among 4-year and graduate programs. Among programs that fail the EP threshold, a relatively high share—more than one-third among 2-year and less programs—would be at passing programs in a subsequent year. The performance of GE programs is only slightly less persistent than that of non-GE programs. Note that GE programs would become ineligible for title IV, HEA funds the following year if they fail the same metric two years in a row. Among enrollment in less than two-year proprietary programs that fail the EP metric in 2025, 21.7 percent would pass in 2026 due to a combination of passing with data and no data.

The observed results also serve as the baseline for each subsequent transition of results (2026 to 2027, 2027 to 2028, etc.). The model applies additional assumptions from this baseline for each transition beginning with 2026 to 2027. Because the baseline assumptions are the actual observed results of programs based on a cohort of students that completed programs prior to the Department's GE rulemaking efforts, these transition assumptions do not account for changes that institutions have made to their programs in response to the Department's regulatory actions or would make after the final regulations are published.

As done with analysis of the 2014 rule, the Department assumes that institutions at risk of warning or sanction would take at least some steps to improve program performance by improving program quality, job placement, and lowering prices (leading to lower levels of debt), beginning with the 2026 to 2027 transition. There is evidence that institutions have responded to past GE measures by aiming to improve outcomes or redirecting enrollment from low-performing programs. Institutions subject to GE regulations have experienced slower enrollment and those that pass GE thresholds tend to have a lower likelihood of program or institution closure.[316] Some leaders of institutions subject to GE regulation in 2014 did make improvements, such as lowering costs, increasing job placement and academic support staff, and other changes.[317] We account for this by increasing the baseline observed probability of having a passing result by five percentage points for programs with at least one failing metric in 2026. Additionally, we improve the baseline observed probability of passing GE programs having a sequential passing result by two and a half percentage points to capture the incentive that currently passing programs have to remain that way. These new rates are shown in the right panels of Tables 6.3 and 6.4.

We assume the same rates of transition between performance categories for subsequent years as we do for the 2026 to 2027 transitions.

Since the budget impact and net costs, benefits, and transfers depend on assumptions about institutional performance after the rule is enacted, we incorporate alternative assumptions about these transitions in our sensitivity analysis.

TABLE 6.3   PROGRAM TRANSITION ASSUMPTIONS NON-GE PROGRAMS

| | Percent in year t+1 status (2026) | | | | Percent in year t+1 status (2027 2033) | | | |
|---|---|---|---|---|---|---|---|---|
| | Pass | Fail D/E only | Fail EP only | Fail Both | Pass | Fail D/E only | Fail EP only | Fail Both |
| **Public and Nonprofit 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ......... | 95.8 | 0.0 | 4.1 | 0.1 | 95.8 | 0.0 | 4.1 | 0.1 |
| Fail D/E only ......... | 10.1 | 84.3 | 1.6 | 4.1 | 15.1 | 79.3 | 1.6 | 4.1 |
| Fail EP only ......... | 37.7 | 0.1 | 62.1 | 0.1 | 42.7 | 0.1 | 57.1 | 0.1 |
| Fail Both ......... | 22.2 | 6.5 | 8.6 | 62.7 | 27.2 | 6.5 | 8.6 | 57.7 |
| **4-year** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ......... | 99.1 | 0.3 | 0.4 | 0.2 | 99.1 | 0.3 | 0.4 | 0.2 |
| Fail D/E only ......... | 28.8 | 63.6 | 0.7 | 6.9 | 33.8 | 58.6 | 0.7 | 6.9 |
| Fail EP only ......... | 45.5 | 1.1 | 48.1 | 5.3 | 50.5 | 1.1 | 43.1 | 5.3 |
| Fail Both ......... | 24.3 | 11.3 | 5.4 | 59.0 | 29.3 | 11.3 | 5.4 | 54.0 |
| **Graduate** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ......... | 98.3 | 1.6 | 0.0 | 0.0 | 98.3 | 1.6 | 0.0 | 0.0 |
| Fail D/E only ......... | 29.2 | 69.3 | 0.0 | 1.5 | 34.2 | 64.3 | 0.0 | 1.5 |
| Fail EP only ......... | 72.4 | 0.0 | 17.9 | 9.7 | 77.4 | 0.0 | 12.9 | 9.7 |
| Fail Both ......... | 20.2 | 44.3 | 2.7 | 32.7 | 25.2 | 44.3 | 2.7 | 27.7 |

---

[315] In order to produce transition rates that are stable over time and that do not include secular trends in passing or failing rates (which are already reflected in our program growth assumptions), we compute transition rates from Year 1 to Year 2 and from Year 2 to Year 1 and average them to generate a stable rate shown in the tables.

[316] Fountain, J. (2019). The Effect of the Gainful Employment Regulatory Uncertainty on Student Enrollment at For-Profit Institutions of Higher Education. Research in Higher Education, Springer; Association for Institutional Research, vol. 60(8), 1065–1089. Kelchen, R. & Liu, Z. (2022). Did Gainful Employment Regulations Result in College

and Program Closures? *Education Finance and Policy;* 17 (3): 454–478.

[317] Hentschke, G.C. & Parry, S.C. (2015). Innovation in Times of Regulatory Uncertainty: Responses to the Threat of ''Gainful Employment.'' Innov High Educ 40, 97–109 (*doi.org/10.1007/ s10755-014-9298-z*).

TABLE 6.4    PROGRAM TRANSITION ASSUMPTIONS GE PROGRAMS

| | Share in year t+1 status (2026) | | | | Share in year t+1 status (2027–2033) | | | |
|---|---|---|---|---|---|---|---|---|
| | Pass | Fail D/E only | Fail EP only | Fail Both | Pass | Fail D/E only | Fail EP only | Fail Both |
| **Proprietary 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ............................. | 91.1 | 2.3 | 5.8 | 0.9 | 93.6 | 1.7 | 4.2 | 0.6 |
| Fail D/E only ................. | 18.8 | 66.7 | 0.2 | 14.4 | 23.8 | 61.7 | 0.2 | 14.4 |
| Fail EP only .................. | 10.7 | 0.0 | 82.1 | 7.2 | 15.7 | 0.0 | 77.1 | 7.2 |
| Fail Both ...................... | 3.4 | 7.2 | 15.8 | 73.6 | 8.4 | 7.2 | 15.8 | 68.6 |
| **Public and Nonprofit 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ............................. | 95.8 | 0.0 | 4.1 | 0.1 | 98.3 | 0.0 | 1.7 | 0.1 |
| Fail D/E only ................. | 60.5 | 0.0 | 0.0 | 39.5 | 65.5 | 0.0 | 0.0 | 34.5 |
| Fail EP only .................. | 47.3 | 0.0 | 51.8 | 0.8 | 52.3 | 0.0 | 46.8 | 0.8 |
| Fail Both ...................... | 29.1 | 29.2 | 8.9 | 32.7 | 34.1 | 29.2 | 8.9 | 27.7 |
| **4-year** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ............................. | 94.1 | 5.4 | 0.0 | 0.4 | 96.6 | 3.1 | 0.0 | 0.2 |
| Fail D/E only ................. | 21.4 | 70.3 | 0.0 | 8.3 | 26.4 | 65.3 | 0.0 | 8.3 |
| Fail EP only .................. | 2.4 | 4.9 | 0.0 | 92.7 | 7.4 | 4.9 | 0.0 | 87.7 |
| Fail Both ...................... | 5.4 | 32.2 | 1.5 | 60.9 | 10.4 | 32.2 | 1.5 | 55.9 |
| **Graduate** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ............................. | 97.0 | 2.9 | 0.0 | 0.1 | 99.5 | 0.5 | 0.0 | 0.0 |
| Fail D/E only ................. | 19.9 | 77.7 | 0.0 | 2.4 | 24.9 | 72.7 | 0.0 | 2.4 |
| Fail EP only .................. | 100.0 | 0.0 | 0.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 |
| Fail Both ...................... | 8.7 | 37.4 | 0.0 | 53.9 | 13.7 | 37.4 | 0.0 | 48.9 |

*Student Response Assumptions*

The Department's model applies assumptions for the probability that a current or potential student would transfer or choose a different program, remain in or choose the same program, or withdraw from or not enroll in any postsecondary program in reaction to a program's performance. The model assumes that student response would be greater when a program becomes ineligible for title IV, HEA aid than when a program has a single year of inadequate performance, which initiates warnings and the acknowledgment requirement for GE programs, an acknowledgment requirement non-GE programs that fail D/E, and publicly reported performance information in the ED portal for both GE and non-GE programs. We also let the rates of transfer and withdrawal or non-enrollment differ with the number of alternative transfer options available to students enrolled (or planning to enroll) in a failing program. Specifically, building on the analysis presented in "Measuring Students' Alternative Options" above, we categorize individual programs into one of four categories:

• *High transfer options:* Have at least one passing program in the same credential level at the same institution and in a related field (as indicated by being in the same 2-digit CIP code).

• *Medium transfer options:* Have a passing transfer option within the same ZIP3, credential level, and narrow field (4-digit CIP code).

• *Low transfer options:* Have a passing transfer option within the same ZIP3, credential level, and broad (2-digit) CIP code.

• *Few transfer options:* Do not have a passing transfer option within the same ZIP3, credential level, and broad (2-digit) CIP code. Students in these programs would be required to enroll in either a distance education program or enroll outside their ZIP3. As shown in "Measuring Students' Alternative Options," all failing programs have at least one non-failing program in the same credential level and 2-digit CIP code in the same State.

For each of the four categories above, we make assumptions for each type of student transition. Programs with passing metrics are assumed to retain all of their students.

Students that transfer are assumed to transfer to passing programs, and for the purposes of the budget simulation this includes programs with an insufficient n-size. We assume that rates of withdrawal (or non-enrollment) and transfer are higher for ineligible programs than those where only the

warning/acknowledgment is required (GE programs with one year of a failing metric and non-GE programs with a failing D/E metric). We also assume that rates of transfer are weakly decreasing (and rates of dropout and remaining in program are both weakly increasing) as programs have fewer transfer options. These assumptions regarding student responses to program results are provided in Tables 6.5 and 6.6. Coupled with the scenarios presented in the "Sensitivity Analysis," these assumptions are intended to provide a reasonable estimation of the range of impact that the regulations could have on the budget and overall social costs, benefits, and transfers.

The assumptions above are based on our best judgment and from extant research that we view as reasonable guides to the share of students likely to transfer to or choose another program when their program loses title IV, HEA eligibility. For instance, a 2021 GAO report found that about half of non-completing students who were at closed institutions transferred.[318] This magnitude is similar to recent analysis that found that 47 percent of students

[318] Government Accountability Office (2022). College Closures: Education Should Improve Outreach to Borrowers about Loan Discharges (GAO–22–104403) (*https://www.gao.gov/products/gao-22-104403*).

reenrolled after an institutional closure.[319] The authors of this report find very little movement from public or nonprofit institutions into for-profit institutions, but considerable movement in the other direction. For example, about half of re-enrollees at closed for-profit 2-year institutions moved to public 2-year institutions, whereas less than 3 percent of re-enrollees at closed public and private nonprofit 4-year institutions moved to for-profit institutions. Other evidence from historical cohort default rate sanctions indicates a transfer rate of about half of students at for-profit colleges that were subject to loss of Federal financial aid disbursement eligibility, with much of that shift to public two-year institutions.[320] The Department also conducted its own internal analysis of ITT Technical Institute closures. About half of students subject to the closure re-enrolled elsewhere (relative to pre-closure patterns). The majority of students that re-enrolled did so in the same two-digit CIP code. Of associate degree students that re-enrolled, 45 percent transferred to a public institution, 41 percent transferred to a different for-profit institution, and 13 percent transferred to a private nonprofit institution. Most remained in associate or certificate programs. Of bachelor's degree students that re-enrolled, 54 percent transferred to a different for-profit institution, 25 percent shifted to a public institution, and 21 percent transferred to a private nonprofit institution.

Data from the Beginning Postsecondary Students Longitudinal 2012/2017 study provides further information on students' general patterns through and across postsecondary institutions (not specific to responses to sanctions or closures). Of students that started at a public or private nonprofit 4-year institution, about 3 percent shifted to a for-profit institution within 5 years. Of those that began at a public or private nonprofit 2-year institution, about 8 percent shifted to a for-profit institution within 5 years.

The attestations for non-GE programs are scheduled to begin the year following the attestations for GE programs. Therefore, we delay applying transfer rates to non-GE programs in the first year of our budget analysis. Additionally, since undergraduate associate and bachelor's degree programs will not have an attestation requirement, we decrease the rate of transfer out by one quarter for these programs.

TABLE 6.5    STUDENT RESPONSE ASSUMPTIONS, BY PROGRAM RESULT AND NUMBER OF ALTERNATIVE PROGRAM OPTIONS AVAILABLE

| Program result → | Pass | | | Fail once | | | Ineligible | | |
|---|---|---|---|---|---|---|---|---|---|
| Student Response → | Remain | Transfer | Withdrawal/non-enroll-ment | Remain | Transfer | Withdrawal/non-enroll-ment | Remain | Transfer | Withdrawal/non-enroll-ment |
| GE: | | | | | | | | | |
| High Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.40 | 0.45 | 0.15 | 0.20 | 0.60 | 0.20 |
| Medium Alternatives ........................... | 1.00 | 0.00 | 0.00 | 0.45 | 0.35 | 0.20 | 0.20 | 0.55 | 0.25 |
| Low Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.50 | 0.30 | 0.20 | 0.25 | 0.45 | 0.30 |
| Few Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.55 | 0.25 | 0.20 | 0.25 | 0.35 | 0.40 |
| Non-GE, Attestation: | | | | | | | | | |
| High Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.80 | 0.20 | 0.00 | na | na | na |
| Medium Alternatives ........................... | 1.00 | 0.00 | 0.00 | 0.85 | 0.15 | 0.00 | na | na | na |
| Low Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.90 | 0.10 | 0.00 | na | na | na |
| Few Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.95 | 0.05 | 0.00 | na | na | na |
| Non-GE, No Attestation: | | | | | | | | | |
| High Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.85 | 0.15 | 0.00 | na | na | na |
| Medium Alternatives ........................... | 1.00 | 0.00 | 0.00 | 0.8875 | 0.1125 | 0.00 | na | na | na |
| Low Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.925 | 0.075 | 0.00 | na | na | na |
| Few Alternatives ................................. | 1.00 | 0.00 | 0.00 | 0.9625 | 0.0375 | 0.00 | na | na | na |

In Table 6.6, we provide detail of the assumptions of the destinations among students who transfer, separately for the following groups:[321]

- Risk 1 (Proprietary <=2 year)
- Risk 2 (Public, Nonprofit <=2 year)
- Risk 3 (Lower division 4 year)
- Risk 4 (Upper division 4 year)

- Risk 5 (Graduate)

TABLE 6.6    STUDENT RESPONSE ASSUMPTIONS, AMONG TRANSFERRING STUDENTS, SHARE SHIFTING SECTORS

| Shift from . . . | Shift to GE programs | | | | | Shift to non-GE programs | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Risk 1 | Risk 2 | Risk 3 | Risk 4 | Risk 5 | Risk 2 | Risk 3 | Risk 4 | Risk 5 |
| GE: | | | | | | | | | |
| Risk 1 ........................................ | 0.50 | 0.30 | 0.10 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 |
| Risk 2 ........................................ | 0.30 | 0.50 | 0.10 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 |
| Risk 3 ........................................ | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 |
| Risk 4 ........................................ | 0.00 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 |
| Risk 5 ........................................ | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 |
| Non-GE: | | | | | | | | | |
| Risk 2 ........................................ | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.70 | 0.20 | 0.00 | 0.00 |
| Risk 3 ........................................ | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.05 | 0.90 | 0.00 | 0.00 |
| Risk 4 ........................................ | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.95 | 0.00 |

[319] State Higher Ed. Executive Officers Ass'n (2022). More than 100,000 Students Experienced an Abrupt Campus Closure Between July 2004 and June 2020 (*sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/*).

[320] Cellini, S.R., Darolia, R. & Turner, L.J. (2020). Where Do Students Go When For-Profit Colleges Lose Federal Aid? *American Economic Journal: Economic Policy*, 12(2), 46–83.

[321] Lower division includes students in their first two years of undergraduate education. Upper division includes students in their third year or higher.

TABLE 6.6    STUDENT RESPONSE ASSUMPTIONS, AMONG TRANSFERRING STUDENTS, SHARE SHIFTING SECTORS Continued

| Shift from . . . | Shift to GE programs | | | | | Shift to non-GE programs | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Risk 1 | Risk 2 | Risk 3 | Risk 4 | Risk 5 | Risk 2 | Risk 3 | Risk 4 | Risk 5 |
| Risk 5 .................................................. | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.95 |

As we describe below, the assumptions for student responses are applied to the estimated enrollment in each aggregate group after factoring in enrollment growth.

Student Borrowing Assumptions

Analyses in the Regulatory Impact Analysis of the 2014 Prior Rule assumed that student debt was unchanged if students transferred from failing to passing programs, but we believe this assumption to be too conservative given that one goal of the GE rule is to reduce the debt burden of students. Recall that Tables 4.29 and 4.30 above reported the percent difference in mean debt between failing GE and non-GE programs and their transfer options, by credential level and 2-digit CIP code. Across all subjects and credential levels, debt is 22 percent lower at alternative programs than at failing GE programs. At non-GE programs, there is no aggregate debt difference between failing programs and their alternatives, though this masks heterogeneity across credential levels. For graduate degree programs, movement to alternative programs from failing programs is associated with lower debt levels while movement from failing to passing Associate programs is associated with an increase in debt. Students that drop out of (or decline to enroll in) failing programs are assumed to acquire no educational debt.

To incorporate changes in average loan volume associated with student transitions, we compute average subsidized and unsubsidized direct loan, Grad PLUS, and Parent PLUS per enrollment separately for GE and non-GE programs by risk group and program performance group. These averages are then applied to shifts in enrollment to generate changes in the amount of aid.

*Methodology for Net Budget Impact*

The budget model estimates a yearly enrollment for AYs 2023 to 2034 and the distribution of those enrollments in programs characterized by D/E and EP performance, risk group, transfer category, and whether it is a GE program. This enrollment is projected for a baseline (in absence of a rule) and under the final rule. The net budget impact for each year is calculated by applying assumptions regarding the

average amount of title IV, HEA program funds received by this distribution of enrollments across groups of programs. The difference in these two scenarios provides the Department's estimate of the impact of the final rule. We do not simulate the impact on the rule at the individual program level because doing so would necessitate very specific assumptions about which programs' students transfer to in response to the regulations. While we made such assumptions in the "Measuring Students' Alternatives" section above, we do not think it is analytically tractable to do for all years. Therefore, for the purposes of budget modeling, we perform analysis with aggregations of programs into groups defined by the following:[322]

• Five student loan model risk groups: (1) 2-year (and below) for-profit; (2) 2-year (and below) public or nonprofit; (3) 4-year (any control) lower division, which is students in their first two years of a bachelor's program; (4) 4-year (any control) upper division, which is students beyond their first two years of a bachelor's program; (5) Graduate student (any control).

• Four transfer categories (high, medium, low, few alternatives) by which the student transfer rates are assumed to differ. This is a program-level characteristic that is assumed not to change.

• Two GE program categories (GE and eligible non-GE) by which the program transitions are assumed to differ.

• Six performance categories: Pass, Fail D/E, Fail EP, Fail Both, Pre-ineligible (a program's current enrollment is Title IV, HEA eligible, but next year's enrollment would not be), Ineligible (current enrollment is not Title IV, HEA eligible).

We refer to groups defined by these characteristics as "program aggregate" groups.

We first generate a projected baseline (in absence of the final rule) enrollment, Pell grant volume, and loan volume for each of the program aggregate groups from AYs 2023 to 2034. This baseline

projection includes several steps. First, we compute average annual growth rate for each control by credential level from 2016 to 2022. These growth rates are presented in Table 6.2. We then apply these annual growth rates to the actual enrollment by program in 2022 to forecast enrollment in each program in 2023. This step is repeated for each year to get projected enrollment by program through 2034. We then compute average Pell, subsidized and unsubsidized direct loan, Grad PLUS, and Parent PLUS per enrollment by risk group, program performance group, and GE vs. non-GE for 2022. These averages are then adjusted according to the PB2024 loan volume and Pell grant baseline assumptions for the change in average loan by loan type and the change in average Pell grant. We then multiply the projected enrollment for each program by these average aid amounts to get projected total aid volume by program through 2034. Finally, we sum the enrollment and aid amounts across programs for each year to get enrollment and aid volume by program aggregate group, AYs 2023 to 2034, and shift the baseline Pell and loan volume from AYs 2023 to 2034 to FYs 2023 to 2033 for calculating budget cost estimates.

The most significant task is to generate projected enrollment, Pell volume, and loan volume for each of the program aggregate groups from 2023 to 2033 with the rule in place. We assume the first set of rates would be released in 2025 award year, so this is starting year for our projections. Projecting counterfactual enrollment and aid volumes involves several steps:

*Step 1:* Start with the enrollment by program aggregate group in 2025. In this first year there are no programs that are ineligible for Title IV, HEA funding.

*Step 2:* Apply the student transition assumptions to the enrollment by program aggregate group. This generates estimates of the enrollment that is expected to remain enrolled in the program aggregate group, the enrollment that is expected to drop out of postsecondary enrollment, and the enrollment that is expected to transfer to a different program aggregate group.

*Step 3:* Compute new estimated enrollment for the start of 2026 (before the second program performance is revealed) for each cell by adding the

---

[322] Note that non-GE programs do not include risk group 1 (2-year and below for-profit institutions) or the pre-ineligible or ineligible performance categories. Some groups also do not have all four transfer group categories. There are 184 total groups used in the analysis.

remaining enrollment to the enrollment that is expected to transfer into that group. We assume that (1) students transfer from failing or ineligible programs to passing programs in the same transfer group and GE program group; (2) Students in risk groups 3 (lower division 4-year), 4 (upper division 4-year college) or 5 (graduate) stay in those risk groups; (3) Students in risk group 1 can shift to risk groups 2 or 3; (4) Students in risk group 2 can shift to risk groups 1 or 3. Therefore, we permit enrollment to shift between proprietary and public or nonprofit certificate programs and from certificate and associate programs to lower—division bachelor's programs. We also allow enrollment to shift between GE and non-GE program, based on the assumptions listed in Table 6.6.

*Step 4:* Determine the change in aggregate baseline enrollment between 2025 and 2026 for each risk group and allocate these additional enrollments to each program aggregate group in proportion to the group enrollment computed in Step 3.

*Step 5:* Apply the program transition assumptions to the aggregate group enrollment from Step 4. This results in estimates of the enrollment that would stay within or shift from each performance category to another performance category in the next year. This mapping would differ for GE and non-GE programs and by risk group, as reported in Tables 6.3 and 6.4 above. For non-GE programs, every performance category can shift enrollment to every performance category. For GE programs, however, enrollment in each failure category would not remain in the same category because if a metric is failed twice, this enrollment would move to pre-ineligibility. The possible program transitions for GE programs are:

• Pass → Pass, Fail D/E, Fail EP, Fail Both
• Fail D/E → Pass, Fail EP, Pre-Ineligible
• Fail EP → Pass, Fail D/E, Pre-Ineligible
• Fail Both → Pass, Pre-Ineligible

*Step 6:* Compute new estimated enrollment at end of 2026 (after program performance is revealed) for each program aggregate group by adding the number that stay in the same performance category plus the number that shift from other performance categories.

*Step 7:* Repeat steps 1 to 6 above using the end of 2026 enrollment by group as the starting point for 2027 and repeat through 2034. The only addition is that in Step 5, two more program

transitions are possible for GE programs: Pre-Ineligible moves to Ineligible and Ineligible remains Ineligible.

*Step 8:* Generate projected Pell grant and loan volume by program aggregate group from AYs 2023 to 2034 under the rule. We multiply the projected enrollment by group by average aid amounts (Pell and loan volume) to get projected total aid amounts by group through 2034. Any enrollment that has dropped out (not enrolled in postsecondary) or in the ineligible category get zero Pell and loan amounts. Note that the average aid amounts by cell come from the PB projections, so are allowed to vary over time.

*Step 9:* Shift Pell grant and loan volume under the rule from AYs 2025 to 2034 to FYs 2025 to 2033 for calculating budget cost estimates.

A net savings for the title IV, HEA programs comes through four mechanisms. The primary source is from students who drop out of postsecondary education in the year after their program receives a failing D/E or EP rate or becomes ineligible. The second is for the smaller number of students who remain enrolled at a program that becomes ineligible for title IV, HEA program funds. Third, we assume a budget impact on the title IV, HEA programs from students who transfer from programs that are failing to better-performing programs because the typical aid levels differ between programs according to risk group and program performance. For instance, subsidized Direct Loan borrowing is 24 percent less ($2044 vs. $1547) for students at GE programs failing the D/E metric in risk group 1 than in passing programs in the same risk group in 2026.

Finally, consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the title IV, HEA programs also reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. To determine the estimated budget impact from reduced loan volume, the difference in yearly loan volumes between the baseline and policy scenarios were calculated as a percent of baseline scenario volumes. This generated an adjustment factor that was applied to loan volumes in the Student Loan Model (SLM) for each cohort, loan type, and risk group combination in the President's Budget for FY2024 (PB2024). The reduced loan volumes are also expected to result in some decrease in future consolidations which is also captured in the model run. Since the implied subsidy rate for each loan type differs by risk group, enrollment shifts

to risk groups with greater expected repayment would generate a net budget savings. Since our analysis does not incorporate differences in subsidy rates between programs in the same risk group, such as between programs passing and failing the D/E or EP metrics, these estimates potentially understate the increase in expected repayment resulting from the regulations.

*Methodology for Costs, Benefits, and Transfers*

The estimated enrollment in each aggregate program group is used to quantify the costs, benefits, and transfers resulting from the regulations for each year from 2023 to 2033. As described in the Discussion of Costs, Benefits, and Transfers, we quantify an earnings gain for students from attending higher financial value programs and the additional tax revenue that comes from that additional earnings. We quantify the cost associated with additional instructional expenses to educate students who shift to different types of programs and the transfer of instructional expenses as students shift programs. We also estimate the transfer of title IV, HEA program funds from programs that lose students to programs that gain students.

Earnings Gain Benefit

A major goal of greater transparency and accountability is to shift students towards higher financial value programs—those with greater earnings potential, lower debt, or both. To quantify the earnings gain associated with the final rule, we estimate the aggregate annual earnings of would-be program graduates under the baseline and policy scenarios and take the difference. For each risk group and program performance scenario, we compute the enrollment-weighted average of median program earnings. Average earnings for programs that have become ineligible is assumed to be the average of median earnings for programs in the three failing categories, weighted by the enrollment share in these categories. This captures, for instance, that the earnings of 2-year programs that become ineligible are quite lower than those that enroll graduate students. Since we have simulated enrollment, but not completion, annual program enrollment is converted into annual program completions by applying a ratio that differs for 2-year programs or less, bachelor's degree programs, or graduate

programs.[323] Earnings for students that do not complete are not available and not included in our calculations. Students that drop out of failing programs (or decline to enroll altogether) are assumed to receive earnings equal to the median earnings of high school graduates in the State (the same measure used for the Earnings Threshold). Therefore, earnings could increase for this group if students reduce enrollment in programs leading to earnings less than a high school graduate. We estimate aggregate earnings by program group by multiplying enrollment by average earnings, reported in Table 6.7, and the completion ratio.

### TABLE 6.7   AVERAGE PROGRAM EARNINGS BY GROUP

[$2019]

| | Pass | Fall D/E | Fail EP only | Fail both | Ineligible |
|---|---|---|---|---|---|
| **GE Programs** | | | | | |
| Proprietary 2yr or less ............................................. | 39,233 | 28,672 | 20,414 | 18,531 | 21,308 |
| Public/Nonprofit (NP) 2yr or less .............................. | 37,274 | 30,234 | 20,188 | 20,630 | 20,254 |
| Bachelor Lower ......................................................... | 51,663 | 31,102 | 24,048 | 23,227 | 30,513 |
| Bachelor Upper ......................................................... | 51,663 | 31,102 | 24,048 | 23,227 | 30,513 |
| Graduate ................................................................... | 67,615 | 46,433 | 15,891 | 19,972 | 44,890 |
| **Non-GE Programs** | | | | | |
| Public/NP 2yr or less ............................................... | 36,492 | 29,522 | 23,642 | 19,388 | N/A |
| Bachelor Lower ......................................................... | 47,839 | 29,158 | 21,508 | 21,925 | N/A |
| Bachelor Upper ......................................................... | 47,839 | 29,158 | 21,508 | 21,925 | N/A |
| Graduate ................................................................... | 76,619 | 58,444 | 19,765 | 22,747 | N/A |

Students experience earnings gain each year they work following program completion. We compute the earnings benefit over the analysis window by giving 2026 completers 7 years of earnings gains, 2027 completers 6 years of earnings gains, and so on. The earnings gain of students that graduate during 2033 are only measured for one year. In reality program graduates would experience an earnings gain annually over their entire working career; our estimates likely understate the total likely earnings benefit of the policy.

However, our approach can overstate the earnings gain of students that shift programs if students experience a smaller earnings gain than the average difference between passing and failing programs within each GE-by-risk group in Table 6.7. To account for this, we apply an additional adjustment factor to the aggregate earnings difference to quantify how much of the earnings difference is accounted for by programs.

There is no consensus in the research literature on the magnitude of this parameter, with some studies finding very large impacts of specific programs or institutions on earnings[324] and others finding smaller impacts.[325] Unfortunately, many of these studies are set in specific contexts (*e.g.* only public four-year universities in one State) and most look at institutions overall rather than programs, which may not extrapolate to our setting given the large outcome variation across programs in the same institution.

To select the value used for this adjustment factor, we compared the average earnings difference between passing and failing programs (conditional on credential level) before versus after controlling for the rich demographic characteristics described in "Student Demographic Analysis" (specifically, the share of students in each race/ethnic category, the share of students that are male, independent, first-generation, and a Pell grant recipient, and the average family income of students).[326] Based on this analysis, our primary estimates adjust the raw earnings difference in Table 6.7 down using an adjustment factor of 75 percent. Given the uncertainty around the proper adjustment factor to use, we include a range of values in the sensitivity analysis.

In the analysis of alternative options above, we showed the expected change in earnings for students that transfer from failing programs for each credential-level by 2-digit CIP code. Across all credential levels, students that shift from failing GE programs were expected to increase annual earnings by about 43 percent and those transferring from failing non-GE programs were expected to increase annual earnings by about 21 percent. These estimates are in line with those from Table 6.7 and used in the benefit impact.

Fiscal Externality Benefit

The increased earnings of program graduates would generate additional Federal and State tax revenue and reductions in transfer program expenditure. To the earnings gain, we multiply an average marginal tax and transfer rate of 18.6 percent to estimate the fiscal benefit. This rate was computed in Hendren and Sprung-Keyser (2020) specifically to estimate the fiscal externality of earnings gains stemming from improvement in college quality, so it is appropriate for use in our setting.[327] The rate is derived from

---

[323] The ratios used are 11.5% for programs of 2-year or less, 16.5% for bachelor's programs, and 27.3% for graduate programs. These are the ratio between number of title IV, HEA completers in the two-year earnings cohort and the average title IV, HEA enrollment in the 2016 and 2017 Award Years.

[324] Hoekstra, Mark (2009). The Effect of Attending the Flagship State University on Earnings: A Discontinuity-Based Approach. *Review of Economics and Statistics*, 91 (4): 717–724. Hoxby, C.M. (2019). The Productivity of US Postsecondary Institutions. In *Productivity in Higher Education*, Hoxby, C.M. & K.M. Stange, K.M. (eds.). University

of Chicago Press: Chicago. Andrews, R.J. & Stange, K.M. (2019). Price Regulation, Price Discrimination, and Equality of Opportunity in Higher Education: Evidence from Texas. *American Economic Journal: Economic Policy*, 11.4, 31–65. Andrews, Rodney, Imberman, Scott, Lovenheim, Michael & Stange, Kevin (Aug. 2022). The Returns to College Major Choice: Average and Distributional Effects, Career Trajectories, and Earnings Variability. NBER Working Paper 30331.

[325] Mountjoy, Jack & Hickman, Brent (Sept. 2021). The Returns to College(s): Relative Value-Added

and Match Effects in Higher Education. NBER Working Paper 29276.

[326] Note that both the "raw" and fully controlled regressions include indicators for credential level, as enrollment is not permitted to move across credential levels in our budget simulations other than modest shift from 2-year programs to lower-division four-year programs.

[327] Hendren, Nathaniel & Sprung-Keyser, Ben (2020). A Unified Welfare Analysis of Government Policies. *Quarterly Journal of Economics* 135 (3): 1209–1318.

2016 CBO estimates and includes Federal and State income taxes and transfers from the Supplemental Nutrition Assistance Program (SNAP) but excludes payroll taxes, housing vouchers, and other safety-net programs. Note that this benefit is not included in our budget impact estimates.

Instructional Spending Cost and Transfer

To determine the additional cost of educating students that shift from one type of program to another or the cost savings from students who chose not to enroll, we estimate the aggregate annual instructional spending under the baseline and policy scenarios and take the difference. We used the instructional expense per FTE enrollee data from IPEDS to calculate the enrollment-weighted average institutional-level instructional expense per FTE student for programs by risk group and performance result,

separately for GE programs and non-GE programs. Average spending for programs that have become ineligible is assumed to be the average of the three failing categories, weighted by the enrollment share in these categories. These estimates are reported in Table 6.8. We estimate aggregate spending by program group by multiplying enrollment from 2023 through 2033 by average spending.

TABLE 6.8 AVERAGE INSTRUCTIONAL COST PER FTE BY GROUP

| | Pass | Fall D/E | Fail EP only | Fail both | Ineligible |
|---|---|---|---|---|---|
| **GE Programs:** | ............. | ............. | ............. | ............. | ............. |
| Proprietary 2yr or less | 4,341 | 3,007 | 4,442 | 3,990 | 4,106 |
| Public/NP 2yr or less | 7,325 | 5,859 | 4,984 | 3,688 | 4,873 |
| Bachelor Lower | 3,668 | 2,655 | 3,047 | 3,644 | 2,728 |
| Bachelor Upper | 3,668 | 2,655 | 3,047 | 3,644 | 2,728 |
| Graduate | 5,294 | 3,837 | 1,837 | 5,151 | 3,910 |
| **Non-GE Programs:** | ............. | ............. | ............. | ............. | |
| Public/NP 2yr or less | 6,408 | 5,187 | 5,959 | 4,361 | N/A |
| Bachelor Lower | 11,263 | 7,563 | 9,036 | 12,021 | N/A |
| Bachelor Upper | 11,263 | 7,563 | 9,036 | 12,021 | N/A |
| Graduate | 15,666 | 16,434 | 7,528 | 24,355 | N/A |

Note that since we are using institution-level rather than program-level spending, this will not fully capture spending differences between undergraduate and graduate enrollment, between upper and lower division, and across field of study.[328]

To calculate the transfer of instructional expenses from failing to passing programs, we multiply the average instructional expense per enrollee shown in Table 6.7 by the estimated number of annual student transfers for 2023 to 2033 from each risk group and failing category.

Student Aid Transfers

To calculate the amounts of student aid that could transfer with students each year, we multiply the estimated number of students receiving title IV, HEA program funds transferring from ineligible or failing GE and non-GE programs to passing programs in each risk category each year by the average Pell grant, Stafford subsidized loan, unsubsidized loan, PLUS loan, and

GRAD PLUS loan per enrollment in the same categories.

To annualize the amount of benefits, costs, and title IV, HEA program fund transfers from 2023 to 2033, we calculate the net present value (NPV) of the yearly amounts using a discount rate of 3 percent and a discount rate of 7 percent and annualize it over 10 years.

**7. Net Budget Impacts**

These final regulations are estimated to have a net Federal budget impact of $−13.8 billion, consisting of $−7.4 billion in reduced Pell grants and $−6.4 billion for loan cohorts 2024 to 2033.[329] A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. The baseline for estimating the cost of these final regulations is the President's Budget for 2024 (PB2024) as modified for the finalization of the SAVE plan included in the final rule published July 10, 2023.[330] This estimated net budget impact addresses the GE and Financial Transparency provisions, as described below. The provisions related to

Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit that were included in the NPRM published on May 19, 2023, will be addressed in a forthcoming separate document.

*Gainful Employment and Financial Transparency*

The final regulations are estimated to shift enrollment towards programs with lower debt-to-earnings or higher median earnings or both, and away from programs that fail either of the two performance metrics. The vast majority of students are assumed to resume their education at the same or another program in the event they are warned about poor program performance or if their program loses eligibility. The final regulations are also estimated to reduce overall enrollment, as some students decide to not enroll. Table 7.1 summarize the main enrollment results for non-GE programs. Enrollment in non-GE programs is expected to increase by about 0.6 percent relative to baseline over the budget period. There is a modest enrollment shift towards programs that pass both metrics, with a particularly large (proportionate) reduction in the share of enrollment in programs that fail D/E. By the end of the analysis window, 96.0 percent of enrollment is expected to be in passing programs.

---

[328] This may cause our estimates to slightly understate the instructional cost impact since failing programs are disproportionately in lower-earning fields and lower credential levels, which tend to have lower instructional costs. Though we anticipate most movement will be within field and credential level, which would mute this effect. See Hemelt, Steven W., Stange, Kevin M., Furquim, Fernando, Simon, Andrew & Sawyer, John E. (2021). Why Is Math Cheaper than English? Understanding Cost Differences in Higher Education. *Journal of Labor Economics*, vol. 39(2), pages 397–435.

[329] Since the policy is not estimated to shift enrollment until AY 2026 (which includes part of FY 2025), we present enrollment and budget impacts starting in 2025. Impacts in both AY and FY 2024 are zero.

[330] 88 FR 43820 (July 10, 2023).

TABLE 7.1    PRIMARY ENROLLMENT ESTIMATE
[Non-GE programs]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Aggregate Enrollment (millions)** | | | | | | | | | |
| Baseline | 14.12 | 13.97 | 13.84 | 13.71 | 13.59 | 13.47 | 13.36 | 13.26 | 13.17 |
| Policy | 14.12 | 14.01 | 13.89 | 13.78 | 13.66 | 13.54 | 13.43 | 13.33 | 13.22 |
| **Percent of Enrollment by Program Performance** | | | | | | | | | |
| Pass: | | | | | | | | | |
| Baseline | 95.9 | 96.0 | 96.0 | 96.1 | 96.1 | 96.1 | 96.2 | 96.2 | 96.2 |
| Policy | 95.9 | 95.7 | 96.1 | 96.3 | 96.5 | 96.5 | 96.6 | 96.6 | 96.7 |
| Fail D/E: | | | | | | | | | |
| Baseline | 1.5 | 1.5 | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| Policy | 1.5 | 1.6 | 1.4 | 1.3 | 1.3 | 1.2 | 1.2 | 1.3 | 1.3 |
| Fail EP: | | | | | | | | | |
| Baseline | 2.0 | 2.0 | 1.9 | 1.9 | 1.9 | 1.8 | 1.8 | 1.7 | 1.7 |
| Policy | 2.0 | 2.2 | 2.1 | 2.0 | 1.9 | 1.9 | 1.8 | 1.8 | 1.7 |
| Fail Both: | | | | | | | | | |
| Baseline | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Policy | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 |

Table 7.2 reports comparable estimates for GE programs. Note that for GE programs we estimate enrollment in two additional categories: Pre-Ineligible, *i.e.,* programs that would be ineligible for title IV, HEA aid the following year; and Ineligible. Enrollment in GE programs is projected to decline by 9 percent relative to baseline, with the largest marginal decline in the first-year programs become ineligible. There is a large enrollment shift towards programs that pass both metrics, with a particularly large reduction in the share of enrollment in programs that fail EP. By the end of the analysis window, 95.0 percent of enrollment is expected to be in passing programs, compared to 71.8 percent in the baseline scenario.

TABLE 7.2    PRIMARY ENROLLMENT ESTIMATE
[GE programs]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Aggregate Enrollment (millions)** | | | | | | | | | |
| Baseline | 2.63 | 2.61 | 2.60 | 2.60 | 2.59 | 2.59 | 2.59 | 2.59 | 2.60 |
| Policy | 2.63 | 2.47 | 2.43 | 2.43 | 2.42 | 2.41 | 2.39 | 2.37 | 2.34 |
| **Percent of Enrollment by Program Performance** | | | | | | | | | |
| Pass: | | | | | | | | | |
| Baseline | 76.2 | 75.7 | 75.3 | 74.8 | 74.3 | 73.8 | 73.3 | 72.8 | 72.3 |
| Policy | 76.2 | 85.1 | 91.5 | 93.5 | 94.3 | 94.6 | 94.8 | 94.8 | 94.9 |
| Fail D/E: | | | | | | | | | |
| Baseline | 6.5 | 6.4 | 6.3 | 6.2 | 6.0 | 5.9 | 5.8 | 5.6 | 5.5 |
| Policy | 6.5 | 2.7 | 1.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| Fail EP: | | | | | | | | | |
| Baseline | 13.9 | 14.4 | 14.9 | 15.5 | 16.0 | 16.6 | 17.2 | 17.8 | 18.4 |
| Policy | 13.9 | 1.9 | 1.2 | 1.3 | 1.3 | 1.4 | 1.4 | 1.4 | 1.4 |
| Fail Both: | | | | | | | | | |
| Baseline | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0. |
| Policy | 0.5 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Pre-Inelig: | | | | | | | | | |
| Baseline | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Policy | 0.0 | 9.9 | 3.3 | 1.6 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 |
| Inelig: | | | | | | | | | |
| Baseline | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Policy | 0.0 | 2.2 | 1.8 | 1.2 | 0.9 | 0.7 | 0.7 | 0.6 | 0.0 |

For non-GE programs, these shifts occur primarily across programs that have different performance in the same loan risk category, with a very modest shift from public and nonprofit two-year and less programs to lower-division 4-year programs. This is shown in Table 7.3. Shifts away from the public and nonprofit two-year sector within non-GE programs is partially offset from shifts into these programs from failing GE programs. Recall that in "Transfer Causes Net Enrollment Increase in Some Sectors" above we showed that the vast majority of community colleges would gain enrollment from the regulations.

TABLE 7.3   PRIMARY ENROLLMENT ESTIMATES BY RISK GROUP
[Non-GE programs]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Projected Total Enrollment by Loan Risk Category (Millions)** | | | | | | | | | |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 3.02 | 2.91 | 2.80 | 2.70 | 2.61 | 2.51 | 2.42 | 2.34 | 2.25 |
| Policy | 3.02 | 2.92 | 2.82 | 2.72 | 2.62 | 2.53 | 2.44 | 2.35 | 2.26 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 6.10 | 6.03 | 5.96 | 5.90 | 5.83 | 5.77 | 5.71 | 5.65 | 5.59 |
| Policy | 6.10 | 6.04 | 5.99 | 5.93 | 5.87 | 5.82 | 5.76 | 5.70 | 5.64 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 2.57 | 2.55 | 2.54 | 2.52 | 2.50 | 2.49 | 2.47 | 2.45 | 2.44 |
| Policy | 2.57 | 2.55 | 2.54 | 2.53 | 2.51 | 2.49 | 2.48 | 2.46 | 2.45 |
| Graduate: | | | | | | | | | |
| Baseline | 2.43 | 2.48 | 2.53 | 2.59 | 2.64 | 2.70 | 2.76 | 2.82 | 2.88 |
| Policy | 2.43 | 2.49 | 2.54 | 2.59 | 2.65 | 2.70 | 2.76 | 2.82 | 2.87 |
| **Percent of Enrollment by Loan Risk Category** | | | | | | | | | |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 21.38 | 20.82 | 20.27 | 19.73 | 19.19 | 18.66 | 18.14 | 17.62 | 17.11 |
| Policy | 21.38 | 20.87 | 20.32 | 19.77 | 19.22 | 18.67 | 18.13 | 17.61 | 17.09 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 43.19 | 43.14 | 43.09 | 43.02 | 42.94 | 42.84 | 42.73 | 42.62 | 42.48 |
| Policy | 43.19 | 43.13 | 43.10 | 43.06 | 43.01 | 42.95 | 42.87 | 42.77 | 42.66 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 18.20 | 18.26 | 18.33 | 18.38 | 18.42 | 18.45 | 18.48 | 18.50 | 18.51 |
| Policy | 18.20 | 18.24 | 18.29 | 18.33 | 18.38 | 18.42 | 18.46 | 18.49 | 18.51 |
| Graduate: | | | | | | | | | |
| Baseline | 17.23 | 17.77 | 18.32 | 18.88 | 19.46 | 20.05 | 20.65 | 21.26 | 21.89 |
| Policy | 17.23 | 17.61 | 17.50 | 17.64 | 17.73 | 17.76 | 17.76 | 17.75 | 17.72 |

Table 7.4—reports a similar breakdown for GE programs. Shifts to passing programs are accompanied by a shift away from proprietary two-year and below programs and towards public and nonprofit programs of similar length, along with a more modest shift towards lower-division 4-year programs.

TABLE 7.4   PRIMARY ENROLLMENT ESTIMATES BY RISK GROUP
[GE programs]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Projected Total Enrollment by Loan Risk Category (Millions)** | | | | | | | | | |
| Prop. 2-year & below: | | | | | | | | | |
| Baseline | 0.72 | 0.75 | 0.77 | 0.80 | 0.83 | 0.86 | 0.89 | 0.92 | 0.95 |
| Policy | 0.72 | 0.62 | 0.59 | 0.59 | 0.60 | 0.60 | 0.61 | 0.61 | 0.61 |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 0.53 | 0.52 | 0.51 | 0.49 | 0.48 | 0.46 | 0.45 | 0.44 | 0.43 |
| Policy | 0.53 | 0.55 | 0.56 | 0.57 | 0.57 | 0.56 | 0.56 | 0.55 | 0.55 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 0.78 | 0.77 | 0.75 | 0.74 | 0.73 | 0.71 | 0.70 | 0.69 | 0.68 |
| Policy | 0.78 | 0.74 | 0.73 | 0.72 | 0.72 | 0.70 | 0.69 | 0.68 | 0.67 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 0.20 | 0.20 | 0.19 | 0.19 | 0.18 | 0.18 | 0.17 | 0.17 | 0.17 |
| Policy | 0.20 | 0.19 | 0.18 | 0.18 | 0.17 | 0.17 | 0.16 | 0.16 | 0.15 |
| Graduate: | | | | | | | | | |
| Baseline | 0.38 | 0.38 | 0.38 | 0.38 | 0.38 | 0.37 | 0.37 | 0.37 | 0.37 |
| Policy | 0.38 | 0.38 | 0.37 | 0.37 | 0.37 | 0.37 | 0.36 | 0.36 | 0.36 |
| **Percent of Enrollment by Loan Risk Category** | | | | | | | | | |
| Prop. 2-year & below: | | | | | | | | | |
| Baseline | 27.52 | 28.58 | 29.65 | 30.77 | 31.91 | 33.05 | 34.22 | 35.41 | 36.63 |
| Policy | 27.52 | 25.12 | 24.33 | 24.40 | 24.69 | 25.03 | 25.40 | 25.77 | 26.14 |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 20.36 | 19.88 | 19.44 | 18.94 | 18.44 | 17.96 | 17.47 | 16.97 | 16.44 |
| Policy | 20.36 | 22.18 | 23.06 | 23.36 | 23.45 | 23.46 | 23.44 | 23.40 | 23.35 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 29.76 | 29.33 | 28.90 | 28.48 | 28.05 | 27.62 | 27.18 | 26.76 | 26.33 |
| Policy | 29.76 | 29.99 | 29.98 | 29.79 | 29.54 | 29.28 | 29.01 | 28.74 | 28.47 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 7.79 | 7.62 | 7.44 | 7.27 | 7.09 | 6.91 | 6.73 | 6.55 | 6.37 |
| Policy | 7.79 | 7.73 | 7.55 | 7.36 | 7.18 | 7.01 | 6.86 | 6.71 | 6.56 |
| Graduate: | | | | | | | | | |
| Baseline | 14.58 | 14.59 | 14.57 | 14.55 | 14.51 | 14.46 | 14.39 | 14.32 | 14.23 |
| Policy | 14.58 | 14.99 | 15.08 | 15.09 | 15.14 | 15.21 | 15.30 | 15.39 | 15.48 |

As reported in Tables 7.5 and 7.6, we estimate that the regulations would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033.

TABLE 7.5   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE

[millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Non-GE Programs:** | | | | | | | | | | |
| Pell | 25 | 57 | 89 | 101 | 108 | 116 | 118 | 116 | 110 | 840 |
| Subs. | 9 | 16 | 11 | 8 | 8 | 10 | 10 | 9 | 9 | 92 |
| Unsub. | 18 | 10 | (45) | (90) | (120) | (143) | (164) | (185) | (209) | (928) |
| Grad PLUS | 4 | (25) | (91) | (147) | (183) | (205) | (221) | (235) | (248) | (1,353) |
| Par. PLUS | 7 | 30 | 52 | 61 | 65 | 68 | 67 | 66 | 64 | 480 |
| **GE Programs:** | | | | | | | | | | |
| Pell | (199) | (511) | (808) | (936) | (983) | (1,050) | (1,138) | (1,247) | (1,376) | (8,248) |
| Subs. | (149) | (380) | (472) | (486) | (501) | (529) | (565) | (606) | (653) | (4,340) |
| Unsub. | (226) | (576) | (707) | (717) | (732) | (765) | (809) | (861) | (921) | (6,313) |
| Grad PLUS | (20) | (51) | (63) | (62) | (60) | (58) | (56) | (55) | (55) | (479) |
| Par. PLUS | (18) | (48) | (59) | (59) | (64) | (74) | (86) | (101) | (117) | (625) |
| **Total:** | | | | | | | | | | |
| Pell | (174) | (455) | (719) | (835) | (875) | (934) | (1,020) | (1,131) | (1,266) | (7,409) |
| Subs. | (139) | (364) | (461) | (477) | (493) | (519) | (555) | (597) | (644) | (4,248) |
| Unsub. | (208) | (566) | (752) | (807) | (852) | (908) | (973) | (1,046) | (1,130) | (7,241) |
| Grad PLUS | (16) | (77) | (154) | (209) | (242) | (263) | (278) | (290) | (303) | (1,832) |
| Par. PLUS | (11) | (18) | (7) | 2 | 1 | (6) | (19) | (35) | (53) | (145) |

TABLE 7.6   ESTIMATED ANNUAL PERCENT CHANGE IN TITLE IV, HEA AID VOLUME BY FISCAL YEAR

(%)

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Non-GE Programs:** | | | | | | | | | | |
| Pell | 0.25 | 0.32 | 0.35 | 0.37 | 0.39 | 0.40 | 0.37 | 0.36 | 0.33 | 0.35 |
| Subs. | 0.09 | 0.15 | 0.11 | 0.08 | 0.08 | 0.10 | 0.10 | 0.09 | 0.09 | 0.10 |
| Unsub. | 0.08 | 0.04 | −0.20 | −0.40 | −0.53 | −0.63 | −0.72 | −0.81 | −0.90 | −0.46 |
| Grad PLUS | 0.07 | −0.47 | −1.62 | −2.48 | −2.95 | −3.24 | −3.42 | −3.56 | −3.68 | −2.48 |
| Par. PLUS | 0.08 | 0.33 | 0.56 | 0.66 | 0.70 | 0.73 | 0.73 | 0.73 | 0.72 | 0.58 |
| **GE Programs:** | | | | | | | | | | |
| Pell | −9.46 | −14.53 | −14.66 | −14.58 | −15.06 | −15.91 | −16.97 | −18.18 | −19.54 | −15.44 |
| Subs. | −5.36 | −13.71 | −17.00 | −17.43 | −17.91 | −18.81 | −19.97 | −21.30 | −22.76 | −17.18 |
| Unsub. | −4.49 | −11.47 | −14.12 | −14.32 | −14.56 | −15.16 | −15.98 | −16.95 | −18.04 | −13.91 |
| Grad PLUS | −2.83 | −7.12 | −8.59 | −8.27 | −7.84 | −7.57 | −7.40 | −7.30 | −7.25 | −7.16 |
| Par. PLUS | −2.54 | −6.62 | −7.90 | −7.67 | −8.16 | −9.26 | −10.70 | −12.35 | −14.14 | −8.97 |
| **Total:** | | | | | | | | | | |
| Pell | −1.46 | −2.32 | −2.36 | −2.37 | −2.48 | −2.68 | −2.95 | −3.24 | −3.61 | −2.59 |
| Subs. | −1.03 | −2.71 | −3.46 | −3.61 | −3.75 | −3.97 | −4.28 | −4.63 | −5.03 | −3.59 |
| Unsub. | −0.77 | −2.08 | −2.76 | −2.95 | −3.09 | −3.27 | −3.48 | −3.72 | −3.99 | −2.91 |
| Grad PLUS | −0.28 | −1.25 | −2.42 | −3.12 | −3.49 | −3.70 | −3.84 | −3.94 | −4.04 | −2.99 |
| Par. PLUS | −0.11 | −0.18 | −0.07 | 0.02 | 0.01 | −0.06 | −0.19 | −0.35 | −0.53 | −0.16 |

Table 7.7 reports the annual net budget impact after accounting for estimated loan repayment. We estimate a net Federal budget impact of $−13.8 billion, consisting of $−7.4 billion in reduced Pell grants and $−6.4 billion for loan cohorts 2024 to 2033.

TABLE 7.7   ESTIMATED ANNUAL NET BUDGET IMPACT

[Outlays in millions]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Pell | −174 | −455 | −719 | −835 | −875 | −934 | −1,020 | −1,131 | −1,266 | −7,409 |
| Subs. | −39 | −114 | −153 | −158 | −158 | −160 | −166 | −172 | −181 | −1,302 |
| Unsub. | −48 | −149 | −218 | −237 | −246 | −255 | −268 | −281 | −300 | −2,003 |
| PLUS (Par & Grad) | −2 | −22 | −53 | −79 | −90 | −98 | −102 | −104 | −106 | −656 |
| Consol | −12 | −36 | −80 | −145 | −229 | −323 | −431 | −537 | −641 | −2,435 |
| Total | −275 | −776 | −1,223 | −1,454 | −1,598 | −1,770 | −1,987 | −2,225 | −2,494 | −13,805 |

The Department's calculations of the net budget impacts represent our best estimate of the effect of the regulations on the Federal student aid programs. As noted in the NPRM published June, realized budget impacts will be heavily influenced by actual program performance, student response to program performance, student borrowing and repayment behavior, and changes in enrollment because of the regulations. For example, if students, including prospective students, react more strongly to the warnings, acknowledgment requirement, or potential ineligibility of programs than anticipated and, if many of these students leave postsecondary education, the impact on Pell grants and loans could increase. Similarly, if institutions react to the regulations by improving performance, the assumed enrollment and aid amounts could be overstated, though this would be very beneficial to

students. Finally, if students' repayment behavior is different than that assumed in the model, the realized budget impact could be larger or smaller than our estimate.

### 8. Accounting Statement

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the benefits, costs, and transfers associated with the provisions of these regulations.

*Primary Estimates*

We estimate that by shifting enrollment to higher financial-value programs, the regulations would increase student's earnings, resulting in net after-tax gains to students and benefits for taxpayers in the form of additional tax revenue. Table 8.1 reports the estimated aggregate earnings gain for each cohort of completers, separately for GE and non-GE programs, and the

cumulative (not discounted) earnings gain over the budget window. The regulation is estimated to generate $32.3 billion of additional earnings gains over the budget window, both from GE and non-GE programs. Using the approach described in "Methodology for Costs, Benefits, and Transfers," we expect $26.3 billion to benefit students and $6.0 billion to benefit Federal and State governments and taxpayers.[331]

TABLE 8.1  ANNUAL AND CUMULATIVE EARNINGS GAIN AND DISTRIBUTION BETWEEN STUDENTS AND GOVERNMENT
[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Single-year Earnings Gains of Each Cohort of Completers** | | | | | | | | | | |
| Non-GE ............................................ | 0 | 139 | 411 | 542 | 598 | 596 | 566 | 497 | 421 | 3,770 |
| GE ................................................... | 0 | 232 | 470 | 570 | 590 | 561 | 510 | 447 | 376 | 3,755 |
| Total ......................................... | 0 | 370 | 881 | 1,112 | 1,189 | 1,157 | 1,075 | 944 | 797 | 7,525 |
| **Cumulative Earnings Gain** | | | | | | | | | | |
| Cumulative gain ............................. | 0 | 370 | 1,251 | 2,363 | 3,551 | 4,708 | 5,783 | 6,728 | 7,525 | 32,280 |
| Student share .............................. | 0 | 302 | 1,019 | 1,923 | 2,891 | 3,832 | 4,708 | 5,476 | 6,125 | 26,276 |
| Gov t share ................................. | 0 | 69 | 233 | 440 | 661 | 876 | 1,076 | 1,251 | 1,400 | 6,004 |

The final rule could also alter aggregate instructional spending, by shifting enrollment to higher-cost institutions (an increase in spending) or by reducing aggregate enrollment (a decrease in spending). Table 8.2 reports estimated annual and cumulative

changes in instructional spending, overall and separately for GE and non-GE programs. The net effect is an increase in aggregate cumulative instructional spending of $2.7 billion (not discounted), though this masks differences between non-GE programs

(net increase in spending) and GE programs (net decrease in spending). Spending is reduced in the first year of the policy due to the decrease in enrollment, but then increases as more students transfer to more costly programs.

TABLE 8.2  INSTRUCTIONAL SPENDING CHANGE
[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE ............................................ | 0 | 381 | 685 | 836 | 904 | 909 | 883 | 800 | 719 | 6,118 |
| GE ................................................... | 0 | −536 | −456 | −336 | −301 | −333 | −399 | −481 | −576 | −3,417 |
| Total ......................................... | 0 | −155 | 230 | 500 | 603 | 576 | 485 | 319 | 143 | 2,701 |

The rule would create transfers between students, the Federal Government, and among postsecondary institutions by shifting enrollment between programs, removing title IV, HEA eligibility for GE programs that fail a GE metric multiple times, and causing

some students to choose non-enrollment instead of a low value program. Table 8.3 reports the number of enrolments that transfer programs, remain enrolled at ineligible programs, or decline to enroll in postsecondary education altogether. We estimate that almost 1.5

million enrollments would transfer from low financial value programs to better programs over the decade. A more modest number would remain enrolled at programs that are no longer eligible for title IV, HEA aid.

TABLE 8.3  ESTIMATED ENROLLMENT OF TRANSFERS AND INELIGIBLE UNDER THE REGULATION

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Non-GE:** | | | | | | | | | | |
| Transfer ................................. | 0 | 33,481 | 96,886 | 81,495 | 72,531 | 67,660 | 64,896 | 63,184 | 62,009 | 542,142 |
| Inelig ..................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **GE:** | | | | | | | | | | |
| Transfer ................................. | 0 | 204,541 | 195,213 | 132,844 | 96,996 | 79,268 | 70,668 | 66,360 | 64,057 | 909,948 |
| Inelig ..................................... | 0 | 0 | 53,244 | 43,729 | 30,098 | 22,035 | 17,816 | 15,631 | 14,466 | 197,019 |
| **Total:** | | | | | | | | | | |
| Transfer ................................. | 0 | 238,022 | 292,099 | 214,339 | 169,527 | 146,928 | 135,565 | 129,544 | 126,066 | 1,452,089 |
| Inelig ..................................... | 0 | 0 | 53,244 | 43,729 | 30,098 | 22,035 | 17,816 | 15,631 | 14,466 | 197,019 |

---

[331] The earnings gains estimate in the NPRM did not include earnings gains over the full budget window, thereby underestimating that gain. For this final RIA, we recalculated earnings gains to account for this more comprehensive budget impact, which resulted in an increase in estimated earnings gains relative to the NPRM.

The resulting reductions in expenditures on title IV, HEA program funds from enrollment declines and continued enrollment at non-eligible institutions are classified as transfers from affected student loan borrowers and Pell grant recipients to the Federal Government. The combined reduction in title IV, HEA expenditures was presented in the Net Budget Impacts section above. Transfers also include title IV, HEA program funds that follow students as they shift from low-performing programs to higher-performing programs, which is presented in Table 8.4.

TABLE 8.4    ESTIMATED TITLE IV, HEA AID TRANSFERRED FROM FAILING TO PASSING PROGRAMS UNDER THE REGULATION

[$2019, millions]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE .................................... | 0 | 145 | 458 | 388 | 351 | 330 | 318 | 311 | 307 | 2,608 |
| GE ........................................... | 0 | 1,109 | 1,057 | 720 | 530 | 434 | 387 | 362 | 349 | 4,948 |
| Total ............................... | 0 | 1,255 | 1,515 | 1,108 | 880 | 764 | 705 | 674 | 656 | 7,557 |

Transfers are neither costs nor benefits, but rather the reallocation of resources from one party to another. Table 8.5 provides our best estimate of the changes in annual monetized benefits, costs, and transfers as a result of these regulations. Our baseline estimate with a discount rate of 3 percent is that the regulation would generate $3.0 billion of annualized benefits against $0.4 billion of annualized costs and $1.3 billion of transfers to the Federal Government and $0.7 billion transfers from failing programs to passing programs. A discount rate of 7 percent results in $2.7 billion of benefits against $0.4 billion of annualized costs and $1.2 billion of transfers to the Federal Government and $0.7 billion transfers from failing programs to passing programs. Note that the accounting statement does not include benefits that are unquantified, such as benefits for students associated with lower default and better credit and benefits for institutions from improved information about their value.

TABLE 8.5    ACCOUNTING STATEMENT FOR PRIMARY SCENARIO

| | Annualized Impact (millions, $2023) | |
|---|---|---|
| | Discount rate = 3% | Discount rate = 7% |
| **Benefits** | | |
| Earnings gain (net of taxes) for students ........................................................ | 2,444 | 2,213 |
| Additional Federal and State tax revenue and reductions in transfer program expenditure (not included in budget impact) ........................................ | 559 | 506 |
| For students, lower default, better credit leading to family and business formation, more retirement savings. For institutions, increased enrollment and revenue associated with new enrollments from improved information about value ........................................ | Not quantified. | |
| **Costs** | | |
| Reduced instructional spending ...................................................................... | 258 | 241 |
| Additional reporting by institutions ................................................................. | 90 | 93 |
| Warning/acknowledgment by institutions and students .................................. | 12 | 12 |
| Implementation of reporting, website, acknowledgment by ED ...................... | 4 | 4 |
| Time/moving cost for transfers; Investments to improve program quality ...... | Not quantified. | |
| **Transfers** | | |
| Transfer of Federal Pell dollars to Federal Government from enrollment reduction ..................... | 709 | 667 |
| Transfer of Federal loan dollars to Federal Government from reduced borrowing and greater repayment ................................................................................................... | 607 | 564 |
| Transfer of aid dollars from non-passing programs to passing programs ...................... | 747 | 732 |
| Transfer of State aid dollars from failing programs for dropouts ......................... | Not quantified. | |

*Sensitivity Analysis*

We conducted the simulations of the rule while varying several key assumptions. Specifically, we provide estimates of the change in title IV, HEA volumes using varied assumptions about student transitions, student dropout, program performance, and the earnings gains associated with enrollment shifts. We believe these to be the main sources of uncertainty in our model.

Varying Levels of Student Transition

Our primary analysis assumes rates of transfer and dropout for GE programs based on the research literature, but these quantities are uncertain. The alternative models adjust transfer and dropout rates for all transfer groups to the rates for high alternatives and few alternatives, respectively, as shown in Table 6.5. As reported in Tables 8.6 and 8.7, we estimate that the regulations

would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033, regardless of if all students have

the highest or lowest amount of transfer alternatives.

TABLE 8.6 HIGH TRANSFER SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE

[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell .................................... | 29 | 63 | 94 | 101 | 105 | 108 | 107 | 104 | 97 | 808 |
| Subs. .................................. | 10 | 18 | 12 | 7 | 5 | 5 | 4 | 3 | 1 | 66 |
| Unsub. ................................ | 20 | 3 | (67) | (119) | (152) | (176) | (198) | (220) | (244) | (1,153) |
| Grad PLUS ........................ | 4 | (37) | (121) | (184) | (223) | (247) | (263) | (277) | (290) | (1,639) |
| Par. PLUS .......................... | 8 | 32 | 53 | 61 | 65 | 68 | 68 | 68 | 67 | 491 |
| GE Programs: | | | | | | | | | | |
| Pell .................................... | (195) | (484) | (754) | (867) | (920) | (999) | (1,097) | (1,213) | (1,348) | (7,877) |
| Subs. .................................. | (149) | (368) | (446) | (460) | (481) | (514) | (553) | (597) | (645) | (4,214) |
| Unsub. ................................ | (226) | (558) | (669) | (679) | (701) | (741) | (790) | (845) | (906) | (6,115) |
| Grad PLUS ........................ | (21) | (52) | (61) | (59) | (57) | (55) | (54) | (53) | (52) | (464) |
| Par. PLUS .......................... | (15) | (40) | (48) | (49) | (56) | (68) | (82) | (97) | (114) | (568) |
| Total | | | | | | | | | | |
| Pell .................................... | (166) | (419) | (659) | (766) | (817) | (891) | (990) | (1,110) | (1,251) | (7,069) |
| Subs. .................................. | (138) | (350) | (434) | (453) | (474) | (506) | (545) | (589) | (638) | (4,127) |
| Unsub. ................................ | (206) | (555) | (736) | (798) | (854) | (917) | (988) | (1,064) | (1,150) | (7,268) |
| Grad PLUS ........................ | (17) | (89) | (182) | (244) | (281) | (302) | (317) | (329) | (342) | (2,103) |
| Par. PLUS .......................... | (7) | (8) | 5 | 12 | 9 | 0 | (13) | (29) | (47) | (77) |

TABLE 8.7 LOW TRANSFER SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE

[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell .................................... | 16 | 43 | 73 | 95 | 113 | 129 | 137 | 142 | 142 | 890 |
| Subs. .................................. | 6 | 12 | 12 | 12 | 14 | 17 | 17 | 17 | 16 | 123 |
| Unsub. ................................ | 11 | 28 | 22 | 6 | (6) | (16) | (29) | (44) | (62) | (91) |
| Grad PLUS ........................ | 2 | 7 | (3) | (24) | (39) | (49) | (57) | (64) | (72) | (300) |
| Par. PLUS .......................... | 5 | 26 | 49 | 61 | 67 | 70 | 70 | 68 | 66 | 482 |
| GE Programs: | | | | | | | | | | |
| Pell .................................... | (187) | (550) | (921) | (1,126) | (1,184) | (1,236) | (1,302) | (1,395) | (1,513) | (9,414) |
| Subs. .................................. | (136) | (399) | (546) | (570) | (578) | (595) | (622) | (657) | (699) | (4,803) |
| Unsub. ................................ | (208) | (607) | (825) | (851) | (856) | (874) | (904) | (948) | (1,001) | (7,074) |
| Grad PLUS ........................ | (19) | (54) | (74) | (75) | (72) | (69) | (67) | (66) | (65) | (561) |
| Par. PLUS .......................... | (20) | (62) | (87) | (89) | (91) | (98) | (107) | (120) | (134) | (808) |
| Total: | | | | | | | | | | |
| Pell .................................... | (170) | (508) | (848) | (1,030) | (1,070) | (1,106) | (1,164) | (1,253) | (1,371) | (8,520) |
| Subs. .................................. | (131) | (386) | (534) | (557) | (564) | (579) | (605) | (640) | (683) | (4,680) |
| Unsub. ................................ | (197) | (579) | (803) | (846) | (862) | (890) | (934) | (992) | (1,063) | (7,165) |
| Grad PLUS ........................ | (16) | (47) | (77) | (99) | (111) | (118) | (124) | (130) | (137) | (860) |
| Par. PLUS .......................... | (15) | (37) | (37) | (28) | (24) | (28) | (37) | (52) | (69) | (326) |

No Program Improvement

Our primary analysis assumes that both non-GE and GE programs improve performance after failing either the D/E or EP metric and that GE programs that pass both metrics still improve performance in response to the rule. We incorporate this by increasing the fail to pass program transition rate by 5 percentage points for each type of program failure after 2026 for GE and non-GE programs, by reducing the rate of repeated failure by 5 percentage points for GE and non-GE programs, and by increasing the rate of a repeated passing result by two and a half percentage points for GE programs. The alternative model will assume no program improvement in response to failing metrics.

As reported in Table 8.8, we estimate that the regulations would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033, regardless of if programs show improvement.

TABLE 8.8 NO PROGRAM IMPROVEMENT SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE

[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell .................................... | 25 | 57 | 94 | 118 | 142 | 165 | 183 | 197 | 207 | 1,188 |
| Subs. .................................. | 9 | 16 | 14 | 17 | 21 | 27 | 31 | 34 | 37 | 206 |
| Unsub. ................................ | 18 | 10 | (31) | (53) | (67) | (76) | (85) | (96) | (109) | (489) |
| Grad PLUS ........................ | 4 | (25) | (79) | (114) | (138) | (153) | (164) | (173) | (182) | (1,026) |
| Par. PLUS .......................... | 7 | 30 | 54 | 68 | 78 | 85 | 89 | 92 | 93 | 597 |
| GE Programs: | | | | | | | | | | |

TABLE 8.8    NO PROGRAM IMPROVEMENT SENSITIVITY ANALYSIS    ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE    Continued

[Millions, $2019]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Pell ................................................ | (199) | (511) | (815) | (962) | (1,039) | (1,137) | (1,252) | (1,387) | (1,541) | (8,843) |
| Subs. ............................................. | (149) | (380) | (477) | (502) | (532) | (571) | (617) | (668) | (723) | (4,618) |
| Unsub. ........................................... | (226) | (576) | (716) | (750) | (792) | (847) | (910) | (980) | (1,056) | (6,853) |
| Grad PLUS .................................... | (20) | (51) | (64) | (68) | (70) | (72) | (74) | (76) | (79) | (575) |
| Par. PLUS ...................................... | (18) | (48) | (62) | (69) | (79) | (94) | (110) | (128) | (147) | (755) |
| Total: |  |  |  |  |  |  |  |  |  |  |
| Pell ................................................ | (174) | (455) | (721) | (846) | (898) | (973) | (1,069) | (1,190) | (1,334) | (7,660) |
| Subs. ............................................. | (139) | (364) | (462) | (485) | (510) | (544) | (586) | (634) | (686) | (4,411) |
| Unsub. ........................................... | (208) | (566) | (747) | (803) | (858) | (923) | (996) | (1,076) | (1,165) | (7,342) |
| Grad PLUS .................................... | (16) | (77) | (143) | (182) | (209) | (226) | (238) | (250) | (261) | (1,602) |
| Par. PLUS ...................................... | (11) | (18) | (8) | (0) | (1) | (8) | (21) | (36) | (54) | (157) |

**Alternative Earnings Gain**

Our primary analysis assumes that the earnings change associated with shifts in enrollment is equal to the difference in average earnings between groups defined by loan risk group, program performance category, and whether the program is a GE program or not, multiplied by an adjustment factor equal to 0.75. This adjustment factor was derived from regression models where we compared the earnings difference between passing and failing programs conditional on credential level with and without a rich set of student characteristics controls. The estimated earnings gain associated with the rule scales directly with the value of this adjustment factor. A value of 1.0 (all of the difference in average earnings between groups would manifest as earnings gain) would increase the total annualized earnings gain for students from $2.4 billion up to $3.3 billion (3 percent discount rate).

A value of 0.40 reduces it to $1.3 billion; a value of 0.20 reduces it to $0.7 billion. The net fiscal externality increases or decreases proportionally. Each of these two scenarios would involve more of the raw earnings difference between passing and failing programs of the same credential level being explained by factors we are not able to measure (such as student academic preparation) than those that we are able to measure (such as race, gender, parent education, family income, and Pell receipt).[332] Even at

these low values for the adjustment factor, the estimated earnings benefits of the rule by themselves outweigh the estimated costs.

**9. Distributional Consequences**

The final regulations advance distributional equity aims because the benefits of the regulation—better information, increased earnings, and more manageable debt repayment— would disproportionately be realized by students who otherwise would have low earnings. Students without access to good information about program performance tend to be more disadvantaged; improved transparency about program performance would be particularly valuable to these students. The final regulations improve program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students. Students already attending high-quality colleges, who tend to be more advantaged, would be relatively unaffected by the regulation. The major costs of the program involve additional paperwork and instructional spending, which are not incurred by students directly.

**10. Alternatives Considered**

As part of the development of these regulations, the Department engaged in a negotiated rulemaking process in which we received comments and proposals from non-Federal negotiators representing numerous impacted constituencies. These included higher education institutions, consumer advocates, students, financial aid administrators, accrediting agencies, and States. Non-Federal negotiators

submitted a variety of proposals relating to the issues under discussion. Information about these proposals is available on our negotiated rulemaking website at *www2.ed.gov/policy/ highered/reg/hearulemaking/2021/ index.html.*

In response to comments received and further internal consideration of these final regulations, the Department reviewed and considered various changes to the proposed regulations detailed in the NPRM. We described the changes made in response to public comments in the Analysis of Comments and Changes section of this preamble. We summarize below the major proposals that we considered but ultimately chose not to implement in these regulations. In developing these final regulations, we contemplated the budgetary impact, administrative burden, and anticipated effectiveness of the options we considered.

*D/E Rate Only*

The Department considered using only the D/E rates metric, consistent with the 2014 Prior Rule. Tables 10.1 and 10.2 show the share of GE and non-GE programs and enrollment that would fail under only the D/E metric compared to our preferred rule that considers both D/E and EP metrics. A greater number of programs do not meet standards when considering both D/E and EP instead of D/E only, especially among certificate programs.

As discussed earlier at length, the D/E and EP measure distinct outcomes of gainful employment, and the EP adds an important protection for students and taxpayers. Even small amounts of debt can be unmanageable borrowers with low earnings, as shown in the RIA and in research.[333] With the inclusion of the

---

[332] In unpublished analysis of approximately 600 programs (defined by 2-digit CIP by institution) at four-year public colleges in Texas as part of their published work, Andrews & Stange (2019) find that a 1 percent increase in log program earnings (unadjusted) is associated with a .72 percent increase in log program earnings after controlling for student race/ethnicity, limited English proficiency, economic disadvantage, and achievement test scores. Additionally controlling for students' college application and admissions behavior reduces this to 0.62. Using the correlation of institution-level average earnings and value-added in Figure 2.1 of Hoxby (2018), we estimate

that an earnings gain of $10,000 is associated with a value added gain of roughly $6,000 over the entire sample, of roughly $4,000 for scores below 1200, and of roughly $2,000 for scores below 1000. These relationships imply parameter values of 0.72, 0.62, 0.60, 0.40, and 0.20, respectively. Again, institution-level correlations may not be directly comparable to program-level data.

[333] See Brown, Meta *et al.* (2015). Looking at Student Loan Defaults Through a Larger Window. Liberty Street Economics, Fed. Reserve Bank of N.Y. (*https://libertystreeteconomics.newyorkfed.org/ 2015/02/looking_at_student_loan_defaults_ through_a_larger_window/*).

EP, the Department affirms that borrowers that postsecondary GE programs should help students reach a minimal level of labor market earnings.

TABLE 10.1   PERCENT OF GE STUDENTS AND PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E OR EP

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E or EP | Fail D/E only | Fail D/E or EP |
| Public: | | | | |
| UG Certificates | 0.0 | 1.0 | 0.4 | 4.4 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 0.1 | 0.1 | 0.4 | 0.4 |
| Total | 0.0 | 0.9 | 0.4 | 4.1 |
| Private, Nonprofit: | | | | |
| UG Certificates | 0.4 | 5.6 | 3.9 | 42.9 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 0.6 | 0.7 | 2.7 | 3.5 |
| Total | 0.4 | 2.6 | 3.3 | 28.5 |
| Proprietary: | | | | |
| UG Certificates | 5.0 | 34.4 | 8.7 | 52.8 |
| Associate | 10.7 | 15.0 | 33.7 | 38.5 |
| Bachelor s | 10.7 | 10.9 | 24.3 | 24.4 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Master s | 9.7 | 9.7 | 16.6 | 16.6 |
| Doctoral | 8.3 | 8.3 | 10.6 | 10.6 |
| Professional | 13.8 | 13.8 | 50.7 | 50.7 |
| Grad Certs | 4.8 | 7.3 | 37.9 | 38.6 |
| Total | 7.7 | 23.0 | 20.2 | 34.1 |
| Foreign Private: | | | | |
| UG Certificates | 0.0 | 0.0 | 0.0 | 0.0 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 1.5 | 1.5 | 84.2 | 84.2 |
| Total | 0.9 | 0.9 | 79.6 | 79.6 |
| Foreign For-Profit: | | | | |
| Master s | 0.0 | 0.0 | 0.0 | 0.0 |
| Doctoral | 0.0 | 0.0 | 0.0 | 0.0 |
| Professional | 28.6 | 28.6 | 20.3 | 20.3 |
| Total | 11.8 | 11.8 | 17.2 | 17.2 |

TABLE 10.2   PERCENT OF NON-GE PROGRAMS AND ENROLLMENT AT GE PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E OR EP

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E or EP | Fail D/E only | Fail D/E or EP |
| Public: | | | | |
| Associate | 0.2 | 1.7 | 0.5 | 7.8 |
| Bachelor s | 0.9 | 1.4 | 1.3 | 1.8 |
| Master s | 0.3 | 0.3 | 1.2 | 1.2 |
| Doctoral | 0.2 | 0.2 | 2.6 | 2.6 |
| Professional | 3.3 | 3.3 | 7.5 | 7.5 |
| Total | 0.5 | 1.2 | 1.0 | 4.5 |
| Private, Nonprofit: | | | | |
| Associate | 2.6 | 3.3 | 22.5 | 24.7 |
| Bachelor s | 0.6 | 0.9 | 2.7 | 4.3 |
| Master s | 1.7 | 1.9 | 4.1 | 4.7 |
| Doctoral | 1.9 | 1.9 | 15.5 | 15.5 |
| Professional | 16.7 | 17.5 | 34.1 | 34.7 |
| Total | 1.2 | 1.5 | 5.8 | 7.1 |
| Foreign Private: | | | | |
| Associate | 0.0 | 0.0 | 0.0 | 0.0 |
| Bachelor s | 0.1 | 0.1 | 1.2 | 1.2 |
| Master s | 0.1 | 0.1 | 1.8 | 1.9 |
| Doctoral | 0.0 | 0.0 | 0.0 | 0.0 |
| Professional | 3.4 | 3.4 | 20.7 | 20.7 |

TABLE 10.2   PERCENT OF NON-GE PROGRAMS AND ENROLLMENT AT GE PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E OR EP   Continued

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E or EP | Fail D/E only | Fail D/E or EP |
| Total ................................................ | 0.2 | 0.2 | 2.9 | 2.9 |

*Alternative Earnings Thresholds*

The Department examined the consequences of two different ways of computing the earnings threshold. For the first, we computed the earnings threshold as the annual earnings among all respondents aged 25–34 in the ACS who have a high school diploma or GED, but no postsecondary education. The second is the median annual earnings among respondents aged 25–34 in the ACS who have a high school diploma or GED, but no postsecondary education, and who worked a full year

prior to being surveyed. These measures, which are included in the 2022 PPD, straddle our preferred threshold, which includes all respondents in the labor force, but excludes those that are not in the labor force.

Tables 10.3 and 10.4 reports the share of programs and enrollment that would pass GE metrics under three different earnings threshold methods, with our approach in the middle column. The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from about 30 percent

under the lowest threshold up to 61 percent under the highest threshold. The failure rate for public undergraduate certificate programs is much lower than proprietary programs under all three scenarios, ranging from about 2 percent for the lowest threshold to 9 percent under the highest. The earnings threshold chosen would have a much smaller impact on failure rates for degree programs, which range from about 34 percent to 42 percent of enrollment for associate programs and essentially no impact for bachelor's degree or higher programs.

TABLE 10.3   SHARE OF ENROLLMENT IN GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

|  | % Failing | | Total | |
|---|---|---|---|---|
|  | DTE + lower EP | DTE + medium EP | DTE + higher EP | Number of enrollees |
| Public: |  |  |  |  |
| UG Certificates .................................... | 1.7 | 4.4 | 9.1 | 869,600 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 12,600 |
| Grad Certs .......................................... | 0.4 | 0.4 | 0.4 | 41,900 |
| Private, Nonprofit: |  |  |  |  |
| UG Certificates .................................... | 25.8 | 40.5 | 43.0 | 77,900 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 7,900 |
| Grad Certs .......................................... | 2.7 | 2.7 | 4.7 | 35,700 |
| Proprietary: |  |  |  |  |
| UG Certificates .................................... | 30.0 | 50.8 | 61.2 | 549,900 |
| Associate ............................................ | 33.9 | 37.1 | 42.4 | 326,800 |
| Bachelor s .......................................... | 24.3 | 24.3 | 24.7 | 675,800 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 800 |
| Master s ............................................. | 16.6 | 16.6 | 16.6 | 240,000 |
| Doctoral .............................................. | 10.6 | 10.6 | 10.6 | 54,000 |
| Professional ........................................ | 50.7 | 50.7 | 50.7 | 12,100 |
| Grad Certs .......................................... | 38.3 | 38.6 | 38.6 | 10,800 |

**Note:** Enrollment counts rounded to the nearest hundred.

TABLE 10.4   SHARE OF GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

|  | % Failing | | Total | |
|---|---|---|---|---|
|  | DTE + lower EP | DTE + medium EP | DTE + higher EP | Number of Programs |
| Public: |  |  |  |  |
| UG Certificates .................................... | 0.6 | 1.0 | 1.6 | 19,00 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 900 |
| Grad Certs .......................................... | 0.1 | 0.1 | 0.1 | 1,900 |
| Private, Nonprofit: |  |  |  |  |
| UG Certificates .................................... | 2.7 | 4.7 | 5.5 | 1,400 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 600 |
| Grad Certs .......................................... | 0.6 | 0.6 | 0.6 | 1,400 |
| Proprietary: |  |  |  |  |
| UG Certificates .................................... | 20.8 | 32.0 | 38.0 | 3,200 |
| Associate ............................................ | 10.8 | 13.8 | 17.6 | 1,700 |
| Bachelor s .......................................... | 10.5 | 10.6 | 11.2 | 1,000 |
| Post-BA Certs ...................................... | 0.0 | 0.0 | 0.0 | 50 |
| Master s ............................................. | 9.6 | 9.6 | 9.6 | 500 |

TABLE 10.4  SHARE OF GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET    Continued

|  | % Failing | | Total | |
|---|---|---|---|---|
|  | DTE + lower EP | DTE + medium EP | DTE + higher EP | Number of Programs |
| Doctoral .................................................. | 8.2 | 8.2 | 8.2 | 100 |
| Professional ............................................. | 12.5 | 12.5 | 12.5 | 30 |
| Grad Certs ............................................... | 5.5 | 7.0 | 7.0 | 100 |

**Note:** Program counts rounded to the nearest 100, except where 50 or fewer.

Tables 10.5 and 10.6 illustrate this for non-GE programs. As with GE programs, the earnings threshold chosen would have a relatively small impact on the share of Bachelors' or higher programs that fail but would impact failure rates for associate degree programs at public institutions, where the share of enrollment in failing programs ranges from about 2 percent at the lowest threshold to 23 percent at the highest. Our measure would result in 8 percent of enrollment in public failing programs.

TABLE 10.5  SHARE OF ENROLLMENT IN NON-GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

|  | % Failing | | | Total Number of Enrollees |
|---|---|---|---|---|
|  | DTE + lower EP | DTE + medium EP | DTE + higher EP |  |
| Public: |  |  |  |  |
| Associate ................................................. | 1.6 | 7.8 | 23.2 | 5,496,800 |
| Bachelor s ............................................... | 1.4 | 1.8 | 4.2 | 5,800,700 |
| Master s .................................................. | 1.2 | 1.2 | 1.3 | 760,500 |
| Doctoral .................................................. | 2.6 | 2.6 | 2.6 | 145,200 |
| Professional ............................................. | 7.5 | 7.5 | 7.5 | 127,500 |
| Private, Nonprofit: |  |  |  |  |
| Associate ................................................. | 22.5 | 23.2 | 25.3 | 266,900 |
| Bachelor s ............................................... | 3.5 | 3.9 | 5.2 | 2,651,300 |
| Master s .................................................. | 4.2 | 4.2 | 4.4 | 796,100 |
| Doctoral .................................................. | 15.5 | 15.5 | 15.5 | 142,900 |
| Professional ............................................. | 34.2 | 34.2 | 34.2 | 130,400 |

**Note:** Enrollment counts rounded to the nearest hundred.

TABLE 10.6  SHARE OF NON-GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

|  | % Failing | | | Total number of programs |
|---|---|---|---|---|
|  | DTE + lower EP | DTE + medium EP | DTE + higher EP |  |
| Public: |  |  |  |  |
| Associate ................................................. | 0.4 | 1.7 | 3.6 | 27,300 |
| Bachelor s ............................................... | 1.0 | 1.3 | 2.9 | 24,300 |
| Master s .................................................. | 0.3 | 0.3 | 0.3 | 14,600 |
| Doctoral .................................................. | 0.2 | 0.2 | 0.2 | 5,700 |
| Professional ............................................. | 3.2 | 3.2 | 3.2 | 600 |
| Private, Nonprofit: |  |  |  |  |
| Associate ................................................. | 2.6 | 2.8 | 3.5 | 2,300 |
| Bachelor s ............................................... | 0.7 | 0.9 | 1.3 | 29,800 |
| Master s .................................................. | 1.7 | 1.8 | 1.8 | 10,400 |
| Doctoral .................................................. | 1.9 | 1.9 | 1.9 | 2,900 |
| Professional ............................................. | 16.8 | 16.8 | 16.8 | 500 |

**Note:** Program counts rounded to the nearest 100.

*No Reporting and Acknowledgment for Non-GE Programs*

The Department considered proposing to apply the reporting and acknowledgment requirements only to GE programs, and calculating D/E rates and the earnings premium measure only for these programs, similar to the 2014 Prior Rule. This approach, however, would fail to protect students, families, and taxpayers from investing in non-GE programs that deliver low value and poor debt and earnings outcomes. As higher education costs and student debt levels increase, students, families, institutions, and the public have a commensurately growing interest in ensuring their higher education investments are justified through positive career, debt, and earnings outcomes for graduates, regardless of the sector in which the institution operates or the credential level of the program. Furthermore, comprehensive performance information about all programs is necessary to guide students that would otherwise choose failing GE programs to better options.

## Small Program Rates

While we believe the D/E rates and earnings premium measure are reasonable and useful metrics for assessing debt and earnings outcomes, we acknowledge that the minimum n-size of 30 completers would exempt small programs from these Financial Value Transparency measures. In our initial proposals during negotiated rulemaking, the Department considered calculating small program rates in such instances. These small program rates would have been calculated by combining all of an institution's small programs to produce the institution's small program D/E rates and earnings premium measure, which would be used for informational purposes only. In the case of GE programs, these small program rates would not have resulted in program eligibility consequences. Several negotiators questioned the usefulness of the small program rates because they would not provide information specific to any particular program, and because an institution's different small programs in various disciplines could lead to vastly different debt and earnings outcomes. In addition, several negotiators expressed concerns about the use of small program rates as a supplementary performance measure under proposed § 668.13(e). Upon consideration of these points, and in the interest of simplifying the final rule, the Department has opted to omit the small program rates.

## Alternative Components of the D/E Rates Measure

The Department considered alternative ways of computing the D/E rates measure, including:

- Lower completer thresholds n-size
- Different ways of computing interest rates
- Different amortization periods

We concluded that the parameters used in the D/E rates and earnings premium calculations were most consistent with best practices identified in prior analysis and research.

## Discretionary Earnings Rate

The Department considered simplifying the D/E rates metric by only including a discretionary earnings rate. We believe that using only the discretionary earnings rate would be insufficient because there may be some instances in which a borrower's annual earnings would be sufficient to pass an 8 percent annual debt-to-earnings threshold, even if that borrower's discretionary earnings is insufficient to pass a 20 percent discretionary debt-to-earnings threshold. Utilizing both

annual and discretionary D/E rates would provide a more complete picture of a program's true debt and earnings outcomes and would be more generous to institutions because a program that passes either the annual earnings rate or the discretionary earnings rate would pass the D/E rates metric.

## Pre- and Post- Earnings Comparison

A standard practice for evaluating the effectiveness of postsecondary programs is to compare the earnings of students after program completion to earnings before program enrollment, to control for any student-specific factors that determine labor market success that should not be attributed to program performance. While the Department introduced limited analysis of pre-program earnings from students' FAFSA data into the evidence above, it is not feasible to perform such comparisons on a wide and ongoing scale in the regulation. Pre-program earnings data is only available for students who have labor market experience prior to postsecondary enrollment, which excludes many students who proceed directly to postsecondary education from high school. Furthermore, earnings data from part-time work during high school is mostly uninformative for earnings potential after postsecondary education. Although some postsecondary programs enroll many students with informative pre-program earnings, many postsecondary programs would lack sufficient numbers of such students to reliably incorporate pre-program earnings from the FAFSA into the regulation.

## 11. Regulatory Flexibility Act

This section considers the effects that the final regulations may have on small entities in the Educational Sector as required by the Regulatory Flexibility Act (RFA, 5 U.S.C. *et seq.,* Public Law 96–354) as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The purpose of the RFA is to establish as a principle of regulation that agencies should tailor regulatory and informational requirements to the size of entities, consistent with the objectives of a particular regulation and applicable statutes. The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a "significant impact on a substantial number of small entities." As we describe below, the Department anticipates that this

regulatory action will have a significant economic impact on a substantial number of small entities. We therefore present this Final Regulatory Flexibility Analysis.

## Description of the Reasons for Agency Action

The Secretary is establishing new regulations to address concerns about the rising cost of postsecondary education and training and increased student borrowing by establishing a final financial value transparency framework to encourage eligible postsecondary programs to produce acceptable debt and earnings outcomes, apprise current and prospective students of those outcomes, and provide better information about program price. In these final regulations, the Secretary also adopts a GE program accountability framework that establishes eligibility and certification requirements tied to the debt-to-earnings and median earnings (relative to high school graduates) of program graduates. The GE program accountability framework will address ongoing concerns about educational programs that are required by statute to provide training that prepares students for gainful employment in a recognized occupation, but instead are leaving students with unaffordable levels of loan debt in relation to their earnings or earnings lower than that of a typical high school graduate. These programs often lead to default or provide no earnings benefit beyond that provided by a high school education, failing to fulfill their intended goal of preparing students for gainful employment.

The regulations will provide a needed framework for oversight around title IV, HEA institutional eligibility for GE programs and increased transparency for all programs. The regulations will also clarify how the Department will determine whether a program is of reasonable length. The effect on small entities will vary by the extent that they currently participate in such programs or that they choose to do so going forward. Small entities could be vulnerable to program closure of poorly performing programs.

## Succinct Statement of the Objectives of, and Legal Basis for, the Regulations

These final regulations amend the Student Assistance General Provisions regulations issued under the HEA in 34 CFR part 668. The changes to part 668 are authorized by 20 U.S.C. 1001–1003, 1070a, 1070g, 1085, 1087b, 1087d, 1087e, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 3474.

The regulations are also designed to protect students and taxpayers from unreasonable risks. Inadequate consumer information could result in students enrolling in programs that will not help them benefit them financially. In addition, institutions may use taxpayer funds in ways that were not what Congress or the Department intended, resulting in greater risk to the taxpayers of waste, fraud, and abuse and to the institution of undeserved negative program review or audit findings that could result in liabilities. These regulations attempt to limit risks to students and taxpayers resulting by enhancing our oversight of GE programs and providing additional transparency for all programs.

**Description of and, Where Feasible, An Estimate of the Number of Small Entities to Which the Regulations Will Apply**

The Small Business Administration (SBA) defines "small institution" using data on revenue, market dominance, tax filing status, governing body, and population. The majority of entities to which the Office of Postsecondary Education's (OPE) regulations apply are postsecondary institutions, however, which do not report such data to the Department. As a result, for purposes of these final regulations, the Department continues to define "small entities" by reference to enrollment, to allow meaningful comparison of regulatory impact across all types of higher education institutions. The enrollment standard for small less-than-two-year institutions (below associate degrees) is less than 750 full-time-equivalent (FTE) students and for small institutions of at least two but less-than-4-years and 4-year institutions, less than 1,000 FTE students.[334] As a result of discussions with the Small Business Administration, this is an update from the standard used in some prior rules, such as the NPRM associated with this final rule, "Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)," published in the **Federal Register** May 19, 2023,[335] the final rule published in the **Federal Register** on July 10, 2023, for the improving income driven repayment rule,[336] and the final rule published in the **Federal Register** on October 28, 2022, "Pell Grants for Prison Education Programs; Determining the Amount of Federal Education Assistance Funds Received by Institutions of Higher Education (90/10); Change in Ownership and Change in Control." [337] Those prior rules applied an enrollment standard for a small two-year institution of less than 500 full-time-equivalent (FTE) students and for a small 4-year institution, less than 1,000 FTE students.[338] The Department consulted with the Office of Advocacy for the SBA and the Office of Advocacy has approved the revised alternative standard for this rulemaking. The Department continues to believe this approach most accurately reflects a common basis for determining size categories that is linked to the provision of educational services and that it captures a similar universe of small entities as the SBA's revenue standard.

TABLE 11.1  SMALL INSTITUTIONS UNDER ENROLLMENT-BASED DEFINITION

|  | Small | Total | Percent |
|---|---|---|---|
| Proprietary | 2,114 | 2,331 | 91 |
| 2-year | 1,875 | 1,990 | 94 |
| 4-year | 239 | 341 | 70 |
| Private not-for-profit | 997 | 1,831 | 54 |
| 2-year | 199 | 203 | 98 |
| 4-year | 798 | 1,628 | 49 |
| Public | 524 | 1,924 | 27 |
| 2-year | 461 | 1,145 | 40 |
| 4-year | 63 | 779 | 8 |
| Total | 3,635 | 6,086 | 60 |

**Source:** 2020 21 IPEDS data reported to the Department.

Table 11.1 summarizes the number of institutions potentially affected by these final regulations. As seen in Table 11.2, the average total revenue at small institutions ranges from $3.0 million for proprietary institutions to $16.5 million at private institutions.

TABLE 11.2  TOTAL REVENUES AT SMALL INSTITUTIONS

|  | Average | Total |
|---|---|---|
| Proprietary | 2,959,809 | 6,257,035,736 |
| 2-year | 2,257,046 | 4,231,961,251 |
| 4-year | 8,473,115 | 2,025,074,485 |
| Private not-for-profit | 16,531,376 | 16,481,781,699 |
| 2-year | 3,664,051 | 729,146,103 |

[334] In regulations prior to 2016, the Department categorized small businesses based on tax status. Those regulations defined "nonprofit organizations" as "small organizations" if they were independently owned and operated and not dominant in their field of operation, or as "small entities" if they were institutions controlled by governmental entities with populations below 50,000. Those definitions resulted in the categorization of all private nonprofit organizations as small and no public institutions as small. Under the previous definition, proprietary institutions were considered small if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. Using FY 2017 IPEDs finance data for proprietary institutions, 50 percent of 4-year and 90 percent of 2-year or less proprietary institutions would be considered small. By contrast, an enrollment-based definition applies the same metric to all types of institutions, allowing consistent comparison across all types.

[335] 88 FR 32300 (May 19, 2023).

[336] 88 FR 43820 (July 10, 2023).

[337] 87 FR 65426 (Oct. 28, 2022).

[338] In those prior rules, at least two but less-than-four-years institutions were considered in the broader two-year category. In this iteration, after consulting with the Office of Advocacy for the SBA, we separate this group into its own category.

TABLE 11.2   TOTAL REVENUES AT SMALL INSTITUTIONS   Continued

|  | Average | Total |
|---|---|---|
| 4-year ................................................................................................... | 19,740,145 | 15,752,635,596 |
| Public ................................................................................................... | 11,084,101 | 5,808,068,785 |
| 2-year ................................................................................................... | 8,329,653 | 3,839,969,872 |
| 4-year ................................................................................................... | 31,239,665 | 1,968,098,913 |
| Total ................................................................................................... | 7,853,339 | 28,546,886,220 |

**Note:** Based on analysis of IPEDS enrollment and revenue data for 2020 [21].

These final regulations require additional reporting and compliance by title IV, HEA participating postsecondary institutions, including small entities, and will have a significant impact on a substantial number of small entities. As described in a previous section, institutions are exempt from the reporting requirements if none of their groups of substantially similar programs have more than 30 completers in total during the four most recently completed award years. Furthermore, GE programs at small institutions could be at risk of losing the ability to distribute title IV, HEA funds under the GE program accountability framework if they fail either the debt-to-earnings (D/E) rate measure or earnings premium (EP) measure. Non-GE programs at small institutions, excluding undergraduate associate and bachelor's degree programs, that fail the D/E metric would be required to have students acknowledge having seen this information prior to entering into enrollment agreements.

Therefore, many small entities will be impacted by the reporting and compliance aspects of the rule, which we quantify below. As we describe in more detail below, the Department estimates that 1.4 percent of non-GE programs at small institutions would fail the D/E metric, therefore triggering the acknowledgement requirement. The Department also estimates that 12.8 percent of GE programs at small institutions would fail either the D/E or EP metric, therefore, being at risk of losing title IV, HEA eligibility. GE programs represent 46 percent of enrollment at small institutions.

The Department's analysis shows programs at small institutions are much more likely to have insufficient sample size to compute and report D/E and EP metrics, though the rate of failing to pass both metrics is higher for programs at such institutions.[339]

Table 11.3 and 11.4 show the number and percentage of non-GE enrollees and non-GE programs at small institutions in each status relative to the performance standard. The share of non-GE programs that have sufficient data and fail the D/E metric is higher for programs at small institutions (1.4 percent) than it is for all institutions (0.8 percent, Table 4.5). Failing the D/E metric for non-GE programs initiates a requirement that the institution must have title IV, HEA students acknowledge having seen the information before an enrollment agreement can be signed. The share of title IV, HEA enrollment in such programs is also higher at small institutions (8.6 percent for small institutions vs. 2.1 percent for all institutions, Table 4.4).

TABLE 11.3   NUMBER OF ENROLLEES IN NON-GE PROGRAMS AT SMALL INSTITUTIONS BY GE RESULT, BY CONTROL, IHE TYPE, AND CREDENTIAL LEVEL

|  | Result in 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
|  | N | % | N | % | N | % | N | % | N | % |
| Public: |  |  |  |  |  |  |  |  |  |  |
| Associate ........................................ | 89,200 | 68.8 | 28,100 | 21.7 | 0 | 0.0 | 0 | 0.0 | 12,300 | 9.5 |
| Bachelor s ........................................ | 9,700 | 72.8 | 3,000 | 22.1 | 0 | 0.0 | 0 | 0.0 | 689 | 5.1 |
| Master s ........................................ | 500 | 32.2 | 1,100 | 67.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Doctoral ........................................ | 300 | 36.3 | 600 | 63.7 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Professional ........................................ | 2,100 | 45.3 | 1,400 | 29.8 | 1,200 | 24.9 | 0 | 0.0 | 0 | 0.0 |
| Total ........................................ | 101,900 | 67.8 | 34,100 | 22.7 | 1,200 | 0.8 | 0 | 0.0 | 13,000 | 8.7 |
| Private, Nonprofit: |  |  |  |  |  |  |  |  |  |  |
| Associate ........................................ | 28,700 | 57.0 | 15,800 | 31.4 | 2,500 | 5.0 | 2,100 | 4.1 | 1,300 | 2.5 |
| Bachelor s ........................................ | 162,500 | 74.9 | 41,400 | 19.1 | 4,600 | 2.1 | 5,100 | 2.4 | 3,400 | 1.5 |
| Master s ........................................ | 29,600 | 61.1 | 14,600 | 30.2 | 3,100 | 6.3 | 1,100 | 2.3 | 54 | 0.1 |
| Doctoral ........................................ | 7,600 | 45.4 | 3,600 | 21.3 | 5,500 | 32.9 | 100 | 0.4 | 0 | 0.0 |
| Professional ........................................ | 9,000 | 25.0 | 7,400 | 20.5 | 19,400 | 53.8 | 0 | 0.0 | 200 | 0.7 |
| Total ........................................ | 237,400 | 64.4 | 82,700 | 22.5 | 35,100 | 9.5 | 8,300 | 2.3 | 4,900 | 1.3 |
| Total: |  |  |  |  |  |  |  |  |  |  |
| Associate ........................................ | 117,900 | 65.5 | 43,900 | 24.4 | 2,500 | 1.4 | 2,100 | 1.2 | 13,600 | 7.6 |
| Bachelor s ........................................ | 172,300 | 74.8 | 44,300 | 19.2 | 4,600 | 2.0 | 5,100 | 2.2 | 4,000 | 1.8 |
| Master s ........................................ | 30,100 | 60.2 | 15,700 | 31.4 | 3,100 | 6.1 | 1,100 | 2.2 | 100 | 0.1 |
| Doctoral ........................................ | 8,000 | 45.0 | 4,200 | 23.5 | 5,500 | 31.2 | 100 | 0.4 | 0 | 0.0 |
| Professional ........................................ | 11,100 | 27.3 | 8,800 | 21.6 | 20,500 | 50.5 | 0 | 0.0 | 200 | 0.6 |
| Total ........................................ | 339,300 | 65.4 | 116,900 | 22.5 | 36,300 | 7.0 | 8,300 | 1.6 | 18,000 | 3.5 |

**Note:** Enrollment counts in this table have been rounded to the nearest 100.

[339] The minimum number of program completers in a 2-year cohort that is required for the Department to compute the D/E and EP performance metrics is referred to as the ''n-size.'' An n-size of 30 is used in the final rule; GE and non-GE programs with fewer than 30 completers across 2 years would not have performance metrics computed.

TABLE 11.4   NUMBER OF NON-GE PROGRAMS AT SMALL INSTITUTIONS BY GE RESULT, BY CONTROL, IHE TYPE, AND CREDENTIAL LEVEL

| | \multicolumn{10}{c}{Result in 2019} | | | | | | | | |
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Public:** | | | | | | | | | | |
| Associate | 2,180 | 94.6 | 96 | 4.2 | 0 | 0.0 | 0 | 0.0 | 28 | 1.2 |
| Bachelor s | 195 | 95.1 | 9 | 4.4 | 0 | 0.0 | 0 | 0.0 | 1 | 0.5 |
| Master s | 30 | 81.1 | 7 | 18.9 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Doctoral | 17 | 89.5 | 2 | 10.5 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Professional | 9 | 60.0 | 4 | 26.7 | 2 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Total | 2,431 | 94.2 | 118 | 4.6 | 2 | 0.1 | 0 | 0.0 | 29 | 1.1 |
| **Private, Nonprofit:** | | | | | | | | | | |
| Associate | 759 | 90.8 | 62 | 7.4 | 3 | 0.4 | 7 | 0.8 | 5 | 0.6 |
| Bachelor s | 4,204 | 94.8 | 176 | 4.0 | 19 | 0.4 | 19 | 0.4 | 15 | 0.3 |
| Master s | 924 | 87.9 | 95 | 9.0 | 24 | 2.3 | 6 | 0.6 | 2 | 0.2 |
| Doctoral | 198 | 88.4 | 11 | 4.9 | 14 | 6.2 | 1 | 0.4 | 0 | 0.0 |
| Professional | 86 | 67.2 | 12 | 9.4 | 27 | 21.1 | 0 | 0.0 | 3 | 2.3 |
| Total | 6,171 | 92.5 | 356 | 5.3 | 87 | 1.3 | 33 | 0.5 | 25 | 0.4 |
| **Total:** | | | | | | | | | | |
| Associate | 2,939 | 93.6 | 158 | 5.0 | 3 | 0.1 | 7 | 0.2 | 33 | 1.1 |
| Bachelor s | 4,399 | 94.8 | 185 | 4.0 | 19 | 0.4 | 19 | 0.4 | 16 | 0.3 |
| Master s | 954 | 87.7 | 102 | 9.4 | 24 | 2.2 | 6 | 0.6 | 2 | 0.2 |
| Doctoral | 215 | 88.5 | 13 | 5.3 | 14 | 5.8 | 1 | 0.4 | 0 | 0.0 |
| Professional | 95 | 66.4 | 16 | 11.2 | 29 | 20.3 | 0 | 0.0 | 3 | 2.1 |
| Total | 8,602 | 93.0 | 474 | 5.1 | 89 | 1.0 | 33 | 0.4 | 54 | 0.6 |

Tables 11.5 and 11.6 report similar tabulations for GE programs at small institutions. GE programs include non-degree certificate programs at all institutions and all degree programs at proprietary institutions. GE programs at small institutions are more likely to have a failing D/E or EP metrics (12.8 percent of all GE programs at small institutions, compared to 5.4 percent for all institutions in Table 4.9) and have a greater share of enrollment in such programs (40.5 percent vs. 23.8 percent for all institutions in Table 4.8). GE programs that fail the same performance metric in two out of three consecutive years will become ineligible to administer Federal title IV, HEA student aid.

TABLE 11.5   NUMBER OF ENROLLEES IN GE PROGRAMS AT SMALL INSTITUTIONS BY GE RESULT, BY CONTROL, IHE TYPE, AND CREDENTIAL LEVEL

| | \multicolumn{10}{c}{Result in 2019} | | | | | | | | |
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Public:** | | | | | | | | | | |
| UG Certificates .. | 53,800 | 74.7 | 15,600 | 21.6 | 0 | 0.0 | 0 | 0.0 | 2,700 | 3.7 |
| Post-BA Certs ... | <50 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 100 | 77.4 | <50 | 22.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Total ........... | 54,000 | 74.7 | 15,600 | 21.6 | 0 | 0.0 | 0 | 0.0 | 2,700 | 3.7 |
| **Private, Nonprofit:** | | | | | | | | | | |
| UG Certificates .. | 9,400 | 41.7 | 6,600 | 29.3 | 0 | 0.0 | 400 | 1.7 | 6,200 | 27.3 |
| Post-BA Certs ... | 1,400 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 1,700 | 83.7 | 0 | 0.0 | 300 | 16.3 | 0 | 0.0 | 0 | 0.0 |
| Total ........... | 12,500 | 48.1 | 6,600 | 25.4 | 300 | 1.3 | 400 | 1.5 | 6,200 | 23.7 |
| **Proprietary:** | | | | | | | | | | |
| UG Certificates .. | 55,600 | 21.8 | 52,900 | 20.7 | 100 | 0.0 | 29,800 | 11.7 | 116,500 | 45.7 |
| Associate ........... | 22,400 | 38.7 | 19,700 | 34.0 | 7,200 | 12.5 | 5,400 | 9.4 | 3,100 | 5.4 |
| Bachelor s ......... | 8,800 | 65.1 | 3,400 | 25.1 | 1,100 | 8.1 | 200 | 1.7 | 0 | 0.0 |
| Post-BA Certs ... | <50 | 55.8 | <50 | 44.2 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ............ | 3,200 | 80.4 | 200 | 3.9 | 100 | 2.0 | 500 | 13.6 | 0 | 0.0 |
| Doctoral ............ | 1,700 | 75.4 | 300 | 11.3 | 300 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Professional ...... | 1,000 | 37.7 | 100 | 3.7 | 1,600 | 58.6 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 300 | 77.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 73 | 22.2 |
| Total ........... | 93,000 | 27.7 | 76,500 | 22.8 | 10,400 | 3.1 | 36,000 | 10.7 | 119,700 | 35.7 |
| **Total:** | | | | | | | | | | |
| UG Certificates .. | 118,800 | 34.0 | 75,100 | 21.5 | 100 | 0.0 | 30,200 | 8.6 | 125,300 | 35.8 |
| Associate ........... | 22,400 | 38.7 | 19,700 | 34.0 | 7,200 | 12.5 | 5,400 | 9.4 | 3,100 | 5.4 |
| Bachelor s ........ | 8,800 | 65.1 | 3,400 | 25.1 | 1,100 | 8.1 | 200 | 1.7 | 0 | 0.0 |

TABLE 11.5   NUMBER OF ENROLLEES IN GE PROGRAMS AT SMALL INSTITUTIONS BY GE RESULT, BY CONTROL, IHE TYPE, AND CREDENTIAL LEVEL   Continued

| | Result in 2019 | | | | | | | | |
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Post-BA Certs ... | 1,400 | 97.4 | <50 | 2.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ............ | 3,200 | 80.4 | 200 | 3.9 | 100 | 2.0 | 500 | 13.6 | 0 | 0.0 |
| Doctoral ............ | 1,700 | 75.4 | 300 | 11.3 | 300 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Professional ...... | 1,000 | 37.7 | 100 | 3.7 | 1,600 | 58.6 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 2,100 | 82.6 | <50 | 1.4 | 300 | 13.1 | 0 | 0.0 | 73 | 2.9 |
| Total ............ | 159,500 | 36.8 | 98,800 | 22.8 | 10,700 | 2.5 | 36,400 | 8.4 | 128,500 | 29.6 |

**Note:** Enrollment counts in this table have been rounded to the nearest 100.

TABLE 11.6   NUMBER OF GE PROGRAMS AT SMALL INSTITUTIONS BY GE RESULT, BY CONTROL, IHE TYPE, AND CREDENTIAL LEVEL

| | Result in 2019 | | | | | | | | |
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Public:** | | | | | | | | | | |
| UG Certificates .. | 3,194 | 93.4 | 174 | 5.1 | 0 | 0.0 | 0 | 0.0 | 50 | 1.5 |
| Post-BA Certs ... | 6 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 13 | 92.9 | 1 | 7.1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Total ........... | 3,213 | 93.5 | 175 | 5.1 | 0 | 0.0 | 0 | 0.0 | 50 | 1.5 |
| **Private, Nonprofit:** | | | | | | | | | | |
| UG Certificates .. | 352 | 81.5 | 44 | 10.2 | 0 | 0.0 | 2 | 0.5 | 34 | 7.9 |
| Post-BA Certs ... | 138 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 103 | 99.0 | 0 | 0.0 | 1 | 1.0 | 0 | 0.0 | 0 | 0.0 |
| Total ........... | 593 | 88.0 | 44 | 6.5 | 1 | 0.1 | 2 | 0.3 | 34 | 5.0 |
| **Proprietary:** | | | | | | | | | | |
| UG Certificates .. | 1,202 | 53.0 | 285 | 12.6 | 1 | 0.0 | 133 | 5.9 | 648 | 28.6 |
| Associate .......... | 626 | 76.4 | 112 | 13.7 | 38 | 4.6 | 23 | 2.8 | 20 | 2.4 |
| Bachelor s ........ | 199 | 88.1 | 16 | 7.1 | 9 | 4.0 | 2 | 0.9 | 0 | 0.0 |
| Post-BA Certs ... | 11 | 91.7 | 1 | 8.3 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ............ | 92 | 92.9 | 2 | 2.0 | 1 | 1.0 | 4 | 4.0 | 0 | 0.0 |
| Doctoral ............ | 33 | 94.3 | 1 | 2.9 | 1 | 2.9 | 0 | 0.0 | 0 | 0.0 |
| Professional ...... | 16 | 80.0 | 1 | 5.0 | 3 | 15.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 16 | 84.2 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 3 | 15.8 |
| Total ........... | 2,195 | 62.7 | 418 | 11.9 | 53 | 1.5 | 162 | 4.6 | 671 | 19.2 |
| **Total:** | | | | | | | | | | |
| UG Certificates .. | 4,748 | 77.6 | 503 | 8.2 | 1 | 0.0 | 135 | 2.2 | 732 | 12.0 |
| Associate .......... | 626 | 76.4 | 112 | 13.7 | 38 | 4.6 | 23 | 2.8 | 20 | 2.4 |
| Bachelor s ........ | 199 | 88.1 | 16 | 7.1 | 9 | 4.0 | 2 | 0.9 | 0 | 0.0 |
| Post-BA Certs ... | 155 | 99.4 | 1 | 0.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ............ | 92 | 92.9 | 2 | 2.0 | 1 | 1.0 | 4 | 4.0 | 0 | 0.0 |
| Doctoral ............ | 33 | 94.3 | 1 | 2.9 | 1 | 2.9 | 0 | 0.0 | 0 | 0.0 |
| Professional ...... | 16 | 80.0 | 1 | 5.0 | 3 | 15.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs ........ | 132 | 96.4 | 1 | 0.7 | 1 | 0.7 | 0 | 0.0 | 3 | 2.2 |
| Total ........... | 6,001 | 78.8 | 637 | 8.4 | 54 | 0.7 | 164 | 2.2 | 755 | 9.9 |

*Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Regulations, Including of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record*

As noted in the Paperwork Reduction Act section, burden related to the final regulations will be assessed in a separate information collection process and that burden is expected to involve individuals more than institutions of any size.

The final rule involves four types of reporting and compliance requirements for institutions, including small entities. First, under § 668.43, institutions will be required to provide additional programmatic information to the Department and make this and additional information assembled by the Department available to current and prospective students by providing a link to a Department-administered program information website. Second, under § 668.407, the Department will require acknowledgments from current and prospective students if an eligible non-

GE certificate or graduate program leads to high debt outcomes based on its D/E rates. Third, under § 668.408, institutions will be required to provide new annual reporting about programs, current students, and students that complete or withdraw during each award year. As described in the Preamble of this final rule, reporting includes student-level information on enrollment, cost of attendance, tuition and fees, allowances for books and supplies, allowances for housing, institutional and other grants, and private loans disbursed. Finally, under § 668.605, institutions with GE programs that fail at least one of the metrics will be required to provide warnings to current and prospective students about the risk of losing title IV, HEA eligibility and would require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

Initial estimates of the reporting and compliance burden for these four items for small entities are provided in Table 11.7, though these are subject to revision as the content of the required reporting is refined.[340]

TABLE 11.7    INITIAL AND SUBSEQUENT REPORTING AND COMPLIANCE BURDEN FOR SMALL ENTITIES

| § 668.43 ........... | Amend § 668.43 to establish a website for the posting and distribution of key information pertaining to the institution s educational programs, and to require institutions to provide information about how to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution. | $6,512,697. |
|---|---|---|
| § 668.407 ......... | Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the program information website maintained by the Secretary if an eligible program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may enter into an enrollment agreement with the student. | $22,459. |
| § 668.408 ......... | Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to establish the reporting timeframe. | $32,636,989 initial year; $12,502,598 subsequent years. |
| § 668.605 ......... | Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds. | $21,227. |

As described in this preamble, much of the necessary information for GE programs would already have been reported to the Department under the 2014 Prior Rule, and as such we believe the added burden of this reporting relative to existing requirements would be reasonable. Furthermore, 88 percent of public and 47 percent of private nonprofit institutions operated at least one GE program and, therefore, have experience with similar data reporting for the subset of their students enrolled in certificate programs under the 2014 Prior Rule. Moreover, many institutions report more detailed information on the components of cost of attendance and other sources of financial aid in the Federal National Postsecondary Student Aid Survey (NPSAS) administered by the National Center for Education Statistics. Finally, the Department proposes flexibility for institutions to avoid reporting data on students who completed programs in the past for the first year of implementation, and instead to use data on more recent completer cohorts to estimate median debt levels. In part, we intend to ease the administrative burden of providing this data for programs that were not covered by the 2014 Prior Rule reporting requirements, especially for the small number of institutions that may not previously have had any programs subject to these requirements.

The Department recognizes that institutions may have different processes for record-keeping and administering financial aid, so the burden of the GE and financial transparency reporting could vary by institution. As noted previously, a high percentage of institutions have already reported data related to the 2014 Prior Rule or similar variables for other purposes. Many institutions can query systems or adapt existing reports to meet these requirements. On the other hand, some institutions may still have data entry processes that are very manual, and generating the information for their programs could involve many more hours and resources. Small entities may be less likely to have invested in systems and processes that allow easy data reporting because it is not needed for their operations. Institutions may fall in between these poles and be able to automate the reporting of some variables but need more effort for others.

We believe that, while the reporting relates to program or student-level information, the reporting process is likely to be handled at the institutional level. There would be a cost to establish the query or report and validate it upfront, but then the marginal increase in costs to process additional programs or students should not be too significant. The reporting process will involve personnel with different skills and responsibility levels. We estimated this using Bureau of Labor statistics median hourly wage rates for postsecondary administrators of $48.05.[341] Table 11.8 presents the Department's estimates of the hours associated with the reporting requirements.

TABLE 11.8    ESTIMATED HOURS FOR REPORTING REQUIREMENTS

| Process | Hours | Hours basis |
|---|---|---|
| Review systems and existing reports for adaptability for this reporting ........................................................... | 10 | Per institution. |
| Develop reporting query/result template: | | |
|     Program-level reporting ........................................................................................................................... | 15 | Per institution. |
|     Student-level reporting ............................................................................................................................ | 30 | Per institution. |
| Run test reports: | | |
|     Program-level reporting ........................................................................................................................... | 0.25 | Per institution. |
|     Student-level reporting ............................................................................................................................ | 0.5 | Per institution. |

[340] For §§ 668.43, 668.407, and 668.605, we obtained these estimates by proportioning the total PRA burden on institutions by the share of institutions that are small entities, as reported in Table 10.1 (60 percent). The estimate for § 668.605 is reduced from the NPRM estimate that included burden on individuals in the calculation. The estimate for the final includes the burden on institutions only.

[341] Available at *www.bls.gov/oes/current/oes119033.htm*.

TABLE 11.8   ESTIMATED HOURS FOR REPORTING REQUIREMENTS   Continued

| Process | Hours | Hours basis |
|---|---|---|
| Review/validate test report results: | | |
|     Program-level reporting | 10 | Per institution. |
|     Student-level reporting | 20 | Per institution. |
| Run reports: | | |
|     Program-level reporting | 0.25 | Per program. |
|     Student-level reporting | 0.5 | Per program. |
| Review/validate report results: | | |
|     Program-level reporting | 2 | Per program. |
|     Student-level reporting | 5 | Per program. |
| Certify and submit reporting | 10 | Per institution. |

The ability to set up reports or processes that can be rerun in future years, along with the fact that the first reporting cycle includes information from several prior years, should significantly decrease the expected burden after the first reporting cycle. We estimate that the hours associated with reviewing systems, developing or updating queries, and reviewing and validating the test queries or reports will be reduced by 35 percent after the first year. The institution would need to run and validate queries or reports to make sure no system changes have affected them and confirm there are no program changes in CIP code, credential level, preparation for licensure, accreditation, or other items, but we expect that would be less burdensome than initially establishing the reporting. Table 11.9 presents estimates of reporting burden for small entities for the initial year and subsequent years under § 668.408 on an overall and a per institution average basis.

TABLE 11.9.1   ESTIMATED REPORTING BURDEN FOR SMALL ENTITIES FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 112 | 323 | 20,737 | 996,413 |
| Proprietary 2-year | 1,077 | 2,459 | 179,352 | 8,617,852 |
| Public 2-year | 355 | 4,871 | 184,992 | 8,888,878 |
| Private 4-year | 470 | 6,156 | 235,839 | 11,332,040 |
| Proprietary 4-year | 96 | 800 | 33,992 | 1,633,316 |
| Public 4-year | 39 | 664 | 24,318 | 1,168,492 |
| Total | 2,149 | 15,273 | 679,230 | 32,636,989 |

TABLE 11.9.2   ESTIMATED REPORTING BURDEN FOR SMALL ENTITIES FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 112 | 323 | 9,895 | 475,467 |
| Proprietary 2-year | 1,077 | 2,459 | 90,139 | 4,331,191 |
| Public 2-year | 355 | 4,871 | 61,180 | 2,939,711 |
| Private 4-year | 470 | 6,156 | 78,729 | 3,782,928 |
| Proprietary 4-year | 96 | 800 | 12,536 | 602,355 |
| Public 4-year | 39 | 664 | 7,720 | 370,946 |
| Total | 2,149 | 15,273 | 260,200 | 12,502,598 |

TABLE 11.9.3   ESTIMATED AVERAGE REPORTING BURDEN PER INSTITUTION FOR SMALL ENTITIES FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Initial average hours per institution | Initial average amount per institution | As % of average revenues |
|---|---|---|---|---|---|
| Private 2-year | 112 | 323 | 185 | 8,897 | 0.24 |
| Proprietary 2-year | 1,077 | 2,459 | 167 | 8,002 | 0.35 |
| Public 2-year | 355 | 4,871 | 521 | 25,039 | 0.30 |
| Private 4-year | 470 | 6,156 | 502 | 24,111 | 0.12 |
| Proprietary 4-year | 96 | 800 | 354 | 17,014 | 0.20 |
| Public 4-year | 39 | 664 | 624 | 29,961 | 0.09 |
| Total | 2,149 | 15,273 | 316 | 15,187 | 0.19 |

TABLE 11.9.4 ESTIMATED AVERAGE REPORTING BURDEN PER INSTITUTION FOR SMALL ENTITIES FOR SUBSEQUENT REPORTING CYCLES

| Control and level | Institution count | Program count | Average hours per institution | Average amount per institution | As % of average revenues |
|---|---|---|---|---|---|
| Private 2-year | 112 | 323 | 88 | 4,245 | 0.11 |
| Proprietary 2-year | 1,077 | 2,459 | 84 | 4,022 | 0.18 |
| Public 2-year | 355 | 4,871 | 172 | 8,281 | 0.10 |
| Private 4-year | 470 | 6,156 | 168 | 8,049 | 0.04 |
| Proprietary 4-year | 96 | 800 | 131 | 6,275 | 0.28 |
| Public 4-year | 39 | 664 | 198 | 9,511 | 0.03 |
| Total | 2,149 | 15,273 | 121 | 5,818 | 0.07 |

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap, or Conflict With the Regulations*

The regulations are unlikely to conflict with or duplicate existing Federal regulations.

Alternatives Considered

As described in section 10 of the Regulatory Impact Analysis above, "Alternatives Considered," we evaluated several alternative provisions and approaches including using D/E rates only, alternative earnings thresholds, no reporting or acknowledgment requirements for non-GE programs, and several alternative ways of computing the performance metrics (smaller n-sizes and different interest rates or amortization periods). Most relevant to small entities was the alternative of using a lower n-size, which would result in larger effects on programs at small entities, both in terms of risk for loss of eligibility for GE programs and greater burden for providing warnings and/or acknowledgment. The alternative of not requiring reporting or acknowledgments in the case of failing metrics for non-GE programs would result in lower reporting burden for small institutions but was deemed to be insufficient to achieve the goal of creating greater transparency around program performance. However, for the final regulations the Department did remove the reporting obligation for programs that have fewer than thirty completers in the previous four award years, which does reduce the burden for institutions with very small programs.

The Department sought to limit the number of hours for occupationally related educational programs to the amount that States require to obtain licensure, where applicable. We believe that this change would particularly benefit students by keeping tuition costs, as well as related non-institutional expenses, lower.

## 12. Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA).[342] This helps so that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents. Sections 600.21, 668.43, 668.407, 668.408, and 668.605 of this final rule contain information collection requirements.

Under the PRA, the Department has or will at the required time submit a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

*PRA Comments*

*Comments:* One commenter suggested that, in calculating administrative burden, the Department should consider the administrative burden of all the proposed rules together, not individually.

*Discussion:* The Department took great care to analyze the impact of the

---

[342] 44 U.S.C. 3506(c)(2)(A).

---

proposed regulations. The Department has separated the GE and Financial Value Transparency Framework topics from the other rules covered in the NPRM. We, therefore, updated the RIA to reflect that, as well as to reflect changes we made from the proposed rules to these final rules.

*Changes:* None.

*Comments:* Some commenters claimed the regulations will increase the cost of higher education because institutions will pass on the increased costs of reporting and data requirements to students, decreasing returns for students and potentially negatively impacting program DTE and EP outcomes.

*Discussion:* The Department is concerned that programs with poor outcomes continue to receive title IV, HEA funding subsidized by taxpayers. We acknowledged increases in costs to institutions in the NPRM and this final rule; however, we believe they will ultimately bring down the cost of postsecondary education by providing prospective students with the necessary resources to make an informed decision about their education. Students deserve to know whether their program will leave the in the same place or worse off if they never had attended in the first place.

We believe these rules will also protect taxpayer dollars by eliminating poor performing programs prior to the need for reactive actions like closed school discharges or borrower defense to repayment discharges. Further the public deserves access to more information and more data regarding the postsecondary institutions and programs that they are supporting through their tax dollars.

*Changes:* None.

*Updating Application Information § 600.21.*

*Requirements:* The change to § 600.21(a)(11)(v) and (vi), would require an institution with GE programs

to update any changes in certification of those program(s).

*Burden Calculations:* The regulatory change would require an update to the current institutional application form, 1845–0012. The form update would be made available for comment through a full public clearance package before being made available for use by the effective dates of the regulations. The burden changes would be assessed to OMB Control Number 1845–0012, Application for Approval to Participate in Federal Student Aid Programs.

*Institutional and Programmatic Information § 668.43*

*Requirements:* Under final § 668.43(d), the Department will establish and maintain a website for posting and distributing key information pertaining to the institution's educational programs. An institution will provide such information as the Department prescribes through a notice published in the **Federal Register** for prospective and enrolled students through the website.

This information could include, but will not be limited to, as reasonably available, the primary occupations that the program prepares students to enter, along with links to occupational profiles on O*NET or its successor site; the

program's or institution's completion rates and withdrawal rates for full-time and less-than-full-time students, as reported to or calculated by the Department; the length of the program in calendar time; the total number of individuals enrolled in the program during the most recently completed award year; the total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the length of the program; the percentage of the individuals enrolled in the program during the most recently completed award year who received a title IV, HEA loan, a private education loan, or both; and whether the program is programmatically accredited and the name of the accrediting agency.

The institution will be required to provide a prominent link and any other needed information to access the website on any web page containing academic, cost, financial aid, or admissions information about the program or institution. The Department could require the institution to modify a web page if the information about how to access the Department's website is not sufficiently prominent, readily accessible, clear, conspicuous, or direct.

In addition, the Department will require the institution to provide the

relevant information to access the website to any prospective student or third party acting on behalf of the prospective student before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution.

*Burden Calculations:* The final regulatory language in § 668.43(d) will add burden to all institutions, domestic and foreign. The changes in § 668.43(d) will require institutions to supply the Department with specific information about programs it is offering as well as provide to enrolled and prospective students this information.

We believe that this reporting activity will require an estimated 50 hours per institution. We estimate that it will take private nonprofit institutions 70,500 hours (1,410 × 50 = 70,500) to complete the required reporting activity. We estimate that it will take proprietary institutions 68,600 hours (1,372 × 50 = 68,600) to complete the required reporting activity. We estimate that it will take public institutions 86,800 hours (1,736 × 50 = 86,800) to complete the required reporting activity.

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.43 is 225,900 hours with a total rounded estimated cost of $10,854,495.

STUDENT ASSISTANCE GENERAL PROVISIONS    OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private nonprofit ......................................................... | 1,410 | 1,410 | 70,500 | 3,387,525.00 |
| Proprietary ............................................................... | 1,372 | 1,372 | 68,600 | 3,296,230.00 |
| Public ...................................................................... | 1,736 | 1,736 | 86,800 | 4,170,740.00 |
| Total ................................................................. | 4,518 | 4,518 | 225,900 | 10,854,495.00 |

*Student Acknowledgments § 668.407*

*Requirements:* The final rule provides in § 668.407(a) that a student will be required to provide an acknowledgment of the D/E rate information for any year for which the Secretary notifies an institution that the program has failing D/E rates for the year in which the D/E rates were most recently calculated by the Department. This final rule excludes undergraduate degree programs from the acknowledgment requirements at § 668.407(a).

*Burden Calculations:* The final regulatory language in § 668.407 will add burden to institutions. The changes in § 668.407 will require institutions to develop and provide notices to prospective students that they are required to review information on the Secretary's website and complete

acknowledge that they have viewed this information if the program to which they are applying has unacceptable D/E rates. The institution would also be obligated to check whether an individual has completed the acknowledgment before entering into an agreement to enroll the student. However, to reduce burden for institutions and students, such an acknowledgment will only be required when a student will attend a program that does not lead to an undergraduate degree and leads to high debt burden, or when a student will attend a GE program at risk of losing title IV, HEA eligibility.

In the burden calculation for § 668.407 here, we account for burden for non-GE programs. We account for all burden related to GE programs,

including where such burden comes from provisions that apply to all programs, as in 668.407, under our discussion of 668.605. We believe that most institutions will develop the notice directing impacted students to the Department's program information website and make it available electronically to current and prospective students. We believe that this action will require an estimated 1 hour per affected program. We estimate that it would take private institutions 670 hours (670 programs × 1 hour = 670) to develop and deliver the required notice based on the information provided by the Department. We estimate that it will take public institutions 109 hours (109 programs × 1 hour = 109) to develop and deliver the required notice based on the

App.180

information provided by the Department.

The changes in § 668.407(a) will require institutions to direct prospective and students enrolled in programs that failed the D/E rates for the year in which the D/E rates were most recently

calculated by the Department to the Department's program information website. We estimate that it will take the 88,000 students 10 minutes to read the notice and go to the program information website to acknowledge receiving the information for a total of

hours (88,000 students × .17 hours = 14,960).

The total estimated increase in burden to OMB Control Number 1845–0174 for § 668.407 is 15,739 hours with a total rounded estimated cost of $370,441.

### STUDENT ACKNOWLEDGMENTS   OMB CONTROL NUMBER 1845 0174

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution $22.26 per individual |
|---|---|---|---|---|
| Individual ........................................................ | 88,000 | 88,000 | 14,960 | $333,010 |
| Private nonprofit ............................................. | 134 | 670 | 670 | 32,194 |
| Public .............................................................. | 11 | 109 | 109 | 5,237 |
| Total ............................................................ | 88,145 | 88,779 | 15,739 | 370,441 |

*Reporting Requirements § 668.408*

*Requirements:* The final rule in subpart Q, Financial Value Transparency, adds new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to define the timeframe for institutions to report this information.

Based on projected data provided earlier in the RIA, the Department anticipates that approximately 4,518 institutions will be required to provide the data specified in § 668.408. We anticipate there will be initial estimated reporting year's burden of 5,078,259 hours total for all institutions. This estimate incorporates establishing required data routines, testing of reports and returned data, and ultimately submission of the data to the Department. It is anticipated that once these data routines and reporting mechanism are established, subsequent year estimated reporting will decrease to 1,459,603 hours total for all institutions.

*Burden Calculations:* The regulatory change will require an update to a Federal Student Aid data system. Once the systems for receiving and sharing the data are established, the reporting update will be made available for comment through a full information collection package with public comment periods before being made available for use on or after the effective dates of the regulations. The burden changes will be assessed to the OMB Control Number assigned to the system.

*Student Warnings and Acknowledgments § 668.605*

*Requirements:* The final rule adds a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA

eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may enter an enrollment agreement, complete registration, or disburse any title IV, HEA funds.

In addition, warnings provided to students enrolled in GE programs will include a description of the academic and financial options available to continue their education in another program at the institution in the event that the program loses eligibility, including whether the students could transfer academic credit earned in the program to another program at the institution and which course credit would transfer; an indication of whether, in the event of a loss of eligibility, the institution would continue to provide instruction in the program to allow students to complete the program, and refund the tuition, fees, and other required charges paid to the institution for enrollment in the program; and an explanation of whether, in the event that the program loses eligibility, the students could transfer credits earned in the program to another institution through an established articulation agreement or teach-out.

The institution will be required to provide alternatives to an English-language warning for current and prospective students with limited English proficiency.

*Burden Calculations:* The final regulatory language in § 668.605 will add burden to institutions. The changes in § 668.605 will require institutions to provide warning notices to enrolled and prospective students that a GE program has unacceptable D/E rates or an unacceptable earnings premium

measure for the year in which the D/E rates or earnings premium measure were most recently calculated by the Department along with warnings about the potential loss of title IV, HEA eligibility.

We account for all burden related to GE programs, including where such burden comes from provisions that apply to all programs, as in § 668.407, under our discussion of § 668.605. We believe that most institutions will develop the warning and make it available electronically to current and prospective students. We believe that this action will require an estimated 1 hour per affected program. We estimate that it will take private institutions 9 hours (9 programs × 1 hour = 9) to develop and deliver the required warning based on the information provided by the Department. We estimate that it will take proprietary institutions 71 hours (71 programs × 1 hour = 71) to develop and deliver the required warning based on the information provided by the Department. We estimate that it will take public institutions 2 hours (2 programs × 1 hour = 2) to develop and deliver the required warning based on the information provided by the Department.

The changes in § 668.605(d) will require institutions to provide alternatives to the English-language warning notices to enrolled and prospective students with limited English proficiency.

We estimate that it will take private institutions 72 hours (9 programs × 8 hours = 72) to develop and deliver the required alternate language the required warning based on the information provided by the Department. We estimate that it will take proprietary institutions 568 hours (71 programs × 8

hours = 568) to develop and deliver the required alternate language the required warning based on the information provided by the Department. We estimate that it will take public institutions 16 hours (2 programs × 8 hours = 16) to develop and deliver the required warning based on the information provided by the Department.

The final changes in § 668.605(e) will require institutions to provide the

warning notices to students enrolled in the GE programs with failing metrics. We estimate that it will take the 60,700 students 10 minutes to read the warning and go to the program information website to acknowledge receiving the information for a total of 10,319 hours (60,700 students × .17 hours = 10,319).

The changes in § 668.605(f) will require institutions to provide the warning notices to prospective students who express interest in the effected GE

programs. We estimate that it will take the 69,805 prospective students 10 minutes to read the warning and go to the program information website to acknowledge receiving the information for a total of 11,867 hours (69,805 students × .17 hours = 11,867).

The total estimated increase in burden to OMB Control Number 1845–0173 for § 668.605 is 22,924 hours with a total rounded estimated cost of $529,322.

### GE STUDENT WARNINGS AND ACKNOWLEDGMENTS OMB CONTROL NUMBER 1845 0173

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution $22.26 per individual |
|---|---|---|---|---|
| Individual ............................................................................ | 130,505 | 130,505 | 22,186 | $493,860 |
| Private nonprofit ................................................................ | 9 | 18 | 81 | 3,893 |
| Proprietary ........................................................................ | 71 | 142 | 639 | 30,704 |
| Public ................................................................................ | 2 | 4 | 18 | 865 |
| Total ............................................................................ | 130,587 | 130,669 | 22,924 | 529,322 |

Consistent with the discussions above, the following chart describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the

information collections. The monetized net cost of the increased burden for institutions, lenders, guaranty agencies and students, using wage data developed using Bureau of Labor Statistics (BLS) data. For individuals, we have used the median hourly wage for all occupations, which is $22.26 per hour according to BLS (*www.bls.gov/*

*oes/current/oes_nat.htm#00-0000*). For institutions we have used the median hourly wage for Education Administrators, Postsecondary, which is $48.05 per hour according to BLS (*www.bls.gov/oes/current/ oes119033.htm*).

| Regulatory section | Information collection | OMB control number and estimated burden | Estimated costs $48.05 institutional $22.26 individual unless otherwise noted |
|---|---|---|---|
| § 668.43 ........ | Amend § 668.43 to establish a website for the posting and distribution of key information pertaining to the institution s educational programs, and to require institutions to provide information about how to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution. | 1845 0022 +225,900 hrs | $+10,854,495. |
| § 668.407 ..... | Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the program information website maintained by the Secretary if an eligible program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution enters an enrollment agreement. | 1845 0174 +15,739 ....... | $+370,441. |
| § 668.408 ..... | Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to establish the reporting timeframe. | Burden will be cleared at a later date through a separate information collection. | Costs will be cleared through separate information collection. |
| § 668.605 ..... | Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may enter an enrollment agreement, complete registration, or disburse any title IV, HEA funds. | 1845 0173 +22,924 ....... | $+529,322. |

The total burden hours and change in burden hours associated with each OMB

Control number affected by the final

regulations follows: 1845–0022, 1845–0173, 1845–0174.

| Control No. | Total burden hours | Change in burden hours |
|---|---|---|
| 1845 0022 ........................................................................................................................ | 2,514,148 | +225,900 |
| 1845 0173 ........................................................................................................................ | 15,739 | +15,739 |
| 1845 0174 ........................................................................................................................ | 22,924 | +22,924 |
| Total ........................................................................................................................ | 2,552,811 | 264,563 |

If you want to comment on the final information collection requirements, please send your comments to the Office of Information and Regulatory Affairs in OMB, Attention: Desk Officer for the U.S. Department of Education. Send these comments by email to *OIRA_DOCKET@omb.eop.gov* or by fax to (202)395–6974. You may also send a copy of these comments to the Department contact named in the **ADDRESSES** section of the preamble.

We have prepared the Information Collection Request (ICR) for these collections. You may review the ICR which is available at *www.reginfo.gov*. Click on Information Collection Review. These collections are identified as collections 1845–0022, 1845–0173, and 1845–0174.

**Intergovernmental Review**

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive order is to foster an intergovernmental partnership and a strengthened federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

*13. Federalism*

Executive Order 13132 requires us to provide meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. ''Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The final regulations do not have federalism implications.

*Accessible Format:* On request to one of the program contact persons listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text

Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 600*

Colleges and universities, Foreign relations, Grant programs—education, Loan programs-education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 668*

Administrative practice and procedure, Aliens, Colleges and universities, Consumer protection, Grant programs-education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

**Miguel A. Cardona,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends parts 600 and 668 of title 34 of the Code of Federal Regulations as follows:

**PART 600   INSTITUTIONAL ELIGIBILITY UNDER THE HIGHER EDUCATION ACT OF 1965, AS AMENDED**

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 20 U.S.C. 1001, 1002, 1003, 1088, 1091, 1094, 1099b, and 1099c, unless otherwise noted.

■ 2. Section 600.10 is amended by redesignating paragraph (c)(3) as paragraph (c)(4) and adding a new paragraph (c)(3) to read as follows:

**§ 600.10   Date, extent, duration, and consequence of eligibility.**

*    *    *    *    *

(c) * * *

(3) For a gainful employment program under 34 CFR part 668, subpart S, subject to any restrictions in 34 CFR 668.603 on establishing or reestablishing the eligibility of the program, an eligible institution must update its application under § 600.21.

*    *    *    *    *

■ 3. Section 600.21 is amended by:
■ a. Revising paragraph (a) introductory text.
■ b. In paragraph (a)(11)(iv), removing the word ''or''.
■ c. Revising paragraph (a)(11)(v).
■ d. Adding paragraph (a)(11)(vi).
The revisions and addition read as follows:

**§ 600.21   Updating application information.**

(a) *Reporting requirements.* Except as provided in paragraph (b) of this section, an eligible institution must report to the Secretary, in a manner prescribed by the Secretary and no later than 10 days after the change occurs, any change in the following:

*    *    *    *    *

(11) * * *

(v) Changing the program's name, classification of instructional program (CIP) code, or credential level; or

(vi) Updating the certification pursuant to 34 CFR 668.604(b).

*    *    *    *    *

**PART 668   STUDENT ASSISTANCE GENERAL PROVISIONS**

■ 4. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 1231a, unless otherwise noted.

Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141.

Section 668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.

Section 668.91 also issued under 20 U.S.C. 1082, 1094.

Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and 5 U.S.C. 404.

Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and 5 U.S.C. 404.

Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.

■ 5. Section 668.2 is amended by adding to paragraph (b), in alphabetical order, definitions of "Annual debt-to-earnings rate (annual D/E rate)," "Classification of instructional program (CIP) code," "Cohort period," "Credential level," "Debt-to-earnings rates (D/E rates)," "Discretionary debt-to-earnings rate (discretionary D/E rate)," "Earnings premium," "Earnings threshold," "Eligible non-GE program," "Federal agency with earnings data," "Gainful employment program (GE program)," "Institutional grants and scholarships," "Length of the program," "Metropolitan statistical area," "Poverty Guideline," "Prospective student," "Qualifying graduate program," "Student," and "Substantially similar program" to read as follows:

### §668.2  General definitions.

\*    \*    \*    \*    \*

(b) \*  \*  \*

*Annual debt-to-earnings rate (annual D/E rate):* The ratio of a program's annual loan payment amount to the annual earnings of the students who completed the program, expressed as a percentage, as calculated under §668.403.

\*    \*    \*    \*    \*

*Classification of instructional program (CIP) code:* A taxonomy of instructional program classifications and descriptions developed by the U.S. Department of Education's National Center for Education Statistics (NCES). Specific programs offered by institutions are classified using a six-digit CIP code.

*Cohort period:* The set of award years used to identify a cohort of students who completed a program and whose debt and earnings outcomes are used to calculate debt-to-earnings rates and the earnings premium measure under subpart Q of this part. The Secretary uses a 2-year cohort period to calculate the debt-to-earnings rates and earnings premium measure for a program when the number of students (after exclusions identified in §§ 668.403(e) and

668.404(c)) in the 2-year cohort period is 30 or more. The Secretary uses a 4-year cohort period to calculate the debt-to-earnings rates and earnings premium measure when the number of students completing the program in the two-year cohort period is fewer than 30 and when the number of students completing the program in the 4-year cohort period is 30 or more. The cohort period covers consecutive award years that are—

(1) For the 2-year cohort period—

(i) The third and fourth award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated, pursuant to §§ 668.403 and 668.404; or

(ii) For a qualifying graduate program, the sixth and seventh award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated.

(2) For the four-year cohort period—

(i) The third, fourth, fifth, and sixth award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated, pursuant to §§ 668.403 and 668.404; or

(ii) For a qualifying graduate program, the sixth, seventh, eighth, and ninth award years prior to the year for which the most recent earnings data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated.

*Credential level:* The level of the academic credential awarded by an institution to students who complete the program. For the purposes of this part, the undergraduate credential levels are: undergraduate certificate or diploma, associate degree, bachelor's degree, and post-baccalaureate certificate; and the graduate credential levels are master's degree, doctoral degree, first-professional degree (*e.g.*, MD, DDS, JD), and graduate certificate (including a postgraduate certificate).

*Debt-to-earnings rates (D/E rates):* The discretionary debt-to-earnings rate and annual debt-to-earnings rate as calculated under §668.403.

\*    \*    \*    \*    \*

*Discretionary debt-to-earnings rate (discretionary D/E rate):* The percentage of a program's annual loan payment compared to the discretionary earnings of the students who completed the program, as calculated under §668.403.

*Earnings premium:* The amount by which the median annual earnings of

students who recently completed a program exceed the earnings threshold, as calculated under §668.404. If the median annual earnings of recent completers is equal to the earnings threshold, the earnings premium is zero. If the median annual earnings of recent completers is less than the earnings threshold, the earnings premium is negative.

*Earnings threshold:* Based on data from the Census Bureau, the median earnings for working adults aged 25–34, who either worked during the year or indicated they were unemployed (*i.e.*, not employed but looking for and available to work) when interviewed, with only a high school diploma (or recognized equivalent)—

(1) In the State in which the institution is located; or

(2) Nationally, if fewer than 50 percent of the students in the program are from the State where the institution is located, or if the institution is a foreign institution.

*Eligible non-GE program:* An educational program other than a gainful employment (GE) program offered by an institution and included in the institution's participation in the title IV, HEA programs, identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level. Includes all coursework associated with the program's credential level.

\*    \*    \*    \*    \*

*Federal agency with earnings data:* A Federal agency with which the Department enters into an agreement to access earnings data for the D/E rates and earnings threshold measure. The agency must have individual earnings data sufficient to match with title IV, HEA recipients who completed any eligible program during the cohort period and may include agencies such as the Treasury Department (including the Internal Revenue Service), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau.

\*    \*    \*    \*    \*

*Gainful employment program (GE program):* An educational program offered by an institution under §668.8(c)(3) or (d) and identified by a combination of the institution's six-digit OPEID number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level.

\*    \*    \*    \*    \*

*Institutional grants and scholarships:* Assistance that the institution or its affiliate controls or directs to reduce or offset the original amount of a student's institutional costs and that does not have to be repaid. Typically, an institutional grant or scholarship includes a grant, scholarship, fellowship, discount, or fee waiver.

\* \* \* \* \*

*Length of the program:* The amount of time in weeks, months, or years that is specified in the institution's catalog, marketing materials, or other official publications for a student to complete the requirements needed to obtain the degree or credential offered by the program.

\* \* \* \* \*

*Metropolitan statistical area:* A core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core.

\* \* \* \* \*

*Poverty Guideline:* The Poverty Guideline for a single person in the continental United States, as published by the U.S. Department of Health and Human Services and available at *https:// aspe.hhs.gov/poverty* or its successor site.

\* \* \* \* \*

*Prospective student:* An individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a program.

*Qualifying graduate program:* (1) For the first three award years that the Secretary calculates debt-to-earnings rates and the earnings premium measure under subpart Q of this part ("initial period"), a graduate program—

(i) Whose students must complete required postgraduation training programs to obtain licensure in one of the following fields: medicine, osteopathy, dentistry, clinical psychology, marriage and family counseling, clinical social work, and clinical counseling; and

(ii) For which the institution attests, in the manner established by the Secretary, that—

(A) If necessary for licensure, the program is accredited by an accrediting agency that meets State requirements; and

(B) At least half of the program's graduates obtain licensure in a State where the postgraduation training requirements apply.

(2)(i) After the initial period, the graduate programs that are on the list described in paragraph (2)(ii) of this definition and for which the Secretary has received an attestation that meets the requirements in paragraph (1)(ii) of this definition.

(ii) For the first award year following the initial period, and every three years thereafter, using publicly available information and information received in response to a request for information, the Secretary publishes in the **Federal Register** a list of graduate degree fields (based on their credential level and CIP codes) that may contain qualifying graduate programs by identifying fields—

(A) That lead to a graduate (master's, first-professional, or doctoral) degree;

(B) For which the Department determines that graduates must complete a required postgraduate training program that takes, on average, three or more years to complete; and

(C) For which, based on College Scorecard data, the Secretary determines that a majority of programs with the same credential level and CIP code have outlier earnings growth. An individual program has outlier earnings growth if the percent change in median earnings between its earnings measured one or three years post-completion and its earnings measured either five or ten years post-completion is more than two standard deviations above the average earnings growth for other programs with the same credential level.

(3) For the purpose of this definition, a "required postgraduation training program" is a supervised training program that—

(i) Requires the student to hold a degree in one of the listed fields in paragraph (1)(i) of this definition or one of the fields identified in the list described in paragraph (2)(ii) of this definition; and

(ii) Must be completed before the student may be licensed by a State and board certified for professional practice or service.

\* \* \* \* \*

*Student:* For the purposes of subparts Q and S of this part and of § 668.43(d), an individual who received title IV, HEA program funds for enrolling in the program.

\* \* \* \* \*

*Substantially similar program:* For the purposes of subpart Q and S of this part, a program is substantially similar to another program if the two programs share the same four-digit CIP code. The Secretary presumes a program is not substantially similar to another program if the two programs have different four-

digit CIP codes, but the institution must provide an explanation of how the new program is not substantially similar to the ineligible or voluntarily discontinued program with its certification under § 668.604.

\* \* \* \* \*

■ 6. Section 668.43 is amended by:
■ a. Revising the section heading.
■ b. Adding paragraph (d).
   The revisions and addition read as follows:

### § 668.43   Institutional and programmatic information.

\* \* \* \* \*

(d)(1) *Program information website.* Beginning on July 1, 2026, the Secretary will establish and maintain a website with information about institutions and their educational programs. For this purpose, an institution must provide to the Department such information about the institution and its programs as the Secretary prescribes through a notice published in the **Federal Register**. The Secretary may conduct consumer testing to inform the design of the website.

(i) The website must include, but is not limited to, the following items, to the extent reasonably available:

(A) The published length of the program in calendar time (*i.e.,* weeks, months, years).

(B) The total number of individuals enrolled in the program during the most recently completed award year.

(C) The total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the published length of the program.

(D) Of the individuals enrolled in the program during the most recently completed award year, the percentage who received a Direct Loan Program loan, a private loan, or both for enrollment in the program.

(E) As calculated by the Secretary, the median loan debt of students who completed the program during the most recently completed award year or for all students who completed or withdrew from the program during that award year.

(F) As provided by the Secretary, the median earnings of students who completed the program or of all students who completed or withdrew from the program, during a period determined by the Secretary.

(G) Whether the program is programmatically accredited and the name of the accrediting agency, as reported to the Secretary.

(H) As calculated by the Secretary, the program's debt-to-earnings rates.

(I) As calculated by the Secretary, the program's earnings premium measure.

(ii) The website may also include other information deemed appropriate by the Secretary, such as the following items:

(A) The primary occupations (by name, SOC code, or both) that the program prepares students to enter, along with links to occupational profiles on O*NET (*www.onetonline.org*) or its successor site.

(B) As reported to or calculated by the Secretary, the program or institution's completion rates and withdrawal rates for full-time and less-than-full-time students.

(C) As calculated by the Secretary, the medians of the total cost of tuition and fees, and the total cost of books, supplies, and equipment, and the total net cost of attendance paid by students completing the program.

(D) As calculated by the Secretary, the loan repayment rate for students or graduates who entered repayment on Direct Loan Program loans during a period determined by the Secretary.

(E) Whether students who graduate from a program are required to complete postgraduation training program to obtain licensure before eligible for independent practice.

(2) *Program web pages.* The institution must provide a prominent link to, and any other needed information to access, the website maintained by the Secretary on any web page containing academic, cost, financial aid, or admissions information about the program or institution. The Secretary may require the institution to modify a web page if the information is not sufficiently prominent, readily accessible, clear, conspicuous, or direct.

(3) *Distribution to prospective students.* The institution must provide the relevant information to access the website maintained by the Secretary to any prospective student, or a third party acting on behalf of the prospective student, before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution.

(4) *Distribution to enrolled students.* The institution must provide the relevant information to access the website maintained by the Secretary to any enrolled title IV, HEA recipient prior to the start date of the first payment period associated with each subsequent award year in which the student continues enrollment at the institution.

\*    \*    \*    \*    \*

■ 7. Section 668.91 is amended by:
■ a. In paragraph (a)(3)(v)(B)(*2*), removing the period at the end of the paragraph and adding, in its place, ''; and''.

■ b. Adding paragraph (a)(3)(vi).
The addition reads as follows:

**§ 668.91    Initial and final decisions.**

(a) \* \* \*
(3) \* \* \*
(vi) In a termination action against a GE program based upon the program's failure to meet the requirements in § 668.403 or § 668.404, the hearing official must terminate the program's eligibility unless the hearing official concludes that the Secretary erred in the applicable calculation.

\*    \*    \*    \*    \*

■ 8. Add subpart Q to read as follows:

**Subpart Q    Financial Value Transparency**

Sec.
668.401    Financial value transparency scope and purpose.
668.402    Financial value transparency framework.
668.403    Calculating D/E rates.
668.404    Calculating earnings premium measure.
668.405    Process for obtaining data and calculating D/E rates and earnings premium measure.
668.406    Determination of the D/E rates and earnings premium measure.
668.407    Student acknowledgments.
668.408    Reporting requirements.
668.409    Severability.

**Subpart Q    Financial Value Transparency**

**§ 668.401    Financial value transparency scope and purpose.**

(a) *General.* Except as provided under paragraph (b) of this section, this subpart applies to a GE program or eligible non-GE program offered by an eligible institution, and establishes the rules and procedures under which—

(1) An institution reports information about the program to the Secretary; and

(2) Except as provided in paragraph (b)(1) of this section, the Secretary assesses the program's debt and earnings outcomes.

(b) *Applicability.* (1) This subpart does not apply to institutions located in U.S. Territories or freely associated states, except that such institutions are subject to the reporting requirements in § 668.408 and the Secretary will follow the procedures in §§ 668.403(b) and (d) and 668.405(b) and (c) to calculate median debt and obtain earnings information for their GE programs and eligible non-GE programs.

(2) For each award year that the Secretary calculates D/E rates or the earnings premium measure under § 668.402, this subpart does not apply to an institution if, over the most recently completed four award years, it offered no groups of substantially similar programs, defined as all programs in the same four-digit CIP code at an institution, with 30 or more completers.

**§ 668.402    Financial value transparency framework.**

(a) *General.* The Secretary assesses the program's debt and earnings outcomes using debt-to-earnings rates (D/E rates) and an earnings premium measure.

(b) *Debt-to-earnings rates.* The Secretary calculates for each award year two D/E rates for an eligible program, the discretionary debt-to-earnings rate, and the annual debt-to-earnings rate, using the procedures in §§ 668.403 and 668.405.

(c) *Outcomes of the D/E rates.* (1) A program passes the D/E rates if—

(i) Its discretionary debt-to-earnings rate is less than or equal to 20 percent;

(ii) Its annual debt-to-earnings rate is less than or equal to 8 percent; or

(iii) The denominator (median annual or discretionary earnings) of either rate is zero and the numerator (median debt payments) is zero.

(2) A program fails the D/E rates if—

(i) Its discretionary debt-to-earnings rate is greater than 20 percent or the income for the denominator of the rate (median discretionary earnings) is negative or zero and the numerator (median debt payments) is positive; and

(ii) Its annual debt-to-earnings rate is greater than 8 percent or the denominator of the rate (median annual earnings) is zero and the numerator (median debt payments) is positive.

(d) *Earnings premium measure.* For each award year, the Secretary calculates the earnings premium measure for an eligible program, using the procedures in §§ 668.404 and 668.405.

(e) *Outcomes of the earnings premium measure.* (1) A program passes the earnings premium measure if the median annual earnings of the students who completed the program exceed the earnings threshold.

(2) A program fails the earnings premium measure if the median annual earnings of the students who completed the program are equal to or less than the earnings threshold.

**§ 668.403    Calculating D/E rates.**

(a) *General.* Except as provided under paragraph (f) of this section, for each award year, the Secretary calculates D/E rates for a program as follows:

(1) Discretionary debt-to-earnings rate = annual loan payment/(the median annual earnings—(1.5 x Poverty Guideline)). For the purposes of this paragraph (a)(1), the Secretary applies the Poverty Guideline for the most recent calendar year for which annual

earnings are obtained under paragraph (c) of this section.

(2) Annual debt-to-earnings rate = annual loan payment/the median annual earnings.

(b) *Annual loan payment.* The Secretary calculates the annual loan payment for a program by—

(1)(i) Determining the median loan debt of the students who completed the program during the cohort period, based on the lesser of the loan debt incurred by each student as determined under paragraph (d) of this section or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student;

(ii) Removing, if applicable, the appropriate number of largest loan debts as described in § 668.405(d)(2); and

(iii) Calculating the median of the remaining amounts; and

(2) Amortizing the median loan debt—

(i)(A) Over a 10-year repayment period for a program that leads to an undergraduate certificate, a post-baccalaureate certificate, an associate degree, or a graduate certificate;

(B) Over a 15-year repayment period for a program that leads to a bachelor's degree or a master's degree; or

(C) Over a 20-year repayment period for any other program; and

(ii) Using an annual interest rate that is the average of the annual statutory interest rates on Federal Direct Unsubsidized Loans that were in effect during—

(A) The three consecutive award years, ending in the final year of the cohort period, for undergraduate certificate programs, post-baccalaureate certificate programs, and associate degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students;

(B) The three consecutive award years, ending in the final year of the cohort period, for graduate certificate programs and master's degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students;

(C) The six consecutive award years, ending in the final year of the cohort period, for bachelor's degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students; and

(D) The six consecutive award years, ending in the final year of the cohort period, for doctoral programs and first professional degree programs. For these

programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students.

(c) *Annual earnings.* (1) The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (e) of this section; and

(2) The Secretary uses the median annual earnings to calculate the D/E rates.

(d) *Loan debt and assessed charges.* (1) In determining the loan debt for a student, the Secretary includes—

(i) The amount of Direct Loans that the student borrowed (total amount disbursed less any cancellations or adjustments except for those related to false certification, borrower defense discharges, or categorical debt relief initiated under the Secretary's statutory authority) for enrollment in the program, excluding Direct PLUS Loans made to parents of dependent students and Direct Unsubsidized Loans that were converted from TEACH Grants;

(ii) Any private education loans as defined in 34 CFR 601.2, including private education loans made by the institution, that the student borrowed for enrollment in the program and that are required to be reported by the institution under § 668.408; and

(iii) The amount outstanding, as of the date the student completes the program, on any other credit (including any unpaid charges) extended by or on behalf of the institution for enrollment in any program attended at the institution that the student is obligated to repay after completing the program, including extensions of credit described in paragraphs (1) and (2) of the definition of, and excluded from, the term ''private education loan'' in 34 CFR 601.2;

(2) The Secretary attributes all the loan debt incurred by the student for enrollment in any—

(i) Undergraduate program at the institution to the highest credentialed undergraduate program subsequently completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; and

(ii) Graduate program at the institution to the highest credentialed graduate program subsequently completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; and

(3) The Secretary excludes any loan debt incurred by the student for enrollment in any program at any other institution. However, the Secretary may include loan debt incurred by the student for enrollment in programs at other institutions as under common ownership or control, as determined by the Secretary in accordance with 34 CFR 600.31.

(e) *Exclusions.* The Secretary excludes a student from both the numerator and the denominator of the D/E rates calculation if the Secretary determines that—

(1) One or more of the student's Direct Loan Program loans are under consideration by the Secretary, or have been approved, for a discharge on the basis of the student's total and permanent disability, under 34 CFR 674.61, 682.402, or 685.212;

(2) The student was enrolled full time in any other eligible program at the institution or at another institution during the calendar year for which the Secretary obtains earnings information under paragraph (c) of this section;

(3) For undergraduate programs, the student completed a higher credentialed undergraduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section;

(4) For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section;

(5) The student is enrolled in an approved prison education program;

(6) The student is enrolled in a comprehensive transition and postsecondary program; or

(7) The student died.

(f) *D/E rates not issued.* The Secretary does not issue D/E rates for a program under § 668.406 if—

(1) After applying the exclusions in paragraph (e) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or

(2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (c) of this section.

## § 668.404 Calculating earnings premium measure.

(a) *General.* Except as provided under paragraph (d) of this section, for each award year, the Secretary calculates the

earnings premium measure for a program by determining whether the median annual earnings of the students who completed the program exceed the earnings threshold.

(b) *Median annual earnings; earnings threshold.* (1) The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (c) of this section; and

(2) The Secretary uses the median annual earnings of students with a high school diploma or GED using data from the Census Bureau to calculate the earnings threshold described in § 668.2.

(3) The Secretary determines the earnings thresholds and publishes the thresholds annually through a notice in the **Federal Register**.

(c) *Exclusions.* The Secretary excludes a student from the earnings premium measure calculation if the Secretary determines that—

(1) One or more of the student's Direct Loan Program loans are under consideration by the Secretary, or have been approved, for a discharge on the basis of the student's total and permanent disability, under 34 CFR 674.61, 682.402, or 685.212;

(2) The student was enrolled full-time in any other eligible program at the institution or at another institution during the calendar year for which the Secretary obtains earnings information under paragraph (b)(1) of this section;

(3) For undergraduate programs, the student completed a higher credentialed undergraduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the earnings premium measure under this section;

(4) For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the earnings premium measure under this section;

(5) The student is enrolled in an approved prison education program;

(6) The student is enrolled in a comprehensive transition and postsecondary program; or

(7) The student died.

(d) *Earnings premium measures not issued.* The Secretary does not issue the earnings premium measure for a program under § 668.406 if—

(1) After applying the exclusions in paragraph (c) of this section, fewer than 30 students completed the program

during the two-year or four-year cohort period; or

(2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (b) of this section.

### § 668.405  Process for obtaining data and calculating D/E rates and earnings premium measure.

(a) *Administrative data.* In calculating the D/E rates and earnings premium measure for a program, the Secretary uses student enrollment, disbursement, and program data, or other data the institution is required to report to the Secretary to support its administration of, or participation in, the title IV, HEA programs. In accordance with procedures established by the Secretary, the institution must update or otherwise correct any reported data no later than 60 days after the end of an award year.

(b) *Process overview.* The Secretary uses the administrative data to—

(1) Compile a list of students who completed each program during the cohort period. The Secretary—

(i) Removes from those lists students who are excluded under § 668.403(e) or § 668.404(c);

(ii) Provides the list to institutions; and

(iii) Allows the institution to correct the information reported by the institution on which the list was based, no later than 60 days after the date the Secretary provides the list to the institution;

(2) Obtain from a Federal agency with earnings data the median annual earnings of the students on each list, as provided in paragraph (c) of this section; and

(3) Calculate the D/E rates and the earnings premium measure and provide them to the institution.

(c) *Obtaining earnings data.* For each list submitted to the Federal agency with earnings data, the agency returns to the Secretary—

(1) The median annual earnings of the students on the list whom the Federal agency with earnings data has matched to earnings data, in aggregate and not in individual form; and

(2) The number, but not the identities, of students on the list that the Federal agency with earnings data could not match.

(d) *Calculating D/E rates and earnings premium measure.* (1) If the Federal agency with earnings data includes reports from records of earnings on at least 30 students, the Secretary uses the median annual earnings provided by the Federal agency with earnings data to calculate the D/E rates and earnings premium measure for each program.

(2) If the Federal agency with earnings data reports that it was unable to match one or more of the students on the final list, the Secretary does not include in the calculation of the median loan debt for D/E rates the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did not match. For example, if the Federal agency with earnings data is unable to match three students out of 100 students, the Secretary orders by amount the debts of the 100 listed students and excludes from the D/E rates calculation the three largest loan debts.

### § 668.406  Determination of the D/E rates and earnings premium measure.

(a) For each award year for which the Secretary calculates D/E rates and the earnings premium measure for a program, the Secretary issues a notice of determination.

(b) The notice of determination informs the institution of the following:

(1) The D/E rates for each program as determined under § 668.403.

(2) The earnings premium measure for each program as determined under § 668.404.

(3) The determination by the Secretary of whether each program is passing or failing, as described in § 668.402, and the consequences of that determination.

(4) Whether the student acknowledgment is required under § 668.407.

(5) For GE programs, whether the institution is required to provide the student warning under § 668.605.

(6) For GE programs, whether the program could become ineligible under subpart S of this part based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the program.

### § 668.407  Student acknowledgments.

(a) Beginning on July 1, 2026, if an eligible program, other than an undergraduate degree program, has failing D/E rates, the Secretary notifies the institution under § 668.406(b)(4) that student acknowledgments are required for such program in the manner specified in this section.

(b)(1) If student acknowledgements are required, prospective students must acknowledge that they have viewed the information provided through the program information website established and maintained by the Secretary described in § 668.43(d).

(2) The Department will administer and collect the acknowledgment from

students through the program information website.

(3) Prospective students must provide such acknowledgments until:

(i) The Secretary notifies the institution pursuant to § 668.406 that the program has passing D/E rates; or

(ii) Three years after the institution was last notified that the program had failing D/E rates, whichever is earlier.

(c)(1) A prospective student must provide the acknowledgment before the institution enters into an agreement to enroll the student.

(2) The Secretary monitors the institution's compliance with the requirements in paragraph (c)(1) of this section through audits, program reviews, or other investigations.

(d) The acknowledgment required in paragraph (c)(1) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as dispositive evidence against a student's claim if applying for a loan discharge.

**§ 668.408    Reporting requirements.**

(a) *Data elements.* In accordance with procedures established by the Secretary, an institution offering any group of substantially similar programs, defined as all programs in the same four-digit CIP code at an institution, with 30 or more completers in total over the four most recent award years must report to the Department—

(1) For each GE program and eligible non-GE program, for its most recently completed award year—

(i) The name, CIP code, credential level, and length of the program;

(ii) Whether the program is programmatically accredited and, if so, the name of the accrediting agency;

(iii) Whether the program meets licensure requirements or prepares students to sit for a licensure examination in a particular occupation for each State in the institution's metropolitan statistical area;

(iv) The total number of students enrolled in the program during the most recently completed award year, including both recipients and non-recipients of title IV, HEA funds; and

(v) Whether the program is a qualifying graduate program whose students are required to complete postgraduate training programs, as described in the definition under § 668.2;

(2) For each student—

(i) Information needed to identify the student and the institution;

(ii) The date the student initially enrolled in the program;

(iii) The student's attendance dates and attendance status (*e.g.,* enrolled,

withdrawn, or completed) in the program during the award year;

(iv) The student's enrollment status (*e.g.,* full time, three-quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;

(v) The student's total annual cost of attendance (COA);

(vi) The total tuition and fees assessed to the student for the award year;

(vii) The student's residency tuition status by State or district;

(viii) The student's total annual allowance for books, supplies, and equipment from their COA under HEA section 472;

(ix) The student's total annual allowance for housing and food from their COA under HEA section 472;

(x) The amount of institutional grants and scholarships disbursed to the student;

(xi) The amount of other State, Tribal, or private grants disbursed to the student; and

(xii) The amount of any private education loans disbursed to the student for enrollment in the program that the institution is, or should reasonably be, aware of, including private education loans made by the institution;

(3) If the student completed or withdrew from the program during the award year—

(i) The date the student completed or withdrew from the program;

(ii) The total amount the student received from private education loans, as described in § 668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;

(iii) The total amount of institutional debt, as described in § 668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;

(iv) The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;

(v) The total amount of the allowances for books, supplies, and equipment included in the student's title IV, HEA COA for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and

(vi) The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program; and

(4) As described in a notice published by the Secretary in the **Federal Register**, any other information the Secretary requires the institution to report.

(b) *Initial and annual reporting.* (1) Except as provided under paragraph (c)

of this section, an institution must report the information required under paragraph (a) of this section no later than—

(i) For programs other than qualifying graduate programs, July 31, following July 1, 2024, for the second through seventh award years prior to July 1, 2024;

(ii) For qualifying graduate programs, July 31, following July 1, 2024, for the second through eighth award years prior to July 1, 2024; and

(iii) For subsequent award years, October 1, following the end of the award year, unless the Secretary establishes different dates in a notice published in the **Federal Register**.

(2) For any award year, if an institution fails to provide all or some of the information required under paragraph (a) of this section, the institution must provide to the Secretary an explanation, acceptable to the Secretary, of why the institution failed to comply with any of the reporting requirements.

(c) *Transitional reporting period and metrics.* (1) For the first six years for which D/E rates and the earnings premium are calculated under this part, institutions may opt to report the information required under paragraph (a) of this section for its eligible programs either—

(i) For the time periods described in paragraphs (b)(1)(i) and (ii) of this section; or

(ii) For only the two most recently completed award years.

(2) If an institution provides transitional reporting under paragraph (c)(1)(ii) of this section, the Department will calculate transitional D/E rates and earnings premium measures using the median debt for the period reported and the earnings for six years.

**§ 668.409    Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of this part and subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby.

■ 9. Add subpart S to read as follows:

**Subpart S    Gainful Employment (GE)**

Sec.
668.601    Gainful employment (GE) scope and purpose.
668.602    Gainful employment criteria.
668.603    Ineligible GE programs.
668.604    Certification requirements for GE programs.
668.605    Student warnings.
668.606    Severability.

## Subpart S   Gainful Employment (GE)

### § 668.601   Gainful employment (GE) scope and purpose.

(a) *General.* Except as provided under paragraph (b) of this section, this subpart applies to an educational program offered by an eligible institution that prepares students for gainful employment in a recognized occupation and establishes rules and procedures under which the Secretary determines that the program is eligible for title IV, HEA program funds.

(b) *Applicability.* (1) This subpart does not apply to programs offered by institutions located in U.S. Territories or freely associated states.

(2) For each award year that the Secretary calculates D/E rates or the earnings premium measure under § 668.402, this subpart does not apply to an institution if, over the most recently completed four award years, it offered no groups of substantially similar programs, defined as all programs in the same four-digit CIP code at an institution, with 30 or more completers in total.

### § 668.602   Gainful employment criteria.

(a) A GE program provides training that prepares students for gainful employment in a recognized occupation if the program—

(1) Satisfies the applicable certification requirements in § 668.604;

(2) Is not a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated; and

(3) Is not a failing program under the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated.

(b) If the Secretary does not calculate or issue D/E rates for a program for an award year, the program receives no result under the D/E rates for that award year and remains in the same status under the D/E rates as the previous award year.

(c) In determining a program's eligibility, the Secretary disregards any D/E rates that were calculated more than five calculation years prior.

(d) If the Secretary does not calculate or issue earnings premium measures for a program for an award year, the program receives no result under the earnings premium measure for that award year and remains in the same status under the earnings premium measure as the previous award year.

(e) In determining a program's eligibility, the Secretary disregards any

earnings premium that was calculated more than five years prior.

### § 668.603   Ineligible GE programs.

(a) *Ineligible programs.* If a GE program is a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated, or the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated, the program is ineligible and its participation in the title IV, HEA programs ends upon the earliest of—

(1) The issuance of a new Eligibility and Certification Approval Report that does not include that program;

(2) The completion of a termination action of program eligibility, if an action is initiated under subpart G of this part; or

(3) A revocation of program eligibility if the institution is provisionally certified.

(b) *Basis for appeal.* If the Secretary initiates an action under paragraph (a)(2) of this section, the institution may initiate an appeal under subpart G of this part if it believes the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. Institutions may not dispute a program's ineligibility based upon its D/E rates or the earnings premium measure except as described in this paragraph (b).

(c) *Restrictions*—(1) *Ineligible program.* Except as provided in § 668.26(d), an institution may not disburse title IV, HEA program funds to students enrolled in an ineligible program.

(2) *Period of ineligibility.* An institution may not seek to reestablish the eligibility of a failing GE program that it discontinued voluntarily either before or after D/E rates or the earnings premium measure are issued for that program, or reestablish the eligibility of a program that is ineligible under the D/E rates or the earnings premium measure, until three years following the earlier of the date the program loses eligibility under paragraph (a) of this section or the date the institution voluntarily discontinued the failing program.

(3) *Restoring eligibility.* An ineligible program, or a failing program that an institution voluntarily discontinues, remains ineligible until the institution establishes the eligibility of that program under § 668.604(c).

### § 668.604   Certification requirements for GE programs.

(a) *Transitional certification for existing programs.* (1) Except as provided in paragraph (a)(2) of this section, an institution must provide to the Secretary no later than December 31, 2024, in accordance with procedures established by the Secretary, a certification signed by its most senior executive officer that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. The Secretary accepts the certification as an addendum to the institution's program participation agreement with the Secretary under § 668.14.

(2) If an institution makes the certification in its program participation agreement pursuant to paragraph (b) of this section between July 1 and December 31, 2024, it is not required to provide the transitional certification under this paragraph (a).

(b) *Program participation agreement certification.* As a condition of its continued participation in the title IV, HEA programs, an institution must certify in its program participation agreement with the Secretary under § 668.14 that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. As provided under 34 CFR 600.21(a)(11)(vi), an institution must update the certification within 10 days if there are any changes in the approvals for a program, or other changes for a program that render an existing certification no longer accurate.

(c) *Establishing eligibility and disbursing funds.* (1) An institution establishes a GE program's eligibility for title IV, HEA program funds by updating the list of the institution's eligible programs maintained by the Department to include that program, as provided under 34 CFR 600.21(a)(11)(i). By updating the list of the institution's eligible programs, the institution affirms that the program satisfies the certification requirements in paragraph (d) of this section. Except as provided in paragraph (c)(2) of this section, after the institution updates its list of eligible programs, the institution may disburse title IV, HEA program funds to students enrolled in that program.

(2) An institution may not update its list of eligible programs to include a GE program, or a GE program that is substantially similar to a failing program that the institution voluntarily discontinued or became ineligible as described in § 668.603(c), that was

App.190

subject to the three-year loss of eligibility under § 668.603(c), until that three-year period expires.

(d) *GE program eligibility certifications.* An institution certifies for each eligible GE program included on its Eligibility and Certification Approval Report, at the time and in the form specified in this section, that such program is approved by a recognized accrediting agency or is otherwise included in the institution's accreditation by its recognized accrediting agency, or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency for the approval of public postsecondary vocational education in lieu of accreditation.

**§ 668.605  Student warnings.**

(a) *Events requiring a warning to students and prospective students.* Beginning on July 1, 2026, the institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the GE program could become ineligible under this subpart based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the GE program.

(b) *Subsequent warning.* If a student or prospective student receives a warning under paragraph (a) of this section with respect to a GE program, but does not seek to enroll until more than 12 months after receiving the warning, the institution must again provide the warning to the student or prospective student, unless, since providing the initial warning, the program has passed both the D/E rates and earnings premium measures for the two most recent consecutive award years in which the metrics are calculated for the program.

(c) *Content of warning.* The institution must provide in the warning—

(1) A warning, as specified by the Secretary in a notice published in the **Federal Register**, that—

(i) The program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings, as applicable; and

(ii) The program could lose access to Federal grants and loans based on the next calculated program metrics;

(2) The relevant information to access the program information website maintained by the Secretary described in § 668.43(d);

(3) A statement that the student must acknowledge having viewed the warning through the program information website before the institution may disburse any title IV, HEA funds to the student;

(4) A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students could transfer credits earned in the program to another program at the institution and which course credits would transfer, in the event that the program loses eligibility for title IV, HEA program funds;

(5) An indication of whether, in the event that the program loses eligibility for title IV, HEA program funds, the institution will—

(i) Continue to provide instruction in the program to allow students to complete the program; and

(ii) Refund the tuition, fees, and other required charges paid to the institution by, or on behalf of, students for enrollment in the program; and

(6) An explanation of whether, if the program loses eligibility for title IV, HEA program funds, the students could transfer credits earned in the program to another institution in accordance with an established articulation agreement or teach-out plan or agreement.

(d) *Alternative languages.* In addition to providing the English-language warning, the institution must also provide translations of the English-language student warning for those students and prospective students who have limited proficiency in English.

(e) *Delivery to enrolled students.* An institution must provide the warning required under this section in writing, by hand delivery, mail, or electronic means, to each student enrolled in the program no later than 30 days after the date of the Secretary's notice of determination under § 668.406 and maintain documentation of its efforts to provide that warning. The warning must be the only substantive content contained in these written communications.

(f) *Delivery to prospective students.* (1) An institution must provide the warning as required under this section to each prospective student or to each third party acting on behalf of the prospective student at the first contact

about the program between the institution and the student or the third party acting on behalf of the student by—

(i) Hand-delivering the warning as a separate document to the prospective student or third party, individually or as part of a group presentation;

(ii) Sending the warning to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the warning is the only substantive content in the email and that the warning is sent by a different method of delivery if the institution receives a response that the email could not be delivered; or

(iii) Providing the warning orally to the student or third party if the contact is by telephone.

(2) An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the institution delivers the warning as described in this paragraph (f).

(g) *Acknowledgment prior to enrollment and disbursement.* An institution may not allow a prospective student seeking title IV, HEA assistance to sign an enrollment agreement, complete registration, or make a financial commitment to the institution, or disburse title IV, HEA funds to the student until the student or prospective student completes the acknowledgment described in paragraph (c)(3) of this section.

(h) *Discharge claims.* The provision of a student warning or the acknowledgment described in paragraph (c)(3) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as dispositive evidence against a student's claim if applying for a loan discharge.

**§ 668.606  Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of this part and subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby.

[FR Doc. 2023–20385 Filed 9–28–23; 8:45 am]

**BILLING CODE 4000 01 P**

# EXHIBIT 2

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 600 and 668

[Docket ID ED 2023 OPE 0089]

RIN 1840 AD51, 1840 AD57, 1840 AD64, 1840 AD65, and 1840 AD80

### Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary is proposing new regulations to promote transparency, competence, stability, and effective outcomes for students in the provision of postsecondary education. Using the terminology of past regulatory proposals, these regulations seek to make improvements in the areas of gainful employment (GE); financial value transparency; financial responsibility; administrative capability; certification procedures; and Ability to Benefit (ATB).

**DATES:** We must receive your comments on or before June 20, 2023.

**ADDRESSES:** Comments must be submitted via the Federal eRulemaking Portal at *regulations.gov.* Information on using *Regulations.gov,* including instructions for finding a rule on the site and submitting comments, is available on the site under "FAQ." If you require an accommodation or cannot otherwise submit your comments via *regulations.gov,* please contact one of the program contact persons listed under **FOR FURTHER INFORMATION CONTACT.** The Department will not accept comments submitted by fax or by email or comments submitted after the comment period closes. To ensure that the Department does not receive duplicate copies, please submit your comment only once. Additionally, please include the Docket ID at the top of your comments.

*Privacy Note:* The Department's policy is to generally make comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at *http://www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information about themselves that they wish to make publicly available. Commenters should not include in their comments any information that identifies other individuals or that permits readers to identify other individuals. If, for example, your

comment describes an experience of someone other than yourself, please do not identify that individual or include information that would facilitate readers identifying that individual. The Department reserves the right to redact at any time any information in comments that identifies other individuals, includes information that would facilitate readers identifying other individuals, or includes threats of harm to another person.

**FOR FURTHER INFORMATION CONTACT:** For financial value transparency and GE: Joe Massman. Telephone: (202) 453–7771. Email: *Joe.Massman@ed.gov.* For financial responsibility: Kevin Campbell. Telephone: (214) 661–9488. Email: *Kevin.Campbell@ed.gov.* For administrative capability: Andrea Drew. Telephone: (202) 987–1309. Email: *Andrea.Drew@ed.gov.* For certification procedures: Vanessa Gomez. Telephone: (202) 453–6708. Email: *Vanessa.Gomez@ed.gov.* For ATB: Aaron Washington. Telephone: (202) 987–0911. Email: *Aaron.Washington@ed.gov.* The mailing address for the contacts above is U.S. Department of Education, Office of Postsecondary Education, 400 Maryland Avenue SW, 5th floor, Washington, DC 20202.

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

*Directed Questions:* The Department invites you to submit comments on all aspects of the proposed regulations, as well as the Regulatory Impact Analysis. The Department is particularly interested in comments on questions posed throughout the Preamble, which are collected here for the convenience of commenters, with a reference to the section in which they appear. The Department is also interested in comments on questions posed in the Regulatory Impact Analysis.

### Calculating Earnings Premium Measure (§ 668.404)

We recognize that it may be more challenging for some programs serving students in economically disadvantaged locales to demonstrate that graduates surpass the earnings threshold when the earnings threshold reflects the median statewide earnings, including locales with higher earnings. We invite public comments concerning the possible use of an established list, such as list of persistent poverty counties compiled by the Economic Development Administration, to identify such locales, along with comments on what specific adjustments, if any, the Department

should make to the earnings threshold to accommodate the data- and data-informed manner programs serving those populations.

### Student Disclosure Acknowledgments (§ 668.407)

The Department is aware that in some cases, students may transfer from one program to another or may not immediately declare a major upon enrolling in an eligible non-GE program. We welcome public comments about how to best address these situations with respect to acknowledgment requirements. The Department also understands that many students seeking to enroll in non-GE programs may place high importance on improving their earnings and would benefit if the regulations provided for acknowledgements when a non-GE program is low-earning. We further welcome public comments on whether the acknowledgement requirements should apply to all programs, or to GE programs and some subset of non-GE programs, that are low-earning.

The Department is also aware that some communities face unequal access to postsecondary and career opportunities, due in part to the lasting impact of historical legal prohibitions on educational enrollment and employment. Moreover, institutions established to serve these communities, as reflected by their designation under law, have often had lower levels of government investment. The Department welcomes comments on how we might consider these factors, in accord with our legal obligations and authority, as we seek to ensure that all student loan borrowers can make informed decisions and afford to repay their loans.

### Financial Responsibility—Reporting Requirements (§ 668.171)(f)(i)(iii)

We specifically invite comments as to whether an investigation as described in § 668.171(f)(1)(iii) warrants inclusion in the final regulations as either a mandatory or discretionary financial trigger. We also invite comment as to what actions associated with the investigation would have to occur to initiate the financial trigger.

### Provisional Certification (§ 668.13(c))

Proposed § 668.13(c)(2)(ii) requires reassessment of provisionally certified institutions that have significant consumer protection concerns (*i.e.,* those arising from claims under consumer protection laws) by the end of their second year of receiving certification. We invite comment about whether to maintain the proposed two-

year limit or extend recertification to no more than three years for provisionally certified schools with major consumer protection issues.

**Approved State Process (§ 668.156(f))**

As agreed by Committee consensus, we propose a success rate calculation under proposed § 668.156(f). To further inform the final regulations, we specifically request comments on the proposed 85 percent threshold, the comparison groups in the calculation, the components of the calculation, and whether the success rate itself is an appropriate outcome indicator for the State process.

**Executive Summary**

*Purpose of This Regulatory Action*

The financial assistance students receive under the title IV, HEA programs for postsecondary education and training represent a significant annual expenditure by the Federal government. When used effectively, Federal aid for postsecondary education and training is a powerful tool for promoting social and economic mobility. However, many programs fail to effectively enhance students' skills or increase their earnings, leaving them no better off than if they had never pursued a postsecondary credential with debt they cannot afford.

The Department is also aware of a significant number of instances where institutions shut down with no warning and is concerned about the impact of such events for students. For instance, one recent study shows that, of closures that took place over a 16-year period, 70 percent of the students at such institutions (100,000 individuals) received insufficient warning that the closures were coming.[1] These closures often come at a significant cost to taxpayers. Students who were enrolled at or close to the time of closure and did not graduate from the shuttered institution may receive a discharge of their Federal student loans. The cost of such discharges is rarely fully reimbursed because once the institution closes there are often few assets to use for repaying Federal liabilities. For example, the Department recouped less than 2 percent of the $550 million in closed school discharges awarded between January 2, 2014, to June 30, 2021, to students who attended private for-profit colleges.[2] While these closures may have occurred without notice for

the students, they were often preceded by months if not years of warning signs. Unfortunately, existing regulations do not provide the Department the necessary authority to rely on those indicators of risk to take action and unfortunately, despite observing these signs, the Department has lacked authority under existing regulations to take action based on those indicators of risk in order to secure financial protection before the institution runs out of money and closes.

The Department's inability to act also has implications for students. Students whose colleges close tend to have high default rates and are highly unlikely to continue their educational journeys elsewhere. Those who enrolled well before the point of closure may have been misled into taking on loans through admissions and recruitment efforts based on misrepresentations about the ability of attendees to obtain employment or transfer credit. Acting more swiftly in the future to obtain financial protection would help either deter risky institutional behavior or ensure the Department has more funds in place to offset the cost to taxpayers of closed schools or borrower defense discharges.

There are also institutions that operate title IV, HEA programs without the administrative capability necessary to successfully serve students, for example, where institutions that lack the resources needed to deliver on promises made about career services and externships or where institutions employ principals, affiliates, or other individuals who exercise substantial control over an institution who have a record of misusing title IV, HEA aid funds. A lack of administrative capability can also result in insufficient institutional controls over verifying students' high school diplomas, which are a key criterion for title IV, HEA eligibility.

Furthermore, there have been instances where institutions have exhibited material problems yet remained fully certified to participate in the Federal student aid programs. This full certification status can limit the ability of the Department to remedy problems identified through monitoring until it is potentially too late to improve institutional behavior or prevent a school closure that ends up wasting taxpayer resources in the form of loan discharges, as well as the lost time, resources, and foregone opportunities of students.

To address these concerns, the Department convened a negotiated rulemaking committee, the Institutional and Programmatic Eligibility Committee

(Committee), that met between January 18, 2022, and March 18, 2022, to consider proposed regulations for the Federal Student Aid programs authorized under title IV of the HEA (title IV, HEA programs) (see the section under *Negotiated Rulemaking* for more information on the negotiated rulemaking process). The Committee operated by consensus, defined as no dissent by any member at the time of a consensus check. Consensus checks were taken by issue, and the Committee reached consensus on the topic of ATB.

These proposed regulations address five topics: financial value transparency and GE, financial responsibility, administrative capability, certification procedures, and ATB.

Proposed regulations for financial value transparency would address concerns about the rising cost of postsecondary education and training and increased student borrowing by establishing an accountability and transparency framework to encourage eligible postsecondary programs to produce acceptable debt and earnings outcomes, apprise current and prospective students of those outcomes, and provide better information about program price. Proposed regulations for GE would establish eligibility and certification requirements to address ongoing concerns about educational programs that are required by statute to provide training that prepares students for gainful employment in a recognized occupation, but instead are leaving students with unaffordable levels of loan debt in relation to their earnings. These programs often lead to default or provide no earnings benefit beyond that provided by a high school diploma, thus failing to fulfill their intended goal of preparing students for gainful employment. GE programs include nearly all educational programs at for-profit institutions of higher education, as well as most non-degree programs at public and private non-profit institutions.

The proposed financial responsibility regulations establish additional factors that will be viewed by the Department as indicators of an institution's lack of financial responsibility. When one of the factors occurs, the Department may seek financial protection from the institution, most commonly through a letter of credit. The indicators of a lack of financial responsibility proposed in this NPRM are events that put an institution at a higher risk of financial instability and sudden closure. Particular emphasis will be made regarding events that bring about a major change in an institution's composite score, the metric used to

---

[1] *https://nscresearchcenter.org/wp-content/uploads/SHEEO-NSCRCCollegeClosuresReport.pdf*.

[2] Figure excludes the $1.1 billion in additional closed school discharges for ITT Technical Institute announced in August 2021.

determine an entity's financial strength based on its audited financial statement as described in § 668.172 and Appendices A and B in subpart L of part 668. Other examples of high-risk events that could trigger a finding of a lack of financial responsibility are when an institution is threatened with a loss of State authorization or loses eligibility to participate in a Federal educational assistance program other than those administered by the Department.

The events linked to the proposed financial triggers are often observed in institutions facing possible or probable closure due to financial instability. By allowing the Department to take certain actions in response to specified financial triggers, the proposed regulations provide the Department with tools to minimize the impact of an institution's financial decline or sudden closure. The additional financial protections established in these regulations are critical to offset potential losses sustained by taxpayers when an institution closes and better ensure the Department may take actions in advance of a potential closure to better protect taxpayers against the financial costs resulting from an institutional closure. These protections would also dissuade institutions from engaging in overly risky behavior in the first place. We also propose to simplify the regulations by consolidating the financial responsibility requirements for changes in ownership under proposed part 668, subpart L and removing and reserving current § 668.15.

We propose several additional standards in the administrative capability regulations at § 668.16 to ensure that institutions can appropriately administer the title IV, HEA programs. While current administrative capability regulations include a host of requirements, the Department proposes to address additional concerns which could indicate severe or systemic administrative problems that negatively impact student outcomes and are not currently reflected in those regulations. The Department already requires institutions to provide adequate financial aid counseling to students, for instance. However, many institutions provide financial aid information to students that is confusing and misleading. The information that institutions provide often lacks accurate information about the total cost of attendance, and groups all types of aid together instead of clearly separating grants, loans, and work study aid. The proposed administrative capability regulations would address these issues by specifying required elements to be included in financial aid communications.

We also propose to add an additional requirement for institutions to provide adequate career services to help their students find jobs, particularly where the institution offers career-specific programs and makes commitments about job assistance. Adequate services would be evaluated based on the number of students enrolled in GE programs at the school, the number and distribution of career services staff, the career services the institution promised to its students, and the presence of partnerships between institutions and recruiters who regularly hire graduates. We believe this requirement would help ensure that institutions provide adequate career services to students. The proposed revisions and additions to § 668.16 address these and other concerns that are not reflected in current regulations.

The proposed certification procedures regulations would create a more rigorous process for certifying institutions for initial and ongoing participation in the title IV, HEA programs and better protect students and taxpayers through a program participation agreement (PPA). The proposed revisions to § 668.2, 668.13, and 668.14 aim to protect the integrity of the title IV, HEA programs and to protect students from predatory or abusive behaviors. For example, in § 668.14(e) we propose requiring institutions that are provisionally certified and that we determine to be at risk of closure to submit an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency. This would ensure that the institution has an acceptable plan in place that allows students to continue their education in the event the institution closes.

Finally, the Department proposes revisions to current regulations for ATB. These proposed changes to § 668.156 would clarify the requirements for the approval of a State process. The State process is one of the three ATB alternatives (see the Background section for a detailed explanation) that an individual who is not a high school graduate could fulfill to receive title IV, HEA, Federal student aid for enrollment in an eligible career pathway program. The proposed changes to § 668.157 add documentation requirements for eligible career pathway programs.

*Summary of the Major Provisions of this Regulatory Action:* The proposed regulations would make the following changes.

**Financial Value Transparency and Gainful Employment (§ 600.10, 600.21, 668.2, 668.43, 668.91, 668.401, 668.402, 668.403, 668.404, 668.405, 668.406, 668.407, 668.408, 668.409, 668.601, 668.602, 668.603, 668.604, 668.605, and 668.606)**

• Amend § 600.10(c) to require an institution seeking to establish the eligibility of a GE program to add the program to its application.

• Amend § 600.21(a) to require an institution to notify the Secretary within 10 days of any change to information included in the GE program's certification.

• Amend § 668.2 to define certain terminology used in subparts Q and S, including "annual debt-to-earnings rate," "classification of instructional programs (CIP) code," "cohort period," "credential level," "debt-to-earnings rates (D/E rates)," "discretionary debt-to-earnings rates," "earnings premium," "earnings threshold," "eligible non-GE program," "Federal agency with earnings data," "gainful employment program (GE program)," "institutional grants and scholarships," "length of the program," "poverty guideline," "prospective student," "student," and "Title IV loan."

• Amend § 668.43 to establish a Department website for the posting and distribution of key information and disclosures pertaining to the institution's educational programs, and to require institutions to provide the information required to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution.

• Amend § 668.91(a) to require that a hearing official must terminate the eligibility of a GE program that fails to meet the required GE metrics, unless the hearing official concludes that the Secretary erred in the calculation.

• Add a new § 668.401 to provide the scope and purpose of newly established financial value transparency regulations under subpart Q.

• Add a new § 668.402 to provide a framework for the Secretary to determine whether a GE program or eligible non-GE program leads to acceptable debt and earnings results, including establishing annual and discretionary D/E rate metrics and associated outcomes, and establishing an earnings premium metric and associated outcomes.

• Add a new § 668.403 to establish a methodology to calculate annual and discretionary D/E rates, including parameters to determine annual loan payments, annual earnings, loan debt

and assessed charges, as well as to provide exclusions and specify when D/E rates will not be calculated.

• Add a new § 668.404 to establish a methodology to calculate a program's earnings premium measure, including parameters to determine median annual earnings, as well as to provide exclusions and specify when the earnings premium measure will not be calculated.

• Add a new § 668.405 to establish a process by which the Secretary will obtain the administrative and earnings data required to issue D/E rates and the earnings premium measure.

• Add a new § 668.406 to require the Secretary to notify institutions of their financial value transparency metrics and outcomes.

• Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the disclosure website maintained by the Secretary if an eligible non-GE program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may disburse any title IV, HEA funds.

• Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to define the timeframe for institutions to report this information.

• Add a new § 668.409 to establish severability protections ensuring that if any financial value transparency provision under subpart Q is held invalid, the remaining provisions of that subpart and of other subparts would continue to apply.

• Add a new § 668.601 to provide the scope and purpose of newly established GE regulations under subpart S.

• Add a new § 668.602 to establish criteria for the Secretary to determine whether a GE program prepares students for gainful employment in a recognized occupation.

• Add a new § 668.603 to define the conditions under which a failing GE program would lose title IV, HEA eligibility, to provide the opportunity for an institution to appeal a loss of eligibility only on the basis of a miscalculated D/E rate or earnings premium, and to establish a period of ineligibility for failing GE programs that lose eligibility or voluntarily discontinue eligibility.

• Add a new § 668.604 to require institutions to provide the Department with transitional certifications, as well as to certify when seeking recertification

or the approval of a new or modified GE program, that each eligible GE program offered by the institution is included in the institution's recognized accreditation or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency.

• Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of a loss of title IV, HEA eligibility, to specify the content and delivery requirements for such notifications, and to provide that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

• Add a new § 668.606 to establish severability protections ensuring that if any GE provision under subpart S is held invalid, the remaining provisions of that subpart and of other subparts would continue to apply.

## Financial Responsibility (§§ 668.15, 668.23, and 668, subpart L §§ 171, 174, 175, 176 and 177)

• Remove and reserve § 668.15 thereby consolidating all financial responsibility factors, including those governing changes in ownership, under part 668, subpart L.

• Amend § 668.23(a) to require that audit reports are submitted in a timely manner, which would be the earlier of 30 days after the date of the report or six months after the end of the institution's fiscal year.

• Amend § 668.23(d) to require that financial statements submitted to the Department must match the fiscal year end of the entity's annual return(s) filed with the Internal Revenue Service. We would further amend § 668.23(d) to require the institution to include a detailed description of related entities with a level of detail that would enable the Department to readily identify the related party. Such information must include, but is not limited to, the name, location and a description of the related entity including the nature and amount of any transactions between the related party and the institution, financial or otherwise, regardless of when they occurred. Section 668.23(d) would also be amended to require that any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized. Additionally, we would amend § 668.23(d) to require an institution to disclose in a footnote to its financial statement audit the dollar

amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures.

• Amend § 668.171(b) to require institutions to demonstrate that they are able to meet their financial obligations by noting additional cases that constitute a failure to do so, including failure to make debt payments for more than 90 days, failure to make payroll obligations, or borrowing from employee retirement plans without authorization.

• Amend § 668.171(c) to revise the set of conditions that automatically require posting of financial protection if the event occurs as prescribed in the regulations. These mandatory triggers are designed to measure external events that pose risk to an institution, financial circumstances that may not appear in the institution's regular financial statements, or financial circumstances that may not yet be reflected in the institution's composite score. Some examples of these mandatory triggers include when, under certain circumstances, there is a withdrawal of owner's equity by any means and when an institution loses eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

• Amend § 668.171(d) to revise the set of conditions that may, at the discretion of the Department, require posting of financial protection if the event occurs as prescribed in the regulations. These discretionary triggers are designed to measure external events or financial circumstances that may not appear in the institution's regular financial statements and may not yet be reflected in the institution's composite score. An example of these discretionary triggers is when an institution is cited by a State licensing or authorizing agency for failing to meet State or agency requirements. Another example is when the institution experiences a significant fluctuation between consecutive award years or a period of award years in the amount of Federal Direct Loan or Federal Pell Grant funds that cannot be accounted for by changes in those title IV, HEA programs.

• Amend § 668.171(f) to revise the set of conditions whereby an institution must report to the Department that a triggering event, described in § 668.171(c) and (d), has occurred.

• Amend § 668.171(h) to adjust the language regarding an auditor's opinion of doubt about the institution's ability to continue operations to clarify that the Department may independently assess whether the auditor's concerns have

been addressed or whether the opinion of doubt reflects a lack of financial responsibility.

• Amend § 668.174(a) to clarify the language related to compliance audit or program review findings that lead to a liability of greater than 5 percent of title IV, HEA volume at the institution, so that the language more clearly states that the timeframe of the preceding two fiscal years timeframe relates to when the reports containing the findings in question were issued and not when the reviews were actually conducted.

• Add a new proposed § 668.176 to consolidate financial responsibility requirements for institutions undergoing a change in ownership under § 668, subpart L.

• Redesignate the existing § 668.176, establishing severability, as § 668.177 with no change to the regulatory text.

## Administrative Capability (§ 668.16)

• Amend § 668.16(h) to require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available to enrolled students that includes clear information about the cost of attendance, sources and amounts of each type of aid separated by the type of aid, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts.

• Amend § 668.16(k) to require that an institution not have any principal or affiliate whose misconduct or closure contributed to liabilities to the Federal government in excess of 5 percent of that institution's title IV, HEA program funds in the award year in which the liabilities arose or were imposed.

• Add § 668.16(n) to require that the institution has not been subject to a significant negative action or a finding by a State or Federal agency, a court, or an accrediting agency, where in which the basis of the action or finding is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive; and to further require that the institution has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

• Amend § 668.16(p) to strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma.

• Add § 668.16(q) to require that institutions provide adequate career services to eligible students who receive title IV, HEA program assistance.

• Add § 668.16(r) to require that an institution provide students with accessible clinical, or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation, within 45 days of the successful completion of other required coursework.

• Add § 668.16(s) to require that an institution timely disburses funds to students consistent with the students' needs.

• Add § 668.16(t) to require institutions to meet new standards for their GE programs, as outlined in regulation.

• Add § 668.16(u) to require that an institution does not engage in misrepresentations or aggressive and deceptive recruitment.

## Certification Procedures (§§ 668.2, 668.13, and 668.14)

• Amend § 668.2 to add a definition of ''metropolitan statistical area.''

• Amend § 668.13(b)(3) to eliminate the provision that requires the Department to approve participation for an institution if it has not acted on a certification application within 12 months so the Department can take additional time where it is needed.

• Amend § 668.13(c)(1) to include additional events that lead to provisional certification, such as if an institution triggers one of the new financial responsibility triggers proposed in this rule.

• Amend § 668.13(c)(2) to require provisionally certified schools that have major consumer protection issues to recertify after no more than two years.

• Add a new § 668.13(e) to establish supplementary performance measures the Secretary may consider in determining whether to certify or condition the participation of the institution.

• Amend § 668.14(a)(3) to require an authorized representative of any entity with direct or indirect ownership of a private institution to sign a PPA.

• Amend § 668.14(b)(17) to include all Federal agencies and add State attorneys general to the list of entities that have the authority to share with each other and the Department any information pertaining to the institution's eligibility for or participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law.

• Amend § 668.14(b)(26)(ii) to limit the number of hours in a GE program to the greater of the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the

program prepares the student, as established by the State in which the institution is located, or the required minimum number of hours required for training in another State, if the institution provides documentation of that State meeting one of three qualifying requirements to use a State in which the institution is not located that is substantiated by the certified public accountant who prepares the institution's compliance audit report as required under § 668.23.

• Amend § 668.14(b)(32) to require all programs that are designed to lead to employment in occupations requiring completion of a program that is programmatically accredited as a condition of State licensure to meet those requirements.

• Amend § 668.14(e) to establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions, such as the submission of a teach-out plan or agreement.

• Amend § 668.14(f) to establish conditions that may apply to institutions that undergo a change in ownership seeking to convert from a for-profit institution to a nonprofit institution.

• Amend § 668.14(g) to establish conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status.

## Ability To Benefit (§§ 668.2, 668.32, 668.156, and 668.157)

• Amend § 668.2 to add a definition of ''eligible career pathway program.''

• Amend § 668.32 to differentiate between the title IV, HEA aid eligibility of non-high school graduates that enrolled in an eligible program prior to July 1, 2012, and those that enrolled after July 1, 2012.

• Amend § 668.156(b) to separate the State process into an initial two-year period and a subsequent period for which the State may be approved for up to five years.

• Amend § 668.156(a) to strengthen the Approved State process regulations to require that: (1) The application contain a certification that each eligible career pathway program intended for use through the State process meets the proposed definition of an eligible career pathway program in regulation; (2) The application describe the criteria used to determine student eligibility for participation in the State process; (3) The withdrawal rate for a postsecondary institution listed for the first time on a State's application not exceed 33 percent; (4) That upon initial

application the Secretary will verify that a sample of the proposed eligible career pathway programs meet statutory and regulatory requirements; and (5) That upon initial application the State will enroll no more than the greater of 25 students or one percent of enrollment at each participating institution.

• Amend § 668.156(c) to remove the support services requirements from the State process which include: orientation, assessment of a student's existing capabilities, tutoring, assistance in developing educational goals, counseling, and follow up by teachers and counselors.

• Amend the monitoring requirement in § 668.156(c)(4) to provide a participating institution that did not achieve the 85 percent success rate up to three years to achieve compliance.

• Amend § 668.156(c)(6) to prohibit an institution from participating in the State process for title IV, HEA purposes for at least five years if the State terminates its participation.

• Amend § 668.156 to clarify that the State is not subject to the success rate requirement at the time of the initial application but is subject to the requirement for the subsequent period, reduce the required success rate from the current 95 percent to 85 percent, and specify that the success rate be calculated for each participating institution. Also, amend the comparison groups to include the concept of "eligible career pathway programs."

• Amend § 668.156 to require that States report information on race, gender, age, economic circumstances, and educational attainment and permit the Secretary to release a **Federal Register** notice with additional information that the Department may require States to submit.

• Amend § 668.156 to update the Secretary's ability to revise or terminate a State's participation in the State process by (1) providing the Secretary the ability to approve the State process once for a two-year period if the State is not in compliance with a provision of the regulations and (2) allowing the Secretary to lower the success rate to 75 percent if 50 percent of the participating institutions across the State do not meet the 85 percent success rate.

• Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs.

*Costs and benefits:* The Department estimates that the proposed regulations would generate benefits to students, postsecondary institutions, and the Federal government that exceed the costs. The Department also estimates substantial transfers, primarily in the form of reduced net title IV, HEA

spending by the Federal government. Net benefits are created primarily by shifting students from low-financial-value to high-financial-value programs or, in some cases, away from low-financial-value postsecondary programs to non-enrollment. This shift would be due to improved and standardized market information about all postsecondary programs that would facilitate better decision making by current and prospective students and their families; the public, taxpayers, and the government; and institutions. Furthermore, the GE component would improve the quality of options available to students by directly eliminating the ability of low-financial-value GE programs to receive title IV, HEA funds. This enrollment shift and improvement in program quality would result in higher earnings for students, which would generate additional tax revenue for Federal, State, and local governments. Students would also benefit from lower accumulated debt and lower risk of default. The proposed regulations would also generate substantial transfers, primarily in the form of title IV, HEA aid shifting between students, postsecondary institutions, and the Federal government, generating a net budget savings for the Federal government. Other components of this proposed regulation related to financial responsibility would provide benefits to the Department and taxpayers by increasing the amount of financial protection available before an institution closes or incurs borrower defense liabilities. This would also help dissuade unwanted behavior and benefit institutions that are in stronger financial shape by dissuading struggling institutions from engaging in questionable behaviors to gain a competitive advantage in increasing enrollment. Similarly, the changes to administrative capability and certification procedures would benefit the Department in increasing its quality of oversight of institutions so that students have more valuable options when they enroll. Finally, the ATB regulations would provide needed clarity to institutions and States on how to serve students who do not have a high school diploma.

The primary costs of the proposed regulations related to the financial value transparency and GE accountability requirements are the additional reporting required by institutions, the time for students to acknowledge having seen disclosures, and additional spending at institutions that accommodate students who would

otherwise have decided to attend failing programs. The proposed regulations may also dissuade some students from enrolling that otherwise would have benefited from doing so. For the financial responsibility portion of the proposed regulations, costs would be primarily related to the expense of providing financial protection to the Department as well as transfers that arise from shifting the cost and burden of closed school discharges from the taxpayer to the institution and the entities that own it. Costs related to certification procedures and administrative capability would be related to any necessary steps to comply with the added requirements. Finally, States and institutions would have some added administrative expenses to administer the proposed ability-to-benefit processes.

*Invitation to Comment:* We invite you to submit comments regarding these proposed regulations. To ensure that your comments have maximum effect in developing the final regulations, we urge you to clearly identify the specific section or sections of the proposed regulations that each of your comments addresses and to arrange your comments in the same order as the proposed regulations.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities. The Department also welcomes comments on any alternative approaches to the subjects addressed in the proposed regulations.

During and after the comment period, you may inspect public comments about these proposed regulations on the *Regulations.gov* website.

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for these proposed regulations. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT**.

## Background

*Financial Value Transparency and Gainful Employment (§§ 600.10, 600.21, 668.2, 668.43, 668.91, 668.401, 668.402, 668.403, 668.404, 668.405, 668.406, 668.407, 668.408, 668.409, 668.601, 668.602, 668.603, 668.604, 668.605, and 668.606)*

Postsecondary education and training generate important benefits both to the students pursuing new knowledge and skills and to the Nation overall. Higher education increases wages and lowers unemployment risk,[3] and leads to myriad non-financial benefits including better health, job satisfaction, and overall happiness.[4] In addition, increasing the number of individuals with postsecondary education creates social benefits, including productivity spillovers from a better educated and more flexible workforce,[5] increased civic participation,[6] improvements in health and well-being for the next generation,[7] and innumerable intangible benefits that elude quantification. The improvements in productivity and earnings lead to increases in tax revenues from higher earnings and lower rates of reliance on social safety net programs. These downstream increases in net revenue to the government can be so large that public investments in higher education more than pay for themselves.[8]

These benefits are not guaranteed, however. Research has demonstrated that the returns, especially the gains in earnings students enjoy as a result of their education, vary dramatically across institutions and among programs within those institutions.[9] As we

illustrate in the Regulatory Impact Analysis of this proposed rule, even among the same types of programs—that is, among programs with similar academic levels and fields of study—both the costs and the outcomes for students differ widely. Most postsecondary programs provide benefits to students in the form of higher wages that help them repay any loans they may have borrowed to attend the program. But too many programs fail to increase graduates' wages, having little, or even negative, effects on graduates' earnings.[10] At the same time, too many programs charge much higher tuition than similar programs with comparable outcomes, leading students to borrow much more than they could have had they attended a more affordable option.

With college tuition consistently rising faster than inflation, and given the growing necessity of a postsecondary credential to compete in today's economy, it is critical for students, families, and taxpayers alike to have accurate and transparent information about the possible financial consequences of their postsecondary program career options when choosing whether and where to enroll. Providing information on the typical earnings outcomes, borrowing amounts, cost of attendance, and sources of financial aid—and providing it directly to prospective students in a salient way at a key moment in their decision-making process—would help students make more informed choices and would allow taxpayers and college stakeholders to better monitor whether public and private resources are being well used. For many students these financial considerations would, appropriately, be just one of many factors used in deciding whether and where to enroll.

For programs that consistently produce graduates with very low earnings, or with earnings that are too low to repay the amount the typical graduate borrows to complete a credential, additional measures are needed to protect students from financial harm. Although making information available has been shown to improve consequential financial choices across a variety of settings, it is a limited remedy, especially for more vulnerable

populations that may have less support in interpreting and acting upon the relevant information.[11][12] We believe that providing more detailed information about the debt and earnings outcomes of specific educational programs would assist students in making better informed choices about whether and where to enroll.

To address these issues, the Department proposes to amend §§ 600.10, 600.21, 668.2, 668.13, 668.43, and 668.98, and to establish subparts Q and S of part 668. Through this proposed regulatory action, the Department seeks to establish the following requirements:

(1) In subpart Q, a financial value transparency framework that would increase the quality and availability of information provided directly to students about the costs, sources of financial aid, and outcomes of students enrolled in all eligible programs. The framework establishes measures of the earnings premium that typical program graduates experience relative to the earnings of typical high school graduates, as well as the debt service burden for typical students. It also establishes performance benchmarks for each measure, denoting a threshold level of performance below which the program may have adverse financial consequences to students. This information would be made available via a website maintained by the Department, and in some cases students and prospective students would be required to acknowledge viewing these disclosures before receiving title IV, HEA funds to attend programs with poor outcomes. Further, the website would provide the public, taxpayers, and the government with relevant information to better safeguard the Federal investment in these programs. Finally, the transparency framework would provide institutions with meaningful information that they could use to benchmark their performance to other institutions and improve student outcomes in these programs.

(2) In subpart S, we propose an accountability framework for career training programs (also referred to as gainful employment, or GE, programs)

[3] Barrow, L., & Malamud, O. (2015). Is College a Worthwhile Investment? *Annual Review of Economics,* 7(1), 519–555.

Card, D. (1999). The causal effect of education on earnings. *Handbook of labor economics,* 3, 1801–1863.

[4] Oreopoulos, P., & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives,* 25(1), 159–184.

[5] Moretti, E. (2004). Workers' Education, Spillovers, and Productivity: Evidence from Plant-Level Production Functions. *American Economic Review,* 94(3), 656–690.

[6] Dee, T.S. (2004). Are There Civic Returns to Education? *Journal of Public Economics,* 88(9–10), 1697–1720.

[7] Currie, J., & Moretti, E. (2003). Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings. *The Quarterly Journal of Economics,* 118(4), 1495–1532.

[8] Hendren, N., & Sprung-Keyser., B. (2020). A Unified Welfare Analysis of Government Policies. *The Quarterly Journal of Economics,* 135(3), 1209–1318.

[9] Hoxby, C.M. 2019. The Productivity of US Postsecondary Institutions. In *Productivity in Higher Education,* C.M. Hoxby and K.M. Stange (eds). University of Chicago Press: Chicago, 2019.

Lovenheim, M. and J. Smith. 2023. Returns to Different Postsecondary Investments: Institution Type, Academic Programs, and Credentials. In *Handbook of the Economics of Education Volume 6,* E. Hanushek, L. Woessmann, and S. Machin (Eds). New Holland.

[10] Cellini, S. and Turner, N. 2018. Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data. Journal of Human Resources. 54(2).

[11] Dominique J. Baker, Stephanie Riegg Cellini, Judith Scott-Clayton, and Lesley J. Turner, "Why information alone is not enough to improve higher education outcomes," The Brookings Institution (2021). *https://www.brookings.edu/blog/brown-center-chalkboard/2021/12/14/why-information-alone-is-not-enough-to-improve-higher-education-outcomes/.*

[12] Mary Steffel, Dennis A. Kramer II, Walter McHugh, Nick Ducoff, "Information disclosure and college choice," The Brookings Institution (2019). *www.brookings.edu/wp-content/uploads/2020/11/ES-11.23.20-Steffel-et-al-1.pdf.*

App.199

that uses the same earnings premium and debt-burden measures to determine whether a GE program remains eligible for title IV, HEA program funds. The GE eligibility criteria are designed to define what it means to prepare students for gainful employment in a recognized occupation, and they tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans. GE programs that fail the same measure in any two out of three consecutive years for which the measure is calculated would lose eligibility for participation in title IV, HEA programs.

Sections 102(b) and (c) of the HEA define, in part, a proprietary institution and a postsecondary vocational institution as one that provides an eligible program of training that prepares students for gainful employment in a recognized occupation. Section 101(b)(1) of the HEA defines an institution of higher education, in part, as any institution that provides not less than a one-year program of training that prepares students for gainful employment in a recognized occupation. The statute does not further specify this requirement, and through multiple reauthorizations of the HEA, Congress has neither further clarified the concept of gainful employment, nor curtailed the Secretary's authority to further define this requirement through regulation, including when Congress exempted some liberal arts programs offered by proprietary institutions from the gainful employment requirement in the Higher Education Opportunity Act of 2008.

The Department previously issued regulations on this topic three times. In 2011, the Department published a regulatory framework to determine the eligibility of a GE program based on three metrics: (1) Annual debt-to-earnings (D/E) rate, (2) Discretionary D/E rate, and (3) Loan repayment rate. We refer to that regulatory action as the 2011 Prior Rule (76 FR 34385). Following a legal challenge, the program eligibility measures in the 2011 Prior Rule were vacated on the basis that the Department had failed to adequately justify the loan repayment rate metric.[13] In 2014, the Department issued new GE regulations, which based eligibility determinations on only the annual and discretionary D/E rates as accountability metrics, rather than the loan repayment rate metric that had been the core source

of concern to the district court in previous litigation, and included disclosure requirements about program outcomes. We refer to that regulatory action as the 2014 Prior Rule (79 FR 64889). The 2014 Prior Rule was upheld by the courts except for certain appeal procedures used to demonstrate alternate program earnings.[14][15][16]

The Department rescinded the 2014 Prior Rule in 2019 based on its judgments and assessments at the time, citing: the inconsistency of the D/E rates with the requirements of other repayment options; that the D/E rates failed to properly account for factors other than program quality that affect student earnings and other outcomes; a lack of evidence for D/E thresholds used to differentiate between "passing," "zone," and "failing" programs; that the disclosures required by the 2014 Prior Rule included some data, such as job placement rates, that were deemed unreliable; that the rule failed to provide transparency regarding debt and earnings outcomes for all programs, leaving students considering enrollment options about both non-profit and proprietary institutions without information; and relatedly, that a high percentage of GE programs did not meet the minimum cohort size threshold and were therefore not included in the debt-to-earnings calculations.[17] In light of the Department's reasoning at the time, the 2019 Prior Rule (*i.e.*, the action to rescind the 2014 Prior Rule) eliminated any accountability framework in favor of non-regulatory updates to the College Scorecard on the premise that transparency could encourage market forces to bring accountability to bear.

This proposed rule departs from the 2019 rescission, as well as the 2014 Prior Rule, for reasons that are previewed here and elaborated on throughout this preamble.[18] At the highest level, the Department remains concerned about the same problems documented in the 2011 and 2014 Prior Rules. Too many borrowers struggle to repay their loans, evidenced by the fact that over a million borrowers defaulted on their loans in the year prior to the payment pause that was put in place due to the COVID–19 pandemic. The Regulatory Impact Analysis (RIA) shows

these problems are more prevalent among programs where graduates have high debts relative to their income, and where graduates have low earnings. While both existing and proposed changes to income-driven repayment plans ("IDR") for Federal student loans partially shield borrowers from these risks, such after-the-fact protections do not address underlying program failures to prepare students for gainful employment in the first place, and they exacerbate the impact of such failures on taxpayers as a whole when borrowers are unable to pay. Not all borrowers participate in these repayment plans and, where they do, the risks of nonpayment are shifted to taxpayers when borrowers' payments are not sufficient to fully pay back the loans they borrowed. This is because borrowers with persistently low incomes who enroll in IDR—and thereby make payments based on a share of their income that can be as low as $0—will see their remaining balances forgiven at taxpayer expense after a specified number of years (*e.g.,* 20 or 25) in repayment.

The Department recognizes that, given the high cost of education and correspondingly high need for student debt, students, families, institutions, and the public have an acute interest in ensuring that higher education investments are justified through positive repayment and earnings outcomes for graduates. The statute acknowledges there are differences across programs and colleges and this means we have different tools available to promote these goals in different contexts. Recognizing this fact, for programs that the statute requires to prepare students for gainful employment in a recognized occupation, we propose reinstating a version of the debt-to-earnings requirement established under the 2014 Prior Rule and adding an earnings premium metric to the GE accountability framework. At the same time, we propose expanding disclosure requirements to all eligible programs and institutions to ensure all students have the benefit of access to accurate information on the financial consequences of their education program choices.

First, the proposed rule incorporates a new accountability metric—an earnings premium (EP)—that captures a distinct aspect of the value provided by a program. The earnings premium measures the extent to which the typical graduate of a program out-earns the typical individual with only a high school diploma or equivalent in the same State the program is located. In

[13] *Ass'n of Priv. Colleges & Universities* v. *Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012).

[14] *Ass'n of Proprietary Colleges* v. *Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

[15] *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016) (per curiam).

[16] *Am. Ass'n of Cosmetology Sch.* v. *DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017).

[17] 84 FR 31392.

[18] We discuss potential reliance interests regarding all parts of the proposed rule below, in the "Reliance Risks" section.

order to be considered a program that prepares students for gainful employment in a recognized occupation, we propose that programs must both have graduates whose typical debt levels are affordable, based on a similar debt-to-earnings (D/E) test as used in the 2014 Prior Rule, and also have a positive earnings premium.

Second, we propose to calculate and require disclosures of key information about the financial consequences of enrolling in higher education programs for almost all eligible programs at all institutions. As we elaborate below and in the RIA, we believe this will help students understand differences in the costs, borrowing levels, and labor market outcomes of more of the postsecondary options they might be considering. It is particularly important for students who are considering or attending a program that may carry a risk of adverse financial outcomes to have access to comparable information across all sectors so they can explore other options for enrollment and potentially pursue a program that is a better financial value.

As further explained in the significant proposed regulations section of this Notice and in the RIA, there are several connected reasons for adding the EP metric to the proposed rule.[19] First, the Department believes that, for postsecondary career training programs to be deemed as preparing students for gainful employment, they should enable students to secure employment that provides higher earnings than what they might expect to earn if they did not pursue a college credential. This position is consistent with the ordinary meaning of the phrase "gainful employment" and the purposes of the title IV, HEA programs, which generally require students who receive assistance to have already completed a high school education,[20] and then require GE programs "to prepare" those high school graduates for "gainful employment" in a recognized occupation.[21] Clearly, GE programs are supposed to add to what high school graduates already have achieved in their preparation for gainful employment, not leave them where they started. We propose to measure that gain, in part, with an administrable test

that is pegged to earnings beyond a typical high school graduate. This approach is likewise supported by the fact that the vast majority of students cite the opportunity for a good job or higher earnings as a key, if not the most important, reason they chose to pursue a college degree.[22]

Furthermore, the EP metric that we propose would set only reasonable expectations for programs that are supposed to help students move beyond a high school baseline. The median earnings of high school graduates is about $25,000 nationally, which corresponds to the earnings level of a full-time worker at an hourly wage of about $12.50 (lower than the State minimum wage in 15 States).[23] While the 2014 Prior Rule emphasized that borrowers should be able to earn enough to afford to repay their debts, the Department recognizes that borrowers need to be able to afford more than "just" their loan payments, and that postsecondary programs should help students reach a minimal level of labor market earnings. Exceeding parity with the earnings of students who never attend college is a modest expectation.

Another benefit of adding the EP metric is that it helps protect students from the adverse borrowing outcomes prevalent among programs with very low earnings. Research conducted since the 2014 Prior Rule as well as new data analyses shown in this RIA illustrate that, for borrowers with low earnings, even small amounts of debt (including levels of debt that would not trigger failure of the D/E rates) can be unmanageable. Default rates tend to be especially high among borrowers with lower debt levels, often because these borrowers left their programs and as a result have very low earnings.[24] Analyses in this RIA show that the default rate among students in programs that pass the D/E thresholds but fail the earnings premium are very high—even higher than programs that fail the D/E measure but pass the earnings premium measure.

Finally, as detailed further below, the EP measure helps protect taxpayers.

Borrowers with low earnings are eligible for reduced loan payments and loan forgiveness which increase the costs of the title IV, HEA loan program to taxpayers.

While the EP and D/E metrics are related, they measure distinct dimensions of gainful employment, further supporting the proposal to require that programs pass both measures. For example, programs that have median earnings of graduates above the high school threshold might still be so expensive as to require excessive borrowing that students will struggle to repay. And, on the other hand, even if debt levels are low relative to a graduate's earnings, those earnings might still be no higher than those of the typical high school graduate in the same State.

As noted above, the D/E metrics and thresholds in the proposed rule mirror those in the 2014 Prior Rule and are based on both academic research about debt affordability and industry practice. Analyses in the Regulatory Impact Analysis (RIA) of this proposed rule illustrate that borrowers who attended programs that fail the D/E rates are more likely to struggle with their debt. For example, programs that fail the proposed D/E standards (including both GE and non-GE programs) account for just 4.1 percent of title IV enrollments (*i.e.,* Federally aided students), but 11.19 percent of all students who default within 3 years of entering repayment. GE programs represent 15.2 percent of title IV, HEA enrollments overall, but 49.6 percent of title IV, HEA enrollments within the programs that fail the D/E standards and 65.6 percent of the defaulters. These facts, in part, motivate the Department's proposal to calculate and disclose D/E and EP rates for all programs under proposed subpart Q, while establishing additional accountability for GE programs with persistently low performance in the form of loss of title IV, HEA eligibility under proposed subpart S.

In addition to ensuring that career training programs ensure that graduates attain at least a minimal level of earnings and have borrowing levels that are manageable, the two metrics in the proposed rule also protect taxpayers from the costs of low financial value programs. For example, the RIA presents estimates of loan repayment under the hypothetical assumption that all borrowers pay on either (1) the most generous repayment plan or (2) the most generous plan that would be available under the income-driven repayment rule proposed by the Department in January (88 FR 1894). These analyses show that both D/E rates and the

---

[19] For further discussion of the earnings premium metric and the Department's reasons for proposing it, see below at "Authority for this Regulatory Action," and at "668.402 Financial value transparency framework" and "668.602 Gainful employment criteria" under the Significant Proposed Regulations section of this Notice. Those discussions also address the D/E metric.

[20] See, for example, 20 U.S.C. 1001(a)(1), 1901.

[21] 20 U.S.C. 1002(b)(1)(A), (c)(1)(A). See also 20 U.S.C. 1088(b)(1)(i), which refers to a recognized profession.

[22] For example, a recent survey of 2,000 16 to 19 year olds and 2,000 22 to 30 year old recent college graduates rated affordable tuition, higher income potential, and lower student debt as the top 3 to 4 most important factors in choosing a college (*https://www.nytimes.com/2023/03/27/opinion/problem-college-rankings.html*). The RIA includes citation to other survey results with similar findings.

[23] See *https://www.dol.gov/agencies/whd/mw-consolidated.*

[24] See *https://libertystreeteconomics.newyorkfed.org/2015/02/looking_at_student_loan_defaults_through_a_larger_window/.*

earnings premium metrics are strongly correlated with an estimated subsidy rate on Federal loans, which measures the share of a disbursed loan that will not be repaid, and thus provides a proxy for the cost of loans to taxpayers. In short, the D/E and earnings premium metrics are well targeted to programs that generate a disproportionate share of the costs to taxpayers and negative borrower outcomes that the Department seeks to improve.

We have also reconsidered the concerns raised in the 2019 Prior Rule about the effect of some repayment options on debt-to-earnings rates. We recognize that some repayment plans offered by the Department allow borrowers to repay their loans as a fraction of their income, and that this fraction is lower for some plans than the debt-to-earnings rate used to determine ineligibility under this proposed rule and the 2014 Prior Rule. For example, under the Revised Pay-As-You-Earn (REPAYE) income-driven repayment plan, borrowers' monthly payments are set at 10 percent of their discretionary income, defined as income in excess of 150 percent of the Federal poverty guideline (FPL). Noting that many borrowers continue to struggle to repay, the Department has proposed more generous terms, allowing borrowers to pay 5 percent of their discretionary income (now redefined as income in excess of 225 percent of the FPL) to repay undergraduate loans, and 10 percent of their discretionary income to repay graduate loans.[25]

Income driven repayment plans are aimed at alleviating the burden of high debt for students who experience unanticipated circumstances, beyond an institution's control, that adversely impact their ability to repay their debts. While the Department believes it is critical to reduce the risk of unexpected barriers that borrowers face, and to protect borrowers from delinquency, default and the associated adverse credit consequences, it would be negligent to lower our accountability standards across the entire population as a result and to permit institutions to encumber students with even more debt while expecting taxpayers to pay more for poor outcomes related to the educational programs offered by institutions. Instead, we view the D/E rates as an appropriate measure of what students can borrow and feasibly repay. Put another way, the D/E provisions proposed in this rule define a maximum amount of borrowing as a function of students' earnings that would leave the typical program graduate in a position

to pay off their debt without having to rely on payment assistance programs like income-driven repayment plans.

The concerns raised by the 2019 Prior Rule about the effect of student demographics on the debt and earnings measures used in the 2014 Prior Rule (which we also propose to use in this NPRM) are addressed at length in this NPRM's RIA. The Department has considered that discrimination based on gender identity or race and ethnicity may influence the aggregate outcomes of programs that disproportionately enroll members of those groups. However, our analyses, and an ever-increasing body of academic research, strongly rebut the claim that differences across programs are solely or primarily a reflection of the demographic or other characteristics of the students enrolled.[26] Moreover, consistent with recurring allegations in student complaints and qui tam lawsuits (a type of lawsuit through which private individuals who initiate litigation on behalf of the government can receive for themselves all or part of the damages or penalties recovered by the government), through our compliance oversight activities including program reviews, the Department has concluded that many institutions aggressively recruit individuals with low income, women, and students of color into programs with substandard quality and poor outcomes and then claim their outcomes are poor because of the "access" they provide to such individuals. An analysis of the effects on access presented in the RIA demonstrates that more than 90 percent of students enrolled in failing programs have at least one non-failing option within the same geographic area, credential level, and broad field. These alternative programs usually entail lower borrowing, higher earnings, or both.

[26] Christensen, Cody and Turner, Lesley. (2021) Student Outcomes at Community Colleges: What Factors Explain Variation in Loan Repayment and Earnings? The Brookings Institution. Washington, DC. *https://www.brookings.edu/wp-content/uploads/2021/09/Christensen_Turner_CC-outcomes.pdf.* Jack, Dan A., and Jeffrey A. Smith. "Estimating the returns to college quality with multiple proxies for quality." *Journal of labor Economics* 24.3 (2006): 701–728.

Cohodes, Sarah R., and Joshua S. Goodman. "Merit aid, college quality, and college completion: Massachusetts' Adams scholarship as an in-kind subsidy." *American Economic Journal: Applied Economics* 6.4 (2014): 251–285.

Andrews, Rodney J., Jing Li, and Michael F. Lovenheim. "Quantile treatment effects of college quality on earnings." *Journal of Human Resources* 51.1 (2016): 200–238.

Dillon, Eleanor Wiske, and Jeffrey Andrew Smith. "The consequences of academic match between students and colleges." *Journal of Human Resources* 55.3 (2020): 767–808.

The Department has also reconsidered concerns raised in the 2019 Prior Rule about the basis for proposed thresholds for debt-to-earnings rates. We have re-reviewed the research underpinning those thresholds. This includes considering concerns raised by one researcher about the way the Department interpreted one of her studies in the 2019 Prior Rule.[27] From this, we have proposed using one set of thresholds that are based upon research and industry practice. This departs from prior approaches that distinguished between programs in a "zone" versus "failing."

The 2019 Prior Rule also raised concerns about the inclusion of potentially unreliable metrics. We agree with this conclusion with respect to job placement and thus do not propose including job placement rates among the proposed disclosures required from institutions.[28] Because inconsistencies in how institutions calculate job placement rates limit their usefulness to students and the public in comparing institutions and programs, until we find a meaningful and comparable measure, the Department does not rely upon job placement rates in this proposed rule.

The Department also considered concerns raised in the 2019 Prior Rule that the accountability framework was flawed because many programs did not have enough graduates to produce data. Since many programs produce only a small number of graduates each year, it is unavoidable that the Department will not be able to publish debt and earnings based aggregate statistics for such programs to protect the privacy of the individual students attending them or to ensure that the data from those programs are adequately reliable. As further explained in our discussion of proposed § 668.405, the IRS adds a small amount of statistical noise to earnings data for privacy protection purposes, which would be greater for populations smaller than 30.

While the Department is mindful of the fractions of programs likely covered, we also are concentrating on the numbers of people who may benefit from the metrics: enrolled students, prospective students, their families, and others. Despite the data limitations noted above, under the proposed regulations, we estimate that programs representing 69 and 75 percent of all title IV, HEA enrollment in eligible non-GE programs and GE programs,

[25] 88 FR 1902 (Jan. 11, 2023).

[27] *www.urban.org/urban-wire/devos-misrepresents-evidence-seeking-gainful-employment-deregulation.*

[28] These rates were not required disclosures under the 2014 Prior Rule, but rather among a list of items that the Secretary may choose to include.

respectively, would have debt and earnings measures available to produce the metrics. We further estimate the share of enrollment that would additionally be covered under the four-year cohort approach (discussed later in this NPRM) by examining the share of enrollment in programs that have fewer than 30 graduates in our data for a two-year cohort, but at least 30 in a four-year cohort. Under this approach, we estimate that an additional 13 percent of eligible non-GE enrollment and 8 percent of GE enrollment would be covered. All told, the metrics could be produced for programs that enroll approximately 82 percent of all students. These students are enrolled in 34 percent of all eligible non-GE programs and 26 percent of all GE programs.[29]

The metrics that we could calculate, therefore, would show results for postsecondary education programs that are attended by the large majority of enrolled students. Those numbers would be directly relevant to those students. And it seems reasonable to further conclude that the covered programs will be the primary focus of attention for the majority of prospective students, as well. The programs least likely to be covered will be the smallest in terms of the number of completers (and likely enrollment), which is correlated with the breadth of interest among those considering enrolling in those programs. We acknowledge that these programs represent potential options for future and even current enrollees, and that relatively small programs might be different in various ways from programs with larger enrollments. At the same time, the Department does not view the fraction of programs covered by D/E and EP as the most important metric. The title IV, HEA Federal student aid programs, after all, provide aid to students directly, making the share of students covered a natural focus of concern. The Department believes that the benefits of providing this information to millions of people about programs that account for the majority of students far outweighs the downside of not providing data on the smallest programs. Furthermore, even for students interested in smaller programs, the outcome measures for other programs at the same institution may be of interest.

The Department continues to agree with the stance taken in the 2019 Prior Rule that publishing metrics that help

students, families, and taxpayers understand the financial value of all programs is important. Prospective students often consider enrollment options at public, for profit, and non-profit institutions simultaneously and deserve comparable information to assess the financial consequences of their choices. A number of research studies show that such information, when designed well, delivered by a trusted source, and provided at the right time can help improve choices and outcomes.[30] However, as further discussed under "§ 668.401 Financial value transparency scope and purpose," merely posting the information on the College Scorecard website has had a limited impact on enrollment choices. Consequently, our proposed rule, in subpart Q below, outlines a financial value transparency framework that proposes measures of debt-to-earnings and earnings premiums that would be calculated for nearly all programs at all institutions. To help ensure students are aware of these outcomes when financial considerations may be particularly important, the framework includes a requirement that all students receive a link to program disclosures including this information, and that students seeking to enroll in programs that do not meet standards on the relevant measures would need to acknowledge viewing that information prior to the disbursement of title IV, HEA funds.

At the same time, the Department believes that the transparency framework alone is not sufficient to protect students and taxpayers from programs with persistently poor financial value outcomes.[31][32] The available information continues to suggest that graduates of some GE programs have earnings below what could be reasonably expected for someone pursuing postsecondary education. In the Regulatory Impact Analysis, the Department shows that about 460,000 students per year, comprising 16 percent of all title IV, HEA recipients enrolled in GE programs annually, attend GE programs where the typical graduate earns less than the

typical high school graduate, and an additional 9 percent of those enrolled in GE programs have unmanageable debt.[33] These rates are much higher among GE programs than eligible non-GE programs, where 4 percent of title IV, HEA enrollment is in programs with zero or negative earnings premiums and 2 percent are in programs with unsustainable debt levels.

Researchers have found that while providing information alone can be important and consequential in some settings, barriers to information and a lack of support for interpreting and acting upon information can limit its impact on students' education choices, particularly among more vulnerable populations.[34] We are also concerned about evidence from Federal and State investigations and qui tam lawsuits indicating that a number of institutions offering GE programs engage in aggressive and deceptive marketing and recruiting practices. As a result of these practices, prospective students and their families are potentially being pressured and misled into critical decisions regarding their educational investments that are against their interests.

We therefore propose an additional level of protection for GE programs that disproportionately leave students with unsustainable debt levels or no gain in earnings. We accordingly include an accountability framework in subpart S that links debt and earnings outcomes to GE program eligibility for title IV, HEA student aid programs. Since these programs are intended to prepare students for gainful employment in recognized occupations, tying eligibility to a minimally acceptable level of financial value is natural and supported by the relevant statutes; and as detailed above and in the RIA, these programs account for a disproportionate share of students who complete programs with very low earnings and unmanageable debt. This approach has been supported by a number of researchers who have recently suggested reinstating the 2014 GE rule with an added layer of accountability through a high school

---

[29] These figures use four-year cohorts to compute rates. The comparable share of programs with calculatable metrics using only the two-year cohorts is 19 and 15 percent for non-GE and GE programs, respectively.

[30] For an overview of research findings see, for example, *ticas.org/files/pub_files/consumer_information_in_higher_education.pdf*.

[31] Dominique J. Baker, Stephanie Riegg Cellini, Judith Scott-Clayton, and Lesley J. Turner, "Why information alone is not enough to improve higher education outcomes," The Brookings Institution (2021). *www.brookings.edu/blog/brown-center-chalkboard/2021/12/14/why-information-alone-is-not-enough-to-improve-higher-education-outcomes/*.

[32] Mary Steffel, Dennis A. Kramer II, Walter McHugh, Nick Ducoff, "Information disclosure and financial value," The Brookings Institution (2019). *www.brookings.edu/wp-content/uploads/2020/11/ES-11.23.20-Steffel-et-al-1.pdf*.

[33] A similar conclusion was reached in a recent study that found that about 670,000 students per year, comprising 9 percent of all students that exit postsecondary programs on an annual basis, attended programs that leave them worse off financially. See Jordan D. Matsudaira and Lesley J. Turner. "Towards a framework for accountability for federal financial assistance programs in postsecondary education." The Brookings Institution. (2020) *www.brookings.edu/wp-content/uploads/2020/11/20210603-Mats-Turner.pdf*.

[34] See discussion in section "Outcome Differences Across Programs" of the Regulatory Impact Analysis for an overview of these research findings.

earnings metric.[35] We further explain the debt-to-earnings (D/E) and earnings premium (EP) metrics in discussions above and below.

Consistent with our statutory authority, this proposed rule limits the linking of debt and earnings outcomes to program eligibility for programs that are defined as preparing students for gainful employment in a recognized occupation rather than a larger set of programs. The differentiation between GE and non-GE programs in the HEA reflects that eligible non-GE programs serve a broader array of goals beyond career training. Conditioning title IV, HEA eligibility for such programs to debt and earnings outcomes not only would raise questions of legal authority, it could increase the risk of unintended educational consequences. However, for purposes of program transparency, we propose to calculate and disclose debt and earnings outcomes for all programs along with other measures of the true costs of programs for students. Since students consider both GE and non-GE programs when selecting programs, providing comparable information for students would help them find the program that best meets their needs across any sector.

While we propose reinstating the consequential accountability provisions, including sanctions of eligibility loss, proposed in the 2011 and 2014 Prior Rules, we depart from those regulations in several ways in addition to those already mentioned above. First, we decided against using measures of loan repayment, like the one proposed in the 2011 Prior Rule. Even with an acceptable basis for setting such a threshold, we recognize that changes to the repayment options available to borrowers may cause repayment rates to change, and as a result such a measure may be an imperfect, or unstable, proxy for students' outcomes and program quality.

We also propose changes relative to the 2014 Prior Rule, including elimination of the ''zone'' and changes to appeals processes. Based on the Department's analyses and experience administering the 2014 Rule, these provisions added complexity and burden in administering the rule but did not further their stated goals and instead unnecessarily limited the Department's ability to remove low-value programs

from eligibility. We further explain those choices below.[36]

Finally, the Department proposes to measure earnings using only the median of program completers' earnings, rather than the maximum of the mean or median of completers' earnings. This approach reflects an updated assessment that the median is a more appropriate measure, indicating the earnings level exceeded by a majority of the programs' graduates. The mean can be less representative of program quality since it may be elevated or lowered by just a few ''outlier'' completers with atypically high or low earnings outcomes. Furthermore, in aggregate National or State measures of earnings, mean earnings are always higher than median earnings due to the right skew of earnings distributions and the presence of a long right tail, when a small number of individuals earn substantially more than the typical person does.[37] As a result, using mean values, rather than medians, would substantially increase the state-level earnings thresholds derived from the earnings of high school graduates. Aggregated up to the State level, the mean earnings of those in the labor force with a high school degree is about 16 percent higher than the median earnings. By State, this difference between mean and median earnings ranges from 9 percent (in Delaware and Vermont) to 28 percent (in Louisiana).

The use of means as a comparison earnings measure within a State would set a much higher bar for programs, driven largely by the presence of high-earning outliers. In contrast, the use of mean earnings, rather than medians, for individual program data typically has a more muted effect. Using 2014 GE data, the typical increase from the use of mean, rather than median earnings, is about 3 percent across programs. Further, some programs have lower earnings when measured using a mean rather than median. Programs at the 25th percentile in earnings difference have a mean that is 3 percent less than the median, and programs at the 75th percentile have a mean that is 12 percent higher than the median. On balance, we believe that using median earnings for both the measure of program earnings and the earnings threshold measure used to calculate the earnings premium leads to a more representative comparison of earnings outcomes for program graduates.

*Financial Responsibility (§§ 668.15, 668.23, 668.171, and 668.174 Through 668.177) (Section 498(c) of the HEA)*

Section 498(c) of the HEA requires the Secretary to determine whether an institution has the financial responsibility to participate in the title IV, HEA programs on the basis of whether the institution is able to:
• Provide the services described in its official publications and statements;
• Provide the administrative resources necessary to comply with the requirements of the law; and
• Meet all of its financial obligations.

In 1994, the Department made significant changes to the regulations governing the evaluation of an institution's financial responsibility to improve our ability to implement the HEA's requirement. The Department strengthened the factors used to evaluate an institution's financial responsibility to reflect statutory changes made in the 1992 amendments to the HEA.

In 1997, we further enhanced the financial responsibility factors with the creation of part 668, subpart L that established a financial ratio requirement using composite scores and performance-based financial responsibility standards. The implementation of these new and enhanced factors limited the applicability of the previous factors in § 668.15 to only situations where an institution is undergoing a change in ownership.

These proposed regulations would remove the outdated regulations from § 668.15 and reserve that section. Proposed regulations in a new § 668.176, under subpart L, would be specific to institutions undergoing a change in ownership and detail the precise financial requirements for that process. Upon implementation, all financial responsibility factors for institutions, including institutions undergoing a change in ownership, would reside in part 668, subpart L.

In 2013, the Office of Management and Budget's Circular A–133, which governed independent audits of public and nonprofit, private institutions of higher education and postsecondary vocational institutions, was replaced with regulations at 2 CFR part 200— Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards. In § 668.23, we would replace all references to Circular A–133 with the current reference, 2 CFR part 200— Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards.

---

[35] Stephanie R. Cellini and Kathryn J. Blanchard, ''Using a High School Earnings Benchmark to Measure College Student Success Implications for Accountability and Equity.'' The Postsecondary Equity and Economics Research Project. (2022). *www.peerresearchproject.org/peer/research/body/2022.3.3-PEER_HSEarnings-Updated.pdf.*

[36] See the discussions below at [TK].

[37] Neal, Derek and Sherwin Rosen. (2000) Chapter 7: Theories of the distribution of earnings. Handbook of Income Distribution. Elsevier. Vol. 1. 379–427. *https://doi.org/10.1016/S1574-0056(00)80010-X.*

App.204

Audit guides developed by and available from the Department's Office of Inspector General contain the requirements for independent audits of for-profit institutions of higher education, foreign schools, and third-party servicers. Traditionally, these audits have had a submission deadline of six months following the end of the entity's fiscal year. These proposed regulations would establish a submission deadline that would be the earlier of two dates:

• Thirty days after the date of the later auditor's report with respect to the compliance audit and audited financial statements; or

• Six months after the last day of the entity's fiscal year.

The Department primarily monitors institutions' financial responsibility through the ''composite score'' calculation, a formula derived through a final rule published in 1997 that relies on audited financial statements and a series of tests of institutional performance. The composite score is only applied to private nonprofit and for-profit institutions. Public institutions are generally backed by the full faith and credit of the State or equivalent governmental entity and, if so, are not evaluated using the composite score test or required to post financial protection.

The composite score does not effectively account for some of the ways in which institutions' financial difficulties may manifest, however, because institutions submit audited financial statements after the end of an institution's fiscal year. An example of this would be when the person or entity that owns the school makes a short-term cash contribution to the school, thereby increasing the school's composite score in a way that allows what would have been a failing composite score to pass. We have seen examples of this activity occurring when that same owner withdraws the same or similar amount after the end of the fiscal year and after the calculation of a passing composite score based on the contribution. The effect is that the institution passes just long enough for the score to be reviewed and then goes back to failing. This is the type of manipulation that the proposed regulation seeks to address.

As part of the 2016 Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program regulations [38] (referred to

collectively as the 2016 Final Borrower Defense Regulations), the Department introduced, as part of the financial responsibility framework, ''triggering events'' to serve as indicators of an institution's lack of financial responsibility or the presence of financial instability. These triggers were used in conjunction with the composite score and already existing standards of financial responsibility and offset the limits inherent in the composite score calculation. Some of the existing standards include that:

• The institution's Equity, Primary Reserve, and Net Income ratios yield a composite score of at least 1.5;

• The institution has sufficient cash reserves to make required returns of unearned title IV, HEA program funds;

• The institution is able to meet all of its financial obligations and otherwise provide the administrative resources required to comply with title IV, HEA program requirements; and

• The institution or persons affiliated with the institution are not subject to a condition of past performance as outlined in 34 CFR 668.174.

The triggering events introduced in the 2016 Final Borrower Defense Regulations were divided into two categories: mandatory and discretionary.

Some required an institution to post a letter of credit or provide other financial protection when that triggering event occurred. This type of mandatory trigger included when an institution failed to demonstrate that at least 10 percent of its revenue derived from sources other than the title IV, HEA program funds (the 90/10 rule). Other mandatory triggers required a recalculation of the institution's composite score, which would result in a request for financial protection only if the newly calculated score was less than 1.0. An example of the latter type of trigger was when an institution's recalculated composite score was less than 1.0 due to its being required to pay any debt or incur any liability arising from a final judgment in a judicial proceeding or from an administrative proceeding or determination, or from a settlement.

The 2016 Final Borrower Defense Regulations also introduced discretionary triggers that only required financial protection from the institution if the Department determined it was necessary. An example of such a trigger was if an institution had been cited by a State licensing or authorizing agency for failing that entity's requirements. In that case, the Department could require financial protection if it believed that the failure was reasonably likely to have a material adverse effect on the financial

condition, business, or results of operations of the institution.

In 2019, as part of the Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program [39] (2019 Final Borrower Defense Regulations) the Department revised many of these triggers, moving some from being mandatory to being discretionary; eliminating some altogether; and linking some triggers to post-appeal or final events. An example of a mandatory 2016 trigger that was removed entirely in 2019 was when an institution's recalculated composite score was less than 1.0 due to its being sued by an entity other than a Federal or State authority for financial relief on claims related to the making of Direct Loans for enrollment at the institution or the provision of educational services. In amending the financial responsibility requirements in the 2019 Final Borrower Defense Regulations, the Department reasoned that it was removing triggers that were speculative, such as triggers based on the estimated dollar value of a pending lawsuit, and limiting triggers to events that were known and quantified, such as triggers based on the actual liabilities incurred from a defense to repayment discharge. The rationale for the 2019 Final Borrower Defense Regulations was also based on the idea that some of the 2016 triggers were not indicators of the institution's actual financial condition or ability to operate. However, after implementing the financial responsibility changes from the 2019 Final Borrower Defense Regulations, the Department has repeatedly encountered institutions that appeared to be at significant risk of closure where we lacked the ability to request financial protection due to the more limited nature of the triggers. To address this fact, these proposed regulations would reinstate or expand mandatory and discretionary triggering events that would require an institution to post financial protection, usually in the form of a letter of credit. Discretionary triggers would provide the Department flexibility on whether to require a letter of credit based on the financial impact the triggering event has on the institution, while the specified mandatory triggering conditions would either automatically require the institution to obtain financial surety or require that the composite score be recalculated to determine if an institution would have to provide surety because it no longer passes. These proposed new triggers would increase

---

[38] 81 FR 75926.

[39] 84 FR 49788.

the Department's ability to monitor institutions for issues that may negatively impact their financial responsibility and to better protect students and taxpayers in cases of institutional misconduct and closure.

*Administrative Capability (§ 668.16)*

Under section 487(c)(1)(B) of the HEA, the Secretary is authorized to issue regulations necessary to provide reasonable standards of financial responsibility, and appropriate institutional administrative capability to administer the title IV, HEA programs, in matters not governed by specific program provisions, including any matter the Secretary deems necessary to the administration of the financial aid programs. Section 668.16 specifies the standards that institutions must meet in administering title IV, HEA funds to demonstrate that they are administratively capable of providing the education they promise and of properly managing the title IV, HEA programs. In addition to having a well-organized financial aid office staffed by qualified personnel, a school must ensure that its administrative procedures include an adequate system of internal checks and balances. The Secretary's administrative capability regulations protect students and taxpayers by requiring that institutions have proper procedures and adequate administrative resources in place to ensure fair, legal, and appropriate conduct by title IV, HEA participating schools. These procedures are required to ensure that students are treated in a fair and transparent manner, such as receiving accurate and complete information about financial aid and other institutional features and receiving adequate services to support a high-quality education. A finding that an institution is not administratively capable does not necessarily result in immediate loss of access to title IV aid. A finding of a lack of administrative capability generally results in the Department taking additional proactive monitoring steps, such as placing the institution on a provisional PPA or HCM2 as necessary.

Through program reviews, the Department has identified administrative capability issues that are not adequately addressed by the existing regulations. The Department proposes to amend § 668.16 to clarify the characteristics of institutions that are administratively capable. The proposed changes would benefit students in several ways.

First, we propose to improve the information that institutions provide to applicants and students to understand the cost of the education being offered. Specifically, we propose to require institutions to provide students financial aid counseling and information that includes the institution's cost of attendance, the source and type of aid offered, whether it must be earned or repaid, the net price, and deadlines for accepting, declining, or adjusting award amounts. We believe that these proposed changes would make it easier for students to compare costs of the schools that they are considering and understand the costs they are taking on to attend an institution.

Additionally, the Department proposes that institutions must provide students with adequate career services and clinical or externship opportunities, as applicable, to enable students to gain licensure and employment in the occupation for which they are prepared. We propose that institutions must provide adequate career services to create a pathway for students to obtain employment upon successful completion of their program. Institutions must have adequate career service staff and established partnerships with recruiters and employers. With respect to clinical and externship opportunities where required for completion of the program, we propose that accessible opportunities be provided to students within 45 days of completing other required coursework.

We also propose that institutions must disburse funds to students in a timely manner to enable students to cover institutional costs. This proposed change is designed to allow students to remain in school and reduce withdrawal rates caused by delayed disbursements.

The Department proposes that an institution that offers GE programs is not administratively capable if it derives more than half of its total title IV, HEA funds in the most recent fiscal year from GE programs that are failing. Similarly, an institution is not administratively capable if it enrolls more than half of its students who receive title IV, HEA aid in programs that are failing under the proposed GE metrics. Determining that these institutions are not administratively capable would allow the Department to take additional proactive monitoring steps for institutions that could be at risk of seeing significant shares of their enrollment or revenues associated with ineligible programs in the following year. This could include placing the institution on a provisional PPA or HCM2.

The Department also proposes to prohibit institutions from engaging in aggressive and deceptive recruitment and misrepresentations. These practices are defined in Part 668 Subpart F and Subpart R. The former was amended by the borrower defense regulations published on November 1, 2022 (87 FR 65904), while the latter was created in that regulation. Both provisions are scheduled to go into effect on July 1, 2023. The scope and definition of misrepresentations was first discussed during the 2009–2010 negotiated rulemaking session. We are now proposing to include aggressive and deceptive recruitment tactics or conduct as one of the types of activities that constitutes substantial misrepresentation by an eligible institution.

We propose that institutions must confirm that they have not been subject to negative action by a State or Federal agency and have not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution. Additionally, we propose that institutions certify when they sign their PPA that no principal or affiliate has been convicted of or pled nolo contender or guilty to a crime related to the acquisition, use, or expenditure of government funds or has been determined to have committed fraud or any other material violation of law involving those funds.

Finally, the Department proposes procedures that we believe would be adequate to verify the validity of a student's high school diploma. This standard was last addressed during negotiated rulemaking in 2010. In these proposed regulations, we identify specific documents that can be used to verify the validity of a high school diploma if the institution or the Secretary has reason to believe that the high school diploma is not valid. We also propose criteria to help institutions with identifying a high school diploma that is not valid.

*Certification Procedures (§§ 668.2, 668.13, and 668.14)*

Certification is the process by which a postsecondary institution applies to initially participate or continue participating in the title IV, HEA student aid programs. To receive certification, an institution must meet all applicable statutory and regulatory requirements in HEA section 498. Currently, postsecondary institutions use the Electronic Application for Approval to Participate in Federal Student Financial Aid Programs (E-App) to apply for designation as an eligible institution, initial participation, recertification, reinstatement, or change in ownership, or to update a current

approval. Once an institution submits its application, we examine three major factors about the school—institutional eligibility, administrative capability, and financial responsibility.

Once an institution has demonstrated that it meets all institutional title IV eligibility criteria, it must enter into a PPA to award and disburse Federal student financial assistance. The PPA defines the terms and conditions that the institution must meet to begin and continue participation in the title IV programs. Institutions can be fully certified, provisionally certified, or temporarily certified under their PPAs. Full certification constitutes the standard level of oversight applied to an institution under which financial and compliance audits must be completed and institutions are generally subject to the same standard set of conditions.

Provisionally certified institutions are subject to more frequent oversight (*i.e.,* a shorter timeframe for certification), and have one or more conditions applied to their PPA depending on specific concerns about the school. For instance, we may require that an institution seek approval from the Department before adding new locations or programs. Institutions that are temporarily certified are subject to very short-term, month-to-month approvals and a variety of conditions to enable frequent oversight and reduce risk to students and taxpayers.

We notify institutions six months prior to the expiration of their PPA, and institutions must submit a materially complete application before the PPA expires. The Department certifies the eligibility of institutions for a period of time that may not exceed three years for provisional certification or six years for full certification. The Department may place conditions on the continued participation in the title IV, HEA programs for provisionally certified institutions.

As part of the 2020 final rule for Distance Education and Innovation,[40] the Department decided to automatically grant an institution renewal of certification if the Secretary did not grant or deny certification within 12 months of the expiration of its current period of participation. At the time, we believed this regulation would encourage prompt processing of applications, timely feedback to institutions, proper oversight of institutions, and speedier remedies of deficiencies. However, HEA section 498 does not specify a time period in which certification applications need to be approved, and we have since

determined that the time constraint established in the final rule for Distance Education and Innovation negatively impacted our ability to protect program integrity. Furthermore, a premature decision to grant or deny an application when unresolved issues remain under review creates substantial negative consequences for students, institutions, taxpayers, and the Department. Accordingly, we propose to eliminate the provision that automatically grants an institution renewal of certification after 12 months without a decision from the Department. Eliminating this provision would allow us to take additional time to investigate institutions thoroughly prior to deciding whether to grant or deny a certification application and ensure institutions are approved only when we have determined that they are in compliance with Federal rules.

Our proposed changes to the certification process would better address conditions that create significant risk for students and taxpayers, such as institutions that falsely certify students' eligibility to receive a loan and subsequently close. Students expect their programs to be properly certified and for their institutions to continue operating through the completion of their programs and beyond. In fact, the value of an educational degree is heavily determined by the reputation of the issuer, thus when institutions mislead students about their certification status, students may invest their money and time in a program that they will not be able to complete, which ultimately creates financial risk for students and taxpayers.

Our proposed changes would also address institutions undergoing changes in ownership while being at risk of closure. We propose to add new events that would require institutions to be provisionally certified and add several conditions to provisional PPAs to increase oversight to better protect students. For example, we propose that institutions that we determine to be at risk of closure must submit an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency. This would ensure that the institution has an acceptable plan in place that allows students to continue their education in the event the institution closes.

We also propose that, as part of the institution's PPA, the institution must demonstrate that a program that prepares a student for gainful employment in a recognized occupation and requires programmatic accreditation

or State licensure, meets the institution's home State or another qualifying State's programmatic and licensure requirements. Another State's requirements could only be used if the institution can document that a majority of students resided in that other State while enrolled in the program during the most recently completed award year or if a majority of students who completed the program in the most recently completed award year were employed in that State. In addition, if the other State is part of the same metropolitan statistical area [41] as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State, then that other State's programmatic and licensure requirements could also be used to demonstrate that the program prepares a student for gainful employment in a recognized occupation. For any programmatic and licensure requirements that come from a State other than the home State, the institution must provide documentation of that State meeting one of three aforementioned qualifying requirements and the documentation provided must be substantiated by the certified public accountant who prepares the institution's compliance audit report as required under § 668.23. In addition, we propose to require that institutions inform students about the States where programs do and do not meet programmatic and licensure requirements. The Department is proposing these regulations because we believe students deserve to have relevant information to make an informed decision about programs they are considering. We also believe programs funded in part by taxpayer dollars should meet the requirements for the occupation for which they prepare students as a safeguard of the financial investment in these programs.

Additionally, as discussed in the 2022 final rule on changes in ownership,[42] the Department has seen an increase in the number of institutions applying for changes in ownership and has determined that it is necessary to reevaluate the relevant policies to accommodate the increased complexity of changes in ownership arrangements and increased risk to students and to taxpayers that arises when institutions

---

[40] 85 FR 54742

[41] *Metropolitan statistical area* as defined by the U.S. Office of Management and Budget (OMB), *www.census.gov/programs-surveys/metro-micro.html.*

[42] 87 FR 65426.

do not provide adequate information to the Department. For example, approving a new owner who does not have the financial and other necessary resources to successfully operate the institution jeopardizes the education of students and increases the likelihood of closure. Consequently, we propose a more rigorous process for certifying institutions to help address this issue. Namely, we propose to mitigate the risk of institutions failing to meet Federal requirements and creating risky financial situations for students and taxpayers by applying preemptive conditions for initially certified nonprofit institutions and institutions that have undergone a change of ownership and seek to convert to nonprofit status. These preemptive conditions would help us monitor risks associated with some for-profit college conversions, such as the risk of improper benefit to the school owners and affiliated persons and entities. Examples of such benefits include having additional time to submit annual compliance audit and financial statements and avoiding the 90/10 requirements that for-profit colleges must comply with. Under these proposed regulations, we would monitor and review the institution's IRS correspondence and audited financial statements for improper benefit from the conversion to nonprofit status.

Lastly, we recognize that private entities may exercise control over proprietary and private, nonprofit institutions, and we propose to increase coverage of an institution's liabilities by holding these entities to the same standards and liabilities as the institution. For instance, owners of private, nonprofit universities and teaching hospitals may greatly influence the institution's operations and should be held liable for losses incurred by the institution.

*Ability To Benefit (§§ 668.2, 668.32, 668.156, and 668.157)*

Prior to 1991, students without a high school diploma or its equivalent were not eligible for title IV, HEA aid. In 1991, section 484(d) of the HEA was amended to allow students without a high school diploma or its recognized equivalent to become eligible for title IV, HEA aid if they could pass an independently administered examination approved by the Secretary (Pub. L. 102–26) (1991 amendments). These examinations were commonly referred to as "ability to benefit tests" or "ATB tests."

In 1992, Public Law 102–325 amended section 484(d) to provide students without a high school diploma

or its recognized equivalent an additional alternative pathway to title IV, HEA aid eligibility through a State-defined process (1992 amendments). The State could prescribe a process by which a student who did not have a high school diploma or its recognized equivalent could establish eligibility for title IV, HEA aid. The Department required States to apply to the Secretary for approval of such processes. Unless the Secretary disapproved a State's proposed process within six months after the submission to the Secretary for approval, the process was deemed to be approved. In determining whether to approve such a process, the HEA requires the Secretary to consider its effectiveness in enabling students without a high school diploma or its equivalent to benefit from the instruction offered by institutions utilizing the process. The Secretary must also consider the cultural diversity, economic circumstances, and educational preparation of the populations served by such institutions.

In 1995, the Department published final regulations[43] to implement the changes made to section 484(d). Under the final rule, in § 668.156, the Department would approve State processes if (1) the institutions participating in the State process provided services to students, including counseling and tutoring, (2) the State monitored participating institutions, which included requiring corrective action for deficient institutions and termination for refusal to comply, and (3) the success rate of students admitted under the State process was within 95 percent of the success rates of high school graduates who were enrolled in the same educational programs at the institutions that participated in the State process.

In 2008, Public Law 110–315 (2008 amendments) further amended section 484(d) of the HEA to allow students without a high school diploma or its recognized equivalent a third alternative pathway to title IV, HEA aid eligibility: satisfactory completion of six credit hours or the equivalent coursework that are applicable toward a degree or certificate offered by the institution of higher education.

In 2011, the Consolidated Appropriations Act of 2012 (Pub. L. 112–74) (2011 amendments) further amended section 484(d) by repealing the ATB alternatives created by the 1991, 1992, and 2008 amendments. Notably, Congress stipulated that the amendment only applied "to students who first

enroll in a program of study on or after July 1, 2012."

In 2014, Public Law 113–235 amended section 484(d) (2014 amendments) to create three ATB alternatives, effectively restoring significant elements of the alternatives that were in the statute prior to the enactment of the 2011 amendments, using substantially identical text. However, the 2014 amendments made a significant change to the ATB processes in that they required students to be enrolled in eligible career pathway programs, in contrast to the pre-2011 statutory framework which permitted students to enroll in any eligible program.

In 2015, Public Law 114–113 amended the definition of an "eligible career pathway program" in section 484(d) to match the definition in Public Law 113–128, the Workforce Innovation and Opportunity Act (2015 amendments). Specifically, the 2015 amendments defined the term "eligible career pathway program" as a program that combines rigorous and high-quality education, training, and other services and that:

• Aligns with the skill needs of industries in the economy of the State or regional economy involved;

• Prepares an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 *et seq.*);

• Includes counseling to support an individual in achieving the individual's education and career goals;

• Includes, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

• Organizes education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

• Enables an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and

• Helps an individual enter or advance within a specific occupation or occupational cluster.

The Department proposes to amend §§ 668.2, 668.32, 668.156, and 668.157. These proposed changes would amend the requirements for approval of a State process and establish a regulatory

---

[43] 60 FR 61830.

definition of "eligible career pathway programs."

As discussed, fulfilling one of the three ATB alternatives grants a student without a high school diploma or its recognized equivalent access to title IV, HEA aid for enrollment in an eligible career pathway program. Although the Department released Dear Colleague Letters GEN 15–09 (May 15, 2015) [44] and GEN 16–09 (May 9, 2016) [45] explaining the statutory changes, the current ATB regulations do not reflect the 2014 amendments to the HEA that require a student to enroll in an eligible career pathway program in addition to fulfilling one of the ATB alternatives. We are now proposing to codify those changes in regulation.

*Specifically, we propose to:* (1) add a definition of "eligible career pathway program"; (2) make technical updates to student eligibility; (3) amend the State process to allow for time to collect outcomes data while establishing new safeguards against inadequate State processes; (4) establish documentation requirements for institutions that wish to begin or maintain title IV, HEA eligible career pathway programs; and (5) establish a verification process for career pathway programs to ensure regulatory compliance.

*Reliance Interests*

Given that the Department proposes to adopt rules that are significantly different from the current rules, we have considered whether those current rules, including the 2019 Prior Rule, engendered serious reliance interests that must be accounted for in this rulemaking. For a number of reasons, we do not believe that such reliance interests exist or, if they do exist, that they would justify changes to the proposed rules.

First of all, the Department's prior regulatory actions would not have encouraged reasonable reliance on any particular regulatory position. The 2019 Prior Rule was written to rescind the 2014 Prior Rule at a point where no gainful employment program had lost eligibility due to failing outcome measures. Furthermore, as various circumstances have changed, in law and otherwise, and as more information and further analyses have emerged, the Department's position and rules have

changed since the 2011 Prior Rule. With respect to the proposed regulations in this NPRM, the Department provided notice of its intent to regulate on December 8, 2021. As the proposed regulations would not be effective before July 1, 2024, we believe institutions will have had sufficient time to take any internal actions necessary to comply with the final regulations.

Even if relevant actors might have relied on some prior regulatory position despite this background, the extent of alleged reliance would have to be supported by some kind of evidence. The Department aims to ensure that any asserted reliance interests are real and demonstrable rather than theoretical and speculative. Furthermore, to affect decisions about the rules, reliance interests must be added to a broader analysis that accords with existing statutes. Legitimate and demonstrable reliance interests, to the extent they exist, should be considered as one factor among a number of counter-balancing considerations, within applicable law and consistent with sound policy. We do not view any plausible reliance interests as nearly strong enough to alter our proposals in this NPRM.

In any event, the Department welcomes public comment on whether there are serious, reasonable, legitimate, and demonstrable reliance interests that the Department should account for in the final rule.

*Public Participation*

The Department has significantly engaged the public in developing this NPRM, including through review of oral and written comments submitted by the public during five public hearings. During each negotiated rulemaking session, we provided opportunities for public comment at the end of each day. Additionally, during each negotiated rulemaking session, non-Federal negotiators obtained feedback from their stakeholders that they shared with the negotiating committee.

On May 26, 2021, the Department published a notice in the ≤**Federal Register** (86 FR 28299) announcing our intent to establish multiple negotiated rulemaking committees to prepare proposed regulations on the affordability of postsecondary education, institutional accountability, and Federal student loans.

The Department proposed regulatory provisions for the Institutional and Programmatic Eligibility Committee (Committee) based on advice and recommendations submitted by individuals and organizations in testimony at three virtual public

hearings held by the Department on June 21 and June 23–24, 2021.

The Department also accepted written comments on possible regulatory provisions that were submitted to the Department by interested parties and organizations as part of the public hearing process. You may view the written comments submitted in response to the May 26, 2021, and the October 4, 2021, ≤**Federal Register** notices on the Federal eRulemaking Portal at *www.regulations.gov*, within docket ID ED–2021–OPE–0077. Instructions for finding comments are also available on the site under "FAQ."

You may view transcripts of the public hearings at *www2.ed.gov/policy/higher/reg/hearulemaking/2021/index.html*.

*Negotiated Rulemaking*

Section 492 of the HEA requires the Secretary to obtain public involvement in the development of proposed regulations affecting programs authorized by title IV of the HEA. After obtaining extensive input and recommendations from the public, including individuals and representatives of groups involved in the title IV, HEA programs, the Department, in most cases, must engage in the negotiated rulemaking process before publishing proposed regulations in the ≤**Federal Register**. If negotiators reach consensus on the proposed regulations, the Department agrees to publish without substantive alteration a defined group of proposed regulations on which the negotiators reached consensus—unless the Secretary reopens the process or provides a written explanation to the participants stating why the Secretary has decided to depart from the agreement reached during negotiations. You can find further information on the negotiated rulemaking process at: *www2.ed.gov/policy/higher/reg/hearulemaking/2021/index.html*.

On December 8, 2021, the Department published a notice in the ≤**Federal Register** (86 FR 69607) announcing its intention to establish a Committee, the Institutional and Programmatic Eligibility Committee, to prepare proposed regulations for the title IV, HEA programs. The notice set forth a schedule for Committee meetings and requested nominations for individual negotiators to serve on the negotiating Committee and announced the topics that Committee would address.

The Committee included the following members, representing their respective constituencies:

• *Accrediting Agencies:* Jamienne S. Studley, WASC Senior College and

---

[44] *fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2015-05-22/gen-15-09-subject-title-iv-eligibility-students-without-valid-high-school-diploma-who-are-enrolled-eligible-career-pathway-programs.*

[45] *fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2016-05-09/gen-16-09-subject-changes-title-iv-eligibility-students-without-valid-high-school-diploma-who-are-enrolled-eligible-career-pathway-programs.*

University Commission, and Laura Rasar King (alternate), Council on Education for Public Health.

• *Civil Rights Organizations:* Amanda Martinez, UnidosUS.

• *Consumer Advocacy Organizations:* Carolyn Fast, The Century Foundation, and Jaylon Herbin (alternate), Center for Responsible Lending.

• *Financial Aid Administrators at Postsecondary Institutions:* Samantha Veeder, University of Rochester, and David Peterson (alternate), University of Cincinnati.

• *Four-Year Public Institutions of Higher Education:* Marvin Smith, University of California, Los Angeles, and Deborah Stanley (alternate), Bowie State University.

• *Legal Assistance Organizations that Represent Students and/or Borrowers:* Johnson Tyler, Brooklyn Legal Services, and Jessica Ranucci (alternate), New York Legal Assistance Group.

• *Minority-Serving Institutions:* Beverly Hogan, Tougaloo College (retired), and Ashley Schofield (alternate), Claflin University.

• *Private, Nonprofit Institutions of Higher Education:* Kelli Perry, Rensselaer Polytechnic Institute, and Emmanual A. Guillory (alternate), National Association of Independent Colleges and Universities (NAICU).

• *Proprietary Institutions of Higher Education:* Bradley Adams, South College, and Michael Lanouette (alternate), Aviation Institute of Maintenance/Centura College/Tidewater Tech.

• *State Attorneys General:* Adam Welle, Minnesota Attorney General's Office, and Yael Shavit (alternate), Office of the Massachusetts Attorney General.

• *State Higher Education Executive Officers, State Authorizing Agencies, and/or State Regulators of Institutions of Higher Education and/or Loan Servicers:* Debbie Cochrane, California Bureau of Private Postsecondary Education, and David Socolow (alternate), New Jersey's Higher Education Student Assistance Authority (HESAA).

• *Students and Student Loan Borrowers:* Ernest Ezeugo, Young Invincibles, and Carney King (alternate), California State Senate.

• *Two-Year Public Institutions of Higher Education:* Anne Kress, Northern Virginia Community College, and William S. Durden (alternate), Washington State Board for Community and Technical Colleges.

• *U.S. Military Service Members, Veterans, or Groups Representing them:* Travis Horr, Iraq and Afghanistan Veterans of America, and Barmak

Nassirian (alternate), Veterans Education Success.

• *Federal Negotiator:* Gregory Martin, U.S. Department of Education.

The Department also invited nominations for two advisors. These advisors were not voting members of the Committee; however, they were consulted and served as a resource. The advisors were:

• David McClintock, McClintock & Associates, P.C. for issues with auditing institutions that participate in the title IV, HEA programs.

• Adam Looney, David Eccles School of Business at the University of Utah, for issues related to economics, as well as research, accountability, and/or analysis of higher education data.

The Committee met for three rounds of negotiations, the first of which was held over four days, while the remaining two were five days each. At its first meeting, the Committee reached agreement on its protocols and proposed agenda. The protocols provided, among other things, that the Committee would operate by consensus. The protocols defined consensus as no dissent by any member of the Committee and noted that consensus checks would be taken issue by issue. During its first week of sessions, the legal aid negotiator petitioned the Committee to add a Committee member representing the civil rights constituency to distinguish that constituency from the legal aid constituency. The Committee subsequently reached consensus on adding a member from the constituency group, Civil Rights Organizations.

The Committee reviewed and discussed the Department's drafts of regulatory language, as well as alternative language and suggestions proposed by Committee members. During each negotiated rulemaking session, we provided opportunities for public comment at the end of each day. Additionally, during each negotiated rulemaking session, non-Federal negotiators obtained feedback from their stakeholders that they shared with the negotiating committee.

At the final meeting on March 18, 2022, the Committee reached consensus on the Department's proposed regulations on ATB. The Department has published the proposed ATB amendatory language without substantive alteration to the agreed-upon proposed regulations.

For more information on the negotiated rulemaking sessions please visit *www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.*

**Summary of Proposed Changes**

The proposed regulations would make the following changes to current regulations.

*Financial Value Transparency and Gainful Employment (§§ 600.10, 600.21, 668.2, 668.43, 668.91, 668.401 Through 668.409, 668.601 Through 668.606) (Sections 101 and 102 of the HEA)*

• Amend § 600.10(c) to require an institution seeking to establish the eligibility of a GE program to add the program to its application.

• Amend § 600.21(a) to require an institution to notify the Secretary within 10 days of any change to the information included in the GE program's certification.

• Amend § 668.2 to define certain terminology used in subparts Q and S, including "annual debt-to-earnings rate," "classification of instructional programs (CIP) code," "cohort period," "credential level," "debt-to-earnings rates (D/E rates)," "discretionary debt-to-earnings rates," "earnings premium," "earnings threshold," "eligible non-GE program," "Federal agency with earnings data," "gainful employment program (GE program)," "institutional grants and scholarships," "length of the program," "poverty guideline," "prospective student," "student," and "Title IV loan."

• Amend § 668.43 to establish a Department website for the posting and distribution of key information and disclosures pertaining to the institution's educational programs, and to require institutions to provide the information required to access the website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution.

• Amend § 668.91(a) to require that a hearing official must terminate the eligibility of a GE program that fails to meet the GE metrics, unless the hearing official concludes that the Secretary erred in the calculation.

• Add a new § 668.401 to provide the scope and purpose of newly established financial value transparency regulations under subpart Q.

• Add a new § 668.402 to provide a framework for the Secretary to determine whether a GE program or eligible non-GE program leads to acceptable debt and earnings results, including establishing annual and discretionary D/E rate metrics and associated outcomes, and establishing an earnings premium metric and associated outcomes.

• Add a new § 668.403 to establish a methodology to calculate annual and

discretionary D/E rates, including parameters to determine annual loan payments, annual earnings, loan debt, and assessed charges, as well as to provide exclusions and specify when D/E rates will not be calculated.

• Add a new § 668.404 to establish a methodology to calculate a program's earnings premium measure, including parameters to determine median annual earnings, as well as to provide exclusions and specify when the earnings threshold measure will not be calculated.

• Add a new § 668.405 to establish a process by which the Secretary will obtain the administrative and earnings data required to calculate the D/E rates and the earnings premium measure.

• Add a new § 668.406 to require the Secretary to notify institutions of their financial value transparency metrics and outcomes.

• Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the disclosure website maintained by the Secretary if an eligible non-GE program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may disburse any title IV, HEA funds.

• Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to establish the timeframe for institutions to report this information.

• Add a new § 668.409 to establish severability protections ensuring that if any financial value transparency provision under subpart Q is held invalid, the remaining provisions continue to apply.

• Add a new § 668.601 to provide the scope and purpose of newly established GE regulations under subpart S.

• Add a new § 668.602 to establish criteria for the Secretary to determine whether a GE program prepares students for gainful employment in a recognized occupation.

• Add a new § 668.603 to define the conditions under which a failing GE program would lose title IV, HEA eligibility, to provide the opportunity for an institution to appeal a loss of eligibility only on the basis of a miscalculated D/E rate or earnings premium, and to establish a period of ineligibility for failing GE programs that lose eligibility or voluntarily discontinue eligibility.

• Add a new § 668.604 to require institutions to provide the Department

with transitional certifications, as well as to certify when seeking recertification or the approval of a new or modified GE program, that each eligible GE program offered by the institution is included in the institution's recognized accreditation or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency.

• Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery requirements for such notifications, and to provide that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

• Add a new § 668.606 to establish severability protections ensuring that if any GE provision under subpart S is held invalid, the remaining provisions would continue to apply.

*Financial Responsibility (§§ 668.15, 668.23, 668.171, and 668.174 Through 668.177) (Section 498(c) of the HEA)*

• Remove all regulations currently under § 668.15 and reserve that section.

• Amend § 668.23 to establish a new submission deadline for compliance audits and audited financial statements not subject to the Single Audit Act, Chapter 75 of title 31, United States Code, to be the earlier of 30 days after the date of the auditor's report, with respect to the compliance audit and audited financial statements, or 6 months after the last day of the entity's fiscal year.

• Replace all references to the "Office of Management and Budget Circular A–133" in § 668.23 with the updated reference, "2 CFR part 200—Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards."

• Amend § 668.23(d)(1) to require that financial statements submitted to the Department must match the fiscal year end of the entity's annual return(s) filed with the Internal Revenue Service.

• Add new language to § 668.23(d)(2)(ii) that would require a domestic or foreign institution that is owned directly or indirectly by any foreign entity to provide documentation stating its status under the law of the jurisdiction under which it is organized.

• Add new § 668.23(d)(5) that would require an institution to disclose in a footnote to its financial statement audit the dollar amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures.

• Amend § 668.171(b)(3)(i) so that an institution would be deemed unable to

meet its financial or administrative obligations if, in addition to the already existing factors, it fails to pay title IV, HEA credit balances, as required.

• Further amend § 668.171(b)(3) to establish that an institution would not be able to meet its financial or administrative obligations if it fails to make a payment in accordance with an existing undisputed financial obligation for more than 90 days; or fails to satisfy payroll obligations in accordance with its published schedule; or it borrows funds from retirement plans or restricted funds without authorization.

• Amend § 668.171(c) to establish additional mandatory triggering events that would determine if an institution is able to meet its financial or administrative obligations. If any of the mandatory trigger events occur, the institution would be deemed unable to meet its financial or administrative obligations and the Department would obtain financial protection.

• Amend § 668.171(d) to establish additional discretionary triggering events that would assist the Department in determining if an institution is able to meet its financial or administrative obligations. If any of the discretionary triggering events occur, we would determine if the event is likely to have a material adverse effect on the financial condition of the institution, and if so, would obtain financial protection.

• Amend § 668.171(e) to recognize the liability or liabilities as an expense when recalculating an institution's composite score after a withdrawal of equity.

• Amend § 668.171(f) to require an institution to notify the Department, typically no later than 10 days, after any of the following occurs:

■ The institution incurs a liability as described in proposed § 668.171(c)(2)(i)(A);

■ The institution is served with a complaint linked to a lawsuit as described in § 668.171(c)(2)(i)(B) and an updated notice when such a lawsuit has been pending for at least 120 days;

■ The institution receives a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity;

■ As described in proposed § 668.171(c)(2)(x), the institution makes a contribution in the last quarter of its fiscal year and makes a distribution in the first or second quarter of the following fiscal year;

■ As described in proposed § 668.171(c)(2)(vi) or (d)(11), the U.S Securities and Exchange Commission (SEC) or an exchange where the entity's

securities are listed takes certain disciplinary actions against the entity;

■ As described in proposed §668.171(c)(2)(iv), (c)(2)(v), or (d)(9), the institution's accrediting agency or a State, Federal or other oversight agency notifies it of certain actions being initiated or certain requirements being imposed;

■ As described in proposed §668.171(c)(2)(xi), there are actions initiated by a creditor of the institution;

■ A proprietary institution, for its most recent fiscal year, does not receive at least 10 percent of its revenue from sources other than Federal educational assistance programs as provided in §668.28(c)(3) (This notification deadline would be 45 days after the end of the institution's fiscal year);

■ As described in proposed §668.171(c)(2)(ix) or (d)(10), the institution or one of its programs loses eligibility for another Federal educational assistance program;

■ As described in proposed §668.171(d)(7), the institution discontinues an academic program;

■ The institution fails to meet any one of the standards in §668.171(b);

■ As described in proposed §668.171(c)(2)(xii), the institution makes a declaration of financial exigency to a Federal, State, Tribal, or foreign governmental agency or its accrediting agency;

■ As described in proposed §668.171(c)(2)(xiii), the institution or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management of policies of the institution, is voluntarily placed, or is required to be placed, into receivership;

■ The institution is cited by another Federal agency for not complying with requirements associated with that agency's educational assistance programs and which could result in the institution's loss of those Federal education assistance funds;

■ The institution closes more than 50 percent of its locations or any number of locations that enroll more than 25 percent of its students. Locations for this purpose include the institution's main campus and any additional location(s) or branch campus(es) as described in §600.2;

■ As described in proposed §668.171(d)(2), the institution suffers other defaults, delinquencies, or creditor events;

■ Amend §668.171(g) to require public institutions to provide documentation from a government entity that confirms that the institution is a public institution and is backed by the full faith and credit of that government entity to be considered as financially responsible.

• Amend §668.171(h) to provide that an institution is not financially responsible if the institution's audited financial statements include an opinion expressed by the auditor that was adverse, qualified, disclaimed, or if they include a disclosure about the institution's diminished liquidity, ability to continue operations, or ability to continue as a going concern.

• Amend §668.174(a) to clarify that an institution would not be financially responsible if it has had an audit finding in either of its two most recent compliance audits that resulted in the institution being required to repay an amount greater than 5 percent of the funds the institution received under the title IV, HEA programs or if we require it to repay an amount greater than 5 percent of its title IV, HEA program funds in a Department-issued Final Audit Determination Letter, Final Program Review Determination, or similar final document in the institution's current fiscal year or either of its preceding two fiscal years.

• Add §668.174(b)(3) to state that an institution is not financially responsible if an owner who exercises substantial control, or the owner's spouse, has been in default on a Federal student loan, including parent PLUS loans, in the preceding five years unless certain conditions are met when the institution first applies to participate in Title IV, HEA programs, or when the institution undergoes a change in ownership.

• Amend §668.175(c) to clarify that we would consider an institution that did not otherwise satisfy the regulatory standards of financial responsibility, or that had an audit opinion or disclosure about the institution's liquidity, ability to continue operations, or ability to continue as a going concern, to be financially responsible if it submits an irrevocable letter of credit to the Department in an amount we determine. Furthermore, the proposed regulation would clarify that if the institution's failure is due to any of the factors in §668.171(b), it must remedy the issues that gave rise to the failure.

• Add §668.176 to specify the financial responsibility standards for an institution undergoing a change in ownership. The proposed regulations would consolidate financial responsibility requirements in subpart L of part 668 and remove the requirements that currently reside in §668.15.

• Add a new §668.177 to contain the severability statement that currently resides in §668.176.

*Administrative Capability (§ 668.16) (Section 498(a) of the HEA)*

• Amend §668.16(h) to require institutions to provide adequate financial aid counseling and financial aid communications to enrolled students that advises students and families to accept the most beneficial types of financial assistance available to them and includes clear information about the cost of attendance, sources and amounts of each type of aid separated by the type of aid, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts.

• Amend §668.16(k) to require that an institution not have any principal or affiliate that has been subject to specified negative actions, including being convicted of or pleading nolo contendere or guilty to a crime involving governmental funds.

• Add §668.16(n) to require that the institution has not been subject to a significant negative action or a finding by a State or Federal agency, a court or an accrediting agency, where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive; and the institution has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

• Amend §668.16(p) to strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma.

• Add §668.16(q) to require that institutions provide adequate career services to eligible students who receive title IV, HEA program assistance.

• Add §668.16(r) to require that an institution provide students with accessible clinical, or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation, within 45 days of the successful completion of other required coursework.

• Add §668.16(s) to require that an institution disburse funds to students in a timely manner consistent with the students' needs.

• Add §668.16(t) to require institutions that offer GE programs to meet program standards as outlined in regulation.

• Add §668.16(u) to require that an institution does not engage in misrepresentations or aggressive recruitment.

*Certification Procedures (§§ 668.2, 668.13, and 668.14) (Section 498 of the HEA)*

• Amend § 668.2 to add a definition of ''metropolitan statistical area.''

• Amend § 668.13(b)(3) to eliminate the provision that requires the Department to approve participation for an institution if it has not acted on a certification application within 12 months so the Department can take additional time where it is needed.

• Amend § 668.13(c)(1) to include additional events that lead to provisional certification.

• Amend § 668.13(c)(2) to require provisionally certified schools that have major consumer protection issues to recertify after two years.

• Add a new § 668.13(e) to establish supplementary performance measures the Secretary may consider in determining whether to certify or condition the participation of the institution.

• Amend § 668.14(a)(3) to require an authorized representative of any entity with direct or indirect ownership of a proprietary or private nonprofit institution to sign a PPA.

• Amend § 668.14(b)(17) to provide that all Federal agencies and State attorneys general have the authority to share with each other and the Department any information pertaining to an institution's eligibility for participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law.

• Amend § 668.14(b)(18)(i) and (ii) to add to the list of reasons for which an institution or third-party servicer may not employ, or contract with, individuals or entities whose prior conduct calls into question the ability of the individual or entity to adhere to a fiduciary standard of conduct. We also propose to prohibit owners, officers, and employees of both institutions and third-party servicers from participating in the title IV, HEA programs if they have exercised substantial control over an institution, or a direct or indirect parent entity of an institution, that owes a liability for a violation of a title IV, HEA program requirement and is not making payments in accordance with an agreement to repay that liability.

• Amend § 668.14(b)(18)(i) and (ii) to add to the list of situations in which an institution may not knowingly contract with or employ any individual, agency, or organization that has been, or whose officers or employees have been, ten-percent-or-higher equity owners, directors, officers, principals, executives, or contractors at an institution in any year in which the

institution incurred a loss of Federal funds in excess of 5 percent of the institution's annual title IV, HEA program funds.

• Amend § 668.14(b)(26)(ii)(A) to limit the number of hours in a gainful employment program to the greater of the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency.

• Amend § 668.14(b)(26)(ii)(B) as an exception to paragraph (A) that limits the number of hours in a gainful employment program to the greater of the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by another State if: the institution provides documentation, substantiated by the certified public accountant that prepares the institution's compliance audit report as required under § 668.23, that a majority of students resided in that other State while enrolled in the program during the most recently completed award year or that a majority of students who completed the program in the most recently completed award year were employed in that State; or if the other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State.

• Amend § 668.14(b)(32) to require all programs that prepare students for occupations requiring programmatic accreditation or State licensure to meet those requirements and comply with all State consumer protection laws.

• Amend § 668.14(b)(33) to require institutions to not withhold transcripts or take any other negative action against a student related to a balance owed by the student that resulted from an error in the institution's administration of the title IV, HEA programs, returns of funds under the Return of Title IV Funds process, or any fraud or misconduct by the institution or its personnel.

• Amend § 668.14(b)(34) to prohibit institutions from maintaining policies and procedures to encourage, or conditioning institutional aid or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including

Federal loan funds, that the student receives, except that the institution may provide a scholarship on the condition that a student forego borrowing if the amount of the scholarship provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow.

• Amend § 668.14(e) to establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions.

• Amend § 668.14(f) to establish conditions that may apply to institutions that undergo a change in ownership seeking to convert from a for-profit institution to a nonprofit institution.

• Amend § 668.14(g) to establish conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status.

*ATB (§§ 668.2, 668.32, 668.156, and 668.157 (Section 484(d) of the HEA)*

• Amend § 668.2 to codify a definition of ''eligible career pathway program.''

• Amend § 668.32(e) to differentiate between the title IV, HEA aid eligibility of non-high school graduates who enrolled in an eligible program prior to July 1, 2012, and those that enrolled after July 1, 2012.

• Amend § 668.156(b) to separate the State process into an initial two-year period and a subsequent period for which the State may be approved for up to five years.

• Amend § 668.156(a) to strengthen the Approved State process regulations to require that: (1) The application contains a certification that each eligible career pathway program intended for use through the State process meets the proposed definition of an ''eligible career pathway program''; (2) The application describes the criteria used to determine student eligibility for participation in the State process; (3) The withdrawal rate for a postsecondary institution listed for the first time on a State's application does not exceed 33 percent; (4) Upon initial application the Secretary will verify that a sample of the proposed eligible career pathway programs are valid; and (5) Upon initial application the State will enroll no more than the greater of 25 students or one percent of enrollment at each participating institution.

• Remove current § 668.156(c) to remove the support services requirements from the State process—orientation, assessment of a student's existing capabilities, tutoring, assistance in developing educational goals,

counseling, and follow up by teachers and counselors—as these support services generally duplicate the requirements in the proposed definition of ''eligible career pathway programs.''

• Amend the monitoring requirement in current § 668.156(d), now redesignated proposed § 668.156(c) to provide a participating institution that has failed to achieve the 85 percent success rate up to three years to achieve compliance.

• Amend current § 668.156(d), now redesignated proposed § 668.156(c) to require that an institution be prohibited from participating in the State process for title IV, HEA purposes for at least five years if the State terminates its participation.

• Amend current § 668.156(b), now redesignated proposed § 668.156(e) to clarify that the State is not subject to the success rate requirement at the time of the initial application but is subject to the requirement for the subsequent period, reduce the required success rate from the current 95 percent to 85 percent, and specify that the success rate be calculated for each participating institution. Also, amend the comparison groups to include the concept of ''eligible career pathway programs.''

• Amend current § 668.156(b), now redesignated proposed § 668.156(e) to require that States report information on race, gender, age, economic circumstances, and education attainment and permit the Secretary to publish a notice in the **Federal Register** with additional information that the Department may require States to submit.

• Amend current § 668.156(g), now redesignated proposed § 668.156(j) to update the Secretary's ability to revise or terminate a State's participation in the State process by (1) providing the Secretary the ability to approve the State process once for a two-year period if the State is not in compliance with a provision of the regulations and (2) allowing the Secretary to lower the success rate to 75 percent if 50 percent of the participating institutions across the State do not meet the 85 percent success rate.

• Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs.

## Significant Proposed Regulations

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

## Financial Value Transparency and Gainful Employment

*Authority for This Regulatory Action:* The Department's authority to pursue financial value transparency in GE programs and eligible non-GE programs and accountability in GE programs is derived primarily from three categories of statutory enactments: first, the Secretary's generally applicable rulemaking authority, which includes provisions regarding data collection and dissemination, and which applies in part to title IV, HEA; second, authorizations and directives within title IV, HEA regarding the collection and dissemination of potentially useful information about higher education programs, as well as provisions regarding institutional eligibility to benefit from title IV; and third, the further provisions within title IV, HEA that address the limits and responsibilities of gainful employment programs.

As for crosscutting rulemaking authority, Section 410 of the General Education Provisions Act (GEPA) grants the Secretary authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.[46] This authority includes the power to promulgate regulations relating to programs that we administer, such as the title IV, HEA programs that provide Federal loans, grants, and other aid to students, whether to pursue eligible non-GE programs or GE programs. Moreover, section 414 of the Department of Education Organization Act (DEOA) authorizes the Secretary to prescribe those rules and regulations that the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.[47]

Moreover, Section 431 of GEPA grants the Secretary additional authority to establish rules to require institutions to make data available to the public about the performance of their programs and about students enrolled in those programs. That section directs the Secretary to collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving their intended purposes, and also to inform the public about Federally supported education programs.[48] This provision

lends additional support for the proposed reporting and disclosure requirements, which will enable the Department to collect data and information for the purpose of developing objective measures of program performance, not only for the Department's use in evaluating programs but also to inform the public—including enrolled students, prospective students, their families, institutions, and others—about relevant information related to those Federally-supported programs.

As for provisions within title IV, HEA, several of them address the effective delivery of information about higher education programs. In addition to older methods of information dissemination, for example, section 131 of the Higher Education Opportunity Act, as amended, and [49] taken together, several provisions declare that the Department's websites should include information regarding higher education programs, including college planning and student financial aid,[50] the cost of higher education in general, and the cost of attendance with respect to all institutions of higher education participating in title IV, HEA programs.[51] Those authorizations and directives expand on more traditional methods of delivering important information to students, prospective students, and others, including within or alongside application forms or promissory notes for which acknowledgments by signatories are typical and longstanding.[52] Educational institutions have been distributing information to students at the direction of the Department and in accord with the applicable statutes for decades.[53]

The proposed rules also are supported by the Department's statutory responsibilities to observe eligibility limits in the HEA. Section 498 of the HEA requires institutions to establish eligibility to provide title IV, HEA funds

[46] 20 U.S.C. 1221e–3.

[47] 20 U.S.C. 3474.

[48] 20 U.S.C. 1231a(2)–(3). The term ''applicable program'' means any program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law. 20 U.S.C. 1221(c)(1).

[49] 20 U.S.C. 1015(a)(3), (b), (c)(5), (e), (h). See also section 111 of the Higher Education Opportunity Act (20 U.S.C. 1015a), which authorizes the College Navigator website and successor websites.

[50] *E.g.,* 20 U.S.C. 1015(e).

[51] 20 U.S.C. 1015(a)(3), (b), (c)(5), (e), (h). See also section 111 of the Higher Education Opportunity Act (20 U.S.C. 1015a), which authorizes the College Navigator website and successor websites.

[52] *E.g.,* 20 U.S.C. 1082(m), regarding common application forms and promissory notes or master promissory notes.

[53] A compilation of the current and previous editions of the *Federal Student Aid Handbook,* which includes detailed discussion of consumer information and school reporting and notification requirements, is posted at *https://fsapartners.ed.gov/knowledge-center/fsa-handbook.*

to their students. Eligible institutions must also meet program eligibility requirements for students in those programs to receive title IV, HEA assistance.

One type of program for which certain types of institutions must establish program-level eligibility is "a program of training to prepare students for gainful employment in a recognized occupation." [54] [55] Section 481 of the HEA articulates this same requirement by defining, in part, an "eligible program" as a "program of training to prepare students for gainful employment in a recognized profession." [56] The HEA does not more specifically define "training to prepare," "gainful employment," "recognized occupation," or "recognized profession" for purposes of determining the eligibility of GE programs for participation in title IV, HEA. At the same time, the Secretary and the Department have a legal duty to interpret, implement, and apply those terms in order to observe the statutory eligibility limits in the HEA. In the section-by-section discussion below, we explain further the Department's interpretation of the GE statutory provisions and how those provisions should be implemented and applied.

The statutory eligibility limits for GE programs are one part of the foundation of authority for disclosures and/or warnings from institutions to prospective and enrolled GE students. In the GE setting, the Department has not only a statutory basis for pursuing the effective dissemination of information to students about a range of GE program attributes and performance metrics, [57] the Department also has authority to use certain metrics to determine that an institution's program is not eligible to benefit, as a GE program, from title IV, HEA assistance. When an institution's program is at risk of losing eligibility based on a given metric, there should be no real doubt that the Department may require the institution that operates the at-risk program to alert prospective and enrolled students that they may not be able to receive title IV, HEA assistance at the program in question. Without a direct communication from the

institution to prospective and enrolled students, the students themselves risk losing the ability to make educational decisions with the benefit of critically relevant information about programs, contrary to the text, purpose, and traditional understandings of the relevant statutes.

The above authorities collectively empower the Secretary to promulgate regulations to (1) Require institutions to report information about GE programs and eligible non-GE programs to the Secretary; (2) Require institutions to provide disclosures or warnings to students regarding programs that do not meet financial value measures established by the Department; and (3) Define the gainful employment requirement in the HEA by establishing measures to determine the eligibility of GE programs for participation in title IV, HEA. Where helpful and appropriate, we will elaborate on the relevant statutory authority in our overviews and section-by-section discussions below.

*Financial Value Transparency Scope and Purpose (§ 668.401)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add subpart Q, which would establish a financial value transparency framework for the Department to calculate measures of the financial value of eligible programs, categorize programs based on those measures as low-earning or high-debt-burden, provide information about the financial value of programs to students, and require, when applicable, acknowledgments from students who are enrolled—and prospective students who are seeking to enroll—in programs with high debt burdens. The proposed regulations would establish rules and procedures for institutions to report information to the Department and for the Department to calculate these measures. The regulations would apply to all educational programs that participate in the title IV, HEA programs except for approved prison education programs and comprehensive transition and postsecondary programs. Proposed § 668.401 would establish the scope and purpose of these financial value transparency regulations in subpart Q.

*Reasons:* The Department recognizes that with the high cost of attendance for postsecondary education and resulting need for high levels of student borrowing, students, families, institutions, and the public have a strong interest in ensuring that higher education investments are justified

through their benefits to students and society.

Choosing whether and where to pursue a postsecondary education is one of the most important and consequential investments individuals make during their lifetimes. The considerations are not purely, or in many cases even primarily, financial in nature: an education requires time away from other pursuits, the possibility of increased family stress, and the hard work required to master new knowledge. Aside from the potential for improved career prospects and higher earnings, a college education has also been shown to improve health, life satisfaction, and civic engagement among other non-financial benefits. [58]

The financial consequences of the choice of whether and where to enroll in higher education, however, are substantial. In the 2020–21 award year, the average cost of attendance for first-time, full-time degree seeking undergraduate student across all 4-year institutions was $27,200, and the top 25 percent of students paid more than $44,800. According to NCES data, median total debt at graduation among students who borrow for degrees was around $23,000 for undergraduates competing in 2017–18 [59] and $67,000 for graduate students, [60] with the top 25 percent of students leaving school with more than $33,000 [61] and $118,000, [62] respectively. There is significant heterogeneity in debt outcomes and costs across programs, even among credentials at the same level and in the same field.

The typical college graduate enjoys substantial financial benefits in the form of increased earnings from their degree. Research has shown that the typical bachelor's degree recipient earns twice what a typical high school graduate earns over the course of their career. [63] But here too, there are enormous

---

[54] 20 U.S.C. 1001(b)(1).

[55] 20 U.S.C. 1002(b)(1)(A)(i), (c)(1)(A).

[56] 20 U.S.C. 1088(b).

[57] *Ass'n of Priv. Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 198–200 (D.D.C. 2015) (recognizing statutory authority to require institutions to disclose certain information about GE programs to prospective and enrolled GE students), *aff'd,* 640 F. App'x 5, 6 (D.C. Cir. 2016) (per curiam) (unpublished) (indicating that the plaintiff's challenge to the GE disclosure provisions was abandoned on appeal).

[58] Oreopoulos, P. & Salavanes, K. (2011). Priceless: The Nonpecuniary Benefits of Schooling. Journal of Economic Perspectives. 25(1) 159–84. Marken, S. (2021). Ensuring a More Equitable Future: Exploring the Relationship Between Wellbeing and Postsecondary Value. Post Secondary Value Commission. Ross, C. & Wu, C. (1995). The Links Between Education and Health. American Sociological Review. 60(5) 719–745. Cutler, D. & Lleras-Muney, A. (2008). Education and Health: Evaluating Theories and Evidence. In Making Americans Healthier: Social and Economic Policy as Health Policy. House, J. et al (Eds). Russel Sage Foundation. New York.

[59] *nces.ed.gov/datalab/powerstats/table/ugaxgz.*

[60] *Nces.ed.gov/datalab/powerstats/table/uuaklv.*

[61] *nces.ed.gov/datalab/powerstats/table/ugaxgz.*

[62] *Nces.ed.gov/datalab/powerstats/table/uuaklv.*

[63] Hershbein, B., and Kearney, M. (2014). Major Decisions: What Graduates Earn Over Their Lifetimes. The Hamilton Project. Brookings Institution. Washington, DC.

earnings differences across different credential levels and fields of study, and across similar programs at different institutions.[64] For example, measures of institutional productivity (assessed using wage and salary earnings, employment in the public or nonprofit sector, and innovation in terms of contributions to research and development) vary substantially within institutions of similar selectivity, especially among less-selective institutions.[65] Typical returns to enrollment vary widely across selected fields, even after accounting for individual student characteristics that may affect selection into a given major or pre-enrollment earnings. These differences are large and consequential over an individual's lifetime. For example, one study found that even after controlling for differences in the characteristics of enrolled students, students at four-year institutions in Texas who majored in high-earning fields earned $5,000 or more per quarter more than students who majored in the lowest earning field of study even 16 to 20 years after college.[66] Similarly, another study found that those who earned master's degrees in Ohio experienced earnings increases ranging from a 24 percent increase for degrees in high earning fields such as health to essentially no increase, relative to baseline earnings, for some lower-value fields.[67]

Surveys of current and prospective college students indicate that overwhelming majorities of students consider the financial outcomes of college as among the very most important reasons for pursuing a postsecondary credential. A national survey of college freshmen at baccalaureate institutions consistently finds students identifying "to get a good job" as the most common reason why students chose their college.[68] Another

survey of a broader set of students found financial concerns dominate in the decision to go to college with the top three reasons identified being "to improve my employment opportunities," "to make more money," and "to get a good job."[69]

Great strides have been made in providing accurate and comparable information to students about their college options in the last decade. The College Scorecard, launched in 2015, provided information on the earnings and borrowing outcomes of students at nearly all institutions participating in the title IV, HEA aid programs. Recognizing the important variation in these outcomes across programs of study, even within the same institution, program-level information was added to the Scorecard in 2019. The dissemination of this information has dramatically improved the information available on the financial value of different programs, and enabled a new national conversation on whether, how, and for whom higher education institutions provide financial benefit.[70]

Still, the Department recognizes that merely posting the information on the College Scorecard website has had a limited impact on student choice. For example, one study[71] found the College Scorecard influenced the college search behavior of some higher income students but had little effect on lower income students. Similarly, a randomized controlled trial inviting high school students to examine program-level data on costs and earnings outcomes had little effect on students' college choices, possibly due to the fact that few students accessed the information outside of school-led sessions.[72]

It is critical to provide students and families access to information that is consistently calculated and presented across programs and institutions, especially for key metrics like program-level net price estimates. When institutions report net price to students, there can be substantial variation in how the prices are calculated,[73] and in how institutions characterize these values, making it difficult for prospective students to compare costs across programs and institutions.[74]

Applicants' use of data at key points during the college decision-making process has been a consistent challenge with other transparency-focused initiatives that the Department administers. Students can often receive information concerning their eligibility for financial aid that is inconsistent or difficult to compare.[75] The College Navigator also provides critical data on college pricing, completion rates, default rates, and other indicators, but there is little evidence that it affects college search processes or enrollment decisions. Similarly, we also administer lists of institutions with the highest prices and changes in price measured in a few ways, but there is no indication that the presence of such lists alters institutional or borrower behavior.[76]

A broader set of research has, however, illustrated that providing information on the financial value of college options can have meaningful impacts on college choices. The difference in effectiveness of information interventions has been studied extensively and informs our proposed approach to the financial transparency framework.[77] To affect

[64] Webber, D. (2016). Are college costs worth it? How ability, major, and debt affect the returns to schooling, Economics of Education Review, 53, 296–310.

[65] Hoxby, C.M. 2019. The Productivity of US Postsecondary Institutions. In Productivity in Higher Education, C. M. Hoxby and K. M. Stange(eds). University of Chicago Press: Chicago, 2019.

[66] Andrews, R.J., Imberman, S.A., Lovenheim, M.F. & Stange, K.M. (2022), "The returns to college major choice: Average and distributional effects, career trajectories, and earnings variability," NBER Working Paper w30331.

[67] Heterogeneity in Labor Market Returns to Master's Degrees: Evidence from Ohio. (EdWorkingPaper: 22–629). Retrieved from Annenberg Institute at Brown University: *doi.org/10.26300/akgd-9911*.

[68] Stolzenberg, E. B., Aragon, M.C., Romo, E., Couch, V., McLennan, D., Eagan, M.K., Kang, N. (2020). "The American Freshman: National Norms Fall 2019," Higher Education Research Institute at

UCLA, *www.heri.ucla.edu/monographs/TheAmericanFreshman2019.pdf*.

[69] Rachel Fishman (2015), "2015 College Decisions Survey: Part I Deciding To Go To College," New America, *static.newamerica.org/attachments/3248-deciding-to-go-to-college/CollegeDecisions PartI.148dcab30a0e414ea2a52f0d8fb04e7b.pdf*.

[70] For example, the work of the Postsecondary Value Commission (*postsecondaryvalue.org/*), the Hamilton Project (*www.hamiltonproject.org/papers/major_decisions_what_graduates_earn_over_their_lifetimes*),and Georgetown University's Center on Education and the Workforce (*https://cew.georgetown.edu/*).

[71] Hurwitz, Michael, and Jonathan Smith. "Student responsiveness to earnings data in the College Scorecard." Economic Inquiry 56, no. 2 (2018): 1220–1243. Also Huntington-Klein 2017. *nickchk.com/Huntington-Klein_2017_The_Search.pdf*.

[72] Blagg, Kristin, Matthew M. Chingos, Claire Graves, and Anna Nicotera. "Rethinking consumer information in higher education." (2017) Urban Institute, Washington DC. *www.urban.org/research/publication/rethinking-consumer-information-higher-education*.

[73] Anthony, A., Page, L. and Seldin, A. (2016) In the Right Ballpark? Assessing the Accuracy of Net Price Calculators. Journal of Student Financial Aid. 46(2). 3.

[74] The Institute for College Access & Success (TICAS). (2012). Adding it All Up 2012: Are College Net Price Calculators Easy to Find, Use, and Compare? *ticas.org/files/pub_files/Adding_It_All_Up_2012.pdf*.

[75] Burd, S. et al. (2018) Decoding the Cost of College: The Case for Transparent Financial Aid Award Letters. New America. Washington, DC. *https://www.newamerica.org/education-policy/policy-papers/decoding-cost-college/*. Anthony, A., Page, L., & Seldin, A. (2016) In the Right Ballpark? Assessing the Accuracy of Net Price Calculators. Journal of Student Financial Aid. 46(2) 3. *https://files.eric.ed.gov/fulltext/EJ1109171.pdf*.

[76] Baker, D. J. (2020). "Name and Shame": An Effective Strategy for College Tuition Accountability? Educational Evaluation and Policy Analysis, 42(3), 393–416. *doi.org/10.3102/0162373720937672*.

[77] Steffel, M., Kramer, D., McHugh, W., & Ducoff, N. (2020). Informational Disclosure and College Choice. Brookings. Washington, DC *www.brookings.edu/research/information-disclosure-and-college-choice/*; Robertson, B. & Stein, B. (2019). Consumer Information in Higher

Continued

college decision-making, information must be timely, personalized, and easy to understand.

The timing of when applicants receive information about institutions and programs is critical—data should be available at key points during the college search process and applicants should have sufficient time and resources to process new information. Informational interventions work best when they arrive at the right moment and are offered with additional guidance and support.[78] For example, unemployment insurance (UI) recipients who received letters informing them of Pell Grant availability and institutional support were 40 percent more likely to enroll in postsecondary education.[79] Families who received information about the FAFSA, as well as support in completing it while filing their taxes, were more likely to submit their aid applications, and students from these families were more likely to attend and persist in college.[80]

Informational interventions are most likely to sway choice when they are tailored to the applicant's personal context.[81] High school students who learn about their peers' admission experiences through an online college search platform tend to shift their college application and attendance choices.[82] Students who receive personalized outreach from colleges, particularly when outreach is paired with information about financial aid

eligibility, are more likely to apply to and enroll in those institutions.[83]

Interventions are most effective when the content is salient and easy to understand. Students, particularly those who are enrolling for the first time, may need additional context for understanding student debt amounts and the feasibility of repayment.[84] Evidence that students defer attention to their student debt while enrolled[85] suggests that inclusion of typical post-graduate earnings data may be likely to engage students.[86] Finally, it is important that these data are consistently presented from a trusted source across institutions and programs.[87]

In keeping with the idea of presenting salient and easy-to-understand information, we propose categorization of acceptable levels of performance on two measures of financial value. This approach ensures that students have clear indication of when attending a

program presents a significant risk of negative financial consequences. In particular, and reflecting the concerns noted above, we would categorize programs with low performance with the easy-to-understand labels of "high debt-burden" and "low earnings," based on the debt and earnings measures used in the framework.

Research shows that receiving information from a trusted source, in a manner that is easy to compare across different programs and institutions, and in a timely fashion is important for disclosures to be effective. Moreover, we believe that actively distributing information to prospective students before the prospective student signs an enrollment agreement, registers, or makes a financial commitment to the institution increases the likelihood that they will view and act upon the information, compared to information that students would have to seek out on their own. Accordingly, we propose to provide disclosures through a website that the Department would administer and use to deliver information directly to students. Additionally, to ensure that students see this information before receiving federal aid for programs with potentially harmful financial consequences, we propose requiring acknowledgment of receipt for high-debt-burden programs before federal aid is disbursed.

We also seek to improve the information available to students and propose several refinements relative to information available on the College Scorecard, including debt measures that are inclusive of private and institutional loans (including income sharing agreements or loans covered by tuition payment plans), as well as measures of institutional, State, and private grant aid. This information would enable the calculation of both the net price to students as well as total amounts paid from all sources. We believe these improvements would better capture the program's costs to students, families, and taxpayers.

To calculate these measures, we would require new reporting from institutions, discussed below under proposed § 668.408.

As noted above, we propose that this transparency framework apply to (nearly) all programs at all institutions. In particular, disclosures of this information would be available for all programs, subject to privacy limitations. This is a departure from the 2014 Prior Rule, which only required disclosures for GE programs. Since students consider both GE and non-GE programs when selecting programs, providing comparable information for students

Education. The Institute for College Access & Success (TICAS). *ticas.org/files/pub_files/ consumer_information_in_higher_education.pdf*; Morgan, J. & Dechter, G. (2012). Improving the College Scorecard. Using Student Feedback to Create an Effective Disclosure. Center For American Progress, Washington, DC.

[78] Carrel, S. & Sacerdote, B. (2017). Why Do College-Going Interventions Work? American Economic Journal; Applied Economics. 1(3) 124–151.

[79] Barr, A. & Turner, S. (2018). A Letter and Encouragement: Does Information Increase Postsecondary Enrollment of UI Recipients? American Economic Journal: Economic Policy 2018, 10(3): 42–68. *doi.org/10.1257/pol.20160570.*

[80] Eric P. Bettinger, Bridget Terry Long, Philip Oreopoulos, Lisa Sanbonmatsu, The Role of Application Assistance and Information in College Decisions: Results from the H&R Block Fafsa Experiment, The Quarterly Journal of Economics. 127(3) 1205–1242. *doi.org/10.1093/qje/qjs017.*

[81] Goldstein, D.G., Johnson, E.J., Herrmann, A., Heitmann, M. (2008). Nudge your customers toward better choices. Harvard Business Review, 86(12). 99–105.

Johnson, E.J., Shu, S.B., Benedict G.C. Dellaert, Fox, C., Goldstein, D.G., Häubl, G., Larrick, R.P., Payne, J.W., Peters, E., Schkade, D., Wansink, B., & Weber, E.U. (2012). Beyond nudges: Tools of a choice architecture. Marketing Letters, 23(2), 487–504.

[82] Mulhern, C. (2021). Changing College Choices with Personalized Admissions Information at Scale: Evidence on Naviance. Journal of Labor Economics. 39(1) 219–262.

[83] Dynarski, S., Libassi, C., Michelmore, K. & Owen, S. (2021). Closing the Gap: The Effect of Reducing Complexity and Uncertainty in College Pricing on the Choices of Low-Income Students. American Economic Review, 111 (6): 1721–56.; Gurantz, O., Hurwitz, M. and Smith, J. (2017). College Enrollment and Completion Among Nationally Recognized High-Achieving Hispanic Students. J. Pol. Anal. Manage., 36: 126–153. *doi.org/10.1002/pam.21962*; Howell, J., Hurwitz, M. & Smith, J., The Impact of College Outreach on High Schoolers' College Choices—Results From Over 1,000 Natural Experiments (November 2020). *ssrn.com/abstract=3463241.*

[84] Boatman, A., Evans, B.J., & Soliz, A. (2017). Understanding Loan Aversion in Education: Evidence from High School Seniors, Community College Students, and Adults. AERA Open, 3(1). *doi.org/10.1177/2332858416683649*; Evans, B., Boatman, A. & Soliz, A. (2019). "Framing and Labeling Effects in Preferences for Borrowing for College: An Experimental Analysis," Research in Higher Education, Springer; Association for Institutional Research, 60(4), 438–457.

[85] Darolia, R., & Harper, C. (2018). Information Use and Attention Deferment in College Student Loan Decisions: Evidence From a Debt Letter Experiment. Educational Evaluation and Policy Analysis, 40(1), 129–150. *doi.org/10.3102/0162373717734368.*

[86] Ruder, A. & Van Noy, M. (2017). Knowledge of earnings risk and major choice: Evidence from an information experiment, Economics of Education Review, 57, 80–90, *doi.org/10.1016/j.econedurev.2017.02.001.*; Baker, R., Bettinger, E., Jacob, B. & Marinescu, I. (2018). The Effect of Labor Market Information on Community College Students' Major Choice, Economics of Education Review, 65, 18–30, *doi.org/10.1016/j.econedurev.2018.05.005.*

[87] Previous informational interventions around net price, for example, were less consistent in the calculation of values, and in the presentation of net price calculation aids. Anthony, A., Page, L., & Seldin, A. (2016). In the Right Ballpark? Assessing the Accuracy of Net Price Calculators, Journal of Student Financial Aid. 46(2), 3. *publications.nasfaa.org/jsfa/vol46/iss2/3*;

The Institute For College Access & Success (TICAS). (2012) Adding it all up 2012: Are college net price calculators easy to find, use, and compare? *ticas.org/files/pub_files/Adding_It_All_Up_2012.pdf.*

would help them find the program that best meets their needs across any sector. In the proposed subpart S, we address the need for additional accountability measures for GE programs, including sanctions for programs determined to lead to high-debt-burden or low earnings outcomes under the metrics described in subpart Q of part 668.

### Financial Value Transparency Framework (§ 668.402)

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add new § 668.402 to establish a framework to measure two different aspects of the financial value of programs based on their debt and earnings outcomes, and to classify programs as "low-earning" or "high-debt-burden" for the purpose of providing informative disclosures to students.

#### D/E Rates

We would define a debt-to-earnings (D/E) metric to measure the debt burden faced by the typical graduate of a program by determining the share of their annual or discretionary income that would be required to make their student loan debt payments under fixed-term repayment plans. We categorize programs as "high debt-burden" if the typical graduate has a D/E rate that is above recognized standards for debt affordability.

In particular, a program would be classified as "high debt-burden" if its discretionary debt-to-earnings rate is greater than 20 percent and its annual debt-to-earnings rate is greater than 8 percent. If the denominator (median annual or discretionary earnings) of either rate is zero, then that rate is considered "high-debt-burden" only if the numerator (median debt payments) is positive.

If it is not possible to calculate or issue D/E rates for a program for an award year, the program would receive no D/E rates for that award year. The program would remain in the same status under the D/E rates measure as the previous award year.

### Earnings Premium (EP)

In addition, we would establish an earnings premium measure to assess the degree to which program graduates out-earn individuals who did not enroll in postsecondary education. The measure would be calculated as the difference in the typical earnings of a program graduate relative to the typical earnings of individuals in the State where the program is located who have only a high school or equivalent credential.

We would categorize programs as "low-earning" if the median annual earnings of the students who complete the program, measured three years after completion, does not exceed the earnings threshold—that is, if the earnings premium is zero or negative. The earnings threshold for each program would be calculated as the median earnings of individuals with only a high school diploma or the equivalent, between the ages of 25 to 34, who are either employed or report being unemployed (*i.e.*, looking and available for work), located in the State in which the institution is located, or nationally if fewer than 50 percent of students in the program are located in the State where the institution is located while enrolled.

If it is not possible to calculate or publish the earnings premium measure for a program for an award year, the program would receive no result under the earnings premium measure for that award year and would remain in the same status under the earnings premium measure as the previous award year.

Proposed changes to § 668.43 would require institutions to distribute information to students, prior to enrollment, about how to access a disclosure website maintained by the Secretary. The disclosure website would provide information about the program. These items might include the typical earnings and debt levels of graduates; information to contextualize each measure including D/E and EP measures; information about the net yearly cost of attendance at the program and total costs paid by completing students; information about typical amounts of student aid received; and

information about career programs, such as the occupation the program is meant to provide training for and relevant licensure information. Certain information may be highlighted or otherwise emphasized to assist viewers in finding key points of information.

For eligible non-GE programs classified by the Department as "high-debt-burden," proposed § 668.407 would require students to acknowledge viewing these informational disclosures prior to receiving title IV, HEA funds for enrollment in these programs.

*Reasons:* The proposed regulations include two debt-to-earnings measures that are similar to those under the 2014 Prior Rule. The debt-to-earnings measures would assess the debt burden incurred by students who completed a program in relation to their earnings. Comparing debt to earnings is a commonly accepted practice when making determinations about a person's relative financial strength, such as when a lender assesses suitability for a mortgage or other financial product. To determine the likelihood a borrower will be able to afford repayments, lenders use debt-to-earnings ratios to consider whether the recipient would be able to afford to repay the debt with the earnings available to them. This practice also protects borrowers from incurring debts that they cannot afford to repay and can prevent negative consequences associated with delinquency and default such as damaged credit scores.

Using the two D/E measures together, the Department would assess whether a program leads to reasonable debt levels in relation to completers' earnings outcomes. This categorization based on the program's median earnings and median debt levels is depicted in Figure 1 below. This Figure shows how the two D/E rates are used to define "high debt-burden" programs, using the relevant amortization rate of certificate programs as an illustrative example. The region labelled D, where program completers' median debt levels are high relative to their median earnings, is categorized as "high debt burden."



Figure 1.



Under the proposed regulations, the annual debt-to-earnings rate would estimate the proportion of annual earnings that students who complete the program would need to devote to annual debt payments. The discretionary debt-to-earnings rate would measure the proportion of annual discretionary income—the amount of income above 150 percent of the Poverty Guideline for a single person in the continental United States—that students who complete the program would need to devote to annual debt payments. We note that given the variation in what is an affordable payment from borrower to borrower, a variety of definitions could potentially be justified. We do not mean to enshrine a single definition for affordability across every possible purpose, but for this proposed rule we choose to maintain the standard used under the 2014 Prior Rule.

The proposed thresholds for the discretionary D/E rate and the annual D/E rate are based upon expert recommendations and mortgage industry practices. The acceptable threshold for the discretionary income rate would be set at 20 percent, based on research conducted by economists Sandy Baum and Saul Schwartz,[88]

[88] Baum, Sandy, and Schwartz, Saul, 2006. "How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt." *eric.ed.gov/ ?id=ED562688.*

which the Department previously considered in connection with the 2011 and 2014 Prior Rules. Specifically, Baum and Schwartz proposed benchmarks for manageable debt levels at 20 percent of discretionary income and concluded that there are virtually no circumstances under which higher debt-service ratios would be reasonable.

In the Figure above, the points along the steeper of the two lines drawn represents the combination of median earnings and median debt levels where the debt-service payments on a 10-year repayment plan at 4.27 percent interest are exactly equal to 20 percent of discretionary income. Programs with median debt and earnings levels above that line (regions B and D) have discretionary D/E rates above 20 percent, and programs below that line (regions A and C) have discretionary D/E rates below 20 percent.

The acceptable threshold of 8 percent for the annual D/E rate used in the proposed regulations has been a reasonably common mortgage-underwriting standard, as many lenders typically recommend that all non-mortgage loan installments not exceed 8 percent of the borrower's pretaxed income. Studies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit. Eight

percent represents the difference between the typical ratios used by lenders for the limit of total debt service payments to pretaxed income, 36 percent, and housing payments to pretax income, 28 percent.

In Figure 1, the less steep of the two lines shows the median earnings and debt levels where annual D/E is exactly 8 percent. Programs above the line (regions D and C) have annual D/E greater than 8 percent and programs below the line have annual D/E less than 8 percent (regions B and A). Note that programs are defined as "high debt-burden" only if their discretionary D/E is above 20 percent and their annual D/E is above 8 percent. As a result, the use of both measures means that programs in region B and C are not deemed "high debt-burden" even though they have debt levels that are too high based on one of the two standards. Classifying programs that have D/E rates below the discretionary D/E threshold but above the annual D/E threshold (*i.e.*, region C) as not "high debt-burden" reflects the fact that devoting the same share of earnings to service student debt is less burdensome when earnings are higher. For example, paying $2,000 per year is less manageable when you make $20,000 a year than paying $4,000 per year when you make $40,000 a year, since at lower levels of income most spending must go to necessities.

App.219

The D/E rates would help identify programs that burden students who complete the programs with unsustainable debt, which may both generate hardships for borrowers and pass the costs of loan repayment on to taxpayers. But the D/E measures do not capture another important aspect of financial value, which is the extent to which graduates improve their earnings potential relative to what they might have earned if they did not pursue a higher education credential. Some programs lead to very low earnings, but still pass the D/E metrics either because typical borrowing levels are low or because few or no students borrow (and so median debt is zero, regardless of typical levels among borrowers). The Department believes that an additional metric is necessary beyond the D/E measures, to ensure students are aware that these low-earnings programs may not be delivering on their promise or providing what students expected from a postsecondary education in helping them secure more remunerative employment.

We propose, therefore, to calculate an earnings premium metric.[89] This metric would be equal to the median earnings of program graduates measured three years after they complete the program, minus the median earnings of high school graduates (or holders of an equivalent credential) who are between the ages of 25 and 34, and either working or unemployed, excluding individuals not in the labor force, in the State where the institution is located, or nationally if fewer than 50 percent of the students in the program are located in the State where the institution is located while enrolled. When this earnings premium is positive, it indicates that graduates of the program gain financially (*i.e.,* have higher typical earnings than they might have had they not attended college).

Similar earnings premium metrics are used ubiquitously by economists and other analysts to measure the earnings gains associated with college credentials relative to a high school education.[90] Other policy researchers have proposed similar earnings premium measures for

accountability purposes that incorporate additional adjustments to subtract some amortized measure of the total cost of college to estimate a ''net earnings premium.''[91] At the same time, our proposed measure is conservative in the sense that it would compare the earnings of completers only to the earnings of high school graduates, without incorporating the additional costs students incur to earn the credential or the value of their time spent pursuing the credential. Moreover, as noted above, the corresponding level of earnings that programs must exceed is modest— corresponding approximately to the earnings someone working full-time at an hourly rate of $12.50 might earn.

As discussed elsewhere in this NPRM, student eligibility requirements in Section 484 of the HEA support this concept that postsecondary programs supported by title IV, HEA funds should lead to outcomes that exceed those obtained by individuals who have only a secondary education. To receive title IV, HEA funds, HEA section 484 generally requires that students have a high school diploma or recognized equivalent. Students who do not have such credentials have a more limited path to title IV, HEA aid, involving ascertainment of whether they have the ability to benefit from their postsecondary program. These statutory requirements, in effect, make high-school-level achievement the presumptive starting point for title IV, HEA funds. Postsecondary training that is supported by title IV, HEA funds should help students to progress and achieve beyond that baseline. The earnings premium follows from the principle that if postsecondary training must be for individuals who are moving beyond secondary-level education, knowledge, and skills, it is reasonable to expect graduates of those programs to earn more than someone who never attended postsecondary education in the first place.

The Department would classify programs as ''low earning'' if the earnings premium is equal to zero or is negative. This is again a conservative approach, using this label only when a majority of program graduates—that is, ignoring the (likely lower) earnings of students who do not complete the program—fail to out-earn the majority of individuals who never attended postsecondary education. As noted above, this metric would also ignore tuition costs and the value of students' time in earning the degree. The ''low

earning'' label suggests that, even ignoring these costs, students are not financially better off than students who did not attend college.

The Department also considered whether this approach would create a risk of programs being labelled ''low-earning'' based on earnings measures several years after graduation, even though those programs eventually lead to significantly higher levels of earnings over a longer time horizon. Based on the estimates in the RIA, however, most programs that would be identified as ''low-earning'' are certificate programs, and for these programs in particular, any earnings gains tend to be realized shortly after program completion (*i.e.,* often immediately or within a few quarters), whereas earnings trajectories for typical degree earners tend to continue to grow over time.[92]

The D/E and earnings premium metrics capture related, but distinct and important dimensions of how programs affect students' financial well-being. The D/E metric is a measure of debt-affordability that indicates whether the typical graduate will have earnings enough to manage their debt service payments without incurring undue hardship. For any median earnings level of a program, the D/E metric and thresholds imply a maximum level of total borrowing beyond which students should be concerned that they may not be able to successfully manage their debt. The earnings premium measure, meanwhile, captures the extent to which programs leave graduates better off financially than those who do not enroll in college, a minimal benchmark that students pursuing postsecondary credentials likely expect to achieve. In addition to capturing distinct aspects of programs' effects on students' financial well-being, these metrics complement each other. For example, as the RIA shows, borrowers in programs that pass the D/E metric but fail the EP metric have very high rates of default, so the EP metric helps to identify programs where borrowing may be overly risky even when debt levels are relatively low.

The Department believes this information on financial value is important to students and would enable them to make a more informed decision, which may include weighing whether low-earnings or high-debt-burden programs nonetheless help them achieve other non-financial goals that

---

[89] For further discussion of the earnings premium metric and the Department's reasons for proposing it, see above at [TK—preamble general introduction, legal authority], and below at [TK—method for calculating metrics, around p.180], and at [TK—GE eligibility, around p.250]. The discussion here concentrates on transparency issues.

[90] See for example, *www.hamiltonproject.org/ papers/major_decisions_what_graduates_earn_ over_their_lifetimes/, cew.georgetown.edu/cew-reports/the-college-payoff/, www.clevelandfed.org/ publications/economic-commentary/2012/ec-201210-the-college-wage-premium,* among many other examples.

[91] Matsudaira and Turner Brookings. PVC ''threshold zero'' measure.

[92] Minaya, Veronica and Scott-Clayton, Judith (2022). Labor Market Trajectories for Community College Graduates: How Returns to Certificates and Associate's Degrees Evolve Over Time. *Education Finance and Policy, 17*(1): 53–80.

they might find more important when considering whether to attend.

Helping students make informed decisions may provide other benefits, too. First, as shown in the RIA, low-earnings programs are not categorized as high debt-burden still have very high rates of student loan default and low repayment rates. For example, borrowers in low-earnings programs that are not high debt-burden have default rates 12.6 percent higher than high-debt-burden programs that have earnings above the level of a high school graduate in their State. The low-earnings classification complements the high debt-burden classification in identifying programs where borrowers are likely to struggle to manage their loans. Second, low-earnings programs where students borrow generate ongoing costs to taxpayers. Student loans from the Department are used to provide tuition revenue to the program. But if low-earning graduates repay using income driven repayment plans, then their payments will often be too low to pay down their principal balances despite spending years or even decades in repayment. As a result, a high share of the loans made to individuals in such programs would be likely to be eventually forgiven at taxpayer expense. If low-earning borrowers don't use income driven repayment plans, the RIA shows they are at higher risk of defaulting on their loans, which also tends to increase the costs of student loans to taxpayers.

The Department would calculate both the D/E rates and the earnings premium measure using earnings data provided by a Federal agency with earnings data, which we propose to define in § 668.2. The Federal agency with earnings data must have data sufficient to match with title IV, HEA recipients in the program and could include agencies such as the Treasury Department, including the Internal Revenue Service (IRS), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau. If the Federal agency with earnings data does not provide earnings information necessary for the calculation of these metrics, we would not calculate the metrics and the program would not receive rates for the award year. Similarly, if the minimum number of completers required to calculate the D/E rates or earnings threshold metrics to be calculated is not met, the program would not receive rates for the award year. For a year for which the D/E rates or earnings premium metric is not calculated, we believe it is logical for the program to retain the same status as under its most recently calculated

results for purposes of determining whether the program leads to acceptable outcomes and whether current and prospective students should be alerted to those outcomes.

*Calculating D/E Rates (§ 668.403)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add new § 668.403 to specify the methodology the Department would use to calculate D/E rates.

Section 668.403(a) would define the program's annual D/E rate as the completers' annual loan payment divided by their median annual earnings. The program's discretionary D/E rate would equal the completers' annual loan payment divided by their median adjusted annual earnings after subtracting 150 percent of the poverty guideline for the most recent calendar year for which annual earnings are obtained.

Under § 668.403(b), the Department would calculate the annual loan payment for a program by (1) Determining the median loan debt of the students who completed the program during the cohort period, based on the lesser of the loan debt incurred by each student, computed as described in § 668.403(d), or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student; removing the highest loan debts for a number of students equal to those for whom the Federal agency with earnings data does not provide median earnings data; and calculating the median of the remaining amounts; and (2) Amortizing the median loan debt. The length of the amortization period would depend upon the credential level of the program, using a 10-year repayment period for a program that leads to an undergraduate certificate, a post-baccalaureate certificate, an associate degree, or a graduate certificate; a 15-year repayment period for a program that leads to a bachelor's degree or a master's degree; or a 20-year repayment period for any other program. The amortization calculation would use an annual interest rate that is the average of the annual statutory interest rates on Federal Direct Unsubsidized Loans that were in effect during a period that varies based on the credential level of the program. For undergraduate certificate programs, post-baccalaureate certificate programs, and associate degree programs, the average interest rate would reflect the three consecutive award years, ending

in the final year of the cohort period, using the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students. As an example, for an undergraduate certificate program, if the two-year cohort period is award years 2024–2025 and 2025–2026, the interest rate would be the average of the interest rates for the years from 2023–2024 through 2025–2026. For graduate certificate programs and master's degree programs, the average interest rate would reflect the three consecutive award years, ending in the final year of the cohort period, using the Federal Direct Unsubsidized Loan interest rate applicable to graduate students. For bachelor's degree programs, the average interest rate would reflect the six consecutive award years, ending in the final year of the cohort period, using the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students. For doctoral programs and first professional degree programs, the average interest rate would reflect the six consecutive award years, ending in the final year of the cohort period, using the Federal Direct Unsubsidized Loan interest rate applicable to graduate students.

Under new § 668.403(c), the Department would obtain program completers' median annual earnings from a Federal agency with earnings data for use in calculating the D/E rates.

In determining the loan debt for a student under new § 668.403(d), the Department would include (1) The total amount of title IV loans disbursed to the student for enrollment in the program, less any cancellations or adjustments except for those related to false certification or borrower defense discharges and debt relief initiated by the Secretary as a result of a national emergency, and excluding Direct PLUS Loans made to parents of dependent students and Direct Unsubsidized Loans that were converted from TEACH Grants; (2) Any private education loans as defined in § 601.2, including such loans made by the institution, that the student borrowed for enrollment in the program; and (3) The amount outstanding, as of the date the student completes the program, on any other credit (including any unpaid charges) extended by or on behalf of the institution for enrollment in any program that the student is obligated to repay after completing the program, including extensions of credit described in the definition of, and excluded from, the term "private education loan" in § 601.2. The Department would attribute all loan debt incurred by the student for enrollment in any undergraduate

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules **32329**

program at the institution to the highest credentialed undergraduate program subsequently completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates. Similarly, we would attribute all loan debt incurred by the student for enrollment in any graduate program at the institution to the highest credentialed graduate program completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates. The Department would exclude any loan debt incurred by the student for enrollment in programs at other institutions, except that the Secretary could choose to include loan debt incurred for enrollment in programs at other institutions under common ownership or control.

Under new § 668.403(e), the Department would exclude a student from both the numerator and the denominator of the D/E rates calculation if (1) One or more of the student's title IV loans are under consideration or have been approved by the Department for a discharge on the basis of the student's total and permanent disability; (2) The student enrolled full time in any other eligible program at the institution or at another institution during the calendar year for which the Department obtains earnings information; (3) For undergraduate programs, the student completed a higher credentialed undergraduate program at the institution subsequent to completing the program, as of the end of the most recently completed award year prior to the calculation of the D/E rates; (4) For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program, as of the end of the most recently completed award year prior to the calculation of the D/E rates; (5) The student is enrolled in an approved prison education program; (6) The student is enrolled in a comprehensive transition and postsecondary (CTP) program; or (7) The student died. For purposes of determining whether a student completed a higher credentialed undergraduate program, the department would consider undergraduate certificates or diplomas, associate degrees, baccalaureate degrees, and post-baccalaureate certificates as the ascending order of credentials. For purposes of determining whether a student completed a higher credentialed graduate program, the Department would consider graduate certificates,

master's degrees, first professional degrees, and doctoral degrees as the ascending order of credentials.

As further explained under "Reasons" below, to prevent privacy or statistical reliability issues, under § 668.403(f) the Department would not issue D/E rates for a program if fewer than 30 students completed the program during the two-year or four-year cohort period, or the Federal agency with earnings data does not provide the median earnings for the program.

For purposes of calculating both the D/E rates and the earnings threshold measure, the Department proposes to use a two-year or a four-year cohort period similar to the 2014 Prior Rule. The proposed rule would, however, measure the earnings of program completers approximately one year later relative to when they complete their degree than under the 2014 Prior Rule. We would use a two-year cohort period when the number of students in the two-year cohort period is 30 or more. A two-year cohort period would consist of the third and fourth award years prior to the year for which the most recent data are available at the time of calculation. For example, given current data production schedules, the D/E rates and earnings premium measure calculated to assess financial value starting in award year 2024–2025 would be calculated in late 2024 or early in 2025. For most programs, the two-year cohort period for these metrics would be award years 2017–2018 and 2018–2019 using the amount of loans disbursed to students as of program completion in those award years and earnings data measured in calendar years 2021 for award year 2017–2018 completers and 2022 for award year 2018–2019 completers, roughly 3 years after program completion.

We would use a four-year cohort period to calculate the D/E rates and earnings thresholds measure when the number of students completing the program in the two-year cohort period is fewer than 30 but the number of students completing the program in the four-year cohort period is 30 or more. A four-year cohort period would consist of the third, fourth, fifth, and sixth award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, for the D/E rates and the earnings threshold measure calculated to assess financial value starting in award year 2024–2025, the four-year cohort period would be award years 2015–2016, 2016–2017, 2017–2018, and 2018–2019; and earnings data would be measured using data from calendar years 2019 through 2022.

Similar to the 2014 Prior Rule, the cohort period would be calculated differently for programs whose students are required to complete a medical or dental internship or residency, and who therefore experience an unusual and unavoidable delay before reaching the earnings typical for the occupation. For this purpose, a required medical or dental internship or residency would be a supervised training program that (1) Requires the student to hold a degree as a doctor of medicine or osteopathy, or as a doctor of dental science; (2) Leads to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility that offers post-graduate training; and (3) Must be completed before the student may be licensed by a State and board certified for professional practice or service. The two-year cohort period for a program whose students are required to complete a medical or dental internship or residency would be the sixth and seventh award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, D/E rates and the earnings threshold measure calculated for award year 2024–2025 would be calculated in late 2024 or early 2025 using earnings data measured in calendar years 2021 and 2022, with a two-year cohort period of award years 2014–2015 and 2015–2016. The four-year cohort period for a program whose students are required to complete a medical or dental internship or residency would be the sixth, seventh, eighth, and ninth award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, the D/E rates and the earnings threshold measure calculated for award year 2024–2025 would be calculated in late 2024 or early 2025 using earnings data measured in calendar years 2021 and 2022, and the four-year cohort period would be award years 2012–2013, 2013–2014, 2014–2015, and 2015–2016.

The Department recognizes that some other occupations, such as clinical psychology, may require a certain number of post-graduate work hours, which might vary from State to State, before an individual fully matriculates into the profession, and that, during this post-graduate working period, a completer's earnings may be lower than are otherwise typical for individuals working in the same occupation. We would welcome public comments about data-informed ways to reliably identify such programs and occupations and determine the most appropriate time period for measuring earnings for these

programs. We are particularly interested in approaches that narrowly identify programs where substantial post-graduate work hours (that may take several years to complete) are required before a license can be obtained, and where earnings measured three years after completion are therefore unusually low relative to subsequent earnings.

*Reasons:* The methodology we would use to calculate the D/E rates under the proposed regulations is largely similar to that of the 2014 Prior Rule. We discuss our reasoning by subject area.

Minimum Number of Students Completing the Program

As under the 2014 Prior Rule, the proposed regulations would establish a minimum threshold number of students who completed a program, or "n-size," for D/E rates to be calculated for that program. Both the 2014 Prior Rule and the proposed regulations require a minimum n-size of 30 students completing the program, after subtracting the number of completers who cannot be matched to earnings data. However, some programs are relatively small in terms of the number of students enrolled and, perhaps more critically, in the number of students who complete the program. In many cases, these may be the very programs whose performance should be measured, as low completion rates may be an indication of poor quality. The 2019 Prior Rule also expressed concern with the 30-student cohort size requirement, stating that it exempted many programs at non-profit institutions while having a disparate impact on proprietary institutions.

We considered and presented, during the negotiations that led to the 2014 Prior Rule, a lower n-size of 10. At that time the non-Federal negotiators raised several issues with the proposal to use a lower n-size of 10. First, some of the negotiators questioned whether the D/E rates calculations using an n-size of 10 would be statistically valid. Further, they were concerned that reducing the minimum n-size to 10 could make it too easy to identify particular individuals, putting student privacy at risk. These negotiators noted that other entities requiring these types of calculations used a minimum n-size of 30 to address these two concerns.

Other non-Federal negotiators supported the Department's past proposal to reduce the minimum n-size from 30 to 10 students completing the program. They argued that the lower number would allow the Department to calculate D/E rates for more programs, which would decrease the risk that programs that serve students poorly are not held accountable. They argued that some programs have very low numbers of students who complete the program, not because these programs enroll small numbers of students, but because they do not provide adequate support or are of low quality and, as a result, relatively few students who enroll actually complete the program. They asserted that these poorly performing programs may never be held accountable under the D/E rates measure because they would not have a sufficient number of completers for the D/E rates to be calculated. For these reasons, these negotiators believed that the Secretary should calculate D/E rates for any program where at least 10 students completed the program during the applicable cohort period.

As in our past analysis, we acknowledge the limitations of using a minimum n-size of 30 students. However, to protect the privacy of individuals who complete programs that enroll relatively few students, and to be consistent with past practice as well as existing regulations at §668.216, which governs institutional cohort default rates, we propose to retain the minimum n-size of 30 students who complete the program as we did in the 2014 Prior Rule. This is also consistent with IRS data policy. As further explained in our discussion of proposed §668.405, the IRS adds a small amount of statistical noise to earnings data for privacy protection purposes, which would be greater for n-sizes smaller than 30. We also note that the four-year cohort will allow the Department to determine D/E rates for programs that have at least 30 completers over a four-year cohort period for whom the Department obtains earnings data, which would help to reduce the number of instances in which rates could not be calculated because of the minimum n-size.

As described in detail in the RIA, the Department estimates that 75 percent of GE enrollment and 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort. An additional 8 percent of GE enrollment and 11 percent of GE programs would be likely to have metrics computed using a four-year completer cohort. The comparable rates for eligible non-GE programs are 69 percent of enrollment and 19 percent of programs with a n-size of 30 covered by two-year cohort metrics, with the use of four-year cohort rates likely increasing these coverage rates of non-GE enrollment and programs by 13 and 15 percent, respectively.

Amortization

As under the 2014 Prior Rule, the proposed regulations would use three different amortization periods, based on the credential level of the program for determining a program's annual loan payment amount. The schedule under the proposed regulations reflects that the regulations are an accountability tool to protect students and taxpayers from programs that leave the majority of their graduates with subpar early career earnings compared to those who have not completed postsecondary education or subpar early career earnings relative to their debts. This schedule would reflect the loan repayment options available under the HEA, which are available to borrowers based on the amount of their loan debt, and would account for the fact that borrowers who enrolled in higher-credentialed programs (*e.g.,* bachelor's and graduate degree programs) are likely to have incurred more loan debt than borrowers who enrolled in lower-credentialed programs and, as a result, are more likely to select a repayment plan that would allow for a longer repayment period.

We decided to choose 10 years as the shortest amortization period available to borrowers because that is the length of the standard repayment plan that is by default offered to borrowers. Moreover, FSA data show that the borrowers who have balances most likely to be associated with certificate programs are most likely to be making use of the 10-year standard plan. Even students who borrow to complete a short-term program are provided a minimum of 10 years to repay their student loan balances. Therefore, it would be inappropriate to assign an amortization period shorter than 10 years to students in such programs.

Loan Debt

As under the 2014 Prior Rule, in calculating a student's loan debt, the Department would include title IV, HEA program loans and private education loans that the student obtained for enrollment in the program, less any cancellations or adjustments except for those related to false certification or borrower defense discharges and debt relief initiated by the Secretary as a result of a national emergency. We would not reduce debt to reflect these types of cancellation since they are unrelated to the value of the program under normal circumstances, and because including that debt is a better reflection of how the program's costs affect students' financial outcomes in the absence of these relief programs.

For these purposes the amount of title IV, HEA loan debt would exclude Direct PLUS Loans made to parents of dependent students and Direct Unsubsidized Loans that were converted from TEACH Grants. The amount of a student's loan debt would also include any outstanding debt resulting from credit extended to the student by, or on behalf of, the institution (*e.g.,* institutional financing or payment plans) that the student is obligated to repay after completing the program. Including both private loans and institutional loans, in addition to Federal loan debt, would provide the most complete picture of the financial burden a student has incurred to enroll in a program.

Including private loans also ensures that an institution could not attempt to alter its D/E rates by steering students away from the Federal loan programs to a private option.

The Department previously considered including Direct PLUS Loans made to parents of dependent students in the debt measure for D/E rates, on the basis that a parent PLUS loan is intended to cover costs related to education and associated with the dependent student's enrollment in an eligible program of study. Some non-Federal negotiators questioned the inclusion of parent PLUS loans, arguing that a dependent student does not sign the promissory note for a parent loan and is not responsible for repayment. Other non-Federal negotiators expressed concern that failing to include parent PLUS loans obtained on behalf of dependent students could incentivize institutions to counsel students away from Direct Subsidized and Unsubsidized Loans, and to promote more costly parent loans, in an attempt to evade accountability under the D/E rates metric. While we recognize these competing concerns, we believe that the primary purpose of the D/E rates is to indicate whether graduates of the program can afford to repay their educational debt. Repayment of PLUS loans obtained by a parent on behalf of a dependent student is ultimately the responsibility of the parent borrower, not the student. Moreover, the ability to repay parent PLUS debt depends largely upon the income of the parent borrower, who did not attend the program. We believe that including in a program's D/E rates the parent PLUS debt obtained on behalf of dependent students would cloud the meaning of the D/E rates and would ultimately render them less useful to students and families. We remain concerned, however, about the potential for an institution to steer families away from less costly Direct

Subsidized and Unsubsidized Loans towards parent PLUS in an attempt to manipulate its D/E rates, and we have addressed this concern, in part, by proposing changes to the administrative capability regulations at § 668.16(h) that would require institutions to adequately counsel students and families about the most favorable aid options available to them. We welcome public comments on additional measures the Department could take to address this issue.

Loan Debt Cap

We propose to cap loan debt for the D/E rates calculations at the net direct costs charged to a student, defined as the costs assessed to the student for enrollment in a program that are directly related to the academic program, minus institutional grants and scholarships received by that student. Under this calculation, direct costs include tuition and fees as well as books, equipment, and supplies. Although institutions in most cases cannot directly limit the amount a student borrows, institutions can exercise control over these types of direct costs for which a student borrows. The total of the student's assessed tuition and fees, and the student's allowance for books, supplies, and equipment would be included in the cost of attendance disclosed under proposed § 668.43(d). The 2014 Prior Rule capped loan debt for D/E rates at the total direct costs using the same definition. In this rule, we further propose to subtract institutional grants and scholarships from the measure of direct costs to produce a measure of net direct costs. For purposes of the D/E rates, we propose to define institutional grants and scholarships as financial assistance that does not have to be repaid that the institution—or its affiliate—controls or directs to reduce or offset the original amount of a student's institutional costs. Upon further consideration and in the interest of fairness to institutions that provide substantial assistance to students, we believe it is necessary to account for institutional grants and scholarships to ensure that the amount of debt disclosed under the D/E rates accurately reflects the borrowing necessary for the student to finance the direct costs of the program.

Attribution of Loan Debt

As under the 2014 Prior Rule, we propose that any loan debt incurred by a student for enrollment in undergraduate programs be attributed to the highest credentialed undergraduate program completed by the student at the institution, and any loan debt incurred

for enrollment in graduate programs at an institution be attributed to the highest credentialed graduate program completed by the student. The undergraduate credential levels in ascending order would include undergraduate certificate or diploma, associate degree, bachelor's degree, and post-baccalaureate certificate. Graduate credential levels in ascending order would include graduate certificate (including a postgraduate certificate), master's degree, first-professional degree, and doctoral degree.

We do not believe that undergraduate debt should be attributed to the debt of graduate programs in cases where students who borrow as undergraduates continue on to complete a graduate credential at the same institution, because the relationships between the coursework and the credential are different. The academic credits earned in an associate degree program, for example, are often necessary for and would be applied toward the credits required to complete a bachelor's degree program. It is reasonable then to attribute the debt associated with all of the undergraduate academic credit earned by the student to the highest undergraduate credential subsequently completed by the student. This reasoning does not apply to the relationship between undergraduate and graduate programs. Although a bachelor's degree might be a prerequisite to pursue graduate study, the undergraduate academic credits would not be applied toward the academic requirements of the graduate program.

In attributing loan debt, we propose to exclude any loan debt incurred by the student for enrollment in programs at another institution. However, the Secretary could include loan debt incurred by the student for enrollment in programs at other institutions if the institution and the other institutions are under common ownership or control. The 2010 and 2014 Prior Rules included the same provision. As we noted previously, although we generally would not include loan debt from other institutions students previously attended, entities with ownership or control of more than one institution offering similar programs might otherwise be incentivized to shift students between those institutions to shield some portion of the loan debt from the D/E rates calculations. Including the provision that the Secretary may choose to include that loan debt should serve to discourage institutions from making these kinds of changes and would assist the

Department in holding such institutions accountable.

Exclusions

Under the proposed regulations, we would exclude from the D/E rates calculations most of the same categories of students that we excluded under the 2014 Prior Rule, including students with one or more loans discharged or under consideration for discharge based on the borrower's total and permanent disability, students enrolled full-time in another eligible program during the year for which earnings data was obtained, students who completed a higher credentialed undergraduate or graduate program as of the end of the most recently completed award year prior to the D/E rates calculation, and students who have died. We believe the approach we adopted in the 2014 Prior Rule continues to be sound policy.

Under these proposed regulations, we would also exclude students enrolled in approved prison education programs, as defined under section 484(t) of the HEA and 34 CFR 668.236. Employment options for incarcerated persons are limited or nonexistent, and Direct Loans are not available to them, so including these students in D/E rates would disincentivize the enrollment of incarcerated students and unfairly disadvantage institutions that may otherwise offer programs to benefit this population. The proposed regulations would also exempt comprehensive transition and postsecondary programs, as defined at § 668.231. CTP programs are designed to provide integrated educational opportunities for students with intellectual disabilities, for whom certain requirements for title IV, HEA eligibility are waived or modified under subpart O of part 668. Unlike most eligible students, these students are not required to possess a high school diploma or equivalent, or to pass an ability-to-benefit test to establish eligibility for title IV, HEA funds. The earnings premium measure proposed in subpart Q is designed to compare postsecondary completers' earnings outcomes to the earnings of those with a high school diploma or equivalent but no postsecondary education. We believe that to judge a CTP program's earnings outcomes against the outcomes of individuals with a high school diploma or the equivalent would be an inherently flawed comparison, as students enrolled in a CTP program are not required to have a high school credential or equivalent. These students also are not eligible to obtain Federal student loans, which would render debt-to-earnings rates meaningless for these programs.

Under the proposed regulations we would include students whose loans are in a military-related deferment. This is a change from the 2014 Prior Rule. Although completers who subsequently choose to serve in the armed forces are demonstrably employed and may access military-related loan deferments, and we believe that their earnings would likely raise the median income measured for the program, that does not eliminate the harm to them if their earnings do not otherwise support the debt they incurred. We believe that servicemembers should expect and receive equal consumer protections as those who enter other occupations.

We continue to believe that we should not include the earnings or loan debt of students who were enrolled full time in another eligible program at the institution or at another institution during the year for which the Secretary obtains earnings information. These students are unlikely to work full time while in school and consequently their earnings would not be reflective of the program being assessed under the D/E rates. It would therefore be unfair to include these students in the D/E rates calculation.

*Calculating Earnings Premium Measure (§ 668.404)*

*Statute:* See Authority for This Regulatory Action.
*Current Regulations:* None.
*Proposed Regulations:* We propose to add a new § 668.404 to specify the methodology the Department would use to calculate the earnings premium measure. The Department would assess the earnings premium measure for a program by determining whether the median annual earnings of the title IV, HEA recipients who completed the program exceed the earnings threshold. The Department would obtain from a Federal agency with earnings data the most currently available median annual earnings of the students who completed the program during the cohort period. Using data from the U.S. Census Bureau, the Department would also calculate an earnings threshold, which would be the median earnings for working adults aged 25 to 34, who either worked during the year or indicated that they were unemployed when they were surveyed. The earnings threshold would be calculated based on the median for State in which the institution is located, or the national median if fewer than 50 percent of students in the program are located in the State where the institution is located during enrollment in the program. The Department would publish the state and national earnings thresholds annually in a notice in the

**Federal Register**. We would exclude a student from the earnings premium measure calculation under the same conditions for which a student would be excluded from the D/E rates calculation under § 668.403, including if (1) One or more of the student's title IV loans are under consideration, or have been approved, for a discharge on the basis of the student's total and permanent disability under 34 CFR 674.61, 682.402, or 685.212; (2) The student was enrolled full time in any other eligible program at the institution or at another institution during the calendar year for which the Department obtains earnings information; (3) For undergraduate programs, the student completed a higher credentialed undergraduate program subsequent to completing the program, as of the end of the most recently completed award year prior to the calculation of the earnings threshold measure; (4) For graduate programs, the student completed a higher credentialed graduate program subsequent to completing the program, as of the end of the most recently completed award year prior to the calculation of the earnings threshold measure; (5) The student is enrolled in an approved prison education program; (6) The student is enrolled in a comprehensive transition and postsecondary program; or (7) The student died. The Department would not issue the earnings premium measure for a program if fewer than 30 students completed the program during the two-year or four-year cohort period. The Department also would not issue the measure if the Federal agency with earnings data does not provide the median earnings for the program, for example because exclusions or non-matches reduce the number of students available to be matched to earnings data to the point that the agency is no longer permitted to disclose median earnings due to privacy restrictions.

*Reasons:* As discussed in ''§ 668.402 Financial value transparency framework,'' some programs with very poor labor market outcomes could potentially achieve passing D/E rates with low levels of loan debt, or because fewer than half of completers receive student loans. Such programs may not necessarily encumber students with high levels of debt but may nonetheless fail to leave students financially better off than had they not pursued a postsecondary education credential, especially given the financial and time costs for students. ED believes that a postsecondary program cannot be considered to lead to an acceptable earnings outcome if the median earnings of the program's completers do not, at

a minimum, exceed the earnings of those who only completed the equivalent of a secondary school education.[93]

This concept that postsecondary education must entail academic rigor and career outcomes beyond what is delivered by high school is embedded in the student eligibility criteria in the HEA. Thus, 20 U.S.C. 1001 states that an institution of higher education must only admit as regular students those individuals who have completed their secondary education or met specific requirements under 20 U.S.C. 1091(d), which includes an assessment that they demonstrate the ability to benefit from the postsecondary program being offered. The definitions for a proprietary institution of higher education or a postsecondary vocational institution in 20 U.S.C. 1002 maintain the same requirement for admitting individuals who have completed secondary education. Similarly, there are only narrow exceptions for students beyond the age of compulsory attendance who are dually or concurrently enrolled in postsecondary and secondary education. The purpose of such limitations is to help ensure that postsecondary programs build skills and knowledge that extend beyond what is taught in high school.

The Department thus believes it is reasonable that, if a program provides students an education that goes beyond the secondary level, students should be alerted in cases where their financial outcomes might not exceed those of the typical secondary school graduate. This does not mean that every individual who attends a program needs to earn more than a high school graduate. Instead, it requires only that at least half of program graduates show that they are earning as much or more than individuals who had never completed postsecondary education. We also note that the earnings premium is a conservative measure in that the program earnings measures only include students who complete the program of study, and do not include students who enrolled but exited without completing the program of study, as these students would in most cases have lower earnings than graduates. To provide consistency and simplicity, the program earnings information used to calculate the earnings premium measure would

be the same as the earnings information used to determine D/E rates.

The Department would compare the median earnings of the program's completers to the median earnings of adults aged 25 to 34, who either worked during the year or indicated they were unemployed (*i.e.*, available and looking for work), with only a high school diploma or recognized equivalent in the State in which the institution is located while enrolled. The Department chose this range of ages to calculate the earnings threshold benchmark because it matches well the age students are expected to be three years after the typical student graduates (*i.e.*, the year in which their earnings are measured under the rule) from the programs covered by this regulation. The average age three years after students graduate across all credential levels is 30 years, and the interquartile range (*i.e.*, from the program at the 25th percentile to the 75th percentile of average age) across all programs extends from 27 to 34 years of age. The 25 to 34 year age range encompasses the interquartile range for most credential types, with the lone exceptions being master's degrees, where the interquartile range of average ages when earnings are measured is 30 to 35, and doctoral programs, which range from 32 to 43 years old.[94] Among these credential programs, students tend to be older than the high school graduates to which they are being compared.

Because many programs are offered through distance education or serve students from neighboring States, if fewer than 50 percent of the students in a program are located in the State where the institution is located, the earnings premium calculation would compare the median earnings of the program's completers to the median earnings nationally for a working adult aged 25 to 34, who either worked during the year or indicated they were unemployed when interviewed, with only a high school diploma or the recognized equivalent. Although we recognize that some nontraditional learners attend and complete programs past age 34, either for retraining or to seek advancement within a current profession, we believe that the earnings premium measure would provide the most meaningful information to students and prospective students by illustrating the earnings outcomes of a program's graduates in comparison to others relatively early in their careers. As the Regulatory Impact

Analysis explains, according to FAFSA data, the typical age of earnings measurement (three years after completion) for students across all program types is 30. This average varies only slightly across undergraduate programs: undergraduate certificate program graduates are an average of 30.6 years when their earnings are measured, associate degree graduates are 30.4, bachelor's degree graduates are 29.2, and all graduate credential graduates are older on average. Additionally, the ten highest-enrollment fields of study for undergraduate certificate programs—the credential level where the median earnings of programs are most likely to fall below the earnings threshold—all have a typical age at earnings measurement in the 25– to 34-year-old range.

We are aware that in some cases, earnings data for high school graduates may not be as reliable or easily available in U.S. Territories, such as Puerto Rico. We welcome public comments on how to best determine a reasonable earnings threshold for programs offered in U.S. territories.

In addition, we recognize that it may be more challenging for some programs serving students in economically disadvantaged locales to demonstrate that graduates surpass the earnings threshold when the earnings threshold is based on the median statewide earnings, including locales with higher earnings. We invite public comments concerning the possible use of an established list, such as a list of persistent poverty counties compiled by the Economic Development Administration, to identify such locales, along with comments on what specific adjustments, if any, the Department should make to the earnings threshold to accommodate in a fair and data-informed manner programs serving those populations.

The Department chose to compute the earnings premium measure by comparing program graduates to those with only a secondary credential who are working or who reported themselves as unemployed, which means they do not currently have a job but report being available and looking for a position. By doing so, the threshold measure excludes individuals who are not in the labor force in calculating median high school graduate earnings. The Department believes this approach creates an appropriate comparison group for recent postsecondary program graduates, as we would anticipate that most graduates—especially those graduating from career training

---

[93] For further discussion of the earnings premium metric and the Department's reasons for proposing it, see above at "Background" and at "Financial value transparency scope and purpose (§ 668.401)", and below at "Gainful employment (GE) scope and purpose (§ 668.601)". The discussion here concentrates on methodology.

[94] Graduate and Post-BA certificates, which make up 140 and 22 programs of the over 26,000 programs with earnings data have interquartile ranges of 30 to 37 and 32 to 39 respectively.

App.226

programs—are likely employed or looking for work.

*Process for Obtaining Data and Calculating D/E Rates and Earnings Premium Measure (§ 668.405)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.405 to establish the process under which the Department would obtain the data necessary to calculate the financial value transparency metrics.

Under this proposed rule, the Department would use administrative data that institutions report to us to identify which students' information should be included when calculating the metrics established by this rule for each program. Institutions would be required to update or otherwise correct any reported data no later than 60 days after the end of an award year, in accordance with procedures established by the Department. We would use this administrative data to compile and provide to institutions a list of students who completed each program during the cohort period. Institutions would have the opportunity to review and correct completer lists. The finalized completer lists would then be used by the Department to obtain from a Federal agency with earnings data the median annual earnings of the students on each list; and to calculate the D/E rates and the earnings premium measure which we would provide to the institution. For each completer list the Department submits to the Federal agency with earnings data, the agency would return to the Department (1) The median annual earnings of the students on the list whom the Federal agency with earnings data matches to earnings data, in aggregate and not in individual form; and (2) The number, but not the identities, of students on the list that the Federal agency with earnings data could not match. If the information returned by the Federal agency with earnings data includes reports from records of earnings on at least 30 students, the Department would use the median annual earnings provided by the Federal agency with earnings data to calculate the D/E rates and earnings premium measure for each program. If the Federal agency with earnings data reports that it was unable to match one or more of the students on the final list, the Department would not include in the calculation of the median loan debt for D/E rates the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did

not match. For example, if the Federal agency with earnings data is unable to match three students out of 100 students, the Department would order the 100 listed students by the amounts borrowed and exclude from the D/E rates calculation the students with the three largest loan debts to calculate the median program loan debt.

*Reasons:* For the reasons discussed in § 668.401 "Scope and purpose," we intend to establish metrics that would assess whether a program leads to acceptable debt and earnings outcomes. As further discussed in § 668.402 "Financial value transparency framework," these metrics would include a program's D/E rates as well as an earnings premium measure. To the extent possible, in calculating these metrics the Department would rely upon data the institution is already required to report to us. As such, it would be necessary that current and reliable information be available to the Department. Institutions would therefore be required to update or otherwise correct any reported data no later than 60 days after the end of an award year, to ensure the accuracy of completers lists while allowing the Department to submit those lists to a Federal agency with earnings data in a timely manner.

We believe that providing institutions the opportunity to review and correct completer lists will promote transparency and provide helpful insight from institutions, while ultimately yielding more reliable eligibility determinations based upon the most current and accurate debt and earnings data possible. We recognize that reviewing completer lists for each program could generate some administrative burden for institutions, but we have attempted to mitigate this burden by ensuring that the completer list review process is optional for institutions. The Department would assume the accuracy of a program's initial completer list unless the institution provides corrections using a process prescribed by the Secretary within the 60-day timeframe provided in these regulations.

To safeguard the privacy of sensitive earnings data, the Federal agency with earnings data would not provide individual earnings data for each completer on the list to the Department. Instead, the Federal agency with earnings data would provide to the Department only the median annual earnings of the students on the list whom it matches to earnings data, along with the number of students on the list that it could not match, if any. This is in keeping with how the Department

has received information on program and institutional earnings from other Federal agencies for years, as we have never obtained earnings information of individuals when using this approach.

For purposes of determining the median loan debt to be used in the D/E rates calculation, the Department would remove the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did not match. In the absence of earnings data for specific borrowers, which would otherwise allow the Department to remove the loan debts specific to the borrowers whose earnings data could not be matched, we propose removing the highest loan debts to represent those borrowers because it is the approach to adjusting debt levels for unmatched individuals that is most favorable to institutions, yielding the lowest estimate of median debt for the subset of program graduates for whom earnings are observed that is consistent with the data.

The proposed rule does not specify a source of data for earnings, but rather allows the Department flexibility to work with another Federal agency to secure data of adequate quality and in a form that adequately protects the privacy of individual graduates. The Department's goal is to evaluate programs, not individual students. The earnings data gathered for purposes of this proposed rule would not be used to evaluate individual students in any way. Moreover, the Department would be seeking aggregate statistical information from a Federal agency with earnings data for combined groups of students, and would not receive any individual data that associate identifiable persons with earnings outcomes. The Department will determine the specific source of earnings data in the future, potentially considering such factors as data availability, quality, and privacy safeguards.

At this stage, however, the Department does have a preliminary preference regarding the source of earnings data. While the 2014 Prior Rule relied upon earnings data from the Social Security Administration, at this time we would prefer to use earnings data provided by the Internal Revenue Service (IRS). IRS now seems to be the highest quality data source available, and is the source used for other Department purposes such as calculating an applicant's title IV, HEA eligibility and determining a borrower's eligibility for income-driven student loan repayment plans. Moreover, the Department has successfully negotiated

agreements with the IRS to produce statistical information for the College Scorecard. Although the underlying data used by both agencies is based on IRS tax records, as an added privacy safeguard we understand that the IRS would use a privacy-masking algorithm to add statistical noise to its estimates before disclosing median earnings information to the Department.

This statistical noise would take the form of a small adjustment factor designed to prevent disclosure of individual data. This adjustment factor can be positive or negative and tends to become smaller as the underlying number of individuals in the completion cohort in a program becomes larger. For a small number of programs, the adjustment factor could potentially affect whether some programs pass or fail the accountability metrics. The Department recognizes this creates a small risk of inaccurate determinations in both directions, including a very small likelihood that a program that would pass if its unadjusted median earnings data were used in calculating either D/E rates or the earnings premium. Using data on the distribution of noise in the IRS earnings figures used in the College Scorecard, we estimate that the probability that a program would be erroneously declared ineligible (that is, fail in 2 of 3 years using adjusted data when unadjusted data would result in failure for 0 years or 1 year) is less than 1 percent.

Assuming that such statistical noise would be introduced, the Department plans to counteract this already small risk of improper classification in several ways. First, we include a minimum n-size threshold as discussed under proposed § 668.403 to avoid disclosing median earnings information for smaller cohorts, where statistical noise would have a greater impact on the disclosed earnings measure. The n-size threshold effectively caps the influence of the noise on results under our proposed metrics. In addition, before invoking a sanction of loss of eligibility in the accountability framework described in proposed § 668.603, we require that GE programs fail the accountability measures multiple times.

Furthermore, elsewhere in the proposed rule, we establish an earnings calculation methodology that is more generous to title IV, HEA supported programs than what the Department adopted in the 2014 Prior Rule for GE programs. The proposed rule would measure the earnings of program completers approximately one year later (relative to when they complete their credential) than under the 2014 Prior

Rule. This leads to substantially higher measured program earnings than under the Department's previous methodology—on the order of $4,000 (about 20 percent) higher for GE programs with earnings between $20,000 and $30,000, which are the programs most at risk for failing the earnings premium threshold.[95] The increase in earnings from this later measurement of income would provide a buffer more than sufficient to counter possible error introduced by the statistical noise added by the IRS. Additional adjustments would present unwelcome trade-offs, with little gain in protecting adequately performing programs in exchange for introducing another type of error. Adjusting earnings calculations to further reduce the low chance of programs failing the proposed metrics based on statistical noise would increase the risk of other kinds of errors, such as programs that should fail the proposed metrics appearing to pass based on an artificial increase in calculated earnings. On the other hand, and with respect to a related issue of earnings measurements, making special accommodations only for programs where under-reporting of earnings is suspected would differentially reward such programs and potentially create adverse incentives for programs to encourage such behavior. This could have the additional effect of inappropriately increasing public subsidies of such programs, as loan payments for program graduates would also be artificially reduced as a result of their lower reported earnings. We therefore do not believe it is necessary or appropriate to make other adjustments to the earnings calculations beyond those described above.

The Department also has gained a fresh perspective on earnings appeals in light of our experience, new research, and other considerations. In the 2014 Prior Rule the Department included an alternate earnings appeal to address concerns similar to those raised by some non-Federal negotiators in the 2022 negotiated rulemaking. The concerns were about whether programs preparing students to enter certain occupations, such as cosmetology, may have very low earnings in data obtained from Federal agencies because a substantial portion of a completer's income may derive from tips and gratuities that may be underreported or unreported to the IRS.

Those arguments on unreported income have become less persuasive to the Department based upon further review of Federal requirements for the accurate reporting of income; consideration that IRS income data is used without adjustment for determining student and family incomes for purposes of establishing student title IV, HEA eligibility and determining loan payments under income-driven repayment plans; past data submitted as part of the alternate earnings appeals; and new research on the effects of tipping on possible debt-to-earnings outcomes. As a result of this review, we have concluded that it would not be appropriate to include a similar appeal process in this proposed rule.

First, there is the issue of legal reporting requirements. The law requires taxpayers to report tipped income to the IRS. Failing to report all sources of the income to the IRS can lead to financial penalties and additional tax liability. And changes made in the American Rescue Plan Act lowered to $600 the reporting threshold for when a 1099–K is issued,[96] which will result in more third-party settlement organizations issuing these forms. Because of these recent changes, the proposed use of earnings data provided directly by a Federal agency with earnings data would be more comprehensive and reliable than previously observed in the 2014 Prior Rule. This is not to deny that some fraction of income will be unreported despite legal duties to report, but instead to recognize as well that legal demands and other relevant circumstances have changed.

Moreover, income adjustments to IRS earnings are not used in other parts of the Department's administration of the title IV, HEA programs. IRS income and tax data are used to determine a student's eligibility for Federal benefits, including the title IV, HEA programs, and we believe it would be most appropriate and consistent to rely on IRS data when measuring the outcomes of those programs. In particular, under the Department's various income-driven repayment plans, student loan borrowers can use their reported earnings to the IRS to establish eligibility for loan payments calculated based on their reported earnings, and so the Department has an independent interest in the level of these earnings since they impact loan repayment. While institutions cannot directly compel graduates to properly report tipped income, they are nonetheless

---

[95] This calculation is based on a comparison of (1) the earnings data released for GE programs in 2017 under the 2014 Prior Rule, inflation adjusted to 2019 dollars, to (2) earnings data for the subset of those GE programs still in existence, calculated using the methodology proposed in this NPRM.

[96] https://www.govinfo.gov/content/pkg/PLAW-117publ2/html/PLAW-117publ2.htm.

App.228

uniquely positioned to educate their students on the importance of meeting their obligation to properly observe Federal tax filing requirements when they enter or reenter the work force. Title IV, HEA support for students and educational programs is in turn supported by taxpayers, and the Department has a responsibility to protect taxpayer interests when implementing the statute.

Beyond those considerations, it is unlikely that any earnings appeal process would generate a better estimate of graduates' median earnings. To date, the Department has identified no other data source that could be expected to yield data of higher quality and reliability than the data available to the Department from the IRS. Alternative sources such as graduate earnings surveys would be more prone to issues such as low response rates and inaccurate reporting, could more easily be manipulated to mask poor program outcomes, and would impose significant administrative burden on institutions. One analysis of alternative earnings data, provided by cosmetology schools as part of the appeals process for GE debt-to-earnings thresholds under the 2014 Prior Rule, found that the average approved appeal resulted in an 82 percent increase in calculated earnings income relative to the numbers in administrative data.[97] Results like that appear to be implausibly high, given our experience and other considerations that we offer above and below. Without relying too heavily on any one study, we can suggest at this stage that it seems likely that the use of alternative earnings estimates, typically generated from student surveys, could yield a substantial overestimate of income above that of unreported tips.[98]

Furthermore, the plausible scope of the unreported income issue should be kept in perspective. First of all, in many fields of work the question of unreported income is insubstantial. Tip income, for instance, certainly is not typical in every occupation and profession in which people work after graduating having received aid from title IV, HEA. In the GE context, the number of occupations related to GE programs where tipping is common seems far smaller than has been presented in the past. One public

comment submitted in 2018 in response to the proposed rescission of the 2014 Prior Rule noted that the only occupations in which there are GE programs where tipping might be occurring are in cosmetology, massage therapy, bartending, acupuncture, animal grooming, and tourism/travel services.[99] While there are other types of occupational categories where tipping does occur, such as restaurant service, these are not areas where the students are being specifically trained to work in programs that might be eligible for title IV, HEA support. For instance, the GE programs related to restaurants are in culinary arts, where chefs are less likely to receive tips.

Even in fields of work that involve title IV, HEA support and where one might suppose that unreported income is substantial, research will not necessarily support that guesswork. For example, recent research indicates that making reasonable adjustments to the earnings of cosmetology programs to account for tips would have minimal effects on whether a program passes the GE metrics. Looking at programs that failed the metrics in the 2014 Prior Rule for GE programs, researchers estimated that underreporting of tipped income likely constituted just 8 percent of earnings and therefore would only lead to small changes in the number and percentage of cosmetology programs that pass or fail the 2014 rule.[100] To reiterate, the Department is interested in a reasonable assessment of available information without overreliance on any one piece of evidence. So, although the above study's estimate of only 8 percent underreporting is noteworthy for its small size, we are not convinced that it would be reasonable to convert that particular number into any flat rule related to disclosures, warnings, acknowledgments, or program eligibility.

Instead, we consider such studies alongside a range of other factors to reach decisions in this rulemaking. In particular, we note again the change in timing for measuring earnings from the 2014 Prior Rule that leads to an increase in earnings for all programs that is higher than this estimate of underreporting, as further explained in the discussion of proposed § 668.403. Thus the proposed rule already includes safeguards against asserted underestimates of earnings. We also seek to avoid the perverse incentives that would be created by making the

rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes. We do not believe that taxpayer-supported educational programs should, in effect, receive credit when their graduates fail to report income for tax purposes. That position, even if it were fiscally sustainable, would incentivize institutions to discourage accurate reporting of earnings among program graduates—at the ultimate expense of taxpayers. Given the career training focus for these programs, we also believe that the institutions providing that training can emphasize the importance of reporting income accurately, not only as a legal obligation but also to ensure that long-term benefits from Social Security are maximized.

In summary, the Department believes that the consistency and reliability benefits of using IRS earnings data would warrant reliance upon these average program earnings without further adjustments beyond those adopted in this proposed rule. This is the same approach used for the calculation of income—including tipped income that is lawfully reported to the IRS—for other title IV, HEA program administration purposes, such as determining eligibility for funds and the payment amounts under various income-driven repayment plans.

### Determination of the Debt to Earnings Rates and Earnings Premium Measure (§ 668.406)

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.406 to require the Department to notify institutions of their program value transparency metrics and outcomes and, in the case of a GE program, to notify the institution if a failing program would lose title IV, HEA eligibility under proposed § 668.603. For each award year for which the Department calculates D/E rates and the earnings premium measure for a program, the Department would issue a notice of determination informing the institution of: (1) The D/E rates for each program; (2) The earnings premium measure for each program; (3) The Department's determination of whether each program is passing or failing, and the consequences of that determination; (4) For a non-GE program, whether the student acknowledgement would be required under proposed § 668.407; (5) For a GE program, whether the institution would be required to provide

---

[97] Stephanie Riegg Cellini and Kathryn J. Blanchard, "Hair and taxes: Cosmetology programs, accountability policy, and the problem of underreported income," Geo. Wash. Univ. (Jan. 2022), *www.peerresearchproject.org/peer/research/body/PEER_HairTaxes-Final.pdf.*

[98] For further discussion on the Department's experience with alternate earnings appeals, see below at § 668.603.

[99] *www.regulations.gov/comment/ED-2018-OPE-0042-13794.*

[100] *www.peerresearchproject.org/peer/research/body/PEER_HairTaxes-Final.pdf.*

the student warning under proposed § 668.605; and (6) For a GE program, whether the program could become ineligible based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the program.

*Reasons:* Proposed § 668.406 would establish the Department's administrative process to determine, and notify an institution of, a program's final financial value transparency measures. The notice of determination will inform the institution of its program outcomes so that it can provide prompt information to students, including warnings as required under proposed § 668.605, and take actions necessary to improve programs with unacceptable outcomes.

*Student Disclosure Acknowledgments (§ 668.407)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.407 to require acknowledgments from current and prospective students if an eligible non-GE program leads to high debt outcomes based on its D/E rates, to specify the content and delivery parameters of such acknowledgments, and to require students to provide the acknowledgments prior to the disbursement of title IV, HEA funds. Additional warning and acknowledgment requirements would also apply to GE programs at risk of a loss of title IV, HEA eligibility, as further detailed in proposed § 668.605.

Under proposed changes to § 668.43, an institution would be required to distribute information to students and prospective students, prior to enrollment, about how to access a disclosure website maintained by the Secretary. The disclosure website would provide information about the program, including the D/E rates and earnings premium measure, when available. For eligible non-GE programs, for any year for which the Secretary notifies an institution that the eligible non-GE program is associated with relatively high debt burden for the year in which the D/E rates were most recently calculated by the Department, proposed § 668.407 would require students to acknowledge viewing these informational disclosures prior to receiving title IV, HEA funds. This acknowledgment would be facilitated by the Department's disclosure website and required before the first time a student begins an academic term after the program has had an unacceptable D/E rate.

In addition, an institution could not enroll, register, or enter into a financial commitment with the prospective student sooner than three business days after the institution distributes the information about the disclosure website maintained by the Secretary to the student. An institution could not disburse title IV, HEA funds to a prospective student enrolling in a program requiring an acknowledgment under this section until the student provides the acknowledgment. We would also specify that the acknowledgment would not otherwise mitigate the institution's responsibility to provide accurate information to students, nor would it be considered as evidence against a student's claim if the student applies for a loan discharge under the borrower defense to repayment regulations at 34 CFR part 685, subpart D.

The Department is aware that in some cases, students may transfer from one program to another, or may not immediately declare a major upon enrolling in an eligible non-GE program. We welcome public comments about how to best address these situations with respect to acknowledgment requirements. The Department also understands that many students seeking to enroll in non-GE programs may place high importance on improving their earnings, and would benefit if the regulations provided for acknowledgements when a non-GE program is low-earning. We further welcome public comments on whether the acknowledgment requirements should apply to all programs, or to GE programs and some subset of non-GE programs, that are low-earning.

The Department is also aware that some communities face unequal access to postsecondary and career opportunities, due in part to the lasting impact of historical legal prohibitions on educational enrollment and employment. Moreover, institutions established to serve these communities, as reflected by their designation under law, have often had lower levels of government investment. The Department welcomes comments on how we might consider these factors, in accord with our legal obligations and authority, as we seek to ensure that all student loan borrowers can make informed decisions and afford to repay their loans.

*Reasons:* Through the proposed regulations the Department intends to establish a framework for financial value transparency for all programs, regardless of whether they are subject to the accountability framework for GE programs. To help achieve these goals, in proposed § 668.407, we set forth acknowledgment requirements for students, which institutions that benefit from title IV, HEA must facilitate by providing links to relevant sources, based on the results of their programs under the metrics described in § 668.402. To enhance the clarity of these proposed regulations, we discuss the warning requirements for GE programs separately under proposed § 668.605.

In the 2019 Prior Rule rescinding the GE regulation, the Department stated that it believed that updating the College Scorecard would be sufficient to achieve the goals of providing comparable information on all institutions to students and families as well as the public. While we continue to believe that the College Scorecard is an important resource for students, families, and the public, we do not think it is sufficient for ensuring that students are fully aware of the outcomes of the programs they are considering before they receive title IV, HEA funds to attend them. One consideration is that the number of unique visitors to the College Scorecard is far below that of the number of students who enroll in postsecondary education in a given year. In fiscal year 2022, we recorded just over 2 million visits overall to the College Scorecard. This figure includes anyone who visited, regardless of whether they or a family member were enrolling in postsecondary education. By contrast, more than 16 million students enroll in postsecondary education annually, in addition to the family members and college access professionals who may also be assisting many of these individuals with their college selection process. Second, research has shown that information alone is insufficient to influence students' enrollment decisions. For example, one study found that College Scorecard data on cost and graduation rates did not impact the number of schools to which students sent SAT scores.[101] The authors found that a 10 percent increase in reported earnings increased the number of score sends by 2.4 percent, and the impact was almost entirely among well-resourced high schools and students. Third, the Scorecard is intentionally not targeted to a specific individual because it is meant to provide comprehensive information to anyone searching for a postsecondary education. By contrast, a disclosure would be a more

---

[101] *onlinelibrary.wiley.com/doi/abs/10.1111/ ecin.12530.*

personalized delivery of information to a student because it would be based on the specific programs that they are considering. Requiring an acknowledgment under certain circumstances would also ensure that students see the information, which may or may not otherwise occur with the College Scorecard. Finally, we think the College Scorecard alone is insufficient to encourage improvements to programs solely through the flow of information indicated in the 2019 Final Rule. Posting the information on the Scorecard in no way guarantees that an institution would even be aware of the outcomes of their programs, and institutions have no formal role in acknowledging their outcomes. By contrast, with these proposed regulations institutions would be fully informed of the outcomes of all their programs and would also know which programs would be associated with acknowledgment requirements and which ones would not. The Department thus anticipates that these disclosures and acknowledgements will better achieve the goals of both delivering information to students and encouraging improvement than the approach outlined in the 2019 Rule did.

Under the proposed regulations, the Department would not publish specific text that institutions would use to convey acknowledgment requirements to students. We believe institutions are well positioned to tailor communications about acknowledgment requirements in a manner that best meets the needs of their students, and institutions would be limited in their ability to circumvent the acknowledgement requirement because the Department's systems would not create disbursement records until the student acknowledges the disclosure through the website maintained by the Secretary. To enhance the clarity of these proposed regulations, we discuss the warning requirements for GE programs separately under proposed § 668.605.

Similar to the 2014 Prior Rule, requiring that at least three days must pass before the institution could enroll a prospective student would provide a ''cooling-off period'' for the student to consider the information provided through the disclosure website without immediate and direct pressure from the institution, and would also provide the student with time to consider alternatives to the program either at the same institution or at another institution.

For both GE and non-GE programs, we propose to collect data, calculate results, and post results on both D/E and EP.

That will make the information about costs, borrowing, and earnings outcomes widely available to the prospective students and the public. As outlined in subpart S, we use these same metrics to establish whether GE programs prepare students for gainful employment and are thus eligible to participate in Title IV, HEA programs, and due to the potential for loss of eligibility we require programs failing either metric to provide warnings and facilitate their students in acknowledging viewing the information before aid can be disbursed. For non-GE programs, we require students to acknowledge viewing the disclosure information when programs fail D/E, but not EP. While many non-GE students surely care about earnings, non-GE programs are more likely to have nonpecuniary goals. Requiring students to acknowledge low-earning information as a condition of receiving aid might risk conveying that economic gain is more important than nonpecuniary considerations. In contrast, students' ability to pursue nonpecuniary goals is jeopardized and taxpayers bear additional costs if students enroll in high-debt burden programs. Requiring acknowledgement of the D/E rates ensures students are alerted to risk on that dimension.

*Reporting Requirements (§ 668.408)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.408 to establish institutional reporting requirements regarding Title IV-eligible programs offered by the institution and students who enroll in, complete, or withdraw from an eligible such programs, and to define the timeframe for institutions to report this information.

For each eligible program during an award year, an institution would be required to report: (1) Information needed to identify the program and the institution; (2) The name, CIP code, credential level, and length of the program; (3) Whether the program is programmatically accredited and, if so, the name of the accrediting agency; (4) Whether the program meets licensure requirements for all States in the institution's metropolitan statistical area, whether the program or prepares students to sit for a licensure examination in a particular occupation, the number of program graduates from the prior award year that take the licensure examination within one year (if applicable), and the number of program graduates that pass the licensure examination within one year (if applicable); (5) The total number of

students enrolled in the program during the most recently completed award year, including both recipients and non-recipients of title IV, HEA funds; and (6) Whether the program is a medical or dental program whose students are required to complete an internship or residency.

For each recipient of title IV, HEA funds, the institution would also be required to annually report at a student level: (1) The date each student initially enrolled in the program; (2) Each student's attendance dates and attendance status (*e.g.,* enrolled, withdrawn, or completed) in the program during the award year; (3) Each student's enrollment status (*e.g.,* full-time, three-quarter time, half-time, less than half-time) as of the first day of the student's enrollment in the program; (4) The total annual cost of attendance; (5) The total tuition and fees assessed for the award year; (6) The student's residency tuition status by State or region (such as in-state, in-district, or out-of-state); (7) The total annual allowance for books, supplies, and equipment; (8) The total annual allowance for housing and food; (9) The amount of institutional grants and scholarships disbursed; (10) The amount of other state, Tribal, or private grants disbursed; and (11) The amount of any private education loans disbursed, including private education loans made by the institution. In addition, if the student completed or withdrew from the program and ever received title IV, HEA assistance for the program, the institution would also be required to report: (1) The date the student completed or withdrew from the program; (2) The total amount, of which the institution is or should reasonably be aware, that the student received from private education loans for enrollment in the program; (3) The total amount of institutional debt the student owes any party after completing or withdrawing from the program; (4) The total amount of tuition and fees assessed the student for the student's entire enrollment in the program; (5) The total amount of the allowances for books, supplies, and equipment included in the student's title IV, HEA cost of attendance for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and (6) The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program. Institutions would also be required to report any additional information the Department may specify

through a notice published in the **Federal Register**.

For GE programs, institutions would be required to report the above information, as applicable, no later than July 31 following the date these regulations take effect for the second through seventh award years prior to that date or, for medical and dental programs that require an internship or residency, July 31 following the date these regulations take effect for the second through eighth award years prior to that date. For eligible non-GE programs, institutions would have the option either to report as described above, or to initially report only for the two most recently completed award years, in which case the Department would calculate the program's transitional D/E rates and earnings premium measure based on the period reported. After this initial reporting, for each subsequent award year, institutions would be required to report by October 1 following the end of the award year, unless the Department establishes different dates in a notice published in the **Federal Register**. If, for any award year, an institution fails to provide all or some of the information described above, the Department would require the institution to provide an acceptable explanation of why the institution failed to comply with any of the reporting requirements.

*Reasons:* Certain student-specific information is necessary for the Department to implement the provisions of proposed subpart Q, specifically to calculate the D/E rates and the earnings premium measure for programs under the program value transparency framework. This information is also needed to calculate many of the disclosures under proposed § 668.43(d), including the completion rates, program costs, median loan debt, median earnings, and debt-to-earnings, among other disclosures. As discussed in "§ 668.401 Scope and purpose," the proposed reporting requirements are designed, in part, to facilitate the transparency of program outcomes and costs by: (1) Ensuring that students, prospective students, and their families, the public, taxpayers, and the Government, and institutions have timely and relevant information about programs to inform student and prospective student decision-making; (2) Helping the public, taxpayers, and the Government to monitor the results of the Federal investment in these programs; and (3) Allowing institutions to see which programs produce exceptional results for students so that those programs may be emulated.

The proposed regulations would require institutions to report the name, CIP code, credential level, and length of the program. Although program completion times can sometimes vary due to differences in student enrollment patterns, to provide the most meaningful information possible for prospective students, we refer in the proposed regulations, particularly in the reporting and disclosure requirements in § 668.43 and § 668.408, to the "length of the program." The "length of the program" would be defined as the amount of time in weeks, months, or years that is specified in the institution's catalog, marketing materials, or other official publications for a student to complete the requirements needed to obtain the degree or credential offered by the program.

In proposed additions to the general definitions at § 668.2, we would establish separate definitions for "CIP code" and "credential level." The proposed definition of "CIP code" largely mirrors the definition in the 2014 Prior Rule. The proposed definition of "credential level" would also be similar to past definitions, and the proposed definition includes a listing of the credential levels for use in the definition of a program.

Reporting whether a program is programmatically accredited along with the name of the relevant accrediting agency would allow the Department to include that information in disclosures. Clear and consistent information about programmatic accreditation would aid current and prospective students in assessing the value of the program and in comparing the program against others, and such information about programmatic accreditation is not readily available to students.

Reporting whether a program meets relevant licensure requirements for the States in the institution's metropolitan statistical area or prepares students to sit for a licensure examination in a particular occupation would allow the Department to provide current and prospective students with invaluable information about the career outcomes for graduates of the program and support informed enrollment decisions. In recent years, some institutions have misrepresented the career and employment outcomes of programs, including the eligibility of program graduates to sit for licensure examinations, resulting in borrower defense claims.[102] We remain concerned about the ongoing potential for such

misrepresentations, and believe that reporting and disclosing information about a program's licensure outcomes—such as share of recent program graduates that sit for and pass licensure exams—will help to reduce the number of future borrower defense claims that are approved.

Reporting the total number of students enrolled in a program, including both recipients and non-recipients of title IV, HEA funds, would allow the Department to calculate and disclose the percentage of students who receive Federal student aid and Federal student loans. This information would assist current and prospective students in comparing programs and institutions and would assist in making better informed enrollment decisions.

Reporting whether a program is a medical or dental program that includes an internship or residency is necessary because proposed § 668.403 would use a different cohort period in calculating the D/E rates for those programs. See "§ 668.403 Calculating D/E rates" for a discussion of why these programs would be evaluated differently.

The dates of a student's attendance in the program and the student's attendance status (*i.e.,* completed, withdrawn, or still enrolled) and enrollment status (*i.e.,* full time, three-quarter time, half time, and less than half time) would be needed by the Department to attribute the correct amount of a student's title IV, HEA program loans that would be used in the calculation of a program's D/E rates. These items would also be needed to identify the program's former students for inclusion on the list submitted to a Federal agency with earnings data to determine the program's median annual earnings for the purpose of the D/E rates and earnings premium calculations, and the borrowers who would be considered in the calculation of the program's completion rate, withdrawal rate, loan repayment rate, median loan debt, and median earnings.

We would require the amount of each student's private education loans and institutional debt, along with the student's title IV, HEA program loan debt, institutional grants and scholarships, and other government or private grants disbursed, to determine the debt portion of the D/E rates. We would also require institutions to report the total cost of attendance, the cost of tuition and fees, and the cost of books, supplies, and equipment to determine the program's costs. We would need both of these amounts to calculate the D/E rates because, as provided under proposed § 668.403, in determining a program's median loan amount, each

---

[102] *studentaid.gov/announcements-events/ borrower-defense-update.*

student's loan debt would be capped at the lesser of the loan debt or the program costs, less any institutional grants and scholarships. We recognize that some institutions with higher overall tuition costs offer significant institutional financial assistance or discounts that reduce the net cost for students to enroll in their programs. Requiring institutions to report institutional grants and scholarships would allow the Department to take such financial assistance into consideration when measuring debt outcomes, would encourage institutions to provide financial assistance to students, and would ultimately result in a fairer metric and more consistent comparisons of the actual debt burdens associated with different programs.

For GE programs, institutions would be required to initially report for the second through seventh prior award years, and for the second through eighth prior award years for medical and dental programs requiring an internship or residency. This reporting would ensure that the Department could calculate the D/E rates and the earnings premium measure under subpart Q and apply the eligibility outcomes under subpart S in as timely a manner as possible, thus protecting students and taxpayers through prompt oversight of failing GE programs. Much of the necessary information for GE programs would already have been reported to the Department under the 2014 Prior Rule, and as such we believe the added burden of this reporting relative to existing requirements would be reasonable. For example, the vast majority (88 percent) of public institutions operated at least one GE program and thus have experience with similar data reporting for the subset of their students enrolled in certificate programs under the 2014 Prior Rule, and nearly half (47 percent) of private non-profit institutions did as well. Moreover, many institutions report more detailed information on the components of cost of attendance and other sources of financial aid in the federal National Postsecondary Student Aid Survey (NPSAS) administered by the National Center for Education Statistics. For example, 2,210 institutions provided very detailed student-level financial aid and other information as part of the 2017–18 National Postsecondary Student Aid Study, Administrative Collection (NPSAS:18–AC) collection, including 74 percent of all public institutions and 37 percent of all private non-profit

institutions.[103] Since the latter are selected for inclusion randomly each NPSAS collection period, the number of institutions that have ever provided such data is much higher than this rate implies.

The proposed financial value transparency framework entails added reporting burden for institutions relative to the 2019 Prior Rule and the 2014 Prior Rule for some additional data items and for students in programs that are not covered by the GE accountability framework. The Department proposes flexibility for institutions to avoid reporting data on students who completed programs in the past for non-GE programs, and instead to use data on more recent completer cohorts to estimate median debt levels. In part, this is intended to ease the administrative burden of providing this data for programs that were not covered by the 2014 Prior Rule reporting requirements, especially for the small number of institutions that may not previously have had any programs subject to these requirements.

The debt-to-earnings rates are intended to capture whether program completers' debt levels are reasonable in light of their earnings outcomes. Since earnings are observed with a lag, the most recent year's D/E rates necessarily involve the earnings and debt levels of individuals completing at least five or six years earlier. For GE programs, where the measures affect program eligibility, the Department believes it is important that debt and earnings measures are based on the same group of students. It might be, for example, that more recent cohorts of students have higher borrowing levels due to changes to curriculum that raised the costs of instruction and, as a result, the cost of tuition. These changes would ideally be reflected in improvements in students' earnings as well, but the D/E rates might not reflect that if the earnings data used for D/E were based on the older cohorts while debt measures are based on a more recent cohort.

[103] These tabulations compare the number of institutions providing enrollment lists in NPSAS 18–AC to the number of institutions in the 2019 Program Performance Data, described in the Regulatory Impact Analysis. The number of institutions represented in the final survey is lower. see Table B1 in Burns, R., Johnson, R., Lacy, T.A., Cameron, M., Holley, J., Lew, S., Wu, J., Siegel, P., and Wine, J. (2022). 2017–18 National Postsecondary Student Aid Study, Administrative Collection (NPSAS:18–AC): First Look at Student Financial Aid Estimates for 2017–18 (NCES 2021–476rev). U.S. Department of Education. Washington, DC: National Center for Education Statistics. Retrieved 1/30/2023 from *nces.ed.gov/ pubsearch/pubsinfo.asp?pubid=2021476rev.*

For non-GE programs the transparency metrics do not affect a program's eligibility for Title IV, HEA programs. While it would be preferable to have more accurate information that is comparable across all programs to better support student choices, for non-GE programs the Department believes alleviating some institutional reporting burden justifies a temporary sacrifice in the quality of the D/E data reported during a transition period. For that reason, the Department proposes to offer institutions the option either to report past cohorts for eligible non-GE programs as otherwise required for GE programs, or to report for only the two most recently completed award years. If institutions opt to report only the most recently completed award years for an eligible non-GE program, we would calculate the program's transitional D/E rates and earnings premium based on the data reported. Transitional D/E rates would differ from those described in proposed § 668.403 by only considering Federal loan debt (no private or institutional loans) and by not capping the total debt based on direct costs minus institutional scholarships. Further, this debt would pertain to recent completers rather than those whose median earnings are available. We believe that the transitional metric, though missing data elements, will provide useful information to institutions that could be used to enhance their program offerings and improve student outcomes until more comprehensive data are available.

For those institutions that opt to or are required to complete the reporting on past cohorts, we recognize that the initial reporting deadline of July 31, 2024, may pose implementation challenges for institutions, who may experience difficulties compiling and reporting data within a month of the date these regulations become effective, particularly for institutions that offer many educational programs and may not have been subject to reporting under the 2014 Prior Rule or similar reporting related to the NPSAS. To assist institutions in preparing for this deadline and to ensure that institutions have sufficient time to submit their data for the first reporting period, the Department anticipates that, as with the 2014 Prior Rule, it would provide training in advance to institutions on the new reporting requirements, provide a format for reporting, and enable the Department's relevant systems to accept optional early reporting from institutions beginning several months prior to the July 31, 2024, deadline.

We propose to include a provision similar to the one from the 2014 Prior

Rule requiring an institution to provide the Secretary with an explanation of why it has failed to comply with any of the reporting requirements. Because the Department would use the reported information to calculate the debt and earnings measures and the transparency disclosures, it is essential for the Secretary to have information about why an institution may not be able to report the information.

Some of the negotiators, particularly those representing postsecondary institutions, expressed unease that the proposed reporting may be burdensome. We understand these concerns, but we nonetheless believe that the benefits to students and to taxpayers derived from the reporting requirements under proposed subpart Q, which allow implementation of the proposed transparency and accountability frameworks, outweigh the costs associated with additional institutional burden. Institutions will also benefit from the reporting because the information would allow them to make targeted changes to improve their program offerings, and they would be able to promote their positive outcomes to potential students to assist in their recruiting efforts.

Most importantly, the Department believes these added reporting requirements will benefit students and taxpayers by providing new and more accurate information to make well-informed postsecondary choices. Multiple studies have shown that students and families are often making their postsecondary choices without sufficient information due to confusing and misleading financial aid offers.[104] The new reporting requirements will permit the Department to provide estimates of the net prices and total direct costs (tuition, fees, books, supplies, and equipment) and indirect costs students must pay to complete a program, and to tailor these estimates of yearly costs to students' financial background. Moreover, the data will allow estimates of the total amount students pay to acquire a degree, capturing variation in how long it takes for students to complete their degree. In some areas—including among graduate programs where borrowing levels have increased substantially in the last decade—this information will be the first systematic source of comparable data available for students and the general public to compare the costs and outcomes of different programs. This information should be beneficial to

institutions as well, helping them to benchmark their tuition prices against similar programs at other institutions, and to keep their prices better aligned with the financial value their programs deliver for students.

*Severability (§ 668.409)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.409 to establish severability protections ensuring that if any program accountability or transparency provision is held invalid, the remaining program accountability and transparency provisions, as well as other subparts, would continue to apply. Proposed § 668.409 would operate in conjunction with the severability provision in proposed § 668.606, which is discussed below and any other applicable severability provision throughout the Department's regulations.

*Reasons:* Through the proposed regulations we intend to (1) Establish measures that would distinguish programs that provide quality, affordable education and training to their students from those programs that leave students with unaffordable levels of loan debt in relation to their earnings or provide no earnings benefit from those who did not pursue a postsecondary degree or credential; and (2) Establish reporting and disclosure requirements that would increase the transparency of student outcomes so that accurate and comparable information is provided to students, prospective students, and their families, to help them make better informed decisions about where to invest their time and money in pursuit of a postsecondary degree or credential; the public, taxpayers, and the Government, to help them better safeguard the Federal investment in these programs; and institutions, to provide them meaningful information that they could use to improve student outcomes in these programs.

We believe that each of the proposed provisions serves one or more important, related, but distinct, purposes. Each of the requirements provides value, separate from and in addition to the value provided by the other requirements, to students, prospective students, and their families; to the public; taxpayers; the Government; and to institutions. To best serve these purposes, we would include this administrative provision in the regulations to establish and clarify that the regulations are designed to operate independently of each other and to

convey the Department's intent that the potential invalidity of any one provision should not affect the remainder of the provisions. Furthermore, proposed § 668.409 would operate in conjunction with the severability provision in proposed § 668.606 regarding GE program accountability. For ease of reference, here we offer an illustrative discussion for both of those severability provisions.

For example, under proposed subpart Q of part 668, a program must meet both the D/E rate and the earnings premium metric in order to pass the financial value transparency metrics. Each metric represents a distinctive measure of program quality, as we have explained elsewhere in this NPRM. Thus, if the D/E rate or the earnings premium metric is held invalid, the metric that was not held invalid could alone serve to help people distinguish, in its own distinctive way, programs that tend to provide relatively high quality and/or affordable education and training to their students from those programs that do not. Accordingly, the proposed rule does not provide that a program can pass the metrics by meeting only one of either the D/E metric or the earnings premium metric. The two metrics are aimed at distinct values, and they can operate independently of each other, in the sense that if one of these metrics is held invalid, the other metric could stand alone to help people distinguish programs on grounds that are relevant to many observers, applicable law, and sound policy. Although the Department believes that implementing both metrics is lawful and preferable for financial value transparency and for GE program accountability, implementing one or the other would be administrable and superior to implementing neither.

As another example, proposed § 668.605 would require institutions to provide various warnings to their students when a GE program fails the D/E rates or the earnings premium metric. If any or all of the student warning provisions are held invalid, the remainder of the rule can operate to provide measurements of financial value transparency even if there is no requirement that students must be warned when a GE program fails one of the metrics. The Department would retain other methods of disseminating information about GE and eligible non-GE programs, albeit methods that might not be as effective for and readily available to the relevant decision makers. Similarly, if a particular form of student warning is held invalid, the other warnings would still operate on their own to achieve the benefits of effectively informing as many students

[104] *www.newamerica.org/education-policy/policy-papers/decoding-cost-college/; https://www.gao.gov/products/gao-23-104708.*

**32342** Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules

as possible about a GE program's failing metrics.

In addition, the Department's ability to evaluate GE programs for title IV eligibility can operate compatibly with a wide range of options for disclosures, warnings, and acknowledgments about programs—and vice versa. Those information dissemination choices involve matters of degree that do not affect the operation of eligibility provisions. GE program eligibility can be determined without depending on one particular kind of information disclosure strategy, as long as the Department itself has the necessary information to make the eligibility determination. Likewise, a wide variety of valuable information can be disseminated in a variety of methods and formats for transparency purposes, regardless of how programs are evaluated for eligibility purposes.

Even if the invalidation of one part of the proposed rule would preclude the best and most effective regulation in the Department's considered view, the Department also believes that a wide range of financial value transparency options and GE program accountability options would be compatible with each other, justified on legal and policy grounds compared to loss of the entire rule, and could be implemented effectively by the Department. The same principle applies to the relationship of the provisions of subparts Q and S of part 668 to other subparts in this rule and throughout title 34 of the CFR, as reflected in the severability provision that will apply to all provisions in part 668 in July, 2023.[105]

*Gainful Employment (GE) Scope and Purpose (§ 668.601)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add subpart S, which would apply to educational programs that are required under the HEA to prepare students for gainful employment in a recognized occupation and would establish rules and procedures under which we would determine program eligibility. Proposed § 668.601 would establish this scope and purpose of the GE regulations in subpart S.

*Reasons:* The HEA requires some programs and institutions—generally all programs at proprietary institutions and most non-degree programs at public or private nonprofit institutions—to prepare students for gainful employment in a recognized occupation

in order to access the title IV, HEA Federal financial aid programs. For many years, however, the standards by which institutions could demonstrate compliance with those requirements were largely undefined. In 2010, the Department conducted a rulemaking and issued regulations that established such standards for GE programs, based in part on the debt that graduates incurred in attending the program, relative to the earnings they received after completion. Following a court challenge to the 2011 Prior Rule and further negotiated rulemaking, the Department reevaluated and modified its position and it issued updated regulations in 2014 that, in part, omitted the GE metric that a district court had found inadequately reasoned and included a debt-to-earnings standard for GE programs. When the data were first released in January 2017, over 800 programs, collectively enrolling hundreds of thousands of students, did not pass the revised GE standards.

In 2019, the Department rescinded the 2014 Prior Rule in favor of an alternate approach that relied upon providing more consumer information via the College Scorecard. As further explained in the discussion of proposed § 668.401, we continue to believe that providing students with clear and accurate measures of the financial value of all programs is critical. Based, however, on studies of the College Scorecard's impact on higher education choices, and an extensive body of research on how to make consumer information most impactful, we propose several improvements involving disclosures and warnings to students to ensure they have this information, especially when enrolling in a program might harm them financially.

For programs that are intended to prepare students for gainful employment in a recognized occupation, however, further steps beyond information provisions are necessary and appropriate. The proposed rule therefore defines the conditions under which a program prepares students for gainful employment in a recognized occupation, and accordingly determines eligibility for title IV, HEA program funds, based on the financial value metrics described in § 668.402.

The Department proposes additional scrutiny for these programs for several reasons. First, informational interventions have been shown to be effective in shifting postsecondary choices when designed well, but it is now reasonably clear that those interventions are insufficient to fully

protect students from financial harm.[106] The impact of information alone tends to be especially limited among more vulnerable populations, including groups that disproportionately enroll in gainful employment programs.[107] Analyses in the RIA show that 17.7 percent of all borrowers, accounting for nearly 33,374 borrowers in recent cohorts, who are in low-earning or high-debt-burden GE programs are in default on their student loans three years after repayment entry (compared with 10.1 percent of students nationwide). Removing Federal aid eligibility for such programs is necessary to prevent low-financial-value programs from continuing to harm these students—and from enjoying taxpayer support.

Second, the mission of gainful employment programs is to further students' career success. If such a program inflicts financial harm on its students, it is less likely that the value of the program can be redeemed by its performance in helping students achieve nonfinancial goals. In any event, this career focus is consistent with the different statutory definition of eligibility for such programs and the purposes of the relevant requirements for Federal support in title IV, HEA. As with other title IV, HEA educational programs, GE students are generally required to already possess a high school diploma or its equivalent. But unlike other title IV provisions, the statute's GE provisions also require that participating programs train students to *prepare* them for *gainful* employment in a *recognized occupation*.[108] Otherwise, taxpayer support is not authorized.

The relevant statutes thus indicate that GE programs are not meant to prepare postsecondary students for any job, irrespective of pay, debt burden, or qualifications. Instead, title IV's GE provisions indicate a purpose of Federal support for programs that actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation. Moreover, the recognized occupations for which GE programs must train and ''prepare'' postsecondary

---

[105] *See* 34 CFR 668.11 at 87 FR 65426, 65490 (Oct. 28, 2022).

[106] Baker, D., Cellini, S., Scott-Clayton, J., & Turner, L. (2021) Why information alone is not enough to improve higher education outcomes. Brookings Institution. Washington, DC.

[107] Gurantz, O., Howell, J., Hurwitz, M., Larson, C., Pender, M. and White, B. (2021), A National-Level Informational Experiment to Promote Enrollment in Selective Colleges. J. Pol. Anal. Manage., 40: 453–479. *doi.org/10.1002/pam.22262*; Hurwitz, M. and Smith, J. (2018), Student Responsiveness to Earnings Data in the College Scorecard. Econ Inq, 56: 1220–1243. *doi.org/10.1111/ecin.12530*.

[108] 20 U.S.C. 1002(b)(1)(A), (c)(1)(A). See also 20 U.S.C. 1088(b)(1)(A)(i), which refers to a recognized profession.

<span style="color:red">App.235</span>

students cannot fairly be considered "gainful" if typical program completers end up with more debt than they can repay absent additional Federal assistance. Likewise, the Department is convinced that programs cannot fairly be said to "prepare" postsecondary students for "gainful" employment in recognized occupations if program completers' earnings fall below those of students who never pursue postsecondary education in the first place. Put simply, the HEA itself calls for special attention to GE programs when it comes to program eligibility. The relevant statutes and policy considerations may differ for transparency purposes, but, for GE program eligibility purposes, the Department must maintain certain limits on taxpayer support. We believe that, at minimum, it is permissible and reasonable for the Department to specify the eligibility standards for GE programs to include D/E rates and an earnings premium.

Third, an expanding body of academic research suggests that additional attention is appropriate for GE programs. Studies have documented persistent problems including poor labor market outcomes, high levels of borrowing, high rates of default, and low loan repayment rates. For example, research has found that some postsecondary certificates have very low or even negative labor market returns for their graduates.[109] This finding is echoed in the Department's Regulatory Impact Analysis, which shows that 23.1 percent of title IV, HEA enrollment in undergraduate certificate programs was in programs where the median earnings among graduates was less than that for high school graduates of a similar age. Studies have reported that students in programs at for-profit institutions, in particular, see much lower employment and earnings gains than students in programs at non-profit institutions, which is also shown in the Department's analysis.[110] Moreover,

multiple studies have concluded that, accounting for differences in student characteristics, borrower outcomes like repayment rates and the likelihood of default are worse in the proprietary sector.[111][112] Finally, research indicates that Federal accountability efforts that deny Title IV, HEA eligibility to low-performing institutions can be effective in driving improved student outcomes, particularly for students who attend (or would have attended) for-profit colleges.[113][114]

We recognize that, since the prior rulemaking efforts in 2010, 2014, and 2019, some institutions have made positive changes to their GE programs, and some with many poor performing programs closed. Nonetheless, the data highlighted in the RIA demonstrate that more improvement in the sector is needed: for example, in the most recent data available (covering graduates in award years 2016 and 2017), nearly one fourth of all federally supported students enrolled in GE programs are in programs that fail either the D/E or EP metrics. Establishing accountability provisions will both prevent students from enrolling in programs where poor financial outcomes are the norm and would deter future bad actors seeking to create new programs that poorly serve students to capture Federal student aid revenue.

*Gainful Employment Criteria (§ 668.602)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to establish a framework to determine

whether a GE program is preparing students for gainful employment in a recognized occupation and thus may access title IV, HEA funds based upon its debt-to-earnings and earnings premium outcomes. Within this framework, we would consider a program to provide training that prepares students for gainful employment in a recognized occupation if the program: (1) Does not lead to high debt-burden outcomes under the D/E rates measure; (2) Does not lead to low-earnings outcomes under the earnings premium measure; and (3) Is certified by the institution as included in the institution's accreditation by its recognized accrediting agency, or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency in lieu of accreditation.

A GE program would, in part, demonstrate that it prepares students for gainful employment in a recognized occupation through passing D/E rates. The program would be ineligible if it fails the D/E rates measure in two out of any three consecutive award years for which the program's D/E rates are calculated. If it is not possible to calculate or issue D/E rates for a program for an award year, the program would receive no D/E rates for that award year and would remain in the same status under the D/E rates measure as the previous award year. For example, if a program failed the D/E rates measure in year 1, did not receive rates in year 2, passed the D/E rates measure in year 3, and failed the D/E rates measure in year 4, that program would be ineligible after year 4 because it failed the D/E rates measure in two out of three consecutive years for which D/E rates were calculated. This approach would avoid simply allowing a program to pass the D/E rates or earnings threshold premium measure when an insufficient number of students complete the program. For situations where it is not possible to calculate D/E rates for the program for four or more consecutive award years, the Secretary would disregard the program's D/E rates for any award year prior to the four-year period in determining the program's eligibility.

A GE program would also would, in part, demonstrate that it prepares students for gainful employment in a recognized occupation through passing the earnings premium measure. The program would be ineligible if it fails the earnings premium measure in two out of any three consecutive award years for which the program's earnings premium is calculated. If it is not possible to calculate or publish the earnings

[109] Clive Belfield and Thomas Bailey, "The Labor Market Returns to Sub-Baccalaureate College: A Review," March 2017. *Ccrc.tc.columbia.edu/media/k2/attachments/labor-market-returns-sub-baccalaureate-college-review.pdf.*

[110] Stephanie Cellini and Nick Turner, "Gainfully Employed?: Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data," Journal of Human Resources (2019, vol. 54, issue 2). *Econpapers.repec.org/article/uwpjhriss/v_3a54_3ay_3a2019_3ai_3a2_3ap_3a342–370.htm.* Cellini, S.R. and Koedel, C. (2017), The Case for Limiting Federal Student Aid to For-Profit Colleges. J. Pol. Anal. Manage., 36: 934–942. *https://doi.org/10.1002/pam.22008.* Deming, D., Yuchtman, N., Abulafi, A., Goldin, C. & Katz, L. (2016). The Value of Postsecondary Credentials in the Labor Market: An Experimental Study. American Economic Review, 106 (3): 778–

806. Armona, L., Chakrabarti, R., Lovenheim, M. (2022). Student Debt and Default: The Role of For-Profit Colleges. Journal of Financial Economics. 144(1) 67–92. Liu, V.Y.T., & Belfield, C. (2020). The Labor Market Returns to For-Profit Higher Education: Evidence for Transfer Students. Community College Review, 48(2), 133–155. *doi.org/10.1177/0091552119886659.*

[111] David Deming, Claudia Goldin, and Lawrence Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?", *Journal of Economic Perspectives* (Volume 26, Number 1, Winter 2012). *www.aeaweb.org/articles?id=10.1257/jep.26.1.139.*

[112] Judith Scott-Clayton, "What Accounts For Gaps in Student Loan Default, and What Happens After", *Evidence Speaks Reports* (Volume 2, Number 57, June 2018). *www.brookings.edu/research/what-accounts-for-gaps-in-student-loan-default-and-what-happens-after/.*

[113] Stephanie Cellini, Rajeev Darolia, and Leslie Turner, "Where Do Students Go When For-Profit Colleges Lose Federal Aid?", *American Economic Journal: Economic Policy* (Volume 12, Number 2, May 2020). *www.aeaweb.org/articles?id=10.1257/pol.20180265.*

[114] Christopher Lau, "Are Federal Student Loan Accountability Regulations Effective?", *Economics of Education Review* (Volume 75, April 2020). *www.sciencedirect.com/science/article/pii/S0272775719303796?via%3Dihub.*

premium measure results for a program for an award year, the program would receive no result under the earnings threshold measure for that award year and would remain in the same status under the earnings threshold measure as the previous award year. For situations where it is not possible to calculate the earnings premium measure for the program for four or more consecutive award years, the Secretary would disregard the program's earnings premium for any award year prior to the four-year period in determining the program's eligibility.

The D/E rates and earnings premium measures capture different dimensions of program performance, and function independently in determining continued eligibility for Title IV student aid programs. For a program to be considered to provide training that prepares students for gainful employment in a recognized occupation, it must neither be deemed a high-debt-burden program in two of three consecutive years in which rates are published, nor be deemed a low-earnings program in two of three consecutive years in which rates are published.

*Reasons:* The financial value transparency and GE program accountability framework would both rely upon the same metrics that are described in proposed § 668.402. This framework would include two debt-to-earnings measures very similar to those used in the 2014 Prior Rule to assess the debt burden incurred by students who completed a GE program in relation to their earnings. This assessment would in part allow the Department to determine, consistent with the statute, whether a program is preparing students for gainful employment in a recognized occupation.

Under the proposed regulations, the first D/E rate is the *discretionary income rate,* which would measure the proportion of annual discretionary income—that is, the amount of income above 150 percent of the Poverty Guideline for a single person in the continental United States—that students who complete the program are devoting to annual debt payments. The second rate is the *annual earnings rate,* which would measure the proportion of annual earnings that students who complete the program are devoting to annual debt payments. A program would pass the D/E rates measure by meeting the standards of either of the two metrics (the discretionary D/E rate or the annual D/E rate) as discussed in more detail under proposed § 668.402. As we have discussed elsewhere in this NPRM, the Department cannot reasonably conclude

that a program meets the statutory obligation to prepare students for gainful employment in a recognized occupation if the program leads to unacceptable debt outcomes by failing both of the D/E rates two out of three consecutive years in which the program is measured.

While D/E rates would help identify GE programs that burden students who complete the programs with unsustainable debt, the D/E rates calculation does not, on its own, adequately capture poorly performing GE programs with low costs, or in which few or no students borrow. Such programs may not necessarily encumber completers with large debt loads, but the programs may nonetheless fail to yield sufficient employment outcomes to justify Federal investment in the program. Even small debt loads can be unsustainable for some borrowers, as demonstrated by the estimated default rates among programs that would pass the D/E rates metric but would fail the earnings premium metric. Again and as discussed elsewhere in this NPRM, the Department has concluded that a GE program does not prepare students for gainful employment if the median earnings of the program's completers (that is, more than half of students completing the program) do not exceed the typical earnings of those who only completed the equivalent of a secondary school education.

The addition of the earnings premium metric to the D/E accountability framework of the 2014 Prior Rule is motivated by several considerations.[115] First, there is increasing concern among the public that some higher education programs are not "worth it" and do not promote economic mobility. While the D/E measure identifies programs where debt is high relative to earnings, students and families use their time and their own money in addition to the amount they borrow to finance their studies. Several recent studies (referenced in the RIA) support adding an earnings premium metric to help ensure that students benefit financially from their career training studies.[116] We

also note in the RIA that programs with very low earnings, but low enough debt levels that they pass the D/E metric, nonetheless have very high default rates. In that sense, the earnings premium measure provides some added protection to borrowers with relatively low balances, but earnings so low that even low levels of debt payments are unaffordable. While the earnings premium provides additional protection to borrowers, it measures a distinct dimension of program performance—*i.e.,* the extent to which the program helps students attain a minimally acceptable level of earnings—from the D/E metrics.

The earnings premium measure would address this issue by requiring the Department to determine whether the median annual earnings of the completers of a GE program exceeds the median earnings of students with at most a high school diploma or GED. Accordingly, the earnings premium measure would supplement the D/E rates measure by identifying programs that may pass the D/E rates measure because loan balances of completers are low but nonetheless do not provide students or taxpayers a return on the investment in career training.

The Department proposes tying ineligibility to the second failure in any three consecutive award years of either the debt-to-earnings rates or the earnings premium measure because it prevents against one aberrantly low performance year resulting in the loss of title IV, HEA program fund eligibility. Additionally, we chose not to use a longer time horizon to avoid a scenario in which a prior result is no longer reflective of current performance of a program. A longer time horizon would also allow poorly performing programs to continue harming students and the integrity of the title IV, HEA programs.

As under the 2014 Prior Rule, the Department proposes a third component to ensure that GE programs meet the statutory requirement of providing training that prepares students for gainful employment in a recognized occupation: that the program meets applicable accreditation or State authorizing agency standards for the approval of postsecondary vocational education. These accrediting agency and

[115] For further discussion of the earnings premium metric and the Department's reasons for proposing it, see above at [TK—preamble general introduction, legal authority], at [TK—transparency, around p.150], and at [TK—method for calculating metrics, around p.180]. The discussion here concentrates on GE program eligibility.

[116] See for example Jordan D. Matsudaira and Lesley J. Turner. "Towards a framework for accountability for federal financial assistance programs in postsecondary education." The Brookings Institution. (2020) *www.brookings.edu/ wp-content/uploads/2020/11/20210603-Mats-Turner.pdf*; Stephanie R. Cellini and Kathryn J. Blanchard, "Using a High School Earnings

Benchmark to Measure College Student Success Implications for Accountability and Equity." The Postsecondary Equity and Economics Research Project. (2022). *www.peerresearchproject.org/peer/ research/body/2022.3.3–PEER_HSEarnings-Updated.pdf*; and Michael Itzkowitz. "Price to Earnings Premium: A New Way of Measuring Return on Investment in Higher Education." Third Way. (2020). *https://www.thirdway.org/report/ price-to-earnings-premium-a-new-way-of-measuring-return-on-investment-in-higher-ed.*

State requirements are often gatekeeping conditions that a student must meet if they want to work in the occupation for which they are being prepared. For instance, many health care professions require completion of an approved program before a student can register to take a licensing examination. The Department cannot reasonably conclude that a program meets the statutory obligation to prepare graduates for gainful employment in a recognized occupation if the program lacks the necessary approvals needed for a student to have a possibility to work in that occupation.

*Ineligible Gainful Employment Programs (§ 668.603)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.603 to define the process by which a failing GE program would lose title IV, HEA eligibility. If the Department determines that a GE program leads to unacceptable debt or earnings outcomes, as calculated in proposed § 668.402 for the length of time specified in § 668.602, the GE program would become ineligible for title IV, HEA aid. The ineligible GE program's participation in the title IV, HEA programs would end upon the institution notifying the Department that it has stopped offering the program; issuance of a new Eligibility and Certification Approval Report (ECAR) that does not include that program; the completion of a termination action of program eligibility under subpart G of part 668; or a revocation of program eligibility if the institution is provisionally certified. If the Department initiates a termination action against an ineligible GE program, the institution could appeal that action, with the hearing official limited to determining solely whether the Department erred in the calculation of the program's D/E rates or earnings premium measure. The hearing official could not reconsider the program's ineligibility on any other basis.

Though not discussed in this section, we also propose in § 668.171 to add a new mandatory financial responsibility trigger that would require an institution to provide financial protection if 50 percent of its title IV, HEA funds went to students enrolled in programs that are deemed failing under the metrics described in proposed § 668.602.

Proposed § 668.603 would also establish a minimum period of ineligibility for GE programs that lose eligibility by failing the D/E rates or the earning premium measure in two out of

three years, and for GE programs at risk of a loss of eligibility that an institution voluntarily discontinues. As under the 2014 Prior Rule, an institution could not seek to reestablish the eligibility of a GE program that lost eligibility until three years following the date the program lost eligibility under proposed § 668.603. Similarly, an institution could not seek to reestablish eligibility for a failing GE program that the institution voluntarily discontinued, or to establish eligibility for a substantially similar program with the same 4-digit CIP prefix and credential level, until three years following the date the institution discontinued the failing program. Following this period of ineligibility, such a program would remain ineligible until the institution establishes the eligibility of that program through the process described in proposed § 668.604(c).

*Reasons:* For troubled GE programs that do not improve, the eventual loss of eligibility protects students by preventing them from incurring debt or using up their limited grant eligibility to enroll in programs that have consistently produced poor debt or earnings outcomes. Codifying in the regulations when and how the Department will end an ineligible GE program's participation in the title IV, HEA programs would provide additional clarity and transparency to institutions and the public as to the Department's administrative procedures.

The paths to ineligibility listed in § 668.603(a) represent the main ways that an academic program ceases participating in the title IV, HEA programs. Institutions can and of course do regularly cease offering programs, but do not always formally notify the Department when that occurs. The list of programs on an institution's ECAR serves as the main repository that tracks which eligible programs an institution offers, so removing a program from that document clearly establishes that it is no longer eligible for aid. In cases where an institution is provisionally certified the process for removing programs is more streamlined, as a provisional status indicates the Department has concerns about the institution's administration of the title IV, HEA programs. Finally, if none of these other events occur, the Department would initiate an action under part 668, subpart G, the section of the Department's regulations that governs the process for a limitation, suspension, or termination action. Given that a program becoming ineligible for title IV, HEA aid is a form of limitation, the

Department believes that subpart G is the appropriate procedure to follow.

As further described under the Financial Responsibility section of this proposed rule, the Department is also proposing to add a new mandatory trigger in § 668.171 that would require the institution to provide financial protection to the Department if 50 percent of its title IV, HEA volume went to students enrolled in failing GE programs. This would ensure that taxpayers are protected while any ineligibility process continues in the instances in which the majority of an institution's aid dollars become ineligible in the next academic year, which could be substantially destabilizing. In addition, the 50 percent threshold would protect institutions from the requirement to provide financial protection to the Department in instances where only programs with very small title IV, HEA volume are at risk of aid ineligibility through failing the GE metrics.

Proposed § 668.603(b) would also clearly define the process and circumstances under which an institution could appeal a program eligibility termination action taken against an ineligible GE program. Specifically, the proposed regulations would allow appeals only on the basis that the Department erred in its calculation of the program's D/E rates or earnings threshold measure. As further discussed under proposed § 668.405, this is a change from the 2014 Prior Rule, which provided more options for institutions to submit challenges and appeals during the process of establishing final GE program rates. However, these options added significant burden and complexity for institutions, including an alternative earnings appeal process that was partially invalidated in Federal litigation.[117] As a result, the Department attempted to make case-by-case judgments about when reported earnings data should be replaced with data submitted by an institution. The prior appeals process ultimately resulted in delayed accountability for institutions and diminished protections for students and the public. Limiting appeals to errors of calculation would simplify the process and reduce administrative burden on the Department and institutions alike by focusing squarely on the circumstances most likely to support a prevailing appeal.

Several additional considerations inform our decision to not include a

---

[117] *Am. Ass'n of Cosmetology Schs.* v. *DeVos*, 258 F. Supp. 3d 50, 76–77 (D.D.C. 2017).

process for appealing the earnings data for programs.[118] First, new research is now available. A 2022 study concluded that the alternate earnings appeals submitted to the Department claimed to show earnings that were implausibly high—on average, 73 percent higher than Social Security Administration (SSA) earnings data under the 2014 Prior Rule, and 82 percent higher for cosmetology programs. The study proceeded to report that the underreporting of tipped income for cosmetologists and hairdressers, based on estimates from IRS data, is likely just 8 percent of SSA earnings.[119] Again, the Department's goal is a reasonable assessment of available evidence and not overreliance on any one source. That said, numbers such as those above give us serious pause, combined with other considerations.

Those other considerations include the Department's observations of the information provided in the earlier alternate earnings appeals process, which likewise suggest that the appeals had little value in improving the assessment of whether programs' "true" debt-to-earnings (or earnings) levels met the GE criteria. We agree that the earnings reported in appeals submitted by institutions seem implausibly high. And although there might be more than one possible explanation for those results, such as the sequence in which appeals were processed, the uncertainties that surround such appeals present another reason against reinstituting them now. There was no simple or easily identifiable test for evaluating appeals, and therefore there is no easy way to evaluate the results in hindsight. In addition, institutions had incentives to collect and show data that cast their programs in the best light within the administrative proceedings, whatever the applicable standard for reviewing appeals. Those structural complications seem difficult to resolve.

Moreover, offering those appeals certainly entailed costs for the Department and for others. The 341 appeals that were filed required substantial Department staff time to process. That administrative cost concern alone would not necessarily

warrant a negative evaluation of an appeals process that had substantial and demonstrable value. However, given difficulties institutions experienced in obtaining and compiling earnings data, along with frequent issues involving statistical accuracy and student privacy due to small sample sizes, the Department has concluded that any evidentiary value afforded by the earnings appeals were more than outweighed by the administrative burden and costs incurred by both institutions and the Department.

As well, we have reason to question the value of appeals to many potentially interested parties. The difference between the 882 programs for which institutions submitted notices of intent to appeal when compared to the 341 appeals that were actually submitted suggests that institutions may often have concluded that the alternative earnings appeal process did not warrant the necessary investment of time and effort—or perhaps the initially supposed difference in graduates' earnings was not as significant as anticipated. And in rescinding the 2014 GE Prior Rule in 2019, the Department's reasoning focused on a deregulatory policy choice based on circumstances at that time rather than the desirability of appeals. In its brief discussion of unreported income in response to comments, the Department did not ascribe any value to the alternate earnings appeals process in addressing unreported income.[120] In addition to the unreliability of the earnings appeals that were previously submitted, as further discussed in our analysis of proposed § 668.405 above, we note again that IRS earnings are used in multiple ways within the Department's administration of the Federal student aid programs. Those uses include establishing student aid eligibility for grants and loans, and setting loan payment amounts when students enroll in income-driven loan repayment plans. We believe it is reasonable for us to use the same source for average program earnings for the metrics that we propose here.

We do propose a narrower and more objective form of appeal, however. As noted above, under this proposed rule an institution could only appeal a termination action if the Department erred in calculating a GE program's D/E rates or earnings premium. The appeal of the termination action would not include the underlying students included in the measures because institutions would already have an opportunity to correct the completer list they submit to the Department as

described under proposed § 668.405(b). The proposed regulations would also establish a three-year waiting period before an ineligible or voluntarily discontinued program could regain eligibility. This waiting period is intended to protect the interests of students, taxpayers, and the public by ensuring that institutions with failing or ineligible GE programs take meaningful corrective actions to improve program outcomes before seeking Federal support for duplicate or substantially similar programs using the same four-digit CIP prefix and credential level.

The Department selected a three-year period of ineligibility because it most closely aligns with the ineligibility period associated with failing the Cohort Default Rate, which is the Department's longstanding primary outcomes-based accountability metric. Under those requirements, an institution that becomes ineligible for title IV, HEA support due to high default rates cannot reapply for approximately three award years.

*Certification Requirements for GE Programs (§ 668.604)*

*Statute:* See Authority for This Regulatory Action.
*Current Regulations:* None.
*Proposed Regulations:* We propose to add a new § 668.604 to require transitional certifications for existing GE programs, as well as certifications when seeking recertification or the approval of a new or modified GE program. An institution would certify that each eligible GE program it offers is approved, or is otherwise included in the institution's accreditation, by its recognized accrediting agency. Alternatively, if the institution is a public postsecondary vocational institution, it could certify that the GE program is approved by a recognized State agency for the approval of public postsecondary vocational education, in lieu of accreditation. Either certification would require the signature of an authorized representative of the institution and, for a proprietary or private nonprofit institution, an authorized representative of an entity with direct or indirect ownership of the institution if that entity has the power to exercise control over the institution.

For each of its currently eligible GE programs, an institution would need to provide a transitional certification no later than December 31 of the year in which this regulation takes effect, as an addendum to the institution's PPA with the Department. Failure to complete the transitional certification would result in discontinued participation in the Title IV, HEA programs for the institution's

---

[118] For further discussion of unreported income, see above at [TK].

[119] The study is Stephanie Riegg Cellini and Kathryn J. Blanchard, "Hair and taxes: Cosmetology programs, accountability policy, and the problem of underreported income," Geo. Wash. Univ. (Jan. 2022), *www.peerresearchproject.org/peer/research/body/PEER_HairTaxes-Final.pdf.* PEER_HairTaxes-Final.pdf (peerresearchproject.org). Note that tips included on credit card payments to a business are more likely to be reported, and it is reasonable to expect that many workers are complying with the law to include tips in their reported income.

[120] 84 FR 31392, 31409–10 (2019).

GE programs. Institutions would also be required to provide this certification when seeking recertification of eligibility for the title IV, HEA programs, and the Department would not recertify the GE program if the institution fails to provide the certification. A transitional GE certification would not be required if an institution makes a GE certification in a new PPA through the recertification process between July 1 and December 31 of the year in which this regulation takes effect. An institution must update its GE certification within 10 days if there are any changes in the approvals for a GE program, or other changes that make an existing certification no longer accurate, or risk discontinuation of title IV, HEA participation for that GE program.

To establish eligibility for a GE program, the institution would be required to update the list of its eligible programs maintained by the Department to add that program. An institution may not update its list of eligible programs to include a GE program that was subject to a three-year loss of eligibility under § 668.603(c) until that three-year period expires. In addition, an institution may not update its list of eligible programs to add a GE program that is substantially similar to a failing program that the institution voluntarily discontinued or that became ineligible because of a failure to satisfy the required D/E rates, earnings premium measure, or both.

*Reasons:* Through these certification requirements, institutions would be required to assess their programs to determine whether they meet these minimum standards. The Department cannot reasonably consider that a program meets the statutory obligation to prepare graduates for gainful employment in a recognized occupation if the program cannot meet the basic certification and licensure requirements for that occupation. We believe that any student attending a program that does not meet all applicable accreditation and State or Federal licensing requirements would experience difficulty or be unable to secure employment in the occupation for which he or she received training and, consequently, would likely struggle to repay the debt incurred for enrolling in that program. The certification requirements are intended to help prevent such outcomes by requiring the institution to proactively assess whether its programs meet those requirements and to affirm to the Department when seeking eligibility that the programs meet those standards. The certification requirements are therefore an

appropriate condition that programs must meet to qualify for title IV, HEA program funds, as they address the concerns about employability outcomes underlying the gainful employment eligibility provisions of the HEA.

As we have proposed in changes to § 668.14, these certifications must be signed by an authorized representative of the institution and, for a proprietary or private nonprofit institution, an authorized representative of an entity with direct or indirect ownership of the institution if that entity has the power to exercise control over the institution. Because of these signature requirements, an institution would have to carefully assess whether each offered GE program meets the necessary requirements, and we expect that institutions would make this self-assessment in good faith and after appropriate due diligence.

In addition, these certification requirements would help make certain that the Department has an accurate list of all GE programs offered by an institution, and that the list is regularly updated as the institution adds or subtracts programs. This accurate listing of programs will in turn ensure that the institution and the Department can provide required disclosures and warnings to students in a timely and effective manner.

The certification requirements would also ensure that an institution cannot add a program that would be ineligible under the conditions in proposed § 668.603.

*Warnings and Acknowledgments (§ 668.605)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.605 to require notifications to current and prospective students who are enrolled in, or considering enrolling in, a GE program if that program could lose title IV, HEA eligibility based on its next published D/E rates or earnings premium; to specify the content and delivery requirements of such notifications; and to require students to acknowledge seeing the notifications when applicable before receiving Title IV aid. An institution would be required to provide a warning to students and prospective students for any year for which the Secretary notifies an institution that the program could become ineligible based on its final D/E rates or earnings premium measure for the next award year for which those metrics are calculated. The warning would be the only substantive content contained in these written communications. The

proposed warning for prospective and current students would include a warning, as specified in a notice published in the **Federal Register**, that the program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings; the relevant information to access a disclosure website maintained by the Department; and that the program could lose access to title IV, HEA funds in the subsequent award year. The warning would also include a statement that the student must acknowledge having seen the warning through the disclosure website before the institution may disburse any title IV, HEA funds. In addition, warnings provided to students enrolled in GE programs would include (1) A description of the academic and financial options available to continue their education in another program at the institution in the event that the program loses title IV, HEA eligibility, including whether the students could transfer academic credit earned in the program to another program at the institution and which course credit would transfer; (2) An indication of whether, in the event of a loss of eligibility, the institution will continue to provide instruction in the program to allow students to complete the program; (3) An indication of whether, in the event of a loss of eligibility, the institution will refund the tuition, fees, and other required charges paid to the institution for enrollment in the program; and (4) An explanation of whether, in the event that the program loses eligibility, the students could transfer credits earned in the program to another institution through an established articulation agreement or teach-out.

In addition to providing the English-language warnings, the institution would be required to provide accurate translations of the English-language warning into the primary languages of current and prospective students with limited English proficiency.[121] The delivery timeframe and procedure for required warnings would depend upon whether the intended recipient is a current or prospective student. For current students, an institution would be required to provide the warning in

---

[121] Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin by recipients of Federal financial assistance. It requires that recipients of Federal funding take reasonable steps to provide meaningful access to their programs or activities to individuals with limited English proficiency (LEP), which may include the provision of translated documents to people with LEP.

writing to each student enrolled in the program no later than 30 days after the date of the Department's notice of determination, and to maintain documentation of its efforts to provide that warning. For prospective students, under proposed § 668.605, an institution must provide the warning to each prospective student or to each third party acting on behalf of the prospective student at the first contact about the program between the institution and the student or third party by one of the following methods: (1) Hand-delivering the warning and the relevant information to access the disclosure website as a separate document to the prospective student or third party individually, or as part of a group presentation; (2) Sending the warning and the relevant information to access the disclosure website to the primary email address used by the institution for communicating with the prospective student or third party about the program, with the stipulation that the warning is the only substantive content in the email and that the warning must be sent by a different method of delivery if the institution receives a response that the email could not be delivered; or (3) Providing the warning and the relevant information to access the disclosure website orally to the student or third party if the contact is by telephone. In addition, an institution could not enroll, register, or enter into a financial commitment with the prospective student sooner than three business days after the institution distributes the warning to the student. An institution could not disburse title IV, HEA funds to a prospective student enrolling in a program requiring a warning under this section until the student provides the acknowledgment described in this section. We also specify that the provision of a student warning or the student's acknowledgment would not otherwise mitigate the institution's responsibility to provide accurate information to students, nor would it be considered as evidence against a student's claim if the student applies for a loan discharge under the borrower defense to repayment regulations at 34 CFR part 685, subpart D.

*Reasons:* In proposed § 668.605, we set forth warning and acknowledgment requirements that would apply to institutions based on the results of their GE programs under the metrics described in § 668.402. A program that fails the D/E rates or earnings premium measure is at elevated risk of losing access to the title IV, HEA programs. Providing timely and effective warnings to students considering or enrolled in

such programs is especially critical in allowing students to make informed choices about whether to enroll or continue in a program for which expected financial assistance may become unavailable.

In the 2019 Prior Rule rescinding the GE regulation, the Department stated that it believed that updating the College Scorecard would be sufficient to achieve the goals of providing comparable information on all institutions to students and families as well as the public. While we continue to believe that the College Scorecard is an important resource for students, families, and the public, we do not think it is sufficient for ensuring that students are fully aware of the outcomes of the programs they are considering before they receive title IV, HEA funds to attend them. One consideration is that the number of unique visitors to the College Scorecard is far below that of the number of students who enroll in postsecondary education in a given year. In fiscal year 2022, we recorded just over 2 million visits overall to the College Scorecard. This figure includes anyone who visited, regardless of whether they or a family member were enrolling in postsecondary education. By contrast, more than 16 million students enroll in postsecondary education annually, in addition to the number of family members and college access professionals who may also be assisting many of these individuals with their college selection process. Second, as noted in the discussion of proposed § 668.401 and in the RIA, research has shown that information alone is insufficient to influence students' enrollment decision. For example, one study found that College Scorecard data on cost and graduation rates did not impact the number of schools to which students sent SAT scores.[122] The authors found that a 10 percent increase in reported earnings increased the number of scores students sent to the school by 2.4 percent, though the impact was almost entirely among well-resourced high schools and students. Third, the Scorecard is intentionally not targeted to a specific individual because it is meant to provide comprehensive information to anyone searching for a postsecondary education. By contrast, a warning or disclosure would be a more personalized delivery of information to a student because it would be based on the programs that they are enrolled in or actively considering enrolling in.

[122] Hurwitz, M. and Smith, J. (2018) Student Responsiveness to Earnings Data in the College Scorecard. *Economic Inquiry*, Vo. 56, Issue 2. *https://doi.org/10.1111/ecin.12530.*

Making it a required disclosure would also ensure that students see the information, which may or may not otherwise occur with the College Scorecard. Finally, we think the College Scorecard alone is insufficient to encourage improvements to programs solely through the flow of information, in contrast to the 2019 Prior Rule. Posting the information on the Scorecard in no way guarantees that an institution would even be aware of the outcomes of their programs, and institutions have no formal role in acknowledging their outcomes. By contrast, with these proposed regulations institutions would be fully informed of the outcomes of all their programs and would also know which programs would be associated with warnings and which ones would not. The Department thus anticipates that these warnings would better achieve the goals of both getting information to students and encouraging improvement than did the approach outlined in the 2019 regulations. As further discussed in the Background section of this proposed rule, we believe that the approach taken with the 2019 Prior Rule does not adequately protect students from low-performing GE programs and that additional protections are needed to safeguard the interests of students and the public.

Under the proposed regulations, as under the 2014 Prior Rule the Department would publish the text that institutions would use for the student warning in a notice in the **Federal Register** to standardize the warning and ensure that the necessary information is adequately conveyed to students. The warning would alert both prospective and enrolled students that the program has not met standards established by the Department based on the amounts students borrow for enrollment in the program and their reported earnings and would also disclose that the program may lose eligibility for title IV, HEA program funds and would explain the implications of ineligibility. In addition, the warning would indicate the options that would be available to continue their education at the institution or at another institution, if the program loses its title IV, HEA program eligibility.

Requiring that the warning be provided directly to a student, and that the student acknowledge having seen the warning, is intended to ensure that students receive and have the ability to act based on the information. Moreover, similar to the 2014 Prior Rule, requiring at least three days to have passed before the institution could enroll a prospective student would provide a "cooling-off period" for the student to

consider the information contained in the warning without immediate and direct pressure from the institution, and would also provide the student with time to consider alternatives to the program either at the same institution or at another institution. To ensure that current and prospective students can make enrollment decisions based upon timely and accurate information, the Department would require institutions otherwise obligated to provide a warning to provide a new warning if a student seeks to enroll more than 12 months after a previous warning was provided in a program that still remains at risk for a loss of eligibility. This 12-month window is longer than the 30-day window provided in the 2014 Prior Rule to reduce administrative burden for institutions while still providing subsequent warning for students after a sufficient time has elapsed. Providing the warnings on an annual basis also increases the likelihood that the warnings would include updated data and limit the chances of providing the exact same data a second time.

*Severability (§ 668.606)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.606 to establish severability protections ensuring that if any GE provision is held invalid, the remaining GE provisions, as well as other subparts, would continue to apply.

*Reasons:* Through the proposed regulations we intend to: (1) Define what it means for a program to provide training that prepares students for gainful employment in a recognized occupation; and (2) Establish a process that would allow the Department to assess and determine the eligibility of GE programs, based in part on the program accountability provisions in proposed subpart Q.

We believe that each of the proposed provisions serves one or more important, related, but distinct, purposes. Each of the requirements provides value, separate from and in addition to the value provided by the other requirements, to students, prospective students, and their families; to the public; taxpayers; the Government; and to institutions. To best serve these purposes, we would include this administrative provision in the regulations to establish and clarify that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of any one provision

should not affect the remainder of the provisions.

Please see the discussion of Severability in § 668.409 of this preamble for additional details about how the proposed provisions operate independently of each other for purposes of severability.

*Date, Extent, Duration, and Consequence of Eligibility (§ 600.10(c)(1)(v))*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* Current § 600.10(c)(1) requires an institution to provide notice to the Department when expanding its participation in the title IV, HEA programs by adding new educational programs and identifies when an institution must first obtain approval for a new educational program before disbursing title IV, HEA program funds to students enrolled in the program.

*Proposed Regulations:* We propose to add a new § 600.10(c)(1)(v) to require an institution to provide notice to the Department when establishing or reestablishing the eligibility of a GE program if the institution is subject to any of the restrictions at proposed § 668.603 for failing GE programs. The institution would provide this notice by updating its application to participate in the title IV, HEA programs, as set forth in § 600.21(a)(11).

*Reasons:* Programs that lose eligibility under proposed subpart S would be subject to the restrictions in proposed § 668.603, namely that an institution may not disburse title IV, HEA program funds to students enrolled in the ineligible program, nor may it seek to reestablish the eligibility of that program until the requisite period of ineligibility has elapsed. Proper enforcement of this provision necessitates conforming changes to § 600.10(c) to require that the Department be informed of when an institution subject to the aforementioned restrictions intends to stand up a GE program either for the first time or following a period of ineligibility.

*Updating Application Information (§ 600.21(a)(11))*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* Current § 600.21(a)(11) requires an institution to report to the Department within 10 days certain changes to the institution's GE programs, including to a program's name or CIP code.

*Proposed Regulations:* We propose to amend § 600.21(a)(11)(v) to require an

institution to report, in addition to the items currently listed, changes to a GE program's credential level. In addition, we propose to add paragraph (a)(11)(vi) to require an institution to report any changes to the GE certification status of a GE program under § 668.604.

*Reasons:* Current § 600.21 requires institutions to update the Department regarding various changes affecting both institutional and program eligibility. We believe this to be the most effective mechanism for institutions to report information regarding GE programs that is critical for the Department to conduct proper monitoring and oversight of those programs. Accordingly, we are proposing conforming changes to § 600.21, which would require institutions to report for any GE program, in addition to the items currently listed, any changes to the program's credential level or certification status pursuant to proposed § 668.604. The Department would require institutions to report changes to a GE program's credential level because different credential levels would be considered distinct programs leading to different employment, earnings, and debt outcomes. We would require institutions to report changes in a GE program's certification status because the program becomes ineligible if it ceases to be included in the scope of an institution's accreditation.

*General Definitions (§ 668.2)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* The current regulations at § 668.2 define key terminology used throughout the student assistance general provisions in this part.

*Proposed Regulations:* We propose to add new definitions to explain key terminology used in the financial value transparency provisions in proposed subpart Q and the GE program accountability provisions in proposed subpart S. These definitions would be as follows:

• *Annual debt-to-earnings rate.* The ratio of a program's typical annual loan payment amount to the median annual earnings of the students who recently completed the program. This measurement would be expressed as a percentage, and the Department would calculate it under the provisions of proposed § 668.403.

• *Classification of instructional program (CIP) code.* A taxonomy of instructional program classifications and descriptions developed by the Department's National Center for Education Statistics (NCES). Specific

educational programs are classified using a six-digit CIP code.

• *Cohort period.* The set of award years used to identify a cohort of students who completed a program and whose debt and earnings outcomes are used to calculate D/E rates and the earnings threshold measure. The Department proposes to use a two-year cohort period to calculate the D/E rates and earnings threshold measure for a program when the number of students in the two-year cohort period is 30 or more. We would use a four-year cohort period to calculate the D/E rates and earnings thresholds measure when the number of students completing the program in the two-year cohort period is fewer than 30 but the number of students completing the program in the four-year cohort period is 30 or more. A two-year cohort period would consist of the third and fourth award years prior to the year for which the most recent data are available at the time of calculation. For example, given current data production schedules, the D/E rates and earnings premium measure calculated to assess financial value starting in award year 2024–2025 would be calculated in late 2024 or early in 2025. For most programs, the two-year cohort period for these metrics would be award years 2017–2018 and 2018–2019, and earnings data would be measured in calendar years 2021 and 2022. A four-year cohort period would consist of the third, fourth, fifth, and sixth award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, for the D/E rates and the earnings threshold measure calculated to assess financial value starting in award year 2024–2025, the four-year cohort period would be award years 2015–2016, 2016–2017, 2017–2018, and 2018–2019; and earnings data would be measured using data from calendar years 2019 through 2022. The cohort period would be calculated differently for programs whose students are required to complete a medical or dental internship or residency. For this purpose, a required medical or dental internship or residency would be a supervised training program that (A) Requires the student to hold a degree as a doctor of medicine or osteopathy, or as a doctor of dental science; (B) Leads to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility that offers post-graduate training; and

(C) Must be completed before the student may be licensed by a State and board certified for professional practice or service. The two-year cohort period for a program whose students are

required to complete a medical or dental internship or residency would be the sixth and seventh award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, D/E rates and the earnings threshold measure calculated for award year 2025–2026 would be calculated in 2024; and the two-year cohort period is award years 2014–2015 and 2015–2016. The four-year cohort period for a program whose students are required to complete a medical or dental internship or residency would be the sixth, seventh, eighth, and ninth award years prior to the year for which the most recent earnings data are available at the time of calculation. For example, the D/E rates and the earnings threshold measure calculated for award year 2025–2026 would be calculated in 2024, and the four-year cohort period would be award years 2012–2013, 2013–2014, 2014–2015, and 2015–2016.

• *Credential level.* The level of the academic credential awarded by an institution to students who complete the program. Undergraduate credential levels would include undergraduate certificate or diploma; associate degree; bachelor's degree; and post-baccalaureate certificate. Graduate credential levels would include graduate certificate, including a postgraduate certificate; master's degree; doctoral degree; and first-professional degree (*e.g.,* MD, DDS, JD).

• *Debt-to-earnings rates (D/E rates).* The annual debt-to-earnings rate and discretionary debt-to-earnings rate, as calculated under proposed § 668.403.

• *Discretionary debt-to-earnings rate.* The percentage of a program's median annual loan payment compared to the median discretionary earnings (defined as median earnings minus 150 percent of the Federal Poverty Guideline for a single person, or zero if this difference is negative) of the students who completed the program.

• *Earnings premium.* The amount by which the median annual earnings of students who recently completed a program exceed the earnings threshold, as calculated under proposed § 668.604. If the median annual earnings of recent completers is equal to the earnings threshold, the earnings premium is zero. If the median annual earnings of completers is less than the earnings threshold, the earnings premium is negative.

• *Earnings threshold.* The median annual earnings for an adult that either has positive annual earnings or is categorized as unemployed (*i.e.,* is not working but is looking and available for work) at the time they are interviewed,

aged 25 through 34, with only a high school diploma or recognized equivalent in the State in which the institution is located, or nationally if fewer than 50 percent of the students in the program are located in the State where the institution is located. The statistic would be determined using data from a Federal statistical agency that the Secretary deems sufficiently representative to accurately calculate the median earnings of high school graduates in each State, such as the American Community Survey administered by the U.S. Census Bureau. This earnings threshold is compared to the median annual earnings of students who recently completed the program to construct the earnings premium.

• *Eligible non-GE program.* For purposes of proposed subpart Q, an educational program other than a GE program offered by an institution and approved by the Secretary to participate in the title IV, HEA programs, identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level. For purposes of attributing coursework, costs, and student assistance received, all coursework associated with the program's credential level would be counted toward the program.

• *Federal agency with earnings data.* A Federal agency with which the Department would maintain an agreement to access data necessary to calculate median earnings for the D/E rates and earnings premium measures. The agency would need to have individual earnings data sufficient to match with title IV, HEA aid recipients who completed any eligible program during the cohort period. Specific Federal agencies with which partnerships may be possible include agencies such as the Treasury Department (including the Internal Revenue Service), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau.

• *GE program.* An educational program offered under § 668.8(c)(3) or (d) and identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level. The Department welcomes public comments about any potential advantages and drawbacks associated with defining a

App.243

GE program using the institution's eight-digit OPE ID number instead of the six-digit OPE ID number as proposed.

• *Institutional grants and scholarships.* Financial assistance that the institution or its affiliate controls or directs to reduce or offset the original amount of a student's institutional costs and that does not have to be repaid. Typical examples of this type of assistance would include grants, scholarships, fellowships, discounts, and fee waivers.

• *Length of the program.* The amount of time in weeks, months, or years that is specified in the institution's catalog, marketing materials, or other official publications for a student to complete the requirements needed to obtain the degree or credential offered by the program.

• *Poverty Guideline.* The Poverty Guideline for a single person in the continental United States as published by HHS.

• *Prospective student.* An individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program, or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a program.

• *Student.* For the purposes of proposed subparts Q and S, an individual who received title IV, HEA funds for enrolling in a GE program or eligible non-GE program.

• *Title IV loan.* A loan authorized under the William D. Ford Direct Loan Program (Direct Loan).

*Reasons:* Current § 668.2 defines key terminology used in the student assistance regulations but does not yet include definitions for the terminology listed above. Uniform usage of these terms would make it easier for institutions to understand the proposed standards and requirements for academic programs and for students and prospective students to understand the information about academic programs that the proposed regulations would provide. Our reasoning for proposing each definition is discussed in the section in which the defined term is first substantively used.

*Institutional and Programmatic Information (§ 668.43)*

*Statute:* See Authority for This Regulatory Action.

*Current Regulations:* Under current § 668.43, institutions must make certain institutional information available to current and prospective students, such as the cost of attending the institution, refund and withdrawal policies, the academic programs offered by the

institution, and accreditation and State approval or licensure information. An institution must also provide written notification to students if it determines that the program's curriculum does not meet the State educational requirements for licensure or certification in the State in which the student is located, or if the institution has not made a determination regarding whether the program's curriculum meets the State educational requirements for licensure or certification.

*Proposed Regulations:* We propose to amend paragraph (a)(5)(v) to clarify the intent of this disclosure. Specifically, we propose to include language that would require a list of all States where the institution is aware that the program does and does not meet such requirements.

Under proposed § 668.43(d), the Department would establish a website for posting and distributing key information and disclosures pertaining to the institution's educational programs. An institution would provide such information as the Department prescribes through a notice published in the **Federal Register** for disclosure to prospective and enrolled students through the website. This information could include, but would not be limited to, (1) The primary occupations that the program prepares students to enter, along with links to occupational profiles on O*NET (*www.onetonline.org*) or its successor site; (2) The program's or institution's completion rates and withdrawal rates for full-time and less-than-full-time students, as reported to or calculated by the Department; (3) The length of the program in calendar time; (4) The total number of individuals enrolled in the program during the most recently completed award year; (5) The program's D/E rates, as calculated by the Department; (6) The program's earnings premium measure, as calculated by the Department; (7) The loan repayment rate as calculated by the Department for students or graduates who entered repayment on title IV loans; (8) The total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the length of the program; (9) The percentage of the individuals enrolled in the program during the most recently completed award year who received a title IV loan, a private education loan, or both; (10) The median loan debt of students who completed the program during the most recently completed award year, or the median loan debt for all students who completed or withdrew from the program during that award year, as calculated by the Department;

(11) The median earnings, as provided by the Department, of students who completed the program or of all students who completed or withdrew from the program; (12) Whether the program is programmatically accredited and the name of the accrediting agency; (13) The supplementary performance measures in proposed § 668.13(e); and (14) A link to the Department's College Navigator website, or its successor site or other similar Federal resource such as the College Scorecard. The institution would be required to provide a prominent link and any other information needed to access the website on any web page containing academic, cost, financial aid, or admissions information about the program or institution. The Department would have the authority to require the institution to modify a web page if the information about how to access the Department's website is not sufficiently prominent, readily accessible, clear, conspicuous, or direct. In addition, the Department would require the institution to provide the relevant information to access the website to any prospective student or third party acting on behalf of the prospective student before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution. The Department would further require that the institution provide the relevant information to access the website maintained by the Secretary to any enrolled title IV, HEA recipient prior to the start date of the first payment period associated with each subsequent award year in which the student continues enrollment at the institution. As further discussed under proposed § 668.407, a student enrolling in a program that the Department has determined to be high-debt-burden or low-earnings through either the D/E rates or the earnings premium measure would receive a warning and would need to acknowledge seeing the warning before the institution disburses title IV, HEA funds.

*Reasons:* We believe it is important for all programs that lead to occupations requiring programmatic accreditation or State licensure to meet their State's requirements because programs financed by taxpayer dollars should meet the minimum requirements for the occupation for which they prepare students as a safeguard for the financial investment in these programs, as would be required under our proposal to amend § 668.14(b)(32). We also believe it is crucial to know which States consider these programs to be meeting

App.244

or not meeting such requirements because students have often enrolled in programs that do not meet the necessary requirements for employment in the State that they reside after completing the program. As further explained in § 668.14(b), when institutions enter a written PPA with the Department they agree to meet the PPA's terms and conditions in order to participate in the title IV programs. Requiring institutions to have the necessary certifications or programmatic accreditation to meet their State's requirements for the programs they offer, and to disclose a list of all States where the institution is aware that the program does and does not meet such requirements as would be required under proposed § 668.43(a)(5), would help students make a more informed decision on where to invest their time and money in pursuit of a postsecondary degree or credential.

As discussed in ''§ 668.401 Scope and purpose,'' the proposed disclosures are designed to improve the transparency of student outcomes by: ensuring that students, prospective students, and their families, the public, taxpayers, and the Government have timely and relevant information about educational programs to inform student and prospective student decision-making; helping the public, taxpayers, and the Government to monitor the results of the Federal investment in these programs; and allowing institutions to see which programs produce exceptional results for students so that those programs may be emulated.

In particular, the proposed disclosures would provide prospective and enrolled students the information they need to make informed decisions about their educational investment, including where to spend their limited title IV, HEA program funds and use their limited title IV, HEA student eligibility. Prospective students trying to make decisions about whether to enroll in an educational program would find it useful to have easy access to information about the jobs that the program is designed to prepare them to enter, the likelihood that they will complete the program, the financial and time commitment they will have to make, their likely debt burden and ability to repay their loans, their likely earnings, and whether completing the program will provide them the requisite coursework, experience, and accreditation to obtain employment in the jobs associated with the program. The proposed disclosures would also provide valuable information to enrolled students considering their ongoing educational investment and

post-completion prospects. For example, we believe that disclosure of completion rates for full-time and less-than-full-time students would inform prospective and enrolled students as to how long it may take them to earn the credential offered by the program. Similarly, we believe that requiring institutions to disclose loan repayment rates would help prospective and enrolled students to better understand how well students who have attended the program before them have been able to manage their loan debt, which could influence their decisions about how much money they should borrow to enroll in the program.

We believe providing these disclosures on a website hosted by the Department would provide consistency in how the information is calculated and presented and would aid current and prospective students in comparing different programs and institutions. To ensure that current and prospective students are aware of this information when making enrollment decisions, institutions would be required to provide a prominent link and any other needed information to access the website on any web page containing academic, cost, financial aid, or admissions information about the program or institution.

*Initial and Final Decisions (§ 668.91)*

*Statute:* Section 487 of the HEA provides for administrative hearings in the event of a limitation, suspension, or termination action against an institution. See also Authority for This Regulatory Action.

*Current Regulations:* Current § 668.91 outlines certain parameters governing the Department's hearing official's initial decision in administrative hearings concerning fine, limitation, suspension, or termination proceedings against an institution or servicer. Section 668.91(a)(2) grants the hearing official latitude to decide whether the imposition of a fine, limitation, suspension, termination, or recovery the Department seeks is warranted. Current § 668.91(a)(3) establishes exceptions to the general authority afforded to the hearing official to weigh the evidence and remedy in an administrative appeal, and sets required outcomes if certain facts are established, including (1) Employing or contracting with excluded parties under § 668.14(b)(18); (2) Failure to provide a required letter of credit or other financial protection unless the institution demonstrates that the amount was not warranted; (3) Failure by an institution or third-party servicer to submit a required annual audit timely; and (4) Failure by an institution

to meet the past performance standards of conduct at § 668.15(c).

*Proposed Regulations:* In new § 668.91(a)(3)(vi), we propose additional circumstances in which the hearing official must rule in a specified manner. Specifically, we propose that a hearing official must terminate the eligibility of a GE program that fails to meet the D/E rates or earnings premium measure, unless the hearing official concludes there was a material error in the calculation of the metric.

*Reasons:* Proposed § 668.91(a)(3)(vi) is a conforming change to the measures at proposed § 668.603 and would require that a hearing official terminate the eligibility of a GE program that fails to meet the D/E rates or earnings premium measure, unless the hearing official concludes there was a material error in the calculation of the metric. We believe it is important to clearly specify the consequences for failing the GE metrics, both to promote fair and consistent treatment for failing programs as well as to safeguard the interests of students and taxpayers. This limitation reflects the Department's determination about the required outcome in those circumstances, and the hearing official is bound to follow the regulations. The rationale for why we propose limiting this review is further explained in our discussion of proposed § 668.603. The proposed regulations would protect students and taxpayers by foreclosing the possibility that an institution could obtain a less severe outcome such as a monetary fine that allows the GE program to remain eligible while continuing to leave unaddressed the conditions that led to the GE program's failure.

In the interest of fairness and adequate process, proposed § 668.405 would provide institutions with an adequate opportunity to correct the list of completers that would be submitted to the Federal agency with earnings data to ensure that the debt and earnings metrics for each program are calculated based upon the most accurate and current information available. As noted in the discussion of proposed § 668.405, we would not, however, consider challenges to the accuracy of the earnings data received from the Federal agency with earnings data, because such an agency would provide the Department with only the median earnings and the number of non-matches for a program, and would not disclose students' individual earnings data that would enable the Secretary to assess a challenge to reported earnings.

**Financial Responsibility (§§ 668.15, 668.23, and 668, Subpart L §§ 171, 174, 175, 176 and 177) (§ 498(c) of the HEA)**

*Authority for This Regulatory Action:* Section 498 of the HEA requires institutions to establish eligibility to provide title IV, HEA funds to their students. The statute directs the Secretary of Education to, among other things, determine the financial responsibility of an institution that seeks to participate, or is participating in, the title IV, HEA student aid programs. To that end, the Secretary is directed to obtain third-party financial guarantees, where appropriate, to offset potential liabilities due to the Department.

The Department's authority for this regulatory action derives primarily from the above statutory provision, which directs the Secretary to establish, make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department.

*Factors of Financial Responsibility (§ 668.15)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.15 contains factors of responsibility for institutions participating in the title IV, HEA programs. However, most of these factors have been supplanted with requirements for institutional financial responsibility found at part 668, subpart L—Financial Responsibility. An exception is that the factors at § 668.15 have been applied to institutions undergoing a change in ownership.

*Proposed Regulations:* The Department proposes to remove and reserve § 668.15.

*Reasons:* The factors stated in § 668.15 have been supplanted with the later requirements that were added to part 668, subpart L—Financial Responsibility, and became effective in 1998. Removing the factors from § 668.15 would remove unnecessary text and streamline part 668. The factors that are currently applicable to institutions undergoing a change in ownership would be replaced with an updated and expanded list of factors in proposed § 668.176, which would better reflect the Department's consideration of an institution's change in ownership application.

*Compliance Audits and Audited Financial Statements (§ 668.23)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible. Sections 487 and 498 of the HEA direct the Secretary to obtain and review a financial audit of an eligible institution regarding the financial condition of the institution in its entirety, and a compliance audit of such institution regarding any funds obtained by it under this statute.

*Current Regulations:* Section 668.23(a)(4) requires institutions not subject to the Single Audit Act, 31 U.S.C. chapter 75, to submit annually to the Department their compliance audit and audited financial statements no later than six months after the end of the institution's fiscal year.

*Proposed Regulations:* We propose to amend § 668.23(a)(4) to state that an institution not subject to the Single Audit Act must submit its compliance audit and its audited financial statements by the date that is the earlier of 30 days after the date of the auditor's report or 6 months after the last day of the institution's fiscal year.

*Reasons:* The Department is concerned that the current deadlines for submitting audited financial statements or compliance audits used to annually assess an institution's financial responsibility do not provide timely notice to the Department about significant financial concerns, even when institutions are aware of these concerns for months. The sooner the Department is made aware of situations where an institution's financial stability is in question, the sooner the Department can address the institution's situation and mitigate potential impacts on the institution's students. This is especially the case when an institution's lack of financial stability is a signal of an imminent potential closure. Those negative impacts associated with institutional closure include disruption of the students' education, delay in completing their educational program, and the loss of academic credit upon transfer to another institution. In addition, many students abandon their educational journeys altogether when their institutions close. In a September 2021 report,[123] the U.S. Government Accountability Office (GAO) found that 43 percent of borrowers whose colleges closed from 2010 through 2020 did not enroll in another institution or complete their program. As GAO noted, this showed that ''closures are often the end of the road for a student's education.'' Furthermore, negative consequences of a school's closure not only impact students but have negative effects on taxpayers as a result of the Department's obligation to discharge student loan balances of borrowers impacted by the closure. The Department recently revised rules governing closed school discharges in final rules published in the **Federal Register** on November 1, 2022,[124] increasing the need for financial protection when the Department is aware of potential and imminent closure. Finally, beyond student loan discharges, the Department often finds itself unable to collect any liabilities owed to the Federal government due to the insolvency of the closed institution. Obtaining financial surety prior to a closure would help to offset these types of liabilities.

Receiving compliance audits and financial statements within 30 days of when the report was dated, if it is dated at least 30 days prior to the six-month deadline (which would then be the operative deadline), would allow the Department to conduct effective oversight, obtain financial protection, and ensure students have options for teach-out agreements once we are made aware of financial situations that may indicate a potential closure is imminent. In addition, earlier submission of an institution's audited financial statements could alert the Department more quickly of an institution's failure to meet the 90/10 requirement, enabling prompt action to enforce those rules thereby protecting student and taxpayer interests.

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible. Sections 487 and 498 of the HEA direct the Secretary to obtain and review a financial audit of an eligible institution regarding the financial condition of the institution in its entirety, and a compliance audit of such institution regarding any funds obtained by it under this statute.

*Current Regulations:* Section 668.23(a)(5) refers to the audit submitted by institutions subject to the Single Audit Act as an audit conducted in accordance with the Office of Management and Budget (OMB) Circular A–133.

*Proposed Regulations:* The Department proposes to amend § 668.23(a)(5) by replacing the outdated reference to the OMB Circular A–133

---

[123] *www.gao.gov/assets/gao-21-105373.pdf.*

[124] 87 FR 65904.

<span style="color:red">App.246</span>

with the current reference: 2 CFR part 200—Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards.

*Reasons:* This change would update the regulation to include the appropriate cite for conducting audits of institutions subject to the Single Audit Act.

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible. Sections 487 and 498 of the HEA direct the Secretary to obtain and review a financial audit of an eligible institution regarding the financial condition of the institution in its entirety, and a compliance audit of such institution regarding any funds obtained by it under this statute.

*Current Regulations:* The requirement in current § 668.23(d)(1) states that an institution's audited financial statements must disclose all related parties and a level of detail that would enable the Department to readily identify the related party. Such information may include, but is not limited to, the name, location and a description of the related entity including the nature and amount of any transactions between the related party and the institution, financial or otherwise, regardless of when they occurred.

*Proposed Regulations:* The Department proposes to amend § 668.23(d)(1) to change the passage "Such information may include. . ." to "Such information must include. . .". The result of the proposal would require that institutions continue to include in their audited financial statements a disclosure of all related parties and a level of detail that would enable the Department to readily identify the related party. The proposed regulation would go on to state that the information must include, but would not be limited to, the name, location and a description of the related entity including the nature and amount of any transactions between the related party and the institution, financial or otherwise, regardless of when they occurred.

The Department also proposes to amend § 668.23(d)(1) to note that the financial statements submitted to the Department must be the latest complete fiscal year (or years, if there is a request for more than one year). We also propose that the fiscal year covered by the financial statements submitted must match the dates of the entity's annual return(s) filed with the Internal Revenue Service (IRS).

*Reasons:* This change is necessary for the Department to ensure that it has greater understanding of an institution's related parties. The items being required here are basic identifying factors and provide the minimum level of information required for an understanding of the institution's situation.

The proposed clarifications to the fiscal years covered by audited financial statements would serve two purposes. First, the requirement to submit financial statements for the latest completed fiscal year would ensure that we are receiving the most up-to-date information from an institution. This is particularly important for new institution submissions, which are already required to comply with these requirements under current § 668.15, which we propose to remove and reserve in light of the new proposed § 668.176. Second, the proposed requirement that the dates of the fiscal year for the financial statements submitted to the Department match those on the statements submitted to the IRS addresses a concern the Department has seen where institutions have adjusted their fiscal years to avoid submitting the most up-to-date financial information to the Department. This change would ensure the Department receives consistent and up-to-date information, which is necessary for evaluating the financial health of institutions.

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible. Sections 487 and 498 of the HEA direct the Secretary to obtain and review a financial audit of an eligible institution regarding the financial condition of the institution in its entirety, and a compliance audit of such institution regarding any funds obtained by it under this statute.

*Current Regulations:* The current regulations do not address any special submission requirements for domestic or foreign institutions that are owned directly or indirectly by any foreign entity with at least a 50 percent voting or equity interest.

*Proposed Regulations:* The Department proposes to add § 668.23(d)(2)(ii) to require that an institution, domestic or foreign, that is owned by a foreign entity holding at least a 50 percent voting or equity interest provide documentation of its status under the law of the jurisdiction under which it is organized, as well as basic organizational documents.

*Reasons:* The proposed regulations would better equip the Department to obtain appropriate and necessary documentation from an institution which has a foreign owner or owners with 50 percent or greater voting or equity interest. Currently, the Department cannot always determine who is or was controlling an entity when it gets into financial difficulty or closes. This is exacerbated when the institution is controlled by a foreign entity. This proposed regulation would provide a clearer picture of the institution's legal status to the Department, as well as who exercises direct or indirect ownership over the institution. Knowing the legal owner is important for situations such as when we request financial protection, when we seek to collect an audit or program review liability, or when an institution closes.

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible. Sections 487 and 498 of the HEA direct the Secretary to obtain and review a financial audit of an eligible institution regarding the financial condition of the institution in its entirety, and a compliance audit of such institution regarding any funds obtained by it under the statute.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to add § 668.23(d)(5) which would require an institution to disclose in a footnote to its audited financial statement the amounts spent in the previous fiscal year on the following:

• Recruiting activities;
• Advertising; and
• Other pre-enrollment expenditures.

*Reasons:* The Department has observed that some institutions spend institutional funds on student recruitment, advertising, and other pre-enrollment expenditures in amounts greatly out of proportion to expenditures on instruction and instructionally related activities. We believe this type of spending pattern is a possible indicator of institutional financial instability. For example, an institution with a solid financial foundation will often spend institutional funds to add new instructional programs or improve existing ones. An institution would expect that such improvements or expansions would improve the future outlook for the institution. On the other hand, an institution feeling pressure due to a declining financial situation may spend excessive amounts of its

resources on recruitment, advertising, or other pre-enrollment expenditures to generate revenue in the short-term, at the possible detriment to the institution in the long-term. Requiring institutions to disclose amounts spent on these types of activities would provide the Department a more comprehensive view into the financial health and stability of institutions.

*Financial Responsibility—General Requirements (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(b)(3)(i) states that an institution is not able to meet its financial or administrative obligations if it fails to make refunds under its refund policy or to return title IV, HEA program funds for which it is responsible.

*Proposed Regulations:* In § 668.171(b)(3), the Department proposes to add additional indicators. Proposed paragraph (b)(3)(i) states that an institution would not be financially responsible if it fails to pay title IV, HEA credit balances as required under current § 668.164(h)(2). Proposed paragraph (b)(3)(iii) states that an institution would not be financially responsible if it fails to make a payment in accordance with an existing undisputed financial obligation for more than 90 days. Proposed paragraph (b)(iv) states that an institution would not be financially responsible if it fails to satisfy payroll obligations in accordance with its published payroll schedule. Lastly, proposed paragraph (b)(3)(v) states that an institution would not be financially responsible if it borrows funds from retirement plans or restricted funds without authorization.

*Reasons:* An institution participating in the title IV, HEA programs acts as a fiduciary in its handling of title IV, HEA program funds on behalf of students. It thus has an obligation to abide by requirements to both return unused title IV, HEA funds and pay out credit balances to students. An institution's failure to pay a student funds belonging to that student is a strong indicator of the institution's lack of financial responsibility and stability. The Department is concerned that an institution that refuses to pay, or is unable to pay, credit balances owed to students may be holding onto them to address underlying financial concerns.

The Department is generally concerned when an institution is not meeting its financial obligations. The additional indicators the Department proposes to add in § 668.171(b)(3) all involve situations where an institution is not meeting its financial obligations, such as making payroll or payments on required debt agreements. To that end, monies that belong to and are owed to students are no different—they are obligations that must be fulfilled. Thus, the proposed regulation would expand the definition of not financially responsible to include the failure to pay title IV, HEA credit balances as required under current § 668.164(h)(2).

This change is also in keeping with recently finalized regulations relating to the requirement that postsecondary institutions of higher education obtain at least 10 percent of their revenue from non-Federal sources, also known as the 90/10 rule. In § 668.28(a)(2)(ii)(B), proprietary institutions may not delay the disbursement of title IV, HEA funds to the next fiscal year to adjust their 90/10 rate.

*Financial Responsibility—Mandatory Triggering Events (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(c) lists several mandatory triggering events impacting an institution's financial responsibility. These triggers were implemented in the 2019 Final Borrower Defense Regulations[125] to reduce the impact of the prior triggers that had been implemented in the 2016 Final Borrower Defense Regulations.[126] The current mandatory triggers are these instances:

• The institution incurs a liability from a settlement, final judgment, or final determination arising from an administrative or judicial action or proceeding initiated by a Federal or State entity;

• For a proprietary institution whose composite score is less than 1.5, there is a withdrawal of an owner's equity from the institution by any means, unless the withdrawal is a transfer to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated; and as a result of that liability or withdrawal, the institution's recalculated composite score is less than 1.0, as determined by the Department;

• For a publicly traded institution—

[125] 84 FR 49788.
[126] 81 FR 75926.

• The U.S. Securities and Exchange Commission (SEC) issues an order suspending or revoking the registration of the institution's securities pursuant to Section 12(j) of the Securities and Exchange Act of 1934 (the "Exchange Act") or suspends trading of the institution's securities on any national securities exchange pursuant to Section 12(k) of the Exchange Act; or

• The national securities exchange on which the institution's securities are traded notifies the institution that it is not in compliance with the exchange's listing requirements and, as a result, the institution's securities are delisted, either voluntarily or involuntarily, pursuant to the rules of the relevant national securities exchange;

• The SEC is not in timely receipt of a required report and did not issue an extension to file the report.

If any of the mandatory triggering events occur, the Department would deem the institution to be unable to meet its financial or administrative obligations. Usually, this will result in the Department obtaining financial protection, generally a letter of credit, from the institution.

*Proposed Regulations:* The Department proposes to amend § 668.171(c) with a more robust set of mandatory triggers. Proposed § 668.171(c) would keep or expand the existing mandatory triggers, change some existing discretionary triggers to become mandatory and add new mandatory triggers. We are also proposing to add new discretionary triggers, which are discussed separately in § 668.171(d). As with the existing § 668.171(c), if any of the mandatory trigger events occur, the Department would deem the institution as unable to meet its financial or administrative obligations and obtain financial protection. The proposed mandatory triggers are situations where:

• Under § 668.171(c)(2)(i)(A), an institution or entity with a composite score of less than 1.5 is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, or a final judgment in a judicial or administrative proceeding, and the debt or liability results in a recalculated composite score of less than 1.0, as determined by the Department;

• Under § 668.171(c)(2)(i)(B), the institution or entity is sued to impose an injunction, establish fines or penalties, or to obtain financial relief such as damages, in an action brought on or after July 1, 2024, by a Federal or State authority, or through a qui tam lawsuit in which the Federal government has intervened and the suit has been pending for at least 120 days;

• Under § 668.171(c)(2)(i)(C), the Department has initiated action to recover from the institution the cost of adjudicated claims in favor of borrowers under the student loan discharge provisions in part 685, and including that potential liability in the composite score results in a recalculated composite score of less than 1.0, as determined by the Department;

• Under § 668.171(c)(2)(i)(D), an institution that has submitted a change in ownership application and is required to pay a debt or incurs liabilities (from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or a determination arising from an administrative proceeding), at any point through the end of the second full fiscal year after the change in ownership has occurred, would be required to post financial protection in the amount specified by the Department if so directed by the Department;

• Under § 668.171(c)(2)(ii)(A) and (B), for a proprietary institution whose composite score is less than 1.5, or for any proprietary institution through the end of the first full fiscal year following a change in ownership, and there is a withdrawal of owner's equity by any means, including by declaring a dividend, unless the withdrawal is a transfer to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated or the withdrawal is the equivalent of wages in a sole proprietorship or general partnership or a required dividend or return of capital and as a result the institution's recalculated composite score is less than 1.0, as determined by the Department;

• Under § 668.171(c)(2)(iii), the institution received at least 50 percent of its title IV, HEA funding in its most recently completed fiscal year from gainful employment programs that are failing under proposed subpart S of part 668, as determined by the Department;

• Under § 668.171(c)(2)(iv), the institution is required to submit a teach-out plan or agreement by a State or Federal entity, an accrediting agency, or other oversight body;

• Under § 668.171(c)(2)(v), the institution is cited by a State licensing or authorizing agency for failing to meet that entity's requirements and that entity provides notice that it will withdraw or terminate the institution's licensure or authorization if the institution does not come into compliance with the requirement. Under current regulations, this is a discretionary trigger;

• Under § 668.171(c)(2)(vi), at least 50 percent of the institution is owned directly or indirectly by an entity whose

securities are listed on a domestic or foreign exchange and is subject to one or more actions or events initiated by the U.S. Securities and Exchange Commission (SEC) or by the exchange where the entity's securities are listed. Those actions or events are when:

■ The SEC issues an order suspending or revoking the registration of any of the entity's securities pursuant to section 12(j) of the Securities Exchange Act of 1934 (the "Exchange Act") or suspends trading of the entity's securities pursuant to section 12(k) of the Exchange Act;

■ The SEC files an action against the entity in district court or issues an order instituting proceedings pursuant to section 12(j) of the Exchange Act;

■ The exchange on which the entity's securities are listed notifies the entity that it is not in compliance with the exchange's listing requirements, or its securities are delisted;

■ The entity failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25; or

■ The entity is subject to an event, notification, or condition by a foreign exchange or foreign oversight authority that the Department determines is the equivalent to the items listed above in the first four sub-bullets of this passage.

• Under § 668.171(c)(2)(vii), a proprietary institution, for its most recently completed fiscal year, did not receive at least 10 percent of its revenue from sources other than Federal education assistance as required under § 668.28;

• Under § 668.171(c)(2)(viii), the institution's two most recent official cohort default rates are 30 percent or greater unless the institution has filed a challenge, request for adjustment, or appeal and that action has reduced the rate to below 30 percent, or the action remains pending. Under current regulations, this is a discretionary trigger;

• Under § 668.171(c)(2)(ix), the institution has lost eligibility to participate in another Federal education assistance program due to an administrative action against the institution;

• Under § 668.171(c)(2)(x), the institution's financial statements reflect a contribution in the last quarter of the fiscal year and then the institution made a distribution during the first or second quarter of the next fiscal year and that action results in a recalculated composite score of less than 1.0, as determined by the Department;

• Under § 668.171(c)(2)(xi), the institution or entity is subject to a

default or other adverse condition under a line of credit, loan agreement, security agreement, or other financing arrangement due to an action by the Department;

• Under § 668.171(c)(2)(xii), the institution makes a declaration of financial exigency to a Federal, State, Tribal or foreign governmental agency or its accrediting agency; or

• Under § 668.171(c)(2)(xiii), the institution, or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law, or has entered against it an order appointing a receiver or appointing a person of similar status under foreign law.

*Reasons:* In the current process, the Department determines annually whether an institution is financially responsible based on its audited financial statements along with enforcing the limited number of triggering events existing in current § 668.171(c). The triggering events complement the annual financial composite score process by providing a stronger and more timely way to conduct regular and ongoing monitoring. Because composite scores are based upon an institution's audited financial statements, they are only produced once a year and are typically not calculated until many months after an institution's fiscal year ends. By contrast, institutions would have to report on triggering events on a much faster timeline, giving the Department more up-to-date information about situations that may appreciably change an institution's financial situation. The Department is concerned that the existing list of financial triggers, which were reduced in the 2019 Final Borrower Defense Regulations, is insufficient to capture the full range of events that can represent significant and urgent threats to an institution's ability to remain financially responsible, putting students and taxpayer dollars at risk. The Department has seen where the existing regulatory mandatory triggers, with their inherent limitations, allow institutions with questionable financial stability to continue without activating a mandatory trigger which would have called for possible Departmental action. This includes several situations where the institution ultimately closed without the Department having any financial protection to offset liabilities, such as those related to closed school loan discharges for borrowers. When an

institution moves toward a status of financial instability or irresponsibility, the Department increases its oversight and, when necessary, obtains financial protection from the institution. These proposed mandatory triggers would remedy the inherent limitations in the current list of triggers and serve as a tool with which the Department can fulfill its oversight responsibility, thereby ensuring better protection for students and taxpayers.

Under the proposed regulations, the Department would determine at the time a material action or triggering event occurs that the institution is not financially responsible and seek financial protection from that institution. The consequences of these actions and triggering events threaten an institution's ability to (1) meet its current and future financial obligations, (2) continue as a going concern or continue to participate in the title IV, HEA programs, and (3) continue to deliver educational services. In addition, these actions and events call into question the institution's ability or commitment to provide the necessary resources to comply with title IV, HEA requirements. The proposed triggers would bring increased scrutiny to institutions that have one or more indicators of impaired financial responsibility. That increased scrutiny would often lead to the Department obtaining financial protection from the institution. This financial protection, usually a letter of credit, funds put in escrow, or an offset of title IV, HEA funds, is important for the Department to protect the interests of students and taxpayers in the event of an institutional closure.

In selecting mandatory triggers, the Department considered a variety of events and conduct that lead to financial risk. In particular, we looked for situations in which these events or conduct have resulted in significant impairment to an institution's financial health, and if the impairment is significant enough, closure of the institution. This has included some closures that were precipitous, harming both students and taxpayers.

One category of mandatory triggers includes events or conduct where we have seen a significant destabilizing effect on an institution's financial health based upon past Department experience. These events are reflected in the mandatory triggers for debts and liabilities, judgments, governmental actions, SEC or regulator action(s) for public institutions, financial exigency, and receivership. Another category of mandatory triggers includes situations where institutional conduct might lead

to loss of eligibility for title IV if not promptly remediated, such as high cohort default rates or failing 90/10, as well as situations involving the loss of access to other Federal educational assistance programs.

We also considered situations for which we do not yet have historical experience, but which have the potential to have a similar negative financial effect. For example, the mandatory triggers related to borrower defense recoupment and a significant share of title IV, HEA program funds in a failing GE program or programs have not occurred in high numbers or have yet to occur, respectively, but they both represent situations in which there would be a known and quantifiable potential liability or loss in revenue that would likely result in significant impairment to an institution's financial health, and if the impairment is significant enough, closure of the institution. Discretionary triggers, by contrast, indicate elements of concern that merit a closer look but may not in all circumstances necessitate obtaining financial protection.

Other mandatory triggers protect the Department's oversight capabilities. Triggers that fall into this category include, for example, situations where owners attempt to manipulate the institution's composite score by making contributions and then withdrawing the funds after the end of the fiscal year. Other triggers in this category include situations in which an outside investor or lender tries to discourage or hamper Department oversight by imposing conditions in financing agreements that trigger negative effects for the institution if the Department were to restrict title IV, HEA funding. Such situations are designed to do one of two things that weakens oversight. One is to discourage the Department from acting against an institution since the threat of financial impairment could cause an institution to become unstable and close, even if the Department's proposed action is less severe than that. The second is to make it easier for outside lenders to get paid as soon as an institution starts to face Department scrutiny. For instance, the Department has in the past seen institutions with financing arrangements that would make entire loans come due upon actions by the Department to delay aid disbursement through heightened cash monitoring. That allows lenders to get paid right away even while the Department determines if there are greater concerns that might otherwise merit obtaining financial protection. Making this type of trigger mandatory thus allows us to address both types of concerning

reasons for using such restrictions in a financing arrangement.

More detail on the individual mandatory triggers follows below.

The Department proposes to amend § 668.171(c)(2)(i)(A) by establishing a mandatory trigger for institutions with a composite score of less than 1.5 that are required to pay a debt or incur a liability from a settlement, arbitration proceeding, or final judgment in a judicial proceeding and that debt or liability occurs after the end of the fiscal year for which the Secretary has most recently calculated the institution's composite score, and as a result of that debt or liability, the recalculated composite score for the institution or entity is less than 1.0. The proposed trigger is similar to current § 668.171(c)(2)(i)(A) but we propose to make two important changes. The first would expand the scope of the type of legal or administrative action to include arbitration proceedings. The Department is concerned that their current exclusion would miss an otherwise similar event that could represent a financial threat to an institution. The Department also proposes to simplify the way these proceedings are defined to eliminate the explanation for what constitutes a determination.

When an institution is subject to the types of debts, liabilities, or losses covered under proposed § 668.171(c)(2)(i)(A), it negatively impacts the institution's ability to direct resources to providing instruction and services to its students. This proposed trigger would focus on institutions that have already been identified as having a composite score that is less than passing. We would only seek financial protection from the institution when the institutional debt, liability or loss pushes the institution's recalculated composite score to less than 1.0, which is the already established threshold for a composite score to be considered failing. That financial protection would protect students from the results of negative consequences, including closure, that flows out of the institution being subject to these debts, liabilities, or losses.

Proposed § 668.171(c)(2)(i)(B) would establish a mandatory trigger for institutions or entities that are sued by a Federal or State authority, to impose an injunction, establish fines or penalties, or obtain financial relief such as damages or through a qui tam lawsuit. In the event of a qui tam lawsuit, this trigger would occur only once the Federal government has intervened. The trigger would take effect when the action has been pending for 120 days, or a qui tam has been pending

for 120 days following intervention, and no motion to dismiss has been filed, or if a motion to dismiss has been filed within 120 days and denied, upon such denial.

Institutions subject to these types of actions are likely to have their financial stability negatively impacted. Institutions with triggering events described here are, in our view, at increased risk of possible closure. Financial protection would be obtained to offset the negative impacts of a possible closure placed upon students and taxpayers.

A version of this trigger had been included in the 2016 final borrower defense regulations but was removed in the 2019 borrower defense final rule on the grounds that the Department wanted to focus on actual liabilities owed rather than theoretical amounts and to wait for lawsuits to be final before seeking to recover liabilities. However, as the Department continues to improve its work overseeing institutions of higher education, we are concerned that waiting until multi-year proceedings are final undermines the purpose of taking proactive actions to protect the Federal fiscal interest. The trigger as structured here is designed to capture lawsuits that indicate significant levels of action and government involvement. These are not particularly common, are not brought lightly, and only involve a non-governmental actor if it is a qui tam lawsuit in which the Federal government has intervened. Moreover, the Department is concerned that waiting until the proceedings finish increases the risk that an institution that fails in an appeal would simply shut down immediately. By contrast, financial protection received can always be returned to the institution if the issues that necessitated it is resolved.

The Department is proposing to add § 668.171(c)(2)(i)(C) related to financial protection when the Department has adjudicated borrower defense claims in favor of borrowers and is seeking to recoup the cost of those discharges through an administrative proceeding. An institution would meet this trigger if a recalculated composite score that included this potential liability results in a composite score below 1.0.

The structure of this trigger acknowledges the circumstances under which an institution could be subject to recoupment actions tied to approved borrower defense applications under the final rule published on November 1, 2022.[127] Specifically, that rule establishes a single framework for reviewing all claims pending on July 1,

2023, or received on or after that date. This is different from prior borrower defense regulations, which apply different standards depending on a student loan's original disbursement date. That regulation states that an institution would not be subject to recoupment if the claim would not have been approved under the standard in effect at the time the loan was disbursed. Therefore, the trigger associated with approved borrower defense claims would not apply to claims that are approved but ineligible for recoupment under the new borrower defense regulation. Obtaining financial protection will help to ensure that there are institutional funds available to pay loan discharges if such discharges arise and are applicable, reducing the need for public funds to meet this obligation.

A similar trigger to this proposal was included in the 2016 Final Borrower Defense Regulations. That trigger was reduced in scope when financial responsibility standards were eliminated or lessened in the 2019 Final Borrower Defense Regulations. The rationale for limiting this trigger in 2019 was to restrict this trigger to what, at that time, was considered "known and quantifiable" amounts. An example of a known and quantifiable trigger was an actual liability incurred from a lawsuit. A known and quantifiable trigger was one whose consequences posed such a severe and imminent risk (*e.g.,* SEC or stock exchange actions) to the Federal interest that financial protection was warranted. This revised trigger would result in a known and quantifiable amount because the Department informs the institution of the amount of liability it is seeking when it initiates a recoupment action. The recalculation requirement also ensures that if the institution would still have a passing composite score, then they would not have to provide additional surety. For those that would have a failing score, this trigger simply ensures that if an institution does not prevail in any sort of recoupment action that the Department would have sufficient resources on hand to fulfill the liability. Absent this protection, there is a risk the institution would not have the resources to pay the liability by the time that proceeding is final.

Further, proposed § 668.171(c)(2)(i)(D) would apply to institutions undergoing a change in ownership for a period of time commencing with their approval to participate in the title IV, HEA programs through the end of the institution's second full fiscal year following certification. The Department proposes to add this condition because we are concerned that institutions may be in a

vulnerable position in the period after a change in ownership as the new owners acclimate to managing the institution. Greater scrutiny of these situations is thus warranted.

The Department proposes to move the current § 668.171(c)(1)(i)(B) and (ii) into a replacement of § 668.171(c)(2)(ii) to establish a mandatory trigger for institutions where an owner withdraws some amount of his or her equity in the institution when that institution has a composite score of less than 1.5 (the threshold considered passing) and the withdrawal of equity results in a recalculated composite score of less than 1.0 (the threshold considered failing). This relocated trigger clarifies that this requirement would also apply to institutions undergoing a change in ownership for the year following that change. This trigger would apply to institutions that have a calculated composite score that is not passing and have already demonstrated some financial instability. This demonstration of financial instability creates a situation where the Department would obtain financial protection from an institution.

The Department proposes to add § 668.171(c)(2)(iii) to establish a mandatory trigger for institutions that received at least 50 percent of its title IV, HEA program funds in its most recently completed fiscal year from gainful employment (GE) programs that are "failing." The 2016 Final Borrower Defense Regulations included a mandatory trigger linked to the number of students enrolled in failing GE programs. The 2019 Final Borrower Defense Regulations removed that trigger due to the regulations regarding GE programs being rescinded in a final rule published in the **Federal Register** on July 1, 2019.[128] This trigger contained in this proposed rule would be linked to the implementation of regulations in part 668, subpart S, governing gainful employment programs. The Department would be able to obtain financial protection from an institution when its revenue is negatively impacted when the GE programs it offers fail the Department's GE metrics. The Department believes reinstating this trigger is necessary because the potential loss of revenue from failing GE programs would have a negative impact on the institution's overall financial stability when it represents such a significant share of the institution's revenue. The Department proposes the trigger occurring when 50 percent of an institution's title IV, HEA volume is in failing GE programs. The

---

[127] 87 FR 65904.

[128] 84 FR 31392.

Department uses percentage thresholds to require financial protection when there is more than an insignificant failure in compliance. For example, under 668.173(b), an institution fails to meet the reserve standards under § 668.173(a)(3) if the institution failed to timely return unearned title IV, HEA funds for 5 percent or more students in a sample. In that circumstance, the financial protection is 25 percent of the total amount of unearned funds. For the failing GE programs, the Department determined that a 50 percent failure is reasonably related to the required financial protection of 10 percent of the institution's title IV, HEA funding because the institution is at risk of losing a majority of its title IV program revenue due to failure of some or all of its GE programs.

The Department proposes to add § 668.171(c)(2)(iv) to establish a mandatory trigger for institutions required to submit a teach-out plan or agreement. This mandatory trigger was originally implemented in the 2016 Final Borrower Defense Regulations and was subsequently removed in the 2019 Final Borrower Defense Regulations. The rationale in 2019 was that teach-outs were primarily the jurisdiction of accrediting agencies. The Department stated in the discussion section of that final rule that accrediting agencies are required to approve teach-out plans at institutions under certain circumstances, which demonstrates how important these plans are to ensuring that students have a chance to complete their instructional program in the event their school closes. At that time, we sought to incentivize teach-outs, and determined that linking a teach-out to a financial trigger was not an incentive. However, the Department has not seen any evidence that the efforts to incentivize teach-out plans or agreements through accreditors has reduced the number of institutions that close without a teach-out plan or agreement in place. Instead, the Department continues to witness disruptive and ill-planned closures where the institution has not made any arrangements for where students might transfer and complete their programs. Even when the school survives after a teach-out, the circumstances that could lead to such a request make it likely that the school's revenues will be significantly reduced and will be indicative of ongoing financial instability. We propose to re-implement this mandatory trigger so that we can obtain financial protection from institutions that are in this status. When an institutional closure is imminent,

regardless if it is one location or the entire institution, obtaining financial protection from the institution as soon as possible is necessary to protect the interests of students who will be negatively affected by the closure. Financial protection is also necessary to protect the interests of taxpayers who would have to provide funds for costs and obligations emanating from the closure, *e.g.,* payment of loan discharges. While a closed institution bears responsibility for reimbursing the Department for student loans discharged due to the closure, the actual recoupment of those funds takes place very rarely due to the institution ceasing to exist. This further illustrates the necessity for financial protection from institutions in this status.

The Department proposes to add § 668.171(c)(2)(v) to establish a mandatory trigger for institutions cited by a State licensing or authorizing agency for failing to meet State or agency requirements when the agency provides notice that it will withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement. The 2016 Final Borrower Defense Regulations had a similar mandatory trigger to this proposed trigger. The 2019 Final Borrower Defense Regulations added the language stating that the authorizing agency would terminate the institution's licensure or authorization if the institution did not comply; however, the 2019 Final Borrower Defense Regulations relegated this trigger to the discretionary category. We propose to keep the language added in the 2019 Final Borrower Defense Regulations but recategorize this trigger as mandatory. State authorization, or similar authorization from a governmental entity, is a fundamental factor of institutional eligibility. If an institution loses that factor, it would lose the ability to participate in the title IV, HEA programs. That loss of eligibility would significantly increase the likelihood that an institution may close. The seriousness of that potential occurrence is so great that the Department does not believe there are circumstances where it would not be appropriate to request financial protection. Accordingly, we think this is more appropriate as a mandatory trigger rather than a discretionary one.

The Department proposes to add § 668.171(c)(2)(vi) to establish a mandatory trigger for institutions that are directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange and that entity is subject to

one or more actions or events initiated by the U.S. Securities and Exchange Commission (SEC) or the exchange where the securities are listed. This mandatory trigger is, for the most part, in current regulation in § 668.171(c)(2). Our proposal would clarify that if the SEC files an action against the entity in district court or issues an order instituting proceedings pursuant to section 12(j) of the Exchange Act, that action would be a triggering event. The Department views either of these as actions we would take only when the SEC has identified and vetted serious issues, signaling increased risk to students attending those affected entities.

We further clarify that "exchanges" includes both domestic and foreign exchanges where the entity's securities may be traded. We recognize that some entities owning schools have stocks that are traded on foreign exchanges, and we believe similar actions initiated in those foreign exchanges or foreign oversight authorities warrant equivalent treatment under these proposed regulations.

The proposed trigger would enable the Department to obtain financial protection in situations where the SEC, a foreign or domestic exchange, or a foreign oversight authority, takes an action that potentially jeopardizes the institution's financial stability. This surety would protect the interests of the institution's students and the interests of taxpayers, both of whom can be negatively impacted by an institution's faltering financial stability.

The Department proposes to add § 668.171(c)(2)(vii) to establish a mandatory trigger for proprietary institutions where, in its most recently completed fiscal year, an institution did not receive at least 10 percent of its revenue from sources other than Federal educational assistance. The financial protection provided under this requirement will remain in place until the institution passes the 90/10 revenue requirement for two consecutive fiscal years. A mandatory trigger linked to the 90/10 revenue requirement was included in the 2016 Final Borrower Defense Regulations and it was reduced to a discretionary trigger in the 2019 Final Borrower Defense Regulations. Both of those triggers were linked to the then applicable rule which prohibited a proprietary institution from obtaining greater than 90 percent of its revenue from the title IV, HEA programs. The American Rescue Plan of 2021[129] amended section 487(a) of the HEA requiring that proprietary institutions

[129] *www.congress.gov/bill/117th-congress/house-bill/1319/text.*

derive not less than 10 percent of their revenue from non-Federal sources. Therefore, we propose to expand the 90/10 requirement to include all Federal educational assistance in the calculation as opposed to only including title IV, HEA assistance. An institution that fails the 90/10 requirement is at significant risk of losing its ability to participate in the title IV, HEA programs, which could put it in extreme financial jeopardy. Since the 90/10 requirement now includes all Federal educational assistance, it is possible that some institutions that previously met this threshold under the prior rule no longer would. The possibility for an increased number of institutions falling into this category warrants making this a mandatory trigger. Obtaining financial protection from an institution in this status is essential to protect students and taxpayers from an institution's potential loss of access to title IV, HEA funds and from a possible institutional closure and its negative consequences.

The Department proposes to add § 668.171(c)(2)(viii) to establish a mandatory trigger for institutions whose two most recent official cohort default rates (CDR) are 30 percent or greater, unless the institution files a challenge, request for adjustment, or appeal with respect to its rates for one or both of those fiscal years; and that challenge, request, or appeal remains pending, results in reducing below 30 percent the official CDR for either or both of those years, or precludes the rates from resulting in a loss of eligibility or provisional certification.

This trigger was included as a mandatory trigger in the 2016 Final Borrower Defense Regulations, and it was reduced to a discretionary trigger in the 2019 Final Borrower Defense Regulations. The rationale in 2019 for categorizing this trigger as discretionary was based on the idea that it was more appropriate to allow the Department to review the institution's efforts to improve their CDR before obtaining financial protection. As part of that review, the Department would evaluate whether the institution had acted to remedy or mitigate the causes for its CDR failure or to assess the extent to which there were anomalous or mitigating circumstances precipitating this triggering event, before determining whether we needed to obtain financial protection. Part of that review was to include evaluating the institution's response to the triggering event to determine whether a subsequent failure was likely to occur, based on actions the institution is taking to mitigate its dependence on title IV, HEA funds. This included the extent to which a loss of

title IV, HEA funds due to a CDR failure would affect its financial condition or ability to continue as a going concern, or whether the institution had challenged or appealed one or more of its official rates. We now propose to raise this trigger to the mandatory classification because of the serious consequences attached to CDRs at this level. Institutions with high CDRs are failing to meet the standards of administrative capability under § 668.16(m). Further, institutions with high CDRs are subject to the following sanctions:

• An institution with a CDR of greater than 40 percent for any one year loses eligibility to participate in the Federal Direct Loan Program.

• An institution with a CDR of 30 percent or more for any one year must create a default prevention taskforce that will develop and implement a plan to address the institution's high CDR. That plan must be submitted to the Department for review.

• An institution with a CDR of 30 percent or more for two consecutive years must submit to the Department a revised default prevention plan and may be placed on provisional certification.

• An institution with a CDR of 30 percent or more for three consecutive years loses eligibility to participate in both the Direct Loan Program and in the Federal Pell Grant Program.

Institutions subject to these sanctions will generally find themselves at risk of losing eligibility to participate in some title IV, HEA programs resulting in a decreased revenue flow. This circumstance is often a harbinger of an institution's financial distress and possible closure. Obtaining financial surety from an institution immediately after the institution finds itself in this status is necessary to offset any costs associated with an institutional closure and to alleviate any possible harm to students or taxpayers.

The Department proposes to add § 668.171(c)(2)(ix) to establish a mandatory trigger for institutions that have lost eligibility to participate in another Federal educational assistance program due to an administrative action against the school. This would be a new trigger not previously included in other regulations. The Department is aware of some institutions that have lost their eligibility to participate in Federal educational assistance programs overseen by agencies other than the Department. Institutions in that status have generally demonstrated some weakness or some area of noncompliance resulting in their loss of eligibility. That weakness or noncompliance may also be an indicator

of the institution's lack of administrative capability to administer the title IV, HEA programs. Further, the institution will likely suffer some negative impact on its revenue flow linked to its loss of eligibility to participate in the program. In either or both events, we propose that the Department obtain financial protection from institutions in this category to protect students and taxpayers from any negative consequences, including the possible closure of the institution, associated with its loss of eligibility to participate in the educational assistance program.

The Department proposes to add § 668.171(c)(2)(x) to establish a mandatory trigger for institutions whose financial statements required to be submitted under § 668.23 reflect a contribution in the last quarter of the fiscal year, and the institution then made a distribution during the first two quarters of the next fiscal year; and the offset of such distribution against the contribution results in a recalculated composite score of less than 1.0, as determined by the Department. This would be a new mandatory trigger. The Department has seen examples of institutions who seek to manipulate their composite score calculations by having a contribution made late in the fiscal year, raising the composite score for that fiscal year typically by enough so that it passes. However, the same institutions then make a distribution in the same or a similar amount early in the following fiscal year. This removes capital from the school and means that it is operating in a situation that may not demonstrate financial responsibility. With this proposal, we would obtain financial protection from an institution engaging in this pattern of behavior when that pattern results in a recalculated composite score of less than 1.0. Institutions engaging in this pattern of behavior generally do so to boost the apparent financial strength of the annual audited financial statements to avoid a failing composite score. Obtaining financial protection from institutions in this status is necessary to protect students and taxpayers from the negative consequences that can appear at institutions such as these.

The Department proposes to add § 668.171(c)(2)(xi) to establish a mandatory trigger for institutions that, as a result of Departmental action, the institution or any entity included in the financial statements submitted in the current or prior fiscal year is subject to a default or other adverse condition under a line of credit, loan agreement, security agreement, or other financing arrangement. This proposed mandatory

trigger is similar to an existing discretionary trigger, but the existing trigger discusses actions of creditors in general and does not separately address creditor events linked to Departmental actions. We propose to make this trigger mandatory due to the negative financial consequences that can follow instances when these actions occur. Actions like these negatively impact the resources an institution has available for normal institutional operations and in the worst cases, events like these can lead to the closure of an institution. It is important for the Department to be aware of institutions subject to creditor events linked to this trigger as soon as possible and to offset the financial instability created by this situation by obtaining financial protection.

The Department proposes to add § 668.171(c)(2)(xii) to establish a mandatory trigger for when an institution declares a state of financial exigency to a Federal, State, Tribal, or foreign governmental agency or its accrediting agency. Institutions experiencing substantial financial challenges sometimes make such declarations in an effort to justify significant changes to the institution, including elimination of academic programs and reductions of administrative or instructional staff. Although such declarations are typically not made unless the institution experiences severe financial hardship, in many cases threatening the institution's survival, the Department's regulations do not currently require an institution to report such status to the Department. The Department may not learn about an institution's financial challenges until an accrediting agency or governmental agency informs us or we learn of it from the media. This proposed trigger is necessary to ensure that the institution quickly informs the Department of any declaration of financial exigency and enables us to obtain financial protection to protect the interests of students and taxpayers.

The Department proposes to add § 668.171(c)(2)(xiii) to establish a mandatory trigger for when an institution is voluntarily placed, or is required to be placed, in receivership. We currently have little ability to act when an institution is in this situation, which indicates severe financial distress. This trigger would allow us greater ability to require financial protection while a receiver manages the funds. In recent years the Department has seen three high profile institutional failures where institutions entered into a receivership and the Department was unable to obtain sufficient financial protection before they closed.

*Financial Responsibility—Discretionary Triggering Events (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(d) contains several discretionary triggering events impacting an institution's financial responsibility. The current discretionary triggers are these instances:

• The institution is subject to an accrediting agency action that could result in a loss of institutional accreditation;

• The institution is found to have violated a provision or requirement in a security or loan agreement;

• The institution has a high dropout rate; The institution's State licensing or authorizing agency notifies the institution that it has violated a State licensing or authorizing agency requirement and that the agency intends to withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement;

• For its most recently completed fiscal year, a proprietary institution did not receive at least 10 percent of its revenue from sources other than title IV, HEA program funds; or

• The institution's two most recent official CDRs are 30 percent or greater.

*Proposed Regulations:* The Department proposes to amend § 668.171(d) to establish a stronger and more expansive set of discretionary triggering events that would assist the Department in determining if an institution is able to meet its financial or administrative obligations. This includes amending some existing triggers, moving some discretionary triggers into the list of mandatory triggers in paragraph (c) of this section, and adding new ones. Unlike the mandatory triggers, if any of the discretionary triggers occurs, the Department would determine if the event is likely to have a material adverse effect on the financial condition of the institution. If we make that determination, we would obtain financial protection from the institution. The proposed discretionary triggers are when:

• Under § 668.171(d)(1), the institution's accrediting agency or a Federal, State, local or Tribal authority places the institution on probation, issues a show-cause order, or places the institution in a comparable status that

poses an equivalent or greater risk to its accreditation, authorization, or eligibility;

• Under § 668.171(d)(2)(i) and (ii), except as provided in proposed § 668.171(c)(2)(xi), the institution is subject to a default or other condition under a line of credit, loan agreement, security agreement, or other financing arrangement; and a monetary or nonmonetary default or delinquency or other event occurs that allows the creditor to require or impose an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

• Under § 668.171(d)(2)(iii), except as provided in proposed § 668.171(c)(2)(xi), any creditor of the institution or any entity included in the financial statements submitted in the current or prior fiscal year under § 600.20(g) or (h), § 668.23, or subpart L of this part takes action to terminate, withdraw, limit, or suspend a loan agreement or other financing arrangement or calls due a balance on a line of credit with an outstanding balance;

• Under § 668.171(d)(2)(iv), except as provided in proposed § 668.171(c)(2)(xi), the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or subpart L of this part enters into a line of credit, loan agreement, security agreement, or other financing arrangement whereby the institution or entity may be subject to a default or other adverse condition as a result of any action taken by the Department; or

• Under § 668.171(d)(2)(v), the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart L has a monetary judgment entered against it that is subject to appeal or under appeal;

• Under § 668.171(d)(3), the institution displays a significant fluctuation in consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds received by the institution that cannot be accounted for by changes in those title IV, HEA programs;

• Under § 668.171(d)(4), an institution has high annual dropout rates, as calculated by the Department;

• Under § 668.171(d)(5), an institution that is required to provide additional financial reporting to the Department due to a failure to meet the regulatory financial responsibility standards and has any of these

indicators: negative cash flows, failure of other liquidation ratios, cash flows that significantly miss projections, significant increased withdrawal rates, or other indicators of a material change in the institution's financial condition;

• Under § 668.171(d)(6), the institution has pending claims for borrower relief discharges from students or former students and the Department has formed a group process to consider claims and, if approved, those claims could be subject to recoupment. Our goal is to determine if the pending claims for borrower relief, when considered along with any other financial triggers, pose any threat to the institution to the extent that a potential closure could result. If we believe such a threat exists, we would seek financial protection to protect the interests of the institution's students and the taxpayers;

• Under § 668.171(d)(7), the institution discontinues academic programs that enroll more than 25 percent of students at the institution; Under § 668.171(d)(8), the institution closes more than 50 percent of its locations, or closes locations that enroll more than 25 percent of its students. Locations for this purpose include the institution's main campus and any additional location(s) or branch campus(es) as described in § 600.2;

• Under § 668.171(d)(9), the institution is cited by a State licensing or authorizing agency for failing to meet requirements;

• Under § 668.171(d)(10), the institution has one or more programs that has lost eligibility to participate in another Federal educational assistance program due to an administrative action;

• Under § 668.171(d)(11), at least 50 percent of the institution is owned directly or indirectly by an entity whose securities are listed on a domestic or foreign exchange and the entity discloses in a public filing that it is under investigation for possible violations of State, Federal or foreign law.

• Under § 668.171(d)(12), the institution is cited by another Federal agency and faces loss of education assistance funds if it does not comply with the agency's requirements.

*Reasons:* The Department is concerned that there are many factors or events that are reasonably likely to, but would not in every case, have an adverse financial impact on an institution. Compared to the mandatory triggers where the impact of an action or event can be reasonably and readily assessed (*e.g.,* where claims, liabilities, and potential losses are reflected in the recalculated composite score), the

materiality or impact of the discretionary triggers is not as apparent and obtaining financial protection in every situation may not be appropriate. The Department would have to conduct a case-by-case review and analysis of the factors or events applicable to an institution to determine whether one or more of those factors or events has an adverse financial impact. In so doing, the Department may request additional information or clarification from the institution about the circumstances surrounding the factors or events under review. If we determine that the factors or events have a significant adverse effect on the institution's financial condition or operations, we would notify the institution of the reasons for, and consequences of, that determination. When an institution moves toward a status of financial instability or irresponsibility, it is necessary for the Department to be aware of that at the earliest possible time so that the situation can be addressed. These proposed discretionary triggers would be a tool with which the Department can pursue that charge.

While there are existing discretionary triggers, the Department is concerned that the current regulations are too limiting. They exclude too many situations where institutions with questionable financial stability could continue to operate without a streamlined mechanism for the Department to receive additional financial protection. The current triggers also do not include certain events that may be precursors to later more concerning events, such as an institution first being placed on probation and then later having to show cause with an accreditation agency. Having these discretionary triggers occur earlier in what could end up being a series of events that results in an institution's impaired financial stability increases the likelihood that the Department would be able to obtain financial protection from institutions while they still possess the resources to comply.

Absent stronger triggers, the Department is concerned that it will expose taxpayers to unnecessarily significant risk of uncompensated discharges tied to institutional closures or approved borrower defense claims. These new proposed triggers would also deter overly risky behavior, as institutions would know there is a possibility that they could be required to provide additional financial protection if they engage in behavior that leads to violating financing arrangements, an increase in borrower

defense claims, or other actions that indicate broader financial problems with an institution.

The Department proposes to amend § 668.171(d)(1) by establishing a discretionary trigger for situations where the institution's accrediting agency or a Federal, State, local or Tribal authority places the institution on probation or issues a show-cause order or places the institution in a comparable status that poses an equivalent or greater risk to its accreditation, authorization, or eligibility. We further propose to expand this requirement to include compliance actions initiated by governmental oversight and authorizing agencies since their actions can be equally impactful on the institution's status. This proposal is similar to two separate triggers that currently exist, and which were implemented in the 2019 Final Borrower Defense Regulations. This proposal expands and strengthens the trigger to include institutions that are placed on probation by their accrediting agency. This proposal uses similar language to a trigger linked to accrediting agency actions that was implemented in the 2016 Final Borrower Defense Regulations. The 2019 Final Borrower Defense Regulations kept accrediting agency actions as a discretionary trigger but eliminated probation as an action that would activate this trigger. We are now concerned that the existing trigger is too limited in considering the types of situations that represent significant concerns from accreditors, especially given the desire to request financial protection before an institution is on the brink of closure. It is not uncommon for institutions to be placed on probation before later ending up on show cause—the status that currently activates a discretionary trigger. Adding probation provides a path for the Department to take a closer look at an institution before it is at the most serious stage of accreditor actions. Institutions that are categorized by their accreditors as being on probation, having to show cause, or having their accreditation status placed at risk may be under stresses that would have a direct impact on their financial stability. The proposed trigger includes compliance actions initiated by governmental oversight or authorizing agencies. The current regulatory trigger, implemented in the 2019 Final Borrower Defense Regulations, is similar to this and is linked to a State licensing or authorizing agency taking action against the institution in which the agency will move to withdraw or terminate the institution's licensure or

authorization. The proposal would combine the actions taken by an accrediting agency and those taken by governmental oversight or authorization agencies into one discretionary trigger. Because this is a discretionary trigger, the Department would be able to examine why an institution is placed on probation or other statuses to determine if they do indicate severe enough situations that financial protection is warranted.

The Department proposes to amend § 668.171(d)(2) by establishing a discretionary trigger for situations where the institution is subject to a default or other condition under a line of credit, loan agreement, security agreement, or other financing arrangement; and a monetary or nonmonetary default or delinquency or other event occurs that allows the creditor to require or impose an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees. This would capture situations that are similar to but not otherwise addressed by the mandatory trigger in proposed § 668.171(c)(2)(xi). This proposed discretionary trigger is similar to a discretionary trigger that was implemented in the 2016 Final Borrower Defense Regulations and was retained in the 2019 Final Borrower Defense Regulations. The proposed regulation would clarify that the rule includes not only the institution but also any entity included in the financial statements submitted in the current or prior fiscal year under §§ 600.20(g) or (h), 668.23, or subpart L of part 668.

The Department is concerned that the situations described in this trigger could result in an institution or associated entity suddenly needing to remove significant resources from the institution, such as to put up greater collateral or to address a sudden increase in the costs of servicing its debt. Such situations mean that an institution or associated entity that may have seemed financially responsible is now in a situation where they cannot afford their debt payments or may be at other risk of significantly negative financial outcomes. Moreover, including these items makes it possible for the Department to be aware earlier about the possible need for financial protection from the institution, improving our ability to protect students' and taxpayers' interests. However, given that institutions and their associated entities may have a significant number of creditors and contracts, we think it is prudent to treat this as a discretionary trigger so that the Department is able to better analyze the specific facts of the

situation and then determine what degree of a threat to an institution's financial health it represents.

The Department proposes to further amend § 668.171(d)(2) by establishing a discretionary trigger for judgments awarding damages or other monetary relief that are subject to appeal or under appeal. Even if under appeal, such judgments against institutions or their owners should not be taken lightly because they may negatively impact the institution's financial strength in the future. Additionally, appeals of such judgments can and often do take years to resolve.

In the event the Department determines that the potential liability resulting from the judgment against the institution or entity could have a significant adverse effect on the institution, the Department believes it should be able to take sensible steps to protect the Federal fiscal interest during the pendency of those proceedings.

The Department proposes to amend § 668.171(d)(3) to establish a discretionary trigger for situations where the institution displays a significant fluctuation in consecutive award years, or a period of award years, in the amount of Federal Direct Loan or Federal Pell Grant funds received by the institution that cannot be accounted for by changes in those title IV, HEA programs. This proposed discretionary trigger is similar to a discretionary trigger that was implemented in the 2016 Final Borrower Defense Regulations and was subsequently removed in the 2019 Final Borrower Defense Regulations. The rationale at that time for removing this trigger was that fluctuation in these program funds did not indicate financial instability at the institution. Additionally, we stated that linking Pell Grant fluctuations to a discretionary trigger would harm low-income students because it would discourage institutions from serving students who rely on Pell Grants. However, we have observed that significant increases or decreases in the volume of Federal funds may signal rapid contraction or expansion of an institution's operations that may either cause, or be driven by, negative turns in the institution's financial condition or its ability to provide educational services. A significant contraction in aid received may indicate that an institution is struggling to attract students and may be at risk of closure. On the other hand, an institution that grows rapidly may present risks that its growth will outpace its capacity to serve students well. In the past, the Department has seen situations, particularly among publicly traded private for-profit

institutions, where institutions experienced hypergrowth, resulting in significant concerns about the value delivered, followed a few years later by a significant contraction, and, in some cases, closure. Being aware of this status at an earlier time than provided under current regulations allows us to seek financial protection from the institution when we determine that it is necessary to protect students' and taxpayers' interests. In evaluating this trigger again, we have come to disagree with the way we framed our concerns around the effect of this trigger on low-income students in the 2019 regulation. The institutions with the largest shares of Pell Grant recipients are open access institutions, meaning they accept any qualified applicant without consideration of that student's finances. The institutions with the fewest shares of low-income students, by contrast, tend to be the institutions that reject the most students and have the greatest financial resources. Because these aspects are core to an institution's structure and mission, we do not see a circumstance where this trigger might affect an institution's decision on the type of students to serve. We also believe that it is important to ensure that low-income students have access to educational options at financially stable institutions offering a high-quality education and are not attending schools that may be at risk of sudden closure.

The Department proposes to amend § 668.171(d)(5) to establish a discretionary trigger for when an institution is required to provide additional interim financial reporting to the Department due to a failure to meet the regulatory financial responsibility standards or due to a change in ownership and has any of these indicators: negative cash flows, failure of other liquidation ratios, cash flows that significantly miss projections, significant increased withdrawal rates, or other indicators of a material change in the institution's financial condition. This proposed discretionary trigger is new. It would only apply to those institutions that fail to meet the financial responsibility standards in subpart L of part 668 or experience a change in ownership. Additionally, one or more of the indicators mentioned in the proposed rule—negative cash flows, failure of other liquidation ratios, cash flows that significantly miss the projections submitted to the Department, withdrawal rates that increase significantly, or other indicators of a material change in the financial condition of the institution—would have to be present for the trigger

to apply. These indicators are of sufficient severity that it is important for the Department to examine the overall financial picture of the institution and determine if financial protection would be required to protect the interests of students and taxpayers.

The Department proposes to amend § 668.171(d)(6) to establish a discretionary trigger for when an institution has pending claims for borrower defense discharges from students or former students and the Department has formed a group process to consider claims. This would only apply in situations where, if approved, the institution might be subject to recoupment for some or all of the costs associated with the approved group claim. This proposed discretionary trigger is similar to a discretionary trigger that was implemented in the 2016 Final Borrower Defense Regulations and was subsequently removed in the 2019 Final Borrower Defense Regulations due to the burden placed on institutions with borrower defense claims, that were otherwise financially stable. At the time the Department argued that the amounts associated with an institution's borrower defense claims were estimates and could create false-positive outcomes resulting in a financially responsible institution having to inappropriately provide financial protection. Further, it was believed that this false-positive situation would impose a significant burden on the Department to monitor and analyze an institution that was financially responsible. However, we have reconsidered our position and adjusted the trigger to address some of our previously stated concerns. First, we have clarified that this trigger applies to group processes, not just decisions on individual claims. To date, groups of borrowers who have received loan discharges based upon borrower defense findings have been very large, representing tens of millions of dollars. The formation of the group process also occurs after the review of evidence and a response from the institution, so there is already some consideration of the relevant evidence before this trigger would potentially be met. Furthermore, this would be a discretionary trigger, so the Department would be required to assess to assess the institution's financial stability and determine if the borrower defense claims pose a threat to the institution's financial responsibility. That would mean that a group process involving a very small number of claims would be less likely to result in a request for financial protection, especially if the institution is large and

otherwise financially stable. If it is determined that the group process is a real financial threat, it is only then that financial protection would be obtained from the institution. The Department believes it is important that institutions be held accountable when they take advantage of student loan borrowers. Unfortunately, the Department has often observed that an institution has closed long before a borrower defense process concludes. Asking for financial protection earlier in the process increases the likelihood that the Department would be able to offset losses from a group claim that is later approved.

The Department intentionally limits this trigger to situations where there may be a recoupment action. The borrower defense rule published on November 1, 2022,[130] notes that institutions would not be subject to recoupment in situations in which the claims would not have been approved under the standards in place when loans were first disbursed. Since the Department is concerned with whether an approved group claim could result in a significant liability for an institution that could create financial problems it would not be appropriate to have this trigger occur if the Department was not going to seek to recoup on that discharge if it is approved.

The Department proposes to add § 668.171(d)(7) by establishing a discretionary trigger for when an institution discontinues academic programs that affect more than 25 percent of enrolled students. This would be a new discretionary trigger. The Department is concerned that ending programs that affect a significant share of enrollment may be a precursor to an overall closure of the entire institution. While the ending of any program that negatively impacts any students is a matter of concern for the Department, we propose that the cessation of a program or programs that enroll 25 percent of an institution's students is the threshold that we would evaluate the institution's financial stability to ensure the termination of the programs has not negatively impacted the institution's financial status.

The goal of this trigger is to identify a situation in which the share of enrollment affected by a program or location closure is significant enough that it merits further institution-specific analysis to determine if the closure suggests a sufficiently large financial impairment where greater protection would be warranted. The Department chose this 25 percent threshold because

we believe that could indicate a serious impairment to an institution's finances that merits a closer and case-by-case review. By way of example, we believe a threshold at this level would allow us to capture the situation where an institution closed all of its programs in a given degree level, only to later shutter the entire institution. As with other triggers, this ability to take a closer look is important because historically the Department has collected very little funds to offset the costs of closed school discharges after an institution goes out of business.

The Department proposes to add § 668.171(d)(8) by establishing a discretionary trigger for when an institution closes more than 50 percent of its locations or closes locations that enroll more than 25 percent of its students. Locations for this purpose include the institution's main campus and any additional location(s) or branch campus(es) as described in § 600.2. This would be a new discretionary trigger. This proposed discretionary trigger is similar to the trigger linked to an institution terminating academic programs in that an institution closing locations in this number may be a harbinger of an imminent closure of the institution. The Department chose the threshold of more than 25 percent of enrolled students for the same reasons that it selected that level for the discontinuation of academic programs.

This trigger considers closures both in terms of the number of campus closures as well as separately considering the amount of enrollment at locations. Both can be concerns. For instance, the Department has seen instances where an institution started closing a number of its additional locations before later shuttering its main campus. We propose the threshold of more than 50 percent of an institution's locations closing as that number of locations, regardless of the percentage of students impacted, may indicate an overall lack of financial stability. A negotiator in the negotiated rulemaking process stated that an institution may be strengthening its financial status by closing locations with zero or very low enrollment or usage. We acknowledge that and believe that our evaluation as a result of this proposed trigger would make that very determination. If an institution is made financially stronger, then financial protection would not be necessary but if the institution is made weaker by the closure of more than half of its locations, then we would obtain financial protection to ensure that students and taxpayers are protected in the event of an overall institutional closure. Similarly, this analysis could

---

[130] 87 FR 65904.

consider if the locations being closed are in fact sizable sources of an institution's enrollment versus being small satellite locations.

The Department proposes to add § 668.171(d)(9) by establishing a discretionary trigger for when an institution is cited by a State licensing or authorizing agency for failing to meet requirements. This captures less severe circumstances related to States than are addressed under the mandatory triggers. This proposed trigger was originally implemented in the 2016 Final Borrower Defense Regulations. The 2019 Final Borrower Defense Regulations kept the trigger but narrowed its scope to only be activated if the State licensing or authorizing agency stated that it intended to withdraw or terminate the licensure or authorization if the institution failed to take steps to comply with the requirement. The rationale at that time was that the trigger would be linked to a known and quantifiable event, in this case, the State agency's intent to withdraw or terminate the agency's licensure or authorization. Proposed § 668.171(d)(9) would return to the original concept where the Department would be aware and be able to obtain financial protection if an institution is cited by its State licensing or authorizing agency. We have observed some institutions with this pattern of behavior that have been unable to correct the area of noncompliance and find its normal operations are more difficult to pursue. An institution's eligibility to administer the title IV, HEA programs is dependent on obtaining and maintaining authorization or licensure from the appropriate State agency in its State. When a State agency cites an institution, its continued eligibility may be in jeopardy. This proposed discretionary trigger would allow the Department to evaluate the situation and determine if the State action is of the magnitude that financial protection would be required. In worst case scenarios, findings and citations of this type are precursors to the institution losing its authorization or licensure and the subsequent loss of eligibility to administer the title IV, HEA programs. Such a loss would have a negative impact on the institution's overall financial stability requiring the Department to make a determination if obtaining financial protection for the institution is warranted to protect students' and taxpayers' interests.

The Department proposes to add § 668.171(d)(10) to establish a discretionary trigger for when an institution has one or more programs that has lost eligibility to participate in another Federal educational assistance program due to an administrative action. This would be a new discretionary trigger and complements the mandatory trigger that occurs if the institution loses eligibility for another Federal educational assistance program. Other Federal agencies administer educational assistance programs including the Departments of Veterans Affairs, Defense, and Health and Human Services. Currently, when an institution has lost its ability to participate in an educational program administered by another Federal agency due to an administrative action by that agency, the Department of Education lacks a regulatory mechanism to include this fact in consideration of the institution's overall financial status, despite the fact that losing eligibility for a Federal educational assistance program can have a very significant impact on a school's revenue and financial stability. This proposed trigger is necessary to allow the Department to make a determination if obtaining financial protection for institutions in this situation is warranted to protect students' and taxpayers' interests.

The Department proposes to add § 668.171(d)(11) to establish a discretionary trigger for when at least 50 percent of the institution is owned directly or indirectly by an entity whose securities are listed on a domestic or foreign exchange and the entity discloses in a public filing that it is under investigation for possible violations of State, Federal, or foreign law. This level of ownership is the threshold for blocking control over the institution's actions. This would be a new discretionary trigger. Institutions that find themselves in this category may have their normal operations and financial stability impacted negatively due to the public filing. In some scenarios, legal actions such as this may damage the institution's public reputation, thereby reducing the institution's enrollment, revenue, and profitability, which would result in the institution's financial stability being shaken. In worst case scenarios, these legal actions may result in the institution's closure and the ensuing negative consequences associated with closure. This proposed trigger is necessary to allow the Department to make a determination if obtaining financial protection for institutions facing legal actions such as this is warranted to protect students' and taxpayers' interests.

The Department proposes to add § 668.171(d)(12) to establish a discretionary trigger for when an institution is cited by another Federal agency for noncompliance with requirements associated with a Federal educational assistance program and that could result in the loss of Federal education assistance funds if the institution does not comply with the agency's requirements. An action by another Federal agency, such as the Department of Veterans Affairs placing an institution on probation, is a risk factor that could result in the loss of Federal funds. We propose this as a discretionary trigger since these actions may be fleeting.

### Financial Responsibility—Recalculating the Composite Score (§ 668.171)

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(e) states when the Department will recalculate an institution's composite score. Specifically, we recalculate an institution's most recent composite score by recognizing the actual amount of the institution's liability, or cumulative liabilities as defined in regulation, as an expense, or by accounting for the actual withdrawal, or cumulative withdrawals, of owner's equity as a reduction in equity. The current regulations account for those expenses and withdrawals as follows:

• For liabilities incurred by a proprietary institution:

▪ For the primary reserve ratio, increasing expenses and decreasing adjusted equity by that amount;

▪ For the equity ratio, decreasing modified equity by that amount; and

▪ For the net income ratio, decreasing income before taxes by that amount;

• For liabilities incurred by a non-profit institution;

▪ For the primary reserve ratio, increasing expenses and decreasing expendable net assets by that amount;

▪ For the equity ratio, decreasing modified net assets by that amount; and

▪ For the net income ratio, decreasing change in net assets without donor restrictions by that amount; and

• For the amount of owner's equity withdrawn from a proprietary institution—

▪ For the primary reserve ratio, decreasing adjusted equity by that amount; and

▪ For the equity ratio, decreasing modified equity by that amount.

*Proposed Regulations:* The Department proposes to amend § 668.171(e) to expand when we would recalculate the institution's composite score. The proposed regulations would establish several mandatory triggers in

§ 668.171(c) that require a recalculation of the institution's composite score to determine if financial protection is required from the institution. The first of these triggers is found in proposed § 668.171(c)(2)(i)(A). It would require recalculation for institutions with a composite score of less than 1.5 (other than a composite score calculated as part of a change in ownership application) that are required to pay a debt or incur a liability from a settlement, arbitration proceeding, or a final judgment in a judicial proceeding. If the recalculated composite score for the institution or entity is less than 1.0 as a result of the debt or liability, the institution would be required to provide financial protection. The second mandatory trigger that would require recalculation is found in proposed § 668.171(c)(2)(i)(C) related to when the Department seeks to recoup the cost of approved borrower defense to repayment discharges. If the recalculated composite score for the institution or entity is less than 1.0 as a result of the liability sought in recoupment, the institution would be required to provide financial protection. The third mandatory trigger that would require recalculation is in proposed § 668.171(c)(2)(ii), which would require recalculation for proprietary institutions with a composite score of less than 1.5 where there is a withdrawal of owner's equity by any means. If the withdrawal results in a recalculated composite score for the institution or entity that is less than 1.0, the institution would be required to provide financial protection. Under § 668.171(e)(3), the composite score would also be recalculated in the case of a proprietary institution that has undergone a change in ownership where there is a withdrawal of owner's equity through the end of the institution's first full fiscal year. If the withdrawal results in a recalculated composite score for the institution or entity that is less than 1.0, the institution would be required to provide financial surety. The final mandatory trigger that would require a recalculation of an institution's composite score is found in proposed § 668.171(c)(2)(x), which would require that any institution's composite score be recalculated when (1) its audited financial statements reflect a contribution in the last quarter of the fiscal year and (2) it makes a distribution during the first two quarters of the next fiscal year. If the offset of the distribution against the contribution results in a recalculated composite score of less than 1.0, the institution would be required to provide financial protection.

Under proposed § 668.171(e), we would adjust liabilities incurred by the entity who submitted its financial statements in the prior fiscal year to meet the requirements of § 668.23, or in the year following a change in ownership, for the entity who submitted financial statements to meet the requirements of § 600.20(g) as follows:

• For the primary reserve ratio, we propose to increase expenses and decrease the adjusted equity by that amount;

• For the equity ratio, we propose to decrease the modified equity by that amount; and

• For the net income ratio, we propose to decrease income before taxes by that amount.

The proposed regulations under § 668.171(e) would also clarify how liabilities would impact a nonprofit institution's composite score. We would adjust liabilities incurred by any nonprofit institution or entity who submitted its financial statements in the prior fiscal year to meet the requirements of § 600.20(g), § 668.23, or subpart L of part 668 and described in §§ 668.171(c)(2)(i)(B) or (C) as follows:

• For the primary reserve ratio, we propose to increase expenses and decrease expendable net assets by that amount;

• For the equity ratio, we propose to decrease modified net assets by that amount; and

• For the net income ratio, we propose to decrease change in net assets without donor restrictions by that amount.

The proposed regulations would also clarify how withdrawal of equity would impact a proprietary institution's composite score. If the withdrawal of equity occurred for an entity who submitted its financial statements in the prior fiscal year to meet the requirements of § 668.23, or in the year following a change in ownership, we would adjust the entity's composite score calculation as follows:

• For the primary reserve ratio, we propose to decrease adjusted equity by that amount; and

• For the equity ratio, we propose to decrease modified equity by that amount.

For a proprietary institution that makes a contribution and distribution under proposed § 668.171(c)(2)(x), we would adjust the composite score as follows:

• For the primary reserve ratio, we propose to decrease adjusted equity by the amount of the contribution; and

• For the equity ratio, we propose to decrease modified equity by the amount of the contribution.

The proposed regulations would not modify the actual formula used to calculate the composite score.

*Reasons:* Proposed § 668.171(e) states how and when we would recalculate an institution's composite score based on certain mandatory triggers in proposed § 668.171(c). The recalculation is performed to address liabilities incurred under proposed § 668.171(c)(2)(i)(A) and (C); withdrawals of an owner's equity under proposed § 668.171(c)(2)(ii); and the accounting for contributions and distributions under proposed § 668.171(c)(2)(x). The proposed regulations describe the specific adjustments to the primary reserve ratio, the equity ratio, and the net income ratio that would result from the identified triggers. The proposed regulations would clarify that the adjustment would be made in the financial statements of the entity that submitted the audited financial statements for the prior fiscal year, or the entity that submitted the audited financial statements to comply with the regulatory requirements for a materially complete application following a change of ownership.

The multiple triggers identified in proposed § 668.171(e) would all diminish the entity's cash position, and the Department would perform a recalculation of the composite score to determine to what extent the triggering event actually impacts the institution's composite score. If we determine that the recalculated composite score is less than 1.0, meaning it has failed, we would require the institution to provide financial protection. In addition, by making an adjustment to the prior year's financial statements, the institution would be relieved from submitting interim audited financial statements when one of the identified triggering events occurs. The Department believes that the triggers identified in proposed § 668.171(e) that would require recalculation of the composite score (and which are described in § 668.171(c)(2)(i)(A) & (C), (ii), and (x)) pose a serious threat to the institution's financial stability. The threat is such that we believe that when the triggering event occurs an immediate determination of how the institution's composite score is impacted by the event must be made. To wait for the annual submission of the institution's audited financial statements would allow an excessive amount of time to elapse before this determination could be made based on the annual submission. When an institution encounters one of the identified triggering events, the quick recalculation of the composite score will

inform us whether the triggering event has had minimal impact on the institution's financial stability or has had such a detrimental impact that financial protection becomes necessary to protect the interests of students and taxpayers.

*Financial Responsibility—Reporting Requirements (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(f) lists the following conditions that must be reported to the Department under the existing financial responsibility reporting requirements:

• When an institution incurs a liability as described in § 668.171(c)(2)(i)(A);

• When there is a withdrawal of an owner's equity as described in § 668.171(c)(2);

• When an institution is subject to provisions relating to a publicly traded institution described in § 668.171(c)(2)(i)(A);

• When an institution's accrediting agency has issued an order, that if not satisfied, could result in the loss of accreditation;

• When an institution is subject to the loan agreement provisions in § 668.171(d)(2) and a loan violation occurs, the creditor waives the violation, or the credit imposes sanctions or penalties in exchange or as a result of granting the waiver;

• When an institution is informed that its State authorizing agency is terminating its authorization or licensure;

• When an institution is found to be non-compliant with the requirement that at least 10 percent of its revenues originate from non-title IV, HEA sources. The deadline for this notification is no later than 45 days after the end of the institution's fiscal year.

*Proposed Regulations:* The Department proposes to amend § 668.171(f) by adding several new events to the existing reporting requirements and expanding others. These events must be generally reported generally no later than 10 days following the event. Institutions would notify the Department of these events by sending an email to: *FSAFinancialAnalysisDivision@ed.gov.*

Under proposed § 668.171(f), the reportable events are situations where:

• The institution incurs a liability described in proposed § 668.171(c)(2)(i)(A);

• The institution is served with a complaint stating that the institution is being sued. An updated notice would be required after the lawsuit has been pending for 120 days;

• The institution receives a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity;

• As described in proposed § 668.171(c)(2)(ii), there is a withdrawal of an owner's equity;

• As described in proposed § 668.171(c)(2)(x), the institution makes a contribution in the last quarter of its fiscal year and makes a distribution in the first or second quarter of the following fiscal year;

• As described in proposed §§ 668.171(c)(2)(vi) and in (d)(11), the institution is subject to the provisions related to a publicly listed entity;

• The institution is subject to any action by an accrediting agency, or a Federal, State, local, or Tribal authority, that is either a mandatory or discretionary trigger;

• As described in proposed § 668.171(c)(2)(xi), the institution is subject to actions initiated by a creditor of the institution;

• As described in proposed § 668.171(d)(2), the institution is subject to provisions related to a default, delinquency, or creditor event;

• As described in proposed § 668.171(c)(2)(vii), the institution fails the non-Federal funds provision. This notification deadline would be 45 days after the end of the institution's fiscal year;

• An institution or entity has submitted an application for a change in ownership under 34 CFR 600.20 that is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or a determination arising from an administrative proceeding described in proposed § 668.171(c)(2)(i)(B) or (C). This reporting requirement is applicable to any action described herein occurring through the end of the second full fiscal year after the change in ownership has occurred.;

• As described in proposed § 668.171(d)(7), the institution discontinues academic programs that enrolled more than 25 percent of students;

• The institution declares a state of financial exigency to a Federal, State, Tribal, or foreign governmental agency or its accrediting agency;

• The institution, or an owner or an affiliate of the institution that has the power, by contract or ownership interest, to direct or cause direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law or is subject to an order appointing a receiver, or appointing a person of similar status under foreign law;

• The institution closes more than 50 percent of its locations or closes locations that enroll more than 25 percent of its students. Locations for this purpose include the institution's main campus and any additional location(s) or branch campus(es) as described in § 600.2;

• The institution is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, and the entity discloses in a public filing that it is under investigation for possible violations of State, Federal or foreign law.

• The institution fails to meet any of the standards in proposed § 668.171(b).

We also propose to remove current § 668.171(f)(3)(i)(A) which provides that the institution may demonstrate that the reported withdrawal of owner's equity was used exclusively to meet tax liabilities of the institution or liabilities of the institution's owners that result from income derived from the institution.

*Reasons:* Implementation of the proposed reportable events would make the Department more aware of instances that may impact an institution's financial responsibility or stability. The proposed reportable events are linked to the financial standards in § 668.171(b) and the proposed financial triggers in § 668.171(c) and (d) where there is no existing mechanism for the Department to know that a failure or a triggering event has occurred. Notification regarding these events would allow the Department to initiate actions to either obtain financial protection, or determine if financial protection is necessary, to protect students from the negative consequences of an institution's financial instability and possible closure. A school closure can have severe negative consequences for students including disruption of their education, delay in completing their educational program, and a loss of academic credit upon transfer. Furthermore, negative consequences of a school's closure not only impact students but have negative effects on taxpayers as a result of the Department's obligation to pay student loan discharges of borrowers impacted by the closure and our inability to collect liabilities owed to the Federal

government due to the insolvency of the closed institution.

Current § 668.171(f)(3)(i)(A) provides that the institution may demonstrate that the reported withdrawal of owner's equity was used exclusively to meet tax liabilities of the institution or its owners for income derived from the institution. We propose to remove this provision because taxation, whether it is an individual or institutional liability, is not significantly different from other liabilities borne by the individual or institution. Therefore, we do not see the necessity to treat taxation differently when examining a withdrawal of owner's equity for financial responsibility purposes.

Directed Questions

We request that commenters submit feedback through the comment process about the requirement under proposed § 668.171(f)(1)(iii) that an institution must report to the Department when it receives a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity (local, State, Tribal, Federal, or foreign). As proposed, § 668.171(f)(1)(iii) is a reporting requirement only and is not included as a mandatory triggering event in § 668.171(c) nor as a discretionary triggering event in § 668.171(d). We believe that an institution subject to an action or actions described here must alert the Department so that we can consider these actions in any compliance activity we undertake. We are especially interested in receiving input as to whether an investigation as described in § 668.171(f)(1)(iii) warrants inclusion in final regulations as either a mandatory or discretionary financial trigger. If inclusion would be warranted, we would ask for suggestions regarding what actions associated with the investigation would have to occur to initiate the financial trigger. We also request commenters provide any other information, thoughts, or opinions on this issue.

*Financial Responsibility—Public Institutions (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(g) states what a public domestic or foreign institution must do to be considered financially responsible. These requirements include notifying the Department that the institution is

designated a public institution by the appropriate foreign or domestic government entity.

*Proposed Regulations:* The Department proposes to amend § 668.171(g) by adding paragraph (g)(1)(ii), which would also require a public institution to provide to the Department a letter from an official of the government entity or other signed documentation acceptable to the Department. The letter or documentation must state that the institution is backed by the full faith and credit of the government entity. The Department also proposes similar amendments to paragraph (g)(2)(ii) which is applicable to foreign institutions. We propose to add paragraph (g)(2)(iv) which would subject a foreign institution to the mandatory triggers described in paragraph (c) of this section, and the discretionary triggers described in paragraph (d) of this section where the Department has determined that the triggering event would have significant adverse effect on the financial condition of the institution. The Secretary would treat the foreign public institution subject to these triggers in the same way as a domestic public institution, which could include heightened cash monitoring or provisional certification.

*Reasons:* The Department has long held that public institutions establish financial responsibility because of having full faith and credit backing by their State or appropriate government entity. That backing means that if the institution were to run into financial trouble the State or appropriate government entity is able to step in and provide the necessary financial support. As a result, the Department does not typically collect surety from a public institution. However, the current regulations do not explicitly require a demonstration of full faith and credit backing by public institutions. That creates a risk that an institution could be deemed public but not actually have the inherent financial backing needed to assuage concerns if the institution were to face financial troubles. The proposed change to § 668.171(g) would allow the Department to secure a document guaranteeing that the public institution is backed by the full faith and credit of the relevant government entity. This change would ensure that we can collect any liability from the entity making the guarantee, thereby protecting taxpayers and students.

*Financial Responsibility—Audit Opinions and Disclosures (§ 668.171)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine

whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.171(h) states that even if an institution meets all of the financial responsibility factors listed in at § 668.171(b), the Department does not consider the institution to be financially responsible if the institution's audited financial statements include an opinion that was adverse, qualified, disclaimed, or the financial statements contain a disclosure in the notes that there is substantial doubt about the institution's ability to continue as a going concern. The Department may determine whether the aforementioned opinions have a significant bearing on the institution's financial condition or whether the going concern issues have been alleviated and may then act on that determination and obtain financial protection from the institution.

*Proposed Regulations:* The Department proposes to amend § 668.171(h) to clarify that an institution would not be considered financially responsible, even if all financial responsibility factors in § 668.171(b) are met, if the notes to the institution's or entity's audited financial statements include a disclosure about the institution or entity's diminished liquidity, ability to continue operations, or ability to continue as a going concern. If we determine that the auditor's adverse, qualified, or disclaimed opinion does not have significant bearing on the institution's financial condition, we may decide that the institution is financially responsible. Similarly, if we determine that the institution has alleviated the condition(s) in the disclosure (diminished liquidity, ability to continue operations, or ability to continue as a going concern), we may decide the institution is financially responsible. The Department would determine, on its own, whether these issues are alleviated even when the disclosure states that alleviation has been completed.

*Reasons:* The Department must have the ability to make its own determination regarding any issues that impact an institution's diminished liquidity, ability to continue operations, or ability to continue as a going concern. In these cases, the Department seeks financial statement disclosures whereby auditors agree with the institution's plan to address such issues or note that the institution has successfully addressed them. However, the Department would determine, on its own, if the issues identified by the

App.261

auditor have been alleviated by the institution.

*Financial Responsibility—Past Performance (§ 668.174)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.174 states that an institution is not financially responsible if it has been limited, suspended, terminated, or entered into a settlement agreement to resolve any of those actions initiated by the Department or a guaranty agency. Further, the regulations state that the institution is not financially responsible if the institution has an audit finding in either of its two most recent compliance audits, or a Departmental program review finding for its current fiscal year or the prior two fiscal years, that resulted in the institution being required to repay an amount greater than five percent of the title IV, HEA program funds received during the year covered by that audit or program review. Also, an institution is not financially responsible if it is cited during the preceding five years for not submitting on-time, acceptable compliance audits and financial statements. Finally, an institution is not financially responsible if it has failed to satisfactorily resolve any compliance problems identified in an audit or program review.

*Proposed Regulations:* The Department proposes to amend § 668.174(a) to clarify that the time period that the Department would evaluate for purposes of determining if the institution had a program review finding resulting in a requirement to repay an amount greater than five percent of title IV, HEA program funds received, is the institution's fiscal year in which the Department issued a report, including a Final Program Review Determination (FPRD) report, and the two prior fiscal years, regardless of the years covered by the report.

*Reasons:* This clarification would address confusion about whether the period for past performance relates to the period in which the conduct that gives rise to the past performance finding or the date of issuance of the FPRD. Because it can take some time to issue a Program Review Report (PRR) and finalize it into an FPRD, the proposed amendment would clarify that the time period for past performance does not refer to when the finding occurred, but to when we issue the FPRD that establishes the liability for

that finding. When financial protection is required under any provision of subpart L, including this section, each requirement for financial protection is separate.

*Financial Responsibility—Past Performance (§ 668.174)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to add § 668.174(b)(3) to state that an institution is not financially responsible if an owner who exercises substantial control, or the owner's spouse, has been in default on a Federal student loan, including parent PLUS loans, in the preceding five years, unless—

• The defaulted Federal student loan has been fully repaid and five years have elapsed since the repayment in full;

• The defaulted Federal student loan has been approved for, and the borrower is in compliance with, a rehabilitation agreement and has been current for five consecutive years; or

• The defaulted Federal student loan has been discharged, canceled or forgiven by the Department.

*Reasons:* Defaulting on a Federal student loan is a serious failure of financial responsibility that relates to the title IV, HEA programs. The Department holds school owners to a higher standard than we hold students, and we expect school owners to be more financially responsible than the students who attend their schools. A student or parent borrower may immediately reestablish eligibility to receive an award under the Title IV, HEA program by rehabilitating, consolidating, or repaying defaulted Federal student loans in full, but this is not an appropriate standard to apply to a school's owner. The Department proposes to apply a higher standard to school owners who have defaulted on a Federal student loan to ensure they have established a long-term track record of loan repayment and financial responsibility before the Department would consider the school owner financially responsible under the past performance regulations in § 668.174. This proposed regulation would ensure that school owners cannot buy their way out of a past performance violation related to their own Federal student loan default(s) by merely rehabilitating their defaulted Federal student loans or repaying them in full.

This regulation would apply to Federal student loans, including parent PLUS loans, borrowed by a school owner and by a school owner's spouse. This regulation would recognize that a school owner should be aware that a spouse is in default on a Federal student loan and the regulation holds the school owner responsible for the spouse's Federal student loan default. However, the regulation would also recognize that a school owner is not responsible for managing the family budgets of all of their family members, as that term is defined in § 600.21(f), nor for ensuring that all of their family members repay their Federal student loans.

*Financial Responsibility—Alternative Standards and Requirements (§ 668.175)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.175(c) explains how an institution that has failed the financial responsibility requirements under the general standards and provisions at § 668.171 can qualify under an alternate standard. One of the requirements an institution must meet is to not have an audit opinion that is adverse, qualified or disclaimed or that includes a disclosure stating that there is substantial doubt about the institution's ability to continue as a going concern as described under § 668.171(h).

*Proposed Regulations:* Under proposed § 668.175(c), the Department would clarify that a disclosure, as required under the applicable accounting or auditing standards, about the institution's liquidity, ability to continue operations, or ability to continue as a going concern, places the institution in the status of not being financially responsible. We would then require the institution to pursue an alternate standard of financial responsibility to comply with the associated regulatory requirements under § 668.175. Proposed § 668.175(f) would further clarify that an institution which is not financially responsible could be permitted to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years and providing the Department an irrevocable letter of credit for an amount determined by the Department. This requirement would not apply to public institutions. Institutions would be required to remedy the issue(s) that gave rise to the failure of financial responsibility.

*Reasons:* This proposed amendment to § 668.175(c) clarifies that an auditor's disclosure may include not only a disclosure expressing doubt about the institution's ability to continue as a going concern but may also include a disclosure about the institution's liquidity or its ability to continue operations. An audit disclosure such as this would demonstrate that the institution is not financially responsible, and we would obtain financial protection. When financial protection is required under any provision of subpart L, including this section, each requirement for financial protection is separate. Additionally, the proposed regulation clarifies that an institution that is not financially responsible due to noncompliance with the requirements under § 668.171(b)(2) or (3) must remedy those areas of noncompliance in order to demonstrate compliance with financial responsibility requirements rather than rely upon other alternatives.

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.175(f) permits an institution that is not financially responsible to participate in title IV, HEA programs under a provisional certification, as long as it (1) Provides the Department an irrevocable letter of credit that is acceptable and payable to the Secretary, or other financial protection, for an amount determined by the Department that is not less than 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this requirement does not apply to a public institution that the Department determines is backed by the full faith and credit of the State; (2) Demonstrates that it was current on its debt payments and has met all of its financial obligations, for its two most recent fiscal years; and (3) Complies with the provisions under the zone alternative.

*Proposed Regulations:* The Department proposes to add a condition in § 668.175(f)(2)(ii) that would require an institution to remedy the issue(s) that gave rise to its failure under § 668.171(b)(2) and (3).

*Reasons:* This proposed amendment is consistent with the proposed amendments to § 668.175(c) because it would help to ensure that an institution that is not financially responsible due to failing to meet the requirements under § 668.171(b)(2) or (3) must remedy those areas of noncompliance in order to

participate in the title IV, HEA programs under a provisional certification. This proposed language replaces the current language in § 668.175(f)(2)(ii) which states that an institution pursuing this avenue must demonstrate it was current on debt payments and met all financial obligations. The proposed language clarifies that all factors stated in 668.171(b)(2) and (3), which include being current on debt payments and meeting financial obligations, must have been remedied to the Department's satisfaction for the purpose of obtaining provisional certification.

*Financial Responsibility—Change in Ownership Requirements (§ 668.176)*

*Statute:* Section 498(c) of the HEA directs the Secretary to determine whether institutions participating in, or seeking to participate in, the title IV, HEA programs are financially responsible.

*Current Regulations:* Section 668.15 originally established the financial responsibility requirements for all institutions participating, or seeking to participate, in the title IV, HEA programs. In 1997, subpart L was implemented and established revised financial responsibility factors for institutions participating in the title IV HEA programs but did not address the factors that would specifically be applied to institutions undergoing a change in ownership. The Department continued to apply the financial responsibility rules still existing in § 668.15 to change in ownership situations even though those regulations were not specific to such institutions.

*Proposed Regulations:* The Department proposes to remove § 668.15 and reserve that section. We propose to redesignate current § 668.176 as § 668.177. The proposed new § 668.176 would contain all updated financial responsibility requirements applicable to institutions undergoing a change in ownership.

Under proposed § 668.176(b), an institution undergoing a change in ownership would be required, as a part of their materially complete application, to submit audited financial statements of the institution's new owner's two most recently completed fiscal years prior to the change in ownership. These statements must be prepared and audited at the highest level of unfractured ownership (meaning 100 percent direct or indirect ownership of the institution) or at the level required by the Department. If the institution's new owner does not have two years of acceptable audited financial statements, or in circumstances where no new owner obtains control, but the combined

new ownership exceeds the ownership share of the existing ownership, the institution would have to provide financial protection in the form of a letter of credit or cash to the Department in the amount of 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year.

Under proposed § 668.176(b)(3), an institution must demonstrate it is a financially responsible. To comply with this requirement a for-profit institution would be required to:

• Demonstrate it has not had operating losses in either or both of its two latest fiscal years that in sum, result in a decrease in tangible net worth exceeding 10 percent of the institution's tangible net worth at the beginning of the first year of the two-year period. The Department may calculate an operating loss for an institution by excluding prior period adjustments and the cumulative effect of changes in accounting principle;

• Demonstrate it has, for its two most recent fiscal years, a positive tangible net worth. In applying this standard, a positive tangible net worth occurs when the institution's tangible assets exceed its liabilities;

• Document it has a passing composite score and meets the other financial requirements of part 668, subpart L for its most recently completed fiscal year.

To demonstrate it is financially responsible, a nonprofit institution would be required to:

• Demonstrate it has, at the end of its two most recent fiscal years, positive net assets without donor restrictions. The Department proposes to exclude all related party receivables/other assets from net assets without donor restrictions and all assets classified as intangibles in accordance with the composite score;

• Document it has not had an excess of net assets without donor restriction expenditures over net assets without donor restriction revenues over both of its two latest fiscal years that results in a decrease exceeding 10 percent in either the net assets without donor restrictions from the start to the end of the two-year period or the net assets without donor restriction in either one of the two years;

• Document it has a passing composite score and meets the other financial requirements of part 668, subpart L for its most recently completed fiscal year.

Under proposed § 668.176(b)(4), a for-profit or nonprofit institution that is not financially responsible under proposed § 668.176(b)(3) would be required to

provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year's title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

Proposed § 668.176(c) would allow the Department to determine that the institution is not financially responsible following a change in ownership if the amount of debt assumed to complete the change in ownership requires payments (either periodic or balloon) that are inconsistent with available cash to service those payments based on enrollments for the period prior to when the payment is or will be due. An institution in this status would be required to provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year's title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

Under proposed § 668.176(d), to meet the requirements for a temporary provisional PPA following a change in ownership, as described in § 600.20(h)(3)(i), the Department would continue to require a proprietary or nonprofit institution to provide us with a same day balance sheet for a proprietary institution or a statement of financial position for a nonprofit institution. On top of the same day balance sheet or statement of financial position, the institution would be required to include a disclosure that includes all related-party transactions and such details that would enable the Department to identify the related party.

If the institution fails to meet the requirements in proposed § 668.176(d)(1)(i), the institution would be required to provide financial protection in the form of a letter of credit or cash to the Department in the amount of at least 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, or an amount determined by the Department, and would be required to follow the zone requirements of § 668.175(d).

For a public institution, the institution would be required to have its liabilities backed by the full faith and credit of a State, or by an equivalent governmental entity, or follow the requirements of this section for a proprietary or nonprofit institution.

*Reasons:* Current regulations related to the assessment of financial responsibility for institutions undergoing a change in ownership are spread out across § 668.15 and subpart L of part 668, where the composite score

rule resides. The result of having requirements in multiple places is that it is not easy to identify which elements from across both sections apply to institutions undergoing a change in ownership. We are proposing to consolidate and revise the section to align with the Department's current practice in processing and applying financial responsibility factors to change in ownership applications. When financial protection is required under any provision of subpart L, including this section, each requirement for financial protection is separate. The proposed new regulatory section states with a new level of clarity exactly what institutions would have to do to demonstrate financial responsibility when undergoing a change in ownership.

We additionally propose a change with respect to how the Department would test the financial responsibility of an institution undergoing a change in ownership. Under current regulations, we primarily evaluate the entity acquiring the institution by examining its same day balance sheet or statement of financial position. If the new owner does not have two years of audited financial statements, but has one year of audited financial statements, we require financial protection at an amount that would be a least 10 percent of the institution's title IV, HEA volume. This is the same minimum amount the Department chooses for institutions that seek the provisional certification alternative in § 668.175(f) for an institution that is failing to meet the standards of financial responsibility. Under the proposed regulations, we would test the new owner's financial statements and would require financial protection if those financial statements fail financial responsibility standards as part of the change in ownership application rules in § 600.20(g). To make that determination we would evaluate the composite score or other financial factors on those financial statements.

In addition, the minimum financial protection for the failure to meet the financial responsibility standards for the submission of the same day balance sheet or statement of financial protection for compliance with § 600.20(h) would be increased from the current 10 percent to 25 percent. We chose this amount because it is what we commonly require for a new owner who does not have two years of financial statements and we think the associated risk levels are similar.

The Department's interest in establishing a clear picture of an institution's ownership is crucial to our

making determinations on the financial stability of the institution as it emerges from the change in ownership. During this period of change, it is imperative that we are able to obtain a level of financial protection sufficient enough to protect the students who are impacted by the change in ownership, if necessary. It is also important to protect the interests of the taxpayers as we extend the institution's eligibility to participate in the title IV, HEA programs under the new owner's control. When financial protection is required under any provision of subpart L, including this section, each requirement for financial protection is separate.

This proposal would also address challenges we have encountered in evaluating the financial statements of institutions undergoing changes in ownership, including by clarifying that financial statements must be provided at the level of highest unfractured ownership (meaning 100 percent direct or indirect ownership of the institution) or at the level determined by the Department; clarifying how a situation where no individual new owner obtains control, but the combined ownership of the new owners is equal to or exceeds the ownership share of the existing ownership will be handled, and clarifying what institutions undergoing a change in ownership must do to receive a temporary provisional PPA following the change in ownership. This proposed rule would enable us to ensure that entities acquiring an eligible institution demonstrate that they are financially responsible by the mechanisms detailed in this proposed regulation or provide financial protection. The proposed approach provides a more predictable and robust examination of financial responsibility for changes in ownership

### Standards of Administrative Capability (§ 668.16)

#### Administrative Capability—Financial Aid Counseling (§ 668.16(h))

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* The current regulations under § 668.16(h) require that, for an institution to be administratively capable, the institution must provide adequate financial aid counseling to eligible students who apply for title IV, HEA program assistance. In determining whether an institution provides adequate counseling, the Department considers whether its counseling includes

information regarding the source and amount of each type of aid offered, and the method by which aid is determined and disbursed, delivered, or applied to a student's account. The institution must also provide counseling that includes the rights and responsibilities of the student with respect to enrollment at the institution and receipt of financial aid. This information includes the institution's refund policy, the requirements for treatment of title IV, HEA program funds when a student withdraws under § 668.22, its standards of satisfactory progress, and other conditions that may alter the student's aid package.

*Proposed Regulations:* The Department proposes to amend paragraph § 668.16(h) to include the details of what should be included in the financial aid communications given to students. We are also proposing to require clear and accurate information about financial aid, alongside existing requirements around what constitutes adequate financial aid counseling. We propose that financial aid counseling and financial aid communications advise students and families to accept the most beneficial types of financial assistance available to them. We further propose to establish requirements with respect to financial aid counseling and communications as follows:

• We propose to require that institutions provide information regarding the cost of attendance of the institution, including the individual components of those costs and a total of the estimated costs that will be owed directly to the institution, for students, based on their enrollment status and attendance.

• Currently the regulation requires the source and amount of each type of aid offered. We propose to add to this provision that each source of aid, which could include Title IV, HEA assistance, private loans, income-share agreements, and tuition payment plans, be separated by the type of the aid and whether it must be earned or repaid.

• We propose to require that institutions provide information regarding the net price, as determined by subtracting the amount of each type of aid offered from the cost of attendance.

• Currently the regulation requires financial aid counseling to include the method by which aid is determined and disbursed, delivered, or applied to a student's account. We propose to add to this provision that the counseling must also include instructions and applicable deadlines for accepting, declining, or adjusting award amounts.

*Reasons:* The Department proposes amendments to the requirement to provide adequate financial aid counseling under § 668.16(h) because we want to ensure that students understand the cost of attendance for the program, including costs charged directly by the institution, and the financial aid offered by an institution. The Department already requires institutions to provide adequate financial aid counseling to their students, but we realize that some financial aid offers may be confusing. Providing students with unclear, confusing, or misleading financial aid offers can undo the benefits of financial aid counseling and result in a student being unable to apply the concepts explained through financial aid counseling to their own financial situation. This in turn jeopardizes their ability to make an informed decision whether to enroll in a given program and how much to borrow in student loans.

The requirements added into this section thus establish requirements for what would be considered sufficiently clear communication, including on financial aid offers. These changes emphasize areas where the Department has seen problematic materials in the past, such as aid offers that fail to explain the full cost of attendance or use confusing terminology that makes it difficult to tell whether or not the aid being offered to the student must be repaid. The items included in these proposed regulations are also informed by the Department's experience in crafting a model financial aid offer, known as the College Financing Plan to address one aspect of financial aid communications. The College Financing Plan reflects feedback from consumer testing and an emphasis on clarity and is used by roughly half of institutions. Some of the items included in these proposed rules are already included in the College Financing Plan and, as such, using the College Financing Plan would be one way for institutions to ensure they meet some of the standards we propose here.

*Administrative Capability—Debarment or Suspension (§ 668.16(k))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* Current regulations under § 668.16(k) require that for an institution to be administratively capable, it is not, and does not have any principal or affiliate of the institution (as those terms are

defined in 2 CFR parts 180 and 3485) that is debarred or suspended under Executive Order 12549 or the Federal Acquisition Regulations (FAR), 48 CFR part 9, subpart 9.4. Section 668.16(k) also requires that the institution not engage in any activity that is a cause under 2 CFR 180.700 or 180.800, as adopted at 2 CFR 3485.12, for debarment or suspension under Executive Order 12549 or the FAR, 48 CFR part 9, subpart 9.4.

*Proposed Regulations:* We propose to maintain the current requirements and add new requirements under a revised § 668.16(k)(2) that would prohibit an institution from having any principal or affiliate of the institution (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or previously exercised substantial control over the institution as defined in § 668.174(c)(3), who has been:

• Convicted of, or has pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, Tribal, or local government funds, or administratively or judicially determined to have committed fraud or any other material violation of law involving those funds.

• Is a current or former principal or affiliate (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or exercised substantial control as defined in § 668.174(c)(3), of another institution whose misconduct or closure contributed to liabilities to the Federal government in excess of 5 percent of that institution's title IV, HEA program funds in the award year in which the liabilities arose or were imposed.

*Reasons:* The Department proposes amendments to § 668.16(k)(2) to improve institutional oversight of the individuals that are hired to make significant decisions that could have an impact on the institution's financial stability and its administration of title IV, HEA funds. Institutions participating in the title IV, HEA programs have a fiduciary responsibility to safeguard title IV, HEA funds and ensure those funds are used to benefit students and must meet all applicable statutory and regulatory requirements. An institution's ability to meet these responsibilities is impaired if a principal, employee, or third-party servicer of the institution committed fraud involving Federal, State, or local funds, or engaged in prior conduct that caused a loss to the Federal Government.

A similar risk occurs if one of the aforementioned individuals has been convicted of, or had pled nolo

contendere or guilty to, a crime, involving the acquisition, use, or expenditure of a Federal agency or State, Tribal, or local government. To mitigate this risk, we are adding this component to the administrative capability standards. We expect institutions to thoroughly examine the background of its principals, employees, affiliates, and third-party servicers as part of this compliance. We believe the school must take action or risk being deemed administratively incapable.

*Administrative Capability—Negative Actions (§ 668.16(n))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* Current regulations under § 668.16(n) provide that an institution is administratively capable if it does not otherwise appear to lack the ability to administer title IV, HEA programs competently.

*Proposed Regulations:* We propose to add a new § 668.16(n) to require that an institution has not been subject to a significant negative action, or a finding by a State or Federal agency, a court or an accrediting agency where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive, and the institution has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution. We propose to redesignate current § 668.16(n) as proposed § 668.16(v).

*Reasons:* The Department proposes that an institution is not administratively capable if it has been subject to a significant negative action or a finding by a State or Federal agency, a court or an accrediting agency where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive, and the institution has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution. § 668.16(n). Such measures are an indication of potentially serious problems with the institution's administrative functions. Adding this proposed section would provide the Department the ability to consider whether those circumstances warrant compliance actions and better align the oversight work across the regulatory triad of States, the Federal government, and accreditation agencies. Examples include provisionally recertifying the

institution with applicable conditions on its eligibility, obtaining protection against potential losses to the government, placing an institution on a different method of payment (such as heightened cash monitoring), or terminating title IV, HEA eligibility due to negative actions of an outside public agency. For example, if the United States Department of Veterans Affairs (VA) took a significant negative action against an institution and that institution lost its ability to participate in the VA education and training benefits programs, the Department could use the VA's determination as a factor in assessing an institution's administrative capability. This would more clearly establish a link between administrative capability and when another Federal agency has revoked an institution's eligibility for one or more of their programs. Other examples are when a State levies sanctions against an institution or an accrediting agency places an institution on probation, or its equivalent, based on an ongoing consumer protection issue.

*Administrative Capability—High School Diploma (§ 668.16(p))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* Current regulations under § 668.16(p) provide that an institution must develop and follow procedures to evaluate the validity of a student's high school completion if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

*Proposed Regulations:* We propose to maintain the current requirement that an institution must develop and follow adequate procedures to evaluate the validity of a student's high school completion if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education. We propose to update the references to high school completion in the current regulation to high school diploma.

Under proposed § 668.16(p)(1) we would add requirements for adequate procedures to evaluate the validity of a student's high school diploma when the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education to include the following:

• Obtaining documentation from the high school that confirms the validity of the high school diploma, including at least one of the following: a transcript, written descriptions of course requirements, or written and signed statements by principals or executive officers at the high school attesting to the rigor and quality of coursework at the high school;

• If the high school is regulated or overseen by a State agency, Tribal agency, or Bureau of Indian Education, confirming with or receiving documentation from that agency that the high school is recognized or meets requirements established by that agency; and

• If the Secretary has published a list of high schools that issue invalid high school diplomas, confirming that the high school does not appear on that list.

Under proposed § 668.16(p)(2) a high school diploma would not be valid if it:

• Did not meet the applicable requirements established by the appropriate State agency, Tribal agency, or Bureau of Indian Education in the State where the high school is located and, if the student does not attend in-person classes, the State where the student was located at the time the diploma was obtained.

• Has been determined to be invalid by the Department, the appropriate State agency in the State where the high school was located, or through a court proceeding.

• Was obtained from an entity that requires little or no secondary instruction or coursework to obtain a high school diploma, including through a test that does not meet the requirements for a recognized equivalent of a high school diploma under § 600.2.

• Was obtained from an entity that maintains a business relationship or is otherwise affiliated with the eligible institution at which the student is enrolled and that entity is not accredited.

*Reasons:* Ensuring that students have a valid high school diploma is a critical part of maintaining integrity in the title IV, HEA financial aid programs. Failure to ensure that a student is qualified to train at a postsecondary level often results in students withdrawing from institutions after incurring significant debt and investing time and personal resources. The Department has seen multiple leaders of institutions face significant financial liabilities and even jail time for receiving Federal aid for students who did not have a valid high school diploma. However, the Department believes that the existing requirements for an institution to have

procedures in place to evaluate the validity of a high school diploma may not be sufficient. These proposed regulations would provide institutions with additional information if necessary to determine the validity of a high school diploma when the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

With regard to how these proposed requirements would apply to certain private religious secondary schools, as noted in § 668.16(p)(1)(ii), the process of confirming or receiving documentation from the State or Tribal agency or the Bureau of Indian Education only applies to high schools that are regulated or overseen by one of those entities. Moreover, the proposed requirements establishing when a high school diploma is not considered valid in § 668.16(p)(2)(i) note that the school would have to meet applicable requirements established by the State or Tribal agency or the Bureau of Indian Education. If those entities do not have applicable requirements for the type of school in question, then the diplomas awarded by the school would not be considered invalid simply for that reason. The institution would still need to ensure that the diploma meets the other requirements of 668.16(p)(2).

The approach in this NPRM addresses concerns raised during negotiated rulemaking that private secondary schools with a demonstrated ability to prepare students for success in title IV, HEA institutions would be considered to not offer valid diplomas simply because they are not regulated by a State. If private secondary schools are not subject to State agency oversight, then the requirement to receive documentation from a State agency would not apply.

In conducting its oversight activities, the Department has seen an increase in institutions directing students to questionable entities to obtain diplomas and institutions accepting questionable diplomas without conducting a proper review of the issuing entity. These actions not only undermine the integrity of the title IV, HEA programs, but also cause undue harm to students who are not actually prepared to succeed at the postsecondary level. These amendments would protect students, postsecondary institutions, and the taxpayer investment in postsecondary education by ensuring adequate standards are in place for institutions to evaluate high school diplomas.

*Administrative Capability—Career Services (§ 668.16(q))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.16(q) to determine if an institution is providing adequate career services to eligible students who receive title IV, HEA program assistance. In making this determination, the Department would consider:

• The share of students enrolled in programs designed to prepare students for gainful employment in a recognized occupation.

• The number and distribution of career services staff.

• The career services the institution promises to its students.

• The presence of institutional partnerships with recruiters and employers who regularly hire graduates of the institution.

*Reasons:* Students regularly indicate on surveys [131] that getting a job is one of their top reasons for pursuing postsecondary education. While there are many non-financial benefits to education beyond high school, being able to find a job is critical for many students who have to repay debt they acquired to attend a program. Many programs explicitly market their offerings with employment in mind, telling students about the services they will help provide for students to find a job, the connections with employers, and the alignment of curricula with employer needs, to identify a few examples. The Department proposes to require adequate career counseling services under new § 668.16(q) because we believe it is critical that institutions have sufficient career services to help their students find jobs and make good on any commitments conveyed about this kind of assistance they can provide. We are not proposing any required ratios for the number of career services staff, but rather proposed § 669.16(q) would ensure that institutions have established a connection between the commitments they make to students and the services they actually provide.

Finally, we believe that when appropriate, an institution should establish or develop partnerships with recruiters and employers. Institutions that make commitments about employment and do not provide career services or do not have established

partnerships with recruiters and employers may leave students unprepared to enter the job market and obtain employment upon completion. Students expect to have access to career services as promised as they transition from their programs into the workforce. An institutions failure to provide such career services may indicate a lack of administrative capability.

*Administrative Capability—Accessible Clinical or Externship Opportunities (§ 668.16(r))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to add a new § 668.16(r) to require that an institution provide students with geographically accessible clinical, or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation within 45 days of the successful completion of other required coursework.

*Reasons:* We propose to require institutions to provide accessible clinical or externship opportunities related to relevant credentialing or licensure requirements under proposed § 668.16(r) because we are aware through program reviews and student complaints that some institutions do not make such opportunities broadly accessible to students, even when students are required to complete an externship or clinical to earn a degree or certificate. In these cases, students may be left to identify their own clinicals or externships. We are also aware of numerous instances where students have been offered a clinical or externship that is geographically distant and inaccessible from the student's location. We are aware of other instances where the work performed at the clinical or externship offered by an institution does not assist the student in meeting the requirements for credentialing or licensure. Therefore, the Department proposes these amendments to require institutions to provide geographically accessible clinical or externship opportunities related to and required for completion of the credential or licensure related to their program. An institution would be considered in compliance with this provision if a student turns down the offer of the externship or clinical opportunity so long as the opportunity offered otherwise meets the requirements of this section.

---

[131] "Why Higher Ed?" *available at stradaeducation.org/report/why-higher-ed/.*

*Administrative Capability—Disbursing Funds (§ 668.16(s))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish that postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.16(s) to require that an institution disburse funds to students in a timely manner that would best meet the students' needs. The Secretary would not consider the manner of disbursements to be consistent with students' needs, if, among other conditions:

• The Secretary is aware of multiple verified and relevant student complaints.

• The institution has high rates of withdrawal attributable to delays in disbursements.

• The institution has delayed disbursements until after the withdrawal date requirements in § 668.22(b) and (c).

• The institution has delayed disbursements with the effect of ensuring an institution passes the 90/10 ratio.

*Reasons:* By law, students have a right to receive their Federal financial aid including amounts in excess of the cost of direct expenses, such as tuition and fees. When a student does not receive their funds in a timely manner, they may struggle to stay enrolled due to an inability to cover costs like food, housing, and transportation. They may also struggle to succeed in a course because of an inability to purchase required textbooks. Students may also accrue expenses which may affect their ability to remain in school, and ultimately graduate. Failing to disburse financial aid in a timely manner thus results in an institution holding on to funds that are not theirs for longer than is appropriate resulting in a detriment to its students. Therefore, the Department proposes that an institution would not be considered administratively capable if the Secretary determines that the institution failed, including for reasons related to the use of a third-party servicer, to disburse funds to students in a timely manner that will best meet the student's needs.

*Administrative Capability—Gainful Employment (§ 668.16(t))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to add a new § 668.16(t). The Department considers an institution to be administratively capable if it offers GE programs subject to part 668 subpart S and at least half of its total title IV, HEA funds in the most recent award year are not from programs that are failing under part 668 subpart S, and at least half of its full-time equivalent title IV, HEA receiving students are not enrolled in programs that are failing under part 668 subpart S.

*Reasons:* The proposed gainful employment regulations in subpart S of part 668 would operate on a programmatic basis. This would allow the Department to identify situations where specific offerings at an institution may not provide sufficient financial value. However, when a majority of an institution's title IV, HEA funds and enrollment is in failing GE programs, those results would indicate a more widespread and systemic set of concerns that is not limited to individual programs. This would allow the Department to take additional steps to increase its oversight of these institutions, such as placing them on a provisional PPA.

Accordingly, the Department proposes that an institution that obtains most of its revenue from, or enrolls most of its Title IV-eligible students in, failing GE programs would lack administrative capability.

*Administrative Capability—Misrepresentation (§ 668.16(u))*

*Statute:* Section 498(a) of the HEA grants the Secretary the authority to establish requirements postsecondary institutions must follow to prove that they are administratively capable.

*Current Regulations:* None.

*Proposed Regulations:* We propose to add a new § 668.16(u) to prohibit an institution from engaging in misrepresentation, as defined in 34 CFR part 668, subpart F, or aggressive and deceptive recruitment tactics or conduct, as defined in 34 CFR part 668, subpart R.

*Reasons:* The Department proposes administrative capability requirements about an institutions' misrepresentation under § 668.16(u) because of the detrimental effects such activity could have on students and the risks it poses to taxpayers. Current § 668.71 defines "misrepresentation" as any false, erroneous or misleading statement an eligible institution or one of its representatives makes directly or indirectly to a student. The definition of "aggressive and deceptive recruitment tactics or conduct" appears in our final

rule published in the **Federal Register** on November 1, 2022.[132] Activities that we consider misrepresentation and aggressive recruitment increase risk to students and taxpayers, specifically with respect to borrower defense claims. The student is often left with a worthless degree, certificate, or credential as a result of institutional misrepresentation or aggressive recruitment into a program with questionable earnings and employment outcomes, and student's debt may be discharged under an approved borrower defense claim. The Department proposes to incorporate these as practices prohibited in the standards of administrative capability. Doing so ensures there is greater alignment between our administrative capability requirements and the standards that relate to other oversight and enforcement work.

**Certification Procedures (§§ 668.2, 668.13, 668.14)**

*General Definitions (§ 668.2)*

*Statute:* Section 410 of the General Education Provisions Act (GEPA) grants the Secretary authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department. This authority includes the power to promulgate regulations relating to programs that we administer, such as the title IV, HEA programs that provide Federal loans, grants, and other aid to students, whether to pursue eligible non-GE programs or GE programs. Moreover, section 414 of the Department of Education Organization Act (DEOA) authorizes the Secretary to prescribe those rules and regulations that the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.

*Current Regulations:* None.

*Proposed Regulations:* We propose to adopt OMB's definition of a "metropolitan statistical area" in our regulations. Under the proposed definition, a "metropolitan statistical area" would mean a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core.[133]

*Reasons:* This added definition is necessary given other changes in this section that set requirements for clock

---

[132] 87 FR 65904.

[133] *www.census.gov/programs-surveys/metro-micro/about.html.*

hours, credit hours, or the equivalent based upon where the institution is physically located or where the students it serves work. To that end, we would define ''metropolitan statistical area'' as part of the proposed requirements in § 668.14(b)(26)(ii)(B) to determine the minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation in a State in which the institution is not located. Our proposed changes would reference the institution's metropolitan statistical area in one of three scenarios in which the minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student could be determined by a State in which the institution is not located. We choose to include a State other than the institution's home State when determining a program's licensure and accreditation requirements because we understand that some students may not currently reside in the State in which the institution is located or have plans to reside in a different State from which the institution is located. Institutions may also be located near borders with other States. Thus, we want institutions to have the flexibility to determine the State in which the student would need to meet licensure and accreditation requirements. Specifically, for a program offered within the same metropolitan statistical area as the institution's home State, we would look for a majority of students that upon enrollment in the program during the most recently completed award year stated in writing which State they intended to work in within the metropolitan statistical area. Using the New York metropolitan area as an example, if a student attended school in Connecticut but had plans to work in New York after graduation, we would permit the institution to use New York's minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation to meet our licensure and accreditation requirements.

### Period of Participation (§ 668.13(b)(3))

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. HEA section 498(g)(1) outlines timing limitations on the certification renewal process.

*Current Regulations:* Current § 668.13(b)(3) specifies the period of

participation for which a postsecondary institution may participate in the title IV, HEA programs. If the Secretary does not grant or deny certification within 12 months of the expiration of its current period of participation, the institution is automatically granted renewal of certification, which may be provisional.

*Proposed Regulations:* We propose to eliminate current § 668.13(b)(3) that automatically grants an institution renewal of certification if the Secretary does not grant or deny certification within 12 months of the expiration of its current period of participation.

*Reasons:* As part of the 2020 final rule for Distance Education and Innovation,[134] the Department believed automatically granting an institution renewal of certification after 12 months would encourage prompt processing of applications, timely feedback to institutions, proper oversight of institutions, and speedier remedies for deficiencies identified. However, since then, the Department has realized that giving ourselves a time constraint negatively impacts our most important goal, program integrity. In fact, a premature decision to grant or deny a certification application when unresolved issues remain under review creates substantial negative consequences for students, institutions, taxpayers, and the Department.

Institutions that remain on month-to-month approval for an extended period of time are typically undergoing extensive investigation. Month-to-month participation beyond the current maximum period of one year would allow the Department additional time to investigate issues more fully and would maintain institutions in a month-to-month status while the Department completes its review. If we are forced to issue a decision under a limited timetable, we are likely to put the institution on a provisional certification for one year, which adds burden for both institutions and the Department. For example, if we place the institution on one-year provisional certification, the institution would need to start the recertification process all over again after nine months. The result is more overall work than simply keeping the institution in a month-to-month status while any issues related to the institution are reviewed by the Department.

Eliminating this provision would allow the Department to take the necessary time to investigate institutions thoroughly prior to deciding whether to grant or deny a certification application and ensure institutions are

approved only when they comply with Federal rules. Ultimately, the Department, institutions, students, and taxpayers benefit from the Department having the necessary time to thoroughly review each application and make an informed decision that protects students and taxpayers from high-risk institutions.

### Provisional Certification (§ 668.13(c))

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV HEA programs. Section 498(h) of the HEA discusses provisional certification of institutional eligibility to participate in the title IV, HEA programs. This provisional certification can occur for up to one year if the institution is seeking initial certification; and for up to three years if the institution's administrative capability and financial responsibility are being determined for the first time, there is a change of ownership, or the Department determines that an institution seeking to renew its certification is in an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities.

*Current Regulations:* Current § 668.13(c)(1)(i)(C) includes a list of circumstances in which the Department may provisionally certify a participating institution. These include circumstances where the Department is certifying a participating institution that—

• Is applying for a certification and meets the standards for an institution to participate in any title IV, HEA program;

• The Secretary determines has jeopardized its ability to perform its financial responsibilities by not meeting the factors of financial responsibility under § 668.15 and subpart L or the standards of administrative capability under § 668.16; and

• Has had its participation limited or suspended by the Department under subpart G, or voluntarily enters into provisional certification.

The Department may also provisionally certify an institution under current § 668.13(c)(1)(i)(D) if the institution seeks a renewal of participation in a Title IV, HEA program after the expiration of a prior period of participation in that program. Under current § 668.13(c)(1)(i)(F) an institution may be provisionally certified if the institution is a participating institution that has been provisionally recertified under the automatic recertification

---

[134] 85 FR 54742.

Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules 32377

requirement in current § 668.13(b)(3). Current § 668.13(c)(1)(ii) provides that a proprietary institution's certification automatically becomes provisional at the start of a fiscal year after it did not derive at least 10 percent of its revenue for its preceding fiscal year from sources other than Title IV, HEA program funds, as required under § 668.14(b)(16). Current § 668.13(c)(2) specifies the maximum period for which an institution, provisionally certified by the Department, may participate in a title IV, HEA program, except as provided in 668.13(c)(3) and (4). Under this paragraph a provisionally certified institution's period of participation expires:

• Not later than the end of the first complete award year following the date on which the Secretary provisionally certified the institution under paragraph (c)(1)(i)(A) of this section.

• Not later than the end of the third complete award year following the date on which the Secretary provisionally certified the institution under paragraphs (c)(1)(i)(B), (C), and (D) or paragraph (c)(1)(ii) of this section.

• If the Secretary provisionally certified the institution under paragraph (c)(1)(i)(E) of this section, no later than 18 months after the date that the Secretary withdrew recognition from the institution's nationally recognized accrediting agency.

*Proposed Regulations:* Under § 668.13(c)(1), the Department proposes to amend existing conditions and add new conditions for when an institution may be provisionally certified. Under § 668.13(c)(2), the Department proposes to add a new time frame for when an institution's provisionally certified status would expire. The Department also proposes to make a few technical corrections and replace outdated cross references with descriptions on what is being referenced in § 668.13(c)(1) and § 668.13(c)(2).

In § 668.13(c)(1)(i)(C), we propose to revise the existing language to specify the Department's provisional certification of an institution that is not only a participating institution, but an institution applying for a renewal certification that fits one of the three circumstances previously included in current § 668.13(c)(1)(i)(C). We also propose to replace current § 668.13(c)(1)(i)(F) with a new condition in which the Secretary may provisionally certify an institution if the Secretary has determined that the institution is at risk of closure. In § 668.13(c)(1)(i)(G), we propose to add another new condition in which the Secretary may provisionally certify an institution if it is permitted to use the

provisional certification alternative under subpart L. We propose to revise and redesignate current § 668.13(c)(1)(ii) as proposed § 668.13(c)(1)(iii). In redesignated § 668.13(c)(1)(iii), we propose to amend "Title IV, HEA program funds" as "Federal educational assistance funds" to conform with the 2022 final rule for 90/10.[135] We propose to add a new § 668.13(c)(1)(ii) that provides that an institution's certification would become provisional upon notification from the Secretary, if the institution either triggers one of the financial responsibility events under § 668.171(c) or (d) and, as a result, the Secretary requires the institution to post financial protection; or any owner or interest holder of the institution with control over that institution, as defined in § 600.31, also owns another institution with fines or liabilities owed to the Department and is not making payments in accordance with an agreement to repay that liability.

The Department also proposes to add subpart L as an exception to § 668.13(c)(2). In addition, we propose to replace the cross reference of "paragraph (c)(1)(i)(A)" in § 668.13(c)(2)(i) with "for its initial certification." We also propose to redesignate current § 668.13(c)(2)(ii) as § 668.13(c)(2)(iii). We propose a new § 668.13(c)(2)(ii) to state that a provisionally certified institution's period of participation would expire no later than the end of the second complete award year following the date on which the Secretary provisionally certified an institution for reasons related to substantial liabilities owed or potentially owed to the Department for borrower defense to repayment or false certification discharges, or for other consumer protection concerns as identified by the Secretary. We consider consumer protection concerns as instances where an institution may create a high-risk situation for students, such as by misleading students about educational programs, institutions falsely certifying students' eligibility to receive a loan, or an institution being at risk of closure. Note that institutions would not automatically lose title IV eligibility if they are found to have consumer protection concerns.

*Reasons:* In § 668.13(c)(1)(i)(C), the Department proposes to clarify, consistent with its current practice, that the Secretary may provisionally certify an institution that is not meeting the requirements for financial responsibility and administrative capability or is subject to an action under subpart G. The reference to subpart G as currently

written does not clearly separate subpart G from the requirements for financial responsibility and administrative capability, and so our proposed changes would clarify that subpart G is not a required element for provisional certification, but rather a separate and independent basis for provisional certification. In addition, we propose to remove the language in existing § 668.13(c)(1)(i)(F) because it is related to the automatic certification requirement in § 668.13(b)(3) the Department is proposing to eliminate. In its place, we propose to add a new condition to § 668.13(c)(1)(i)(F) that would allow the Secretary the option to place an institution on provisional status if the Department has determined the institution is at risk of closure. This proposed condition aligns with additional conditions the Department proposes to add to provisionally certified schools at risk of closure in § 668.14 and would make it easier to apply conditions, such as prohibiting transcript withholding, if the Secretary is concerned about the institution's viability. Institutional closures create significant disruption for students and the Department, which often leave students no choice but to restart their education. In addition, students often lose credits when transferring to another institution because teach-out plans were not in place, resulting in significant liabilities tied to closed school discharges. In fact, a GAO report stated that students who transferred lost an estimated 43 percent of their credits. However, that differed greatly across types of colleges.[136] Students transferring among for-profit colleges lost an average of 83 percent of their credits, compared to a loss of 50 percent and 37 percent for transfers among non-profit and public colleges, respectively. Thus, it is imperative for the Department to address risks associated with institutions that are at risk of closure before they close, including by encouraging more orderly closures, increasing the possibility of financial protection for both the Department and students, and support students during this difficult transition. As stated during negotiations, the Department would notify the institution when it has determined that the school is at risk for closure and provisionally certify it. In addition, we propose to add a new condition in § 668.13 (c)(1)(i)(G) in which the Secretary may provisionally certify an institution if it is permitted to

---

[135] 87 FR 65426.

[136] GAO Report, GAO–17–574, "Students Need More Information to Help Reduce Challenges in Transferring College Credits," Aug. 14, 2017. *www.gao.gov/products/gao-17-574.*

use the provisionally certified alternative under subpart L. The provisional certification alternative in subpart L is not dependent on an initial application, a change of ownership, reinstatement or a recertification, but permits an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years.

The Department proposes new language in § 668.13(c)(1)(ii) designed to better protect students and taxpayers by placing certain high-risk institutions under provisional status. It also aligns the certification procedures regulations with other changes being made to financial responsibility in other parts of this NPRM. Institutions are currently placed on provisional status for a variety of reasons, including changes in ownership, late submission of compliance audits, and State or accreditor actions. The Department believes it is appropriate to additionally place an institution under provisional status when an institution lacks financial responsibility or any owner or interest holder of the institution with control over that institution owns or owned another institution with fines or liabilities owed to the Department. Placing an institution under provisional certification for these reasons provides the Department the ability to closely monitor that institution and it allows us to impose conditions in a PPA to address our concerns (*e.g.*, by limiting the growth in an institution if it is subject to an adverse condition by a creditor that indicates the institution may be at risk of closure).

The Department proposes to add subpart L in § 668.13(c)(2) to provide a provisional certification alternative that is not currently reflected in § 668.13(c). Unlike § 668.13(c), the alternative is not dependent on an initial application, change of ownership, or recertification.

Proposed § 668.13(c)(2)(ii), would require institutions exhibiting consumer protection concerns to recertify within two years. The Department believes this proposed language would ensure more frequent oversight of institutions and would allow the Department to reassess any problems regularly. While there are many consumer protection concerns the Department would reassess institutions for, we are particularly interested in reassessing changes of ownership with new owners who have never operated a school, as well as where there has been an approved conversion from proprietary to nonprofit status, for any continued involvement after the change in ownership with prior owners that

show signs of possible prohibited insider advantage. As stated in a December 2020 GAO report [137] on for-profit college conversions, it is imperative for the Department to develop and implement procedures to monitor newly converted colleges. Proposed § 668.13(c)(2)(ii) would particularly help with changes in ownership as it would require reassessment of provisionally certified institutions that have significant consumer protection concerns by the end of their second year of receiving certification.

The December 2020 GAO report [138] identified 59 changes of ownership from a for-profit entity to a nonprofit entity, which involved 20 separate tax-exempt organizations, between January 2011 and August 2020. Notably, one chain included 13 separate institutions that closed prior to the Department deciding whether to approve the requested conversion to nonprofit status. Three-fourths of the institutions were sold to a formerly for-profit entity (or nonprofit affiliate of a for-profit entity) that had no previous experience operating an institution of higher education, increasing the risk that an institution would not be well-managed, or might be on shaky financial footing that depends upon unrealistic assumptions about enrollment growth or profitability, or that is unable to deliver an educational experience to students that has been promised. This is the type of population of new owners we would reassess more frequently. Without prior experience, we are not confident these owners would know how to properly administer the title IV, HEA programs. For instance, one of the most high-profile college failures in the last several years involved an owner that had no prior experience running a postsecondary institution. On the other hand, one-third of the institutions had what GAO termed "insider involvement" in the purchasing of the nonprofit organization (*i.e.*, someone from the former for-profit owner was involved in the nonprofit purchaser, as well), suggesting greater risk of impermissible benefits to those insiders. We would reassess prior owners that show signs of possible prohibited insider advantage because "insider involvement" is typically done for an owner's own financial benefit and not necessarily as a benefit for students.

[137] GAO Report, GAO–21–89, "Higher Education: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions", Dec. 31, 2020. *www.gao.gov/products/gao-21-89.*

[138] Ibid.

*Directed Question*

We seek feedback from commenters about whether to maintain the proposed two-year limit or extend recertification to no more than three years for provisionally certified schools with major consumer protection issues. Both approaches would operate as maximum lengths, allowing the Department to certify individual institutions for shorter periods of time. We want to further consider whether two years is long enough to evaluate how well the institution has addressed consumer protection issues. If the Department makes a recertification decision before it has enough information, it could mean not taking a fully informed action when the institution reaches its recertification or taking a premature action to deny recertification to an institution that is making a real effort to improve. Since continuing to let an institution operate for longer could result in significant increases in the total amount of potential liabilities, we are especially interested to receive feedback from commenters.

*Supplementary Performance Measures (§ 668.13(e))*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. This includes the requirement for institutions to enter a written PPA with the Department.

*Current Regulations:* Current § 668.13 stipulates certain procedures governing the Department's determination to certify an institution's eligibility to participate in the title IV, HEA programs or condition the institution's participation.

*Proposed Regulations:* We propose to add paragraph (e) to establish supplementary performance measures the Department may consider in determining whether to certify or condition the participation of the institution. Under proposed § 668.13(e), when making certification decisions, we could assess and consider (1) the institution's withdrawal rate, defined as the percentage of students in the enrollment cohort who withdrew from the institution within 100 percent or 150 percent of the published length of the program; (2) D/E rates of programs offered by the institution, if applicable; (3) Earnings premium measures of programs offered by the institution, if applicable; (4) the amounts the institution spent on instruction/

instructional activities, academic support, and support services, and the amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures, as provided through a disclosure in the institution's required audited financial statements required under § 668.23; and (5) the licensure pass rate of programs offered by the institution that are designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, if the institution is required by an accrediting agency or State to report licensure passage rates.

*Reasons:* Metrics such as withdrawal rates, D/E rates, earnings premium measures, and spending on instruction, student support, and recruitment, can provide the Department useful information regarding the value of an institution's educational offerings and the outcomes students experience. To safeguard the interests of students and taxpayers, we believe it is important that the Department consider this information when making decisions about whether to certify or condition an institution's title IV, HEA participation. Codifying these supplemental performance measures would also provide additional clarity and transparency to institutions regarding the types of information the Department will likely consider when making certification decisions.

*Signing a Program Participation Agreement (§ 668.14(a))*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. This includes the requirement for institutions to enter a written PPA with the Department. HEA section 498(e) specifies that the Secretary may, to the extent necessary to protect the financial interest of the United States, require financial guarantees from an institution participating or seeking to participate in a title IV, HEA program, or from one or more individuals who exercise substantial control over the institution.

*Current Regulations:* Current § 668.14(a) states that an institution may participate in any title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters a written PPA with the Secretary. A PPA conditions the initial and continued participation of an eligible institution in any title IV, HEA program upon

compliance with the conditions specified in the PPA.

*Proposed Regulations:* The Department proposes to add a new paragraph in current § 668.14 that would specify who must sign an institution's PPA. The Department proposes new § 668.14(a)(3), which would state that an institution's PPA must be signed by an authorized representative of the institution. Proprietary or private nonprofit institutions would also be required to have an authorized representative of an entity with direct or indirect ownership sign the PPA if that entity has the power to exercise control over the institution. The Secretary would consider the following as examples of circumstances in which an entity has such power—

• If the entity has at least 50 percent control over the institution through direct or indirect ownership, by voting rights, or by its right to appoint board members to the institution or any other entity, whether by itself or in combination with other entities or natural persons with which it is affiliated or related, or pursuant to a proxy or voting or similar agreement.

• If the entity has the power to block significant actions.

• If the entity is the 100 percent direct or indirect interest holder of the institution.

• If the entity provides or will provide the financial statements to meet any of the requirements of § 600.20(g) or (h), or § 668 subpart L.

*Reasons:* Electronic Announcement (EA) GENERAL 22–16 updated PPA signature requirements for entities exercising substantial control over non-public institutions of higher education.[139] To protect taxpayers and students, the Department believes that entities that exert control over institutions should assume responsibility for institutional liabilities. Requiring owner entities to sign the PPA and assume such liability provides protection in the event that an institution fails to pay its liabilities, which has been a recurring problem when institutions close, particularly those that close precipitously. While EA GENERAL 22–16 used a rebuttable presumption, here we propose language in § 668.14(a)(3) that would not only require a representative of the

institution to sign a PPA, but also an authorized representative of an entity with direct or indirect ownership or control of non-public institutions. The difference is we would then be able to require these signatures in all situations that meet the regulatory threshold, rather than on a case-by-case basis using the rebuttable presumption.

When an institution closes, the Department often struggles to access funds from the closing institution to pay its liabilities. This is particularly troublesome knowing that some entities that own the institution continue to operate or have the resources to repay the liabilities. In the event of closure, this protection would allow the Department to ensure owner entities with at least a 50 percent interest in the institution are liable for taxpayer losses that may be incurred by the institution. Since owning more than 50 percent is considered a simple majority, we believe this is a suitable percent to use as the threshold. As discussed in our Final Rule for closed school discharges,[140] section 438 of the HEA states that the Secretary must subsequently pursue any claim available to such borrower (who received a closed school discharge) against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H. Consequently, we would pursue affiliates and principals, along with the institution, to settle the loan obligation associated with a closed school discharge. Specifically, we would consider owner entities with at least a 50 percent interest in the institution to be among those considered to be affiliates or principals.

*Entering Into a Program Participation Agreement (§ 668.14(b)(5), (17), (18), (26))*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. This includes the requirement for institutions to enter a written PPA with the Department. HEA section 498(c) outlines the criteria used to determine whether an institution demonstrates financial responsibility.

*Current Regulations:* Current § 668.14(b)(5) states that by entering into a PPA, an institution agrees that it will comply with the provisions of § 668.15 relating to factors of financial responsibility. Current § 668.14(b)(17)

---

[139] Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions of Higher Education, *fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education.*

[140] 87 FR 65904.

<span style="color:red">App.272</span>

states that the Secretary, guaranty agencies and lenders as defined in § 682, nationally recognized accrediting agencies, the Secretary of Veterans Affairs, State agencies recognized under § 603 for the approval of public postsecondary vocational education, and State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the title IV, HEA programs or any information on fraud and abuse. Current § 668.14(b)(18)(ii) states that an institution will not knowingly contract with an institution or third-party servicer that has been terminated under section 432 of the HEA for a reason involving the acquisition, use, or expenditure of Federal, State, or local government funds, or an institution or third-party servicer that has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds. Current § 668.14(b)(18)(iii)(B) states that an institution will not knowingly contract with or employ any individual, agency, or organization that has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds. Current § 668.14(b)(26)(i) states that if an educational program offered by the institution is required to prepare a student for gainful employment in a recognized occupation, the institution must demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. In current § 668.14(b)(26)(i)(A) and (B), the Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed the greater of one hundred and fifty percent of the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, or the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student as established in a State adjacent to the State in which the institution is located.

*Proposed Regulations:* The Department proposes to add three new paragraphs in § 668.14(b), amend one paragraph due to other changes made in

the financial responsibility regulations, and amend the program length requirements of GE programs. We also propose to add language to extend to all federal agencies the authority to share with each other any information pertaining to the institution's eligibility for or participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law.

The Department proposes to amend current § 668.14(b)(5) to refer to all factors of financial responsibility in an expanded subpart L, instead of the current mention of § 668.15, the text of which is being deleted with the section reserved. In § 668.14(b)(17), the Department proposes to broaden the reference of "the Secretary of Veterans Affairs" to "Federal agencies" and add State attorneys general to the list of entities authorized to share information with each other. Additionally, we propose to add "or other violations of law are included within the fraud and abuse purposes of this information-sharing provision. In § 668.14(b)(18), the Department proposes to restructure the language to clarify the requirements for contracting and employing an individual, agency, or organization. In § 668.14(b)(18)(ii)(C), the Department proposes for an institution to not knowingly contract with any institution, third-party servicer, individual, agency, or organization that has, or whose owners, officers or employees have, been judicially determined to have committed fraud or had participation in the title IV programs terminated, certification revoked, or application for certification or recertification for participation in the title IV programs denied. This would include any individuals who exercised substantial control by ownership interest or management over the institution, third-party servicer, agency, or organization that has had its participation in title IV programs terminated or revoked, or its certification or recertification denied. We also propose to add to the list of reasons in which an institution or third-party servicer may be terminated from participating in the title IV, HEA programs. Specifically, we propose to add that an institution may not have owners, officers, or employees of the institution or its third-party servicer that have exercised substantial control over an institution, or a direct or indirect parent entity of an institution that owes a liability for a violation of a title IV, HEA program, requirement and is not making payments in accordance with an agreement to repay that liability. The Department also proposes for an institution to not knowingly contract

with or employ any individual, agency, or organization that has been, or whose officers or employees have been, ten-percent-or-higher equity owners, directors, officers, principals, executives, or contractors at an institution in any year in which that institution incurred a loss of Federal funds in excess of 5 percent of the institution's annual title IV, HEA program funds.

The Department proposes to make several revisions in § 668.14(b)(26) regarding an educational program offered by an institution that is required to prepare a student for gainful employment in a recognized occupation. Namely, in new § 668.14(b)(26)(ii), we propose to limit the number of hours in gainful employment programs to the greater of the required minimum number of clock or credit hours as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency.

If certain criteria are met, then a program may instead be limited to another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student. Another State's requirements could only be used if the institution can demonstrate that:

• A majority of students resided in that other State while enrolled in the program during the most recently completed award year;

• A majority of students who completed the program in the most recently completed award year were employed in that State; or

• The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State.

For any programmatic and licensure requirements that come from a State other than the home State, the institution must provide documentation of the State meeting one of the three qualifying requirements listed above and the documentation provided must be substantiated by the certified public accountant who prepares the institution's compliance audit report as required under § 668.23.

*Reasons:* Current § 668.14(b)(5) refers to a legacy section of the General Provisions (§ 668.15) that would be reserved under these proposed regulations. Accordingly, in signing a

PPA, an institution would now agree to comply with the provisions of subpart L of part 668 (instead of § 668.15 as is currently required), where all requirements related to financial responsibility would now be located.

The Department's proposed changes to § 668.14(b)(17) broadening the list of entities authorized to share information related to an institution's eligibility for or participation in the title IV, HEA programs to include all Federal agencies, as well as State attorneys general, would create an improved accountability structure. Many Federal agencies provide student assistance and are in possession of information potentially relevant to the Department's oversight of institutions' participation in the title IV, HEA programs. This is especially the case where such information indicates that an institution is in a tenuous financial position or in danger of closing. Likewise, the addition of State attorneys general to the list of entities included in information-sharing related to title IV, HEA participation would codify in regulation access to one of the best outside sources of knowledge available to the Department about activities that may be detrimental to program integrity or the interests of students. States play an important role in oversight of institutions, and we believe the actions of attorneys general, especially where fraud or abuse are suspected, and when an institution is in imminent danger of closing, are of primary interest to the Department in meeting its responsibilities to oversee the title IV, HEA programs and protect the interests of students. Evidence generated from State attorneys general has enabled the Department to conduct a more thorough and rigorous review of borrower defense claims against institutions such as Corinthian Colleges, Inc., ITT Technical Institute (ITT), the Court Reporting Institute, Minnesota School of Business and Globe University, and Westwood College.[141] In several of these instances, State attorneys general submitted internal company documents, presentations, emails, and memos that assisted in establishing that these institutions engaged in misrepresentations. The financial implications on borrowers of approved borrower defense claims are significant. For example, the approval of 18,000 borrower defense claims for individuals who attended ITT resulted

in borrowers receiving 100 percent of their loans discharged, which amounted to approximately $500 million in relief.[142] Thus, State attorneys general have been an invaluable source of evidence for many of the Department's approvals of borrower defense claims and we anticipate they will continue to be an important source of evidence. Not only would adding State attorneys general to the list of entities included in information-sharing related to title IV, HEA participation formalize an existing relationship that has greatly facilitated the Department's oversight activities and granting of relief to borrowers, it would make possible an exchange of information (applicable to all entities listed in § 668.14(b)(17)) that is mutually beneficial to the oversight activities of all involved. Lastly, the addition in § 668.14(b)(17) of fraud, abuse, and other violations of law in the type of information that may be shared among listed entities recognizes the need for the Department, specifically the Office of the Inspector General, to be informed whenever such activity is suspected and would establish in regulation a protocol for that to occur.

In § 668.14(b)(18), the Department proposes to separate the employee and contractor requirements between two romanettes because although they have similar requirements, it reads clearer when splitting them into two paragraphs and eliminates the duplication that previously occurred when additional criteria was added. Current regulations found in § 668.14(b)(18)(ii) prohibit institutions from contracting with other institutions or third-party servicers that have been terminated from participation in title IV, HEA programs for a reason involving the acquisition, use, or expenditure of Federal, State, or local government funds, or that have been administratively or judicially determined to have committed fraud or any other material violation of the law involving Federal, State, or local government funds. The regulations are silent on the principals of such entities except to the extent that current § 668.14(b)(18)(iii) prohibits an institution from contracting with or employing any individual, agency, or organization that has been, or whose officers or employees have been convicted of or pled *nolo contendere* to a crime involving the use or expenditure

of Federal, State, or local government funds or has been administratively determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds. In conducting oversight activities, the Department has become aware of individuals involved with the administration of title IV, HEA programs who, though not convicted of a crime or determined to have committed fraud involving public funds, have nevertheless been principally involved in the operation of institutions that have unpaid liabilities assessed against them. These individuals often contract with another institution or third-party servicer who have been terminated from participation in title IV, HEA, or whose owners, officers, or employees had substantial control over an institution that still owes a liability to the Department for a title IV, HEA violation that is not being repaid. In addition, we also propose language that would ensure that institutions may not employ or contract with owners or officers from an institution that incurred a loss of Federal funds in excess of 5 percent of the institution's annual title IV, HEA volume. In both cases, the Department is concerned that allowing such individuals to continue to work with title IV, HEA funds presents an ongoing risk to the integrity of the programs and could result in additional future liabilities.

The proposed changes in § 668.14(b)(26) address concerns the Department has about institutions offering programs tied to licensure that are longer than required by their State, which results in those students using up more of their lifetime eligibility for Pell Grants or other Federal financial aid, potentially making it harder for them to pursue later training. Longer programs associated with State minimum licensure requirements are more likely to result in higher debt and a longer period of enrollment without requisite career benefits. To that end, we propose changes to § 668.14(b)(26) that would limit the occasions when an institution can offer a GE program that requires students to complete more hours than are required by the institution's State for licensure or certification purposes. Such a change ensures that students will still obtain the necessary hours that the State requires so that they will be able to work in a given profession but protects against accumulation of student debt and usage of a student's lifetime limits for title IV, HEA financial assistance that go beyond that required point. The current regulations, which permit an

---

[141] U.S. Department of Education press releases: *www.ed.gov/news/press-releases/education-department-approves-415-million-borrower-defense-claims-including-former-devry-university-students*; *www.ed.gov/news/press-releases/department-education-approves-borrower-defense-claims-related-three-additional-institutions.*

[142] U.S. Department of Education press release: *www.ed.gov/news/press-releases/department-education-announces-approval-new-categories-borrower-defense-claims-totaling-500-million-loan-relief-18000-borrowers?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.*

institution to offer a program that includes the greater of 150 percent of the hours required by the State in which the institution is located, or the minimum hours required by an adjacent State, have led to situations where institutions have offered more hours than were necessary for a student to become licensed in the State where the institution was located, even when the adjacent State that had a requirement for a greater number of hours was many miles away and students were unlikely to seek to become employed there.

Our proposed changes in § 668.14(b)(26)(ii)(A) would generally allow for programs to be at least as long as required by the State in which the institution is located but allow for exceptions under § 668.14(b)(26)(ii)(B). Namely, the institution would be permitted to offer a longer program that fulfills another State's greater minimum requirements if an institution can demonstrate that a majority of students resided in that State while enrolled in the program during the most recently completed award year, were employed in such a State during the most recently completed award year after completing the program, or affirmed in writing upon enrollment that they intended to work in such a State, as long as the State was in the same metropolitan statistical area as the institution. In other words, if one of the exception criteria is met, the institution could increase the minimum number of hours in the program to align with the required number of hours in the State where students reside, were employed, or intend to be employed. We included ''credit hours, or the equivalent'' to codify our current policy that a program with credit hours must perform a conversion to ensure that the converted hours in the program do not exceed the minimum requirements for the State. Furthermore, to improve the integrity and accuracy of the information supporting an exception, our proposed changes in § 668.14(b)(26)(ii)(B) would add a required auditor attestation of the institution's documentation that a majority of the students in its program have a relationship with another State that meets one of the aforementioned exemption criteria. In the three paragraphs under proposed § 668.14(b)(26)(ii)(B), we also added timeframes that reflect the most current information that an institution could reasonably be expected to have in its possession.

Notably, these changes leave untouched many existing provisions of the current regulatory requirement in § 668.14(b)(26). This includes that the language only applies to programs that are required to prepare a student for gainful employment in a recognized occupation, that the institution establishes the need for the training, and the concept that there be a reasonable relationship between the length of the program and the requirements for working in the occupation for which the student is being prepared.

*Entering Into a Program Participation Agreement (§ 668.14(b)(32–34))*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. This includes the requirement for institutions to enter a written PPA with the Department. HEA section 498(c) outlines the criteria used to determine whether an institution demonstrates financial responsibility.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to add three additional new paragraphs to § 668.14(b). We propose § 668.14(b)(32) to require that in each State in which the institution is located or in which students enrolled by the institution are located, as determined at the time of initial enrollment in accordance with § 600.9(c)(2), the institution must determine that each program eligible for title IV, HEA program funds—

• Is programmatically accredited if the State or a Federal agency requires such accreditation, including as a condition for employment in the occupation for which the program prepares the student, or is programmatically pre-accredited when programmatic pre-accreditation is sufficient according to the State or Federal agency;

• Satisfies the applicable educational prerequisites for professional licensure or certification requirements in the State so that a student who completes the program and seeks employment in that State qualifies to take any licensure or certification exam that is needed for the student to practice or find employment in an occupation that the program prepares students to enter; and

• Complies with all State consumer protection laws related to closure, recruitment, and misrepresentations, including both generally applicable State laws and those specific to educational institutions.

The Department also proposes for § 668.14(b)(33) to state that an institution will not withhold transcripts or take any other negative action against a student related to a balance owed by the student that resulted from an error in the institution's administration of the title IV, HEA programs, any fraud or misconduct by the institution or its personnel, or returns of funds under the Return of Title IV Funds process under § 668.22 unless the balance owed was the result of fraud on the part of the student. We propose for § 668.14(b)(34) to state that an institution will not maintain policies and procedures to encourage, or condition institutional aid, including income-share agreements, tuition payment plans, or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including Federal loan funds, that the student receives. The institution may provide a scholarship, however, on the condition that a student forego borrowing if the amount of the scholarship -provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow.

*Reasons:* Proposed § 668.14(b)(32) would require that an institution offering a program that leads to an occupation meet all applicable requirements, particularly if a program needs to meet programmatic accreditation or has licensure requirements in order for program graduates to qualify to work in that occupation. We are aware of institutions enrolling students in programs that do not meet such requirements. Students in these programs often find themselves struggling to find employment and owing student loans on credentials that do not qualify them to work in the occupations for which they were trained. Thus, this additional requirement would further protect students so that they do not waste their time and money on programs that will not qualify them for licensure or certification in an occupation in that State. The proposed regulations would also further strengthen protection of the financial investment that taxpayers are making in education so that Federal funds are not expended on programs that will not qualify a student for licensure or certification.

To operate legally in a State, an institution is already required to comply with that State's authorization requirements, including any State consumer protection requirements. For an institution covered by a State authorization reciprocity agreement to be considered legally offering postsecondary distance education in a State, it is subject to any limitations in that agreement and to any State requirements not relating to authorization of distance education.

The additional requirement of § 668.14(b)(32)(iii) specifies that an institution would have to make a determination that each of its programs eligible for title IV, HEA program funds comply with all of a State's consumer protection laws related to closure, recruitment, and misrepresentations, including both generally applicable State laws and those specific to educational institutions. In crafting this language, the Department is balancing the goals of ensuring that institutions have a reasonable path to offer distance education to students who do not reside within their borders while ensuring that States have the ability to protect their students if an institution located in another State tries to take advantage of students or is at risk of closure. We are concerned about past situations in which States have raised concerns about institutions that are physically located outside of its borders and taking advantage of students while the State is limited in its ability to apply its own consumer protection laws in these areas to protect its residents. That can hamper State efforts to try and step in and help students if there is evidence that an out-of-State school is taking advantage of students. It can also minimize the ability of students to access tuition recovery funds to repay any tuition paid out of pocket. Our proposed approach intentionally only applies to laws in three areas: closure, recruitment, and misrepresentation. These are the three areas where the Department has historically incurred the greatest expenses from student loan discharges related to either closed schools or borrower defense. This includes instances where closed institutions left students with no path to complete a credential, cases where students were pressured into enrollment, and cases where institutions misled students about key elements of the education. At the same time, this language would not apply to other types of laws that may represent significant variation across States in ways that would make it harder for an institution to operate through a reciprocity agreement. This includes tuition refund policies, rules on site visits, and State-specific outcomes metrics.

While crafting this proposed requirement we recognize that there is a great diversity in the types of different consumer protection laws and the benefits they can provide students. Therefore, we seek feedback on the best way to construct this requirement so that students are protected, financially and otherwise, without creating unnecessary burden on institutions.

Furthermore, we propose a PPA requirement in § 668.14(b)(33) that prohibits institutions from withholding transcripts as a means of forcing a student to pay a balance on their account if the balance was created because the institution made an administrative error with respect to the student's title IV, HEA funds, if the balance otherwise results from the institution's fraud or misconduct, or if the balance results solely from returns of title IV, HEA funds under the Return of Title IV Funds requirements under § 668.22. We have seen instances where institutions have improperly calculated a student's aid and, after correcting the error and returning title IV, HEA funds back to the Department, the institutions bill the student for those amounts. Additionally, following the conclusion of negotiated rulemaking, the Department performed a comprehensive analysis of the impact of the CARES Act waiver of returns of funds under Return of Title IV Funds requirements on a student's likelihood to immediately re-enroll following the withdrawal. The results of this analysis suggest that students who qualified for the CARES Act waiver of returns of funds under the Return of Title IV process were more likely to re-enroll in the following semester at either their current or a new postsecondary institution. Given this analysis, the stated concerns of negotiators regarding the practice of transcript withholding, and several recent policy reports [143] [144] regarding the negative consequences for students related to transcript withholding, we also believe that transcript withholding and debt collection procedures are inappropriate in cases where account balances or other debts to the institution result solely from the Return of Title IV Funds process. Institutional tuition refund policies often stop providing refunds to students sooner than the point at which institutions no longer have to return title IV, HEA aid from a student who withdrew during a term. The result is that many students who withdraw after tuition refund periods are over are frequently left with significant balances owed to the institution simply because they withdrew from the institution and were subject to the mandated Return of Title IV funds process. An institution taking

further negative action against a student in those circumstances could exacerbate a situation that was already difficult for the student. In all these circumstances, holding transcripts or taking other negative actions against the student make it more difficult for the student to re-enroll or transfer credit to another institution. Thus, in these circumstances we believe that withholding transcripts for additional charges is counterproductive and inappropriate. The proposed regulations would benefit students by not allowing institutions to withhold transcripts from them when it was the institution's own actions (whether unintentional or through fraud or other malfeasance) or the Return of Title IV Funds process that resulted in an unanticipated charge. Furthermore, as mentioned during negotiations, the Department oversees the administration of title IV, HEA funds on students' behalf; however, separate from title IV, HEA, the student has an agreement with the institution. Title IV Funds calculations and institutional errors, misconduct, and fraud related to the awarding or disbursement of title IV, HEA funds. Note that if an institution is provisionally certified, we may apply other conditions that are necessary or appropriate to the institution, including, but not limited to releasing holds on student transcripts if the institution is at risk of closure, is teaching out or closing, or is not financially responsible or administratively capable.

We propose a PPA condition in § 668.14(b)(34) that would address a problem where institutions may prevent students from taking out Federal financial aid that students are entitled to through various inducements, incentives, or unnecessarily burdensome barriers. The last category includes setting up hurdles such as requiring the completion of unnecessary or duplicative forms. We believe it is critical that students be able to access all the Federal aid to which they are entitled, especially to afford necessities like food and housing. We would, however, make an exception for cases where the institution offers institutional scholarships of the same or greater amounts as the Direct Loan funds for which the student would otherwise be eligible to borrow. In such situations the student would still have access to, and be able to receive, the full amount of funding for which the school determined was needed. We believe this exception would promote greater affordability and potentially leave students less indebted at graduation, while still ensuring that the students

[143] Ithaka S+R. (2021). *Stranded Credits: A Matter of Equity*. www.sr.ithaka.org/publications/stranded-credits-a-matter-of-equity/.

[144] Consumer Financial Protection Bureau (Fall 2022). *Supervisory Highlights Student Loan Servicing Special Edition*, 8–9. www.files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

have funds to pay for educational expenses.

Note that this proposed provision that would prevent institutions from establishing obstacles or inducements against borrowing is distinct from and would not impact an institution's ability to refuse to originate a student's Direct Loan under § 685.301(a)(8). Under those regulations, an institution may refuse to originate or reduce the amount of a student's Direct Loan if the reason for that action is documented and provided to the borrower in writing, and if the institution makes such determinations on a case-by-case basis, maintains documentation of each decision, and does not engage in any pattern or practice that results in a denial of a borrower's access to Direct Loans because of the borrower's race, gender, color, religion, national origin, age, disability status, or income. The proposed restriction is on institutional policies or practices designed to limit borrowing generally, not specific refusals for individual students that are documented and made solely on a case-by-case basis.

*Conditions That May Apply to Provisionally Certified Institutions (§ 668.14(e)).*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. HEA section 498(c) outlines the criteria used to determine whether an institution has met the standards of financial responsibility. HEA section 498(d) authorizes the Secretary to establish reasonable procedures and requirements to ensure that institutions are administratively capable. HEA section 498(h) discusses provisional certification of institutional eligibility to participate in the title IV, HEA programs. HEA section 498(k) outlines the treatment of teach-outs.

*Current Regulations:* Current § 668.14(e) states that a PPA becomes effective on the date that the Secretary signs the agreement.

*Proposed Regulations:* We propose to redesignate current § 668.14(e) as § 668.14(h). The Department also proposes to add a new paragraph (e) that outlines a non-exhaustive list of conditions that we may opt to apply to provisionally certified institutions. We propose for institutions at risk of closure to submit an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency. We also propose

that institutions at risk of closure must submit an acceptable records retention plan that addresses title IV, HEA records, including but not limited to student transcripts, and evidence that the plan has been implemented, to the Department. We also propose for an institution at risk of closure that is teaching out, closing, or that is not financially responsible or administratively capable, to release holds on student transcripts. Other conditions for institutions that are provisionally certified would include—

• Restrictions or limitations on the addition of new programs or locations;

• Restrictions on the rate of growth, new enrollment of students, or Title IV, HEA volume in one or more programs;

• Restrictions on the institution providing a teach-out on behalf of another institution;

• Restrictions on the acquisition of another participating institution, which may include, in addition to any other required financial protection, the posting of financial protection in an amount determined by the Secretary but not less than 10 percent of the acquired institution's Title IV, HEA volume for the prior fiscal year;

• Additional reporting requirements, which may include, but are not limited to, cash balances, an actual and protected cash flow statement, student rosters, student complaints, and interim unaudited financial statements;

• Limitations on the institution entering into a written arrangement with another eligible institution or an ineligible institution or organization for that other eligible institution or ineligible institution or organization to provide between 25 and 50 percent of the institution's educational program under § 668.5(a) or (c);

• For an institution alleged or found to have engaged in misrepresentations to students, engaged in aggressive recruiting practices, or violated incentive compensation rules, requirements to hire a monitor and to submit marketing and other recruiting materials (*e.g.,* call scripts) for the review and approval of the Secretary.

*Reasons:* We propose new language under § 668.14(e), and to redesignate current § 668.14(e) as § 668.14(h). The Department proposes a non-exhaustive list of conditions in new paragraph (e) to ensure greater monitoring and oversight on provisionally certified institutions where we may already have concerns. This non-exhaustive list of conditions would allow the Department to formalize tools that are currently available but are not typically used. The list of conditions we have included proactively address some of the issues

we have seen with some provisionally certified institutions, namely those at risk of closure, those that are teaching out or closing, and those that are not financially responsible or administratively capable. We propose a non-exhaustive list because we do not want to foreclose any current flexibility that we have with respect to monitoring provisionally certified institutions and we will publish updates to the list as needed. The proposed § 668.14(e)(2) respond to concerns regarding transcript withholding we heard during negotiations. Several negotiators stated that students of color are disproportionately unable to access their transcripts due to transcript withholding. In addition, one negotiator stated that if an institution was being considered as a risk for closure, most students would want to transfer institutions, but transcript holds for certain amounts would negatively impact a student's ability to transfer to another institution. Accordingly, we have expanded the provisional conditions related to transcript withholding to increase students' access to their educational records at institutions with risk of closure or institutions that are not financially responsible or administratively capable. Moreover, we believe the other conditions under proposed paragraph (e) for institutions at risk of closure would better protect students from sudden closures that often leave them without opportunities to complete their credentials or to transfer to another institution. As described in a GAO report,[145] school closures derail the education of many students, leaving them with loans but no degree. In fact, college closure represented the end of many borrowers' educational pursuits. Forty-three percent of borrowers enrolled at a college that closed did not complete their program or continue their education by transferring to another college.

The proposed restrictions and limitations are directed at institutions we already have significant concerns with. These proposed conditions would make it easier to manage the size of a risky institution and ensure that it does not keep growing when it may be in dire straits. Specifically, we propose expressly providing the authority to limit the addition of new programs and locations, including in cases where we have concerns about an institution's ability to adequately administer aid for

---

[145] GAO Report, GAO–21–105373, "Many Impacted Borrowers Struggled Financially Despite Being Eligible for Loan Discharges", Sept. 30, 2021. *www.gao.gov/products/gao-21-105373.*

the programs they currently offer. In addition, we propose expressly authorizing restrictions on the rate of growth, new enrollment of students, or Title IV, HEA volume in one or more programs. Such restrictions would help the Department manage an institution's risk of imminent closure and mitigate the resulting harms to students.

We also propose prohibiting provisionally certified institutions to provide a teach-out on behalf of another institution. As GAO found,[146] some borrowers who transfer after a school closure end up at a school that later shuts its doors as well. From 2014 through 2020, nearly 11,500 borrowers transferred from a closing college to another college that subsequently closed, accounting for about 5 percent of borrowers affected by closures in that time. The government's interest is to provide students the best possible chance of finishing their education, and this could be substantially more challenging for students if they transfer to institutions that are not providing adequate academic resources, are not financially stable, are subject to State or accrediting agency actions or program review findings, or generally lack administrative capability. We propose to expressly authorize the Department to prevent institutions in these situations from acquiring other institutions or participating in teach-outs of closing institutions to limit risk to students. We also propose allowing for additional reporting requirements, which may include, but are not limited to, cash balances, an actual and protected cash flow statement, student rosters, student complaints, and interim unaudited financial statements to monitor the institution's progress. In addition, we propose allowing limitations on written arrangements in which another eligible institution or ineligible organization would provide more than 25 percent of a program because we are concerned about institutions outsourcing their education to unregulated companies or to other institutions. As indicated in DCL (GEN–22–07),[147] the Department is aware of several arrangements between eligible institutions and ineligible entities that have exceeded the regulatory limitations in § 668.5. For example, the Department has witnessed cases where a program was offered in its entirety by an ineligible entity, but the program was inaccurately represented as being offered by the eligible

institution for the primary purpose of obtaining title IV, HEA funds for an otherwise ineligible program.

Furthermore, we are concerned with institutions that engage in misrepresentation and aggressive recruitment because often these programs are not what they advertise, and consequently this increases the likelihood of students filing a borrower defense to repayment or false certification claim. As defined in subpart F of part 668, misrepresentation includes false, erroneous, or misleading statements, by an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services made directly or indirectly to a student, prospective student, or any member of the public, to an accrediting agency, to a State agency, or to the Secretary. An eligible institution has engaged in aggressive and deceptive recruitment tactics or conduct when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, lead generation, recruiting, or admissions services, engages in one or more of the prohibited practices in § 668.501. We propose that an institution alleged or found to have misrepresented students, engaged in aggressive recruiting practices, or that has violated incentive compensation rules, may be required to hire a monitor and submit marketing and other recruiting materials (*e.g.,* call scripts) for the Department to review and approve. We included the hiring of a monitor as a possible requirement because we believe a monitor would help us get information that we do not readily get from audits. Conditions for institutions that undergo a change in ownership seeking to convert from a for-profit to a nonprofit institution (§ 668.14(f)).

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the title IV, HEA programs. HEA section 498(i) outlines the treatment of changes of ownership.

*Current Regulations:* Current § 668.14(f) states that except as provided in current paragraphs § 668.14(g) and (h), the Secretary terminates a PPA through the proceedings in subpart G of part 668.

*Proposed Regulations:* We propose to redesignate current § 668.14(f) as § 668.14(i). The Department proposes to add a new paragraph (f) that outlines conditions that would be applied to institutions that undergo a change in ownership seeking to convert from a for-profit institution to a nonprofit institution. The first condition we propose is for the institution to continue to meet the revenue percentage requirements under § 668.28(a) until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years in which the institution meets the requirements of § 668.14(b)(16) under its new ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later. The second condition we propose is for the institution to continue to meet the GE requirements of subpart S of part 668 until we have accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years under its new ownership, or until we approve the institution's request to convert to a nonprofit institution, whichever is later. The third condition we propose is for the institution to submit regular and timely reports on agreements entered with a former owner of the institution or a natural person or entity related to or affiliated with the former owner of the institution, so long as the institution participates as a nonprofit institution. In our fourth condition, we propose to prohibit an institution from advertising that it operates as a nonprofit institution for the purposes of title IV, HEA until the Department approves the institution's request to convert to a nonprofit institution. We also propose to apply any other conditions the Secretary deems appropriate to serve the interests of students and taxpayers and ensure compliance from institutions.

*Reasons:* We propose new language under § 668.14(f), thus the current § 668.14(f) would be redesignated as § 668.14(i). Proposed § 668.14(f) expands on recent changes made to § 600.31(d)(7), particularly on the Department's belief that it is reasonable to require institutions seeking to convert from for-profit to nonprofit status to continue to meet all the requirements applicable to for-profit colleges for the later of two complete consecutive years under the new ownership or until the Department approves the institution's request to convert to nonprofit status. The conversion from a for-profit to a nonprofit institution is among the

---

[146] Ibid.

[147] *www.fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-06-16/written-arrangements-between-title-iv-eligible-institutions-and-ineligible-third-party-entities-providing-portion-academic-program.*

riskier types of transactions we review, and we want to make certain that these transitions are not being made to evade financial consequences or federal oversight for the school, such as failures of the 90/10 rule or the proposed gainful employment requirements in this NPRM. As explained in the recent final rule [148] regarding changes in ownership (CIOs), a 2020 GAO report noted that of 59 CIOs (involving 20 separate transactions) involving a conversion from a for-profit entity to a nonprofit entity, one entire chain that comprised 13 separate institutions was granted temporary continued access to title IV, HEA aid but ceased operations prior to the Department reaching a decision on whether to approve the requested conversion to nonprofit status. Three-fourths of these CIOs involved sales to a nonprofit entity that had not previously operated an institution of higher education, a particular challenge given that many of the institutions involved in these CIOs had a history of lawsuits, settlements, and investigations into the practices of the underlying institutions that suggested students were not being served well. One-third of these CIOs had what GAO termed "insider involvement" in the purchasing of the nonprofit organization (*i.e.,* someone from the former for-profit ownership was also involved with the nonprofit purchaser), suggesting greater risk of impermissible benefits to those insiders. Altogether, the 59 institutions that underwent a change in ownership resulting in a conversion received more than $2 billion in taxpayer-financed Federal student aid in Award Year 2018–19. Given the potential risk in such transactions, we want to ensure that they occur in a way that protects students, the Department, and taxpayers. The conditions in proposed § 668.14(f) include complying with 90/10 and gainful employment requirements for the later of two years or until the Department approves the institution's request to convert to non-profit status. This ensures there is no change in oversight of 90/10 until a CIO has been thoroughly reviewed and approved. In addition, we believe it is necessary for an institution to submit agreements with the former owner of the institution to assess whether former owners are improperly benefitting from those agreements.[149] These concerns are detailed in final regulations related to

change in ownership procedures that were published in the **Federal Register** on October 28, 2022, and include ensuring that the institution is operating as a nonprofit for the purposes of title IV aid and ensuring that the institution's revenues are not impermissibly benefiting the prior owner or other parties.[150] Lastly, we believe that if an institution's website or other public information describes its ownership structure as private, the institution should identify whether it participates in title IV, HEA programs as a nonprofit institution or a proprietary institution for clarity as we would consider an institution to be a for-profit institution until we have reviewed and approved the institution's application for nonprofit college status.

This list of conditions under proposed § 668.14(f) would address the interim period during which the Department is determining whether the institution seeking to convert from a for-profit institution to a nonprofit institution would be considered as a nonprofit institution for title IV, HEA purposes. The Department does not take a position regarding an institution being designated a 501(c)(3) tax-exempt status by the IRS. However, the institution would have to refrain from identifying itself as a nonprofit institution in any advertising publications or other notifications until the Department recognizes and approves the change of status. In other words, if the Department has not approved the institution as a non-profit for purposes of the federal student aid programs, then it cannot mislead prospective students or misrepresent itself as a "nonprofit institution" in the context of title IV, HEA aid. Using the term nonprofit prematurely could potentially confuse students and the public who may interpret nonprofit as the Department having granted the institution nonprofit status under its regulations, which would not be accurate. Thus, as the institution would still be considered a for-profit entity during this interim period, reporting requirements for the for-profit entity would continue to apply.

*Conditions for Initially Certified Nonprofit Institutions, or Institutions That Have Undergone a Change of Ownership and Seek To Convert to Nonprofit Status (§ 668.14(g)).*

*Statute:* HEA section 498 requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable

statutory and regulatory requirements to participate in the title IV, HEA programs. HEA section 498(i) outlines the treatment of changes of ownership.

*Current Regulations:* Current § 668.14(g) states conditions when an institution's PPA automatically expires.

*Proposed Regulations:* We propose to redesignate current § 668.14(g) as § 668.14(j). The Department proposes to add a new paragraph (g) that outlines conditions for initially certified nonprofit institutions, or institutions that have undergone a change of ownership and seek to convert to nonprofit status, which would apply upon initial certification or following the change in ownership. The first condition we propose is for the institution to submit reports on accreditor and State authorization agency actions and any new servicing agreements within 10 business days of receipt of the notice of the action or of entering into the agreement, as applicable. This condition would continue to apply until (1) the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years following initial certification, (2) two complete fiscal years after a change in ownership, or (3) until the Department approves the institution's request to convert to nonprofit status, whichever is later. Note that accreditors are already obligated to tell the Department about actions related to the institutions they accredit. Accreditors currently use the Database of Accredited Postsecondary Institutions and Programs (DAPIP) to submit these reports, but in proposed § 668.14(g) the institution, irrespective of what the accreditor does, would report this information to Department staff. The second condition we propose is for the institution to submit a report and copy of the communications from the IRS (Internal Revenue Service) or any State or foreign country related to tax-exempt or nonprofit status within 10 business days of receipt so long as the institution participates as a nonprofit institution. We also propose to apply any other conditions that the Secretary deems appropriate.

*Reason:* We propose new language under § 668.14(g), thus the current § 668.14(g) would be redesignated as § 668.14(j). In proposed § 668.14(g) the Department would be more hands-on with initially certified nonprofit institutions and institutions that have undergone a change of ownership and seek to convert to nonprofit status by helping them familiarize themselves with the Federal financial aid programs.

---

[148] 87 FR 65426.

[149] GAO Report, GAO–21–89, "Higher Education: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions", Dec. 31, 2020. *www.gao.gov/ products/gao-21-89.*

[150] 87 FR 65426.

With respect to proposed § 668.14(g) we believe it is important to obtain reports on accreditor and State authorization agency actions and any new servicing agreements quickly because we need access to the information to better assess the strength of the institution and confirm that it is complying with the requirements of the other members of the triad. The proposed language in § 668.14(g) would require institutions to report more information to the Department from accreditors, States, and the IRS ensures that the Department is made aware of any likely oversight actions by other key entities. This is an improvement over current conditions in which reporting may be irregular and is not required of institutions. Moreover, as part of GAO's report addressing risks associated with some for-profit college conversions, GAO recommended the IRS collect information that would enable the agency to systematically identify tax-exempt colleges with a for-profit history for audit and other compliance activities.[151] In the same GAO report, GAO recommended that the Department develop and implement monitoring procedures for staff to review the audited financial statements of all newly converted nonprofit colleges for the risk of improper benefit. We believe that looking over an institution's correspondence with the IRS would help us monitor institutions for any improper benefits from their conversions to nonprofit status.

**Ability To Benefit**

The Committee reached consensus on the Department's proposed regulations on ATB. The Department has published the proposed ATB amendatory language without substantive alteration to the agreed-upon proposed regulations.

*General Definitions (§ 668.2)*

*Statute:* Section 484(d)(2) of the HEA defines "eligible career pathway program."

*Current Regulations:* None.

*Proposed Regulations:* We propose to adopt almost the entire statutory definition of an "eligible career pathway program" in our regulations. Under the proposed definition, an "eligible career pathway program" would mean a program that combines rigorous and high-quality education, training, and other services that—

• Align with the skill needs of industries in the economy of the State or regional economy involved;

• Prepare an individual to be successful in any of a full range of secondary or postsecondary education

options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 *et seq.*);

• Include counseling to support an individual in achieving the individual's education and career goals;

• Include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

• Organize education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

• Enable an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and

• Help an individual enter or advance within a specific occupation or occupational cluster.

*Reasons:* This definition is in large part a duplication of the statute, which requires that students accessing title IV, HEA aid through ATB be enrolled in eligible career pathway programs. The Department has proposed to exclude the statutory definition's cross-reference to apprenticeship programs, which reads in the statute as "(referred to individually in this chapter as an 'apprenticeship', except in section 171);"[152] because we do not discuss apprenticeships elsewhere in part 668.

*Student Eligibility—General (§ 668.32)*

*Statute:* Section 484(d) of the HEA establishes the student eligibility requirement for students who are not high school graduates.

*Current Regulations:* Current § 668.32(e)(2) states that a student is eligible to receive title IV, HEA aid if the student has obtained a passing score specified by the Secretary on an independently administered test in accordance with subpart J of the student assistance general provisions. Subpart J delineates the process for approval of the independently administered tests and the specifications of passing scores, among other criteria.

Current § 668.32(e)(3) states that a student is eligible to receive title IV, HEA aid if he or she is enrolled in an eligible institution that participates in a

State "process" that is approved by the Secretary under subpart J of part 34.

Current § 668.32(e)(5) provides that a student is eligible for title IV, HEA aid if the institution determines that the student could benefit from the education offered based on satisfactory completion of 225 clock hours or six semester, trimester, or quarter hours that are applicable toward a degree or certificate offered by the institution.

*Proposed Regulations:* Throughout §§ 668.32(e)(2), (3) and (5), we propose changes that clarify the differences between eligibility for students who enrolled before July 1, 2012, and students who enrolled on or after that date.

We propose to amend § 668.32(e)(2), by allowing for student eligibility for title IV, HEA aid if a student has obtained a passing score specified by the Secretary on an independently administered test in accordance with subpart J of this part, and either under proposed § 668.32(e)(2)(i) was first enrolled in an eligible program before July 1, 2012; or under proposed § 668.32(e)(2)(ii) is enrolled in an eligible career pathway program as defined in section 484(d)(2) on the HEA.

We propose to amend § 668.32(e)(3) by allowing for student eligibility for title IV, HEA aid if a student is enrolled in an eligible institution that participates in a State process approved by the Secretary under subpart J of this part, and either was first enrolled in an eligible program before July 1, 2012; or (ii) is enrolled in an eligible career pathway program as defined in section 484(d)(2) of the HEA.

We propose to amend § 668.32(e)(5), by allowing for student eligibility for title IV, HEA aid if it has been determined by the institution that the student has the ability to benefit from the education or training offered by the institution based on the satisfactory completion of six semester hours, six trimester hours, six quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by the institution, and either: (i) was first enrolled in an eligible program before July 1, 2012; or (ii) is enrolled in an eligible career pathway program as defined in section 484(d)(2) of the HEA.

*Reasons:* These are technical changes. Section 309(c), Division F, title III of the 2011 amendments to the HEA (Pub. L. 112–74), allows students who were enrolled prior to July 1, 2012, to continue to be eligible for title IV, HEA aid under the previous ability to benefit alternatives. The Department discussed the amendment in Dear Colleague Letter

---

[151] Ibid.

[152] This reference to "section 171," may have been intended as a reference to section 171 of the Workforce Innovation and Opportunity Act, Public Law 113–128, which is classified to section 3226 of Title 29, Labor. Neither the National Apprenticeship Act nor the HEA contains a section 171.

App.280

GEN–12–09 (June 28, 2012),[153] where we explained that the new provision in the 2014 amendments did not affect the eligibility of students first enrolled in an eligible program or registered to attend an eligible institution prior to July 1, 2012.

The 2014 amendments to the HEA, enacted on December 16, 2014 (Pub. L. 113–235), amended section 484(d) to allow a student who does not have a high school diploma or its recognized equivalent, or who did not complete a secondary school education in a homeschool setting, to be eligible for title IV, HEA aid through the three ATB alternatives discussed in the Background section of this NPRM, but only if the student is enrolled in an eligible career pathway program. These technical changes to the regulatory text would further clarify how student eligibility applies in each case.

*Approved State Process (§ 668.156)*

*Statute:* Section 484(d)(1)(A)(ii) of the HEA states that a non-high school graduate shall be determined as having the ability to benefit from the education or training in accordance with such process as the State prescribes.

*Current Regulations:* Section 668.156(a) provides that the State process is one of the ATB alternatives. Under this section, if a State wishes the Department to consider its State process, that State must list all of the institutions that will participate in the State process.

Section 668.156(b) requires that if a State wishes the Department to consider its state process, the State submit a success rate for non-high school graduates that is within 95 percent of the success rate of students with high school diplomas. The method for calculating the success rate is described in § 668.156(h) and (i).

Section 668.156(c) requires that the participating institution provide certain services to each student admitted through the State process, which generally include orientation, assessment of the student's existing capabilities, tutoring, counseling, and follow-up by teachers and counselors regarding student performance.

Section 668.156(d) requires that if a State wishes the Department to consider its State process, a State monitor each participating institution on an annual basis, prescribe corrective action for noncompliant institutions, and terminate the participation of an institution that refuses or fails to

comply. Section 668.156(e) requires the Secretary to respond to a State's application within six months or the application is automatically approved. Section 668.156(f) stipulates that the State process can be approved for up to five years.

Section 668.156(g) provides the Secretary with the authority to withdraw the State process if the State violates any part of § 668.156. This provision also provides the State with an appeal process.

*Proposed Regulations:* The Department proposes to restructure the section and add several new provisions to § 668.156.

In § 668.156(a)(1) we propose to update the regulations to include the six-credit hour ATB alternative in section 484(d)(1)(A)(iii). Currently the regulations list only the test alternative and the State process.

Under § 668.156(a)(2) we propose that a State, in its application for the State process:

• List all institutions that would be eligible to participate in the State process.

• Describe the requirements that participating institutions must meet to offer eligible career pathway programs under that process.

• Certify that each proposed eligible career pathway program meets the definition under § 668.2 and documentation requirements under § 668.157 as of the submission date of the application.

• List the criteria used to determine student eligibility in the State process.

• Exclude from participation in the State process any institution that has a withdrawal rate that exceeds 33 percent of the institution's undergraduate regular students. Institutions must count all regular students who were enrolled during the latest completed award year, except those students who withdrew from, dropped out of, or were expelled and received a refund of 100 percent of their tuition and fees.

In § 668.156(a)(3) we propose that the Secretary would verify that a sample of eligible career pathway programs offered by institutions participating in the State process meet the definition of an eligible career pathway program.

We propose to separate the State process application into the initial application process, as described under § 668.156(b), and a subsequent application process, as described under § 668.156(e). All applications, whether initial or subsequent, would comply with requirements under § 668.156(a). In both the initial and subsequent applications, we propose to remove the services required under current

§ 668.156(c), and instead those services would largely appear under the definition of an eligible career pathway program in proposed § 668.157.

In § 668.156(b)(1) we propose that a State's initial application may be approved for two years if the State satisfies requirements under proposed § 668.156(a), discussed above, and proposed §§ 668.156(c) and (d), which are discussed later in this section. Under proposed § 668.156(b)(2), the States would be required to agree not to exceed enrollment under the State process of more than 25 students or one percent of the enrollment, whichever is greater, at each participating institution.

In § 668.156(c)(1) we propose that institutions must adhere to the student eligibility requirements under § 668.32 for access to title IV, HEA aid. We also propose that States must ensure monitoring of the institutions that fall within the State process and take appropriate action in response to that monitoring, including:

• On an annual basis, monitoring each participating institution's compliance with the State process, including the success rate requirement;

• Requiring corrective action if an institution is found to be noncompliant with the State process;

• Providing participating institutions up to three years to come into compliance with the success rate if, in the State's subsequent application for continued participation of the State process, an institution fails to achieve the success rate required under proposed § 668.156(e)(1) and (f); and

• Requiring termination of a participating institution from the State process if there is a refusal or failure to comply.

Proposed § 668.156(d) simply redesignates the current § 668.156(e), with the language otherwise unchanged.

We propose to outline the new subsequent application process under the new § 668.156(e). Each participating institution would be required to calculate a success rate for non-high school graduates that is within 85 percent of the success rate of students with high school diplomas. We would require the State to continue to comply with proposed §§ 668.156(a) and (c)(related to the contents of the application and monitoring requirements). We would require the State to report information about participating students in eligible career pathway programs, including disaggregated by race, gender, age, economic circumstances, and educational attainment, related to their enrollment and success. Current § 668.156(d), which relates to the

[153] *ifap.ed.gov/dear-colleague-letters/06-28-2012-gen-12-09-subjecttitle-iv-eligibility-students-without-valid-high.*

Secretary's approval of the State process application, would continue to apply.

We propose several changes from current regulations under § 668.156:

• The success rate would be 85 percent. Currently it is 95 percent.

• The success rate would be calculated and reported separately for every institution. Currently the success rate combines all institutional data into one calculation.

• The success rate for participating institutions would compare non-high school graduates to high school graduates in the same programs. Currently the regulation compares non-high school graduates to high school graduates in any program.

Current § 668.156(i), which states that the success rate would be based on the last award year for which data are available during the last two completed award years before the application is submitted, would be redesignated as proposed § 668.156(g)(1). The Department proposes to remove the requirement that the data come from the last two completed award years. The Department also proposes to add a new § 668.156(g)(2), to allow that if no students enroll through the State process during the initial approval, we would extend the approval for one additional year.

The Department also proposes under § 668.156(h) to require States to submit reports on their process in accordance with deadlines and procedures established in a notice published in the **Federal Register**. Proposed § 668.156(i), which states that the maximum length of the State process approval is five years, is simply redesignated from current § 668.156(f), which includes the same maximum length.

Finally, proposed § 668.156(j)(1) clarifies that the Secretary would withdraw approval of the State process for violation of the terms of § 668.156 or for the submission of inaccurate information. Proposed § 668.156(j)(1)(i) would provide that this withdrawal of approval occurs if the State fails to terminate an institution from participation in the State process after its failure to meet the success rate. However, proposed § 668.156(j)(1)(ii) would provide that, under exceptional circumstances determined by the Secretary, the State process can be approved once for a 2-year period. If more than 50 percent of participating institutions across all States do not meet the 85 percent success rate requirement, proposed § 668.156(j)(1)(iii) provides that the Secretary may lower the success rate to no less than 75 percent for two years. Current § 668.156(g)(2) would be redesignated as proposed § 668.156(j)(2)

and would state that the Secretary provides the State an opportunity to contest a finding that the State process violated the requirements of the section or that the information submitted was inaccurate. Under proposed § 668.156(j)(3), we propose that if the Secretary's termination of a State process is upheld after the appeal, the State cannot reapply to the Department for approval of a State process for five years.

*Reasons:* The change made to proposed § 668.156(a)(1) is a technical update to include the six-credit hour or recognized equivalent alternative as defined in section 484(d)(1)(A)(iii) of the HEA so that the list of alternatives in regulation is complete.

Proposed § 668.156(a)(2) describes documentation that would be required in both the initial and subsequent applications. The requirement to provide a list of participating institutions in proposed § 668.156(a)(2)(i) aligns with the current regulation. In § 668.156(a)(2)(ii), we propose to require a list of standards that participating institutions must meet to offer an eligible career pathway program under the State process as an alternative to including the list of particular services that must be required of institutions under current § 668.156(c). We believe that the eligible career pathway program definition we propose to add to the regulations includes substantially similar types of services; and cross-referencing to that list would provide more clarity to the field about how the State process connects to the definition of an eligible career pathway program. We also propose under § 668.156(a)(2)(iii) to require institutions to certify that the eligible career pathway program offered by participating institutions under the State process meets the regulatory definition and documentation requirements. This certification would provide greater assurances to the Department that institutions are compliant with the statutory requirements for ability to benefit, provide greater certainty that students utilizing ability to benefit would receive the support services they need to succeed, and would protect taxpayers from investing Federal financial aid dollars in programs that do not meet the intended requirements. For those reasons, we believe that the Secretary need only approve a sample of eligible career pathway programs. To better understand the State process as it relates to students, and to ensure that States have a process sufficiently rigorous to comply with the law, the Department requires that student eligibility criteria

be outlined in all applications, as described under proposed § 668.156(a)(2)(iv). This would also provide deeper insights into the landscape of programming that States and institutions are providing to students who have not earned a high school diploma or equivalent. Proposed § 668.156(a)(2)(v) would require that all institutions listed for the first time on an application not have a withdrawal rate of over 33 percent as a consumer protection. This is similar to the current administrative capability regulations in § 668.16(l), which apply to all institutions seeking initial certification to participate in the Federal aid programs. We believe that students who have not yet earned a high school diploma or equivalent require substantial supports to ensure they are able to succeed. As we noted when we added the withdrawal rate measure as an eligibility requirement, the Secretary believes that these rates are appropriate measures of an institution's past administrative performance, and that withdrawal rates are a function of overall institutional performance and the support services that are provided to students. The Department proposes under § 668.156(e)(1) to move the success rate calculation (the outcome metric) to the subsequent application, since we recognize that before the State process is in place, it is unlikely the State or its institutions would have calculated a rate and may not even have enrolled students through ability to benefit. The Department is aware that this challenge has kept many States from being able to submit a complete State process application and believes this change would provide States with sufficient time to make the success rate calculation.

Proposed § 668.156(b) describes the initial application process. Currently, the regulations require the success rate to be included as a part of States' first application to the Secretary. No currently approved State has provided the success rate as a part of its application. The current success rate formula outlined in current § 668.156(h) does not take into account eligible career pathway programs, therefore, it has been difficult for the Department to provide a consistent application to States. Further, many States would not be able to complete the success rate calculation unless participating institutions have their own funds to enroll non-high school graduates under a State process for at least a year. The current regulation at § 668.156(b)(1) references students it admits ''under that process'', meaning that

participating institutions must be enrolling non-high school graduates into programs prior to their application to the Department, which is very difficult for institutions without funds to support such students. Therefore, the Department proposes to give States more time in their State process to gather the necessary data to calculate the success rate after students become eligible for Title IV, HEA aid.

In proposed § 668.156(b)(2), the Department initially proposed to the Committee a one percent cap on enrollment through the State process at each participating institution. This cap is intended to serve as a guardrail against the rapid expansion of eligible career pathway programs. We believe these protections are particularly important because the required success metric is no longer included at the initial application of a State process. A committee member believed the cap on enrollment in the initial phase would restrict enrollment at smaller institutions and suggested that the cap be established as the greater of a one percent on enrollment or 25 students at each participating institution. The Committee adopted that committee member's suggestion.

Proposed § 668.156(c) generally incorporates current § 668.156(d), in that it would require the State to ensure annual monitoring, corrective action, and termination of institutions that refuse or fail to comply with the State process. Proposed § 668.156(c)(1) simply conveys that States and participating institutions must comply with title IV, HEA student eligibility requirements. We propose to add § 668.156(c)(4), which would allow an institution that does not meet the success rate requirements up to three years to come back into compliance. This would provide some latitude to States to ensure that the failure to meet the success rate requirement is not due just to a single-year variation and would grant institutions some time to demonstrate improved outcomes, while ensuring that institutions that continue to miss the required rate are not permitted to participate in the State process indefinitely. In § 668.156(c)(6), we propose to prohibit an institution that has been terminated from the State process from participating for at least five years after the action because we believe that is a reasonable amount of time for the institution to rectify issues before returning to the State process. This timeline also mirrors the proposed limitation in § 668.156(j)(1)(v) that limits a State for which the Secretary has withdrawn approval of the State process from reapplying for a State

process for at least five years after the withdrawal.

Proposed § 668.156(e) establishes the requirements for the subsequent application. During the negotiations, the Department originally wanted to maintain the 95 percent success rate requirement established in current regulations. However, the Department ultimately accepted a committee member's recommendation of lowering the success rate from 95 percent to 85 percent in proposed § 668.156(e)(1) because the member believed that 95 percent is too difficult to achieve. The Department views this change as necessary to achieve consensus, and notes all of the other guardrails and consumer protections that would be put in place under the proposed changes to § 668.156, which would ensure adequate student protections are in place even with a lower success rate. The new proposed protections include withdrawal rate considerations, caps on initial enrollment, review of a sample of eligible career pathway programs during the application review to ensure that they meet the requirements in the regulations, enhanced reporting by States, and expanded Departmental authority to terminate a State process and bar participation for five years. The Department also notes that, given an absence of existing data to either support or contradict the 95 percent success rate, there is limited information with which to consider this requirement; to that end, we invite commenters to submit additional information about the success rates of ATB students to further inform this rulemaking. Proposed § 668.156(e)(3) would require that States report on the demographic information of participating students and on their outcomes because the Department seeks to implement section 484(d) of the HEA, which requires the Department to take into account the cultural diversity, economic circumstances, and educational preparation of the populations served by the institutions. The Department also believes that ensuring diversity, disaggregating data to assess the outcomes of all students and student subgroups and promoting equitable success for students are critical goals and central to the purpose of the title IV, HEA programs.

The overall structure of the success rate calculation under proposed § 668.156(f) is based in large part on the success rate formula in current § 668.156(h). Due to the implementation of the eligible career pathway programs as a requirement for students that fulfill an ATB alternative, not reflected in the current regulations, we believe that it is

necessary to further clarify the comparison groups for the formula. In particular, proposed § 668.156(f) would clarify that the success rate must be calculated for each participating institution, rather than as an overall number for the State. We also believe this would be better for States because if one institution continually fails to produce the required success rate, that specific institution would be removed from the State process without risking the termination of the entire State process and every participating institution that falls under that process. Proposed § 668.156(f)(1) would compare students in the same programs because we believe it would yield more relevant outcomes data about specific programs. Currently students in the State process are compared to all high school graduates in any program, even if they were not programs that students admitted through the State process engaged in. We do not believe the comparison is targeted enough to yield data that States, participating institutions, or the Department could use in making determinations about the State process.

We propose to provide participating institutions two years of initial approval, so they have sufficient time to collect data needed to calculate and report the success rate. Accordingly, we propose to revise § 668.156(g)(1) to reflect that the data used in calculating the success rate must be from the prior award year, rather than from either of the two prior award years. We also recognize that some States may not see significant enrollment, and in fact, may have years in which no ATB student enrolls in an eligible career pathway program. Accordingly, in proposed § 668.156(g)(2), we would provide those States with a one-year extension to the initial approval to allow for more time to enroll students to calculate a success rate.

To have sufficient access to relevant and timely data about the State process, and to provide for adequate oversight of States' efforts and the outcomes at their participating institutions, proposed § 668.156(h) would require States to submit reports in accordance with processes laid out in a **Federal Register** notice. This would also aid us in monitoring areas where policy changes may be needed to better support States, institutions, and States.

Finally, proposed § 668.156(j) would grant the Secretary the authority to rescind a State process approval and would grant the State an appeal process. There was already similar language in current § 668.156(g) but we believe that the proposed language provides a

clearer framework. Furthermore, similar enforcement and due process requirements are included throughout other parts of the Department's regulations. Among the changes from current regulations, the Department proposes in § 668.156(j)(1)(iii) to clarify that the Secretary may lower the success rate to not less than 75 percent in the event that more than 50 percent of participating institutions across all States fail the 85 percent success rate requirement. Given that there is little information available about the current success rates of ATB students, we believe that this ability to lower the requirement if most institutions are unable to meet the requirement would provide some ability for the Department to act in the event a change in the standard is needed. This may also account for years in which external circumstances, like those seen during the pandemic, may necessitate a system-wide accommodation. The Department believes that, by setting a floor of not less than 75 percent, proposed § 668.156(j) would still protect ATB students from poor-performing institutions and ensure they have access to quality opportunities.

Directed Questions

The Committee reached consensus on the Department's proposed regulations on ATB. The Department has published the proposed ATB amendatory language without substantive alteration to the agreed-upon proposed regulations. We would like additional feedback on the regulations to further inform the rulemaking process.

We propose a success rate calculation under proposed § 668.156(f) and would like to receive public comments specific to this success rate calculation) to further inform this rulemaking. We specifically request comments on the proposed 85 percent threshold, the comparison groups in the calculation, the components of the calculation, and whether the success rate itself is an appropriate outcome indicator for the State process as well as any other information, thoughts, or opinions on the success rate calculation. For more information on § 668.156(f), please see the information discussed previously in this section and also the current regulations in § 668.156(h). You can also review the proposed regulatory language.

*Eligible Career Pathway Program (§ 668.157)*

*Statute:* Section 484(d)(2) of the HEA defines an eligible career pathway program.

*Current Regulations:* None.

*Proposed Regulations:* The Department proposes to create new § 668.157 in subpart J. This section would dictate the documentation requirements for eligible career pathway programs for submission to the Department for approval as a title IV, HEA eligible program. In proposed § 668.157(a)(1) an institution would demonstrate to the Secretary that a student is enrolled in an eligible career pathway program by documenting that the student has enrolled in or is receiving all three of the following elements simultaneously—

• An eligible postsecondary program as defined in § 668.8;

• Adult education and literacy activities under the Workforce Innovation and Opportunity Act as described in § 463.30 that assist adults in attaining a secondary school diploma or its recognized equivalent and in the transition to postsecondary education and training; and

• Workforce preparation activities as described in § 463.34.

In proposed § 668.157(a)(2) an institution would demonstrate to the Department that a student is enrolled in an eligible career pathway program by documenting that the program aligns with the skill needs of industries in the State or regional labor market in which the institution is located, based on research the institution has conducted, including—

• Government reports identifying in-demand occupations in the State or regional labor market;

• Surveys, interviews, meetings, or other information obtained by the institution regarding the hiring needs of employers in the State or regional labor market; and

• Documentation that demonstrates direct engagement with industry;

In proposed § 668.157(a)(3) through (a)(6), an institution would demonstrate to the Department that a student is enrolled in an eligible career pathway program by documenting the following:

• The skill needs described in proposed § 668.157(a)(2) align with the specific coursework and postsecondary credential provided by the postsecondary program or other required training;

• The program provides academic and career counseling services that assist students in pursuing their credential and obtaining jobs aligned with the skill needs described in proposed § 668.157(a)(2), and identifies the individuals providing the career counseling services;

• The appropriate education is offered, concurrently with and in the same context as workforce preparation

activities and training for a specific occupation or occupational cluster through an agreement, memorandum of understanding, or some other evidence of alignment of postsecondary and adult education providers that ensures the secondary education is aligned with the students' career objectives; and

• The program is designed to lead to a valid high school diploma as defined in § 668.16(p) or its recognized equivalent.

Under § 668.157(b) we propose that, for career pathway programs that do not enroll students through a State process as defined in § 668.156, the Secretary would verify the eligibility of eligible career pathway programs for title IV, HEA program purposes pursuant to proposed § 668.157(a). Under proposed § 668.157(b), we would also provide an institution with the opportunity to appeal any adverse eligibility decision.

*Reasons:* Currently, we do not approve individual career pathway programs and have provided minimal guidance on documentation requirements. The Department is aware of compliance and program integrity concerns with programs that claim to offer an eligible career pathway program but do not offer all the required components. While the Department believes that many institutions have made a good-faith effort to comply with the statutory definition, we believe it is necessary to establish baseline requirements in regulation to curtail bad actors' efforts to provide subpar programming. These baseline requirements would also support good actors by providing further regulatory clarity to support their efforts, weeding out subpar eligible career pathway programs, and steering students towards eligible career pathway programs with better outcomes.

This new section provides a reasonable baseline for documentation requirements and allows the Department to better enforce the eligible career pathway program statutory requirement through approval of all eligible career pathway programs that enroll students through the six-credit and ATB test options. We received a suggestion from a committee member to better align eligible career pathway programs with integrated education and training programs. Proposed § 668.157(a)(1) would do this by referring to adult education and literacy programs, activities, and workforce preparation activities described under the Workforce Innovation and Opportunity Act (WIOA) implementing regulations (§ 463.30 and § 463.34).

In proposed § 668.157(a)(2), we clarify that the eligible career pathway program

would have to align with the skill and hiring needs of the industry. By proposing that there be direct interaction by the institution with a government source and that the collaboration is supported by other means that demonstrate engagement with industry, we believe that institutions would produce stronger analyses and demonstrate clearer connections with the workforce needs of their communities. Proposed § 668.157(a)(3) supports the language in proposed § 668.157(a)(2) by mandating that the coursework and postsecondary credential would also have to align to these industry needs. We believe this would provide for further connections between students' academic and career needs, and ultimately would help to ensure that students are able to obtain a career in their intended field.

The documentation required under proposed § 668.157(a)(4) is similar to section 484(d)(2)(C) of the HEA, which requires academic and career counseling. Proposed § 668.157(a)(5), which also largely mirrors section 484(d)(2)(D) of the HEA, proposes further requirements regarding evidence of coordination to ensure better alignment of adult education with post-secondary education. The language in proposed § 668.157(a)(5) would not require an institution to develop a new adult education curriculum to offer an eligible career pathway program, as it would allow for workforce preparation activities and training to be offered through an agreement, memorandum of understanding, or some other evidence of alignment. The documentation proposed under § 668.157(a)(6) reflects the statutory requirement in section 484 of the HEA that requires the program to lead to a valid high school diploma for ATB students.

Under proposed § 668.157(b), we would review and approve every eligible career pathway program that enrolls students through means other than exclusively the State process. This is to ensure that the programs comply with the regulatory definition and documentation requirements. By requiring this verification, the Department would be able to address existing issues by which some programs may have failed to meet statutory requirements and have still received aid for ATB.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and,

therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order.

This proposed regulatory action will have an annual effect on the economy of more than $100 million because the proposed Financial Value Transparency and GE provisions of the regulations alone could impact transfers between postsecondary institutions, the Federal Government, and borrowers in excess of this amount. Annualized transfers between borrowers and the Federal Government are estimated to be $1.1 billion at a 7 percent discount rate and $1.2 billion at a 3 percent discount rate in reduced Pell Grants and loan volume. This analysis also estimates additional annualized transfers of $836 million (at a 3 percent discount rate; $823 million at 7 percent discount rate) among institutions as students shift programs and estimated annualized paperwork and compliance burden of $115.1 million (at a 3 percent discount rate; $118 million at a 7 percent discount rate) are also detailed in this analysis Therefore, this proposed action is economically significant and subject to review by OMB under section 3(f)(1) of Executive Order 12866. We therefore have assessed the potential costs and benefits, both quantitative and qualitative, of this proposed regulatory action and have determined that the benefits would justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these proposed regulations only on a reasoned determination that their benefits would justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these proposed regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action would not unduly interfere with State, local, and Tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, summarize the key provisions, present a detailed analysis of the Financial Value Transparency and GE provisions of the proposed regulation, discuss the potential costs and benefits, estimate the net budget impacts and paperwork burden as required by the Paperwork Reduction Act, discuss distributional consequences, and discuss regulatory alternatives we considered. The

App.285

Financial Value Transparency and GE provisions are the most economically substantial components of the package, so we include a much more detailed quantitative analysis of these components than the others and focus on the budget impact of these provisions. For the purposes of the analysis contained in this RIA, we combine the Financial Value Transparency and GE parts of the regulation. However, we do present many results separately for eligible non-GE programs (only subject to programmatic reporting and acknowledgment requirements) and GE programs (additionally subject to ineligibility and warnings about eligibility). Economic analysis for the proposed Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit rules are presented separately.

The proposed Financial Value Transparency and GE regulations aim to generate benefits to students, postsecondary institutions, and the Federal government primarily by shifting students from low financial value to higher financial value programs or, in some cases, from low-financial-value postsecondary programs to non-enrollment.[154] This shift would be due to improved and standardized market information about all postsecondary programs, allowing for better decision making by students, prospective students, and their families; the public, taxpayers, and the government; and institutions. Furthermore, the proposed GE regulations aim to improve program quality by directly eliminating the ability of low-financial-value programs to participate in the title IV, HEA programs. Our analysis concludes that this enrollment shift and improvement in program quality would result in higher earnings for students, which would generate additional tax revenue for the Federal, State, and local governments. Students would also likely benefit from lower accumulated debt and lower risk of default. The primary costs of the proposed regulations would be the additional reporting required by institutions, the time necessary for students to acknowledge having seen program information and warnings, and additional spending at institutions that accommodate students that would otherwise attend failing programs. We anticipate that the proposed regulations would also generate substantial

transfers, primarily in the form of title IV, HEA aid shifting between students, postsecondary institutions, and the Federal government. Based on our analysis, we conclude that the benefits outweigh the costs.

The proposed regulatory actions related to Financial Responsibility, Administrative Capability, and Certification Procedures would provide benefits to the Department by strengthening our ability to conduct more proactive and real-time oversight of institutions of higher education. Specifically, under the Financial Responsibility regulations, the Department would be able to more easily obtain financial protection that can be used to offset the cost of discharges when an institution closes or engages in behavior that results in approved defense to repayment claims. The proposed changes to the Certification Procedures would allow the Department more flexibility to increase its scrutiny of institutions that exhibit concerning signs, including by placing them on provisional status or adding conditions to their program participation agreement. For Administrative Capability, we propose to expand the requirements to address additional areas of concern that could indicate severe or systemic administrative issues in properly managing the title IV, HEA programs, such as failing to provide adequate financial aid counseling including clear and accurate communications or adequate career services. Enhanced oversight ability would better protect taxpayers and help students by dissuading institutions from engaging in overly risky behavior or encouraging institutions to make improvements. These benefits would come at the expense of some added costs for institutions to acquire additional financial protection or potentially shift their behavior. The Department believes these benefits of improved accountability would outweigh those costs. There could also be limited circumstances in which an institution that was determined to lack financial responsibility and required to provide financial protection could choose to cease participating in the Federal aid programs instead of providing the required financial protection. The Department believes this would be most likely to occur in a situation in which the institution was already facing severe financial instability and on the verge of abrupt closure. In such a situation, there could be transfers from the Department to borrowers that occur in the form of a closed school loan discharge, though

it is possible that the amount of such transfers is smaller than what it would otherwise be as the institution would not be operating for as long a period of time as it would have without the request for additional financial protection. However, the added triggers are intended to catch instances of potential financial instability far enough in advance to avoid an abrupt closure.

Finally, the ability-to-benefit regulations would provide much-needed clarity on the process for reviewing and approving State applications to offer a pathway into title IV, HEA aid for individuals who do not have a high school diploma or its recognized equivalent. Although States would incur costs in pursuing the application proposed, for this population of students, the proposed regulations would provide students with more opportunities for success by facilitating States' creation and expansion of options.

### 1. Need for Regulatory Action

Summary

The title IV, HEA student financial assistance programs are a significant annual expenditure by the Federal government. When used well, Federal student aid for postsecondary education can help boost economic mobility. But the Department is concerned that there are too many instances in which the financial returns of programs leave students with debt they cannot afford or with earnings that leave students no better off than similarly aged students who never pursued a postsecondary education.

The Department is also concerned about continued instances where institutions shut down without sufficient protections in place and with no prior notice for students, including instances where they do so without identifying alternative options for students to continue their education. For instance, one study found that 70 percent of students—more than 100,000 students—affected by a closure between July 2004 and June 2020 were subjected to a sudden closure where there was minimal notice and no teach out agreement in place.[155] Many of the students affected by such closures may obtain a closed school discharge, but even that financial assistance cannot make up for lost time invested in a program or out of the labor force or any out-of-pocket payments made. Significant shares of such students also no longer continue any sort of postsecondary program. This same

---

[154] We use the phrase "low-financial-value" at various points in the RIA to refer to low-earning or high-debt-burden programs that fail debt-to-earnings and earnings premium metrics.

[155] https://nscresearchcenter.org/wp-content/uploads/SHEEO-NSCRCCollegeClosuresReport.pdf.

study found that less than half of students reenrolled after they experienced a closure and students who went through an abrupt closure had significantly worse reenrollment and completion outcomes. Taxpayers are also often left to bear the costs of student loan discharges because existing regulations lack sufficient mechanisms for the Department to seek financial protection from an institution before it suddenly closes. Having tools for obtaining stronger upfront protection is particularly important because many of the institutions that close suddenly exhibited a series of warning indicators in the weeks, months, and years leading up to their shuttering. Thus, while the Department would not have been able to anticipate the exact date an institution would cease operating, greater regulatory flexibility would have allowed the Department to act faster to obtain taxpayer protection, more closely monitor or place conditions on the institution, and gain additional protection for students such as a teach-out plan or agreement that would allow them to transfer and continue their education. Going forward this flexibility could have a deterrent effect to dissuade institutions from engaging in some of the risky and questionable behavior that ultimately led to their closure.

We have also found during program reviews that there are institutions receiving title IV, HEA aid that lack the administrative capability necessary to successfully serve students. Some of these indicators of a lack of administrative capability can involve direct negative effects on students, such as having insufficient resources to deliver on promises made about career services and externships, or controls that are insufficient to ensure students' high school diplomas (or equivalent credentials) are legitimate—a key criterion for title IV, HEA student eligibility that may otherwise result in students taking on aid when they are not set up to succeed academically. In other situations, institutions may employ individuals who in the past exerted control at another institution that was found to have significant problems with the administration of the title IV, HEA student aid programs, which raises the concern that the institution may engage in the same conduct as the institution where the individual was previously involved, including mismanagement, misrepresentations, or other risky behaviors.

The Department is also concerned that, in the past, institutions have shown significant signs of problems yet remained fully certified to participate in

the Federal student aid programs. Existing regulations do not fully account for the range of scenarios that might indicate risk to institutions or students. For instance, current regulations do not allow the Department to address how conditions placed on an institution's financing might affect their ability to have the funds necessary to keep operating or how outside investors might affect the health of an institution if those outside investors start to face their own financial struggles. The current regulations also limit the Department's ability to take swift action to limit the effects of an institution's closure on taxpayers and students. In the past, a lack of financial protection in place prior to an institutional closure has resulted in large amounts of closed school loan discharges that are not otherwise reimbursed by the institution. Moreover, borrowers whose institutions close while they are enrolled have high rates of student loan default. In addition to expanding the Department's capacity to act in such situations, the proposed changes to the regulation would help students by dissuading the riskier behavior by an institution that could result in a closure and by ensuring that more closures do not occur in an abrupt fashion with no plans for where students can continue their programs.

The proposed regulations would provide stronger protections for current and prospective students of programs where typical students have high debt burdens or low earnings. Under a program-level transparency and accountability framework, the Department would assess a program's debt and earnings outcomes based on debt-to-earnings (D/E) and earnings premium (EP) metrics. The regulations would require institutions to provide current and prospective students with a link to a Department website disclosing the debt and earnings outcomes of all programs, and students enrolling in non-GE programs that have failed debt-to-earnings metrics must acknowledge they have viewed the information prior to disbursing title IV, HEA funds. GE programs that consistently fail to meet the performance metrics would become ineligible for title IV, HEA funds. The proposed regulations would also expand the Department's authority to require financial protection when an institution starts to exhibit problems instead of waiting until it is too late to protect students and taxpayers. This proactive accountability would be buttressed by proposed changes to the way the Department certifies institutional participation in the title IV, HEA programs to ensure that it can monitor

institutions more easily and effectively if they start to show signs of problems. The proposed approach would help the Department better target its oversight to institutions that exhibit a greater risk to students and taxpayers instead of simply allowing them to receive substantial sums of Federal resources with minimal scrutiny every year. By identifying additional indicators that an institution is not administratively capable of participating in the aid programs, the proposed regulations would enable the Department to step in and exert greater oversight and accountability over an institution before it is too late.

The proposed regulations would, therefore, strengthen accountability for postsecondary institutions and programs in several critical ways. All institutions would be required to provide students a link to access information about debt and earnings outcomes. Non-GE programs not meeting the D/E standards would need to have students acknowledge viewing this information before receiving aid, and career training programs failing either the D/E or EP metrics would need to warn students about the possibility that they would lose eligibility for federal aid. Some institutions would have to improve their offerings or lose access to Federal aid. Concerning behavior would be more likely to result in required financial protection or other forms of oversight. As a result, students and taxpayers would have greater assurances that their money is spent at institutions that deliver value and merit Federal support.

The Financial Value Transparency and GE provisions in subparts Q and S of the proposed regulations are intended to address the problem that many programs are not delivering sufficient financial value to students and taxpayers, and students and families often lack the information on the financial consequences of attending different programs needed to make informed decisions about where to attend. These issues are especially prevalent among programs that, as a condition of eligibility for title IV, HEA program funds, are required by statute to provide training that prepares students for gainful employment in a recognized occupation. Currently, many of these programs leave the typical graduate with unaffordable levels of loan debt in relation to their income, earnings that are no greater than what they would reasonably expect to receive if they had not attended the program, or both.

Through this regulatory action, the Department proposes to establish: (1) A

Financial Value Transparency framework that would increase the quality, availability, and salience of information about the outcomes of students enrolled in all title IV, HEA programs and (2) an accountability framework for GE programs that would define what it means to prepare students for gainful employment in a recognized occupation by establishing standards by which the Department would evaluate whether a GE program remains eligible for title IV, HEA program funds. As noted in the preamble to this NPRM, there are different statutory grounds for the proposed transparency and accountability frameworks.

The transparency framework (subpart Q and § 668.43) would establish reporting and disclosure requirements that would increase the transparency of student outcomes for all programs. This would ensure that the most accurate and comparable information possible is disseminated to students, prospective students, and their families to help them make better informed decisions about where to invest their time and money in pursuit of a postsecondary degree or credential. Institutions would be required to provide information about program characteristics, outcomes, and costs and the Department would assess a program's debt and earnings outcomes based on debt-to-earnings and earnings premium metrics, using information reported by institutions and information

otherwise obtained by the Department. The proposed rule would seek to ensure information's salience to students by requiring that institutions provide current and prospective students with a link to view cost, debt, and earnings outcomes of their chosen program on the Department's website. For non-GE programs failing the debt-to-earnings metrics, the Department would require an acknowledgement that the enrolled or prospective student has viewed the information, prior to disbursing title IV, HEA funds. Further, the website would provide the public, taxpayers, and the Government with relevant information to help understand the outcomes of the Federal investment in these programs. Finally, the transparency framework would provide institutions with meaningful information that they can use to improve the outcomes for students and guide their decisions about program offerings.

The accountability framework (subpart S) would define what it means to prepare students for gainful employment by establishing standards that assess whether typical students leave programs with reasonable debt burdens and earn more than the typical worker who completed no more education than a high school diploma or equivalent. Programs that repeatedly fail to meet these criteria would lose eligibility to participate in title IV, HEA student aid programs.

Overview of Postsecondary Programs Supported by Title IV, HEA

Under subpart Q, we propose, among other things, to assess debt and earnings outcomes for students in all programs participating in Title IV, HEA programs, including both GE programs and eligible non-GE programs. Under subpart S, we propose, among other things, to establish title IV, HEA eligibility requirements for GE programs. In assessing the need for these regulatory actions, the Department analyzed program performance. The Department's analysis of program performance is based on data assembled for all title IV, HEA postsecondary programs operating as of March 2022 that also had completions reported in the 2015–16 and 2016–17 award years. This data, referred to as the "2022 Program Performance Data (2022 PPD)," is described in detail in the "Data Used in this RIA" section below, though we draw on it in this section to describe outcome differences across programs.

Table 1.1 reports the number of programs and average title IV, HEA enrollment for all institutions in our data for AY 2016 and 2017. Throughout this RIA, we provide analysis separately for programs that would be affected only by subpart Q (eligible non-GE programs) and those that would additionally be affected by subpart S (GE programs).

TABLE 1.1   COMBINED NUMBER OF TITLE IV ELIGIBLE PROGRAMS AND TITLE IV ENROLLMENT BY CONTROL AND CREDENTIAL LEVEL COMBINING GE AND NON-GE

|  | Number of | |
|---|---|---|
|  | Programs | Enrollees |
| Public: | | |
| UG Certificates | 18,971 | 869,600 |
| Associate s | 27,312 | 5,496,800 |
| Bachelor s | 24,338 | 5,800,700 |
| Post-BA Certs | 872 | 12,600 |
| Master s | 14,582 | 760,500 |
| Doctoral | 5,724 | 145,200 |
| Professional | 568 | 127,500 |
| Grad Certs | 1,939 | 41,900 |
| Total | 94,306 | 13,254,700 |
| Private, Nonprofit: | | |
| UG Certificates | 1,387 | 77,900 |
| Associate s | 2,321 | 266,900 |
| Bachelor s | 29,752 | 2,651,300 |
| Post-BA Certs | 629 | 7,900 |
| Master s | 10,362 | 796,100 |
| Doctoral | 2,854 | 142,900 |
| Professional | 493 | 130,400 |
| Grad Certs | 1,397 | 35,700 |
| Total | 49,195 | 4,109,300 |
| Proprietary: | | |
| UG Certificates | 3,218 | 549,900 |
| Associate s | 1,720 | 326,800 |
| Bachelor s | 963 | 675,800 |

32396    Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules

TABLE 1.1    COMBINED NUMBER OF TITLE IV ELIGIBLE PROGRAMS AND TITLE IV ENROLLMENT BY CONTROL AND CREDENTIAL LEVEL COMBINING GE AND NON-GE    Continued

|  | Number of | |
|---|---|---|
|  | Programs | Enrollees |
| Post-BA Certs | 52 | 800 |
| Master s | 478 | 240,000 |
| Doctoral | 122 | 54,000 |
| Professional | 32 | 12,100 |
| Grad Certs | 128 | 10,800 |
| Total | 6,713 | 1,870,100 |
| Foreign Private: | | |
| UG Certificates | 28 | 100 |
| Associate s | 18 | 100 |
| Bachelor s | 1,228 | 5,500 |
| Post-BA Certs | 27 | <50 |
| Master s | 3,075 | 9,000 |
| Doctoral | 793 | 2,800 |
| Professional | 104 | 1,500 |
| Grad Certs | 77 | 1,500 |
| Total | 5,350 | 20,400 |
| Foreign For-Profit: | | |
| UG Certificates | 1 | <50 |
| Master s | 6 | 200 |
| Doctoral | 4 | 1,900 |
| Professional | 7 | 11,600 |
| Total | 18 | 13,700 |
| Total: | | |
| UG Certificates | 23,605 | 1,497,500 |
| Associate s | 31,371 | 6,090,700 |
| Bachelor s | 56,281 | 9,133,200 |
| Post-BA Certs | 1,580 | 21,400 |
| Master s | 28,503 | 1,805,800 |
| Doctoral | 9,497 | 346,800 |
| Professional | 1,204 | 283,100 |
| Grad Certs | 3,541 | 89,900 |
| Total | 155,582 | 19,268,200 |

**Note:** Counts are rounded to the nearest 100.

There are 123,524 degree programs at public or private non-profit institutions (hereafter, "eligible non-GE programs" or just "non-GE programs") in the 2022 PPD that would be subject to the proposed transparency regulations in subpart Q but not the GE regulations in subpart S. These programs served approximately 16.3 million students annually who received title IV, HEA aid, totaling $25 billion in grants and $61 billion in loans. Table 1.2 displays the number of non-GE programs by two-digit CIP code, credential level, and institutional control in the 2022 PPD. Two-digit CIP codes aggregate programs by broad subject area. Table 1.3 displays enrollment of students receiving title IV, HEA program funds in non-GE programs in the same categories.

**BILLING CODE 4000 01 P**

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules    **32397**

Table 1.2 – Number of non-GE Programs by CIP2, Credential Level, and Control

Table 1.2 – Title IV Enrollment of non-GE Programs by CIP2, Credential Level, and Control

**Note:** Counts rounded to the nearest 100.

GE programs are non-degree programs, including diploma and certificate programs, at public and private non-profit institutions and nearly all educational programs at for-profit institutions of higher education regardless of program length or credential level.[156] Common GE programs provide training for occupations in fields such as cosmetology, business administration, medical assisting, dental assisting,

nursing, and massage therapy. There were 32,058 GE programs in the 2022 PPD.[157] About two-thirds of these programs are at public institutions, 11 percent at private non-profit institutions, and 21 percent at for-profit institutions. These programs annually served approximately 2.9 million students who received title IV, HEA aid in AY 2016 or 2017. The Federal investment in students attending GE programs is significant. In AY 2022,

these students received approximately $5 billion in Federal Pell grant funding and approximately $11 billion in Federal student loans. Table 1.4 displays the number of GE programs grouped by two-digit CIP code, credential level, and institutional control in the 2022 PPD. Table 1.5 displays enrollment of students receiving title IV, HEA program funds in GE programs in the same categories.

Table 1.4 – Number of GE Programs by CIP2, Credential Level, and Control

| | Public | | | Private, Nonprofit | | | Proprietary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UG Certs | Post-BA Cert | Grad Cert | UG Certs | Post-BA Cert | Grad Cert | UG Certs | Assoc. | Bach. | Post-BA Cert | Master's | Engr. | Prof. | Grad Cert | Total |
| 1: Agriculture & Related Sciences | 378 | 4 | 3 | 7 | | 2 | 11 | 4 | 1 | | | | | | 405 |
| 3: Natural Resources & Conservation | 91 | 10 | 21 | 9 | | 2 | 11 | | 4 | | | | | 1 | 143 |
| 4: Architecture & Related Services | 29 | 10 | 10 | 8 | 1 | 3 | 1 | | 4 | | | | | 1 | 76 |
| 9: Area, Ethnic, Cultural, Gender, & Group Studies | | | | | | | | | | | | | | | |
| 9: Communication | 61 | 14 | 62 | 14 | 4 | 12 | 1 | | | | | | | | 148 |
| 10: Communications Tech | 171 | 12 | 28 | 21 | 5 | 14 | 14 | 28 | | 8 | | | | 1 | 332 |
| 11: Computers & Information Sciences & Support Services | 272 | 2 | 3 | 3 | 3 | 3 | 24 | 23 | 24 | 1 | 8 | | | | 360 |
| 12: Personal & Culinary Services | 1,478 | 20 | 44 | 51 | 31 | 38 | 140 | 168 | 113 | 1 | 41 | 4 | | 8 | 2,141 |
| 13: Education | 788 | 2 | 2 | 34 | 1 | | 800 | 79 | 11 | 4 | 6 | 8 | 4 | 7 | 1,041 |
| 14: Engineering | 461 | 222 | 494 | 62 | 136 | 406 | 30 | 30 | 63 | 6 | 61 | 25 | 1 | 29 | 1,991 |
| 15: Engineering Tech | 92 | 81 | 62 | 10 | 6 | 23 | 6 | 5 | 1 | | 4 | | | | 284 |
| 16: Foreign Languages | 1,453 | 5 | 21 | 34 | 4 | 4 | 34 | 71 | 21 | 1 | 4 | | | 1 | 1,708 |
| 19: Family & Consumer Sciences/Human Sciences | 208 | 15 | 9 | 37 | 5 | 2 | | | | | | | | | 276 |
| 22: Legal Professions & Studies | 930 | 7 | 25 | 18 | 9 | 7 | 10 | 9 | 11 | 1 | 2 | 1 | | 2 | 823 |
| 23: English Language | 208 | 18 | 15 | 38 | 15 | 16 | 68 | 66 | 24 | 4 | 5 | 1 | | | 560 |
| 24: Liberal Arts | 78 | 18 | 29 | 15 | 8 | 4 | 11 | 5 | 11 | | 3 | | | | 188 |
| 25: Library Science | 329 | 18 | 22 | 20 | 10 | 19 | 1 | 13 | 12 | | 2 | 1 | | | 451 |
| 26: Biological & Biomedical Sciences | 23 | 7 | 16 | | 1 | 5 | | 1 | | | | | | | 52 |
| 27: Mathematics & Statistics | 63 | 12 | 61 | 22 | 14 | 20 | 3 | 1 | 3 | | 1 | 2 | | 1 | 228 |
| 29: Military Science | 15 | 12 | 26 | 10 | 2 | 6 | | 1 | 1 | 1 | | | | 1 | 79 |
| 30: Military Tech | 4 | | 1 | 1 | | 1 | | 2 | 1 | | 5 | | | | 16 |
| 30: Multi/Interdisciplinary Studies | 156 | 91 | 105 | 26 | 22 | 24 | 5 | 4 | 14 | 3 | 4 | | | | 433 |
| 31: Parks & Rec | 149 | 7 | 18 | 14 | 2 | 8 | 28 | 28 | 9 | | 2 | 1 | | 1 | 288 |
| 32: Basic Skills & Developmental/Remedial Education | 26 | | | 4 | | 1 | 7 | | | | 1 | | | | 39 |
| 33: Citizenship Activities | 1 | | | | | | | | | | | | | | 1 |
| 34: Health-Related Knowledge & Skills | 4 | | 3 | 1 | | 3 | 5 | | | | | | | | 15 |
| 35: Interpersonal & Social Skills | | | | | | 1 | | | | | | | | | 1 |
| 36: Leisure & Recreational Activities | 8 | | | 3 | | | 1 | | | | | | | | 9 |
| 37: Personal Awareness & Self-Improvement | 2 | 1 | 1 | | | | | | | | | | | | 4 |
| 38: Philosophy & Religious Studies | 18 | 1 | 7 | 20 | 4 | 7 | | | | | | | | | 61 |
| 39: Theology & Religious Vocations | 1 | | | 60 | 43 | 50 | 1 | 1 | 2 | | 7 | 1 | 1 | | 175 |
| 40: Physical Sciences | 41 | 7 | 16 | 18 | | 9 | 1 | 1 | 3 | | 8 | | | | 69 |
| 41: Science Technologies/Technicians | 75 | 2 | 3 | 1 | 1 | | 1 | 1 | | | | | | | 84 |
| 42: Psychology | 32 | 23 | 74 | 13 | 20 | 38 | 1 | 2 | 14 | 2 | 15 | 15 | | 7 | 282 |
| 43: Homeland Security | 747 | 15 | 32 | 62 | 9 | 30 | 81 | 74 | 89 | 1 | 25 | 8 | | | 1,071 |
| 44: Public Admin & Social Services | 161 | 20 | 58 | 17 | 8 | 28 | 3 | 5 | 14 | 1 | 18 | 7 | | 4 | 382 |
| 45: Social Sciences | 164 | 20 | 79 | 44 | 11 | 28 | 1 | 1 | 15 | | 8 | 3 | | | 379 |
| 46: Construction Trades | 940 | | | 20 | | | 62 | 14 | | | | | | | 948 |
| 47: Mechanic & Repair Technologies/Technicians | 1,489 | 1 | 1 | 42 | | | 188 | 49 | 1 | | | | | | 1,787 |
| 48: Precision Production | 791 | | | 19 | | | 91 | 13 | | | | | | | 922 |
| 49: Transportation & Materials Moving | 137 | 2 | 2 | 11 | | | 32 | 9 | | | 1 | | | | 240 |
| 50: Visual & Performing Arts | 560 | 16 | 63 | 75 | 20 | 36 | 65 | 88 | 1 | 26 | | 1 | | | 1,021 |
| 51: Health Professions & Related Programs | 4,025 | 124 | 537 | 596 | 132 | 274 | 1,263 | 637 | 174 | 8 | 101 | 35 | 11 | 24 | 7,535 |
| 52: Business | 2,733 | 100 | 109 | 145 | 83 | 308 | 198 | 303 | 232 | 18 | 117 | 25 | 4 | 27 | 4,378 |
| 54: History | 18 | 9 | 7 | 9 | | | 1 | 1 | | | | | | | 52 |
| 60: Residency Programs | 1 | | | 3 | 1 | | 2 | | 1 | | | | | | 13 |

Note: Foreign institutions omitted because all cells are suppressed as empty.

---

[156] "For-profit" and "proprietary" are used interchangeably throughout the text. Foreign schools are schools located outside of the United States at which eligible U.S. students can use federal student aid.

[157] Note that the 2022 PPD will differ from the universe of programs that are subject to the proposed GE regulations for the reasons described in more detail in the "Data Used in this RIA" section, including that the 2022 PPD includes

programs defined by four-digit CIP code while the rule would define programs by six-digit CIP code.

Table 1.5 – Title IV Enrollment of GE Programs by CIP2, Credential Level, and Control

| | Public | | | Private, Nonprofit | | | Proprietary | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UG Certs | Post-BA Cert | Grad Cert | UG Certs | Post-BA Cert | Grad Cert | UG Certs | Assoc. | Bach. | Post-BA Cert | Master's | Doc. | Prof. | Grad Cert | |
| 1: Agriculture & Related | 5,400 | <50 | <50 | 200 | | | 200 | <50 | <50 | <50 | | | | | 6,200 |
| 3: Natural Resources & Conservation | 1,200 | <50 | 200 | 100 | <50 | <50 | 100 | | 4,400 | <50 | <50 | | | | 6,400 |
| 4: Architecture & Related | 600 | <50 | <50 | <50 | <50 | <50 | <50 | | 600 | | 200 | | 300 | | 1,700 |
| 5: Area, Ethnic, Cultural, Gender, & Group Studies | 300 | 100 | 300 | 300 | 100 | 100 | <50 | | | | | | | | 1,300 |
| 9: Communication | 3,700 | 100 | 400 | 300 | <50 | <50 | 3,300 | 400 | 6,700 | | 900 | | | <50 | 15,800 |
| 10: Communications Tech | 4,700 | <50 | <50 | <50 | <50 | <50 | 3,300 | 700 | 7,300 | <50 | 900 | | | | 18,100 |
| 11: Computer & Info Sciences | 14,500 | 200 | 1,200 | 1,200 | 300 | 300 | 5,900 | 20,500 | 52,500 | <50 | 6,400 | 300 | | 300 | 127,100 |
| 12: Personal & Culinary Services | 81,000 | <50 | 900 | 9,200 | <50 | | 176,900 | 7,600 | 1,100 | <50 | 200 | | <50 | | 226,100 |
| 13: Education | 16,100 | 4,500 | 16,000 | 1,700 | 2,400 | 14,100 | 700 | | 33,500 | 100 | 27,000 | 15,800 | 1,100 | 2,100 | 113,200 |
| 14: Engineering | 5,800 | 200 | 500 | 100 | 200 | 300 | 200 | | 300 | 1,500 | | 100 | | | 11,300 |
| 15: Engineering Tech | 22,900 | <50 | 300 | 1,100 | <50 | <50 | 14,500 | 6,300 | 2,000 | <50 | 1,400 | | | <50 | 54,100 |
| 16: Foreign Languages | 4,800 | <50 | <50 | 300 | <50 | <50 | | | | | | | | 100 | 5,600 |
| 19: Family & Consumer Sciences/Human Sciences | 21,100 | <50 | 200 | 300 | 500 | 100 | 600 | 2,100 | 4,500 | <50 | 1,000 | 100 | | 100 | 31,600 |
| 22: Legal Professions | 7,100 | 900 | 400 | 900 | 400 | 900 | 1,200 | 6,700 | 3,200 | 200 | 400 | <50 | 2,700 | | 22,600 |
| 23: English Language | 2,900 | 100 | 300 | 1,600 | 100 | <50 | 4,300 | 700 | 4,500 | | 300 | | | | 15,700 |
| 24: Liberal Arts | 128,500 | 900 | 2,300 | 1,400 | 900 | 600 | <50 | 2,300 | 3,600 | | 300 | 100 | | | 151,800 |
| 25: Library Science | 300 | 100 | 400 | | | <50 | | | 300 | | | | | | 1,200 |
| 26: Biological & Biomedical Sciences | 2,700 | 100 | 600 | 300 | 100 | 200 | <50 | | 2,700 | | <50 | <50 | | <50 | 6,900 |
| 27: Mathematics & Statistics | 400 | 200 | 300 | 100 | <50 | <50 | | | <50 | | <50 | | | | 1,300 |
| 28: Military Science | | | <50 | | | | <50 | <50 | 200 | | | | | 0 | 200 |
| 29: Military Tech | | | | | | 100 | <50 | 200 | | <50 | | | | | 400 |
| 30: Multi/Interdisc. Studies | 14,100 | 700 | 1,400 | 500 | 500 | 500 | 100 | 1,300 | 23,000 | <50 | 1,200 | | | 300 | 48,100 |
| 31: Parks & Rec | 4,300 | <50 | 200 | 900 | <50 | 100 | 100 | 1,800 | 1,700 | | 900 | | <50 | | 10,400 |
| 32: Basic Skills & Developmental | 600 | | | | | <50 | 300 | | | | | | | | 1,100 |
| 33: Citizenship Activities | <50 | | | | | | | | | | | | | | <50 |
| 34: Health-Related Knowledge & Skills | 100 | | <50 | | 100 | | | | | | | | | | 200 |
| 35: Interpersonal & Social Skills | | | | | | 0 | | | | | | | | | |
| 36: Leisure & Recreational Activities | 200 | | <50 | | | | | <50 | | | | | | | 300 |
| 37: Personal Awareness & Self-Improvement | 100 | <50 | 900 | | | | <50 | 400 | | | | | | | 400 |
| 38: Philosophy & Religious Studies | 200 | <50 | <50 | 200 | <50 | 200 | | 300 | | | 100 | | | | 1,200 |
| 39: Theology & Religious Vocations | <50 | | | 2,300 | 300 | 1,700 | <50 | 3,200 | | 900 | 300 | 300 | | | 9,900 |
| 40: Physical Sciences | 1,200 | <50 | 100 | 100 | | 0 | <50 | <50 | <50 | | | | | | 1,200 |
| 41: Science Technologies | 2,200 | <50 | <50 | | 100 | 200 | 100 | | <50 | | | | | | 2,600 |
| 42: Psychology | 2,700 | 300 | 1,400 | 400 | 200 | 1,200 | <50 | | 20,300 | <50 | 17,900 | 10,100 | | 2,300 | 57,900 |
| 43: Homeland Security | 53,400 | 200 | 600 | 1,100 | 100 | 300 | 3,300 | 21,400 | 40,100 | 0 | 7,000 | 700 | | 200 | 127,500 |
| 44: Public Admin & Social Services | 6,500 | 700 | 300 | 300 | 100 | 300 | 600 | 4,300 | 32,500 | <50 | 10,100 | 1,400 | | 500 | 50,100 |
| 45: Social Sciences | 3,200 | 400 | 700 | 300 | 100 | 500 | <50 | | 4,100 | | 1,400 | 700 | | | 12,600 |
| 46: Construction Trades | 15,900 | | 1,800 | | <50 | 9,300 | 900 | | | | | | | | 28,900 |
| 47: Mechanic & Repair Technologies | 48,200 | 0 | 4,100 | | 89,200 | 10,400 | <50 | | | | | | | | 121,600 |
| 49: Precision Production | 14,100 | | 500 | | | | | | | | | | | | 55,700 |
| 49: Transportation | 6,300 | <50 | 700 | | 9,400 | 200 | | | <50 | | | | | | 18,300 |
| 50: Visual & Performing Arts | 15,000 | 100 | 300 | 3,100 | 200 | 400 | 2,400 | 7,700 | 29,700 | 0 | 3,100 | 11,700 | 8,900 | 2,300 | 61,200 |
| 51: Health Professions & Related Programs | 275,300 | 1,800 | 7,400 | 65,100 | 1,900 | 7,000 | 228,100 | 145,200 | 135,600 | <50 | 74,200 | 11,700 | 8,900 | 2,300 | 955,700 |
| 52: Business | 85,500 | 1,700 | 4,300 | 6,100 | 700 | 4,920 | 6,850 | 70,500 | 226,500 | 400 | 74,200 | 9,200 | 100 | 2,900 | 504,200 |
| 53: High School/Secondary Diplomas | <50 | | | 6,100 | | <50 | <50 | | | | | | | | 300 |
| 54: History | 400 | <50 | 300 | 100 | <50 | | <50 | | 0 | | | | | | 1,900 |
| 60: Residency Programs | <50 | <50 | <50 | | <50 | <50 | | | 200 | 3,200 | | 900 | | 100 | 200 |

Note: Foreign institutions omitted because all cells are suppressed or empty.

**Note: Counts rounded to the nearest 100.**

BILLING CODE 4000 01 C

Tables 1.6 and 1.7 show the student characteristics of title IV, HEA students in non-GE and GE programs, respectively, by institutional control, predominant degree of the institution, and credential level. In all three types of control, the majority of students served by the programs are female students. At public non-GE programs, 58 percent of students received a Pell Grant, 31 percent are 24 years or older, 36 percent are independent, and 43 percent non-white. At not-for-profit non-GE programs, 43 percent of students received a Pell Grant, 37 percent are 24 years or older, 44 percent are independent, and 43 percent are non-white. The average public GE program has 68 percent of its students ever received Pell, 44 percent are 24 years or older, 50 percent are independent, and 46 percent are non-white. At for-profit GE programs, 67 percent of students received a Pell Grant, 66 percent are 24 years or older, 72 percent are independent, and 59 percent are non-white.

TABLE 1.6   CHARACTERISTICS OF NON-GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL (ENROLLMENT-WEIGHTED)

| | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
| | | Age 24+ | Male | Pell | Non-white | Independent |
| Public: | | | | | | |
| Less-Than 2-Year: | | | | | | |
| Associate s | 5,700 | 36.4 | 37.2 | 73.8 | 41.8 | 41.7 |
| Bachelor s | 10,600 | 59.4 | 40.6 | 54.0 | 37.4 | 62.6 |
| Master s | 8,700 | 71.8 | 34.7 | 36.1 | 27.7 | 81.5 |
| 2-Year: | | | | | | |
| Associate s | 5,800 | 29.6 | 37.5 | 74.1 | 49.3 | 34.8 |
| Bachelor s | 9,300 | 48.3 | 41.3 | 69.4 | 40.3 | 55.6 |
| Master s | 7,600 | 79.6 | 37.4 | 52.2 | 63.7 | 90.9 |
| Professional | 5,800 | 100.0 | 33.3 | 33.3 | .................. | 100.0 |
| 4-Year or Above: | | | | | | |
| Associate s | 7,600 | 36.5 | 37.8 | 67.0 | 39.7 | 42.2 |
| Bachelor s | 16,600 | 24.0 | 43.3 | 47.3 | 39.8 | 27.0 |
| Master s | 11,900 | 60.6 | 35.9 | 32.9 | 40.2 | 72.7 |

TABLE 1.6  CHARACTERISTICS OF NON-GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL (ENROLLMENT-WEIGHTED) Continued

| | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
| | | Age 24+ | Male | Pell | Non-white | Independent |
| Doctoral | 10,400 | 69.9 | 41.4 | 28.0 | 44.1 | 84.1 |
| Professional | 7,800 | 55.7 | 48.4 | 10.8 | 37.1 | 91.7 |
| Total: | | | | | | |
| Total | 11,300 | 30.5 | 40.2 | 57.8 | 43.2 | 35.6 |
| Private, Nonprofit: | | | | | | |
| Less-Than 2-Year: | | | | | | |
| Associate s | 2,600 | 64.6 | 33.8 | 89.7 | 65.9 | 74.8 |
| Bachelor s | 9,100 | 65.8 | 37.1 | 67.0 | 62.6 | 70.0 |
| Master s | 9,200 | 52.2 | 30.7 | 37.7 | 56.3 | 61.4 |
| Doctoral | 5,500 | 24.7 | 14.6 | 32.1 | 41.2 | 58.5 |
| Professional | 4,600 | 52.0 | 54.6 | 1.9 | 39.6 | 97.1 |
| 2-Year: | | | | | | |
| Associate s | 6,300 | 47.4 | 34.8 | 72.4 | 52.2 | 53.6 |
| Bachelor s | 8,300 | 60.7 | 40.7 | 68.3 | 51.4 | 64.8 |
| Master s | 9,600 | 86.5 | 34.0 | 28.9 | 69.9 | 89.2 |
| Doctoral | 9,600 | 81.3 | 26.4 | 14.6 | 62.5 | 100.0 |
| 4-Year or Above: | | | | | | |
| Associate s | 6,800 | 54.9 | 34.6 | 70.2 | 49.3 | 60.5 |
| Bachelor s | 17,600 | 23.2 | 39.9 | 48.9 | 40.2 | 26.1 |
| Master s | 13,100 | 67.3 | 35.3 | 25.0 | 45.9 | 78.0 |
| Doctoral | 12,200 | 69.4 | 41.1 | 17.7 | 49.7 | 87.1 |
| Professional | 9,200 | 57.2 | 48.8 | 10.1 | 43.0 | 89.1 |
| Total: | | | | | | |
| Total | 15,400 | 37.3 | 39.0 | 43.3 | 42.6 | 43.5 |

**Note:** Average EFC values rounded to the nearest 100. Credential levels with very few programs and most table elements missing are suppressed.

TABLE 1.7  CHARACTERISTICS OF GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL

| | Average EFC | Percent of students who are . . . | | | | |
|---|---|---|---|---|---|---|
| | | Age 24+ | Male | Pell | Non-white | Independent |
| Public: | | | | | | |
| Less-Than 2-Year: | | | | | | |
| UG Certificates | 4,500 | 45.5 | 37.5 | 76.5 | 42.4 | 53.1 |
| Post-BA Certs | 6,300 | 75.9 | 30.4 | 57.9 | ............. | 78.2 |
| Grad Certs | 8,100 | 57.1 | 16.7 | 57.5 | 32.1 | 65.2 |
| 2-Year: | | | | | | |
| UG Certificates | 6,100 | 41.9 | 37.8 | 70.3 | 50.9 | 46.8 |
| Post-BA Certs | 10,800 | 47.2 | 23.7 | 58.4 | ............. | 59.5 |
| Grad Certs | 7,600 | 89.7 | 68.1 | 68.9 | 50.6 | 89.7 |
| 4-Year or Above: | | | | | | |
| UG Certificates | 23,300 | 28.5 | 41.6 | 36.8 | 32.3 | 31.8 |
| Post-BA Certs | 11,500 | 60.5 | 31.6 | 35.9 | ............. | 71.3 |
| Grad Certs | 10,700 | 69.8 | 30.1 | 39.2 | 36.2 | 79.0 |
| Total: | | | | | | |
| Total | 7,100 | 43.7 | 37.6 | 68.3 | 45.7 | 49.8 |
| Private, Nonprofit: | | | | | | |
| Less-Than 2-Year: | | | | | | |
| UG Certificates | 4,900 | 48.3 | 36.6 | 80.2 | 63.7 | 58.3 |
| Post-BA Certs | 15,600 | 51.0 | 59.2 | 3.3 | ............. | 65.3 |
| Grad Certs | 7,600 | 28.2 | 38.7 | 3.1 | 47.2 | 62.1 |
| 2-Year: | | | | | | |
| UG Certificates | 3,300 | 61.0 | 21.1 | 83.2 | 56.3 | 73.8 |
| Post-BA Certs | 10,100 | 94.8 | 28.4 | 53.7 | ............. | 94.8 |
| Grad Certs | 26,700 | 89.5 | 10.5 | 19.3 | 100.0 | 100.0 |
| 4-Year or Above: | | | | | | |
| UG Certificates | 10,500 | 37.4 | 35.8 | 66.4 | 65.8 | 42.1 |
| Post-BA Certs | 14,200 | 60.1 | 31.8 | 36.0 | ............. | 68.5 |
| Grad Certs | 11,500 | 70.8 | 32.8 | 29.8 | 44.5 | 80.3 |
| Total: | | | | | | |
| Total | 8,300 | 55.1 | 32.3 | 60.6 | 57.3 | 64.2 |
| Proprietary: | | | | | | |
| Less-Than 2-Year: | | | | | | |
| UG Certificates | 3,900 | 45.7 | 31.5 | 82.4 | 63.0 | 56.5 |
| Associate s | 5,900 | 56.6 | 32.2 | 80.6 | 63.2 | 63.7 |
| Bachelor s | 4,200 | 54.2 | 36.9 | 86.5 | 63.2 | 57.3 |

<span style="color:red">App.293</span>

TABLE 1.7    CHARACTERISTICS OF GE STUDENTS BY CONTROL, PREDOMINANT DEGREE, AND CREDENTIAL LEVEL Continued

| | Average EFC | Percent of students who are . . . | | | | |
| | | Age 24+ | Male | Pell | Non-white | Independent |
|---|---|---|---|---|---|---|
| Post-BA Certs ............................................... | 9,100 | 70.7 | 44.7 | 36.8 | .................. | 77.2 |
| Master s ............................................... | 9,200 | 85.4 | 26.7 | 32.2 | 62.1 | 90.4 |
| Doctoral ............................................... | 9,800 | 98.6 | 19.2 | 32.0 | 47.6 | 99.7 |
| Professional ............................................... | 14,100 | 84.7 | 19.5 | 30.5 | 54.2 | 100.0 |
| Grad Certs ............................................... | 6,200 | 64.6 | 7.7 | 63.9 | 6.6 | 67.4 |
| 2-Year: | | | | | | |
| UG Certificates ............................................... | 4,800 | 48.4 | 39.8 | 77.8 | 64.2 | 57.1 |
| Associate s ............................................... | 5,700 | 51.8 | 33.3 | 77.8 | 60.6 | 58.1 |
| Bachelor s ............................................... | 7,900 | 61.6 | 42.7 | 70.5 | 65.0 | 67.9 |
| Post-BA Certs ............................................... | 13,400 | 86.4 | 25.0 | 39.4 | .................. | 86.4 |
| Master s ............................................... | 7,100 | 82.3 | 42.1 | 31.0 | 65.1 | 89.5 |
| Doctoral ............................................... | 0 | 0.0 | 0.0 | 100.0 | .................. | 0.0 |
| Professional ............................................... | 5,700 | 71.6 | 46.0 | 14.6 | 36.7 | 99.0 |
| Grad Certs ............................................... | 3,700 | 64.8 | 32.4 | 0.0 | 24.3 | 67.6 |
| 4-Year or Above: | | | | | | |
| UG Certificates ............................................... | 5,400 | 77.7 | 22.1 | 76.2 | 55.4 | 84.3 |
| Associate s ............................................... | 5,400 | 75.4 | 31.9 | 76.1 | 57.2 | 82.7 |
| Bachelor s ............................................... | 9,700 | 75.2 | 40.7 | 64.2 | 54.6 | 78.8 |
| Post-BA Certs ............................................... | 7,500 | 84.6 | 28.5 | 54.7 | .................. | 92.3 |
| Master s ............................................... | 11,300 | 82.3 | 30.2 | 38.8 | 58.0 | 85.8 |
| Doctoral ............................................... | 19,800 | 92.9 | 30.0 | 25.2 | 57.9 | 95.2 |
| Professional ............................................... | 7,100 | 89.0 | 25.7 | 47.1 | 34.1 | 93.2 |
| Grad Certs ............................................... | 11,900 | 88.6 | 27.1 | 38.2 | 63.2 | 90.7 |
| Total: | | | | | | |
| Total ............................................... | 7,700 | 66.1 | 34.7 | 67.3 | 58.8 | 72.4 |

**Note:** EFC values rounded to the nearest 100.

## Outcome Differences Across Programs

A large body of research provides strong evidence of the many significant benefits that postsecondary education and training provides, both private and social. Private pecuniary benefits include higher wages and lower risk of unemployment.[158] Increased educational attainment also provides private nonpecuniary benefits, such as better health, job satisfaction, and overall happiness.[159] Social benefits of increases in the number of individuals with a postsecondary education include productivity spillovers from a better educated and more flexible workforce,[160] increased civic participation,[161] and improvements in health and well-being for the next generation.[162] Improved productivity and earnings increase tax revenues from higher earnings and lower rates of reliance on social safety net programs. Even though the costs of postsecondary education have risen, there is evidence that the average financial returns to graduates have also increased.[163]

However, there is also substantial heterogeneity in earnings and other outcomes for students who graduate from different types of institutions and programs. Table 1.8 shows the enrollment-weighted average borrowing and default by control and credential level. Mean borrowing amounts are for title IV recipients who completed their program in AY 2016 or 2017, with students who did not borrow counting as having borrowed $0. For borrowing, our measure is the average for each institutional control type and credential level combination of program average debt. For default, our measure is, among borrowers (regardless of completion status) who entered repayment in 2017, the fraction of borrowers who have ever defaulted three years later. The cohort default rate measure follows the methodology for the official institutional cohort default rate measures calculated by the Department, except done at the program level. Though average debt tends to be higher for higher-level credential programs, default rates tend to be lower. At the undergraduate level, average debt is much lower for public programs than private non-profit and for-profit programs and default rates are lower for public and non-profit programs than those at for-profit institutions.

TABLE 1.8    AVERAGE DEBT AND COHORT DEFAULT RATE, BY CONTROL AND CREDENTIAL LEVEL (ENROLLMENT-WEIGHTED)

| | Average debt | Cohort default rate |
|---|---|---|
| Public: | | |

[158] Barrow, L., & Malamud, O. (2015). Is College a Worthwhile Investment? *Annual Review of Economics,* 7(1), 519–555.

Card, D. (1999). The causal effect of education on earnings. *Handbook of labor economics,* 3, 1801–1863.

[159] Oreopoulos, P., & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives,* 25(1), 159–184.

[160] Moretti, E. (2004). Workers' Education, Spillovers, and Productivity: Evidence from Plant-Level Production Functions. *American Economic Review,* 94(3), 656–690.

[161] Dee, T.S. (2004). Are There Civic Returns to Education? *Journal of Public Economics,* 88(9–10), 1697–1720.

[162] Currie, J., & Moretti, E. (2003). Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings. *The Quarterly Journal of Economics,* 118(4), 1495–1532.

[163] Avery, C., and Turner, S. (2013). Student Loans: Do College Students Borrow Too Much-Or Not Enough? *Journal of Economic Perspectives,* 26(1), 165–192.

TABLE 1.8   AVERAGE DEBT AND COHORT DEFAULT RATE, BY CONTROL AND CREDENTIAL LEVEL (ENROLLMENT-WEIGHTED)   Continued

|  | Average debt | Cohort default rate |
|---|---|---|
| UG Certificates ........................................................ | 5,759 | 16.9 |
| Associate s ........................................................ | 5,932 | 17.4 |
| Bachelor s ........................................................ | 17,935 | 7.6 |
| Post-BA Certs ........................................................ | 7,352 | 2.3 |
| Master s ........................................................ | 29,222 | 2.9 |
| Doctoral ........................................................ | 71,102 | 2.9 |
| Professional ........................................................ | 124,481 | 0.8 |
| Grad Certs ........................................................ | 24,883 | 2.5 |
| Private, Nonprofit: |  |  |
| UG Certificates ........................................................ | 9,367 | 12.0 |
| Associate s ........................................................ | 16,445 | 14.9 |
| Bachelor s ........................................................ | 20,267 | 7.3 |
| Post-BA Certs ........................................................ | 9,497 | 2.8 |
| Master s ........................................................ | 40,272 | 2.9 |
| Doctoral ........................................................ | 128,998 | 2.3 |
| Professional ........................................................ | 151,473 | 1.3 |
| Grad Certs ........................................................ | 40,732 | 2.4 |
| Proprietary: |  |  |
| UG Certificates ........................................................ | 8,857 | 14.2 |
| Associate s ........................................................ | 18,766 | 15.3 |
| Bachelor s ........................................................ | 29,038 | 12.4 |
| Post-BA Certs ........................................................ | 15,790 | 16.9 |
| Master s ........................................................ | 39,507 | 4.1 |
| Doctoral ........................................................ | 99,422 | 4.4 |
| Professional ........................................................ | 96,836 | 0.7 |
| Grad Certs ........................................................ | 47,803 | 3.9 |
| Foreign Private: |  |  |
| UG Certificates ........................................................ | (*) | 0.0 |
| Associate s ........................................................ | (*) | (*) |
| Bachelor s ........................................................ | 17,074 | 7.0 |
| Post-BA Certs ........................................................ | (*) | (*) |
| Master s ........................................................ | 40,432 | 2.0 |
| Doctoral ........................................................ | 22,600 | 3.5 |
| Professional ........................................................ | 247,269 | 3.1 |
| Grad Certs ........................................................ | 284,200 | 0.2 |
| Foreign For-Profit: |  |  |
| Master s ........................................................ | (*) | 0.0 |
| Doctoral ........................................................ | 84,200 | 1.4 |
| Professional ........................................................ | 280,667 | 1.3 |

*Cell suppressed because it based on a population of fewer than 30.

Table 1.9 shows median earnings ($2019) for graduates (whether or not they borrow) along these same dimensions. Similar patterns hold for earnings, with lower earnings in proprietary programs than in public and non-profit programs for almost all types of credential level.

TABLE 1.9   ENROLLMENT-WEIGHTED AVERAGE OF PROGRAM MEDIAN EARNINGS 3 YEARS AFTER PROGRAM COMPLETION, BY CONTROL AND CREDENTIAL LEVEL

|  | Median earnings 3 years after completion |
|---|---|
| Public: |  |
| UG Certificates ........................................................ | 33,400 |
| Associate s ........................................................ | 34,400 |
| Bachelor s ........................................................ | 46,100 |
| Post-BA Certs ........................................................ | 45,600 |
| Master s ........................................................ | 66,600 |
| Doctoral ........................................................ | 83,500 |
| Professional ........................................................ | 91,300 |
| Grad Certs ........................................................ | 71,500 |
| Private, Nonprofit: |  |
| UG Certificates ........................................................ | 26,200 |
| Associate s ........................................................ | 35,700 |
| Bachelor s ........................................................ | 48,800 |
| Post-BA Certs ........................................................ | 61,600 |
| Master s ........................................................ | 68,600 |
| Doctoral ........................................................ | 86,200 |

TABLE 1.9    ENROLLMENT-WEIGHTED AVERAGE OF PROGRAM MEDIAN EARNINGS 3 YEARS AFTER PROGRAM COMPLETION, BY CONTROL AND CREDENTIAL LEVEL    Continued

| | Median earnings 3 years after completion |
|---|---|
| Professional | 88,200 |
| Grad Certs | 74,800 |
| Proprietary: | |
| UG Certificates | 25,400 |
| Associate s | 34,600 |
| Bachelor s | 45,600 |
| Post-BA Certs | 43,500 |
| Master s | 59,300 |
| Doctoral | 78,000 |
| Professional | 49,200 |
| Grad Certs | 52,200 |
| Foreign Private: | |
| UG Certificates | .......... |
| Associate s | .......... |
| Bachelor s | 8,200 |
| Post-BA Certs | .......... |
| Master s | 38,600 |
| Doctoral | .......... |
| Professional | 88,400 |
| Grad Certs | 15,100 |
| Foreign For-Profit: | |
| Master s | .......... |
| Doctoral | 65,900 |
| Professional | 100,400 |

**Note:** Values rounded to the nearest 100.

A growing body of research, described below, shows that differences in institution and program quality are important contributors to the variation in borrowing and earnings outcomes described above. That is, differences in graduates' outcomes across programs are not fully (or primarily) explained by the characteristics of the students that attend. Differences in program quality—measured by the causal effect of attending the program on its students' outcomes—are important.[164] It is, therefore, important to provide students with this information and to hold programs accountable for poor student debt and earnings outcomes. Research reviewed below also shows that GE programs are the programs least likely to reliably provide an adequate return on investment, from the perspective of both the student and society. These findings imply that aggregate student outcomes—including their earnings and likelihood of positive borrowing outcomes—would be improved by limiting students enrollment in low-quality programs.

A recent study computed productivity—value-added per dollar of social investment—for 6,700 undergraduate programs across the United States.[165] Value-added in that study was measured using both private (individual earnings) and social (working in a public service job) notions of value. A main finding was that productivity varied widely even among institutions serving students of similar aptitude, especially at less selective institutions. That is, a dollar spent educating students does much more to increase lifetime earnings potential and public service at some programs than others. The author concludes that "market forces alone may be too weak to discipline productivity among these schools."

The finding of substantial variation in student outcomes across programs serving similar students or at similar types of institutions or in similar fields has been documented in many other more specific contexts. These include community colleges in California,[166] public two- and four-year programs in Texas,[167] master's degree programs in Ohio,[168] law and medical schools, and programs outside the United States.[169] Variation in institutional and program performance is a dominant feature of postsecondary education in the United States.[170]

[164] Black, Dan A., and Jeffrey A. Smith. "Estimating the returns to college quality with multiple proxies for quality." *Journal of Labor Economics* 24.3 (2006): 701–728.

Cohodes, Sarah R., and Joshua S. Goodman. "Merit aid, college quality, and college completion: Massachusetts' Adams scholarship as an in-kind subsidy." *American Economic Journal: Applied Economics* 6.4 (2014): 251–285.

Andrews, Rodney J., Jing Li, and Michael F. Lovenheim. "Quantile treatment effects of college quality on earnings." *Journal of Human Resources* 51.1 (2016): 200–238.

Dillon, Eleanor Wiske, and Jeffrey Andrew Smith. "The consequences of academic match between students and colleges." *Journal of Human Resources* 55.3 (2020): 767–808.

[165] Hoxby, C.M. 2019. The Productivity of US Postsecondary Institutions. In *Productivity in Higher Education*, C.M. Hoxby and K.M. Stange(eds). University of Chicago Press: Chicago, 2019.

[166] Carrell, S.E. & M. Kurleander. 2019. Estimating the Productivity of Community Colleges in Paving the Road to Four-Year College Success. In *Productivity in Higher Education*, C.M. Hoxby and K.M. Stange(eds). University of Chicago Press: Chicago, 2019.

[167] Andrews, R.J., & Stange, K.M. (2019). Price regulation, price discrimination, and equality of opportunity in higher education: Evidence from Texas. *American Economic Journal: Economic Policy*, 11.4, 31–65.

Andrews, R.J., Imberman, S.A., Lovenheim, M.F. & Stange, K. M. (2022), "The returns to college major choice: Average and distributional effects, career trajectories, and earnings variability," NBER Working Paper w30331.

[168] Minaya, V., Scott-Clayton, J. & Zhou, R.Y. (2022). Heterogeneity in Labor Market Returns to Master's Degrees: Evidence from Ohio. (EdWorkingPaper: 22–629). Retrieved from Annenberg Institute at Brown University: *doi.org/10.26300/akgd-9911*.

[169] Hastings, J.S., Neilson, C.A. & Zimmerman, S.D. (2013), "Are some degrees worth more than others? Evidence from college admission cutoffs in Chile," NBER Working Paper w19241.

[170] A recent overview can be found in Lovenheim, M. and J. Smith. 2023. Returns to Different Postsecondary Investments: Institution Type, Academic Programs, and Credentials. In *Handbook of the Economics of Education Volume 6*, E.

Continued

The wide range of performance across programs and institutions means that prospective students face a daunting information problem. The questions of where to go and what to study are key life choices with major consequences. But without a way to discern the differences between institutions through comparable, reliably reported measures of quality, students may ultimately have to rely on crude signals about the caliber of education a school offers.

Recent evidence demonstrates that information about colleges, delivered in a timely and relevant way, can shape students' choices. Students at one large school district were 20 percent more likely to apply to colleges that have information listed on a popular college search tool, compared with colleges whose information is not displayed on the tool. A particularly important finding of the study is that for Black, Hispanic, and low-income students, access to information about local public four-year institutions increases overall attendance at such institutions. This, the author argues, suggests ''that students may have been unaware of these nearby and inexpensive options with high admissions rates.'' [171]

This evidence reveals both the power of information to shape student choices at critical moments in the decision process and how a patchwork of information about colleges maybe result in students missing out on opportunities. Given the variation in quality across programs apparent in the research evidence outlined above, these missed opportunities can be quite costly.

Unfortunately, the general availability of information does not always mean students are able to find and use it. Indeed, evidence on the initial impact of the Department's College Scorecard college comparison tool found minimal effects on students' college choices, with any possible effects concentrated among the highest achieving students. [172] But the contrast between these two pieces evidence, one where information affects college choices and one where it doesn't, is instructive: while students generally must seek out the College Scorecard during their college search process, the college search tool from the first study delivers

information to students as they are taking other steps through the tool, from requesting transcripts and recommendation letters to submitting applications. And it tailors that information to the student, providing information about where other students from the same high school have gone to college and their outcomes there. Accordingly, there is some basis to believe that personalized information delivered directly to students at key decision points from a credible source can have an impact.

To that end, the transparency component of these regulations attempts not only to improve the quality of information available to students (by newly collecting key facts about colleges), but also its salience, relevance, and timing. Because this information would be delivered directly to students about the college for which they are finalizing their financial aid packages, students would be likely to see it and understand its credibility at a time when they are likely to find it useful for deciding. Better still, the information would not be ambiguous when the message is most critical: if a school is consistently failing to put graduates on better financial footing, students would receive a clear indication of that fact before they make a financial commitment.

Still, the market-disciplining role of accurate information does not always suffice. Such mechanisms may decrease, but not eliminate, the chance that students will make suboptimal choices. The Department has concluded that regulation beyond information provision alone is warranted due to evidence, reviewed below, that such regulations could reduce the risk that students and taxpayers put money toward programs that will leave them worse off. Program performance is particularly varied and problematic among the non-degree certificate programs offered by all types of institutions, as well as at proprietary degree programs. These are the places where concerns about quality are at their height, especially given the narrower career-focused nature of the credentials offered in this part of the system.

Certificate programs are intended to prepare students for specific vocations and have, on average, positive returns relative to not attending college at all. Yet this aggregate performance masks considerable variability: certificate program outcomes vary greatly across programs, States, fields of study, and

institutions, [173] and even within the same narrow field and within the same institution. [174] Qualitative research suggests some of this outcome difference stems from factors that providers directly control, such as how they engage with industry and employers in program design and whether to incorporate opportunities for students to gain relevant workforce experience during the program. [175] Unfortunately, many of the most popular certificate programs do not result in returns on investment for students who complete the program. An analysis of programs included in the 2014 GE rule found that 10 of the 15 certificate programs with the most graduates have typical earnings of $18,000 or less, well below what a typical high school graduate would earn. [176]

The proposed GE rule would subject for-profit degree programs to the proposed transparency framework in § 668.43, the transparency framework in subpart Q, and the GE program-specific eligibility requirements in subpart S. This additional scrutiny, based in the requirements of the HEA, is warranted because for-profit programs have demonstrated particularly poor outcomes, as was shown in Tables 1.8 and 1.9 above. A large body of research provides causal evidence on the many ways students at for-profit colleges are at an economic disadvantage upon exiting their institutions. This research base includes studies showing that students who attend for-profit programs are significantly more likely to suffer from poor employment prospects, [177] low earnings, [178] and loan repayment

Hanushek, L. Woessmann, and S. Machin (Eds). New Holland.

[171] Mulhern, Christine. ''Changing college choices with personalized admissions information at scale: Evidence on Naviance.'' Journal of Labor Economics 39.1 (2021): 219–262.

[172] Hurwitz, Michael, and Jonathan Smith. ''Student responsiveness to earnings data in the College Scorecard.'' Economic Inquiry 56.2 (2018): 1220–1243.

[173] Aspen Institute. 2015. *From College to Jobs: Making Sense of Labor Market Returns to Higher Education.* Washington, DC. *www.aspeninstitute.org/publications/ labormarketreturns/.*

[174] Much of the research is summarized in Ositelu, M.O., McCann, C. & Laitinen, A. 2021. The Short-term Credential Landscape. New America: Washington DC. *www.newamerica.org/education-policy/reports/the-short-term-credentials-landscape.*

[175] Soliz, A. 2016. *Preparing America's Labor Force: Workforce Development Programs in Public Community Colleges,* (Washington, DC: Brookings, December 9, 2016), *www.brookings.edu/research/ preparing-americas-labor-force-workforce-development-programs-in-public-community-colleges/.*

[176] Aspen Institute. 2015. *From College to Jobs: Making Sense of Labor Market Returns to Higher Education.* Washington, DC. *www.aspeninstitute.org/publications/ labormarketreturns.*

[177] Deming, D.J., Yuchtman, N., Abulafi, A., Goldin, C., & Katz, L.F. (2016). The Value of Postsecondary Credentials in the Labor Market: An Experimental Study. *American Economic Review,* 106(3), 778–806.

[178] Cellini, S.R. & Chaudhary, L. (2014). The Labor Market Returns to a For-Profit College

difficulties.[179] Students who transfer into for-profit institutions instead of public or nonprofit institutions face significant wage penalties.[180] In some cases, researchers find similar earnings or employment outcomes between for-profit and not-for-profit associate and bachelor degree programs.[181] However, students pay and borrow more to attend for-profit degree programs, on average.[182] That means their overall earnings return on investment is worse. This evidence of lackluster labor market outcomes accords with the growing evidence that many for-profit programs may not be preparing students for careers as well as comparable programs at public institutions. A 2011 GAO report found that, for nine out of 10 licensing exams in the largest fields of study, graduates of for-profit institutions had lower passage rates than graduates of public institutions.[183] This lack of preparation may not be surprising, as many for-profit institutions devote more resources to recruiting and marketing than to instruction or student support services. A 2012 investigation by the U.S. Senate Committee on Health, Education, Labor and Pensions (Senate HELP Committee) found that almost 23 percent of revenues at proprietary institutions were spent on marketing and recruiting but only 17 percent on instruction.[184] The report further found that at many institutions, the number of recruiters greatly outnumbered the career services and support services staff.

Particularly strong evidence comes from a recent study that found that the average undergraduate certificate-

seeking student that attended a for-profit institution did not experience any earnings gains relative to the typical worker in a matched sample of high school graduates. They also had significantly lower earnings gains than students who attended certificate programs in the same field of study in public institutions.[185] Furthermore, the earnings gain for the average for-profit certificate-seeking student was not sufficient to compensate them for the amount of student debt taken on to attend the program.[186] At the same time, research also shows substantial variation in earnings gains from title IV, HEA-eligible undergraduate certificate programs by field of study,[187] with students graduating from cosmetology and personal services programs in all sectors experiencing especially poor outcomes.[188]

Consequences of Attending Low Financial Value Programs

Attending a postsecondary education or training program where the typical student takes on debt that exceeds their capacity to repay can cause substantial harm to borrowers. For instance, high debt may cause students to delay certain milestones; research shows that high levels of debt decreases students' long-term probability of marriage.[189] Being overburdened by student payments can also reduce the likelihood that borrowers will invest in their future. Research shows that when students borrow more due to high tuition, they are less likely to obtain a graduate degree [190] and less likely to take out a mortgage to purchase a home after leaving college.[191]

Unmanageable debt can also have adverse financial consequences for borrowers, including defaulting on their student loans. For those who do not

complete a degree, more student debt may raise the probability of bankruptcy.[192] Borrowers who default on their loans face potentially serious repercussions. Many aspects of borrowers' lives may be affected, including their ability to sign up for utilities, obtain insurance, or rent an apartment.[193] The Department reports loans more than 90 days delinquent or in default to the major national credit bureaus, and being in default has been shown to be correlated with a 50-to-90-point drop in borrowers' credit scores.[194] A defaulted loan can remain on borrowers' credit reports for up to seven years and lead to higher costs that make insurance, housing, and other services and financial products less affordable and, in some cases, harm borrowers' ability to get a job.[195] Borrowers who default lose access to some repayment options and flexibilities. At the same time, their balances become due immediately, and their accounts become subject to involuntary collections such as wage garnishment and redirection of income tax refunds toward the outstanding loan.[196]

Research shows that borrowers who attend for-profit colleges have higher student loan default rates than students with similar characteristics who attend public institutions.[197] Furthermore, most of the rise in student loan default rates from 2000 to 2011 can be traced to increases in enrollment in for-profit institutions and, to a lesser extent, two-year public institutions.[198]

Low loan repayment also has consequences for taxpayers. Calculating the precise magnitude of these costs will require decades of realized

Education. *Economics of Education Review*, 43, 125–140.

[179] Armona, L., Chakrabarti, R., & Lovenheim, M.F. (2022). Student Debt and Default: The Role of For-Profit Colleges. *Journal of Financial Economics*, 144(1), 67–92.

[180] Liu, V. Y.T. & Belfield, C. (2020). The labor market returns to for-profit higher education: Evidence for transfer students. *Community College Review*, 48(2), 133–155.

[181] Lang, K., & Weinstein, R. (2013). The Wage Effects of Not-For-Profit and For-Profit Certifications: Better Data, Somewhat Different Results. *Labour Economics*, 24, 230–243.

[182] Cellini, S.R. & Darolia, R. (2015). College costs and financial constraints. In B. Hershbein & K. Hollenbeck (Ed.), *Student Loans and the Dynamics of Debt* (137–174). Kalamazoo, MI: W.E. Upjohn Institute for Employment Research.

Cellini, S.R., & Darolia, R. (2017). High Costs, Low Resources, and Missing Information: Explaining Student Borrowing in the For-Profit Sector. *The ANNALS of the American Academy of Political and Social Science*, 671(1), 92–112.

[183] Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools (GAO–12–143), GAO, December 7, 2011.

[184] For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, Senate HELP Committee, July 30, 2012.

[185] Cellini, S.R., & Turner, N. (2019). Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students using Administrative Data. *Journal of Human Resources*, 54(2), 342–370.

[186] Ibid.

[187] Lang, K., & Weinstein, R. (2013). The Wage Effects of Not-For-Profit and For-Profit Certifications: Better Data, Somewhat Different Results. *Labour Economics*, 24, 230–243.

[188] Dadgar, M., & Trimble, M.J. (2015). Labor Market Returns to Sub-Baccalaureate Credentials: How Much Does a Community College Degree or Certificate Pay? *Educational Evaluation and Policy Analysis*, 37(4), 399–418.

[189] Gicheva, D. (2016). Student Loans or Marriage? A Look at the Highly Educated. *Economics of Education Review*, 53, 207–2016.

[190] Chakrabarti, R., Fos, V., Liberman, A. & Yannelis, C. (2020). Tuition, Debt, and Human Capital. Federal Reserve Bank of New York Staff Report No. 912.

[191] Mezza, A., Ringo, D., Sherlund, S., & Sommer, K. (2020). "Student Loans and Homeownership," *Journal of Labor Economics*, 38(1): 215–260.

[192] Gicheva, D. & Thompson, J. (2015). The effects of student loans on long-term household financial stability. In B. Hershbein & K. Hollenbeck (Ed.). *Student Loans and the Dynamics of Debt* (137–174). Kalamazoo, MI: W.E. Upjohn Institute for Employment Research.

[193] *studentaid.gov/manage-loans/default*.

[194] Blagg, K. (2018). Underwater on Student Debt: Understanding Consumer Credit and Student Loan Default. Urban Institute Research Report.

[195] Elliott, D. & Granetz Lowitz, R. (2018). What Is the Cost of Poor Credit? Urban Institute Report.

Corbae, D., Glover, A. & Chen, D. (2013). Can Employer Credit Checks Create Poverty Traps? *2013 Meeting Papers*, No. 875, Society for Economic Dynamics.

[196] *studentaid.gov/manage-loans/default*.

[197] Deming, D., Goldin, C., & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164.

Hillman, N.W. (2014). College on Credit: A Multilevel Analysis of Student Loan Default. *Review of Higher Education* 37(2), 169–195.

[198] Looney, A., & Yannelis, C. (2015). A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Loan Defaults. *Brookings Papers on Economic Activity*, 2, 1–89.

periods for millions of borrowers. However, Table 1.10 shows estimates of the share of disbursed loans that will not be repaid based on simulated debt and earnings trajectories at each program in the 2022 PPD under the proposed income-driven repayment plan announced in January 2023.[199] These estimates incorporate the subsidy coming from the features of the repayment plan itself (capped payments, forgiveness), not accounting for default or delinquency. Starting with the median earnings and debt at each program, the Department simulated typical repayment trajectories for each measure.

Using U.S. Census Bureau (Census) microdata on earnings and family formation for a nationally representative sample of individuals, the Department projected the likely repayment experience of borrowers at each program assuming all were enrolled in the Proposed Revised Pay as You Earn (REPAYE) repayment plan (which can be found at 88 FR 1894).[200] Starting from the median earnings level of each program, the projections incorporate the estimated earnings growth over the life course through age sixty for individuals starting from the same earnings level in a given State. The projections also include likely spousal earnings, student debt, and family size of each borrower (also derived from the Census data), which makes it possible to calculate the total amount repaid by borrowers under each plan when paying in full each month (even if that means making a payment of $0). The simulation incorporates different demographic and income groups probabilistically due to important non-linearities in plan structure.

Table 1.10 shows that, among all programs, students that attend those that fall below the proposed debt-to-earnings standard are consistently projected to pay back less on their loans, in present value terms, than they took out.[201] This is true regardless of whether a program is in the public, private nonprofit, or proprietary sector. The projected repayment ratio is even lower for programs that only fail the EP measure because at very low earnings levels, students are expected to make zero-dollar payments over extended periods of time.

TABLE 1.10   PREDICTED RATIO OF DOLLARS REPAID TO DOLLARS BORROWED BY CONTROL AND PASSAGE STATUS

|  | Predicted repayment ratio under proposed REPAYE |
| --- | --- |
| Public: | |
| No D/E or EP data | 0.53 |
| Pass | 0.72 |
| Fail D/E (regardless of EP) | 0.29 |
| Fail EP only | 0.13 |
| Private, Nonprofit: | |
| No D/E or EP data | 0.69 |
| Pass | 0.96 |
| Fail D/E (regardless of EP) | 0.38 |
| Fail EP only | 0.19 |
| Proprietary: | |
| No D/E or EP data | 0.41 |
| Pass | 0.79 |
| Fail D/E (regardless of EP) | 0.26 |
| Fail EP only | 0.07 |
| Total: | |
| No D/E or EP data | 0.57 |
| Pass | 0.77 |
| Fail D/E (regardless of EP) | 0.30 |
| Fail EP only | 0.12 |

Our analysis, provided in more detail in ''Analysis of the Regulations,'' shows that for many GE programs, the typical graduate earns less than the typical worker with only a high school diploma or has debt payments that are higher than is considered manageable given typical earnings. As we show below, high rates of student loan default are especially common among GE programs that are projected to fail either the D/E rates or the earnings premium metric.

Furthermore, low earnings can cause financial trouble in aspects of a graduate's financial life beyond those related to loan repayment. In 2019, US individuals between 25 and 34 who had any type of postsecondary credential reported much higher rates of material hardship if their annual income was below the high school earnings threshold, with those below the threshold reporting being food insecure and behind on bills at more than double the rate of those with earnings above the threshold.[202]

In light of the low earnings, high debt, and student loan repayment difficulties for students in some GE programs, the Department has identified a risk that students may be spending their time and money and taking on Federal debt to attend programs that do not provide sufficient value to justify these costs. While even very good programs will have some students who struggle to

[199] https://www.ed.gov/news/press-releases/new-proposed-regulations-would-transform-income-driven-repayment-cutting-undergraduate-loan-payments-half-and-preventing-unpaid-interest-accumulation.

[200] These estimates of the subsidy rate are not those used in the budget and do not factor in take-up. Rather, they show the predicted subsidy rates

under the assumption that all students are enrolled in Proposed REPAYE.

[201] As explained in more detail later, the Department computed D/E and EP metrics only for those programs with 30 or more students who completed the program during the applicable two-year cohort period—that is, those programs that met the minimum cohort size requirements.

[202] These findings come from ED's analysis of the 2019 Survey of Income and Program Participation. This analysis compares individuals with annual income below the 2019 U.S. national median income for individuals with a high school degree aged 25–34 who had positive earnings or reported looking for work in the previous year, according to the Census Bureau's American Community Survey (ACS).

obtain employment or repay their student loans, the proposed metrics identify programs where the majority of students experience adverse financial outcomes upon completion.

Although enrollment in for-profit and sub-baccalaureate programs has declined following the Great Recession, past patterns suggest that—absent regulatory action—future economic downturns could reverse this trend. For-profit institutions are more responsive than public and nonprofit institutions to changes in economic conditions [203] and during the COVID–19 pandemic, it was the only sector to see increases in student enrollment.[204] Additionally, research shows that reductions in State and local funding for public higher education institutions tend to shift college students into the for-profit sector.[205] During economic downturns, this response is especially relevant since State and local funding is procyclical, falling during recessions even as student demand is increasing.[206]

For-profit institutions that participate in title IV, HEA programs are also more reliant on Federal student aid than public and nonprofit institutions. In recent years, around 70 percent of revenue received by for-profit institutions came from Pell Grants and Federal student loans.[207] For-profit institutions also have substantially higher tuition than public institutions offering similar degrees. In recent years, average for-profit tuition and fees charged by two-year for-profit institutions was over 4 times the average tuition and fees charged by community colleges.[208] Research suggests that Federal student aid supports for-profit expansions and higher prices.[209] Indeed, one study finds that for-profit programs in institutions that participate in title IV, HEA programs charge tuition that is around 80 percent higher than tuition charged by programs in the same field and with similar outcomes in nonparticipating for-profit institutions.[210]

For-profit institutions disproportionately enroll students with barriers to postsecondary access: low-income, non-white, and older students, as well as students who are veterans, single parents, or have a General Equivalency Degree.[211] In the 1990s, sanctions related to high cohort default rates led a large number of for-profit institutions to close, significantly reducing enrollment in this sector.[212] Yet, these actions did not reduce access to higher education. Instead, a large share of students who would have attended a sanctioned for-profit institution instead enrolled in local open access public institutions and, as a result, took on less debt and were less likely to default.[213] Similar conclusions were reached in recent studies of students that experienced program closures.[214] Better evidence is now available on the enrollment outcomes of students that would otherwise attend sanctioned or closed schools than when the 2014 Prior Rule was considered.

*2. Summary of Key Provisions*

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Definitions ............................................. | § 668.2 ........................ | Add definitions related to part 668, subparts Q and S, as well as other parts of the proposed regulations. |
| **Financial Value Transparency and Gainful Employment** | | |
| Financial value transparency scope and purpose. | § 668.401 .................... | Provide the scope and purpose of newly established financial value transparency regulations under subpart Q. |
| Financial value transparency framework ......... | § 668.402 .................... | Provide a framework under which the Secretary would assess the debt and earnings outcomes for students at both GE programs and eligible non-GE programs, using a debt-to-earnings metric and an earnings premium metric. |
| Calculating D/E rates ..................................... | § 668.403 .................... | Establish a methodology to calculate annual and discretionary D/E rates, including parameters to determine annual loan payments, annual earnings, loan debt and assessed charges, as well as to provide exclusions and specify when D/E rates would not be calculated. |
| Calculating earnings premium measure ........... | § 668.404 .................... | Establish a methodology to calculate a program s earnings premium measure, including parameters to determine median annual earnings, as well as to provide exclusions and specify when the earnings premium measure would not be calculated. |
| Process for obtaining data and calculating D/E rates and earnings premium measure. | § 668.405 .................... | Establish a process by which the Secretary would obtain administrative and earnings data to issue D/E rates and the earnings premium measure. |
| Determination of the D/E rates and earnings premium measure. | § 668.406 .................... | Require the Secretary to notify institutions of their financial value transparency metrics and outcomes. |

[203] Deming, D., Goldin, C., & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164.

Gilpin, G.A., Saunders, J., & Stoddard, C. (2015). Why has for-profit colleges' share of higher education expanded so rapidly? Estimating the responsiveness to labor market changes. *Economics of Education Review*, 45, 53–63.

[204] Cellini, S.R. (2020). The Alarming Rise in For-Profit College Enrollment. Washington, DC: Brookings Institution.

[205] Cellini, S.R. (2009). Crowded Colleges and College Crowd-Out: The Impact of Public Subsidies on the Two-Year College Market. *American Economic Journal: Economic Policy*, 1(2), 1–30.

Goodman, S. & Volz, A.H. (2020). Attendance Spillovers between Public and For-Profit Colleges: Evidence from Statewide Variation in Appropriations for Higher Education. *Education Finance and Policy*, 15(3), 428–456.

[206] Ma, J. & Pender, M. (2022). *Trends in College Pricing and Student Aid 2022*. New York: College Board.

[207] Cellini, S. & Koedel, K. (2017). The Case for Limiting Federal Student Aid to For-Profit Colleges. *Journal of Policy Analysis and Management*, 36(4), 934–942.

[208] NCES. (2022). Digest of Education Statistics (Table 330.10). Available at: *nces.ed.gov/programs/digest/d21/tables/dt21_330.10.asp*.

[209] Cellini, S.R. (2010). Financial aid and for-profit colleges: Does aid encourage entry? *Journal of Policy Analysis and Management*, 29(3), 526–552.

Lau, C.V. (2014). The incidence of federal subsidies in for-profit higher education. Unpublished manuscript. Evanston, IL: Northwestern University.

[210] Cellini, S.R., & Goldin, C. (2014). Does federal student aid raise tuition? New evidence on for-profit colleges. *American Economic Journal: Economic Policy*, 6(4), 174–206.

[211] Deming, D., Goldin, C., & Katz, L. (2012). The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators? *Journal of Economic Perspectives*, 26(1), 139–164.

Cellini, S.R. & Darolia, R. (2015). College costs and financial constraints. In B. Hershbein & K. Hollenbeck (Ed.). *Student Loans and the Dynamics of Debt* (137–174). Kalamazoo, MI: W.E. Upjohn Institute for Employment Research.

[212] Darolia, R. (2013). Integrity versus access? The effect of federal financial aid availability on postsecondary enrollment. *Journal of Public Economics*, 106, 101–114.

[213] Cellini, S.R., Darolia, R., & Turner, L.J. (2020). Where do students go when for-profit colleges lose federal aid? *American Economic Journal: Economic Policy*, 12(2), 46–83.

[214] See *https://www.gao.gov/products/gao-22-104403* and *sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/*.

App.300

**32408**    Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Student disclosure acknowledgments ............. | § 668.407 ..................... | Require current and prospective students to acknowledge having seen the information on the disclosure website maintained by the Secretary if an eligible non-GE program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may disburse any title IV, HEA funds. |
| Reporting requirements .................................... | § 668.408 ..................... | Establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and the timeframe for institutions to report this information. |
| Severability .................................................... | § 668.409 ..................... | Establish severability protections ensuring that if any provision from part 668 is held invalid, the remaining provisions would continue to apply. |
| Scope and purpose .......................................... | § 668.601 ..................... | Provide the scope and purpose of the GE regulations under subpart S. |
| GE criteria .................................................... | § 668.602 ..................... | Establish criteria for the Secretary to determine whether a GE program prepares students for gainful employment in a recognized occupation. |
| Ineligible GE programs ................................... | § 668.603 ..................... | Define the conditions under which a failing GE program would lose title IV, HEA eligibility, provide the opportunity for an institution to appeal a loss of eligibility only on the basis of a miscalculated D/E rate or earnings premium, and establish a period of ineligibility for failing GE programs that lose eligibility or voluntarily discontinue eligibility. |
| Certification requirements for GE programs .... | § 668.604 ..................... | Require institutions to provide the Department with transitional certifications, as well as to certify when seeking recertification or the approval of a new or modified GE program, that each eligible GE program offered by the institution is included in the institution s recognized accreditation or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency. |
| Warnings and acknowledgments ..................... | § 668.605 ..................... | Require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge to having seen the warning before the institution may disburse any title IV, HEA funds. |
| Severability .................................................... | § 668.606 ..................... | Establish severability protections ensuring that if any provision under part 668 is held invalid, the remaining provisions would continue to apply. |
| Date, extent, duration, and consequence of eligibility. | § 600.10(c)(1)(v) ......... | Require an institution seeking to establish the eligibility of a GE program to add the program to its application. |
| Updating application information ...................... | § 600.21(a)(11) ............ | Require an institution to notify the Secretary within 10 days of any update to information included in the GE program s certification. |
| License/certification disclosure ...................... | § 668.43(a)(5) .............. | Require all programs that are designed to meet educational requirements for a specific professional license or certification for employment in an occupation list all States where the institution is aware the program does and does not meet such requirements. |
| Institutional and programmatic information ..... | § 668.43(d) .................. | Establish a website for the posting and distribution of key information and disclosures pertaining to the institution s educational programs; require institutions to provide information about how to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution; and require institutions provide information about how to access that website to a current student before the start date of the first payment period associated with each consecutive award year in which the student enrolls. |
| Initial and final decisions ............................... | § 668.91(d)(3)(vi) ....... | Require that a hearing official must terminate the eligibility of a GE program that fails to meet the GE metrics, unless the hearing official concludes that the Secretary erred in the calculation. |

| Financial Responsibility | | |
|---|---|---|
| Centralizing requirements related to change of ownership. | § 668.15 ....................... | Remove and reserve section; move all requirements related to financial responsibility and change of ownership to § 668.176. |
| Timing of audit and financial statement submission. | § 668.23(a)(4) .............. | Require audit and financial statement submission within the earlier of 30 days after the date of the report or six months after the end of an institution s fiscal year. |
| Updating audit reference and clarifying fiscal years of submissions. | § 668.23(d)(1) .............. | Replace the reference to A 133 audits to 2 CFR part 200, subpart F. Require audits cover most up-to-date fiscal year and match periods covered by submissions to the IRS. |
| Disclosing amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures. | § 668.23(d)(5) .............. | Require institution to disclose in a footnote to its financial statement audit the dollar amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures. |
| Increased information from foreign entities ..... | § 668.23(d)(2) .............. | Require institutions with at least 50 percent ownership by a foreign entity to report additional information. |
| General financial responsibility standards ...... | § 668.171(b) ................. | Identify the standards generally used to establish that an institution is financially responsible. |
| Mandatory triggering events ........................... |  | Identify events that would automatically result in the Department either recalculating a financial responsibility composite score or requiring financial protection from an institution. |
| Discretionary triggering events ...................... | § 668.171(d) ................. | Identify events that the Secretary could consider in determining whether an institution is not able to meet its financial or administrative obligations and therefore must obtain financial protection. |
| Recalculating an institution s composite score | § 668.171(e) ................. | Identify how the Department would recalculate an institution s composite score when certain mandatory triggers occur. |
| Reporting requirements .................................... | § 668.171(f) ................. | Identify the various triggering events that require the institution to notify the Department that the triggering event has occurred. |
| Financial responsibility factors for public institutions. | § 668.171(g) ................. | Establishes financial responsibility standards for public institutions when backed by the full faith and credit of the appropriate government entity. |
| Audit opinions and disclosures ....................... | § 668.171(h) ................. | Establishes that the Department does not consider an institution to be financially responsible if the audited financial statements contain and opinion that is adverse, qualified or disclaimed unless the Department determines it does not have significant bearing on the institution s financial condition. |
| Past performance ........................................... | § 668.174 ..................... | Establishes the actions the Department may take based on an individual s or entity s past performance and the related impact on financial responsibility. |
| Alternative standards and requirements ......... | § 668.175 ..................... | Establishes the alternative standards for financial responsibility when the standards in § 668.171(b) are not met or the Department acts based on the triggers in § 668.171(c)&(d). |

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules  **32409**

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Financial responsibility for changes in ownership. | §668.176 ................... | Establish the standards and requirements for determining if an institution undergoing a change in ownership is financially responsible. |
| **Administrative Capability** | | |
| Require clear dissemination of financial aid information. | §668.16(h) ................. | Expand existing requirements on sufficient financial aid counseling to include clear and accurate financial aid communications to students. |
| Additional past performance requirements ...... | §668.16(k) ................. | Require that institutions not have a principal, affiliate, or anyone who exercises or previously exercised substantial control, who has been convicted of, or who has pled nolo contendere or guilty to, certain crimes or been found to have committed fraud. This also covers similar individuals at other institutions if the institution was found to have engaged in misconduct or faced liabilities in excess of 5 percent of its annual title IV, HEA program funds. |
| Negative actions ................................................ | §668.16(n) ................. | Provide that an institution is not administratively capable if it has been subject to a significant negative action subject to findings by a State or Federal agency, a court, or accrediting agency, where the basis of the action is repeated or unresolved, and the institution has not lost eligibility to participate in another Federal educational assistance program because of it. |
| Procedures for determining validity of high school diplomas. | §668.16(p) ................. | Require institutions to have adequate procedures for determining the validity of a high school diploma. |
| Career services .................................................. | §668.16(q) ................. | Require the institution to provide adequate career services. |
| Accessible clinical externship opportunities ..... | §668.16(r) ................. | Require the institution to provide students with accessible clinical or externship opportunities within 45 days of successful completion of coursework. |
| Timely fund disbursements ............................... | §668.16(s) ................. | Require the institution to disburse funds to students in a timely manner. |
| Significant enrollment in failing GE programs ... | §668.16(t) ................. | Provide that an institution is not administratively capable if half of its title IV, HEA revenue and half of its student enrollment comes from programs that are failing the GE requirements in part 668, subpart S. |
| Misrepresentations ............................................. | §668.16(u) ................. | Provide that an institution is not administratively capable if it has been found to engage in misrepresentations or aggressive recruitment. |
| **Certification Procedures** | | |
| Removing automatic certification approval ...... | §668.13(b)(3) ............. | Eliminate provision that requires Department approval to participate in the title IV, HEA programs if the Department has not acted on an application within 12 months. |
| Provisional certification triggers ...................... | §668.13(c)(1) ............. | Expand the list of circumstances that may lead to provisional certification. |
| Recertification timeframe for provisionally certified institutions. | §668.13(c)(2) ............. | Require provisionally certified institutions with major consumer protection issues to recertify within a maximum timeframe of two years. |
| Supplementary performance measures ............. | §668.13(e) ................. | Establish supplementary performance measures the Secretary may consider in determining whether to certify or condition the participation of an institution. |
| Signature requirements for Program Participation Agreements (PPAs). | §668.14(a)(3) ............. | Require direct or indirect owners of proprietary or private nonprofit institutions to sign the PPA. |
| Increasing information sharing on an institution s eligibility for or participation in title IV, HEA programs. | §668.14(b)(17) ........... | Expand the list of entities that have the authority to share information pertaining to an institution s eligibility for or participation in title IV, HEA programs or any information on fraud, abuse, or other violations to include Federal agencies and State attorneys general. |
| Prohibit the contract or employment of any individual, agency, or organization that was at an institution in any year in which the institution incurred a loss of Federal funds in excess of 5 percent of the institution s annual title IV, HEA program funds. | §668.14(b)(18)(i) and (ii). | Add to the list of situations in which an institution may not knowingly contract with or employ any individual, agency, or organization that has been, or whose officers or employees have been, 10-percent-or-higher equity owners, directors, officers, principals, executives, or contractors at an institution in any year in which the institution incurred a loss of Federal funds in excess of 5 percent of the institution s annual title IV, HEA program funds. |
| Limiting excessive hours of GE programs ....... | §668.14(b)(26)(ii) ....... | Limit the number of hours in a GE program to the greater of the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student. |
| Licensure/certification requirements and consumer protection. | §668.14(b)(32) ........... | Require all programs that prepare students for occupations requiring programmatic accreditation or State licensure to meet those requirements and comply with all applicable State consumer protection laws related to misrepresentation, closure, and recruitment. |
| Prohibition on transcript withholding for institutional errors or misconduct and returns under the Return of Title IV Funds requirements. | §668.14(b)(33) ........... | Prevents institutions from withholding transcripts or taking any other negative action against a student related to a balance owed by the student that resulted from an institution s administrative error, fraud, or misconduct, or returns of funds under the Return of Title IV Funds requirements. |
| Adding conditions that may apply to provisionally certified institutions. | §668.14(e) ................. | Establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions. |
| Adding conditions that may apply to for-profit institutions that undergo a change in ownership to convert to a nonprofit institution. | §668.14(f) .................. | Establish conditions that may apply to institutions that undergo a change in ownership to convert from a for-profit institution to a nonprofit institution. |
| Adding conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status. | §668.14(g) ................. | Establish conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status. |
| **Ability To Benefit** | | |
| Amend student eligibility requirements ............ | §668.32 ..................... | Differentiate between the title IV, HEA aid eligibility of non-high school graduates who enrolled in an eligible program prior to July 1, 2012, and those who enrolled after July 1, 2012. |
| Amend the State process ATB alternative ...... | §668.156 ................... | Amend the State process ATB alternative regulations to separate the State process into an initial period and subsequent period. Require institutions to submit an application that includes specified components. Set the success rate needed for approval of the subsequent period at 85 percent and allow an institution up to three years to achieve compliance. Prohibit participating institutions terminated by the State from participating in the State process for five years. Require reporting on the demographics of students enrolling through the State process. Allow the Secretary to lower the success rate to 75 percent in specified circumstances. |

<span style="color:red;">App.302</span>

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Add eligible career pathway program documentation requirements. | § 668.157 .................... | Clarify the documentation requirement for eligible career pathway programs. |

### 3. Analysis of the Financial Value Transparency and GE Regulations

This section presents a detailed analysis of the likely consequences of the Financial Value Transparency and GE provisions of the proposed regulations.

Methodology

Data Used in This RIA

This section describes the data referenced in this regulatory impact analysis and the NPRM. To generate information on the performance of different postsecondary programs offered in different higher education sectors, the Department relied on data on the program enrollment, demographic characteristics, borrowing levels, post-completion earnings, and borrower outcomes of students who received title IV, HEA aid for their studies. The Department produced program performance information, using measures based on the typical debt levels and post-enrollment earnings of program completers, from non-public records contained in the administrative systems the Department uses to administer the title IV, HEA programs along with earnings data produced by the U.S. Treasury. This performance information was supplemented with information from publicly available sources including the Integrated Postsecondary Education Data System (IPEDS), Postsecondary Education Participants System (PEPS), and the College Scorecard. The data used for the State earnings thresholds come from the Census Bureau's 2019 American Community Survey, while statistics about the price level used to adjust for inflation come from the Bureau of Labor Statistics' Consumer Price Index. This section describes the data used to produce this program performance information and notes several differences from the measures used for this purpose and the proposed D/E rates and earning premium measures set forth in the rule, as well as differences from the data disseminated during Negotiated Rulemaking. The data described below are referred to as the ''2022 Program Performance Data (2022 PPD),'' where 2022 refers to the year the programs were indicated as active. These data are being released with the NPRM.[215]

The proposed rule relies on non-public measures of the cumulative borrowing and post-completion earnings of federally aided title IV, HEA students, including both grant and loan recipients. The Department has information on all title IV, HEA aid grant and loan recipients at all institutions participating in the title IV, HEA programs, including the identity of the specific programs in which students are enrolled and whether students complete the program. This information is stored in the National Student Loan Data System (NSLDS), maintained by the Department's Office of Federal Student Aid (FSA).

Using this enrollment and completion information, in conjunction with non-public student loan information also stored in NSLDS, and earnings information obtained from Treasury, the Department calculated annual and discretionary debt-to-earnings (D/E) ratios, or rates, for all title IV, HEA programs. The Department also calculated the median earnings of high school graduates aged 25 to 34 in the labor force in the State where the program is located using public data, which is referred to as the Earnings Threshold (ET). This ET is compared to a program's graduates' annual earnings to determine the Earnings Premium (EP), the extent to which a programs' graduates earn more than the typical high school graduate in the same State. The methodology that was used to calculate both D/E rates, the ET, and the EP is described in further detail below. In addition to the D/E rates and earnings data, we also calculated informational outcomes measures, including program-level cohort default rates, to evaluate the likely consequences of the proposed rule.

In our analysis, we define a program by a unique combination consisting of the first six digits of its institution's Office of Postsecondary Education Identification (''OPEID'') number, also referred to as the six-digit OPEID, the program's 2010 Classification of Instructional Programs (CIP) code, and the program's credential level. The terms OPEID number, CIP code, and credential level are defined below. Throughout, we distinguish ''GE Programs'' from those that are not subject to the GE provisions of the proposed rule, referred to as ''non-GE Programs.'' The 2022 PPD includes information for 155,582 programs that account for more than 19 million title IV, HEA enrollments annually in award years 2016 and 2017. This includes 2,931,000 enrollments in 32,058 GE Programs (certificate programs at all institution types, and degree programs at proprietary institutions) and 16,337,000 enrollments in 123,524 non-GE Programs (degree programs at public and private not-for-profit institutions).

We calculated the performance measures in the 2022 PPD for all programs based on the debt and earnings of the cohort of students who both received title IV, HEA program funds, including Federal student loans and Pell Grants, and completed programs during an applicable two-year cohort period. Consistent with the proposed rule, students who do not complete their program are not included in the calculation of the metrics. The annual loan payment component of the debt-to-earnings formulas for the 2022 PPD D/E rates was calculated for each program using student loan information from NSLDS for students who completed their program in award years 2016 or 2017 (*i.e.*, between July 1, 2015, and June 30, 2017—we refer to this group as the 16/17 cohort). The earnings components of the rates were calculated for each program using information obtained from Treasury for students who completed between July 1, 2014, and June 30, 2016 (the 15/16 completer cohort), whose earnings were measured in calendar years 2018 and 2019.

Programs were excluded from the 2022 PPD if they are operated by an institution that was not currently active in the Department's PEPS system as of March 25, 2022, if the program did not have a valid credential type, or if the program did not have title IV, HEA

---

[215] To protect student privacy, we have applied certain protocols to the publicly released 2022 PPD and thus that dataset differs somewhat from the 2022 PPD analyzed in this RIA. Such protocols include omitting the values of variables derived from fewer than 30 students. For instance, the title IV enrollment in programs with fewer than 30 students is used to determine the number and share of enrollment in GE programs in this RIA, while the exact program-level enrollment of such programs is omitted in the public 2022 PPD. The privacy protocols are described in the data documentation accompanying this NPRM. The Department would not have reached different conclusions on the impact of the regulation or on the proposed rules if we had instead relied on this privacy-protective dataset, though the Department views analysis based on the 2022 PPD and described in this NPRM to provide a more precise representation of such impact. We view the differences in the analyses as substantively minor for purposes of this rulemaking.

completers in both the 15/16 and 16/17 completer cohorts.

Consistent with the proposed regulations, the Department computed D/E and EP metrics in the 2022 PPD only for those programs with 30 or more students who completed the program during the applicable two-year cohort period—that is, those programs that met the minimum cohort size requirements. A detailed analysis of the likely coverage rate under the proposed rule and of the number and characteristics of programs that met the minimum size in the 2022 PPD is included in ''Analysis of Data Coverage'' below.

We determined, under the provisions in the proposed regulations for the D/E rates and EP measures, whether each program would ''Pass D/E,'' ''Fail D/E,'' ''Pass EP,'' and ''Fail EP'' based on their 2022 PPD results, or ''No data'' if they did not meet the cohort size requirement.[216] These program-specific outcomes are then aggregated to determine the fraction of programs that pass or fail either metric or have insufficient data, as well as the enrollment in such programs.

• *Pass D/E:* Programs with an annual D/E earnings rate less than or equal to 8 percent *OR* a discretionary D/E earnings rate less than or equal to 20 percent.

• *Fail D/E:* Programs with an annual D/E earnings rate over 8 percent *AND* a discretionary D/E earnings rate over 20 percent.

• *Pass EP:* Programs with median annual earnings greater than the median earnings among high school graduates aged 25 to 34 in the labor force in the State in which the program is located.

• *Fail EP:* Programs with median annual earnings less than or equal to the median earnings among high school graduates aged 25 to 34 in the labor force in the State in which the program is located.

• *No data:* Programs that had fewer than 30 students in the two-year completer cohorts and so earnings and debt levels could not be determined.

Under the proposed regulations, a GE program would become ineligible for title IV, HEA program funds if it fails the D/E rates measure for two out of

three consecutive years or fails the EP measure for two out of three consecutive years. GE programs would be required to provide warnings in any year in which the program could lose eligibility based on the next D/E rates or earnings premium measure calculated by the Department. Students at such programs would be required to acknowledge having seen the warning and information about debt and earnings before receiving title IV aid. Eligible non-GE programs not meeting the D/E standards would need to have students acknowledge viewing this information before receiving aid.

The Department analyzed the estimated impact of the proposed regulations on GE and non-GE programs using the following data elements defined below:

• *Enrollment:* Number of students receiving title IV, HEA program funds for enrollment in a program. To estimate enrollment, we used the count of students receiving title IV, HEA program funds, averaged over award years 2016 and 2017. Since students may be enrolled in multiple programs during an award year, aggregate enrollment across programs will be greater than the unduplicated number of students.

• *OPEID:* Identification number issued by the Department that identifies each postsecondary educational institution (institution) that participates in the Federal student financial assistance programs authorized under title IV of the HEA.

• *CIP code:* Identification code from the Department's National Center for Education Statistics' (NCES) Classification of Instructional Programs, which is a taxonomy of instructional program classifications and descriptions that identifies instructional program specialties within educational institutions. The proposed rule would define programs using six-digit CIP codes, but due to data limitations, the statistics used in this NPRM and RIA are measured using four-digit codes to identify programs.[217] We used the 2010 CIP code instead of the 2020 codes to

align with the completer cohorts used in this analysis.

• *Control:* The control designation for a program's institution—public, private non-profit, private for-profit (proprietary), foreign non-profit, and foreign for-profit—using PEPS control data as of March 25, 2022.

• *Credential level:* A program's credential level—undergraduate certificate, associate degree, bachelor's degree, post-baccalaureate certificate, master's degree, doctoral degree, first professional degree, or post-graduate certificate.

• *Institution predominant degree:* The type designation for a program's institution which is based on the predominant degree the institution awarded in IPEDS and reported in the College Scorecard: less than 2 years, 2 years, and 4 years or more.

• *State:* Programs are assigned to a U.S. State, DC, or territory based on the State associated with the main institution.

The information contained in the 2022 PDD and used in the analysis necessarily differs from that used to evaluate programs under the proposed rule in a few ways due to certain information not being currently collected in the same form as it would under the proposed rule. These include:

• 4-digit CIP code is used to define programs in the 2022 PPD, rather than 6-digit CIP code. Program earnings are not currently collected at the 6-digit CIP code level, but would be under the proposed rule. Furthermore, the 2022 PPD uses 2010 CIP codes to align with the completer cohorts used in the analysis, but programs would be defined using the 2020 CIP codes under the proposed rule;

• Unlike the proposed rule, the total loan debt associated with each student is not capped at an amount equivalent to the program's tuition, fees, books, and supplies in the 2022 PPD, nor does debt include institutional and other private debt. Doing so requires additional institutional reporting of relevant data items not currently available to the Department. In the 2014 Prior Rule, using information reported by institutions, the tuition and fees cap was applied to approximately 15 percent of student records for the 2008–2009 2012 D/E rates cohort, though this does not indicate the share of programs whose median debt would be altered by the cap.

---

[216] This is a simplification. Under the proposed regulation, a ''no data'' year is not considered passing when determining eligibility for GE programs based on two out of three years. For non-GE programs, passing with data and without data are treated the same for the purposes of the warnings.

[217] In many cases the loss of information from conducting analysis at a four- rather than six-digit CIP code is minimal. According to the Technical Documentation: College Scorecard Data by Field of Study, 70 percent of credentials conferred were in four-digit CIP categories that had only one six-digit category with completers at an institution. The 2015 official GE rates can be used to examine the extent of variation in program debt and earnings outcomes across 6-digit CIP programs within the same credential level and institution.

• D/E rates using earnings levels measured in calendar years 2018 and 2019 would ideally use debt levels measured for completers in 2015 and 2016. Since program level enrollment data are more accurate for completers starting in 2016, we use completers in 2016 and 2017 to measure debt. We measure median debt levels and assume completers in the 2015 and 2016 cohorts would have had total borrowing that was the same in real terms (*i.e.,* we use the CPI to adjust their borrowing levels to estimate what the earlier cohort would have borrowed in nominal terms). This use of one cohort to measure earnings outcomes and another to measure debt necessarily reduces the estimated coverage in the 2022 PPD to a lower level than will be experienced in practice, as we describe in more detail below. Finally, the methodology used to assign borrowing to particular programs in instances where a borrower may be enrolled in multiple programs is different in the 2022 PPD than the methodology that would be used in the proposed rule (which is the same as that used in the 2014 Prior Rule);

• Medical and dental professional programs are not evaluated because earnings six years after completion are not available. The earnings and debt levels of these programs are set to missing and not included in the tabulations presented here;

• 150 percent of the Federal Poverty Guideline is used to define the ET for institutions in U.S. Territories (other than Puerto Rico, which uses Puerto Rico-specific ET) and foreign institutions in the 2022 PPD, rather than a national ET;

• The proposed rule would use a national ET if more than half of a program's students are out-of-state, but the 2022 PPD use an ET determined by the State an institution is located;

• Programs at institutions that have merged with other institutions since 2017 are excluded, but these programs' enrollment would naturally be incorporated into the merged institution if the proposed rule goes into effect.

• Under the proposed rule, if the two-year completer cohort has too few students to publish debt and earnings outcomes, but the four-year completer cohort has a sufficient number of students, then debt and earnings outcomes would be calculated for the four-year completer cohort. This was not possible for the 2022 PPD, so some programs with no data in our analysis would have data to evaluate performance under the proposed rule.

The 2022 PPD also differ from those published in the Negotiated Rulemaking data file in several ways. The universe

of programs in the previously published Negotiated Rulemaking data file were based, in part, on the College Scorecard universe which included programs as they are reported to IPEDS, but not necessarily to NSLDS. IPEDS is a survey, so institutions may report programs (degrees granted by credential level and CIP code) differently in IPEDS than is reflected in NSLDS. To reflect the impact of the proposed rule more accurately, the universe of the 2022 PPD is based instead on NSLDS records because it captures programs as reflected in the data systems used to administer title IV, HEA aid. Nonetheless, the 2022 PPD accounts for the same loan volume reflected in the Negotiated Rulemaking data file. In addition, the Negotiated Rulemaking data file included programs that were based on a previous version of College Scorecard prior to corrections made to resolve incorrect institution-reported information in underlying data sources.

Methodology for D/E Rates Calculations

The D/E rates measure is comprised of two debt-to-earnings ratios, or rates. The first, the annual earnings rate, is based on annual earnings, and the second, the discretionary earnings rate, is based on discretionary earnings. These two components together define a relationship between the maximum typical amount of debt program graduates should borrow based on the programs' graduates' typical earnings. Both conceptually and functionally the two metrics operate together, and so should be thought of as one "debt to earnings (D/E)" metric. The formulas for the two D/E rates are:

Annual Earnings Rate = (Annual Loan Payment)/(Annual Earnings)
Discretionary Earnings Rate = (Annual Loan Payment)/(Discretionary Earnings)

A program's annual loan payment, the numerator in both rates, is the median annual loan payment of the 2016–2017 completer cohort. This loan payment is calculated based on the program's cohort median total loan debt at program completion, including non-borrowers, subject to assumptions on the amortization period and interest rate. Cohorts' median total loan debt at program completion were computed as follows.

• Each student's total loan debt includes both FFEL and Direct Loans. Loan debt does not include PLUS Loans made to parents, Direct Unsubsidized Loans that were converted from TEACH Grants, private loans, or institutional loans that the student received for enrollment in the program.

• In cases where a student completed multiple programs at the same institution, all loan debt is attributed to the highest credentialed program that the student completed, and the student is not included in the calculation of D/E rates for the lower credentialed programs that the student completed.

• The calculations exclude students whose loans were in military deferment, or who were enrolled at an institution of higher education for any amount of time in the earnings calendar year, or whose loans were discharged because of disability or death.

The median annual loan payment for each program was derived from the median total loan debt by assuming an amortization period and annual interest rate based on the credential level of the program. The amortization periods used were:

• 10 years for undergraduate certificate, associate degree, post-baccalaureate certificate programs, and graduate certificate programs;

• 15 years for bachelor's and master's degree programs;

• 20 years for doctoral and first professional degree programs.

The amortization periods account for the typical outcome that borrowers who enroll in higher-credentialed programs (*e.g.,* bachelor's and graduate degree programs) are likely to have more loan debt than borrowers who enroll in lower-credentialed programs and, as a result, are more likely to take longer to repay their loans. These amortization rates mirror those used in the 2014 Prior Rule, which were based on Department analysis of loan balances and the differential use of repayment plan periods by credential level at that time.[218] The interest rates used were:

• 4.27 percent for undergraduate programs;

• 5.82 percent for graduate programs. For both undergraduate and graduate programs, the rate used is the average interest rate on Federal Direct Unsubsidized loans over the three years prior to the end of the applicable cohort period, in this case, the average rate for loans disbursed between the beginning of July 2013 and the end of June 2016.

The denominators for the D/E rates are two different measures of student earnings. Annual earnings are the median total earnings in the calendar year three years after completion, obtained from the U.S. Treasury. Earnings were measured in calendar years 2018 and 2019 for completers in award years 2015–2016 and 2016–2017, respectively, and were converted to

---

[218] See pages 64939–40 of 79 FR *https://www.federalregister.gov/d/2014-25594.*

2019 dollars using the CPI–U. Earnings are defined as the sum of wages and deferred compensation for all W–2 forms plus self-employment earnings from Schedule SE.[219] Graduates who were enrolled in any postsecondary program during calendar year 2018 (2015–2016 completers) or 2019 (2016–2017 completers) are excluded from the calculation of earnings and the count of students. Discretionary earnings are equal to annual earnings, calculated as above, minus 150 percent of the Federal Poverty Guidelines for a single person, which for 2019 is earnings in excess of $18,735.

Professional programs in Medicine (MD) and Dentistry (DDS) would have earnings measured over a longer time horizon to accommodate lengthy post-graduate internship training, where earnings are likely much lower three years after graduation than they would be even a few years further removed from completion.[220] Since longer horizon earning data are not currently available, earnings for these programs were set to missing and treated as if they lacked sufficient number of completers to be measured.

Methodology for EP Rate Calculation

The EP measures the extent to which a program's graduates earn more than the typical high school graduate in the same State. The Department first calculated the ET, which is the median earnings of high school graduates in the labor force in each State where the program is located. The ET is adjusted for differences in high school earnings across States and over time so it naturally accounts for variations across these dimensions to reflect what workers would be expected to earn in the absence of postsecondary participation. The ET is computed as the median annual earnings among respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education, and who are in the labor force when they are interviewed, indicated by working or looking for and being available to work. The ET is lower than that proposed during Negotiated Rulemaking, which would compute median annual earnings among respondents aged 25–34 in the

American Community Survey who have a high school diploma or GED, but no postsecondary education, and who reported working (*i.e.*, having positive earnings) in the year prior to being surveyed. Table 3.1 below shows the ET for each State (along with the District of Columbia and Puerto Rico) in 2019. The ET ranges from $31,294 (North Dakota) to $20,859 (Mississippi). The threshold for institutions in U.S. territories (other than Puerto Rico) and outside the United States is $18,735. We provide evidence in support of the chosen threshold below. Estimates of the impact of the proposed regulations using these alternative thresholds are presented in Section 9 "Regulatory Alternatives Considered."

TABLE 3.1   EARNINGS THRESHOLDS BY STATE, 2019

|  | Earnings threshold, 2019 |
| --- | --- |
| State of Institution: |  |
| Alabama | 22,602 |
| Alaska | 27,489 |
| Arizona | 25,453 |
| Arkansas | 24,000 |
| California | 26,073 |
| Colorado | 29,000 |
| Connecticut | 26,634 |
| Delaware | 26,471 |
| District of Columbia | 21,582 |
| Florida | 24,000 |
| Georgia | 24,435 |
| Hawaii | 30,000 |
| Idaho | 26,073 |
| Illinois | 25,030 |
| Indiana | 26,073 |
| Iowa | 28,507 |
| Kansas | 25,899 |
| Kentucky | 24,397 |
| Louisiana | 24,290 |
| Maine | 26,073 |
| Maryland | 26,978 |
| Massachusetts | 29,830 |
| Michigan | 23,438 |
| Minnesota | 29,136 |
| Mississippi | 20,859 |
| Missouri | 25,000 |
| Montana | 25,453 |
| Nebraska | 27,000 |
| Nevada | 27,387 |
| New Hampshire | 30,215 |
| New Jersey | 26,222 |
| New Mexico | 24,503 |
| New York | 25,453 |
| North Carolina | 23,300 |
| North Dakota | 31,294 |
| Ohio | 24,000 |
| Oklahoma | 25,569 |
| Oregon | 25,030 |
| Pennsylvania | 25,569 |
| Rhode Island | 26,634 |

TABLE 3.1   EARNINGS THRESHOLDS BY STATE, 2019   Continued

|  | Earnings threshold, 2019 |
| --- | --- |
| South Carolina | 23,438 |
| South Dakota | 28,000 |
| Tennessee | 23,438 |
| Texas | 25,899 |
| Utah | 28,507 |
| Vermont | 26,200 |
| Virginia | 25,569 |
| Washington | 29,525 |
| West Virginia | 23,438 |
| Wisconsin | 27,699 |
| Wyoming | 30,544 |
| Puerto Rico | 9,570 |
| Foreign Institutions & Territories | 18,735 |

The EP is computed as the difference between Annual Earnings and the ET:

Earnings Premium = (Annual Earnings) − (Earnings Threshold)

where the Annual Earnings is computed as above, and the ET is assigned for the State in which the program is located. For foreign institutions and institutions located in U.S. territories, 150 percent of the Federal Poverty Guideline for the given year is used as the ET because comparable information about high school graduate earnings is not available.

The Department conducted several analyses to support the decision of the particular ET chosen. The discussion here focuses on undergraduate certificate programs, which our analysis below suggests is the sector where program performance results are most sensitive to the choice of ET.

First, based on student age information available from students' Free Application for Federal Student Aid (FAFSA) data, we estimate that the typical undergraduate program graduate three years after completion, when their earnings are measured, would be 30 years old. The average age of students three years after completion for undergraduate certificate programs is 31 years, while for Associate's programs it is 30, Bachelor's 29, Master's 33, Doctoral 38, and Professional programs 32. There are very few Post-BA and Graduate Certificate programs (162 in total) and their average ages at earnings measurement 35 and 34, respectively.[221]

BILLING CODE 4000 01 P

---

[219] See Technical Documentation: College Scorecard Data by Field of Study.

[220] For example, the average medial resident earns between roughly $62,000 and $67,000 in the first three years of residency, according to the AAMC Survey of Resident/Fellow Stipends and Benefits, and the mean composition for physicians is $260,000 for primary care and $368,000 for

specialists, according to the Medscape Physician Compensation Report.

[221] Age at earnings measurement is not contained in the data, so we estimate it with age at FAFSA filing immediately before program enrollment plus typical program length (1 for certificate, 2 for Associate's programs, 4 for Bachelor's programs) plus 3 years. To the extent that students take longer

to complete their programs, the average age will be even older than what is reported here. Using this approach, the mean age when earnings are likely to be measured in programs with at least 30 students is 30.34 across all undergraduate programs; the mean for undergraduate certificate students is 30.42.



Figure 3.1. Mean Age When Earnings are Measured, UG

For-Profit Certificate Programs

Figure 3.1 shows the average estimated age for for-profit certificate holders 3 years after completion, when earnings would be measured, for the 10 most common undergraduate certificate programs (and an aggregate 'other' category). All credentials have an average age that falls within or above the range of ages used to construct the earnings threshold. In cases where the average age falls above this range, our earnings threshold is lower than it would be if we adjusted the age band use to match the programs' completers ages.

Second, the ET proposed is typically less than the average pre-program income of program entrants, as measured in their FAFSA. Figure 3.2 shows average pre-program individual income for students at these same types of certificate programs, including any dependent and independent students that had previously been working.[222] The figure also plots the ET and the average post-program median earnings for programs under consideration. The program-average share of students used to compute pre-program income is also reported in parentheses.[223] Pre-program income falls above or quite close to the

ET for most types of certificate programs. Furthermore, the types of certificate programs which we show below have very high failure rates—Cosmetology and Somatic Bodywork (massage), for example—are unusual in having very low post-program earnings compared to other programs that have similar pre-program income.

We view this as suggestive evidence that the ET chosen provides a reasonable, but conservative, guide to the minimum earnings that program graduates should be expected to obtain.[224]

[222] To exclude workers that are minimally attached to the labor force or in non-covered employment, the Census Postsecondary Employment Outcomes data requires workers to have annual earnings greater than or equal to the annual equivalent of full-time work at the prevailing Federal minimum wage and at least three quarters of non-zero earnings. (*lehd.ces.census.gov/ data/pseo_documentation.html*). We impose a similar restriction, including only those students whose pre-program earnings are equivalent to full-

time work for three quarters at the Federal minimum wage. We only compute average pre-program income if at least 30 students meet this criteria.

[223] Across undergraduate certificate programs for which the pre-program income measure was calculated, the average share of students meeting the criteria is 41 percent (weighting each program equally) or 38 percent (weighting programs by title IV, HEA enrollment). Given incomplete coverage and the potential for non-random selection into the

sample measuring pre-program income, we view this analysis only suggestive.

[224] The earnings of 25 to 34 high school graduates used to construct the ET (similar in age to program completers 3 years after graduation) should be expected to exceed pre-program income because the former likely has more labor force experience than the latter. Thus the comparison favors finding that the ET exceeds pre-program income. The fact that pre-program income generally exceeds the ET suggests that the ET is conservative.



Figure 3.2 Average Income Before Program and Earnings After Program, For-Profit UG Certificate Programs

BILLING CODE 4000 01 C

Analysis of Data Coverage

This section begins with a presentation of the Department's estimate of the share of enrollment and programs that would meet the n-size requirement and be evaluated under the proposed rule. We assembled data on the number of completers in the two-year cohort period (AYs 2016–2017) and total title IV enrollment for programs defined at the six-digit OPEID, credential level, and six-digit CIP code from NSLDS. This is the level of aggregation that would be used in the proposed rule. Total Title IV enrollment at this same level of disaggregation was also collected. Deceased students and students enrolled during the earnings measurement rule would be excluded from the earnings sample under the proposed rule; however, the Department has not yet applied such information on the number of such completers to the counts described above. We therefore impute the number of completers in the earning sample by multiplying the total completer count in our data by 82 percent, which is the median ratio of

non-enrolled earning count to total completer count derived from programs defined at a four-digit CIP code level.

Table 3.2 below reports the share of Title IV, HEA enrollment and programs that would have metrics computed under an n-size of 30 and using six-digit CIP codes to define programs. We estimate that 75 percent of GE enrollment and 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort. An additional 8 percent of enrollment and 11 percent of programs have an n-size of between 15 and 29 and would thus be likely have metrics computed using a four-year completer cohort. The comparable rates for eligible non-GE programs are 69 percent of enrollment and 19 percent of programs with a n-size of 30 and using two-year cohort metrics, with the use of four-year cohort rates likely increasing these coverage rates of enrollment and programs by 13 and 15 percent, respectively.

The table also reports similar estimates aggregating programs to a four-digit CIP code level. Coverage does not diminish dramatically (3–5

percentage points) when moving from four-digit CIP codes, as presented in the 2022 PPD, to six-digit CIP codes to define programs.

We note that the high coverage of Title IV enrollment relative to Title IV programs reflects the fact that there are many very small programs with only a few students enrolled each year. For example, based on our estimates, more than half of all programs (defined at six-digit CIP code) have fewer than five students completing per year and about twenty percent have fewer than five students enrolled each year. The Department believes that the coverage of students based on enrollment is sufficiently high to generate substantial net benefits and government budget savings from the policy, as described in "Net Budget Impacts" and "Accounting Statement" below. We believe that the extent to which enrollment is covered by the proposed rule is the appropriate measure on which to focus coverage analysis on because the benefits, costs, and transfers associated with the policy almost all scale with the number of students (enrollment or completions) rather than the number of programs.

TABLE 3.2   SHARE OF ENROLLMENT AND PROGRAMS MEETING SAMPLE SIZE RESTRICTIONS, BY CIP CODE LEVEL

|  | Enrollment | | Programs | |
|---|---|---|---|---|
|  | CIP4 | CIP6 | CIP4 | CIP6 |
| GE Programs: | | | | |
| n-size = 15 | 0.86 | 0.83 | 0.29 | 0.26 |
| n-size = 30 | 0.79 | 0.75 | 0.18 | 0.15 |
| Non-GE Programs: | | | | |
| n-size = 15 | 0.85 | 0.82 | 0.39 | 0.34 |
| n-size = 30 | 0.74 | 0.69 | 0.23 | 0.19 |

**Notes:** Average school-certified enrollment in AY1617 is used as the measure of enrollment, but the 2022 PPD analyzed in the RIA uses total (certified and non-certified) enrollment, so coverage rates will differ. Non-enrolled earnings count for AY1617 completers is not available at a six-digit CIP level (for any n-size) or at a four-digit CIP level (for n-size = 15). Therefore, non-enrolled earnings counts are imputed based on the median ratio of non-enrolled earnings count to total completer counts at the four-digit CIP level where available. This median ratio is multiplied by the actual completer count for AY1617 at the four- and six-digit CIP level for all programs to determine the estimated n-size.

The rest of this section describes coverage rates for programs as they appear in the 2022 PPD to give context for the numbers presented in the RIA. Again, the analyses above are the better guide to the coverage of metrics we expect to build under the rule. The coverage in the 2022 PPD is lower than that reported in Table 3.2, due to differences in data used and because the 2022 PPD does not apply the four-year cohort period "look back" provisions and instead only uses two-year cohorts.[225]

Tables 3.3a and 3.3b report the share of non-GE and GE enrollment and programs with valid D/E rates and EP rates in the 2022 PPD, by control and

credential level. For Non-GE programs, metrics could be calculated for 62.0 percent of enrollment who attended 18.0 percent of programs. Coverage is typically highest for public bachelor's degree programs and professional programs at private non-profit institutions. Doctoral programs in either sector are the least likely to have sufficient size to compute performance metrics. Programs at foreign institutions are very unlikely to have a sufficient number of completers.

Overall, 65.4 percent of title IV, HEA enrollment is in GE programs that have a sufficient number of completers to allow the Department to construct both valid D/E and EP rates in the 2022 PPD.

This represents 12.8 percent of GE programs. Note that a small number of programs have an EP metric computed but a D/E metric is not available because there are fewer than 30 completers in the two-year debt cohort. Coverage is typically higher in the proprietary sector—we are able to compute D/E or EP metrics for programs accounting for about 87.0 percent of enrollment in proprietary undergraduate certificate programs. Comparable rates are 61.5 percent and 21.4 percent of enrollment in the non-profit and public undergraduate certificate sectors, respectively.

TABLE 3.3a   PERCENT OF PROGRAMS AND ENROLLMENT IN PROGRAMS WITH VALID D/E AND EP INFORMATION BY CONTROL AND CREDENTIAL LEVEL (NON-GE PROGRAMS)

|  | Data availability category | | | | | |
|---|---|---|---|---|---|---|
|  | Has both D/E and EP | | Has EP only | | Does not have EP or D/E | |
|  | Programs | Enrollees | Programs | Enrollees | Programs | Enrollees |
| Public: | | | | | | |
| Associate s | 11.6 | 55.8 | 0.3 | 0.3 | 88.1 | 43.9 |
| Bachelor s | 39.3 | 74.3 | 0.5 | 0.2 | 60.2 | 25.5 |
| Master s | 15.5 | 57.4 | 0.8 | 0.9 | 83.8 | 41.7 |
| Doctoral | 3.0 | 21.7 | 0.3 | 0.7 | 96.7 | 77.6 |
| Professional | 37.7 | 55.5 | 0.7 | 0.6 | 61.6 | 43.9 |
| Private, Nonprofit: | | | | | | |
| Associate s | 12.6 | 61.9 | 0.4 | 0.1 | 87.0 | 38.0 |
| Bachelor s | 13.4 | 50.6 | 0.3 | 0.4 | 86.3 | 49.1 |
| Master s | 19.7 | 67.1 | 0.9 | 0.9 | 79.3 | 32.0 |
| Doctoral | 7.6 | 50.8 | 0.3 | 1.9 | 92.1 | 47.4 |
| Professional | 43.3 | 74.8 | 1.9 | 0.8 | 54.8 | 24.4 |
| Foreign Private: | | | | | | |
| Associate s | .............. | .............. | .............. | .............. | 100.0 | 100.0 |
| Bachelor s | 0.1 | 1.2 | .............. | .............. | 99.9 | 98.8 |
| Master s | 0.3 | 4.6 | 0.1 | 0.4 | 99.6 | 95.0 |
| Doctoral | .............. | .............. | .............. | .............. | 100.0 | 100.0 |
| Professional | 3.4 | 20.7 | 1.1 | 3.9 | 95.5 | 75.4 |
| Total: | | | | | | |
| Total | 18.0 | 62.0 | 0.4 | 0.4 | 81.6 | 37.7 |

[225] Unlike the proposed rule, the 2022 PPD also combines earnings and debt data from two different (but overlapping) two-year cohorts. Alternatively, the calculations in Table 3.2 use information for a single two-year completer cohort for both earnings and debt, as the rule would do, and thus provides a more accurate representation of the expected overall coverage. A second difference between the coverage estimates in Table 3.2 and that in the 2022 PPD has do with different data sources that result in slightly different estimates of enrollment coverage between the two sources.

TABLE 3.3b   PERCENT OF PROGRAMS AND ENROLLMENT IN PROGRAMS WITH VALID D/E AND EP INFORMATION BY CONTROL AND CREDENTIAL LEVEL (GE PROGRAMS)

| | Data availability category | | | | | |
| | Has both D/E and EP | | Has EP only | | Does not have EP or D/E | |
| | Programs | Enrollees | Programs | Enrollees | Programs | Enrollees |
|---|---|---|---|---|---|---|
| **Public:** | | | | | | |
| UG Certificates | 4.8 | 21.4 | 0.3 | 0.4 | 94.9 | 78.2 |
| Post-BA Certs | 0.9 | 7.0 | 0.1 | 0.2 | 99.0 | 92.7 |
| Grad Certs | 2.7 | 21.7 | 0.2 | 1.3 | 97.1 | 77.0 |
| **Private, Nonprofit:** | | | | | | |
| UG Certificates | 12.4 | 61.5 | 0.5 | 0.1 | 87.1 | 38.4 |
| Post-BA Certs | 0.7 | 3.8 | 1.0 | 2.5 | 98.3 | 93.8 |
| Grad Certs | 3.9 | 25.6 | 0.4 | 1.1 | 95.8 | 73.4 |
| **Proprietary:** | | | | | | |
| UG Certificates | 50.8 | 87.0 | 1.4 | 0.4 | 47.8 | 12.7 |
| Associate s | 34.9 | 84.4 | 2.3 | 0.7 | 62.9 | 15.0 |
| Bachelor s | 38.5 | 91.6 | 1.3 | 0.6 | 60.3 | 7.8 |
| Post-BA Certs | 8.7 | 62.2 | ............ | ............ | 91.3 | 37.8 |
| Master s | 41.4 | 93.2 | 2.1 | 0.7 | 56.4 | 6.1 |
| Doctoral | 35.0 | 74.0 | 1.7 | 3.9 | 63.3 | 22.2 |
| Professional | 31.0 | 65.1 | 3.4 | 21.2 | 65.5 | 13.7 |
| Grad Certs | 16.1 | 66.8 | 4.8 | 1.1 | 79.0 | 32.2 |
| **Total:** | | | | | | |
| Total | 12.8 | 65.4 | 0.6 | 0.7 | 86.6 | 34.0 |

## Explanation of Terms

While most analysis will be simple cross-tabulations by two or more variables, we use linear regression analysis (also referred to as "ordinary least squares") to answer some questions about the relationship between variables holding other factors constant. Regression analysis is a statistical method that can be used to measure relationships between variables. For instance, in the demographic analysis, the demographic variables we analyze are referred to as "independent" variables because they represent the potential inputs or determinants of outcomes or may be proxies for other factors that influence those outcomes. The annual debt to earnings (D/E) rate and earnings premium (EP) are referred to as "dependent" variables because they are the variables for which the relationship with the independent variables is examined. The output of a regression analysis contains several relevant points of information. The "coefficient," also known as the point estimate, for each independent variable is the average amount that a dependent variable is estimated to change with a one-unit change in the associated independent variable, holding all other independent variables included in the model constant. The standard error of a coefficient is a measure of the precision of the estimate. The ratio of the coefficient and standard error, called a "t-statistic" is commonly used to

determine whether the relationship between the independent and dependent variables is "statistically significant" at conventional levels.[226] If an estimated coefficient is imprecise (*i.e.*, it has a large standard error relative to the coefficient), it may not be a reliable measure of the underlying relationship. Higher values of the t-statistic indicate a coefficient is more precisely estimated. The "R-squared" is the fraction of the variance of the dependent variable that is statistically explained by the independent variables.

Results of the Financial Value Transparency Measures for Programs Not Covered by Gainful Employment

In this subsection we examine the results of the transparency provisions of the proposed regulations for the 123,524 non-GE Programs. The analysis is focused on results for a single set of financial-value measures— approximating rates that would have been released in 2022 (with some differences, described above). Though programs with fewer than 30 completers in the cohort are not subject to the D/E and EP tests and would not have these metrics published, we retain these programs in our analysis and list them in the tables as "No Data" to provide a more complete view of the distribution of enrollment and programs across the D/E and EP metrics.

Table 3.4 and 3.5 reports the results for non-GE programs by control and credential level. Non-GE programs with failing D/E metrics are required to have

students acknowledge having seen the program outcome information before aid is disbursed. Students at non-GE programs that do not pass the earnings premium metric are not subject to the student acknowledgement requirement, however, for informational purposes, we report rates of passing this metric for non-GE programs as well. We expect performance on the EP metric contained on the ED-administered program disclosure website to be of interest to students even if it is not part of the acknowledgement requirement. This analysis shows that:

• 870 public and 760 non-profit degree programs (representing 1.2 and 1.6 percent of programs and 4.6 and 7.8 percent of enrollment, respectively) would fail at least one of the D/E or EP metrics.

• At the undergraduate level, failure of the EP metric is most common at public Associate degree programs, whereas failure of the D/E metric is relatively more common among Bachelor's degree programs, particularly at non-profit institutions.

• Failure for graduate programs is almost exclusively due to the failure of the D/E metric and is most prominent for doctoral and professional programs at private, non-profit institutions.

• In total, 127,900 students (1.1 percent) at public institutions and 273,700 students (6.8 percent) at non-profit institutions are in programs with failing D/E metrics and would be required to provide acknowledgment prior to having aid disbursed.

[226] We use significance level, or alpha, of 0.05 when assessing the statistical significance in our regression analysis.

TABLE 3.4   NUMBER AND PERCENT OF TITLE IV ENROLLMENT IN NON-GE BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Percent of enrollment | | | | | Number of enrollments | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| **Public:** | | | | | | | | | | |
| Associate s | 44.1 | 48.1 | 0.4 | 0.2 | 7.3 | 2,424,700 | 2,642,100 | 19,900 | 9,800 | 400,400 |
| Bachelor s | 25.7 | 72.5 | 1.1 | 0.2 | 0.6 | 1,491,800 | 4,202,800 | 63,000 | 10,300 | 32,800 |
| Master s | 42.6 | 55.8 | 1.5 | 0.0 | 0.0 | 324,300 | 424,600 | 11,300 | 300 | 0 |
| Doctoral | 78.3 | 19.1 | 2.6 | 0.0 | 0.0 | 113,600 | 27,800 | 3,800 | 0 | 0 |
| Professional | 44.5 | 48.0 | 7.5 | 0.0 | 0.0 | 56,700 | 61,100 | 9,600 | 0 | 0 |
| Total | 35.8 | 59.7 | 0.9 | 0.2 | 3.5 | 4,411,100 | 7,358,400 | 107,600 | 20,300 | 433,200 |
| **Private, Nonprofit:** | | | | | | | | | | |
| Associate s | 38.1 | 37.2 | 7.7 | 15.3 | 1.7 | 101,800 | 99,300 | 20,700 | 40,700 | 4,500 |
| Bachelor s | 49.4 | 46.3 | 1.8 | 1.1 | 1.3 | 1,310,000 | 1,228,500 | 47,900 | 30,100 | 34,700 |
| Master s | 32.8 | 59.4 | 7.4 | 0.3 | 0.1 | 261,400 | 472,900 | 58,600 | 2,400 | 800 |
| Doctoral | 49.2 | 31.0 | 19.6 | 0.1 | 0.0 | 70,300 | 44,300 | 28,000 | 200 | 0 |
| Professional | 25.2 | 40.1 | 34.6 | 0.0 | 0.2 | 32,800 | 52,300 | 45,100 | 0 | 200 |
| Total | 44.5 | 47.6 | 5.0 | 1.8 | 1.0 | 1,776,300 | 1,897,400 | 200,300 | 73,400 | 40,200 |
| **Foreign Private:** | | | | | | | | | | |
| Associate s | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100 | 0 | 0 | 0 | 0 |
| Bachelor s | 98.8 | 0.0 | 0.0 | 1.2 | 0.0 | 5,400 | 0 | 0 | 100 | 0 |
| Master s | 95.4 | 2.8 | 1.8 | 0.0 | 0.0 | 8,600 | 300 | 200 | 0 | 0 |
| Doctoral | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,800 | 0 | 0 | 0 | 0 |
| Professional | 79.3 | 0.0 | 20.7 | 0.0 | 0.0 | 1,200 | 0 | 300 | 0 | 0 |
| Total | 95.7 | 1.3 | 2.6 | 0.4 | 0.0 | 18,100 | 300 | 500 | 100 | 0 |
| **Total:** | | | | | | | | | | |
| Associate s | 43.8 | 47.6 | 0.7 | 0.9 | 7.0 | 2,526,500 | 2,741,400 | 40,500 | 50,500 | 404,800 |
| Bachelor s | 33.2 | 64.2 | 1.3 | 0.5 | 0.8 | 2,807,200 | 5,431,300 | 111,000 | 40,400 | 67,500 |
| Master s | 38.0 | 57.3 | 4.5 | 0.2 | 0.1 | 594,300 | 897,800 | 70,100 | 2,700 | 800 |
| Doctoral | 64.2 | 24.8 | 10.9 | 0.1 | 0.0 | 186,700 | 72,100 | 31,800 | 200 | 0 |
| Professional | 35.0 | 43.7 | 21.2 | 0.0 | 0.1 | 90,700 | 113,400 | 55,000 | 0 | 200 |
| Total | 38.0 | 56.7 | 1.9 | 0.6 | 2.9 | 6,205,500 | 9,256,100 | 308,400 | 93,800 | 473,400 |

**Note:** Enrollment counts rounded to the nearest 100.

TABLE 3.5   NUMBER AND PERCENT OF NON-GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Result in 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | Percent | N | Percent | N | Percent | N | Percent | N | Percent | N |
| **Public:** | | | | | | | | | | |
| Associate s | 88.5 | 24,161 | 9.9 | 2,694 | 0.1 | 24 | 0.1 | 19 | 1.5 | 414 |
| Bachelor s | 60.8 | 14,801 | 37.8 | 9,202 | 0.7 | 164 | 0.2 | 48 | 0.5 | 123 |
| Master s | 84.6 | 12,337 | 15.0 | 2,191 | 0.3 | 50 | 0.0 | 3 | 0.0 | 1 |
| Doctoral | 97.0 | 5,553 | 2.8 | 162 | 0.2 | 9 | 0.0 | 0 | 0.0 | 0 |
| Professional | 63.4 | 360 | 33.5 | 190 | 3.2 | 18 | 0.0 | 0 | 0.0 | 0 |
| Total | 78.9 | 57,212 | 19.9 | 14,439 | 0.4 | 265 | 0.1 | 70 | 0.7 | 538 |
| **Private, Nonprofit:** | | | | | | | | | | |
| Associate s | 87.7 | 2,036 | 9.1 | 212 | 1.2 | 28 | 1.5 | 34 | 0.5 | 11 |
| Bachelor s | 86.7 | 25,784 | 12.4 | 3,689 | 0.4 | 125 | 0.3 | 75 | 0.3 | 79 |
| Master s | 80.5 | 8,342 | 17.1 | 1,771 | 2.2 | 227 | 0.2 | 17 | 0.0 | 5 |
| Doctoral | 92.4 | 2,638 | 5.3 | 150 | 2.2 | 64 | 0.1 | 2 | 0.0 | 0 |
| Professional | 57.6 | 284 | 25.2 | 124 | 16.6 | 82 | 0.0 | 0 | 0.6 | 3 |
| Total | 85.4 | 39,084 | 13.0 | 5,946 | 1.1 | 526 | 0.3 | 128 | 0.2 | 98 |
| **Foreign Private:** | | | | | | | | | | |
| Associate s | 100.0 | 18 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Bachelor s | 99.9 | 1,227 | 0.0 | 0 | 0.0 | 0 | 0.1 | 1 | 0.0 | 0 |
| Master s | 99.7 | 3,067 | 0.1 | 4 | 0.1 | 3 | 0.0 | 0 | 0.0 | 1 |
| Doctoral | 100.0 | 793 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Professional | 97.1 | 101 | 0.0 | 0 | 2.9 | 3 | 0.0 | 0 | 0.0 | 0 |
| Total | 99.8 | 5,206 | 0.1 | 4 | 0.1 | 6 | 0.0 | 1 | 0.0 | 1 |
| **Total:** | | | | | | | | | | |
| Associate s | 88.4 | 26,215 | 9.8 | 2,906 | 0.2 | 52 | 0.2 | 53 | 1.4 | 425 |
| Bachelor s | 75.6 | 41,812 | 23.3 | 12,891 | 0.5 | 289 | 0.2 | 124 | 0.4 | 202 |
| Master s | 84.7 | 23,746 | 14.2 | 3,966 | 1.0 | 280 | 0.1 | 20 | 0.0 | 7 |
| Doctoral | 95.9 | 8,984 | 3.3 | 312 | 0.8 | 73 | 0.0 | 2 | 0.0 | 0 |
| Professional | 63.9 | 745 | 27.0 | 314 | 8.8 | 103 | 0.0 | 0 | 0.3 | 3 |
| Total | 82.2 | 101,502 | 16.5 | 20,389 | 0.6 | 797 | 0.2 | 199 | 0.5 | 637 |

Tables 3.6 and 3.7 report results by credential level and 2-digit CIP code for non-GE programs. This analysis shows that:

• Rates of not passing at least one of the metrics are particularly high for professional programs in law (CIP 22,

19.6 percent of law programs representing 29.2 percent of enrollment in law programs), theology (CIP 39, 6.6 percent, 25.4 percent) and health (CIP 51, 9.7 percent, 18.6 percent). Recall that for graduate degrees, failure is almost exclusively due to the D/E metric, which would trigger the acknowledgement requirement.

TABLE 3.6  NUMBER AND PERCENT OF NON-GE TITLE IV ENROLLMENT IN PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | |
|---|---|---|---|---|---|---|
| | Associate s | Bachelor s | Master s | Doctoral | Professional | Total |
| 1: Agriculture & Related Sciences | 0.8 | 1.2 | 0.0 | 0.0 | 0.0 | 1.0 |
| 3: Natural Resources And Conservation | 0.0 | 1.3 | 1.8 | 0.0 | 0.0 | 1.2 |
| 4: Architecture And Related Services | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.7 |
| 5: Area & Group Studies | 0.0 | 0.6 | 0.0 | 0.0 | 0.0 | 0.5 |
| 9: Communication | 3.5 | 2.1 | 2.0 | 0.0 | 0.0 | 2.3 |
| 10: Communications Tech | 8.1 | 2.9 | 0.0 | | | 5.9 |
| 11: Computer Sciences | 1.5 | 0.1 | 0.0 | 0.0 | 0.0 | 0.6 |
| 12: Personal And Culinary Services | 9.5 | 0.0 | 0.0 | | | 8.3 |
| 13: Education | 16.6 | 2.7 | 1.8 | 4.3 | 0.0 | 4.4 |
| 14: Engineering | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 15: Engineering Tech | 0.3 | 0.0 | 0.0 | 0.0 | | 0.2 |
| 16: Foreign Languages | 1.0 | 2.1 | 0.0 | 0.0 | | 1.8 |
| 19: Family & Consumer Sciences | 11.2 | 8.0 | 3.8 | 0.0 | 0.0 | 9.2 |
| 22: Legal Professions | 7.8 | 9.8 | 3.6 | 29.6 | 29.2 | 20.4 |
| 23: English Language | 1.1 | 5.7 | 3.9 | 0.0 | 0.0 | 4.8 |
| 24: Liberal Arts | 14.0 | 2.8 | 6.6 | 0.0 | 0.0 | 10.8 |
| 25: Library Science | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 26: Biological & Biomedical Sciences | 4.9 | 2.6 | 6.3 | 1.4 | 0.0 | 3.1 |
| 27: Mathematics And Statistics | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 28: Military Science | | 0.0 | 0.0 | | | 0.0 |
| 29: Military Tech | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 30: Multi/Interdisciplinary Studies | 1.3 | 1.2 | 1.6 | 0.0 | 0.0 | 1.3 |
| 31: Parks & Rec | 4.8 | 1.8 | 0.6 | 0.0 | 0.0 | 2.2 |
| 32: Basic Skills | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 33: Citizenship Activities | | 0.0 | 0.0 | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 35: Interpersonal And Social Skills | | 0.0 | 0.0 | | | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 37: Personal Awareness And Self-Improvement | | | 0.0 | | | 0.0 |
| 38: Philosophy And Religious Studies | 40.5 | 1.3 | 0.0 | 0.0 | 0.0 | 4.2 |
| 39: Theology And Religious Vocations | 9.4 | 21.5 | 7.7 | 0.0 | 25.4 | 14.8 |
| 40: Physical Sciences | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.2 |
| 41: Science Technologies/Technicians | 4.2 | 0.0 | 0.0 | 0.0 | | 3.7 |
| 42: Psychology | 10.8 | 6.4 | 31.5 | 25.3 | 13.6 | 10.5 |
| 43: Homeland Security | 3.7 | 2.6 | 7.6 | 0.0 | 0.0 | 3.4 |
| 44: Public Admin & Social Services | 23.4 | 5.1 | 6.9 | 0.0 | 0.0 | 9.0 |
| 45: Social Sciences | 4.9 | 0.9 | 3.2 | 0.0 | 0.0 | 1.6 |
| 46: Construction Trades | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 47: Mechanic & Repair Tech | 0.4 | 0.0 | | | | 0.4 |
| 48: Precision Production | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 49: Transportation And Materials Moving | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 50: Visual And Performing Arts | 6.4 | 12.7 | 21.6 | 1.9 | 0.0 | 11.6 |
| 51: Health Professions And Related Programs | 6.2 | 1.7 | 5.8 | 20.1 | 18.6 | 5.8 |
| 52: Business | 5.3 | 0.7 | 0.8 | 0.0 | 0.0 | 2.0 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 54: History | 0.0 | 0.8 | 12.2 | 0.0 | 0.0 | 1.6 |
| 60: Residency Programs | | | 0.0 | 0.0 | 0.0 | 0.0 |
| Total | 8.6 | 2.6 | 4.7 | 11.0 | 21.3 | 5.4 |

TABLE 3.7  NUMBER AND PERCENT OF NON-GE PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2

| | Credential level | | | | | |
|---|---|---|---|---|---|---|
| | Associate s | Bachelor s | Master s | Doctoral | Professional | Total |
| 1: Agriculture & Related Sciences | 0.1 | 0.7 | 0.0 | 0.0 | 0.0 | 0.3 |
| 3: Natural Resources And Conservation | 0.0 | 0.4 | 0.3 | 0.0 | 0.0 | 0.3 |
| 4: Architecture And Related Services | 0.0 | 0.0 | 0.8 | 0.0 | 0.0 | 0.3 |
| 5: Area & Group Studies | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.2 |
| 9: Communication | 0.8 | 1.3 | 0.6 | 0.0 | 0.0 | 1.1 |
| 10: Communications Tech | 2.2 | 2.4 | 0.0 | | | 2.1 |
| 11: Computer Sciences | 0.4 | 0.1 | 0.0 | 0.0 | 0.0 | 0.2 |
| 12: Personal And Culinary Services | 3.9 | 0.0 | 0.0 | | | 3.6 |
| 13: Education | 3.5 | 0.8 | 0.7 | 0.1 | 0.0 | 1.0 |
| 14: Engineering | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 15: Engineering Tech | 0.1 | 0.0 | 0.0 | 0.0 | | 0.1 |
| 16: Foreign Languages | 0.3 | 0.0 | 0.0 | 0.0 | | 0.4 |
| 19: Family & Consumer Sciences | 3.5 | 2.9 | 1.2 | 0.0 | 0.0 | 2.7 |
| 22: Legal Professions | 1.0 | 1.4 | 0.4 | 14.3 | 19.6 | 5.0 |
| 23: English Language | 0.4 | 1.9 | 1.0 | 0.0 | 0.0 | 1.4 |
| 24: Liberal Arts | 15.3 | 2.1 | 0.4 | 0.0 | 0.0 | 8.1 |
| 25: Library Science | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 26: Biological & Biomedical Sciences | 0.8 | 1.4 | 0.6 | 0.1 | 0.0 | 0.9 |

App.312

TABLE 3.7    NUMBER AND PERCENT OF NON-GE PROGRAMS FAILING EITHER D/E OR EP METRIC, BY CIP2    Continued

| | Credential level | | | | | |
|---|---|---|---|---|---|---|
| | Associate s | Bachelor s | Master s | Doctoral | Professional | Total |
| 27: Mathematics And Statistics | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 28: Military Science | | 0.0 | 0.0 | | | 0.0 |
| 29: Military Tech | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 30: Multi/Interdisciplinary Studies | 1.1 | 0.7 | 0.4 | 0.0 | 0.0 | 0.6 |
| 31: Parks & Rec | 0.8 | 1.3 | 0.3 | 0.0 | 0.0 | 1.0 |
| 32: Basic Skills | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 33: Citizenship Activities | | 0.0 | 0.0 | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 35: Interpersonal And Social Skills | | 0.0 | 0.0 | | | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 37: Personal Awareness And Self-Improvement | | | 0.0 | | | 0.0 |
| 38: Philosophy And Religious Studies | 2.1 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 |
| 39: Theology And Religious Vocations | 2.0 | 2.5 | 2.6 | 0.0 | 6.6 | 2.4 |
| 40: Physical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 41: Science Technologies/Technicians | 0.6 | 0.0 | 0.0 | | | 0.4 |
| 42: Psychology | 3.1 | 2.9 | 5.4 | 3.1 | 4.2 | 3.7 |
| 43: Homeland Security | 0.8 | 2.2 | 1.3 | 0.0 | 0.0 | 1.3 |
| 44: Public Admin & Social Services | 6.3 | 1.5 | 2.2 | 0.0 | 0.0 | 2.5 |
| 45: Social Sciences | 0.5 | 0.5 | 0.2 | 0.0 | 0.0 | 0.4 |
| 46: Construction Trades | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 47: Mechanic & Repair Tech | 0.2 | 0.0 | | | | 0.2 |
| 48: Precision Production | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 49: Transportation And Materials Moving | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 50: Visual And Performing Arts | 1.4 | 4.4 | 4.9 | 0.4 | 0.0 | 3.7 |
| 51: Health Professions And Related Programs | 1.5 | 1.0 | 2.6 | 4.5 | 9.7 | 2.2 |
| 52: Business | 1.4 | 0.3 | 0.2 | 0.0 | 0.0 | 0.6 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 54: History | 0.0 | 0.3 | 0.5 | 0.0 | 0.0 | 0.3 |
| 60: Residency Programs | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 |
| Total | 1.8 | 1.1 | 1.1 | 0.8 | 9.1 | 1.3 |

## Results of GE Accountability for Programs Subject to the Gainful Employment Rule

This analysis is based on the 2022 PPD described in the "Data Used in this RIA" above. In this subsection, we examine the combined results of the GE accountability components of the proposed regulations for the 32,058 GE Programs. The analysis is primarily focused on GE metric results for a single year, though continued eligibility depends on performance in multiple years. The likelihood of repeated failure is discussed briefly below and is incorporated into the budget impact and cost-benefit analyses. Though programs with fewer than 30 completers in the cohort are not subject to the D/E and EP tests, we retain these programs in our analysis to provide a more complete view of program passage than if they were excluded.

### Program-Level Results

Table 3.8 and 3.9 reports D/E and EP results by control and credential level for GE programs. This analysis shows that:

• 65.3 percent of enrollment is in the 4,100 GE programs for which rates can be calculated.

• 41.3 percent of enrollment is in 2,300 programs (7.1 percent of all GE programs) that meet the size threshold and would pass both the D/E measure and EP metrics.

• 24 percent of enrollment is in 1,800 programs (5.5 percent of all GE programs) that would fail at least one of the two metrics.

• Failure rates are significantly lower for public certificate programs (4.3 percent of enrollment is in failing programs) than for proprietary (50 percent of enrollment is in failing programs) or non-profit (43.6 percent of enrollment is in failing programs) certificate programs, though the latter represents a small share of overall enrollment. Certificate programs that fail typically fail the EP metric, rather than the D/E metric.

• Across all proprietary certificate and degree programs, 33.6 percent of enrollment is in programs that fail one of the two metrics, representing 22.1 percent of programs. Degree programs that fail typically fail the D/E metric, with only associate degree programs having a noticeable number of programs that fail the EP metric.

TABLE 3.8    NUMBER AND PERCENT OF TITLE IV ENROLLMENT IN GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Percent | | | | | Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Public: | | | | | | | | | | |
| UG Certificates | 78.5 | 17.2 | 0.0 | 0.3 | 4.0 | 682,300 | 149,300 | 200 | 3,000 | 34,700 |
| Post-BA Certs | 93.0 | 7.0 | 0.0 | 0.0 | 0.0 | 11,800 | 900 | 0 | 0 | 0 |
| Grad Certs | 78.3 | 21.3 | 0.4 | 0.0 | 0.0 | 32,800 | 8,900 | 200 | 0 | 0 |
| Total | 78.7 | 17.2 | 0.0 | 0.3 | 3.8 | 726,900 | 159,200 | 300 | 3,000 | 34,700 |
| Private, Nonprofit: | | | | | | | | | | |
| UG Certificates | 38.5 | 18.0 | 0.0 | 4.9 | 38.7 | 30,000 | 14,000 | 0 | 3,800 | 30,100 |
| Post-BA Certs | 96.2 | 3.8 | 0.0 | 0.0 | 0.0 | 7,600 | 300 | 0 | 0 | 0 |
| Grad Certs | 74.4 | 22.1 | 3.5 | 0.0 | 0.0 | 26,600 | 7,900 | 1,300 | 0 | 0 |

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules 32421

TABLE 3.8  NUMBER AND PERCENT OF TITLE IV ENROLLMENT IN GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL  Continued

| | Percent | | | | | Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Total ................. | 52.8 | 18.3 | 1.0 | 3.1 | 24.8 | 64,200 | 22,200 | 1,300 | 3,800 | 30,100 |
| Proprietary: | | | | | | | | | | |
| UG Certificates ............. | 12.7 | 37.3 | 0.2 | 8.5 | 41.3 | 70,000 | 205,000 | 1,100 | 46,500 | 227,300 |
| Associate s ............. | 15.5 | 46.2 | 19.3 | 14.4 | 4.5 | 50,600 | 151,100 | 63,200 | 47,200 | 14,700 |
| Bachelor s ............. | 8.4 | 67.2 | 22.3 | 2.0 | 0.1 | 56,800 | 454,000 | 150,600 | 13,700 | 600 |
| Post-BA Certs ............. | 37.8 | 62.2 | 0.0 | 0.0 | 0.0 | 300 | 500 | 0 | 0 | 0 |
| Master s ............. | 6.8 | 75.2 | 17.0 | 0.9 | 0.0 | 16,400 | 180,500 | 40,800 | 2,200 | 0 |
| Doctoral ............. | 26.0 | 58.8 | 15.1 | 0.0 | 0.0 | 14,100 | 31,800 | 8,200 | 0 | 0 |
| Professional ............. | 34.9 | 14.5 | 50.7 | 0.0 | 0.0 | 4,200 | 1,800 | 6,100 | 0 | 0 |
| Grad Certs ............. | 32.6 | 28.9 | 37.9 | 0.0 | 0.7 | 3,500 | 3,100 | 4,100 | 0 | 100 |
| Total ............. | 11.5 | 55.0 | 14.7 | 5.9 | 13.0 | 215,900 | 1,027,800 | 274,200 | 109,600 | 242,700 |
| Foreign Private: | | | | | | | | | | |
| UG Certificates ............. | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100 | 0 | 0 | 0 | 0 |
| Post-BA Certs ............. | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 | 0 | 0 |
| Grad Certs ............. | 15.8 | 0.0 | 0.0 | 84.2 | 0.0 | 200 | 0 | 0 | 1,300 | 0 |
| Total ............. | 20.4 | 0.0 | 0.0 | 79.6 | 0.0 | 300 | 0 | 0 | 1,300 | 0 |
| Foreign For-Profit: | | | | | | | | | | |
| Master s ............. | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 200 | 0 | 0 | 0 | 0 |
| Doctoral ............. | 80.5 | 19.5 | 0.0 | 0.0 | 0.0 | 1,600 | 400 | 0 | 0 | 0 |
| Professional ............. | 79.7 | 0.0 | 20.3 | 0.0 | 0.0 | 9,200 | 0 | 2,400 | 0 | 0 |
| Total ............. | 80.0 | 2.8 | 17.2 | 0.0 | 0.0 | 11,000 | 400 | 2,400 | 0 | 0 |
| Total: | | | | | | | | | | |
| UG Certificates ............. | 52.2 | 24.6 | 0.1 | 3.6 | 19.5 | 782,400 | 368,400 | 1,300 | 53,300 | 292,100 |
| Associate s ............. | 15.5 | 46.2 | 19.3 | 14.4 | 4.5 | 50,600 | 151,100 | 63,200 | 47,200 | 14,700 |
| Bachelor s ............. | 8.4 | 67.2 | 22.3 | 2.0 | 0.1 | 56,800 | 454,000 | 150,600 | 13,700 | 600 |
| Post-BA Certs ............. | 92.1 | 7.9 | 0.0 | 0.0 | 0.0 | 19,700 | 1,700 | 0 | 0 | 0 |
| Master s ............. | 6.9 | 75.2 | 17.0 | 0.9 | 0.0 | 16,600 | 180,500 | 40,800 | 2,200 | 0 |
| Doctoral ............. | 27.9 | 57.5 | 14.6 | 0.0 | 0.0 | 15,600 | 32,200 | 8,200 | 0 | 0 |
| Professional ............. | 56.8 | 7.4 | 35.8 | 0.0 | 0.0 | 13,400 | 1,800 | 8,500 | 0 | 0 |
| Grad Certs ............. | 70.3 | 22.2 | 6.1 | 1.4 | 0.1 | 63,100 | 19,900 | 5,500 | 1,300 | 100 |
| Total ............. | 34.7 | 41.3 | 9.5 | 4.0 | 10.5 | 1,018,300 | 1,209,600 | 278,100 | 117,600 | 307,500 |

**Note:** Enrollment counts rounded to the nearest 100.

TABLE 3.9  NUMBER OF GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL

| | Number | | | | | Percent | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Public: | | | | | | | | | | |
| UG Certificates ............. | 18,051 | 729 | 1 | 6 | 184 | 95.2 | 3.8 | 0.0 | 0.0 | 1.0 |
| Post-BA Certs ............. | 865 | 7 | 0 | 0 | 0 | 99.2 | 0.8 | 0.0 | 0.0 | 0.0 |
| Grad Certs ............. | 1,887 | 50 | 2 | 0 | 0 | 97.3 | 2.6 | 0.1 | 0.0 | 0.0 |
| Total ............. | 20,803 | 786 | 3 | 6 | 184 | 95.5 | 3.6 | 0.0 | 0.0 | 0.8 |
| Private, Nonprofit: | | | | | | | | | | |
| UG Certificates ............. | 1,218 | 94 | 0 | 8 | 67 | 87.8 | 6.8 | 0.0 | 0.6 | 4.8 |
| Post-BA Certs ............. | 625 | 4 | 0 | 0 | 0 | 99.4 | 0.6 | 0.0 | 0.0 | 0.0 |
| Grad Certs ............. | 1,344 | 44 | 9 | 0 | 0 | 96.2 | 3.1 | 0.6 | 0.0 | 0.0 |
| Total ............. | 3,187 | 142 | 9 | 8 | 67 | 93.4 | 4.2 | 0.3 | 0.2 | 2.0 |
| Proprietary: | | | | | | | | | | |
| UG Certificates ............. | 1,596 | 548 | 4 | 154 | 916 | 49.6 | 17.0 | 0.1 | 4.8 | 28.5 |
| Associate s ............. | 1,135 | 339 | 98 | 79 | 69 | 66.0 | 19.7 | 5.7 | 4.6 | 4.0 |
| Bachelor s ............. | 601 | 259 | 80 | 21 | 2 | 62.4 | 26.9 | 8.3 | 2.2 | 0.2 |
| Post-BA Certs ............. | 48 | 4 | 0 | 0 | 0 | 92.3 | 7.7 | 0.0 | 0.0 | 0.0 |
| Master s ............. | 282 | 148 | 39 | 9 | 0 | 59.0 | 31.0 | 8.2 | 1.9 | 0.0 |
| Doctoral ............. | 80 | 30 | 12 | 0 | 0 | 65.6 | 24.6 | 9.8 | 0.0 | 0.0 |
| Professional ............. | 23 | 5 | 4 | 0 | 0 | 71.9 | 15.6 | 12.5 | 0.0 | 0.0 |
| Grad Certs ............. | 105 | 14 | 6 | 0 | 3 | 82.0 | 10.9 | 4.7 | 0.0 | 2.3 |
| Total ............. | 3,870 | 1,347 | 243 | 263 | 990 | 57.6 | 20.1 | 3.6 | 3.9 | 14.7 |
| Foreign Private: | | | | | | | | | | |
| UG Certificates ............. | 28 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Post-BA Certs ............. | 27 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs ............. | 76 | 0 | 0 | 1 | 0 | 98.7 | 0.0 | 0.0 | 1.3 | 0.0 |
| Total ............. | 131 | 0 | 0 | 1 | 0 | 99.2 | 0.0 | 0.0 | 0.8 | 0.0 |
| Foreign For-Profit: | | | | | | | | | | |
| UG Certificates ............. | 1 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Master s ............. | 6 | 0 | 0 | 0 | 0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Doctoral ............. | 3 | 1 | 0 | 0 | 0 | 75.0 | 25.0 | 0.0 | 0.0 | 0.0 |
| Professional ............. | 5 | 0 | 2 | 0 | 0 | 71.4 | 0.0 | 28.6 | 0.0 | 0.0 |
| Total ............. | 15 | 1 | 2 | 0 | 0 | 83.3 | 5.6 | 11.1 | 0.0 | 0.0 |
| Total: | | | | | | | | | | |
| UG Certificates ............. | 20,894 | 1,371 | 5 | 168 | 1,167 | 88.5 | 5.8 | 0.0 | 0.7 | 4.9 |

32422 **Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules

TABLE 3.9  NUMBER OF GE PROGRAMS BY RESULT, CONTROL, AND CREDENTIAL LEVEL  Continued

| | Number | | | | | Percent | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only |
| Associate s | 1,135 | 339 | 98 | 79 | 69 | 66.0 | 19.7 | 5.7 | 4.6 | 4.0 |
| Bachelor s | 601 | 259 | 80 | 21 | 2 | 62.4 | 26.9 | 8.3 | 2.2 | 0.2 |
| Post-BA Certs | 1,565 | 15 | 0 | 0 | 0 | 99.1 | 0.9 | 0.0 | 0.0 | 0.0 |
| Masters | 288 | 148 | 39 | 9 | 0 | 59.5 | 30.6 | 8.1 | 1.9 | 0.0 |
| Doctoral | 83 | 31 | 12 | 0 | 0 | 65.9 | 24.6 | 9.5 | 0.0 | 0.0 |
| Professional | 28 | 5 | 6 | 0 | 0 | 71.8 | 12.8 | 15.4 | 0.0 | 0.0 |
| Grad Certs | 3,412 | 108 | 17 | 1 | 3 | 96.4 | 3.0 | 0.5 | 0.0 | 0.1 |
| Total | 28,006 | 2,276 | 257 | 278 | 1,241 | 87.4 | 7.1 | 0.8 | 0.9 | 3.9 |

Tables 3.10 and 3.11 reports the results by credential level and 2-digit CIP code. This analysis shows:

• Highest rate of failure is in Personal and Culinary Services (CIP2 12), where 76 percent of enrollment, representing 38 percent of undergraduate certificate programs in that field, have failing metrics. This is primarily due to failing the EP metric.

• In Health Professions and Related Programs (CIP2 51), where allied health, medical assisting, and medical administration are the primary specific fields, 26.2 percent of enrollment is in an undergraduate certificate program that fails at least one of the two metrics, representing 8.6 percent of programs.

**BILLING CODE 4000 01 P**

Table 3.10 - Percent of GE Title IV Enrollment in Programs Failing Either D/E or EP Metric, by CIP2 and Credential Level

| | UG Certificates | Associate's | Bachelor's | Post-BA Certs | Master's | Doctoral | Professional | Grad Certs | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1: Agriculture & Related Sciences | 1.6 | 0.0 | 0.0 | | 0.0 | | | 0.0 | 1.5 |
| 3: Natural Resources And Conservation | 0.0 | | 13.1 | | 0.0 | | | 0.0 | 9.1 |
| 4: Architecture And Related Services | 0.0 | | 0.0 | | 0.0 | | 0.0 | 0.0 | 0.0 |
| 5: Area & Group Studies | 0.0 | | | | | | | | 0.0 |
| 9: Communication | 42.4 | 0.0 | 22.9 | 0.0 | 21.8 | | | 0.0 | 30.1 |
| 10: Communications Tech | 10.4 | 39.6 | 61.9 | 0.0 | 88.9 | | | 0.0 | 36.3 |
| 11: Computer Sciences | 5.6 | 9.7 | 3.6 | 0.0 | 4.5 | 0.0 | | 0.0 | 5.2 |
| 12: Personal And Culinary Services | 76.1 | 59.5 | 31.8 | 0.0 | 0.0 | | 0.0 | 31.5 | 75.2 |
| 13: Education | 7.3 | 74.5 | 75.5 | 0.0 | 14.1 | 0.8 | 0.0 | 3.4 | 25.1 |
| 14: Engineering | 0.0 | 37.0 | 14.5 | 0.0 | 0.0 | | | 0.0 | 3.4 |
| 15: Engineering Tech | 2.5 | 1.8 | 0.0 | 0.0 | 0.0 | | | 0.0 | 1.9 |
| 16: Foreign Languages | 0.0 | | 94.8 | 0.0 | | | | 0.0 | 4.5 |
| 19: Family & Consumer Sciences | 2.0 | 90.2 | 72.0 | 0.0 | 100.0 | 100.0 | | 0.0 | 21.9 |
| 22: Legal Professions | 3.3 | 55.9 | 32.3 | 0.0 | 0.0 | 0.0 | 61.0 | 24.2 | 26.9 |
| 23: English Language | 57.4 | 94.6 | 87.4 | 0.0 | 98.2 | | | 0.0 | 66.0 |
| 24: Liberal Arts | 3.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 3.5 |
| 25: Library Science | 0.0 | | | 100.0 | 0.0 | | | 0.0 | 23.5 |
| 26: Biological & Biomedical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 9.1 | 1.1 |
| 27: Mathematics And Statistics | 0.0 | | 0.0 | | | | | 0.0 | 0.0 |
| 28: Military Science | 0.0 | 0.0 | | | | | | 0.0 | 0.0 |
| 29: Military Tech | 0.0 | 0.0 | 0.0 | | 0.0 | | | 0.0 | 0.0 |
| 30: Multi/Interdisciplinary Studies | 0.0 | 96.2 | 92.0 | 0.0 | 0.0 | | | 8.8 | 55.3 |
| 31: Parks & Rec | 4.3 | 66.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 41.9 |
| 32: Basic Skills | 41.8 | | | | 0.0 | | | 0.0 | 41.4 |
| 33: Citizenship Activities | 0.0 | | | | | | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | | | | | | | | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | | | | 0.0 | | | | 0.0 |
| 37: Personal Awareness | 0.0 | | | | | | | | 0.0 |
| 38: Philosophy And Religious Studies | 0.0 | | 0.0 | 0.0 | | | | 0.0 | 0.0 |
| 39: Theology And Religious Vocations | 50.6 | 0.0 | 94.2 | 0.0 | 90.0 | 0.0 | 0.0 | 0.0 | 56.1 |
| 40: Physical Sciences | 0.0 | 0.0 | 0.0 | | | | | 0.0 | 0.0 |
| 41: Science Technologies/Technicians | 0.0 | 0.0 | | | | | | 0.0 | 0.0 |
| 42: Psychology | 0.0 | 0.0 | 50.3 | 0.0 | 29.1 | 62.1 | | 33.3 | 41.0 |
| 43: Homeland Security | 3.3 | 54.3 | 21.9 | 0.0 | 19.2 | 66.5 | | 0.0 | 21.8 |
| 44: Public Admin & Social Services | 0.0 | 81.9 | 57.5 | 0.0 | 43.3 | 9.2 | | 2.8 | 42.4 |
| 45: Social Sciences | 0.0 | 0.0 | 25.4 | 0.0 | 64.5 | 0.0 | | 0.0 | 18.0 |
| 46: Construction Trades | 4.9 | 0.0 | | | | | | 0.0 | 4.7 |
| 47: Mechanic & Repair Tech | 5.1 | 9.6 | 0.0 | | | | | 0.0 | 5.5 |
| 48: Precision Production | 4.1 | 0.0 | | | | | | | 4.0 |
| 49: Transportation And Materials Moving | 2.6 | 0.0 | | 0.0 | 0.0 | | | 0.0 | 2.3 |
| 50: Visual And Performing Arts | 11.3 | 45.5 | 51.8 | 0.0 | 83.5 | | 0.0 | 0.0 | 38.7 |
| 51: Health Professions And Related | 26.2 | 36.0 | 25.6 | 0.0 | 24.0 | 3.3 | 36.7 | 16.6 | 27.1 |
| 52: Business | 6.8 | 40.5 | 2.8 | 0.0 | 3.8 | 2.0 | 0.0 | 0.6 | 5.3 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | | | | | | | 0.0 |
| 54: History | 0.0 | 0.0 | 36.4 | 0.0 | | | | 0.0 | 20.3 |
| 60: Residency Programs | | | | 0.0 | | | | 0.0 | 0.0 |
| Total | 23.2 | 38.3 | 24.4 | 0.0 | 17.9 | 14.6 | 35.8 | 7.6 | 24.0 |

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules $\quad$ **32423**

Table 3.11 - Percent of GE Programs Failing Either D/E or EP Metric, by CIP2

| | US Certificates | Associate's | Bachelor's | Post-BA Certs | Master's | Doctoral | Professional | Grad Certs | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1: Agriculture & Related Sciences | 0.3 | 0.0 | 0.0 | 0.0 | | | | 0.0 | 0.2 |
| 3: Natural Resources And Conservation | 0.0 | | 20.0 | 0.0 | 0.0 | | | 0.0 | 0.7 |
| 4: Architecture And Related Services | 0.0 | | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 |
| 5: Area & Group Studies | 0.0 | | | 0.0 | | | | 0.0 | 0.0 |
| 9: Communication | 1.9 | 0.0 | 12.0 | 0.0 | 11.1 | | | 0.0 | 2.4 |
| 10: Communications Tech | 1.3 | 13.0 | 29.2 | 0.0 | 33.3 | | | 0.0 | 4.2 |
| 11: Computer Sciences | 0.9 | 6.0 | 1.8 | 0.0 | 2.4 | 0.0 | | 0.0 | 1.3 |
| 12: Personal And Culinary Services | 58.3 | 13.9 | 18.2 | 0.0 | 0.0 | 0.0 | 0.0 | 11.1 | 36.6 |
| 13: Education | 1.8 | 10.0 | 18.2 | 0.0 | 6.3 | 4.3 | 0.0 | 0.4 | 1.4 |
| 14: Engineering | 0.0 | 20.0 | 10.0 | 0.0 | 0.0 | | | 0.0 | 0.5 |
| 15: Engineering Tech | 0.4 | 2.8 | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.5 |
| 16: Foreign Languages | 0.0 | | 50.0 | 0.0 | | | | 0.0 | 0.4 |
| 17: Family & Consumer Sciences | 0.9 | 25.0 | 27.3 | 0.0 | 100.0 | 100.0 | | 0.0 | 2.1 |
| 22: Legal Professions | 0.6 | 19.7 | 12.5 | 0.0 | 0.0 | 0.0 | 25.0 | 3.8 | 4.0 |
| 23: English Language | 8.6 | 20.0 | 36.4 | 0.0 | 50.0 | | | 0.0 | 7.9 |
| 24: Liberal Arts | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 0.9 |
| 25: Library Science | 0.0 | | 100.0 | 0.0 | | | | 0.0 | 1.9 |
| 26: Biological & Biomedical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 1.1 | 0.4 |
| 27: Mathematics And Statistics | 0.0 | | 0.0 | 0.0 | | | | 0.0 | 0.1 |
| 28: Military Science | 0.0 | | | | | | | 0.0 | 0.0 |
| 29: Military Tech | 0.0 | 0.0 | 0.0 | | | | | 0.0 | 0.0 |
| 30: Multi/Interdisciplinary Studies | 0.0 | 25.0 | 28.6 | 0.0 | 0.0 | | | 0.7 | 1.4 |
| 31: Parks & Rec | 1.6 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 2.3 |
| 32: Basic Skills | 5.4 | | | | 0.0 | | | 0.0 | 5.4 |
| 33: Citizenship Activities | 0.0 | | | | | | | | 0.0 |
| 34: Health-Related Knowledge And Skills | 0.0 | | | | | | | 0.0 | 0.0 |
| 35: Interpersonal And Social Skills | 0.0 | | | | | | | 0.9 | 0.0 |
| 36: Leisure And Recreational Activities | 0.0 | | | | 0.0 | | | 0.0 | 0.0 |
| 37: Personal Awareness | 0.0 | | | 0.0 | | | | 0.0 | 0.0 |
| 38: Philosophy And Religious Studies | 0.0 | | 0.0 | 0.0 | 0.0 | | | 0.0 | 0.0 |
| 39: Theology And Religious Vocations | 4.9 | 0.0 | 20.0 | 0.0 | 14.3 | 0.0 | 0.0 | 0.0 | 2.8 |
| 40: Physical Sciences | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | 0.0 |
| 41: Science Technologies/Technicians | 0.0 | 0.0 | | | | | | 0.0 | 0.0 |
| 42: Psychology | 0.0 | 0.0 | 28.6 | 0.0 | 21.1 | 26.7 | | 1.6 | 4.7 |
| 43: Homeland Security | 0.7 | 21.6 | 12.1 | 0.0 | 13.0 | 25.0 | | 0.0 | 3.1 |
| 44: Public Admin & Social Services | 0.0 | 40.0 | 21.4 | 0.0 | 15.8 | 25.6 | | 1.1 | 3.1 |
| 45: Social Sciences | 0.0 | 0.0 | 13.3 | 0.0 | 20.0 | 0.0 | | 0.0 | 1.3 |
| 46: Construction Trades | 1.2 | 0.0 | | | | | | 0.0 | 1.2 |
| 47: Mechanic & Repair Tech | 1.9 | 4.2 | 0.0 | 0.0 | | | | 0.0 | 2.0 |
| 48: Precision Production | 1.6 | 0.0 | | | | | | | 1.6 |
| 49: Transportation And Materials Moving | 1.3 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.0 | 1.3 |
| 50: Visual And Performing Arts | 1.5 | 17.6 | 22.4 | 0.0 | 38.5 | | 0.0 | 0.0 | 5.5 |
| 51: Health Professions And Related | 8.6 | 17.6 | 6.9 | 0.0 | 10.6 | 5.1 | 22.2 | 1.3 | 8.4 |
| 52: Business | 1.5 | 14.6 | 5.2 | 0.0 | 4.3 | 4.3 | 0.0 | 0.2 | 2.5 |
| 53: High School/Secondary Diplomas | 0.0 | 0.0 | | | | | | 0.0 | 0.0 |
| 54: History | 0.0 | 0.0 | 16.7 | 0.0 | 0.0 | | | 0.0 | 1.8 |
| 60: Residency Programs | 0.0 | | | 0.0 | | | 15.4 | 0.0 | 0.0 |
| Total | 5.7 | 14.1 | 10.6 | 0.0 | 9.9 | 9.5 | 15.4 | 0.6 | 5.5 |

## Program Ineligibility

For GE programs, Title IV ineligibility is triggered by two years of failing the same metric within a three-year period. Years of not meeting the n-size requirement are not counted towards those three years. The top panel of Table 3.12 shows the share of GE enrollment and programs in each result category in a second year as a function of the result in the first year, along with the rate of becoming ineligible. Failure rates are quite persistent, with failure in one year being highly predictive of failure in the next year, and thus ineligibility for title IV, HEA funds. Among programs that fail only the D/E metric in the first year, 58.4 percent of enrollment is in programs that also fail D/E in year 2 and would be ineligible for Title IV aid the following year. The comparable rates for programs that fail EP only or both D/E and EP in the first year are 91.2 and 88.8 percent, respectively. The share of programs (rather than enrollment in such programs) that become ineligible conditional on first year results is similar, as shown in the bottom panel of Table 3.12. These rates understate the share of programs that would ultimately become ineligible when a third year is considered.

Table 3.12. GE Program Performance Transition Between Years One and Two

| | Percent of Enrollment by Result in Year Two | | | | | |
|---|---|---|---|---|---|---|
| Result in Year 1 | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Ineligible |
| No D/E or EP data | 77.1 | 14.9 | 0.6 | 6.1 | 1.3 | |
| Pass | 4.0 | 90.6 | 2.0 | 3.3 | 0.2 | |
| Fail D/E only | 3.5 | 24.1 | 58.3 | 0.1 | 14.0 | 58.4 |
| Fail both D/E and EP | 6.5 | 4.6 | 0.8 | 79.9 | 8.1 | 88.8 |
| Fail EP only | 0.3 | 0.3 | 8.2 | 10.3 | 80.9 | 91.2 |

| | Percent of Programs by Result in Year Two | | | | | |
|---|---|---|---|---|---|---|
| Result in Year 1 | No D/E or EP data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Ineligible |
| No D/E or EP data | 95.5 | 3.0 | 0.1 | 1.2 | 0.2 | |
| Pass | 10.6 | 81.4 | 1.9 | 5.6 | 0.5 | |
| Fail D/E only | 13.6 | 16.3 | 52.7 | 0.4 | 17.1 | 53.1 |
| Fail both D/E and EP | 13.7 | 4.1 | 0.2 | 74.5 | 7.5 | 82.2 |
| Fail EP only | 2.2 | 1.4 | 7.2 | 17.7 | 71.5 | 89.2 |

BILLING CODE 4000 01 C

Institution-Level Aanalysis of GE Program Accountability Provisions

Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures. Characterizing the share of GE programs that have reported debt and earnings metrics that fail in particular postsecondary sectors can therefore give a distorted sense for the effect the rule might have on institutions in that sector. For example, a college (or group of colleges) might offer a single GE program that fails the rule and so appear to have 100 percent of its GE programs fail the rule. But if that program is a very small share of the institution's overall enrollment (or its title IV, HEA enrollment) then even if every student in that program were to stop enrolling in the institution—an unlikely scenario as discussed below—the effect on the institution(s) would be much less than would be implied by the 100 percent failure rate among its GE programs. To provide better context for evaluating the potential effect of the GE rule on institutions or sets of institutions, we describe the share of all title IV supported enrollment—including enrollment in both GE and non-GE programs—that is in a GE program and that fails a GE metric and, therefore, is at risk of losing title IV, HEA eligibility.[227] Again, this should not be viewed as an estimate of potential enrollment (or revenue) loss to the institution—in many cases the most likely impact of a program failing the GE metrics or losing eligibility is that students enroll in higher performing programs in the same institution.

Table 3.13 reports the distribution of institutions by share of enrollment that is in a failing GE program, by control and institution type. It shows that 93 percent of public institutions and 97 percent of non-profit institutions have no enrollment in GE programs that fail the GE metric. This rate is much lower—42 percent—for proprietary institutions, where all types of credential programs are covered by GE accountability and failure rates tend to be higher.

TABLE 3.13  DISTRIBUTION OF INSTITUTIONS BY SHARE OF ENROLLMENT THAT FAILS GE ACCOUNTABILITY, BY CONTROL AND INSTITUTION TYPE (ALL INSTITUTIONS)

| | Share of institutional enrollment in failing GE programs | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | 0% | 0 5% | 5 10% | 10 20% | 20 40% | 40 99% | 100% |
| Public: | | | | | | | | |
| Less-Than 2-Year | 561 | 470 | 23 | 13 | 26 | 23 | 5 | 1 |
| 2-Year | 691 | 649 | 35 | 3 | 1 | 2 | 1 | 0 |
| 4-Year or Above | 560 | 557 | 2 | 1 | 0 | 0 | 0 | 0 |
| Total | 1,812 | 1,676 | 60 | 17 | 27 | 25 | 6 | 1 |
| Private, Nonprofit: | | | | | | | | |
| Less-Than 2-Year | 113 | 92 | 1 | 0 | 1 | 3 | 11 | 5 |
| 2-Year | 110 | 101 | 2 | 0 | 2 | 2 | 2 | 1 |
| 4-Year or Above | 1,350 | 1,332 | 10 | 4 | 1 | 1 | 1 | 1 |

[227] Note that these statistics still do not fully capture the financial impact of GE on institutions. A complete analysis would account for the share of institutional revenue accounted for by title IV, HEA students, and the extent to which students in programs that fail GE will unenroll from the institutions entirely (vs. transferring to a passing program at the same institution). The measures here are best viewed as a proxy for the share of Federal title IV, HEA revenue at an institution that is potentially at risk due to the GE accountability provisions.

TABLE 3.13  DISTRIBUTION OF INSTITUTIONS BY SHARE OF ENROLLMENT THAT FAILS GE ACCOUNTABILITY, BY CONTROL AND INSTITUTION TYPE (ALL INSTITUTIONS)  Continued

| | Share of institutional enrollment in failing GE programs | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | 0% | 0 5% | 5 10% | 10 20% | 20 40% | 40 99% | 100% |
| Total | 1,573 | 1,525 | 13 | 4 | 4 | 6 | 14 | 7 |
| Proprietary: | | | | | | | | |
| Less-Than 2-Year | 1,274 | 499 | 6 | 8 | 24 | 38 | 208 | 491 |
| 2-Year | 119 | 67 | 1 | 6 | 4 | 14 | 24 | 3 |
| 4-Year or Above | 101 | 62 | 0 | 3 | 7 | 10 | 16 | 3 |
| Total | 1,494 | 628 | 7 | 17 | 35 | 62 | 248 | 497 |
| Total: | | | | | | | | |
| Less-Than 2-Year | 1,948 | 1,061 | 30 | 21 | 51 | 64 | 224 | 497 |
| 2-Year | 920 | 817 | 38 | 9 | 7 | 18 | 27 | 4 |
| 4-Year or Above | 2,011 | 1,951 | 12 | 8 | 8 | 11 | 17 | 4 |
| Total | 4,879 | 3,829 | 80 | 38 | 66 | 93 | 268 | 505 |

Very few public community or technical colleges (CCs) have considerable enrollment in programs that would fail GE. Only 40 (6 percent) of the 690 predominant 2-year public colleges have any of their enrollment in certificate programs that would fail, and only 30 (5 percent) of the 560 predominantly less than 2-year technical colleges have more than 20% of enrollment that does. The share of enrollment in failing GE programs for HBCUs, TCCUs, and other minority-serving institutions is even smaller, as shown in Table 3.14. At HBCUs, only one college out of 100 has more than 5 percent of enrollment in failing programs; across all HBCUs, only 5 programs at 4 schools fail. TCCUs have no failing programs, only 5 (1 percent) of Hispanic-serving institutions have more than 10 percent of enrollment in failing programs.[228] We conducted a similar analysis excluding institutions that do not have any GE programs. The patterns are similar.

TABLE 3.14  DISTRIBUTION OF INSTITUTIONS BY SHARE OF ENROLLMENT THAT FAILS GE ACCOUNTABILITY, BY SPECIAL MISSION TYPE

| | Share of institutional enrollment in failing GE programs | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | 0% | 0 5% | 5 10% | 10 20% | 20 40% | 40 99% |
| | | N of Institutions | | | | | |
| HBCU | 100 | 96 | 3 | 1 | 0 | 0 | 0 |
| TCCU | 35 | 35 | 0 | 0 | 0 | 0 | 0 |
| HSI | 446 | 417 | 22 | 2 | 1 | 2 | 2 |
| All Other Non-FP MSI | 158 | 144 | 3 | 3 | 4 | 4 | 0 |
| Total | 739 | 692 | 28 | 6 | 5 | 6 | 2 |

As noted above, these estimates cannot assess the impact of the GE provisions on total enrollment at these institutions. Especially at institutions with diverse program offerings, many students in failing programs can be expected to transfer to other non-failing programs within the institution (as opposed to exiting the institution). Moreover, many institutions are likely to admit additional enrollment into their programs from failing programs at other (especially for-profit) institutions. We quantify the magnitude of this enrollment shift and revisit the implications for overall institution-level enrollment effects in a later section.

Regulation Targets Low-Performing GE Programs

The Department conducted an analysis on which specific GE programs fail the metrics. The analysis concludes that the metrics target programs where students earn little, borrow more, and default at higher rates on their student loans than similar programs providing the same credential.

Table 3.15 reports the average program-level cohort default rate for GE programs, separately by result, control, and credential level. Programs are weighted by their average title IV, HEA enrollment in AY 2016 and 2017 to better characterize the outcomes experienced by students. The overall 3-year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools. The average default rate is higher for programs that fail the EP threshold than for programs that fail the D/E metric, despite debt being lower for the former. This is because even low levels of debt are difficult to repay when earnings are very low. Programs that pass the metrics, either with data or without, have lower default rates than those that fail.

---

[228] The number of Hispanic Serving Institutions reported here differs slightly from the current eligibility list, as the 2022 PPD uses designations from 2021. The number of HBCUs and TCCUs is the same in both sources, however.

TABLE 3.15   AVERAGE PROGRAM COHORT DEFAULT RATE BY RESULT, OVERALL AND BY CONTROL, AND CREDENTIAL LEVEL (ENROLLMENT-WEIGHTED)

| | No data | Pass | Fail D/E only | Fail both D/E and EP | Fail EP only | Total |
|---|---|---|---|---|---|---|
| **Public:** | | | | | | |
| UG Certificates | 16.6 | 17.5 | 11.1 | 20.4 | 19.9 | 16.9 |
| Post-BA Certs | 2.3 | 2.4 | | | | 2.3 |
| Grad Certs | 2.6 | 2.2 | 0.0 | | | 2.5 |
| Total | 15.8 | 16.5 | 6.2 | 20.4 | 19.9 | 16.1 |
| **Private, Nonprofit:** | | | | | | |
| UG Certificates | 9.7 | 9.6 | | 16.4 | 14.4 | 12.0 |
| Post-BA Certs | 2.9 | 1.2 | | | | 2.8 |
| Grad Certs | 2.7 | 1.9 | 0.3 | | | 2.4 |
| Total | 6.0 | 6.7 | 0.3 | 16.4 | 14.4 | 8.7 |
| **Proprietary:** | | | | | | |
| UG Certificates | 14.8 | 14.0 | 16.9 | 14.9 | 14.1 | 14.2 |
| Associate s | 14.4 | 13.0 | 17.8 | 19.8 | 16.4 | 15.3 |
| Bachelor s | 13.8 | 11.6 | 14.4 | 14.8 | 0.0 | 12.4 |
| Post-BA Certs | 26.4 | 13.2 | | | | 16.9 |
| Master s | 3.9 | 3.9 | 5.3 | 4.5 | | 4.1 |
| Doctoral | 4.1 | 4.5 | 4.6 | | | 4.4 |
| Professional | 1.0 | 0.0 | 0.7 | | | 0.7 |
| Grad Certs | 1.4 | 4.2 | 5.5 | | | 3.9 |
| Total | 12.3 | 10.6 | 13.1 | 16.8 | 14.2 | 12.0 |
| **Foreign Private:** | | | | | | |
| UG Certificates | 0.0 | | | | | 0.0 |
| Post-BA Certs | 12.5 | | | | | 12.5 |
| Grad Certs | 5.2 | | | 0.0 | | 0.2 |
| Total | 3.6 | | | 0.0 | | 0.2 |
| **Foreign For-Profit:** | | | | | | |
| Master s | 0.0 | | | | | 0.0 |
| Doctoral | 0.5 | 5.3 | | | | 1.4 |
| Professional | 1.3 | | 1.3 | | | 1.3 |
| Total | 1.1 | 5.3 | 1.3 | | | 1.3 |
| **Total:** | | | | | | |
| UG Certificates | 16.2 | 15.1 | 16.1 | 15.3 | 14.7 | 15.5 |
| Associate s | 14.4 | 13.0 | 17.8 | 19.8 | 16.4 | 15.3 |
| Bachelor s | 13.8 | 11.6 | 14.4 | 14.8 | 0.0 | 12.4 |
| Post-BA Certs | 2.9 | 5.4 | | | | 3.2 |
| Master s | 3.9 | 3.9 | 5.3 | 4.5 | | 4.1 |
| Doctoral | 3.7 | 4.5 | 4.6 | | | 4.3 |
| Professional | 1.2 | 0.0 | 0.8 | | | 1.0 |
| Grad Certs | 2.6 | 2.4 | 4.2 | 0.0 | | 2.6 |
| Total | 14.1 | 11.3 | 12.9 | 16.7 | 14.7 | 12.9 |

To better understand the specific types of programs that underpin the aggregate patterns described above, Table 3.16 lists the 20 most common types of programs (the combination of field and credential level) by enrollment count in the 2022 PPD. The programs with the highest enrollments are undergraduate certificate programs in cosmetology, allied health, liberal arts, and practical nursing, along with bachelor's programs in business and nursing. These 20 most common types of programs represent more than half of all enrollments in GE programs. Table 3.17 provides the average program annual loan payment (weighted by the number of students completing a program), the average program earnings (weighted by the number of students completing a program), the average annual D/E rate, and the average cohort default rate (weighted by the number of students completing a program). This shows quite a bit of variability in debt, loan service, earnings, and default across different types of programs.

TABLE 3.16   GE PROGRAMS WITH THE MOST STUDENTS, BY CIP AND CREDENTIAL LEVEL

| | Number of programs | Percent of all programs | Number of students | Percent of students at all programs |
|---|---|---|---|---|
| Field of Study (Ordered by All-Sector Enrollment): | | | | |
| 1204   Cosmetology & Personal Grooming   UG Certificates | 1,267 | 4.0 | 191,600 | 6.5 |
| 5202   Business Administration   Bachelor s | 72 | 0.2 | 149,000 | 5.1 |
| 5108   Allied Health (Medical Assisting)   UG Certificates | 895 | 2.9 | 147,100 | 5.0 |
| 2401   Liberal Arts   UG Certificates | 345 | 1.1 | 140,900 | 4.8 |
| 5139   Practical Nursing   UG Certificates | 1,032 | 3.3 | 130,900 | 4.5 |
| 5107   Health & Medical Administrative Services   UG Certificates | 910 | 2.9 | 83,500 | 2.8 |
| 5138   Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing   Bachelor s | 56 | 0.2 | 75,600 | 2.6 |
| 4706   Vehicle Maintenance & Repair   UG Certificates | 722 | 2.3 | 75,100 | 2.6 |
| 4301   Criminal Justice & Corrections   Bachelor s | 47 | 0.2 | 55,500 | 1.9 |
| 5202   Business Administration   Master s | 46 | 0.1 | 55,400 | 1.9 |
| 4805   Precision Metal Working   UG Certificates | 761 | 2.4 | 49,000 | 1.7 |
| 5109   Allied Health (Diagnostic & Treatment)   UG Certificates | 725 | 2.3 | 47,000 | 1.6 |
| 5108   Allied Health (Medical Assisting)   Associate s | 142 | 0.5 | 43,800 | 1.5 |
| 5107   Health & Medical Administrative Services   Bachelor s | 46 | 0.1 | 42,100 | 1.4 |
| 5202   Business Administration   Associate s | 89 | 0.3 | 39,600 | 1.4 |
| 5107   Health & Medical Administrative Services   Associate s | 128 | 0.4 | 38,700 | 1.3 |

TABLE 3.16  GE PROGRAMS WITH THE MOST STUDENTS, BY CIP AND CREDENTIAL LEVEL  Continued

| | Number of programs | Percent of all programs | Number of students | Percent of students at all programs |
|---|---|---|---|---|
| 5138 Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing Master s | 20 | 0.1 | 37,800 | 1.3 |
| 5138 Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing Associate s | 92 | 0.3 | 36,300 | 1.2 |
| 5202 Business Administration  UG Certificates | 573 | 1.8 | 34,300 | 1.2 |
| 5106 Dental Support  UG Certificates | 432 | 1.4 | 33,100 | 1.1 |
| All Other Programs | 22,920 | 73.2 | 1,424,900 | 48.6 |

TABLE 3.17  ANNUAL LOAN PAYMENT, EARNINGS, D/E RATE, COHORT DEFAULT RATE BY PROGRAM TYPE (ENROLLMENT-WEIGHTED)

| | Annual loan payment | Median 2018 19 earnings (in 2019 $) of 3 yrs after graduation | Average annual DTE rate | Cohort default rate |
|---|---|---|---|---|
| Field of Study (Ordered by All-Sector Enrollment): | | | | |
| 1204 Cosmetology & Personal Grooming  UG Certificates | 1,004 | 16,822 | 6.4 | 13.7 |
| 5202 Business Administration  Bachelor s | 2,711 | 47,956 | 5.8 | 14.1 |
| 5108 Allied Health (Medical Assisting)  UG Certificates | 947 | 24,000 | 4.2 | 16.6 |
| 2401 Liberal Arts  UG Certificates | 99 | 29,894 | 0.3 | 16.4 |
| 5139 Practical Nursing  UG Certificates | 1,075 | 39,273 | 3.5 | 10.2 |
| 5107 Health & Medical Administrative Services  UG Certificates | 1,107 | 23,231 | 5.5 | 15.0 |
| 5138 Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing  Bachelor s | 1,948 | 72,449 | 2.8 | 3.8 |
| 4706 Vehicle Maintenance & Repair  UG Certificates | 1,410 | 36,260 | 4.1 | 19.5 |
| 4301 Criminal Justice & Corrections  Bachelor s | 2,720 | 37,537 | 7.6 | 17.1 |
| 5202 Business Administration  Master s | 3,725 | 58,204 | 6.6 | 4.1 |
| 4805 Precision Metal Working  UG Certificates | 642 | 34,456 | 2.1 | 26.6 |
| 5109 Allied Health (Diagnostic & Treatment)  UG Certificates | 564 | 41,511 | 2.1 | 11.7 |
| 5108 Allied Health (Medical Assisting)  Associate s | 2,275 | 30,226 | 7.6 | 12.2 |
| 5107 Health & Medical Administrative Services  Bachelor s | 3,292 | 37,028 | 9.2 | 10.9 |
| 5202 Business Administration  Associate s | 2,532 | 32,427 | 8.3 | 21.7 |
| 5107 Health & Medical Administrative Services  Associate s | 2,721 | 26,600 | 10.4 | 14.0 |
| 5138 Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing  Master s | 3,852 | 96,798 | 4.0 | 2.6 |
| 5138 Registered Nursing, Nursing Administration, Nursing Research & Clinical Nursing  Associate s | 2,535 | 54,352 | 4.7 | 6.9 |
| 5202 Business Administration  UG Certificates | 705 | 35,816 | 1.6 | 20.1 |
| 5106 Dental Support  UG Certificates | 1,024 | 24,502 | 4.4 | 14.0 |
| All Other Programs | 3,105 | 42,273 | 8.0 | 12.1 |

Table 3.18 lists the most frequent types of failing GE programs (by enrollment in failing programs). Failing programs are disproportionately in a small number of types of programs. Twenty-two percent of enrollment is in UG Certificate Cosmetology programs alone, reflecting both high enrollment and high failure rates. Another 23 percent are in UG Certificate programs in Health/Medical administration and assisting, dental support, and massage, reflecting large enrollment and moderate failure rates. These 20 categories account for 71 percent of all enrollments in programs that fail at least one GE metric. Table 3.19 provides the average program annual loan payment, the average program earnings, and the average default rate (all weighted by title IV, HEA enrollment) for the most frequent types (by field and credential) of GE programs that fail at least one GE metric (by enrollment count), separately for failing and passing programs. Within each type of program, failing programs have much higher loan payments, lower earnings, and higher default rates than programs that pass the GE metrics. This demonstrates that higher-performing GE programs exist even within the same field and credential level as programs that fail GE.

TABLE 3.18  FAILING GE PROGRAMS WITH THE MOST STUDENTS, BY GE RESULT, CIP AND CREDENTIAL LEVEL

| | Number of failing programs | Percent of failing programs | Number of students | Percent of students at failing programs |
|---|---|---|---|---|
| 1204 Cosmetology & Personal Grooming  UG Certificates | 639 | 36.2 | 154,100 | 21.9 |
| 5108 Allied Health (Medical Assisting)  UG Certificates | 155 | 8.8 | 70,300 | 10.0 |
| 5107 Health & Medical Administrative Services  UG Certificates | 102 | 5.8 | 32,400 | 4.6 |
| 5107 Health & Medical Administrative Services  Associate s | 37 | 2.1 | 28,800 | 4.1 |
| 5107 Health & Medical Administrative Services  Bachelor s | 5 | 0.3 | 26,400 | 3.7 |
| 3017 Behavioral Sciences  UG Certificates | 2 | 0.1 | 20,100 | 2.9 |
| 5202 Business Administration  Associate s | 23 | 1.3 | 19,000 | 2.7 |
| 5108 Allied Health (Medical Assisting)  Associate s | 38 | 2.2 | 17,600 | 2.5 |
| 1312 Teacher Education & Professional Development, Specific Levels & Methods  Bachelor s | 2 | 0.1 | 17,500 | 2.5 |
| 5115 Mental & Social Health Services & Allied Professions  Master s | 5 | 0.3 | 15,400 | 2.2 |
| 5106 Dental Support  UG Certificates | 60 | 3.4 | 13,400 | 1.9 |
| 5135 Somatic Bodywork  UG Certificates | 95 | 5.4 | 13,400 | 1.9 |

App.320

TABLE 3.18   FAILING GE PROGRAMS WITH THE MOST STUDENTS, BY GE RESULT, CIP AND CREDENTIAL LEVEL Continued

| | | Number of failing programs | Percent of failing programs | Number of students | Percent of students at failing programs |
|---|---|---|---|---|---|
| 4301 | Criminal Justice & Corrections   Bachelor s | 7 | 0.4 | 13,100 | 1.9 |
| 4400 | Human Services, General   Bachelor s | 2 | 0.1 | 12,100 | 1.7 |
| 4301 | Criminal Justice & Corrections   Associate s | 16 | 0.9 | 11,700 | 1.7 |
| 4201 | Psychology   Bachelor s | 4 | 0.2 | 10,200 | 1.5 |
| 1205 | Culinary Arts   UG Certificates | 21 | 1.2 | 5,800 | 0.8 |
| 2301 | English Language & Literature, General   UG Certificates | 8 | 0.5 | 5,600 | 0.8 |
| 5139 | Practical Nursing   UG Certificates | 27 | 1.5 | 5,500 | 0.8 |
| 5204 | Business Operations   UG Certificates | 33 | 1.9 | 5,400 | 0.8 |
| All Other Programs | | 485 | 27.5 | 205,500 | 29.2 |
| Total | | 1,766 | 100.00 | 703,300 | 100.0 |

**Note:** Student counts rounded to the nearest 100.

3.19: Annual loan payment, earnings, D/E rate, default rate among top types of failing GE programs

| Field of Study & Level (Ordered by Failing Program Enrollment) | Annual Loan Payment | | Earnings | | Default Rate (Ever) | |
|---|---|---|---|---|---|---|
| | Passing | Failing | Passing | Failing | Passing | Failing |
| 1204 - Cosmetology & Personal Grooming - UG Certificates | 647.7 | 1,045.4 | 27,368.7 | 16,637.0 | 16.3 | 13.2 |
| 5108 - Allied Health (Medical Assisting) - UG Certificates | 823.6 | 1,025.7 | 27,340.2 | 22,434.5 | 16.7 | 16.5 |
| 5107 - Health & Medical Administrative Services - UG Certificates | 976.3 | 1,229.5 | 27,652.3 | 20,223.7 | 14.6 | 15.4 |
| 5107 - Health & Medical Administrative Services - Associate's | 2,250.0 | 2,867.4 | 31,410.0 | 28,696.7 | 9.5 | 15.5 |
| 5107 - Health & Medical Administrative Services - Bachelor's | 2,960.3 | 3,482.3 | 43,499.7 | 34,118.7 | 10.4 | 11.2 |
| 3017 - Behavioral Sciences - Bachelor's | . | 3,499.3 | . | 29,512.7 | 0.0 | 16.5 |
| 5202 - Business Administration - Associate's | 2,304.5 | 2,762.1 | 37,887.8 | 27,280.5 | 19.6 | 23.9 |
| 5108 - Allied Health (Medical Assisting) - Associate's | 2,170.3 | 2,425.6 | 34,591.8 | 23,935.6 | 9.6 | 16.0 |
| 1312 - Teacher Education, Specific Levels & Methods - Bachelor's | 2,468.0 | 3,121.2 | 36,596.3 | 31,081.2 | 9.2 | 11.0 |
| 5115 - Mental & Social Health Services & Allied - Master's | 5,305.3 | 7,096.9 | 49,712.0 | 42,604.7 | 4.5 | 6.1 |
| 5106 - Dental Support - UG Certificates | 992.3 | 1,060.4 | 27,180.3 | 22,894.8 | 12.9 | 15.3 |
| 5135 - Somatic Bodywork - UG Certificates | 682.2 | 948.1 | 26,077.6 | 19,245.8 | 13.8 | 13.2 |
| 4301 - Criminal Justice & Corrections - Bachelor's | 2,465.7 | 3,527.6 | 33,218.6 | 32,371.9 | 15.4 | 22.9 |
| 4400 - Human Services, General - Bachelor's | 2,493.8 | 3,903.3 | 33,323.4 | 32,798.8 | 14.3 | 14.9 |
| 4301 - Criminal Justice & Corrections - Associate's | 1,516.5 | 2,626.3 | 33,479.0 | 28,409.6 | 18.7 | 22.1 |
| 4201 - Psychology - Bachelor's | 2,068.4 | 3,333.3 | 36,641.7 | 28,865.8 | 11.1 | 17.4 |
| 1205 - Culinary Arts - UG Certificates | 682.1 | 629.7 | 27,544.3 | 15,884.1 | 24.4 | 10.0 |
| 2301 - English Language & Literature, General - UG Certificates | 2,399.3 | 0.0 | . | 19,361.7 | 35.0 | 6.2 |
| 5139 - Practical Nursing - UG Certificates | 1,085.8 | 864.4 | 40,891.3 | 17,406.6 | 10.0 | 14.2 |
| 5204 - Business Operations - UG Certificates | 507.5 | 624.0 | 28,985.0 | 17,896.7 | 13.5 | 12.2 |
| All Other Programs | 2,404.9 | 4,037.5 | 52,545.8 | 29,918.2 | 12.1 | 13.7 |

Student Demographic Analysis

Methodology for Student Demographic Analysis

The Department conducted analyses of the 2022 PPD to assess the role of student demographics as a factor in program performance. Our analysis demonstrates that GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone. We examined the demographic composition of program enrollment, comparing the composition of programs that pass, fail, or did not have data. We also conducted regression analysis, which permits us to hold constant several factors at once. This analysis focuses on GE programs since non-GE programs are not at risk of becoming ineligible for title IV, HEA aid.[229]

For the race and ethnicity variables, we used the proportion of individuals in each race and ethnicity category among all completers of each certificate or degree reported in the IPEDS 2016 and 2017 Completions Surveys.[230] Race and ethnicity is not available for only title IV, HEA recipients, so we rely on information for all (including non-title IV, HEA student) completers instead from IPEDS. We construct four race/ethnicity variables:

- Percent Black
- Percent Hispanic
- Percent Asian
- Percent non-White, which also includes individuals with more than one race. Note that this is not mutually exclusive with the other three race/ethnicity categories.

We aggregated the number of completions in each race/ethnicity category reported for each program in IPEDS to the corresponding GE program definition of six-digit OPEID, CIP code, and credential level. While D/E and EP rates measure only the outcomes of students who completed a program and received title IV, HEA program funds, IPEDS completions data include both title IV, HEA graduates and non-title IV, HEA graduates. Race and ethnicity data is not available separately for title IV, HEA completers. We believe the IPEDS data provides a reasonable approximation of the proportion, by race and ethnicity, of title IV, HEA graduates completing GE programs. We determined percent of each race and ethnicity category for 25,278 of the 32,058 programs. Many smaller programs could not be matched primarily because, as stated above, IPEDS and NSLDS use different program categorization systems, and the two sources at times are not sufficiently consistent to match data at the GE program-level. Nonetheless, we do not believe this will substantially affect our results since programs that do not match are less likely to meet the n-size criteria and thus would be likely excluded from our analysis of program performance.

Percent Pell for this analysis is the percentage of title IV, HEA completers during award years 15, 16, and 17 who received a Pell Grant at any time in their academic career. Because Pell status is being used as a proxy for socioeconomic background, we counted students if they had received a Pell Grant at any time in

---

[229] We conducted the regression analysis discussed below for non-GE programs as well. Our conclusions about the relative contribution of demographic factors in explaining program performance on the D/E and EP metrics is similar for non-GE programs as for GE programs.

[230] Specifically, the C2016A and C2017A datasets available from the IPEDS data center. These cover the 2015–16 and 2016–17 academic years (July 1 to June 30).

their academic career, even if they did not receive it for enrollment in the program. For instance, students that received Pell at their initial undergraduate institution but not at another institution they attended later would be considered a Pell Grant recipient at both institutions.

Several other background variables were collected from students' Free Application for Federal Student Aid (FAFSA) form. For all students receiving title IV, HEA aid in award years 15, 16, and 17, the Department matched their enrollment records to their latest FAFSA filed associated with their first award year in the program in which they were enrolled. First-generation status, described below, is taken from students earliest received FAFSA. From these, the Department constructed the following:

• Percent of students that are male.
• Percent of students that are first-generation, defined as those who indicated on the FAFSA not having a parent that had attended college. Children whose parents completed college are more likely to attend and complete college.
• Average family income in 2019 dollars. For dependent students, this includes parental income and the students' own income. For independent students, it includes the student's own income and spousal income.
• Average expected family contribution. We consider EFC as an indicator of socioeconomic status because EFC is calculated based on household income, other resources, and family size.
• Average age at time of FAFSA filing.
• Percent of students aged 24 or older at time of FAFSA filing.
• Share of students that are independent. Independent status is determined by a number of factors, including age, marital status, having dependents, and veteran status.
• Median student income prior to program enrollment among students whose income is greater than or equal to three-quarters of a year of earnings at Federal minimum wage. We only compute this variable for programs where at least 30 students meet this requirement, this variable should be viewed as a rough indicator of students' financial position prior to program entry. The average percentage of enrollees covered by this variable is 57.6 across all programs.

Based on these variables, we determined the composition of over 23,907 of the 32,058 programs in our data, though some demographic variables have more non-missing observations. Unless otherwise stated, our demographic analysis treats programs (rather than students) as the unit of analysis. The analysis, therefore, does not weight programs (and their student characteristics) by enrollment.

Table 3.20 provides program-level descriptive statistics for these demographic variables in the GE program dataset. The typical (median) program has 6 percent completers that are Black, 6 percent Hispanic, 0 percent Asian (program mean is 3 percent), and 38 percent non-White. At the median program, sixty-one percent are independent, half are over the age 24, and 31 percent are male. Half are first-generation college students and 77 percent have ever received a Pell Grant. Average family income at time of first FAFSA filing is $38,000 and the typical student who is attached to the labor force earns $29,900 before enrolling in the program.

TABLE 3.20   DESCRIPTIVE STATISTICS OF THE DEMOGRAPHIC VARIABLES

|  | Programs | Median | Average | Std. deviation |
|---|---|---|---|---|
| Share T4 Completers First Gen | 24,199 | 50 | 49 | 34 |
| Share T4 Completers Ever Pell | 24,199 | 77 | 67 | 36 |
| Share T4 Completers Out-of-State | 24,199 | 0 | 16 | 30 |
| Share of T4 Completers Male | 24,199 | 31 | 42 | 41 |
| Share of T4 Completers Age 24+ | 24,199 | 50 | 51 | 37 |
| Share T4 Completers Independent | 24,199 | 61 | 58 | 36 |
| Share All Completions Non-White | 25,278 | 38 | 43 | 30 |
| Share All Completions Black | 25,278 | 6 | 14 | 20 |
| Share All Completions Hispanic | 25,278 | 6 | 15 | 23 |
| Share All Completions Asian | 25,278 | 0 | 3 | 9 |
| Age at Time of FAFSA | 23,907 | 26 | 28 | 8 |
| FAFSA Family Income | 23,907 | 38,137 | 47,726 | 45,433 |
| Median Student Pre-Inc | 17,599 | 29,908 | 38,585 | 32,806 |

**Student Demographics Descriptive Analysis**

Table 3.21 reports average demographic characteristics of GE programs separately by GE result. Programs that fail at least one GE metric have a higher share of students that are female, higher share of students that are Black or Hispanic, lower student and family income, and higher share of students that have ever received the Pell Grant. Average student age and dependency status is similar for passing and failing programs.

TABLE 3.21   DEMOGRAPHIC SHARES BY RESULT

|  | All | Passing | Fail (any) | Fails D/E | Fails EP |
|---|---|---|---|---|---|
| Share TIV Completers First Gen | 49 | 48 | 61 | 55 | 62 |
| Share TIV Completers Ever Pell | 67 | 66 | 81 | 74 | 83 |
| Share TIV Completers Out-of-State | 16 | 15 | 20 | 39 | 15 |
| Share of TIV Completers Male | 42 | 44 | 22 | 28 | 20 |
| Share of TIV Completers Age 24+ | 51 | 51 | 49 | 57 | 45 |
| Share TIV Completers Independent | 58 | 58 | 59 | 66 | 56 |
| Share All Completions Non-White | 43 | 41 | 58 | 58 | 57 |
| Share All Completions Black | 14 | 13 | 21 | 25 | 20 |

TABLE 3.21    DEMOGRAPHIC SHARES BY RESULT    Continued

|  | All | Passing | Fail (any) | Fails D/E | Fails EP |
|---|---|---|---|---|---|
| Share All Completions Hispanic ................................................. | 15 | 15 | 25 | 18 | 26 |
| Share All Completions Asian ................................................... | 3 | 3 | 3 | 2 | 4 |
| Age at Time of FAFSA .......................................................... | 28 | 28 | 27 | 29 | 27 |
| FAFSA Family Income ........................................................... | 47,700 | 48,700 | 35,100 | 41,000 | 33,300 |
| Median Student Pre-Inc ........................................................ | 38,600 | 39,600 | 29,100 | 34,200 | 27,200 |

**Note:** Income values rounded to the nearest 100.

Student Demographics Regression Analysis

One limitation of the descriptive tabulations presented above is that it is difficult to determine which factors, whether they be demographics or program characteristics, explain the higher failure rate of programs serving certain groups of students. To further examine the relationship between student demographics and program results under the proposed regulations, we analyzed the degree to which specific demographic characteristics might be associated with a program's annual D/E rate and EP, while holding other characteristics constant.

For this analysis, the Department estimated the parameters of linear regression models (OLS) with annual debt-to-earnings or the earnings premium as the dependent (outcome) variables and indicators of student, program, and institutional characteristics as independent variables.[231] The independent demographic variables included in the regression analysis are: share of students in different race and ethnicity categories; share of students ever receiving Pell Grants; share of students that are male; share of students that are first-generation college students; share of students that are independent; and average family income from student's FAFSA. Program and institutional characteristics include credential level and control (public, private non-profit, and proprietary). In some specifications

we include institution fixed effects and omit control. When used with program-level data, institutional fixed effects control for any factors that differ between institutions but are common among programs in the same institution, such as institutional leadership, pricing strategy, and state or local factors.

Table 3.22 reports estimates from the D/E rate regressions described above, with each column representing a different regression model that includes different sets of independent variables. Comparing the R-squared across different columns demonstrates the degree to which different factors explain variation in the outcome. The first three columns quantify the extent to which variation in D/E rates are accounted for by program and institutional characteristics. The institutional control alone (column 1) explains 15 percent of the variation in D/E and adding credential level increases the R-squared to 23 percent (column 2). D/E rates are 3.7 to 3.9 percentage points higher for private non-profit and for-profit institutions than public institutions (the omitted baseline category) after controlling for credential level. This likely reflects the much higher tuition prices charged by private institutions, which results in higher debt service. Graduate credential levels also have much higher debt-to-earnings ratios than undergraduate credentials, reflecting the typically higher tuition costs associated with graduate programs.

Almost all programs are in institutions with multiple GE programs, so column 3 includes institution fixed effects in place of indicators for control.[232] Credential level and institution together account for 69 percent of the variation in D/E rates across programs. To illustrate how much more of the variation in outcomes is accounted for by student characteristics, column 4 adds the demographic characteristics on top of the model with credential level and institution effects. Doing so only slightly increases the model's ability to account for variation in D/E, lifting the R-squared to 71 percent. This specification effectively compares programs with more Pell students to those with fewer Pell students within the same institution and same credential level, while also controlling for the other independent variables listed. Demographic characteristics, therefore, appear to explain little of the variation in D/E rates across programs beyond what can be predicted by institutional characteristics and program credential level. Evidently, institution- and program-level factors, which could include such things as institutional performance and decisions about institutional pricing along with other factors, are much more important.[233] The final two columns report similar models, but weighting by average title IV, HEA enrollment, and the results are qualitatively similar.

TABLE 3.22    REGRESSION ANALYSIS OF THE DEMOGRAPHIC VARIABLES, GE PROGRAMS, OUTCOME: D/E

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Private, Nonprofit ................................................. | 4.367 (0.898) | 3.939 (0.947) | ..................... | ..................... | ..................... | ..................... |
| Proprietary ......................................................... | 4.797 (0.109) | 3.685 (0.102) | ..................... | ..................... | ..................... | ..................... |
| Credential Level: |  |  |  |  |  |  |
|   UG Certificates ............................................. | ..................... | −2.162 (0.205) | −2.446 (0.585) | −3.973 (0.602) | −1.096 (0.636) | −5.005 (0.586) |
|   Associate s ................................................. | ..................... | 0.065 (0.250) | 0.298 (0.433) | −0.617 (0.413) | 1.344 (0.629) | −0.926 (0.418) |
|   Master s ................................................... | ..................... | 2.850 (0.747) | 1.541 (0.575) | 1.252 (0.469) | 0.991 (0.704) | 1.593 (0.563) |

[231] Though not shown below, we have conducted parallel regression analysis with binary indicators for whether the program fails the D/E metric and whether it fails the EP metric as the outcomes. Results are qualitatively similar to those reported here using continuous outcomes, though the amount of variation in these binary outcomes that

demographics explain is even more muted than that reported here.

[232] Only 4 percent of GE programs are the only GE program within the institution. The median number of programs within an institution is 18.

[233] The patterns by race are broadly similar to what was found in analysis of the 2014 final rule.

The coefficient on % Black in the final column suggests that a 10-percentage point increase in the percent of students that are black is associated with a 0.15 higher debt-to-earnings ratio, holding institution, credential level, and the other demographic factors listed constant. Analysis of the prior rule found an increase of 0.19, though the set of controls is not the same.

TABLE 3.22   REGRESSION ANALYSIS OF THE DEMOGRAPHIC VARIABLES, GE PROGRAMS, OUTCOME: D/E   Continued

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Doctoral | | 4.883 (0.795) | 3.811 (1.054) | 5.599 (1.008) | 3.803 (1.397) | 7.716 (1.189) |
| Professional | | 12.510 (3.678) | 5.828 (0.998) | 5.616 (1.365) | 6.711 (0.837) | 8.627 (1.540) |
| Grad Certs | | 0.558 (0.697) | 1.408 (1.702) | 0.831 (1.639) | 4.573 (2.536) | 4.517 (2.376) |
| % Black | | | | 0.015 (0.009) | | 0.032 (0.016) |
| % Hispanic | | | | −0.013 (0.011) | | −0.030 (0.017) |
| % Asian | | | | −0.056 (0.028) | | −0.159 (0.043) |
| % Male | | | | −0.015 (0.002) | | −0.029 (0.004) |
| % Ever Pell | | | | 0.002 (0.011) | | 0.044 (0.016) |
| % First Generation | | | | −0.001 (0.010) | | −0.021 (0.016) |
| % Independent | | | | −0.005 (0.006) | | −0.005 (0.008) |
| FAFSA Family Income ($1,000) | | | | −0.055 (0.013) | | −0.088 (0.014) |
| Intercept | 1.260 (0.064) | 3.290 (0.216) | 6.328 (0.456) | 10.787 (1.594) | 6.223 (0.413) | 12.187 (1.968) |
| R-squared | 0.15 | 0.23 | 0.69 | 0.71 | 0.61 | 0.71 |

**Notes:** Specifications 3 to 6 include fixed effects for each six-digit OPEID number. Bachelor s degree and public are the omitted categories for credential type and control, respectively. Columns 5 and 6 weight programs by average title IV enrollment in AY16 and AY17.

Table 3.23 reports estimates from identical regression models, but instead using EP as the outcome. Again, each column represents a different regression model that includes different sets of independent variables. Program and institutional characteristics still matter greatly to earnings outcomes.

Institutional effects and credential level together explain 77 percent of the variation in program-level earnings outcomes (column 3). Adding demographic variables explains an additional 7 percent of the variation in program-level earnings (column 4). Note that the estimated regression

coefficients will likely overstate the effect of the baseline characteristics on outcomes if these characteristics are correlated with differences in program quality not captured by the crude institution and program characteristics included in the regression.

TABLE 3.23   REGRESSION ANALYSIS OF THE DEMOGRAPHIC VARIABLES, GE PROGRAMS, OUTCOME: EP ($1,000S)

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Private, Nonprofit | 7.355 (2.327) | 0.215 (1.647) | | | | |
| Proprietary | −4.613 (0.607) | −10.717 (0.486) | | | | |
| Credential Level: | | | | | | |
| UG Certificates | | −18.505 (0.821) | −17.197 (1.611) | −7.579 (1.376) | −20.851 (2.298) | −0.728 (1.902) |
| Associate s | | −6.844 (0.985) | −8.616 (1.283) | −3.605 (1.093) | −11.086 (1.938) | −0.341 (1.242) |
| Master s | | 11.188 (1.613) | 11.085 (2.031) | 7.169 (1.764) | 11.323 (3.453) | 8.738 (2.830) |
| Doctoral | | 32.005 (2.892) | 32.988 (4.440) | 20.813 (3.932) | 28.303 (6.102) | 10.521 (4.338) |
| Professional | | 41.519 (12.275) | 58.782 (13.667) | 44.858 (11.362) | 66.297 (9.928) | 43.511 (11.765) |
| Grad Certs | | 23.979 (3.219) | 13.521 (4.118) | 11.646 (3.529) | 7.767 (6.321) | 8.836 (6.407) |
| % Black | | | | −0.114 (0.047) | | −0.198 (0.058) |
| % Hispanic | | | | −0.084 (0.038) | | −0.002 (0.061) |
| % Asian | | | | 0.492 (0.110) | | 1.390 (0.266) |
| % Male | | | | 0.099 (0.007) | | 0.096 (0.016) |
| % Ever Pell | | | | −0.153 (0.045) | | −0.084 (0.064) |
| % First Generation | | | | −0.053 (0.029) | | 0.001 (0.047) |
| % Independent | | | | 0.143 (0.017) | | 0.193 (0.031) |
| FAFSA Family Income ($1,000) | | | | 0.170 (0.055) | | 0.443 (0.072) |
| Intercept | 11.267 (0.514) | 27.732 (0.918) | 19.839 (1.311) | 9.842 (7.404) | 21.911 (1.645) | −20.679 (9.331) |
| R-squared | 0.03 | 0.42 | 0.84 | 0.84 | 0.71 | 0.87 |

**Notes:** Specifications 3 to 6 include fixed effects for each six-digit OPEID number. Bachelor s degree and public are the omitted categories for credential type and control, respectively. Columns 5 and 6 weight programs by average title IV enrollment in AY16 and AY17.

Conclusions about the extent to which different factors explain variation in program outcomes can be sensitive to the order in which factors are entered into regressions. However, a variance decomposition analysis (that is insensitive to ordering) demonstrates that program and institutional factors explain the majority of the variance in both the D/E and EP metrics across programs when student characteristics are also included.

Figure 3.3 provides another view, demonstrating that many successful

programs exist and enroll similar shares of low-income students. It shows the distribution of raw EPs for undergraduate certificate programs (the y-axis is in $1,000s) grouped by the average FAFSA family income of the program.[234] Each program is placed in 20 equally sized groups from lowest to highest FAFSA family income.[234] Each dot represents an individual program. The EP of the median program in each income group, indicated by the large black square, is clearly increasing,

reflecting the greater earnings opportunities for students that come from higher income families. However, there is tremendous variation around this median. Even among programs with students that come from the lowest income families, there are clearly programs whose students go on to have earnings success after program completion. This graph demonstrates that demographics are not destiny when it comes to program performance.

---

[234] Since each of the 20 groups includes the same number of programs, the income range varies across groups.



Figure 3.3 Distribution of Earnings Premium by Family Income, Certificate Programs

**Gender Differences**

The analysis above showed that programs failing the EP threshold have a higher share of female students. In Table 3.24, descriptively we show that there are many programs that have similar gender composition but have much higher rates of passage than programs in cosmetology and massage, where failure rates are comparatively higher. Other programs, such as practical nursing and dental support, are similar in terms of their gender and racial balance but have much higher passage rates.

TABLE 3.24   GENDER AND RACIAL COMPOSITION OF UNDERGRADUATE CERTIFICATE PROGRAMS

| | Share of programs failing | Share of all completers who are . . . | | | | | Women (any race) |
|---|---|---|---|---|---|---|---|
| | | Black women | Hispanic women | Asian women | Other women | White women | |
| Teacher Education | 0.068 | 0.226 | 0.165 | 0.025 | 0.094 | 0.439 | 0.950 |
| Human Development | 0.022 | 0.216 | 0.284 | 0.039 | 0.063 | 0.366 | 0.968 |
| Health & Medical Admin | 0.388 | 0.209 | 0.171 | 0.029 | 0.086 | 0.442 | 0.938 |
| Medical Assisting | 0.478 | 0.171 | 0.292 | 0.030 | 0.067 | 0.317 | 0.876 |
| Laboratory Science | 0.178 | 0.163 | 0.138 | 0.030 | 0.079 | 0.434 | 0.843 |
| Practical Nursing | 0.042 | 0.154 | 0.134 | 0.033 | 0.067 | 0.498 | 0.886 |
| Cosmetology | 0.803 | 0.150 | 0.191 | 0.051 | 0.059 | 0.451 | 0.902 |
| Dental Support | 0.405 | 0.146 | 0.300 | 0.025 | 0.064 | 0.384 | 0.920 |
| Business Operations | 0.261 | 0.142 | 0.166 | 0.020 | 0.057 | 0.395 | 0.781 |
| Business Administration | 0.001 | 0.128 | 0.090 | 0.018 | 0.058 | 0.308 | 0.601 |
| Culinary Arts | 0.322 | 0.123 | 0.148 | 0.019 | 0.060 | 0.249 | 0.598 |
| Somatic Bodywork | 0.617 | 0.102 | 0.127 | 0.029 | 0.079 | 0.418 | 0.754 |
| Accounting | 0.071 | 0.096 | 0.141 | 0.060 | 0.067 | 0.361 | 0.725 |
| Criminal Justice | 0.041 | 0.072 | 0.079 | 0.004 | 0.027 | 0.151 | 0.333 |
| Liberal Arts | 0.038 | 0.049 | 0.205 | 0.043 | 0.055 | 0.262 | 0.613 |
| Allied Health, Diagnostic | 0.026 | 0.046 | 0.089 | 0.016 | 0.034 | 0.309 | 0.494 |
| IT Admin & Mgmt | 0.046 | 0.044 | 0.021 | 0.009 | 0.029 | 0.081 | 0.183 |
| Ground Transportation | 0.007 | 0.041 | 0.007 | 0.003 | 0.007 | 0.034 | 0.092 |
| Computer & Info Svcs | 0.074 | 0.030 | 0.078 | 0.012 | 0.017 | 0.113 | 0.250 |
| Precision Metal Working | 0.041 | 0.009 | 0.007 | 0.001 | 0.005 | 0.036 | 0.058 |
| HVAC | 0.026 | 0.008 | 0.003 | 0.000 | 0.001 | 0.012 | 0.025 |
| Fire Protection | 0.000 | 0.007 | 0.019 | 0.001 | 0.005 | 0.058 | 0.091 |
| Power Transmission | 0.016 | 0.007 | 0.006 | 0.000 | 0.003 | 0.019 | 0.035 |
| Vehicle Maintenance | 0.049 | 0.006 | 0.011 | 0.001 | 0.006 | 0.027 | 0.052 |
| Environment Ctrl Tech | 0.011 | 0.006 | 0.007 | 0.001 | 0.005 | 0.018 | 0.036 |

Conclusions of Student Demographic Analysis

On several dimensions, programs that have higher enrollment of underserved students have worse outcomes—lower completion, higher default, and lower post-college earnings levels—due to a myriad of challenges these students face, including fewer financial resources and structural discrimination in the labor market.[235] And yet, there is evidence that some institutions aggressively recruited vulnerable students—at times with deceptive marketing and fraudulent data—into programs without sufficient institutional support and instructional investment, placing students at risk for having high debt burdens and low earnings.[236] Nonetheless, our analysis demonstrates that GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone. Furthermore, alternative programs with similar student characteristics but where students have better outcomes exist and serve as good options for students that would otherwise attend low-performing programs. We quantify the extent of these alternative options more directly in the next section. The proposed GE rule aims to protect students from low-value programs and steer them to programs that would be greater engines of upward economic mobility.

Alternative Options Exist for Students To Enroll in High-Value Programs

Measuring Students' Alternative Options

One concern with limiting title IV, HEA eligibility for low-performing GE programs is that such measures could reduce postsecondary opportunities for some students. The Department conducted an analysis to estimate the short-term alternative options that are available to students that might, in the absence of these regulations, enroll in failing programs.

Students deterred from attending a specific program because of a loss of title IV, HEA aid eligibility at that program have several alternatives. For programs that are part of a multi-program institution, many may choose to still enroll at the institution, but attend a different program in a related subject that did not lose access to title IV, HEA and, therefore, likely offers better outcomes for students in terms of student debt, earnings, or both. Some would stay in their local area but attend a similar program at a different nearby institution. Others would venture to a related subject at a different nearby institution. Still others would attend an institution further away, but perhaps in the same State or online.[237] In order to identify geographical regions where the easiest potential transfer options exist, we used the 3-digit ZIP code (ZIP3) in which each institution is located. Three-digit zip codes designate the processing and distribution center of the United States Postal Service that serves a given geographic area. For each combination of ZIP3, CIP code, and credential level, we determined the number of programs available and the number of programs that would pass both the D/E and EP rates measures. Since programs that pass due to insufficient n-size to compute D/E and EP rates represent real options for students at failing programs, we include these programs in our calculations. Importantly, we also include all non-GE programs at public and private non-profit institutions.[238]

Our characterization of programs by the number of alternative options available is also used in the simulations of enrollment shifts that underly the Budget Impact and Cost, Benefit, and Transfer estimates, which we describe later.

Table 3.25 reports the distribution of the number of transfer options available to the students that would otherwise attend GE programs that fail at least one of the two metrics. We present estimates for four different ways of conceptualizing and measuring these transfer options. We assume students have more flexibility over the specific field and institution attended than credential level, so all four measures assume students remain in the same credential level. While not captured in this analysis, it is possible that some students would pursue a credential at a higher level in the same field, thereby further increasing their available options. Half of students in failing GE programs (in 42 percent of failing programs) have at least one alternative non-failing program of the same credential level at the same institution, but in a related field (as indicated by being in the same 2-digit CIP code). Nearly a quarter have more than one additional option. Two-thirds of students (at 61 percent of the failing programs) have a transfer option passing the GE measures within the same geographic area (ZIP3), credential level, and narrow field (4-digit CIP code). More than 90 percent of students have at least one transfer option within the same geographic area and credential level when the field is broadened to include programs in the same 2-digit CIP code. Finally, all students have at least one program in the same State, credential level, and 2-digit CIP code. While this last measure includes options that may not be viable for currently enrolled students—requiring moving across the State or attending virtually—it does suggest that at least some options are available for all students, both current and potential students, that would otherwise attend failing GE programs.

[235] Blau, Francine D., and Lawrence M. Kahn. 2017. ''The Gender Wage Gap: Extent, Trends, and Explanations.'' Journal of Economic Literature 55 (3): 789–865.

Hillman, N.W. (2014). College on Credit: A Multilevel Analysis of Student Loan Default. *Review of Higher Education* 37(2), 169–195.

Pager, D., Western, B. & Bonikowski, B. (2009). Discrimination in a Low-Wage Labor Market: A Field Experiment. *American Sociological Review, 74*, 777–799.

[236] Cottom, T.M. (2017). *Lower Ed: The Troubling Rise of For-Profit Colleges in the New Economy.*

Government Accountability Office (2010). *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices.*

United States Senate Committee on Health, Education, Labor and Pensions (2012). *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success.*

[237] Two other possibilities, which we include in our simulation of budget impacts, is that students continue to enroll in programs without receiving title IV, HEA aid or decline to enroll altogether.

[238] Since the 2022 PPD are aggregated to each combination of the six-digit OPEID, four-digit CIP code, and credential level, we do not have precise data on geographic location. For example, a program can have multiple branch locations in different cities and States. At some of these locations, the program could be offered as an online program while other locations offer only in-person programs. Each of these locations would present as a single program in our data set without detail regarding precise location or format. We do not possess more detailed geographic information that would allow us to address this issue, so we recognize that our analysis of geographic scope and

alternatives may be incomplete and cause us to understate the number of options students have. Nonetheless, the vast majority of alternative options will be captured in our analysis.

TABLE 3.25    SHARE OF PROGRAMS AND ENROLLMENT IN FAILING GE PROGRAMS, BY NUMBER OF ALTERNATIVE OPTIONS

| | Same institution, cred level, CIP2 | Same Zip3, cred level, CIP4 | Same Zip3, cred level, CIP2 | Same state, cred level, CIP2 |
|---|---|---|---|---|
| A. Programs Transfer options: | | | | |
|     1 or more | 0.42 | 0.61 | 0.88 | 1.00 |
|     5 or more | 0.04 | 0.05 | 0.51 | 0.96 |
| B. Enrollment Transfer options: | | | | |
|     1 or more | 0.50 | 0.66 | 0.91 | 1.00 |
|     5 or more | 0.04 | 0.05 | 0.53 | 0.96 |

Table 3.26 repeats this analysis for non-GE programs with at least one failing GE metric. Students considering non-GE programs with D/E or EP metrics that do not meet Department standards may choose to enroll elsewhere. More than half of students at failing non-GE programs have a non-failing program in the same 4-digit CIP code, credential level, and geographic area that they could choose to enroll in. This share approaches three-quarters if the field is broadened to include programs in the same two-digit CIP code. Therefore, while the set of alternatives is not as numerous for non-GE programs as for GE programs, the number of alternatives is still quite high. Furthermore, since non-GE programs are not at risk of losing eligibility for title IV aid, the slightly lower number of alternatives to failing non-GE programs is less concerning.

TABLE 3.26    SHARE OF PROGRAMS AND ENROLLMENT IN FAILING NON-GE PROGRAMS, BY NUMBER OF ALTERNATIVE OPTIONS

| | Same institution, cred level, CIP2 | Same Zip3, cred level, CIP4 | Same Zip3, cred level, CIP2 | Same state, cred level, CIP2 |
|---|---|---|---|---|
| A. Programs Transfer options: | | | | |
|     1 or more | 0.54 | 0.50 | 0.81 | 0.99 |
|     5 or more | 0.11 | 0.07 | 0.41 | 0.94 |
| B. Enrollment Transfer options: | | | | |
|     1 or more | 0.38 | 0.51 | 0.72 | 1.00 |
|     5 or more | 0.08 | 0.06 | 0.31 | 0.93 |

This analysis likely understates the transfer options available to students for three reasons. First, as stated above, it does not consider programs of a different credential level. For example, students who would have pursued a certificate program might opt for an associate degree program that shows higher earnings. Second, it does not consider the growth of online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions.

Third, we do not consider non-title IV, HEA institutions. Undergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics. Nonetheless, recent data from California and Texas suggest that many students successfully pass licensure exams after completing non-title IV, HEA programs in cosmetology.[239] Non-title IV, HEA

cosmetology schools operate in almost all counties in Texas.[240] In Florida, non-title IV, HEA cosmetology schools have similar licensure pass rates but much lower tuition.[241]

Potential Alternative Programs Have Better Outcomes Than Failing Programs

A key motivation for more accountability via this proposed rule is to steer students to higher value programs. As mentioned previously, research has shown that when an institution closed due to failing an accountability measure, students were diverted to schools with better outcomes.[242] The Department

conducted an analysis of the possible earnings impact of students shifting from programs that fail one of the GE metrics to similar programs that do not fail. For each failing program, we computed the average program-level median earnings of non-failing programs included in the failing program's transfer options, which we refer to as "Alternative Program Earnings." Earnings were weighted by average title IV, HEA enrollment in award years 2016 and 2017. Alternative options were determined in the same way as described above. In computing Alternative Program Earnings, priority was first given to passing programs in the same institution, credential level, and two-digit CIP code if such programs exist and have valid earnings. This assigned Alternative Program Earnings for 20 percent of failing programs. Next priority was given to programs in the same ZIP3, credential level, and four-digit CIP code, which assigned Alternative Program Earnings for 8 percent of programs. Next was programs in the same ZIP3, credential level, and two-digit CIP code, which assigned Alternative Program Earnings for 14

[239] In California, 55 percent of individuals passing either the practical or written components of the licensure test are from title IV, HEA schools according to Department analysis using licensing exam data retrieved from *www.barbercosmo.ca.gov/schools/schls_rslts.shtml* on December 7, 2022.

[240] Cellini, S. R. & Onwukwe, B. (2022). Cosmetology Schools Everywhere. Most Cosmetology Schools Exist Outside of the Federal Student Aid System. Postsecondary Equity & Economics Research Project working paper, August 2022.

[241] Cellini, S. R., & Goldin, C. (2014). Does federal student aid raise tuition? New evidence on for-profit colleges. *American Economic Journal: Economic Policy*, 6(4), 174–206.

[242] Cellini, S.R., Darolia, R. & Turner, L.J. (2020). Where Do Students Go When For-Profit Colleges Lose Federal Aid? *American Economic Journal: Economic Policy*, 12(2): 46–83.

percent of programs. We did not use the earnings of programs outside the ZIP3 to assign Alternative Program Earnings given the wage differences across regions. It was not possible to compute the earnings of alternative options for the remaining 59 percent of programs primarily because their options have insufficient number of completers to report median earnings (47 percent) or because they did not have alternative options in the same ZIP3 (12 percent). For these programs, we set the Alternative Program Earnings equal to the median earnings of high school graduates in the State (the same value used to determine the ET). The percent increase in earnings associated with moving from a failing program to a passing program was computed as the difference between a program's Alternative Program Earnings and its own median earnings, divided by its own median earnings. We set this earnings gain measure to 100 percent in the small number of cases where the median program earnings are zero or the ratio is greater than 100 percent.

Table 3.27 reports the estimated percent difference in earnings between alternative program options and failing programs, separately by two-digit CIP and credential level. Across all subjects,

the difference in earnings at passing undergraduate certificate programs and failing programs is about 50 percent. This is unsurprising, given that the EP metric explicitly identifies programs with low earnings, which in practice are primarily certificate programs. Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail. Failing associate degree programs also have similar non-failing programs with much higher earnings. Earnings differences are still sizable and positive, though not quite as large for higher credentials. Passing GE bachelor's programs have 31 percent higher earnings than bachelor's programs that fail the GE metrics.

Table 3.28 reports similar estimates for non-GE programs. The earnings difference between failing and passing non-GE programs is more modest than for GE programs, but still significant: 21 percent across all credential levels, ranging from close to zero for Doctoral programs to 30 percent for Bachelor's programs.

We use a similar process to compute the percent change in average program-level median debt between failing GE or non-GE programs and alternative programs.[243] Tables 3.29 and 3.30 report

the percent change in debt between alternative program options and failing programs, separately by two-digit CIP and credential level. Across all subjects and credential levels, debt is 22 percent lower at alternative programs than at failing GE programs. Large differences in debt are seen at all degree levels (other than professional), with modest differences for undergraduate certificate programs. At non-GE programs, there is no aggregate debt difference between failing programs and their alternatives, though this masks heterogeneity across credential levels. For graduate degree programs, relative to failing programs, alternative programs have lower debt levels ranging from 24 percent (Professional programs) to 35 percent (Doctoral programs). Failing associate degree programs have debt that is 12 percent higher than in passing programs.

While these differences don't necessarily provide a completely accurate estimate of the actual earnings gain or debt reduction that students would experience by shifting programs, they suggest alternative options exist that provide better financial outcomes than programs that fail the proposed D/E and EP metrics.

TABLE 3.27   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | UG cert. | Assoc. | Bach. | Masters | Doctoral | Profess. | Grad certs | |
| cip2 | | | | | | | | |
| 1 | 1.00 | ............. | ............. | ............. | ............. | ............. | ............. | 1.00 |
| 3 | ............. | ............. | −0.18 | ............. | ............. | ............. | ............. | −0.18 |
| 9 | 0.18 | ............. | 0.24 | 0.24 | ............. | ............. | ............. | 0.20 |
| 10 | 0.42 | 0.26 | −0.02 | −0.38 | ............. | ............. | ............. | 0.07 |
| 11 | 0.55 | 0.24 | 0.79 | −0.62 | ............. | ............. | ............. | 0.47 |
| 12 | 0.54 | 0.11 | −0.18 | ............. | ............. | ............. | 1.00 | 0.53 |
| 13 | 0.48 | 0.38 | 0.13 | 0.46 | 0.18 | ............. | −0.04 | 0.22 |
| 14 | ............. | −0.01 | −0.37 | ............. | ............. | ............. | ............. | −0.20 |
| 15 | 0.16 | −0.10 | ............. | ............. | ............. | ............. | ............. | 0.13 |
| 16 | ............. | ............. | −0.03 | ............. | ............. | ............. | ............. | −0.03 |
| 19 | 0.69 | 0.29 | 0.13 | −0.27 | −0.55 | ............. | ............. | 0.12 |
| 22 | 0.33 | −0.03 | −0.03 | ............. | ............. | 0.22 | −0.60 | −0.00 |
| 23 | 0.57 | 0.00 | 0.38 | −0.09 | ............. | ............. | ............. | 0.45 |
| 24 | 0.06 | ............. | ............. | ............. | ............. | ............. | ............. | 0.06 |
| 25 | ............. | ............. | −0.03 | ............. | ............. | ............. | ............. | −0.03 |
| 26 | ............. | ............. | ............. | ............. | ............. | ............. | −0.32 | −0.32 |
| 30 | ............. | 0.24 | −0.03 | ............. | ............. | ............. | −0.34 | 0.01 |
| 31 | 0.51 | −0.00 | ............. | ............. | ............. | ............. | ............. | 0.09 |
| 32 | 0.32 | ............. | ............. | ............. | ............. | ............. | ............. | 0.32 |
| 39 | 0.40 | ............. | −0.03 | −0.20 | ............. | ............. | ............. | 0.04 |
| 42 | ............. | ............. | 0.06 | 0.21 | −0.39 | ............. | −0.34 | −0.06 |
| 43 | 0.25 | 0.19 | 0.24 | 0.42 | −0.56 | ............. | ............. | 0.21 |
| 44 | ............. | 0.10 | 0.43 | 0.15 | 0.12 | ............. | −0.50 | 0.31 |
| 45 | ............. | ............. | 0.23 | −0.24 | ............. | ............. | ............. | 0.06 |
| 46 | 0.45 | ............. | ............. | ............. | ............. | ............. | ............. | 0.45 |
| 47 | 0.70 | 0.14 | ............. | ............. | ............. | ............. | ............. | 0.61 |

[243] The only exception being that we use the debt for alternative programs in the same credential level, same two-digit CIP code, and State to impute alternative program debt if such a program is not available or calculable in students' ZIP3. This is because there is no other natural benchmark debt level analogous to the ET used to compute alternative program earnings.

TABLE 3.27   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL   Continued

|  | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
|  | UG cert. | Assoc. | Bach. | Master s | Doctoral | Profess. | Grad certs |  |
| 48 | 0.25 | ............ | ............ | ............ | ............ | ............ | ............ | 0.25 |
| 49 | 0.76 | ............ | ............ | ............ | ............ | ............ | ............ | 0.76 |
| 50 | 0.46 | 0.22 | 0.27 | 0.46 | ............ | ............ | ............ | 0.30 |
| 51 | 0.50 | 0.81 | 0.76 | 0.87 | −0.07 | −0.06 | 0.00 | 0.60 |
| 52 | 0.51 | 0.31 | 0.61 | 0.22 | 0.34 | ............ | 0.20 | 0.38 |
| 54 | ............ | ............ | −0.13 | ............ | ............ | ............ | ............ | −0.13 |
| Total | 0.51 | 0.48 | 0.31 | 0.49 | −0.34 | −0.03 | −0.14 | 0.43 |

TABLE 3.28   PERCENT EARNINGS DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

|  | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
|  | Assoc. | Bach. | Master s | Doctoral | Profess. |  |
| cip2 |  |  |  |  |  |  |
| 1 | 0.31 | 0.12 | ............ | ............ | ............ | 0.16 |
| 3 | ............ | 0.38 | −0.24 | ............ | ............ | 0.30 |
| 4 | ............ | ............ | −0.31 | ............ | ............ | −0.31 |
| 5 | ............ | 0.02 | ............ | ............ | ............ | 0.02 |
| 9 | 0.12 | 0.31 | −0.02 | ............ | ............ | 0.27 |
| 10 | 0.14 | −0.01 | ............ | ............ | ............ | 0.11 |
| 11 | 0.32 | 1.00 | ............ | ............ | ............ | 0.37 |
| 12 | 0.25 | ............ | ............ | ............ | ............ | 0.25 |
| 13 | 0.22 | 0.32 | 0.20 | −0.12 | ............ | 0.23 |
| 15 | 0.83 | ............ | ............ | ............ | ............ | 0.83 |
| 16 | 0.03 | 0.43 | ............ | ............ | ............ | 0.40 |
| 19 | 0.18 | 0.40 | −0.42 | ............ | ............ | 0.27 |
| 22 | −0.02 | −0.09 | −0.26 | −0.59 | −0.08 | −0.14 |
| 23 | 0.38 | 0.23 | −0.18 | ............ | ............ | 0.20 |
| 24 | 0.15 | 0.10 | −0.54 | ............ | ............ | 0.14 |
| 26 | 0.13 | 0.39 | 0.12 | −0.70 | ............ | 0.31 |
| 30 | 0.12 | 0.11 | −0.17 | ............ | ............ | 0.10 |
| 31 | 0.10 | 0.22 | −0.22 | ............ | ............ | 0.18 |
| 38 | −0.05 | −0.10 | ............ | ............ | ............ | −0.07 |
| 39 | 0.55 | 0.49 | −0.02 | ............ | 0.20 | 0.38 |
| 40 | ............ | 0.58 | ............ | ............ | ............ | 0.58 |
| 41 | 0.08 | ............ | ............ | ............ | ............ | 0.08 |
| 42 | 0.31 | 0.04 | −0.10 | −0.34 | −0.69 | −0.01 |
| 43 | 0.20 | 0.02 | −0.12 | ............ | ............ | 0.09 |
| 44 | 0.21 | −0.04 | 0.11 | ............ | ............ | 0.12 |
| 45 | 0.09 | 0.47 | −0.12 | ............ | ............ | 0.23 |
| 47 | 0.38 | ............ | ............ | ............ | ............ | 0.38 |
| 50 | 0.23 | 0.40 | 0.31 | −0.29 | ............ | 0.37 |
| 51 | 0.65 | 0.77 | 0.57 | 0.26 | 0.11 | 0.48 |
| 52 | 0.14 | 0.53 | 0.42 | ............ | ............ | 0.23 |
| 54 | ............ | 0.06 | −0.19 | ............ | ............ | −0.09 |
| Total | 0.22 | 0.30 | 0.15 | −0.00 | 0.03 | 0.21 |

TABLE 3.29   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

|  | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
|  | UG cert. | Assoc. | Bach. | Master s | Doctoral | Profess. | Grad certs |  |
| cip2 | ............ |  |  |  |  |  |  |  |
| 1 | 0.00 | ............ | ............ | ............ | ............ | ............ | ............ | 0.00 |
| 3 | ............ | ............ | −0.65 | ............ | ............ | ............ | ............ | −0.65 |
| 9 | 0.06 | ............ | −0.26 | −0.01 | ............ | ............ | ............ | −0.04 |
| 10 | 0.15 | 0.63 | −0.32 | ............ | ............ | ............ | ............ | −0.15 |
| 11 | 0.06 | −0.36 | −0.23 | −0.79 | ............ | ............ | ............ | −0.19 |
| 12 | −0.23 | −0.49 | 0.13 | ............ | ............ | ............ | 0.00 | −0.24 |
| 13 | −0.27 | −0.89 | −0.31 | −0.36 | −0.18 | ............ | −0.20 | −0.39 |

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules **32437**

TABLE 3.29   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL   Continued

| | Credential level | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | UG cert. | Assoc. | Bach. | Masters | Doctoral | Profess. | Grad certs | |
| 14 | | 0.01 | −0.58 | | | | | −0.30 |
| 15 | −0.13 | −0.69 | | | | | | −0.19 |
| 16 | | | −0.52 | | | | | −0.52 |
| 19 | −0.05 | −0.26 | −0.24 | −0.30 | | | | −0.23 |
| 22 | 1.00 | −0.60 | −0.26 | | | −0.40 | | −0.47 |
| 23 | 0.00 | −0.82 | −0.33 | 0.00 | | | | −0.18 |
| 24 | 0.00 | | | | | | | 0.00 |
| 25 | | | | | | | | |
| 26 | | | | | | | −0.25 | −0.25 |
| 30 | | −0.91 | −0.54 | | | | | −0.58 |
| 31 | −0.83 | −0.75 | | | | | | −0.80 |
| 32 | 0.00 | | | | | | | 0.00 |
| 39 | 0.59 | | | | | | | 0.59 |
| 42 | | | −0.49 | −0.21 | −0.76 | | −0.77 | −0.42 |
| 43 | −0.57 | −0.70 | −0.42 | −0.10 | | | | −0.53 |
| 44 | | −0.74 | −0.09 | −0.28 | −0.38 | | | −0.23 |
| 45 | | | −0.11 | | | | | −0.11 |
| 46 | 0.16 | | | | | | | 0.16 |
| 47 | 0.10 | −0.24 | | | | | | 0.05 |
| 48 | −0.21 | | | | | | | −0.21 |
| 49 | 0.32 | | | | | | | 0.32 |
| 50 | 0.21 | −0.60 | −0.34 | −0.23 | | | | −0.31 |
| 51 | 0.02 | −0.14 | −0.37 | −0.48 | −0.64 | 0.60 | −0.58 | −0.09 |
| 52 | −0.14 | −0.42 | −0.33 | −0.17 | −0.17 | | −0.27 | −0.35 |
| 54 | | | −0.22 | | | | | −0.22 |
| Total | −0.09 | −0.37 | −0.36 | −0.35 | −0.60 | 0.48 | −0.43 | −0.22 |

TABLE 3.30   PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL

| | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
| | Assoc. | Bach. | Masters | Doctoral | Profess. | |
| cip2 | | | | | | |
| 1 | −0.37 | −0.14 | | | | −0.19 |
| 3 | | 0.02 | −0.53 | | | −0.06 |
| 4 | | | −0.35 | | | −0.35 |
| 5 | | −0.12 | | | | −0.12 |
| 9 | 0.64 | −0.17 | −0.37 | | | −0.09 |
| 10 | 0.01 | −0.11 | | | | −0.01 |
| 11 | −0.29 | −0.42 | | | | −0.30 |
| 12 | 0.08 | | | | | 0.08 |
| 13 | 0.24 | −0.14 | −0.32 | −0.03 | | 0.04 |
| 15 | 0.22 | | | | | 0.22 |
| 16 | −0.27 | 0.19 | | | | 0.15 |
| 19 | 0.07 | | −0.39 | | | 0.14 |
| 22 | −0.55 | −0.28 | | −0.16 | −0.27 | −0.29 |
| 23 | 0.19 | −0.04 | −0.33 | | | −0.04 |
| 24 | 0.19 | −0.10 | | | | 0.16 |
| 26 | 0.78 | 0.13 | −0.29 | | | 0.18 |
| 30 | −0.15 | −0.10 | 0.00 | | | −0.12 |
| 31 | 0.80 | −0.22 | | | | 0.12 |
| 38 | | −0.26 | | | | −0.26 |
| 39 | −0.67 | −0.03 | −0.29 | | 0.00 | −0.10 |
| 40 | | 1.00 | | | | 1.00 |
| 41 | | | | | | |
| 42 | 0.33 | −0.11 | −0.32 | −0.46 | | −0.16 |
| 43 | −0.22 | −0.23 | −0.35 | | | −0.24 |
| 44 | −0.26 | −0.30 | −0.40 | | | −0.32 |
| 45 | −0.08 | −0.19 | −0.53 | | | −0.18 |
| 47 | 0.21 | | | | | 0.21 |
| 50 | 0.25 | −0.02 | −0.28 | | | −0.01 |
| 51 | 0.02 | 0.02 | −0.10 | −0.38 | −0.22 | −0.10 |
| 52 | −0.15 | −0.26 | −0.12 | | | −0.17 |
| 54 | | 0.39 | −0.79 | | | 0.10 |

TABLE 3.30 PERCENT DEBT DIFFERENCE BETWEEN TRANSFER OPTIONS AND FAILING NON-GE PROGRAMS, BY CIP AND CREDENTIAL LEVEL —Continued

|  | Credential level | | | | | Total |
|---|---|---|---|---|---|---|
|  | Assoc. | Bach. | Masters | Doctoral | Profess. | |
| Total .................................................................... | 0.12 | −0.07 | −0.27 | −0.35 | −0.24 | 0.00 |

**Transfer Causes Net Enrollment Increase in Some Sectors**

The aggregate change in enrollment overall, by sector, and by institution would likely be less than that implied by the program- and institution-level results presented in the ''Results of GE Accountability'' section above because those do not consider that many students would likely transfer to passing programs or even remain enrolled at failing programs in response to a program losing title IV eligibility. The Department simulated the likely destinations of students enrolled in failing GE programs. Based on the research literature and described more fully in ''Student Response Assumptions'' subsection in Section 5 below, we use assumptions about the share of students that transfer to another program, remain enrolled in the original program, or drop out entirely if a program loses title IV, HEA eligibility. These student mobility assumptions differ according to the number of alternative options that exist and are the same assumptions used in the Net Budget Impact section.

Using these assumptions, for every failing GE program, we estimate the title IV, HEA enrollment from that program that would remain, dropout, or transfer

to another program. Our notion of ''transfers'' includes both current students and future students who attend an alternative program instead of one that fails the GE metrics. The number of transfers is then reallocated to specific other non-failing GE and non-GE programs in the same institution (OPEID6), credential level, and 2-digit CIP code. If multiple such programs exist, transfer enrollment is allocated based on the share of initial title IV, HEA enrollment in these programs. If no alternative options exist using this approach, the transfer enrollment is allocated to non-failing GE and non-GE programs in the same geographic area (ZIP3), credential level, and 4-digit CIP code. Again, initial title IV, HEA enrollment shares are used to allocate transfer enrollment if multiple such alternative programs exist. These two approaches reallocate approximately 80 percent of the transfer enrollments we would expect from failing GE programs. Finally, new title IV, HEA enrollment is computed for each program that sums existing enrollment (or retained enrollment, in the case of failing GE programs) and the allocated transfer enrollment.

Table 3.30 summarizes these simulation results, separately by type of

institution.[244] Without accounting for transfers or students remaining in failing GE programs, aggregate title IV, HEA enrollment drops by 699,700 (3.6 percent), with at least some enrollment declines in all sectors. This will greatly overstate the actual enrollment decline associated with the proposed regulation because it assumes that students leave postsecondary education in response to their program failing a GE metric. The final column simulates enrollment after accounting for transfers within institution (to similar programs) and to similar programs at other geographically-proximate institutions, along with permitting some modest enrollment retention at failing programs. In this scenario, aggregate enrollment declines by only 228,000 (1.2 percent) due to the proposed rule.[245] Importantly, some sectors experience an enrollment increase as students transfer from failing to passing programs. For instance, public 2-year community colleges are simulated to experience a 27,000-student enrollment increase once transfers are accounted for rather than a 30,000-student decrease when they are not. Historically Black Colleges and Universities (HBCUs) are simulated to gain 1,200 students rather than lose 700.

TABLE 3.31 PROJECTED ENROLLMENT WITH AND WITHOUT TRANSFERS, BY SECTOR

|  | Number of inst. | Initial enrollment | No transfers or retention | + within institution-CIP2 transfers | + within ZIP3 CIP4 transfers |
|---|---|---|---|---|---|
| Sector of institution: | | | | | |
| Public, 4-year + ............................................ | 700 | 8,186,900 | 8,179,700 | 8,184,900 | 8,209,000 |
| Non-profit, 4-year + ....................................... | 1,400 | 4,002,400 | 3,994,500 | 3,998,900 | 4,005,500 |
| For-profit, 4-year + ....................................... | 200 | 1,298,800 | 950,900 | 1,150,600 | 1,158,900 |
| Public, 2-year ................................................ | 900 | 5,025,200 | 4,995,600 | 5,013,300 | 5,052,000 |
| Non-profit, 2-year .......................................... | 100 | 97,200 | 74,300 | 88,100 | 89,100 |
| For-profit, 2-year .......................................... | 300 | 290,900 | 205,000 | 251,800 | 259,500 |
| Public, < 2-year ............................................ | 200 | 42,600 | 41,300 | 42,100 | 46,200 |
| Non-profit, < 2-year ....................................... | <50 | 11,600 | 6,200 | 8,300 | 8,500 |
| For-profit, < 2-year ........................................ | 1,000 | 278,400 | 86,900 | 149,400 | 177,500 |
| Total ............................................................. | 4,900 | 19,234,100 | 18,534,500 | 18,887,300 | 19,006,000 |

**Note:** Values rounded to the nearest 100.

[244] Programs at foreign institutions are excluded from this table as they do not have an institutional type.

[245] Note that since many failing programs result in earnings lower than those of the typical high school graduate, students leaving postsecondary

education still may be better off financially compared to staying in a failing program.

*4. Discussion of Costs, Benefits, and Transfers*

Description of Baseline

In absence of the proposed regulations, many students enroll in low-financial-value programs where they either end up not being able to secure a job that leads to higher earnings, take on unmanageable debt, or both. Many of these students default on their loans, with negative consequences for their credit and financial security and at substantial costs to the taxpayers. Many students with insufficient earnings to repay their debts would be eligible to have their payments reduced and eventually have their loans forgiven through income-driven repayment (IDR). This shields low-income borrowers from the consequences of unaffordable debts but shifts the financial burden onto taxpayers.

Transparency and Gainful Employment

We have considered the primary costs, benefits, and transfers of both the transparency and accountability proposed regulations for the following groups or entities that would be affected by the final regulations:

- Students
- Institutions
- State and local governments
- The Federal government

We first discuss the anticipated benefits of the proposed regulations, including improved market information. We then assess the expected costs and transfers for students, institutions, the Federal government, and State and local governments. Table 4.1 below summarizes the major benefits, costs, and transfers and whether they are quantified in our analysis or not.

TABLE 4.1   SUMMARY OF COSTS, BENEFITS, AND TRANSFERS FOR FINANCIAL VALUE TRANSPARENCY AND GAINFUL EMPLOYMENT PROPOSED REGULATIONS

| | Students | Institutions | State and local governments | Federal government |
|---|---|---|---|---|
| **Benefits** | | | | |
| Quantified ........ | Earnings gain from shift to higher value programs. | ...................................................... | State tax revenue from higher earnings. | Federal tax revenue from higher earnings. |
| Not quantified .. | Lower rates of default, higher rates of family & business formation, higher retirement savings, saving of opportunity cost for non-enrollees. | Increased enrollment and revenue associated with new enrollments from improved information about value; improvements in program quality. | | |
| **Costs** | | | | |
| Quantified ........ | Time for acknowledgment .............. | Disclosure reporting; time for acknowledgment. | Additional spending at institutions that absorb students from failing programs. | Implementation of data collection and information website. |
| Not quantified .. | Time, logistics, credit loss associated with program transfer. | Investments to improve program quality; decreased enrollment and revenue associated with fewer new enrollments from improved information about value. | | |
| **Transfers** | | | | |
| Quantified ........ | ...................................................... | Aid money from failing programs to govt for non-enrollments; aid money from failing to better-value programs for transfers. | ...................................................... | Aid money from failing programs to govt for non-enrollments. |
| Not quantified .. | Increased loan payments associated with less IDR forgiveness. | Aid money from failing programs to State govt for non-enrollments. | Aid money from failing programs to State govt for non-enrollments. | Increased loan payments associated with less IDR forgiveness and fewer defaults. |

Benefits

We expect the primary benefits of both the accountability and transparency components of the proposed regulation to derive from a shift of students from low-value to high-value programs, or in some cases, a shift away from low-value postsecondary programs to non-enrollment. This shift would be due to improved and standardized market information about GE and non-GE programs. This would increase the transparency of student outcomes for better decision making by current students, prospective students, and their families; the public, taxpayers, and the Government; and institutions. Furthermore, the accountability component would improve program quality by directly eliminating the ability of low-value programs to participate in the title IV, HEA programs. Finally, both the transparency and accountability provisions of the rule should lead to a more competitive postsecondary market that encourages improvement, thereby, improving the outcomes and/or reducing the cost of existing programs that continue to enroll students.

Benefits to Students

Under the proposed regulation, students, prospective students, and their families would have extensive, comparable, and reliable information about the outcomes of students who enroll in GE and non-GE programs such as cost, debt, earnings, completion, and repayment outcomes. This information would assist them in choosing institutions and programs where they believe they are most likely to complete their education and achieve the earnings they desire, while having debt that is manageable. This information would result in more informed decisions based on reliable information about a program's outcomes.

Students would potentially benefit from this information via higher earnings, lower costs and less debt, and better program quality. This can happen through three channels. First, students benefit by transferring to passing programs. Second, efforts to improve programs would lead to better labor market outcomes, such as improved job prospects and higher earnings, by offering better student services, working with employers to ensure graduates have needed skills, improving academic quality, and helping students with

App.332

career planning. This may happen as institutions improve programs to avoid failing the D/E or EP measures or simply from programs competing more for students based on quality, with the proposed rule providing greater transparency about program quality. As a result of these enrollment shifts, students who graduate with manageable debts and adequate earnings would be more likely to pay back their loans, marry, buy a home, and invest in their futures.[246] Finally, some students that chose not to enroll in low-value programs will save opportunity costs by not investing their time in programs that do not lead to good outcomes. While these other factors are certainly important to student wellbeing, our analysis focuses on the improvement in earnings associated with a shift from low-value programs to higher value programs.

### Benefits to Institutions

Institutions offering high-performing programs to students are likely to see growing enrollment and revenue and to benefit from additional market information that permits institutions to demonstrate the value of their programs without excessive spending on marketing and recruitment. Additionally, institutions that work to improve the quality of their programs could see increased revenues from improved retention and completion and therefore, additional tuition revenue.

We believe disclosures would increase enrollment and revenues in well-performing programs. Improved information from disclosures would increase market demand for programs that produce good outcomes. While the increases or decreases in revenues for institutions are benefits or costs from the institutional perspective, they are transfers from a social perspective. However, any additional demand for education due to overall program quality improvement would be considered a social benefit.

[246] Chakrabarti, R, Fos, V., Liberman, A. & Yannelis, C. (2020). Tuition, Debt, and Human Capital. Federal Reserve Bank of New York Staff Report No. 912.

Gicheva, D. (2016). Student Loans or Marriage? A Look at the Highly Educated. Economics of Education Review, 53, 207–2016.

Gicheva, D. & Thompson, J. (2015). The effects of student loans on long-term household financial stability. In B. Hershbein & K. Hollenbeck (Ed.). Student Loans and the Dynamics of Debt (137–174). Kalamazoo, MI: W.E. Upjohn Institute for Employment Research.

Hillman, N.W. (2014). College on Credit: A Multilevel Analysis of Student Loan Default. Review of Higher Education 37(2), 169–195.

Mezza, A., Ringo, D., Sherlund, S., & Sommer, K. (2020). ''Student Loans and Homeownership,'' Journal of Labor Economics, 38(1): 215–260.

The improved information that would be available as a result of the proposed regulations would also benefit institutions' planning and improvement efforts. Information about student outcomes would help institutions determine whether it would be prudent to expand, improve quality, reduce costs, or eliminate various programs. Institutions may also use this information to offer new programs in fields where students are experiencing positive outcomes, including higher earnings and steady employment. Additionally, institutions would be able to identify and learn from programs that produce exceptional results for students.

### Benefits to State and Local Governments

State and local governments would benefit from additional tax revenue associated with higher student earnings and students' increased ability to spend money in the economy. They would also benefit from reduced costs because, as institutions improve the quality of their programs, their graduates would likely have improved job prospects and higher earnings, meaning that governments would likely be able to spend less on unemployment benefits and other social safety net programs. State and local governments would also experience improved oversight of their investments in postsecondary education. Additionally, State and local postsecondary education funding could be allocated more efficiently to higher-performing programs. State and local governments would also experience a better return on investment on their dollars spent on financial aid programs as postsecondary program quality improves.

### Benefits to Federal Government

The Federal government would benefit from additional tax revenue associated with higher student earnings and students' increased ability to spend money in the economy. Another primary benefit of the proposed regulations would be improved oversight and administration of the title IV, HEA programs, particularly the new data reported by institutions. Additionally, Federal taxpayer funds would be allocated more efficiently to higher-performing programs, where students are more likely to graduate with manageable amounts of debt and gain stable employment in a well-paying field, increasing the positive benefits of Federal investment in title IV, HEA programs.

The taxpayers and the Government would also benefit from improved information about GE programs. As the

funders and stewards of the title IV, HEA programs, these parties have an interest in knowing whether title IV, HEA program funds are benefiting students. The information provided in the disclosures would allow for more effective monitoring of the Federal investment in GE programs.

### Costs

### Costs to Students

Students may incur some costs as a result of the proposed regulations. One cost is that all title IV, HEA students attending eligible non-GE programs that fail the D/E metric would be required to acknowledge having seen information about program outcomes before title IV aid is disbursed. Students attending GE programs with at least one failing metric would additionally be required to acknowledge a warning that the program could lose title IV, HEA eligibility. The acknowledgement is the main student cost we quantify in our analysis. We expect that over the long-term, all students would have increased access to programs that lead to successful outcomes. In the short term, students in failing programs would incur search and logistical costs associated with finding and enrolling in an alternative program, whether that be a GE or non-GE program. Further, at least some students may be temporarily left without transfer options. We expect that many of these students would re-enter postsecondary education later, but we understand that some students may not continue. We do not quantify these costs associated with searching for and transferring to new postsecondary programs.

### Costs to Institutions

Under the proposed regulations, institutions would incur costs as they make changes needed to comply, including costs associated with the reporting, disclosure, and acknowledgment requirements. These costs could include: (1) Training of staff for additional duties, (2) potential hiring of new employees, (3) purchase of new, or modifications to existing, software or equipment, and (4) procurement of external services.

As described in the Preamble, much of the necessary information required from GE programs would already have been reported to the Department under the 2014 Prior Rule, and as such we believe the added burden of this reporting relative to existing requirements would be reasonable. Furthermore, 88 percent of public and 47 percent of private non-profit institutions operated at least one GE

program and thus have experience with similar data reporting for the subset of their students enrolled in certificate programs under the 2014 Prior Rule. Moreover, many institutions report more detailed information on the components of cost of attendance and other sources of financial aid in the Federal National Postsecondary Student Aid Survey (NPSAS) administered by the National Center for Education Statistics. Finally, for the first year after the effective date of the proposed rule, the Department proposes flexibility for institutions to avoid reporting data on students who completed programs in the past, and instead to use data on more recent completer cohorts to estimate median debt levels. In part, this is intended to ease the administrative burden of providing this data for programs that were not covered by the 2014 Prior Rule reporting requirements,

especially for the small number of institutions that may not previously have had any programs subject to these requirements.

Our initial estimate of the time cost of these reporting requirements for institutions is 5.1 million hours initially and then 1.5 million hours annually after the first year. The Department recognizes that institutions may have different approaches and processes for record-keeping and administering financial aid, so the burden of the GE and financial transparency reporting could vary by institution. Many institutions may have systems that can be queried or existing reports that can be adapted to meet these reporting requirements. On the other hand, some institutions may still have data entry processes that are very manual in nature and generating the information for their programs could involve many more

hours and resources. Institutions may fall in between these poles and be able to automate the reporting of some variables but need more effort for others. The total reporting burden will be distributed across institutions depending on the setup of their systems and processes. We believe that, while the reporting relates to program or student-level information, the reporting process is likely to be handled at the institutional level.

Table 4.2 presents the Department's estimates of the hours associated with the reporting requirements. The reporting process will involve staff members or contractors with different skills and levels of responsibility. We have estimated this using Bureau of Labor statistics median hourly wage for Education Administrators, Post-Secondary of $46.59.[247]

TABLE 4.2  ESTIMATED HOURS AND WAGE RATE FOR REPORTING REQUIREMENTS

| Process | Hours | Hours basis |
|---|---|---|
| Review systems and existing reports for adaptability for this reporting | 10 | Per institution. |
| Develop reporting query/result template: | | |
| Program-level reporting | 15 | Per institution. |
| Student-level reporting | 30 | Per institution. |
| Run test reports: | | |
| Program-level reporting | 0.25 | Per institution. |
| Student-level reporting | 0.5 | Per institution. |
| Review/validate test report results: | | |
| Program-level reporting | 10 | Per institution. |
| Student-level reporting | 20 | Per institution. |
| Run reports: | | |
| Program-level reporting | 0.25 | Per program. |
| Student-level reporting | 0.5 | Per program. |
| Review/validate report results: | | |
| Program-level reporting | 2 | Per program. |
| Student-level reporting | 5 | Per program. |
| Certify and submit reporting | 10 | Per institution. |

The ability to set up reports or processes that can be rerun in future years, along with the fact that the first reporting cycle includes information from several prior years, means that the expected burden should decrease significantly after the first reporting cycle. We estimate that the hours

associated with reviewing systems, developing or updating queries, and reviewing and validating the test queries or reports will be reduced by 35 percent after the first year. After initial reporting is completed, the institution will need to confirm there are no program changes in CIP code, credential level,

preparation for licensure, accreditation, or other items on an ongoing basis. We expect that process would be less burdensome than initially establishing the reporting. Table 4.3 presents estimates of reporting burden for the initial year and subsequent years under proposed § 668.408.

TABLE 4.3.1  ESTIMATED REPORTING BURDEN FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 153 | 530 | 31,080 | 1,448,006 |
| Proprietary 2-year | 1,353 | 3,775 | 246,575 | 11,487,918 |
| Public 2-year | 1,106 | 36,522 | 1,238,082 | 57,682,217 |

[247] Available at *https://www.bls.gov/oes/current/oes119033.htm.*

TABLE 4.3.1    ESTIMATED REPORTING BURDEN FOR THE INITIAL REPORTING CYCLE    Continued

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 4-year | 1,449 | 48,797 | 1,651,449 | 76,940,997 |
| Proprietary 4-year | 204 | 3,054 | 114,207 | 5,320,904 |
| Public 4-year | 742 | 57,769 | 1,861,886 | 86,745,245 |
| Total | 5,007 | 150,447 | 5,143,277 | 239,625,287 |

TABLE 4.3.2    ESTIMATED REPORTING BURDEN FOR SUBSEQUENT REPORTING CYCLES

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year | 153 | 530 | 14,206 | 661,834 |
| Proprietary 2-year | 1,353 | 3,775 | 118,554 | 5,523,443 |
| Public 2-year | 1,106 | 36,522 | 356,042 | 16,587,973 |
| Private 4-year | 1,449 | 48,797 | 473,811 | 22,074,843 |
| Proprietary 4-year | 204 | 3,054 | 37,133 | 1,730,003 |
| Public 4-year | 742 | 57,769 | 496,682 | 23,140,403 |
| Total | 5,007 | 150,447 | 1,496,426 | 69,718,499 |

The Department welcomes comments on the assumptions related to the reporting burden of the proposed regulations. As described under Paperwork Reduction Act of 1995, the final estimates of reporting costs will be cleared at a later date through a separate information collection.

As described in the section titled ''Paperwork Reduction Act of 1995,'' the final estimates of reporting costs will be cleared at a later date through a separate information collection. Institutions' share of the annual costs associated with disclosures, acknowledgement for non-GE programs, and warnings and acknowledgement for GE programs are estimated to be $12 million, $0.05 million, and $0.76 million, respectively. Note that most of the burden associated acknowledgements will fall on students, not institutions. These costs are discussed in more detail in the section titled ''Paperwork Reduction Act of 1995.''

Institutions that make efforts to improve the outcomes of failing programs would face additional costs. For example, institutions that reduce the tuition and fees of programs would see decreased revenue. For students who are currently enrolled in a program, the reduced price would be a transfer to them in the form of a lower cost of attendance. In turn, some of this price reduction would be a transfer to the government if the tuition was being paid for with title IV, HEA funds. An institution could also choose to spend more on curriculum development to, for example, link a program's content to the needs of in-demand and well-paying jobs in the workforce, or allocate more funds toward other functions. These

other functions could include hiring better faculty; providing training to existing faculty; offering tutoring or other support services to assist struggling students; providing career counseling to help students find jobs; acquiring more up-to-date equipment; or investing in other areas where increased spending could yield improved performance. However, as mentioned in the benefits section, institutions that improve program quality could see increased tuition revenue with improved retention and completion.

The costs of program changes in response to the proposed regulations are difficult to quantify generally as they would vary significantly by institution and ultimately depend on institutional behavior. For example, institutions with all passing programs could elect to commit only minimal resources toward improving outcomes. On the other hand, they could instead make substantial investments to expand passing programs and meet increased demand from prospective students, which could result in an attendant increase in enrollment costs. Institutions with failing programs could decide to devote significant resources toward improving performance, depending on their capacity, or could instead elect to discontinue one or more of the programs. However, as mentioned previously, some of these costs might be offset by increased revenue from improved program quality. Given these ambiguities, we do not quantify costs (or benefits) associated with program quality improvements.

Finally, some poorly performing programs will experience a reduction in enrollment that is not fully offset by

gains to other institutions (which will experience increased enrollment) or the Federal government (which will experiences lower spending on Title IV, HEA aid). These losses should be considered as costs for institutions.

Costs to States and Local Governments

State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions.

The Department recognizes that a shift in students to public institutions could result in higher State and local government costs, but the extent of this is dependent on student transfer patterns, State and local government choices, and the existing capacity of public programs. If States choose to expand the enrollment capacity of passing programs at public institutions, it is not necessarily the case that they would face marginal costs that are similar to their average cost or that they would only choose to expand through traditional brick-and-mortar institutions. The Department continues to find that many States across the country are experimenting with innovative models that use different methods of instruction and content delivery, including online offerings, that allow students to complete courses faster and at lower cost. Furthermore, enrollment shifts would likely be towards community colleges, where declining enrollment has created excess capacity. An under-subscribed college may see greater efficiency gains from increasing enrollment and avoid other

costly situations such as unused classroom space or unsustainably low enrollment. Forecasting the extent to which future growth would occur in traditional settings versus online education or some other model is outside the scope of this analysis. Nonetheless, we do include the additional instructional cost associated with a shift from failing to passing programs in our analysis, some of which will fall on state and local governments.

Costs to Federal Government

The main costs to the Federal government involve setting up the infrastructure to handle and process additional information reported by institutions, compute rates and other information annually, and maintain a website to host the disclosure information and acknowledgment process. Most of these activities would be integrated into the Department's existing processes. We estimate that the total implementation cost will be $30 million.

Transfers

Enrollment shifts between programs, and potentially to non-enrollment, would transfer resources between students, institutions, State and local governments, and the Federal government. We model three main transfers. First, if some students drop out of postsecondary education or remain in programs that lose eligibility for title IV, HEA Federal student aid, there would be a transfer of Federal student aid from those students to the Federal government. Second, as students change programs based on program performance, disclosures, and title IV, HEA eligibility, revenues and expenses associated with students would transfer between postsecondary

institutions. Finally, the additional earnings associated with movement from low- to high-value programs would result in greater loan repayment by borrowers. This is through both lower default rates and a lower likelihood of loan forgiveness through existing IDR plans. This represents a transfer from students to the Federal government. We do not quantify the transfers between students and State governments associated with changes in State-financed student aid, as such programs differ greatly across States. Transfers between students and States could be net positive for States if fewer students apply for, or need, State aid programs or they could be negative if enrollment shifts to State programs results in greater use of State aid.

Financial Responsibility

The Department has a responsibility to ensure that the institutions participating in the title IV, HEA programs have the financial resources to meet the requirements of the HEA and its regulations. This includes ensuring that their financial situation is unlikely to lead them to a sudden and unexpected closure or to operate in ways that either lead to a significant deterioration in the education and related services delivered or the need to engage in riskier behavior, such as aggressive recruitment, to stay financially afloat.

The Department also has a responsibility to protect taxpayers from the costs incurred by the Federal government due to the sudden closure of an institution. Ensuring the Department has sufficient tools to identify and take steps to more closely oversee institutions that are in a financially precarious position is

particularly important because students enrolled at the time an institution closes, or who have left shortly before without completing their program, are entitled to a discharge of their Federal student loan balances. If the Department has failed to secure financial protection from the institution prior to that point it is highly likely under existing regulations that taxpayers will end up bearing the cost of those discharges in the form of a transfer from the Department to those borrowers who have their loans cancelled.

Historically when institutions close there are little to no resources left at the school, and to the extent there are, the Department must compete with other creditors to secure some assets. In some cases, other entities that had ownership stakes in the institution still had resources even when the institution itself did not, but the Department lacked the ability to recover funds from these other entities.

These proposed regulations provide greater tools for the Department to demand financial protection when an institution exhibits signs of financial instability and to obtain information that would make it easier to detect those problems sooner than it currently does. It also clarifies the rules about financial protection when institutions change owners, a situation that can be risky for students and taxpayers, particularly if the purchasing entity lacks experience or the necessary financial strength to effectively manage an acquired institution.

The table below provides information on the Department's estimates of how frequently the circumstances associated with the proposed mandatory and discretionary triggers have occurred in the last several years.

TABLE 4.4  MANDATORY TRIGGERING EVENTS

| Trigger | Description | Impact |
|---|---|---|
| Debts or liability payments 668.171(c)(2)(i)(A). | An institution with a composite score of less than 1.5 with some exceptions is required to pay a debt or incurs a liability from a settlement, final judgment, or similar proceeding that results in a recalculated composite score of less than 1.0. | For institutional fiscal years that ended between July 1, 2019, and June 30, 2020, there were 225 private nonprofit or proprietary schools with a composite score of less than 1.5. Of these, 7 owe a liability to the Department, though not all of these liabilities are significant enough to result in a recalculated score of 1.0. We do not have data on non-Department liabilities that might meet this trigger. |
| Lawsuits 668.171(c)(2)(i)(B) ...... | Lawsuits against an institution after July 1, 2024, by Federal or State authorities or a qui tam pending for 120 days in which the Federal government has intervened. | The Department is aware of approximately 50 institutions or ownership groups that have been subject to Federal or State investigations, lawsuits, or settlements since 2012. This includes criminal prosecutions of owners. |
| Borrower defense recoupment 668.171(c)(2)(i)(C). | The Department has initiated a proceeding to recoup the cost of approved borrower defense claims against an institution. | The Department has initiated one proceeding against an institution to recoup the proceeds of approved claims. Separately, the Department has approved borrower defense claims at more than six other institutions or groups of institutions where it has not sought recoupment. |
| Change in ownership debts and liabilities 668.171(c)(2)(i)(D). | An institution in the process of a change of ownership must pay a debt or liability related to settlement, judgment, or similar matter at any point through the second full fiscal year after the change in ownership. | Over the last 5 years there have been 188 institutions that underwent a change in ownership. This number separately counts campuses that may be part of the same chain or ownership group that are part of a single transaction. The Department does not currently have data on how many of those had a debt or liability that would meet this trigger. |

TABLE 4.4    MANDATORY TRIGGERING EVENTS    Continued

| Trigger | Description | Impact |
|---|---|---|
| Withdrawal of owner s equity 668.171(c)(2)(ii)(A). | A proprietary institution with a score less than 1.5 has a withdrawal of owner s equity that results in a composite score of less than 1.0. | In the most recent available data, 161 proprietary institutions had a composite score that is less than 1.5. The Department has not determined how many of those may have had a withdrawal of owner s equity that would meet this trigger. |
| Significant share of Federal aid in failing GE programs 668.171(c)(2)(iii). | An institution has at least 50 percent of its title IV, HEA aid received for programs that fail GE thresholds. | There are approximately 740 institutions that would meet this trigger. These are almost entirely private for-profit institutions that offer only a small number of programs total. These data only include institutions operating in March 2022 that had completions reported in 2015  16 and 2016  2017. Data are based upon 2018 and 2019 calendar year earnings. |
| Teach-out plans 668.171(c)(2)(iv). | The institution is required to submit a teach-out plan or agreement. | Not identified because the Department is not currently always informed when an institution is required to submit a teach-out plan or agreement. |
| State actions 668.171(c)(2)(v)  ... | The institution is cited by a State licensing or similar authority for failing to meet State requirements and the institution receives notice that its licensure or authorization will be terminated or withdrawn if it does not come into compliance. | Not identified because the Department is not currently always informed when an institution is subject to these requirements. |
| Actions related to publicly listed entities 668.171(c)(2)(vi). | These apply to any entity where at least 50 percent of an institution s direct or indirect ownership is listed on a domestic or foreign exchange. Actions include the SEC taking steps to suspend or revoke the entity s registration or taking any other action. It also includes actions from exchanges, including foreign ones, that say the entity is not in compliance with the listing requirements or may be delisted. Finally, the entity failed to submit a required annual or quarterly report by the required due date. | Department data systems currently identify 38 schools that are owned by 13 publicly traded corporations. One of these may be affected by this trigger. |
| 90/10 failure 668.171(c)(2)(vii)  .. | A proprietary institution did not meet the requirement to derive at least 10 percent of its revenue from sources other than Federal educational assistance. | Over the last 5 years an average of 12 schools failed the 90/10 test. Most recently, the Department reported that 21 proprietary institutions had received 90 percent or more of their revenue from title IV, HEA programs based upon financial statements for fiscal years ending between July 1, 2020, and June 30, 2021. |
| Cohort default rate (CDR) failure 668.171(c)(2)(viii). | An institution s two most recent official CDRs are 30 percent or greater. | Twenty institutions with at least 30 borrowers in their cohorts had a CDR at or above 30 percent for the fiscal year (FY)2017 and FY2016 cohorts (the last rates not impacted by the pause on repayment during the national emergency). |
| Loss of eligibility from other Federal educational assistance program 668.171(c)(2)(ix). | The institution loses its ability to participate in another Federal educational assistance program. | The Department is aware of 5 institutions participating in title IV, HEA programs that have lost access to the Department of Defense s Tuition Assistance (TA) program since 2017. Three of those also lost accreditation or access to title IV, HEA funds. |
| Contributions followed by a distribution 668.171(c)(2)(x). | The institution s financial statements reflect a contribution in the last quarter of its fiscal year followed by a distribution within first two quarters of the next fiscal year and that results in a recalculated composite score of <1.0. | Not currently identified because this information is not currently centrally recorded in Department databases. |
| Creditor events 668.171(c)(2)(xi) | An institution has a condition in its agreements with a creditor that could result in a default or adverse condition due to an action by the Department or a creditor terminates, withdraws, or limits a loan agreement or other financing arrangement. | Not currently identified because institutions do not currently report the information needed to assess this trigger to the Department. Several major private for-profit colleges that failed had creditor arrangements that would have met this trigger. |
| Financial exigency 668.171(c)(2)(xii). | The institution makes a formal declaration of financial exigency | Not identified because institutions do not currently always report this information to the Department. |
| Receivership 668.171(c)(2)(xiii) | The institution is either required to or chooses to enter a receivership. | The Department is aware of 3 instances of institutions entering receiverships in the last few years. Each of these institutions ultimately closed. |

TABLE 4.5    DISCRETIONARY TRIGGERING EVENTS

| Trigger | Description | Impact |
|---|---|---|
| Accreditor actions 668.171(d)(1) | The institution is placed on show cause, probation, or an equivalent status. | Since 2018, we identified just under 190 private institutions that were deemed as being significantly out of compliance and placed on probation or show cause by their accrediting agency, with the bulk of these stemming from one agency that accredits cosmetology schools. |
| Other creditor events and judgments 668.171(d)(2). | The institution is subject to other creditor actions or conditions that can result in a creditor requesting grated collateral, an increase in interest rates or payments, or other sanctions, penalties, and fees, and such event is not captured as a mandatory trigger. This trigger also captures judgments that resulted in the awarding of monetary relief that is subject to appeal or under appeal. | Not identified because institutions do not currently report this information to the Department. |
| Fluctuations in title IV, HEA volume 668.171(d)(3). | There is a significant change upward or downward in the title IV, HEA volume at an institution between consecutive award years or over a period of award years. | From the 2016  2017 through the 2021  2022 award years, approximately 155 institutions enrolled 1,000 or more title IV, HEA students and saw their title IV, HEA volume change by more than 25 percent from one year to the next. Of those, 33 saw a change of more than 50 percent. The Department would need to determine which circumstances indicated enough risk to need additional financial protection. |

App.337

Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules

**32445**

TABLE 4.5  DISCRETIONARY TRIGGERING EVENTS  Continued

| Trigger | Description | Impact |
|---|---|---|
| High dropout rates 668.171(d)(4). | An institution has high annual dropout rates, as calculated by the Department. | According to College Scorecard data for the AY2014 15 cohort, there were approximately 66 private institutions that had more than half their students withdraw within two years of initial enrollment. Another 132 had withdrawal rates between 40 and 50 percent. The Department would need to determine which circumstances indicated enough risk to need additional financial protection. |
| Interim reporting 668.171(d)(5) | An institution that is required to provide additional reporting due to a lack of financial responsibility shows negative cash flows, failure of other liquidation ratios, or other indicators in a material change of the financial condition of a school. | Not currently identified because Department staff currently do not look for this practice in their reviews. |
| Pending borrower defense claims 668.171(d)(6). | The institution has pending borrower defense claims and the Department has formed a group process to consider at least some of them. | To date there are 48 institutional names as recorded in the National Student Loan Data System that have had more than 2,000 borrower defense claims filed against them. This number may include multiple institutions associated with the same ownership group. There is no guarantee that a larger number of claims will result in a group claim, but they indicate a higher likelihood that there may be practices that result in a group claim. |
| Program discontinuation 668.171(d)(7). | The institution discontinues a program or programs that affect more than 25 percent of enrolled students. | Not currently identified due to data limitations. |
| Location closures 668.171(d)(8) | The institution closes more than 50 percent of its locations or locations that enroll more than 25 percent of its students. | Not currently identified due to data limitations. |
| State citations 668.171(d)(9) ..... | The institution is cited by a State agency for failing to meet a State requirement or requirements. | Not identified because institutions do not currently report this information consistently to the Department. |
| Loss of program eligibility 668.171(d)(10). | One or more of the programs at the institution loses eligibility to participate in another Federal education assistance program due to an administrative action. | The Department does not currently have comprehensive data on program eligibility loss for all other Federal assistance programs. So, we looked at VA, which is one of the other largest sources of Federal education assistance. Since 2018 the VA reported over 900 instances of an institution of higher education having its access to VA benefits withdrawn. However, this number includes extensive duplication that counts multiple locations of the same school, withdrawals due to issues captured elsewhere like loss of accreditation or closure, and withdrawals that may not have lasted an extended period. The result is that the actual number of affected institutions would likely be significantly lower. |
| Exchange disclosures 668.171(d)(11). | An institution that is at least 50 percent owned by an entity that is listed on a domestic or foreign stock exchange notes in a filing that it is under investigation for possible violations of State, Federal or foreign law. | Department data systems currently identify 38 schools that are owned by 13 publicly traded corporations. There is one school that could potentially be affected by this trigger. |
| Actions by another Federal agency 668.171(d)(12). | The institution is cited and faces loss of education assistance funds from another Federal agency if it does not comply with that agency s requirements. | Not identified because current reporting by institutions do not always capture these events. |

**Benefits**

The proposed improvements to the Financial Responsibility regulations would provide significant benefits to the Federal government and to borrowers. They also could benefit institutions that are in stronger financial shape by dissuading struggling institutions from engaging in questionable behaviors to gain a competitive advantage in increasing enrollment. Each of these benefits is discussed below in greater detail.

The proposed Financial Responsibility regulations would provide benefits to the Federal government because they would increase the frequency with which the Department secures additional financial protection from institutions of higher education. This would help the government, and in turn taxpayers, in several ways. First, when an institution closes, a borrower who was enrolled at the time of closure or within 180 days of closure and does not complete their program is entitled to a discharge of

their Federal student loans. If the proposed regulations result in more instances where the Department has obtained a letter of credit or other form of financial protection from an institution that closes, then taxpayers would bear less of the costs from those discharges, which occur in the form of a transfer from the Department to the borrower whose loans are discharged. This is important because to date it is very uncommon for the Department to have significant financial resources from an institution to offset the costs from closed school discharges. According to FSA data, closures of for-profit colleges that occurred between January 2, 2014, to June 30, 2021, resulted in $550 million in closed school discharges. These are discharges for borrowers who did not complete their program and were enrolled on the date of closure or left the institution in the months prior to the closure. (This excludes the additional $1.1 billion in closed school discharges related to ITT Technical Institute that was announced in August

2021). Of that amount, the Department recouped just over $10.4 million from institutions.[248]

Second, the ability to secure additional financial protection would help offset the costs the government would otherwise face in the form of transfers associated with approved borrower defense to repayment claims. Under the HEA, borrowers may receive a discharge of their loans when their institutions engage in certain acts or omissions. Under the Biden-Harris Administration, the Department has approved $13 billion in discharges for 979,000 borrowers related to borrower defense findings. This includes a combination of borrowers who received a borrower defense discharge after review of an application they submitted and others who received a discharge as part of a group based upon borrower defense findings where the mechanism used to effectuate relief was the

---

[248] The budgetary cost of these discharges is not the same as the amount forgiven.

Department's settlement and compromise authority. To date there has only been a single instance in which the Department recovered funds to offset the costs of borrower defense discharges from the institution, which was in the Minnesota School of Business and Globe University's bankruptcy proceeding. In that situation, the Department received $7 million from a bankruptcy settlement. While the Department cannot simply cash in a letter of credit or take other financial protection solely upon approval of borrower defense claims, having the funding upfront is still important. That is because, to date, the Department has mostly approved borrower defense claims against institutions that are no longer operating, including several situations where an institution closed years prior. When that occurs, even if the Department sought to recoup the cost of discharges, there are unlikely to be assets to draw upon. Were there financial protection in place, the Department would have greater confidence that a successful recoupment effort would result in funds being available to offset the cost of discharges.

Third, the Federal government would also benefit from the deterrent effect of additional financial responsibility triggers. Articulating more situations that could lead to either mandatory financial protection or the possibility of a financial protection request would dissuade institutions from taking steps that could trigger those conditions. For example, the Department proposes a trigger tied to situations where an institution has conditions in a financing agreement with an external party that would result in an automatic default if the Department takes an action against the institution. The Department is concerned that such situations are used by institutions to try and discourage the Department from exercising its proper oversight authority due to the financial consequences for the school. It could also be used by the school to blame the Department if the action later results in a closure even though its shuttering is a result of poor management. Therefore, this proposed trigger should discourage the inclusion of such provisions going forward. The same is true for the inclusion of various actions taken by States, accrediting agencies, or the SEC. Knowing that such situations could result in additional requests for financial protection would provide an even greater reason for institutions to avoid risky behavior that could run afoul of other actors.

These proposed triggers would also benefit students. For one, the deterrence benefits mentioned above would help

protect students from being taken advantage of by predatory institutions. The Department has seen situations in the past where institutions engaged in risky behavior to keep growing at a rapid rate to satisfy investor expectations. This resulted in colleges becoming too big, too fast to be able to deliver educational value. It also meant that institutions risked becoming financially shaky if they experienced declines in enrollment. While these proposed triggers would not fully discourage rapid growth, they would discourage a growth-at-all-costs mindset, particularly if that growth is encouraged through misrepresentations, aggressive recruitment, or other practices that may run afoul of both the Department and other oversight entities. With the proposed triggers in place, institutions that would otherwise engage in such behaviors may instead opt to stay at a more appropriate and sustainable size at which they are able to deliver financial value for students and taxpayers. This outcome would also decrease the risk of closure, which can be very disruptive for students, often delaying if not terminating their pursuit of a postsecondary credential. For example, research by GAO found that 43 percent of borrowers never completed their program or transferred to another school after a closure.[249] While 44 percent transferred to another school, 5 percent of all borrowers transferred to a college that later closed. GAO then looked at the subset of borrowers who transferred long enough ago that they could have been at the new school for six years, the amount of time typically used to calculate graduation rates. GAO found that nearly 49 percent of these students who transferred did not graduate in that time. These findings are similar to those from SHEEO, which found that just 47 percent of students reenrolled after a closure and only 37 percent of students who reenrolled earned a postsecondary credential.[250]

The proposed regulations' deterrence effect would also benefit students by encouraging institutions to improve the quality and value of their educational offerings. For example, the proposed trigger for institutions with high dropout rates would incentivize institutions to improve their graduation rates. Along with the trigger for institutions failing the cohort default rate, this can reduce the number of students who default on their loans, as students who do not complete a degree

are more likely to default on their loans.[251] Improved completion rates also have broader societal benefits, such as increased tax revenue because college graduates, on average, have lower unemployment rates, are less likely to rely on public benefit programs, and contribute more in tax revenue through higher earnings.[252]

Finally, the proposed regulations would also provide benefits for institutions that are not affected by a new request for financial protection. Many of the factors that can lead to a letter of credit are associated with institutions that have engaged in questionable, and sometimes predatory, behavior, often in the hopes of maintaining or growing enrollment. For instance, aggressive conduct during the recruitment process, including misrepresenting key elements of a program to students, can generate lawsuits, State actions, and borrower defense claims. To the extent these proposed triggers discourage such behaviors, that would help institutions that act responsibly by allowing them to better compete for potential students based on factors like quality and value delivered and of the educational program.

Costs

The proposed regulations could create costs for institutions in a few ways. First, institutions could face costs to obtain a letter of credit or other form of financial protection. Financial institutions typically charge some sort of fee to provide a letter of credit. Or the institution may have to set aside funds so the financial institution is willing to issue the letter of credit. These fees or set aside amounts may be based upon the total amount of the letter of credit and could potentially also reflect the bank's view of the level of risk represented by the school. Institutions do not currently inform the Department of how much they must spend to obtain a letter of credit, so the Department does not have a way of ascertaining any potential added costs resulting from fees or set aside amounts. The fees, however, would be borne by the institution regardless of whether the letter of credit is collected on or not, while funds set aside for the letter of credit would be returned to the institution if it is not collected upon. Other types of financial protection, such as providing funds directly or offsetting title IV, HEA aid

---

[249] www.gao.gov/products/gao-21-105373.

[250] https://sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.

[251] libertystreeteconomics.newyorkfed.org/2017/11/who-is-more-likely-to-default-on-student-loans/.

[252] www.luminafoundation.org/resource/its-not-just-the-money/; www.thirdway.org/report/ripple-effect-the-cost-of-the-college-dropout-rate.

App.339

received, would not come with such fees.

The second form of cost would be transfers to the Department that occur when it collects on a letter of credit or keeps the funds from a cash escrow account, title IV, HEA offset, or other forms of financial protection. In those situations, the Department would use those funds to offset liabilities owed to it. This would be a benefit to the Department and taxpayers.

The rate at which the Department collects on financial protection it receives would likely change under these proposed regulations. The Department anticipates that one effect of the proposed regulations would be an increase in the instances in which it requests financial protection. That would result in a larger total amount of financial protection available. However, it is possible that the increase in financial protection would result in a lower rate at which those amounts are collected on. This could be a result of the financial protection providing a greater and earlier deterrence against behavior that would have otherwise led to a closure. Additionally, the proposed regulations could result in be more situations where the Department has financial protection but an institution does not ultimately have unpaid liabilities. At the same time, if the Department is more successful in securing financial protection from institutions that do close, it may end up with a greater share of outstanding liabilities covered by funds from an institution.

Administrative Capability

Benefits

The proposed Administrative Capability regulations would provide several benefits for students, the Department, and other institutions of higher education. Each is discussed below in turn.

Students

For students, the proposed changes would particularly help them make more informed choices about where to enroll, how much they might borrow, and ensure that students who are seeking a job get the assistance they need to launch or continue their careers. On the first point, the proposed changes in § 668.16(h) expand an existing requirement related to sufficient financial aid counseling to also include written information, such as what is contained when institutions inform students about their financial aid packages. Having a clear sense of how much an institution will cost is critical

for students to properly judge the financial transaction they are entering into when they enroll. For many students and families, a postsecondary education is the second most expensive financial decision they make after buying a home. However, the current process of understanding the costs of a college education is far less consistent than that of a buying a home. For the latter, there are required standard disclosures that present critical information like the total price, interest rate, and the amount of interest that will ultimately be paid. Having such common disclosures helps to compare different mortgage offers.

By contrast, financial aid offers are extremely varied. A 2018 study by New America that examined more than 11,000 financial aid offers from 515 schools found 455 different terms used to describe an unsubsidized loan, including 24 that did not use the word "loan." [253] More than a third of the financial aid offers New America reviewed did not include any cost information. Additionally, many colleges included Parent PLUS loans as "awards" with 67 unique terms, 12 of which did not use the word "loan" in the description. Similarly, a 2022 report by the GAO estimated that, based on their nationally representative sample of colleges, 22 percent of colleges do not provide any information about college costs in their financial aid offers, and of those that include cost information, 41 percent do not include a net price and 50 percent understate the net price. [254] GAO estimated that 21 percent of colleges do not include key details about how Parent PLUS loans differ from student loans. This kind of inconsistency creates significant risk that students and families may be presented with information that is both not directly comparable across institutions but may be outright misleading. That hinders the ability to make an informed financial choice and can result in students and families paying more out-of-pocket or going into greater debt than they had planned.

While the proposed regulatory language would not mandate that all colleges adopt the same offer, they would establish requirements around key information that must be provided to students. Some of these details align with the existing College Financing Plan, which is used by half of the institutions in at least some form. The proposed regulations will thereby increase the likelihood that students

receive consistent information, including, in some cases, through the expanded adoption of the College Financing Plan. Clear and reliable information could further help students choose institutions and programs that might have lower net prices, regardless of sticker price, which may result in students enrolling in institutions and programs where they and their families are able to pay less out of pocket or take on lower amounts of debt.

Students would also benefit from the proposed § 668.16(p), related to proper procedures for evaluating high school diplomas. It is critical that students can benefit from the postsecondary training they pursue. If they do not, then they risk wasting time and money, as well as ending up with loan debt they would struggle to repay because they are unable to secure employment in the field they are studying. Students who have not obtained a valid high school diploma may be at a particular risk of ending up in programs where they are unlikely to succeed. The Department has seen in the past that institutions that had significant numbers of students who enrolled from diploma mills or other schools that did not provide a proper secondary education have had high rates of withdrawal, non-completion, or student loan default. The added requirements in proposed § 668.16(p) would better ensure that students pursuing postsecondary education have received the secondary school education needed to benefit from the programs they are pursuing.

The provision related to adequate career services in proposed § 668.16(q) and the provision of externships in proposed § 668.16(r) would result in significant benefits for students as they are completing their programs. While postsecondary education and training provides a range of important benefits, students repeatedly indicate that getting a job is either the most or among the most important reasons for attending. For example, one survey asked students their reasons for deciding to go to college and 91 percent said to improve their employment opportunities, 90 percent said to make more money, and 89 percent said to get a good job. [255] Another survey of 14- to 23-year-olds showed that two-thirds said they wanted a degree to provide financial security. [256] Similarly, many institutions construct their marketing around their connections to employers, the careers

[253] www.newamerica.org/education-policy/policy-papers/decoding-cost-college/.

[254] www.gao.gov/products/gao-23-104708.

[255] www.luminafoundation.org/resource/deciding-to-go-to-college/.

[256] www.washingtonpost.com/news/grade-point/wp/2018/09/01/college-students-say-they-want-a-degree-for-a-job-are-they-getting-what-they-want/.

their students pursue, or other job-related outcomes. But students will have a hard time achieving those goals if the institution lacks sufficient career services to assist them in finding a job. This is even more pronounced for students whose career pathways require an externship or clinical experience, which is commonly a requirement to obtain the necessary license to work in certain fields. Making it an explicit requirement that institutions have sufficient career services and provide necessary clinical or externship experiences would increase the ability of students to find jobs in the fields for which they are being prepared.

The Department anticipates that the proposed provisions in § 668.16(s) would ensure students receive their funds when they most need them. Refunds of financial aid funds remaining after paying for tuition and fees gives students critical resources to cover important costs like food, housing, books, and transportation. Students that are unable to pay for these costs struggle to stay enrolled and may instead need to either leave a program or increase the number of hours they are working, which can hurt their odds of academic success. Ensuring institutions disburse funds in a timely manner would help students get their money when they need it.

Finally, the provisions in §§ 668.16(k)(2) and 668.16(t) through (u) would also benefit students by protecting them from institutions that are engaging in poor behavior, institutions that are at risk of losing access to title IV, HEA aid for a significant share of their students because they do not deliver sufficient value, and institutions that are employing individuals who have a problematic history with the financial aid programs. All three of these elements can be a sign of an elevated risk of closure or an institution's engagement in concerning behaviors that could result in the approval of borrower defense claims or actions under part 668, subpart G, either of which could place the institution in challenging financial situations.

Federal Government

The proposed Administrative Capability regulations would also provide benefits for the Department. False institutional promises about the availability of career services, externships or clinical placements, or the ability to get a job can result in the Department granting a borrower defense discharge. For instance, the Department has approved borrower defense claims at American Career Institute for false

statements about career services and at Corinthian Colleges and ITT Technical Institute related to false promises about students' job prospects. But the Department has not been able to recoup the costs of those transfers to borrowers from the Department. Adding these requirements to the Administrative Capability regulations would increase the ability of the Department to identify circumstances earlier that might otherwise lead to borrower defense discharges later. That should reduce the number of future claims as institutions would know ahead of time that failing to offer these services is not acceptable. It also could mean terminating the participation in the title IV, HEA programs sooner for institutions that do not meet these standards, reducing the exposure to future possible liabilities through borrower defense.

The Department would also benefit from improved rules around verifying high school diplomas. Borrowers who received student loans when they did not in fact have a valid high school diploma may be eligible for a false certification discharge. If that occurs, the Department has no guarantee that it would be able to recover the cost of such a discharge, resulting in a transfer from the government to the borrower. Similarly, grant aid that goes to students who lack a valid high school diploma is a transfer of funds that should not otherwise be allowed and is unlikely to be recovered. Finally, if students who lack a valid high school diploma or its equivalent are not correctly identified, then the Department may end up transferring Federal funds to students who are less likely to succeed in their program and could end up in default or without a credential. Such transfers would represent a reduction in the effectiveness of the Federal financial aid programs.

Provisions around hiring individuals with past problems related to the title IV, HEA programs would also benefit the Department. Someone with an existing track record of misconduct, including the possibility that they have pled guilty to or been convicted of a crime, represents a significant risk to taxpayers that those individuals might engage in the same behavior again. Keeping these individuals away from the Federal aid programs would decrease the likelihood that concerning behavior will repeat. The Department is already concerned that today there can be executives who run one institution poorly and then simply jump to another or end up working at a third-party servicer. Without this proposed regulatory change, it can be harder to prevent these individuals from

continuing to participate in the aid programs.

The Department would gain similar benefits from the provisions related to institutions with significant enrollment in failing GE programs; institutions subject to a significant negative action subject to findings by a State or Federal agency, court, or accrediting agency; and institutions engaging in misrepresentations. These are situations where a school may be at risk of closure or facing significant borrower defense liabilities. Allowing these institutions to continue to participate in Title IV, HEA programs could result in transfers to borrowers in the form of closed school or borrower defense discharges that are not reimbursed. These proposed provisions would allow for more proactive action to address these concerning situations and behaviors.

Finally, the Department would benefit from students receiving accurate financial aid information. Students whose program costs end up being far different from what the institution initially presented may end up not completing a program because the price tag ends up being unaffordable. That can make them less likely to pay their student loans back and potentially leave them struggling in default. This could also include situations where the cost is presented accurately but the institution fails to properly distinguish grants from loans, resulting in a student taking on more debt than they intended to and being unable to repay their debt as a result.

Costs

The costs of the proposed regulations would largely fall on institutions, as well as some administrative costs for the Department. For institutions that fail to provide clear financial aid information or lack sufficient career services staff, they may face costs either updating their financial aid information (*e.g.*, redoing financial aid offers) or hiring additional staff to bolster career services. The former costs would likely be a one-time, minimal expense, while the latter would be ongoing. Institutions may also face some administrative costs for creating procedures for verifying high school diplomas if they currently lack sufficient processes. This proposed requirement would not entail reviewing every individual high school diploma, so the costs would depend on how many students the institution enrolls that have high school diplomas that may merit additional investigation. Institutions currently enrolling large numbers of students who should not otherwise be deemed to have eligible high school diplomas under these

revised policies may also face costs in the form of reduced transfers from the Federal government if these individuals are not able to enroll under an ability-to-benefit pathway. Finally, the costs to an institution associated with having a failing GE program are similar to those discussed in that section of the regulatory impact analysis.

These changes would also impose some administrative costs on the Department. The Department would need to incorporate procedures into its reviews of institutions to identify the added criteria. That could result in costs for retraining staff or added time to review certain institutions where these issues manifest.

Finally, institutions that face significant administrative capability problems related to issues such as State, accreditor, or other Federal agency sanctions or conducting misrepresentations could face costs in the form of reduced transfers from the Department if those actions result in loss of access to title IV, HEA financial assistance. Situations that do not reach that level may or may not result in added costs, including transfers, if they affect receipt of title IV, HEA aid, depending on the steps an institution needs to take to address the concerns.

Certification Procedures

An institution must be certified to participate in the title IV, HEA financial assistance programs. Doing so ensures the institution agrees to abide by the requirements of these programs, helping to maintain integrity and accountability around Federal dollars. Decisions about whether to certify an institution's participation, how long to certify it for, and what types of conditions should be placed on that certification are a critical element of managing oversight of institutions, particularly the institutions that pose risks to students and taxpayers. Shorter certification periods or provisional certification can allow the Department greater flexibility to respond to an institution that may be exhibiting some signs of concern. This is necessary to ensure that students and taxpayer funds are well protected. Similarly, institutions that do not raise concerns can be certified for longer and with no additional conditions, allowing the Department to focus its resources where greater attention is most needed.

The proposed regulations are necessary to ensure that the Department can more effectively manage its resources in overseeing institutions of higher education. The proposed changes would remove requirements that risked giving institutions longer approval periods when they merit closer scrutiny

and would clarify the options available when additional oversight is necessary. The net result would be an oversight and monitoring approach that is more flexible and effective.

Benefits

The proposed regulations would provide several important benefits for the Department that would result in better allocation of its administrative resources. One of these is the proposed elimination of § 668.13(b)(3). This is a recently added provision that requires the Department to issue a decision on a certification within 12 months of the date its participation expires. While it is important for the Department to move with deliberate speed in its oversight work, the institutions that have extended periods with a pending certification application are commonly in this situation due to unresolved issues that must be dealt with first. For instance, an institution may have a pending certification application because it may have an open program review or a Federal or State investigation that could result in significant actions. Being forced to make a decision on that application before the review process or an investigation is completed could result in suboptimal outcomes for the Department, the school, and students. For the institution, the Department may end up placing it on a short certification that would result in an institution facing the burden of redoing paperwork after only a few months. That would carry otherwise unnecessary administrative costs and increase uncertainty for the institution and its students.

The Department would similarly benefit from provisions in proposed § 668.13(c)(1) that provides additional circumstances in which an institution would become provisionally certified. The proposed change in § 668.13(c)(1)(i)(F)—giving the Secretary the ability to place an institution on provisional certification if there is a determination that an institution is at risk of closure—would be a critical tool for better protecting students and taxpayers when an institution appears to be on shaky footing. The same is true for the proposed changes in § 668.13(c)(1)(ii) related to how certain conditions can automatically result in provisional status. Institutional closures can occur very quickly. An institution may face a sudden shock that puts them out of business or the gradual accumulation of a series of smaller problems that culminates in a sudden closure. The pace at which these events occur requires the Department to be nimble in responding to issues and

better able to add additional requirements for an institution's participation outside of the normal renewal process. Absent this proposed language, the Department would be in a position where an obviously struggling institution might stay fully certified for years longer, despite the risk it poses.

Such benefits are also related to the provisions in proposed § 668.14(e) that lay out additional conditions that could be placed on an institution if it is in a provisional status. This non-exhaustive list of requirements specifies ways the Department can more easily protect students and taxpayers when concerns arise. Some of these conditions would make it easier to manage the size of a risky institution and would ensure that it does not keep growing when it may be in dire straits. Such size management would be accomplished by imposing conditions such as restricting the growth of an institution, preventing the addition of new programs or locations, or limiting the ability of the institution to serve as a teach-out partner for other schools or to enter into agreements with other institutions to provide portions of an educational program.

Other conditions in proposed § 668.14(e) would give the Department better ability to ensure that it is receiving the information it needs to properly monitor schools and that there are plans for adequately helping students. The additional reporting requirements proposed in § 668.14(e)(7) would help the Department more quickly receive information about issues so it could react in real-time as concerns arise. The proposed requirements in § 668.14(e)(1), meanwhile, would give the Department greater tools to ensure students are protected when a college is at risk of closure. Too often of late, colleges have closed without any meaningful agreement in place for where students could continue their programs. According to SHEEO, of the more than 143,000 students who experienced a closure over 16 years, 70 percent experienced an abrupt closure without a teach-out plan or adequate notice.[257] Additionally, even for those with a teach-out plan, some of the teach-out plans were at another branch campus that later closed. The proposed changes would, therefore, increase the number of meaningful teach-out plans or agreements in place prior to a closure.

To get a sense of the potential effect of these changes, Table 4.4 below breaks down the certification status of all

---

[257] *sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.*

institutions participating in title IV, HEA programs. This provides some sense of which institutions might currently be subject to additional conditions.

TABLE 4.6   CERTIFICATION STATUS OF INSTITUTIONS PARTICIPATING IN THE TITLE IV, HEA FEDERAL STUDENT AID PROGRAMS

| | Fully certified | Provisionally certified | Month-to-month certification |
|---|---|---|---|
| Public | 1,732 | 95 | 32 |
| Private Nonprofit | 1,461 | 197 | 57 |
| Private For-Profit | 1,120 | 502 | 78 |
| Foreign Public | 2 | 1 | 0 |
| Foreign Private Nonprofit | 312 | 59 | 60 |
| Foreign Private For-Profit | 0 | 9 | 1 |
| Total | 4,627 | 863 | 228 |

Source: Postsecondary Education Participants Systems as of January 2023.
**Note:** The month-to-month column is a subset of schools that could be in either the fully certified or the provisionally certified column.

Other provisions in proposed § 668.14 would provide benefits to the Department by increasing the number of entities that could be financially liable for the cost of monies owed to the Department that are unpaid when a college closes. Electronic Announcement (EA) GENERAL 22–16 updated PPA signature requirements for entities exercising substantial control over non-public institutions of higher education.[258] While EA GENERAL 22–16 used a rebuttable presumption, we propose language in § 668.14(a)(3) that would not only require a representative of the institution to sign a PPA, but also an authorized representative of an entity with direct or indirect ownership of a private institution. Historically, the Department has often seen colleges decide to close when faced with significant liabilities instead of paying them. The result is both that the existing liability is not paid and the cost to taxpayers may further increase due to closed school discharges due to students.

To get a sense of how often the Department successfully collects on assessed liabilities, we looked at the amount of institutional liabilities established as an account receivable and processed for repayment, collections, or referral to Treasury following the exhaustion of any applicable appeals over the prior 10 years. This does not include liabilities that were settled or not established as an account receivable and referred to the Department's Finance Office. Items in the latter category could include liabilities related to closed school loan discharges that the Department did not assess because there were no assets remaining at the institution to collect from.

We then compared estimated liabilities to the amount of money collected from institutions for liabilities owed over the same period. The amount collected in a given year is not necessarily from a liability established in that year, as institutions may make payments on payment plans, have liabilities held while they are under appeal, or be in other similar circumstances.

TABLE 4.7   LIABILITIES VERSUS COLLECTIONS FROM INSTITUTIONS

[$ in millions]

| Federal fiscal year | Established liabilities | Amounts collected from institutions |
|---|---|---|
| 2013 | 19.6 | 26.9 |
| 2014 | 86.1 | 37.5 |
| 2015 | 108.1 | 13.1 |
| 2016 | 64.5 | 30.8 |
| 2017 | 149.7 | 34.5 |
| 2018 | 126.2 | 51.1 |
| 2019 | 142.9 | 52.3 |
| 2020 | 246.2 | 31.7 |
| 2021 | 465.7 | 29.1 |
| 2022 | 203.0 | 37.0 |
| 2013  2022 | 1,611.9 | 344.2 |

Source: Department analysis of data from the Office of Finance and Operations including reports from the Financial Management Support System.

At the same time, there may be many situations where the entities that own the closed college still have resources that could be used to pay liabilities owed to the Department. The provisions in proposed § 668.14(a)(3) would make it clearer that the Department would seek signatures on program participation agreements from those

---

[258] Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions of Higher Education. *https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-* *participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education.*

types of entities, making them financially liable for the costs to the Department. In addition to the financial benefits in the form of the greater possibility of transfers from the school or other entities to the Department, this provision would also provide deterrence benefits. Entities considering whether to invest in or otherwise purchase an institution would want to conduct greater levels of due diligence to ensure that they are not supporting a place that might be riskier and, therefore, more likely to generate liabilities the investors would have to repay. The effect should mean that riskier institutions receive less outside investment and are unable to grow unsustainably. In turn, outside investors may then be more willing to consider institutions that generate lower returns due to more sustainable business practices. This could include institutions that do not grow as quickly because they want to ensure they are capable of serving all their students well, or make other choices that place a greater priority on student success.

The added provisions in proposed § 668.14(b)(32) through (34) would also provide benefits to the Department, largely by ensuring that Federal student aid is spent more efficiently, is paying for fewer wasted credits, and is not withheld from students in a way that may harm completion. On the first point, proposed § 668.14(b)(32) would make it harder for institutions to offer programs that lead to licensure or certification whose length far exceeds what is required to obtain the approvals necessary to work in that field in a student's State. While it is important that students get enough aid to finish their program, the Department is concerned that overly long programs may end up generating unnecessary transfers from the Department to the institution in the form of financial aid funding courses that are not needed for the borrower to obtain a position in the field for which they are being prepared. For instance, if a State only requires 1,000 hours for a program but an institution sets its program length at 1,500 hours, then the taxpayer would be supporting significant additional courses that are not required by the state and are potentially superfluous. These types of protections are also necessary for students and families, as some of these additional transfers may come from them in tuition dollars paid, often in the form of greater and unnecessary student loan debt, increasing both the amount students have to pay back and representing potentially a larger share of their annual income. Other parts of paragraph (32), meanwhile, would

ensure that colleges enrolling online students from another State would not be able to avoid any relevant key State consumer protection laws regarding closure, recruitment, or misrepresentation. This would help the Federal government by ensuring States can continue to play meaningful roles in the three areas that are most likely to be a source of liabilities in the form of closed school or borrower defense discharges.

Proposed § 668.14(b)(33), meanwhile would reduce the number of credits paid for with title IV, HEA funds that a student is unable to transfer to another institution or use to verify education to potential employers due to a hold on their transcript. The Department is concerned that credits funded with taxpayer money that are on transcripts that an institution will not release due to mistakes on its own part or returns of title IV, HEA funds through the Return of Title IV Funds process represent an unacceptable loss of Federal money. Credits that cannot be redeemed elsewhere toward a credential do not help a student complete a program and increase the potential for the government to pay for the same courses twice. Credits that cannot be verified do not help students obtain employment. While this proposed change may not address broader issues of credit transfer or transcript withholding, it would mitigate some of those problems and at least benefit the government by preventing withholding and wasting of credits due to administrative errors or required functions related to the title IV, HEA programs.

Proposed § 668.14(b)(34) would provide benefits to the Department. Research shows that additional financial aid can provide important supports to help increase the likelihood that students graduate. For example, one study showed that increasing the amount some students were allowed to borrow improved degree completion, later-life earnings, and their ability to repay their loans.[259] This proposed language would prevent situations in which an institution may prevent a student from receiving all the title IV aid they are entitled to without replacing it with other grant aid. This would diminish the risk that students are left with gaps that could otherwise have been covered by title IV aid, which would help them finish their programs.

Students

Many of the same benefits for the Department would also accrue to

students. In most cases, college closures are extremely disruptive for students. As found by GAO and SHEEO, only 44 to 47 percent of students enroll elsewhere and even fewer complete college.[260] SHEEO also found that over 100,000 students were affected by sudden closures from July 2004 to June 2020.[261] Proposed § 668.13(e) would benefit students in two ways. First, some potential conditions added to the program participation agreement would protect students from enrolling in an at-risk institution in the first place. Preventing a risky school from growing or adding new programs would mean enrollment does not increase and, therefore, fewer students attending a place that may close. Second, the requirements around teach-out plans and agreements would increase the number of schools where there is better planning on what will happen to students' educational journeys should a college cease operating. That would help more students make informed decisions about when to re-enroll versus walk away from their programs.

Students would also benefit from the proposed requirements in § 668.14(a)(3) around making additional entities responsible for unpaid liabilities. This proposed provision would make outside investors more cautious in engaging with riskier institutions, making it harder for them to grow as quickly. This in turn would reduce the number of students enrolling in risky institutions that might not serve them well.

The proposed changes in § 668.14(b)(32) would provide benefits to students by reducing the likelihood of them paying more for education and training programs that artificially extend their program length beyond what is needed to earn the licensure or certification for which they are being prepared. Programs that are unnecessarily long may depress students' ability to complete, as it introduces more opportunities for life to interfere with academics, and cost students time out of the labor force where they could be earning money in the occupation for which they are training. It can also result in students taking out more student loans than otherwise needed, potentially increasing the risk of unaffordable loan payments, followed by delinquency and default. Similarly, the provision that an institution must abide by State laws

[259] www.nber.org/papers/w27658.

[260] www.gao.gov/products/gao-21-105373; sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.

[261] https://sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.

related to closure, recruitment, and misrepresentation would ensure that students are protected by key State consumer protection laws regardless of whether they attend an institution that is physically located in their State.

Restrictions on the ability of institutions to withhold transcripts as proposed in § 668.14(b)(33) would benefit students by helping them better leverage the credits they earned in courses paid for by their title IV, HEA aid. Refusing to release a transcript means that students cannot easily transfer their credits. That can arrest progress toward completion elsewhere and result in credits paid for by title IV, HEA dollars that never lead to a credential. A 2020 study by Ithaka S+R estimated that 6.6 million students have credits they are unable to access because their transcript is being withheld by an institution.[262] That study and a 2021 study published by the same organization estimate that the students most affected are likely adult learners, low-income students, and racial and ethnic minority students.[263] This issue inhibits students with some college, but no degree from completing their educational programs, as well as prevents some students with degrees from pursuing further education or finding employment if potential employers are unable to verify that they completed a degree or if they are unable to obtain licensure for the occupation for which they trained.

The proposal in § 668.14(b)(34), meanwhile, would provide benefits to students by ensuring that they receive all the Federal aid they are entitled to. This could result in an increase in transfers from the Department to students as they receive aid that would otherwise have been withheld by the school. Research shows that increased ability to borrow can increase completed credits and improve grade point average, completion, post-college earnings, and loan repayment for some students.[264]

## Costs

The proposed regulations would create some modest administrative costs for the Department. These would consist of staffing costs to monitor the additional conditions added to program participation agreements, as well as any increase in changes to an institution's certification status. This cost would likely be larger than the amount the

Department spends on reviews of less risky institutions. Beyond these administrative costs, the Department could see a slight increase in costs in the title IV, HEA programs that come in the form of greater transfers to students who would otherwise have received less financial aid under the conditions prohibited in proposed § 668.14(b)(34). As discussed in the benefits section, greater aid could help students finish their programs.

The Department is not anticipating that these proposals would have a significant cost for students. While some of the proposals could affect the institution in which a student chooses to enroll, the Department does not believe that these provisions would likely have a significant effect on whether students enroll in a postsecondary institution at all.

The proposed regulations would establish costs in various forms for institutions. For some, the changes would create costs in the form of reduced transfers from the Department. This would occur in situations such as growth restrictions or preventing institutions from starting new programs or opening new locations. It is not possible to clearly estimate these costs, as which conditions are placed on institutions would be fact-specific and gauging their effect would require judging how many students the institution would then have otherwise enrolled.

Institutions that would be affected by the proposed requirements to limit programs to the required length in their State (or that of a neighboring state in certain limited circumstances) would also face administrative costs to redesign programs. This could require determining what courses to eliminate or how to otherwise make a program shorter. These changes could also reduce transfers from the Department to the institution as aid is no longer provided for the portion of the program that is eliminated.

Other costs to institutions would come in the form of administrative expenses. Institutions that are placed on provisional status may need to submit additional information for reporting purposes, which would require some staff time. Similarly, an institution that becomes provisionally certified may have to submit an application for recertification sooner than anticipated, which would require additional staff time. The extent of these administrative costs would vary depending on the specific demands for an institution and it is not possible to model them.

## Ability To Benefit

The HEA requires students who are not high school graduates to fulfill an ATB alternative and enroll in an eligible career pathway program to gain access to title IV, HEA aid. The three ATB alternatives are passing an independently administered ATB test, completing six credits or 225 clock hours of coursework, or enrolling through a State process.[265] Colloquially known as ATB students, these students are eligible for all title IV, HEA aid, including Federal Direct loans. The ATB regulations have not been updated since 1994. In fact, the current Code of Federal Regulations makes no mention of eligible career pathway programs. Changes to the statute have been implemented through subregulatory guidance laid out in Dear Colleague Letters (DCLs). DCL GEN 12–09, 15–09, and 16–09 explained the implementation procedures for the statutory text. Due to the changes over the years, as described in the Background section of this proposed rule, the Department seeks to update, clarify, and streamline the regulations related to ATB.

## Benefits

The proposed regulations would provide benefits to States by more clearly establishing the necessary approval processes. This would help more States have their applications approved and reduce the burden of seeking approval. This would be particularly achieved by the proposal to separate the application into an initial process and a subsequent process. Currently, States that apply are required to submit a success rate calculation under current § 668.156(h) as a part of the first application. Doing so is very difficult because the calculation requires that a postsecondary institution is accepting students through its State process for at least one year. This means that a postsecondary institution needs to enroll students without the use of title IV aid for one year to gather enough data to submit a success rate to the Department. Doing so may be cost prohibitive for postsecondary institutions.

The proposed regulations would also benefit institutions by making it easier for them to continue participating in a State process while they work to improve their results. More specifically, reducing the success rate calculation threshold from 95 percent to 85 percent, and the proposal for struggling institutions to meet a 75 percent

[262] sr.ithaka.org/publications/solving-stranded-credits/.

[263] sr.ithaka.org/publications/stranded-credits-a-matter-of-equity/.

[264] www.aeaweb.org/articles?id=10.1257/pol.20180279; www.nber.org/papers/w24804.

[265] As of January 2023, there are six States with an approved State process.

threshold for a limited number of years, would give institutions additional opportunities to improve their outcomes before being terminated from a State process. This added benefit would not come at the expense of costs to the student from taking out title IV, HEA aid to attend an eligible career pathway program. This is because the Department proposes to incorporate more guardrails and student protections in the oversight of ATB programs, including documentation and approval by the Department of the eligible career pathway program. That means the proposed changes would not on the whole decrease regulatory oversight.

Institutions that are not struggling to maintain results would also benefit from these proposed regulations. Under current regulations, the success rate calculation includes all institutions combined. The result is that an institution with strong outcomes could be combined with those that are doing worse. Under this proposal, the Department would calculate the success rate for each individual participating institution, therefore allowing other participating institutions that are in compliance with the proposed regulations to continue participation in the State process.

Costs

The proposed regulatory changes would impose additional costs on the Department, postsecondary institutions, and entities that apply for the State process.

The proposed regulations would break up the State process into an initial and subsequent application that must be submitted to the Department after two years of initial approval. This would increase costs to the State and participating institutions. This new application process would be offset because the participating institutions would no longer need to fund their own State process without title IV, HEA program aid to gain enough data to submit a successful application to the Department.

In the proposed initial application, the institution would have to calculate the withdrawal rate for each participating institution, and the Department would verify a sample of eligible career pathway programs offered by participating institutions to verify compliance with the proposed definition under § 668.2. This would increase costs to the State and participating institutions. The increased administrative costs associated with the new outcome metric would be minimal because a participating institution would already know how to calculate

the withdrawal rate as it is already required under Administrative Capability regulations. These costs are also worthwhile because they allow for the added benefit that the State could remove poorer performing institutions from its application.

The increase in program eligibility costs associated with the eligible career pathway verification process would be minimal because schools are already required to meet to the definition of an eligible career pathway program under the HEA.

The Department is also proposing to place additional reporting requirements on States, including information on the demographics of students. This would increase administrative burden costs to the State and participating institutions. There is a lack of data about ability to benefit and eligible career pathway programs, and the new reporting the Department would be able to analyze the data and may be able to report trends publicly.

Proposed § 668.157 prescribes the minimum documentation requirements that all eligible career pathway programs would have to meet in the event of an audit, program review, or review and approval by the Department. Currently the Department does not approve eligible career pathway programs, therefore, the proposed regulation would increase costs to any postsecondary institutions that provide an eligible career pathway program. For example, proposed § 668.157(a)(2) would require a government report demonstrate that the eligible career pathway program aligns with the skill needs of industries in the State or regional labor market. Therefore, if no such report exists the program would not be title IV, HEA eligible. Further, under proposed § 668.157(b) the Department would approve every eligible career pathway program for postsecondary institutions that admit students under the six credit and ATB test options. We believe that benefits of the new documentation standards outweigh their costs because the proposed regulations would increase program integrity and oversight and could stop title IV, HEA aid from subsidizing programs that do not meet the statutory definition.

Institutions currently use their best faith to comply with the statute which means there are likely many different interpretations of the HEA. These proposed regulations would set clear expectations and standardize the rules.

Elsewhere in this section under the Paperwork Reduction Act of 1995, we identify and explain burdens

specifically associated with information collection requirements.

*5. Methodology for Budget Impact and Estimates of Costs, Benefits, and Transfers*

In this section we describe the methodology used to estimate the budget impact as well as the main costs, benefits, and transfers. Our modeling and impact only include the Financial Value Transparency and GE parts of the proposed rule. We do not include separate estimates for Financial Responsibility, Administrative Capability, Certification Procedures, or ATB because we anticipate these to have negligible impact on the budget in our primary scenario. We do, however, include a sensitivity analysis for Financial Responsibility.

The main behaviors that drive the direction and magnitudes of the budget impacts of the proposed rule and the quantified costs, benefits, and transfers are the performance of programs and the enrollment and borrowing decisions of students. The Department developed a model based on assumptions regarding enrollment, program performance, student response to program performance, and average amount of title IV, HEA funds per student to estimate the budget impact of these proposed regulations. Additional assumptions about the earnings outcomes and instructional spending associated with program enrollment and tax revenue from additional earnings were used to quantify costs, benefits, and transfers. The model (1) takes into account a program's past results under the D/E and EP rates measure to predict future results, and (2) tracks a GE program's cumulative results across multiple cycles of results to determine title IV, HEA eligibility.

Assumptions

We made assumptions in four areas in order to estimate the budget impact of the proposed regulations: (1) Program performance under the proposed regulations; (2) Student behavior in response to program performance; (3) Borrowing of students under the proposed regulation; and (4) Enrollment growth of students in GE and non-GE programs. Table 5.1 below provides an overview of the main categories of assumptions and the sources. Assumptions that are included in our sensitivity analysis are also highlighted. Wherever possible, our assumptions are based on past performance and student enrollment patterns in data maintained by the Department or documented by scholars in prior research. Additional assumptions needed to quantify costs,

benefits, and transfers are described    later when we describe the methodology for those calculations.

TABLE 5.1    MAIN ASSUMPTIONS AND SOURCES

| Category | Detail | Source | Included in sensitivity? |
|---|---|---|---|
| **Assumptions for Budget Impact and Calculation of Costs, Benefits, and Transfers** | | | |
| Program Performance at Baseline .. | Share in each performance category at baseline (GE and non-GE programs). | ED data ............................................ | No. |
| Enrollment Growth ........................ | Annual enrollment growth rate by sector/level and year ....................... | Sector-level projections based on Department data. | No. |
| Program transition between performance categories. | AY2025 26, AY2026 27 onward, separately by loan risk group and for GE and non-GE programs. | Based on Department data + program improvement assumptions. | Yes. |
| Student response ........................... | Share of students who remain in programs, transfer to passing programs, or withdraw or decline to enroll by program performance category and transfer group; separately for GE and non-GE programs. | Assumptions from 2014 RIA and prior work. | Yes. |
| Student borrowing ........................... | Debt changes if students transfer to passing program by program performance, risk group, and cohort; separately for GE and non-GE programs. | Based on Department data ............ | No. |
| **Additional Assumptions for Calculation of Costs, Benefits, and Transfers** | | | |
| Earnings gain ........................................ | Average program earnings by risk group and program performance, separately for GE and non-GE programs. | Based on Department data ........... | Yes. |
| Tax rates ......................................... | Federal and State average marginal tax and transfer rates ................. | Hendren and Sprung-Keyser 2020 estimates based on CBO. | No. |
| Instructional cost ............................... | Average institution-level instructional expenditure by risk group and program performance; separately for GE and non-GE programs. | IPEDS .............................................. | No. |

## Enrollment Growth Assumptions

For AYs 2023 to 2034, the budget model assumes a constant yearly rate of growth or decline in enrollment of students receiving title IV, HEA program funds in GE and non-GE programs in absence of the rule.[266] We compute the average annual rate of change in title IV, HEA enrollment from AY 2016 to AY 2022, separately by the combination of control and credential level. We assume this rate of growth for each type of program for AYs 2023 to 2034 when constructing our baseline enrollment projections.[267] Table 5.2 below reports the assumed average annual percent change in title IV, HEA enrollment.

TABLE 5.2    ANNUAL ENROLLMENT GROWTH RATE (PERCENT) ASSUMPTIONS

| | Public | Private, non-profit | Proprietary |
|---|---|---|---|
| UG Certificates ................................................. | −2.6 | −6.9 | 4.1 |
| Associate s ..................................................... | −3.7 | −3.9 | −3.7 |
| Bachelor s ...................................................... | −0.5 | −0.8 | −2.7 |
| Post-BA Certs .................................................. | 4.2 | −2.3 | −0.4 |
| Master s ......................................................... | 3.0 | 0.5 | −1.1 |
| Doctoral .......................................................... | 4.9 | 3.1 | −1.7 |
| Professional .................................................... | 0.9 | −0.1 | −0.4 |
| Grad Certs ...................................................... | 1.2 | 2.0 | −0.8 |

## Program Performance Transition Assumptions

The methodology, described in more detail below, models title IV, HEA enrollment over time not for specific programs, but rather by groupings of programs by broad credential level and control, the number of alternative programs available, whether the program is GE or non-GE, and whether the program passes or fails the D/E and EP metrics. The model estimates the flow of students between these groups due to changes in program performance over time and reflects assumptions for the share of enrollment that would transition between the following four performance categories in each year:

• Passing (includes with and without data)
• Failing D/E rate only
• Failing EP rate only
• Failing both D/E and EP rates

A GE program becomes ineligible if it fails either the D/E or EP rate measures in two out of three consecutive years. We assume that ineligible programs remain that way for all future years and, therefore, do not model performance transitions after ineligibility is reached.

The model applies different assumptions for the first year of transition (from year 2025 to 2026) and subsequent years (after 2026). It assumes that the rates of program transition reach a steady state in 2027. We assume modest improvement in performance, indicated by a reduction in the rate of failing and an increase in the rate of passing, among programs that fail one of the metrics, and an increase in the rate of passing again, among GE programs that pass the metrics. All transition probabilities are estimated separately for GE and non-GE programs and for four

---

[266] AYs 2023 to 2034 are transformed to FYs 2022 to 2023 later in the estimation process.

[267] The number of programs in proprietary post-BA certificates and proprietary professional degrees was too low to reliably compute a growth rate.

Therefore, we assumed a rate equal to the overall proprietary rate of −0.4%.

aggregate groups: proprietary 2-year or less; public or non-profit 2-year or less; 4-year programs; graduate programs.[268]

The assumptions for the 2025 to 2026 transition are taken directly from an observed comparison of actual rates results for two consecutive cohorts of students. The initial assignment of performance categories in 2025 is based on the 2022 PPD for students who completed programs in award years 2015 and 2016, whose earnings are measured in calendar years 2018 and 2019. The program transition assumptions for 2025 to 2026 are based on the outcomes for this cohort of students along with the earnings outcomes of students who completed programs in award years 2016 and 2017 (earnings measured in calendar years 2019 and 2020) and debt of students who completed programs in award years 2017 and 2018. A new set of D/E and EP metrics was computed for each program using this additional two-year cohort. Programs with fewer than 30 completers or with fewer than 30 completers with earnings records are determined to be passing, though can transition out of this category between years. The share of enrollment that transitions from each performance category to another is computed separately for each group.[269]

The left panel of Tables 5.3 and Table 5.4 report the program transition assumptions from 2025 to 2026 for non-GE and GE programs, respectively. Program performance for non-GE is quite stable, with 95.8 percent of passing enrollment in two-year or less public and non-profit expected to

remain in passing programs. Persistence rates are even higher among 4-year and graduate programs. Among programs that fail the EP threshold, a relatively high share—more than one-third among 2-year and less programs—would be at passing programs in a subsequent year. The performance of GE programs is only slightly less persistent than that of non-GE programs. Note that GE programs would become ineligible for title IV, HEA funds the following year if they fail the same metric two years in a row. Among enrollment in less than two-year proprietary programs that fail the EP metric in 2025, 21.7 percent would pass in 2026 due to a combination of passing with data and no data.

The observed results also serve as the baseline for each subsequent transition of results (2026 to 2027, 2027 to 2028, etc.). The model applies additional assumptions from this baseline for each transition beginning with 2026 to 2027. Because the baseline assumptions are the actual observed results of programs based on a cohort of students that completed programs prior to the Department's GE rulemaking efforts, these transition assumptions do not account for changes that institutions have made to their programs in response to the Department's regulatory actions or would make after the final regulations are published.

As done with analysis of the 2014 rule, the Department assumes that institutions at risk of warning or sanction would take at least some steps to improve program performance by improving program quality, job placement, and lowering prices (leading

to lower levels of debt), beginning with the 2026 to 2027 transition. There is evidence that institutions have responded to past GE measures by aiming to improve outcomes or redirecting enrollment from low-performing programs. Institutions subject to GE regulations have experienced slower enrollment and those that pass GE thresholds tend to have a lower likelihood of program or institution closure.[270] Some leaders of institutions subject to GE regulation in 2014 did make improvements, such as lowering costs, increasing job placement and academic support staff, and other changes.[271] We account for this by increasing the baseline observed probability of having a passing result by five percentage points for programs with at least one failing metric in 2026. Additionally, we improve the baseline observed probability of passing GE programs having a sequential passing result by two and a half percentage points to capture the incentive that currently passing programs have to remain that way. These new rates are shown in the right panels of Tables 5.3 and 5.4.

We assume the same rates of transition between performance categories for subsequent years as we do for the 2026 to 2027 transitions.

Since the budget impact and net costs, benefits, and transfers depend on assumptions about institutional performance after the rule is enacted, we incorporate alternative assumptions about these transitions in our sensitivity analysis.

TABLE 5.3    PROGRAM TRANSITION ASSUMPTIONS NON-GE PROGRAMS

| | Percent in year t+1 status (2026) | | | | Percent in year t+1 status (2027 2033) | | | |
|---|---|---|---|---|---|---|---|---|
| | Pass | Fail D/E only | Fail EP only | Fail both | Pass | Fail D/E only | Fail EP only | Fail both |
| **Public and Non-Profit 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ................................................ | 95.8 | 0.0 | 4.1 | 0.1 | 95.8 | 0.0 | 4.1 | 0.1 |
| Fail D/E only ................................... | 9.8 | 86.0 | 0.0 | 4.2 | 14.8 | 81.0 | 0.0 | 4.2 |
| Fail EP only .................................... | 37.8 | 0.0 | 62.0 | 0.1 | 42.8 | 0.0 | 57.0 | 0.1 |
| Fail Both ......................................... | 21.7 | 5.2 | 3.2 | 69.9 | 26.7 | 5.2 | 3.2 | 64.9 |
| **4-year** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass ................................................ | 99.0 | 0.3 | 0.5 | 0.2 | 99.0 | 0.3 | 0.5 | 0.2 |
| Fail D/E only ................................... | 26.9 | 66.1 | 0.0 | 7.0 | 31.9 | 61.1 | 0.0 | 7.0 |
| Fail EP only .................................... | 36.8 | 0.0 | 58.7 | 4.6 | 41.8 | 0.0 | 53.7 | 4.6 |

[268] The budget simulations separate lower and upper division enrollment in 4-year programs. We assume the same program transition rates for both.

[269] In order to produce transition rates that are stable over time and that do not include secular trends in passing or failing rates (which are already reflected in our program growth assumptions), we compute transition rates from Year 1 to Year 2 and from Year 2 to Year 1 and average them to generate a stable rate shown in the tables.

[270] Fountain, J. (2019). The Effect of the Gainful Employment Regulatory Uncertainty on Student Enrollment at For-Profit Institutions of Higher Education. Research in Higher Education, Springer; Association for Institutional Research, vol. 60(8), 1065–1089. Kelchen, R. & Liu, Z. (2022) Did Gainful

Employment Regulations Result in College and Program Closures? *Education Finance and Policy;* 17 (3): 454–478.

[271] Hentschke, G.C., Parry, S.C. Innovation in Times of Regulatory Uncertainty: Responses to the Threat of "Gainful Employment". Innov High Educ 40, 97–109 (2015). *doi.org/10.1007/s10755-014-9298-z.*

TABLE 5.3   PROGRAM TRANSITION ASSUMPTIONS NON-GE PROGRAMS   Continued

| | Percent in year t+1 status (2026) | | | | Percent in year t+1 status (2027 2033) | | | |
|---|---|---|---|---|---|---|---|---|
| | Pass | Fail D/E only | Fail EP only | Fail both | Pass | Fail D/E only | Fail EP only | Fail both |
| Fail Both | 22.5 | 10.6 | 7.0 | 59.8 | 27.5 | 10.6 | 7.0 | 54.8 |
| **Graduate** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass | 98.4 | 1.5 | 0.0 | 0.0 | 98.4 | 1.5 | 0.0 | 0.0 |
| Fail D/E only | 20.2 | 78.7 | 0.0 | 1.1 | 25.2 | 73.7 | 0.0 | 1.1 |
| Fail EP only | 75.6 | 0.0 | 24.4 | 0.0 | 80.6 | 0.0 | 19.4 | 0.0 |
| Fail Both | 21.5 | 38.8 | 0.0 | 39.7 | 26.5 | 38.8 | 0.0 | 34.7 |

TABLE 5.4   PROGRAM TRANSITION ASSUMPTIONS GE PROGRAMS

| | Share in year t+1 status (2026) | | | | Share in year t+1 status (2027 2033) | | | |
|---|---|---|---|---|---|---|---|---|
| | Pass | Fail D/E only | Fail EP only | Fail both | Pass | Fail D/E only | Fail EP only | Fail both |
| **Proprietary 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass | 93.4 | 0.6 | 5.8 | 0.1 | 95.9 | 0.4 | 3.6 | 0.1 |
| Fail D/E only | 10.0 | 82.1 | 0.0 | 7.9 | 15.0 | 77.1 | 0.0 | 7.9 |
| Fail EP only | 21.7 | 0.0 | 77.8 | 0.6 | 26.7 | 0.0 | 72.8 | 0.6 |
| Fail Both | 10.0 | 5.5 | 6.9 | 77.6 | 15.0 | 5.5 | 6.9 | 72.6 |
| **Public and Non-Profit 2-year or less** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass | 92.4 | 0.5 | 6.2 | 0.9 | 94.9 | 0.4 | 4.2 | 0.6 |
| Fail D/E only | 14.0 | 31.2 | 0.0 | 54.8 | 19.0 | 26.2 | 0.0 | 54.8 |
| Fail EP only | 38.8 | 0.0 | 57.6 | 3.6 | 43.8 | 0.0 | 52.6 | 3.6 |
| Fail Both | 34.8 | 1.5 | 2.5 | 61.2 | 39.8 | 1.5 | 2.5 | 56.2 |
| **4-year** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass | 94.6 | 4.8 | 0.2 | 0.4 | 97.1 | 2.6 | 0.1 | 0.2 |
| Fail D/E only | 18.6 | 72.5 | 0.0 | 8.9 | 23.6 | 67.5 | 0.0 | 8.9 |
| Fail EP only | 14.0 | 0.0 | 86.0 | 0.0 | 19.0 | 0.0 | 81.0 | 0.0 |
| Fail Both | 5.1 | 37.8 | 0.0 | 57.0 | 10.1 | 37.8 | 0.0 | 52.0 |
| **Graduate** | | | | | | | | |
| Year t Status: | | | | | | | | |
| Pass | 97.3 | 2.6 | 0.0 | 0.1 | 99.8 | 0.2 | 0.0 | 0.0 |
| Fail D/E only | 15.1 | 83.0 | 0.0 | 1.9 | 20.1 | 78.0 | 0.0 | 1.9 |
| Fail EP only | 100.0 | 0.0 | 0.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 |
| Fail Both | 8.7 | 37.4 | 0.0 | 53.9 | 13.7 | 37.4 | 0.0 | 48.9 |

Student Response Assumptions

The Department's model applies assumptions for the probability that a current or potential student would transfer or choose a different program, remain in or choose the same program, or withdraw from or not enroll in any postsecondary program in reaction to a program's performance. The model assumes that student response would be greater when a program becomes ineligible for title IV, HEA aid than when a program has a single year of inadequate performance, which initiates warnings and the acknowledgment requirement for GE programs, an acknowledgement requirement non-GE programs that fail D/E, and publicly reported performance information in the ED portal for both GE and non-GE programs. We also let the rates of transfer and withdrawal or non-enrollment differ with the number of alternative transfer options available to students enrolled (or planning to enroll) in a failing program. Specifically, building on the analysis presented in "Measuring Students' Alternative Options" above, we categorize individual programs into one of four categories:

• High transfer options: Have at least one passing program in the same credential level at the same institution and in a related field (as indicated by being in the same 2-digit CIP code).

• Medium transfer options: Have a passing transfer option within the same ZIP3, credential level, and narrow field (4-digit CIP code).

• Low transfer options: Have a passing transfer option within the same ZIP3, credential level, and broad (2-digit) CIP code.

• Few transfer options: Do not have a passing transfer option within the same ZIP3, credential level, and broad (2-digit) CIP code. Students in these programs would be required to enroll in either a distance education program or enroll outside their ZIP3. As shown in "Measuring Students' Alternative Options," all failing programs have at least one non-failing program in the same credential level and 2-digit CIP code in the same State.

For each of the four categories above, we make assumptions for each type of student transition. Programs with

passing metrics are assumed to retain all of their students.

Students that transfer are assumed to transfer to passing programs, and for the purposes of the budget simulation this includes programs with an insufficient n-size. We assume that rates of withdrawal (or non-enrollment) and transfer are higher for ineligible programs than those where only the warning/acknowledgment is required (GE programs with one year of a failing metric and non-GE programs with a failing D/E metric). We also assume that rates of transfer are weakly decreasing (and rates of dropout and remaining in program are both weakly increasing) as programs have fewer transfer options. These assumptions regarding student responses to program results are provided in Table 5.5 and Table 5.6. Coupled with the scenarios presented in the ''Sensitivity Analysis,'' these assumptions are intended to provide a reasonable estimation of the range of impact that the proposed regulations could have on the budget and overall social costs, benefits, and transfers.

The assumptions above are based on our best judgment and from extant research that we view as reasonable guides to the share of students likely to transfer to or choose another program when their program loses title IV, HEA eligibility. For instance, a 2021 GAO report found that about half of non-completing students who were at closed institutions transferred.[272] This magnitude is similar to recent analysis that found that 47 percent of students reenrolled after an institutional closure.[273] The authors of this report find very little movement from public or non-profit institutions into for-profit institutions, but considerable movement in the other direction. For example, about half of re-enrollees at closed for-profit 2-year institutions moved to public 2-year institutions, whereas less than 3% of re-enrollees at closed public and private non-profit 4-year institutions moved to for-profit institutions. Other evidence from historical cohort default rate sanctions indicates a transfer rate of about half of students at for-profit colleges that were subject to loss of federal financial aid disbursement eligibility, with much of that shift to public two-year institutions.[274] The Department also conducted its own internal analysis of ITT Technical Institute closures. About half of students subject to the closure re-enrolled elsewhere (relative to pre-closure patterns). The majority of students that re-enrolled did so in the same two-digit CIP code. Of Associate's degree students that re-enrolled, 45% transferred to a public institution, 41% transferred to a different for-profit institution, and 13% transferred to a private non-profit institution. Most remained in Associate's or certificate programs. Of Bachelor's degree students that re-enrolled, 54% transferred to a different for-profit institution, 25% shifted to a public institution, and 21% transferred to a private non-profit institution.

Data from the Beginning Postsecondary Students Longitudinal 2012/2017 study provides further information on students' general patterns through and across postsecondary institutions (not specific to responses to sanctions or closures). Of students that started at a public or private non-profit 4-year institution, about 3 percent shifted to a for-profit institution within 5 years. Of those that began at a public or private non-profit 2-year institution, about 8 percent shifted to a for-profit institution within 5 years.

TABLE 5.5   STUDENT RESPONSE ASSUMPTIONS, BY PROGRAM RESULT AND NUMBER OF ALTERNATIVE PROGRAM OPTIONS AVAILABLE

| Program result → | Pass | | | Fail once | | | Ineligible | | |
|---|---|---|---|---|---|---|---|---|---|
| Student response → | Remain | Transfer | Withdrawal/ non-enrollment | Remain | Transfer | Withdrawal/ non-enrollment | Remain | Transfer | Withdrawal/ non-enrollment |
| GE: | | | | | | | | | |
| High Alternatives | 1.00 | 0.00 | 0.00 | 0.40 | 0.45 | 0.15 | 0.20 | 0.60 | 0.20 |
| Medium Alternatives | 1.00 | 0.00 | 0.00 | 0.45 | 0.35 | 0.20 | 0.20 | 0.55 | 0.25 |
| Low Alternatives | 1.00 | 0.00 | 0.00 | 0.50 | 0.30 | 0.20 | 0.25 | 0.45 | 0.30 |
| Few Alternatives | 1.00 | 0.00 | 0.00 | 0.55 | 0.25 | 0.20 | 0.25 | 0.35 | 0.40 |
| Non-GE: | | | | | | | | | |
| High Alternatives | 1.00 | 0.00 | 0.00 | 0.80 | 0.20 | 0.00 | na | na | na |
| Medium Alternatives | 1.00 | 0.00 | 0.00 | 0.85 | 0.15 | 0.00 | na | na | na |
| Low Alternatives | 1.00 | 0.00 | 0.00 | 0.90 | 0.10 | 0.00 | na | na | na |
| Few Alternatives | 1.00 | 0.00 | 0.00 | 0.95 | 0.05 | 0.00 | na | na | na |

In Table 5.6, we provide detail of the assumptions of the destinations among students who transfer, separately for the following groups:[275]

- Risk 1 (Proprietary <=2 year)
- Risk 2 (Public, NonProfit <=2 year)
- Risk 3 (Lower division 4 year)
- Risk 4 (Upper division 4 year)
- Risk 5 (Graduate)

TABLE 5.6   STUDENT RESPONSE ASSUMPTIONS, AMONG TRANSFERRING STUDENTS, SHARE SHIFTING SECTORS

| Shift from . . . | Shift to GE programs | | | | | Shift to non-GE programs | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Risk 1 | Risk 2 | Risk 3 | Risk 4 | Risk 5 | Risk 2 | Risk 3 | Risk 4 | Risk 5 |
| GE: | | | | | | | | | |
| Risk 1 | 0.50 | 0.30 | 0.10 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 |
| Risk 2 | 0.30 | 0.50 | 0.10 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 |
| Risk 3 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 |
| Risk 4 | 0.00 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 |

[272] https://www.gao.gov/products/gao-22-104403.

[273] sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.

[274] Cellini, S.R., Darolia, R., & Turner, L.J. (2020). Where do students go when for-profit colleges lose federal aid? *American Economic Journal: Economic Policy,* 12(2), 46–83.

[275] Lower division includes students in their first two years of undergraduate education. Upper division includes students in their third year or higher.

TABLE 5.6    STUDENT RESPONSE ASSUMPTIONS, AMONG TRANSFERRING STUDENTS, SHARE SHIFTING SECTORS Continued

| Shift from . . . | Shift to GE programs | | | | | Shift to non-GE programs | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Risk 1 | Risk 2 | Risk 3 | Risk 4 | Risk 5 | Risk 2 | Risk 3 | Risk 4 | Risk 5 |
|    Risk 5 .......................................... | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.20 |
| Non-GE: | | | | | | | | | |
|    Risk 2 .......................................... | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.70 | 0.20 | 0.00 | 0.00 |
|    Risk 3 .......................................... | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.05 | 0.90 | 0.00 | 0.00 |
|    Risk 4 .......................................... | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.95 | 0.00 |
|    Risk 5 .......................................... | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.95 |

As we describe below, the assumptions for student responses are applied to the estimated enrollment in each aggregate group after factoring in enrollment growth.

Student Borrowing Assumptions

Analyses in the Regulatory Impact Analysis of the 2014 Prior Rule assumed that student debt was unchanged if students transferred from failing to passing programs, but we believe this assumption to be too conservative given that one goal of the GE rule is to reduce the debt burden of students. Recall that tables 3.29 and 3.30 above reported the percent difference in mean debt between failing GE and non-GE programs and their transfer options, by credential level and 2-digit CIP code. Across all subjects and credential levels, debt is 22 percent lower at alternative programs than at failing GE programs. At non-GE programs, there is no aggregate debt difference between failing programs and their alternatives, though this masks heterogeneity across credential levels. For graduate degree programs, movement to alternative programs from failing programs is associated with lower debt levels while movement from failing to passing Associate's programs is associated with an increase in debt. Students that drop out of (or decline to enroll in) failing programs are assumed to acquire no educational debt.

To incorporate changes in average loan volume associated with student transitions, we compute average subsidized and unsubsidized direct loan, Grad PLUS, and Parent PLUS per enrollment separately for GE and non-GE programs by risk group and program performance group. These averages are then applied to shifts in enrollment to generate changes in the amount of aid.

Methodology for Net Budget Impact

The budget model estimates a yearly enrollment for AYs 2023 to 2034 and the distribution of those enrollments in programs characterized by D/E and EP performance, risk group, transfer category, and whether it is a GE program. This enrollment is projected

for a baseline (in absence of the proposed rule) and under the proposed policy. The net budget impact for each year is calculated by applying assumptions regarding the average amount of title IV, HEA program funds received by this distribution of enrollments across groups of programs. The difference in these two scenarios provides the Department's estimate of the impact of the proposed policy. We do not simulate the impact on the rule at the individual program level because doing so would necessitate very specific assumptions about which programs' students transfer to in response to the regulations. While we made such assumptions in the "Measuring Students' Alternatives" section above, we do not think it is analytically tractable to do for all years. Therefore, for the purposes of budget modeling, we perform analysis with aggregations of programs into groups defined by the following:[276]

• Five student loan model risk groups: (1) 2-year (and below) for-profit; (2) 2-year (and below) public or non-profit; (3) 4-year (any control) lower division, which is students in their first two years of a Bachelor's program; (4) 4-year (any control) upper division, which is students beyond their first two years of a Bachelor's program; (5) Graduate student (any control).[277]

• Four transfer categories (high, medium, low, few alternatives) by which the student transfer rates are assumed to differ. This is a program-level characteristic that is assumed not to change.

• Two GE program categories (GE and eligible non-GE) by which the program transitions are assumed to differ.

• Six performance categories: Pass, Fail D/E, Fail EP, Fail Both, Pre-ineligible (a program's current enrollment is Title IV, HEA eligible, but next year's enrollment would not be),

Ineligible (current enrollment is not Title IV, HEA eligible).

We refer to groups defined by these characteristics as "program aggregate" groups.

We first generate a projected baseline (in absence of the proposed rule) enrollment, Pell volume, and loan volume for each of the program aggregate groups from 2023 to 2033. This baseline projection includes several steps. First, we compute average annual growth rate for each control by credential level from 2016 to 2022. These growth rates are presented in Table 5.5. We then apply these annual growth rates to the actual enrollment by program in 2022 to forecast enrollment in each program in 2023. This step is repeated for each year to get projected enrollment by program through 2033. We then compute average Pell, subsidized and unsubsidized direct loan, Grad PLUS, and Parent PLUS per enrollment by risk group, program performance group, and GE vs. non-GE for 2022. These averages are then adjusted according to the PB2024 loan volume and Pell Grant baseline assumptions for the change in average loan by loan type and the change in average Pell Grant. We then multiply the projected enrollment for each program by these average aid amounts to get projected total aid volume by program through 2033. Finally, we sum the enrollment and aid amounts across programs for each year to get enrollment and aid volume by program aggregate group, 2023 to 2033.

The most significant task is to generate projected enrollment, Pell volume, and loan volume for each of the program aggregate groups from 2023 to 2033 with the rule in place. We assume the first set of rates would be released in 2025 award year, so this is starting year for our projections. Projecting counterfactual enrollment and aid volumes involves several steps:

*Step 1:* Start with the enrollment by program aggregate group in 2025. In this first year there are no programs that are ineligible for Title IV, HEA funding.

*Step 2:* Apply the student transition assumptions to the enrollment by

---

[276] Note that non-GE programs do not include risk group 1 (2-year and below for-profit institutions) or the pre-ineligible or ineligible performance categories. Some groups also do not have all four transfer group categories. There are 184 total groups used in the analysis.

program aggregate group. This generates estimates of the enrollment that is expected to remain enrolled in the program aggregate group, the enrollment that is expected to drop out of postsecondary enrollment, and the enrollment that is expected to transfer to a different program aggregate group.

*Step 3:* Compute new estimated enrollment for the start of 2026 (before the second program performance is revealed) for each cell by adding the remaining enrollment to the enrollment that is expected to transfer into that group. We assume that (1) students transfer from failing or ineligible programs to passing programs in the same transfer group and GE program group; (2) Students in risk groups 3 (lower division 4-year), 4 (upper division 4-year college) or 5 (graduate) stay in those risk groups; (3) Students in risk group 1 can shift to risk groups 2 or 3; (4) Students in risk group 2 can shift to risk groups 1 or 3. Therefore, we permit enrollment to shift between proprietary and public or non-profit certificate programs and from certificate and Associate's programs to lower-division Bachelor's programs. We also allow enrollment to shift between GE and non-GE program, based on the assumptions listed in Table 5.6.

*Step 4:* Determine the change in aggregate baseline enrollment between 2025 and 2026 for each risk group and allocate these additional enrollments to each program aggregate group in proportion to the group enrollment computed in Step 3.

*Step 5:* Apply the program transition assumptions to the aggregate group enrollment from Step 4. This results in estimates of the enrollment that would stay within or shift from each performance category to another performance category in the next year. This mapping would differ for GE and non-GE programs and by risk group, as reported in Table 5.3 and 5.4 above. For non-GE programs, every performance category can shift enrollment to every performance category. For GE programs, however, enrollment in each failure category would not remain in the same category because if a metric is failed twice, this enrollment would move to pre-ineligibility. The possible program transitions for GE programs are:

- Pass → Pass, Fail D/E, Fail EP, Fail Both
- Fail D/E → Pass, Fail EP, Pre-Ineligible
- Fail EP → Pass, Fail D/E, Pre-Ineligible
- Fail Both → Pass, Pre-Ineligible

*Step 6:* Compute new estimated enrollment at end of 2026 (after program performance is revealed) for each program aggregate group by adding the number that stay in the same performance category plus the number that shift from other performance categories.

*Step 7:* Repeat steps 1 to 6 above using the end of 2026 enrollment by group as the starting point for 2027 and repeat through 2034. The only addition is that in Step 5, two more program transitions are possible for GE programs: Pre-Ineligible moves to Ineligible and Ineligible remains Ineligible.

*Step 8:* Generate projected Pell and loan volume by program aggregate group from AY 2023 to 2034 under the proposed rule. We multiply the projected enrollment by group by average aid amounts (Pell and loan volume) to get projected total aid amounts by group through 2034. Any enrollment that has dropped out (not enrolled in postsecondary) or in the ineligible category get zero Pell and loan amounts. Note that the average aid amounts by cell come from the PB projections, so are allowed to vary over time.

*Step 9:* Shift Pell and loan volume under the proposed rule from AYs 2025 to 2034 to FYs 2025 to 2033 for calculating budget cost estimates.

A net savings for the title IV, HEA programs comes through four mechanisms. The primary source is from students who drop out of postsecondary education in the year after their program receives a failing D/E or EP rate or becomes ineligible. The second is for the smaller number of students who remain enrolled at a program that becomes ineligible for title IV, HEA program funds. Third, we assume a budget impact on the title IV, HEA programs from students who transfer from programs that are failing to better-performing programs because the typical aid levels differ between programs according to risk group and program performance. For instance, subsidized direct loan borrowing is 24 percent less ($2044 vs. $1547) for students at GE programs failing the D/E metric in risk group 1 than in passing programs in the same risk group in 2026.

Finally, consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the title IV, HEA programs also reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. To determine the estimated budget impact from reduced loan volume, the difference in yearly loan volumes between the baseline and policy scenarios were calculated as a percent of

baseline scenario volumes. This generated an adjustment factor that was applied to loan volumes in the Student Loan Model (SLM) for each cohort, loan type, and risk group combination in the President's Budget for FY2024 (PB2024). The reduced loan volumes are also expected to result in some decrease in future consolidations which is also captured in the model run. Since the implied subsidy rate for each loan type differs by risk group, enrollment shifts to risk groups with greater expected repayment would generate a net budget savings. Since our analysis does not incorporate differences in subsidy rates between programs in the same risk group, such as between programs passing and failing the D/E or EP metrics, these estimates potentially understate the increase in expected repayment resulting from the proposed regulations.

Methodology for Costs, Benefits, and Transfers

The estimated enrollment in each aggregate program group is used to quantify the costs, benefits, and transfers resulting from the proposed regulations for each year from 2023 to 2033. As described in the Discussion of Costs, Benefits, and Transfers, we quantify an earnings gain for students from attending higher financial value programs and the additional tax revenue that comes from that additional earnings. We quantify the cost associated with additional instructional expenses to educate students who shift to different types of programs and the transfer of instructional expenses as students shift programs. We also estimate the transfer of title IV, HEA program funds from programs that lose students to programs that gain students.

Earnings Gain Benefit

A major goal of greater transparency and accountability is to shift students towards higher financial value programs—those with greater earnings potential, lower debt, or both. To quantify the earnings gain associated with the proposed regulation, we estimate the aggregate annual earnings of would-be program graduates under the baseline and policy scenarios and take the difference. For each risk group and program performance group, we compute the enrollment-weighted average of median program earnings. Average earnings for programs that have become ineligible is assumed to be the average of median earnings for programs in the three failing categories, weighted by the enrollment share in these categories. This captures, for instance, that the earnings of 2-year programs that

become ineligible are quite lower than those that enroll graduate students. Since we have simulated enrollment, but not completion, annual program enrollment is converted into annual program completions by applying a ratio that differs for 2-year programs or less, Bachelor's degree programs, or graduate programs.[278] Earnings for students that

do not complete are not available and thus not included in our calculations. Students that drop out of failing programs (or decline to enroll altogether) are assumed to receive earnings equal to the median earnings of high school graduates in the State (the same measure used for the Earnings Threshold). Therefore, earnings could

increase for this group if students reduce enrollment in programs leading to earnings less than a high school graduate. We estimate aggregate earnings by program group by multiplying enrollment by average earnings, reported in Table 5.7, and the completion ratio.

TABLE 5.7  AVERAGE PROGRAM EARNINGS BY GROUP

[$2019]

|  | Pass | Fall D/E | Fail EP only | Fail both | Ineligible |
|---|---|---|---|---|---|
| **GE Programs** | | | | | |
| Proprietary 2yr or less | 38,147 | 28,673 | 18,950 | 18,498 | 20,408 |
| Public/NP 2yr or less | 37,235 | 30,234 | 19,904 | 18,400 | 19,789 |
| Bachelor Lower | 51,096 | 31,160 | 5,147 | 23,491 | 30,427 |
| Bachelor Upper | 51,096 | 31,160 | 5,147 | 23,491 | 30,427 |
| Graduate | 66,848 | 47,523 | 15,891 | 19,972 | 46,056 |
| **Non-GE Programs** | | | | | |
| Public/NP 2yr or less | 36,473 | 29,626 | 23,502 | 19,071 | N/A |
| Bachelor Lower | 47,602 | 28,723 | 19,813 | 20,729 | N/A |
| Bachelor Upper | 47,602 | 28,723 | 19,813 | 20,729 | N/A |
| Graduate | 74,631 | 55,654 | 19,765 | 22,747 | N/A |

Students experience earnings gain each year they work following program completion. We compute the earnings benefit over the analysis window by giving 2026 completers 7 years of earnings gains, 2027 completers 6 years of earnings gains, and so on. The earnings gain of students that graduate during 2033 are only measured for one year. In reality program graduates would experience an earnings gain annually over their entire working career; our estimates likely understate the total likely earnings benefit of the policy.

However, our approach can overstate the earnings gain of students that shift programs if students experience a smaller earnings gain than the average difference between passing and failing programs within each GE-by-risk group in Table 5.7. To account for this, we apply an additional adjustment factor to the aggregate earnings difference to quantify how much of the earnings difference is accounted for by programs.

There is not consensus in the research literature on the magnitude of this

parameter, with some studies finding very large impacts of specific programs or institutions on earnings [279] and others finding smaller impacts.[280] Unfortunately, many of these studies are set in specific contexts (*e.g.*, only public four-year universities in one state) and most look at institutions overall rather than programs, which may not extrapolate to our setting given the large outcome variation across programs in the same institution.

To select the value used for this adjustment factor, we compared the average earnings difference between passing and failing programs (conditional on credential level) before versus after controlling for the rich demographic characteristics described in "Student Demographic Analysis." We find that this conditional earnings difference declined by approximately 25 percent after controlling for the share of students in each race/ethnic category, the share of students that are male, independent, first-generation, and a Pell recipient, and the average family

income of students.[281] Our primary estimates thus adjust the raw earnings difference in Table 5.7 down using an adjustment factor of 75 percent.

Given the uncertainty around the proper adjustment factor to use, we include a range of values in the sensitivity analysis. We seek public comment as to how best to craft any further assumptions of the earnings benefits of the Financial Value Transparency and Gainful Employment components of the proposed rule.

In the analysis of alternative options above, we showed the expected change in earnings for students that transfer from failing programs for each credential-level by 2-digit CIP code. Across all credential levels, students that shift from failing GE programs were expected to increase annual earnings by 44 percent and those transferring from failing non-GE programs were expected to increase annual earnings by 22 percent. These estimates are in line with those from Table 5.7 and used in the benefit impact.

[278] The ratios used are 11.5% for 2-year or less, 16.5% for Bachelor's programs, and 27.3% for graduate programs. These are the ratio between number of title IV, HEA completers in the two-year earnings cohort and the average title IV, HEA enrollment in the 2016 and 2017 Award Years.

[279] Hoekstra, Mark (2009) The Effect of Attending the Flagship State University on Earnings: A Discontinuity-Based Approach, Review of Economics and Statistics 2009, 91(4): 717–724.

Hoxby, C.M. 2019. The Productivity of US Postsecondary Institutions. In *Productivity in*

*Higher Education*, C.M. Hoxby and K.M. Stange (eds). University of Chicago Press: Chicago, 2019.

Andrews, R.J., & Stange, K.M. (2019). Price regulation, price discrimination, and equality of opportunity in higher education: Evidence from Texas. *American Economic Journal: Economic Policy*, 11.4, 31–65.

Andrews, Rodney, Scott Imberman, Michael Lovenheim, & Kevin Stange (2022). The Returns to College Major Choice: Average and Distributional Effects, Career Trajectories, and Earnings

Variability. NBER Working Paper 30331, August 2022.

[280] Mountjoy, Jack and Brent Hickman (2021). The Returns to College(s): Relative Value-Added and Match Effects in Higher Education. NBER Working Paper 29276, September 2021.

[281] Note that both the "raw" and fully controlled regressions include indicators for credential level, as enrollment is not permitted to move across credential levels in our budget simulations other than modest shift from 2-year programs to lower-division four-year programs.

Fiscal Externality Benefit

The increased earnings of program graduates would generate additional Federal and State tax revenue and reductions in transfer program expenditure. To the earnings gain, we multiply an average marginal tax and transfer rate of 18.6 percent to estimate the fiscal benefit. This rate was computed in Hendren and Sprung-Keyser (2020) specifically to estimate the fiscal externality of earnings gains stemming from improvement in college quality, so it is appropriate for use in our setting.[282] The rate is derived from 2016 CBO estimates and includes Federal and State income taxes and transfers from the Supplemental Nutrition Assistance Program (SNAP) but excludes payroll taxes, housing vouchers, and other safety-net programs. Note that this benefit is not included in our budget impact estimates.

Instructional Spending Cost and Transfer

To determine the additional cost of educating students that shift from one type of program to another or the cost savings from students who chose not to enroll, we estimate the aggregate annual instructional spending under the baseline and policy scenarios and take the difference. We used the instructional expense per FTE enrollee data from IPEDS to calculate the enrollment-weighted average institutional-level instructional expense per FTE student for programs by risk group and performance result, separately for GE programs and non-GE programs. Average spending for programs that have become ineligible is assumed to be the average of the three failing categories, weighted by the enrollment share in these categories. These estimates are reported in Table 5.8. We estimate aggregate spending by program group by multiplying enrollment from 2023 through 2033 by average spending.

TABLE 5.8  AVERAGE INSTRUCTIONAL COST PER FTE BY GROUP

|  | Pass | Fall D/E | Fail EP only | Fail both | Ineligible |
|---|---|---|---|---|---|
| **GE Programs:** |  |  |  |  |  |
| Proprietary 2yr or less | 4,392 | 3,038 | 4,347 | 3,957 | 4,045 |
| Public/NP 2yr or less | 7,334 | 5,859 | 4,956 | 3,681 | 4,838 |
| Bachelor Lower | 3,671 | 2,667 | 844 | 3,396 | 2,721 |
| Bachelor Upper | 3,671 | 2,667 | 844 | 3,396 | 2,721 |
| Graduate | 5,309 | 3,896 | 1,837 | 5,151 | 3,959 |
| **Non-GE Programs:** |  |  |  |  |  |
| Public/NP 2yr or less | 6,411 | 5,197 | 5,940 | 4,357 | N/A |
| Bachelor Lower | 11,274 | 7,467 | 8,572 | 11,419 | N/A |
| Bachelor Upper | 11,274 | 7,467 | 8,572 | 11,419 | N/A |
| Graduate | 15,696 | 15,874 | 7,528 | 24,355 | N/A |

Note that since we are using institution-level rather than program-level spending, this will not fully capture spending differences between undergraduate and graduate enrollment, between upper and lower division, and across field of study.[283]

To calculate the transfer of instructional expenses from failing to passing programs, we multiply the average instructional expense per enrollee shown in 5.7 by the estimated number of annual student transfers for 2023 to 2033 from each risk group and failing category.

Student Aid Transfers

To calculate the amounts of student aid that could transfer with students each year, we multiply the estimated number of students receiving title IV, HEA program funds transferring from ineligible or failing GE and non-GE programs to passing programs in each risk category each year by the average Pell Grant, Stafford subsidized loan, unsubsidized loan, PLUS loan, and GRAD PLUS loan per enrollment in the same categories.

To annualize the amount of benefits, costs, and title IV, HEA program fund transfers from 2023 to 2033, we calculate the net present value (NPV) of the yearly amounts using a discount rate of 3 percent and a discount rate of 7 percent and annualize it over 10 years.

*6. Net Budget Impacts*

These proposed regulations are estimated to have a net Federal budget impact of $−12.6 billion, consisting of $−8.6 billion in reduced Pell Grants and $−4.1 billion for loan cohorts 2024 to 2033.[284] A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. The baseline for estimating the cost of these final regulations is the President's Budget for 2024 (PB2024) as modified for the proposed changes to the REPAYE plan published in the NPRM dated January 10, 2023. The GE and Financial Transparency provisions are responsible for the estimated net budget impact of the proposed regulations, as described below. The other provisions are considered in the Other Provisions section of this Net Budget Impact topic.

Gainful Employment and Financial Transparency

The proposed regulations are estimated to shift enrollment towards programs with lower debt-to-earnings or higher median earnings or both, and away from programs that fail either of the two performance metrics. The vast majority of students are assumed to resume their education at the same or another program in the event they are warned about poor program performance or if their program loses eligibility. The proposed regulations are

---

[282] Hendren, Nathaniel, and Ben Sprung-Keyser. 2020. ''A Unified Welfare Analysis of Government Policies.'' Quarterly Journal of Economics 135(3): 1209–1318.

[283] This may cause our estimates to slightly understate the instructional cost impact since failing programs are disproportionately in lower-earning fields and lower credential levels, which tend to have lower instructional costs. Though we anticipate most movement will be within field and credential level, which would mute this effect. See Steven W. Hemelt & Kevin M. Stange & Fernando Furquim & Andrew Simon & John E. Sawyer, 2021. ''Why Is Math Cheaper than English? Understanding Cost Differences in Higher Education,'' Journal of Labor Economics, vol 39(2), pages 397–435.

[284] Since the policy is not estimated to shift enrollment until AY 2026 (which includes part of FY 2025), we present enrollment and budget impacts starting in 2025. Impacts in both AY and FY 2024 are zero.

also estimated to reduce overall enrollment, as some students decide to not enroll. Table 6.1 summarize the main enrollment results for non-GE programs. Enrollment in non-GE programs is expected to increase by about 0.3 percent relative to baseline over the budget period. There is a modest enrollment shift towards programs that pass both metrics, with a particularly large (proportionate) reduction in the share of enrollment in programs that fail D/E. By the end of the analysis window, 96.5 percent of enrollment is expected to be in passing programs.

TABLE 6.1   PRIMARY ENROLLMENT ESTIMATE (NON-GE PROGRAMS)

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Aggregate Enrollment (millions)** | | | | | | | | | |
| Baseline | 14.119 | 13.974 | 13.839 | 13.710 | 13.588 | 13.472 | 13.364 | 13.265 | 13.170 |
| Policy | 14.119 | 14.001 | 13.885 | 13.766 | 13.646 | 13.530 | 13.418 | 13.311 | 13.209 |
| **Percent of Enrollment by Program Performance** | | | | | | | | | |
| Pass: | | | | | | | | | |
| Baseline | 95.6 | 95.6 | 95.6 | 95.6 | 95.7 | 95.7 | 95.7 | 95.8 | 95.8 |
| Policy | 95.6 | 95.7 | 96.0 | 96.2 | 96.3 | 96.4 | 96.4 | 96.5 | 96.5 |
| Fail D/E: | | | | | | | | | |
| Baseline | 1.8 | 1.8 | 1.8 | 1.9 | 1.9 | 1.9 | 1.9 | 2.0 | 2.0 |
| Policy | 1.8 | 1.7 | 1.5 | 1.4 | 1.4 | 1.3 | 1.3 | 1.3 | 1.4 |
| Fail EP: | | | | | | | | | |
| Baseline | 2.1 | 2.1 | 2.0 | 2.0 | 1.9 | 1.9 | 1.8 | 1.8 | 1.8 |
| Policy | 2.1 | 2.2 | 2.1 | 2.0 | 2.0 | 1.9 | 1.9 | 1.8 | 1.8 |
| Fail Both: | | | | | | | | | |
| Baseline | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Policy | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |

Table 6.2 reports comparable estimates for GE programs. Note that for GE programs we estimate enrollment in two additional categories: Pre-Ineligible, *i.e.,* programs that would be ineligible for title IV, HEA aid the following year; and Ineligible. Enrollment in GE programs is projected to decline by 8 percent relative to baseline, with the largest marginal decline in the first year programs become ineligible. There is a large enrollment shift towards programs that pass both metrics, with a particularly large reduction in the share of enrollment in programs that fail EP. By the end of the analysis window, 95.1 percent of enrollment is expected to be in passing programs, compared to 72.2 percent in the baseline scenario.

TABLE 6.2   PRIMARY ENROLLMENT ESTIMATE (GE PROGRAMS)

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Aggregate Enrollment (millions)** | | | | | | | | | |
| Baseline | 2.628 | 2.614 | 2.604 | 2.596 | 2.590 | 2.588 | 2.588 | 2.591 | 2.596 |
| Policy | 2.628 | 2.472 | 2.472 | 2.444 | 2.437 | 2.425 | 2.410 | 2.394 | 2.378 |
| **Percent of Enrollment by Program Performance** | | | | | | | | | |
| Pass: | | | | | | | | | |
| Baseline | 76.0 | 75.5 | 75.1 | 74.6 | 74.2 | 73.7 | 73.2 | 72.7 | 72.2 |
| Policy | 76.0 | 85.5 | 91.7 | 93.7 | 94.4 | 94.8 | 94.9 | 95.0 | 95.1 |
| Fail D/E: | | | | | | | | | |
| Baseline | 6.8 | 6.6 | 6.5 | 6.4 | 6.3 | 6.1 | 6.0 | 5.9 | 5.7 |
| Policy | 6.8 | 2.3 | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | 1.1 |
| Fail EP: | | | | | | | | | |
| Baseline | 13.9 | 14.4 | 14.9 | 15.5 | 16.0 | 16.6 | 17.1 | 17.7 | 18.3 |
| Policy | 13.9 | 2.4 | 1.7 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.9 |
| Fail Both: | | | | | | | | | |
| Baseline | 3.4 | 3.4 | 3.5 | 3.5 | 3.6 | 3.6 | 3.7 | 3.7 | 3.8 |
| Policy | 3.4 | 0.4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Pre-Inelig: | | | | | | | | | |
| Baseline | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Policy | 0.0 | 9.3 | 3.2 | 1.5 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| Inelig: | | | | | | | | | |
| Baseline | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Policy | 0.0 | 0.0 | 2.1 | 1.7 | 1.2 | 0.8 | 0.7 | 0.6 | 0.6 |

For non-GE programs, these shifts occur primarily across programs that have different performance in the same loan risk category, with a very modest shift from public and non-profit two-year and less programs to lower-division 4-year programs. This is shown in Table 6.3. Shifts away from the public and non-profit two-year sector within non-GE programs is partially offset by shifts into these programs from failing GE programs. Recall that in "Transfer Causes Net Enrollment Increase in Some Sectors" above we showed that the vast majority of community colleges would gain enrollment from the proposed regulations.

TABLE 6.3  PRIMARY ENROLLMENT ESTIMATES BY RISK GROUP (NON-GE PROGRAMS)

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| **Projected Total Enrollment by Loan Risk Category (millions)** | | | | | | | | | |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 2.926 | 2.818 | 2.715 | 2.615 | 2.519 | 2.426 | 2.337 | 2.251 | 2.169 |
| Policy | 2.926 | 2.824 | 2.723 | 2.623 | 2.524 | 2.428 | 2.335 | 2.246 | 2.160 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 6.163 | 6.093 | 6.026 | 5.960 | 5.896 | 5.833 | 5.771 | 5.712 | 5.654 |
| Policy | 6.163 | 6.108 | 6.054 | 5.996 | 5.937 | 5.878 | 5.819 | 5.760 | 5.701 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 2.597 | 2.580 | 2.563 | 2.546 | 2.530 | 2.513 | 2.496 | 2.481 | 2.464 |
| Policy | 2.597 | 2.582 | 2.567 | 2.552 | 2.536 | 2.520 | 2.504 | 2.488 | 2.472 |
| Graduate: | | | | | | | | | |
| Baseline | 2.432 | 2.483 | 2.535 | 2.588 | 2.644 | 2.701 | 2.760 | 2.821 | 2.883 |
| Policy | 2.432 | 2.487 | 2.541 | 2.595 | 2.649 | 2.704 | 2.760 | 2.817 | 2.875 |
| **Percent of Enrollment by Loan Risk Category** | | | | | | | | | |
| Public/NP 2-year & below: | | | | | | | | | |
| Baseline | 20.7 | 20.2 | 19.6 | 19.1 | 18.5 | 18.0 | 17.5 | 17.0 | 16.5 |
| Policy | 20.7 | 20.2 | 19.6 | 19.1 | 18.5 | 17.9 | 17.4 | 16.9 | 16.4 |
| 4-year (lower): | | | | | | | | | |
| Baseline | 43.6 | 43.6 | 43.5 | 43.5 | 43.4 | 43.3 | 43.2 | 43.1 | 42.9 |
| Policy | 43.6 | 43.6 | 43.6 | 43.6 | 43.5 | 43.4 | 43.4 | 43.3 | 43.2 |
| 4-year (upper): | | | | | | | | | |
| Baseline | 18.4 | 18.5 | 18.5 | 18.6 | 18.6 | 18.7 | 18.7 | 18.7 | 18.7 |
| Policy | 18.4 | 18.4 | 18.5 | 18.5 | 18.6 | 18.6 | 18.7 | 18.7 | 18.7 |
| Graduate: | | | | | | | | | |
| Baseline | 17.2 | 17.8 | 18.3 | 18.9 | 19.5 | 20.0 | 20.7 | 21.3 | 21.9 |
| Policy | 17.2 | 17.8 | 18.3 | 18.8 | 19.4 | 20.0 | 20.6 | 21.2 | 21.8 |

Table 6.4 reports a similar breakdown for GE programs. Shifts to passing programs are accompanied by a shift away from proprietary two-year and below programs and towards public and non-profit programs of similar length, along with a more modest shift towards lower-division 4-year programs.

TABLE 6.4  PRIMARY ENROLLMENT ESTIMATES BY RISK GROUP (GE PROGRAMS)

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Total Enrollment by Loan Risk Category (Millions)** | | | | | | | | | | |
| Prop. 2-year & below: | | | | | | | | | | |
| Baseline | 0.710 | 0.734 | 0.759 | 0.785 | 0.813 | 0.842 | 0.872 | 0.904 | 0.938 | ........... |
| Policy | 0.710 | 0.605 | 0.592 | 0.606 | 0.621 | 0.637 | 0.653 | 0.668 | 0.683 | ........... |
| Public/NP 2-year & below: | | | | | | | | | | |
| Baseline | 0.533 | 0.518 | 0.504 | 0.489 | 0.475 | 0.462 | 0.450 | 0.437 | 0.424 | ........... |
| Policy | 0.533 | 0.548 | 0.551 | 0.547 | 0.537 | 0.523 | 0.509 | 0.494 | 0.480 | ........... |
| 4-year (lower): | | | | | | | | | | |
| Baseline | 0.794 | 0.779 | 0.765 | 0.752 | 0.739 | 0.728 | 0.717 | 0.707 | 0.697 | ........... |
| Policy | 0.794 | 0.756 | 0.746 | 0.742 | 0.735 | 0.725 | 0.714 | 0.703 | 0.692 | ........... |
| 4-year (upper): | | | | | | | | | | |
| Baseline | 0.208 | 0.202 | 0.197 | 0.192 | 0.186 | 0.182 | 0.177 | 0.172 | 0.168 | ........... |
| Policy | 0.208 | 0.194 | 0.187 | 0.183 | 0.178 | 0.173 | 0.168 | 0.163 | 0.158 | ........... |
| Graduate: | | | | | | | | | | |
| Baseline | 0.383 | 0.381 | 0.379 | 0.378 | 0.376 | | 0.374 | 0.373 | 0.371 | 0.369 |
| Policy | 0.383 | | 0.369 | 0.366 | 0.367 | 0.367 | 0.367 | 0.366 | 0.366 | 0.365 |
| **Percent of Enrollment by Loan Risk Category** | | | | | | | | | | |
| Prop. 2-year & below: | | | | | | | | | | |
| Baseline | 27.0 | 28.1 | 29.1 | 30.3 | 31.4 | 32.5 | 33.7 | 34.9 | 36.1 | ........... |
| Policy | 27.0 | 24.5 | 24.3 | 24.8 | 25.5 | 26.3 | 27.1 | 27.9 | 28.7 | ........... |
| Public/NP 2-year & below: | | | | | | | | | | |
| Baseline | 20.3 | 19.8 | 19.4 | 18.9 | 18.4 | 17.9 | 17.4 | 16.9 | 16.3 | ........... |
| Policy | 20.3 | 22.2 | 22.5 | 22.4 | 22.0 | 21.6 | 21.1 | 20.7 | 20.2 | ........... |
| 4-year (lower): | | | | | | | | | | |
| Baseline | 30.2 | 29.8 | 29.4 | 29.0 | 28.5 | 28.1 | 27.7 | 27.3 | 26.8 | ........... |
| Policy | 30.2 | 30.6 | 30.6 | 30.4 | 30.1 | 29.9 | 29.6 | 29.4 | 29.1 | ........... |
| 4-year (upper): | | | | | | | | | | |
| Baseline | 7.9 | 7.7 | 7.6 | 7.4 | 7.2 | 7.0 | 6.8 | 6.6 | 6.5 | ........... |
| Policy | 7.9 | 7.9 | 7.7 | 7.5 | 7.3 | 7.1 | 7.0 | 6.8 | 6.7 | ........... |
| Graduate: | | | | | | | | | | |
| Baseline | 14.6 | 14.6 | 14.6 | 14.5 | 14.5 | 14.5 | 14.4 | 14.3 | 14.2 | ........... |
| Policy | 14.6 | 14.9 | 15.0 | 15.0 | 15.1 | 15.1 | 15.2 | 15.3 | 15.3 | ........... |

As reported in Tables 6.5 and 6.6, we estimate that the regulations would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033.

TABLE 6.5   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE
[Millions, $2019]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell | (80) | (157) | (217) | (157) | (149) | (150) | (197) | (210) | (221) | (1,538) |
| Subs | (46) | (54) | (51) | (48) | (52) | (54) | (51) | (53) | (51) | (460) |
| Unsub | (18) | (34) | (123) | (88) | (110) | (175) | (194) | (219) | (238) | (1,200) |
| Grad PLUS | 87 | (30) | (69) | (68) | (199) | (249) | (269) | (285) | (300) | (1,381) |
| Par. PLUS | 38 | 53 | 88 | 71 | 77 | 13 | 15 | 13 | 14 | 381 |
| GE Programs: | | | | | | | | | | |
| Pell | (102) | (354) | (648) | (838) | (906) | (944) | (1,003) | (1,077) | (1,168) | (7,040) |
| Subs | (133) | (327) | (383) | (374) | (372) | (381) | (397) | (418) | (444) | (3,229) |
| Unsub | (229) | (531) | (631) | (595) | (579) | (593) | (610) | (634) | (665) | (5,067) |
| Grad PLUS | (10) | (49) | (58) | (49) | (57) | (57) | (54) | (53) | (51) | (437) |
| Par. PLUS | (8) | (25) | (18) | (10) | (5) | (11) | (14) | (19) | (26) | (135) |
| Total: | | | | | | | | | | |
| Pell | (181) | (510) | (864) | (995) | (1,055) | (1,094) | (1,200) | (1,287) | (1,388) | (8,574) |
| Subs | (180) | (381) | (435) | (423) | (424) | (435) | (448) | (471) | (495) | (3,689) |
| Unsub | (247) | (564) | (754) | (683) | (689) | (769) | (804) | (853) | (903) | (6,267) |
| Grad PLUS | 76 | (78) | (127) | (117) | (255) | (305) | (323) | (338) | (351) | (1,818) |
| Par. PLUS | 30 | 29 | 70 | 62 | 72 | 2 | 1 | (6) | (13) | 246 |

TABLE 6.6   ESTIMATED ANNUAL PERCENT CHANGE IN TITLE IV, HEA AID VOLUME BY FISCAL YEAR
[%]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non−GE Programs: | | | | | | | | | | |
| Pell | −0.80 | −0.78 | −0.71 | −0.18 | −0.63 | −0.63 | −0.67 | −0.73 | −0.71 | −0.65 |
| Subs | −0.43 | −0.50 | −0.48 | −0.46 | −0.50 | −0.52 | −0.50 | −0.52 | −0.51 | −0.49 |
| Unsub | −0.08 | −0.15 | −0.55 | −0.40 | −0.49 | −0.77 | −0.85 | −0.95 | −1.03 | −0.59 |
| Grad PLUS | 1.72 | −0.55 | −1.25 | −1.19 | −3.26 | −3.97 | −4.21 | −4.37 | −4.50 | −2.58 |
| Par. PLUS | 0.42 | 0.59 | 0.96 | 0.77 | 0.83 | 0.13 | 0.17 | 0.14 | 0.15 | 0.46 |
| GE Programs: | | | | | | | | | | |
| Pell | −4.88 | −11.87 | −14.12 | −13.51 | −13.86 | −14.23 | −14.92 | −15.74 | −16.61 | −13.31 |
| Subs | −4.75 | −10.78 | −12.78 | −12.12 | −11.79 | −12.01 | −12.32 | −12.77 | −13.33 | −11.41 |
| Unsub | −4.74 | −10.78 | −12.79 | −12.15 | −11.86 | −12.11 | −12.44 | −12.93 | −13.51 | −11.48 |
| Grad PLUS | −1.50 | −6.81 | −8.01 | −6.63 | −7.46 | −7.42 | −7.14 | −6.95 | −6.78 | −6.56 |
| Par. PLUS | −1.11 | −3.43 | −2.47 | −1.28 | −0.63 | −1.37 | −1.77 | −2.38 | −3.19 | −1.96 |
| Total: | | | | | | | | | | |
| Pell | −1.51 | −2.73 | −3.10 | −2.59 | −3.05 | −3.15 | −3.35 | −3.60 | −3.81 | −2.97 |
| Subs | −1.32 | −2.82 | −3.24 | −3.17 | −3.20 | −3.30 | −3.43 | −3.63 | −3.84 | −3.10 |
| Unsub | −0.95 | −2.12 | −2.81 | −2.55 | −2.55 | −2.82 | −2.93 | −3.09 | −3.25 | −2.57 |
| Grad PLUS | 1.33 | −1.29 | −2.03 | −1.80 | −3.73 | −4.34 | −4.52 | −4.64 | −4.73 | −3.02 |
| Par. PLUS | 0.31 | 0.29 | 0.71 | 0.62 | 0.72 | 0.02 | 0.01 | −0.06 | −0.13 | 0.28 |

Table 6.7 reports the annual net budget impact after accounting for estimated loan repayment. We estimate a net Federal budget impact of $12.6 billion, consisting of $8.6 billion in reduced Pell Grants and $4.1 billion for loan cohorts 2024 to 2033.

TABLE 6.7   ESTIMATED ANNUAL NET BUDGET IMPACT
[Outlays in millions]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Pell | −181 | −510 | −864 | −995 | −1,055 | −1,094 | −1,200 | −1,287 | −1,388 | −8,574 |
| Subs | −38 | −99 | −121 | −117 | −115 | −115 | −117 | −140 | −114 | −975 |
| Unsub | −36 | −115 | −177 | −174 | −169 | −185 | −197 | −208 | −216 | −1,476 |
| PLUS (Par. & Grad) | −55 | −56 | −62 | −66 | −94 | −106 | −106 | −108 | −111 | −764 |
| Consol | 0 | −1 | −10 | −33 | −65 | −109 | −157 | −207 | −262 | −844 |
| Total | −310 | −781 | −1,234 | −1,385 | −1,498 | −1,609 | −1,777 | −1,950 | −2,091 | −12,633 |

The provisions most responsible for the costs of the proposed regulations are those related to Financial Value Transparency and Gainful Employment. The Department does not anticipate significant costs related to the Ability to Benefit, Financial Responsibility, Administrative Capability, and Certification Procedures provisions. The Department's calculations of the net budget impacts represent our best estimate of the effect of the regulations on the Federal student aid programs. However, realized budget impacts will be heavily influenced by actual program performance, student response to program performance, student borrowing and repayment behavior, and changes in enrollment as a result of the regulations. For example, if students, including prospective students, react more strongly to the warnings, acknowledgement requirement, or potential ineligibility of programs than

anticipated and, if many of these students leave postsecondary education, the impact on Pell Grants and loans could increase. Similarly, if institutions react to the regulations by improving performance, the assumed enrollment and aid amounts could be overstated, though this would be very beneficial to students. Finally, if students' repayment behavior is different than that assumed in the model, the realized budget impact could be larger or smaller than our estimate.

Other Provisions

The proposed regulations related to Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit have

not been estimated to have a significant budget impact. This is consistent with how the Department has treated similar changes in recent regulatory packages related to Financial Responsibility and Certification Procedures. The Financial Responsibility triggers are intended to identify struggling institutions and increase the financial protection the Department receives. While this may increase recoveries from institutions for certain types of loan discharges, affect the level of closed school discharges, or result in the Department withholding title IV, HEA funds, all items that would have some budget impact, we have not estimated any savings related to those provisions. Historically, the Department

has not been able to obtain much financial protection obtained from closed schools and existing triggers have not been used to a great extent. Therefore, we would wait to include any effects from the proposed revisions until indications are available in title IV, HEA loan data that they meaningfully reduce closed school discharges or significantly increasing recoveries. However, we did run some sensitivity analyses where these changes did affect these discharges, as described in Table 6.8. We only project these sensitivity analyses affecting future cohorts of loans since it would be related to financial protection obtained in the future.

TABLE 6.8    FINANCIAL RESPONSIBILITY SENSITIVITY ANALYSIS

| Scenario | Cohorts 2024 2033 outlays ($ in millions) |
|---|---|
| Closed School Discharges Reduced by 5 percent ................................................................................................ | −4,060 |
| Closed School Discharges Reduced by 25 percent .............................................................................................. | −5,516 |
| Borrower Defense Discharges Reduced by 5 percent .......................................................................................... | −4,130 |
| Borrower Defense Discharges Reduced by 15 percent ........................................................................................ | −4,290 |

*7. Accounting Statement*

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the benefits, costs, and transfers associated with the provisions of these regulations.

Primary Estimates

We estimate that by shifting enrollment to higher financial-value

programs, the proposed regulations would increase student's earnings, resulting in net after-tax gains to students and benefits for taxpayers in the form of additional tax revenue. Table 7.1 reports the estimated aggregate earnings gain for each cohort of completers, separately for GE and non-GE programs, and the cumulative (not discounted) earnings gain over the

budget window. The proposed regulation is estimated to generate $19.4 billion of additional earnings gains over the budget window, both from GE and non-GE programs. Using the approach described in "Methodology for Costs, Benefits, and Transfers," we expect $15.8 billion to benefit students and $3.6 billion to benefit Federal and State governments and taxpayers.

TABLE 7.1    ANNUAL AND CUMULATIVE EARNINGS GAIN AND DISTRIBUTION BETWEEN STUDENTS AND GOVERNMENT

[millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Single-year Earnings Gains of Each Cohort of Completers | | | | | | | | | | |
| Non-GE ................................... | 0 | 251 | 513 | 644 | 703 | 701 | 670 | 599 | 520 | 4,602 |
| GE ........................................... | 0 | 378 | 654 | 780 | 824 | 818 | 792 | 756 | 712 | 5,714 |
|     Total .................................. | 0 | 629 | 1,167 | 1,423 | 1,527 | 1,519 | 1,463 | 1,355 | 1,232 | 10,316 |
| Cumulative Earnings Gain | | | | | | | | | | |
| Cumulative gain ..................... | 0 | 629 | 1,797 | 2,591 | 2,950 | 3,046 | 2,982 | 2,818 | 2,587 | 19,400 |
| Student share ......................... | 0 | 512 | 1,462 | 2,109 | 2,401 | 2,479 | 2,427 | 2,294 | 2,106 | 15,792 |
| Gov t share ............................ | 0 | 117 | 334 | 482 | 549 | 567 | 555 | 524 | 481 | 3,608 |

The proposed rule could also alter aggregate instructional spending, by shifting enrollment to higher-cost institutions (an increase in spending) or by reducing aggregate enrollment (a decrease in spending). Table 7.2 reports estimated annual and cumulative

changes in instructional spending, overall and separately for GE and non-GE programs. The net effect is an increase in aggregate cumulative instructional spending of $2.7 billion (not discounted), though this masks differences between non-GE programs

(net increase in spending) and GE programs (net decrease in spending). Spending is reduced in the first year of the policy due to the decrease in enrollment, but then increases as more students transfer to more costly programs.

TABLE 7.2   INSTRUCTIONAL SPENDING CHANGE
[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE | 0 | 362 | 644 | 780 | 836 | 830 | 794 | 702 | 613 | 5,562 |
| GE | 0 | −435 | −358 | −258 | −240 | −282 | −352 | −434 | −525 | −2,883 |
| Total | 0 | −73 | 287 | 522 | 596 | 548 | 442 | 268 | 88 | 2,679 |

The proposed rule would create transfers between students, the Federal Government, and among postsecondary institutions by shifting enrollment between programs, removing title IV, HEA eligibility for GE programs that fail a GE metric multiple times, and causing some students to choose non-enrollment instead of a low value program. Table 7.3 reports the number of enrolments that transfer programs, remain enrolled at ineligible programs, or decline to enroll in postsecondary education altogether. We estimate that more than 1.6 million enrollments would transfer from low financial value programs to better programs over the decade. A more modest number would remain enrolled at a program that is no longer eligible for title IV, HEA aid.

TABLE 7.3   ESTIMATED ENROLLMENT OF TRANSFERS AND INELIGIBLE UNDER PROPOSED REGULATION

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE: | | | | | | | | | | |
| Transfer | 0 | 115,145 | 112,088 | 97,411 | 88,455 | 83,331 | 80,240 | 78,200 | 76,722 | 731,591 |
| Inelig | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GE: | | | | | | | | | | |
| Transfer | 0 | 212,919 | 191,246 | 129,756 | 94,840 | 77,576 | 69,140 | 64,862 | 62,537 | 902,876 |
| Inelig | 0 | 0 | 50,106 | 41,127 | 28,100 | 20,400 | 16,374 | 14,284 | 13,168 | 183,559 |
| Total: | | | | | | | | | | |
| Transfer | 0 | 328,064 | 303,334 | 227,167 | 183,296 | 160,906 | 149,380 | 143,062 | 139,259 | 1,634,467 |
| Inelig | 0 | 0 | 50,106 | 41,127 | 28,100 | 20,400 | 16,374 | 14,284 | 13,168 | 183,559 |

The resulting reductions in expenditures on title IV, HEA program funds from enrollment declines and continued enrollment at non-eligible institutions are classified as transfers from affected student loan borrowers and Pell grant recipients to the Federal Government. The combined reduction in title IV, HEA expenditures was presented in the Net Budget Impacts section above. Transfers also include title IV, HEA program funds that follow students as they shift from low-performing programs to higher-performing programs, which is presented in Table 7.4.

TABLE 7.4   ESTIMATED TITLE IV, HEA AID TRANSFERRED FROM FAILING TO PASSING PROGRAMS UNDER PROPOSED REGULATION
[$2019, millions]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE | 0 | 547 | 532 | 466 | 430 | 409 | 396 | 387 | 381 | 3,548 |
| GE | 0 | 1,163 | 1,039 | 700 | 512 | 417 | 370 | 347 | 333 | 4,882 |
| Total | 0 | 1,710 | 1,571 | 1,167 | 942 | 826 | 766 | 734 | 715 | 8,430 |

Transfers are neither costs nor benefits, but rather the reallocation of resources from one party to another. Table 7.5 provides our best estimate of the changes in annual monetized benefits, costs, and transfers as a result of these proposed regulations. Our baseline estimate with a discount rate of 3 percent is that the proposed regulation would generate $1.851 billion of annualized benefits against $371 million of annualized costs and $1.209 billion of transfers to the Federal government and $836 million transfers from failing programs to passing programs. A discount rate of 7 percent results in $1.734 billion of benefits against $361 million of annualized costs and $1.138 billion of transfers to the Federal government and $823 million transfers from failing programs to passing programs. Note that the accounting statement does not include benefits that are unquantified, such as benefits for students associated with lower default and better credit and benefits for institutions from improved information about their value.

TABLE 7.5   ACCOUNTING STATEMENT FOR PRIMARY SCENARIO

| | Annualized impact (millions, $2019) | |
|---|---|---|
| | Discount rate = 3% | Discount rate = 7% |
| **Benefits** | | |
| Earnings gain (net of taxes) for students | 1,507 | 1,411 |

TABLE 7.5   ACCOUNTING STATEMENT FOR PRIMARY SCENARIO   Continued

|  | Annualized impact (millions, $2019) | |
|---|---|---|
|  | Discount rate = 3% | Discount rate = 7% |
| Additional Federal and State tax revenue and reductions in transfer program expenditure (not included in budget impact) | 344 | 323 |
| For students, lower default, better credit leading to family and business formation, more retirement savings. For institutions, increased enrollment and revenue associated with new enrollments from improved information about value | Not quantified. | |
| **Costs** | | |
| Greater instructional spending | 258 | 245 |
| Additional reporting by institutions | 89.0 | 92.3 |
| Warning/acknowledgment by institutions and students | 20.1 | 20.1 |
| Implementation of reporting, website, acknowledgement by ED | 3.4 | 4.0 |
| Time/moving cost for transfers; Investments to improve program quality | Not quantified. | |
| **Transfers** | | |
| Transfer of Federal Pell dollars to Federal government from enrollment reduction | 821 | 773 |
| Transfer of Federal loan dollars to Federal government from reduced borrowing and greater repayment | 388 | 365 |
| Transfer of aid dollars from non-passing programs to passing programs | 836 | 823 |
| Transfer of State aid dollars from failing programs for dropouts | Not quantified. | |

## Sensitivity Analysis

We conducted the simulations of the rule while varying several key assumptions. Specifically, we provide estimates of the change in title IV, HEA volumes using varied assumptions about student transitions, student dropout, program performance, and the earnings gains associated with enrollment shifts. We believe these to be the main sources of uncertainty in our model.

### Varying Levels of Student Transition

Our primary analysis assumes rates of transfer and dropout for GE programs based on the research literature, but these quantities are uncertain. The alternative models adjust transfer and dropout rates for all transfer groups to the rates for high alternatives and few alternatives, respectively, as shown in Tables 5.5. As reported in Tables 7.6 and 7.7, we estimate that the regulations would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033, regardless of if all students have the highest or lowest amount of transfer alternatives.

TABLE 7.6   HIGH TRANSFER SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE
[Millions, $2019]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell | (81) | (160) | (225) | (170) | (165) | (169) | (219) | (233) | (245) | (1,667) |
| Subs | (46) | (54) | (53) | (50) | (55) | (57) | (53) | (55) | (53) | (477) |
| Unsub | (32) | (68) | (168) | (137) | (159) | (224) | (242) | (266) | (284) | (1,580) |
| Grad PLUS | 71 | (71) | (122) | (126) | (258) | (306) | (325) | (340) | (354) | (1,831) |
| Par. PLUS | 39 | 56 | 90 | 73 | 79 | 15 | 19 | 17 | 18 | 406 |
| GE Programs: | | | | | | | | | | |
| Pell | (100) | (338) | (607) | (778) | (841) | (886) | (954) | (1,035) | (1,129) | (6,668) |
| Subs | (131) | (313) | (356) | (348) | (350) | (363) | (382) | (404) | (431) | (3,079) |
| Unsub | (225) | (509) | (590) | (554) | (545) | (565) | (585) | (611) | (642) | (4,826) |
| Grad PLUS | (11) | (49) | (55) | (45) | (53) | (53) | (51) | (49) | (48) | (415) |
| Par. PLUS | (4) | (15) | (7) | 0 | 3 | (4) | (9) | (14) | (21) | (72) |
| Total: | | | | | | | | | | |
| Pell | (179) | (497) | (832) | (947) | (1,005) | (1,055) | (1,171) | (1,267) | (1,373) | (8,326) |
| Subs | (177) | (367) | (409) | (399) | (405) | (420) | (435) | (460) | (484) | (3,555) |
| Unsub | (257) | (577) | (759) | (691) | (704) | (788) | (826) | (876) | (926) | (6,406) |
| Grad PLUS | 59 | (120) | (178) | (172) | (311) | (360) | (376) | (389) | (401) | (2,247) |
| Par. PLUS | 35 | 41 | 83 | 73 | 82 | 11 | 10 | 3 | (3) | 334 |

TABLE 7.7   LOW TRANSFER SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE
[Millions, $2019]

|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell | (77) | (149) | (203) | (133) | (114) | (106) | (144) | (149) | (154) | (1,229) |

<span style="color:red">App.360</span>

TABLE 7.7   LOW TRANSFER SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE   Continued

[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Subs | (43) | (44) | (40) | (35) | (38) | (40) | (36) | (38) | (37) | (351) |
| Unsub | 13 | 50 | (6) | 50 | 43 | (11) | (23) | (41) | (55) | 18 |
| Grad PLUS | 121 | 64 | 64 | 92 | (19) | (58) | (71) | (81) | (91) | 21 |
| Par. PLUS | 37 | 53 | 88 | 73 | 79 | 15 | 17 | 14 | 14 | 391 |
| GE Programs: | | | | | | | | | | |
| Pell | (96) | (367) | (721) | (987) | (1,100) | (1,139) | (1,184) | (1,245) | (1,326) | (8,165) |
| Subs | (125) | (352) | (459) | (461) | (453) | (454) | (464) | (480) | (504) | (3,753) |
| Unsub | (216) | (572) | (758) | (740) | (716) | (716) | (722) | (739) | (766) | (5,946) |
| Grad PLUS | (10) | (55) | (73) | (66) | (73) | (71) | (68) | (65) | (64) | (546) |
| Par. PLUS | (10) | (39) | (46) | (40) | (33) | (37) | (38) | (41) | (47) | (331) |
| Total: | | | | | | | | | | |
| Pell | (173) | (516) | (924) | (1,119) | (1,214) | (1,245) | (1,328) | (1,393) | (1,480) | (9,392) |
| Subs | (168) | (396) | (499) | (497) | (492) | (494) | (500) | (519) | (540) | (4,104) |
| Unsub | (203) | (522) | (765) | (690) | (672) | (728) | (745) | (781) | (822) | (5,928) |
| Grad PLUS | 111 | 9 | (9) | 26 | (93) | (130) | (139) | (147) | (155) | (525) |
| Par. PLUS | 27 | 13 | 43 | 33 | 46 | (22) | (20) | (27) | (34) | 59 |

No Program Improvement

Our primary analysis assumes that both non-GE and GE programs improve performance after failing either the D/E or EP metric and that GE programs that pass both metrics still improve performance in response to the rule. We incorporate this by increasing the fail to pass program transition rate by 5 percentage points for each type of program failure after 2026 for GE and non-GE programs, by reducing the rate of repeated failure by 5 percentage points for GE and non-GE programs, and by increasing the rate of a repeated passing result by two and a half percentage points for GE programs. The alternative model will assume no program improvement in response to failing metrics.

As reported in Table 7.8, we estimate that the regulations would result in a reduction of title IV, HEA aid between fiscal years 2025 and 2033, regardless of if programs show improvement.

TABLE 7.8   NO PROGRAM IMPROVEMENT SENSITIVITY ANALYSIS   ESTIMATED ANNUAL CHANGE IN TITLE IV, HEA AID VOLUME RELATIVE TO BASELINE

[Millions, $2019]

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-GE Programs: | | | | | | | | | | |
| Pell | (80) | (157) | (214) | (147) | (124) | (110) | (139) | (135) | (131) | (1,237) |
| Subs | (46) | (54) | (49) | (41) | (40) | (38) | (31) | (29) | (24) | (353) |
| Unsub | (18) | (34) | (110) | (51) | (54) | (105) | (111) | (124) | (132) | (739) |
| Grad PLUS | 87 | (30) | (56) | (34) | (150) | (191) | (204) | (215) | (226) | (1,020) |
| Par. PLUS | 38 | 53 | 90 | 77 | 88 | 28 | 34 | 36 | 40 | 483 |
| GE Programs: | | | | | | | | | | |
| Pell | (102) | (354) | (650) | (854) | (948) | (1,015) | (1,104) | (1,204) | (1,321) | (7,552) |
| Subs | (133) | (327) | (388) | (393) | (404) | (426) | (453) | (484) | (520) | (3,529) |
| Unsub | (229) | (531) | (639) | (627) | (639) | (677) | (714) | (758) | (807) | (5,621) |
| Grad PLUS | (10) | (49) | (60) | (55) | (68) | (72) | (73) | (74) | (76) | (535) |
| Par. PLUS | (8) | (25) | (22) | (20) | (20) | (31) | (39) | (48) | (59) | (270) |
| Total: | | | | | | | | | | |
| Pell | (181) | (510) | (865) | (1,000) | (1,071) | (1,124) | (1,243) | (1,341) | (1,451) | (8,786) |
| Subs | (180) | (381) | (437) | (434) | (445) | (464) | (484) | (514) | (544) | (3,881) |
| Unsub | (247) | (564) | (749) | (678) | (694) | (782) | (825) | (881) | (939) | (6,360) |
| Grad PLUS | 76 | (78) | (116) | (89) | (218) | (263) | (277) | (290) | (301) | (1,555) |
| Par. PLUS | 30 | 29 | 68 | 58 | 67 | (4) | (4) | (12) | (19) | 213 |

Alternative Earnings Gain

Our primary analysis assumes that the earnings change associated with shifts in enrollment is equal to the difference in average earnings between groups defined by loan risk group, program performance category, and whether the program is a GE program or not, multiplied by an adjustment factor equal to 0.75. This adjustment factor was derived from a regression model where the earnings difference between passing and failing programs conditional on credential level was shown to decline by 25 percent when a rich set of student characteristics are controlled for. The estimated earnings gain associated with the rule scales directly with the value of this adjustment factor. A value of 1.0 (all of the difference in average earnings between groups would manifest as earnings gain) would increase the total annualized earnings gain for students from $1.412 billion up to $1.883 billion (3 percent discount rate).

A value of 0.40 reduces it to $0.754 billion; a value of 0.20 reduces it to $0.377 billion. The net fiscal externality increases or decreases proportionally.

Each of these two scenarios would involve more of the raw earnings difference between passing and failing programs of the same credential level being explained by factors we are not able to measure (such as student academic preparation) than those that we are able to measure (such as race, sex, parent education, family income, and Pell receipt).[285] Even at these low

[285] In unpublished analysis of approximately 600 programs (defined by 2-digit CIP by institution) at four-year public colleges in Texas as part of their published work, Andrews & Stange (2019) find that a 1 percent increase in log program earnings (unadjusted) is associated with a .72 percent

values for the adjustment factor, the estimated earnings benefits of the rule by themselves outweigh the estimated costs.

Additional Sensitivity Analysis

The Department is currently examining the sensitivity to changes in the following assumptions.

• Constant aid amounts for students that transfer. Our primary analysis assumes that students' aid volume (Pell and loans) would change as they shift enrollment between types of programs. This assumption captures the fact that students moving to less expensive programs would likely require less financial aid. The alternative model will assume that students' aid packages are unchanged when they transfer between institutions.

• Alternative enrollment growth rates. Our primary analysis projects program-level enrollment based on annual growth rates for each credential level and control from 2016 to 2022. It is possible that these recent growth patterns will not continue for the next decade. The alternative model will project baseline enrollment growth using assumed higher and lower growth rates for the sectors that have the highest failure rates of the performance metrics.

We seek public comment as to how best to craft any further assumptions of the possible budgetary effect of the Financial Value Transparency and Gainful Employment components of the proposed rule.

Financial Responsibility Triggers

We also conducted several sensitivity analyses to provide some indication of the potential effects of the Financial Responsibility triggers if they did result in meaningful increases in financial protection obtained that can offset either closed school or borrower defense discharges. We modeled these as reductions in the amount of projected discharges in these categories. This would not represent a reduction in benefits given to students, but a way of considering what the cost would be if the Department was reimbursed for a portion of the discharges. These are described above in Net Budget Impacts. We seek public comment as to how best to craft any further assumptions of the possible budgetary effect of these triggers.

### 8. Distributional Consequences

The proposed regulation would advance distributional equity aims because the benefits of the proposed regulation—better information, increased earnings, and more manageable debt repayment—would disproportionately be realized by students who otherwise would have low earnings. Students without access to good information about program performance tend to be more disadvantaged; improved transparency about program performance would be particularly valuable to these students. The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately

enrolls low-income students. Students already attending high-quality colleges, who tend to be more advantaged, would be relatively unaffected by the regulation. The major costs of the program involve additional paperwork and instructional spending, which are not incurred by students directly.

### 9. Alternatives Considered

As part of the development of these proposed regulations, the Department engaged in a negotiated rulemaking process in which we received comments and proposals from non-Federal negotiators representing numerous impacted constituencies. These included higher education institutions, consumer advocates, students, financial aid administrators, accrediting agencies, and State attorneys general. Non-Federal negotiators submitted a variety of proposals relating to the issues under discussion. Information about these proposals is available on our negotiated rulemaking website at *www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html*.

Financial Value Transparency and Gainful Employment

D/E Rate Only

The Department considered using only the D/E rates metric, consistent with the 2014 Prior Rule. Tables 9.1 and 9.2 show the share of GE and non-GE programs and enrollment that would fail under only the D/E metric compared to our preferred rule that considers both D/E and EP metrics.

TABLE 9.1  PERCENT OF GE STUDENTS AND PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E + EP

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E + EP | Fail D/E only | Fail D/E + EP |
| Public: |  |  |  |  |
| UG Certificates | 0.0 | 1.0 | 0.4 | 4.4 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 0.1 | 0.1 | 0.4 | 0.4 |
| Total | 0.0 | 0.9 | 0.4 | 4.1 |
| Private, Nonprofit: |  |  |  |  |
| UG Certificates | 0.6 | 5.8 | 4.9 | 43.5 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 0.7 | 0.7 | 3.5 | 3.5 |
| Total | 0.5 | 2.6 | 4.2 | 28.9 |
| Proprietary: |  |  |  |  |
| UG Certificates | 5.0 | 34.0 | 8.7 | 50.0 |
| Associate s | 10.8 | 14.8 | 33.8 | 38.3 |
| Bachelor s | 10.7 | 10.8 | 24.3 | 24.4 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Master s | 10.1 | 10.1 | 17.9 | 17.9 |
| Doctoral | 10.0 | 10.0 | 15.1 | 15.1 |

increase in log program earnings after controlling for student race/ethnicity, limited English proficiency, economic disadvantage, and achievement test scores. Additionally controlling for students' college application and admissions behavior reduces this to 0.62. Using the correlation

of institution-level average earnings and value-added in Figure 2.1 of Hoxby (2018) we estimate that an earnings gain of $10,000 is associated with a value added gain of roughly $6,000 over the entire sample, of roughly $4,000 for scores below 1200, and of roughly $2,000 for scores below 1000. These

relationships imply parameter values of 0.72, 0.62, 0.60, 0.40, and 0.20, respectively. Again, institution-level correlations may not be directly comparable to program-level data.

TABLE 9.1    PERCENT OF GE STUDENTS AND PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E + EP    Continued

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E + EP | Fail D/E only | Fail D/E + EP |
| Professional | 13.8 | 13.8 | 50.7 | 50.7 |
| Grad Certs | 4.8 | 7.3 | 37.9 | 38.6 |
| Total | 7.8 | 22.8 | 20.5 | 33.5 |
| Foreign Private: |  |  |  |  |
| UG Certificates | 0.0 | 0.0 | 0.0 | 0.0 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 0.0 |
| Grad Certs | 1.5 | 1.5 | 84.2 | 84.2 |
| Total | 0.9 | 0.9 | 79.6 | 79.6 |
| Foreign For-Profit: |  |  |  |  |
| Master s | 0.0 | 0.0 | 0.0 | 0.0 |
| Doctoral | 0.0 | 0.0 | 0.0 | 0.0 |
| Professional | 28.6 | 28.6 | 20.3 | 20.3 |
| Total | 11.8 | 11.8 | 17.2 | 17.2 |

TABLE 9.2    PERCENT OF NON-GE PROGRAMS AND ENROLLMENT AT GE PROGRAMS THAT FAIL UNDER D/E ONLY VS. D/E + EP

|  | Programs | | Students | |
|---|---|---|---|---|
|  | Fail D/E only | Fail D/E + EP | Fail D/E only | Fail D/E + EP |
| Public: |  |  |  |  |
| Associate s | 0.2 | 1.7 | 0.5 | 7.8 |
| Bachelor s | 0.9 | 1.4 | 1.3 | 1.8 |
| Master s | 0.4 | 0.4 | 1.5 | 1.5 |
| Doctoral | 0.2 | 0.2 | 2.6 | 2.6 |
| Professional | 3.3 | 3.3 | 7.5 | 7.5 |
| Total | 0.5 | 1.2 | 1.0 | 4.6 |
| Private, Nonprofit: |  |  |  |  |
| Associate s | 2.7 | 3.2 | 23.0 | 24.7 |
| Bachelor s | 0.7 | 0.9 | 2.9 | 4.3 |
| Master s | 2.4 | 2.4 | 7.7 | 7.8 |
| Doctoral | 2.3 | 2.3 | 19.7 | 19.7 |
| Professional | 17.1 | 17.7 | 34.6 | 34.7 |
| Total | 1.4 | 1.7 | 6.9 | 7.9 |
| Foreign Private: |  |  |  |  |
| Associate s | 0.0 | 0.0 | 0.0 | 0.0 |
| Bachelor s | 0.1 | 0.1 | 1.2 | 1.2 |
| Master s | 0.1 | 0.1 | 1.8 | 1.9 |
| Doctoral | 0.0 | 0.0 | 0.0 | 0.0 |
| Professional | 3.4 | 3.4 | 20.7 | 20.7 |
| Total | 0.2 | 0.2 | 2.9 | 2.9 |

Alternative Earnings Thresholds

The Department examined the consequences of two different ways of computing the earnings threshold. For the first, we computed the earnings threshold as the annual earnings among all respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education. The second is the median annual earnings among respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education, and who worked a full year prior to being surveyed. These measures, which are included in the 2022 PPD, straddle our preferred threshold, which includes all respondents in the labor force, but excludes those that are not in the labor force.

Tables 9.3 and 9.4 reports the share of programs and enrollment that would pass GE metrics under three different earnings threshold methods, with our proposed approach in the middle column. The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from 34 percent under the lowest threshold up to 66 percent under the highest threshold. The failure rate for public undergraduate certificate programs is much lower than proprietary programs under all three scenarios, ranging from 2 percent for the lowest threshold to 9 percent under the highest. The earnings threshold chosen would have a much smaller impact on failure rates for degree programs, which range from 36 percent to 46 percent of enrollment for associate's programs and essentially no impact for Bachelor's degree or higher programs.

Federal Register / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules    32471

TABLE 9.3  SHARE OF ENROLLMENT IN GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

| | DTE + lower EP | % Failing DTE + medium EP | DTE + higher EP | Total number of enrollees |
|---|---|---|---|---|
| Public: | | | | |
| UG Certificates | 1.7 | 4.4 | 9.1 | 869,600 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 12,600 |
| Grad Certs | 0.4 | 0.4 | 0.4 | 41,900 |
| Private, Nonprofit: | | | | |
| UG Certificates | 27.9 | 43.5 | 46.1 | 77,900 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 7,900 |
| Grad Certs | 3.5 | 3.5 | 5.5 | 35,700 |
| Proprietary: | | | | |
| UG Certificates | 31.4 | 50.0 | 64.1 | 549,900 |
| Associate s | 34.5 | 38.3 | 44.7 | 326,800 |
| Bachelor s | 24.3 | 24.4 | 24.9 | 675,800 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 800 |
| Master s | 17.9 | 17.9 | 17.9 | 240,000 |
| Doctoral | 15.1 | 15.1 | 15.1 | 54,000 |
| Professional | 50.7 | 50.7 | 50.7 | 12,100 |
| Grad Certs | 38.3 | 38.6 | 38.6 | 10,800 |

**Note:** Enrollment counts rounded to the nearest hundred.

TABLE 9.4  SHARE OF GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

| | DTE + lower EP | % Failing DTE + medium EP | DTE + higher EP | Total number of programs |
|---|---|---|---|---|
| Public: | | | | |
| UG Certificates | 0.6 | 1.0 | 1.6 | 19,00 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 900 |
| Grad Certs | 0.1 | 0.1 | 0.1 | 1,900 |
| Private, Nonprofit: | | | | |
| UG Certificates | 3.3 | 5.6 | 6.3 | 1,400 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 600 |
| Grad Certs | 0.6 | 0.6 | 0.7 | 1,400 |
| Proprietary: | | | | |
| UG Certificates | 21.7 | 33.2 | 39.8 | 3,200 |
| Associate s | 11.1 | 14.1 | 18.1 | 1,700 |
| Bachelor s | 10.5 | 10.6 | 11.4 | 1,000 |
| Post-BA Certs | 0.0 | 0.0 | 0.0 | 50 |
| Master s | 10.0 | 10.0 | 10.0 | 500 |
| Doctoral | 9.8 | 9.8 | 9.8 | 100 |
| Professional | 12.5 | 12.5 | 12.5 | 30 |
| Grad Certs | 5.5 | 7.0 | 7.0 | 100 |

**Note:** Program counts rounded to the nearest 100, except where 50 or fewer.

Tables 9.5 and 9.6 illustrate this for non-GE programs. As with GE programs, the earnings threshold chosen would have almost no impact on the share of Bachelors' or higher programs that fail but would impact failure rates for associate degree programs at public institutions, where the share of enrollment in failing programs ranges from 2 percent at the lowest threshold to 23 percent at the highest. Our proposed measure would result in 8 percent of enrollment failing.

TABLE 9.5  SHARE OF ENROLLMENT IN NON-GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

| | DTE + lower EP | % Failing DTE + medium EP | DTE + higher EP | Total number of enrollees |
|---|---|---|---|---|
| Public: | | | | |
| Associate s | 1.6 | 7.8 | 23.2 | 5,496,800 |
| Bachelor s | 1.4 | 1.8 | 4.3 | 5,800,700 |
| Master s | 1.5 | 1.5 | 1.6 | 760,500 |
| Doctoral | 2.6 | 2.6 | 2.6 | 145,200 |
| Professional | 7.5 | 7.5 | 7.5 | 127,500 |
| Private, Nonprofit: | | | | |
| Associate s | 23.3 | 24.7 | 27.0 | 266,900 |
| Bachelor s | 3.7 | 4.3 | 6.0 | 2,651,300 |
| Master s | 7.7 | 7.8 | 7.9 | 796,100 |
| Doctoral | 19.7 | 19.7 | 19.7 | 142,900 |

<span style="color:red">App.364</span>

TABLE 9.5   SHARE OF ENROLLMENT IN NON-GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET—Continued

|  | DTE + lower EP | % Failing DTE + medium EP | DTE + higher EP | Total number of enrollees |
|---|---|---|---|---|
| Professional ................................................................................. | 34.7 | 34.7 | 34.7 | 130,400 |

**Note:** Enrollment counts rounded to the nearest hundred.

TABLE 9.6   SHARE OF NON-GE PROGRAMS THAT FAIL, BY WHERE EARNINGS THRESHOLD IS SET

|  | DTE + lower EP | % Failing DTE + medium EP | DTE + higher EP | Total number of programs |
|---|---|---|---|---|
| Public: | | | | |
| Associate s ................................................................................. | 0.4 | 1.7 | 3.6 | 27,300 |
| Bachelor s ................................................................................. | 1.0 | 1.4 | 3.0 | 24,300 |
| Master s ................................................................................. | 0.4 | 0.4 | 0.4 | 14,600 |
| Doctoral ................................................................................. | 0.2 | 0.2 | 0.2 | 5,700 |
| Professional ................................................................................. | 3.2 | 3.2 | 3.2 | 600 |
| Private, Nonprofit: | | | | |
| Associate s ................................................................................. | 2.8 | 3.1 | 4.0 | 2,300 |
| Bachelor s ................................................................................. | 0.8 | 0.9 | 1.4 | 29,800 |
| Master s ................................................................................. | 2.4 | 2.4 | 2.4 | 10,400 |
| Doctoral ................................................................................. | 2.3 | 2.3 | 2.3 | 2,900 |
| Professional ................................................................................. | 17.2 | 17.2 | 17.2 | 500 |

**Note:** Program counts rounded to the nearest 100.

No Reporting, Disclosure, and Acknowledgment for Non-GE Programs

The Department considered proposing to apply the reporting, disclosure, and acknowledgment requirements only to GE programs, and calculating D/E rates and the earnings premium measure only for these programs, similar to the 2014 Prior Rule. This approach, however, would fail to protect students, families, and taxpayers from investing in non-GE programs that deliver low value and poor debt and earnings outcomes. As higher education costs and student debt levels increase, students, families, institutions, and the public have a commensurately growing interest in ensuring their higher education investments are justified through positive career, debt, and earnings outcomes for graduates, regardless of the sector in which the institution operates or the credential level of the program. Furthermore, comprehensive performance information about all programs is necessary to guide students that would otherwise choose failing GE programs to better options.

Small Program Rates

While we believe the D/E rates and earnings premium measure are reasonable and useful metrics for assessing debt and earnings outcomes, we acknowledge that the minimum n-size of 30 completers would exempt small programs from these Financial Value Transparency measures. In our initial proposals during negotiated

rulemaking, the Department considered calculating small program rates in such instances. These small program rates would have been calculated by combining all of an institution's small programs to produce the institution's small program D/E rates and earnings premium measure, which would be used for informational purposes only. In the case of GE programs, these small program rates would not have resulted in program eligibility consequences. Several negotiators questioned the usefulness of the small program rates because they would not provide information specific to any particular program, and because an institution's different small programs in various disciplines could lead to vastly different debt and earnings outcomes. In addition, several negotiators expressed concerns about the use of small program rates as a supplementary performance measure under proposed § 668.13(e). Upon consideration of these points, and in the interest of simplifying the proposed rule, the Department has opted to omit the small program rates.

Alternative Components of the D/E Rates Measure

The Department considered alternative ways of computing the D/E rates measure, including:

• Lower completer thresholds n-size
• Different ways of computing interest rates
• Different amortization periods

We concluded that the proposed parameters used in the D/E rates and earnings premium calculations were most consistent with best practices identified in prior analysis and research.

Discretionary Earnings Rate

The Department considered simplifying the D/E rates metric by only including a discretionary earnings rate. We believe that using only the discretionary earnings rate would be insufficient because there may be some instances in which a borrower's annual earnings would be sufficient to pass an 8 percent annual debt-to-earnings threshold, even if that borrower's discretionary earnings are insufficient to pass a 20 percent discretionary debt-to-earnings threshold. Utilizing both annual and discretionary D/E rates would provide a more complete picture of a program's true debt and earnings outcomes and would be more generous to institutions because a program that passes either the annual earnings rate or the discretionary earnings rate would pass the D/E rates metric.

Pre- and Post-Earnings Comparison

A standard practice for evaluating the effectiveness of postsecondary programs is to compare the earnings of students after program completion to earnings before program enrollment, to control for any student-specific factors that determine labor market success that should not be attributed to program performance. While the Department

introduced limited analysis of pre-program earnings from students' FAFSA data into the evidence above, it is not feasible to perform such comparisons on a wide and ongoing scale in the proposed regulation. Pre-program earnings data is only available for students who have labor market experience prior to postsecondary enrollment, which excludes many students who proceed directly to postsecondary education from high school. Furthermore, earnings data from part-time work during high school is mostly uninformative for earnings potential after postsecondary education. Although some postsecondary programs enroll many students with informative pre-program earnings, many postsecondary programs would lack sufficient numbers of such students to reliably incorporate pre-program earnings from the FAFSA into the proposed regulation.

Financial Responsibility

We considered keeping the existing set of financial responsibility triggers, but ultimately decided it was important to propose to expand the options. The Department is concerned that the existing set of triggers do not properly account for all the scenarios in which there is significant financial risk at an institution. We also believe these additional triggers are necessary due to concerns about the frequency with which institutions close or can face liabilities without sufficient financial protection in place.

The Department considered proposing a mandatory trigger for borrower defense based solely upon the approval of claims. However, we decided not to propose that given that there may be circumstances in which we did not decide to seek to recoup the cost of approved claims or would not be able to do so under the relevant regulations, and in these circumstances it is not necessary to retain financial protection to ensure the institution is able to cover the cost of approved borrower defense claims.

We also considered constructing the proposed trigger related to closing a location or a program solely in terms of the share of locations or programs at an institution. However, we decided that a component that reflects student enrollment is important because if an institution only has two locations but enrolls 95 percent of its students at one of them, then closing the smaller location should not be as much of a concern.

We also considered constructing more of the proposed triggers as requiring a recalculation of the composite score as

was done in the 2016 regulations. However, we are concerned that determining how to recalculate the composite score in many circumstances would be challenging and could create additional burden internally and externally to properly assess the financial situation. Moreover, composite scores by their very nature always have a built-in lag since an institution must wait for its fiscal year to end and then conduct a financial audit. The result is that recalculating composite scores that may reflect a quite old financial situation for an institution would not help further the goal of better protecting against unreimbursed discharges or unpaid liabilities. Instead, dividing triggers into situations that would automatically require financial protection versus those where the Department has discretion ensures that the Department can obtain protection more readily when severe situations necessitate it.

Administrative Capability

The Department considered additional guidance regarding the validity of a high school diploma. We are proposing that a high school diploma should not be valid if (1) it does not meet the requirements set by the State agency where the high school is located, (2) it has been deemed invalid by the Department, State agency where the high school is located, or through a court proceeding, (3) was obtained from an entity that requires little or no secondary instruction, or (4) was obtained from an entity that maintains a business relationship with the eligible institution or is not accredited. We considered providing greater discretion to the institution around how it would determine that a high school diploma is valid. However, we are concerned that the current situation, which already incorporates extensive deference, has led to the too many instances of insufficient verification of high school diplomas.

Certification Procedures

For circumstances that may lead to provisional certification, the Department initially considered proposing to make an institution provisionally certified when an institution received the same finding of noncompliance in more than one program review or audit. However, after hearing negotiators' concerns on how and when this provision would be used, we abandoned this proposed specification. We agreed with negotiators who noted that we already have the authority to place an

institution on provisional status for repeat findings of noncompliance.

In addition, to address excessive program hours in GE programs, the Department considered proposing to limit title IV, HEA eligibility for GE programs to no longer than the national median of hours required for the occupation in all States that license the occupation (if at least half of States license the occupation). However, negotiators were concerned with funding being cut off before students finished their programs, and many negotiators also pointed out how harmful it would be for students to begin programs with title IV, HEA funds but not be able to finish with them. During negotiations there was also support for the Department to revert to using the ''greater'' language instead of ''lesser''. Ultimately, we are proposing the ''greater'' language, and we also dropped the proposal of establishing a limitation on the amount of title IV, HEA aid that can be provided to a GE program that is subject to State licensure requirements. We did not propose this out of concern about its complexity and the confusing situation that would arise where a borrower would potentially only receive funding for a portion of their program.

Moreover, to address transcript withholding we initially considered language for institutions at risk of closure to release holds on student transcripts over a de minimis amount of unpaid balances, and to release all holds on student transcripts in the event of a closure. However, negotiators felt that this approach was too narrow and did not go far enough to help students. Several negotiators stated that students of color are disproportionately unable to access their transcripts due to transcript withholding. In addition, one negotiator argued that if an institution was being considered at risk for closure, most students would want to transfer institutions, but unfortunately transcript holds for certain amounts would negatively impact a student's ability to transfer to another institution. As mentioned during negotiations, the Department's authority to prohibit institutions from withholding transcripts is limited to instances where the institution's reason for withholding the transcript involves the title IV, HEA functions. However, if an institution is provisionally certified, we may apply other conditions that are necessary or appropriate to the institution, including, but not limited to releasing holds on student transcripts. Accordingly, we are proposing to expand the provisional conditions related to transcript withholding to increase students' access

to their educational records at institutions with risk of closure or institutions that are not financially responsible or administratively capable.

Ability To Benefit

The Department considered not regulating in this area. We were concerned, however, that the lack of an update to ATB regulations since the mid-1990s could create confusion. Moreover, the Department had stated in DCL GEN 16–09 that we would not develop a career pathway program approval process but would instead review the eligibility of these programs through program reviews and audits. This statement in effect allowed institutions to use their best-faith determinations to initiate eligible career pathway programs but provided no framework for how the Department would evaluate these programs from through a program review. This led to a vacuum in guidance for institutions and authority to intervene for the Department. We also think this ultimately chilled the usage of a State process, the first application we received was in 2019 and as of February 2023 only six States have applied for approval. The Department also noted that there were technical updates to the regulations necessary to codify the changes to student eligibility made by Public Law 113–235 in 2014. Therefore, we decided the added clarity from these proposed regulations would result in greater usage of the State process for ATB, while still preserving protections for students and taxpayers.

The Department also considered using completion rates as an outcome metric in our approval of a State process, as opposed to the success rate calculation that is required under the current regulation and amended in this proposed regulation. We were concerned with the complexity of developing a framework for a completion rate in regulation for eligible career pathway programs. These programs can be less than two-years, two-years, or four-years long. We did not want to create a framework in regulation that did not account for the nuances between programs. We believe we have clarified the calculation with the proposed amendments to the success rate calculation. We also propose to lower the success rate threshold from 95 percent to 85 percent and to give the Secretary the ability to lower it to 75 percent for up to two years if more than 50 percent of the participating institutions in the State cannot achieve the 85 percent success rate. This would provide participating institutions and the Department

reasonable accommodations for unintended or unforeseen circumstances that may arise.

In drafting proposed § 668.157, we initially did not require postsecondary institutions to document that students would receive adult education and literacy activities as described in 34 CFR 463.30 and workforce preparation activities as described in 34 CFR 463.34, simultaneously. A negotiator recommended that the Department utilize existing definitions in the Code of Federal regulations for concepts like adult education and literacy services and workforce preparation activities, and the Department agreed to propose to cross reference them instead of creating different standards in 34 CFR 668.157. We also did not initially consider proposing to require that, in order to demonstrate that the program aligns with the skill needs of industries in the State or regional labor market, the institution would have to submit (1) Government reports (2) Surveys, interviews, meetings, or other information, and (3) Documentation that demonstrates direct engagement with industry. We were persuaded by a committee member that the documentation the Department initially considered proposing was lacking and could allow programs that did not comply with the definition of an eligible career pathway program to be approved. Our goal is to ensure students have ability to benefit and we believe these proposed reasonable documentation standards would achieve that.

Clarity of the Regulations

Executive Order 12866 and the Presidential memorandum ''Plain Language in Government Writing'' require each agency to write regulations that are easy to understand. The Secretary invites comments on how to make these proposed regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the proposed regulations clearly stated?

• Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the proposed regulations (grouping and order of sections, use of headings, paragraphing, etc.) aid or reduce their clarity?

• Would the proposed regulations be easier to understand if we divided them into more (but shorter) sections? (A ''section'' is preceded by the symbol ''§'' and a numbered heading; for example, § 668.2.)

• Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of

this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

• What else could we do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, see the instructions in the **ADDRESSES** section.

*10. Regulatory Flexibility Act Analysis*

This section considers the effects that the proposed regulations may have on small entities in the Educational Sector as required by the Regulatory Flexibility Act (RFA, 5 U.S.C. *et seq.,* Pub. L. 96– 354) as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The purpose of the RFA is to establish as a principle of regulation that agencies should tailor regulatory and informational requirements to the size of entities, consistent with the objectives of a particular regulation and applicable statutes. The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a ''significant impact on a substantial number of small entities.'' As we describe below, the Department anticipates that the proposed regulatory action would have a significant economic impact on a substantial number of small entities. We therefore present this Initial Regulatory Flexibility Analysis. Our analysis focuses on the financial value transparency and gainful employment (GE) components of the proposed regulation, as those would have the most economically significant implications for small entities.

Description of the Reasons That Action by the Agency Is Being Considered

The Secretary is proposing new regulations to address concerns about the rising cost of postsecondary education and training and increased student borrowing by establishing an accountability and transparency framework to encourage eligible postsecondary programs to produce acceptable debt and earnings outcomes, apprise current and prospective students of those outcomes, and provide better information about program price. Proposed regulations for gainful employment would establish eligibility and certification requirements tied to the debt-to-earnings and median earnings (relative to high school

App.367

graduates) of program graduates. These regulations address ongoing concerns about educational programs that are required by statute to provide training that prepares students for gainful employment in a recognized occupation, but instead are leaving students with unaffordable levels of loan debt in relation to their earnings or earnings lower than that of a typical high school graduate. These programs often lead to default or provide no earnings benefit beyond that provided by a high school education, thus failing to fulfill their intended goal of preparing students for gainful employment.

Succinct Statement of the Objectives of, and Legal Basis for, the Regulations

Through the proposed financial value transparency regulations, the Department aims to ensure that prospective students, families, and taxpayers can receive accurate information about program costs, typical borrowing, available financial aid, and realistic earnings potential to evaluate a program and compare it to similar programs offered at other institutions before investing time and resources in a postsecondary program. The GE regulations further aim to ensure that students receiving title IV, HEA aid only enroll in GE programs if such programs prepare students for gainful employment.

The Department's authority to pursue financial value transparency in GE programs and eligible non-GE programs and accountability in GE programs is derived primarily from three categories of statutory enactments: first, the Secretary's generally applicable rulemaking authority in 20 U.S.C. 1221e–3 (section 410 of the General Education Provisions Act) and 20 U.S.C. 3474 (section 414 of the Department of Education Organization Act), along with 20 U.S.C. 1231a, which applies in part to title IV, HEA; second, authorizations and directives within sections 131 and 132 of title IV of the HEA, regarding the collection and dissemination of potentially useful information about higher education programs, as well as section 498 of the HEA, regarding eligibility and certification standards for institutions that participate in title IV; and third, the further provisions within title IV of the HEA, such as sections 101 and 481, which address the limits and responsibilities of gainful employment programs. The specific statutory sources of this authority are detailed in the Authority for This Regulatory Action section of the Preamble above.

Description of and, Where Feasible, an Estimate of the Number of Small Entities To Which the Proposed Regulations Would Apply

The Small Business Administration (SBA) defines ''small institution'' using data on revenue, market dominance, tax filing status, governing body, and population. The majority of entities to which the Office of Postsecondary Education's (OPE) regulations apply are postsecondary institutions, however, which do not report data on revenue that is directly comparable across institutions. As a result, for purposes of this NPRM, the Department proposes to continue defining ''small entities'' by reference to enrollment, to allow meaningful comparison of regulatory impact across all types of higher education institutions. The enrollment standard for a small two-year institution is less than 500 full-time-equivalent (FTE) students and for a small four-year institution, less than 1,000 FTE students.[286] We invite public comment on whether our Regulatory Flexibility Analysis would more accurately reflect the burden on small entities if we instead used the revenue standards set out in 13 CFR part 121, sector 61— Educational Services.

TABLE 10.1  SMALL INSTITUTIONS UNDER ENROLLMENT-BASED DEFINITION

| | Small | Total | Percent |
|---|---|---|---|
| Proprietary | 1,973 | 2,331 | 85 |
| 2-year | 1,734 | 1,990 | 87 |
| 4-year | 239 | 341 | 70 |
| Private not-for-profit | 983 | 1,831 | 54 |
| 2-year | 185 | 203 | 91 |
| 4-year | 798 | 1,628 | 49 |
| Public | 380 | 1,924 | 20 |
| 2-year | 317 | 1,145 | 28 |
| 4-year | 63 | 779 | 8 |
| Total | 3,336 | 6,086 | 55 |

Table 10.1 summarizes the number of institutions affected by these proposed regulations. As seen in Table 10.2, the average total revenue at small institutions ranges from $2.6 million for proprietary institutions to $16.6 million at private institutions.

TABLE 10.2  AVERAGE AND TOTAL REVENUES AT SMALL INSTITUTIONS

| | Average | Total |
|---|---|---|
| Proprietary | 2,593,382 | 5,116,742,179 |
| 2-year | 1,782,969 | 3,091,667,694 |
| 4-year | 8,473,115 | 2,025,074,485 |
| Private not-for-profit | 16,608,849 | 16,326,498,534 |
| 2-year | 3,101,962 | 573,862,938 |
| 4-year | 19,740,145 | 15,752,635,596 |
| Public | 8,644,387 | 3,284,866,903 |

[286] The Department uses an enrollment-based definition since this applies the same metric to all types of institutions, allowing consistent comparison across all types. For a further explanation of why the Department proposes this alternative size standard, please see Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program (Borrower Defense) proposed rule published July 31, 2018 (83 FR 37242).

TABLE 10.2    AVERAGE AND TOTAL REVENUES AT SMALL INSTITUTIONS    Continued

|  | Average | Total |
|---|---|---|
| 2-year ....................................................... | 4,153,842 | 1,316,767,990 |
| 4-year ....................................................... | 31,239,665 | 1,968,098,913 |
| Total ....................................................... | 7,412,502 | 24,728,107,616 |

These proposed regulations require additional reporting and compliance by all title IV postsecondary institutions, including all small entities, and thus would have a significant impact on a substantial number of small entities. Furthermore, GE programs at small institutions could be at risk of losing the ability to distribute title IV, HEA funds under the proposed regulations if they fail either the debt-to-earnings (D/E) or Earnings Premium (EP) metrics, as described in the Financial Value and Transparency and GE sections of the proposed regulation. Non-GE programs at small institutions that fail the D/E metric would be required to have students acknowledge having seen this information prior to aid disbursement.

Thus, all (100 percent) of small entities will be impacted by the reporting and compliance aspects of the rule, which we quantify below. As we describe in more detail below, the Department estimates that 1.2 percent of non-GE programs at small institutions would fail the D/E metric, thus triggering the acknowledgement requirement. The Department also

estimates that 15.9 percent of GE programs at small institutions would fail either the D/E or EP metric, thus being at risk of losing title IV, HEA eligibility. GE programs represent 45 percent of enrollment at small institutions.

The Department's analysis shows programs at small institutions are much more likely to have insufficient sample size to compute and report D/E and EP metrics, though the rate of failing to pass both metrics is higher for programs at such institutions.[287]

As noted in the net budget estimate section, we do not anticipate that the proposed Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit components of the regulation would have any significant budgetary impact, this includes on a substantial number of small entities. We have, however, run a sensitivity analysis of what an effect of the Financial Responsibility provisions could be on offsetting the transfers of certain loan discharges from the Department to borrowers by obtaining additional funds from institutions. We

conclude that these provisions could increase recoveries via closed school discharges or borrower defense of $4 to $5 million from all types of institutions, not just small institutions. Since these amounts scale with the number of students, we anticipate the impact to be much smaller at small entities.

Table 10.3 and 10.4 show the number and percentage of non-GE enrollees and non-GE programs at small institutions in each status relative to the performance standard. The share of non-GE programs that have sufficient data and fail the D/E metric is higher for programs at small institutions (1.6 percent) than it is for all institutions (0.6 percent, Table 3.5). Failing the D/E metric for non-GE programs initiates a requirement that the institution must have title IV, HEA students acknowledge having seen the informational disclosures before Federal student aid is disbursed. The share of title IV, HEA enrollment in such programs is also higher at small institutions (9.3 percent for small institutions vs. 1.9 percent for all institutions, Table 3.5).

TABLE 10.3    NUMBER OF ENROLLEES IN NON-GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL

|  | Result in 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
|  | N | % | N | % | N | % | N | % | N | % |
| **Public:** | | | | | | | | | | |
| Associate s ....................................... | 23,000 | 85.0 | 3,500 | 13.0 | 0 | 0.0 | 0 | 0.0 | 500 | 2.0 |
| Bachelor s ....................................... | 8,900 | 75.1 | 3,000 | 24.9 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ....................................... | 500 | 32.2 | 1,100 | 67.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Doctoral ....................................... | 300 | 36.3 | 600 | 63.7 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Professional ....................................... | 2,100 | 45.3 | 1,400 | 29.8 | 1,200 | 24.9 | 0 | 0.0 | 0 | 0.0 |
| Total ....................................... | 35,000 | 75.6 | 9,500 | 20.7 | 1,200 | 2.5 | 0 | 0.0 | 500 | 1.2 |
| **Private, Nonprofit:** | | | | | | | | | | |
| Associate s ....................................... | 27,000 | 58.6 | 13,500 | 29.3 | 2,500 | 5.5 | 1,400 | 3.1 | 1,600 | 3.4 |
| Bachelor s ....................................... | 160,200 | 73.9 | 43,300 | 19.9 | 4,600 | 2.1 | 5,100 | 2.4 | 3,700 | 1.7 |
| Master s ....................................... | 28,100 | 58.1 | 15,400 | 31.9 | 3,700 | 7.6 | 1,100 | 2.3 | 50 | 0.1 |
| Doctoral ....................................... | 6,300 | 37.9 | 3,600 | 21.3 | 6,800 | 40.4 | 70 | 0.4 | 0 | 0.0 |
| Professional ....................................... | 8,000 | 22.4 | 8,300 | 23.1 | 19,400 | 53.8 | 0 | 0.0 | 200 | 0.7 |
| Total ....................................... | 229,800 | 63.1 | 84,100 | 23.1 | 37,000 | 10.2 | 7,700 | 2.1 | 5,600 | 1.5 |
| **Total:** | | | | | | | | | | |
| Associate s ....................................... | 50,000 | 68.4 | 17,000 | 23.3 | 2,500 | 3.4 | 1,400 | 2.0 | 2,100 | 2.9 |
| Bachelor s ....................................... | 169,100 | 73.9 | 46,200 | 20.2 | 4,600 | 2.0 | 5,100 | 2.2 | 3,700 | 1.6 |
| Master s ....................................... | 28,600 | 57.3 | 16,500 | 33.0 | 3,700 | 7.4 | 1,100 | 2.2 | 50 | 0.1 |
| Doctoral ....................................... | 6,700 | 37.8 | 4,200 | 23.5 | 6,800 | 38.3 | 70 | 0.4 | 0 | 0.0 |

[287] The minimum number of program completers in a two-year cohort that is required in order for the Department to compute the D/E and EP performance metrics is referred to as the "n-size." An n-size of 30 is used in the proposed rule; GE and non-GE programs with fewer than 30 completers across two years would not have performance metrics computed.

TABLE 10.3   NUMBER OF ENROLLEES IN NON-GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL   Continued

|  | Result in 2019 | | | | | | | | | |
|  | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
|  | N | % | N | % | N | % | N | % | N | % |
| Professional ........................................................ | 10,200 | 25.0 | 9,700 | 23.9 | 20,500 | 50.5 | 0 | 0.0 | 200 | 0.6 |
| Total ............................................................. | 264,600 | 64.5 | 93,600 | 22.8 | 38,100 | 9.3 | 7,700 | 1.9 | 6,100 | 1.5 |

**Note:** Enrollment counts rounded to the nearest 100.

TABLE 10.4   NUMBER OF NON-GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL

|  | Result in 2019 | | | | | | | | | |
|  | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
|  | N | % | N | % | N | % | N | % | N | % |
| Public: |  |  |  |  |  |  |  |  |  |  |
| Associate s ........................................................ | 700 | 97.3 | 20 | 2.3 | 0 | 0.0 | 0 | 0.0 | 3 | 0.4 |
| Bachelor s ........................................................ | 200 | 95.4 | 9 | 4.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s ........................................................ | 30 | 81.1 | 7 | 18.9 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Doctoral ........................................................ | 20 | 89.5 | 2 | 10.5 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Professional ........................................................ | 10 | 60.0 | 4 | 26.7 | 2 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Total ............................................................. | 100 | 95.6 | 40 | 3.9 | 2 | 0.2 | 0 | 0.0 | 3 | 0.3 |
| Private, Nonprofit: |  |  |  |  |  |  |  |  |  |  |
| Associate s ........................................................ | 700 | 91.6 | 50 | 6.7 | 3 | 0.4 | 5 | 0.6 | 6 | 0.7 |
| Bachelor s ........................................................ | 4,200 | 94.7 | 200 | 4.1 | 20 | 0.4 | 19 | 0.4 | 20 | 0.4 |
| Master s ........................................................ | 900 | 87.2 | 100 | 9.5 | 30 | 2.6 | 6 | 0.6 | 2 | 0.2 |
| Doctoral ........................................................ | 200 | 87.1 | 10 | 4.9 | 20 | 7.6 | 1 | 0.4 | 0 | 0.0 |
| Professional ........................................................ | 80 | 65.6 | 10 | 10.9 | 30 | 21.1 | 0 | 0.0 | 3 | 2.3 |
| Total ............................................................. | 6,100 | 92.3 | 400 | 5.4 | 90 | 1.4 | 31 | 0.5 | 30 | 0.4 |
| Total: |  |  |  |  |  |  |  |  |  |  |
| Associate s ........................................................ | 1,500 | 94.3 | 70 | 4.6 | 3 | 0.2 | 5 | 0.3 | 9 | 0.6 |
| Bachelor s ........................................................ | 4,400 | 94.7 | 200 | 4.1 | 20 | 0.4 | 19 | 0.4 | 20 | 0.3 |
| Master s ........................................................ | 1,000 | 86.9 | 100 | 9.8 | 30 | 2.5 | 6 | 0.6 | 2 | 0.2 |
| Doctoral ........................................................ | 200 | 87.2 | 10 | 5.3 | 20 | 7.0 | 1 | 0.4 | 0 | 0.0 |
| Professional ........................................................ | 100 | 65.0 | 20 | 12.6 | 30 | 20.3 | 0 | 0.0 | 3 | 2.1 |
| Total ............................................................. | 7,100 | 92.7 | 400 | 5.2 | 100 | 1.2 | 31 | 0.4 | 30 | 0.4 |

**Note:** Program counts rounded to nearest hundred when above hundred, nearest 10 when below 100, and unrounded when below 10.

Tables 10.5 and 10.6 report similar tabulations for GE programs at small institutions. GE programs include non-degree certificate programs at all institutions and all degree programs at proprietary institutions. GE programs at small institutions are more likely to have a failing D/E or EP metrics (15.9 percent of all GE programs at small institutions, compared to 5.5 percent for all institutions in Table 3.9) and have a greater share of enrollment in such programs (45.3 percent vs. 24.0 percent for all institutions in Table 3.8). GE programs that fail the same performance metric in two out of three consecutive years will become ineligible to administer Federal title IV, HEA student aid.

TABLE 10.5   NUMBER OF ENROLLEES IN GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL

|  | Result in 2019 | | | | | | | | | |
|  | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
|  | N | % | N | % | N | % | N | % | N | % |
| Public: |  |  |  |  |  |  |  |  |  |  |
| UG Cert ........................................................ | 26,000 | 71.8 | 9,300 | 25.7 | 0 | 0.0 | 0 | 0.0 | 900 | 2.6 |
| Post-BA Cert ........................................................ | <30 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Cert ........................................................ | 100 | 77.2 | 40 | 22.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Total ............................................................. | 26,100 | 71.8 | 9,300 | 25.6 | 0 | 0.0 | 0 | 0.0 | 900 | 2.6 |
| Private, Nonprofit: |  |  |  |  |  |  |  |  |  |  |
| UG Cert ........................................................ | 9,100 | 45.6 | 5,100 | 25.8 | 0 | 0.0 | 100 | 0.6 | 5,500 | 27.9 |
| Post-BA Cert. ........................................................ | 1,400 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Cert ........................................................ | 1,400 | 70.3 | 0 | 0.0 | 600 | 29.7 | 0 | 0.0 | 0 | 0.0 |
| Total ............................................................. | 11,900 | 51.0 | 5,100 | 22.0 | 600 | 2.6 | 100 | 0.5 | 5,500 | 23.8 |
| Proprietary: |  |  |  |  |  |  |  |  |  |  |

TABLE 10.5    NUMBER OF ENROLLEES IN GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL    Continued

| | Result in 2019 | | | | | | | | | |
| | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| UG Cert | 44,700 | 21.6 | 36,500 | 17.6 | 80 | 0.0 | 25,200 | 12.1 | 101,000 | 48.7 |
| Associate s | 18,800 | 40.9 | 12,600 | 27.4 | 7,100 | 15.5 | 5,200 | 11.3 | 2,300 | 5.0 |
| Bachelor s | 8,800 | 65.1 | 3,400 | 25.1 | 1,100 | 8.2 | 200 | 1.7 | 0 | 0.0 |
| Post-BA Cert | 50 | 55.8 | 40 | 44.2 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s | 2,900 | 74.2 | 200 | 3.9 | 300 | 8.2 | 600 | 13.6 | 0 | 0.0 |
| Doctoral | 1,700 | 75.4 | 300 | 11.3 | 300 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Professional | 1,000 | 37.7 | 100 | 3.7 | 1,600 | 58.6 | 0 | 0.0 | 0 | 0.0 |
| Grad Cert | 300 | 77.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 70 | 22.2 |
| Total | 78,200 | 28.3 | 53,000 | 19.2 | 10,500 | 3.8 | 31,100 | 11.3 | 103,400 | 37.4 |
| Total: | | | | | | | | | | |
| UG Cert | 79,800 | 30.3 | 50,900 | 19.3 | 80 | 0.0 | 25,300 | 9.6 | 107,500 | 40.8 |
| Associate s | 18,800 | 40.9 | 12,600 | 27.4 | 7,100 | 15.5 | 5,200 | 11.3 | 2,300 | 5.0 |
| Bachelor s | 8,800 | 65.1 | 3,400 | 25.1 | 1,100 | 8.2 | 200 | 1.7 | 0 | 0.0 |
| Post-BA Certs | 1,400 | 97.4 | 40 | 2.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s | 2,900 | 74.2 | 200 | 3.9 | 300 | 8.2 | 500 | 13.6 | 0 | 0.0 |
| Doctoral | 1,700 | 75.4 | 300 | 11.3 | 300 | 13.3 | 0 | 0.0 | 0 | 0.0 |
| Professional | 1,000 | 37.7 | 100 | 3.7 | 1,600 | 58.6 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs | 1,800 | 71.7 | 30 | 1.4 | 600 | 24.0 | 0 | 0.0 | 70 | 2.9 |
| Total | 116,300 | 34.6 | 67,400 | 20.1 | 11,100 | 3.3 | 31,300 | 9.3 | 109,800 | 32.7 |

**Note:** Enrollment counts rounded to the nearest 100, except where counts are less than 100, where they are rounded to nearest 10 (and suppressed when under 30).

TABLE 10.6    NUMBER OF GE PROGRAMS AT SMALL INSTITUTIONS BY RESULT, BY CONTROL AND CREDENTIAL LEVEL

| | Result in 2019 | | | | | | | | | |
| | No data | | Pass | | Fail D/E only | | Fail both D/E and EP | | Fail EP only | |
| | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Public UG:** | | | | | | | | | | |
| Certificates | 1,700 | 92.4 | 100 | 6.3 | 0 | 0.0 | 0 | 0.0 | 20 | 1.3 |
| Post-BA Certs | 10 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs | 10 | 91.7 | 1 | 8.3 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Total | 1,700 | 92.5 | 100 | 6.3 | 0 | 0.0 | 0 | 0.0 | 20 | 1.2 |
| **Private, Nonprofit UG:** | | | | | | | | | | |
| Certificates | 300 | 83.9 | 40 | 9.0 | 0 | 0.0 | 1 | 0.2 | 30 | 6.8 |
| Post-BA Certs | 100 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs | 100 | 98.1 | 0 | 0.0 | 2 | 1.9 | 0 | 0.0 | 0 | 0.0 |
| Total | 600 | 89.6 | 40 | 5.7 | 2 | 0.3 | 1 | 0.2 | 30 | 4.3 |
| **Proprietary UG:** | | | | | | | | | | |
| Certificates | 1,000 | 52.3 | 200 | 10.6 | 1 | 0.1 | 100 | 6.4 | 600 | 30.6 |
| Associate s | 500 | 79.6 | 70 | 9.6 | 36 | 5.3 | 20 | 2.9 | 20 | 2.5 |
| Bachelor s | 200 | 87.9 | 20 | 7.1 | 9 | 4.0 | 2 | 0.9 | 0 | 0.0 |
| Post-BA Certs | 10 | 91.7 | 1 | 8.3 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s | 90 | 91.8 | 2 | 2.0 | 2 | 2.0 | 4 | 4.1 | 0 | 0.0 |
| Doctoral | 30 | 94.3 | 1 | 2.9 | 1 | 2.9 | 0 | 0.0 | 0 | 0.0 |
| Professional | 20 | 80.0 | 1 | 5.0 | 3 | 15.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs | 20 | 84.2 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 3 | 15.8 |
| Total | 1,900 | 63.3 | 300 | 9.7 | 52 | 1.7 | 200 | 5.0 | 620 | 20.4 |
| **Total UG** | | | | | | | | | | |
| Certificates | 3,100 | 72.8 | 400 | 8.6 | 1 | 0.0 | 100 | 3.0 | 650 | 15.5 |
| Associate s | 500 | 79.6 | 70 | 9.6 | 36 | 5.3 | 20 | 2.9 | 20 | 2.5 |
| Bachelor s | 200 | 87.9 | 20 | 7.1 | 9 | 4.0 | 2 | 0.9 | 0 | 0.0 |
| Post-BA Certs | 200 | 99.4 | 1 | 0.6 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Master s | 100 | 91.8 | 2 | 2.0 | 2 | 2.0 | 4 | 4.1 | 0 | 0.0 |
| Doctoral | 30 | 94.3 | 1 | 2.9 | 1 | 2.9 | 0 | 0.0 | 0 | 0.0 |
| Professional | 20 | 80.0 | 1 | 5.0 | 3 | 15.0 | 0 | 0.0 | 0 | 0.0 |
| Grad Certs | 100 | 95.6 | 1 | 0.7 | 2 | 1.5 | 0 | 0.0 | 3 | 2.2 |
| Total | 4,200 | 76.1 | 500 | 8.1 | 54 | 1.0 | 200 | 2.8 | 700 | 12.1 |

**Note:** Program counts rounded to nearest hundred when above hundred, nearest 10 when below 100, and unrounded when below 10.

Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Regulations, Including an Estimate of the Classes of Small Entities That Would Be Subject to the Requirements and the Type of Professional Skills Necessary for Preparation of the Report or Record

The proposed rule involves four types of reporting and compliance requirements for institutions, including small entities. First, under proposed § 668.43, institutions would be required to provide additional programmatic information to the Department and make this and additional information assembled by the Department available to current and prospective students by providing a link to a Department-administered disclosure website. Second, under proposed § 668.407, the Department would require acknowledgments from current and prospective students prior to the disbursement of title IV, HEA funds if an eligible non-GE program leads to high debt outcomes based on its D/E rates. Third, under proposed § 668.408, institutions would be required to provide new annual reporting about programs, current students, and students that complete or withdraw during each award year. As described in the Preamble of this proposed rule, reporting includes student-level information on enrollment, cost of attendance, tuition and fees, allowances for books and supplies, allowances for housing, institutional and other grants, and private loans disbursed. Finally, under proposed § 668.605, institutions with GE programs that fail at least one of the metrics would be required to provide warnings to current and prospective students about the risk of losing title IV, HEA eligibility and would require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

Initial estimates of the reporting and compliance burden for these four items for small entities are provided in Table 10.7, though these are subject to revision as the content of the required reporting is refined.[288]

TABLE 10.7  INITIAL AND SUBSEQUENT REPORTING AND COMPLIANCE BURDEN FOR SMALL ENTITIES

| | | |
|---|---|---|
| § 668.43 ............ | Amend § 668.43 to establish a website for the posting and distribution of key information and disclosures pertaining to the institution s educational programs, and to require institutions to provide information about how to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution. | 6,700,807. |
| § 668.407 .......... | Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the disclosure website maintained by the Secretary if an eligible non-GE program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may disburse any title IV, HEA funds. | 25,522. |
| § 668.408 .......... | Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to establish the reporting timeframe. | 31,121,875 initial, 12,689,497 subsequent years. |
| § 668.605 .......... | Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds. | 415,809. |

As described in the Preamble, much of the necessary information for GE programs would already have been reported to the Department under the 2014 Prior Rule, and as such we believe the added burden of this reporting relative to existing requirements would be reasonable. Furthermore, 88 percent of public and 47 percent of private non-profit institutions operated at least one GE program and thus have experience with similar data reporting for the subset of their students enrolled in certificate programs under the 2014 Prior Rule. Moreover, many institutions report more detailed information on the components of cost of attendance and other sources of financial aid in the Federal National Postsecondary Student Aid Survey (NPSAS) administered by the National Center for Education Statistics. Finally, the Department proposes flexibility for institutions to avoid reporting data on students who completed programs in the past for the first year of implementation, and instead to use data on more recent completer cohorts to estimate median debt levels. In part, this is intended to ease the administrative burden of providing this data for programs that were not covered by the 2014 Prior Rule reporting requirements, especially for the small number of institutions that may not previously have had any programs subject to these requirements.

The Department recognizes that institutions may have different processes for record-keeping and administering financial aid, so the burden of the GE and financial transparency reporting could vary by institution. As noted previously, a high percentage of institutions have already reported data related to the 2014 Prior Rule or similar variables for other purposes. Many institutions may have systems that can be queried or existing reports that can be adapted to meet these reporting requirements. On the other hand, some institutions may still have data entry processes that are very manual in nature and generating the information for their programs could involve many more hours and resources. Small entities may be less likely to have invested in systems and processes that allow easy data reporting because it is not needed for their operations. Institutions may fall in between these poles and be able to automate the reporting of some variables but need more effort for others.

We believe that, while the reporting relates to program or student-level information, the reporting process is likely to be handled at the institutional level. There would be a cost to establish the query or report and validate it upfront, but then the marginal increase in costs to process additional programs or students should not be too significant. The reporting process will involve staff members or contractors with different skills and levels of responsibility. We have estimated this using Bureau of Labor statistics median hourly wage rates for postsecondary administrators of $46.59.[289] Table 10.8 presents the Department's estimates of the hours associated with the reporting requirements.

---

[288] For subparts 68.43, 668.407, and 668.605, these estimates were obtained by proportioning the total PRA burden falling on institutions by the share of institutions that are small entities, as reported in Table 10.1 (55 percent).

[289] Available at *https://www.bls.gov/oes/current/oes119033.htm*.

TABLE 10.8 ESTIMATED HOURS FOR REPORTING REQUIREMENTS

| Process | Hours | Hours basis |
|---|---|---|
| Review systems and existing reports for adaptability for this reporting ............................................ | 10 | Per institution. |
| Develop reporting query/result template: | | |
| Program-level reporting ........................................................................................... | 15 | Per institution. |
| Student-level reporting ............................................................................................ | 30 | Per institution. |
| Run test reports: | | |
| Program-level reporting ........................................................................................... | 0.25 | Per institution. |
| Student-level reporting ............................................................................................ | 0.5 | Per institution. |
| Review/validate test report results: | | |
| Program-level reporting ........................................................................................... | 10 | Per institution. |
| Student-level reporting ............................................................................................ | 20 | Per institution. |
| Run reports: | | |
| Program-level reporting ........................................................................................... | 0.25 | Per program. |
| Student-level reporting ............................................................................................ | 0.5 | Per program. |
| Review/validate report results: | | |
| Program-level reporting ........................................................................................... | 2 | Per program. |
| Student-level reporting ............................................................................................ | 5 | Per program. |
| Certify and submit reporting ...................................................................................... | 10 | Per institution. |

The ability to set up reports or processes that can be rerun in future years, along with the fact that the first reporting cycle includes information from several prior years, means that the expected burden should decrease significantly after the first reporting cycle. We estimate that the hours associated with reviewing systems, developing or updating queries, and reviewing and validating the test queries or reports will be reduced by 35 percent after the first year. The queries or reports would have to be run and validated to make sure no system changes have affected them and the institution will need to confirm there are no program changes in CIP code, credential level, preparation for licensure, accreditation, or other items, but we expect that would be less burdensome than initially establishing the reporting. Table 10.9 presents estimates of reporting burden for small entities for the initial year and subsequent years under proposed § 668.408.

TABLE 10.9.1 ESTIMATED REPORTING BURDEN FOR SMALL ENTITIES FOR THE INITIAL REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year ................................................................................... | 139 | 393 | 25,492 | 1,187,684 |
| Proprietary 2-year .............................................................................. | 1,227 | 2,635 | 199,170 | 9,279,342 |
| Public 2-year ..................................................................................... | 286 | 2,058 | 91,183 | 4,248,193 |
| Private 4-year ................................................................................... | 655 | 6,876 | 275,872 | 12,852,888 |
| Proprietary 4-year .............................................................................. | 146 | 1,098 | 48,018 | 2,237,135 |
| Public 4-year ..................................................................................... | 52 | 751 | 28,260 | 1,316,633 |
| Total ............................................................................................ | 2,505 | 13,811 | 667,995 | 31,121,875 |

TABLE 10.9.2 ESTIMATED REPORTING BURDEN FOR SMALL ENTITIES FOR SUBSEQUENT REPORTING CYCLE

| Control and level | Institution count | Program count | Hours | Amount |
|---|---|---|---|---|
| Private 2-year ................................................................................... | 139 | 393 | 12,220 | 569,318 |
| Proprietary 2-year .............................................................................. | 1,227 | 2,635 | 101,403 | 4,724,377 |
| Public 2-year ..................................................................................... | 286 | 2,058 | 34,826 | 1,622,520 |
| Private 4-year ................................................................................... | 655 | 6,876 | 96,519 | 4,496,820 |
| Proprietary 4-year .............................................................................. | 146 | 1,098 | 18,146 | 845,399 |
| Public 4-year ..................................................................................... | 52 | 751 | 9,252 | 431,062 |
| Total ............................................................................................ | 2,505 | 13,811 | 272,365 | 12,689,497 |

The Department welcomes comments from small entities on the processes and burden required to meet the reporting requirements under the proposed regulations.

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap or Conflict With the Proposed Regulations*

The proposed regulations are unlikely to conflict with or duplicate existing Federal regulations. Under existing law and regulations, institutions are already required to disclose data and provide reporting in a number of areas related to the regulations. The regulations propose using data that is already reported by institutions or collected administratively by the Department wherever possible.

*Alternatives Considered*

As described in section 9 of the Regulatory Impact Analysis above,

''Alternatives Considered'', we evaluated several alternative provisions and approaches including using D/E rates only, alternative earnings thresholds, no reporting or acknowledgement requirements for non-GE programs, and several alternative ways of computing the performance metrics (smaller n-sizes and different interest rates or amortization periods). Most relevant to small entities was the alternative of using a lower n-size, which would result in larger effects on programs at small entities, both in terms of risk for loss of eligibility for GE programs and greater burden for providing warnings and/or disclosure acknowledgement. The alternative of not requiring reporting or acknowledgements in the case of failing metrics for non-GE programs would result in lower reporting burden for small institutions but was deemed to be insufficient to achieve the goal of creating greater transparency around program performance.

## 11. Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents. Sections 600.21, 668.14, 668.15, 668.16, 668.23, 668.43, 668.156, 668.157, 668.171, 668.407, 668.408, and 668.605 of this proposed rule contain information collections requirements.

Under the PRA, the Department has or will at the required time submit a copy of these sections and Information Collection requests to OMB for its review. A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number. In the final regulations, we would display the control numbers assigned by OMB to any information collection requirements proposed in this NPRM and adopted in the final regulations.

*Section 600.21—Updating application information.*

*Requirements:* The proposed change to §§ 600.21((1)(11)(v) and (vi), would require an institution with GE programs to update any changes in certification of those program(s).

*Burden Calculations:* The proposed regulatory change would require an update to the current institutional application form, 1845–0012. The form update would be made available for comment through a full public clearance package before being made available for use by the effective dates of the regulations. The burden changes would be assessed to OMB Control Number 1845–0012, Application for Approval to Participate in Federal Student Aid Programs.

*Section 668.14—Program participation agreement.*

*Requirements:* The NPRM proposes to redesignate current § 668.14(e) as § 668.14(h). The Department also proposes to add a new paragraph (e) that outlines a non-exhaustive list of conditions that we may opt to apply to provisionally certified institutions. The NPRM proposes that institutions at risk of closure must submit an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency. The NPRM proposes that institutions at risk of closure must submit an acceptable records retention plan that addresses title IV, HEA records, including but not limited to student transcripts, and evidence that the plan has been implemented, to the Department.

The NPRM also proposes that an institution at risk of closure that is teaching out, closing, or that is not financially responsible or administratively capable, would release holds on student transcripts. Other conditions for institutions that are provisionally certified and may be applied by the Secretary are also proposed.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.14 would add burden to all institutions, domestic and foreign. The proposed change in § 668.14(e) would potentially require provisionally certified institutions at risk of closure to submit to the Department acceptable teach-out plans, and acceptable record retention plans. For provisionally certified institutions at risk of closure, are teaching out or closing, or are not financially responsible or administratively capable, the proposed change requires the release of holds on student transcripts.

We believe that this type of update would require 10 hours for each institution to provide the appropriate material, or required action based on the proposed regulations. As of January 2023, there were a total of 863 domestic and foreign institutions that were provisionally certified. We estimate that of that figure 5% or 43 provisionally certified institutions may be at risk of closure. We estimate that it would take private non-profit institutions 250 hours (25 × 10 = 250) to complete the submission of information or required action. We estimate that it would take proprietary institutions 130 hours (13 × 10 = 130) to complete the submission of information or required action. We estimate that it would take public institutions 50 hours (5 × 10 = 50) to complete the submission of information or required action.

The estimated § 668.14(e) total burden is 430 hours with a total rounded estimated cost for all institutions of $20,035 (430 × $46.59 = $20,033.70).

STUDENT ASSISTANCE GENERAL PROVISIONS   OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit ............................................................... | 25 | 25 | 250 | $11,648 |
| Proprietary | 13 | 13 | 130 | 6,057 |
| Public ................................................................................ | 5 | 5 | 50 | 2,330 |
| Total ........................................................................... | 43 | 43 | 430 | 20,035 |

*Section 668.15—Factors of financial responsibility.*

*Requirements:* This section is being removed and reserved.

*Burden Calculations:* With the removal of regulatory language in Section 668.15 the Department would remove the associated burden of 2,448 hours under OMB Control Number 1845–0022.

STUDENT ASSISTANCE GENERAL PROVISIONS    OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit | −866 | −866 | −816 | −$38,017 |
| Proprietary | −866 | −866 | −816 | −$38,017 |
| Public | −866 | −866 | −816 | −$38,017 |
| Total | −2,598 | −2,598 | −2,448 | −$114,051 |

*Section 668.16—Standards of administrative capability.*

*Requirements:* The Department proposes to amend § 668.16 to clarify the characteristics of institutions that are administratively capable. The NPRM proposes amending § 668.16(h) which would require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available to enrolled students. This would include clear information about the cost of attendance, sources and amounts of each type of aid separated by the type of aid, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts. Institutions would also have to provide students with information about the institution's cost of attendance, the source and type of aid offered, whether it must be earned or repaid, the net price, and deadlines for accepting, declining, or adjusting award amounts.

The NPRM also proposes amending § 668.16(p) which would strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

The Department proposes to update the references to high school completion in the current regulation to high school diploma which would set specific requirements to the existing procedural requirement for adequate evaluation of the validity of a student's high school diploma.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.16 would add burden to all institutions, domestic and foreign. The proposed changes in § 668.16(h) would require an update to the financial aid communications provided to students.

We believe that this update would require 8 hours for each institution to review their current communications and make the appropriate updates to the material based on the proposed regulations. We estimate that it would take private non-profit institutions 15,304 hours (1,913 × 8 = 15,304) to complete the required review and update. We estimate that it would take proprietary institutions 12,302 hours (1,504 × 8 = 12,302) to complete the required review and update. We estimate that it would take public institutions 14,504 hours (1,813 × 8 = 14,504) to complete the required review and update. The estimated § 668.16(h) total burden is 41,840 hours with a total rounded estimated cost for all institutions of $1,949,326 (41,840 × $46.59 = 1,949,325.60).

The proposed changes in § 668.16(p) would add requirements for adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

We believe that this update would require 3 hours for each institution to review their current policy and procedures for evaluating high school diplomas and make the appropriate updates to the material based on the proposed regulations. We estimate that it would take private non-profit institutions 5,739 hours (1,913 × 3 = 5,739) to complete the required review and update. We estimate that it would take proprietary institutions 4,512 hours (1,504 × 3 = 4,512) to complete the required review and update. We estimate that it would take public institutions 5,439 hours (1,813 × 3 = 5,439) to complete the required review and update. The estimated § 668.16(p) total burden is 15,690 hours with a total rounded estimated cost for all institutions of $730,997 (15,690 × $46.59 = $730,997.10).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.16 is 57,530 hours with a total rounded estimated cost of $2,680,323.

STUDENT ASSISTANCE GENERAL PROVISIONS    OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit | 1,913 | 3,826 | 21,043 | $980,394 |
| Proprietary | 1,504 | 3,008 | 16,544 | 770,785 |
| Public | 1,813 | 3,626 | 19,943 | 929,144 |
| Total | 5,230 | 10,460 | 57,530 | 2,680,323 |

*Section 668.23—Compliance audits and audited financial statements.*

*Requirements:* The Department proposes to add § 668.23(d)(2)(ii) that would require that an institution, domestic or foreign, that is owned by a foreign entity holding at least a 50 percent voting or equity interest to

<span style="color:red">App.375</span>

provide documentation of its status under the law of the jurisdiction under which it is organized, as well as basic organizational documents. The submission of such documentation would better equip the Department to obtain appropriate and necessary documentation from an institution which has a foreign owner or owners with 50 percent or greater voting or equity interest which would provide a clearer picture of the institution's legal status to the Department, as well as who exercises direct or indirect ownership over the institution.

The Department also proposes adding new § 668.23(d)(5) that would require an institution to disclose in a footnote to its financial statement audit the dollar amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.23(d)(2)(ii) would add burden to foreign institutions and certain domestic institutions to submit documentation, translated into English as needed.

We believe this reporting activity would require an estimated 40 hours of work for affected institutions to complete. We estimate that it would take private non-profit institutions 13,520 hours (338 × 40 = 13,520) to complete the required documentation gathering and translation as needed. We estimate that it would take proprietary institutions 920 hours (23 × 40 = 920) to complete the required footnote activity. The estimated § 668.23(d)(2)(ii) total burden is 14,440 hours with a total rounded estimated cost for all institutions of $672,760 (14,440 × $46.59 = $672,759.60).

The proposed NPRM regulatory language in § 668.23(d)(5) would add burden to all institutions, domestic and foreign. The proposed changes in § 668.23(d)(5) would require a footnote to its financial statement audit regarding the dollar amount spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures.

We believe that this footnote reporting activity would require an estimated 8 hours per institution to complete. We estimate that it would take private non-profit institutions 15,304 hours (1,913 × 8 = 15,304) to complete the required footnote activity. We estimate that it would take proprietary institutions 12,032 hours (1,504 × 8 = 12,032) to complete the required footnote activity. We estimate that it would take public institutions 14,504 hours (1,813 × 8 = 14,504) to complete the required footnote activity. The estimated § 668.23(d)(5) total burden is 41,840 hours with a total rounded estimated cost for all institutions of $1,949,326 (41,840 × $46.59 = $1,949,325.60).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.23 is 56,280 hours with a total rounded estimated cost of $2,622,085.

STUDENT ASSISTANCE GENERAL PROVISIONS   OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit | 1,913 | 2,251 | 28,824 | $1,342,910 |
| Proprietary | 1,504 | 1,527 | 12,952 | 603,434 |
| Public | 1,813 | 1,813 | 14,504 | 675,742 |
| Total | 5,230 | 5,591 | 56,280 | 2,622,086 |

*Section 668.43—Institutional and programmatic information.*

*Requirements:* Under proposed § 668.43(d), the Department would establish and maintain a website for posting and distributing key information and disclosures pertaining to the institution's educational programs. An institution would provide such information as the Department prescribes through a notice published in the **Federal Register** for disclosure to prospective and enrolled students through the website.

This information could include, but would not be limited to, the primary occupations that the program prepares students to enter, along with links to occupational profiles on O*NET or its successor site; the program's or institution's completion rates and withdrawal rates for full-time and less-than-full-time students, as reported to or calculated by the Department; the length of the program in calendar time; the total number of individuals enrolled in the program during the most recently completed award year; the total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the length of the program; the percentage of the individuals enrolled in the program during the most recently completed award year who received a title IV, HEA loan, a private education loan, or both; whether the program is programmatically accredited and the name of the accrediting agency; and the supplementary performance measures in proposed § 668.13(e).

The institution would be required to provide a prominent link and any other needed information to access the website on any web page containing academic, cost, financial aid, or admissions information about the program or institution. The Department could require the institution to modify a web page if the information about how to access the Department's website is not sufficiently prominent, readily accessible, clear, conspicuous, or direct.

In addition, the Department would require the institution to provide the relevant information to access the website to any prospective student or third party acting on behalf of the prospective student before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.43(d) would add burden to all institutions, domestic and foreign. The proposed changes in § 668.43(d) would require institutions to supply the Department with specific information about programs it is offering as well as disclose to enrolled and prospective students this information.

We believe that this reporting or disclosure activity would require an estimated 50 hours per institution. We estimate that it would take private non-profit institutions 95,650 hours (1,913 × 50 = 95,650) to complete the required reporting or disclosure activity. We estimate that it would take proprietary institutions 75,200 hours (1,504 × 50 = 75,200) to complete the required reporting or disclosure activity. We estimate that it would take public institutions 90,650 hours (1,813 × 50 = 90,650) to complete the required reporting/disclosure activity.

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.43 is 261,500 hours with a total rounded estimated cost of $12,183,286.

STUDENT ASSISTANCE GENERAL PROVISIONS  OMB CONTROL NUMBER 1845 0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit | 1,913 | 1,913 | 95,650 | $4,456,334 |
| Proprietary | 1,504 | 1,504 | 75,200 | 3,503,568.00 |
| Public | 1,813 | 1,813 | 90,650 | 4,223,384 |
| Total | 5,230 | 5,230 | 261,500 | 12,183,286.00 |

*Section 668.156—Approved State process.*

*Requirements:* The proposed changes in the NPRM to § 668.156 would clarify the requirements for the approval of a State process. Under proposed § 668.156, a State must apply to the Secretary for approval of its State process as an alternative to achieving a passing score on an approved, independently administered test or satisfactory completion of at least six credit hours or its recognized equivalent coursework for the purpose of determining a student's eligibility for title IV, HEA program. The State process is one of the three ability to benefit alternatives that an individual who is not a high school graduate could fulfill to receive title IV, HEA, Federal student aid to enroll in an eligible career pathway program.

The NPRM proposes to amend the monitoring requirement in redesignated § 668.156(c) to provide a participating institution that has failed to achieve the 85 percent success rate up to three years to achieve compliance.

The NPRM also proposes to amend redesignated § 668.156(e) to require that States report information on race, gender, age, economic circumstances, and education attainment and permit the Secretary to publish a notice in the **Federal Register** with additional information that the Department may require States to submit.

*Burden Calculation:* We estimate that it would take a State 160 hours to create and submit an application for a State Process to the Department under the regulations in Section 668.156(a) for a total of 1,600 hours (160 hours × 10 States).

We estimate that it would take a State an additional 40 hours annually to monitor the compliance of the institution's use of the State Process under Section 668.156(c) for a total of 400 hours (40 hours × 10 States). This time includes the development of any Corrective Action Plan for any institution the State finds not be complying with the State Process.

We estimate that it would take a State 120 hours to meet the reapplication requirements in Section 668.156(e) for a total of 1,200 hours (120 hours × 10 States).

The total hours associated with the change in the regulations as of the effective date of the regulations are estimated at a total of 3,200 hours of burden (320 hours × 10 States) with a total estimated cost of $1,149,088.00 in OMB Control Number 1845–NEW1.

APPROVED STATE PROCESS  1845 NEW1

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| State | 10 | 30 | 3,200 | $149,088 |
| Total | 10 | 30 | 3,200 | 149,088 |

*Section 668.157—Eligible career pathway program.*

*Requirements:* The NPRM proposes changes to subpart J by adding § 668.157 to clarify the documentation requirements for eligible career pathway program. This new section would dictate the documentation requirements for eligible career pathway programs for submission to the Department for approval as a title IV eligible program. Under § 668.157(b) we propose that, for career pathways programs that do not enroll students through a State process as defined in § 668.156, the Secretary would verify the eligibility of eligible career pathway programs for title IV, HEA program purposes pursuant to proposed § 668.157(a). Under proposed § 668.157(b), we would also provide an institution with the opportunity to appeal any adverse eligibility decision.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.157 would add burden to institutions to participate in the eligible career pathway programs. The proposed regulations in § 668.157 would require institutions to demonstrate to the Department that the eligible career pathways programs being offered meet the regulations as proposed.

We estimate that 1,000 institutions would submit documentation to determine eligibility for the eligible career pathway programs. We believe that this documentation and reporting activity would require an estimated 10 hours per program per institution. We estimate that each institution would document and report on five individual eligible career pathways programs for a total of 50 hours per institution. We estimate it

would take private non-profit institutions 18,000 hours (360 institutions × 5 programs = 1,800 programs × 10 hours per program = 18,000) to complete the required documentation and reporting activity. We estimate that it would take proprietary institutions 6,500 hours (130 institutions × 5 programs = 650 programs × 10 hours per program = 6,500) to complete the required documentation and reporting activity. We estimate that it would take public institutions 25,500 hours (510 institutions × 5 programs = 2,550 programs × 10 hours per program = 25,500) to complete the required documentation/reporting activity. The total estimated increase in burden to OMB Control Number 1845–NEW2 for § 668.157 is 50,000 hours with a total estimated cost of $2,329,500.00.

ELIGIBLE CAREER PATHWAYS PROGRAM   1845 NEW2

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit ................................................................................ | 360 | 1,800 | 18,000 | $838,620 |
| Proprietary ........................................................................................... | 130 | 650 | 6,500 | 302,835 |
| Public .................................................................................................. | 510 | 2,550 | 25,500 | 1,188,045 |
| Total ............................................................................................... | 1,000 | 5,000 | 50,000 | 2,329,500 |

*Section 668.171—General. Requirements:* The NPRM proposes to amend § 668.171(f) by adding several new events to the existing reporting requirements, and expanding others, that must be reported generally no later than 10 days following the event. Implementation of the proposed reportable events would make the Department more aware of instances that may impact an institution's financial responsibility or stability. The proposed reportable events are linked to the financial standards in § 668.171(b) and the proposed financial triggers in § 668.171(c) and (d) where there is no existing mechanism for the Department to know that a failure or a triggering event has occurred. Notification regarding these events would allow the Department to initiate actions to either obtain financial protection, or determine if financial protection is necessary, to protect students from the negative consequences of an institution's financial instability and possible closure.

The NPRM also proposes to amend § 668.171(g) by adding language which would require a public institution to provide to the Department a letter from an official of the government entity or other signed documentation acceptable

to the Department. The letter or documentation must state that the institution is backed by the full faith and credit of the government entity. The Department also proposes similar amendments to apply to foreign institutions.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.171(f) would add burden to institutions regarding evidence of financial responsibility. The proposed regulations in § 668.171(f) would require institutions to demonstrate to the Department that it met the triggers set forth in the regulations. We estimate that domestic and foreign, have the potential to hit a trigger that would require them to submit documentation to determine eligibility for continued participation in the title IV programs. The overwhelming majority of reporting would likely stem from the mandatory triggering event on gainful employment programs that are failing with limited reporting under additional events. We believe that this documentation and reporting activity would require an estimated 2 hours per institution. We estimate it would take private non-profit institutions 100 hours (50 institutions × 2 hours = 100) to complete the required documentation and reporting activity.

We estimate that it would take proprietary institutions 1,300 hours (650 institutions × 2 hours = 1,300) to complete the required documentation and reporting activity.

The proposed NPRM regulatory language in § 668.171(g) would add burden to public institutions regarding evidence of financial responsibility. The proposed regulations in § 668.171(g) would require institutions to demonstrate to the Department that the public institution is backed by the full faith and credit of the government entity. We believe that this document filing would be done by the majority of the public institutions upon recertification of currently participating institutions. We estimate that 36 public institutions (two percent of the currently participating public institutions) would be required to recertify in a given year. We further estimate that it would take each institution 5 hours to procure the required documentation from the appropriate governmental agency for a total of 180 hours (36 institutions × 5 hours = 180 hours).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.171 is 1,580 hours with a total rounded estimated cost of $73,612.

STUDENT ASSISTANCE GENERAL PROVISIONS   OMB CONTROL NUMBER 1845  0022

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution |
|---|---|---|---|---|
| Private non-profit ................................................................................ | 50 | 50 | 100 | 4,659 |
| Proprietary ........................................................................................... | 650 | 650 | 1,300 | 60,567 |
| Public .................................................................................................. | 36 | 36 | 180 | 8,386 |
| Total ............................................................................................... | 736 | 736 | 1,580 | 73,612 |

*Section 668.407—Student disclosure acknowledgments.*

*Requirements:* The NPRM proposes in Subpart Q—Financial Value Transparency § 668.407(a)(1) that a student would be required to provide an acknowledgment of the D/E rate information for any year for which the Secretary notifies an institution that the eligible non-GE program has failing D/E rates for the year in which the D/E

rates were most recently calculated by the Department.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.407 would add burden to institutions. The proposed changes in § 668.407 would require institutions to develop and provide notices to enrolled and prospective students that a program has unacceptable D/E rates for non-GE programs or an unacceptable D/E rate

and earnings premium measure for GE programs for the year in which the D/E rates or earnings premium measure were most recently calculated by the Department.

We believe that most institutions would develop the notice directing impacted students to the Department's disclosure website and make it available electronically to current and prospective students. We believe that this action

App.378

would require an estimated 1 hour per affected program. We estimate that it would take private institutions 661 hours (661 programs × 1 hour = 661) to develop and deliver the required notice based on the information provided by the Department. We estimate that it would take public institutions 335 hours (335 programs × 1 hour = 335) to develop and deliver the required notice based on the information provided by the Department.

The proposed changes in § 668.407(a)(1) would require institutions to direct prospective and students enrolled in the non-GE programs that failed the D/E rates for the year in which the D/E rates were most recently calculated by the Department to the Department's disclosure website. We

estimate that it would take the 401,600 students 10 minutes to read the notice and go to the disclosure website to acknowledge receiving the information for a total of hours (401,600 students × .17 hours = 68,272).

The total estimated increase in burden to OMB Control Number 1845–NEW3 for § 668.407 is 69,268 hours with a total rounded estimated cost of $1,548,388.

STUDENT DISCLOSURE ACKNOWLEDGMENTS  OMB CONTROL NUMBER 1845  NEW3

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution $22.00 per individual |
|---|---|---|---|---|
| Individual | 401,600 | 401,600 | 68,272 | $1,501,984 |
| Private non-profit | 173 | 661 | 661 | 30,796 |
| Public | 74 | 335 | 335 | 15,608 |
| Total | 401,847 | 402,596 | 69,268 | 1,548,388 |

*Section 668.408—Reporting requirements.*

*Requirements:* The NPRM proposes in Subpart Q—Financial Value Transparency to add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to define the timeframe for institutions to report this information.

*Burden Calculations:* The proposed regulatory change would require an update to a Federal Student Aid data system. The reporting update would be made available for comment through a full public clearance package before being made available for use on or after the effective dates of the regulations. The burden changes would be assessed to the OMB Control Number assigned to the system.

*Section 668.605—Student warnings and acknowledgments.*

*Requirements:* The NPRM adds a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds.

In addition, warnings provided to students enrolled in GE programs would include a description of the academic and financial options available to continue their education in another program at the institution in the event that the program loses eligibility, including whether the students could transfer academic credit earned in the program to another program at the institution and which course credit

would transfer; an indication of whether, in the event of a loss of eligibility, the institution would continue to provide instruction in the program to allow students to complete the program, and refund the tuition, fees, and other required charges paid to the institution for enrollment in the program; and an explanation of whether, in the event that the program loses eligibility, the students could transfer credits earned in the program to another institution through an established articulation agreement or teach-out.

The institution would be required to provide alternatives to an English-language warning for current and prospective students with limited English proficiency.

*Burden Calculations:* The proposed NPRM regulatory language in § 668.605 would add burden to institutions. The proposed changes in § 668.605 would require institutions to provide warning notices to enrolled and prospective students that a GE program has unacceptable D/E rates or an unacceptable earnings premium measure for the year in which the D/E rates or earnings premium measure were most recently calculated by the Department along with warnings about the potential loss of title IV eligibility.

We believe that most institutions would develop the warning and make it available electronically to current and prospective students. We believe that this action would require an estimated 1 hour per affected program. We estimate that it would take private institutions 86 hours (86 programs × 1 hour = 86) to develop and deliver the required warning based on the information provided by the

Department. We estimate that it would take proprietary institutions 1,524 hours (1,524 programs × 1 hour = 1,524) to develop and deliver the required warning based on the information provided by the Department. We estimate that it would take public institutions 193 hours (193 programs × 1 hour = 193) to develop and deliver the required warning based on the information provided by the Department.

The proposed changes in § 668.605(d) would require institutions to provide alternatives to the English-language warning notices to enrolled and prospective students with limited English proficiency.

We estimate that it would take private institutions 688 hours (86 programs × 8 hours = 688) to develop and deliver the required alternate language the required warning based on the information provided by the Department. We estimate that it would take proprietary institutions 12,192 hours (1,524 programs × 8 hours = 12,192) to develop and deliver the required alternate language the required warning based on the information provided by the Department. We estimate that it would take public institutions 1,544 hours (193 programs × 8 hours = 1,544) to develop and deliver the required warning based on the information provided by the Department.

The proposed changes in § 668.605(e) would require institutions to provide the warning notices to students enrolled in the GE programs with failing metrics. We estimate that it would take the 703,200 students 10 minutes to read the warning and go to the disclosure website to acknowledge receiving the information for a total of 119,544 hours

(703,200 students × .17 hours = 119,544).

The proposed changes in § 668.605 (f) would require institutions to provide the warning notices to prospective students who express interest in the effected GE programs. We estimate that

it would take the 808,680 prospective students 10 minutes to read the warning and go to the disclosure website to acknowledge receiving the information for a total of 137,476 hours (808,680 students × .17 hours = 137,476).

The total estimated increase in burden to OMB Control Number 1845–NEW4 for § 668.605 is 273,247 hours with a total rounded estimated cost of $6,410,456.

GE STUDENT WARNINGS AND ACKNOWLEDGMENTS   OMB CONTROL NUMBER 1845 NEW4

| Affected entity | Respondent | Responses | Burden hours | Cost $46.59 per institution $22.00 per individual |
|---|---|---|---|---|
| Individual ................................................................ | 1,511,880 | 1,511,880 | 257,020 | $5,654,440 |
| Private non-profit ...................................................... | 86 | 172 | 774 | 36,061 |
| Proprietary ............................................................... | 873 | 3,048 | 13,716 | 639,028 |
| Public ...................................................................... | 193 | 386 | 1,737 | 80,927 |
| Total ................................................................ | 1,513,032 | 1,515,486 | 273,247 | 6,410,456 |

Consistent with the discussions above, the following chart describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the

information collections. The monetized net cost of the increased burden for institutions, lenders, guaranty agencies and students, using wage data developed using Bureau of Labor Statistics (BLS) data. For individuals, we have used the median hourly wage for all occupations, $22.00 per hour according to BLS. *https://www.bls.gov/*

*oes/current/oes_nat.htm#00-0000.* For institutions, lenders, and guaranty agencies we have used the median hourly wage for Education Administrators, Postsecondary, $46.59 per hour according to BLS. *https:// www.bls.gov/oes/current/ oes119033.htm.*

COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $46.59 institutional $22.00 individual unless otherwise noted |
|---|---|---|---|
| § 600.21 .......... | Amend § 600.21 to require an institution to notify the Secretary within 10 days of any update to information included in the GE program s certification. | Burden will be cleared at a later date through a separate information collection. | Costs will be cleared through separate information collection. |
| § 668.14 .......... | Amend § 668.14(e) to establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions, such as the submission of a teach-out plan or agreement. Amend § 668.14(g) to establish conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status. | 1845 0022, +430 hrs ............ | $20,035. |
| § 668.15 .......... | Remove and reserve § 668.15 thereby consolidating all financial responsibility factors, including those governing changes in ownership, under part 668, subpart L. | 1845 0022, −2,448 hrs ....... | $ − 114,051. |
| § 668.16 .......... | Amend § 668.16(h) to require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available. Amend § 668.16(p) to strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student s high school diploma. | 1845 0022, +57,530 hrs ...... | $2,680,323. |
| § 668.23 .......... | Amend § 668.23(d) to require that any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution must provide documentation of the entity s status under the law of the jurisdiction under which the entity is organized. Amend § 668.23(d) to require an institution to disclose in a footnote to its financial statement audit the dollar amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures. | 1845 0022, +56,280 hrs ...... | $2,622,086. |
| § 668.43 .......... | Amend § 668.43 to establish a website for the posting and distribution of key information and disclosures pertaining to the institution s educational programs, and to require institutions to provide information about how to access that website to a prospective student before the student enrolls, registers, or makes a financial commitment to the institution. | 1845 0022, +261,500 hrs .... | $12,183,286. |
| § 668.156 ....... | Amend § 668.156 to clarify the requirements for the approval of a State process. The State process is one of the three ability to benefit alternatives that an individual who is not a high school graduate could fulfill to receive title IV, Federal student aid to enroll in an eligible career pathway program. | 1845 NEW1, +3,200 ............ | $149,088. |
| § 668.157 ....... | Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs. | 1845 NEW2, +50,000 .......... | $2,329,500. |

COLLECTION OF INFORMATION    Continued

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $46.59 institutional $22.00 individual unless otherwise noted |
|---|---|---|---|
| § 668.171 ........ | Amend § 668.171(f) to revise the set of conditions whereby an institution must report to the Department that a triggering event, described in § 668.171(c) and (d), has occurred. Amend § 668.171(g) to require public institutions to provide documentation from a government entity that confirms that the institution is a public institution and is backed by the full faith and credit of that government entity to be considered as financially responsible. | 1845 0022, +1,580 hrs ......... | $+73,612. |
| § 668.407 ........ | Add a new § 668.407 to require current and prospective students to acknowledge having seen the information on the disclosure website maintained by the Secretary if an eligible non-GE program has failed the D/E rates measure, to specify the content and delivery of such acknowledgments, and to require that students must provide the acknowledgment before the institution may disburse any title IV, HEA funds. | 1845 NEW3, +69,268 .......... | $+1,548,388. |
| § 668.408 ........ | Add a new § 668.408 to establish institutional reporting requirements for students who enroll in, complete, or withdraw from a GE program or eligible non-GE program and to establish the reporting timeframe. | Burden will be cleared at a later date through a separate information collection. | Costs will be cleared through separate information collection. |
| § 668.605 ........ | Add a new § 668.605 to require warnings to current and prospective students if a GE program is at risk of losing title IV, HEA eligibility, to specify the content and delivery parameters of such notifications, and to require that students must acknowledge having seen the warning before the institution may disburse any title IV, HEA funds. | 1845 NEW4, +273,247 ........ | $6,410,456. |

The total burden hours and change in burden hours associated with each OMB Control number affected by the final regulations follows: 1845–0022, 1845– NEW1, 1845–NEW2, 1845–NEW3, 1845–NEW4.

| Control No. | Total burden hours | Change in burden hours |
|---|---|---|
| 1845 0022 ............................................................................................................................... | 2,663,120 | +374,872 |
| 1845 NEW1 ............................................................................................................................. | 3,200 | +3,200 |
| 1845 NEW2 ............................................................................................................................. | 50,000 | +50,000 |
| 1845 NEW3 ............................................................................................................................. | 69,268 | +69,268 |
| 1845 NEW4 ............................................................................................................................. | 273,247 | +273,247 |
| Total ................................................................................................................................. | 3,058,835 | 770,587 |

If you want to comment on the information collection requirements, please send your comments to the Office of Information and Regulatory Affairs in OMB, Attention: Desk Officer for the U.S. Department of Education. Send these comments by email to *OIRA_DOCKET@omb.eop.gov* or by fax to (202)395–6974. You may also send a copy of these comments to the Department contact named in the **ADDRESSES** section of the preamble.

We have prepared the Information Collection Request (ICR) for these collections. You may review the ICR which is available at *www.reginfo.gov.* Click on Information Collection Review. These collections are identified as collections 1845–022, 1845–NEW1, 1845–NEW2, 1845–NEW3, 1845–NEW4.

Intergovernmental Review

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive Order is to foster an intergovernmental partnership and a strengthened federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This provides early notification of our specific plans and actions for this program.

Assessment of Educational Impact

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether these proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* On request to one of the program contact persons listed under **FOR FURTHER INFORMATION CONTACT,** individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects

*34 CFR Part 600*

Colleges and universities, Foreign relations, Grant programs-education, Loan programs—education, Reporting and recordkeeping requirements, Selective service system, Student aid, Vocational education.

*34 CFR Part 668*

Administrative practice and procedure, Aliens, Colleges and universities, Consumer protection, Grant programs-education, Loan programs-education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

**Miguel A. Cardona,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary proposes to amend parts 600 and 668 of title 34 of the Code of Federal Regulations as follows:

## PART 600  INSTITUTIONAL ELIGIBILITY UNDER THE HIGHER EDUCATION ACT OF 1965, AS AMENDED

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 20 U.S.C. 1001, 1002, 1003, 1088, 1091, 1094, 1099b, and 1099c, unless otherwise noted.

■ 2. Section 600.10, amended October 28, 2022 at 87 FR 65426, is further amended by:
■ a. In paragraph (c)(1)(iii) removing the word "and" at the end of the paragraph;
■ b. Revising paragraph (c)(1)(iv); and
■ c. Adding paragraph (c)(1)(v).
The revisions and addition read as follows:

### § 600.10  Date, extent, duration, and consequence of eligibility.

*   *   *   *   *

(c) *   *   *
(1) *   *   *

(iv) For the first eligible prison education program under subpart P of 34 CFR part 668 offered at the first two additional locations (as defined in § 600.2) at a Federal, State, or local penitentiary, prison, jail, reformatory, work farm, juvenile justice facility, or other similar correctional institution; and

(v) For a gainful employment program under 34 CFR part 668, subpart S, subject to any restrictions in 34 CFR 668.603 on establishing or reestablishing the eligibility of the program, update its application under § 600.21.

*   *   *   *   *

■ 3. Section 600.21 is amended by:
■ a. Revising paragraph (a) introductory text.
■ b. In paragraph (a)(11)(iv) by removing the word "or".
■ c. Revising paragraph (a)(11)(v).
■ d. Adding paragraph (a)(11)(vi).
The revisions and addition read as follows:

### § 600.21  Updating application information.

(a) *Reporting requirements.* Except as provided in paragraph (b) of this section, an eligible institution must report to the Secretary, in a manner prescribed by the Secretary and no later than 10 days after the change occurs, any change in the following:

*   *   *   *   *

(11) *   *   *

(v) Changing the program's name, CIP code, or credential level; or

(vi) Updating the certification pursuant to 34 CFR 668.604.

*   *   *   *   *

## PART 668  STUDENT ASSISTANCE GENERAL PROVISIONS

■ 4. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 1231a, unless otherwise noted.

Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141.

Section 668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.

Section 668.91 also issued under 20 U.S.C. 1082, 1094.

Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95–452, 92 Stat. 1101–1109.

Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95–452, 92 Stat. 1101–1109.

Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.

■ 5. In § 668.2 amend paragraph (b) by adding, in alphabetical order, definitions of "Annual debt-to-earnings rate," "Classification of instructional program (CIP) code," "Cohort period," "Credential level," "Debt-to-earnings rates (D/E rates)," "Discretionary debt-to-earnings rate (Discretionary D/E rate)", "Earnings premium," "Earnings threshold," "Eligible career pathway program," "Eligible non-GE program," "Federal agency with earnings data," "Financial exigency," "Gainful employment program (GE program)," "Institutional grants and scholarships," "Length of the program," "Metropolitan statistical area," "Poverty Guideline," "Prospective student," "Student," and "Title IV loan" to read as follows:

### § 668.2  General definitions.

*   *   *   *   *

(b) *   *   *

*Annual debt-to-earnings rate (Annual D/E rate):* The ratio of a program's annual loan payment amount to the annual earnings of the students who completed the program, expressed as a percentage, as calculated under § 668.404.

*   *   *   *   *

*Classification of instructional program (CIP) code.* A taxonomy of instructional program classifications and descriptions developed by the U.S. Department of Education's National Center for Education Statistics (NCES). Specific programs offered by institutions are classified using a six-digit CIP code.

*Cohort period.* The set of award years used to identify a cohort of students who completed a program and whose debt and earnings outcomes are used to calculate debt-to-earnings rates and the earnings premium measure under subpart Q of this part. The Secretary uses a two-year cohort period to calculate the debt-to-earnings rates and earnings premium measure for a program when the number of students (after exclusions identified in §§ 668.403(e) and 668.404(c)) in the two-year cohort period is 30 or more. The Secretary uses a four-year cohort period to calculate the debt-to-earnings rates and earnings premium measure when the number of students completing the program in the two-year cohort period is fewer than 30 and when the number of students completing the program in the four-year cohort period is 30 or more. The cohort period covers consecutive award years that are—

(1) For the two-year cohort period—

(i) The third and fourth award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated, pursuant to §§ 668.403 and 668.404; or

(ii) For a program whose students are required to complete a medical or dental internship or residency, the sixth and seventh award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated. For this purpose, a required medical or dental internship or residency is a supervised training program that—

(A) Requires the student to hold a degree as a doctor of medicine or osteopathy, or as a doctor of dental science;

(B) Leads to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility that offers post-graduate training; and

(C) Must be completed before the student may be licensed by a State and board certified for professional practice or service.

(2) For the four-year cohort period—

(i) The third, fourth, fifth, and sixth award years prior to the year for which the most recent data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated, pursuant to §§ 668.403 and 668.404; or

(ii) For a program whose students are required to complete a medical or dental internship or residency, the sixth, seventh, eighth, and ninth award years prior to the year for which the most recent earnings data are available from the Federal agency with earnings data at the time the D/E rates and earnings premium measure are calculated. For this purpose, a required medical or dental internship or residency is a supervised training program that meets the requirements in paragraph (1)(ii) of this definition.

*Credential level.* The level of the academic credential awarded by an institution to students who complete the program. For the purposes of this subpart, the undergraduate credential levels are: undergraduate certificate or diploma, associate degree, bachelor's degree, and post-baccalaureate certificate; and the graduate credential levels are master's degree, doctoral degree, first-professional degree (*e.g.,* MD, DDS, JD), and graduate certificate (including a postgraduate certificate).

*Debt-to-earnings rates (D/E rates).* The discretionary debt-to-earnings rate and annual debt-to-earnings rate as calculated under § 668.403.

\*    \*    \*    \*    \*

*Discretionary debt-to-earnings rate (Discretionary D/E rate).* The percentage of a program's annual loan payment compared to the discretionary earnings of the students who completed the program, as calculated under § 668.403.

*Earnings premium.* The amount by which the median annual earnings of students who recently completed a program exceed the earnings threshold, as calculated under § 668.404. If the median annual earnings of recent completers is equal to the earnings threshold, the earnings premium is zero. If the median annual earnings of recent completers is less than the earnings threshold, the earnings premium is negative.

*Earnings threshold.* Based on data from a Federal agency with earnings data, the median earnings for working adults aged 25–34, who either worked during the year or were unemployed when interviewed, with only a high school diploma (or recognized equivalent)—

(1) In the State in which the institution is located; or

(2) Nationally, if fewer than 50 percent of the students in the program are located in the State where the institution is located while enrolled.

*Eligible career pathway program.* A program that combines rigorous and high-quality education, training, and other services that—

(1) Align with the skill needs of industries in the economy of the State or regional economy involved;

(2) Prepare an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 *et seq.*);

(3) Include counseling to support an individual in achieving the individual's education and career goals;

(4) Include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

(5) Organize education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

(6) Enable an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and

(7) Help an individual enter or advance within a specific occupation or occupational cluster.

*Eligible non-GE program.* For purposes of subpart Q of this part, an educational program other than a GE program offered by an institution and approved by the Secretary to participate in the title IV, HEA programs, identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID), the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level. Includes all coursework associated with the program's credential level.

\*    \*    \*    \*    \*

*Federal agency with earnings data.* A Federal agency with which the Department enters into an agreement to access earnings data for the D/E rates and earnings threshold measure. The agency must have individual earnings data sufficient to match with title IV, HEA recipients who completed any title IV-eligible program during the cohort period and may include agencies such as the Treasury Department (including the Internal Revenue Service), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau.

\*    \*    \*    \*    \*

*Financial exigency.* A status declared by an institution to a governmental entity or its accrediting agency representing severe financial distress that, absent significant reductions in expenditures or increases in revenue, reductions in administrative staff or faculty, or the elimination of programs, departments, or administrative units, could result in the closure of the institution.

\*    \*    \*    \*    \*

*Gainful employment program (GE program).* An educational program offered by an institution under § 668.8(c)(3) or (d) and identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level.

\*    \*    \*    \*    \*

*Institutional grants and scholarships.* Assistance that the institution or its affiliate controls or directs to reduce or offset the original amount of a student's institutional costs and that does not have to be repaid. Typically a grant, scholarship, fellowship, discount, or fee waiver.

\*    \*    \*    \*    \*

*Length of the program.* The amount of time in weeks, months, or years that is specified in the institution's catalog, marketing materials, or other official publications for a student to complete the requirements needed to obtain the degree or credential offered by the program.

\*    \*    \*    \*    \*

*Metropolitan statistical area:* A core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core.

\*    \*    \*    \*    \*

*Poverty Guideline.* The Poverty Guideline for a single person in the continental United States, as published by the U.S. Department of Health and Human Services and available at *http://aspe.hhs.gov/poverty* or its successor site.

\*    \*    \*    \*    \*

*Prospective student.* An individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a program or who has been contacted directly by the institution or by a third

party on behalf of the institution about enrolling in a program.

\*    \*    \*    \*    \*

*Student.* For the purposes of subparts Q and S of this part, an individual who received title IV, HEA program funds for enrolling in the program.

\*    \*    \*    \*    \*

*Title IV loan.* A loan authorized under the William D. Ford Direct Loan Program (Direct Loan).

\*    \*    \*    \*    \*

■ 6. Section 668.13 is amended by:
■ a. Removing paragraph (b)(3).
■ b. Revising paragraphs (c)(1) an (2).
■ c. Revising paragraph (d)(2)(ii).
■ d. Adding paragraph (e).
   The revisions and addition read as follows:

### § 668.13   Certification procedures.

\*    \*    \*    \*    \*

(c) * * *
(1)(i) The Secretary may provisionally certify an institution if—
(A) The institution seeks initial participation in a Title IV, HEA program;
(B) The institution is an eligible institution that has undergone a change in ownership that results in a change in control according to the provisions of 34 CFR part 600;
(C) The institution is a participating institution that is applying for a renewal of certification—
(*1*) That the Secretary determines has jeopardized its ability to perform its financial responsibilities by not meeting the factors of financial responsibility under subpart L of this part or the standards of administrative capability under § 668.16;
(*2*) Whose participation has been limited or suspended under subpart G of this part; or
(*3*) That voluntarily enters into provisional certification;
(D) The institution seeks to be reinstated to participate in a Title IV, HEA program after a prior period of participation in that program ended;
(E) The institution is a participating institution that was accredited or preaccredited by a nationally recognized accrediting agency on the day before the Secretary withdrew the Secretary's recognition of that agency according to the provisions contained in 34 CFR part 602; or
(F) The Secretary has determined that the institution is at risk of closure.
(G) The institution is under the provisions of subpart L.
(ii) An institution's certification becomes provisional upon notification from the Secretary if—
(A) The institution triggers one of the financial responsibility events under

§ 668.171(c) or (d) and, as a result, the Secretary requires the institution to post financial protection; or
(B) Any owner or interest holder of the institution with control over that institution, as defined in 34 CFR 600.31, also owns another institution with fines or liabilities owed to the Department and is not making payments in accordance with an agreement to repay that liability.
(iii) A proprietary institution's certification automatically becomes provisional at the start of a fiscal year if it did not derive at least 10 percent of its revenue for its preceding fiscal year from sources other than Federal educational assistance funds, as required under § 668.14(b)(16).
(2) If the Secretary provisionally certifies an institution, the Secretary also specifies the period for which the institution may participate in a Title IV, HEA program. Except as provided in paragraph (c)(3) of this section or subpart L, a provisionally certified institution's period of participation expires—
(i) Not later than the end of the first complete award year following the date on which the Secretary provisionally certified the institution for its initial certification;
(ii) Not later than the end of the second complete award year following the date on which the Secretary provisionally certified an institution for reasons related to substantial liabilities owed or potentially owed to the Department for discharges related to borrower defense to repayment or false certification, or arising from claims under consumer protection laws;
(iii) Not later than the end of the third complete award year following the date on which the Secretary provisionally certified the institution as a result of a change in ownership, recertification, reinstatement, automatic re-certification, or a failure under 668.14(b)(32); and
(iv) If the Secretary provisionally certified the institution as a result of its accrediting agency losing recognition, not later than 18 months after the date that the Secretary withdrew recognition from the institution's nationally recognized accrediting agency.

\*    \*    \*    \*    \*

(d) * * *
(2) * * *
(ii) The revocation takes effect on the date that the Secretary transmits the notice to the institution.

\*    \*    \*    \*    \*

(e) *Supplementary performance measures.* In determining whether to certify, or condition the participation of,

an institution under §§ 668.13 and 668.14, the Secretary may consider the following, among other information at the program or institutional level:
(i) *Withdrawal rate.* The percentage of students who withdrew from the institution within 100 percent or 150 percent of the published length of the program.
(ii) *Debt-to-earnings rates.* The debt-to-earnings rates under § 668.403, if applicable.
(iii) *Earnings premium measure.* The earnings premium measure under § 668.404, if applicable.
(iv) *Educational and pre-enrollment expenditures.* The amounts the institution spent on instruction and instructional activities, academic support, and support services, and the amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures, as provided through a disclosure in the audited financial statements required under § 668.23(d).
(v) *Licensure pass rate.* If a program is designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, and the institution is required by an accrediting agency or State to report passage rates for the licensure exam for the program, such passage rates.

\*    \*    \*    \*    \*

■ 7. Section 668.14 is amended by:
■ a. Adding paragraph (a)(3).
■ b. Revising paragraphs (b)(5), (17), (18), and (26).
■ c. In paragraph (b)(30)(ii)(C) removing the word "and" at the end of the paragraph.
■ d. Adding paragraphs (b)(32) through (b)(34).
■ e. Redesignating paragraphs (e) through (h) as paragraphs (h) through (k), respectively.
■ f. Adding new paragraphs (e) through (g).
   The revisions and additions read as follows:

### § 668.14   Program participation agreement.

(a) * * *
(3) An institution's program participation agreement must be signed by—
(i) An authorized representative of the institution; and
(ii) For a proprietary or private nonprofit institution, an authorized representative of an entity with direct or indirect ownership of the institution if that entity has the power to exercise control over the institution. The Secretary considers the following as examples of circumstances in which an entity has such power:
(A) If the entity has at least 50 percent control over the institution through

direct or indirect ownership, by voting rights, by its right to appoint board members to the institution or any other entity, whether by itself or in combination with other entities or natural persons with which it is affiliated or related, or pursuant to a proxy or voting or similar agreement.

(B) If the entity has the power to block significant actions.

(C) If the entity is the 100 percent direct or indirect interest holder of the institution.

(D) If the entity provides or will provide the financial statements to meet any of the requirements of 34 CFR 600.20(g) or (h), or subpart L of this part.

(b) * * *

(5) It will comply with the provisions of subpart L relating to factors of financial responsibility;

* * * * *

(17) The Secretary, guaranty agencies and lenders as defined in 34 CFR part 682, nationally recognized accrediting agencies, Federal agencies, State agencies recognized under 34 CFR part 603 for the approval of public postsecondary vocational education, State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, and State attorneys general have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law;

(18) It will not knowingly—

(i) Employ in a capacity that involves the administration of the title IV, HEA programs or the receipt of funds under those programs, an individual who has been

(A) Convicted of, or pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds;

(B) Administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(C) An owner, director, officer, or employee who exercised substantial control over an institution, or a direct or indirect parent entity of an institution, that owes a liability for a violation of a title IV, HEA program, requirement and is not making payments in accordance with an agreement to repay that liability; or

(D) A Ten-percent-or-higher equity owner, director, officer, principal, executive, or contractor at an institution in any year in which the institution

incurred a loss of Federal funds in excess of 5 percent of the participating institution's annual title IV, HEA program funds.

(ii) Contract with any institution, third-party servicer, individual, agency, or organization that has, or whose owners, officers or employees have—

(A) Been convicted of, or pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds;

(B) Been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(C) Had its participation in the title IV programs terminated, certification revoked, or application for certification or recertification for participation in the title IV programs denied;

(D) Been an owner, director, officer, or employee who exercised substantial control over an institution, or a direct or indirect parent entity of an institution, that owes a liability for a violation of a title IV, HEA program requirement and is not making payments in accordance with an agreement to repay that liability; or

(E) Been a ten-percent-or-higher equity owner, director, officer, principal, executive, or contractor affiliated with another institution in any year in which the other institution incurred a loss of Federal funds in excess of 5 percent of the participating institution's annual title IV, HEA program funds.

* * * * *

(26) If an educational program offered by the institution is required to prepare a student for gainful employment in a recognized occupation, the institution must—

(i) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student; and

(ii) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to the greater of—

(A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency; or

(B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if certain criteria is met. This exception to paragraph (A) would only be applicable if the institution documents, with substantiation by a certified public accountant who prepares the institution's compliance audit report as required under § 668.23 that—

(*1*) A majority of students resided in that State while enrolled in the program during the most recently completed award year;

(*2*) A majority of students who completed the program in the most recently completed award year were employed in that State; or

(*3*) The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State;

* * * * *

(32) In each State in which the institution is located or in which students enrolled by the institution are located, as determined at the time of initial enrollment in accordance with 34 CFR 600.9(c)(2), the institution must determine that each program eligible for title IV, HEA program funds—

(i) Is programmatically accredited if the State or a Federal agency requires such accreditation, including as a condition for employment in the occupation for which the program prepares the student, or is programmatically pre-accredited when programmatic pre-accreditation is sufficient according to the State or Federal agency;

(ii) Satisfies the applicable educational prerequisites for professional licensure or certification requirements in the State so that a student who completes the program and seeks employment in that State qualifies to take any licensure or certification exam that is needed for the student to practice or find employment in an occupation that the program prepares students to enter; and

(iii) Complies with all State consumer protection laws related to closure, recruitment, and misrepresentations, including both generally applicable State laws and those specific to educational institutions;

(33) It will not withhold transcripts or take any other negative action against a student related to a balance owed by the student that resulted from an error in

the institution's administration of the title IV, HEA programs, any fraud or misconduct by the institution or its personnel, or returns of title IV, HEA funds required under § 668.22 unless the balance owed was the result of fraud on the part of the student; and

(34) It will not maintain policies and procedures to encourage, or condition institutional aid or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including Federal loan funds, that the student receives, except that the institution may provide a scholarship on the condition that a student forego borrowing if the amount of the scholarship provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow.

*       *       *       *       *

(e) If an institution is provisionally certified, the Secretary may apply such conditions as are determined to be necessary or appropriate to the institution, including, but not limited to—

(1) For an institution that the Secretary determines may be at risk of closure—

(i) Submission of an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency; and

(ii) Submission to the Department of an acceptable records retention plan that addresses title IV, HEA records, including but not limited to student transcripts, and evidence that the plan has been implemented;

(2) For an institution that the Secretary determines may be at risk of closure, that is teaching out or closing, or that is not financially responsible or administratively capable, the release of holds on student transcripts;

(3) Restrictions or limitations on the addition of new programs or locations;

(4) Restrictions on the rate of growth, new enrollment of students, or Title IV, HEA volume in one or more programs;

(5) Restrictions on the institution providing a teach-out on behalf of another institution;

(6) Restrictions on the acquisition of another participating institution, which may include, in addition to any other required financial protection, the posting of financial protection in an amount determined by the Secretary but not less than 10 percent of the acquired institution's Title IV, HEA volume for the prior fiscal year;

(7) Additional reporting requirements, which may include, but are not limited to, cash balances, an actual and protected cash flow statement, student rosters, student complaints, and interim unaudited financial statements;

(8) Limitations on the institution entering into a written arrangement with another eligible institution or an ineligible institution or organization for that other eligible institution or ineligible institution or organization to provide between 25 and 50 percent of the institution's educational program under § 668.5(a) or (c); and

(9) For an institution alleged or found to have engaged in misrepresentations to students, engaged in aggressive recruiting practices, or violated incentive compensation rules, requirements to hire a monitor and to submit marketing and other recruiting materials (*e.g.,* call scripts) for the review and approval of the Secretary.

(f) If a proprietary institution seeks to convert to nonprofit status following a change in ownership, the following conditions will apply to the institution following the change in ownership, in addition to any other conditions that the Secretary may deem appropriate:

(1) The institution must continue to meet the requirements under § 668.28(a) until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years in which the institution meets the requirements of § 668.14(b)(16) under its new ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(2) The institution must continue to meet the gainful employment requirements of subpart S of this part until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years under its new ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(3) The institution must submit regular and timely reports on agreements entered into with a former owner of the institution or a natural person or entity related to or affiliated with the former owner of the institution, so long as the institution participates as a nonprofit institution.

(4) The institution may not advertise that it operates as a nonprofit institution for the purposes of Title IV, HEA until the Department approves the institution's request to convert to nonprofit status.

(g) If an institution is initially certified as a nonprofit institution, or if it has undergone a change of ownership and seeks to convert to nonprofit status, the following conditions will apply to the institution upon initial certification or following the change in ownership, in addition to any other conditions that the Secretary may deem appropriate:

(1) The institution must submit reports on accreditor and State authorization agency actions and any new servicing agreements within 10 business days of receipt of the notice of the action or of entering into the agreement, as applicable, until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years following initial certification, or two complete fiscal years after a change in ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(2) The institution must submit a report and copy of the communications from the Internal Revenue Service or any State or foreign country related to tax-exempt or nonprofit status within 10 business days of receipt so long as the institution participates as a nonprofit institution.

*       *       *       *       *

### § 668.15   [Removed and Reserved]

■ 8. Remove and reserve § 668.15.
■ 9. Section 668.16 is amended by:
■ a. Revising the introductory text, and paragraphs (h_, (k), (m), (n) and (p); and
■ b. Adding paragraphs (q) through (v).
  The revisions and additions read as follows:

### § 668.16   Standards of administrative capability.

  To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that the institution is capable of adequately administering that program under each of the standards established in this section. The Secretary considers an institution to have that administrative capability if the institution—

*       *       *       *       *

(h) Provides adequate financial aid counseling with clear and accurate information to students who apply for title IV, HEA program assistance. In determining whether an institution provides adequate counseling, the Secretary considers whether its counseling and financial aid communications advise students and families to accept the most beneficial types of financial assistance available to them and include information regarding—

(1) The cost of attendance of the institution as defined under section 472 of the HEA, including the individual components of those costs and a total of the estimated costs that will be owed directly to the institution, for students, based on their attendance costs;

(2) The source and amount of each type of aid offered, separated by the type of the aid and whether it must be earned or repaid;

(3) The net price, as determined by subtracting total grant or scholarship aid included in paragraph (h)(2) of this section from the cost of attendance in paragraph (h)(1) of this section;

(4) The method by which aid is determined and disbursed, delivered, or applied to a student's account, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts; and

(5) The rights and responsibilities of the student with respect to enrollment at the institution and receipt of financial aid, including the institution's refund policy, the requirements for the treatment of title IV, HEA program funds when a student withdraws under § 668.22, its standards of satisfactory progress, and other conditions that may alter the student's aid package;

\*    \*    \*    \*    \*

(k)(1) Is not, and has not been—

(i) Debarred or suspended under Executive Order (E.O.) 12549 (3 CFR, 1986 Comp., p. 189) or the Federal Acquisition Regulations (FAR), 48 CFR part 9, subpart 9.4; or

(ii) Engaging in any activity that is a cause under 2 CFR 180.700 or 180.800, as adopted at 2 CFR 3485.12, for debarment or suspension under Executive Order (E.O.) 12549 (3 CFR, 1986 Comp., p. 189) or the FAR, 48 CFR part 9, subpart 9.4; and

(2) Does not have any principal or affiliate of the institution (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or previously exercised substantial control over the institution as defined in § 668.174(c)(3), who—

(i) Has been convicted of, or has pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, Tribal, or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving those funds; or

(ii) Is a current or former principal or affiliate (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or exercised substantial control as defined in § 668.174(c)(3), of another institution

whose misconduct or closure contributed to liabilities to the Federal government in excess of 5 percent of its title IV, HEA program funds in the award year in which the liabilities arose or were imposed;

\*    \*    \*    \*    \*

(m)(1) Has a cohort default rate—

(i) That is less than 25 percent for each of the three most recent fiscal years during which rates have been issued, to the extent those rates are calculated under subpart M of this part;

(ii) On or after 2014, that is less than 30 percent for at least two of the three most recent fiscal years during which the Secretary has issued rates for the institution under subpart N of this part; and

(iii) As defined in 34 CFR 674.5, on loans made under the Federal Perkins Loan Program to students for attendance at that institution that does not exceed 15 percent;

(2) Provided that—

(i) if the Secretary determines that an institution's administrative capability is impaired solely because the institution fails to comply with paragraph (m)(1) of this section, and the institution is not subject to a loss of eligibility under § 668.187(a) or § 668.206(a), the Secretary allows the institution to continue to participate in the title IV, HEA programs. In such a case, the Secretary may provisionally certify the institution in accordance with § 668.13(c) except as provided in paragraphs (m)(2)(ii) through (v) of this section;

(ii) An institution that fails to meet the standard of administrative capability under paragraph (m)(1)(ii) of this section based on two cohort default rates that are greater than or equal to 30 percent but less than or equal to 40 percent is not placed on provisional certification under paragraph (m)(2)(i) of this section if it—

(A) Has timely filed a request for adjustment or appeal under § 668.209, § 668.210, or § 668.212 with respect to the second such rate, and the request for adjustment or appeal is either pending or succeeds in reducing the rate below 30 percent;

(B) Has timely filed an appeal under § 668.213 after receiving the second such rate, and the appeal is either pending or successful; or

(C)(*1*) Has timely filed a participation rate index challenge or appeal under § 668.204(c) or § 668.214 with respect to either or both of the two rates, and the challenge or appeal is either pending or successful; or

(*2*) If the second rate is the most recent draft rate, and the institution has

timely filed a participation rate challenge to that draft rate that is either pending or successful;

(iii) The institution may appeal the loss of full participation in a title IV, HEA program under paragraph (m)(2)(i) of this section by submitting an erroneous data appeal in writing to the Secretary in accordance with and on the grounds specified in § 668.192 or § 668.211 as applicable;

(iv) If the institution has 30 or fewer borrowers in the three most recent cohorts of borrowers used to calculate its cohort default rate under subpart N of this part, we will not provisionally certify it solely based on cohort default rates; and

(v) If a rate that would otherwise potentially subject the institution to provisional certification under paragraphs (m)(1)(ii) and 2(i) of this section is calculated as an average rate, we will not provisionally certify it solely based on cohort default rates;

(n) Has not been subject to a significant negative action or a finding as by a State or Federal agency, a court or an accrediting agency where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive, and the institution has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

\*    \*    \*    \*    \*

(p) Develops and follows adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education, consistent with the following requirements:

(1) Adequate procedures to evaluate the validity of a student's high school diploma must include—

(i) Obtaining documentation from the high school that confirms the validity of the high school diploma, including at least one of the following—

(A) Transcripts;

(B) Written descriptions of course requirements; or

(C) Written and signed statements by principals or executive officers at the high school attesting to the rigor and quality of coursework at the high school;

(ii) If the high school is regulated or overseen by a State agency, Tribal agency, or Bureau of Indian Education, confirming with, or receiving documentation from that agency that the high school is recognized or meets

requirements established by that agency; and

(iii) If the Secretary has published a list of high schools that issue invalid high school diplomas, confirming that the high school does not appear on that list; and

(2) A high school diploma is not valid if it—

(i) Did not meet the applicable requirements established by the appropriate State agency, Tribal agency, or Bureau of Indian Education in the State where the high school is located and, if the student does not attend in-person classes, the State where the student was located at the time the diploma was obtained;

(ii) Has been determined to be invalid by the Department, the appropriate State agency in the State where the high school was located, or through a court proceeding;

(iii) Was obtained from an entity that requires little or no secondary instruction or coursework to obtain a high school diploma, including through a test that does not meet the requirements for a recognized equivalent of a high school diploma under 34 CFR 600.2; or

(iv) Was obtained from an entity that—

(A) Maintains a business relationship or is otherwise affiliated with the eligible institution at which the student is enrolled; and

(B) Is not accredited.

(q) Provides adequate career services to eligible students who receive title IV, HEA program assistance. In determining whether an institution provides adequate career services, the Secretary considers—

(1) The share of students enrolled in programs designed to prepare students for gainful employment in a recognized occupation;

(2) The number and distribution of career services staff;

(3) The career services the institution has promised to its students; and

(4) The presence of institutional partnerships with recruiters and employers who regularly hire graduates of the institution;

(r) Provides students, within 45 days of successful completion of other required coursework, geographically accessible clinical or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation;

(s) Disburses funds to students in a timely manner that best meets the students' needs. The Secretary does not consider the manner of disbursements to be consistent with students' needs if, among other conditions—

(1) The Secretary is aware of multiple verified and relevant student complaints;

(2) The institution has high rates of withdrawals attributable to delays in disbursements;

(3) The institution has delayed disbursements until after the point at which students have earned 100 percent of their eligibility for title IV, HEA funds, in accordance with the return to title IV, HEA requirements in 34 CFR 668.22; or

(4) The institution has delayed disbursements with the effect of ensuring the institution passes the 90/10 ratio;

(t) Offers gainful employment (GE) programs subject to subpart S of this part and—

(1) At least half of its total title IV, HEA funds in the most recent award year are not from programs that are "failing" under subpart S; and

(2) At least half of its full-time equivalent title IV-receiving students are not enrolled in programs that are "failing" under subpart S;

(u) Does not engage in misrepresentations, as defined in subpart F of this part, or aggressive and deceptive recruitment tactics or conduct, including as defined in subpart R of this part; or

(v) Does not otherwise appear to lack the ability to administer the title IV, HEA programs competently.

*    *    *    *    *

■ 10. Section 668.23 amended October 28, 2022 at 87 FR 65426, is further amended by

■ a. Revising paragraphs (a)(4), (a)(5), (d)(1), and (d)(2).

■ b. Adding paragraph (d)(5).

The revisions and addition read as follows:

### § 668.23  Compliance audits and audited financial statements.

(a) * * *

(4) *Submission deadline.* Except as provided by the Single Audit Act, chapter 75 of title 31, United States Code, an institution must submit annually to the Department its compliance audit and its audited financial statements by the date that is the earlier of—

(i) Thirty days after the later of the date of the auditor's report for the compliance audit and the date of the auditor's report for the audited financial statements; or

(ii) Six months after the last day of the institution's fiscal year.

(5) *Audit submission requirements.* In general, the Department considers the compliance audit and audited financial statements submission requirements of

this section to be satisfied by an audit conducted in accordance with 2 CFR part 200—Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards, or the audit guides developed by and available from the Department of Education's Office of Inspector General, whichever is applicable to the entity, and provided that the Federal student aid functions performed by that entity are covered in the submission.

*    *    *    *    *

(d) * * *

(1) *General.* To enable the Department to make a determination of financial responsibility, an institution must, to the extent requested by the Department, submit to the Department a set of acceptable financial statements for its latest complete fiscal year (or such fiscal years as requested by the Department or required by these regulations), as well as any other documentation the Department deems necessary to make that determination. Financial statements submitted to the Department must match the fiscal year end of the entity's annual return(s) filed with the Internal Revenue Service. Financial statements submitted to the Department must include the Supplemental Schedule required under § 668.172(a) and section 2 of Appendix A and B to subpart L of this part, and be prepared on an accrual basis in accordance with generally accepted accounting principles, and audited by an independent auditor in accordance with generally accepted government auditing standards, issued by the Comptroller General of the United States and other guidance contained in 2 CFR part 200—Uniform Administrative Requirements, Cost Principles, And Audit Requirements For Federal Awards; or in audit guides developed by and available from the Department of Education's Office of Inspector General, whichever is applicable to the entity, and provided that the Federal student aid functions performed by that entity are covered in the submission. As part of these financial statements, the institution must include a detailed description of related entities based on the definition of a related entity as set forth in Accounting Standards Codification (ASC) 850. The disclosure requirements under this provision extend beyond those of ASC 850 to include all related parties and a level of detail that would enable the Department to readily identify the related party. Such information must include, but is not limited to, the name, location and a description of the related entity including the nature and amount of any

transactions between the related party and the institution, financial or otherwise, regardless of when they occurred.

(2) *Submission of additional information.* (i) In determining whether an institution is financially responsible, the Department may also require the submission of audited consolidated financial statements, audited full consolidating financial statements, audited combined financial statements, or the audited financial statements of one or more related parties that have the ability, either individually or collectively, to significantly influence or control the institution, as determined by the Department.

(ii) For a domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution, the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized, including, at a minimum, the date of organization, a current certificate of good standing, and a copy of the authorizing statute for such entity status. The institution must also provide documentation that is equivalent to articles of organization and bylaws and any current operating or shareholders' agreements. The Department may also require the submission of additional documents related to the entity's status under the foreign jurisdiction as needed to assess the entity's financial status. Documents must be translated into English.

*    *    *    *    *

(5) *Disclosure of amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures.* An institution must disclose in a footnote to its financial statement audit the dollar amounts it has spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures.

*    *    *    *    *

■ 11. Section 668.32, amended October 28, 2022 at 87 FR 65426, is further amended by revising paragraphs (e)(2), (e)(3), and (e)(5) to read as follows:

**§ 668.32    Student eligibility.**

*    *    *    *    *

(e) * * *

(2) Has obtained a passing score specified by the Secretary on an independently administered test in accordance with subpart J of this part, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2;

(3) Is enrolled in an eligible institution that participates in a State process approved by the Secretary under subpart J of this part, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2;

*    *    *    *    *

(5) Has been determined by the institution to have the ability to benefit from the education or training offered by the institution based on the satisfactory completion of 6 semester hours, 6 trimester hours, 6 quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by the institution, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2.

*    *    *    *    *

■ 12. Section 668.43, amended October 28, 2022 at 87 FR 65426, is further amended by:
■ a. Revising the section heading.
■ b. Revising paragraph (a)(5)(v).
■ c. Adding paragraph (d).
The revisions and addition read as follows:

**§ 668.43    Institutional and programmatic information.**

(a) * * *
(5) * * *
(v) If an educational program is designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, or is advertised as meeting such requirements, a list of all States where the institution is aware that the program does and does not meet such requirements;

*    *    *    *    *

(d)(1) *Disclosure website.* An institution must provide such information about the institution and educational programs it offers as the Secretary prescribes through a notice published in the **Federal Register** for disclosure to prospective students and enrolled students through a website established and maintained by the Secretary. The Secretary may conduct consumer testing to inform the design of the website. The Secretary may include on the website the following items, among others:

(i) The primary occupations (by name, SOC code, or both) that the program prepares students to enter, along with links to occupational profiles on O*NET (*www.onetonline.org*) or its successor site.

(ii) As reported to or calculated by the Secretary, the program's or institution's

completion rates and withdrawal rates for full-time and less-than-full-time students.

(iii) The published length of the program in calendar time (*i.e.,* weeks, months, years).

(iv) The total number of individuals enrolled in the program during the most recently completed award year.

(v) As calculated by the Secretary, the program's debt-to-earnings rates;

(vi) As calculated by the Secretary, the program's earnings premium measure.

(vii) As calculated by the Secretary, the loan repayment rate for students or graduates who entered repayment on title IV loans during a period determined by the Secretary.

(viii) The total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the published length of the program.

(ix) Of the individuals enrolled in the program during the most recently completed award year, the percentage who received a title IV loan, a private loan, or both for enrollment in the program.

(x) As calculated by the Secretary, the median loan debt of students who completed the program during the most recently completed award year or for all students who completed or withdrew from the program during that award year.

(xi) As provided by the Secretary, the median earnings of students who completed the program or of all students who completed or withdrew from the program, during a period determined by the Secretary.

(xii) Whether the program is programmatically accredited and the name of the accrediting agency, as reported to the Secretary.

(xiii) The supplementary performance measures in § 668.13(e).

(xiv) A link to the U.S. Department of Education's College Navigator website, or its successor site, or other similar Federal resource.

(2) *Program web pages.* The institution must provide a prominent link to, and any other needed information to access, the website maintained by the Secretary on any web page containing academic, cost, financial aid, or admissions information about the program or institution. The Secretary may require the institution to modify a web page if the information is not sufficiently prominent, readily accessible, clear, conspicuous, or direct.

(3) *Distribution to prospective students.* The institution must provide the relevant information to access the website maintained by the Secretary to

any prospective student, or a third party acting on behalf of the prospective student, before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution.

(4) *Distribution to enrolled students.* The institution must provide the relevant information to access the website maintained by the Secretary to any enrolled title IV, HEA recipient prior to the start date of the first payment period associated with each subsequent award year in which the student continues enrollment at the institution.

\* \* \* \* \*

■ 13. Section 668.91 is amended by:
■ a. In paragraph (a)(3)(v)(B)(*2*) removing the period at the end of the paragraph and adding, in its place, ''; and''.
■ b. Adding paragraph (a)(3)(vi).
The addition reads as follows:

### §668.91   Initial and final decisions.

(a) \* \* \*
(3) \* \* \*
(vi) In a termination action against a GE program based upon the program's failure to meet the requirements in §668.403 or §668.404, the hearing official must terminate the program's eligibility unless the hearing official concludes that the Secretary erred in the applicable calculation.

\* \* \* \* \*

■ 14. Revise §668.156 to read as follows:

### §668.156   Approved State process.

(a)(1) A State that wishes the Secretary to consider its State process as an alternative to achieving a passing score on an approved, independently administered test or satisfactory completion of at least six credit hours or its recognized equivalent coursework for the purpose of determining a student's eligibility for title IV, HEA program funds must apply to the Secretary for approval of that process.

(2) A State's application for approval of its State process must include—
(i) The institutions located in the State included in the proposed process, which need not be all of the institutions located in the State;
(ii) The requirements that participating institutions must meet to offer eligible career pathway programs through the State process;
(iii) A certification that, as of the date of the application, each proposed career pathway program intended for use through the State process constitutes an ''eligible career pathway program'' as defined in §668.2 and as documented pursuant to §668.157;

(iv) The criteria used to determine student eligibility for participation in the State process; and
(v) For an institution listed for the first time on the application, an assurance that not more than 33 percent of the institution's undergraduate regular students withdrew from the institution during the institution's latest completed award year. For purposes of calculating this rate, the institution must count all regular students who were enrolled during the latest completed award year, except those students who, during that period—
(A) Withdrew from, dropped out of, or were expelled from the institution; and
(B) Were entitled to and actually received in a timely manner, a refund of 100 percent of their tuition and fees.

(3) Before approving the State process, the Secretary will verify that a sample of the proposed eligible career pathway programs constitute an ''eligible career pathway program'' as defined in §668.2 and as documented pursuant to §668.157.

(b) For a State applying for approval for the first time, the Secretary may approve the State process for a two-year initial period if—
(1) The State's process satisfies the requirements contained in paragraphs (a), (c), and (d) of this section; and
(2) The State agrees that the total number of students who enroll through the State process during the initial period will total no more than the greater of 25 students or 1.0 percent of enrollment at each institution participating in the State process.

(c) A State process must—
(1) Allow the participation of only those students eligible under §668.32(e)(3);
(2) Monitor on an annual basis each participating institution's compliance with the requirements and standards contained in the State's process, including the success rate as calculated in paragraph (f) of this section;
(3) Require corrective action if an institution is found to be in noncompliance with the State process requirements;
(4) Provide a participating institution that has failed to achieve the success rate required under paragraphs (e)(1) and (f) up to three years to achieve compliance;
(5) Terminate an institution from the State process if the institution refuses or fails to comply with the State process requirements, including exceeding the total number of students referenced in paragraph (b)(2) of this section; and
(6) Prohibit an institution from participating in the State process for at least five years after termination.

(d)(1) The Secretary responds to a State's request for approval of its State process within six months after the Secretary's receipt of that request. If the Secretary does not respond by the end of six months, the State's process is deemed to be approved.

(2) An approved State process becomes effective for purposes of determining student eligibility for title IV, HEA program funds under this subpart—
(i) On the date the Secretary approves the process; or
(ii) Six months after the date on which the State submits the process to the Secretary for approval, if the Secretary neither approves nor disapproves the process during that six-month period.

(e) After the initial two-year period described in paragraph (b) of this section, the State must reapply for continued participation and, in its application—
(1) Demonstrate that the students it admits under that process at each participating institution have a success rate as determined under paragraph (f) of this section that is within 85 percent of the success rate of students with high school diplomas;
(2) Demonstrate that the State's process continues to satisfy the requirements in paragraphs (a), (c), and (d) of this section; and
(3) Report information to the Department on the enrollment and success of participating students by eligible career pathway program and by race, gender, age, economic circumstances, and educational attainment, to the extent available.

(f) The State must calculate the success rate for each participating institution as referenced in paragraph (e)(1) of this section by—
(1) Determining the number of students with high school diplomas or equivalent who, during the applicable award year described in paragraph (g)(1) of this section, enrolled in the same programs as students participating in the State process at each participating institution and—
(i) Successfully completed education or training programs;
(ii) Remained enrolled in education or training programs at the end of that award year; or
(iii) Successfully transferred to and remained enrolled in another institution at the end of that award year;
(2) Determining the number of students with high school diplomas or equivalent who, during the applicable award year described in paragraph (g)(1) of this section, enrolled in the same programs as students participating in

the State process at each participating institution;

(3) Determining the number of students calculated in paragraph (f)(2) of this section who remained enrolled after subtracting the number of students who subsequently withdrew or were expelled from each participating institution and received a 100 percent refund of their tuition under the institution's refund policies;

(4) Dividing the number of students determined under paragraph (f)(1) of this section by the number of students determined under paragraph (f)(3) of this section; and

(5) Making the calculations described in paragraphs (f)(1) through (f)(4) of this section for students who enrolled through a State process in each participating institution.

(g)(1) For purposes of paragraph (f) of this section, the applicable award year is the latest complete award year for which information is available.

(2) If no students are enrolled in an eligible career pathway program through a State process, then the State will receive a one-year extension to its initial approval of its State process.

(h) A State must submit reports on its State process, in accordance with deadlines and procedures established and published by the Secretary in the **Federal Register**, with such information as the Secretary requires.

(i) The Secretary approves a State process as described in paragraph (e) of this section for a period not to exceed five years.

(j)(1) The Secretary withdraws approval of a State process if the Secretary determines that the State process violated any terms of this section or that the information that the State submitted as a basis for approval of the State process was inaccurate.

(i) If a State has not terminated an institution from the State process under paragraph (c)(5) of this section for failure to meet the success rate, then the Secretary withdraws approval of the State process, except in accordance with paragraph (j)(1)(ii) of this section.

(ii) At the Secretary's discretion, under exceptional circumstances, the State process may be approved once for a two-year period.

(iii) If 50 percent or more participating institutions across all States do not meet the success rate in a given year, then the Secretary may lower the success rate to no less than 75 percent for two years.

(2) The Secretary provides a State with the opportunity to contest a finding that the State process violated any terms of this section or that the information that the State submitted as

a basis for approval of the State process was inaccurate.

(3) If the Secretary upholds the withdrawal of approval of a State process, then the State cannot reapply to the Secretary for a period of five years.

(Approved by the Office of Management and Budget under control number 1845–0049)

(Authority: 20 U.S.C. 1091(d))

■ 15. Adding § 668.157 to subpart J to read as follows:

### § 668.157   Eligible career pathway program.

(a) An institution demonstrates to the Secretary that a student is enrolled in an eligible career pathway program by documenting that—

(1) The student has enrolled in or is receiving all three of the following elements simultaneously—

(i) An eligible postsecondary program as defined in § 668.8;

(ii) Adult education and literacy activities under the Workforce Innovation and Opportunity Act as described in 34 CFR 463.30 that assist adults in attaining a secondary school diploma or its recognized equivalent and in the transition to postsecondary education and training; and

(iii) Workforce preparation activities as described in 34 CFR 463.34;

(2) The program aligns with the skill needs of industries in the State or regional labor market in which the institution is located, based on research the institution has conducted, including—

(i) Government reports identifying in-demand occupations in the State or regional labor market;

(ii) Surveys, interviews, meetings, or other information obtained by the institution regarding the hiring needs of employers in the State or regional labor market; and

(iii) Documentation that demonstrates direct engagement with industry;

(3) The skill needs described in paragraph (a)(2) of this section align with the specific coursework and postsecondary credential provided by the postsecondary program or other required training;

(4) The program provides academic and career counseling services that assist students in pursuing their credential and obtaining jobs aligned with skill needs described in paragraph (a)(2) of this section, and identifies the individuals providing the career counseling services;

(5) The appropriate education is offered, concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster

through an agreement, memorandum of understanding, or some other evidence of alignment of postsecondary and adult education providers that ensures the secondary education is aligned with the students' career objectives; and

(6) The program is designed to lead to a valid high school diploma as defined in § 668.16(p) or its recognized equivalent.

(b) For career pathway programs that do not enroll students through a State process as defined in § 668.156, the Secretary will verify the eligibility of eligible career pathway programs for title IV, HEA program purposes pursuant to paragraph (a) of this section. The Secretary provides an institution with the opportunity to appeal any adverse eligibility decision.

■ 16. Section 668.171, as amended October 28, 2022 at 87 FR 65495, is further amended by revising paragraph (b) introductory text, paragraphs (b)(3), and (c) through (i) to read as follows:

### § 668.171   General

\*       \*       \*       \*       \*

(b) *General standards of financial responsibility.* Except as provided in paragraph (h) of this section, the Department considers an institution to be financially responsible if the Department determines that—

\*       \*       \*       \*       \*

(3) The institution is able to meet all of its financial obligations and provide the administrative resources necessary to comply with title IV, HEA program requirements. An institution is not deemed able to meet its financial or administrative obligations if—

(i) It fails to make refunds under its refund policy, return title IV, HEA program funds for which it is responsible under § 668.22, or pay title IV, HEA credit balances as required under § 668.164(h)(2);

(ii) It fails to make repayments to the Department for any debt or liability arising from the institution's participation in the title IV, HEA programs;

(iii) It fails to make a payment in accordance with an existing undisputed financial obligation for more than 90 days;

(iv) It fails to satisfy payroll obligations in accordance with its published payroll schedule;

(v) It borrows funds from retirement plans or restricted funds without authorization; or

(vi) It is subject to an action or event described in paragraph (c) of this section (mandatory triggering events), or an action or event that the Department has determined to have a material adverse effect on the financial condition

of the institution under paragraph (d) of this section (discretionary triggering events); and

\*      \*      \*      \*      \*

(c) *Mandatory triggering events.* (1) Except for the mandatory triggers that require a recalculation of the institution's composite score, the mandatory triggers in this paragraph (c) constitute automatic failures of financial responsibility. For any mandatory triggers under this paragraph (c) that result in a recalculated composite score of less than 1.0, and for those mandatory triggers that constitute automatic failures of financial responsibility, the Department will require the institution to provide financial protection as set forth in this subpart. The financial protection required under this paragraph is not less than 10 percent of the total title IV, HEA funding in the prior fiscal year. If the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger. The Department will consider whether the financial protection can be released following the institution's submission of two full fiscal years of audited financial statements following the Department's notice that requires the posting of the financial protection. In making this determination, the Department considers whether the administrative or financial risk caused by the event has ceased or been resolved, including full payment of all damages, fines, penalties, liabilities, or other financial relief.

(2) The following are mandatory triggers:

(i) *Debts, liabilities, and losses.* (A) For an institution or entity with a composite score of less than 1.5, other than a composite score calculated under 34 CFR 600.20(g) and § 668.176, that is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, or a final judgment in a judicial proceeding, and as a result of the debt or liability, the recalculated composite score for the institution or entity is less than 1.0, as determined by the Department under paragraph (e) of this section;

(B) The institution or any entity whose financial statements were submitted in the prior fiscal year to meet the requirements of 34 CFR 600.20(g) or this subpart, is sued by a Federal or State authority to impose an injunction, establish fines or penalties, or to obtain financial relief such as damages, or through a qui tam lawsuit in which the Federal government has intervened, and the action was brought

on or after July 1, 2024, and the action has been pending for 120 days, or a qui tam has been pending for 120 days following intervention, and no motion to dismiss has been filed, or if a motion to dismiss has been filed within 120 days and denied, upon such denial.

(C) The Department has initiated action to recover from the institution the cost of adjudicated claims in favor of borrowers under the loan discharge provisions in 34 CFR part 685 and, the recalculated composite score for the institution or entity as a result of the adjudicated claims is less than 1.0, as determined by the Department under paragraph (e) of this section; or

(D) For an institution or entity that has submitted an application for a change in ownership under 34 CFR 600.20 that is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or a determination arising from an administrative proceeding described in paragraph (c)(2)(i)(B) or (C) of this section, at any point through the end of the second full fiscal year after the change in ownership has occurred.

(ii) *Withdrawal of owner's equity.* (A) For a proprietary institution whose composite score is less than 1.5, or for any proprietary institution through the end of the first full fiscal year following a change in ownership, and there is a withdrawal of owner's equity by any means, including by declaring a dividend, unless the withdrawal is a transfer to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated; or is the equivalent of wages in a sole proprietorship or general partnership or a required dividend or return of capital; and

(B) As a result of that withdrawal, the institution's recalculated composite score for the entity whose financial statements were submitted to meet the requirements of § 668.23 for the annual submission, or § 600.20(g) or (h) for a change in ownership, is less than 1.0, as determined by the Department under paragraph (e) of this section.

(iii) *Gainful employment.* As determined annually by the Department, the institution received at least 50 percent of its title IV, HEA program funds in its most recently completed fiscal year from gainful employment (GE) programs that are ''failing'' under subpart S of this part.

(iv) *Teach-out plans.* The institution is required to submit a teach-out plan or agreement, by a State or Federal agency, an accrediting agency or other oversight body.

(v) *State actions.* The institution is cited by a State licensing or authorizing agency for failing to meet State or agency requirements and the agency provides notice that it will withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement.

(vi) *Publicly listed entities.* For an institution that is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, the entity is subject to one or more of the following actions or events:

(A) *SEC actions.* The U.S. Securities and Exchange Commission (SEC) issues an order suspending or revoking the registration of any of the entity's securities pursuant to section 12(j) of the Securities Exchange Act of 1934 (the ''Exchange Act'') or suspends trading the entity's securities pursuant to section 12(k) of the Exchange Act.

(B) *Other SEC actions.* The SEC files an action against the entity in district court or issues an order instituting proceedings pursuant to section 12(j) of the Exchange Act.

(C) *Exchange actions.* The exchange on which the entity's securities are listed notifies the entity that it is not in compliance with the exchange's listing requirements, or its securities are delisted.

(D) *SEC reports.* The entity failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25.

(E) *Foreign exchanges or Oversight Authority.* The entity is subject to an event, notification, or condition by a foreign exchange or oversight authority that the Department determines is equivalent to those identified in paragraphs (c)(2)(vi)(A)–(D) of this section.

(vii) *Non-Federal educational assistance funds.* For its most recently completed fiscal year, a proprietary institution did not receive at least 10 percent of its revenue from sources other than Federal educational assistance, as provided under § 668.28(c). The financial protection provided under this requirement will remain in place until the institution passes the 90/10 revenue requirement for two consecutive years.

(viii) *Cohort default rates.* The institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(A) The institution files a challenge, request for adjustment, or appeal under

subpart N of this part with respect to its rates for one or both of those fiscal years; and

(B) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both of those years or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(ix) *Loss of eligibility.* The institution has lost eligibility to participate in another Federal educational assistance program due to an administrative action against the school.

(x) *Contributions and distributions.* (A) An institution's financial statements required to be submitted under § 668.23 reflect a contribution in the last quarter of the fiscal year, and the institution then made a distribution during the first two quarters of the next fiscal year; and

(B) The offset of such distribution against the contribution results in a recalculated composite score of less than 1.0, as determined by the Department under paragraph (e) of this section.

(xi) *Creditor events.* As a result of an action taken by the Department, the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart is subject to a default or other adverse condition under a line of credit, loan agreement, security agreement, or other financing arrangement.

(xii) *Declaration of financial exigency.* The institution declares a state of financial exigency to a Federal, State, Tribal or foreign governmental agency or its accrediting agency.

(xiii) *Receivership.* The institution, or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law, or has entered against it an order appointing a receiver or appointing a person of similar status under foreign law.

(d) *Discretionary triggering events.* The Department may determine that an institution is not able to meet its financial or administrative obligations if the Department determines that a discretionary triggering event is likely to have a significant adverse effect on the financial condition of the institution. For those discretionary triggers that the Department determines will have a significant adverse effect on the financial condition of the institution, the Department will require the institution to provide financial

protection as set forth in this subpart. The financial protection required under this paragraph is not less than 10 percent of the total title IV, HEA funding in the prior fiscal year. If the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger. The Department will consider whether the financial protection can be released following the institution's submission of two full fiscal years of audited financial statements following the Department's notice that requires the posting of the financial protection. In making this determination, the Department considers whether the administrative or financial risk caused by the event has ceased or been resolved, including full payment of all damages, fines, penalties, liabilities, or other financial relief. The discretionary triggers include, but are not limited to, the following events:

(1) *Accrediting agency and government agency actions.* The institution's accrediting agency or a Federal, State, local or Tribal authority places the institution on probation or issues a show-cause order or places the institution in a comparable status that poses an equivalent or greater risk to its accreditation, authorization or eligibility.

(2) *Other defaults, delinquencies, creditor events, and judgments.*

(i) Except as provided in paragraph (c)(2)(xi) of this section, the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart is subject to a default or other condition under a line of credit, loan agreement, security agreement, or other financing arrangement;

(ii) Under that line of credit, loan agreement, security agreement, or other financing arrangement, a monetary or nonmonetary default or delinquency or other event occurs that allows the creditor to require or impose on the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

(iii) Any creditor of the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart takes action to terminate, withdraw, limit, or suspend a loan agreement or other

financing arrangement or calls due a balance on a line of credit with an outstanding balance;

(iv) The institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart enters into a line of credit, loan agreement, security agreement, or other financing arrangement whereby the institution or entity may be subject to a default or other adverse condition as a result of any action taken by the Department; or

(v) The institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart has a judgment awarding monetary relief entered against it that is subject to appeal or under appeal.

(3) *Fluctuations in Title IV volume.* There is a significant fluctuation between consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs.

(4) *High annual dropout rates.* As calculated by the Department, the institution has high annual dropout rates.

(5) *Interim reporting.* For an institution required to provide additional financial reporting to the Department due to a failure to meet the financial responsibility standards in this subpart or due to a change in ownership, there are negative cash flows, failure of other liquidation ratios, cash flows that significantly miss the projections submitted to the Department, withdrawal rates that increase significantly, or other indicators of a material change in the financial condition of the institution.

(6) *Pending borrower defense claims.* There are pending claims for borrower relief discharge under 34 CFR 685.400 from students or former students of the institution and the Department has formed a group process to consider claims under 34 CFR 685.402 and, if approved, those claims could be subject to recoupment.

(7) *Discontinuation of programs.* The institution discontinues academic programs, that affect more than 25 percent of enrolled students.

(8) *Closure of locations.* The institution closes more than 50 percent of its locations or closes locations that enroll more than 25 percent of its students.

(9) *State citations.* The institution is cited by a State licensing or authorizing

agency for failing to meet State or agency requirements.

(10) *Loss of program eligibility.* One or more programs at the institution has lost eligibility to participate in another Federal educational assistance program due to an administrative action against the school or its programs.

(11) *Exchange disclosures.* If an institution is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, the entity discloses in a public filing that it is under investigation for possible violations of State, Federal or foreign law.

(12) *Actions by another Federal agency.* The institution is cited and faces loss of education assistance funds from another Federal agency if it does not comply with the agency's requirements.

(e) *Recalculating the composite score.* When a recalculation of an institution's most recent composite score is required by the mandatory triggering events described in paragraph (c) of this section, the Department makes the recalculation as follows:

(1) For a proprietary institution, debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) since the end of the prior fiscal year incurred by the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) through the end of the first full fiscal year following a change in ownership incurred by the entity whose financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, increasing expenses and decreasing adjusted equity by that amount.

(ii) For the equity ratio, decreasing modified equity by that amount.

(iii) For the net income ratio, decreasing income before taxes by that amount.

(2) For a nonprofit institution, debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) since the end of the prior fiscal year incurred by the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) through the end of the first full fiscal year following a change in ownership incurred by the entity whose

financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, increasing expenses and decreasing expendable net assets by that amount.

(ii) For the equity ratio, decreasing modified net assets by that amount.

(iii) For the net income ratio, decreasing change in net assets without donor restrictions by that amount.

(3) For a proprietary institution, the withdrawal of equity (including cumulative withdrawals of equity) since the end of the prior fiscal year from the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and the withdrawal of equity (including cumulative withdrawals of equity) through the end of the first full fiscal year following a change in ownership from the entity whose financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, decreasing adjusted equity by that amount.

(ii) For the equity ratio, decreasing modified equity by that amount.

(4) For a proprietary institution, a contribution and distribution in the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23, this subpart, or 34 CFR 600.20(g) will be adjusted as follows:

(i) For the primary reserve ratio, decreasing adjusted equity by the amount of the distribution.

(ii) For the equity ratio, decreasing modified equity by the amount of the distribution.

(f) *Reporting requirements.* (1) In accordance with procedures established by the Department, an institution must timely notify the Department of the following actions or events:

(i) For a liability incurred under paragraph (c)(2)(i)(A) of this section, no later than 10 days after the date of written notification to the institution or entity of the final judgment or determination.

(ii) For a lawsuit described in paragraph (c)(2)(i)(B) of this section, no later than 10 days after the institution or entity is served with the complaint, and an updated notice must be provided 10 days after the suit has been pending for 120 days.

(iii) No later than 10 days after the institution receives a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any local, State, Tribal, Federal, or foreign government or government entity.

(iv) For a withdrawal of owner's equity described in paragraph (c)(2)(ii) of this section—

(A) For a capital distribution that is the equivalent of wages in a sole proprietorship or general partnership, no later than 10 days after the date the Department notifies the institution that its composite score is less than 1.5. In response to that notice, the institution must report the total amount of the wage-equivalent distributions it made during its prior fiscal year and any distributions that were made to pay any taxes related to the operation of the institution. During its current fiscal year and the first six months of its subsequent fiscal year (18-month period), the institution is not required to report any distributions to the Department, provided that the institution does not make wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year, less any distributions that were made to pay any taxes related to the operation of the institution. However, if the institution makes wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year less any distributions that were made to pay any taxes related to the operation of the institution at any time during the 18-month period, it must report each of those distributions no later than 10 days after they are made, and the Department recalculates the institution's composite score based on the cumulative amount of the distributions made at that time;

(B) For a distribution of dividends or return of capital, no later than 10 days after the dividends are declared or the amount of return of capital is approved; or

(C) For a related party receivable/other assets, no later than 10 days after that receivable/other assets are booked or occur.

(v) For a contribution and distribution described in paragraph (c)(2)(x) of this section, no later than 10 days following each transaction.

(vi) For the provisions relating to a publicly listed entity under paragraph (c)(2)(vi) or (d)(11) of this section, no later than 10 days after the date that such event occurs.

(vii) For any action by an accrediting agency, Federal, State, local or Tribal authority that is either a mandatory or discretionary trigger, no later than 10 days after the date on which the institution is notified of the action.

(viii) For the creditor events described in paragraph (c)(2)(xi) of this section, no later than 10 days after the date on

which the institution is notified of the action by its creditor.

(ix) For the other defaults, delinquencies, or creditor events described in paragraph (d)(2)(i), (ii), (iii), and (iv) of this section, no later than 10 days after the event occurs, with an update no later than 10 days after the creditor waives the violation, or the creditor imposes sanctions or penalties, including sanctions or penalties imposed in exchange for or as a result of granting the waiver. For a monetary judgment subject to appeal or under appeal described in paragraph (d)(2)(v), no later than 10 days after the court enters the judgment, with an update no later than 10 days after the appeal is filed or the period for appeal expires without a notice of appeal being filed. If an appeal is filed, no later than 10 days after the decision on the appeal is issued.

(x) For the non-Federal educational assistance funds provision in paragraph (c)(2)(vii) of this section, no later than 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3).

(xi) For an institution or entity that has submitted an application for a change in ownership under 34 CFR 600.20 that is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or a determination arising from an administrative proceeding described in paragraph (c)(2)(i)(B) or (C) of this section, the institution must report this no later than ten days after the action. This reporting requirement is applicable to any action described herein occurring through the end of the second full fiscal year after the change in ownership has occurred.

(xii) For a discontinuation of academic programs described in paragraph (d)(7) of this section, no later than 10 days after the discontinuation of programs.

(xiii) For a failure to meet any of the standards in paragraph (b) of this section, no later than 10 days after the institution ceases to meet the standard.

(xiv) For a declaration of financial exigency, no later than 10 days after the institution communicates its declaration to a Federal, State, Tribal or foreign governmental agency or its accrediting agency.

(xv) If the institution, or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law, or has entered against it an order appointing a receiver or appointing a person of similar status under foreign law, no later than 10 days after either the filing for receivership or the order appointing a receiver or appointing a person of similar status under foreign law, as applicable.

(xvi) The institution closes more than 50 percent of its locations or closes locations that enroll more than 25 percent of its students no later than 10 days after the closure that meets or exceeds these thresholds.

(xvii) If the institution is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, and the entity discloses in a public filing that it is under investigation for possible violations of State, Federal or foreign law, no later than ten days after the public filing.

(2) The Department may take an administrative action under paragraph (i) of this section against an institution, or determine that the institution is not financially responsible, if it fails to provide timely notice to the Department as provided under paragraph (f)(1) of this section, or fails to respond, within the timeframe specified by the Department, to any determination made, or request for information, by the Department under paragraph (f)(3) of this section.

(3)(i) In its notice to the Department under this paragraph, or in its response to a preliminary determination by the Department that the institution is not financially responsible because of a triggering event under paragraph (c) or (d) of this section, in accordance with procedures established by the Department, the institution may—

(A) Show that the creditor waived a violation of a loan agreement under paragraph (d)(2) of this section. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (d)(2)(ii) of this section, the institution must identify and describe those penalties, constraints, or requirements and demonstrate that complying with those actions will not significantly affect the institution's ability to meet its financial obligations;

(B) Show that the triggering event has been resolved, or demonstrate that the institution has insurance that will cover all or part of the liabilities that arise under paragraph (c)(2)(i)(A) of this section; or

(C) Explain or provide information about the conditions or circumstances that precipitated a triggering event under paragraph (c) or (d) of this section that demonstrates that the triggering event has not had, or will not have, a material adverse effect on the financial condition of the institution.

(ii) The Department will consider the information provided by the institution in determining whether to issue a final determination that the institution is not financially responsible.

(g) *Public institutions.* (1) The Department considers a domestic public institution to be financially responsible if the institution—

(i) Notifies the Department that it is designated as a public institution by the State, local, or municipal government entity, or Tribal authority, or other government entity that has the legal authority to make that designation; and

(ii) Provides a letter or other documentation acceptable to the Department and signed by an official of that government entity confirming that the institution is a public institution and is backed by the full faith and credit of the government entity. This letter must be submitted before the institution's initial certification, upon a change in ownership and request to be recognized as a public institution, and for the first re-certification of a public institution after the effective date of these regulations. Thereafter, the letter must be submitted—

(A) When the institution submits an application for re-certification following any period of provisional certification;

(B) Within 10 business days following a change in the governmental status of the institution whereby the institution is no longer backed by the full faith and credit of the government entity; or

(C) Upon request by the Department;

(iii) Is not subject to a condition of past performance under § 668.174; and

(iv) Is not subject to an automatic mandatory triggering event as described in paragraph (c) of this section or a discretionary triggering event as described in paragraph (d) of this section that the Department determines will have a significant adverse effect on the financial condition of the institution.

(2) The Department considers a foreign public institution to be financially responsible if the institution—

(i) Notifies the Department that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(ii) Provides a letter or other documentation acceptable to the Department and signed by an official of that country or other government entity confirming that the institution is a public institution and is backed by the

full faith and credit of the country or other government entity. This letter must be submitted before the institution's initial certification, upon a change in ownership and request to be recognized as a public institution, and for the first re-certification of a public institution after the effective date of these regulations. Thereafter, the letter must be submitted in the following circumstances—

(A) When the institution submits an application for re-certification following any period of provisional certification;

(B) Within 10 business days following a change in the governmental status of the institution whereby the institution is no longer backed by the full faith and credit of the government entity; or

(C) Upon request by the Department;

(iii) Is not subject to a condition of past performance under § 668.174 and

(iv) Is not subject to an automatic mandatory triggering event as described in paragraph (c) of this section or a discretionary triggering event as described in paragraph (d) of this section that the Department determines will have a significant adverse effect on the financial condition of the institution.

(h) *Audit opinions and disclosures.* Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Department does not consider the institution to be financially responsible if the institution's audited financial statements—

(1) Include an opinion expressed by the auditor that was an adverse, qualified, or disclaimed opinion, unless the Department determines that the adverse, qualified, or disclaimed opinion does not have a significant bearing on the institution's financial condition; or

(2) Include a disclosure in the notes to the institution's or entity's audited financial statements about the institution's or entity's diminished liquidity, ability to continue operations, or ability to continue as a going concern, unless the Department determines that the diminished liquidity, ability to continue operations, or ability to continue as a going concern has been alleviated. The Department may conclude that diminished liquidity, ability to continue operations, or ability to continue as a going concern has not been alleviated even if the disclosure provides that those concerns have been alleviated.

(i) *Administrative actions.* If the Department determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative

standard in § 668.175, or the institution does not submit its financial statements and compliance audits by the date and in the manner required under § 668.23, the Department may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs;

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d); or

(3) Deny the institution's application for certification or recertification to participate in the title IV, HEA programs.

■ 17. Section 668.174 is amended by:
■ a. Revising paragraphs (a)(2) and (b)(2)(i);
■ b. Adding paragraph (b)(3); and
■ c. Revising paragraph (c)(1).

The revisions and addition read as follows:

### § 668.174   Past performance

(a) * * *

(2) In either of its two most recently submitted compliance audits had a final audit determination or in a Departmentally issued report, including a final program review determination report, issued in its current fiscal year or either of its preceding two fiscal years, had a program review finding that resulted in the institution's being required to repay an amount greater than five percent of the funds that the institution received under the title IV, HEA programs during the year covered by that audit or program review;

\*       \*       \*       \*       \*

(b) * * *
(2) * * *

(i) The institution notifies the Department, within the time permitted and as provided under 34 CFR 600.21, that the person or entity referenced in paragraph (b)(1) of this section exercises substantial control over the institution; and

\*       \*       \*       \*       \*

(3) An institution is not financially responsible if an owner who exercises substantial control, or the owner's spouse, has been in default on a Federal student loan, including parent PLUS loans, in the preceding five years, unless—

(i) The defaulted Federal student loan has been fully repaid and five years have elapsed since the repayment in full;

(ii) The defaulted Federal student loan has been approved for, and the borrower is in compliance with, a rehabilitation agreement and has been current for five consecutive years; or

(iii) The defaulted Federal student loan has been discharged, canceled or forgiven by the Department.

(c) * * *

(1) An ownership interest is defined in 34 CFR 600.31(b).

\*       \*       \*       \*       \*

■ 18. Section 668.175 is amended by revising paragraphs (b), (c), (d), (f)(1) and (2) to read as follows:

### § 668.175   Alternative standard and requirements.

\*       \*       \*       \*       \*

(b) *Letter of credit or cash escrow alternative for new institutions.* A new institution that is not financially responsible solely because the Department determines that its composite score is less than 1.5, qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Department, or providing other surety described under paragraph (h)(2)(i) of this section, for an amount equal to at least one-half of the amount of title IV, HEA program funds that the Department determines the institution will receive during its initial year of participation. A new institution is an institution that seeks to participate for the first time in the title IV, HEA programs.

(c) *Financial protection alternative for participating institutions.* A participating institution that is not financially responsible, either because it does not satisfy one or more of the standards of financial responsibility under § 668.171(b), (c), or (d), or because of an audit opinion or disclosure about the institution's liquidity, ability to continue operations, or ability to continue as a going concern described under § 668.171(h), qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Department, or providing other financial protection described under paragraph (h)(2)(i) of this section, for an amount determined by the Department that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this requirement does not apply to a public institution. For purposes of a failure under § 668.171(b)(2) or (3), the institution must also remedy the issue(s) that gave rise to the failure to the Department's satisfaction.

(d) *Zone alternative.* (1) A participating institution that is not financially responsible solely because the Department determines that its composite score under § 668.172 is less than 1.5 may participate in the title IV,

HEA programs as a financially responsible institution for no more than three consecutive years, beginning with the year in which the Department determines that the institution qualifies under this alternative.

(i)(A) An institution qualifies initially under this alternative if, based on the institution's audited financial statements for its most recently completed fiscal year, the Department determines that its composite score is in the range from 1.0 to 1.4; and

(B) An institution continues to qualify under this alternative if, based on the institution's audited financial statements for each of its subsequent two fiscal years, the Department determines that the institution's composite score is in the range from 1.0 to 1.4.

(ii) An institution that qualified under this alternative for three consecutive years, or for one of those years, may not seek to qualify again under this alternative until the year after the institution achieves a composite score of at least 1.5, as determined by the Department.

(2) Under the zone alternative, the Department—

(i) Requires the institution to make disbursements to eligible students and parents, and to otherwise comply with the provisions, under either the heightened cash monitoring or reimbursement payment method described in § 668.162;

(ii) Requires the institution to provide timely information regarding any of the following oversight and financial events—

(A) Any event that causes the institution, or related entity as defined in Accounting Standards Codification (ASC) 850, to realize any liability that was noted as a contingent liability in the institution's or related entity's most recent audited financial statements; or

(B) Any losses that are unusual in nature or infrequently occur, or both, as defined in accordance with Accounting Standards Update (ASU) No. 2015–01 and ASC 225;

(iii) May require the institution to submit its financial statement and compliance audits earlier than the time specified in § 668.23(a)(4); and

(iv) May require the institution to provide information about its current operations and future plans.

(3) Under the zone alternative, the institution must—

(i) For any oversight or financial event described in paragraph (d)(2)(ii) of this section for which the institution is required to provide information, in accordance with procedures established by the Department, notify the Department no later than 10 days after that event occurs; and

(ii) As part of its compliance audit, require its auditor to express an opinion on the institution's compliance with the requirements under the zone alternative, including the institution's administration of the payment method under which the institution received and disbursed title IV, HEA program funds.

(4) If an institution fails to comply with the requirements under paragraph (d)(2) or (3) of this section, the Department may determine that the institution no longer qualifies under this alternative.

*       *       *       *       *

(f) *Provisional certification alternative.* (1) The Department may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b), its recalculated composite score under § 668.171(e) is less than 1.0, it is subject to an action or event under § 668.171(c), or an action or event under paragraph (d) has an adverse material effect on the institution as determined by the Department, or because of an audit opinion or going concern disclosure described in § 668.171(h); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Department that it has satisfied or resolved that condition; and

(2) Under this alternative, the institution must—

(i) Provide to the Department an irrevocable letter of credit that is acceptable and payable to the Department, or provide other financial protection described under paragraph (h) of this section, for an amount determined by the Department that is not less than 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this requirement does not apply to a public institution that the Department determines is backed by the full faith and credit of the State or equivalent governmental entity;

(ii) Remedy the issue(s) that gave rise to its failure under § 668.171(b)(2) or (3) to the Department's satisfaction; and

(iii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3) of this section.

*       *       *       *       *

### § 668.176   [Redesignated]

■ 19. Redesignate § 668.176 as § 668.177.
■ 20. Add § 668.176 to read as follows:

### § 668.176   Change in Ownership.

(a) *Purpose.* To continue participation in the title IV, HEA programs during and following a change in ownership, institutions must meet the financial responsibility requirements in this section.

(b) *Materially complete application.* To meet the requirements of a materially complete application under 34 CFR 600.20(g)(3)(iii) and (iv)—

(1) An institution undergoing a change of ownership and control as provided under 34 CFR 600.31 must submit audited financial statements of its two most recently completed fiscal years prior to the change in ownership, at the level of the change in ownership or the level of financial statements required by the Department, that are prepared and audited in accordance with the requirements of § 668.23(d);

(2) The institution must submit audited financial statements of the institution's new owner's two most recently completed fiscal years prior to the change in ownership that are prepared and audited in accordance with the requirements of § 668.23 at the highest level of unfractured ownership or at the level required by the Department.

(i) If the institution's new owner does not have two years of acceptable audited financial statements, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year;

(ii) If the institution's new owner only has one year of acceptable financial statements, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year; or

(iii) For an entity where no individual new owner obtains control, but the combined ownership of the new owners is equal to or exceeds the ownership share of the existing ownership, financial protection in the form of a letter of credit or cash to the Department in the amount of 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, based on the

combined ownership share of the new owners, except for any new owner that submits two years or one year of acceptable audited financial statements as described in paragraphs (b)(2)(i) and (ii) of this section.

(3) The institution must meet the financial responsibility provision. In general, the Department considers an institution to be financially responsible only if it—

(i) For a for-profit institution evaluated at the ownership level required by the Department for the new owner—

(A) Has not had operating losses in either or both of its two latest fiscal years that in sum result in a decrease in tangible net worth in excess of 10 percent of the institution's tangible net worth at the beginning of the first year of the two-year period. The Department may calculate an operating loss for an institution by excluding prior period adjustment and the cumulative effect of changes in accounting principle. For purposes of this section, the calculation of tangible net worth must exclude all related party accounts receivable/other assets and all assets defined as intangible in accordance with the composite score;

(B) Has, for its two most recent fiscal years, a positive tangible net worth. In applying this standard, a positive tangible net worth occurs when the institution's tangible assets exceed its liabilities. The calculation of tangible net worth excludes all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(C) Has a passing composite score and meets the other financial requirements of this subpart for its most recently completed fiscal year.

(ii) For a nonprofit institution evaluated at the ownership level required by the Department for the new owner—

(A) Has, at the end of its two most recent fiscal years, positive net assets without donor restrictions. The Department will exclude all related party receivables/other assets from net assets without donor restrictions and all assets classified as intangibles in accordance with the composite score;

(B) Has not had an excess of net assets without donor restriction expenditures over net assets without donor restriction revenues over both of its two latest fiscal years that results in a decrease exceeding 10 percent in either the net assets without donor restrictions from the start to the end of the two-year period or the net assets without donor restriction in either one of the two years.

The Department may exclude from net changes in fund balances for the operating loss calculation prior period adjustment and the cumulative effect of changes in accounting principle. In calculating the net assets without donor restriction, the Department will exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(C) Has a passing composite score and meets the other financial requirements of this subpart for its most recently completed fiscal year.

(iii) For a public institution, has its liabilities backed by the full faith and credit of a State or equivalent governmental entity.

(4) For a for-profit or nonprofit institution that is not financially responsible under paragraph (b)(3) of this section, provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

(c) *Acquisition debt.* (1) Notwithstanding any other provision in this section, the Department may determine that the institution is not financially responsible following a change in ownership if the amount of debt assumed to complete the change in ownership requires payments (either periodic or balloon) that are inconsistent with available cash to service those payments based on enrollments for the period prior to when the payment is or will be due.

(2) For a for-profit or nonprofit institution that is not financially responsible under this provision, provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

(d) *Terms of the extension.* To meet the requirements for a temporary provisional program participation agreement following a change in ownership, as described in 34 CFR 600.20(h)(3)(i), an institution must meet the following requirements:

(1) For a proprietary institution or a nonprofit institution—

(i) The institution must provide the Department a same-day balance sheet for a proprietary institution or a statement of financial position for a nonprofit institution that shows the financial position of the institution under its new owner, as of the day after

the change in ownership, and that meets the following requirements:

(A) The same-day balance sheet or statement of financial position must be prepared in accordance with Generally Accepted Accounting Principles (GAAP) published by the Financial Accounting Standards Board and audited in accordance with Generally Accepted Government Auditing Standards (GAGAS) published by the U.S. Government Accountability Office (GAO);

(B) As part of the same-day balance sheet or statement of financial position, the institution must include a disclosure that includes all related-party transactions, and such details as would enable the Department to identify the related party in accordance with the requirements of § 668.23(d). Such information must include, but is not limited to, the name, location, and description of the related entity, including the nature and amount of any transaction between the related party and the institution, financial or otherwise, regardless of when it occurred;

(C) Such balance sheet or statement of financial position must be a consolidated same-day financial statement at the level of highest unfractured ownership or at a level determined by the Department for an ownership of less than 100 percent;

(D) The same-day balance sheet or statement of financial position must demonstrate an acid test ratio of at least 1:1. The acid test ratio must be calculated by adding cash and cash equivalents to current accounts receivable and dividing the sum by total current liabilities. The calculation of the acid ratio must exclude all related party receivables/other assets and all assets classified as intangibles in accordance with the composite score;

(E) A proprietary institution's same-day balance sheet must demonstrate a positive tangible net worth the day after the change in ownership. A positive tangible net worth occurs when the tangible assets exceed liabilities. The calculation of tangible net worth must exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(F) A nonprofit institution's statement of financial position must have positive net assets without donor restriction the day after the change in ownership. The calculation of net assets without donor restriction must exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score.

App.398

(ii) If the institution fails to meet the requirements in paragraphs (d)(1)(i) of this section, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of at least 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, or an amount determined by the Department, and must follow the zone requirements of § 668.175(d); and

(2) For a public institution, the institution must have its liabilities backed by the full faith and credit of a State, or by an equivalent governmental entity, or must follow the requirements of this section for a proprietary or nonprofit institution.

■ 21. Add subpart Q to part 668 to read as follows:

**Subpart Q    Financial Value Transparency**

Sec.
668.401    Financial value transparency scope and purpose.
668.402    Financial value transparency framework.
668.403    Calculating D/E rates.
668.404    Calculating earnings premium measure.
668.405    Process for obtaining data and calculating D/E rates and earnings premium measure.
668.406    Determination of the D/E rates and earnings premium measure.
668.407    Student disclosure acknowledgements.
668.408    Reporting requirements.
668.409    Severability.

**Subpart Q    Financial Value Transparency**

**§ 668.401    Financial value transparency scope and purpose.**

This subpart applies to a GE program or eligible non-GE program offered by an eligible institution, and establishes the rules and procedures under which—

(a) An institution reports information about the program to the Secretary; and

(b) The Secretary assesses the program's debt and earnings outcomes.

**§ 668.402    Financial value transparency framework.**

(a) *General.* The Secretary assesses the program's debt and earnings outcomes using debt-to-earnings rates (D/E rates) and an earnings premium measure.

(b) *Debt-to-earnings rates.* The Secretary calculates for each award year two D/E rates for an eligible program, the discretionary debt-to-earnings rate and the annual debt-to-earnings rate, using the procedures in §§ 668.403 and 668.405.

(c) *Outcomes of the D/E rates.* (1) A program passes the D/E rates if—

(i) Its discretionary debt-to-earnings rate is less than or equal to 20 percent;

(ii) Its annual debt-to-earnings rate is less than or equal to 8 percent; or

(iii) The denominator (median annual or discretionary earnings) of either rate is zero and the numerator (median debt payments) is zero.

(2) A program fails the D/E rates if—

(i) Its discretionary debt-to-earnings rate is greater than 20 percent or the income for the denominator of the rate (median discretionary earnings) is negative or zero and the numerator (median debt payments) is positive; and

(ii) Its annual debt-to-earnings rate is greater than 8 percent or the denominator of the rate (median annual earnings) is zero and the numerator (median debt payments) is positive.

(d) *Earnings premium measure.* For each award year, the Secretary calculates the earnings premium measure for an eligible program, using the procedures in § 668.404 and 668.405.

(e) *Outcomes of the earnings premium measure.* (1) A program passes the earnings premium measure if the median annual earnings of the students who completed the program exceed the earnings threshold.

(2) A program fails the earnings premium measure if the median annual earnings of the students who completed the program are equal to or less than the earnings threshold.

**§ 668.403    Calculating D/E rates.**

(a) *General.* Except as provided under paragraph (f) of this section, for each award year, the Secretary calculates D/E rates for a program as follows:

(1) Discretionary debt-to-earnings rate = annual loan payment/(the median annual earnings − (1.5 × Poverty Guideline)). For the purposes of this paragraph, the Secretary applies the Poverty Guideline for the most recent calendar year for which annual earnings are obtained under paragraph (c) of this section.

(2) Annual debt-to-earnings rate = annual loan payment/the median annual earnings.

(b) *Annual loan payment.* The Secretary calculates the annual loan payment for a program by—

(1)(i) Determining the median loan debt of the students who completed the program during the cohort period, based on the lesser of the loan debt incurred by each student as determined under paragraph (d) of this section or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student;

(ii) Removing, if applicable, the appropriate number of largest loan debts as described in § 668.405(d)(2); and

(iii) Calculating the median of the remaining amounts;

(2) Amortizing the median loan debt—

(i)(A) Over a 10-year repayment period for a program that leads to an undergraduate certificate, a post-baccalaureate certificate, an associate degree, or a graduate certificate;

(B) Over a 15-year repayment period for a program that leads to a bachelor's degree or a master's degree; or

(C) Over a 20-year repayment period for any other program; and

(ii) Using an annual interest rate that is the average of the annual statutory interest rates on Federal Direct Unsubsidized Loans that were in effect during—

(A) The three consecutive award years, ending in the final year of the cohort period, for undergraduate certificate programs, post-baccalaureate certificate programs, and associate degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students;

(B) The three consecutive award years, ending in the final year of the cohort period, for graduate certificate programs and master's degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students;

(C) The six consecutive award years, ending in the final year of the cohort period, for bachelor's degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students; and

(D) The six consecutive award years, ending in the final year of the cohort period, for doctoral programs and first professional degree programs. For these programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students.

(c) *Annual earnings.* (1) The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (e) of this section; and

(2) The Secretary uses the median annual earnings to calculate the D/E rates.

(d) *Loan debt and assessed charges.* (1) In determining the loan debt for a student, the Secretary includes—

(i) The amount of title IV loans that the student borrowed (total amount disbursed less any cancellations or adjustments except for those related to false certification, borrower defense

<span style="color:red">App.399</span>

discharges, or debt relief initiated by the Secretary as a result of a national emergency) for enrollment in the program, excluding Direct PLUS Loans made to parents of dependent students and Direct Unsubsidized Loans that were converted from TEACH Grants;

(ii) Any private education loans as defined in 34 CFR 601.2, including private education loans made by the institution, that the student borrowed for enrollment in the program and that are required to be reported by the institution under § 668.408; and

(iii) The amount outstanding, as of the date the student completes the program, on any other credit (including any unpaid charges) extended by or on behalf of the institution for enrollment in any program attended at the institution that the student is obligated to repay after completing the program, including extensions of credit described in clauses (1) and (2) of the definition of, and excluded from, the term ''private education loan'' in 34 CFR 601.2;

(2) The Secretary attributes all the loan debt incurred by the student for enrollment in any—

(i) Undergraduate program at the institution to the highest credentialed undergraduate program subsequently completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; and

(ii) Graduate program at the institution to the highest credentialed graduate program completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; and

(3) The Secretary excludes any loan debt incurred by the student for enrollment in any program at any other institution. However, the Secretary may include loan debt incurred by the student for enrollment in programs at other institutions if the institution and the other institutions are under common ownership or control, as determined by the Secretary in accordance with 34 CFR 600.31.

(e) *Exclusions.* The Secretary excludes a student from both the numerator and the denominator of the D/E rates calculation if the Secretary determines that—

(1) One or more of the student's title IV loans are under consideration by the Secretary, or have been approved, for a discharge on the basis of the student's total and permanent disability, under 34 CFR 674.61, 682.402, or 685.212;

(2) The student was enrolled full time in any other eligible program at the institution or at another institution

during the calendar year for which the Secretary obtains earnings information under paragraph (c) of this section;

(3) For undergraduate programs, the student completed a higher credentialed undergraduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section;

(4) For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section;

(5) The student is enrolled in an approved prison education program;

(6) The student is enrolled in a comprehensive transition and postsecondary program; or

(7) The student died.

(f) *D/E rates not issued.* The Secretary does not issue D/E rates for a program under § 668.406 if—

(1) After applying the exclusions in paragraph (e) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or

(2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (c) of this section.

### § 668.404  Calculating earnings premium measure.

(a) *General.* Except as provided under paragraph (d) of this section, for each award year, the Secretary calculates the earnings premium measure for a program by determining whether the median annual earnings of the title IV, HEA recipients who completed the program exceed the earnings threshold.

(b) *Median annual earnings; earnings threshold.* (1) The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (c) of this section; and

(2) The Secretary uses the median annual earnings of students with a high school diploma or GED using data from the Census Bureau to calculate the earnings threshold described in § 668.2.

(3) The Secretary determines the earnings thresholds and publishes the thresholds annually through a notice in the **Federal Register**.

(c) *Exclusions.* The Secretary excludes a student from the earnings premium measure calculation if the Secretary determines that—

(1) One or more of the student's title IV loans are under consideration by the Secretary, or have been approved, for a discharge on the basis of the student's total and permanent disability, under 34 CFR 674.61, 682.402, or 685.212;

(2) The student was enrolled full-time in any other eligible program at the institution or at another institution during the calendar year for which the Secretary obtains earnings information under paragraph (b)(1) of this section;

(3) For undergraduate programs, the student completed a higher credentialed undergraduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the earnings premium measure under this section;

(4) For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the earnings premium measure under this section;

(5) The student is enrolled in an approved prison education program;

(6) The student is enrolled in a comprehensive transition and postsecondary program; or

(7) The student died.

(d) *Earnings premium measures not issued.* The Secretary does not issue the earnings premium measure for a program under § 668.406 if—

(1) After applying the exclusions in paragraph (c) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or

(2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (b) of this section.

### § 668.405  Process for obtaining data and calculating D/E rates and earnings premium measure.

(a) *Administrative data.* In calculating the D/E rates and earnings premium measure for a program, the Secretary uses student enrollment, disbursement, and program data, or other data the institution is required to report to the Secretary to support its administration of, or participation in, the title IV, HEA programs. In accordance with procedures established by the Secretary, the institution must update or otherwise correct any reported data no later than 60 days after the end of an award year.

(b) *Process overview.* The Secretary uses the administrative data to—

(1) Compile a list of students who completed each program during the cohort period. The Secretary—

(i) Removes from those lists students who are excluded under §§ 668.403(e) or 668.404(c);

(ii) Provides the list to institutions; and

(iii) Allows the institution to correct the information about the students on the list, as provided in paragraph (a) of this section;

(2) Obtain from a Federal agency with earnings data the median annual earnings of the students on each list, as provided in paragraph (c) of this section; and

(3) Calculate the D/E rates and the earnings premium measure and provide them to the institution.

(c) *Obtaining earnings data.* For each list submitted to the Federal agency with earnings data, the agency returns to the Secretary—

(1) The median annual earnings of the students on the list whom the Federal agency with earnings data has matched to earnings data, in aggregate and not in individual form; and

(2) The number, but not the identities, of students on the list that the Federal agency with earnings data could not match.

(d) *Calculating D/E rates and earnings premium measure.* (1) If the Federal agency with earnings data includes reports from records of earnings on at least 30 students, the Secretary uses the median annual earnings provided by the Federal agency with earnings data to calculate the D/E rates and earnings premium measure for each program.

(2) If the Federal agency with earnings data reports that it was unable to match one or more of the students on the final list, the Secretary does not include in the calculation of the median loan debt for D/E rates the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did not match. For example, if the Federal agency with earnings data is unable to match three students out of 100 students, the Secretary orders by amount the debts of the 100 listed students and excludes from the D/E rates calculation the three largest loan debts.

**§ 668.406   Determination of the D/E rates and earnings premium measure.**

(a) *Notice of determination.* For each award year for which the Secretary calculates D/E rates and the earnings premium measure for a program, the Secretary issues a notice of determination.

(b) The notice of determination informs the institution of the following:

(1) The D/E rates for each program as determined under § 668.403.

(2) The earnings premium measure for each program as determined under § 668.404.

(3) The determination by the Secretary of whether each program is passing or failing, as described in § 668.402, and the consequences of that determination.

(4) For non-GE programs, whether the student acknowledgement is required under § 668.407.

(5) For GE programs, whether the institution is required to provide the student warning under § 668.605.

(6) For GE programs, whether the program could become ineligible under subpart S of this part based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the program.

**§ 668.407   Student disclosure acknowledgments.**

(a) *Events requiring an acknowledgment from students.*

(1) *Eligible non-GE programs.* The student must provide an acknowledgment with respect to an eligible non-GE program in the manner specified in this section for any year for which the Secretary notifies an institution that the eligible non-GE program has failed the D/E rates for the year in which the D/E rates were most recently calculated by the Department.

(2) *GE Programs.* Warnings and acknowledgments with respect to GE programs are required under the conditions and in the manner specified in § 668.605.

(b) *Content and mechanism of acknowledgment.*

(1) The student must acknowledge having seen the information about the program provided through the disclosure website established and maintained by the Secretary described in § 668.43(d).

(2) The Department will administer and collect the acknowledgment through the disclosure website established and maintained by the Secretary described in § 668.43(d).

(c) An institution may not disburse title IV, HEA funds to the student until the student provides the acknowledgment required in paragraph (a)(1) of this section.

(d) The acknowledgment required in paragraph (a)(1) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as evidence against a student's claim if applying for a loan discharge.

**§ 668.408   Reporting requirements.**

(a) *General.* In accordance with procedures established by the Secretary, an institution must report to the Department—

(1) For each GE program and eligible non-GE program—

(i) The name, CIP code, credential level, and length of the program;

(ii) Whether the program is programmatically accredited and, if so, the name of the accrediting agency;

(iii) Whether the program meets licensure requirements or prepares students to sit for a licensure examination in a particular occupation for each State in the institution's metropolitan statistical area;

(iv) The total number of students enrolled in the program during the most recently completed award year, including both recipients and non-recipients of title IV, HEA funds; and

(v) Whether the program is a medical or dental program whose students are required to complete an internship or residency, as described in the definition of "cohort period" under § 668.2.

(2) For each student—

(i) Information needed to identify the student and the institution;

(ii) The date the student initially enrolled in the program;

(iii) The student's attendance dates and attendance status (*e.g.*, enrolled, withdrawn, or completed) in the program during the award year; and

(iv) The student's enrollment status (*e.g.*, full time, three quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;

(v) The student's total annual cost of attendance;

(vi) The total tuition and fees assessed to the student for the award year;

(vii) The student's residency tuition status by State or district;

(viii) The student's total annual allowance for books, supplies, and equipment from their cost of attendance under HEA section 472;

(ix) The student's total annual allowance for housing and food from their cost of attendance under HEA section 472;

(x) The amount of institutional grants and scholarships disbursed to the student;

(xi) The amount of other State, Tribal, or private grants disbursed to the student; and

(xii) The amount of any private education loans disbursed, including private education loans made by the institution;

(3) If the student completed or withdrew from the program during the award year—

(i) The date the student completed or withdrew from the program;

(ii) The total amount the student received from private education loans, as described in § 668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;

(iii) The total amount of institutional debt, as described in § 668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;

(iv) The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;

(v) The total amount of the allowances for books, supplies, and equipment included in the student's title IV Cost of Attendance (COA) for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and

(vi) The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program; and

(4) As described in a notice published by the Secretary in the **Federal Register**, any other information the Secretary requires the institution to report.

(b)(1) *Reporting deadlines.* Except as provided under paragraph (c) of this section, an institution must report the information required under paragraph (a) of this section no later than—

(i) For programs other than medical and dental programs that require an internship or residency, July 31, following the date these regulations take effect, for the second through seventh award years prior to that date;

(ii) For medical and dental programs that require an internship or residency, July 31, following the date these regulations take effect, for the second through eighth award years prior to that date; and

(iii) For subsequent award years, October 1, following the end of the award year, unless the Secretary establishes different dates in a notice published in the **Federal Register**.

(2) For any award year, if an institution fails to provide all or some of the information required under paragraph (a) of this section, the institution must provide to the Secretary an explanation, acceptable to the Secretary, of why the institution failed to comply with any of the reporting requirements.

(c) *Transitional reporting period and metrics.*

(1) For the initial award year for which D/E rates and the earnings premium are calculated under this part,

institutions may opt to report the information required under paragraph (a) of this section for its eligible programs that are not GE programs either—

(i) For the time periods described in paragraph (b)(1)(i) and (ii) of this section; or

(ii) For only the two most recently completed award years.

(2) If an institution provides transitional reporting under paragraph (c)(1)(ii) of this section, the Department will calculate transitional D/E rates and earnings premium measures based on the period reported.

## § 668.409   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the part and this subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby.

■ 22. Add subpart S to part 668 to read as follows:

## Subpart S   Gainful Employment (GE)

Sec.
668.601   Gainful employment (GE) scope and purpose.
668.602   Gainful employment criteria.
668.603   Ineligible GE programs.
668.604   Certification requirements for GE programs.
668.605   Student warnings and acknowledgments.
668.606   Severability.

## Subpart S   Gainful Employment

### § 668.601   Gainful employment (GE) scope and purpose.

This subpart applies to an educational program offered by an eligible institution that prepares students for gainful employment in a recognized occupation and establishes rules and procedures under which the Secretary determines that the program is eligible for title IV, HEA program funds.

### § 668.602   Gainful employment criteria.

(a) A GE program provides training that prepares students for gainful employment in a recognized occupation if the program—

(1) Satisfies the applicable certification requirements in § 668.604;

(2) Is not a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated; and

(3) Is not a failing program under the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated.

(b) If the Secretary does not calculate or issue D/E rates for a program for an award year, the program receives no result under the D/E rates for that award year and remains in the same status under the D/E rates as the previous award year.

(c) If the Secretary does not calculate D/E rates for the program for four or more consecutive award years, the Secretary disregards the program's D/E rates for any award year prior to the four-year period in determining the program's eligibility.

(d) If the Secretary does not calculate or issue earnings premium measures for a program for an award year, the program receives no result under the earnings premium measure for that award year and remains in the same status under the earnings premium measure as the previous award year.

(e) If the Secretary does not calculate the earnings premium measure for the program for four or more consecutive award years, the Secretary disregards the program's earnings premium for any award year prior to the four-year period in determining the program's eligibility.

### § 668.603   Ineligible GE programs.

(a) *Ineligible programs.* If a GE program is a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated, or the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated, the program becomes ineligible and its participation in the title IV, HEA programs ends upon the earliest of—

(1) The issuance of a new Eligibility and Certification Approval Report that does not include that program;

(2) The completion of a termination action of program eligibility, if an action is initiated under subpart G of this part; or

(3) A revocation of program eligibility, if the institution is provisionally certified.

(b) *Basis for appeal.* If the Secretary initiates an action under paragraph (a)(2) of this section, the institution may initiate an appeal under subpart G of this part if it believes the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. Institutions may not dispute a program's ineligibility based upon its D/E rates or the earnings premium measure except as described in this paragraph (b).

(c) *Restrictions*—(1) *Ineligible program.* Except as provided in § 668.26(d), an institution may not

disburse title IV, HEA program funds to students enrolled in an ineligible program.

(2) *Period of ineligibility.* An institution may not seek to reestablish the eligibility of a failing GE program that it discontinued voluntarily either before or after D/E rates or the earnings premium measure are issued for that program, or reestablish the eligibility of a program that is ineligible under the D/E rates or the earnings premium measure, until three years following the earlier of the date the program loses eligibility under paragraph (a) of this section or the date the institution voluntarily discontinued the failing program.

(3) *Restoring eligibility.* An ineligible program, or a failing program that an institution voluntarily discontinues, remains ineligible until the institution establishes the eligibility of that program under § 668.604(c).

### § 668.604   Certification requirements for GE programs.

(a) *Transitional certification for existing programs.* (1) Except as provided in paragraph (a)(2) of this section, an institution must provide to the Secretary no later than December 31 of the year in which this regulation takes effect, in accordance with procedures established by the Secretary, a certification signed by its most senior executive officer that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. The Secretary accepts the certification as an addendum to the institution's program participation agreement with the Secretary under § 668.14.

(2) If an institution makes the certification in its program participation agreement pursuant to paragraph (b) of this section between July 1 and December 31 of the year in which this regulation takes effect, it is not required to provide the transitional certification under this paragraph.

(b) *Program participation agreement certification.* As a condition of its continued participation in the title IV, HEA programs, an institution must certify in its program participation agreement with the Secretary under § 668.14 that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. An institution must update the certification within 10 days if there are any changes in the approvals for a program, or other changes for a program that render an existing certification no longer accurate.

(c) *Establishing eligibility and disbursing funds.* (1) An institution establishes a GE program's eligibility for title IV, HEA program funds by updating the list of the institution's eligible programs maintained by the Department to include that program, as provided under 34 CFR 600.21(a)(11)(i). By updating the list of the institution's eligible programs, the institution affirms that the program satisfies the certification requirements in paragraph (d) of this section. Except as provided in paragraph (c)(2) of this section, after the institution updates its list of eligible programs, the institution may disburse title IV, HEA program funds to students enrolled in that program.

(2) An institution may not update its list of eligible programs to include a GE program, or a GE program that is substantially similar to a failing program that the institution voluntarily discontinued or became ineligible as described in § 668.603(c), that was subject to the three-year loss of eligibility under § 668.603(c), until that three-year period expires.

(d) *GE program eligibility certifications.* An institution certifies for each eligible GE program included on its Eligibility and Certification Approval Report, at the time and in the form specified in this section, that such program is approved by a recognized accrediting agency or is otherwise included in the institution's accreditation by its recognized accrediting agency, or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency for the approval of public postsecondary vocational education in lieu of accreditation.

### § 668.605   Student warnings and acknowledgments.

(a) *Events requiring a warning to students and prospective students.* The institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the GE program could become ineligible under this subpart based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the GE program.

(b) *Subsequent warning.* If a student or prospective student receives a warning under paragraph (a) of this section with respect to a GE program, but does not seek to enroll until more than 12 months after receiving the warning, the institution must again provide the warning to the student or

prospective student, unless, since providing the initial warning, the program has passed both the D/E rates and earnings premium measures for the two most recent consecutive award years in which the metrics were calculated for the program.

(c) *Content of warning.* The institution must provide in the warning—

(1) A warning, as specified by the Secretary in a notice published in the **Federal Register**, that—

(i) The program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings, as applicable; and

(ii) The program could lose access to Federal grants and loans based on the next calculated program metrics;

(2) The relevant information to access the disclosure website maintained by the Secretary described in § 668.43(d);

(3) A statement that the student must acknowledge having seen the warning through the disclosure website maintained by the Secretary described in § 668.43(d) before the institution may disburse any title IV, HEA funds;

(4) A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students could transfer credits earned in the program to another program at the institution and which course credits would transfer, in the event that the program loses eligibility for title IV, HEA program funds;

(5) An indication of whether, in the event that the program loses eligibility for title IV, HEA program funds, the institution will—

(i) Continue to provide instruction in the program to allow students to complete the program; and

(ii) Refund the tuition, fees, and other required charges paid to the institution by, or on behalf of, students for enrollment in the program; and

(6) An explanation of whether, in the event that the program loses eligibility for title IV, HEA program funds, the students could transfer credits earned in the program to another institution in accordance with an established articulation agreement or teach-out plan or agreement.

(d) *Alternative languages.* In addition to providing the English-language warning, the institution must also provide translations of the English-language student warning for those students and prospective students who have limited proficiency in English.

(e) *Delivery to enrolled students.* An institution must provide the warning required under this section in writing,

**Federal Register** / Vol. 88, No. 97 / Friday, May 19, 2023 / Proposed Rules **32511**

by hand delivery, mail, or electronic means, to each student enrolled in the program no later than 30 days after the date of the Secretary's notice of determination under § 668.406 and maintain documentation of its efforts to provide that warning. The warning must be the only substantive content contained in these written communications.

(f) *Delivery to prospective students.* (1) An institution must provide the warning as required under this section to each prospective student or to each third party acting on behalf of the prospective student at the first contact about the program between the institution and the student or the third party acting on behalf of the student by—

(i) Hand-delivering the warning as a separate document to the prospective student or third party individually, or as part of a group presentation;

(ii) Sending the warning to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the warning is the only substantive content in the email and that the warning is sent by a different method of delivery if the institution receives a response that the email could not be delivered; or

(iii) Providing the warning orally to the student or third party if the contact is by telephone.

(2) An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the institution delivers the warning as described in paragraph (f) of this section.

(g) *Restriction on disbursement.* An institution may not disburse title IV, HEA funds to the student until the student completes the acknowledgment described in paragraph (c)(3) of this section, as administered and collected through the disclosure website

maintained by the Secretary described in § 668.43(d).

(h) *Disclaimer.* The provision of a student warning or the acknowledgment described in paragraph (c)(3) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as evidence against a student's claim if applying for a loan discharge.

### § 668.606  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the part and this subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby.

[FR Doc. 2023–09647 Filed 5–18–23; 8:45 am]

**BILLING CODE 4000 01 P**

# EXHIBIT 3

detailing the reasons that necessitate the extension request. (HI, No. 109, page 1.).

DOE has reviewed the requests and is extending the comment period to allow additional time for interested parties to submit comments. As noted, the RFI was issued as part of the preliminary stages of rulemaking to consider amendments to the test procedure and energy conservation standards for circulator pumps and vertical in-line pumps. If DOE determines that amended test procedures and/or energy conservation standards may be appropriate, additional notifications will be published (*e.g.,* a notice of proposed rulemaking) providing interested parties with an additional opportunity to submit comment. As such, DOE has determined that an extension until the end of July is sufficient for this preliminary stage. Therefore, DOE is extending the comment period to July 30, 2021.

**Signing Authority**

This document of the Department of Energy was signed on May 18, 2021, by Kelly Speakes-Backman, Principal Deputy Assistant Secretary and Acting Assistant Secretary for Energy Efficiency and Renewable Energy, pursuant to delegated authority from the Secretary of Energy. That document with the original signature and date is maintained by DOE. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DOE Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of the Department of Energy. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

Signed in Washington, DC, on May 19, 2021.

**Treena V. Garrett,**
*Federal Register Liaison Officer, U.S. Department of Energy.*
[FR Doc. 2021–10883 Filed 5–25–21; 8:45 am]
**BILLING CODE 6450 01 P**

# DEPARTMENT OF EDUCATION

## 34 CFR Chapter VI

[Docket ID ED 2021 OPE 0077]

## Negotiated Rulemaking Committee; Public Hearings

**AGENCY:** Office of Postsecondary Education, Department of Education.
**ACTION:** Intent to establish negotiated rulemaking committees.

**SUMMARY:** We announce our intention to establish negotiated rulemaking committees to prepare proposed regulations for programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA). The Department is committed to advancing equitable outcomes for all students and invites comments from organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations being considered by the particular committee. We also announce public hearings at which interested parties may comment on the topics for regulation suggested by the Department and suggest additional topics that should be considered for action by the negotiating committees. In addition, we announce that the Department will accept written comments on the topics suggested by the Department and suggestions for additional topics that should be considered for action by the negotiating committees.

**DATES:** The dates, times, and locations of the public hearings are listed under the **SUPPLEMENTARY INFORMATION** section of this document. We must receive written comments on the topics for regulation suggested by the Department and additional topics that should be considered for action by the negotiating committees on or before July 1, 2021.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments by fax. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "FAQ."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* If you mail or deliver your comments, address them to Vanessa Gomez, U.S. Department of Education, 400 Maryland Ave. SW, Room 2C179, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public (including those submitted by postal mail, commercial delivery, or hand delivery) available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** For information about negotiated rulemaking in general, see *The Negotiated Rulemaking Process for Title IV Regulations, Frequently Asked Questions* at: *www2.ed.gov/policy/highered/reg/hearulemaking/hea08/neg-reg-faq.html.* For information about the public hearings, or for additional information about negotiated rulemaking, contact: Vanessa Gomez, U.S. Department of Education, 400 Maryland Ave. SW, Room 2C179, Washington, DC 20202. Telephone: (202) 453–6708. Email: *vanessa.gomez@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** Section 492 of the HEA requires that, before publishing any proposed regulations to implement programs authorized under title IV of the HEA, the Secretary obtain public involvement in the development of the proposed regulations. After obtaining advice and recommendations from the public, the Secretary conducts negotiated rulemaking to develop the proposed regulations. We announce our intent to develop proposed title IV regulations by following the negotiated rulemaking procedures in section 492 of the HEA.

We intend to select participants for the negotiated rulemaking committees from nominees of the organizations and groups that represent the interests significantly affected by the proposed regulations. To the extent possible, we will select from the nominees individual negotiators who reflect the diversity among program participants.

We intend to convene multiple committees to develop proposed regulations on the affordability of postsecondary education, institutional accountability, and Federal student loans. Each committee will be comprised of a unique set of negotiators. The public will be made aware of the schedule and topics of each committee meeting in subsequent **Federal Register** notice(s).

**Regulatory Issues**

The Department suggests the following topics for regulation:

(1) Change of ownership and change in control of institutions of higher education under 34 CFR 600.31;

(2) Certification procedures for participation in title IV, HEA programs under 34 CFR 668.13;

(3) Standards of administrative capability under 34 CFR 668.16;

(4) Ability to benefit under 34 CFR 668.156;

(5) Borrower defense to repayment under 34 CFR 682.410, 682.411, 685.206, and 685.222;

(6) Discharges for borrowers with a total and permanent disability under 34 CFR 674.61, 682.402, and 685.213;

(7) Closed school discharges under 34 CFR 685.214 and 682.402;

(8) Discharges for false certification of student eligibility under 34 CFR 685.215(a)(1) and 682.402;

(9) Loan repayment plans under 34 CFR 682.209, 682.215, 685.208, and 685.209;

(10) The Public Service Loan Forgiveness program under 34 CFR 685.219;

(11) Mandatory pre-dispute arbitration and prohibition of class action lawsuits provisions in institutions' enrollment agreements (formerly under 34 CFR 685.300) and associated counseling about such arrangements under 34 CFR 685.304;

(12) Financial responsibility for participating institutions of higher education under 34 CFR subpart L, such as events that indicate heightened financial risk;

(13) Gainful employment (formerly located in 34 CFR subpart Q); and

(14) Pell Grant eligibility for prison education programs under 34 CFR part 690.

We also invite public input on how the Department could address, through its title IV regulations, gaps in postsecondary outcomes such as retention, completion, loan repayment, and student loan default by race, ethnicity, gender, and other key student characteristics.

After a complete review of the public comments presented at the public hearings and in the written submissions, we will publish a document (or documents) in the **Federal Register** announcing the specific topics for which we intend to establish negotiated rulemaking committees and a request for nominations for individual negotiators for the committees who represent the communities of interest that would be significantly affected by the proposed regulations. This document will also be posted on the Department's website at: *https:// www2.ed.gov/policy/highered/reg/ hearulemaking/2021/index.html.*

**Public Hearings**

We will hold virtual public hearings for interested parties to comment on the rulemaking agenda from 10:00 a.m. to 12:00 p.m. and 2:00 p.m. to 4:00 p.m., Eastern time on the following dates:

• June 21, 2021;
• June 23, 2021; and
• June 24, 2021.

Further information on the public hearings is available at: *https:// www2.ed.gov/policy/highered/reg/ hearulemaking/2021/index.html.*

Individuals who would like to present comments at the public hearings must register by sending an email message to *negreghearing@ed.gov* no later than 12:00 p.m. Eastern time on the business day prior to the public hearing at which they want to speak. The message should include the name of the speaker, the email address of the speaker, the general topic(s) the individual would like to address, and one or more dates and times during which the individual would be available to speak. We will attempt to accommodate each speaker's preference for date and time; however, if we are unable to do so, we will make the determination on a first- come first-served basis, based on the time and date we received the message. We will limit each participant's comments to five minutes.

The Department will notify speakers of the time slot reserved for them and provide information on how to log in to the hearing as a speaker. An individual may make only one presentation at the public hearings. If we receive more registrations than we can accommodate, the Department reserves the right to reject the registration of an entity or individual affiliated with an entity or individual that is already scheduled to present comments to ensure that a broad range of entities and individuals are able to present. Unique speaker access to the meetings will be through Microsoft Teams.

In part due to increased cybersecurity concerns, individuals who want to observe the public hearing, but who do not want present comments, are required to register. We will post registration links for attendees who wish to observe on our website at: *www2.ed.gov/policy/highered/reg/ hearulemaking/2021/index.html.* There will be a unique link each day for attendees who wish to observe. Non-speaking attendees will join the public hearings through Microsoft Teams Live and will be muted with no option to unmute for the duration of each public hearing. The Department will also post transcripts of the hearings on that site.

The Department will accept written comments via the Federal eRulemaking portal, and by postal mail, commercial delivery, or hand delivery, through July 1, 2021. (See the **ADDRESSES** section of this document for submission information.)

**Schedule for Negotiations**

We anticipate that any committees established after the public hearings will begin negotiations no earlier than August 2021, with the committees meeting for up to three sessions of approximately five days each at roughly four-week intervals. The committees will meet virtually. We may adjust the number of days of each session and time between sessions to adapt to the virtual environment. The dates and locations of these meetings will be published in a subsequent notice in the **Federal Register** and will be posted on the Department's website at: *https:// www2.ed.gov/policy/highered/reg/ hearulemaking/2021/index.html.*

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document and a copy of the application package in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or portable document format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available for free on the site. You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**Program Authority:** 20 U.S.C. 1098a.

**Michelle Asha Cooper,**

*Acting Assistant Secretary for Postsecondary Education.*

[FR Doc. 2021–11120 Filed 5–25–21; 8:45 am]

**BILLING CODE 4000 01 P**

# EXHIBIT 4

App.408

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

**§ 600.10 Date, extent, duration, and consequence of eligibility.**

* * *

**(c)** Educational programs.

**(1)** An eligible institution that seeks to establish the eligibility of an educational program must -

    (i)  Pursuant to a requirement regarding additional programs included in the institution's program participation agreement under 34 CFR 668.14, obtain the Secretary's approval;

    (ii)  For a direct assessment program under 34 CFR 668.10, and for a comprehensive transition and postsecondary program under 34 CFR 668.232, obtain the Secretary's approval; ~~and~~

    (iii)  For a first direct assessment program under 34 CFR 668.10, the first direct assessment program offered at each credential level, and for a comprehensive transition and postsecondary program under 34 CFR 668.232, obtain the Secretary's approval; and~~-~~

    (iv)  For a gainful employment program under 34 CFR part 668, subpart Q of this chapter, update its application under § 600.21, and meet any time restrictions that prohibit the institution from establishing or reestablishing the eligibility of the program as may be required under 34 CFR 668.~~407~~504.

**(2)** Except as provided under § 600.20(c), an eligible institution does not have to obtain the Secretary's approval to establish the eligibility of any program that is not described in paragraph (c)(1) of this section.

**§ 600.21 Updating application information.**

**(a)** *Reporting requirements.* Except as provided in paragraph (b) of this section, an eligible institution must report to the Secretary in a manner prescribed by the Secretary no later than 10 days after the change occurs, of any change in the following:

* * *

**(11)** For any program that is required to provide training that prepares a student for gainful employment in a recognized occupation -

    (i)  Establishing the eligibility or reestablishing the eligibility of the program;

    (ii)  Discontinuing the program's eligibility;

    (iii)  Ceasing to provide the program for at least 12 consecutive months;

    (iv)  Losing program eligibility under § 600.40; ~~or~~

    (v)  Changing the program's name, CIP code, or credential level; or

    (vi)  Updating the certification pursuant to 34 CFR 668.~~410~~505.

* * *

**~~Subpart Q—Gainful Employment (GE) Programs~~Debt-to-Earnings (DE) programs and rates**

**§ 668.401 Scope and purpose.**

This subpart ~~applies to an educational program offered by an eligible institution that prepares students for gainful employment in a recognized occupation, and~~ establishes the rules and procedures under ~~which~~

> **Commented [A1]:** We have placed the D/E rate calculation and disclosure framework under this revised subpart Q, clarifying that D/E rates would be calculated and disclosed for all "D/E programs." The calculation and disclosure of these informational rates is authorized under 20 U.S.C. § 1092, the same statutory authority used for 668.43. D/E rates would still be used to determine eligibility for GE programs under the new subpart R.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

~~(a) The Secretary determines that the program is eligible for title IV, HEA program funds; and~~

~~(b)~~ ~~An institution reports~~ institutions report information about ~~the program to~~ their D/E programs to the Secretary and the Secretary~~,~~ calculates and issues D/E rates.

**§ 668.402 Definitions.**

The following definitions apply to this subpart~~,~~ and to subpart R.

*Annual earnings rate.* The percentage of a ~~GE~~D/E program's annual loan payment compared to the annual earnings of the students who completed the D/E program, as calculated under §668.~~404~~403.

*Classification of instructional program (CIP) code.* A taxonomy of instructional program classifications ~~and~~ descriptions developed by the U.S. Department of Education's National Center for Education ~~Statistics~~ (NCES). Specific D/E programs offered by institutions are classified using a six-digit CIP code. ~~However, for purposes of this subpart, the Secretary uses the first four digits of the CIP code to identify gainful employment programs that have comparable content and objectives.~~

*Cohort period.* The set of award years used to identify a cohort of students who completed a D/E program and whose debt and earnings outcomes are used to calculate debt-to~~-~~earnings rates. The Secretary uses a two-year cohort period to ~~calculates~~calculate the debt-to-earnings rates for a D/E program when the number of students (after exclusions identified in §668.~~404~~403(e)) in the two-year cohort period is 30 or more. The Secretary uses a four-year cohort period to calculate the debt-to-earnings rates when the number of students completing the D/E program in the two-year cohort period is less than 30 and when the number of students completing the D/E program in the four-year cohort period is 30 or more. The cohort period covers consecutive award years that are--

**(1)** For the two-year cohort period--

    **(i)**  The fifth and sixth ~~third and fourth~~ award years prior to the award year for which the D/E rates are  calculated pursuant to §668.40~~3~~4. For example, if D/E rates are calculated for award year 2021-2022, the two-year cohort period is award years 2015-2016 and 2016-2017~~2017-2018 and 2018-2019~~; and earnings data  used will be for calendar years ~~2020 and~~ 2021; or

    **(ii)**  For a D/E program whose students ~~are required to~~may complete an ~~medical or dental~~ internship or residency, the eighth and ninth~~sixth and seventh~~ award years prior to the award year for which the D/E rates are calculated. For example, if D/E rates are calculated for award year 2021-2022, the two-year cohort period is award years 2012-2013 and 2013-2014~~2014-2015 and 2015-2016~~. For this purpose, an ~~required medical or  dental~~ internship or residency is a supervised training program that--

    ~~(A)~~

    ~~(B)~~**(A)**  Leads to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility that offers post-graduate training; and

    **(B)**  ~~(C)~~ Must be~~Is~~ commonly completed before the student ~~may be~~becomes licensed by a State and board ~~-~~certified for professional practice or service.

    **(C)**  ~~(2)~~Is programmatically accredited if required under Federal or State law.

**(2)**  For the four-year cohort period—

> **Commented [A2]:** Both the two-year and four-year cohort periods would begin with the fifth year preceding the award year for which rates are being calculated. Placing the initial measurement four full years following graduation will afford graduates additional time to establish normal earning levels and thus better capture whether typical earnings for the program are reasonable relative to typical debt burden.

> **Commented [A3]:** We have clarified that the earnings data for all cohorts is the data from the most recent calendar year, consistent with all prior D/E metrics.

> **Commented [A4]:** We have extended this accommodation to all programs with qualifying internships and residencies, not just medical and dental programs.  This will ensure more consistent measurement across all such programs.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(i)  ~~The third, fourth,~~ For the four-year cohort period the fifth, sixth, seventh, and ~~sixth~~eighth award years prior to the award year for which the D/E rates are calculated pursuant to §668.~~404~~403. For example, if D/E rates are calculated for award year ~~2021-2022, the two~~four-year cohort period is award years 2013-2014, 2014-2015, 2015-2016, and 2016-2017~~, 2017-2018, and 2018-2019~~; and earnings data used will be for ~~2020 and~~ 2021; or

(ii)  For a D/E program whose students ~~are required to~~may complete ~~a medical or dental~~an internship or ~~-~~residency, the ~~sixth, seventh, eighth, and~~ ninth, tenth, and eleventh award years prior to the award year for which the D/E rates are calculated. For example, if D/E rates are calculated for award year 2021-2022, ~~the~~four-year cohort period is award years 2010-2011, 2011-2012, 2012-2013, and 2013-2014~~, 2014 2015, and 2015 2016~~.  For this purpose, a required medical or ~~dental~~an internship or residency is a supervised training ~~-~~program that--

   ~~(A)Requires the student to hold a degree as a doctor of medicine or osteopathy, or as a  doctor of dental science;~~

   ~~(B)~~(A)        Leads to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility that offers post-graduate training; and

   ~~(C)~~(B)        ~~Must be~~Is commonly completed before the student ~~may be~~is licensed by a State and board ~~-~~certified for professional practice or service~~-~~; and

   (C)  Is programmatically accredited if required under Federal or State law.

*Credential level.* The level of the academic credential awarded by an institution to students who  complete the D/E program. For the purposes of this subpart, ~~the~~hierarchy of undergraduate ~~credential levels are:~~ credentials, from lowest to highest, is: undergraduate certificate or diploma, associate degree, bachelor's degree, and post-baccalaureate certificate~~.; and the.~~

*Debt-to-earnings program (D/E program).* An educational program offered by an institution under §668.8 and identified by a combination of the institution's six-digit Office of Postsecondary Education ID (OPEID) number, the program's six-digit CIP code as assigned by the institution or determined by the Secretary, and the program's credential level.

*Debt-to-earnings rates (D/E rates).* The discretionary earnings rate and annual earnings rate as calculated under §668.~~404~~403.

*Discretionary earnings rate.* The percentage of a ~~GE~~D/E program's annual loan payment compared to the discretionary earnings of the students who completed the D/E program, as calculated under §668.~~404~~403.

*Federal agency with earnings data.* A Federal agency with which the Department enters into an agreement to access earnings data for the D/E rates. The agency must have data that includes unearned income and self-employment income for graduates and is sufficient to match~~-~~ with at least 90 percent of title IV graduates, and may include the Treasury Department (including the Internal Revenue Service), the Social Security Administration (SSA), the Department of Health and  Human Services (HHS), and/or the Census Bureau.

*Gainful employment program (GE program).* An ~~educational~~undergraduate D/E program offered by an institution under  §668.8(c)(3) or (d) ~~and identified by a combination of the institution's six digit Office of Postsecondary Education ID (OPEID) number, the program's four digit CIP code as assigned by the institution or  determined by the Secretary, and the program's credential level. .~~).

> **Commented [A5]:** This would clarify the hierarchy of undergraduate and graduate credentials when consolidating debt.

> **Commented [A6]:** D/E rates would be calculated for all D/E programs at all institutions.

> **Commented [A7]:** The full 6-digit CIP code would distinguish individual D/E programs, consistent with the design of the CIP taxonomic scheme.

> **Commented [A8]:** This would ensure a more complete and accurate earnings number, and thus better D/E rates.

> **Commented [A9]:** D/E rates calculated for graduate GE programs would be strictly for informational purposes.  D/E rates are not an appropriate measure of "gainful employment" for graduate degree programs, for the reasons articulated in *Initial Comments and Concerns of Proprietary Schools.*

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

*Length of the D/E program.* The amount of time in weeks, months, or years that is specified in the institution's catalog, marketing materials, or other official publications for a student to complete the requirements needed to obtain the degree or credential offered by the D/E program.

*Poverty Guideline.* The Poverty Guideline for a single person in the continental United States as published by the U.S. Department of Health and Human Services and available at http://aspe.hhs.gov/poverty or its successor site.

*Prospective student.* An individual who has contacted an eligible institution for the purpose of requesting information about enrolling in a D/E program or who has been contacted directly by the institution or by a third party on behalf of the institution about enrolling in a D/E program.

*Small D/E program.* A ~~GE~~D/E program for which the number of students completing the program in the two- and four-year cohort periods is fewer than 30.

*Small D/E program rates.* The discretionary earnings rate and annual earnings rate calculated on an aggregate basis for all small D/E programs sharing the same four-digit CIP code at an institution within the same credential level in accordance with §668.~~404~~403(g).

*Student.* An individual who received title IV, HEA program funds for enrolling in the ~~GE~~ a D/E program.

*Title IV loan.* A loan authorized under the William D. Ford Direct Loan Program (Direct Loan).

~~§ 668.403 Gainful employment framework.~~

~~(a) General. A program provides training that prepares students for gainful employment in a recognized occupation if the program~~

~~(1) Satisfies the applicable certification requirements in §668.414; and~~

~~(2) Is not an ineligible program under the D/E rates.~~

~~(b) Debt-to-earnings rates (D/E rates). For each award year the Secretary calculates two D/E rates for a GE program, the discretionary earnings rate and the annual earnings rate, using the procedures in §§668.404 through 668.406.~~

~~(c) Outcomes of the D/E rates.~~

~~(1) A GE program passes the D/E rates if~~

~~(i) Its discretionary earnings rate is less than or equal to 20 percent; or~~

~~(ii) Its annual earnings rate is less than or equal to 8 percent.~~

~~(2) A GE program fails the D/E rates if~~

~~(i) Its discretionary earnings rate is greater than 20 percent or the income for the denominator of the rate (discretionary earnings) is negative or zero; and~~

~~(ii) Its annual earnings rate is greater than 8 percent or the denominator of the rate (annual earnings) is zero.~~

~~(3) A GE program becomes ineligible, subject to paragraph (c)(4), if it fails the D/E rates in two out of any three consecutive award years for which the program's D/E rates are calculated, except that failing the small program rate does not make those small programs ineligible.~~

> **Commented [A10]:** This would ensure that the small D/E program relates bear some relationship to the programs and related occupations for which they have been calculated. As discussed during the negotiations, combining data for all small D/E programs will not provide meaningful data to students and could prove highly misleading.

> **Commented [A11]:** This section concerning the GE framework has been moved to the new subpart R that applies solely to GE programs.

App.412

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

(4) If the Secretary does not calculate or issue D/E rates for a program for an award year, or calculates only a small program rate with respect to that program, the program receives no result under the D/E rates measure for that award year and remains in the same status under the D/E rates as the previous award year.

§ 668.404 Calculating D/E rates.

(a)  (a) *General*. Except as provided under paragraphs (f) and (g) of this section, for each award year, the Secretary calculates D/E rates for a GE D/E program as follows:

(1)  Discretionary earnings rate = annual loan payment / (the higher of the mean or median annual earnings – (1.5 x Poverty Guideline)). For the purposes of this paragraph, the Secretary applies the Poverty Guideline for the calendar year immediately following the calendar year for which annual earnings are obtained under paragraph (c) of this section.

(2)(1)       Annual earnings rate = annual loan payment / the higher of the mean or median annual earnings.

(b)  (b) *Annual loan payment*.

(1)  The Secretary calculates the annual loan payment for a GE D/E program by--

(i)  (1)(i) Determining the median loan debt of the students who completed the D/E program during the cohort period, based on the lesser of the loan debt incurred by each student as determined under paragraph (d)(1) of this section and the total amount actual cost for tuition and fees and books, equipment, and supplies for each student as determined under paragraph (d)(2) of this section;

(ii)  Removing, if applicable, the appropriate number of highest loan debts as described in §668.404 403(b)(1)(ii); and

(iii)  Calculating the median of the remaining amounts.
(2) Amortizing

(iii)(2)       The Secretary amortizes the median loan debt--

(i)  (i)

(A)  Over a 10-year repayment period for a D/E program that leads to an undergraduate certificate, a post-baccalaureate certificate, an associate degree, or a graduate certificate;

(B)  Over a 15-year repayment period for a D/E program that leads to a bachelor's degree or a master's degree; or

(C)  (C) Over a 20-year repayment period for any other D/E program; and

(ii)  (ii) Using an annual interest rate that is the average of the annual statutory interest rates on Federal Direct Unsubsidized Loans that were in effect during—

(A)  The three consecutive award years, ending in the final year of the cohort period, for undergraduate certificate D/E programs, post-baccalaureate certificate D/E programs, and

(A)  associate degree D/E programs. For these D/E programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students;

(B)  The three consecutive award years, ending in the final year of the cohort period, for graduate certificate D/E programs and master's degree D/E programs. For these D/E

**Commented [A12]:** Throughout this proposal, we have restored the use of the higher of the mean or median, consistent with all prior D/E metrics. This provides more balanced earnings data and thus better D/E rates.

App.413

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students;

**(C)** The six consecutive award years, ending in the final year of the cohort period, for bachelor's degree D/E programs. For these D/E programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to undergraduate students; and

**(D)** The six consecutive award years, ending in the final year of the cohort period, for doctoral D/E programs and first professional degree D/E programs. For these D/E programs, the Secretary uses the Federal Direct Unsubsidized Loan interest rate applicable to graduate students.

*Note to paragraph (b)(2)(ii):* For example, for an undergraduate certificate D/E program, if the two-year cohort period is award years ~~2017-2018~~2015-2016 and ~~2018-2019~~2016-2017, the interest rate would be the average of the interest rates for the years from 2014-2015 through 2016-2017 ~~through 2018-2019~~.

**(c)** ~~(c)~~ *Annual earnings.*

**(1)** The Secretary obtains from a Federal agency with earnings data, under §668.~~405~~402, the most currently available mean and median annual earnings of the students who completed the ~~GE~~D/E program during the cohort period and who are not excluded under paragraph (e) of this section; and

**(2)** The Secretary uses the higher of the mean and median annual earnings to calculate the D/E rates.

**(d)** ~~(d)~~ *Loan debt and* ~~assessed charges~~*actual cost.*

**(1)** ~~(1)~~ In determining the loan debt for a student, the Secretary~~includes~~–

    **(i)** ~~The~~Includes the amount of title IV loans that the student borrowed (total amount disbursed less any cancellations or adjustments) for enrollment in the ~~GE program, including Direct PLUS Loans made to parents of dependent students but excluding Direct Unsubsidized Loans that were converted from TEACH Grants;~~ D/E program;

    **(ii)** ~~Any~~Includes any private education loans as defined in 34 CFR 601.2, including private education loans made by the institution, that the student borrowed for enrollment in the D/E program and that are required to be reported by the institution under §668.~~408~~407; and

    **(iii)** ~~The~~Includes the amount outstanding, as of the date the student completes the D/E program, on any other credit ~~(including any unpaid charges)~~ extended by or on behalf of the institution for enrollment in any ~~GE~~ D/E program attended at the institution that the student is obligated to repay after completing the ~~GE~~ D/E program, including extensions of credit described in clauses (1) and (2) of the definition of, and excluded from, the term "private education loan" in 34 CFR 601.2;

    **(iv)** Excludes the amount of any Direct PLUS Loans made to parents of dependent students and Direct Unsubsidized Loans that were converted from TEACH Grants.

**(2)** The Secretary uses the information reported by the institution under §668.407(a)(2)(iv) and (v) to determine the actual cost for a student. In determining the actual cost for a student, the Secretary–

    **(i)** Includes the total amount of tuition, fees, books, supplies, and equipment for the program;

    **(ii)** Excludes any institutional grant, scholarship, or discount provided to the student; and

> **Commented [A13]:** We have replaced "assessed charges" with "actual cost" to emphasize that this represents the amount the institution actually charged the student.

> **Commented [A14]:** Consistent with the 2014 rule, non-student debt and grants would be excluded. If parental debt is included in the numerator, parental earnings would need to be included in the denominator.

> **Commented [A15]:** This approach produces a more accurate D/E rate, as it captures the actual cost paid by students, not the "sticker price" that may have been assessed prior to the application of institutional aid. This is extremely important given the prevalence of tuition discounting and institutional aid in higher education.

App.414

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(iii) Excludes any Federal or State non-loan funds the student received and used to pay the cost of tuition, fees, books, supplies, and equipment.

(3) The Secretary attributes all the loan debt incurred by the student ~~for~~, and attributes the actual costs reported for the student under § 668.407(a)(2)(iv) and (v),for enrollment in any--

(i)  ~~(i) Undergraduate GE~~Uncompleted undergraduate D/E program at the institution to the highest credentialed undergraduate ~~GE~~D/E program subsequently completed by the student at the institution as of the end of the most ~~-~~recently completed award year prior to the calculation of the D/E rates under this section.~~; and~~

~~(ii) Graduate GE program at the institution to the highest credentialed graduate GE program completed by the student at the institution as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; and~~

(4)  ~~(3)~~The Secretary excludes any loan debt and actual costs incurred by the student for enrollment in D/E programs at other  institutions. However, the Secretary may include loan debt or actual costs incurred by the student for enrollment in ~~GE~~uncompleted D/E programs at other institutions if the institution and the other institutions are under common ownership  or control, as determined by the Secretary in accordance with 34 CFR 600.31.

(5)  ~~(e)~~The Secretary uses the lesser of the loan debt or actual costs to calculate the annual loan payment for the D/E rates.

(e) **_Exclusions_**. The Secretary excludes a student from both the numerator and the denominator of the D/E rates calculation if the Secretary determines that--

(1) One or more of the student's title IV loans are under consideration by the Secretary, or have been approved, for a discharge on the basis of the student's total and permanent disability, under 34 CFR 674.61, 682.402, or 685.212;

(2) One or more of the student's title IV loans were in a military-related deferment status at any time during the calendar year for which the Secretary obtains earnings information under paragraph (c) of this section;

~~(2)~~(3)        The student was enrolled ~~full-time~~in any other eligible D/E program at the institution or at another institution during the calendar year for which the Secretary obtains earnings information under paragraph (c) of this section;

~~(3)~~(4)        For undergraduate ~~GE~~D/E programs, the student completed a higher credentialed undergraduate ~~GE~~D/E program at the institution subsequent to completing the D/E program as of the end of the most recently  completed award year prior to the calculation of the D/E rates under this section; or

~~(4)~~(5)        ~~For graduate programs, the student completed a higher credentialed graduate program at the institution subsequent to completing the program as of the end of the most recently completed award year prior to the calculation of the D/E rates under this section; or~~

~~(5)~~(6)        The student died.

(f)  ~~(f)~~ **_D/E rates not issued_**. The Secretary does not issue D/E rates for a ~~GE~~D/E program under §668.~~405~~404 if--

> **Commented [A16]:** This clarifies that debt/actual costs are only rolled up if the lower level program was not completed. If the lower level program was completed, the debt/actual cost taken on should remain attached to that completed program.  D/E rates the incorporate debt/actual cost from prior or unrelated programs corrupt the quality of the rates and may mislead consumers.

> **Commented [A17]:** We have reinstated this important exclusion, which appeared in the 2014 rule and acknowledges that earnings of graduates in a military-related deferment are not representative of graduate earnings and thus corrupt the quality of the D/E rates.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(1)  After applying the exclusions in paragraph (e) of this section, fewer than 30 students completed the D/E program during the two-year or four-year cohort period, except as provided in paragraph (g); or

(2)  The Federal agency with earnings data does not provide the mean and median earnings for the D/E program as provided under paragraph (c) of this section.

**(g)** ~~(g)~~ *Small D/E program rates.* For each award year, the Secretary—

(i)  Determines the total number of students who completed small D/E programs within a credential level at the institution during the four-year cohort period; and

(ii)  If that total is 30 or more students, calculates the small D/E program rates for those small D/E programs under the provisions of this section.

**§ 668.~~405~~404 Issuing and challenging D/E rates.**

(a)  ~~(a) *Administrative data.*~~ *Process Overview.* In calculating the D/E rates for a ~~GE~~D/E program and the small D/E program rates, the Secretary uses student enrollment, disbursement, and program data, or other data the institution is ~~required to report to the Secretary to support its administration of, or participation in, the title IV, HEA programs.~~ In accordance with procedures ~~established by~~set forth in this section, each award year, the Secretary₊ uses this administrative data to determine the D/E rates for a D/E program at an institution ~~must update or otherwise correct any reported data no later than 60 days after the end of an award year.~~ by —

~~(b) *Process overview.* The Secretary uses the administrative data to—~~

(1)  ~~Compile~~Creating a list of the students who completed ~~each GE~~the D/E program during the applicable cohort period ~~and a list of~~providing the completers ~~in small programs. The Secretary removes~~list to the institution;

(2)  Allowing the institution to correct the information about the students on the completers list;

~~(1) Obtaining from those lists students who are excluded under §668.404(e) and provides the list to institutions;~~

~~(2)~~(3)  ~~Obtain from a~~the Federal agency with earnings data the mean and median annual earnings of the students on ~~each~~the list₊ ~~as provided in paragraph (c) of this section; and~~

~~(3)~~(4)  ~~Calculate the~~Calculating draft D/E rates and ~~provide~~providing them to the institution₊;

(5)  ~~(c)~~ Allowing the institution to challenge the median loan debt used to calculate the draft D/E rates;

(6)  Calculating final D/E rates and providing them to the institution; and

(7)  Allowing the institution to appeal the final D/E rates.

**(b)**  *Creating the completers list.*

(1)  The Secretary selects the students to be included on the list by -

(i)  Identifying the students who completed the program during the cohort period from the data provided by the institution under § 668.407; and

(ii)  Indicating which students would be removed from the list under § 668.403(e) and the specific reason for the exclusion.

> **Commented [A18]:** In this section 668.404, we have reintroduced the processes for reviewing completers lists, challenging the median loan debt, and filing alternate earnings appeals. These processes, all present in the 2014 rule and absent from the Department's current proposal, afford critical opportunities for institutions to correct data. This process makes for better, more accurate D/E rates.

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

(2) The Secretary provides the list to the institution and states which cohort period was used to select the students.

(c) *Institutional corrections to the completers list.*

(1) The Secretary presumes that the list of students and the identity information for those students are correct unless, as set forth in procedures established by the Secretary, the institution provides evidence to the contrary satisfactory to the Secretary. The institution bears the burden of proof that the list is incorrect.

(2) No later than 45 days after the date the Secretary provides the completers list to the institution, the institution may -

(i) Provide evidence showing that a student should be included on or removed from the completers list pursuant to § 668.403(e); or

(ii) Correct or update a student's identity information and the student's program attendance information.

(3) After the 45-day period expires, the institution may no longer seek to correct the completers list of students or revise the identity or program information of those students included on the list.

(4) The Secretary considers the evidence provided by the institution and either accepts the correction or notifies the institution of the reasons for not accepting the correction. If the Secretary accepts the correction, the Secretary uses the corrected information to create the final completers list. The Secretary provides the institution with the final list and indicates the cohort period or cohort periods used to create the final completers list.

(d) *Obtaining earnings data*. For each completers list submitted to the Federal agency with earnings data, the agency returns to the Secretary--

(1) The mean and median annual earnings of the students on the list whom the Federal agency with earnings data ~~has matched to~~ with earnings data of $1.00 or more, in aggregate and not in individual form; and

(2) The number, but not the identities, of students on the list who reported no income or that the Federal agency with earnings data ~~could not match.~~

(e) ~~(d)~~ *Calculating draft D/E rates.*

(1) If the Federal agency with earnings data includes reports from records of earnings ~~on~~of at least $1.00 or more for at least 30 -students, the Secretary uses the higher of the mean or median annual earnings provided by the Federal agency with earnings ~~data~~ to calculate the D/E rates for each ~~GED~~/E program or the small D/E program rate, as provided in § 668.~~404~~403.

(2) If the Federal agency with earnings data reports that it was unable to match or had no reported income for one or more of the students on the final completers list, the Secretary does not include in the calculation of the median loan debt the -same number of students with the highest loan debts as the number of students whose earnings ~~SSA~~the Federal agency with earnings data did -not match- or reported no income. For example, if the Federal agency with earnings data is unable to match ~~three~~two students out -of 100 students and one student reported no income, the Secretary orders by amount the debts of the 100 listed students and excludes from -the D/E rates calculation the three largest loan debts.

> **Commented [A19]:** We have clarified that individuals with no reported income would be excluded from the D/E rate calculations. An individual who reports no income does not provide earnings data that is representative of what may be earned by an individual actively employed in the field. Further, individuals reporting no income may not be seeking employment, or may be unable to secure employment for reasons unknown to the Department (e.g., temporary disability, lack of child care). D/E rates incorporating this data could be significantly misleading and particularly damaging for D/E programs graduating high percentages of women. Multiple studies have shown that women, more often than men, are forced to leave the workforce to care for children (e.g., Center for American Progress, "The Child Care Crisis is Keeping Women Out of the Workforce").

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(3)  The Secretary notifies the institution of the draft D/E rates for the D/E program and provides the mean and median annual earnings obtained from the Federal agency with earnings data and the individual student loan information used to calculate the rates, including the loan debt that was used in the calculation for each student.

(4)  The draft D/E rates and the data described in this paragraph (e) are not considered public information.

(f)  *Institutional corrections to draft D/E rates.*

(1)  The Secretary presumes that the loan debt information used to calculate the median loan debt for the program under § 668.403 is correct unless the institution provides evidence satisfactory to the Secretary, as provided in paragraph (f)(2) of this section, that the information is incorrect. The institution bears the burden of proof to show that the loan debt information is incorrect and to show how it should be corrected.

(2)  No later than 45 days after the Secretary notifies an institution of the draft D/E rates for a D/E program, the institution may challenge the accuracy of the loan debt information that the Secretary used to calculate the median loan debt for the program under § 668.403 by submitting evidence, in a format and through a process determined by the Secretary, that demonstrates that the median loan debt calculated by the Secretary is incorrect.

(3)  In a challenge under this section, the Secretary does not consider -

(i)  Any objection to the mean or median annual earnings that the Federal agency with earnings data provided to the Secretary;

(ii)  More than one challenge to the student-specific data on which draft D/E rates are based for a D/E program for an award year; or

(iii) Any challenge that is not timely submitted.

(1)  The Secretary considers the evidence provided by an institution challenging the median loan debt and notifies the institution of whether the challenge is accepted or the reasons why the challenge is not accepted.

(2)  If the information from an accepted challenge changes the median loan debt of the D/E program, the Secretary recalculates the D/E program's draft D/E rates.

(3)  Except as provided under § 668.404, an institution that does not timely challenge the draft D/E rates for a program waives any objection to those rates.

(g)  *Final D/E rates.*

(1)  After expiration of the 45-day period and subject to resolution of any challenge under paragraph (f) of this section, a program's draft D/E rates constitute its final D/E rates.

(2)  The Secretary informs the institution of the final D/E rates for each of its D/E programs by issuing the notice of determination described in § 668.406(a).

(3)  After the Secretary provides the notice of determination to the institution, the Secretary may publish the final D/E rates for the program, unless the Secretary has received timely notice that the institution intends to file an alternate earnings appeal under § 668.405.

(h)  *Conditions for corrections and challenges.*  An institution must ensure that any material that it submits to make any correction or challenge under this section is complete, timely, accurate, and in a format

> **Commented [A20]:** This ensures that misleading D/E rates would not be published. The Secretary would publish rates only after alternate earnings appeals were completed and the most accurate D/E rates calculated.

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

acceptable to the Secretary and consistent with any instructions provided to the institution with the notice of its draft D/E rates and the notice of determination.

**§ 668.405 D/E rates alternate earnings appeals.**

**(a)** *D/E rates alternate earnings appeals.*  An institution may file an alternate earnings appeal to request recalculation of the program's most recent final D/E rates issued by the Secretary. The alternate earnings must be from the same calendar year for which the Secretary obtained earnings data from the Federal agency with earnings data to calculate the final D/E rates under § 668.403.

**(b)** *Basis for appeals.*

    **(1)**  The institution may use alternate earnings from an institutional survey conducted under paragraph (c) of this section, or from a State-sponsored data system under paragraph (d) of this section, to recalculate the program's final D/E rates.

    **(2)**  When submitting its appeal of the final D/E rates, the institution must -

        **(i)**  Use the annual loan payment used in the calculation of the final D/E rates; and

        **(ii)**  Use the higher of the mean or median alternate earnings.

    **(3)**  The institution must include in its appeal the alternate earnings of all the students who completed the program during the same cohort period that the Secretary used to calculate the final D/E rates under § 668.403 or a comparable cohort period, provided that the institution may elect -

        **(i)**  If conducting an alternate earnings survey, to exclude from the survey, in accordance with the standards established by NCES, all or some of the students excluded from the D/E rates calculation under § 668.403(e); or

        **(ii)**  If obtaining annual earnings data from one or more State-sponsored data systems, and in accordance with paragraph (d)(2) of this section, to exclude from the list of students submitted to the administrator of the State-administered data system all or some of the students excluded from the D/E rates calculation under § 668.403(e).

**(c)** *Survey requirements for appeals.*  An institution must -

    **(1)**  In accordance with the standards included on an Earnings Survey Form developed by NCES, conduct a survey to obtain annual earnings information of the students described in paragraph (b)(3) of this section. The Secretary will publish in the Federal Register the Earnings Survey Form that will include a universe survey pilot-tested following the effective date of this regulation, as well as the survey standards. An institution is not required to use the Earnings Survey Form but, in conducting a survey under this section, must adhere to the survey standards and present to the survey respondent in the same order and same manner the same survey items, included in the Earnings Survey Form; and

    **(2)**  Submit to the Secretary as part of its appeal -

        **(i)**  A certification signed by the institution's chief executive officer attesting that the survey was conducted in accordance with the survey standards in the Earnings Survey Form, and that the mean or median earnings used to recalculate the D/E rates was accurately determined from the survey results; and

        **(ii)**  Supporting documentation requested by the Secretary.

**(d)** *State-sponsored data system requirements for appeals.*  An institution must -

**Commented [A21]:** We have restored this critical opportunity, found in the 2014 rule, for institutions to correct and improve their earnings data.  We have also provided this opportunity to all institutions for all D/E programs to ensure that the data and rates are as accurate for consumers as possible.

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

(1)  Obtain annual earnings data from one or more State-sponsored data systems by submitting a list of the students described in paragraph (b)(3) of this section to the administrator of each State-sponsored data system used for the appeal;

(2)  Demonstrate that annual earnings data were obtained for more than 50 percent of the number of students in the cohort period not excluded pursuant to paragraph (b)(3) of this section, and that number of students must be 30 or more; and

(3)  Submit as part of its appeal -

(i)  A certification signed by the institution's chief executive officer attesting that it accurately used the State-provided earnings data to recalculate the D/E rates; and

(ii)  Supporting documentation requested by the Secretary.

(e)  *Appeals procedure.*

(1)  For any appeal under this section, in accordance with procedures established by the Secretary and provided in the notice of draft D/E rates under § 668.404 and the notice of determination under § 668.406, the institution must -

(i)  Notify the Secretary of its intent to submit an appeal no earlier than the date that the Secretary provides the institution the draft D/E rates under § 668.404(e)(3), but no later than 14 days after the date the Secretary issues the notice of determination under § 668.406(a) informing the institution of the final D/E rates under § 668.404(g); and

(ii)  Submit the recalculated D/E rates, all certifications, and specified supporting documentation related to the appeal no later than 60 days after the date the Secretary issues the notice of determination.

(2)  An institution that timely submits an appeal that meets the requirements of this section is not subject to any consequences under § 668.504 based on the D/E rates under appeal while the Secretary considers the appeal. If the Secretary has published final D/E rates under § 668.404(g), the program's final D/E rates will be retracted until the appeal has been determined.

(3)  An institution that does not submit a timely appeal waives its right to appeal the D/E program's failing D/E rates for the relevant award year.

(f)  *Appeals determinations.*

(1)  *Appeals denied.*  If the Secretary denies an appeal, the Secretary notifies the institution of the reasons for denying the appeal, and the program's final D/E rates previously issued in the notice of determination under § 668.406(a) remain the final D/E rates for the program for the award year.

(2)  *Appeals granted.*  If the Secretary grants the appeal, the Secretary notifies the institution that the appeal is granted, that the recalculated D/E rates are the new final D/E rates for the program for the award year, and of any consequences of the recalculated rates under § 668.504. The Secretary also publishes the D/E program's new final D/E rates.

(g)  *Conditions for alternate earnings appeals.*  An institution must ensure that any material that it submits to make an appeal under this section is complete, timely, accurate, and in a format acceptable to the Secretary and consistent with any instructions provided to the institution with the notice of determination.

§ 668.406 Determination and publication of the final D/E rates following appeal.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(a) *Notice of determination* of D/E rates. For each award year for which the Secretary calculates D/E rates for a GED/E program or the small D/E program rate, the Secretary issues a notice of determination informing the institution of the following:

(1)(a)   The D/E rates for each GED/E program and for its small D/E programs as determined under §668.404; 403.

(2)   The determination by the Secretary of whether each GE program is passing, failing, or ineligible, as described in §668.403, and the consequences of that determination;

(3)   Whether the program could become ineligible based on its final D/E rates for the next award year for which D/E rates are calculated for the program; and

(4) Whether the institution is required to provide the student warning under §668.407.

(b) (b) *Effective date of Secretary's determination.* The Secretary's determination as to the D/E rates measure is effective on the date that is specified in the notice of determination, subject to the challenges and appeals described in §§ 668.404 and 668.405, respectively.

§ 668.407 Consequences of the D/E rates.

(a) *Student warning.*

(1) *Events requiring a warning to students and prospective students.* The institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the program could become ineligible based on its D/E rates for the next award year.

(2) *Content of warning.* The institution must provide—

(i)   The relevant information to access the website maintained by the Secretary;

(iv) A warning, as specified by the Secretary in a notice published in the *Federal Register,* that the program has not passed standards established by the U.S. Department of Education and may face restrictions on enrollment and/or could lose access to Federal grants and loans in the subsequent award year; and

(v) A statement that the student must attest to having seen the warning through the disclosure website established and maintained by the Secretary.

(vi) For warnings provided to enrolled students—

(A) A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students could transfer credits earned in the program to another program at the institution and which course credits would transfer, in the event that the program loses eligibility for title IV, HEA program funds;

(B) An indication of whether the institution will—

(1)   Continue to provide instruction in the program to allow students to complete the program; and

(2)   Refund the tuition, fees, and other required charges paid to the institution by or on behalf of, students for enrollment in the program; and

**Commented [A22]:** This section concerning consequences has been moved to the new subpart R that applies solely to GE programs.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

~~(C) An explanation of whether the students could transfer credits earned in the program  to another institution.~~

~~(3) *Alternative languages.* To the extent practicable, the institution must provide alternatives to the English-language student warning for those students and prospective students for whom English is not their first language.~~

~~(4)  *Delivery to enrolled students.* An institution must provide the warning required under this section in  writing to each student enrolled in the program no later than 30 days after the date of the Secretary's~~

~~notice of determination under §668.406 and maintain documentation of its efforts to provide that warning.~~

~~(5) *Delivery to prospective students.*~~

~~(i) An institution must provide the warning as required under paragraph (2) of this section to  each prospective student or to each third party acting on behalf of the prospective student at  the first contact about the program between the institution and the student or the third party acting on behalf of the student by—~~

~~(A) Hand-delivering the warning and the relevant information to access the website maintained by the Secretary as a separate document to the prospective student or third party individually, or as part of a group presentation;~~

~~(B) Sending the warning and the relevant information to access the website maintained  by the Secretary to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the  warning is the only substantive content in the email and that the warning is sent by a  different method of delivery if the institution receives a response that the email could  not be delivered; or~~

~~(C) Providing the warning and the relevant information to access the website  maintained by the Secretary orally to the student or third party if the contact is by telephone.~~

~~(ii) An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the student completes the attestation in subparagraph (a)(2)(iii).~~

~~(b) *Restrictions.*~~

~~(1) *Ineligible program.* Except as provided in §668.26(d), an institution may not disburse title IV, HEA program funds to students enrolled in an ineligible program.~~

~~(2) *Period of ineligibility.* An institution may not seek to reestablish the eligibility of a failing program  that it discontinued voluntarily either before or after D/E rates are issued for that program, or  reestablish the eligibility of a program that is ineligible under the D/E rates, until three years following  the date specified in the notice of determination informing the institution of the program's ineligibility or the date the institution discontinued the failing program.~~

~~(3) *Restoring eligibility.* An ineligible program, or a failing program that an institution voluntarily discontinues, remains ineligible until the institution establishes the eligibility of that program under §668.410(c).~~

~~§ 668.408~~ Reporting requirements for ~~GE~~/E programs.

~~(a)~~ (a) In accordance with procedures established by the Secretary, an institution must report--

**Commented [A23]:** We urge the Department to consider each of the information reporting obligations detailed in this section and to consider removing those data points that can be obtained by the Department directly through NSLDS and other available systems.  This would reduce the already considerable administrative burden this rule places on institutions.

App.422

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

**(1)** ~~(1)~~ For each student enrolled in a ~~GE~~D/E program during an award year who received title IV, HEA program funds for enrolling in that program—

    **(i)** Information needed to identify the student and the institution;

    **(ii)** The name, CIP code, credential level, and length of the D/E program;

    **(iii)** Whether the D/E program is a ~~medical or dental~~ program whose students ~~are required to~~ complete an internship or residency, as described in § 668.402;

    **(iv)** The date the student initially enrolled in the D/E program;

    **(v)** The student's attendance dates and attendance status (e.g., enrolled, withdrawn, or completed) in the D/E program during the award year; and

    **(vi)** The student's enrollment status (e.g., full-time, three-quarter time, half-time, less than halftime) as of the first day of the student's enrollment in the D/E program;

**(2)** ~~(2)~~ If the student completed or withdrew from the ~~GE~~D/E program during the award year—

    **(i)** The date the student completed or withdrew from the D/E program;

    ~~(ii)~~ The total amount the student received from private education loans, as described in

    ~~§ 6~~668.~~404~~403(d)(1)(ii), for enrollment in the D/E program that the institution is, or should reasonably be,

    **(ii)** aware of;

    **(iii)** The total amount of institutional debt, as described in § 668.~~404~~403(d)(1)(iii), the student owes any party after completing or withdrawing from the D/E program;

    **(iv)** The total amount of tuition and fees assessed the student for the student's entire enrollment in the D/E program and any institutional grants, scholarships, or discounts provided to the student; ~~and~~

    ~~(iv)~~**(v)** The total amount of Federal or State non-loan funds the student received and used to pay the cost of tuition, fees, books, supplies, and equipment; and

    ~~(v)~~**(vi)** The total amount of the allowances for books, supplies, and equipment included in the student's title IV Cost of Attendance (COA) for each award year in which the student was enrolled in the D/E program, or a higher amount if assessed the student by the institution;

**(3)** ~~(3)~~ As described in a notice published by the Secretary in the *Federal Register*, any other information the Secretary requires the institution to report in order to calculate the D/E rates described in this section.

**(b)** ~~(b)(1)~~

    **(1)** An institution must report the information required under paragraphs (a)(1) and (2) of this section no later than—

    **(i)** ~~July 31~~October 1, following the date these regulations take effect, or 90 days following the date the Secretary makes available the procedures and reporting instructions, whichever is later, for the ~~second through~~fifth, sixth, seventh, and eighth award years prior to that date;

    **(ii)** For ~~medical and dental~~D/E programs that ~~require~~include an internship or residency, ~~July 31~~October 1, following the date these regulations take effect, or 90 days following the date the Secretary makes

> **Commented [A24]:** This would afford institutions additional time to gather the data required to calculate the initial round of D/E rates. We do not believe one month following the effective date of the regulations is sufficient.

15 | P a g e

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

available the procedures and reporting instructions, whichever is later, for the ~~second through~~ eighth, ninth, tenth, and eleventh award years prior to that ~~date~~; and

**(iii)** For subsequent award years, October 1, following the end of the award year, unless the Secretary establishes different dates in a notice published in the *Federal Register.*

**(2)** ~~(2)~~ For any award year, if an institution fails or is unable to provide all or some of the information required under ~~paragraph (a) of this section, the institution must provide to the Secretary an explanation, acceptable to the Secretary, of why the institution failed or was unable to comply with any of the reporting requirements.  The Secretary will deem acceptable the inability of an institution to provide all or some of the required information if the institution is no longer required to maintain such information under applicable Federal or State record retention requirements.

> **Commented [A25]:** Institutions would not be penalized if unable to produce data from years that exceed required record retention periods.

**§ 668.408** **Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

* * *

App.424

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

Subpart QR—Gainful Employment (GE) Programsprograms.

§ 668.401501 Scope and purpose.

This subpart applies to an educationala GE program offered by an eligible institution that prepares students for gainful employment in a recognized occupation, and establishes the rules and procedures under which——

(a) The Secretary determines that the program is eligible for title IV, HEA program funds; and

(b)(a)    An institution reportscertifies information about the programits GE programs to the Secretary.; and

(a)  § Beginning with the 2026-2027 award year, the Secretary determines whether a GE program is eligible for title IV loans or otherwise subject to the consequences set forth in §668.403504.

> **Commented [A1]:** This helps to ensure that sanctions would not be imposed for metrics calculated using data from years that precede the effective date of the rule.

§ 668.502 Gainful employment framework.

(a)  (a) *General.* A GE program provides training that prepares students for gainful employment in a recognized occupation if the program--

(1)  Satisfies the applicable certification requirements in §668.414505; and

(2)  Is not an ineligible program under the D/E rates calculated pursuant to §668.403.

(b)  (b) *Debt-to-earnings rates (D/E rates.)) for GE programs.* For each award year, the Secretary calculates two D/E rates for a GE program, the discretionary earnings rate and the annual earnings rate, using the procedures in  §§668.404 through §668.406. 403.

(c)  (c) *Outcomes of the D/E rates for GE programs.*

> **Commented [A2]:** We have returned these D/E rate thresholds to those promulgated by the Obama administration in the 2011 rule.  We believe these thresholds are more reasonable, and this simplified approach is superior to one involving a zone, as contemplated in 2014.

(1)  (1) A GE program passes the D/E rates if--

(i)  Its discretionary earnings rate is less than or equal to 2030 percent; or

(ii)  Its annual earnings rate is less than or equal to 812 percent.

(2)  (2) A GE program fails the D/E rates if--

(i)  Its discretionary earnings rate is greater than 2030 percent or the income for the denominator of the rate (discretionary earnings) is negative or zero; or

(ii)  Its annual earnings rate is greater than 812 percent or the denominator of the rate (annual earnings) is zero.

(3) A GE program becomes ineligible, subject to paragraph (c)(4), if it fails the D/E rates in two out of any three consecutive award years for which the program's D/E rates are calculated, except that failing the  small program rate does not make those small programs ineligible.

(4) If the Secretary does not calculate or issue D/E rates for a program for an award year, or calculates only a small program rate with respect to that program, the program receives no result under the D/E  rates measure for that award year and remains in the same status under the D/E rates as the previous award year.

> **Commented [A3]:** These paragraphs were relocated to the next section in the discussion of consequences.

§ 668.406503 Determination of the D/E rates for GE programs.

(a)  (a) *Notice of determination.* For each award year for which the Secretary calculates D/E rates for a GE program or the small program rate, the Secretary issues a notice of determination informing the  institution of the following:

(1)  The D/E rates for each GE program and for its small programs as determined under §668.404403;

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

(2)  The determination by the Secretary of whether each GE program is passing, failing, or ineligible, as described in §668.~~403~~502, and the consequences of that determination;

(3)  Whether the program could become ineligible based on its final D/E rates for the next award year for which D/E rates are calculated for the program; and

(4)  ~~(4)~~ Whether the institution is required to provide the student warning under §668. ~~407~~504.

**(b)** ~~(b)~~ **_Effective date of Secretary's determination_**. The Secretary's determination as to the D/E rates measure is effective on the date that is specified in the notice of determination.

**§ 668.~~407~~504 Consequences of the D/E rates for GE programs.**

**(a)** ~~(a)~~ _Waiver of consequences._

(1)  The Secretary will waive and will not impose the consequences set forth in this section based on D/E rates calculated using data from award or calendar years that precede July 1, 2023.

(2)  For any given year, the Secretary may waive sanctions if the Secretary determines –

  (i)   That the GE program trains students to be essential workers or to enter professions experiencing critical national job shortages;

  (ii)  That the GE program's earnings were negatively and materially impacted by an unforeseen event beyond the institution's control such as a global pandemic; or

  (iii) That the GE program's earnings were negatively and materially impacted by wage discrimination experienced by the program's graduates.

**(a)** _Loss of Eligibility._

(1)

  (i)   A GE program becomes ineligible for title IV loans, subject to paragraph (b)(2), if it fails the D/E rates in three out of any four consecutive award years for which the program's D/E rates are calculated, except that failing the small program rate does not make those small programs ineligible.

  (ii)  In the event a GE program becomes ineligible pursuant to paragraph (b)(1)(i), students currently enrolled in the GE program at the time the program becomes ineligible may continue to receive title IV loans until they have graduated from the program.

(2)  If the Secretary does not calculate or issue D/E rates for a GE program for an award year, or calculates only a small program rate with respect to that program, the GE program receives no result under the D/E rates measure for that award year and remains in the same status under the D/E rates as the previous award year.

**(b)** _Student warning._

(1)  _Events requiring a warning to students and prospective students._ The institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the GE program could become ineligible to disburse title IV loan funds based on its D/E rates for the next award year.

(2)  _Content of warning._ The institution must provide—

---

Commented [A4]: Sanctions would not be imposed for metrics calculated using data from years that precede the effective date of the rule.

Commented [A5]: This would afford the Secretary flexibility to ensure that critical training opportunities are not reduced during times of great need, or based on wage discrimination or events beyond an institution's control.

Commented [A6]: This additional year would afford institutions a more reasonable opportunity to adjust for market shifts or other unforeseen events like a global pandemic.

Commented [A7]: This would ensure that students who have enrolled in or remained enrolled in a program with full knowledge of the program's D/E rates would be permitted to receive title IV aid until they complete their program. The GE rule should not force mass withdrawals. This would be terrible for students.

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

**(i)** The relevant information to access the website maintained by the Secretary;

**(ii)** A warning, as specified by the Secretary in a notice published in the *Federal Register*, that the program has not passed standards established by the U.S. Department of Education and ~~may  face restrictions on enrollment and/or~~ could lose access to Federal ~~grants and~~ loans in the  subsequent award year; and

**(iii)** A statement that the student must attest to having seen the warning through the disclosure website established and maintained by the Secretary.

**(iv)** For warnings provided to enrolled students--

    **(A)** ~~(A)~~ A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students  could attempt to transfer credits earned in the program to another program at the institution, ~~and~~  which course credits might~~would~~ transfer, and an express statement that whether to receive credits on transfer is always at the discretion of the receiving institution, in the event that the program loses eligibility for title IV~~, HEA program funds~~ loans;

    **(B)** ~~(B)~~ An indication of whether the institution will--

        **(1)** Continue to provide instruction in the program to allow students to complete the program; and

        **(2)** Refund the tuition, fees, and other required charges paid to the institution  by, or on behalf of, students for enrollment in the program; and

    **(C)** ~~(C)~~ An explanation of whether the students could transfer credits earned in the program  to another institution.

**(3)** *Alternative languages.* To the extent practicable, the institution must provide alternatives to the English-language student warning for those students and prospective students for whom English is not their first language.

**(4)** *Delivery to enrolled students.* An institution must provide the warning required under this section in  writing to each student enrolled in the program no later than 30 days after the date of the Secretary's notice of determination under §668.406 and maintain documentation of its efforts to provide that warning.

**(5)** ~~(5)~~ *Delivery to prospective students.*

    ~~(i)~~ An institution must provide the warning as required under paragraph (c)(2) of this section to each prospective student or to each third party acting on behalf of the prospective student at  the first contact about the program between the institution and the student or the third party acting on behalf of the student. ~~by--~~

    ~~(A)  Hand-delivering the warning and the relevant information to access the website  maintained by the Secretary as a separate document to the prospective student or third  party individually, or as part of a group presentation;~~

    ~~(B)  Sending the warning and the relevant information to access the website maintained  by the Secretary to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the  warning is the only~~

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

substantive content in the email and that the warning is sent by a different method of delivery if the institution receives a response that the email could not be delivered; or

(C)(i)    Providing the warning and the relevant information to access the website maintained by the Secretary orally to the student or third party if the contact is by telephone.

(i)(ii)    (ii) An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the student completes the attestation in subparagraph (a)(2)(iii).

(ii)(iii)    The Secretary shall provide institutions with real-time, on demand access to the website maintained by the Secretary for the purposes of identifying the students who have completed the attestation in subparagraph (a)(2)(iii) and determining the date such attestation was completed.

(c)    (b)    *Restrictions.*

(1)    *Ineligible program.* Except as provided in §668.26(d), an institution may not disburse title IV, HEA program loan funds to students enrolled in an ineligible GE program.

(2)    *Period of ineligibility.* An institution may not seek to reestablish the eligibility of a failing GE program that it discontinued voluntarily either before or after failing D/E rates are issued for that program, or reestablish the eligibility of a program that is ineligible under the D/E rates, until three years following the date specified in the notice of determination informing the institution of the program's ineligibility or the date the institution discontinued the failing program.

(3)    *Restoring eligibility.* An ineligible GE program, or a failing program that an institution voluntarily discontinues after failing D/E rates are issued for that program, remains ineligible until the institution establishes the eligibility of that program under §668.410505(c).

(3)(d)    *Exclusion.* For any year for which the Secretary provides the institution a notice of determination under section 668.503 that a D/E rate is failing for a GE program, the program is excluded from consequences in this section if the D/E rate contained in that notice of determination exceeds the median debt to earnings rate for programs leading to the same primary occupation (by name and/or CIP code) as calculated by the Secretary using the median loan debt and median earnings data provided by all participating institutions under section 668.43 and subpart Q or as published on the College Scorecard.

§ 668.409 Supplementary performance measures.

(a) *General.* The Secretary assesses and analyzes the following information prior to issuing an institution a new Program Participation Agreement, and may consider the information in determining whether to certify, or condition the participation of, an institution under §§ 668.13 and 668.14

(1)    *Withdrawal rate.* The percentage of students in the enrollment cohort who withdrew from the institution within 100 percent or 150 percent of the length of the program.

(2)    *Debt-to-earnings rates.* The debt-to-earnings rates under §668.403, if applicable.

(3)    *Small program rates.* The small program rates under §668.404(g), if applicable.

(4)    *Instructional, advertising, and administrative expenses.* The amounts the institution spent on instruction/instructional activities; advertising or recruiting activities; and administrative activities, which

> **Commented [A8]:** Any discussion regarding information that the Department will review as part of certification or recertification determinations should appear in 668.13 and apply to all institutions.

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

include the salaries and compensation of the owners and principal officers, as provided through a disclosure in the audited financial statements required under §668.23(d).

(5) *Job placement rate.* If the institution is required by its accrediting agency or State to calculate a placement rate for either the institution or a program, or both, the placement rate or rates, calculated using the methodology required by that accrediting agency or State, and the name of that accrediting agency or State.

**§ 668.410505 Certification requirements for GE programs.**

**(a)** (a) *Transitional certification for existing programs.*

    **(1)** Except as provided in paragraph (a)(2) of this section, an institution must provide to the Secretary no later than December 31 of the year in which this regulation takes effect, in accordance with procedures established by the Secretary, a certification signed by its most senior executive officer that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. The Secretary accepts the certification as an addendum to the institution's program participation agreement with the Secretary under §668.14.

**(2)** If an institution makes the certification in its program participation agreement pursuant to paragraph

    **(2)** (b) of this section between July 1 and December 31 of the year in which this regulation takes effect, it is not required to provide the transitional certification under this paragraph.

**(b)** (b) *Program participation agreement certification.* As a condition of its continued participation in the title IV, HEA programs, an institution must certify in its program participation agreement with the Secretary under §668.14 that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. An institution must update the certification within 10 days if there are any changes in the approvals for a program, or other changes for a program that make an existing certification no longer accurate.

**(c)** (c) *Establishing eligibility and disbursing funds.*

    **(1)** (1) An institution establishes the eligibility for title IV, HEA program funds loans of a GE program by updating the list of the institution's eligible programs maintained by the Department to include that program, as provided under 34 CFR 600.21(a)(11)(i). By updating the list of the institution's eligible programs, the institution affirms that the program satisfies the certification requirements in paragraph (d) of this section. Except as provided in paragraph (c)(2) of this section, after the institution updates its list of eligible programs, the institution may disburse title IV, HEA program funds loans to students enrolled in that program.

    **(2)** (2) An institution may not update its list of eligible programs to include a GE program, or a GE program that is substantially similar to a failing program that the institution voluntarily discontinued or became ineligible as described in §668.407504(b), that was subject to the three-year loss of eligibility under §668.407504(b), until that three-year period expires.

**(d)** (d) *GE program eligibility certifications.* An institution certifies for each eligible program included on its Eligibility and Certification Approval Report, at the time and in the form specified in this section, that each eligible GE program it offers is approved by a recognized accrediting agency or is otherwise included in the institution's accreditation by its recognized accrediting agency, or, if the institution is a public postsecondary vocational institution, the program is approved by a recognized State agency for the approval of public postsecondary vocational education in lieu of accreditation.

App.429

**REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES**
**SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS**
**ROUND 3 | MARCH 14 - 18, 2022**

**§ 668.~~506~~411 Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

* * *

**§ 668.43 Institutional and programmatic information.**

* * *

~~(d)~~

~~(d)~~ ~~(1)~~

(1) *D/E program rates.* An institution must make readily available to enrolled and prospective students the D/E rates calculated for D/E programs under subpart Q.

(2) *Disclosure website.* An institution must provide such information as the Secretary prescribes through a *Federal Register* notice for disclosure to prospective and enrolled students through a website established and maintained by the Secretary. The Secretary will conduct consumer testing to inform the design of the website. The Secretary may include on the website, among other disclosures:

(i)   The D/E rates calculated for D/E programs under subpart Q.

~~(i)~~(ii)    The primary occupations (by name and/or SOC code) that ~~the~~a D/E program prepares students to~~ enter, along with links to occupational profiles on O*NET (www.onetonline.org) or its successor site.

~~(ii)~~(iii)   As reported to or calculated by the Secretary, the D/E program's completion rates for full-time and less-than-full-time students and the program's withdrawal rates.

~~(iii)~~(iv)  The length of the D/E program in calendar time (i.e., weeks, months, years).

~~(iv)~~(v)    The total number of individuals enrolled in the D/E program during the most recently completed  award year.

~~(v)~~(vi)   As calculated by the Secretary, the loan repayment rate for students or graduates who entered repayment on title IV loans during a period determined by the Secretary.

~~(vi)~~(vii)  The total cost of tuition~~and~~, fees, and ~~the total cost of books, supplies, and equipment,~~other institutional charges that a student would incur for completing the D/E program within the length of the program.

~~(vii)~~(viii)       Of the individuals enrolled in the D/E program during the most recently completed award year,  the percentage who received a title IV loan and/or a private loan for enrollment in the program.

~~(viii)~~(ix) As calculated by the Secretary in accordance with § 668.403, the median loan debt of students who completed the D/E program during the most recently completed award year or for all students who completed or withdrew from the program during that award year.

~~(ix)~~(x)    As ~~provided~~determined by the Secretary in accordance with § 668.403, the greater of the mean or median earnings of students who completed the D/E program~~ or of all students who completed or withdrew from the program, during a period determined by the Secretary.

REVISED DEBT-TO EARNINGS & GAINFUL EMPLOYMENT RULES
SUBMITTED BY BRAD ADAMS | PROPRIETARY SCHOOLS
ROUND 3 | MARCH 14 - 18, 2022

(x)(xi)   Whether the D/E program is programmatically accredited and the name of the accrediting agency, as reported to the Secretary.

(xi) The supplementary performance measures in § 668.409.

(xii)A link to the U.S. Department of Education's College Navigator Web site, or its successor site, or other similar Federal resource.

(2)(3)      *Program web pages.* The institution must provide a link and any needed information to access the -website maintained by the Secretary on any web pagewebpage containing academic, cost, financial aid, or -admissions information about the D/E program. The Secretary may require the institution to modify a  webpage if the information is not sufficiently prominent, readily accessible, clear, conspicuous, or direct.

(3)(4)      *Distribution to prospective students.* The institution must provide the relevant information to access -the website maintained by the Secretary to any prospective student (as defined in 34 CFR 668.402), or a third party acting on behalf of the prospective student, before the prospective student signs an  enrollment agreement, completes registration, or makes a financial commitment to the institution.

# EXHIBIT 5

App.432

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

INSTITUTIONAL AND PROGRAMMATIC

ELIGIBILITY COMMITTEE

SESSION 3, DAY 3, MORNING

March 16, 2022

On the 16th day of March, 2022, the following meeting was held virtually, from 10:00 a.m. to 12:00 p.m., before Jamie Young, Shorthand Reporter in the state of New Jersey.

```
1                        PROCEEDINGS

2           MS. JEFFRIES: Good morning. I'm Commissioner Cindy

3    Jeffries from FMCS and I will be facilitating this morning's

4    discussions and process. I'd like to welcome everyone back.

5    Our esteemed negotiators, the Department, the advocate or the,

6    now I'm losing my train of thought ,the advisers. And with

7    that, I'd like to jump right into roll call this morning and

8    then we'll review the agenda, and we'll get moving. So, I'm

9    just going to go down the list here. For accrediting agencies

10   as primary, we have Jamie Studley.

11          MS. STUDLEY: Yes. It's dawn and it's good to be with

12   you.

13          MS. JEFFRIES: Wonderful. And alternate Dr. Laura

14   Rasar King.

15          DR. KING: Good morning.

16          MS. JEFFRIES: Good morning. For civil rights

17   organizations and consumer advocacy organizations, we have

18   Carolyn Fast as primary.

19          MS. FAST: Good morning.

20          MS. JEFFRIES: Morning. And Jaylon Herbin as

21   alternate.

22          MR. HERBIN: Good morning.

23          MS. JEFFRIES: Good morning. Financial aid

24   administrators at postsecondary institutions, we have Samantha

25   Veeder as primary.
```

1          MS. VEEDER: Good morning, everybody.

2          MS. JEFFRIES: Good morning. And David Peterson as
3     the alternate.

4          MR. PETERSON: Good morning, everyone.

5          MS. JEFFRIES: Good morning. Four-your public
6     institutions of higher education, Marvin Smith as primary.

7          MR. SMITH: Good morning.

8          MS. JEFFRIES: Morning. And Deborah Stanley as
9     alternate.

10          MS. STANLEY: Morning.

11          MS. JEFFRIES: Morning. Legal assistance
12     organizations that represent students and/or borrowers,
13     primary is Johnson Tyler.

14          MR. TYLER: Morning.

15          MS. JEFFRIES: And alternate is Jessica Ranucci.

16          MS. RANUCCI: Hi, everybody.

17          MS. JEFFRIES: Good morning to both of you. Minority
18     serving institutions, primary Dr. Beverly Hogan, who is not
19     with us today. She will not be with us all day. And Ms. Ashley
20     Schofield is the alternate who will be with us part of the
21     day. Correct Ashley? Okay. Welcome. Private nonprofit
22     institutions of higher education, Kelli Perry as primary.

23          MS. PERRY: Morning.

1              MS. JEFFRIES: Morning. And Emmanual Guillory as
2     alternate.

3              MR. GUILLORY: Morning, everyone.

4              MS. JEFFRIES: Morning. Proprietary institutions of
5     higher education, primary Bradley Adams.

6              MR. ADAMS: Good morning.

7              MS. JEFFRIES: Morning. And alternate, Michael
8     Lanouette.

9              DR. LANOUETTE: Good morning.

10             MS. JEFFRIES: Morning. State attorneys general, Adam
11    Welle primary.

12             MR. WELLE: Good morning.

13             MS. JEFFRIES: Morning. And Yael Shavit alternate.

14             MS. SHAVIT: Good morning.

15             MS. JEFFRIES: Good morning. State higher education
16    executive officers state authorizing agencies and/or state
17    regulators of institutions of higher education and/or loan
18    servicers, primary Debbie Cochrane.

19             MS. COCHRANE: Good morning.

20             MS. JEFFRIES: Morning. Alternate, David Socolow.

21             MR. SOCOLOW: Good morning.

1        MS. JEFFRIES: Good morning. Students and student
2   loan borrowers, primary Ernest Ezeugo.

3        MR. EZEUGO: Morning, everyone.

4        MS. JEFFRIES: Morning. Alternate, Carney King.
5   Doesn't appear as Carney has joined us yet. Two-year public
6   institutions of higher education, primary Dr. Anne Kress.

7        DR. KRESS: Good morning.

8        MS. JEFFRIES: Good morning. And alternate, William
9   Durden.

10       MR. DURDEN: Good morning.

11       MS. JEFFRIES: Good morning. U.S. military service
12  members, veterans or groups representing them, primary Travis
13  Horr.

14       MR. HORR: Morning.

15       MS. JEFFRIES: Morning. Alternate, Barmak Nassirian.

16       MR. NASSIRIAN: Morning.

17       MS. JEFFRIES: Morning. Civil rights, primary is
18  Amanda Martinez.

19       MS. AMANDA MARTINEZ: Morning.

20       MS. JEFFRIES: Good morning. We have the two esteemed
21  advisors, as we've had throughout the entire process,
22  compliance auditor with experience auditing institutions that
23  participate in the Title IV HEA programs, Mr. David
24  McClintock.

```
 1              MR. MCCLINTOCK: Good morning. And it might be the
 2    last time you do it, so I appreciate you always working in the
 3    word esteemed.

 4              MS. JEFFRIES: Okay, thank you. And the second
 5    advisor is labor economist or an individual with experience in
 6    policy research, accountability and/or analysis of education
 7    data, Dr. Adam Looney. Doesn't look like Adam's with this
 8    today. And, last but not least, for the Department of
 9    Education, Gregory Martin is the lead negotiator.

10              MR. MARTIN: Good morning.

11              MS. JEFFRIES: Good morning. And Steve Finley is at
12    the table for office of general counsel.

13              MR. FINLEY: Good morning.

14              MS. JEFFRIES: Good morning. Did I miss anyone? Okay.
15    Barmak Nassirian will be at the table for service members and
16    veterans today. Are there any other substitutions that we need
17    to announce?

18              MS. VEEDER: Yes. Dave Peterson will continue through
19    the Gainful Employment discussion for financial aid.

20              MS. JEFFRIES: Okay. Thank you, Samantha. Alright.
21    So, with that, if we can just have the people who will be at
22    the negotiating table on camera and for the rest of you, we
23    invite you to turn your cameras off. Emmanual will be
24    continuing for the Gainful Employment discussions as well. So,
25    with that, our agenda today is to complete the process,
26    including consensus on Gainful Employment and then move
```

```
 1   directly into financial responsibilities, issue paper number
 2   four, I believe it is. So, with that, I'm going to turn it
 3   over to Greg from the Department to kick us off.

 4              MR. MARTIN: Thank you, Cindy, and welcome,
 5   everybody. And I want to say to all our friends in California
 6   and on the West Coast that today your weather has nothing on
 7   us here. We finally have a beautiful 70-degree day and it's
 8   perfect out. So, no better time to spend than doing negotiated
 9   rulemaking, right? So, I do have a window outside which I can
10   look out and see, see what's going on out there. So usually,
11   the wintertime finds me pining to be in some places like
12   California. But when spring comes then I'm okay. So, lift the
13   spirits. But you know, the way it is, probably in a week or
14   two it'll be 40 degrees and there'll be snow flurries. So, I
15   shouldn't get too used to it. So, before we before I go any
16   further today, I wanted to finish up on a final discussion on
17   668.13 certification procedures. And I don't believe I gave
18   any opportunity for final comments on that particular section.
19   So, I want to go revisit that and I'll ask Renee. I think it's
20   Renee today. I'm not certain. To pull up the, yeah it is
21   Renee. Thanks, Renee. To pull up 668.13. And we'll just take a
22   look at this again. We have had discussions about it off and
23   on throughout the paper. We were referring to it. So, this is
24   the supplementary performance measures. And just as a review,
25   here we have it, the negotiator suggestion is to move the
26   supplemental performance measures to a new subsection which
27   you see here. We have left them in the GE paper for
28   convenience and consideration since it does affect the GE
29   rule. And so just to look through these, these are the
30   Secretary assessments so analyze the following information,
```

 1   among other information prior to issuing an institution, a new
 2   program participation agreement, and may consider the
 3   information in determining whether to certify or condition the
 4   participation of an institution under 668.13 and which is this
 5   section 668.14, which is program participation agreement. So,
 6   we've already walked through most of these. But I'll just to
 7   an overview here, the withdrawal rate, the debt-to-earnings
 8   rate or earnings threshold measure, the small program rate,
 9   educational spending, job placement rate and licensure pass
10   rate. These are just all things the Department can consider in
11   either certifying or recertifying an institution. So, I think
12   we have already had a lot of discussion about this. I'll ask
13   people not to be too redundant of what we've talked about
14   before, but what I do want to make certain that we've provided
15   an opportunity for discussion about each section. So, sticking
16   with that, I'll open it up now.

17        MS. JEFFRIES: Thanks, Greg. Emmanual.

18        MR. GUILLORY: So, I want to clarify that this
19   section is applying to all institutions of higher education,
20   not just this since it is not GE specific. That it's all
21   institutions of higher education. And with that clarification,
22   with the debt-to-earnings rates, the earnings threshold
23   measures, if in the nonprofit sector, the 18 institutions or
24   the 18 programs from the data that we received yesterday that
25   failed at those, and I don't know if I have to go back and see
26   how many institutions that actually was, but at those
27   institutions, would that then mean that those institutions as
28   a whole can have their PPAs not be recertified or be put on

1   provisional status because of failing programs on their
2   campuses? Is that accurate?

3          MR. MARTIN: Partially. Your statement about this
4   applies to all institutions, not just GE programs. That is
5   correct. This is again, not in subpart Q this is from 668.13.
6   It's just included here because there are some references to
7   what's in subpart Q. Specifically with the debt-to-earnings
8   rate, the actual debt-to-earnings rate, that is what's
9   applicable. That will be generated for GE programs. So, if a
10  program is not a GE, it doesn't have a, so the debt-to-
11  earnings rates generated for GE programs and when we talk
12  about the small earnings rates, those where those programs
13  don't meet the numbers thresholds to have to have debt-to-
14  earnings rate generated. The small earnings rates don't have,
15  I want to reiterate, they don't have a pass-fail threshold
16  associated with them because they don't affect the program
17  eligibility. So, it isn't as if the small earnings rate would
18  be a certain percentage that would necessitate the Department
19  not certifying or provisionally certifying an institution. It
20  simply says that the Department can, in making a determination
21  about recertification or whether to put an institution on
22  provisional certification, can include that rate as is or can
23  consider that rate rather among many other things as in its
24  decision regarding an institution's certification or
25  recertification. And remember, this is not an area not talking
26  about program eligibility here. We're talking about the
27  certification or recertification of the institution. And it's
28  just one of many things the Department can consider. So,
29  there's no way we're not going to apply any threshold cutoff
30  for this, even where even where debt-to-earnings rates are

 1    applicable for a GE program. Certainly, those rates could have
 2    an effect on program eligibility under the GE rule. But here
 3    there's no threshold that's applied as far as whether or not
 4    it would result in any conditional certification or a
 5    provisional certification. I hope that clarifies it for you.

 6         MR. GUILLORY: So, I hear what you're saying, but
 7    what this language is literally saying and what it would do is
 8    that the Department would be able to look at debt-to-earnings
 9    rates, earnings threshold measures and small program rates
10    when determining an overall institution's ability to
11    participate in Title IV eligibility overall. So, it's actually
12    scaling up from just looking at the program and saying, this
13    program is bad, this program is going to lose Title IV
14    eligibility because this program is a GE program. This is now
15    being scaled up to look at the entire institution and say
16    based on GE rates, earning threshold measures and small
17    program rates, we may use that information to determine
18    whether or not to approve your PPA, recertify your PPA or put
19    your PPA provisional status, which includes additional metrics
20    that we will later talk about later today or this week. And
21    so, with that, scaling up is very, very concerning. And if we
22    look at the data that we saw yesterday and even looking at the
23    18 programs that supposedly fail at private nonprofits, the 12
24    programs that fail at publics, and then there were 210
25    programs that failed at private for-profits. But even looking
26    at private nonprofit data only in our sector, then those
27    campuses with those failing programs to potentially not have
28    their PPA be recertify because the Department can look at it
29    and say, well, you didn't have passing programs and we're
30    going to use that data. So that's just very concerning to us.

1   And I want to highlight that and point out what this is
2   saying. So maybe the Department's intent is to look at it a
3   little bit differently, which I think is good with the intent,
4   but with the words on paper, this could be troublesome to
5   future administrations that may come along and use this
6   language and do something differently with it. So, I just want
7   to highlight that it's a concern of ours, but I appreciate
8   your response, Greg.

9          MR. MARTIN: Thank you.

10         MS. JEFFRIES: Thanks, Emmanual. Brad?

11         MR. ADAMS: Yes. I just want to clarify if what's
12  currently listed as romanette four, educational spending. If
13  the categories listed here are the same categories, we are
14  using for what we've already submitted in IPEDS and if not,
15  should we align the two? Just from an administration point of
16  view, I'd rather have one educational spending definition if
17  possible versus it looks to be comparable. I just don't know
18  if it is. You just wanted to clarify that with the Department.

19         MR. MARTIN: Brad, like you, I think it does look
20  comfortable to me, but I'm not enough of an expert in IPEDS to
21  recall exactly if it mirrors language in there. Remember, I
22  would say this is not a definition, this is a consideration.
23  So, we can consider the amount of spend on instructional
24  activities, academic support, recruiting, those types of
25  things. So, we're not necessarily defining that here, but I'll
26  check for you as to how if what you're asking is how closely
27  does the language here mirror what's reported in IPEDS? Off
28  the top of my head, it looks awfully similar to me, but I

1    don't know if it mirrors it. So, I'll have to get someone to
2    confirm.

3         MR. ADAMS: In this disclosure. That's the very last
4    sentence there. Is that a new disclosure? I don't recall that
5    in there in the past. Is that going to be something that our
6    auditors will need to update our audit guides or is that
7    existing?

8         MR. MARTIN: Which one are you talking about?

9         MR. ADAMS: The same thing. Educational spending.
10   Very last sentence.

11        MR. MARTIN: Okay, as, oh, as provided through a
12   disclosure in the audited for some recovery activities,
13   advertising and pre-enrollment expenditures as provided the
14   disclosure and the audited financial statement required in
15   under 668.23 D. So, you're asking is that current or new? Let
16   me check that one for you too Brad, I want to make sure.
17   Steve, do you know the answer to that?

18        MR. FINLEY: Yeah. I'm looking at the financial
19   responsibility stuff. I don't see this added as a new
20   provision.

21        MR. MARTIN: I thought it was existing, but I'll have
22   someone check on that for you, Brad.

23        MR. FINLEY: Yeah, I don't know the answer.

24        MR. MARTIN: They'll probably send me a message
25   pretty soon.

1            MS. JEFFRIES: Alright, thank you. Marvin, you're
2     next.

3            MR. SMITH: Yeah, I'm just still asking about small
4     program rates and I wanted to see if the Department has run
5     some data on small program rates. I guess that's the first
6     question. If you have done that, can it be shared with the
7     committee?

8            MR. MARTIN: Data on what we have done on small
9     program rates. I'll ask if we have data to share that. I don't
10    know the extent to which we have anything that we can share,
11    but I'll definitely see if it's something we can put out.

12           MR. SMITH: Thank you.

13           MS. JEFFRIES: Thank you. Johnson, you're next.

14           MR. TYLER: Yeah. I just want to support this
15    supplementary, let me see if I can say it correctly, the
16    supplemental performance measures. Not to digress too much
17    here, but I'm going to for a second, when I interviewed for a
18    job at Legal Services back in 1989, student loans and for-
19    profit institutions were a problem. And the waiting room,
20    there was actually a brochure on the whole issue. I remember
21    reading it. And so, we're all here today because we're trying
22    to change the game here. We're trying to improve outcomes, and
23    I think we can't lose sight of that. All of these metrics that
24    are here in this provision are things that I look at when I'm
25    trying to get a loan discharged based on borrower defense. The
26    Secretary recognizes these things as issues related to being
27    misled. And so, I think it's really important that we not lose
28    sight that we're here not just to help the students, but we're

1    here trying to change our society, making education the
2    promise that in 1965, President Johnson tried to create. And
3    so, people taking advantage of this easy money is often the
4    case. And I have nothing but good things to say for the
5    community colleges. They are of great value, but I don't think
6    they should lose sight to the value of the purpose behind
7    this. So, that's it.

8          MS. JEFFRIES: Thanks. Johnson. Barmak.

9          MR. NASSIRIAN: I want to echo Johnson's comments
10   here. I think it is understandable, certainly, that
11   institutions may have some anxiety about the disclosure of
12   these criteria. And obviously, I understand the concern that
13   some future Department of Education could arbitrarily act on
14   one of these just because they're cited. But frankly, it's
15   outrageous that these are not things that are currently
16   factored in. I mean, who wouldn't want to know the performance
17   of programs that are receiving as much federal money as higher
18   education programs are. Whether it be a public for-profit
19   nonprofit, you don't want to put the Department in a
20   straitjacket and blind it to the actual criteria on the basis
21   of which any reasonable person would want to make some kind of
22   judgment. That does not necessarily, and certainly the
23   Department's behavior to date does not indicate a particular
24   willfulness of purpose when it comes to taking action against
25   the institution. So, I wouldn't worry too much about it. The
26   reason I raised my hand was to reiterate again in romanette
27   two since you're citing 668.404, the importance of truthfully,
28   this issue of teacher grants again. If you don't change the
29   language in 404, you're actually providing misinformation to

1    students in terms of how many of the people who were packaged
2    with TEACH Grants are actually repaying on sub loans. So, this
3    is another way in which the artificial exclusion of what are
4    actual loans, not imputed, these are actual loans, results in
5    misinformation going out. So, I hope this this is additional
6    reason to go back and fix that. Thank you.

7         MS. JEFFRIES: Okay, thank you. Jamie.

8         MS. STUDLEY: I think Johnson's and Barmak's comments
9    are very well taken, and the Secretary should have reasonable
10   ability to consider factors like these in granting the
11   privilege of a PPA. That said, the government always has a
12   responsibility to be as efficient and apply as little burden
13   as possible to get through the information it needs to make an
14   important decision like this. So, I see in the notes that our
15   esteemed advisor, Mr. McClintock, has said the educational
16   spending outlined would require a new audit disclosure. The
17   disclosure is probably not the hard part, it's the calculation
18   and having a definition that makes sense for institutions. So,
19   my thoughts here are just to try to understand whether this
20   language is doing it in a way that allows for a reasonable and
21   efficient calculation by institutions that would give the
22   Secretary the information the Department needs. And if there
23   is burden in the collection, whether it's possible to consider
24   a sort of safe harbor so that institutions that are very, very
25   secure in the sense that their spending is not instructional
26   in student services in a very clear way that their auditor can
27   identify, don't have to do a micro accounting, don't have to
28   do a lot of extra work to make that evident to the Secretary
29   on this issue. I realize that includes some technical

1    questions you might not be able to answer now, but I think
2    it's important to think about effort being appropriate to the
3    need.

4            MR. MARTIN: Thank you.

5            MS. JEFFRIES: Okay. Thanks, Jamie. I'm not seeing
6    any additional hands at this point. Greg, is there anything
7    that you need to say, or do you want to just move to consensus
8    check on this?

9            MR. MARTIN: I do have a couple of comments I just
10   want to make overall before we, you know, before we move on to
11   that vote. So, I want to thank everybody for the good and
12   robust discussion we've had on GE. I realize that there are
13   varying opinions, people come at it from various perspectives
14   and that we have various opinions on it. And I appreciate the
15   professional and useful discussion we've had. I want to close
16   out here before we end with a few responses to some of the
17   questions that we had lingering from yesterday before we move
18   on to a vote. And before I do that, I want to say, [inaudible]
19   confirm, we don't have any smaller program data to share. That
20   was just confirmed for me. I want to reiterate the
21   Department's reason for the proposed rule. Overall, we are
22   concerned about programs that may not be meeting their
23   statutory obligation to prepare students for Gainful
24   Employment in a recognized occupation. And this includes
25   programs that leave graduates with unaffordable debt, but also
26   includes programs that are leaving graduates worse off than
27   they if they'd never gone to college in the first place and
28   don't seem to benefit students beyond what they would have,
29   the benefit they would have received from just having a high

1   school diploma. The Title IV programs are meant to provide for
2   socioeconomic mobility and drive generational change through
3   higher education programs, leaving most graduates with wages
4   below with someone who never went to college receive, are not
5   meeting that promise and aren't operating consistent with
6   their legal obligation to prepare students for Gainful
7   Employment in a recognized occupation. We also heard from a
8   number of negotiators about the possible impact of these
9   rules, their possible inclusion of pandemic affected years,
10  and also the newness of the earnings threshold metric. We hear
11  that and we understand it while we think it is premature to
12  propose language that would include some sort of a transition
13  period to account for that, we are looking closely at this
14  matter and are committed to looking at whether we can include
15  something like that in the final rule, provided we don't reach
16  consensus today. We will, relatedly, consider whether certain
17  types of conditions like broader economic impacts are
18  appropriate for consideration of the rules. And next, I know
19  that some negotiators are concerned about small program rates.
20  So, we just had a discussion about that. We appreciate those
21  concerns. And while the small program rate would never be a
22  sole basis for revoking the participation of an institution
23  for those programs, we do believe that the information is
24  important to have and will help to feed disclosure
25  requirements and will generally add to the amount of
26  information available and we think it is a good thing to have
27  those rates generated. Additionally, we had a few suggestions
28  yesterday. One was to provide a longer time frame to measure
29  the earnings of certain types of programs that have
30  prelicensure requirements. At this time, we're not considering

```
 1   making that change. We are concerned that not all programs
 2   with prelicensure requirements had the same significant
 3   difference in earnings as medical and dental residency
 4   programs. Another was to provide a safe harbor for programs
 5   based on borrowers' repayment rates. We did not have adequate
 6   justification for repayment metric at this time. And finally,
 7   we are aware that at least one negotiator was concerned about
 8   an alternative earnings appeal. We reiterate our position that
 9   as the federal government, our concern is with ensuring that
10   we use the best data available and consistent with other
11   programs under the Higher Education Act, including the FAFSA
12   and Income Driven Repayment, and consistent with a host of
13   other government programs outside of the Department of
14   Education. We believe this is an appropriate way to measure
15   the earnings of institution's GE programs. So, with that, I
16   will turn it back over to the facilitators to take a vote on
17   consensus.

18           MS. JEFFRIES: Okay. Thank you, Greg. So, with that,
19   we are going to move to the consensus check, and we will be
20   doing a verbal accounting of that for the record. So please
21   hold your thumbs high and keep them up until I have called
22   your name and your position on this. So, let's see thumbs. I
23   see. Carolyn Fast is thumbs up. Brad Adams is thumbs down.
24   Anne Kress is thumbs down. Emmanual Guillory thumbs down.
25   Jamie Studley sideways thumb. Johnson Tyler thumbs up. Debbie
26   Cochrane sideways thumb. Adam Welle sideways thumb. David
27   Peterson thumbs down. Barmak Nassirian thumbs up. Amanda
28   Martinez thumbs up. Ernest Ezeugo thumbs up. Marvin Smith
29   thumbs down. Ashley Schofield thumbs down. And Greg Martin
30   thumbs up. Did I miss anyone? Okay. Just give me a minute
```

1    here. What we want to do next is as soon as I get a counting
2    from my team for the thumbs down, so I don't miss anyone that
3    was a thumbs down. What we're going to do, as we have
4    consistently done, is call on each person who was in dissent.
5    We are going to ask you to please only articulate a list of
6    the changes that you need, you would need to have to get to,
7    you know, either sideways or thumbs up. The Department would
8    be, it's very helpful to the Department for you to be succinct
9    and just list what those items are. For example, if it's
10   traditional rate concepts from the 2014 rule, so state. If
11   it's allowing a slightly longer cohort period for extended
12   prelicensure requirements, state it. So, with that, let's
13   start moving through this. I know Carolyn was, Carolyn, were
14   you thumbs down? No, you weren't. Okay. So, I think Brad, you
15   would on my screen anyway. Be the first thumbs down.

16          MR. ADAMS: Can I just have another 30 seconds to get
17   my thoughts written out? Sorry.

18          MS. JEFFRIES: Sure. Emmanual or Anne you were thumbs
19   down, right?

20          DR. KRESS: Sure. So, the first thing I would say is
21   that the community colleges are very much in favor of Gainful
22   Employment. We started this negotiation requesting that the
23   Department restore the 2014 requirements that was not heard.
24   So that's one place that I would start. I would also support
25   the notion that was brought up of a transition period. If
26   there are going to be new standards that are imposed. And then
27   I will just go back to something that I've mentioned several
28   times, which is that we really need to make like comparisons.
29   So, to have a median income for individuals through Gainful

1   Employment programs, that includes everyone, but then to
2   compare them to high school graduates that does not include
3   everyone in that population does not seem appropriate. But
4   given a lot of the uncertainties around the new earnings
5   threshold and how it's been calculated, I'd strongly recommend
6   a transition period. But that's really where we are right now.
7   But we are in support of Gainful Employment, and I'm very
8   disappointed that we were put in a position that we had to
9   vote this way today.

10          MS. JEFFRIES: Thank you, thank you, Anne. Brad, are
11  you ready or do you want more time?

12          MR. ADAMS: I can go now, and I want to start by
13  thanking Greg for the summary, that's helpful. And I thought
14  it was well said. And although we may disagree, I do think
15  that was very beneficial to get the Department's perspective
16  on that. I want to go before the record, since I've quoted
17  wrong in previous articles that my no vote has nothing to do
18  with protecting proprietary schools or programs. I just want
19  that clear as clear can be. My no vote was really for four
20  things. One of which most important is that the Department has
21  stated yesterday does have the ability, if they chose to do
22  so, to provide a disclosure for all programs that are subject
23  to the Gainful Employment definition of a Gainful Employment
24  program. So that would be a debt-to-earning disclosure and an
25  alternative or an earnings metric disclosure. The second would
26  be I agree with Anne and others, transitional rates. I think
27  especially due to the COVID pandemic that's going to be
28  impacting salaries in 2020 and beyond is very would be very
29  important. Third would be the slightly longer prelicensure

1    program period, and fourth would be the alternative earnings

2    appeal for programs like the cosmetology industry. Thank you.

3           MS. JEFFRIES: Thank you, Brad. Appreciate that.

4    Emmanual?

5           MR. GUILLORY: Yeah. I wanted to say that we're also

6    in support of Gainful Employment and what the Department is

7    trying to do. And when Greg had indicated, here's the

8    Department's intent, we support that intent, we want to make

9    sure we're getting after the bad actors. We want to do that.

10   And we actually wanted to reach consensus here. I didn't want

11   to vote down on this overall because I know what the

12   Department is trying to do, and I respect what the Department

13   is trying to do. The big concerns that remain for us, though,

14   is it's hard for me to support a process when there is no

15   ability to ensure the data. Well, when the appeals process is

16   what we see it now, I guess at the end when an institution is

17   already eligible, and it just seems like how does that really

18   work in reality. So that remains a concern. The other big

19   concern is the undetermined small program rate data. I know

20   I've heard from Greg say that I mean, we don't really know

21   what is good or bad or but either way, someone's been

22   determined if something's good or bad and just not having any

23   clear information on that, not being able to see any data on

24   that, which I do appreciate the data that the Department has

25   shared, at least thus far. It just makes it very, very

26   troublesome. And then also what I said most recently in

27   section 668.13, just how those additional metrics would be

28   applied, scaled up to the institutional level and completely

29   eliminate institution's ability to participate in Title IV. I

1    really fear for our smaller institutions in our sector, they
2    may have one or two GE programs that happen to not do well for
3    whatever reason, and then all of a sudden, the whole
4    institution can't participate in Title IV. And you're
5    displacing those students. So, that's it for us.

6          MS. JEFFRIES: Okay. Thank you, Emmanual. David.

7          MR. PETERSON: Like everyone else who spoke,
8    financial aid administrators were coming into this really
9    excited to discuss Gainful Employment. And we really are not
10   happy with the outcome of today. But some of the same things
11   that everyone else has mentioned, uncertainties with the small
12   program rate transitional. The idea of incorporating in a
13   transitional rate would be something we would be interested in
14   discussing the appeals process. And then minor, Barmak brought
15   it up, the TEACH Grant, really that loan should be included.
16   Again, that's not a reason to vote no, but that seems like a
17   small change that would have made a lot of sense and it
18   doesn't seem like we are willing to discuss or willing to do
19   that when it was brought up. So, thank you.

20         MS. JEFFRIES: Thank you, David. Marvin?

21         MR. SMITH: Yeah. I also think we're supportive of
22   the efforts here. It's the details and really the rushed
23   process here. And my concern is that four-year publics and
24   community colleges will look at this and we'll say this is not
25   worth the risk of offering short-term certificate programs to
26   low-income students. And so, there's this balancing act here
27   that I'm concerned about. I'm concerned about small program
28   rates and folks not sharing that data. To me, that seems

1    honestly like a half-baked idea, but maybe you have more
2    information. If small program rates are that important to the
3    Department, I wonder if a compromise is to put it into this
4    disclosure website because again, I don't know how that data
5    is going to help students or schools. So that's, I think, my
6    main concern for four-year publics.

7              MS. JEFFRIES: Thank you, Marvin. Ashley?

8              MS. SCHOFIELD: I echo the same sentiment as my
9    colleagues as a representation of minority serving
10   institutions. I would also like to add that the outcomes of
11   the debt-to-earnings ratio is a concern for us, particularly
12   in the HBCU and minority service community, because of the
13   type of students that we serve. And being that most of our
14   students come from lower socioeconomic status and experience
15   an overwhelming higher debt burden than most students that are
16   not in this low-income category. And so, I applaud the
17   Department for its intent as relates to Gainful Employment,
18   because I think it is beneficial. I just think that, as Marvin
19   stated, rushing through this particular piece of legislation
20   is just not in the best interest of the institutions that we
21   serve and the students that we serve.

22             MS. JEFFRIES: Okay. Thank you, Ashley. Appreciate
23   it. Greg, does the Department have what they need, they
24   captured those and?

25             MR. MARTIN: Yes, I want to thank everybody for
26   again, for the discussion and for their willingness after the
27   vote to share with us their reasons for not feeling that they

1    can vote consensus at this time. So, again, my sincere
2    appreciation to everybody.

3            MS. JEFFRIES: Thanks, Greg. And I want to thank the
4    committee. This was a highly important area for each and every
5    one of you. I know that. We know that. You've worked hard and
6    we do appreciate it. And I do want to thank you, especially to
7    the dissent, for clearly articulating a list of what your
8    concerns are for the Department to consider as they go through
9    the towards the NPRM period. So, with that, we are going to
10   move to issue paper number four, I believe, financial
11   responsibilities. Oh, geez. I don't even have to ask Renee,
12   you're right on top of it.

13           MR. MARTIN: It's right there. So, we're moving into
14   financial responsibility. And just want to point out that the
15   first part of this is the 668.15, which is the reserved
16   section which we've removed. So, there'll be no discussion on
17   that. But just want to reiterate again that we have taken that
18   out and moved the relevant parts over to subpart L which we
19   will be discussing today. So, where we're going to begin is in
20   668.23, which is a compliance audits and financial statements.
21   So, I'll give everybody a second to get there and that begins
22   on, if you have the paper copy of your issue paper, it would
23   be on the page at the bottom of page eight and then moving on
24   to page nine. So, I will direct your attention to 668.23 D
25   under audited financial statements. And starting a (d)(1) and
26   we point out here that we've added acceptable to further
27   clarify the meaning of this item. So, you'll see they're under
28   audited financial statements to enable the Secretary to make a
29   determination of financial responsibility and institutions

1    must, to the extent requested by the Secretary, submit to the
2    Secretary a set of acceptable financial statements for its
3    latest fiscal year. And then turning over to (d)(2) and in
4    (d)(2) romanette two, we have deleted individuals since the
5    other documentation items in this category all relate to a
6    foreign entity. So that is changed to for a domestic or
7    foreign institution that is owned directly or indirectly by
8    any foreign entity holding at least a 50 percent voting or
9    equity interest in the institution. The institution must
10   provide documentation of the entity status under the law of
11   jurisdiction under which the entity is organized to include,
12   at a minimum, the date of organization, a current certificate
13   of good standing, and a copy of the authorizing statute for
14   such entity status. And that is everything for 23. It isn't
15   much, but since we're going by going by section, I will open
16   it up for discussion because after this we're going to move on
17   to subpart L.

18        MS. JEFFRIES: Thanks, Greg. Any comments on this?
19   Questions? Steve, you have your hand up.

20        MR. FINLEY: Yes. I just want to note there is a
21   carryover here because we are welcoming suggestions on the
22   disclosures that were mentioned for the educational
23   expenditures from the GE discussion and that would result in
24   something being added to 23 here. So, there's a carryover and
25   a request for suggestions on what that language should look
26   like.

27        MR. MARTIN: Thanks, Steve.

1          MS. JEFFRIES: Thanks, Steve. I don't see any hands,
2     Greg, but I do want to announce that Kelli Perry is back at
3     the table for financial responsibility discussion. I'm Sorry.

4          MR. MARTIN: Okay.

5          MS. JEFFRIES: I got a couple more. Sam Veeder is
6     back in, and Jessica Ranucci is back. So, with that, I think
7     you can go ahead and move on.

8          MR. MARTIN: So just to build on what Steve was
9     saying, I know this came kind of quickly. So, you know, if
10    after mulling it over, people have thoughts about this as it
11    relates to what we discussed in under 668.13, be more than
12    happy to go back and entertain those at a later point.

13         MS. JEFFRIES: Okay, great.

14         MR. MARTIN: So, I just want to I know it doesn't
15    give people a lot of time just to throw that out there. And,
16    you know, you have a few seconds before we move on. So, I just
17    want to offer that opportunity. I'll go back and bring it up
18    again and provide an opportunity for comments on what Steve
19    just mentioned. So, with that, we're going to move into
20    financial responsibility into subpart L. And so, we are at
21    668.171. The first thing is just a technical point in (d)(3)
22    romanette one, we've updated the cross reference to (h)(2),
23    regarding a requirement to pay credit balances under 668.164.
24    And then moving on to romanette six, we've updated six of
25    romanette six here to further clarify the language without
26    making any substantive change. So, all we have here is subject
27    to an action or event described in paragraph C of this
28    section, mandatory triggering events or an action that the

1    Secretary has determined to have material adverse effect on
2    the financial condition of the institution under paragraph D
3    of this section. And that being the discretionary triggering
4    events. And so, with that, we're going to move on to paragraph
5    C, which are a mandatory triggering events . So, we'll go
6    through the mandatory triggering events. And then at that
7    point, when we're done with mandatory, we'll open the floor
8    for discussion. So, changes that we have here for mandatory
9    triggering events and looking at (c)(1), which are mandatory
10   trigger events, an institution is not able to meet its
11   financial administrative obligations under paragraph (b)(3)
12   romanette five of this section if one or more of the following
13   occurs. And so, we are in romanette one. And following some
14   confusion from the negotiators, we have taken another look at
15   this language and sought to further clarify the substance that
16   the trigger remains the same. So, for an institution with a
17   composite score of less than 1.5 or an institution affected by
18   the litigation or liabilities described in B and C, the
19   institution must undergo a recalculated composite score for
20   any other debts or liabilities from a settlement arbitration,
21   judgment or administrative proceeding. So just looking at the
22   change here, these are if one of the more following occurs,
23   debts, liabilities and losses in romanette one for an
24   institution for institutions, composite score of less than
25   1.5, the institution or entity after the end of the fiscal
26   year for the Secretary has most recently calculated the
27   institution or the entities composing score is required to pay
28   any debt or incurs a liability from settlement arbitration
29   proceeding proceedings, final judgment, determination arising
30   from administrative action recalculated for the administration

1   or entity or the composite score is less than 1.0, as
2   determined by the Secretary in paragraph E of this section. So
3   just some clarifying language there. But the intent remains
4   basically the same. If we move down to B, this is in romanette
5   one B. Again, here we have proposed language changes to
6   simplify the language and address any confusion. Of our prior
7   language. This trigger still relates to any institution or
8   entity whose financial statements were submitted under 668.23
9   for a change in ownership under 600.2 G or H that has sued for
10  relief by a state or federal authority or through a Qui Tam
11  lawsuit where the federal government has intervened. So, we'll
12  look at, B, the institution or any entity whose financial
13  statements were submitted in the prior fiscal year to meet the
14  requirements of 600.20 G or H 668.23 or subpart L of this
15  section is sued for financial relief, an action brought on or
16  after July 1, 2023, by a federal or state.

17      MS. JEFFRIES: Greg, can you hang on one second here?
18  I think someone is attempting to mute. Something they
19  inadvertently muted, including you.

20      MR. MARTIN: Yes. I thought the background the
21  background was coming from me, but I assure you it wasn't.

22      MS. JEFFRIES: Okay, thanks.

23      MR. MARTIN: No problem. So, we'll go through B
24  again. So, this is again, we're looking at B we're looking at
25  one romanette one B. So, the institution or any entity whose
26  financial statements were submitted in the prior fiscal year
27  to meet the requirements of 600.20 G or H 668.23 or subpart L
28  of this part is sued for financial relief in an action brought

1    on or after July 1, 2023, by a federal or state authority or
2    through a Qui Tam lawsuit, and which the federal government
3    has intervened and the suit has been pending for 120 days. The
4    next area we'll look at is in romanette three, Gainful
5    Employment. Here we have clarified the language to reflect
6    that the trigger will be at least 10 percent of the Title IV
7    revenue if that revenue, rather, is in a failing GE program.
8    We understand there were confusion on the part of some. There
9    was confusion, rather, on the part of some negotiators during
10   the last meeting. We believe this language will clarify those
11   concerns. So, in romanette three, under Gainful Employment, as
12   determined annually by the Secretary, the institution received
13   at least 10 percent of its Title IV HEA program funds in its
14   most recently completed fiscal year from Gainful Employment
15   programs that are failing under subpart Q of this part. So, I
16   hope that language clarifies that revenue requirement. And if
17   we move down to romanette six. At negotiator's suggestions we
18   have added an additional trigger to address SEC actions other
19   than the suspension or revocation of an entity's registration
20   or trading. We believe this additional set of events will
21   capture very serious actions and provide the Department with
22   earlier protection from institutions facing serious action.
23   So, we'll take a look at what is the changes here to romanette
24   six. This is under public entities. If an institution is
25   directly or indirectly owned by at least 50 percent of an
26   entity whose securities are listed on a domestic or foreign
27   exchange, the entity is subject to one or more of the
28   following actions or events, and this would be the SEC
29   actions. The U.S. Securities and Exchange Commission or SCC,
30   SEC rather issues an order suspending or revoking the

1    registration of any of the securities pursuant to Section
2    12(j) of the Securities and Exchange Act of 1934 or suspends
3    trading of the entity's securities pursuant to 12(k) or the
4    Exchange Act. Or in B, other SEC actions. The SEC files an
5    action against the entity in district court or issues an order
6    instituting a cease-in-desist or administrative proceeding
7    against the entity. And the next change here is in romanette
8    nine. So, in romanette nine is contributions and
9    distributions. We have in, let me make sure I've got this, no,
10   I'm sorry, that's romanette ten, that is romanette ten, not
11   romanette nine. I got confused on my cross outs here. So
12   romanette ten is contributions and distributions and we have
13   rephrased the sentence to clarify our intent here in romanette
14   ten B. So that has changed to the offset of such distribution
15   against the contribution results in a recalculated composite
16   score of less than 1.0 as determined by the Secretary under
17   paragraph E of this section. And then in 11. We have clarified
18   the language throughout this section in terms of an entity
19   whose financial statements are submitted for an institution.
20   We also modified B to reflect that we are referring to
21   termination or suspension of a loan agreement or financing
22   arrangement or when a creditor calls due a balance on a line
23   of credit. So, we'll look at 11 and the changes there. As a
24   result of an action taken by the Department, the institution
25   or entity included in the financial statements submitted in
26   the current or prior fiscal year under 600.20 G or H 600.23 or
27   subpart L of this part is subject to default or other adverse
28   condition under a line of credit loan agreement, security
29   agreements or other financing arrangement or any creditor
30   terminates, withdrawals, limits, or suspends the loan

1   agreement or other financing arrangement or calls due a
2   balance on a line of credit. And there's also a change in two
3   here as well. This is romanette 11 (b)(2). Hold on one second.
4   Just a moment here. This is, I'm sorry, we're moving on to
5   number, I'm sorry, we're moving on to number, on to the number
6   two here. This is just strictly number two. My mistake. So, we
7   have proposed some language changes to further clarify this
8   section without making any substantive changes and this
9   section still requires that two discretionary triggers become
10  mandatory if they both occur and remain unresolved 60 days
11  after the second trigger or remain mandatory if three or more
12  discretionary triggers are hit. So, we'll look at the revised
13  language here in in two. So. In the fiscal year following the
14  year in which the Secretary is most as has recently calculated
15  the institutions composite score the institution becomes
16  subject to two or more discretionary triggering events as
17  defined in paragraph D of this section that remain, that
18  remain rather 60 days following the second triggering event.
19  All further discretionary triggering events during that fiscal
20  year become mandatory triggering events even if the two
21  original triggering events are resolved. So, with that, I'll
22  open the floor for discussion on mandatory triggering events.

23          MS. JEFFRIES: Thank you, Greg. Ernest, you are up
24  first.

25          MR. EZEUGO: Yeah. Okay. So, in the interest of full
26  disclosure, I actually have a comment about the previous vote.
27  I am so sorry. I recognize that this is against what you all
28  have been asking. And I actually debated not saying it, but I
29  really feel it on my heart, especially after some of the

 1   stories I heard yesterday, after our sessions and after
 2   negotiated rulemaking, I should say, to just say this clearly.
 3   I have to call at the fact that all of the dissent for Gainful
 4   Employment and I and to be honest, some other proposals that
 5   we've talked about over the course of the past couple of weeks
 6   seem to trend on everybody wants Gainful Employment, but no
 7   one wants to keep any schools out. Everybody wants to protect
 8   students but doesn't want to do what's necessary to do that.
 9   Everybody's concerned about the circumstances of students from
10   low-income backgrounds, but they don't want to take the steps
11   that might consider bettering a lot of those students. What
12   students are seeing, at least with the students that from
13   Young Invincibles and other organizations that we're working
14   with who are watching are telling me is that they see
15   institutions and they see other actors claiming to care about
16   the well-being and their lives, but only up to a certain level
17   of inconvenience. And for many, not all, but for many of those
18   students, this actually reflects, and this is why I wanted to
19   say this here and actually reflects the experiences that
20   they've had on campus. I'm talking about students who have
21   stopped out, students from nontraditional kind of backgrounds
22   to higher education, who've had experiences that are not the
23   experiences of the standard 18-year-old coming straight out of
24   high school. And I do not want to diminish valid concerns that
25   were brought up. That's not my intention, and it's not even my
26   intention to doubt the intention of folks on this committee.
27   That's not what I'm trying to do. It just feels important to
28   say, especially after the particular story I heard last night,
29   I want to protect that person's privacy, that this is the
30   perception of people watching, at least for the students

1   watching. And it's one that hurts higher education, quite
2   frankly, not even to speak of the obvious ways that it hurts
3   students who are being left out of consideration when those
4   dissents are made, especially from certain seats on this
5   committee. The stories are clear and numerous, at least to me.
6   I'm happy to just share some of them in the forum. The
7   research supports them. We know that poorly performing
8   programs, the ones that perform poorly, intentionally, and
9   some that do so with good intentions, still hurt students in
10  the short-term. And they hurt and have severe impacts on
11  students and their families and their networks long after
12  graduation. If they even get to that point, to the extent that
13  these dissents throughout the rest of these negotiations, in
14  this final consensus, we are critical and would directly
15  impugn the different constituencies that we serve, their
16  ability to serve these students like we say that we want to
17  do. I just implore you to really make.

18          MR. WAGNER: Earnest, you have 30 seconds remaining.

19          MR. EZEUGO: Thank you. I appreciate it. I'm almost
20  done. I really implore you to make that plain, because I'm
21  telling you now, it's the students that I'm talking to and
22  what they've shared about these processes, it's really
23  disheartening. And it's just on my heart. I just have to say
24  that I'm sorry for distracting and we can continue with the
25  discussions.

26          MS. JEFFRIES: Thank you, Ernest. So, I think we left
27  off at discussion on discretionary triggers is that right,
28  Greg?

 1              MR. MARTIN: Yeah. I just want to point out again, I
 2     know that coming off our emotional debate over GE I just want
 3     to remind everybody that even though we didn't reach consensus
 4     on GE, we are hoping to reach consensus on as many of the
 5     areas as possible. So, as you as we make our comments today
 6     try to tailor those with if there's something you see here
 7     that you would need to see different in order to reach
 8     consensus. Let us know what that is. So just directing
 9     everybody to specifically what you need to see here. At this
10     point, this late in the week, it's going to be very difficult
11     for the Department to provide additional data or, you know,
12     I'm not against debating the theory behind this or if that's
13     necessary, but I would like to have us move in the direction
14     of where we need to be to get the consensus, if that's
15     possible. Thanks.

16              MS. JEFFRIES: Okay, thank you. Again, thank you as
17     well, Ernest. Barmak, you are up next.

18              MR. NASSIRIAN: Thank you. So, let's go to romanette
19     one A, debts, liabilities, and losses. Page 11, I think.

20              MR. MARTIN: I'm there.

21              MR. NASSIRIAN: Okay. I don't quite grasp why the
22     Department is only interested in institutions whose score was
23     less than 1.5 and then drop down below 1. But in fact, the
24     more severe case, in my opinion, would be an institution that
25     has a more precipitous drop. An institution that actually
26     scored way above 1.5 and suddenly drops below 1 should be of
27     much greater concern to the Department, therefore, that
28     qualifying openings should go. It should simply read if an

 1    institution drops below one, you've got a problem with them.
 2    Their prior condition actually, you're picking a much weaker
 3    case of an institution that was already sort of barely there,
 4    dropping below 1, [inaudible] surprise. I think, I keep
 5    thinking of ITT and Corinthian that were in pretty good shape
 6    and then dropped like a rock. You repeat the same construct in
 7    two romanette two B. Again, it really doesn't matter or
 8    romanette 2 one, romanette two A, for a prop school whose
 9    composite score was again less than 1.5 if there's a
10    withdrawal. No, I think any withdrawal, even if the score was
11    higher than that, frankly, again, if the score was higher than
12    that, they're withdrawing more money. So, I don't see why you
13    would limit the Secretary's discretion here. Then I'd like to
14    go to romanette 11. If I can find it. Creditor events. I see
15    that, I believe this is just a redundancy and I'm being a
16    little paranoid, but I don't see why you qualify the
17    subsection A to only those actions taken by the Department. I
18    mean, what if an institution, I believe B takes care of it but
19    I don't understand. Maybe they bought too many Russian bonds
20    and are now defaulting on their own obligations because they
21    didn't get paid. I don't see why the action has to have been
22    taken by the Department. I feel like default is default. And
23    the Secretary does not need to limit him or herself to just
24    the causality. I think default is sufficient by itself. Thank
25    you.

26            MS. JEFFRIES: Okay. Thank you, Barmak. Brad, you are
27    up next.

28            MR. ADAMS: Thank you, Cindy. I've got a few comments
29    in here, so I may need to get back in line, but on a romanette

```
 1    three on the Gainful Employment. Let me first by stating I
 2    understand the intent of wanting to ensure somebody's
 3    financially responsible if they lose revenue, and it really
 4    could be losing revenue for any reason. It doesn't have to
 5    just be for Gainful Employment programs. But from this being a
 6    mandatory here's where I have my largest problem is we define
 7    as a discretionary trigger in number seven down below that, if
 8    you lose 25 percent of your students, that's a discretionary
 9    trigger. But here is a mandatory you've got 10 percent as
10    Gainful Employment as a mandatory. So, you've given the bar at
11    a much higher level for proprietary schools than the bar
12    you've given for everyone else as a discretionary. And I
13    really struggle with that. And in addition to that, we just
14    talked about yesterday an administrative capability in 668.16
15    M, that 50 percent or more would have to be failing for you to
16    not be administratively capable. So, help me understand why we
17    want a different threshold for proprietary schools here as a
18    mandatory at 10 percent, then we're giving for everyone else
19    down below as a discretionary 25 percent.

20            MR. MARTIN: Well here. Our concern is that where the
21    revenue has been derived from a program deemed to be failing
22    because if the program is failing thatcould be an indication
23    that a very significant revenue stream for those institutions
24    is in danger of being cut off. So that's the rationale behind
25    including it as a mandatory. And once you've failed that the
26    prospect of not having the revenue from that program anymore
27    which is a fairly serious and you know, very concrete thing
28    and that possibility certainly exists at that point.
```

1       MR. ADAMS: But Greg, I'm sorry, that's not answering
2   the question that this financial responsibility is for
3   everyone, for all colleges. And you've applied a mandatory
4   trigger at a 10 percent level up here, and you put a 25
5   percent trigger as a discretionary down below for the for
6   everybody else. I mean, to me, that's not apples to apples and
7   especially to me either gainful needs to move down as a
8   discretionary or if it's going to stay as a mandatory, at a
9   minimum, it should be tied to what we did in administrative
10  capability, but it shouldn't be at a level 15 percent less
11  than the nonprofits and publics. I don't think that's sending
12  the right message that we don't care if they're financially
13  responsible.

14      MR. MARTIN: We're saying we don't care if they're
15  not financially responsible. The only situation in which in
16  which a program could lose eligibility as a result of GE is a
17  GE program. So that would be the only the only instance where
18  that would be that outcome could occur would be in that
19  situation. That wouldn't be the case with any program that
20  wasn't subject to Gainful Employment. I think that's the
21  difference. I don't know how else I could ask Steve if. Do you
22  want to comment, Steve?

23      MR. FINLEY: Yeah. I don't think I can improve that
24  observation.

25      MR. ADAMS: Well, I would like the Department to
26  state why it shows a 25 percent revenue threshold for everyone
27  not subject to Gainful Employment, which is everyone at this
28  table but me. And you've got a 10 percent as a mandatory right
29  here. At a minimum, it should be the same. Right? And I'd

1    argue they should both be discretionary, too. But you really
2    haven't answered the question because a nonprofit could have a
3    12 percent reduction in revenue and not [30 seconds]. Right?
4    And I'm just I'm struggling with the difference in thresholds.
5    It seems like you're picking and choosing who you want to fail
6    based on not having the threshold the same.

7              MR. FINLEY: We'll take that back, Brad.

8              MS. JEFFRIES: Thank you. Jessica?

9              MS. RANUCCI: Just to respond briefly to Brad before
10   I make the point I was going to make. My reading of this is
11   that the discretionary trigger would include orderly closure,
12   which would not pose the same level of risk to the overall
13   finances of the school that could have been planned for years
14   and could have been taken into account. And I will say from my
15   own perspective, not speaking for the Department, I actually
16   do think there may be reasons to consider financial
17   responsibility different by sector. Specifically, the ability
18   to essentially milk an institution for cash, put it in your
19   own pocket and walk away. And having been on the other side of
20   that and see students left holding the bag, I do think that
21   that is a very serious risk that is much less available at
22   schools that are nonprofit and public. But turning to what I
23   was going to say was on number two, not romanette two, but the
24   last thing that we talked about the multiple discretionary is
25   leading up to the mandatory. I don't really understand why
26   this is now tied to a fiscal year since it seems to be
27   divorced from a composite score. It seems to me like two
28   discretionary events that happen in September and October
29   should be treated the same as two discretionary events that

1   happened in October or November, or November or December,
2   whether they're in the same fiscal year doesn't really seem to
3   be material. So, I would encourage the Department perhaps to
4   do like a rolling 365 day period rather than a set fiscal year
5   period.

6           MR. MARTIN: Thank you.

7           MS. JEFFRIES: Thanks, Jessica. Kelli.

8           MS. PERRY: Thank you. First, I want to support the
9   Department's language on the debt liabilities. I know there's
10  some concern, and that's why I want to say what I have to say,
11  because I did say all the plus ones in the chat. Those are
12  related to what Barmak said. So, I do agree with you from the
13  concept of the fact that having a school that may be passing
14  the financial responsibilities for it and then dropping down
15  below is important if they incur a debt or liability that big.
16  Right? But if you were to change that and change it, take out
17  the 1.5 measure, you're in essence, addressing all schools.
18  So, colleges and universities are sued all the time and as a
19  result, there are some that result in the things that are
20  listed in here. Right? So, if the Department were to consider
21  removing that 1.5 and making this eligible for all schools,
22  one, I very strongly disagree with that. But if you were, you
23  have to go back to the concept of addressing materiality,
24  because to require schools across the country to submit within
25  ten days, every time they're sued and have a judgment or
26  required to pay a debt as it relates to liability for
27  settlement. If it's not material enough to affect the
28  composite score it is something that will become unwieldy on
29  both sides. So just to give you some context about removing

 1  that 1.5, what that would do. So, if it's removed, the
 2  materiality concept needs to be addressed. The second question
 3  I would have, and I'm just curious more than anything, it goes
 4  back to these contributions and distributions section. And I
 5  think, you know, and we've talked about the whole concept of
 6  what we're trying to address here and the fact that somebody
 7  may contribute to pass the composite score and then make that
 8  distribution that would then cause them to fail. So, in
 9  essence, they would have failed without that contribution.
10  When you get into the reporting of this, the concept is that
11  you're going to report this within ten days, right? You're
12  relying on the school to report to you. Yes, I made a
13  contribution, then I made a distribution. And I'm assuming the
14  reporting would be after that distribution. I guess the
15  question I would have is, is that if I was a school and I was
16  trying to, in essence, game the system by making that
17  contribution, why would I, within ten days after making the
18  distribution report it to you? So, I guess I just would
19  caution the Department on this of how you're going to know
20  this.

21          MR. WAGNER: You have 30 seconds.

22          MS. PERRY: Because this is not something that you
23  would be able to see or pick out in the financial statement.
24  So just some thoughts there.

25          MS. JEFFRIES: Okay. Thank you, Kelli. Carolyn,
26  you'll be up next. But I need to announce that Yael is coming
27  to the table for state attorney generals. And Johnson Tyler is
28  back at the table for a comment from legal aid groups. So,
29  with that, Carolyn.

 1          MS. FAST: Thank you. I just also was wanted to ask
 2   about the thing that Barmak had raised about limiting these
 3   provisions to schools that are all ready to start with at a
 4   below 1.5 composite score. It seems to be a pretty important
 5   issue in terms of how this would work and what schools would
 6   be affected. And I wondered if we could get potentially a
 7   response from the Department on whether they would consider
 8   making this change before consensus votes, since it seems like
 9   it is important to a lot of people on the committee based on
10   what was in the chat and I think it might be useful to us to
11   get in consensus.

12          MR. MARTIN: I will take it back and I'll discuss it
13   over the lunch period, and see if I can get a decision on
14   whether we would consider changing that or not.

15          MS. JEFFRIES: Okay, thank you. Barmak?

16          MR. NASSIRIAN: Yeah. I candidly did not quite
17   understand Kelli's concern here in terms of materiality, if we
18   remove the 1.5 percent, it seems to me that composite scores
19   that drop from above 1.5 percent to below 1 would by
20   definition be more material than the ones that drop from a
21   number below 1.5 to a number below 1. But I mean, not always,
22   but in general, I think that's a bigger delta in most cases to
23   the same fixed number. But I also wanted to disagree with
24   Brad. You know, we're not engaged in any kind of mystical
25   numerology here where the numbers have to line up, the numbers
26   have to make sense in the context of what we're doing. The 25
27   percent reduction in enrollment is a fairly high threshold to
28   accommodate orderly enrollment management practices that
29   institutions engage in all the time. Deriving a subset of your

1    revenue from failing programs is a different animal
2    altogether. I think a lower threshold is appropriate when the
3    source of the revenues speaks to something about what the
4    institution is engaged in. So, I don't know that ten is the
5    right number or 25 is the right number, but I just wanted to
6    argue against the belief that the numbers have to somehow
7    elegantly line up. They don't. They have to be appropriate in
8    the context of what index they're measuring. Thank you.

9             MS. JEFFRIES: Thank you, Barmak. Brad.

10            MR. ADAMS: Thank you, Barmak. Just a quick response
11   here. To me, you should have the ability to also reduce some
12   sort of expenses to offset changes in revenues. And that
13   ability is not here. But I do think 10 percent is a low
14   threshold as compared to some of the discretionary triggers. I
15   do want to talk through what the others at the group have been
16   talking about. In one romanette, one A and here's where I'm
17   struggling. And maybe it is the CPA in me, a composite score
18   by its nature is, number one, as we've mentioned, it needs to
19   be updated, it's antiquated, but by its nature, it's a point
20   in time score as of a certain date. And so, for us, we're a
21   9/30 fiscal year end and what our composite score is as of
22   that date, six months from now, if and again, we're above a
23   1.5 and I think it should stay where it's just schools below
24   1.0. And I agree with Kelli on this, that the administrative
25   burden would be significant. The schools would have to know
26   they're always recalculating their composite score for any
27   liability. And we're talking no materiality out into the
28   future. So, these liabilities a lot of times occur in the
29   fiscal year subsequent to your audit. But the point here

```
 1    being, six months from now, you get a lawsuit. You may be in a
 2    much better composite score position six months later. So,
 3    there's no opportunity as written. And I think Kelli actually
 4    proposed this in her proposed language to resubmit in interim
 5    financial numbers say yes, even though this occurred after the
 6    fact, and it could have taken me from a 1.4 down to a .9, I
 7    may be sitting as of today in a position where I'm at a 2.0
 8    because income's been good for the year, right? Because income
 9    flows through your equity part of your balance sheet. So,
10    where I'm struggling with the composite score as written is a
11    point in time midnight as of the end of your fiscal year. If
12    you're going to try and recalculate it, you need to do an
13    interim composite score as of that date that the liability
14    occurred to then see if you're still below 1.0. And I think,
15    Kelli, maybe you can speak to it because of your comment in
16    the issue paper, but I do think you've got to be apples to
17    apples, or you've got to change your composite score one way
18    or the other, because the composite score is a date and time.
19    And once you get to the next day, the composite score changes
20    to whatever you are on that day. So, thank you. And I'll get
21    back in line for my last comment.

22        MS. JEFFRIES: Okay. Johnson, real quick, do you mind
23    if I check in with Kelli to see if her hands up in response to
24    that? Would that be okay? Okay, Kelli.

25        MS. PERRY: Yeah. It was actually in response to what
26    Barmak had come back with the second time, and then I can
27    address what Brad said. So Barmak my concern is the reporting
28    of the liability, right? So, the way that it's not so much if
29    a school is not in the zone, which would be under 1.5 or
```

1   failing. Right? They're passing school. And the way that this
2   is what this says is that if you go from 1.5 down to 1 in a
3   recalculated score that would trigger this. But if the way
4   that the reporting language reads, unless I'm misinterpreting
5   it, is that the deposit the Department is the one that has to
6   recalculate that score, not the individual institution. Right?
7   So, if the Department is the one that has to recalculate that
8   score, that means me as an institution, regardless of if I'm
9   say I have a 3.0 and any debt or liability that I have, I then
10  have to report to the Department within ten days so that they
11  can recalculate my score. Let's say that that that liability
12  is only $20,000. And my financial statements show, you know,
13  revenue of 400 million, that $20,000 isn't going to have an
14  impact. And it's going to create a lot of work for schools and
15  a lot of work for the Department if the Department is the one
16  that has to do the recalculation. If the school can do the
17  recalculation and say, okay, you know, I just had a $20,000
18  liability, that $20,000 is not going to affect my composite
19  score. So, I don't have to report at anything. That's
20  different. And so, I guess maybe there's clarification on that
21  per se. And then to what Brad talked about, you know, he's
22  right in the perspective of that the composite score is a
23  point in time, and it's calculated based on your audited
24  financials. Schools are schools, you're right, they could
25  change, they could go up, they could go down, that liability
26  is also a point in time and will affect what your financial
27  statements look like or what they or they could be better,
28  right. So that that liability is not going to have an impact
29  on that score. But the problem with calculating composite
30  scores in the middle of the year is that not all schools do

1    accrual-based accounting throughout the year. So not all
2    schools are closing their books on a regular basis every
3    single month to recalculate a composite score. So, there's
4    just a lot of complexities in that recalculation that would
5    potentially be challenging.

6         MS. JEFFRIES: Okay. Thank you, Kelli. Johnson?

7         MR. TYLER: Thanks. I'm not an accountant. I don't
8    get into the high finance. I think the attorney general's
9    here. Carolyn used to be one as well, do a lot of this stuff
10   when they're going after them. But I did help a borrower once
11   in a Borrower Defense claim and we see a lot of these from
12   this one institution that was right next to Penn Station,
13   preyed on a lot of low-income people there, including homeless
14   people, including veterans who are protecting transportation
15   hubs during right after 9/11. They were in this great, crazy
16   financial thing that the shareholders brought the suit and
17   that's how I know about it. So was trying to get these loans
18   discharged. So, the owners issued $10 million of stock
19   certificates and then sold it about three or four months later
20   and took $9 million in cash. And the shareholders brought an
21   action and that's how it's public. But I think there has to be
22   some way to deal with this composite score stuff where that
23   sort of shenanigans doesn't happen. That school is now out of
24   business. There are thousands of students. My colleague
25   Jessica has been, her organization is part of trying to help
26   those students and the company's gone bankrupt. And there's
27   really nothing for the students. They all have a ton of debt,
28   and they have nothing to show for it. So, I really do think
29   that, you know, the Secretary needs some flexibility on this

1  and should think about how important that metric is. I just
2  think it's important to be able to do something in that sort
3  of situation and not rely on shareholders to try to protect
4  our own interests. And the students get nothing out of it. I
5  mean, the school went out of business 10 or 12 years after
6  that lawsuit. So, thank you.

7      MS. JEFFRIES: Thank you, Johnson. Appreciate that.
8  Barmak?

9      MR. NASSIRIAN: Yes. First of all, I wanted to
10  appreciate Kelli's clarification of where her concern is. But
11  I have to tell you, I don't see anything about reporting here.
12  What I see is a provision that limits the Secretary's
13  discretion and precludes action where it's most needed, where
14  there is. Now, however, we calculated what the basis of
15  reporting is that we can talk about. But I would posit that an
16  institution that precipitously drops from a 3.0 to .5 is
17  probably a better target of immediate concern than an
18  institution that drops from 1.1 to .9. So, in this provision,
19  I don't see why the Secretary would want to limit that
20  discretion and preclude action where they really ought to
21  hustle and get something done. With regard to the example,
22  obviously the judgment of materiality should also be available
23  to the institution itself. An institution with $400 million of
24  revenues on a $20,000 judgment would be pretty safe in
25  assuming that that its 3.0 is not going to be dislodged to a
26  0.9 as a result of that particular judgment. I think that's
27  where the reporting language resides and what the obligations
28  are I don't presently have in mind, but it seems to me that
29  here we're talking about the legal basis of authority for the

1   Secretary to intervene and to me just doesn't make any sense
2   to exclude larger drops from above. 1.5. Now how you get it
3   reported, I understand. And apropos Brad's point, of course,
4   it's a fluctuating number. The composite number may be
5   different by the hour. But guess what, the number that should
6   concern us is when it drops, even for a moment below a
7   critical threshold. Because, yes, while there is a high, there
8   may be a theoretical possibility that it could bounce back.
9   What we've seen historically is that it doesn't bounce back.
10  That is indicative of a dangerous trend that ends up costing
11  students and taxpayers. So, it has to be monitored. The
12  Department has to monitor it. That is standard practice in
13  commercial credit transactions. We don't just take a snapshot
14  and say, good luck, I'll see you next year. You obligate
15  people to report changing circumstances that have an impact on
16  their ability to service the debt. Thank you.

17          MS. JEFFRIES: Okay. Thank you. I think we're going
18  to take the three hands that are up, Brad, Kelli and Jessica,
19  and see if there's some new information to share with the
20  Department and then let the Department move on to the next
21  section of this, as you do have this as a large document to go
22  through, so we want to be sure we can get to all of it. Brad.

23          MR. ADAMS: Well, I do have a comment within
24  mandatory, but I may let Kelli and Jessica if they want to
25  finish up on one A, romanette one. I think there's still on
26  that topic, but I'll hold off, if that's alright and keep my
27  place in line.

28          MS. JEFFRIES: Sure. Just want to check in. Kelli and
29  Jessica, do you have something new that you want to share?

1          MS. PERRY: No, I just wanted to just one more
2    response to what Barmak just said. I'm not saying that this,
3    so the reporting that I'm talking about is actually in this
4    issue paper. We get to it a little bit later. And all I'm
5    saying is that if we're going to do something with this one,
6    we need to take them in tandem and do them together. Is what
7    I'm saying.

8          MS. JEFFRIES: Okay. Thank you. I see the advisor,
9    David McClintock, has come on camera and has his hand up. Do
10   you have some input on this, Dave?

11         MR. MCCLINTOCK: I just wanted to make a quick
12   clarification, I guess. So, the composite score is a
13   combination of a point in time because you use the balance
14   sheet, right? So, the last day of the year, but it also
15   includes the PNL, so the profitability of the entity during a
16   time period. So, it's not as if it's a continuous calculation
17   of the composite score because you would need to update it
18   with activity since the most recent balance sheet dates. So,
19   there are considerations about the timing of when you look at
20   whether it be a month end or quarter end or something that
21   would be reasonable to do, it's not every single day a school
22   would calculate it. The changes could be made. You just have
23   to consider that as part of the process.

24         MS. JEFFRIES: Okay. Thanks, Dave. Appreciate it. So,
25   Jessica, is your comment on one A? Okay. So, Brad has deferred
26   to you on that before him. So.

27         MS. RANUCCI: Thank you. I'll try and be quick
28   because this is just, I believe, a drafting issue. But I

1    wanted to bring it up because I think it's maybe an important
2    one. My understanding of one A is that it was intended to
3    cover a variety of liabilities resulting from settlements or
4    final judgments, whereas one B was intended to cover certain
5    losses of state and federal losses that have not gone to
6    judgment. But I'm a little concerned that the redrafting of
7    one A with the language that says proceeding described in
8    paragraph (c)(1) one B or C of this section, that that clause
9    suggests that that entire list of things. So, debt or
10   liability from a settlement or arbitration proceeding, final
11   judgment, judicial proceeding is only limited to things that
12   are otherwise described in paragraph B and C, and I don't
13   think that that was intended to be based on all of our
14   conversations and the rulemaking. So, I was wondering if you
15   could just take a look at that? I can try and rephrase it if
16   that's not clear.

17            MR. MARTIN: Could you put that, would you put that
18   in the comment please? Thank you.

19            MS. JEFFRIES: Thanks, Jessica. Brad.

20            MR. ADAMS: Thank you. So, I had a comment on, its 11
21   creditor events, B. And I understand the point, but there's no
22   materiality threshold in here whatsoever, and this is a
23   mandatory trigger. But, you know, I was an auditor in 08, and
24   I saw what the banks did to companies and just calling a
25   balance on a line of credit. You can have a balance called on
26   a line of credit for not using your line of credit. And it
27   doesn't mean you're not fiscally responsible. So, I just am
28   really struggling with how we word B as we worded it. I
29   actually think in the discretionary number two creditor events

1    is actually worded more I guess at a higher level than this.
2    This is just so open to discretion. Maybe someone can help me
3    understand why we think calling a balance due on a line of
4    credit that may be because it's not being used is a bad thing
5    and it means you're not fiscally responsible.

6        MS. JEFFRIES: Okay. I'm not seeing an immediate
7    response, Brad. Maybe something the Department has to mull
8    over and get back to you on.

9        MR. MARTIN: I'll take that, I'll take it back.
10   You're talking about the creditor term, about the suspension
11   of a line of credit. Well, our concern is obviously where
12   schools are experiencing financial difficulties. One of the
13   ways we have of picking up on that in time to do anything
14   about it is where creditors begin to limit or suspend lines of
15   credit or call-in balances on loans. And so, I think that's
16   stuff that we're coming from here is trying is a lot of this
17   is ways in which the Department can be aware of where an
18   institution is potentially in trouble. And while I do
19   understand that that you could have a line of credit ended for
20   not using it. Our overriding concern is this is awareness here
21   of when an institution begins to be in financial trouble. And
22   these are important indicators of that. But I will take it
23   back.

24       MR. ADAMS: And I added comments in the text for you,
25   Greg. I do think if we just added at the very end of B because
26   the institution is in financial distress or something that
27   relates to the fact that it was called because of the fiscal
28   nature of the school or being in a bad position, however you
29   need a word it but some sort of qualifier there. And then I'd

 1   like to move to two right below it on the two discretionaries
 2   becoming a mandatory and we'll get through this when we cover
 3   discretionaries but some of these discretionaries as you know
 4   having not been defined that the Department can't tell us how
 5   you resolve it, is still a problem for me. And I understand
 6   why the Department has discretionary triggers and why we want
 7   them to be not limiting. But at the same time, if a school has
 8   no idea what the benchmark is, I don't see how two of them
 9   that are undefined can then result into a mandatory financial
10   issue that would be could potentially require a letter of
11   credit. I just don't think it's worded in a way with the
12   discretionary triggers down below that that we could live
13   with. Thank you.

14        MS. JEFFRIES: Thanks, Brad. Certainly, if you have
15   some suggestion what the language would look like, that would
16   be more acceptable. You could put that in the chat. The
17   Department's looking for that type of information as well for
18   consideration. I'm not seeing any more hands on this section,
19   Greg, so why don't we go ahead and move to the discretionary
20   triggers, I believe are next.

21        MR. MARTIN: Thank you, Cindy. Yes. We will be moving
22   to the discretionary triggers and those are found in paragraph
23   D. So, we'll wait for those to come up. Renee, can you bring
24   up D? Oh, there it is. Thanks. Oh, Vanessa's started. Okay.
25   So, we had a switch over. No problem. Thanks, Vanessa. So,
26   Vanessa Freeman is doing this now, so want to acknowledge her
27   efforts here. So, this should be page 14, right? I think we
28   need to go back, Vanessa. Yeah. This is page. Right, right
29   there. Thanks. That's great. Fantastic. Okay, so we are

```
 1    starting with our discretionary triggers here in D and let's
 2    move down to D two, which is creditor events. And you see that
 3    there. We have clarified the cross-references in this item.
 4    And again, we've updated throughout the section what we mean
 5    by the entity of financial statements were submitted to the
 6    institution. So that's just noting those changes there. And
 7    then we'll move on to, let's move on to number six on page 15,
 8    Vanessa. This is pending Borrower Defense claims number six
 9    there that you see. And we have revised this item to clarify
10    the original intent. And here under pending Borrower Defense
11    claims there are pending claims for borrower relief discharge
12    under 685.206 from students or former students of the
13    institution. And the Secretary has formed a group process to
14    consider the claims under 685.402. And then moving down to
15    number seven. Discontinuation of programs. These here we have
16    moved the affecting at least 25 percent of the students from
17    reporting requirement for this trigger to the discretionary
18    trigger itself. Because we think the intent of the trigger
19    will be clearer. So, in number seven, then the institution
20    discontinues a significant share of its academic programs,
21    affecting at least 25 percent of enrolled students. And our
22    next change is under ten, number ten, which is borrowing. And
23    we have clarified here this applies to all borrowing during
24    the last quarter that is repaid during the first two quarters.
25    So, there I'll read the revisions to ten. An institution's
26    financial statements submitted under 600.20 G or H or 668.23
27    or subpart L of this part include a line of credit or
28    borrowing in the last quarter of the fiscal year that was
29    repaid during the first two quarters of the next fiscal year.
30    And then we move down to number 11, the loss of program
```

```
 1    eligibility. And we've added this discretionary trigger here
 2    (d)(11). This is a new trigger, discretionary trigger that
 3    will ensure the Department has adequate information about such
 4    actions but does not require the Department to take action
 5    where loss of eligibility is against a single small program at
 6    an institution. And this is, again, number 11, loss of program
 7    eligibility. One or more programs at the institution has lost
 8    eligibility to participate in another federal educational
 9    assistance program due to an administrative action against the
10    school or its programs. And that is everything for the
11    discretionary triggers under D. So I'll open the floor for
12    discussion.

13          MS. JEFFRIES: Thank you, Greg. Brad, you are up
14    first.

15          MR. ADAMS: Thank you, Cindy. And back to my previous
16    comment on the language. I think we should remove the two
17    discretionary triggers becoming mandatory since the Secretary
18    already has the ability to judge any trigger it wants to that
19    warrants a consequence. So that would be my recommendation.
20    I'll put it in the chat. On this, again, I'm struggling with
21    three and four. Three in particular on a fluctuation in Title
22    IV, because it's not a fluctuation only down, it's a
23    fluctuation up. So, you could have an instance where revenues
24    increased 25 percent that you could be deemed financially not
25    responsible. So, in the fact that neither one of these as Greg
26    nor Mr. Finley's own admission in session to the Department
27    can define what either one of these is. And so, I don't know
28    how a school knows whether they're triggering either one of
29    these two. I did want to bring up, though, on the new item
```

1    number ten. I'm struggling with this one because there's no
2    way to game the system with borrowing money at the end of the
3    year anymore. It's now the money has to be used for a fixed
4    asset in order to help your composite score. So why are we
5    going to penalize schools that have short-term borrowed money
6    in the last quarter of one year and then pay it off in the
7    first six months of the next year when it doesn't help you
8    game any kind of calculation. All we're doing here is saying
9    schools don't pay off your debt early or you'll be penalized.
10   So maybe someone talk to me why we think number ten is
11   important here? Paying off debt early is good, I thought. I'm
12   confused.

13        MS. JEFFRIES: Okay. Greg? Nope. Okay.

14        MR. MARTIN: I'll take that back.

15        MS. JEFFRIES: Okay, you'll take that back? Alright.
16   Thank you. And I don't know, maybe some of your other
17   negotiators may weigh in on that as well, Brad. We'll see.
18   Kelli?

19        MS. PERRY: Yeah, I have some concerns about ten as
20   well, because there's a very good chance that a school could
21   use a line of credit as a cash need. So, I'll give you an
22   example. A lot of schools will have lines of credits set up
23   with banks, but they never draw on them. But let's say, you
24   know, the school is running short on cash. Let's say they have
25   a June 30 year end. They're running short on cash because
26   their fall tuition revenue hasn't all come in. And they need
27   to use that line and that line of credit to get through the
28   summer months and then they pay it back once that fall tuition

1   revenue comes in immediately. So, this is this whole concept
2   of having a line of credit that you borrow against in one
3   fiscal period and you pay it back in another fiscal period is
4   something that Treasury Department's use or can use as a means
5   of determining how they use their cash because they don't want
6   to dip into their investments or their endowment or such. So,
7   they have a real concern about this one, because I think this
8   happens more than you think for reasons not because the school
9   is at risk of closure, but because they do it to manage their
10  cash.

11         MS. JEFFRIES: Thank you, Kelli. Greg, I don't see
12  any other hands. Oh, here we go. Jamie?

13         MS. STUDLEY: I think the change to number seven,
14  adding the 25 percent program closure level is a good
15  direction. I don't know if 25 is magic, but I appreciate the
16  ability to distinguish between appropriate management and
17  terminating programs for whatever reason and the need to look
18  at them as triggers. I will reiterate the two discretionaries
19  should not become mandatory refrain that you've heard. I rise
20  now just to speak to the simple question of number one
21  accrediting agency actions has placed or places the
22  institution on a status is a very reasonable discretionary
23  trigger but has no time horizon. So, it could I don't think
24  the Secretary would, but it could encompass an accreditation
25  status ten years ago. So, I'm not sure what has placed adds
26  since what you're looking for is a delta something that
27  happens that the Secretary wants to be informed of and look
28  at. So, if the intent is the institution is placed on the it
29  has placed the institution on probation or show cause that may

1    be a sufficient trigger or you can add a timeframe. I don't
2    think it's a severe problem, but it just leaves open a
3    historic door that the Department's probably already looked at
4    that action.

5         MR. MARTIN: Certainly, certainly our intent is not
6    to do that, to go back to ten years. But I can understand that
7    there could be some that could be read in there. So, take a
8    look at it.

9         MS. JEFFRIES: Thanks, Jamie. Debbie?

10        MS. COCHRANE: I'm just trying to understand some of
11   the comments that have been raised around the two
12   discretionary triggers becoming one mandatory one given and I
13   know there's some questions have been raised around what can
14   be added authorities like give the Department. I'm just
15   wondering if the Department had a response on that?

16        MR. MARTIN: About the two discretionaries becoming
17   mandatory?

18        MS. COCHRANE: Yeah. Given that it can already look
19   at the kind of take any one discretionary triggering event and
20   kind of escalate it. That's what I think if I'm understanding
21   what some of the other negotiators have been asking about, I
22   would just like to hear the Department's perspective.

23        MR. MARTIN: It is true that we can take any of the
24   discretionary ones are at our discretion. It is as I think,
25   acknowledgment in the regulation that if there are two or more
26   discretionary events that happen, that that becomes a that
27   becomes an item of concern. And at that point, they become

1   mandatory. And it elevates what the Department has to do as
2   well as opposed to what the Department can do. So that, but I
3   get the I take the point that, yes, that we can use any of
4   these in any of these discretionary triggers independent of
5   that independent of that mandatory trigger. I sense there
6   seems to be a considerable amount of concern about the
7   mandatory discretionary two or more discretionary triggers
8   becoming mandatory.I'll take that back for discussion.

9           MS. JEFFRIES: Okay. Thank you, Greg. Barmak?

10          MR. NASSIRIAN: I wanted to echo Brad's comment and
11  Kelli's comment with regard to a ten. If short-term borrowing
12  and repayments really doesn't have an impact on the composite
13  score. What's the point of just forcing institutions to report
14  and overwhelming the Department with non-actionable
15  information that it can't really use? I don't see that as
16  particularly adding any value to anything. But the comment I
17  had was my and this may have to do with the manner in which
18  the mandatory trigger on default was crafted, maybe? But the
19  way I read it, number two, romanette one and two, which are
20  intended to be discretionary triggers are actually more
21  limited than the mandatory trigger on default. This seems to
22  be from my reading, this is already a mandatory default and is
23  already a mandatory trigger. So now you're saying you have to
24  default and there has to be further conditions. And if those
25  conditions are met, this becomes just a discretionary trigger.
26  Just it seems either redundant or there's something kind of
27  incongruent about what we're doing here. I just don't
28  understand what this provision is supposed to do if default is
29  a mandatory trigger. What is this provision doing here? I may

1   be missing some nuance, which I often do, but some
2   clarification on this would be helpful.

3          MS. JEFFRIES: Thank you, Barmak. Carolyn?

4          MS. FAST: I just wanted to offer some support for
5   the Department's proposal that two discretionary triggers
6   would equal a mandatory trigger. That seems to be a very clear
7   need for this type of provision here. There's been a
8   historical problem with the Department acting in time to
9   protect students and taxpayers from these closures. And part
10  of it is that the Department has other things to do or there
11  might be other concerns that the Department is wrestling with
12  instead of just focusing on what can we do to protect students
13  and taxpayers before it's too late. So having a mechanism that
14  says here are some multiple big problems and this is going to
15  be mandatory without having to get the Department to
16  necessarily pay attention or resist other pressures, to let
17  these things go to have protections in place seems to be
18  extremely important. And it would be a big step backward to
19  get rid of that provision.

20         MS. JEFFRIES: Thank you, Caroline. Greg, you have
21  your hand up?

22         MR. MARTIN: Yeah, after we take the last comment, I
23  wanted to ask if I may impose upon our advisor, Mr.
24  McClintock, to comment on ten about the extent to which, in
25  his professional opinion, he feels that the borrowing in the
26  last quarter and repayment in the first two quarters could be
27  used to gain composite scores. If he feels he would like to
28  comment on it.

1          MS. JEFFRIES: Sure, wait just a second. Yael was in
2     line, and I want to see if she's okay with you holding your
3     place right now and letting Dave address that or? Okay, great.
4     Thank you. Okay, Dave.

5          MR. MCCLINTOCK: Yeah. Thanks. And I did add to the
6     chat. I know the public can't see that, that I don't see a way
7     that it can be game. So, after the Borrower Defense went into
8     effect, the way the composite score works, schools have to
9     subtract their net fixed assets from equity, but they can add
10    back long-term debt and they now have to add any new fixed
11    assets any new debt has to be specifically tied to the
12    acquisition of fixed assets. And so, in this case, if you
13    borrow money and pay it back, it's not getting captured in the
14    composite score or that add back in any way. So, I can't see a
15    way that it would game the composite score calculation.

16         MR. MARTIN: Thanks, David. I appreciate that.

17         MS. JEFFRIES: Thanks, David. Okay, Yael?

18         MS. SHAVIT: Thanks. I just want to add on to
19    Carolyn's comment. I view the necessity of the two
20    discretionary triggers becoming mandatory the same way that
21    Carolyn does. And I do want to note that the discretionary
22    triggers are constrained and targeted. I think it's good to
23    give the Department discretion there. But where there are two
24    discretionary triggers at issue, I think at that point,
25    understanding the different obligations of the Department and
26    the amount of time that it can take to make discretionary
27    actions. Time is not on the side of the institutions or their
28    students, and I think it's unlikely for the Department in

```
 1    those scenarios to be able to act as quickly in every
 2    circumstance as would be necessitated by multiple red flags
 3    going off. So, I think as a timing matter, more than anything,
 4    this is a critical addition. And I do just want to note again,
 5    it isn't the case that the list of discretionary triggers is
 6    expansive. I think it is targeted and I think it's meaningful.
 7    And so, where there are more than one of these triggers
 8    creating red flags and concerns, I agree that it's not only
 9    appropriate for the Department to create a mechanism by which
10    two discretionary triggers become mandatory. I think it's
11    critical for the functioning of these regs.

12           MS. JEFFRIES: Okay. Thanks, Yael. I appreciate that.
13    Okay. Jamie, do you have something quick because we're fast
14    approaching the lunch hour?

15           MS. STUDLEY: I can wait till after lunch, if you
16    prefer?

17           MS. JEFFRIES: No, go ahead. We need to get as much
18    as we can, because you still have a significant piece of this
19    paper to cover.

20           MS. STUDLEY: It, I respect the considerations,
21    although managing the Secretary by regulation is a challenging
22    task. Maybe the Department at some point can explain that,
23    that remain unresolved. That might be helpful and knowing the
24    limit of this. Just very briefly, here's the situation that
25    I'm concerned about not having an automatic effect. So, and
26    it's a much more benign counterpoint to the multiple seriously
27    troubling issues that Carolyn and Jessica have spoken to. A
28    college in prudent management of the institutional programing
```

1    in the best interests of the student says we need to
2    discontinue a quarter of our programs. We've planned for that.
3    We do that so that we can continue to offer good programs. The
4    secretary says, yes, that's no problem there. You're not in
5    financial distress. In fact, that's good for you. Oh, and we
6    are closing some locations that will also change our
7    structure, but it's all to the good. And the Secretary says
8    that's fine. Does the third thing that they want to do, that
9    they would otherwise have the right to talk to the institution
10   about why they wanted to close something else, throw them into
11   a mandatory financial responsibility. After all this prudent
12   planning to reorganize themselves, they are now mandatorily in
13   a financially determined state to be financially precarious
14   when in fact these were the changes that were necessary to
15   make them healthy. And the Secretary has exercised this
16   discretion to say they are. I don't know that you can answer
17   it right now. That's the needle we're trying to thread to I
18   respect the idea of moving these and not having them sit
19   around when there are decisions to be made. But I also I think
20   that's why the 25 percent helps that that may tilt the balance
21   of this as we navigate this. But that's the kind of thing that
22   I worry about, not the bad ones, but the ordinary course kinds
23   of activities that are appropriate for discretion. Could a
24   school doing wise things be thrown into that pot? That's it.

25           MS. JEFFRIES: Appreciate that, Jamie. And you
26   brought us right directly to the lunch hour. So perfect. So,
27   we will adjourn and reconvene at 1 p.m. today and pick up on
28   financial responsibilities. Hopefully being able to move
29   through that document and at least look at, I believe, change
30   of ownership would be next, right? Yes.

1          MR. MARTIN: Correct.

2          MS. JEFFRIES: Okay. Alright. So, with that, if we
3     could go off broadcast and everyone have a great lunch.

4          Department of Education, Office of Postsecondary
5     Education

6          Zoom Chat Transcript

7          Institutional and Programmatic Eligibility Committee
8     Session 3, Day 3, Morning, March 16, 2022

9          From Kelli Perry - (P) Private Non-Profits to
10    Everyone:

11         Emmanual will continue for GE

12         From Debbie Cochrane (P), State Agencies to
13    Everyone:

14         It is still dark here!

15         From Adam Welle, State AGs (P) to Everyone:

16         The notion that programs with failing D/E rates are
17    considered as to overall institutional capability (here, for
18    purposes of entering a PPA) seems entirely reasonable.

19         From Jamienne Studley--Accrediting agencies (P)
20    she/her to Everyone:

21         Same question as Brad: what might be the burden on
22    schools to calculate if not the same as IPEDS, and is that a
23    standard disclosure?

1          From Anne Kress (P) Comm Colleges to Everyone:

2          +1 Jamie and Brad

3          From Dave McClintock (Advisor) Auditor to Everyone:

4          The educational spending outlined would be a new
5      disclosure

6          From Ernest Ezeugo (P) Students and Student Loan
7      Borrowers to Everyone:

8          +1 Johnson and Barmak

9          From Johnson Tyler (P) Legal Aid to Everyone:

10         I think the educational spending on instruction is
11     already in IPEDS data.

12         From Bradley Adams (P - Proprietary Institutions) to
13     Everyone:

14         Educational spending is already part of IPEDS
15     submission, so if the definitions align it will not create an
16     additional burden. If the don't align I believe it will create
17     confusion.

18         From Jamienne Studley--Accrediting agencies (P)
19     she/her to Everyone:

20         Thanks, Brad.

21         From Carolyn Fast (P) Consumer/Civil Rights
22     organizations to Everyone:

```
 1              IPEDS does have instructional spending reporting,
 2       but it does not currently allow for a good understanding of
 3       non-educational expenditures because expenses for advertising
 4       are included in other categories, including "student
 5       services"" This definition addresses that problem.

 6              From Kelli Perry - (P) Private Non-Profits to
 7       Everyone:

 8              I will be coming back to the table for Fin Resp.

 9              From Sam Veeder (P) FA Administrators to Everyone:

10              I will be rejoining for FA

11              From Jessica Ranucci (A)- Legal Aid to Everyone:

12              I'll be coming to the table for legal aids

13              From Johnson Tyler (P) Legal Aid to Everyone:

14              Jessica is taking over for legal aid. thx. johnson

15              From Bradley Adams (P - Proprietary Institutions) to
16       Everyone:

17              my request remains the same that use IPEDs
18       educational spending definition as it currently exists and if
19       we want to change the current IPEDs definition then to do it
20       in IPEDs so that they align and are the same.

21              From Johnson Tyler (P) Legal Aid to Everyone:

22              Thank You Ernest
```

1          From Carolyn Fast (P) Consumer/Civil Rights
2    organizations to Everyone:

3          Thank you Ernest.

4          From Ernest Ezeugo (P) Students and Student Loan
5    Borrowers to Everyone:

6          Of course, and I appreciate that reminder Greg.
7    Thank you.

8          From Amanda Martinez (P) Civil Rights to Everyone:

9          +1 Ernest. Important perspective to share for the
10   public and group.

11         From Bradley Adams (P - Proprietary Institutions) to
12   Everyone:

13         Thanks for sharing Ernest. As I have stated for
14   three sessions I firmly believe a DE and earning disclosure
15   for all programs at all institutions would provide students
16   with valuable information about the value of a program. The
17   small program rate is a good start, but it could go to all
18   degree programs as well.

19         From Carolyn Fast (P) Consumer/Civil Rights
20   organizations to Everyone:

21         +1 to Barmak - why would we limit this provision to
22   schools that start with scores under 1.5? If a school drops
23   below 1, that is significant, regardless of the prior score.

24         From Jessica Ranucci (A)- Legal Aid to Everyone:

1           +1 to Barmak/Carolyn

2           From Debbie Cochrane (P), State Agencies to
3     Everyone:

4           Agree on the point raised by Barmak/Carolyn.

5           From Jamienne Studley--Accrediting agencies (P)
6     she/her to Everyone:

7           +1 to Barmak/Carolyn/Debbie on this issue of
8     dropping below

9           From Adam Welle, State AGs (P) to Everyone:

10          Yael is coming to the table for state AGs

11          From Jessica Ranucci (A)- Legal Aid to Everyone:

12          Johnson is coming back to the table to make a
13    comment

14          From Barmak Nassirian (A) Servicemembers & Vets to
15    Everyone:

16          "you may be in a better position 6 months later . .
17    . but you may not be"

18          From Bradley Adams (P - Proprietary Institutions) to
19    Everyone:

20          I am going to let Barmak go in front of me so we can
21    finish debate on 1 (i) A

22          From Jessica Ranucci (A)- Legal Aid to Everyone:

1           I'm coming back to the table for legal aids

2           From Jessica Ranucci (A)- Legal Aid to Everyone:

3           I am concerned about the language in (c)(1)(i)(A)
4    regarding settlement, arbitration proceeding… administrative
5    proceeding described in paragraph (c)(1)(i)(B) or (C)…" I
6    believe that this final clause ("described in paragraph
7    (c)(1)(i)(B) or (C)") is NOT intended to circumscribe this
8    whole list to events listed in (B) or (C), but I'm concerned
9    that it could be read that way.

10          From Bradley Adams (P - Proprietary Institutions) to
11   Everyone:

12          I recommend we change 11 B to the following:

13          Any creditor terminates, withdraws, limits, or
14   suspends any line of credit, loan agreement, or other
15   financing arrangement because the institution is in financial
16   distress.

17          From Jamienne Studley--Accrediting agencies (P)
18   she/her to Everyone:

19          + 1 to Brad --as I've said before i don't understand
20   why two discretionary triggers become mandatory, since the
21   Secretary always has the ability to judge that a discretionary
22   trigger warrants attention or consequence

23          From Bradley Adams (P - Proprietary Institutions) to
24   Everyone:

1          +1 Jamie. My recommendation would be to remove the
2     two discretionary triggers become mandatory since the
3     secretary has the ability to judge any discretionary trigger
4     that warrants consequence already.

5          From Barmak Nassirian (A) Servicemembers & Vets to
6     Everyone:

7          +1 on Brad's point on 10

8          From Dave McClintock (Advisor) Auditor to Everyone:

9          I would echo the comments about #10 and don't
10    understand the risks it is trying to address now that all debt
11    must be specifically assigned to new fixed assets in the
12    composite score calculation

13         From Bradley Adams (P - Proprietary Institutions) to
14    Everyone:

15         +1 to Jamie. I appreciate the department defining a
16    figure on point 7. I am not sure 25% is the right number and I
17    would like for it to align to point 3 in mandatory, but 25% is
18    a defined number which helps institutions.

19         From Ernest Ezeugo (P) Students and Student Loan
20    Borrowers to Everyone:

21         Thanks for asking Debbie. I've been seeing it as a
22    streamlining process but am also curious to hear this
23    response.

24         From Bradley Adams (P - Proprietary Institutions) to
25    Everyone:

1          +1 Debbie

2          From Kelli Perry - (P) Private Non-Profits to
3    Everyone:

4          +1 Debbie

5          From Emmanual Guillory (A) PNPs to Everyone:

6          +1 Debboe

7          From Emmanual Guillory (A) PNPs to Everyone:

8          *Debbie

9          From Jessica Ranucci (A)- Legal Aid to Everyone:

10          In response to Jamie, aren't all discretionary
11    triggers subject to the introductory language that "the
12    Secretary determines… likely to have a material adverse effect
13    on the financial condition of the institution"? If so, I think
14    that might take care of the long-ago accreditation action
15    issue.

16          From Jamienne Studley--Accrediting agencies (P)
17    she/her to Everyone:

18          In a sense the "two discretionaries" provision could
19    override the Secretary's discretion to judge that they are not
20    of concern. Thanks, Debbie, for asking.

21          From Anne Kress (P) Comm Colleges to Everyone:

22          +1 to Jamie's reading as the heart of the concern

1          From Bradley Adams (P - Proprietary Institutions) to
2     Everyone:

3          +1 Barmak. As I referenced not as well as Barmak I
4     am not sure why creditor events are in both places.

5          From Kelli Perry - (P) Private Non-Profits to
6     Everyone:

7          +1 Barmak

8          From Ernest Ezeugo (P) Students and Student Loan
9     Borrowers to Everyone:

10         That's how I've been seeing it, thanks Carolyn.

11         From Johnson Tyler (P) Legal Aid to Everyone:

12         +1 Carolyn

13         From Debbie Cochrane (P), State Agencies to
14    Everyone:

15         Thanks everyone, I can see those perspectives. The
16    discussion of the topic is helpful.

17         From Emmanual Guillory (A) PNPs to Everyone:

18         Also, what happens for institutions that are simply
19    restructuring majors?

# EXHIBIT 6

App.503

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

INSTITUTIONAL AND PROGRAMMATIC

ELIGIBILITY COMMITTEE

SESSION 3, DAY 4, AFTERNOON

March 17, 2022

On the 17th day of March, 2022, the following
meeting was held virtually, from 1:00 p.m. to 4:00 p.m.,
before Jamie Young, Shorthand Reporter in the state of
New Jersey.

```
1                         PROCEEDINGS

2          MR. ROBERTS: Welcome back to everyone. Hope you

3     enjoyed the lunch hour. My name is Brady Roberts. I'll be

4     facilitating this afternoon. We have a lot more discussion to

5     get to, so let's jump right into it. I think the last hand we

6     had up was Jessica and then Debbie on certification. And so, I

7     would welcome, Jessica, if you wouldn't mind, turn on your on

8     camera, take it away. Oh, and Will Durden is in on behalf of

9     two-year public institutions for the remainder of the

10    afternoon, so welcome, Will.

11         MS. RANUCCI: Thanks. I was just hoping the

12    Department could respond to a question I put in the chat,

13    which is just on this licensure issue, are there any other

14    circumstances in which the Department allows Title IV for

15    part, but not all of a program's published length? I can't

16    think of one, and I think that's what's being proposed here.

17         MR. MARTIN: Generally, no. We do have instances

18    where sometimes, for instance, in a clock hour situation where

19    you've got a given number of clock hours and a given number of

20    weeks in a program and the way clock hours works, it is

21    possible for students to accelerate and finish their clock

22    hours in a shorter period of time. And we are aware of that

23    and understand that. We sometimes will look at an institution

24    where if there's a preponderance of students finishing early

25    all of the time that calls into question the number of hours

26    the number of weeks, we will say that the program really isn't

27    that, that it really isn't that length, but that really isn't

28    anything that's regulatory. I don't think we have anything. I
```

1  will, I'll just, we have some people monitoring this. I'll get
2  in my, I'll ask my colleagues back at the Department to
3  confirm that. But you are correct. We don't have anything
4  currently in regulations that would where we would fund where
5  a student would be partially funded, if that's what you're
6  asking.

7          MS. RANUCCI: Right.

8          MR. MARTIN: Funded for a certain number of hours.

9          MS. RANUCCI: I just want to reiterate; I think
10 that's a real problematic thing. And I'm glad that we don't
11 have any. And I hope that you decide not to add it here.

12         MR. MARTIN: Thank you.

13         MR. ROBERTS: Thank you. Brad, I see your hand, but I
14 want to make sure we give Debbie a chance to get to what she
15 was going to get to before lunch. So, Debbie, go ahead.

16         MS. COCHRANE: Thanks, Brady. I have a question and a
17 comment related to how this intersects with satisfactory
18 academic progress standards. So those standards typically
19 allow for some amount of wiggle room in terms of eligibility
20 for students who don't pass all their programs, usually 150
21 percent. So, if, my question is whether limiting the HEA
22 eligibility for the program to the minimum number of hours
23 required for training, if that still allows for kind of that
24 SAP buffer or whether it would not. And then my comment
25 related to SAP is, you know, kind of related to Jessica's
26 question. Are there places where students do kind of get cut
27 off from Federal Aid currently? I would say that might

1   actually be an interesting place to look for precedent there.
2   There is some research that shows that SAP policies can
3   negatively impact students' ability to complete because
4   precisely they are cut off from aid midstream. So, again,
5   that's a comment for consideration. I would love a response to
6   the question.

7           MR. MARTIN: Oh, sure. So, it was just confirmed by
8   my colleagues that there are no other areas where we limit the
9   amount of a program that can be covered by Title IV Aid. I
10  want to be careful about using the phrase cutting a student
11  off of aid. It wouldn't be that. It would be limiting the
12  portion of the program that can be funded by Title IV Aid.
13  Some people might argue that's semantics, but I think it's an
14  important distinction. Are there any other areas where we cut
15  students off of Title IV Aid? Obviously, students can lose
16  eligibility for a number of reasons, right? That would have
17  the effect of cutting them off. They could go into default,
18  things like that. The other thing would be as far as SAP goes,
19  yes, it's possible for a student to lose eligibility for aid
20  if they've run afoul of the institution's SAP policy. That has
21  to be constructed within our guidelines. That's, and of
22  course, you know, I want to point out that there are appeal
23  procedures there involved. We have, you know, warnings,
24  probation, things like that to mitigate that. But I don't
25  think you could draw a distinction between SAP and this. Now,
26  is it the question of how would SAP work in conjunction with
27  this? That's a very legitimate question. And as you know, SAP
28  is structured on, in your example, the 150 percent completion
29  is 150 percent of program length. And what would that and I
30  guess your question would be, what that program length be? We

1    would be considering it the total length of the program the
2    school has? Or would it be that would it be based on the
3    number of hours for which the student is eligible for Title IV
4    Aid? I hesitate to go too far. It's certainly something the
5    Department would have to look at in terms of its policy. I
6    think right now, the way SAP rules are written, they are
7    written to program length. And we're not, in this rule,
8    proposing to limit the length of a program. So, our program
9    would still be the number of hours that it is. So, I would
10   imagine, I'm just I'm kind of going off on speculation here
11   that it would be based on, it would still be based on program
12   length. But it's something the Department would have to look
13   at. And I don't know if Steve's back with us. Steve, do you
14   have any comments on that? Steve's an old SAP warrior from way
15   back. So, I'll, not too far back, Steve, but I'll ask if he
16   wants to comment.

17          MR. FINLEY: Actually, I think that's Greg's polite
18   way of calling me a sap, but that's okay. And there's some
19   similarity here. But as Greg notes, satisfactory academic
20   progress is based on a student not making an acceptable rate
21   of progress over based on the length of the program. So, if
22   the suggestion is we would have to look at the interplay there
23   to see if that's one way this could be worked out, I think we
24   would just have to look at it. It's not clear how they would
25   overlay one another.

26          MS. COCHRANE: Okay. So just a clarifying question.
27   So, you're not necessarily intending, if we have 1000-hour
28   program, to strictly to basically eliminate that kind of SAP
29   or SAP flexibility for the students in the thousand-hour

1    program? Basically, they have a strict, they must meet a
2    stricter rate of progress.

3           MR. MARTIN: Go ahead, Steve.

4           MR. FINLEY: Yeah, it's interesting because SAP only
5    comes into play if the student is not progressing at the
6    normal rate of the expected rate of completion within the
7    programs. Right? So that's what happens, all of a sudden, you
8    start talking about 150 percent of the program length and
9    whether the student is going to be able to complete it with a
10   satisfactory grade level during that period. So, it's just not
11   clear how the two are going to work out right now. I mean, the
12   proposal here is, is that for students making normal progress
13   in the program, they would be capped before they reach the
14   enlarged program hours that would be established by the
15   measurement under this proposed regulation.

16          MR. MARTIN: Now, I should point out, too, with SAP
17   that we are talking about Gainful Employment programs here and
18   while, certainly this doesn't apply to every Gainful
19   Employment program. But I do want to point out that for
20   Gainful, for programs that are met that are, if they're non-
21   term in nature, and that would be a lot of these programs,
22   that there is no pace requirement anymore related to SAP for
23   those programs. Remember, that a student cannot be paid in a
24   program such as that in a program structured in that way. And
25   until, unless they've completed one-half the weeks and hours
26   in the academic year. So, a pace requirement for SAP is
27   redundant. So, the only, the only thing you would have would
28   be the GPA requirement, which wouldn't be affected by this.
29   And, and there would still be a maximum there'll still be a

 1    maximum timeframe as measured in calendar time. So, it
 2    probably wouldn't be as have as big an effect on most of these
 3    types of programs as you might think. But that is not to say
 4    that we don't we wouldn't have some thinking to do about
 5    exactly how the interplay would work, as Steve points out.

 6            MR. ROBERTS: Thank you. Brad, you're up.

 7            MR. ADAMS: In this comment, does it lend- again, I'm
 8    still not supporting as written, but I just want to point out
 9    if we truly want to get the states involved, you know, most
10    legislative calendars are already finishing, at least in the
11    states where I operate, and some states operate on an every-
12    other-year basis. So, I would think you need at least a two to
13    three year from effective date language in here if you want
14    the states to have any chance at all to try to comply with
15    whatever you're trying to do.

16            MR. ROBERTS: Adam.

17            MR. WELLE: Yeah. I was just going to say, I do agree
18    with Jessica's concerns. I think having the student not be
19    able to finish the program if it reaches the cap would be
20    harsh and kind of place the risk and the harm on the student
21    as opposed to the institution. It might even be better if the
22    program, and I think Jessica maybe suggested this as the
23    alternative, but if the program just wasn't available or
24    eligible for aid altogether, if it didn't meet the requirement
25    or if it was longer than the maximum, and at the very least, I
26    would think there should be some sort of disclosure
27    requirement at the outset so that the student is aware that
28    they don't have Title IV funding to bring them to the end of

1    the program so that they can be fully aware of that and can be
2    packaged in some other way to be able to complete it.

3              MR. ROBERTS: Alright.

4              MR. MARTIN: Thank you.

5              MR. ROBERTS: Thank you. Jessica.

6              MS. RANUCCI: Thanks. And just to piggyback on what
7    Adam said, I believe that the language in the session two
8    issue paper accomplished precisely that. I understand when
9    Greg spoke that the reason that the language was changed was
10   to allow these programs to continue to operate for non-Title
11   IV purposes. I don't have a problem with that. If people want
12   to do the whole program wholly funded not by Title IV, I think
13   that's completely fine. And I think you could write out an
14   exception. I think the problem is that the way that that
15   problem was solved creates this huge new problem.

16             MR. ROBERTS: Alright. Thank you, Jessica. Johnson.

17             MR. TYLER: Sorry. I'm jumping in really at the spur
18   here. But, you know, if you're not going to fully fund the
19   education, you're just perpetuating transcript withholding
20   because it happens all the time. Students are excited about
21   going to school. They have the funding and then there's some
22   bill at the end that they can't afford to pay that they never
23   budgeted for. And it's very confusing and a lot of students
24   are just going to walk away without their completing or
25   stranding all those credits, and they're going to end up with
26   a debt and they're never go back to school until they pay off
27   the debt. So, I think it's, you, know it's really you've got

```
 1    to address this somehow because you're just creating a huge
 2    problem here.

 3            MR. ROBERTS: Thank you, Johnson. Greg, not seeing
 4    any additional comments on this section. Would you like to
 5    move us to the next piece of the issue paper?

 6            MR. MARTIN: Yes. So, we'll be discussing 32. And one
 7    of the reasons which I think are probably fairly obvious, I
 8    will look at 32. No. Yeah. So, we'll. Okay, yeah. Let's just
 9    let's just start with 32. So, I'll discuss what I wanted to
10    say later. So, here under 32 we have, we've clarified the
11    provision at the suggestion of negotiators that institutions
12    must comply with consumer protection laws. So, let's review
13    that in each state in which the institution is located or in
14    which the student in which students enrolled by the
15    institution are located. The institution must ensure that, if
16    we go down to let's go down to romanette three, ensure that it
17    complies with all state consumer protection laws, including
18    both generally applicable state laws and those specific to
19    educational institutions, except where state requirements for
20    obtaining authorization are or inapplicable pursuant to state
21    authorization or reciprocity agreements. So, because, we get
22    into transcripts in the next one. Why don't I just, I know I
23    don't usually stop, but let's just stop here at 32 before we
24    get into transcripts and then and clear this, any discussion
25    here first, if you don't mind just bearing with me there. So,
26    I'm going to open it up for discussion on 32 by itself.

27            MR. ROBERTS: Comments and questions for the
28    Department on 32 alone. Just want to welcome Laura to the
```

```
 1   table on behalf of the credit agencies. Welcome, Dr. King.
 2   Barmak, I see your hand first.

 3            MR. NASSIRIAN: So, I think all of the negotiators
 4   and the public are fully aware of how controversial these
 5   provisions are. I was going to suggest that we take this
 6   section in two distinct components, one of them having to do
 7   with current romanette one and two. Let's work that out if we
 8   can, because I think we do have a compromise solution for
 9   that. And then address three, which I know is the subject of
10   much consternation and email traffic, and apropos romanettes
11   one and two, and I do this with permission from the folks that
12   I'm calling out, but Carolyn Fast and I, because we were
13   originally involved in submitting some language on this, have
14   been working since the end of the last session with colleagues
15   at WCET and WICHE who have taken the lead in attempting to
16   improve this language together with us to address our mutual
17   concerns. And we did a draft language with them that satisfies
18   both our concerns and theirs. So, I have their permission to
19   say this. We have submitted that. And I think Cindy just
20   recirculated the language with a header. We believe that
21   language accomplishes everything the Department wants to do
22   here at the same time as it addresses some of the operational
23   concerns that our colleagues on the institutional side would
24   have with the current draft. So, if you'd like to I don't know
25   whether folks want to look at that language or do, how do we
26   want to proceed? But that's the effort we engaged in to
27   attempt to come back to the committee with something that the
28   various sides might find agreeable.
```

1          MS. JEFFRIES: Barmak, just to be clear, I didn't
2    recirculate it with the header because the language had stayed
3    the same. I certainly can if the committee would like to have
4    it with the header on it.

5          MR. NASSIRIAN: Well, the header just references the
6    section of the draft it would go in, which is section 32. What
7    it does is it would add a romanette three to the current
8    subsection and I could go through the provisions one at a
9    time, if you like, or however the committee wishes to proceed.

10         MR. MARTIN: Go ahead, Barmak. You can walk us
11   through it. What, you said it adds, I just to be clear it adds
12   so we have romanette one, two and three. Does this does
13   replace one of the, it still retains that that structure?

14         MR. NASSIRIAN: Yes, it would have. Should I share my
15   screen so people can see the language?

16         MR. ROBERTS: If you wouldn't mind, Barmak.

17         MR. MARTIN: I don't have problem with that.

18         MR. NASSIRIAN: Can I do that?

19         MR. MARTIN: Yeah, go ahead, Barmak. Yeah.

20         MR. NASSIRIAN: Okay. So hopefully you're seeing,
21   unfortunately, I couldn't track changes because of the PDF to
22   Word conversion, but the construct here is intended to address
23   multiple concerns that we heard from our colleagues on the
24   institutional side, one of which has to do again with pegging
25   the requirements for licensure to the location of the of the
26   student. And I want to emphasize here and the Department was

 1    kind enough to take an edit from me with regard to high school
 2    diplomas in the same vein, that any mandates or requirements
 3    should be pegged to the location of the student. I want to be
 4    very clear and I hope the Department, should it accept this
 5    language, clearly states this in the preamble that by location
 6    we don't mean the residence of the student, we mean where the
 7    student actually encounters the educational experience. So,
 8    it's because the goal here is to address both physical as well
 9    as distance ed modalities so that a student who crosses
10    jurisdictions and attends a school physically, say, in another
11    jurisdiction in another state would be located in that second
12    state. We want to make sure physical institutions don't have
13    to go through a requirement to satisfy a 50-state licensure
14    mandate. So, one of the changes that we made was to change the
15    location definition, to tie it to where the student begins
16    their participation. And then the language is the programmatic
17    accreditation, if it is required by the state or federal
18    agency. Romanette two addresses a concern they had about the
19    institution being required to assure that the program
20    necessarily meets the criteria for each state, mainly because
21    they explain that in some states that may not be easily
22    available or available at all. So, we want to make sure that
23    to the extent that such prerequisites are knowable, that the
24    institution has to satisfy them. And then the third romanette
25    is intended to address those cases, because we are not tying
26    it to licensure and pre- and other prerequisites associated
27    with location of the student. We wanted to make sure that we
28    accommodate any individuals who, say, plan to go to another
29    state but are preparing to do so through an online program
30    that may not satisfy the prerequisites for where they are, but

1    that would satisfy the prerequisites for another venue as long
2    as that's done on a case-by-case basis with prior with prior
3    consent. So, those are the modifications we made in response
4    to the concerns we heard from our colleagues who are quite
5    expert in these matters and sort of educated us about how the
6    language could be modified. Thank you.

7              MR. MARTIN: And Barmak, just to confirm, I saw
8    something pop up in the chat that said the current romanette
9    three would be romanette four. Is that correct?

10             MR. NASSIRIAN: Yes, we would. Again, the current
11   romanette three is a whole other ball of wax that we're going
12   to have to discuss. But should the committee accept these
13   changes, the conforming change would be to renumber and
14   include current romanette three as now romanette four.

15             MR. MARTIN: Okay. Thank you.

16             MR. NASSIRIAN: I'm going to stop sharing if I know
17   how.

18             MR. MARTIN: Yes.

19             MR. ROBERTS: Thank you, Barmak. I'm going to presume
20   the Department needs some time to think on that. So, if it's
21   okay with you, I'll move back to the queue, and Laura, I have
22   your hand next.

23             DR. KING: Thanks, Barmak. I'd like to offer a
24   friendly amendment based on what we had talked about at the
25   last, at session two. I was surprised to see that pre-
26   accreditation was not added in after our discussion in session

```
 1    two. So, in the spirit of focusing comments on what might
 2    affect a consensus vote, I want to talk about that again. So,
 3    the suggested language is programmatically accredited or pre-
 4    accredited if such accreditation is required. So just adding
 5    those two words, and I'm not sure if it was an oversight or a
 6    decision, but I did want to talk about what it means. So,
 7    602.16 which is the, those are the accreditation regulations.
 8    Accreditor is recognized by the Secretary specifically have
 9    pre-accreditation in their scope and it has very specific
10    requirements that are that are assessed when accreditors go
11    through their recognition process. It addresses curriculum,
12    faculty, fiscal viability, all of those things that you would
13    expect. And there's a federally regulated limit on how long a
14    program or institution can stay in pre-accreditation. Also,
15    pre-accreditation status is a pretty there's a lot of scrutiny
16    that goes into it. Oftentimes programs in particular, I'll
17    speak for programs, go through multiple site visits, multiple
18    reporting requirements during that period of time. So, it's
19    actually a time of pretty intense working with the accreditor
20    and pretty intense scrutiny. There's also an obligation for
21    institutions in pre-accreditation status now. This was
22    negotiated in 2019 for the 2020 regs to have a teach out plan
23    in place if they're in pre-accreditation. So, this isn't you
24    know something that is just sort of given willy nilly. I mean,
25    it fits here. And finally, licensing agencies and professions
26    that have pre-accreditation as part of their accreditation
27    process accept students from pre-accredited program to sit for
28    the licensing exam. So, it's not putting students at any
29    disadvantage. So, I'm again, I'm curious about why it wasn't
30    added in here in this draft three.
```

1          MR. NASSIRIAN: Unintended oversight. I agree with
2     you.

3          DR. KING: And my comment was, my question was really
4     to the Department, not to Barmak, because I know that Barmak
5     agrees with me. I just didn't know if there was some reason
6     that that was the case.

7          MR. MARTIN: I'm sorry. Could you restate that, if
8     it's directed to us?

9          DR. KING: Yeah. What, why was after the conversation
10    in session two, why was pre-accreditation not added in here.

11         MR. MARTIN: I'm sorry, could you reference the exact
12    part of the where you're where you are in the in 32, please?

13         DR. KING: Sure. It's 32 romanette one.

14         MR. MARTIN: Okay. So, in each state, the institution
15    is located where in which students enrolled by the institution
16    are located. The institution must ensure that it is
17    programmatically, oh, programmatically accredited. And you
18    wanted to know.

19         DR. KING: Or pre-accredited is what-

20         MR. MARTIN: Or pre-accredited. I'm, we had concerns
21    about pre-accreditation status and making certain that the
22    program is actually is actually accredited. So [interposing]
23    that language.

1          DR. KING: Right. But I just what I just said in my,
2    what I just said in my comments actually explained why it
3    should be there. It doesn't seem like you heard it or-

4          MR. MARTIN: We did-

5          DR. KING: I'm just it is a category of accreditation
6    and without it, it really puts programs, accreditors, students
7    between a rock and a hard place. It's addressed in 602.16.
8    It's specific. I'm at a loss to understand. I just want to
9    hear a cogent argument why.

10          MR. MARTIN: Well, you know, we have with pre-
11    accreditation, we have concerns about the prospect of Title IV
12    Aid floating programs, and you know taxpayer money being used
13    to float programs which have yet to receive accreditation. The
14    potential for them not to be accredited is still there.

15          DR. KING: But that's not how it works. And, if, so,
16    let's say that we just go with accreditation and an agency has
17    to give accreditation and not go through the pre-accreditation
18    process, so they get their accreditation withdrawn. I mean,
19    it's the same, they actually get more scrutiny in the pre-
20    accreditation process. I just think there's a lack of
21    understanding and I strongly recommend that that gets added
22    back in because it makes no sense.

23          MR. MARTIN: I'll take it back.

24          MR. ROBERTS: Thank you. Debbie.

25          MS. COCHRANE: So, I have some questions. I'm kind of
26    I'm looking at the proposed amended language. And I think that

1   there are some really good steps in here that I appreciate
2   particularly saying that's clarifying that the location is
3   where the student begins their participation. I know I've
4   heard that concern of students can move across state lines.
5   And, you know, I don't think that's what the Department's
6   trying to get here. I also appreciate the kind of case-by-case
7   exceptions to enroll students and how institutions could
8   handle that. I, I have spent my question is really around this
9   question is the proposed from Barmak and Carolyn 32 romanette
10  two around if you know making sure that it satisfies the, you
11  know, applicable standards if they are available and can be
12  obtained from the state. And my question, I guess I have I
13  have spent a chunk of time trying to understand the concerns
14  in this issue. I've connected directly with about two dozen
15  state licensing entities in California and in other states. I
16  am not understanding the problem. So, it's not that I'm
17  necessarily averse to a solution to it, but I would like to
18  more clearly hear that problem articulated. What I do see is
19  institutions consistently pointing to large online
20  institutions, consistently pointing students to state
21  licensing entities. So, I'm reading it from one website right
22  now. This institution strongly encourages you, the student, to
23  contact the State Licensing Board where you intend to seek
24  licensure to ensure the program will meet the state's
25  licensing requirements. Another one saying students should be
26  assured by their institution that the program actually does
27  meet the requirements of the state in which [audio] practice.
28  So, I feel like even with the disclosures as they exist right
29  now, where we see large institutions pointing students saying,
30  you better go check yourself. You better make sure that the

1    requirements are met. So, if students are supposed to make
2    sure the requirements are met, it feels like that should be
3    something institutions are doing before they enroll students
4    across state lines. And then finally, I would just say so
5    again, I'm not averse to a solution, but I'm having a hard
6    time understanding what the problem is. And I would just
7    finally say that you know we just heard about in the with
8    regards to the hours, the maximum program hours is clearly an
9    effort on the part of the Department to move states in what
10   seems like a more consumer-friendly direction. And I would say
11   that you know I think that the language where states need, or
12   institutions need to confirm that that programs are meeting
13   the requirements could actually have the same impact. If it is
14   true, and this would be horrifying, if it is true that there
15   are some state licensing entities that will not let a student
16   or an institution know what they need to do in their
17   educational program to ultimately gain licensure [30 seconds]
18   that is a huge problem. Like I don't know how students are
19   supposed to navigate this. So, part of these rules are the
20   Department's approach in this paper in particular, is to move
21   states towards a better, clearer, more consumer friendly
22   direction. This, to me, seems like a good opportunity to do
23   so. So again, all that to say, I would love to hear examples
24   of you know Michigan Accounting Board, whatever doesn't tell
25   people or what like just what specifically is the problem
26   here.

27          MR. ROBERTS: Thank you, Debbie. Not seeing an
28   immediate response. I'm going to go to Brad.

1          MR. ADAMS: I'd like to second Laura's position on 32

2    romanette one. I'm really struggling and I'll give you a

3    perfect example, Greg. Our pharmacy school was accredited. We

4    were seeking accreditation. Students had to sign a

5    certification knowing the program wasn't fully accredited. But

6    the program cannot be fully accredited until you actually

7    graduate students and produce outcomes. Students are aware of

8    that. They sign a disclosure certification, understanding

9    that. How in the world could you ever start a new healthcare

10   program, at least at the graduate level, if you have to be

11   fully accredited when you can't be fully accredited till you

12   graduate somebody. It's the chicken before the egg. I don't

13   get why the Department is so strongly against putting some

14   language in there about pre-accreditation or seeking

15   accreditation, because that's not the way programmatic

16   accreditation works. And I just, I'm not sure, I'm still

17   struggling like Laura. Why is that an issue?

18         MR. MARTIN: Well, as I said before, I mean, I

19   understand the process, but pre-accreditation is not

20   accreditation or else there wouldn't be the delineation so the

21   pre-accreditation to get from pre-accreditation to

22   accreditation as you just pointed out that the program has to

23   meet certain thresholds and standards in order for that to in

24   order for that to occur.

25         MR. ADAMS: Would that mean funding would not be

26   available until you reach that? Is that what that means?

27         MR. MARTIN: That is correct. A student would not be

28   Title- there would not be Title IV eligible until the program

29   is accredited.

1          MR. ADAMS: Then you've essentially shut down all new
2     healthcare programs from this point forward if you do that
3     because this isn't just for-profits, this is for all schools.
4     So, I want to make sure the publics and the non-profits hear
5     this, too. You cannot get accreditation in many healthcare
6     programs until you have outcomes and graduate students. And
7     what he just said means you will never be able to start a new
8     program again because that can't happen in this scenario right
9     here. Thank you.

10         MR. MARTIN: I want to for the record state that,
11    we're not saying that you can't start a new program. That's
12    what we said is that it would not-

13         MR. ADAMS: It would not get funding.

14         MR. MARTIN: It wouldn't be eligible until such time
15    as it was accredited.

16         MR. ADAMS: But you killed all new healthcare
17    programs under that.

18         MR. ROBERTS: Barmak, I see your hand, but I just
19    want to note that Emmanual is at the table for private
20    nonprofits [inaudible]. Barmak, please.

21         MR. NASSIRIAN: I just I'll do my very best to
22    respond to Debbie's concerns. It is my understanding that in a
23    number of states, the final judgment is rendered only after an
24    individual evaluation of, say, transcripts and so in teaching,
25    for example, and nursing in some states, so that it becomes
26    somewhat of a Catch-22 and a real problem for an institution
27    to make representations on the front end about an assessment

1    that is post facto. And this was what the additional sort of
2    flexibility and the language we drafted was supposed to
3    address. I agree with you that it is a really an abominable
4    practice for a state not to be able to articulate a priori
5    what it takes to qualify for a particular licensure exam or
6    for a particular type of license. But to whatever extent that
7    is true, and that's you know that's to be determined after
8    these regs go into effect. To whatever extent it's true, it
9    would not make sense to hold institutions accountable for that
10   kind of practice. And furthermore, to the extent that the
11   criteria are clear in advance, this does mandate that
12   institutions, unlike what you are, you and I are both
13   concerned about the idea of just simply shrugging your
14   shoulders and telling the student to go figure it out. To the
15   extent that the criteria are knowable, I think that mandate
16   would be on the institution to know them, not on the student.
17   So that's the best I can do in explaining why some variability
18   in state licensure practices may justify a little bit of
19   flexibility here.

20            MR. ROBERTS: Thank you, Barmak. Laura.

21            DR. KING: I wanted to again try to explain and
22   clarify because I feel like we're not having a meeting of the
23   minds here. Programmatic accreditors are not Title IV
24   gatekeepers. We don't have, we are not where the Title IV link
25   happens unless it is an institutional accreditor that
26   accredits single purpose programs. But that's not what we're
27   talking about. So, if you think about all of the healthcare
28   professions, those are all located within larger institutions
29   with institutional accreditation that serves as their Title IV

1   gatekeeper. So, are you saying, Greg, then, that if a program
2   is new that you and in a larger institution that has
3   institutional accreditation, that a program would not, that
4   students in that new program would not be able to receive
5   Title IV funding if they're not accredited by the programmatic
6   accreditor? Is that it? And if that's the case, then are you
7   somehow making programmatic accreditors into Title IV
8   gatekeepers?

9        MR. MARTIN: No, we're not making the programmatic
10  accreditor into a Title IV gatekeeper. And in an instance
11  where an institution is accredited, say, by a regional
12  accreditor, yes, I fully understand that that is the
13  accreditor and for Title IV gatekeeping purposes. Here, we're
14  saying that in each state where the institution must ensure
15  that each program that is programmatically accredited is
16  programmatically accredited, these are programs not
17  institutions as programmatically accredited if such
18  accreditation is required by the state so or a federal agency.
19  So, in this case, we're talking about where that program is
20  required to be accredited at a programmatic level so that it
21  actually so that it actually is accredited.

22       DR. KING: Okay. Right. But how would a new program
23  start then? Because basically what pre-accreditation does is
24  it protects the first class of students going through. How
25  would a new program start?

26       MR. MARTIN: Well, as I said, I don't I can't speak
27  to how it would start. It would not be, as the rule is
28  written, would preclude Title IV funding.

1          DR. KING: In an institutionally accredited in an
2     institution that is accredited?

3          MR. MARTIN: Because the program is required to be
4     accredited in this case, which is not which is not our
5     [interposing]

6          DR. KING: So, the institution-

7          MR. MARTIN: It's not our requirement. It's in most
8     cases, a state requirement that the program be accredited.

9          DR. KING: Okay. But here's what I'm saying, is that
10    pre-accreditation is recognized by licensing agencies and
11    states. So. So, it is accredited. So again, I feel like we're
12    not connecting on the words here. This is an important issue.

13         MR. MARTIN: I entirely get that it's important and I
14    understand your concerns, but I've tried to elucidate our
15    concerns as well about the fact that even though you know,
16    that, when you talk about the pre-accreditation status, it is
17    it is not actual accreditation. Otherwise, it would be
18    accredited at the outset.

19         DR. KING: No, it wouldn't, because it doesn't have,
20    programs have to start. They have to develop. And then they
21    have to recruit students and they have to have students going
22    through the program.

23         MR. MARTIN: I understand that. And we have a concern
24    about the students in that developmental portion before that
25    program is fully accredited. I will take it back for
26    discussion, but I don't think there's anything else I could

1    say about it now. Unless Steve wants to add anything to my

2    comments.

3              MR. FINLEY: Yeah. We'll take this back and come back

4    either with a clarifying response or you know, a restatement

5    of our position on this issue.

6              MR. ROBERTS: Okay. Thank you, Emmanual.

7              MR. GUILLORY: So, I wanted to share that I support

8    what Laura is saying. I understand what she's saying. And I

9    think it is also an issue that the Department should

10   definitely take a closer look at before, ideally before a

11   consensus vote is taken, because it's something that needs to

12   be addressed. But I wanted to talk about this particular

13   section, because we've heard from a number of our members

14   regarding their concerns around the language that the

15   Department has proposed here. And just with the language as

16   written, trying to follow a student where students are going

17   to go and making sure they're complying with state licensing

18   requirements in all 50 states obviously is nearly impossible

19   to do, especially when states are often changing their state

20   licensing requirements and institutions are having to make

21   sure their programs are still meeting those state licensing

22   requirements. But aside from that, there is an example of the

23   state of Louisiana, to be exact. And in this particular state,

24   as it relates to their nursing licensure program, it's very

25   vague text on what it means to actually meet the state

26   licensing requirements for this particular program. And they

27   use the words nursing, which programs meet or exceeds the

28   educational standards for nursing education programs in

29   Louisiana. And that's me not reading the entire thing, but

1   I've picked out just the sentence that's actually very
2   confusing. And when one particular institution reached out to
3   the state of Louisiana to ask clarification on the educational
4   standards that need to be met, the answer from the board was
5   that they review each application individually. And so it's
6   like, okay, so we will send in our application and you will
7   just review it and get back to us and let us know something at
8   some point in time, instead of you having it spelled out
9   exactly what the state licensing requirements are for this
10  particular program. So it could be that other states have
11  outlined licensing requirements for certain programs. It's
12  very clear to understand. It's like, okay, this makes sense.
13  We either meet that or we don't meet that, but not for every
14  single program as it's actually happened, which sometimes
15  leads institutions to then have to say, well, we can't
16  determine whether or not we meet those state licensing
17  requirements, because it's not clear we've reached out. We
18  haven't gotten a clear answer. We don't know when we will get
19  a clear answer. So, we are kind of left in the dark, which is
20  why currently in regulatory text there is that not to be
21  determined aspect, but I know the Department is proposing to
22  get rid of that. But even aside from that here with the
23  language that Barmak and Carolyn have proposed-

24          MR. WAGNER: Emmanual, 30 seconds.

25          MR. GUILLORY: -this language is much better than and
26  it addresses a lot of the issues that we have been hearing
27  from a number of our member institutions regarding this. So, I
28  will stop there.

29          MR. ROBERTS: Thank you, Emmanual. Jessica, please.

1          MS. RANUCCI: Thanks. I just want to speak on the
2     pre-accreditation issue. I'm no expert, but I think the real
3     consumer protection issue that I would be very concerned about
4     is if, in fact, under the circumstance where pre-accreditation
5     is not accepted by the state. Right? And so, I think we're
6     talking about two different universes, right? Where the
7     licensing authority, either state or federal, does accept pre-
8     accreditation for licensure or does not accept pre-
9     accreditation for licensure. And if we're in the camp where it
10    does not accept pre-accreditation for licensure, I think the
11    concerns that the Department has are very real. And I'm not
12    I'm not an expert. I don't know how to deal with it. But as I
13    understand, Laura is not talking about that group. I think
14    Laura is talking about the group where, in fact, pre-
15    accreditation is accepted by the state for licensure. And so,
16    these students will be eligible for licensure in the
17    occupation. And I think that that presents fewer consumer
18    protection concerns. And so, I guess I just thought maybe it
19    would be helpful to clarify those two groups. And maybe,
20    Laura, please correct me if I'm wrong, but I think in that
21    group, I think I would be curious to know, it just sounds like
22    the Department's concerns are not withstanding full
23    institutional accreditation, that somehow programmatic pre-
24    accreditation, even if accepted for state licensure, is
25    somehow insufficient. And I, that's fine, but it doesn't
26    really make sense here because this is attached to the state
27    licensure requirements. So, I don't really understand what the
28    point is.

29          MR. ROBERTS: Okay. Thank you. Barmak.

```
 1              MR. NASSIRIAN: Yeah. I was going to raise the same
 2    issue as Jessica just addressed. I certainly think to the
 3    extent that pre-accreditation does satisfy the licensure
 4    requirement, the Department should be quite comfortable
 5    accepting it. Because if you look at romanette two, the
 6    rationale for all of this now, it doesn't it's not clearly not
 7    applicable to romanette one, but the idea is so that a student
 8    who completes the program can actually get a job in the field.
 9    And if pre-accreditation satisfies that, I really don't see
10    any reason why the Department would want to exclude it. I also
11    want to address Emmanual's concerns. Those are very much the
12    same concerns that we had heard. And that was the purpose,
13    again, partially addressing Debbie's concern about why the
14    latitude. That was the motivation to ensure that where you
15    really couldn't get a clear answer from the State as to what
16    the requirements are a priori that you could still offer the
17    program because you had done your best and hopefully the State
18    would get its act together. But until then, the institution
19    would be in a no-win position trying to ascertain things that
20    the State refuses to disclose. By the way, we also lock [ph]
21    Emmanual mentioned the problem of chasing students across
22    state lines. Our proposal is really pegged to the initiation
23    of the program as long as the student remains continuously
24    enrolled, because that's the bulletin year that should
25    articulate the terms and conditions for grant granting the
26    degree so that just the fact of a student moving from one
27    state to another would not suddenly put the institution in the
28    position of having to secure an additional set of approvals.
29    Thank you.

30              MR. ROBERTS: Thank you. Marvin.
```

1          MR. SMITH: I just also want to go on record that

2     large four-year publics are expressing the same concerns. And

3     I want to thank Barmak and Carolyn for really negotiating with

4     a lot of different stakeholders and have put together, I

5     think, a proposal that I urge the Department to consider.

6          MR. ROBERTS: Thank you. Greg, do you want to move to

7     the next section? I don't see any new hands.

8          MR. MARTIN: Yeah, what I'd like to do is move on to

9     a discussion of romanette three as well. As it stands now and

10    then, if I may call for a break so I can take some of this

11    back to my colleagues at the Department. But I want to do 32

12    in its entirety. So, if there are any comments about, let's

13    yeah, Vanessa's pulling back that back up again so we're

14    talking about 32 romanette three and that, just to restate,

15    complies with all state consumer protection laws, including

16    both generally applicable state laws and those specific to

17    educational institutions, except where state requirements for

18    obtaining authorization are inapplicable pursuant to a state

19    authorization reciprocity agreement. So why don't we continue

20    the discussion there? Going back to what Barmak had asked that

21    we split those up, so I'll take romanette three now.

22         MR. ROBERTS: Comments for romanette three as the

23    Department's written it. Carolyn.

24         MS. FAST: I wanted to offer my strong support for

25    this addition language here. I think it's really important,

26    and it also addresses some of the concerns about how this

27    could affect states that are part of the reciprocity

28    agreement, which is, you know, obviously right now all states

1    except for California. And you know I think it's meant to
2    address this by saying that that that schools really need to
3    be following consumer protection laws wherever they're
4    operating. And the reciprocity agreement you know can preserve
5    its core function of permitting states to operate in multiple
6    states with only having to fill out one application and pay
7    one fee because of the language that the Department has
8    adopted in this provision. So, I think it's a really good
9    addition that will really help consumers in you know in each
10   state and also be good for states and to make sure that they
11   can protect students the way that they want to do.

12          MR. ROBERTS: Thank you. Barmak.

13          MR. NASSIRIAN: So I also would like to voice my
14   strong support for this language with a proviso, and that
15   proviso is that I am certainly aware of the somewhat alarmist
16   concerns that have really escalated over the course of the
17   past few days about this language and the suggestion that
18   somehow the inclusion of this provision will end distance
19   education or subject institutions to absolutely untenable
20   requirements, none of which sort of pans out when you consider
21   the fact that the state of California has opted out and the
22   sky has not fallen in California. I would say that the
23   disagreement that seems to divide some of the consumer
24   advocates from some of the institutional folks has to do with
25   the fact that the institutions, for completely understandable
26   reasons, I don't ascribe any moral failure here, it's mostly
27   an epistemological one. You see the world from your point of
28   view, and it makes perfect sense to me that institutions got
29   together and attempted to construct an arrangement for their

1    maximum convenience without fully grasping the impact of the
2    arrangement and the potential ways in which it could be abused
3    so that we now have a reciprocity arrangement which was
4    supposed to address authorization. It was never intended to
5    address consumer protection. It did not include consumer
6    protection experts. Most of the participants to this
7    arrangement would not have had authority within their own
8    states to argue for what they managed to do together
9    nationally. And that at this at the moment, the reciprocity
10   that dominates is really kind of a textbook example of
11   regulatory capture by the regulated entities. The entities
12   that are being regulated are telling not only the states, but
13   also the Federal Government whose wallet is on the table, how
14   it's going to be. Now, having said all this, we have made a
15   commitment to work with our colleagues on the other side of
16   this proposition to come to some agreement. But I do I do
17   believe that the Federal Government has a compelling interest
18   in making sure that the local cops are on the beat and that
19   they have jurisdiction to protect their residents. So, I want
20   to support this with the understanding that if by some miracle
21   we don't end up with consensus on this language, that we are
22   committed to working with folks who have legitimate concerns
23   to attempt to come back with a constructive alternative at the
24   comments and at the notice and comment period. Thank you.

25            MR. ROBERTS: Thank you, Barmak. I just want to note
26   Emmanual's returning to the table on behalf of private
27   nonprofits. And Jamie is back to the table on behalf of the
28   accrediting agencies. So, Jessica, please.

```
 1              MS. RANUCCI: Thanks. I really want to say I agree, I
 2    echo what other people have said. I strongly support this
 3    language is the kind of language that will go a long way
 4    towards putting me out of a job in a good way. It allows other
 5    people to do their job so people don't have to come to me
 6    later. I think that you know some of us at this table were at
 7    a different table back in 2019 when the world looked pretty
 8    different. And in similar language, I believe was I don't want
 9    to say noncontroversial, but relatively non-controversial. And
10    I believe got through, someone correct me, Greg, you were
11    there. So, correct me if I'm wrong, but the subcommittee and
12    the main committee on consensus, including from all sectors of
13    institutions and I guess I would just say that you know if we
14    look at how the world has changed since we were in person in
15    that room in 2019, I think the need for this is even more
16    critical. There's no question the distance that is here to say
17    that it's going to be a large portion of students, a large
18    portion of institutions. And I think it would be a real shame
19    to not have seat protections. I understand from the
20    institution perspective that there is tremendous value in the
21    Interstate Compact in the initial state authorization piece.
22    You know, that's obviously something I don't see in my
23    practice. It's pretty invisible to the students and legal aid.
24    But I heard from you that it's important and I think that this
25    language does a good job of balancing that concern with the
26    concern on the back end of making sure that people are treated
27    fairly. So, I just I appreciate the Department including it. I
28    want to speak in support.

29              MR. ROBERTS: Thank you, Jessica. Adam.
```

 1              MR. WELLE: Thank you. So, this seems to me like a
 2    very obvious quality control measure that simply just requires
 3    that institutions aren't violating state laws. From the
 4    perspective of AGs, I have to say it is not unusual. It is
 5    typical for a business that markets and sells its products
 6    online or across state lines to comply with the laws of the
 7    state where the consumer lives. That's where the transaction
 8    is taking place. That is the state in which that has the
 9    highest regulatory interest. So, you know the ability to
10    protect consumers, I would say, is, if anything, at its
11    height, when we're talking about one of the most important
12    decisions, a person, consumer decisions a person makes in
13    their life, and that the decision to make an investment in
14    higher education. So if a state believes that there's a
15    necessary consumer protection, for example, that schools have
16    to make certain disclosures or you know a topic that we've
17    talked about a lot, if the state decides it's an unfair debt
18    collection practices practice to withhold transcripts, you
19    know, it really shouldn't be controversial that the state be
20    able to protect its own consumers and enforce those laws. And
21    those are important policy questions that state legislatures
22    can consider and maybe states can decide to exempt those laws
23    when a school is operating under a reciprocity agreement.
24    That's actually what we have in Minnesota to a large degree.
25    And that states subject to the reciprocity agreements can be
26    exempt from those from those statutes. But that's the
27    prerogative of the state. And if they think that and it's
28    their prerogative if they think the consumers are adequately
29    protected under the reciprocity agreements, and you know there
30    are very significant concerns with a lack of consumer

1    protection for schools operating online. And those are
2    detailed in the letters that I circulated last night that come
3    from a bipartisan group of 25 state AGs, where we lay out the
4    concerns, we've had for several years now with a lack of
5    consumer protection for students who are subject to distance
6    learning. So, I think that without this provision, there's a
7    huge risk of impunity for schools that potentially engage in
8    fraud and abuse. And I think it makes complete sense for the
9    Department to make sure that this provision is in there to
10   ensure that programs are complying with state law. Thank you.

11        MR. ROBERTS: Thank you. Emmanual.

12        MR. GUILLORY: I wanted to share that I agree and
13   respect the comments of my colleagues regarding strong
14   consumer protections for students. I wanted to share kind of
15   what we've been hearing back from our member institutions in
16   our sector, which are who are all very, very concerned about
17   this language because it would pretty much upend the SARA
18   agreement that they are a part of. Reason being is the states
19   basically, often by legislative initiative, agreed to be a
20   part of NC-SARA and it's a, it's a choice the state makes to
21   be a part of that the institution then because the state' a
22   part of NC-SARA then if they want to offer this education
23   programs in other states, then they're able to do so without
24   having to meet 50 different state authorization requirements
25   in order to participate. Now, there are cases where in the
26   memo that was sent by my colleagues that it does create a two-
27   tiered approach where those states that are not a part of NC-
28   SARA, a state could have stronger consumer protections than
29   what's actually in NC-SARA, but I think what we're also not

1    talking about is that there are other states that have weaker
2    consumer protections that actually have to rise up to the
3    minimum standards of consumer protection standards within NC-
4    SARA too, as well. And from what I'm hearing, that's around 30
5    to 40 states or so that don't have the strongest consumer
6    protection laws that have stronger consumer protection laws
7    because of their participation within NC-SARA. So, I think the
8    conversation more would be about how could increase consumer
9    protections happen within the reciprocity agreement versus
10   upending the reciprocity agreement due to this. We and I am
11   articulating all of the many concerns that I'm hearing from
12   our members about this issue and so that seems to be the
13   biggest one. We definitely don't want to have a situation
14   where institutions that are a part of the that are a part of
15   NC-SARA, all of a sudden, there is no reciprocity if you
16   didn't have to comply with many different other state rules
17   and laws and regulations that why are you a part of the
18   reciprocity agreement? It just doesn't even exist really
19   anymore, so.

20              MR. ROBERTS: Thank you, Emmanual. Brad.

21              MR. ADAMS: I'm going to second what Emmanual just
22   said. I mean, there's no requirement for states to participate
23   into this reciprocity arrangement, and California is a perfect
24   example. They didn't think that, I'm assuming it's because
25   they didn't think the consumer protection laws were strong
26   enough so they've dropped out and you have to get separate
27   approval in that state. So, any of the states at this table
28   represented at this table could do the same thing. And so, I
29   really struggle with all the finger pointing about SARA's

1    consumer protection laws. I mean, there's no requirement for a
2    state to participate in SARA. It's a complete choice on their
3    behalf. And so, any state can drop out and do what California
4    did, if that's what they choose to do. I do think if that were
5    to happen, it'd be a problem for students. It would be less
6    opportunity for programs to be offered in their state because
7    of the onerous process to get approved in every single state.
8    But again, the Department of Education and states do not have
9    to join SARA. They can do whatever they choose to do. And SARA
10   is a good thing for students because it provides more
11   opportunities for programs to be offered in their states than
12   they would have if we did not have that arrangement. Thank
13   you.

14            MR. ROBERTS: Carolyn.

15            MS. FAST: I just wanted to respond that I think that
16   it's a little bit overblown to consider the language that's
17   been proposed to cause sort of the collapse of SARA. I mean, I
18   think that's a little bit of I don't know, not accurate
19   characterization of what this is doing, because the language
20   is specifically carving out those state laws that relate to
21   obtaining authorization. So, in other words, the application,
22   the licensing fee, those sort of state laws would be
23   preserved. And I think it's important to keep that in mind
24   when we're assessing whether this, you know what is the impact
25   of this of this provision.

26            MR. ROBERTS: Thank you, Carolyn. Debbie.

27            MS. COCHRANE: So, I also am very strongly supportive
28   of this provision. You know, just a minor, potentially minor,

1    clarifying point. California actually was never part of the
2    agreement. It has declined to join. You know, it's not because
3    there haven't been a lot of conversations about it within the
4    state. There's been very significant conversations. Perhaps
5    most notably, I would say there is a state regulatory agency
6    called the California Law Revision Commission that kind of
7    tried to take up the issue a couple of years ago to really
8    look, it's kind of a neutral entity providing guidance to the
9    legislature on where laws might need to change. They looked at
10   this issue for SARA and said, you know, should we look at
11   changing the laws in California to allow the state to join the
12   reciprocity agreement? They ultimately set it aside. But I
13   want to read just a very short excerpt of their paper on this,
14   which is, SARA sets a regulatory ceiling above which member
15   states cannot go. In other words, member states appear to cede
16   their regulatory control to an external policymaking body. So,
17   I think that that's kind of it just in terms of in a nutshell
18   of why California hasn't joined the agreement, I think that
19   that's a relevant argument to put forth. I also do think that,
20   you know, obviously there's a lot of people with a lot of
21   prerogatives in here. There are states who can join. I
22   appreciated Adam's example of how there are state consumer
23   protection laws and the legislature can leave them for certain
24   for certain institutions within the reciprocity agreement. But
25   similar again to the licensure point, it's also the
26   prerogative of the Federal Government to figure out where
27   federal taxpayer dollars should be spent and what types of
28   consumer protections should be available in there. I don't,
29   you know, I don't think anyone looked at the last language
30   with respect to hours associated with various licensure

1    programs, saying, now we're going to eliminate all licensure
2    programs. Right? We said, we looked at those and we said, I
3    think this would force an evolution in these programs at the
4    state level. And it's an evolution that we all understand why,
5    what the goal is there. And it's an evolution that the
6    Department wanted to use its position to try to try to move
7    forward. And I see this at the same thing. I don't see this as
8    I don't see this as undercutting a reciprocity agreement. I
9    see it as furthering the evolution of it in a more consumer
10   protection direction.

11          MR. ROBERTS: Thank you, Debbie. Adam.

12          MR. WELLE: Yes, just wanted to add to push back on
13   you know the I do think it's hyperbole to say that this would
14   upend NC-SARA. This would allow schools to obtain
15   authorization licensing through their portal entity and have
16   it recognized through a reciprocity arrangement. What we're
17   talking about here are substantive consumer protections in the
18   states, and that is what would apply and that is what
19   institutions would have to do. They would have to make sure
20   that they're complying with those substantive consumer
21   protections in those states. I just want to add, I think at
22   bottom, this is a problem of incentives. If only the
23   institutions, the home states as consumer protection laws
24   apply, which is how NC-SARA currently operates, schools will
25   inevitably flock to the states with the lowest level of
26   regulation and the lowest level of resources to be able to
27   enforce those laws and have the least amount of interest in
28   protecting consumers out of that state. If this provision is
29   in there, it's going to change those incentives. It will

1    incentivize NC-SARA to boost potentially their consumer
2    protections and maybe that will lead states to say, well, the
3    consumer protections in NC-SARA, are adequate and sufficient
4    and are protecting our consumers. So maybe we would exempt our
5    laws, those state specific education laws in our state if we
6    think those consumer protections are sufficient. So, I just
7    think this is very much necessary to preserve to change those
8    incentives and really preserve the integrity of these programs
9    ultimately, which is what this is about. Thanks.

10           MR. ROBERTS: Thanks. Greg. I see your hand up. Did
11   you want to weigh in?

12           MR. MARTIN: Yeah. I appreciate all the conversation
13   on this, certainly. I think we have hit all the relevant
14   points. And I want to say for the record, the Department's
15   position on this, we have considered this. We did have some
16   conversations about it last night and this morning. And what
17   it comes down to is our position here does not in any way
18   prejudice the merits of NC-SARA and what it's attempting to
19   do. And in looking at what is in romanette three, noting that
20   except where the state requirements for obtaining
21   authorization are inapplicable pursuant to state authorization
22   reciprocity. So, we're keeping intact everything dealing with
23   reciprocity with authorization. And we feel that that's a
24   very, very noble, noble pursuit there. What we're talking
25   about here mostly is the protection for students and that
26   these institutions who are involved in SARA as any as are any
27   institutions, any entity that provides basically a service to
28   consumers that needs to comply with the state consumer
29   protection laws, that's a basic protection for students who

```
 1    participate in these programs and who benefit from Title IV
 2    and who in many cases are taking out loans, obligating
 3    themselves to repayment for these programs, that we do not see
 4    that requiring an institution to adhere to applicable state
 5    consumer laws in any way prejudices SARA or makes a judgment
 6    on that or it's quite the opposite it's simply there to
 7    protect students and I just want to reiterate that's where we
 8    stand. I think if people still have some relevant comments
 9    where we haven't gone yet, I'm fine with that. We do need to
10    move on at a certain point because I'd like to get through the
11    paper. Thank you, all.

12           MR. ROBERTS: Any new discussion on this that Jamie
13    or Kelli you'd like to add?

14           MS. STUDLEY: I would, and I can be very brief. Go
15    ahead?

16           MR. ROBERTS: Go ahead.

17           MS. STUDLEY: Okay. I've spent more time thinking
18    about the ramifications of this particular issue than any
19    other provision and about the theory of change. Greg kind of
20    stole some of my points so I can collapse them. California
21    institutions, including both publics and small nonprofits,
22    eagerly seek the benefits of a strong reciprocity agreement.
23    This provision could help move reciprocity in the direction of
24    achieving its potential. And like Barmak and some others
25    who've mentioned it, I stand ready to participate in
26    discussions about constructive strategies that can get the
27    boat the best of the advantages of reciprocity while
```

1    satisfying these consumer protection requirements. So, I, I
2    support that position all around.

3          MR. ROBERTS: Thank you, Jamie. Kelli, would you like
4    to add anything?

5          MS. PERRY: Yeah, I'll be very brief because I'm
6    clearly not an expert in this and have learned a lot about it
7    in the last few days and talking with everyone that we've
8    talked to as far as our constituency. But the thing that I've
9    kind of come to after listening to all of this and listening
10   to what we heard was that you know there are a lot of states
11   out there that have consumer protection laws that would
12   benefit students tremendously. But as evidenced and I think
13   Adam's, I think it was Adam who submitted a letter where 25 of
14   the state AGs signed it, but there's 25 states that didn't.
15   And my understanding is that there's, you know, 25 plus states
16   out there whose consumer protection laws either don't exist or
17   are much less than what SARA has in place currently. So it
18   seems to me if we're trying to protect students, which is
19   obviously the ultimate goal here, that, you know, maybe the
20   course of action is to, you know, work with SARA in order to
21   come up with consumer protection that would apply to all
22   states so that students are being protected equally across all
23   states, as opposed to some being protected more because their
24   states have consumer protection laws where there's other
25   states out there that don't have them and those students are
26   not are not benefiting from this language.

27         MR. ROBERTS: Thank you, Kelli and the rest of the
28   committee. Greg, do you want to do want to move to the next
29   section?

```
 1                MR. MARTIN: Yes, I think we need to move on. I thank
 2    everybody for the very robust discussion and it was very
 3    informative. We are moving on to 33. Just make sure I'm where
 4    I want to be. Yes, I am where I want to be. So, let's see.
 5    Yes, so we are in 33 and at negotiators' urging, we have added
 6    a PPA requirement here that the institutions may not withhold
 7    transcripts if those holds were caused by the institution's
 8    error in Title IV HEA calculations. Please note we've also
 9    expanded the provisional conditions in E related transcript
10    withholding on the next page and I'll read that section. So,
11    the new 33 would read it will not withhold transcripts or take
12    any other negative action against the student related to a
13    balance owed by the student that resulted from an error in the
14    institution's administration of a Title IV HEA programs or any
15    fraud or misconduct by the institution or its personnel,
16    unless the error was a result of fraud on the part of the
17    institution. And I'll also read 34 and then I'll stop there
18    for comment. In 34, we have proposed a PPA condition that
19    addresses the problem in which institutions sometimes act to
20    foreclose the federal funds, aid to which students are
21    entitled to through various inducements, incentives, or
22    coercive tactics. We believe that it's critical that students
23    be able to access all of the aid they need, including to
24    ensure they're able to afford basic necessities like food and
25    housing. This language will allow the Department to ensure it
26    can do so. We have added an exception related to institutional
27    scholarships that at least make up for the difference in
28    student loans, which ensures that the college can be more
29    affordable for those students and leave them less indebted at
30    graduation. So I'll read 34. It will not maintain policies and
```

1   procedures or condition institutional aid or other student
2   benefits in a manner that induces the student to limit the
3   amount of Federal Student Aid, including Federal Loan funds
4   that the student receives, except that the institution may
5   provide a scholarship on the condition that a student forgo
6   borrowing if the amount of the scholarship provided is equal
7   to or greater than the amount of Federal Loan funds that the
8   student agrees not to borrow. So, with that, I'll open it up
9   the floor up. And what I would like to do is do it
10  sequentially. So, let's start with all comments related to 33
11  first, and then move on to 34.

12          MR. ROBERTS: And Johnson, I just want to note that
13  Johnson's at the table for legal aid and I'm going to ask the
14  committee, try to hold their speaking time to two questions
15  for the Department or concerns that they'd like to surface.
16  So, with that, Amanda.

17          MS. AMANDA MARTINEZ: Sorry. I was misunderstanding.
18  You only want us to ask questions?

19          MR. ROBERTS: Rather than using speaking time to
20  indicate support for the provision. If just in the interest of
21  moving to the document, if you've got questions or concerns
22  for the Department.

23          MS. AMANDA MARTINEZ: Okay. Sorry, I just, I thought
24  you said only questions. Well, for 33, I would like to express
25  my disappointment with the Department's attempt at trying to
26  address the concerns brought by negotiators on this committee.
27  And also, you were lucky to hear from students themselves. You
28  know, a lot of folks on this committee like to say that we're

 1    here for students. But I think the best advocates for students
 2    are when you actually hear their own words and their own
 3    stories. And we were able to hear actually we were privileged
 4    to hear students come forward in public comment very quickly
 5    to tell their story. For instance, on March 15th of this week,
 6    we heard from Kristy and she talked about how transcript
 7    withholding ultimately upended her higher education goals.
 8    She, I'll quote her and her words are better than mine. She
 9    says, "In consequence of this holding, I was unable to finish
10    my educational journey and was set back years of progress.
11    Transcript withholding ultimately delayed in my education, and
12    because of this withholding, I missed out on opportunities
13    that would have presented themselves to me if I had remained
14    on track towards her own personal goals." So, she was
15    derailed. She was unable, she still continues to try to
16    achieve that feat, which is admirable for her. But would've
17    ultimately been able to accomplish it if it wasn't for
18    institutions and the Federal Government not being able to
19    solve this problem for her, which they should have.
20    Institutions should work for students, not against them. And
21    specifically, the Federal Government should also play a part
22    as a separate, larger institution governing other
23    institutions. Also protect students' rights in this in this
24    context. So, we would while this is a great attempt, this is a
25    very specific and limiting scenario, it does not cover what
26    you actually hear from students' stories and personal
27    experiences with this issue. So, we recommend strongly
28    recommend that you take up actually banning withholdings and
29    not slowly attempt and try to make not necessarily a
30    meaningful change here. It's a large problem. So, with large

1    problems, you have to put forward good substantive policy
2    solutions. And this is not that.

3              MR. ROBERTS: Thank you, Amanda. Johnson.

4              MR. TYLER: Yeah. You know, I'm disappointed, but I'm
5    you know I'm not surprised, given the way the conversation is
6    going that we haven't really got anything meaningful here. But
7    I would say I think this is really actually counterproductive.
8    And, you know, I've been litigating with a large institution,
9    a public institution, over their failure to help my client get
10   aid and now they're suing him and administrations are not
11   likely to admit they made a mistake and then give you your
12   transcript. I think that's a useless and, you know,
13   farfetched, especially if, you know, you have to really know
14   your stuff to show where someone made a mistake. And I just
15   don't think that's going to happen. It's not realistic. I'm
16   very concerned that this is the first regulation that would be
17   out there where the Secretary's actually discussing about
18   transcript withholding. And it's essentially saying that the
19   practice you know is acceptable if it wasn't at the fault of
20   the school or the school has that that ability to do this. I'm
21   worried that that's going to discourage the efforts that are
22   going on in my state and in other states to ban transcript
23   withholding that they will somehow be perceived as preempting
24   this field. And you know, if we can't be heard on this I
25   would, I mean I would ask you know that there be some
26   rulemaking on this issue and that it not be addressed in 33,
27   that the language be scrapped. But if the Secretary is going
28   to go forward with it, that they have to say something about

1   this not preempting a state's right to ban the practice. Thank
2   you.

3           MR. ROBERTS: Thank you, Johnson. Ernest, you are
4   next.

5           MR. EZEUGO: Thank you. Yeah, I [inaudible] myself
6   with Amanda's and Johnson's comments here, you know I can
7   acknowledge that in many ways, 33 is, if anything, kind of a
8   tacit acknowledgment that the Department realizes that this is
9   a problem and can act on it. I have to say that the scope of
10  issues related to transcript withholdings covered by the
11  current language is itself de minimis. I just don't think and
12  I would echo again Johnson's concerns about the likelihood
13  that you know institutions kind of stumble over themselves to
14  report their own errors in this in this extent. But also, I
15  think it is clear both from the comments, the public comments
16  we received on this, I even have one to share from a student
17  who reached out to me directly that was waitlisted, that this
18  is just not, the text, what the text I think tries to address
19  in 33 is just not where the concern of the issue is,
20  especially related to students from low income backgrounds.
21  You know, Amanda is right that this is this is a policy
22  practice that has had disparate impact on [inaudible] low-
23  income backgrounds, on black and Latino students. And it
24  requires fixes that go far beyond the scope of what we're
25  seeing here. I don't even think if in just in full disclosure
26  and respect that what we see in 33 here necessarily even
27  covers comments that the Secretary and the CFPB have made on
28  their concern about this issue. I would really, really, really
29  like to see the Department go a little bit harder, to be

1    honest on this and the [inaudible] and I will I'll get back in
2    line. And I'm sure other folks have things to say about this,
3    but I just wanted to add to the course there as a student.

4              MR. ROBERTS: Thank you, Ernest. Adam.

5              MR. WELLE: Thanks. I won't repeat our position on
6    the transcript withholding issue that's been discussed in
7    previous sessions. I think, you know we think it's an
8    important consumer protection that should be in place. Just to
9    add to Johnson's comment, you know, as state AGs, we often
10   face arguments, you know often frivolous and incorrect
11   arguments that state laws are preempted. You know, I've faced
12   arguments that the Higher Education Act preempts certain state
13   consumer protections. I wouldn't want any institution to try
14   to claim that here as a way to you know avoid compliance with
15   a state requirement on a transcript withholding. So, you know
16   it might be helpful, just perhaps some sort of clarifying
17   language in the regulation and the preamble wherever, just
18   making it abundantly clear if it wasn't already that the
19   provision doesn't do anything to disrupt a state's efforts to
20   protect consumers and debt collection around transcript
21   withholding.

22             MR. ROBERTS: Thank you, Adam. Greg, would the
23   Department care to move to the next section?

24             MR. MARTIN: Yes, remember I did ask for a discussion
25   on 34 if there is one. If not, we'll move on, but I want to-

26             MR. FINLEY: Yeah, I would like to address something
27   on 33, Greg, before we move on, if there are no other comments
28   on it.

1              MR. MARTIN: Go ahead, Steve.

2              MR. FINLEY: So, there's a couple of issues here. I
3     mean, basically, the Department oversees the administration of
4     the Federal Student Aid programs, making sure that the
5     institution is meeting its obligations to determine,
6     administer, and properly return unearned Title IV funds on
7     behalf of the student. Separate from that is the student's
8     agreement with the institutions. And that agreement in many in
9     most cases determines the amount of funds the institution is
10    able to charge the students. And that's separate from the
11    Title IV requirements. What we're proposing here are actually
12    touching the areas where we think there is some connection
13    enough connection with the Title IV programs to change that
14    relationship in the contract with between the student and the
15    institutions. Specifically, you might not realize it, but in
16    33, the Department has seen a number of instances where
17    schools awarded too much aid to students through their own
18    improper calculations and determinations of aid and then when
19    they corrected that procedure later in return, the Federal
20    Student Aid funds back to the Department, they billed the
21    student for those amounts. And what we're doing here is to say
22    they can't at least take other actions against the student to
23    withhold a transcript or other negative actions when it's the
24    institution that's made those errors. And those are the cases
25    where the Department hears about this, right? This is brought
26    to Department staff attention sometimes by the students. And
27    in the past, we've had to say you know we don't regulate the
28    charges the institution is able to assess you when they've had
29    to return Federal Student Aid funds, even if they were the
30    ones that improperly overestimated the amount you were

1   entitled to receive. So, this is an area where we're trying to
2   put a little more balance back in favor of the students
3   because there is a Title IV connection. And I would say the
4   same goes for where the Department is determining there's some
5   risk of closure by the institution. Right? There's and so
6   that's why you see what you see here. And I understand and we
7   understand it doesn't go as far as you want it to, but we are
8   concerned that we need a Title IV connection to try to
9   regulate in this area and the proposals in front of you try to
10  strike that balance.

11          MR. ROBERTS: Thank you, Steve. Johnson.

12          MR. TYLER: No, I appreciate that. I see there's a
13  disconnect between the reality of the students and the
14  obligation of the Department of Education to protect
15  taxpayers. I completely get that. But I think it's all the
16  more reason we actually need a meaningful negotiated
17  rulemaking on this issue. Six million people, some studies
18  say, are affected by this. And, you know, my experience in the
19  statistics are that there are low income people, and many of
20  them involve Pell recipients who no fault of their own, they
21  cannot continue, they drop out at the wrong time. If they
22  dropped out 60 days into the semester, they wouldn't have this
23  problem. I think that's the number. But they drop out three
24  weeks in and then they're on the hook for lots of money. I
25  just think this is not what this is not what the Pell Grant
26  was designed to do. It was supposed to open doors, not close
27  doors, and it's having that effect. So, I really, you know I
28  hear what you're saying, Steve, but I think it's all the more
29  reason we have to have some discussion to figure this out. And

1   you know I understand that it wasn't on the agenda and you're
2   only hearing the harm it's causing and the racial impact that
3   it's having. But I think you know there's some way we've got
4   to get together on this. So, thank you.

5         MR. ROBERTS: Okay, Adam.

6         MR. WELLE: Thanks. Just quickly to, just to respond
7   to Steve. I guess, you know, Counsel, I think I just disagree
8   on the on the basis for saying that there's no authority to
9   make this kind of regulation. It seems that the Department has
10  a direct interest in making sure that when it is distributing
11  financial aid and it invests in a student, it should be able
12  to tell the institution that receives that aid that it has to
13  provide proof of that you know that education that was
14  invested in to employers, other schools, etc. If the student
15  can't obtain the transcript, the investment that the
16  Department has made in the student for that past financial aid
17  is lost. It's meaningless. So, I feel there is a direct
18  connection and I think there's, so I think there's plenty of
19  basis for the Department to act here. But I respect that
20  that's the Department's position right now.

21        MR. ROBERTS: Barmak.

22        MR. NASSIRIAN: I want to emphasize that I appreciate
23  the technical nexus that the Department is seeking to apply
24  whatever protections it offers. But I have to tell you, to the
25  extent that the vast majority of unpaid receivables are from
26  low-income people who, as Johnson pointed out, could never
27  have afforded to pay a dime on the front end, were fully
28  packaged because they're so poor that they would not have an

1    expected family contribution. We expose those people to the
2    risk to risks, which, by the way, they're much, much at much
3    greater exposure to. Because when you're poor, there are many
4    different ways in which your education could get disrupted.
5    Right? You could get sick, your mom could get sick, your car
6    breaks down, etc., etc. So, so we're exposing those, we're
7    essentially checkmating those aid recipients who because they
8    were so poor that there were zero [inaudible] fully packaged,
9    who then drop out for various reasons to essentially a
10   complete cessation of any opportunity until they can offer
11   blood from a turnip. I think there is a Federal interest here
12   to the extent that the purpose of these programs is to elevate
13   folks to enable economic mobility. At the very least, even if
14   you don't want to ban transcript withholding across the board
15   it ought to be prohibited for Pell recipients who for whom the
16   balance is a function of having dropped out. Because,
17   remember, some of us are old enough to remember the refund
18   rule in HEA, which was then replaced with Return of Title IV
19   Fund. That bifurcation, when the Federal Government decided it
20   was only going to manage its own refunds and not worry about
21   students, that's at the root of this problem. And I think that
22   the Department of Education has every legal right to assert
23   some jurisdiction with regard to at least that population.
24   Because talk about disparate impact, talk about racial justice
25   and really unequal application of risk. That is the population
26   these programs were designed to help and that is the
27   population that is getting very disproportionately hurt by
28   transcript withholding. We do not want to mitigate the right
29   of institutions to collect. The Department is saying don't
30   collect any debt, don't use the easy way out and hold

1    somebody's education hostage in perpetuity until they can
2    cough up money they simply don't have. If their aid
3    recipients, the Department has jurisdiction.

4            MR. ROBERTS: Thank you, Barmak. I see Ernest and
5    Debbie's hand, hands. And I think we'll take those two
6    comments and then Greg, does Department need a short break?

7            MR. MARTIN: Yes, after that I would, I do want to,
8    but let's take the two comments we have in the in the queue
9    and then I want to, and any that pertain to 34.

10           MR. ROBERTS: Okay. Okay. So, Ernest and Debbie,
11   please.

12           MR. EZEUGO: I can't emphasize or appreciate Adam's
13   or Barmak's comments enough here on this [inaudible] and I
14   want to touch in particular about something that Adam was
15   alluding to here about kind of the Department's consideration
16   of past investments nullified and these agreements, right? And
17   I want to preface by saying, you know, maybe I shouldn't have
18   used de minimis. I can own that. I appreciate and respect, and
19   Steve, I appreciate your kind of clarification on where the
20   Department's thoughts on this are. I appreciate that there's
21   thought in this and again, that kind of tacit acknowledgment.
22   But I do wonder if the Department doesn't have the authority
23   to think about, consider in this process and in this paper in
24   particular, what happens to their investment in students
25   because, I mean, you know, say what facts are about
26   transcripts. Most students who have issues with transcripts
27   withholding, their balances are held usually on account of a
28   semester's work [ph], occurrence or class [ph] who knows what

```
 1   kind of recent charges and their entire transcripts are 100
 2   percent of their transcripts are held as a result of that. So
 3   I would then wonder, you know, in combination with the
 4   comments that Barmak made just about the Department's broad
 5   authority and quite frankly, historical you know perspective
 6   on standing up for students, particularly from for these
 7   subgroups, I would wonder then if that doesn't also come into
 8   play, this idea that, you know, it would be one thing entirely
 9   if we were talking about partial you know locking, you know
10   locking behind transcripts or partial you know parts of the
11   transcripts under debts owed. But it's I don't know; I'm
12   struck by that. And I really I have a hard time accepting that
13   you know under these circumstances you know where students you
14   know can't get these transcripts or, in the worst case, the
15   worst instances, you know their entire degrees and proof that
16   they completed college because of balances held and can't use
17   those transcripts to go and transfer out to other institutions
18   to continue their education or apply for jobs in many cases. I
19   just kind of wondered then if there's not additional steps the
20   Department can take on this. And in this part, in this section
21   subsection, I'm sorry, in particular.

22        MR. ROBERTS: Debbie, and then we'll move on to
23   section 34.

24        MS. COCHRANE: Thank you. I will be very brief. I
25   think if I am understanding the Department's comments related
26   to authority, it would seem to me like another way of
27   approaching the issue would be to prohibit the withholding of
28   transcripts for any student who had previously received Title
29   IV regardless of what the debt was attributable to. Those seem
```

1    like those are the students that the Department has invested
2    in and where the Department should be most concerned about
3    that investment paying off.

4              MR. MARTIN: Thank you.

5              MR. ROBERTS: Anything new for the Department's
6    consideration on section 34? I know we had, yeah, Will,
7    please.

8              MR. DURDEN: I want to just clarify in reading in
9    this section that it's not the Department's intent to suggest
10   that if an institution isn't participating in the loan
11   program, that that itself constitutes a policy that induces
12   the student to limit the amount of student aid that they
13   receive. It doesn't seem like that would be the intent, but
14   you could read that in that language.

15             MR. MARTIN: No, that's not the intent. As I say, we
16   just want to be certain that there is the student that the
17   institution not doing anything that will has any policies to
18   limit the amount of Federal Student Aid, including Federal
19   Loan Funds the student receives. And that includes practices
20   such as limiting the amount of student can borrow, even if the
21   reasons for that are in the view of the institution
22   altruistic, such as controlling the amount of debt students
23   receive, trying to have some type of a default management
24   plan. Loan amounts under a Direct Loan program or statutory
25   entitlement. So, any of those things where we've seen
26   instances where institutions will make students fill out forms
27   as to why they need that money, the only reason why they need
28   it is cost of attendance, minus EFC, minus EFA provides a

1   number, and that is where you figure out where students are
2   eligible for. So, we are just want to preclude all those all
3   those types of all those types of practice and any anything
4   else that would any other way a school might be inducing a
5   student or coercing or any way not to take aid. Now, there's
6   nothing wrong with an institution counseling a student saying,
7   you know, you don't you don't have to borrow the full amount
8   that you're eligible for. It may be wise or judicious to
9   borrow less if you don't need to borrow more. We have no
10  problem with that. But these are policies or other types of
11  conditions on a student receiving aid that he or she is
12  eligible for.

13          MR. DURDEN: Great. And that makes sense. And we
14  assume that that's the intent. But just wouldn't want any
15  suggestion that an institution somehow must participate in the
16  Federal Student Loan Program.

17          MR. MARTIN: No. No, we don't require participation
18  in the student loan program, no.

19          MR. ROBERTS: Thank you. Brad.

20          MR. ADAMS: Yeah, Greg, I think that mostly answered
21  my question. I was more confused. I thought this was already a
22  rule. So help me, is this just codifying something that
23  already exists? I've always known that you can't limit a
24  student's ability to take the Federal Aid that they're
25  eligible for. And if you have your own loan program that may
26  have a lower interest rate than the Feds, that's okay to
27  present to the student as well. Like get a 0 percent loan,

 1    maybe help me understand why we need 34 as a rule is if that's
 2    already in place somewhere else.

 3           MR. MARTIN: Well, it's I you're absolutely right,
 4    Brad. It is in place in various other measures. And certainly
 5    it's implicit in the law itself. We just felt the need to make
 6    it clear here that, you know actually put it in a regulation
 7    so that we can cite to it. In my mindit's always gone without
 8    saying that you cannot limit the amount of loans a student
 9    might receive in an arbitrary way. But there are schools that
10    do it, and I think a lot of them do it for purposes which they
11    believe to be quite noble. I don't in a lot of cases it isn't
12    done with any type of malice or anything like that. But it's
13    not an acceptable practice. I'm not aware, it's pretty, as far
14    as grants go, it's awfully hard to limit. I mean, the Pell
15    Grant is what the Pell Grant is. We do allow students to turn
16    down his or her Pell Grant due to lifetime eligibility limits
17    if they want to. But I don't think that's so much of an issue.
18    It mostly comes into play, I think with loans. But I don't
19    disagree with you, Brad. I just think that it was necessary
20    here to state this in an actual in an actual regulation.

21           MR. ROBERTS: Okay, thank you. I was unaware that
22    that was even an issue. So, I guess if you need to state it,
23    you can. I was just making sure there wasn't anything else I'm
24    missing around- [interposing]

25           MR. MARTIN: No, I don't think it's-

26           MR. ADAMS: -anything like that.

27           MR. MARTIN: I would say this if institutions are
28    packaging, if institutions are awarding aid in accordance with

1    existing rules and this shouldn't cause any change in what
2    institutions are doing currently.

3         MR. ROBERTS: Okay, Marvin. I just want to note that
4    Jessica is back in for legal aid. But Marvin, take it away.

5         MR. SMITH: Greg, just an observation that, you know,
6    in the GE session we were talking about Parent Loan debt and
7    maybe some bad actors encouraging Parent Loans. And I just
8    didn't know if you wanted to be even more specific on this
9    with parent borrowing. I actually, yeah, so just a question or
10   suggestion.

11        MR. MARTIN: Yeah. You know, that's a good question.
12   And I think when it comes to Parent Loans, it's kind of a
13   great thing because everybody knows that there are plenty of
14   situations where a student would be eligible for, loans, but
15   the parent steps in and says, you know, I want to I want to
16   borrow I'll borrow that amount of money. That's perfectly
17   acceptable. Where the boundary is between that and a school, I
18   think coercion is the strong word. But inducing in some way or
19   heavily suggesting that the burden be leveled on the parents
20   as opposed to the student loan. That is potentially a problem.
21   But I think it's difficult to determine where that occurs. I
22   know that you know in my own situation, you know my own
23   daughter was packaged for unsubsidized loans, which we chose
24   not to borrow because I rightly or wrongly am paying for it.
25   But I think a lot of us are probably in that situation. But
26   I've just decided that I didn't want her to have any debt for
27   undergraduate loans, but undergraduate education. But yeah, I
28   take your point, Marvin. I think it's an interesting one, but
29   I don't I'm not sure it can be addressed in the context of

```
 1    this. This is more like there is that issue of shifting
 2    responsibility. But here I think we're dealing with cutting
 3    off or in a way precluding a student from borrowing. And that
 4    would be, if a school said the student shouldn't borrow this,
 5    a parent must borrow it because, you know, we're worried about
 6    our default rates that would be covered by this because the
 7    student the school would be in some way coercing or inducing a
 8    student not to borrow his or her full eligibility.

 9              MR. ROBERTS: Greg, would you like to take us to the
10    next section?

11              MR. MARTIN: Can I request a break, please?

12              MR. ROBERTS: Sure. What are you thinking?

13              MR. MARTIN: 15 minutes.

14              MR. ROBERTS: 15?

15              MR. MARTIN: Yes, 15 minutes.

16              MR. ROBERTS: It is 2:40. I'll ask folks to be back
17    on at 2:55.

18              MR. MARTIN: Thank you, everyone.

19              MR. ROBERTS: Welcome back, everyone. We are about 35
20    minutes away from public comments day and indeed our last
21    public comment of this negotiated rulemaking as we will not be
22    having it tomorrow. So, we do urge folks who do have an
23    assigned speaking time to please log on a little bit early
24    just so we can get you all set up and make sure we can
25    transition to that period smoothly. But with that, Greg, I'll
```

1    turn it back over to you. Do you want to walk us through the
2    next section?

3             MR. MARTIN: I'm going to do that. Before we start
4    with that, though, I'm going to have Vanessa bring up 32 back
5    onto the screen for a brief moment here. And here we have some
6    changes we made. We did, I did take back all of the suggested
7    changes for 32. What you see in front of you here is the only
8    change that is the change that we were able to get approval to
9    put in. We, regarding the suggested changes to romanettes one,
10   two and three that were not associated with programmatic
11   accreditation, the Department has some concerns about the
12   potential for abuse given the case-by-case exception, so we
13   were unable to move there. I will discuss what we did here in
14   32, and you can see that we have made some change to the text
15   in consideration of the discussion we had about programmatic
16   accreditation. So just going back and reviewing each state
17   where the institution is located in which students enrolled by
18   the institution are located, the institution must ensure each
19   program is eligible for Title IV HEA program funds, is
20   programmatically accredited if such accreditation is required
21   by the state or a federal agency, except that programmatic
22   pre-accreditation is sufficient if acceptable according to the
23   state or federal agency. So that was the change that we were
24   able to make in in 32. Vanessa, would you bring up E, please?
25   So, we're going back to 14E. We are on page eight at the very
26   top. The original document. Here we go. Thank you very much.
27   So, in E we're just starting from the stem [ph] there. If an
28   institution is provisionally certified and if an institution
29   is provisionally certified, the Secretary may apply such
30   conditions as are determined to be appropriate to the

 1  institution including. And if we move down to two, at the
 2  negotiators' urging we have added an additional cases in which
 3  transcript withholding may be prohibited. So, we are just
 4  incorporating that language and that's if the institution is
 5  at risk of closure, if the institution is teaching out its
 6  students, whether itself or through a teach out or transfer
 7  agreement with another institution, if the institution is not
 8  financially responsible or if the institution is not
 9  administratively capable. We believe that this will have a
10  real, meaningful impact on students' access to their
11  educational records and cover a wider swath. Again, I don't
12  want to reopen debate. I think we've already explored all of
13  the of the relevant opinion on that topic of transcripts. So,
14  I don't want to open that up. And then I'll move on to, I want
15  to make sure I get this right here. So, we are in E. I'm
16  sorry, we're moving to F. And just to read the stem there for
17  proprietary institution. If a proprietary institution seeks to
18  convert to nonprofit status following a change in ownership,
19  the following conditions will apply to the institution
20  following the change in ownership in addition to any other
21  conditions that the Secretary may deem appropriate. And we
22  have, no, I thought there was a change there, but there is
23  not. I'm sorry. I was wrong. We have there's no change there.
24  The next change I see is to G. So, let's roll down to G,
25  Vanessa. My apologies for squandering your time there. There
26  were no changes. I thought there were, but there are none. So,
27  G, we do have a change. This is if an institution that's
28  initially certified as a nonprofit institution or has
29  undergone a change of ownership and seeks to convert to
30  nonprofit status, the following conditions will apply to the

1    institution upon certification or following the change of
2    ownership in addition to any other conditions that the
3    Secretary may deem appropriate. And we've added some
4    clarifying edits here to this language, including that
5    institutions must submit reports on state accreditor actions
6    and new servicing agreements, both within ten days of
7    receiving the notice of an action or of entering into entering
8    into an agreement. And that is reflected there in G1. The
9    institution that the institution must submit reports to an
10   accreditor and state authorization agency, must submit
11   reports, rather, on accreditor and state authorization agency
12   actions and any new servicing agreements within ten business
13   days of receipt of the notice of an action or of entering into
14   the agreement as applicable until the Department has accepted,
15   reviewed, and approved the institution's financial statements
16   and compliance audits that cover two consecutive fiscal years
17   following the initial certification, or two complete fiscal
18   years after a change of ownership, or until the Department
19   approves the institution's request to convert to nonprofit
20   status, whichever is later. And let's makes certain that, and
21   then we have a change in, nope that is everything that we have
22   for E. So, sorry, everything we have for F. So, I'll open the
23   floor to any comments on what is in what is in F.

24           MR. ROBERTS: New comments and suggestions for the
25   Department on what was just outlined. Yael, who I will note
26   who is sitting in on behalf of state attorneys general,
27   please.

28           MR. MARTIN: I'm sorry. I meant E and F, I'm going to
29   correct myself.

1          MR. ROBERTS: Right, right. E, section E beginning
2    subsection two and below, inclusive of that.

3          MS. SHAVIT: Thanks. And Greg, I took your comment
4    about wanting to move on from transcripts. I do have one
5    comment that I think isn't wasn't covered before and I don't
6    think will invite responses but I wanted to just put it on the
7    record, if that's okay with you, and that I hope would be
8    helpful.

9          MR. MARTIN: Go ahead.

10         MS. SHAVIT: You noted, or Steve noted, the view that
11   the Department may lack the authority to place conditions on
12   the debt collection methods of institutions. And I want to
13   note, you know I think this may be inconsistent with positions
14   the Department has taken in the past. And just as support for
15   the notion that the Department does have this type of
16   authority, I wanted to you know point in the direction of the
17   Department's arguments in its summary judgment briefing and
18   the CAPS [ph] litigation that were that prevailed, but I think
19   are relevant. There, the Department argued, you know, and I'm
20   quoting here, but I'll do this very briefly, you know, the
21   Department stated, "Congress has granted the Department
22   authority to include in its PPAs with institutions such
23   provisions as the Secretary determines are necessary to
24   protect the interest of the United States and to promote the
25   purposes of the Direct Loan program." And in that context,
26   I've made a point of noting that you know Congress can
27   delegate to the executive branch agencies the authority to
28   attach conditions on funding. And while there's a nexus that
29   needs to be met with respect to those conditions in the Title

1    IV program, the relatedness showing that's relevant there is
2    not only this is the Department's language, it's not a
3    difficult hurdle. And in fact, it requires only some
4    relationship between spending conditions and the purpose of
5    the Federal spending. You know, Debbie made the comment here
6    that the Department could put conditions on transcript
7    withholding specifically as to those students who did take out
8    any Federal funds. I think that would more than satisfy the
9    nexus requirement, as the Department has itself previously
10   stated it, and I think you know would certainly go a long way
11   and as the Department noted, protecting the interests of the
12   United States and promoting the purposes of the Direct Loan
13   program. I think in fact it would promote the interest of
14   taxpayers and students. So, I appreciate that you're being
15   thoughtful about this. And I just want to point you in the
16   direction of those previous comments.

17           MR. MARTIN: Thank you.

18           MR. ROBERTS: Kelli.

19           MS. PERRY: I just have a clarifying question about
20   the, and I apologize, it's the one with the transcript
21   question, but it says that an institution not financially
22   responsible. I just want to make sure that, so if an
23   institution falls into a situation where they fail a composite
24   score, but they do post the 50 percent letter of credit which
25   deems them financially responsible, that they wouldn't be
26   subject to this. I think that's the case. But I just wanted to
27   confirm.

28           MR. MARTIN: Steve, do you want to address that?

1            MR. FINLEY: I would agree with that, Kelli.

2            MR. MARTIN: I would as well.

3            MS. PERRY: Thanks.

4            MR. ROBERTS: Thank you. Brad, I see your hand.

5            MR. ADAMS: Thank you. I also had a question on E2 on

6    the risk of closure. And I wanted to find out if this is

7    referencing the six-digit CIP or would this also include any

8    branch campus that was being taught out at the eight-digit

9    OPEID? I think I said CIP, but I meant OPEID if I did. I just,

10   curious, is this at an institutional level, is this also

11   include any teaching out at a branch location, Greg?

12           MR. MARTIN: We've not, I would interpret, I'll ask

13   Steve to step in here if, I would look at this as being any

14   entity that would be subject that would be at risk of closure,

15   whether it's the main institution itself or any additional

16   location. Because the key the key here would be if the student

17   is attending an additional location of an institution that's

18   at risk of closure for any reason that that it that it gives

19   those transcripts to the students there.

20           MR. ADAMS: I'm more referencing- [interposing]

21           MR. MARTIN: Irrespective if the main is, I'm saying

22   if the main would remain open but that additional location

23   would be closing that it would be applicable to that location.

24           MR. ADAMS: So, you believe if you're teaching out at

25   a branch location that you would do you would release all

26   student holds. And this is clarifying for me, I'm, you know,

1   not that I'm saying I agree or disagree on the approach. I
2   read it at the institutional level, is why I'm asking.

3           MR. MARTIN: Go ahead, Steve.

4           MR. FINLEY: Yeah, Brad. Now, I think we would look
5   at that on a location-by-location basis. Would that be your
6   suggestion?

7           MR. ADAMS: Yeah. Well, my question is, is truly
8   like, I read this, this is an institutional rule. But if
9   you're teaching out a location for good reason, do you have to
10  then release all transcript holds from that teach out even if
11  the school itself is financially capable and administratively
12  capable and all the other things associated with what we've
13  been discussing over the past week?

14          MR. MARTIN: If that location is at risk of closing,
15  I think what this is about getting the transcripts to students
16  wherever they are. So, if the question is being phrased, I
17  hope I get it right. We've determined the additional locations
18  at risk of closure for any reason then we would expect the
19  transcripts to be released at that level, even if the main
20  institution was not in danger of closing.

21          MR. FINLEY: Yeah, let me just ask another question.
22  I certainly think it would facially apply if there's a
23  precipitous closure. Right? Even with a teach out, because
24  there's certainly an opportunity for students to apply for
25  closed school loan discharges. Are you trying to describe
26  situations where there's just a planned closure that's
27  provided for you know well in advance and it's an orderly
28  closure? We'd have to look at that. But-

1              MR. ADAMS: That's my question.

2              MR. FINLEY: -that seems different from what we're
3      trying to reach here.

4              MR. ADAMS: Right, and that's my question. And it's
5      not, I mean, the transcripts would be available to those
6      students if needed, you know, so, at the main campus. So yeah,
7      that was my question, Steve. Good orderly closure, is that
8      implicated here on the release of student transcripts?

9              MR. FINLEY: And if you've got students doing a teach
10     out and transferring, it seems like you would, there would
11     have, you would have to be providing the transcripts for those
12     students, right, without limitation?

13             MR. ADAMS: Yeah. So, I'm just really asking is do
14     you have to release the holds on the student transcripts if
15     you go through an orderly teach out and the main is still in
16     operation and good financial condition and everything else.

17             MR. FINLEY: Well, we'll take that back and clarify
18     it for you.

19             MR. ADAMS: Thank you.

20             MR. FINLEY: And for ourselves.

21             MR. ADAMS: Thank you.

22             MR. ROBERTS: Thank you. Jessica, I see your hand.

23             MS. RANUCCI: Brad, my read on this is that it's just
24     preserved as discretion for provisionally certified
25     institutions to imply that condition, which I think is

1   appropriate, because I think it really would depend on the
2   circumstances of the programmatic teach out. And so, to me
3   that makes sense. Maybe I'm misreading it.

4           MR. ADAMS: That's helpful. I actually missed that
5   this is only for provisionally certified institutions. I did
6   miss that. Thank you, Jessica.

7           MR. ROBERTS: Okay. Thank you. Greg, I think I'm not
8   seeing any other hands. Do you want to walk us through the
9   last section, which I believe is 668.43?

10          MR. MARTIN: Yes. We're going to move on to 43. And
11  this is institutional and programmatic information. And if I
12  can just make certain here. Wehave a change here in A5,
13  romanette five. It's the only one we have. We've just revised
14  the language here to hopefully clarify the intent of the
15  disclosure required here under 668.43. So, in 5, if an
16  educational program is designed to meet educational
17  requirements for a specific professional license or
18  certification that is required for employment in an occupation
19  or is advertised as meeting such requirements, a list of all
20  states where the institution offers the program and where the
21  program does and does not meet such requirements. That is the
22  only, that is the only change that we have in 668.43, so.

23          MR. ROBERTS: Vanessa, if you wouldn't mind bringing
24  down the document. Thank you, Jamie, I see your hand first.

25          MS. STUDLEY: Is the institution able to have
26  essentially a third category, that it has made no
27  determination or it makes no claim that it does need, but it
28  hasn't checked. Is that an option for-? [interposing]

1          MR. MARTIN: Not in this rule. The school, the
2    institution, would have to make a determination in all states
3    where the institution offers the program.

4          MS. STUDLEY: So, it's limited to states where they
5    offer the program-

6          MR. MARTIN: Right.

7          MS. STUDLEY: -and then they have to make one or the
8    other of those determinations?

9          MR. MARTIN: Correct.

10         MS. STUDLEY: If there's a state where they say this,
11   this is not being offered in X and we don't know whether it
12   would meet those.

13         MR. MARTIN: Right if it's not being, if it's not
14   being offered in that state, then it would not be required.

15         MS. STUDLEY: Okay.

16         MR. ROBERTS: Greg, I'm not seeing any hands up for
17   this. Oh, Will, sorry, I spoke too soon.

18         MR. DURDEN: Sorry. I just want to clarify, make
19   sure, it seems like this romanette five at the end here, if
20   32, if paragraph 32 romanette two goes through, isn't this
21   superfluous? Or am I missing something in that?

22         MR. MARTIN: You know, it's funny you should ask
23   that. That was going through my head, sort of. I was thinking
24   about whether that does make this superfluous, if the
25   institution is required to meet the licensure requirements in

1    the state in which they're offering the program, would this be

2    would this be superfluous or redundant? I think it's an

3    excellent question. I can take, Steve, do you have any

4    thoughts on that?

5            MR. FINLEY: Not off the top of my head, sorry.

6            MR. MARTIN: I don't really either, so I think I

7    think that's an excellent point. I don't think it-

8            MS. FAST: Would it be okay for me to respond?

9            MR. MARTIN: Go ahead. Sure.

10           MS. FAST: I was thinking that the reason that that

11   was left in was to address the issue that sometimes students

12   are living somewhere but plan to move somewhere else and we

13   don't need to, this wouldn't create an additional burden on a

14   school because the school would already have to have done the

15   work to figure out whether they meet requirements each state.

16   But this would just make sure that students could find out if

17   they were planning to move where whether they could, you know

18   whether this, you know, I'm in Connecticut, I'm planning to

19   move to New York, whether the program would meet the

20   requirements.

21           MR. MARTIN: You know what? Thank you, Carolyn.

22   That's an excellent point, because I think if you're looking

23   at it from a, I think we have to look at it from not a program

24   eligibility standpoint, but from a strictly consumer

25   information standpoint because this is in 43. So, it's

26   [inaudible] programmatic information just announcing to, you

27   know, or disclosing which states it meets the requirements and

1   which states that does not. Of course, it wouldn't be able to

2   offer the program where it does not. But since it would be

3   known already, it would not list additional burden. So, that's

4   an excellent point. So, I think that does address it. Thank

5   you very much.

6        MR. ROBERTS: I do see Dave, our esteemed advisor, do

7   you want to add anything?

8        MR. MARTIN: Go ahead, Dave.

9        MR. MCCLINTOCK: I just have a question; I don't know

10  if I'm being dense. I feel like when I read this wording, it's

11  different than the response that Jamie got to her question. It

12  says, if you offer any program designed to meet educational

13  requirements. So I'm a school in central PA offering programs

14  to a geographic area and I'm representing that you are meeting

15  licensing that I am meeting number one, then I have to provide

16  a list of all states where the institution offers the program,

17  it seems like it needs to designate that you're providing the

18  program in those other states because that school would have a

19  difficult time knowing what the requirements are in all 50

20  states. They're not operating in that capacity.

21       MR. MARTIN: You're referencing 43 again, Dave?

22       MR. MCCLINTOCK: Yeah.

23       MR. MARTIN: So, yeah. So if an educational program

24  is designed to meet the educational requirements for a

25  specific professional license or certification that is

26  required for employment in an occupation or is advertised as

27  meeting such requirements, a list of all states where the

1    institution offers so it's only the list of states clarifies

2    that there where the institution offers the program and where

3    the program does and does not meet such requirements. So, it's

4    only of those states where it offers a program. But again, it

5    seems that if the school is offering the program in those

6    states-

7              MR. MCCLINTOCK: Maybe adding the wording-

8              MR. MARTIN: -it would have to meet the requirement.

9    But-

10             MR. MCCLINTOCK: If you add wording about in those

11   states or something at the end, as far as what needs to be

12   listed, I think that would clarify some of that.

13             MR. MARTIN: Right. I think that's maybe the language

14   there could use a little bit of, I mean, the intention

15   obviously is as a disclosure to it, to disclose all these you

16   know all these areas. But I do think that if you're listing

17   the states where the, so the school offers the program, it

18   cannot offer the program to students, Title IV for those

19   programs unless it meets those requirements in the state. So,

20   it's only where they offer the programs. And it would then

21   necessarily, I'm not sure that they would be, where it does

22   not meet the requirements, it seems to me it wouldn't be

23   offering the program, but that's-

24             MR. MCCLINTOCK: What you're describing is intended.

25   I understand that. I think it makes sense. I just have trouble

26   connecting the wording as it is to what you are-

1          MR. MARTIN: Yeah, I agree. It is a little awkward,
2    but that certainly is the intent.

3          MR. ROBERTS: Steve, did you want to, did you want to
4    add to this?

5          MR. FINLEY: I just wanted to ask if people thought
6    it would be clearer to put back in the language at the end of
7    that sentence that was struck.

8          MR. MARTIN: That might be clearer because it just
9    says a list of all states where it does not meet such
10   requirements. But again, they wouldn't be offering the program
11   there and in those states. So, if it's, I think this. I mean,
12   I absolutely can convey the intent here, which is as a
13   disclosure because what we're trying to because this is
14   different from the [inaudible] this is actually where the
15   institution's required to disclose this information. So, if
16   they're disclosing where they offer the program, then, they
17   are in, the program is required to meet, must meet those
18   licensure requirements in the state then they wouldn't be
19   offering any states where they don't meet the requirements.
20   And I see the language might be a little awkward as stated.

21         MR. ROBERTS: Okay, Barmak.

22         MR. NASSIRIAN: In a world where the way section 32
23   would read after the changes that the Department has made, I'm
24   not sure the example that Emmanual gave of a program in
25   Louisiana that can only be opposed post facto on the basis of
26   a transcript review, I'm not sure what the what the
27   institution would do. Would, the institution could certainly
28   not claim that it meets the requirements because those

1    requirements can only be established by the state after the
2    fact on a case-by-case basis. And it would be prohibited from
3    offering it otherwise, it seems to me, because the language is
4    so strict. But leaving that aside, it seems to me that Greg's
5    comment is correct. If you keep that language the way it is so
6    tightly mandatory, then I think what 43 should say is just a
7    list of where the program is offered, because by definition,
8    the program could only be offered where it meets those
9    requirements.

10            MR. MARTIN: I agree with you, Barmak. I think that's
11   just one of those things where it wasn't precisely aligned.
12   SoI would be willing to go ahead and make that, I'm just going
13   to ask my, my colleagues to make any comment to me regarding
14   that. But I think I'm I think I'm correct on that.

15            MR. ROBERTS: Kelli, go ahead.

16            MS. PERRY: To me, I agree with Steve's comment or
17   what was struck should in essence be put back in. Because to
18   me, in listening to this, if schools are required to obtain
19   state licensure in the states that they're offering the
20   program, based on what's in 32, then what you would want to be
21   disclosing to students is where the state doesn't meet those
22   requirements. Right? So, if the student were to, say the
23   student were to get their degree or whatever and they were
24   going to move and they were moving to a state that they
25   weren't going to have licensure in and the school doesn't
26   offer that licensure program in, that's what I think that they
27   would want to know.

1          MR. MARTIN: Yeah. I would think it would be easy
2    enough for the school to list. I mean if they don't, it would
3    seem to me to be somewhat redundant to have to list something
4    about a state. If you give a list, if you provide a list of
5    states you don't offer the program in, that might be more
6    instructive. I mean, it seems to me, my apologies for thinking
7    through this as we're going through it, but there can only be
8    two scenarios here. A, the school offers the program in a
9    state, and if they offer the program in a state, then it
10   necessarily meets the licensing requirements of those states
11   for 32, right? It could be no other way. Or they don't offer
12   the program in the state, in which case it makes no difference
13   what any requirements are because they just don't offer the
14   program, a student can't take the program in that state. So, I
15   would probably structure it that way. I don't, if adding a
16   list of states that does not meet requirements, that would get
17   us there, I guess, because we'd basically be saying the school
18   that's tacitly saying the school simply doesn't offer them it
19   doesn't offer it in those states. So, we could I think by
20   adding that back would get there if that would be acceptable
21   to people.

22         MR. ROBERTS: Okay, I see a few hands. We'll go
23   Carolyn first. But I do want to just ask the negotiators if
24   they can keep comments brief so we can finish the day with
25   asking the Department how they'd like to proceed on this
26   issue. Carolyn, go ahead.

27         MS. FAST: Just very briefly that, just want to make
28   sure that it doesn't get lost that we don't want to just have
29   a disclosure be where the program is offered because the more

1   important part is for the student from the student's
2   perspective, is where they're going to be able to get
3   licensure. So just to make sure that doesn't get lost in
4   whatever rewrite happens.

5          MR. MARTIN: Right. Well, they will I think according
6   to our rules, it has to be they can't offer it unless there's
7   licensure. But I think you're right, that should be disclosed.
8   As a student knows, they will be licensed. What I can do is,
9   entertaining more comments we have, so we're coming up on
10  3:25. So if we want to, I could, I don't know if I can feel
11  this on my feet right now because as close to the end of the
12  day as we are. But I can work on the lang- we can work on the
13  language overnight and come back tomorrow morning and just
14  take the consensus for it based on the new unrevised language,
15  hopefully would be a little more instructive here, but I don't
16  think any of us are in disagreement where we what we want it
17  to say, it's just how we convey that. So, if you would allow
18  me to wordsmith that overnight. And we can all sleep on it,
19  well not sleep on it because we're going to change, we're
20  going to make some changes here. But I think we could make
21  some changes toward clarity in this in this disclosure. But I
22  think we have to, you know, the intent is obviously different
23  than what's in 32. This is a disclosure. This is a disclosure
24  requirement in 668.43. But I think the language still needs to
25  still needs to align.

26         MR. ROBERTS: That'll be how we start off tomorrow.
27  But I do want to note Emmanual is coming to the table to ask a
28  final question on behalf of private nonprofits. So go ahead,
29  Emmanual.

1          MR. GUILLORY: So, I'm happy the Department is
2    willing to take another look at this and come back to the
3    table tomorrow to look at it because with the unchanged
4    proposals in 32, there's still going to be some major
5    complications there. We did submit proposed language to the
6    Department, you know looked at it and decided not to take. And
7    that's, I respect that decision. But also, some of my other
8    colleagues, Carolyn and Barmak had a proposal too as well that
9    would remedy the situation. And I'm really disappointed that
10   not even that proposal was taken into consideration,
11   considering the support that was offered for that, because
12   that proposal would have been much better for us than the
13   current text that we have here. Requiring institutions to meet
14   all state licensing requirements if they want to offer a
15   program to students where they're located or where they are or
16   where they may seek employment is very, very, very
17   problematic. So, I hope that the Department will think about
18   it once again and just really reconsider the proposed
19   alternative language to 32 and how that relates to what we're
20   talking about here in 5. Thank you.

21          MR. ROBERTS: Okay, thank you. We are coming up right
22   on public comment as it is our last one of a negotiated
23   rulemaking. I don't want to cut into that. So, the plan for
24   tomorrow will be to pick up with certification and then move
25   right into 90/10. And I understand, Johnson, you wanted to
26   address the committee before we move to public comment.

27          MR. TYLER: Yeah, hi. I- [interposing]

28          MS. JEFFRIES: Johnson, hang on one second. I just
29   want to let the committee know, I [audio]-

 1              MR. TYLER: You muted yourself.

 2              MR. ROBERTS: I think, Cindy, you're muted right now.

 3              MS. JEFFRIES: I did it twice. I'm going to go ahead
 4    and admit Senator Tom Carper while Johnson addresses the
 5    committee because he was having some technical issues. And
 6    we're going to try to jump start that in case he does so,
 7    unless I hear any objections to that, I'm going to go ahead
 8    and admit him now.

 9              MR. TYLER: Great, I'm preceding a senator.
10    Excellent. I just wanted to thank everyone. I'm not going to
11    be here tomorrow. And I want to be able to say my goodbyes and
12    how much I've enjoyed working with everyone here, and
13    particularly Greg and the other people, Steve from the
14    Department of Education, Donna. I know you guys are career
15    people and this is your mission and I really appreciate all
16    the work you're doing. Everyone else here, I know we all have
17    students in mind. But the last thing I just want to say, is
18    you know, George Floyd, really, his murder showed so much
19    inequity. And I think when we talk about the students, we
20    really have to think also about racial justice. I think that
21    is what education is, the method by which we can fix this
22    problem. And we really have to make sure that these
23    institutions remedy it rather than perpetuate racial inequity
24    in the country. So anyway, thank you. Thanks for listening to
25    me all this time and good luck tomorrow.

26              MR. ROBERTS: Thank you very much, Johnson, for your
27    comments and for all your hard work and indeed the entire

1   committee's hard work throughout these last few months. Cindy,
2   are we ready to proceed to public comment?

3            MS. JEFFRIES: We are, and it looks like Senator Tom
4   Carper is on video if he, so he should be ready to go as soon
5   as he unmutes himself.

6            MR. ROBERTS: Good afternoon, Senator Carper. Can you
7   hear me?

8            SEN. CARPER: I cannot hear you.

9            MR. ROBERTS: Cannot hear me. What about-
10  [interposing] There we go. Okay, great. You have three minutes
11  for public comment beginning when you start speaking, and the
12  floor is yours.

13           SEN. CARPER: Thanks. Well, good afternoon, everyone.
14  I'm Tom Carper, United States Senator from Delaware, retired
15  Navy Captain, last Vietnam veteran serving in the US Senate
16  and GI Bill recipient. I just want to thank the US Department
17  of Education for giving me the opportunity to take a brief
18  moment to talk a bit about the importance of protecting our
19  nation's military and our veterans, and especially of veteran
20  students, by closing the 90/10 loophole once and for all. One
21  year ago, during floor debate of the American Rescue Plan, the
22  United States Senate unanimously passed a bipartisan
23  amendment. It was offered by Senator Jerry Moran, Republican
24  of Kansas, close friend, and myself, to establish this
25  negotiated rulemaking process. Our amendment for those who may
26  not have heard, was a bipartisan promise, a promised to our
27  nation's veterans to close the 90/10 loophole once and for
28  all. And I'm grateful to the negotiators and to the Department

1    for making good on that promise. I'm also deeply grateful to
2    the many veterans and veteran service organizations that who
3    did the heavy lifting over the last year, not just over the
4    last year, but the last decade, walking the halls of Congress,
5    knocking on doors and stressing the importance of harnessing
6    market forces and harnessing market forces to improve
7    educational opportunities for our nation's military [audio]
8    for too long, far too many bad actors in the for-profit
9    college sector, including the now defunct Corinthian Colleges
10   and along with ITT Tech were able to evade the bipartisan
11   intent of Congress that for-profit schools should receive at
12   least 10 percent of their revenues from non-Federal sources.
13   This rulemaking, this rulemaking process restores the
14   bipartisan intent of Congress, first established by
15   legislation signed by into law by former President George
16   Herbert Walker Bush, Navy veteran and a Republican, and
17   reaffirmed during the amendment to the American Rescue Plan,
18   which was signed into law by President Joe Biden, a Democrat.
19   I want to make clear that not all for-profit schools,
20   underline this, not all for-profit schools are bad actors.
21   Many for-profit schools do a very fine job preparing our
22   military and preparing our veteran students for civilian
23   careers and we should acknowledge that. Closing, having said
24   that, closing the 90/10 loopholes simply about making sure
25   that our veterans get the most out of their hard-earned GI
26   Bill benefits. For me, this is personal. My own father, a
27   World War Two veteran, also served the times in the Korean War
28   and the Vietnam War chief petty officer for over 30 years. He
29   used the original GI Bill at a vocational school in Beckley,
30   West Virginia, where he learned how to fix wrecked cars and

```
 1    went to work at Burleson Oldsmobile, became a claims adjuster
 2    for Nationwide Insurance, and ended up teaching the Academy of
 3    Training Academy for all Nationwide Insurance claims adjusters
 4    and across the country. He did it thanks to the GI Bill. But
 5    for myself, after serving three tours of active duty in [30
 6    seconds] I used the GI Bill to attend the University of
 7    Delaware to earn a master's degree and to go on to be elected
 8    as the Treasurer of the State of Delaware and congressman and
 9    governor. My dad, as I said, went on to do extraordinary
10    things in his own life. We don't always have time or the
11    opportunity to make a huge change in the lives of people. But
12    this is one instance where we can do that. And I just want to
13    say to those who are involved in this process, I hope you will
14    end up doing the right thing by virtue of our veterans and
15    keep in mind the golden rule to treat other people the way we
16    want to be treated and that's what our legislation does. And I
17    would on that will sign off and say, good luck. God bless.

18            MR. ROBERTS: Same to you. Thank you very much for
19    your comments, Senator Carper.

20            SEN. CARPER: Thank you so much.

21            MR. ROBERTS: [Audio] next, Cindy?

22            MS. JEFFRIES: Next, we have Malcolm Youngren from
23    Pacific College.

24            MR. ROBERTS: Good afternoon, Malcolm, can you hear
25    me?

26            MR. YOUNGREN: This is Malcolm.
```

1          MR. ROBERTS: Great. Your video and sound are coming
2     in very clearly. So, you have three minutes for public comment
3     beginning when you start speaking and you have the floor now.

4          MR. YOUNGREN: Okay, great. Thank you. My name is
5     Malcolm Youngren. I'm the president and CEO of Pacific College
6     of Health and Science, founded in 1986. Pacific College is
7     regionally accredited by WASC and currently has 1900 students.
8     Acupuncture is increasingly becoming part of the US healthcare
9     system and is now recognized as safe and effective by the
10    National Institutes of Health, the Center for Disease Control,
11    Medicare, and the Veterans Administration. The CDC recently
12    identified acupuncture as the first line of defense in the
13    opioid crisis. We at Pacific College support an appropriate
14    accountability framework, and Pacific College students are
15    repaying their loans. Our credit default rate is 5.3 percent,
16    and our 2011 repayment rate was 44 percent. The proposed GE
17    ratios do not accurately indicate quality in the field of
18    acupuncture for two reasons. Most acupuncturists seek a
19    flexible work/life balance. The most recent American Society
20    of Acupuncture survey showed over 50 percent of acupuncturists
21    practice part time. Our average acupuncture student is a
22    mature 36 years old and a quarter are married with spousal
23    support. They enter this field for flexibility. Second, it
24    takes five years for graduates to fully build a practice.
25    Measure, measuring earnings in 18 to 36 months is not
26    consistent with its occupation. 5 to 9 years out after
27    graduation, over 60 percent earn more than $65,000 dollars and
28    25 percent earn more than $100,000 dollars. Pacific College
29    and other private acupuncture schools provide quality
30    education, leading to higher satisfaction rate among

1    acupuncturists. 87 percent of our graduates become licensed,
2    and 66 percent of all acupuncturists are satisfied with their
3    lifestyle. The GE ratios do not indicate quality of
4    acupuncture colleges. The pass rate on licensure exams are the
5    same for both for-profit and nonprofit schools, and the price
6    of the education is actually 12 percent lower for for-profit
7    schools. The price is relatively consistent because the
8    curriculum is dictated by the state. California requires 3000
9    hours and Florida requires a four- year program. Schools
10   cannot shorten the program and make them significantly less
11   expensive. The proposed GE framework, if adopted, would
12   devastate the acupuncture industry. All 24 colleges that are
13   for-profit would go out of business and there are only 51
14   colleges. There would be no acupuncture schools in cities like
15   San Diego or Chicago or states such as Texas or Ohio. To avoid
16   this disaster, only modest changes need to be made. Proposal
17   one is for doctorate and master's leading to licensure to use
18   a 35 percent repayment rate and a benchmark licensure pass
19   rate of [30 seconds] number two is for an annual appeal
20   process for small industries and there are only 6000
21   acupuncturists in the country where alternative measures such
22   as repayment rates could be used. This would allow small and
23   unique industries to survive. Either measure would give a
24   strong quality framework without injuring acupuncture, which
25   is so needed at this point in the country's recovery from the
26   pandemic and the opioid crisis. Thank you.

27          MR. ROBERTS: Thank you very much for your comment.

28          MS. JEFFRIES: Okay Brady, I am admitting Martin
29   Gaiter who is Solution Wizard USBS.

1          MR. ROBERTS: Alright, Martin, can you hear me? Good
2    afternoon, Martin. Can you hear me?

3          MS. JEFFRIES: Let me go ahead and bring in Tanya
4    Foose from the Ohio Business College while we figure out
5    what's going on with Martin.

6          MR. ROBERTS: Sounds good. Thank you. Good afternoon,
7    Tanya. Are you able to hear me?

8          MS. FOOSE: I can hear you.

9          MR. ROBERTS: Great. You have three minutes for
10   public comment, beginning when you start speaking, and the
11   floor is yours.

12         MS. FOOSE: Hi, my name is Tanya Foose, and I
13   appreciate this opportunity to speak to you today about the
14   career college education sector and our value to the economy.
15   I have worked for over 20 years at several for-profit
16   colleges, and quite frankly, this is where I found my love for
17   education and my passion for the career college sector. As the
18   daughter of a college professor of a state university, I grew
19   up at a college campus. I watched my father deal with the
20   perils of publish or perish and the never-ending research he
21   did for his tenured position. While publishing is great, it
22   does not directly contribute to the local economy. In fact,
23   most of his students had to leave their hometown to find work.
24   Career colleges serve a very important part of our local
25   economy. Having spent four years in career services and now
26   campus director at Ohio Business College, I have been able to
27   maintain over 70 percent placement for each of our programs in
28   medical assisting, HVAC, electrical, and business. Not only do

1    we assist our graduates with resumes, interview skills and
2    maintain weekly communication after graduation, we also work
3    with local businesses to help address their hiring needs.
4    This, along with our personal and accessible approach to
5    admissions and financial aid, we are able to help students
6    easily navigate the enrollment process. On a personal note, as
7    the mother of a community college student, I can't tell you
8    how difficult it was to enroll my son. No one at his school
9    could answer questions about which program would fit him best.
10   No one helped me with the FAFSA, and in fact, no one would
11   even answer the phone. Having been so accustomed to the
12   amazing customer service that we offer our students, I was
13   shocked at how difficult it was to enroll at a public
14   institution. Career colleges make the whole process easy.
15   Students know what they're signing, and they understand their
16   financial aid package when complete. I personally can't
17   understand why public institutions don't mimic the level of
18   service and assistance that we do for our students, because I
19   would imagine they lose a lot of students who become
20   frustrated due to the lack of help. Career colleges must
21   remain a viable option for many students who are looking to
22   level up their opportunities in the world by offering ease of
23   admission, strong skills-based education, and assistance upon
24   graduation. Thank you for your time. We do such amazing work
25   for our students and local businesses and hope to continue to
26   do so for now and years to come. Thank you.

27              MR. ROBERTS: Thank you, Tanya, for your comment.

28              MS. JEFFRIES: Brady, it looks like Martin Gaiter is
29   up and running and with us.

1          MR. ROBERTS: Alright. Good afternoon, Martin. Can
2     you hear me?

3          MR. GAITER: I can.

4          MR. ROBERTS: Great. You have three minutes for
5     public comment that begins when you start speaking.

6          MR. GAITER: Thank you. Good afternoon. My name is
7     Martin Gaiter. 20 years ago, I achieved my MBA in global
8     management. I went on to start my PhD studies in
9     organizational development and leadership. I'm also a US Air
10    Force veteran. Today I serve as a catalyst for change. I
11    respectfully ask for the Education Department to really
12    examine why some people in this country who look like me
13    struggle professionally after graduation with degrees they are
14    encouraged to get. Yes, it's true, I am a graduate of the
15    University of Phoenix. So many other universities copy the
16    model that University of Phoenix has been using for decades.
17    After article after article that I've read, University of
18    Phoenix graduates outpace other university graduates careers
19    advancements year after year. I do notice something is
20    missing. The larger population of minority students is missing
21    in those statistics. We are told consistently to just go out
22    and get a little more educated and then it would be our
23    chance, our turn to develop internally. I ask you to stop
24    looking at the University of Phoenix and its structure for
25    culpability and to investigate the businesses that continue to
26    move the line, and do the minimum or check the box so they
27    don't get flagged. I did not choose the wrong school. There is
28    more to my story. I have founded my own consultancy business
29    that focuses on providing equity and digital access to the

 1  largest minority group in our country, the disabled. I also am
 2  heavily involved in diversity equity issues in my home state
 3  of Oregon. Yes, I am an angry black man, but I'm equally mad
 4  for non-black and black friends and colleagues equally because
 5  we need to come together. I have seen people in your position
 6  turn these issues at stake to personal attacks and make it
 7  easier to attack the testimony, the University of Phoenix or
 8  even supporters of University of Phoenix. Employers must be
 9  held accountable to follow through on the promises. No more
10  carrot and stick. I've made the collective choice in the past
11  and chosen to use my GI Bill to try to advance my military
12  police training and actually could not attend military police
13  training after the military because I was at a for-profit
14  program that didn't qualify. I used my GI Bill for my
15  undergraduate BA Technical Speech, Communication and Conflict
16  Management. These were skills that I developed for employers
17  that no longer had a place for me in my degrees. Reach out to
18  us. We want to tell our stories. I fight for being, I fight
19  being marginalized. Now I have my own business. I respectfully
20  request that you work with us to amplify our voices with the
21  Education Department and other leaders in Washington. Our
22  voices should be heard. Thank you.

23          MR. ROBERTS: Thank you for your comment.

24          MS. JEFFRIES: Hey, Brady, I am admitting Samer
25  Hassan from the Young Invincibles next.

26          MR. ROBERTS: Good afternoon, Samer, can you hear me?
27  How about now? Can you hear me, Samer?

28          MR. HASSAN: Hi. Yes, can you hear me?

1          MR. ROBERTS: Yes. Coming through quite clearly. You
2     have three minutes for public comment that begins when you
3     start addressing the committee.

4          MR. HASSAN: Please allow me to pull up the page,
5     give me one second. Okay. Thank you to the Negotiated
6     Rulemaking Committee for having me today. My name is Samer
7     Hassan. Before I begin, I want to let you know how
8     disappointed I am. I and millions of students are after
9     learning about how institution negotiators voted on Gainful
10    Employment yesterday. To us, your decision has taught us that
11    you are gatekeepers and refuse to be held accountable.
12    Students do not look at you as allies. Remember that. In 2014,
13    I signed up for a career program that would allow me to earn
14    my certificate as a certified nursing assistant. I grew up
15    undocumented in this country, so I did not qualify for
16    financial aid. I saved up every penny I could in order to
17    begin the CNA program. My school had ads on busses, trains,
18    park benches and the radio, all of which advertised the great
19    help you could do for your community while earning a great
20    salary to someone who was renting out a room in a three-
21    bedroom home filled with 12 other people. The CNA certificate
22    represented my way out of poverty and, to be frank, a
23    dangerous living situation. The first day of my program was
24    the first day I had ever entered a college. The instructor
25    told us that a CNA could earn $50,000 if we played our cards
26    right. I passed all my exams, did every assignment, and took
27    every chance I could in order to absorb knowledge. During the
28    last half of the three-month full-time program, we were sent
29    to nursing homes in order to fulfill our clinical hours. We
30    essentially provided free labor to nursing homes that were

1    extremely understaffed and overworked. I remember bike riding
2    five miles a day in order to get to those inaccessible
3    locations, but we didn't have a choice as to where we could
4    go. But I'm happy to say I passed with all As and glowing
5    recommendations. After I received my CNA license, finding a
6    job proved excruciatingly difficult and long, even though we
7    were constantly told there was a high demand for CNAs all
8    across the state. I had gotten my work permit, so being
9    undocumented was no longer a barrier to employment but it
10   still took me five months to get a job. I beat ten other folks
11   in group interview for a position that paid me $9 an hour. I
12   figured I was given low pay because of lack of experience, but
13   what I found out just a few days later was that even the CNAs
14   who had been at the nursing facility for 15 years only made
15   $12 an hour. The way around that low pay, everyone was
16   encouraged to work overtime as that ensured time and a half.
17   Every single CNA at the nursing facility worked an extra 12 to
18   36 hours on top of their full-time hours in order to make ends
19   meet instead of-

20          MR. WAGNER: You have 30 seconds remaining.

21          MR. HASSAN: Thank you. Instead of a culture that
22   pushed you until you could no longer get out of bed, we should
23   never have been told that a CNA certificate could pay us the
24   salaries we worked so hard to earn. My story illustrates why
25   the Department of Education should write strong Gainful
26   Employment rules that prioritize protecting students and hold
27   programs accountable for poor outcomes. If programs falsely
28   advertise post-graduation earnings, they should be held

1   accountable to that, right? Thank you so much for your time
2   and hearing me speak today.

3           MR. ROBERTS: Thank you for your public comment.

4           MS. JEFFRIES: Okay, Brady, I am admitting Lisa Houck
5   representing, she's actually a veteran.

6           MR. ROBERTS: Lisa, are you able to hear me?

7           MS. JEFFRIES: Okay, while I figure out what's going
8   on with Lisa, I'm going to go ahead and admit Cody Hounanian
9   from Student Debt Crisis Center. Oops.

10          MR. ROBERTS: Cody, are you able to hear me? Looks
11  like he's connecting. Hi, Cody. Can you hear me?

12          MR. HOUNANIAN: Yeah, I can. Thank you.

13          MR. ROBERTS: Excellent. You have three minutes for
14  public comment that begins when you start taking.

15          MR. HOUNANIAN: Alright. Thank you so much. Well, I
16  appreciate the opportunity to comment. My name is Cody
17  Hounanian. I am the executive director of the Student Debt
18  Crisis Center. We echo the voices of 2 million supporters
19  across the country, and you know our mission is to center
20  their voices and their needs. And by doing so, I think we can
21  impact public policy and end this crisis. And that's exactly
22  what I'm here to do today. So, I want to share some comments
23  and also an experience from a borrower of ours that has
24  reached out. So, you know, each year we hear from thousands of
25  student loan borrowers and most are reaching out because
26  they're facing unprecedented distress. You know, these are

```
 1   people that are unable to put food on the table, afford rent
 2   or cover healthcare costs. All of these issues have been
 3   exacerbated during the pandemic. In fact, we recently surveyed
 4   over 23,000 borrowers and found that one in three was skimping
 5   out on basic needs due to payments resuming in May and the
 6   fear of the burden of student loan debt. And you know all of
 7   this harm is caused by the basic fact that these people sought
 8   out the American dream, and they did so through higher
 9   education, which is a pathway to that dream. You know, we hear
10   from women, black, and brown borrowers and others that see the
11   burden of student debt exacerbated by systemic inequities in
12   higher education. And these communities you know for the first
13   time had access to this dream and higher education, but the
14   prosperity that it was supposed to provide has been completely
15   stripped away because of this debt. So, you know it's clear
16   that our system is inherently immoral, but the level of harm
17   caused by purposeful profiteering is especially shameful.
18   Vulnerable students are targeted by for-profit colleges that
19   overpromise and under-deliver. Students are left holding the
20   bag for an overpriced, low-quality education that wastes
21   taxpayer resources and leaves students worse off than when
22   they started. So, reinstating the Gainful Employment rule will
23   ensure that the Department protects students from taking on
24   debt that they are unlikely to be able to repay due to
25   deceptive programs and guarantees that for-profit programs are
26   able to fully prepare students for Gainful Employment. And I
27   want to share a story. Lori in Aurora, Colorado, is an older
28   American who should be retired. Instead, she is forced to
29   continue to work a difficult, exhausting and low-paying job in
30   a field that was completely unrelated to her education. You
```

1   know, Lori went back to school to skill up. We hear from
2   borrowers every day that, particularly during the Great
3   Recession, thought that education was their way to increase
4   the stability of their finances in the future. But-

5           MR. WAGNER: 30 seconds remaining.

6           MR. HOUNANIAN: Yes. Like many, Lori's goal to
7   improve her job prospects and make her future more secure has
8   resulted in the complete opposite. Instead, her future is less
9   secure, and it's destroyed her ability to retire with dignity.
10  So, you know I encourage you to continue with implementing the
11  Gainful Employment rule again and protect students from these
12  low-quality programs. Thank you.

13          MR. ROBERTS: Thank you for your public comment.

14          MR. HOUNANIAN: I appreciate the opportunity.

15          MR. ROBERTS: Lisa, I believe, can you hear me? You
16  have to unmute, but you have three minutes for public comment
17  that begins when you begin speaking, and the floor is yours.

18          MS. HOUCK: Okay. I'm just going to read my
19  statement. My name is Lisa Houck, and I was once employed in
20  the admissions Department at Hessar College, which was a for-
21  profit school owned by Kaplan that is no longer open. I worked
22  there from 2004 to 2012, and I want to tell you what the
23  school told the admission representatives to do to further the
24  goal of recruiting as many students as possible. The most
25  important thing to the school was numbers. The Admissions
26  Department was completely numbers driven, and the more
27  students we convinced to enroll, the better we were we were

 1  graded. We were told to pressure students to enroll on the
 2  same day that they came into the school so basically, they
 3  couldn't think about it. If they wanted to go home and think
 4  about it, we were told to tell them that classes were starting
 5  right now and they would miss out. The school did not want
 6  admission reps to tell students that we had rolling
 7  admissions, which meant that they could really enroll up to a
 8  week after the start. So, we really pressured them to enroll
 9  as soon as we met them. When I first started, admission reps
10  were under the pressure to promise students anything to get
11  them to enroll, like promising that they would be able to get
12  a job in the field. And that became problematic when the GAO
13  investigated Kaplan for predatory lending and predatory
14  admission practices, which we definitely had. For instance, in
15  the medical assistant program, we were told to tell them they
16  would be able to find a job, even though we knew the market
17  was completely saturated and they probably wouldn't be able to
18  find a job. The same with early childhood education. We knew
19  that we were selling them a very expensive degree, that they
20  would only be paid about 12 or $13 an hour for. So, we had to
21  undergo retraining and basically were told not to promise
22  those things. But that only lasted about a month before the
23  company then were pressuring us again to get our numbers up.
24  So, we got students to enroll by promising them absolutely
25  anything. I saw instances where the school would fill out
26  their financial aid forms for the student, like the FAFSA,
27  instead of letting the student take their time and do it
28  themselves. The financial process was also very rushed, with
29  the goal of getting the students signed up as quickly as
30  possible. I now work in a different university and it is much

 1  better. I don't see these practices at all. So that's my
 2  statement. Do you have any questions?

 3          MR. ROBERTS: I don't believe so, Lisa, but thank you
 4  for offering your comment for the public today.

 5          MS. HOUCK: Okay. Thank you.

 6          MR. ROBERTS: Have a nice day.

 7          MS. HOUCK: You too.

 8          MR. ROBERTS: Who are we admitting next?

 9          MS. MILLER: I am admitting Tiffany Horne, who is
10  representing herself.

11          MR. ROBERTS: Great. Thank you, Roz. It looks like
12  she's enabling audio. Hi, Tiffany. Can you hear me?

13          MS. HORNE: Yes, I can. Hello.

14          MR. ROBERTS: Hello, good afternoon. You have three
15  minutes for public comment that's going to begin when you
16  start speaking.

17          MS. HORNE: Thank you. Good afternoon, everyone. My
18  name is Tiffany Horne. I'm a 26-year Army veteran and a first-
19  generation college student. I was a single parent of three
20  children when I graduated from the University of Phoenix with
21  a bachelor's degree in business. When I decided to go back to
22  school to earn my bachelor's degree, I was an active-duty
23  military soldier stationed at Fort Bragg, North Carolina. I
24  had young children at home, and other schools that I attended
25  were not conducive nor realistic to the demands of my military

```
 1    lifestyle. I was deployed constantly and I knew that earning a
 2    degree was going to be a challenge. I chose the University of
 3    Phoenix because it offered a flexible degree program that
 4    accommodated and provided the support I needed to meet the
 5    demands of my life at that particular time. This meant I could
 6    fulfill my duties in the field during the day and at night I
 7    could work on my degree and turn my assignments in when my
 8    unit came in to take showers, which is where I could get
 9    internet service. None of this was easy. The classes were
10    hard. My instructors challenged me daily and I worked full-
11    time and was a full-time parent. But I was dedicated to my
12    educational goals, focused, and I knew how beneficial it would
13    be for my career if I earned this degree. I was able to
14    succeed because of my work ethic and because I chose to attend
15    a school that provided the resources and had the flexibility
16    that would ensure my success. The University of Phoenix is
17    test [ph] the standard when it comes to supporting the
18    students, especially adult students. Obtaining my degree
19    allowed me to set a powerful example for my children and for
20    the other service soldiers that I served with. Upon completion
21    of my degree, I was promoted to the next higher rank. Many of
22    my military colleagues, they also followed in my footsteps
23    once they saw that it was actually possible to complete their
24    education while on active duty. I decided to pursue my
25    educational endeavors elsewhere only because of the senseless,
26    negative stigma surrounding the University of Phoenix and the
27    value of its curriculum. I am currently pursuing my doctoral
28    degree, but all roads began with the University of Phoenix.
29    Aside from my doctorate course, the coursework was much more
30    challenging in my opinion, and the academic advisers were much
```

1    more hands-on and geared me towards my goals. I continue to
2    use a lot of the tools such as the team skills assessments and
3    inventories, case study data, etc., all which I learned from
4    the University of Phoenix in my current role. Working in teams
5    is extremely challenging. However, the benefit of using the
6    skills that everyone has in order to accomplish objectives is
7    a skillset that continues to serve me well. Please consider my
8    story and the stories of so many other military personnel who
9    pursue a degree while they are actively in the military, for
10   when we retire this uniform, just as I have, we still continue
11   to serve our nation, but just in a different capacity. The
12   military encourages and recognizes education-

13           MR. WAGNER: Tiffany, you have 30 seconds.

14           MS. HORNE: Mary Roach said, "Heroism doesn't always
15   happen in a burst of glory. Sometimes small triumphs and large
16   hearts change the course of history." I belong to several
17   veteran organizations, and we work with delegates on the jill
18   to bring about meaningful change. I hope that you all consider
19   my story, and I hope that you hold all the universities
20   accountable and the rules that they that you have set aside in
21   order to benefit everyone, just keep everything fair. Thank
22   you for your time.

23           MR. ROBERTS: Thank you, Tiffany, for your comment.
24   Okay. Roz, I think we have time for one last speaker. Who are
25   we admitting?

26           MS. MILLER: I'm admitting Brian Black, who's
27   representing himself.

1       MR. ROBERTS: It looks like he's admitted, but he
2   might have stepped away from his computer. Do we want to move
3   to the to the next speaker? Roz, would you mind admitting, I
4   think I see Ethan-

5       MS. MILLER: Ethan Schlat- Schlatlecker, Schaltegger,
6   sorry about that, who is representing Association of Young
7   Americans.

8       MR. ROBERTS: Great. Ethan, are you able to hear me?
9   Ethan, are you able to hear me or did he just leave the
10  meeting? Oh, there he is. Ethan, can you hear me?

11      MR. SCHALTEGGER: I can hear you.

12      MR. ROBERTS: Great.

13      MR. SCHALTEGGER: Yeah.

14      MR. ROBERTS: Fantastic. You have three minutes for
15  public comment, which begins when you start speaking.

16      MR. SCHALTEGGER: So first, just thank you for the
17  opportunity to speak. It was 2018. I was taking my last class
18  over a shortened summer semester, about to graduate with a
19  double major in nutrition and kinesiology, ready to work
20  towards my dream job of becoming a private coach, working with
21  elite level athletes. Unfortunately, I had also accumulated
22  $100,000 of student debt with an 11.5 percent interest rate
23  after a lifetime of being taught to go to college no matter
24  what. Debt is normal and this is just what you're supposed to
25  do. I remember during that summer, the reality of what I had
26  gotten myself into finally started to dawn. And I was

1    terrified. I was truly terrified. Two weeks before I was
2    scheduled to officially graduate, my physical health started
3    to aggressively decline. I was sent to the emergency room and
4    diagnosed with type one diabetes, a chronic autoimmune disease
5    without a cure, and a laundry list of daily demands,
6    challenges, and symptoms. Not only was I about to graduate
7    with this enormous financial burden, but I now had one of the
8    most, if not the most expensive chronic health conditions in
9    the United States. I have since given up on that dream job,
10   and I'm currently working in corporate America, lucky to be
11   paying my bills, lucky to even have stumbled into a job
12   capable of scraping by. The amount of grief that I feel not
13   only for myself but for my generation and the medical, the
14   medically vulnerable is difficult to describe. The amount of
15   greed, insanity, and dysfunctionality I see in our system is
16   disgusting. And I share this story of mine with the hope and
17   the prayer that the people on this call can recognize that
18   your work has real meaningful power over the lives of others.
19   I pray that the people on this call can feel beyond the
20   statistics and can recognize that the future of this country
21   is more than just a numbers game. I pray that the people on
22   this call have the compassion to recognize that this corrupt
23   system creates real casualties. And these casualties have real
24   consequences individually and collectively for our country.
25   And I pray that we can all take on the resolve to do what
26   needs to be done.

27          MR. WAGNER: Ethan, you have 30 seconds.

28          MR. SCHALTEGGER: As far as tangible action,
29   reinstating Gainful Employment is a good first step, in my

```
 1    view, a step towards creating a larger systemic change. The
 2    Department taking responsibility for protecting students from
 3    higher education profiteering and protecting students from
 4    taking on aggressive debt they're unlikely to pay backand
 5    ensuring career programs are available for Gainful Employment
 6    is a necessary first step towards addressing this crisis, in
 7    my view. That's all I have to say. And thank you for your time
 8    and space.

 9           MR. ROBERTS: Thank you, Ethan, for your comment. We
10    appreciate it. And thank you to all the members of the public
11    who have taken the time to offer public comment to this
12    committee throughout the last couple of months. Thank you to
13    the committee for all your hard work today. We will pick up
14    for our final day of negotiated rulemaking tomorrow at 10 a.m.
15    Eastern. Thank you very much.

16           Department of Education, Office of Postsecondary
17    Education

18           Zoom Chat Transcript

19           Institutional and Programmatic Eligibility Committee
20    Session 3, Day 4, Afternoon, March 17, 2022

21           From Adam Welle, State AGs (P) to Everyone:

22           I've encountered situations where students have been
23    enrolled in a program where they don't have enough eligible
24    Title IV aid eligibility (because they are approaching the
25    limit) and it is disastrous when they reach their limit and
26    can't finish their program.
```

```
 1              From Laura Rasar King (A) Accrediting Agencies to
 2     Everyone:

 3              +1 Adam

 4              From Carolyn Fast (P) Consumer/Civil Rights to
 5     Everyone:

 6              +1 Jessica and Adam. Seems cutting off students
 7     Title IV mid program is setting them up for failure.

 8              From Ernest Ezeugo (P) Students and Student Loan
 9     Borrowers to Everyone:

10              +1 Debbie's points on SAP, as well as Jessica and
11     Adam's points.

12              From Bradley Adams (P - Proprietary Institutions) to
13     Everyone:

14              +1 Carolyn, Jessica, and Adam. I do not like their
15     aid is cutoff before they finish.

16              From Laura Rasar King (A) Accrediting Agencies to
17     Everyone:

18              +1 Adam - disclosure is very important here.

19              From Marvin Smith (P) 4 Year Publics to Everyone:

20              +1 on idea that program should not be eligible if ED
21     wants to go down this path

22              From Carolyn Fast (P) Consumer/Civil Rights to
23     Everyone:
```

1          +1 Jessica

2          From Amanda Martinez (P) Civil Rights to Everyone:

3          +1 Jessica

4          From Carolyn Fast (P) Consumer/Civil Rights to
5     Everyone:

6          +1 Johnson

7          From Yael Shavit to Everyone:

8          +1 to Jessica and Johnson

9          From Adam Welle, State AGs (P) to Everyone:

10         +1 to Johnson. And in that case the Dept's
11    investment in the student is lost.

12         From Laura Rasar King (A) Accrediting Agencies to
13    Everyone:

14         Laura Rasar King is in for Accrediting Agencies

15         From Jamienne Studley--Accrediting Agencies (P)
16    she/her to Everyone:

17         Laura Raser King coming in for accrediting agencies
18    here as noted

19         From Carolyn Fast (P) Consumer/Civil Rights to
20    Everyone:

21         Note, current (32)(iii) would become (iv), not be
22    replaced

```
 1          From Bradley Adams (P - Proprietary Institutions) to
 2   Everyone:

 3          +1 to Laura. (i) needs to have seeking accreditation
 4   and pre-accreditation added

 5          From Barmak Nassirian (A) Servicemembers & Vets to
 6   Everyone:

 7          +1 to Laura's edit

 8          From Barmak Nassirian (A) Servicemembers & Vets to
 9   Everyone:

10          The omission was an oversight and unintended

11          From Adam Welle, State AGs (P) to Everyone:

12          I think it's important that ED ensure that programs
13   meet licensure requirements in states in which they enroll
14   students and I think Barmak's suggested edits accomplish that
15   goal and I support them.

16          From Kelli Perry - (P) Private Non-Profits to
17   Everyone:

18          Emmanual is going to come to the table to address
19   Debbie's comments

20          From Jamienne Studley--Accrediting Agencies (P)
21   she/her to Everyone:

22          + Laura and Brad: the program has met quality
23   requirements to achieve pre-accreditation. It has met
24   standards. It has simply not yet graduated students yet.
```

1    Recall that this is within an institution that is accredited
2    at the institutional level.

3              From Jamienne Studley--Accrediting Agencies (P)
4    she/her to Everyone:

5              So if the state requirement is for pre-accreditation
6    and accrdetation then would that control?

7              From Debbie Cochrane (P), State Agencies to
8    Everyone:

9              I support the idea of adding pre-accreditation
10   language.

11             From Jamienne Studley--Accrediting Agencies (P)
12   she/her to Everyone:

13             It IS recognized by ED as accreditation

14             From Laura Rasar King (A) Accrediting Agencies to
15   Everyone:

16             UNDER 600.4, DEFINITION OF INSTITUTION OF HIGHER
17   EDUCATION, AND INSTITUTION CAN RECEIVE TITLE IV IT HAS
18   INSTITUTIONAL PREACCREDITATION OR ACCREDITATION.

19             From Laura Rasar King (A) Accrediting Agencies to
20   Everyone:

21             Pardon the caps - unintended

22             From Debbie Cochrane (P), State Agencies to
23   Everyone:

```
1              Thank you very much, Emmanual, for the specific
2       example.

3              From Jamienne Studley--Accrediting Agencies (P)
4       she/her to Everyone:

5              That's exactly the poit if the state accepts pre-
6       accreditation for licensure their judgment should control.

7              From Laura Rasar King (A) Accrediting Agencies to
8       Everyone:

9              +1 Jessica - can we clarify the language to link it
10      to acceptance by licensure agencies?

11             From Jamienne Studley--Accrediting Agencies (P)
12      she/her to Everyone:

13             + Barmak -- purpose is to be sure student is
14      eligible for state licensure

15             From Emmanual Guillory (A) PNPs to Everyone:

16             +1 Barmak

17             From Laura Rasar King (A) Accrediting Agencies to
18      Everyone:

19             +1 Barmak

20             From Debbie Cochrane (P), State Agencies to
21      Everyone:

22             Strongly support this addition in (iii).
```

1    From Ernest Ezeugo (P) Students and Student Loan
2    Borrowers to Everyone:

3    +1 Carolyn. I strongly support (iii) in this
4    subpart. Additionally, support and resonate with the proposed
5    text + Laura's addition of pre-accreditation to the text.

6    From Kelli Perry - (P) Private Non-Profits to
7    Everyone:

8    Emmanual will be coming to the able to address
9    32(iii)

10    From Laura Rasar King (A) Accrediting Agencies to
11    Everyone:

12    Jamie is back in for Accrediting Agencies

13    From Jamienne Studley--Accrediting Agencies (P)
14    she/her to Everyone:

15    Jessica -- there will always be a role for you !

16    From Jessica Ranucci (A)- Legal Aids to Everyone:

17    I hope so!

18    From Jessica Ranucci (A)- Legal Aids to Everyone:

19    +1 to Adam and Carolyn— this language preserves the
20    institutions' ability to get authorization on the front end,
21    while maintaining the states' ability to address consumer
22    protection issues

23    From Barmak Nassirian (A) Servicemembers & Vets to
24    Everyone:

```
 1              +1 on ED's position

 2              From Carolyn Fast (P) Consumer/Civil Rights to
 3        Everyone:

 4              +1 to ED

 5              From Johnson Tyler (p) legal aid to Everyone:

 6              +1 on Greg

 7              From Yael Shavit to Everyone:

 8              +1 to ED's position

 9              From Ernest Ezeugo (P) Students and Student Loan
10        Borrowers to Everyone:

11              +1 on ED's position here.

12              From Debbie Cochrane (P), State Agencies to
13        Everyone:

14              Agree with Jamie.

15              From Jessica Ranucci (A)- Legal Aids to Everyone:

16              I agree with Kelli— but I think it's not an
17        either/or. I would love if our students in NY have both the
18        protection of NY law and independent protections from a
19        reciprocity agreement.

20              From Carolyn Fast (P) Consumer/Civil Rights to
21        Everyone:
```

1          To Kelli - this provision just says that NC-SARA
2     isn't the ceiling for consumer protection.

3          From Jessica Ranucci (A)- Legal Aids to Everyone:

4          Johnson is coming back to the table for legal aid

5          From Emmanual Guillory (A) PNPs to Everyone:

6          To Carolyn - a big part of the SARA agreement is
7     being compliant with consumer protection laws in the state
8     that distance education is being offered. While obtaining
9     state authorization remains intact with your proposal, the
10    concern we are hearing is that the compliance with consumer
11    protection laws is going away. This means that any institution
12    that seeks to offer distance education courses to students
13    would need to meet the varying consumer protection laws across
14    the states. For our smaller institutions that are under-
15    resourced and have capacity issues, this would disincentive
16    them from participating. I hope this better explains the
17    overwhelming concern that we have heard.

18         From Adam Welle, State AGs (P) to Everyone:

19         +1 to Amanda

20         From Ernest Ezeugo (P) Students and Student Loan
21    Borrowers to Everyone:

22         +1 Amanda.

23         From Carolyn Fast (P) Consumer/Civil Rights to
24    Everyone:

25         +1 to Amanda

```
 1              From Barmak Nassirian (A) Servicemembers & Vets to
 2      Everyone:

 3              +1 on Amanda, Johnson, and Ernest's comments
 4      regarding transcripts

 5              From David Socolow to Everyone:

 6              +1 to Amanda, Johnson, and Ernest on transcript
 7      ransom

 8              From Jaylon Herbin- (A) Consumer Advocate & Civil
 9      Rights to Everyone:

10              +1 to Amanda, Johnson, and Ernest's comments

11              From Debbie Cochrane (P), State Agencies to
12      Everyone:

13              +1 to Adam's suggestion.

14              From Bradley Adams (P - Proprietary Institutions) to
15      Everyone:

16              my comment is on 34, so I will let Johnson go first

17              From Bradley Adams (P - Proprietary Institutions) to
18      Everyone:

19              given the additional hands being raised i will wait
20      on 34

21              From Kelli Perry - (P) Private Non-Profits to
22      Everyone:
```

1        Thank you Steve - that context was important to
2   hear.

3        From Carolyn Fast (P) Consumer/Civil Rights to
4   Everyone:

5        +1 to Adam on ED's authority to act to preserve its
6   investment of Title IV in the students.

7        From Anne Kress (P) Comm College to Everyone:

8        Do we know how many of these obligations are due to
9   R2T4 requirements—and if so, is the Dept looking at this
10  requirement?

11       From David Socolow to Everyone:

12       +1 to Adam's point about the Department's interest
13  in its investment in students. Also, if students cannot
14  provide prospective employers documentation of the education
15  that the Department financed, the students' opportunities to
16  secure employment will be harmed -- thus reducing their
17  ability to repay their student loans which the Department is
18  interested in collecting.

19       From Adam Welle, State AGs (P) to Everyone:

20       +1 to Debbie's comment

21       From Emmanual Guillory (A) PNPs to Everyone:

22       We have been told that many institutions won't
23  withhold if an employer is seeking the transcript as part of a
24  job opportunity. If the employer makes the request then the

1    institution will send it along regardless of the student's
2    account status.

3            From Jessica Ranucci (A)- Legal Aids to Everyone:

4            The Department has previously taken a broad view of
5    its authority to regulate school conduct in PPA— from the 2016
6    Final Rule (81 Fed Reg 75,926):

7            From Jessica Ranucci (A)- Legal Aids to Everyone:

8            "[T]he HEA gives the Department the authority to
9    impose conditions on schools that wish to participate in a
10   Federal benefit program. In this regulation, the Department is
11   exercising its broad authority, as provided under the HEA, to
12   impose conditions on schools that wish to participate in the
13   Federal Direct Loan Program. Section 452(b) of the HEA states,
14   "No institution of higher education shall have a right to
15   participate in the [Direct Loan] programs authorized under
16   this part [part D of title IV of the HEA]." 20 U.S.C.
17   1087b(b). If a school chooses to participate in the Direct
18   Loan Program, it must enter into a Direct Loan Program
19   participation agreement (PPA). 20 U.S.C. 1087d. Section
20   454(a)(6) of the HEA authorizes the Department to include in
21   that PPA "provisions that the Secretary determines are
22   necessary to protect the interests of the United States and to
23   promote the purposes of" the Direct Loan Program. 20 U.S.C.
24   1087d(a)(6); 81 FR 39385."

25           From Jessica Ranucci (A)- Legal Aids to Everyone:

26           I'm coming back to the table for legal aids

1          From Ernest Ezeugo (P) Students and Student Loan
2     Borrowers to Everyone:

3          I appreciate Emmanual's comment and yet know that
4     was not my experience at first, and have heard from students
5     that it wasn't theirs as well. If there is a chance the
6     Department would consider protection on this piece, that's
7     something to be considered.

8          From Ernest Ezeugo (P) Students and Student Loan
9     Borrowers to Everyone:

10         worth considering*

11         From Ernest Ezeugo (P) Students and Student Loan
12    Borrowers to Everyone:

13         Jessica raises a could point. Could we get a
14    response from OGC?

15         From Ernest Ezeugo (P) Students and Student Loan
16    Borrowers to Everyone:

17         a good point*

18         From Jamienne Studley--Accrediting Agencies (P)
19    she/her to Everyone:

20         Laura and I believe that will address the pre-
21    accreditation issue.

22         From Ernest Ezeugo (P) Students and Student Loan
23    Borrowers to Everyone:

24         +1 Yael

1              From Jessica Ranucci (A)- Legal Aids to Everyone:

2              +1 to Yael

3              From Carolyn Fast (P) Consumer/Civil Rights to
4      Everyone:

5              +1 to Yael

6              From Carolyn Fast (P) Consumer/Civil Rights to
7      Everyone:

8              I have a resonse

9              From Laura Rasar King (A) Accrediting Agencies to
10     Everyone:

11             +1 Carolyn - disclosure is needed.

12             From Bradley Adams (P - Proprietary Institutions) to
13     Everyone:

14             good question Dave

15             From Emmanual Guillory (A) PNPs to Everyone:

16             But doesn't the program have to meet state licensing
17     requirements by your changed regulatory proposal?

18             From Emmanual Guillory (A) PNPs to Everyone:

19             Other proposals to allow an institution to offer a
20     program in states that does not meet state licensing
21     requirements was not approved

1          From Jamienne Studley--Accrediting Agencies (P)
2      she/her to Everyone:

3          Perhaps ED could look at this issue that Greg wants
4      to look at, plus a response to Barmak's proposed addition to
5      (32) and return to this tomorrow morning?

6          From Kelli Perry - (P) Private Non-Profits to
7      Everyone:

8          Emmanual also would like to ask a question regarding
9      this and is coming to the table

10          From Jessica Ranucci (A)- Legal Aids to Everyone:

11          And I would ask ED to please take another look at
12      the new language in (26) that would partially fund some
13      students' programs with Title IV

14          From Laura Rasar King (A) Accrediting Agencies to
15      Everyone:

16          +1 Jessica

17          From Yael Shavit to Everyone:

18          +1 Jessica

19          From Debbie Cochrane (P), State Agencies to
20      Everyone:

21          David Socolow will be closing out the day for state
22      agencies.

23          From Yael Shavit to Everyone:

1          Adam is coming back for State AGs

2          From Ernest Ezeugo (P) Students and Student Loan
3    Borrowers to Everyone:

4          Thank you for your participation and your thoughtful
5    insights the past few months, Johnson.

6          From Marvin Smith (P) 4 Year Publics to Everyone:

7          Been a pleasure Johnson.

8          From Carolyn Fast (P) Consumer/Civil Rights to
9    Everyone:

10         Thank you for all of your contributions!

11         From Bradley Adams (P - Proprietary Institutions) to
12   Everyone:

13         Johnson it was a pleasure meeting and working with
14   you. have a great weekend and stay in touch. I am going to
15   have to drop off during public comment. Mike will fill me in
16   on what i missed later tonight.

17         From Emmanual Guillory (A) PNPs to Everyone:

18         Thank you Johnson!

19         From Amanda Martinez (P) Civil Rights to Everyone:

20         Thank you Johnson! We appreciate your advocacy, your
21   perspective, and work on behalf of students!

# EXHIBIT 7

App.617

Imputation of Income Under Gainful Employment

By Eric Bettinger, Ph.D.

Stanford Graduate School of Education

May 26, 2014

Disclaimer

This report was prepared at the request of Gallegos Legal Group.  Much of this report is heavily based on information provided to Gallegos Legal Group by the U.S. Department of Education and the U.S. Social Security Administration as a result of Freedom of Information Act requests. The report may be revised as new information becomes available.

About the Author

Dr. Eric Bettinger is an associate professor of education at the Stanford Graduate School of Education.  Dr. Bettinger earned his Ph.D. in economics at MIT in 2000.  His research focuses on student success in higher education. Dr. Bettinger has over 25 articles published in refereed journals or books.  He has been an associate editor for multiple academic journals focusing on the economics of education.  Dr. Bettinger teaches the economics of higher education at Stanford University.

App.618

This report focuses on two related issues surrounding the implementation of "gainful employment" (GE) regulations proposed by the United State Department of Education (DoE). 79 Fed. Reg. 16426 (March 25, 2014) (Docket ID ED-2014-OPE-0039). Under the proposed GE regulations, SSA extracts earnings for DoE-identified cohorts of recent graduates using information from the Master Earnings File (MEF) of the Social Security Administration (SSA). SSA then calculates the mean and median earnings of these cohorts and reports them back to DoE in aggregate form. It is believed that SSA imputes $0 earnings to individuals in such cohorts for whom SSA has no earnings data. DoE would then compare these earnings calculations to annual median loan debt of these graduates and assess whether earnings are sufficient to meet proposed debt to earnings (DE) threshold percentages.

The first part of the report focuses on the impact of zero-value imputation, given the limited coverage of the MEF, on the mean and median earnings calculations by SSA. The earnings of many graduates are not found in the MEF, and we discuss the situations under which an individual's earnings would be excluded from the MEF. We also discuss how the inclusion of an individual's earnings in the MEF and their treatment within the MEF differ by occupational classes and employment status.

The second issue upon which this report focuses is how SSA zero-value imputation potentially impacts success in the proposed DE metrics.

Our key findings are

- Earnings exclusion from MEF is prejudicial for certain academic programs which train workers who pursue specific occupations in the public sector including firefighters, public hospital employees, police officers, other public employees, and for academic programs whose graduates are self-employed individuals, such as cosmetologist who rent stations in salons and freelance artists. The supply of many of these workers includes significant numbers of graduates from for-profit colleges. SSA's imputation of zero income to these workers leads to a reduction in the mean and often the median reported earnings of specific programs.

- Under-inclusion of earnings is more likely for individuals in many occupations, especially those in industries with significant self-employment or tip income and individuals with social security numbers but who work abroad who are known to underreport their income leading to downward bias in the earnings reported in the MEF.

- SSA's imputation of zero earnings makes an assumption, with no factual foundation or rationale, about the nature of excluded workers leading to bias in the mean and potentially the median earnings reported by the SSA to DoE.

- Federal government agencies and departments, including the DoE, utilize imputation methods other than the imputation of zeroes in dealing with missing data. State governments which often must impute earnings for governmental programs and policies do not impute zero earnings to cases where income is not observable.

**Current Practice**

In its March 25, 2014 Notice of Proposed Rulemaking (NPRM), DoE proposes GE regulations. This NPRM proposes provisions for DoE to submit lists of the names and social security numbers of graduates of certain programs (GE programs) to the SSA. SSA conducts a verification process by comparing these graduates' personal information to the MEF. If it cannot verify the identity of the graduate with the social security number or if there is a death indicator for the graduate, SSA excludes the individual from further calculations. If SSA can verify the social security number and there is no death indicator, then SSA includes the earnings listed in the MEF in its mean and median aggregate calculations that it then reports to DoE.

In the case where SSA can verify the social security number of an individual included in a program cohort but no earnings record is recorded, SSA imputes an earnings level of zero. As a result of information obtained through a FOIA request of the Gallegos Legal Group to SSA and DoE, it has been learned that SSA has carried out several earnings extractions for DoE since March 2012 (March 4, 2014 Letter from Dawn Higgins (SSA) to Yolanda Gallegos). These earnings extractions were carried out in accordance with an information exchange agreement between DoE and SSA. Pursuant to that agreement, SSA has reported, for each earnings extraction, the number of verified individuals who it assigned zero earnings (E-Mail Correspondence between SSA and DoE from Feb. 16, 2012 to Dec. 18, 2013). According to those e-mails, DoE released SSA zero earnings reports for 4 of 5 earnings extractions it has carried out since March 2012, showing that, overall, SSA has imputed zero earnings to approximately 12% of the total population measured.

Figure 1 illustrates the percentage of the population where SSA reported zero earnings to DoE for individuals whose SSN was verified but for whom no earnings data was included in the MEF. The first entry is the overall sample from the 4 earnings extractions while the subsequent figures represent the missing rates for the submission occurring in July, August, September, or December respectively. These missing values represent the percentages of the verified population where zero earnings was imputed by the SSA.

**Figure 1.  Percentage of Verified Students with Imputed Zeroes for Earnings
By Date of Submission by SSA to DoE**



Under the methodology set out in the proposed GE regulations, once SSA retrieves or imputes earnings, it computes the mean and the median earnings for each GE program for each school and reports these calculations to DoE. DoE then applies the larger of the median and mean to its GE DE ratios metrics in order to ascertain whether the program meets its DE thresholds.

This report focuses on the earnings data coverage of the MEF and on the imputation of zeroes to individuals for whom earnings are not found in the MEF.

**Exclusion in Master Earnings File**

The MEF is the database which records earnings on individuals who are eligible for social security benefits.  SSA populates MEF with data primarily from the Internal Revenue Service which oversees tax collection and enforcement and from employer-submitted W-2 forms.  While its coverage has evolved over time, SSA estimates that 94 percent of the workforce is included in the MEF (SSA 2013).

There are five important categories of individuals for whom income may be excluded in the MEF.  These include civilian federal employees hired before 1984, railroad workers, employees of some state and local governments, domestic and farm workers (under some conditions),  self-employed individuals with low or no net earnings, and self-employed individuals who fail to file tax returns.  The earnings of such federal employees, railroad workers, and employees of state and local governments are not included in the MEF because they are all covered by separate

App.621

retirement systems administered outside of SSA and, therefore, do not participate in the Social Security programs.   The earnings of individuals with low or no net earnings are not included in the MEF because their earnings are reported only if they file a Schedule SE and they are not required to do so unless they have at least $400 of net earnings.  Finally, the MEF excludes earnings of self-employed individuals who fail to file tax returns because their income will not be reported to SSA by employers in W2 forms or by anyone else.  The IRS estimated the number of self-employed nonfilers to be 1.7 million individuals in 1988 (Rosage 88).  One distinct category of nonfilers are Americans with social security numbers living outside of the United States.  Recently the IRS has acknowledged that the proportion of US citizens living abroad who file taxes is extremely low (GAO 1998) making it so that individuals with a valid social security number who live abroad are highly likely to be excluded from MEF.

According to the Government Accountability Office (GAO 2010), 29 percent of state and local government earnings are not covered by social security and therefore not included in the MEF. Figure 2 shows the proportions of state and local government earnings that are uncovered for the eight most populous states.  While New York, Florida, and Pennsylvania have low levels of noncoverage, California, Texas, Illinois, and Ohio have significant portions of state and local employees who are not included in the MEF.  For example, 99 percent of all state and local employees in Ohio are uncovered.

**Figure 2. Percent of Uncovered State and Local Government Workers for Eight Most Populous States**



Note:  Source is GAO 2010, Appendix II (2007 Earnings).

Any worker who is uncovered by SSA may be excluded in the MEF and SSA will incorrectly assign zero earnings to him or her.  We discuss the bias of assigning zero in the last section of this report.  We now try to demonstrate how this affects specific occupations.

Table 1 shows the breakdown of government employees by government level – federal, state, and local levels.   The table shows the categories of employment by government level.  We exclude national defense, space research, and postal workers where all employment happens at the federal level.

**Table 1. State and Local Employee Functions**

| Employment Functions | Total March Full-Time and Part-Time Employment | Percentage of Total Government Employment | Percentage Employed at the Federal Level | Percentage Employed at the State Level | Percentage Employed at the Local Level |
|---|---|---|---|---|---|
| Total | 22,040,106 | 100.0 | 12.7 | 24.0 | 63.3 |
| Financial administration | 532,794 | 2.4 | 22.3 | 30.5 | 47.2 |
| Other government administration | 441,516 | 2.0 | 5.6 | 12.9 | 81.5 |
| Judicial and legal | 491,729 | 2.2 | 12.8 | 35.6 | 51.7 |
| Police protection | 1,183,717 | 5.4 | 16.2 | 9.1 | 74.6 |
| Fire protection | 426,663 | 1.9 | 0.0 | 0.0 | 100.0 |
| Corrections | 745,862 | 3.4 | 5.1 | 59.6 | 35.3 |
| Highways | 521,254 | 2.4 | 0.6 | 43.2 | 56.3 |
| Air transportation | 95,154 | 0.4 | 50.2 | 3.3 | 46.4 |
| Water transport and terminals | 18,409 | 0.1 | 25.9 | 25.8 | 48.3 |
| Public welfare | 532,332 | 2.4 | 1.8 | 44.1 | 54.1 |
| Health | 643,795 | 2.9 | 25.5 | 32.2 | 42.3 |
| Hospitals | 1,259,049 | 5.7 | 16.8 | 33.5 | 49.7 |
| Social insurance administration | 154,407 | 0.7 | 43.5 | 56.2 | 0.3 |
| Housing and community development | 128,317 | 0.6 | 11.1 | 0.0 | 88.9 |
| Parks and recreation | 418,491 | 1.9 | 6.4 | 10.0 | 83.6 |
| Natural resources | 369,484 | 1.7 | 49.7 | 38.9 | 11.4 |
| Solid waste management | 116,377 | 0.5 | 0.0 | 2.2 | 97.8 |
| Sewerage | 129,224 | 0.6 | 0.0 | 1.3 | 98.7 |
| Water supply | 178,633 | 0.8 | 0.0 | 0.4 | 99.6 |
| Electric power | 81,448 | 0.4 | 0.0 | 5.1 | 94.9 |
| Gas supply | 11,734 | 0.1 | 0.0 | 0.0 | 100.0 |
| Transit | 233,467 | 1.1 | 0.0 | 14.4 | 85.6 |
| Education - elementary and secondary | 7,698,741 | 34.9 | 0.0 | 0.8 | 99.2 |
| Education - higher education | 3,176,999 | 14.4 | 0.0 | 81.0 | 19.0 |
| Education -– other | 102,506 | 0.5 | 10.2 | 89.8 | 0.0 |
| Libraries | 183,812 | 0.8 | 2.1 | 0.4 | 97.5 |
| State liquor stores | 11,824 | 0.1 | 0.0 | 100.0 | 0.0 |
| All other and unallocable | 740,281 | 3.4 | 26.6 | 25.9 | 47.5 |

Source: US Census Bureau, 2012 Census of Governments

Some of the largest categories of workers who are employed at the state and local levels include those working in the fields of education, healthcare, police protection, and corrections. These categories of workers are those who are uncovered in the MEF if their state or local employer is not in a coverage agreement with SSA as illustrated in Figure 2.

There is no definitive national source of data which comprehensively identifies the academic programs from which the state and local workers achieved their education. NCES provides some data but it is limited to those who earned bachelor degrees. NCES data shows that among workers who earned bachelor's degrees, 7 percent of protective service occupations and 5 percent of nurses came from for-profit colleges.[i] However, the Bureau of Labor Statistics reports that 2/3 of all police workers have less than a bachelor degree. We do not know the proportion of the workforce that received their training in specific colleges. Nevertheless, anecdotal evidence suggests that law enforcement and corrections are significant employers of graduates from sub-baccalaureate programs of for-profit schools.

One way to investigate the likely effects of the exclusion of these occupations is to examine data which includes workers who are included in the MEF and other workers who are not. To do so, we used the Current Population Survey (CPS) from 2012. The CPS is the survey that the Bureau of Labor Statistics (BLS) uses each month to gauge unemployment statistics throughout the United States. In these interviews, BLS interviews individuals regardless of their inclusion/exclusion from the MEF.

To gauge potential bias among police, corrections and other public safety employees, we focused on those who stated that their employer was a state or local government. Consistent with the data from Figure 1, we randomly selected 30 percent of these individuals. We set their earnings to "missing" to represent the state and local employees that were not included in the MEF. We then imputed zero incomes for these individuals consistent with the process of computing means and medians under the gainful employment regulations. We then compared the resulting mean and median to the true distribution. We repeated this process 100 times and averaged the results to eliminate the potential for sampling error. This gives a reasonable estimate of median and average wages for a specific set of workers where there is significant exclusion in the MEF. Using this process, we compute that the median as computed just using MEF data would be underestimated by 19 percent and the mean as computed just using MEF data would be underestimated by 24 percent.[ii]

**Bias in Master Earnings File**

The MEF data primarily originates from the IRS and depends on earnings reported through individual tax returns and employers' W-2 forms. While most employees' wages are straightforward in the way in which they are reported to the IRS, self-employment income and tip wages are two categories of income that are well known to be severely underreported. The MEF would be downward biased for jobs where underreporting is prevalent.

In the academic literature, "tax gaps" refer to the difference between true income and that reported to the IRS. For example, the IRS estimates that 235 billion dollars of individual income

was underreported in the 2006 tax year.  Nineteen percent of all tax returns misreport income in one way or another (Bloomquist, Emblom, Johns, and Langetieg 2012).

Two categories with substantial underreporting are self-employment income and tip wages.  In 2006, self-employment income was underreported by 59 percent (Bloomquist et al 2012).  Additionally, IRS has long recognized that tip income is underreported.  The IRS estimated in 1998 that only 40 percent of all tips were reported (Robertson, Quinn, and Carr 2006).  Other information suggests that 56 percent of income was underreported when little formal reporting (as in the case of cash tips) was required (Bloomquist et al 2012).

There is a significant relationship between underreported income through self-employment and underreported tip income and specific occupations.  For example, in 2006, the Bureau of Labor Statistics estimated that there would be 319,000 self-employed barbers, hairdressers, hairstylists, and cosmetologists (Silvestri 1999).  Considering that the Bureau of Labor Statistics estimated that there were 663,300 overall jobs in these fields in 2012 (BLS 2014), the implied proportion of the profession which is self-employed is significant (48%).  Given that the number of self-employed workers in this computation is outdated (a 1999 projection of 2006 levels), the estimate may be an underestimate.  Additionally, according to the Current Population Survey in 2012, 56 percent of hairdressers and cosmetologists and 60 percent of barbers reported receiving significant tip and commission income.[iii]

The combination of these facts – high rates of self-employment and tip income – suggest that these occupations (i.e. barbers, hairdressers, hairstylists, and cosmetologists) are highly likely to underreport earnings to the IRS.  Given that MEF depends on the IRS data to establish wages, it suggests that MEF will systematically underreport earnings in these occupations.  Additionally, a majority of individuals in this industry receive training from for-profit colleges, and hence, for graduates of these programs, earnings for this population as reported by MEF should underestimate the true earnings.

As in the prior section, we can use data from the CPS to estimate the potential bias to income.  In the CPS, we can identify all barbers, hairdressers, and cosmetologists who reported receiving tip income.  We augmented their salaries in the CPS to reflect the tip income that was likely unreported.[iv]  The CPS does not include wages for self-employed individuals, so we could not correct the estimates for underreporting among self-employed individuals.  With the augmented tip income, reported wages underestimated the median by 19 percent and the mean by 24 percent.  In other words, the failure to impute tip income and other unreported income resulted in an underestimation of the median and mean income reported of 19 and 24 percent respectively.  This underestimation would have a significant effect on the debt to earnings rates of barbering and cosmetology programs under the GE Rule since approximately 48% of workers in those fields are self-employed (as discussed above).

The CPS does not include wages for self-employed individuals, so we could not correct the estimates for underreporting among self-employed individuals.

App.626

These analyses could be conducted among any number of industries.  In cases where large numbers of individuals are self-employed or have significant tip income, earnings from MEF will underreport the true earnings.

Finally, while we have discussed bias in terms of cases where IRS earnings underreport true earnings, there are other cases where MEF earnings may be inaccurate.  In particular, if earnings exceed $113,700 (in 2013), earnings are top-coded at $113,700.  If individuals earn more than that, their earnings are coded at $113,700.

**Imputation of Zeroes**

Missing data is a frequent topic in statistics.  In survey or administrative data, missing observations frequently occur in data.  The National Academy of Sciences has produced multiple volumes on how to deal with missing data (Madow, Nisselson, and Olkin 1983; Madow and Olkin 1983; Madow, Olkin and Rubin 1983).

Each imputation strategy has imbedded assumptions.  For example, to ignore missing values altogether inherently assumes that missing values occur at random throughout the population.  If indeed values of a variable are missing at random, then the mean and the median from the sample would be unbiased.  However, missing variables are hardly random and rarely do missing variables arise from processes unrelated to individual characteristics and outcomes.

In assigning zero incomes to the individuals whose income is not available in MEF, SSA makes an assumption that all of these individuals are unemployed over the entire year.  In other words, SSA assumes, presumably with no evidence, that if its MEF has no earnings data for an individual, he or she was not engaged in the labor force over the whole year.  As we discuss in the next section, we know of no other government agency that imputes zeroes in its computation of statistics in cases where it data are missing.

The use of zeroes certainly biases the average income.  By using zeroes in place of missing values, the average income is biased downward.  In terms of the median, the use of zeroes for missing values does not bias the results if and only if all of the missing incomes would fall below the median if they were available to include in real numbers.  Particularly, in areas where state and local employees are highly unionized (e.g. education, protective services, corrections), there is little support for this assumption.

Consider the following numeric example.  Suppose that 100 workers comprise the set of graduates from a given educational program.  Suppose that 12 of these individuals' incomes are not observed.  If these individuals had zero earnings, then an imputation of zero is reasonable, and the mean and median of the sample of the 88 observed individuals is unbiased.  If, however, missing data occurs at random, then both the mean and the median are biased.  The mean with imputed zeroes will, on average, be lower than the true mean, and the median will be lower than the true median if any of the individuals with imputed zeroes have incomes above the median.

Table 2 includes simulations using data from the Current Population Survey (CPS). As we explained above, the CPS is the survey that the Bureau of Labor Statistics uses each month to gauge unemployment statistics throughout the United States. For each occupational grouping, we computed the average weekly earnings as reported on the survey and excluded occupational groupings with less than 30 individuals. [v]

We then tried two simulations. In each simulation, we set wages for 12 percent of the sample to be missing. These missing wages would represent those individuals with positive wages but whose earnings might be unobservable in the MEF. We used 12 percent as that is near the proportion of imputed zeroes from the overall column in Figure 1.

The first simulation utilized the assumption that SSA is making in using zeroes. SSA inherently assumes that unobserved earnings only occurs for the lowest earners. As we mentioned, if this assumption is true, then the median should not be biased. However, even if the assumption that missing values reflect the lowest earners is correct, then we still would miss some income. Using the CPS values for these low earners, we see that the mean as reported by SSA with imputed zeroes would be biased 3 percent lower than it would otherwise be. This is the smallest possible bias in any scenario since it assumes that all of the missing values come from the lowest earners.

Given that the mean would be lower by 3 percent, we then turned to the 2012 GE Informational Rate worksheet used by the DoE for determining which programs did not pass the expected rates of 8 percent debt to income ratio and 20 percent debt to discretionary income ratio, which it released with its March 2014 proposed regulations. We use the variation of the regulations focused on cohorts over 30 with amortization at 10/15/20 years. If we alter income by 3 percent as is the smallest possible implied bias, we find that 6 percent of programs that previously did not pass the 8 percent debt to income ratio now pass. Three percent of programs that previously failed the 20 percent debt to discretionary income ratio now pass.

As we previously mentioned, there is no reason to believe that the assumption that missing earners must come from the bottom of the distribution is correct. State and local government employees are not amongst the lowest earners in the income distribution. An alternative and equally plausible assumption is that the missing incomes represent people throughout the true earnings distribution.

In the next simulation, we randomly assigned "missing" values to 12 percent of workers in the CPS. We then computed the means and medians for each occupation by using the SSA imputation of zero incomes for the missing values. We then compared the bias in the imputed zero group to the true mean from the CPS data. We repeated the exercise 100 times so that the results are not affected by sampling bias.

In this simulation, which probably more closely reflects the actual population than the simulation that assumed all missing values were from the bottom of the distribution, the median is biased downward 9 percent while the mean is biased downward by 11 percent. With these changes, 19 percent of programs that previously failed the debt to income test now pass it, and 9 percent of programs that previously failed the debt to discretionary income test now pass it.

The results of these two simulations are set forth in Table 2.

**Table 2.  Potential Biases in SSA Median/Mean Income Based Different Assumptions About the Nature of Missing Values**

|  | Bias Relative to the Median | Bias Relative to the Mean | % of Programs Now Passing 8% Annual Earnings Test | % of Programs Now Passing 20% Debt to Discretionary Income Test |
|---|---|---|---|---|
| Missing Incomes Concentrated Among Lowest Earners | 0% | -3% | 6% | 3% |
| Missing Incomes Distributed Across All Earners | -9% | -11% | 19% | 9% |

Source:  2012, CPS Merged Outgoing Rotation Sample.  Department of Education, Gainful Employment Negotiated Rulemaking Debt To Earnings Calculations (2012 GE Informational Rates)

The second simulation in Table 2 is equally as plausible if not more so than the first simulation. The result is an enormous change in institutions passing the gainful employment tests.  These simulations could be enhanced further by incorporating corrections for tip income, self-employment underreporting of income, or information from excluded employees.  These would only make the estimated bias larger and hence the number of programs subject to loss of eligibility and other penalties under the regulation would be dramatically reduced.

As an example of one industry, we look at cosmetology.  Among the 729 cosmetology programs listed in the 2012 GE Informational Rates, there were 169 cases where a program failed the debt to income test and 495 cases where a program failed the debt to discretionary income test.  If we used the 3 percent bias estimate from Table 2, 8 percent of programs that previously failed the debt to income test would now pass.  If we used the simulations with 10% bias, then 23 percent and 1 percent of programs that previously failed the debt to income or debt to discretionary income tests respectively would now pass.

If the goal of an assignment of zero income is to create an unbiased measure of mean or median income, it is unsuccessful and largely ignores 30 years of scientific advancements in imputation methodologies.  Additionally the lack of reliance on other data goes against the most common strategy, "multiple imputation" as explained by Rubin (1987).  In multiple imputation, the statistician uses other data to predict the missing value.  The statistician predicts the missing value multiple times under alternative assumptions and while introducing some variability.  The final imputation is a combination of the multiple imputations.  There are other imputation methods.  Hu (2001) provides a study of popular imputation methods, but as Hu explains "It is advisable to conduct a sensitivity analysis when choosing an imputation method."

**Imputation of Non-Zero Values in Other Governmental Agencies**

Finally, imputation of income and other data is not new in the creation of government statistics. Frequently, governmental survey or administrative data have missing values. The statistician or policy maker must impute values to create unbiased measures of the underlying statistic. However, the imputation of zeroes in the absence of data is well known to create bias.

*Examples from Federal Agencies*

- The United States Census Bureau uses "hot deck" imputation by assigning values for several data points, including income, to missing observations by examining a "similar" unit (Census 2014). The Bureau does this for the Survey of Income and Program Participation, the Census, and the CPS.
- The Bureau of Labor Statistics uses "nearest neighbor" imputation by assigning values for data points, including income, from a similar unit to the missing values. "Neighbor" is based on an index of variables.
- The Census Bureau also uses multiple imputation of income values based on single variables, trends and multiple variable correlations.
- The Federal Economic Statistics Advisory Committee, housed in the Department of Commerce, regularly reviews studies from other federal agencies which incorporate different forms of imputation. None of the reviewed methods use imputed zeroes.
- The Bureau of Justice Statistics allows imputation and requires imputed values be noted for the general public. They emphasize "theoretical and empirical considerations" in choices of imputation standards.
- This list includes the Department of Education itself. The National Center of Educational Statistics (NCES), housed in the Department of Education, has expressly cautioned against the imputation of zero values for missing data and established standards for imputation for educational statistics collected by NCES. In NCES Statistical Standard 4-1-8 discussing cases of zero imputation, they explain that zero imputations "will underestimate the true population totals" (NCES 2002).

*Examples from State Agencies*

The clearest example of states imputing incomes comes from child support cases. States impute earnings for noncustodial parents in setting child support payments when earnings are not observable in state administrative data. The Office of the Inspector General in the Department of Health and Human Services published an overview of state's imputation strategies in 2000. Their overview included the following observations:

- 48 states impute income when it is missing.
- 35 states assume that the individual should have been able to work at least a minimum wage job for 40 hours per week.

- 15 states use an area wage
- 31 states use the most recent employment information for an individual
- 35 states use skills and experience to predict earnings (OIG 2000, p. 15).

In short, none of the states assign zero earnings to the noncustodial parent in cases where they have no earnings data on that parent. Interestingly, under the DoE's proposed GE regulations, an individual could have an imputed non-zero income according to a state government (in 35 states the wage would be equivalent to at least the minimum wage multiplied by 40 hours per week that an individual could work) and an imputed zero income under the gainful employment regulation if the individual's income is not known.


**Conclusion and Summary**

- Exclusion of earnings from MEF handicaps specific academic programs in their ability to meet DoE's proposed DE metrics. The MEF does not include earnings of specific types of workers including firefighters, police officers, other public employees, self-employed individuals with little or no net earnings, and individuals who are required to file tax returns but do not. The supply of many of these workers includes significant numbers of graduates from for-profit colleges. The imputation of zero income to these excluded workers leads to a reduction in the mean and often the median reported earnings of specific programs.

- While earnings for most workers may be reported accurately through employer W-2 forms or individual tax filing, another gap in the MEF results from self-employed persons who under-report their income, such as barbers, cosmetologists, freelance artists, massage therapists, and others. Many occupations, especially those in industries with significant self-employment or tip income, underreport earnings leading to downward bias in the earnings reported in the MEF.

- By imputing zero earnings to graduates in cases where SSA has no data, SSA makes an assumption without explanation or rationale about the nature of excluded workers that creates a downward bias of the mean and potentially the median earnings reported by the SSA to DoE.

- Federal government agencies and departments, including the DoE, routinely utilize well known methods to impute data other than the assignment of zeroes in dealing with missing data. State governments which often must impute earnings for governmental programs and policies do not impute zero earnings to cases where income is not observable.

As an expert in statistics and data analysis, my unequivocal expert opinion is that SSA's imputation of zeroes for gainful employment computations runs counter to acceptable statistical methods and would be expected to result in underestimation of both the mean and median

calculations under the proposed gainful employment regulation currently being carried out by SSA.  It ignores current practices in statistical modeling, including the imputation models used in other parts of the government to impute earnings and other types of missing data.

Bloomquist, Kim, Ed Emblom, Drew Johns, and Patrick Langetieg 2012. "Estimates of the Tax Year 2006 Indiviaul Income Tax Underreporting Gap." Washington, DC:  IRS Office of Research. Available at http://www.irs.gov/pub/irs-soi/12resconEstimates.pdf.

[BLS] Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2014-15 Edition*, Barbers, Hairdressers, and Cosmetologists, on the Internet at http://www.bls.gov/ooh/personal-care-and-service/barbers-hairdressers-and-cosmetologists.htm (visited *May 21, 2014*).

[Census] The Census Bureau, US Department of Commerce, "Survey of Income and Program Participation" available at http://www.census.gov/programs-surveys/sipp/methodology/data-editing-and-imputation.html.

[GAO] Government Accountability Office. 2010. *Social Security Administration: Management Oversight Needed to Ensure Accurate Treatment of State and Local Government Employees*. Washington, DC: GAO. Available at http://www.gao.gov/assets/320/310303.pdf.

[GAO] Government Accountability Office. 1998.  Tax Administration: Nonfiling among US Citizens Abroad."  Report to the Chairman Committee on Ways and Means, House of Representatives.  Available at http://www.gpo.gov/fdsys/pkg/GAOREPORTS-GGD-98-106/html/GAOREPORTS-GGD-98-106.htm.

Madow, W. G., Nisselson, J. and Olkin, I., eds. (1983). Incomplete data in sample surveys, volume 1: Report and case studies. New York: Academic Press.

Madow, W. G.;Olkin, I., and Rubin, D. B., eds. (1983). Incomplete data in sample surveys, volume 2: Theory and bibliographies. New York: Academic Press.

Madow, W. G. and Olkin, I., eds. (1983). Incomplete data in sample surveys, volume 3: Proceedings of the symposium. New York: Academic Press.

[NCES] National Center for Educational Statistics.  2002. Statistical Standards Program (Standard 4-1).  Available at http://nces.ed.gov/statprog/2002/std4_1.asp.

[OIG] Office of Inspector General, Department of Health and Human Services.  2000.  "State Policies Used to Establish Child Support Orders For Low Income Non-custodial Parents."  OEI-05-99-00391.

Robertson, John, Tina Quinn, and Rebecca C. Carr. 2006. "Unreported Tip Income: A Taxing Issue." *The CPA Journal*. New York State Society of CPAs.  http://www.nysscpa.org/cpajournal/2006/1206/essentials/p30.htm

Rosage, Laura. 1988.  "Self-Employed Nonfilers, 1988." Available at http://www.irs.gov/pub/irs-soi/88sen.pdf

Rubin, Donald. 1987. *Multiple Imputation for Nonresponse in Surveys.* John Wiley: New York.

Silvestri, George. 1999.  "Considering self-employment: What to think about before starting a business." *Occupational Outlook Quarterly.* Available at http://www.bls.gov/opub/ooq/1999/Summer/art02.pdf.

[SSA] Social Security Administration. 2013. *Annual Statistical Supplement to the Social Security Bulletin, 2013*. Washington, DC: SSA. Available at http://www.socialsecurity.gov/policy/docs/statcomps/supplement/2013/supplement13.pdf.

---

[i] Author's computations from the Baccalaureate and Beyond Study, 2009.  Computed using the National Center for Education Statistics' PowerStats.

[ii] Author's calculations using the Current Population Survey's Merged Outgoing Rotation Group microdata for 2012.

[iii] Author's calculations using the Current Population Survey's Merged Outgoing Rotation Group microdata for 2012.

[iv] The IRS reports that 60 percent of tips are unreported.  We augmented wages by 50 percent to control for these extra earnings.

[v] There are many alternative ways to conduct this simulation.  We could have determined the bias in each industry and reported the average bias.  In each case the assignment of zeroes leads to a downward bias in the mean and in the median (to the extent that errors are made in assigning individuals to low earnings).

Imputation of Income Under Gainful Employment, Technical Appendix

By Eric Bettinger, Ph.D.

Stanford Graduate School of Education

In the report "Imputation of Income Under Gainful Employment," I created three simulations. These simulations used income data from the Current Population Survey (CPS) to examine the potential biases that may be present in the calculation of the mean and median as proposed by gainful employment regulations. Under gainful employment regulations, individuals who have a valid social security number but no earnings in the MEF are imputed to have zero earnings. The CPS interviews individuals regardless of their inclusion in the MEF, and many of them may be excluded from the MEF.

*Data Preparation*
We focus on CPS interviewees who participated in the Merged Outgoing Rotation in 2012. The data are available at http://www.nber.org/data/morg.html.

Given that our analysis focuses on specific occupations, we only included observations where individuals revealed their occupation (the specific variable is *occ2012*). Many individuals, especially self-employed individuals, do not report earnings (variable is *earnwke*) during the last week. We only include individuals who reported earnings for the prior week.

*Simulation #1.  Public Employees*
One category where a majority of employees work for state and local governments are "protective services." This includes fire fighters, police officers, and correction officers. The first simulation focuses only on these individuals.

We include both public and private workers. Given the information in Figure 2, we know that 30 percent of state and local employees are not covered in the MEF. The variable *class94* identifies workers who work for state and local governments. We then randomly choose 30 percent of these workers to have "missing" observations.

We replace their true earnings with imputed zeroes following the procedures of gainful employment. We then compute the mean earnings with the imputed zeroes.

We repeat this process 100 times to reduce sampling error.

For each iteration, we computed the average and median. We combine these 100 sample statistics by computing the average of across the 100 averages and medians. We compare this combined mean and median to the actual. The percentage difference from the correct mean is reported in the text.

*Simulation #2.  Cosmetology*
The second simulation focuses on excluded tips. We focus on the occupational codes that focus on hairdressing and cosmetology. The variable *otc* identifies individuals who received additional income including tip income. Given that the IRS reports that 60 percent of income is unreported, we increase earnings by 50 percent when individuals in cosmetology reported having received tip income. Fifty percent is more conservative than the 60 percent unreported income measure that the IRS reported. The variable *otc* also identifies extra commissions, but this is likely not as relevant for cosmetology. Fifty-two percent of individuals in cosmetology fields report tip income.

We are also implicitly assuming that the CPS survey does not include tip income. Even if the CPS income estimate includes tips, the point of the exercise is to show that if tip income was not reported (as the IRS has indicated is the case for tip income), then the mean and median reported in the MEF will underestimate the correct mean and median.

*Simulations #3 and #4. Imputed Zeroes Across All Occupation Categories*

The SSA reported that 12 percent of college graduates submitted as part of gainful employment regulations had missing income in the MEF.

In simulation #3, we use the assumption that SSA employs in imputing zeroes. Namely, we identify for each occupation the 12 percent of individuals with the lowest earnings. We set their wages to be "missing." We then impute their earnings to be zero. We then recomputed the mean and median. Given that the lowest earners would not change in repeated iterations, we only have to run one simulation in this case.

We compare the mean and median with imputed zeroes to the true mean and median. The median does not change since the ordering of the data has not changed. The mean falls by 3 percent.

In simulation #4, we randomly assigned "missing" values to 12 percent of workers in the CPS. We generate a uniformly distributed random variable to select the 12 percent of workers.

Once we identified these workers. We imputed their incomes to be zero. We then computed the means and medians for each occupation by using the SSA imputation of zero incomes for the missing values.

We repeated the exercise 100 times so that the results are not affected by sampling bias.

After the 100 iterations, we then combined the 100 estimates of the mean and the 100 estimates of the median by averaging across our estimated values to get a combined mean and a combined median. We then compared this to the true mean and median.

Once we completed the simulations to measure means and medians, we then examined the "2012-Informational Rates" spreadsheet with the most recent computations used by the US Department of Education for determining compliance with the 8 percent threshold of debt to annual earnings and the 20 percent threshold of debt to discretionary income.

Under Simulation 3, we measured that MEF would likely be 3 percent lower than the truth. In the "2012 Informational Rates," we revised annual earnings and discretionary income to take into account the three percent increase in earnings. This accounts for the lower bound of possible biases.

In principle, DoE would use the larger of the median or the mean. It is unobservable to us whether the mean or median is employed for any program. We assumed in Simulation 3 that the

means were used.  With additional information about means and medians, the simulation could be improved to account for the specific mean or median used in measurement.

With the revised income, we then examined which programs would now pass the respective tests and compared that to those that had previously failed.

We then repeated this exercise for Simulation 4.  In Simulation 4, we found that the means and medians declined by 11 and 9 percent respectively.  We used 10 percent as the change in income being the average of these two changes.  We again adjusted the earnings reported by SSA to DoE.  We increased the MEF earnings by 10 percent and again checked for whether programs that previously failed the respective tests now passed it.  The results appear in Table 2.

# Eric P.  Bettinger

| | |
|---|---|
| Stanford School of Education | Phone: (650) 736-7727 |
| CERAS 522 | Fax: (650)-723-9931 |
| 500 Galvez Mall | Email: ebettinger@stanford.edu |
| Stanford, CA 94305 | CV Version: Mar 12, 2014 |

## Professional Experience

*Associate Professor of Education.* Stanford University School of Education.  (Sep 08 to present)

*Research Associate*.  National Bureau of Economic Research.  (Sep 11– present)

*Faculty Research Fellow*.  National Bureau of Economic Research.   (Mar 03– Aug  11)

*Associate Professor of Economics.* Case Western Reserve.  (Jul 06 to Aug 08 )

*Assistant Professor of Economics*.  Case Western Reserve  (Jul 00 to Jun 06)

*Visiting Fellow.* American Academy of Arts and Science.  (Sep–Dec 2002)

## Education

*Ph.D.*          Economics, Massachusetts Institute of Technology, 2000

*B.A.*          Economics, Brigham Young University, 1996.  *Magna cum Laude,* Honors

## Peer-Reviewed Articles

Bettinger, Eric, Mari Rege, and Torbjorn Haegland, (2014) "Home with Mom: The Effects of Stay at Home Parents on Children's Long-run Outcomes." *Journal of Labor Economics* 32:3. [equal authorship].

Bettinger, Eric and Rachel Baker. (2014) "The Effects of Student Coaching: An Evaluation of a Randomized Experiment in Student Advising." *Educational Evaluation and Policy Analysis* 36:1 pp 3-19. [equal authorship].

Bettinger, Eric, Brent Evans, and Devin Pope (2013). "Improving College Performance and Retention the Easy Way: Unpacking the ACT Exam," *American Economic Journal: Economic Policy*, 5(2), 26-52.

Bettinger, Eric, Bridget Long, Phil Oreopoulos and Lisa Sanbonmatsu, (2012) "The Role of Simplification and Information: Evidence from the FAFSA Experiment.*"*  *Quarterly Journal of Economics* 127 (3), 1205-1242.[equal authorship]

Bettinger, Eric (2012) "Paying for Performance in Grade School: Evidence from a Policy Experiment" *Review of Economics and Statistics* 94 (3), 686-698.

Bettinger, Eric, Michael Kremer, and Juan Saavedra (2010) "How Do Vouchers Work? Evidence from Colombia." *Economic Journal* 546(08):F204-F228. [equal authorship].

Bettinger, Eric and B. T. Long. (2010) "Does Cheaper Mean Better? The Impact of using Adjunct Instructors on Student Outcomes." *Review of Economics and Statistics* 92(3): 598–613. [equal authorship]

Bettinger, Eric and B. T. Long. (2009) "Addressing the Needs of Under-Prepared College Students: Does College Remediation Work?" *Journal of Human Resources* 44(3): 736–771. [equal authorship]

Slonim, Robert, James Carlson, and Eric Bettinger, (2007), "Possession and Discounting Behavior." *Economics Letters 97*(3): 216-221.

Bettinger, Eric and Robert Slonim (2007), "Patience in Children: Evidence from Experimental Economics." *Journal of Public Economics 91*(1-2): 343-363. [equal authorship].

Bettinger, Eric and Robert Slonim (2006), "Using Experimental Economics to Measure the Effects of a Natural Educational Experiment on Altruism," *Journal of Public Economics 90*(8-9): 1625-1648. [equal authorship].

Angrist, Joshua, Eric Bettinger, and Michael Kremer (2006), "Long-Term Educational Consequences of Secondary School Vouchers: Evidence from Administrative Records in Colombia," *American Economic Review 96*(3): 847-862. [equal authorship].

Bettinger, Eric and B. T. Long. (2005) "Do Faculty Members serve as Role Models? The Impact of Faculty Gender on Female Students." *American Economic Review,* vol. 95, no. 2. [equal authorship]

Bettinger, Eric P (2005), "The Effect of Charter Schools on Charter Students and Public Schools," *Economics of Education Review*, 24(2) pp. 133-147.

Bettinger, Eric and Bridget Long. (2005) "Remediation at the Community College: Student Participation and Outcomes" *New Directions for Community Colleges*, Number 129, pp. 17-26. [equal authorship].

Angrist, Joshua, Eric Bettinger, Erik Bloom, Michael Kremer, and Elizabeth King (2002) "The Effects of School Vouchers on Students: Evidence from Colombia," *American Economic Review 92(5)*: 1535-1558. [equal authorship].

Bettinger, Eric, and William T. Bogart (2001), "Open Enrollment and Property Values: Who Really Benefits?" *National Tax Association Conference Proceedings 2001*: 273-278. [equal authorship].

Other Refereed Papers in Review Process

Bettinger, Eric and Bridget Long, "Class Size in College." Under Review. [equal authorship].

Bettinger, Eric, Bridget Long, and Eric Taylor, "Graduate Student Teaching" Under Review. [equal authorship].

Book Chapters

Bettinger, Eric and Betsy Williams (forthcoming 2014) "Federal and State Financial Aid during the Great Recession" How the Financial Crisis and Great Recession Affected Higher Education. Jeffrey Brown and Caroline Hoxby, Eds.. University of Chicago Press.

Zimmer, Ron and Eric Bettinger. (forthcoming 2014). "Getting Beyond the Rhetoric: Surveying the Evidence of Vouchers and Tax Credits" In *Handbook of Research in Education Finance and Policy*, ed. Helen Ladd, and Edward Fiske. Note that this is an updated version of our 2007 chapter.

Bettinger, Eric (2012) "Financial Aid: A Blunt Instrument for Increasing Degree Attainment." In *Getting to Graduation: The Completion Agenda in Higher Education*, Andrew Kelly and Mark Schneider, Eds. John Hopkins Press.

Bettinger, Eric (2011) "Educational Vouchers in International Contexts" in *The Handbook of the Economics of Education, Volume 4,* ed. Eric Hanushek, Stephen Machin, and Ludger Woessmann, Elsevier.

Bettinger, Eric (2010) "To Be or Not to Be: Major Choices in Budding Scientists" in *The American University in the Global Economy.* Ed. Charles Clotfelter. University of Chicago Press, pp. 69-100.

Bettinger, Eric (2010) "Instrumental Variables," *International Encyclopedia of Education*. Statistics Volume.  Elsevier Press. pp. 223-228.

Bettinger, Eric and B. T. Long. (2007) "Institutional Responses to Reduce Inequalities in College Outcomes: Remedial and Developmental Courses in Higher Education." In Stacy Dickert-Conlin and Ross Rubenstein, Eds. *Economic Inequality and Higher Education: Access, Persistence, and Success*. New York: Russell Sage Foundation. [equal authorship]

Zimmer, Ron and Eric Bettinger. (2007). "Getting Beyond the Rhetoric: Surveying the Evidence of Vouchers and Tax Credits" In *Handbook of Research in Education Finance and Policy*, ed. Helen Ladd, and Edward Fiske. New York: Routledge: 447-466. Also published in The International Encyclopedia of Education, 3rd Edition, edited by Barry McGaw, Penelope Peterson and Eva Baker, Elsevier, 2010.

Bettinger, Eric. "Evaluating Educational Interventions in Developing Countries." (2006) in *Educating All Children: A Global Agenda*, ed. Joel E. Cohen, David E. Bloom, and Martin B. Malin. MIT Press.

Bettinger, Eric and B. T. Long. (2006) "The Increasing Use of Adjunct Instructors at Public Institutions: Are we Hurting Students?" In Ronald Ehrenberg, Ed. *What's Happening to Public Higher Education*. Westport, CT: Greenwood Press for the American Council on Education. [equal authorship]

Bettinger, Eric and Bridget Long. (2006)"The Increasing Use of Adjunct Instructors at Public Institutions: Are We Hurting Students?" in *Assessing Public Higher Education at the Start of the 21st Century*, ed. Ron Ehrenberg. [equal authorship].

Bettinger, Eric and Robert Slonim, "The Effects of Educational Vouchers on Student Over-confidence." (2005)  *Field Experiments in Economics,* ed. Glenn Harrison, Elsevier. [equal authorship].

Bettinger, Eric and Erin Riley. "Buying Ohioans Loyalty? How State Financial Aid Affects Brain Drain" (2005) in *Creating Enterprise: University-Government Partnerships to Promote Entrepreneurship*, ed. Scott Shane, Aldershot, UK: Edward Elgar. [equal authorship].

Bettinger, Eric, "Is the Finish Line in Sight?  Financial Aid's Impact on Retention and Graduation."  (2004) in *College Choices: The Economics of Where to Go, When to Go, and How to Pay For It*, ed. Caroline M. Hoxby, Chicago University Press and NBER.

<u>Research in Progress</u>

Bettinger, Eric and Bridget Long. "Simplification and Incentives: A Randomized Experiment to Increase College Savings"

Bettinger, Eric and Bridget Long. "Peer Effects and Student Achievement: The Role of Race in the College Classroom"

Antonio, Anthony, Eric Bettinger, Brent Evans and Jesse Foster. "The Effect of High School College Advisement:  Evidence from a Randomized Evaluation in Texas."

Bettinger, Eric, Michael Kremer, Maurice Kugler, and Juan Saavedra. "The Effect of Educational Vouchers in Colombia on Students' Labor Market Outcomes."

<u>Book Reviews and Other Published Reports</u>

Bettinger, Eric and B. T. Long. (2009) Strategies for the Redesign of the Beginning Postsecondary Students Longitudinal Study. Submitted to the National Center for Education Statistics (NCES).

"Book Reviews: *When Schools Compete: A Cautionary Tale* by H. Ladd and E. Fiske and *Policy Entrepreneurship* by M. Mintrom" in *Journal of Policy Analysis and Management* (2001).

"Book Reviews: *Privatizing Education* ed. H. Levin" in *Journal of Economic Literature* (Dec 2003).

## Public and Professional Service

Associate Editor. *Journal of Labor Economics.* (Jan 2009–present).

Associate Editor. *Economics of Education Review.* (Aug 2006–December 2013).

Editorial Board. *Education Finance and Policy*. (June 2010 to present).

## Academic Grants

Institute of Educational Sciences grant for research on College Advising Corps (2013-2016).

Institute of Educational Sciences grant for research on FAFSA Simplification  (2012-2016).

Bill and Melinda Gates Foundation Grant for Research on FAFSA Simplification (2009-2011).

Institute of Educational Sciences grant for research on college savings (2009-2012).

Bill and Melinda Gates Foundation Grant for Research on State Administrative Databases (2008-2012)

Bill and Melinda Gates Foundation Grant for Research on FAFSA Simplification (2007-2010).

National Science Foundation grant for research on FAFSA Simplification (2007-2010)

Ohio Board of Regents Grant for Development of Virtual Ohio Center for Transitions and Success in Postsecondary Education.  Joint with Ohio State, Cinc U, Sinclair Comm. College, Ohio College Access Network, and Cleveland Scholarship Program.  PI representing Case Western (2007).

Kauffman Foundation Grant for Research on FAFSA Simplification (2007).

Bill and Melinda Gates Foundation Grant for Research on FAFSA Simplification (2007).

Atlantic Philanthropic and Ford Foundation Grant for Research in Higher Education (2006-07).

UCLA Center on Education Policy and Evaluation Grant on Women/Minority Involvement in the Sciences (2004-05).

Lumina Grant for Research on College Remediation (2003-2004).

National Science Foundation grant for research on Educational Vouchers (2002-2005).

Russell Sage Grant for research on Educational Vouchers (2001).

Upjohn Institute Mini-grant for research on Educational Vouchers (2001).

Armington Fund grant for research on values in children (2001).

MacArthur Network on Social Interactions and Economic Inequality:  Dissertation Fellowship (99-00)

National Science Foundation:  Dissertation Improvement Grant (1999-2001)

MIT Economics Department Fellowship (1996-1998).

Ezra Taft Benson, Scholar BYU (1990, 1993-1996).

## Teaching Experience

Spring, 2007    Awarded Weatherhead Undergraduate Instructor of Year

Spring, 2006    Finalist for Wittke Teaching Award (top instructor at Case Western)

| | |
|---|---|
| Spring, 2004 | Finalist for Wittke Teaching Award (top instructor at Case Western) and Jackson Mentoring Award (top faculty mentor at Case Western) |
| Summer, 2001 | Awarded Nord Teaching Grant for innovative instruction (Case Western Reserve University) |
| Spring, 2001 | Awarded Dorney Grant for Teaching (Case Western Reserve University) |
| Courses taught: | Experimental Design, Economics of Higher Education, Graduate Econometrics, Undergraduate Econometrics, State and Local Public Finance. |

# EXHIBIT 8



RESEARCH & ANALYSIS

# Economic Well-Being of
# U.S. Households in 2021

May 2022



BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

App 645

 The Federal Reserve System is the central bank of the United States. It performs five key functions to promote the effective operation of the U.S. economy and, more generally, the public interest.

The Federal Reserve

- **conducts the nation's monetary policy** to promote maximum employment and stable prices in the U.S. economy;

- **promotes the stability of the financial system** and seeks to minimize and contain systemic risks through active monitoring and engagement in the U.S. and abroad;

- **promotes the safety and soundness of individual financial institutions** and monitors their impact on the financial system as a whole;

- **fosters payment and settlement system safety and efficiency** through services to the banking industry and U.S. government that facilitate U.S.-dollar transactions and payments; and

- **promotes consumer protection and community development** through consumer-focused supervision and examination, research and analysis of emerging consumer issues and trends, community economic development activities, and administration of consumer laws and regulations.

To learn more about us, visit www.federalreserve.gov/aboutthefed.htm.



RESEARCH & ANALYSIS

# Economic Well-Being of U.S. Households in 2021

May 2022



BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

App.647

# Contents

**Executive Summary** ........................................................................................ 1

Overall Financial Well-Being ....................................................... 2

Income ......................................................................................... 2

Employment ................................................................................. 3

Dealing with Unexpected Expenses ........................................... 3

Banking and Credit ...................................................................... 3

Housing ........................................................................................ 4

Education ..................................................................................... 4

Student Loans .............................................................................. 5

Retirement and Investments ....................................................... 5

**Overall Financial Well-Being** ..................................................... 7

Current Financial Situation ......................................................... 7

Changes in Financial Situation over Time .................................. 12

Local and National Economic Conditions ................................... 14

Overall Life Satisfaction .............................................................. 15

**Income** ............................................................................................ 17

Level and Source ........................................................................ 17

Child Tax Credit ........................................................................... 19

Income Variability ........................................................................ 20

**Employment** .................................................................................. 23

Reasons for Not Working ............................................................ 23

Working from Home ..................................................................... 25

Job Changes ................................................................................ 28

COVID-19 Precautions at Work .................................................. 29

Part-Time Jobs, Temporary Jobs, and Irregular Schedules ....... 31

The Gig Economy ........................................................................ 31

**Dealing with Unexpected Expenses** ......................................... 35

Small, Unexpected Expenses ..................................................... 35

Health-Care Expenses ................................................................ 38

Hardships from Natural Disasters ............................................... 39

**Banking and Credit** ...................................................................... 43

Unbanked and Underbanked ...................................................... 43

Overdraft ...................................................................................... 46

Credit Outcomes and Perceptions .............................................. 47

Credit Cards ................................................................................. 48

Buy Now, Pay Later ..................................................................... 49

## Housing ........................................................................................ 53
Living Arrangements ................................................................... 53
Moving ...................................................................................... 54
Homeownership and Mortgages ................................................. 55
Renting and Evictions ................................................................ 56

## Education ..................................................................................... 61
Modes of Learning in Primary and Secondary School ................. 61
Perceptions of Children's Performance in School ....................... 64
Modes of Learning in Higher Education ...................................... 65
Overall Value of Higher Education .............................................. 66
Look Back on Education Decisions .............................................. 68

## Student Loans .............................................................................. 71
Incidence and Types of Education Debt ...................................... 71
Student Loan Payment Status ..................................................... 73
Relation to Financial Well-Being ................................................. 75
Relation to Self-Assessed Value of Higher Education .................. 75

## Retirement and Investments ........................................................ 77
Current Retirees ........................................................................ 77
Retirement Savings among Non-Retirees .................................... 79
Financial Literacy and Experience with Investments ................... 82

## Description of the Survey ............................................................. 85
Survey Participation ................................................................... 85
Targeted Outreach and Incentives .............................................. 85
Survey Questionnaire ................................................................. 86
Survey Mode .............................................................................. 86
Sampling and Weighting ............................................................ 87
Item Non-response and Imputation ............................................. 88

## Acknowledgments ....................................................................... 91

## Corrections ................................................................................. 93

# Executive Summary

This report describes the responses to the 2021 Survey of Household Economics and Decision-making (SHED). The Federal Reserve Board has fielded this survey each fall since 2013 to understand the wide range of financial challenges and opportunities facing families in the United States.[1] The findings in this report primarily reflect financial circumstances in late October and early November of 2021, before the increase in coronavirus (COVID-19) cases from the Omicron variant.

Despite persistent concerns that people expressed about the national economy, the survey highlights the positive effects of the recovery on the individual financial circumstances of U.S. families. In 2021, perceptions about the national economy declined slightly. Yet self-reported financial well-being increased to the highest rate since the survey began in 2013. The share of prime-age adults not working because they could not find work had returned to pre-pandemic levels. More adults were able to pay all their monthly bills in full than in either 2019 or 2020. Additionally, the share of adults who would cover a $400 emergency expense completely using cash or its equivalent increased, reaching a new high since the survey began in 2013.

Parents with children at home, who had been disproportionally affected by the pandemic in 2020, exhibited notable improvements in their financial well-being in 2021. After declining in 2020, parents' assessments of their financial circumstances rebounded in 2021. This improvement is consistent both with reduced childcare burdens as schools returned to in-person classes, as well as additional financial resources provided to parents such as the enhanced child tax credit (CTC). Most parents also said that their child was doing better academically, socially, and emotionally in 2021 than they were a year earlier.

The report also highlights several new topics added to the survey in 2021, such as disruptions from natural disasters, rental debt, and employer vaccine mandates. These new questions provide additional context on the experiences of U.S. adults in handling unexpected expenses, paying for housing, and navigating ongoing changes in the labor market.

To better understand consumer experiences with emerging products, cryptocurrencies and "Buy Now, Pay Later" (BNPL) products were included on the survey for the first time. While most adults did not use cryptocurrencies in the prior year, cryptocurrency use as an investment was far more

---

[1] The latest survey interviewed over 11,000 individuals in October and November 2021. The anonymized data, as well as appendixes containing the complete SHED questionnaire and responses to all questions in the order asked, are also available at https://www.federalreserve.gov/consumerscommunities/shed.htm.

common than use for transactions or purchases. However, while transactional use of cryptocurrencies was low, those using cryptocurrencies for purchases rather than as investments frequently lacked traditional bank and credit card accounts.

The report also provides insights into long-standing issues related to individuals' personal financial circumstances, including returns to education, housing situations, and retirement savings. In many cases, the report finds that disparities by education, race and ethnicity, and income persisted in 2021.

Key findings from the survey include the following:

## Overall Financial Well-Being

*In the fourth quarter of 2021, the share of adults who were doing at least okay financially increased relative to 2020. With these improvements, overall financial well-being reached its highest level since the survey began in 2013.*

- Seventy-eight percent of adults were either doing okay or living comfortably financially, the highest share with this level of financial well-being since the survey began in 2013.

- Parents experienced particularly large gains in financial well-being over the prior year. In 2021, three-fourths of parents said they were doing at least okay financially, up 8 percentage points from 2020.

- Forty-eight percent of adults rated their local economy as "good" or "excellent" in 2021. This share was up from 43 percent in 2020 but well below the 63 percent of adults who rated their local economy as "good" or "excellent" in 2019, before the pandemic.

## Income

*The majority of parents received additional income in 2021 through the monthly CTC. Most higher-income parents primarily saved this money, while most lower-income parents primarily spent it on housing, items for their children, or food.*

- Three in 10 CTC recipients with income less than $50,000 used the largest portion of their credit on housing expenses, just over 2 in 10 spent the largest portion on their child, and 15 percent spent the largest portion on food.

- Fifteen percent of adults with income less than $50,000 struggled to pay their bills because of varying monthly income. This challenge was even more acute among people who were parents in this income range, of whom 27 percent struggled to pay their bills because of income variability.

## Employment

*Many people switched jobs in 2021, and those who did generally said that their new job was better than their old one. Most employees also said that their employer was taking about the right amount of COVID-19 precautions, although some people not working indicated that concerns about the virus contributed to the choice not to work.*

- Fifteen percent of workers said they were in a different job than 12 months earlier. Just over 6 in 10 people who changed jobs said their new job was better overall, compared with 1 in 10 who said that it was worse.

- Seventy-seven percent of employees said their employers were taking the right amount of precautions against COVID-19. Those who did not were almost evenly split between thinking their employers were taking too many and too few precautions.

- Seven percent of all prime-age adults said that they were not working and that concerns about getting COVID-19 contributed at least in part to their decision not to work.

- Among those working from home, the share of employees who would look for another job if their employer required they work in person was similar to the share who would look after a pay freeze.

## Dealing with Unexpected Expenses

*The overall share of adults who would cover a small emergency expense using cash or its equivalent increased to the highest level since 2013, when the survey began. Financial preparedness is an important buffer for those who encounter unexpected events, such as medical expenses or disruptions from natural disasters.*

- Sixty-eight percent of adults said they would cover a $400 emergency expense exclusively using cash or its equivalent, up from 50 percent who would pay this way when the survey began in 2013.

- Twenty percent of adults had major, unexpected medical expenses in the prior 12 months, with the median amount between $1,000 and $1,999.

- Sixteen percent of adults experienced a financial disruption or hardship from a natural disaster or severe weather event in the prior year.

## Banking and Credit

*Most adults had a bank account and were able to obtain credit from mainstream sources in 2021, but notable gaps in access to basic financial services still exist among Black and Hispanic adults and those with low income.*

- Six percent of adults did not have a bank account. Black (13 percent) and Hispanic (11 percent) adults were more likely not to have a bank account than adults overall.

- Eleven percent of adults with a bank account paid an overdraft fee in the previous 12 months, with higher shares of low-income adults having overdrafted over this period.

- Three percent of adults used cryptocurrency for purchases or money transfers. Among these transactional users of cryptocurrencies, 13 percent did not have a bank account.

## Housing

*Low mortgage rates resulted in a continuation of the wave of refinancing in 2021, although high-income borrowers were primarily the beneficiaries of this opportunity to reduce monthly housing costs. The share of renters who had been behind on their rent in the prior 12 months was higher than before the pandemic, and many still owed back rent at the time of the survey.*

- Nearly one-fourth of all homeowners with a mortgage refinanced their mortgage in 2021. This includes nearly 3 in 10 mortgage holders with an income of at least $100,000, but a lower 16 percent of those with income under $50,000.

- Seventeen percent of renters were behind on their rent at some point in 2021, including 8 percent who were behind at the time of the survey in late 2021. Among those still behind in late 2021, the total outstanding back rent was between $9.3 billion and $10.9 billion.

## Education

*At the time of the survey, most parents of primary or secondary school students reported that their children were attending classes completely in person. Most parents also said that their child was doing better academically compared with a year earlier. In contrast to the experience of K–12 students, online education remained prevalent at higher education institutions in the fall of 2021.*

- Ninety-three percent of parents with a child in public or private school said their youngest child who was enrolled in K–12 education was attending classes completely in person, compared with 27 percent attending completely in person in 2020.

- Fifty-six percent of parents with a child in public or private school said that their child's academic performance improved in 2021, compared with 7 percent who said it declined.

- Seventy-six percent of higher education students in 2021 said they prefer online or hybrid education, given the situation with the pandemic.

## Student Loans

*The share of student loan borrowers who were behind on their payments in the fall of 2021 declined relative to before the pandemic. These borrowers also saw increases in their financial well-being compared with prior years.*

- Twelve percent of borrowers were behind on their payments in 2021, a significant decline from the 17 percent who were behind in the fall of 2019.

- Seventy-three percent of those who went to college and have student loans for their own education were doing at least okay financially in 2021, up from 65 percent before the pandemic.

## Retirement and Investments

*Among non-retirees, a higher share reported they felt like their retirement savings were on track than in either 2020 or 2019. However, a sizeable share of recent retirees said COVID-related factors affected the timing of their retirement decision.*

- Forty percent of non-retirees thought their retirement saving was on track, up from 36 percent in 2020 and 37 percent in 2019.

- Twenty-five percent of adults who retired in the prior 12 months, and 15 percent of those who retired one to two years ago, said factors related to COVID-19 contributed to when they retired.

App.655

# Overall Financial Well-Being

The share of adults doing at least okay financially rose to the highest level since the survey began in 2013.[2] Although financial challenges and risks to the recovery remain, this generally positive assessment of financial well-being was consistent with improved economic conditions and additional COVID-19 relief measures in 2021.

The increase in financial well-being occurred broadly across the population and was especially large among parents. Even so, existing gaps by education and by race and ethnicity persisted.

## Current Financial Situation

At the end of 2021, 78 percent of adults were doing at least okay financially, meaning they reported either "doing okay" financially (39 percent) or "living comfortably" (39 percent). The rest reported either "just getting by" (16 percent) or "finding it difficult to get by" (6 percent). The 78 percent of adults doing at least okay financially in 2021 was up 3 percentage points from 2020 and was well above the 62 percent doing at least this well in 2013 (figure 1).

As further evidence of greater financial well-being in 2021, the share of adults who said they were living comfortably rose by 4 percentage points. This increase in financial well-being aligns with improved economic conditions and the additional COVID-19 relief measures enacted in 2021.[3]



**Figure 1. At least doing okay financially (by year)**

Percent

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|------|
| 62 | 65 | 69 | 70 | 74 | 75 | 75 | 75 | 78 |

Note: Among all adults.

---

[2] The survey was fielded in October and November 2021 and results reflect financial situations at that time. References to "in 2021" refer to the 12-month period before the survey rather than the precise calendar year.

[3] The American Rescue Plan Act of 2021 became law in March 2021 and provided additional relief to most households to address the continued impact of the COVID-19 pandemic; see https://www.congress.gov/bill/117th-congress/house-bill/1319 and https://www.whitehouse.gov/wp-content/uploads/2021/03/American-Rescue-Plan-Fact-Sheet.pdf.

Adults with at least a bachelor's degree continued to be much more likely to be doing at least okay financially (91 percent) than those with less than a high school degree (49 percent). The 42 percentage point gap in well-being was little changed from the 44 percentage point gap in 2020 (figure 2). Moreover, looking over the past five years shows a steady and sizeable increase in financial well-being among those with at least a bachelor's degree (an increase of 9 percentage points in the share doing at least okay from 2016 to 2021), while adults with less than a high school degree have not experienced lasting gains in financial well-being.



Figure 2. At least doing okay financially (by year and education)

Note: Among all adults. Results for 2017 to 2019 differ slightly from previous reports because of adjustments in education coding for consistency.

Parents were one group that experienced particularly large gains in financial well-being over the prior year. In 2021, three-fourths of parents said they were doing at least okay financially, up 8 percentage points from 2020 (figure 3).

Low-income parents saw even more substantial increases in their financial well-being in 2021. Among parents with income under $25,000, the share doing at least okay financially rose by 13 percentage points, from 40 percent in 2020 to 53 percent in 2021. The share of parents with income between $25,000 and $49,999 who were doing at least okay financially increased by 7 percentage points, while those with higher income exhibited more modest improvements.

A potential explanation for the large rise in financial well-being among parents is the expansion of the CTC. The American Rescue Plan temporarily increased the CTC from $2,000 per child to $3,000 per child ($3,600 for a child under age 6), increased eligibility among low-income families,



Figure 3. At least doing okay financially (by year and parental status)

Note: Among all adults.

and paid the credit monthly (the "Income" section of this report discusses how parents used this credit).[4] Many families also saw a return to in-person schooling in the fall of 2021, which may have eased childcare responsibilities and allowed some parents to return to work or work more hours.

The increase in financial well-being among parents in 2021 contrasts with the decline they experienced from 2019 to 2020 (figure 3).[5] Parents were hit especially hard by the pandemic in 2020, having experienced higher rates of job loss and having faced disruptions to childcare and in-person K–12 schooling that affected their availability to work. (See the report *Economic Well-Being of U.S Households in 2020* for additional information).[6]

---

4   More details on the enhanced CTC are available from U.S. Department of the Treasury, "Child Tax Credit," https://home.treasury.gov/policy-issues/coronavirus/assistance-for-american-families-and-workers/child-tax-credit.

5   Results in earlier years were updated for consistency with 2021 methods for classifying education status so may differ slightly from earlier reports.

6   See *Economic Well-Being of U.S. Households in 2020,* https://www.federalreserve.gov/publications/files/2020-report-economic-well-being-us-households-202105.pdf.

Differences in financial well-being across racial and ethnic groups persisted in 2021. Eighty-eight percent of Asian adults were doing at least okay financially, followed by 81 percent of White adults, 71 percent of Hispanic adults, and 68 percent of Black adults (figure 4).[7]



**Figure 4. At least doing okay financially (by year and race/ethnicity)**

Percent

□ Asian    ● White    ○ Hispanic    ■ Black

Note: Among all adults.

All racial and ethnic groups measured in the survey saw an increase in financial well-being over the prior year, with Hispanic adults seeing a particularly sharp increase. In 2021, the 71 percent of Hispanic adults who said they were doing at least okay was up 7 percentage points from 2020.

The increase in well-being for Hispanic adults was largely concentrated among parents, similar to the pattern for adults overall. The share of Hispanic parents doing at least okay increased 14 percentage points (to 70 percent) in 2021. However, Hispanic adults not living with their own children under age 18 saw a relatively slight increase (figure 5).

---

[7] The reported categorizations reflect the largest statistical groupings but are neither exhaustive nor the only distinctions important to understand. Sample sizes for other racial and ethnic groups and subpopulations are not large enough to produce reliable estimates. Asian adults were separately identified for the first time in the survey in the *Economic Well-Being of U.S. Households in 2020*, and in 2021 the Federal Reserve Board identified Asian adults in earlier years of the survey. However, results for Asian adults are sometimes excluded when the sample size is insufficient to provide a reliable estimate.



Figure 5. At least doing okay financially (by year, race/ethnicity, and parental status)

Note: Among all adults. Parents are adults living with their own children under age 18.

Other dimensions across which financial well-being differed include income, geography, LGBTQ+ status, and disability status (table 1). Fifty-five percent of adults with family income less than $25,000 were doing at least okay financially, compared with 96 percent of adults with family income greater than $100,000. People living in low- or moderate-income communities also had lower levels of financial well-being than those living in middle- or upper-income communities.[8] Additionally, those living in metro areas were faring better than those in non-metro communities.[9]

Other surveys have shown that adults identifying as LGBTQ+ were more likely to face economic insecurity, suggesting LGBTQ+ status may be associated with financial well-being.[10] Consistent with this evidence, the 2021 SHED found that 67 percent of adults identifying as LGBTQ+ were doing at least okay financially, compared with 78 percent of the overall population.[11] Moreover, an even lower 62 percent of adults who were transgender or nonbinary, or who reported their sexual

---

[8] Neighborhood income is defined using the Community Reinvestment Act definition. Under this definition, low- and moderate-income refers to communities that have a median family income of less than 50 percent of the area median income. For details on the definition, see https://www.federalreserve.gov/consumerscommunities/cra_resources.htm.

[9] Non-metro areas are defined throughout this report as being outside of a Metropolitan Statistical Area (MSA), and metro areas are those inside of an MSA, as defined by the Office of Management and Budget. This definition differs from the Census Bureau's definition of urbanized areas. For details, see U.S. Census Bureau, "2010 Urban Area FAQs," https://www.census.gov/programs-surveys/geography/about/faq/2010-urban-area-faq.html.

[10] For example, see U.S. Census Bureau, "Household Pulse Survey Shows LGBT Adults More Likely to Report Living in Households with Food and Economic Insecurity than Non-LGBT Respondents," https://www.census.gov/library/stories/2021/08/lgbt-community-harder-hit-by-economic-impact-of-pandemic.html.

[11] Survey respondents could report their sexual orientation and gender identity on a demographic profile survey previously conducted by the survey vendor. Respondents are classified as LGBTQ+ based on responses to these questions.

### Table 1. At least doing okay financially (by demographic characteristics)

Percent

| Characteristic | 2021 | 1-year change | 5-year change |
|---|---|---|---|
| **Family income** | | | |
| Less than $25,000 | 55 | 3 | 8 |
| $25,000–$49,999 | 67 | 2 | 5 |
| $50,000–$99,999 | 85 | 1 | 5 |
| $100,000 or more | 96 | 1 | 4 |
| **Disability status** | | | |
| Disability | 60 | n/a | n/a |
| No disability | 81 | n/a | n/a |
| **LGBTQ+ status** | | | |
| Identifies as LGBTQ+ | 67 | -1 | n/a |
| Does not identify as LGBTQ+ | 79 | 2 | n/a |
| **Marital status** | | | |
| Married | 86 | 4 | 9 |
| Not married | 67 | 0 | 6 |
| **Place of residence** | | | |
| Metro area | 79 | 3 | 9 |
| Non-metro area | 72 | 3 | 4 |
| **Neighborhood income** | | | |
| Low or moderate income | 66 | 4 | 6 |
| Middle or upper income | 82 | 2 | 9 |
| **Overall** | **78** | **3** | **8** |

Note: Among all adults. Low- or moderate-income neighborhoods are defined here using the definition from the Community Reinvestment Act. LGBTQ+ status was first identifiable in the 2019 survey and disability status was first identifiable in the 2021 survey. Here and in subsequent tables and figures, percentages may not sum to 100 because of rounding.
n/a Not applicable.

orientation as something other than straight, gay, lesbian, or bisexual, were doing at least okay financially.[12]

Finally, 60 percent of adults with a disability were doing at least okay financially, markedly lower than the overall population.[13] Prior to 2021, the SHED did not include disability status, so we cannot observe how financial well-being has evolved for adults with a disability through the pandemic. However, as discussed in the "Employment" section of this report, other surveys find evidence of an increase in employment among adults with a disability in recent years.

## Changes in Financial Situation over Time

The survey also tracks overall financial well-being by asking respondents whether they are better or worse off financially than they were 12 months earlier. Measuring well-being in this way helps track changes in perceived well-being over time, as some individuals may feel worse off financially than they were a year earlier, for instance, even if they feel they are still doing okay overall (or that their financial well-being is improving even if they are still struggling overall).

The share of adults who said they were worse off financially than a year earlier fell from 24 percent in 2020 to 20 percent in 2021, yet remained much higher than the 14 percent seen in 2019,

---

[12] Differences in financial well-being between adults identifying as LGBTQ+ and other adults were present across age groups. For example, only 58 percent of LGBTQ+ adults ages 45 to 54 were doing at least okay, compared with 75 percent among all adults in that age group.

[13] Disability status is defined based on a five-question functional limitation sequence that asks about hearing, vision, ambulatory, self-care, and independent living difficulties. This approach for determining disability status is similar to the six-question sequence used for the American Community Survey (see U.S. Census Bureau, "How Disability Data Are Collected from the American Community Survey," https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html).

before the pandemic (figure 6). The share doing about the same as a year earlier increased 3 per-
centage points to 54 percent, while the share who said they were better off was unchanged at
25 percent.



Figure 6. Financial situation compared with 12 months prior (by year)

Note: Among all adults.

When asked to compare their financial situation to two years ago, before the pandemic, nearly
one-fourth (24 percent) said they were worse off. Forty percent said they were doing about the
same, and 36 percent said they were better off than two years ago.[14] Those who were doing
worse off than before the pandemic were disproportionately adults with lower family income and
less education.

To get a longer-term perspective, individuals were also asked to compare their current financial cir-
cumstances to how they perceived their parents' financial situation at the same age. Looking
across a generation shows evidence of economic progress over time, despite financial setbacks
during the pandemic. A majority of adults (57 percent) thought they were better off financially than
their parents were, up from 54 percent in 2020 and back to the pre-pandemic level from 2019.
Twenty-one percent thought they were worse off than their parents were at the same age.

---

[14] A subset of respondents completed both the 2020 and 2021 surveys. Combining the one-year change in well-being
results in the 2020 and 2021 surveys for these repeat respondents leads to similar results. Twenty-four percent
reported that their financial well-being declined in one year and did not improve in the other, while 34 percent indicated
that their well-being improved in one year and did not decline in the other. The remaining 43 percent either said their
well-being was about the same in each year (35 percent) or had an improvement in one year and a decline in the other
(7 percent).

People holding at least a bachelor's degree were more likely to experience upward economic mobility, relative to those with less education. This is particularly true among first-generation college graduates, among whom 70 percent thought they were better off financially than their parents were.[15]

## Local and National Economic Conditions

Along with questions about their own financial circumstances, people were asked to rate their local economy and the national economy as "excellent," "good," "only fair," or "poor." The share of adults rating their local economy favorably increased from 2020 to 2021. Forty-eight percent of adults rated their local economy as "good" or "excellent" in 2021, with the rest rating conditions as "only fair" or "poor." This share was up from 43 percent in 2020, but well below the 63 percent of adults who rated their local economy as "good" or "excellent" in 2019, before the pandemic.

**Table 2. Self-assessment of the local economy as good or excellent (by race/ethnicity and place of residence)**

Percent

| Characteristic | 2019 | 2020 | 2021 |
|---|---|---|---|
| **Race/ethnicity** | | | |
| White | 67 | 46 | 50 |
| Black | 46 | 32 | 42 |
| Hispanic | 57 | 39 | 44 |
| Asian | 72 | 44 | 61 |
| **Place of residence** | | | |
| Metro area | 65 | 44 | 50 |
| Non-metro area | 53 | 35 | 34 |

Note: Among all adults.

This pattern was generally similar across racial and ethnic groups, with higher shares rating their local economy favorably relative to 2020 but still below the share from 2019 (table 2). One exception was Black adults: the share of Black adults rating their local economy favorably increased 10 percentage points from 2020 to 2021, and was much closer to the pre-pandemic level than for other groups. However, Black and Hispanic adults remained the least likely to report that their local economy was faring well.

People's perceptions about their local economy diverged in 2021 for metro and non-metro areas. While perceptions of the local economy improved for residents of metro areas, perceptions ticked down 1 percentage point for those in non-metro areas. Additionally, the 34 percent of non-metro residents who rated their local economy as "good" or "excellent" remained far below the 53 percent that did so in 2019.

---

[15] First-generation college graduates are those who have at least a bachelor's degree and who report that neither of their parents completed at least a bachelor's degree.

Similar to people's perceptions of their local economy, the share rating the national economy favorably fell precipitously from 2019 to 2020, after the onset of the pandemic (figure 7). However, people's perceptions of the national economy continued to decline in 2021. Only 24 percent of adults rated the national economy as "good" or "excellent" in 2021, down 2 percentage points from 2020 and about half the rate seen in 2019. This trend contrasts starkly with people's increasingly favorable assessment of their own financial well-being.



**Figure 7. Assessment of own financial well-being, local economy, and national economy (by year)**

Note: Among all adults.

## Overall Life Satisfaction

In addition to questions on financial well-being, the 2021 survey included a question on overall life satisfaction to provide a broader look at how people were faring. Respondents rated how satisfied they were with life as a whole on a scale from 0 to 10. Fifty-eight percent of adults reported "high" life satisfaction (rating 7 to 10), 30 percent reported "medium" life satisfaction (rating 4, 5, or 6), and 11 percent reported "low" life satisfaction (rating 0 to 3).

Life satisfaction was strongly associated with income. Nearly three-fourths (73 percent) of adults with family income of $100,000 or more reported high life satisfaction, compared with 41 percent among those with family income less than $25,000. Differences by education were also large, as were those by disability status and LGBTQ+ status (table 3).[16]

Differences in overall life satisfaction by race/ethnicity, on the other hand, were small. The shares of White, Black, and Hispanic adults reporting high life satisfaction were all within 2 percentage points of the share doing so for the overall population. Asian adults exhibited the largest difference from the overall population, with 63 percent reporting high life satisfaction.

---

[16] The scales used to measure life satisfaction and financial well-being are not directly comparable.

| Table 3. Share of adults with high life satisfaction (by demographic characteristics) | |
|---|---|
| Characteristic | Percent |
| **Family income** | |
| Less than $25,000 | 41 |
| $25,000–$49,999 | 51 |
| $50,000–$99,999 | 61 |
| $100,000 or more | 73 |
| **Education** | |
| Less than a high school degree | 40 |
| High school degree or GED | 53 |
| Some college/technical or associate degree | 55 |
| Bachelor's degree or more | 67 |
| **Race/ethnicity** | |
| White | 59 |
| Black | 56 |
| Hispanic | 57 |
| Asian | 63 |
| **Disability status** | |
| Disability | 41 |
| No disability | 62 |
| **LGBTQ+** | |
| Identifies as LGBTQ+ | 46 |
| Does not identify as LGBTQ+ | 60 |
| **Parental status** | |
| Not living with own children under age 18 | 57 |
| Parent (living with own children under age 18) | 62 |
| **Place of residence** | |
| Metro area | 59 |
| Non-metro area | 53 |
| **Overall** | **58** |
| Note: Among all adults. | |

# Income

Income is central to most people's financial well-being. Recognizing this, the survey included a series of questions on income level and sources, as well as monthly income volatility.

Most parents with a child under age 18 received additional income in 2021 from the CTC. Parents used these monthly payments in a variety of ways, including saving them, spending them on food, and spending them on rent, mortgage, and utilities.

Most adults had income that was roughly the same each month. For adults with varying monthly income, 3 in 10 reported that the volatility caused financial challenges. Income variability was more likely to result in financial challenges among those with lower income.

## Level and Source

Family income in this survey is the cash income from all sources, before taxes and deductions, that the respondents and their spouse or partner received during the previous year. Income is reported in dollar ranges and not exact amounts. Just over one-fourth of adults had a family income below $25,000 in 2021, and nearly one-third had $100,000 or more (table 4).

| Table 4. Family income (by race/ethnicity) Percent | | | | |
|---|---|---|---|---|
| Race/ethnicity | Less than $25,000 | $25,000–$49,999 | $50,000–$99,999 | $100,000 or more |
| White | 20 | 16 | 27 | 37 |
| Black | 43 | 18 | 22 | 17 |
| Hispanic | 40 | 18 | 22 | 20 |
| Asian | 17 | 10 | 23 | 51 |
| **Overall** | **26** | **16** | **25** | **32** |
| Note: Among all adults. | | | | |

Family income varied dramatically by race and ethnicity in 2021. Forty-three percent of Black adults and 40 percent of Hispanic adults had a family income below $25,000. This is at least twice the rate among White and Asian adults. Conversely, White and Asian adults were disproportionately likely to have family income above $100,000.

Labor earnings were the most common source of income, but many people had other sources of income as well. Sixty-seven percent of adults and their spouse or partner received wages,

salaries, or self-employment income (collectively referred to here as labor income) (figure 8), matching the share from 2020. Yet, 59 percent of adults and their spouse or partner received non-labor income in 2021.[17]



**Figure 8. Family income sources**

| Income source | 2020 | 2021 |
|---|---|---|
| Wages, salaries, or self-employment income | 67 | 67 |
| **Non-labor income** | | |
| Interest, dividends, or rental income | 32 | 33 |
| Social security (including old age and DI) | 27 | 27 |
| SSI, TANF, or cash assistance from a welfare program | 5 | 5 |
| Unemployment income | 14 | 9 |
| **Any non-labor income** | 61 | 59 |

Percent

Note: Among all adults. Respondents could select multiple answers. DI is Disability Insurance; SSI is Supplemental Security Income; and TANF is Temporary Assistance for Needy Families. Key identifies bars in order from top to bottom.

The share of adults receiving unemployment income in 2021 (9 percent) remained higher than before the pandemic but was lower than in 2020, when the job losses caused by the COVID-19 pandemic peaked. Individuals who received income from unemployment insurance in 2021 reported that they were most likely to learn about their eligibility from their employer (45 percent), followed by their own internet research (32 percent).

Assistance from nonprofits and private sources—including financial support from a friend or family member living outside of their home—can also supplement family income. Fifteen percent of adults ages 21 and older received at least one type of assistance from private or nonprofit

---

[17] Non-labor income is defined as income from interest, dividends, or rental income; social security (including old age and Disability Insurance (DI)); Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), or cash assistance from a welfare program; unemployment income; or income from a pension. Non-labor income does not include Economic Impact Payments, tax credits such as the Earned Income Tax Credit, or in-kind benefits.

sources in 2021 (table 5). Nearly 1 in 10 adults received groceries or meals from a food pantry, religious organization, or community organization, down 2 percentage points from 2020.

Seven percent of adults ages 21 and older received financial assistance from a friend or family member living outside of their home, essentially unchanged from 2020. On the other hand, 15 percent of adults provided support to others.

| Table 5. Financial assistance received (by educational attainment) Percent | | | | |
|---|---|---|---|---|
| Characteristic | Free groceries or meals | Financial support from religious or community organization | Financial support from friends or family not in household | Received at least one type of private or nonprofit support |
| Less than a high school degree | 27 | 5 | 15 | 34 |
| High school degree or GED | 13 | 2 | 7 | 17 |
| Some college/technical or associate degree | 10 | 2 | 9 | 17 |
| Bachelor's degree or more | 3 | 1 | 5 | 8 |
| **Overall** | **9** | **2** | **7** | **15** |
| Note: Among adults age 21 and older. Respondents could select multiple answers. | | | | |

Adults with less education were more likely to receive at least one type of assistance from private or nonprofit sources. More than 3 in 10 (34 percent) adults with less than a high school degree received this type of assistance, compared with less than 1 in 10 adults with at least a bachelor's degree.

## Child Tax Credit

Starting in July 2021, most parents of children under age 18 saw their income supplemented by the enhanced CTC. Eighteen percent of all adults, and 70 percent of adults living with their children under age 18, reported receiving monthly CTC payments in 2021.[18] An additional 5 percent of adults living with children under age 18 did not know if they received monthly CTC payments.

Parents who received monthly CTC payments most frequently saved the payments, spent them on their child, or used them for necessities. Saving was the most common use of the monthly CTC payments, with 43 percent of recipients saying they saved at least a portion of them.

---

[18] This estimate corresponds to 27 million payments to 52 million children. Administrative data from the Treasury Department find that 36 million payments were made in December 2021 for 61 million qualifying children (U.S. Department of the Treasury, *By State: Advance Child Tax Credit Payments Distributed in December 2021* (Washington, DC: Department of the Treasury, December 2021), https://home.treasury.gov/system/files/131/Advance-CTC-Payments-Disbursed-December-2021-by-State-12152021.pdf). The lower estimate of parents reporting the credit in the SHED suggests that some parents either did not know their family received the payment or did not know that it was the CTC.

**Table 6. Uses for Child Tax Credit (CTC)**
Percent

| Purpose | Used any for purpose | Used largest portion for purpose |
|---------|---------------------|----------------------------------|
| Saved it | 43 | 36 |
| Paid off debt | 21 | 10 |
| Spent on child | 40 | 20 |
| Spent on rent, mortgage, or utilities | 29 | 17 |
| Spent on food | 31 | 12 |
| Spent on other things | 12 | 5 |

Note: Among parents with a child under age 18 who reported receiving CTC payments. Respondents could select multiple answers.

Other common uses were spending on their child (40 percent); spending on food (31 percent); and spending on rent, mortgage, or utilities (29 percent) (table 6).

Respondents were also asked how they used the largest portion of the monthly CTC payments. Saving the monthly payment was again the most common response (36 percent), with many others saying that they spent the largest portion on their child or on rent, mortgage, or utilities.

The ways people used the CTC payments varied by income. Higher-income adults were most likely to save the largest portion of their credit, whereas lower-income adults were most likely to spend it on housing. For instance, 54 percent of recipients with income of at least $100,000 saved the largest portion of their credit, whereas only 18 percent of recipients with income less than $25,000 did so (table 7).

**Table 7. Use for largest portion of Child Tax Credit (by family income)**
Percent

| Purpose | Less than $25,000 | $25,000–$49,999 | $50,000–$99,999 | $100,000 or more |
|---------|-------------------|-----------------|-----------------|------------------|
| Saved it | 18 | 15 | 33 | 54 |
| Paid off debt | 14 | 9 | 9 | 10 |
| Spent on child | 22 | 22 | 22 | 16 |
| Spent on rent, mortgage, or utilities | 29 | 33 | 18 | 6 |
| Spent on food | 13 | 19 | 15 | 7 |
| Spent on other things | 5 | 2 | 5 | 7 |

Note: Among parents with a child under age 18 who reported receiving CTC payments.

## Income Variability

Since many bills must be paid monthly, variations in monthly income can lead to financial challenges. Most adults had income that was roughly the same each month, but about 3 in 10 had income that varied from month to month. This share was essentially unchanged from 2020.

Since income variability can result from either dips or spikes in monthly income, the survey asked those who reported varying monthly income whether they struggled to pay bills as a result. Thirty percent of those who experienced varying monthly income, representing slightly less than

1 in 10 adults overall, said they struggled to pay their bills at least once in the past 12 months because of varying monthly income.

Lower-income adults were more likely to have varying monthly income and to report that they struggled to pay their bills at least once in the past 12 months as a result (table 8). Fifteen percent of adults with income less than $50,000 struggled to pay their bills because of varying monthly income. Among lower-income parents, an even greater 27 percent struggled to pay their bills because of income variability.

Adults with and without a disability were similarly likely to experience income variability. However, when those with a disability experienced such variability, it was more likely to lead to a hardship.

### Table 8. Income volatility and related hardship (by family income, race/ethnicity, and disability status)
Percent

| Characteristic | Varying income, causes hardship | Varying income, no hardship | Stable income |
|---|---|---|---|
| **Family income** | | | |
| Less than $25,000 | 16 | 23 | 61 |
| $25,000–$49,999 | 14 | 17 | 69 |
| $50,000–$99,999 | 6 | 18 | 75 |
| $100,000 or more | 1 | 19 | 79 |
| **Race/ethnicity** | | | |
| White | 7 | 19 | 75 |
| Black | 12 | 19 | 69 |
| Hispanic | 14 | 23 | 63 |
| Asian | 4 | 20 | 76 |
| **Disability status** | | | |
| No disability | 7 | 20 | 72 |
| Disability | 13 | 15 | 72 |
| **Overall** | **9** | **20** | **72** |

Note: Among all adults.

Income variability also continued to differ greatly by industry in 2021. Workers in the leisure and hospitality industry were the most likely to have varying monthly income (figure 9).



Figure 9. Income varied at least occasionally from month to month (by industry)

| Industry | Percent |
|---|---|
| Leisure and hospitality | 47 |
| Natural resources and mining | 42 |
| Wholesale and retail trade | 39 |
| Construction | 37 |
| Other services | 35 |
| Transportation and utilities | 34 |
| Education and health services | 27 |
| Information | 27 |
| Manufacturing | 27 |
| Financial activities | 24 |
| Professional and business services | 22 |
| Armed forces | 22 |
| Public administration | 21 |

Note: Among adults who reported industry of employment.

These workers also reported the highest rates of hardship because of their varying income. However, the prevalence of income variability within the leisure and hospitality industry was similarly high both before and after the pandemic.

# Employment

The share of adults who were working in late 2021 remained below the pre-pandemic level. Health limitations, concerns about COVID-19, and family responsibilities were common reasons for not working. Many also switched jobs in 2021, and those who did generally said their new job was better than their old one.

## Reasons for Not Working

Twenty-three percent of prime-age adults (ages 25 to 54) were not working in October 2021, down from 26 percent in 2020, but up from 21 percent in 2019, before the pandemic.[19]

Health limitations and concerns about getting COVID-19 were commonly cited reasons for not working. Twelve percent of all prime-age adults were not working, at least in part, for one of these reasons. Health limitations or disability were cited by 9 percent and specific concerns about COVID-19 were cited by 7 percent (figure 10). Family responsibilities were also commonly cited as reasons for not working.



Figure 10. Reasons for not working among prime-age adults

Note: Among adults ages 25 to 54. Respondents could select multiple answers.

The proportion of prime-age adults who said that they were not working because they could not find work fell from 9 percent in 2020 back to 5 percent in 2021, the same as before the pandemic.[20]

Two percent of all prime-age adults said that they were not working, at least in part, because they didn't want to lose access to unemployment insurance or other government ben-

---

[19] This pattern is consistent with that observed by the Bureau of Labor Statistics, who reported 22 percent not working in October 2021, down from 24 percent not working at the time of the survey in 2020, but up from 20 percent in October 2019. See U.S. Bureau of Labor Statistics, "(Seas) Employment-Population Ratio—25–54 yrs.," https://data.bls.gov/timeseries/LNS12300060.

[20] Some of the decrease could have been due to a change in the questionnaire from 2020 to 2021 to include an additional reason that respondents could give for why they were not working, although respondents still could give multiple answers.

efits.[21] Among those whose family received government benefits in the prior year, 6 percent indicated that benefit eligibility contributed to them not working.[22] However, even among benefit recipients, other factors including concerns about COVID-19 exposure (15 percent) and an inability to find work (11 percent) were more likely to be cited as reasons for not working.

Prime-age women were particularly likely to say that they were not working because of childcare and other family responsibilities. Six percent of prime-age women cited childcare as a reason for not working, and 10 percent cited other family responsibilities, far exceeding that for men (figure 11). However, the share of women not working because of childcare responsibilities did not increase relative to that seen before the pandemic.



**Figure 11. Reasons for not working among prime-age adults (by gender)**

Note: Among adults ages 25 to 54. Respondents could select multiple answers. Key identifies bars in order from top to bottom.

Another difference between prime-age men and women is that women were more likely to say they were not working, at least in part, because of concerns about getting COVID-19. Eight percent of

[21] The survey was conducted in the fourth quarter of 2021, after the expiration of expanded unemployment insurance programs in September.

[22] Government benefit recipients include prime-age adults whose family received unemployment insurance, Social Security, Supplemental Security Income, TANF, other cash welfare assistance, SNAP benefits, Medicare, or Medicaid.

prime-age women cited concern about getting the virus as a reason for not working, compared with 5 percent of prime-age men. Previous studies have found that occupations with more women working in them before the pandemic had higher rates of COVID-19 exposure.[23]

## Working from Home

A major change in many people's work lives since 2019 was the increased prevalence of working from home, also known as remote work. During the week of the survey in late 2021, 22 percent of adults who worked for someone else ("employees") worked entirely from home. This share was down from 29 percent in 2020, but well above the 7 percent who worked entirely from home in 2019, before the pandemic.[24] In addition, 17 percent of employees said they worked from home some of the time during the week of the survey in 2021. For some workers, such as those with disabilities, the increased prevalence of remote work in recent years may have facilitated greater participation in the labor market (see box 1).

Employees with more education were much more likely to work from home than those with less education. Thirty-three percent of employees with at least a bachelor's degree worked entirely from home, whereas 14 percent of employees with some college, and 9 percent with a high school degree or less, did so (figure 12).[25]



**Figure 12. Amount of work done from home (by education)**

| | None | Some | All |
|---|---|---|---|
| High school degree or less | 81 | 9 | 9 |
| Some college/ technical or associate degree | 75 | 11 | 14 |
| Bachelor's degree or more | 43 | 24 | 33 |

Percent

Note: Among adults who worked for someone else. Key identifies bars in order from left to right.

One reason for the differences by education is that employees with more education were more likely to have a job where they could work from home. Nearly three-fourths of employees with a bachelor's degree or more either worked from home or said that they could if their employer would let them, compared with 29 percent of employees with a high school degree or less. Overall, 53 percent of employees either worked from home or said that they could if their employer would let them.

---

[23] Stefania Albanesi and Jiyeon Kim, "Effects of the COVID-19 Recession on the U.S. Labor Market: Occupation, Family, and Gender," *Journal of Economic Perspectives* 35, no. 3 (Summer 2021): 3–24, https://www.aeaweb.org/articles?id=10.1257/jep.35.3.3.

[24] The question asked in 2019 was different from 2020 and 2021. The 2019 survey asked where people worked in their main jobs most of the time.

[25] There is variation across industry in the likelihood of working from home, although even within an industry those with a bachelor's degree are generally more likely to work from home than are those with less education.

## Box 1. Pandemic Employment Experiences of Adults with a Disability

Individuals with a disability have long faced significant barriers in the labor market. Before the pandemic, in February 2020, the employment rate among individuals with a disability was only 19 percent, compared with 67 percent among those without a disability. Most of this gap was due to individuals with a disability being out of the labor force, meaning they were not looking for work.[1] The widespread disruptions to the labor market during the pandemic created unique challenges for adults with disabilities, but the restructuring of how work is conducted also created an opportunity for some to enter the labor force and contribute in ways that were not previously possible.

Despite the additional pandemic-related hurdles, employers' increased reliance on working from home and remote work had the potential to expand employment opportunities for a wide array of workers with a disability. Thirty-three percent of workers with a disability who had less than a bachelor's degree worked from home some of the time in the week before the survey, compared with 25 percent of their peers without a disability (figure A). Among workers with at least a bachelor's degree, a higher share worked from home, and the shares were similar among workers with and without a disability. The increase in remote work opportunities during the pandemic may have contributed to the more rapid recovery in employment rates since the start of the pandemic among workers with disabilities observed in other data.[2]



Figure A. Worked from home at least some of the time (by education and disability status)

Note: Among adults who worked in the month prior to the survey. Key identifies bars in order from top to bottom.

*(continued)*

[1] U.S. Bureau of Labor Statistics "(Unadj) Employment-Population Ratio—With a Disability, 16 Years and Over" https://data.bls.gov/timeseries/LNU02374597; and U.S. Bureau of Labor Statistics, "(Unadj) Employment-Population Ratio—With No Disability, 16 Years and Over," https://data.bls.gov/timeseries/LNU02374593.
[2] According to the U.S. Bureau of Labor Statistics, the employment to population ratio of workers with a disability in October 2021 was 1 percentage point above pre-pandemic levels from February 2020 while remaining 2 percentage points below pre-pandemic levels among those without a disability.

## Box 1—*continued*

Nevertheless, with the unprecedented health challenges that the pandemic presented to the general population, adults with a disability faced significant difficulties that may be exacerbated by their disability. For some types of disabilities, contracting COVID-19 may present unique difficulties in going about one's day or receiving care. Further compounding matters, comorbidities are more prevalent among adults with a disability, meaning a COVID-19 infection may be more likely to result in serious illness or death.[3]

Consequently, workers with a disability may have different preferences on workplace COVID-19 precautions. This, in turn, could affect their employment decisions. After controlling for their level of education, employees with a disability were more likely to favor a vaccine mandate relative to those without a disability.

Additionally, among those who were not working, people with a disability were more likely to say that concerns about contracting COVID-19 contributed to their not working. Among adults with at least a bachelor's degree, 19 percent of those with a disability reported that COVID-19 concerns were a contributing factor. This is nearly twice the frequency of these concerns among similarly educated people without a disability. Among those with less than a bachelor's degree, just over one-fifth of nonworkers with a disability, and just under one-fifth of nonworkers without a disability, said that COVID-19 concerns were a factor in their employment decision. Consequently, while employment rates among workers with a disability have improved recently, health and safety concerns appear to be hampering their employment growth more than among other adults.

_____

[3] Sally-Ann Cooper, Gary McLean, Bruce Guthrie, Alex McConnachie, Stewart Mercer, Frank Sullivan, and Jull Morrison, "Multiple Physical and Mental Health Comorbidity in Adults with Intellectual Disabilities: Population-Based Cross-Sectional Analysis," *BMC Family Practice*, 16, no. 1 (2015): 1–11.

Most employees who worked from home, or who said they could if their employer would let them, would prefer to work from home. Eighty-nine percent said they would like to work from home at least some of the time. Forty-one percent said they would prefer to do so all of the time.

Employees who preferred to work from home at least some of the time most commonly cited less time commuting and work-life balance as reasons (figure 13). Both were cited by 89 percent of employees who preferred to work from home.

Another common reason employees said they preferred to work from home was increased productivity. Seventy percent of employees who preferred to work from home said that one reason for their preference was that they were more productive at home. While lower,



**Figure 13. Reasons employees prefer to work from home**

| Reason | Percent |
|---|---|
| Less time commuting | 89 |
| Work–life balance | 89 |
| More productive working at home | 70 |
| Concerns about COVID-19 | 56 |
| Able to live in a different area | 47 |

Note: Among employees who worked from home or could work from home if their employer allowed, who also said they preferred working from home at least some of the time. Respondents could select multiple answers.

56 percent of employees who preferred to work from home said that concerns about COVID-19 contributed to their preference.

Many of those who worked from home at least some of the time also said that they would actively look for another job if their employer required them to work in person each workday. Forty-five percent said they were at least somewhat likely to look for another job or leave their job if their employer required them to work in person each workday.[26] Twenty-two percent were very likely. Among those working from home full time, an even larger 55 percent said that they would somewhat or very likely to look for another job if required to report in person each workday.

For context on the importance of the ability to work from home in people's job decisions, the survey also asked respondents about their likelihood of looking for another job if their employer froze their pay or cut their pay by various amounts.[27] The share of employees who were at least somewhat likely to look for another job if their employer required they work in person was similar to the share who would look after a pay freeze (figure 14).



Figure 14. Likelihood of looking for a new job (by required in-person work and pay cuts)

Note: Among adults working for someone else who worked from home at least some of the time. Key identifies bars in order from left to right.

## Job Changes

In the fourth quarter of 2021, 15 percent of workers said they were in a different job than they were 12 months earlier. Most people who changed jobs said that their new job was better than

---

[26] However, 16 percent of those working from home who said that they would prefer to work in person also said that they would actively look for another job in this situation. This suggests that at least some of these individuals either were actively looking irrespective of the work location, or they value being given the choice of where to work even if they chose not to work from home.

[27] The order of the pay cut and telework questions was randomized in the survey, as was the amount of the pay cut that respondents were asked about.

their old one. Over 6 in 10 people who changed jobs said their new job was better overall, compared with 1 in 10 who said that it was worse.

Pay, opportunities for advancement, and interest in the work were frequently seen as better in the new job. Just over half of people who changed jobs said that their pay and benefits improved, compared with 20 percent who said their pay was worse. Similarly, far more people said that their work-life balance, opportunities for advancement, and interest in the work improved than said these measures declined (figure 15).



**Figure 15. Change in quality of job characteristics after job change**

Note: Among working adults whose main job was not the same as it was a year ago. Key identifies bars in order from left to right.

Of the characteristics considered, COVID-19 policies and exposure were the most likely to be the same in the old and new jobs. Nearly two-thirds (64 percent) of job changers said that COVID-19 policies and exposure were about the same, while one-fourth said that they were better, and 11 percent said that they were worse.[28]

Workers who experienced a layoff and changed jobs were less positive about their new positions than other job changers.[29] Those who were laid off were substantially less likely than those not laid off to say their new job was better overall.[30] They also were less likely to say that the pay and benefits, opportunities for advancement, and interest in the job improved at their new position (figure 16).

## COVID-19 Precautions at Work

One factor in people's decisions on whether to work and where to work is their perceptions of workplace safety, including COVID-19 precautions. Employees mostly thought that their employers were taking the right amount of precautions to prevent the spread of COVID-19. Seventy-seven percent of employees said their employers were taking the right amount of precautions. Those who

---

[28] Better COVID-19 policies could mean stricter or more lenient policies, depending on the preference of the respondent. The survey did not define what better or worse policies meant.

[29] Seven percent of adults said that they were laid off in the 12 months prior to the survey.

[30] People's perceptions of their old jobs likely also reflect the circumstances of their leaving, including negative feelings from getting laid off. Moreover, while it is likely the laid-off worker is comparing their new job to the job they were laid off from, it is also possible they had another job in-between.



**Figure 16. Share reporting that job characteristic is better after job change (by layoff status)**

Note: Among working adults whose main job was not the same as it was a year ago. Key identifies bars in order from top to bottom.

did not were almost evenly split between thinking their employers were taking too many (11 percent) and too few precautions (12 percent).[31]

In terms of specific precautions, just under one-fourth of employees said that their employer had a policy requiring vaccination. An additional 19 percent of employees said that employees could either be vaccinated or be tested regularly. Forty-nine percent said their employer had no specific vaccine or testing requirement.[32]

Employees were almost evenly split on whether they wanted vaccine requirements in their workplaces. Forty-nine percent of workers said that they wanted their employer to require vaccinations of all employees, whereas 51 percent said that they did not. The share who wanted a vaccine requirement was higher (59 percent) among employees who had a COVID-19 vaccine themselves. Just 4 percent of workers who were not vaccinated wanted their employer to require vaccines.

---

[31] One important aspect, however, is that people who had left an employer over their level of precautions would not have been asked this question about the job that they left. In these cases, an individual will be asked about the precautions at their new job or, if not working, would not be asked the question at all. Nevertheless, most who changed jobs said that their new job's COVID-19 policies were no better or worse than at their previous job.

[32] The remaining 8 percent did not know if there were any requirements.

## Part-Time Jobs, Temporary Jobs, and Irregular Schedules

Thirteen percent of adults worked part time at their main job, and 5 percent said that their main job was a temporary position. The share of adults who were working part time declined 1 percentage point from 2020 to 2021. Part-time work was more common among women than among men. Sixteen percent of women worked part time, while 10 percent of men did.

One indication of a stronger job market is that the share of part-time workers who said they wanted to work more hours declined to 41 percent in 2021, from 51 percent in 2020. Differences remained across the population, however. For example, a higher 58 percent of Hispanic part-time workers said that they wanted more work.

People who had a part-time or temporary job reported more financial strain than people who worked full time. Twenty-nine percent of part-time workers and 31 percent of temporary workers said that they were either just getting by or finding it difficult to get by. A smaller 16 percent of permanent, full-time workers reported the same levels of financial strain.

Some employees also had irregular schedules, including 16 percent who had a work schedule that varied based on their employer's needs. These workers with irregular schedules that they did not control tended to be under more financial strain. Twenty-seven percent of workers with a schedule that varied based on their employer's needs said that they were either just getting by or finding it difficult to get by. This compares with 16 percent of workers with a fixed schedule or with a schedule that they control.

## The Gig Economy

Individuals who perform gig work or other gig activities may be contributing to the economy in ways not observed through traditional employment measures. To understand this aspect of the economy, including the effects of the gig economy on household finances, the survey includes a series of questions about gig activities. Gig activities in this report include selling items at places such as flea markets and garage sales or through online marketplaces, short-term rentals of items or property, and freelance gig work such as ridesharing or other roles where people are paid for specific tasks and generally have flexibility about when and how to work.

Overall, 16 percent of adults had performed gig activities over the prior month.[33] This includes 11 percent who sold things, 1 percent who offered short-term rentals, and 6 percent doing other freelance or gig work (with some people performing more than one type of gig activity) (figure 17).

---

[33] It is not possible to compare how frequently people did gig activities in 2021 with prior years because the gig economy questions were revised substantially in 2021 to refine the definition of gig activities and to reduce respondent burden.



**Figure 17. Gig activities performed**

Note: Among all adults. Respondents could select multiple answers.

Most commonly, people sold things that they owned for personal use, like clothing. Eight percent of all adults sold a personal item in the prior month. A smaller 3 percent sold something that they purchased to resell, and 2 percent sold something that they made.

Gig activities were typically not full-time jobs. Sixty-four percent of those who performed gig activities (10 percent of all adults) said they spent less than 20 hours doing so over the prior month. That said, those doing freelance gig work were more likely than those selling or renting items to spend at least 20 hours on it over the prior month.

People performing gig activities often had another job. Over half of those performing gig activities (54 percent) also had a job working for someone else. Even among those who spent at least 20 hours on gigs, 46 percent reported that they had a job working for someone else.[34]

As a result, gig activities were rarely people's main source of income. Only 2 percent of all adults said they earned more than half of their income from gigs over the prior month. An even lower 1 percent of all adults said that they earned at least 90 percent of their income from gig activities.



**Figure 18. Share performing gig activities (by financial well-being)**

Note: Among all adults.

People with lower financial well-being were more likely to perform gig activities than those who were faring better financially. One-fourth of people who found it difficult to get by financially did gig activities, compared with 13 percent of those who were living comfortably (figure 18). At the same time, however, people who performed gig activities were more likely to say that they did it by choice (71 percent) than out of necessity (29 percent).

People who did freelance gig work also varied in how they felt their pay compared with what

---

[34] Gig questions were asked separately from the standard employment questions. One percent of all adults said that they were both not employed and spending at least 20 hours on gig activities in the prior month.

they could earn from a more traditional job. Thirty-three percent of people who did freelance gig work said that they earned more doing gig work than they could in a traditional job, while 39 percent said they earned less. The remaining 28 percent said they earned about the same amount as they could in a traditional job.

App.684

# Dealing with Unexpected Expenses

The overall share of adults who would cover a small emergency expense using cash or its equivalent increased to the highest level since 2013, when the survey began. Despite this positive trend, many still faced difficulty paying monthly bills. Black and Hispanic adults, as well as adults with lower income, disproportionately faced such challenges.

## Small, Unexpected Expenses

Relatively small, unexpected expenses, such as a car repair or a modest medical bill, can be a hardship for many families. When faced with a hypothetical expense of $400, 68 percent of all adults in 2021 said they would have covered it exclusively using cash, savings, or a credit card paid off at the next statement (referred to, altogether, as "cash or its equivalent").[35] The remainder said they would have paid by borrowing or selling something, or said they would not have been able to cover the expense.

The share who would pay using cash or its equivalent was up 4 percentage points from 2020 and was at the highest level since the survey began in 2013 (figure 19). This increase is consistent with the results on overall financial well-being and may reflect improving economic conditions and the additional COVID-19 relief measures enacted in 2021.

Like the results for overall financial well-being, parents saw a sharp increase in the share who would cover a $400 expense with cash or its equivalent—up from 56 percent in 2020 to 64 percent in 2021. Those not living with their own children under age 18 saw a smaller increase of 3 percentage points. One reason that parents experienced this sharp increase



**Figure 19. Would cover a $400 emergency expense completely using cash or its equivalent (by year)**

Percent

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|------|
| 50 | 53 | 54 | 56 | 59 | 61 | 63 | 64 | 68 |

Note: Among all adults.

---

[35] However, some who would not have paid with cash or its equivalent likely still had access to $400 in cash. Instead of using that cash to pay for the expense, they may have chosen to preserve their cash as a buffer for other expenses (See box 3 from the *Report on the Economic Well-Being of U.S. Households in 2019, Featuring Supplemental Data from April 2020* at https://www.federalreserve.gov/publications/files/2019-report-economic-well-being-us-households-202005.pdf.)



**Figure 20. Other ways individuals would cover a $400 emergency expense**

Put it on a credit card and pay it off over time — 14
Borrow from a friend or family member — 8
Sell something — 6
Use money from a bank loan or line of credit — 2
Use a payday loan, deposit advance, or overdraft — 1
Would not be able to pay for the expense right now — 11

Percent

Note: Among all adults. Respondents could select multiple answers.

may be the expansion of the CTC. The most common way parents used their CTC payments was saving them, potentially improving their ability to handle unexpected expenses.[36]

Those who would not have covered a $400 expense completely with cash or its equivalent (32 percent of adults) may have found it more difficult to handle small, unexpected expenses. For these adults, the most common approach was to use a credit card and then carry a balance, although many indicated they would use multiple approaches (figure 20). Eleven percent of all adults said they would be unable to pay the expense by any means, similar to the 12 percent seen in 2020.

To understand more about covering household expenses, the survey asked about adults' ability to pay their monthly bills. As of October and November 2021, 24 percent of adults indicated that they had, or were close to having, difficulty paying bills for that month: 14 percent of adults had one or more bills that they were unable to pay in full, and an additional 10 percent said they would have been unable to pay their bills if faced with a $400 expense. The 24 percent having difficulty (or close to having difficulty) paying bills was down 3 percentage points from 2020 and down 4 percentage points from 2019. These declines are consistent with improvements seen in overall financial well-being.[37]

Lower-income adults were especially likely to face difficulty paying bills. Half of adults with a family income less than $25,000 had one or more bills that they were unable to pay in full that month or were one $400 financial setback away from being unable to pay them, compared with 5 percent for adults with a family income of $100,000 or more.

Black and Hispanic adults were much more likely than White or Asian adults to face difficulty paying bills, and these differences were present at all income levels (figure 21). Forty percent of Black adults and 35 percent of Hispanic adults had, or were close to having, difficulty paying bills, compared with 19 percent of White adults and 11 percent of Asian adults.

---

[36] More detail on the CTC is available in the "Income" section of this report.

[37] Hispanic adults and parents were two groups that experienced particularly large declines in the share facing difficulty paying bills, similar to results for financial well-being. (See the "Overall Financial Well-Being" section for results on financial well-being among Hispanics and parents.)



**Figure 21. Not able to fully pay current month's bills (by income and race/ethnicity)**

Note: Among all adults. Key identifies bars in order from left to right.

Looking across income levels shows that, even among adults with a family income of $100,000 or more, Black and Hispanic adults were more than twice as likely as White or Asian adults to face these challenges. Several interrelated factors, including discrimination or differences in credit access, could have contributed to the differences by race and ethnicity. (See box 2 on "Racial and Ethnic Discrimination" in the report *Economic Well-Being of U.S Households in 2020* for a discussion of discrimination, and the "Banking and Credit" section for differences in credit access.)[38]

Some financial challenges, such as a job loss, require more financial resiliency than would an unexpected $400 expense. One common measure of financial resiliency is whether people have savings sufficient to cover three months of expenses if they lost their primary source of income. In 2021, nearly 60 percent of people said they had set aside money specifically as emergency savings or "rainy day" funds, the highest share since the survey began in 2013.

For those who did not set aside money for this purpose, some would have dealt with a loss of their main source of income by borrowing, selling assets, or drawing on other savings. Fourteen percent

---

[38] See *Economic Well-Being of U.S Households in 2020*, May 2021, https://www.federalreserve.gov/publications/files/2020-report-economic-well-being-us-households-202105.pdf.

of adults said that they could have covered three months of expenses in this way. Twenty-seven percent of adults indicated they could not cover three months of expenses by any means.

## Health-Care Expenses

Out-of-pocket spending for health care is a common unexpected expense that can be a substantial hardship for those without a financial cushion. As with the financial setbacks discussed earlier, many adults were not financially prepared for health-related costs at the time of the survey.

Twenty percent of adults had major, unexpected medical expenses in the prior 12 months, with the median amount between $1,000 and $1,999. Fifteen percent of adults had debt from their own medical care or that of a family member (not necessarily from the past year).



**Figure 22. Forms of medical treatment skipped because of cost during 2021**

| | Percent |
|---|---|
| Dental care | 17 |
| Seeing a doctor or specialist | 13 |
| Prescripton medicine | 8 |
| Follow-up care | 8 |
| Mental health care or counseling | 8 |
| **Any treatment** | 24 |

Note: Among all adults. Respondents could select multiple answers.

Many went without medical care because they could not afford it. Twenty-four percent of adults went without some form of medical care because they could not pay, ticking up from 23 percent in 2020 but well below the 32 percent reported in 2013. Dental care was the most frequently skipped, followed by visiting a doctor (figure 22). Some people also reported skipping prescription medicine, follow-up care, or mental health visits.

The likelihood of skipping medical care because of cost was strongly related to family income. Among those with family income less than $25,000, 38 percent went without some medical care because they couldn't afford it, compared with 9 percent of adults making $100,000 or more.

Ability to afford health care may contribute to the finding that, as family income rises, the likelihood a person reported being in good health increases substantially. Among those in families with income less than $25,000, 75 percent reported being in good health, compared with 92 percent for those in families with income of $100,000 or more.

Health insurance is one way that people can pay for routine medical expenses and protect against the financial burden of large, unexpected expenses. In 2021, 91 percent of adults had health insurance, a slight uptick from 2020. Those without health insurance were nearly twice as likely to

forgo medical treatment because they couldn't afford it. Among the uninsured, 40 percent went without medical treatment because they couldn't afford it, versus 22 percent among the insured.

## Hardships from Natural Disasters

Those without a financial cushion may face unique and particularly severe challenges in the event of natural disasters. Natural disasters may cause disruptions to people's ability to work, damage to or displacement from their home, or higher bills for heating or cooling. These consequences all require some financial resources to manage, such as a rainy-day fund; access to credit; or support from family, friends, or the local community.

Almost one in six adults (16 percent) were directly affected by a natural disaster during the prior 12 months, meaning that they experienced one or more of the following five events as the result of a natural disaster or severe weather event: (1) an income loss or work disruption, (2) property damage, (3) a temporary evacuation, (4) longer-term displacement from home, or (5) the injury or death of a family member or close friend. The two most common ways that people were affected by natural disasters were property damage, which affected 8 percent of adults, and an income loss or work disruption, which affected 6 percent. Four percent of people had a close friend or relative who was injured or killed by a natural disaster (figure 23).



**Figure 23. Disruptions from natural disasters in the prior 12 months**

| | Percent |
|---|---|
| Income disruption | 6 |
| Property damage | 8 |
| Temporary evacuation | 2 |
| Long-term displacement | 1 |
| Injury or death of family or friend | 4 |
| **Any disruption** | 16 |

Note: Among all adults. Respondents could select multiple answers.

The effects from natural disasters are not uniform across segments of society. Adults with lower income or less education were more likely to be affected by natural disasters than those with higher income (table 9). Nearly 2 in 10 of those with income below $50,000 reported any disaster-related hardship.

Looking at specific hardships, people with an income of less than $50,000 were more than twice as likely to experience an income loss or work disruption, longer-term displacement from home, or the injury or death of a friend or relative than someone with an income of $100,000 or more. Similar differences were observed across education levels. Black or Hispanic adults were also more likely to be affected by natural disasters than White or Asian adults, both overall and within specific income or education categories.

**Table 9. Disruptions from natural disasters (by demographic characteristics)**

| Characteristic | Percent |
|---|---|
| **Family income** | |
| Less than $25,000 | 20 |
| $25,000–$49,999 | 18 |
| $50,000–$99,999 | 14 |
| $100,000 or more | 13 |
| **Education** | |
| Less than a high school degree | 23 |
| High school degree or GED | 15 |
| Some college/technical or associate degree | 17 |
| Bachelor's degree or more | 14 |
| **Race/ethnicity** | |
| White | 14 |
| Black | 19 |
| Hispanic | 21 |
| Asian | 15 |
| **Age** | |
| 18–29 | 17 |
| 30–44 | 17 |
| 45–59 | 17 |
| 60+ | 14 |
| **Homeownership status** | |
| Own | 15 |
| Rent | 18 |
| Other | 14 |
| **Overall** | **16** |

Note: Among all adults.

**Figure 24. Expect risk of being affected by natural disaster to increase in the next 5 years (by whether affected in the prior 12 months)**




| | Expect risk to be much higher | Expect risk to be somewhat higher |
|---|---|---|
| Not affected by a disaster | 9 | 26 |
| Affected by disaster in past year | 20 | 31 |
| **Overall** | 11 | 27 |

Percent

Note: Among all adults. Key identifies bars in order from left to right.

Overall, most people did not expect their risk of experiencing a natural disaster to change in the near future. Fifty-eight percent of adults assessed their likelihood of experiencing a natural disaster in five years as "about the same" as it is currently. However, 37 percent of adults expected their risk of experiencing a natural disaster to be higher in five years, including 11 percent of adults who assessed their natural disaster risk to be "much higher." Less than 5 percent of adults expected their risk of experiencing a natural disaster to decrease.

In contrast to the overall population who expected their risk from natural disasters would be about the same in five years, most people affected by a natural disaster in the past year expected their risk of a natural disaster to be higher in five years. This includes 20 percent who expected their risk to be "much higher" (figure 24).

Some people undertook mitigation activities to reduce their risks from natural disasters. These mitigation activities differed substantially by homeownership status. Nineteen percent of renters investigated other places to live, which was about twice the rate of homeowners. Conversely, 18 percent of homeowners improved their property to mitigate the risks of disasters (figure 25).

While the risks from natural disasters appear higher for people with less education, these individuals were less likely to engage in natural-disaster mitigation activities (table 10). Twenty-two percent of renters with a bachelor's degree or more investigated other

places to live in the prior 12 months because of natural disaster risks, double the 11 percent of renters with less than a high school degree who did so. Homeowners with college degrees were also more likely to improve their properties to reduce natural disaster risks than were those with less education.

Mitigation activities also differed significantly by age. Younger adults—regardless of whether they were renters or homeowners—were more likely to investigate other places to live because of natural disaster risk and more likely to invest in property improvements than older adults.

Mitigation activities were also much more common among people who expected their risk of experiencing a natural disaster to be higher in five years. Among adults who expected their natural disaster risk to be higher in five years, 28 percent of renters investigated other places to live, and 29 percent of homeowners improved their properties—each about 10 percentage points higher than the comparable rates for all renters and homeowners.

Fewer adults purchased additional insurance to mitigate their natural disaster risk compared with the other disaster mitigation activities asked about in the survey. Overall, 6 percent of renters and 5 percent of homeowners purchased additional insurance in the prior 12 months. While the rates were higher among people who expected their risk of experiencing a natural disaster to increase, they were less than 10 percent for that population.



**Figure 25. Natural disaster mitigation activities (by homeownership status)**

Percent

| Activity | Homeowner | Renter |
|---|---|---|
| Investigated other places to live | 10 | 19 |
| Improved property | 18 | 7 |
| Purchased additional insurance | 5 | 6 |

■ Homeowner   ■ Renter

Note: Among all adults. Key identifies bars in order from left to right.

**Table 10. Natural disaster mitigation activities (by homeownership status, education, and age)**
Percent

| Characteristic | Investigated other places to live | | Improved property to reduce risk | |
|---|---|---|---|---|
| | Home-owner | Renter | Home-owner | Renter |
| **Education** | | | | |
| Less than a high school degree | 7 | 11 | 12 | 9 |
| High school degree or GED | 6 | 15 | 13 | 5 |
| Some college/technical or associate degree | 10 | 21 | 19 | 9 |
| Bachelor's degree or more | 11 | 22 | 20 | 6 |
| **Age** | | | | |
| 18–29 | 15 | 21 | 20 | 8 |
| 30–44 | 12 | 21 | 18 | 6 |
| 45–59 | 10 | 16 | 17 | 5 |
| 60+ | 6 | 10 | 18 | 6 |
| Note: Among all adults. | | | | |

# Banking and Credit

Access to financial services from banks and credit unions can be important for people's financial well-being. Most adults had a bank account and were able to obtain credit from mainstream sources in 2021, but notable gaps in access to basic financial services still exist among Black and Hispanic adults and those with low income.

Fewer applicants were denied credit in 2021, and the share of adults who were "very confident" that they would be approved for credit if they applied increased to the highest levels observed since the survey first asked this question in 2015. The use of alternative financial services such as money orders, check cashing, and payday loans was essentially unchanged after a years-long decline.

## Unbanked and Underbanked

Most adults in the United States (81 percent) were "fully banked," meaning that they had a bank account and, in the past 12 months, did not use any of the alternative financial services asked about in the survey. Such services include money orders, check cashing services, payday loans or payday advances, pawn shop loans, auto title loans, and tax refund advances.

An additional 13 percent had a bank account but also made use of alternative financial services. These adults are considered "underbanked" because the banking services they accessed appear to have been insufficient to meet their financial service needs.

The rest of the adult population (6 percent) did not have a bank account. Less than half of these "unbanked" adults used alternative financial services.

Unbanked and underbanked rates were higher among adults with lower income, adults with less education, and Black and Hispanic adults. The largest differences were by education and income level. Twenty-four percent of adults with less than a high school degree, and 17 percent of adults with income below $25,000, were unbanked (table 11). The share of people with income under $25,000 without a bank account far exceeded that of the two highest income levels. As a result, 79 percent of all unbanked adults had income below $25,000, and 91 percent had income below $50,000.

Adults with less education and adults with lower income were also more likely to be underbanked. Nearly one-fourth of those with less than a high school degree and 20 percent of those with

| Table 11. Banking status (by family income, education, and race/ethnicity) Percent | | | |
|---|---|---|---|
| Characteristic | Unbanked | Underbanked | Fully banked |
| **Family income** | | | |
| Less than $25,000 | 17 | 20 | 62 |
| $25,000–$49,999 | 4 | 20 | 76 |
| $50,000–$99,999 | 1 | 12 | 87 |
| $100,000 or more | 1 | 5 | 94 |
| **Education** | | | |
| Less than a high school degree | 24 | 23 | 53 |
| High school degree or GED | 10 | 15 | 75 |
| Some college/technical or associate degree | 5 | 17 | 79 |
| Bachelor's degree or more | 1 | 7 | 92 |
| **Race/ethnicity** | | | |
| White | 3 | 10 | 87 |
| Black | 13 | 27 | 59 |
| Hispanic | 11 | 18 | 71 |
| Asian | 2 | 6 | 92 |
| **Overall** | **6** | **13** | **81** |
| Note: Among all adults. | | | |

income less than $25,000 were underbanked. In addition to being more likely to use alternative financial services, lower-income adults were also more likely to use cryptocurrencies for transaction purposes, as discussed in box 2.

Between 2020 and 2021, the shares of unbanked, underbanked, and fully banked adults were essentially unchanged. Looking at the longer-term trend, however, shows a 7 percentage point decline in the underbanked rate since 2015. During this same period, the share of adults with a bank account increased by 2 percentage points. As a result, much of the decline in the underbanked rate likely reflects the decline in the share using the alternative financial services asked about in the survey.

This decline does not necessarily reflect improvements in financial inclusion, however. The market for financial products and services has been evolving during this time, particularly in the digital space. As a result, while use of these alternative financial services have declined, people may have substituted away from the products and services asked about in the survey to other nonbank offerings that are harder to measure.

## Box 2. Conducting Financial Transactions Using Cryptocurrencies

Cryptocurrencies are relatively new digital assets that may be held as an investment or used for conducting financial transactions.[1] In 2021, most people using cryptocurrencies did so for investment purposes. In 2021, 12 percent of adults held or used cryptocurrencies in the prior year. Eleven percent of adults had held cryptocurrency as an investment, while a far smaller 2 percent of adults said that they used cryptocurrency to buy something or make a payment in the prior 12 months, and 1 percent used it to send money to friends or family.[2]

Those who held cryptocurrency purely for investment purposes were disproportionately high-income, almost always had a traditional banking relationship, and typically had other retirement savings. Forty-six percent of those using cryptocurrencies only for investment had an income of $100,000 or more, while 29 percent had an income under $50,000. Additionally, 99 percent of those investing in cryptocurrency, but not using it for transactions, had a bank account, and 89 percent of nonretired cryptocurrency investors had at least some retirement savings (figure A).



**Figure A. Share without a bank account, credit card, or retirement savings (by cryptocurrency use)**

Percent

| | No bank account | No credit card | No retirement savings |
|---|---|---|---|
| No cryptocurrency use | 6 | 17 | 27 |
| Cryptocurrency for investment only | 1 | 7 | 11 |
| Cryptocurrency for transactions | 13 | 27 | 29 |

Note: Among all adults. Key identifies bars in order from left to right.

*(continued)*

---

[1] Cryptocurrencies are decentralized digital assets that have a distributed ledger and can be used for peer-to-peer payments. For additional information on cryptocurrencies, see Board of Governors of the Federal Reserve System, *Money and Payments: The U.S. Dollar in the Age of Digital Transformation* (Washington: Board of Governors, January 2022), https://www.federalreserve.gov/publications/files/money-and-payments-20220120.pdf.

[2] Because the survey is conducted online, the sample population may be more technologically connected than the overall population, which could increase the share of adults reporting use of emerging technologies such as cryptocurrencies.

---

> **Box 2**—*continued*
>
> The financial profiles of those who used cryptocurrency for transactions, however, were quite different. Nearly 6 in 10 adults who used cryptocurrencies for transactions had an income of less than $50,000. A far lower 24 percent of transactional users had an income of more than $100,000.
>
> Transactional cryptocurrency users also were less likely to have a bank account. Thirteen percent of those who used cryptocurrency for transactions lack a bank account, compared with 6 percent of adults who did not use cryptocurrency. Similarly, 27 percent of transactional cryptocurrency users did not have a credit card, exceeding the 17 percent of non-users without a credit card.

Moreover, the longer-term decline in use of alternative financial services has been similar among both the unbanked and banked, providing more evidence that a wider availability of banking services may not explain the decline in the underbanked rate.

### Table 12. Paid an overdraft fee on a bank account in the prior year (by demographic characteristics)

| Characteristic | Percent |
|---|---|
| **Family income** | |
| Less than $25,000 | 16 |
| $25,000–$49,999 | 16 |
| $50,000–$99,999 | 10 |
| $100,000 or more | 5 |
| **Education** | |
| Less than a high school degree | 16 |
| High school degree or GED | 11 |
| Some college/technical or associate degree | 13 |
| Bachelor's degree or more | 7 |
| **Race/ethnicity** | |
| White | 9 |
| Black | 20 |
| Hispanic | 14 |
| Asian | 3 |
| **Age** | |
| 18–29 | 15 |
| 30–44 | 14 |
| 45–59 | 10 |
| 60+ | 5 |
| **Overall** | **11** |

Note: Among adults with a bank account.

## Overdraft

Overall, 11 percent of adults with a bank account paid an overdraft fee in the previous 12 months (table 12). Adults with income less than $50,000 were three times as likely to have paid an overdraft fee as people with an income of $100,000 or more. Similarly, the share of adults paying an overdraft fee tended to be higher among people with less education or of younger ages. Across races or ethnicities, a larger share of Black or Hispanic adults paid an overdraft fee in the past 12 months than the population as a whole. In contrast, 3 percent of Asian adults paid an overdraft fee, a rate about one-third of the population as a whole.

Adults with bank accounts who used credit alternative financial services and those with lower self-reported credit ratings were particularly likely to have paid an overdraft fee in the prior year.[39] Fifty-three percent of banked adults who used credit alternative financial

---

[39] Credit alternative financial services include payday loans or payday advances, pawn shop loans, auto title loans, and tax refund advances.

services also paid an overdraft fee in the prior 12 months, about five times the rate of the banked population overall (figure 26).[40] Additionally, 35 percent of those rating their credit as "poor" and 28 percent rating their credit as "very poor" paid an overdraft fee, compared with 3 percent of those rating their credit as "excellent."

One explanation for these patterns is that those using credit alternative financial services and those rating their credit as "poor" or "very poor" were in a precarious financial position, making them more likely to unintentionally overdraft their account. Another possibility is that people without access to cheaper forms of credit were intentionally using overdraft as a form of short-term, albeit high-cost, credit. Finally, use of online credit alternative financial services themselves may directly trigger an overdraft when the lender attempts to collect payment.[41]



**Figure 26. Paid an overdraft fee on a bank account in the prior year (by use of credit alternative financial services (AFS) and self-reported credit rating)**

Percent

| | |
|---|---|
| All banked adults | 11 |
| Used credit AFS | 53 |
| Excellent | 3 |
| Good | 10 |
| Fair | 25 |
| Poor | 35 |
| Very poor | 28 |

Note: Among adults with a bank account.

## Credit Outcomes and Perceptions

Thirty-eight percent of adults applied for credit in 2021, a slight increase over the share who applied in 2020. But among those who applied, the share who were either denied credit, or approved for less credit than they requested, fell about 3 percentage points to 28 percent. Consistent with the lower denial rates, consumer confidence about credit card applications improved. Sixty-five percent of adults were "very confident" that their application would be approved, 4 percentage points higher than in 2020 and the highest share since this question was first asked in 2015. Similarly, only 12 percent of adults were "not confident" that their application would be approved.

The share of adults who were denied credit, or approved for less than requested, differed by income level and by race and ethnicity (figure 27). Almost half of credit applicants with income below $50,000 experienced such actions, compared with 11 percent of those with income above $100,000.

---

[40] Overall, 4 percent of adults had a bank account and used credit alternative financial services.

[41] See Consumer Financial Protection Bureau, *Online Payday Loan Payments* (Washington: CFPB, April 2016), https://files.consumerfinance.gov/f/201604_cfpb_online-payday-loan-payments.pdf.



**Figure 27. Denied credit or approved for less than was requested (by family income and race/ethnicity)**

Note: Among adults who applied for some form of credit in the past 12 months.

Denial rates also differed by race and ethnicity, with Black and Hispanic applicants being particularly likely to report a denial or an approval for less credit than requested. For Black applicants, this was also true within income levels, although for Hispanic applicants with income below $50,000, the denial rates were comparable to others with similar incomes.

## Credit Cards

People use credit cards in different ways. Some use credit cards as a convenient, if not necessary, way to pay expenses, paying off their balances in full each month and avoiding any interest costs. Others carry a balance and thus use credit cards as a source of credit to defer paying expenses.

Eighty-four percent of adults had a credit card in 2021. They were nearly evenly split between the people who paid off their balances in each of the previous 12 months and people who carried balances from month to month at least once in the prior year. Among those who carried a balance at least once, 73 percent were carrying a balance at the time of the survey.

Almost all people with income of at least $100,000 had a credit card. At lower income levels, having a credit card was somewhat less common, though adults at these income levels who did have credit cards were more likely to use them to carry balances from month to month. Consequently, middle-income adults were the most likely to have a credit card that they used to finance purchases by carrying balances from one month to the next. Almost half of people with income between $25,000 and $99,999 carried a balance on a credit card at least once in the past

12 months, exceeding the shares of adults with either lower or higher income levels who did so (table 13).

Similar patterns were observed across education levels, with more-educated adults being both more likely to have a credit card and less likely to carry a balance from one month to the next. Credit card usage also differed by race and ethnicity. Over 90 percent of Asian adults had a credit card but just under one in four of those with a credit card carried a balance at least once in the prior 12 months. Black and Hispanic adults were much more likely to carry balances on their credit cards than other racial or ethnic groups.

The share of adults with outstanding debt who were carrying less debt than 12 months ago was comparable with, though slightly higher than, the share carrying more debt. This pattern is similar to that in recent years, with the exception of 2020, when the share who had reduced their credit card debt exceeded the share who had increased it by 8 percentage points.

## Buy Now, Pay Later

The 2021 survey introduced a series of questions about the use of BNPL services. BNPL allows people to finance a purchase by making a small number of equal payments, often without being charged interest. For example, someone purchasing a $100 item, instead of paying the entire amount upfront, may instead be able to make four monthly payments of $25, with the first payment due at the time of purchase.

Overall, 10 percent of people used a BNPL service in the previous 12 months. Seven percent were making payments under a BNPL plan at the time of the survey, with about half paying on just one purchase.

### Table 13. Credit card access and usage (by demographic characteristics)
Percent

| Characteristic | Has a credit card | Carried a balance (among credit card holders) | Carried a balance (among adults) |
|---|---|---|---|
| **Family income** | | | |
| Less than $25,000 | 57 | 57 | 33 |
| $25,000–$49,999 | 84 | 59 | 49 |
| $50,000–$99,999 | 94 | 50 | 47 |
| $100,000 or more | 98 | 36 | 36 |
| **Education** | | | |
| Less than a high school degree | 52 | 57 | 30 |
| High school degree or GED | 76 | 57 | 43 |
| Some college/technical or associate degree | 83 | 56 | 46 |
| Bachelor's degree or more | 96 | 35 | 34 |
| **Race/ethnicity** | | | |
| White | 88 | 42 | 37 |
| Black | 72 | 72 | 52 |
| Hispanic | 77 | 63 | 48 |
| Asian | 93 | 24 | 22 |
| **Self-reported credit rating** | | | |
| Very poor | 33 | 66 | 22 |
| Poor | 45 | 77 | 35 |
| Fair | 73 | 81 | 59 |
| Good | 90 | 65 | 58 |
| Excellent | 97 | 31 | 31 |
| Don't know | 40 | 39 | 16 |
| **Overall** | **84** | **48** | **40** |

Note: Among all adults. Carried a balance in the prior 12 months includes adults who carried an unpaid balance from one month to the next at least once in the 12-month period.

The most cited reasons for using BNPL services were convenience (78 percent) and not wanting to use a credit card (53 percent) (figure 28). Just over half of people who used BNPL also indicated that it was the only way they could afford their purchase (51 percent).



**Figure 28. Reasons for using Buy Now, Pay Later (BNPL) services**

| Reason | Percent |
|---|---|
| More convenient | 78 |
| Did not want to use a credit card | 53 |
| Only way I could afford it | 51 |
| Cheaper | 34 |
| Only accepted payment method I had | 19 |
| Other | 11 |

Note: Among adults who have used a BNPL service in the past year.

The use of BNPL was more common among people with lower income and less education (table 14). Around 13 percent of those with income below $50,000 used BNPL in the prior year, compared with 7 percent of those with an income of $100,000 or more. Similarly, 14 percent of people with less than a high school degree used BNPL, compared with 8 percent of those with at least a bachelor's degree.

The reasons for using BNPL also differed with income and education levels. While convenience was universally the most cited reason for using BNPL, around 60 percent of people with income under $50,000 or with no more than a high school degree cited an inability to pay for the product otherwise, compared with about one-fourth of people whose income was at least $100,000. More-over, around 25 percent of people in these lower income and education groups reported using BNPL because they lacked another accepted payment option, more than twice the rate for people in the highest income and education categories.

People also differed in their use of BNPL according to their self-reported credit rating. Those with lower credit ratings were more likely to use BNPL than were people who rated their credit as "excellent." Among those who used BNPL, adults with lower self-reported credit ratings were also more likely to cite an inability to afford the purchase otherwise or a lack of other payment options as reasons for using BNPL than adults who rated their credit higher.

Most people who use BNPL make their payments on time. Overall, 15 percent of people who used BNPL in the prior 12 months were late making a payment. Late payments were somewhat more common among people with income less than $50,000. Late payments were also more common among people with lower self-reported credit ratings. Adults who rated their credit as "poor" were over five times as likely to have been late making a BNPL payment as someone who rated their credit as "excellent." Among people who would not have been able to afford their purchase without BNPL, 23 percent paid late, compared with 7 percent of people who did not give that reason for using BNPL.

### Table 14. BNPL service use (by demographic characteristics)
Percent

| Characteristic | Used a BNPL service | Paid BNPL late (among users) |
|---|---|---|
| **Family income** | | |
| Less than $25,000 | 12 | 23 |
| $25,000–$49,999 | 14 | 18 |
| $50,000–$99,999 | 11 | 11 |
| $100,000 or more | 7 | 6 |
| **Education** | | |
| Less than a high school degree | 14 | n/a |
| High school degree or GED | 10 | 15 |
| Some college/technical or associate degree | 12 | 17 |
| Bachelor's degree or more | 8 | 10 |
| **Race/ethnicity** | | |
| White | 7 | 10 |
| Black | 20 | 21 |
| Hispanic | 15 | 19 |
| Asian | 7 | n/a |
| **Age** | | |
| 18–29 | 13 | 18 |
| 30–44 | 13 | 18 |
| 45–59 | 12 | 13 |
| 60+ | 6 | 9 |
| **Credit card ownership** | | |
| Has a credit card | 10 | 14 |
| No credit card | 10 | 23 |
| **Self-reported credit score** | | |
| Very poor | 13 | n/a |
| Poor | 21 | 29 |
| Fair | 22 | 13 |
| Good | 12 | 13 |
| Excellent | 5 | 5 |
| Don't know | 6 | n/a |
| **Overall** | **10** | **15** |

Note: Among all adults. Some results are not applicable because of small sample size.
n/a Not applicable.

# Housing

Housing—especially the cost of housing and housing tenure type—affects people's economic well-being. The majority of adults owned their homes. Adults who rented their homes were disproportionately lower-income, Black, or Hispanic. The share of renters who had been behind on their rent in the prior 12 months was higher than the level before the pandemic. Among homeowners, the refinancing wave continued, although high-income borrowers were primarily the beneficiaries of this opportunity.

## Living Arrangements

Living arrangements can affect family finances and well-being. Eighty-six percent of adults lived with other people, usually a spouse or a partner and frequently their children under age 18 (table 15). More than half (52 percent) of all adults lived in a household with a spouse or partner or with a child under age 18 and with no one else. Other types of living arrangements were less common. Still, more than one-fourth of adults (28 percent) lived in a household that contains multiple generations of adults, meaning that the adult respondents either lived with their parents or adult children.

| Table 15. Other people living in household | |
|---|---|
| Category | Percent |
| Live alone | 14 |
| Spouse or partner | 66 |
| Children under age 18 | 25 |
| Adult children age 18 or older | 16 |
| Parents | 13 |
| Brothers or sisters | 6 |
| Other relatives | 4 |
| Other non-relatives | 5 |

Note: Among all adults. Respondents (other than those who live alone) can select multiple answers.

Older adults, and older women in particular, were the most likely to live alone. Twenty-one percent of adults age 65 or older lived alone, and 27 percent of women age 65 or older lived alone. In contrast, young adults were very likely to live with their parents. But this rate drops significantly for adults in their mid- and late 20s: 47 percent of 22- to 24-year-olds lived with their parents compared with 27 percent of 25- to 29-year-olds. Fewer adults in older age cohorts live with their parents: 13 percent of 30- to 44-year-olds live with their parents and 7 percent of 45- to 59-year-olds live with their parents. Conversely, the share living with a spouse or partner increased with age, from 26 percent of 22- to 24-year-olds to 52 percent of 25- to 29-year-olds.[42]

---

[42] Among adults ages 22 to 24, the majority of those living with a spouse or partner are not married, and a smaller share are married. For the older age groups, the majority of adults living with a spouse or partner are married.

<span style="color:red">App.703</span>

| Table 16. Reasons for living with parents (by age) | | | | |
|---|---|---|---|---|
| **Reason** | **22–24** | **25–29** | **30–44** | **45–59** |
| To save money | 92 | 88 | 63 | 48 |
| To help them financially | 31 | 44 | 57 | 61 |
| To provide help with childcare or medical care | 7 | 15 | 27 | 45 |
| To receive help with childcare or medical care | 13 | 16 | 20 | 15 |
| Prefer living with others | 46 | 40 | 36 | 23 |

Note: Among people living with parents. Respondents could select multiple answers.

A substantial majority of young adults living with their parents said that saving money was a reason for their living arrangement. Overall, three-fourths of people who lived with their parents said this was to save money. However, the direction of financial support flips for many older adults who live with their parents. Fifty-seven percent of adults ages 30 to 44 who lived with their parents said that providing financial help was a reason, as did 61 percent of those ages 45 to 59 (table 16).

Another common reason for living with parents was to provide care, especially as people get older. Twenty-one percent of people who lived with their parents gave this reason. Adults in their 30s, 40s, and 50s who lived with their parents were more likely to say that they lived with others for caregiving reasons. Forty-five percent of 45- to 59-year-olds who lived with their parents said they lived with others to provide care.

## Moving

The share of people who reported moving in 2021 was unchanged from 2020. Nine percent of adults said they moved to their home in 2021. The majority of individuals who moved remained in the same state. Just over one in four adults who moved—2 percent of all adults—crossed state lines in 2021.

Moving was generally associated with an increasing distance from family, friends, and other informal supports. Thirty-two percent of people who moved in 2021 said they moved farther away from family, while 24 percent said they moved closer (figure 29). Forty percent of adults who



Figure 29. Distance to friends, families, and workplaces after moves

Note: Among people who moved in 2021. Distance relative to one's usual workplace is among employed adults. Key identifies bars in order from left to right.

moved said they moved farther from friends. Another moving pattern that continued in 2021 was employed adults moving farther away from their usual workplace. Thirty-four percent of movers who were employed moved farther away from their usual workplace compared with 27 percent who moved closer.

## Homeownership and Mortgages

Nearly two-thirds of adults owned their homes, though young adults, as well as Black and Hispanic adults, were less likely to own. Twenty-nine percent of 18- to 29-year-olds owned their homes, compared with 84 percent of people age 60 and older. Within each age group, there is substantial variation in the homeownership rate by race and ethnicity. For example, 4 in 10 Black adults and nearly 5 in 10 Hispanic adults ages 30 to 44 were homeowners. Among White adults in this age range, nearly 7 in 10 owned their home (table 17).

Many homeowners took advantage of the continued low interest rates in 2021 to refinance their mortgages. Nearly one-fourth of all homeowners with a mortgage refinanced their mortgage within the prior year. Higher-income homeowners were the predominant group who opted to refinance (figure 30).[43] Nearly 3 in 10 mortgage holders with income of at least $100,000 per year refinanced within the prior 12 months, compared with 23 percent of those with income between $50,000 and $99,999 and 16 percent of those with income under $50,000.

| Table 17. Homeownership rate (by age and race/ethnicity) | |
|---|---|
| Characteristic | Percent |
| **18–29** | |
| White | 35 |
| Black | 18 |
| Hispanic | 20 |
| Asian | 34 |
| **Overall** | **29** |
| **30–44** | |
| White | 69 |
| Black | 40 |
| Hispanic | 49 |
| Asian | 71 |
| **Overall** | **61** |
| **45–59** | |
| White | 83 |
| Black | 57 |
| Hispanic | 63 |
| Asian | 90 |
| **Overall** | **76** |
| **60+** | |
| White | 88 |
| Black | 68 |
| Hispanic | 78 |
| Asian | 78 |
| **Overall** | **84** |
| Note: Among all adults. | |



**Figure 30. Share of homeowners with a mortgage who refinanced in the prior year (by family income)**

| | Percent |
|---|---|
| Less than $25,000 | 16 |
| $25,000–$49,999 | 15 |
| $50,000–$99,999 | 23 |
| $100,000 or more | 29 |

Note: Among homeowners with a mortgage.

---

[43] This fact holds when considering individuals who refinanced in 2020 as well. Among those who have refinanced in the past two years, high-income (those with an income of $100,000 or more) homeowners with a mortgage were about twice as likely to have refinanced as those with an income of less than $50,000.



**Figure 31. Share of homeowners with a mortgage who refinanced in the prior year (by current month mortgage payment)**

| Category | Percent |
|---|---|
| Less than $500 | 7 |
| $500–$749 | 15 |
| $750–$999 | 19 |
| $1,000–$1,249 | 19 |
| $1,250–$1,499 | 26 |
| $1,500–$1,999 | 30 |
| $2,000 or more | 35 |
| **Overall** | 24 |

Note: Among homeowners with a mortgage.

Mortgage holders with a higher mortgage payment were also more likely to have refinanced during the prior year. More than one-third (35 percent) of homeowners with a monthly mortgage payment of $2,000 or more refinanced, compared with 15 percent of homeowners with a monthly payment from $500 to $749 (figure 31).[44]

## Renting and Evictions

More than one in four adults rent their home (27 percent). Benefits of renting include the flexibility to move more easily as well as the convenience of not having to manage repairs. But renting can also lead to less-stable living arrangements and less control over living spaces and repairs. Many renters do not own their home because of financial circumstances. (See box 3 for a discussion of renters who fell behind on rent during the pandemic.)

Adults with lower income, and those who are Black and Hispanic, are more likely to rent their homes. Forty-five percent of adults with a family income of less than $25,000 rent, compared with 10 percent of adults with family income of $100,000 or more (table 18). Forty-four percent of Black adults and 37 percent of Hispanic adults rent, compared with 21 percent of White adults and 23 percent of Asian adults.

Housing tenure varies by other demographic characteristics, including disability status and neighborhood income. Adults with a disability had a greater likelihood of being renters than adults with no disability. Forty-four percent of adults who live in low- and moderate-income neighborhoods rent. This is over twice the rate among adults who live in middle- and upper-income neighborhoods.

---

[44] While families with more income have higher mortgage payments on average, the increased prevalence of refinancing among those with higher mortgage payments holds even when controlling for income. In part, this may reflect that the potential savings from refinancing are greater for those with larger loans.

Renters with lower family income were fre-quently cost burdened, meaning that they spent more than 30 percent of their income on rent payments.[45] About half of renters with income between $25,000 and $49,999 had rent payments that exceeded 30 percent of their income.

Reflecting the flexibility that comes with renting, most people who moved were renters. Almost three-fourths of people who moved in the prior year did not own their home before the move. In general, these moves were to another rental, rather than a home purchase—just 26 percent of those who did not own their previous house and moved in the past year did so for a home that they pur-chased.

Some of these moves, however, resulted from an eviction. Slightly fewer than 1 percent of adults, which is about 1.8 million people, said they moved in the prior year because of an eviction or the threat of an eviction.[46] This represents approximately 8 percent of all people who moved during this period.

| Table 18. Share who rent (by demographic characteristics) | |
|---|---|
| **Characteristic** | **Percent** |
| **Family income** | |
| Less than $25,000 | 45 |
| $25,000–$49,999 | 36 |
| $50,000–$99,999 | 24 |
| $100,000 or more | 10 |
| **Race/ethnicity** | |
| White | 21 |
| Black | 44 |
| Hispanic | 37 |
| Asian | 23 |
| **Disability status** | |
| Disability | 36 |
| No disability | 24 |
| **Metro status** | |
| Metro | 28 |
| Non-metro | 21 |
| **Neighborhood income** | |
| Low or moderate income | 44 |
| Middle or upper income | 21 |
| **Overall** | **27** |
| Note: Among all adults. | |

---

[45] Cost burdened is defined using the midpoint of both the monthly rent payment range and the family income range and comparing the ratio to the 30 percent threshold. The Department of Housing and Urban Development has established this "cost burdened" threshold of 30 percent. For details, see U.S. Department of Housing and Urban Development, "Rental Burdens: Rethinking Affordability Measures," https://www.huduser.gov/portal/pdredge/pdr_edge_featd_article_092214.html.

[46] In this report, people who experienced an eviction or the threat of eviction include those who reported they were evicted or received an eviction notice; had a landlord tell them or a person they were staying with to leave; missed a rent pay-ment and thought they would be evicted; or were living in a property that was condemned by the city, forcing them to leave.

## Box 3. Pandemic's Effect on Rent Payment

Many renters faced challenges paying their rent before the pandemic, but in the fall of 2021, after nearly two years of economic disruptions from the pandemic, a higher share of renters reported they had been behind on their rent in the prior 12 months. Moreover, many still owed back rent despite a variety of government supports including unemployment benefits, stimulus checks, and rental assistance.

More renters were behind on rent in 2021 than before the pandemic. When asked about their rent payments before the pandemic, 10 percent of renters reported they had missed a payment at some point in 2019.[1] In the fall of 2021, a higher 17 percent of renters reported they had been behind on their rent in the prior 12 months.

The pandemic increased the share of renters who were behind on rent for most racial and ethnic groups. When compared with pre-pandemic levels, White, Black, and Hispanic renters all saw increases in the share behind on rent sometime in the prior 12 months (figure A).



Figure A. Share of renters behind on rent during the year (by year and race/ethnicity)

Note: Among renters. Key identifies bars in order from left to right.

Black renters and Hispanic renters were more likely to be behind on rent payments, compared with other renters. This disparity was present in 2019 and persisted through the pandemic. In 2021, over one in five Black renters and Hispanic renters said they had been behind on rent in the prior year.

*(continued)*

_____

[1] This question was asked of renters in 2021 about their rent payments in 2019. It was not asked on the 2019 survey.

## Box 3—*continued*

Layoffs during the pandemic likely contributed to difficulty paying rent. Among renters who were laid off in the prior 12 months, 38 percent were behind on rent, compared with 15 percent of renters who were not laid off. Differences in layoffs by race and ethnicity may contribute to differences in being behind on rent since layoffs were more common for Black and Hispanic renters than other renters in 2020 and 2021.

Low-income renters were also hit particularly hard by the pandemic recession. The share of adult renters with income below $50,000 reporting being behind on rent increased from 12 percent in 2019 to 23 percent in 2021. For renters with income of $50,000 or more, a smaller 6 percent reported in the fall of 2021 that they had been behind on rent in the prior 12 months—similar to the 5 percent who said they were behind in 2019.

Many renters who fell behind during the year still carried rental debt as of late 2021. Forty-five percent of renters who were behind on their rent at some point in 2021 said that they still owed money for back rent or fees at the time of the survey. This represents 8 percent of renters (2 percent of adults) who still owed back rent or fees in late 2021. For this group of renters, the mean amount still owed was $2,064 and the median was $1,200. This mean amount of back rent suggests total estimated back rent for all renters as of late 2021 was between $9.3 and $10.9 billion.[2] These estimates are lower than October 2021 estimates from the Federal Reserve Bank of Philadelphia ($16.8 billion) and Moody's Analytics and the Urban Institute ($16.7 billion).[3]

---

[2] These estimates are for adults who are renters. Because respondents who were married could have given the amount of back rent for their household, or just their individual share, the lower estimate divides the amount of back rent in half for married couples to account for married respondents who may have answered for their household rather than for just themselves.

[3] The Federal Reserve Bank of Philadelphia's estimate comes from a model simulating job loss and calculates total back rent for renters who experienced a job loss during the pandemic (Federal Reserve Bank of Philadelphia, *Household Rental Debt during COVID-19: Update for August 2021* (Philadelphia: FRB Philadelphia, July 2021), https://www.philadelphiafed.org/-/media/frbp/assets/community-development/briefs/updatedhouseholdrentdebt-final.pdf ). Moody's Analytics and Urban Institute's estimate comes from Moody's baseline economic forecast and calculates back rent for all renters, including those without a job loss during the pandemic (Jim Parrott and Mark Zandi, "The Race to Save Millions from Eviction," Urban Institute, September 2021, https://www.urban.org/sites/default/files/publication/104762/the-race-to-save-millions-from-eviction.pdf). In contrast, the SHED estimates rely on survey questions that ask directly about the amount of back rent owed.

# Education

Education is widely recognized as a path to higher income and greater financial well-being. The pandemic brought widespread education disruptions, including school closures for students of all ages in 2020. In 2021, K–12 schools largely returned to in-person education. At the time of the survey, most parents of primary or secondary school students reported that their youngest child was attending classes completely in person.

This shift to in-person learning likely reduced childcare responsibilities, and most parents said they preferred in-person classes over online or hybrid options. However, potentially reflecting ongoing concerns about COVID-19 transmission, some parents whose children were attending school in person in the fall of 2021 would have preferred online or hybrid classes for their child.

In contrast to the experience of K–12 students, online education remained prevalent at higher education institutions in the fall of 2021. Most higher-education students preferred at least some online classes.

## Modes of Learning in Primary and Secondary School

In the fall of 2021, most parents of primary and secondary school students said their children had returned to completely in-person education after the widespread reliance on online learning in 2020.[47] At the time of the survey, 93 percent of parents with children in school said their youngest child enrolled in K–12 education was attending classes completely in person, compared to 27 percent with completely in-person classes in 2020.

Even among children attending school in person, however, disruptions occurred because of the pandemic. Over one-fourth (27 percent) of parents whose youngest child's classes were completely in person said that at least once, since the start of the school year, their child was unable to attend in person because of a pandemic-related disruption. For 7 percent of parents whose child's classes were completely in person, a disruption to in-person schooling led them to work fewer hours or take unpaid leave from work.

Though nearly all parents of K–12 students said that their child's classes were in person, lower-income parents were less likely to report in-person K–12 education than higher-income parents. Ninety percent of parents making less than $25,000 per year said that their child's classes were

---

[47] References to a child's education in this section refer to the individual's youngest school-age child. Parents of school-age children are respondents who lived with their own children under age 18 who were enrolled in a public or private K–12 school. Except where specified, parents who only home-school their children are excluded.

in person, compared with 97 percent of parents making $100,000 or more per year. Additionally, Black and Asian parents were less likely to say their child was attending school in person than White and Hispanic parents.

However, preferred modes of education also varied by income and race. Nearly 9 in 10 parents of school-age children with an annual income of $100,000 or more said they prefer completely in-person education, compared with fewer than 7 in 10 parents with an annual income under $25,000. Eighty-seven percent of White parents with school-age children said they prefer completely in-person education, higher than that seen among Black, Hispanic, or Asian parents (figure 32).



Figure 32. Actual and preferred mode of learning for K–12 (by income and race/ethnicity)

| | Prefers completely in-person education | Child's school is completely in person |
|---|---|---|
| **Family income** | | |
| Less than $25,000 | 68 | 90 |
| $25,000–$49,999 | 76 | 91 |
| $50,000–$99,999 | 80 | 92 |
| $100,000 or more | 89 | 97 |
| **Race/ethnicity** | | |
| White | 87 | 95 |
| Black | 64 | 89 |
| Hispanic | 76 | 94 |
| Asian | 80 | 89 |
| **Overall** | 80 | 93 |

Note: Among parents with a child enrolled in public or private school. Based on the youngest child enrolled in public or private school who lives with their parent.

Additionally, parents' preferred mode of learning differed by the type and level of the school. Parents of children in public school were less likely (80 percent) than parents of children in private school (89 percent) to prefer completely in-person education, and parents whose youngest child is in middle or high school were less likely (76 percent) to prefer in-person class than parents with children in elementary school (84 percent).

Most parents (72 percent) felt that their child's school was taking the right level of COVID-19 precautions. Of those who did not, slightly more felt that the school was taking too few precautions (17 percent) than too many (12 percent). This is consistent with the observation that a larger share of students had in-person education than parents preferred.

Parents' views on the precautions taken by their children's schools varied along similar lines to their preferences for in-person education. Low-income parents were more likely than high-income parents to say their child's school was not taking enough precautions in light of the pandemic, and Black parents were over twice as likely as White parents to say this (figure 33).



**Figure 33. Parents' views on precautions taken by child's school (by income and race/ethnicity)**

Note: Among parents with a child enrolled in public or private school. Based on the youngest child enrolled in public or private school who lives with their parent. Key identifies bars in order from left to right.

Parents of children in public school were also more likely (18 percent) than those with children in private school (9 percent) to say their child's school was not taking enough precautions. However, parents' opinions on precautions at school did not vary by the age of their youngest child.

Some parents opted to home school their children in 2021. Just under 1 in 10 parents of school-age children said that one of their children was home schooled and not enrolled in public or private school. For most home-schooling parents, this was not because of COVID-19. Fifty-three percent said that COVID-19 concerns and school safety policies did not contribute to the decision. This is consistent with observations from other data that about half of the current rate of home schooling predated the pandemic.[48]

Of those who home schooled their children for COVID-19-related reasons, most did so because of concerns about exposure at school. Thirty-seven percent of parents who home school at least one child said they do so in part because of concern about COVID-19 exposure at school.

---

[48] The Census Household Pulse Survey indicates that, by the fall of 2020, the share of households with school-age children who home school their children was around 11 percent—about double the share who home schooled at the start of the pandemic. See https://www.census.gov/library/stories/2021/03/homeschooling-on-the-rise-during-covid-19-pandemic.html. By December 2021, the share of households with school-age children who reported home schooling in the Census Household Pulse Survey was still around 11 percent, similar to the share who reported home schooling in this year's SHED.

Fourteen percent said they decided to home school their child in part because the local school's safety measures were too strict.

## Perceptions of Children's Performance in School

An important factor for parents as they are making work, spending, and housing decisions is the effects that these decisions have on their children. Parents may make changes in these areas that have implications for their family finances if they feel that their child is falling behind. Consequently, the survey asked parents how they felt that their child was faring as the educational environment shifted through the pandemic.

Many parents in the 2020 survey felt that the quality of their children's education had declined amid the pandemic. In 2021, parents generally said their youngest child in K–12 school was doing well, both academically and emotionally. Eighty-five percent of parents with a child in public or private school said that their child was doing well academically, 84 percent said that they were doing well socially and emotionally, and 84 percent said their child liked school. A slightly smaller majority (76 percent) said that their child was prepared for this school year.

A majority of parents with a child in public or private school also said that their child was doing better academically than in 2020. Fifty-six percent said that their child's academic performance improved, compared with 7 percent who said it declined. Similarly, a majority of parents (59 percent) said their child was doing better socially and emotionally compared with a year earlier, while many fewer parents (8 percent) said their child's social and emotional performance was worse than in 2020.

However, parents of children taking classes partially or completely online were less likely to say their child has improved socially and emotionally. Forty-three percent of parents whose youngest child was attending classes at least partially online said that their child was doing better socially and emotionally than in 2020, compared with 60 percent of parents whose youngest child was attending classes completely in person. In addition, parents of children in online or hybrid education were less likely to say that their youngest child likes school or that their child was doing well academically (figure 34). The share of parents who said their child had improved academically did not differ significantly between those with completely in-person classes and those with online or hybrid education.

While most parents said their youngest school-age child was doing well in school in the fall of 2021, parents' assessments of their child's educational performance varied by race and ethnicity. Seventy-six percent of Black parents believed their youngest child was doing well academically, lower than the share seen among the other racial and ethnic groups. Similarly, Black parents and Hispanic parents were least likely to say that their youngest child was prepared for the school year.



**Figure 34. Parents' assessment of child's performance in school (by mode of education)**

They are doing well academically — In person: 86, Online or hybrid: 74

They are doing well socially and emotionally — In person: 84, Online or hybrid: 75

They like school — In person: 85, Online or hybrid: 68

They were prepared academically to start the school year — In person: 76, Online or hybrid: 76

■ In person    ■ Online or hybrid    Percent

Note: Among parents with a child enrolled in public or private school. Based on the youngest child enrolled in public or private school who lives with their parent. Key identifies bars in order from top to bottom.

However, the share of parents who said their child likes school did not differ significantly by race and ethnicity (table 19).

Parents' assessments of their children's performance in school also increased with income. Seventy-seven percent of parents with under $25,000 in income said their child is doing well academically, compared with 89 percent of parents with $100,000 or more in income. Seventy-four percent of parents earning less than $25,000 agreed that their child was doing well socially and emotionally, whereas 88 percent of parents with income of $100,000 or more agreed with this statement.

**Table 19. Parent's assessment of child's performance in school (by race/ethnicity)**

Percent

| Assessment | White | Black | Hispanic | Asian |
|---|---|---|---|---|
| They are doing well academically | 87 | 76 | 83 | 82 |
| They are doing well socially and emotionally | 86 | 76 | 83 | 81 |
| They like school | 84 | 81 | 84 | 86 |
| They were prepared academically to start the school year | 79 | 70 | 74 | 79 |

Note: Among parents with a child enrolled in public or private school. Based on the youngest child enrolled in public or private school who lives with their parent.

## Modes of Learning in Higher Education

While primary and secondary schools largely returned to in-person classes in 2021, online learning remained prevalent at higher education institutions. More than three-fourths of students enrolled in higher education said their classes were partly or completely online. Although many postsecondary students in the 2020 survey expressed concern about the quality of online classes, 76 percent of college students in 2021 said they prefer online or hybrid education.

| Table 20. Prefer online only education (by type of degree program) | |
|---|---|
| Characteristic | Percent |
| GED, technical, or associate degree | 47 |
| Bachelor's degree | 29 |
| Graduate or professional degree | 47 |
| **Overall** | **40** |

Note: Among students currently enrolled in higher education.

Bachelor's degree students were the least likely to prefer completely online education, given the situation with the pandemic. Just fewer than 3 in 10 students enrolled in bachelor's degree programs said they prefer completely online classes (table 20). In contrast, 47 percent of students in either technical and associate degree programs or graduate and professional degree programs prefer online-only education. This may reflect that technical and associate degree students, as well as graduate degree students, were more likely to be older adults who may have other responsibilities. Sixty-four percent of technical and associate degree students and 78 percent of graduate degree students were over age 24. Among bachelor's degree students, a far lower 36 percent were over age 24.

College students generally expressed satisfaction with the amount of pandemic-related precautions taken by their school. Eight in ten postsecondary students said they thought their school was taking about the right amount of precautions, while just more than 1 in 10 said their school was not taking enough precautions.

## Overall Value of Higher Education

At the time of the survey, 70 percent of adults had ever enrolled in an educational degree program beyond high school, and 36 percent had received a bachelor's degree. Self-reported financial well-being rose strongly with education, although the effects differed across demographic groups (see the "Overall Financial Well-Being" section of this report for details on financial well-being by education).

Consistent with the higher rates of financial well-being among those who have more education, more than half of adults who went to college said that the lifetime financial benefits of their higher education exceeded the financial costs. Meanwhile, one in five said that the costs are higher. The rest saw the benefits as about the same as the costs. These self-assessments of the value of education have changed little in recent years.

The self-assessed value of higher education, while generally positive, depends on several aspects of a person's educational experience. Most importantly, those who completed their program and received a degree were more likely to see net benefits than noncompleters. For example, among those who went to college but did not complete at least an associate degree, 31 percent said the benefits of their education exceeded the cost. This fraction jumped to 46 percent of those with an associate degree and 67 percent of those with at least a bachelor's degree.

The self-assessed value of higher education also differed by age. Among those with at least an associate degree, older adults were more likely than younger adults to see the benefits of their education as greater than the costs (figure 35).[49] One explanation for this result could be that older respondents have had a longer time to experience the benefit of their education than younger respondents. This variation in views on the net benefit of college may also be driven by the rising cost of higher education—people who attended college more recently likely faced a higher cost than those who attended college further in the past.[50]



**Figure 35. Benefits of education exceed costs (by education and age)**

Note: Among adults who attended college. Key identifies bars in order from top to bottom.

Additionally, the gap in valuations of higher education across age groups was wider among those with higher degree levels. Among those with an associate degree, fewer than 4 in 10 adults under age 30 said the benefits of their education exceeded the costs, compared with nearly 6 in 10 adults age 60 and over. Among those with a bachelor's degree or more, this gap was wider—56 percent of adults under age 30 thought the benefits of their education exceeded the cost, compared with 82 percent of adults age 60 and over.

One potential explanation is that younger adults are more likely to have taken out debt for their education and to be paying down these loans. Consequently, the costs of education may be more salient for them than for older adults (see the "Student Loans" section of this report for a discussion of educational debt and the self-assessment of the value of higher education).

---

[49] If adults currently enrolled in higher education levels are excluded, the share of adults who say the benefits outweigh the cost increases with age at every education level.

[50] From 1995 to 2015, net tuition, fees, room, and board rose 54 percent at public four-year institutions and 29 percent at private, nonprofit, four-year institutions. See College Board, *Trends in College Pricing 2014*, https://research.collegeboard.org/pdf/trends-college-pricing-2014-full-report.pdf. In the current school year, net tuition, room, board, and fees at public and private nonprofit institutions are about the same as they were in the 2014–15 school year (see https://research.collegeboard.org/pdf/trends-college-pricing-student-aid-2021.pdf).



Figure 36. Changes would now make to earlier education decisions (by education)

Note: Among adults who attended college and are not currently enrolled. Respondents could select multiple answers. Key identifies bars in order from top to bottom.

Another contributor to differences in how people viewed their education was the type of institution attended.[51] Consistent with previous years of the survey, 69 percent of those with bachelor's degrees from public institutions and 63 percent with bachelor's degrees from private not-for-profit institutions saw their educational benefits as greater than their costs. However, 43 percent of those with bachelor's degrees from for-profit institutions felt their education was worth the cost.

## Look Back on Education Decisions

Another way to assess the value of education is to consider what people would have done differently if given the chance. Most people value the education they have, but with the benefit of hindsight and life experience, it is also common to think that different educational decisions could have been better.

Completing more education was the most common change that those with less education would have made if they were able to make a change. Sixty-seven percent of those without a college degree and 61 percent of those with an associate degree said they would like to have completed more education (figure 36). For those with a bachelor's degree or more, choosing a different field of study (37 percent) was the most common change they would make to their education. Few people of any education level said they would have completed less education if they could make their decisions again.

---

[51] Individuals do not self-report the type of institution in the survey. Instead, the institution type is assigned by matching the name and location of the college reported by the individual with data from the Center on Postsecondary Research at the Indiana University School of Education (https://cpr.indiana.edu/). For individuals who completed an associate or bachelor's degree, institution type is based on the school from which they received the degree. For other individuals, it is based on the last school attended.



Figure 37. Changes would now make to earlier education decisions (by institution type)

Note: Among adults who attended college and are not currently enrolled. Respondents could select multiple answers. Key identifies bars in order from top to bottom.

Additionally, reassessments of educational decisions varied by the type of institution attended. Slightly over half of those who attended a for-profit institution said they would have attended a different school, compared with 31 percent of those attending a private not-for-profit institution and 23 percent attending a public institution (figure 37). This difference remains even after accounting for the selectiveness of the institution, level of education completed, the parents' level of education, and demographic characteristics of the student.[52]

The changes adults who completed at least some college said they would now make to their educational decisions were also related to the field of study they pursued. In particular, the share who said they would study a different topic in hindsight varied by fields of study. Forty-eight percent of those who studied the humanities and arts, and 46 percent of those who studied social and behavioral sciences, said they would choose a different field. In comparison, a lower share (24 percent) of those who studied engineering said they would have chosen a different field (figure 38).

---

[52] Selective institutions, as defined by the Carnegie Classification, are those whose first-year students' test scores are in the middle two-fifths of baccalaureate institutions; more selective institutions are in the top one-fifth of baccalaureate institutions. See also "The Carnegie Classification of Institutions of Higher Education," web page, http://carnegieclassifications.iu.edu/. The remainder are referred to here as "less selective" institutions.



**Figure 38. Would now choose a different field of study (by field of study)**

| Field of study | Percent |
| --- | --- |
| Humanities/arts | 48 |
| Social/behavioral sciences | 46 |
| Undeclared/other | 44 |
| Vocational/technical training | 42 |
| Education | 40 |
| Business/management | 37 |
| Life sciences | 36 |
| Law | 36 |
| Physical sciences/math | 33 |
| Health | 33 |
| Computer/information sciences | 32 |
| Engineering | 24 |
| **Overall** | 38 |

Note: Among adults who completed at least some college who are not currently enrolled.

# Student Loans

Education debt is prevalent among people who went to college, and especially among younger adults. In 2021, many student loan borrowers continued to receive delays in payment due dates for student loan bills because of ongoing pandemic relief measures. Consequently, the share of borrowers from a range of backgrounds who were behind on their payments in the fall of 2021 declined relative to before the pandemic. Additionally, borrowers who had outstanding student loan debt at the time of the survey reported higher levels of financial well-being compared with prior years.

## Incidence and Types of Education Debt

Thirty percent of all adults—representing over 4 in 10 people who went to college—said they incurred at least some debt for their education. This includes 20 percent of college attendees who still owed money and 22 percent who borrowed but fully repaid their education debts. Adults under age 30 who attended college were more likely to have taken out loans than older adults, consistent with the upward trend in educational borrowing over the past several decades (figure 39).[53]



**Figure 39. Acquired debt for own education, including repaid debt (by age and highest degree completed)**

Note: Among adults who attended college. Key identifies bars in order from top to bottom.

___

[53] Student loan borrowing has declined since its peak in 2010–11 but remains substantially above the levels from the mid-1990s. (Jennifer Ma and Matea Pender, *Trends in College Pricing and Student Aid 2021* (New York: The College Board, 2021), https://research.collegeboard.org/pdf/trends-college-pricing-student-aid-2021.pdf).

The incidence of education debt varied by the type of institution attended. Among those who attended public institutions, 40 percent either previously held debt or currently had debt at the time of the survey, compared with 57 percent of those who attended private not-for-profit and 59 percent who attended private for-profit institutions. Among younger cohorts of students, those who attended private for-profit institutions were also more likely to have taken out student loans than those who attended either private not-for-profit or public institutions.

**Table 21. Type of education debt**
Percent

| Debt type | Own education | Child's or grandchild's education |
|---|---|---|
| Student loan | 96 | 88 |
| Credit card | 19 | 12 |
| Home equity loan | 4 | 9 |
| Other loan | 11 | 11 |

Note: Among adults with at least some debt outstanding for their own education or a child's or grandchild's education. Some people had more than one type of debt.

Not all education debt is in the form of student loans. Ninety-six percent of those with outstanding debt from their own education had student loans, but many borrowers had other forms of education debt as well (table 21). This includes 19 percent who borrowed with credit cards, 4 percent with a home equity loan, and 11 percent with some other form. Collectively, 24 percent of borrowers had one or more forms of education debt besides student loans for their own education.

Most student loan borrowers owe less than $25,000 on their loans. The median amount of education debt in 2021 among those with any outstanding debt for their own education was between $20,000 and $24,999. One-quarter of student loan borrowers had less than $10,000 in outstanding student debt (figure 40). Student debt balances vary across different demographic groups. Borrowers with an income of less than $50,000 a year were more likely to carry lower balances of student loan debt.



**Figure 40. Distribution of adults with outstanding debt for their own education**

Note: Among adults who borrowed for their own education.

Some people also took out education debt to assist family members with their education through either a co-signed loan with the student or a loan taken out independently. Although this is less common than borrowing for one's own education, 4 percent of adults owed money for a spouse's or partner's education, and 4 percent had debt that paid for a child's or grandchild's education. Like debt outstanding for the borrower's education, debt for a child's or grandchild's education can be in forms other than a student loan.

## Student Loan Payment Status

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and subsequent executive orders in response to COVID-19 provided federal student loan payment relief throughout 2021, dramatically reducing the share of borrowers who were behind on their payments.[54] Among adults with outstanding debt from their own education, 12 percent were behind on their payments in 2021, a significant decline from the 17 percent who were behind in the fall of 2019, before the pandemic.[55]

Consistent with previous years, borrowers with less education were more likely to be behind on their payments. Twenty-three percent of borrowers with loans outstanding who completed less than an associate degree reported being behind.[56] Among borrowers with an associate degree, 18 percent were behind. The delinquency rate was even lower among borrowers with a bachelor's degree (6 percent) or graduate degree (5 percent).

Borrowers who said neither of their parents had completed a bachelor's degree were more likely to be behind on their payments than those with a parent who had completed a bachelor's degree. In 2021, borrowers who did not have a parent with a bachelor's degree were almost twice as likely to be behind on their payments as those with a parent who completed a bachelor's degree (table 22). However, the difference in repayment status among these groups has narrowed since the fall of 2019.

---

[54] Beginning on March 27, 2020, the CARES Act granted relief to student loan borrowers by temporarily pausing payments—including principal and interest—on federally held student loans. This payment pause for federal student loan borrowers has been extended multiple times by executive orders during the COVID-19 pandemic through all of 2021 and into 2022. (See U.S. Department of Education at https://studentaid.gov/announcements-events/coronavirus).

[55] Borrowers could be behind on payments for student loans or other types of debt for their own education. Although the federal student loan pause has been in effect since March 2020, findings from the 2020 survey did not show substantial improvement in student loan repayment status among borrowers. This could be due to the uncertainty regarding the policy and interpretation of the survey questions. Data from the Federal Reserve Bank of New York show a decline in student loan delinquency in 2020 and 2021 (Federal Reserve Bank of New York, *Quarterly Report on Household Debt and Credit* (New York: FRB New York, November 2021), https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2021Q3.pdf).

[56] Currently enrolled students are frequently not required to make payments so are less likely to fall behind. Among those with less than an associate degree who are not currently enrolled, a larger 28 percent of borrowers are behind.

| Table 22. Behind on student loan payments for own education (by parents' education, race/ethnicity, and institution type) | | | |
|---|---|---|---|
| Percent | | | |
| Characteristic | 2019 | 2021 | Change |
| **Parents' education** | | | |
| Parent has completed a bachelor's degree | 9 | 8 | −2 |
| Neither parent has completed a bachelor's degree | 22 | 15 | −7 |
| **Race/ethnicity** | | | |
| White | 11 | 9 | −2 |
| Black | 29 | 17 | −12 |
| Hispanic | 24 | 18 | −6 |
| **Institution type** | | | |
| Public | 15 | 11 | −4 |
| Private not-for-profit | 11 | 7 | −4 |
| Private for-profit | 27 | 23 | −4 |

Note: Among adults with outstanding debt for their own education. Change reported may not match difference between the columns because of rounding.

Difficulties with repayment also vary by race and ethnicity. While Black and Hispanic borrowers were still disproportionately likely to be behind on their debt and were less likely to have completely paid off their student loan debts, these borrowers saw improvements in their repayment status. In 2021, 17 percent of Black borrowers and 18 percent of Hispanic borrowers reported being behind on their student loan debt, compared with 29 and 24 percent in 2019, respectively.

While the percentage of borrowers behind on payments declined over the prior two years, disparities in payment status persist based on the type of institution attended. Twenty-three percent of borrowers who attended for-profit institutions were behind on student loan payments, versus 11 percent who attended public institutions and 7 percent who attended private not-for-profit institutions.

Greater difficulties with loan repayment among attendees of for-profit institutions may partly reflect the lower returns on degrees from these institutions.[57] Indeed, when accounting for race and ethnicity, parents' education, level of institution (two year or four year), and institution selectivity, the relationship between for-profit institution attendance and being behind on student loan payments persists. This suggests that the high payment difficulty rates for attendees of for-profit institutions reflect characteristics of the schools and is not simply due to the characteristics of their students.

Although it is common to focus only on those with outstanding debt, many people who borrowed for their education had repaid their loans completely. Excluding these people who have paid off their debt could overstate difficulties with repayment. Indeed, the share of adults who were behind on their payments is much lower when accounting for all who ever borrowed, including those who had completely repaid that debt.

Among those who ever incurred debt for their education, 6 percent were behind on their payments at the time of the 2021 survey, 42 percent had outstanding debt and were current on their pay-

---

[57] See David J. Deming, Claudia Goldin, and Lawrence F. Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?" *Journal of Economic Perspectives* 26, no. 1 (Winter 2012): 139–64, https://www.aeaweb.org/articles?id=10.1257/jep.26.1.139, for a discussion of the rates of return by education sector.

ments, and 52 percent had completely paid off their loans. Nevertheless, the demographic and educational characteristics of those who fall behind on payments remain similar when also incorporating those who have paid off their loans.

## Relation to Financial Well-Being

Consistent with the student loan payment relief and improvements in payment statuses, self-reported financial well-being among adults with outstanding debt has increased over the pandemic. Among all adults who went to college and had outstanding student loan debt, 73 percent were doing at least okay financially in 2021. This is up from 65 percent who were doing at least okay financially in 2019.

The improvement in financial well-being among student loan borrowers occurred among borrowers of all education levels. The 65 percent of borrowers with an associate degree who reported doing at least okay financially in 2021 was up 9 percentage points from the 56 percent who were doing at least okay in 2019 (table 23). Among borrowers with some college education but no associate degree, the improvement was 7 percentage points. Among those with at least a bachelor's degree, the improvement in financial well-being was 6 percentage points.

| Table 23. At least doing okay financially (by education and debt status) | | | |
|---|---|---|---|
| Percent | | | |
| Characteristic | 2019 | 2021 | Change |
| **Some college, no associate degree** | | | |
| Never had debt | 77 | 76 | −1 |
| Previously had debt, now repaid | 71 | 74 | 3 |
| Currently has debt | 51 | 58 | 7 |
| **Associate degree** | | | |
| Never had debt | 85 | 83 | −2 |
| Previously had debt, now repaid | 79 | 76 | −3 |
| Currently has debt | 56 | 65 | 9 |
| **Bachelor's degree or more** | | | |
| Never had debt | 92 | 94 | 2 |
| Previously had debt, now repaid | 92 | 94 | 2 |
| Currently has debt | 75 | 81 | 6 |
| Note: Among all adults who attended college. | | | |

In contrast, adults who attended college and either did not borrow or had already repaid their student loan debts did not exhibit similar improvements in financial well-being. For those with an associate degree who never borrowed, 83 percent were doing okay financially in 2021, as were 76 percent of those who borrowed and paid off their debt. Each of these were similar to or below the shares doing at least okay in 2019, standing in contrast to the improvements seen among those with outstanding loans. This suggests that the changes in student loan policies likely contributed to the increase in self-reported well-being among borrowers.

## Relation to Self-Assessed Value of Higher Education

The self-assessed value of higher education was lower among those who had outstanding debt. Among borrowers with outstanding debt, 40 percent said the benefits of their education exceeded

the cost. This was below the 63 percent of borrowers who completely paid off their debt and 51 percent of those who went to college but never had debt.[58] Student loan borrowers with outstanding debt also were twice as likely as those who repaid their debt to say that the costs of their education outweigh the benefits.

These gaps in perceptions of one's higher education were particularly notable among those who completed a degree. Approximately 3 in 10 adults who attended college but did not complete an associate or bachelor's degree said that the benefits of their education exceeded the costs, regardless of their student loan status. However, substantial gaps in perceptions of higher education emerged for those who completed a degree. Just over 3 in 10 associate degree recipients with outstanding debt said that the benefits exceeded the costs, compared with half of those without outstanding debt. Among bachelor's degree recipients, the gap in perceptions between those with and without outstanding student loan debt is even greater (figure 41). This gap indicates the extent to which perceptions of higher education are linked to whether individuals had to borrow for their education, and whether the returns on their education were sufficient for them to repay their student loans.



**Figure 41. Self-assessed value of higher education (by education and debt status)**

Note: Among adults who attended college. Key identifies bars in order from left to right.

_____
[58] Differences in the level of education within these debt status groups also contribute to the self-assessment of costs and benefits. Those with a bachelor's degree or higher make up 71 percent of those who attended college and previously had debt, compared with 42 percent of those who attended and never had debt.

# Retirement and Investments

In 2021, retirees' descriptions of their reasons for retirement and their income sources were consistent with recent years. As was the case in 2020, a sizeable share of recent retirees said COVID-related factors affected the timing of their retirement decision. Among non-retirees, a higher share reported they felt like their retirement savings were on track, and a smaller share borrowed against or cashed out retirement savings, compared with 2020. Yet, differences by age and race or ethnicity in retirement preparedness among non-retirees remained similar to earlier years.

## Current Retirees

Retirees represent a sizeable portion of the adult population. Twenty-seven percent of adults in 2021 considered themselves to be retired, even though some were still working in some capacity.[59] Fourteen percent of retirees had done some work for pay or profit in the prior month. Consequently, 4 percent of all adults considered themselves retired and were still working. Retirees with more education were slightly more likely to work in retirement.

In deciding when to retire, most retirees indicated that their preferences played a role, but life events contributed to the timing of retirement for a substantial share (figure 42). Forty-nine percent of retirees said a desire to do other things or to spend time with family was important for their decision to retire, and 45 percent said they retired because they reached a normal retirement age.



**Figure 42. Reasons for the timing of retirement**

Note: Among retirees. Respondents could select multiple answers.

Nonetheless, 29 percent said that a health problem was a factor in their decision to retire, and 15 percent said they retired to care for family members. One in 10 said they were forced to retire or that work was not available. Collectively, health problems, caring for family, and lack of work contributed to the timing of retirement for 45 percent of retirees.

---

[59] In this report, descriptions of current retirees include everyone who reported being retired, including those who also reported that they are working.

A sizeable share of recent retirees indicated that COVID-19 was a factor in their retirement decision. Twenty-five percent of adults who retired in the prior 12 months, and 15 percent of those who retired one to two years ago, said factors related to COVID-19 contributed to when they retired. Compared with other retirees, recent retirees whose retirement decision was related to COVID-19 were more likely to say they retired because they were forced to do so or work was not available. While the pandemic may be contributing to retirement decisions for some recent retirees, the share of adults who consider themselves to be retired has remained relatively consistent during the pandemic.[60]

| Table 24. Sources of income in the prior 12 months among retirees (by age) | | |
|---|---|---|
| Percent | | |
| Source | Retirees age 65 and older | All retirees |
| Social Security | 92 | 78 |
| Pension | 66 | 57 |
| Interest, dividends, or rental income | 49 | 43 |
| Wages, salaries, or self-employment | 25 | 32 |
| Cash transfers other than Social Security | 7 | 11 |

Note: Among retirees. Respondents could select multiple answers. Sources of income include the income of a spouse or partner.

Social Security remained the most common source of retirement income, but 79 percent of retirees had one or more sources of private income. This included 57 percent of retirees with income from a pension; 43 percent with interest, dividends, or rental income; and 32 percent with labor income (table 24).[61] Seventy-eight percent of retirees received income from Social Security in the prior 12 months, including 92 percent of retirees age 65 or older.

While retirees as a group report a generally high level of financial well-being and life satisfaction, those who were not married and those with a disability reported lower levels for these subjective measures (table 25).[62] In 2021, 81 percent of all retirees said they were doing at least okay financially, and 60 percent reported high levels of life satisfaction. On average, retirees who were not married were not doing as well, with just 68 percent saying that they were doing at least okay financially and 49 percent reporting high levels of life satisfaction. Retirees with a disability, regardless of their marital status, were less likely to report they were doing at least okay financially or that they had high levels of life satisfaction.

---

[60] Other recent data have shown an increase in retirements during the pandemic. In part, the difference in findings is because retirees in the SHED include some who are retired while also working in some capacity, as well as some who are retired but provide other reasons—such as health limitations—as the reason for not working. An alternative definition of retirement focuses only on older adults who are not working and who say the reason they are not working is because they are retired. By this measure in the SHED, 51 percent of adults age 55 or older were retired in 2021—a share that edged up over the course of the pandemic from 48 percent in 2019 and 49 percent in 2020—consistent with results from the Current Population Survey using a similar definition (Richard Fry, "Amid the Pandemic, a Rising Share of Older U.S. Adults Are Now Retired," web page, Pew Research Center 2021, https://www.pewresearch.org/fact-tank/2021/11/04/amid-the-pandemic-a-rising-share-of-older-u-s-adults-are-now-retired/).

[61] The type of pension was not specified, so pension income may include income from defined benefit plans, which pay a fixed monthly amount, and defined contribution plans, such as 401(k) and 403(b) plans.

[62] About one-third of retirees were not married, and about one-fourth of retirees had a disability.

# Retirement Savings among Non-Retirees

Although three-fourths of non-retired adults had at least some retirement savings, about one-fourth did not have any (figure 43). This share has remained nearly unchanged since 2019. Among those with retirement savings, these savings were most frequently in defined contribution plans, such as a 401(k) or 403(b), with 55 percent of non-retired adults having money in such a plan. These accounts were more than twice as common as traditional defined benefit pension plans. Fifty-two percent of non-retirees had retirement savings outside of formal retirement accounts, up from 48 percent of non-retirees who reported having such accounts in 2020.

While most non-retired adults had some type of retirement savings, only 40 percent of non-retirees thought their retirement saving was on track. Still, the share of non-retirees who thought their retirement saving was on track increased in 2021, from 36 percent who thought their saving was on track in 2020 and 37 percent who thought their retirement savings were on track in 2019. Because retirement saving strategies differ by circumstances and age, survey respondents assessed whether or not they felt that they were on track, but they defined that for themselves.

**Table 25. Financial well-being and life satisfaction among retirees (by marital status and disability status)**
Percent

| Characteristic | At least doing okay financially | High life satisfaction |
|---|---|---|
| **Married** | | |
| No disability | 92 | 70 |
| Disability | 77 | 53 |
| **Overall** | **88** | **65** |
| **Not married** | | |
| No disability | 75 | 54 |
| Disability | 58 | 40 |
| **Overall** | **68** | **49** |

Note: Among retirees.



**Figure 43. Forms of retirement savings among non-retirees**

- Defined contribution pension: 55
- Savings not in retirement accounts: 52
- IRA: 36
- Defined benefit pension: 22
- Other retirement savings: 13
- Business or real estate: 10
- None: 25

Percent

Note: Among non-retirees. Respondents could select multiple answers.

Retirement savings and perceived preparedness differed across demographic groups. Younger adults were both less likely to have retirement savings and to view their savings as on track than older adults. Compared with all non-retirees, Black and Hispanic non-retirees were less likely to have retirement savings and to view their retirement savings as on track, while White and Asian non-retirees were more likely to have such savings and say they were on track (table 26).

| Table 26. Retirement saving and self-assessed preparedness (by age, race/ethnicity, and disability status) Percent | | |
|---|---|---|
| Characteristic | Any retirement savings | Retirement savings on track |
| **Age** | | |
| 18–29 | 62 | 30 |
| 30–44 | 75 | 39 |
| 45–59 | 84 | 45 |
| 60+ | 87 | 52 |
| **Race/ethnicity** | | |
| White | 81 | 46 |
| Black | 64 | 26 |
| Hispanic | 61 | 25 |
| Asian | 85 | 52 |
| **Disability status** | | |
| No disability | 79 | 43 |
| Disability | 49 | 17 |
| **Overall** | **75** | **40** |

Note: Among non-retirees.

The lower rates of savings among Black and Hispanic non-retirees partly reflect the fact that Black and Hispanic adults were, on average, younger than the non-retired population overall. Even within age cohorts, however, significant differences remained in retirement savings by race and ethnicity, consistent with patterns seen in previous years.

Non-retirees with a disability were also less likely to have retirement savings and to view their savings as on track. Among non-retirees with a disability, only 49 percent had retirement savings and 17 percent viewed their savings as on track. Adults with a disability have a lower rate of employment compared with adults without a disability. (See box 1 for more on the employment experiences of adults with a disability during the pandemic.) In addition, adults with a disability who receive means-tested benefits may face asset limits that would deter holding any savings they may have accrued.[63]

Occasionally, retirement savings can also act as a source of emergency funds for non-retirees who face economic hardships. Overall, 8 percent of non-retired adults tapped their retirement savings—a slight decrease from 2020. Yet, 14 percent of non-retired adults who had experienced a layoff in 2021 borrowed or cashed out funds from their retirement savings. Even so, some non-retirees who may have a need for a reserve fund to weather a hardship may not have retirement savings or may have already tapped such savings. Forty-three percent of non-retirees who experienced a layoff in the prior 12 months did not have self-directed retirement savings at the time of the survey, compared with 26 percent of non-retirees who did not experience a layoff.

Non-retirees with smaller account balances were more likely to have borrowed from, or cashed out, funds from their retirement accounts in the prior 12 months (figure 44). Twelve percent of those

---

[63] SSI and Social Security Disability Insurance (SSDI) are federal programs to support adults with a disability who meet medical and other requirements. SSI recipients must have limited income and resources, but SSDI recipients do not have to meet income and resource limits to qualify for benefits. See Social Security Administration, *Red Book: A Summary Guide to Employment Supports for Persons with Disabilities Under the Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) Programs*, January 2020, https://www.ssa.gov/redbook/.

with account balances under $50,000 borrowed from, or cashed out, these accounts, compared with 7 percent of those with account values of $50,000 or more. While tapping retirement funds could result in smaller account balances, or the exhaustion of such reserves altogether, adults with lower income (and likely with lower account balances) were more likely to experience shocks that could prompt them to tap retirement reserves early.[64]



Figure 44. Borrowed from or cashed out retirement savings accounts in the prior 12 months (by amount of self-directed retirement savings)

Note: Among non-retirees.

Self-directed retirement accounts frequently have complex rules on withdrawals and rely on individuals to have the skills and knowledge required to manage their own investments. Non-retirees with self-directed retirement savings varied in their comfort with making investment decisions for their accounts. Nearly 6 in 10 non-retirees with self-directed retirement savings expressed low levels of comfort in making investment decisions with their accounts.

Among those non-retirees with self-directed savings, a higher share of men were comfortable managing their retirement investments compared to women (figure 45). Sixty-four percent of men with a bachelor's degree were mostly or very comfortable making investment decisions, compared to 33 percent of women with this level of education who were mostly or very comfortable. In fact, the 33 percent of women with a bachelor's degree who were comfortable investing was similar to the 37 percent of men with a high school degree or less who expressed the same level of comfort.



Figure 45. Mostly or very comfortable investing self-directed retirement savings (by gender and education)

Note: Among non-retirees with self-directed retirement savings. Key identifies bars in order from top to bottom.

---

[64] For more on early withdrawals and the relationship with economic shocks and income, see Robert Argento, Victoria L. Bryant, and John Sabelhaus, "Early Withdrawals from Retirement Accounts during the Great Recession," *Contemporary Economic Policy* 33, no. 1 (March 2013), https://www.researchgate.net/publication/254969212_Early_Withdrawals_from_Retirement_Accounts_during_the_Great_Recession.



**Figure 46. Responses to financial literacy questions**

| | Correct | Don't know | Incorrect |
|---|---|---|---|
| Interest | 69 | 19 | 12 |
| Inflation | 64 | 26 | 10 |
| Diversification | 43 | 53 | 4 |

Percent

Note: Among the one-half of respondents who were asked the questions including "Don't know" as an answer choice. Key identifies bars in order from left to right.

**Table 27. Financial literacy (by retirement savings and comfort investing)**
Percent

| Presence of retirement savings and level of investing comfort | Correct | Incorrect | Don't know/ Refused |
|---|---|---|---|
| Has self-directed retirement savings | 67 | 7 | 26 |
| Mostly or very comfortable investing | 78 | 7 | 15 |
| Not or slightly comfortable investing | 59 | 8 | 33 |
| No self-directed retirement savings | 32 | 11 | 56 |
| Retired | 61 | 8 | 31 |
| **Overall** | **59** | **8** | **33** |

Note: Among the one-half of respondents who were asked the questions including "Don't know" as an answer choice.

## Financial Literacy and Experience with Investments

To get some sense of individuals' financial knowledge, respondents were asked three questions—on interest, inflation, and risk diversification, respectively—that are commonly used as measures of financial literacy (figure 46).[65]

Higher shares of adults provided correct answers to questions about interest and inflation than to the question on risk diversification. The average number of correct answers was 1.8 out of 3, and 34 percent of adults got all three correct.

Self-assessed comfort in managing investments was correlated with these measures of financial literacy. Among those with self-directed retirement accounts, on average, those who expressed comfort with managing their investments answered a larger share of questions correctly (78 percent) than those who expressed little or no comfort (59 percent) (table 27). Notably, the share of incorrect answers did not vary much with investment comfort. Instead, the number of "don't know" responses fell as investment comfort rose. Overall, however, non-retirees with such accounts still answered more financial literacy questions correctly, on average, than either non-retirees who did not have such accounts or people who were already retired.

[65] These questions were developed by Annamaria Lusardi and Olivia Mitchell (see "Financial Literacy around the World: An Overview," *Journal of Pension Economics and Finance* 10, no. 4 (2011): 497–508) and have been widely used to study financial literacy. In the 2021 SHED, half of the respondents received the questions and answer choices developed by Lusardi and Mitchell, and the results reported here reflect their responses. The other half of the respondents received the same questions without the "don't know" answer option. Full question wording is available in appendix A and results from the group who received the alternative formulation are included in appendix B of the appendixes to this report.

Gender differences in financial literacy mirrored differences in being comfortable with the invest-ment decisions. Women, on average, answered a lower share of financial literacy questions cor-rectly (52 percent) than men (66 percent). Women were also more likely to select "don't know" or to skip questions (39 percent) than men (26 percent). As a result, women, on average, had lower levels of financial literacy by this measure. Some evidence suggests that one driver of this gender difference may relate to different levels of experience with financial decisions.[66]

Financial knowledge appears to be correlated with experience with other investments as well. On average, people who own individual stock answered 77 percent of the financial literacy questions correctly. Those who have self-directed retirement savings, but no individual stocks, answered 59 percent correctly, and those with no self-directed retirement savings or stock holdings answered 32 percent correctly.

The high financial literacy scores among those who own individual stocks is particularly notable since one of the questions asks if owning individual stocks is riskier than owning a stock mutual fund. Sixty-three percent of stock owners correctly answered that it is riskier to own an individual stock, whereas just 33 percent of people who do not own individual stocks answered this question correctly. Consequently, many people who own individual stocks appear to be aware of this addi-tional risk and either view the benefits as outweighing the risk or see the individual stocks as part of their broader investment portfolio.

Financial well-being is higher among people with higher rates of financial knowledge. Among those who answered all three of the financial lit-eracy questions correctly, 89 percent were doing at least okay financially, whereas a lower 64 per-cent of those who did not answer any of the questions correctly were doing at least okay financially (figure 47). This positive relationship between financial well-being and financial lit-eracy remains even when looking at people with the same level of education, although the magnitude of differences shrinks. Neverthe-less, at least a portion of the increase in well-being with additional financial knowledge is likely attributable to other factors rather than to differences in financial knowledge alone.



**Figure 47. At least doing okay financially (by number of financial literacy questions answered correctly)**

| | |
|---|---|
| Three | 89 |
| Two | 79 |
| One | 69 |
| Zero | 64 |

Percent

Note: Among the one-half of respondents who were asked the questions including "Don't know" as an answer.

---

[66] Some of the gender gap in financial literacy may relate to specialization in financial tasks within a household, with women being less likely to handle the finances. Joanne Hsu finds that women's financial literacy increases after the death of a spouse (see "Aging and Strategic Learning: The Impact of Spousal Incentives on Financial Literacy," *Journal of Human Resources* 51(4) (Fall 2016): 1036–67).

# Description of the Survey

The Survey of Household Economics and Decisionmaking was fielded from October 29 through November 22, 2021. This was the ninth year of the survey, conducted annually in the fourth quarter of each year since 2013.[67] Staff of the Federal Reserve Board wrote the survey questions in consultation with other Federal Reserve System staff, outside academics, and professional survey experts.

Ipsos, a private consumer research firm, administered the survey using its KnowledgePanel, a nationally representative probability-based online panel. Since 2009, Ipsos has selected respondents for KnowledgePanel based on address-based sampling (ABS). SHED respondents were then selected from this panel.

## Survey Participation

Participation in the 2021 SHED depended on several separate decisions made by respondents. First, they agreed to participate in Ipsos' KnowledgePanel. According to Ipsos, 10.1 percent of individuals contacted to join KnowledgePanel agreed to join (study-specific recruitment rate). Next, they completed an initial demographic profile survey. Among those who agreed to join the panel, 61.3 percent completed the initial profile survey and became a panel member (study-specific profile rate). Finally, selected panel members agreed to complete the 2021 SHED.

Of the 18,322 panel members contacted to take the 2021 SHED, 11,965 participated and completed the survey, yielding a final-stage completion rate of 65.3 percent.[68] Taking all the stages of recruitment together, the cumulative response rate was 4.0 percent. After removing a small number of respondents because of high refusal rates or completing the survey too quickly, the final sample used in the report included 11,874 respondents.[69]

## Targeted Outreach and Incentives

To increase survey participation and completion among hard-to-reach demographic groups, Board staff and Ipsos used a targeted communication plan with monetary incentives. The target groups—young adults ages 18 to 29; adults with less than a high school degree; adults with

---

[67] Data and reports of survey findings from all past years are available at https://www.federalreserve.gov/consumerscommunities/shed.htm.

[68] Three hundred ninety-five respondents were not included in the analysis because they started, but did not complete, the survey (known as break-offs). The study break-off rate for the SHED was 3.2 percent.

[69] Of the 11,965 respondents who completed the survey, 91 were excluded from the analysis in this report because of either leaving responses to a large number of questions missing, completing the survey too quickly, or both.

household income under $50,000 who are under age 60; and those who are a race or ethnicity other than White, non-Hispanic—received additional email reminders and text messages during the field period, as well as additional monetary incentives.

All survey respondents not in a target group received a $5 incentive payment after survey completion. Respondents in the target groups received a $15 incentive. These targeted individuals also received additional follow-up emails during the field period to encourage completion. Additionally, the incentives offered to some targeted individuals increased to $25 during the field period to increase the incentive for completion.[70]

## Survey Questionnaire

The 2021 survey took respondents 21.6 minutes (median time) to complete.

A priority in designing the survey questions was to understand how individuals and families—particularly those with low- to moderate-income—fared financially in 2021. The questions were intended to complement and augment the base of knowledge from other data sources, including the Board's Survey of Consumer Finances. In addition, some questions from other surveys were included to allow direct comparisons across datasets.[71] The full survey questionnaire can be found in appendix A of the appendixes to this report.

## Survey Mode

While the sample was drawn using probability-based sampling methods, the SHED was administered to respondents entirely online. Online interviews are less costly than telephone or in-person interviews and can be an effective way to interview a representative population.[72] Ipsos' online panel offers some additional benefits. Their panel allows the same respondents to be re-interviewed in subsequent surveys with relative ease, as they can be easily contacted for several years.

---

[70] All participants received a pre-notification email before the survey launch. They also received four email reminders during the three-week field period in addition to the initial survey invitation. Targeted respondents received two additional email reminders over this period. Three days before closing the survey, the email reminder to targeted adults increased the incentive for completing the survey from $15 to $25. Of the 5,733 respondents in a targeted group, 251 received the higher $25 incentive payment and the rest received the $15 incentive payment.

[71] For a comparison of results to select overlapping questions from the SHED and Census Bureau surveys, see Jeff Larrimore, Maximilian Schmeiser, and Sebastian Devlin-Foltz, "Should You Trust Things You Hear Online? Comparing SHED and Census Bureau Survey Results," Finance and Economics Discussion Series Notes (Washington: Board of Governors of the Federal Reserve System, October 15, 2015), https://doi.org/10.17016/2380-7172.1619.

[72] David S. Yeager et al., "Comparing the Accuracy of RDD Telephone Surveys and Internet Surveys Conducted with Probability and Non-Probability Samples," Public Opinion Quarterly 75, no. 4 (2011): 709–47.

Furthermore, internet panel surveys have numerous existing data points on respondents from pre-viously administered surveys, including detailed demographic and economic information. This allows for the inclusion of additional information on respondents without increasing respondent burden.[73] The respondent burdens are further reduced by automatically skipping irrelevant ques-tions based on responses to previous answers.

The "digital divide" and other differences in internet usage could bias participation in online sur-veys, so recruited panel members who did not have a computer or internet access were provided with a laptop and access to the internet to complete the surveys. Even so, individuals who com-plete an online survey may have greater comfort or familiarity with the internet and technology than the overall adult population, which has the potential to introduce bias in the characteristics of who responds.

## Sampling and Weighting

The SHED sample was designed to be representative of adults age 18 and older living in the United States.

The Ipsos methodology for selecting a general population sample from KnowledgePanel ensured that the resulting sample behaved as an equal probability of selection method (EPSEM) sample. This methodology started by weighting the entire KnowledgePanel to the benchmarks in the latest March supplement of the Current Population Survey along several geo-demographic dimensions. This way, the weighted distribution of the KnowledgePanel matched that of U.S. adults. The geo-demographic dimensions used for weighting the entire KnowledgePanel included gender, age, race, ethnicity, education, census region, household income, homeownership status, and metropolitan area status.

Using the above weights as the measure of size (MOS) for each panel member, in the next step a probability proportional to size (PPS) procedure was used to select study specific samples. This methodology was designed to produce a sample with weights close to one, thereby reducing the reliance on post-stratification weights for obtaining a representative sample.

After the survey collection was complete, statisticians at Ipsos adjusted weights in a post-stratification process that corrected for any survey non-response as well as any non-coverage or under- and oversampling in the study design. The following variables were used for the adjustment of weights for this study: age, gender, race, ethnicity, census region, residence in a metropolitan area, education, and household income. Demographic and geographic distributions for the

---

[73] This approach also may allow for the retroactive linking of information learned about respondents from other data, as was done in 2021 to determine Asian respondents in earlier years of the survey.

noninstitutionalized, civilian population age 18 and older from the March Current Population Survey were the benchmarks in this adjustment. Household income benchmarks were obtained from the 2021 March Current Population Survey (CPS).

One feature of the SHED is that a subset of respondents also participated in prior waves of the survey. In 2021, about one-third of respondents had participated in the fall 2020 survey. Prior year case identifiers for these repeat respondents are available in the publicly available dataset, along with weights for this subset of respondents. These weights use a similar procedure as described above to ensure estimates based on the repeated sample are representative of the U.S. population.

Although weights allow the sample population to match the U.S. population (excluding those in the military or in institutions, such as prisons or nursing homes) based on observable characteristics, similar to all survey methods, it remains possible that non-coverage, non-response, or occasional disparities among recruited panel members result in differences between the sample population and the U.S. population. For example, address-based sampling likely misses homeless popula- tions, and non-English speakers may not participate in surveys conducted in English.[74]

Despite an effort to select the sample such that the unweighted distribution of the sample more closely mirrored that of the U.S. adult population, the results indicate that weights remain neces- sary to accurately reflect the composition of the U.S. population. Consequently, all results pre- sented in this report use the post-stratification weights produced by Ipsos for use with the survey.

## Item Non-response and Imputation

Item non-response in the 2021 SHED was handled by imputation. Typically, less than 1 percent of observations were missing for each question.[75] As a result, population estimates were not sensi- tive to the imputation procedure and a simple regression approach was used.[76]

---

[74] For example, while the survey was weighted to match the race and ethnicity of the entire U.S. adult population, there is evidence that the Hispanic population in the survey were somewhat more likely to speak English at home than the overall Hispanic population in the United States. In the 2021 SHED, the 60 percent of Hispanic adults who speak Spanish at home is below estimates from the 2019 American Community Survey. See table B16006 at https:// data.census.gov. See the *Report on the Economic Well-Being of U.S. Households in 2017* for a comparison of results to select questions administered in Spanish and English at https://www.federalreserve.gov/publications/2018-economic- well-being-of-us-households-in-2017-preface.htm.

[75] Because item non-response is very low in the SHED, 2021 estimates are comparable with prior years where item non- response was handled differently.

[76] A logit regression was used for binary variables, a multinomial logit for categorical variables, an ordinal logit for ordered values, and a linear regression for continuous values. Typical predictors included income, education, race and ethnicity, age, gender, and metropolitan status, but varied depending on how well they predicted the variable of interest and item non-response. Additional predictors were included as appropriate.

The imputation procedure was carried out as follows:

1. Impute questions, like income and education, to be used in the imputation models throughout.

2. Continue at the beginning of the survey and impute missing values sequentially, question by question.

In some cases, the imputation for one question affected later questions by switching an observation from out-of-universe to in-universe or vice versa. These cases were handled by imputing the missing "downstream" question response or recoding it to missing, where appropriate.

Each variable in the publicly available SHED dataset has a corresponding imputation flag, 'var'_iflag, which is set to 1 if the observation was imputed and 0 otherwise.[77] For example, the first question of the survey about whether the respondent lived with their spouse or partner, L0_a, has a corresponding imputation flag of L0_a_iflag. This question had 31 missing values that were imputed, accounting for 0.3 percent of all observations.

---

[77] The survey data can be downloaded at https://www.federalreserve.gov/consumerscommunities/shed_data.htm.

# Acknowledgments

This survey and report were prepared by the Consumer and Community Research Section of the Federal Reserve Board's Division of Consumer and Community Affairs (DCCA).

DCCA directs consumer- and community-related functions performed by the Board, including conducting research on financial services policies and practices and their implications for consumer financial stability, community development, and neighborhood stabilization.

DCCA staff members Alicia Lloro, Ellen Merry, Kenneth Brevoort, Kayla Jones, Jeff Larrimore, Jacob Lockwood, Anna Tranfaglia, Erin Troland, Douglas Webber, and Mike Zabek prepared this report. Federal Reserve staff members Laura Benedict, Andrea Brachtesende, David Buchholz, Ellen Levy, Madelyn Marchessault, Kirk Schwarzbach, and Pamela Wilson provided valuable feedback on the report. The authors would like to thank Eric Belsky, Anna Alvarez Boyd, Eileen Divringi, Dan Gorin, Simona Hannon, Geng Li, Tenisha Noel, Kamila Sommer, Sarah Stein, and Ann Thompson for their contributions to new survey questions. The authors would also like to thank Bob Torongo, Frances Barlas, Poom Nukulkij, and Alyssa Marciniak for their assistance fielding the survey.

If you have questions about the survey or this report, please email SHED@frb.gov.

# Corrections

The Federal Reserve revised this report on August 22, 2022, to reflect corrected data described below.

On page 38, in the Health-Care Expenses section, figure 22, "Forms of medical treatment skipped because of cost during 2021," data were corrected for the entry "Dental care" from 13 percent to 17 percent and for the entry "Seeing a doctor or specialist" from 17 percent to 13 percent.

The Federal Reserve revised this report on February 2, 2023, to reflect the corrections described below.

On page 12, in the Overall Financial Well-Being section, in table 1, "At least doing okay financially (by demographic characteristics)," "LGBTQ+ status was first identifiable in the 2020 survey" was corrected to "LGBTQ+ status was first identifiable in the 2019 survey."

On page 54, in the Housing section, the title of figure 29 was corrected from "Distance to friends, families, and workplaces in 2020" to "Distance to friends, families, and workplaces after moves" and the bar lengths were adjusted to match the figure values.

On page 63, in the Education section, the bar lengths of figure 33, "Parent's views on precautions taken by child's school (by income and race/ethnicity)," were adjusted to match the figure values.

On page 71, in the Education section, the bar lengths of figure 39, "Acquired debt for own education, including repaid debt (by age and highest degree completed)," were adjusted to match the figure values.

On page 76, in the Education section, text in the footnote of figure 41, "Self-assessed value of higher education (by education and debt status)," was corrected from "Among adults ages who borrowed for their own education" to "Among adults who attended college."

On page 83, in the Retirement and Investments section, in figure 47, "At least doing okay financially (by number of financial literacy questions answered correctly)," the text "Key identifies bars in order from left to right" was removed from the footnote.



Find other Federal Reserve Board publications (www.federalreserve.gov/publications.htm) or order
those offered in print (www.federalreserve.gov/files/orderform.pdf) on our website. Also visit the site for more
information about the Board and to learn how to stay connected with us on social media.

www.federalreserve.gov
0522

App. 744

# EXHIBIT 9

# Trouble in the Tails? What We Know about Earnings Nonresponse 30 Years after Lillard, Smith, and Welch

Christopher R. Bollinger

*University of Kentucky*

Barry T. Hirsch

*Georgia State University and Institute of Labor Economics (IZA)*

Charles M. Hokayem

*United States Census Bureau*

James P. Ziliak

*University of Kentucky*

Earnings nonresponse in household surveys is widespread, yet there is limited knowledge of how nonresponse biases earnings measures. We examine the consequences of nonresponse on earnings gaps and inequality using Current Population Survey individual records linked to administrative earnings data. The common assumption that earnings are missing at random is rejected. Nonresponse across the earnings distribution is U-shaped, highest in the left and right tails. Inequality measures differ between household and administrative data due in part to nonresponse. Nonresponse biases earnings differentials by race, gender, and education, particularly in the tails. Flexible copula-based models can account for nonrandom nonresponse.

We thank Adam Bee, Dan Black, Charlie Brown, James Heckman, Bruce Meyer, Chuck Nelson, Trudi Renwick, James Spletzer, Ed Welniak, and five anonymous reviewers for helpful comments, plus participants at presentations at the United States Census Bureau, Soci-

Electronically published July 17, 2019
[ *Journal of Political Economy*, 2019, vol. 127, no. 5]
© 2019 by The University of Chicago. All rights reserved. 0022-3808/2019/12705-0004$10.00

AR-F-001042

App.746

## I.  Introduction

Thirty-plus years ago, Lillard, Smith, and Welch (1986) brought to the fore-front the issue of earnings nonresponse in the Current Population Survey (CPS), providing a sharp critique of Census Bureau (hereafter, Census) imputation procedures. Since that time much has changed, some for the better and some not. Census responded to the critique of Lillard et al. and substantially improved the quality of its imputation procedures. For the Annual Social and Economic Supplement (ASEC; known histori-cally as the March supplement), Census uses a sequential hot-deck proce-dure to address item nonresponse for missing earnings data by assigning individuals with missing earnings values that come from individuals ("do-nors") with similar characteristics.[1] Less well known is that in addition to item nonresponse, there exists ASEC supplement nonresponse. This oc-curs when households participating and responding in the monthly CPS refuse to participate in the ASEC supplement. Census also uses a hot-deck procedure for whole-supplement nonresponse. Offsetting the progress in data processing, however, were sharply rising rates of earnings nonre-sponse. As depicted in figure 1, there was a substantial increase in the 1990s and then again after 2011, such that by 2015 total (item and whole) nonresponse in the ASEC reached 43 percent.[2] The item nonresponse rate of 25 percent is more than double that at the time of the critique of Lillard et al. Additionally, the CPS monthly outgoing rotation group files have earnings-item nonresponse rates currently above 35 percent, while the much larger American Community Survey (ACS) has earnings nonresponse rates of about 20 percent, suggesting that nonresponse is pervasive across the most important federal household surveys.

Unfortunately, we know surprisingly little about patterns of earnings nonresponse, or its potential consequences for important labor-market is-sues such as earnings gaps by gender and race, or inequality. Lillard et al.

ety of Labor Economists, Joint Statistical Meetings, American Economic Association Meet-ings, Brigham Young University, Emory University, Federal Reserve Bank of Cleveland, Fed-eral Reserve Board, Institute for Fiscal Studies, University of Essex, University of New South Wales, and University of Sydney. The analysis provided in this paper has been conducted at the United States Census Bureau, the Atlanta Research Data Center, and the Kentucky Re-search Data Center. All results shown in the paper have received clearance from the Census Bureau. The opinions and conclusions are solely those of the authors. Programs are pro-vided as supplementary material online at the journal's website.

[1] Welniak (1990) documents changes over time in Census hot-deck methods for the CPS ASEC.

[2] For a careful analysis, see Bee, Gathright, and Meyer (2015). An additional form of nonresponse is so-called unit nonresponse, which occurs when there is a noninterview or refusal to participate even in the monthly CPS survey. These rates for the basic CPS were between 8 and 9 percent during our sample period (Dixon 2012). Also, as a point of com-parison, nonresponse rates for typical labor supply variables (weeks worked or hours per week) were in the 3 to 5 percent range over the past two decades.

FIG. 1.—Trends in item and total earnings imputations in the ASEC. This figure displays trends in item earnings and total (item + whole supplement) imputations in the ASEC among workers. The imputation rate is weighted using the ASEC supplement weight. Sources: Authors' calculations and the US Census Bureau Current Population Survey, 1988–2016 Annual Social and Economic Supplement.

(1986, 492) suggested that ASEC nonresponse is likely to be highest in the tails of the distribution, but provided limited evidence since they could not observe earnings for nonrespondents. Lillard et al. (1986, 493, table 2) place white men in eight earnings intervals based on a combination of reported and predicted earnings. They find a U-shaped nonresponse pattern with respect to earnings, with the highest rates in the top three earnings categories.

Whether and to what extent earnings nonresponse is of economic consequence depends on the questions being addressed and the reasons for nonresponse. Prior research has shown that use of imputed earnings can seriously bias average wage gap estimates studied widely by social science researchers (Hirsch and Schumacher 2004; Bollinger and Hirsch 2006; Heckman and LaFontaine 2006), even if the earnings data are missing completely at random.[3] If earnings are missing completely at random,

---

[3] Hirsch and Schumacher (2004) labeled this "match bias," which occurs most notably in earnings equations in which the dependent variable includes nonrespondents whose earnings are assigned (imputed) based on a set of match attributes. If one includes attributes on the right-hand side that are not matched in the earnings imputation process, coefficients on these attributes are attenuated. Hirsch and Schumacher used union status as an example; nonrespondent union members are mostly assigned nonunion earnings, while nonunion workers are sometimes assigned the earnings of a union member. Heckman and LaFontaine (2006) focus on bias to GED estimated returns; nonrespondent GED holders are rarely assigned the earnings of a GED donor. Bollinger and Hirsch (2006) expand the analysis to forms of imperfect matching (e.g., education or age) and derive precise measures of match bias.

then nonresponse is not dependent on earnings, even absent covariates; if earnings are missing at random (MAR), then nonresponse is not dependent on earnings after conditioning on covariates; and if earnings are not missing at random (NMAR), then nonresponse is dependent on the value of missing earnings even after conditioning on covariates (Rubin 1976; Little and Rubin 2002). It is this latter case that is referred to as having nonresponse bias or nonignorable nonresponse. Both Census imputation procedures and common inverse-probability weighting methods to deal with nonresponse assume that nonresponse is ignorable; that is, those not reporting earnings have earnings similar to respondents with equivalent measured attributes. If the MAR assumption is violated, measures of earnings gaps and distributions will be biased.

Given the high earnings nonresponse rates in Census household surveys, coupled with a paucity of evidence on nonresponse patterns and its consequences, we address three important and closely related questions. We do so using restricted-access ASEC household files linked to administrative tax data from the Social Security Administration Detailed Earnings Record (DER) for March 2006–11 (corresponding to calendar years 2005–10). First, how does earnings nonresponse vary across the earnings distribution? Access to the DER is uniquely advantageous to address this question as it affords the opportunity to fill in missing earnings for nonrespondents, and to compare survey responses to administrative tax records for respondents. We align each worker's ASEC earnings response status against the worker's corresponding earnings level from the DER. We examine this relationship for men and women separately, as well as for full-time, full-year workers and those whose ASEC reports are provided by a proxy (i.e., another household member). Nearly half of ASEC earnings reports are from proxies. The extent to which proxy reporting affects nonresponse patterns and earnings accuracy is not well understood.

The second question we address is whether nonresponse is ignorable. That is, do respondents and nonrespondents have equivalent conditional earnings distributions, and if so, can the earnings of survey respondents accurately describe the missing counterfactual distribution of a combined respondent and nonrespondent sample as if the nonrespondents had responded? This question directly addresses the efficacy of the MAR assumption used in Census imputation procedures and, more broadly, in many related missing-data procedures. MAR relies on the assumption that the joint distribution of earnings and response status, conditional on covariates, can be expressed as the product of the conditional marginal distribution of response status and the conditional marginal distribution of earnings. This leads to our two complementary tests of MAR made possible with access to administrative data, one that examines whether the decision to respond to the ASEC earnings question is independent of

earnings, and a second that examines whether the distribution of earnings is independent of response status. Furthermore, we also estimate parametric and nonparametric earnings regressions using the DER, and then test differences in the residuals from those regressions based on response status. This provides estimates of summary statistics for the conditional distribution of earnings for both respondents and nonrespondents. Absent the link to the DER these tests are not possible because of missing earnings of ASEC nonrespondents.

The third question is whether earnings nonresponse affects standard estimates of earnings gaps (by gender, race, and ethnicity), returns to schooling, and earnings inequality and volatility. To address this question, we estimate saturated quantile earnings models to test how nonresponse affects outcomes in the tails of the distribution, alongside models of central tendency. In addition, we also present estimates of how nonresponse impacts standard measures of inequality such as the Gini and 90-10 (and 90-50 and 50-10) ratios and top income shares. For the volatility analysis, we exploit the longitudinal dimension of the ASEC whereby it is possible to match up to half of the sample from one year to the next to examine both the dynamics of nonresponse and implications for summary measures of volatility. Answers to the inequality and volatility questions have taken on increasing importance in recent years with the expansion of distributional research, whether using standard summary measures of unconditional or conditional inequality (e.g., Piketty and Saez 2003; Lemieux 2006; Autor, Katz, and Kearney 2008; Burkhauser et al. 2012) or fully specified quantile regression models of earnings (Buchinsky 1994; Kline and Santos 2013; Arellano and Bonhomme 2017). Under MAR, unconditioned measures of inequality may differ between the full sample with imputations and a sample omitting imputed earners. The full sample is likely to provide a consistent estimate of unconditional inequality if the covariates used in the imputation procedure provide an unbiased measure of earnings and maintain variance. Using only respondents provides more accurate earnings responses, but risks bias (absent reweighting) to the extent that nonresponse rates differ across the earnings distribution, as we subsequently show. The full sample with imputations results in biased estimates of conditional inequality, however, because the relationship between inequality and the multivariate correlations with respect to demographic, geographical, and job attributes not used (or not used fully) in the imputation process will be biased (Hirsch and Schumacher 2004; Bollinger and Hirsch 2006). Data from the DER are particularly helpful here both because we can fill in the missing ASEC earnings with the DER and because, unlike the public-release and internal versions of ASEC, earnings from the DER are not top coded, which improves our estimates of the importance of nonresponse in the right tail of the earnings distribution.

We are not the first to examine nonresponse using a validation study or to find deviations from MAR, but prior studies are generally old, use small samples, and/or examine restricted populations (e.g., married white males). Most similar to our initial analysis is a paper by Greenlees, Reece, and Zieschang (1982), who examined the 1973 ASEC and compared wage-and-salary earnings the previous year with 1972 linked income tax records of full-time, full-year male heads of households in the private non-agricultural sector whose spouse did not work. They found evidence that selection into response declined weakly with respect to earnings. No distributional analysis was provided. David et al. (1986) conducted a related validation study using the 1981 ASEC linked to 1980 IRS reports, also finding evidence of negative selection into response. More recently, Kline and Santos (2013) examined whether returns to schooling and other earnings-equation parameters are sensitive to departures from the MAR assumption, using the exact match of the 1973 ASEC linked to IRS earnings data. They provided evidence that missing data probabilities among men are U-shaped, with very low and high wage men least likely to report. Hokayem, Bollinger, and Ziliak (2015) used the linked ASEC-DER data to examine how treatment of nonrespondents affects family poverty rate estimates and noted the U-shaped nonresponse pattern. Although informative and suggestive, it is not known whether results from studies that examined response bias using older data can be generalized outside their time period and narrow demographic samples. In short, there is little validation evidence using recent data to examine the extent and consequences of CPS nonresponse bias across the earnings distribution. Given the increasing rates of nonresponse over time, it is important to know whether nonresponse is ignorable and, if not, the size and patterns of bias.

In general, we find that nonresponse is not ignorable—earnings are not missing at random, even conditional on a rich set of covariates—and as we allude to in the title, the highest rates of nonresponse are in the tails of the earnings distribution. While on average, male (female) nonrespondents have slightly higher (lower) earnings than respondents, nonresponse is not simply an up or down shift in the distribution. Individuals with earnings that differ substantially from the average (either the gross or conditional mean) are the most likely not to report earnings. This U-shaped pattern is in evidence across gender, race, ethnicity, employment status (hourly and full time, full year), month-in-sample, proxy earnings status, and panel status (year 1 or year 2).

Our finding of NMAR suggests that reliance on respondent samples (even if reweighted) also may provide biased estimates of population earnings. While we find the impact of nonresponse bias on *averages* is small, the bias on conditional quantile estimates of gender, race, and education earnings gaps associated with very high or low earnings is upward of 20 percent and statistically significant. Moreover, between one-third and one-half

the difference in inequality measures between the CPS and administrative data is accounted for by nonresponse in the CPS. We conclude by demonstrating that public users of the ASEC can approximate the population distribution of earnings using a copula-based selection model recently proposed by Arellano and Bonhomme (2017).

## II.  Earnings Nonresponse and Response Bias

Official government statistics, as well as most research analyzing earnings (and income) differences, include both respondents and nonrespondents, replacing the missing earnings with an imputed value. Researchers typically assume (usually implicitly) that nonresponse does not produce systematic biases in the measurement of earnings. The aim of our paper is to determine whether this assumption is justified.

Formally the ignorability of missing earnings underlying the MAR assumption is a statement about the joint distribution of earnings ($Y$) and response status ($R$), conditional on covariates ($X$):

$$f(Y, R|X) = f(Y|X) * f(R|X), \qquad (1)$$

which means that once we condition on known covariates, earnings and response status are independent. Because the Bayes theorem permits us to relate the joint distribution of ($Y$, $R$) to conditional distributions regardless of whether MAR holds, we can write the joint distribution as

$$f(Y, R|X) = f(Y|R, X) * f(R|X) = f(R|Y, X) * f(Y|X). \qquad (2)$$

The implication of MAR is then readily seen by equating equations (1) and (2):

$$f(Y|R, X) = f(Y|X) \quad \text{and} \quad f(R|Y, X) = f(R|X).$$

If either of these conditions fails, then the MAR assumption fails. When the only data available are survey reports, one method for testing for the presence of nonresponse bias across the joint distribution in equation (2) is to treat response as a form of sample selection and to estimate a flexible quantile model via copula methods (Joe 2014; Arellano and Bonhomme 2017). Bollinger and Hirsch (2013) adopted a restrictive version of this approach by estimating the conditional mean of earnings controlling for selection via a standard two-step Heckman (1979) method. Below we demonstrate the efficacy of the copula-based method to recover the unbiased distribution of earnings using respondents only, but the main analysis in this study takes advantage of our access to linked administrative earnings for both respondents and nonrespondents, permitting direct tests of nonresponse bias via validation methods.

Specifically, because the MAR assumption is conditioned on covariates, it is sufficient to test MAR by focusing on the conditional distributions on the right-hand side of equation (2). Simply put, does response status depend on earnings or does the distribution of earnings depend on response status? For the former we estimate models of the form

$$\Pr(R_i = 1 | Y_i^{\text{DER}}, X_i) = F(\alpha + \gamma Y_i^{\text{DER}} + X_i \beta), \qquad (3)$$

where $Y_i^{\text{DER}}$ is administrative earnings reports from the DER described in the next section. Because of the very large number of covariates we restrict these tests to parametric estimators (probit and linear probability) so that a test that $f(R|Y, X) = f(R|X)$ amounts to a test of $\gamma = 0$. We consider specifications that control for $Y_i^{\text{DER}}$ in both logarithmic form and flexible percentiles, as well as models that relax separability between $Y_i^{\text{DER}}$ and $X_i$. Greenlees et al. (1982) and David et al. (1986) implemented tests along the lines of equation (3) as it provides the simplest and most straightforward way to answer the question of independence. Since $R$ is a binary variable, its entire distribution is summarized by $\Pr(R = 1 | Y, X)$. If earnings have any predictive power, then earnings and response are not independent and the MAR assumption fails.

For the test of conditional independence of earnings from response we estimate both parametric and nonparametric models of the form

$$Y_i^{\text{DER}} = \delta + \theta R_i + X_i \pi + v_i. \qquad (4)$$

Summary measures of $f(Y | R, X)$ are the key for understanding sample selection when $Y$ is the dependent variable in a regression. Unlike $f(R|Y, X)$, the conditional distribution of earnings given response may be summarized by a variety of parameters (e.g., mean, median, quantiles, variance, and skewness) that describe different features of the distribution, such as center, spread, or symmetry. The classic paper by Heckman (1979) and later papers (for a survey, see Vella [1998]) suggest that a key parameter is $E[Y | R = 1, X]$, in which case the test that $f(Y | R, X) = f(Y | X)$ amounts to a test of $\theta = 0$. When the regression of interest is a quantile regression such as the median or other percentiles, it is less clear what the most important parameters will be. For the nonparametric models we estimate kernel density functions separately for respondents and nonrespondents and conduct Kolmogorov-Smirnov tests of the null that $f(Y | R = 1, X) = f(Y | R = 0, X)$. Rejecting the null of equality is a sufficient condition to reject the hypothesis that $f(Y | R, X) = f(Y | X)$.

## III.  Data: The ASEC-DER Link Files

The data used in our analysis are restricted-access CPS ASEC person records linked to the Social Security Administration Detailed Earnings Record

(DER) for survey years 2006–11 (reporting earnings for calendar years 2005–10).[4] The ASEC is a survey of roughly 60,000 households (plus an additional 30,000 households as part of the Children's Health Insurance Program) conducted in March of each year. It serves as the source of official federal statistics on income, poverty, inequality, and health insurance coverage, and has been the workhorse data set for earnings-inequality research in the United States. The primary difference between the internal ASEC we use and the version available publicly is that the internal file has higher top-code values on income components (Larrimore et al. 2008). We link the internal ASEC to the DER file, which is an extract of the Master Earnings File and includes data on total earnings as reported on a worker's W-2 form, wages and salaries and income from self-employment subject to Federal Insurance Contributions Act and/or Self-Employment Contributions Act taxation, as well as deferred wage (tax) contributions to 401(k), 403(b), 408(k), 457(b), and 501(c) retirement and trust plans, all of which we include in our earnings measure. Only positive self-employment earnings are reported in the DER because individuals do not make self-employment tax contributions if they have self-employment losses (Nicholas and Wiseman 2009). In addition, some parts of gross compensation do not appear in the DER file such as pretax health insurance premiums and education benefits (Abowd and Stinson 2013), nor do "off the books" earnings appear in the DER, though they could be reported in the ASEC.[5] Unlike the internal ASEC earnings records, DER earnings are not top coded.[6] This is important given substantial concerns regarding nonresponse and response bias in the right tail of the distribution.

The principal sample used in our analysis includes civilian wage-and-salary workers ages 18 to 65 who have reported or imputed positive earnings in the prior year. We exclude workers who are full-time students, as well as a small number of workers identified in the ASEC and linked to the DER who show zero DER earnings but positive deferred compensation. We also exclude individuals with whole imputations of the ASEC, that is, those for whom all ASEC supplement data are imputed. We provide

---

[4] The linked ASEC-DER files were obtained as part of an internal-to-Census project and analyzed in a secure facility at the US Census Bureau in Suitland, MD. Researchers outside the Census Bureau interested in accessing such data must have their project approved by the bureau and the Social Security Administration for analysis conducted in a secure Federal Statistical Research Data Center. For more information, see https://www.census .gov/fsrdc.

[5] Whether survey reports of earnings differ from tax reports is an important, open issue. Recent evidence in Hurst, Li, and Pugsley (2014) suggests that among the self-employed, survey and tax reports do not differ substantively, but whether this holds for the general labor force is not established and should be the subject of future research.

[6] Confidentiality protections preclude us from disclosing individual earnings values such as the maximum earnings values in the DER. The two components of our internal ASEC total earnings variable—earnings on the primary job and all other earnings—are each capped at $1.1 million.

a separate analysis of this subsample in the appendix, which is available as an online supplement. The full sample, including those with no ASEC-DER link, consists of 508,288 individuals (270,409 men and 237,879 women).

Since a worker can appear multiple times per year in the DER file if they have multiple jobs, we collapse the DER file into one earnings observation per worker per year by aggregating total earnings (box 1 of the W-2, labeled "wages, tips, other compensation"), total self-employment earnings, and total deferred contributions across all employers. In this way, DER earnings are most compatible with ASEC earnings from all wage-and-salary jobs (WSAL-VAL) plus nonnegative self-employment earnings. We classify a worker as having imputed earnings if wage-and-salary income from the longest job (I-ERNVAL), from other jobs (I-WSVAL), or from self-employment earnings is imputed. For much of our analysis, we focus on annual earnings because this measure is available in both the ASEC and DER, but we also examine earnings among full-time, full-year workers, as well as average hourly earnings found by dividing annual ASEC or DER earnings by annual hours worked. Annual hours worked is constructed by multiplying weeks worked (WKSWORK) by the usual hours worked per week (HRSWK); these ASEC labor-market measures are available for earnings nonrespondents as well as respondents.

Table 1 provides summary statistics for our full sample in column 1, weighted by the ASEC person supplement weight. The average worker is 41 years old, slightly more likely to be a male, and has an average of nearly 14 years of education. The majority are married with spouse present (58 percent), native born (84 percent), and work full time, full year (71 percent). Nonresponse to either the wage-and-salary questions or the self-employment earnings question totals 23 percent of the sample. Nonresponse is concentrated on the wage-and-salary questions (22 percent) largely because relatively few individuals are self-employed. ASEC interviews identify for each household a single respondent who provides information about other members of the household; hence, 48 percent of the earnings responses are proxy responses, an issue we return to in a subsequent section. Inflation-adjusted ASEC total earnings are $45,897, while average real DER earnings are a higher $48,478.

Table 1 also presents descriptive statistics for the sample broken down by ASEC response status and by DER link status. In general, nonrespondents are not markedly different from the full sample (or the respondent sample). They are slightly less likely to be a Hispanic or a female, more likely to be never married, and more likely to be full-time, full-year workers. In both the ASEC and the DER measures, nonrespondents have slightly higher annual earnings. It is unsurprising that the ASEC difference is small since the imputed earnings derive from the earnings of the respondents. On average, 86 percent of the ASEC sample is successfully linked to the DER, though appendix figure 1 demonstrates that the linkage rate is considerably lower at low earnings, rising from about 72 percent

TROUBLE IN THE TAILS?                                     2153

TABLE 1
SAMPLE AVERAGES BY RESPONSE STATUS AND BY LINKAGE STATUS

| | FULL SAMPLE (1) | RESPONSE STATUS | | LINKAGE STATUS | |
| | | Respondent (2) | Non-respondent (3) | Linked (4) | Nonlinked (5) |
|---|---|---|---|---|---|
| Age | 41.4 | 41.3 | 41.8 | 41.7 | 39.6 |
| Race/ethnicity: | | | | | |
| White, non-Hispanic | 68.7 | 69.3 | 66.4 | 71.8 | 49.0 |
| Black, non-Hispanic | 10.6 | 9.9 | 13.0 | 10.6 | 10.9 |
| Asian, non-Hispanic | 4.5 | 4.3 | 5.2 | 4.2 | 6.2 |
| Other race, non-Hispanic | 1.9 | 1.9 | 1.7 | 1.9 | 1.7 |
| Hispanic | 14.4 | 14.5 | 13.7 | 11.5 | 32.2 |
| Gender: | | | | | |
| Female | 46.8 | 47.5 | 44.7 | 47.9 | 39.9 |
| Education (years) | 13.7 | 13.7 | 13.6 | 13.9 | 12.6 |
| Marital status: | | | | | |
| Married, spouse present | 57.6 | 58.5 | 54.3 | 58.9 | 49.4 |
| Married, spouse absent | 16.9 | 16.9 | 16.9 | 16.6 | 18.6 |
| Single, never married | 25.6 | 24.6 | 28.9 | 24.5 | 32.0 |
| Nativity: | | | | | |
| Native | 84.2 | 84.5 | 83.4 | 87.6 | 63.6 |
| Foreign born, US citizen | 6.5 | 6.3 | 7.2 | 6.3 | 7.7 |
| Foreign born, not a US citizen | 9.2 | 9.2 | 9.4 | 6.1 | 28.8 |
| Employment: | | | | | |
| Full time, full year | 71.2 | 70.6 | 73.4 | 72.3 | 64.3 |
| Work hours (per week) | 39.9 | 40.0 | 39.8 | 40.2 | 38.5 |
| Nonresponse: | | | | | |
| Nonresponse rate (wages and salaries or self-employment income) | 22.6 | 0 | 100 | 20.1 | 38.0 |
| Nonresponse rate (wages and salaries) | 22.4 | 0 | 99.1 | 19.9 | 37.9 |
| Linkage rate | 86.2 | 88.9 | 76.7 | 100 | 0 |
| Proxy | 48.0 | 45.1 | 58.1 | 47.2 | 53.1 |
| ASEC total earnings (2010 dollars) | 45,897 | 45,838 | 46,099 | 47,665 | 34,884 |
| DER total earnings (2010 dollars) | 48,478 | 47,895 | 50,796 | 48,478 | NA |
| DER average hourly total earnings (2010 dollars) | 25.61 | 25.45 | 28.70 | 26.10 | NA |
| Observations | 508,288 | 399,823 | 108,465 | 440,227 | 68,061 |

SOURCES.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

NOTE.—This table shows sample descriptive statistics for the full sample and broken down by ASEC response status and ASEC-DER linkage status. Full ASEC averages include imputed nonrespondent earnings. Each average is weighted by the ASEC supplement weight. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar17.pdf.

to 92 percent across the ASEC earnings distribution. In table 1, the non-linked sample shows more striking differences from the full sample than the nonrespondent sample. Individuals for whom a link was not found are 2 years younger, 8 percentage points more likely to be male, and have

AR-F-001052

1.3 fewer years of education. Most notably they are more than twice as likely to be Hispanic, and over three times more likely to be foreign born and not a citizen. Nonlinked workers are almost twice as likely to be an earnings nonrespondent, and they report ASEC earnings nearly $13,000 lower than those reported by linked workers.

In appendix tables 1 and 2 we document that link failure between ASEC and DER is concentrated among noncitizen immigrants. Because the opt-out rate to agree to link the ASEC and DER is a trivial 0.5 percent, most link failures are due to lack of personally identifiable information used in constructing a linkage indicator. To address this, we estimate a saturated probit model of the probability of an ASEC-DER link as a function of a full array of demographic characteristics, including nativity, Hispanic ethnicity, and their interaction (see appendix table 3). As described in the appendix, we then use the fitted values to construct inverse-probability weights (IPWs) to rebalance the ASEC-DER linked sample for the missing nonlink sample (i.e., the ratio of the ASEC weight to the fitted probability of a link). Because most of the linkage failures are not due to an opt-out choice by the respondent and instead are accounted for by observed demographics, we believe any potential bias from selection on unobservables, which would not be corrected by IPWs, is minimal.

## IV.    Is Response a Function of Earnings, and Are Earnings a Function of Response?

We begin our analysis by examining the conditional distribution of response given earnings, where in table 2 we present estimates of equation (3) using the linked ASEC-DER sample and both unweighted and IPW linear-probability models.[7] In this first test, we begin by conditioning only on the logarithm of DER earnings. Columns 1 and 2 do not control for any confounders, while in columns 3 and 4 we control for a rich set of covariates in $X_i$, including a quartic in potential experience, race, marital status, citizenship, education, metropolitan area size, occupation, industry, and year. Column 4 also interacts the covariates with DER earnings, relaxing separability. We recognize that this is a relatively simple model of the joint distribution, so subsequent analysis moves from use of a single linear log earnings term to categorical measures for earnings percentiles that allow for different responses throughout the distribution. This allows for a less parametric relationship between nonresponse and earnings.

The results in table 2 suggest an average tendency of positive rather than negative selection into response. That said, the coefficients for both men and women are close to zero (with or without controls). The effect of DER earnings for men with controls is a precisely estimated −0.014

---

[7] Probit models yield observationally equivalent marginal effects to the linear-probability models presented.

TABLE 2
ASEC Mean Nonresponse with Respect to DER Earnings
for Men and Women, 2006–11

| | OLS | | | |
|---|---|---|---|---|
| | Unweighted (1) | Weighted (2) | Weighted, with $X$'s (3) | Weighted, with $X$'s Interacted with DER (4) |
| | *Men* | | | |
| ln Earnings$^{DER}$ | −.017*** | −.018*** | −.014*** | −.012*** |
| | (.001) | (.001) | (.001) | (.001) |
| Constant | .374*** | .398*** | .436*** | .401*** |
| | (.009) | (.011) | (.017) | (.054) |
| Observations | 224,852 | 224,852 | 224,852 | 224,852 |
| $R^2$ | .002 | .002 | .018 | .019 |
| | *Women* | | | |
| ln Earnings$^{DER}$ | −.009*** | −.010*** | −.008*** | −.008*** |
| | (.001) | (.001) | (.001) | (.001) |
| Constant | .276*** | .292*** | .349*** | .412 |
| | (.008) | (.010) | (.017) | (.051) |
| Observations | 214,869 | 214,869 | 214,869 | 214,869 |
| $R^2$ | .001 | .001 | .015 | .016 |

Sources.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.
Note.—This table shows OLS estimation of eq. (3) described in Sec. IV of the text. Cols. 1 and 2 include a single control, ln Earnings$^{DER}$. Cols. 3 and 4 include additional controls for potential experience, race, marital status, citizenship, education, metropolitan area size, occupation, industry, and year. Col. 4 interacts these controls with ln Earnings$^{DER}$. Robust standard errors in parentheses. Weighted estimates are weighted using inverse-probability weights for ASEC-DER linkage.
*** Significance $p < .01$.

(a 10 percent increase in earnings decreases the probability of nonresponse by just over a tenth of a percentage point). The effect for women is roughly half that size (−0.008). Although these results provide what we believe are accurate measures of central tendency for these broad samples of men and women, our results for men appear to be just the opposite of that found by Greenlees et al. (1982), who found negative selection into response. Their small sample of married white men with nonworking spouses in 1972, however, is not representative of today's workforce. In order to compare our estimates with those of Greenlees et al., in results not shown we create a similar sample restricted to married white male citizens with spouse present. Unlike Greenlees et al., we include those with working spouses since married women's labor force participation is now closer to the norm rather than the exception. In contrast to the negative coefficients on log earnings for all men, using the restrictive married white male sample flips the signs and produces positive coefficients, meaning negative selection into response. The latter results are

qualitatively consistent with Greenlees et al., as well as previous studies finding negative selection into response, though again we emphasize that their sample is not representative of the modern labor force.

## A.   Nonresponse across the DER Distribution

Rather than focusing on central tendency, it is more informative to examine how nonresponse varies across the distribution. Grouping observations by DER earnings centile for the linked sample and estimating nonresponse rates for each centile (by gender) produces nonresponse rates that vary across the distribution nonparametrically. Panel A of figure 2 plots these results for the entire sample (smoothed using 3 percentile point moving averages). We note that the highest nonresponse rates are for men through the lowest 30 centiles (as high as 28 percent) and for both men and women at the highest 5 centiles, reaching 25 percent. Throughout the middle of the distribution, the graph is relatively flat. This is suggestive of our main result—"trouble is in the tails"—which is underscored in more dramatic fashion in panels B and C of figure 2. In panel B we focus on earnings among full-time, full-year workers, and in panel C we adjust for hours of work regardless of work status and depict nonresponse rates across the distribution of average real hourly earnings. Here the "trouble in the tails" is most evident: nonresponse rates rise dramatically in the left and right tails. Although similar to panel A, in panel C both men and women in the highest centiles have nonresponse rates reaching 30 percent. Through the middle of the distribution, however, the nonresponse rates are remarkably flat. The linear models reported in table 4 will necessarily fit this part of the distribution, thus explaining the apparent absence of substantive nonresponse bias when focusing on central tendency. The less pronounced trouble in the lower tails in panel A, which includes part-time and part-year workers, is largely explained by the fact that low earnings are caused not only by low pay but also by few weeks worked and low weekly hours. Both panels B and C adjust for annual hours and thus reveal a more striking pattern of U-shaped nonresponse across the distribution.[8] In short, nonresponse in the left tail is associated primarily with a low wage, not low earnings resulting from low hours worked. This pattern is widespread. Appendix figures 2–4 show that U-shaped patterns hold across race, ethnicity, interview month, and proxy report status.

[8] Reported hours are concentrated at 2080 (full-time, full-year). While nonresponse is somewhat higher for workers at 2080 hours (3 percentage points), there is no other obvious pattern across hours worked. Mean annual hours worked systematically increase across the DER earnings distribution, as expected. That said, for those with low DER earnings, mean hours worked are substantial, about 1000 hours for men and 650 for women in the lowest 3 earnings percentiles. This suggests that hours worked are not driving the U-shape.



Fig. 2.—Nonresponse rates by gender for joint DER earnings distribution. *A*, Earnings: all workers. *B*, Earnings: full-time, full-year workers. *C*, Average hourly earnings: all workers. Each panel shows the nonresponse rate for a 3 point moving percentile average across a common DER earnings distribution for men and women. The nonresponse rate is weighted using inverse-probability weights for ASEC-DER linkage. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

The nonresponse rates in figure 2 do not control for other factors, many of which are known to be associated with earnings and nonresponse. To address this, we modify the nonresponse equation specification seen previously in table 2 by grouping the bottom 90 percent of earners into earnings deciles, while breaking up the top decile into finer percentile increments. Table 3 presents results both with and without human capital, demographic, and location controls, separately for men and women. In all cases, we include a full set of decile/percentile dummy variables, rather than including an intercept. Hence, each coefficient provides an estimate of the nonresponse rate at the given DER earnings level. Readily evident from the coefficients is that nonresponse rates are not constant across the distribution, with the highest earnings deciles producing the highest nonresponse. The U-shapes are highly similar with and without controls.[9] Among men, the lowest decile has a 14 percent nonresponse rate, while the typical range through the rest of the distribution is roughly

---

[9] Note that our unconditioned figures showing nonresponse rates across the earnings distribution also have been constructed conditioned on a detailed set of covariates. While conditioning affects the level of nonresponse, curvature of the conditioned and unconditioned nonresponse figures is indistinguishable to the eye.

JOURNAL OF POLITICAL ECONOMY

TABLE 3
ASEC NONRESPONSE ACROSS THE DER EARNINGS DISTRIBUTION
FOR MEN AND WOMEN, 2006–11

| | OLS | | | |
| | Men | | Women | |
| DER EARNINGS DECILES AND PERCENTILES | Earnings Decile Dummies (1) | Earnings Decile Dummies and $X$'s (2) | Earnings Decile Dummies (3) | Earnings Decile Dummies and $X$'s (4) |
|---|---|---|---|---|
| Decile 10 | .267*** | .140*** | .213*** | .120*** |
| | (.004) | (.009) | (.003) | (.009) |
| Decile 20 | .253*** | .130*** | .214*** | .119*** |
| | (.004) | (.009) | (.004) | (.009) |
| Decile 30 | .217*** | .098*** | .202*** | .109*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 40 | .210*** | .095*** | .198*** | .107*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 50 | .189*** | .074*** | .194*** | .103*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 60 | .179*** | .064*** | .184*** | .095*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 70 | .178*** | .065*** | .180*** | .094*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 80 | .176*** | .064*** | .174*** | .089*** |
| | (.003) | (.009) | (.003) | (.009) |
| Decile 90 | .185*** | .073*** | .176*** | .091*** |
| | (.003) | (.009) | (.003) | (.009) |
| Percentiles 91–95 | .200*** | .088*** | .176*** | .090*** |
| | (.004) | (.010) | (.004) | (.010) |
| Percentile 96 | .199*** | .086*** | .197*** | .106*** |
| | (.010) | (.013) | (.010) | (.013) |
| Percentile 97 | .227*** | .111*** | .193*** | .102*** |
| | (.011) | (.014) | (.010) | (.013) |
| Percentile 98 | .252*** | .133*** | .183*** | .091*** |
| | (.011) | (.014) | (.010) | (.013) |
| Percentile 99 | .271*** | .149*** | .189*** | .097*** |
| | (.011) | (.014) | (.010) | (.013) |
| Percentile 100 | .320*** | .192*** | .243*** | .146*** |
| | (.011) | (.015) | (.011) | (.014) |
| Observations | 224,852 | 224,852 | 214,869 | 214,869 |
| $R^2$ | .212 | .225 | .192 | .204 |

SOURCES.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.
NOTE.—This table shows OLS estimation of eq. (3), which includes DER earnings decile dummy variables described in Sec. IV.A of the text. Cols. 1 and 3 include only decile dummy variables, while cols. 2 and 4 add controls described in table 2. Robust standard errors in parentheses. Estimates are weighted using inverse-probability weights for ASEC-DER linkage.
  *** Significance $p < .01$.

half that at 6.5 percent to 7.5 percent. For men in the highest 3 percentiles, the nonresponse rate again rises over 14 percent with the top 1 percent having a 19 percent nonresponse rate. For women, the results with controls are less pronounced, but again we see the U-shape. At the lowest decile, the nonresponse rate is 12 percent, while through the middle

of the distribution it falls to around 9 percent, and in the highest percentile, it rises to 14 percent. While we do not reject the null hypothesis that these rates are equal through the middle of the decile range (40th through 70th deciles), we do reject the null that all deciles are equal.

Our final evidence in this section is to show nonresponse rates for men and women with respect to percentiles across the *predicted* earnings distribution, seen in figure 3. We do this to test whether or not the U-shape is largely a result of observable covariates. The linked ASEC-DER sample is used to estimate conditional mean earnings equations along the lines of equation (4) using the same rich set of demographic controls, as well as controls for both full-time/part-time and full-year/part-year status. The predicted DER earnings for each worker, which can be thought of as an "attribute index," are then used similarly to the actual DER wage in figure 2. Workers are grouped by (3 point moving average) centile, and the resulting nonresponse rate is plotted, along with a smoothed quadratic trend function. Panel A of figure 3 makes it clear that nonresponse is somewhat higher in the tails of the attribute distribution of men compared to that in women in panel B. For the most part, though, nonresponse for



FIG. 3.—Nonresponse rate by predicted DER earnings. *A*, Men. *B*, Women. Each panel shows the nonresponse rate for a 3 point moving average across the predicted DER earnings distribution, along with a smoothed polynomial. The nonresponse rate is weighted using inverse-probability weights for ASEC-DER linkage. Predicted DER earnings come from an OLS estimation of equation (4) described in Section IV.A in the text. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

men and women demonstrates less of a U-shape across the attribute distribution than it does across the earnings distribution. The U-shaped nonresponse (i.e., trouble in the tails) is not driven primarily by observable earnings attributes; rather, it results from the *realization* of either very low or very high earnings.

### B. DER Earnings Residuals across the Distribution

We next examine the distribution of earnings conditional on response and earnings covariates, $f(Y|R, X)$, again using the linked ASEC-DER data with inverse-probability weights. We estimate earnings regressions specified in equation (4) using $\ln \text{Earnings}_i^{\text{DER}}$, and in figure 4 provide kernel density estimates of residuals for respondents and nonrespondents.

The left panel of figure 4 presents the administrative earnings distributions by ASEC response status among men, while the right panel does so for women. In both panels, peaks of the respondent distribution are higher than peaks of the nonrespondent distribution. Similarly, the tails of the nonrespondent distribution are generally longer, indicating a higher variance for nonrespondents. Appendix table 4 supports this, demonstrating



FIG. 4.—Residuals of log earnings regressions by ASEC response status and gender. *A*, Male kernel density of residuals; kernel = Epanechnikov, bandwidth = 0.0475. *B*, Female kernel density of residuals; kernel = Epanechnikov, bandwidth = 0.0502. Each panel shows the kernel density estimate of residuals for respondent and nonrespondent distributions. Residuals come from an OLS estimation of equation (4) described in Section IV.B in the text and appendix A.5. The OLS estimation uses inverse-probability weights for ASEC-DER linkage. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

that the variance for male (female) nonrespondents is 1.37 (1.12) times the variance of male (female) respondents. Testing differences between these variances using either the standard $F$-test or Levine's test rejects the null hypothesis of equivalence at conventional levels. Tests for differences in means reject the null hypothesis as well. A simple test of the difference in the medians fails to reject for men, but does reject for women. Examining the percentiles shows that the major differences occur in the tails, as seen in figure 4. We conclude that there is strong evidence of differences between these distributions, with the most substantive differences in the variances and percentiles. Furthermore, Kolmogorov-Smirnov tests reject the null ($p$-value $< 0.00$) that $f(Y|R = 1, X) = f(Y|R = 0, X)$, which is a sufficient condition to reject the hypothesis that $f(Y|R, X) = f(Y|X)$.

### C.   Proxy Respondents and Measurement Error

Census interviewers designate a single person to be the respondent for all household members in a bid to lower the time and money costs of conducting household surveys. Although a single person is recorded as providing answers to survey questions, the designee may rely on input from other household members in providing requested information. In the ASEC sample used in our analysis, 54 percent of men have their earnings reported by a proxy, while 42 percent of women rely on proxy reports.[10] As seen in appendix figure 4, earnings nonresponse is substantially higher among individuals with proxy earnings responses than among self-respondents. For our combined sample of women and men, earnings nonresponse rates are 24.2 percent for proxy respondents versus 16.4 percent for self-respondents. The gap in nonresponse rates between proxies and self-respondents is about 2 percentage points greater among men than among women; this gap varies little across the earnings distribution.

There exists rather limited information on the reliability of proxy earnings responses (Mellow and Sider 1983; Lee and Lee 2012; Reynolds and Wenger 2012). Using the linked ASEC-DER sample, we can observe whether administrative earnings in the DER, where there are no proxies, vary with respect to proxy use in the ASEC. That is, we estimate two equations, each separately for men and women: (1) an ASEC wage equation with spouse and nonspouse proxy variables and (2) a DER wage equation with ASEC spouse and nonspouse proxy variables. Each wage regression also controls for a saturated set of confounders. The proxy variables in the DER equation act as "phantom" dummies; if ASEC proxy coefficients only measured

---

[10] We designate a response as a proxy response when an individual's line number differs from the line number of the household respondent. This method is not 100 percent accurate. Census identifies a respondent at the end of an interview. If there has been a change in the respondent after the survey collects earnings information, this method need not identify correctly the household member providing the earnings information.

reporting differences between proxies and self-respondents, the DER proxy coefficients should be zero. Proxy coefficients in ASEC wage equations reflect the combined effects of proxy misreporting and worker heterogeneity. Inclusion of phantom ASEC proxy variables in DER administrative earnings regressions thus provides estimates of worker earnings heterogeneity correlated with proxy status (conditional on measured attributes). Thus, in order to estimate proxy misreporting error, we simply subtract the DER phantom proxy coefficients from the corresponding ASEC proxy coefficients. Note that we exclude imputed earners since we cannot know whether the donor's earnings used in the ASEC imputation were self-reported or from a proxy.

These results are summarized in columns 5 and 6 of table 4, using both a single proxy variable and distinguishing between spouse and nonspouse proxies. In general, the DER and ASEC proxy coefficients differ substantively, particularly so in the male regressions. In models with a single proxy variable (i.e., proxy use versus self-response), we find that proxies understate both men's annual earnings and men's hourly earnings by 0.062 log points. Underreporting of men's earnings are moderately larger when there are nonspouse rather than spousal proxies. For women, underreporting by proxies is a comparatively small 0.014 log points. Underreporting by nonspouse proxies is about a third larger than by spouse proxies. One clear result from this analysis is that inclusion of dummies for spouse and nonspouse proxy reports captures substantive unobserved heterogeneity, as seen by the DER coefficients. Both women and men with earnings reported by spousal proxies have higher administrative (DER) earnings (note that we control for marital status in all earnings equations).

The substantive underreporting of men's wages and earnings by proxies, coupled with minimal underreporting of women's earnings, has obvious implications for measurement of the gender gap, which is frequently measured using the CPS.[11] From above, the difference-in-difference in the male-female earnings gap from proxy reports is 0.048 log points (0.062 − 0.014). Were all earnings reported by proxies, these results would imply that the gender gap is understated by the full 0.048 log points. Based on sample averages of proxy use among men of 54.4 percent and 41.5 percent among women, a back-of-the-envelope calculation implies that gender-asymmetric underreporting of earnings by proxies understates the gender gap by about 0.028 log points ($0.544 \times 0.0621 - 0.415 \times 0.0145 = 0.0278$), or about 14 percent of the regression-adjusted ASEC average wage gap of .20 (the adjusted DER gender gap is .19). We return to the gender gap in a later section, focusing on the gap across the distribution using quantile models.

[11] Blau and Kahn (2017) provide a comprehensive survey of the gender wage gap, with a focus on CPS estimates.

TABLE 4

PROXY MISREPORTING OF MALE AND FEMALE ANNUAL AND HOURLY EARNINGS
BASED ON CPS-ASEC AND DER DIFFERENCES IN PROXY COEFFICIENTS

| | VARIABLE | | | | | |
| | CPS-ASEC | | DER | | CPS Proxy Misreport | |
| | Men (1) | Women (2) | Men (3) | Women (4) | Men (5) | Women (6) |
|---|---|---|---|---|---|---|
| Annual earnings: | | | | | | |
|   Earnings equations with proxy coefficients: | | | | | | |
|     Proxy | −.0638 | .0502 | −.0017 | .0647 | −.0621 | −.0145 |
|   Earnings equations with spouse and nonspouse proxy coefficients: | | | | | | |
|     Spouse proxy | .0233 | .1210 | .0807 | .1330 | −.0574 | −.0120 |
|     Nonspouse proxy | −.2010 | −.0576 | −.1320 | −.0392 | −.0690 | −.0184 |
| Hourly earnings: | | | | | | |
|   Wage equations with proxy coefficients: | | | | | | |
|     Proxy | −.0501 | .0031 | .0117 | .0172 | −.0618 | −.0141 |
|   Wage equations with spouse and nonspouse proxy coefficients: | | | | | | |
|     Spouse proxy | −.0091 | .0360 | .0483 | .0476 | −.0574 | −.0116 |
|     Nonspouse proxy | −.1150 | −.0473 | −.0459 | −.0289 | −.0691 | −.0184 |

SOURCES.— US Census Bureau Current Population Survey, 2006–11 Annual Social and
Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.
NOTE.—This table shows the OLS estimation of earnings and wage regressions that in-
clude controls for proxy, spouse proxy, and nonspouse proxy. Cols. 1 and 2 use ASEC earn-
ings, while cols. 3 and 4 use DER earnings. CPS proxy misreporting estimates (cols. 5 and
6) are calculated as the difference between the ASEC and DER proxy coefficients (col. 1
minus col. 3 for men and col. 2 minus col. 4 for women). See Sec. IV.C in the text for fur-
ther explanation. The CPS-ASEC equations exclude imputed earners since we cannot know
whether the donor's earnings were self-reported or from a proxy. The DER equations in-
clude the same sample. All columns include additional controls described in table 2. Esti-
mates are weighted using inverse-probability weights for ASEC-DER linkage.

We conclude this section with a brief discussion of differences in the
reported earnings in the ASEC and in the DER. Empirical investigation of
measurement error in earnings in the CPS and other surveys has a long
history (Herriot and Spiers 1975; Halsey 1978; Alvey and Cobleigh 1980;
Mellow and Sider 1983; Duncan and Hill 1985; Poterba and Summers
1986; Rogers and Herzog 1987; Mathiowetz and Duncan 1988; Marquis
and Moore 1990; Bound and Krueger 1991; Bound et al. 1994; Bollinger
1998; Bound, Brown, and Mathiowetz 2001; Roemer 2002). The goal of
this exercise is to examine the relationship between the survey respondents
for those with linked surveys using nonparametric kernel regression. We
use ordinary least squares (OLS) to estimate models of both ASEC and
DER earnings on the same covariates as previously, and the residuals from
each model are then used for the nonparametric regression of ASEC on
DER. Appendix figure 5, using a log-earnings scale, shows that the "com-
mon man" hypothesis (i.e., mean reverting measurement error) found in
the validation literature is supported: individuals with low earnings tend
to overreport their earnings, while individuals with high earnings tend to
underreport. Since this analysis was conducted on residuals, these are

not associated with demographic characteristics such as education or race. This evidence provides some interesting qualifications on our main finding that nonresponse is concentrated in the tails of the distribution. Here we see that for respondents, measurement error is also concentrated in the tails of the distribution. Previous authors (Bollinger and David 2001; Kapteyn and Ypma 2007) have found similar overlaps in the population of "noncooperative" survey respondents. This suggests, perhaps, that the Census imputation procedure may reflect the response that typical nonrespondents *would make*, were they to participate, measurement error and all. It does, however, highlight that individuals in the extreme parts of the earnings distribution (both unconditional and conditional) are not responding to the survey in ways we might hope. Our prior results show that many simply do not respond, while appendix figure 5 shows that those who do respond are not appropriately revealing their earnings. This evidence adds support to the idea that survey response and nonresponse are correlated with the level of income, even controlling for demographic factors.

### D.  Earnings Nonresponse over Time and Earnings Growth

One advantage of the rotation group structure of the ASEC is the overlapping nature of the sample, allowing up to 50 percent of sample individuals to be followed across adjacent years. There is a small literature examining either measurement error or nonresponse in panel settings (Bound and Krueger 1991; Fitzgerald, Gottschalk, and Moffitt 1998; Bound et al. 2001; Bollinger and David 2005). We briefly examine the rates of nonresponse for the 2 year panels covered by our data, the relationship between earnings and nonresponse, and the impact of nonresponse on simple measures of earnings growth. Several authors (Peracchi and Welch 1995; Cameron and Tracy 1998; Hardy and Ziliak 2014) have pointed out that the subsample of individuals who can be followed across adjacent years in the ASEC are not fully representative because the sample frame is the household address and not the person, and thus movers are not followed. Nonetheless, the longitudinal sample is widely used and thus it is important to assess nonresponse, and indeed, as appendix table 6 demonstrates, there are few observable differences between the panel and cross-sectional samples. We find that the linkage rate for panel individuals rises to 88.3 percent (compared to 87.4 percent for the full ASEC sample). The earnings nonresponse rate is 16.9 percent in year 1 of the panel and 18.2 percent in year 2, as compared to 22.6 percent in the full cross-section sample.

Column 1 of table 5 presents the (unweighted) response status in the first year, cross-tabulated with the response status in the second year. Overall, 72.8 percent of the sample responds in both years and 7.9 percent

TABLE 5
JOINT DISTRIBUTION OF RESPONSE AND LOG EARNINGS GROWTH
BY RESPONSE STATUS

| | | Log Earnings Growth | |
|---|---|---|---|
| | Rate (1) | ASEC (2) | DER (3) |
| Full sample | | .006 | .013 |
| Nonrespondent in both years | 7.9 | .037 | .020 |
| Respondent in both years | 72.8 | .0001 | .011 |
| Respondent only in year 1 | 10.3 | −.008 | −.017 |
| Respondent only in year 2 | 9.0 | .037 | .055 |

SOURCES.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

NOTE.—This table shows nonresponse and response rates (col. 1) and log earnings growth for ASEC earnings (col. 2) and DER earnings (col. 3) by response status for the 2 year ASEC panel. Col. 1 is unweighted, while cols. 2 and 3 are weighted by inverse-probability weights for ASEC-DER linkage.

does not respond in either year. The joint-year response rate is of course lower than the single-year response rates (83.1 percent in the first and 81.8 percent in the second year, as reported in appendix table 6). Many individuals change their response status and such changes are approximately symmetric. We find that 10 percent of individuals respond in the first year but become nonrespondents in the second year; 9 percent of individuals do not respond in year 1 but then do so in year 2. Figure 5 displays panel nonresponse rates plotted against the DER earnings centile for the first year in the panel. Panel A combines full-time, full-year workers with part-time and part-year workers, but unlike the earlier figures, here we combine the male and female samples. The year 1 and year 2 rates are (unsurprisingly) very comparable in shape to our prior results seen in figure 2. The third line tracks the percentage of those who failed to respond in both years. Although multiyear nonresponse is obviously lower than annual nonresponse, we again find that such nonresponse is U-shaped with respect to the level of earnings. Panel B presents the same breakdown for the full-time, full-year sample, while panel C shows the full sample with respect to hourly wage centiles. As in comparable panels in figure 2, we find more pronounced U-shaped patterns in panels B and C.

Using IPW weights to account for individuals not linked to the DER, columns 2 and 3 of table 5 present average earnings growth between the first and second year of the panel. We focus primarily on column 3, examining the growth of inflation-adjusted earnings in the DER. Overall, the average earnings growth was 0.013 log points. Most notable is the striking pattern between those who respond only in one year: low (negative) DER earnings growth for those who respond only in year 1 and high (positive) DER earnings growth for those who respond in year 2. This

2166                                    JOURNAL OF POLITICAL ECONOMY



FIG. 5.—Nonresponse rates by panel status for year 1 joint DER earnings distribution. *A*, Earnings: all workers. *B*, Earnings: full-time, full-year workers. *C*, Average hourly earnings: all workers. Each panel shows the nonresponse rate for a 3 point moving average for the year 1 DER earnings distribution in the 2 year ASEC panel. The nonresponse rate is shown for year 1, year 2, and both years of the panel. The nonresponse rate is weighted using inverse-probability weights for ASEC-DER linkage. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

pattern suggests strong selection into response based on changes in earnings, and is consistent with the U-shaped pattern found in the cross-sectional analysis as well; those who have very low or very high earnings may fail to respond if that is an unusual or new situation. Earnings growth for nonrespondents in either year is higher in absolute value than for those who respond in both years. This provides further evidence that nonresponse in the CPS should be treated as NMAR.

Here, unlike the previous analyses, the ASEC earnings growth includes the imputations for nonrespondents. We include the ASEC growth rates in column 2 for comparison and evaluation of the imputation process. Comparison of growth rates between the ASEC and DER confound both measurement error and imputations in the two categories in which response switches. For those who respond in both periods, measurement differences lead to the ASEC having strikingly lower estimates of earnings growth. In the case of nonresponse in both periods, the ASEC imputation procedure appears to impute higher earnings growth than observed. While one can take a variety of perspectives on whether administrative earnings are the correct measure, the marked difference in relative growth suggests that the imputations are extremely poor in capturing earnings dynamics.

## V.  How Troubling Is Trouble in the Tails?
##     The Consequences of Nonresponse

The linked ASEC-DER data permit us to examine directly whether rely-ing solely on respondents' earnings may produce in some circumstances results similar to what would be produced using complete (but unobtain-able) data. Because the DER sample includes administrative earnings for nonrespondents as well as respondents, we can compare estimates from respondent-only samples with those from complete samples, something not possible with publicly available data. Here we focus on three main types of estimation that should provide researchers with guidelines for judging the importance of nonresponse in their research (above and beyond that demonstrated in the prior section on proxy responses and longitudinal earnings growth). In Section V.A we examine the implications for linear models of earnings fitted with least-squares estimators. We find a modest impact from using a respondent-only sample, as the symmetric nonre-sponse in the tails has little impact on estimation of the means. In Sec-tion V.B, we consider the impact on coefficient estimates from quantile regressions. Here we find estimates in the lower and upper quantiles from respondent-only samples to be problematic, as compared to use of a full sam-ple from the ASEC-DER link. Our concerns regarding use of a respondent-only ASEC sample are reinforced in Section V.C, where we examine earn-ings inequality. This conclusion is not surprising given that measures of inequality are sensitive to earnings in the tails.

### A.  *Mean Earnings Estimates*

Using the ASEC-DER sample and the IPW weighting to account for rep-resentativeness, we estimate least-squares log annual DER earnings equa-tions by gender, separately for the linked respondents, linked nonrespon-dents, and all linked workers samples, again controlling for the same set of covariates used previously in the analysis. In table 6 we provide the pre-dicted DER earnings for men and women using means from the full sam-ple multiplied by coefficient estimates from (1) regressions using the full sample in column 1, (2) regressions on the subsample of respondents in column 2, and (3) regressions on the subsample of nonrespondents in column 3. We use as our benchmark the predicted DER earnings based on coefficients from the full sample in column 1.

Focusing first on men, the use of full-sample coefficients with the full-sample worker attributes ($X$'s) results in a predicted mean log earnings of 10.488. This is close to that obtained using respondent-only $\beta$'s, which leads to a predicted mean log earnings of 10.502, or 0.014 (1 percent) higher than obtained with the full sample. The equivalent values for women are 10.053 using full sample $\beta$'s and 10.061 using respondent $\beta$'s, a 0.008 dif-ference. However, selection on observables is readily evident comparing

TABLE 6
PREDICTED LOG DER EARNINGS WITH FULL SAMPLE, ASEC RESPONDENTS,
AND ASEC NONRESPONDENTS, 2006–11

| | Variable | | |
|---|---|---|---|
| | $\beta$'s from ln Earnings$^{DER}$ | | |
| | All Workers (1) | Respondents (2) | Nonrespondents (3) |
| Men: | | | |
| Prediction with full sample $X$'s | 10.488 | 10.502 | 10.437 |
| Observations | 224,852 | 180,564 | 44,288 |
| $R^2$ of earnings equation | .321 | .327 | .306 |
| Women: | | | |
| Prediction with full sample $X$'s | 10.053 | 10.061 | 10.018 |
| Observations | 214,869 | 175,253 | 39,616 |
| $R^2$ of earnings equation | .268 | .274 | .253 |

SOURCES.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.
NOTE.—This table shows predicted mean ln Earnings$^{DER}$ from earnings regressions for all linked workers (col. 1), linked respondents (col. 2), and linked nonrespondents (col. 3). Predicted ln Earnings$^{DER}$ are based on sample means from the full ASEC sample. All columns include additional controls described in table 2. Regression estimates use inverse-probability weights for ASEC-DER linkage.

columns 2 and 3 using respondent (R) and nonrespondent (NR) $\beta$'s, respectively. The R − NR predicted earnings difference is $10.502 - 10.437 = 0.065$ for men and $10.061 - 10.018 = 0.043$ for women. These differences are substantive. Because the nonrespondent shares of the total samples are relatively small (roughly 20 percent), the respondent-only sample provides coefficient estimates close to what would be produced using the full sample, the latter not being an option with public-use data. In short, users of public data can avoid substantial bias by removing imputed earnings. One can rebalance the respondent sample using inverse-probability weights, adjusting the ASEC supplement weight with model-based estimates of the probability of response. The analysis comparing male and female earnings is particularly interesting because gender is the one worker attribute always matched correctly in Census imputations (Bollinger and Hirsch 2006). That is, there exists no "match bias" (i.e., wage gap attenuation) resulting from assignment of imputed earnings from a different-sex donor.

### B. Earnings Gaps across the Distribution

We next examine the implications of nonresponse across the distribution of earnings for a host of widely studied outcomes such as earnings gaps across gender, race, and education. Figures 6–8 depict estimates of coefficients from quantile regressions of log annual earnings on the same set of covariates used in our earlier conditional analyses at the 5th, 10th,



Fig. 6.—Female-male earnings gap by quantile for full-time, full-year workers. This figure plots the female coefficient from saturated quantile and OLS regressions using DER earnings for two samples: (1) linked ASEC respondents and nonrespondents ("DER All Linked Quantile" and "DER All Linked OLS") and (2) linked respondents only ("DER Linked Respondent Quantile" and "DER Linked Respondent OLS"). OLS and quantile estimates are weighted using inverse-probability weights for ASEC-DER linkage. Numbers in the figure show $p$-values of the difference in the quantile estimates between the "DER All Linked" and "DER Linked Respondent" samples at each quantile. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

25th, 50th, 75th, 90th, 95th, and 99th quantiles. Each figure contains estimates from two samples—one using DER earnings on both linked ASEC respondents and nonrespondents ("All Linked"), and the other using linked respondents only ("Linked Respondent"). We focus here on the full-time, full-year subsample, in part because earnings distributions including part-time and part-year workers confound the level of earnings with hours worked and thus are difficult to interpret. While wages are often used in applications, concern arises there too with differences in wage distributions between full-time/full-year workers and those who work less, as well as potential measurement error in annual hours worked. It should be noted that quantile estimates are measuring differences in the conditional distribution and hence do not match the unconditional quantiles.

Figure 6 presents the estimated coefficients on the female indicator variable from pooled earnings quantile regressions, along with the $p$-value of the difference in coefficient estimates from the two samples. The OLS coefficients are presented as horizontal lines for comparison. In general,

there are very few differences between the OLS estimates on the two samples; respondent-only samples produce mean estimates highly similar to the typically unavailable full sample, thus avoiding the sometimes severe bias from including imputations. Quantile estimates at the tails, however, diverge substantially from mean estimates and from each other. We observe gender-gap estimates from the respondent-only sample that are biased in the tails. The understatement is 0.04 log points at the 5th percentile, and 0.1 log points at the 99th percentile, or nearly one-fourth of the overall gap. As noted in figure 2, differential response rates between men and women are most pronounced in the tails of the distribution. These differential rates in the tails have little impact on average gender gaps, but gender-gap estimates in the tails are problematic.

In figure 7 we examine the black-white earnings differential separately for men (panel A) and women (panel B) in the top panel, and the Hispanic-white differential for men (panel C) and women (panel D) in the bottom panel. As in figure 6, we see a similar pattern, where the respondent sample



Fig. 7.—Earnings gaps by race, ethnicity, gender, and quantile for full-time, full-year workers. *A,* Male black-white earnings gap. *B,* Female black-white earnings gap. *C,* Male Hispanic-white earnings gap. *D,* Female Hispanic-white earnings gap. Panel A (C) plots the black (Hispanic) coefficient from saturated quantile and OLS regressions using DER earnings for two male samples: (1) linked ASEC respondents and nonrespondents ("DER All Linked Quantile" and "DER All Linked OLS") and (2) linked respondents only ("DER Linked Respondent Quantile" and "DER Linked Respondent OLS"). Similarly, panel B (D) plots the black (Hispanic) coefficient from saturated quantile and OLS regressions using DER earnings for two female samples. OLS and quantile estimates are weighted using inverse-probability weights for ASEC-DER linkage. Numbers in the figure show *p*-values of the difference in the quantile estimates between the "DER All Linked" and "DER Linked Respondent" samples at each quantile. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

produces biased estimates that understate the racial gap among men. The largest impact in panel A is at the high end of the distribution, where the bias is 0.038 log points, or nearly 20 percent relative to the combined respondent-nonrespondent sample. As with the male-female differential, this is likely driven by missing high-earning men. Although black men are less likely to report than white men in general, it appears that conditional on other factors, nonrespondents are disproportionately white men at the highest earnings. Here, along with the consistent underestimation of the differential in the respondent-only sample, the OLS estimates display modest underestimation as well. In panel B, the black-white differential for women displays a slightly different pattern. While at the higher quantiles, the respondent-only sample continues to slightly understate the gap, we note that at the lower quantiles the bias is reversed, with the respondent-only subsample slightly overstating the gap by about 0.012 log points, or about 10 percent of the combined sample gap. Panels C and D depict the respective gaps for men and women between Hispanics and whites. As we saw for the female black-white differential, the respondent-only sample understates the differential at the highest quantiles but overstates it at the lower quantiles for both men and women. For Hispanic men, the bias in the differential is most pronounced at the highest quantiles (0.03 log points at the 99th percentile, or 20 percent of the combined respondent/nonrespondent gap), while for women the bias is largest at the lowest quantiles.

Finally, figure 8 examines the earnings differential between those whose highest degree is high school (excluding GEDs) compared to high school dropouts (panel A) and college graduates (with that being the highest degree) compared to high school graduates (panel B). High school returns are systematically understated using the respondent sample, particularly so in the bottom half of the distribution, but with minimal difference at the top of the distribution. The same qualitative pattern is seen for estimates of the return to college, but with a modest downward bias throughout the entire distribution (being largest at the 90th and 95th percentiles). In both schooling return cases, the respondent sample understates the return at the means (OLS).

## C.  Earnings Inequality

There is limited evidence regarding how earnings nonresponse affects the measurement of inequality; a priori it is not readily apparent how it should do so. One needs to identify who fails to respond, how nonresponse differs with respect to true and typically unobserved earnings (conditional on covariates), how any such nonresponse bias might differ across the earnings distribution, and how one can best treat top-coded earnings. Census uses different top-code values depending on earnings source, and these



Fig. 8.—Earnings gaps by education and quantile: full-time, full-year workers. *A*, High school return. *B*, College return. Panel A plots the coefficient comparing high school to high school dropouts from saturated quantile and OLS regressions using DER earnings for the two samples described in figure 6. Similarly, panel B plots the coefficient comparing college graduates to high school graduates from saturated quantile and OLS regressions using DER earnings for the two samples described in figure 6. OLS and quantile estimates are weighted using inverse-probability weights for ASEC-DER linkage. Numbers in the figure show *p*-values of the difference in the quantile estimates between the "DER All Linked" and "DER Linked Respondent" samples at each quantile. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

values differ between internal and public-release versions of the ASEC. A key advantage of the DER data is that earnings are not top coded, thus permitting a direct comparison of estimates of upper-tail inequality from tax records to top-coded survey responses. Some inequality studies have excluded imputed earners (Lemieux 2006; Autor et al. 2008), while others have not (Burkhauser et al. 2012). This is the first such direct comparison from linked individual survey and tax data on how nonresponse and top coding affects earnings-inequality estimates. We estimate several leading measures of inequality emphasized in the recent literature—including the Gini coefficient (fig. 9) and 90-10 ratio (fig. 10), along with 90-50, 50-10, and top 1 percent share in appendix figures 7–9. For brevity, we restrict our discussion here to the Gini coefficient results as similar patterns are obtained for the 90-10 ratio.

In panel A of figure 9 we show the earnings Gini for the full sample of workers. Shown with the dash-dotted line is the full ASEC sample, with the long-dashed line is the ASEC for respondents only, with the solid line is the DER for all linked workers (and ASEC for nonlinked), and with the short-dashed line is the DER for linked respondents. Comparing the full ASEC with imputations versus ASEC respondents only, one sees that the respondent-only sample shows too low a level of inequality owing to the omission of nonrespondents disproportionately represented in the far left and right tails. Hence, inclusion of imputations is appropriate for measuring uncon-ditioned inequality, despite the severe biases that can arise from inclusion of imputations in conditioned analyses (Bollinger and Hirsch 2006). As with the ASEC, removing nonrespondents from the DER reduces the Gini measure. The larger impact in the DER reflects the fact that the imputa-tions in the ASEC do not capture the NMAR aspect of nonresponse. As compared to the two DER measures, the ASEC measures show a substan-tially lower level of inequality and somewhat different trends. Earnings in-equality in the ASEC is roughly flat over the full sample period, and every-where below the DER. Using DER earnings, we find a higher level of inequality (about 10 percent higher) and a modest upward trend after 2007. Panel A establishes that NMAR nonresponse has an impact on measures of inequality. Removing those missing values results in a down-ward bias in estimating inequality. Although inclusion of the imputations fails to account for NMAR bias, it does correct for MAR bias with respect to those attributes matched in the Census imputations.

In panels B and C of figure 9, we explore whether the gap between ASEC and DER earnings inequality is due to nonresponse (panel B) or due to differences in measurement of earnings, including top coding (panel C). Panel B shows three series—the ASEC inclusive of nonrespon-dents, the DER for linked respondents and nonrespondents (and ASEC for nonlinked), and a hybrid DER measure that uses DER earnings for linked nonrespondents and ASEC earnings for respondents (and ASEC



Fig. 9.—Trends in Gini earnings inequality. A, All workers and respondents only. B, Role of nonresponse. C, Role of measurement. Panel A shows the earnings Gini for the following series: (1) full ASEC sample ("ASEC"); (2) ASEC earnings for only respondents ("ASEC, Respondents Only"); (3) DER earnings for all linked workers and ASEC earnings for nonlinked respondents ("DER"); and (4) DER earnings for only linked respondents ("DER, Respondents Only"). Panel B includes a series that uses DER earnings for nonrespondents and ASEC earnings for respondents ("DER for NR, ASEC for R"). Panel C includes a series that uses DER earnings only for top-coded ASEC earnings ("DER for Top Code Only") and a series that uses DER earnings for workers in the top half of the ASEC earnings distribution ("DER for Top 50% Only"). The Gini is weighted using the ASEC supplement weight. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

2174

AR-F-001073

App.777



Fig. 10.—Trends in 90-10 earnings inequality. A, All workers and respondents only. B, Role of nonresponse. C, Role of measurement. This figure shows the 90-10 percentile ratio for various series. See note to figure 9 for series descriptions. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

2175

AR-F-001074

App.778

for the nonlinked). In all cases the sample size is held constant by using the ASEC for the nonlinked, whether a respondent or nonrespondent. Here we see that the hybrid measure produces a Gini level roughly one-third to halfway between the pure ASEC and DER measures. Comparing the hybrid measures to the pure ASEC measures supports the conclusion that nonrandom, nonresponse bias (NMAR) causes an understatement in the level and trend in earnings inequality based solely on ASEC.

Panel C presents the original ASEC and DER series, along with two additional series. In one series the DER is used only for top-coded ASEC values with a DER link, and in the other series we replace the ASEC with the DER for workers in the top half but not bottom half of the ASEC earnings distribution, regardless of imputation or top-code status. The former case is of interest because the full ASEC and DER groups include a convolution of nonrespondents and top-coded workers, and thus it is less obvious what direct role the top code in the internal ASEC plays vis-à-vis administrative tax data. The latter case is of interest because the DER does not capture off-the-book earnings, and thus the higher level of inequality observed in the DER might be an artifact of underreported earnings in the lower half of the distribution. The results in panel C demonstrate that top-coded earnings alone in the internal ASEC are not the primary cause of the gap in inequality estimates from tax data in the DER versus ASEC survey data. The DER-only series shows substantially higher and (to a lesser extent) rising inequality as compared to ASEC earnings with DER replacing ASEC top codes. In addition, the majority of the gap between the DER and ASEC earnings inequality arises from earnings in the upper half of the ASEC distribution, and not from off-the-books underreporting in the lower half. This conclusion is based on the minimal differences between the DER-only series and the hybrid ASEC-DER series with DER earnings replacing the ASEC in the top half of the ASEC distribution. ASEC measures of inequality tend to understate inequality because the Census hot deck (owing to nonresponse bias) imputes earnings for nonrespondents that are too high in the left tail and too low in the right tail.

## VI. Recommendations for Users of Public ASEC

Our results indicate that nonresponse bias causes both earnings gaps and inequality measures estimated with ASEC earnings responses to be understated. Because of nonresponse, the observed data include too few low earners and too few very high earners. The Census hot-deck procedure, based on the MAR assumption, fails to correct this problem because MAR conditions are not met. The general CPS user community does not have access to either the internal ASEC used in this paper or the DER. The advantage of the former comes primarily from data with higher top-code values compared to the public ASEC. Since 1996 Census has attempted

to address this discrepancy, while still maintaining confidentiality, by releasing "proxy values" for those individuals with earnings in between the public and internal top codes. During survey years 1996–2010 the proxy came in the form of cell means, while from 2011 onward via rank swapping. The latter approach is preferred because it preserves the distribution of earnings above the top code. Recently Census released rank-swap values for all the top-code income components (not just earnings) back to 1975, and we recommend that public researchers using the ASEC prior to the 2011 survey year adopt these top codes.[12]

Hirsch and Schumacher (2004) and Bollinger and Hirsch (2006) recommended dropping the imputed nonrespondents in the ASEC because of the attenuation bias that imputations impart on regression coefficients, and then reweighting the sample with inverse-probability weights to retain population representativeness. Their recommendation to drop imputations was based on analyses focusing on models of central tendency (OLS, median regression). Overall, our results here strongly suggest that MAR is violated across the distribution, and thus dropping nonrespondents and reweighting will not correct for nonrandom nonresponse. In practice, we demonstrate that the economic bias from nonresponse may be small in well-specified linear models of wages and earnings. As a general recommendation for distributional research, however, public ASEC users are advised to implement a flexible selection model that corrects for nonrandom nonresponse. In this section, we demonstrate the utility of one such approach in an application to earnings inequality.

Specifically, we implement a procedure recently proposed in Arellano and Bonhomme (2017) whereby one first estimates quantile regressions corrected for nonresponse using copula methods, and then uses predictions from those regressions to create simulated earnings data. The key assumptions to identification are an exclusion restriction, continuity of the residuals of the two equations (main and selection), continuity of the dependent variable in the main outcome (earnings), and the propensity of being observed being conditionally nonzero (e.g., there is not some group that can be correctly predicted to never be observed). For our application, we estimate conditional quantile models of earnings that include controls for a quartic in age, nine education categories, race, gender, immigration status, region and metro status, and industry, and correct for nonrandom selection using the Frank copula as it allows for nonresponse being concentrated in a tail.[13] To identify the selection model, we use the month-in-sample in which the respondent is observed in the ASEC as an

[12] See https://www2.census.gov/programs-surveys/demo/datasets/income-poverty/time-series/data-extracts/asec-incometopcodes-swappingmethod-corrected-110514.zip.
[13] Our programs, which are based on those provided by Arellano and Bonhomme (2017), are available as supplementary material online at the journal's website.

exclusion restriction. All else being equal, we expect nonresponse to be lower in month 1 or 5 of the rotation cycle as interviews are done in person, while the other six months are conducted over the phone. Appendix figure 3 seems to confirm this as it shows that rates of nonresponse in months 1 and 5 lie everywhere below months 2–4 and 6–8. Thus month-in-sample should be correlated with nonresponse, and at the same time, we do not expect month-in-sample to be related to true individual earnings (Bollinger and Hirsch 2013).[14] We have not observed any variable or combination of variables that perfectly predicts nonresponse or response. Thus, we are confident that the key assumptions for identifying the Arellano and Bonhomme model are met.

After estimating the quantiles, we randomly generate an integer $q$ between 1 and 99 for each individual in the full sample. Following the conditional quantile decomposition method of Machado and Mata (2005), we use the quantile coefficients associated with the draw of $q$ for each individual to produce a prediction of the $q$th quantile of the earnings distribution. This provides a simulated distribution that can then be used to estimate a variety of statistics, including measures of income inequality. Because the nonresponse throughout the distribution is addressed differentially at each quantile, the Arellano-Bonhomme approach will provide a simulated distribution that has higher dispersion compared to the more restrictive approach in Buchinsky (1998).

In evaluating the efficacy of this approach, there are two possible benchmarks against which to compare our estimates, the latter of which is based solely on survey responses from the ASEC. The first is the administrative records of the DER. The DER provides a source of information on income that is official and is a natural comparison. As noted in Section IV.C, however, there are differences in how individuals report ASEC earnings relative to their DER earnings. While one perspective is that the DER earnings are "correct," there is the potential that ASEC earnings contain earnings that are not reported to the government (at the low end) or that DER earnings contain other errors (see Kapteyn and Ypma 2007). The fundamental question being addressed in this paper is how to account for nonresponse. Hence the ideal "benchmark" would be the ASEC in which everyone answered the earnings question. The closest approximation to that would be to use the ASEC earnings, but replace linked nonrespondents with their DER. This is the benchmark we adopt.

We estimate the quantile selection model for each year, and in table 7 we present the 6 year average Gini coefficient, and 90-10, 90-50, and

---

[14] Krueger, Mas, and Niu (2017) and Hirsch and Winters (2016) find substantial differences across the CPS month-in-sample reports of unemployment and multiple job holding, respectively. We find no such pattern of rotation group bias with respect to earnings.

TABLE 7
PERFORMANCE OF SELECTION CORRECTION METHODS
FOR NONRESPONSE IN THE ASEC ON INEQUALITY

| SAMPLE | INEQUALITY MEASURES | | | |
|---|---|---|---|---|
| | Gini | 90-10 | 90-50 | 50-10 |
| ASEC | .461 | 10.099 | 2.607 | 3.870 |
| ASEC, only respondents with IPW | .464 | 10.227 | 2.641 | 3.869 |
| ASEC, only respondents with copula | .482 | 10.521 | 2.676 | 3.929 |
| ASEC for respondents, DER for | | | | |
| nonrespondents (benchmark) | .477 | 11.038 | 2.683 | 4.112 |

SOURCES.—US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.
NOTE.—This table shows inequality measures for the following series: the full ASEC sample, ASEC earnings only for respondents weighted by inverse-probability weights for nonresponse, ASEC earnings only for respondents using the copula selection model, and DER earnings for nonrespondents and ASEC earnings for respondents. See Sec. VI in the text for further details about each series. Unless otherwise noted, all series are estimated using the ASEC supplement weight.

50-10 ratios. We present the estimates for the full ASEC including both respondents and imputed nonrespondents, the ASEC for respondents only but using inverse-probability weights to adjust for nonresponse, the ASEC for respondents only using the copula selection model, and the benchmark of ASEC for respondents and DER for nonrespondents. Table 7 demonstrates that while the ASEC with IPWs brings the inequality estimates closer to the benchmark compared to the full ASEC, the IPW approach falls short compared to the quantile copula selection model that captures nonrandom selection into response in the tails. Figure 11 presents the annual estimates of the inequality measures, where we see that for several measures (i.e., Gini and 90-50 ratio) our method sometimes exceeds inequality from the benchmark, and in some years falls below, so that on average it aligns closely with the benchmark. The 90-10 and 50-10 ratios using the copula method lie below the benchmark in each year, suggesting that some of the measurement differences between the DER and ASEC at low earnings persist. The copula method still performs better, relative to the benchmark, compared to either ASEC or the ASEC with IPWs.

## VII.  Conclusion

This paper set out to examine the progress in earnings measurement in the CPS in the more than three decades since the important critique of Lillard et al. (1986). In our analysis we address three questions relying on a unique restricted-access data set that links ASEC household files to administrative earnings tax records. First, how do nonresponse and patterns



Fig. 11.—Performance of inequality measures in ASEC. *A*, Gini coefficient. *B*, 90–10 ratio. *C*, 90–50 ratio. *D*, 50–10 ratio. Each panel shows inequality measures for the following series: (1) full ASEC sample ("ASEC"); (2) DER earnings for nonrespondents and ASEC earnings for respondents ("DER for NR, ASEC for R"); (3) ASEC earnings for only respondents weighted by inverse-probability weights for nonresponse ("ASEC, Respondents Only, IPW"); and (4) ASEC earnings for only respondents using the copula selection model ("ASEC, Respondents Only, Copula"). See Section VI in the text for further details about each series. Unless otherwise noted, all series are estimated using the ASEC supplement weight. Sources: US Census Bureau Current Population Survey, 2006–11 Annual Social and Economic Supplement; Social Security Administration Detailed Earnings Record, 2005–10.

AR-F-001079

of nonresponse bias vary across the earnings distribution, and are these patterns similar for women and men (and other groups)? Although levels of nonresponse differ based on gender, race, and ethnicity, U-shaped patterns of nonresponse across the earnings distribution are highly similar across groups. Likewise, we see substantial differences in the level of nonresponse based on the CPS survey month-in-sample and for proxy versus self-respondents, yet we see highly similar U-shaped patterns of nonresponse with respect to earnings for each of these groups. With or without conditioning on covariates, we find a U-shaped nonresponse pattern, with left-tail "stragglers" and right-tail "stars" being least likely to report earnings. Women and men have similar U-shaped nonresponse patterns across the distribution, although men have a higher level of nonresponse.

Second, is nonresponse ignorable? The short answer is no. As stated above, nonresponse is not independent of realized earnings, with or without control for covariates. Relatedly, earnings differ with respect to response status, conditional on covariates. Our third question asks whether there are economic implications of nonrandom nonresponse on estimates of earnings gaps and inequality. We do find small biases at the means for some earnings gaps (e.g., schooling returns and racial/ethnic wage gaps). Gender gaps are slightly understated throughout much of the distribution, but substantively understated in both the left and right tails. Because those with unusually low and high earnings, conditional on measured attributes, are disproportionately missing from the sample, wage equation coefficient estimates on attributes associated with very low (high) earnings are understated in absolute value. Race, gender, and returns to schooling gaps in the tails can be off by as much as 20 percent due to nonresponse. Particularly pronounced are estimates of upper-tail inequality, where nonresponse accounts for one-third to one-half of the 30 percent gap between survey and tax record estimates. Moreover, our evidence from matched panels shows that earnings-growth estimates in the ASEC are substantially understated from imputations. There is trouble in the tails.

The analysis in this paper has implications for researchers using the CPS, as well as similar household data sets such as the American Community Survey (ACS). As emphasized in prior work, even if nonresponse were completely missing at random, severe "match bias" can arise in the estimation of earnings-equation coefficients if researchers include nonrespondents whose earnings are imputed by Census. The simplest and most widely used solution in this case is to throw out imputed earnings. The respondent-only sample can be reweighted by the inverse probability of response, although in practice this typically makes little difference. This easy fix, however, does not provide consistent estimates when there is nonrandom nonresponse. This is particularly true for research focusing on the upper and lower tails of the earnings distribution. Solving the problem of

survey nonresponse is much more difficult absent access to linked administrative data. Progress on this front can continue with additional efforts to link household surveys, tax records, and federal and state-level administrative data on transfers, as recommended recently by the bipartisan Commission on Evidence-Based Policymaking (2017). In the interim, we demonstrated that a flexible copula-based model to correct for nonrandom selection into response offers promise for researchers conducting distributional analysis using the ASEC.

## References

Abowd, John M., and Martha H. Stinson. 2013. "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data." *Rev. Econ. and Statis.* 95 (December): 1451–67.

Alvey, Wendy, and Cynthia Cobleigh. 1980. "Exploration of Differences between Linked Social Security and CPS Earnings Data for 1972." In *Studies from Interagency Data Linkages*, report no. 11, 11–18. Washington, DC: U.S. Dept. Health, Educ., and Welfare.

Arellano, Manuel, and Stéphane Bonhomme. 2017. "Quantile Selection Models with an Application to Understanding Changes in Wage Inequality." *Econometrica* 85 (January): 1–28.

Autor, D., L. Katz, and M. Kearney. 2008. "Trends in U.S. Wage Inequality: Revising the Revisionists." *Rev. Econ. and Statis.* 90 (May): 300–323.

Bee, C. Adam, Graton M. R. Gathright, and Bruce D. Meyer. 2015. "Bias from Unit Non-Response in the Measurement of Income in Household Surveys." https://harris.uchicago.edu/files/jsm2015_bgm_unit_non-response_in_cps.pdf.

Blau, Francine, and Lawrence Kahn. 2017. "The Gender Wage Gap: Extent, Trends, and Sources." *J. Econ. Literature* 55 (September): 789–865.

Bollinger, Christopher R. 1998. "Measurement Error in the Current Population Survey: A Nonparametric Look." *J. Labor Econ.* 16 (July): 576–94.

Bollinger, Christopher R., and Martin H. David. 2001. "Estimation with Response Error and Nonresponse: Food-Stamp Participation in the SIPP." *J. Bus. and Econ. Statis.* 19 (April): 129–141.

———. 2005. "I Didn't Tell and I Won't Tell: Dynamic Response Error in the SIPP." *J. Appl. Econometrics* 20 (May/June): 563–69.

Bollinger, Christopher R., and Barry T. Hirsch. 2006. "Match Bias from Earnings Imputation in the Current Population Survey: The Case of Imperfect Matching." *J. Labor Econ.* 24 (July): 483–519.

———. 2013. "Is Earnings Nonresponse Ignorable?" *Rev. Econ. and Statis.* 95 (May): 407–16.

Bound, John, Charles Brown, Greg J. Duncan, and Willard L. Rodgers. 1994. "Evidence on the Validity of Cross-Sectional and Longitudinal Labor Market Data." *J. Labor Econ.* 12 (July): 345–68.

Bound, John, Charles Brown, and Nancy Mathiowetz. 2001. "Measurement Error in Survey Data." In *Handbook of Econometrics*, vol. 5, edited by E. E. Leamer and J. J. Heckman, 3705–843. Amsterdam: Elsevier.

Bound, John, and Alan B. Krueger. 1991. "The Extent of Measurement Error in Longitudinal Earnings Data: Do Two Wrongs Make a Right?" *J. Labor Econ.* 9 (January): 1–24.

Buchinsky, Moshe. 1994. "Changes in the U.S. Wage Structure 1963–1987: An Application of Quantile Regression." *Econometrica* 62 (March): 405–58.

———. 1998. "The Dynamics of Changes in the Female Wage Distribution in the USA: A Quantile Regression Approach." *J. Appl. Econometrics* 13 (January): 1–30.

Burkhauser, Richard V., Shuaizhang Feng, Stephen Jenkins, and Jeff Larrimore. 2012. "Recent Trends in Top Income Shares in the USA: Reconciling Estimates from March CPS and IRS Tax Return Data." *Rev. Econ. and Statis.* 94 (May): 371–88.

Cameron, Stephen, and Joseph Tracy. 1998. "Earnings Variability in the United States: An Examination Using Matched-CPS Data." Working paper, Fed. Reserve Bank New York.

Commission on Evidence-Based Policymaking. 2017. "The Promise of Evidence-Based Policymaking." https://www.cep.gov/cep-final-report.html.

David, Martin, Roderick J. A. Little, Michael E. Samuhel, and Robert K. Triest. 1986. "Alternative Methods for CPS Income Imputation." *J. American Statis. Assoc.* 81 (March): 29–41.

Dixon, John. 2012. "Using Contact History Information to Adjust for Nonresponse in the Current Population Survey." In *2012 JSM Proceedings: Papers Presented at the Joint Statistical Meetings*, 1977–1982. Alexandria, VA: American Statis. Assoc.

Duncan, Greg J., and Daniel H. Hill. 1985. "An Investigation of the Extent and Consequences of Measurement Error in Labor-Economic Survey Data." *J. Labor Econ.* 3 (October): 508–32.

Fitzgerald, John, Peter Gottschalk, and Robert Moffitt. 1998. "The Michigan Panel Study of Income Dynamics." *J. Human Resources* 33 (Spring): 251–99.

Greenlees, John, William Reece, and Kimberly Zieschang. 1982. "Imputation of Missing Values when the Probability of Response Depends on the Variable Being Imputed." *J. American Statis. Assoc.* 77 (June): 251–61.

Halsey, H. 1978. "Validating Income Data: Lessons from the Seattle and Denver Income Maintenance Experiment." In *Proceedings of the Survey of Income and Program Participation Workshop, Survey Research Issues in Income Measurement: Field Techniques, Questionnaire Design, and Income Validation.* Washington, DC: U.S. Dept. Health, Educ., and Welfare.

Hardy, Bradly, and James P. Ziliak. 2014. "Decomposing Trends in Income Volatility: The 'Wild Ride' at the Top and the Bottom." *Econ. Inquiry* 52 (January): 459–76.

Heckman, James J. 1979. "Sample Selection Bias as Specification Error." *Econometrica* 47 (January): 153–61.

Heckman, James J., and Paul A. LaFontaine. 2006. "Bias-Corrected Estimates of GED Returns." *J. Labor Econ.* 24 (July): 661–700.

Herriot, R. A., and E. F. Spiers. 1975. "Measuring the Impact on Income Statistics of Reporting Differences between the Current Population Survey and Administrative Sources." *Proceedings, American Statistical Association Social Statistics Section*, 147–58. Alexandria, VA: American Statis. Assoc.

Hirsch, Barry T., and Edward J. Schumacher. 2004. "Match Bias in Wage Gap Estimates due to Earnings Imputation." *J. Labor Econ.* 22 (July): 689–722.

Hirsch, Barry T., and John V. Winters. 2016. "Rotation Group Bias in Measures of Multiple Job Holding." *Econ. Letters* 147 (October): 160–63.

Hokayem, Charles, Christopher Bollinger, and James P. Ziliak. 2015. "The Role of CPS Nonresponse in the Measurement of Poverty." *J. American Statis. Assoc.* 110 (September): 935–45.

Hurst, Erik, Geng Li, and Ben Pugsley. 2014. "Are Household Surveys Like Tax Forms? Evidence from Income Underreporting of the Self-Employed." *Rev. Econ. and Statis.* 96 (March): 19–33.

Joe, Harry. 2014. *Dependence Modeling with Copulas.* Boca Raton, FL: CRC Press.

Kapteyn, Arie, and Jelmer Y. Ypma. 2007. "Measurement Error and Misclassification: A Comparison of Survey and Administrative Data." *J. Labor Econ.* 25 (July): 513–50.

Kline, Patrick, and Andres Santos. 2013. "Sensitivity to Missing Data Assumptions: Theory and an Evaluation of the U.S. Wage Structure." *Quantitative Econ.* 4 (July): 231–67.

Krueger, Alan, Alexandre Mas, and Xiaotong Niu. 2017. "The Evolution of Rotation Group Bias: Will the Real Unemployment Rate Please Stand Up?" *Rev. Econ. and Statis.* 99 (May): 258–64.

Larrimore, Jeff, Richard V. Burkhauser, Shuaizhang Feng, and Laura Zayatz. 2008. "Consistent Cell Means for Topcoded Incomes in the Public Use March CPS (1976–2007)." *J. Econ. and Social Measurement* 33:89–128.

Lee, Jungmin, and Sokbae Lee. 2012. "Does It Matter Who Responded to the Survey? Trends in the U.S. Gender Earnings Gap Revisited." *Indus. and Labor Relations Rev.* 65 (January): 148–60.

Lemieux, Thomas. 2006. "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill." *A.E.R.* 96 (June): 461–98.

Lillard, Lee, James P. Smith, and Finis Welch. 1986. "What Do We Really Know about Wages? The Importance of Nonreporting and Census Imputation." *J.P.E.* 94 (June): 489–506.

Little, Roderick J. A., and Donald B. Rubin. 2002. *Statistical Analysis with Missing Data.* 2nd ed. Hoboken, NJ: Wiley-Interscience.

Machado, José A. F., and José Mata. 2005. "Counterfactual Decomposition of Changes in Wage Distributions Using Quantile Regression." *J. Appl. Econometrics* 20 (May/June): 445–65.

Marquis, Kent H., and Jeffrey C. Moore. 1990. "Measurement Errors in SIPP Program Reports." In *Proceedings of the 1990 Annual Research Conference,* 721–45. Washington, DC: U.S. Bur. Census.

Mathiowetz, Nancy A., and Greg J. Duncan. 1988. "Out of Work, Out of Mind: Response Error in Retrospective Reports of Unemployment." *J. Bus. and Econ. Statis.* 6 (April): 221–29.

Mellow, Wesley, and Hal Sider. 1983. "Accuracy of Response in Labor Market Surveys: Evidence and Implications." *J. Labor Econ.* 1 (October): 331–44.

Nicholas, Joyce, and Michael Wiseman. 2009. "Elderly Poverty and Supplemental Security Income." *Social Security Bull.* 69 (May): 45–73.

Peracchi, Franco, and Finis Welch. 1995. "How Representative are Matched Cross-Sections? Evidence from the Current Population Survey." *J. Econometrics* 68 (July): 153–79.

Piketty, Thomas, and Emmanuel Saez. 2003. "Income Inequality in the United States." *Q. J.E.* 118 (February): 1–39.

Poterba, James M., and Lawrence H. Summers. 1986. "Reporting Errors and Labor Market Dynamics." *Econometrica* 6 (November): 221–29.

Reynolds, Jeremy, and Jeffrey B. Wenger. 2012. "He Said, She Said: The Gender Wage Gap According to Self and Proxy Reports in the Current Population Survey." *Social Sci. Res.* 41 (March): 392–411.

Roemer, Mark. 2002. "Using Administrative Earnings Records to Assess Wage Data Quality in the Current Population Survey and the Survey of Income

and Program Participation." Longitudinal Employer-Household Dynamics Program Technical Paper No. TP-2002-22, U.S. Census Bureau.

Rogers, Willard L., and A. Regula Herzog. 1987. "Covariances of Measurement Errors in Survey Responses." *J. Official Statis.* 3 (October): 403–18.

Rubin, Donald B. 1976. "Inference and Missing Data (with Discussion)." *Biometrika* 63 (3): 581–92.

Vella, Francis. 1998. "Estimating Models with Sample Selection Bias: A Survey." *J. Human Resources* 33 (Winter): 127–69.

Welniak, Edward J. 1990. "Effects of the March Current Population Survey's New Processing System on Estimates of Income and Poverty." In *Proceedings of the American Statistical Association.* Alexandria, VA: American Statis. Assoc.

# EXHIBIT 10

# The College Payoff

### Education, Occupations, Lifetime Earnings



## Anthony P. Carnevale, Stephen J. Rose and Ban Cheah

#### THE GEORGETOWN UNIVERSITY CENTER ON EDUCATION AND THE WORKFORCE

EDUCATION
OCCUPATIONS
LIFETIME EARNINGS



GEORGETOWN UNIVERSITY
Center
on Education
and the Workforce

**TABLE OF CONTENTS**

1    **INTRODUCTION**

3    **PART I:** Lifetime Earnings by Educational Attainment

4    **PART II:** Lifetime Earnings by Educational Attainment and Age

6    **PART III:** Variations in Earnings by Education and Occupation: Earnings Overlap

10    **PART IV:** Lifetime Earnings by Educational Attainment, Gender, and Race/Ethnicity

13    **PART V:** Top Ten Occupations by Educational Attainment

20    **CONCLUSION**

21    **TECHNICAL APPENDIX**

23    **APPENDIX:** Lifetime Earnings by Educational Attainment and Occupation

All data in this report are the authors' analysis of the 2007-2009 American Community Survey.

We would like to express our gratitude to the individuals and organizations that have made this report possible. First, we thank the Lumina Foundation and the Bill and Melinda Gates Foundation for their support of our research over the past few years, and in particular, we are grateful for the support of Jamie Merisotis, Hilary Pennington, Holly Zanville, and Parminder Jassal. We are honored to be partners in their mission of promoting postsecondary access and completion for all Americans.

We also want to thank our editor, Vic Caleca, and our designers Michael Lizama, Lisa Milan and Heather Negaard, as well as Jeff Strohl, Nicole Smith, Tamara Jayasundera, Laura Meyer, Michelle Melton, Peter Daniels, and numerous other colleagues, too many to list here, who provided support and insight throughout the process.

Georgetown University Center on Education and the Workforce

**A college degree pays off — but by just how much?** In this report from the Georgetown University Center on Education and the Workforce, we examine just what a college degree is worth — and what else besides a degree might influence an individual's potential earnings. This report examines lifetime earnings for all education levels and earnings by occupation, age, race/ethnicity, and gender. The data are clear: a college degree is key to economic opportunity, conferring substantially higher earnings on those with credentials than those without. A 2002 Census Bureau study estimated that in 1999, the average lifetime earnings of a Bachelor's degree holder was $2.7 million (2009 dollars), 75 percent more than that earned by high school graduates in 1999. Today, we find similar numbers — but since 1999, the premium on college education has grown to 84 percent. In other words, over a lifetime, a Bachelor's degree is worth $2.8 million on average.[1] We present our findings in dollar totals over a career, which is defined as being a full-time, full-year worker from 25 to 64 years old.[2]

**Over a lifetime, individuals with a Bachelor's degree make 84% more than those with only a high school diploma.**



---

[1] See the technical appendix for a discussion about the different ways to measure returns, including a discussion on why we do not use net present value in estimating lifetime earnings.

[2] Using full-time, full-year workers helps reduce the earnings differentials produced from temporary labor market exit for reasons like maternity, caretaking, and disability. See technical appendix for why we chose simple dollar value over net present value. The earnings data are based on median values, compared to the Census report, which was based on averages because this metric, in our opinion, gives a clearer picture of the earnings distribution. We use median and not mean because it gives a better overall picture of what is happening, whereas mean can be skewed by outliers. For example, if Bill Gates walks into a room of 50 people, the average income of people in the room shoots towards a billion dollars, but the median income in the room would not significantly change.

**Even within the same occupation, more education gets workers more money. Truck drivers with less than high school make $1.3 million over a lifetime, compared to $1.5 million for truck drivers with a high school diploma. Elementary and middle school teachers with a Bachelor's degree make $1.8 million over a lifetime, compared with $2.2 million for those with a Master's degree.**

Despite a general earnings boost conferred by a degree, earnings vary greatly depending on the degree type, age, gender, race/ethnicity, and occupation of an individual. The findings are stark: Women earn less at all degree levels, even when they work as much as men. On average, women who work full-time, full-year earn 25 percent less than men, even at similar education levels. At all levels of educational attainment, African Americans and Latinos earn less than Whites. For example, African Americans and Latinos with Master's degrees have lifetime earnings lower than Whites with Bachelor's degrees.

But variations are not just among people of different degree levels or by gender or race/ethnicity. In spite of the obvious returns to more education, the job someone is doing — their occupation — also matters when it comes to earnings. In fact, there is a wide variation in earnings by occupation even among people with the same degree. For example, financial managers with a Bachelor's degree earn $3.1 million over a lifetime, while accountants and auditors with a Bachelor's make $2.5 million.[3] Clearly, these differences are driven by the occupations, not only by educational attainment.

But that's not all — earnings also vary within the same occupation by education level. For instance, truck drivers with less than a high school diploma make $1.3 million over a lifetime, compared to $1.5 million for truck drivers with a high school diploma. Elementary and middle school teachers with a Bachelor's degree make $1.8 million over a lifetime, compared with $2.2 million for those with a Master's degree.

Finally, some people with lower educational attainment earn more than their more highly educated counterparts as a result of occupational difference. We call this concept 'overlap.' For example, customer service representatives with an Associate's degree make $1.4 million over a lifetime, while high school graduates who are supervisors of production workers make $1.8 million over a lifetime. In fact, 14 percent of people with a high school diploma make at least as much as the median earnings of those with a Bachelor's degree, and 17 percent of people with a Bachelor's degree make more than the median earnings of those with a Professional degree. A lot of this overlap can be explained by the occupations in which individuals are found.

These occupational differences highlight another fact: our traditional understanding of career mobility is from an industry perspective: you work your way up from the mail room to the corner office. This is a relic of an earlier time — today, careers are based on occupation. Because of the emphasis on postsecondary education — which generally means more specific occupational training — workers will be attached more to the occupations they will fill than the industries in which they work. In other words, workers progress up an occupational hierarchy, not an industry-based one.

In the first section of the report, we present earnings data on eight levels of educational attainment, including less than high school, high school, some college/no degree, Associate's degree, Bachelor's degree, Master's degree, Doctoral degree, and Professional degree. Next, we discuss how earnings change across the career of an individual, as related to age and educational attainment. Then, we turn to an often-overlooked fact: earnings within education levels can vary

---

[3] These earnings, and all earnings presented hereafter, are at the median and not the average.

dramatically. We show the range of earnings within each level, which demonstrates that there is significant overlap of earnings. In other words, those in the upper reaches of one level of educational attainment have significant earnings overlap with those in the lower reaches of another. For example, about 28 percent of workers with Associate's degrees earn more than the median earnings of workers with Bachelor's degrees. This section also presents earnings and education and occupation, which demonstrates that earnings vary not only by educational attainment, but by occupation. Next, we examine how earnings vary not just by educational attainment, but also by gender, and race/ethnicity. In the final section, we identify the ten most common occupations at each education level and their lifetime earnings. In the appendix table, we present earnings and demographic information on nearly 300 specific occupations.

## PART I: Lifetime Earnings by Educational Attainment

As **Figure 1** shows, median lifetime earnings rise steadily for workers with increasing educational attainment. Overall, the median lifetime earnings for all workers are $1.7 million, which is just under $42,000 per year ($20 per hour). Over a 40-year career, those who didn't earn a high school diploma or GED are expected to bring in less than $1 million, which translates into slightly more than $24,000 a year ($11.70 per hour). Obtaining a high school diploma adds 33 percent more to lifetime earnings; the average annual earnings of people with a high school diploma are $32,600 ($15.67 per hour). Clearly, then, the economic penalty for not finishing high school is steep — almost $9,000 a year.

**FIGURE 1:** MEDIAN LIFETIME EARNINGS BY HIGHEST EDUCATIONAL ATTAINMENT, 2009 DOLLARS



Having some postsecondary education, even without earning a degree, adds nearly one-quarter of a million dollars to lifetime earnings. Annual earnings rise to $38,700 ($18.69 per hour). Getting an Associate's degree adds another bump of nearly $200,000 in lifetime earnings. At $43,200 a year ($20.77 per hour), those with Associate's degrees earn nearly one-third more than those with just a high school diploma. These numbers demonstrate conclusively the advantage of non-baccalaureate postsecondary education.

Getting a Bachelor's degree adds another large increase in lifetime earnings. With median earnings of $56,700 ($27.26 per hour), or $2.3 million over a lifetime, Bachelor's degree holders earn 31 percent more than workers with an Associate's degree and 74 percent more than those with just a high school diploma. Further, obtaining a Bachelor's is also the gateway to entering and completing graduate education. About one-third of Bachelor's degree holders obtain a graduate degree.

All graduate degree holders can expect lifetime earnings at least double that of those with only a high school diploma. For those with a Master's degree (which includes those with Master's degrees in elementary teaching and in business administration), typical lifetime earnings are $2.7 million ($66,800 a year or $32 per hour).[4] Moreover, earnings rise substantially for those with Doctoral and Professional degrees: Doctoral degree holders have lifetime earnings of $3.3 million ($81,300 per year; $39 per hour) while those with Professional degrees (mainly doctors and lawyers) have the highest earnings, making over $3.6 million over the course of a lifetime ($91,200 per year; $44 per hour). This is a 61 percent increase (nearly 1.4 million) over Bachelor's degree holders.[5]

## PART II: Lifetime Earnings by Educational Attainment and Age

Another way to compare the labor force outcomes of workers with different levels of education is to detail their earnings over the course of their careers. As **Figure 2** shows, the differences among median earnings by education level are much smaller at the beginning of an individual's career (25-29 years old) than later in an individual's working life. Earnings at ages 40-44 are considerably higher for all workers, independent of educational attainment. However, the rise is only 19 percent for high school dropouts and 25 percent for those with high school diplomas. The returns

---

[4] This number hides the fact that people with a Master's in Business Administration earn substantially more than the other large categories of Master's degrees—Master's in Education (and Master's in Fine Arts). However, there are significantly more Master's in Education, which bring the median down.

[5] It should be noted that the choice to use the median values has the biggest effect on those with Bachelor's and graduate degrees because of the very high earnings of top earners. For example, the mean (average) earnings of those with a Bachelor's degree is $500,000 higher than the median ($2.7 million) and the Bachelor's to high school premium is 87 percent on the basis of the mean (versus 74% on the basis of the median). The mean of those with a Master's degree rises to $3.3 million and for Doctoral degree holders to $3.9 million. But the biggest effect of choosing median over mean is seen with Professional degree holders whose mean ($5.1 million) is nearly $1.5 million higher than its median.

to career advancement rise to 35 percent for those with an Associate's degree and some college/ no degree. By contrast, earnings of Bachelor's degree holders in the workforce grow by 50 percent over these years, those with Master's degree grow by 57 percent, and those with a Doctoral degree grow by 65 percent. By far, the biggest gain over the early years of one's career involves those with Professional degrees. Workers with Professional degrees earn 100 percent more in their 40's than they do in their initial years in the workforce.

**FIGURE 2:** LIFETIME EARNINGS TRAJECTORIES, 2009 DOLLARS



**There is significant overlap in earnings at all education levels: 17% of people with a Bachelor's degree make more than the median of those with a Professional degree, for example.**

**PART III:** Variations in Earnings by Education and Occupation: Earnings Overlap

Thus far, have we focused on the typical person at each educational level by using median earnings. It is important to also note that there is wide variation in earnings within educational levels, which means that the highest earners of a lower education level earn more than the typical worker at a higher level of educational attainment. We call this phenomenon "overlap." Overlap is very much related to differences in earnings by occupation.

**Table 1** shows what share of less-educated workers earn the same or more as those at the median in the next education level. For example, the bottom leftmost number of 31 percent means that 31 percent of workers without a high school diploma earn more than the median earnings of workers with a high school diploma. Moving up the "Less than high school" column, the highest earning 16 percent of this group earns more than the median of those with Associate's degrees, and 7 percent of people with less than a high school diploma earn more than the typical worker with a Bachelor's degree. At the extreme, the most successful 1 percent of less than high school workers has at least the median lifetime earnings of those with a Professional degree.

**TABLE 1:** PERCENT OF PEOPLE IN A PARTICULAR EDUCATION LEVEL EARNING MORE THAN THOSE AT A HIGHER EDUCATIONAL LEVEL

**How to read this chart**
Taking the less than high school column and reading down, it shows that 1.3% of people with less than a high school education make the same amount or more as the median earnings of someone with a Professional degree. 2.3% of people with less than high school make the same amount or more as the median for someone with a Doctoral degree, 4.6% of people with less than a high school education make the same amount or mare than someone with a Master's degree, and so on.

| | Less than High School | High School Diploma | Some College/No Degree | Associate's | Bachelor's | Master's | Doctoral |
|---|---|---|---|---|---|---|---|
| Professional | 1.3% | 2.4% | 4.8% | 4.9% | 17.2% | 24.2% | 36.9% |
| Doctoral | 2.3% | 4.6% | 8.6% | 9.5% | 26.7% | 35.5% | . |
| Master's | 4.6% | 9.2% | 15.9% | 19.2% | 39.9% | . | . |
| Bachelor's | 7.3% | 14.3% | 23.1% | 28.2% | . | . | . |
| Associate's | 16.3% | 29.8% | 41.9% | . | . | . | . |
| Some College/No Degree | 21.3% | 36.6% | . | . | . | . | . |
| High School Diploma | 31.4% | . | . | . | . | . | . |

**TABLE 1A:** LIFETIME EARNINGS VARIATIONS WITHIN EDUCATION LEVELS, 2009 DOLLARS

|  | 25th Percentile | 75th Percentile | Interquartile Range |
|---|---|---|---|
| Less than High School | 644,600 | 1,464,000 | 819,400 |
| High School Diploma | 867,500 | 1,889,500 | 1,022,000 |
| Some College/No Degree | 1,035,500 | 2,252,100 | 1,216,700 |
| Associate's Degree | 1,177,100 | 2,426,300 | 1,249,200 |
| Bachelor's Degree | 1,490,600 | 3,388,700 | 1,898,100 |
| Master's Degree | 1,864,400 | 3,835,600 | 1,971,200 |
| Doctoral Degree | 2,150,400 | 4,743,400 | 2,592,900 |
| Professional Degree | 2,004,600 | 6,472,800 | 4,468,200 |

Continuing up the lower diagonal, 37 percent of workers with a high school diploma have lifetime earnings greater than the median amount earned by workers with some college/no degree. Since some college/no degree has a median very close to that of Associate-degree holders, it is not surprising that the overlap is very high — 42 percent of some college/no degree workers have lifetime earnings more than the median of workers with an Associate's degree. However, the next step — from a two- to a four-year degree — is a big one, and only the most successful 28 percent of Associate's degree workers earn more than the median earnings of workers with a Bachelor's degree.

Another way to look at earnings variation within a specific education level is "interquartile range"– the difference between the lifetime earnings at the 75th and 25th percentile among people with the same highest educational attainment. For example, among those who did not finish high school, median lifetime earnings amount to $973,000. However, at the 25th percentile, workers earn $645,000 over a lifetime, while at the 75th percentile workers earn $1.5 million over a lifetime. As Table 1A shows, the interquartile range is approximately 1–4.5 million dollars (which is about 80 percent of the value of the median for each education level, although it increases as educational attainment increases). The largest variation (120% of the median) occurs among those with Professional degrees, due to very high earnings at the 75th percentile of this group.

Finally, **Figure 3** shows the large amount of overlap when interquartile ranges are aligned with progressively higher levels of education. The overlap would even be greater if we didn't limit the low values to the 25th percentile and the high values to the 75th percentile.

As stated above, much of the overlap can be attributed to differences in occupation. As **Figure 4** shows, there is great variation among earnings for those with the same educational attainment in different occupations. Moreover, within the same occupation, different education levels see differences in earnings.



**Figure 3:** OVERLAP IN EARNINGS, 2009 DOLLARS

**Figure 4:** LIFETIME EARNINGS BY EDUCATION AND OCCUPATION, 2009 DOLLARS



**Women need a Doctoral or Professional degree to make more than men with a Bachelor's degree.**

**PART IV:** Lifetime Earnings by Educational Attainment, Gender, and Race/Ethnicity

**Figure 5** shows the median lifetime earnings of male and female workers for each of our eight education levels. As can be seen in **Table 2**, women with the same educational attainment as men earn about a quarter less than their male counterparts over a lifetime. This is consistent with the yearly reported gender earnings gap of 23 percent, which is based on comparing full-time, full-year workers in a single year. For example, over the course of their lifetime, women who obtain a Bachelor's degree make over $650,000 less than men with the same level of education. The smallest gender gaps within postsecondary educational bands occurs among those with Associate's degrees and those with Doctoral degrees, where women earn about $400,000 and $600,000 less than men over a lifetime, respectively. However, the largest gender gap in earnings is for those with Professional degrees: men earn about a million dollar more over a lifetime than women with these degrees.

Had we defined lifetime earnings on the basis of all workers, including those who had periods with no earnings (for example, women who leave the labor force for childbearing/child rearing, or anyone who leaves for disability or other reasons), we would see even higher gaps between the earnings of men and women because women are much more likely than men to be out of the labor force for spells of time (and thus, not regularly work full-time, full-year). Considering all

**Figure 5:** MALE AND FEMALE EARNINGS BY EDUCATIONAL ATTAINMENT



workers— not just those who work full-time, full-year— the gender gap in earnings widens by about 20 percentage points (with the exception of those with a Master's or Doctoral degree where it only widens 6–9 percentage points).

**At all levels of educational attainment, women earn, on average, 25% less than men.**

**TABLE 2:** GENDER GAP (FEMALE EARNINGS RELATIVE TO MALE EARNINGS)

| | Full-time, Full-Year Workers (ideal) | Workers with Typical Experiences with the Labor Market |
|---|---|---|
| Less than High School | -27.7% | -90.0% |
| High School Diploma | -25.5% | -52.2% |
| Some College/No Degree | -26.4% | -47.1% |
| Associate's Degree | -20.1% | -37.6% |
| Bachelor's Degree | -25.2% | -43.7% |
| Master's Degree | -26.2% | -33.7% |
| Doctoral Degree | -17.6% | -26.7% |
| Professional Degree | -25.4% | -44.6% |

Because so few women with less than a high school diploma work, the earnings gap among this group expands to an alarming 90 percent. Women with just a high school diploma are also likely to be out of the labor force and their lifetime earnings gap versus comparable males is 52 percent. At the some college/no degree, Bachelor's, and Professional degree levels, the gender gap stands at a hefty 45 percent. The smallest gender gaps for the 'typical' worker can be found at the Associate's degree (38%), Master's degree (34%), and Doctoral degree (27%) levels.

Wage disparities also are visible when lifetime earnings are examined on the basis of race or ethnicity. Historically, non-Hispanic Whites (hereafter, Whites) have had higher earnings than those of other races/ethnicities. There is now an exception, though, because Asians— especially highly-educated Asians— earn wages comparable to Whites. Latinos, meanwhile, have median lifetime earnings 34 percent lower than Whites across the board. African Americans make 23 percent less than Whites. A similar gap (22%) exists for Other Races/Ethnicities (Native Americans, Pacific Islanders, and others).

As **Figure 6** shows, there is a lot of variation of the relative earnings of people of different races/ethnicities relative to Whites. Among African Americans, for example, lifetime earnings are 13-16 percent less than Whites with three prominent exceptions— less than high school (18% less than Whites), Bachelor's degrees (20% less than Whites), and Professional degrees (23% less than Whites). Latinos have a similar pattern, but the earnings gap is generally in a lower range (10-12%). A larger gap exists among Latinos with less than high school (23% less than Whites), high school (18% less than Whites), Bachelor's degrees (21% less than Whites), and Professional degrees (18% less than Whites).

**At the highest levels of educational attainment, African Americans and Latinos lag far behind the earnings of their White and Asian counterparts—over a lifetime, they make close to a million dollars less.**

For African Americans and Latinos, there are large gaps between earnings when compared to Whites, especially at the lowest levels of educational attainment. It should be noted that these gaps would be larger if the full-time, full-year approach was expanded to include periods when workers were out of the labor force. While the gaps are smallest at the some college/no degree, Associate's, Master's, and Doctoral degree levels, they are large again among Bachelor's and Professional degree holders. These patterns suggest that more study is needed regarding the nature of occupational concentration by race/ethnicity at the high and low ends of the occupational ladder.

**FIGURE 6:** LIFETIME EARNINGS BY RACE/ETHNICITY, 2009 DOLLARS



**African Americans with Bachelor's degrees make 20% less than Whites with Bachelor's degrees.**

Asian workers, by contrast, have the most varied earnings relative to Whites. Among the least-educated Asian workers — high school graduates and dropouts — lifetime earnings are 20 percent below Whites with the same education levels. The gap falls to 6-9 percent for those with some college/no degree, an Associate's degree, or a Bachelor's degree. However, among those with graduate degrees, Asian workers have higher lifetime earnings than Whites.

## PART V: Top Ten Occupations by Educational Attainment

Here we detail the ten most common occupations for each education level. There are 300 detailed occupations, which are all presented in the appendix table.

**Table 3** presents the ten most common occupations for those who did not finish high school. Not surprisingly, virtually all of these jobs are low-skill manual labor and service jobs. The blue collar 'male' jobs of truck drivers, carpenters, construction laborers, and other production workers earn more than the median of all workers at this education level.

**TABLE 3:** TOP TEN OCCUPATIONS FOR THOSE WITH LESS THAN HIGH SCHOOL

|  | Share of all Occupations for those with less than High School | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Less than High School** |  | **$973,000** |
| Driver/Sales Workers and Truck Drivers | 6.1% | 1,300,000 |
| Janitors and Building Cleaners | 4.6% | 855,000 |
| Cooks | 3.3% | 761,000 |
| Construction Laborers | 3.2% | 1,037,000 |
| Maids and Housekeeping Cleaners | 3.1% | 663,000 |
| Laborers and Material Movers | 2.9% | 965,000 |
| Maintenance Workers | 2.7% | 772,000 |
| Other Agricultural Workers | 2.6% | 814,000 |
| Other Production Workers | 2.3% | 980,000 |
| Carpenters | 2.2% | 1,069,000 |

Table 4 lists the most common occupations for those with a high school diploma and no postsecondary education, many of which are also found in Table 3. However, the difference between having and not having a high school degree leads to much higher earnings in these same occupations. For example, driver/sales workers and truck drivers with a high school diploma have lifetime earnings $230,000 higher than workers in the same field without a high school diploma. There is an equivalent bump for janitors, other production workers, and laborers and material handlers. In this table, however, there are also now new titles with greater responsibilities and pay — other managers, supervisors and managers of retail sales workers, and supervisors and managers of production workers.

**TABLE 4:** TOP TEN OCCUPATIONS, HIGH SCHOOL DIPLOMA

|  | Share of all Occupations High School Diploma | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, High School Diploma** |  | **$1,304,000** |
| Driver/Sales Workers and Truck Drivers | 4.9% | 1,531,000 |
| Secretaries and Administrative Assistants | 3.7% | 1,264,000 |
| Supervisors/Managers of Retail Sales Workers | 3.3% | 1,345,000 |
| Janitors and Building Cleaners | 2.6% | 1,048,000 |
| Laborers and Movers | 2.2% | 1,199,000 |
| Retail Salespersons | 1.8% | 1,134,000 |
| Nursing and Home Health Aides | 1.8% | 966,000 |
| Other Production Workers | 1.8% | 1,308,000 |
| Other Managers | 1.7% | 1,876,000 |
| Supervisors/Managers of Production Worker | 1.6% | 1,809,000 |

**Table 5** presents the occupations where workers with some college/no degree are concentrated. While some of these occupations also appeared in **Table 4**, the relative pay within these common occupations vary greatly. On the one hand, driver/sales workers and truck drivers and nursing and home health aides have virtually the same lifetime earnings. By contrast, retail salespersons and other managers with some college/no degree make considerably more than their counterparts with just a high school diploma. Finally, secretaries and administrative assistants make slightly more if they have some postsecondary education.

This variation shows that some jobs have narrowly defined tasks and that college education does not always lead to extra earnings. In other jobs, however, there is more room for personal initiative, which permits those with college-level skills to perform more productive activities and attain higher pay. Further, those with some college/no degree expand their access to more supervisory, financial, and high sales functions.

**TABLE 5:** TOP TEN OCCUPATIONS, SOME COLLEGE/NO DEGREE

| | Share of all Occupations, Some College/ No Degree | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Some College/No Degree** | | **$1,547,000** |
| Secretaries and Administrative Assistants | 4.7% | 1,348,000 |
| Supervisors/Managers of Retail Sales Workers | 3.4% | 1,507,000 |
| Other Managers | 2.8% | 2,220,000 |
| Drivers/Sales Workers and Truck Drivers | 2.4% | 1,569,000 |
| Accounting, and Auditing Clerks | 2.1% | 1,391,000 |
| Supervisors/Managers of Administrative Support Workers | 2.0% | 1,657,000 |
| Customer Service Representatives | 2.0% | 1,331,000 |
| Retail Salespersons | 2.0% | 1,320,000 |
| Nursing and Home Health Aides | 1.6% | 1,030,000 |
| Sales Representatives, Wholesale and Manufacturing | 1.5% | 2,009,000 |

As **Table 6** shows, registered nurse is by far the most common occupation among workers with an Associate's degree; this occupation pays considerably more than what is earned at the median for all workers with an Associate's degree. Medical technologists and technicians also make significantly more than the median for Associate's degree holders. For many other jobs, however, earnings for those with some college/no degree and those with an Associate's are quite similar; secretaries and administrative assistants, other managers, supervisory of retail sales workers and administrative support workers, accounting, customer service representatives, and retail sales workers all earn similar pay in the same occupation at the some college/no degree and Associate's degree level.

**TABLE 6:** TOP TEN OCCUPATIONS, ASSOCIATE'S DEGREES

|  | Share of all Occupations Associate's Degree | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Associate's Degree** |  | **$1,728,000** |
| Registered Nurses | 9.1% | 2,267,000 |
| Secretaries and Administrative Assistants | 4.3% | 1,385,000 |
| Other Managers | 2.6% | 2,292,000 |
| Supervisors/Managers of Retail Sales Workers | 2.5% | 1,531,000 |
| Accountants and Auditors | 2.0% | 1,636,000 |
| Supervisors/Managers of Administrative Support Workers | 1.7% | 1,736,000 |
| Customer Service Representatives | 1.6% | 1,379,000 |
| Retail Salespersons | 1.5% | 1,312,000 |
| Medical Technologists and Technicians | 1.2% | 2,187,000 |
| Accounting, and Auditing Clerks | 1.2% | 1,327,000 |

As **Table 7** indicates, Managerial and Professional occupations are the most common occupations for those with Bachelor's degrees. With the exception of elementary and middle school teachers and supervisors of retail workers, lifetime earnings are much higher at the Bachelor's level than for less-educated workers. Registered nurses earn $260,000 more over a lifetime if they have a Bachelor's rather than an Associate's, while accountants/auditors and other managers with a Bachelor's have extra lifetime earnings of approximately $800,000 more than their counterparts with Associate's degrees. New occupations such as chief executives, financial managers, computer software engineers, and marketing and sales managers all have lifetime earnings over $3 million with only a Bachelor's, close to the median lifetime earnings of Doctoral degree holders.

**TABLE 7:** TOP TEN OCCUPATIONS, BACHELOR'S DEGREES

|  | Share of all Occupations Bachelor's Degree | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Bachelor's Degree** |  | **$2,268,000** |
| Elementary and Middle School Teachers | 5.1% | 1,757,000 |
| Other Managers | 4.6% | 3,094,000 |
| Accountants and Auditors | 4.6% | 2,422,000 |
| Registered Nurses | 4.0% | 2,527,000 |
| Sales Representatives, Wholesale and Manufacturing | 2.5% | 3,062,000 |
| Suoervisors/Managers of Retail Sales Workers | 2.3% | 1,807,000 |
| Chief Executives | 1.9% | 4,483,000 |
| Financial Managers | 1.9% | 3,081,000 |
| Computer Software Engineers | 1.8% | 3,554,000 |
| Marketing and Sales Managers | 1.8% | 3,494,000 |

Those who obtain Master's degrees seek specialization, which limits the number of occupations in which they can seek work. **Table 8** details the top ten occupations for those with a Master's degree. Once again, elementary and middle school teachers lead the way because of the large number of teachers with a Master's in education. Many of the top jobs are common to both those with Bachelor's degrees (as shown in **Table 7**) and those with Master's degrees (as shown in **Table 8**). The difference is that at the graduate level workers have significantly higher lifetime earnings; for example, computer software engineers make nearly $300,000 extra with a Master's degree over a lifetime, while elementary and middle school teachers make $400,000 extra with a Master's degree. This is clear evidence that additional educational preparation, which is often only two years of schoolwork, leads to a significant payoff — but that payoff varies by occupation.

**TABLE 8:** TOP TEN OCCUPATIONS, MASTER'S DEGREES

|  | Share of all Occupations Master's Degree | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Master's Degree** |  | **$2,671,000** |
| Elementary and Middle School Teachers | 13.0% | 2,155,000 |
| Other Managers | 5.4% | 3,762,000 |
| Education Administrators | 4.0% | 2,786,000 |
| Accountants and Auditors | 3.7% | 3,030,000 |
| Secondary School Teachers | 3.1% | 2,217,000 |
| Computer Software Engineers | 2.6% | 3,835,000 |
| Registered Nurses | 2.5% | 3,044,000 |
| Postsecondary Teachers | 2.5% | 2,024,000 |
| Counselors | 2.4% | 1,945,000 |
| Chief Executives | 2.4% | 5,160,000 |

Traditionally, Doctoral degree holders have worked predominantly within academia, though today only 26 percent of Doctoral degree holders work as postsecondary teachers or professors (as shown in **Table 10**). Yet a number of people can have both Doctoral and Professional degrees (e.g., physicians, lawyers, etc.) and are put in the Doctoral degree category because the Census treats a Doctoral degree as a higher attainment level than a Professional degree (and defers to the higher educational attainment level). Doctors and lawyers can seek additional education (Doctoral degrees), though many of those who get a Doctoral degree in addition to their Professional degree tend to teach or do research at the university level rather than pursue private practice (which can be more remunerative). Finally, there are a few workers with Doctoral degrees who are categorized as business executives (other managers and chief executives); these may be scientists or technical specialists who have become company leaders and have been substantially rewarded as a result.

**TABLE 10:** TOP TEN OCCUPATIONS, DOCTORAL DEGREES

|  | Share of all Occupations Doctoral | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Doctoral Degree** |  | **$3,252,000** |
| Postsecondary Teachers | 26.0% | 2,803,000 |
| Physicians and Surgeons | 5.7% | 5,085,000 |
| Physical Scientists | 5.2% | 3,577,000 |
| Lawyers and Judges | 4.7% | 3,676,000 |
| Education Administrators | 4.6% | 3,465,000 |
| Other Managers | 3.7% | 4,670,000 |
| Psychologists | 3.5% | 2,515,000 |
| Medical Scientists | 3.5% | 3,259,000 |
| Pharmacists | 2.6% | 4,358,000 |
| Chief Executives | 2.1% | 5,131,000 |

Those who get Professional degrees receive specialized training for their occupations, in particular in law and medicine. About a third (32%) of these workers are practicing lawyers and judges, and another third (32%) obtained a degree in one of the medical specialties (physicians and surgeons, dentists, pharmacists, veterinarians, and nurses). The remaining occupations in the top ten are other managers, teachers, accountants, and auditors. The managerial field is particularly undercounted because of the plethora of industry-specific managers. There are also several occupations in this list that pay a similar amount as those with just a Master's degree: elementary and secondary school teachers, accountants and auditors, and registered nurses (who actually make less than their counterparts with a Master's degree).

**TABLE 9:** TOP TEN OCCUPATIONS, PROFESSIONAL DEGREES

| | Share of all Occupations Professional degree | Lifetime Earnings (2009 dollars) |
|---|---|---|
| **All Occupations, Professional Degree** | | **$3,648,000** |
| Lawyers and Judges | 31.5% | 4,032,000 |
| Physicians and Surgeons | 22.8% | 6,172,000 |
| Dentists | 3.4% | 4,035,000 |
| Elementary and Middle School Teachers | 2.8% | 2,292,000 |
| Pharmacists | 2.3% | 4,420,000 |
| Veterinarians | 2.1% | 2,981,000 |
| Accountants and Auditors | 1.7% | 3,203,000 |
| Other Managers | 1.7% | 3,873,000 |
| Postsecondary Teachers | 1.6% | 2,919,000 |
| Registered Nurses | 1.5% | 2,722,000 |

**CONCLUSION**

No matter how you cut it, more education pays. The data presented here show that there is a sizeable economic return to going to college and earning at least a two- or four-year degree. The 33 percent of Bachelor's degree holders that continue on to graduate and professional schools have even more prosperous futures ahead. Moreover, the difference in earnings between those who go to college and those who don't is growing — meaning that postsecondary education is more important than ever.

However, as we have demonstrated, there are significant variations based on age, gender, race/ethnicity, and above all, occupation. In the following appendices, we present lifetime earnings by education level for 300 distinct occupations. These numbers prove that higher education opens up the highest-paying jobs, but also that there is a range of pay within jobs and that more highly-educated people usually earn considerably more than their less-educated counterparts in the same occupation.



**TECHNICAL APPENDIX**

We reproduced the methodology originally used in the 2002 Census report on lifetime earnings. They describe this approach as:

> "Synthetic estimates of work-life earnings are created by using the working population's 1-year annual earnings and summing their age-specific average earnings for people ages 25 to 64 years. The resulting totals represent what individuals with the same educational level could expect to earn, on average, in today's dollars, during a hypothetical 40-year working life."

Specifically, the Census approach looks at 5-year age groups — 25-29, 30-34, etc. — to get an average for each age group and then sums each of these 5-year averages of a particular demographic and/or educational group to estimate the average 40-year degree for that group.

This approach is an estimate and is not based on real careers of people. In real life, people's careers are much more volatile — they change jobs, have wide yearly earnings variations, have periods of time where they are not working, often start working before age 25, and may retire before age 64 or work well past it. Also, by only using earnings levels from 2009 data, these estimates are only approximations of what individuals who are 25 years old today can expect to earn over their lifetime. It is quite probable that productivity growth will lead to higher earnings in the future and therefore the career of today's young adults will lead to higher lifetime earnings than presented here.

We differ from the Census in that we use median earnings rather than average earnings. As noted in footnote 2, median earnings tend to be more representative of "typical" experiences than average earnings.

To construct medians and the 25th and 75th percentile groups, we combine the medians, 25th, and 75th percentile levels in the different 5-year periods rather than the averages.

Since no data source exists with a large number of cases that tracks individuals throughout their careers by earnings, occupation, and hours worked per year, this approach is the only viable one to construct even a rough estimate of lifetime earnings. While most people don't increase their education level after age 25, very few people work full-time, full-year in the same narrow occupation. The numbers presented here should be viewed as representing the broad earning differences that exist based on education, gender, race/ethnicity, and occupation and not exact representations of an individual's lifetime earnings.

**Simple Dollars versus Net Present Value**

A series of commentators objected to the Census computations because it treated a dollar today the same as a dollar 30 years later in one's career (e.g., it didn't take into account net present value). The essence of this criticism is the financial principle that a dollar in the future is worth less than dollar today. A person who wins a million dollars in the lottery has the choice of receiving $50,000 per year for 20 years or taking a lump sum of $450,000 to $550,000 (depending on the state and current interest rate on government bonds). The reason for this discrepancy is that those who take the money today could be earning money by investing it (in government bonds, for example).

Simple financial calculators can turn a stream of earnings into a "net present discounted value" with a specific discounting rate. We chose 2.5% because this represents the real interest rate of long term government bonds.

Thus, the $2,789,000 lifetime earnings of a Bachelor's degree holder has a current lump sum value of $1,712,000, which is 39 percent less than the simple adding up of yearly earnings. Using discounted values, the dollar gap between Bachelor's degree holders and high school graduates falls to $786,000 (from nearly $1.3 million).

Even with discounted dollars, workers with a Bachelor's degree today can expect to have lifetime earnings $593,000 higher than workers with only a high school diploma. Therefore, it is still worth the time and investment to obtain a college education.

For those interested in present discounted values, simply reducing each of these numbers by 39 percent will result in a satisfactory estimate.

**Full-Time, Full-Year Workers**  Another important choice in determining lifetime earnings is whether to base these computations on an "ideal" career in which the person works full-time, full-year for each of 40 years from 25 to 64. In reality, only about half of men and a small share of women meet these criteria, since major interruptions, including temporary unemployment, illness, early retirement, and time taken off to meet family responsibilities, often take people out of the workforce for some period of time. Over a recent 15-year period, Rose and Hartmann (2004) found that 74 percent of men and 26 percent of women were "super attached workers"–working at least 1,750 hours in 12 of 15 years. Following the Census approach, we chose to compute lifetime earnings on the basis of full-time, full-year workers and alert the reader that many workers, especially female workers, don't meet this standard.

**But what if we take the costs of college into account?**  James Altucher and others have been vocal that the costs of college change the equation and make going to college not worth it. In many media appearances, he has claimed that the $200,000-$250,000 that parents might spend on a college education could easily return over $2 million if it were invested long-term in stocks and bonds rather than spent on college.

This argument contains several errors. To begin with, only a very small share of private colleges cost between $200,000-$250,000, and no public college costs this much; only 10% of 2008 Bachelor's degree students had total costs (tuition, fees, books, room, board, transportation, and other expenses) of $50,000 or more per year. Second, more than two-thirds (65%) of students don't pay the full price of college and have access to grants and low-interest loans. Third, the multimillion-dollar payoff assumes that neither the principal nor the yearly profits on the investment will be used for 40 years. However, it is absurd to suggest that people with a high school education are likely to leave their investments untouched for 40 years, because, as we have just demonstrated, they are more likely to earn much less than their more highly educated counterparts and need the money. The reality is that 20- and 30-year olds have very low savings rates because this is the time when they are raising their own children. Most saving occurs after age 40, and are done by people with high earnings. The median net worth of people approaching retirement with a Bachelor's degree is four times higher than those with only a high school diploma. It is a fantasy to think that starting one's career after high school and using the money that might have been used to pay for college will lead to a gold mine later in life.

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White• | Percent African American• | Percent Latino• | Percent High School or less | Percent Some College or Associate's | Percent BA and Graduate |
| Chief Executives and Legislators | . | 2.6 | 3.2 | 3.0 | 4.5 | 5.1 | 30.2 | 21.1 | 87.0 | 3.3 | 4.6 | 11.2 | 22.6 | 66.2 |
| General and Operations Managers | . | 2.2 | 2.5 | 2.5 | 3.3 | 4.0 | 28.1 | 28.0 | 82.2 | 5.7 | 7.6 | 18.0 | 33.8 | 48.2 |
| Advertising, Promotions, Public Relations Managers | . | . | . | . | 2.9 | . | 28.1 | 55.7 | 84.8 | 5.6 | 5.7 | 6.7 | 20.1 | 73.2 |
| Marketing and Sales Managers | . | 2.2 | 2.5 | 2.5 | 3.5 | 4.3 | 37.1 | 41.7 | 83.9 | 4.2 | 6.7 | 8.7 | 24.4 | 66.9 |
| Administrative Services Managers | . | . | 2.1 | . | 2.6 | . | 13.0 | 30.9 | 78.2 | 9.9 | 8.2 | 21.8 | 42.3 | 36.0 |
| Computer and Information Systems Managers | . | . | 3.1 | 3.0 | 3.7 | 4.0 | 14.6 | 28.3 | 77.4 | 6.0 | 5.2 | 4.9 | 24.1 | 71.0 |
| Financial Managers | . | 1.8 | 2.1 | 2.2 | 3.1 | 4.2 | 61.1 | 52.8 | 77.8 | 8.1 | 8.3 | 12.4 | 26.9 | 60.7 |
| Human Resources Managers | . | 1.9 | 2.2 | 2.2 | 2.9 | 3.4 | 19.9 | 60.2 | 75.2 | 9.6 | 10.1 | 13.9 | 29.8 | 56.3 |
| Industrial Production Managers | . | 2.3 | 2.4 | . | 3.3 | 3.9 | 23.8 | 16.6 | 83.4 | 4.1 | 8.3 | 23.6 | 33.0 | 43.4 |
| Purchasing Managers | . | . | 2.2 | . | 2.9 | 3.7 | 24.5 | 42.5 | 80.1 | 8.5 | 6.9 | 12.6 | 30.0 | 57.4 |
| Transportation, Storage, and Distribution Managers | . | 1.7 | 1.9 | . | 2.6 | . | 3.3 | 16.9 | 74.8 | 9.3 | 11.4 | 38.6 | 36.2 | 25.2 |
| Farmers and Ranchers, Farm, Ranch, and other Agricultural Managers | . | . | . | . | . | . | . | 11.7 | 92.6 | .7 | 4.9 | 46.5 | 31.3 | 22.2 |
| Construction Managers | 1.5 | 2.0 | 2.3 | 2.3 | 3.1 | 3.6 | 20.0 | 6.4 | 85.4 | 3.0 | 9.0 | 34.8 | 33.4 | 31.8 |
| Education Administrators | . | 1.4 | 1.5 | 1.6 | 2.0 | 2.9 | 27.5 | 62.7 | 76.3 | 13.4 | 7.4 | 5.1 | 14.1 | 80.8 |
| Miscellaneous Managers, including Engineering, Funeral Directors, Postmasters and Mail Superintendents | 1.4 | 1.9 | 2.2 | 2.3 | 3.2 | 3.9 | 29.3 | 31.9 | 79.8 | 6.8 | 7.5 | 16.6 | 28.1 | 55.2 |
| Food Service Managers | 1.0 | 1.2 | 1.5 | 1.5 | 1.8 | . | 33.3 | 43.1 | 66.0 | 8.5 | 14.2 | 38.4 | 37.9 | 23.7 |
| Gaming and Lodging Managers | . | . | 1.7 | . | 2.1 | . | 30.1 | 48.3 | 70.4 | 6.7 | 9.3 | 24.4 | 36.3 | 39.3 |
| Natural Sciences, Medical and Health Services Managers | . | 1.7 | 1.9 | 2.3 | 2.7 | 3.5 | 29.5 | 67.7 | 75.4 | 12.1 | 7.2 | 10.8 | 28.0 | 61.2 |
| Property, Real Estate, and Community Association Managers | . | . | 1.7 | 1.6 | 2.2 | 2.9 | 27.2 | 49.5 | 75.5 | 9.1 | 11.7 | 24.4 | 37.2 | 38.4 |
| Social and Community Service Managers | . | 1.5 | 1.7 | . | 2.1 | 2.6 | 22.4 | 66.3 | 74.9 | 14.2 | 7.4 | 8.7 | 21.7 | 69.6 |
| Agents and Business Managers of Artists, Performers, and Athletes, Logisticians, Meeting and Convention Planners | . | . | 1.9 | . | 2.5 | . | 19.7 | 47.0 | 74.0 | 12.2 | 9.2 | 14.1 | 33.8 | 52.0 |
| Purchasing Agents, except Wholesale, Retail, and Farm and Non-Farm Products | . | 1.7 | 1.8 | 1.9 | 2.3 | . | 18.1 | 52.3 | 78.8 | 9.1 | 7.8 | 21.9 | 38.9 | 39.3 |
| Wholesale and Retail Buyers, except Farm Products | . | 1.4 | 1.6 | . | 2.1 | . | 15.7 | 49.0 | 79.6 | 5.7 | 8.8 | 26.2 | 36.9 | 36.9 |
| Claims Adjusters, Appraisers, Examiners, and Investigators | . | 1.7 | 1.7 | 1.8 | 2.3 | . | 27.0 | 61.8 | 72.3 | 15.2 | 8.3 | 18.2 | 36.0 | 45.8 |
| Compliance Officers, except Agriculture, Construction, Health and Safety, and Transportation | . | . | 2.0 | . | 2.7 | 3.1 | 10.9 | 46.2 | 73.8 | 11.0 | 9.0 | 11.7 | 29.8 | 58.5 |
| Cost Estimators | . | . | 2.2 | . | 2.7 | . | 37.5 | 12.9 | 88.8 | 1.5 | 6.5 | 26.2 | 41.8 | 32.0 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races).

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White* | Percent African American* | Percent Latino* | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Human Resources, Training, and Labor Relations Specialists | - | 1.7 | 1.9 | 1.9 | 2.3 | 2.9 | 24.2 | 70.2 | 72.2 | 13.9 | 9.3 | 13.6 | 33.4 | 53.0 |
| Management Analysts | - | - | 2.2 | - | 2.9 | 3.5 | 24.6 | 40.6 | 78.5 | 6.7 | 5.3 | 5.4 | 18.4 | 76.2 |
| Other Business Operations Specialists | - | 1.6 | 1.8 | - | 2.3 | 3.1 | 39.7 | 60.6 | 69.5 | 14.0 | 9.3 | 15.5 | 33.5 | 51.0 |
| Accountants and Auditors | - | 1.5 | 1.7 | 1.6 | 2.4 | 3.0 | 40.8 | 58.2 | 73.6 | 8.8 | 6.6 | 4.5 | 18.6 | 76.9 |
| Appraisers and Assessors of Real Estate | - | - | - | - | 2.0 | . | 16.5 | 33.2 | 89.1 | 3.9 | 4.0 | 12.1 | 36.1 | 51.8 |
| Budget, Credit, Financial Analysts | - | - | . | - | 2.7 | 3.8 | 40.1 | 49.0 | 72.6 | 10.5 | 6.8 | 6.0 | 20.3 | 73.7 |
| Personal Financial Advisors | - | - | 2.0 | - | 3.1 | 3.8 | 53.5 | 28.7 | 79.9 | 7.0 | 6.6 | 4.9 | 17.1 | 78.1 |
| Insurance Underwriters | - | - | . | - | 2.7 | . | 42.6 | 68.9 | 78.9 | 9.5 | 6.8 | 17.4 | 28.3 | 49.2 |
| Financial Examiners, Financial Specialists, all other | - | - | . | - | 2.7 | . | 84.8 | 54.7 | 72.5 | 13.2 | 8.5 | 13.9 | 28.3 | 57.8 |
| Loan Counselors and Officers | - | 1.6 | 1.8 | - | 2.4 | 2.9 | 44.7 | 52.4 | 76.7 | 8.4 | 10.2 | 14.7 | 35.1 | 50.2 |
| Tax Examiners, Collectors, Revenue Agents, and Preparers | - | 2.2 | . | 2.3 | 2.2 | 3.5 | 23.0 | 61.1 | 66.1 | 17.5 | 11.5 | 15.5 | 33.4 | 51.2 |
| Computer Scientists and Systems Analysts | - | - | 2.4 | - | 3.0 | 3.3 | 14.8 | 29.3 | 70.0 | 9.2 | 5.9 | 5.9 | 28.4 | 65.6 |
| Computer Programmers | - | - | 2.6 | 2.7 | 3.0 | 3.9 | 11.0 | 24.0 | 74.4 | 4.7 | 4.4 | 5.4 | 24.4 | 70.2 |
| Computer Software Engineers | - | - | 3.1 | 3.0 | 3.6 | . | 16.5 | 20.4 | 63.4 | 4.5 | 3.7 | 2.8 | 15.1 | 82.1 |
| Computer Support Specialists | - | 1.9 | 2.1 | 2.0 | 2.4 | 2.6 | 15.0 | 29.4 | 72.5 | 11.1 | 7.8 | 12.1 | 47.0 | 40.9 |
| Database Administrators | - | - | . | - | 3.0 | . | 28.9 | 32.6 | 73.0 | 6.2 | 5.1 | 5.5 | 26.2 | 68.3 |
| Network and Computer Systems Administrators | - | - | 2.5 | 2.5 | 2.9 | 3.3 | 15.0 | 18.5 | 77.2 | 8.2 | 6.0 | 8.5 | 39.3 | 52.3 |
| Network Systems and Data Communications Analysts | - | - | 2.4 | 2.5 | 2.7 | 3.4 | 19.1 | 23.0 | 74.7 | 8.8 | 6.4 | 7.9 | 36.4 | 55.7 |
| Actuaries, Miscellaneous Mathematical Science Occupations, including Mathematicians and Statisticians | - | - | . | - | . | 3.8 | 23.6 | 40.3 | 73.8 | 4.2 | 4.6 | 1.2 | 6.3 | 92.4 |
| Operations Research Analysts | - | - | . | - | 3.0 | 3.5 | 14.6 | 49.0 | 72.7 | 12.6 | 6.2 | 7.1 | 25.5 | 67.4 |
| Architects, except Naval | - | - | . | - | 2.8 | 2.9 | 9.7 | 23.0 | 80.6 | 3.3 | 7.0 | 1.8 | 8.3 | 89.9 |
| Surveyors, Cartographers, and Photogrammetrists, and Surveying and Mapping Technicians | - | - | 1.9 | - | . | . | 18.2 | 12.6 | 85.7 | 2.9 | 8.1 | 23.4 | 47.2 | 29.4 |
| Aerospace, Biomedical, Agricultural, Chemical, Computer Hardware, Environmental, Marine, Materials, Petroleum, Mining, Geological | - | - | . | - | 3.6 | 4.0 | 13.9 | 12.8 | 75.6 | 4.9 | 5.6 | 3.4 | 14.3 | 82.2 |
| Civil Engineers | - | - | . | 3.2 | 3.7 | 3.7 | 16.9 | 11.1 | 79.3 | 4.4 | 5.7 | 3.5 | 11.5 | 85.0 |
| Electrical and Electronics Engineers | - | - | . | - | 3.4 | 4.1 | 12.8 | 8.3 | 72.4 | 4.7 | 5.6 | 4.2 | 17.9 | 77.9 |
| Industrial Engineers, including Health and Safety | - | - | . | - | 3.0 | 3.4 | 8.4 | 18.3 | 79.7 | 4.1 | 6.2 | 8.2 | 23.0 | 68.8 |

\* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

App.815

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White* | Percent African American* | Percent Latino* | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Mechanical Engineers | . | . | . | . | 3.2 | 3.6 | 10.5 | 7.1 | 81.7 | 3.5 | 5.4 | 5.2 | 21.5 | 73.4 |
| Miscellaneous Engineers, Including Nuclear Engineers | . | . | 2.7 | 2.6 | 3.4 | 3.8 | 4.7 | 11.6 | 74.7 | 4.4 | 5.2 | 3.7 | 15.4 | 80.9 |
| Drafters | . | . | 2.0 | 1.9 | 2.0 | . | 12.4 | 17.3 | 81.4 | 4.3 | 8.5 | 14.1 | 62.2 | 23.8 |
| Engineering Technicians, except Drafters | . | 1.9 | 2.1 | 2.2 | 2.2 | . | 31.3 | 16.0 | 72.9 | 9.6 | 9.4 | 26.4 | 56.9 | 16.6 |
| Agricultural and Food, Biological, Conservation Scientists and Foresters, Environmental Scientists and Geoscientists | . | . | . | . | 2.3 | 2.8 | 2.9 | 32.9 | 84.0 | 4.4 | 4.1 | 2.5 | 7.6 | 89.9 |
| Medical Scientists | . | . | . | . | . | 3.1 | 16.4 | 51.3 | 59.9 | 5.1 | 4.8 | 1.0 | 2.0 | 97.0 |
| Astronomers and Physicists, Atmospheric and Space, Physical Scientists, all other | . | . | . | . | 2.8 | 3.4 | 29.5 | 33.4 | 70.0 | 3.0 | 4.6 | .7 | 2.4 | 96.9 |
| Chemists and Materials Scientists | . | . | . | . | 2.5 | 3.4 | 7.7 | 36.0 | 67.9 | 7.6 | 5.4 | 1.2 | 7.4 | 91.4 |
| Economists, Market and Survey Researchers, Urban and Regional Planners, Miscellaneous Social Scientists, including Sociologists | . | . | . | . | 2.7 | 3.4 | 29.6 | 47.1 | 79.7 | 5.2 | 6.1 | 3.2 | 11.1 | 85.7 |
| Psychologists | . | . | . | . | . | 2.2 | 8.6 | 62.4 | 84.2 | 6.6 | 6.0 | .4 | .9 | 98.6 |
| Agricultural/Food Science, Biological, Geological/Petroleum and Miscellaneous Life, Physical and Social Science Technicians, including Social Science Nuclear Technicians Research Assistants | . | 1.5 | 1.7 | . | 2.0 | . | 15.9 | 42.7 | 72.9 | 7.8 | 10.1 | 21.7 | 36.3 | 42.0 |
| Counselors | . | . | 1.3 | . | 1.5 | 2.0 | -2.3 | 68.3 | 64.6 | 22.0 | 10.1 | 7.5 | 17.3 | 75.2 |
| Social Workers | . | 1.3 | 1.3 | 1.4 | 1.6 | 2.0 | 6.5 | 78.0 | 61.4 | 23.8 | 11.2 | 7.1 | 17.1 | 75.8 |
| Miscellaneous Community and Social Service Specialists | . | 1.2 | 1.4 | . | 1.7 | 2.0 | 21.9 | 65.3 | 58.7 | 23.8 | 13.8 | 14.0 | 32.5 | 53.6 |
| Clergy | . | . | 1.4 | . | 1.6 | 1.8 | 10.4 | 14.2 | 79.9 | 9.1 | 5.8 | 8.2 | 14.7 | 77.2 |
| Directors, Religious Activities and Education, and Religious Workers, all other | . | . | . | . | 1.5 | . | 22.8 | 53.7 | 79.5 | 6.1 | 8.7 | 11.0 | 22.3 | 66.7 |
| Lawyers and Judges, Magistrates, and other Judicial Workers | . | . | . | . | . | 4.0 | 19.7 | 33.2 | 86.4 | 5.2 | 4.4 | .8 | 1.3 | 98.0 |
| Paralegals and Legal Assistants | . | 1.7 | 1.7 | 1.7 | 2.0 | . | 10.2 | 88.1 | 74.5 | 9.4 | 12.0 | 13.5 | 47.3 | 39.2 |
| Miscellaneous Legal Support Workers | . | 1.5 | 1.6 | . | 2.2 | . | 32.7 | 71.9 | 73.1 | 11.2 | 10.7 | 19.1 | 41.0 | 39.9 |
| Postsecondary Teachers | . | . | . | . | 1.8 | 2.5 | 17.9 | 45.3 | 78.0 | 6.4 | 5.1 | 1.2 | 4.8 | 94.0 |
| Preschool and Kindergarten Teachers | . | .7 | .8 | .9 | 1.3 | 1.9 | 57.9 | 98.0 | 63.4 | 20.2 | 12.7 | 15.9 | 40.3 | 43.8 |
| Elementary and Middle School Teachers | . | . | 1.1 | 1.3 | 1.8 | 2.2 | 9.9 | 77.6 | 80.7 | 9.5 | 7.4 | 1.4 | 3.6 | 94.9 |
| Secondary School Teachers | . | . | . | . | 1.8 | 2.2 | 8.4 | 56.6 | 81.1 | 8.9 | 7.3 | 1.0 | 3.3 | 95.7 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

## Lifetime Earnings by Degree (in millions of dollars) / Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations

| Occupation | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/ Professional/ Doctoral | Gender Earnings Gap % | Percent Female | Percent White• | Percent African American• | Percent Latino• | Percent High School or less | Percent Some College or Associate's | Percent BA and Graduate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Special Education Teachers | . | . | . | . | 1.8 | 2.1 | 6.7 | 84.2 | 79.6 | 11.8 | 6.4 | 3.5 | 7.6 | 89.0 |
| Other Teachers and Instructors | . | 1.2 | 1.6 | 1.8 | 1.7 | 2.1 | 36.6 | 54.5 | 74.6 | 13.2 | 8.0 | 14.1 | 31.2 | 54.7 |
| Archivists, Curators, and Museum Technicians, Librarians | . | . | . | . | 1.6 | 2.1 | 8.5 | 76.4 | 84.9 | 7.7 | 4.2 | 3.9 | 11.5 | 84.7 |
| Library Technicians, and Other Education, Training, and Library Workers | . | . | . | . | .9 | 2.3 | 8.7 | 72.3 | 73.5 | 12.8 | 8.7 | 10.0 | 18.3 | 71.7 |
| Teacher Assistants | . | .7 | .8 | .8 | 1.6 | . | 34.1 | 90.3 | 58.6 | 20.4 | 17.3 | 32.6 | 48.7 | 18.7 |
| Artists and Related Workers | . | . | . | . | 1.6 | . | 44.2 | 35.0 | 82.7 | 2.8 | 8.3 | 13.5 | 30.0 | 56.5 |
| Designers | . | 1.4 | 1.7 | 1.8 | 1.9 | 2.3 | 36.2 | 45.6 | 78.9 | 3.8 | 9.2 | 13.4 | 33.3 | 53.3 |
| Producers and Directors and Broadcast and Sound Engineering Technicians and Radio Operators, and Media and all other Communication Equipment Workers, Television, Video, and Motion Picture Camera Operators and Editors | . | . | 2.1 | . | 2.4 | . | -.9 | 25.2 | 77.6 | 8.6 | 10.0 | 11.8 | 30.1 | 58.1 |
| Athletes, Coaches, Umpires and Related Workers | . | . | . | . | 1.9 | . | 15.8 | 20.9 | 77.6 | 11.8 | 6.7 | 8.4 | 25.0 | 66.6 |
| Announcers, and News Analysts, Reporters and Correspondents | . | . | . | . | 2.2 | . | 15.8 | 35.2 | 79.6 | 6.0 | 10.6 | 9.0 | 20.2 | 70.8 |
| Public Relations Specialists | . | . | . | . | 2.5 | . | 29.3 | 60.4 | 82.6 | 7.2 | 6.7 | 4.3 | 15.2 | 80.5 |
| Editors | . | . | . | . | 2.3 | 2.2 | 13.7 | 52.5 | 85.0 | 5.0 | 5.5 | 4.3 | 14.8 | 80.9 |
| Technical Writers | . | . | . | . | 2.6 | . | 8.4 | 55.1 | 85.4 | 7.0 | 3.6 | 6.7 | 19.6 | 73.7 |
| Writers and Authors | . | . | . | . | 2.0 | 2.0 | -3.7 | 51.0 | 85.8 | 5.9 | 3.6 | 2.9 | 10.5 | 86.6 |
| Photographers and Miscellaneous Media and Communication Workers | . | . | . | . | 1.3 | . | 19.1 | 44.2 | 69.6 | 5.4 | 17.4 | 16.9 | 35.3 | 47.7 |
| Chiropractors, Optometrists, Podiatrists, Veterinarians | . | . | . | . | . | 2.7 | 11.2 | 32.0 | 88.7 | 1.7 | 3.7 | 1.0 | 1.2 | 97.7 |
| Dentists | . | . | . | . | 4.0 | 4.0 | 18.2 | 22.4 | 74.9 | 3.4 | 6.1 | .6 | .9 | 98.5 |
| Pharmacists | . | . | . | . | 4.4 | 4.4 | 7.6 | 49.0 | 71.8 | 6.5 | 3.6 | .8 | 1.9 | 97.3 |
| Physicians and Surgeons | . | . | . | . | . | 6.0 | 36.3 | 31.9 | 69.9 | 5.4 | 6.1 | .6 | 1.1 | 98.2 |
| Physician Assistants | . | . | . | . | . | 3.5 | 29.3 | 61.6 | 74.1 | 11.0 | 8.6 | 6.7 | 18.2 | 75.1 |
| Registered Nurses | . | . | 2.1 | 2.3 | 2.5 | 3.0 | 13.2 | 89.1 | 74.1 | 11.3 | 4.9 | 1.6 | 43.0 | 55.4 |
| Audiologists, Radiation Therapists, Recreational Therapists, Respiratory Therapists, Speech-Language Pathologists, Therapists, all other | . | . | . | 2.1 | 2.1 | 2.2 | 10.9 | 75.4 | 79.2 | 10.1 | 7.0 | 2.9 | 29.2 | 67.8 |
| Occupational Therapists, and Physical Therapists | . | . | . | . | 2.7 | 2.8 | 13.1 | 69.6 | 79.4 | 5.6 | 4.6 | 1.5 | 8.6 | 89.9 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races).

App.817

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White● | Percent African American● | Percent Latino● | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Health Diagnosing and Treating Practitioner Support Technicians, Health Diagnosing and Treating Practitioners, all other | . | 1.2 | 1.3 | 1.4 | 1.3 | . | 20.0 | 79.0 | 66.5 | 15.3 | 10.9 | 28.3 | 53.2 | 18.5 |
| Clinical Laboratory Technologists and Technicians | . | . | 1.4 | 1.7 | 2.1 | . | 11.9 | 72.6 | 62.4 | 16.8 | 8.0 | 12.8 | 36.8 | 50.5 |
| Dental Hygienists, and Other Healthcare Practitioners and Technical Occupations | . | . | . | 2.1 | 2.2 | . | 15.3 | 66.1 | 79.8 | 8.8 | 7.4 | 9.0 | 43.6 | 47.4 |
| Diagnostic Related Technologists and Technicians | . | . | 2.0 | 2.2 | 2.4 | . | 14.7 | 66.6 | 76.2 | 8.8 | 8.7 | 9.8 | 66.9 | 23.3 |
| Emergency Medical Technicians and Paramedics | . | . | 1.7 | 1.8 | . | . | 27.0 | 27.6 | 83.1 | 6.0 | 8.8 | 15.1 | 69.8 | 15.1 |
| Licensed Practical and Licensed Vocational Nurses | . | 1.4 | 1.5 | 1.5 | . | . | 11.0 | 92.0 | 63.1 | 25.4 | 7.0 | 20.9 | 73.4 | 5.7 |
| Miscellaneous Health Technologists and Technicians | . | . | 1.3 | . | . | . | 43.2 | 64.9 | 60.2 | 21.4 | 10.2 | 24.4 | 50.4 | 25.3 |
| Nursing, Psychiatric, and Home Health Aides | .9 | 1.0 | 1.0 | 1.1 | 1.2 | . | 22.7 | 87.1 | 44.4 | 36.9 | 12.6 | 54.2 | 37.9 | 7.9 |
| Occupational Therapist Assistants and Aides, Physical Therapist Assistants and Aides | . | . | . | 1.7 | . | . | 7.4 | 78.1 | 74.4 | 11.3 | 10.4 | 11.4 | 70.6 | 18.0 |
| Dental Assistants | . | 1.2 | 1.2 | . | . | . | 19.4 | 95.9 | 65.0 | 7.7 | 20.7 | 34.9 | 55.0 | 10.1 |
| Medical Assistants and Other Healthcare Support Occupations, except Dental Assistants | . | 1.1 | 1.2 | 1.2 | 1.3 | . | 14.9 | 89.4 | 60.0 | 17.2 | 17.6 | 32.0 | 56.9 | 11.1 |
| First-line Supervisors/Managers of Police and Detectives | . | . | 2.5 | . | 3.0 | . | 28.1 | 14.9 | 78.2 | 12.1 | 7.8 | 13.6 | 47.7 | 38.7 |
| Fire Fighters, Fire Inspectors | . | 2.1 | 2.4 | 2.6 | 2.7 | . | 9.1 | 3.6 | 81.2 | 8.5 | 8.2 | 18.7 | 62.2 | 19.1 |
| Bailiffs, Correctional Officers, and Jailers | . | 1.6 | 1.7 | 1.8 | 1.9 | . | 26.5 | 28.5 | 63.1 | 23.4 | 11.4 | 34.0 | 53.2 | 12.8 |
| Detectives and Criminal Investigators | . | . | 2.5 | . | 2.9 | . | 26.9 | 22.8 | 72.8 | 12.7 | 11.4 | 9.1 | 39.3 | 51.6 |
| Police Officers | . | 1.9 | 2.2 | 2.4 | 2.7 | 3.1 | 12.5 | 13.9 | 72.0 | 12.7 | 12.5 | 13.5 | 53.0 | 33.4 |
| Security Guards and Gaming Surveillance Officers | .9 | 1.1 | 1.3 | 1.3 | 1.6 | . | 9.4 | 23.5 | 50.8 | 29.7 | 14.3 | 42.2 | 43.7 | 14.1 |
| Chefs and Head Cooks | .9 | 1.2 | 1.3 | 1.6 | . | . | 24.2 | 16.0 | 48.9 | 12.3 | 20.2 | 49.3 | 38.3 | 12.4 |
| First-line Supervisors/Managers of Food Preparation and Serving Workers | .9 | 1.0 | 1.1 | . | 1.5 | . | 37.2 | 54.1 | 60.1 | 15.8 | 18.7 | 51.7 | 34.5 | 13.7 |
| Cooks | .8 | .8 | .8 | .9 | .9 | . | 26.9 | 39.6 | 34.2 | 16.2 | 41.5 | 76.0 | 19.2 | 4.9 |
| Food Preparation Workers | .7 | .8 | .8 | . | . | . | 17.9 | 55.8 | 33.4 | 14.4 | 39.9 | 74.7 | 19.2 | 6.2 |
| Bartenders | . | .9 | 1.0 | . | . | . | 25.3 | 50.1 | 78.1 | 5.4 | 13.1 | 38.8 | 45.0 | 16.2 |
| Combined Food Preparation and Serving Workers, including Fast Food | .8 | . | . | . | . | . | 12.1 | 73.1 | 58.6 | 14.8 | 19.8 | 70.5 | 23.4 | 6.1 |
| Hosts and Hostesses, Restaurant, Lounge, and Coffee Shop, Waiters and Waitresses | .7 | .8 | .9 | . | 1.0 | . | 37.8 | 66.0 | 59.4 | 7.1 | 23.4 | 53.0 | 32.2 | 14.8 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White* | Percent African American* | Percent Latino* | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Food Servers, Non-restaurant | . | .9 | . | . | . | . | 31.1 | 67.4 | 40.7 | 25.4 | 23.5 | 63.3 | 29.7 | 7.0 |
| First-line Supervisors/Managers of Housekeeping and Janitorial Workers | 1.1 | 1.2 | 1.4 | . | . | . | 50.8 | 35.2 | 57.7 | 16.8 | 22.1 | 56.9 | 32.5 | 10.7 |
| First-Line Supervisors/Managers of Landscaping, Lawn Service, and Groundskeeping Workers | . | 1.1 | 1.3 | . | . | . | 39.5 | 5.2 | 72.9 | 4.2 | 21.0 | 48.5 | 32.4 | 19.1 |
| Janitors and Building Cleaners | .9 | 1.0 | 1.2 | 1.2 | 1.0 | . | 40.0 | 25.5 | 48.6 | 17.4 | 29.5 | 71.4 | 23.6 | 5.0 |
| Maids and Housekeeping Cleaners | .7 | .7 | .7 | . | . | . | 33.7 | 85.4 | 29.8 | 19.3 | 44.0 | 80.4 | 15.6 | 4.0 |
| Pest Control Workers, Grounds Maintenance Workers | .8 | 1.0 | 1.0 | 1.2 | 1.1 | . | 1.9 | 4.7 | 42.9 | 7.5 | 47.5 | 74.1 | 19.5 | 6.3 |
| First-line Supervisors/Managers of Personal Service Workers | . | .8 | 1.1 | . | . | . | 69.1 | 59.8 | 68.2 | 8.3 | 11.1 | 37.5 | 37.9 | 24.6 |
| Animal Trainers, Non-farm Animal Caretakers | . | .0 | . | . | . | . | 15.9 | 62.7 | 83.0 | 3.9 | 11.2 | 46.2 | 33.3 | 20.5 |
| Gaming Services Workers, Motion Picture Projectionists, Ushers, Lobby Attendants, and Ticket Takers, Miscellaneous Entertainment Attendants and Related Workers | . | 1.3 | 1.4 | . | . | . | 13.3 | 44.5 | 55.6 | 11.7 | 11.8 | 41.2 | 41.4 | 17.5 |
| Barbers, Hairdressers, Hairstylists, and Cosmetologists | . | .6 | . | . | . | . | -5.7 | 78.5 | 63.3 | 15.0 | 15.0 | 54.8 | 38.7 | 6.5 |
| Miscellaneous Personal Appearance Workers | .6 | .7 | . | . | . | . | 2.9 | 82.1 | 27.4 | 2.3 | 9.5 | 62.9 | 27.8 | 9.3 |
| Baggage Porters, Bellhops, and Concierges, Transportation Attendants | . | . | 1.4 | . | . | . | -3.2 | 46.4 | 54.4 | 20.3 | 17.9 | 35.7 | 38.5 | 25.8 |
| Tour and Travel Guides, Recreation and Fitness Workers | . | 1.0 | 1.1 | . | 1.4 | . | 21.2 | 58.2 | 73.5 | 12.3 | 9.5 | 23.6 | 36.5 | 39.9 |
| Child Care Workers | . | .4 | .3 | .3 | .6 | . | 193.7 | 95.6 | 54.5 | 19.5 | 21.4 | 47.7 | 38.2 | 14.0 |
| Personal and Home Care Aides | .7 | .8 | .8 | .9 | .9 | . | 16.1 | 85.4 | 46.7 | 26.7 | 17.9 | 55.0 | 34.5 | 10.5 |
| First-line Supervisors/Managers of Retail Sales Workers | 1.1 | 1.3 | 1.5 | 1.5 | 1.8 | 2.0 | 41.0 | 41.3 | 75.4 | 7.7 | 10.8 | 37.4 | 38.3 | 24.3 |
| First-line Supervisors/Managers of Non-retail Sales Workers | 1.3 | 1.7 | 2.0 | 2.0 | 2.9 | 3.4 | 17.5 | 28.5 | 78.0 | 6.2 | 10.1 | 27.2 | 32.7 | 40.1 |
| Cashiers | .7 | .8 | .9 | .9 | 1.1 | . | 32.5 | 71.8 | 53.5 | 15.9 | 19.7 | 59.5 | 29.4 | 11.2 |
| Parts and Salespersons | . | 1.3 | . | . | . | . | 4.1 | 11.0 | 80.5 | 4.9 | 12.6 | 58.2 | 34.9 | 6.9 |
| Retail Salespersons | .9 | 1.1 | 1.3 | 1.3 | 1.8 | 1.9 | 49.3 | 39.0 | 73.4 | 9.5 | 12.1 | 36.8 | 37.9 | 25.3 |
| Advertising Sales Agents | . | . | 1.8 | . | 2.6 | . | 15.8 | 50.5 | 82.3 | 6.6 | 8.4 | 13.7 | 31.1 | 55.2 |
| Insurance Sales Agents | . | 1.5 | 1.6 | 1.6 | 2.2 | 2.4 | 35.2 | 45.4 | 81.7 | 6.8 | 8.1 | 17.2 | 36.6 | 46.2 |
| Securities, Commodities, and Financial Services Sales Agents | . | . | 1.9 | . | 3.4 | 4.4 | 53.7 | 29.0 | 82.0 | 5.6 | 6.7 | 8.4 | 22.0 | 69.7 |
| Sales Representatives, Services, all other | . | 1.8 | 2.0 | 2.0 | 2.9 | 3.7 | 27.3 | 31.4 | 82.7 | 6.3 | 7.8 | 17.6 | 34.1 | 48.3 |
| Sales Representatives, Wholesale and Manufacturing | 1.4 | 1.8 | 2.0 | 2.1 | 3.1 | 3.6 | 21.2 | 24.2 | 85.5 | 3.3 | 7.8 | 19.6 | 31.9 | 48.5 |

\* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

App.819

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White* | Percent African American* | Percent Latino* | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Models, Demonstrators, and Product Promoters, Sales Engineers, and Sales and Related Workers, all other | . | 1.3 | 1.7 | . | 2.6 | 3.1 | 42.6 | 48.1 | 83.9 | 4.9 | 7.1 | 15.2 | 25.6 | 59.3 |
| Real Estate Brokers and Sales Agents | . | 1.0 | 1.1 | 1.2 | 1.5 | 1.5 | 37.7 | 49.0 | 80.8 | 5.4 | 8.9 | 15.1 | 37.3 | 47.5 |
| First-line Supervisors/Managers of Office and Administrative Support Workers | 1.4 | 1.5 | 1.7 | 1.7 | 2.2 | 2.8 | 29.8 | 64.3 | 73.6 | 11.1 | 10.9 | 26.8 | 43.3 | 30.0 |
| Bill and Account Collectors | . | 1.3 | 1.3 | . | . | . | 11.1 | 71.2 | 62.0 | 20.1 | 15.1 | 36.1 | 49.5 | 14.4 |
| Billing and Posting Clerks and Machine Operators | . | 1.2 | 1.3 | 1.3 | 1.4 | . | 22.9 | 90.1 | 71.2 | 12.3 | 11.5 | 36.1 | 49.8 | 14.1 |
| Bookkeeping, Accounting and Auditing Clerks | . | 1.3 | 1.4 | 1.3 | 1.5 | . | 19.1 | 88.9 | 75.8 | 9.1 | 9.8 | 34.9 | 52.3 | 12.9 |
| Gaming Cage Workers, Procurement Clerks, Payroll and Timekeeping Clerks | . | 1.4 | 1.5 | . | . | . | 20.7 | 85.8 | 71.9 | 12.4 | 10.1 | 32.9 | 51.0 | 16.1 |
| Tellers | . | 1.0 | 1.0 | . | . | . | 23.0 | 91.0 | 70.0 | 11.8 | 12.4 | 41.0 | 44.4 | 14.6 |
| Brokerage Clerks, Customer Service Representatives, New Account Clerks | 1.0 | 1.2 | 1.3 | 1.4 | 1.6 | 1.9 | 25.2 | 68.7 | 65.3 | 17.1 | 13.1 | 31.8 | 45.3 | 22.9 |
| Court, Municipal, and License Clerks | . | . | 1.4 | . | . | . | 20.2 | 80.4 | 67.4 | 14.4 | 13.3 | 30.2 | 50.5 | 19.3 |
| File Clerks | . | 1.2 | 1.3 | . | 1.4 | . | 14.5 | 80.9 | 62.9 | 18.3 | 12.6 | 34.9 | 46.5 | 18.6 |
| Loan Interviewers and Clerks | . | . | 1.5 | . | . | . | 14.3 | 82.3 | 72.7 | 10.6 | 11.6 | 29.5 | 48.4 | 22.1 |
| Correspondence Clerks and Order Clerks | . | 1.2 | 1.3 | . | . | . | 11.3 | 60.9 | 68.6 | 11.7 | 14.5 | 45.6 | 38.0 | 16.4 |
| Receptionists and Information Clerks | . | 1.0 | 1.1 | 1.1 | 1.2 | . | 19.1 | 91.5 | 66.7 | 13.7 | 16.0 | 41.6 | 46.7 | 11.7 |
| Reservation and Transportation Ticket Agents and Travel Clerks | . | . | 1.5 | . | . | . | 28.5 | 59.5 | 61.7 | 17.0 | 12.9 | 28.5 | 43.8 | 27.7 |
| Information and Record Clerks, all other | . | . | 1.3 | . | . | . | 18.8 | 86.8 | 68.4 | 15.0 | 11.0 | 26.1 | 56.5 | 17.4 |
| Cargo and Freight Agents, Couriers and Messengers | . | 1.4 | 1.6 | . | . | . | 31.6 | 14.1 | 63.6 | 14.6 | 17.1 | 45.9 | 42.0 | 12.2 |
| Dispatchers, Meter Readers, Utilities | . | 1.4 | 1.5 | 1.6 | . | . | 20.7 | 51.5 | 72.8 | 14.1 | 10.9 | 42.0 | 47.0 | 11.0 |
| Postal Service Clerks | . | 2.0 | 2.0 | . | . | . | 6.9 | 48.7 | 52.3 | 26.9 | 9.1 | 36.5 | 47.8 | 15.7 |
| Postal Service Mail Carriers | . | 2.0 | 2.0 | 2.0 | 2.0 | . | 7.0 | 34.5 | 67.3 | 15.7 | 9.5 | 35.8 | 49.4 | 14.9 |
| Production, Planning and Expediting Clerks | . | 1.5 | 1.7 | 1.8 | 2.2 | . | 38.7 | 55.5 | 76.4 | 10.3 | 9.1 | 28.4 | 41.6 | 30.1 |
| Shipping, Receiving, and Traffic Clerks | 1.1 | 1.2 | 1.2 | . | 1.3 | . | 19.0 | 29.8 | 61.0 | 13.9 | 20.9 | 62.2 | 30.3 | 7.5 |
| Stock Clerks and Order Fillers | .9 | 1.1 | 1.2 | 1.2 | 1.3 | . | 19.2 | 39.4 | 58.3 | 16.6 | 19.9 | 59.9 | 31.8 | 8.4 |
| Secretaries and Administrative Assistants | 1.1 | 1.3 | 1.3 | 1.4 | 1.5 | 1.6 | 24.3 | 96.3 | 76.5 | 10.5 | 9.8 | 33.2 | 50.3 | 16.6 |
| Computer Operators and Statistical Assistants | . | 1.4 | 1.6 | 1.6 | . | . | 31.8 | 51.2 | 68.9 | 14.1 | 9.8 | 26.9 | 47.4 | 25.7 |
| Data Entry Keyers | . | 1.2 | 1.2 | 1.3 | 1.3 | . | 28.9 | 81.1 | 63.5 | 17.7 | 12.6 | 37.9 | 47.3 | 14.9 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

## Lifetime Earnings by Degree (in millions of dollars) / Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations

| Occupation | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White● | Percent African American● | Percent Latino● | Percent High School or less● | Percent Some College and Associate's | Percent BA and Graduate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Word Processors and Typists | . | 1.2 | 1.3 | 1.2 | 1.4 | . | 18.3 | 90.0 | 67.3 | 16.4 | 10.5 | 36.3 | 48.2 | 15.5 |
| Insurance Claims and Policy Processing Clerks | . | 1.3 | 1.3 | 1.4 | 1.6 | . | 18.1 | 83.5 | 69.7 | 17.0 | 10.3 | 31.0 | 46.9 | 22.2 |
| Mail Clerks and Mail Machine Operators, except Postal Service and Office Machine Operators, except Computer | . | 1.1 | . | . | . | . | 19.1 | 51.2 | 54.0 | 22.4 | 15.6 | 53.1 | 36.9 | 10.1 |
| Proofreaders and Copy Markers, Office Clerks, General | . | 1.2 | 1.3 | 1.3 | 1.5 | . | 21.7 | 84.1 | 63.8 | 15.7 | 14.4 | 35.7 | 46.8 | 17.4 |
| Miscellaneous Office and Administrative Support Workers, including Desktop Publishers | . | 1.3 | 1.5 | 1.5 | 1.7 | 2.2 | 33.3 | 74.6 | 68.7 | 15.5 | 10.6 | 25.9 | 43.4 | 30.6 |
| Graders and Sorters, Agricultural Products, Miscellaneous Agricultural Workers, including Animal Breeders | .8 | 1.0 | 1.0 | . | . | . | 29.0 | 17.4 | 35.9 | 4.3 | 57.9 | 81.9 | 13.6 | 4.5 |
| Fishing and Hunting, Forest and Conservation, Logging Workers | . | .9 | . | . | . | . | -27.6 | 3.3 | 79.0 | 7.8 | 10.3 | 77.0 | 16.0 | 7.1 |
| First-line Supervisors/Managers of Construction Trades and Extraction Workers | 1.7 | 2.0 | 2.2 | 2.2 | 2.3 | . | 24.8 | 2.5 | 79.9 | 4.1 | 14.1 | 56.5 | 33.1 | 10.5 |
| Structural Iron and Steel Workers, Reinforcing Iron and Rebar Workers including Boilermakers | . | 1.8 | . | . | . | . | 43.7 | 1.6 | 70.4 | 7.6 | 19.4 | 68.2 | 28.7 | 3.0 |
| Brick Masons, Block Masons, and Stonemasons | . | 1.4 | . | . | . | . | -26.9 | 1.2 | 52.7 | 7.1 | 39.1 | 77.8 | 18.3 | 3.9 |
| Carpenters | 1.1 | 1.3 | 1.2 | 1.2 | 1.1 | . | .8 | 1.2 | 65.1 | 4.7 | 27.5 | 67.2 | 25.9 | 6.9 |
| Carpet, Floor, and Tile Installers and Finishers | . | 1.1 | . | . | . | . | 10.1 | 2.1 | 54.6 | 3.4 | 39.8 | 75.6 | 18.9 | 5.5 |
| Construction Laborers | 1.0 | 1.2 | 1.3 | 1.3 | 1.3 | . | 9.5 | 2.4 | 48.7 | 7.7 | 41.0 | 74.7 | 19.7 | 5.5 |
| Construction Equipment Operators, Except Paving, Surfacing and Tamping Equipment Operators | 1.4 | 1.6 | 1.8 | . | . | . | -2.0 | 1.8 | 77.7 | 5.9 | 14.2 | 75.1 | 22.0 | 2.9 |
| Drywall Installers, Ceiling Tile Installers, and Tapers, Plasterers and Stucco Masons | 1.0 | 1.1 | . | . | . | . | 54.7 | 1.9 | 35.6 | 4.4 | 57.7 | 84.1 | 13.2 | 2.7 |
| Electricians | 1.4 | 1.8 | 2.0 | 2.1 | 1.8 | . | 5.8 | 1.8 | 75.7 | 6.2 | 15.2 | 46.7 | 46.2 | 7.0 |
| Glaziers, Insulation Workers, Paperhangers | . | 1.4 | 1.5 | . | . | . | 64.1 | 3.1 | 65.5 | 7.0 | 25.3 | 70.9 | 24.2 | 5.0 |
| Painters, Construction and Maintenance | .9 | 1.1 | 1.0 | . | . | . | 67.3 | 4.8 | 48.9 | 6.1 | 42.9 | 73.8 | 19.8 | 6.4 |
| Pipelayers, Plumbers, Pipefitters, and Steamfitters | 1.3 | 1.7 | 1.9 | 2.0 | . | . | 25.9 | 1.0 | 71.9 | 6.4 | 19.9 | 63.1 | 32.6 | 4.3 |
| Roofers | 1.0 | 1.2 | . | . | . | . | 130.6 | .9 | 43.3 | 5.3 | 49.2 | 84.7 | 11.7 | 3.6 |
| Sheet Metal Workers | . | 1.7 | . | . | . | . | 19.6 | 3.1 | 77.5 | 5.8 | 14.0 | 64.4 | 31.5 | 3.2 |
| Miscellaneous Construction | . | 1.5 | . | . | . | . | 10.7 | 5.7 | 62.4 | 9.1 | 26.0 | 67.0 | 27.0 | 6.0 |
| Construction and Building Inspectors | . | . | 1.9 | . | . | . | 12.0 | 11.5 | 76.9 | 7.3 | 11.5 | 27.7 | 47.1 | 25.2 |
| Highway Maintenance Workers | . | 1.3 | . | . | . | . | 6.9 | 3.3 | 76.1 | 10.0 | 12.2 | 69.0 | 28.3 | 2.7 |
| Ext-Mining Machine Operators | . | 2.1 | . | . | . | . | 17.0 | 3.1 | 82.9 | 5.1 | 10.7 | 69.2 | 27.1 | 3.8 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

App.821

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | Gender Earnings Gap % | Percent Female | Percent White● | Percent African American● | Percent Latino● | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| First-line Supervisors/Managers of Mechanics, Installers, and Repairers | . | 2.0 | 2.2 | 2.3 | 2.6 | . | 16.9 | 6.9 | 80.0 | 7.0 | 9.9 | 43.1 | 44.0 | 12.9 |
| Computer, Automated Teller, and Office Machine Repairers | . | 1.6 | 1.9 | 1.9 | 1.9 | . | 3.9 | 11.6 | 71.6 | 10.6 | 9.6 | 22.0 | 56.0 | 22.0 |
| Radio and Telecommunications Equipment Installers and Repairers | . | 2.0 | 2.2 | 2.2 | . | . | 3.2 | 11.5 | 72.3 | 13.0 | 10.7 | 32.5 | 54.8 | 12.7 |
| Avionics Technicians, Aircraft Mechanics and Service Technicians | . | 2.0 | 2.2 | 2.3 | . | . | 21.7 | 4.3 | 73.8 | 7.3 | 13.2 | 32.6 | 56.2 | 11.2 |
| Other Electric/Electronic | . | 1.7 | 1.8 | . | . | . | 20.2 | 3.9 | 72.0 | 8.3 | 15.0 | 43.0 | 48.4 | 8.6 |
| Automotive Body and Related Repairers, Automotive Glass Installers and Repairers | 1.2 | 1.5 | . | . | . | . | 33.4 | 1.3 | 69.2 | 4.5 | 23.4 | 73.0 | 24.4 | 2.5 |
| Automotive Service Technicians and Mechanics | 1.1 | 1.3 | 1.6 | 1.6 | . | . | 23.1 | 1.2 | 69.5 | 6.7 | 19.6 | 63.3 | 32.8 | 3.9 |
| Bus and Truck Mechanics and Diesel Engine Specialists | 1.5 | 1.7 | 1.8 | . | . | . | -22.2 | .8 | 77.3 | 6.8 | 13.0 | 63.3 | 34.1 | 2.5 |
| Heavy Vehicle and Mobile Equipment Service Technicians and Mechanics | . | 1.8 | 1.9 | . | . | . | 4.7 | 1.0 | 81.1 | 4.9 | 12.5 | 61.9 | 34.4 | 3.7 |
| Small Engine Mechanics, Miscellaneous Vehicle and Mobile Equipment Mechanics, Installers and Repairers, Control and Valve Installers and Repairers | . | 1.3 | . | . | . | . | -24.3 | 2.5 | 73.9 | 8.9 | 15.5 | 65.0 | 30.0 | 5.0 |
| Heating, Air Conditioning, and Refrigeration Mechanics and Installers | . | 1.6 | 1.8 | 1.8 | . | . | 5.3 | 1.0 | 74.8 | 6.7 | 16.0 | 51.7 | 42.6 | 5.7 |
| Home Appliance Repairers, Maintenance Workers, Machines, Millwrights | . | 1.7 | 2.0 | . | . | . | 30.7 | 3.3 | 81.5 | 6.3 | 9.6 | 55.2 | 39.2 | 5.6 |
| Industrial and Refractory Machinery Mechanics | 1.5 | 1.7 | 2.0 | 2.0 | . | . | 28.2 | 3.1 | 76.8 | 7.1 | 12.9 | 53.4 | 41.3 | 5.3 |
| Maintenance and Repair Workers, General | 1.2 | 1.6 | 1.7 | 1.9 | . | . | 19.9 | 3.0 | 71.3 | 8.8 | 16.1 | 56.1 | 37.9 | 6.0 |
| Electrical Power-line Installers and Repairers | . | 2.4 | 2.6 | 2.6 | . | . | 61.0 | 1.2 | 80.8 | 7.1 | 10.8 | 51.3 | 43.4 | 5.3 |
| Telecommunications Line Installers and Repairers | . | 2.0 | 2.2 | 2.2 | . | . | 14.5 | 5.9 | 67.4 | 15.0 | 14.8 | 41.3 | 49.1 | 9.6 |
| Other-installation, Maintenance, and Repair Workers | 1.1 | 1.4 | 1.6 | . | . | . | 24.8 | 6.6 | 71.5 | 8.1 | 16.6 | 56.0 | 35.9 | 8.1 |
| First-line Supervisors/Managers of Production and Operating Workers | 1.5 | 1.8 | 2.1 | 2.2 | 2.5 | 3.1 | 41.4 | 17.9 | 72.6 | 9.1 | 14.0 | 49.3 | 34.9 | 15.8 |
| Food and Tobacco Roasting, Baking, and Drying Machine Operators and Tenders, Food Batchmakers, Food Cooking Machine Operators and Tenders | . | 1.3 | . | . | . | . | 55.8 | 35.5 | 61.5 | 11.3 | 22.5 | 67.4 | 26.4 | 6.2 |
| Electrical, Electronics, and Electromechanical Assemblers | . | 1.1 | . | . | . | . | 29.2 | 55.6 | 49.0 | 11.5 | 19.6 | 68.7 | 24.5 | 6.9 |
| Miscellaneous Assemblers and Fabricators | .9 | 1.2 | 1.4 | 1.3 | 1.3 | . | 31.5 | 40.0 | 57.5 | 14.2 | 18.9 | 68.3 | 26.1 | 5.6 |

● Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | Gender Earnings Gap % | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/ Doctoral | | Percent Female | Percent White• | Percent African American• | Percent Latino• | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Bakers | . | 1.0 | . | . | . | . | 23.4 | 49.0 | 44.5 | 10.9 | 37.6 | 70.2 | 22.6 | 7.2 |
| Butchers and other Meat, Poultry, and Fish Processing Workers | .9 | 1.2 | . | . | . | . | 39.8 | 21.3 | 44.0 | 10.4 | 40.7 | 78.7 | 18.7 | 2.6 |
| Aircraft Structure, Computer Control Programmers/Operators, Extruding/Drawing, Forging, Rolling Machine Setters, Operators and Tenders, Metal and Plastic | . | 1.5 | . | . | . | . | 32.1 | 10.8 | 77.6 | 7.4 | 10.7 | 58.3 | 35.9 | 5.7 |
| Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | . | 1.2 | . | . | . | . | 38.4 | 21.2 | 71.6 | 10.4 | 14.8 | 72.1 | 24.1 | 3.8 |
| Machinists | 1.4 | 1.7 | 1.8 | 1.8 | . | . | 39.6 | 3.8 | 76.6 | 5.7 | 12.1 | 58.9 | 37.6 | 3.5 |
| Metal Workers including Kiln Model Makers, Molders and other Machine Setters | 1.3 | 1.5 | 1.7 | 1.8 | . | . | 44.7 | 6.2 | 69.5 | 8.5 | 18.6 | 69.3 | 27.9 | 2.9 |
| Miscellaneous Metal Workers and Plastic Workers, including Milling and Planning, and Multiple Machine Tool Setters and Lay-out Workers | 1.1 | 1.3 | 1.4 | . | . | . | 37.4 | 23.0 | 54.8 | 12.7 | 24.4 | 71.1 | 24.4 | 4.5 |
| Bookbinders and Bindery Workers, Job Printers, Prepress Technicians and Workers | . | 1.3 | . | . | . | . | 40.1 | 34.2 | 72.7 | 9.8 | 12.3 | 56.0 | 32.1 | 11.9 |
| Printing Machine Operators | . | 1.4 | 1.5 | . | . | . | 50.2 | 15.0 | 72.6 | 9.1 | 14.5 | 63.5 | 30.2 | 6.3 |
| Laundry and Dry-cleaning Workers | .7 | .8 | . | . | . | . | 25.3 | 60.2 | 37.1 | 15.9 | 35.2 | 78.7 | 14.6 | 6.7 |
| Textile, Apparel, and Furnishings Workers | .8 | .9 | . | . | . | . | 29.4 | 53.5 | 47.2 | 12.3 | 28.0 | 74.9 | 17.3 | 7.7 |
| Sewing Machine Operators | .7 | .8 | . | . | . | . | 17.5 | 73.4 | 33.1 | 11.0 | 42.1 | 82.9 | 13.2 | 3.9 |
| Miscellaneous Woodworkers, including Model Makers and Pattern Makers | . | 1.1 | . | . | . | . | 26.3 | 11.9 | 69.9 | 5.8 | 20.3 | 73.8 | 19.9 | 6.3 |
| Power Plant, Water and Liquid Waste Treatment, Miscellaneous Plant and System Operators | . | 1.9 | 2.2 | . | . | . | 21.3 | 4.9 | 79.7 | 8.7 | 9.2 | 42.2 | 45.7 | 12.0 |
| Stationary Engineers and Boiler Operators | . | 2.0 | 2.0 | . | . | . | 25.4 | 2.9 | 70.9 | 13.6 | 11.2 | 45.2 | 44.7 | 10.1 |
| Chemical Processing Machine, Extruding, Forming, Pressing and Compacting, Furnace, Kiln, Oven, Drier, and Kettle Operators and Tenders | . | 1.7 | . | . | . | . | 42.9 | 13.7 | 70.4 | 13.3 | 13.0 | 55.3 | 35.1 | 9.6 |
| Crushing, Grinding, Polishing, Mixing, and Blending Workers | . | 1.4 | . | . | . | . | 28.2 | 10.5 | 62.6 | 12.9 | 20.8 | 66.4 | 28.1 | 5.5 |
| Inspectors, Testers, Sorters, Samplers, and Weighers | 1.0 | 1.4 | 1.7 | 1.8 | 2.0 | . | 54.1 | 38.0 | 66.9 | 11.3 | 14.7 | 48.0 | 37.3 | 14.8 |
| Other Production Workers, including Semiconductor Processors and Cooling and Freezing Equipment Operators | 1.0 | 1.3 | 1.5 | 1.6 | 1.6 | . | 38.6 | 28.7 | 56.2 | 14.2 | 23.5 | 68.1 | 25.7 | 6.1 |
| Packaging and Filling Machine Operators and Tenders | .8 | 1.1 | . | . | . | . | 33.8 | 56.7 | 37.0 | 17.1 | 29.6 | 77.8 | 18.0 | 4.3 |
| Painting Workers | 1.1 | 1.4 | . | . | . | . | 46.6 | 12.7 | 57.6 | 9.9 | 23.5 | 75.1 | 21.7 | 3.2 |
| Supervisors, Transportation and Material Moving Workers | . | 1.8 | 1.9 | . | 2.3 | . | 30.8 | 18.7 | 69.7 | 12.5 | 13.4 | 43.4 | 38.9 | 17.6 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races)

App.823

| Occupation | Lifetime Earnings by Degree (in millions of dollars) | | | | | | Gender Earnings Gap % | Distributions of Race/Ethnicity, Gender, and Educational Attainment within Occupations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than High School | High School Diploma | Some college | Associate's | Bachelor's | Master's/Professional/Doctoral | | Percent Female | Percent White● | Percent African American● | Percent Latino● | Percent High School or less | Percent Some College and Associate's | Percent BA and Graduate |
| Aircraft Pilots and Flight Engineers, Air Traffic Controllers and Airfield Operations Specialists | . | . | . | . | 3.9 | . | 24.0 | 8.5 | 88.7 | 4.3 | 4.4 | 7.7 | 29.4 | 62.9 |
| Ambulance Drivers and Attendants, Taxi Drivers and Chauffeurs, Motor Vehicle Operators, all other | .8 | .9 | .9 | . | . | . | 10.2 | 12.8 | 39.5 | 28.6 | 20.7 | 55.1 | 31.4 | 13.5 |
| Bus Drivers | . | 1.2 | 1.3 | . | . | . | 39.4 | 41.2 | 45.2 | 35.3 | 15.4 | 54.2 | 38.7 | 7.1 |
| Driver/Sales Workers and Truck Drivers | 1.3 | 1.5 | 1.6 | 1.5 | 1.5 | . | 42.2 | 3.8 | 64.9 | 14.0 | 18.4 | 68.5 | 26.8 | 4.8 |
| Locomotive Engineers, Railroad Brake, Signal and Switch Operators, Railroad Conductors and Yardmasters, Subway, Streetcar, and other Rail Transportation Workers | . | 2.4 | 2.5 | . | . | . | 22.6 | 6.8 | 71.8 | 18.4 | 7.5 | 44.2 | 44.5 | 11.3 |
| Parking Lot, Service Station Attendants | . | .9 | . | . | . | . | 20.9 | 15.4 | 48.0 | 17.6 | 26.2 | 65.8 | 24.8 | 9.5 |
| Conveyor Operators/Tenders; Hoist/Winch Operators, Miscellaneous Material Moving/Transportation Workers, Inspectors | . | 1.6 | 1.8 | . | . | . | 41.3 | 13.7 | 67.4 | 14.1 | 14.6 | 49.8 | 41.2 | 9.1 |
| Crane and Tower, Dredge, Excavating, and Loading Machine, Pumping Station Operators | . | 1.9 | . | . | . | . | 26.5 | 2.7 | 77.5 | 8.6 | 12.0 | 71.7 | 24.7 | 3.7 |
| Industrial Truck and Tractor Operators | 1.1 | 1.2 | 1.3 | . | . | . | 6.1 | 8.7 | 49.2 | 21.1 | 27.4 | 76.8 | 20.7 | 2.6 |
| Cleaners of Vehicles and Equipment | .9 | 1.0 | . | . | . | . | 7.9 | 13.3 | 36.2 | 18.9 | 41.9 | 79.1 | 17.4 | 3.5 |
| Laborers and Freight, Stock, and Material Movers, Hand, Machine Feeders and Offbearers | 1.0 | 1.2 | 1.3 | 1.4 | 1.3 | . | 27.6 | 18.2 | 59.6 | 15.2 | 21.6 | 70.6 | 24.5 | 5.0 |
| Packers and Packagers, Hand | .8 | .9 | . | . | . | . | 25.5 | 60.2 | 34.1 | 12.5 | 46.2 | 80.5 | 15.6 | 4.0 |

* Percent White, Percent African American and Percent Latino rows total to 100% (may not add to exactly 100% due to missing other races.)

# The
# College Payoff

Education, Occupations, Lifetime Earnings



GEORGETOWN UNIVERSITY

Center

*on* Education

*and the* Workforce

3300 Whitehaven Street, NW, Suite 5000
Washington, DC 20007

Mail: Campus Box 571444, Washington, DC 20057

cew.georgetown.edu

