**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS et al., | ) ) ) |
| *Plaintiffs*, | ) ) No. 4:23-cv-01267-O |
| v. | ) ) |
| U.S. DEPARTMENT OF EDUCATION et al., | ) ) ) |
| *Defendants*. | ) ) |

## PLAINTIFFS OGLE SCHOOL MANAGEMENT, LLC & TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................................ii

INTRODUCTION ..............................................................................................................................1

STATEMENT OF THE CASE ............................................................................................................2

    A.    Historical & Statutory Background ...........................................................................2

    B.    Regulatory Background ...............................................................................................6

    C.    The Challenged 2023 Rule ......................................................................................14

    D.    Procedural History ....................................................................................................19

SUMMARY OF ARGUMENT .........................................................................................................19

LEGAL STANDARD ........................................................................................................................21

ARGUMENT ......................................................................................................................................22

I.    The 2023 Rule Is *Ultra Vires* .........................................................................................22

II.    The 2023 Rule Is Arbitrary And Capricious ...............................................................34

    A.    The Rule Illogically Relies on Concededly Inaccurate Earnings Data .......................35

    B.    The Rule Illogically Penalizes Schools for Factors Beyond Their Control .................40

    C.    The Rule Uses Illogical Debt-to-Earnings Thresholds ..................................................45

    D.    The Rule's Cost-Benefit Analysis Is Illogical .................................................................48

CONCLUSION ...................................................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

*AACS v. DeVos,*
  258 F.Supp.3d 50 (D.D.C. 2017) .................................................................. 12, 36, 37, 38

*Allen v. Cooper,*
  589 U.S. 248 (2020) ................................................................................................ 31

*Ass'n of Priv. Colleges & Universities v. Duncan,*
  870 F.Supp.2d 133 (D.D.C. 2012) ........................................................................ 11

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan,*
  110 F.Supp.3d 176 (D.D.C. 2015) ........................................................................ 11

*Ass'n of Proprietary Colls. v. Duncan,*
  107 F.Supp.3d 332 (S.D.N.Y. 2015) ..................................................................... 11

*Biden v. Texas,*
  597 U.S. 785 (2022) ............................................................................................... 30

*Biden v. Nebraska,*
  143 S.Ct. 2355 (2023) ............................................................................................ 32

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ................................................................. 42, 46, 49, 50

*Carlson v. Postal Regul. Comm'n,*
  938 F.3d 337 (D.C. Cir. 2019) .............................................................................. 47

*Chamber of Com. of US v. DOL,*
  885 F.3d 360 (2018) .................................................................................. 28, 44, 48

*Chevron U.S.A., Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984) ................................................................................................. 1

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund,*
  583 U.S. 416 (2018) ............................................................................................... 34

*Data Mktg. P'ship, LP v. DOL,*
  45 F.4th 846 (5th Cir. 2022) ................................................................................. 22

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ............................................................................................... 46

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ............................................................................................... 33

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................. 35

*Horn v. State Farm Lloyds,*
    703 F.3d 735 (5th Cir. 2012) ................................................. 23

*In re Acad. For Jewish Educ.,*
    Dep't of Educ., 1994 WL 1026087 (Mar. 23, 1994) ............ 7, 32

*In re Beth Medrash Eeyun Hatalmud,*
    Dep't of Educ., 1999 WL 33954497 (Apr. 1, 1999) ............... 7

*In re Bnai Arugath Habosem,*
    Dep't of Educ., 1994 WL 1026098 (June 16, 1994) .............. 7

*In re Derech Ayson Rabbinical Seminary,*
    Dep't of Educ., 1995 WL 931579 (Jan. 12, 1995) ................. 7

*In re Sara Schenirer Teachers Seminary,*
    Dep't of Educ., 1994 WL 1026085 (Mar. 25, 1994) .............. 7

*In re Seminar L'moros Bais Yaakov,*
    Dep't of Educ., 1994 WL 1026093 (Mar. 21, 1994) .............. 7

*Jama v. ICE,*
    543 U.S. 335 (2005) ................................................................. 29

*Kovac v. Wray,*
    109 F.4th 331 (5th Cir. 2024) ................................................. 28

*Loaiza v. Loaiza,*
    130 S.W.3d 894 (Tex. App. 2004) ......................................... 48

*Lomax v. Ortiz-Marquez,*
    140 S.Ct. 1721 (2020) ............................................................. 31

*Loper Bright Enters. v. Raimondo,*
    144 S.Ct. 2244 (2024) ............................................. 1, 22, 24, 31

*MCR Oil Tools, L.L.C. v. DOT,*
    110 F.4th 677 (5th Cir. 2024) ............................................ 35, 39

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) .............................................. 45, 49

*Motor Vehicle Mfrs. Of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) ................................................................... 40

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ................................................................................. 32

*Ohio v. EPA,*
    144 S.Ct. 2040 (2024) ................................................................. *passim*

*Rest. L. Ctr. v. DOL,*
    2024 WL 3911308 (5th Cir. Aug. 23, 2024) ........................... 20, 26, 28, 35

*Ryan LLC v. FTC,*
    2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) .......................................... 22

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) .............................................. 37, 40, 41, 42

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ........................................................... 38, 50

*Texas v. Cardona,*
    2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ............................................ 21

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) .................................................................. 22

*United States v. Cooper,*
    38 F.4th 428 (5th Cir. 2022) ................................................................... 30

*United States v. Davis,*
    139 S.Ct. 2319 (2019) ..............................................................................33

*United States v. Koutsostamatis,*
    956 F.3d 301 (5th Cir. 2020) ..................................................................29

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
    985 F.3d 472 (5th Cir. 2021) ..................................................................35

*Utah v. Su,*
    109 F.4th 313 (5th Cir. 2024) ....................................................................1

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ...................................................................23

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ..................................................................35

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .................................................................................32

**Statutes**

5 U.S.C. §553(d) ........................................................................................................15

5 U.S.C. §706 ............................................................................................................21

5 U.S.C. §706(2)(A) .............................................................................................22, 35

5 U.S.C. §706(2)(C) ...................................................................................................22

20 U.S.C. §1002(a) ....................................................................................................22

20 U.S.C. §1002(b)(1) ..........................................................................................passim

20 U.S.C. §1002(b)(1)-(2) ...........................................................................................6

20 U.S.C. §1002(c)(1) ................................................................................................28

20 U.S.C. §1002(c)(1)-(2) ............................................................................................6

20 U.S.C. §1015a(i)(1) ...............................................................................................29

20 U.S.C. §1015a(k)(D) .........................................................................................8, 29

20 U.S.C. §1036(e)(1) ...........................................................................................7, 31

20 U.S.C. §1070(a) ....................................................................................................34

20 U.S.C. §1085 .........................................................................................................29

20 U.S.C. §1085(a)(2) ...........................................................................................8, 29

20 U.S.C. §§1085(b)-(c) (1992) ...................................................................................5

20 U.S.C. §1085(c) (1970) ...........................................................................................5

20 U.S.C. §1085(m)(1) ..........................................................................................8, 29

20 U.S.C. §1087a(a) ..................................................................................................34

20 U.S.C. §1087dd(e)(1) ...........................................................................................29

20 U.S.C. §1088(b)(1) (1994) ......................................................................................6

20 U.S.C. §§1088(b)-(c) (1994) ...............................................................................5, 6

20 U.S.C. §1088(b)(1) ...................................................................................2, 6, 20, 22

20 U.S.C. §1088(b)(2) ................................................................................................32

20 U.S.C. §1088(b)(5) ...................................................................................................................6

20 U.S.C. §1088(c)(1) (1994) ........................................................................................................6

20 U.S.C. §1088(c)(3) ...................................................................................................................6

20 U.S.C. §1088(e)(1) (1994) ........................................................................................................6

20 U.S.C. §1098e ...........................................................................................................................8

20 U.S.C. §1098e(b)(7) ...............................................................................................................29

20 U.S.C. §1099c(a) .....................................................................................................................22

20 U.S.C. §1134c(a) ................................................................................................................ 8, 31

20 U.S.C. §1135c(d)(2) ........................................................................................................... 8, 31

20 U.S.C. §1161g(d)(5) ........................................................................................................... 8, 31

Pub. L. No. 64-347, 39 Stat. 929 (1917) ................................................................................ 3, 33

Pub. L. No. 78-346, 58 Stat. 284 (1944) .......................................................................................3

Pub. L. No. 85-864, 72 Stat. 1580 (1958) ............................................................................. 3, 33

Pub. L. No. 89-287, 79 Stat. 1037 (1965) ............................................................................... 4, 5

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ........................................................................ 3, 4, 30

Pub. L. No. 90-575, 82 Stat. 1014 (1968) .....................................................................................5

Pub. L. No. 92-318, 86 Stat. 235 (1972) ....................................................................................26

Pub. L. No. 102-325, 106 Stat. 448 (1992) ...................................................................................5

Pub. L. No. 110-315, 122 Stat. 3078 (2008) ................................................................................6

**Rule and Regulations**

Fed. R. App. P. 8(a) .....................................................................................................................51

34 C.F.R. §600.2 ...........................................................................................................................9

34 C.F.R. §668.8(g)(1) ................................................................................................................32

34 C.F.R. §668.8(g)(2) ................................................................................................................33

75 Fed. Reg. 43,616 (July 26, 2010) ...................................................................................... 9, 10

76 Fed. Reg. 34,386 (June 13, 2011) ................................................................. 9, 10, 36

79 Fed. Reg. 64,890 (Oct. 31, 2014) ............................................................ 11, 36, 45, 46

83 Fed. Reg. 40,167 (Aug. 14, 2018) ........................................................................... 12

84 Fed. Reg. 31,392 (July 1, 2019) ....................................................................... *passim*

88 Fed. Reg. 32,300 (May 19, 2023) ................................................................ 14, 38, 45

88 Fed. Reg. 43,820 (July 10, 2023) ........................................................................... 48

88 Fed. Reg. 70,004 (Oct. 10, 2023) ................................................................... *passim*

**Other Authorities**

Beth Almeida et al., Ctr. for Am. Progress, *Fact Sheet: The State of Women in the Labor
    Market 2023* (Feb. 6, 2023), https://rb.gy/5ah4rp ................................................ 42

American Heritage Dictionary of the English Language (1969) ..................................... 23

Nick Anderson, *Democrats Join GOP in Voting to Block Tighter Regulation of For-Profit
    Schools*, Wash. Post (Feb. 19, 2011), https://rb.gy/jrztyi ....................................... 10

Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much? Defining Benchmarks for
    Manageable Student Debt* (2006), https://rb.gy/zcsl1r ................................... 9, 10, 46, 47

*Black's Law Dictionary* (4th ed. rev. 1968) ............................................................... 25

*Black's Law Dictionary* (5th ed. 1979) ..................................................................... 23

*Black's Law Dictionary* (11th ed. 2019) ............................................................. 23, 25

*Cambridge Dictionary* (online ed.) ............................................................................ 25

David Carleton, *Landmark Congressional Laws on Education* (2002) ....................... 3, 33

CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s ................... 43

Linda E. Coco, *Mortgaging Human Potential*,
    42 Sw. L. Rev. 565 (2013) ...................................................................................... 3

*Collins Dictionary* (online ed.) ................................................................................ 25

Defs.' Cross-Mot. for Summ. J., *Ass'n of Priv. Sector Colleges & Univs. v. Duncan*,
    No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18 ................................................. 6

Defs.' Reply in Supp. of Cross-Mot. for Summ. J., *Ass'n of Priv. Colleges & Universities
    v. Duncan*, No. 11-cv-1314 (D.D.C. filed Feb. 2, 2012) ........................................... 11

Dep't of Educ., *Electronic Announcement ID: General-24-74* (June 20, 2024),
    https://rb.gy/nwwgs3 ..................................................................................................17

Dep't of Educ., *Strayer University—Final Program Review Determination* (July 18, 2013),
    https://rb.gy/2vsztu ....................................................................................................7

Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* (1898) ........................................3

H.R. Rep. No. 89-308 (1965) ..........................................................................................5, 33

IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform
    Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation*
    (Nov. 21, 2023), https://rb.gy/6jkx6k .................................................................................38

Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257 (1999) ......................................3

Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* (2023),
    https://rb.gy/r2e256 ...................................................................................................46

O*Net OnLine, *See All Occupations*, https://rb.gy/14qgm0 (last visited Mar. 20, 2024) ..................9

Off. of the Tex. Governor, *Governor Abbott Issues Executive Order, Implements Statewide
    Essential Services and Activities Protocols* (Mar. 31, 2020), https://rb.gy/7hswe2 ...................44

Oxford English Dictionary (online ed.) ...........................................................................23

Press Release, Illinois, *Gov. Pritzker Announces Statewide Stay At Home Order to Maximize
    COVID-19 Containment, Ensure Health Care System Remains Fully Operational* (Mar.
    20, 2020), https://rb.gy/j259zd ......................................................................................44

Random House Dictionary of the English Language (2d ed. unabridged, 1987) .....................23, 26

S. Rep. No. 89-758 (1965) ..........................................................................................5, 33

S. Rep. No. 92-346 (1971) ............................................................................................26

U.S. Bureau of Labor Statistics, *2018 SOC Definitions* (Nov. 2017),
    https://rb.gy/2zfef1 ....................................................................................................26

U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2021* (Mar. 2023),
    https://rb.gy/ju086j ...................................................................................................43

U.S. Bureau of Labor Statistics, *May 2019 National Occupation Employment and Wage
    Estimates* (last modified Mar. 31, 2020), https://rb.gy/g9sn4r ...........................................27

U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook: Barbers, Hairstylists, and
    Cosmetologists* (last modified Aug. 29, 2024), https://rb.gy/rlhhuo .....................................49

U.S. Dep't of Educ., *Biden-Harris Administration Announces Landmark Final Rules to Protect Consumers From Unaffordable Student Debt and Increase Transparency* (Sept. 27, 2023), https://rb.gy/iavrwt..................................................................50

U.S. Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 17, 2023), https://rb.gy/uyl2xk..................................................................14

U.S. Dep't of Educ., *The Federal Role in Education* (last modified June 15, 2021), https://rb.gy/2ud2gi..................................................................................................3

Webster's New International Dictionary (2d ed. unabridged, 1954) .......................................23

## INTRODUCTION

The Department of Education (Department) has promulgated a renewed "gainful employment" Rule, *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023) (2023 Rule), that defies the ordinary and best meaning of "gainful employment" and is arbitrary and capricious to boot. While this Court denied the request by Ogle School Management, LLC and Tricoci University of Beauty Culture, LLC (collectively, the *Ogle* Plaintiffs) for "the extreme relief of a preliminary injunction" by applying an especially demanding standard for that remedy, *Ogle*.Dkt.31 at 11, the rule now must stand or fall under ordinary standards of judicial review. What is more, since this Court's earlier decision, the Supreme Court has clarified principles of statutory construction and Administrative Procedure Act (APA) review in ways that heighten the government's burden and doom the 2023 Rule. First, in a "landmark" decision, *Utah v. Su*, 109 F.4th 313, 317-18 (5th Cir. 2024), the Supreme Court held that agency interpretations of statutes receive no deference. *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) ("*Chevron [U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)] is overruled."). The Supreme Court made clear that henceforth courts must "apply[] all relevant interpretive tools" and "determine the best reading of the statute" because, "[i]n the business of statutory interpretation, if it is not the best, it is not permissible." *Id.* at 2266. The Supreme Court also made clear that especial skepticism should be employed when it comes to executive interpretations that were adopted long after statutory enactment or have varied over time. *See id.* at 2265. Second, the Supreme Court emphasized that the APA's arbitrary-and-capricious standard is no pushover and that courts should not hesitate to flunk agencies that fail to offer reasoned explanations for their actions or ignore critical issues during rulemaking. *Ohio v. EPA*, 144 S.Ct. 2040 (2024). Applying those recent decisions and the less-demanding standards applicable at the summary-judgment stage, the 2023 Rule has little chance. It depends on a second-best (to put it charitably) construction of the statute and is arbitrary and capricious in multiple dimensions.

