**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

AMERICAN ASSOCIATION OF
COSMETOLOGY SCHOOLS *et al.*,

               *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

               *Defendants*.

No. 4:23-cv-01267-O

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 4

    I.     The Higher Education Act of 1965 ................................. 4

    II.    Regulatory History ............................................................ 7

    III.   The 2023 FVT and GE Rules .......................................... 10

    IV.   Procedural History .......................................................... 13

ARGUMENT ................................................................................ 14

    I.     The Secretary Has Statutory Authority To Promulgate the GE Rule ................. 15

    II.    A GE Rule Provision (34 C.F.R. § 668.603) Lawfully Identifies How a GE Program's Eligibility Is Terminated ................................................................. 31

    III.   The GE Rule Is Not Arbitrary or Capricious ..................................... 37

          A.    The D/E and EP Metrics Reasonably Rely on Reported Earnings and Forego Alternate School Surveys Deemed Unreliable, Burdensome, and Unnecessary ............................................................................... 38

          B.    The Metrics Reasonably Focus on Student Outcomes ........................... 51

               1.  Part-time and non-workers ................................................... 52

               2.  Demographic characteristics .............................................. 57

               3.  Changes in economic conditions and the pandemic ........................ 63

          C.    The D/E Metric's 8% and 20% Thresholds Are Well Founded .............. 64

          D.    The NFR Thoroughly Explains the GE Rule's Costs and Benefits and Shows that It Serves Title IV's Purpose To Help Students .............. 69

    IV.   AACS Identifies No First Amendment Violation ................................. 72

          A.    The GE Rule Does Not Unconstitutionally Burden Speech ................... 72

        B.     Consistent with the First Amendment, the GE Rule's Warning Requirement (§ 668.605) Ensures Students Are Notified When Their Programs May Lose Title IV Eligibility ................................................... 75

   V.    Even If the Court Were To Grant Plaintiffs Relief, It Should Be Carefully Limited ........................................................................................................................ 79

CONCLUSION ............................................................................................................................ 80

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AACS v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992) ...................................................... 36, 37

*AACS v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) .................................. 9, 39, 41, 43, 44, 47, 49

*Air Prod. & Chems., Inc. v. GSA,* 700 F. Supp. 3d 487 (N.D. Tex. 2023) .................................. 38

*Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020) ........................................................... 78

*Am. Petroleum Inst. v. EPA*, 540 F.2d 1023 (10th Cir. 1976) ...................................................... 59

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016 (D.C. Cir. 1977) .................... 40, 47

*Appalachian Power Co. v. EPA*, 135 F.3d 791 (D.C. Cir. 1998) ................................................. 59

*Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215 (5th Cir. 2016) ..................................... 39

*Ass'n of Private Colls. & Univs.* ("*APCU*") *v. Duncan*,
    870 F. Supp. 2d 133 (D.D.C. 2012) ......................................... 8, 16, 17, 18, 22, 24, 36, 66

*Ass'n of Private Sector Colls. & Univs* ("*APSCU*") *v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) .................................................................................... 6, 19

*APSCU v. Duncan*,
    No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) (unpublished) ................ *passim*

*APSCU v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015),
    *aff'd*, No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016)............................... *passim*

*Ass'n of Proprietary Colls.* ("*APC*") *v. Duncan*,
    107 F. Supp. 3d 332 (S.D.N.Y. 2015) ..................................... 8, 16, 17, 18, 21, 36, 57, 65

*Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008) ............................................... 40

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .............................................................................. 35

*Biden v. Texas*, 597 U.S. 785 (2022) .......................................................................................... 25

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) ..................................................... 76, 77

*Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) ............................................ 79

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................................... 79

iv

*Career Coll. Ass'n v. Riley*, 74 F.3d 1265 (D.C. Cir. 1996) .................................................. 24, 35

*Chamber of Com. v. SEC,* 85 F.4th 760 (5th Cir. 2023) ........................................................ 37, 59

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co.*, 94 F.4th 492 (5th Cir. 2024) ...................... 18

*Chem. Mfrs. Ass'n v. EPA*, 885 F.2d 253, 262 (5th Cir. 1989) .................................................. 58

*Chevron, USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ........................................................ 2, 14, 16

*Cigar Ass'n  v. FDA*, 5 F.4th 68, 76 (D.C. Cir. 2021) .................................................................. 70

*Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) ...................................... 36

*DC Operating, L.L.C. v. Paxton*, 100 F.4th 657 (5th Cir. 2024) ................................................ 75

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ....................................................................... 37

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ....................................................................... 18

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564 (5th Cir. 2017) ..................... 65

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) ............................................................... 37

*FMC Corp. v. Train*, 539 F.2d 973 (4th Cir. 1976) .................................................................... 58

*Gill v. Whitford*, 585 U.S. 48 (2018) ........................................................................................... 79

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) ...................................... 15

*Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510 (5th Cir. 2023) ............................... 38

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................................... 74

*Holy Cross Coll., Inc. v. Criswell*, No. 23-30085, 2024 WL 2318166 (5th Cir. May 22, 2024)  37

*James v. ICE*, 543 U.S. 335 (2005) ............................................................................................. 24

*Judulang v. Holder*, 565 U.S. 42, 53 (2011) .......................................................................... 14, 37

*Labrador v. Poe*, 144 S. Ct. 921 (2024) ...................................................................................... 80

*Leathers v. Medlock*, 499 U.S. 439 (1991) .................................................................................. 74

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ............................... 2, 14, 16, 17, 22

*Louisiana v. Verity*, 853 F.2d 322 (5th Cir. 1988) ....................................................... 37

*Matter of Dallas Roadster, Ltd.*, 846 F.3d 112 (5th Cir. 2017) .................................... 15

*Med-Cert Home Care, LLC v. Becerra*,
    No. 3:18-CV-02372-E, 2023 WL 6202050 (N.D. Tex. Sept. 21, 2023) ........................ 15

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687 (5th Cir. 2010) ........... 38

*Mex. Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023) ............................. 69

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 43 (1983) ................................................................... 37

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
    No. 4:23-CV-00830-O, 2024 WL 3517504 (N.D. Tex. July 23, 2024) ......................... 15

*Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024) ........................................ 47

*Ohio v. EPA*, 144 S. Ct. 2040 (2024) ........................................................... 37

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury*, 73 F.4th 291 (5th Cir. 2023) ................ 38

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) ................. 73

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 527 (2022) ............... 78

*Regan v. Tax'n With Representation*, 461 U.S. 540 (1983) ........................................ 73

*R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir. 2024) .................................. 78

*Rust v. Sullivan*, 500 U.S 173 (1991) ........................................................... 74

*Texas v. EPA*, 91 F.4th 280 (5th Cir. 2024) ..................................................... 46

*Texas Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383 (5th Cir. 2020) ................... 18

*Trump v. Hawaii*, 585 U.S. 667 (2018) ......................................................... 80

*United States v. Am. Libr. Ass'n*, 539 U.S. 194 (2003) ......................................... 74

*United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014) ........................................ 77

*United States v. Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020) .................................. 25

*United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023),
    *cert. denied*, 144 S. Ct. 551 (2024) ........................................................... 18

*U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521 (5th Cir. 2012) ............. 15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ......................... 76

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................. 73, 79

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) ............................................... 74

*Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985) ..................................... 78

**Statutes**

Smith-Hughes Act, Pub. L. No. 64-929 (1917) ........................................................ 28

National Defense Education Act ("NDEA"), Pub. L. No. 85-864 (1958) .............................. 5, 28

National Vocational Student Loan Insurance Act of 1965 ("NVSLIA"),
    Pub. L. 89-287, § 17(a), 79 Stat. 1037 ......................................................... 4, 5, 7, 29

Higher Education Act of 1965, Pub. L. No. 89-329 (1965) .............................................. 5

Higher Education Act Amendments, Pub. L. No. 90-575 (1968) ....................................... 5

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ......................................... 14

5 U.S.C. § 706 ........................................................................... 15, 31, 37, 80

Higher Education Act ("HEA"), 20 U.S.C. §§ 1001 *et seq.* ............................................ 5

20 U.S.C. § 1001 ..................................................................................... 75

20 U.S.C. § 1002 ............................................................................... 25, 74

20 U.S.C. § 1036 ..................................................................................... 26

HEA Title IV, 20 U.S.C. §§ 1070-1099dd .......................................................... *passim*

20 U.S.C. § 1070 ........................................................................... 4, 19, 20, 51

20 U.S.C. § 1078 ...................................................................................... 6

20 U.S.C. § 1080 ...................................................................................... 6

20 U.S.C. § 1085 ........................................................................................................... 24

20 U.S.C. § 1087a ....................................................................................................... 4, 51

20 U.S.C. § 1087c ................................................................................................... 6, 19, 30

20 U.S.C. § 1087d .............................................................................................. 6, 7, 19, 76

20 U.S.C. § 1088 ................................................ 7, 16, 17, 23, 24, 25, 27, 31, 35

20 U.S.C. § 1094 ...................................... 6, 7, 15, 17, 22, 24, 30, 31, 32, 33, 35

20 U.S.C. § 1099c .............................................................. 6, 22, 30, 32, 35

20 U.S.C. § 1134c ......................................................................................................... 26

20 U.S.C. § 1135c ......................................................................................................... 26

20 U.S.C. § 1161g ......................................................................................................... 26

20 U.S.C. § 1221e-3 ................................................................................................ 7, 19

20 U.S.C. § 1231a ......................................................................................................... 30

20 U.S.C. § 3474 ............................................................................................................. 7

**Legislative Materials**

H.R. Rep. No. 64-81 (1916) ....................................................................................... 28

H.R. Rep. No. 89-308 (1965) ................................................................................... 7, 29

S. Rep. No. 89-758 (1965) ....................................................................................... 7, 29

S. Rep. No. 92-346 (1971) ........................................................................................... 23

GAO, GAO–10–948T, *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged
Fraud and Engaged in Deceptive and Questionable Marketing Practices* (2010) ......... 60

Staff of S. Comm. on Health, Education, Labor, and Pensions, 112th Cong., *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (Comm. Print 2012)[1] ........................................................................ 59

**Executive Materials**

Lyndon B. Johnson, Statement by the President upon Signing the National Vocational Student Loan Insurance Act - October 22, 1965, 1965 Pub. Papers 1075 (1965), *available at* https://www.govinfo.gov/app/collection/PPP .................................................... 4

Lyndon B. Johnson, Statement by the President upon Signing the Higher Education Act - November 8, 1965, 1965 Pub. Papers 1103 (1965), *available at* https://www.govinfo.gov/app/collection/PPP .................................................... 4

**Regulations**

76 Fed. Reg. 34386, 34497 (June 13, 2011) ("2011 Rule") ................................................. 27, 41

79 Fed. Reg. 64890 (Oct. 31, 2014) ("2014 Rule").................................................... 8, 41

84 Fed. Reg. 31392 (July 1, 2019) ("2019 Rule") ..................................................... 9, 54, 64, 66

NPRM, 88 Fed. Reg. 32300 (May 19, 2023) ....................................................... *passim*

Final regulations ("FVT & GE Rules"), 88 Fed. Reg. 70004 (Oct. 10, 2023) .................... *passim*

34 C.F.R. § 668.2 ........................................................................................ 33, 52

34 C.F.R. § 668.8 ........................................................................................ 28

34 C.F.R. § 668.13 ....................................................................................... 33

34 C.F.R. § 668.14 ....................................................................................... 34

34 C.F.R. § 668.26 ....................................................................................... 33

34 C.F.R. § 668.32 ....................................................................................... 17

[1] This report is included in the Administrative Record (AR-F-007418-AR-F-008513) but is not reproduced in the Appendix accompanying this filing due to its length (over 1000 pages) and because it is a Congressional document publicly available at https://www.help.senate.gov/hearings/for-profit-higher-education-the-failure-to-safeguard-the-federal-investment-and-ensure-student-success).

34 C.F.R. § 668.43 ................................................................................................ 11

34 C.F.R. Subpart G, 34 C.F.R. §§ 668.81 to .100 .................................. 33, 34, 35, 36

34 C.F.R. § 668.81 ................................................................................................ 33

34 C.F.R. Subpart Q ............................................................................................. 11

34 C.F.R. § 668.403 ........................................................................................ 52, 64

34 C.F.R. § 668.404 ............................................................................................. 52

34 C.F.R. § 668.408 ........................................................................................ 11, 30

34 C.F.R. § 668.409 ............................................................................................. 80

34 C.F.R. Subpart S ............................................................................................. 12

34 C.F.R. § 668.602 ............................................................................................. 13

34 C.F.R. § 668.603 .............................................................. 31, 32, 33, 34, 35, 36, 37

34 C.F.R. § 668.605 .................................................................... 13, 75, 77, 78, 79

34 C.F.R. § 668.606 ............................................................................................. 80

34 C.F.R. § 685.304 ............................................................................................. 76

## <u>Secondary Sources</u>

Baum, Sandy & Saul Schwartz,
 *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt*,
 THE COLLEGE BOARD (2006) ............................................................. 65, 66. 67

Baum, Sandy,
 *DeVos misrepresents the evidence in seeking gainful employment deregulation*,
 URBAN INSTITUTE (2018) ................................................................... 66, 67

Cellini, Stephanie Riegg & Kathryn J. Blanchard,
 *Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of
 Underreported Income*, POSTSECONDARY EQUITY & ECON. RESEARCH PROJECT
 (2022) ......................................................................... 9, 43, 44, 48, 49, 50, 61

Cellini, Stephanie Riegg & Chaudhary, Latika,
    *The Labor Market Returns to a For-Profit College Education,*
    ECON. OF EDUC. REV., 43 (2014) ...................................................................... 55

Cellini, Stephanie Riegg & Darolia, Rajeev,
    *High Costs, Low Resources, and Missing Information: Explaining Student Borrowing in*
    *the For-Profit Sector,* THE ANNALS OF THE AM. ACADEMY OF POLITICAL & SOCIAL
    SCIENCE, 671(1) (2017) ...................................................................... 58, 60

Cellini, Stephanie Riegg & Claudia Goldin,
    *Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges*,
    AM. ECON. J.: ECON. POLICY 6(4) (Nov. 2014) ..................................................... 45, 46, 62

Cellini, Stephanie Riegg & Bianca Onwukwe,
    *Cosmetology Schools Everywhere: Most Cosmetology Schools Exist Outside of the*
    *Federal Student Aid System*, POSTSECONDARY EQUITY & ECONOMICS RESEARCH PROJECT
    working paper (Aug. 2022) ................................................. 24, 45, 46, 51, 60, 62, 71, 73

Cellini, Stephanie Riegg & Turner, Nicholas,
    *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students*
    *using Administrative Data,* J. OF HUMAN RESOURCES, 54(2) (2022) ...........................................61

Cellini, Stephanie Riegg, Darolia, Rajeev, Turner, Lesley J.,
    *Where do Students Go When For-Profit Colleges Lose Federal Aid?* AM. ECON. J.: ECON.
    POLICY, 12(2) (2020) ...........................................................................60

Dadgar, Mina. & Trimble, Madeline Joy, *Labor Market Returns to Sub-Baccalaureate Credentials:*
    *How Much Does a Community College Degree or Certificate Pay?* EDUC. EVALUATION
    & POLICY ANALYSIS, Vol. 37(4) (2015) ...........................................................55

Qnity Institute, A Career in Pro Beauty (2023) ............................................... 48, 49, 53

Scalia, Antonin & Bryan A. Garner,
    READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ....................................... 29

## INTRODUCTION

Plaintiffs American Association of Cosmetology Schools ("AACS") and three of its for-profit members challenge aspects of Final Regulations, 88 Fed. Reg. 70004 (Oct. 10, 2023), promulgated by the Department of Education ("Department") under Title IV of the Higher Education Act of 1965 ("HEA"), which established various Federally funded student financial assistance programs, including loan programs, to help students access a postsecondary education. Schools like AACS's members collectively receive billions of dollars of Title IV student loan money as tuition and fees and do not have to repay any of it if students default. Rather, that risk is borne entirely by the students, who suffer long-lasting adverse consequences if they cannot repay their loans, and taxpayers, who cover the resulting loss.

As the agency charged with administering Title IV, the Department must enforce statutory conditions to ensure the taxpayer funds it disburses serve their intended purpose. Facing a growing student debt crisis with over $1.6 trillion and counting in outstanding loans that too often go unpaid, with huge negative impacts on individuals' futures and the public fisc, the Department determined to take steps within its statutory authority to ensure that Title IV aid helps students as Congress intended. It did so through two separate rules, set forth in the same Federal Register notice, that each build upon prior efforts that never fully went into effect but were upheld in substantial part by other courts. The Financial Value Transparency ("FVT") Rule establishes a framework to help students compare postsecondary school options by sharing, via a Department website, relevant information about the financial costs and benefits of nearly all programs that participate in Title IV. The Gainful Employment ("GE") Rule establishes an accountability framework—modified from those in prior rules based on the Department's experience, as well as new research and analysis—to measure whether career training programs participating in Title IV

prepare students for gainful employment, as statutorily required. Both Rules took effect on July 1, 2024, after this Court denied the preliminary injunction ("PI") sought by plaintiffs Ogle School Management, LLC and Tricoci University of Beauty Culture, LLC (collectively, "Ogle"), holding Ogle failed to show a likelihood of success in its challenge to the GE Rule. As this Court recognized, what the GE Rule seeks to prevent is "funneling Title IV loan money to for-profit schools whose graduates' financial outcomes are, on average, worse than when they started." Order of June 20, 2024 ("PI Order"), No. 4:24-cv-259 [ECF 31], at 7.

Plaintiffs' arguments at summary judgment, submitted in two separate motions and again focusing on aspects of the GE Rule, similarly fail.[1] Plaintiffs first challenge the Department's statutory authority to issue the GE Rule, arguing that the HEA's eligibility criterion for career training programs—that they must "prepare students for gainful employment in a recognized occupation"—prohibits the use of metrics to assess eligibility and instead requires the Department to accept any program that intends its graduates to get paying jobs. Seeking to overcome the repeated rejection of their theory by several courts, including this one, Plaintiffs rely on the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). However, this Court's PI Order did not rely on *Chevron* deference, which *Loper* overruled. Past courts' reasoning remains persuasive precisely because they largely engaged in the same review of dictionary definitions and application of traditional tools of statutory construction that *Loper* requires. Such tools continue to demonstrate that the best reading of the statutory phrase "gainful employment," in context, is not "any job that pays," but instead requires the employment to be

---

[1] Pursuant to the parties' agreement [ECF 25], Defendants opt to file this combined response to both motions in order to avoid unnecessary redundancy and reduce the amount of briefing before the Court. Defendants refer herein to the original AACS plaintiffs as "AACS" (and their summary judgment motion and brief as "A.Mot.," and "A.Br."); to the two AACS members originally filing separately as "Ogle" ("O.Mot.," "O.Br."); and to all plaintiffs collectively as "Plaintiffs."

"gainful," or "profitable." Under that reading, programs do not prepare students for gainful employment if, on average, they leave their graduates no better off than when they started, or, even worse, drowning in more debt than their earnings can bear.

Plaintiffs also argue aspects of the GE Rule are arbitrary and capricious, but in each instance, the Department supported its decisions with sound reasoning and consideration of the relevant factors, again as the Court found at the PI stage. Plaintiffs' various complaints boil down to the argument that many for-profit cosmetology programs are likely to fail the GE Rule's eligibility assessment and may ultimately (if they fail for two out of three years) lose access, at least temporarily, to Title IV funds. The Department particularly addressed cosmetology programs in its Notice of Final Regulations ("NFR") when issuing the Rules, explaining its careful review of the research in this area. The Department concluded that, unlike other career training fields where most programs—including for-profit programs—are predicted to remain eligible, the for-profit cosmetology programs that participate in Title IV do share characteristics making them more likely to fail—though not due to underreported income as Plaintiffs allege. Rather, research suggests many of these programs charge relatively high tuition to train students for a profession where typical earnings are relatively low. Of course, the higher the tuition, the more risk-free Title IV money these programs receive even as their graduates are more likely to default or otherwise fail to repay their loans. But cosmetology programs need not follow this business model, and most do not. Many cosmetology programs—including hundreds in Texas alone—do not participate in Title IV at all, yet apparently succeed by charging students less. The Department reasonably concluded that the specific features of cosmetology programs do not justify ignoring Title IV's statutory eligibility criteria. The GE Rule seeks to ensure Title IV-participating GE programs, including cosmetology programs, prepare students for gainful employment as Congress intended.

