**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS et al., | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | No. 4:23-cv-1267-O |
| U.S. DEPARTMENT OF EDUCATION et al., | ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

**PLAINTIFFS OGLE SCHOOL MANAGEMENT, LLC & TRICOCI UNIVERSITY OF
BEAUTY CULTURE, LLC'S MEMORANDUM REPLYING IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT &
OPPOSING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.....................................................................................................ii

INTRODUCTION ...................................................................................................................1

ARGUMENT...........................................................................................................................3

I.      The 2023 Rule Is *Ultra Vires* ......................................................................................3

II.     The 2023 Rule Is Arbitrary And Capricious ...............................................................18

        A.      The Rule Illogically Relies on Concededly Inaccurate Earnings Data.........................18

        B.      The Rule Illogically Penalizes Schools for Factors Beyond Their Control .................23

        C.      The Rule Uses Illogical Debt-to-Earnings Thresholds....................................27

        D.      The  Rule's Cost-Benefit Analysis Is Illogical................................................29

III.    There Is No Basis To Artificially Narrow The Relief. ....................................................30

CONCLUSION ......................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Ass'n of Cosmetology Schs. v. Devos,*
258 F.Supp.3d 50 (D.D.C. 2017) ........................................................................19

*Am. Health Care Ass'n v. Burwell,*
217 F.Supp.3d 921 (N.D. Miss. 2016) ...............................................................21

*Ams. for Beneficiary Choice v. HHS,*
2024 WL 3297527 (N.D. Tex. July 3, 2024)......................................................20

*Antelope Valley Bus Co. v. NLRB,*
275 F.3d 1089 (D.C. Cir. 2002) ..........................................................................25

*APSCU v. Duncan,*
640 F.App'x 5 (D.C. Cir. 2016) .............................................................................4

*Ass'n of Priv. Colls. & Univs. v. Duncan,*
870 F.Supp.2d 133 (D.D.C. 2012) ........................................................................4

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan,*
110 F. Supp. 3d 176 (D.D.C. 2015) ..........................................................4, 13, 16

*Ass'n of Proprietary Colls. v. Duncan,*
107 F.Supp.3d 332 (S.D.N.Y. 2015).......................................................................4

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) .............................................................................................13

*Career Colls. & Sch. of Tex. v. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024) .................................................................18, 23, 30

*Chamber of Com. of U.S. v. DOL,*
885 F.3d 360 (5th Cir. 2018) ...............................................................20, 28, 29, 30

*Dep't of Homeland Sec. v. MacLean,*
574 U.S. 383 (2015) .............................................................................................12

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)..............................................................................................28

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) .............................................................................................16

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)..............................................................................................20

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ........................................................................9

*Lomax v. Ortiz-Marquez*,
    140 S.Ct. 1721 (2020) ................................................................................13

*Loper Bright Enters. v. Raimondo*,
    144 S.Ct. 2244 (2024) ........................................................................*passim*

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) .............................................................. 27, 29

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018) ....................................................................................8

*Nat'l Ass'n of Mfrs. v. SEC*,
    105 F.4th 802 (5th Cir. 2024) ....................................................................25

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ..................................................................................15

*Ohio v. EPA*,
    603 U.S. 279 (2024) ..................................................................................20

*Rest. L. Ctr. v. DOL*,
    120 F.4th 163 (5th Cir. 2024) ............................................................*passim*

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 (2018) ..................................................................................12

*Sekhar v. United States*,
    570 U.S. 729 (2013) ..................................................................................27

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ....................................................................23

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .............................................................. 22, 30

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ....................................................................19

*United States v. Lopez-Valenzuela*,
    511 F.3d 487 (5th Cir. 2007) ....................................................................11

*United States v. Santos*,
    553 U.S. 507 (2008) ..................................................................................10

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ..................................................................................8

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
586 U.S. 9 (2018) ......................................................................................7

**Statutes**

5 U.S.C. §706(2) ........................................................................................18

20 U.S.C. §1002(a) ..............................................................................3, 13, 18

20 U.S.C. §1002(b)(1) ............................................................................*passim*

20 U.S.C. §1002(c)(1) ................................................................................10

20 U.S.C. §1015a(k) ...................................................................................12

20 U.S.C. §1036(e)(1) ................................................................................12

20 U.S.C. §1070(a) .....................................................................................17

20 U.S.C. §1085 ..........................................................................................11

20 U.S.C. §1085(o) .....................................................................................12

20 U.S.C. §1087a(a) ...................................................................................17

20 U.S.C. §1087dd(e)(1) ............................................................................12

20 U.S.C. §1088(b)(1) ......................................................................1, 3, 13, 18

20 U.S.C. §1098e(b)(7) ...............................................................................12

20 U.S.C. §1098ee(4) ..................................................................................27

20 U.S.C. §1134c(a) ...................................................................................12

20 U.S.C. §1135c(d)(2) ...............................................................................12

20 U.S.C. §1161g(d)(5) ...............................................................................12

Pub. L. No. 64-347, 39 Stat. 929 (1917) ...................................................17

Pub. L. No. 92-318, 86 Stat. 235 (1972) ...................................................8

**Regulations**

34 C.F.R. §668.8(g)(2) ...............................................................................15

76 Fed. Reg. 34,386 (June 13, 2011) ............................................................................ 1, 19

79 Fed. Reg. 16,426 (March 25, 2014) ..............................................................................27

79 Fed. Reg. 64,890 (Oct. 31, 2014) ........................................................................... 1, 19

84 Fed. Reg. 31,392 (July 1, 2019) ............................................................................*passim*

88 Fed. Reg. 43,820 (July 10, 2023) ..................................................................................29

88 Fed. Reg. 70,004 (Oct. 10, 2023) ..........................................................................*passim*

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) .............................................................................7

David Carleton, *Landmark Congressional Laws on Education* (2002) .............................17

CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s ...................24

*Collins Dictionary*, https://rb.gy/cpj3lm (last visited Dec. 19, 2024) ...........................8

Dep't of Educ., *2022 Program Performance Data Description*, https://rb.gy/zqc5ec
    (last visited Dec. 20, 2024) ......................................................................................29

Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for
    Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt*
    (May 22, 2023), https://rb.gy/uyl2xk ....................................................................15

Dep't of Educ., *Updated Timeline for Financial Value Transparency and Gainful Employment
    Reporting and Completers Lists* (Sept. 13, 2024), https://rebrand.ly/lp662d6 .......................3

K.D. Drummond, *'Are You Stupid??' Cowboys Star Got Early Career Wakeup Call After
    Going Broke*, USA Today Cowboys Wire (Sept. 4, 2024),
    https://rebrand.ly/x8jstdn ......................................................................................7

Claudia Goldin & Lawrence F. Katz, *Why the United States Led in Education: Lessons
    from Secondary School Expansion, 1910 to 1940* at 41 fig. 1 (June 2008),
    https://rebrand.ly/8exg8v8 ....................................................................................16

H.R. Rep. No. 64-181 (1916) ...........................................................................................16

H.R. Rep. No. 64-81 (1916) .............................................................................................16

H.R. Rep. No. 89-308 (1965) ...........................................................................................16

*Merriam-Webster Online Dictionary*, https://rebrand.ly/1162p3l
    (last visited Dec. 19, 2024) ........................................................................................8

S. Rep. No. 89-758 (1965) ................................................................................................16

S. Rep. No. 92-346 (1971) ....................................................................................................8

*The American Heritage Dictionary of the English Language* (1969) .................................................13

U.S. Census Bureau, *American Community Survey* (2024), https://rb.gy/0jxt5c .....................................19

## INTRODUCTION

Five years ago, in 2019, the Department of Education (Department) admitted that it "had incorrectly described congressional intent and engaged in regulatory overreach" when it promulgated "fundamentally flawed" and "absurd" gainful-employment regulations in 2011 and 2014 that had departed from decades of regulatory practice and industry understanding.  84 Fed. Reg. 31,392, 31,392, 31,402, 31,410 (July 1, 2019) (2019 Rule); *see also* 76 Fed. Reg. 34,386 (June 13, 2011) (2011 Rule); 79 Fed. Reg. 64,890 (Oct. 31, 2014) (2014 Rule).  Although the Department subsequently flip-flopped in 2023 under the Biden Administration to promulgate the gainful-employment rule at issue here, *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023) (2023 Rule), its 80-page summary-judgment submission in defense of that rule makes clear that the Department got it exactly right in 2019 when restoring the status quo that had prevailed for half-a-century—and, if anything, that the 2023 Rule with all of its new bells and whistles is the most flawed regulatory effort yet in this area.  In short, the 2023 Rule is plainly *ultra vires*, and it is arbitrary and capricious in spades.  The time has come to vacate the 2023 Rule and to end the Department's novel regulatory experiment here once and for all.

