**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> Defendants. | Civil Action No. 4:23-cv-01267-O |

<u>**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR OWN MOTION FOR SUMMARY JUDGMENT**</u>

**DUANE MORRIS LLP**

John M. Simpson (admitted *pro hac vice*)
Drew T. Dorner (DC Bar No. 1035125)
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone: +1 202 776 7800
Fax: +1 202 776 7801
JMSimpson@duanemorris.com
DTDorner@duanemorris.com

Edward M. Cramp (admitted *pro hac vice*)
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
EMCramp@duanemorris.com

Joakim G. Soederbaum (Texas Bar No. 24091338)
777 Main Street, Suite 2790
Fort Worth, TX 76102
Telephone:  +1 817 704 1000
Fax:  +1 817 704 1001
JSoederbaum@duanemorris.com

*Attorneys for Plaintiffs*
*American Association of Cosmetology Schools and DuVall's School of Cosmetology, L.L.C.*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    RESPONSE TO DEFENDANTS' "BACKGROUND" CLAIMS...................................4

       A.    Legislative History Reflects Congress's Goal to Make Aid Widely
             Available. ........................................................................................ 5

       B.    Defendants' Authority is Not as Broad as They Claim. ........................................ 6

       C.    Defendants Attempt to Justify the Final Rule with Inaccurate Claims.................. 9

III.   ARGUMENTS IN RESPONSE AND IN REPLY ...........................................................12

       A.    AACS Plaintiffs Challenge the Entire Final Rule................................................. 13

       B.    AACS Plaintiffs Can and Do Argue that the Final Rule is *Ultra Vires*............... 13

       C.    The Higher Education Act Does Not Give Defendants Power to Issue the
             Final Rule........................................................................................ 14

             1.    *Loper Bright* Undermines the Relevance of Prior GE Litigation. ............ 15

             2.    "Gainful Employment" Means What it Meant in 1965, Before the
                   Department of Education Existed. ............................................. 16

             3.    The Final Rule Does Not Reflect the Best Reading of the HEA. ............. 18

                   a.    Congress Did Not Grant Defendants Interpretive Authority. ........19

                   b.    Even if Congress Delegated Interpretive Authority,
                         Defendants Overstepped the Outer Bounds..................................22

             4.    Defendants Invent Post-Hoc, Irrational Explanations for Depriving
                   Institutions of a Statutorily Mandated Notice and Hearing. .................... 28

             5.    The Final Rule Deprives Schools of Constitutional Due Process............ 33

       D.    The Final Rule is Arbitrary and Capricious. ........................................................ 35

             1.    Defendants Fail to Justify Using Objectively Bad Data and Rejecting
                   Alternate Earnings Appeals. ..................................................... 36

             2.    Defendants' Demographics-Related Arguments Are Unavailing............ 45

             3.    Ignoring Part-Time Work and Voluntary Non-Employment Is Not
                   Reasoned Decisionmaking. ....................................................... 52

4.      Disregarding the Coronavirus Pandemic is Arbitrary and Indefensible. .. 61

5.      Defendants Fail to Justify Their Assumption that Quality Alternatives Exist. ...................................................................................................... 63

6.      Defendants Never Explain Their "Privacy" Justification. ....................... 66

E.     The Final Rule Violates the First Amendment's Speech Protections. ................. 67

1.      The Final Rule is an Unconstitutional Content-Based Burden on Speech. ...................................................................................................... 67

a.      Defendants' Procedural Arguments Are Frivolous ...................... 67

b.      The Final Rule Discriminates Based on Content and Speaker ............................................................................................ 68

2.      The Final Rule Unconstitutionally Compels Private Speech. ................... 71

IV.    CONCLUSION .................................................................................................... 75

## <u>TABLE OF AUTHORITIES</u>

**United States Constitution**

U.S. Const. amend. I ................................................................................................ 67-75

U.S. Const. amend. V.....................................................................................................33

**Federal Cases**

*Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017)
........................................................................................................ 38, 41-43, 45

*American Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020).....................................75

*Anderton v. Tex. Parks & Wildlife Dep't*, No. 3:13-cv-1641, 2014 WL 11281086 (N.D. Tex. Feb. 14, 2014), *aff'd* 605 F. App'x 339 (5th Cir. 2015) .....................................9

*Ass'n of Private Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012)
........................................................................................................ 15-16, 18, 33

*Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) . 15-16, 18, 28

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 640 F. Appx. 5 (D.C. Cir. 2016)
........................................................................................................ 15-16

*Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015)
........................................................................................................ 15-16, 33-34, 46

*Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992) .........................................................................................................34, 45

*Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821 (D.C. Cir. 1993)............28

*Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 40 (D.D.C. 2008).................................36

*BNSF Rwy. Co. v. Fed. R.R. Admin.*, 62 F.4th 905 (5th Cir. 2023).........................56, 66

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)........................................ 71-74

*Bosarge v. Edney*, 669 F. Supp. 3d 598 (S.D. Miss. 2023) .........................................26

*Butowsky v. Folkenflik*, No. 4:18-cv-442, 2019 WL 12373861 (E.D. Tex. Dec. 13, 2019)..........51

*Butte Cnty., Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010).............................52, 58, 65

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) ....................43

*Celanese Chem. Co., Inc. v. U.S.*, 632 F.2d 568 (5th Cir. 1980) ...................................................66

*Chamber of Com. of U.S. v. SEC*, 85 F.4th 760 (5th Cir. 2023)........................................11, 42, 62

*Chamber of Comm. v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) ...................................50

*Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004).........................................23

*Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990)......................... 33-34

*D&B Boat Rentals, Inc. v. U.S.*, 508 F. Supp. 3d 87 (E.D. La. 2020) ...........................................31

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022)
...........................................................................................................41, 53, 55, 58, 60

*Doe v. Jaddou*, 2024 WL 2057144 (D. Md. May 8, 2024)...........................................................35

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006)..................................................................21, 24

*Fleming Cos., Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744 (E.D. Tex. 2004) .....................31

*Gilbert v. Wilson*, 292 F. Supp. 3d 426 (D.D.C. 2018)................................................................49

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020)...............15

*Hisp. Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ...................................................41

*Howell v. Reno*, 939 F. Supp. 802 (D. Colo. 1996) ....................................................................37

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023)............................................44, 52, 58, 65

*James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000)...............................14

*Jorge v. Atl. Housing Found., Inc.*, No. 3:20-cv-2782, 2022 WL 6250698 (N.D. Tex. Oct. 7, 2022) .......................................................................................................................9

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ...................................................................35

*Kellam v. Metrocare Servs.*, No. 3:12-CV-352-P, 2013 WL 12093753 (N.D. Tex. May 31, 2013), *aff'd* 560 F. Appx. 360 (5th Cir. 2014) ......................................9, 12, 42, 47, 58, 71

*KLC Farm v. Perdue*, 426 F. Supp. 3d 837 (D. Kan. 2019) .........................................................37

*Leathers v. Medlock*, 499 U.S. 439 (1991) ...............................................................................69

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ....................14-16, 18-20, 22, 28

*Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461 (5th Cir. 2024)........................................21, 49, 71

*Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611 (5th Cir. 2024) ............................................. 19-20

*Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024) ..........................................................................12

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...................................................................................................................10, 12, 51, 61

*Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115 (D.C. Cir. 2013)...........................66

*Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024)............................................... 40-41, 56

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188 (D.C. Cir. 2007) ..................................................................................................................48

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) ................................................................................................................................ 67-70

*Penobscot Indian Nation v. U.S. Dep't of Housing & Urban Dev.*, 539 F. Supp. 2d 40 (D.D.C. 2008) .................................................................................................................30

*R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023) ................................................55

*R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024) ....................................75

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022)........................................................................75

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) ....................... 67-69

*Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100 (D.D.C. 2016) ..................................................................................................................................11, 42, 44

*Restaurant Law Ctr. v. U.S. Dep't of Labor*, 120 F.4th 163 (5th Cir. 2024)..........................16, 43

*Robles v. Eminent Med. Ctr., LLC*, 619 F. Supp. 3d 609 (N.D. Tex. 2022)............................9, 11

*Rodriguez-Avalos v. Holder*, 788 F.3d 444 (5th Cir. 2015)........................................................8, 20

*S.W. Elec. Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019)........................................................46

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 659 F. Supp. 3d 33 (D.D.C. 2023) .......................................................................................................................44

*Scott & White Health Plan v. Becerra*, 693 F. Supp. 3d 1 (D.D.C. 2023) ...................................32

*Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693 (D.C. Cir. 2024)................................8, 21

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................................................... 69-70

*State v. Biden*, 10 F.4th 538 (5th Cir. 2024) ...............................................................................29

*Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923 (5th Cir. 1998) ................................................11, 42

*Texas v. Becerra*, 577 F. Supp. 3d 527 (N.D. Tex. 2021) ...............................................................49

*Texas v. Cardona*, No. 4:23-cv-604, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024)....................35

*Texas v. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019).............................................................. 46-47

*U.S. Dep't of Homeland Sec. v. Regents of Univ. of Calif.*, 591 U.S. 1 (2020)............................29

*U.S. ex rel. Brooks v. Stevens-Henager College, Inc.*, 359 F. Supp. 3d 1088 (D. Utah)..............33

*U.S. ex rel. Diop v. Wayne Cnty. Cmty. Coll. Dist.*, 242 F. Supp. 2d 497 (E.D. Mich. 2003) .........................................................................................................................................33

*U.S. v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003).................................................................69

*U.S. v. Bellard*, 674 F.2d 330 (5th Cir. 1982).............................................................................23

*U.S. v. Garner*, 767 F.2d 104 (5th Cir. 1985) ............................................................................29

*U.S. v. Moore*, 71 F.4th 392 (5th Cir. 2023).........................................................................5, 24

*U.S. v. Reagan*, 596 F.3d 251 (5th Cir. 2010)..................................................9, 12, 42, 47, 58, 71

*United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014) .............................................................73

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472 (5th Cir. 2023) .......................................................................................................12

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .....................................................52, 65

*Van Loon v. Dep't of Treasury*, __ F.4th __, 2024 WL 4891474 (5th Cir. Nov. 26, 2024).... 16-17

*Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021)................................55, 60

*West Virginia v. EPA*, 597 U.S. 697 (2020).................................................................................18

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009)................................................................69

*Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985)...................................................75

**Federal Statutes and Rules of Court**

20 U.S.C. § 1001.........................................................................................................................20

20 U.S.C. § 1002 ........................................................................................................................20

20 U.S.C. § 1070(a).....................................................................................................................22

20 U.S.C. § 1070a-15(e) ................................................................................................20

20 U.S.C. § 1070a(b)(1) ...........................................................................................64-65

20 U.S.C. § 1071(a)(1)(B) ............................................................................................22

20 U.S.C. § 1087-53 .....................................................................................................20

20 U.S.C. § 1087a ........................................................................................................22

20 U.S.C. § 1087aa(a) .................................................................................................23

20 U.S.C. § 1087c(b)(2) ...............................................................................................21

20 U.S.C. § 1087e(e)(5) ...............................................................................................20

20 U.S.C. § 1088 ..........................................................................................................20

20 U.S.C. § 1091(q)(4) .................................................................................................20

20 U.S.C. § 1094 ...............................................................7-8, 13, 21, 26, 29-30, 32

20 U.S.C. §§ 1099a-1099c-2 .........................................................................................7

20 U.S.C. § 1099b ........................................................................................................33

20 U.S.C. § 1099c .......................................................................6, 14, 21, 24-26

20 U.S.C. § 1221(c)(1) .................................................................................................27

20 U.S.C. § 1231a(3) ...................................................................................................26

29 U.S.C. § 213(a)(1) ...................................................................................................19

**Regulatory Authorities**

34 C.F.R. § 668.13(b)(2) .........................................................................................30-31

34 C.F.R. § 668.71(b) ...................................................................................................73

34 C.F.R. § 668.402(c) ..................................................................................................18

34 C.F.R. § 668.403(a)(1) ..............................................................................................2

34 C.F.R. § 668.406 ...............................................................................................13, 70

34 C.F.R. § 668.603 .............................................................13, 28-30, 34, 72

88 Fed. Reg. 32,300 (May 19, 2023) ................................................................39, 47-49

88 Fed. Reg. 70,004 (Oct. 10, 2023)....................................................................... *passim*

88 Fed. Reg. 74,568 (Oct. 31, 2023)..............................................................................21

## **GLOSSARY**

| Abbreviation | Definition |
|---|---|
| D/E Rates | Debt-to-earnings rates |
| EP | Earnings premium |
| ECAR | Eligibility and Certification Approval Report |
| GE | Gainful employment |
| Not-for-Profit Schools | Public institutions and private not-for-profit institutions |
| HEA | Higher Education Act of 1965 |
| PPA | Program Participation Agreement |
| SAVE | Saving on a Valuable Education plan |
| CDR | Cohort default rate |
| E-App | Electronic application for applying for Title IV certification/recertification |
| Data-Providing Agencies | Agencies, like the IRS, from whom Defendants intend to get earnings data |
| Subpart G | Subpart G to Title 34, part 668 of the Code of Federal Regulations |
| 2014 Rule | 2014 Gainful Employment rule, 79 Fed. Reg. 64,890 (Oct. 31, 2014) |

## I.    INTRODUCTION

As much as the Department of Education and its Secretary (collectively, "Defendants" or "the government") have written about "gainful employment," they have never disputed (and, often, have *admitted*) critical facts showing that their twice-rejected "gainful employment" rule is arbitrary, capricious, and contrary to law.[1]  Among the noteworthy concessions and admissions:

1.  Earnings in cosmetology and other tip-heavy industries are underreported by *at least* eight percent;

2.  To account for unreported tipped income, a researcher on whom Defendants rely (Cellini) proposed an upward adjustment of eight to 10 percent when calculating the earnings of cosmetologists and other workers in tip-heavy fields;

3.  Defendants refused their own researcher's proposal;

4.  Defendants employ "wooden use" of reported income for calculating completers' earnings;

5.  Even if the earnings data that Defendants obtain are wrong, institutions are bound by those data, have no right to challenge them, and may lose their Title IV eligibility as a result of them;

6.  Defendants knew individuals working in cosmetology, esthetics, massage therapy, and other personal service industries work part-time or leave the workforce temporarily more often than workers in other industries;

7.  Defendants refused to adjust their formula for calculating the earnings of cosmetology program completers to account for their uniquely high level of part-time work and voluntary departures from the workforce;

8.  Defendants' regression analysis—central to their claim that demographics do not

---

[1]  Capitalized terms not defined herein take their meaning from Plaintiffs' Brief in Support of Motion for Summary Judgment, ECF 29 ("Brief" or "AACS Brief"), unless otherwise indicated, and are set forth on the Glossary provided herein.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 1

materially affect completers' earnings—suffers from flaw known as multicollinearity (Declaration of Dr. Rajeev Darolia, ECF 37 ("Darolia Decl."), at ¶ 11(a));

9. Defendants failed to provide commenters with a "decomposition analysis" that addresses the multicollinearity problem, as well as the data and methodology underlying that analysis;

10. Even if multicollinearity were not a problem, demographics account for at least seven to 16 percent of the variation (*i.e.*, results) in Defendants' regression analysis (Darolia Decl. at ¶ 11(b));

11. Defendants refused to adjust their formula for calculating the earnings of cosmetology program completers, who are primarily women and minorities, to account for the wage gap affecting those groups;

12. The new tax laws that Defendants cite to support their Final Rule will not impact earnings calculations until at least 2028;

13. Defendants will have calculated D/E Rates and EPs at least three times before those new tax laws take effect;

14. There are no regulations or limitations governing the issuance of ECARs, which the Department can issue to "end" a program's "participation in the title IV, HEA programs" (34 C.F.R. § 668.403(a)(1));

15. Defendants' studies show that government-ordered closures during the coronavirus pandemic affected cosmetology schools and other personal service industries (massage therapy, esthetics, etc.) to a greater extent than other industries and the general workforce;

16. Defendants refused to adjust their formula for calculating the earnings of cosmetology program completers to account for the closures and other effects of the coronavirus pandemic;

17. Beginning in 2025, Defendants will start requiring institutions who "fail" either GE metric

just once to post a letter of credit or other financial security or face immediate termination;

18. Defendants have exempted every undergraduate degree program at Not-for-Profit Schools from every potential sanction under the Final Rule, even if those programs have the worst GE results in the country;

19. Completers of for-profit cosmetology programs have a lower student loan default rate than completers of not-for-profit cosmetology programs, yet, under the Final Rule, 65.9 percent of for-profit cosmetology programs will "fail" the GE metrics compared to 17.2 percent of not-for-profit cosmetology programs (Appx. 1618-19).

    With these matters unchallenged, the Court need not struggle through Defendants' arguments which, even if true, do not offset the abovementioned problems with the Final Rule. Defendants claim support from "research" (funded by partisan grants), a "regression analysis" (for which they unlawfully withheld critical data and results from commenters), and their own "experience" (briefly implementing rules that courts have struck down twice). But as complex, technical, or reasoned as Defendants' claims may have appeared at the preliminary injunction stage, AACS and DuVall (collectively, "AACS Plaintiffs") have identified dispositive flaws in each—plus a whole new set of issues not previously raised—that Defendants have failed to rebut.

    Defendants also have no good answer to the point that the "best reading" of the HEA is that Congress gave no authority to the Department to impose a host of extra requirements on institutions seeking to qualify their educational programs as "eligible" for Title IV funding. Defendants have provided no evidence that the 89th Congress, in 1965, had in mind a Byzantine system of data collection and metrics when it included a simple phrase, "prepare students for gainful employment in a recognized occupation," in the HEA. Defendants respond with a simplistic claim that the HEA is intended to "help students," but they ignore that the HEA's

purpose was simply to make student aid available—something that, in and of itself, "helps students."  Defendants also fail to appreciate that Congress already included the provisions it deemed necessary to "help students" and preserve tax dollars in the HEA.  Because Congress itself addressed matters of excessive debt, loan repayment, and program quality in other provisions, Defendants' cumbersome "gainful employment" metrics go beyond the will of Congress.

Defendants also have no justification for taking away the one protection for institutions in prior iterations of their "gainful employment" rules: an institution's chance to be heard before Title IV participation is cut off.  Despite an explicit entitlement in the HEA to "reasonable notice and an opportunity for hearing" and a constitutional entitlement to the same, Defendants now propound a never-before-seen interpretation of the HEA that would let them bypass serving as "judge" and "jury" and skip straight to playing "executioner."

If the fatal flaws that invalidate the Final Rule under the APA were not enough, the Final Rule also violates the First Amendment.  Defendants fail to rebut the points that the Final Rule is unconstitutional because it is a content-based restriction on protected speech (vocational education) and because the "warnings" to students required by the Final Rule constitute compelled private speech, both of which violate AACS Plaintiffs' rights under the First Amendment.

For all these reasons and the reasons in AACS Plaintiffs' motion for summary judgment, the Court should set aside the Final Rule.

