**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

---

AMERICAN ASSOCIATION OF
COSMETOLOGY SCHOOLS *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

        *Defendants*.

No. 4:23-cv-01267-O

---

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 5

    I.     The Secretary Has Statutory Authority To Promulgate the GE Regulations ........ 5

    II.    AACS's Challenge to 34 C.F.R. § 668.603 Lacks Merit ....................................16

    III.   The GE Regulations Are Not Arbitrary or Capricious .........................................19

         A.    The NFR Reasonably Chose Reported Earnings as the Best Available
             Data and Reasonably Explained Its Rejection of Proposed Alternatives
             (D.Br. III.A; O.Opp. II.A; A.Opp. III.D.1)...............................................20

         B.    The Metrics Reasonably Focus on Student Outcomes (D.Br. III.B;
             O.Opp. II.B; A.Opp. III.D.2, 3, 4) .........................................................25

             1. Part-time and non-workers ..............................................................26

             2. Demographic characteristics ...........................................................29

              3. Changes in economic conditions and the pandemic .........................31

             4. Application of EP Metric to Cosmetology Programs (A.Opp. II.C) ..32

         C.    The D/E Metric's Thresholds Are Neither Arbitrary Nor Capricious
             (D.Br. III.C;O.Opp. II.C) .......................................................................33

         D.    Plaintiffs Fail To Undermine the NFR's Analysis of Costs and Benefits
             (D.Br. III.D; O.Opp. II.D; A.Opp. III.D.5) .............................................35

         E.    The Department Adequately Explained Its 30-Completer Minimum for a
             Cohort (A.Opp. III.D.6).........................................................................38

    IV.   AACS Fails To Establish a First Amendment Violation ....................................39

         A.    The GE Rule Does Not Unconstitutionally Burden Speech ...................39

         B.    The Warning Requirement in § 668.605 Does Not Violate the Compelled
             Speech Doctrine ...................................................................................42

    V.    Any Relief Should Be Carefully Limited ...........................................................44

CONCLUSION ....................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .................................................................40

*AFT v. DeVos*, 484 F. Supp. 3d 731 (N.D. Cal. 2020) .............................................................39

*Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215 (5th Cir. 2016) .....................................21

*Ass'n of Private Colls. & Univs.* ("*APCU*") *v. Duncan*,
   870 F. Supp. 2d 133 (D.D.C. 2012) .................................................................................. 9

*APSCU v. Duncan*,
   No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) (unpublished) ...................9, 14

*APSCU v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015),
   *aff'd*, No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) ...........................9, 21, 24

*Ass'n of Proprietary Colls.* ("*APC*") *v. Duncan*,
   107 F. Supp. 3d 332 (S.D.N.Y. 2015) .........................................................................9, 15

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) ...................................................42, 43

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022) .................................................................25

*Chamber of Com. v. SEC*, 85 F.4th 760 (5th Cir. 2023) ...........................................................36

*Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) .....................................19

*DHS v. MacLean*, 574 U.S. 383 (2015) ............................................................................ 10-11

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) .............................................................19

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127 (D.C. Cir. 2022) ....................20

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020) .............. 7

*Harris Cnty. v. Eli Lilly & Co.*,
   No. CV H-19-4994, 2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) ...............................20

*Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024) .....................................................................41

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ...................................................24

*Indigenous Peoples v. U.S. Army Corps of Eng'rs*,
   132 F.4th 872 (5th Cir. 2025) ..........................................................17, 18, 20, 26, 30, 39

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................ 5-6

*Mex. Gulf Fishing Co. v. U.S. Dep't of Com.,* 60 F.4th 956 (5th Cir. 2023) ................... 16, 35, 38

*Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024) ........................................24

*Ohio v. EPA*, 144 S. Ct. 2040 (2024) ........................................................19

*Outsourcing Facilities Ass'n v. FDA*,
    No. 4:24-cv-0953-P, 2025 WL 746028 (N.D. Tex. Mar. 5, 2025) .................19

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) .............40, 41

*R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir.),
    *cert. denied*, 145 S. Ct. 592 (2024). ........................................43, 44

*Rust v. Sullivan*, 500 U.S 173 (1991) ........................................................40

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .....................................41

*Texas v. EPA*, 91 F.4th 280 (5th Cir. 2024) ....................................19

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ........................39

*United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) ....................................20

*United States v. Santos,* 553 U.S. 507 (2008) ....................................10

*Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) ............................. 7

## **Statutes**

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................................*passim*

5 U.S.C. § 706 ........................................................20

Higher Education Act ("HEA"), 20 U.S.C. §§ 1001 *et seq.* ........................................ 5

20 U.S.C. § 1036 ........................................................11

HEA Title IV, 20 U.S.C. §§ 1070-1099dd ........................................*passim*

20 U.S.C. § 1070 ........................................................14

20 U.S.C. § 1088 ........................................................5, 12, 41

20 U.S.C. § 1094 ...................................................................................................15, 18

20 U.S.C. § 1099c ................................................................................................14, 15

20 U.S.C. § 1134c ......................................................................................................11

20 U.S.C. § 1135c ......................................................................................................11

20 U.S.C. § 1161g ......................................................................................................11

20 U.S.C. § 1221 ........................................................................................................15

20 U.S.C. § 1221e-3 ....................................................................................................7

20 U.S.C. § 1231a ......................................................................................................15

20 U.S.C. § 3474 ..........................................................................................................7

## Regulations

59 Fed. Reg. 9526 (Feb. 28, 1994) ............................................................................13

59 Fed. Reg. 22348 (Apr. 29, 1994) ..........................................................................13

84 Fed. Reg. 31392 (July 1, 2019) ("2019 Rule") ................................................8, 12

NPRM, 88 Fed. Reg. 32300 (May 19, 2023) .....................................................*passim*

Final regulations ("FVT & GE Rules"), 88 Fed. Reg. 70004 (Oct. 10, 2023) ....................*passim*

34 C.F.R. § 668.8 ................................................................................................12, 13

34 C.F.R. § 668.13 .....................................................................................................17

34 C.F.R. § 668.26 .....................................................................................................16

34 C.F.R. § 668.81 .....................................................................................................16

34 C.F.R. § 668.603 .............................................................................16, 17, 18, 19

34 C.F.R. § 668.605 .............................................................................41, 43, 44

**Secondary Sources**

Baum, Sandy & Saul Schwartz,
  *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt*,
  THE COLLEGE BOARD (2006)................................................................................................34

Cellini, Stephanie Riegg & Kathryn J. Blanchard,
  *Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of
  Underreported Income,* POSTSECONDARY EQUITY & ECON. RESEARCH PROJECT
  (2022) ....................................................................................................................23, 24

Cellini, Stephanie Riegg & Turner, Nicholas,
  *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students
  using Administrative Data,* J. OF HUMAN RESOURCES, 54(2) (2022) ..................................28, 31

Qnity Institute, A Career in Pro Beauty (2023) ........................................................................22

## **INTRODUCTION**

It is the Federal Government's responsibility to be a good steward of taxpayer dollars, and the Department of Education's interest in doing so is particularly acute in light of the billions of dollars it disburses in Title IV aid, and the high levels of unpaid student debt that continue to plague many Americans who have sought some form of higher education. The Department's October 10, 2023 Notice of Federal Regulations ("NFR") not only set forth an accountability framework for career training programs (the gainful employment or "GE" regulations), but also established a new financial value and transparency (transparency or "FVT") framework that will, for the first time, publicly share crucial information about all Title IV-eligible programs so that students and their families can make informed enrollment and borrowing decisions. Plaintiffs in this case, on behalf of the cosmetology industry, focus their challenge on the accountability framework, where the NFR implements a statutory Title IV eligibility criterion that applies only to career training programs, which must "prepare students for gainful employment in a recognized occupation." Their statutory authority claims *only* impact that accountability framework, but the best meaning of the term "gainful" in the context of the Higher Education Act's investment of taxpayer funds in student training is that "gainful" means profitable, and Congress could not possibly have intended to waste taxpayer money on programs that leave students in unaffordable debt or no better off than when they started.

Plaintiffs' arbitrary-and-capricious claims are properly viewed as as-applied challenges, again to the accountability framework, based on what Plaintiffs claim are typical characteristics of cosmetology program graduates. However viewed, the Department's reasoned decisionmaking defeats each of those claims. Indeed, as this Court recognized when denying a preliminary injunction, the Department exhaustively considered and responded to comments on the same

subjects Plaintiffs raise. In particular, the Court should reject Plaintiff American Association of Cosmetology Schools ("AACS")'s ongoing effort to draw the Court into a "battle of the experts," and consider material outside the administrative record. Instead, the Department's analysis, including its review of studies showing the availability of lower-cost cosmetology programs outside Title IV, ruled out many of the supposed problems Plaintiffs complain of and warrant significant deference. AACS's arguments on that front should be disregarded, and Defendants' pending Motion to Strike AACS's offer of extra-record material should be granted.

Nor should the Court credit the list of supposed "concessions" that AACS offers without citation in its introduction to its opposition brief. AACS again tries to bypass or ignore applicable Administrative Procedure Act ("APA") standards, where the Court's review is based on the administrative record and the parties did not submit or respond to statements of undisputed material fact. To the extent relevant, Defendants addressed AACS's contentions on these points in their opening brief and further respond herein.  In particular, Defendants explained:

1. The record supports—and AACS has conceded—that many cosmetologists, particularly those who receive W-2s, do report all or most of their income. D.Br. 49.[1] The Department reasonably concluded that aggregate reported earnings of a completer cohort of a particular program are the best available data regarding that program's earnings levels. Even assuming an average level of underreporting by cosmetologists of 8 percent as a general matter, commenters failed to identify any feasible way to attribute any particular level of underreporting to any particular cosmetology program.

---

[1] Defendants refer herein to their opening brief in support of their motion for summary judgment and in opposition to Plaintiffs' motions [ECF 34] as "D.Br."; AACS's reply/opposition [ECF 50] as "A.Opp."; and Ogle School's reply/opposition [ECF 40] as "O.Opp." As with their opening brief, Defendants file a combined reply responding to both sets of Plaintiffs' separate briefs and adhere to the agreed-upon page limit set forth in the parties' proposed briefing schedule [ECF 25].

Meanwhile, the Department's revised methodology is already estimated to bump lower earnings levels by 20 percent. These were just a few reasons among many that the Department identified in support of its reasonable rejection of an across-the-board compensatory adjustment. *See* D.Br. 38-50; *infra* III.A.

2. The Department reasonably rejected the proposed alternative of alternate earnings appeals given its earlier experience and later studies suggesting such appeals are not feasible nor do they result in accurate or reliable earnings assessments for a particular program. *See* D.Br. 11-12, 41-50 & n .23; *infra* III.A.

3. The Department reasonably responded to concerns raised about part-time or non-employment. *See* D.Br. 52-57; *infra* III.B.1.

4. The Department's statistical analyses are entitled to deference and provided a sound basis for rejecting commenters' concerns that demographic factors undermined the metrics' reliability; the supposed "multicollinearity" issue that AACS raises is based on its purported expert's flawed understanding, and because the purported expert's testimony should be stricken pursuant to Defendants' Motion to Strike, arguments based on that expert should be disregarded; the Department provided sufficient information with the NPRM to allow for meaningful comment, and no commenter requested more. *See* D.Br. 57-62; Def. Mot. to Strike [ECF 36]; *infra* III.B.2.

