**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS et al.,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Civil Action No. 4:23-cv-01267-O** |
| | § § | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | § § § | |
| **Defendants.** | § | |

## <u>ORDER</u>

Before the Court are Plaintiffs, the American Association of Cosmetology Schools and DuVall's School of Cosmetology, L.L.C.'s ("AACS") Motion for Summary Judgment (ECF No. 28); Plaintiff Ogle School Management, LLC, Tricoci University of Beauty Culture, LLC's ("Ogle") Motion for Summary Judgment (ECF No. 31); Defendants United States Department of Education and Miguel Cardona's ("Defendants") Cross Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment (ECF No. 33); Defendants' Motion to Strike AACS' Appendix in Support (ECF No. 36); Ogle's Reply to Defendant's Motion for Summary Judgment and Response (ECF No. 40); AACS' Amended Complaint (ECF No. 42); AACS' Response to Defendants' Motion to Strike (ECF No. 44); AACS' Motion to Strike Defendants' Appendix in Support (ECF No. 47); AACS' Response to Defendants' Cross Motion for Summary Judgment and Response (ECF No. 49); an *Amici Curiae* Brief of the State of Kansas, Missouri, and Six Other States in Support of Plaintiffs (ECF No. 56); Defendants' Reply to Defendants' Motion to Strike (ECF No. 61); Defendants Response to AACS' Motion to Strike

(ECF No. 62); AACS' Reply to Defendants' Motion to Strike (ECF No. 65); and Defendants' Reply to Defendants' Cross Motion for Summary Judgment and Response (ECF No. 72).

For the reasons outlined below, the Court finds that the Defendants did not engage in any unlawful agency action under the APA. Therefore, AACS and Ogle's Motions for Summary Judgment (ECF Nos. 28, 31) are **DENIED** and Defendants' Cross-Motion (ECF No. 33) is **GRANTED.** AACS' Motion to Strike (ECF No. 47) is **DENIED** and Defendants' Motion to Strike (ECF No. 36) is **GRANTED.**

## I.    STATUTORY AND REGULATORY BACKGROUND[1]

Title IV of the Higher Education Act ("HEA") provides that schools are eligible for Title IV loans—*i.e.*, financial aid—if the school meets certain requirements. Currently, what are conventionally thought of as trade schools or certificate programs, are also eligible for loan programs. One of the conditions for these schools to receive funding is that programs offered must lead to "gainful employment." 20 U.S. § 1088(b)(1).

The Department of Education (the "Department") is an executive department of the United States responsible for, *inter alia*, overseeing the provision of these grants and loans to students enrolled at institutions. For nearly 60 years the Department did not issue any rules regarding the "gainful employment" requirement. "Gainful employment" simply differentiated vocational training from more general, liberal-arts programs.

Currently, over $1.6 trillion in Title IV loans remains outstanding—an increase of 49% in the last ten years. 88 Fed. Reg. at 70006. In response to the growing debt crisis, about a decade ago the Department implemented a test to determine if a school provided "gainful employment"

---

[1] Unless otherwise indicated, all facts are taken from Plaintiffs' and Defendants' Motions for Summary Judgment. *See* AACS' Mot. Summ. J., ECF No. 28; Ogle Mot. Summ. J., ECF No. 31; Defs' Mot. Summ. J., ECF No. 34. There is no indication in the summary judgment records—or at any stage in this litigation—that the parties disagree as to these relevant facts.

("The 2011 Rule"). The Department's "gainful employment" rules have been no stranger to litigation. The 2011 Rule was vacated, *Ass'n of Priv. Colls. & Univs. v. Duncan (Duncan I)*, 870 F. Supp. 2d 133, 146 (D.D.C. 2012), so the Department created a new rule in 2014 ("2014 Rule"), parts of which a district court ordered not to be enforced, *AACS v. DeVos*, 258 F. Supp. 3d 50, 63, 73 (D.D.C. 2017). And in 2018, under a new administration, the Department announced its intent to rescind the 2014 Rule, criticizing various aspects of it. Then, in 2023, the Department promulgated the Final Rule at issue here. *See* 88 Fed. Reg. 70,004 (Oct. 10, 2023).

The 2023 Rule has two distinct tests—both of which must be met by the school's program to qualify as "gainful employment." Under the 2023 Rule, the Department strips programs of their Title IV eligibility if, in two out of three consecutive years (1) the median program graduate devotes either more than 8% of their annual earnings, or more than 20% of discretionary earnings to pay down student loan debt, or (2) the median program graduate earns less than the median high school graduate in the state who is aged 25–34 and never enrolled in postsecondary education. *See Id.* at 70,008.

Breaking this down, the first test—which is called the debt-to-earnings metric—seeks to measure the "unmanageable debt" incurred by graduates of gainful-employment programs. Essentially, how much of a graduate's earnings will go toward student loan payments? This debt-to-earnings test checks for unmanageable debt based on two metrics: one that assesses debt-to-*annual*-earnings and another that assesses debt-to-*discretionary* earnings. *Id.* at 70,011. A program will fail the *annual* earnings metric if its median graduate uses more than 8% of their annual earnings to pay down debt. And a program will fail its *discretionary* earnings metric if its median graduate spends more than 20% of their discretionary earnings to pay down debt, with

discretionary earnings defined as those above 150% of the federal poverty guideline. *Id.* at 70,020, 70,124.

The second test—which is called the earnings premium metric—purports to measure whether at least half of all program graduates have higher earnings than the median income of in-state-high-school graduates aged 25–34 who never enrolled in postsecondary education. *Id.* at 70,124–25. This test is supposed to answer the question, how much better off financially is the graduate having completed this program?

To remain eligible, programs must not fail the same metric—debt-to-earnings or earnings premium—for two out of any three consecutive award years for which the metrics are calculated. 88 Fed. Reg. at 70192; *see also* 34 C.F.R. § 668.602(a)(2), (3)).

The 2023 Rule also has another requirement. Under the Financial Value Transparency ("FVT") requirement, programs must provide warnings to current and prospective students if they fail either metric once. *See* 34 C.F.R. § 668.43. These warnings appear online on the admissions websites and warn a student at the failing school of the above-mentioned statistics.