To begin with, there is now no question that the Department's 2023 Rule is contrary to the Higher Education Act (HEA). The relevant statutory text says that, to qualify as eligible to participate in student-aid programs under Title IV of the HEA, a for-profit school must "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20

U.S.C. §1002(b)(1)(A)(i); *id.* §1088(b)(1)(A)(i).  The best reading of that text, and the one consistently embraced by the Department until recent years, requires for-profit schools merely to provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field—which is precisely what the *Ogle* Plaintiffs do.  Nothing in the words "gainful employment" or the surrounding text says anything about tests involving debt ratios or relative earnings.  To the contrary, as other uses of the same words elsewhere in the HEA confirm, "gainful employment" is a binary concept that distinguishes paid employment from volunteer activity, not a relative concept that imports debt ratios or relative earnings.  When Congress addresses those concepts, it does so directly and uses very different language, as it has done elsewhere in the HEA.  Moreover, the proper inquiry focuses on factors that schools can control—like the nature of the instruction that they provide in their classrooms—not factors wholly beyond their control—from graduates' lifestyle decisions to macroeconomic trends.  Thus, employing the full range of statutory-construction tools that the Court's preliminary-injunction decision eschewed, it is clear that the 2023 Rule does not embody the best reading of the HEA and is *ultra vires*.  That deficiency alone resolves this case.

In all events, *Ohio* underscores that the 2023 Rule cannot survive arbitrary-and-capricious review either.  The 2023 Rule is replete with illogical explanations and repeatedly ignores highly relevant factors.  Those are hallmarks of arbitrary-and-capricious action—not a valid basis to throw the cosmetology sector into a tailspin to the detriment of students nationwide.  Accordingly, the Court should grant the *Ogle* Plaintiffs summary judgment and set aside the 2023 Rule as soon as practicable.  Indeed, the Department has recently warned that, once the first test results associated with the rule are issued in early 2025, failing schools may have to begin posting debilitating letters of credit within a matter of weeks.  Prompt vacatur of the 2023 Rule thus is imperative.

## STATEMENT OF THE CASE

### A.        Historical & Statutory Background

The federal government has provided financial support for education, including career and technical education, for more than a century.  In 1917, for example, Congress enacted the Smith-Hughes Act—known as "the Magna Carta of vocational education," David Carleton, *Landmark*

*Congressional Laws on Education* 63 (2002) (Carleton)—which provided federal subsidies to states to fund the salaries of certain teachers so long as "the controlling purpose of such education shall be to fit for useful employment" "persons over fourteen years of age who have entered upon or who are preparing to enter upon" work in the given field. Pub. L. No. 64-347, §§2-3, 10-11, 39 Stat. 929, 930-31, 934 (1917). In other words, the Smith-Hughes Act sought to encourage preparation for remunerative—*i.e.*, paid or gainful—employment. *See, e.g.*, Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* 121, 206, 256 (1898) (describing "useful" as synonymous with "remunerative" and "gainful," and describing "remunerated" as synonymous with "[p]aid").

After World War II, the federal government began "provid[ing] financial support directly to students" to "allow[] them to attend institutions of higher learning." Linda E. Coco, *Mortgaging Human Potential*, 42 Sw. L. Rev. 565, 582 (2013). The GI Bill, for instance, offered subsidies for veterans to attend the institution of their choice, including for-profit schools. *See* Pub. L. No. 78-346, 58 Stat. 284 (1944). Although some unscrupulous "fly-by-night" for-profit schools "cropped up" "to take advantage of public dollars," Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257, 265 n.18, 266 n.23 (1999), the GI Bill proved a resounding success, sending millions of veterans to college, *see* Dep't of Educ., *The Federal Role in Education* (last modified June 15, 2021), https://rb.gy/2ud2gi. And Congress created similarly targeted programs for students in the 1950s—*e.g.*, "national defense fellowships" for students at qualifying institutions, so long as those students did "not engag[e] in gainful employment other than part-time employment by such institution in teaching, research or similar activities" during the fellowship period. Pub. L. No. 85-864, §§401-05, 72 Stat. 1580, 1590-91 (1958).

By the 1960s, Congress determined that offering federal student aid to a much broader swath of the population would best serve the national interest. To that end, Congress enacted two statutes in 1965 that sought to benefit students at different types of schools. The first relevant statute—the HEA—sought "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965). To accomplish that objective, Title IV of the HEA established a variety of grant and loan programs. To participate in those programs and process federal student aid, the HEA

imposed various requirements on schools.  Among other things, a school had to qualify as an "eligible institution" under the HEA, *id.* §427(a)(1), which the statute defined in relevant part as "a public or other nonprofit institution" that "admits as regular students only persons having a certificate of graduation from a school providing secondary education," *id.* §435(a)(1), (4).  As a general matter, an eligible institution under the HEA had to "provide[] an educational program for which it awards a bachelor's degree or provides not less than a two-year program which is acceptable for full credit toward such a degree."  *Id.* §435(a)(3).  But the HEA also stated that eligible institutions included "any school which provides not less than a one-year program of training to prepare students for gainful employment in a recognized occupation."  *Id.* §435(a).  Accordingly, under the original HEA, public or nonprofit institutions could participate in Title-IV programs regardless of whether their students chose to enroll in liberal-arts or humanities programs, or instead chose to enroll in vocational programs designed to prepare them for gainful—*i.e.*, useful or paid—employment in a particular field.

Congress enacted the second relevant statute—the National Vocational Student Loan Insurance Act of 1965 (NVSLIA)—as a complement to the HEA.  Pub. L. No. 89-287, 79 Stat. 1037 (1965).  The NVSLIA sought "[t]o establish a system of loan insurance and a supplementary system of direct loans to assist students to attend post-secondary business, trade, technical, and other vocational schools."  *Id.* at 1037.  Like the HEA, the NVSLIA required schools that wished to participate in these programs to satisfy the definition of "eligible institution."  *Id.* §8(a)(1).  But the NVSLIA defined that term differently from the HEA, stating that an eligible institution for NVSLIA purposes is "a business or trade school, or technical institution or other technical or vocational school," that provides "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations."  *Id.* §17(a)(2).  And the NVSLIA also stated that eligible institutions could "admit[] as regular students only persons who have completed or left elementary or secondary school."  *Id.* §17(a)(1).  Thus, unlike the HEA, which left out for-profit schools and non-high-school graduates, the NVSLIA expanded the institutions at which students could receive federal student aid "as widely as possible" and provided a pathway for the "large numbers of actual and potential students who have left elementary or secondary school" to "attain the goals they have

established for themselves." S. Rep. No. 89-758, at 3, 12 (1965); *see also* H.R. Rep. No. 89-308, at 9 (1965). At the same time, Congress endeavored to protect the public fisc by "explicitly eliminat[ing] from eligibility" the bad-actor "'fly by night' institutions of the post-World War II era"—an objective that Congress achieved by inserting an additional "eligibility feature" into the definition of "eligible institution," *see* NVSLIA §17(a)(3), "which require[d] an institution to have been in existence for 2 years," S. Rep. No. 89-758, at 7; *see also* H.R. Rep. No. 89-308, at 9.

That two-track system did not last long. In 1968, Congress repealed the NVSLIA and "merge[d]" it with the HEA. Pub. L. No. 90-575, 82 Stat. 1014, 1023 (1968). In the revised version of the HEA, Congress renamed as "institution[s] of higher education" the public and nonprofit schools that qualified as eligible institutions under the original HEA, while dubbing as "vocational school[s]" the schools that qualified as eligible institutions under the NVSLIA. *Id.* §116(a). Although the merger allowed for-profit schools that provided career and technical education to qualify for Title-IV programs, the revised HEA otherwise maintained the same eligibility features that existed pre-merger. Thus, the schools now known as "vocational schools" could qualify as eligible institutions under the HEA if (among other things) they provided programs "designed to fit individuals for useful employment"—*i.e.*, gainful or paid employment—"in recognized occupations," "admit[ted] as regular students only persons who have completed or left elementary or secondary school," and "ha[d] been in existence for two years." 20 U.S.C. §1085(c) (1970).

For almost 25 years, Congress left this statutory scheme largely untouched. *See, e.g.*, 20 U.S.C. §§1085(b)-(c) (1992). In 1992, however, Congress acted again. Specifically, in the Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (1992), Congress removed the term "vocational school" from the HEA and replaced it with two other terms: "proprietary institution of higher education" (covering for-profit schools focused on career and technical education) and "postsecondary vocational institution" (covering public and nonprofit schools focused on career and technical education). *Id.* §481; *see* 20 U.S.C. §§1088(b)-(c) (1994). While Congress tweaked the Title-IV eligibility requirements for these schools, it left much in place. For example, whereas "vocational schools" previously had to provide programs "designed to fit individuals for *useful* employment in recognized

occupations," the 1992 amendments stated that "proprietary institutions of higher education" and "postsecondary vocational institutions" had to "provide an eligible program of training to prepare students for *gainful* employment in a recognized occupation," with "eligible program" similarly defined as "a program of training to prepare students for *gainful* employment in a recognized profession." *Id.* §§1088(b)(1), (c)(1), (e)(1)(A)(i) (1994) (emphasis added). As the Department has previously explained, there is "not" a "substantive" difference between the "useful employment" phraseology and the "gainful employment" phraseology. Defs.' Cross-Mot. for Summ. J. 17, *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18. Furthermore, whereas "vocational schools" could "admit[] as regular students only persons who have completed or left elementary or secondary school," the 1992 amendments similarly allowed "proprietary institutions of higher education" and "postsecondary vocational schools" to "admit[] as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located," regardless of whether they actually graduated from high school (though proprietary institutions of higher education could admit high-school graduates too). 20 U.S.C. §§1088(b)-(c) (1994). And just as "vocational schools" had to "ha[ve] been in existence for at least 2 years," the 1992 amendments said the same thing about "proprietary institution[s] of higher education" and "postsecondary vocational schools," *see id.* §§1088(b)(5), (c)(3), thus ensuring that fly-by-night schools could not proliferate.

Today, "proprietary institutions of higher education" and "postsecondary vocational schools" can secure and maintain Title-IV eligibility by meeting these same basic requirements and certain other ones. *See* 20 U.S.C. §§1002(b)(1)-(2), (c)(1)-(2), 1088(b)(1)(A)(i). And in recognition of the fact that for-profit schools are capable of providing something other than career and technical training, Congress in 2008 (via the Higher Education Opportunity Act) provided an additional option by which a for-profit school could establish Title-IV eligibility: by "provid[ing] a program leading to a baccalaureate degree in liberal arts," so long as the school held accreditation since 2007 and provided the program since 2009. *Id.* §1002(b)(1)(A); *see* Pub. L. No. 110-315, 122 Stat. 3078, 3086 (2008).

### B.    Regulatory Background

As the statutory history reveals, for nearly 60 years, Congress has made clear that for-profit

schools are eligible for federal student aid, including Title-IV aid, if they offer programs of training to prepare students for gainful/useful employment in recognized occupations or professions. For nearly 50 of those years, it never occurred to the Department (or anyone else) that this statutory language did more than differentiate vocational training from more general, liberal-arts programs, or that the Department could use this language to render schools or programs ineligible to process federal student aid if their students did not, in fact, obtain employment after graduation (let alone if their alumni did not meet certain financial benchmarks several years after leaving school).

Instead, the Department long maintained that the "statutorily intended goal or result" of this language is simply "preparation for gainful employment in such an occupation"—"not that such a goal or result be potentially derived or incidentally available at the conclusion of the program." *In re Acad. For Jewish Educ.*, Dep't of Educ., 1994 WL 1026087, at *2-3 (Mar. 23, 1994); *see In re Bnai Arugath Habosem*, Dep't of Educ., 1994 WL 1026098, at *1 (June 16, 1994). As a result, even if students "subsequently … obtained jobs" in recognized occupations after their programs, it would not suffice: The Department would deny Title-IV eligibility if schools did "not" "design[]" those programs to prepare students for gainful employment in particular vocations. *In re Derech Ayson Rabbinical Seminary*, Dep't of Educ., 1995 WL 931579, at *5 (Jan. 12, 1995); *see also In re Beth Medrash Eeyun Hatalmud*, Dep't of Educ., 1999 WL 33954497, at *2 (Apr. 1, 1999); *In re Seminar L'moros Bais Yaakov*, Dep't of Educ., 1994 WL 1026093, at *1 (Mar. 21, 1994); *In re Sara Schenirer Teachers Seminary*, Dep't of Educ., 1994 WL 1026085, at *2 (Mar. 25, 1994). The Department maintained that view into the 2010s. *See* Dep't of Educ., *Strayer University—Final Program Review Determination* 5 (July 18, 2013), https://rb.gy/2vsztu.

That the Department focused on the nature of the in-school training provided to students, and affirmatively disclaimed the relevance of post-graduate financial outcomes, is unsurprising. A requirement that schools provide a program of training to prepare students for gainful employment in a recognized occupation would be an especially obtuse way of suggesting that schools must guarantee that their alumni satisfy specific post-graduate earnings and debt standards that the statute never actually specifies. And that is especially so given that the HEA's other mentions of "gainful employment" simply refer to paid employment, *see* 20 U.S.C. §1036(e)(1)(B)(ii) (allowing schools to give grant

money to certain students so long as they are not "engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"); *id.* §1134c(a) (similar); *id.* §1135c(d)(2) (similar); *id.* §1161g(d)(5)(B), and that the HEA repeatedly addresses matters of debt and earnings using different language specifically tailored to those subjects. For example, the HEA includes separate provisions (the cohort-default-rate provisions) providing that schools are "ineligib[le]" under Title IV if a certain percentage of their graduates have excessively "high default rates" on their student debt—*i.e.*, if they do not have sufficient earnings to cover their debt. *Id.* §§1085(a)(2)(A), (B)(iv), (m)(1). The HEA also includes other provisions establishing extended-repayment and income-driven-repayment programs reducing monthly and annual debt payments and ultimately allowing for complete loan forgiveness. *See id.* §1098e. And the HEA includes still other provisions requiring the Department to conduct a survey of federal financial-aid recipients that is supposed to "describe the … debt burden of such loan recipients, and their capacity to repay their education debts," as well as the "impact of such debt burden on the recipients' … post-graduation plans." 20 U.S.C. §1015a(k)(D).

Precisely because the Department long maintained this common-sense understanding of the HEA, schools organized their operations in reliance on it. The *Ogle* Plaintiffs are illustrative. Ogle opened its first school in Arlington, Texas in 1973 and has since expanded to nine campuses across the Dallas/Fort Worth, San Antonio, and Houston areas. *See Ogle.*Dkt.10.Ex.A at 1-2 (¶¶5-6). At each one, Ogle has designed its programs to prepare its students—who are 98% female (which is common at cosmetology schools) and largely identify as racial minorities (currently 72% are Black/African American or Hispanic)—for careers in the beauty industry by offering salon-modeled, student-centered training and development. *See id.* at 2-3 (¶¶7, 13). Likewise, after Tricoci opened its first school in Chicago in 2004, it expanded to 15 campuses across Illinois, Indiana, and Wisconsin. *See Ogle.*Dkt.10.Ex.B at 1-2 (¶¶5, 7). At each one, Tricoci has designed its programs so that its students— who have a similar demographic profile to those at Ogle—have the tools necessary for paid employment in professional salons. *See id.* at 2-3 (¶¶6, 13). Because the Department could not dispute that Ogle and Tricoci provided training programs to prepare students for gainful or paid employment in

recognized occupations[1] (and satisfied all other requirements), Ogle and Tricoci had no trouble secur-ing and maintaining Title-IV eligibility.  *See Ogle*.Dkt.10.Ex.A at 2 (¶10); *Ogle*.Dkt.10.Ex.B at 2 (¶10).