AACS raises new due process and First Amendment arguments not at issue at the PI stage, but they are equally meritless. As a statutory scheme of federal funding intended to help students, Title IV vests no rights in the schools that profit by their participation, and Title IV eligibility requirements and other conditions on participation do not implicate schools' provision of instruction, which they remain free to do with or without federal taxpayer funds. Though some GE programs must transmit warnings if they face the prospect of becoming ineligible for Title IV the next year, that commonsense measure is necessary to ensure students—the intended beneficiaries of Title IV—are apprised of the risk to their ability to use their federally funded grants and loans at a particular program and what they could expect in the event the program loses eligibility. Because Plaintiffs' claims fail, summary judgment should be entered in favor of Defendants.

## BACKGROUND

## I.    The Higher Education Act of 1965

When signing the HEA into law on November 8, 1965 at his alma mater in San Marcos, Texas, President Lyndon B. Johnson emphasized the law's benefits for schools, and above all, for students, who could expect futures of "greater productivity" and "more profitable" jobs because federal assistance would allow them to afford postsecondary education.[2] While other HEA titles focus on schools and teachers, Title IV is devoted to students, detailing various grant, loan, and work study assistance programs. *See* 20 U.S.C. §§ 1070–1099d; *cf. id.* §§ 1070(a), 1087a(a) (recognizing purpose of Title IV's grant and loan programs is to help students pursue their courses

---

[2] *See* 1965 Pub. Papers 1103-04. Less than a month earlier, President Johnson signed the National Vocational Student Loan Insurance Act ("NVSLIA"), which later merged with the HEA, with similar emphasis. 1965 Pub. Papers 1075, 1076 (Oct. 22, 1965) (NVSLIA would benefit students by affording them vocational training "to become useful and productive citizens" and "return [an amount] to our economy with their new skills and training [that] is far beyond counting").

of study at participating schools).[3] In recent years, the Department has annually disbursed more than $100 billion in new Title IV federal aid to millions of postsecondary students and their families, including approximately $72 billion in loans. 88 Fed. Reg. at 70103, 70107.

Although students are the intended beneficiaries of Title IV aid, postsecondary schools benefit when student aid recipients choose to attend their programs and thereby send federal grant and loan money to those programs in the form of tuition and fees. Students choose a particular career training program hoping their investment of time, effort, and money will pay off financially. 88 Fed. Reg. at 70015. At the very least, students hope they will be able to repay their Title IV loans. The consequences if they cannot repay their loans are severe. High debt levels decrease a student's prospects for marriage and home ownership. *Id.* at 70116. Students who default on their loans face collection costs and penalties, garnishment of their wages, loss of tax refunds, and significant drops in their credit scores that can hinder their ability to rent or buy a home, sign up for utilities or insurance, buy a car, or get a job. *Id.* at 70117.

Not only students, but American taxpayers, face adverse consequences when Title IV loans are not repaid. Defaults "shift[] [student] tuition costs onto taxpayers" because the HEA requires

---

[3] The current HEA, 20 U.S.C. §§ 1001 *et seq.*, merges a series of Congress's enactments: the 1958 National Defense Education Act ("NDEA"), Pub. L. No. 85-864 (which established the first federal loan program for postsecondary students, explaining the purpose of Congress's investment to provide "substantial assistance" to students to develop "the mental resources and technical skills" of the Nation's youth and to promote the "national interest" in an educated and skilled citizenry); the 1965 HEA, Pub. L. No. 89-329 (in Part A establishing the first general postsecondary grant program (now known as Pell Grants); in Part B focusing on loan insurance; and in Part D building on the NDEA's loan program); the 1965 NVSLIA, Pub. L. No. 89-287 (loan insurance for vocational school students); and the 1968 Higher Education Act Amendments, Pub. L. No. 90-575, which merged the three previous Acts into a single statutory scheme, including by combining the HEA and NVSLIA loan insurance components and by expanding the NDEA loan program to students at all eligible postsecondary programs, including eligible vocational programs, while authorizing the Secretary to include such terms and conditions in agreements with such schools to ensure that "the availability of [Title IV] assistance" would not "increase the tuition, fees, or other charges" to such students as a result. *See id.* §§ 151, 174.

the United States government to cover those costs one way or another. *See APSCU v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012); 20 U.S.C. §§ 1078(c), 1080; 88 Fed. Reg. at 70012-13.

Schools' finances, on the other hand, are unaffected. Instead, schools keep their students' tuition payments—and thus financially benefit from Title IV—"regardless of whether those students are ultimately able to repay their loans." *APSCU*, 681 F.3d at 435.

Although Congress did not make schools financial guarantors for students' loans, the HEA's Title IV framework nevertheless holds schools accountable through statutory conditions and requirements administered by the Secretary. The HEA limits Title IV participation to "eligible" schools and requires such schools to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094; *APSCU*, 681 F.3d at 435. The Secretary must determine whether schools meet the necessary requirements of financial responsibility and administrative capability before deeming them eligible to participate in Title IV, 20 U.S.C. § 1099c(a), and, relatedly, must "prescribe such regulations as may be necessary" for "the establishment of reasonable standards of financial responsibility and appropriate institutional capability" for schools, "including any matter the Secretary deems necessary to the sound administration of the financial aid programs," *id.* § 1094(c)(1)(B). The Secretary selects schools to participate in Title IV's loan program based on their applications, "containing such information and assurances as the Secretary may require," as well as their satisfaction of "such other eligibility requirements as the Secretary shall prescribe." *Id.* § 1087c(b)(2).

Once the Secretary selects a school for participation, the school must sign a Program Participation Agreement ("PPA"), which conditions a school's continuing Title IV eligibility on the school's compliance both with express statutory requirements and with further requirements that the Secretary "determines are necessary to protect the interests of the United States and to

promote the purposes of" Title IV. *Id.* § 1087d(a)(6); *cf.* id. § 1094(a). Among other things, schools must continue providing information to the Department relating to the school's "administrative capability and financial responsibility," as well as other information that "the Secretary may reasonably require." *See id.* § 1094(a). Congress also vested the Secretary with authority to issue and amend rules "governing the manner of operations of, and governing the applicable programs administered by, the Department." *Id.* § 1221e-3; *see also id.* § 3474 (authorizing Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions).

Congress also identified specific eligibility requirements for vocational schools. When Congress extended federal loan eligibility to students at for-profit career training programs through the NVSLIA, later merged with the HEA, it did so only after receiving assurances that a high percentage of students receiving such training later found sufficiently high-paying jobs to afford repayment. S. Rep. No. 89-758, at 3-12 (1965); H.R. Rep. No. 89-308, at 3-9, 11 (1965). Congress limited NVSLIA eligibility to schools providing "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." NVSLIA, Pub. L. No. 89-287, § 17(a). The current HEA provisions similarly limit Title IV aid in this category to schools that provide "an *eligible* program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), (emphasis added); *cf. id.* § 1088(b)(1) (an "eligible program" is one that, among other things, "provides a program of training to prepare students for gainful employment in a recognized profession.").

## II.    **Regulatory History**

For over a decade, the Department has recognized that, while many students benefit from Title IV loans, a significant number struggle with the resulting debt long after graduation and

ultimately fail to repay their loans. The Department also recognized that a disproportionate share of graduates with unaffordable loan debt attended programs at for-profit schools, which are generally more expensive than their public or nonprofit counterparts, leading to higher loan amounts. *See* 79 Fed. Reg. 64890, 65032 (Oct. 31, 2014). The Department concluded that some GE programs were failing to prepare students for gainful employment in accord with Title IV's statutory eligibility requirement. In rules issued first in 2011 and then in 2014, the Department set forth reporting and disclosure requirements as well as accountability measures aimed at addressing GE programs graduates' rising loan defaults that could not be primarily attributed to students' characteristics, but instead correlated to the quality of training that GE programs provided. *See, e.g.*, *Ass'n of Private Colls. & Univs.* ("*APCU*") *v. Duncan*, 870 F. Supp. 2d 133, 150-51 (D.D.C. 2012) (describing "a series of multivariate regression analyses" that the Department conducted before issuing the 2011 Rule to rule out the possibility that its measures simply reflected student demographics); *APSCU v. Duncan*, 110 F. Supp. 3d 176, 192 (D.D.C. 2015) (discussing similar analysis for 2014 Rule), *aff'd*, No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016); *Ass'n of Proprietary Colls.* ("*APC*") *v. Duncan*, 107 F. Supp. 3d 332, 364-65 (S.D.N.Y. 2015) (same).

All courts to consider the 2011 and 2014 Rules recognized the Department's statutory authority to issue them, rejecting the same arguments that Plaintiffs raise here. *See APCU*, 870 F. Supp. 2d at 146-48; *APC*, 107 F. Supp. 3d at 358-63; *APSCU*, 110 F. Supp. 3d at 184-89, *aff'd by APSCU*, 640 Fed. Appx. at *7-8. These courts also held that the debt-to-earnings ("D/E") metric that the Department first introduced in the 2011 Rule satisfied facial APA review. *APCU*, 870 F. Supp. 2d at 152-53 (holding D/E metric reasonable but invalidating 2011 Rule because separate "debt repayment" metric—not at issue in any subsequent rule—was insufficiently supported by evidence); *see also APC*, 107 F. Supp. 3d at 368 (upholding 2014 Rule containing the same D/E

metric); *APSCU*, 110 F. Supp. 3d at 191 (same), *aff'd by APSCU*, 640 Fed. Appx. at *8.

Ultimately, the only court that found fault with the D/E metric did so in an as-applied context. AACS, the same cosmetology school organization that is a plaintiff in this case, claimed cosmetology graduates failed to report tip income to the IRS and cited a single study suggesting reported earnings were up to 50% lower as a result. *AACS v. DeVos*, 258 F. Supp. 3d 50, 74-75 (D.D.C. 2017). The court held the Department had reasonably ruled out proposed alternatives to the 2014 Rule's use of aggregate reported earnings from the Social Security Administration ("SSA") for initial D/E rate calculations. *See id.* But the court concluded that the 2014 Rule's integrity standards for alternate earnings data offered by failing programs that sought recalculation of their rates on appeal were too difficult for cosmetology programs to satisfy. *See id.* The court decided to craft its own appeal process for such programs by removing those integrity standards altogether for AACS members. *See id.* at 76-77.

The Department implemented *AACS* across-the-board for its first year of D/E rate calculations, allowing any program to resubmit alternate earnings data with no data quality control. Not surprisingly, the programs that did were able to provide substantially higher earnings data—on average 82% higher. NPRM, 88 Fed. Reg. 32300, 32336 (May 19, 2023).[4] The SSA then stopped providing earnings data, and the Department was forced to halt implementation of the 2014 Rule after a single year's calculations. 84 Fed. Reg. 31392, 31392-93 (July 1, 2019).

In 2019, a new Administration rescinded the 2014 Rule. *Id.* at 31393. It concluded that problems with loan repayment extended beyond GE program graduates, and that the framework in the 2014 Rule was "insufficient to address the student borrowing and under-payment problem

---

[4] *Cf.* Cellini, Stephanie Riegg & Kathryn J Blanchard, *Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of Underreported Income* (2022) [Defendants' Appendix ("App."), filed concurrently herewith, 23-33].

of this magnitude." *Id.* at 31394. Rather, data showing that 43% of all outstanding loans were in distress "reinforce the need for an accountability and transparency framework that applies to all title IV programs and institutions." *Id.* The 2019 Rule settled on the College Scorecard "as the tool for delivering" "program-level debt and earnings data for title IV programs," further noting that, in light of the Department's "general authority to collect and report data related to the performance of title IV programs," no rulemaking was required to modify the College Scorecard. *Id.* The Department emphasized that the Scorecard's expansion would give students and parents "access to comparable information about program outcomes at all types of title IV-participating institutions," informing students' enrollment choices with debt and earnings data necessary to enable a "market-based accountability system to function." *Id.*

### III.    The 2023 FVT and GE Rules

The expansion of the College Scorecard, however, did little to rein in unpaid student debt. Currently, over $1.6 trillion in Title IV loans remains outstanding—an increase of 49% in the last ten years. 88 Fed. Reg. at 70006. Studies showed that merely posting debt and earnings information on the Scorecard was insufficient; rather, it is critical that students access such information "at key points during the college decision-making process." 88 Fed. Reg. at 32323-24; *cf.* 88 Fed. Reg. at 70070. The Department also determined that GE accountability measures should be reinstated, with adjustments to more accurately assess whether GE programs prepare students for gainful employment. 88 Fed. Reg. at 32307-08, 32309-11, 3243-43. After a lengthy negotiated and notice-and-comment rulemaking process, *cf. id.* at 32316 (describing public participation and negotiated rulemaking), the Department issued the FVT and GE Rules on October 10, 2023, with an effective date of July 1, 2024. 88 Fed. Reg. 70004. The Rules establish transparency and accountability frameworks that differ in significant respects from prior GE rules:

**First**, the FVT Rule, set forth in 34 C.F.R. § 668.43 and Subpart Q, fundamentally differs from the transparency frameworks of the 2011 and 2014 Rules because it generally covers all Title IV programs, not just GE programs. *See* 88 Fed. Reg. at 32324. The FVT Rule thus builds on the 2019 Rule's conclusion that students are best able to make informed choices when they have comparable information about all available programs, allowing for apples-to-apples comparisons, but it enhances the mechanisms through which information is provided to make it more useful. *Id.*; 88 Fed. Reg. at 70020. In particular, the FVT Rule establishes a new Department website, to be set up by July 1, 2026. 88 Fed. Reg. at 32351; 88 Fed Reg. at 70072-77, 70187-88 (§ 668.43(d)(1)). Programs are required to report certain information to populate the website's data fields. *Id.* at 70187, 70191 (§§ 668.43(d)(1), .408).

The website will be unique among other Department websites in providing students with vital information about the financial value of postsecondary programs at key points in time when students are making enrollment decisions. Prospective students will receive the website URL before they sign an enrollment agreement, complete registration, or make a financial commitment, and enrolled students will receive the URL each year before the date of their first expected payment to continue their studies. 88 Fed. Reg. at 70187 (§ 668.43(d)(3), (4))

The website will also include two metrics, calculated by the Department using information collected from all programs with enough graduates to meet data privacy standards, to help students compare programs' financial outcomes. First is a D/E metric, similar to the metric set forth in prior GE rules, but now measuring graduates' earnings "approximately one year later relative to when they complete their degree than under the 2014 Prior Rule." 88 Fed. Reg. at 32335. Because graduates' earnings tend to increase over time, this change "will yield substantially higher measured program earnings than under the [2014 Rule's] methodology—on the order of $4000

(about 20 percent) higher" for lower-earning programs. 88 Fed. Reg. at 70096. The 2023 version of the D/E calculation omits an alternate earnings appeal process because the Department's experience led it to conclude school-conducted surveys yielded inconsistent and unreliable results, and new research revealed deep flaws in the single study suggesting underreporting of tip income was likely to affect results while post-*AACS* alternate earnings had been grossly inflated. *Id.* at 70042 & n.139.

The FVT Rule's second metric—the Earnings Premium ("EP") metric—measures how program graduates' typical earnings compare to earnings of typical high school graduates. *Id.* at 70015 ("While the D/E rates measure identifies programs where debt is high relative to earnings, the EP measure assesses the economic boost a program provides to its students independent of the debt incurred."). Recognizing that "[t]he vast majority of students cite the opportunity for a good job or higher earnings as a key, if not the most important, reason they chose to pursue a college degree," the Department concluded the EP measure would provide valuable information for prospective students choosing what program to attend. *Id.* The Department also identified a strong correlation between low EPs and student defaults, reinforcing its understanding that even small amounts of debt are unaffordable to those with very low earnings. *Id.*

**Second**, the GE Rule, laid out in 34 C.F.R. Subpart S, uses the same D/E and EP metrics that will be posted on the FVT website for a separate purpose—to determine whether GE programs meet their unique statutory eligibility requirement by preparing students for gainful employment in a recognized occupation. 78 Fed. Reg. at 32342-43; 78 Fed. Reg. at 70015-16. The Department recognized GE programs' "mission" under the statutory eligibility requirement to prepare students for gainful employment in a recognized occupation was "to further students' career success," and training that "inflicts financial harm on its students" by leaving graduates with more debt than they

can repay, or with no greater earnings than those without postsecondary training, "cannot fairly be considered 'gainful.'" 78 Fed. Reg. at 32342-43. The Department concluded it could reasonably use the metrics to assess whether GE programs are eligible under the statutory language. *Id.*

To remain eligible, GE programs must not fail the same metric (D/E or EP) for two out of any three consecutive award years for which the metrics are calculated. 88 Fed. Reg. at 70192 (§ 668.602(a)(2), (3)). Thus, the earliest any GE program might lose Title IV eligibility under the GE Rule is 2026. In addition, beginning on July 1, 2026, a GE program must warn students and prospective students of its potential loss of eligibility if it has already failed one of the metrics during the previous two award years. *Id.* at 70193 (§ 668.605). The Department projected that, even with privacy restrictions limiting the metrics' applicability to programs with 30 or more graduates within a 2- or 4-year cohort period, the metrics will allow it to assess eligibility for the GE programs attended by over 80% of students receiving Title IV aid. *Id.* at 70046; *see* 88 Fed. Reg. at 32415 (explaining expansion of cohort period to 4 years would cover 8% more enrollments). While the vast majority of those programs would remain eligible, the 5% likely to fail enrolled nearly 24% of GE program students receiving Title IV aid. 88 Fed. Reg. at 70017.

## IV.    Procedural History

AACS filed suit on December 22, 2023, challenging aspects of the GE Rule as arbitrary and capricious (Count I); providing inadequate pre-termination review in violation of statutory requirements and due process (Count II); and unconstitutional under the First Amendment and the Equal Protection and Due Process Clauses of the Fifth Amendment (Count III). AACS Compl. [ECF 1] ¶¶ 162-207. Ogle filed its separate case, as well as its PI motion, three months later, on March 20, 2024, challenging the GE Rule as in excess of statutory authority (Count I), and aspects

of the GE Rule as arbitrary and capricious (Count II). Ogle Compl. [ECF 1] ¶¶ 80-160.[5]

On June 20, 2024 the Court denied Ogle's PI motion. [Ogle ECF 31]. The Court first rejected Ogle's claim that the GE Rule was ultra vires. Recognizing that the Department did not seek to rely on *Chevron*, the Court concluded that the "ordinary meaning" of the phrase "gainful employment" encompassed the concept of profitability and "an excess of returns," and that, "[w]hen students borrow more to afford a program than its training prepares them to repay," the program by definition fails to prepare them for gainful employment. *Id.* at 7. The Court also rejected Ogle's arguments that aspects of the GE Rule are arbitrary and capricious, recognizing that agencies "have expertise and experience in administering their statutes that no court can properly ignore," *id.* at 8 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)), and that the record here "shows that the Department engaged in thorough rule making," responding to comments and providing extensive explanations for its decisions, *id.* at 9.

The Court further ordered the parties, including AACS, to confer regarding consolidation, *id.* at 11-12, and after they did so, ordered the two cases consolidated under AACS's caption. ECF 22. Pursuant to an agreed-upon schedule [ECF 25, 27], AACS and Ogle filed separate motions for summary judgment on September 13, 2024. A.Mot. [ECF 28]; O.Mot. [ECF 31].

## ARGUMENT

The APA, 5 U.S.C. §§ 701-706, "delineates the basic contours of judicial review of [agency] action." *Loper Bright Enters.*, 144 S. Ct. at 2261. In such cases, summary judgment "serves as the mechanism" for the district court, "functionally operating as an appellate tribunal,"

---

[5] Neither set of Plaintiffs expressly limits their challenge to the GE Rule, but their arguments are entirely focused on the prospect of for-profit cosmetology programs losing Title IV eligibility—a result that could only occur if they are deemed ineligible under the GE Rule. The separate FVT Rule—which only involves collection and posting of information on a Department website—has no such consequence.

to decide, as a matter of law, "whether the [challenged agency] action is supported by the administrative record and otherwise consistent with the APA standard of review." *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2024 WL 3517504, at *14 (N.D. Tex. July 23, 2024) (internal quotation omitted). Plaintiffs here challenge the GE Rule as in excess of statutory authority, pursuant to § 706(C), and, in the alternative, challenge aspects of the GE Rule as arbitrary and capricious pursuant to § 706(A). AACS also challenges aspects of the GE Rule as contrary to constitutional right pursuant to § 706(B).[6]

## I.    The Secretary Has Statutory Authority To Promulgate the GE Rule

Plaintiffs do not dispute the Secretary's authority to issue the FVT Rule, which requires schools to report certain information. However, Ogle re-asserts its "ultra vires" challenge to the GE Rule.[7] As it did at the PI stage, and as have all other courts to face the question, the Court should uphold the Secretary's statutory authority to deem GE programs Title IV ineligible when

---

[6] Although AACS seeks summary judgment on all three Counts of its Complaint, *see* A.Mot. [ECF 28], its brief contains no argument in support of its equal protection claim asserted in Count III. Because AACS has thus abandoned that claim, Defendants do not address it herein. *See Matter of Dallas Roadster, Ltd.*, 846 F.3d 112 (5th Cir. 2017). AACS addresses its due process claim in a paragraph within the section asserting the Defendants acted in excess of statutory authority, A.Br. at 16, so Defendants address it below in that context as well.