Under the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2266 (2024), this Court must adopt the "best" interpretation of a statute—and only one such interpretation can exist.  The Department comes nowhere close to demonstrating that it has the best interpretation of the Higher Education Act (HEA) language at issue here, which provides that a for-profit school can qualify as eligible to participate in student-aid programs administered under Title IV of the HEA if it "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §1002(b)(1)(A)(i); *id.* §1088(b)(1)(A)(i).  Ordinary meaning and every other tool in the statutory-interpretation toolkit make clear that this language just requires schools to provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field (like cosmetology).  It decidedly does *not* mean (as the Department asserts) that it gives the agency discretionary authority to deny eligibility to programs if the median program graduate who is three years removed from school does not out-earn the median in-state high-school graduate between the ages of 25 and 34, or if that same program graduate devotes more than 8% of

1

annual earnings or more than 20% of discretionary earnings to student-loan payments. Indeed, if you asked ordinary people on the street if they are gainfully employed, no one would need to consult the American Community Survey to find out how they are faring in comparison to some peer group, let alone whip out their calculators to determine their debt-load. Instead, they would simply answer yes or no, based on whether they had a paying job, because the ordinary meaning of gainful employment is binary and simply distinguishes paid work from volunteer work and in no way excludes some paid workers based on their relative income or debt-to-earnings ratios. The Department's contrary view hinges on out-of-circuit decisions applying the very *Chevron* framework that *Loper Bright* repudiated and a purposivist approach to statutory interpretation that understands the HEA's purpose at its highest possible level of generality. None of that is any match for ordinary meaning, and it defies the purposes that Congress actually enumerated. In short, because the Department's understanding of the statutory language is not the best (to put it charitably), the 2023 Rule is *ultra vires*.

That alone should be the end of the road for the 2023 Rule. But the Department also fails to refute the *Ogle* Plaintiffs' showing that the 2023 Rule is arbitrary and capricious four times over, as that rule illogically relies on concededly inaccurate earnings data, illogically penalizes schools for factors beyond their control, uses illogical debt-to-earnings thresholds, and fails to substantiate any of its expected benefits. The Department resists those conclusions only by ignoring its own prior statements, mischaracterizing the facts before it, or otherwise defying common sense. The *Ogle* Plaintiffs thus are entitled to summary judgment. And contrary to the Department's suggestion, there is no basis to artificially narrow the scope of relief. Because the *Ogle* Plaintiffs challenged the rule at issue here in its entirety, and because it is unlawful in its entirety, it follows that the whole thing must go. Accordingly, the Court should vacate the 2023 Rule *in toto* and do so promptly after the close of briefing.[1]

---

[1] As the *Ogle* Plaintiffs explained in their opening summary-judgment brief, and as the Department does not dispute, the Department intends to require schools to post significant letters of credit if they have "failing" programs under the initial set of calculations conducted under the 2023 Rule, which the Department originally intended to complete in early 2025. On the same day that the *Ogle* Plaintiffs

**ARGUMENT**

**I.    The 2023 Rule Is *Ultra Vires*.**

The HEA states that a for-profit school can qualify as "eligible" to process Title-IV aid if it "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§1002(a), (b)(1)(A)(i); *see id.* §1088(b)(1)(A)(i). All tools of statutory interpretation confirm that this language means only that for-profit schools must provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field—*i.e.*, unlike public or non-profit schools, for-profit schools typically cannot qualify as Title-IV eligible by providing general instruction in the liberal arts or humanities. *See* Ogle.SJ.Br.22-34. The Department fails to establish that, unbeknownst to everyone for half-a-century, this language *actually* means that the Title-IV eligibility of for-profit schools should turn not on the nature of the training supplied in classrooms, but instead on metrics inspired by mortgage underwriters and academics scouring the European debt literature that measure the debt-to-earnings ratios of program alumni several years after graduation and that compare those graduates' earnings to those of a subset of in-state high-school graduates between the ages of 25 and 34.

The Department stumbles out of the starting gate, as it first claims that this Court will have to "overturn settled law" to find the 2023 Rule *ultra vires*, Dep't.SJ.Br.16, because a handful of decisions issued by out-of-circuit courts rejected certain challenges to the 2011 and 2014 Rules several years ago. Even setting aside that the Southern District of New York and other lower courts sitting beyond the Fifth Circuit do not sit above this Court in the judicial hierarchy—and that the Department is arguing here that the 2023 Rule "differ[s] in significant respects" from the 2011 and 2014 Rules

---

filed their opening summary-judgment brief, however, the Department delayed the deadline by which schools must report the information necessary for the agency to calculate its metrics. *See* Dep't of Educ., *Updated Timeline for Financial Value Transparency and Gainful Employment Reporting and Completers Lists* (Sept. 13, 2024), https://rebrand.ly/lp662d6. Schools thus now have until January 15, 2025 to comply with the reporting requirement, and it is not clear when the Department will complete its initial set of calculations (and require letters of credit). Because of that uncertainty, a prompt decision after the close of briefing from this Court remains necessary; the Department is currently scheduled to file its final brief on January 31, 2025.

reviewed by those other courts, including because this latest iteration of the rule includes an earnings-premium metric that never previously occurred to the Department in the 60-year history of the HEA, Dep't.SJ.Br.10—the fundamental problem with the Department's position is that *all* of those prior decisions declared the relevant statutory text ambiguous and relied on the now-defunct *Chevron* doctrine to defer to the Department's (dubious) understanding of the statute.[2]  While the Department apparently believes that those *Chevron*-dependent decisions remain "persuasive," Dep't.SJ.Br.17, that is wishful thinking.[3]  As the Fifth Circuit recently explained, "the Supreme Court's intervening opinion in *Loper Bright* requires us to depart" "at the very start" "from the … analysis" applied in cases invoking the "*Chevron* framework," as courts must now "parse the text of the [statute] using the traditional tools of statutory interpretation" instead of merely identifying ambiguities. *Rest. L. Ctr. v. DOL*, 120 F.4th 163, 171 (5th Cir. 2024).  The Department's small stable of ambiguity-identifying cases addressing rules that the agency describes as significantly different in material respects thus do not "inform the analysis" in this post-*Chevron* world.  *Contra* Dep't.SJ.Br.18.

In a similar vein, the Department suggests that this Court's pre-*Loper Bright* preliminary-injunction decision should "still" control here because it is purportedly "consistent with" *Loper Bright*. Dep't.SJ.Br.16.  That theory is likewise unavailing.  As an initial matter, the Department forgets that the preliminary-injunction decision turned on a demanding application of the preliminary-injunction standard—*i.e.*, a finding that "the extraordinary remedy of injunctive relief" is not "in order" because the 2023 Rule "is not *so* clearly beyond the bounds of [the Department's] authority." *Ogle*.Dkt.32 at 7

---

[2] *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 181 (D.D.C. 2015) (*APSCU*) (holding that the "deferential *Chevron*" standard "presents too great a hurdle" for the plaintiff); *APSCU v. Duncan*, 640 F.App'x 5, 7 (D.C. Cir. 2016) (affirming the district court and explaining that "[w]e agree" that the gainful-employment language is "ambiguous" and that "the Department's interpretation … warrants *Chevron* deference[.]"); *Ass'n of Proprietary Colls. v. Duncan*, 107 F.Supp.3d 332, 359, 363 (S.D.N.Y. 2015) ("[T]he GE Rules are a reasonable interpretation of an ambiguous statutory command" "'under step two of the *Chevron* analysis.'"); *Ass'n of Priv. Colls. & Univs. v. Duncan*, 870 F.Supp.2d 133, 146, 149 (D.D.C. 2012) (same).

[3] The Department suggests that courts may still "defer[]" to agency interpretations of statutes in certain circumstances.  Dep't.SJ.Br.17.  That assertion is irreconcilable with *Loper Bright*.  *See* 144 S.Ct. at 2261 ("[A]gency interpretations of statutes … are *not* entitled to deference.").

(emphasis added). Although the *Ogle* Plaintiffs disagreed with that decision, that is beside the point now. As the Department's submission elsewhere acknowledges, *see* Dep't.SJ.Br.11-12, that heightened preliminary-injunction standard does not apply here at this summary-judgment stage, where the relevant question is simply whether the Department's action is *ultra vires* to any degree, not whether it is *ultra vires* to a fare-thee-well. Furthermore, the Department ignores that this Court explicitly "d[id] not consider," let alone exhaust, most tools of statutory interpretation at the preliminary-injunction stage. *Ogle*.Dkt.32 at 7. As *Loper Bright* has since clarified, that is no longer the approach that courts should take: Courts must "use every tool at their disposal to determine the best reading of the statute." *Rest. L. Ctr.*, 120 F.4th at 171 (quoting *Loper Bright*, 144 S.Ct. at 2266).

Simply put, no prior decision from this Court or any other settles the dispute here. Instead, the 2023 Rule can survive only if a fresh and exhaustive application of the tools of statutory interpretation—such as text, context, structure, and history—prove that the Department has the best interpretation of the statutory text. As the Department's submission makes abundantly clear, its interpretation is nothing of the sort.

1. The Department agrees that the analytical starting point is the text of the HEA stating that, to qualify as Title-IV-eligible, for-profit schools generally must "provide[] a program of training to prepare students for gainful employment in a recognized profession." Dep't.SJ.Br.16. But the Department offers no argument about the bulk of that text and instead concentrates on just the last six words—and above all the word "gainful." According to the Department, because "gainful" is synonymous with "profitable," that gives it a general license to evaluate whether there is an "excess of returns over expenses" several years after students graduate from school—though apparently only that subset of expenses that specifically relate to Title-IV loans. Dep't.SJ.Br.18.