## II. RESPONSE TO DEFENDANTS' "BACKGROUND" CLAIMS

Defendants' account of the Final Rule's "background" is misleading at best.  They misquote presidential speeches, legislative history texts, and statutes, all in an effort to overstate the limited authority that Congress gave Defendants.  Even if Defendants had the authority they claim (they don't), they have exercised it against the proprietary education industry, and cosmetology schools in particular, based on a fiction.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 4

**A.      Legislative History Reflects Congress's Goal to Make Aid Widely Available.**

Despite the fact that relying on legislative history is "generally discouraged in this circuit," *U.S. v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023), Defendants rely heavily on the HEA's legislative history, but misrepresent that legislative history in the process.

Defendants begin by misquoting President Johnson's speech at the signing of the HEA. The government contends the President spoke of "the law's benefits . . . above all, for students, who could expect futures of 'greater productivity' and 'more profitable' jobs . . . ."  Gov't Brief[2] at 4.  In fact, President Johnson said nothing of more "productive" or "profitable" jobs.  He did not address loan repayment or keeping student debt in check.  Rather, his speech focused on how the HEA would "make available scholarships . . . awarded on the basis of need alone" and facilitate "loans, free of interest and free of any payment schedule" until after graduation.  The President said it was "the obligation of [the] Nation to provide and permit and assist every child born in these borders to receive all the education that he can take," and that Congress, through the HEA, had "pulled the gates down" to make college available to every student.  Appx. 1649, 1651.

Defendants also claim, citing a Senate report, that Congress only extended federal loan eligibility to vocational programs "after receiving assurances that a high percentage of students receiving such training later found sufficiently high-paying jobs to afford repayment."  Gov't Brief at 7.  But while one witness did testify about loan repayment, there are no words *from the legislators* indicating that loan repayment was a driving factor behind the HEA, let alone *the* driving factor.  In fact, the only two concerns that the Senate identified were "fly by night" institutions of the post-World War II era and unaccredited institutions, which were addressed with

---

[2] Gov't Brief refers to Defendants' Combined Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, ECF 34.

requirements that institutions exist for two years before becoming eligible and that schools prove accreditation.  S. Rep. 89-758 (Sept. 21, 1965) at 3753.  Beyond that, senators intended the "definition of 'eligible institution' [to] be as liberal as possible . . . ."  *Id.*  The House committee's report is consistent, as it summarized the meaning of "eligible institution" as "a business or trade school . . . which . . . admits as regular students only persons . . . who have the *ability* to benefit from the training offered by such institutions . . . ."  *See* H.R. Rep. No. 89-308 (May 6, 1965) at 11.[3] (emphasis added).  Pecuniary gain and debt repayment are nowhere to be found.[4]

**B.    Defendants' Authority is Not as Broad as They Claim.**

Defendants claim broad authority under the HEA.  They first argue that the "Secretary must determine whether schools meet the necessary requirements of financial responsibility and administrative capability before deeming them eligible to participate in Title IV."  Gov't Brief at 6.  While this is true, "financial responsibility" and "administrative capability" are entirely different criteria under the HEA that have nothing to do with "gainful employment" or "eligibility."  "Financial responsibility" and "administrative capability" are addressed in a wholly different section of the HEA.  *See* 20 U.S.C. § 1099c(c), (d).  Broadly, "financial responsibility" covers an institution's solvency and money management, while "administrative capability" refers to an institution's administration of Title IV programs (*e.g.*, record-keeping, compliance, etc.).  The Department's authority to police "financial responsibility" and "administrative capability" is irrelevant to "gainful employment."  No statute refers to "gainful employment" as a condition for satisfying the "administrative capability" requirements of the HEA, and the Final Rule nowhere relies on this authority as the legal basis for "gainful employment" rules anyway.

---

[3] The Senate and House reports are included in AACS Plaintiffs' appendix at Appx. 1653-88.

[4] AACS Plaintiffs address Defendants' other claims regarding the HEA's purpose *infra*.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 6

Defendants, however, suggest they have the authority to prescribe regulations for "any matter the Secretary deems necessary to the sound administration of the financial aid program." Gov't Brief at 6 (citing 20 U.S.C. § 1094(c)(1)(B)). Congress did not go so far. Section 1094(c)(1)(B) limits the Secretary to "prescrib[ing] such regulations as may be necessary to provide for . . . the establishment of reasonable standards of *financial responsibility* and appropriate *institutional capability* . . . ." (emphasis added). There is no statutory text that also grants Defendants authority to establish standards for gainful employment. Defendants cite none.

Defendants also claim they can impose "such other eligibility requirements as the Secretary shall prescribe," citing section 1087c(b)(2) of the HEA. Again, Defendants imply they have power that Congress did not actually convey. Section 1087c relates only to the direct loan program. It does not govern all Title IV programs. Thus even if this section gave Defendants *carte blanche* to impose "other eligibility requirements" on the direct loan program, it still does not vest Defendants with the authority to impose new eligibility requirements on every other Title IV program (*e.g.*, Pell Grants, Perkins loans, etc.).[5] Section 1087c thus cannot be a vehicle for applying the D/E Rates and EP metrics to every Title IV program, though the Final Rule purports to do just that.

Rather, provisions that are universally applicable to all Title IV programs are housed in subpart G to Title IV (20 U.S.C. §§ 1088-1098h) ("General Provisions Relating to Student Assistance Programs") and, to a lesser extent, subpart H (20 U.S.C. §§ 1099a-1099c-2) ("Program Integrity"). Neither subpart G nor subpart H to Title IV contains any plenary grant of authority to Defendants to make up new eligibility criteria akin to their GE tests. It is telling that the government's brief cites no section that gives Defendants the power to prescribe new eligibility

---

[5] While the Perkins loan program ended in 2017, it was active when Congress established the direct loan program and thus is relevant to show the limit of Defendants' authority.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 7

criteria applicable to all Title IV programs.

Defendants next point to HEA sections 1087d(a)(6) and 1094 to claim they can include in a PPA any "requirements that the Secretary 'determines are necessary to protect the interests of the United States and to promote the purposes *of' Title IV*." Gov't Brief at 6-7 (emphasis added). But Section 1087d(a)(6) actually says (with emphasis added) that a PPA shall "include such other provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes *of this part*." "This part" refers to part D of Title IV—the federal direct loan program. Like section 1087c, section 1087d does not grant Defendants the authority to set new conditions for every Title IV program using PPAs.

Defendants' reliance on section 1094 is also misplaced. As AACS Plaintiffs noted in their Brief, section 1094 lists at least 10 specific areas in which Defendants may or "shall" impose regulations and indicates where the Secretary has the option of gap-filling, like subsection (a)(5) (authorizing reports "containing such information as the Secretary may reasonably require to carry out the purpose of this subchapter"). However, section 1094 has no language granting Defendants broad authority to regulate every aspect of the Title IV programs as they see fit, and likewise vests Defendants with no power to gap-fill, define, enhance, or modify what the phrase "gainful employment in a recognized occupation" means. Courts in the Fifth Circuit "'generally presume' that, 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 451 (5th Cir. 2015) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)); *see also Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 709 (D.C. Cir. 2024) (applying same principle in post-*Chevron* case).

Finally, Defendants' brief makes token citations to sections 1221e-3 and 3474 of the HEA.

Gov't Brief at 7. Anticipating this, AACS Plaintiffs argued in their Brief that these two sections do not grant plenary rulemaking authority and more closely resemble "housekeeping statutes," especially in the post-*Chevron* era. *See* AACS Brief at 19-21. Defendants failed to respond to AACS Plaintiffs' argument or distinguish the cited cases. Defendants' non-responsiveness has serious consequences: "the failure to respond to arguments constitutes abandonment or waiver of the issue." *See Kellam v. Metrocare Servs.*, No. 3:12-CV-352-P, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd* 560 F. Appx. 360 (5th Cir. 2014); *see also U.S. v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (a party's failure to adequately brief an argument results in waiver).[6]

### C.    Defendants Attempt to Justify the Final Rule with Inaccurate Claims.

The Final Rule contains one metric that prior iterations of "gainful employment" regulations lacked: an "earnings premium" test, or EP. Defendants posit that the EP is rational and necessary because they have "identified a strong correlation between low EPs [i.e., completers allegedly not earning much more than high school graduates] and student defaults," even "in programs that pass the D/E rates thresholds." Gov't Brief at 12, 51; 88 Fed. Reg. 70,004, 70,015 (Oct. 10, 2023). Defendants claim that this "correlation . . . reinforces [their] understanding that even small amounts of debt are unaffordable to those with very low earnings," even for programs that pass the D/E Rates test. *Id.* To Defendants, this justifies imposing both GE metrics on cosmetology schools notwithstanding the extremely low debt of cosmetology students. *See id.*

---

[6] AACS Plaintiffs are entitled to the "last word" on the matters raised in their motion for summary judgment and on matters for which they bear the burden of persuasion. *See Jorge v. Atl. Housing Found., Inc.*, No. 3:20-cv-2782, 2022 WL 6250698, at *4 (N.D. Tex. Oct. 7, 2022); *see also Anderton v. Tex. Parks & Wildlife Dep't*, No. 3:13-cv-1641, 2014 WL 11281086, at *1 n.1 (N.D. Tex. Feb. 14, 2014), *aff'd* 605 F. App'x 339 (5th Cir. 2015). Defendants' reply should be limited to the affirmative grounds they assert for summary judgment. Any matter in the government's reply that they could have included in their opposition brief should be stricken. *Robles v. Eminent Med. Ctr., LLC*, 619 F. Supp. 3d 609, 626 (N.D. Tex. 2022).

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 9

One of many undisputed facts is that AACS students finish school with little debt and low monthly payments. It is uncontested that the average loan payment for an AACS school graduate is $59 per month. Appx. 1089.[7] That is less than the average monthly cell phone bill in the United States. *See* Am. Compl., ECF 42, at ¶ 4 n.1. Yet, Defendants claim their EP is a reasonable exercise of regulatory power because even that low monthly payment can be "unaffordable."

Under the APA, Defendants must justify these conclusions by articulating a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). They have failed to do that. While Defendants have placed thousands of pages of academic papers in the administrative record and have written hundreds of pages in support of the Final Rule, hundreds of pages of poor reasoning is still poor reasoning, no matter how many times Defendants label their decisions "reasonable."

To support their conclusion that low earnings correlate with high loan defaults, Defendants cite one study from 2015. *See* 88 Fed. Reg. at 70,015; *see also* Gov't Brief at 12. This study focused on five questions, all of which dealt with loan default rates. Appx. 1689. Noticeably absent, however, is any comparison of post-graduation income to default rate. In fact, the study did not even obtain the earnings of the graduates it reviewed. Moreover, the study measured only two-year and four-year degree programs. Cosmetology certificate programs are less than half as long, meaning that students take on far less debt and have an easier time repaying. That is clear from Defendants' own data, which showed that DuVall's default rate was four percent and its monthly loan payment was $84. *See* Am. Compl., ECF 42, at ¶ 4 (citing College Scorecard data).

"When an agency adopts a regulation based on a study [that is] not designed for the purpose and is limited or criticized by its authors on points essential to the use sought to be made of it[,]

---

[7] Appx. refers to AACS Plaintiffs' appendix. Gov't Appx. refers to Defendants' appendix.

the administrative action is arbitrary and capricious and a clear error in judgment." *Texas Oil &amp; Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998) (quoting *Humana of Aurora, Inc. v. Heckler*, 753 F.2d 1579, 1583 (10th Cir. 1985)) (modification in original); *see also Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) (agency may not "ask for—and then ignore—already-existing data it did not want to consider"). Relatedly, if an agency relies on statistics and research to support a regulation, those statistics and research must be "reasonably reli[able] . . . to measure what they purport." *Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016). A study that did not measure (or obtain) earnings data for the graduates cannot possibly show whether low earnings lead to high defaults. Here, Defendants based their justification for the EP on a study whose authors explicitly set forth the matters they were investigating—none of which involved graduate earnings, much less a correlation between earnings and defaults.[8] Because the study Defendants cite to support their EP was "not designed for the [government's] purpose," their reliance on it is arbitrary.

Defendants also misleadingly claim that "only 8% of dollars that students borrow to attend for-profit programs with failing EP scores will be repaid." Gov't Brief at 51. However, this is not a reference to a general estimated repayment rate, but to the Department's Saving on a Valuable Education ("SAVE") plan. 88 Fed. Reg. at 70,117. The limited SAVE plan does not apply to everyone. It gives borrowers who choose to enroll capped payments and would have forgiven loan balances (for borrowers who take out less than $12,000, like cosmetology students) after 10 years.[9]

---

[8] This study actually hurts Defendants' position because it contains a regression analysis showing that a student's risk of default on a loan "could partially reflect differences in the backgrounds and financial means of students who choose to attend various colleges." Appx. 1690-94. The authors found that "students from different educational and family backgrounds experience different returns on their academic investments." *Id*. The government consistently has ignored these contrary findings, and has never attempted to reconcile them with its own regression analysis.

[9] https://studentaid.gov/announcements-events/save-plan.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 11

These concessions lower the expected repayment rate.  Defendants did not inform the Court that their estimated eight percent repayment rate is a product of their own making.

Worse, Defendants failed to apprise the Court that the SAVE plan's loan forgiveness provisions were enjoined pending appeal as likely to be set aside.  *Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024).  That, in turn, will drive up the rate of repayment from students whose schools "fail" the EP test.  But all this Court has to go on is the now-outdated justification in the Final Rule.  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 475 (5th Cir. 2023) (courts are limited to reviewing the explanation of the agency in the administrative record).  Because the Final Rule rests on a student loan forgiveness plan whose legality is questionable at best and presents no alternative data showing what repayment rates will be without the SAVE plan, Defendants' reliance on the SAVE plan is arbitrary and capricious.

Defendants failed to address AACS Plaintiffs' argument that Defendants' own statistics show, industry-wide, that cosmetology-related GE Programs that "pass" the arbitrary GE metrics have a <u>higher</u> rate of loan repayment defaults than programs that "fail."  *See* 88 Fed. Reg. at 70,140 (17.2% default rate at "passing" programs versus 13.0% default rate at "failing" programs); AACS Brief at 10 n.6.  If Defendants' GE metrics were rational, those numbers would be reversed.  An agency cannot "offer[ ] an explanation for its decision that runs counter to the evidence before [it]."  *State Farm*, 463 U.S. at 43.  Furthermore, by failing to respond to this argument, Defendants have conceded the issue.  *Kellam*, 2013 WL 12093753, at *3; *Reagan,* 596 F.3d at 254.

## III.    ARGUMENTS IN RESPONSE AND IN REPLY

In their motion, AACS Plaintiffs argued: (1) the Final Rule deprives institutions of notice and a hearing in contravention of the plain language of the HEA; (2) the best reading of the HEA is that Congress *did not* give Defendants authority to invent and impose new eligibility tests like the D/E Rates and EP metrics; (3) irrespective of Defendants' purported authority to impose tests

to measure "gainful employment," the Final Rule is arbitrary and capricious; and (4) the Final Rule unconstitutionally regulates speech based on its subject matter and compels controversial speech. To the extent Defendants address those arguments, their responses are unconvincing. Defendants also assert feeble challenges attacking the scope of AACS Plaintiffs' case and their standing.

### A.    AACS Plaintiffs Challenge the Entire Final Rule.

The government argues that the plaintiffs have only attacked the "accountability" part of the Final Rule (*i.e.*, subpart S, the part that threatens GE Programs with warnings and termination) and that they leave the "transparency" part in subpart Q unchallenged. Gov't Brief at 14 n.5. This is incorrect. Plaintiffs' claims are not limited to the "accountability" part of the Final Rule. AACS Plaintiffs pled that they are forced to spend money to comply with the reporting obligations in the "transparency" part of the Final Rule. *See* Am. Compl., ECF 42, at ¶ 100. Ogle School Management, LLC and Tricoci University of Beauty Culture, LLC (collectively, "Ogle Plaintiffs") also allege injury from compliance with the Final Rule. *See* Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF 10, at 43. All plaintiffs have identified an injury from the "transparency" rule. On the merits, both the "accountability" and "transparency" parts of the Final Rule are founded upon on the flawed and unreasonable D/E Rates and EP tests. *See, e.g.*, 34 C.F.R. § 668.406 (determining D/E Rates and EP for "transparency"); 34 C.F.R. § 668.603 (using D/E Rates or EP to terminate GE Program eligibility). If those metrics are unfit for one, they are unfit for both. It would be arbitrary and capricious for Defendants to post inaccurate data on their website that will mislead students trying to choose where to go to college.

### B.    AACS Plaintiffs Can and Do Argue that the Final Rule is *Ultra Vires*.

Defendants assert that the only "in excess of statutory authority" argument in AACS Plaintiffs' complaint relates to the Final Rule's failure to provide for notice and a fair hearing as required by 20 U.S.C. § 1094(c)(1)(F), and request that the Court disregard AACS Plaintiffs'

position on *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) and arguments under section 702(2)(C) of the APA. *See* Gov't Brief at 15 n.7. This argument is misconceived. The Supreme Court's landmark *Loper Bright* decision did not exist when AACS Plaintiffs filed their complaint; AACS Plaintiffs could not have based a claim on precedent that did not exist. In any event, *Loper Bright* requires this Court to scrutinize Defendants' authority under the HEA whether AACS Plaintiffs pled it or not, so AACS Plaintiffs must brief that case. Nevertheless, since Defendants—at their request—have not yet filed a responsive pleading or a motion under Federal Rule of Civil Procedure 12(b), (e), or (f), AACS Plaintiffs have an "absolute right" to amend their complaint. Fed. R. Civ. P. 15(a)(1)(B). *See also* ECF 13 (granting government's request to file answer following resolution of the parties' cross-motions for summary judgment); *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 319 (D.C. Cir. 2000) (confirming plaintiff's "absolute right" to file amended complaint in APA case where no responsive pleading was filed). To put this trivial matter to bed, AACS Plaintiffs have filed an amended complaint.

### C. The Higher Education Act Does Not Give Defendants Power to Issue the Final Rule.

In their opening briefs, AACS Plaintiffs explained why the HEA does not give Defendants authority to interpret and expand the phrase "gainful employment in a recognized occupation." First, the clear and plain language of the HEA directs Defendants to determine every program's eligibility using a single, standardized application that "requires sufficient information and documentation to determine that the requirements of eligibility . . . are met." 20 U.S.C. § 1099c(b)(1). AACS Brief at 17-18. Second, Defendants' interpretation of the HEA creates a "chicken and egg" problem: it is impossible for new GE Programs to show they are "eligible" because new programs have no completers whose earnings can be measured for the GE tests. AACS Brief at 18-19. Third, with other sections in the HEA, Congress has already dealt with the

problems that the Final Rule purports to address, effectively occupying the entire field.  AACS

Brief at 20-21.  Defendants point out that Congress did not make schools financial guarantors for

students' loans (Gov't Brief at 6), but that illustrates AACS Plaintiffs' point: if Congress wanted

to impose additional, loan-related eligibility requirements at the program (rather than institutional)

level, it could have.  Through all the other protections it has passed, Congress has shown that it

"knows how to legislate on the subject when it wishes."  *Gulf Fishermens Ass'n v. Nat'l Marine*

*Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020).