5. The Department reasonably responded to concerns raised about the impact of the pandemic or of future unexpected events on the metrics. *See* D.Br. 63-64; *infra* III.B.3.

6. The NFR's reference to ECARs in its description of how a GE program's loss of Title IV eligibility would be implemented in different circumstances nowhere suggests that ECARs may be used to circumvent Subpart G procedures where a Program

3

Participation Agreement is currently in effect. *See* D.Br. 31-37; *infra* II.

7. In sum, through the NFR, the Department reasonably seeks to ensure all Title IV taxpayer funds are responsibly spent, whether on proprietary or non-profit programs, and whether on Pell grants, such as those often received by proprietary cosmetology program students, or on Title IV loans. The NFR's accountability framework applies to GE programs based on that category's statutory definition and eligibility criteria while for the first time, the NFR also institutes a transparency framework applicable to all programs seeking to maintain Title IV eligibility.

AACS's novel First Amendment claims—also focused solely on the accountability framework—should also be rejected. The GE regulations seek to implement statutory eligibility criteria for the expenditure of federal money that the Department is responsible for safeguarding. The notion that this effort amounts to an unconstitutional burden on speech, simply because the funds help students receive instruction, contradicts established Supreme Court authority and would open the door to unwarranted First Amendment scrutiny of everything the Department does.

Summary judgment should be granted to Defendants on all counts. But even if the Court grants judgment to Plaintiffs on one or more claims, it should limit any relief to what is necessary to remedy the corresponding injury. In particular, the NFR encompasses two separate frameworks—the GE accountability regulations, which Plaintiffs challenge as applied to cosmetology programs, and which can affect a career training program's Title IV eligibility; and the transparency regulations that simply seek to provide students with information about all programs. At the very least the Court should leave the latter intact so that students can have as much information as possible when making crucial decisions about their future.

## ARGUMENT

**I.    The Secretary Has Statutory Authority To Promulgate the GE Regulations**

As explained in Defendants' opening brief, the Higher Education Act (HEA) imposes an express statutory condition on postsecondary career training programs' Title IV eligibility—namely, that such a program must "prepare students for gainful employment in a recognized profession." 20 U.S.C. § 1088(b)(1)(A)(i). Only if a GE program meets this eligibility criterion may it enroll student recipients of Title IV aid, including grants and loans, and thereby reap its own financial benefit. The Department has interpreted this language in the instant rulemaking, consistent with Congress's intent to ensure a return on the government's investment, as requiring GE programs to "actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation." Notice of Proposed Rulemaking (NPRM), 88 Fed. Reg. 32300, 32342 (May 19, 2023). The Department also properly recognizes that students are not prepared for "gainful" employment if a program is designed to leave its graduates financially worse off than when they started. *Id.* at 32343. In that situation, Congress's intent is frustrated, and the allocated taxpayer funds serve no purpose but to enrich schools even as students—Title IV's intended beneficiaries—are harmed. All relevant tools of statutory construction confirm the Department's view of the best meaning of the statutory language. *See* D.Br. at 17-31.

Plaintiffs' contrary arguments fail.[2] Ogle continues to insist that the statutory language

---

[2] Defendants indicated in their opening brief that the Court should disregard AACS's arguments on this issue because AACS's complaint failed to raise a claim on this ground. D.Br. 15 n.7. AACS has now filed an amended complaint including this claim, *see* AACS Am. Compl. [ECF 42] ¶ 175, together with a 75-page combined opposition/reply brief that exceeds the parties' agreed-upon page limits. AACS cites no authority justifying its original attempt to seek summary judgment on a claim that had not yet been filed. Contrary to AACS's contention, A.Opp. 14, the Supreme Court's decision in *Loper Bright* did not impose an obligation on courts to analyze the "best meaning" of statutory language *sua sponte*, in the absence of a claim that implicates such issues;

must be read without regard to its context within a federal funding scheme. But willfully ignoring that context deviates from standard tools of statutory construction. It also would undermine Congress's intent and allow schools to escape accountability for designing GE programs that are unnecessarily costly simply to enrich themselves with taxpayer money. Indeed, Plaintiffs in this case epitomize the very problem that the GE regulations aim to address. The record shows that cosmetology programs are perfectly able to train students for rewarding cosmetology careers outside the Title IV framework, at a lower overall cost and at no cost at all to federal taxpayers. 88 Fed. Reg. at 70086; *cf.* D.Br. at 45 & n.26. "Ordinary people on the street," O.Opp. 2, unaware of the government's investment, might deem individuals "gainfully employed" if they earn money from their profession. But the initial investment of Title IV funds adds another factor to the calculus: Neither taxpayers nor Title IV aid recipients would likely deem their resulting employment "gainful" if it fails to offset the Title IV investment, and graduates are left financially worse off than when they enrolled. Ogle, like this Court and others before it, recognizes that "gainful" *can* mean "profitable," *see* PI Order at 7 & n.12; O.Br. [ECF 32] at 23 & n.10—and that is the term's best meaning when the investment of federal taxpayer dollars is at stake.

In fact, Ogle has largely abandoned the absurd notion that Congress had no concern at all with whether taxpayer-funded career training leaves its graduates financially better off than when they started. Instead, Ogle continues to argue against a statutory interpretation that the Department never made: It points out that the HEA does not identify a particular methodology for determining whether a career training program does in fact prepare its students for gainful employment, but of

---

rather, the decision simply addresses how courts should analyze such issues when they are raised. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398 (2024) (court's role under the APA is to decide questions of law when "relevant" to a party's claim). In any event, AACS's arguments largely duplicate Ogle's, and Defendants' briefing in its opening brief and herein serves to address them to the extent the Court considers them.

course, as explained in Defendants' opening brief, the Department has never suggested otherwise. D.Br. at 21-22. This is not a situation like *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020), cited by Ogle, which held that a statutory reference to "harvesting" was insufficient to expand regulatory *authority* beyond wild fishing to aquaculture. *See id.* at 465-66. Nor is it like *Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024), cited by AACS, which held an entire category of activity fell outside OFAC's power to sanction. *See id.* at 565-66 (concluding smart contracts did not qualify as "property" under the International Emergency Economic Powers Act).

Here, the Department is indisputably authorized to determine whether a career training program is eligible for Title IV funding. To the extent AACS suggests otherwise, A.Opp. 6-7, such a notion is untenable. Congress's imposition of eligibility criteria on the disbursement of federal funds necessarily calls for a determination of whether those criteria are met. *See* 88 Fed. Reg. at 70011. Absent such authority, the Department would be left powerless even to assess whether a program provides training leading to "paid" employment (consistent with Plaintiffs' mistaken interpretation), much less employment that is gainful—but AACS simply ignores that absurd result. Again, the Department has never purported to exercise "carte blanche" authority to "make up new eligibility criteria," A.Opp. 7, but instead has implemented a criterion that appears in the statutory text.[3]

---

[3] Nor has the Department solely relied on general rulemaking authority in 20 U.S.C. §§ 1221e-3 and 3474. *See* 88 Fed. Reg. at 70011. Rather, the Department cited those provisions to reinforce the Department's authority in administering Title IV, and particularly Title IV eligibility criteria. *See id.* Defendants have not waived reliance on those statutes when they were cited in the NFR and in Defendants' brief. Meanwhile, as noted *supra*, AACS's arguments in its opening brief related to no claim in its complaint.

The pages that Ogle spends criticizing the methodology adopted in the NFR, *see* O.Opp. 5-7, 9-11, are thus properly addressed to whether the GE Rule is arbitrary or capricious, not to any issue of statutory interpretation. Indeed, the Department has tried to refine its methodology with each new rule addressing this subject—which makes clear it has never taken the position that any particular methodology is statutorily required. *See* D.Br. at 7-10 (describing regulatory history). Even the 2019 Rule—which Ogle touts as reversing prior Department policy—never suggested that the goal of the statutory gainful employment language was to indiscriminately funnel taxpayer funds to any career training program, regardless of whether that program leaves students better off than when they started. Instead, the 2019 Rule disagreed with the methodologies adopted in prior 2011 and 2014 Rules. *E.g.,* 84 Fed. Reg. 31392, 31402 (July 1, 2019) ("The Department shares the concern of commenters who highlighted the need to protect low-income students and taxpayers from programs with poor outcomes, and from waste, fraud, and abuse. However, we do not believe the GE regulations are an effective tool for either of those purposes.").[4] Because the meaning of the statutory language is an issue separate from any particular method that the Department might adopt to implement it, Ogle's so-called "ultra vires" claim falls flat.

In addition to these overarching problems, Ogle rehashes previous flawed arguments that Defendants have already refuted. First, though Ogle argues otherwise, O.Opp. at 3-4, the prior decisions of other courts, and this Court, addressing the "gainful employment" language before *Loper Bright*, continue to carry persuasive weight in at least two respects: (1) their sound rejection

---

[4] Ogle misleadingly quotes the 2019 Rule's assessment that the *methodology* adopted by the 2014 Rule was "fundamentally flawed" (among other things because the Social Security Administration data it relied on was no longer available) as if that statement applied to the HEA's statutory interpretation, but none of the pages Ogle cites addresses statutory interpretation. *Compare* Ogle Opp. at 1, *with* 84 Fed. Reg. at 31392, 31402, 31410.

of the notion that the statutory language unambiguously requires Plaintiffs' preferred reading[5], and (2) their recognition of the absurdity of Plaintiffs' position.[6] The fact that prior decisions ultimately deferred to the Department's interpretation, as required under the law at the time, in no way affects the Court's ability now to agree that the Department's interpretation is the best one, considering the statutory language in context.

Second, rather than grapple with the statutory scheme, Ogle reflexively relies on the tired theory—rejected by all courts to have considered the issue—that "gainful employment" in the Title IV context necessarily means any paying job even when the pay is so low that GE program graduates are no better off, and the investment of taxpayer funds is essentially wasted. Ogle now tries to walk back its prior concession that "gainful" can mean "profitable" by cherry picking two online definitions of the whole phrase "gainfully employed" or "gainful employment" to support its "ordinary meaning" theory—the same one rejected by all prior decisions—that gainful can only mean "paid." O.Opp. at 8. But most dictionaries do not address the phrase as a whole—validating prior analyses focusing instead on each word separately—while the more closely contemporaneous *Black's Law Dictionary* 610 (5th ed. 1979) defines "gainful employment," in line with the Department's interpretation, as "any calling, occupation, profession, or work which one may profitably pursue."

Ogle points to the phrase "provide a program of training to prepare students" as suggesting the NFR's metrics inappropriately focus on outcomes rather than the "nature of the instruction"

---

[5] D.Br. 17-18 (citing *APC v. Duncan*, 107 F. Supp. 3d 332, 359 (S.D.N.Y. 2015) (quoting *APCU v. Duncan*, 870 F. Supp. 2d 133, 145-46 (D.D.C. 2012)); *accord APSCU v. Duncan*, 110 F. Supp. 3d 176, 185 D.D.C. 2015)).