Implementation of the 2023 Final Rule will result in the closure of significant percentage of cosmetology schools whose graduates derive their income from tips allegedly not captured by the tests. In response Plaintiffs filed suit alleging that the Departments 2023 Final Rule violates the APA.

## II.    PARTIES & PROCEDURAL BACKGROUND

Plaintiffs are two cosmetology school associations. Plaintiffs, the American Association of Cosmetology Schools and DuVall's School of Cosmetology, L.L.C. (collectively, "AACS"), represent not-for-profit and public cosmetology schools. Plaintiffs Ogle School Management, LLC

Tricoci University of Beauty Culture, LLC ("Ogle") operate a cosmetology school that is a for-profit institution.

AACS filed suit on December 22, 2023, challenging aspects of the 2023 Final Rule as arbitrary and capricious (Count I); providing inadequate pre-termination review in violation of statutory requirements and due process (Count II); and unconstitutional under the First Amendment, Equal Protection, and Due Process Clauses of the Fifth Amendment (Count III).[2] Ogle filed its separate case, as well as its motion for a preliminary injunction, three months later, on March 20, 2024, challenging the 2023 Final Rule as in excess of statutory authority (Count I), and aspects of it as arbitrary and capricious (Count II).[3]

On June 20, 2024, the Court denied Ogle's preliminary injunction motion. The Court first rejected Ogle's claim that the 2023 Final Rule was in excess of statutory authority. Recognizing that the Department did not seek to rely on *Chevron*,[4] the Court concluded that the "ordinary meaning" of the phrase "gainful employment" encompassed the concept of profitability and "an excess of returns," and that, "[w]hen students borrow more to afford a program than its training prepares them to repay," the program by definition fails to prepare them for gainful employment.[5] The Court also rejected Ogle's arguments that aspects of the 2023 Final Rule are arbitrary and capricious because the record showed "that the Department engaged in thorough rule making," responding to comments and providing extensive explanations for its decisions.[6]

---

[2] *See generally* AACS' Compl., ECF No. 1.
[3] *See generally* Ogle' Compl., ECF No. 1.
[4] *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)
[5] PI Order, ECF No. 31, *Ogle School Management, LLC et al v. U.S. Dep't of Educ. et al*, No. 4:24-cv-259-O (N.D. Tex. 2024) (O'Connor, J.).
[6] *Id.*

The Court ordered the parties, including AACS, to confer regarding consolidation,[7] and after they did so, ordered the two cases consolidated under AACS's caption.[8] Pursuant to an agreed-upon schedule,[9] AACS and Ogle filed separate motions for summary judgment on September 13, 2024.[10] Defendants filed a cross-motion for summary judgment on November 8, 2024.[11] On the same day Defendants also filed a motion to strike AACS' extra-record evidence.[12] Ogle then filed its reply to Defendants' cross-motion on December 20, 2024.[13] Also on December 20, 2024, ACS filed its first amended complaint, [14] a response to Defendants' motion to strike,[15] a motion to strike Defendants' evidence,[16] and a response to Defendants' cross-motion.[17] The States of Kansas, Missouri, and six other states filed an Amicus Brief in Support of Plaintiffs on December 26, 2024.[18] Defendants filed a reply to their motion to strike[19] and its response to AACS' motion to strike[20] on January 10, 2025. AACS then filed a reply to Defendants' motion to strike on January 24, 2025.[21] Defendants then filed a reply to the cross-motion for summary judgment on May 16, 2025.[22]

### III.    LEGAL STANDARDS

#### A.  SUMMARY JUDGMENT

---

[7] *Id.*
[8] Order Consolidating Cases, June 2, 2024, ECF No. 22.
[9] Order on Briefing Schedule, June 15, 2024, ECF No. 27.
[10] AACS' Mot. Summ. J., ECF No. 28; Ogle Mot. Summ. J., ECF No. 31.
[11] Defs' Mot. Summ. J., ECF No. 34.
[12] Defs' Mot. Strike, ECF No. 36.
[13] Ogle's Reply, ECF No. 40.
[14] AACS' First Am. Compl., ECF No. 42.
[15] AACS' Resp. to Defs' Mot. Strike, ECF No. 44.
[16] AACS' Mot. Strike, ECF No. 47.
[17] AACS' Resp., ECF No. 49.
[18] Brief Amicus Curiae, ECF No. 56.
[19] Defs' Reply to Defs' Mot. Strike, ECF No. 61.
[20] Defs' Resp. to AACS' Mot. Strike, ECF No. 62.
[21] AACS' Reply to Defs' Mot. Strike, ECF No. 65.
[22] Defs' Reply, ECF No. 72.

Disputes arising under the APA are commonly resolved on summary judgment, where the district court sits as an appellate tribunal to decide legal questions based on the administrative record. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Summary judgment is proper where the Court finds that there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Here, the questions before the Court are of a purely legal nature and contain no factual disputes.

Upon review of agency action, the APA requires the district court to "hold unlawful and set aside agency action" found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

### B. MOTION TO STRIKE

In reviewing an APA challenge, a federal district court is generally limited to considering the administrative record that was before the agency at the time of its decision. *See* 5 U.S.C. § 706 (requiring courts to "review the whole record or those parts of it cited by a party"). The "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).

The Fifth Circuit has emphasized that supplementation "is not allowed unless the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency." *OnPath Fed. Credit Union v. U.S. Dep't of Treasury*, 73 F.4th 291, 299 (5th Cir. 2023). And the Fifth Circuit has identified only

three situations where such unusual circumstances might be present: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision," "(2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Id.* (internal quotation omitted).

## IV.    ANALYSIS

### A.    Count I—Contrary to Law and in Excess of Statutory Authority

The APA authorizes reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, limitations, or short of a statutory right." 5 U.S.C. § 706(2)(C). Under this provision, Plaintiffs claim the Final Rule is not in accordance with law and exceeds statutory limitations, requiring this Court to hold it unlawful and set it aside.[23] However, this Court finds that the Higher Education Act does give Defendants the authority to issue the 2023 Final Rule.