*The 2011 Rule:*  The Department radically departed from this decades-long understanding in 2011, when it promulgated a rule that suddenly deemed the HEA's "gainful employment" language "subject to many different views and interpretations."  76 Fed. Reg. 34,386, 34,393 (June 13, 2011) (2011 Rule).  Latching onto this alleged ambiguity, the Department declared that it would determine whether programs at for-profit schools and certificate programs at other schools could still qualify as Title-IV-eligible based on two tests that purported to measure the ability of program graduates "to repay their [student] loans."  *Id.* at 34,388, 34,393.  The first test, which examined debt-to-earnings ratios using a dataset that included only those earnings reported by taxpayers, assessed whether pro-gram graduates in their first few years after graduation had an "annual loan payment" at or below 12% of "annual earnings," or at or below 30% of "discretionary income" (defined as earnings above 150% of the federal poverty guideline).  *Id.* at 34,400, 34,450.  The second test assessed whether program graduates had a "loan repayment rate" of "at least" 35%.  *Id.*  The Department then said that, if programs failed both tests in three out of the four most recent fiscal years, they would lose Title-IV eligibility, while also having to warn students if they failed just once or twice.  *See id.* at 34,388.

How did the Department arrive at these numeric thresholds?  The Department plucked the 35% loan-repayment rate from the ether, and it selected the metric examining the ratio of debt to discretionary income "based on research conducted by economists Sandy Baum and Saul Schwartz," who issued a paper in 2006 titled "How Much Debt Is Too Much?  Defining Benchmarks for Man-ageable Student Debt."  75 Fed. Reg. at 43,616, 43,620 (July 26, 2010); *see* Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much?  Defining Benchmarks for Manageable Student Debt* (2006), https://rb.gy/zcsl1r (Baum & Schwartz) (reproduced at AR-F-000444).  Notably, the Baum & Schwartz paper never

---

[1] The *Ogle* Plaintiffs use the terms "cosmetology" and "cosmetologists" as shorthand for all beauty programs and professionals.  Employment in this sector is a "recognized occupation."  *See, e.g.*, 34 C.F.R. §600.2 (defining "Recognized occupation" to include "[a]n occupation … Identified by … an Occupational Information Network O*Net-SOC code"); O*Net OnLine, *See All Occupations*, https://rb.gy/14qgm0 (last visited Mar. 20, 2024) (listing "Hairdressers, Hairstylists, and Cosmetolo-gists" under O*Net-SOC Code 39-5012.00).

consulted the HEA or its gainful-employment language. Instead, after consulting sources like "[t]he European literature on overindebtedness" to determine the "various possible approaches to setting benchmarks for reasonable student debt levels," Baum & Schwartz settled on what they described as the "somewhat arbitrary" ceiling of 20% of discretionary income ("defined as income exceeding 150 percent of the poverty level for a single person") as the appropriate benchmark. Baum & Schwartz 4, 11-12. In doing so, Baum & Schwartz explained that the theretofore-most-common benchmark for assessing excessive debt—when non-mortgage-related debt exceeds 8% of annual earnings—has "no particular merit or justification" in the student-loan context and that its "shortcomings" are readily "apparent." *Id.* at 2-3. As they emphasized, the 8% threshold "arose from mortgage underwriting standards"—*i.e.*, the rule of thumb that mortgage debt should not exceed 28% of annual earnings and that total debt should not exceed 36% of annual earnings, leaving 8% for non-mortgage-related debt—and does not reflect "the experience of young people who have recently left school" and who typically lack mortgages. *Id.* After providing that background, the Department declared that it had chosen the debt thresholds of 30% of discretionary earnings and 12% of annual earnings—which are "50%" higher than those discussed by Baum & Schwartz—because it is purportedly "unambiguous" that "debt levels are excessive" at those levels. 75 Fed. Reg. at 43,620. And in response to the concern that debt-to-earnings measures based on reported income are misleading and inaccurate in cash- and tip-heavy sectors like cosmetology, the Department noted that any program that failed the debt-to-earnings test could submit "alternative earnings data." 76 Fed. Reg. at 34,421, 34,425, 34,428-29.

The 2011 Rule generated bipartisan criticism. *See, e.g.*, Nick Anderson, *Democrats Join GOP in Voting to Block Tighter Regulation of For-Profit Schools*, Wash. Post (Feb. 19, 2011), https://rb.gy/jrztyi. It also generated a legal challenge arguing, among other things, that the Department exceeded its statutory authority and had engaged in arbitrary-and-capricious conduct. *See Ass'n of Priv. Colls. & Univs. v. Duncan (APSCU I)*, No. 11-cv-1314 (D.D.C. filed July 20, 2011), Dkt.1. In defending its rule, the Department insisted that the HEA's gainful-employment language is "ambiguous" and asked the court to "defer[]" to its interpretation of it under *Chevron*, while further claiming that its rule passed muster in all other respects. Defs.' Reply in Supp. of Cross-Mot. for Summ. J. 4 & n.2, *APSCU I* (D.D.C.

filed Feb. 2, 2012), Dkt.20. The district court obliged and held that the Department's interpretation deserved *Chevron* deference. *See APSCU I*, 870 F.Supp.2d 133, 146 (D.D.C. 2012). But the court then held that, because the 35% loan-repayment-rate test "was not based upon any facts at all," it failed arbitrary-and-capricious review. *Id.* at 154. And because that test could not "be severed from the other debt measures"—including the debt-to-earnings measures—the court set aside the 2011 Rule in its entirety. *Id.*

***The 2014 Rule:*** Instead of appealing, the Department embarked on a new rulemaking process, which resulted in a new gainful-employment rule in 2014. *See* 79 Fed. Reg. 64,890 (Oct. 31, 2014) (2014 Rule). While the Department abandoned its loan-repayment-rate test, it doubled down on the proposition that the HEA's gainful-employment language meant that the Title-IV eligibility of school programs could hinge not on the nature and content of their instruction, but on their graduates' debt-to-earnings ratios. Again invoking "research conducted by economists Sandy Baum and Saul Schwartz" and "mortgage industry practices," the Department proclaimed that programs would fail its new rule—requiring schools to issue warnings to students before programs lost Title-IV eligibility—if graduates once again had a median annual loan payment above 30% of discretionary earnings and 12% of annual earnings, with the earnings figures still coming from earnings reported to the federal government by taxpayers. *See id.* at 64,919. But acknowledging the "underreporting" problem, the Department allowed schools whose programs failed the debt-to-earnings test to initiate an "alternate earnings appeal" in which the Department could consider state earnings data (if they existed) or earnings data that the school collected through a graduate survey (if feasible). *Id.* at 64,955, 65,010.

The 2014 Rule prompted three legal challenges. In two, the courts agreed with the Department that it should resolve the statutory question in the agency's favor under *Chevron* and then rejected other challenges. *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan* (*APSCU II*), 110 F.Supp.3d 176, 184-204 (D.D.C. 2015), *aff'd*, 640 F.App'x 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colls. v. Duncan*, 107 F.Supp.3d 332, 344-69 (S.D.N.Y. 2015). But the Department had less success in the third lawsuit, which focused on the distinct problems that the 2014 Rule posed for cosmetology schools. That suit, brought by the American Association of Cosmetology Schools (AACS), challenged both the Department's decision

to rely on federal earnings data and the Department's stringent alternate-earnings-appeal process.[2] *See AACS v. DeVos*, No. 17-cv-263 (D.D.C. filed Feb. 10, 2017). The district court ultimately agreed that the Department's "wooden use" of federal earnings data "is problematic," as the Department "openly acknowledged that underreporting is an issue" in the cosmetology sector. *AACS v. DeVos*, 258 F.Supp.3d 50, 63, 73 (D.D.C. 2017). And the court determined that the Department's alternate-earnings-appeal process did not mitigate the problem, as the Department had "unjustifiably made appeals difficult to mount." *Id.* at 61, 64. Given these concerns, the court determined that cosmetology schools "need not secure any specific amount of survey responses or state-sponsored data to raise an appeal." *Id.* at 76-77. The Department did not appeal and never fully implemented the 2014 Rule.

**The 2019 Rule:** By 2018, the Department announced its intent to rescind the 2014 Rule, *see* 83 Fed. Reg. 40,167 (Aug. 14, 2018), and followed through in 2019, *see* 84 Fed. Reg. 31,392 (July 1, 2019) (2019 Rule). In doing so, the Department "recognize[d]" that it had "incorrectly described congressional intent" in the HEA and "engaged in regulatory overreach." *Id.* at 31,402. For decades, the Department observed, "the term 'gainful employment' has been widely understood to … differentiate[] between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities," as Congress "reaffirmed" in the Higher Education Opportunity Act of 2008, which allowed certain for-profit schools to secure Title-IV eligibility by "offer[ing] baccalaureate degrees in liberal arts" instead of career-focused programs. *Id.* at 31,401. The Department emphasized that, "[d]espite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-earnings ratios." *Id.* at 31,401-02.

The Department also stressed that "Congress has elected to address concerns about unmanageable student loan debt" in other deliberate ways. *Id.* at 31,401. The Department noted, for example, that Congress has "provid[ed] numerous extended repayment and income-driven repayment programs that reduce monthly and annual payments and provide loan forgiveness" after specified periods.

---

[2] AACS is also moving for summary judgment in this case, and the *Ogle* Plaintiffs adopt all arguments consistent with this brief by reference.

*Id.* The Department further highlighted that Congress required the Department to "restrict[] title IV eligibility to those institutions, including proprietary institutions, that pass the [cohort-default-rate] test," which measures the percentage of graduates who default on loans. *Id.* at 31,403. And the Department found it odd to interpret gainful-employment language that applies only to a subset of schools as a covert congressional effort to ensure that borrowers can repay their loans: "Congress intends for all Federal student loan borrowers to repay their loans, not just those who borrow to attend 'vocational training' programs." *Id.* at 31,401. In light of these and other defects, the Department explained that it would return to "enforc[ing] the law … in the same way it enforced it between 1968 and 2011": by "disallow[ing] proprietary institutions, other than those exempted by the above-mentioned provision of the [Higher Education Opportunity Act of 2008], to offer general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation." *Id.*

Apart from finding the 2014 Rule *ultra vires*, the Department found the Rule's debt-to-earnings tests "fundamentally flawed." *Id.* at 31,438. The Department observed that the 8% ratio assessing debt-to-annual-earnings "is not appropriate to use in determining a program's continuing eligibility in title IV programs," as it is "a mortgage standard and one that 'has no particular merit or justification' for use in establishing student borrowing limits"—as Baum & Schwartz themselves observed. *Id.* at 31,407; *see id.* at 31,426. Turning to the 20% ratio assessing debt-to-discretionary-earnings, the Department explained that it had "failed to provide a sufficient, objective, and reliable basis" for it. *Id.* at 31,407. The Department deemed that metric irrational given that the Department's own income-based repayment plans established a 10% threshold "as the debt-to-discretionary income threshold … to determine a borrower's monthly payment obligation"—*i.e.*, a 20% threshold is "obsolete since no borrower would ever be required to pay more than 10 percent of their discretionary income." *Id.*

The Department added that it "does not believe that it should sanction institutions" because of incorrect federal earnings data or "for aspects of student debt and earning outcomes that are outside of the institution's control." *Id.* at 31,409. For instance, the Department noted that, in "heavily tip-influenced professions, such as cosmetology," not all income is reported to the government—which is "not the fault of institutions"—and that underreporting "renders the earnings portion of

the D/E calculation subject to significant errors." *Id.* at 31,409-10. Moreover, the Department recognized that individuals leave the workforce or work part-time for varied and valid reasons—*e.g.*, "to care for children [or] other family members"—and said that "[p]enalizing programs" because students choose those options is "absurd." *Id.* at 31,410, 31,413. The Department observed that, "because the GE regulations do not calculate D/E rates until years after a student is admitted," those regulations effectively compelled schools "to predict macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future in order to establish a price that will guarantee passing D/E rates"—"a nearly impossible task." *Id.* at 31,417.

The Department further lamented that "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups." *Id.* at 31,414. Relatedly, the Department noted that, because many affected "programs serve high proportions of women and minorities," a regime that "would eliminate these programs could reduce postsecondary opportunities, thereby contributing to the earnings and opportunity gap." *Id.* In particular, the Department acknowledged that cosmetology programs suffered under its prior regime: "[C]osmetology … programs were disproportionately represented among the programs that failed the D/E rates measure," but these are "'bright outlook' occupations," so "GE-related program closures could reduce availability of … programs needed to fill high-demand occupations." *Id.* at 31,400 (footnote omitted). For these reasons, the Department "determined that the 2014 Rule is fundamentally flawed and … should not serve as the basis for high stakes sanctions that negatively impact institutions and students." *Id.* at 31,426.

## C.   The Challenged 2023 Rule

Last year, the Department reviewed this prior history and reached the stunning conclusion that the time had come to promulgate "the strongest-ever Gainful Employment (GE) rule." Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 17, 2023), https://rb.gy/uyl2xk. In May 2023, the Department thus issued a proposed rule spanning over 200 pages of the Federal Register, *see* 88 Fed. Reg. 32,300 (May 19, 2023), and gave interested parties just 30 days to comment—the shortest possible period, *see* 5 U.S.C. §553(d). A host of commenters, including the *Ogle* Plaintiffs, moved quickly to

14

explain that the proposed rule was both *ultra vires* and arbitrary and capricious, while warning of its devastating impact on for-profit schools generally and cosmetology schools in particular. Undeterred, the Department promulgated the final rule in October 2023 with virtually no changes. *See* 88 Fed. Reg. 70,004 (Oct. 10, 2023).

The 2023 Rule's centerpiece is "an accountability and eligibility framework for gainful employment programs" that "reinstates" certain features of the 2014 Rule—*i.e.*, features that the Department itself had rejected as unlawful and irrational in the 2019 Rule—while introducing a completely unprecedented feature. *Id.* at 70,005. The 2023 Rule thus has two distinct tests. The first marks the Department's third attempt to determine whether the HEA's gainful-employment language is satisfied utilizing complex debt-to-earnings ratios: "[B]ased on research conducted by economists Sandy Baum and Saul Schwartz" and "mortgage-underwriting standards," the Department's first test assesses whether the share of annual earnings that the median graduate in a two- or four-year cohort period needs to devote to paying down her debt (which the Department amortizes over a 10-year period for the types of certificate programs offered by cosmetology schools) is less than or equal to 8%, or less than or equal to 20% of discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline). *See id.* at 70,020, 70,124. The second test is entirely novel: Dubbed the "earnings premium," it purports to examine whether at least half of all program graduates (including those who have voluntarily opted out of the labor force in the years after graduation) have higher earnings than the median income for in-state high-school graduates aged 25-34 who never enrolled in postsecondary education (excluding those who have opted out of the labor force).[3] *See id.* at 70,124-25.