[7] AACS's brief makes a similar argument. A.Br. at 16-21. However, AACS pled no such claim in its Complaint. The only "in excess of statutory authority" claim in AACS's Complaint is specifically that the GE Rule violates 20 U.S.C. § 1094(c)(1)(F) by depriving schools of a hearing before terminating a GE program's eligibility. AACS Compl. ¶¶ 167-75. AACS's arguments on this issue are therefore improper and should not be considered. *See Med-Cert Home Care, LLC v. Becerra*, No. 3:18-CV-02372-E, 2023 WL 6202050, at *11 (N.D. Tex. Sept. 21, 2023) ("it is inappropriate for parties to assert new . . . claims in their motions for summary judgment"); *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012) ("[T]he district court did not err in denying DeKort's motion for partial summary judgment because he attempted to raise a new claim, not asserted in his fifth amended complaint."); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004) (Plaintiffs may not "raise new claims at the summary judgment stage."). Although the court in *Med-Cert*, in its discretion, construed the new claim as a motion to amend, this Court need not do the same, particularly as AACS's arguments largely repeat Ogle's and are in all respects without merit. To the extent the Court considers AACS's claim, Defendants' responses to Ogle herein apply equally to AACS.

15

they fail to "prepare students for gainful employment in a recognized occupation." PI Order at 7; *see also APSCU*, 640 Fed. Appx. at \*7-8 (affirming *APSCU*, 110 F. Supp. 3d at 184-90); *APC*, 107 F. Supp. 3d at 359-63; *APCU*, 870 F. Supp. 2d at 145-49. Ogle argues *Loper* requires the Court to reverse its PI decision and overturn settled law on this issue. But although the PI Order was issued before *Loper*, the Court properly rejected Ogle's ultra vires claim, not by applying now-defunct *Chevron* deference, but—consistent with *Loper*— based on the "ordinary meaning" of the relevant statutory language. PI Order at 5-6. That reasoning still warrants rejection of Ogle's claim.

Under *Loper*, "courts must exercise independent judgment in determining the meaning of statutory provisions" and, when faced with ambiguity, must identify the "best reading," using "the traditional tools of statutory construction." *Loper*, 144 S. Ct. at 2262-63, 2268. Although the agency's reading is not binding, courts may give "due respect" to the agency's "body of experience and informed judgment," particularly where the agency's interpretation "rests on factual premises within [the agency's] expertise." *Id.* at 2267. A court may also conclude that a "statute's meaning" is that "the agency is authorized to exercise a degree of discretion," for example where it "empower[s] an agency to . . . regulate subject to the limits imposed by a term or phrase"—such as "appropriate" or "reasonable"—that "leaves agencies with flexibility." *Id.* at 2263. In that circumstance, the court's role is to "effectuate the will of Congress subject to constitutional limits" by recognizing "the boundaries of [the] delegated authority" and "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (internal quotation omitted).

Here, the GE Rule implements an undisputed statutory eligibility criterion for GE programs, that such programs "provide[] a program of training to prepare students for gainful employment in a recognized profession." 20 U.S.C. § 1088(b)(1)(A)(i). The Secretary plainly is *not* authorized to enter into Title IV participation agreements with schools that are statutorily

excluded from participation, nor could the Secretary properly approve the use of Title IV funds to attend an ineligible program. *See id.* §§ 1088(b)(1), 1094(a); *cf.* 34 C.F.R. § 668.32(a)(1)(i) (students may use Title IV aid only at "an eligible program at an eligible institution").

Accordingly, the Secretary not only may but must make program-level eligibility determinations under § 1088(b)(1) to ensure that Title IV operates within its statutory bounds. The Secretary properly interpreted the statutory eligibility criterion in § 1088(b)(1)(A)(i) as requiring GE programs to "actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation." 88 Fed. Reg. at 32342. The Secretary also properly recognized that students are not prepared for "gainful" employment if a program is designed to leave its graduates financially worse off than when they started. *Id.* at 32343.

Upholding the Secretary's view at the PI stage, the Court noted the undisputed fact that contemporary dictionaries defined "gainful" as "profitable" or "lucrative." PI Order at 7 & n.12. And it further recognized that, "[w]hen students borrow more to afford a program tha[n] its training prepares them to repay, that program is by definition not profitable because it did not prepare the student for gainful employment." *Id.* at 7. The Court's conclusion was in line with three other district courts and the D.C. Circuit. *APSCU*, 640 Fed. Appx. at *7-8 (affirming *APSCU*, 110 F. Supp. 3d at 184-90); *APC*, 107 F. Supp. 3d at 359-63; *APCU*, 870 F. Supp. 2d at 145-49. Although pre-*Loper* and thus ultimately deferring to the Department's reasonable interpretation of ambiguous language (which this Court may not do absent its own independent evaluation), the reasoning of those cases is persuasive insofar as they applied traditional tools of statutory construction—the same methodology *Loper* approved. And those cases did so, reviewing the same dictionary definitions at issue here and—before applying any deference at all—unanimously rejecting the notion that, in the context of a Title IV eligibility criterion, "gainful employment"

17

unambiguously meant "any" paying job in a vocational field, as Ogle suggests, *see* O.Br. [ECF 32] at 21. Rather, all three district judges in earlier cases agreed that contemporary dictionary definitions of "gainful" as "profitable" or "lucrative" can imply "an excess of returns over expenses," and that "gainful employment in a recognized occupation," taken as a whole, suggests a "decently paying" job. *APC*, 107 F. Supp. 3d at 359 (quoting *APCU*, 870 F. Supp. 2d at 145-46); *accord APSCU*, 110 F. Supp. 3d at 185.

Above all, these courts recognized the sheer absurdity of the plaintiffs' (and Plaintiffs' here) proposed interpretation, which posits that—in a statutory scheme governing the distribution of taxpayer funds for students' benefit—Congress intended "to loan out money to train students for jobs that were insufficiently remunerative to permit the students to repay their loans." *APSCU*, 640 Fed. Appx. at 8. The Fifth Circuit recognizes that, when interpreting language in one clause within a complex statutory framework, "[t]ext should never be divorced from context." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 551 (2024). While dictionary definitions may aid in ascertaining a term's meaning, its proper interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *accord Cheapside Mins., Ltd. v. Devon Energy Prod. Co.*, 94 F.4th 492, 499 (5th Cir. 2024) (undefined terms should be interpreted "according to their ordinary and natural meaning and the overall policies and objectives of the statute" (internal quotation omitted)). The Fifth Circuit also applies the "presumption against ineffectiveness" as one of "the fundamental principles" to determine the best reading of statutory language: "That is, a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." *Texas Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (broadly interpreting

18

the term "operate" in Randolph-Sheppard Act's bidding priority for blind vendors so as to further the Act's purpose to help blind persons obtain remunerative employment).

Here, these canons favor the Secretary's reading, in line with prior cases. As the D.C. Circuit recognized, "Congress enacted the HEA pursuant to its spending power," which in turn empowers it to "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *APSCU*, 681 F.3d at 459. In other words, within the HEA's structural context as spending power legislation, Congress's investment of taxpayer funds in specific Title IV loan programs suggests that any associated statutory conditions on that funding are designed to ensure a return on that investment. Indeed, Congress made clear that the Secretary's mandate in administering Title IV encompasses that very goal—protecting the United States' interests, including its financial interests, and promoting Title IV's purpose to help students. *Cf.* 20 U.S.C. §§ 1070(b) (requiring Secretary to "carry out programs to achieve [Title IV's] purpose"); 1087c(c)(2)(F) (authorizing the Secretary to approve schools' participation in Title IV's loan program based on "such . . . criteria as the Secretary may establish to protect the financial interest of the United States and to promote the purposes of [Title IV]"); 1087d(a)(6) (authorizing the Secretary to condition schools' Title IV participation on "such other provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of [Title IV]"); 1221e-3 (authorizing Secretary to promulgate "rules and regulations . . . governing the applicable programs," including Title IV, "administered by the Department"). Because Title IV is specifically aimed at helping students, "[t]he conditions attached to Title IV funds 'are intended to ensure that participating schools actually prepare their students for employment, such that those students can repay their loans.'" *APSCU*, 640 Fed. Appx. at 8 (quoting *APSCU*, 681 F.3d at 434). By contrast, "it would

be a perverse system that, by design, wasted taxpayer money in order to impose crippling, credit-destroying debt on lower-income students and graduates." *Id.* Only the Department's interpretation, not the plaintiffs'—and not Plaintiffs' here—avoids such obvious perversity.

None of Ogle's arguments in favor of its proposed "plain language" reading overcome that glaring flaw, nor does Ogle try to reconcile its reading, which prioritizes the enrichment of GE programs even when students are left worse off than when they started, with Congress's intent to help students.[8] First, doubling down on its dictionary approach, Ogle again devotes pages to a recitation of definitions of each word in the phrase "prepare students for gainful employment in a recognized occupation," most of which—as this Court observed—are not in dispute. PI Order at 7 n.11.[9] With respect to the term "gainful," Ogle once again concedes that contemporary dictionaries defined "gainful" as "profitable" or "lucrative," yet it concludes that "gainful employment" in 1965 simply meant a "paying job." O.Br. at 23 & n.10. This time, it suggests that "profitable" itself denotes revenue in any amount, no matter the size of the original investment. O.Br. at 25. But as the Ogle plaintiffs—two "for-profit" schools—surely know, a business is not "profitable" unless its earnings exceed its expenses. A sale of stock may yield a payment, but it is not "profitable" unless it exceeds the original cost. Similarly, employment following training in a GE program cannot plausibly qualify as "profitable" if the associated earnings are too low to offset any debt incurred, or to justify the original taxpayer investment that the training required. The ordinary

---

[8] Incredibly, Ogle sprinkles suggestions throughout its brief that Congress never specified that Title IV's purpose is to help students—even though Title IV is entirely devoted to "Student Assistance" in the form of grant and loan programs. *E.g.*, O.Br. at 34. Ogle is wrong. *E.g.*, 20 U.S.C. § 1070(a); *see id.* § 1070(a)(5) (any assistance to schools is for the purpose of "making available the benefits of postsecondary education to eligible students").

[9] Even so, Ogle continues to demonstrate a tendency to disregard context by again proposing that the term "program," used in the HEA, might just be a "plan of action" rather than a course of training or study at a school. O.Br. at 23.

meaning of "profitable," and its synonym "gainful," thus belies Ogle's theory.[10] Particularly in a context where Congress was undertaking, for the first time, a significant investment of federal taxpayer money in loans for postsecondary vocational training, it would be foolish to read the statutory language as if Congress were utterly unconcerned with whether GE program graduates would actually benefit from this investment, or whether instead federal funds would be wasted.

Ogle misleadingly suggests that the Secretary has interpreted the HEA's "gainful employment" language not simply to preclude programs that leave students worse off than when they started, but as mandating the specific metrics adopted in the GE Rule. O.Br. at 24-25. The Department never suggested that the statutory language requires a specific eligibility test.[11] As other courts have recognized, the Department's introduction of GE accountability provisions, beginning with the 2011 Rule, did not implement a new statutory interpretation as Ogle suggests. Rather, the metrics are simply a tool to assess *whether* such programs prepare students for gainful employment, given new indications that some programs—despite profiting themselves from their Title IV eligible status—were instead leaving students with excessive debt. *E.g.*, *APC*, 107 F. Supp. 3d at 362 (recognizing "the adequacy of a program's preparation is difficult to measure— and it is reasonable to consider students' success in the job market as an indication of whether

---

[10] *E.g.*, American College Dictionary (1966) (defining "gain" as "to obtain as a profit"; "gainful" as "profitable, lucrative," "profit" as "the ratio of such pecuniary gain to the amount of capital invested," "profitable" as "yielding profit; remunerative").

[11] Many of Ogle's arguments restate in various ways that the specific metrics in the GE Rule are not expressly required by statute. *E.g.*, O.Br. at 28 (suggesting those metrics cannot be deemed statutorily required because they cannot be applied to all programs). These arguments simply misconstrue the Department's interpretation, so they are irrelevant to the analysis. To the extent Ogle intends to bolster the notion that the metrics are arbitrary, they also fail. The Department has explained the metrics will cover over 80% of student enrollments. 88 Fed. Reg. at 70128 tbl. 4.2. The fact that they cannot be calculated for every single program, due to legitimate reasons such as a program's existence for less than three years or student privacy concerns, does not undermine their value or utility for the vast majority of student enrollments they do cover.

those students were, in fact, adequately prepared." (quoting *APCU*, 870 F. Supp. 2d at 147)); *cf.* 88 Fed. Reg. at 32342-43. Although the Department believes that it adopted the best measures available, its reasoning in that regard should be evaluated under the APA's arbitrary and capricious standard, not *Loper*'s "best reading" standard.[12] The Court in *Loper* recognized that Congress may "delegate[] discretionary authority to an agency" by leaving it with "flexibility" through terms "such as 'appropriate' or 'reasonable.'" *Loper*, 144 S. Ct. at 2263. The HEA confers such authority by including, within the same provision itemizing express participation conditions for schools and directions to the Secretary, the additional specific direction to "prescribe such regulations as may be necessary to provide for . . . any matter the Secretary deems necessary to the sound administration of the financial aid programs[.]" 20 U.S.C. § 1094(c)(1)(B); *see also id.* § 1099c(d) (authorizing Secretary "to establish such other reasonable procedures as the Secretary determines will contribute to ensuring that [a school] will comply with administrative capability required by [Title IV]"). The Secretary deemed the metrics a necessary and reasonable tool to assess whether GE programs meet their statutory eligibility requirement, thereby protecting students and taxpayers.

Ogle also takes issue with the *APSCU* court's invocation of the "canon against surplusage" when recognizing that, if "gainful" simply meant "paid," "gainful employment in a recognized occupation" would be redundant. *Cf. APSCU*, 110 F. Supp. 3d at 185. But its suggestion that Congress only sought to exclude "voluntary" employment proves the opposite point. If, as Ogle

---

[12] Ogle argues that the earnings premium metric "has nothing to do with returns-vs-expenses," O.Br. at 24-25, but that is not so. The EP metric is designed to assess whether GE program graduates, on average, earn more than they would have without the investment of taxpayer funds in their training, and the Department's analysis suggested that "the default rate among students in programs that pass the D/E rates thresholds but fail the earnings premium are very high." 88 Fed. Reg. at 70014-15; *cf. id.* at 70023 (low earnings, as well as high debt burdens, "affect students' financial well-being, and the return on the title IV, HEA financial investment").

concedes, Congress did not generally intend to invest Title IV funds in training volunteers, it similarly could not have intended to invest those same funds in training that leaves GE program graduates earning so little that they are no better off than when they started, and potentially saddled with unaffordable debt. Such a reading is contrary to the HEA's purpose to help students and is certainly not the "best." Rather, Ogle's concession further bolsters the Department's reading of "gainful" to require a positive return on investment.[13]

Ogle similarly misses the mark by suggesting that the inclusion of such low-paying jobs as "dishwasher" and "fast food cook" in the relevant list of "recognized occupations" proves that Congress only sought to ensure that GE students be prepared for any paying job. O.Br. at 26. Instead, that again supports the opposite conclusion. While Ogle's reading suggests that Congress would gladly invest taxpayer dollars and saddle students with debt so that they could attend an entirely unnecessary "dishwashing" training program, the Department's superior reading would prevent that unfortunate result because a program designed to train students in dishwashing, but that leaves its graduates with no greater earning power than when they started, would not prepare them for *gainful* employment. Again, only the Department's reading, not Plaintiffs', avoids an absurd result and ensures that Title IV funds serve their intended purpose to help students.[14]

---

[13] Ogle's counter-example of volunteer fireman, O.Br. at 26 & n.13, who were expressly identified as an exception in a 1971 amendment to the Vocational Education Act of 1963, *see* S. Rep. No. 92-346, at 75, 237, further proves the point because it shows Congress was only willing to forgo a financial return on its investment when there was a clear compensatory societal benefit—ensuring the availability of firemen in communities that rely solely on volunteers. Congress has not identified any other vocation—including cosmetology—as warranting a similar exception.

[14] To be sure, it is theoretically possible that, for example, a half-day training session on how properly to load industrial dishwashers and ensure dishes are sanitized could incrementally boost a would-be dishwasher's employment prospects and earnings, and the GE Rule's metrics could serve as a tool to measure whether such training prepared those students for "gainful" employment. But Congress excluded certain short-term programs from Title IV aid based on their length alone, 20 U.S.C. § 1088(b)—presumably recognizing that an investment of taxpayer funds would not make sense because the return would be minimal and such programs should be affordable without

Second, Ogle purports to address Title IV's "context and structure," but in fact it simply rehashes past arguments about a separate Title IV provision—the cohort default rate ("CDR")—which should again be rejected. The statutory CDR provision bars an entire school from Title IV participation if the school's total student loan default rate exceeds 30% for three years in a row. 20 U.S.C. § 1085. The provision thus identifies a consequence of high defaults on a school-wide level. It does not preclude the Department from taking into account different data—program-level student aid debt and graduate earnings—as part of a metric helpful to identify which GE programs "provide[] a program of training to prepare students for gainful employment in a recognized profession," the entirely separate programmatic eligibility requirement in 20 U.S.C. § 1088(b)(1). Other courts have agreed the CDR provision is not the exclusive program integrity mechanism for all of Title IV. *See APCU*, 870 F. Supp. 2d at 147; *APSCU*, 110 F. Supp. 3d at 187. Indeed, the D.C. Circuit held that, even with the statutory CDR provision, the Department could exercise its authority under 20 U.S.C. § 1094(c) to establish "reasonable standards of financial responsibility and appropriate institutional capability" by setting forth an "administrative capability" test that "differs significantly from the statutory [CDR] test." *APCU*, 870 F. Supp. 2d at 147 (discussing *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1273 (D.C. Cir. 1996)).

As those courts recognized, this is not an instance where Congress's express use of certain words in one clause or statute might show an opposite intent where those words are missing from a parallel clause or similar statute in another context.[15] The CDR provision and the GE provisions

---

any Title IV aid. A study reviewed by the Department, concluding 86% of Texas cosmetology programs do not participate in Title IV and cost substantially less than Title IV-participating programs, supports precisely the same conclusion. Cellini, Stephanie Riegg & Bianca Onwukwe, *Cosmetology Schools Everywhere: Most Cosmetology Schools Exist Outside of the Federal Student Aid System* (2022) [App. 116-17].

[15] Ogle cites *James v. ICE*, 543 U.S. 335, 341 (2005), but there the Court compared parallel clauses in the same statute, each clause identifying an independent alternative for an alien's removal to

coexist in the same context—Title IV—but they are not parallel. As the agency responsible for administering Title IV, the Department uses information about student aid debt for multiple purposes and, in the GE Rule, does so to help assess eligibility at the *program* level rather than the institutional level. The only significance of the CDR provision to the inquiry here is that it reflects and reinforces Congress's stated purpose to help students—the same purpose that informs the proper interpretation of the GE language.[16] *See* 88 Fed. Reg. at 70017 (CDR and other safeguards are "complementary" rather than exclusive); *APSCU*, 110 F. Supp. 3d at 187 (provision allowing accreditors to assess program quality "does not forbid the Department from examining . . . programs' *out*puts in terms of student earnings and debts"). Ogle's suggestion that Congress "has

---

another country. The Court attributed interpretive significance to the fact that some alternatives expressly require the receiving country's willingness to accept the alien while others do not. *See id.* Similarly, in *United States v. Koutsostamatis*, 956 F.3d 301, 309 (5th Cir. 2020), the court was comparing the same type of clause—a restitution clause—in different statutes. Here, the CDR clause and GE language are not in parallel as alternatives or the same type of clause in different contexts. Rather, both are in Title IV, and one applies to schools while the other defines one type of eligible program. Ogle also cites *Biden v. Texas*, 597 U.S. 785, 798 (2022), where the Court held that statutory language limiting available relief did not limit a court's subject matter jurisdiction, but that Court's assessment that Congress could have used "words far simpler than those that it wrote" if it had wanted to limit jurisdiction is wholly inapposite here, where Congress expressly required that a GE program "provide[] a program of training to prepare students for gainful employment," 20 U.S.C. §§ 1002(b)(1), 1088(b)(1)(A)—language that is far simpler, even if deemed ambiguous, than the language Ogle proposes.