That submission is fundamentally misguided. To begin with, even though it promulgated the 2023 Rule over a year ago, the Department still cannot provide a credible explanation why statutory language that supposedly calls for a comparison of a graduate's earnings in relation to a portion of her expenses supports the earnings-premium metric, which instead compares the graduate's earnings to *an entirely different person's earnings—viz.*, those of the median in-state high school graduate between the

ages of 25 and 34.  In a footnote, the Department asserts that the earnings-premium test does examine "returns-vs-expenses" because it is "designed to assess whether GE program graduates, on average, earn more than they would have without the investment of taxpayer funds" by the government. Dep't.SJ.Br.22 n.12.  That explanation remains deficient.  To the extent that the Department is suggesting that the earnings-premium test compares the *graduate's* earnings to the *government's* expenses, that defies the ordinary meaning of profitability, as no one measures profitability by comparing their own returns to someone else's expenses.  That includes the Department, which highlights (as an example) that a "business" is "profitable" only if "*its* earnings exceed *its* expenses," not the expenses of an entirely different party.  Dep't.SJ.Br.20 (emphasis added).

Ultimately, however, the Department's strained effort to reimagine the earnings-premium test as an exercise in returns-vs.-expenses is a red herring.  As the Department eventually admits, the earnings-premium test has nothing to do with returns-vs.-expenses, but rather "seek[s] to allow comparisons … between completers' *earnings* and what they might have *earned* if they had not sought postsecondary training at all."  Dep't.SJ.Br.52 (emphases added).  The earnings-premium test thus is indisputably an earnings-vs.-earnings test, which has no grounding in ordinary "concept[s] of profitability" either.  Dep't.SJ.Br.14.  The median graduate of a cosmetology program who is operating a profitable business does not suddenly cease doing so just because the median high-school graduate operating the hardware store next door is earning one extra dollar in profits.  It is therefore little wonder why—despite submitting an 80-page brief—the Department buries its statutory defense of the earnings-premium test in all of one footnote:  Even under the Department's own understanding of the "gainful employment" language, the earnings-premium test is *ultra vires*.

But concepts of profitability do not help the Department in relation to the debt-to-earnings tests enshrined in the 2023 Rule either, Dep't.SJ.Br.14—and not merely because those tests are designed to strip programs of Title-IV eligibility even when the measured returns (the median program graduate's annual or discretionary earnings) *exceed* the measured expenses (the median program graduate's student-loan-related payments).  Indeed, even more fundamentally, the Department's gainful-is-synonymous-with-profitable theory loses sight of the fact that the adjective "gainful" modifies one

6

very specific noun in the statute: "employment." *Cf. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018) ("Adjectives modify nouns[.]"). The statute thus is not asking whether schools are preparing students to lead gainful "lives" or (as the preliminary-injunction decision put it) whether their overall post-graduate "financial outcomes" are profitable. *Contra Ogle.*Dkt.32 at 7. Instead, the statute is clear that the relevant question is whether schools are preparing students for a gainful or profitable *employment relationship*. As a matter of ordinary English, when an employee is getting paid a positive sum by her employer—in other words, when the employment is in fact a money-making endeavor—that employment relationship is unquestionably gainful or profitable from the employee's perspective. All that explains why lexicographers define the phrase "gainful employment" as "work that a person can pursue and perform for money"—and trace that definition back five centuries, no less. Gainful Employment *in* Employment, *Black's Law Dictionary* (11th ed. 2019). And that is why everyone would agree that Dallas Cowboys receiving millions of dollars from Jerry Jones are gainfully employed even if (as sometimes occurs) their substantial earnings do not actually exceed their off-the-job expenses. *See, e.g.*, K.D. Drummond, *'Are You Stupid??' Cowboys Star Got Early Career Wakeup Call After Going Broke*, USA Today Cowboys Wire (Sept. 4, 2024), https://rebrand.ly/x8jstdn (explaining how Cowboys star defensive end DeMarcus Lawrence went "completely broke" by his third playing year despite earning $5.5 million during that period).

At the preliminary-injunction stage, the Department protested that interpreting "gainful employment" to mean a paying job would violate the "canon against surplusage" because the term "employment" supposedly already encompasses payment. *Ogle.*Dkt.25 at 19. The Department no longer presses that untenable theory, *see* Dep't.SJ.Br.22—perhaps because even the Department "recognize[d]" in the 2023 Rule that it is possible to "obtain employment that is unpaid," 88 Fed. Reg. at 70,067. The modifier "gainful" thus performs critical non-superfluous work by clarifying that the relevant type of employment here is paid employment, not unpaid or volunteer employment. Despite its interpretive misstep, however, the Department insists that Congress' evident desire to exclude volunteer work still aids its own interpretation because it implicitly suggests that Congress also would not have wanted to provide student loans to those who do not have a sufficiently "positive return on

investment" (which supposedly describes someone who pays more than 8% of annual earnings or 20% of discretionary earnings to student-loan payments). Dep't.SJ.Br.23. The short answer to that argument is that the words "gainful employment that produces a sufficiently positive return after accounting for payments toward Title IV loans" "are not the words that Congress wrote, and this Court is not free to 'rewrite the statute' to the Government's liking." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018); *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (referencing "the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"); *Rest. L. Ctr.*, 120 F.4th at 173. In reality, Congress just used the words "gainful employment," and the ordinary meaning of that language—as numerous dictionaries confirm—is a job that yields take-home pay for the employee. *Accord* Gainfully Employed, *Merriam-Webster Online Dictionary*, https://rebrand.ly/1162p3l (last visited Dec. 19, 2024) (defining "gainfully employed" as "provided with a job that pays wages or salary"); Gainful Employment, *Collins Dictionary*, https://rb.gy/cpj3lm (last visited Dec. 19, 2024) (defining "gainful employment" as "an occupation that pays an income"). That is the reason why Congress long ago recognized that a "volunteer fireman"—in which the fireman serves "without compensation" at all—does not fall within the ordinary meaning of "gainfully employed" and would need a special statutory exception to fall within the ambit of "gainful employment."[4] S. Rep. No. 92-346, at 75 (1971); *see* Pub. L. No. 92-318, §202(b), 86 Stat. 235, 325 (1972).

Undeterred, the Department posits that the statutory language could not possibly require just a paying job because it uses the phrase "gainful employment *in a recognized occupation*," and that phrase "taken as a whole" supposedly connotes a "*decently* paying job"—which the Department supposedly has "discretionary authority" to define because it has the power to promulgate "reasonable" and "necessary" regulations. Dep't.SJ.Br.18, 22 (emphasis added). But nothing about the phrase "in a

---

[4] In a footnote, the Department surmises that the statutory exception for unpaid volunteer firemen "shows Congress was only willing to forgo a financial return on its investment when there was a clear compensatory societal benefit." Dep't.SJ.Br.23 n.13. The Department offers no evidence to support its atextual return-on-investment theory; instead, the Senate report cited in the footnote discusses the existence *vel non* of compensation.

recognized occupation" injects a nebulous and subjective "decent pay" standard into the equation, and the Department offers no contrary evidence. In fact, it does just the opposite. As the Department recognizes, jobs like "dishwasher" and "fast food cook" are "recognized occupations" even though they are "*low-paying*" vocations, not "decently paying" ones. Dep't.SJ.Br.23 (emphasis added). The Department's arguments thus succeed only in reinforcing the straightforward conclusion that the statutory phrase "gainful employment in a recognized occupation"—when "taken as a whole"—simply means a paying job in an acknowledged vocational field. And once that much is established, the Department's authority to promulgate "reasonable" and "necessary" regulations is irrelevant, as the Department cannot promulgate any such regulations that defy the ordinary meaning of the language that it is supposed to implement. *See, e.g., Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) ("[T]he grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'" (alteration in original)).

Although the Department's affirmative argument about the statutory text goes no further, the other operative language in the statute that the agency ignores—*i.e.*, "provide a program of training to prepare students"—is equally illuminating. That language demonstrates that the statutory focus is on the nature of the instruction that for-profit schools provide to current enrollees in the classroom, *see* Ogle.SJ.Br.23, not on the financial well-being of graduates who are not even enrolled in school anymore. That approach makes good sense. If Congress really intended to "tie program eligibility" to the debt and earnings figures of program alumni who are several years removed from school, 88 Fed. Reg. at 70,005, then—as the Department recognized in the 2019 Rule—schools would have to accomplish the "nearly impossible task" of "predict[ing] macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future" in order to obtain Title-IV eligibility in the first place, 84 Fed. Reg. at 31,417. Abandoning what it said in 2019, the Department now suggests that this task is not impossible because "the GE Rule's use of the metrics does not hold federally funded programs responsible for the success or failure of each and every student," but "[r]ather" only "the median debt and earnings of a cohort of students." Dep't.SJ.Br.52. But that argument just underscores that the Department has wandered miles from the

9

statutory text, which is written in a way that requires schools to do something for *all* students: "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." By far the best interpretation of that language is that Congress wanted to tie program eligibility to the provision of a training program that is designed to get every enrolled student ready for a paying job in a particular field (*i.e.*, instruction that is entirely within a school's control), not that a school would have to act as a guarantor of job openings, future earnings, or macroeconomic conditions for a select cohort of students as periodically defined by the Department (*i.e.*, factors that are entirely beyond a school's control).