In response, Defendants rely on prior GE litigation that is of little utility in the post-

*Chevron* era, their baseless interpretation of Title IV's "purpose," and conclusions about their

statutory authority that are irreconcilable with the HEA's plain language.

### 1.    *Loper Bright* Undermines the Relevance of Prior GE Litigation.

Defendants argue that their authority to impose "gainful employment" metrics is "settled

law," pointing to prior court opinions they claim are "persuasive insofar as they applied traditional

tools of statutory construction—the same methodology *Loper* approved."  Gov't Brief at 16-17.

Given the Supreme Court's decision in *Loper Bright*, the government's position is absurd.  All

prior cases upholding Defendants' supposed authority to impose GE metrics turn *explicitly* on

*Chevron* deference.  *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d

176, 184, 186 (D.D.C. 2015) ("*APSCU I*")[10]; *Ass'n of Proprietary Colleges v. Duncan*, 107 F.

Supp. 3d 332, 358, 362-63 (S.D.N.Y. 2015) ("*APC*"); *Ass'n of Private Colleges & Univs. v.*

*Duncan*, 870 F. Supp. 2d 133, 145 (D.D.C. 2012) ("*APCU*").  They sided with the Department

---

[10] On appeal, the D.C. Circuit also found the "gainful employment" language to be "undefined
[and] ambiguous," and it held that the Department's interpretation "warrants *Chevron*
deference . . . ."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 640 F. Appx. 5, 7 (D.C. Cir.
2016) ("*APSCU II*").

because they found its interpretation to be "reasonable" in the face of statutory ambiguity. 640 F. Appx. at 8; 110 F. Supp. 3d at 186; 107 F. Supp. 3d at 363; 870 F. Supp. 2d at 149. The rationale underlying all of these cases is no more. *Loper Bright* compels rejection of these *Chevron*-based holdings. *See Van Loon v. Dep't of Treasury*, __ F.4th __, 2024 WL 4891474, at *7 (5th Cir. Nov. 26, 2024) ("*Loper Bright* . . . overruled *Chevron* . . . and eliminated the 'judicial invention' of deference to administrative actions and rulemaking") (citations omitted). "Reasonable" or "permissible" is no longer the standard; only the "best reading" matters, and none of these courts ever decided what the best reading of "gainful employment in a recognized occupation [or profession]" in sections 1001, 1002, and 1088 is. *Loper Bright*, 144 S. Ct. at 2266 ("In the business of statutory interpretation, if it is not the best, it is not permissible."); *Van Loon*, 2024 WL 4891474, at *7 (a court "must 'determine the "best" reading of a statute; a merely "permissible" reading is not enough'") (citations omitted). These cases also turned on a now-rejected presumption that an *agency* has the authority to interpret a statute over a *court*. The opposite is true now, and in light of that change in law, this Court must take a renewed look with fresh eyes. *See Restaurant Law Ctr. v. U.S. Dep't of Labor*, 120 F.4th 163, 171 (5th Cir. 2024).

        2.    <u>"Gainful Employment" Means What it Meant in 1965, Before the Department of Education Existed.</u>

This Court's charge under *Loper Bright* is to discern what the "best meaning" of "gainful employment in a recognized occupation" is. 144 S. Ct. at 2266. The "best reading" of a statute is "'the reading the court would have reached' if no agency were involved," *id*., and the statute's meaning is locked in on the day that Congress passes it, since "every statute's meaning is fixed at the time of enactment." *Id*. (quoting *Wisc. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018)).

These core concepts refute Defendants' policy-driven claims that "gainful employment" must be synonymous with debt repayment and "earnings premiums." Defendants admit that it was

not until 2011 that the Department "began . . . to craft tools that could measure whether GE programs in fact prepared students for gainful employment, not because of a new statutory interpretation, but instead because of *new concerns that such programs were failing to do so*." Gov't Brief at 29 (emphasis added).  Elsewhere, the government admits that it issued the Final Rule because the Department is "[f]acing a growing student debt crisis with over $1.6 trillion and counting in outstanding loans that too often go unpaid," Gov't Brief at 1, but this "crisis," is a modern development not on the minds of the 89th Congress in 1965.  Today's problems cannot inform the Court's determination of the HEA's "best meaning" at the time of enactment.

The Fifth Circuit's recent decision in *Van Loon v. Dep't of the Treasury* is instructive. There, the Office of Foreign Assets Control ("OFAC") sanctioned a cryptocurrency believed to be used by malicious cyber actors pursuant to the International Emergency Economic Powers Act ("IEEPA").  No. 23-50669, 2024 WL 4891474, at *1.  The Fifth Circuit set aside OFAC's sanction, holding that the IEEPA simply did not extend to the type of modern software technology at issue. The court sympathized with the administration's "concern[ ] with malicious cyber-enabled activities" and the fact that the IEEPA became law "years before the modern Internet was even invented," but nevertheless limited itself to "uphold[ing] the statutory bargain struck (or mis-struck) by Congress" and "not tinker[ing] with it."  *Id*. at *14.  Courts, it held, must not "revis[e] Congress's handiwork under the guise of interpreting it," because "[l]egislating is Congress's job—and Congress's alone."  *Id*.  "Mending a statute's blind spots or smoothing its disruptive effects falls outside [the Court's] lane."  *Id*.  The same restrictions must apply to addressing the affordability and debt problems that Defendants cite as a basis for the Final Rule.  If it needs fixing, the HEA must be fixed by a law, not by regulatory self-help.

The importance of fixing a statute's meaning at the time of its enactment is borne out by

the history of the gainful employment rule.  Since 2011, the Department has assigned three different meanings to the term "gainful employment."  In the 2011 GE rule, "gainful employment" meant that median completers achieved a certain debt-to-earnings ratio and that no more than 65 percent of completers defaulted on their loan payments.  *See APCU*, 870 F. Supp. 2d at 144.  In the 2014 GE rule, a program satisfied "gainful employment" criteria so long as the median completer had sufficiently high debt-to-earnings ratios, regardless of how often completers defaulted on their loans.  *See APSCU I*, 110 F. Supp. 3d at 183.  In this Final Rule, "gainful employment" means that the median completer both achieves a certain debt-to-earnings ratio and earns more than the average high school graduate.  *See* 34 C.F.R. § 668.402(c).  *Loper Bright* forbids the possibility that the "best reading" of "gainful employment" did not entail an "earnings premium" from 1965 to 2023, but suddenly does now.  That it took Defendants 46 years to "discover" lurking in the "gainful employment" language a purported power to impose debt and earnings metrics is strong evidence that such authority was never conferred by Congress in the first place.  *West Virginia v. EPA*, 597 U.S. 697, 725 (2020) ("'[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.'") (citation omitted).

### 3.    The Final Rule Does Not Reflect the Best Reading of the HEA.

*Loper Bright* eliminated the presumption that statutory ambiguities indicate Congress's intent to transfer "the power to authoritatively interpret the statute from the courts and give[ ] it to the agency."  144 S. Ct. at 2267.  *Loper Bright* makes clear that this Court, not the Department, must ascertain the "best reading" of the HEA.  *Id*. at 2266.  The Court resolves any ambiguities using traditional tools of statutory construction unless the "best reading" reflects a legislative intent to delegate interpretive authority to an agency.  *Id*. at 2266-68.  If Congress did delegate

interpretive authority to the agency, then the Court "respect[s] such delegations of authority, police[s] the outer statutory boundaries of those delegations, and ensure[s] that [the] agenc[y] exercise[s] [its] discretion consistent with the APA." *Id*. at 2268.

       a.    Congress Did Not Grant Defendants Interpretive Authority.

AACS Plaintiffs do not dispute prior courts' determination that the phrase "gainful employment in a recognized occupation" is ambiguous. AACS Plaintiffs do, however, oppose Defendants' position that Congress endowed them with the authority to put their own spin on what "gainful employment in a recognized occupation" means. As *Loper Bright* explains, a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id*. at 2263. Sometimes, Congress will "*expressly* delegate . . . the authority to give meaning to a particular statutory term." *Id*. (emphasis added). Other times, the text of the statute will "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id*. (citations omitted). The Supreme Court gave examples of each type. The Fair Labor Standards Act ("FLSA") and the Energy Reorganization Act of 1974 "expressly delegate" the authority to regulate. Both contain plain-language directives to agencies to "define[ ] and delimit[ ]" terms or to "define[ ] by regulations" what a substantial safety hazard is. *Loper Bright*, 144 S. Ct. at 2263 n.5. The Clean Water Act, Clean Air Act, and Judiciary Acts of 1789 and 1793 empowered agencies to "fill up the details" of statutory schemes, all shown by statutory text like "in the judgment of the Administrator," or "appropriate and necessary," or "in their discretion."

The Fifth Circuit applied this approach in *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611 (5th Cir. 2024). There, the court interpreted a section of the FLSA giving the Secretary of Labor an "explicit delegation" of authority to "define[ ] and delimit[ ]" the "terms" of the White Collar Exemption to FLSA's overtime requirement. *See id.* at 614, 617; *see also* 29 U.S.C. § 213(a)(1).

The Fifth Circuit upheld the agency's action because its secretary exercised, but did not exceed, his power to "define" and "delimit" the terms of the White Collar Exemption.  117 F.4th at 618.

Title IV is no different.  In some places, Congress directs the Secretary to pass rules.  *See, e.g.*, 20 U.S.C. § 1091(q)(4) ("the Secretary shall promulgate regulations allowing programs enrolling students with intellectual disabilities . . . to receive such awards").  In others, Congress gives the Secretary the option to issue additional regulations.  *See, e.g.*, 20 U.S.C. § 1087e(e)(5) ("The Secretary may promulgate regulations limiting the amount of interest that may be capitalized[.]").  Elsewhere, Congress allows the Secretary to "fill up the details" of a statutory scheme.  *See, e.g.*, 20 U.S.C. § 1070a-15(e) ("In addition to such other selection criteria as may be prescribed by regulations, the Secretary shall consider in making awards . . . .").  And still elsewhere, Congress grants the Secretary relatively broad authority to regulate "subject to the limits imposed by a term or phrase that 'leaves [him] with flexibility,' such as 'appropriate' or 'reasonable.'"  *See, e.g.*, 20 U.S.C. § 1087-53 (agreements for the federal work-study program may "include such other reasonable provisions as the Secretary shall deem necessary or appropriate to carry out the purpose of this part."); *see also Loper Bright*, 144 S. Ct. at 2263 n.5.

However, the four places in which the phrase "gainful employment in a recognized occupation" appears in Title IV stand in stark contrast to the abovementioned statutes.  Neither 20 U.S.C. § 1001(b) nor § 1002(b), § 1002(c), or § 1088(b), contain any of the hallmarks of an intent to delegate interpretive authority that the Supreme Court identified in *Loper Bright*.  Instead, Defendants point to other instances in the HEA where Congress delegated regulatory authority.  But the fact the government has to dig up delegations of authority from sections other than the ones at issue only reinforces the obvious point that, when it comes to "gainful employment in a recognized occupation," Congress left no room for Defendants to interpret.  *See Rodriguez-Avalos*

*v. Holder*, 788 F.3d at 451; *Sinclair Wyo. Refining*, 114 F.4th 693, 709.

Defendants claim 20 U.S.C. § 1094(c)(1)(B) and 20 U.S.C. § 1099c(d) confer "flexibility" to impose any metrics they deem "necessary and reasonable." Gov't Brief at 22. Defendants did not rely on these grounds in explaining the Final Rule, so these *post-hoc* rationalizations are irrelevant. *See Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024). In any event, as discussed *supra* at 7-8, the government is wrong that these statutes (which do not mention "gainful employment") permit them to decide what "gainful employment" means. Whatever "gainful employment" is, it is not a "financial responsibility" or "administrative capability" matter. Furthermore, section 1094(c)(1)(B)'s references to regulating the financial and administrative decisions of owners, shareholders, and persons exercising control of institutions is more evidence that it has nothing to do with "gainful employment" or student outcomes. As the government's cited cases make clear, a word is known by the company it keeps. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Reading section 1094(c)(1)(B) to also give Defendants the authority to interpret "gainful employment" on top of "financial responsibility" and "administrative capability" would "giv[e] . . . unintended breadth to the Acts of Congress." *Id*. Section 1099c(d), like section 1094(c)(1)(B), deals with "administrative capacity"; it says nothing about gainful employment.[11]

Defendants claim 20 U.S.C. § 1087c(b)(2) allows them to set "such other eligibility requirements as the Secretary shall prescribe." As discussed *supra* at 7-8, section 1087c covers only the Direct Loan program, not *all* Title IV programs. But even if section 1087c did grant Defendants the authority to add more "eligibility requirements," it still would not grant Defendants authority to issue their interpretation of what "gainful employment in a recognized occupation"

---

[11] Administrative "capability" and "capacity" are interchangeable. *See* 88 Fed. Reg. 74,568, 74,607-08 (Oct. 31, 2023).

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 21

means, because preparing students for "gainful employment" is not some "other eligibility requirement" invented by Defendants. Rather, it is an eligibility requirement that Congress *already has* prescribed, with its meaning fixed in 1965. *Loper Bright*, 144 S. Ct. at 2266.

> b. Even if Congress Delegated Interpretive Authority, Defendants Overstepped the Outer Bounds.

To the extent the HEA vests Defendants with some authority to interpret what "gainful employment in a recognized occupation" means and form eligibility standards to enforce it, Defendants have gone past the "outer bounds" of any authority conferred.

> i. Defendants Misinterpret Title IV's Purpose.

Many of Defendants' arguments are founded on their claim that Title IV programs are intended to "help students." *See, e.g.*, Gov't Brief at 19, 20, 23. Defendants' attempts to ascribe a motive to the Congress in enacting the HEA falls flat. In a sentence, Defendants insist that "helping students" must mean ensuring that they make a certain amount of money to "profit," pay back a loan, or out-earn individuals who did not go to college. *See, e.g.*, Gov't Brief at 19-21, 52. However, as AACS Plaintiffs have shown, in 1965, Congress's purpose in enacting the HEA was simply to make aid available to as many young people as possible.

Congress declared that the purpose of the Pell Grant program is "to *assist in making available* the benefits of postsecondary education to eligible students . . . ." 20 U.S.C. § 1070(a). The purpose of the Federal Family Education Loan Program was to "to *provide* a Federal program of student loan insurance for students . . . *who do not have reasonable access* to a State or private nonprofit program of student loan insurance . . . ." 20 U.S.C. § 1071(a)(1)(B) (emphasis added). Congress reiterated with the Direct Loan program that Title IV's purpose is "to make loans *to all eligible students* . . . in attendance at participating institutions . . . *to enable such students to pursue their courses of study* . . . ." 20 U.S.C. § 1087a (emphasis added). Congress's stated purpose in

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**       Page 22

authorizing the Perkins loan program was to "assist[ ] in the maintenance of funds at institutions . . . for *the making of loans to undergraduate students in need to pursue their courses of study* . . . ." 20 U.S.C. § 1087aa(a) (emphasis added). All of these statutes indicating Congress's expressed intent discuss "making available" or "providing" loans, and none mentions anything about financial returns or economic outcomes. *See also Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1127 (11th Cir. 2004) (purposes of the HEA's loan programs are "to encourage lenders to make student loans, to provide student loans to those students who might not otherwise have access to funds, to pay a portion of the interest on student loans, and to guarantee lenders against losses"); *U.S. v. Bellard*, 674 F.2d 330, 334 (5th Cir. 1982) (there is a "national interest in . . . inducing the private sector to make available necessary financing on favorable terms.").

Defendants propose a medley of arguments otherwise. They encourage the Court to "give 'due respect' to the agency's 'body of experience and informed judgment,' particularly where the agency's interpretation 'rests on factual premises within [the agency's] expertise.'" Gov't Brief at 16 (quoting *Loper Bright*, 144 S. Ct. at 2262-63). However, gleaning the meaning of "gainful employment" is not a matter in which Defendants have special expertise, and Defendants do not argue otherwise. The Department is not an economist or a personal finance consultant. It did not exist when Congress came up with the "gainful employment" language. It has not offered a technical analysis of what "gainful employment" means, but instead has relied on statutory interpretation. Defendants are no more adept at parsing a statute or analyzing legislative history than this Court. Their "body of experience and informed judgment," deserves no deference.

Defendants next argue that the text of a law should "never be divorced from context" and echo their claim that the "context" around Title IV is one of "help[ing] students" and ensuring that they repay loans. Gov't Brief at 18, 51 (citing *Moore*, 71 F.4th at 395; *Dolan*, 546 U.S. at 486).

But the government botches the very "contextual" analysis that *Moore* and *Dolan* command.  In *Moore*, the Fifth Circuit held that "context can mean both the immediate clause and 'the broader context of the statute as a whole.'"  71 F.4th at 395.  Here, the phrase "gainful employment in a recognized occupation" indicates no intent to delegate interpretive authority to the Department, while many other provisions in the HEA do convey such authority on other subjects.  Moreover, the HEA protects against overcommitting taxpayer money to proprietary schools (90-10 rule), allowing frequent student loan defaults (cohort default rate), and causing widespread defaults (income-based repayment), not to mention statements of intent to make student aid widely available.  Both the immediate clause and the broader context of the HEA reflect that Congress *does* want to dole out aid, *does not* want Defendants adding eligibility criteria in the name of "gainful employment," and is satisfied with the student and taxpayer protections that have been in place for decades.

Defendants argue that the HEA was an exercise of Congress's spending power legislation, so its "investment of taxpayer funds in specific Title IV loan programs" must mean that Congress intended to "ensure a return on that investment."  Gov't Brief at 19 (citing *APSCU II*, 681 F.3d at 459).  The D.C. Circuit did not go so far, holding only that Congress's exercise of the spending power was relevant to whether federalism concerns barred the Department from placing conditions on funding to schools.  Congress's reliance on its spending power says nothing about its intent.

ii.    Defendants Cannot Escape the Dictates of Section 1099c.

AACS Plaintiffs argue that the plain language of 20 U.S.C. § 1099c forbids Defendants from using D/E Rates, EPs, and data gathered years after a program has been certified as "eligible" to ascertain a program's eligibility to participate in Title IV programs.  AACS Brief at 17-19.  The Court should reject the government's response.