[6] D.Br. 18-20 (citing *APSCU v. Duncan,* No. 15-5190, 640 Fed. Appx. 5, 8 (D.C. Cir. Mar. 8, 2016) ("it would be a perverse system that, by design, wasted taxpayer money in order to impose crippling, credit-destroying debt on lower-income students and graduates."))

that GE programs provide. O.Opp. at 9. It also repeats its prior criticism that the NFR's chosen methodology cannot be applied to every single program due to data and privacy constraints, suggesting that the Department has thus applied "different meanings in different factual contexts." O.Opp. at 10 (quoting *United States v. Santos,* 553 U.S. 507, 522 (2008)). But these attacks again conflate statutory interpretation with the NFR's chosen mechanism to implement that interpretation. The NFR adopted the metrics as a tool to measure whether a career training program in fact provides a program of training that prepares students for gainful employment. A "program of training" that leaves most students financially worse off and unable to repay their loans does not "prepare" them for employment that is "gainful." While Ogle runs in circles trying to refute that simple notion, it never stops to acknowledge that Congress indisputably imposed a specific eligibility requirement on career training programs and thus indisputably intended the Department to ensure that requirement is satisfied for every program to the extent it is able to do so.[7] Under Ogle's view, the Department should simply ignore its statutory obligation entirely by funneling Title IV funds to career training programs even where they demonstrably leave students worse off, enriching those programs at the expense of taxpayers and students alike.[8]

Third, to the extent Ogle does address context, its arguments fail to move the needle towards their absurdist reading. Ogle again misapplies canons of statutory construction when it focuses on other, non-parallel HEA provisions that simply demonstrate Congress's broad interest in avoiding waste of taxpayer funds. The case they cite, *DHS v. MacLean*, 574 U.S. 383 (2015),

---

[7] As Defendants have explained, the NFR's methodology covers over 80% of enrollments in Title IV-participating schools. D.Br. 72.

[8] To be sure, the Department's chosen methodology, though entitled to deference under the APA's arbitrary and capricious standard, is not set in stone, and there could be other ways to determine whether career training programs prepare students for gainful employment. Such possibilities in no way affect the best meaning of the statutory language.

held that Congress's omission of "rule or regulation" in a specific phrase was intentional where parallel clauses elsewhere in the statutory scheme included those terms. *See id.* at 391-92. As Defendants have explained, such authority addresses the situation where the same term appears, or fails to appear, in parallel clauses—which serve as relevant points of comparison for the very reason that they are parallel. D.Br. 24-25. But that principle does not apply here. None of the instances that Ogle identifies qualifies as a relevant point of comparison because none involves Congress's use of the term "gainful" in a parallel context or provision. The cohort default rate provision, for example, does not contain the word "gainful" but serves as an extreme fail-safe measure to catch severe school-level failures at the back end. D.Br. 25. That effort is perfectly consistent with Congress's desire to ensure at the front end—before any investment of federal taxpayer dollars occurs—that career training programs, in particular, provide training that prepares students for gainful employment.

Simply put, there can be no reasonable inference that Congress intended to waste taxpayer funding on career training programs that leave students no better off simply because Congress used different language in two entirely separate, non-parallel provisions. Similarly, the multiple instances where Congress did use the term "gainful" when restricting federal fellowship funds to students who, rather than studying, spend their time earning money elsewhere demonstrate the same concern that the investment of taxpayer money not be wasted, but instead yield the intended return.[9] Nor does Ogle succeed in showing that the "fixed meaning" canon precludes "gainful" from meaning "profitable," O.Opp. at 13, since the term can mean "profitable" in this context as well—which Ogle does not deny. After all, it is because students engaging in outside "gainful

---

[9]Ogle misleadingly refers to Congress's "repeated" use of the phrase "gainful employment" in other statutes, O.Opp. 12, without acknowledging that *all* such instances it identifies, 20 U.S.C. §§ 1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2), 1161g(d)(5)(B), are variations on the same theme—setting forth the same restriction on different graduate fellowships.

employment" would be profiting from that work, while failing to attend to their taxpayer-funded education, that such work is restricted. Ogle's arguments thus fail to support its preferred meaning of "gainful" as nothing more than "paid," even when yielding a net loss.

Fourth, Defendants have also refuted Ogle's historical arguments. D.Br. 27-29. Ogle continues to rely on the notion of Departmental "flip-flopping," but it fails to point to a single statement by the Department, throughout its history, adopting the notion that the statutory phrase "prepare students for gainful employment in a recognized profession" simply means "results in a paying job," regardless of whether a program's students are generally left no better off or unable to repay their loans. As Defendants have explained, the Department's initiation of rulemaking on this issue in 2011 did not result from a changed statutory interpretation but reflected its growing awareness that some career training programs were not preparing students for gainful employment, and the Department's revisions since then have reflected its efforts to improve its methodology (including in response to prior court decisions), not a change in statutory interpretation. D.Br. 27. The 2019 Rule stands as an example, particularly reflecting the Department's concern that accountability and transparency is needed for *all* programs, and that "the student loan repayment situation was more dire than we originally thought," while recognizing the "gainful employment" language specifically applies to career training programs. 84 Fed. Reg. at 31394. As explained, the NFR here sought to synthesize the Department's past efforts. Rather than flip-flopping on any interpretational issue, the Department has simply refined its approach with each new rule to ensure Title IV funds are spent responsibly.

Ogle also continues to err in its focus on the *Department's* use of the term "gainful" when promulgating § 668.8(g) (then § 668.8(e)) in 1994. The Department's concern in that provision was to implement a statutory subsection, 20 U.S.C. § 1088(b)(2)A), that required short-term GE

12

programs (between 300 and 600 clock hours) to meet additional requirements, including that they demonstrate a 70% success rate for their students to complete the program and find employment (were "placed") in a related field. *See* 59 Fed. Reg. 9526, 9531 (Feb. 28, 1994). The Department adopted a method to determine a program's placement rate based on how many students found related work ("obtained gainful employment in the recognized occupation for which they were trained or in a related comparable recognized occupation"), and had remained employed for 13 weeks, within six months of completing the program. *See id.* at 9532; 59 Fed. Reg. 22348, 22351, 22367-68 (Apr. 29, 1994); 34 C.F.R. § 668.8(g)(1)(ii). In other words, programs document *placement* (not gainfulness) through the methods identified in § 668.8(g)(2).

Ogle suggests that, because those methods focus on evidence that a completer is employed, through a statement from the student's employer or evidence of tax payments, the Department at the time thought "gainful" simply meant "paid." O.Opp. 15-16. But the provision simply assumed gainfulness when assessing a program's placement rate.[10] After all, Department promulgated § 668.8(g)(2) over fifteen years before it concluded that a separate methodology was needed to determine whether GE programs meet the separate eligibility requirement that they prepare students for gainful employment in a recognized occupation. Ogle's argument on this point thus fails for the same reasons its "flip-flop" argument fails. It ignores that, even though a term's meaning stays the same, the Department may adopt new regulations when it determines they are needed to adhere to that meaning.

While not relying on legislative history, the Department's statutory interpretation is most consistent with it. Ogle's point that early iterations of the phrase appeared in statutes that did not

---

[10] The Department could hardly do otherwise when assessing the placement rate only six months after program completion. The metrics now adopted by the Department look at median earnings of a cohort three years after program completion, allowing completers sufficient time to establish a higher earnings level. 88 Fed. Reg. at 32328-29, 32332-33; 88 Fed. Reg. at 70037.

provide loans, O.Opp. 16, actually weighs in the Department's favor. Evidence that Congress was concerned with a return on investment even before it started providing loans is an even stronger indicator that the specific statutory context here, including the government's investment of billions of taxpayer dollars in student grants as well as loans, requires "gainfulness" to be assessed with respect to the overall return on investment.

Ogle's final salvo tries to distinguish Congress's overall intent that Title IV aid help students and what it calls a "far more specific purpose" in 20 U.S.C. § 1070(a) to "mak[e] available the benefits of postsecondary education to eligible students . . . in institutions of higher education." O.Opp. 17. But Ogle ignores that "benefit" in that phrase is a synonym of "help" or "advantage." Title IV confers no benefits on GE program graduates if they are left no better off than when they started.[11] The best meaning of the statutory language here should be consistent with Congress's intent, not diametrically opposed to it. *See APSCU*, 640 Fed. Appx. at 8 ("It would be strange for Congress to loan out money to train students for jobs that were insufficiently remunerative to permit the students to repay their loans. And it would be a perverse system that, by design, wasted taxpayer money in order to impose crippling, credit-destroying debt on lower-income students and graduates."). Defendants should be granted summary judgment on this claim.

To the extent not addressed directly above, AACS's arguments again largely duplicate Ogle's and fail for the same reasons. AACS's additional focus on 20 U.S.C. § 1099c(b)(1) as somehow shedding light on the meaning of "gainful employment" continues to fall flat. As Defendants explained, the direction in that provision that the Department "prepare and prescribe a

---

[11] AACS similarly suggests President Johnson touted Title IV aid for its functional ability to make education "available" to students, without regard to whether that education actually helps them. A.Opp. 5. But the President expressly cited his expectation that such education would be beneficial to those who receive it. D.Br. 4. Any other understanding begs the question of why the federal government would invest money in this endeavor in the first place.

single application form" for schools to use when applying for Title IV participation has no bearing on Congress's intent that its investment of taxpayer funds in career training education not leave students in crushing debt or no better off than when they started. There is simply no connection between the two. Nor does § 1099c(b)(1) forever prohibit the Department from seeking further information from schools, including through the NFR's transparency framework. D.Br. 30-31; 88 Fed. Reg. at 70010-11. AACS has no answer to the fact that it is the Department that calculates the metrics, using in part data that it will have collected pursuant to authority that is entirely independent of the gainful employment language. *See* D.Br. 30 (citing 20 U.S.C. §§ 1094(a)(3), (5), 1231a(3)).[12] The fact that schools use a single application form does not by its plain terms prohibit the Department from drawing on information independently in its possession to assess a program's eligibility. AACS's attempt, yet again, to mischaracterize the Department's argument as suggesting the gainful employment language requires the NFR's metrics, in particular, and thus creating a "'chicken and egg' problem," A.Opp. 25, should be rejected. The NFR as well as the history of the Department's regulation in this area make clear that the metrics are simply tools to assess a program's value vis-à-vis the investment of Title IV taxpayer funds, including, for GE programs, whether a program prepares its students for gainful employment. AACS's repetition of this misguided argument, already rejected by other courts, D.Br. 21 (citing *APC*, 107 F. Supp. 3d at 362), does nothing to make it more persuasive.

---

[12] AACS suggests that the cited statutes do not authorize the Department to "demand" taxpayer earnings data from other federal agencies. A.Opp. 26. But the NFR makes clear that the Department has no plan to make such "demands," and nothing in the HEA prohibits the Department from obtaining such data, for example pursuant to a memorandum of understanding with such an agency. Moreover, information about programs' completers certainly informs the Department's assessment of the effectiveness of Title IV programs, consistent with 20 U.S.C. § 1221(c)(1). AACS cites no authority supporting its novel contrary argument.