---

[23] *See* AACS' Mot. Summ. J. 12–21, ECF No. 29; *see also* Ogle's Mot. Summ. J. 34–48, ECF No. 32. As Defendants point out, AACS did not raise the same "excess of statutory authority" claims as Ogle until AACS filed its Motion for Summary Judgment and First Amended Complaint (which they did not request leave of court for, despite being filed after Defendants' cross motion for summary judgment and past the deadline to amend). Defs' Mot. Summ. J. 5 n. 2, ECF No. 34. In its original complaint, AACS only argues under Count I that the 2023 Final Rule violates 20 U.S.C. § 1094(c)(1)(F) by depriving schools of a hearing before terminating a program's eligibility. AACS' Compl. 37–39, ECF No. 1. AACS justifies this later-asserted argument as an amendment as of right under Fed. R. Civ. P. 15(a)(1)(B) because here, the Defendants have not filed a responsive pleading or a motion under Federal Rule of Civil Procedure 12(b), (e), or (f). *See* Order, Mar. 1. 2024, ECF No. 13 (granting Defendants request to answer, move, or otherwise plead in response to Plaintiffs' Complaint (ECF No. 1) no later than 30 days following the Courts' resolution of the parties' impending cross-motions for summary judgment). AACS also explains that it did not bring the "excess of statutory authority" claim earlier because the argument was prompted by *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)—which was decided after AACS filed their complaint. AACS' Fed. R. Civ. P. 15(a)(1)(B) argument is likely meritless because the 21-day deadline in FRCP 15(a)(1) would be triggered by AACS' service of its original complaint. Thus, their amended complaint would require leave of court. Irrespective of whether AACS could raise their new "excess of statutory authority" so late in litigation, they are nevertheless meritless as are Plaintiff Ogle's claims.

To begin, when an agency has been given authority to administer and enforce a particular statute—as here—the agency must often interpret the enactments Congress has charged them with implementing. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). As for the Secretary of Education, courts have regularly recognized he "enjoys broad authority 'to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.'" *(Duncan I)*, 870 F. Supp. 2d at 150–51 (quoting 20 U.S.C. § 1221e-3); *see also* 20 U.S.C. § 3474 (authorizing the Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions).

Additionally, sometimes a "statute's meaning" is that "the agency is authorized to exercise a degree of discretion." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). For example, where the statute "empower[s] an agency to . . . regulate subject to the limits imposed by a term or phrase"—such as "appropriate" or "reasonable"—that "leaves agencies with flexibility." *Id.* at 395. Of course, even such broad discretion does not mean that the Department may interpret or redefine terms in a way that contradicts the terms' originating statute. *See Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) ("The authority of administrative agencies if constrained by the language of the statute they administer.").

With these parameters in mind, "[t]he appropriate starting point when interpreting any statute is its plain meaning." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024). And here, because "the HEA does not more specifically define" gainful employment, 88 Fed. Reg. at 70,008, "we give each term its ordinary meaning." *Bondi v. Vanderstok*, 145 S. Ct. 857, 883 (2025) (internal citation and alterations omitted).

Ogle argues that the best reading of "gainful" has nothing to with debt ratios or income relative to a subset of high-school graduates. Additionally, it is Ogle's position that *Loper Bright* forecloses any claim of an implied delegation to import those concepts into the term."[24] AACS contends that gainful employment means what it meant in 1965; it is "locked in on the day that Congress passe[d] it," before the Department of Education existed.[25] In support AACS relies on the Supreme Court's reminder in *Loper Bright* that "every statute's meaning is fixed at the time of enactment."[26]

On the other hand, Defendants claim that the best meaning of the term "gainful" in the context of the Higher Education Act is that "gainful" means profitable.[27] Defendants have interpreted gainful employment in the instant rulemaking as requiring programs to "actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation."[28] And that students are not prepared for gainful employment if a program is designed to leave its graduates financially worse off than when they started, and unable to repay their loans.[29]

The ordinary meaning analysis supports Defendants reading of gainful employment. To determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries." *Horn v. State 23 Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). And when such sources reveal that statutory text is "unambiguous," the interpretive exercise not only "begins" with that text, but "ends" there too. *Texas Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018).

---

[24] Ogle's Mot. Summ. J. 22, ECF No. 32.
[25] AACS' Reply 16, ECF No. 50.
[26] *Id.* (citing *Loper Bright*, 603 U.S. at 400).
[27] Defs' Reply 1, ECF No. 72.
[28] *Id.* at 5 (citing Note of Proposed Rulemaking (NPRM), 88 Fed. Reg. 32,300, 32,342 (May 19, 2023).
[29] *Id.* (citing Note of Proposed Rulemaking (NPRM), 88 Fed. Reg. 32,300, 32,343 (May 19, 2023).

Dictionary definitions of "gainful" reveal it means "profitable," "advantageous," or "lucrative."[30] Although the 2023 Rule is in the form of an equation, it no less does the same work as the words "gainful employment," by ensuring the programs lead to profitable jobs, instead of loan deficits.

As for Ogle's concerns about implied delegation,[31] the Supreme Court in *Loper Bright* recognized that Congress may "delegate[] particular discretionary authority to an agency" by leaving it with "flexibility" through terms "such as 'appropriate' or 'reasonable.'" 603 U.S. at 394–95. The HEA confers such authority by including the additional specific direction to "prescribe such regulations as may be necessary to provide for . . . any matter the Secretary deems necessary to the sound administration of the financial aid programs[.]"[32] 20 U.S.C. § 1094(c)(1)(B); *see also id.* § 1099c(d)(2) (authorizing the Secretary "to establish such other reasonable procedures as the Secretary determines will contribute to ensuring that [a school] will comply with administrative capability required by [Title IV]").

AACS also raises *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 571 (5th Cir. 2024) to claim the Department is using an older statutory grant to solve new problems not formerly contemplated by Congress.[33] In *Van Loon*, the Fifth Circuit set aside action by the Office of Foreign Assets Control because the International Emergency Economic Powers Act (IEEPA)

---

[30] Gainful, Black's Law Dictionary (4th ed. 1968); *see also* Employment, Black's Law Dictionary (4th ed. 1968) ("the act of hiring," or "implying a request and a contract for compensation"); *see also* Employment, Black's Law Dictionary (3rd ed.) ("the act of hiring" or "implying a requestion and a contract for compensation"); *see also* Gain, Black's Law Dictionary (3rd ed.) ("winnings," "increment of value," or "difference between receipts and expenditures; pecuniary gain").