---

[3] The earnings-premium test seeks to compare program graduates to high-school graduates who never enrolled in post-secondary education "[n]ationally" if "fewer than 50 percent of the students in the program are from the State where the institution is located, or if the institution is a foreign institution." 88 Fed. Reg. at 70,186. But it is doubtful whether the Department can accurately measure the earnings of *either* the targeted group of in-state high-school graduates *or* the targeted group of national high-school graduates. That is because the Department obtains earnings information about high-school graduates from the Census Bureau's American Community Survey, *see id.* at 70,022, which allows respondents to identify as having only a high school degree even if they *have* enrolled in postsecondary education—indeed, even if they have obtained a credential like a cosmetology certificate, *see* U.S. Census Bureau, *American Community Survey* 12 (2024), https://rb.gy/0jxt5c (Question 11). So,

The tests are not based on prospective data and do not otherwise allow schools a transition period to come into compliance.  Instead, in most circumstances, the Department will conduct these tests three years after the students have graduated, and "[t]he first official rates … will, for most programs, be based on students who completed a program in award years 2018 and 2019, measuring their earnings outcomes in 2021 and 2022."  *Id.* at 70,037, 70,099.  The Department expects to release its first test results in early 2025.  *See id.* at 70,160.  But because the Department lacks the requisite information to conduct its tests, the 2023 Rule requires schools to comply with an onerous information-gathering and reporting requirement, which will cost schools hundreds of millions of dollars and millions of hours of manpower.  *See id.* at 70,191, 70,153-54.  Although initial eligibility determinations were based on years profoundly influenced by the pandemic, the 2023 Rule refuses to account for "the COVID-19 pandemic" and other exogenous factors that may depress earnings, such as economic "recessions" or voluntary decisions by graduates to "choos[e] not to work full time" or opt out of the labor force—even though the Department acknowledged that the pandemic likely impacted earnings in "the beauty industry," *id.* at 70,092, and that graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job," *id.* at 70,035, 70,045, 70,099.

Failing the 2023 Rule's tests can result in dire consequences.  If a program fails either the debt-to-earnings or earnings-premium tests just once, the school must issue a warning to all students enrolled or interested in a program alerting them that the program may lose its Title-IV eligibility the following year.  *See id.* at 70,052, 70,084, 70,193.  Such warnings, the Department anticipates, may prompt students "to transfer to another program or choose not to enroll in such a program."  *Id.* at 70,078.  Furthermore, the Department has recently alerted some schools via email that, if they have failing programs under the first round of GE metrics (released in early 2025), they may have to post "letters of credit" within 45 days of email notification from the Department.[4]  *See also* Dep't of Educ.,

---

the supposed pool of high-school graduates who never enrolled in post-secondary education that the Department would like to assess likely includes high-school graduates who *have* attended or completed a technical or vocational post-secondary certificate or degree program.

[4] Accordingly, the *Ogle* Plaintiffs respectfully request a decision as soon as practicable after the close of briefing on January 31, 2025.

*Electronic Announcement ID: General-24-74* (June 20, 2024), https://rb.gy/nwwgs3 (providing some background of this requirement). Then, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title-IV programs entirely. *See* 88 Fed. Reg. at 70,052, 70,084.

In promulgating the 2023 Rule, presumably as a hedge against the anticipated demise of *Chevron*, the Department purported to discover clarity in the HEA's text after previously emphasizing its ambiguity. On its theory, the debt-to-earnings and earnings-premium tests are "consistent with the ordinary meaning of the operative words in the statute," and "all indications of Congress's intent" confirm that "a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt"—as defined by mortgage underwriters and a 2006 academic paper heedless of the HEA—or "if they earn no more than comparable high school graduates." *Id.* at 70,012. The Department "recognize[d]" that these purported clues escaped its attention for decades, but the agency deemed it irrelevant that it had "initially refrained from issuing regulations" comparable to the 2023 Rule between 1965 and 2011. *Id.* at 70,014.

Notwithstanding the Department's confidence that the 2023 Rule is consistent with "all indications of Congress's intent," *id.* at 70,007, 70,012, the Department acknowledged that it could not actually apply its understanding of the statute to the majority of schools covered by the gainful-employment language. For instance, because "[t]he Department must have student outcomes data to measure program performance, which can only come after a period of time," "new programs" could qualify as Title-IV-eligible—meaning that the Department would have to certify that those programs are preparing students for gainful employment in a recognized occupation—even though the Department could not apply the tests that purportedly capture Congress' intent vis-à-vis that language. *Id.* at 70,018. In addition to exempting newer schools, the Department also stated that, because it lacked "confiden[ce]" in the data for U.S. Territories and the Freely Associated States (the Marshall Islands, Micronesia, and Palau), it had no choice but to "exempt" every school in those locations from the 2023 Rule. *Id.* at 70,027-28. And "to protect the privacy of individuals who complete smaller programs," the Department concluded that it could not legitimately apply its tests to programs with fewer than 30 graduates in a four-year cohort period. *Id.* at 70,046. That 30-graduate "n-size" threshold,

the Department admitted, meant that approximately three-fourths (74%) of all gainful-employment programs are not covered by its rule. *Id.* at 70,127, 70,046.

The Department further recognized that the 2023 Rule has imperfections even for those programs that remain subject to it—especially for cosmetology programs. For example, when applying the debt-to-earnings and earnings-premium tests, the Department announced that it would use a dataset that includes only those earnings reported by taxpayers to the federal government, and it expressed a "preference for … IRS data," *id.* at 70,045, even though it acknowledged that this data contained "statistical noise" for privacy reasons, which creates a "risk of inaccurate determinations," *id.* at 70,095. The Department also recognized that, beyond this statistical noise, cosmetology professionals' reported earnings often do not reflect actual earnings. The Department emphasized one recent study (which examined only the underreporting of tips) that indicated that federal earnings data are off-the-mark by 8-10% (while acknowledging but downplaying other studies placing the figure as high as 60%). *See id.* at 70,042 & n.139. Despite that problem, the Department declared that it would exclusively rely on federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting." *Id.* at 70,042, 70,090.

The 2023 Rule is almost certain to devastate cosmetology schools. According to the Department's own dataset, of the 1,270 cosmetology programs currently eligible for Title-IV funding, *only 13* would satisfy the 2023 Rule.[5] The majority of current programs—639 programs enrolling 80% of students attending such programs, *compare* 88 Fed. Reg. at 70,140 (Table 4.18), *with id.* at 70,138 (Table 4.16)—would fail. Of those 639 programs, 507 would fail based on the earnings-premium test alone, while the remaining 132 would fail both the earnings-premium and the debt-to-earnings tests. The remaining programs would duck the rule entirely because they are too new or too small for the Department to assess (or located in the Territories or Freely Associated States).

The programs offered by the *Ogle* Plaintiffs, however, are among the hundreds of programs identified in the Department's dataset as failing programs. *See Ogle*.Dkt.10.Ex.A at 4-5 (¶22);

---

[5] The dataset is reproduced at AR-M-000001. *See also Ogle*.Dkt.10 at 19 n.6.

*Ogle*.Dkt.10.Ex.B at 4-5 (¶22).  Thus, as long as the 2023 Rule remains standing, the programs offered by the *Ogle* Plaintiffs are almost certain to lose access to the Title-IV aid on which over 90% of their students rely, even though the vast majority of graduates from those programs are sufficiently well-prepared to pass state licensure exams and secure placement in their fields of study.  *See Ogle*.Dkt.10.Ex.A at 3 (¶15), 5 (¶24); *Ogle*.Dkt.10.Ex.B at 3 (¶15), 5 (¶24).  And the *Ogle* Plaintiffs will also have to continue devoting substantial effort and money to compile and supply the Department with the very information that the agency will use to smother them.  *See Ogle*.Dkt.10.Ex.A at 5-8 (¶¶25-36); *Ogle*.Dkt.10.Ex.B at 5-8 (¶¶25-37).

    **D.**    **Procedural History**

Given these devastating consequences and the onerous reporting requirements, the *Ogle* Plaintiffs challenged the 2023 Rule as *ultra vires* as well as arbitrary and capricious and sought a preliminary injunction.  *See Ogle*.Dkt.1, 4, 10.  "At th[at]" early "stage," the Court declined preliminary relief.  *Ogle*.Dkt.31 at 7, 11.  In the Court's view, "one of the more 'natural interpretations' of 'gainful employment' encompasses profitability and, by extension, advantageous financial outcomes," so the 2023 Rule "is not so clearly beyond the bounds of the agency's authority that the extraordinary remedy of injunctive relief is in order."  *Id.* at 7.  The Court "d[id] not consider," let alone exhaust, the tools of statutory construction in reaching that preliminary conclusion, nor did it hold that the Department's interpretation of the statute is the best one.  *Id.*  Furthermore, while the Court did not specifically address each of the *Ogle* Plaintiffs' arbitrary-and-capricious arguments, it applied a demanding standard, stating that they "have not shown that they are *substantially* likely to succeed on their arbitrary and capricious claim to warrant the extreme relief of a preliminary injunction."  *Id.* at 11.  Recognizing that it had applied an extremely high preliminary-injunction standard, the Court emphasized that the *Ogle* Plaintiffs "may ultimately succeed" at summary judgment, *id.*, and subsequently consolidated their suit for summary-judgment purposes with another suit brought by AACS, *see Ogle*.Dkt.33.

## SUMMARY OF ARGUMENT

"The [2023] Rule fails under the Administrative Procedure Act twice over," as it is "contrary to the [HEA's] clear statutory text" and "arbitrary and capricious."  *Rest. L. Ctr. v. DOL*, 2024 WL

3911308, at *1 (5th Cir. Aug. 23, 2024).  The Court should grant summary judgment to the *Ogle* Plain-tiffs and vacate that rule.

The 2023 Rule is *ultra vires*.  Since this Court issued its preliminary-injunction decision, the Supreme Court has given federal courts clear direction in cases like this one:  use all tools of statutory construction to determine the best interpretation of a statute and reject contrary interpretations—even "reasonable" or permissible ones—proffered by administrative agencies.  Those tools confirm that the Department's interpretation of the HEA's gainful-employment language is not remotely close to the best one, and therefore is wrong.  Ordinary meaning confirms that the plain text itself—which requires for-profit schools seeking Title-IV eligibility to "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," 20 U.S.C. §1002(b)(1)(A)(i); *id.* §1088(b)(1)(A)(i)—simply requires those schools to provide instruction that provides current enrol-lees the skills needed for a paying job in an acknowledged vocation field, without regard to whether graduates ultimately seek a paying job or economic conditions permit them to find one.  In other words, that gainful-employment language focuses on the training provided to current enrollees (which, not incidentally, is subject to the school's control) and has nothing whatsoever to do with debt-to-earnings ratios or income relative to an age-restricted pool of in-state high-school graduates (which, not incidentally, turns on graduates' life choices and micro- and macro-economic conditions wholly outside the school's control).  Confirming the point, the HEA contains numerous other provisions proving that Congress knew how to address matters of graduates' debt and earnings when it wanted to do so.  The HEA also contains other provisions employing identical "gainful employment" lan-guage, and none indicates that the phrase has anything to do with debt and earnings or means anything other than a paying job.  And decades of history and established practice are likewise consistent with that common-sense understanding.  The Department's effort to contradict that long-settled under-standing with a novel interpretation that defies prior practice and industry practice is precisely the kind of interpretation that *Loper Bright* warns against and cannot carry the day in a post-*Chevron* world.

The 2023 Rule is also arbitrary and capricious on multiple fronts.  With respect to cosmetology programs, the 2023 Rule utilizes earnings data that the Department and its handpicked sources

consider inaccurate. The 2023 Rule penalizes schools for factors that they cannot control—such as a graduate's voluntary decision to exit the labor force to care for children several years after leaving school. The 2023 Rule embraces a debt-to-earnings test that hinges on percentage thresholds that the Department itself has previously rejected as inappropriate. Those untoward effects have a disproportionate impact on programs with a high proportion of women enrollees, given that women are demonstrably more likely to leave the workforce or opt for part-time employment for family-related reasons and also face continuing discrimination in wages. Not coincidentally, the 2023 Rule threatens to shutter nearly all Title-IV-eligible cosmetology programs for which the Department has sufficient data to apply its rule, precisely because those programs serve primarily female and minority individuals who find the flexible and skilled nature of employment in the cosmetology industry particularly attractive. The Supreme Court's decision in *Ohio* makes clear that the Department's actions cannot overcome the arbitrary-and-capricious standard. This Court thus cannot allow the 2023 Rule to remain in effect. Indeed, as long as the rule stays standing, it will present an existential threat to the *Ogle* Plaintiffs' operations and those of scores of other cosmetology schools nationwide—all of which will only negatively impact students. That result has nothing to recommend it.

## LEGAL STANDARD

"Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record." *Texas v. Cardona*, 2024 WL 3658767, at *27 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.). The APA states that "the reviewing court shall decide all relevant questions of law, interpret … statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. §706. The APA also provides that "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* §706(2)(A), (C). Thus, when the challenged action exceeds the agency's statutory remit or is arbitrary or capricious, "vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859-60 (5th Cir. 2022).

## ARGUMENT

### I.    The 2023 Rule Is *Ultra Vires*.

As the Supreme Court held in *Loper Bright*, "[i]n the business of statutory interpretation," the inquiry for courts now involves just one step: find the "best reading" of the statute and apply it.  144 S.Ct. at 2266.  If an interpretation "is not the best, it is not permissible."  *Id.*  And to determine the best reading, courts must apply "all relevant interpretive tools."  *Id.*  Here, those interpretive tools— "statutory text, context, structure, and history," *Texas v. EPA*, 983 F.3d 826, 836 (5th Cir. 2020)— confirm that the 2023 Rule does not reflect the best interpretation of the HEA.  The best reading of "gainful" has nothing to do with debt ratios or income relative to a subset of high-school graduates, and *Loper Bright* forecloses any claim of an implied delegation to import those concepts into the term.  The upshot is that "the Court must 'hold unlawful' and 'set aside' the [Department's] Rule as required under §706(2)" of the APA.  *Ryan LLC v. FTC*, 2024 WL 3879954, at *14 (N.D. Tex. Aug. 20, 2024).

1.    "The appropriate starting point when interpreting any statute is its plain meaning." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024).  The relevant statutory language here is found in Title IV of the HEA, which states that "institutions of higher education" must "qualify[]" in order to "participat[e] in programs under this subchapter"—*i.e.*, Title IV.  20 U.S.C. §1099c(a).  The HEA then explains that, "for purposes of student assistance programs" described in Title IV, the term "institution of higher education" includes a "proprietary institution of higher education," which is in turn defined in pertinent part as one that "provides an eligible program of training to prepare students for gainful employment in a recognized occupation."  *Id.* §§1002(a), (b)(1)(A)(i).  And the HEA then defines "eligible program" using materially identical language:  "a program of training to prepare students for gainful employment in a recognized profession."  *Id.* §1088(b)(1)(A)(i).

The Department recognizes that "the HEA does not more specifically define" what it means to provide a program of training to prepare students for gainful employment in a recognized occupation or profession.  88 Fed. Reg. at 70,008.  Thus, "the ordinary meaning of the words control." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023).  And to determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries."  *Horn v. State*

*Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). This Court has already acknowledged the propriety of this approach in this very case. *See Ogle.*Dkt.31 at 7.