[16]The same is true for 20 U.S.C. § 1002(b)(1)(e) and (c)(1)(C), which require Title IV-participating schools to have existed for at least two years—a condition Ogle ascribes to Congress's attempt to exclude "fly-by-night" schools that had historically taken advantage of federal dollars but did not try to educate students. O.Br. at 6. Congress's express exclusion of one type of abuse by schools cannot reasonably mean Congress had no interest in ensuring its investment of taxpayer funds otherwise not be wasted. *Cf.* 88 Fed. Reg. at 70025, 70175 (GE Rule should "make predatory behavior less attractive and less lucrative," reducing risk of waste, fraud, and abuse of taxpayer funds by schools). Ogle also mentions statutory debt relief (which only addresses student debt at the back end so does not avoid shifting costs to taxpayers or the significant adverse consequences graduates may suffer before obtaining such relief), the College Navigator website (which provides cost information only at the school, not program level), and financial-aid recipient surveys. O.Br. at 29. None of these provisions are in structurally parallel statutory clauses, nor do they state their measures are exclusive or otherwise purport to limit the Department's exercise of authority under other statutory provisions. They therefore do not support Ogle's asserted statutory interpretation.

chosen" to address post-graduate debt and earnings "at the school- rather than the program-level, and at the back- rather than the front-end," O.Br. at 30, ignores that Congress has *also* identified a programmatic eligibility requirement for GE programs, which the Secretary is authorized to enforce. There is no contradiction between Congress taking specific actions toward a certain goal while granting the Secretary discretion to take additional action toward that same goal. In the end, the Secretary's reading of the "gainful employment" language is best because it is fully consistent with the statutory language and supports Congress's intent rather than undermining it.

Other courts emphasized that "context matters," *APSCU*, 110 F. Supp. 3d at 186, when rejecting another old argument Ogle rehashes here, regarding the occurrence of the phrase "gainful employment" in other HEA provisions. O.Br. at 30. As those courts recognized, "it is axiomatic that a term 'may have a plain meaning in the context of a particular section' of a statute without having 'the same meaning in all other sections and in all other contexts.'" *APSCU*, 110 F. Supp. 3d at 186. The other occurrences Ogle cites "mean different things in different contexts," but the context here suggests "elevation to something more than just any paying job," consistent with the Department's interpretation. *APSCU*, 640 Fed. Appx. at *7-8. Nor is there any violation of the "fixed meaning" canon as Ogle suggests. O.Br. at 31. Congress's limitation on "gainful employment" by Title IV-supported students while they are still in school similarly serves Congress's intent by ensuring students' focus is on completing their course of study. *See* 20 U.S.C. §§ 1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2), 1161g(d)(5)(B). In those contexts, Congress's return on investment, and students' ultimate ability to benefit from their Title IV-supported education, would be undermined, not protected, by allowing students to work in some unrelated job even as they receive Title IV assistance. The fact that it would make no sense to use metrics as a means to assess whether employment was truly "gainful" in contexts where such employment is entirely

prohibited does not negate their utility when assessing GE program eligibility.

Ogle points to a 2008 statutory amendment, allowing for-profit baccalaureate degree programs to qualify as Title IV eligible, O.Br. at 31, but it fails to explain how that amendment, granting Title IV eligibility for non-GE programs based on entirely different statutory language, has any bearing on GE program eligibility requirements. To the extent Ogle relies on the 2019 Rule's suggestion that students should have more information about all programs, not just GE programs, the 2023 FVT Rule achieves that goal separately from the GE Rule.

Third, Ogle asserts that the Department's interpretation has "flip-flop[ped] over time," O.Br. at 31. Not so. As explained, the Department *never* interpreted the HEA as requiring it to funnel Title IV aid indiscriminately to GE programs that fail to prepare students for gainful employment. Such a position would prioritize GE programs' risk-free income over students' expectations that their training will afford them better-paying jobs, wantonly wasting taxpayer money and inflicting long-lasting harm on the very students Title IV was intended to help. Rather than flip-flopping, the Department's efforts beginning in 2011 to ensure the "gainful employment" criterion for GE programs' Title IV eligibility is met stemmed from its concern that GE graduates increasingly ended up worse off, and that a significant number of GE programs may not be preparing their students for gainful employment. *See* 76 Fed. Reg. 34386, 34497 (June 13, 2011) ("the trends in graduates' earnings, student loan debt, defaults, and repayment underscore the need for the Department to act"); 88 Fed. Reg. at 32307-08; 88 Fed. Reg. at 70014 ("The need for such rules became clearer over time.").

Nor is the Department's implementation of the HEA's program placement reporting requirement in 20 U.S.C. § 1088(b)(2)(A)(ii) contrary to its interpretation of "gainful employment" as Ogle suggests, O.Br. at 32. Under that requirement, the Department must

calculate certain short-term GE programs' substantiated placement rate to determine if those programs are eligible for Title IV loans. The provision Ogle cites, *see* 34 C.F.R. § 668.8(g)(1)(ii), essentially assumes, for purposes of that calculation, that a specific graduate's employment is gainful. But that assumption, which inures to GE programs' benefit, is entirely consistent with the separate requirement that the same programs prepare students for gainful employment, *id.* § 668.8(d)(3)(iii)—a determination that will now be controlled by the GE Rule. Like § 668.8(g)(1)(ii), the GE Rule also does not require GE programs to demonstrate that every single graduate's employment is "gainful." Rather, as described above, the GE Rule identifies specific tools—the D/E and EP metrics—to assess whether GE programs prepare students for gainful employment, by measuring average graduate earnings over a span of time.

Ogle also deems historically significant the fact that Congress used "gainful/useful employment language" in "predecessor statutes like the Smith-Hughes Act and [NDEA]" that did not provide student loans. O.Br. at 33. But Congress certainly intended that those investments of federal funds also help students by leading to employment that was truly gainful.[17] *See, e.g.*, H.R. Rep. No. 64-81, at 2 (House Report on Smith-Hughes Act, describing federal support for vocational education as "a sane business proposition" when viewed as "an investment" because, if it "augment[s] the income by 10 cents a day, there would be an increase of wealth in the hands

---

[17] The 1917 Smith-Hughes Act, Pub. L. No. 64-929, provided federal matching funds to states to pay public teacher salaries for agricultural, trade, home economics, or industrial education and required state plans to ensure "that the controlling purpose of such education shall be to fit for useful employment." *Id.* §§ 10, 11. The NDEA, in addition to the loans described above, extended the Smith-Hughes Act's provision of federal matching funds to states, finding that vocational education was necessary "to meet national defense requirements for personnel equipped to render skilled assistance in fields particularly affected by scientific and technological developments," and defining the relevant vocational programs as those that are "designed to fit individuals for useful employment as technicians or skilled workers in recognized occupations requiring scientific or technical knowledge" and enroll students who were either junior high graduates or at least 16 and "can reasonably be expected to profit by the instruction offered."  Pub. L. No. 85-864 §§ 801-802.

of the workers of two and one-half million dollars per day, or three-fourths of a billion dollars per year"). Ogle cites nothing suggesting Congress instead intended taxpayer money to be wasted. Again, the Department began in 2011 to craft tools that could measure whether GE programs in fact prepare students for gainful employment, not because of a new statutory interpretation, but instead because of new concerns that such programs were failing to do so.

Fifth, Ogle tries to discount legislative history, but legislative documents permissibly qualify as evidence of contemporaneous public meaning. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 394 (2012). Contemporary House and Senate Reports regarding the 1965 NVSLIA show that Congress only voted to extend loan insurance to students at vocational programs after receiving assurance that a high percentage of such students completed their training and proceeded to find sufficiently high-paying jobs that they could repay any loans. S. Rep. No. 89-758, at 8 (1965) (testimony of Dr. Hoyt, finding "sufficient numbers were working for sufficient wages" to make loan repayment a "reasonable" concept, which together with the "benefits accruing to both these students and to society in general," justified the "financial risk"); H.R. Rep. No. 89-308, at 4-7 (1965) (same, with further findings that the "economics" of the NVSLIA "are definitely sound and positive" because of "the added incomes these students may receive upon termination of their training, and the revenue the Government will receive because of those added incomes"). The evidence that Congress viewed its investment of taxpayer funds in vocational education in economic terms, with an expected financial return in the form of a more competitive, higher-earning workforce, which could in turn afford to repay its loans and contribute to the nation's tax revenues, supports a similar reading of the phrase "gainful employment"—as addressing the return on investment that Congress expected.

As noted, AACS essentially asserts arguments similar to Ogle's on this point, though not

set forth in its Complaint and in less detail. A.Br. [ECF 29] at 19-21. To the extent the Court considers them, those arguments should be rejected for the same reasons set forth above. The only unique argument AACS raises to support its un-pled claim can easily be dispensed with. AACS asserts that the GE Rule is contrary to 20 U.S.C. § 1099c(b)(1), which directs the Secretary to "prepare and prescribe a single application form" for schools seeking to participate in Title IV that "requires sufficient information and documentation to determine that the requirements of eligibility, accreditation, financial responsibility, and administrative capability" of the school "are met." According to AACS, the GE Rule violates that provision because calculation of the metrics "requires [the Department] to pull information" from other sources, such as the IRS. A.Br. at 18. However, nothing in § 1099c—which governs a school's initial application—limits the Department's authority to assess a GE program's continuing eligibility, for schools that are already participating in Title IV, using information already in its possession, or obtained from other sources. In practice, the Department collects information for the metrics from already-participating schools under the FVT Rule, 34 C.F.R. § 668.408(a) (information collected is for past "award years"), not the GE Rule, and its authority to do so, outside the application form, is well established, *e.g.*, 20 U.S.C. §§ 1094(a)(3), (5), 1231a(3), and not challenged here. Another Title IV provision further makes clear that, in addition to the application; schools must also "meet such other eligibility requirements as the Secretary shall prescribe." 20 U.S.C. § 1087c(b)(2).

Moreover, AACS's argument again relies on the fallacy that the Secretary has interpreted the "gainful employment" language to require specific metrics; instead, as explained, the Secretary has adopted the metrics as a tool to assess whether a program satisfies the statutory eligibility requirement that it prepare students for gainful employment, but has recognized there are circumstances—such as when a school seeks Title IV participation for the first time, or seeks to

add a new program—when the tool will be unavailable. *E.g.*, 88 Fed. Reg. at 70051 ("There are no eligibility consequences for a program with no D/E or EP rates available."). AACS also suggests that the "gainful employment" language cannot be read to "solve" for any problem that other statutory provisions address. A.Br. at 19. But the "gainful employment" language solves for Congress's particular concern that its investment in vocational education help students and yield an appropriate return—by requiring that programs prepare their students for gainful employment.

Plaintiffs thus fail to show that the Secretary's interpretation of the GE program eligibility requirement is ultra vires. Rather, the Department acted properly within its authority to try to ensure taxpayer funds are funneled to Title IV-eligible GE programs that in fact prepare their students for gainful employment rather than leaving them unable to repay their loans and financially worse off than when they started.

## II.   A GE Rule Provision (34 C.F.R. § 668.603) Lawfully Identifies How a GE Program's Eligibility Is Terminated

AACS raises a separate claim under § 706(2)(C) (indeed, the only § 706(2)(C) claim asserted in its Complaint), alleging that 34 C.F.R. § 668.603, the section in the GE Rule describing how and when a GE program's participation in Title IV ends after it has failed the D/E or EP metric two out of three consecutive award years, is in violation of 20 U.S.C. § 1094(c)(1)(F) and the Due Process Clause. This claim also lacks merit as discussed below.

AACS appears to misunderstand § 668.603(a), which identifies the three ways a GE program's Title IV participation might end administratively once it no longer qualifies as eligible under the GE Rule. As discussed above, the GE Rule identifies the D/E and EP metrics as tools for determining whether GE programs satisfy the statutory eligibility requirement in 20 U.S.C. § 1088(b) that a GE program must provide training "to prepare students for gainful employment in a recognized profession," and a program is recognized as ineligible after failing the metrics in

31

two out of three consecutive years. Section 668.603(a) describes how such a program's participation in Title IV would end in practice, which would depend on the current Title IV status of the school offering that program—and specifically whether the school is undergoing a renewal of its Title IV certification or is in a provisional status at the time a program becomes ineligible.

The Department enters into PPAs with schools ("institutions"), not with individual programs. 20 U.S.C. § 1094(a).[18] As a prerequisite to entering into a PPA, a school must be certified, and the certification may last for up to six years, after which it expires and must be renewed. 20 U.S.C. § 1099c(g). A school may also receive provisional certification, but the HEA expressly confers authority on the Secretary to terminate the school's Title IV participation while the school is in that status based solely on the Secretary's determination that the school "is unable to meet its responsibilities under its [PPA]." *Id.* § 1099c(h); *see id.* § 1099c(h)(3). When a school is certified or recertified by the Department and consequently enters into its PPA, the Department generates a new Eligibility and Certification Approval Report ("ECAR") for the school that lists all Title IV eligible programs offered by that school.[19]

If a program becomes Title IV ineligible under the GE Rule, one of three circumstances might be present: (1) the program's school might be in the process of renewing its certification, and once certification is renewed, the school will receive a new ECAR; (2) the program's school might be fully certified and participating in Title IV pursuant to a current PPA and ECAR; (3) the program's school might be provisionally certified. Subsection § 668.603(a) addresses each of these circumstances in turn. If a school is in the first category, when its new ECAR is issued, the ECAR

---

[18] The term "program" in Program Participation Agreement ("PPA") refers to the federal student assistance programs authorized under the HEA, Title IV.

[19] This process is described in the Department's Federal Student Aid ("FSA") Guide, *available at* https://fsapartners.ed.gov/ch1-fsa-program-requirements.

would not list the GE program that is now ineligible. 34 C.F.R. § 668.603(a)(1). If a school is in the second category, the Department would have to initiate an action under Subpart G in order to terminate the program's Title IV participation. *Id.* § 668.603(a)(2). If a school is in the third category, its provisional status would allow the Department to revoke the program's Title IV participation without going through the Subpart G process. *Id.* § 668.603(a)(3). Section 668.603(a) simply describes the existing frameworks that would apply, depending on the school's Title IV status at the time, and clarifies that a GE program, even if deemed ineligible under the GE Rule, may in practice continue participating in Title IV until one of the three events identified in subsection (a) occurs.

Given this background, AACS's challenge clearly lacks merit. AACS cites 20 U.S.C. § 1094(c)(1)(F), which expressly directs the Secretary to "prescribe such regulations as may be necessary" to provide for the termination of a Title IV-participating school that has a current PPA in effect. The Secretary promulgated such regulations in Subpart G. *See* 34 C.F.R. §§ 668.81 to .100. Consistent with § 1094(c)(1)(F), those regulations specifically do not apply to a determination that a school's program "fails to qualify for initial designation" as eligible because it "fails to satisfy the statutory and regulatory provisions that define an eligible . . . educational program"; a determination that a participating school's period of participation under its PPA has expired; or the revocation of a school's provisional certification (which is instead governed by 34 C.F.R. § 668.13). *Id.* § 668.81(c)(1), (3), (4). In those circumstances, the school's ability to enter into or renew its PPA is in question, so the PPA itself—which is the instrument that would confer whatever rights a Title IV-participating school might have under Subpart G—does not govern. *Cf.* 34 C.F.R. § 668.26(a)(4), (5).

AACS's challenge to § 668.603(a)(1) as inconsistent with 20 U.S.C. § 1094(c)(1)(F)

therefore makes no sense because § 668.603(a)(1) governs a circumstance where a school's original PPA has expired and is superseded by a new PPA with a new ECAR. *See* 34 C.F.R. § 668.14(h)(2). Any program not identified as eligible in the new ECAR would simply not be part of the school's Title IV participation under its new PPA, so Subpart G would have no application. At the same time, AACS's suggestion that this framework gives the Department "the ability to terminate any GE Program's participation at any time," A.Br. at 13, is wrong because if a school is not at the point where it needs to renew its certification and PPA, its current PPA would be in effect, and the Department could only terminate a program's eligibility pursuant to Subpart G, as described in § 668.603(a)(2). In that circumstance, § 668.603(a)(2), not (a)(1), would govern.

AACS's challenge to § 668.603(a)(2) likewise fails. That subsection makes clear that the regular Subpart G procedure applies whenever a school is fully certified and is participating in Title IV pursuant to a valid PPA that includes the program at issue. Because the basis for the Department's ineligibility determination under this provision would be the program's failure under the D/E or EP metric for two out of three consecutive years, § 668.603(b) specifies that the basis for a school's appeal of that determination must relate to that issue. Subsection § 668.603(b) also specifies the timing of such a challenge, indicating that a school cannot dispute its GE program's ineligibility unless the Department has initiated an action under § 668.603(a)(2) and Subpart G. In other words, a school need not dispute the Department's calculations if its program has failed the metrics only once, or if the Department delays in initiating any action after two years of failing the metrics; until then, the program may continue participating in Title IV. There is no inconsistency with statutory authority here, and AACS identifies none. Rather, the crux of AACS's quarrel does not relate to § 668.603(a)(2) or Subpart G at all, but instead to the Department's decision not to include alternate earnings appeals as part of the GE Rule—an issue

that, as AACS acknowledges, A.Br. at 14 & n.10, falls under its arbitrary and capricious challenges, which Defendants fully address below.

AACS's challenge to § 668.603(a)(3) also fails to identify any inconsistency with statutory authority. It is well established that revocation of provisional certification is not governed by Subpart G, *Career Coll. Ass'n,* 74 F.3d at 1274. AACS concedes that a school in provisional certification status may instead be terminated under 20 U.S.C. § 1099c(h)(3) if "the Secretary determines" that the school "is unable to meet its responsibilities under its [PPA]," but AACS argues that PPAs only require schools to comply with statutory requirements, A.Br. at 15. This argument fails, first of all, because GE programs are statutorily required to prepare students for gainful employment in a recognized profession," 20 U.S.C. § 1088(b)(1)(A)(i). Although Plaintiffs have separately challenged the Secretary's authority to use metrics as a tool to assess whether GE programs satisfy this eligibility requirement, if the Court agrees the Secretary has such authority, it should reject this argument as well. Moreover, the HEA requires PPAs to condition Title IV participation on schools' compliance with Title IV regulations as well as statutes, *see* 20 U.S.C. § 1094(a)(21) (schools must "meet the requirements established by the Secretary")—an indisputable fact that AACS ignores.

Although AACS also asserts that § 668.603 violates schools' due process rights, that claim should also be rejected under well-established due process law. As the Department explained in response to comments raising this issue, schools enter into PPAs with the understanding that they are subject to statutory and regulatory requirements as they may be amended during the PPA's term. *See* 88 Fed. Reg. at 70090; 20 U.S.C. § 1094. Any property interest that a school might have depends on the existence of a currently valid PPA—but the PPA is of limited duration. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576–78 (1972) (non-tenured assistant professor with one-year

contract had no property interest in continued employment beyond the contract term). Indeed, AACS raised the same issue thirty years ago, and the D.C. Circuit specifically rejected AACS's claim that schools have a "vested right" in future Title IV eligibility (in that case, for the Guaranteed Student Loan program). *AACS v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992). The court then observed that AACS's procedural due process argument simply repeated its retroactivity argument and declined to address it further, given that the record failed to contain any information about any actual termination procedure that had occurred. *See id.* at 867.