And the Department's inability to plug other gaping holes in its statutory argument only buttresses the conclusion that its interpretation is inferior. While the Department adamantly insists that the "best" interpretation of the statute entails an assessment of alumni debt and earnings several years after students have graduated, Dep't.SJ.Br.26, the HEA explicitly says that for-profit schools offering gainful-employment programs can qualify as Title-IV-eligible even if they have existed for just two years and hence lack alumni with such statistics, *see* 20 U.S.C. §§1002(b)(1)(E), (c)(1)(C). In a footnote, the Department tries to dismiss this issue as "irrelevant," ostensibly because "[t]he fact that [the metrics] cannot be calculated for every single program … does not undermine their value or utility for the vast majority of student enrollments they do cover." Dep't.SJ.Br.21 n.11. As the Department recognizes, however, the statutory language at issue here amounts to an "undisputed statutory eligibility criterion" that applies to *all* gainful-employment programs. Dep't.SJ.Br.16-17. The fact that the Department's interpretation would prohibit the agency from determining compliance with that universal eligibility requirement in the same way for all programs—and would instead require the gainful-employment language to mean different things in different factual contexts, such as how long a school has existed (or the "n-size" of a graduate cohort or a school's presence in Palau)—eliminates any possible doubt that its interpretation is second-best. As Justice Scalia once explained, "giving the same word, in the same statutory provision, different meanings in different factual contexts" is an "interpretive contortion" that the Supreme Court "ha[s] … never engaged in[.]" *United States v. Santos,* 553 U.S. 507, 522 (2008) (emphases omitted); *United States v. Lopez-Valenzuela,* 511 F.3d 487, 491 (5th Cir.

2007) (giving "different meanings to the same words" is "inconsistent with customary standards of statutory interpretation"). This Court should not engage in such contortions either or otherwise entangle itself in the "logical knots" that the Department's understanding of the text creates. *Rest. L. Ctr.*, 120 F.4th at 172. Instead, the Court should hold that plain language of the operative statutory text thus is strike one against the Department.

2.    The Department's arguments regarding statutory context fare no better. Invoking an argument that it has never previously presented in defense of the 2023 Rule, the Department asserts that "the HEA's structural context as spending power legislation" indicates that Congress could not have "intended to loan out money to train students for jobs that were insufficiently remunerative." Dep't.SJ.Br.18-19. But as the Department itself "point[ed] out" in the 2019 Rule, "Congress intends for all Federal student loan borrowers to repay their loans, not just those who borrow to attend 'vocational training' programs." 84 Fed. Reg. at 31,401. Consistent with that principle, Congress has enacted different provisions in Title IV that explicitly address the consequences for schools if a critical mass of their graduates have insufficiently remunerative jobs. In particular, the "cohort default rate" provisions render schools "ineligible" to participate in Title-IV programs if the school's student-loan-default rate exceeds 30% for three consecutive years. *See* 20 U.S.C. §1085.

The Department acknowledges that the cohort-default-rate provisions address "post-graduate debt and earnings" and that—at least at the *school*-level—they "reflect[]" exactly what the agency is trying to accomplish in the 2023 Rule. Dep't.SJ.Br.25-26. The Department claims, however, that it is free to develop similar restrictions at the *program*-level because "Congress has *also* identified a programmatic eligibility requirement for GE programs" via the gainful-employment language. Dep't.SJ.Br.26. But the Department never explains why Congress would address matters of post-graduate debt and earnings and the ramifications of insufficiently remunerative jobs using such materially different language in the very same statute. Because "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," the natural "inference"— "unless we abandon all pretense at precise communication"—is that the language in the cohort-default-rate provisions is meant to address those issues while the gainful-employment language is meant

11

to address something else at a different and earlier point in time: namely, the provision of in-class-room training oriented toward a particular vocation. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391-92 (2015).

That inference is particularly compelling here. As the Department (grudgingly) acknowledges, *see* Dep't.SJ.Br.25 n.16, even beyond the cohort-default-rate provisions, the HEA repeatedly addresses matters of post-graduate debt and earnings using crystal-clear language, including in Title IV itself. For example, one provision addresses what should happen if "the borrower's debt burden equals or exceeds 20 percent of such borrower's gross income." 20 U.S.C. §1087dd(e)(1). Other provisions discuss what should happen when a "borrower is working full-time" but "is earning an amount which does not exceed … an amount equal to 150 percent of the poverty line applicable to the borrower's family size." *Id.* §1098e(b)(7)(B)(v), 1085(*o*). And another provision talks about "the debt burden o[n] … loan recipients," "their capacity to repay their education debts," and the "impact of such debt burden on the recipients' … post-graduation plans." *Id.* §1015a(k). While the Department declares (deep in a footnote) that such provisions "do not support Ogle's asserted statutory interpretation," Dep't.SJ.Br.25 n.16, they are proof-positive that Congress "knew exactly" how to address the types of issues that the 2023 Rule addresses and that Congress never used "gainful employment" language to do the trick, *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 365 (2018).

And it is not as though Congress never deployed "gainful employment" language elsewhere in the HEA either. To the contrary, as the Department agrees, Congress repeatedly used that very term in multiple provisions throughout the HEA, and in every instance, there is no question that Congress just had in mind a paying job (and not even one that earns "decent" pay, since the provisions contemplate that a student's "part-time employment related to teaching, research, or a similar activity" is gainful employment). *See, e.g.*, 20 U.S.C. §§1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2), 1161g(d)(5)(B). Indeed, even the Department itself concedes that "it would make no sense" to interpret those statutory references to "gainful employment" as allowing for the application of the kinds of debt-to-earnings and earnings-premium metrics enshrined in the 2023 Rule. Dep't.SJ.Br.26. Regardless, the Department proclaims that its interpretation of the gainful-employment language specifically at issue

remains the best because that language simply "mean[s]" something "different" in this single "context" alone. Dep't.SJ.Br.26. As the Department acknowledges, however, succeeding on that argument is an uphill climb and requires it to overcome the "'fixed meaning' canon," Dep't.SJ.Br.26, which provides that, "'[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute," *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1725 (2020). The Department offers no persuasive reason why this is a "most unusual situation[]" where that presumption is overcome.[5] *Cf. Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019) ("[T]he government fails to offer any good reason or evidence to unseat our normal presumption that, when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout."). At most, the Department gestures to the fact that the other gainful-employment provisions address "students" who "are still in school." Dep't.SJ.Br.26. But the exact same is true of the provision at issue here, which requires schools to "*provide*[] an eligible program of training to prepare *students* for gainful employment in a recognized occupation." 20 U.S.C. §§1002(a), (b)(1)(A)(i) (emphases added); *see id.* §1088(b)(1)(A)(i). To state the obvious, a school cannot "provide" something to one of its "students" unless that student is actually still in school. *See, e.g.*, *The American Heritage Dictionary of the English Language* 1279 (1969) (defining student as "[o]ne who attends a school").

That the statutory language here is focused only on the nature of in-school training to students—as opposed to focusing on the post-graduate financial outcomes of those who are no longer enrolled in school—is only reinforced by the 2008 amendment to the HEA stating that for-profit schools could achieve Title-IV eligibility in certain circumstances when it "provides a program leading to a baccalaureate degree in liberal arts." 20 U.S.C. §1002(b)(1)(A)(ii). While the Department suggests

---

[5] The Department cites a district-court decision addressing the 2014 Rule in an effort to bolster its argument that the "gainful employment" language at issue here means something different from every other use of that term in the HEA. *See* Dep't.SJ.Br.26 (citing *APSCU*, 110 F.Supp.3d at 186). But that court seized on the fact that the language at issue here says "gainful employment *in a recognized occupation*"—and then declared the language "ambiguous" before deferring to the Department under *Chevron*. *APSCU*, 110 F.Supp.3d at 187. As already explained (and as the Department ultimately appears to acknowledge), the "in a recognized occupation" language does not smuggle in conceptions of higher pay. The *APSCU* court's analysis does nothing to explain why the use of "gainful employment" language at issue here is different from every other use of that phrase in the HEA.

that the *Ogle* Plaintiffs "fail[] to explain how that amendment" involving "entirely different statutory language … has any bearing" here, Dep't.SJ.Br.27, that "entirely different statutory language" underscores that Congress sought to tie initial Title-IV eligibility for for-profit schools to the type of instruction that the school provides. The Department itself recognized as much in the 2019 Rule:

> The Department does not agree that it needs to define the term "gainful employment" beyond what appears in statute. Since it was added to the HEA in 1968, the term "gainful employment" has been widely understood to be a descriptive term that differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities, including all degree programs offered by public and private, non-profit institutions.

> Congress reaffirmed this interpretation when it added a provision to the 2008 Higher Education Opportunity Act (HEOA) that allowed a small number of proprietary institutions to offer baccalaureate degrees in liberal arts. Had Congress intended the term "gainful employment" to mean something other than a limitation on HEA section 102 institutions from offering programs that are not CTE-focused [*i.e.*, career- and technical-education-focused], it would not have needed to create a statutory exception to allow some HEA section 102 institutions to offer liberal arts programs.

84 Fed. Reg. at 31,401 (footnote omitted). The Department's present-day case of selective amnesia aside, that prior reasoning is both correct and fully applicable today. Thus, while all can agree that "[t]ext should never be divorced from context," Dep't.SJ.Br.18, the bottom line is that all of the context (including the context that the Department brazenly ignores) demonstrates that the 2023 Rule is *ultra vires*.