Defendants begin by claiming that section 1099c "governs a school's initial application,"

apparently implying that it does not govern the applications for Title IV recertification. Gov't Brief at 30. This is false. Defendants cite *no* authority indicating that section 1099c only covers initial applications and not renewals, and the text of section 1099c is affirmative proof to the contrary. Section 1099c(f) expressly contemplates "site visit[s] at each institution before certifying *or recertifying* its eligibility for purposes of any program under this subchapter," and section 1099c(g)(1) discusses renewals of eligibility after an institution's certification ends. And there is no dispute that the Department must "prescribe a single application form" to determine that the requirements of eligibility are met for both initial and renewal requests for certification, 20 U.S.C. § 1099c(b)(1), as demonstrated in the Department's own handbook. Appx. 1709 ("E-App" is used both to apply to participate in *Title IV* programs initially and *for recertification*.).

Even if section 1099c applied only to initial applications for certification, that does not plug the hole in the government's boat. In the Final Rule, Defendants claim they are "statutorily obligated to confirm whether GE programs are eligible for HEA assistance." 88 Fed. Reg. at 70,026. Defendants admit that "eligibility" is a statutory requirement that applies from day one. *See, e.g.*, Gov't Brief at 17. Defendants have no answer for their "chicken and egg" problem: if, as Defendants argue, eligibility turns on "gainful employment," and "gainful employment" turns on earnings achieved three years after school, then it is impossible for the Department to fulfill its "statutory obligation" (Defendants' words) to confirm eligibility for new programs or programs less than three years old. In short, the Final Rule is irreconcilable with the statutory requirement.

Defendants jump through hoops trying to reason around this, but fail. Aware that Congress, in 1965, could not have equated multi-factor, data-intensive D/E Rates and EP tests with "gainful employment," they claim that they have not interpreted "gainful employment in a recognized occupation" to "require specific metrics," and recast the D/E Rates and EP tests as mere optional

"tools to assess whether a program satisfies the statutory eligibility requirement" in sections 1002 and 1088. Gov't Brief at 30. "Tools" or not, the effect is the same: the D/E Rates and EP tests are the *de facto* and *de jure* standards for "gainful employment" under the Final Rule. There is no alternative way in the Final Rule or in the Department's regulations for an institution to show that its program leads to "gainful employment." There are no alternative "tools" for evaluating whether GE Programs fewer than three years old prepare students for "gainful employment." When the D/E Rates and EP "tools" are the only options Defendants have given themselves, those "tools" are tantamount to their interpretation of the HEA.

Defendants claim that *other* sections of the HEA and the Final Rule authorize them to collect information "to assess a GE program's continuing eligibility." Gov't Brief at 30 (citing 20 U.S.C. § 1094(a)(3), (5); 20 U.S.C. § 1231a(3)). However, Defendants cannot lean on general statutes authorizing information-gathering when there is a specific statutory command telling them how to determine eligibility. "[W]here a general statute and a more specific statute are at issue, 'it is a commonplace of statutory construction that the specific governs the general.'" *Bosarge v. Edney*, 669 F. Supp. 3d 598, 613 (S.D. Miss. 2023) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Section 1099c is explicit and specific: "The Secretary *shall* prepare and prescribe a single application form which . . . requires sufficient information and documentation to determine that the requirements of eligibility . . . are met." 20 U.S.C. § 1099c(b)(1). That is how the Department *must* decide eligibility.

These information-gathering statutes do not even support Defendants' argument. 20 U.S.C. § 1094(a)(3) and (a)(5) deal with getting "administrative and fiscal" information and "reports" *from institutions*. They do not authorize the Secretary to demand information from Data-Providing Agencies to determine an institution's eligibility. 20 U.S.C. § 1231a(3) commands the

Department to "collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving the intended purposes of such programs."  This statute envisions collecting data on the efficacy of Title IV programs—not individual academic programs at institutions.  *See* 20 U.S.C. § 1221(c)(1).

> iii.    Defendants Fail to Rebut the Preclusive and Protective Effects of the Cohort Default Rate, 90-10 Rule, and Income-Based Repayment.

Defendants attack AACS Plaintiffs' position as "perverting" the purpose of the HEA and as "utterly unconcerned with whether GE program graduates would actually benefit . . . or whether instead federal funds would be wasted" from grants and loans available under Title IV.  *See, e.g.*, Gov't Brief at 19-20, 21.  Their claims make little sense given that AACS Plaintiffs partially rest their argument on the fact that the HEA contains protections like the 90-10 rule and accreditation requirements (preventing waste of federal funds), income-based repayment programs (limiting students' debt payments so they can afford other necessities and save money), and the cohort default rate (ensuring the overall quality of institutions).  AACS Brief at 19.  If Congress (and the plaintiffs) were "utterly unconcerned" with student repayment obligations and the use of taxpayer dollars, these protections would not exist; student aid programs would simply be a free-for-all. However, these protections *do* exist (and have existed for decades).  AACS Plaintiffs accordingly argue that Defendants are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  *Id*. (quoting *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994); *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015)).

Defendants do not say much in response to AACS Plaintiffs' argument, except to argue that the cohort default rate is "not the exclusive program integrity mechanism for all of Title IV," and that its inclusion does not foreclose additional tests on individual programs.  Gov't Brief at

25.  For support, Defendants cite themselves (*ipse dixit*) and *APSCU I* (analysis overruled by *Loper Bright*).  *Id.*  No case has analyzed the effect of the cohort default rate[12] in determining what the "best reading" of "gainful employment in a recognized occupation" is.  That provision takes on new importance in the *Loper Bright* era.  When this Court decides what "gainful employment" means, it must place itself in the mindset of Congress in 1965 without regard for subsequent developments.  *Loper Bright*, 144 S. Ct. at 2266.

### 4.  Defendants Invent Post-Hoc, Irrational Explanations for Depriving Institutions of a Statutorily Mandated Notice and Hearing.

Defendants deny that the Final Rule deprives institutions of notice and a hearing before programs are terminated, claiming instead that AACS Plaintiffs "misunderstand" how the termination provisions of the Final Rule work.  Gov't Brief at 31.  Not so.  AACS Plaintiffs' arguments are based on the plain and clear language of 34 C.F.R. § 668.603, as promulgated in the Final Rule.  Defendants have not rebutted them.

34 C.F.R. § 668.603(a)(1) states that if the Department determines that a GE Program has failed the D/E Rates or EP test twice in three years, the program "is ineligible and its participation in [Title IV] ends upon . . . [t]he issuance of a new Eligibility and Certification Approval Report that does not include that program."  It says nothing of notice or a hearing.  During rulemaking, the National Student Legal Defense Network spotted this loophole.  It wrote: "Student Defense does not see the necessity of using the [Subpart G] termination proceeding in this circumstance. Rather, if the Department can proceed under proposed 34 C.F.R. § 668.603(a)(1), what is the need for proposed § 668.603(a)(2) or 668.603(a)(3)?"  Appx. 1722.  The comment captures AACS

---

[12] The fact that the cohort default rate was passed <u>in 1990</u> to address the Department being "forced to ante up increasing amounts of money on defaulted loans," *see Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 824 (D.C. Cir. 1993), indicates that the frequency of student defaults was not on Congress's mind in 1965.

Plaintiffs' concern: section 668.603's plain language gives the Department license to terminate a GE Program without notice and a hearing required under 20 U.S.C. § 1094(c)(1)(F) simply by issuing a new ECAR.

An agency is required to "respond to significant points raised by the public." *State v. Biden*, 10 F.4th 538, 554 n.4 (5th Cir. 2024) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012)). Defendants did not respond to this. Now, however, they claim that the Department's internal processes satisfy the notice and hearing requirements in the HEA. Defendants' entire explanation is from counsel, not the agency. As such, it is "simply an inadequate basis for the exercise of substantive review of an administrative decision." *U.S. v. Garner*, 767 F.2d 104, 117 (5th Cir. 1985); *see also U.S. Dep't of Homeland Sec. v. Regents of Univ. of Calif.*, 591 U.S. 1, 20 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action.") (citation omitted).

Defendants' arguments also fail on their merits. They first claim that 34 C.F.R. § 668.603(a) "describes how [an ineligible] program's participation in Title IV would end in practice, which would depend on the current Title IV status of the school offering that program[.]" Gov't Brief at 32. But Defendants fail to point to any regulation, statute, case, internal policy, or other writing indicating this to be so. This explanation appears for the first time in their brief.

Next, Defendants claim that ECARs are generated "[w]hen a school is certified or recertified by the Department and consequently enters into its PPA." Gov't Brief at 32. That may be so, but Defendants have not shown that ECARs are *only* generated in connection with certification or recertification. The extra-record "2022 New School Guide" that Defendants cite says only that institutions will receive an ECAR after the institution and Department execute a PPA, but it does not indicate any limitations on the use of ECARs (and even if it did, the document

lacks the force of law).  Appx. 1696-1713.[13]  In fact, other documents prove that the Department issues ECARs outside of the certification/recertification process.  The FSA Handbook indicates that the Department may issue "a revised ECAR" to schools that add a program that is eligible for Title IV participation or that add a campus location.  Appx. 1588-89.  With no formal rules governing ECARs, there is nothing to stop Defendants from issuing an ECAR and ending a program's Title IV participation at will whenever they determine that a program has "failed" their GE metrics.

The government then argues that institutions are not entitled to a hearing under 34 C.F.R. § 668.603(a)(1) because subsection (a)(1) only governs when a school's "original PPA has expired and is superseded by a new PPA with a new ECAR."  Gov't Brief at 34.[14]  Defendants reason that, if they have issued a new ECAR and PPA, then the institution is not entitled to a hearing on the termination of a program listed in its prior ECAR.  *Id*.  Defendants' interpretation still deprives a school of its right to a hearing.  PPAs and ECARs do not "expire" just because an institution has applied for recertification, or even if the Department has sent a new PPA for the institution's execution.  As long as an institution files an application to renew its certification 90 days before it expires, "the institution's existing certification will be extended on a month to month basis . . . until the end of the month in which the Secretary issues a decision on the application for recertification."  34 C.F.R. § 668.13(b)(2).  An example shows the flaw in Defendants' reasoning:

- **January 1**: Proprietary school offering GE Programs files a materially complete application to renew its certification.  Its certification is currently set to expire on April 15.
- **April 15**: Because the school filed an application more than 90 days prior to expiration, its

---

[13] Defendants cannot "cure [their] failure to articulate a rational explanation by pointing to various sources that [they] possessed but never referred to during the rulemaking."  *Penobscot Indian Nation v. U.S. Dep't of Housing & Urban Dev.*, 539 F. Supp. 2d 40, 53 (D.D.C. 2008).

[14] Defendants assert that PPAs are "the instrument[s] that would confer whatever rights a Title IV-participating school might have under Subpart G."  It is actually the HEA that confers a right to notice and a hearing.  20 U.S.C. § 1094(c)(1)(F).

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 30

current PPA remains in effect on a month-to-month basis.  34 C.F.R. § 668.13(b)(2).

- **September 1**: The Department decides to approve the school's application, but has determined that the school's cosmetology program has failed the EP metric twice and concludes the cosmetology program is ineligible.  Department transmits a new PPA for school to sign.
- **September 15**: School's previous PPA remains valid through the end of September.  *See* 34 C.F.R. § 668.13(b)(2).  School signs the new PPA, receives a new ECAR *after* signing PPA (*see* Appx. 1727), learns for the first time that its cosmetology program is no longer eligible for Title IV participation, and receives no Subpart G hearing.

Defendants argue they have not given themselves authority to terminate a program without a hearing "because if a school is not at the point where it needs to renew its certification and PPA, its current PPA would be in effect, and the Department could only terminate a program's eligibility pursuant to Subpart G . . . ."  Gov't Brief at 34.  Section 668.603 says otherwise.  Its plain language makes Subpart G proceedings optional for the Department ("*if* an action is initiated under subpart G")—a point AACS Plaintiffs made in their opening Brief that Defendants failed to address.  Its plain language also sets no limits on the "issuance of a new Eligibility and Certification Approval Report."  "Once an agency has drafted and proposed a given regulation, it may not suddenly alter course from the plain language of the regulation because it could have chosen to draft the regulation differently."  *D&B Boat Rentals, Inc. v. U.S.*, 508 F. Supp. 3d 87, 99 (E.D. La. 2020).  Nor can agencies "'bolster ostensibly invalid regulatory action with after-the-fact explanations as to the regulation's validity."  *Fleming Cos., Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 754 (E.D. Tex. 2004) (quoting *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1060 (5th Cir. 1985)).

Yet, Defendants insist that section 668.603(a)(2) "makes clear" that the Department's Subpart G hearing procedure "applies whenever a school is fully certified and is participating in Title IV pursuant to a valid PPA that includes the program at issue."  Gov't Brief at 34.  Subsection (a)(2) says nothing of the sort.  Subsection (a)(2) says (with emphasis added) that a GE Program's participation in Title IV ends upon "The completion of a termination action of program eligibility, *if an action is initiated* under subpart G of this part[.]"  Whatever "clarity" the government finds

in subsection (a)(2) is not backed up by the rule's plain language, and this "court cannot accept an agency's interpretation that is contrary to the regulation's plain language . . . ." *Scott & White Health Plan v. Becerra*, 693 F. Supp. 3d 1, 10 (D.D.C. 2023) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Defendants go on to conflate AACS Plaintiffs' argument that the HEA mandates notice and a hearing with its separate argument that the Department arbitrarily eliminated the alternate earnings appeal. Gov't Brief at 34. This is nonsense. Whether or not Defendants allow an alternate earnings appeal in the Final Rule, 20 U.S.C. § 1094(c)(1)(F) *mandates* that institutions receive notice and a meaningful hearing before their participation is limited or terminated.

With respect to termination under section 668.603(a)(3), Defendants all but admit that the HEA limits summary terminations of provisionally certified programs to instances in which the school "is unable to meet its responsibilities under its [PPA]" because they attempt to shoehorn the D/E Rates and EP tests into the terms of PPAs. Gov't Brief at 35 (quoting 20 U.S.C. § 1099c(h)(3)).[15] AACS Plaintiffs argued that none of the 29 conditions that PPAs "shall" contain relate to "gainful employment" or "eligibility." *See* 20 U.S.C. § 1094(a)(1-29). The government responds that section 1094(a)(21)—requiring schools to "meet the requirements established by the Secretary"—incorporates the Final Rule's D/E Rates and EP tests into every PPA. Gov't Brief at 35. Subsection (a)(21) actually says that institutions "will meet the requirements established by the Secretary and accrediting agencies or associations, and will provide evidence to the Secretary that the institution has the authority to operate within a State." Courts have concluded that, as used in subsection (a)(21), the "'requirements established by the Secretary and accrediting agencies'

---

[15] AACS Plaintiffs never argued that "PPAs only require schools to comply with statutory requirements," as the government suggests. Gov't Brief at 35. AACS Plaintiffs argued that the terms of PPAs are fixed by statute. *See* AACS Brief at 15 (citing 20 U.S.C. § 1094).

are set forth in 20 U.S.C. § 1099b," which is a statute governing the recognition of accrediting agencies, associations, and an institution's accreditation. *U.S. ex rel. Diop v. Wayne Cnty. Cmty. Coll. Dist.*, 242 F. Supp. 2d 497, 523 (E.D. Mich. 2003); *U.S. ex rel. Brooks v. Stevens-Henager College, Inc.*, 359 F. Supp. 3d 1088, 1114 (D. Utah) (citing subsection (a)(21) to show schools must meet accreditation requirements). Subsection (a)(21) is about accreditation; it is not a backdoor for Defendants to sneak their "gainful employment" metrics into PPAs.

### 5. The Final Rule Deprives Schools of Constitutional Due Process.

The government argues it is "well-established" that institutions participating in Title IV programs do not have a "vested right" protected by the Due Process Clause because their participation is limited in duration. Gov't Brief at 36. But, as AACS Plaintiffs noted, there is a circuit split on this issue. This Court should adopt the Seventh Circuit's opinion in *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990).

Defendants criticize *Cavazos* as being less "fulsome" than *APC* and *APCU,* but *Cavazos* presents a perfectly "fulsome" and persuasive analysis. It found that a school, despite being an indirect beneficiary whose participation in Title IV is time-limited, "had both a liberty and a property interest at stake" when the Department tried to cut it off from Title IV funding. 893 F.2d at 893. The Seventh Circuit compared the Title IV programs to Medicare, observing that both mandate "extensive" certification and eligibility requirements. Citing two cases from the Supreme Court and three more of its own, the Seventh Circuit concluded that the "eligibility standards in the HEA provide the sort of 'substantive predicate' that courts have required before finding that property interests exist." *Id*. Knowing it had the backing of the Supreme Court, the Seventh Circuit's opinion was perfectly "fulsome" and generously succinct.[16]

---

[16] *Cavazos* is not as much of an outlier as the government makes it out to be. In *APC*—a case on which the government puts great weight—the court found that the 2014 Rule provided

Defendants then urge the Court to find that AACS Plaintiffs are not deprived of due process at all in light of 34 C.F.R. § 668.603(a)(2)'s "references [to] the procedures under Subpart G . . . ." Gov't Brief at 36. But, as shown above, section 668.603(a)(2) does not *guarantee* a hearing, nor is it the sole mode by which Defendants will terminate programs from Title IV. *See supra* at 28-33. Defendants will also terminate programs "outside the Subpart G process" using subsections (a)(1) and (a)(3), similar to what the Department attempted in *Cavazos*.

Finally, Defendants invite the Court to refrain from ruling on AACS Plaintiffs' due process challenge because they have not yet acted, citing *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992). The Court should decline the invitation. In *Alexander*, the at-issue HEA provision authorized "appellate procedures . . . which provide an expeditious means of challenging in writing the correctness of [the Department's] [cohort default rate] calculations or the fairness of terminating a given school," which "satisfie[d] the dictates of due process." 979 F.2d at 867. In contrast, the Final Rule leaves no meaningful appellate process available to schools. Defendants have issued regulations that attempt to circumvent the HEA's mandatory notice and hearing provisions, leaving schools with no guarantee that they will ever have an opportunity to "challenge in writing the correctness of [the Department's] [GE] calculations or the fairness of terminating a given [program]." And, even if schools do get a Subpart G proceeding under section 668.603(a)(2), it is not a meaningful hearing; it only permits double-checking the Department's math. Thus, there is no need for a court to wait and see how Defendants will carry out notice-and-hearing procedures when they are guaranteed to be

---

"constitutionally sufficient" due process because it "g[a]ve affected institutions at least three opportunities to make submissions to [the Department], and two of those are *pre*-eligibility determination," including an appeal based on "alternate earnings from an institutional survey . . . ." 107 F. Supp. 3d at 352, 355.

constitutionally and statutorily deficient, if they happen at all.

### D.    The Final Rule is Arbitrary and Capricious.

The Final Rule must be set aside for its wooden reliance on undisputedly bad data, disregard for the high amount of part-time work and voluntary non-employment among completers of cosmetology and esthetics programs, elimination of an alternate earnings appeal, deafness to the impacts of the coronavirus pandemic on cosmetologists' (and others') earnings, rejection of demographics as a significant cause of low earnings, assumption that programs for which Defendants have no data are "higher quality" than proprietary programs, and outsized adverse impacts on cosmetology schools despite the minimal student loan debts of their completers.