**II.    AACS's Challenge to 34 C.F.R. § 668.603 Lacks Merit**

As Defendants explained in their opening brief, AACS's challenge to 34 C.F.R. § 668.603 also fails on the merits—not least because AACS appears to misunderstand the provision. D.Br. 31-37. That provision simply describes the administrative mechanisms through which Title IV eligibility would be terminated once a GE program becomes ineligible under the GE regulations—an outcome that can only occur once a program has failed the same metric for two out of three years. The provision recognizes that the precise mechanism for termination will depend on a program's Title IV certification status (which in turn determines whether it has a currently valid Program Participation Agreement ("PPA")) at the time it is deemed ineligible pursuant to the metrics. *Id.* 32-33 (describing the three possible circumstances that might apply, depending on whether a school is in the process of renewing its certification, has a currently valid certification, or has a provisional certification). Under longstanding Title IV law, only where a school has a currently valid PPA would the Department follow the Subpart G procedures to terminate a program's eligibility because the PPA is what confers any rights a school might have to those procedures. *Id.* 33-34 (citing 34 C.F.R. § 668.81(c)(1), (3), (4); *id.* § 668.26(a)(4), (5)).

AACS seeks to further confuse the issue in its opposition by misreading the provision's language as allowing for implausible scenarios that in fact could not occur. At the outset, AACS's accusation of post hoc rationalization merely highlights that its entire argument strays far afield of any concerns raised in comments. AACS purports to rely on a comment that proposed the Department dispense with Subpart G procedures altogether, regardless of a school's status. A.Opp. 28-29. But the Department in fact responded to that comment, *see* 88 Fed. Reg. at 70093, and thus fulfilled its obligation. *Mex. Gulf Fishing Co. v. U.S. Dep't of Com.,* 60 F.4th 956, 971 (5th Cir.

2023) (agency's obligation is to respond to "significant points" raised by comments). AACS instead seeks to fault the Department for failing to respond to a point that the comment did not make. Nor does AACS point to any other comment suggesting—as AACS now does—that Subpart G procedures are required in the circumstance described in § 668.603(a)(1). Far from establishing post hoc rationalization, AACS thus demonstrates that its claim on this point is forfeited. *See Indigenous Peoples v. U.S. Army Corps of Eng'rs*, 132 F.4th 872, 884 (5th Cir. 2025) (issues not raised during notice and comment are forfeited).

Second, AACS's implausible suggestion that the Department might use the ECAR process to avoid Subpart G even when there is a valid PPA in effect, A.Opp. 30, is mere speculation that is not supported by the NFR. Although AACS argues "there is nothing to stop" the Department from taking such a step, A.Opp. 30, nothing in § 668.603(a)(2) authorizes the issuance of a new ECAR without Subpart G procedures where Subpart G procedures would normally be required. AACS points to 34 C.F.R. § 668.13(b)(2), which provides that a school's certification is temporarily extended after the original period of participation expires until the Department issues a recertification decision. But as AACS concedes, the new ECAR in that scenario would not be issued during that interim period; it would only be issued *after* the Department's recertification decision, at a point when the original PPA has expired. Subpart G procedures are not required when issuing the new ECAR that will govern during the next period of participation.[13] In other words, far from serving as a mechanism to bypass Subpart G, § 668.603(a)(1) does not affect the Department's existing authority. Rather, it is merely descriptive, applying only when the

---

[13] AACS's example posits that, in the circumstance described by § 668.603(a)(1), a school could be taken by surprise if the Department issues a new ECAR reflecting its determination that a program has lost Title IV eligibility under the GE regulations. *See* A.Opp. 30-31. Not so. Schools would have received their programs' metric results well before that point, so they would be aware if any GE program had failed the same metric two out of the past three years.

17

Department is otherwise authorized to issue a new ECAR and when Subpart G procedures are not required.[14] In such a circumstance, when a program has failed the same metric twice in three years, the ECAR's omission of the program serves to recognize that the program has become ineligible.

While AACS also suggests that the word "if" in § 668.603(a)(2) is somehow problematic, A.Opp. 31, the provision means exactly what it says: A program's eligibility may be terminated at the completion of a Subpart G action *if* such an action is initiated. Otherwise, the program's eligibility is not terminated unless the circumstances in one of the other two subsections apply. Again, the fact that no commenter raised such specious arguments during rulemaking means that they are forfeited. *Indigenous Peoples*, 132 F.4th at 884. AACS essentially concedes any other objection to § 668.603(a)(2) by merely citing 20 U.S.C. § 1094(c)(1)(F) while identifying no basis to conclude that that provision has been violated. *See* A.Opp. 32.

Third, AACS largely abandons any objection to § 668.603(a)(3), which only applies to provisionally-certified schools. As Defendants explained, such schools' status may be terminated for failure to comply with Department regulations, which would include those promulgated by the NFR. D.Br. 35 (citing 20 U.S.C. § 1094(a)(21)). AACS's only response is to suggest that § 1094(a)(21) only requires schools to comply with accreditors' requirements, A.Opp. 32-33, but that interpretation improperly reads "the Secretary" out of the statute, and no case cited by AACS suggests that PPAs allow schools to disregard Department regulations. AACS fails to identify any basis for deeming § 668.603(a)(3) invalid.

AACS now devotes a separate section to its due process argument, but its claim continues to lack merit. As Defendants explained, AACS has identified no authority finding a due process violation in this context, and the weight of authority rejects the notion that schools have due

---

[14] As described in Defendants' opening brief, the applicability of Subpart G depends on Subpart G itself and a school's PPA, not on § 668.603(a). *See* D.Br. 33.

process interests at stake. D.Br. 35-37. Even the Seventh Circuit case AACS cites—upon which its claim entirely relies—rejected the due process claim at issue. *See id*. at 36 (discussing *Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877, 893-94 (7th Cir. 1990), which found no due process violation). Particularly where no program has yet been deemed ineligible, it would be premature to address this issue at all. AACS's arguments to the contrary again rely on its gross distortion of the circumstances described in § 668.603(a) and fail for the same reasons explained above.

## III.    The GE Regulations Are Not Arbitrary or Capricious

Plaintiffs fail to show that any aspect of the NFR, as applied to cosmetology programs through the GE regulations, is arbitrary or capricious. To the contrary, each challenged aspect is "reasonable and reasonably explained," which is all that the APA requires. *Texas v. EPA*, 132 F.4th 808, 839 (5th Cir. 2025) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Plaintiffs' oppositions to Defendants' Motion rehash the very same points raised and refuted in prior briefing, conceding the Department's exhaustive consideration of relevant factors but disagreeing with the outcome and seemingly holding the Department to a standard of perfection that is neither necessary nor realistic. *Outsourcing Facilities Ass'n v. FDA*, No. 4:24-cv-0953-P, 2025 WL 746028, at *11–12 (N.D. Tex. Mar. 5, 2025) ("Plaintiffs seemingly insist that the [challenged agency action] needed to be perfect. It did not. Rather, it needed only to 'articulate[] a rational relationship between the facts found and the choice made.'").[15] As discussed in turn below, each of Plaintiffs' challenges should be rejected, and the regulations should be upheld.[16]

---

[15] Ogle continues to suggest that *Ohio v. EPA*, 603 U.S. 279 (2024), changed the APA standard, O.Opp. 20, but the Fifth Circuit's post-*Ohio* decision in *Texas* makes clear the same longstanding deferential standard continues to apply.

[16] Throughout its opposition brief, AACS relies heavily, and inappropriately, on arguments that were never raised in comments before the Department during rulemaking, rely on material outside

A.   **The NFR Reasonably Chose Reported Earnings as the Best Available Data and Reasonably Explained Its Rejection of Proposed Alternatives (D.Br. III.A; O.Opp. II.A; A.Opp. III.D.1)**

First, as discussed in Defendants' opening brief, the NFR reasonably provides that the Department will use taxpayers' reported earnings data—as maintained by other federal agencies like the IRS—for its metrics calculations. D.Br. 38-50. The Department deems such data "reliable, verifiable, and accurate," 88 Fed. Reg. at 70097, and after considering and rejecting other alternatives—including those cited by Plaintiffs—the Department concluded that reported earnings data is the best data available. D.Br. 42 (citing 88 Fed. Reg. at 70041-43). The APA requires nothing more.

Plaintiffs' opposition on this issue fails at the outset because it relies on alleged characteristics specific to cosmetology programs—and thus should be recognized as an unripe as-applied claim rather than a facial challenge. O.Opp. 19 (asserting arguments "with respect to cosmetologists"); A.Opp. 36 (referencing "service industries" but focusing on cosmetology). The notion that the Department should have carved out special exceptions for cosmetology programs is an "uphill battle" to begin with. *Cf. Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 135 (D.C. Cir. 2022) ("in formulating general rules, 'a regulator need not always carve out

---

the administrative record, or were raised in conclusory fashion in footnotes in its opening brief, which it now contends Defendants have conceded. All such arguments should be rejected. Indeed, it is well established that arguments not raised before the agency are forfeited, *Indigenous Peoples*, 132 F.4th at 884; the Court's review is limited to the administrative record, *see* 5 U.S.C. § 706; D. Mot. to Strike; and "arguments raised only "in a perfunctory manner, such as in a footnote, are waived." *Harris Cnty. v. Eli Lilly & Co.*, No. CV H-19-4994, 2020 WL 5803483, at *3 (S.D. Tex. Sept. 29, 2020) (quoting *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)). Defendants attempt to identify *infra* these instances where they occur. In addition, to the extent AACS relies on post-NFR developments, *e.g.*, A.Opp. 10-12 (discussing post-NFR injunction of loan forgiveness program in another case), it also fails to undermine the NFR. While such developments may be addressed as appropriate in future rulemakings, the NFR reasonably addressed the circumstances that existed at the time while never relying on the possibility of loan forgiveness as its sole justification.

exceptions for arguably distinct subcategories'"). All the more so when Plaintiffs seek to invalidate the NFR in all its applications because of the alleged failure by cosmetology graduates to accurately report their earnings to the government. As Defendants have pointed out, and Plaintiffs do not contest, facial invalidation is improper unless "no set of circumstances exists under which" reported earnings could reasonably be used. D.Br. 39; *Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016). Yet Plaintiffs make no such showing and do not try to.

Plaintiffs also fail to undermine the NFR's reasoned decisionmaking even with respect to cosmetology programs. The NFR reflects that the Department was not only "aware" of comments regarding cosmetologists' reported earnings, O.Opp. 20, but carefully considered them, as well as alternatives involving alternate earnings appeals or an across-the-board percentage bump, and explained its conclusion that reported earnings data was nevertheless the best data available for the program-specific assessment at issue. D.Br. 39, 41-45. Even now, Plaintiffs identify "no other earnings data source that could be expected to yield higher quality and reliability" regarding the earnings of a particular program. *Cf.* 88 Fed. Reg. at 70095. Rather, they simply repeat the same arguments that the Department already addressed in the NFR (and that were also addressed at length in Defendants' opening brief) and ask the Court, in the absence of any concrete data undermining the Department's reasoning, to reach a different conclusion.