[31] AACS also argues that Defendants wrongly rely on two sections of the HEA—§ 1221e-3 and 20 U.S.C. § 3474—to give it broad authority to issue any regulations they believe are "necessary or appropriate" to administer any aspect Title IV, including the Final Rule. AACS Mot. Summ. J. 19, ECF No. 29 (citing 88 Fed. Reg. at 70,011).

[32] This is found within the same provision itemizing express participation conditions for schools and directions to the Secretary.

[33] AACS' Reply 15, ECF No. 50.

could not extend to the type of modern software technology at issue. *Id.* The IEEPA was enacted years before the modern internet was even invented, so Congress could not have intended for the agency to address malicious cyber-enabled activities. The Fifth Circuit reasoned that "[m]ending a statute's blind spots or smoothing its disruptive effects falls outside [the Court's] lane." *Id.*

The difference here is that gainful employment always meant profitable employment, and nothing about that term suggests the Department can't call employment unprofitable when a student remains in high loan debt.

Ogle also argues that post-*Loper Bright* this Court should not repeat its analysis from the denial of Ogle's preliminary injunction,[34] but this Court explicitly stated that it would not and did not engage in a *Chevron* analysis.[35]

Lastly, although other circuits have considered "gainful employment" ambiguous under *Chevron* step two, this Court is not bound to follow the same analysis.[36] Prior decisions evaluating the 2011 and 2014 Rules ultimately deferred to the Department's interpretation, as required under *Chevron* at the time. This in no way affects this Court's ability to agree with its previously issued preliminary injunction, which concluded that the Department's interpretation was the best one considering the statutory language. Therefore, the Court finds that the 2023 Final Rule is not in excess of statutory authority.

### B. Count II—Arbitrary and Capricious

---

[34] Ogle's Reply 4, ECF No. 40.

[35] *See* PI Order, ECF No. 31, *Ogle School Management, LLC et al v. U.S. Dep't of Educ. et al*, No. 4:24-cv-259-O (N.D. Tex. 2024) (O'Connor, J.) ("Finally, though *Chevron* deference applies to agency interpretations of ambiguous statues, such deference is inapplicable if, as in this case, the agency has not asked the reviewing court to defer.").

[36] *See Ass'n of Private Sector Colleges & Univs. v. Duncan (Duncan II),* 110 F. Supp. 3d 176, 184, 186 (D.D.C. 2015); *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 358, 362–63 (S.D.N.Y. 2015); *(Duncan I)*, 870 F. Supp. 2d at 145.

Alternatively, Plaintiffs argue that various aspects of the 2023 Rule are arbitrary and capricious under the APA. Among other things, Plaintiffs claim that the 2023 Rule (1) relies on inaccurate earnings data and unjustifiably rejects any appeals to that data,[37] (2) uses inaccurate debt-to-earnings thresholds,[38] (3) penalizes schools for factors beyond their control, like COVID-19,[39] and (4) has an illogical cost benefit analysis.[40]

Under Section 706 of the APA, reviewing courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA's arbitrary and capricious standard requires that agency action is both "reasonable and reasonably explained[.]" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Court looks to whether "an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017). This means that agencies cannot "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem" when issuing regulations. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In *Loper Bright*, the Supreme Court explained that especial skepticism should be employed when it comes to executive interpretations that were adopted long after statutory enactment or have varied over time. 603 U.S. at 400–01 (2024). An agency must provide a more "detailed justification" for a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing

---

[37] Ogle's Mot. Summ. J. 35–40, ECF No. 32; AACS' Mot. Summ. J. 22–33, ECF No. 29.
[38] Ogle's Mot. Summ. J, 45–48, ECF No. 32.
[39] AACS' Reply 61, ECF No. 50.
[40] Ogle's Reply 29, ECF No. 40.

*Smiley v. Citibank (South Dakota), N.A.*, 515 U.S. 735, 742 (1996)). It is incumbent on the government to account for contradictory evidence, explain its methodologies, justify its decisions, and draw a rational choice between its decision and the facts of record when issuing a regulation. *See, e.g., Illumina, Inv. v. FTC*, 88 F.4th 1036, 1060 (5th Cir. 2023). The Supreme Court has further clarified that the APA's arbitrary-and-capricious standard is no pushover and that courts should not hesitate to flunk agencies that fail to offer reasoned explanations for their actions or ignore critical issues during rulemaking. *Ohio v. EPA*, 603 U.S. 279, 292–98 (2024).

But in doing this, the court should be careful "not to substitute its judgment for that of the agency." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (1983). Instead, the court should consider whether, given the relevant factors before the agency, there was a "clear error of judgment." *Id.*

### i. Reliance on Inaccurate Data and Rejection of Alternate Earnings Appeals

Plaintiffs first challenge the Department's reliance on federal taxpayer records to generate the average earnings data in the debt-to-earnings and earnings premium metrics. The Notice for Proposed Rulemaking ("NPRM") provided that the Department would use taxpayers' reported earnings data—as maintained by agencies like the IRS—for metrics. AACS and Ogle express concern that in the cosmetology industry, a large amount of income goes unreported because it is received in cash, through payment apps, or via tips that individuals are required to report on their taxes but do not.[41]

The Department reasonably chose reported earnings as the best available data, fully explained its view that underreporting is likely not as widespread as Plaintiffs claim, and it reasonably explained and responded to comments about its rejection of proposed alternatives. The Department reviewed and responded to comments about the reported earnings, the debt to earnings

---

[41] Ogle's Mot. Summ. J. 35–39, ECF No.32; AACS' Mot. Summ. J. 22–30, ECF No. 29.

ratio, and the earnings premium. Further, it specifically cited studies indicating that underreporting of earnings is not widespread.[42]

In the NPRM the Department concluded that it had "identified no other data source that could be expected to yield data of higher quality and reliability than the data available to the Department from the IRS[.]" 88 Fed. Reg. at 32,336. Also, alternative sources, like the graduate surveys used in the 2014 Rule appeals, were prone to inaccuracies and manipulation while imposing significant administrative burdens. *Id.*