Dictionaries point the way forward here. The term "program" means a "plan of action to accomplish a specified end."[6] The term "training" means "[s]ustained instruction and practice (given or received) in an art, profession, occupation, or procedure, with a view to proficiency in it."[7] The term "prepare" means to "get ready."[8] The term "student" means "a person formally engaged in learning, esp. one enrolled in a school or college."[9] The term "gainful employment" means "work that a person can pursue and perform for money."[10] The term "recognized" means "[a]cknowledged; accepted; known; identified."[11] And the terms "occupation" and "profession" mean a "vocation."[12] The ordinary meaning of the statutory language thus is quite clear: As one of the conditions to qualify as Title-IV-eligible, for-profit schools must provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field—*i.e.*, unlike other schools, for-profit schools typically cannot qualify as Title-IV eligible by providing general liberal-arts or humanities instruction. The focus of all those terms is on the program and what it prepares students for; none of those terms makes the school the guarantor of job openings, future earnings, or macroeconomic conditions.

---

[6] The Random House Dictionary of the English Language 1546 (2d ed. unabridged, 1987) (Random House); *see also* Oxford English Dictionary (online ed.) (OED) (defining program as "a planned series of activities or events"); Webster's New International Dictionary 1977 (2d ed. unabridged, 1954) (Webster's New International) (defining "program" as "a syllabus").

[7] OED; *see also* Webster's New International 2687 (defining "training" as "education; discipline"); The American Heritage Dictionary of the English Language 1361 (1969) (American Heritage) (defining "train" as "to make proficient with specialized instruction and practice").

[8] Random House 1527; *see also* American Heritage 1053 (defining prepare as "to make ready").

[9] Random House 1888; *see also* American Heritage 1279 (defining student as "[o]ne who attends a school").

[10] *Black's Law Dictionary*, Gainful Employment *in* Employment (11th ed. 2019); *see also* OED (defining "gainful" as "leading to pecuniary gain; lucrative; remunerative"; defining "pecuniary" as "[c]onsisting of money"; defining "lucrative" as "profitable"; defining "remunerative" as "bring[ing] financial remuneration; profitable"; defining "remuneration" as "money paid for work or a service; payment; pay"); *Black's Law Dictionary* 610, 855 (5th ed. 1979) (defining "gainful employment" as "any calling, occupation, profession or work which one may profitably pursue"; explaining that "profitable" means "lucrative" or "bearing or yielding a revenue or salary").

[11] OED; *see also* Webster's New International 2079 (defining "recognize" as "to acknowledge formally").

[12] Webster's New International 1684; *see* Random House 1339 (same); *see also* OED (profession).

That ordinary meaning deals a fatal blow to the 2023 Rule. That is because the rule is premised on the Department's view that the gainful-employment language means something much different: that it empowers the Department not just to evaluate whether the program includes a course of training designed to prepare students for gainful employment, but to evaluate future results and sanction programs at for-profit schools, including by prohibiting them from participating in Title IV altogether, if (1) the median program graduate devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt or (2) the median program graduate (regardless of whether she has voluntarily exited the labor force) earns less than the median in-state high-school graduate aged 25-34 who never enrolled in postsecondary education (but only if that high-school graduate is in the labor force). Because the "best" interpretation of gainful employment has nothing to do with debt ratios or median income, *Loper Bright*, 144 S.Ct. at 2266—which presumably explains why the Department never embraced it until recently—the Department's novel effort to import foreign concepts into the statutory text must fail. Indeed, most of what the rule addresses is covered more directly (and less onerously) by different statutory provisions, *see* pp.28-31, *infra*, and has nothing to do with the bedrock requirement that the program provide vocational training rather than a liberal-arts degree.

None of the textual arguments that the Department has provided to date compels a contrary conclusion. Departing from its prior (if brief) view that the gainful-employment language is "ambiguous," *see* pp.9-12, *supra*, the Department now asserts that its interpretation is "consistent with the ordinary meaning of the operative words in the statute," 88 Fed. Reg. at 70,012, because "dictionary definitions of 'gainful' as 'profitable' or 'lucrative' can imply 'an excess of returns over expenses,'" *Ogle*.Dkt.25 at 18. This Court, too, appeared receptive to this theory when concluding that "one of the more 'natural interpretations' of 'gainful employment' encompasses profitability and, by extension, advantageous financial outcomes." *Ogle*.Dkt.31 at 7. But even assuming this is a plausible interpretation or one of several possible ones, it is far from the best, which is all that matters after *Loper Bright*.

First, the Department has never articulated how this gainful-to-lucrative-to-excess-of-returns-over-expenses view of "gainful employment" explains the earnings-premium test, which has nothing

to do with returns-vs.-expenses and instead demands a comparison of the earnings of recent program completers to the earnings of in-state high-school graduates who potentially have upwards of 16 years of post-high-school work experience. That oversight is no trivial matter: The earnings-premium metric *alone* is anticipated to fail the vast majority of cosmetology programs for which the Department has sufficient data to apply the 2023 Rule. *See* p.18, *supra*. The Department's inability to present any textual defense of the earnings-premium test thus is proof-positive that it is textually indefensible.

But this theory fares little better in the debt-to-earnings test, which does not compare program cost to average wages of program completers and stretches the ordinary meaning of "profitable" and "lucrative" past their breaking points. After all, dictionaries reveal that "profitable" and "lucrative," just like "gainful," simply mean an activity "bearing or yielding a revenue or salary," *Black's Law Dictionary* 807, 1098 (4th ed. rev. 1968)—*i.e.*, a vocation as opposed to an avocation—without suggesting how profitable or lucrative an activity must be. *Cf. Ogle*.Dkt.31 at 7 n.12 (citing this definition/dictionary). That is why the phrase "gainful employment" (traced all the way back to the 17th century) is defined as "work that a person can pursue and perform for money." *Black's Law Dictionary*, Gainful Employment *in* Employment (11th ed. 2019). The definition thus is well-designed to distinguish activity that pays something from activity pursued voluntarily or for its own sake, but whether the money earned is a lot or a little or exceeds certain expenses is simply not part of the definition. Dallas Cowboys players, from Dak Prescott on down, are gainfully employed as football players, and players in a pick-up game are not. The Cowboys remain gainfully employed no matter how much of their salaries are devoted to mortgage payments or other debt. And a hair stylist with a paying job in a salon is still gainfully employed as a hair stylist no matter whether she devotes 19% of her discretionary income to student-loan payments or 21%. *See, e.g.*, *Collins Dictionary*, Gainful Employment, https://rb.gy/cpj3lm (defining "gainful employment" as "an occupation that pays an income"); *Cambridge Dictionary*, Gainful, https://rb.gy/c5dw2b (defining "gainful" as "providing money or something else that is useful").

The Department has protested that this centuries-old understanding of "gainful employment"—a paying vocation—violates the "canon against surplusage," since "employment" purportedly already encompasses payment. *Ogle*.Dkt.25 at 19. But that argument again reflects a poor

understanding of the English language, as it is well-recognized that "employment" can simply mean "an activity or the like that occupies a person's time," even if unpaid—*e.g.*, "[s]he found knitting a comforting employment for her idle hours."  Random House 638.  The modifier "gainful" thus does important work, as it clarifies that the relevant type of "employment" here is paid employment.  Indeed, Congress has recognized as much by adding specific provisions to bring certain unpaid occupations—*e.g.*, "volunteer firemen"—within the ambit of "gainful employment."[13]  Pub. L. No. 92-318, §202(b), 86 Stat. 235 (1972); *cf. Rest. L. Ctr.*, 2024 WL 3911308, at *8 (rejecting surplusage argument).

In implicit recognition that "gainful" merely distinguishes paid work from volunteer work, the Department has asserted that the phrase "'gainful employment in a recognized occupation,' taken as a whole, suggests a 'decently paying' job" (which coincidentally would exactly satisfy the Department's novel metrics).  *Ogle*.Dkt.25 at 18.  But the addition of the term "recognized occupation" does nothing to import debt ratios or median income or otherwise boost the Department's position.  In reality, a "recognized occupation" is just a vocation that is generally acknowledged as such.  *See* p.23, *supra*.  Consistent with that view, outside the context of the 2023 Rule, the Department agrees that jobs like "dishwasher" and "fast food cook" are "recognized occupations," *see* U.S. Bureau of Labor Statistics, *2018 SOC Definitions* 94, 96 (Nov. 2017), https://rb.gy/2zfef1; 34 C.F.R. §600.2, even though such workers typically earn *less* than what the Department considers "decent" pay, *compare* U.S. Bureau of Labor Statistics, *May 2019 National Occupation Employment and Wage Estimates* (last modified Mar. 31, 2020), https://rb.gy/g9sn4r, *with* 88 Fed. Reg. at 70,125 (Table 4.1).  As that general practice illustrates, nebulous conceptions of "decent pay" are not baked into the ordinary meaning—let alone the "best" reading—of either "gainful employment" or "recognized occupation."

Undeterred, the Department has insisted that the "proper interpret[ation]" of all the operative

---

[13] The amendment was necessary not because volunteer fireman did not earn *enough* as compared to some expense or benchmark, but because their employment paid them nothing—*i.e.*, they were volunteers.  *See* S. Rep. No. 92-346, at 75 (1971) ("Since these firemen serve on a volunteer basis, without compensation, they are not gainfully employed as firemen and therefore their training cannot be considered fundable vocational education.  Section 203(b) amends the definition of vocational education to include training for volunteer firemen explicitly.").

text—"provide[] a program of training to prepare students for gainful employment in a recognized profession"—"requir[es] such programs to 'actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation,'" by which the Department means jobs that allow "graduates" to clear certain "financial[]" benchmarks. *Ogle*.Dkt.25 at 18. But zooming out in this manner only undermines the Department's position, as words like "program," "training," and "prepare" all underscore that the focus is on the program and what it prepares students for—factors within the school's control—and not on future results dictated by graduates' life decisions and economic factors—all of which lie beyond the school's control.

The problems with the Department's textual argument run deeper. If the gainful-employment language really meant that for-profit schools could lose Title-IV eligibility based on debt-to-earnings and earnings-premium metrics for alumni years down the line, schools would have to accomplish the "nearly impossible task" of "predict[ing] macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future"—as the Department understood in 2019. 84 Fed. Reg. at 31,417. Indeed, even in the 2023 Rule, the Department recognized that a host of factors impact employment and earnings, including that (1) graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job"; (2) others "choos[e] not to work full-time" and instead work "part-time"; (3) "systemic discrimination" against "some groups" "may affect their earnings after graduation"; and (4) unpredictable events like "recessions" and "pandemic[s]" can depress earnings too. 88 Fed. Reg. at 70,035, 70,031, 70,045, 70,099. Confronted with its words, the Department has quibbled that schools would not have to "guarantee the financial success of *every* … graduate," just the median one. *Ogle*.Dkt.25 at 21 (emphasis added). But ensuring that the median graduate clears specific financial hurdles years after leaving school is no less daunting (and is precisely the issue that the Department addressed in 2019), especially for cosmetology schools that provide training for students disproportionately likely both to face systematic pay discrimination and to opt out of the workforce for family reasons. And if Congress intended Title-IV eligibility to entail such nearly impossible undertakings, "one would reasonably expect Congress to say so" more explicitly: "Congress does not 'hide elephants in mouseholes,'" "particularly" when the

elephants are addressed expressly in other parts of the statutory scheme and the "consequences … 'are undeniably significant,'" *Chamber of Com. of US v. DOL*, 885 F.3d 360, 376 (2018)—and the Department agrees that losing Title-IV aid is "undeniably serious," 88 Fed. Reg. at 70,083.

The Department's interpretation of the operative statutory text runs into yet more problems. For example, the Department has acknowledged that the gainful-employment language is a universal "eligibility requirement[]" that all for-profit schools "must" satisfy to process Title-IV aid. *Ogle*.Dkt.25 at 6, 18. And the Department believes that the "ordinary meaning" of this language requires an assessment of earnings and debt three years after students graduate. 88 Fed. Reg. at 70,012, 70,018. But as the Department recognizes, Congress made clear that for-profit schools offering gainful-employment programs can secure Title-IV eligibility if they have existed for only two years, when such "performance results" are "not yet available." *Id.* at 70,018; *see* 20 U.S.C. §§1002(b)(1)(E), (c)(1)(C). The Department thus "invites us to tie ourselves" into "logical knots"—insisting that its interpretation gives effect to language that applies universally to all for-profit schools, while simultaneously conceding that its interpretation cannot apply universally to all for-profit schools—which "further confirms that its interpretation is not the best reading" of the text. *Rest. L. Ctr.*, 2024 WL 3911308, at *7.

    2.    "Of course, statutes cannot be viewed in isolation, and statutory interpretation requires considering the context and structure of the overall statutory scheme." *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024). That evidence—which this Court expressly "d[id] not consider" at the preliminary-injunction stage, *Ogle*.Dkt.31 at 7—only bolsters the conclusion that the Department's interpretation of the HEA's gainful-employment language is not the best reading of the text.

Confirming that the Department reads far too much into far too little, other provisions in the HEA demonstrate that, when Congress wanted to address post-graduate debt and earnings, as opposed to whether a program prepared students for some form of gainful employment, it knew precisely how to do so and did not use anything like the language in §§1002(b)(1)(A)(i) and 1088(b)(1)(A)(i). For example, Congress has provided in the "cohort default rate" provisions that institutions are "ineligib[le]" under Title IV if a certain percentage of their graduates have excessively "high default rates" on their student debt—*i.e.*, if they do not have sufficient earnings to cover their

debt.  20 U.S.C. §§1085(a)(2)(A), (B)(iv), (m)(1).  Congress has also provided that a borrower can qualify for debt relief when "the borrower's debt burden equals or exceeds 20 percent of such borrower's gross income."  *Id.* §1087dd(e)(1).  And Congress has also provided that a borrower can qualify for debt relief if she has an "economic hardship," *id.* §1098e(b)(7)(B)(5), which is a term that requires the Department to consider "the borrower's income and debt-to-income ratio," *id.* §1085.

Nor is that all.  Congress has also required the Department to develop a "College Navigator" website that makes available information regarding each school that "participates in programs under [Title] IV."  *Id.* §1015a(*l*)(1).  In particular, Congress has mandated the disclosure of information regarding "cost of attendance," the "average annual grant amount … awarded," the "average annual amount of Federal student loans provided through the institution," and "[a] link to the appropriate section of the Bureau of Labor Statistics website that provides information on regional data on starting salaries in all major occupations"—in other words, information regarding debt and post-graduate earnings.  *Id.* §1015a(*l*)(1)(N), (O), (P), (W).  And Congress has also instructed the Department to conduct regular surveys of financial-aid recipients that "describe the debt burden of such loan recipients," "their capacity to repay their education debts," and the "impact of such debt burden on the recipients' … post-graduation plans."  *Id.* §1015a(k)(D).

Congress thus has "shown elsewhere in the same statute" that it "knows" how to use language addressing the subjects that the 2023 Rule addresses.  *Jama v. ICE*, 543 U.S. 335, 341 (2005).  But Congress "did not do so here"—in the much different and simpler language differentiating vocational training from liberal-arts degrees—"and the contrast is telling."  *United States v. Koutsostamatis*, 956 F.3d 301, 309 (5th Cir. 2020).  These other provisions thus confirm that, "[i]f Congress had wanted the provision" here "to have th[e] effect" that the Department ascribes to it—that schools must not only provide training for a useful occupation, but guarantee that alumni meet specific debt and earnings benchmarks—it would have "said so in words far simpler."  *Biden v. Texas*, 597 U.S. 785, 798 (2022).  To be sure, while Congress has required the disclosure of some metrics on its College Navigator site, it has never demanded disclosure of how median graduate income (including graduates who exit the workforce) compares to median high-school graduate income 7-16 years after graduation (excluding

graduates who exit the workforce), let alone used it as a basis for Title-IV eligibility.  But that simply reflects that such an apples-to-oranges comparison is arbitrary and capricious, *see* pp.28-31, *infra*, not that Congress viewed that misleading statistic as implicit in the best reading of "gainful employment."