Two district court cases, specifically addressing the 2014 Rule, similarly held that Title IV-participating schools have no protected property interest at issue. *APC*, 107 F. Supp. 3d at 349–52; *APCU*, 870 F. Supp. 2d at 155 n.7. AACS points to *Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990), as reaching a different conclusion, but that case is the earliest of the four, and its facts are no help to AACS: there, a current PPA and full certification were in effect, yet (unlike here) the Department had sought to terminate a school's eligibility outside the Subpart G process. *See id.* at 893-94. Even so, the court found no due process violation; because schools are not the intended beneficiaries of Title IV, their interests are "less weighty," and despite the Department's violation of the HEA, the school had all the process that was required. *Id.* at 893-94.

The court in *APC* considered both *AACS* and *Cavazos* and persuasively held schools have no constitutionally-protected interest in continued Title IV eligibility in the context of the statutory GE requirement. *APC*, 107 F. Supp. 3d at 349-52. Here, even if the Court accepts *Cavazos*'s conclusion that an existing PPA confers some form of property interest, and rejects the more fulsome analysis of *AACS* and *APC*, § 668.603(a)(2) (the only subsection governing the same circumstance as in *Cavazos*) already references the procedures under Subpart G, which the court in *Cavazos* evidently deemed more than sufficient to satisfy due process. In any event, due process

36

claims are typically raised after the challenged deprivation of a property or liberty interest has occurred so that the court can evaluate the process provided based on the record. *See AACS*, 979 F.2d at 867. Here, no such review is possible, and AACS fails to identify any deficiency in § 668.603 on its face that could support a due process violation at this stage.

## III.    The GE Rule Is Not Arbitrary or Capricious

Both Ogle and AACS claim in the alternative that aspects of the GE Rule are arbitrary and capricious under 5 U.S.C. § 706(2)(A), largely repeating the same unsuccessful arguments in Ogle's PI motion. Judicial review under the APA's "arbitrary and capricious" standard "is deferential" and the court should uphold an agency rule if the agency has "reasonably considered the relevant issues and reasonably explained [its] decision." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).[20]   A court "is not to substitute its judgment for that of the agency." PI Order at 8 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In particular, agencies "have expertise and experience in administering their statutes that no court can properly ignore." PI Order at 8 (quoting *Judulang*, 565 U.S. at 53). Thus, the court's role in considering the administrative record is not to "weigh the evidence in the record pro and con," *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988), or "to ask whether [the] decision was the best one possible or even whether it was better than the alternatives." *Holy Cross Coll., Inc. v. Criswell*, No. 23-30085, 2024 WL 2318166, at *8 (5th Cir. May 22, 2024) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 777 (2019)). Instead, the court determines "whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chamber of Com.*

---

[20] Ogle cites the Supreme Court's decision in *Ohio v. EPA*, 144 S. Ct. 2040 (2024), as "emphasiz[ing]" the "demanding nature" of APA arbitrary and capricious review, O.Br. at 35, but *Ohio* was a Clean Air Act case and did not involve APA review, nor did it identify any change to longstanding APA case law. *See* 144 S. Ct. at 2053.

*v. SEC*, 85 F.4th 760, 768 (5th Cir. 2023).

"[I]t is Plaintiffs who bear 'the burden of proving that the agency's determination was arbitrary and capricious.'" *Air Prod. & Chems., Inc. v. GSA,* 700 F. Supp. 3d 487, 503 (N.D. Tex. 2023) (quoting *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)). And just as the agency may not rely on post hoc rationalization, plaintiffs are equally bound by the arguments raised and alternatives proposed during the administrative stage. *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 521-22 (5th Cir. 2023) ("[U]nder ordinary principles of administrative law a reviewing court will not consider arguments that [plaintiffs] failed to raise in timely fashion before an administrative agency," and "in the case of alternatives, parties generally must raise them during the public comment period"); *OnPath Fed. Credit Union v. U.S. Dep't of Treasury*, 73 F.4th 291, 298 (5th Cir. 2023) (recognizing bar on post hoc rationalization goes both ways). As discussed below, Plaintiffs fail to meet their "heavy burden" under this standard. *See* PI Order at 9.

## A. The D/E and EP Metrics Reasonably Rely on Reported Earnings and Forego Alternate School Surveys Deemed Unreliable, Burdensome, and Unnecessary

Plaintiffs first challenge the GE Rule's reliance on federal taxpayer records for the average earnings data—specific to each program's graduates—used for both the D/E and EP metrics. They rely, as Ogle did at the PI stage, on supposed inaccuracies in cosmetologists' reported earnings—an alleged flaw that, contrary to Plaintiffs' assertions, the Department has never conceded but instead continues to refute. In Plaintiffs' view, deriving earnings data from federal taxpayer records is arbitrary and capricious because cosmetologists may fail to report tips, or if they are self-employed, even their non-tip income, on their tax returns.

Plaintiffs' facial claims on this basis fail at the outset because they do not contend that *all* GE programs' graduates fail to report all their earnings as required by federal law, nor do they

quarrel with the accuracy of federal earnings data on any other ground. Indeed, the administrative record shows that this issue is one specific to cosmetology programs.[21] Plaintiffs thus concede the metrics could reasonably rely on reported earnings in most circumstances. *See Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (facial invalidity requires that "no set of circumstances exists under which" reported earnings could reasonably be used).

To the extent either Complaint could be read to assert an as-applied challenge specific to cosmetology programs, this claim also fails.[22] As the Court previously recognized, "the Department engaged in thorough rule making" and "specifically considered comments criticizing the use of federal reported earnings data to calculate D/E and EP metrics but concluded that no change to its proposed use of such data was warranted." PI Order at 9.

The full administrative record bolsters the Court's conclusion. As discussed in detail below, the Department reasonably adopted federal taxpayer records as the best available data source for earnings data specific to each program, including each cosmetology program, for both the D/E and EP metric calculations. At the same time, the Department revised programs' earnings metrics in ways that will bolster average earnings of cosmetology programs by approximately 20%—more than the 8% estimate of tips that Plaintiffs say is uncontested—and include a larger number of smaller programs. As another court recognized when refuting a similar challenge to an

---

[21] Plaintiffs fail to identify any comments in the record raising this issue other than with respect to cosmetology programs. *See* AACS App. [ECF 30] 988-1178. The Department also addressed the issue in such terms. 88 Fed. Reg. at 70041. The administrative record shows that the Department received other comments supportive of the metrics. *E.g.*, [App. 246-332].

[22] Neither Complaint here expressly raises an as-applied claim, and neither AACS nor Ogle have attempted to identify a "final agency action" for such a claim, 5 U.S.C. § 706. In contrast, AACS's earlier suit in D.D.C. did raise an express as-applied claim, but only after the D/E metrics had been calculated and some AACS members faced warning obligations, which the court deemed sufficient to satisfy the APA's "final agency action" requirement. *AACS*, 258 F. Supp. 3d at 65.

earlier version of the GE Rule (which lacked the current Rule's 20% buffer), the APA's arbitrary and capricious standard "does not 'demand the perfect at the expense of the achievable.'" *APSCU*, 110 F. Supp. at 195 (quoting *Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1046 (D.C. Cir. 1977)). Rather, "'the accuracy of any particular [data] . . . must be evaluated by reference to the data that was available to the agency at the relevant time.'" *Id.* (quoting *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 41 (D.D.C. 2008)). Agencies therefore act reasonably if they use "the best data available." *Id.*

The Department did so here with the benefit of over a decade's familiarity with the relevant issues, having gone through three prior rulemakings, and the defense of those rulemakings in litigation, in addition to the negotiated rulemaking for this round; comprehensive statistical assessments and regression analyses modeling how the proposed metrics would work; practical experience with the alternate earnings appeals that had occurred under the 2014 Rule; and a growing body of recent research. With that background, the Department was already mindful of past arguments regarding unreported income when issuing the NPRM and carefully explained its proposed earnings calculation while pointing out specific ways the new metrics were designed to include "safeguards against asserted underestimates of earnings." 88 Fed. Reg. at 32336.

The Department proposed to obtain the median "earnings" amount for each program using (1) a list of students who completed the program during the specified cohort period (allowing schools the opportunity to review and correct the completer lists for their programs); and (2) a median annual earnings amount for those completers, obtained from a federal agency with earnings data (such as the IRS). 88 Fed. Reg. at 32334. The Department left flexibility in the regulations regarding the earnings source but indicated that "IRS now seems to be the highest quality data source available." *Id.* at 32335. Although IRS data includes "statistical noise," in the form of a

"small adjustment factor," to protect individual privacy, such noise—even without any mitigation—would have less than a 1 percent probability of impacting any GE program's eligibility. *Id*. But the Department noted that its adoption of a minimum "n-size threshold" of 30 (meaning median earnings would only be calculated for programs with at least 30 completers within a 2- or 4-year period), which was already necessary to protect individual privacy, would further minimize the effect of statistical noise, as would the requirement that GE programs fail the accountability measures at least twice before they were deemed ineligible. *Id.*

In the NPRM, the Department concluded that it had "identified no other data source that could be expected to yield data of higher quality and reliability than the data available to the Department from the IRS," and that alternative sources, like the graduate surveys used in the 2014 Rule appeals, were prone to inaccuracies and manipulation while imposing significant administrative burdens. *Id.* at 32336.[23] The NPRM anticipated cosmetology programs' assertions regarding underreported earnings, 88 Fed. Reg. at 32335, and comments to the NPRM raised those very points, repeating arguments that cosmetology graduates underreport their earnings and proposing that the Department reinstate alternate earnings appeals. The Department devoted several pages in two separate sections of the NFR to thoroughly address the issues raised. 88 Fed. Reg. at 70041-42, 70094-98.

---

[23] In 2011, when promulgating the first set of GE regulations, the Department deemed reported earnings—which it then planned to obtain from SSA—"extremely accurate and likely . . . the best source of income data." 76 Fed. Reg. at 34427. The Department included an appeal process in the 2011 Rule not because it doubted the accuracy of the SSA data but to provide schools with "additional assurance" since they did not have independent access to their graduates' wage records or tax returns. *Id.* The original appeals could be based on Bureau of Labor Statistics data (even though the Department deemed BLS data a poor match to measure specific program outcomes) or graduate surveys conducted in strict compliance with NCES standards. *Id.* In the 2014 Rule, the Department dispensed with the BLS data option but continued to allow appeals accompanied by NCES-compliant surveys. 79 Fed. Reg. at 16459. However, as described above, AACS challenged those appeals as overly burdensome for cosmetology schools, and the court then rewrote the survey option to eliminate the NCES-conferred quality controls. *AACS*, 258 F. Supp. 3d at 76.

The Department's discussions identify several developments that, together with the Department's experience administering the 2014 Rule, led the Department to conclude that federal reported earnings data was the best source for its calculations, without an appeal process that would allow programs to submit alternate earnings based on their own attempts to gather earnings information from their graduates through voluntary surveys. 88 Fed. Reg. at 70041-43.

First, the Department revised its methodology to measure program completers' earnings "approximately one year later (relative to when they complete their credential)" than under the 2014 Rule. 88 Fed. Reg. at 32335. This change "leads to substantially higher measured program earnings," amounting to an additional $4000 (20%) for programs (like cosmetology) most at risk of failing the D/E or EP metrics, with earnings between $20,000 and $30,000. *Id.* Indeed, the Department observed that this estimated 20% increase in programs' median earnings amounts would more than offset the 8% of earnings that one study had identified as the likely average amount of unreported tips for cosmetology—one of the few occupations where both vocational training and tipping were common. *Id.* at 32336. The revised methodology thus "already includes safeguards against potential underestimates of earnings." 88 Fed. Reg. at 70042.

Second, the Department identified technological and legal changes in how payments are made and how income is reported. Because of the proliferation of digital payment methods (such as Venmo, Zelle, CashApp, and PayPal) rather than cash, "under-the-table" payments, including for tips, are less common and less easily hidden from the IRS. 88 Fed. Reg. at 32335; *cf.* 88 Fed. Reg. at 70041. Those payment platforms must issue 1099s when a user's annual income on the platform exceeds a certain amount—scheduled to be as low as $600 in the near future. 88 Fed. Reg. at 32335. Taxpayers are unlikely to leave income unreported if it can be tracked electronically or has already been reported in a 1099, as doing so could easily trigger an audit.

Third, new research calls into question the notion that underreported income would affect GE programs' results in any meaningful way while highlighting problems with the prior alternate earnings appeals, particularly after the Department was forced to remove integrity standards for alternate earnings data. *Id.* at 32336 & n.97 (citing Cellini & Blanchard [App. 23-33]). Indeed, one study concluded, after examining publicly available data from 2017, the last year in which D/E rates were calculated under the 2014 Rule, that while most cosmetology programs (68% of 1359 programs) had received "passing" D/E rates without appeals, the post-*AACS* alternate earnings data submitted by cosmetology programs that had initially failed were 82% higher than the median reported earnings that the Department had received from SSA. Cellini & Blanchard 3 & fig.1 [App. 25, 29]. Yet the authors' analysis of IRS "tax gap" and audit data concluded that, in 2018, cosmetologists' unreported tipped income was likely around 8% of their annual income ($1991, where the median income was $24,780)—a far cry from 82%. *Id.* App. 26. The implausibly large increases that schools reported based on "alternate" data thus likely reflected the *AACS* court's elimination of quality control standards, allowing schools unfettered discretion over what data they chose to submit. *Id.* App. 27. The authors also found an 8% adjustment to cosmetology programs' income had "little impact" on their outcomes under the 2014 Rule. *Id.* App. 28.

Meanwhile, the Department concluded, in agreement with Cellini & Blanchard, that a 2014 report by Eric Bettinger, cited by the court in *AACS* as having "found" that "both tip income and self-employment income are, on average, underreported by around 60%," was significantly flawed. 88 Fed. Reg. at 70042 & n.139 (citing Cellini & Blanchard 11 n.14 [App. 33] as well as the Department's independent review).[24]

---

[24] The *AACS* court noted a commenter had cited Bettinger but did not otherwise address the report. *See AACS*, 258 F. Supp. 3d at 59-60. In fact, there was an obvious disconnect between Bettinger's unsupported suggestion that "the IRS reports that 50 percent of [unspecified] *income*" rather than 50 of *tips*, "is unreported," and his decision to "increase [*total*] earnings" in his model "by 50

43

In the NFR, the Department thoroughly explained its rejection of the notion that alternate earnings appeals, relying on school-sponsored surveys of graduates, would increase the accuracy of earnings data. 88 Fed. Reg. at 70095-98 (explaining such appeals were "neither necessary nor appropriate" as a "substitute for substantiated earnings reported to the IRS," given the "relatively low quality" of data submitted in past appeals, the lack of controls and inability to verify results, and the research indicating underreporting of income is far less significant than previously suggested); Cellini & Blanchard [App. 24-25]. Rather, "in view of the Department's experience with appeals under prior GE rules," the Department was "convinced that adding such procedures will not improve decisions but will increase delays, expenditures, and other burdens." 88 Fed. Reg. at 70090. The Department further explained that its access to IRS W-2 records, including its ability to "observe self-employment income through the 1040-SE records it has access to," was superior to any private entity's access to another earnings source, which would contain gaps and be laborious to collect; in short, "[o]nly Federal administrative sources contain such a comprehensive view of earned income." *Id.* at 70043.

Ultimately, as the Department explained, commenters failed to rebut the studies that the Department cited and failed to identify an alternative reliable standardized data source that could contradict the Department's conclusion that there was "no other earnings data source that could be

---

percent when individuals in cosmetology reported having received *tip* income." [AACS App. 636] (emphasis added). (Bettinger in fact conceded that he had no access to self-employment earnings data at all. [*Id.* 626.]). Cellini and Blanchard correctly point out that this method "mixes up the value of tipped income and total income." Cellini & Blanchard 11 n.14 [App. 33]. They explain that if a cosmetologist's cash tips are 21% (though it is unlikely 100% of tips would be paid in cash), the unreported *income* would be 11.55%. *Id.* App. 26. Of course, neither Bettinger nor any commenter on the 2014 Rule provided any actual evidence of cosmetologists' unreported tip income or its extent. Indeed, the *AACS* court apparently "double-counted" Bettinger's report, citing, in addition to Bettinger, the Department's "acknowledge[ment]" that "comments included claims that 'about half of earnings in service occupations such as cosmetology' are made up of tips," *AACS*, 258 F. Supp. 3d at 59—which was itself a reference to Bettinger.

expected to yield higher quality and reliability than the data available to the Department from the IRS." 88 Fed. Reg. at 70095. Nor did any commenter question, much less rebut, the Department's point that its revised methodology, resulting in a 20% increase in reported earnings for those GE programs most at risk, would "provide a buffer" that would "provid[e] further assurance that programs will not inadvertently fail" either of the metrics. 88 Fed. Reg. at 70095-96.[25]

Indeed, the studies reviewed by the Department suggest that, to the extent Title IV-participating for-profit cosmetology programs are at risk of failing the new metrics, that result accurately reflects that such programs are a poor value for students, due to their high tuition costs relative to the typical earnings in this profession. Significantly, those studies suggest that the vast majority of cosmetology programs do not participate in Title IV, and charge lower tuition, yet provide students with training comparable to the more expensive Title IV-participating programs. 88 Fed. Reg. at 70086.[26] In particular, in Texas, out of a total of over 800 cosmetology programs in the state, only 14% participate in Title IV, and the other 86%, located in almost every county in Texas where Title IV programs operate, provide ample alternatives should any Title IV-participating program close. *Id.* (citing similar evidence that only a third of California schools

---

[25] Ogle now suggests that Defendants' PI brief mischaracterized the "buffer" effect of the additional year because the quoted language related only to "statistical noise," not "underreported income." O.Br. at 37. However, both the NPRM and the NFR make clear that the "buffer" addressed both of these issues. 88 Fed. Reg. at 32336; 88 Fed. Reg. at 70095-96.

[26] The NFR cites a California state website; Cellini & Onwukwe (2022) [App. 116-25]; Cellini & Koedel, *The Case for Limiting Federal Student Aid to For-Profit Colleges*, J. Policy Analysis & Mgmt., 36(4) (2017) [App. 107-115]; and Cellini & Goldin, *Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges*, Am. Econ. J.: Economic Policy, 6(4) (Nov. 2014) [App. 71-106]. These studies explain, for example, that a Title IV-participating cosmetology program in Dallas identified its cost for a 1000-hour program as $16,060 while a non-participating program 6 miles away charged $4775 for an equivalent course of study. Cellini & Onwukwe [App. 118]. Plaintiff Ogle School's cosmetology program tuition appears on par with the cited Title-IV participating programs, with 2024 tuitions ranging from $14,800 to $16,500, not including another $3000 for books, equipment and supplies. *See* Ogle School, 2024 Catalog 33 https://www.ogleschool.edu/wp-content/uploads/2024/02/2024-Catalog-02.27.2024.pdf.

yielding licensed cosmetologists participate in Title IV); Cellini & Onwukwe (2022) [App. 118-9]. At the same time, the Department emphasized that the assumption that most Title IV-participating cosmetology programs would close is itself speculative and contradicted by research. 88 Fed. Reg. at 70086 (citing Cellini & Goldin (2014) [App. 72, 98-99] (describing for-profit schools that do not participate in title IV)); *see* Cellini & Koedel (2017) [App. 112] (Cellini & Goldin study "provides clear evidence that [for-profit colleges] can exist and thrive without access to federal aid"). Thus far, the Department's modeling and statistical analyses have necessarily relied on the data currently available—which is not the data that will be used for calculations under the Rules, and, as noted above, the new metrics include a more generous measurement of earnings three, rather than two, years after program completion. *Id.* at 70120-24. Studies also suggest that, instead of closing, programs that do fail the metrics would "adjust[] their tuition downward." 88 Fed. Reg. at 70086.

Despite now having the entire administrative record at hand, Plaintiffs still fail to contradict the Department's conclusion that there was "no other earnings data source that could be expected to yield higher quality and reliability than the data available to the Department from the IRS." 88 Fed. Reg. at 70095. That failure dooms their claim on this issue. *See APSCU*, 110 F. Supp. 3d at 195 (upholding Department's use of reported earnings data obtained from SSA under 2014 Rule as "the best data available" at the time); *cf. Texas v. EPA*, 91 F.4th 280, 297 (5th Cir. 2024) (recognizing that, under *State Farm* reasonableness factors, agency's evaluation of modeling data was entitled to deference and agency did not act arbitrarily or capriciously by reasonably selecting among available alternatives).