       3.      The Department's historical arguments are even weaker. The Department kicks off its submission by highlighting that President Lyndon B. Johnson "sign[ed] the HEA into law on November 8, 1965 at his alma mater in San Marcos, Texas." Dep't.SJ.Br.4. But as the Department acknowledges, it embraced something resembling its current interpretation of the gainful-employment language "beginning" only "in 2011." Dep't.SJ.Br.27. While the Department seems to think that its late-breaking interpretation is nevertheless entitled to "due respect" under *Loper Bright*, Dep't.SJ.Br.16, that gets matters backwards. As *Loper Bright* itself makes clear, such respect is "warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time," 144 S.Ct. at 2258—and even then, courts are free to reject the

14

agency's view, *see, e.g., Rest. L. Ctr.*, 120 F.4th at 174. Here, however, the Department's extant under-standing of the statute fails both of *Loper Bright*'s prongs. As just explained, the Department intro-duced that interpretation nearly a half-century after the HEA's enactment, which is powerful evidence of *ultra vires* agency action. *See, e.g., NFIB v. OSHA*, 595 U.S. 109, 119 (2022) ("It is telling that OSHA, in its half century of existence, has never before adopted a … regulation of this kind …. This 'lack of historical precedent[]' … is a 'telling indication' that the mandate extends beyond the agency's legitimate reach."). And even since 2011, the Department has flip-flopped back and forth. The De-partment declares that this is "[n]ot so," Dep't.SJ.Br.27, but only by ignoring the 2019 Rule. After initially adopting its novel theory in 2011, the Department later abandoned it altogether in 2019—only to reinstate it in 2023 in its "strongest" and most intricate form. Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 22, 2023), https://rb.gy/uyl2xk. That is the definition of flip-flopping (not that the Department is concerned with fidelity to ordinary understanding).

And the flip-flopping is even worse, as the Department promulgated a rule 30 years ago (which remains in effect today) that reflected an understanding of "gainful employment" that contradicts the theory that the agency is now peddling. As that regulation explained, certain short-term programs could qualify as Title-IV-eligible only if a certain number of students who completed the program obtained "gainful employment," and the Department stated that schools could provide "satisfactory documentation of a student's gainful employment" by submitting "[a] written statement from the student's employer," "[s]igned copies of State or Federal income tax forms," or "[w]ritten evidence of payments of Social Security taxes." 34 C.F.R. §668.8(g)(2). All of those examples are just ways of showing paid employment. Confronted with that obstacle, the Department claims that this regulation just "assumes" that a particular graduate's employment is "gainful." Dep't.SJ.Br.28. But as the De-partment concedes, the regulation is implementing a statutory requirement that tells the Department that it "must" calculate these rates to certify the program as Title-IV eligible. Dep't.SJ.Br.28. So, either the Department shirked its legal responsibilities in this area for many years by failing to calculate debt-to-earnings ratios or earnings-premium metrics en route to verifying gainful employment—or the

Department complied with those responsibilities because evidence of paid employment is indeed evidence of gainful employment as a matter of ordinary meaning. The latter assumption is the far more plausible one.

That assumption is particularly appropriate here, moreover, since the understanding that gainful employment equates to paid employment stretches back over a century in statutes like the Smith-Hughes Act and the National Defense Education Act. As the Department does not dispute, the gainful/useful employment language in those statutes could not possibly tolerate the kinds of debt-to-earnings and earnings-premium metrics in the 2023 Rule, not least because Congress did not even authorize student loans in those statutes and/or enacted them at a time when most people did not even graduate high school. *See, e.g.*, Claudia Goldin & Lawrence F. Katz, *Why the United States Led in Education: Lessons from Secondary School Expansion, 1910 to 1940* at 41 fig. 1 (June 2008), https://rebrand.ly/8exg8v8. Nevertheless, the Department insists that these statutes somehow support its position, because some legislative history associated with the Smith-Hughes Act (which provided funds to states so that public schools could provide training for useful employment) "describ[ed] federal support for vocational education as 'a sane business proposition' when viewed as 'an investment' because, if it 'augment[s] the income by 10 cents a day, there would be an increase of wealth in the hands of the workers of two and one-half million dollars per day, or three-fourths of a billion dollars per year.'" Dep't.SJ.Br.28-29 (quoting H.R. Rep. No. 64-181, at 2 (1916)).[6] Even accepting the faulty premise that the Department's invocation of legislative history here is "permissibl[e]," Dep't.SJ.Br.29. *But see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law."), the Department's argument is self-defeating.[7] The cited House report shows that its authors well

---

[6] The Department mistakenly cites a different piece of legislative history: H.R. Rep. No. 64-81 (1916), which is a report titled "Closing Forty-First Street NW."

[7] The Department also cites two other legislative reports about the HEA. *See* Dep't.SJ.Br.29. But not even the *Chevron*-dependent decisions addressing prior versions of the gainful-employment rules found those reports particularly illuminating. *See APSCU*, 110 F.Supp.3d at 189. And to the extent that they are illuminating, those reports favor the *Ogle* Plaintiffs, as they indicate that the provision governing eligibility for for-profit vocational schools' "was intended" to "be as liberal as possible." S. Rep. No. 89-758, at 12; *see* H.R. Rep. No. 89-308, at 9. The Department does not explain how stripping

understood the concept of post-graduate financial outcomes, and yet the legislation that Congress actually enacted said precisely nothing about such outcomes and provided no hint that the federal government could deny funding to states if the students receiving vocational training did not actually augment their wealth by 10 cents a day later in their lives (which could face extraordinary interruptions like World War I and the Great Depression). Instead, both the report and the statute itself are clear that states would qualify as eligible to receive funding if (as relevant here) "education [is] given in schools or classes" and "the controlling purpose of such education [is] to fit [students] for useful employment"—a phrase that everyone agrees is synonymous with gainful employment. Pub. L. No. 64-347, §11, 39 Stat. 929, 934 (1917). The Smith-Hughes Act thus simply focused on the provision of training that would prepare students for paid employment. The fact that the 2023 Rule and the Department's current understanding of the gainful-employment language departs so dramatically from the "Magna Carta of vocational education" is yet another red flag. David Carleton, *Landmark Congressional Laws on Education* 63 (2002).

    4.    Without text, context, history, or precedent in its corner, the Department ultimately hangs its hat on Title IV's "purpose," which (the Department repeats over and over like a mantra) is to "help students." Dep't.SJ.Br.19, 20 & n.8, 23, 25, 28. The Department's purposivist arguments cannot rescue the 2023 Rule. Although the Department considers it "[i]ncredibl[e]" that anyone could deny that the purpose of Title IV is to "help students" since the short title for Title IV is "Student Assistance," Dep't.SJ.Br.20 n.8, the problem for the Department is that Title IV proceeds to enumerate far more specific purposes, such as "making available the benefits of postsecondary education to eligible students … *in institutions of higher education*." 20 U.S.C. §1070(a) (emphasis added); *see id.* §1087a(a) (similar); *see also* Dep't.SJ.Br.20 n.8, 51 (citing these provisions). Because "institutions of higher education" are defined to include for-profit schools that "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," *id.* §1002(b)(1)(A)(i), honoring

---

Title-IV eligibility from most Title-IV-eligible cosmetology schools—such that cosmetology students would have to attend "non-Title IV-participating" schools, Dep't.SJ.Br.71—aligns with that legislative history.

Congress' purposes here is coextensive with enforcing the ordinary meaning of the gainful-employment language. The upshot is that disqualifying from Title-IV eligibility schools that clearly satisfy that language—and precluding students from using federal student loans to attend their schools of choice—*undermines* Congress' purposes. *Cf. Career Colls. & Sch. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (*CCST*) (explaining that, if schools are forced to "withdraw from Title IV entirely," it "would be to the detriment of students who rely on the availability of Direct Loans," and "[s]uch a consequence would harm the public at large"). Indeed, as the Department recognized in the 2019 Rule, "title IV programs … were designed to promote freedom of institutional choice," not eliminate it. 84 Fed. Reg. at 31,397. The 2023 Rule is antithetical to that purpose.

*    *    *

"In the business of statutory interpretation, if it is not the best, it is not permissible." *Loper Bright*, 144 S.Ct. at 2266. In the HEA, Congress declared that a for-profit school can qualify as Title-IV eligible if it "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§1002(a), (b)(1)(A)(i); *see id.* §1088(b)(1)(A)(i). The Department's theory that it can deny eligibility to schools based on the debt-to-earnings ratios of program alumni or based on alumni earnings in relation to an age-restricted pool of high-school graduates is unmoored from the statutory text, and every other tool in the statutory-interpretation toolkit confirms that it is *ultra vires* too. The task for this Court thus is simple: It "shall … hold unlawful and set aside" the 2023 Rule. 5 U.S.C. §706(2).

## II.    The 2023 Rule Is Arbitrary And Capricious.

While a holding that the 2023 Rule is *ultra vires* suffices to enter summary judgment in favor of the *Ogle* Plaintiffs, the rule is also arbitrary and capricious in at least four ways. *See* Ogle.SJ.Br.34-50. The Department fails to demonstrate otherwise, further confirming that the 2023 Rule cannot remain standing.

### A.    The Rule Illogically Relies on Concededly Inaccurate Earnings Data

As noted, the 2023 Rule hinges on two metrics—the debt-to-earnings and earnings-premium metrics—that in turn rely on federal data purportedly showing the earnings of program graduates,

including cosmetology-program graduates.  For years, however, the Department, courts, and others have recognized that federal earnings data are hopelessly inaccurate with respect to cosmetologists, as the underreporting of income is rife in this cash-heavy field.  That is why even the 2011 and 2014 Rules gave cosmetology schools at least some ability to challenge the earnings data in an appeals process—and partly why the 2019 Rule abandoned an earnings-based test altogether.  *See, e.g.*, 84 Fed. Reg. at 31,409; 79 Fed. Reg. at 64,955; 76 Fed. Reg. at 34,424-25.  Thus, the Department's decision in the 2023 Rule to rely solely on federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting" is arbitrary in the extreme.[8] 88 Fed. Reg. at 70,042; *see* Ogle.SJ.Br.30-34.