The government leans on the Court's prior ruling on Ogle Plaintiffs' preliminary injunction motion.  *See, e.g.*, Gov't Brief at 3.  However, AACS Plaintiffs' challenges under section 706(2)(A) of the APA are different and more numerous than those of Ogle Plaintiffs (challenging multicollinearity, for example).  More important, the Court's prior order leaves the door open to setting aside the Final Rule "upon review of the full administrative record."  Order, ECF 31, at 11. That "full administrative record" reveals numerous instances of ignored evidence, contravened findings, and flawed methodologies.  And Defendants' cross-motion reveals even more.[17]

---

[17] Defendants incorrectly claim in a footnote (Gov't Brief at 39 n.22) that AACS Plaintiffs did not "raise[ ] an as-applied claim" in their Complaint.  *But see* ECF 1 at 45 (requesting "as applied" relief in the alternative).  *See also Doe v. Jaddou*, 2024 WL 2057144, at *10 (D. Md. May 8, 2024) (complaint that sought injunction barring government from enforcement "against Plaintiff" sufficiently stated as-applied challenge); *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014). AACS Plaintiffs have also shown final agency action.  Final rules are the consummation of agency decision-making, and the Final Rule imposes obligations on schools (e.g., reporting completer information by January 15, 2025) from which legal consequences (warnings, termination, demands for letters of credit) will flow.  *See Texas v. Cardona*, No. 4:23-cv-604, 2024 WL 3658767, at *7 (N.D. Tex. Aug. 5, 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                     Page 35

1.    Defendants Fail to Justify Using Objectively Bad Data and Rejecting
       Alternate Earnings Appeals.

In the epitome of a statement "that runs counter to the evidence before" it, Defendants claim that they "continue[ ] to refute" that cosmetologists underreport their earnings. Even the experts and studies on which Defendants principally rely concede that underreporting is common in the cosmetology industry. *See, e.g.*, Appx. 827 (tips, cash payments, and self-employment income underreported); Appx. 906 (Qnity Report identifying underreporting of income as an "issue with current workforce earnings data"); Appx. 1776 ("[B]ecause gainful employment analyses are based on income reported to the federal government, actual earnings for occupations in which workers tend to underreport income may be misstated. This is most likely true for jobs in which substantial income is earned in tips, such as . . . hair stylists."); *see also* Appx. 832 (indicating significant underreporting occurs in fields other than cosmetology); Appx. 1786 (same). Unsurprisingly, Defendants do not cite a single source "refuting" underreporting.

Despite their own experts' conclusions and cited research, Defendants insist that IRS data, which reflect only reported income, are the "best available data source" they can use, noting that the APA "does not demand the perfect at the expense of the achievable." Gov't Brief at 40. However, their choice of data "must be evaluated by reference to the data that was available . . . at the relevant time." *Id.*; *see also Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 40, 41 (D.D.C. 2008). Against that standard, Defendants' reliance *only* on reported earnings data is arbitrary.

The information available to the agency showed widespread agreement among researchers and the industry that tip underreporting happens in service industries. *See, e.g.*, Appx. 827; Appx. 1805; Appx. 1823 (earnings premium calculations "will not capture unreported tipped income and earnings from self-employment, which may make up a substantial portion of earned income in some sectors"); Appx. 1868 ("Beauticians may receive part of their income in cash tips which go

unreported to the IRS").  Defendants even recite Cellini's conclusion that "about 8 percent" of tips in the cosmetology industry go unreported.  88 Fed. Reg. at 70,042.  Cellini[18] admits that underreporting from self-employment, cash payments, and cash tips can only drive that number higher.  Appx. 827.[19] And still, Defendants refuse to make even a modest eight-percent adjustment when calculating the earnings of cosmetology completers.  *See* 88 Fed. Reg. at 70,042.

Defendants' decision is arbitrary because nothing in the APA says agencies cannot use data from multiple sources.  *Cf. KLC Farm v. Perdue*, 426 F. Supp. 3d 837, 856-59 (D. Kan. 2019) (agency's combination of two different methods or data sources was not arbitrary); *Howell v. Reno*, 939 F. Supp. 802, 806-07 (D. Colo. 1996) (use of "a variety of sources" to "calculate how much radiation a claimant was exposed to while mining" permitted).  In fact, the study Defendants cite to back up their claim that underreporting is no greater than 8 percent combined information from at least three different sources.  Appx. 829 (GE data, IRS data, Bureau of Labor Statistics data).

Thus, even if not "perfect," it is eminently "achievable" for Defendants to address at least *some* of the underreporting in personal service industries like cosmetology by adjusting IRS data upwards by eight to 10 percent, consistent with Cellini's recommendation.  Appx. 832 ("[A]n 8-10% adjustment may reasonably be applied beyond cosmetology to other fields where

---

[18] The government complains that AACS Plaintiffs refer to Cellini as Defendants' expert.  Gov't Brief at 48 n.29.  Whatever her connection to Defendants may be, she has co-written at least five papers with the government's insider expert and declarant, Rajeev Darolia.  *See, e.g.*, Appx. 1887; Appx. 1949; Appx. 1975; Appx. 1977; Appx. 2016; Appx. 2046.  Cellini also authored "The Case for Limiting Federal Student Aid to For-Profit Colleges," arguing "in favor of the policies put in place" under the Obama administration (who produced the first GE rule) "and suggest[ing] that even further restrictions on federal student aid flowing to [for-profit colleges] would be beneficial for both students and taxpayers."  Appx. 2039.

[19] Other evidence that Defendants failed to consider and explain shows that the amount of overall income—tips, cash, self-employment—is far higher than eight percent.  *See infra* at 38-39.  For purposes of this argument, however, the point is that Defendants *know* their data are wrong, *know* that a reasonable adjustment will fix those data (at least in part), yet arbitrarily refuse to do so.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 37

underreporting is prevalent."). By refusing even a modest, feasible, and standardized adjustment in the face of a known and fixable data gap, Defendants are doubling down on the same "wooden use" of incomplete earnings data that doomed them when the 2014 Rule was set aside. *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) ("*AACS*").

Defendants' primary contention is that, as compared to the 2014 Rule, the Final Rule will measure completers' earnings one year later, resulting in a 20 percent boost. Gov't Brief at 11-12, 39, 42, 45, 47. The government reasons that this "buffer" offsets the eight percent of unreported tip income and solves the underreporting problem. It does not come close, for several reasons.

First, this is a mere sleight of hand. A 20-percent increase in a number that was off by eight percent to begin with is still off by eight percent. The eight percent deficit due to underreporting of tips does not magically disappear because the worker is projected to make more overall in the extra year. The 20-percent "buffer" that Defendants claim will come in the extra year would wipe out the eight-percent deficit only if tip underreporting was also to cease to be an issue in that extra year. Defendants cite zero evidence that that will be the case.

Second, Defendants have no idea how much income reporting is attributable to underreporting of cash payments and self-employment. Even if one assumes tip underreporting is limited to 8 percent (the IRS estimates it is as high as 60 percent, *see* AACS Brief at 26), the government's lynchpin study indicates that underreporting of self-employment income and cash tips is an even bigger issue. In that study, Cellini adopts the IRS's estimates that reporting noncompliance for "sole proprietor net income" and "cash tips" is 55 percent. Appx. 830. *Id*.[20] Commenters informed Defendants that 91 percent of salon businesses are solo operators. Appx.

---

[20] The IRS's estimate is supported by research. Researchers found that self-employment income was underreported at a rate of 59 percent in 2006, and that cash tips were underreported by 56 percent. Appx. 626. This is uncontested.

1063, 1067.  Taken together, this means that 91 percent of salon businesses underreport 55 percent of their income.  Even if Defendants' "buffer" is a legitimate reason to disregard the underreporting of *tips* (it isn't), Defendants have not explained how or why the "buffer" addresses the other forms of underreporting (self-employment and cash payments).

Third, if Defendants' one-year "buffer" were truly an adjustment to account for income underreporting, then it should only apply to industries in which underreporting is a material issue. Instead, the Final Rule applies the "buffer" to every GE Program—nurses, HVAC technicians, and cosmetologists alike.  As a result, even if the "buffer" works to true-up the median earnings of cosmetology completers, it will simultaneously cause earnings in other industries to balloon by 20 percent, allowing more GE Programs to pass the D/E Rates and EP tests than actually should. Defendants acknowledged this phenomenon, at least generally, in the NPRM but did nothing about it.  *See* 88 Fed. Reg. 32,300, 32,335 (May 19, 2023) ("Adjusting earnings calculations to further reduce the low chance of programs failing the proposed metrics . . . would increase the risk of . . . programs that should fail . . . appearing to pass based on an artificial increase in calculated earnings.").  Defendants will end up arbitrarily and capriciously determining that some non-cosmetology GE Programs prepare students for "gainful employment" when, in fact, they do not.

Fourth, any benefit from the "buffer" is offset by the EP test.  Defendants argue that they designed the EP test to measure the earnings of completers three years after completion against high school graduates at the same age level, *i.e.*, 25 to 34 years old.  *See* 88 Fed. Reg. at 70,060 ("[T]he typical graduate from most credential programs is within the comparison EP age range three years after graduation.").  Had Defendants stayed consistent with the 2014 Rule (measuring earnings two years after completing school), it follows that the earnings threshold for the EP test would have been 24 to 33 years old.  Defendants' "buffer" assumes that the median earnings of

GE Program completers will rise by 20 percent during the extra year under the Final Rule. But Defendants neglected the obvious problem that high school graduates, with an extra year of work experience, will also have enjoyed a boost in earnings during the extra year. That, in turn, will drive up the earnings threshold that GE Programs must exceed to pass the EP test. Defendants did not quantify what the boost to high school graduate earnings will be. The increase in high school graduate earnings could entirely offset the effect of any "buffer," leaving programs in industries with unreported income just as likely to fail the EP test as they were without the "buffer."[21]

Finally, Defendants still fail to address the crux of the issue: by using bad data, Defendants are ensuring that some GE Programs that should pass will fail. Perhaps fewer programs will "fail" as a result of their "buffer," but that is cold comfort to a school that loses its cosmetology program because Defendants refused to make a simple correction.

Defendants' next argue that "technological and legal changes" in how Americans use currency have reduced cash and under-the-table payments in the cosmetology sector. Gov't Brief at 42. Neither the NPRM nor the Final Rule cites any evidence that "digital payment methods" have reduced underreporting by anyone, let alone tipped and self-employed workers, nor that cash is no longer king in the cosmetology industry. *See* Appx. 1067 (salons are "very cash-intensive businesses"). Instead, Defendants now argue *post-hoc* that the "general rise in mobile app and other forms of electronic payments is a commonly known and judicially noticeable fact." Gov't Brief at 50. But even if Defendants "believe[d] this to be a 'common-sense proposition,' the agency was still required to explain the proposition when justifying its decision." *See Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024). It did not. Further, the "general rise" in

---

[21] As Mr. Hill notes in his declaration, Defendants' data show that no for-profit cosmetology programs are expected to fail only the D/E Rates test. Appx. 1618. The EP test is the hammer.

electronic payments is not informative of payment methods *in the cosmetology and personal services sectors*. The Cellini Study took special note of the use of cash in cosmetology transactions, and industry insiders advised Defendants that cash remains ubiquitous in salons. *See, e.g.*, Appx. 832; Appx. 2049 ("The beauty industry is known as a cash industry[.]"); Appx. 2053 ("The beauty and wellness industry operates largely on a cash basis. Not only are service provider's incomes largely cash and underreported, and tips are also largely cash based and underreported."). Defendants put nothing in the record to justify their assumption that the use of cash in the personal services industries has materially dropped, which the APA requires. *Nat'l Ass'n of Mfrs.*, 105 F.4th at 815 (quoting *Hisp. Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018)) (agency has "an 'affirmative burden' to explain all of the 'key assumption[s]' embedded in its new regulations") (quotation marks omitted, modification in original).[22]

Instead, the government waited until its brief in this case to try to justify its assumptions on the use of cash payments. *See* Gov't Brief at 50. Its attempt to rationalize Defendants' assumptions in the Final Rule *post-hoc* is invalid. "[T]he fact that an agency provided a *post hoc* rationalization is relevant evidence that the action is arbitrary and capricious." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022) (citing *Wages & White Lion Invs.,*

---

[22] Defendants attempt to minimize *National Association of Manufacturers*, claiming that the Fifth Circuit "simply applied the APA's reasonableness standard," Gov't Brief at 47 n.28, but justifying key assumptions is part of the "reasonableness standard," along with articulating a "rational connection between the facts found and the choice made" and making choices that are "reasonable and reasonably explained." *Nat'l Ass'n of Mfrs.*, 105 F.4th at 813-15. The government also argues that *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) is "inapposite," but the Fifth Circuit invoked *Hispanic Affairs* in *National Association of Manufacturers*. Defendants also attempt to distance this case from *AACS* on the basis that *AACS* was an as-applied challenge. But this case is an as-applied challenge too. *See supra* at n.17. Moreover, Defendants cite no authority that their duty to explain critical assumptions differs in an as-applied challenge versus a facial challenge. Nor could they, since *National Association of Manufacturers* was itself a successful "facial" challenge to an agency action. *See* 105 F.4th at 815-16.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                Page 41

*LLC v. FDA*, 16 F.4th 1130, 1140 (5th Cir. 2021) ("The very fact that the FDA perceived the need to rehabilitate its Order with new and different arguments before our court underscores that the Order itself omitted a reasoned justification for the agency's action.")).

As to Defendants' reliance on changes to tax law, Defendants did not engage with the flaws in their logic that AACS Plaintiffs briefed, and therefore have waived the issue. *Kellam*, 2013 WL 12093753, at *3; *Reagan*, 596 F.3d at 254. AACS Plaintiffs showed that the lower threshold for issuing 1099s is irrelevant for at least the first four years of D/E Rates and EP measurements. AACS Brief at 23-24. Defendants do not contest that. AACS Plaintiffs also argued that it was improper for Defendants to claim that the new tax laws were not "dispositive" to its decision, because it is improper under the APA to assign some undefined amount of weight to a factor without explaining why. *Id.*; *see also Chamber of Com.*, 85 F.4th at 774 n.14 (agency "must cogently explain why it has exercised its discretion in a given manner and must offer a rational connection between the facts found and the choice made"). Defendants do not contest this either.

The government's third basis for using only IRS data with no right of appeal is its conclusion that prior research by Bettinger "was significantly flawed." Gov't Brief at 43-44 n.24. Rather than contest AACS Plaintiffs' actual argument—that Defendants misread Bettinger's report (*see* AACS Brief at 26)—Defendants reprise the same critique that appears in the Final Rule. Gov't Brief at 43-44 n.24. The government's non-responsiveness should operate as a concession, but even if it does not, Defendants' reasoning is arbitrary because it is based on a mistaken interpretation of the evidence. Defendants reject Bettinger because they concluded his report says something that it does not actually say. That is entitled to no deference at all. *Cf. Texas Oil & Gas Ass'n*, 161 F.3d at 935; *Resolute*, 187 F. Supp. 3d at 123. Defendants attempt to defend their irrational decision by charging the *AACS* court with making an "erroneous conclusion," but one

court's purported mistake does not give an agency license to misconstrue the evidence.  Regardless

of how the *AACS* court interpreted Bettinger's analysis, it is incumbent on Defendants to accurately

interpret the evidence before them and offer an explanation for their decision that is consistent

with that evidence.  *Restaurant Law Ctr.*, 120 F.4th at 175 (quoting *State Farm*, 463 U.S. at 43).[23]

Next, Defendants argue they have barred appeals because their "experience" and Cellini's

"research" led them to conclude that school-conducted earnings surveys yielded "implausible"

results.  Gov't Brief at 12, 43.  Defendants, like Cellini, never explain what is so "implausible."

Their claim demands that the Court take them at their word that earnings appeals produced

"implausible" results.  This is improper *ipse dixit* forbidden by the APA, especially when the

decision can be "institution-destroying."  *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98

F.4th 220, 251 (5th Cir. 2024).  Defendants' "implausibility" *ipse dixit* also is undercut by the

evidence in the record.  Defendants knew that the IRS estimates that 60 percent of tips are

unreported, and other research shows self-employment and cash payment underreporting is

between 55 and 60 percent.  Appx. 626, 830.  Defendants also knew—because Cellini told them—

that her eight percent estimate excludes underreporting of income from self-employment and cash

receipts.  Appx. 832.  And, as noted *supra*, Defendants knew that the use of cash is dominant in

cosmetology and that a majority of stylists employ themselves.  Further, in the applicable earnings

range, even modest changes in earnings will show up as high-percentage changes.  AACS Brief at

---

[23] The government charges AACS Plaintiffs with the same mistake.  Gov't Brief at 49.  As it turns
out, however, even if Bettinger did conclude that 60 percent of *income* (not just *tips*) goes
unreported in the cosmetology field, he would not have been materially off.  Cellini found it
reasonable to adopt the IRS's estimate that 55 percent of income from sole proprietorships and 55
percent of cash tips are not reported.  In a cash-driven industry in which 52 percent of workers are
self-employed and 91 percent of salon businesses are sole proprietorships, it is not unreasonable
to conclude that 60 percent of income is unreported.  *See supra* at 38-39.  Defendants did not
explain why they disregarded this countervailing evidence in the administrative record.

27. For example, an 82-percent increase for someone whose reported income was $20,000 would only be $36,400. Defendants wrote off this contradictory evidence without even acknowledging it and simply deemed the results of prior appeals "implausible."

The APA requires more. Although an agency's factual finding may be upheld "if supported by substantial evidence," it has long been the law that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1060 (5th Cir. 2023) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Put simply, an agency "acts arbitrarily . . . when it . . . ignores 'evidence contradicting its position,'" as happened here. *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 659 F. Supp. 3d 33, 48 (D.D.C. 2023) (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).[24]

Defendants attempt to overcome their misuse of the Qnity Report (*see* AACS Brief at 28) by arguing that AACS "fails to propose a more reliable data source that would capture such alleged underreporting." Gov't Brief at 39. Their argument does not square with AACS Plaintiffs' argument, namely, that Defendants drew conclusions about underreported income within the *entirety* of the cosmetology industry based on a report that covers a very unrepresentative portion of the industry. That is not a "data source" problem; it is a "satisfactory explanation" problem. If an agency relies on research to support a rule, that research must be "reasonably reli[able] . . . to measure what [it] purport[s]." *Resolute*, 187 F. Supp. 3d at 123. Further, commenters identified Bureau of Labor Statistics data as a data source. *See, e.g.*, Appx. 2063; Appx. 2064; Appx. 2066;

---

[24] AACS Plaintiffs also argued that it is arbitrary for Defendants to reject school-administered surveys on the basis that respondents skew toward those making more money when, in the survey Defendants intend to use to calculate the EP's earnings threshold, the same flaw exists. AACS Brief at 32-33. A commenter made a similar argument. *See* Appx. 2059 ("[T]he DOE has seen fit to use an earnings survey as the source of its high school earnings information[.] So, surely an earnings survey could be constructed, with the right components to be delivered in a secure web-based modality," to produce reliable results). Defendants left this unanswered, conceding it.