For the reasons already explained, the Department met its obligations on this issue. The Department's starting point—that, as a general matter, reported earnings are a uniquely available, accurate, and reliable data source because every person with taxable income in this country is legally obligated to report it—can hardly be disputed. PI Order at 9; 88 Fed. Reg. at 32335; *APSCU*, 110 F. Supp. 3d at 195. As the NFR states, "[o]nly Federal administrative sources contain such a comprehensive view of earned income"—as evidenced by the fact that many commenters

relied on their own businesses' W-2 earnings data for their comments. 88 Fed. Reg. at 70043. That conclusion is not undermined by the possibility that some unspecified individuals—for whatever reason—might fail to report all their income in accord with federal law. Significantly, for all Plaintiffs' insistence that some cosmetologists may underreport tips or self-employment income, the record refutes the notion that all do so. *Cf.* D.Br. 48-40 (citing record evidence and AACS's concession that many cosmetologists do report tips).[17] Nor did any commenter identify a reliable method to measure the extent of any underreporting by particular graduates of a particular program—an unsurprising omission since any unreported earnings are by definition not reported anywhere, but one that is fatal to Plaintiffs' arguments on this issue.

The Department explained at length how the metrics avoid negative distortions from any one individual's earnings data, as well as privacy-protective statistical noise, by (1) setting quite modest thresholds in the first place, 88 Fed. Reg. at 70015 ("the EP measure that we adopt will set only minimal and reasonable expectations"), 70017 (NFR sets "relatively modest, commonsense, minimum performance standards that most GE programs seeking government support can and should pass without trouble"), 70095 ("we designed the metrics to be commonsense and modest standards"); (2) using a cohort's median, rather than mean, earnings so that over 50% of a program cohort's graduates would have to be affected by the same flaw in earnings data before it impacted the program's metrics, *id.* at 70015, 70044 (median earnings are "not as sensitive to outlier observations"); (3) requiring at least 30 completers in each two- or four-year cohort, *id.* at 70096;

---

[17] AACS's opposition repeats that concession but insists that the evidence cited by the Department was "very unrepresentative." A.Opp. 44. But it offers no better data. Indeed, though it references sole proprietorships, it ignores that such businesses may have employees for which W-2s are generated, and W-2 earnings are highly likely to be reported—the very point that the Qnity study confirms. D.Br. 48-49 (pointing out AACS's concession that W-2 employees report tips). In the end, AACS's assertion that the issue is "not a 'data source' problem" but a "'satisfactory explanation' problem," A.Opp. 44, ignores that the Department did thoroughly explain why it deemed reported earnings the best data available. Plaintiffs fail to undermine that conclusion.

(4) requiring that a GE program "fail" the same metric two out of three years before its Title IV eligibility is impacted, *id.* at 70095; and (5) measuring graduates' earnings a year later, creating a 20% buffer for programs in lower-earning fields, *id.* at 70042, 70095-96. *Cf.* D.Br. 41-50.

Plaintiffs continue to focus on two alternatives that the Department reasonably rejected. First, the NFR's rejection of alternate earnings appeals was hardly "conclusory" or "unsupported," O.Opp. 22, nor was the conclusion, drawn by outside researchers focusing on the issue, that past appeals had yielded implausibly high results "improper *ipse dixit*," A.Opp. 43. Instead, the Department thoroughly explained the problems with such surveys and the significant problems it had encountered administering such appeals in the past. D.Br. 44-45; 88 Fed. Reg. at 70041-42 (describing problems with surveys), 70095 (rejecting alternate earnings appeal alternative). Second, the NFR reasonably rejected AACS's proposal here—that the Department "use data from multiple sources," A.Opp. 37, by applying an across-the-board 8-10% adjustment to all cosmetology programs—explaining that its revised methodology already provides a 20% "buffer" for programs most at risk. D.Br. 47-48; 88 Fed. Reg. at 70042 (buffer increase is "likely to be much higher than the 8 percent estimate of underreporting from the Cellini and Blanchard research"). AACS's only response is that the 20% buffer is irrelevant, A.Opp. 38. To the extent AACS is relying on its later suggestion, A.Opp. 40, that the 20% buffer will be canceled in the EP metric, A.Opp. 40, it is simply wrong. That point, which was not raised in comments, ignores that the measurement of high school graduate earnings is based on age, not years after graduation, so no similar "buffer" would apply to that side of the comparison. 88 Fed. Reg. at 70060.[18]  AACS's reasoning is also inconsistent; if an 8% bump would help a program exceed the NFR's minimum

---

[18] By contrast, any impact of underreporting on earnings would apply to the high school earnings side of the EP metric as well. *See* A.App. 830 (tipped fields include restaurants and personal services); 88 Fed. Reg. at 70044 (making similar point regarding part-time employment).

thresholds, a 20% bump would as well. AACS suggests the Department's "own researcher" (evidently referring to Cellini, who is not the Department's researcher but is instead the co-author of a number of studies included in the administrative record) recommended an 8-10% bump, A.Opp. 1, but that is incorrect. In fact, the referenced Cellini & Blanchard study recommended continued use of SSA or IRS earnings data, and although it suggested that an adjustment may be appropriate in some cases if appeals were allowed, it also recommended that appeals avoid use of graduate surveys and concluded, after applying an 8% adjustment to 2014 earnings data, that unreported tip income "has little impact on program outcomes." Def. App. 28; A.App. 832 (Cellini & Blanchard). Plaintiffs point to nothing in the administrative record contradicting those conclusions.[19] Significantly, even as AACS rejects the 20% buffer resulting from the Department's revised methodology, it identifies no way to assess whether a particular cosmetology program's graduates in a particular cohort have underreported their earnings by 8 or 10%, or some other amount, or not at all.[20] *Cf.* 88 Fed. Reg. at 70045 (rejecting use of BLS data for similar reasons).

---

[19] AACS also suggests the percentage of underreporting is actually 55%. A.Opp. 38 (citing A.App. 830). However, its reliance on Cellini & Blanchard's estimate, which is in turn based on IRS data from over a decade ago, ignores that it was used only to double check the 8% unreported tips estimate. Far from suggesting that a 55% adjustment to cosmetology programs' earnings data could conceivably be warranted, the study viewed tips as "likely the largest component of underreported income for cosmetologists" while emphasizing that any underreporting "undoubtedly var[ies] by occupation, location, nature of the employer-employee relationship, and more." A.App. 830, 832. None of this undermines the Department's conclusion that reported earnings are the best data available.

[20] AACS's brief incomprehensibly asserts that Defendants "have no idea" how much "income reporting" is "attributable to underreporting." A.Opp. at 38. To the extent AACS means to suggest the Department has no reliable data source identifying the amount of underreporting, if any, by a cosmetology program's graduates, that suggestion supports the conclusion that the Department reasonably selected the best data available. *APSCU*, 110 F. Supp. at 195. AACS again tries to invert the APA's arbitrary and capricious standard by characterizing a negative as a "key assumption" that the Department bore the burden to prove. A.Opp. 41 n.22. But the Department's obligation was simply to "explain" its reasoning. *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) (agency was "required to explain" common-sense proposition); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (agency had to "explain why sheep, goat, and free-

AACS's other points are similarly baseless. For example, contrary to AACS's contentions, the Department fully explained its view that underreporting has likely decreased for several reasons, including the less frequent use of cash, and that the possibility of underreporting did not change the Department's conclusion that reported earnings is the best data available. 88 Fed. Reg. 70041-43 & n.139, 70094-98.[21]

If anything, Plaintiffs' efforts highlight why the Court should not entertain this type of as-applied challenge at this stage, when "key facts have not 'crystallized' and it remains to be seen" whether the Department's contemplated metrics calculations for a particular program's graduates will raise the issues that Plaintiffs allege. *Cf. Brennan v. Dickson*, 45 F.4th 48, 65 (D.C. Cir. 2022). Viewing the NFR on its face, the Department's reasoning is not arbitrary or capricious.

## B. The Metrics Reasonably Focus on Student Outcomes (D.Br. III.B; O.Opp. II.B; A.Opp. III.D.2, 3, 4)

Plaintiffs next attack the metrics' focus on graduate outcomes, but they do so by inappropriately second-guessing the Department's expert analyses while conceding the Department's consideration of the very factors they identify as relevant. Although Ogle accuses the metrics of "blam[ing] schools for their graduates' 'insufficiently remunerative' jobs," O.Opp. 23, Defendants' opening brief explains that the metrics were carefully designed to ensure the

---

range herding is the type of job for which employers have only a temporary . . . need," so district court improperly deemed the issue waived). The Department did so here. The NFR reasonably supports the Department's conclusion that reported earnings are the best available data, and the APA requires nothing more.

[21] AACS claims Defendants have "waived" opposition to its arguments regarding changes to tax law. A.Opp. 42. Not so. As Defendants explained, the NFR itself pointed out that the new $600 threshold for 1099s was not dispositive and any delays in its effective date did not warrant postponing implementation of the NFR. *See* D.Br. 50. AACS also asserts that the Department misunderstood the Bettinger study. But the Department was in agreement with more recent research concluding that study was "significantly flawed." D.Br. 43-44, 47, 49 & nn.24, 28; D.App. 33. AACS simply repeats the same refrain that the Department failed to explain its decision, but the NFR dispositively shows otherwise.

responsible use of taxpayer funds, allocated to Title IV on the assumption they will help students as Congress intended. D.Br. 51-64. The metrics provide critical information about whether students attending a particular program will be left worse off than when they started, and whether taxpayer funds can responsibly be invested in that program. *Cf.* 88 Fed. Reg. at 70005. Moreover, the NFR addressed the concerns that Plaintiffs now raise and explained in detail its conclusion that no changes to the metrics were warranted. *See id.* Far from "bizarre," O.Opp. 24, the NFR's treatment of these issues demonstrates the Department's reasoned decisionmaking.

Plaintiffs' latest rehashing of the same issues changes nothing. As explained, the Department reasonably addressed each supposed problem that Plaintiffs identify.

### 1. Part-time and non-workers

First, the NFR explains that graduates who choose to work part-time or not at all still must repay their loans and meet other expenses, so including their earnings in the median calculation contributes to an overall accurate picture of program value. D.Br. 52; 88 Fed. Reg. at 70035, 70044. At the same time, the calculation methodology minimizes the impact of any single graduate's employment choices, D.Br. 52-53; *see supra* pp. 22-23 (enumerated list), as does the fact that the other side of the EP metric may also have part-time or unemployed (but seeking a job) workers among high school graduate earners, 88 Fed. Reg. at 70044, 70061. The Department did not act arbitrarily by declining to amend its proposed regulations on this ground—particularly where no commenter proposed a feasible alternative other than doing away with the metrics altogether. *Id.* at 70035, 70044.

Plaintiffs continue to disagree with the Department's conclusion but fail to show its reasoning was arbitrary. Indeed, they now rely on assertions and proposals that were not offered during the rulemaking itself and are thus forfeited. *See Indigenous Peoples*, 132 F.4th at 884. Ogle

relies on a series of hypotheses and presumptions regarding when and how often cosmetology program graduates might give birth, and how that might affect their earnings. O.Opp. 24. It points to no comment offering such data, nor does it explain why Title IV's purpose would be served by saddling such graduates with overwhelming debt even as they faced the expenses of new parenthood, or why Title IV funds should be invested to leave such graduates no better off, particularly given the Department's review of research suggesting the wide availability of lower-cost cosmetology programs outside Title IV. D.Br. 45 & nn.14, 26 (citing D.App. 116-25, among other studies). For its part, AACS repeats the same argument in different terms, suggesting that the EP metric cannot measure "comparable" groups of earners if more cosmetology program graduates than high school earners work part-time. A.Opp. 55 (quoting 88 Fed. Reg. at 70079). It ignores the Department's view that the measure appropriately captures part-time workers in its comparison of actual earnings, reflecting the goal to assess whether a program's graduates are, on average, financially better off. 88 Fed. Reg. at 70035.