And despite finding a lack of underreporting, the Department still carefully pointed out five specific ways that the new metrics were designed to include "safeguards against underestimates of earnings."[43] For example, the Department revised its methodology to measure program completers' earnings "approximately one year later (relative to when they complete their credential)" than under the 2014 Rule.[44] This change "leads to substantially higher measured program earnings," amounting to an additional $4000 (20%) for programs (like cosmetology) most at risk of failing the debt-to-earnings or earnings premium metrics, with earnings between $20,000 and $30,000.[45] The Department also observed that the estimated 20% increase in programs' median earnings amounts would more than offset the 8% of earnings that one study had identified as the likely average amount of unreported tips for cosmetology—one of the few occupations where both vocational training and tipping were common.[46]

---

[42] Defs' Mot. Summ. J. 24, ECF No. 32 (explaining how the Cellini & Blanchard study recommended the continued use of Social Security Administration or Internal Revenue Service data and concluded that after applying an 8% adjustment to 2014 earnings data, the unreported top income has little impact on program outcomes).
[43] Defs' Reply 40, ECF No. 72 (citing 88 Fed. Reg. at 32,336).
[44] Defs' Mot. Summ. J. 42, ECF No. 34 (citing 88 Fed. Reg. at 32,335).
[45] *Id.*
[46] *Id.* (citing 88 Fed. Reg. at 32,336).

Defendants also note that AACS rejects the one-size-fits-all 20% buffer but identifies no way to assess whether a particular cosmetology program's graduates in a particular cohort have underreported their earnings by 8% or 10%, or some other amount, or not at all.[47]

Moreover, even though Plaintiffs point to the fact that data from the IRS includes "statistical noise," in the form of a "small adjustment factor," to protect individual privacy, the Department affirmed in the NPRM that such noise—even without any mitigation—would have only a less than a 1% probability of impacting a program's eligibility for funding.[48] 88 Fed. Reg. at 32,336.

Lastly, Defendants point to new research calling into question the reliability of allowing schools to appeal their earnings data. Alternate earnings appeals are particularly questionable after the Department was directed by a court to remove the limitations it imposed on the kind and quality of data that could be presented.[49] On that point, a study also concluded that there were implausibly large increases in income that schools reported when allowed to appeal their data with no discretion over what data they chose to submit—around 82% higher than data received from the SSA.[50] Meanwhile, a study concluded that in the same year cosmetologists unreported tipped income should have been around 8% of their annual income.[51] And in the NFPR, the Department

---

[47] Defs' Reply 24, ECF No. 72 (citing 88 Fed. Reg. at 70,045 (rejecting use of BLS data for similar reasons)).

[48] *See also* Defs' Mot. Summ. J. 22, ECF No. 34 (explaining the five methods that the 2023 Rule's metrics use to avoid negative distortions and well and the statistical noise that comes with using IRS data). These methods include setting modest performance standards for the programs, using a cohort's median rather than a mean, requiring at least thirty completers in each two-or four-year cohort, requiring that a program fail for two out of three years before eligibility is impacted, and measuring earnings a year later to create a 20% buffer for programs in lower-earning fields.

[49] Defs' Mot. Summ. J. 43, ECF No. 34 (citing 88 Fed. Reg. at 32,336 (citing the "Cellini & Blanchard" study)). When AACS challenged the 2014 Rule, it argued the earnings appeal was overly burdensome for cosmetology schools, so the court rewrote the survey option to eliminate the data quality controls that existed. *See AACS v. DeVos*, 258 F. Supp. 3d at 76 (D.D.C. 2017).

[50] Defs' Reply 43, ECF No. 72.

[51] *Id.* (citing the "Cellini & Blanchard" study).

thoroughly explained why using school-sponsored surveys of graduates would not be a reliable alternative way to conduct earnings appeals.[52]

These considerations taken together lead the Court to conclude that the Department was not arbitrary and capricious in its choice of data, or rejection of alternate earnings appeals.

     ii.   <u>The Use of Inaccurate Debt-to-Earnings Thresholds</u>

Ogle claims that the Department not only relies on flawed earnings data but also uses an unjustifiable threshold for the debt to earnings test.[53] That is, Ogle would have this Court find that the Defendants' have no reason to claim debts compared to earnings should not exceed the ratios of 8% for one test and 20% for another.[54] The Court disagrees with Ogle.

The debt-to-earnings metric—set out in 34 C.F.R. § 668.403—sets the thresholds for the amount of debt that a student can typically withstand as a percentage of the median earnings. If the median debt of the program's student cohort three years after graduation exceeds 8% of the cohort's median annual earnings and exceeds 20% of its median discretionary income (income above 150% of the federal Poverty Guideline), the program fails the debt-to-earnings metric for the year.[55] The Department made two different thresholds because if a student makes higher earnings (above 150% of the federal Poverty Guideline) then paying more in loans would be more manageable.[56]

---

[52] *Id.* at 44 (citing 88 Fed. Reg. at 70,095-98 (explaining such appeals were "neither necessary nor appropriate" as a "substitute for substantiated earnings reported to the IRS," given the "relatively low quality" of data submitted in past appeals, the lack of controls and inability to verify results, and the research indicating underreporting of income is far less significant than previously suggested)).
[53] Ogle's Mot. Summ. J. 45, ECF No. 32.
[54] *Id.*
[55] Defs' Mot. Summ. J. 65, ECF No. 34 (citing 88 Fed. Reg. at 70,188 (§ 668.402)).
[56] *Id.* (citing 88 Fed. Reg. at 32,326 & fig.1). The Defendants provide the example: paying $2,000 per year is less manageable when you make $20,000 a year than paying $4,000 per year when you make $40,000 a year.