The Department has sought to dismiss these other provisions as irrelevant because they are "not parallel" to the gainful-employment language—*e.g.*, the other provisions apply to "schools" and not "programs," or address post-graduate debt and earnings "at the back end," whereas the 2023 Rule is supposedly disqualifying programs based on such data at the front end.  *Ogle*.Dkt.25 at 23 & n.14. But that objection misses the forest for the trees.  As just explained, the salient point is that "we know that Congress knows how to target" post-graduate debt and earnings—because Congress has a con- sistent practice of using language that is unambiguously directed towards those topics.  *United States v. Cooper*, 38 F.4th 428, 434 (5th Cir. 2022).  That Congress has chosen to address those issues at the school- rather than the program-level, and at the back- rather than the front-end, are congressional judgments worthy of respect, not an invitation to distort the meaning of "gainful employment."

The broader context of the HEA undermines the Department's interpretation of the gainful- employment language in other ways too.  Indeed, Congress has used the term "gainful employment" in numerous *other* provisions in the HEA, and none suggests that Congress had complicated debt and earnings metrics rather than something far more basic and binary in mind.  In fact, those provisions are coherent only if "gainful employment" means simply a paying job—and not even an especially *high*-paying job, as Congress has consistently and repeatedly used gainful-employment language in a way that suggests that even low-paying, part-time student employment is gainful employment.[14]  *See, e.g.*, 20 U.S.C. §1036(e)(1)(B)(ii) (allowing schools to give grant money to certain students if they are not "engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"); *id.* §1134c(a) (similar); *id.* §1135c(d)(2) (similar); *id.* §1161g(d)(5)(B) (similar).

The Department's retort is that the gainful-employment language in the operative text here

---

[14] This understanding is reflected in the original 1965 version of the HEA too.  *See, e.g.*, HEA §527, 79 Stat. at 1260 (authorizing fellowships on the condition that the recipient "is not engaging in gainful employment other than such part-time employment in teaching, research, or similar activities related to his training as has been approved by the Commissioner").

just "mean[s]" something "different" given the immediately surrounding "context." *Ogle*.Dkt.25 at 21.  But as already noted, the surrounding context only underscores that the language here bears its ordinary meaning and focuses on the training provided and other factors within the school's control, not graduates' lifestyle choices and economic factors schools are powerless to control.  Regardless, embracing that "good-for-one-clause-only" theory, *Allen v. Cooper*, 589 U.S. 248, 259 (2020), "would violate yet another rule of statutory construction:  'In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute," *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1725 (2020).  The Department's invocation of "context" cannot overcome that heavy presumption—especially since the Department is now *ignoring* context.  As the Department recognized in the 2019 Rule, Congress in 2008 amended one of the provisions at issue to clarify that a for-profit school could obtain Title-IV eligibility even if it "provides a program leading to a baccalaureate degree in liberal arts." 20 U.S.C. §1002(b)(1)(A)(ii).  That amendment thus "reaffirmed" that the operative gainful-employment language just "differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities."  84 Fed. Reg. at 31,401.  The Department has no answer to an amendment that confirms ordinary meaning and consistent usage.  Text, context, and structure thus all cut against the Department's interpretation.

   3. As *Loper Bright* reaffirmed, history is another valuable tool of statutory interpretation. As that decision emphasized, "the longstanding practice of the government … can inform a court's determination of what the law is."  *Loper Bright*, 144 S.Ct. at 2258.  Hence, "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."  *Id.* at 2262.  At the same time, *Loper Bright* distinguished agency interpretations that flip-flop over time and/or emerged years after the statutory text was adopted.  *See id.* at 2265.  The Department's proffered interpretation of the HEA here exemplifies the kind of wavering agency position *Loper Bright* warned against.

   For nearly half-a-century after the HEA's enactment, the Department *never* suggested that the statute's gainful/useful employment language meant that it could "tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings

beyond those of high school graduates and sufficient to allow students to repay their student loans." 88 Fed. Reg. at 70,005.  Instead, the Department understood that the statutory language simply called for an assessment into whether the "preparation" provided to "students" is "for a specific area of employment."  *Id.* at 70,018 (discussing *In re Acad. For Jewish Educ.*, 1994 WL 1026087).  While the Department evidently believes that this half-century "initial[]" period of regulatory restraint poses no obstacle to the 2023 Rule and its focus on post-graduate "outcome-based measures," *id.* at 70,014, 70,018, that position is impossible to square not only with *Loper Bright* but with a host of other Supreme Court cases too.  As the Supreme Court repeatedly admonished even before the Department promulgated the 2023 Rule, the fact that an agency "never before adopted" a particular interpretation of a statute in the previous "half century" is a "telling indication" that a regulation suddenly embracing that interpretation is "beyond the agency's legitimate reach."  *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *see also Biden v. Nebraska*, 143 S.Ct. 2355, 2372 (2023); *West Virginia v. EPA*, 597 U.S. 697, 725 (2022).

More troubling still, the Department previously adopted the *Ogle* Plaintiffs' understanding of "gainful employment" not only with respect to the specific statutory provisions at issue here, but also in other contexts.  For example, the HEA defines "eligible program" for certain purposes as a program that "has a verified placement rate of at least 70 percent, as determined in accordance with the regulations of the Secretary."  20 U.S.C. §1088(b)(2)(A)(ii).  To implement that statutory directive, the Department in 1994 promulgated regulations (which remain in effect today) requiring schools to "determine the number of students who, within 180 days of the day they received their degree, certificate, or other recognized educational credential, obtained *gainful employment in the recognized occupation* for which they were trained or in a related comparable recognized occupation."  34 C.F.R. §668.8(g)(1)(ii) (emphasis added).  There is, of course, no mention of debt ratios or relative median income.  And to prove that graduates are gainfully employed, the Department requires schools to simply submit documents like "[s]igned copies of State or Federal income tax forms" or "[w]ritten evidence of payments of Social Security taxes"—*i.e.*, evidence that graduates have paying jobs—without any need to inquire into debt loads or the median income of high-school graduates in the area.  *Id.* §668.8(g)(2).  That history further buttresses the conclusion that the Department's newfound interpretation is untenable.

There are other telling historical clues here too.  As recounted above, long before the HEA's enactment, Congress repeatedly deployed gainful/useful employment language in other statutes, including in the statute considered the "Magna Carta of vocational education," Carleton 63, and it always did so in a way that meant merely a paying job—not a job that required a comparison of pay in relation to other factors like debt loads.  In fact, predecessor statutes like the Smith-Hughes Act and National Defense Education Act involved subsidies or stipends that did not even result in debt for their beneficiaries.  *See, e.g.*, 39 Stat. at 930-31, 934; 72 Stat. at 1590-91; pp.2-3, *supra*.  Those related statutes are highly informative here, as courts "normally presume that the same language in related statutes carries a consistent meaning."  *United States v. Davis*, 588 U.S. 445, 458 (2019).

4.      With nothing to show from text, context, structure, or history, the Department relied on "legislative history" in the 2023 Rule—specifically, the Senate and House reports that accompanied the NVSLIA, which later merged with the HEA.  88 Fed. Reg. at 70,012.  "But legislative history is not the law," as "[i]t is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute [w]e do not inquire what the legislature meant; we ask only what the statute means."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018).  Regardless, the Department's preferred legislative reports are self-defeating.  In reality, the legislative reports describe how "the definition of 'eligible institution'" under the NVSLIA, which later made its way into the HEA, "was intended" to "be as liberal as possible" and that Congress effectuated that intent through language explaining that eligible institutions must provide "a program of postsecondary vocational or technical education designed to fit individuals for *useful* employment in recognized occupations."  S. Rep. No. 89-758, at 12 (emphasis added); *see* H.R. Rep. No. 89-308, at 9.  No ordinary user of the English language would say that preparing students for "useful employment" entails an assessment of debt-to-earnings ratios or comparisons to the earnings of an age-restricted pool of high-school graduates.  And the Department's use of those metrics to disqualify the overwhelming majority of cosmetology schools for which the relevant data are available is about as miserly and illiberal as possible.  At bottom, nothing in the legislative reports suggests that Congress viewed the "useful employment" language as anything other than modest language intended to ensure that schools provided students with vocational training.

5.      Perhaps recognizing as much, the Department all but ditched the legislative history at the preliminary-injunction stage and instead posited that its interpretation of the statutory text is consistent with the broader "purposes" of the HEA, which (in the Department's view) is "to help students." *Ogle.*Dkt.25 at 18, 20 & n.11, 23.  Even if Title IV enumerated that broad purpose, the Supreme Court has "has long rejected the notion that '*whatever* furthers the statute's primary objective must be the law.'" *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 434 (2018).  And it hardly "helps students" to deny them their programs of choice or relegate them to programs without a sufficient track record to be subjected to the Department's new tests.  In all events, Title IV never enumerates that broad and manipulable purpose.  Rather, Title IV articulates more specific (and less in-the-eye-of-the-beholder) purposes, such as "making available the benefits of postsecondary education to eligible students … in institutions of higher education," 20 U.S.C. §1070(a); *see id.* §1087a(a) (similar), which are in turn defined to include for-profit schools that "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," *id.* §1002(b)(1)(A)(i). That actually enumerated purpose just brings us back to "gainful employment" and its ordinary meaning, which plainly does not empower the Department to disqualify schools providing training for gainful employment and satisfying statutory default metrics based on its vague sense that it will "help students" to deny them funding for the programs that they have chosen to pursue.

6.      Finally, while the Department may prefer to ignore these insuperable problems because "past judicial decisions" addressing the 2011 and 2014 Rules allowed it to stretch statutory language, that argument is distinctly unavailing.  88 Fed. Reg. at 70,013 & n.63; *see Ogle.*Dkt.25 at 16-17. Those out-of-circuit decisions all relied entirely on the now-defunct *Chevron* doctrine without resolving the statutory question presented here.  Decisions from the "now-*ancien régime* that *Chevron* imposed" thus are of no help to the Department anymore.  *Rest. L. Ctr.*, 2024 WL 3911308, at *4.  Instead, the inquiry here demands the use of old-fashioned tools of statutory interpretation, which uniformly demonstrate that the 2023 Rule is *ultra vires*.  That is the end of the road for the 2023 Rule.

## II.    The 2023 Rule Is Arbitrary And Capricious.

The 2023 Rule is not merely *ultra vires*; it is also arbitrary and capricious.  The APA provides

that courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).  Agency action thus must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The Fifth Circuit has described that standard as "searching and careful," *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021), and possessing "serious bite," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).  And since this Court's preliminary-injunction decision, the Supreme Court has emphasized its demanding nature too.  *See Ohio*, 144 S.Ct. at 2040.  To satisfy the standard, the agency must examine the relevant data and "offer[] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* at 2053 (alterations omitted).  Thus, "illogic" and internal inconsistency doom the agency action.  *MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 700 (5th Cir. 2024).

The Fifth Circuit recently rejected agency action as "arbitrary and capricious thrice over." *Id.* at 683.  Here, the Department has gone one (irrational) step further, as the 2023 Rule is arbitrary and capricious in at least four ways.  First, it illogically relies on concededly inaccurate earnings data.  Second, it illogically penalizes schools for factors beyond their control.  Third, its debt-to-earnings test utilizes illogical percentage thresholds.  Fourth, it does not adequately substantiate benefits despite the enormous costs that it imposes.  Without the benefit of the demanding standard for "the extreme relief of a preliminary injunction," *Ogle*.Dkt.31 at 11, the 2023 Rule cannot survive APA review.

### A.    The Rule Illogically Relies on Concededly Inaccurate Earnings Data

1.     One major problem with the 2023 Rule is the Department's illogical decision to use concededly inaccurate earnings data.  As noted, under the 2023 Rule, the Department will strip programs at for-profit schools of Title-IV eligibility if, in two out of three consecutive years, (1) the median program graduate devotes more than 8% of annual earnings or more than 20% of discretionary earnings to pay down student-loan debt, or (2) the median program graduate earns less than the median high-school graduate in the state aged 25-34 who never enrolled in postsecondary education. 88 Fed. Reg. at 70,008.  And the 2023 Rule requires programs to provide warnings to current and

prospective students if they fail either metric once. *See id.* The Department thus finds itself in a position similar to the one that it occupied vis-à-vis the 2011 and 2014 Rules: subjecting programs to draconian sanctions based on tests that use post-graduate earnings data as a critical input.

Under those prior regimes, the Department relied on datasets that included only those earnings reported by taxpayers to the federal government. But the Department understood that many professionals who work in cash- and tip-heavy fields—especially "cosmetology"—do not actually report all earnings to the federal government. 76 Fed. Reg. at 34,424-25. Indeed, in recent years, the Department has "openly acknowledged that underreporting is an issue, even identifying cosmetology schools by name," and that studies (including one from a Stanford economist) estimated that "both tip income and self-employment income are, on average, underreported by around 60%." *AACS*, 258 F.Supp.3d at 59-60, 63. In an implicit acknowledgement of this serious problem, both the 2011 and 2014 Rules gave schools whose programs failed the Department's earnings-based tests an opportunity to provide alternative and more accurate earnings data. *See* 76 Fed. Reg. at 34,428-29; 79 Fed. Reg. at 65,010. But that proved insufficient; after cosmetology schools challenged those appeal process, a court concluded that the Department acted arbitrarily and capriciously because it "narrowly circumscribed" that process—*i.e.*, the Department "inexplicably requir[ed] high response rates to submit state-sponsored or survey-based alternate earnings calculations." *AACS*, 258 F.Supp.3d at 56.

But rather than scrap the inaccurate data or improve the appeals process this time, the Department has doubled down on the use of inaccurate data and scrapped the appeals process altogether. The Department has proclaimed that it will obtain the earnings data necessary to conduct its debt-to-earnings and earnings-premium tests from "a Federal agency with earnings data," and its "current preference" is to use IRS earnings data—data that already has privacy-protective "statistical noise" baked into it, which means that they contain errors to the point that any program "could be erroneously declared ineligible" under Title IV. 88 Fed. Reg. at 70,045, 70,096-97. And although all federal earnings data contain *additional* inaccuracies since they do not account for income underreporting in the cosmetology sector, the Department has declared that it will *not* provide *any* "opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting." *Id.* at

70,042.  The end result is that the Department is embarking on its most "wooden" and "problematic" use of federal earnings data yet.  *AACS*, 258 F.Supp.3d at 73.  The Department, the courts, and other parties have spent the last decade "detailing how bad" federal earnings data are when it comes to cosmetologists, but now the Department is insisting that it will rely solely on that data with their "conceded defects"—all while eliminating every mechanism that it previously thought necessary to avoid intolerably inaccurate results.  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019).  That is just the sort of "illogic" that the APA does not tolerate.  *Chamber of Com.*, 885 F.3d at 382.