Indeed, despite bearing the burden to show arbitrariness, Plaintiffs fail to substantiate their claim with evidence in the record. Instead, Plaintiffs present an array of inconsistent critiques of

the Department's statistical analyses and the research it reviewed (with AACS impermissibly trying to introduce new expert testimony in this effort[27] while Ogle primarily nitpicks at Defendants' PI brief)—ultimately asserting that the Department should have adopted one of two alternatives: either applying an across-the-board 8% increase to cosmetology programs' average earnings or reinstating alternate earnings appeals.

Perhaps due to the absence of concrete data on the issue of underreporting by cosmetology program graduates, Plaintiffs rely on the notion that the Department has conceded that underreporting exists. O.Br. at 36; A.Br. at 30.[28] They suggest that, in light of that concession, the Department was obligated to compensate for underreporting in its earnings methodology. *See id.* But Plaintiffs ignore, first of all, the Department's reasoned rejection of the premise that underreported income called into question the reliability of federal reported earnings data, described above. *Cf.* 88 Fed. Reg. at 70041-42 & n.139, 70095-97.

Second, Plaintiffs also ignore that, even though the Department's research led it to conclude that underreporting was unlikely to affect cosmetology program results, the Department nevertheless *did* build in an even higher buffer than the "8-10%" adjustment Plaintiffs argue was

---

[27] Defendants will move to strike AACS's Hill declaration in a concurrently-filed separate motion.

[28] AACS tries to shift the burden to the Department to prove that its "key assumptions" are valid. A.Br. at 21-22, 31, 39. But the Fifth Circuit case it cites simply applied the APA's reasonableness standard, *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024), while the D.C. Circuit cases are inapposite. *Am. Pub. Gas Ass'n*, 22 F.4th at 1025-27 (concluding agency bore statutory "clear and convincing evidence" burden but failed to explain assumption that was contrary to common sense); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (addressing whether plaintiff was required to raise an issue in comments). The court in *AACS* applied this notion in an as-applied case when *rejecting* the very alternate appeals process that Plaintiffs now fault the Department for avoiding, *AACS*, 258 F. Supp. 3d at 74-75; ignoring predictable problems caused by its rewriting of the regulation; and after misconstruing the Bettinger study as described above. Here, in any event, the Department extensively addressed why past claims of underreported earnings did not undermine its confidence in the reliability of reported earnings data—both in general and with respect to cosmetology programs. 88 Fed. Reg. at 70041-42 & n.139, 70095-97.

warranted based on the Cellini & Blanchard study—and clearly explained that it was doing so. *Id.* at 70095-96 (revised methodology for calculating median earnings would increase cosmetology programs' reported earnings by 20%). Plaintiffs fault the Department for failing to adopt an 8% adjustment, A.Br. at 30; O.Br. at 39, but disregard that the 20% buffer is already twice that.[29] Although Ogle acknowledged the new methodology, it simply discounts the significance on the ground that higher earnings may also mean more underreporting. O.Br. at 37. But Ogle ignores that, under the GE Rule, the relevant question is whether median earnings are sufficiently high to pass the modest thresholds set by the metrics. *Cf.* 88 Fed. Reg. at 70044 (explaining median earnings of a program's graduates are compared to median earnings of state's high school graduates). The exact amount by which total earnings exceed those thresholds does not matter. Thus, consistent with the Department's conclusion, and contrary to Ogle's, higher median reported earnings necessarily reduce the potential significance of any underreporting.

As that example illustrates, Plaintiffs' assertions regarding underreported earnings are all over the map but ultimately lead nowhere. The Department had cited a beauty industry report submitted during rulemaking, pointing out its assertion that "87 percent of salons served reported that tips were included on the W2 for all employees," while "another 5 percent" reported tips for "some" employees. 88 Fed. Reg. at 70042 n.139 (citing Qnity Institute, A Career in Pro Beauty (2023) [AACS App. 936]). Ogle argues that the Department "badly misread" the Qnity report, but

---

[29] AACS improperly refers to findings in certain studies that the Department reviewed as those of "Defendants' own expert," A.Br. at 30—presumably trying to highlight that many of the relevant studies include a common author, Cellini. But Cellini does not work for the Department, nor was she retained as an expert. Rather, the Department considered many of her studies (almost all of which were coauthored with various other scholars) because her research, conducted over the past fifteen years as a faculty member of the George Washington University Trachtenberg School of Public Policy and Public Administration, happens to focus on issues relevant to the rulemaking. *See* https://sites.google.com/view/stephaniecellini/research. Although these studies were cited in the NPRM, commenters offered no countervailing studies or critiques of her work.

AACS now concedes that "salons with *W-2 employees*"—like those reflected in the Qnity report—in fact *do* "report tip income." A.Br. at 28. AACS thus suggests that only self-employed or "independent contractor" cosmetologists underreport their earnings—yet fails to propose a more reliable data source that would capture such alleged underreporting. *See id.*

AACS also tries to rehabilitate Bettinger from the criticisms noted above by declaring that "Bettinger *never* concluded that workers in the cosmetology industry underreport their income by 60 percent." A.Br. at 26. But as the Department and the Cellini & Blanchard study point out, the court in *AACS* cited Bettinger for that erroneous conclusion. *AACS*, 258 F. Supp. 3d at 59-60. AACS then attributes that same error to the IRS, but it makes the same mistake it just defended Bettinger against; just like the *AACS* court, AACS appears to read the statement "that 60 percent of *tips* are unreported" (emphasis added) as synonymous with a statement that 60 percent of *earnings* are unreported, then suggests a "remarkable consistency" with one school's alternate earnings data that the Department deemed implausibly high. A.Br. at 26 (citing A.App. 634 n. iv). Because the IRS statement addressed only tips, the alternate earnings data remains implausible.

With similar audacity, AACS repeatedly accuses the Department of ignoring "evidence before [it]," A.Br. at 25, 27—but the supposed evidence, consisting of a Treasury official's testimony in 2007, over 17 years ago, was never submitted in comments.[30] Although the court in *AACS* cited the testimony as "lend[ing] credence to the general idea" of a reported income gap, it found the testimony to "have little direct relevance." *Id.* Indeed, the Cellini & Blanchard study explains the complexities involved in the "IRS process for assessing the underreporting gap" on a

---

[30] The testimony was instead obliquely referenced in AACS's comment by citing a declaration from its earlier litigation. *See* A.App. 1156 & n.201. That declaration also sought to introduce material outside the relevant administrative record. *AACS*, 258 F. Supp. 3d at 60 (noting the testimony was "apparently not submitted in connection with notice-and-comment").

broad scale, and in trying to translate tax gap estimates into reliable estimates of cosmetology graduates' earnings in general (not specific to any program or individual). Cellini & Blanchard 4. Although Cellini & Blanchard attempted this process for tips (which allowed them to double-check results based on other data points), *see id*. at 4-5, the record contains no similar estimates for overall underreported earnings of self-employed cosmetologists.

Plaintiffs also accuse the Department of failing to prove a trend of increasing electronic payments and point out that the IRS has delayed the new $600 threshold for third-party 1099s. A.Br. at 23; O.Br. at 38. However, the general rise in mobile app and other forms of electronic payments is a commonly known and judicially noticeable fact that the Department reasonably recognized; that recognition did not obligate it to prove the extent of this trend for cosmetologist payments.[31] As for the IRS rule, the Department always viewed this factor as buttressing its reliance on reported earnings data, but not dispositive, and explained it did not consider the IRS's delay a reason to postpone implementation of the GE Rule. 88 Fed. Reg. at 70042.

Given the Department's revised methodology resulting in a 20% earnings buffer for cosmetology programs, which is in effect exactly what Plaintiffs say it should have done, Plaintiffs' other proposed alternative—that the Department revert to the unreliable alternate earnings appeals—should carry less force at the outset. In any case, the Department's thorough explanation for its decision not to adopt an alternate earnings appeal process, described above, suffices to overcome Plaintiffs' claim that this decision was arbitrary and capricious. The Department's earnings calculation passes APA review as a matter of law.

---

[31] According to the Federal Reserve's 2024 Diary of Consumer Payment Choice, cash was used for only 16% of payments by those under 55, and 22% of payments by those 55 and older; and consumers used mobile apps for 50% of person-to-person payments, "continuing a widespread consumer transition away from paper-based payments." *See* https://www.frbservices.org/news/research/2024-findings-from-the-diary-of-consumer-payment-choice.

### B.    The Metrics Reasonably Focus on Student Outcomes

Plaintiffs next suggest the GE Rule's use of the new metrics arbitrarily holds schools "responsible for their former students' post-graduate 'financial outcomes" and "punish[] schools for factors outside their control." O.Br. at 40; *cf.* A.Br. at 33-39. But here Plaintiffs display their skewed understanding of Title IV's purpose. The GE Rule was not promulgated to punish schools but rather to help students, consistent with 20 U.S.C. §§ 1070(a), 1087a(a), and ensure Title IV taxpayer funds are disbursed only to eligible GE programs. As the Department explained in the NFR, students attend postsecondary programs anticipating higher earnings, while graduates with low earnings are particularly vulnerable because "even small amounts of debt. . . can be unmanageable." 88 Fed. Reg. at 70015. Most programs in most fields do generally lead to higher earnings, and they do so without imposing high debt burdens. *Id.* at 70025 & tbl. 4.11. However, the Department estimates that only 8% of dollars that students borrow to attend for-profit programs with failing EP scores will be repaid, with the loss covered by taxpayers but without financial consequence to the programs themselves. *Id.* at 70117 & tbl. 2.10.

As explained above, studies reviewed by the Department suggest that cosmetology graduates generally have low earnings, but most programs in this area compensate for that reality by charging lower tuition, and they do not participate in Title IV at all. Cellini & Onwukwe (2022) [App. 119]. Plaintiffs, on the other hand, have chosen a business model by which they charge higher tuition in anticipation that students will take out Title IV loans to afford them; indeed, they claim 90% of their students rely on such aid. *E.g.*, O.Br. at 19. But this model creates a risk—though borne only by students and taxpayers, not by schools—that students will not be able to repay their loans in light of cosmetologists' generally low earnings. The Department's establishment of a financial value transparency framework for all Title IV programs in the FVT Rule, and its further

51

promulgation of the GE Rule, setting forth criteria by which to assess whether GE programs satisfy their statutory eligibility requirements, are both designed with Congress' intent that Title IV help students firmly in mind. Moreover, as explained above, the GE Rule's use of the metrics does not hold federally funded programs responsible for the success or failure of each and every student. Rather, the metrics look generally at the median debt and earnings of a cohort of students completing a program over a period of years. *See* 88 Fed. Reg. at 70186 (§ 668.2 defining "cohort period"). The metrics include aggregate earnings for all completers within a cohort for whom earnings data can be matched. *Id.* at 70189 (§§ 668.403(c), .404(b)). This approach makes sense because the metrics seek to allow comparisons between completers' earnings and their debt, for the D/E metric, and between completers' earnings and what they might have earned if they had not sought postsecondary training at all, for the EP metric.

Plaintiffs argue the Department failed to account for various characteristics of their graduates, many of whom they contend choose to work part-time or not at all, are women, and/or belong to minority groups; or for other unusual circumstances. In fact, the Department thoroughly addressed all these issues and reasonably concluded they did not warrant changes to the metrics.

### 1.    Part-time and non-workers

First, with respect to graduates who, Plaintiffs assert, may choose to work part-time or not at all, the Department addressed comments raising this possibility by explaining that graduates face the exact same debt burdens regardless of how many hours they work. 88 Fed. Reg. at 70035 ("Graduates choosing not to work full-time or providing volunteer services in addition to working part-time still are faced with the obligation to repay the education debt associated with their program."). The Department also explained that, for the EP metric—which AACS suggests should be treated differently, A.Br. at 39—earnings on both sides of the metric include part-time workers.

88 Fed. Reg. at 70044. Moreover, because median (not mean) earnings are used, the EP metric "requires only that at least half of [completers] are earning at least slightly more than individuals who had never completed postsecondary education"; the earnings of the other half, no matter how low or reflective of part-time work, would not affect the program's EP. *Id.* at 70015.[32]

Plaintiffs now propose a "multiplier" to adjust part-time earnings, O.Br. at 42, or surveys of the prevalence of part-time work in an entire industry, A.Br. at 39 n.25, but they fail to explain how such ideas could feasibly be applied while accurately reflecting median graduate earnings of a specific program. After all, "part-time" can include anything from 5 to 35 hours per week and can fluctuate over time (even week to week), while an entire industry includes many beyond the recent graduates who would fall within a program's cohort group. Indeed, the Department was reasonably skeptical of the notion that Ogle now raises—that, because its own students are primarily females in their twenties, many of them will choose to take out loans to attend cosmetology programs, then almost immediately have children and "choose to exit the labor force." O.Br. at 42-43. Instead, the Department assessed the completers included in the metrics— who are recent graduates—as highly motivated to be employed (among other reasons, so that they could try to repay their education debt). 88 Fed. Reg. at 70045. Nothing in the administrative record contradicts this assessment, as no comments point to any studies substantiating the hypothesis that any significant number of cosmetology graduates voluntarily abandon their professions or choose to work minimal hours within three years after program completion, particularly after attending programs like Ogle's where loans are typically required to afford

---

[32] Ogle cites the Qnity Institute report for the notion that only 3.5% of cosmetologists work 40 hours or more per week. O.Br. at 36. However, that report also found cosmetologists' W-2s reported an average of $41,721 in actual annual earnings during their first three years after graduation, AACS App. 932, 936—if anything, suggesting that cosmetology programs are likely to pass the GE Rule's metrics.

them.[33] AACS again tries to shift the burden to the Department to prove that GE program graduates typically want to be employed three years after graduation, A.Br. at 39, but the Department can reasonably assume GE program graduates want to work when that is the entire purpose of its investment of taxpayer funds in their training. The Department also cited survey evidence that postsecondary students' primary goal is to get a better job. 88 Fed. Reg. at 70015, 70067 & nn.76, 160. Moreover, if certain graduates are not fully employed within three years of graduation, including their earnings is still important to best "capture the labor market outcomes of program graduates, including both the likelihood that they find employment and the earnings among those who are employed." *Id.* at 70045.

Meanwhile, the NFR explains at length that many factors affecting GE programs' performance in the metrics *are* within their control, including the tuition they charge, the "workforce experience" opportunities they provide students during the program, and the career services they offer, as well as the relative allocation of resources a program devotes to "instruction or student support services," as opposed to simply trying to attract as many enrollees (and Title IV-subsidized tuition dollars) as possible. *See also* 88 Fed. Reg. at 70116 (discussing "large body of research provid[ing] causal evidence on the many ways students at for-profit colleges are at an economic disadvantage upon exiting their institutions," and "growing evidence that many for-profit programs may not be preparing students for careers as effectively as comparable programs at public institutions," including evidence that graduates of for-profit schools have been found to

---

[33] Ogle cites a statement in the 2019 Rule that a significant percentage of wives with children under the age of 6 do not work, O.Br. at 43, but that statistic does not indicate the ages of those wives or whether any of them had graduated from a cosmetology or other vocational program in the previous three years, making the data point of little value. *See* 84 Fed. Reg. at 31406. Plaintiffs point to no comments or studies in the administrative record that indicate how many cosmetology program students are married within three years of graduation, much less how many have children during that period and then choose to exit the labor force. The Department did not act arbitrarily in failing to implement adjustments based on unsupported theories.

have "lower passage rates" on the licensing exams they need to pass to enter their professions, as well as evidence that for-profit schools "devote more resources to recruiting and marketing than to instruction or student support services").[34]

The Department also rigorously tested its proposed methodologies to ensure their reliability and rule out the possibility that factors such as those Plaintiffs identify would determine results. With respect to the EP metric's "earnings threshold" ("ET") (reflecting median earnings of high school graduates in the same state as a program, which the Department compares against the median earnings of that program's completer cohort), the Department used data from students' Federal Student Aid applications to estimate that typical program graduates three years after graduation are on average 30 years old, falling in the middle of the range of high school graduates (age 25-34) whose earnings were used to create the ET. 88 Fed. Reg. at 70125. The Department specifically noted the median age of cosmetology program graduates, reflected in Figure 4.1 as between 25 and 30, within this same range. *Id.* The Department also determined that its ET methodology yielded a result "typically less than the average pre-program income of program entrants," demonstrating that the inclusion of all high school graduates in the labor force within that range would not impose a high barrier even though some would have more years' work experience. *Id.* at 70126 & n.286. In other words, median graduate earnings would only need to

---

[34] *E.g.*, Cellini, Stephanie Riegg & Chaudhary, Latika, *The Labor Market Returns to a For-Profit College Education* 138-39 (2014) [App. 47-48] (finding sample of for-profit associate's degree program graduates experienced 10% earnings gains in the 3 to 4 years after attendance, but noting they also face tuition costs over four times higher than community colleges and take out more than half the cost in loans, with 22% defaulting within 3 years). The Department also observed that "students graduating from cosmetology and personal services programs in all sectors experience[ed] especially poor [earnings] outcomes." 88 Fed. Reg. at 70116 (citing Dadgar, Mina. & Trimble, Madeline Joy, *Labor Market Returns to Sub-Baccalaureate Credentials: How Much Does a Community College Degree or Certificate Pay?* (2015) [App. 208-211] (study focusing on returns to earnings for community college graduates)).

equal what those students were earning before they began the program for the program to pass the EP metric. (The Department noted that it had revised its negotiated rulemaking proposal to include high school graduates "in the labor force" in the ET—a change that lowers the threshold, making it easier for programs to exceed it, by encompassing those who were not working but were looking for or available to work. *Id.* at 70125.[35]) The Department's preliminary data showed that cosmetology and massage therapy program graduates had "very low post-program earnings," but that result was not shared by "other programs that have similar pre-program income," suggesting that it was not caused by any flaw in the Department's methodology. *See id.* The Department concluded that its ET methodology would yield "a reasonable, but conservative, guide to the minimum earnings that program graduates should be expected to obtain." *Id.*

Despite that reasoned explanation, Plaintiffs now challenge the Department's ET methodology by citing arguments the Department already refuted. Ogle suggests the Department "never explained" why the EP metric includes all program completers, regardless of employment status, on one side of the balance, but does not include high school graduates outside the labor force on the other side of the scale. *See* O.Br. at 43. But the Department explained that the two groups are directly parallel. On one side, high school graduates "in the labor force" includes both those who are employed and those who report they are available and looking for a job. 88 Fed.

---

[35] Ogle erroneously suggests in a footnote that the Department's use of the American Community Survey ("ACS") (the national census) as the source for high school graduates' earnings is flawed because the ACS data would include high school graduates with certificate credentials. O.Br. at 15 n.3. But ACS Individual Question 11 clearly distinguishes between high school graduates and those with "some college credit, but less than 1 year" or "1 or more years of college credit," and the instructions direct people to mark the highest applicable level. *See* https://www2.census.gov/programs-surveys/acs/methodology/questionnaires/2024/quest24.pdf. The Department reasonably concluded that ACS (unlike a graduate survey by an individual school) is a reliable source. 88 Fed. Reg. at 70058 ("The U.S. Census Bureau has researched the accuracy of ACS income data and found that income data from the ACS corresponds well with administratively reported earnings measures . . . in IRS records."), 70097 (school-sponsored surveys "are entirely reflective of whatever figures respondents choose to report, unverifiable").

Reg. at 70061. On the other side, postsecondary program graduates are similarly "likely to seek work or be employed three years after graduation." *Id.* As described, the Department's analysis also addresses AACS's objection that the ET results in comparing earnings of a 22-year-old cosmetology graduate with a 34-year-old master electrician, A.Br. at 37: In fact, cosmetologists three years after graduation are typically older than 22; the EP measure relies on median earnings on both sides of the metric, not direct comparisons of individuals; and there was no indication that using a 25-34 age range for high school graduates would impose unduly high ETs. 88 Fed. Reg. at 70125-26. Moreover, using "high school graduates in the labor force" for such comparisons is standard procedure when measuring "the effectiveness or value of completing a given post-secondary credential." *Id.* at 70054 & n.149 (citing examples).

### 2.        Demographic characteristics

Plaintiffs further suggest that the low earnings of for-profit cosmetology program graduates likely reflect their demographic characteristics rather than the quality of the programs they attended. But other courts expressly rejected the same argument based on the Department's prior statistical analyses showing the opposite. *E.g., APSCU*, 110 F. Supp. 3d at 192 (rejecting plaintiff's argument that D/E test "really measures student demographics" because the Department ruled out that possibility through "several regression analyses"), *aff'd on this point by APSCU*, 640 Fed. Appx. at *8; *APC*, 107 F. Supp. 3d at 364-65 (rejecting plaintiff's claim as appearing "utterly to disregard the extensive statistical analyses" described in the 2014 Rule).