The Department's lead response is that it "has never conceded" anything about "supposed inaccuracies in cosmetologists' reported earnings."[9]  Dep't.SJ.Br.38.  Nonsense.  In the 2019 Rule, for example, the Department said that, although it "agrees that individuals who receive tip income should report that income fully and pay required taxes on that income, it is not the fault of institutions of higher education that *many individuals do not*."  84 Fed. Reg. at 31,409 (emphasis added).  Those individuals, the Department added, are "especially" concentrated in the "cosmetology" sector.  *Id.*  Nor did the Department come to that realization starting only in 2019.  When promulgating and defending earlier iterations of its gainful-employment rule, the Department "openly acknowledged that underreporting is an issue, even identifying cosmetology schools by name."  *Am. Ass'n of Cosmetology Schs. v. Devos* ("*AACS*"), 258 F.Supp.3d 50, 63 (D.D.C. 2017); *see also* 84 Fed. Reg. at 31,431 ("In the 2014

---

[8] In a footnote, the Department timidly questions whether there is final agency action here.  *See* Dep't.SJ.Br.39 n.22.  But "a substantive rule"—which the 2023 Rule plainly is—"is, by definition, a final agency action."  *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).

[9] The Department also suggests that the American Community Survey's earnings figures for high-school graduates between the ages of 25 and 34 is accurate and does not mistakenly include anyone who has a credential like a cosmetology certificate, which would obviously render results calculated under the earnings-premium test erroneous.  Dep't.SJ.Br.56 n.35.  But the Department's argument assumes that a high-school graduate who never enrolled in college and instead received a credential like a cosmetology certificate would identify herself on the American Community Survey as someone who received "some college credit" and not as someone who is a "high school graduate" with an "alternative credential."  U.S. Census Bureau, *American Community Survey* 12 (2024), https://rb.gy/0jxt5c (Question 11).

Rule, the Department admitted that individuals who work in barbering, cosmetology, food service, or web design may under report their income (79 FR 64955) and hoped that the alternate earnings appeal would provide an opportunity to correct earnings in those fields for the purpose of the D/E rates."). Try as it might, the Department cannot "disregard[]" these "facts" and hope to survive a challenge under the Administrative Procedure Act (APA). *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

Turning to the merits, the Department invokes this Court's statement from the preliminary-injunction decision that, in the 2023 Rule, the Department "specifically considered comments criticizing the use of federal reported earnings data to calculate D/E and EP metrics but concluded that no change to its proposed use of such data was warranted." Dep't.SJ.Br.39 (quoting *Ogle*.Dkt.32 at 9). But the Supreme Court's intervening decision in *Ohio v. EPA*, 603 U.S. 279, 295 (2024), makes clear that "awareness" of a commenter's "concern[s]" "is not itself" sufficient to satisfy the arbitrary-or-capricious standard. In yet another footnote, the Department counters that "*Ohio* was a Clean Air Act case and did not involve APA review." Dep't.SJ.Br.37 n.20. But as this Court and others have noticed, *Ohio* treated the Clean Air Act's arbitrary-and-capricious standard as coextensive with the APA's arbitrary-and-capricious standard, which is why *Ohio* repeatedly invokes APA precedents. *See, e.g.*, *Ams. for Beneficiary Choice v. HHS*, 2024 WL 3297527, at *4 (N.D. Tex. July 3, 2024) (O'Connor, J.). Thus, consistent with *Ohio*, this Court must do more than simply assess whether the Department displayed awareness of the objections related to the earnings data before deciding to sit tight; instead, the Court must also examine whether the Department acted logically in addressing those objections. That is because "illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of U.S. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018).

On that score, the Department asserts that it did act logically in utilizing flawed earnings data because it "revised its methodology to measure program completers' earnings 'approximately one year later (relative to when they complete their credential)' than under the 2014 Rule." Dep't.SJ.Br.42. This change, says the Department, will increase measured earnings by 20%, which would supposedly "more than offset the 8% of earnings that one study"—the study prepared by Cellini & Blanchard (and

financed by an organization seemingly opposed to for-profit schools, *see* AACS.SJ.Br.25 & n.17)—
"had identified as the likely average amount of unreported tips for cosmetology." Dep't.SJ.Br.42.
Setting aside that the Cellini & Blanchard study says that underreported tips in the cosmetology sector
are potentially as high as 10% (and potentially higher still, *see* AACS.SJ.Br.27-28) and that it expressly
states that "underreporting is *not* limited to tips"—which means that the 10% (or higher) figure is
actually the *floor* of the underreporting estimate—that explanation still does not cut it. After all, even
if year-3 measured earnings are 20% higher than year-2 measured earnings, the basic defect here is
that, no matter which year is analyzed, the measured earnings are still not accurately capturing total
earnings because of pervasive underreporting. The Department dismisses that issue as immaterial
because "[t]he exact amount by which total earnings exceed th[e] thresholds does not matter."
Dep't.SJ.Br.48. But the Department's own data show that virtually every cosmetology program for
which the Department has sufficient data to apply its thresholds is projected to fall *short* of them, *see*
Ogle.SJ.Br.18, which means that every dollar counts. The Department has never offered any logical
reason why it refuses to do so.

 As it has done previously, the Department also attempts to justify its approach on the ground
that "payment platforms" like Venmo "must issue 1099s when a user's annual income on the platform
exceeds a certain amount—scheduled to be as low as $600 in the near future"—and that "[t]axpayers
are unlikely to leave income unreported if it can be tracked electronically." Dep't.SJ.Br.42. But the
Department concedes that it never produced any evidence that cosmetologists seeking to evade tax
requirements are adopting Venmo. Instead, the Department just says that this Court can take judicial
notice of "the general rise in mobile app and other forms of electronic payments," apparently by
looking to a report issued by the Federal Reserve after the rulemaking at issue here had concluded.
Dep't.SJ.Br.50 & n.31. The Department does not grapple with the rule that "[j]udicial notice is 'typi-
cally an inadequate mechanism' for a court to consider extra-record evidence in reviewing an agency
action." *Am. Health Care Ass'n v. Burwell*, 217 F.Supp.3d 921, 928-29 (N.D. Miss. 2016). Regardless,
the Department does not explain why a $600 threshold for 1099 forms has any bearing here when (as
the Department never disputes) the 2023 Rule will flunk and disqualify programs from Title-IV

participation before that $600 threshold ever takes effect.  *See* Ogle.SJ.Br38.

The Department also says that it legitimately eliminated an appeal process altogether in the 2023 Rule because of purported "problems with the prior alternate earnings appeals"—*i.e.*, cosmetology schools allegedly reported "implausibly large" earnings—and because the research from Cellini & Blanchard supposedly showed that adjusting for underreported income would not "affect GE programs' results in any meaningful way."  Dep't.SJ.Br.43.  But even the Cellini & Blanchard study suggested that the Department could easily administer an appeal process in which the earnings of cosmetology graduates are uniformly adjusted upwards by 8-10%, *see* AR-F-1507 [Ogle.App.26],[10] and the Department offers no reason why this would create any "problems."  And the Department fails to account for the fact that the Cellini & Blanchard study examined the implications of upwardly adjusting earnings data under the *2014 Rule*, not the 2023 Rule.  *See* Dep't.SJ.Br.43.  As the Department itself repeatedly trumpets, its decision in the 2023 Rule to measure earnings in year-3 instead of year-2 means that it "differ[s] significant[ly]" from the 2014 Rule.  Dep't.SJ.Br.10-11.  Thus, at bottom, the Department is placing its chips on a *supposition* that adjusting earnings higher to account for underreporting will have little effect on cosmetology-program outcomes under the 2023 Rule.  Such suppositions are surely a way to streamline a rulemaking, but the APA requires more.  *See, e.g.*, *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("We do not defer to the agency's conclusory or unsupported suppositions.").

The Department thus changes the subject, blaming Title-IV-eligible cosmetology programs for "high tuition costs relative to the typical earnings in this profession."[11]  Dep't.SJ.Br.45.  But that

---

[10] Because the *Ogle* Plaintiffs seek review of an administrative action under 5 U.S.C. §702, and because the Department has conventionally filed the administrative record, *see* Dkt.16, Plaintiffs do not read Local Rule 56.6 to require any further appendix.  To appease the Department, *see* Dkt.36 at 2, and in accordance with the well-accepted practice of deferring the filing of an appendix until after the close of briefing, the *Ogle* Plaintiffs are concurrently submitting an appendix collecting the materials from the administrative record cited both in their opening summary-judgment brief and in this combined reply/opposition brief.

[11] It bears emphasizing that the Department has previously conceded that "creating a system of sanctions that are so closely linked to the tuition and fees a [school] charges would exceed the Department's current authority."  84 Fed. Reg. at 31,416.

"oversimplifie[d]" view of tuition costs,[12] 84 Fed. Reg. at 31,399—which has no connection to the earnings-premium metric, as it does not account for tuition costs—just begs the question whether the Department has accurate earnings data for the "typical" cosmetologist. Until now, no one (including the Department) has thought that unadjusted federal earnings data are correct; the Department's decision here to forge ahead with such data while eliminating any appeal process "is not adequately justified or reasonably explained." *CCST*, 98 F.4th at 246.