Appx. 2068 ("the median income posted by the U.S. Bureau of Labor Statistics for this industry, in our state . . . is researched, updated, and shows a much more realistic median income for service providers in the fields of cosmetology, esthetics, massage, etc.").

Next, Defendants claim they can disregard testimony from a U.S. Treasury official that self-employed individuals who operate businesses report only 68 percent of their earnings (and only 19 percent of their earnings when operating a cash basis) because it was "never submitted in comments." Gov't Brief at 49. In fact, it was (*see* Appx. 1156; Appx. 2073), and the testimony is a matter of public record. *See A Closer Look at the Size and Sources of the Tax Gap*, 109th Cong. 1004 at 95 (2006) (statement of Russell George) (attached at Appx. 2091). Defendants also attack the date of the testimony. Little has changed since 2006, however, as Mr. George's testimony is relatively consistent with more recent figures that Cellini herself used (*e.g.*, 55 percent of self-employment income is unreported). Appx. 830. Defendants end by blasting Mr. George's testimony for having "little direct relevance" in *AACS*, but that was because his testimony was not in the administrative record in that case. 258 F. Supp. 3d at 60. This time, it is.

### 2.    Defendants' Demographics-Related Arguments Are Unavailing.

The government argues that demographics like race and gender do not have a sufficiently material effect on students' post-graduation outcomes to warrant adjustments to the Final Rule. Gov't Brief at 57.[25] The centerpiece of their argument is a "regression analysis" ("RA") accompanied by a "variance decomposition analysis" ("VDA"). *Id*. at 58. AACS Plaintiffs demonstrated two critical flaws with the government's RA. First, the RA suffers from

---

[25] This position is belied by the fact that Defendants themselves have argued that the lower earnings of cosmetology completers are at least partially attributable to cosmetology schools' "aggressive recruitment" of women and students of color. *See* Gov't Brief at 59-60 n.38. Moreover, though Defendants cite Congressional materials addressing recruiting practices of for-profit schools *generally*, those say nothing about recruitment at *cosmetology* schools. *See* Gov't Brief at 59-60.

"multicollinearity," which masks the effects demographics have on completers' post-graduation outcomes, making them seem less influential on outcomes than they actually are. Defendants knew of their multicollinearity problem but offer nothing but capricious reasons for disregarding it. Second, Defendants failed to produce the VDA that allegedly absolves the multicollinearity problem, and failed to describe the methodology behind it or share the data underlying it.[26] This is a paradigmatic violation of the government's notice-and-comment obligations under the APA.

Defendants next assert that the Court must give tremendous deference to their "statistical methodologies." Gov't Brief at 58. But in this circuit, even when statistical analyses are in play, a court's "review under the APA is not toothless[.]" *S.W. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). As with any agency decision, the government must have "examined the relevant data," "articulated a satisfactory explanation for its action," and "consider[ ] the relevant factors." *Id.* (modifications removed).

Defendants give little attention to multicollinearity in their brief, relegating substantive discussion to a motion to strike and an extra-record declaration from their statistician, Rajeev Darolia, in spite of this Court's rules requiring parties to file "a brief that sets forth [its] contentions of fact and/or law." L.R. 7.1(d). The Court should disregard that *post-hoc* material.

The Court should also set aside the Final Rule due to Defendants' failure to disclose the VDA. "[A]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007)). "The most critical factual

---

[26] Defendants point to prior GE cases that favorably cited past regression analysis, *see* Gov't Brief at 57, but none deals with either of the two problems that AACS Plaintiffs raised. *See, e.g.*, *APC*, 107 F. Supp. 3d at 365 (no challenge to multicollinearity).

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 46

material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Id.* (quoting *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)).  The VDA is among the "most critical factual material" in the Final Rule. Defendants' RA is the primary, if not only, basis for their claim that demographics are immaterial to student outcomes, but the RA only works if the methodology is sound.  Recognizing the multicollinearity problem, Defendants prepared the VDA before publishing the NPRM.  In both the NPRM and the Final Rule, all the government said about the VDA was:

> However, a variance decomposition analysis (that is insensitive to ordering) demonstrates that program and institutional factors explain the majority of the variance in both the D/E and EP metrics across programs when student characteristics are also included.

88 Fed. Reg. at 32,431; 88 Fed. Reg. at 70,144.  Neither the NPRM nor the Final Rule explained the methodology behind the VDA or specified the data it used.  All commenters had was Defendants' 37-word description.  AACS Plaintiffs argued this point in their motion.  AACS Brief at 35 n.22.  Once again, Defendants do not contest the facts or the law.  *See Kellam*, 2013 WL 12093753 at *3; *Reagan,* 596 F.3d at 254.[27]

Assuming that the government conducted a standard VDA, there should have been plenty to share with commenters.  VDAs produce results, often reflected in a table or chart.  They rely on source data.  They are accompanied by *lengthy* discussions of methodology.  Mr. Darolia himself has published at least one decomposition analysis containing all those characteristics.  *See* Appx.

---

[27] To be sure, Mr. Darolia argues that "information on the shares of race and gender within each program . . ., along with the other data that the Department provided in the PPD would allow an individual to estimate similar regressions and follow a similar approach to what was described in" the Final Rule.  Darolia Decl. at ¶ 13.  This does not resolve Defendants' "serious procedural error."  Mr. Darolia's statement is artfully worded to refer to *regressions*, but not to *decomposition analyses*.  *Id*.  The Final Rule and NPRM contain two "regressions" but zero decomposition analyses.  *See, e.g.*, 88 Fed. Reg. at 70,143.  Mr. Darolia's statement also makes no mention of the VDA's methodology, which Defendants were obligated to share in the NPRM.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 47

2119-24 (six-page decomposition analysis with charts, results, and citations to sources). In contrast to Mr. Darolia's published decomposition analysis and others in the administrative record, the government provided almost no information regarding their VDA. Most notably, they failed to provide *the actual, numerical results*. Commenters cannot critique a statistical analysis when the results are known only to the agency. Defendants also failed to explain the methodology behind the VDA, which they were required to do with sufficient detail to "'expose[ ] [the analysis] to refutation,' as required by the APA." *Owner-Operator*, 494 F.3d at 202. Defendants certainly knew of their obligation to discuss the methodologies behind their statistical analyses given the lengthy discussion of the (flawed) methods behind the RA. *See* 88 Fed. Reg. at 70,140-44.

Finally, even if the government's failure to provide the VDA was excusable, its description of the VDA's results are inadequately explained to survive APA review. Defendants claim that the VDA showed that "program and institutional factors explain the *majority* of the variance in both the D/E and EP metrics," 88 Fed. Reg. at 32,431 (emphasis added), but "majority" ranges from 51 percent to 100 percent. If institutional characteristics account for just over half of D/E and EP outcomes, while demographics account for just under half, demographics have a *massive* effect on whether schools pass Defendants' GE tests. But, because Defendants concealed the actual results of the "decomposition analysis," neither this Court nor any commenter will ever know. Had commenters had access to Defendants' "decomposition analysis," they could have mounted a credible challenge to their claim that demographics do not matter sufficiently to warrant adjustments to the Final Rule's metrics. Appx. 1624-25. Even with the limited data that Defendants did produce, Mr. Hill was able to make credible challenges to Defendants' disregard for race, gender, locale, and socioeconomic background. Appx. 1624-40. Defendants cheated commenters out of the opportunity to attack a critical element of the Final Rule, so the Final Rule

must be set aside.

Defendants' responses to other arguments that AACS Plaintiffs made fall flat. Defendants argue that it would be "infeasible as a practical matter" to adjust the earnings threshold that a GE Program must exceed to pass the EP test. *Id*. at 61.[28] Defendants identify no legal authority that permits them to ignore the pay gap between the genders on "feasibility" grounds. *Id*. Even if they can, Defendants fail to support their claim that preparing a men's and women's earnings threshold is "infeasible" or a "highly complicated endeavor." *Id*. Courts in this circuit "cannot affirm agency action on the basis of 'conclusory' statements." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 477 (5th Cir. 2024) (citing *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021)). Nor may a court permit a "one-size-fits-all approach" (as Defendants have taken with the earnings threshold) unless the agency has "cite[d] evidence supporting these conclusory statements." *Texas v. Becerra*, 577 F. Supp. 3d 527, 553 (N.D. Tex. 2021); *see also Gilbert v. Wilson*, 292 F. Supp. 3d 426, 434 (D.D.C. 2018) ("Conclusory statements will not do; an agency's statement must be one of *reasoning*.") (emphasis in original; brackets removed) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)). Defendants give no estimate of time or manpower that would be needed (if any), cite no examples from the past of similar ideas that failed, or even attempt a conclusory claim that their "experience" warns against gender-sensitive earnings thresholds (not that such a claim would be "reasoned").

To the contrary, it is easy to develop a gender-sensitive earnings threshold for GE Programs. Assume a cohort of completers at DuVall is 90 percent female and 10 percent male and that the American Community Survey shows that, in Texas, the median male high school graduate

---

[28] Defendants acknowledge the possibility of adjusting the earnings threshold calculation to account for gender rather than adjusting the D/E Rates and EP calculations. AACS Plaintiffs adopt it as an even simpler solution for the purpose of this argument.

earns $30,000 per year and the median female high school graduate earns $20,000 per year.  To create a gender-sensitive earnings threshold for DuVall, the Department would do a simple calculation: ($30,000 x 10% male completers) + ($20,000 x 90% female completers) = $21,000 earnings threshold.[29]  If DuVall's completers earned a median income of $21,000.01 or more, it would pass the EP test, and the gender wage gap would be accounted for.  This is not "infeasible," particularly given the massive undertaking that Defendants have brought on themselves to calculate D/E Rates and EPs for every academic program in America (with 30 or more completers).

Defendants argue that a standard adjustment to completers' earnings could "misrepresent the true median earnings of graduates from a given program."  Gov't Brief at 62.  AACS Plaintiffs challenged Defendants' reasoning, arguing that it is illogical and inconsistent for Defendants to refuse a standard upward adjustment (for women) because it might cause overstated earnings while, at the same time, to allow a downward adjustment of eight percent (for tipped employees) that is *known* to cause understated earnings.  AACS Brief at 36-37.  The government's cross-motion fails to acknowledge or respond to AACS Plaintiffs' argument, but in this circuit, "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Comm. v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).

The government's other argument—that it rejected standard adjustments because they may cause "year-over-year uncertainty"—fares no better.  Gov't Brief at 62.  There is no "certainty" when it comes to the GE metrics.  The D/E Rates and EP tests will use different data every year, leading to different year-over-year results.  The earnings threshold will be different every year as well.  When the math and the results, by rule, change every year, no school or agency can have

---

[29] This alternative does not require "dividing up a state's graduates into subgroups . . . to ensure a sufficient number of individuals for the calculation."  Gov't Brief at 61.  Any GE Program with 30 completers—no matter how many are men or women—would still be tested.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 50

"certainty" about whether a given program will pass the gainful employment tests.

In an apparent attempt to escape their burden under the APA, the government next defends its actions concerning demographics on the (false) basis that AACS "fails to . . . provid[e] any affirmative evidence that . . . demographic factors *are* the cause of any for-profit cosmetology program's failure, or that such programs due [sic] provide sufficient financial value to students." Gov't Brief at 62. No plaintiff in an APA case has a burden to affirmatively disprove an agency's factual claim or assumption. Rather, a plaintiff only "has the burden to show the [agency's] decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Butowsky v. Folkenflik*, No. 4:18-cv-442, 2019 WL 12373861, at *9 (E.D. Tex. Dec. 13, 2019), which it can do by showing, *inter alia*, that the agency "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *State Farm*, 463 U.S. at 43. Regardless, AACS Plaintiffs *did* provide affirmative evidence, using Defendants' own data, showing that demographics cause more cosmetology schools to fail. Mr. Hill's analysis of Defendants' data revealed "predominantly male programs mostly passing [the EP test] while predominantly female failing EP." Appx. 1628. His analysis also showed that, by adjusting the EP test to account for the wage gap that women face, 72 more cosmetology programs would pass. Appx. 1640. AACS Plaintiffs also pointed to evidence that cosmetology programs provide sufficient value to students. For example, DuVall's low four-percent loan default rate and the government's own study showing that students from for-profit cosmetology schools have better financial outcomes than cosmetology students at Not-for-Profit Schools." AACS Brief at 10, 45; Appx. 1607-08.

Last, Defendants accuse AACS Plaintiffs of "ignoring" another Cellini study "suggest[ing] that programs could improve their graduates' outcomes by simply lowering their tuition." Gov't

Brief at 62.  This argument is ludicrous.  Of course there would be no student debt crisis if schools charged low (or no) tuition.  That does not mean the solution is reasonable.  Furthermore, AACS Plaintiffs have demonstrated that cosmetology students do not pay much and leave with very little debt.  *See, e.g.*, Appx. 1606-07, 1612.  But most important, the Final Rule's EP test undermines Defendants' argument.  Lowering tuition may improve a completer's debt-to-earnings ratio, but it has no effect whatsoever on a completer's "earnings premium."  Cosmetology schools could charge $0, but that would not affect how much cosmetologists earn in the workforce.

Separately, AACS Plaintiffs note in opposition to the government's cross-motion that Defendants have failed to consider and explain their rejection of relevant evidence concerning the impact of demographics on student outcomes.  At least one of Defendants' own studies shows that a completer's earnings premium is affected by race and gender.  Sandy Baum—the same individual whose research Defendants use for their D/E Rates metric—concluded in 2014 that the "earnings premium also differs across demographic groups," noting that the premium was significantly greater for men compared to women and for Asian individuals compared to African American individuals.  Appx. 2132.  Neither the NPRM nor the Final Rule discusses this part of Baum's study even though it flatly contradicts Defendants' RA and other conclusions about race and gender.  The failure to reckon with contrary evidence is classic arbitrary decision-making. *Illumina*, 88 F.4th at 1060; *Universal Camera*, 340 U.S. at 487; *Butte Cnty.*, 613 F.3d at 194.

3.    <u>Ignoring Part-Time Work and Voluntary Non-Employment Is Not Reasoned Decisionmaking.</u>

The cosmetology industry has particularly high levels of part-time work and voluntary departures from the workforce.  *See* AACS Brief at 37-39.  The Final Rule arbitrarily ignores that unique characteristic, holding cosmetology and other highly female, highly minority programs to the same D/E Rates and EP metrics as every other GE Program.  *Id*.  Defendants have failed to

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                Page 52

elucidate a non-arbitrary reason for their decision.

The government rests its case on the truism that completers "face the exact same debt burdens regardless of how many hours they work." Gov't Brief at 52. But "agency action is lawful only if it rests on a consideration of the relevant factors and important aspects of the problem." *Data Mktg. P'ship*, 45 F.4th at 856 (quoting *Michigan v. EPA*, 576 U.S. 743, 750, 752 (2015)) (modifications removed). Simply acknowledging the status quo is not the same as considering the complications that part-time work and voluntary non-employment cause when deciding whether GE Programs prepare students for "gainful employment" using exclusively economic metrics.

Working part-time versus working full-time is not indicative of "program quality," which the Final Rule purportedly aims to measure. *See, e.g.*, 88 Fed. Reg. at 70,114. Rather, it is a personal choice that completers make after (or while) completing their programs. Nevertheless, Defendants' refusal to make any adjustments for part-time work adversely affects cosmetology schools, whose completers go into cosmetology specifically because "[t]here aren't many industries where an employee has as much choice about the number of hours they work." Appx. at 942. Defendants' refusal to account for part-time work throws the Final Rule's entire "value" paradigm into disarray. A cosmetologist making $30,000 per year working 20 hours per week is getting more "value" for her time, effort, and education than a nursing assistant making $40,000 per year working full-time. Under the logic of the Final Rule, the cosmetologist's job is "lower value" simply because her gross earnings are less than the nursing assistant's. But the cosmetologist's job is more enriching on a per-hour basis.

During rulemaking, Defendants had evidence that part-time work drives down earnings as well as the converse: when adjusting cosmetologists' part-time schedules to a 40-hour work week, their jobs are relatively lucrative. For example, the Qnity Study indicates that, when adjusted for

a 40-hour work week, 24 percent of cosmetologists working as W2 employees would make over $100,000 per year. Appx. 935. Neither the Final Rule nor the NPRM reflect any appreciation or consideration of this fact, notwithstanding the commands of the APA.

Furthermore, even if the Court accepts Defendants' non-answer to this issue, it still does not solve the problem that part-time work poses to the EP test. The EP test has nothing to do with debt. If, hypothetically, all graduates of a cosmetology GE Program completed their training with $0 in debt, that cosmetology program still would not be eligible to participate in Title IV unless it also clears the EP hurdle. Given the acknowledged prevalence of part-time work in cosmetology and similar industries, *see* 88 Fed. Reg. at 70,044, GE Programs in those fields will necessarily be at a disadvantage in passing the EP test. Defendants' data bear this out. According to their own statistics, no cosmetology schools will fail the D/E Rates metric alone. 14.8 percent will fail both the D/E Rates and EP tests. But 51.1 percent will fail *only* the EP test. Appx. 1618. This comes as no surprise. AACS Plaintiffs showed—and Defendants never refuted—that cosmetology students finish school with little debt. Yet the EP test appears tailor-made to kill off cosmetology programs. Defendants' irrational disregard for part-time work is a significant reason why.

The government notes that the earnings threshold that GE Programs must clear to pass the EP test "include[s] part-time workers," and that institutions need only show that half their completers earn above the threshold. Gov't Brief at 52-53. Defendants do not deal with the problem or evidence before them. AACS Plaintiffs showed that the beauty and wellness sectors have a significantly higher percentage of part-time workers than the general population. In addition to the studies cited *supra*, one salon advised that 40 percent of its salon employees worked part-time by choice. Appx. 2144. Two studies by the International SPA Association found that almost 50 percent of positions in the spa industry are part-time. Appx. 2148; Appx. 2182. In

contrast, between 10.7 and 13 percent of men, and 25.6 and 25.8 percent of women, are employed part-time in the general workforce according to a study cited by Defendants.  Appx. 2268.

Defendants assert that the intention behind the EP test is to terminate programs whose completers "earn no more than *comparable* high school graduates."  88 Fed. Reg. at 70,079.  If that is Defendants' goal, then the EP was capriciously designed.  Measuring the earnings of completers in a field with demonstrated high part-time work against the earnings of the general populace of high school graduates is not "comparable," nor does it accurately measure the relative economic benefits of their respective educations.