AACS also recycles familiar tactics that the Court should reject. First, it urges the Court to find the NFR arbitrary for failing to address an alternative—AACS's proposed part-time "multiplier," A.Opp. 55—that was never proposed in comments and thus should be deemed forfeited. *Indigenous Peoples*, 132 F.4th at 884. In any event, as Defendants explained, AACS fails to show that such an alternative would be feasible, even if proposed, given that part-time work can cover anything from 5 to 35 hours, may fluctuate over time, and would differ for each program. D.Br. 53. Second, it tries to evade, and invert, the deferential APA standard by characterizing the Department's assertion that program graduates want to work as a "key assumption" that the Department must prove. A.Opp. 56. As Defendants already explained, the Department did cite survey evidence that supports the common-sense notion that people attend GE programs in order

to get better-paying jobs and also concluded that the metrics were important in any event to "capture the labor market outcomes of program graduates." D.Br. 54.[22] In other words, if more than 50% of a cosmetology program's graduates do tend to leave the work force almost as soon as they graduate (as would be necessary to affect a program's median earnings), the metrics should take that fact into account in any accurate assessment of the program's financial value. Given the Department's obligation to ensure taxpayer funds are responsibly spent, the NFR is not arbitrary on this ground.

Defendants also explained the Department's reasonable adoption of an earnings threshold ("ET") for the EP metric and its rejection of alternatives that were essentially impossible to apply. D.Br. 56-57, 61-62; 88 Fed. Reg. at 70054, 70060. AACS argues that the ET adopted in the NFR differs from the examples cited by the Department of similar benchmarks relying on high school graduate earnings, which included unemployed graduates outside the labor force. A.Opp. 59-60. But the Department never suggested that the precise contours of such a benchmark must always be identical regardless of context. Here, the Department sought to assess whether program graduates are left better off than when they started, and it explained that, for such a comparison, it made sense to include all high school graduates in the labor force in the ET while including all program completers in the EP's mean earnings determination. 88 Fed. Reg. at 70054-55, 70060-61 (comparing program completers three years after graduation with high school graduates "who cannot work, or who have chosen not to work, is not appropriate in this case.").

---

[22] AACS's attempt to point to contrary "evidence" in the record falls flat. It cites no clear evidence that any significant number of cosmetology program graduates voluntarily leave the workforce or work lower hours *within the first three years after graduation*—which is when the metrics measure earnings. *Cf.* A.Opp. 56-57 (citing only general statements about the benefits of flexibility). AACS also errs in suggesting Defendants failed to address the Cellini & Turner study cited in its opening brief, A.Opp. 58; Defendants in fact pointed out the study's conclusion that for-profit cosmetology programs had "negative total returns" despite higher earnings. *See* D.Br. 61 n.41.

### 2. Demographic Characteristics

Second, Defendants have explained that the NFR's statistical analyses, similar to those upheld in prior rules, reasonably ruled out the possibility that the metrics reflect the demographic characteristics of a program's graduates rather than the quality of the programs themselves. D.Br. 57-62. Plaintiffs simply disregard or downplay the significance of those analyses, but the Department's conclusions on this issue are entitled to significant deference. *Id.* 58-59; 88 Fed. Reg. at 70031 (metrics' "minimal thresholds" were not sufficiently impacted by student demographics to warrant alteration or abandonment of metrics).[23] Ogle's continued reliance on the general notion of "historical discrimination against women and minorities," and its attempt to apportion "blame" for poor outcomes among different variables, O.Opp. 25, reflect its misunderstanding of how regression analyses work. AACS meanwhile seeks to draw the Court into a "battle of the experts" through the extra-record material that it inappropriately filed and that Defendants have moved to strike. *See* Def. Mot. to Strike [ECF 36].[24] The Court should not consider or address those arguments, particularly given strong indications, explained in Defendants' briefing on its Motion, that AACS's purported expert is unfamiliar with statistical analyses in higher education contexts. *Cf.* Reply to Mot. to Strike [ECF 61] at 10.[25] AACS's reliance on this outside material as a back door to raise issues not presented in comments should

---

[23] The Department's conclusion on this point not only reflects the results of rigorous statistical analysis but is also consistent with the Administration's renewed commitment to "serv[e] every person with equal dignity and respect, and to expend[] precious taxpayer resources only on making America great." E.O. 14151, § 1 (Jan. 29, 2025). Indeed, Ogle cites no authority for the notion that Title IV funding should disregard program quality because the program enrolls more students from historically disadvantaged demographic groups. Such graduates have the same need to pay their student debt and reap a financial benefit from their education.

[24] Defendants' Motion to Strike is fully briefed and remains pending before the Court.

[25] In brief, AACS's entire argument on the issue of "multicollinearity" relies on a flawed premise and should be rejected. *See* Darolia Decl. ¶ 11.a.

also be rejected. *See Indigenous Peoples*, 132 F.4th at 884 (issues not raised during notice and comment are forfeited). In particular, AACS now suggests the Department failed to make its variance decomposition analysis available, A.Opp. 46-47, but it raised this issue only in a footnote in its opening brief, which in turn relied on its purported expert declaration, *see* A.Br. 35 n.22. Defendants explained in connection with their Motion to Strike that the Department made sufficient data available. *E.g.*, Darolia Decl. [ECF 37] ¶ 12; Reply to Mot to Strike at 3-4 & nn.1, 2. AACS now elaborates on this argument without acknowledging that the Department discussed the variance decomposition analysis in the NPRM, *see* 88 Fed. Reg. at 32421; if commenters thought additional information was needed, they had the opportunity to say so during the comment period, but none did. This issue is therefore forfeited as well as meritless.

Defendants also explained the Department's reasonable rejection of proposals to calculate separate earnings thresholds for different demographic groups. D.Br. 61-62. AACS's suggestion that the Department should have quantified the "time or manpower that would be needed" to adopt those alternatives, A.Opp. 49, falls flat when the Department explained there was no justification for them in the first place, and the inefficiency of calculating separate thresholds based on factors that themselves may change over time is plain. *See* 88 Fed. Reg. at 70032-33 (discussing "several challenges" that program-specific thresholds would pose while referencing NFR's analysis concluding that "program demographics do not play an outsized role in influencing" metric outcomes). AACS's contention that it has offered "affirmative evidence" contradicting the Department's conclusions regarding the impact of demographics, A.Opp. 51, deserves no consideration when the supposed evidence was not submitted during rulemaking but, again, is the subject of Defendants' Motion to Strike (which also explains its significant defects). AACS also cites an article included in the administrative record that recognizes the earnings premium may be

different for different demographic groups and argues this counts as "contrary evidence." A.Opp. 52. But as discussed, the Department's analysis here showed that demographic factors did not materially affect the program outcomes measured through its chosen methodology—which the cited study did not address. As Defendants explained, the Department provided extensive discussion and analysis of this issue, and its conclusions cannot be deemed arbitrary or capricious. D.Br. 57-62.

Finally, Plaintiffs try to discount the significance of the wide availability of lower-cost cosmetology programs outside Title IV, but they do not dispute that such programs exist.[26] The Department was not arbitrary in taking that availability into account when addressing commenters' claims about cosmetology programs.

### 3. Changes in economic conditions and the pandemic

Third, the NFR also reasonably refuted the notion that unpredictable events like the pandemic, with the potential to impact the overall economy, warranted abandoning the metrics. D.Br. 63-64. AACS argues that the Department conceded that the initial reporting period contemplated by the NFR would be distorted by pandemic-era data. A.Opp. 61 (citing 88 Fed. Reg. at 70065). But AACS ignores the Department's ultimate conclusion (and erroneously accuses Defendants of asserting it for the first time in briefing) that the pandemic would not significantly affect the first year's earnings data, citing among other reasons that it would include completers'

---

[26] Ogle errs in suggesting that, in promulgating the NFR, the Department ignored a Cellini study cited in the prior 2019 Rule. *See* O.Opp. 26 n.14. In fact, the administrative record includes the final draft of the very same article. *See* Cellini & Turner (2022), AR-F-001665 [D.App. 126]. And Defendants' opening brief already addressed the very point Ogle's opposition raises, noting the study's conclusion that for-profit cosmetology program graduates still had "negative total returns," despite their apparent higher earnings from employment at high end salons. D.Br. 61 n.41.

earnings for 2022 as well as 2021. D.Br. (citing 88 Fed. Reg. at 70099).[27] AACS acknowledges the Department's asserted flexibility to waive or modify requirements if warranted by a future emergency, *see* D.Br. 64, but suggests Defendants have not explained when or how such flexibility would be exercised. A.Opp. 63 n.33. However, the Department's inability to predict the future is no basis to conclude its current action is arbitrary.[28] As for Ogle, its only response is to emphasize that unpredictable future events, as well as the government's potential response, are indeed unpredictable. O.Opp. 27. It fails to show the metrics are facially arbitrary on this ground.

### 4.    Application of EP Metric to Cosmetology Programs (A.Opp. II.C)

AACS's opposition brief includes a separate section that it describes as devoted to NFR "inaccuracies." A.Opp. 9. In addition to its discussion of the post-NFR injunction in another case, addressed *supra* note 16, AACS also includes in this section the argument that cosmetology graduates tend to have low debt levels, which it contends undermines the Department's application of the EP metric to cosmetology programs. A.Opp. 9-10. But as AACS acknowledges, the NFR explains that the Department adopted the EP metric for the very reason that the D/E metric alone fails to identify programs that, though they result in little debt, nevertheless yield earnings that are so low, relative to what their graduates could have earned with merely a high school degree, that they fail to justify *any* expenditure of taxpayer money. A.Opp. 9 (citing D.Br. 12, 51; 88 Fed. Reg.

---

[27] AACS also appears to argue that the Department should have considered treating cosmetology programs differently based on "comments specific to the beauty and wellness industry." A.Opp. 62. But it cites no comment proposing, for example, that cosmetology programs be exempted from the first year's metrics calculation on this basis, so any such argument is forfeited. AACS's arguments again would more properly be raised in an as-applied context once the metrics have been calculated at least for an initial year, similar to its prior challenge to the 2014 Rule.

[28] AACS also contends that the Department's assertion of such flexibility contradicts the Department's view of the HEA's gainful employment language. *Id.* But this tired refrain fails for the same reasons already explained. The Department has never asserted that the HEA language prescribes a specific methodology; instead, the Department has sought to improve its methodology over time and could similarly do so in the future in response to changed future circumstances.

at 70015). AACS now purports to critique specific studies cited by the Department, but it points to no comment raising these criticisms during the rulemaking process even though the Department clearly explained the basis for the EP metric in the NPRM. 88 Fed. Reg. at 32308-09 (identifying "several connected reasons for adding the EP metric to the proposed rule"). Meanwhile, the NFR thoroughly addressed comments that were submitted. 88 Fed. Reg. at 70013-16.