Ogle argues that the 8% threshold is arbitrary because it derives from mortgage underwriting standards, which it argues are not the best choice.[57] Further, Ogle argues this is unreasonable because recent vocational school graduates are young and unlikely to own homes, so they have no mortgage debt that could interfere with their ability to pay off education loans.[58]

However, the Department points to studies which actually show that both the 8% threshold and the 20%, when combined, if anything, are too generous to gainful employment programs.[59] The same study recognized the unlikeliness of these students to own homes, but finds that nevertheless students probably have car payments, rent payments, credit cards, and maybe even personal loans.[60] This is why the study suggested a 20% benchmark would be a helpful counter-balance, because it was tied to income above the poverty level.[61] Ogle focuses on each threshold separately, but when applied together, the Department reasonably concluded that they are more than reasonable for the debt to earnings metric, and this Court agrees.[62]

### iii.    Penalizes School for Factors Beyond Their Control

AACS also points out that when the 2023 Final Rule goes into effect, the first measurements the Department will take will be based on earnings data in 2021 and 2022, when non-essential business where closed, and state licensing agencies were "six to eight months behind."[63]

---

[57] Ogle's Mot. Summ. J. 45, ECF No. 32.
[58] *Id.* at 47.
[59] Defs' Mot. Summ. J. 65, ECF No. 34 (citing Baum, Sandy & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt* (2006)).
[60] *Id.*
[61] *Id.* at 66–67 (citing Baum, Sandy & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt* (2006)).
[62] *Id.* at 67 (citing 88 Fed. Reg. at 70,053 (the "overall point stands—that it would not be affordable for borrowers to have student debt-service ratios beyond what is in the GE rule")).
[63] AACS' Reply 61, ECF No. 50.

First, the Department confirmed that the data in the administrative record reflected that "the pandemic did not lead to systematically lower measured median earnings for all or even most programs[.]"[64] The data concluded this by examining available earnings data from before and during the pandemic in the College Scorecard.[65] Plaintiffs produced no contrary data.

Additionally, the Department points out that the ratios should still work effectively because closures due to COVID-19, and other macroeconomic trends, often affect everyone.[66] In typical economic downturns, high school graduates' earnings would also fall, maybe even more than earnings of workers with higher levels of education. This would generally result in lower earnings premium thresholds, creating a buffering impact on metric outcomes for programs producing college graduates.[67] And as for future concerns, the Department also reserved the authority to waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances.[68] The 2023 Final Rule cannot be deemed arbitrary based on hypothetical future events. As for the pandemic, the Department reasonably concluded no delay, or other modification was warranted since its review of available data did not suggest a significant impact, and the Court agrees.[69]

### iv.  Illogical Cost and Benefit Analysis

Ogle argues that the 2023 Rule is arbitrary because the Department has displayed no rational connection between the costs it imposes on cosmetology programs and the benefits of the

---

[64] Defs' Mot. Summ. J. 63, ECF No. 34 (citing 88 Fed. Reg. at 70,099).
[65] *Id.*
[66] *Id.* at 63–64 (citing 88 Fed. Reg. at 70,058).
[67] *Id.* (citing 88 Fed. Reg. at 70,058).
[68] *Id.* (citing 88 Fed. Reg. at 70,058 n. 152).
[69] Defs' Mot. Summ. J. 63–64, ECF No. 34 (citing 88 Fed. Reg. at 70,099)

2023 Rule.[70] Ogle points to the major cost that is the closure of cosmetology schools whose students rely primarily on Title IV loans.

However, the Department has explained throughout the rulemaking process why the benefit of putting taxpayer dollars toward programs with the ability to pay off their loans is worth this. The NFPR engaged in extensive discussion of costs and benefits with students, schools, state and local governments.[71] And the Federal Government and taxpayers and explained in detail its methodology and conclusions.[72] The Court agrees with the NFPR's conclusion that the regulations will significantly benefit students "who otherwise would have low earnings" by improving program quality and making "good information about program performance" available.[73]  The Department also projected that these regulations will save nearly $14 billion in taxpayer funds.[74] Furthermore, according to the Department's projections, the compliance costs due will significantly decrease after the first year.[75] Better-performing programs will increase their enrollments while poorly performing programs may incur costs from decreased enrollments or efforts to make improvements.[76]

Although this will change the future for many cosmetology schools, Plaintiffs fail to explain why this is irrational given Congress's directives to the Department.

v.    Arbitrarily Ignores Data on Demographics

Plaintiffs also suggest that the low earnings of cosmetology program graduates reflect their demographic characteristics rather than the quality of the programs they attend.

---

[70] Ogle's Reply 29, ECF No. 40.
[71] Defs' Reply 35, ECF No. 72 (citing 88 Fed. Reg. at 70,150-70).
[72] Id.
[73] Id. (citing 88 Fed. Reg. at 70,170).
[74] Id. at 36 (citing 88 Fed. Reg. at 70,163).
[75] Id. at 36–37 (citing 88 Fed. Reg. at 70,152–53).
[76] Defs' Reply 36–37, ECF No. 72 (citing 88 Fed. Reg. at 70,152–53).

Not only have other courts rejected this argument already,[77] but the Department also concluded that demographics have an insufficient influence on program results to warrant an adjustment. The Department used a range of research-informed statistical and non-statistical factors, which it described in detail in the NPRM.[78] Based on the totality of its data analyses, the Department concluded that "programs and institutions play an important causal role in determining student outcomes, more so than student demographics," and that "programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone."[79] The Department further explained that it had designed debt measures to minimize the impact of demographics by excluding debt related to borrowing for living costs—an expense it found that low-income students are more likely to incur.[80] And as a further check, the Department reviewed studies and analyzed data showing that median program debt was directly correlated with program cost and not with socioeconomic status.[81] Aside from this, there is no authority anyway which says that Title IV funding should disregard program quality because the program enrolls more students from historically disadvantaged groups.

Therefore, the Court concludes that the 2023 Final Rule is not arbitrary and capricious under the APA.

---

[77] *Duncan II*, 110 F. Supp. 3d at 192 (rejecting plaintiff's argument that debt-to-earnings test "really measures student demographics" because the Department ruled out that possibility through "several regression analyses"), *aff'd on this point by Ass'n of Private Sector Colls. & Univs. v. Duncan*, 640 F. App'x 5 at *8 (D.C. Cir. 2016), *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d at 364–65 (rejecting plaintiff's claim as appearing "utterly to disregard the extensive statistical analyses" described in the 2014 Rule).