2.      At the preliminary-injunction stage, this Court stated that the Department "considered comments criticizing the use of federal reported earnings data to calculate D/E and EP metrics but concluded that no change to its proposed use of such data was warranted."  *Ogle*.Dkt.31 at 9.  *Ohio* confirms that simply fielding comments and doing nothing about them cannot save the Department.  An agency's mere "awareness" of commenter "concern[s]," the Supreme Court explained, does not satisfy the arbitrary-or-capricious standard.  *Ohio*, 144 S.Ct. at 2054.  And although the Department certainly reached the conclusion that it would employ inaccurate data while eliminating the appeal process designed to redress those inaccuracies, it never "reasonably explained" that conclusion.  *Id.*

In arguing otherwise, the Department has contended that underreporting is no cause for alarm because the 2023 Rule will measure earnings in the third post-graduate year instead of the second (as under the 2014 Rule), which will purportedly "lead[] to substantially higher measured program earnings."  *Ogle*.Dkt.25 at 27; *see* 88 Fed. Reg. at 70,042; *see also Ogle*.Dkt.31 at 9 (this Court appearing to credit this argument).  But if "graduates' earnings tend to increase over time," *Ogle*.Dkt.25 at 10, that would make year-3 data even more distorted than year-2 data, as more earnings and tips will go unreported.  Citing a passage from the 2023 Rule, the Department tried to neutralize this issue at the preliminary-injunction stage by arguing that the increase in year-3 earnings will "'provide a buffer more than sufficient to counter possible error' arising from … underreported income."  *Id.* at 29.  But this passage in fact relates to the "statistical noise added" to the earnings data "by the IRS," 88 Fed. Reg. at 70,096; *see* 88 Fed. Reg. at 32,355, not underreported income (which is the relevant issue here).

The Department has also sought to justify its approach on the ground that cosmetologist

37

professionals who fail to report their earnings to the federal government are subject to "considerable legal penalties." 88 Fed. Reg. at 70,041. That is true but irrelevant, as the data universally attest that the possibility of those penalties does not deter underreporting, and it makes no sense to punish schools for the underreporting of their graduates. As a court explained in rejecting the identical argument in litigation over the 2014 Rule, the fact that "underreporters are subject to civil and criminal penalties" if they are caught underreporting is a "non sequitur," as such penalties have demonstrably failed to cure the underreporting problem in the past. *AACS*, 258 F.Supp.3d at 63-64. The Department tried to get around that barrier here by arguing that "circumstances have changed" because "payment platforms" like Venmo "must issue 1099s when a user's annual income exceeds a certain amount—scheduled to be as low as $600 in the near future"—and "[t]axpayers are unlikely to leave income unreported if it has already been reported in a 1099." *Ogle*.Dkt.25 at 27; 88 Fed. Reg. at 70,041; *see Ogle*.Dkt.31 at 9 (this Court appearing to credit this argument). But the Department has never identified any evidence that cash is no longer king when it comes to cosmetology, or that cosmetologists intent on evading the taxman are adopting Venmo. *But see Ohio*, 144 S.Ct. at 2053-54 (holding that agencies cannot rely on an unexplained "assumption"); *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021). Even worse, this change to the 1099 reporting threshold has not even taken effect. Instead, through at least tax year 2023, the reporting threshold is $20,000; and while the IRS "is planning for a threshold of $5,000 for tax year 2024," it has not yet implemented it. IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation* (Nov. 21, 2023), https://rb.gy/6jkx6k. Given that the Department will examine earnings data from as early as 2021 and 2022 and that a program can lose Title-IV eligibility with just two consecutive years of failing scores, *see* 88 Fed. Reg. at 70,099, 70,123, the someday prospect of a $600 threshold for 1099s is utterly irrelevant.

Switching gears, the Department has suggested that "new research called into question the notion that underreported income was a significant issue, and pointed to problems with the prior alternate earnings appeals." *Ogle*.Dkt.25 at 27; *see* 88 Fed. Reg. at 70,041-42 & n.139; *see also Ogle*.Dkt.31 at 9 (this Court referencing this research). But that "new research" (from Stepanie Riegg Cellini &

Kathryn J. Blanchard) did not suggest that unadjusted federal earnings data are accurate or that appeals processes are not administrable. Quite the opposite. Even that research *agreed* that the underreporting of tip income is "prevalent" in the cosmetology sector and then said that, in an "appeal" process, "a reasonable earnings adjustment would be to allow earnings to be inflated by" "8-10%" to account for underreported tips—all while conceding that "underreporting is *not* limited to tips." AR-F-001507 (emphasis added). The Department's adamant insistence that it will use unadjusted federal earnings data alone thus is "inadequately substantiated," to put it mildly.[15]  *MCR Oil Tools*, 110 F.4th at 697.

The Department has nevertheless maintained that "no change" to its use of federal earnings data "was warranted" because "comments agreed that there is no evidence that underreporting is widespread among cosmetology program graduates" and because a "recent survey conducted by the beauty industry itself … indicated a 'high rate of tip [reporting] compliance' by salon owners." *Ogle*.Dkt.25 at 28-29. But the comments cited by the Department (from Arnold Ventures) just pointed to the Cellini & Blanchard study referenced above (a study bankrolled by Arnold Ventures itself), which *found* widespread tip underreporting and did not even measure *all* forms of underreporting. *See* AR-I-008426, AR-F-001502. And the Department badly misread the cited survey (the Qnity survey). *See also Ogle*.Dkt.31 at 9 (this Court referencing the Qnity survey). In fact, that survey emphasized that "[u]nderreporting of income" *is* an "issue[] with current workforce earnings data" and then said that, among a very small sample size of companies that claimed to largely report tip income, cosmetologists had "staggering[ly]" *higher* annual earnings as compared to what the Department's average-earnings data reflected. AR-F-004759, 4789, 4791, 4803. Far from supporting the Department's position, then, the Qnity survey severely undermines it, since it strongly indicates that actually accounting for commonly underreported income dramatically increases cosmetologist earnings.

Finally, the Department has suggested that it wanted to "avoid the perverse incentives that

---

[15] The Department has also observed that it uses the same data for "determining Pell grant and other aid eligibility, as well as monthly loan payments on income-driven repayment plans." 88 Fed. Reg. at 70,041. But using inaccurate data for multiple purposes does not make the data any less inaccurate, especially when the consequences of it in this context are draconian and have a disproportionate effect on programs that equip students for gainful employment.

would be created by making the rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes." 88 Fed. Reg. at 70,042. But those perverse incentives do not operate on the institutions. As the 2019 Rule explained, it is "not the fault of institutions" that graduates underreport income, as schools "do not complete tax returns" for graduates and "cannot guarantee accurate reporting." 84 Fed. Reg. at 31,409. The Department has never explained why a different conclusion is warranted now.

In short, the Department's decision to rely exclusively on unadjusted federal earnings data "runs counter to" the critical limitations associated with that data, *Motor Vehicle Mfrs. Of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and the many "shortcomings in the agency's explanations" confirm that its "paradoxical" action cannot stand, *Sw. Elec. Power Co.*, 920 F.3d at 1016, 1018.

B.     **The Rule Illogically Penalizes Schools for Factors Beyond Their Control**

1.     The Department's decision to use earnings-based tests also fails arbitrary-and-capricious review by punishing schools for factors outside their control. Indeed, the 2023 Rule brands a school program a "failure" just because certain groups of alumni have debt-to-earnings ratios that exceed 8% of annual earnings or 20% of discretionary earnings, or if their annual earnings do not exceed those of high-school graduates in the state between the ages of 25 and 34. 88 Fed. Reg. at 70,012. The 2023 Rule thus hinges entirely on the theory that schools are responsible for their former students' post-graduate "financial outcomes," including everything from their relative earnings to whether they remain in the workforce. *Id.* at 70,011. That makes no sense.

The Department itself reached just that conclusion in the 2019 Rule. As the Department explained then, schools do "*not* have the ability to control for the many variables that impact earnings." 84 Fed. Reg. at 31,409 (emphasis added). "[S]ome students take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices," all of which can negatively affect individual earnings. *Id.* at 31,413. Moreover, "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups," such as "women and

40

minorities." *Id.* at 31,414. And "macroeconomic" events like "the Great Recession"—which are "outlier events" and by definition unpredictable—"can have a considerable impact on D/E rates outcomes" and impose "downward pressure on wages." *Id.* at 31,410-11. The Department thus concluded in the 2019 Rule that "[p]enalizing" and "sanction[ing] institutions for aspects of student debt and earning outcomes that are outside of the institution's control" is "absurd." *Id.* at 31,409-10.

The 2023 Rule embraces that absurdity. The fact that the rule renders programs ineligible based on factors entirely outside the schools' control, rather than based on the nature of the training supplied in their classrooms, strongly indicates that the Department has not adopted the best reading of "gainful employment." *See* pp.22-34, *supra*. But doing so while ignoring all context is arbitrary and capricious in the extreme. And the 2023 Rule does just that, blaming schools even if graduates themselves "choose" not to work at all or "choos[e] not to work full-time," 88 Fed. Reg. at 70,035, 70,045, or if there are events like the COVID-19 pandemic that depress earnings, *see, e.g.*, *id.* at 70,065, 70,092. That approach is "seemingly illogical"—because it is illogical. *Sw. Elec. Power Co.*, 920 F.3d at 1013-14.

2.    This Court did not pass on this argument at the preliminary-injunction stage, *see Ogle*.Dkt.31 at 8-11, and the Department has offered only an incoherent defense. In the 2023 Rule, the Department explicitly "acknowledge[d]" that "workers often choose fields such as cosmetology for their flexible work schedules, allowing them to combine part-time work with other valuable activities," and that "often individuals choose to leave the labor force for reasons that do not reflect their ability to find a job." 88 Fed. Reg. at 70,044-45. Nonetheless, the Department concluded that it would interpret the reduced or even nonexistent earnings of these graduates as proof of the school's failure to prepare its students for gainful employment in the cosmetology sector. *See id.*

That is nonsensical. Initially, it bears emphasizing that women are far more likely than men to not work or to work-part time for family-related reasons. *See, e.g.*, Beth Almeida et al., Ctr. for Am. Progress, *Fact Sheet: The State of Women in the Labor Market 2023* (Feb. 6, 2023), https://rb.gy/5ah4rp ("A massive gender gap exists in the share of women and men who are either not working or working part time because of child care or family reasons."). And the Department conceded that this dynamic holds true in the overwhelmingly female cosmetology sector, observing that "many" cosmetologists

41

"often" make rational decisions to work fewer hours or not to work at all *for reasons that have nothing to do with the preparation for gainful employment that they received years prior.* To concede these basic facts about the occupation and then use these graduates' reduced or nonexistent earnings to conclude programs fail to train students for gainful employment exemplifies just the sort of "internal inconsistency" that is "characteristic of arbitrary and unreasonable agency action." *Sw. Elec. Power Co.*, 920 F.3d at 1014.

The Department dismissed this internal inconsistency as harmless error because (in its view) "program outcomes under the metrics" are unlikely to "be determined by certain graduates' voluntary choices to earn less." *Ogle*.Dkt.25 at 32. But that blinks the very reality that the Department has acknowledged. In fact, the Department's own data showed that virtually every cosmetology program subject to its earning-based metrics will fail them. And the Department itself relied on studies (*e.g.*, the Qnity survey) showing that the average cosmetologist works just 27.8 hours/week and that cosmetologist earnings are substantial when adjusted to 40-hour workweeks. *See* AR-F-004787-88, 4791. To just assume that the impact of industry-wide part-time work is isolated or immaterial is not only arbitrary and capricious, but "absurd[]." *Career Colls. & Schs. of Tex. v. Dep't of Educ.* (*CCST*), 98 F.4th 220, 246 (5th Cir. 2024). The Department has disagreed, claiming that its metrics "provide[] relevant information" "regardless of … individual circumstances." *Ogle*.Dkt.25 at 32. But the proper response to "relevant" but misleading information is to correct for the inaccuracy—say, by applying a multiplier to reflect the earnings of a graduate choosing to work a 40-hour week—not to "simply ignore" that "important aspect of the problem," *Ohio*, 144 S.Ct. at 2053, and disqualify from Title-IV participation a broad swath of programs based on concededly problematic data.

The Department has deemed it "implausible" that graduates "might be able to find work three years after graduation yet still 'choose' not to work." *Ogle*.Dkt.25 at 33; *see* 88 Fed. Reg. at 70,044-45. Those familiar with parenting would beg to differ. Like most cosmetology programs, the *Ogle* Plaintiffs' students are almost exclusively female, and the median graduate is in her mid-20s. *See Ogle*.Dkt.10.Ex.A at 3 (¶¶13-14); *Ogle*.Dkt.10.Ex.B at 3 (¶¶13-14). That means that the median graduate three-years-removed from school is in prime childbearing years. *See* CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s ("[m]ean age at first birth" is "27.4"). And as the

Department itself has previously recognized, "[a]mong the 10,727,000 married couples with children under the age of 6, there are 3,811,000 in which the husband works but the wife does not." 84 Fed. Reg. at 31,406. It thus is hardly "implausible" that, three years post-graduation, cosmetologists would (at least temporarily) choose to exit the labor force even if they could find work.

In all events, even if one credits the Department's unexplained assumption that "typical" graduates of gainful-employment programs desire employment three years after graduation, the rational way to assess how *those* graduates are faring is to isolate *those* graduates, not graduates who "choose to leave the labor force." 88 Fed. Reg. at 70,045. It is not as though the Department is incapable of conducting such a tailored inquiry. The earnings-premium test itself involves an evaluation of *only* those high-school graduates in the state aged 25-34 who remain "in the labor force." *Id.* at 70,061. The Department never explained why that same type of approach—which at least eliminates the most skewed data—is inappropriate vis-à-vis graduates of gainful-employment programs.

There is more. The Department recognized in the 2023 Rule that "systemic discrimination may affect the need for some groups of students to borrow and may affect their earnings after graduation." *Id.* at 70,031; *see also, e.g.*, U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2021* (Mar. 2023), https://rb.gy/ju086j (statistics confirming that women and minorities earn less). The Department nevertheless forged ahead with tests that incorporate such discriminatory effects because "demographics *alone*" do not explain income. 88 Fed. Reg. at 70,031, 70,145, 70,140 (emphasis added); *see Ogle.*Dkt.25 at 34-35. But plenty of non-sole causes still move the needle, and regardless, the Department is indisputably holding schools accountable for their graduates' earnings even though the Department concedes that those earnings (at least partly) reflect historical discrimination for which schools are not responsible. "It is illogical for the rule … to accept" the reality that schools are not responsible for historical discrimination that reduces earnings while "simultaneously" sanctioning schools for those reduced earnings. *Chamber of Com.*, 85 F.4th at 778.

The Department lastly sought to downplay the relevance of macroeconomic conditions on the ground that the earnings-premium test "is well suited to adjust to State or national disruptions to the labor market," 88 Fed. Reg. at 70,058, because (according to the Department at the preliminary-

injunction stage) that test includes a "buffering" mechanism that favors schools since the earnings of high-school graduates tend to fall more than others' during economic downturns, *Ogle*.Dkt.25 at 35-36. But this so-called buffering mechanism applies when the earnings of high-school graduates are compared to those of "college graduates," which does not help schools (like cosmetology schools) that do not produce college graduates. 88 Fed. Reg. at 70,058.

Moreover, as the Department's focus on the earnings-premium test implicitly confirms, the debt-to-earnings test is undeniably *ill*-suited to adjust to labor-market disruptions. As the 2019 Rule noted when addressing a comparable debt-to-earnings test, it "do[es] not calculate D/E rates until years after a student is admitted," so "an institution must be able to predict macro-economic conditions, future earnings, and various other factors … well in to the future in order to establish a price that will guarantee passing D/E rates"—and that is "a nearly impossible task." 84 Fed. Reg. at 31,417. The Department has never had any response to that considerable problem other than to argue that at least the effects of the COVID-19 pandemic "will have very little impact" on its metrics because "the first earnings measurements will be for a cohort whose third year after completion was 2021 or 2022," and by then, "the unemployment rate had fallen to 3.5%." *Ogle*.Dkt.25 at 35. But the Department's discussion of the pandemic just shows how bizarre the 2023 Rule really is. Indeed, if a 2018 cosmetology-school graduate had to accept a different job in an entirely different industry in 2020 because the pandemic forced the closure of her salon,[16] the Department would *still* consider her 2021 earnings in that unrelated industry a valid barometer of whether the cosmetology school adequately performed its cosmetology-related educational duties in 2018. That approach does not pass the straight-face test.