For purposes of the FVT and GE Rules, the Department similarly ruled out the notion that student demographics sufficiently influence program results under the D/E and EP metrics to warrant any adjustment. It did so based on a range of research-informed statistical and non-statistical factors, including by once again conducting a regression analysis, which it described in

57

detail in the NPRM, 88 Fed. Reg. at 32430-33, and NFR, 88 Fed. Reg. at 70142-44, as well as a "variance decomposition analysis" that ruled out the possibility that the regression results were affected by the order in which factors were input. *Id.* at 70144. Based on the totality of its data analyses, the Department concluded that "programs and institutions play an important causal role in determining student outcomes, more so than student demographics," and that "GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone." *Id.* at 70031, 70142-45 & tbls. 4.22, 4.23, 4.24 (finding strong correlations between student outcomes and program-controlled factors, such as tuition, while only modest correlations with students' family income, gender, or race).[36] The Department further explained that it had designed debt measures to minimize the impact of demographics by excluding debt related to borrowing for living costs—an expense that low-income students are more likely to incur. *Id.* at 70031. And as a further check, the Department reviewed studies and analyzed data showing that median program debt was directly correlated with program cost and not with socioeconomic status. *Id.* at 70032.[37]

The Department's exercise of its expertise in selecting and applying the appropriate statistical methodologies to evaluate its metrics is not a proper subject for judicial second-guessing. *Chem. Mfrs. Ass'n v. EPA*, 885 F.2d 253, 262 (5th Cir. 1989) (recognizing EPA had "broad discretion in the choice of statistical techniques"); *accord FMC Corp. v. Train*, 539 F.2d 973, 986

---

[36] The NFR's detailed statistical analyses suffice to explain why the Department ultimately rejected the contrary assertions in the 2019 Rule, cited by Ogle, O.Br. at 40-41. Those assertions simply hypothesized about the impact of external factors, but the 2019 Rule did not point to any quantitative analysis supporting those hypotheses in connection with the 2014 Rule's metrics.

[37] *See, e.g.*, Cellini, Stephanie Riegg & Darolia, Rajeev, *High Costs, Low Resources, and Missing Information: Explaining Student Borrowing in the For-Profit Sector* (2017) [App. 64, 66] (while students at for-profit programs "tend to come from relatively poor backgrounds," "[t]he primary observed driver of borrowing for students in for-profit colleges is the cost of the college itself," not demographic or socioeconomic factors, while they have "similar or weaker labor market outcomes" relative to community college students).

(4th Cir. 1976); *Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1035 (10th Cir. 1976); *cf. Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998) ("Statistical analysis is perhaps the prime example of those areas of technical wilderness into which judicial expeditions are best limited to ascertaining the lay of the land."). Ogle's invocation of *Chamber of Com.*, O.Br. at 43, is inapposite because that case did not ask the court to evaluate an agency's statistical analysis—and in fact, the agency's failure to conduct such an analysis was challenged but upheld by the court as a matter within the agency's discretion. *Chamber of Com.,* 85 F.4th at 774. Far from the circumstance here, the flaw that the court there identified consisted of internal inconsistencies of logic that, in its view, rendered the agency's analysis of costs and benefits arbitrary. *Id.* at 778.

Ogle further suggests that even if "systemic discrimination" of its graduates is not the "sole" reason that it and other for-profit cosmetology programs might fail the D/E or EP metrics, it could still be a factor, and such discrimination is not Ogle's fault. O.Br. at 43. But this argument misunderstands that a regression analysis does not allocate causation among different factors but instead measures how a particular factor is correlated with a particular outcome. The Department conducted its analyses for the very purpose of testing whether the correlation between a program's outcome and its demographics—which, as Ogle points out, O.Br. at 43, the Department acknowledged could theoretically be due to systemic discrimination, but could also be due to other factors such as effective recruiting strategies by programs that are in fact low quality—warranted any adjustment to the D/E or EP measures, and concluded that no change was warranted. 88 Fed. Reg. at 70031.[38] Its analysis suggests that school and credential characteristics are responsible for

---

[38] AACS argues that the Department failed to cite evidence for its observation that some for-profit GE programs "aggressively recruit women or students of color" and questioned the relevance of this fact. A.Br. at 35-36. However, the Department reasonably pointed this out as part of its conclusion that "programs and institutions play an important causal role in determining student outcomes," and cited its own direct experience from compliance oversight activities. *See* 88 Fed. Reg. at 70031. The Department also cited Congressional materials addressing for-profit schools'

64-77% of the variation in the D/E metric, and 71-77% of the variation in the EP metric, while demographic variables "appear to explain little of the variation," leading the Department to conclude that a school's "performance" and decisions about "pricing," along with other factors, are "much more important." *Id.* at 70142-43. Moreover, the Department concluded that "GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone," while other programs that do not fail the metrics "exist and serve as good options for students that would otherwise attend low-performing programs." *Id.* at 70145.[39] Considering that the GE Rule uses the metrics as a tool to assess whether GE programs prepare students for gainful employment, in line with Title IV's purpose to help students, the Department's prioritization of students over failing programs was not arbitrary.

Meanwhile, AACS's critique of the Department's regression analysis relies on flawed assessments provided by its purported expert's extra-record declaration. *See* A.Br. at 34-35 & nn.20, 22. Even if the Court considers this material, which was not provided to the agency during rulemaking, the declaration's suggestion that the Department's regression analyses suffer from a "critical flaw" due to "multicollinearity," A.Br. at 34, mischaracterizes the Department's statistical findings and its variance decomposition that ruled out the significance of the order in which

---

recruiting practices, including the targeting of populations (such as veterans) precisely because of their federal aid eligibility. *See generally* GAO, GAO–10–948T, For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010) [App. 215-245]; *cf.* Staff of S. Comm. on Health, Education, Labor, and Pensions, 112th Cong., *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* 78 (Comm. Print 2012) ("many schools have invested significant resources into recruiting and enrolling students eligible for [federal] military education benefits").

[39] *See* Cellini et al., *Where do Students Go When For-Profit Colleges Lose Federal Aid?* AM. ECON. J.: ECON. POLICY 12(2) (2020) [App. 190] (finding that 70% of students unable to attend a sanctioned school "ultimately enrolled in the public and nonprofit sectors"); Cellini & Darolia (2017) [App. 64, 66]; Cellini & Onwukwe (2022) [App. 119].

variables were added to the analysis. *See* 88 Fed. Reg. at 70142-43.[40] AACS also argues the Department should have adopted proposed alternative methods of calculating the earnings threshold, such as calculating separate thresholds for different demographic subgroups of high school graduates, or applying a standard adjustment to female high school graduates' earnings. A.Br. at 36-37. However, the Department carefully considered and reasonably rejected both alternatives as unnecessary and for the former—even if otherwise warranted, which the Department concluded it was not—infeasible as a practical matter, since the demographic composition of a program's students might change from one year to the next, making any attempt to adjust a state's resulting ET to match the demographic composition of each program, for purposes of the EP comparison, a highly complicated endeavor; and dividing up a state's graduates into subgroups would require further adjustments to ensure a sufficient number of individuals for the calculation. *Id.* at 70032-33.[41] AACS's suggestion that the Department could instead only do "two D/E Rate and EP calculations per state (one for men, one for women)," A.Br. at 36, simply

---

[40] Defendants further address the flaws in AACS's purported expert's analysis in their Motion to Strike, filed concurrently herewith. *See* Declaration of Rajeev Darolia (attached thereto).

[41] In a footnote, AACS suggests that because one study in the AR (which AACS again inaccurately references as "Defendants' own expert," A.Br. at 34n.21) used demographically-similar "comparison groups" in order to isolate "the causal impact of attending a for-profit institution on subsequent outcomes," the Department should be able to as well. *See* Cellini, Stephanie Riegg & Turner, Nicholas, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students using Administrative Data,* J. OF HUMAN RESOURCES 54(2) (2022) [App. 135-36]. However, that study instead bolsters the Department's conclusion that program outcomes are not demographics-dependent; after ruling out the impact of demographics, the study concluded that "[d]ifferences in the costs of attendance likely drive much of the difference in debt." *Id.* [App. 137]. The study also observed that although for-profit cosmetology program graduates appeared to have higher earnings than those of Title IV-participating public sector programs, perhaps because some for-profit programs "are directly linked to high-end salons," they still had "negative total returns." *Id.* [App. 144]. (Though this study speculated, with no analysis, that this result may be due to unreported tips, *id.*, the Department considered Cellini & Blanchard (2022) to have refuted that possibility. 88 Fed. Reg. at 70042; [App. 28] (estimating unreported tips at 8% and concluding such an amount had minimal impact on outcomes).

makes no sense since the GE Rule requires each calculation be done per program, not per state.[42] The Department also reasonably rejected the second proposal based on flaws the commenter had acknowledged, and because it "would misrepresent the true median earnings of graduates from a given program" if applied to program earnings, thus misrepresenting the ability of that program's graduates to repay their debts, and would cause "year-over-year uncertainty" in the ET if applied to a state's high school graduates. 88 Fed. Reg. at 70033. In the end, AACS fails to contradict the Department's conclusions by providing any affirmative evidence that, despite the Department's analysis, demographic factors *are* the cause of any for-profit cosmetology program's failure, or that such programs due provide sufficient financial value to students.

Additional data, addressed in studies reviewed by the Department but simply ignored by Plaintiffs and by AACS's purported expert, further refute the notion that poor outcomes of for-profit cosmetology programs participating in Title IV are due to demographics, including, specifically, the high attendance of minority women, and are outside those programs' control. Cellini & Onwukwe's analysis of cosmetology programs in Texas suggests that such programs *could* improve their graduates' outcomes by simply lowering their tuition, as do hundreds of other cosmetology programs in the state that successfully operate and produce licensed graduates without profiting from Title IV taxpayer money. Cellini & Onwukwe (2022) [App. 119]; *see also* Cellini & Goldin (2014) [App. 98] (study of for-profit programs in five states indicated Title IV-participating programs charge 78% more than non-participating programs). Tellingly, Plaintiffs do not refute this analysis, essentially conceding that programs could take steps to pass the metrics. O.Br. at 44.

---

[42] To the extent AACS intended to suggest the Department calculate two ETs per state, it would still face the same complications described because it would still have to make program-specific adjustments to match programs' demographics.

### 3.    Changes in economic conditions and the pandemic

The Department also addressed concerns regarding the potential impact of the covid pandemic on earnings, noting that the first earnings measurements will be for a cohort whose third year after completion was 2021 or 2022—after the worst impact of covid on employment had passed—and there is no evidence median earnings for that year will be significantly affected. 88 Fed. Reg. at 70065, 70099 (indicating that the unemployment rate had fallen to 3.5%—its lowest level in 50 years—by July 2022, and because the cohort median earnings will cover both 2021 and 2022, the somewhat higher unemployment rate of 6.6% in July 2021 "will have very little impact on median earnings"). The Department confirmed that "the pandemic did not lead to systematically lower measured median earnings for all or even most programs" by examining available earnings data from before and during the pandemic in the College Scorecard. *Id.* at 70099.

AACS cites commenters' anecdotal evidence that many salons and spas "were closed or not hiring" during the pandemic, and some closed altogether, A.Br. at 39-40, while Ogle speculates that many cosmetology program graduates have shifted to entirely new careers, O.Br. at 44, even as they inconsistently assert that cosmetology is very much in-demand. *Id.* at 48. However, neither offers any concrete earnings data to contradict the Department's review of College Scorecard data, nor do they show that any impacts on median earnings of a 2021-2022 cosmetology program cohort would affect results under the GE Rule metrics, given that many high school graduates' earnings may also reflect career shifts during this period. *Cf.* 88 Fed. Reg. at 70058.

Indeed, the Department explained that in typical economic downturns, high school graduates' earnings would *also* fall—even more than earnings of workers with higher levels of education—which would generally result in lower EP thresholds, creating a buffering impact on metric outcomes for programs producing college graduates. *Id.* Although Plaintiffs point out

cosmetology programs are not in that category, the Department also reserved the authority to waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances. *Id.* & n.152. The GE Rule cannot be deemed arbitrary based on hypothetical future events. As for the pandemic, the Department reasonably concluded no delay or other modification was warranted since its review of available data did not suggest a significant impact. *See id.* at 70099.

Ogle's further suggestion, citing the 2019 Rule, that programs must be able to predict the future to "establish a price that will guarantee passing D/E rates," O.Br. at 44, misses the point and again ignores the purpose of Title IV. Like Title IV itself, the 2023 FVT and GE Rules are not designed with the goal of allowing programs to maximize their risk-free Title IV-funded income by setting their costs as high as they possibly can without failing the metrics. The FVT Rule seeks to provide students with information about program costs and the earnings they can expect so that students can make informed choices about the program they wish to attend—exactly what the 2019 Rule proposed, *see* 84 Fed. Reg. at 31417 (favoring "an equitable and meaningful transparency framework" that reports "debt and earnings income for all types of title IV programs to the public")—and the GE Rule seeks to ensure that GE programs satisfy their statutory eligibility requirement of preparing students for gainful employment. None of Plaintiffs' arguments on these issues show the GE Rule's use of the metrics is arbitrary or capricious.

### C.    The D/E Metric's 8% and 20% Thresholds Are Well Founded

Ogle again challenges the D/E metric's thresholds, but, as the Court explained at the PI stage, the Department provided a fulsome explanation for "why the 8% annual income threshold and 20% discretionary income threshold are reasonable benchmarks for purposes of the D/E metrics." PI Order at 10. The D/E metric (calculated as set forth in § 668.403) sets thresholds for the amount of debt students can typically withstand as a percentage of a student cohort's median

earnings. If the median debt of the program's student cohort three years after graduation exceeds 8% of the cohort's median annual earnings *and* exceeds 20% of its median discretionary income (income above 150% of the federal Poverty Guideline), the program "fails" the D/E metric for the year. *See* 88 Fed. Reg. at 70188 (§ 668.402). The Department reasonably combines the two thresholds to account for the fact that higher percentages of debt are affordable if earnings in general are higher. 88 Fed. Reg. at 32326 ("paying $2,000 per year is less manageable when you make $20,000 a year than paying $4,000 per year when you make $40,000 a year"); *see* 88 Fed. Reg. at 32326 & fig.1.

As the Court observed, "the Department took into account a 2006 study published by Sandy Baum and Saul Schwartz that recognized a general agreement in previous research: '[S]tudents should not devote more than 8 percent of their gross income to repayment of student loans.'" PI Order at 10 (quoting Baum, Sandy & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt* (2006) [App. 6]). "The Department also considered that higher earners could afford to spend no more than 20% of income on debt repayment while lower earners (those below 150% of the Poverty Guideline) could afford no repayment at all." *Id.* (citing 88 Fed. Reg. at 70054). The Department therefore never adopted the 8% earnings threshold, derived from mortgage-underwriting, "full stop," nor did it fully adopt Baum & Schwartz's recommendation of a 20% discretionary income threshold. *Id.* Rather, in order to be "more generous" to schools, it provided that a program can pass the D/E metric as long as it passes either of the thresholds. 88 Fed. Reg. at 70174. The Court concluded that the Department "articulated a rational connection between the facts found and the decision made." PI Order at 10 (quoting *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017).[43]

---

[43] Other courts have upheld the same thresholds as they were applied in the 2011 and 2014 GE rules. *APC*, 107 F. Supp. 3d at 366 (noting Department "cites to at least four studies that have

Ogle argues, first, that the 8% threshold is arbitrary because it derives from mortgage underwriting standards and was not supported by Baum & Schwartz, and on that basis was "skewered" by the 2019 Rule. O.Br. at 46 (citing 84 Fed. Reg. at 31426). However, the 2019 Rule's analysis on this point is cursory (not "careful" as Ogle suggests, *id.*). In fact, the Department simply recognized that the Baum & Schwartz study did not approve that threshold as a *stand-alone* benchmark for student debt. 84 Fed. Reg. at 31426. No prior rule had suggested otherwise, nor do the current regulations. Indeed, as the 2019 Rule and the 2023 NFR both acknowledge, Baum has stated that, if anything, both the 8 and 20 percent thresholds are too generous to GE programs. *Id.* (acknowledging Baum's view as expressed in comments on the 2019 rule that the evidence supported a standard stricter than 8 percent).[44]

Ogle also suggests that the 8% threshold is unreasonable because recent vocational school graduates are young and unlikely to own homes, so they have no mortgage debt that could interfere with their ability to pay off education loans. O.Br. at 45-46. But Baum & Schwartz noted students may nevertheless have car payments, rent payments, credit cards, or other personal loans while lower earnings may make any student debt completely unaffordable; they preferred the 20% benchmark precisely because it was tied to income above the poverty level, but they also

---

accepted [the 8%] standard in the context of student debt," and "various states" have also based their student debt guidelines on that standard; and that both thresholds are "based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely" (quoting *APCU*, 870 F. Supp. 2d at 153)); *accord APSCU*, 110 F. Supp. 3d at 194-95.

[44] *Cf.* 88 Fed. Reg. at 78 (recognizing Baum's view that "if anything, a 20 percent discretionary threshold for the median borrower is too permissive and a stricter standard would be justified" (citing Baum, Sandy, *DeVos misrepresents the evidence in seeking gainful employment deregulation* (2018) [App. 20]). Ogle also suggests it is "remarkabl[e]" that the administrative record fails to include "the principal sources" that the 2019 Rule relied on to reject an 8 percent stand-alone threshold. O.Br. at 46 n.17. However, the 2019 Rule appeared to rely solely on the Baum & Schwartz study itself, which is in the record, and publicly posted D/E rates calculated under the 2014 Rule. 84 Fed. Reg. at 31426. Ogle identifies no specific source that was not included, implicitly conceding that there was none.

recognized the 20% figure was the upper limit of what was reasonable. Baum & Schwartz 3, 12 [App. 7, 16]. The Department's adoption of the 8% threshold as well, applied to the median debt of a program's student cohort, is more generous to schools because not only do lower earnings (closer to the poverty level) more easily pass the threshold, but "half of a program's graduates could exceed this limit" before a program would fail the metric. Baum (2018) [App. 20]. Ogle's challenge to the 20% threshold similarly ignores that, to the extent Baum & Schwartz deemed the threshold "somewhat arbitrary," it was only because they deemed it the maximum reasonable ratio—making the Department's adoption of that threshold again maximally generous to programs. Baum & Schwartz (2006) [App. 16]. While Ogle focuses on each threshold separately, in the abstract, the Department reasonably concluded that they are more than reasonable when applied together in the D/E metric. 88 Fed. Reg. at 70053 (the "overall point stands—that it would not be affordable for borrowers to have student debt-service ratios beyond what is in the GE rule").

Ogle also suggests the Baum & Schwartz study supports the notion that the D/E metric is arbitrary—or indeed "absurd"—for failing to include total household earnings on the earnings side of the metric. O.Br. at 47. But Ogle ignores that the GE Rule is not meant to address "whether going into debt to obtain vocational training makes sense" to a particular borrower, *id.*, but instead whether a particular program prepares its students for gainful employment in a recognized occupation. While Baum & Schwartz suggested "family size" was a factor for student borrowers to consider when applying the 20% benchmark to their own circumstances, [App. 16], the Department reasonably concluded that, for purposes of the GE Rule, the earnings of individuals in a household who did not attend a program—and who thus did not receive the training that it provided—have no bearing on whether the program prepares its students for gainful employment.

Ogle fails to explain how that conclusion could qualify as absurd. [45]

The Department's decision to retain the 20% discretionary income threshold even though many graduates whose debt exceeds 20% of their income may be eligible for loan payment reductions and ultimately loan forgiveness under the Department's income-driven repayment ("IDR") programs also passes muster under arbitrary and capricious review. The D/E rates set maximum borrowing thresholds, based on students' earnings, that reflect what a "typical program graduate" can repay "without having to rely on payment programs" like IDR. 88 Fed. Reg. at 70050. As explained in the NFR, the "after-the-fact protections" available through the IDR programs—while providing important safeguards for students saddled with overwhelming debt—ultimately shift the costs of unreasonable debt onto taxpayers. *Id.* at 70013, 70051 (identifying IDR participation as a growing contributor to the costs shifted to taxpayers).[46] The Department is obligated to minimize that result to the extent possible by ensuring the responsible expenditure of taxpayer funds on Title IV aid within the bounds of statutory authority, and the GE Rule accordingly uses the D/E metric to assess a program's statutory eligibility. *Id.* at 70013. Ogle would apparently prefer that the Department protect the "public fisc" by leaving students in the

---

[45] As explained above, the Department's data suggest students who invest significant time and money in postsecondary education do so with the expectation that their own earnings potential will be enhanced. Ogle cites no contrary research suggesting that any significant number of students take on unaffordable debt for career training because they expect others in their household to repay their loans. Ogle's wild speculation that, even though 90% of its students receive Title IV aid, a significant number also have household income of over a million dollars, and that such a prospect negates any need for GE programs to prepare students for their own gainful employment, O.Br. at 47, seems far-fetched, to say the least. The Department reasonably did not build into the D/E metric an assumption that students saddled with an amount of debt that they could not hope to repay with a particular program's typical earnings could rely on other household members to bear such costs.