**B.    The Rule Illogically Penalizes Schools for Factors Beyond Their Control**

The 2023 Rule is also arbitrary and capricious because its earnings-based metrics penalize schools for factors outside their control—a flaw that this Court never addressed at the preliminary-injunction stage, as the Department does not disagree. The 2023 Rule blames schools for their graduates' "insufficiently remunerative" jobs, Dep't.SJ.Br.18, *even if* (for example) graduates themselves choose to work only part-time or not at all, those graduates are affected by historical discrimination that depresses earnings, and those graduates' earnings are affected by unpredictable macroeconomic shocks. In 2019, the Department deemed it "absurd" to hold schools accountable for such uncontrollable "variables." 84 Fed. Reg. at 31,409-10. The Department's about-face here is just as absurd and "illogical." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019); *see* Ogle.SJ.Br.40-45.

The Department begins by trying to downplay the problem in the cosmetology sector, insisting that it "was reasonably skeptical" in the 2023 Rule that "any significant number" of cosmetology-program graduates would (at least temporarily) work part-time or not at all three years after graduating—which would reduce their measured earnings—since "no comments" or "studies" "substantiat[ed]" this "hypothesis." Dep't.SJ.Br.53. But the Department's own statements and cited studies contradict that theory. In the 2023 Rule, the Department recounted how it had received numerous comments explaining how "workers often choose fields such as cosmetology for their flexible work

---

[12] As the 2019 Rule explained, "in some instances, … higher cost is associated with better equipment and facilities, more highly qualified faculty, better quality or more plentiful supplies, and more abundant or convenient student support services." 84 Fed. Reg. at 31,415. By contrast, lower tuition at public schools may reflect "public subsidies." *Id.* at 31,416.

schedules, allowing them to combine part-time work with other valuable activities such as childcare," and in response, it explicitly "acknowledge[d]" that "*many* workers may choose to pursue occupations with work schedules that suit their lives" and that "*often* individuals choose to leave the labor force for reasons that do not reflect their ability to find a job." 88 Fed. Reg. at 70,044-45 (emphases added). The Department itself also calculated that the median age of cosmetology-program graduates (which everyone agrees are overwhelmingly female) is between 25 and 30, *see id.* at 70,125 (fig. 4.1), which is the age when the average woman starts having children, *see* CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s ("[m]ean age at first birth" is "27.4"). And in the 2019 Rule, the Department itself emphasized that over 35% of mothers with children under the age of six do not work at all, which means that the percentage of less-than-full-time workers is even higher when accounting for part-time workers. *See* 84 Fed. Reg. at 31,406. Despite all that, the Department insists that it could just "assume" that cosmetology-program graduates will "want to work" in the third post-graduate year because "survey evidence" (like a New York Times article) about *college students* suggested that "students' primary goal is to get a better job." Dep't.SJ.Br.54; *see* 88 Fed. Reg. at 70,015 & n.76, 70,067 & n.160. But the Department does not explain why evidence involving students uninterested in attending gainful-employment programs informs the analysis here, and the agency ignores that a student can deem a job "better" precisely because of its flexibility. Indeed, in the 2023 Rule, the Department itself relied on cosmetology-specific studies showing that the "average" cosmetologist "who ha[s] been working in the industry for 2-3 years" works 27.8 hours/week and describing cosmetology as attractive precisely because of its "extreme flexibility."[13] AR-F-4786, 4791 [Ogle.App.104, 109].

The Department thus is unquestionably holding schools responsible for the uncontrollable life circumstances of their graduates, and it has never had any logical explanation for this bizarre approach. The Department contends that, even "if certain graduates are not fully employed within

---

[13] In defending the earnings-premium test, the Department suggests that the pool of high-school graduates that it is examining here are "directly parallel" to cosmetology-program graduates. Dep't.SJ.Br.56-57. But the Department provides no evidence that the average high-school graduate works the same reduced hours as the average cosmetologist.

three years of graduation, including their earnings is still important to best 'capture the labor market outcomes of program graduates.'" Dep't.SJ.Br.54. But that does not "reasonably explain[]," *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 810 (5th Cir. 2024), why uncontrollable decisions by graduates to adjust their hours years after leaving school—for reasons as varied as "car[ing] for children" or "manag[ing] a personal health condition," 84 Fed. Reg. at 31,413—provide evidence of how well "GE programs *prepare* students for gainful employment" consistent with the "statutory eligibility require-ments," Dep't.SJ.Br.52, 60 (emphasis added); *cf. Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1094 (D.C. Cir. 2002) (Garland, J.) ("As the old adage goes, you can lead a horse to water …"). The only answer that the Department musters is that the 2023 Rule "explains at length that many factors … *are* within [a school's] control," like "the career services they offer." Dep't.SJ.Br.54. But a *non sequitur* is no defense to allegations of arbitrary-and-capricious conduct—especially when it just highlights the underlying problem (that the Department is blaming schools for many factors that are *not* within their control).

The Department's defense of its decision to hold schools responsible for historical discrimi-nation against women and minorities is equally unsatisfactory. The Department does not deny that such historical discrimination can suppress earnings—nor could it, as the 2023 Rule admits as much. *See* 88 Fed. Reg. at 70,031 ("We agree that systemic discrimination … may affect … earnings after graduation."). The Department nevertheless sweeps that issue aside because its "regression analyses" led it to believe that "demographics" are not "alone" "responsible" for earnings and "other factors" are supposedly "more important." Dep't.SJ.Br.59-60. But even those regression analyses show that "demographic variables" are not insignificant—for example, they "explain[] … 7 percentage points of the variation in program-level earnings" in the earnings-premium test. 88 Fed. Reg. at 70,143. And when the Department is already blaming schools for so many other uncontrollable variables—indeed, the Department itself estimates that factors *other* than "school and credential characteristics" are re-sponsible for upwards of 29% and 36% of the variation in the earnings-premium and debt-to-earnings metrics, respectively—this illogical choice just compounds the problems. The Department postulates that, regardless of earnings-suppressing historical discrimination, schools "*could* improve their

graduates' outcomes by simply lowering their tuition," as "Cellini & Onwukwe's analysis of cosmetology programs in Texas suggests" that there are cheaper programs that do not participate in Title-IV programs but "successfully operate and produce licensed graduates." Dep't.SJ.Br.42. That theory suffers from any number of problems,[14] but chief among them is that it is just another way of saying that schools should bear responsibility for the effects of historical discrimination, which is the illogical proposition that the Department fails to establish.

Finally, the Department does not and cannot deny that the 2023 Rule blames schools for unpredictable macroeconomic events that impact earnings. *See, e.g.*, 88 Fed. Reg. at 70,092 ("We acknowledge that the COVID-19 pandemic likely affected the earnings of workers in salons, spas, [and] the beauty industry[.]"). Nor does the Department seriously dispute that its debt-to-earnings metric is manifestly ill-suited to adjust for these macroeconomic events (since debt is of course incurred before they occur).[15] And while the Department has previously argued that the earnings-premium test is exceptionally "well-suited" to adjust to exogenous shocks because it contains a so-called "buffering" mechanism—since (according to the Department) the earnings of high school graduates fall more than those of college graduates during economic downturns, 88 Fed. Reg. at 70,043, 70,058—it now concedes that this buffering mechanism has no relevance whatsoever for

---

[14] Among other things, the Cellini & Onwukwe study did not examine post-graduate earnings at these non-Title-IV-participating schools, which is how the Department is evaluating Title-IV-participating cosmetology programs in the 2023 Rule. *See* AR-F-1656 [Dep't.App.117] ("We know little about the quality of non-Title IV cosmetology programs, as data on completion, earnings, debt, and most other student outcomes are not available."). And in the 2019 Rule, the Department highlighted a different Cellini study that concluded that "those who completed [cosmetology] certificates at proprietary institutions had higher earnings gains" because of "the number of proprietary cosmetology colleges that are affiliated with high-end salons and channel graduates to jobs at those salons." 84 Fed. Reg. at 31,405-06. Unfortunately, however, the Department apparently did not consider this other Cellini study in the 2023 Rule, as it is not in the administrative record. *Contra* Dep't.SJ.Br.66 n.44.

[15] The Department states that "Plaintiffs' suggestion … that programs must be able to predict the future to 'establish a price that will guarantee passing D/E rates' … misses the point." Dep't.SJ.Br.64. But the Department does not explain which point that is, nor could it: Tuition rates (which inform the numerator in the debt-to-earnings metric) are established years before the period relevant to the Department's assessment of earnings (which inform the metric's denominator).

cosmetology-program graduates, who are not college graduates, *see* Dep't.SJ.Br.64. That leaves the Department promising that it can use its "reserved … authority to waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances." Dep't.SJ.Br.63-64. But the only authority cited in the 2023 Rule for this reserved authority is 20 U.S.C. §1098bb(a)(2)(E), *see* 88 Fed. Reg. at 70,058 & n.152, which requires the President of the United States to first declare a national emergency, *see* 20 U.S.C. §1098ee(4). Accordingly, the default approach under the 2023 Rule is to place 100% of the blame on schools for their graduates' earnings *regardless* of what occurs in the world during their post-graduate lives and even if external events lead graduates to undergo "career shifts" into different recognized occupations altogether. Dep't.SJ.Br.63. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

### C.    The Rule Uses Illogical Debt-to-Earnings Thresholds

The Department also fails to overcome the *Ogle* Plaintiffs' showing that it failed to "adequately justify" the 8%-of-annual-earnings and 20%-of-discretionary-earnings debt thresholds used in the debt-to-earnings metric. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023); *see* Ogle.SJ.Br.38-41. The Department does not dispute that it phoned in its explanation for the 8% threshold in the 2023 Rule by copying-and-pasting the explanation provided in the 2014 Rule, which just cited the 2006 paper from Baum & Schwartz as the justification for that threshold. *See* 79 Fed. Reg. 16,426, 16,443 & nn.50-51 (March 25, 2014). But as the Department explained in the 2019 Rule after conducting a "more careful reading of" the Baum & Schwartz paper, it "does not support the eight percent threshold, but instead clearly refutes it for the purpose of establishing manageable student loan debt." 84 Fed. Reg. at 31,426.