Defendants further claim that it is not "feasible" to apply a multiplier to earnings data to account for part-time work or to survey GE Program completers to compute an adjustment for part-time employment.  Gov't Brief at 53.  This differs from their record reasoning.  *See* 88 Fed. Reg. at 70,044 (arguing only that it is "important" that students can afford debt payments and that the earnings threshold includes high school graduates, "some of whom" work part-time).  An agency "must defend its actions based on the reasons it gave when it acted."  *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023).  Defendants' reliance on a new explanation in their brief is considered in this circuit to be evidence of arbitrary decisionmaking.  *Data Mktg. P'ship*, 45 F.4th at 856; *Wages & White Lion Invs.,* 16 F.4th at 1140.

AACS Plaintiffs established in their motion that, due to the (undisputed) high percentage of female cosmetologists, the median earnings of cohorts from cosmetology programs will be depressed as compared to cohorts from other fields.  AACS Brief at 38-39.  The reason, established by at least two studies and myriad personal accounts in the administrative record, is that women in their twenties and thirties are far more likely than men to work part-time or voluntarily leave the workforce entirely, whether that is to care for a parent or start a family.  *Id*.  Defendants deny

this, claiming that they have "assessed the completers included in the metrics—who are recent graduates—as highly motivated to be employed," and that there is nothing in the administrative record proving them wrong. Gov't Brief at 53. The government's defense—that completers are "highly motivated to be employed" three years after school when their earnings are measured—is a pure assumption. They argue that they may "reasonably assume GE program graduates want to work," and they attempt to shift the burden to AACS Plaintiffs to identify materials in the record *dis*proving them. Gov't Brief at 53-54. Defendants are wrong. The affirmative burden is on them to "explain all of the key assumptions embedded in [the] new regulation[ ]," even for propositions that they claim are "common-sense." *Nat'l Ass'n of Mfrs.*, 105 F.4th at 815. Simply labeling graduates as "motivated" is an unjustified and unexplained shot in the dark, and Defendants point to no evidence in the administrative record about the motivations of women in their twenties and thirties to stay in the workforce—likely because all the evidence points the other way.

Agency action is arbitrary and capricious if the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *BNSF Rwy. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). Though AACS Plaintiffs have no affirmative burden to disprove the government, they did anyway. For example, the Qnity Study that Defendants rely on trumpets the flexibility of the cosmetology industry. It states that flexibility of hours makes cosmetology a "top career choice." It notes, "The fact that so many choose to work less than full time demonstrates how much career professionals view this as a benefit." Appx. 941. The same study finds that 80 percent of employers offer scheduling flexibility. Appx. 942. Another study Defendants rely on indicates that women have "periods with no earnings (for example, women who leave the labor force for childbearing/child rearing)" and found that women are far more likely than men to "be out of the labor force for spells of time."

That study indicates that these periods of reduced (or no) earnings affect "20- and 30-year olds . . . because this is the time when they are raising their own children." Appx. 813. The ages when women are often out of the workforce line up exactly with the ages of the high school graduates whose earnings make up the earnings premium. 88 Fed. Reg. at 70,060 ("Across all credential levels, the average age three years after graduation is 30 years old, and the range from 25th to 75th percentile of program age . . . is 27 to 34 years old.").

Underlying the government's top-level assumption—that recent graduates are "motivated" to work—are two more assumptions. The first is that being "motivated" to work is the same is "actually" working. This is not always the case; family necessities might take a "motivated" worker out of a job, and that has nothing to do with her education. The second is that Defendants assume a student's attitude will remain static from the day she enrolls through the third year after finishing school. If common sense tells us anything, it is that young people's minds change.

Defendants turn to alleged "survey evidence that postsecondary students' primary goal is to get a better job." Gov't Brief at 54. That may be true for the respondents measured in the surveys, all of whom "plan[ned] on enrolling in a two-year or four-year college." Appx. 2399; Appx. 2411-12.[30] Cosmetology programs, which funnel roughly half their completers into part-time work, are entirely different, and Defendants have no evidence on the goals of those students.

The government claims it can ignore part-time work because it is "important to . . . capture the labor market outcomes of program graduates." Gov't Brief at 54. This response, unsupported by any evidence or reasoning, fails to show any "consideration of the relevant factors and important

---

[30] The government did not produce one of the studies in full, but instead relied on a newspaper article that "obliquely"—to borrow their word—describes it. Nevertheless, this study questioned respondents about the factors they consider in choosing a college, including the existence of varsity sports and "campus life." Appx. 2412. It plainly focused on traditional college-bound students.

aspects of the problem" of part-time work and voluntary non-employment. *Data Mktg. P'ship*, 45 F.4th at 856. Defendants can capture and report the "labor market outcomes of program graduates" without penalizing GE Programs whose completers choose to be less than fully employed. In fact, they already do using the College Scorecard.[31]

Next, the government argues that institutions can control "many factors affecting GE programs' performance in the [D/E Rates and EP] metrics," including the tuition they charge, "workforce experience" they provide, and other aspects of running a college. Gov't Brief at 54-55. Whatever Defendants' point is, it is not responsive to the problem before the agency: part-time workers earn less than full-time workers, and cosmetology GE Programs have an unusually high number of part-time workers. *See, e.g.*, Appx. 2144; Appx. 2148. The working schedule that completers choose to adopt is definitively *not* something institutions can control.

Defendants also refer to a study allegedly suggesting that for-profit programs "may not be preparing" students for careers as well as programs at Not-for-Profit Schools. Gov't Brief at 55. The study Defendants reference—authored by Cellini—is contradicted by another study in the record—*also authored by Cellini*. As AACS Plaintiffs showed, Cellini finds that completers of for-profit cosmetology programs have better outcomes than those who attend cosmetology programs at Not-for-Profit Schools. *See* AACS Brief at 45. Defendants do not address this point. Their apparent failure to consider the contrary evidence is arbitrary, while their failure to contest AACS Plaintiffs' argument amounts to a waiver of the issue. *Illumina*, 88 F.4th at 1060; *Butte Cnty.*, 613 F.3d at 194; *Kellam*, 2013 WL 12093753, at *3; *Reagan*, 596 F.3d at 254.

---

[31] *See* Press Release, U.S. Dep't of Educ., New Updates to College Scorecard Make Tool More Useful for Students and Families With Data About College Costs, Graduation Rates, and Post-College Earnings (Oct. 31, 2023) (stating Department "restored several metrics" including "post-college earnings") (available at https://www.ed.gov/about/news/press-release/new-updates-college-scorecard-make-tool-more-useful-students-and-families).

Defendants' final arguments relate to the high school graduates whose median earnings comprise the earnings threshold to pass the EP. Defendants argue that they made it easier for GE Programs to pass the EP test by including, in the earnings threshold, high school graduates "in the labor force," *i.e.*, "those who were not working but were looking for or available to work"; that it is appropriate to compare *all* postsecondary program graduates (including those who have opted out of the workforce) with high school graduates "in the labor force"; and that using high school graduates "in the labor force" is "standard procedure" when measuring the value of college. Gov't Brief at 56-57. These three claims are meritless.

To the first, adding high school graduates "not working but . . . looking for . . . work" into the earnings threshold cures nothing. The problem that commenters identified—that individuals who *voluntarily* leave the workforce altogether will drive down a school's median earnings through no fault of the school (*see, e.g.*, Appx. 2427)—is not mitigated by adding individuals actively looking for work in the earnings threshold. Persons looking for work may eventually get work; but persons who have chosen not to work (to raise a family, to care for parents, etc.) will by definition not take a job.

To the second, Defendants' argument is just a re-hash of their baseless and disproven assumption that completers of GE Programs are "motivated" to be in the workforce for the first three years after finishing school. AACS adopts its earlier argument *supra* at 55-57.

The third argument suggests a lack of candor. Defendants claim that using "high school graduates *in the labor force*" is "standard procedure" for measuring the value of a degree, citing the Final Rule and a study. Gov't Brief at 57. But what the Final Rule *actually* says is: "Comparison to the earnings of those *with only a high school diploma* has long been the measure of the . . . value" of a degree. 88 Fed. Reg. at 70,054. The difference is subtle, but critical. Being

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**                    Page 59

"in the labor force" means working or available and looking for work. *See* Gov't Brief at 56-57. In contrast, "those with only a high school diploma" means exactly what it says: anyone with a high school degree, including those who (like many cosmetologists) have chosen not to work.

In essence, Defendants have changed their tune about what is "standard." In the Final Rule, Defendants claimed that it is standard to compare all completers of a postsecondary program (whether in or out of the workforce) with all completers of high school (whether in or out of the workforce). Now that the Final Rule is under attack, Defendants claim it is standard to compare all completers of a postsecondary program (whether in or out of the workforce) with high school graduates "in the labor force." Defendants' change in their story is a post-hoc rationalization evidencing arbitrary action. *Data Mktg. P'ship*, 45 F.4th at 856; *Wages & White Lion Invs.*, 16 F.4th at 1140.

Worse yet (for Defendants), the studies they cite actually prove that a proper "earnings premium" is calculated by comparing full-time workers with full-time workers, exactly as commenters proposed. The first study calculated the "college wage premium" using "the log weekly earnings of *full time, full-year workers*." Appx. 2457 (emphasis added). Graduates who had opted to work part-time or not work at all were not included in their calculations.[32] The second study was even more direct. Its author found that "most commentaries choose to report only one number. That number is usually the difference between median earnings of individuals with bachelor's degrees and those with only high school diplomas . . . *working full time, year-round*." Appx. 2131 (emphasis added). This is even what the U.S. Census Bureau does. *Id*. Defendants'

---

[32] This study also undermines Defendants' definition of the phrase "gainful employment." When calculating the share of high school graduates in the workforce, the researchers "use[d] individual-level data on *all labor force participants (those reporting a gainful occupation)* aged 14 years or older . . . ." Appx. 2985 (emphasis added). For these researchers, a paying job is all it takes for employment to be "gainful." Defendants did not address this at any point in the rulemaking.

choice to abandon this methodology is unsupported and arbitrary.

    4.    <u>Disregarding the Coronavirus Pandemic is Arbitrary and Indefensible.</u>

The first time the Department measures the D/E Rates and EPs of AACS member schools, it will use earnings data from the years 2021 and 2022. AACS Plaintiffs proved that, in those years, the earnings of cosmetologists and workers in similar industries were unusually depressed due to the coronavirus pandemic. AACS Brief at 39-41. Defendants admit as much. *See* 88 Fed. Reg. at 70,065. Defendants refuse to make any adjustments or to simply delay the Final Rule for a year or two to allow for cosmetology earnings to return to normal. This is arbitrary and unfair.

Contradicting their admission in the Final Rule, Defendants now argue that the worst of the coronavirus pandemic "had passed" by 2021 and that there is "no evidence median earnings for that year will be significantly affected." Defendants further assail AACS Plaintiffs for putting "anecdotal" evidence into the administrative record, not "offer[ing] any concrete earnings data" to disprove their claim or an analysis of College Scorecard data cited in the Final Rule. Gov't Brief at 63; 88 Fed. Reg. at 70,099.

To begin, Defendants act as if coming up with "concrete earnings data" in the 30 days they permitted for comments is doable for cosmetology schools. Unlike Defendants, cosmetology schools do not have the IRS at their disposal. And as history (and the Final Rule) show, Defendants would deem any earnings surveys "unreliable" and "implausible." *See supra* at 43-44. Regardless, AACS Plaintiffs do not have an affirmative obligation to disprove the government's assumptions. The burden to articulate a "rational connection between the facts found and the choice made" is on Defendants. *State Farm*, 463 U.S. at 43. Once commenters from the cosmetology and similarly affected sectors raised issues concerning the pandemic (*e.g.*, salons could not even open their doors because state licensing agencies were six to eight months behind, AACS Brief at 40), it fell to the government to "consider *all relevant factors* . . . and provide a response to significant points."

*Chamber of Com.*, 85 F.4th at 774.

Defendants did not respond to the "significant points" that cosmetology commenters raised. Their explanation artfully relied on general macroeconomic trends from all industries instead of dealing with comments specific to the beauty and wellness industry. For example, Defendants note the national unemployment rate, but say nothing about unemployment among cosmetologists. Gov't Brief at 63; 88 Fed. Reg. at 70,099. Similarly, Defendants claim (citing no evidence, and never having argued this point during rulemaking) that the earnings threshold could be lower if high school graduates' incomes also dropped during the pandemic, but fail to account for the fact that the general population of high school graduates are not employed in jobs as uniquely affected by the coronavirus pandemic as those in the cosmetology sector. *Id*. The Court need not take AACS Plaintiffs' word for it; Defendants admit that cosmetology schools are not helped by the supposed drop in the earnings threshold. Gov't Brief at 63-34 ("cosmetology programs are not in that category").

Defendants' College Scorecard analysis likewise reflects the use of general trends to whitewash the specific problems in the cosmetology industry. They argue that Scorecard data "did not lead to systematically lower measured median earnings for *all or even most* programs." 88 Fed. Reg. 70,099. But cosmetology commenters did not raise issues with respect to "all or even most programs"; they identified problems with *their* programs. As another example, Defendants argued that the "middle 50 percent of programs ranged from a decline in earnings of 4.2 percent to an increase in earnings of 4.0 percent . . . ." 88 Fed. Reg. at 70,099. But sharing the results for the "middle 50 percent of programs" necessarily *omits* the results for the most affected programs, like cosmetology. Defendants do not "provide a response to significant points" by covering up

industry-specific problems with general trends.[33]

     5.    <u>Defendants Fail to Justify Their Assumption that Quality Alternatives Exist.</u>

Defendants' conclusion that "higher quality" alternatives exists for any student whose schools is shut down by the Final Rule is arbitrary. Because Defendants have exempted programs with fewer than 30 completers from *all* D/E Rate tests, *all* EP tests, and *all* sanctions, Defendants have no data on the quality of more than 80 percent of programs to support their assumption that they are "higher quality" than "failing" GE Programs. *See* AACS Brief at 42-44.

Most of the government's responses fail to address the actual problem raised: that Defendants simply cannot judge the quality of "alternative" programs unless they apply the same D/E Rates and EP tests to them that GE Programs with more than 30 completers must pass. Defendants argue at length that there are many cosmetology programs that do not participate in Title IV programs, charge students less, and leave them with training "comparable" to GE Programs participating in Title IV, but none of this addresses the problem before the agency.

First, the government has no idea what outcomes students in non-Title IV programs achieve. All over the Final Rule, Defendants equate "high quality" with "good financial outcome." *See, e.g.*, 88 Fed. Reg. at 70,009. However, in the 2022 study Defendants cite as support, Cellini, wrote, "*We know little about the quality of non-Title IV cosmetology programs*, as data on completion, earnings, debt, and most other student outcomes are not available." Appx. 2483 (emphasis added). Cellini admits she had no data on earnings or financial outcomes for non-Title

---

[33] Defendants also state that they may "waive or modify regulatory provisions" in the future to respond to economic conditions. This is inconsistent with their claim that they are statutorily obligated under the HEA to ensure that programs prepare students for "gainful employment," and even if it were not, Defendants provide no explanation about when and how they would exercise their proclaimed authority to waive conditions in a non-arbitrary way.

IV students. *Id*. For all the government and Cellini know, students in non-Title IV programs may even take out private loans and leave school indebted. The government does not acknowledge Cellini's finding, let alone explain how its conclusions are consistent with it.

Second, the government arbitrarily uses licensure examination pass rates as a proxy for "quality." In their brief, Defendants claim that non-Title IV programs "produce licensed graduates" without Title IV dollars, and the 2022 Cellini study they cite measured program quality using licensure exam pass rates from Florida. *See* Gov't Brief at 62; Appx. 2483. But, as noted above, the Final Rule does not define "quality" as passing a state license examination; it defines "quality" by the amount of money a completer earns, how much debt they have, and nothing more. Passing a licensure exam does not equal a job that will allow a student to pay off a loan.

Third, Defendants failed to consider a significant factor: the availability of Pell Grants to students enrolled in Title IV-participating programs. Students in the "alternative" programs Cellini and the government espouse in their study and in the Final Rule cannot receive Pell Grants. 20 U.S.C. § 1070a(b)(1). Thus, while sticker-price tuition may be less for a non-Title IV "alternative" program, the ultimate cost to the student can often be less when a Pell Grant is involved.

The Cellini study that Defendants rely upon provides a perfect example. Cellini determined whether two non-Title IV programs are cheaper than one Title IV-participating programs based on tuition alone. *See* Appx. 2484-85. However, she admitted that, at the Title IV-participating school, 51 percent of students receive Pell Grants. Appx. 2484. If one actually does the math, Cellini's own study shows that students receiving Pell Grants can save money going to the Title IV-participating school rather than one of the non-Title IV schools:

| | Title IV School | Non-Title IV School |
|---|---|---|
| Tuition (esthetics program): | $13,550 | $12,300 |
| Pell Grant: | ($7,395)[34] | ($0) |
| **Net Cost to Student:** | **$6,155** | **$12,300** |

*Id*.  As Cellini admits, "[w]hat matters to the consumer (in this case a student) is the *net* price: gross tuition minus the amount of the subsidy."  Appx. 2519.

Fourth, Defendants' claim that it is "speculative" to conclude that institutions with Title IV-participating GE Programs will close when the Department terminates their eligibility is contradicted by research in the administrative record that Defendants failed to deal with.  Two studies (one by Cellini and one by Darolia) found that "restrictions on federal student aid at for-profit colleges led to enrollment declines within sanctioned institutions."  Appx. 2529 (citing R. Darolia, *Integrity Versus Access?   The Effect of Federal Financial Aid Availability on Postsecondary Enrollment*, J. OF PUBLIC ECON., 2013).  In her study, Cellini even admits that when schools lost Title IV eligibility because they failed Congress's cohort default rate test, it "led to widespread for-profit enrollment declines and closures."  *Id*.  Defendants' failure to address, anywhere in the record, the contrary evidence from their own two experts is arbitrary.  *Illumina*, 88 F.4th at 1060; *Universal Camera*, 340 U.S. at 487; *Butte Cnty.*, 613 F.3d at 194.

Fifth, the government relegates a nonsensical argument about standing to a footnote, claiming that AACS lacks standing to challenge the Final Rule's exclusion of GE Programs in U.S. territories from the D/E Rates and EP tests.  Gov't Brief at 72 n.47.  AACS Plaintiffs do not need special standing or a member school in a territory to argue that Defendants acted arbitrarily in exempting all GE Programs in the territories.  AACS Plaintiffs are simply using the Final Rule's

---

[34] https://studentaid.gov/understand-aid/types/grants/pell

exemption for GE Programs in the territories as more proof of its illogic, flaws, and caprice.  *See* AACS Brief at 43, 43 n.26.  Defendants do not contest the argument on the merits.