AACS's critique in fact mischaracterizes the NFR's rationale, suggesting that the only basis for the EP metric is to ensure students can repay their loans, however minimal. To the contrary, the NFR's discussion makes clear that "the EP measure assesses the economic boost a program provides to its students independent of the debt incurred." *Id.* at 70015. AACS's attempt to critique cited studies based on whether they assessed students with debt carries forward this mischaracterization, but it never contradicts the Department's original premise—that program graduate earnings may be so low, in an absolute sense, that they leave students no better off than when they started. The EP metric simply sets a minimal threshold for that very measurement. *Id.* ("the measure requires only that at least half of those who actually complete [a] program are earning at least slightly more than individuals who had never completed postsecondary education"). As for the study cited in the NFR, the Department's point was simply to illustrate the distinction between the two metrics by pointing out that those who earn very little can afford hardly any debt at all, *id.* at 70015 & n.77; again, it never suggested that the *only* purpose of the EP metric was to avoid loan defaults. The Department's adoption of the EP metric is not arbitrary or capricious on any of the grounds identified by AACS.

### C. The D/E Metric's Thresholds Are Neither Arbitrary Nor Capricious (D.Br. III.C; O.Opp. II.C)

In line with the Court's PI ruling, Defendants' opening brief thoroughly debunked Ogle's challenge to the D/E metric's 8% and 20% thresholds, confirming that the NFR's re-adoption of

those thresholds is neither arbitrary nor capricious. D.Br. 64-69; *cf.* PI Order at 10 (concluding Department "articulated a rational connection between the facts found and the decision made"). Rather than trying to refute the substance of those analyses, Ogle's opposition falsely claims that the Department failed to explain during the rulemaking process itself how its combined use of both the 8 percent and 20 percent thresholds was consistent with the 2006 Baum & Schwartz study and also failed to "display awareness" that it was reversing the 2019 Rule (which had in turn reversed the prior 2014 Rule) on this issue. O.Opp. 27-28. But contrary to Ogle's contentions, the NPRM analyzed the intersection of the two thresholds, in conjunction with Baum & Schwartz's conclusion that "there are virtually no circumstances under which" debt that exceeded 20 percent of discretionary income would be reasonable; it further emphasized the D/E metric's "use of both measures," meaning that "programs are defined as 'high debt-burden'" under the D/E metric "only if" both thresholds are exceeded. 88 Fed. Reg. at 32325-26 & fig.1. The NPRM also acknowledged the 2019 Rule's view while concluding that "both academic research about debt affordability and industry practice," as well as the Department's own analysis, supported applying the metrics in this context. 88 Fed. Reg. at 32307-09 (recognizing metrics were "strongly correlated" with measures of "the share of a disbursed loan that will not be repaid"). The NPRM further explained that the 2019 Rule's concerns were ameliorated by the new proposal to add an additional earnings premium metric and to apply both metrics to all programs, not just GE programs. 88 Fed. Reg. at 32308-09. Far from post hoc justifications, Defendants' summary judgment arguments thus firmly rely on the administrative record already before the Court and provide ample basis to reject Ogle's claim.

Ogle's only other argument on this issue is to suggest that the NFR was arbitrary in failing to include total "household" income on the "earnings" side of the metric. But, as Defendants

explained, such a notion ignores that the entire purpose of the metric in the context of the GE regulations is to assess whether a program is designed to prepare students for gainful employment. Earnings that do not derive from the program's graduates cannot reasonably bear on that assessment; such earnings are not relevant to whether the program leaves students better off than when they started or provides a good return on the investment of taxpayer funds. D.Br. 67-68 & n.45; *cf.* 88 Fed. Reg. at 70048 (similarly explaining that Parent PLUS loans are not included on the debt side of the metric because it "would cloud the meaning of the D/E rates and would ultimately render them less useful to students and families"). The Department's exclusion of earnings of non-graduate family members from the earnings side of the metric thus does not make the earnings thresholds arbitrary or capricious.

### D.    Plaintiffs Fail To Undermine the NFR's Analysis of Costs and Benefits (D.Br. III.D; O.Opp. II.D; A.Opp. III.D.5)

As Defendants have explained, the Department's determination in the NFR's Regulatory Impact Analysis that the final regulations' benefits "justify their costs" satisfies the "minimum standards of rationality" required for an agency's cost-benefit analysis. D.Br. 69-70 (quoting *Mex. Gulf Fishing Co.,* 60 F.4th at 973). Indeed, the NFR engaged in extensive discussion of costs and benefits to students, schools, state and local governments, and the Federal Government and taxpayers and explained in detail its methodology and conclusions. 88 Fed. Reg. at 70150-70. Ultimately, the NFR concludes that the regulations will significantly benefit students "who otherwise would have low earnings" by improving program quality and making "good information about program performance" available. *Id.* at 70170. The NFR also estimates that the regulations will save nearly $14 billion in taxpayer funds. *Id.* at 70163. While the NFR projects that schools may incur compliance costs due to the transparency framework's reporting requirements, those costs will significantly decrease after the first year; it also projects that better-performing programs

will increase their enrollments while poorly-performing programs may incur costs from decreased enrollments or efforts to make improvements. *Id.* at 70152-53.

Plaintiffs fail to show that the NFR's discussion is irrational. Indeed, while Ogle refers to "extraordinary costs" imposed by the GE regulations, O.Opp. 29, it apparently just means the profits that Title IV-participating cosmetology programs currently pocket directly from taxpayer funds, even where they leave students worse off than when they started. The NFR's analysis, of course, addressed costs and benefits far more broadly.[29] Yet even with respect to cosmetology programs, Plaintiffs' argument fails. D.Br. 70-72. Plaintiffs point to no internal inconsistencies of the type the court in *Chamber of Commerce* found troubling, *see Chamber of Com. v. SEC,* 85 F.4th 760, 777 (5th Cir. 2023), nor do they dispute the existence of a student debt crisis, or the Department's obligation to ensure that the billions of taxpayer dollars that are funneled to schools through Tile IV are responsibly spent.

Instead of disputing the Department's explanation of what is known, Plaintiffs point to what is *not* known—questioning the quality of lower-cost cosmetology programs that do not participate in Title IV, and of the smaller Title IV-participating programs that currently enroll only 20% of Title IV-supported students. O.Opp. 29-30; A.Opp. 63. AACS points specifically to a statement in the Cellini & Onwukwe study acknowledging little data on student outcomes in the non-participating programs is known. O.App. 2493. But in fact, the study cites data showing both types of programs have similar pass rates on licensing exams in Florida, *id.*, and the Department cited similar data for California and Texas, 88 Fed. Reg. at 70146-47 & nn.303-305. Plaintiffs

---

[29] Ogle's arguments on this point are another indicator that their challenge is in substance as-applied rather than facial, yet the APA does not require the NFR to assess costs and benefits separately as to every potentially affected subset of Title IV programs. Much of the NFR's discussion of cosmetology programs, in particular, appropriately occurs in other sections rather than in the section focusing specifically on costs and benefits.

point to no contrary evidence in the record, and AACS's attempt to criticize licensure passage as a proxy for program value, A.Opp. 64, falls flat, ignoring other research finding that non-participating programs are also less expensive. A.App. 2485 (prior studies found "dramatic tuition differences").

AACS next suggests the Department failed to consider that students enrolling in non-participating programs could not receive Pell Grants. A.Opp. 64. However, the NFR repeatedly emphasizes the Department's concern with costs to taxpayers as well as to students, in light of its obligation to ensure Title IV funds are responsibly spent. *E.g.*, 88 Fed. Reg. at 70015-16 ("If the Department does not act effectively at the front end to screen out the subset of GE programs that do not meet minimal performance standards of enhanced earnings and affordable debt, students and taxpayers will continue to suffer the consequences at the back end."), 70017 (stressing importance of "every Federal dollar saved from expenditure on poorly performing GE programs"). Indeed, that concern is baked into a proper understanding of "gainful employment" in the Title IV context. Plaintiffs provide no evidence that the absence of Pell Grants would prevent students from enrolling in the lower-cost programs that operate outside Title IV.

AACS also contests the Department's statement that Title IV-participating cosmetology programs that do not pass the metrics could avoid closure by reducing their tuition or implementing other modifications. A.Opp. 65. But as Defendants explained, the relevant portion of the NFR cited studies supporting that conclusion. D.Br. 46 (citing 88 Fed. Reg. at 70086, D.App. 72, 98-99, 112). AACS, on the other hand, relies on data regarding closures when an entire school is deemed Title IV-ineligible after failing the cohort default rate—which could only occur based on high defaults on a school-wide level. *See* D.Br. 24. When only one program closes, students may choose to enroll in a different program within the same school. 88 Fed. Reg. at 70030 (such "alternative

options leave graduates with 43 percent higher earnings and 21 percent less debt"). Indeed, the Department's concern in the NFR was not to assess program survival for its own sake but to consider whether students would have access to alternative programs, and the same study AACS now cites supports the Department's conclusion that alternatives would remain available. *E.g.*, 88 Fed. Reg at 70017 ("most students in institutions closed by accountability provisions successfully reenroll in higher performing colleges"), 70119 ("a large share of students who would have attended a sanctioned for-profit institution instead enrolled in local open access public institutions and, as a result, took on less student debt and were less likely to default").

In sum, Plaintiffs do not establish that the Department's analysis is irrational. Plaintiffs essentially argue that the Department must be able to prove in advance exactly what will happen to cosmetology programs and their students two or three years from now once the results of the metrics are fully known. But the APA does not impose that burden. Instead, the NFR's careful analysis more than satisfies "minimum standards of rationality," *Mex. Gulf Fishing Co.,* 60 F.4th at 973, by taking account of all the information currently available and reasonably concluding that, to the extent cosmetology programs currently in Title IV lose eligibility, students will find better value in lower cost programs, whether in or outside Title IV. 88 Fed. Reg. at 70086, 70118, 70139. Such results would be, on balance, a win for taxpayers and students alike.

### E.    The Department Adequately Explained Its 30-Completer Minimum for a Cohort (A.Opp. III.D.6)

AACS devotes a separate section of its opposition brief to its contention that Defendants failed to respond to a paragraph in its opening brief, in a section purportedly challenging the Department's reasoning regarding students' alternatives, that focused on the Department's decision, in part for privacy reasons, not to calculate metrics for programs with fewer than 30 completers in a cohort. A.Opp. 66. However, Defendants did respond by pointing to the NFR,

which adequately addressed comments on this issue, and pointed out that, even with the 30-completer limitation, the metrics will cover over 80% of student enrollments. D.Br. 72 (citing 88 Fed. Reg. at 70046, which cites "past Department practices, including the policy governing the development of cohort default rates, as well as IRS data policy").

AACS now argues that the Department should have further substantiated the privacy justification, but it points to no comment demanding further detail or contradicting the notion that a cohort of fewer than 30 completers would raise student privacy concerns. *See* A.Opp. 66. These arguments are thus forfeited. *Indigenous Peoples*, 132 F.4th at 884. In any event, the NFR makes clear the Department's reasonable recognition that the use of individual earnings data necessarily raises greater privacy concerns when fewer completers' data were aggregated[30], so some line had to be drawn, requiring a balance of privacy against coverage. AACS fails to show that the Department's choice of 30 completers, which would cover 80% of enrollments, was arbitrary.[31]

## IV.    AACS Fails To Establish a First Amendment Violation

### A.    The GE Rule Does Not Unconstitutionally Burden Speech

As explained in Defendants' opening brief, AACS's claim that the GE Rule

---

[30] As an extreme example, if a program had only one completer, it would be obvious that any earnings data the Department received for that program's cohort belonged to that person.