[78] Defs' Mot. Summ. J. 57–58, ECF No. 34 (citing 88 Fed. Reg. at 32,430-33, 70,142-44, 70,144).

[79] *Id.* (citing 88 Fed. Reg at 70,031, 70,142-45 & tbls. 4.22, 4.23, 4.24 (finding strong correlations between student outcomes and program-controlled factors, such as tuition, while only modest correlations with students' family income, gender, or race)).

[80] Defs' Mot. Summ. J. 58, ECF No. 34 (citing Fed. Reg. at 70,031).

[81] *Id.* (citing Fed. Reg. at 70,032).

AACS also presented extra-record material to refute the Department's data. Defendants have moved to strike that material, as is discussed *infra*.

### C. Count III—Equal Protection, Compelled Speech and Restraint on Speech, and Due Process and Statutory Hearing Violations

#### i. Equal Protection

Plaintiffs AACS also raised an equal protection argument in its original complaint.[82] Ogle did not. Although all parties moved for summary judgment on all claims, AACS' equal protection argument appears in no summary judgment briefing.[83] The Court therefore agrees with Defendants that the equal protection argument is deemed abandoned under Fifth Circuit precedent. *See e.g., McClelland v. Katy Indep. School Distr.*, 63 F.4th 996, 1010 (2023) ("This circuit's well-settled precedent instructs that a party abandons a claim by failing to defend it in response to motions to dismiss and other dispositive pleadings.").

#### ii. Compelled Speech and Restraint on Speech

Plaintiffs do not dispute the Secretary's authority to issue the FVT rule—which requires schools to give its students "warnings" about its failing rates—but Plaintiffs challenge it under the APA as a violation of free speech.[84] First, AACS claims that the 2023 Rule regulates speech based on content and speaker.[85] This rests on the theory that prospective students who once intended to finance their way through cosmetology school through Title IV aid would lose their ability to

---

[82] AACS' Compl. 42–44, ECF No. 1.
[83] *See generally* AACS' Mot. Summ. J., ECF No. 29; AACS' Reply, ECF No. 50. For clarity, AACS first filed a complaint including the equal protection argument. It then filed a motion for summary judgment on all claims but never in its briefing mentioned the equal protection argument. AACS then filed an amended complaint which *still included* the equal protection argument, but AACS neglected to subsequently raise or defend the equal protection argument in any summary judgment briefing before the Court.
[84] Defs' Mot. Summ. J. 15, ECF No. 34.
[85] *See* AACS' Mot. Summ. J. at 45, ECF No. 29.

attend that program. And if those students lose their ability to attend, then the cosmetology institutions lose their ability to disseminate information about a select set of subjects.

The 2023 Final Rule does not unconstitutionally burden speech. This argument is foreclosed because courts have repeatedly rejected First Amendment challenges to federal funding conditions. *See e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."); *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas").

Second, AACS claims that the 2023 Rule's FVT requirement is a form of unconstitutionally compelled speech.[86] Schools are required to give current and prospective students a fair warning if the program they are slated to attend may lose Title IV eligibility the following award year. 34 C.F.R. § 668.605. The Department will clarify the exact wording of these warnings in a future Federal Register notice, but the warnings will include information allowing students to access the Department's program information website. *See id.* § 668.605(c)(1), (2). The warnings also require schools to include a description of students' "academic and financial options." *Id.* § 668.605(c)(4), (5).

But these FVT requirements are government speech, not AACS' speech. AACS relies on *Book People Inc. v. Wong*, 91 F. 4th 318 (5th Cir. 2024), wherein the Fifth Circuit held that state-mandated vendor ratings of public-school library materials could not be classified as government speech.[87] There the Fifth Circuit reasoned that the vendors were required to "undertake a fact-

---

[86] AACS' Reply 71, ECF No. 50.
[87] AACS' Mot. Summ. J. 49, ECF No. 29.

intensive process of weighing and balancing factors to rate library material" based on its sexual-content, which was "highly discretionary" and "neither precise nor certain." *Id.* at 338. These warnings are different because they convey the Department's black-and-white factual assessments, in language that the Department will provide, and are likely to be understood by the student as government information for those reasons.

AACS argues that the warnings are not government speech because the Department rejected a proposal that the metrics could instead be posted on the Department's College Scoreboard.[88] *See* 88 Fed. Reg. at 70,083. But the Department makes the compelling justification that schools should be the ones to send out the warnings, to ensure that students would see the information. *Id.* The Court is not convinced these standard warnings rise to the level of unconstitutional speech violations.

      iii.  <u>Due Process Violations and Statutory Hearing</u>

AACS alleges that 34 C.F.R. § 668.603—the section in the 2023 Final Rule describing how and when a program's participation in Title IV ends after failing the metrics two out of three consecutive award years—is in violation of 20 U.S.C. § 1094(c)(1)(F) and the Due Process Clause.[89]

Under § 668.603(a) there are three ways a program's Title IV participation might end administratively once it no longer qualifies as eligible under the 2023 Final Rule. AACS claims that all three ways ignore an institution's right under 20 U.S.C. § 1094(c)(1)(F) to a reasonable notice and opportunity for a hearing.[90] But AACS' argument misunderstands the types of cases 20 U.S.C. § 1094(c)(1)(F) and its hearing right apply to.

---

[88] AACS' Reply 72, ECF No. 50.
[89] *Id.* at 28.
[90] AACS' Mot. Summ. J. 13, ECF No. 29.

The way a program's participation ends depends on the current Title IV status of the school offering that program—and specifically, whether they are undergoing a renewal of their Title IV certification or is in provisional status at the time a program becomes ineligible.

First, the Department enters into Program Participation Agreements ("PPA's") with schools. 20 U.S.C. § 1094(a). To enter a PPA, a school must be certified. Certifications may last for up to six years, after which it expires and must be renewed. 20 U.S.C. § 1099c(g). Schools may also receive provisional certifications, under which the HEA expressly gives the Secretary authority to terminate the school's Title IV participation based solely on the Secretary's determination that a school is "unable to meet its responsibilities under its [PPA]." 20 U.S.C. § 1099c(h); *see id.* § 1099c(h)(3). When a school is certified or recertified by the Department and consequently enters a PPA, the Department generates a new Eligibility and Certification Approval Report ("ECAR") for the school that lists all Title IV eligible programs the school offers.