In its last-ditch effort, the Department has asserted that at least *some* "factors" affecting a program's "performance in the metrics *are* within [the school's] control." *Id.* at 33. But that argument gives up the game, as it concedes that a program's performance in the metrics turns on numerous

---

[16] *See, e.g.*, Off. of the Tex. Governor, *Governor Abbott Issues Executive Order, Implements Statewide Essential Services and Activities Protocols* (Mar. 31, 2020), https://rb.gy/7hswe2 (explaining the Texas governor's "directive" to "avoid" "visiting" "cosmetology salons"); Press Release, Illinois, *Gov. Pritzker Announces Statewide Stay At Home Order to Maximize COVID-19 Containment, Ensure Health Care System Remains Fully Operational* (Mar. 20, 2020), https://rb.gy/j259zd (similar in Illinois).

44

factors *outside* a school's control.  The Department has "failed to supply 'a satisfactory explanation'" for this head-scratching approach—and it is too late to do so now.  *Ohio*, 144 S.Ct. at 2054.

C.     **The Rule Uses Illogical Debt-to-Earnings Thresholds**

1.     Although the Department's reliance on fatally flawed *earnings* data dooms both the 2023 Rule's debt-to-*earnings* test and its *earnings*-premium test, the debt-to-earnings test suffers from additional flaws:  The Department failed to "adequately justify" its use of the 8% and 20% thresholds.  *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

At the preliminary-injunction stage, the Department insisted that the 2023 Rule "addresses in detail why the 8% annual income threshold" is "reasonable."  *Ogle*.Dkt.25 at 37.  In fact, in the 2023 Rule, the Department stated only that the 8% threshold is "grounded in mortgage-underwriting standards" and then incorporated its explanation for that threshold from the proposed rule.  88 Fed. Reg. at 70,020.  The proposed rule in turn said:

> The acceptable threshold of 8 percent for the annual D/E rate used in the proposed regulations has been a reasonably common mortgage-underwriting standard, as many lenders typically recommend that all non-mortgage loan installments not exceed 8 percent of the borrower's pretaxed income.  Studies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit.  Eight percent represents the difference between the typical ratios used by lenders for the limit of total debt service payments to pretaxed income, 36 percent, and housing payments to pretax income, 28 percent.

88 Fed. Reg. at 32,326.  The Department did not deign to support this statement with any citations.  But as the Department did not dispute at the preliminary-injunction stage, that explanation is a copy-and-paste of the one that the Department provided in the 2014 Rule.  *See* 79 Fed. Reg. at 16,443.  And that 2014 Rule provided just one citation to support the use of an 8% threshold:  the 2006 paper from Baum & Schwartz.  *See id.* at nn.50-51 (citing Baum & Schwartz 2-3).

But the Baum & Schwartz paper comes nowhere close to justifying an 8% threshold.  That is because Baum & Schwartz reviewed the existing studies and then declared that "[t]he shortcomings" of the 8% threshold are readily "apparent" and that such a threshold has "no particular merit or justification," since it does not reflect "the experience of young people who have recently left school,"

45

Baum & Schwartz 3—*young people who likely do not have a mortgage*, *see, e.g.*, Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* 7 (2023), https://rb.gy/r2e256 ("The typical first-time buyer was 35 years old this year[.]").  Given that absence of home ownership and attendant mortgage debt, it would be more logical to use Baum & Schwartz to adopt a 28% threshold than an 8% threshold designed to be used in conjunction with a 20% threshold for mortgage debt.  All that explains why the Department emphasized in the 2019 Rule that the Baum & Schwartz paper "*does not support the eight percent threshold*, but instead *clearly refutes it*" in this context.  84 Fed. Reg. at 31,426 (emphases added).

Given that starting point, the Department had a duty in the 2023 Rule to "reasonably explain[]" why an 8% threshold that it had just skewered as hopelessly irrational is suddenly rational.  *CCST*, 98 F.4th at 246.  But the 2023 Rule does not even "display awareness that it is changing position" vis-à-vis the 8% figure,[17] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and the Department's preliminary-injunction submission just repeated that error, *see Ogle*.Dkt.25 at 37 ("The Department first adopted both thresholds in the 2011 Rule, applied them again in the 2014 Rule, and has now applied the same thresholds in the 2023 metric.").  And respectfully, the rationale in this Court's pre-liminary-injunction decision does not suffice either.  The Court observed only that the Department "did not adopt the 8% mortgage-underwriting full stop" because it also utilized a "20% discretionary income threshold."  *Ogle*.Dkt.31 at 10.  But the existence of a different disjunctive threshold does not address why the Department could legitimately use an 8% threshold *at all* when it had just deter-mined—based on "more careful" analysis than ever before—that such a threshold is "not appropriate to use in determining a program's continuing eligibility in title IV programs."  84 Fed. Reg. at 31,426.

This shortcoming alone dooms the debt-to-earnings test *in toto* since that test cannot "function sensibly" without the 8% threshold—and the Department has never suggested otherwise.[18] *Carlson v.*

---

[17] Quite remarkably, none of the principal sources relied upon by the Department in the 2019 Rule are in the administrative record for the 2023 Rule.  *But see Ohio*, 144 S.Ct. at 2053 ("[A]n agency cannot simply ignore 'an important aspect of the problem.'").

[18] The Department included a severability provision in the 2023 Rule in an attempt to ensure that either the debt-to-earnings test or the earnings-premium test could survive if a court invalidated only one of them.  *See* 88 Fed. Reg. at 70,007 n.25; 88 Fed Reg. at 32,341-42.  But the Department never suggested that the debt-to-earnings test could survive without both the 8% and 20% thresholds.

*Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  But the 20% threshold is equally problematic.  At the outset, even Baum & Schwartz deemed that figure "somewhat arbitrary," Baum & Schwartz 12—hardly a promising starting point for an agency purporting to engage in "nonarbitrary" conduct, 88 Fed. Reg. at 70,012.  Baum & Schwartz also made clear that their somewhat-arbitrary 20% threshold "should be used thoughtfully with modification for family size" (among other variables).  Baum & Schwartz 12.  But the 2023 Rule does nothing of the sort.  Rather, the Department has adopted an approach that assesses debt *only* in relation to the earnings of the "*graduates*" themselves.  88 Fed. Reg. at 70,005 (emphasis added).  As the 2019 Rule highlighted, this approach means that programs can fail the 20% threshold even if their graduates' "household earnings" are more than "adequate to support a family without needing the graduate to work outside of the home"—*e.g.*, $1 million/year.  84 Fed. Reg. at 31,410.  Five years ago, the Department found it "absurd" to embrace such a test.  *Id.* The Department failed to offer a reasoned explanation why it should indulge such absurdities now.

The only response that the Department has mustered is that "the earnings of individuals in a household who did not attend a program have no bearing on whether that program prepares its students for gainful employment in a recognized occupation."  *Ogle.*Dkt.25 at 39.  That might be a valid basis for concluding that debt ratios, as opposed to some appropriate measure of earnings, have no role to play in determining whether a program has facilitated relatively remunerative employment (assuming gainful employment entails some kind of relative pay bump as opposed to simply a paying job).  But once the Department considers prudent levels of debt at all, it is arbitrary to ignore household income, as whether going into debt to obtain vocational training makes sense obviously depends on household circumstances.  It is common sense that households afford what they pay for by sharing income.  Indeed, states like Texas are "community property" states, so "any spouse's personal income during marriage" is owned together.  *Loaiza v. Loaiza*, 130 S.W.3d 894, 908 (Tex. App. 2004).

Ignoring household income and imposing a 20% threshold is especially illogical, moreover, since the Department's own income-driven repayment programs *do* account for household income and then cap repayment obligations at just 5-10% of the household's discretionary income.  *See* 88 Fed. Reg. 43,820, 43,820, 43,881 (July 10, 2023).  The net effect is that the 20% threshold in the 2023

Rule is "obsolete since no borrower would ever be required to pay more than 10 percent of their discretionary income"—*i.e.*, "[t]he GE regulations essentially held GE programs to a student loan repayment standard that no student would be held to by law or regulation." 84 Fed. Reg. at 31,407, 31,438. This Court did not analyze this issue in its preliminary-injunction decision either, and the Department's only argument on this front is that the "after-the-fact protections" provided by income-driven repayment programs are beside the point because the 2023 Rule addresses the supposed ante-cedent failure of schools to ensure that graduates have sufficiently high-paying jobs. *Ogle.*Dkt.25 at 39. That theory is even less persuasive the second time around. *See* pp.40-45, *supra.* Indeed, as the Department understood in 2019, "it cannot be said that a borrower in an IDR plan is one who has been harmed by his or her program or institution," not least because "borrowers" themselves "may elect to pursue a lower paying job in order to benefit from IDR-derived loan forgiveness." 84 Fed. Reg. at 31,400. Again, the Department never reasonably explained why different analysis applies now.

### D.    The Rule's Cost-Benefit Analysis Is Illogical

1.    Last but certainly not least, the Department's cost-benefit analysis is irrational. Cost-benefit analysis is an "'important aspect of the problem'" when agencies regulate, and an agency thus must "adequately substantiate[]" "benefits" that 'bear a rational relationship to the … costs imposed.'" *Chamber of Com.*, 85 F.4th at 777. The Department flouted that obligation here too.

The costs that the 2023 Rule imposes on cosmetology schools are enormous. As the Depart-ment has never disputed, *only 13* of the 1,270 cosmetology programs now eligible for Title-IV funding are projected to pass the 2023 Rule's tests. Meanwhile, 639 programs that enroll some 80% of students in Title-IV-eligible programs are projected to fail. Such extraordinary costs—in a sector that the fed-eral government expects to "grow 7 percent from 2023 to 2033, faster than the average for all occu-pations," U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook: Barbers, Hairstylists, and Cos-metologists* (last modified Aug. 29, 2024), https://rb.gy/rlhhuo—require the Department to establish commensurate benefits. *See Mexican Gulf Fishing*, 60 F.4th at 973. The agency did not do so.

2.    In the 2023 Rule, the Department first made the unlikely argument that its regulation

48

will not impose serious costs.  According to its "estimate," the Department explained, the "average institution" that awards cosmetology certificates "awarded about 38 percent of its credentials to students who did not receive any Federal aid," and "[t]here is a difference between an institution losing access to title IV, HEA funds and closing."  88 Fed. Reg. at 70,086, 70,093.  But even assuming that the Department's 38% estimate is correct (and it is way off with respect to the *Ogle* Plaintiffs), the Department did not adequately explain how a school could stay afloat after losing 62% of its business.

Unable to deny the "serious … costs imposed" by the 2023 Rule, *Mexican Gulf Fishing*, 60 F.4th at 973, the Department shifted to arguing that the costs are manageable because students will transfer to "high-performing programs" that do "not fail the D/E rates or EP measure," and graduates of those programs will eventually earn greater income, which will lead to higher tax revenue for the federal government as well as state and local governments.[19]  *Id.* at 70,017, 70,152.  But as just explained, most cosmetology programs in the Department's dataset are likely to lose Title-IV eligibility, and the Department offered no evidence that the remaining minority can accommodate the 150,000+ students currently attending "failing" programs.  *See id.* at 70,138, 70,140.  More fundamentally, the so-called "high-performing programs" are those that the Department *did not actually evaluate* because of an insufficient "n-size."  *See id.* at 70,127.  So, even assuming that those other programs have extra capacity (and will resist the temptation to cap enrollment to avoid coming within range of the Department's lethal tests), the Department ultimately has no idea whether those schools are performing even *worse* than those that the Department now considers failures.  In other words, there is no evidence that the Department's approach will "alleviate the risk that exorbitant and potentially unjustified Title IV loans create for students and taxpayers"—which is the reason why this Court thought that the Department survived arbitrary-and-capricious review at the preliminary-injunction stage.  *Ogle* Dkt.31 at 11.  Courts are not supposed to "defer to the agency's conclusory or unsupported suppositions." *Texas*, 10 F.4th at 555.  Just so here, where industry-crushing costs are looming on the horizon.

Nor do the Department's smattering of other arguments get the job done.  The Department

---

[19] The Department's interest for the public fisc is hard to take seriously when the agency is "forgiv[ing] … students' loan obligations" "to the greatest extent possible."  *CCST*, 98 F.4th at 226 n.1.

has suggested that "cosmetology programs that lose Title IV eligibility" could "lower their tuition" to avoid failing the 2023 Rule's metrics. *Ogle*.Dkt.25 at 41. But schools obviously cannot lower tuition retroactively (which is what they would need to do here), and even if they could, it would not help them pass the earnings-premium test, which cares only about salaries. The Department also posited that the hundreds of programs projected to fail the 2023 Rule's metrics might not in fact fail. *See id.* But not even the Department is buying that: It has publicly proclaimed that the 2023 Rule "will protect" 700,000 students at various programs (*i.e.*, by failing them), U.S. Dep't of Educ., *Biden-Harris Administration Announces Landmark Final Rules to Protect Consumers From Unaffordable Student Debt and Increase Transparency* (Sept. 27, 2023), https://rb.gy/iavrwt, and that number includes the 150,000+ students at cosmetology programs, *see* 88 Fed. Reg. at 70,140 (Table 4.18). In addition, the Department suggested that all these program failures are much ado about nothing because "students will find ample more affordable alternatives" among "non-Title IV-participating cosmetology programs." *Ogle*.Dkt.25 at 42. But it gets things backwards to suggest that the way to "help students" who require much-needed Title-IV aid is to direct them to schools where that aid is *not even available*. *Id.* at 39. The Department has already conceded that the loss of Title-IV aid is an "undeniably serious consequence for students"—and it presumably did so because countless students could not attend school without it. 88 Fed. Reg. at 70,083; *cf. CCST*, 98 F.4th at 255 (explaining that a school's loss of Title-IV eligibility "would be to the detriment of students," a "consequence" that "would harm the public at large").

*       *       *

In sum, the ordinary meaning of the gainful-employment language offers no support for the 2023 Rule. And that rule is arbitrary and capricious four times over to boot. The *Ogle* Plaintiffs are entitled to summary judgment, and prompt vacatur of the 2023 Rule is the proper remedy.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for the *Ogle* Plaintiffs. If the Court grants summary judgment to the Department, the Court should at least grant an injunction against the 2023 Rule pending appeal to the Fifth Circuit. *See* Fed. R. App. P. 8(a).

Respectfully submitted,

s/Cole Ramey
Cole Ramey, TX Bar #16494980
Christin Jones, TX Bar #24070017
KILPATRICK TOWNSEND & STOCKTON
LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7126
cramey@ktslaw.com
cjones@ktslaw.com

Paul D. Clement, VA Bar #37915
  (admitted pro hac vice)
Andrew C. Lawrence, VA Bar #99830
  (admitted pro hac vice)
Kevin Wynosky*, PA Bar #326087
  (admitted pro hac vice)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com

*Supervised by principals of the firm who are
  members of the Virginia bar

*Counsel for Plaintiffs Ogle School Management, LLC & Tricoci University of Beauty Culture, LLC*

September 13, 2024