[46] Although Ogle quotes the suggestion in the 2019 Rule that students may intentionally "pursue a lower paying job in order to benefit from IDR-derived loan forgiveness," O.Br. at 48 (quoting 84. Fed. Reg. at 31400), neither that rule nor Ogle cites any evidence of the extent of such a tactic. The Department concluded in the NFR that it would be unreasonable to adjust the D/E metric to allow schools "to encumber students with even more debt while expecting taxpayers to pay more for poor outcomes" of GE programs. 88 Fed. Reg. at 70050.

lurch, O.Br. at 49 n.19, but when GE programs charge high tuition to get more risk-free Title IV money, without regard to the value those programs provide to students, taxpayer funds do not serve their statutory purpose to help students.

### D.    The NFR Thoroughly Explains the GE Rule's Costs and Benefits and Shows that It Serves Title IV's Purpose To Help Students

Lastly, Ogle argues that the GE Rule is arbitrary because, it contends, the Department has failed to substantiate a rational connection between the benefits of the GE Rule and the costs that it would impose on cosmetology programs. Ogle here relies on the notion that many currently Title IV-eligible cosmetology programs are projected to fail the GE Rule's metrics, and that programs like Ogle's, which rely on Title IV for two thirds of their total income, would thus close. O.Br. at 48. However, Ogle effectively acknowledges that at least 80% of students currently attending Title IV-eligible cosmetology programs are estimated to be in programs that do not prepare them for gainful employment. *See id.* Ogle fails to show that it is irrational for the Department to identify such programs so that students can instead use their Title IV funding at different programs that have not failed the GE metrics. Nor does it contest the availability of hundreds of lower-cost cosmetology programs that are affordable without Title IV, and do not seek to rely on such funding, but even so, by all accounts, produce graduates that are equally successful at passing state licensure requirements. Ogle's last-ditch efforts to preserve its risk-free taxpayer-funded revenues regardless of whether its students are well-served should be soundly rejected.

In the NFR's Regulatory Impact Analysis, the Department made a "reasoned determination" that both Rules' benefits "justify their costs." *See* 88 Fed. Reg. at 70100 (citing E.O. 13563). That analysis easily satisfies the applicable deferential review. *See, e.g., Mex. Gulf Fishing Co. v. U.S. Dep't of Com.,* 60 F.4th 956, 973 (5th Cir. 2023) (consideration of costs and benefits associated with a regulation requires that the agency's "reasons and policy choices" satisfy

"minimum standards of rationality" (internal quotation omitted)); *Cigar Ass'n v. FDA*, 5 F.4th 68, 76 (D.C. Cir. 2021) ("because the court reviews cost-benefit analyses deferentially," a plaintiff's "burden to show error is high" (internal quotation omitted)).

The problem that both Rules identify and seek to address—the fact that many students who complete college, graduate school, or a career training program are left with unaffordable debt from their Title IV loans, and that when students cannot repay, the cost of their loan debt is unfairly borne by taxpayers—is undeniable. 88 Fed. Reg. at 70100-01. The significance of this problem cannot be overstated, given the billions of taxpayer dollars that are funneled to Title IV-participating schools each year. *See id*. at 70103-07 (in Academic Year 2022, $86 billion was directed through Title IV student aid to non-GE programs and $16 billion to GE programs). The costs when programs do not provide financial value to students run in the hundreds of millions of dollars, with adverse impacts on the lives and credit histories of millions of graduates. *Id.* at 70113, 70116-18. The NFR explains that "the earnings gain for the average for-profit certificate-seeking student was not sufficient to compensate them for the amount of student debt taken on to attend the program," but that outcomes varied depending on the specific program and field of study. *Id.* at 70116-18. Applying the new metrics to assess GE programs' Title IV eligibility will identify which programs provide training to prepare students for gainful employment in a recognized occupation and which do not. *See id*. at 70116 & nn.237-248.

The NFR also squarely addresses the specific characteristics of cosmetology programs and refutes Ogle's assertions that *all* cosmetology programs that fail the metrics would close under the GE Rule, or that 80% of cosmetology students would be left without any available program to attend, O.Br. at 49. The NFR's data analysis showed that cosmetology programs that failed the estimated metric calculations had "much higher loan payments, lower earnings, and higher default

rates" than Title IV-participating cosmetology programs that passed. 88 Fed. Reg. at 70139 & tbl. 4.19. Yet cosmetology programs that lose Title IV eligibility tend to lower their tuition with no effect on quality. *Id.* at 70086; *see also id.* at 70118 ("Research suggests that Federal student aid supports for-profit expansions and higher prices," with Title IV-participating for-profit programs charging 80% more tuition than non-participating programs, with no better earnings outcomes for students). In fact, most cosmetology programs do not participate in Title IV at all; those programs charge far lower tuitions while operating free of federal aid. *Id.* Moreover, Title IV-participating cosmetology programs that remain Title IV-eligible could expand their programs to respond to any demand that non-participating programs do not meet. *Id.*

To be sure, Title IV-participating cosmetology programs may fare better than the 2023 Rule's preliminary estimates suggest since those estimates, based on the best data currently available to the Department, combine more types of programs into single categories (using 4-digit rather than 6-digit CIP codes); do not incorporate the new metrics' removal of loan debt not attributable to tuition and fees; and were not able to measure earnings and debt from identical periods. *See id.* at 70123. Programs can also improve from one year to the next, and GE programs will not lose eligibility unless they fail the same metric for two out of three years. However, even if cosmetology programs like Plaintiffs' were to lose Title IV eligibility (a result that would occur, at the earliest, in 2026), the research reviewed by the Department suggests that students will find ample more affordable alternatives that will in no way diminish the quality of their training. 88 Fed. Reg. at 70118-19, 70145-47; Cellini & Onwukwe (2022) [App. 119]. As the NFR points out, hundreds of non-Title IV-participating cosmetology programs operate in Texas, in the same counties where Title IV-participating programs operate. 88 Fed. Reg. at 70147.

Plaintiffs entirely ignore the availability of non-Title IV-participating cosmetology

programs, together with the aforementioned indications that such programs are of at least equal quality to those currently in Title IV at a lesser cost. Instead, they speculate that, if their programs shut down, their students may end up at one of the smaller programs that does participate in Title IV but has too few completers to be subject to the metrics, and there is no guarantee *that* program will be better. O.Br. at 49; A.Br. at 42. The Department has explained that, consistent with its own and IRS data policies, it cannot perform D/E or EP calculations for very small programs without compromising student privacy. 88 Fed. Reg. at 70046. However, the metrics will cover over 80% of student enrollments in Title IV-participating schools, including 87% of enrollments in for-profit undergraduate programs. *See id.* at 70046, 70121, 70128. No comments submitted during the rulemaking provided any statistical analysis or other evidence substantiating that there is any significant risk that students who would have attended cosmetology programs that fail the D/E or EP metrics will end up at a small program that provides even less value, and Plaintiffs also fail to provide such evidence. The speculative risk they posit is minimal at best and does not undermine the Department's cost-benefit analysis or otherwise make the GE Rule arbitrary or capricious.[47]

## IV.    AACS Identifies No First Amendment Violation

### A.    The GE Rule Does Not Unconstitutionally Burden Speech

Finally, AACS's two First Amendment challenges should be rejected as baseless. First, AACS asserts the entirely novel claim—never raised during rulemaking or in any prior case—that GE programs' potential loss of Title IV eligibility under the GE Rule burdens speech, on the theory that "prospective students" who had intended to finance their attendance at a GE program through

---

[47] AACS also contests the Department's exclusion of programs in U.S. territories, A.Br. at 43, but it fails to establish its standing to do so. AACS does not identify any members in U.S. territories or suggest its members are affected in any way by this exclusion, nor did it raise any issue on this subject in its comment on the proposed rule. *Cf.* AACS App. 1088-68. In any event, the Department reasonably explained its decision on this point. 88 Fed. Reg. at 70027-28.

Title IV aid would "lose their ability to attend that program" if it became Title IV ineligible. A.Br. at 46. Multiple defects doom this claim. For one thing, AACS appears to be asserting First Amendment rights of unknown prospective students, but it fails to establish standing for such a claim. A plaintiff "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *DC Operating, L.L.C. v. Paxton*, 100 F.4th 657, 658 (5th Cir. 2024) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (holding strip club operator lacked standing to assert First Amendment interests of its employees). Here, AACS relies on organizational standing, but its members are schools, not students, and it fails to show that any member school would have standing for this claim. Even the Ninth Circuit case on which AACS chiefly relies, *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), was brought by an identified prospective student who sought the horseshoeing instruction at issue. *Id.* at 1065. Moreover, the student plaintiff in *Kirchmeyer* sought to attend the only source of full-time horseshoeing instruction in the entire state, and the challenged state regulation threatened to prohibit him from attending the school altogether by requiring him to pass a test before he could enroll. *Id.* at 1067. Here, on the other hand, an AACS member's loss of Title IV eligibility for its cosmetology program would not deprive unknown prospective students of cosmetology training; such students may use their Title IV funding elsewhere or may attend a cosmetology program that does not participate in Title IV at all. 88 Fed. Reg. at 70145-47; Cellini & Onwukwe (2022) [App. 117].

This claim fails on the merits for similar reasons. The Supreme Court has made clear that the First Amendment is not implicated by the government's decision not to financially subsidize a private party's speech. *Regan v. Tax'n With Representation*, 461 U.S. 540, 550 (1983) (rejecting First Amendment challenge to lobbying restriction as condition of tax-exempt status because the

73

Constitution "does not confer an entitlement to [government] funds" in order to exercise freedom of speech); *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe that right" (quoting *Rust v. Sullivan*, 500 U.S 173, 193 (1991)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights"). AACS's claim is precisely the type that does not implicate the First Amendment at all because it challenges government funding decisions: Whether a GE program is deemed Title IV eligible governs whether federal taxpayer funds may be funneled to it to subsidize the cost of students' tuition.

Because Title IV and the GE Rule govern the conditions under which federal funding is provided, the Court need go no further to reject this claim. AACS suggests the "conduct triggering coverage under" the GE Rule is vocational instruction, which in their view "consists of communicating a message." A.Br. at 46. But that is clearly wrong. In fact, the conduct at issue is not instruction at all but simply the status of seeking continuing eligibility for Title IV funding. Vocational programs face no requirements whatsoever under the GE Rule if they do not seek Title IV funding. The situation here is thus quite different from either *Kirchmeyer* or *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), also cited by AACS, because neither case involved eligibility for government funding; rather, *Kirchmeyer* involved a direct prohibition on enrollment, and *Holder* involved imposing criminal penalties on the provision of training to  and engaging in political advocacy on behalf of foreign terrorist organizations, *Holder*, 561 U.S. at 14-15.

Nor is AACS correct that Title IV or the GE Rule "differentiates between speech or speakers" based on content, *see* A.Br. at 47. Title IV defines the categories of schools and programs

74

that are eligible to participate in and receive Title IV taxpayer funding based on whether a school is public, non-profit, or for-profit; and whether a program leads to a Bachelor of Arts degree, provides credits that can be applied to such a degree, or does not confer a degree but qualifies as an eligible program of training to prepare students for gainful employment in a recognized occupation. 20 U.S.C. §§ 1001(a), (b); 1002(a), (b), (c). None of these categories are based on the subject matter of instruction, much less based on content or viewpoint. AACS fails to show otherwise. In sum, this claim should be soundly rejected.

### B. Consistent with the First Amendment, the GE Rule's Warning Requirement (§ 668.605) Ensures Students Are Notified When Their Programs May Lose Title IV Eligibility

AACS also raise a separate challenge to 34 C.F.R. § 668.605—a GE Rule provision—under the First Amendment's "compelled speech" doctrine, but that claim also fails. Section 668.605 reasonably requires schools to give current and prospective students fair warning if the GE program they are slated to attend may lose Title IV eligibility the following award year. 34 C.F.R. § 668.605. The wording of the warning will be specified by the Department in a future Federal Register notice but will include information allowing students to access the Department's program information website, which will contain information about the program as specified in the separate FVT Rule. *See id.* § 668.605(c)(1), (2). Schools must also include in such warnings a description of students' "academic and financial options," and how the school would proceed, in regard to providing instruction, refunding money already paid, and allowing for transfers of credit, should the GE program lose Title IV eligibility, to continue their studies there or elsewhere. *Id.* § 668.605(c)(4), (5).

Addressing First Amendment concerns in the NFR, the Department noted that this provision simply requires schools to provide "a straightforward, purely factual, and

uncontroversial warning," to students with whom the schools "already have a relationship," "when there is a serious risk that [Title IV] aid will not be available at a given GE program." 88 Fed. Reg. at 70083. The Department deemed such warnings necessary for students' protection, given the "undeniably serious consequence for students"—the intended beneficiaries of Title IV aid— should the program in which they are enrolled or seek to enroll become unavailable for the use of such funds. *Id.* The Department explained it lacked the ability itself to direct such warnings to the relevant group of enrolled and prospective students, but that it sought to minimize any burden on schools by making the warnings a "one-time obligation" (except where students seek to enroll more than a year after the warning was provided), with several different options, including e-mail, for their transmission. *Id.* Moreover, schools were not required to misrepresent or refrain from communicating their own views to students regarding the value of their programs. *Id.* at 70084. The Department pointed out that schools' Title IV participation agreements require them to "comply with requirements established by the Secretary relating to student loan information," 20 U.S.C. § 1087d(a)(2), and that pursuant to that authority, the Department already required schools to provide students with loan counseling to comprehensively explain the terms of their loans. *See* 88 Fed. Reg. at 70084 (citing 34 C.F.R. § 685.304(a)(3)).

The GE Rule warnings are consistent with the First Amendment. While government-compelled speech may be subject to strict scrutiny under the First Amendment, such scrutiny does not apply if (1) the speech is actually government speech rather than compelled private expression, *Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015), which held specialty license plates conveyed government speech); or if either (2) the government operations exception or (3) the commercial-speech exception applies, *id.* at 339. All three exceptions apply here.

76

First, to the extent § 668.605 simply requires schools to warn their students that their GE program is at risk of losing Title IV eligibility under the GE Rule and refer them to the Department website for specific information about the program posted there under the FVT Rule, the information conveyed can properly be viewed as government speech that does not implicate the First Amendment. Such an assessment is guided by "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Book People, Inc.*, 91 F.4th at 337. Here, it is common knowledge that Title IV eligibility determinations are made by the Department; the Department will specify the precise content of the warning; and the referral to the Department's website will further confirm that the information has been issued by the Department. Moreover, the Department has made clear that schools are free to communicate their own views regarding their value. 88 Fed. Reg. at 70084.

Second, the warnings described in § 668.605 are necessary for the proper operation of Title IV because students need to know, for planning purposes and to avoid being unfairly surprised, if the GE program they are attending or may attend is at risk of losing Title IV eligibility. The "government operations" exception thus applies because "[t]here is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'" *Book People, Inc.*, 91 F.4th at 339 (quoting *United States v. Arnold*, 740 F.3d 1032, 1036 (5th Cir. 2014)). The Fifth Circuit has recognized that the government can compel sex offenders to register their residence to promote public safety, just as it can compel individuals to disclose information for tax collection. *Arnold*, 740 F.3d at 1035. The Department similarly can require Title IV-participating schools to inform their students when one of their programs faces a known risk of losing Title IV eligibility. Such warning is simply the "responsible" thing to do, *see*

77

88 Fed. Reg. at 70083; since both the school and the Department are aware of the risk, affected students should also be informed. The further requirement in § 668.605 that schools tell students what they could expect, should the program lose Title IV eligibility, similarly seeks to ensure students are adequately prepared for that possibility.

Third, the § 668.605 warnings also qualify for the "commercial-speech" exception, which commonly applies to similar consumer warnings as long as they are "(1) purely factual and (2) uncontroversial," "(3) [are] justified by a legitimate state interest," and "(4) not unduly burdensome." *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024) (upholding tobacco warning label requirement); *see also Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (upholding state disclosure requirements for attorney advertisements); *Recht v. Morrisey*, 32 F.4th 398, 419 (4th Cir. 2022) (upholding required disclosures in attorney solicitations), *cert. denied*, 143 S. Ct. 527 (2022); *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020) (upholding required hospital pricing disclosures). Here, all four requirements are met. The warnings are purely factual and uncontroversial because, if a GE program is at risk of losing Title IV eligibility the following award year under the GE Rule, the required warning would simply convey that fact, as well as certain details about how the school would respond if that happened. 34 C.F.R. § 668.605(c). The warnings serve a legitimate government interest in ensuring affected students receive fair notice if the GE program in which they are enrolled or seek to enroll is at risk of losing Title IV eligibility. And the Department has sought to minimize any burden on schools by limiting the frequency of warnings and allowing them to be conveyed in whichever manner, out of several options including e-mail, is easiest for schools. *See* 88 Fed. Reg. at 70083.

AACS does not address the first two exceptions, and though it tries to address the third, it

does not contest the Department's legitimate interest, nor do they suggest the warnings are overly burdensome. Rather, they argue that, even though the required warnings would be "literally" true, they may be misunderstood by students. A.Br. at 50. They also rely on the notion that the GE Rule itself is controversial because it is the subject of litigation. *See id.* However, AACS provides no evidence that the warnings would be misunderstood, and if schools have such fears, they are free to provide clarification. 88 Fed. Reg. at 70084 (emphasizing schools need not misrepresent their views or refrain from communicating them). Moreover, regardless of how "contentious" the GE Rule has been for AACS and its members, A.Br. at 50, the warning requirement will not be triggered unless the GE Rule is in effect, and notifying students how their program may be impacted the next award year is not itself controversial. To the contrary, it would make no sense to hide this information from students, keeping them in the dark even when there is a risk a program may lose Title IV eligibility, simply because cosmetology schools have challenged the GE Rule in court. Accordingly, the Court should hold that § 668.605 does not violate the First Amendment.

## V.    Even If the Court Were to Grant Plaintiffs Relief, It Should Be Carefully Limited

Although judgment should be entered in favor of Defendants, any relief that Court grants Plaintiffs should be carefully tailored to any plaintiff's established injury, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth*, 422 U.S. at 499 (emphasis added). It is also inconsistent with traditional equitable principles premised on "providing

equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

While the Fifth Circuit has held that "vacatur under § 706" is the "'default' remedy for unlawful agency action," *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024), that default does not, of course, mean that an entire set of regulations must be vacated if the Court finds fault with only one subsection. Nor must the Court apply the "default" if there is a legitimate reason not to do so—for example, if a provision is deemed invalid only as applied but there are other applications that would be valid. Here, all of Plaintiffs' claims address the GE Rule, not the FVT Rule—which involves collecting and posting information about all Title IV programs on a Department website. Moreover, many claims focus on only one of the metrics (D/E or EP) used as a tool in the GE Rule, or specific regulatory sections or even subsections within that Rule, and many rely on the specific asserted circumstances of cosmetology schools. The Final regulations themselves state the Department's view that their provisions are severable: "[i]f any provision" of either the FVT Rule or the GE Rule "or its application to any person, act, or practice is held invalid, the remainder of [the Rules], and the application of [the FVT Rule or the GE rule] to any other person, act, or practice, will not be affected thereby." 34 C.F.R. §§ 668.409, 668.606. Thus, should the Court deem any provision of the Rules invalid in the circumstances of this case, Defendants request the opportunity to further brief the appropriate remedy.

## **CONCLUSION**

For the foregoing reasons, judgment should be entered in Defendants' favor.

DATED:  November 8, 2024                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           MARCIA BERMAN

Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
KATHRYN L. WYER (DC Bar #90023642)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Counsel for Defendants*