In response, the Department now suggests that, in the 2019 Rule, it did not actually conduct a "careful" review of the Baum & Schwartz paper but instead engaged in a "cursory" one—but nevertheless managed to make the incisive point during that cursory review that "the Baum & Schwartz study did not approve that threshold as a *stand-alone* benchmark for student debt" but approved that threshold as a benchmark for student debt when "combine[d]" with another threshold. Dep't.SJ.Br.65-66. Unfortunately for the Department, these explanations for the resurrection of the

8% threshold appear exactly nowhere in the 2023 Rule. *See Chamber of Com.*, 85 F.4th at 775 n.17 ("We don't evaluate *post-hoc* justifications, given that 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"). And that is unsurprising, as the notion that the 2019 Rule left the door ajar to an 8% threshold under any circumstances does not pass the straight-face test when the Department said in that rule that it "has no empirical basis for the 8 percent threshold and will, there-fore, no longer use it to determine title IV program eligibility." 84 Fed. Reg. at 31,407. There is accordingly no denying that, by using an 8% threshold in the 2023 Rule, the Department made a "change" in "existing polic[y]" while failing to "display awareness" of it, which is a textbook violation of the arbitrary-and-capricious standard. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

This Court need not go any further in examining whether the debt-to-earnings thresholds are unlawful, as it is common ground that a determination that the 8% threshold is arbitrary and capricious suffices to wipe out the debt-to-earnings metrics in their entirety. *See* Ogle.SJ.Br.46-47. But the De-partment's defense of the 20% threshold produces more questions than answers. The Department acknowledges that even Baum & Schwartz deemed the 20% threshold "somewhat arbitrary," but the Department sees no cause for concern there because the threshold is somewhat arbitrary in a way that is supposedly "maximally generous to programs." Dep't.SJ.Br.67. But as the Department quickly acknowledges, the 20% threshold is *not* maximally generous to programs, as the agency could make the threshold more generous (and far more reflective of real-world realities) by considering the pro-gram graduate's household earnings instead of the earnings of the graduate alone—as Baum & Schwartz themselves advocated when originally inventing the 20% threshold. *See* Dep't.SJ.Br.67 (rec-ognizing that Baum & Schwartz believed "'family size' was a factor for student borrowers to consider when applying the 20% benchmark"). The Department's only response is that "the earnings of indi-viduals in a household who did not attend a program—and who thus did not receive the training that it provided—have no bearing on whether the program prepares its students for gainful employment." Dep't.SJ.Br.67. But the Department is the one interpreting this statutory language as a font of author-ity to address "[t]he problem" of "unaffordable debt" that graduates "cannot repay." Dep't.SJ.Br.70. As the Department recognized in the 2019 Rule, debt is obviously not unaffordable if household

earnings are "adequate" to repay it.  84 Fed. Reg. at 31,410.  And the common-sense wisdom that student-loan affordability is directly connected to household earnings is reflected in other Department rules too, such as its own recent rule addressing income-based-repayment programs.  *See, e.g.*, 88 Fed. Reg. 43,820, 43,881 (July 10, 2023).  Thus, while the debate over the 20% threshold is ultimately academic, the Department's arguments underscore that its use of that threshold is no less arbitrary and capricious than its use of the 8% threshold.

### D.  The  Rule's Cost-Benefit Analysis Is Illogical

Finally, the Department comes up far short in seeking to "adequately substantiat[e]" "benefits" that "'bear a rational relationship'" to the huge "'costs imposed'" by the 2023 Rule.  *Chamber of Com.*, 85 F.4th at 777; *see* Ogle.SJ.Br.48-50.  As the Department does not and cannot dispute, current projections reveal that only 13 of the 1,270 cosmetology programs now eligible for Title-IV funding—or a grand total of 1%—are projected to pass the 2023 Rule's tests, while 639 programs that enroll some 80% of students in Title-IV-eligible programs are projected to fail (while all others skate by simply because the Department cannot actually subject them to its tests).  *See* Ogle.SJ.Br.18, 48.  Although the Department speculates that "cosmetology programs may fare better than the 2023 Rule's preliminary estimates suggest," Dep't.SJ.Br.71, the Department's own "best possible depiction of the rule's impact" shows otherwise, Dep't of Educ., *2022 Program Performance Data Description* 1, https://rb.gy/zqc5ec (last visited Dec. 20, 2024).  The extraordinary costs detailed above thus amount to the "expected costs associated with the [2023 Rule]," which requires the Department to compare them to the "expected benefits," *Mexican Gulf  Fishing*, 60 F.4th at 966.

The benefits are nowhere in sight.  The Department repeats its theories that cosmetology students who would otherwise attend one of the hundreds of programs that will soon face the prospect of Title-IV disqualification could instead attend one of the 13 allegedly superior Title-IV-eligible programs that will "remain … eligible" (which supposedly "could expand" their operations), or they could alternatively attend one of the hundreds of Title-IV-eligible programs that the Department "cannot perform D/E or EP calculations for."  Dep't.SJ.Br.71-72.  But the Department has never offered any evidence that the handful of still-eligible programs (not one of which is located in the

states where the *Ogle* Plaintiffs operate) can accommodate an influx of hundreds of thousands of students. And precisely because the Department cannot even assess the other 618 "non-failing" programs, it has no idea whether those programs are any better than the Ogles and Tricocis of the world—or whether its approach would push cosmetology students into nightmare situations. The Department promises that these risks are "minimal at best" and blames Plaintiffs for "fail[ing] to provide" contrary evidence. Dep't.SJ.Br.72. But the burden lies with "*the agency*" to "identify" the "benefits" and "substantiate" them, *Chamber of Com.*, 85 F.4th at 777 (emphasis added), and it cannot satisfy that burden with "unsupported suppositions," *Texas*, 10 F.4th at 555, which is all that the Department offers here.

The Department thus is left contending that hundreds of thousands of cosmetology students could attend "non-Title IV-participating cosmetology programs [that] operate in Texas," since the Cellini & Onwukwe study purportedly said that those programs "are of at least equal quality to those currently in Title IV at a lesser cost." Dep't.SJ.Br.71. The Department does not explain how this plan will work for Tricoci's students in Illinois, Indiana, and Wisconsin or for numerous other cosmetology students living in other states outside Texas, and in all events, the Department does not appear to have actually read the Cellini & Onwukwe study. The authors confessed in that study that they "know little about the quality of non-Title IV cosmetology programs, as data on completion, earnings, debt, and most other student outcomes are not available." AR-F-1656 [Dep't.App.117]. It cannot seriously be disputed, then, that the Department has "inadequately substantiated" the benefits of the 2023 Rule, which is yet another reason to find it unlawful. *Chamber of Com.*, 85 F.4th at 777.

## III.    There Is No Basis To Artificially Narrow The Relief.

As the Fifth Circuit has explained, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *CCST*, 98 F.4th at 255. The Department asks this Court to deviate from that ordinary rule, *see* Dep't.SJ.Br.79-80, but there is no basis for doing so.

The 2023 Rule contains two core components: (1) subpart S, which is the "accountability and eligibility framework for gainful employment programs," and (2) subpart Q, which is a "financial value

transparency framework."  88 Fed. Reg. at 70,005.  As explained, the Department's effort to establish an accountability and eligibility framework for gainful-employment programs is *ultra vires*, and the two tests utilized in that framework—the debt-to-earnings and earnings-premium tests—are arbitrary and capricious on multiple levels, including in ways that apply to *all* schools (*e.g.*, by holding schools responsible for factors entirely beyond their control).  This Court thus must set aside Subpart S (the accountability and eligibility framework).  And because subpart Q (the financial value transparency framework) utilizes "the same earnings premium and debt-burden measures," *id.*, it too must go.[16]  It is that simple.  In all events, to the extent that the Court grants the Department's request for supplemental briefing on the appropriate remedy in the event of an adverse ruling for the Department, the *Ogle* Plaintiffs stand ready to correct the Department's misguided arguments.

## CONCLUSION

The Court should enter summary judgment in favor of the *Ogle* Plaintiffs and deny summary judgment to the Department.

---

[16] The Department repeatedly argues that the *Ogle* Plaintiffs do not take issue with subpart Q, but as the agency concedes, nothing "expressly" supports its argument.  Dep't.SJ.Br.14 n.5.  That is no accident, as the *Ogle* Plaintiffs object to the Department's desire to use its arbitrary-and-capricious metrics in any circumstances.

Respectfully submitted,

Paul D. Clement, VA Bar #37915
  (pro hac vice)
Andrew C. Lawrence, VA Bar #99830
  (pro hac vice)
Kevin Wynosky, PA Bar #326087
  (pro hac vice)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com

s/Cole Ramey
Cole Ramey, TX Bar #16494980
Christin Jones, TX Bar #24070017
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7126
cramey@ktslaw.com
cjones@ktslaw.com

*Counsel for Plaintiffs*

December 20, 2024