### 6.    Defendants Never Explain Their "Privacy" Justification.

The government's brief mentions "privacy standards" that it claims justify excluding any GE Program with fewer than 30 completers from all GE calculations and tests.  Gov't Brief at 18, 21 n.11, 41, 72.  These "privacy" restrictions are one of two bases that Defendants rely upon to support the 30-completer minimum; the other is the fact that Defendants use a 30-completer minimum for cohort default rate calculations.  *See* 88 Fed. Reg. at 70,046.  AACS Plaintiffs argue in their motion for summary judgment that the Department's decision to set the limit at 30 completers is arbitrary and capricious for want of a rational connection between the facts found and the choice made, as the APA requires.  *See* AACS Brief at 42-43; *BNSF Ry.*, 62 F.4th at 910.

Defendants failed to respond to AACS Plaintiffs' argument; nothing in their brief addresses this issue.  It is conceded.  Worse, nothing in the Final Rule addresses this issue either.  At no point in the Final Rule do Defendants specify the "standards" or "restrictions" they use, identify a legal or factual underpinning for them, or explain how they chose the number 30.  It simply appears out of thin air with vague references to an unnamed IRS policy, but Defendants could not even be bothered to identify the IRS policy (if there is one).  Plucking a number out of thin air is quintessentially arbitrary.  *See Celanese Chem. Co., Inc. v. U.S.*, 632 F.2d 568, 577 (5th Cir. 1980) (holding rate set by agency to be arbitrary where it "seem[ed] to have been pulled out of thin air"); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1153 (D.C. Cir. 2013) ("[A]n agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role.").  Defendants' resort to the fact that the cohort default rate uses an "n-size" of 30 does not salvage their decision.  Defendants give no reason in the Final Rule why the number of completers necessary for a cohort default rate calculation is a reasonable choice for a D/E Rate or

EP calculation. In fact, given Defendants' argument that the cohort default rate is *not* an adequate way of ensuring that a GE Program leads to "gainful employment" (*see, e.g.,* Gov't Brief at 24), if anything, it is illogical for Defendants to adopt its 30-completer minimum.

### E.    The Final Rule Violates the First Amendment's Speech Protections.

#### 1.    The Final Rule is an Unconstitutional Content-Based Burden on Speech.

##### a.    Defendants' Procedural Arguments Are Frivolous.

Defendants claim Plaintiffs "never raised" their First Amendment arguments "during rulemaking." Gov't Brief at 72. This is false. AACS made the same First Amendment arguments in its comment in the rulemaking, including a discussion of *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020). That case, on virtually identical facts, sustained a First Amendment challenge to a law that also burdened the ability of a trade school to teach its curriculum. *Compare* AACS Brief at 45-49 *with* Appx. 1150-52. Defendants even responded to AACS's arguments in the preamble to the Final Rule with much the same weak defenses that they offer here. *See* 88 Fed. Reg. at 70,069, 70,084.

Defendants also claim that Plaintiffs lack standing to raise their First Amendment arguments because Plaintiffs are "asserting First Amendment rights of unknown prospective students." Gov't Brief at 73. This also is untrue; Plaintiffs assert their own First Amendment rights. Defendants do not dispute that cosmetology training is speech protected by the First Amendment, and Plaintiffs are asserting their First Amendment rights to convey that speech free of the burdens that the Final Rule imposes. This is clear from the face of AACS Plaintiffs' complaint: "The instruction imparted by DuVall and AACS members . . . is protected by the First Amendment. Because it will force the termination of educational programs and the closure of institutions of higher learning, the Final Rule is a restriction on the speech of institutions and their faculties." Am. Compl., ECF 42, at ¶ 190.

In this regard, Defendants misread *Pacific Coast Horseshoeing*. Three plaintiffs sued in that case—the school, the owner of the school, and the student. 961 F.3d at 1066-67. All three plaintiffs asserted that the ability-to-benefit testing requirement violated their respective First Amendment rights. *Id*. The court found that the testing requirement violated the First Amendment rights of each plaintiff:

> There can be little question that vocational training is speech protected by the First Amendment. … And, important to this case, "[the school's and its owner's] right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated. … Furthermore, "the Constitution protects [the student's] right to receive information and ideas.

*Id*. at 1069 (citations omitted). That, as Defendants suggest (Gov't Brief at 72), there was only one horseshoeing school in California and there allegedly are other cosmetology schools for students to attend if Title IV cosmetology institutions fail the Final Rule makes no difference. Defendants do not dispute the fact that 50.4 percent of cosmetology GE Programs will fail the D/E Rates or EP tests and lose Title IV funding, 88 Fed. Red. at 70,139-40, or, in particular that plaintiff DuVall will not only fail and lose Title IV funding but also will cease to operate. Appx. at 1005-06, 1608. AACS Plaintiffs therefore clearly have standing to assert their First Amendment rights.

> b.    The Final Rule Discriminates Based on Content and Speaker.

Citing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), Defendants claim that the Final Rule passes First Amendment muster because it is merely an instance in which the government has "decided not to financially subsidize a private party's speech." Gov't Brief at 73. The holding in *Regan*—that there is no constitutional right to funds to exercise freedom of speech—has no application here because the government, through the HEA, has already decided to fund speech by providing financial aid for postsecondary education. Having made that decision to "subsidize" educational speech, the government cannot, as the Final Rule

does, pick winners and losers on access to funding based on what the educational speech teaches or who is doing the teaching. Unlike the Final Rule, the restriction in *Regan* was content-neutral because it applied to all lobbying by 501(c)(3) organizations regardless of content. *Regan*, 461 U.S. at 548. The other Supreme Court cases Defendants cite are similarly off point.[35] As emphasized by the Supreme Court in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)—a case AACS Plaintiffs cited that Defendants totally ignore—a law like the Final Rule is unconstitutional where, "[b]oth on its face and in its practical operation . . . [it] imposes a burden based on the content of speech and the identity of the speaker." *Id*. at 567.

Defendants insist that the Final Rule does not regulate speech "but simply the status of seeking continuing eligibility for Title IV funding." Gov't Brief at 74. But this is no different than the state's rejected argument in *Pacific Coast Horseshoeing*. There, the state argued that the law was only a form of "education licensing," 961 F.3d at 1069, but the Ninth Circuit observed that "when the Act is viewed in its entirety, it becomes clear that it controls more than contractual relations. It also regulates what kind of educational programs different institutions can offer to different students." *Id*. Here, the Final Rule directly regulates the creation and dissemination of GE Programs by subjecting them to the loss of Title IV funding if they fail the D/E Rates and EP

---

[35] *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009), upheld a state law prohibiting deductions from local public employee wages for political activities by their unions without regard to the content of the political speech. *Id*. at 355. In *U.S. v. Am. Library Ass'n, Inc*., 539 U.S. 194 (2003), the Court upheld a restriction conditioning federal assistance for internet access upon libraries taking measures to block access to obscenity or child pornography and, thus, is an example, like *Regan*, of a governmental decision not to fund speech, as opposed to the Final Rule that picks which speakers get federal assistance based on the content of what they say. *Id*. at 212. *Leathers v. Medlock*, 499 U.S. 439 (1991), upheld a state sales tax that, while applicable to cable and satellite broadcasters, was not applicable to newspapers and magazines because, despite the differing treatment of these modes of communication, the restriction was still content-neutral. *Id*. at 447, 449. Furthermore, the case also rested on the ground that differential imposition of a tax does not, without more, raise First Amendment concerns. *Id*. at 452-53. Defendants defend their GE regulations, not on Congress' taxing power, but on Congress' spending power. Gov't Brief at 19.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 69

metrics.  That a "failing" cosmetology school could theoretically still teach students who do not

need Title IV aid does not change the fact that it will destroy its ability to teach students who *do*

need Title IV aid.  The burden on the school's speech is no different from *Pacific Coast*

*Horseshoeing*.  Even if the horseshoeing school could teach students who passed the ability-to-

benefit test, it could not teach students who failed that test.  *Id*. at 1073.  This type of speech burden

is as unconstitutional as an outright speech ban.  *See Sorrell*, 564 U.S. at 566 ("Lawmakers may

no more silence unwanted speech by burdening its utterance than by censoring its content").

Defendants' further argument (Gov't Brief at 74-75) that the Final Rule does not

differentiate between speech or speakers based on content is belied by the very provisions of the

Final Rule.  It is undisputed that all postsecondary Title IV institutions with 30 or more completers

will be subject to the D/E Rates and EP metrics.  However, while GE Programs, like cosmetology,

will lose Title IV funding if they fail the metrics, undergraduate programs at Not-for-Profit Schools

who fail these metrics will not lose Title IV funding.  *See* 34 C.F.R. §§ 668.406; 668.603.  The

Final Rule thus unconstitutionally "picks winners and losers when it comes to which institutions"

must suffer the loss of Title IV funding upon failure of the metrics.  *Pac. Coast Horsehoeing*, 961

F.3d at 1071.  It does so based on the identity of the speakers (for-profit versus not-for-profit

institutions) and the content of what is taught (vocational instruction leading to a certificate, such

as cosmetology, versus undergraduate instruction leading to a degree, such as a B.A. in biology).

Moreover, it cannot be seriously contested that the Final Rule disfavors GE Programs, and

cosmetology programs in particular, given the disparaging references in the Final Rule to such

instructional programs as "low value" that perform "poorly."  *See, e.g*., 88 Fed. Reg. at 70,012,

70,017, 70,025, 70,030, 70,145, 70,151-52, 70,167, 70,173; *see also Sorrell*, 564 U.S. at 565

("strict scrutiny applies to regulations reflecting 'aversion' to what 'disfavored speakers' have to

say") (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)).

Defendants do not deny, as Plaintiffs argued (AACS Brief at 48-49), that a content-based restriction on speech is subject to strict scrutiny, which requires the government (not the plaintiff) to justify the restriction by affirmative proof of a compelling government interest that cannot be accomplished through less restrictive means. Defendants make no effort to demonstrate a compelling governmental interest or the existence of less restrictive means. Nor do Defendants claim that the provision of vocational education is commercial speech that can be regulated by measures that do not trigger First Amendment strict scrutiny analysis. The Court therefore should deem these points waived by Defendants and should not entertain any effort by Defendants to resurrect them in their reply brief. *Kellam*, 2013 WL 12093753, at *3; *Reagan*, 596 F.3d at 254; *cf. Louisiana*, 45 F.4th at 844. Accordingly, the Final Rule should be set aside as an unconstitutional, content-based restriction on Plaintiffs' speech.

### 2.    The Final Rule Unconstitutionally Compels Private Speech.

The "warnings" that the Final Rule requires a Title IV school to give to its students if the school initially fails either the D/E Rates or EP tests are unconstitutional, government-compelled private speech. AACS Brief at 49-50; *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). Defendants fail to distinguish *Book People* and offer no other convincing argument as to why these "warnings" are constitutional.

*First*, Defendants claim that the "warnings" are actually government, not private speech. Gov't Brief at 77. But the "warnings" here are no different than the state-mandated book ratings at issue in *Book People*. In *Book People*, booksellers had to adhere to whatever rating the state gave to the books at issue, whether the sellers agreed with them or not, and endure the fact that the sellers' names would be listed on a government website along with the government-mandated ratings. In other words, the sellers had to "speak as the state demands or suffer the consequences."

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 71

91 F.4th at 338.  Under the Final Rule, a failing GE program likewise must "speak as [Defendants] demand"; they will be listed on a government website with the name of the school and the fact that the program "failed" the D/E or EP metric, whether the school agrees with those metrics or not. The compelled nature of the speech in the instant case is actually worse than *Book People* because, in addition to enduring the website listing, schools with "failing" GE Programs must proactively send these "warnings" to students.  The book sellers in *Book People* had no such obligation.

Defendants note that whether speech is government speech depends on "'the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression.'"  Gov't Brief at 77 (quoting *Book People*, 91 F.4th at 337).  However, Defendants point to no "history" of any such required "warnings" to students by Title IV institutions.  There likewise can be no serious dispute that a written "warning" from the school—as opposed to a "warning" from the Department—will be perceived by a student as a statement from the school. In fact, the Department rejected continued use of the College Scorecard as an adequate alternative disclosure mechanism precisely because it was "not an adequate substitute for warnings *from participating institutions* that their GE programs are at risk."  88 Fed. Reg. at 70,083 (emphasis added).  In other words, Defendants intend that the communication be perceived as the school's communication.  And while schools are purportedly "free to communicate their own views regarding their value," Gov't Brief at 77, schools obviously will not be allowed to dispute the validity of the D/E Rates or EP tests that underlie the compelled message given that the Final Rule forbids a school from challenging those metrics in an earnings appeal.  *See* 34 C.F.R. § 668.603(b). In fact, it is likely that any effort by the school to dispute the metrics in communications to students would be regarded by Defendants as an unlawful "substantial misrepresentation" about the "nature

of [the school's] educational program, its financial charges, or the employability of its graduates." *See* 34 C.F.R. § 668.71(b) (describing "substantial misrepresentation"). Thus, there is no question that these "warnings" are government-compelled private speech.

*Second*, Defendants claim that the Final Rule falls into the "government operations" exception to the compelled speech doctrine. Gov't Brief at 77. This argument was rejected in *Book People* due to the paucity of precedent in the Fifth Circuit on what actually constitutes essential government operations required "'for the preservation of an orderly society.'" *Book People*, 91 F.4th at 339 (citation omitted). The book ratings in *Book People* were "unlike any information to which courts have applied the exception," *id*., and the same is true for the "warnings" mandated by the Final Rule. Moreover, the book ratings in *Book People* went "beyond a mere disclosure of demographic or similar factual information." *Id*. Similarly, the D/E Rates and EP metrics are anything but straightforward disclosures of plain factual information, but, instead, are laden with regulatory judgments concerning the "value" of GE Programs.

To support their government operations argument, Defendants cite *United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014), which rejected a First Amendment challenge to sex offender registration. Gov't Brief at 77. But the Fifth Circuit in *Book People* held that *Arnold* was not controlling in holding that the compelled book ratings were unconstitutional. 91 F.4th at 339. *Arnold* is even less relevant here where there not only are compelled website disclosures as in *Book People*, but also compelled proactive communications from a school to its students.

*Third*, Defendants claim that the "warnings" also "qualify for the 'commercial-speech' exception." Gov't Brief at 78. This argument fails because Defendants make no effort to demonstrate why the "warnings" compelled by the Final Rule are commercial speech. As noted by the Fifth Circuit, commercial speech is "speech which does no more than propose a commercial

transaction." *Book People*, 91 F.4th at 339 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (cleaned up)).  Defendants fail to explain how the "warnings" supposedly will propose a commercial transaction.  To the contrary, the "warnings" are designed to *discourage* a commercial transaction between the school and the "warned" student.

Even if the "warnings" were commercial speech, they can be constitutional only if they convey "'purely factual and uncontroversial'" information.  *Book People*, 91 F.4th at 339 (citing *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985)).  The warnings are anything but "purely factual" because, as shown above in greater detail, they are based upon metrics that Defendants themselves admit are at least, in part, factually inaccurate.  For example, if, during the first year, a cosmetology program fails the EP metric—a metric that Defendants claim measures whether there was an "earnings boost" for completers who took the course—the school will have to "warn" its students of this purported lack of an "earnings boost" even though the EP does not measure how cosmetology completers' wages actually fared when compared to similarly situated high school graduates.  Similarly, if DuVall fails the D/E Rates metric—a metric that Defendants claim measures "unaffordable" debt—DuVall will have to "warn" its students of this purported "risk" of "unaffordable debt" even though it is undisputed that DuVall completers repay their student loans at a rate of 96 percent.  Appx. at 1608.  Defendants fail to explain why providing students with such factually inaccurate and/or incomplete information would not be misleading to students.  Defendants' further assertion that the warnings are "noncontroversial" is nonsensical given the fact that the gainful employment issue has been the subject of intense litigation and Departmental flip-flops on a continual basis since 2011.  And, like the book ratings in *Book People*, the D/E Rates and EP metrics involve a "[b]alancing of a myriad of factors" and are "anything but the mere disclosure of factual information."  91 F.4th at 340.

**AACS PLAINTIFFS' CONSOLIDATED OPPOSITION AND REPLY**          Page 74

*R.J. Reynolds Tobacco Co. v. FDA*, Gov't Brief at 78, is not to the contrary because the plaintiffs in that case did not challenge the truth of the text of the cigarette warnings. 96 F.4th 863, 881 (5th Cir. 2024). The truth of the "warnings" at issue here is anything but "settled." Moreover, the Final Rule reflects an ongoing regulatory and policy debate as to the "value" of GE programs stretching back to 2011 which cannot reasonably be characterized as "noncontroversial." *See id*. ("A factual statement is 'controversial' under *Zauderer* where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute").[36] Therefore, the "warnings" requirement of the Final Rule should be set aside as compelled private speech that violates the First Amendment.

## IV.    CONCLUSION

Defendants failed to establish the legality and rationality of their latest "gainful employment" regulations in the Final Rule, and their cross-motion fares no better. The Court should enter judgment in plaintiffs' favor and set the Final Rule aside.

---

[36] The out-of-circuit cases cited by Defendants (Gov't Brief at 78) also are off point. The First Amendment challenge failed in *American Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020), because the compelled disclosure of hospitals' standard charges was purely factual information contained in the hospitals' contracts. *Id*. at 540. This is different from the Final Rule, which requires a school to transmit to students a regulatory conclusion of the Department that is based on admittedly flawed data. The compelled disclosures in *Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022), were constitutional because the information that attorneys were required to convey was purely factual, *i.e.*, that stopping a medication without a doctor's advice could be harmful and that a particular medication or device was approved by the FDA—information that was "entirely anodyne." *Id*. at 418.

Dated: December 20, 2024                    Respectfully submitted,

                                  /s/ Drew T. Dorner
                                  John M. Simpson (admitted *pro hac vice*)
                                  Drew T. Dorner
                                  Duane Morris LLP
                                  901 New York Avenue NW, Suite 700 East
                                  Washington, D.C.  20001-4795
                                  Telephone: +1 202 776 7800
                                  Fax: +1 202 776 7801
                                  JMSimpson@duanemorris.com
                                  DTDorner@duanemorris.com

                                  Joakim G. Soederbaum (Texas Bar No. 24091338)
                                  Duane Morris LLP
                                  777 Main Street, Suite 2790
                                  Fort Worth, TX 76102
                                  Telephone:  +1 817 704 1000
                                  Fax:  +1 817 704 1001
                                  JSoederbaum@duanemorris.com

                                  Edward M. Cramp (admitted *pro hac vice*)
                                  Duane Morris LLP
                                  750 B Street, Suite 2900
                                  San Diego, CA 92101-4681
                                  Telephone: +1 619 744 2200
                                  Fax: +1 619 744 2201
                                  EMCramp@duanemorris.com

                                  *Attorneys for American Association of Cosmetology Schools and DuVall's School of Cosmetology, L.L.C.*