[31] AACS also asserts that its opening brief cited the NFR's exclusion of programs in U.S. territories merely "as more proof of its illogic, flaws, and caprice," so Defendants' argument that it lacks standing to assert such a claim is irrelevant. A.Opp. 65. However, AACS makes no attempt to identify any injury resulting from this aspect of the NFR. *Cf. Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (elements of standing must be satisfied "for each claim [a plaintiff] seeks to press and for each form of relief that is sought"); *AFT v. DeVos*, 484 F. Supp. 3d 731, 742-43 (N.D. Cal. 2020) (holding plaintiff must identify separate injury for separate aspects the 2019 Rule). In fact, the NFR reasonably explains that, in contrast to Census information available for state earners, "there is no robust source of earnings information in most U.S. Territories that would allow us to measure high school earnings," and also identified other concerns. 88 Fed. Reg. at 70027. The Department's discussion of this issue is an example of reasoned decisionmaking and certainly does not undermine the NFR as a whole.

unconstitutionally burdens speech fails on multiple levels, first and foremost because AACS lacks standing to assert the First Amendment interests of cosmetology program students, and because the Supreme Court has rejected the notion that the First Amendment is implicated when the federal government establishes conditions on federal funding that have nothing to do with speech. D.Br. 72-75.[32] AACS's efforts to contest established law on these issues is unavailing. AACS first argues that its First Amendment claim is brought on behalf of its member schools, not students. A.Opp.67. But although AACS's opening brief referenced schools' speech in passing, it failed to address schools' speech interests in any detail. A.Br. 46. Although AACS member schools may teach cosmetology, their interest in Title IV funding appears to be exclusively pecuniary. AACS's argument stands in contrast to *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), where the Supreme Court held that a wedding website creator's content "involve[d] *her* speech," due to its original creative aspects. *Id.* at 588. AACS's conclusory reference to the notion that speech, in the form of vocational training, is burdened fails to establish standing at this stage.[33]

In any event, even aside from standing, AACS's claim fails on the merits. As Defendants explained, and as AACS acknowledges, courts have repeatedly rejected First Amendment challenges to federal funding conditions. *See* D.Br. 73-74 (collecting cases); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").

---

[32] Defendants acknowledge that, contrary to Defendants' prior statement, D.Br. 72, AACS included First Amendment arguments in its comment. The NFR correctly rejected the notion that the regulations implicate the First Amendment. 88 Fed. Reg. at 70069, 70084.

[33] In *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), relied on by AACS, where the horseshoeing school's instructor-owner, as well as his would-be student, were both plaintiffs, the court did not discuss the owner's standing.

Although AACS continues to rely on the Ninth Circuit's decision in *Kirchmeyer*, it appears to ignore that the Fifth Circuit does not apply heightened scrutiny unless a law "regulates speech directly" and "not merely incidentally." *Hines v. Pardue*, 117 F.4th 769, 774 n.22 (5th Cir. 2024). Although AACS argues the GE regulations "burden" speech, they do not regulate speech directly. Instead, they regulate eligibility for Title IV federal funds. That alone dooms AACS's claim.

Moreover, the GE regulations are unlike those at issue in *Kirchmeyer* or *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), also cited by AACS. Neither case involved conditions on federal funding. In *Kirchmeyer*, the court's conclusion that the First Amendment was implicated, and that heightened scrutiny was warranted, rested on the nature of the restriction at issue, which served to prohibit the plaintiff student from enrolling in his chosen program altogether, and its selective application to a horseshoeing program while exempting programs based on their subject matter (flight instruction, recreational education). *See Kirchmeyer*, 961 F.3d at 1066. And *Sorrell* addressed a state's direct restriction on private companies' sale of information based on how the buyer intended to use that information, which the Court held "burdens disfavored speech by disfavored speakers." *Id.* at 564. By contrast, no such content-based distinction exists in the GE regulations. The regulations apply to programs falling within statutory categories that are delineated based on program length, the level of education required for admission, and whether the program "provides a program of training to prepare students for gainful employment in a recognized profession." 20 U.S.C. § 1088(b)(1). None of those criteria depend on the content of instruction. Accepting AACS's argument would open the door to First Amendment challenges to nearly every condition the government might place on federal funds, particularly funds provided to students or schools, which by their nature are engaged in speech-related activities. AACS cites not a single case that has adopted such a notion, and its claim here should be soundly rejected.

41

**B.     The Warning Requirement in § 668.605 Does Not Violate the Compelled Speech Doctrine**

Defendants also explained in their opening brief that 34 C.F.R. § 668.605, the NFR provision requiring a school to give current and prospective students fair warning if its GE program is at risk of losing Title IV eligibility the following year, does not compel schools' speech in violation of the First Amendment. D.Br. 75-79. Rather, the warnings fit within a number of established exceptions within the compelled speech doctrine. In particular, they properly qualify as government speech because they simply convey the fact of a program's status in terms that the Department will provide and refer the student to a Department website. They are necessary to the proper operation of Title IV, including the GE regulations as a whole, because students are entitled to know if the program they plan to attend the following year may be unable to accept Title IV funds. And, in the alternative, they qualify as commercial speech because they convey factual information that serves the government's legitimate interest in ensuring students are kept informed regarding the availability of Title IV funding. *Id.* 77-78.

AACS argues that the warnings resemble the state-mandated vendor ratings of public school library materials at issue in *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024), which the court held were not government speech. However, the court in that case emphasized that vendors were required to "undertake a fact-intensive process of weighing and balancing factors to rate library material" based on its sexual content, which was "highly discretionary" and "neither precise nor certain." *Id.* at 338. Here, on the other hand, the warnings simply convey assessments conducted by the Department, in language that the Department will provide, and they will be understood as such; contrary to AACS's speculation, they thus could not reasonably be attributed

to schools themselves.[34] AACS points to the Department's rejection of the proposed alternative that metrics results be posted on the Department's College Scorecard, but the Department simply sought the best method to ensure students would receive the information. *See* 88 Fed. Reg. at 70083. The decision that schools should be the ones to send out the warnings says nothing about whether the warnings themselves are government speech.

Moreover, the purely factual nature of the warnings also makes clear that they qualify for the other two exceptions. Again, that feature distinguishes this case from *Book People*, and AACS's insistence that the warnings "are laden with regulatory judgments," A.Opp. 73, disregards the text of § 668.605, which simply requires notification of an undisputed fact—that a program "could become ineligible" for Title IV in the next award year due to its metric results. 34 C.F.R. § 668.605(a). The Fifth Circuit squarely rejected a similar argument regarding tobacco warning labels, recognizing that "[a] fact does not become 'value-laden' merely because the fact drives a reaction." *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 880 (5th Cir.), *cert. denied*, 145 S. Ct. 592 (2024). Here, AACS's disagreement with the metrics' value as an assessment of whether a program prepares students for gainful employment, and "the fact that the gainful employment issue has been the subject of intense litigation," A.Opp. 74, does not change the simple reality that, under the GE regulations, a GE program that fails a metric is at risk of becoming Title-IV ineligible the following year. The latter fact is what the warnings convey so that students are aware that a program's Title IV eligibility may change.

Indeed, the factual nature of the warnings makes them a clear parallel to the tobacco

---

[34] To the extent there is any dispute on this issue, the fact that the Department has not yet issued the language to be used for such warnings renders AACS's challenge on this ground unripe. For example, if the required text expressly states that the Department requires the warning to be sent out and is responsible for its content, there could be no question that it would qualify as government speech. Nothing in the provision itself suggests the contrary.

warning labels at issue in *R J Reynolds Tobacco Co.*, which the Fifth Circuit recognized as qualifying for the commercial speech exception. 96 F.4th at 877. AACS is far off-base in suggesting that the warning itself must "propose a commercial transaction" in order to qualify for this exception. *See* A.Opp. 74. Warnings that cigarettes cause cancer are no more a "proposal" than the warnings at issue here, but courts have long recognized them as part and parcel of the commercial transaction of buying a pack of cigarettes. *Cf. R J Reynolds Tobacco Co.*, 96 F.4th at 876-77. Similarly, communications between a school and individuals about their current or prospective enrollment as students are part of the commercial transaction of enrolling in exchange for tuition and fees, and the § 668.605 warnings relate directly to that transaction. The warnings easily pass muster under applicable First Amendment law, and summary judgment should be granted to Defendants on this issue.

## V.    Any Relief Should Be Carefully Limited

As explained in Defendants' opening brief, Plaintiffs are entitled to no relief, but any relief granted by the Court should be no more burdensome to Defendants than necessary to redress the injury traceable to whatever defect the Court might identify. D.Br. 79-80. That is particularly true here where Plaintiffs bring their claims on behalf of a specific sector—cosmetology programs— and their arguments are essentially as-applied claims aimed at the NFR's accountability framework. Meanwhile, the transparency framework—which Ogle, at least, concedes it has not challenged[35]—operates entirely independently to provide those seeking higher education with

---

[35] Ogle now suggests in a footnote that it "object[s]" to the use of the metrics "in any circumstances," but the fact remains that it has never challenged the transparency framework, and its arguments all relate exclusively to the accountability framework's application to cosmetology programs. AACS, on the other hand, insists that it has challenged the transparency framework from the outset, but its arguments mirror Ogle's in scope. Although AACS points to asserted injuries in the form of burdens caused by the transparency framework's reporting requirements, no Plaintiff has asserted a claim challenging the Department's authority to collect information. Indeed, Defendants previously pointed to the disconnect between that asserted burden and the

important information about *all* Title IV programs, not just GE programs. Indeed, Plaintiffs' challenge to the meaning of the gainful employment language has no bearing on the transparency framework at all. And even though the transparency framework uses the same metrics that Plaintiffs challenge as arbitrary and capricious, the transparency framework is informational only, and programs' Title IV eligibility does not depend on certain outcomes. The Department also made clear in the NFR that it intends all promulgated provisions to be severable. *See* 34 C.F.R. §§ 668.409, 668.606; 88 Fed. Reg. at 32341; 88 Fed. Reg. at 70007 & nn.25, 81. While vacatur may be the default in this Circuit, circumstances here warrant an exception, and further briefing would be warranted if Plaintiffs prevail on any of their claims.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief, judgment should be entered in Defendants' favor.

DATED:  May 16, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        MICHELLE BENNETT
                                        Assistant Director, Federal Programs Branch

                                        /s/ Kathryn L. Wyer
                                        KATHRYN L. WYER (DC Bar #90023642)
                                        U.S. Department of Justice, Civil Division
                                        1100 L Street, N.W., Room 12014
                                        Tel. (202) 616-8475
                                        kathryn.wyer@usdoj.gov
                                        *Counsel for Defendants*

---

nature of the claims asserted when opposing Ogle's motion for a preliminary injunction. *See* Def. PI Opp. [ECF 25], No. 4:24-cv-259, at 15 ("Plaintiffs' motion independently fails because the 'compliance costs' they rely on for their irreparable injury derive from the FVT Rule's reporting requirement, not the GE Rule," and "Plaintiffs do not allege the FVT Rule's reporting requirement is illegal").