So, if a program becomes ineligible under the 2023 Final Rule, it may be in the process of renewing its certification, or it may already be fully certified, or it may be only provisionally certified. If the school is on a provisional status, § 668.603(a)(3) applies and the school's provisional status means the Department can revoke participation automatically. If the school is fully certified and participating pursuant to its PPA, § 668.603(a)(2) applies and the Department would have to initiate a "Subpart G action" to terminate the program's Title IV participation. If the school is in the middle, where it is in the process of renewing its certification, 34 C.F.R. § 668.603(a)(1) applies and the new ECAR that the Department issues would not list the now-ineligible program.

AACS's challenge to 34 C.F.R. § 668.603 fails. AACS cites 20 U.S.C. § 1094(c)(1)(F), which expressly directs the Secretary to "prescribe such regulations as may be necessary" to foster

the termination of a school currently under a PPA. And, for the schools under a PPA, the Secretary provided such regulations in Subpart G. *See* 34 C.F.R. §§ 668.81. For all other situations, the specific hearing right AACS refers to that exists under Subpart G, does not apply. Therefore, AACS' challenge under 20 U.S.C. § 1094(c)(1)(F) fails.

As for AACS' due process challenge,[91] under *Bd. of Regents v. Roth*, 408 U.S. 564, 576–78 (1972) this Court finds AACS has no property interest in the potential loss of Title IV funding. The Department explained in response to comments raising this issue that schools enter into PPAs with the understanding that they are subject to statutory and regulatory requirements which also may be amended during the PPAs term. *See* 88 Fed. Reg. at 70,090; 20 U.S.C. § 1094. Therefore, any property interest a school might have depends on the existence of a currently valid PPA—but the PPA is also of a limited duration. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576–78 (1972) (non-tenured assistant professor with one-year contract had no property interest in continued employment beyond the contract term).

AACS urges the Court to adopt the Seventh Circuit's decision in *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990) which held that a school, despite being an indirect beneficiary whose participation in Title IV is time-limited, "had both a liberty and a property interest at stake" when the Department tried to cut it off from Title IV funding. The court declines and instead follows the opinion of two district court cases, addressing the 2014 Rule, which instead held that Title IV participating schools have no protected property interest at issue. *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d at 349–52; *Duncan I*, 870 F. Supp. 2d at 155 n.7.

---

[91] AACS' Reply 33, ECF No. 50.

Therefore, the Court finds that the 2023 Final Rule does not violate the APA and Defendants' cross-motion for summary judgment is **GRANTED.**

### D. Motions to Strike

It is a "venerable principle of administrative law" that "'[a]n agency must defend its actions based on the reasons it gave when it acted.'" *OnPath Fed. Credit Union*, 73 F.4th at 298. And "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Arguments not raised before the agency are forfeited, *Indigenous Peoples v. U.S. Army Corps of Eng'rs*, 132 F.4th 872, 884 (5th Cir. 2025) (issues not raised during notice and comment are forfeited), and the Court's review is limited to the administrative record, *see* 5 U.S.C. § 706.

AACS also relies on arguments never raised in comments before the Department during rulemaking and on material outside the administrative record.[92] Defendants argue that the Court should decline AACS's attempt to make the "data on demographics" claim a battle of the experts, particularly because AACS impermissibly presents data outside the administrative record.[93]

AACS uses the Hill Declaration to argue that the Department's statistical analyses are flawed, and that the Department failed to make certain information available for comment during the rulemaking.[94] But the Hill Declaration was signed on September 13, 2024, nearly a year after the Final Regulations were issued and the same date as AACS's summary judgment filing. AACS clearly cannot maintain that the Hill Declaration was submitted during the rulemaking comment period and was before the Department at the time of its decision. In fact, AACS admits that it never

---

[92] Defs' Reply 19 n.16, ECF No. 72.
[93] *Id.* at 2.
[94] AACS' Mot. Summ. J. 34–35, ECF No. 29.

moved to supplement the administrative record with the three extra-record documents at issue at any time between Defendants' lodging of the certified administrative record and AACS's summary judgment filing over four months later.[95]

This Court need not analyze whether this material fits into any of the three categories of "unusual circumstances" that the Fifth Circuit has identified.[96] The Fifth Circuit has declined to consider extra-record material where the party offering the material failed to file such a motion. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,* 602 F.3d 687, 707 (5th Cir. 2010). In agreement with that case, this Court declines to consider the extra-record material and Defendants' motion to strike is **GRANTED.**

AACS also filed a motion to strike the Declaration of Dr. Rajeev Darolia, an employee of the Defendant, because it is "nothing more than an attempt at a post-hoc rationalization for the Final Rule . . . which is not permitted under federal law."[97] AACS adds that it should also be striken because as an employee involved in drafting the Final Rule, Darolia not neutral.[98] Lastly, AACS adds that Darolia does not appear to be an expert in statistics.[99] Because this Declaration had no impact on the Court's analysis of the parties' cross-motions for summary judgment, AACS' motion to strike is **DENIED.**

---

[95] Defs' Mot. Strike Reply 1, ECF No. 30.
[96] *OnPath Fed. Credit Union*, 73 F.4th at 299 (agency deliberately or negligently excluded adverse documents, district court needed to supplement record with background information to determine whether the agency considered all relevant factors, or agency failed to explain administrative action so as to frustrate judicial review).
[97] AACS' Mot. Strike, 1, ECF No. 48.
[98] *Id.*
[99] *Id.*

V.      **CONCLUSION**

For the reasons set out above, the Court **DENIES** Plaintiff AACS and Plaintiff Ogle's Motions for Summary Judgment (ECF No. 28, 31) on the grounds that the Final Rule did not violate the APA; **GRANTS** Defendants' Cross Motion for Summary Judgment (ECF No. 33), **GRANTS** Defendants' Motion to Strike (ECF No. 36), and **DENIES** AACS' Motion to Strike (ECF No. 47).

**SO ORDERED** on this **2nd day** of **October 2025.**

_____
Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**